Christopher Marcus, P.C.
John T. Weber
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

James H.M. Sprayregen, P.C.
William A. Guerrieri (*pro hac vice* pending)
Alexandra Schwarzman (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| 21st CENTURY ONCOLOGY HOLDINGS, INC., *et al.*,[1] | ) Case No. 17-22770 (RDD) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

---

**DECLARATION OF PAUL RUNDELL (I) IN SUPPORT OF FIRST DAY
MOTIONS AND (II) PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: 21C East Florida, LLC (0905); 21st Century of Florida Acquisition, LLC (7449); 21st Century Oncology Holdings, Inc. (7745); 21st Century Oncology Management Services, Inc. (7211); 21st Century Oncology of Alabama, LLC (3649); 21st Century Oncology of Harford County, Maryland, LLC (6540); 21st Century Oncology of Jacksonville, LLC (4308); 21st Century Oncology of Kentucky, LLC (3667); 21st Century Oncology of New Jersey, Inc. (9875); 21st Century Oncology of Pennsylvania, Inc. (0463); 21st Century Oncology of Prince Georges County, Maryland, LLC (2750); 21st Century Oncology of South Carolina, LLC (1654); 21st Century Oncology of Washington, LLC (3274); 21st Century Oncology Services, LLC (6866); 21st Century Oncology, Inc. (8951); 21st Century Oncology, LLC (5899); AHLC, LLC (9353); American Consolidated Technologies, L.L.C. (4024); Arizona Radiation Therapy Management Services, Inc. (3876); Asheville CC, LLC (9175); Associates in Radiation Oncology Services, LLC (0866); Atlantic Urology Clinics, LLC (0029); Aurora Technology Development, LLC (5383); Berlin Radiation Therapy Treatment Center, LLC (3712); Boynton Beach Radiation Oncology, L.L.C. (0780); California Radiation Therapy Management Services, Inc. (7222); Carepoint Health Solutions, LLC (7130); Carolina Radiation and Cancer Treatment Center, LLC (5493); Carolina Regional Cancer Center, LLC (6164); Derm-Rad Investment Company, LLC (4111); Devoto Construction of Southwest Florida, Inc. (3949); Financial Services Of Southwest Florida, L.L.C. (3717); Fountain Valley & Anaheim Radiation Oncology Centers, Inc. (3999); Gettysburg Radiation, L.L.C. (8771); Goldsboro Radiation Therapy Services, LLC (2589); Jacksonville Radiation Therapy Services, LLC (6266); Maryland Radiation Therapy Management Services, LLC (0079); MD International Investments, LLC (3303); Medical Developers, LLC (2330); Michigan Radiation Therapy Management Services, Inc. (3965); Nevada Radiation Therapy Management Services, Incorporated (4204); New England Radiation Therapy Management Services, Inc. (6448); New York  Radiation  Therapy Management Services, LLC (8868); North Carolina Radiation Therapy Management Services, LLC (4741); OnCure Holdings, Inc. (1697); OnCure Medical Corp. (1053); Palms West Radiation Therapy L.L.C. (4934); Phoenix Management Company, LLC (8644); Radiation Therapy School For Radiation Therapy Technology,

I, Paul Rundell, hereby declare under penalty of perjury:

1.      I am the Interim Chief Executive Officer of 21st Century Oncology Holdings, Inc.

("*21CH*"), one of the debtors and debtors in possession in the above-captioned chapter 11 cases

(collectively, the "*Debtors*" and, together with their non-Debtor affiliates, the "*Company*").

2.      I have served the Debtors in my current capacity since February 27, 2017.  In

such capacity, I am generally familiar with the Debtors' day-to-day operations, business and

financial affairs, and books and records.  I am above 18 years of age, and I am competent to

testify.

3.      I am a managing director and lead the restructuring and Midwest healthcare

practice for Alvarez & Marsal Healthcare Industry Group, LLC ("*A&M*"), a restructuring

advisory services firm with numerous offices throughout the country.  I have almost 20 years of

experience specializing in restructurings in the healthcare industry.  During that time I have

advised clients on business strategy and planning, financial analysis, cash management, crisis

management, market analysis, and operational improvement, both in and out of court.  My past

experience includes serving as:  (a) the chief restructuring officer to several post-acute healthcare

companies; (b) the executive vice president of restructuring to one of the largest continuing care

and retirement communities in the U.S., where I oversaw the restructuring of $2 billion in debt;

(c) the senior advisor on the fifth largest assisted living operator in the country; and (d) the senior

vice president of restructuring for a $1.5 billion hospital system.  Prior to joining A&M, I

worked with several restructuring and interim management firms where I assisted clients with

---

Inc. (7840); Radiation Therapy Services International, Inc. (7575); RVCC, LLC (3578); Sampson Accelerator,
LLC (2724); Sampson Simulator, LLC (2250); SFRO Holdings, LLC (6927); South Florida Medicine, LLC
(6002); South Florida Radiation Oncology, LLC (7256); Treasure Coast Medicine, LLC (0975); U.S. Cancer
Care, Inc. (3730); USCC Florida Acquisition, LLC (0485); West Virginia Radiation Therapy Services, Inc.
(0691).  The location of 21st Century Oncology Holdings, Inc.'s corporate headquarters and the Debtors'
service address is: 2270 Colonial Boulevard, Fort Myers, Florida 33907.

revenues ranging from $50 million to more than $15 billion.  I have a bachelor's degree and a MBA from the University of Illinois and I am a Certified Insolvency and Restructuring Advisor and a Certified Turnaround Professional.  I am also a member of the Turnaround Management Association and the Association of Insolvency and Restructuring Advisors.

4.      A&M was initially engaged by the Company on January 17, 2017 to assist the Debtors with reviewing their strategic alternatives and a possible restructuring of their debt obligations.  I was subsequently appointed as the Company's Interim Chief Executive Officer on February 27, 2017, following the resignation of the Company's previous chief executive officer.

5.      I submit this declaration in accordance with Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York to assist this Court and parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of:  (a) the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***") filed on the date hereof; and (b) the emergency relief that the Debtors have requested from the Court pursuant to the motions and applications described herein.

6.      Except as otherwise indicated herein, all facts set forth in this declaration are based on my personal knowledge, my discussions with other members of the Debtors' management team and the Debtors' advisors, and my review of the relevant documents and information concerning the Debtors' operations, financial affairs, and refinancing and restructuring initiatives.  If called upon to testify, I could and would testify competently to the facts set forth herein.

## __Introduction__[2]

7.      The Company is a leading, global, physician-led provider of integrated cancer care services.  The Company provides comprehensive care to patients across the United States, South America, and Latin America.  While the Company's business is fundamentally strong and profitable, the Debtors have been operating with an unsustainable balance sheet in light of the size of the business, current industry dynamics, and certain unexpected one-time costs.  Notably, changes in reimbursement practices under certain insurance programs have negatively affected the Company's level of revenue.  Additionally, unforeseen government penalties and settlements have reduced the Company's operating revenue and resulted in unexpected cash outflows.  In the aggregate, these factors have led to a liquidity shortfall and have negatively impacted the Company's ability to operate its business while servicing in excess of $100 million in annual debt service obligations.

8.      In light of these developments, the Debtors engaged restructuring advisors to assist in the redevelopment and refinement of a business plan and initiated restructuring negotiations with each of their primary stakeholders.  These cases represent the culmination of approximately six months of business plan development and restructuring negotiations with the Debtors' primary stakeholders.  As a result of these negotiations, the Debtors, their non-Debtor parent 21st Century Oncology Investments, LLC ("*21CI*"), the holder of nearly all of the Debtors' common units, the holder of all of 21CH's Series A Preferred Stock, an ad hoc group of certain MDL Lenders, First Lien Lenders, and Senior Noteholders (such ad hoc group the "*Crossover Group*"), and an ad hoc group of certain First Lien Lenders (the "*First Lien Lender Group*") have reached an agreement on the terms of a prearranged restructuring, as more

---

[2]    Capitalized terms used in this Introduction and not defined have the same meanings given to such terms elsewhere in this Declaration.

fully set forth in the Restructuring Support Agreement, dated as of May 25, 2017 attached hereto as **Exhibit B** (the "*RSA*").  The restructuring contemplated by the RSA is supported by (i) MDL Lenders holding 100 percent of the aggregate outstanding principal amount of the loans under MDL Facility (as defined below), (ii) First Lien Lenders holding in excess of 90 percent of the aggregate outstanding principal amount of the loans under First Lien Credit Facilities (as defined below), (iii) Senior Noteholders holding in excess of 90 percent of the aggregate outstanding principal amount of the Senior Notes (as defined below), 100 percent of the Series A Preferred Stock (defined below), and the majority equity owners of the Debtors' ultimate parent.

9.      The restructuring contemplated by the RSA will reduce the Debtors' net debt by more than $500 million and provide working capital for the Debtors' postpetition operations. The material terms of the RSA are summarized in Part II.D below.

10.      In addition, to fund these chapter 11 cases, certain Senior Noteholders and First Lien Lenders each as defined herein) have agreed to provide approximately $75 million in postpetition financing, pursuant to a senior secured superpriority debtor in possession delayed draw term loan, all as more fully described herein.  This financing is the result of extensive, arms'-length negotiations between the Debtors and certain creditor groups, and provides the Debtors with the necessary liquidity to conduct these chapter 11 cases and expeditiously implement the contemplated consensual reorganization.

11.      This declaration is organized into four sections.  The first section describes the Company's business and capital structure, including detailed information on the Company's history, operations, and organizational structure.  The second section details the circumstances surrounding the commencement of these chapter 11 cases.  The third section sets forth the evidentiary basis for the relief requested in each of the pleadings filed in connection with these

chapter 11 cases. The fourth section provides an overview of the exhibits attached hereto that set forth certain additional information about the Debtors as required by the Local Bankruptcy Rules.

<div align="center">**Background**</div>

I.      **The Company's History and Operations.**

      A.      **The Debtors' Corporate History.**

12.     The Company was founded in 1983 by a group of physicians seeking to deliver academic-level, quality radiation therapy at the community level and has since expanded to become the largest integrated network of cancer treatment centers and affiliated physicians in the world.

13.     On February 21, 2008, the Company was acquired by a private equity firm. Following such acquisition, the Company continued to grow its operations organically through a services agreement model, as well as through the formation of joint ventures and the acquisition of other radiation therapy networks. Certain notable transactions include the 2011 acquisition and partnership with the management team of Medical Developers, LLC, the largest company in South America dedicated to radiation therapy, and the October 2013 acquisition of OnCure Holdings, Inc. ("*OnCure*"), and certain of its subsidiaries, which operated a network of 14 medical groups that treated cancer patients at 37 radiation oncology centers located in California, Florida, and Indiana. The Company acquired OnCure for approximately $125 million, consisting of $42.5 million in cash and $82.5 million in assumed debt under the OnCure Notes (defined herein).

14.     Shortly after the OnCure acquisition, the Company invested in Florida-based SFRO Holdings LLC ("*SFRO*") in February 2014, acquiring 65 percent of the equity interests in

<div align="center">6</div>

SFRO in consideration for approximately $60 million in cash funded with the proceeds of a new $60 million term loan (the "**SFRO Term Loan**").

15.     To address challenges relating to the Company's significant debt service obligations and other operational cash needs, on September 27, 2014, the Company and one of its investors (the "**Preferred Equity Investor**") reached an agreement whereby the Preferred Equity Investor invested $325 million (the "**Preferred Equity Investment**") in consideration for shares of Series A Preferred Stock (defined herein) and the right to appoint two directors to the board of directors of 21CH.  The Debtors used a portion of the Preferred Equity Investment to repay, among other things, outstanding borrowings under the Debtors' then-existing revolving credit facility.

16.     On July 15, 2015, the Company purchased the remaining 35 percent interest in SFRO for $44.1 million, comprised of $15.0 million in cash, $14.6 million in SFRO PIK Notes (defined herein), and $14.5 million of preferred stock in the Debtors' parent, 21CI.

17.     Additionally, on September 9, 2016, in connection with the First Capital Event (defined herein), the Preferred Equity Investor agreed to acquire, pursuant to the 2016 Subscription Agreement (defined herein), an additional 25,000 shares of Series A Preferred Stock, par value $0.001 per share, for a purchase price of $25 million.

**B.      The Company's Current Business Operations.**

18.     Today, the Company is the leading global, physician-led provider of integrated cancer care services, operating the largest network of cancer treatment centers and affiliated physicians in the world.  With 179 locations worldwide, the Debtors service patients in seven Latin American countries and 17 U.S. States.



19.     The Company employs a range of medical professionals, including radiation oncologists, medical oncologists, breast surgeons, colorectal surgeons, urologists, gynecologic oncologists, and other medical professionals, to provide high-end, complete end-to-end care for cancer patients.  The Company also provides a complete selection of advanced radiotherapy services that may otherwise be unavailable in the communities in which the Company operates.  Finally, the Company provides support services, including psychological and nutritional counseling, as well as transportation assistance.

20.     In light of the varied state regulatory landscape for health care services, the Company is unable to directly employ physicians and other medical professionals in certain states in which they operate.  As a result, the Company has developed two distinct business models.    First, the Company owns treatment facilities and directly employ the medical professionals working therein.    In the second model, the Company contracts with private physician groups and provides a variety of administrative, financial, and management services to such physician groups pursuant to exclusive, long-term services agreements.    Under certain arrangements, the Company provides management services to independent physician practices.

### 1.    The Company-Owned Business Model.

21.    In states that allow for the corporate practice of medicine, the Company offers medical services directly to the general public by employing physicians at Company-owned clinics or treatment facilities owned entirely by the Company or jointly with other entities.  This business model allows the Company to attract and retain the top physicians in their field and maintain management oversight over both the clinical and non-clinical aspects of their services. The majority of revenue generated from this business model is derived from commercial payers, including healthcare insurers, managed care organizations, workers' compensation programs, contract management services, and private pay sources, with the remaining reimbursement derived from Medicare and Medicaid.  In addition, when the demand arises, the Company subcontracts the services of Company-employed physicians to hospitals and other cancer treatment centers.

### 2.    The Services Agreement Business Model.

22.    In states that prohibit the corporate practice of medicine, medical services must be provided at physician-owned clinics.  In these states, the Company contracts with physician-owned facilities to provide certain administrative and financial services, including the provision of non-physician clinical and administrative staff, operations management, purchasing assistance, managed care contract negotiation assistance, reimbursement, billing, and collections assistance, information technology, human resource and payroll services, and compliance, accounting, and treasury functions.

23.    In some instances, the Company also leases the facilities where oncology treatment centers are located and provide financing for certain of the medical equipment located in such centers. Importantly, the physicians treat patients and retain full control over the

9

treatment's clinical aspects in compliance with the terms of the services agreements and applicable state law.

24.     In consideration for its services, the Company is reimbursed by the physician groups for certain operating expenses related to the applicable treatment center and earn a monthly management fee from each physician group.  The management fees generally are calculated as a percentage of each group's revenue associated with the provision of radiation therapy.

### 3.    Services Overview

25.     Broadly speaking, the Company provides two primary types of radiation therapy: external beam therapy ("***External Radiation***") and internal radiation therapy ("***Internal Radiation***").  External Radiation involves directing a high-energy x-ray beam at a patient's tumor.  External Radiation is typically administered over the course of 10–40 treatments, depending on the total radiation required to achieve a specific therapeutic goal.  Internal Radiation, on the other hand, involves the placement of a radiation-emitting element within or adjacent to the patient's tumor.  Internal Radiation delivers a higher dose of radiation in a shorter time than is possible with external treatments, and is typically used to treat cancers of the prostate, cervix, breast, lung, and esophagus.

26.     In addition to these main forms of radiation treatment, the Company has also begun testing a new technology known as adaptive radiotherapy, which allows for near real-time adjustment of radiation delivery in response to anatomic changes that occur during treatment.

27.     The following table sets forth the forms of radiation therapy treatments and advanced services that the Company currently offers:

| Technologies | Description |
|---|---|
| **External Beam Therapy** |  |
| *Conformal Radiation Therapy* | A process of creating a radiation treatment field that matches precisely the size and shape of the intended target tumor or organ. |
| *Intensity Modulated Radiation Therapy* | A process of adjusting the intensity of the radiation beam in addition to shaping the radiation dose to match the size and shape of the treated tumor, resulting in a higher degree of precision than conformal therapy. |
| *Stereotactic Radiosurgery* | A process of delivering highly precise, highly accurate, high dose radiation to small tumors. |
| **Advanced Services Used with External Beam Therapies** | |
| *Image Guided Radiation Therapy* | Enables radiation oncologists to utilize x-ray imaging at the time of treatment to identify the exact position of the tumor within the patient's body and adjust the radiation beam to that position for better accuracy of treatment delivery. |

| Technologies | Description |
|---|---|
| *Gamma Function* | A proprietary capability that enables precise calculation of the actual amount of radiation dose delivered during a treatment.  Gamma Function also enables the quantitative comparison between the actual radiation dose delivered and the planned radiation dose.  This technology further reports discrepancies in planned-to-actual dose to the physician and provides useful information to assist in the physician's clinical decision-making. |
| *Respiratory Gating* | Coordinates treatment beam activation with the respiratory motion of the patient, thereby permitting accurate delivery of radiation dosage to a tumor that moves with breathing, such as lung and liver cancers. |
| **Internal Radiation Therapy** |  |
| *High-Dose Rate Brachytherapy* | Enables radiation oncologists to treat cancer by internally delivering high doses of radiation directly to the cancer using temporarily implanted radioactive elements. |
| *Low-Dose Rate Brachytherapy* | Enables radiation oncologists to treat cancer by internally delivering doses of radiation directly to the cancer over an extended period of time using permanently implanted radioactive elements. |
| *Radiopharmaceutical Therapy* | Enables radiation oncologists to treat cancer that has metastasized widely to the skeleton with an intravenously injected radioactive solution that is rapidly absorbed by the skeleton and delivers the radiation dose comprehensively to the entire skeleton. |

| Technologies | Description |
|---|---|
| **Operating Technologies Under Development** |  |
| *Adaptive Radiotherapy* | A novel approach to radiation therapy that is currently under development by the Debtors and a small number of academic medical centers.   Adaptive radiotherapy is a process that will automatically trigger a new treatment plan during the course of therapy in order to adapt to anatomic changes that occur to the tumor. |

### C.    The Company's Corporate and Capital Structure.

28.    The Company's corporate organizational structure is depicted on the chart attached hereto as **Exhibit A**.  As set forth herein, 21CI serves as the ultimate parent entity of the Company through its 100 percent equity ownership of Debtor 21CH.  Debtor 21CH, in turn, owns, directly or indirectly, each of the Company's remaining 66 domestic subsidiaries, 59 of which are Debtors in these chapter 11 cases.[3]  As of the Petition Date, the Debtors' long-term

---

[3]    Not including joint ventures, professional corporations, or non-U.S. entities.

debt obligations totaled in excess of $1.1 billion, excluding accrued and unpaid interest of approximately $51.4 million and capitalized leases of approximately $30 million. The primary components of the Debtors' consolidated funded debt obligations outstanding as of the Petition Date are:

| Debt Instrument | Principal Amount Outstanding as of Petition Date |
|---|---|
| First Lien Term Loan | $599 million |
| First Lien Revolver | $121 million |
| MDL Facility | $35 million |
| Senior Notes | $368 million |
| SFRO PIK Notes | $19 million |
| **Total** | **$1,143 million** |

### 1.     The First Lien Credit Facility.

29.     Debtor 21st Century Oncology, Inc. ("**21C**") is the borrower under that certain Credit Agreement, dated as of April 30, 2015 (as amended, restated, supplemented, and otherwise modified from time to time, the "***First Lien Credit Agreement***"), among 21C, 21CH, the lenders party thereto from time to time (the "***First Lien Lenders***"), Morgan Stanley Senior Funding, Inc. as administrative agent, issuing bank, and swingline lender (the "***First Lien Agent***"), and the other agents and arrangers named therein. The First Lien Credit Agreement provides for credit facilities consisting of a term loan facility (the "***First Lien Term Loan***") and a revolving loan facility (the "***First Lien Revolver***," and together with the First Lien Term Loan, the "***First Lien Credit Facilities***"). As of the Petition Date, the principal amount outstanding under the First Lien Term Loan was approximately $599 million, and the principal amount outstanding under the First Lien Revolver was approximately $121 million, with $3.9 million in outstanding letters of credit. As of the Petition Date there was approximately $7.2 million in

accrued and unpaid interest under the First Lien Credit Facilities.  The First Lien Revolver matures on April 30, 2020 and the First Lien Term Loan matures on April 30, 2022.

30.    The First Lien Credit Facilities are secured by a security interest in substantially all of the Debtors' (excluding the MDL Entities' (as defined below)) assets (the "*21C Domestic Collateral*")).  The First Lien Credit Facilities are guaranteed by Debtor 21CH and each direct and indirect, domestic subsidiary of Debtor 21C (excluding the MDL Entities).

**2.    The 11.00% Senior Unsecured Notes.**

31.    Debtor 21C issued those certain 11.00% senior notes due 2023 (the "*Senior Notes*") in an aggregate principal amount of $360 million pursuant to that certain Indenture, dated as of April 30, 2015 (as amended, restated, and supplemented from time to time, the "*Senior Notes Indenture*") by and among 21C, as issuer, Wilmington Trust, National Association, as trustee (the "*Senior Notes Trustee*"), and the other parties thereto.  The Senior Notes are guaranteed on a senior unsecured basis by 21CH and each of 21C's existing and future direct and indirect domestic subsidiaries that is a guarantor under the First Lien Credit Facilities. As of the Petition Date there is approximately $368 million in principal outstanding and approximately $44.2 million in accrued and unpaid interest under the Senior Notes.

**3.    The SFRO PIK Notes.**

32.    On July 2, 2015, Debtor 21CH issued $14.6 million of subordinated payable-in-kind notes (the "*SFRO PIK Notes*") to partially fund the purchase of a non-controlling interest in SFRO.  The SFRO PIK Notes accrue interest at 10 percent annually, which interest is accrued quarterly and added to the outstanding principal amount.  The SFRO PIK Notes mature on June 30, 2019 and provide for accelerated principal payments along with premium payments to the sellers upon achievement of certain operational milestones.  The SFRO PIK Notes are structurally subordinated to the First Lien Credit Facilities and the Senior Notes.  The SFRO PIK

Notes are also expressly payment subordinated to the First Lien Credit Facilities and the Senior Notes. As of the Petition Date, there is approximately $19 million in principal amount of SFRO PIK Notes outstanding and approximately $120,000 in accrued and unpaid interest.

### 4. The MDL Facility.

33.    In connection with the Debtors' (excluding the MDL Entities) entry into the Forbearance Agreements (defined herein), as described more fully below, the Debtors entered into a $20 million senior secured delayed draw term loan credit facility (the "**MDL Facility**") pursuant to that certain credit and guaranty agreement dated as of December 6, 2016 (the "**MDL Facility Credit Agreement**") among Debtor Medical Developers, LLC ("**MDL**"), as borrower, Debtor MD International Investments, LLC (together with MDL, the "**MDL Entities**") and certain other subsidiaries and affiliates of Debtor 21C, as guarantors (collectively, the "**MDL Guarantors**"), Wilmington Savings Fund Society, FSB as administrative agent and collateral agent (the "**MDL Agent**") and the lenders from time to time party thereto (including certain Consenting Lenders and Majority Senior Noteholders referred to and described in paragraph 51 below) (the "**MDL Lenders**").

34.    The MDL Facility initially provided the Debtors with $20 million of additional liquidity, $10 million of which was available immediately and the remainder of which was available subject to satisfaction of certain milestones. The Debtors and the MDL Facility lenders intended for the incremental liquidity provided by the MDL Facility to fund the Debtors' operations while the Crossover Group and the First Lien Lender Group engaged with the Debtors regarding the terms of a consensual restructuring. In connection with the amendment and restatement of the MDL Facility Credit Agreement on March 6, 2017 (as discussed more fully below) and certain other subsequent amendments, the borrowings under the MDL Facility were increased to $35 million and its maturity date was extended to May 31, 2017. As of the Petition

16

Date, there is approximately $215,000 in accrued and unpaid interest outstanding under the MDL Facility. The obligations under the MDL Facility are secured by a first priority lien on substantially all of the Debtors' (including the MDL Entities') property and assets (such property and assets, collectively, the "*MDL Facility Collateral*"), including all property and assets securing obligations under the First Lien Credit Facilities and 65 percent of all voting capital stock and 100 percent of all non-voting capital stock of Medical Developers Coöperatief, U.A. owned by the MDL Entities.

### 5.    Series A Preferred Stock.

35.    On September 26, 2014, 21CH entered into a subscription agreement (the "*Original Subscription Agreement*"), pursuant to which 21CH issued to the Preferred Equity Investor 385,000 newly issued shares of series A convertible preferred stock ("*Series A Preferred Stock*"), par value $0.001 per share, initial stated value $1,000 per share, for a purchase price of $325 million.

36.    On September 9, 2016, 21CH, the Preferred Equity Investor, 21CI, and 21C entered into a second subscription agreement (the "*2016 Subscription Agreement*"), pursuant to which 21CH issued to the Preferred Equity Investor an additional 25,000 shares of Series A Preferred Stock, par value $0.001 per share, for a purchase price of $25 million. In connection with the 2016 Subscription Agreement, the Preferred Equity Investor irrevocably and unconditionally waived, released, and forgave any and all default events under the Certificate of Designations (as defined below), occurring prior to the closing of the equity issuance and any and all rights or remedies with respect thereto.

37.    Holders of Series A Preferred Stock have, among other rights, the right to require 21CH to repurchase their shares upon the occurrence of certain events of default and certain change of control transactions, at the prices set forth in the certificate of designations for the

Series A Preferred Stock (the "***Certificate of Designations***").  The Certificate of Designations also provides for certain consent rights of a majority of the holders of the Series A Preferred Stock in connection with specified corporate events of 21CI or its subsidiaries, including, among other things, with respect to certain equity issuances and certain acquisitions, financing transactions and asset sale transactions.  Upon certain events of default and the obtaining of applicable anti-trust regulatory approvals, holders of Series A Preferred Stock are also entitled to vote together with holders of common stock, on an as-converted basis. In addition, the Series A Preferred Stock is senior in preference to 21CH's common stock with respect to dividend rights, rights upon liquidation, winding up or dissolution.  As of the Petition Date, all of 21CH's Series A Preferred Stock was owned by the Preferred Equity Investor.

### 6.    Common Equity.

38.    Approximately 80 percent of class A voting interests in non-Debtor 21CI is held by a single private equity firm (the "***Common Equity Owner***"), which in turn directly or indirectly owns 100 percent interests in all of the Debtors.  The remaining 20 percent of class A voting interests in non-Debtor 21CI are owned by the Company's management and former management as well as several other investors holding less than 1 percent of such interests.

## II.    Events Leading to the Chapter 11 Cases.

39.    The Company's philosophy and business structure has allowed it to hold market-leading positions in most of its domestic and international markets, and the Company's international operations are quickly growing.   Nonetheless, recent market and other developments have left the Debtors with unsustainable debt service obligations, which require a deleveraging of their balance sheet to provide operational liquidity and right-size their capital structure.  As the overall population has aged and the types of coverage offered through readily available health insurance have changed, the Company has seen its profitability decline, due to

18

lower reimbursement rates and higher denials of coverage. This lower profitability has made it difficult for the Debtors to meet their debt service obligations. At the same time, the Company has been forced to pay certain amounts in connection with non-compliance with certain regulatory requirements. In each such circumstance, non-compliance has since been remedied. Additionally, the Company has experienced material one-time cash outflows in connection with the settlement of certain litigations brought against one or more of the Debtors.

### A.    Liquidity Constraints.

#### 1.    Shifting Healthcare Trends.

40.    The Debtors' principal capital requirements are for debt service obligations, working capital, acquisitions, expansion, and *de novo* treatment center development. Current trends affecting the healthcare market, and the Company's patient base, including changes in Medicare radiation, a shift by part of the Company's from higher revenue per treatment PPO insurance plans to HMO plans, lower volumes of treatment support services in 2016, and the need to comply with electronic heath records ("***EHR***") regulations in order to avoid payment adjustments and penalties from Medicare and Medicaid, have led to decreased margins and overall revenue in calendar year 2016 and a net cash outflow of $33.2 million in the twelve months ended December 31, 2016. Additionally, a changing political landscape has injected uncertainty into the health insurance market.

#### 2.    Pending and Settled Litigation.

41.    The Debtors' industry is highly regulated at both the federal and state level. Federal law and regulations are based primarily upon Medicare and Medicaid programs, each of which is financed, at least in part, with federal money. State jurisdiction is based upon the state's authority to license certain categories of healthcare professionals and providers, the state's interest in regulating the quality of healthcare in the state, regardless of the source of payment,

and state healthcare programs. Further information regarding these various governmental regulations are set forth in the Debtors' most recent Annual Report.[4]

42.    One such federal law is the federal False Claims Act, which provides that the government may fine companies that knowingly submit, or participate in submitting, any claims for payment that are false or fraudulent, or that contain false or misleading information, or if companies knowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money or property to the government. An "obligation" includes an established duty arising from an express or implied contractual arrangement, from statute or regulation, or from the retention of any overpayment. Knowingly making or using a false record or statement to receive payment from the federal government or to improperly retain payment is also a violation. The False Claims Act does not require proof of specific intent to defraud; a provider can be found liable for submitting false claims with actual knowledge or with reckless disregard or deliberate ignorance of such falseness. A False Claims lawsuit may be brought by the government or by a private individual by means of a "qui tam" action. Such lawsuits have increased significantly in recent years. In addition, the federal government has engaged a number of non-governmental audit organizations to assist in tracking and recovering false claims for healthcare services.

43.    Another federal law governing the Debtors' conduct is section 1877 of the Social Security Act, also known as the "Stark Law," which prohibits a physician from referring a patient to a healthcare provider for certain designated health services reimbursable by Medicare if the physician (or close family members) has a financial relationship with that provider, including an investment interest, a loan, debt, or compensation relationship. The Stark Law

---

[4]    21st Century Oncology Holdings, Inc. Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, *available at* https://www.21co.com/investors/sec-filings.

covers radiology services, infusion therapy, radiation therapy and supplies, clinical laboratory, diagnostic imaging, outpatient prescription drugs, and hospital services, among others.   In addition to the conduct directly prohibited by the law, the statute also prohibits "circumvention schemes" that are designed to obtain referrals indirectly that cannot be made directly.   The regulatory framework for the Stark Law is to first prohibit all referrals from physicians to entities for Medicare designated health services and then to except certain types of arrangements from that broad general prohibition.   The Debtors' compensation and other financial arrangements with physicians must comply with the Stark Law.

44.     On December 18, 2015, the Debtors entered into a settlement agreement—and paid $19.75 million to the federal government—to resolve an inquiry regarding the ordering, billing and medical necessity of certain laboratory services as well as agreements with certain physicians.   Subject to certain conditions, the federal government agreed to release the Debtors from any civil or administrative monetary claim the federal government has with respect to the conduct covered by the Settlement Agreement under the False Claims Act (which is discussed further below) and certain other statutes and legal theories.   This settlement did not constitute an admission of liability by the Debtors.

45.     On March 9, 2016, the Debtors entered into a second settlement agreement—and paid an additional $34.7 million to the federal government—to resolve inquiries pursuant to the False Claims Act concerning allegations that the Debtors knowingly billed for services that were not medically necessary.   The allegations related to this second settlement focused on clinical training in new facility locations for a radiation dose calculation system used by radiation oncologists, known as Gamma.   The Debtors fully cooperated with the federal government and entered into the second settlement with no admission of wrongdoing.   There was no indication

that patient harm was a component of the dispute, and the Debtors are not aware of harm to any patient related to this dispute.

46.    As disclosed on **Exhibit K** attached hereto, the Debtors currently are responding to certain governmental inquiries, including inquiries by the Office of Civil Rights, the Florida Attorney General's Office and several other states' attorney general's offices, and the Department of Justice.  The inquiries from the Office of Civil Rights and the states' attorney general's offices relate to potential violations of the Health Insurance and Portability Act (HIPAA) arising out of a 2.2 million patient data breach in 2015.  The Department of Justice has inquiries related to potential violations of the False Claims Act and the Stark Law and an inquiry related to certain potential criminal anti-trust violations regarding the market in Florida.  In connection with these inquiries, the Debtors are voluntarily producing documents and information and fully cooperation with the relevant governmental agencies regarding all inquiries.

### B.    Credit Agreement Amendment and Supplemental Indenture.

47.    On May 17, 2016, the Debtors received notice from the Senior Notes Trustee of a default under the Senior Notes Indenture due to 21C's failure to timely furnish the Senior Notes Trustee and the holders of the Senior Notes (the "*Senior Noteholders*") with the Company's annual report for the fiscal year ended December 31, 2015.  21C's failure to timely furnish this annual report was a result of a required restatement of financial results from prior years.  This default under the Senior Notes Indenture, if left uncured for 60 days, would have triggered a cross-default under the First Lien Credit Agreement and given the Senior Noteholders and the lenders under the First Lien Credit Agreement the right to accelerate the Debtors' (excluding the MDL Entities') obligations under the Senior Notes Indenture and First Lien Credit Agreement, respectively.

22

48.     As a result, on June 10, 2016, the Debtors (excluding the MDL Entities) entered into an amendment and waiver to the First Lien Credit Agreement waiving through July 31, 2016 any default related to the failure to deliver financial statements and modifying the interest rates thereunder  (the "*July 2016 Credit Agreement Amendment*").  Similarly, on July 22, 2016, the Debtors (excluding the MDL entities) entered into a supplement to the Senior Notes Indenture (the "*Supplemental Senior Notes Indenture*") to waive the same default through July 31, 2016. In consideration for entering into these amendments, the Debtors (excluding the MDL Entities) agreed to pay each Senior Noteholder $2.30 per $1,000 principal amount of Senior Notes held by such noteholder.  On August 15, 2016 and August 16, 2016, the Debtors (excluding the MDL Entities) entered into an additional amendment and waiver to each of the First Lien Credit Agreement and the Senior Notes Indenture (collectively, the "*August 2016 Amendments*"), extending the waivers provided for in the July 2016 Credit Agreement Amendment and Supplemental Senior Notes Indenture through September 10, 2016 for defaults related to the failure to provide an annual report for the fiscal year ended December 31, 2015, and through September 30, 2016 for defaults related to the failure to timely provide quarterly financial statements for the quarters ended March 31, 2016 and June 30, 2016.

49.     The August 2016 Amendments also established certain fundraising milestones the Debtors (excluding the MDL Entities) were required to satisfy to avoid further defaults under the First Lien Credit Agreement and Senior Notes Indenture, including:

- *First Capital Event*:  Debtor 21C was required to raise net cash proceeds of at least $25 million from specified transactions by September 30, 2016.

- *Second Capital Event*: Debtor 21C was required to raise additional net cash proceeds of at least $25 million (or an amount such that the aggregate capital raised by the First Capital Event and Second Capital Event was no less than $50 million) from specified transactions by November 30, 2016.

- ***Third Capital Event***: Debtor 21C was required to raise additional net cash proceeds from specified transactions by March 31, 2017 of at least (a) $75 million (or an amount such that the aggregate capital raised by all capital events was no less than $125 million) or (b) an amount such that 21C's cash and unused revolving loan commitments equaled at least $120 million and 21C's consolidated leverage ratio was not greater than 6.4 to 1.

50.     On September 9, 2016, Debtor 21C satisfied the First Capital Event by entering into the 2016 Subscription Agreement with the Preferred Equity Investor.  However, the Debtors have not raised sufficient capital to satisfy the Second Capital Event, which was due on December 1, 2016.  As a result, the Debtors (excluding the MDL Entities) initiated negotiations with the Senior Noteholders and lenders under the First Lien Credit Agreement regarding the terms of a forbearance agreement.

### C.     The Forbearance Agreements and Restructuring Negotiations.

51.     In light of the Debtors' constrained liquidity position, 21C determined to forgo a $19.8 million interest payment due on November 1, 2016 on the Senior Notes (the "***November Interest Payment***").  In early December 2016, the Debtors negotiated a forbearance agreement (the "***Noteholder Forbearance***") with the beneficial owners (and investment managers or advisors for beneficial owners) of more than 90 percent of the aggregate principal amount of Senior Notes outstanding (the "***Majority Senior Noteholders***").  The Noteholder Forbearance provided a forbearance through December 15, 2016 of 21C's failure to satisfy the November Interest Payment and the Second Capital Event.  Concurrently therewith, the Debtors (excluding the MDL Entities) entered into a similar forbearance agreement (the "***Lender Forbearance***" and together with the Noteholder Forbearance, the "***Forbearance Agreements***") with certain lenders under the First Lien Credit Agreement (the "***Consenting Lenders***"), forbearing on a cross-default under the First Lien Credit Agreement as a result of the Debtors' failure to satisfy the November Interest Payment and the Second Capital Event.  Additionally, the Forbearance Agreements

24

provided that the Debtors would, among other things, engage in negotiations with the Crossover Group regarding the terms a transaction or series of transactions to remedy existing defaults under the Senior Notes Indenture and the First Lien Credit Agreement, with a transaction support agreement to be entered into no later than December 15, 2016 and a transaction to be commenced by January 15, 2017.

52.    On December 15, 2016 the Debtors (excluding the MDL Entities), Majority Senior Noteholders, and Consenting Lenders entered into amendments to the Forbearance Agreements, extending the Forbearance Agreements through January 4, 2017.  The same parties subsequently entered into four additional amendments, each of which extended the forbearance periods, ultimately through May 31, 2017.

53.    To provide the Debtors with additional liquidity, the MDL Facility Credit Agreement was amended and restated pursuant to that certain Amended and Restated Credit and Guaranty Agreement, dated as of March 6, 2017 (as amended, supplemented and otherwise modified from time to time, the "***Restated MDL Facility Credit Agreement***"), by and among MDL, the MDL Guarantors, the MDL Agent and the lenders party thereto (including the lenders originally party to the MDL Facility Credit Agreement), to provide for an additional $15 million of new "***Tranche B***" term loans, bringing the total outstanding principal amount under the MDL Facility to $35 million.   In connection with entry into the Restated MDL Facility Credit Agreement, the Debtors (excluding the MDL Entities) entered into that certain Security Agreement, dated as of March 6, 2017 with the MDL Agent, pursuant to which substantially all property and assets of the Debtors (excluding the MDL Entities) (including such property and assets constituting 21C Domestic Collateral, collectively, the "***New MDL Collateral***") were pledged and became part of the MDL Facility Collateral.  To ensure that the security interests in,

and liens on, the New MDL Collateral which secure the obligations under the MDL Facility were senior and prior to the security interests on any New MDL Collateral which secure the obligations under the First Lien Credit Facility, the MDL Agent, the First Lien Agent and the Debtors (excluding the MDL Entities) entered into that certain Intercreditor Agreement, dated as of March 6, 2017, pursuant to which the First Lien Agent, on behalf of itself and the First Lien Lenders, subordinated the security interests in and liens on any property and assets constituting New MDL Collateral securing obligations under the First Lien Credit Facilities.  The MDL Facility initially matured on January 15, 2017, but the maturity date was subsequently extended in a series of amendments (including under the Restated MDL Facility Credit Agreement) to May 31, 2017.  Simultaneously, the Debtors (excluding the MDL Entities) entered into an amendment to the First Lien Credit Agreement to allow for the incurrence of additional debt under the MDL Facility without triggering a default under the First Lien Credit Agreement.

### D.    The Restructuring Support Agreement.[5]

54.    With the additional runway afforded by the Forbearance Agreements and the revised business plan in place, the Debtors re-engaged in substantive discussions with the Crossover Group, as well as several other key stakeholders, regarding a potential balance sheet restructuring.  Following months of restructuring negotiations, the Debtors entered into the RSA with 21CI, the Crossover Group, the First Lien Lender Group, the Common Equity Owner, and the Preferred Equity Investor on May 25, 2017.  The RSA contemplates a comprehensive restructuring of the Debtors' balance sheet through, among other things, (a) the conversion of the Debtors' existing obligations under the MDL Facility and the First Lien Credit Agreement into two new term loan credit facilities, (b) a debt-to-equity conversion of the Senior Notes and

---

[5]    Capitalized Terms used but not defined in this Part II.D shall have the meanings ascribed to such terms in the RSA.

26

certain general unsecured claims, (c) rights offerings, available to all Senior Noteholders who are accredited investors, for the rights to purchase their a *pro rata* shares of (i) $200 million in aggregate original principal amount of new second lien notes (such notes, the "***New Second Lien Notes***" and such rights, the "***Notes Rights***") and (ii) new preferred equity interests with an aggregate initial liquidation value of $88.235 million (the "***New Preferred Equity***" and such rights, the "***Equity Rights***"), each backstopped by certain members of the Crossover Group (the "***Backstop Parties***"), and (d) New Warrants provided to holders of existing equity interests in the Debtors, <u>provided</u> that all creditor classes as well as the equity holders vote to accept the proposed plan.   Specifically, the RSA contemplates recoveries to all key constituencies, including:

- ***MDL Facility Lenders***: *pro rata* share of a New MDL Term Loans in an aggregate original principal amount of $35,000,000, on substantially similar terms to the MDL Facility (the "***New MDL Facility***").   The New MDL Facility will provide for the incurrence of additional debt in the form of revolving loans;

- ***First Lien Lenders***: *pro rata* share of New First Lien Term Loans in an aggregate original principal amount equal to (i) the aggregate amount of the Existing Credit Facility Obligations owned or held by the First Lien Lenders, minus (ii) $200 million in aggregate principal amount of First Lien Term Loans that will be converted into the New Second Lien Notes through the Notes Rights Offering;

- ***Senior Noteholders***: *pro rata* share 100% of: (i) the New Common Stock (subject to dilution on account of the New Preferred Equity, the shares of New Common Stock issuable upon exercise of the New Warrants, and the equity issued under the Equity Incentive Plan) (to be distributed on a *pro rata* basis to Senior Noteholders and General Unsecured Creditors that elect to receive New Common Stock), (ii) the Notes Rights (but only if such Senior Noteholder is an accredited investor), and (iii) the Equity Rights (but only if such Senior Noteholder is an accredited investor);

- ***General Unsecured Creditors***: *pro rata* share of 100% of the New Common Stock (subject to dilution on account of the New Preferred Equity, the shares of New Common Stock issuable upon exercise of the New Warrants, and the equity issued under the Equity Incentive Plan) (to be distributed on a pro rata basis to Senior Noteholders and General Unsecured Creditors that elect to

27

receive New Common Stock), or (ii) the Convenience Claim Distribution on the terms more fully set forth in the RSA; and

- **Equity holders**: *pro rata* share of 100% of the New Warrants on the terms more fully set forth in the RSA.

55.    The restructuring contemplated by the RSA will reduce the Debtors' net debt by more than $500 million and provide the Debtors with working capital upon emergence to execute on its new business plan.

### E.    DIP Financing.

56.    To fund these chapter 11 cases, certain First Lien Lenders among the First Lien Lender Group and Crossover Group have agreed to provide the Debtors with an approximately $75 million senior secured superpriority debtor in possession financing facility (the "***DIP Facility***"). The DIP Facility is structured as a delayed draw term loan credit facility with $25 million available upon entry of an interim order approving the DIP facility, and an incremental $50 million available upon entry of a final order approving the DIP Facility. The DIP Facility is secured by superpriority liens that will prime the existing prepetition liens under the First Lien Credit Agreement.

57.    I believe that the restructuring contemplated by the RSA and the incurrence of indebtedness under the DIP Facility offers the best available option for the Debtors, as entry into the RSA will allow the Debtors to reduce their net debt by approximately $500 million (approximately 34 percent (excluding capital leases) of the Debtors' prepetition funded indebtedness), which will right-size the Debtors' balance sheet and position the Debtors for growth in the rapidly changing healthcare market. Additionally, the support among key creditors for the transactions contemplated by the RSA will reduce the risk of potentially expensive and protracted litigation. Finally, reorganization under chapter 11 will allow the Debtors to resolve certain contingent liabilities in a comprehensive manner, removing the litigation overhang and

28

providing certainty regarding future operations.  Accordingly, I believe that these chapter 11 cases are in the best interests of the Debtors' estates and will maximize value for all parties in interest.

### III.    Evidentiary Support for First Day Motions.[6]

58.    The Debtors have filed or will file a number of First Day Motions seeking orders granting various forms of relief.  I believe the forms of relief requested are necessary to enable the Debtors to operate with minimal disruption during the pendency of the chapter 11 cases and to ensure consummation of the Debtors' proposed restructuring transactions.  A description of the relief requested and the facts supporting each of the First Day Motions is set forth below.

59.    I have reviewed each of the First Day Motions, including the exhibits thereto. The Debtors believe, and I agree, that the Debtors have satisfied the applicable standards for the relief requested in each of the First Day Motions, and that the Court's grant of the requested relief is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.  Accordingly, on behalf of the Debtors, I respectfully submit that the First Day Motions should be approved.

### A.    Administrative and Procedural Pleadings.

#### 1.    Debtors' Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases ("*Joint Administration Motion*").

60.    Pursuant to the Joint Administration Motion, the Debtors request entry of an order (a) directing procedural consolidation and joint administration of these chapter 11 cases and (b) granting related relief.  Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience

---

[6]    Capitalized terms used in this section but not defined have the meaning ascribed to them in the applicable motion.

without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders in these chapter 11 cases will affect each and every Debtor entity.  For example, virtually all of the relief sought by the Debtors in the first day motions is sought on behalf of all of the Debtors.  The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections.  Joint administration of the these chapter 11 cases, for procedural purposes only, under a single docket entry, will also ease the administrative burdens on the Court by allowing the Debtors' cases to be administered as a single joint proceeding instead of 60 independent chapter 11 cases.

61.     I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

> **2.      Debtors' Motion For Entry of an Order (I) Authorizing the Debtors to (A) Prepare a List of Creditors In Lieu of Submitting a Formatted Mailing Matrix and (B) File a Consolidated List of the Debtors' 50 Largest Unsecured Creditors and (II) Approving the Form and Manner of Notifying Creditors of Commencement of these Chapter 11 Cases ("*Creditor Matrix Motion*").**

62.     Pursuant to the Creditor Matrix Motion, the Debtors seek entry of an order: (a) authorizing the Debtors to (i) prepare a consolidated list of creditors in lieu of submitting separate mailing matrices for each Debtor, (ii) file a consolidated list of the Debtors' 50 largest unsecured creditors, and (iii) mail initial notices through their Proposed Notice and Claims Agent, (b) approving the form and manner of notifying creditors of commencement of these chapter 11 cases, and (c) granting related relief.

63.     Because the Debtors have approximately 7,000 creditors and other parties in interest, converting the Debtors' computerized information to a format compatible with the matrix requirements would be a burdensome task and would greatly increase the risk of any error.

64.     The Debtors, working together with the Proposed Notice and Claims Agent already have prepared a single, consolidated list of the Debtors' creditors in electronic format. The Debtors are prepared to make that list available in electronic form to any party in interest who so requests (or in non-electronic form at such requesting party's sole cost and expense) in lieu of submitting a mailing matrix to the clerk of the Court.

65.     Compiling separate top 20 creditor lists for each individual Debtor would consume a substantial amount of the Debtors' time and resources.  Further, the Debtors believe a single, consolidated list of the Debtors' 50 largest unsecured creditors will aid, to the extent necessary, the United States Trustee for Region 2 in its efforts to communicate with these creditors.  As such, I believe that permitting the Debtors to maintain a single consolidated list of creditors, in lieu of filing a separate creditor matrix for each Debtor will maximize the value of the Debtors' estates.

66.     I believe that the relief requested in the Creditor Matrix Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, I respectfully submit that the Creditor Matrix Motion should be approved.

> **3.      Debtors' Motion for the Entry of an Order Establishing Certain Notice, Case Management, and Administrative Procedures ("*Case Management Motion*").**

67.     I expect there will be numerous parties in interest in these chapter 11 cases and anticipate that a significant number of parties will file requests for service of filings.  I also

expect that numerous motions and applications will be filed in these chapter 11 cases.  The costs and burdens that might arise absent adoption of the proposed procedures—such as, for example, those associated with multiple hearings per month, plus the costs associated with copying, mailing, delivering, or otherwise serving paper copies of all such documents—could impose significant economic and administrative burdens on our estates and the Court.

68.    Given the size and scope of the chapter 11 cases, I believe that the proposed case management procedures will facilitate service of court papers in a manner that will be less burdensome and costly than serving such pleadings on every potentially interested party, which, in turn, will maximize the efficiency and orderly administration of these chapter 11 cases.

69.    I believe that the relief requested in the Case Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Case Management Motion should be approved.

**4.    Debtors' Motion for Entry of an Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, Statements of Financial Affairs, and Rule 2015.3 Financial Reports ("*Schedules and Statements Extension Motion*").**

70.    Pursuant to the Schedules and Statements Extension Motion, the Debtors seek entry of an order:  (a) extending the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs by 30 days, for a total of 44 days from the Petition Date, without prejudice to the Debtors' ability to request additional extensions; (b) extending the deadline by which the Debtors must file either their initial reports of financial information, or to file a motion seeking a modification of such reporting

requirements for cause, with respect to entities in which the Debtors hold a controlling or substantial interest as set forth in Federal Rule of Bankruptcy Procedure 2015.3 to the later of: (i) 30 days after the meeting of creditors to be held pursuant to section 341 of the Bankruptcy Code or (ii) 90 days from the Petition Date, without prejudice to the Debtors' ability to request additional extensions; and (c) granting related relief.

71.     To prepare their Schedules and Statements, the Debtors will have to compile information from books, records, and documents relating to thousands of claims, assets, and contracts from each Debtor entity.  Accordingly, collection of the necessary information will require a significant expenditure of time and effort on the part of the Debtors and their employees.  Additionally, because numerous invoices related to prepetition goods and services have not yet been received and entered into the Debtors' accounting system, it may be some time before the Debtors have access to all of the information required to prepare the Schedules and Statements.

72.     Although the Debtors, with the assistance of their professional advisors, are mobilizing their employees to work diligently and expeditiously on preparing the Schedules and Statements, resources are strained.  Given the amount of work entailed in completing the Schedules and Statements and the competing demands on the Debtors' employees and professionals to assist in efforts to stabilize business operations during the initial postpetition period, the Debtors likely will not be able to properly and accurately complete the Schedules and Statements within the required time period.

73.     The Debtors' business operations are complex, and preparing the Schedules and Statements accurately and in appropriate detail will require significant attention from the Debtors' personnel and the Debtors' advisors.  Engaging in such preparation immediately before

or after the commencement of these chapter 11 cases would distract such personnel and advisors from the Debtors' business operations at a critical juncture. The Debtors believe that their request for a 30-day extension of time to file the Schedules and Statements, without prejudice to the Debtors' ability to request additional extensions for cause shown, is appropriate and warranted under the circumstances.

74.    Additionally, cause exists to extend the deadline for filing the 2015.3 Reports based on (a) the size, complexity and geographic scope of the Debtors' business, and (b) the substantial burdens imposed by compliance with Bankruptcy Rule 2015.3 in the early days of these chapter 11 cases. The Debtors are simply not in a position to complete the initial 2015.3 Reports within the time required under Bankruptcy Rule 2015.3. In light of the foregoing, I believe that an extension of the time by which the Debtors must file their initial 2015.3 Reports to the later of: (a) 30 days after the 341 Meeting or (b) 90 days from the Petition Date pursuant to Bankruptcy Rule 2015.3(d) is in the best interests of the Debtors' estates, creditors, and all other parties in interest. Accordingly, on behalf of the debtors, I respectfully request that the Schedules and Statements Extension Motion should be approved.

**5.    Debtors' Application for Entry of an Order (I) Authorizing and Approving the Appointment of Kurtzman Carson Consultants LLC as Claims and Noticing Agent and (II) Granting Related Relief ("*Claims Agent Application*").**

75.    Pursuant to the Claims Agent Application, the Debtors seek entry of an order (a) authorizing and approving the employment and retention of KCC as the Claims and Noticing Agent for the Debtors in connection with these chapter 11 cases *nunc pro tunc* to the Petition Date, including assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in these chapter 11 cases, and (b) granting related relief.

34

76.     The Debtors' selection of KCC to act as the Claims and Noticing Agent has satisfied the Claims Agent Protocol, in that the Debtors have obtained and reviewed engagement proposals from at least two other court-approved claims and noticing agent to ensure selection through a competitive process.   Moreover, the Debtors submit, based on all engagement proposals obtained and reviewed, that KCC's rates are competitive and reasonable given KCC's quality of services and expertise.   The terms of KCC's retention are set forth in the Engagement Agreement dated as of May 5, 2017 and attached to the Claims Agent Application as Exhibit C; provided, that KCC is seeking approval solely of the terms and provisions as set forth in the Claims Agent Application and the related order.

77.     Based on KCC's experience in providing similar services in large chapter 11 cases, I believe that KCC is eminently qualified to serve as claims and noticing agent in these chapter 11 cases.   A detailed description of the services that KCC has agreed to render and the compensation and other terms of the engagement are provided in the Claims Agent Application. I have reviewed the terms of the engagement and believe that the Debtors estates, creditors, parties in interest, and the Court will benefit as a result of KCC's experience and cost-effective methods.

78.     I believe that the relief required in the Claims Agent Application is in the best interest of the Debtors estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in Chapter 11 without disruption.   Accordingly, on behalf the Debtors, I respectfully submit that the Claims Agent Application should be approved.

B.      **Financing Motion Requesting Immediate Relief.**

1.      **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief ("*DIP Motion*").**

79.     Pursuant to the DIP Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to obtain a non-amortizing senior secured super-priority postpetition credit facility in the form of a delayed-draw term loan facility in an aggregate principal amount of $75 million, of which up to $25 million shall be available to the Debtors on an interim basis. The Debtors further seek the Court's authorization to (a) use Cash Collateral (b) grant the Prepetition Secured Parties the forms of Adequate Protection described in the DIP Motion, and (c) modify the automatic stay to the extent necessary to effectuate the terms of the proposed interim and final orders.

80.     The DIP Facility will supply the Debtors with critical and necessary postpetition debtor-in-possession financing and consent to the use of Cash Collateral.  Obtaining access to the DIP Facility, including the use of Cash Collateral, on the first day of these chapter 11 cases is critical for the success of the Debtors' reorganization efforts.  With the consent of the Prepetition Secured Parties, the Debtors will use Cash Collateral to fund working capital, capital expenditures, and other general corporate purposes.  Cash Collateral alone, however, will be insufficient to fund the costs associated with the Debtors' restructuring.

81.     Absent an ability to demonstrate that the Debtors have the means available to operate in the ordinary course and procure supplies and services that are vital to ongoing business operations, patients may seek alternative physicians, third-party payors may take actions to terminate their arrangements with the Debtors, and vendors and suppliers may refuse to do business with the Debtors.  Moreover, absent access to capital under the DIP Facility, the

Debtors may not have sufficient liquidity to continue their business operations in the ordinary course, which would be materially detrimental to the Debtors' patients, creditors, employees, and other parties in interest, jeopardizing the success of the Debtors' reorganization.

82.    I believe that the DIP Facility pending approval before the Court represents the Debtors best available financing option and is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.    Accordingly, I respectfully submit that the DIP Motion should be approved.

## C.    Operational Motions Requesting Immediate Relief.

### 1.    Debtors' Motion for Entry of Interim and Final Orders Authorizing the Payment of Certain Prepetition Taxes and Fees ("*Taxes Motion*").

83.    Pursuant to the Taxes Motion, the Debtors seek entry of interim and final orders: (a) authorizing the Debtors to remit and pay Taxes and Fees accrued prior to the Petition Date and that will become payable during the pendency of these chapter 11 cases, including those obligations subsequently determined upon audit or otherwise to be owed for periods prior to the Petition Date, (b) scheduling a final hearing to consider approval of the motion on a final basis, and (c) granting related relief.    The Debtors estimate that, as of the Petition Date, there is approximately $3.585 million outstanding on account of Taxes and Fees, approximately $245,000 of which will come due within the first 21 days of these chapter 11 cases.

84.    In the ordinary course of business, the Debtors collect, withhold, and incur sales taxes, use taxes, income taxes, franchise taxes, property taxes, and business and similar taxes and fees.    The Debtors remit the Taxes and Fees to various federal, state, and local governmental units, including taxing authorities.    Payment of the Taxes and Fees is critical to the Debtors' continued and uninterrupted operations.    The Debtors' failure to pay prepetition Taxes and Fees

could materially disrupt the Debtors' business and may cause the Authorities to take precipitous action, including, but not limited to, conducting audits, filing liens, seeking to lift the automatic stay, or pursuing payment of the Taxes and Fees from the Debtors' officers and directors, all of which would greatly disrupt the Debtors' operations and ability to focus on their reorganization efforts.

85.     I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Taxes Motion.

> **2.     Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to Maintain, Administer, Modify, and Renew Their Refund Programs and Practices and Honor Obligations Related Thereto ("*Refund Programs Motion*").**

86.     Pursuant to the Refund Programs Motion, the Debtors seek entry of interim and final orders:  (a) authorizing the Debtors (i) to maintain, administer, modify, and renew their Refund Program and make payments to patients and third-party payors or to otherwise honor accrued prepetition obligations owed under their Refund Program and (ii) to continue, replace, modify, or terminate any Refund Program in the ordinary course of business, (b) authorizing and directing financial institutions to receive, process, honor, and pay all related checks and electronic payment requests for payment of Refund Program Obligations, (c) scheduling a final hearing to consider approval of the motion on a final basis, and (d) granting related relief.

87.     Various state and federal laws require the Debtors to refund patients and third-party payors, including healthcare insurers, managed care organizations, workers' compensation programs, contract management services, private pay sources, Medicare, and Medicaid when overpayments are identified.  In the ordinary course of business, the Debtors routinely issue

refunds for reimbursement of overpayments made by or on behalf of patients resulting from the interaction between the Debtors' billing procedures, patient medical insurance deductibles, and third-party payments.

88.     The case-by-case nature of integrated cancer care services makes the process of determining each patient's insurance coverage particularly complex.  As a result, whether due to data input errors during claims processing, or overpayments arising from coordination-of-benefits issues among multiple insurers, patient accounts—once fully processed—may contain credit balances.  Once the Debtors receive payments from patients or insurers, the Debtors review accounts that have credit balances and refund any surplus to the patient or the third-party payor who is due a refund based on an overpayment.  The Debtors estimate that, as of the Petition Date, approximately $15 million in refunds and credit balances may be due and owing under the Refund Program, of which approximately $1.1 million will become due and owing during the first 21 days of these chapter 11 cases.

89.     The necessity of the Refund Program cannot be overstated.  Failure to honor the Refund Program Obligations likely would cause the Debtors to lose a significant number of payors and patients, which would damage their reputation for reliability, thereby resulting in a long-term decline in business.  Additionally, if the Refund Program Obligations are not honored, the Debtors may face legal sanctions or be liable for fines in the jurisdictions in which they operate.  Thus, the Refund Program is necessary for the Debtors to remain competitive and maintain their patient base at this critical juncture and, as such, should be approved.

3.     **Debtors' Motion For Entry of Interim and Final Orders Authorizing the Debtors to (I) Continue Insurance Coverage Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto, (II) Renew, Amend, Supplement, Extend or Purchase Insurance Policies, (III) Honor the Terms of the Premium Financing Agreements and Pay Premiums Thereunder, and (IV) Enter Into New Premium Financing Agreements in the Ordinary Course of Business (the "*Insurance Motion*").**

90.     Pursuant to the Insurance Motion, the Debtors seek entry of interim and final orders (a) authorizing the Debtors to (i) continue insurance coverage entered into prepetition and satisfy prepetition obligations related thereto in the ordinary course of business; (ii) renew, amend, supplement, extend, or purchase insurance coverage in the ordinary course of business; (iii) honor the terms of the premium financing agreements and pay premiums thereunder; (iv) enter into new premium financing agreements in the ordinary course of business; (b) scheduling a final hearing to consider approval of the motion on a final basis; and (c) granting related relief.

91.     In the ordinary course of business, the Debtors maintain over 270 insurance policies that are administered by several third-party insurance carriers.  The insurance policies provide coverage for, among other things:  (a) general umbrella liability; (b) property liability; (c) excess liability; (d) automobile liability; (e) international package liability; (f) storage tank liability;  (g) directors and officers liability; (h) employment practices liability; (i) fiduciary liability; (j) commercial crime liability; (k) special risk liability; (l) network security and cyber liability; (m) business owners liability; (n) term life insurance; (o) physician group and non-group malpractice liability; (p) wind insurance; and (q) flood insurance.

92.     Continuation and renewal of the insurance policies and entry into new insurance policies is essential to preserving the value of the Debtors' businesses, properties, and assets. Moreover, in many cases, coverage provided by the insurance policies is required by the

regulations, laws, and contracts that govern the Debtors' commercial activities, including the requirements of the U.S. Trustee.

93.     The Debtors finance premiums under certain of their insurance policies pursuant to premium financing agreements because it is not economically advantageous for the Debtors to pay the premiums on the financed policies, in full, on a lump-sum, quarterly, or monthly basis. If the Debtors were required to obtain replacement insurance and pay a lump-sum premium for the financed policies in advance, this payment would likely result in greater costs for the Debtors.

94.     I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be approved.

> **4.     Debtors' Motion for Entry of an Order Determining Adequate Assurance of Payment for Future Utility Services ("*Utilities Motion*").**

95.     In connection with the operation of their businesses and management of their properties, the Debtors obtain electricity, telephone, internet, cable, recycling, and other similar services from various Utility Providers or brokers.  Uninterrupted Utility Services are essential to the Debtors' ongoing operations and the overall success of these chapter 11 cases.  Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' business operations could be severely disrupted, and such disruption could jeopardize the Debtors' ability to manage their reorganization efforts.  Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be approved.

41

5.      **Debtors' Motion for Entry of Interim and Final Orders Approving
Notification and Hearing Procedures for Certain Transfers of and
Declarations of Worthlessness with Respect to Common Stock
("*Equity Trading Motion*").**

96.      Pursuant to the Equity Trading Motion, the Debtors request entry of interim and

final orders:  (a) approving certain notification and hearing procedures related to certain transfers

of Debtor 21CH's existing common stock and existing Series A Convertible Preferred Stock or

any Beneficial Ownership thereof; (b) directing that any purchase, sale, other transfer of, or

declaration of worthlessness with respect to Common Stock or Preferred Stock in violation of the

Procedures shall be null and void *ab initio*; (c) scheduling a final hearing to consider approval of

the Equity Trading Motion on a final basis; and (d) granting related relief.

97.      The Debtors believe that, as of December 31, 2016, they had state and federal

NOLs in the aggregate amount of approximately $592 million, and the Debtors expect that

additional NOLs will be generated in 2017.  These NOLs and certain other Tax Attributes

provide the potential for material future tax savings or other tax structuring possibilities in these

chapter 11 cases.  The Tax Attributes are of significant value to the Debtors and their estates

because the Debtors can carry forward their Tax Attributes to offset their future taxable income

potentially for up to 20 years, thereby reducing their future aggregate tax obligations.   In

addition, such Tax Attributes may be utilized by the Debtors to offset any taxable income

generated by transactions consummated during these chapter 11 cases.  The value of the Tax

Attributes will inure to the benefit of all of the Debtors' stakeholders.

98.      The Procedures are the mechanism by which the Debtors propose that they will

monitor, and if necessary, object to, certain transfers of Common Stock, Preferred Stock, and

declarations of worthlessness with respect to the Common Stock and Preferred Stock to ensure

preservation of the Tax Attributes.  By establishing and implementing such Procedures, the

Debtors will be in a position to object to "ownership changes" that threaten their ability to preserve the value of their NOLs for the benefit of the estates. If no restrictions on trading or worthlessness deductions are imposed by the Court, such trading or deductions could severely limit or even eliminate the Debtor's ability to utilize their NOLs. Accordingly, I respectfully submit that the Equity Trading Motion should be approved.

> **6.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Using the Cash Management Systems and (B) Maintain Existing Bank Accounts and Business Forms; (II) Authorizing Continued Intercompany Transactions; (III) Granting Administrative Expense Status to Intercompany Claims; and (IV) Granting Related Relief ("*Cash Management Motion*").**

99.    Under the Cash Management Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, continued use of the Cash Management Systems as well as honoring any prepetition obligations related to the use thereof; (b) authorizing, but not directing, continued use of the: (i) Bank Accounts (as well as authorizing the Debtors to open and close new bank accounts as appropriate); (ii) Business Forms; and (iii) Books and Records; (c) authorizing and directing the Banks to continue to maintain, service, and administer the Bank Accounts and to debit the Bank Accounts in the ordinary course of business; and (d) authorizing, but not directing, continued intercompany funding through the Cash Management Systems, approving the Intercompany Transactions, and granting administrative expense status to all postpetition Intercompany Claims among the Debtors; and (e) granting related relief.

100.    The Debtors' Cash Management Systems are comprised of fifty-four (54) bank accounts that are maintained with banks and other financial institutions, of which fifty-one (51) are maintained as part of the Debtors' Cash Management System and three (3) bank accounts maintained as part of the OnCure Cash Management System. A substantial majority of the Debtors' Bank Accounts are held at Wells Fargo Bank. In addition, there are thirteen (13) bank

accounts controlled by non-Debtor joint ventures and fourteen (14) bank accounts controlled by non-Debtor professional corporations, including deposit, payroll and operational accounts that are not part of the Debtors' Cash Management System, but are relevant thereto.

101.    The Debtors utilize the Cash Management Systems in the ordinary course of their businesses for the collection, concentration, management, and disbursement of funds used in their operations and to facilitate cash monitoring, forecasting, and reporting.   The Cash Management Systems are comparable to centralized cash management systems used by similarly situated companies to manage the cash of numerous operating units in a cost-effective, efficient manner.

102.    The Debtors' treasury personnel centrally manage the Cash Management Systems from the Debtors' corporate headquarters located in Fort Myers, Florida.   Approximately $3.2 million flows through the Debtors' Cash Management Systems each day.   Notably, with the assistance of their advisors, the Debtors have implemented internal procedures to control and prohibit payments on account of prepetition debts without the prior approval of the Debtors' senior management and treasury department.

103.    As of the Petition Date, the Debtors have approximately $5 million in the Bank Accounts.   The Debtors incur periodic Bank Fees in connection with the maintenance of the Cash Management System, which average approximately $115,000 per month.   The Bank Fees are paid in arrears and are automatically deducted from the Debtors' Bank Accounts as they are assessed by their respective Banks.

104.    Each Bank Account is maintained at a bank that is insured by the FDIC, and, therefore, complies with section 345(b) of the Bankruptcy Code.   Here, all but four (4) of the Bank Accounts are held at Wells Fargo Bank, which is designated as an authorized depository in

the Southern District of New York.  Two of the remaining Bank Accounts are with Edison

National Bank, one (1) is with WSFS Bank, and one (1) is with Seaside National Bank & Trust.

Edison National Bank, WSFS Bank, and Seaside National Bank & Trust are not designated as

authorized depositories in the Southern District of New York, but they are well-capitalized and

financially stable financial institutions.  Additionally, the amounts maintained at Edison National

Bank, WSFS Bank, and Seaside National Bank & Trust are fully insured by the FDIC and the

Bank Account at WSFS Bank is a disbursement account for proceeds of the Existing MDL

Facility, and an account the Debtors are obligated to maintain under the Existing MDL Facility.

Requiring the Debtors to close these accounts at Edison National Bank, WSFS Bank, and

Seaside National Bank & Trust and reopen them at a designated authorized depository would

place an unnecessary administrative burden on the Debtors given that there is no meaningful risk

to the cash held therein.  Therefore, the Debtors respectfully submit that cause exists to continue

to allow the Debtors to utilize these accounts.

105.    In the ordinary course of business, the Debtors and their non-Debtor affiliates also

engage in routine MSA/ASA/PSA Payments and Intercompany Dividends resulting in various

Intercompany Claims.  The Intercompany Claims are reflected as journal entry receivables and

payables, as applicable, in the respective Debtors' accounting systems.  The Debtors track all

fund transfers in their respective accounting system and can ascertain, trace, and account for all

Intercompany Transactions.  If the Intercompany Transactions were to be discontinued, the Cash

Management Systems and the Debtors' operations could be unnecessarily disrupted to the

detriment of the Debtors' estates, their creditors, and other stakeholders.

106.    As part of their Cash Management Systems, the Debtors utilize numerous

preprinted Business Forms in the ordinary course of their businesses.  To minimize expenses to

their estates and avoid confusion on the part of employees, customers, vendors, and suppliers during the pendency of these chapter 11 cases, the Debtors request that the Court authorize their continued use of all preprinted correspondence and business forms (including, without limitation, letterhead, purchase orders, invoices, and preprinted checks) as such forms were in existence immediately before the Petition Date, without reference to the Debtors' status as debtors in possession, rather than requiring the Debtors to incur the expense and delay of ordering entirely new business forms.

107.    The Cash Management Systems constitute an ordinary course and essential business practice of the Debtors.  The Cash Management Systems provide significant benefits to the Debtors including, among other things, the ability to control corporate funds, ensure the availability of funds when necessary, and reduce costs and administrative expenses by facilitating the movement of funds and developing timely and accurate account balance information.  Thus, to ensure the seamless operation of the Debtors' businesses and realize the benefits of the Cash Management Systems, the Debtors should be allowed to continue using the Cash Management Systems and should not be required to open new bank accounts, and, as such, the Motion should be approved.

**7.    Debtors' Motion for Entry of an Order Authorizing, but not Directing, the Debtors to Pay or to Honor Prepetition Claims and Obligations of Certain Physicians (the "*Physicians Reimbursement Motion*").**

108.    Pursuant to the Physicians Reimbursement Motion the Debtors seek entry of interim and final orders, (a) authorizing, but not directing, the Debtors to pay or honor prepetition claims and obligations due and owing to the Physicians in the ordinary course of business and (b) granting related relief.  To provide comprehensive, end-to-end care care, the Debtors employ directly or contract with approximately 700 physicians who specialize in a

46

number of disciplines, including radiation oncology, medical oncology, breast, gynecological and general surgery, urology, and primary care. Simply put, the Physicians are the lifeblood of the Debtors' business. In addition to the services provided by the Debtors' employees, the Debtors would be unable to operate absent the uninterrupted service and dedication of the Physicians.

109.    Due to state health care regulations, the Debtors are unable to directly provide medical services in certain states. Instead, medical services must be provided at physician-owned clinics. In these states, the Debtors' business model is built around contracting with physician-owned facilities to provide certain administrative and financial services, including the provision of non-physician clinical and administrative staff, operations management, purchasing assistance, managed care contract negotiation assistance, reimbursement, billing, and collections assistance, information technology, human resource and payroll services, and compliance, accounting, and treasury functions. Additionally, the Debtors contract with physician-owned facilities to provide the capital necessary to fund the businesses, including payment of certain operating expenses, such as travel and business development expenses, office supplies, repairs/maintenance, utilities, rent, medical supplies and equipment, and certain legal and licensing fees.

110.    To comply with applicable state regulations as well as the terms of the contracts between the Debtors and the physician-owned practices, the physician-owned practices or individual Physicians employed thereby directly incur the costs of operating their business. Subsequently, the practices or the individual Physicians submit invoices to the Debtors for reimbursement. The Debtors pay approximately $1,000,000 per month on account of Physician Expenses. As of the Petition Date, the Debtors owe the Physicians approximately $1,000,000 on

47

account of prepetition Physician Expenses, approximately $750,000 of which will come due and owing within the first 21 days of these chapter 11 cases. Additionally, although the Debtors request that the Physicians timely submit invoices on account of Physician Expenses, it is possible that not all obligations for prepetition Physician Expenses are accounted for at this time.

111.    If the Debtors' fail to honor such obligations to the Physicians, the Debtors believe that the Physicians may seek alternative employment opportunities, perhaps with the Debtors' competitors. Such a development would be detrimental to the Debtors' businesses, hinder the Debtors' ability to meet its customer and patient obligations, and likely diminish creditors' confidence in the Debtors. The loss of these valuable individuals and the recruiting efforts that would be required to replace them would be a massive and costly distraction at a time when the Debtors should be focusing on stabilizing their operations and other reorganization efforts. Moreover, certain of the Physicians incur the Physician Expenses on credit cards in the name of the individual Physician or practice and could be exposed to significant financial difficulties if the Debtors are not permitted to honor the Physician Expenses.

112.    Therefore, I believe that the relief requested in the Physician Reimbursement Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, I respectfully submit that the Physician Reimbursement Motion should be approved.

**8.    Debtors' Motion for Interim and Final Orders Authorizing Payment of Certain Prepetition (I) Warehousing and Related Claims, and (II) Mechanics and Materialmen Claims (the "*Trade Creditors Motion*").**

113.    Pursuant to the Trade Creditors Motion, the Debtors seek entry of interim and final orders, (a) authorizing, but not directing, the Debtors to pay certain prepetition claims of

(i) Warehousemen, and (ii) Mechanics and Materialmen, (b) scheduling a final hearing to consider approval of this motion on a final basis, and (c) granting related relief.  In the ordinary course of business, the Debtors incur various fixed, liquidated, and undisputed payment obligations to third-party Warehousemen who supply the necessary warehousing services that the Debtors require in order to store business records, medical equipment, and certain office supplies, all of which are necessary for the Debtors to provide top quality service and care to its patients.  In addition, the Debtors use the services of Mechanics and Materialmen to repair, perform maintenance work, and provide software upgrades necessary to ensure the continued safe functioning of treatment center machinery or equipment. By the Trade Creditors Motion, the Debtors request authority to pay any prepetition amounts owing on account of the claims of the Warehousemen and Mechanics and Materialmen that arose in the ordinary course of business.

114.    The Debtors also seek, out of an abundance of caution, to (a) confirm the administrative expense priority status of the Debtors' undisputed obligations for the postpetition delivery of goods and provision of services and (b) authorize the Debtors to satisfy such obligations in the ordinary course of business.

115.    It is a sound exercise of the Debtors' business judgment to pay the claims of the Warehousemen and Mechanics and Materialmen as they become due in the ordinary course of business, because doing so will avoid value-destructive business interruption and will not prejudice the Debtors' other stakeholders.   The goods and services provided by the Warehousemen and Mechanics and Materialmen are necessary for the continued, uninterrupted operation of the Debtors' business, and the Debtors anticipate that failure to pay the claims of the Warehousemen and Mechanics and Materialmen as they become due is likely to result in such parties altering the terms of service adhered to in the ordinary course.  Such change in the level

of service by any Warehouseman or Mechanic and Materialman could materially disrupt the Debtors' operations to the detriment of all of the Debtors' stakeholders.

116.   Therefore, I believe that the relief requested in the Trade Creditors Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption. Accordingly, I respectfully submit that the Trade Creditors Motion should be approved.

**9.    Debtors' Motion For Interim and Final Orders  Authorizing The Debtors to (I) Pay Certain Prepetition  Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses, and (II) Continue Employee Benefits ("*Wages Motion*").**

117.   Pursuant to the Wages Motion, the Debtors seek entry of interim and final orders: (a) authorizing, but not directing, the Debtors to (i) pay prepetition wages, salaries, other compensation, and reimbursable employee expenses, and (ii) continue the employee benefits programs in the ordinary course, (b) scheduling a final hearing to consider approval of the Wages Motion on a final basis, and (c) granting related relief.

118.   As of the Petition Date, the Debtors employ approximately 3,631 Employees, including approximately 3,269 full-time, approximately 90 part-time, approximately 137 reduced hours, and approximately 135 temporary Employees.   The Debtors also contract with approximately 75 independent contractor physicians.  The Employees perform a wide variety of functions critical to the administration of these chapter 11 cases.  Significantly, and core to their business, the Debtors employ approximately 350 physicians, who partner with the Debtors to deliver patient care and provide cancer treatment.  In many instances, the Employees include personnel who are intimately familiar with the Debtors' businesses, processes, and systems, who possess unique healthcare and oncology skill and experience, or who have developed relationships with counterparties that are essential to the Debtors' business.  Indeed, a majority of

the Employees are highly skilled physicians, nurses, radiation therapists, and radiation physicists. These individuals cannot be easily replaced. Without the continued, uninterrupted services of the Employees, the ability of the Debtors maintain and administer their estates will be materially impaired.

119.    To minimize the personal hardship the Employees could suffer if prepetition Employee-related obligations are not paid when due or as expected and to maintain stability in the Debtors' workforce during the administration of these chapter 11 cases, the Debtors, by the Wages Motion, seek authority, but not direction, to: (a) pay and honor certain prepetition claims relating to, among other things, wages, salaries, variable compensation, temporary agency fees, federal and state withholding taxes and other amounts withheld (including garnishments, Employees' share of insurance premiums, taxes, and 401(k) contributions), reimbursable expenses, health insurance benefits, health savings accounts, flexible savings accounts, life and AD&D insurance, short- and long-term disability benefits, the workers' compensation program, employee assistance services, time-off benefits, retirement savings, health, and welfare benefits (including the 401(k) plans, and COBRA benefits program, and certain other benefits that the Debtors have historically provided in the ordinary course; and (b) pay all costs incident to the Employee Compensation and Benefits.

120.    I believe that paying the Employee Compensation and Benefits will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption. Indeed, without the relief requested in the Wages Motion, Employees may seek alternative employment opportunities, perhaps with the Debtors' competitors. Such a development would deplete the Debtors' workforce, thereby hindering the Debtors' ability to operate their business and, likely, diminishing stakeholder confidence in the Debtors' ability to

successfully reorganize. The loss of valuable Employees and resulting need to recruit new personnel (and the costs attendant thereto) would be distracting at this crucial time when the Debtors need to focus on stabilizing their business operations. More specifically, the Employees possess interpersonal relationships with patients, knowledge of previous patient care, and experience providing care to specific individuals, which cannot be replicated by substitute Employees. There can be no doubt that the Debtors must do their utmost to retain their workforce by, among other things, continuing to honor all wage, benefits, and related obligations, including the prepetition Employee Compensation and Benefits. As such, I believe the relief requested in the Wages Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Wages Motion.

## IV.    Information Required By Local Bankruptcy Rule 1007-2.

121.    Local Bankruptcy Rule 1007-2 requires certain information related to the Debtors, which I have provided in the exhibits attached hereto as **Exhibit C** through **Exhibit N**. Specifically, these exhibits contain the following information with respect to the Debtors (on a consolidated basis, unless otherwise noted):[7]

- Pursuant to Local bankruptcy Rule 1007-2(a)(3), **Exhibit C** hereto provides the names and addresses of the members of, and attorneys for, any committee organized prior to the order for relief in these chapter 11 cases, and a brief description of the circumstances surrounding the formation of the committee and the date of the formation.

---

[7] The information contained in the Exhibits attached to this Declaration shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt. The descriptions of the collateral securing the underlying obligations are intended only as brief summaries. In the event of any inconsistencies between the summaries set forth and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(4), **Exhibit D** hereto provides the following information with respect to each of the holders of the Debtors' fifty (50) largest unsecured claims, excluding claims of insiders:  the creditors name; the address (including the number, street, apartment, or suite number, and zip code, if not included in the post office address); the telephone number; the name(s) of the person(s) familiar with the Debtors' account; the nature and approximate amount of the claim; and an indication of whether the claim is contingent, unliquidated, disputed, or partially secured.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(5), **Exhibit E** hereto provides the following information with respect to each of the holders of the five largest secured claims against the Debtors:  the creditor's name; address (including the number, street, apartment, or suite number, and zip code, if not included in the post office address); the amount of the claim; a brief description of the claim; an estimate of the value of the collateral securing the claim; and an indication of whether the claim or lien is disputed at this time.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(6), **Exhibit F** hereto provides a summary of the Debtors' assets and liabilities.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(7), **Exhibit G** hereto provides a summary of the publicly held securities of the Debtors.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(8), **Exhibit H** hereto provides the following information with respect to any property in possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, or secured creditors, or agent for such entity:  the name; address; and telephone number of such entity and the court in which any proceeding relating thereto is pending.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(9), **Exhibit I** hereto provides a list of property comprising the premises owned, leased, or held under other arrangement from which the Debtors operate their business.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(10), **Exhibit J** hereto sets forth the location of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the U.S.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(11), **Exhibit K** hereto provides a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their property where a judgment or seizure of their property may be imminent.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(12), **Exhibit L** hereto sets forth a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

53

- Pursuant to Local Bankruptcy Rule 1007-2(b)(1)-(2)(A), **Exhibit M** hereto provides the estimated amount of payroll to the Debtors' employees (not including officers, directors, and equityholders) and the estimated amounts to be paid to officers, equityholders, directors, and financial and business consultants retained by the Debtors, for the 30-day period following the Petition Date.

- Pursuant to Local Bankruptcy Rule 1007-2(b)(3), **Exhibit N** hereto provides a schedule, for the 30-day period following the Petition Date, of estimated cash receipts and disbursements, net gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, for the 30-day period following the filing of the chapter 11 cases, and any other information relevant to an understanding of the foregoing.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: May 25, 2017                          Respectfully submitted,

_/s/ Paul Rundell_
_____
Paul Rundell
Interim Chief Executive Officer
21st Century Oncology Holdings, Inc.
2270 Colonial Blvd
Fort Myers, Florida  33907

## <u>Exhibit A</u>

**Organizational Structure Chart**



21st Century Oncology
KIRKLAND & ELLIS LLP
21st Century Oncology Investments, LLC
f/k/a Radiation Therapy Investments, LLC
#26-1813960 (DE)
Vestar indirectly controls 80% of the Class A voting equity units.
Owns 100% of the common stock of 21CH.
21st Century Oncology Holdings, Inc. ("21CH")
f/k/a Radiation Therapy Services Holdings, Inc.
#26-1747745 (DE)
21st Century Oncology, Inc. ("21CI")
f/k/a Radiation Therapy Services, Inc.
#65-0768951
(FL)
Alabama
Arizona
California
Delaware
Kentucky
Florida
Maryland
West Virginia
Massachusetts/Rhode Island
Michigan
Nevada
New Jersey
New York
North Carolina
Pennsylvania
South Carolina
Washington
OnCure Network
International
California Operations
Florida Operations
Indiana Operations
Argentina
Mexico
Dominican Republic
Brazil
Costa Rica
El Salvador
Guatemala
Bolivia
Chile
Columbia
LEGEND
21st Century Oncology Joint Venture
Non- 21st Century Oncology JV Counterparty
A blank square is a 21st Century Oncology owned entity that is not obligated under any of the debt documents and is not a party to a joint venture
Affiliated Professional Corp./Assoc. (has MSA/PSA or other contractual relationship with 21st Century Oncology or its JV)
Non-Affiliated Professional Corp./Assoc. (has MSA/PSA or other contractual relationship with 21st Century Oncology or its JV)
Solid lines indicate 100% ownership unless other percentage shown.
Dotted lines indicate contractual relationship.
Colored lines in international entities are immaterial; they are included only for ease of tracking ownership percentages.
ASA: Administrative Services Agreement
LEA: Leased Employee Agreement
MSA: Management Services Agreement
PSA: Professional Services Agreement
TSA: Technical Services Agreement

## **Exhibit B**

**Restructuring Support Agreement**

**EXECUTION VERSION**

---

**RESTRUCTURING SUPPORT AGREEMENT**

Dated as of May 25, 2017

by and among

**21ST CENTURY ONCOLOGY INVESTMENTS, LLC,**

**21ST CENTURY ONCOLOGY HOLDINGS, INC. AND EACH OF ITS SUBSIDIARIES PARTY HERETO,**

**CANADA PENSION PLAN INVESTMENT BOARD,**

**CERTAIN ENTITIES AFFILIATED WITH VESTAR CAPITAL PARTNERS V, L.P.**

and

**THE CREDITOR PARTIES AND EQUITY PARTIES SET FORTH HEREIN**

# INDEX OF DEFINED TERMS

Solely for the purposes of this index, "<u>Restructuring Term Sheet</u>" means the restructuring term sheet attached hereto as <u>Exhibit A</u>.

<u>Reference</u>

Accredited Investor ............................................................................ Restructuring Term Sheet
Adjusted Commitment Percentage ....................................................... Restructuring Term Sheet
Administrative Claims ........................................................................ Restructuring Term Sheet
Affiliate ................................................................................................................. Section 2(a)
Agreed Debt Documents ..................................................................... Restructuring Term Sheet
Agreement ........................................................................................................................ Preamble
Allowed .............................................................................................. Restructuring Term Sheet
Alternative Transaction .......................................................................................... Section 2(b)
ARTMS ............................................................................................. Restructuring Term Sheet
Awards ............................................................................................... Restructuring Term Sheet
Backstop Assumption Motion ................................................................................... Section 2(c)
Backstop Commitment ........................................................................ Restructuring Term Sheet
Backstop Commitment Amount ........................................................... Restructuring Term Sheet
Backstop Commitment Percentage ....................................................... Restructuring Term Sheet
Backstop Expenses .............................................................................. Restructuring Term Sheet
Backstop Order ...................................................................................................... Section 2(d)
Backstop Parties ............................................................................................................ Preamble
Backstop Party Termination Event ........................................................................... Section 6(a)
Backstop Party Termination Notice .......................................................................... Section 6(a)
Backstop Party ............................................................................................................... Preamble
Backstop Prepayment .......................................................................... Restructuring Term Sheet
Backstop Purchase Agreement ............................................................ Restructuring Term Sheet
Bankruptcy Code ........................................................................................................... Preamble
Bankruptcy Court ........................................................................................................... Preamble
Bankruptcy Rules ................................................................................................... Section 2(l)
Business Day ............................................................................................................ Section 2(e)
Chapter 11 Cases ............................................................................................................ Preamble
Claims ..................................................................................................................... Section 2(f)
Claims and Interests .............................................................................................. Section 2(g)
Commencement Date ........................................................................... Restructuring Term Sheet
Company ............................................................................................. Restructuring Term Sheet
Confirmation Order .................................................................................................. Section 2(h)
Consenting Existing Lender Termination Event ......................................................... Section 6(b)
Consenting Existing Lender Termination Notice ....................................................... Section 6(b)
Consenting Existing Lender ............................................................................................ Preamble
Consenting MDL Lender ............................................................................................... Preamble
Consenting Noteholder .................................................................................................. Preamble
Consenting Parties' Advisors ................................................................................... Section 2(i)
control .................................................................................................................... Section 2(a)
controlled by .......................................................................................................... Section 2(a)

controlling ................................................................................................Section 2(a)
Convenience Claim Distribution................................Restructuring Term Sheet
Convenience Claim Election.......................................Restructuring Term Sheet
CPPIB .............................................................................................. Preamble
Credit Facility Claims .................................................Restructuring Term Sheet
Creditor Party................................................................................. Preamble
CTSA ............................................................................Restructuring Term Sheet
CTSI-A ..........................................................................Restructuring Term Sheet
CTSA Obligations........................................................Restructuring Term Sheet
CTSA Operating Agreement.......................................Restructuring Term Sheet
CTSA Settlement Agreement .....................................Restructuring Term Sheet
Cumulative Test Period Updated Budget ....................Section 5(a)(xiv)(A)
Debtor Termination Event ......................................................Section 6(d)
Debtor Termination Notice ...................................................Section 6(d)
Debtor ............................................................................................... Preamble
Defaulting Backstop Party .........................................Restructuring Term Sheet
Definitive Debt Documents ........................................Restructuring Term Sheet
DIP Agent ....................................................................Restructuring Term Sheet
DIP Borrower.......................................................................Section 5(a)(xiv)(B)
DIP Claims ...................................................................Restructuring Term Sheet
DIP Covenants ............................................................... Section 5(a)(xv)
DIP Credit Agreement ................................................Restructuring Term Sheet
DIP Credit Documents ................................................Restructuring Term Sheet
DIP Facility Motion ..................................................................Section 2(j)
DIP Facility Obligations .............................................Restructuring Term Sheet
DIP Facility...................................................................Restructuring Term Sheet
DIP Lenders .................................................................Restructuring Term Sheet
DIP Orders .................................................................................Section 2(k)
Disbursements Variance .............................................. Section 5(b)(xvii)(B)
Disclosure Statement ...............................................................Section 2(l)
Disclosure Statement Order .....................................................Section 2(m)
Domestic MDL Collateral............................................Restructuring Term Sheet
Effective Date ..............................................................Restructuring Term Sheet
e-mail ........................................................................................ Section 20
End Date.....................................................................................Section 6(b)(xi)
Equity Incentive Plan .................................................Restructuring Term Sheet
Equity Interests ........................................................................Section 2(n)
Equity Party ................................................................................... Preamble
Equity Party Termination Event ...............................................Section 6(c)
Equity Party Termination Notice ..............................................Section 6(c)
Equity Pool...................................................................Restructuring Term Sheet
Equity Rights ...............................................................Restructuring Term Sheet
Equity Rights Offering................................................Restructuring Term Sheet
Equity Rights Offering Amount..................................Restructuring Term Sheet
Equity Rights Offering Cash Amount.........................Restructuring Term Sheet
Event ..........................................................................................Section 2(x)

Exchange Act ........................................................................................................Section 2(o)
Exchanged Credit Facility Claims ....................................................Restructuring Term Sheet
Exercise Price................................................................................Restructuring Term Sheet
Existing Credit Agent .....................................................................Restructuring Term Sheet
Existing Credit Agreement ..............................................................Restructuring Term Sheet
Existing Credit Facility Obligations .................................................Restructuring Term Sheet
Existing Equity Interests .................................................................Restructuring Term Sheet
Existing Lenders ............................................................................Restructuring Term Sheet
Existing Loan Documents.........................................................................................Section 2(p)
Existing Loans .........................................................................................................Section 2(q)
Existing MDL Agent .....................................................................Restructuring Term Sheet
Existing MDL Agreement...............................................................Restructuring Term Sheet
Existing MDL Lenders ...................................................................Restructuring Term Sheet
Existing MDL Obligations ..............................................................Restructuring Term Sheet
Expiration Date .............................................................................Restructuring Term Sheet
Expiration Time ......................................................................................... Section 6(f)
Fiduciary Out ..............................................................................................Section 6(d)(iv)
Final DIP Order......................................................................................... Section 2(r)
Financial Covenants................................................................................Section 5(b)(xvii)
First Day Motions ................................................................................Section 2(oo)
FOP Obligations..............................................................................Restructuring Term Sheet
Foreign MDL Collateral .................................................................Restructuring Term Sheet
Four-Week Rolling Test Period Updated Budget..........................................Section 5(a)(xiv)(A)
General Unsecured Claims ...............................................................Restructuring Term Sheet
Global Prepayment...........................................................................Restructuring Term Sheet
Governance Term Sheet...................................................................Restructuring Term Sheet
Governmental Bar Date .............................................................................. Section 2(s)
Governmental Entity ......................................................................................Section 2(t)
herein .........................................................................................................Section 2
hereof ........................................................................................................ Section 2
hereunder ................................................................................................... Section 2
include ....................................................................................................... Section 2
including .................................................................................................... Section 2
Initial Consenting Existing Lender ..........................................................................Preamble
Initial Consenting MDL Lender...............................................................................Preamble
Initial Consenting Noteholder..................................................................................Preamble
Intercreditor Arrangements..............................................................Restructuring Term Sheet
Interim DIP Order..................................................................................Section 2(u)
Investments LLC Agreement...................................................................Section 2(v)
Investments ..................................................................................................Preamble
Joinder Agreement .......................................................................................Section 3(c)
Law .............................................................................................................Section 2(w)
Liquidated Damages Payment ...........................................................Restructuring Term Sheet
Liquidation Event............................................................................Restructuring Term Sheet
Management Conference Call......................................................... Section 5(a)(xv)
Material Adverse Effect........................................................................................Section 2(x)

MDI ............................................................................................ Restructuring Term Sheet
MDL Collateral .................................................................................................. Section 2(y)
MDL Credit Documents ..................................................................................... Section 2(z)
MDL Facility Claims ................................................................... Restructuring Term Sheet
MDL Loans ...................................................................................................... Section 2(aa)
MDL Sale Proceeds ..................................................................... Restructuring Term Sheet
MDL ........................................................................................... Restructuring Term Sheet
Milestones ................................................................................................ Section 5(a)(iv)
Millstein Engagement Letter ..................................................................... Section 5(b)(xvi)
Millstein ................................................................................................... Section 5(b)(xvi)
Monthly Test Date ............................................................................... Section 5(a)(xiv)(C)
Monthly Variance Report .................................................................... Section 5(a)(xiv)(C)
MSSF ......................................................................................... Restructuring Term Sheet
Net Cash Flow Variance ..................................................................... Section 5(b)(xvii)(C)
New Board ................................................................................... Restructuring Term Sheet
New Common Stock ..................................................................... Restructuring Term Sheet
New Common Stock Election ....................................................... Restructuring Term Sheet
New Domestic Loan Parties .......................................................... Restructuring Term Sheet
New Domestic Revolver Liens ...................................................... Restructuring Term Sheet
New Domestic Revolving Loans ................................................... Restructuring Term Sheet
New First Lien Term Lenders ....................................................... Restructuring Term Sheet
New First Lien Term Loan Credit Facility ................................... Restructuring Term Sheet
New First Lien Term Loans .......................................................... Restructuring Term Sheet
New MDL Debt Documents .......................................................... Restructuring Term Sheet
New MDL Revolver Liens ............................................................ Restructuring Term Sheet
New MDL Revolving Loan Obligations ....................................... Restructuring Term Sheet
New MDL Revolving Loans .......................................................... Restructuring Term Sheet
New MDL Term Lenders .............................................................. Restructuring Term Sheet
New MDL Term Liens .................................................................. Restructuring Term Sheet
New MDL Term Loan Facility ...................................................... Restructuring Term Sheet
New MDL Term Loan Obligations ............................................... Restructuring Term Sheet
New MDL Term Loans ................................................................. Restructuring Term Sheet
New Notes Liens ........................................................................... Restructuring Term Sheet
New Organizational Documents ................................................... Restructuring Term Sheet
New Preferred Equity ................................................................... Restructuring Term Sheet
New Registration Rights Agreement ............................................ Restructuring Term Sheet
New Revolving Loan Liens ........................................................... Restructuring Term Sheet
New Revolving Loans ................................................................... Restructuring Term Sheet
New Second Lien Notes ................................................................ Restructuring Term Sheet
New Second Lien Notes Debt Documents .................................... Restructuring Term Sheet
New Second Lien Notes Obligations ............................................ Restructuring Term Sheet
New Stockholders Agreement ...................................................... Restructuring Term Sheet
New Term Loan Debt Documents ................................................ Restructuring Term Sheet
New Term Loan Liens .................................................................. Restructuring Term Sheet
New Term Loan Obligations ........................................................ Restructuring Term Sheet
New Warrants ............................................................................... Restructuring Term Sheet

Non-Cash Accrual Covenant ...................................................................Section 5(b)(xvii)(E)
Non-Defaulting Backstop Party............................................................Restructuring Term Sheet
Note Documents..............................................................................................Section 2(bb)
Notes Rights...........................................................................................Restructuring Term Sheet
Notes Rights Offering............................................................................Restructuring Term Sheet
Notes Rights Offering Amount..............................................................Restructuring Term Sheet
Notes Rights Offering Cash Amount.....................................................Restructuring Term Sheet
Notes Rights Offering.............................................................................Restructuring Term Sheet
Obligations.............................................................................................Restructuring Term Sheet
Original Credit Agreement ....................................................................Restructuring Term Sheet
Other Claims ...................................................................................................Section 2(cc)
Other Priority Claims.............................................................................Restructuring Term Sheet
Other Secured Claims ...........................................................................Restructuring Term Sheet
Outside Date................................................................................................ Section 5(a)(iv)(I)
Permitted Variances .................................................................................. Section 5(b)(xvii)(C)
Person.................................................................................................................Section 2(dd)
Petition Date..................................................................................................Section 5(a)(iv)(A)
Plan Supplement ............................................................................................. Section 2(ee)
Plan .................................................................................................................... Preamble
Priority Tax Claims................................................................................Restructuring Term Sheet
Proceeding......................................................................................................Section 2(ff)
Prohibited Change...........................................................................................Section 2(gg)
Put Option Payment ..............................................................................Restructuring Term Sheet
Qualified Marketmaker...................................................................................Section 2(hh)
Qualified Marketmaker Joinder Date................................................................Section 3(d)
Receipts Variance .................................................................................. Section 5(b)(xvii)(A)
Related Fund ................................................................................................... Section 2(ii)
Related Parties .................................................................................................. Section 2(jj)
Related Party Contract ......................................................................................... Section 5(a)(x)
Released Party.......................................................................................Restructuring Term Sheet
Reorganized 21C Holdings.....................................................................Restructuring Term Sheet
Reorganized 21C Oncology....................................................................Restructuring Term Sheet
Reorganized Debtor ..............................................................................Restructuring Term Sheet
Reorganized MDL ................................................................................Restructuring Term Sheet
Requisite Backstop Parties.............................................................................Section 2(kk)
Requisite Consenting Existing Lenders ..........................................................Section 2(ll)
Requisite Consenting Noteholders........................................................... Section 2(mm)
Requisite Parties.............................................................................................Section 2(nn)
Restructuring Documents...............................................................................Section 2(oo)
Restructuring Support Effective Date .......................................................... Section 11
Restructuring Support Parties ...................................................................... Preamble
Restructuring Support Party Group ...............................................................Section 2(pp)
Restructuring Support Party.......................................................................... Preamble
Restructuring Support Period........................................................................Section 2(qq)
Restructuring Term Sheet .............................................................................. Preamble
Restructuring...........................................................................................Restructuring Term Sheet

Rights ..............................................................................Restructuring Term Sheet
Rights Offering Participant .................................................Restructuring Term Sheet
Rights Offering Procedures.................................................Restructuring Term Sheet
Rights Offerings.................................................................Restructuring Term Sheet
RSA .....................................................................................Restructuring Term Sheet
RSA Assumption Motion .............................................................. Section 2(rr)
RSA Order ................................................................................Section 2(ss)
Seaside Note 1....................................................................Restructuring Term Sheet
Seaside Note 2....................................................................Restructuring Term Sheet
Seaside Notes ......................................................................Restructuring Term Sheet
Seaside Obligations.............................................................Restructuring Term Sheet
Section 510(b) Claims.........................................................Restructuring Term Sheet
Securities Act ............................................................................ Section 2(tt)
Senior Notes .......................................................................Restructuring Term Sheet
Senior Notes Claims ..........................................................Restructuring Term Sheet
Senior Notes Indenture ......................................................Restructuring Term Sheet
Senior Notes Obligations ...................................................Restructuring Term Sheet
SFRO Note 1 ......................................................................Restructuring Term Sheet
SFRO Note 2 ......................................................................Restructuring Term Sheet
SFRO Note 3 ......................................................................Restructuring Term Sheet
SFRO Note 4 ......................................................................Restructuring Term Sheet
SFRO Notes ........................................................................Restructuring Term Sheet
SFRO Obligations ..............................................................Restructuring Term Sheet
SNBT ..................................................................................Restructuring Term Sheet
Solicitation ...............................................................................Section 2(uu)
Special Payments Accrual Covenant ......................... Section 5(b)(xvii)(D)
Special Termination Notice ....................................................... Section 6(f)
Specified Backstop Parties.......................................................Section 2(vv)
Specified Creditor Parties .......................................................Section 2(ww)
Subsidiary ...............................................................................Section 2(xx)
TCRO...................................................................................Restructuring Term Sheet
Term Sheet ..........................................................................Restructuring Term Sheet
Termination Event .....................................................................Section 6(d)
Termination Notice ...................................................................Section 6(d)
Termination Period ...............................................................Section 6(d)(iv)
Transaction Expenses.................................................................Section 2(yy)
Transfer ......................................................................................Section 3(c)
Transferee ...................................................................................Section 3(c)
Triggering Event ................................................................Restructuring Term Sheet
Trustee.................................................................................Restructuring Term Sheet
under common control with ......................................................Section 2(a)
Unsubscribed Equity ..........................................................Restructuring Term Sheet
Unsubscribed Notes ...........................................................Restructuring Term Sheet
Unsubscribed Securities.....................................................Restructuring Term Sheet
Updated Budget ...................................................................Section 5(a)(xiv)(A)
Variance Report ...................................................................Section 5(a)(xiv)(C)

46944535.13:

Vestar Executives.................................................................................................... Preamble
Vestar Funds ........................................................................................................... Preamble
Vestar Holdings ...................................................................................................... Preamble
Vestar V .................................................................................................................. Preamble
Vestar V-A .............................................................................................................. Preamble
Vestar/RTS .............................................................................................................. Preamble
Warrant Conditions ....................................................................... Restructuring Term Sheet
Warrant Documentation ................................................................ Restructuring Term Sheet
Weekly Test Date........................................................................... Section 5(a)(xiv)(B)
Weekly Variance Report ...............................................................Section 5(a)(xiv)(B)
WSFS ............................................................................................ Restructuring Term Sheet
21C Collateral ............................................................................... Section 2(zz)
21C Holdings ........................................................................................................ Preamble
21C Holdings Common Stock ....................................................... Section 2(aaa)
21C Holdings Preferred Stock .......................................................Section 2(bbb)
21C Oncology ....................................................................................................... Preamble
21C Securityholders Agreement .................................................... Section 2(ccc)

46944535.13:

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (together with all exhibits, schedules and attachments hereto, as amended, supplemented, amended and restated or otherwise modified from time to time in accordance with the terms hereof, this "<u>Agreement</u>"), dated as of May 25, 2017, is entered into by and among:

(a)    21st Century Oncology Holdings, Inc., a Delaware corporation ("<u>21C Holdings</u>"), 21st Century Oncology, Inc., a Florida corporation ("<u>21C Oncology</u>"), and each of the direct and indirect Subsidiaries (as defined below) of 21C Oncology identified on <u>Schedule 1</u> attached hereto (such Subsidiaries, together with 21C Holdings and 21C Oncology, each, a "<u>Debtor</u>" and, collectively, the "<u>Debtors</u>");

(b)    21st Century Oncology Investments, LLC, a Delaware limited liability company ("<u>Investments</u>");

(c)    (i) each of the beneficial owners (or nominees, investment managers, advisors or subadvisors for the beneficial owners) of the Senior Notes identified on the signature pages hereto (such Persons (as defined below) described in this <u>clause (c)(i)</u>, each, an "<u>Initial Consenting Noteholder</u>" and, collectively, the "<u>Initial Consenting Noteholders</u>") and (ii) each of the other beneficial owners (or nominees, investment managers, advisors or subadvisors for the beneficial owners) of the Senior Notes that becomes a party to this Agreement after the Restructuring Support Effective Date (as defined below) in accordance with the terms hereof by executing and delivering a Joinder Agreement (as defined below) (such Persons described in this <u>clause (c)(ii)</u>, together with the Initial Consenting Noteholders, each, a "<u>Consenting Noteholder</u>" and, collectively, the "<u>Consenting Noteholders</u>");

(d)    (i) each of the Existing Lenders (as defined below) (or nominees, investment managers, advisors or subadvisors for the Existing Lenders) identified on the signature pages hereto (such Persons described in this <u>clause (d)(i)</u>, each, an "<u>Initial Consenting Existing Lender</u>" and, collectively, the "<u>Initial Consenting Existing Lenders</u>") and (ii) each of the other Existing Lenders (or nominees, investment managers, advisors or subadvisors for the Existing Lenders) that becomes a party to this Agreement after the Restructuring Support Effective Date in accordance with the terms hereof by executing and delivering a Joinder Agreement (such Persons described in this <u>clause (d)(ii)</u>, together with the Initial Consenting Existing Lenders, each, a "<u>Consenting Existing Lender</u>" and, collectively, the "<u>Consenting Existing Lenders</u>");

(e)    (i) each of the Existing MDL Lenders (as defined below) (or nominees, investment managers, advisors or subadvisors for the Existing MDL Lenders) identified on the signature pages hereto (such Persons described in this <u>clause (e)(i)</u>, each, an "<u>Initial Consenting MDL Lender</u>" and, collectively, the "<u>Initial Consenting MDL Lenders</u>") and (ii) each of the other Existing MDL Lenders (or nominees, investment managers, advisors or subadvisors for the Existing MDL Lenders) that becomes a party to this Agreement after the Restructuring Support Effective Date in accordance with the terms hereof by executing and delivering a Joinder Agreement (such Persons described in this <u>clause (e)(ii)</u>, together with the Initial Consenting MDL Lenders, each, a "<u>Consenting MDL Lender</u>" and, collectively, the "<u>Consenting MDL Lenders</u>");

(f)     Canada Pension Plan Investment Board, a Canadian federal crown corporation ("CPPIB"); and

(g)     (i) Vestar Capital Partners V, L.P., a Cayman Islands exempted limited partnership ("Vestar V"), (ii) Vestar Capital Partners V-A, L.P., a Cayman Islands exempted limited partnership ("Vestar V-A"), (iii) Vestar Executives V, L.P., a Cayman Islands exempted limited partnership ("Vestar Executives"), (iv) Vestar Holdings V, L.P., a Cayman Islands exempted limited partnership ("Vestar Holdings"), and (v) Vestar/Radiation Therapy Investments, LLC, a Delaware limited liability company ("Vestar/RTS" and together with Vestar V, Vestar V-A, Vestar Executives and Vestar Holdings, each, a "Vestar Fund" and, collectively, the "Vestar Funds").

Each of the Debtors, Investments, the Consenting Noteholders, the Consenting Existing Lenders, the Consenting MDL Lenders, CPPIB and the Vestar Funds are referred to herein as a "Restructuring Support Party" and, collectively, the "Restructuring Support Parties". Each of the Consenting Noteholders, the Consenting Existing Lenders and the Consenting MDL Lenders are referred to herein as a "Creditor Party" and, collectively, the "Creditor Parties". CPPIB, the Vestar Funds and Investments are referred to herein, each as an "Equity Party" and, collectively, the "Equity Parties". Capitalized terms used herein and not defined herein shall have the meanings ascribed to such terms in the Restructuring Term Sheet (as defined below).

## PRELIMINARY STATEMENTS

**WHEREAS**, as of the date hereof, the Initial Consenting Noteholders collectively own or control, in the aggregate, in excess of 90% of the aggregate principal amount of the outstanding Senior Notes;

**WHEREAS**, as of the date hereof, the Initial Consenting Existing Lenders collectively own or control, in the aggregate, in excess of 90% of the aggregate principal amount of the outstanding Existing Loans (as defined below);

**WHEREAS**, as of the date hereof, the Initial Consenting MDL Lenders collectively own or control, in the aggregate, 100% of the aggregate principal amount of the outstanding MDL Loans (as defined below);

**WHEREAS**, as of the date hereof, CPPIB owns, legally and beneficially, all of the issued and outstanding shares of 21C Holdings Preferred Stock (as defined below);

**WHEREAS**, as of the date hereof, Investments owns, legally and beneficially, all of the issued and outstanding shares of 21C Holdings Common Stock (as defined below);

**WHEREAS**, as of the date hereof, the Vestar Funds collectively own, legally and beneficially, in the aggregate, in excess of 78% of the issued and outstanding Preferred Units (as defined in the Investments LLC Agreement (as defined below)) and in excess of 78% of the issued and outstanding Class A Units (as defined in the Investments LLC Agreement);

**WHEREAS**, the Restructuring Support Parties have agreed to implement a restructuring transaction for the Debtors in accordance with, and subject to the terms and conditions set forth

in, this Agreement and in the Restructuring Term Sheet attached hereto as <u>Exhibit A</u> (including any schedules, annexes and exhibits attached thereto, each as may be modified in accordance with the terms hereof, the "<u>Restructuring Term Sheet</u>") (such restructuring transaction, for the avoidance of doubt, being defined as the "Restructuring" in the Restructuring Term Sheet and more fully described therein);

**WHEREAS**, the Restructuring Term Sheet, which is expressly incorporated herein by reference and made part of this Agreement as if fully set forth herein, (a) is the product of arm's-length, good faith negotiations among the Restructuring Support Parties and their respective professionals and (b) sets forth the material terms and conditions of the Restructuring, as supplemented by the terms and conditions of this Agreement;

**WHEREAS**, the Restructuring contemplates the Debtors commencing voluntary, pre-arranged reorganization cases (the "<u>Chapter 11 Cases</u>") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532 (as amended, the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>") to effectuate the Restructuring, which will be implemented pursuant to a chapter 11 plan of reorganization that shall be consistent in all material respects with the terms of this Agreement and the Restructuring Term Sheet and otherwise in form and substance reasonably acceptable to the Requisite Parties (as defined below) (such plan, together with all exhibits, schedules and attachments thereto, as amended, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement, the "<u>Plan</u>");

**WHEREAS**, the Restructuring contemplates that, as part of the Chapter 11 Cases, the Debtors shall commence and consummate the Rights Offerings;

**WHEREAS**, on the Restructuring Support Effective Date, the Consenting Noteholders listed on <u>Schedule 2</u> attached hereto (such Persons, together with any of their respective successors and permitted assigns of Backstop Commitments, each, a "<u>Backstop Party</u>" and, collectively, the "<u>Backstop Parties</u>") have agreed to backstop the Rights Offerings on terms and subject to conditions set forth in the Restructuring Term Sheet (for the avoidance of doubt, such agreement to backstop shall be contained in the Backstop Purchase Agreement); and

**WHEREAS**, the Restructuring Support Parties desire to express to each other their mutual support and commitment in respect of the matters discussed herein.

**NOW, THEREFORE**, in consideration of the promises, mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the Restructuring Support Parties, intending to be legally bound, agrees as follows:

1.     <u>**Restructuring Term Sheet.**</u>

The Restructuring Term Sheet is expressly incorporated herein by reference and made part of this Agreement as if fully set forth herein.  The Restructuring Term Sheet sets forth the material terms and conditions of the Restructuring; <u>provided</u>, <u>however</u>, the Restructuring Term Sheet is supplemented by the terms and conditions of this Agreement.

2.      **Certain Definitions; Rules of Construction.**

As used in this Agreement, the following terms have the following meanings:

(a)      "Affiliate" means, with respect to any Person, any other Person controlled by, controlling or under common control with such Person; provided, that, for purposes of this Agreement, none of the Debtors shall be deemed to be Affiliates of any Creditor Party.  As used in this definition, "control" (including, with its correlative meanings, "controlling," "controlled by" and "under common control with") shall mean possession, directly or indirectly, of power to direct or cause the direction of management or policies of a Person (whether through ownership of securities, by contract or otherwise).  A Related Fund of any Person shall be deemed to be the Affiliate of such Person.

(b)      "Alternative Transaction" means any reorganization, merger, consolidation, tender offer, exchange offer, business combination, joint venture, partnership, sale of a material portion of assets, financing (debt (including any debtor-in-possession financing other than any incremental funding under the DIP Facility, solely to the extent that each Specified Backstop Party and each Consenting Existing Lender is offered the right to participate in such incremental funding based on such Specified Backstop Party's and such Consenting Existing Lender's *pro rata* share of the Total DIP Commitments (as defined in the DIP Term Sheet (as defined below)) or equity), recapitalization or restructuring of any of the Debtors (including, for the avoidance of doubt, a transaction premised on a sale of a material portion of assets under section 363 of the Bankruptcy Code), other than the Restructuring.

(c)      "Backstop Assumption Motion" means the motion and proposed form of order to be filed by the Debtors with the Bankruptcy Court seeking the assumption of the Backstop Purchase Agreement pursuant to section 365 of the Bankruptcy Code, authorizing the payment of certain expenses and other amounts thereunder (including the Put Option Payment, the Liquidated Damages Payment and the Backstop Expenses) and the indemnification provisions set forth therein, and granting any other related relief, which motion and proposed form of order shall be consistent in all material respects with this Agreement and otherwise in form and substance reasonably acceptable to the Requisite Parties.

(d)      "Backstop Order" means an order of the Bankruptcy Court approving the Backstop Assumption Motion, which order shall be consistent in all material respects with this Agreement and otherwise in form and substance reasonably acceptable to the Requisite Parties and shall include, among other things, provisions expressly approving (i) the payment of the Put Option Payment, the Liquidated Damages Payment and the Backstop Expenses, and (ii) the indemnification provisions set forth in the Backstop Purchase Agreement.

(e)      "Business Day" means any day other than a day which is a Saturday, Sunday or legal holiday on which banks in the City of New York are authorized or obligated by Law to close.

(f)      "Claims" is defined in section 101(5) of title 11 of the United States Code.

(g)      "Claims and Interests" means, as applicable, the MDL Facility Claims, the Senior Notes Claims, the Credit Facility Claims, the Other Claims and/or the Existing Equity Interests.

(h)     "Confirmation Order" means an order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which order shall be consistent in all material respects with this Agreement and otherwise in form and substance reasonably acceptable to the Requisite Parties.

(i)     "Consenting Parties' Advisors" means, collectively, (i)(x) Stroock & Stroock & Lavan LLP, as counsel to the Backstop Parties, certain Consenting Noteholders, certain Consenting MDL Lenders and certain Consenting Existing Lenders, (y) Houlihan Lokey, Inc., as financial advisor to the Backstop Parties, certain Consenting Noteholders, certain Consenting MDL Lenders and certain Consenting Existing Lenders, and (z) one (1) healthcare counsel to the Backstop Parties, certain Consenting Noteholders, certain Consenting MDL Lenders and certain Consenting Existing Lenders; (ii)(x) Milbank Tweed Hadley & McCloy LLP, as counsel to certain Consenting Existing Lenders, and (y) PJT Partners LP, as financial advisor to certain Consenting Existing Lenders; (iii) Cahill Gordon & Reindel LLP, as counsel to the Existing Credit Agent; and (iv) Debevoise & Plimpton LLC, as counsel to CPPIB.

(j)     "DIP Facility Motion" means a motion to be filed by the Debtors with the Bankruptcy Court seeking Bankruptcy Court approval of the DIP Facility, which motion shall be consistent in all material respects with this Agreement and otherwise in form and substance reasonably acceptable to the Debtors, the Requisite Consenting Existing Lenders, and the Requisite Backstop Parties.

(k)     "DIP Orders" means, collectively, the Interim DIP Order and the Final DIP Order.

(l)     "Disclosure Statement" means the disclosure statement for the Plan that is prepared and distributed in accordance with, among other things, sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Rule 3018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and other applicable Law, and all exhibits, schedules, supplements, modifications and amendments thereto, all of which shall be consistent in all material respects with this Agreement and otherwise in form and substance reasonably acceptable to the Requisite Parties.

(m)     "Disclosure Statement Order" means an order of the Bankruptcy Court approving the Disclosure Statement and the Solicitation, which order shall be consistent in all material respects with this Agreement and otherwise in form and substance reasonably acceptable to the Requisite Parties.

(n)     "Equity Interests" means, with respect to any Person, (i) any capital stock (including common stock and preferred stock), limited liability company interests, partnership interests or other equity, ownership, beneficial or profits interests of such Person, and (ii) any options, warrants, securities, stock appreciation rights, phantom units, incentives, commitments, calls, redemption rights, repurchase rights or other agreements, arrangements or rights of any kind that are convertible into, exercisable or exchangeable for, or otherwise permit any Person to acquire, any capital stock (including common stock and preferred stock), limited liability company interests, partnership interests or other equity, ownership, beneficial or profits interests of such Person.

(o)     "Exchange Act" means the Securities Exchange Act of 1934, as amended and including any rule or regulation promulgated thereunder.

(p)     "Existing Loan Documents" has the meaning given to the term "Loan Documents" in the Existing Credit Agreement.

(q)     "Existing Loans" has the meaning given to the term "Loans" in the Existing Credit Agreement.

(r)     "Final DIP Order" means a final order of the Bankruptcy Court approving the DIP Facility Motion, which order shall be consistent in all material respects with this Agreement and otherwise in form and substance reasonably acceptable to the Debtors, the Requisite Consenting Existing Lenders, and the Requisite Backstop Parties.

(s)     "Governmental Bar Date" means the date or dates to be established by the Bankruptcy Court by which proofs of claim by each Governmental Entity must be filed.

(t)     "Governmental Entity" means any applicable federal, state, local or foreign government or any agency, bureau, board, commission, court or arbitral body, department, political subdivision, regulatory or administrative authority, tribunal or other instrumentality thereof, or any self-regulatory organization.

(u)     "Interim DIP Order" means an interim order of the Bankruptcy Court approving the DIP Facility Motion, which order shall be consistent in all material respects with this Agreement and otherwise in form and substance reasonably acceptable to the Debtors, the Requisite Consenting Existing Lenders, and the Requisite Backstop Parties.

(v)     "Investments LLC Agreement" means the Eighth Amended and Restated Limited Liability Company Agreement of Investments, dated as of September 9, 2016, by and among Investments and the members of Investments, as amended, supplemented, amended and restated or otherwise modified from time to time.

(w)     "Law" means, in any applicable jurisdiction, any applicable statute or law (including common law), ordinance, rule, treaty, code or regulation and any decree, injunction, judgment, order, ruling, assessment, writ or other legal requirement, in any such case, of any applicable Governmental Entity.

(x)     "Material Adverse Effect" means, other than the filing of the Chapter 11 Cases, any event, change, effect, occurrence, development, circumstance, condition, result, state of fact or change of fact (each, an "Event") that, individually or together with all other Events, has had, or would reasonably be expected to have, a material adverse effect on either (i) the business, operations, finances, properties, condition (financial or otherwise), assets or liabilities of the Debtors, taken as a whole, or (ii) the ability of the Debtors, taken as a whole, to perform their respective obligations under, or to consummate the transactions contemplated by, this Agreement.

(y)     "MDL Collateral" has the meaning given to the term "Collateral" in the Existing MDL Agreement.

46944535.13:

(z)      "MDL Credit Documents" has the meaning given to the term "Credit Documents" in the Existing MDL Agreement.

(aa)     "MDL Loans" has the meaning given to the term "Term Loans" in the Existing MDL Agreement.

(bb)     "Note Documents" has the meaning given to the term "Note Documents" in the Senior Notes Indenture.

(cc)     "Other Claims" means any and all Claims against any of the Debtors other than any Senior Notes Claims, Credit Facility Claims or MDL Facility Claims.

(dd)     "Person" means an individual, a partnership, a joint venture, a limited liability company, a corporation, a trust, an unincorporated organization, a group, a Governmental Entity, or any legal entity or association.

(ee)     "Plan Supplement" means the supplement or supplements to the Plan containing certain schedules, documents, forms of documents and/or term sheets relevant to the implementation of the Plan, to be filed with the Bankruptcy Court prior to the hearing held by the Bankruptcy Court to consider confirmation of the Plan, each of which shall contain terms and conditions consistent in all material respects with this Agreement and shall otherwise be in form and substance reasonably acceptable to the Requisite Parties.

(ff)     "Proceeding" means any action, claim, complaint, investigation, petition, suit, arbitration, mediation, alternative dispute resolution procedure, hearing, audit, examination, investigation or other proceeding of any nature, whether civil, criminal, administrative or otherwise, in Law or in equity.

(gg)     "Prohibited Change" means, with respect to any Restructuring Support Party Group in the context of any amendment, supplement or modification of this Agreement (including the Restructuring Term Sheet), if such amendment, supplement or modification (i) adds covenants, undertakings or obligations to this Agreement applicable to such Restructuring Support Party Group, or changes the covenants, undertakings or obligations in this Agreement applicable to such Restructuring Support Party Group, in either such case, such that the covenants, undertakings or obligations in this Agreement applicable to such Restructuring Support Party Group, as in effect immediately after giving effect to such amendment, supplement or modification and taken as a whole, are materially more burdensome or onerous on such Restructuring Support Party Group than the covenants, undertakings or obligations in this Agreement applicable to such Restructuring Support Party Group as in effect immediately prior to such amendment, supplement or modification and taken as a whole, (ii) materially and adversely affects the rights of such Restructuring Support Party Group under this Agreement or (iii) materially and adversely affects the Claims and Interests of such Restructuring Support Party Group (including the treatment thereof under the Plan) or the releases to be received by such Restructuring Support Party Group or its Related Parties under the Plan.

(hh)     "Qualified Marketmaker" means an entity that (i) holds itself out to the market as standing ready in the ordinary course of business to purchase from and sell to customers Claims and Interests, or enter with customers into long and/or short positions in Claims and Interests, in

its capacity as a dealer or market maker in such Claims and Interests; and (ii) is in fact regularly in the business of making a market in claims, interests and/or securities of issuers or borrowers.

(ii)    "Related Fund" means, with respect to any Person, any fund, account or investment vehicle that is controlled or managed by (i) such Person, (ii) an Affiliate of such Person or (iii) the same investment manager, advisor or subadvisor as such Person or an Affiliate of such investment manager, advisor or subadvisor.

(jj)    "Related Parties" means, with respect to any Person, such Person's current and former Affiliates, partners, Subsidiaries, officers, directors, principals, employees (including, in the case of the Equity Parties, any current or former director of any Debtor that is, or was, employed by either Equity Party), agents, managed funds, advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, together with their respective successors and assigns, in each case in their capacity as such.

(kk)    "Requisite Backstop Parties" means, as of any date of determination, the Non-Defaulting Backstop Parties that are Specified Backstop Parties whose aggregate Backstop Commitments constitute more than 66-2/3% of the aggregate Backstop Commitments of all Non-Defaulting Backstop Parties that are Specified Backstop Parties as of such date. Prior to the effectiveness of the Backstop Purchase Agreement, for purposes of determining the Backstop Commitments of the Specified Backstop Parties, the Backstop Commitment Percentage of each Specified Backstop Party shall be set forth opposite the name of the Affiliates of such Specified Backstop Party on Schedule 2 attached hereto. After the effectiveness of the Backstop Purchase Agreement, for purposes of determining the Backstop Commitments of the Specified Backstop Parties, the Backstop Commitment Percentage of each Specified Backstop Party shall be set forth in, or as determined by, the Backstop Purchase Agreement.

(ll)    "Requisite Consenting Existing Lenders" means, as of any date of determination, the Consenting Existing Lenders (other than the Specified Backstop Parties and the Specified Creditor Parties) who own or control as of such date at least a majority of the aggregate principal amount of the Existing Loans owned or controlled by all of the Consenting Existing Lenders (other than the Specified Backstop Parties and the Specified Creditor Parties) as of such date.

(mm)    "Requisite Consenting Noteholders" means, as of any date of determination, the Consenting Noteholders who own or control as of such date at least a majority of the aggregate principal amount of the Senior Notes owned or controlled by all of the Consenting Noteholders as of such date.

(nn)    "Requisite Parties" means the Debtors and the Requisite Backstop Parties; provided, however, that in the context of whether a Restructuring Document is acceptable (including reasonably acceptable) to the Requisite Parties, to the extent such Restructuring Document contains provisions that are (i) not addressed in this Agreement or (ii) not consistent with the terms of this Agreement, then the term "Requisite Parties" shall also include (x) the Requisite Consenting Existing Lenders to the extent (and solely to the extent) such provisions materially and adversely affect the treatment of the Credit Facility Claims under the Plan or the releases to be received by the Consenting Existing Lenders and their respective Related Parties under the Plan, (y) the Requisite Consenting Noteholders to the extent (and solely to the extent)

46944535.13:

such provisions materially and adversely affect the treatment of the Senior Notes Claims under the Plan or the releases to be received by the Consenting Noteholders or any of their respective Related Parties under the Plan, and (z) the Equity Parties to the extent (and solely to the extent) such provisions materially and adversely affect the treatment of the Existing Equity Interests under the Plan or the releases to be received by the Equity Parties or any of their respective Related Parties under the Plan; provided, further that if this Agreement (including the Restructuring Term Sheet) otherwise provides that a Restructuring Document must be acceptable (including reasonably acceptable) to a specified Person or group of Persons (other than the Requisite Parties), then such Restructuring Document need only be acceptable (or reasonably acceptable) to such specified Person or group of Persons and not the Requisite Parties.

(oo)    "Restructuring Documents" means all agreements, instruments, pleadings, orders, forms, questionnaires and other documents (including all exhibits, schedules, supplements, appendices, annexes, instructions and attachments thereto) that are utilized to implement or effectuate, or that otherwise relate to, this Agreement, any of the Rights Offerings, the Plan and/or the Restructuring, including, but not limited to, (i) the Backstop Purchase Agreement, the Backstop Assumption Motion and the Backstop Order, (ii) the New MDL Debt Documents, the New Term Loan Debt Documents and the New Second Lien Notes Debt Documents, (iii) the Plan and the Plan Supplement, (iv) the Disclosure Statement and any motion seeking the approval thereof, (v) the Disclosure Statement Order, (vi) the Confirmation Order, (vii) any "first day" motions (the "First Day Motions"), (viii) the ballots, the motion to approve the form of the ballots and the Solicitation, and the order of the Bankruptcy Court approving the form of the ballots and the Solicitation, (ix) the DIP Credit Documents and the DIP Orders, (x) the New Organizational Documents, (xi) the Warrant Documentation, (xii) the RSA Assumption Motion and the RSA Order, and (xiii) any documentation relating to the use of cash collateral, distributions provided to the holders of any Claims and Interests, the Rights Offerings (including the Rights Offering Procedures) or other related documents, each of which shall contain terms and conditions that are consistent in all material respects with this Agreement and shall otherwise be in form and substance reasonably acceptable to the Requisite Parties.

(pp)    "Restructuring Support Party Group" means a reference to any of the following: (i) the Consenting Noteholders, (ii) the Consenting Existing Lenders, (iii) CPPIB, or (iv) the Vestar Funds and Investments.

(qq)    "Restructuring Support Period" means, with reference to any Restructuring Support Party, the period commencing on the Restructuring Support Effective Date (or, in the case of any Creditor Party that becomes a party hereto after the Restructuring Support Effective Date, as of the date such Creditor Party becomes a party hereto) and ending on the earlier of (i) the Effective Date and (ii) the date on which this Agreement is terminated with respect to such Restructuring Support Party in accordance with Section 6 hereof.

(rr)    "RSA Assumption Motion" means the motion and proposed form of order to be filed by the Debtors with the Bankruptcy Court seeking the assumption of this Agreement pursuant to section 365 of the Bankruptcy Code, authorizing the payment of certain expenses and other amounts hereunder, and granting any other related relief, which motion and proposed form of order shall be consistent in all material respects with this Agreement and otherwise in form and substance reasonably acceptable to the Requisite Parties.

(ss)    "<u>RSA Order</u>" means an order of the Bankruptcy Court approving the RSA Assumption Motion, which order shall be consistent in all material respects with this Agreement and otherwise in form and substance reasonably acceptable to the Requisite Parties.

(tt)    "<u>Securities Act</u>" means the Securities Act of 1933, as amended and including any rule or regulation promulgated thereunder.

(uu)    "<u>Solicitation</u>" means the solicitation of votes in connection with the Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code and the applicable procedures approved by the Bankruptcy Court and set forth in the Disclosure Statement Order.

(vv)    "<u>Specified Backstop Parties</u>" means, collectively, the Backstop Parties other than the Backstop Parties identified in Item 6 on <u>Schedule 2</u> attached hereto.

(ww)    "<u>Specified Creditor Parties</u>" means, collectively, each of the Specified Backstop Parties that delivers a Special Termination Notice in accordance with <u>Section 6(f)(i)</u> hereof.

(xx)    "<u>Subsidiary</u>" means, as of any time of determination and with respect to any specified Person, (i) any corporation more than fifty percent (50%) of the voting or capital stock of which is, as of such time, directly or indirectly owned by such Person, (ii) any limited liability company, partnership, limited partnership, joint venture, association, or other entity in which such Person, directly or indirectly, owns more than fifty percent (50%) of the equity economic interest thereof, or (iii) any corporation, limited liability company, partnership, limited partnership, joint venture, association, or other entity in which such Person, directly or indirectly, has the power to elect or direct the election of more than fifty percent (50%) of the members of the board of directors, board of managers, managing member, general partner or similar governing body of such entity as of such time.

(yy)    "<u>Transaction Expenses</u>" means all reasonable and documented fees, costs and expenses of each of the Consenting Parties' Advisors (other than those of Debevoise & Plimpton LLP, as counsel to CPPIB), in each case, (i) in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation and/or enforcement of this Agreement, the Plan, the Disclosure Statement and/or any of the other Restructuring Documents, and/or the transactions contemplated thereby, and/or any amendments, waivers, consents, supplements or other modifications to any of the foregoing and (ii)(A) consistent with any engagement letters or fee reimbursement letters entered into between the Debtors and the applicable Consenting Parties' Advisors (as supplemented and/or modified by this Agreement), as applicable, or (B) as provided in the DIP Orders and/or the Backstop Order.

(zz)    "<u>21C Collateral</u>" has the meaning given to the term "Collateral" in the Existing Credit Agreement.

(aaa)    "<u>21C Holdings Common Stock</u>" means shares of common stock, par value $0.01 per share, of 21C Holdings.

(bbb)    "<u>21C Holdings Preferred Stock</u>" means shares of preferred stock, par value $0.001 per share, of 21C Holdings designated as "Series A Convertible Preferred Stock" pursuant to the terms of the Amended and Restated Certificate of Designations of Series A

Convertible Preferred Stock filed by 21C Holdings with the Delaware Secretary of State on September 8, 2016.

(ccc)    "21C Securityholders Agreement" means the Third Amended and Restated Securityholders Agreement, dated as of September 9, 2016, by and among Investments, 21C Holdings, the Vestar Funds, CPPIB and certain other Persons party thereto as "Securityholders" thereunder, as amended, supplemented, amended and restated or otherwise modified from time to time.

Unless otherwise specified, references in this Agreement to any Section, subsection, clause, subclause or paragraph refer to such Section, subsection, clause, subclause or paragraph as contained in this Agreement.  The words "herein," "hereof" and "hereunder" and other words of similar import in this Agreement refer to this Agreement as a whole, and not to any particular Section, subsection, clause, subclause or paragraph contained in this Agreement.  Wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter genders.  The words "including," "includes" and "include" shall be deemed to be followed by the words "without limitation".

## 3.    Agreements of the Creditor Parties.

(a)    Support of Restructuring.  Each of the Creditor Parties hereby agrees (severally and not jointly) that, for the duration of the Restructuring Support Period, unless otherwise required (or prohibited) by Law, such Creditor Party shall:

(i)    support and take all reasonable actions necessary to implement and consummate the Restructuring in a timely manner as contemplated by this Agreement and the Restructuring Term Sheet; provided that no Creditor Party shall be obligated to waive (to the extent waivable by such Creditor Party) any condition to the consummation of any part of the Restructuring set forth in any Restructuring Document;

(ii)    (A) subject to the receipt of the Disclosure Statement approved by the Disclosure Statement Order, (I) timely vote, or cause to be voted, all of the Claims and Interests held by such Creditor Party at the voting record date provided for in the Disclosure Statement by timely delivering its duly executed and completed ballot(s) accepting the Plan following commencement of the Solicitation, and (II) not "opt out" of, or object to, any releases or exculpations provided under the Plan (and, to the extent required by the ballot, affirmatively "opt in" to such releases and exculpations), and (B) not change, withdraw or revoke such vote (or cause or direct such vote to be changed, withdrawn or revoked); provided, however, that such vote may be revoked (and, upon such revocation, deemed void ab initio) by such Creditor Party at any time following the expiration or termination of the Restructuring Support Period with respect to such Creditor Party (it being understood that any termination of the Restructuring Support Period with respect to a Creditor Party shall entitle such Creditor Party to change its vote in accordance with section 1127(d) of the Bankruptcy Code, and the Solicitation materials with respect to the Plan shall be consistent with this proviso);

(iii)    not, directly or indirectly,

(A)        seek, solicit, support, encourage, propose, assist, consent to, vote for, or enter or participate in any discussions or any agreement with any Person regarding, any Alternative Transaction;

(B)        support or encourage the termination or modification of any Debtor's exclusive period for the filing of a plan of reorganization or any Debtor's exclusive period to solicit a plan of reorganization;

(C)        announce publicly, or announce to any of the Restructuring Support Parties or other holders of Claims and Interests, its intention not to support the Restructuring;

(D)        take any action that is inconsistent with this Agreement or any of the Restructuring Documents, or that would, or would reasonably be expected to, prevent, interfere with, delay or impede the implementation, solicitation, confirmation, or consummation of the Restructuring (including, but not limited to, the Bankruptcy Court's approval of the Restructuring Documents (if applicable), the Solicitation and confirmation of the Plan), including, but not limited to, (I) initiating any Proceeding or taking any other action to oppose the execution or delivery of any of the Restructuring Documents, the performance of any obligations of any party to any of the Restructuring Documents or the consummation of the transactions contemplated by any of the Restructuring Documents, (II) initiating any Proceeding or taking any other action to amend, supplement or otherwise modify any of the Restructuring Documents, which amendment, modification or supplement is not consistent in all material respects with this Agreement or otherwise reasonably acceptable to the Requisite Parties, or (III) initiating any Proceeding or taking any other action, or exercising or seeking to exercise any rights or remedies (including rights or remedies under the Existing Loan Documents, the MDL Credit Documents or the Note Documents, as applicable, or under applicable Law) as a holder of Claims and Interests that is barred by or is otherwise inconsistent with this Agreement, the Restructuring Term Sheet or any of the other Restructuring Documents;

(E)        oppose or object to, or support any other Person's efforts to oppose or object to, the approval of the First Day Motions, the DIP Facility Motion, the Backstop Assumption Motion, the RSA Assumption Motion, and any other motions filed by any of the Debtors in furtherance of the Restructuring that are consistent in all material respects with this Agreement or which are otherwise reasonably acceptable to the Requisite Parties; or

(F)        seek to convert any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or request the appointment of a trustee or examiner in any Chapter 11 Case;

(iv)        negotiate in good faith, execute, perform its obligations under, and consummate the transactions contemplated by, the Restructuring Documents to which it is (or will be) a party; provided, however, that no Creditor Party shall be obligated to waive (to the

extent waivable by such Creditor Party) any condition to the consummation of any part of the Restructuring set forth in any Restructuring Document;

(v)    timely vote or cause to be voted its Claims and Interests against any Alternative Transaction;

(vi)    in the case of a Consenting Noteholder, if any holder of the Senior Notes has requested the Trustee to exercise rights or remedies under or with respect to the Senior Notes Indenture or any of the other Note Documents, or if the Trustee announces that it intends to exercise, or exercises, rights or remedies under or with respect to the Senior Notes Indenture or any of the other Note Documents, direct the Trustee not to exercise any rights or remedies, or assert or bring any claims, under or with respect to the Senior Notes Indenture or any of the other Note Documents; provided, however, that nothing in this clause (vi) shall require the Consenting Noteholders to waive any Default (as defined in the Senior Notes Indenture) or Event of Default (as defined in the Senior Notes Indenture) or any of the Senior Notes Obligations;

(vii)    in the case of a Consenting Existing Lender, if any Existing Lender has requested the Existing Credit Agent to exercise rights or remedies under or with respect to any of the Existing Loan Documents or the 21C Collateral, or if the Existing Credit Agent announces that it intends to exercise, or exercises, rights or remedies under or with respect to any of the Existing Loan Documents or the 21C Collateral, direct the Existing Credit Agent not to exercise any rights or remedies, or assert or bring any claims, under or with respect to any of the Existing Loan Documents or the 21C Collateral; provided, however, that nothing in this clause (vii) shall require the Consenting Existing Lenders to waive any Default (as defined in the Existing Credit Agreement) or Event of Default (as defined in the Existing Credit Agreement) or any of the Existing Credit Facility Obligations or release or terminate any liens on any of the 21C Collateral; and

(viii)    in the case of a Consenting MDL Lender, if any Existing MDL Lender has requested the Existing MDL Agent to exercise rights or remedies under or with respect to any of the MDL Credit Documents or the MDL Collateral, or if the Existing MDL Agent announces that it intends to exercise, or exercises, rights or remedies under or with respect to any of the MDL Credit Documents or the MDL Collateral, direct the Existing MDL Agent not to exercise any rights or remedies, or assert or bring any claims, under or with respect to any of the MDL Credit Documents or the MDL Collateral; provided, however, that nothing in this clause (viii) shall require the Consenting MDL Lenders to waive any Default (as defined in the Existing MDL Agreement) or Event of Default (as defined in the Existing MDL Agreement) or any of the Existing MDL Obligations or release or terminate any liens on any of the MDL Collateral.

Notwithstanding anything in this Agreement to the contrary, (x) no Creditor Party shall be required to incur, assume, become liable in respect of or suffer to exist any expenses, liabilities or other obligations, or agree to or become bound by any commitments, undertakings, concessions, indemnities or other arrangements that could result in expenses, liabilities or other obligations to such Creditor Party (except in the case of any Creditor Party that is a Backstop Party, such Creditor Party's Backstop Commitments, subject to the terms and conditions of the Backstop Purchase Agreement), and (y) nothing in this Agreement shall limit any of the rights or remedies of (I) the DIP Agent or any of the DIP Lenders under or with respect to any of the DIP

Credit Documents or any of the DIP Orders and (II) the Backstop Parties under the Backstop Purchase Agreement or the Backstop Order.

(b)    <u>Rights of Creditor Parties Unaffected</u>.  Nothing contained herein, or in any of the confidentiality agreements in place between the Debtors and each of the Creditor Parties and their respective advisors, shall: (i) limit (A) the rights of a Creditor Party under any applicable bankruptcy, insolvency, foreclosure or similar Proceeding, including appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases, in each case, so long as the exercise of any such right is not inconsistent with such Creditor Party's obligations hereunder; (B) the ability of a Creditor Party to purchase, sell or enter into any transactions regarding the Claims and Interests, subject to the terms hereof; (C) except as set forth in this Agreement, any right or remedy of any Creditor Party under, as applicable, (w) the Existing MDL Agreement or any of the other MDL Credit Documents, (x) the Senior Notes Indenture or any of the other Note Documents, (y) the Existing Credit Agreement or any of the other Existing Loan Documents, and (z) any other applicable agreement, instrument or document that gives rise to a Creditor Party's Claims and Interests; (D) the ability of a Creditor Party to consult with any of the other Restructuring Support Parties; (E) the rights of any Creditor Party to engage in any discussions, enter into any agreements or take any other action regarding matters to be effectuated after the expiration or termination of the Restructuring Support Period; or (F) the ability of a Creditor Party to enforce any right, remedy, condition, consent or approval requirement under this Agreement or any of the Restructuring Documents; (ii) constitute a waiver or amendment of any term or provision of (w) the Existing MDL Agreement or any of the other MDL Credit Documents, (x) the Senior Notes Indenture or any of the other Note Documents, (y) the Existing Credit Agreement or any of the other Existing Loan Documents, or (z) any other agreement, instrument or document that gives rise to a Creditor Party's Claims and Interests, or (iii) constitute a termination or release of any liens on the 21C Collateral or the MDL Collateral.

(c)    <u>Transfers</u>.  Each Creditor Party agrees (severally and not jointly) that, for the duration of the Restructuring Support Period, such Creditor Party shall not, directly or indirectly, sell, transfer, loan, issue, pledge, hypothecate, assign, grant, or otherwise dispose of (including by participation) (collectively, "<u>Transfer</u>"), in whole or in part, any of its Claims and Interests, or any option thereon or any right or interest therein (including granting any proxies with respect to any Claims and Interests, depositing any Claims and Interests into a voting trust or entering into a voting agreement with respect to any Claims and Interests), unless the transferee of such Claims and Interests (the "<u>Transferee</u>") either (i) is a Creditor Party at the time of such Transfer or (ii) prior to the effectiveness of such Transfer, agrees in writing, for the benefit of the Restructuring Support Parties, to become a Restructuring Support Party hereunder as a Consenting Noteholder, Consenting MDL Lender and/or Consenting Existing Lender, as applicable, and to be bound by all of the terms of this Agreement applicable to a Consenting Noteholder, Consenting MDL Lender and/or Consenting Existing Lender, as applicable (including with respect to any and all Claims and Interests it already may own or control prior to such Transfer), by executing a joinder agreement, substantially in the form attached hereto as <u>Exhibit B</u> (the "<u>Joinder Agreement</u>"), and by delivering an executed copy thereof to (A) counsel to the Debtors and (B) in redacted form that removes the amounts of the Claims and Interests held by such Transferee, each of the Consenting Parties' Advisors that are lawyers (in each case, at the addresses for such law firms set forth in <u>Section 21</u> hereof), in which event (x) the

-14-

Transferee shall be deemed to be a Consenting Noteholder, Consenting MDL Lender and/or Consenting Existing Lender, as applicable, hereunder to the extent of such transferred Claims and Interests (and all Claims and Interests it already may own or control prior to such Transfer) and (y) the transferor Creditor Party shall be deemed to relinquish its rights, and be released from its obligations, under this Agreement solely to the extent of such transferred Claims and Interests; provided, however, that such Transfer shall not, in and of itself, release any Consenting Noteholder who is also a Backstop Party from its obligations under, to the extent in effect, the Backstop Purchase Agreement (the Transfer of Backstop Commitments being governed by, to the extent in effect, the Backstop Purchase Agreement).  Notwithstanding the foregoing, the restrictions on Transfer set forth in this Section 3(c) shall not apply to the grant of any liens or encumbrances on any Claims and Interests in favor of a bank or broker-dealer holding custody of such Claims and Interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such Claims and Interests.  Each Creditor Party agrees (severally and not jointly) that any Transfer of any Claims and Interests that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and each of the Debtors and each other Creditor Party shall have the right to enforce the voiding of such Transfer.

(d)     Qualified Market Maker.  Notwithstanding anything herein to the contrary, (i) any Creditor Party may Transfer any of its Claims and Interests to an entity that is acting in its capacity as a Qualified Marketmaker without the requirement that the Qualified Marketmaker be or become a Creditor Party; provided, however, that the Qualified Marketmaker subsequently Transfers all right, title and interest in such Claims and Interests to a Transferee that is or becomes a Creditor Party as provided above, and the Transfer documentation between the transferor Creditor Party and such Qualified Marketmaker shall contain a requirement that provides as such; and (ii) to the extent any Creditor Party is acting in its capacity as a Qualified Marketmaker, it may Transfer any Claims and Interests that it acquires from a holder of such Claims and Interests that is not a Creditor Party without the requirement that the Transferee be or become a Creditor Party.  Notwithstanding the foregoing, if, at the time of the proposed Transfer of any Claims and Interests to a Qualified Marketmaker, such Claims and Interests (x) may be voted on the Plan or any Alternative Transaction, the proposed transferor Creditor Party must first vote such Claims and Interests in accordance with the requirements of Section 3(a) hereof, or (y) have not yet been and may not yet be voted on the Plan or any Alternative Transaction and such Qualified Marketmaker does not Transfer such Claims and Interests to a subsequent Transferee prior to the fifth (5th) Business Day prior to the expiration of the voting deadline (such date, the "Qualified Marketmaker Joinder Date"), such Qualified Marketmaker shall be required to (and the Transfer documentation to the Qualified Marketmaker shall have provided that it shall), on the first (1st) Business Day immediately following the Qualified Marketmaker Joinder Date, become a Creditor Party with respect to such Claims and Interests in accordance with the terms hereof (provided, that the Qualified Marketmaker shall automatically, and without further notice or action, no longer be a Creditor Party with respect to such Claims and Interests at such time that the Transferee of such Claims and Interests becomes a Creditor Party with respect to such Claims and Interests).

(e)     Additional Claims and Interests.  This Agreement shall in no way be construed to preclude any Creditor Party or any of its Affiliates from acquiring additional Claims and Interests following its execution of this Agreement.  To the extent any Creditor Party acquires additional Claims and Interests, such Creditor Party agrees (severally and not jointly) that any

such additional Claims and Interests shall automatically and immediately be deemed subject to this Agreement, including the obligations with respect to Claims and Interests set forth in Section 3(a) hereof.

4.    **Agreements of the Equity Parties.**

(a)    Support of Restructuring.  Each of the Equity Parties hereby agrees (severally and not jointly (except that the agreements of the Vestar Funds shall be joint and several agreements of the Vestar Funds)) that, for the duration of the Restructuring Support Period, unless otherwise required (or prohibited) by Law, such Equity Party shall:

(i)    support and take all reasonable actions necessary to implement and consummate the Restructuring in a timely manner as contemplated by this Agreement and the Restructuring Term Sheet;

(ii)    (A) subject to the receipt of the Disclosure Statement approved by the Disclosure Statement Order, (I) timely vote, or cause to be voted, all of the Claims and Interests held by such Equity Party at the voting record date provided for in the Disclosure Statement by timely delivering its duly executed and completed ballot(s) accepting the Plan following commencement of the Solicitation, and (II) not "opt out" of, or object to, any releases or exculpations provided under the Plan (and, to the extent required by the ballot, affirmatively "opt in" to such releases and exculpations), and (B) not change, withdraw or revoke such vote (or cause or direct such vote to be changed, withdrawn or revoked); provided, however, that such vote may be revoked (and, upon such revocation, deemed void *ab initio*) by such Equity Party at any time following the expiration or termination of the Restructuring Support Period with respect to such Equity Party (it being understood that any termination of the Restructuring Support Period with respect to an Equity Party shall entitle such Equity Party to change its vote in accordance with section 1127(d) of the Bankruptcy Code, and the Solicitation materials with respect to the Plan shall be consistent with this proviso);

(iii)    not, directly or indirectly,

(A)    seek, solicit, support, encourage, propose, assist, consent to, vote for, or enter or participate in any discussions or any agreement with any Person regarding, any Alternative Transaction;

(B)    support or encourage the termination or modification of any Debtor's exclusive period for the filing of a plan of reorganization or any Debtor's exclusive period to solicit a plan of reorganization;

(C)    announce publicly, or announce to any of the Restructuring Support Parties or other holders of Claims and Interests, its intention not to support the Restructuring;

(D)    take any action that is inconsistent with this Agreement or any of the Restructuring Documents, or that would, or would reasonably be expected to, prevent, interfere with, delay or impede the implementation, solicitation, confirmation, or consummation of the Restructuring (including, but not limited to,

the Bankruptcy Court's approval of the Restructuring Documents (if applicable), the Solicitation and confirmation of the Plan), including, but not limited to, (I) initiating any Proceeding or taking any other action to oppose the execution or delivery of any of the Restructuring Documents, the performance of any obligations of any party to any of the Restructuring Documents or the consummation of the transactions contemplated by any of the Restructuring Documents, (II) initiating any Proceeding or taking any other action to amend, supplement or otherwise modify any of the Restructuring Documents, which amendment, modification or supplement is not consistent in all material respects with this Agreement or otherwise reasonably acceptable to the Requisite Parties, or (III) initiating any Proceeding or taking any other action, or exercising or seeking to exercise any rights or remedies (including rights or remedies under the Investments LLC Agreement, the 21C Securityholders Agreement or any other organizational documents of any of the Debtors, as applicable, or under the Delaware General Corporation Law, the Delaware Limited Liability Company Act or other applicable Law) as a holder of Claims and Interests that is barred by or is otherwise inconsistent with this Agreement, the Restructuring Term Sheet or any of the other Restructuring Documents;

(E)    oppose or object to, or support any other Person's efforts to oppose or object to, the approval of the First Day Motions, the DIP Facility Motion, the Backstop Assumption Motion, the RSA Assumption Motion, and any other motions filed by any of the Debtors in furtherance of the Restructuring that are consistent in all material respects with this Agreement or which are otherwise reasonably acceptable to the Requisite Parties; or

(F)    seek to convert any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or request the appointment of a trustee or examiner in any Chapter 11 Case;

(iv)    promptly notify the Consenting Parties' Advisors (and in any event within one (1) Business Day after obtaining actual knowledge thereof) of (A) any Governmental Entity or other third party complaints, litigations, investigations or hearings (or communications indicating that the same may be contemplated or threatened) challenging the validity of the transactions contemplated by this Agreement or any other Restructuring Document or seeking to enjoin, restrain or prohibit this Agreement or any other Restructuring Document or the consummation of any of the transactions contemplated hereby or thereby; (B) any breach by such Equity Party in any respect of any of its obligations, representations, warranties or covenants set forth in this Agreement; (C) any Material Adverse Effect; and (D) the happening or existence of any Event that shall have made any of the conditions precedent set forth in (or to be set forth in) any of the Restructuring Documents incapable of being satisfied prior to the Outside Date (as defined below);

(v)    if such Equity Party receives an unsolicited proposal or expression of interest with respect to an Alternative Transaction, within two (2) Business Days after the receipt of such proposal or expression of interest, notify the Consenting Parties' Advisors of the receipt thereof, with such notice to include the material terms thereof;

-17-

46944535.13:

(vi)     negotiate in good faith, execute, perform its obligations under, and consummate the transactions contemplated by, the Restructuring Documents to which it is (or will be) a party (if any);

(vii)     timely vote or cause to be voted its Claims and Interests against any Alternative Transaction; and

(viii)     without limiting such Equity Party's obligations under Section 4(b), not pledge, encumber, assign, sell, or otherwise transfer, including by the declaration of a worthless stock deduction for any tax year ending on or prior to the Effective Date, offer, or contract to pledge, encumber, assign, sell, or otherwise transfer, in whole or in part, any portion of its right, title, or interests (directly or indirectly) in any of its shares, stock, or other interests in the Debtors.

Notwithstanding anything in this Agreement to the contrary, no Equity Party shall be required to incur, assume, become liable in respect of or suffer to exist any expenses, liabilities or other obligations, or agree to or become bound by any commitments, undertakings, concessions, indemnities or other arrangements that could result in expenses, liabilities or other obligations to such Equity Party.

(b)     Transfers.   Each of the Equity Parties hereby agrees (severally and not jointly (except that the agreements of the Vestar Funds shall be joint and several agreements of the Vestar Funds)) that, for the duration of the Restructuring Support Period, such Equity Party shall not Transfer any Claims and Interests owned or held by such Equity Party without the prior written consent of the Debtors and the Requisite Backstop Parties.

(c)     Additional Claims and Interests.   This Agreement shall in no way be construed to preclude the Equity Parties from acquiring additional Claims and Interests following its execution of this Agreement.   To the extent any Equity Party acquires additional Claims and Interests, such Equity Party agrees that any such additional Claims and Interests shall automatically and immediately be deemed subject to this Agreement, including the obligations with respect to Claims and Interests set forth in Section 4(a) hereof.

(d)     Rights of Equity Parties Unaffected.   Nothing contained herein shall limit (i) the rights of an Equity Party under any applicable bankruptcy, insolvency, foreclosure or similar Proceeding, including, appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases, in each case, so long as the exercise of any such right is not inconsistent with such Equity Party's obligations hereunder, (ii) the ability of an Equity Party to purchase Claims and Interests, subject to the terms hereof, (iii) the ability of an Equity Party to consult with any of the other Restructuring Support Parties, (iv) the rights of any Equity Party to engage in any discussions, enter into any agreements or take any other action regarding matters to be effectuated after the expiration or termination of the Restructuring Support Period, or (v) the ability of an Equity Party to enforce any right, remedy, condition, consent or approval requirement under this Agreement or any of the Restructuring Documents.

46944535.13:

(e)    <u>Waivers and Consents</u>.    Each of the Equity Parties hereby irrevocably and unconditionally grants all waivers and consents that may be necessary or required under the Investments LLC Agreement, the 21C Securityholders Agreement, any other organizational documents of Investments, any of the Debtors or any of the Subsidiaries of any of the Debtors, or under applicable Law to permit the consummation of the Restructuring consistent in all material respects with the terms of this Agreement (including all waivers and consents that are required under Section 2.3 of the 21C Securityholders Agreement and Section 6.10(a) of the Investments LLC Agreement).    Notwithstanding the foregoing, upon the termination of the Restructuring Support Period for any Equity Party, the obligations, waivers and consents of such Equity Party under this <u>Section 4(a)</u> shall terminate and be of no further force or effect from and after such termination (it being understood, however, that any such waivers and consents that are provided by an Equity Party prior to such termination that relate to any portion of the Restructuring that occurs after such termination shall remain in full force and effect after such termination).

## 5.    **Agreements of the Debtors.**

(a)    <u>Affirmative Covenants</u>.    Each of the Debtors, jointly and severally, agrees that, for the duration of the Restructuring Support Period, the Debtors shall:

(i)    support and take all reasonable actions necessary, or reasonably requested by the Requisite Backstop Parties, to implement and consummate the Restructuring (including, but not limited to, the Bankruptcy Court's approval of the Restructuring Documents, the Solicitation, confirmation of the Plan and the consummation of the Restructuring pursuant to the Plan) by the deadlines set forth in <u>Section 5(a)(iv)</u> hereof;

(ii)    (A) complete the preparation, as soon as reasonably practicable after the Restructuring Support Effective Date, of each of the Plan, the Disclosure Statement and the other Restructuring Documents (including all motions, applications, orders, agreements and other documents, each of which, for the avoidance of doubt, shall contain terms and conditions consistent in all material respects with this Agreement and shall otherwise be in form and substance reasonably acceptable to the Requisite Parties), (B) provide the Plan, the Disclosure Statement and the other Restructuring Documents to, and afford reasonable opportunity of comment and review of such documents by, each of the Consenting Parties' Advisors no less than three (3) Business Days in advance of any filing, execution, distribution or use (as applicable) thereof, (C) consult in good faith with each of the Consenting Parties' Advisors regarding the form and substance of the Plan, the Disclosure Statement and the other Restructuring Documents in advance of the filing, execution, distribution or use (as applicable) thereof and (D) negotiate in good faith, execute, perform its obligations under, and consummate the transactions contemplated by, the Restructuring Documents to which it is (or will be) a party; <u>provided</u>, <u>however</u>, that the obligations under this <u>Section 5(a)(ii)</u> shall in no way alter or diminish any right expressly provided to any applicable Creditor Party or Equity Party under this Agreement to review, comment on, and/or consent to the form and/or substance of any document;

(iii)    unless otherwise required by the Bankruptcy Court, cause the amount of the Claims and Interests held by the Creditor Parties as set forth on the signature pages attached to this Agreement (or, with respect to any Creditor Party that becomes a party hereto after the

date hereof, to any Joinder Agreement) to be redacted to the extent this Agreement or the Restructuring Term Sheet is (A) filed on the docket maintained in the Chapter 11 Cases or (B) otherwise made publicly available;

(iv)    comply with each of the following milestones (the "Milestones"), which Milestones may be extended (but with no obligation to extend) only with the express prior written consent of the Requisite Backstop Parties:

(A)    commence the Chapter 11 Cases in the Bankruptcy Court with respect to each of the Debtors and file the First Day Motions no later than May 25, 2017 (the date of commencement of the Chapter 11 Cases, the "Petition Date");

(B)    obtain entry of the Interim DIP Order by the Bankruptcy Court as soon as reasonably practicable after the Petition Date (but in no event later than five (5) Business Days after the Petition Date);

(C)    file the Plan, the Disclosure Statement, the Backstop Assumption Motion and the motion for approval of the Disclosure Statement and the Solicitation procedures with the Bankruptcy Court as soon as reasonably practicable after the Petition Date (but in no event later than fourteen (14) calendar days after the Expiration Time);

(D)    obtain entry of the Final DIP Order by the Bankruptcy Court as soon as reasonably practicable after the Petition Date (but in no event later than thirty (30) calendar days after the Petition Date);

(E)    (x) obtain entry of the Backstop Order by the Bankruptcy Court as soon as reasonably practicable after the Petition Date (but in no event later than sixty (60) calendar days after the Petition Date, and (y) execute and deliver to the Backstop Parties the Backstop Purchase Agreement (which, for the avoidance of doubt, shall be consistent in all material respects with this Agreement (including the Restructuring Term Sheet) and otherwise in form and substance reasonably acceptable to the Requisite Backstop Parties) no later than one (1) day after the date that the Bankruptcy Court enters the Backstop Order;

(F)    obtain entry of the RSA Order by the Bankruptcy Court as soon as reasonably practicable after the Petition Date (but in no event later than sixty (60) calendar days after the Petition Date);

(G)    commence the Solicitation as soon as reasonably practicable after the Petition Date (but in no event later than seven (7) calendar days after entry of the Disclosure Statement Order by the Bankruptcy Court);

(H)    obtain entry of the Confirmation Order by the Bankruptcy Court as soon as reasonably practicable after the Petition Date (but in no event later than thirty-five (35) calendar days after the Governmental Bar Date; and

(I)      cause the Effective Date to occur as soon as reasonably practicable after the Petition Date (but in no event later than fifteen (15) calendar days after the entry of the Confirmation Order, such date, the "Outside Date");

(v)      (A) conduct, and shall cause their respective Subsidiaries to conduct, their businesses and operations only in the ordinary course in a manner that is consistent with past practices and in compliance with Law, (B) maintain their physical assets, properties and facilities in their working order condition and repair as of the Restructuring Support Effective Date, ordinary wear and tear excepted, (C) maintain their respective books and records on a basis consistent with prior practice, (D) maintain all insurance policies, or suitable replacements therefor, in full force and effect, and (E) use reasonable best efforts to preserve intact their business organizations and relationships with third parties (including creditors, lessors, licensors, physicians, suppliers, distributors and customers) and employees;

(vi)      timely file a formal objection to any motion filed with the Bankruptcy Court by any Person seeking the entry of an order (A) directing the appointment of an examiner with expanded powers or a trustee, (B) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (C) dismissing the Chapter 11 Cases, or (D) for relief that (x) is inconsistent with this Agreement in any material respect, or (y) would, or would reasonably be expected to, frustrate the purposes of this Agreement, including by preventing the consummation of the Restructuring;

(vii)      timely file a formal objection to any motion filed with the Bankruptcy Court by any Person seeking the entry of an order modifying or terminating any Debtor's exclusive right to file and/or solicit acceptances of a plan of reorganization;

(viii)      timely file a formal written response in opposition to any objection filed with the Bankruptcy Court by any Person with respect to (A) the DIP Facility (or motion filed by such Person that seeks to interfere with the DIP Facility) or any of the adequate protection granted to the Existing Credit Agent, the Existing Lenders, the Existing MDL Agent or the Existing MDL Lenders pursuant to the DIP Orders or otherwise, or (B) any aspect of, or agreement or arrangement set forth in, the Backstop Purchase Agreement (or motion filed by such Person that seeks to interfere with any aspect of, or agreement or arrangement set forth in, the Backstop Purchase Agreement);

(ix)      promptly notify the Consenting Parties' Advisors (and in any event within two (2) Business Days after obtaining actual knowledge thereof) of (A) any pending, existing, instituted or threatened direct or derivative Proceeding by (x) any Person (other than a Governmental Entity) involving any of the Debtors or any of their respective current or former officers, employees or directors (in their capacities as such) that is material to the Debtors, (y) any Governmental Entity involving any of the Debtors or any of their respective current or former officers, employees or directors (in their capacities as such), or (z) any relator on behalf of a Governmental Entity involving any of the Debtors or any of their respective current or former officers, employees or directors (in their capacities as such), except (in any such case) to the extent any of the same are disclosed on the docket maintained in the Chapter 11 Cases; (B) any breach by any Debtor in any respect of any of its obligations, representations, warranties or covenants set forth in this Agreement, the Backstop Purchase Agreement, the Backstop Order,

46944535.13:

the DIP Credit Documents or either of the DIP Orders; (C) any Material Adverse Effect; (D) the happening or existence of any Event that shall have made any of the conditions precedent set forth in (or to be set forth in) any of the Restructuring Documents incapable of being satisfied prior to the Outside Date; (E) the occurrence of any Termination Event; and (F) the receipt of notice from any Governmental Entity or other third party alleging that the consent of such Person is or may be required in connection with the consummation of any part of the Restructuring, unless such notice is disclosed on the docket maintained in the Chapter 11 Cases;

(x)    assume or reject each executory contract and unexpired lease between any of the Debtors, on the one hand, and any non-Debtor Affiliate of any of the Debtors or any current or former partner, officer, director, principal, employee or agent of any such Affiliate, on the other hand (any such executory contract or unexpired lease, a "Related Party Contract"), as directed or instructed by the Requisite Backstop Parties;

(xi)    maintain its good standing and legal existence under the Laws of the state in which it is incorporated, organized or formed, except to the extent that any failure to maintain its good standing arises solely as a result of the filing of the Chapter 11 Cases;

(xii)    if any Debtor receives an unsolicited proposal or expression of interest with respect to an Alternative Transaction, within two (2) Business Days after the receipt of such proposal or expression of interest, notify the Consenting Parties' Advisors of the receipt thereof, with such notice to include the material terms thereof;

(xiii)    use reasonable best efforts to obtain, file, submit or register any and all required Governmental Entity and/or third party approvals, filings, registrations or notices that are necessary or advisable for the implementation or consummation of the Restructuring or the approval by the Bankruptcy Court of the Restructuring Documents;

(xiv)    deliver to the Backstop Parties (all capitalized terms used in this Section 5(a)(xiv) and not otherwise defined herein shall have the meanings given to such terms in the form of DIP Credit Agreement attached as Annex 2 to Exhibit 1 of the Restructuring Term Sheet (with such changes to such form of DIP Credit Agreement (including the terms, conditions, definitions and other provisions set forth therein) as approved by the Requisite Backstop Parties):

(A)    not later than 5:00 p.m., New York City time, on the third (3rd) Business Day of each week ending after Petition Date (including the week in which the Petition Date occurs), a supplement to the Approved Budget covering the 13-week period that commences with the week in which such supplemental budget is delivered, consistent with the form and level of detail set forth in the Initial Budget and otherwise in form and substance satisfactory to the Requisite Backstop Parties (each such supplement, an "Updated Budget"); provided, that (i) only the Initial Budget and the Updated Budget that is delivered in the fifth (5th) week after the Petition Date and each fourth (4th) week ending thereafter (i.e., the fifth (5th) week, ninth (9th) week, thirteenth (13th) week, seventeenth (17th) week, etc. after the Petition Date) shall be the Approved Budget for purposes of the Receipts Variance (as defined below) and the Disbursements Variance (as defined below) upon (and subject to) the approval of any such Updated Budget by the Requisite Backstop Parties in their sole discretion (the "Four-Week Rolling Test Period Updated Budget"), (ii) each Four-Week Rolling Test Period Updated

Budget shall include pro forma adjustments for the first three weeks of the Four-Week Rolling Test Period to give effect to only specifically identifiable and supportable timing differences between the actual results for such three weeks and the projected results included in the Approved Budget previously in-effect, (iii) only the Initial Budget and each Updated Budget that is delivered during the fourteenth (14th) week after the Petition Date and each thirteenth (13th) week thereafter (i.e., the fourteenth (14th) week, the twenty-seventh (27th) week, etc. after the Petition Date) shall be the Approved Budget for purposes of the Net Cash Flow Variance (as defined below) and the Special Payments Accrual Covenant (as defined below) upon (and subject to) the approval of any such Updated Budget by the Requisite Backstop Parties in their sole discretion (the "Cumulative Test Period Updated Budget"), (iv) each Cumulative Test Period Updated Budget shall include pro forma adjustments for the Cumulative Test Period to give effect to only specifically identifiable and supportable timing differences between actual results for such Cumulative Test Period and the projected results included in the Approved Budget previously in-effect and (v) each Updated Budget that is not a Four-Week Rolling Test Period Updated Budget or a Cumulative Test Period Updated Budget shall be furnished for informational purposes only and shall not supersede, supplement or replace the then in-effect Approved Budget for any purposes, including for purposes of the Financial Covenants;

(B)    not later than 5:00 p.m., New York City time, on the third (3rd) Business Day of each week commencing with Wednesday, June 7, 2017 (each such day, a "Weekly Test Date"), a variance report (each, a "Weekly Variance Report") (i) setting forth actual "Patient Service Receipts", "Total Operating Disbursements" and "Net Cash Flow" before "Total Special Payments" of 21C Oncology (the "DIP Borrower") and its Domestic Subsidiaries for such calendar week and setting forth all of the variances, on a line item and aggregate basis, as compared to the corresponding amounts set forth in the Approved Budget for such week/period, in each case, on a weekly basis and a cumulative basis from the beginning of the first forecasted week covered by the Approved Budget, together with a certificate of the chief financial officer of the DIP Borrower and its Domestic Subsidiaries, (ii) explaining in reasonable detail all material variances from the Approved Budget for such week/period and (iii) in the case of a Weekly Variance Report delivered on a Weekly Test Date, certifying compliance by the DIP Borrower and its Domestic Subsidiaries with the applicable Financial Covenants for such Testing Period or identifying and explaining in reasonable detail any non-compliance by the DIP Borrower and its Domestic Subsidiaries with the applicable Financial Covenants for such Testing Period.  Variances, if any, from the applicable Approved Budget, and any proposed changes to the applicable Approved Budget, shall be subject to the prior written consent of the Requisite Backstop Parties.  Any incurrence or payment by any of the Debtors of expenses (x) other than as set forth in the Approved Budget and (y) in excess of the Permitted Variances in Section 5(b)(xvii) shall constitute a Backstop Party Termination Event hereunder; provided, however, that disbursements to Lender Advisors shall not be included or otherwise considered for such variance testing;

(C)    not later than 5:00 p.m., New York City time, on the third (3rd) Business Day of the first full calendar week of each month, commencing with Wednesday, June 7, 2017 (each such day, a "Monthly Test Date"), a variance report (each, a "Monthly Variance Report" and, together with a Weekly Variance Report, the "Variance Reports" and, each a "Variance Report") setting forth (i) actual non-cash accruals, charges or expenses in respect of "Total Special Payments" for the Cumulative Test Period, on a monthly basis and cumulative

basis since the beginning of the Cumulative Test Period and (ii) the actual individual components of the Non-Cash Accrual Covenant for the Three-Month Rolling Test Period, on a monthly basis and a cumulative basis from the beginning of such Three-Month Rolling Test Period, together with a certificate of the chief financial officer of the DIP Borrower and its Domestic Subsidiaries, certifying compliance by the DIP Borrower and its Domestic Subsidiaries with the Special Payments Accrual Covenant and the Non-Cash Accrual Covenant for such Testing Period or identifying and explaining in reasonable detail any non-compliance by the DIP Borrower and its Domestic Subsidiaries with the Special Payments Accrual Covenant and the Non-Cash Accrual Covenant for such Testing Period; and

(D)    on each Monday and Thursday of each week after the Petition Date, a liquidity report in form and substance satisfactory to the Requisite Backstop Parties and consistent with the "Liquidity Report" delivered pursuant to (and as such term is defined in) the Existing MDL Agreement; and

(xv)    arrange for a teleconference (the "Management Conference Call") to take place at least once per calendar week (at such time as is reasonably satisfactory to the Requisite Backstop Parties), which Management Conference Call shall (A) require participation by at least one senior member of the DIP Borrower's management team and permit participation by such Backstop Parties and their advisors as elect to participate therein, who shall be provided with an invitation to and details of such Management Conference Call at least two (2) Business Days prior to the scheduled date therefor) and (B) be intended for purposes of discussing the Debtors' financials (including any budget proposed to be the Approved Budget, Variance Reports and any projections) and such other information and matters reasonably related thereto or requested by any Backstop Party (it being understood that no such response by the DIP Borrower shall require it to disclose or permit the discussion of, any document, information or other matter (x) that constitutes any Debtor's trade secrets or proprietary information, (y) in respect of which disclosure to the Backstop Parties (or their representatives or contractors) is prohibited by law, fiduciary duty or any binding agreement or (z) that is subject to attorney client or similar privilege or constitutes attorney work product; provided, that, in each case, the DIP Borrower explains the reason it cannot provide such response).

Further, each of the Debtors, jointly and severally, agrees that each of the covenants and agreements set forth in Section 6 and Section 7 of the form of DIP Credit Agreement attached as Annex 2 to Exhibit 1 of the Restructuring Term Sheet (with such changes to such form of DIP Credit Agreement (including the terms, conditions, definitions and other provisions set forth therein) as approved by the Requisite Backstop Parties) (collectively, the "DIP Covenants") are hereby incorporated herein by reference with full force and effect as if fully set forth herein by applying the provisions thereof mutatis mutandis (such that all changes and modifications to the defined terms and other terminology used in the DIP Covenants shall be made so that the DIP Covenants can be applied in a logical manner in this Agreement, including by construing each reference therein to "Required Lenders" as a reference to Requisite Backstop Parties), and the Debtors shall perform, abide by and observe, for the benefit of the Backstop Parties, all of the DIP Covenants as incorporated herein and modified hereby, and without giving effect to any amendment, modification, supplement, forbearance or termination of or to any such DIP Covenants that are made or provided under the terms of the DIP Credit Agreement, other than any amendment, modification, supplement, forbearance or termination of or to any such DIP

Covenants which (x) the Requisite Backstop Parties have provided their prior written consent to or (y) have the effect of making the DIP Covenants more favorable to the Requisite Backstop Parties, as determined by the Requisite Backstop Parties in their sole discretion. The Debtors shall not assert, or support any assertion by any third party (including any DIP Lender), that the Requisite Backstop Parties shall be required to obtain relief from the automatic stay from the Bankruptcy Court as a condition to the right of the Requisite Backstop Parties to terminate this Agreement pursuant to Section 6(a) on account of a breach or violation of any of the DIP Covenants.

(b)    Negative Covenants. The Debtors, jointly and severally, agree that, for the duration of the Restructuring Support Period, the Debtors shall not, and the Debtors shall not permit any of their respective Subsidiaries to, directly or indirectly, do or permit to occur any of the following:

(i)    after the Expiration Time, seek, solicit, support, encourage, propose, assist, consent to, vote for, enter or participate in any discussions or any agreement with any Person regarding, pursue or consummate, any Alternative Transaction; provided, however, that, upon entry of the Backstop Order by the Bankruptcy Court, the Debtors may participate in discussions with any third party that has made (and not withdrawn) a *bona fide*, unsolicited proposal that the boards of directors or similar governing bodies of the Debtors determine, in good faith and based upon advice of legal counsel, that the failure to participate in such discussions would be inconsistent with such board's or governing body's fiduciary duties under applicable Law, provided, that the Debtors shall (x) comply with their obligations under Section 5(a)(xii) and (y) provide such information to the Consenting Parties' Advisors regarding (A) any discussions and/or negotiations relating to any such proposal and/or (B) any amendments, modifications or other changes to, or any further developments of, any such proposal, in any such case as is necessary to keep the Consenting Parties' Advisors contemporaneously informed as to the status and substance of such discussions, negotiations, amendments, modifications, changes and/or developments;

(ii)    announce publicly, or announce to any of the Restructuring Support Parties or other holders of Claims and Interests, its intention not to support the Restructuring;

(iii)    take any action that is inconsistent with this Agreement or any of the Restructuring Documents, or that would, or would reasonably be expected to, prevent, interfere with, delay or impede the implementation, solicitation, confirmation, or consummation of the Restructuring (including, but not limited to, the Bankruptcy Court's approval of the Restructuring Documents, the Solicitation and confirmation of the Plan), including, but not limited to, (A) initiating any Proceeding or taking any other action to oppose the execution or delivery of any of the Restructuring Documents, the performance of any obligations of any party to any of the Restructuring Documents or the consummation of the transactions contemplated by any of the Restructuring Documents, (B) initiating any Proceeding or taking any other action to amend, supplement or otherwise modify any of the Restructuring Documents, which amendment, modification or supplement is not consistent in all material respects with this Agreement or otherwise reasonably acceptable to the Requisite Parties, or (C) initiating any Proceeding or taking any other action that is barred by or is otherwise inconsistent with this Agreement, the Restructuring Term Sheet or any of the other Restructuring Documents;

(iv)     execute, deliver and/or file any Restructuring Document (including any amendment, supplement or modification of, or any waiver to, any Restructuring Document) that, in whole or in part, is not consistent in all material respects with this Agreement or is not otherwise reasonably acceptable to the Requisite Parties, or file any pleading seeking authorization to accomplish or effect any of the foregoing;

(v)     move for an order from the Bankruptcy Court authorizing or directing the assumption or rejection of any executory contract (including any employment agreement or employee benefit plan) or unexpired lease (other than a Related Party Contract), other than any assumption or rejection that (A) is done with the advance written consent of the Requisite Backstop Parties, which consent shall not be unreasonably withheld, or (B) is expressly contemplated by the Plan;

(vi)     assume or reject any Related Party Contract without the consent of the Requisite Backstop Parties in their sole and absolute discretion;

(vii)     (A) seek discovery in connection with, prepare or commence an avoidance action or other legal Proceeding that challenges (x) the amount, validity, allowance, character, enforceability or priority of any Claims and Interests of any of the Creditor Parties, or (y) the validity, enforceability or perfection of any lien or other encumbrance securing any Claims and Interests of any of the Creditor Parties, or (B) support any third party in connection with any of the acts described in clause (A);

(viii)     enter into any commitment or agreement with respect to debtor-in-possession financing, cash collateral usage, exit financing and/or other financing arrangements, other than the DIP Facility, the New MDL Term Loan Facility, the New First Lien Term Loan Credit Facility, the New Second Lien Notes, and the New Revolving Loans;

(ix)     assert, or support any assertion by any third party, that, in order to act on the provisions of Section 6 hereof, the Creditor Parties shall be required to obtain relief from the automatic stay from the Bankruptcy Court (and each of the Debtors hereby waives, to the greatest extent possible, the applicability of the automatic stay to the giving of any Termination Notice (as defined below) in accordance with Section 6 hereof);

(x)     grant or agree to grant any increase in the wages, salary, bonus, commissions, retirement benefits, severance or other compensation or benefits of any director, manager, officer or employee of, or any physician or other professional that is retained or engaged by, any of the Debtors or any of their respective Subsidiaries, except for any increase that is done in the ordinary course of business consistent with past practices;

(xi)     enter into, adopt or establish any new compensation or employee benefit plans or arrangements (including employment agreements), or amend or agree to amend any existing compensation or employee benefit plans or arrangements (including employment agreements), except for any of the foregoing that is done in the ordinary course of business consistent with past practices;

(xii)    amend or propose to amend its certificate or articles of incorporation, certificate of formation, bylaws, limited liability company agreement, partnership agreement or similar organizational documents;

(xiii)    authorize, create or issue any additional Equity Interests in any of the Debtors, or redeem, purchase, acquire, declare any distribution on or make any distribution on any Equity Interests in any of the Debtors;

(xiv)    pay, or agree to pay, any indebtedness, liabilities or other obligations (including any accounts payable or trade payable) that existed prior to the Petition Date or that arose from any matter, occurrence, action, omission or circumstance that occurred prior to the Petition Date, unless the Bankruptcy Court authorizes the Debtors to pay such indebtedness, liabilities or other obligations (including any accounts payable or trade payable) pursuant to the relief granted in connection with the First Day Motions (each of which, for the avoidance of doubt, shall contain terms and conditions that shall be in form and substance reasonably acceptable to the Requisite Backstop Parties);

(xv)    settle, agree to settle or compromise any Proceeding described in clause (A) of Section 5(a)(ix) (without giving effect to the exception set forth at the end of such clause (A)) without the prior written consent of the Requisite Backstop Parties, which shall not be unreasonably withheld;

(xvi)    [Intentionally Deleted]; and

(xvii)    permit:

(A)    the actual "Patient Service Receipts" for the most recently ended Four-Week Rolling Test Period to be less than 90% of the projected "Patient Service Receipts" line item for such Four-Week Rolling Test Period in the Approved Budget in effect at such time (the "Receipts Variance");

(B)    the actual "Total Operating Disbursements" for the most recently ended Four-Week Rolling Test Period to exceed 110% of the projected "Total Operating Disbursements" line item for such Four-Week Rolling Test Period in the Approved Budget in effect at such time (the "Disbursements Variance");

(C)    the variance in actual "Net Cash Flow" before "Total Special Payments" for the most recently ended Cumulative Test Period as compared to the "Net Cash Flow" before "Total Special Payments" line item for such Cumulative Test Period in the then in-effect Approved Budget to be more unfavorable than the greater of (i) $2.0 million and (ii) 10% of the "Net Cash Flow" before "Total Special Payments" line item for such Cumulative Test Period in the Approved Budget in effect at such time (the "Net Cash Flow Variance" and, together with the Receipts Variance and the Disbursements Variance, the "Permitted Variances");

(D) non-cash accruals, charges or expenses in respect of "Total Special Payments" for any Cumulative Test Period to exceed $25.0 million (the "<u>Special Payments Accrual Covenant</u>"); or

(E) the sum of the following to exceed $5.0 million for any Three-Month Rolling Test Period: (w) bad debt expense for such Three-Month Rolling Test Period in excess of $5.5 million; (x) post-petition litigation and/or settlement expenses or charges and/or expenses or charges ancillary or related thereto for such Three-Month Rolling Test Period; (y) non-cash accruals, charges or expenses for such Three-Month Rolling Test Period that are incurred outside the ordinary course of business (excluding in respect of professional fees and expenses); and (z) non-cash accruals, charges or expenses for such Three-Month Rolling Test Period incurred in the ordinary course of business in excess of the historical run-rate amount of such non-cash accruals, charges or expenses for such period (the "<u>Non-Cash Accrual Covenant</u>").

The covenants set forth in <u>clauses (A)-(E)</u> of this <u>Section 5(b)(xvii)</u> shall be referred to herein as the "<u>Financial Covenants</u>".

## 6.    <u>Termination of Agreement.</u>

(a)    <u>Backstop Party Termination Events</u>.    The Requisite Backstop Parties may terminate this Agreement with respect to all Restructuring Support Parties, and such termination shall be effective immediately upon written notice (each, a "<u>Backstop Party Termination Notice</u>") being delivered by the Requisite Backstop Parties to each of the non-terminating Restructuring Support Parties and their respective counsel in accordance with <u>Section 21</u> hereof, at any time after the occurrence, and during the continuation, of any of the following events (each, a "<u>Backstop Party Termination Event</u>"), unless waived in writing by the Requisite Backstop Parties:

(i)    the breach in any material respect (without giving effect to any "materiality" qualifiers set forth therein) by any Debtor or any Equity Party of any of its covenants, undertakings, obligations, representations or warranties contained in this Agreement, and, to the extent such breach is curable, such breach remains uncured for a period of five (5) Business Days (it being understood and agreed that the failure by the Debtors to comply with any of the covenants set forth in <u>Section 5(a)(iv)</u> by the deadlines set forth therein shall not be subject to cure); <u>provided</u>, <u>however</u>, that the right to terminate this Agreement under this Section 6(a)(i) on account of a failure by the Debtors to comply with the Milestones set forth in Section 5(a)(iv) hereof shall not be available to any Backstop Party if the Debtors' failure to comply with such Milestones is caused solely by, or results solely from, the breach by any of the Backstop Parties of their respective covenants, agreements or obligations under this Agreement;

(ii)    the breach in any material respect (without giving effect to any "materiality" qualifiers set forth therein) by one or more of the Consenting Existing Lenders (other than any of the Specified Backstop Parties or the Specified Creditor Parties) of any of their

covenants, undertakings, obligations, representations or warranties contained in this Agreement such that the non-breaching Consenting Existing Lenders (other than the Specified Backstop Parties and the Specified Creditor Parties) own or control less than 50.0% in aggregate principal amount of the Existing Loans owned or controlled by all of the Consenting Existing Lenders (other than the Specified Backstop Parties and the Specified Creditor Parties), which breach remains uncured for a period of five (5) Business Days;

(iii)    any Debtor obtains debtor-in-possession financing (other than the Backstop Parties DIP Facility) that is in an amount, on terms and conditions, from banks or other financial institutions, or otherwise in form and substance, that (in any such case) is/are not acceptable to the Requisite Backstop Parties in their sole and absolute discretion;

(iv)    the occurrence of (A) an "Event of Default" under the DIP Credit Agreement or either of the DIP Orders (without giving effect to any amendments, supplements, modifications or waivers to the DIP Credit Agreement or either of the DIP Orders made or provided after the Restructuring Support Effective Date) or (B) an acceleration of the obligations or termination of commitments under the DIP Credit Agreement;

(v)    to the extent in effect, the Backstop Purchase Agreement shall have been terminated in accordance with its terms;

(vi)    the issuance by any Governmental Entity, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order making illegal, enjoining, or otherwise preventing or prohibiting the consummation of the Restructuring, unless such ruling, judgment or order has been stayed, reversed or vacated within five (5) Business Days after the date of such issuance;

(vii)    the occurrence of a Material Adverse Effect;

(viii)    the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any assets of any Debtor having an aggregate fair market value in excess of $1,500,000; provided, however, that any modification of the automatic stay expressly provided by either of the DIP Orders shall not constitute a Backstop Party Termination Event;

(ix)    the Bankruptcy Court grants relief that (A) is inconsistent with this Agreement in any material respect or (B) would, or would reasonably be expected to, frustrate the purposes of this Agreement, including by preventing the consummation of the Restructuring;

(x)    after entry by the Bankruptcy Court of either DIP Order, the Backstop Order, the Disclosure Statement Order, the RSA Order, or the Confirmation Order, any such order is reversed, stayed, dismissed, vacated, reconsidered, modified or amended without the approval of the Requisite Backstop Parties;

(xi)    the Bankruptcy Court enters an order terminating any Debtor's exclusive right to file and/or solicit acceptances of a plan of reorganization;

(xii)      the Bankruptcy Court enters an order authorizing or directing the assumption, assumption and assignment, or rejection of an executory contract (including any employment agreement, severance agreement or other employee benefit plan) or unexpired lease, other than any assumption or rejection that (A) is approved in advance by the Requisite Backstop Parties or (B) is expressly contemplated by the Plan;

(xiii)     any Debtor (A) withdraws the Plan, (B) publicly announces, or announces to any of the Restructuring Support Parties or other holders of Claims and Interests, its intention to withdraw the Plan or not support the Plan, (C) moves to voluntarily dismiss any of the Chapter 11 Cases, (D) moves for conversion of any of the Chapter 11 Cases to cases under chapter 7 under the Bankruptcy Code or (E) moves for the appointment of an examiner with expanded powers or a chapter 11 trustee, and, in any such case, such withdrawal, announcement or motion, as applicable, has not been withdrawn or retracted by any Debtor within ten (10) Business Days after the date such withdrawal, announcement or motion was made;

(xiv)     the waiver, amendment or modification of the Plan or any of the other Restructuring Documents, or the filing by any Debtor of a pleading seeking to waive, amend or modify any term or condition of the Plan or any of the other Restructuring Documents, which waiver, amendment, modification or filing contains any provision that (A) is not consistent in all material respects with this Agreement or (B) otherwise reasonably acceptable to the Requisite Backstop Parties;

(xv)      the Bankruptcy Court enters an order invalidating, disallowing, subordinating, recharacterizing, or limiting, as applicable, any of the Senior Notes Claims, Credit Facility Claims or MDL Facility Claims;

(xvi)     the Bankruptcy Court enters an order (A) directing the appointment of an examiner with expanded powers or a chapter 11 trustee, (B) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or (C) dismissing any of the Chapter 11 Cases;

(xvii)    any Debtor violates Section 5(b)(i); or

(xviii)   either (A) the Requisite Consenting Existing Lenders terminate this Agreement with respect to the Consenting Existing Lenders pursuant to Section 6(b) or (B) any Equity Party terminates this Agreement with respect to such Equity Party pursuant to Section 6(c).

(b)      Consenting Existing Lender Termination Events.  The Requisite Consenting Existing Lenders may terminate this Agreement only with respect to the Consenting Existing Lenders, and such termination shall be effective immediately upon written notice (each, a "Consenting Existing Lender Termination Notice") delivered to each of the non-terminating Restructuring Support Parties in accordance with Section 21 hereof, at any time after the occurrence, and during the continuation, of any of the following events (each, a "Consenting Existing Lender Termination Event"), unless waived in writing by the Requisite Consenting Existing Lenders:

-30-

(i)     (A) the breach in any material respect (without giving effect to any "materiality" qualifiers set forth therein) by any Debtor of any of its covenants, undertakings, obligations, representations or warranties contained in this Agreement to the extent (and solely to the extent) such breach materially and adversely affects the Credit Facility Claims (including the treatment thereof under the Plan) or the releases to be received by the Consenting Existing Lenders or their respective Related Parties under the Plan, and (B) to the extent such breach is curable, such breach remains uncured for a period of five (5) Business Days (it being understood and agreed that the failure by the Debtors to comply with any of the covenants set forth in Section 5(a)(iv) shall not result in a Consenting Existing Lender Termination Event);

(ii)     the breach in any material respect (without giving effect to any "materiality" qualifiers set forth therein) by one or more of the Consenting Noteholders of any of their covenants, undertakings, obligations, representations or warranties contained in this Agreement such that the non-breaching Consenting Noteholders own or control less than 50.0% in aggregate principal amount of the Senior Notes owned or controlled by all of the Consenting Noteholders, which breach remains uncured for a period of five (5) Business Days;

(iii)     to the extent in effect, the Backstop Purchase Agreement shall have been terminated in accordance with its terms;

(iv)     any Debtor (A) withdraws the Plan, (B) publicly announces, or announces to any of the Restructuring Support Parties or other holders of Claims and Interests, its intention to withdraw the Plan or not support the Plan, (C) moves to voluntarily dismiss any of the Chapter 11 Cases, (D) moves for conversion of any of the Chapter 11 Cases to cases under chapter 7 under the Bankruptcy Code, or (E) moves for the appointment of an examiner with expanded powers or a chapter 11 trustee, and, in any such case, such withdrawal, announcement or motion, as applicable, has not been withdrawn or retracted by any Debtor within ten (10) Business Days after the date such withdrawal, announcement or motion was made;

(v)     the waiver, amendment or modification of the Plan or any of the other Restructuring Documents, or the filing by any Debtor of a pleading seeking to waive, amend or modify any term or condition of the Plan or any of the other Restructuring Documents, which waiver, amendment, modification or filing contains any provision that (A) is not consistent in all material respects with this Agreement, and (B) materially and adversely affects the treatment of the Credit Facility Claims or the releases to be received by the Consenting Existing Lenders or their respective Related Parties under the Plan;

(vi)     the Bankruptcy Court grants relief that (A)(x) is inconsistent with this Agreement in any material respect or (y) would, or would reasonably be expected to, frustrate the purposes of this Agreement, including by preventing the consummation of the Restructuring, and (B) materially and adversely affects the treatment of the Credit Facility Claims under the Plan  or the releases to be received by the Consenting Existing Lenders or their respective Related Parties under the Plan;

(vii)     after entry by the Bankruptcy Court of the DIP Order, the Backstop Order, the Disclosure Statement Order, the RSA Order, or the Confirmation Order, (A) any such order is reversed, stayed, dismissed, vacated, reconsidered, modified or amended without the approval

of the Requisite Consenting Existing Lenders and (B) such reversal, stay, dismissal, vacatur, reconsideration, modification or amendment, as applicable, materially and adversely affects the treatment of the Credit Facility Claims under the Plan  or the releases to be received by the Consenting Existing Lenders or their respective Related Parties under the Plan;

(viii)   the Bankruptcy Court enters an order invalidating, disallowing, subordinating, recharacterizing, or limiting, as applicable, any of the Credit Facility Claims;

(ix)   the Bankruptcy Court enters an order (A) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (B) dismissing the Chapter 11 Cases;

(x)   the issuance by any Governmental Entity, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order making illegal, enjoining, or otherwise preventing or prohibiting the consummation of the Restructuring, unless, in each case, such ruling, judgment or order has been issued at the request of any of the Consenting Existing Lenders, or, in all other circumstances, such ruling, judgment or order has been stayed, reversed or vacated within five (5) Business Days after such issuance;

(xi)   the Effective Date shall not have occurred by February 28, 2018 (the "End Date"); provided, however, that the right to terminate this Agreement under this Section 6(b)(xi) shall not be available to the Requisite Consenting Existing Lenders if the failure of the Effective Date to have occurred by the End Date is caused by, or results from, the breach by any of the Consenting Existing Lenders of their respective covenants, agreements or other obligations under this Agreement; or

(xii)   the Requisite Backstop Parties terminate this Agreement pursuant to Section 6(a).

(c)   Equity Party Termination Events.  An Equity Party may terminate this Agreement only with respect to itself, and such termination shall be effective immediately upon written notice (each, an "Equity Party Termination Notice") delivered to each of the non-terminating Restructuring Support Parties in accordance with Section 21 hereof, at any time after the occurrence, and during the continuation, of any of the following events (each, an "Equity Party Termination Event"), unless waived in writing by such Equity Party:

(i)   the breach in any material respect (without giving effect to any "materiality" qualifiers set forth therein) by one or more of the Consenting Noteholders of any of their covenants, undertakings, obligations, representations or warranties contained in this Agreement such that the non-breaching Consenting Noteholders own or control less than 50% in aggregate principal amount of the Senior Notes owned or controlled by all of the Consenting Noteholders, which breach remains uncured for a period of five (5) Business Days;

(ii)   the Bankruptcy Court grants relief that (A) is inconsistent with this Agreement in any material respect and (B) materially and adversely affects the treatment of the Existing Equity Interests under the Plan or the releases to be received by such Equity Party or its Related Parties under the Plan;

(iii)     the Bankruptcy Court enters an order (A) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (B) dismissing the Chapter 11 Cases;

(iv)     the issuance by any Governmental Entity, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order making illegal, enjoining, or otherwise preventing or prohibiting the consummation of the Restructuring, unless, in each case, such ruling, judgment or order has been issued at the request of any of the Equity Parties, or, in all other circumstances, such ruling, judgment or order has been stayed, reversed or vacated within five (5) Business Days after such issuance; or

(v)     the Effective Date shall not have occurred by the End Date; provided, however, that the right to terminate this Agreement under this Section 6(c)(v) shall not be available to any Equity Party if the failure of the Effective Date to have occurred by the End Date is caused by, or results from, the breach by any of the Equity Parties of their respective covenants, agreements or other obligations under this Agreement.

(d)     Debtor Termination Events.  The Debtors may terminate this Agreement with respect to all Restructuring Support Parties, and such termination shall be effective immediately upon written notice (each, a "Debtor Termination Notice" and, together with a Backstop Party Termination Notice, a Consenting Existing Lender Termination Notice and an Equity Party Termination Notice, a "Termination Notice") delivered to each of the non-terminating Restructuring Support Parties in accordance with Section 21 hereof, at any time after the occurrence, and during the continuation, of any of the following events (each, a "Debtor Termination Event" and, together with each Backstop Party Termination Event, each Consenting Existing Lender Termination Event and each Equity Party Termination Event, each, a "Termination Event" and, collectively, the "Termination Events"), unless waived in writing by the Debtors:

(i)     the breach in any material respect (without giving effect to any "materiality" qualifiers set forth therein) by one or more of the Consenting Noteholders of any of their covenants, undertakings, obligations, representations or warranties contained in this Agreement such that the non-breaching Consenting Noteholders own or control less than 50.0% in aggregate principal amount of the Senior Notes owned or controlled by all of the Consenting Noteholders, which breach remains uncured for a period of five (5) Business Days;

(ii)     the Bankruptcy Court enters an order (A) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (B) dismissing the Chapter 11 Cases;

(iii)     the issuance by any Governmental Entity, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order making illegal, enjoining, or otherwise preventing or prohibiting the consummation of the Restructuring, unless, in each case, such ruling, judgment or order has been issued at the request one or more Debtors, or, in all other circumstances, such ruling, judgment or order has been stayed, reversed or vacated within five (5) Business Days after such issuance;

(iv)     the board of directors of 21C Holdings determines in good faith, and after consultation with outside counsel, that the Restructuring is not in the best interests of the

Debtors' estates and continued support for the Restructuring would be inconsistent with the exercise of its fiduciary duties under applicable Law; provided, however, that in the event the Debtors desire to terminate this Agreement pursuant to this Section 6(d)(iv) (such right to terminate this Agreement pursuant to this Section 6(d)(iv), the "Fiduciary Out"), the Debtors shall provide at least five (5) Business Days advance written notice to the Consenting Parties' Advisors prior to the date the Debtors elect to terminate this Agreement pursuant to the Fiduciary Out (such five (5) Business Day period, the "Termination Period") advising the Consenting Parties' Advisors that the Debtors intend to terminate this Agreement pursuant to the Fiduciary Out and specifying, in reasonable detail, the reasons therefor (including the material facts and circumstances related thereto and, to the extent applicable, the terms, conditions and provisions of any Alternative Transaction that the Debtors may pursue), and during the Termination Period, the Debtors shall cause their advisors to use good faith efforts to discuss with the Requisite Backstop Parties and the Requisite Consenting Existing Lenders the need for the Debtors to exercise the Fiduciary Out; or

(v)     the Effective Date shall not have occurred by the End Date; provided, however, that the right to terminate this Agreement under this Section 6(d)(v) shall not be available to the Debtors if the failure of the Effective Date to have occurred by the End Date is caused by, or results from, the breach by any of the Debtors of their respective covenants, agreements or other obligations under this Agreement.

(e)     Mutual Termination.  This Agreement may be terminated by mutual written agreement among the Debtors, the Requisite Backstop Parties, the Requisite Consenting Existing Lenders and the Requisite Consenting Noteholders.  Notwithstanding anything in this Agreement to the contrary, this Agreement shall terminate automatically without further required action upon the occurrence of the Effective Date.

(f)     Special Termination Rights.

(i)     Each Specified Backstop Party shall have the right to terminate its obligation to provide its Backstop Commitment pursuant to this Agreement, and such termination shall be effective immediately upon written notice (each, a "Special Termination Notice") delivered to the Debtors and each of the Consenting Parties' Advisors in accordance with Section 21 hereof, any time at or prior to 12:00 p.m. (Eastern Time) on June 26, 2017 (such time on such date, the "Expiration Time") if such Specified Backstop Party is not satisfied with the results of its due diligence investigation in respect of the historical or projected financial performance of the Debtors and their Subsidiaries, including on account of the substance of the findings of such due diligence investigation or a conclusion that such Specified Backstop Party has not received sufficient or complete information with respect to any matter; provided that if the basis for such termination is the failure by the Debtors or their Subsidiaries to have provided sufficient or complete information in response to a diligence request, such Specified Backstop Party must first make a written request for such information.  No Specified Backstop Party shall be permitted to terminate its obligations under this Section 6(f)(i) based solely on information provided to it by any Debtor or any Subsidiary of any Debtor prior to May 23, 2017 (as such information existed prior to May 23, 2017 and without taking into account any modification, alteration or change to such information (or the meaning thereof) arising from information provided to such Specified Backstop Party on or after May 23, 2017).  The election by a

46944535.13:

Specified Backstop Party to terminate its obligation to provide its Backstop Commitment pursuant to this Agreement in accordance with this Section 6(f)(i) shall be made by such Specified Backstop Party in its sole and absolute discretion. Any Specified Backstop Party that terminates its obligation to provide its Backstop Commitment pursuant to this Agreement in accordance with this Section 6(f)(i) shall, effective immediately upon such termination, (x) cease to constitute a Backstop Party hereunder and shall be deemed to be a Specified Creditor Party hereunder (and the Debtors are hereby authorized and directed to update Schedule 2 attached hereto to remove the name of such Specified Backstop Party from such Schedule 2 and to include the name of such Specified Backstop Party on a new Schedule 4 to be attached hereto), (y) be deemed released from all obligations and agreements under this Agreement to provide its Backstop Commitment and (z) have no further rights, benefits or privileges hereunder as a Backstop Party, including any right to receive any portion of the Put Option Payment or the Liquidated Damages Payment. Any Specified Backstop Party that has not delivered a Special Termination Notice to each of the Debtors and each of the Consenting Parties' Advisors in accordance with Section 21 hereof at or prior to the Expiration Time shall be deemed to have irrevocably waived its right to terminate its obligation to provide its Backstop Commitment pursuant to this Agreement under this Section 6(f)(i). If any Specified Backstop Party terminates its obligation to provide its Backstop Commitment pursuant to this Agreement in accordance with this Section 6(f)(i), then this Agreement shall terminate with respect to all Restructuring Support Parties at the later of (A) 11:59 p.m. (Eastern Time) on the tenth (10th) Business Day following the date on which the Special Termination Notice is delivered by such Specified Backstop Party and (B) the Expiration Time, unless, at or prior to such time, Backstop Parties assume in writing the obligation to provide the entire Backstop Commitment of such Specified Backstop Party.

(ii)        Prior to the Expiration Time, the Debtors shall provide the Specified Backstop Parties' and the Consenting Existing Lenders' Consenting Parties' Advisors and other representatives with access to (and the right to examine and make copies of), during regular business hours, (A) the books, work papers, records and materials of any Debtor or any Subsidiary of any Debtor, and (B) the personnel of any Debtor (and such Debtor shall cause such personnel to cooperate and work in good faith with such Consenting Parties' Advisors and other representatives), in each case, as reasonably requested by such Consenting Parties' Advisors for purposes of the Specified Backstop Parties' due diligence investigation in respect of the historical or projected financial performance of the Debtors and their Subsidiaries. The Debtors shall make arrangements for the foregoing information to be made public to the extent requested by the Consenting Existing Lenders and consistent with past practice.

(g)        Effect of Termination. Upon the termination of this Agreement with respect to any Restructuring Support Party in accordance with this Section 6, and except as provided in Section 15 hereof, this Agreement shall forthwith become void and of no further force or effect with respect to such Restructuring Support Party, and each such Restructuring Support Party shall, except as otherwise expressly provided in this Agreement, be immediately released from its liabilities, obligations, commitments, undertakings and agreements under or related to this Agreement, have no further rights, benefits or privileges hereunder, and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement, including all rights and remedies available to it under applicable Law and, in the

case of the Creditor Parties, the Senior Notes Indenture or any of the other Note Documents, the Existing MDL Agreement or any of the other MDL Credit Documents, and the Existing Credit Agreement or any of the other Existing Loan Documents; provided, however, that in no event shall any such termination relieve a Restructuring Support Party from (i) liability for its breach or non-performance of its obligations hereunder prior to the date of such termination or (ii) obligations under this Agreement which by their terms expressly survive termination of this Agreement.  Notwithstanding anything to the contrary herein, any of the Termination Events may be waived in accordance with the procedures established by <u>Section 9</u> hereof, in which case the Termination Event so waived shall be deemed not to have occurred, this Agreement shall be deemed to continue in full force and effect, and the rights and obligations of the Restructuring Support Parties shall be restored, subject to any modification set forth in such waiver.  If this Agreement has been terminated in accordance with this <u>Section 6</u> at a time when permission of the Bankruptcy Court shall be required for a Creditor Party to change or withdraw (or cause to change or withdraw) its vote to accept the Plan, neither the Debtors nor any of the Equity Parties shall oppose any attempt by such Creditor Party to change or withdraw (or cause to change or withdraw) such vote at such time.

(h)     <u>Automatic Stay</u>.  The Debtors acknowledge and agree, and shall not dispute, that after the commencement of the Chapter 11 Cases, the giving of a Termination Notice by the Requisite Backstop Parties, the Requisite Consenting Existing Lenders or any Equity Party pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and the Debtors hereby waive, to the greatest extent possible, the applicability of the automatic stay to the giving of such Termination Notice), and no cure period contained in this Agreement shall be extended without the prior written consent of the Requisite Backstop Parties, the Requisite Consenting Existing Lenders, or any Equity Party, as applicable.

## 7.     <u>Good Faith Cooperation; Further Assurances; Acknowledgement.</u>

During the Restructuring Support Period, the Restructuring Support Parties shall cooperate with each other in good faith and shall coordinate their activities with each other (to the extent practicable and subject to the terms hereof) in respect of (a) all matters concerning the implementation of the Restructuring, and (b) the pursuit and support of the Restructuring (including confirmation of the Plan).  Furthermore, subject to the terms hereof, each of the Restructuring Support Parties shall take such action as may be reasonably necessary to carry out the purposes and intent of this Agreement and the Restructuring, including making and filing any required Governmental Entity filings and voting any Claims and Interests in favor of the Plan (provided that, none of the Creditor Parties shall be required to incur, assume, become liable in respect of or suffer to exist any expenses, liabilities or other obligations, or agree to or become bound by any commitments, undertakings, concessions, indemnities or other arrangements that could result in expenses, liabilities or other obligations to such Creditor Party, in connection therewith).  This Agreement is not, and shall not be deemed, a solicitation of votes for the acceptance of a chapter 11 plan of reorganization or a solicitation to tender or exchange any securities.  The acceptance of the Plan by the Creditor Parties will not be solicited until entry by the Bankruptcy Court of the Disclosure Statement Order and the Creditor Parties have received the Disclosure Statement and related ballots, as approved by the Bankruptcy Court.

8.    **Representations and Warranties.**

(a)    Each Restructuring Support Party, severally (and not jointly (except that the representations and warranties of the Vestar Funds shall be joint and several representations and warranties of the Vestar Funds)), represents and warrants to the other Restructuring Support Parties that the following statements are true and correct as of the date hereof (or, in the case of a Creditor Party that becomes a party hereto after the Restructuring Support Effective Date, as of the date such Creditor Party becomes a party hereto):

(i)    such Restructuring Support Party is validly existing and in good standing under the Laws of its jurisdiction of incorporation, organization or formation (as applicable), and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated under this Agreement and perform its obligations contemplated under this Agreement, and the execution and delivery of this Agreement by such Restructuring Support Party and the performance of such Restructuring Support Party's obligations under this Agreement have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

(ii)    the execution, delivery and performance by such Restructuring Support Party of this Agreement do not and shall not (A) violate any provision of Law applicable to it, (B) violate its or any of its Subsidiaries' certificate or articles of incorporation, certificate of formation, bylaws, limited liability company agreement, partnership agreement or similar organizational documents, (C) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its Subsidiaries is a party, other than breaches that arise from the filing of the Chapter 11 Cases, or (D) result in the creation of any lien or other encumbrance of any of its Claims and Interests (except for any lien or encumbrance created by this Agreement);

(iii)    the execution, delivery and performance by such Restructuring Support Party of this Agreement do not and shall not require any registration or filing with, consent or approval of, or notice to, or other action of, with or by, any Governmental Entity, except such filings as may be necessary or required under the Bankruptcy Code;

(iv)    subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code, this Agreement is the legally valid and binding obligation of such Restructuring Support Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court or any other court of competent jurisdiction;

(v)    such Restructuring Support Party (A) is a sophisticated party with respect to the subject matter of this Agreement and the transactions contemplated hereby, (B) has adequate information concerning the matters that are the subject of this Agreement and the transactions contemplated hereby, (C) has such knowledge and experience in financial and business matters of this type that it is capable of evaluating the merits and risks of entering into this Agreement and of making an informed investment decision, and has independently and without reliance upon any warranty or representation by, or information from, any other

-37-

46944535.13:

Restructuring Support Party or any officer, employee, agent or representative thereof, of any sort, oral or written, except the warranties and representations expressly set forth in this Agreement, and based on such information as such Restructuring Support Party has deemed appropriate, made its own analysis and decision to enter into this Agreement and the transactions contemplated hereby, and (D) acknowledges that it has entered into this Agreement voluntarily and of its own choice and not under coercion or duress;

(vi)     such Restructuring Support Party is not aware of the occurrence of any Event that, due to any fiduciary or similar duty to any other Person, would prevent it from taking any action required of it under this Agreement; and

(vii)     such Restructuring Support Party is not currently engaged in any discussions, negotiations or other arrangements with respect to any Alternative Transaction with any Person that owns or holds Claims and Interests.

(b)     Each Restructuring Support Party (other than the Debtors) severally (and not jointly (except that the representations and warranties of the Vestar Funds shall be joint and several representations and warranties of the Vestar Funds)) represents and warrants to each other Restructuring Support Party that, as of the date hereof (or, in the case of a Creditor Party that becomes a party hereto after the Restructuring Support Effective Date, as of the date such Creditor Party becomes a party hereto):

(i)     such Restructuring Support Party (A) is the sole beneficial owner of the principal amount or number of Claims and Interests, as applicable, set forth below its name on the signature page hereof (or, in the case of a Creditor Party that becomes a party hereto after the Restructuring Support Effective Date, below its name on the signature page of the Joinder Agreement executed and delivered by such Creditor Party), and/or (B) has full power and authority to vote on and consent to matters concerning such Claims and Interests, or to exchange, assign and Transfer such Claims and Interests, and to bind the beneficial owners of such Claims and Interests to any such vote, consent, exchange, assignment or Transfer;

(ii)     such Restructuring Support Party has made no prior assignment, sale, participation, grant, conveyance or other Transfer of, and has not entered into any agreement to assign, sell, participate, grant, convey or otherwise Transfer, in whole or in part, any portion of its right, title, or interests in any Claims and Interests that is inconsistent with the representations and warranties of such Restructuring Support Party herein or would render such Restructuring Support Party otherwise unable to comply with this Agreement and perform its obligations hereunder;

(iii)     the Claims and Interests owned by such Restructuring Support Party are free and clear of any option, proxy, voting restriction, right of first refusal or other limitation on disposition of any kind that would reasonably be expected to adversely affect in any way the performance by such Restructuring Support Party of its obligations contained in this Agreement at the time such obligations are required to be performed;

(iv)     it is an Accredited Investor; and

46944535.13:

(v)     to the extent it is a Backstop Party or Consenting Noteholder, it acknowledges the Debtors' representation and warranty that the issuance of the New Preferred Equity and New Common Stock pursuant to the Plan is intended, as of the Effective Date, to be exempt from registration under the Securities Act pursuant to Section 4(a)(2) of the Securities Act and Regulation D thereunder or pursuant to section 1145 of the Bankruptcy Code.

(c)     The Debtors represent and warrant, on a joint and several basis, to the Creditor Parties that, as of the Restructuring Support Effective Date, the aggregate outstanding principal amount, as of the date hereof, of (i) the Senior Note Obligations is $368,177,181, (ii) the Existing Credit Facility Obligations is $720,185,000 (which amount does not include $2,700,469 in aggregate amount of undrawn and unexpired outstanding letters of credit), and (iii) the Existing MDL Obligations is $35,000,000 (in each case, excluding any fees, costs, expenses and indemnities that may be owed by the applicable obligors), and such amounts (together with accrued interest and fees thereon) are outstanding and owing by the Debtors without defense, offset or counterclaim.

It is understood and agreed that the representations and warranties made by a Creditor Party that is an investment manager, advisor or subadvisor of a beneficial owner of Claims and Interests are made with respect to, and on behalf of, such beneficial owner and not such investment manager, advisor or subadvisor, and, if applicable, are made severally (and not jointly) with respect to the investment funds, accounts and other investment vehicles managed by such investment manager, advisor or subadvisor.

### 9.     <u>Amendments and Waivers.</u>

(a)     Except as otherwise set forth herein, this Agreement, including the Restructuring Term Sheet and any other exhibits or schedules hereto, may not be amended, supplemented, amended and restated, modified or waived except in a writing signed by the Debtors and the Requisite Backstop Parties; <u>provided</u>, <u>however</u>, that: (i) any amendment, supplement or modification of or to this <u>Section 9</u> shall require the written consent of all of the Restructuring Support Parties; (ii) any amendment, supplement or modification to any of the definitions of "Requisite Parties", "Requisite Backstop Parties", "Requisite Consenting Noteholders", "Requisite Consenting Existing Lenders", "Restructuring Support Party Group", "Specified Backstop Parties" or "Specified Creditor Parties" shall also require the written consent of all of the Restructuring Support Parties included in any such definition; (iii) any amendment, supplement or modification to the definition of "Prohibited Change" with respect to any Restructuring Support Party Group shall also require the written consent of all Restructuring Support Parties included in such Restructuring Support Party Group; (iv) if any such amendment, supplement or modification results in a Prohibited Change with respect to a Restructuring Support Party Group, then such amendment, modification or supplement shall also require the written consent of (A) the Requisite Consenting Noteholders if such Restructuring Support Party Group is the Consenting Noteholders, (B) the Requisite Consenting Existing Lenders if such Restructuring Support Party Group is the Consenting Existing Lenders, (C) CPPIB if such Restructuring Support Party Group is CPPIB, or (D) the Vestar Funds if such Restructuring Support Party Group is the Vestar Funds and/or Investments; (v) if any such amendment, supplement, modification or waiver would adversely affect any of the rights or obligations (as applicable) of any Consenting Noteholder (in its capacity as a holder of Senior Notes Claims) set

forth in this Agreement in a manner that is different or disproportionate in any material respect from the effect on the rights or obligations (as applicable) of the Requisite Consenting Noteholders (in their capacity as holders of Senior Notes Claims) set forth in this Agreement (other than in proportion to the amount of such Senior Notes Claims), such amendment, modification, waiver or supplement shall also require the written consent of such affected Consenting Noteholder (it being understood that in determining whether consent of any Consenting Noteholder is required pursuant to this clause (v), no personal circumstances of such Consenting Noteholder shall be considered); (vi) if any such amendment, supplement, modification or waiver would adversely affect any of the rights or obligations (as applicable) of any Consenting Existing Lender (in its capacity as a holder of Credit Facility Claims) set forth in this Agreement in a manner that is different or disproportionate in any material respect from the effect on the rights or obligations (as applicable) of the Requisite Consenting Existing Lenders (in their capacity as holders of Credit Facility Claims) set forth in this Agreement (other than in proportion to the amount of such Credit Facility Claims), such amendment, supplement, modification or waiver shall also require the written consent of such affected Consenting Existing Lender (it being understood that in determining whether consent of any Consenting Existing Lender is required pursuant to this clause (vi), no personal circumstances of such Consenting Existing Lender shall be considered); (vii) any amendment, supplement or modification to Section 6(f) hereof shall require the written consent of the Debtors, each of the Specified Backstop Parties and the Requisite Consenting Existing Lenders; provided, however, that any Specified Backstop Party shall be entitled to waive its rights under Section 6(f) without the written consent of the Debtors, the Requisite Consenting Existing Lenders and the other Specified Backstop Parties; and (viii) if the breach by any Restructuring Support Party of any of its covenants, undertakings, obligations, representations or warranties contained in this Agreement would permit any other Restructuring Support Party or Restructuring Support Parties to terminate this Agreement pursuant to Section 6 as a result of such breach, then the compliance by such Restructuring Support Party with any such covenant, undertaking, obligation, representation or warranty contained in this Agreement, or the breach thereof, may only be waived by the Restructuring Support Party or Restructuring Support Parties that is/are permitted to terminate this Agreement pursuant to Section 6 as a result of such breach.

(b)      Anything herein to the contrary notwithstanding, except to the extent required by applicable Law (including any order of the Bankruptcy Court) (in which case, any such amendment, supplement or modification must be acceptable to the Requisite Backstop Parties), none of the provisions of the Restructuring Term Sheet identified on Schedule 3 attached hereto shall be amended, supplemented or otherwise modified without the written consent of the Requisite Parties and each Specified Backstop Party that is adversely affected thereby; provided, however, that no Backstop Commitment of any Backstop Party may be amended, supplemented or otherwise modified without the written consent of such Backstop Party.

(c)      In determining whether any consent or approval has been given or obtained by the Requisite Consenting Noteholders or the Requisite Consenting Existing Lenders (as applicable), any then-existing Consenting Noteholder or Consenting Existing Lender (as applicable) that is in material breach of its covenants, obligations or representations under this Agreement (and the respective Senior Notes or Existing Loans (as applicable) held by such Creditor Party) shall be excluded from such determination and the Senior Notes or Existing Loans (as applicable) held by such Creditor Party shall be treated as if they were not outstanding.

10. **Transaction Expenses.**

(a)    Whether or not the transactions contemplated by this Agreement are consummated and, in each case, subject to the terms of the applicable engagement letter or fee reimbursement letter, the DIP Orders (after the DIP Orders are entered by the Bankruptcy Court), and the Backstop Order (after the Backstop Order is entered by the Bankruptcy Court), the Debtors hereby agree, on a joint and several basis, to pay in cash the Transaction Expenses as follows: (i) all accrued and unpaid Transaction Expenses incurred up to (and including) the Restructuring Support Effective Date shall be paid in full in cash on the Restructuring Support Effective Date, (ii) prior to the Petition Date and after the Restructuring Support Effective Date, all accrued and unpaid Transaction Expenses shall be paid in full in cash by the Debtors on a regular and continuing basis promptly (but in any event within five (5) Business Days) and no later than the Business Day prior to the Petition Date against receipt of reasonably detailed invoices, (iii) after the Petition Date, to the extent permitted by order of the Bankruptcy Court, all accrued and unpaid Transaction Expenses shall be paid in full in cash by the Debtors on a regular and continuing basis promptly (but in any event within five (5) Business Days) against receipt of reasonably detailed invoices, (iv) upon termination of this Agreement with respect to any Restructuring Support Party, all accrued and unpaid Transaction Expenses of the Consenting Parties' Advisors to such Restructuring Support Party incurred up to (and including) the date of such termination shall be paid promptly (but in any event within five (5) Business Days) in full in cash, against receipt of reasonably detailed invoices, and (v) on the Effective Date, so long as this Agreement has not been terminated with respect to all Restructuring Support Parties (other than a termination pursuant to the second sentence of Section 6(e)), all accrued and unpaid Transaction Expenses incurred up to (and including) the Effective Date shall be paid in full in cash on the Effective Date against receipt of reasonably detailed invoices, without any requirement for Bankruptcy Court review or further Bankruptcy Court order.  For the avoidance of doubt, copies of all invoices shall be provided contemporaneously to the Debtors and the Consenting Parties' Advisors.

(b)    The terms set forth in this Section 10 shall survive termination of this Agreement and shall remain in full force and effect regardless of whether the transactions contemplated by this Agreement are consummated.  The Debtors hereby acknowledge and agree that the Creditor Parties have expended, and will continue to expend, considerable time, effort and expense in connection with this Agreement and the negotiation of the Restructuring, and that this Agreement provides substantial value to, is beneficial to, and is necessary to preserve, the Debtors, and that the Creditor Parties have made a substantial contribution to the Debtors and the Restructuring.  If and to the extent not previously reimbursed or paid in connection with the foregoing, subject to the approval of the Bankruptcy Court, the Debtors shall reimburse or pay (as the case may be) all reasonable and documented Transaction Expenses pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise.  The Debtors hereby acknowledge and agree that the Transaction Expenses are of the type that should be entitled to treatment as, and the Debtors shall seek treatment of such Transaction Expenses as, administrative expense claims pursuant to sections 503(b) and 507(a)(2) of the Bankruptcy Code.

11. **Effectiveness.**

This Agreement shall become effective and binding upon the Restructuring Support Parties when counterpart signature pages to this Agreement have been executed and delivered by the Debtors, each of the Initial Consenting Noteholders, each of the Initial Consenting Existing Lenders, each of the Initial Consenting MDL Lenders and each of the Equity Parties, but not until the commencement of the Chapter 11 Cases (the date this Agreement becomes effective and binding upon the Restructuring Support Parties, the "Restructuring Support Effective Date"). In addition to (and without limiting) the terms of Section 3(c), a Person that owns or controls MDL Facility Claims, Senior Notes Claims and/or Credit Facility Claims may become a party hereto as a Consenting Noteholder, Consenting MDL Lender and/or Consenting Existing Lender, as applicable, by executing a Joinder Agreement and delivering an executed copy thereof to counsel to the Debtors and the Consenting Parties' Advisors that are lawyers (in each case, at the addresses for such law firms set forth in Section 21 hereof), in which event such Person shall be deemed to be a Consenting Noteholder, Consenting MDL Lender and/or Consenting Existing Lender hereunder to the extent of the Claims and Interests owned and controlled by such Person; provided, however, that such Person shall be reasonably acceptable to the Requisite Backstop Parties. With respect to any Person that becomes a party to this Agreement by executing and delivering a Joinder Agreement after the Restructuring Support Effective Date, this Agreement shall become effective as to such Person at the time such Joinder Agreement is executed and delivered to counsel to the Debtors and the Consenting Parties' Advisors that are lawyers (in each case, at the addresses for such law firms set forth in Section 21 hereof).

12. **Conflicts.**

The Restructuring Term Sheet is supplemented by the terms and conditions of this Agreement. However, to the extent this Agreement is silent as to a particular matter set forth in the Restructuring Term Sheet, such matter shall be governed by the terms and conditions set forth in the Restructuring Term Sheet. In the event the terms and conditions as set forth in the Restructuring Term Sheet and this Agreement are inconsistent, the terms and conditions of the Restructuring Term Sheet shall control. In the event of any conflict among the terms and provisions of the Plan, this Agreement and/or the Restructuring Term Sheet, the terms and provisions of the Plan shall control. In the event of any conflict among the terms and provisions of the Confirmation Order, the Plan, this Agreement and/or the Restructuring Term Sheet, the terms and provisions of the Confirmation Order shall control. Notwithstanding the foregoing, nothing contained in this Section 12 shall affect, in any way, the requirements set forth herein for the amendment of this Agreement.

13. **GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL.**

THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION (EXCEPT TO THE EXTENT IT MAY BE PREEMPTED BY THE BANKRUPTCY CODE). BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE RESTRUCTURING SUPPORT PARTIES HEREBY IRREVOCABLY AND

UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT, DISPUTE OR PROCEEDING ARISING UNDER, OUT OF OR IN CONNECTION WITH THIS AGREEMENT SHALL BE BROUGHT EXCLUSIVELY IN THE FEDERAL OR STATE COURTS LOCATED IN THE STATE OF NEW YORK, COUNTY OF NEW YORK, AND THE RESTRUCTURING SUPPORT PARTIES IRREVOCABLY CONSENT TO THE JURISDICTION OF SUCH COURTS AND WAIVE ANY OBJECTIONS AS TO VENUE OR INCONVENIENT FORUM.  NOTWITHSTANDING THE FOREGOING CONSENT TO JURISDICTION, FOLLOWING THE COMMENCEMENT OF THE CHAPTER 11 CASES AND SO LONG AS THE BANKRUPTCY COURT HAS JURISDICTION OVER THE DEBTORS, EACH OF THE RESTRUCTURING SUPPORT PARTIES AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, AND HEREBY SUBMITS TO THE JURISDICTION OF THE BANKRUPTCY COURT.  EACH RESTRUCTURING SUPPORT PARTY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

### 14.   **Specific Performance/Remedies.**

It is understood and agreed by the Restructuring Support Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Restructuring Support Party and each non-breaching Restructuring Support Party shall be entitled to specific performance and injunctive or other equitable relief (including reasonable attorneys' fees, costs and expenses) as a remedy of any such breach, in addition to any other remedy to which such non-breaching Restructuring Support Party may be entitled, at law or in equity, without the necessity of proving the inadequacy of money damages as a remedy, including an order of the Bankruptcy Court requiring any Restructuring Support Party to comply promptly with any of its obligations hereunder.  Each Restructuring Support Party hereby waives any requirement for the securing or posting of any bond in connection with such remedies.

### 15.   **Survival.**

Notwithstanding the termination of this Agreement pursuant to Section 6 hereof, the agreements and obligations of the Restructuring Support Parties in this Section 15 and Sections 6(g), 6(h), 9, 10 (solely for purposes of enforcement of the payment of Transaction Expenses accrued through the occurrence of the applicable Termination Event), 13, 14, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, and 26 hereof, the last paragraph of Section 2, and the last paragraph of Section 3(a), and any defined terms used in any of the forgoing Sections or paragraphs (solely to the extent used therein), shall survive such termination and shall continue in full force and effect in accordance with the terms hereof.

### 16.   **Headings.**

The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

46944535.13:

**17.     Successors and Assigns; Severability.**

This Agreement is intended to bind and inure to the benefit of the Restructuring Support Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives; provided, however, that nothing contained in this Section 17 shall be deemed to permit sales, assignments or other Transfers of the Claims and Interests other than in accordance with Sections 3(c) and 3(d) of this Agreement.  If any provision of this Agreement, or the application of any such provision to any Person or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision and this Agreement shall continue in full force and effect; provided, however, that nothing in this Section 17 shall be deemed to amend, supplement or otherwise modify, or constitute a waiver of, any Termination Event.  Upon any such determination of invalidity, the Restructuring Support Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Restructuring Support Parties as closely as possible, in a reasonably acceptable manner, such that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

**18.     No Third-Party Beneficiaries.**

Unless expressly stated herein, this Agreement shall be solely for the benefit of the Restructuring Support Parties and no other Person shall be a third-party beneficiary hereof.

**19.     Prior Negotiations; Entire Agreement.**

This Agreement, including the exhibits and schedules hereto, constitutes the entire agreement of the Restructuring Support Parties, and supersedes all other prior negotiations, with respect to the subject matter of this Agreement, whether written or oral; provided, however, that any confidentiality agreement executed by any Creditor Party or Equity Party shall survive execution and delivery of this Agreement and shall continue in full force and effect, subject to the terms thereof, irrespective of the terms hereof.

**20.     Counterparts.**

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Any execution copies of this Agreement and executed counterpart signature pages to this Agreement may be delivered by facsimile, electronic mail ("e-mail") or other electronic imaging means, which shall be deemed to be an original for the purposes of this Section 20; provided, however, that signature pages executed by the Creditor Parties shall be delivered to (a) each of the other Creditor Parties and the Equity Parties in a redacted form that removes the Creditor Parties' holdings of Claims and Interests, and (b) the Debtors and the Consenting Parties' Advisors in an unredacted form.

**21.     Notices.**

All notices, requests, demands, document deliveries and other communications under this Agreement shall be in writing and shall be deemed to have been duly given, provided, made or

received (a) when delivered personally, (b) when sent by e-mail or facsimile, (c) one (1) Business Day after deposit with an overnight courier service, or (d) three (3) Business Days after mailed by certified or registered mail, return receipt requested, with postage prepaid to the Restructuring Support Parties at the following addresses, facsimile numbers or e-mail addresses (or at such other addresses, facsimile numbers or e-mail addresses for a Restructuring Support Party as shall be specified by like notice):

**If to the Debtors**:

21st Century Oncology
2270 Colonial Boulevard
Fort Myers, FL 33907
Attention:      Kimberly Commins-Tzousmakas
                      (Kimberly.commins Tzousmakas@21co.com)

**with a copy to (which shall not constitute notice)**:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Facsimile:      (212) 446-6460
Attention:      Christopher Marcus (cmarcus@kirkland.com)
                      John T. Weber (john.weber@kirkland.com)


and

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Facsimile:      (312) 862-2200
Attention:      William A. Guerrieri (wguerrieri@kirkland.com)

**If to the Creditor Parties**:

To each Creditor Party at the addresses, facsimile numbers or e-mail addresses set forth in the Creditor Parties' signature pages to this Agreement (or in the signature page to a Joiner Agreement in the case of any Creditor Party that becomes a party hereto after the Restructuring Support Effective Date)

**with copies to (which shall not constitute notice)**:

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038
Facsimile:      (212) 806-6006
Attention:      Jayme Goldstein (jgoldstein@stroock.com)

Matthew A. Schwartz (mschwartz@stroock.com)

and

Milbank, Tweed, Hadley & McCloy LLP
28 Liberty Street
New York, NY 10005
Facsimile:     (212) 530-5219
Attention:     Evan R. Fleck (efleck@milbank.com)
               Matthew L. Brod (mbrod@milbank.com)

**If to CPPIB**:

Canada Pension Plan Investment Board
One Queen Street East
Suite 2500
Toronto, ON, Canada, M5C 2W5
Facsimile: (416) 868-4760
Attention:     Logan Willis (lwillis@cppib.com)

**with copies to (which shall not constitute notice):**

Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
Facsimile:     (212) 909-6836
Attention:     My Chi To (mcto@debevoise.com)

**If to the Vestar Funds or Investments**:

Vestar Capital Partners, Inc.
245 Park Avenue, 41st Floor
New York, NY 10167
Facsimile: (212) 808-4922
Attention:     Steven Della Rocca
               (sdellarocca@vestarcapital.com)

## 22.    <u>Reservation of Rights; No Admission.</u>

Except as expressly provided in this Agreement and in any amendment hereto, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of each of the Restructuring Support Parties to (a) protect and preserve its rights, remedies and interests, including its claims against any of the other Restructuring Support Parties (or their respective Affiliates or Subsidiaries), (b) consult with any of the other Restructuring Support Parties, (c) fully participate in any bankruptcy case filed by any Debtor, or (d) purchase, sell or enter into any transactions in connection with Claims and Interests, in each case subject to the terms hereof.   Without limiting the foregoing sentence in any way, if the Restructuring is not consummated, or if this Agreement is terminated for any reason, nothing shall be construed

herein as a waiver by any Restructuring Support Party of any or all of such Restructuring Support Party's rights, remedies, claims and defenses and the Restructuring Support Parties expressly reserve any and all of their respective rights, remedies, claims and defenses.  No Creditor Party shall have, by reason of this Agreement, a fiduciary relationship in respect of any other Restructuring Support Party, any holder of Claims and Interests, or any other Person, and nothing in this Agreement (including the Restructuring Term Sheet), express or implied, is intended to impose, or shall be construed as imposing, upon any Creditor Party any obligations in respect of this Agreement or the Restructuring except as expressly set forth herein.  This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Restructuring Support Parties.  Pursuant to Rule 408 of the Federal Rules of Evidence, any applicable state rules of evidence and any other applicable Law, foreign or domestic, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any Proceeding other than a Proceeding to enforce its terms.  This Agreement, the Restructuring Term Sheet and the Plan shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Restructuring Support Party of any claim, fault, liability or damages whatsoever.  Each of the Restructuring Support Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

### 23.    **Prevailing Party.**

If any Restructuring Support Party brings a Proceeding against any other Restructuring Support Party based upon a breach by such Restructuring Support Party of its obligations hereunder, the prevailing Restructuring Support Party shall be entitled to the reimbursement of all reasonable fees and expenses incurred, including reasonable attorneys', accountants' and financial advisors' fees in connection with such Proceeding, from the non-prevailing Restructuring Support Party.

### 24.    **Representation by Counsel.**

Each Restructuring Support Party acknowledges that it has been represented by, or has been provided a reasonable period of time to obtain access to and advice by, counsel with respect to this Agreement and the Restructuring contemplated herein.  Accordingly, any rule of law or any legal decision that would provide any Restructuring Support Party with a defense to the enforcement of the terms of this Agreement against such Restructuring Support Party based upon lack of legal counsel shall have no application and is expressly waived.

### 25.    **Relationship Among Restructuring Support Parties.**

Notwithstanding anything herein to the contrary, the duties and obligations of the Creditor Parties and the Equity Parties under this Agreement shall be several, not joint (provided, that the agreements of the Vestar Funds shall be joint and several agreements of the Vestar Funds).  It is understood and agreed that no Creditor Party has any duty of trust or confidence in any kind or form with any other Restructuring Support Party, and, except as expressly provided in this Agreement, there are no commitments among or between them.  In this regard, it is understood and agreed that any Creditor Party may trade in the Claims and Interests of any Debtor without the consent of any other Restructuring Support Party, subject to applicable

46944535.13:

securities laws and the terms of this Agreement; provided, however, that no Creditor Party shall have any responsibility for any such trading to any other entity by virtue of this Agreement. No prior history, pattern or practice of sharing confidences among or between the Restructuring Support Parties shall in any way affect or negate this understanding and agreement. No Creditor Party shall, as a result of its entering into and performing its obligations under this Agreement, be deemed to be part of a "group" (as that term is used in Section 13(d) of the Exchange Act) with any other Restructuring Support Party. For the avoidance of doubt, no action taken by a Creditor Party pursuant to this Agreement shall be deemed to constitute or to create a presumption by any of the Parties that the Creditor Parties are in any way acting in concert or as such a "group."

## 26.    Disclosure; Publicity.

The Debtors shall submit drafts to the Consenting Parties' Advisors of any press releases and public documents that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement at least three (3) Business Days prior to making any such disclosure, and shall afford them a reasonable opportunity under the circumstances to comment on such documents and disclosures and shall incorporate any such reasonable comments in good faith. Except as required by Law, no Restructuring Support Party or its advisors shall (a) use the name of any Creditor Party or Equity Party in any public manner (including in any press release) with respect to this Agreement, the Restructuring or any of the Restructuring Documents or (b) disclose to any Person (including, for the avoidance of doubt, any other Creditor Party or Equity Party), other than advisors to the Debtors, the principal amount or percentage of any Claims and Interests held by any Creditor Party or Equity Party, or the Backstop Commitment Percentage of any Backstop Party, in each case, without such Creditor Party's, Equity Party's or Backstop Party's prior written consent; provided, however, that (i) if such disclosure is required by Law, the disclosing Restructuring Support Party shall afford the relevant Creditor Party or Equity Party a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure and (ii) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of Claims and Interests held by any Creditor Party or Equity Party, collectively. Notwithstanding the provisions in this Section 26, (x) any Restructuring Support Party may disclose the identities of the Restructuring Support Parties in any action to enforce this Agreement or in any action for damages as a result of any breaches hereof, and (y) any Restructuring Support Party may disclose, to the extent expressly consented to in writing by a Creditor Party or Equity Party, such Creditor Party's or Equity Party's identity and individual holdings.

## 27.    Consideration

Each Restructuring Support Party hereby acknowledges that no consideration, other than that specifically described herein or in the Plan, shall be due or paid to any Restructuring Support Party for its agreement (subsequent to proper disclosure and solicitation) to vote to accept the Plan or to otherwise support and take actions to effectuate the Restructuring in accordance with the terms and conditions of this Agreement, other than each of the Restructuring Support Parties' representations, warranties, and agreements with respect to their commitments hereunder

regarding the consummation of the Restructuring and the confirmation and consummation of the Plan.

**28.** **Acknowledgements.**

THIS AGREEMENT, THE RESTRUCTURING TERM SHEET, THE PLAN, THE OTHER RESTRUCTURING DOCUMENTS, THE RESTRUCTURING, AND THE TRANSACTIONS CONTEMPLATED HEREIN AND THEREIN ARE THE PRODUCT OF ARMS'-LENGTH NEGOTIATIONS BETWEEN THE RESTRUCTURING SUPPORT PARTIES AND THEIR RESPECTIVE REPRESENTATIVES.  EACH RESTRUCTURING SUPPORT PARTY HEREBY ACKNOWLEDGES THAT THIS AGREEMENT IS NOT, AND SHALL NOT BE DEEMED TO BE, A SOLICITATION OF VOTES FOR THE ACCEPTANCE OF THE PLAN OR REJECTION OF ANY OTHER CHAPTER 11 PLAN FOR PURPOSES OF SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE OR OTHERWISE.  THE PROPONENTS OF THE PLAN SHALL NOT SOLICIT ACCEPTANCES OF THE PLAN FROM ANY PERSON UNTIL THE PERSON HAS BEEN PROVIDED WITH A COPY OF THE PLAN, DISCLOSURE STATEMENT, AND RELATED DOCUMENTS. NOTHING IN THIS AGREEMENT SHALL REQUIRE ANY RESTRUCTURING SUPPORT PARTY TO TAKE ANY ACTION PROHIBITED BY THE BANKRUPTCY CODE, THE SECURITIES ACT, ANY OTHER APPLICABLE LAW OR REGULATION, OR AN ORDER OR DIRECTION OF ANY COURT OR ANY OTHER GOVERNMENTAL ENTITY.

*[Signature pages follow]*

46944535.13:

IN WITNESS WHEREOF, the Restructuring Support Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

21st CENTURY ONCOLOGY, INC.,

By: _____

Name:    Paul Rundell
Title:    Interim Chief Executive Officer

21st CENTURY ONCOLOGY HOLDINGS, INC.

By: _____

Name:    Paul Rundell
Title:    Interim Chief Executive Officer

21C EAST FLORIDA, LLC
21ST CENTURY OF FLORIDA ACQUISITION, LLC
21ST CENTURY ONCOLOGY, LLC
21ST CENTURY ONCOLOGY MANAGEMENT SERVICES, INC.
21ST CENTURY ONCOLOGY OF ALABAMA, LLC
21ST CENTURY ONCOLOGY OF HARFORD COUNTY, MARYLAND LLC
21ST CENTURY ONCOLOGY OF JACKSONVILLE, LLC
21ST CENTURY ONCOLOGY OF KENTUCKY, LLC
21ST CENTURY ONCOLOGY OF NEW JERSEY, INC.
21ST CENTURY ONCOLOGY OF PENNSYLVANIA, INC.
21ST CENTURY ONCOLOGY OF PRINCE GEORGES COUNTY, MARYLAND, LLC
21ST CENTURY ONCOLOGY OF SOUTH CAROLINA, LLC
21ST CENTURY ONCOLOGY OF WASHINGTON, LLC
21ST CENTURY ONCOLOGY SERVICES, LLC
AHLC, LLC
AMERICAN CONSOLIDATED TECHNOLOGIES, L.L.C.

[Restructuring Support Agreement Signature Pages]

ARIZONA RADIATION THERAPY MANAGEMENT
SERVICES, INC.
ASHEVILLE CC, LLC
ATLANTIC UROLOGY CLINICS, LLC
AURORA TECHNOLOGY DEVELOPMENT, LLC
BERLIN RADIATION THERAPY TREATMENT
CENTER, LLC
CAROLINA RADIATION AND CANCER
TREATMENT CENTER, LLC
CALIFORNIA RADIATION THERAPY
MANAGEMENT SERVICES, INC.
CAREPOINT HEALTH SOLUTIONS, LLC
CAROLINA REGIONAL CANCER CENTER, LLC
DERM-RAD INVESTMENT COMPANY, LLC
DEVOTO CONSTRUCTION OF SOUTHWEST
FLORIDA, INC.
FINANCIAL SERVICES OF SOUTHWEST FLORIDA,
LLC
FOUNTAIN VALLEY & ANAHEIM RADIATION
ONCOLOGY CENTERS, INC.
GETTYSBURG RADIATION, LLC
GOLDSBORO RADIATION THERAPY SERVICES,
LLC
JACKSONVILLE RADIATION THERAPY SERVICES,
LLC
MARYLAND RADIATION THERAPY MANAGEMENT
SERVICES, LLC
MD INTERNATIONAL INVESTMENTS, LLC
MEDICAL DEVELOPERS, LLC
MICHIGAN RADIATION THERAPY MANAGEMENT
SERVICES, INC.
NEVADA RADIATION THERAPY MANAGEMENT
SERVICES, INCORPORATED
NEW ENGLAND RADIATION THERAPY
MANAGEMENT SERVICES, INC.
NEW YORK RADIATION THERAPY MANAGEMENT
SERVICES, LLC
NORTH CAROLINA RADIATION THERAPY
MANAGEMENT SERVICES, LLC
ONCURE HOLDINGS, INC.
ONCURE MEDICAL CORP.
PHOENIX MANAGEMENT COMPANY, LLC
RADIATION THERAPY SCHOOL FOR RADIATION
THERAPY TECHNOLOGY, INC.
RADIATION THERAPY SERVICES
INTERNATIONAL, INC.
PALMS WEST RADIATION THERAPY, L.L.C.

[Restructuring Support Agreement Signature Pages]

RVCC, LLC
SAMPSON ACCELERATOR, LLC
SAMPSON SIMULATOR, LLC
SFRO HOLDINGS, LLC
U.S. CANCER CARE, INC.
USCC FLORIDA ACQUISITION, LLC
WEST VIRGINIA RADIATION THERAPY SERVICES,
INC.

By:  _____
     Name:   Paul Rundell
     Title:   Interim Chief Executive Officer


SOUTH FLORIDA MEDICINE, LLC


By:   21st Century Oncology, LLC
Its:   Manager

By:  _____
Name:  Paul Rundell
Title:   Interim Chief Executive Officer

ASSOCIATES IN RADIATION ONCOLOGY
SERVICES, LLC
BOYNTON BEACH RADIATION ONCOLOGY, L.L.C.
SOUTH FLORIDA RADIATION ONCOLOGY, LLC
TREASURE COAST MEDICINE, LLC

By:   SFRO Holdings, LLC
Its:   Sole Member

By:  _____
Name:  Paul Rundell
Title:   Interim Chief Executive Officer


[Restructuring Support Agreement Signature Pages]

[Creditor and Equity Holder Signature Pages Redacted]

**EXHIBIT A**
**TERM SHEET**

# 21ST CENTURY ONCOLOGY HOLDINGS, INC.

## RESTRUCTURING TERM SHEET

THIS RESTRUCTURING TERM SHEET (INCLUDING ALL EXHIBITS, SCHEDULES AND ANNEXES HERETO, AS MAY BE AMENDED, SUPPLEMENTED, AMENDED AND RESTATED OR OTHERWISE MODIFIED FROM TIME TO TIME IN ACCORDANCE WITH THE TERMS OF THE RSA (AS DEFINED BELOW), THIS "TERM SHEET"), WHICH IS EXHIBIT A TO THE RESTRUCTURING SUPPORT AGREEMENT, DATED AS OF MAY 25, 2017 (AS MAY BE AMENDED, SUPPLEMENTED, AMENDED AND RESTATED OR OTHERWISE MODIFIED FROM TIME TO TIME IN ACCORDANCE WITH THE TERMS THEREOF, THE "RSA"),[1] PRESENTS THE PRINCIPAL TERMS OF A COMPREHENSIVE RESTRUCTURING (THE "RESTRUCTURING") OF THE EXISTING DEBT AND OTHER OBLIGATIONS OF, AND THE EXISTING EQUITY INTERESTS IN, THE DEBTORS (AS DEFINED BELOW) WHICH WILL BE CONSUMMATED PURSUANT TO A PLAN OF REORGANIZATION TO BE FILED BY THE DEBTORS IN CONNECTION WITH THE CHAPTER 11 CASES (AS DEFINED IN THE RSA).    THE IMPLEMENTATION OF THE TERMS OF THE RESTRUCTURING AS REFLECTED HEREIN, AND ALL RESTRUCTURING DOCUMENTS (AS DEFINED IN THE RSA), ARE SUBJECT TO THE AGREEMENTS AND CONSENTS REFLECTED IN THE RSA.

THIS TERM SHEET DOES NOT CONSTITUTE AN OFFER OF SECURITIES OR A SOLICITATION OF THE ACCEPTANCE OR REJECTION OF A CHAPTER 11 PLAN FOR PURPOSES OF SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE (AS DEFINED IN THE RSA).  ANY SUCH OFFER OR SOLICITATION WILL ONLY BE MADE IN COMPLIANCE WITH ALL APPLICABLE SECURITIES, BANKRUPTCY AND/OR OTHER APPLICABLE LAWS.

THIS TERM SHEET DOES NOT INCLUDE A DESCRIPTION OF ALL OF THE TERMS, CONDITIONS AND OTHER PROVISIONS THAT ARE TO BE CONTAINED IN THE RESTRUCTURING DOCUMENTS, ALL OF WHICH REMAIN SUBJECT TO DISCUSSION AND NEGOTIATION AMONG THE RESTRUCTURING SUPPORT PARTIES (AS DEFINED IN THE RSA); PROVIDED, HOWEVER, THAT ALL SUCH TERMS, CONDITIONS AND OTHER PROVISIONS SHALL NOT, DIRECTLY OR INDIRECTLY, CONTRADICT OR BE INCONSISTENT IN ANY MATERIAL RESPECT WITH ANY OF THE TERMS, CONDITIONS OR PROVISIONS HEREIN.

THIS TERM SHEET IS BEING PROVIDED AS PART OF A COMPREHENSIVE COMPROMISE AND SETTLEMENT, EACH ELEMENT OF WHICH IS CONSIDERATION FOR THE OTHER ELEMENTS AND AN INTEGRAL ASPECT OF THE RESTRUCTURING.  THIS TERM SHEET IS CONFIDENTIAL AND SUBJECT TO FEDERAL RULE OF EVIDENCE 408.  NOTHING IN THIS TERM SHEET SHALL CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION OR A WAIVER, AND EACH STATEMENT CONTAINED HEREIN IS MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH A FULL RESERVATION AS TO ANY RIGHTS, REMEDIES OR DEFENSES OF THE RESTRUCTURING SUPPORT PARTIES.

---

[1] All defined terms shall have the meanings ascribed to them in the RSA unless otherwise defined herein.

KE JTWEBER:22995-16:46770487.13

| **MATERIAL TERMS OF THE RESTRUCTURING** |
|---|

| **Overview of the Restructuring** | This Term Sheet contemplates the restructuring of 21C Holdings, 21C Oncology and the other Debtors pursuant to the Plan, which is to be confirmed by the Bankruptcy Court. |
|---|---|

The Claims and Interests to be treated under the Plan include, among other Claims and Interests, the following:

(a) any and all indebtedness, liabilities and obligations of every nature of any Debtor, whether for principal, premium, interest (including any default interest and also including interest accruing on or after the commencement of any insolvency or liquidation proceeding, whether or not a claim for such interest is, or would be, allowed in such insolvency or liquidation proceeding) (whether payable in cash or in kind), fees, costs, expenses, disbursements, indemnification and any other amounts (each of the foregoing, collectively, the "Obligations") under or arising in connection with (i) that certain Amended and Restated Credit and Guaranty Agreement, dated as of March 6, 2017 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Existing MDL Agreement"), by and among Medical Developers LLC ("MDL"), as "Borrower" thereunder, each Subsidiary and Affiliate of MDL party thereto as a "Guarantor" thereunder, the financial institutions and other entities party thereto as "Lenders" thereunder (collectively, the "Existing MDL Lenders"), and Wilmington Savings Fund Society, FSB ("WSFS"), as "Administrative Agent" and as "Collateral Agent" thereunder (in such capacities, the "Existing MDL Agent"), and (ii) the Intercreditor Agreement (as defined in the Existing MDL Agreement) and the other MDL Credit Documents (the Obligations described in this clause (a), the "Existing MDL Obligations");

(b) the Obligations under or arising in connection with (i) that certain Credit Agreement, dated as of April 30, 2015 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Existing Credit Agreement"), by and among 21C Holdings, 21C Oncology, as "Borrower" thereunder, Morgan Stanley Senior Funding, Inc. ("MSSF"), as "Administrative Agent" thereunder (in such capacity, the "Existing Credit Agent"), the several banks and other financial institutions or entities from time to time party thereto as "Lenders" thereunder (collectively, the "Existing Lenders"), and certain other parties thereto, and (ii) the other Existing Loan Documents (the Obligations described in this clause (b), the "Existing Credit Facility Obligations");

(c) the Obligations under or arising in connection with (i) the 11.00% Senior Notes due 2023 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Senior Notes"), issued by 21C Oncology under that certain Indenture, dated as of April 30, 2015 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Senior Notes Indenture"), by and among 21C Oncology, as "Issuer" thereunder, the "Guarantors" party thereto, and Wilmington Trust, National Association, as

"Trustee" thereunder (in such capacity, the "Trustee"), and (ii) the other Note Documents (the Obligations described in this clause (c), which, for the avoidance of doubt, include the "premium" described in Section 5.7(g) of the Senior Notes Indenture, the "Senior Notes Obligations");

(d) the Obligations under or arising in connection with (i) the Promissory Note, dated January 15, 2011, issued by Treasure Coast Radiation Oncology, LLC ("TCRO") payable to the order of Seaside National Bank & Trust ("SNBT") in the original principal amount of $3,270,400.63 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Seaside Note 1"), (ii) the Promissory Note, dated January 15, 2011, issued by TCRO payable to the order of SNBT in the original principal amount of $1,922,831.74 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Seaside Note 2," and together with the Seaside Note 1, collectively, the "Seaside Notes"), and (iii) the other Loan Documents (as defined in each of the Seaside Notes) (the Obligations described in this clause (d), the "Seaside Obligations");

(e) the Obligations under or arising in connection with (i) the 10% Subordinated Unsecured PIK Note due 2019, dated July 2, 2015, issued by 21C Holdings payable to Kishore Dass in the original principal amount of $3,428,571.43 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "SFRO Note 1"), (ii) the 10% Subordinated Unsecured PIK Note due 2019, dated July 2, 2015, issued by 21C Holdings payable to Seema Dass 2014 GRAT in the original principal amount of $3,321,428.57 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "SFRO Note 2"), (iii) the 10% Subordinated Unsecured PIK Note due 2019, dated July 2, 2015, issued by 21C Holdings payable to Ben Han in the original principal amount of $6,750,000.00 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "SFRO Note 3"), and (iv) the 10% Subordinated Unsecured PIK Note due 2019, dated July 2, 2015, issued by 21C Holdings payable to Rajiv Patel in the original principal amount of $1,500,000.00 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "SFRO Note 4," and together with the SFRO Note 1, the SFRO Note 2 and the SFRO Note 3, collectively, the "SFRO Notes") (the Obligations described in this clause (e), the "SFRO Obligations");

(f) the Obligations under or arising in connection with (i) Section 7.7 and Section 13.2 of that certain Amended and Restated Operating Agreement of Cancer Treatment Services Arizona, LLC, dated as of July 1, 2013 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "CTSA Operating Agreement"), among Cancer Treatment Services Arizona, LLC ("CTSA"), Cancer Treatment Services International – Arizona LLC ("CTSI-A"), Regional Healthcare Ventures, and Arizona Radiation Treatment Management Services, Inc. ("ARTMS"), (ii) any term or provision of the CTSA Operating Agreement that relates, directly or indirectly, to Section 7.7 and/or Section 13.2 of the CTSA Operating

3

|  |  |
|---|---|
|  | Agreement or any of the Obligations thereunder, and (iii) that certain Settlement Agreement, effective as of December 10, 2016 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "CTSA Settlement Agreement"), among CTSA, CTSI-A, ARTMS and 21C Oncology (the Obligations described in this clause (f), the "CTSA Obligations"); |
|  | (g) the Obligations under or arising in connection with that certain Promissory Note, dated December 14, 2015, issued by 21st Century Oncology, LLC and 21C Oncology payable to the order of Florida Oncology Partners, LLC in the original principal amount of $5,522,435.00 (as amended, supplemented, amended and restated or otherwise modified from time to time) (the Obligations described in this clause (g), the "FOP Obligations"); and |
|  | (h) the Equity Interests of the Debtors (collectively, the "Existing Equity Interests"), including (i) all shares of common stock, par value $0.01 per share, of 21C Holdings and (ii) all shares of preferred stock, par value $0.001 per share, of 21C Holdings designated as "Series A Convertible Preferred Stock" pursuant to the terms of the Amended and Restated Certificate of Designations of Series A Convertible Preferred Stock filed by 21C Holdings with the Delaware Secretary of State on September 8, 2016. |
| **DIP Facility** | In conjunction with the Restructuring, the Backstop Parties and those Consenting Existing Lenders (other than Backstop Parties) that elect to provide commitments to make loans under the DIP Facility shall provide 21C Oncology, as borrower thereunder, with a senior secured superpriority debtor-in-possession delayed-draw term loan credit facility in an aggregate principal amount not to exceed $75.0 million (such facility, the "DIP Facility").   The terms and provisions of the DIP Facility (including the definitions, conditions, prepayment requirements, representations, warranties, covenants, collateral and security provisions, events of default, indemnities and reimbursements) shall be consistent in all material respects with the terms and conditions set forth on Exhibit 1 attached hereto and otherwise in form and substance reasonably acceptable to the Debtors, the Requisite Backstop Parties and the Requisite Consenting Existing Lenders. |
|  | The debtor-in-possession credit agreement (the "DIP Credit Agreement") and all other Definitive Debt Documents (as defined below) governing the DIP Facility (together with the DIP Credit Agreement, collectively, the "DIP Credit Documents") shall be consistent in all material respects with the terms and conditions set forth on Exhibit 1 attached hereto and otherwise in form and substance reasonably acceptable to the Debtors, the Requisite Backstop Parties and the Requisite Consenting Existing Lenders. |
|  | The Obligations under or arising in connection with the DIP Facility (the "DIP Facility Obligations") shall be paid in full in cash on the effective date of the Plan (the "Effective Date").   The lenders that provide the DIP Facility shall be referred to herein as the "DIP Lenders" and the agent for the DIP |

| | |
|---|---|
| | Lenders shall be referred to herein as the "<u>DIP Agent</u>". |
| **Rights Offerings** | **Notes Rights Offering.**  The Debtors shall effectuate a notes rights offering during the Chapter 11 Cases and in conjunction with and pursuant to the Plan (the "<u>Notes Rights Offering</u>") to record holders as of a specified record date of Senior Notes, each of which shall be an "accredited investor" (as such term is defined in Rule 501 under the Securities Act) (an "<u>Accredited Investor</u>") and shall complete a customary accredited investor questionnaire (each such holder, a "<u>Rights Offering Participant</u>" and, collectively, the "<u>Rights Offering Participants</u>").  Each Rights Offering Participant shall be offered the right (collectively, the "<u>Notes Rights</u>") to purchase its *pro rata* share (based on such Rights Offering Participant's relative share of all outstanding Senior Notes) of New Second Lien Notes (as defined below) in the aggregate principal amount of $200.0 million (the "<u>Notes Rights Offering Amount</u>") issued at par.  Rights Offering Participants shall be issued Notes Rights at no charge.

Each Rights Offering Participant electing to exercise its Notes Rights in the Notes Rights Offering shall purchase New Second Lien Notes by, at the election of such Rights Offering Participant, (a) exchanging all or a portion of the Allowed[2] Credit Facility Claims (as defined below) that such Rights Offering Participant owns or controls and/or (b) paying cash in an aggregate amount (taking together <u>clauses (a)</u> and <u>(b)</u> above) equal to the aggregate original principal amount of New Second Lien Notes to be acquired by such Rights Offering Participant in the Notes Rights Offering.  Any Allowed Credit Facility Claims that are exchanged for New Second Lien Notes in the Notes Rights Offering shall acquire New Second Lien Notes on a dollar-for-dollar basis based on the face amount of such Allowed Credit Facility Claims as of the Effective Date.

Any New Second Lien Notes that are not subscribed for and purchased in the Notes Rights Offering by a Rights Offering Participant (including any portion of the Notes Rights Offering Amount that holders of Senior Notes as of the applicable record date who are not Accredited Investors could have purchased if such holders exercised their respective Notes Rights in the Notes Rights Offering) shall be put to and purchased by the Backstop Parties in accordance with the terms and conditions of the Backstop Purchase Agreement (as defined below); <u>provided</u>, <u>however,</u> that no Backstop Party shall be required to purchase New Second Lien Notes pursuant to such Backstop Party's Backstop Commitment in an aggregate original principal amount that exceeds the Backstop Commitment Amount (as defined below) for such Backstop Party applicable to the Notes Rights Offering.  There will be no over-subscription privilege in the Notes Rights Offering, such that any New Second Lien Notes that are not subscribed for and purchased in the Notes Rights Offering by a Rights Offering Participant (including any portion of the Notes Rights Offering Amount that holders of Senior Notes as |

---

[2] "<u>Allowed</u>" shall mean any claim that is determined to be an allowed claim in the Chapter 11 Cases in accordance with section 502 and/or section 506 of the Bankruptcy Code.

of the applicable record date who are not Accredited Investors could have purchased if such holders exercised their respective Notes Rights in the Notes Rights Offering) will not be offered to other Rights Offering Participants, but rather will be purchased by the Backstop Parties (subject to their respective Backstop Commitment Amounts applicable to the Notes Rights Offering) in accordance with the terms and conditions of the Backstop Purchase Agreement.

The Credit Facility Claims that are exchanged by (i) Rights Offering Participants for New Second Lien Notes in the Notes Rights Offering or (ii) Backstop Parties for New Second Lien Notes pursuant to the Backstop Purchase Agreement shall be referred to herein as the "Exchanged Credit Facility Claims".  The aggregate amount of cash received by the Debtors from (x) Rights Offering Participants for New Second Lien Notes in the Notes Rights Offering and (y) the Backstop Parties for New Second Lien Notes pursuant to the Backstop Purchase Agreement shall be referred to herein as the "Notes Rights Offering Cash Amount".

On the Effective Date, Reorganized 21C Oncology (as defined below) shall offer to prepay, at 100% of the principal amount thereof (plus all accrued and unpaid interest thereon to the date of prepayment), New First Lien Term Loans (as defined below) held by the Backstop Parties or any of their respective Affiliates in an aggregate principal amount equal to the lesser of (i) the Notes Rights Offering Cash Amount and (ii) the aggregate principal amount of New First Lien Term Loans held by the Backstop Parties and their respective Affiliates.  Such prepayment (the "Backstop Prepayment") shall be made to the Backstop Parties and their respective Affiliates that accept the offer on a *pro rata* basis (based on their respective shares of the aggregate principal amount of Senior Notes that were held by such Backstop Parties and their respective Affiliates as of the Effective Date (prior to the consummation of the Restructuring)); provided, however, if any portion of the Backstop Prepayment is not accepted by any such Backstop Party or any of its Affiliates, then such portion shall be re-offered to the other Backstop Parties and their respective Affiliates that accepted their respective full *pro rata* shares of the Backstop Prepayment and continue to hold New First Lien Term Loans until the full amount of the Backstop Prepayment has been accepted by such Backstop Parties and/or such Affiliates or any portion of the Backstop Prepayment is not accepted by such Backstop Parties and their respective Affiliates.  If the Notes Rights Offering Cash Amount exceeds the Backstop Prepayment that is actually paid to Backstop Parties and their respective Affiliates, then Reorganized 21C Oncology shall offer to prepay, at 100% of the principal amount thereof (plus all accrued and unpaid interest thereon to the date of prepayment), New First Lien Term Loans held by all holders of New First Lien Term Loans (including, for the avoidance of doubt, New First Lien Term Loans held by the Backstop Parties or any of their respective Affiliates) in an aggregate principal amount equal to the amount of such excess, such offer to be made on a *pro rata* basis to such holders (based on their respective shares of the aggregate principal amount of New First Lien Term Loans held by all holders of New First Lien Term Loans) (such prepayment, the "Global Prepayment").  If the Notes Rights Offering Cash Amount exceeds the sum of (x) the Backstop Prepayment that

is actually paid to the Backstop Parties and their respective Affiliates and (y) the Global Prepayment that is actually paid to holders of New First Lien Term Loans, then the amount of such excess shall be used by Reorganized 21C Oncology to permanently repay New MDL Term Loan Obligations (as defined below) in an aggregate amount equal to such excess.

**Equity Rights Offering.**   The Debtors shall effectuate an equity rights offering during the Chapter 11 Cases and in conjunction with and pursuant to the Plan (the "Equity Rights Offering" and, together with the Notes Rights Offering, collectively, the "Rights Offerings") to the Rights Offering Participants.   Each Rights Offering Participant shall be offered the right (collectively, the "Equity Rights" and, together with the Notes Rights, the "Rights") to purchase its *pro rata* share (based on such Rights Offering Participant's relative share of all outstanding Senior Notes) of New Preferred Equity (as defined below) with an aggregate initial liquidation value of $88.235 million (the "Equity Rights Offering Amount").   Rights Offering Participants shall be issued Equity Rights at no charge.

Each Rights Offering Participant electing to exercise its Equity Rights shall purchase New Preferred Equity by paying cash in an aggregate amount equal to eighty-five percent (85%) of the aggregate initial liquidation value of New Preferred Equity to be acquired by such Rights Offering Participant in the Equity Rights Offering.  For the avoidance of doubt, the total amount of cash that will be paid for all of the New Preferred Equity offered in the Equity Rights Offering (whether purchased in the Equity Rights Offering or pursuant to the Backstop Purchase Agreement) shall be $75.0 million.

Any New Preferred Equity that is not subscribed for and purchased in the Equity Rights Offering by a Rights Offering Participant (including any portion of the Equity Rights Offering Amount that holders of Senior Notes as of the applicable record date who are not Accredited Investors could have purchased if such holders exercised their respective Equity Rights in the Equity Rights Offering) shall be put to and purchased by the Backstop Parties in accordance with the terms and conditions of the Backstop Purchase Agreement; provided, however, that no Backstop Party shall be required to purchase New Preferred Equity pursuant to such Backstop Party's Backstop Commitment with an aggregate initial liquidation value that exceeds the Backstop Commitment Amount for such Backstop Party applicable to the Equity Rights Offering.   There will be no over-subscription privilege in the Equity Rights Offering, such that any New Preferred Equity that is not subscribed for and purchased in the Equity Rights Offering by a Rights Offering Participant (including any portion of the Equity Rights Offering Amount that holders of Senior Notes as of the applicable record date who are not Accredited Investors could have purchased if such holders exercised their respective Equity Rights in the Equity Rights Offering) will not be offered to other Rights Offering Participants, but rather will be purchased by the Backstop Parties (subject to their respective Backstop Commitment Amounts applicable to the Equity Rights Offering) in accordance with the terms and conditions of the Backstop Purchase Agreement.

The aggregate amount of cash received by the Debtors from (i) Rights

| | |
|---|---|
| | Offering Participants for New Preferred Equity in the Equity Rights Offering and (ii) the Backstop Parties for New Preferred Equity pursuant to the Backstop Purchase Agreement shall be referred to herein as the "Equity Rights Offering Cash Amount". |
| | The Equity Rights Offering Cash Amount shall be used: (x) first, to satisfy any unpaid amounts constituting DIP Facility Obligations outstanding on the Effective Date; (y) second, to satisfy out-of-pocket costs and expenses incurred by the Debtors in connection with the Restructuring and (z) third, for working capital and other general corporate purposes of the Reorganized Debtors following the Effective Date. |
| | A Rights Offering Participant shall not be permitted to participate in one Rights Offering unless such Rights Offering Participant also participates in the other Rights Offering in an equal proportionate amount; provided, however, that, upon issuance thereof on the Effective Date, the New Preferred Equity and the New Second Lien Notes shall not be attached to each other.  The Rights received by each Rights Offering Participant shall not be transferable. |
| | The Rights Offerings shall be conducted by the Debtors and consummated on terms, subject to conditions and in accordance with procedures that are consistent in all material respects with this Term Sheet and otherwise in form and substance reasonably acceptable to the Requisite Parties (the "Rights Offering Procedures"). |
| **Backstop Commitments** | In conjunction with the Restructuring, the Backstop Parties shall provide the Debtors with a commitment to backstop the Rights Offerings on terms and conditions set forth in the Backstop Purchase Agreement.

On the terms and subject to the conditions set forth in the Backstop Purchase Agreement, each of the Backstop Parties will severally, and not jointly, purchase its Backstop Commitment Percentage (as defined below) (subject to such Backstop Party's applicable Backstop Commitment Amount) of (i) New Second Lien Notes offered for sale in the Notes Rights Offering that are not purchased by Rights Offering Participants (including any portion of the Notes Rights Offering Amount that holders of Senior Notes as of the applicable record date who are not Accredited Investors could have purchased if such holders exercised their respective Notes Rights in the Notes Rights Offering) (the "Unsubscribed Notes") at par (the purchase price to be paid by a Backstop Party for Unsubscribed Notes shall be made, at the election of such Backstop Party, in the form of Credit Facility Claims and/or cash), and (ii) New Preferred Equity offered for sale in the Equity Rights Offering that is not purchased by Rights Offering Participants (including any portion of the Equity Rights Offering Amount that holders of Senior Notes as of the applicable record date who are not Accredited Investors could have purchased if such holders exercised their respective Equity Rights in the Equity Rights Offering) (the "Unsubscribed Equity," and together with the Unsubscribed Notes, the "Unsubscribed Securities") at eighty-five percent (85%) of the aggregate initial liquidation value thereof (the purchase price to be paid by a Backstop Party for Unsubscribed Equity shall be made in cash). |

8

In the event that a Backstop Party defaults on its obligation to purchase Unsubscribed Securities (a "Defaulting Backstop Party"), then each Backstop Party that is not a Defaulting Backstop Party (each, a "Non-Defaulting Backstop Party") shall have the right, but not the obligation, to purchase, at par (in the case of Unsubscribed Notes) or eighty-five percent (85%) of the aggregate initial liquidation value thereof (in the case of Unsubscribed Equity) and on the other terms set forth in Backstop Purchase Agreement, its Adjusted Commitment Percentage of such Unsubscribed Securities.

"Adjusted Commitment Percentage" means, with respect to any Non-Defaulting Backstop Party, a fraction, expressed as a percentage, the numerator of which is the Backstop Commitment Percentage of such Non-Defaulting Backstop Party and the denominator of which is the aggregate Backstop Commitment Percentages of all Non-Defaulting Backstop Parties.

"Backstop Commitment" means, with respect to any Backstop Party for any Rights Offering, the commitment, on the terms set forth in the Backstop Purchase Agreement, of such Backstop Party to purchase (directly or through an Affiliate) a portion of the New Second Lien Notes or New Preferred Equity, as applicable, offered for sale in such Rights Offering to the extent that such Rights Offering is not fully subscribed pursuant to the terms and conditions thereof. If a group of Backstop Parties that are Affiliates of one another purchase (i) New Second Lien Notes in the Notes Rights Offering in an aggregate original principal amount that is less than the product of (A) aggregate Backstop Commitment Percentages of such Backstop Parties and (B) the Notes Rights Offering Amount, or (ii) New Preferred Equity in the Equity Rights Offering with an aggregate initial liquidation value that is less than the product of (A) the aggregate Backstop Commitment Percentages of such Backstop Parties and (B) the Equity Rights Offering Amount, then, in either case, such Backstop Parties shall be required to purchase Unsubscribed Notes or Unsubscribed Equity, as applicable, such that no such deficiency exists and such obligation shall constitute the Backstop Commitments of such Backstop Parties (it being understood that such obligation to purchase such Unsubscribed Securities shall be satisfied prior to determining the Backstop Commitments of all other Backstop Parties).

"Backstop Commitment Amount" means, with respect to any Backstop Party, (a) for the Notes Rights Offering, (i) the product of (x) the Notes Rights Offering Amount and (y) such Backstop Party's Backstop Commitment Percentage, minus (ii) the aggregate original principal amount of New Second Lien Notes that such Backstop Party purchases in the Notes Rights Offering in its capacity as a Rights Offering Participant, and (b) for the Equity Rights Offering, (i) the product of (x) the Equity Rights Offering Amount and (y) such Backstop Party's Backstop Commitment Percentage, minus (ii) the aggregate initial liquidation value of New Preferred Equity that such Backstop Party purchases in the Equity Rights Offering in its capacity as a Rights Offering Participant.

"Backstop Commitment Percentage" means, with respect to any Backstop

Party, a percentage that will be ascribed to such Backstop Party, which percentage will be a portion of the percentage that is set forth opposite name of the Affiliates of such Backstop Party on Schedule 2 to the RSA.

"Backstop Purchase Agreement" means an agreement to be executed by and between the Debtors and the Backstop Parties setting forth, among other things, the terms and conditions of the Rights Offerings, the Backstop Commitments and the payment of the Put Option Payment (as defined below), the Liquidated Damages Payment and the Backstop Expenses (as defined below), such agreement to contain representations, warranties, covenants, conditions to closing, termination rights, indemnities, reimbursements and other terms and provisions that are consistent in all material respects with this Term Sheet and otherwise reasonably acceptable to the Requisite Parties, and the disclosures to the representations and warranties made by the Debtors in the Backstop Purchase Agreement shall be reasonably acceptable to the Requisite Backstop Parties.

In consideration for the Debtors' right to cause the Backstop Parties to purchase (directly or through an Affiliate) their respective Backstop Commitment Percentages of the Unsubscribed Securities (limited by their respective Backstop Commitment Amounts), 21C Holdings shall be required to make a non-refundable put option payment (the "Put Option Payment") equal to $20,625,000, which Put Option Payment shall be paid in the form of additional New Preferred Equity with an aggregate initial liquidation value equal to the Put Option Payment. The Put Option Payment shall be paid to the Backstop Parties on a *pro rata* basis based upon their respective Backstop Commitment Percentages; provided, however, that (a) no Defaulting Backstop Party shall be entitled to any portion of the Put Option Payment and (b) Non-Defaulting Backstop Parties that purchase Unsubscribed Securities and/or any New Second Lien Notes or shares of New Preferred Equity that are offered for sale in the applicable Rights Offering that are not purchased by any other Backstop Party (in its capacity as a Right Offering Participant) pursuant to the exercise of such other Backstop Party's Rights in such Rights Offering shall be entitled to receive a proportionate share of the amount of the Put Option Payment that would have otherwise been distributed to the applicable Defaulting Backstop Party if such Defaulting Backstop Party was a Non-Defaulting Backstop Party. The Put Option Payment (i) shall be fully earned as of the date of execution of the Backstop Purchase Agreement, (ii) shall not be refundable under any circumstance or creditable against any other amount paid or to be paid in connection with the Backstop Purchase Agreement or otherwise, (iii) shall be issued without setoff or recoupment and shall not be subject to defense or offset on account of any claim, defense or counterclaim, (iv) shall be issued free and clear of and without deduction for any and all applicable taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto (with appropriate gross-up for withholding taxes), and (v) shall be treated for U.S. federal income tax purposes as a premium for an option to put the Unsubscribed Securities to the Backstop Parties. The amount of the Put Option Payment shall be allocated between the Backstop Commitments of the Rights Offerings in a manner that is acceptable to the Requisite Backstop Parties.

If any Debtor (a) enters into, publicly announces its intention to enter into, or announces to any of the Restructuring Support Parties or other holders of Claims and Interests its intention to enter into, an agreement (including, without limitation, any agreement in principle, letter of intent, memorandum of understanding or definitive agreement), whether binding or non-binding, or whether subject to terms and conditions, with respect to any Alternative Transaction, (b) files any pleading or document with the Bankruptcy Court agreeing to, evidencing its intention to support, or otherwise supports, any Alternative Transaction or (c) consummates any Alternative Transaction (any of the events described in clause (a), clause (b) or clause (c), a "Triggering Event"), in any such case described in clause (a), clause (b) or clause (c), at any time prior to the termination of the Backstop Purchase Agreement or within twelve (12) months following the termination of the Backstop Purchase Agreement, then the Debtors will pay to the Non-Defaulting Backstop Parties a cash payment in the aggregate amount of $10,375,000 (the "Liquidated Damages Payment"), such Liquidated Damages Payment shall be deemed earned in full on the date of the occurrence of the Triggering Event and to be paid to the Non-Defaulting Backstop Parties on a *pro rata* basis based upon their respective Adjusted Commitment Percentages.  The Liquidated Damages Payment, if any, shall be paid (A) only upon consummation of an Alternative Transaction, (B) without setoff or recoupment and shall not be subject to defense or offset on account of any claim, defense or counterclaim, and (C) free and clear of and without deduction for any and all applicable taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto (with appropriate gross-up for withholding taxes).  Anything herein to the contrary notwithstanding, the Liquidated Damages Payment shall not be paid if the Backstop Purchase Agreement terminates pursuant to Section 6(f)(i) of the RSA.

The Debtors will reimburse or pay, as the case may be, all reasonable fees, costs, expenses, disbursements and charges of the Backstop Parties incurred in connection with or relating to the diligence, negotiation, preparation, execution, delivery, implementation and/or consummation of the Plan, the Rights Offerings, the Backstop Commitments, the Backstop Purchase Agreement, the Backstop Assumption Motion, the Backstop Order, the DIP Facility, the DIP Facility Motions, the DIP Orders and the transactions contemplated by any of the foregoing, or any of the other Restructuring Documents, and the enforcement, attempted enforcement or preservation of any rights or remedies under the Backstop Purchase Agreement or any of the other Restructuring Documents (collectively, the "Backstop Expenses"), including, but not limited to, (i) the reasonable and documented fees, costs and expenses of counsel, advisors and agents for the Backstop Parties and (y) filing fees (if any) required by the Hart Scott Rodino Antitrust Improvements Act of 1976 or any other competition Laws and any expenses related thereto.

The Backstop Commitment of a Backstop Party shall not be assigned (whether by operation of Law or otherwise) without the prior written consent of the Debtors and the Requisite Backstop Parties.  Notwithstanding the immediately   preceding   sentence,   any   Backstop   Party's   Backstop

Commitment may be freely assigned or transferred, in whole or in part, by such Backstop Party, to (a) any other Backstop Party or (b) any Affiliate of a Backstop Party; provided, that any such assignee of a Backstop Commitment must be an Accredited Investor.

The Backstop Purchase Agreement shall contain conditions to closing that are customary for transactions of this nature and shall include, without limitation, the following:

(a) there shall be no pending, existing, instituted or threatened direct or derivative Proceeding by (i) any Person (other than a Governmental Entity) involving any of the Debtors or any of their respective current or former officers, employees or directors (in their capacities as such) that is material to the Debtors, (ii) any Governmental Entity involving any of the Debtors or any of their respective current or former officers, employees or directors (in their capacities as such), or (iii) any relator on behalf of a Governmental Entity involving any of the Debtors or any of their respective current or former officers, employees or directors (in their capacities as such);

(b) all Governmental Entity and material third party approvals and consents, including Bankruptcy Court approval, necessary in connection with the Restructuring shall have been obtained, not be subject to unfulfilled conditions and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any Governmental Entity that would restrain, prevent or otherwise impose materially adverse conditions on any portion of the Restructuring;

(c) (i) actual consolidated EBITDA of 21C Oncology and its consolidated Subsidiaries (collectively, the "Company") shall not be less than (x) in the case of the Company's U.S. operations, $101.7 million, and (y) in the case of the Company's non-U.S. operations, $25 million, for, (A) in the event that the Effective Date is on or prior to December 31, 2017, the period commencing on January 1, 2017 and ending on the Effective Date (expressed on an annualized basis), or (B) in the event that the Effective Date is after December 31, 2017, the twelve-month period ending on the Effective Date, and (ii) projected consolidated EBITDA of the Company for the twelve-month period commencing on the Effective Date shall not be less than (x) in the case of the Company's U.S. operations, $107.0 million, and (y) in the case of the Company's non-U.S. operations, $27 million. EBITDA shall be calculated using the methodology used to calculate "Adjusted EBITDA" of the Company in the financial projections that were provided by the Debtors to the Backstop Parties in April 2017 and giving pro forma effect to all changes to the businesses and operations of the Company since March 31, 2017 (which, in the case of any cost savings, operating expense reductions or other operating improvements, have been realized), including, without limitation, exiting or materially reducing activity in a market in which the Company is operating,

12

losses of employees and physicians that were associated with the Company, losses of payors, and changes in work rules and business operations required by Governmental Entities or settlements. For the avoidance of doubt, EBITDA will be calculated before EHR penalties and restructuring costs;

(d) no Material Adverse Effect shall have occurred;

(e) the aggregate amount of unrestricted domestic cash of the Company shall be not less than $30.0 million as of the Effective Date (after giving effect to the consummation of the Restructuring and all payments to be made on or as of the Effective Date); and

(f) the aggregate amount of disbursements and other payments (including, without limitation, all fees, costs and expenses of advisors, cure amounts, settlements and payments to general unsecured creditors) owed by the Debtors on or around the Effective Date arising from or relating to the Restructuring (other than repayment of the DIP Facility and payment of all accrued and unpaid interest on the MDL Loans and the Existing Loans) shall not exceed $27.5 million.

Following the Restructuring Support Effective Date through the termination of the rights of the Specified Backstop Parties to terminate their Backstop Commitments pursuant to Section 6(f) of the RSA, the Specified Backstop Parties and the Debtors shall continue to discuss modifications to clauses (c) and (f) above that may be requested by either such party and such clauses shall be deemed amended to reflect any modifications that are mutually agreed upon in writing by the Debtors and the Requisite Backstop Parties.

| **DEBT AND EQUITY SECURITIES AND OBLIGATIONS TO BE ISSUED OR INCURRED UNDER THE PLAN** | |
|---|---|
| **New MDL Term Loan Facility** | On the Effective Date, reorganized 21C Holdings ("Reorganized 21C Holdings"), reorganized 21C Oncology ("Reorganized 21C Oncology"), and the other reorganized Debtors (together with Reorganized 21C Holdings and Reorganized 21C Oncology, each, a "Reorganized Debtor" and, collectively, the "Reorganized Debtors") that were borrowers, guarantors or obligors under the Existing Credit Agreement or with respect to the Existing Credit Facility Obligations (such Reorganized Debtors, the "New Domestic Loan Parties") shall enter into a new first lien term loan credit facility (the "New MDL Term Loan Facility") pursuant to which new first lien term loans (the "New MDL Term Loans" and, together with all other Obligations under the New MDL Term Loan Facility, the "New MDL Term Loan Obligations") in an aggregate original principal amount equal to the aggregate amount of the Existing MDL Obligations outstanding as of immediately prior to the Effective Date shall be deemed provided to Reorganized 21C Oncology, as borrower, on the Effective Date, by holders of the MDL Facility Claims (as defined below) (such holders, in their capacity as lenders under the New MDL Term Loan Facility, the "New MDL Term Lenders"), by converting |

the aggregate amount of MDL Facility Claims into, and automatically reclassifying MDL Facility Claims as, New MDL Term Loans held by the New MDL Term Lenders as set forth below in the "Classified Claims and Interests" section of this Term Sheet, and no actual funding shall occur on the Effective Date in respect of the New MDL Term Loans.

The New MDL Term Loan Facility shall be incurred pursuant to Definitive Debt Documents (the "New MDL Debt Documents") which shall (a) provide that (i) non-default interest on the New MDL Term Loans shall accrue at a rate equal to ten percent (10.0%) per annum and be payable quarterly in cash, with default interest accruing in cash at a rate equal to four percent (4.0%) per annum in excess of the non-default interest rate, (ii) the New MDL Term Loan Facility shall have a maturity date that is four and three-quarter (4-3/4) years after the Effective Date, (iii) holders of the New MDL Term Loan Obligations shall have the first right to receive all MDL Sale Proceeds (as defined below), subject to prior payment of all MDL Sale Proceeds owing to holders, if any, of New MDL Revolving Loan Obligations (as defined below), (iv) the New MDL Term Loan Obligations shall be guaranteed by the New Domestic Loan Parties (except Reorganized 21C Oncology, as borrower) and secured by a first priority security interest in and lien on all 21C Collateral (as defined below) (collectively, the "New MDL Term Liens") with the lien priorities set forth in the "Intercreditor Arrangements" section of this Term Sheet and (v) additional indebtedness in the form of revolving loans may be incurred at any time after the Effective Date by (x) the New Domestic Loan Parties in an aggregate principal amount not to exceed $50.0 million (plus up to an additional $35.0 million; provided, that the proceeds of any such additional amount shall be used solely to prepay the New MDL Term Loan Obligations after the Effective Date) (the "New Domestic Revolving Loans"), which New Domestic Revolving Loans may be guaranteed only by the New Domestic Loan Parties and secured only by a security interest in and lien on any and all 21C Collateral (the "New Domestic Revolver Liens") with the lien priorities set forth in the "Intercreditor Arrangements" section of this Term Sheet and (y) MDL, MD International Investments, LLC ("MDI") and/or any of their respective Subsidiaries in an aggregate principal amount not to exceed $10.0 million (the "New MDL Revolving Loans" and, together with the New Domestic Revolving Loans, the "New Revolving Loans"), which New MDL Revolving Loans may (A) be incurred by MDL, MDI and/or any of their respective Subsidiaries as borrower or guarantor and secured only by a security interest in and lien on any and all Foreign MDL Collateral (as defined below) (the "New MDL Revolver Liens" and, together with the New Domestic Revolver Liens, the "New Revolving Loan Liens") and (B) provide that holders of Obligations under the New MDL Revolving Loans (the "New MDL Revolving Loan Obligations") shall have the right to receive any and all MDL Sale Proceeds prior to payment of any MDL Sale Proceeds to holders of any other indebtedness (including the New MDL Term Lenders), until such time as all New MDL Revolving Loan Obligations have been discharged in full and (b) substantially reflect the form and substance of the Agreed Debt Documents (as defined below), as applicable to Term Loans (as defined in the Original Credit Agreement (as defined below)), subject to such modifications and changes thereto as are deemed

14

necessary, appropriate or desirable by the Debtors, the Requisite Backstop Parties and the Requisite Consenting Existing Lenders to reflect any matters contemplated by the Restructuring and any features of, or terms applicable to, the New MDL Term Loan Facility.

"Agreed Debt Documents" means the Existing Credit Agreement as in effect on April 30, 2015, without giving effect to any amendments thereto after such date (the "Original Credit Agreement") and the other Loan Documents (as defined in the Original Credit Agreement) (including the definitions, conditions, prepayment requirements, representations, warranties, covenants, collateral and security provisions, intercreditor and subordination provisions, events of default, enforcement rights, remedies, indemnities and reimbursements set forth therein).

"Definitive Debt Documents" means, with respect to any indebtedness (including indebtedness in the form of loans, notes, bonds, letters of credit and similar types of debt), the definitive documentation evidencing and/or governing such indebtedness (including, as applicable, any credit or loan agreement, indenture, note, bond, debenture, guarantee, mortgage, pledge or security agreement, collateral trust agreement, intercreditor and subordination agreement, and any other certificate, document or agreement executed and/or delivered in connection with or relating to such indebtedness).

"21C Collateral" means, as at any date of determination, all property which would constitute "Collateral" for purposes of (x) that certain Security Agreement, dated as of March 6, 2017 (as amended, amended and restated, supplemented or otherwise modified from time to time and as in effect on the Effective Date, immediately prior to giving effect to the Restructuring), among 21C Holdings, 21C Oncology, the Subsidiaries of 21C Oncology parties thereto from time to time and WSFS, as collateral agent thereunder, including 65% of the Capital Stock (as defined in the Original Credit Agreement) of each of MDL and MDI (such 65% of such Capital Stock, the "Domestic MDL Collateral"), and (y) the Existing Credit Agreement, including "Collateral" as defined in that certain Guarantee and Security Agreement, dated as of April 30, 2015 (as amended, amended and restated, supplemented or otherwise modified from time to time and as in effect on the Effective Date, immediately prior to giving effect to the Restructuring), among 21C Holdings, 21C Oncology, the Subsidiaries of 21C Oncology parties thereto from time to time and MSSF, as administrative agent thereunder.

"Domestic Revolver Collateral" means, as at any date of determination, all 21C Collateral that constitutes accounts receivable, inventory and property, plant and equipment as of such date.

"Foreign MDL Collateral" means, as at any date of determination, all property which would constitute "Collateral" for purposes of that certain Security Agreement, dated as of December 6, 2016 (as amended, amended and restated, supplemented or otherwise modified from time to time and as in effect on the Effective Date, immediately prior to giving effect to the

| | |
|---|---|
| | Restructuring), by and among MDL and MDI, as grantors, and WSFS, as collateral agent (including 65% of the Capital Stock of Medical Developers Coöperatief U.A.).<br><br>"MDL Sale Proceeds" means all net cash proceeds received by any of the Reorganized Debtors or any of their Subsidiaries from the sale of, or other value attributed in a bankruptcy, insolvency or similar proceeding with respect to Equity Interests in and/or assets or property of reorganized MDL ("Reorganized MDL") and/or reorganized MDI and/or any of their respective Subsidiaries. |
| **New First Lien Term Loan Credit Facility** | On the Effective Date, the New Domestic Loan Parties shall enter into a new first lien term loan credit facility (the "New First Lien Term Loan Credit Facility") pursuant to which new first lien term loans in an aggregate principal amount equal to (a) the aggregate amount of the Existing Credit Facility Obligations as of immediately prior to the Effective Date, minus (b) the Exchanged Credit Facility Claims (the "New First Lien Term Loans" and, together with all other Obligations under the New First Lien Term Loan Credit Facility, the "New Term Loan Obligations") shall be deemed provided to Reorganized 21C Oncology by the holders of Allowed Credit Facility Claims that receive New First Lien Term Loans under the Plan (the "New First Lien Term Lenders").<br><br>The New First Lien Term Loan Credit Facility shall be incurred pursuant to Definitive Debt Documents (the "New Term Loan Debt Documents") which shall (a) provide that (i) the New First Lien Term Loan Credit Facility shall have a maturity date that is five (5) years after the Effective Date, (ii) non-default interest on the New First Lien Term Loans shall accrue at an annual rate equal to LIBOR (subject to a 1% LIBOR floor) plus 6.125% and be payable quarterly in cash, (iii) the principal amount of the New First Lien Term Loans shall amortize in equal quarterly installments equal to 0.25% of the aggregate principal amount of New First Lien Term Loans outstanding on the Effective Date, such amortization to commence on the date that is the later of (A) the last day of the first full calendar quarter that ends after the Effective Date, provided that if the last day of the calendar quarter in which the Effective Date occurs is more than 60 days after the Effective Date, then the date referred to in this clause (A) shall be the last day of the calendar quarter in which the Effective Date occurs, and (B) March 31, 2018 (such later date, the "Commencement Date"), (iv) a 50% Excess Cash Flow (as defined in the Original Credit Agreement) sweep shall apply (subject to a $50.0 million minimum domestic cash requirement), provided, that such percentage shall be (A) 25% if consolidated first lien net leverage is equal to or less than 4.0x but greater than 3.0x and (B) 0% if consolidated first lien net leverage is equal to or less than 3.0x, (v) incurrence of New Revolving Loans and New Revolving Loan Liens shall be permitted, (vi) the right of holders of New Term Loan Obligations to receive MDL Sale Proceeds shall (x) be subordinate and junior in priority to the right thereto of holders of New MDL Revolving Loan Obligations (if any) and New MDL Term Loan Obligations and (y) rank equal to the right thereto of the holders of New Second Lien Notes Obligations to receive such MDL Sale Proceeds; provided, that, with respect to any MDL Sale Proceeds which are received by |

any of the Reorganized Debtors or any of their Subsidiaries (A) prior to the first anniversary of the Effective Date, holders of New Term Loan Obligations shall receive 60% of such MDL Sale Proceeds and holders of New Second Lien Notes Obligations shall receive 40% of such MDL Sale Proceeds and (B) on or at any time after the first anniversary of the Effective Date, holders of New Term Loan Obligations shall receive 50% of such MDL Sale Proceeds and holders of New Second Lien Notes Obligations shall receive 50% of such MDL Sale Proceeds, (vii) the New Term Loan Obligations shall be guaranteed by the New Domestic Loan Parties (except Reorganized 21C Oncology, as borrower) and secured by a security interest in and lien on all 21C Collateral (collectively, the "New Term Loan Liens") with the lien priorities set forth in the "Intercreditor Arrangements" section of this Term Sheet, (viii) incurrence of up to $35.0 million of additional New First Lien Term Loans or other first lien debt ranking *pari passu* with the New First Lien Term Loans shall be permitted; provided, that the proceeds of any such additional debt shall be used solely to prepay the New MDL Term Loan Obligations, (ix) the New First Lien Term Loans may be prepaid, in whole or in part, at any time and from time to time, without premium or penalty of any kind, (x) permit the payment of cash interest on the New Second Lien Notes to the extent that (A) consolidated first lien net leverage is less than or equal to 3.25x and (B) pro forma domestic cash of the New Domestic Loan Parties and their Subsidiaries is not less than $50.0 million, (xi) in lieu of the consolidated total net debt leverage covenant included in the Existing Credit Agreement, the New First Lien Term Loan Credit Facility shall include a consolidated first lien net leverage covenant such that consolidated first lien net leverage shall not be more than 5.5x (the testing of such covenant shall commence on the Commencement Date) (for the avoidance of doubt, there shall be no financial maintenance covenants contained in the New First Lien Term Loan Credit Facility other than the financial maintenance covenants described in this clause (xi) and clause (xii) below), (xii) the New First Lien Term Loan Credit Facility shall include a $25.0 million minimum liquidity covenant (which shall include all domestic cash (excluding joint venture cash) and domestic revolver availability) to be tested on the last day of each month, commencing on the earlier to occur of (A) the Commencement Date and (B) the last day of the month in which the 90th day following the Effective Date occurs; provided, that such testing shall be done on the last day of each calendar quarter after consolidated first lien net leverage is equal to or less than 4.5x, (xiii) for purposes of calculating all relevant financial covenants and ratios, (A) all cash of the New Domestic Loan Parties and their Subsidiaries (including MDL and each of its Subsidiaries) shall be netted from indebtedness; provided, that, with respect to any domestic cash held in joint ventures, only a proportionate amount (proportionate to the applicable New Domestic Loan Party's or its applicable Subsidiary's equity interest in such joint venture) shall be netted from indebtedness, and (B) the definition of EBITDA shall allow addbacks for pro forma cost savings up to $5 million in any 12-month period and will not allow for any addbacks for ordinary course legal expenses (other than legal expenses that are included as part of a judgment, fine or settlement); provided that the combination of pro forma cost savings of up to $5 million and addbacks for non-ordinary course legal expenses (other than legal expenses incurred in connection with or relating to the Restructuring and

| | |
|---|---|
| | legal expenses that are included as part of a judgment, fine or settlement) shall not exceed 10% of EBITDA, (xiv) the event of default in the New First Lien Term Loan Credit Facility for judgments and decrees shall also include fines and settlements (the threshold for such event of default to be the threshold for the event of default for judgments and decrees set forth in the Existing Credit Agreement), and (xv) the New First Lien Term Loan Credit Facility shall be subject to other negative covenants substantially similar to those in the New MDL Debt Documents, with such modifications thereto as are reasonably acceptable to the Requisite Backstop Parties, the Requisite Consenting Existing Lenders and the Debtors, and (b) substantially reflect the form and substance of the Agreed Debt Documents, as applicable to Term Loans, subject to such modifications and changes thereto as are deemed necessary, appropriate or desirable by the Debtors, the Requisite Consenting Existing Lenders and the Requisite Backstop Parties to reflect any matters contemplated by the Restructuring and any other features of, or terms applicable to, the New First Lien Term Loan Credit Facility. |
| **New Second Lien Notes** | On the Effective Date, Reorganized 21C Oncology shall issue new second lien PIK toggle notes (the "<u>New Second Lien Notes</u>" and the Obligations thereunder, the "<u>New Second Lien Notes Obligations</u>") in an aggregate original principal amount equal to the Notes Rights Offering Amount. <br><br> The New Second Lien Notes shall be incurred pursuant to Definitive Debt Documents (the "<u>New Second Lien Notes Debt Documents</u>") which shall (a) provide that (i) the New Second Lien Notes shall have a maturity date that is five and one-quarter (5-1/4) years after the Effective Date and shall accrue interest (which shall be paid on a quarterly basis) at a rate of (x) ten percent (10.0%) per annum in the event Reorganized 21C Oncology elects to pay such accrued interest in cash; <u>provided</u>, that such election shall only be permitted to the extent that (A) consolidated first lien net leverage is less than or equal to 3.25x and (B) pro forma domestic cash of the New Domestic Loan Parties and their Subsidiaries is not less than $50.0 million, or (y) twelve percent (12.0%) per annum in the event Reorganized 21C Oncology elects or is required to pay such accrued interest in kind, (ii) the New Second Lien Notes Obligations shall be guaranteed by the New Domestic Loan Parties (except Reorganized 21C Oncology, as borrower) and secured by a security interest in and lien on all 21C Collateral (collectively, the "<u>New Notes Liens</u>") with the lien priorities set forth in the "Intercreditor Arrangements" section of this Term Sheet, (iii) the right of holders of the New Second Lien Notes Obligations to receive MDL Sale Proceeds shall (x) be subordinate and junior in priority to the right thereto of holders of New MDL Revolving Loan Obligations (if any) and New MDL Term Loan Obligations and (y) rank equal to the right thereto of the holders of New Term Loan Obligations to receive such MDL Sale Proceeds; <u>provided</u>, that, with respect to any MDL Sale Proceeds which are received by any of the Reorganized Debtors or any of their Subsidiaries (A) prior to the first anniversary of the Effective Date, holders of New Term Loan Obligations shall receive 60% of such MDL Sale Proceeds and holders of New Second Lien Notes Obligations shall receive 40% of such MDL Sale Proceeds and (B) on or at any time after the first anniversary of the Effective Date, holders of New Term Loan Obligations shall receive 50% of such MDL Sale Proceeds and holders of New Second Lien Notes Obligations shall receive |

<table>
<tr>
<td></td>
<td>50% of such MDL Sale Proceeds, (iv) incurrence of New Revolving Loans and New Revolving Loan Liens shall be permitted, (v) the New Second Lien Notes shall be redeemable, in whole or in part, at the issuer's option at any time and from time to time prior to maturity, without premium or penalty of any kind, and (vi) for purposes of calculating all relevant financial covenants and ratios, all cash of the New Domestic Loan Parties and their Subsidiaries (including MDL and each of its Subsidiaries) shall be netted from indebtedness; <u>provided</u>, that, with respect to any domestic cash held in joint ventures, only a proportionate amount (proportionate to the applicable New Domestic Loan Party's or its applicable Subsidiary's equity interest in such joint venture) shall be netted from indebtedness, and (b) substantially reflect the substance of the Agreed Debt Documents, subject to such amendments and modifications thereto (including to the form and type of documentation) as are deemed necessary, appropriate or desirable by the Debtors, the Requisite Consenting Existing Lenders and the Requisite Backstop Parties to reflect any matters contemplated in the Restructuring and any other features of, or terms applicable to, the New Second Lien Notes.</td>
</tr>
<tr>
<td><strong>Intercreditor Arrangements</strong></td>
<td>The New MDL Term Loan Facility, New First Lien Term Loan Credit Facility, New Second Lien Notes and New Domestic Revolving Loans (if any) shall be subject to such customary intercreditor and subordination arrangements (the "<u>Intercreditor Arrangements</u>") to achieve the following lien priorities with respect to 21C Collateral:

(a)  New Domestic Revolver Liens (if any) on Domestic Revolver Collateral shall rank (i) senior to or <em>pari passu</em> with New MDL Term Liens on any Domestic Revolver Collateral and (ii) senior to New Term Loan Liens and New Notes Liens on any Domestic Revolver Collateral;

(b)  New MDL Term Liens on 21C Collateral shall rank (i) senior to New Term Loan Liens and New Notes Liens on 21C Collateral, (ii) junior and subordinate to or <em>pari passu</em> with New Domestic Revolver Liens (if any) on Domestic Revolver Collateral, and (iii) senior to New Domestic Revolver Liens (if any) on 21C Collateral (other than Domestic Revolver Collateral);

(c)  New Term Loan Liens shall rank (i) with respect to all 21C Collateral (other than Domestic MDL Collateral), senior to New Notes Liens thereon, (ii) with respect to Domestic MDL Collateral only, <em>pari passu</em> with the New Notes Liens thereon on a ratable basis in accordance with the proportionate allocations of the MDL Sale Proceeds between the New First Lien Term Loans and the New Second Lien Notes, (iii) junior and subordinate to New MDL Term Liens on any 21C Collateral, (iv) junior and subordinate to New Domestic Revolver Liens on all Domestic Revolver Collateral, and (v) senior to New Domestic Revolver Liens on all 21C Collateral (other than Domestic Revolver Collateral); and

(d)  New Notes Liens shall rank (i) with respect to Domestic MDL Collateral only, <em>pari passu</em> with the New Term Loan Liens thereon on a ratable basis in accordance with the proportionate allocations of the MDL Sale Proceeds between the New Second Lien Notes and the New First Lien</td>
</tr>
</table>

| | |
|---|---|
| | Term Loans, (ii) with respect to all 21C Collateral (other than Domestic MDL Collateral), junior and subordinate to New Term Loan Liens thereon, (iii) junior and subordinate to New MDL Term Liens on any 21C Collateral, and (iv) junior and subordinate to New Domestic Revolver Liens (if any) on all Domestic Revolver Collateral. |
| **New Preferred Equity** | On the Effective Date, Reorganized 21C Holdings shall issue a new series of convertible preferred stock (the "<u>New Preferred Equity</u>") with an aggregate initial liquidation value of $108.860 million, which New Preferred Equity shall be deemed validly issued, fully paid and non-assessable. The New Preferred Equity shall:<br><br>(a) accrue a pay-in-kind dividend at a rate of fifteen percent (15.0%) per annum, payable on a quarterly basis;<br><br>(b) initially be convertible, at any time and from time to time at the option of the holder thereof, into shares of New Common Stock representing (after giving effect to such conversion) eighty-five percent (85%) of the total number of shares of New Common Stock that are issued and outstanding on the Effective Date after giving effect to the consummation of the Restructuring (including the distribution of all shares of New Common Stock in respect of the Senior Notes Claims (as defined below) and any other distributions of shares of New Common Stock made pursuant to the Plan or in connection with the Restructuring) and assuming full issuance of all shares of New Common Stock that are subject to the Equity Pool (as defined below);<br><br>(c) entitle the holders of the New Preferred Equity to receive, upon a liquidation, dissolution, winding-up, merger, consolidation, sale of all or substantially all of the assets of Reorganized 21C Holdings or other liquidity event involving Reorganized 21C Holdings (any of the foregoing, a "<u>Liquidation Event</u>"), an amount equal to the greater of (i) the aggregate liquidation value attributable to the New Preferred Equity plus all accrued and unpaid dividends thereon, and (ii) the amount that such holders would have been entitled to receive with respect to such Liquidation Event if such holders had exercised their rights to convert shares of New Preferred Equity into shares of New Common Stock immediately prior to such Liquidation Event;<br><br>(d) prohibit the declaration or payment of any dividends or other payments on or in respect of any shares of New Common Stock or other Equity Interests of Reorganized 21C Holdings that rank junior to the New Preferred Equity upon a Liquidation Event;<br><br>(e) vote with the New Common Stock as a single class (on an as-converted basis) on all matters submitted to the holders of New Common Stock for a vote, consent or approval (including without limitation, the election of directors); |

|  | (f) not be redeemable by Reorganized 21C Holdings; and |
|---|---|
|  | (g) have such other rights, preferences, privileges, powers, qualifications, limitations, restrictions, and relative, participating, optional and other special rights as reasonably agreed upon by the Debtors and the Requisite Backstop Parties. |
| **New Common Stock** | On the Effective Date, Reorganized 21C Holdings shall issue one or more classes of new common stock (the "New Common Stock"), which New Common Stock shall be deemed validly issued, fully paid and non-assessable. |
| **New Warrants** | Subject to the satisfaction of the Warrant Conditions (as defined below), on the Effective Date, Reorganized 21C Holdings shall issue warrants (the "New Warrants") to acquire an aggregate number of shares of New Common Stock equal to (after giving effect to the full exercise of the New Warrants) 7.5% of the sum of (i) the total number of shares of New Common Stock that are issued and outstanding on the Effective Date (immediately after giving effect to the consummation of the Restructuring), and (ii) the total number of shares of New Common Stock that are issuable upon full conversion of the New Preferred Equity on the Effective Date, such sum subject to dilution on account of the equity issued under the Equity Incentive Plan. The New Warrants shall be subject to anti-dilution adjustments for stock splits, stock dividends and stock combinations, but the New Warrants shall not contain any economic anti-dilution adjustments.

The exercise price per share of New Common Stock under the New Warrants (the "Exercise Price") shall be equal to the quotient obtained by dividing (a) $600.0 million by (b) the sum (x) the total number of shares of New Common Stock that are issued and outstanding on the Effective Date (immediately after giving effect to the consummation of the Restructuring) and (y) the total number of shares of New Common Stock that are issuable upon full conversion of the New Preferred Equity on the Effective Date.

The New Warrants shall be exercisable at any time and from time to time prior to the Expiration Date (as defined below). The New Warrants must be exercised by payment of the Exercise Price in cash (*i.e.*, the New Warrants shall not contain a cashless exercise feature), except that the New Warrants may be exercised on a cashless basis in connection with a liquidity event (to be defined). The New Warrants shall not be assignable or transferable to any Person. It shall be an express condition to the exercise of the New Warrants that the holder thereof executes and delivers to Reorganized 21C Holdings a counterpart of the New Stockholders Agreement (as defined below).

The New Warrants shall expire on the earlier to occur of (A) the five (5) year anniversary of the Effective Date and (B) the consummation of a liquidity event (the date of the occurrence of such earlier event, the "Expiration Date").

The holders of the New Warrants shall be entitled to receive (a) annual audited consolidated financial statements of Reorganized 21C Holdings within 120 days after the end of Reorganized 21C Holdings' fiscal year, and |

21

|  | (b) quarterly unaudited consolidated financial statements of Reorganized 21C Holdings within 45 days after the end of each of Reorganized 21C Holdings' first three fiscal quarters during each fiscal year, subject to confidentiality obligations that are acceptable to Reorganized 21C Holdings.

The New Warrants shall not entitle any holder thereof (in its capacity as such) to vote or receive dividends or to be deemed the holder of capital stock or any other Equity Interests of Reorganized 21C Holdings, nor shall the New Warrants confer upon any holder thereof (in its capacity as such) any of the rights of a stockholder of Reorganized 21C Holdings (including appraisal rights, any right to vote for the election of directors or upon any matter submitted to stockholders of Reorganized 21C Holdings at any meeting thereof, or to receive notice of meetings, or to receive dividends or subscription rights or otherwise).

The documents and certificates evidencing the New Warrants (the "<u>Warrant Documentation</u>") shall be consistent in all material respects with the terms and conditions set forth in this Term Sheet and otherwise in form and substance reasonably acceptable to the Requisite Parties. |
| **CLASSIFICATION AND TREATMENT OF CLAIMS** | |
| **Unclassified Claims** | |
| **DIP Claims** | **Treatment.**  On the Effective Date, each holder of an Allowed claim under the DIP Credit Documents (collectively, the "<u>DIP Claims</u>") shall receive payment in full, in cash, of the unpaid portion of its DIP Claim, which payment shall be funded from the Equity Rights Offering Cash Amount and/or cash on hand.

**Voting.**  Not classified; non-voting. |
| **Administrative Claims** | **Treatment.**  Except to the extent that a holder of an Allowed administrative claim (collectively, the "<u>Administrative Claims</u>") and the Debtors, with the consent of the Requisite Backstop Parties and the Requisite Consenting Existing Lenders, which consent shall not be unreasonably withheld, agree in writing to less favorable treatment for such Administrative Claim, such holder shall receive payment in full, in cash, of the unpaid portion of its Allowed Administrative Claim on the Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, on the due date of such Allowed Administrative Claim).

Administrative Claims shall include, among other things: (a) claims against the Debtors arising under section 503(b) of the Bankruptcy Code; (b) Allowed claims for reasonable fees and expenses of professionals retained in the Chapter 11 Cases with the approval of the Bankruptcy Court; and (c) all Transaction Expenses (including Backstop Expenses) in accordance with the terms and conditions of the RSA and/or the Backstop Purchase Agreement. |

| | |
|---|---|
| | **Voting.** Not classified; non-voting. |
| **Priority Tax Claims** | **Treatment.** All Allowed claims against the Debtors under section 507(a)(8) of the Bankruptcy Code (collectively, the "Priority Tax Claims") shall be treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code.<br><br>**Voting.** Not classified; non-voting. |
| **Intercompany Claims** | There shall be no distributions on account of intercompany claims between and among the Debtors and their Subsidiaries. Notwithstanding the foregoing, (a) the Debtors, with the consent of the Requisite Backstop Parties and the Requisite Consenting Existing Lenders, may reinstate or compromise, as the case may be, the intercompany claims between and among the Debtors and their Subsidiaries, and (b) the treatment of the intercompany claims shall be effectuated in a tax efficient manner. |
| | **Classified Claims and Interests** |
| **Other Priority Claims** | **Treatment.** Except to the extent that a holder of an Allowed claim described in section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim (collectively, the "Other Priority Claims") and the Debtors, with the consent of the Requisite Backstop Parties and the Requisite Consenting Existing Lenders, which consent shall not be unreasonably withheld, agree in writing to less favorable treatment for such Other Priority Claim, such holder shall receive payment in full, in cash, of the unpaid portion of its Allowed Other Priority Claim on the Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, on the due date of such Other Priority Claim).<br><br>**Voting.** Unimpaired. Each holder of an Other Priority Claim will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each holder of an Allowed Other Priority Claim will not be entitled to vote to accept or reject the Plan. |
| **Other Secured Claims** | **Treatment.** Except to the extent that a holder of an Allowed secured claim, other than an MDL Facility Claim and a Credit Facility Claim (collectively, the "Other Secured Claims"), and the Debtors, with the consent of the Requisite Backstop Parties and the Requisite Consenting Existing Lenders, which consent shall not be unreasonably withheld, agree in writing to less favorable treatment for such Other Secured Claim, such holder shall receive payment in full, in cash, of the unpaid portion of its Allowed Other Secured Claim on the Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, on the due date of such Other Secured Claim).<br><br>**Voting.** Unimpaired. Each holder of an Allowed Other Secured Claim will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each holder of an Allowed Other Secured Claim will not be entitled to vote to accept or reject the Plan. |

| | |
|---|---|
| **MDL Facility Claims** | **Treatment.**  On the Effective Date or as soon thereafter as reasonably practicable, each holder of an Allowed claim arising under the Existing MDL Obligations (collectively, the "<u>MDL Facility Claims</u>") shall receive its *pro rata* share of New MDL Term Loans in an aggregate principal amount equal to the aggregate amount of the Existing MDL Obligations as of immediately prior to the Effective Date.<br><br>**Voting.**  Impaired.  Each holder of an Allowed MDL Facility Claim will be entitled to vote to accept or reject the Plan. |
| **Credit Facility Claims** | **Treatment.**  On the Effective Date or as soon thereafter as reasonably practicable, each holder of an Allowed secured claim arising under the Existing Credit Facility Obligations (collectively, the "<u>Credit Facility Claims</u>"), except to the extent that a holder of an Allowed Credit Facility Claim agrees, with the consent of the Requisite Backstop Parties and the Requisite Consenting Existing Lenders, which consent shall not be unreasonably withheld, to less favorable treatment of its Allowed Credit Facility Claim, shall receive New First Lien Term Loans in an aggregate principal amount equal to (i) the aggregate amount of the Existing Credit Facility Obligations owned or held by such holder as of immediately prior to the Effective Date, <u>minus</u> (ii) the Exchanged Credit Facility Claims of such holder; <u>provided</u>, <u>however</u>, that no distributions shall be made on any of the Exchanged Credit Facility Claims.<br><br>**Voting.**  Impaired.  Each holder of an Allowed Credit Facility Claim will be entitled to vote to accept or reject the Plan. |
| **Senior Notes Claims** | **Treatment.**  On the Effective Date or as soon thereafter as reasonably practicable, each holder of an Allowed claim arising under the Senior Notes Obligations (collectively, the "<u>Senior Notes Claims</u>"), except to the extent that a holder of an Allowed Senior Notes Claim agrees to less favorable treatment of its Allowed Senior Notes Claim, shall receive its *pro rata* share of:<br><br>(a) the Notes Rights (but only to the extent such holder is an Accredited Investor);<br><br>(b) the Equity Rights (but only to the extent such holder is an Accredited Investor); and<br><br>(c) 100% of the New Common Stock (subject to dilution on account of the New Preferred Equity, the shares of New Common Stock issuable upon exercise of the New Warrants, and the equity issued under the Equity Incentive Plan (as defined below)) (to be distributed on a *pro rata* basis to holders of Allowed Senior Notes Claims and holders of Allowed General Unsecured Claims that receive New Common Stock as described below in the section titled "General Unsecured Claims").<br><br>**Voting.**  Impaired.  Each holder of an Allowed Senior Notes Claim will be entitled to vote to accept or reject the Plan. |

24

| General Unsecured Claims | **Treatment.** On the Effective Date or as soon thereafter as reasonably practicable, each holder of any Allowed unsecured claim against any of the Debtors that is not (a) an Administrative Claim, (b) a Priority Tax Claim, (c) an Other Priority Claim, (d) an Intercompany Claim, (e) a Senior Notes Claim, or (f) a Section 510(b) Claim (as defined below), including without limitation any unsecured claim arising under the SFRO Obligations, the CTSA Obligations, the Seaside Obligations or the FOP Obligations (collectively, the "General Unsecured Claims"), shall receive, unless such holder and the Debtors, with the consent of the Requisite Backstop Parties and the Requisite Consenting Existing Lenders, which consent shall not be unreasonably withheld, agree to less favorable treatment of its Allowed General Unsecured Claim, its *pro rata* share of either (i) 100% of the New Common Stock (subject to dilution on account of the New Preferred Equity, the shares of New Common Stock issuable upon exercise of the New Warrants, and the equity issued under the Equity Incentive Plan) (to be distributed on a *pro rata* basis to holders of Allowed Senior Notes Claims and holders of Allowed General Unsecured Claims that receive New Common Stock as described in this paragraph), or (ii) the Convenience Claim Distribution (as defined below). |
|  | "Convenience Claim Distribution" means cash in the aggregate amount of $500,000, which amount shall be used to make distributions to holders of Allowed General Unsecured Claims (x) each asserted in an amount less than or equal to $1,000,000, unless the holder has properly made the New Common Stock Election (as defined below) on a properly cast ballot, or (y) each asserted in an amount greater than $1,000,000, for which the holder has properly made the Convenience Claim Election (as defined below) on a properly cast ballot. |
|  | "Convenience Claim Election" means the election available to a holder of an Allowed General Unsecured Claim asserted in an amount greater than $1,000,000 to opt to receive its *pro rata* share of the Convenience Claim Distribution in full and complete satisfaction, discharge and release of such Allowed General Unsecured Claim; provided, that in making such election, the holder of such Allowed General Unsecured Claim has agreed, to the extent such holder's Allowed General Unsecured Claim is for an amount greater than $1,000,000, to reduce the amount of such Allowed General Unsecured Claim for purposes of voting and distributions under the Plan to $1,000,000. |
|  | "New Common Stock Election" means the election available to a holder of an Allowed General Unsecured Claim asserted in an amount less than or equal to $1,000,000 to opt to receive its *pro rata* share of the New Common Stock (subject to dilution on account of the New Preferred Equity, the shares of New Common Stock issuable upon exercise of the New Warrants, and the equity issued under the Equity Incentive Plan), in full and complete satisfaction, discharge and release of such Allowed General Unsecured Claim. |
|  | **Voting.** Impaired. Each holder of an Allowed General Unsecured Claim |

| | will be entitled to vote to accept or reject the Plan. |
|---|---|
| **Section 510(b) Claims** | **Treatment.** Holders of any claim subject to subordination under section 510(b) of the Bankruptcy Code (collectively, the "Section 510(b) Claims"), shall receive no recovery.<br><br>**Voting.** Impaired. Each holder of a Section 510(b) Claim will be deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each holder of a Section 510(b) Claim will not be entitled to vote to accept or reject the Plan. |
| **Existing Equity Interests** | **Treatment.** In the event that (a) all classes of creditors entitled to vote on the Plan vote to accept the Plan, (b) there are no Allowed Section 510(b) Claims, and (c) holders of the Existing Equity Interests vote to accept the Plan (clauses (a), (b) and (c), collectively, the "Warrant Conditions"), each holder of an Existing Equity Interest shall receive its *pro rata* share of the New Warrants. If each of the Warrant Conditions is not satisfied, each holder of an Existing Equity Interest shall receive no distribution.<br><br>**Voting.** Impaired. Each holder of an Existing Equity Interest will be entitled to vote to accept or reject the Plan. |
| **GENERAL PROVISIONS** | |
| **Equity Incentive Plan** | Within one hundred fifty (150) days after the Effective Date, the New Board (as defined below) shall adopt an equity incentive plan (the "Equity Incentive Plan") that provides for the issuance of options and/or other equity-based awards (collectively, "Awards") to employees, consultants and directors of any of the Reorganized Debtors or any of their respective Subsidiaries. The New Board shall determine a percentage of the shares of New Common Stock that are issued and outstanding on the Effective Date after giving effect to the consummation of the Restructuring (including the distribution of all shares of New Common Stock in respect of the Senior Notes Claims and any other distributions of shares of New Common Stock made pursuant to the Plan or in connection with the Restructuring) shall be reserved for issuance under the Equity Incentive Plan (the "Equity Pool"). The form of the Awards (*i.e.*, stock options, restricted stock, appreciation rights, etc.), the participants in the Equity Incentive Plan, the allocations of the Awards to such participants (including the amount of allocations and the timing of the grant of the Awards), and the terms and conditions of the Awards (including vesting, exercise prices, base values, hurdles, forfeiture, repurchase rights and transferability) shall be determined by the New Board in its sole discretion. |
| **Cancellation of Instruments, Certificates and Other Documents** | On the Effective Date, except to the extent otherwise provided above, all instruments, certificates and other documents evidencing indebtedness or debt securities of, or Equity Interests in, any of the Debtors shall be cancelled, and the obligations of the Debtors thereunder, or in any way related thereto, shall be discharged. |

26

| | |
|---|---|
| **Executory Contracts and Unexpired Leases** | Executory contracts and unexpired leases shall be assumed or rejected (as the case may be), as determined by the Debtors, and with the consent of the Requisite Backstop Parties, which consent shall not be unreasonably withheld, during the pendency of the Chapter 11 Cases; provided, however, that any executory contract or unexpired lease between any of the Debtors, on the one hand, and any Affiliate of any of the Debtors (other than a Debtor) or any current or former partner, officer, director, principal, employee or agent of any such Affiliate, on the other hand, shall be assumed or rejected by the applicable Debtor(s) upon the request of the Requisite Backstop Parties. |
| **Avoidance Actions** | All claims or causes of action pursuant to chapter 5 of the Bankruptcy Code to avoid a transfer of property or an obligation incurred by the Debtors shall be retained by the Debtors, unless otherwise agreed to by the Requisite Parties. |
| **Capital Structure** | On the Effective Date, the debt and equity capital structure of the Reorganized Debtors will be consistent in all material respects with the capital structure of the Reorganized Debtors as set forth in this Term Sheet, unless otherwise agreed to by the Requisite Backstop Parties and the Requisite Consenting Existing Lenders.<br><br>Neither the New Common Stock, the New Preferred Equity or any other Equity Interests of any of the Reorganized Debtors will be listed for trading on a securities exchange, and none of the Reorganized Debtors will be required to file reports with the United States Securities and Exchange Commission unless it is required to do so pursuant to the Exchange Act. |
| **COMPANY GOVERNANCE/ORGANIZATIONAL DOCUMENTS PROVISIONS/RELEASES** | |
| **New Board** | The board of directors of Reorganized 21C Holdings immediately after the consummation of the Restructuring (the "New Board") shall consist of seven (7) directors. The initial members of the New Board will be appointed as set forth in the "Board of Directors" section of the Summary of Terms of New Organizational Documents attached hereto as Exhibit 2 (the "Governance Term Sheet"). |
| **New Organizational Documents** | The new organizational documents of each of the Reorganized Debtors (including the New Stockholders Agreement and the New Registration Rights Agreement (as defined below)) shall be consistent in all material respects with the terms and conditions set forth in the Governance Term Sheet and otherwise in form and substance reasonably acceptable to the Requisite Parties (such new organizational documents, collectively, the "New Organizational Documents"). In addition, Reorganized 21C Holdings and all Persons that receive New Common Stock and/or New Preferred Equity on the Effective Date shall enter into a stockholders agreement (the "New Stockholders Agreement") on the Effective Date that shall contain terms and provisions that are consistent in all material respects with the Governance Term Sheet and otherwise in form and substance reasonably acceptable to the Requisite Parties. It shall be an express condition to the right of a holder of an Allowed Claim or any other Person to receive New |

27

| | |
|---|---|
| | Common Stock and/or New Preferred Equity in connection with the Restructuring that such holder or other Person execute and deliver to Reorganized 21C Holdings a counterpart of the New Stockholders Agreement.<br><br>In addition, on the Effective Date, Reorganized 21C Holdings shall enter into a registration rights agreement (the "New Registration Rights Agreement") for the benefit of Persons that receive shares of New Common Stock and/or shares of New Preferred Equity under the Plan (including in the Rights Offerings) or pursuant the Backstop Purchase Agreement providing for registration rights that are consistent in all material respects with the Governance Term Sheet and otherwise in form and substance reasonably acceptable to the Requisite Parties. |
| **Exemption from SEC Registration** | The issuance of all securities under the Plan will be exempt from registration under section 1145 of the Bankruptcy Code to the extent permitted pursuant to section 1145 of the Bankruptcy Code. |
| **Debtor/Third Party Releases** | "Released Party" means each of: (a) the Backstop Parties; (b) the DIP Lenders; (c) the DIP Agent; (d) the Consenting MDL Lenders; (e) the Existing MDL Agent; (f) the Consenting Existing Lenders; (g) the Existing Credit Agent; (h) the Consenting Noteholders; (i) the Trustee; (j) the Equity Parties; and (k) with respect to each of the foregoing Persons described in clauses (a) through (j), such Person's current and former Affiliates, partners, Subsidiaries, officers, directors, principals, employees, agents, managed funds, advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, together with their respective successors and assigns, in each case in their capacity as such; and (l) the Debtors' and the Reorganized Debtors' current and former Affiliates, partners, Subsidiaries, certain officers, certain directors, principals, employees, agents, advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, together with their respective successors and assigns, in each case in their capacity as such, and only if serving in such capacity; provided, however, that notwithstanding if any such Person is described in clause (l) above, any Person described in clause (j) above (and, to the extent related to a Person described in clause (j), any Person described in clause (k)) shall only constitute a Released Party to the extent such Person described in clause (j) becomes a Restructuring Support Party, does not breach its obligations under the RSA, and does not terminate the RSA; provided, further that the Debtors' and Reorganized Debtors' current and former directors and officers that do not fall within the meaning of Released Party shall (x) be identified as part of the Plan Supplement and (y) not include any current or former director of any Debtor that is, or was, employed by either Equity Party.<br><br>**Debtor Releases.**  Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, on and after the Effective Date, in exchange for their cooperation and, to the extent applicable, provision of new money pursuant to the Restructuring, the Released Parties shall be deemed released and discharged by the Debtors, the Reorganized Debtors, and their estates from any and all claims, obligations, |

28

debts, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claims asserted on behalf of the Debtors and/or the Reorganized Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, their estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any claim or equity interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, the Restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any claim or equity interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of claims and equity interests prior to or in the Chapter 11 Cases, the Rights Offerings, the Backstop Purchase Agreement, the Backstop Commitments, the RSA, the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, or any other Restructuring Documents, any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes fraud, willful misconduct or gross negligence.

**Third-Party Releases.**  As of the Effective Date, (i) holders of all Claims and Interests who vote to accept the Plan, (ii) holders of Claims or Interests that are Unimpaired under the Plan, (iii) holders of Claims or Interests whose vote to accept or reject the Plan is solicited but who do not vote either to accept or reject the Plan, (iv) holders of Claims or Interests who vote to reject the Plan but do not opt out of the Plan's release provisions pursuant to an election contained in the relevant ballot, (v) the Backstop Parties, (vi) the DIP Lenders, (vii) the DIP Agent, (viii) the Consenting Noteholders, (ix) the Existing MDL Agent, (x) the Consenting Existing Lenders, (xi) the Existing Credit Agent, (xii) the Equity Parties, and (xiii) the Trustee shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Debtors, the Reorganized Debtors, and the Released Parties from any and all claims, equity interests, obligations, debts, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claims asserted on behalf of a debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Person would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, the Restructuring, the Chapter 11 Cases, the Rights Offerings, the Backstop Purchase Agreement, the Backstop Commitments, the RSA, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any claim or equity interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of claims and equity interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, or any other Restructuring Documents, any

| | |
|---|---|
| | other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes fraud, willful misconduct or gross negligence. |
| **Exculpation** | Customary exculpation provisions. |
| **Discharge** | Customary discharge provisions. |
| **Injunction** | Customary injunction provisions. |
| **Indemnification of Prepetition Officers and Directors** | The Debtors shall assume/continue all indemnification provisions and agreements currently in place for Persons that are officers and directors of the Debtors as of the Effective Date, so long as such provisions or agreements do not require the Debtors to make any payments or provide any arrangements (including severance payments) to such Persons other than indemnification payments, reimbursement and advancement of expenses. The indemnification provisions and agreements related to certain Persons to be identified in the Plan Supplement shall not be assumed and/or continued, such Persons to be reasonably acceptable to the Requisite Backstop Parties. |
| **Tax Structure** | To the extent reasonably practicable, the Restructuring shall be structured in a manner which minimizes any current cash taxes payable as a result of the consummation of the Restructuring, and the terms of the Restructuring contemplated by this Term Sheet shall be structured to maximize the favorable tax attributes of the Debtors and the Reorganized Debtors going forward, including, but not limited to, structuring in a manner designed to produce a taxable acquisition of the Debtors' assets for U.S. federal income tax purposes. |
| **PLAN IMPLEMENTATION** | |
| **Conditions Precedent to the Effective Date** | The Plan shall contain the following conditions precedent to the Effective Date: |
| | (a) the Plan and all other Restructuring Documents shall be in form and substance consistent in all material respects with this Term Sheet and otherwise reasonably acceptable to the Requisite Parties; |
| | (b) the Bankruptcy Court shall have entered an order confirming the Plan in form and substance consistent in all material respects with this Term Sheet and otherwise reasonably acceptable to the Requisite Parties, and such order shall not have been stayed or modified or vacated on appeal; |
| | (c) the RSA shall not have been validly terminated as to all parties thereto; |
| | (d) (i) the Backstop Purchase Agreement shall not have been terminated and shall remain in full force and effect, and (ii) all conditions precedent to the obligations of the Backstop Parties under the |

|  | Backstop Purchase Agreement shall have been satisfied or waived with the prior written consent of the Requisite Backstop Parties;

(e) all Transaction Expenses (including Backstop Expenses) shall have been paid in full, in cash, in accordance with the RSA, the Backstop Purchase Agreement, the Plan, the DIP Orders, and the Backstop Order;

(f) each of the New MDL Term Loan Facility, the New First Lien Term Loan Credit Facility and the New Second Lien Notes shall have closed;

(g) there shall be no ruling, judgment or order issued by any Governmental Entity making illegal, enjoining, or otherwise preventing or prohibiting the consummation of the Restructuring, unless such ruling, judgment or order has been stayed, reversed or vacated within three (3) Business Days after such issuance; and

(h) there shall be no material litigation or governmental investigations involving the Debtors as of the Effective Date that has had, or would reasonably be expected to have, a material adverse effect on the business, financial condition or results of operations of the Reorganized Debtors, taken as a whole.

The conditions precedent to the Effective Date may not be waived without the written consent of the Debtors, the Requisite Backstop Parties and the Requisite Consenting Existing Lenders. |

31

**EXHIBIT 1**
**DIP FACILITY**

**ANNEX 1**
**DIP TERM SHEET**

**ANNEX 2**
**FORM OF DIP CREDIT AGREEMENT**

**EXHIBIT 2**
<u>**GOVERNANCE TERM SHEET**</u>

**EXHIBIT B**
**JOINDER AGREEMENT**

[_____], 2017

The undersigned ("Joinder Party") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of [_____], 2017 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Agreement"), by and among 21st Century Oncology Holdings, Inc., 21st Century Oncology, Inc. ("21C Oncology"), each of the direct and indirect Subsidiaries of 21C Oncology parties thereto, and the Persons named therein as "Creditor Parties" and "Equity Parties" thereunder.  Capitalized terms used and not otherwise defined herein shall have the meanings set forth in the Agreement.

1.    Agreement to be Bound.  The Joinder Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached hereto as Annex I (as the same has been or may hereafter be amended, supplemented, amended and restated or otherwise modified from time to time in accordance with the provisions hereof).  The Joinder Party shall hereafter be deemed to be a "[Consenting Noteholder / Consenting Existing Lender / Consenting MDL Lender / Equity Party]" and a "Restructuring Support Party" for all purposes under the Agreement and with respect to all Claims and Interests held such Joinder Party.

2.    Representations and Warranties.  The Joinder Party hereby makes the representations and warranties of the Restructuring Support Parties (other than the Debtors) set forth in Section 8 of the Agreement to each other Restructuring Support Party.

3.    Governing Law.  This joinder agreement (the "Joinder Agreement") to the Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Joinder Party has caused this Joinder Agreement to be executed as of the date first written above.

[Name of Transferor: _____]

Name of Joinder Party: _____

By: _____

       Name: _____

       Title: _____

Notice Address:

_____

_____

Facsimile: _____

Attention: _____

with a copy to:

_____

_____

Facsimile: _____

Attention: _____

Principal Amount of MDL Facility Claims:

$_____

Principal Amount of Credit Facility Claims:

$_____

Principal Amount of Senior Notes Claims:

$_____

Principal Amount of Other Claims:

$_____

Equity Interests:

_____

[Joinder Agreement to Restructuring Support Agreement Signature Page]

46944535.13:

## SCHEDULE 1
## DEBTORS

1. 21st Century Oncology Holdings, Inc.
2. 21st Century Oncology, Inc.
3. 21C East Florida, LLC
4. 21st Century of Florida Acquisition, LLC
5. 21st Century Oncology Management Services, Inc.
6. 21st Century Oncology of Alabama, LLC
7. 21st Century Oncology of Harford County, Maryland, LLC
8. 21st Century Oncology of Jacksonville, LLC
9. 21st Century Oncology of Kentucky, LLC
10. 21st Century Oncology of New Jersey, Inc.
11. 21st Century Oncology of Pennsylvania, Inc.
12. 21st Century Oncology of Prince Georges County, Maryland, LLC
13. 21st Century Oncology of South Carolina, LLC
14. 21st Century Oncology Services, LLC
15. 21st Century Oncology, LLC
16. AHLC, LLC
17. American Consolidated Technologies, L.L.C.
18. Arizona Radiation Therapy Management Services, Inc.
19. Asheville CC, LLC
20. Associates in Radiation Oncology Services, LLC
21. Atlantic Urology Clinics, LLC
22. Aurora Technology Development, LLC
23. Berlin Radiation Therapy Treatment Center, LLC
24. Boynton Beach Radiation Oncology, L.L.C.
25. California Radiation Therapy Management Services, Inc.
26. Carepoint Health Solutions, LLC
27. Carolina Radiation and Cancer Treatment Center, LLC
28. Carolina Regional Cancer Center, LLC
29. Derm-Rad Investment Company, LLC
30. Devoto Construction of Southwest Florida, Inc.
31. MD International Investments, LLC
32. Financial Services of Southwest Florida, LLC
33. Fountain Valley & Anaheim Radiation Oncology Centers, Inc.
34. Gettysburg Radiation, LLC
35. Goldsboro Radiation Therapy Services, LLC
36. Jacksonville Radiation Therapy Services, LLC
37. Maryland Radiation Therapy Management Services, LLC
38. Michigan Radiation Therapy Management Services, Inc.
39. Nevada Radiation Therapy Management Services, Incorporated
40. New England Radiation Therapy Management Services, Inc.
41. New York Radiation Therapy Management Services, LLC
42. North Carolina Radiation Therapy Management Services, LLC
43. OnCure Holdings, Inc.
44. OnCure Medical Corp.
45. Palms West Radiation Therapy L.L.C.
46. Phoenix Management Company, LLC
47. Radiation Therapy School for Radiation Technology, Inc.
48. Radiation Therapy Services International, Inc.
49. RVCC, LLC
50. Sampson Accelerator, LLC
51. Sampson Simulator, LLC
52. SFRO Holding, LLC
53. South Florida Medicine, LLC
54. South Florida Radiation Oncology, LLC
55. Treasure Coast Medicine, LLC
56. U.S. Cancer Care, Inc.
57. USCC Florida Acquisition LLC
58. West Virginia Radiation Therapy Services, Inc.
59. 21st Century Oncology of Washington, LLC
60. Medical Developers, LLC

## SCHEDULE 2
## BACKSTOP PARTIES

| Item | Backstop Party | Backstop Commitment Percentage |
|------|----------------|-------------------------------|
| 1. | Certain funds, accounts or investment vehicles party to this Agreement that are managed or advised by, or are Affiliates of, Beach Point Capital Management, LP, as designated by Beach Point Capital Management, LP | 55.599356% |
| 2. | Certain funds, accounts or investment vehicles party to this Agreement that are managed or advised by, or are Affiliates of, Governors Lane LP, as designated by Governors Lane LP | 9.693001% |
| 3. | Certain funds, accounts or investment vehicles party to this Agreement that are managed or advised by, or are Affiliates of, J.P. Morgan Investment Management Inc., as designated by J.P. Morgan Investment Management Inc. | 8.829841% |
| 4. | Certain funds, accounts or investment vehicles party to this Agreement that are managed or advised by, or are Affiliates of, Oaktree Capital Management, L.P., as designated by Oaktree Capital Management, L.P. | 12.662433% |
| 5. | Certain funds, accounts or investment vehicles party to this Agreement that are managed or advised by, or are Affiliates of, Roystone Capital Management LP, as designated by Roystone Capital Management LP | 8.154424% |
| 6. | Certain funds, accounts or investment vehicles party to this Agreement that are managed or advised by, or are Affiliates of,  HPS Investment Partners, LLC, as designated by HPS Investment Partners, LLC | 5.060945% |

## SCHEDULE 3

Anything herein to the contrary notwithstanding, except to the extent required by applicable Law (including any order of the Bankruptcy Court) (in which case, any such amendment, supplement or modification must be acceptable to the Requisite Backstop Parties), none of the following provisions of the Restructuring Term Sheet shall be amended, supplemented or otherwise modified without the written consent of each adversely affected Specified Backstop Party:

(i)    any provisions of Exhibit 1 attached to the Restructuring Term Sheet (the "DIP Term Sheet") which, if amended, supplemented or otherwise modified would result in any of the following (each defined term set forth below having the meaning assigned thereto in the DIP Term Sheet):

(A)    any MDL Entity becoming a Loan Party;

(B)    an increase in the aggregate principal amount of such Specified Backstop Party's DIP Commitment;

(C)    an extension of the Maturity Date or the Extension, or a reduction in the extension fee described therein;

(D)    a decrease or reduction in the Interest Rate, the OID Payment or the fees described under the section entitled "Unused Facility Fee";

(E)    any decrease or reduction in the minimum percentage of outstanding DIP Loans and undrawn DIP Commitments that is needed to constitute Requisite DIP Lenders pursuant to the definition thereof; or

(F)    subordinating the DIP Obligations in right of payment to any other indebtedness, or subordinating the priority of the DIP Liens to any other liens.

(ii)    each of the provisions contained in the "Rights Offerings" section of the Restructuring Term Sheet, except for (x) the fifth paragraph of such section and (y) the last three paragraphs of such section; provided, however, that any change in the Notes Rights Offering Amount and/or the Equity Rights Offering Amount shall not be deemed to adversely affect any Specified Backstop Party unless such Specified Backstop Party's Backstop Commitment is increased;

(iii)    each of the provisions contained in the "Backstop Commitments" section of the Restructuring Term Sheet, except for the last three paragraphs of such section (including clauses (a)-(f) set forth in the penultimate paragraph of such section);

(v)    each of the provisions contained in the "New MDL Term Loan Facility" section of the Restructuring Term Sheet, except for clause (a)(v) in the second paragraph of such section;

(vi)     each of the provisions contained in the "New First Lien Term Loan Credit Facility" section of the Restructuring Term Sheet, except for clauses (a)(iii), (a)(iv), (a)(v), (a)(viii), (a)(x), (a)(xiii), (a)(xiv) and (a)(xv) in the second paragraph of the such section;

(vii)     each of the provisions contained in the second paragraph of the "New Second Lien Notes" section of the Restructuring Term Sheet, except for clauses (a)(iv), (a)(v) and (a)(vi) of such paragraph; and

(viii)    each of the provisions contained in each of the following sections of the Restructuring Term Sheet:  "Intercreditor Arrangements," "New Preferred Equity," "DIP Claims," "MDL Facility Claims," "Credit Facility Claims," and "Senior Notes Claims".

**Exhibit C**

**List of Committees Formed Before the Petition Date**

| Prepetition Committee | Counsel | Members |
|---|---|---|
| Crossover Group | Stroock & Stroock & Lavan LLP<br>180 Maiden Lane<br>New York, NY 10038-4982 | Various MDL Lenders, First Lien Lenders, and Senior Noteholders |
| First Lien Lender Group | Milbank Tweed Hadley & McCloy LLP<br>28 Liberty St.<br>New York, NY 10005 | Various First Lien Lenders |

## **EXHIBIT D**

### **Consolidated List of the Holders of the Debtors' 50 Largest Unsecured Claims**

Pursuant to Local Bankruptcy Rule 1007-2(a)(4), the following is a consolidated list of the Debtors' creditors holding the 50 largest unsecured claims (the "Consolidated Creditor List") based on the Debtors' unaudited books and records as of the Petition Date.  The Consolidated Creditor List has been prepared in accordance with Bankruptcy Rule 1007(d) and does not include (i) persons who come within the definition of "insider" set forth in section 101(31) of the Bankruptcy Code or (ii) secured creditors, unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the 50 largest unsecured claims.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| Rank | Vendor Name | Street Address | Nature of Claim | Is claim contingent, unliquidated, disputed, or subject to set off | Amount of Claim ($) |
|------|-------------|----------------|-----------------|---------------------------------------------------------------------|---------------------|
| 1 | Senior Notes Trustee (Wilmington Trust) | 246 Goose Lane, Suite 105 Guilford, CT  06437-2186 | Unsecured Notes | No | 368,177,173[8] |
| 2 | Dr. Ben Han | c/o Ravi Patel 2783 Pillsbury Way Wellington, FL  33414 | Unsecured Notes | No | 7,871,701 |
| 3 | Dr. Kishore Dass | c/o Ravi Patel 2783 Pillsbury Way Wellington, FL  33414 | Unsecured Notes | No | 3,998,324 |
| 4 | Seema Dass | c/o Ravi Patel 2783 Pillsbury Way Wellington, FL  33414 | Unsecured Notes | No | 3,873,377 |
| 5 | Cancer Treatment Services International | Attn: Dr. Michael Stanek & Dr. Ajay Bhatnager 1876 E Sabin Drive, Suite 10 Casa Grande, AZ  85122 | Breach of Contract | No | 3,534,995 |
| 6 | Florida Oncology Partners, LLC Note | Attn: Alan Gold 2400 Research Blvd., Suite 325 Rockville, MD  20850 | Unsecured Notes | No | 2,470,420 |
| 7 | McKesson Specialty Care Distribution | Director or Officer 15212 Collection Drive Chicago, IL 60693 | Trade Debt | No | 1,770,587 |

---

[8]    Does not include approximately $44.2 million in accrued and unpaid interest under the Senior Notes or any applicable premium that may be payable as part of such claim.

| Rank | Vendor Name | Street Address | Nature of Claim | Is claim contingent, unliquidated, disputed, or subject to set off | Amount of Claim ($) |
|------|-------------|----------------|-----------------|----------------|----------------|
| 8 | Rajiv Patel | c/o Ravi Patel<br>2783 Pillsbury Way<br>Wellington, FL  33414 | Unsecured Notes | No | 1,749,267 |
| 9 | Seaside National Bank & Trust (Treasure Coast) | Attn: President<br>201 South Orange Avenue, Suite 1350<br>Orlando, FL  32801 | Unsecured Business Loan | No | 1,476,199 |
| 10 | Besse Medical Supply | Attn: Director or Officer<br>1576 Solutions Ctr<br>Chicago, IL  60677-1005 | Trade Debt | No | 1,056,796 |
| 11 | Elekta Inc | Attn: Richard Hausmann, President<br>400 Perimeter Center Terrace, Suite 50<br>Atlanta, GA 30346 | Trade Debt | No | 525,057 |
| 12 | Pitt County Memorial Hospital Inc | Medical Staff Fund<br>Vidant Medical Center<br>2100 Stantonsburg Rd.<br>Greenville, NC  27835 | Trade Debt | No | 474,782 |
| 13 | Cardinal Health | Attn:  Dave Ellis, VP<br>Medical Products & Services<br>14265 Collections Center Drive<br>Chicago, IL  60693 | Trade Debt | No | 439,041 |
| 14 | Accuray Inc. | Attn: Kelly J. Londy, Executive VP And CFO<br>1310 Chesapeake Terrace<br>Sunnyvale, CA 94089 | Trade Debt | No | 406,501 |
| 15 | Healthcare Support Staffing Inc. | 101 Southhall Lane, Suite 100<br>Maitland, FL 32751 | Trade Debt | No | 359,557 |
| 16 | Mckesson Medical Surgical Inc. | Attn: James Beer, Executive VP and CFO<br>One Post Street<br>San Francisco, CA 94104 | Trade Debt | No | 306,246 |
| 17 | BC Technical Inc | Attn: Randall Jackson, CFOCt Support Center<br>6209 Gheens Mill Rd<br>Jeffersonville, IN 47130 | Trade Debt | No | 279,777 |
| 18 | Siemens Medical Solutions Inc. | Attn: Ann Custin, CFO<br>40 Liberty Boulevard<br>Malven, PA 19355 | Trade Debt | No | 236,361 |
| 19 | Medical Group Insurance Services Inc | Attn: Jeff Brunken, President<br>10 West Broadway, Suite 800<br>Salt Lake City, UT 84101 | Trade Debt | No | 165,706 |
| 20 | Office Depot Inc | Attn: Stephen E. Hare<br>6600 North Military Trail<br>Boca Raton, FL 33496 | Trade Debt | No | 158,283 |

| Rank | Vendor Name | Street Address | Nature of Claim | Is claim contingent, unliquidated, disputed, or subject to set off | Amount of Claim ($) |
|------|-------------|----------------|-----------------|-------------------------------------------------------------------|---------------------|
| 21 | Nuance Communications Inc | Attn: Dan Tempesta, Executive VP<br>1 Wayside Road<br>Burlington, MA 01803 | Trade Debt | No | 132,492 |
| 22 | United Healthcare Insurance Company | Attn: John Rex, Executive VP and CFO<br>22703 Network Place<br>Chicago, IL 60673-1227 | Trade Debt | No | 123,934 |
| 23 | Radiation Therapy Alliance | Attn: Andrew Woods<br>1425 K Street, NW, Suite 650<br>Washington, DC 20005 | Trade Debt | No | 115,000 |
| 24 | Soliant Physician Staffing LLC | Attn: Director or Officer<br>1979 Lakeside Parkway, Suite 800<br>Atlanta, GA 30084 | Trade Debt | No | 112,722 |
| 25 | Granite Telecommunications LLC | Attn: Director or Officer<br>100 Newport Avenue Extension<br>Quincy, MA 02171 | Trade Debt | No | 106,779 |
| 26 | Scio Management Solutions LLC | Attn: Josh Marks, VP Business Development<br>3830 Bee Ridge Rd, Suite 301<br>Sarasota, FL 34233 | Trade Debt | No | 92,456 |
| 27 | Windstream Communications | Attn: Anthony Thomas, President<br>4001 Rodney Parham Road<br>Little Rock, AR 72212 | Trade Debt | No | 86,532 |
| 28 | Varian Medical Systems Inc. | Attn: Gary E. Bischoping, Jr., CFO<br>70140 Network Place<br>Chicago, IL  60673-1701 | Trade Debt | No | 85,491 |
| 29 | East Carolina University ECU Borody School of Medicine | Ecup Contracts Office<br>600 Moye Blvd<br>Brody 2N-72 Mail Stop 647<br>Greenville, NC 27834 | Trade Debt | No | 82,411 |
| 30 | Mcdermott Will & Emery LLP | Attn: Richard Bardahl<br>444 West Lake Street<br>Chicago, IL 60606-0029 | Trade Debt | No | 73,433 |
| 31 | Stratus Technologies Ireland Ltd Lockbox | Attn: Greg Paden<br>28478 Network Place<br>Chicago, IL 60673-1284 | Trade Debt | No | 70,928 |
| 32 | Landauer Medical Physics | Attn: Michael R. Kennedy, President<br>2 Science Road<br>Glenwood, Il 60425 | Trade Debt | No | 68,719 |
| 33 | German Ramirez | 502 Palm Street, Suite 1<br>West Palm Beach, FL 33401 | Trade Debt | No | 64,392 |
| 34 | Navicure Inc. | Attn: Craig Bridge, CFO<br>2055 Sugarloaf Circle Suite 600<br>Duluth, GA 30097 | Trade Debt | No | 63,002 |

3

| Rank | Vendor Name | Street Address | Nature of Claim | Is claim contingent, unliquidated, disputed, or subject to set off | Amount of Claim ($) |
|---|---|---|---|---|---|
| 35 | Laborie Medical Tech Corp | Attn: Brian Ellacott, President And CEO 400 Avenue D, Suite 10 Williston, VT 05495 | Trade Debt | No | 59,270 |
| 36 | Stellar Medical LLC | Attn: Milton Larrea 10970 S Cleveland Ave, Ste 403 Fort Myers, FL 33907 | Trade Debt | No | 59,250 |
| 37 | Jewish Hospital & St. Mary's Healthcare | Attn: Rebecca Kistler, Accounting Mgr 539 South 4th Street Louisville, KY 40202 | Trade Debt | No | 57,362 |
| 38 | Civco Radiotherapy | Attn: Ron Vaske, VP Finance 2303 Jones Blvd., Suite B Coralville, IA 52241 | Trade Debt | No | 50,796 |
| 39 | Grainger Inc | Attn: Ronald L. Jadin, Sr VP And CFO 100 Grainger Parkway Dept 823243035 Lake Forest, IL 60045 | Trade Debt | No | 49,298 |
| 40 | Moodys Investors Service Inc | Attn: Robert Scott Fauber, President 250 Greenwich Street 7 World Trade Center New York, NY 10007 | Trade Debt | No | 45,000 |
| 41 | Urologix | Attn: Bryon Merade, CEO 14405 21st Avenue North, Suite 110 Minneapolis, MN 55447 | Trade Debt | No | 43,420 |
| 42 | Palm Beach Urology Associates, Pa | Attn: Nadya Prieto 3347 State Rd 7, Suite 101 Wellington, FL 33449 | Trade Debt | No | 41,928 |
| 43 | Healthcare Underwriters Group Inc | Attn: Thomas Mueller 1250 S Pine Island Rd, Ste 300 Plantation, FL 33324 | Trade Debt | No | 41,650 |
| 44 | Insight Direct Inc | Attn: Glynis Bryan, CFO 6820 South Harl Avenue Tempe, AZ 85283 | Trade Debt | No | 38,342 |
| 45 | Newco Cancer Services LLC | Attn: Director or Officer Other Accounts Receivable 600 Moye Blvd Greenville, NC 27834 | Trade Debt | No | 37,933 |
| 46 | Advanced Radiation Therapy LLC | Attn: Ray Bricault, COO & CFO One Industrial Way Tyngsboro, MA 01879 | Trade Debt | No | 34,580 |
| 47 | The CSI Companies Inc | Attn: Jun Onimaru, CFO 7650 W Courtney Campbell Causeway #220 Tampa, FL 33607 | Trade Debt | No | 33,736 |

| Rank | Vendor Name | Street Address | Nature of Claim | Is claim contingent, unliquidated, disputed, or subject to set off | Amount of Claim ($) |
|------|-------------|----------------|-----------------|--------------------------------------------------------------------|---------------------|
| 48 | GE Healthcare | Attn: Director or Officer<br>500 W Monroe Street<br>Chicago, IL 60661 | Trade Debt | No | 33,654 |
| 49 | The Negotiators LLC | Attn: William Fread, COO<br>1070 E Indiantown Rd,<br>Suite 206<br>Jupiter, FL 33477 | Trade Debt | No | 33,507 |
| 50 | Sarasota Sun Center, LLC | Attn: Susana Paul, Director of Finance<br>23421 Walden Center Dr # 300<br>Bonita Springs, FL 34134 | Trade Debt | No | 32,093 |

## EXHIBIT E

### Consolidated List of the Holders of the Debtors' Five Largest Secured Claims

Pursuant to Local Bankruptcy Rule 1007-2(a)(5), the following is a list of creditors holding the five largest secured claims against the Debtors, on a consolidated basis, as of the Petition Date.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt. The descriptions of the collateral securing the underlying obligations are intended only as brief summaries. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| Name of Creditor | Creditor Name, telephone number and complete mailing address, including zip code of employee, agents, or department of creditor familiar with claim who may be contacted | Amount of Claim | Collateral Description and Value |
|---|---|---|---|
| Morgan Stanley Senior Funding, Inc. | 1585 Broadway<br>New York, NY 10036<br>Telecopy: (917) 2600588<br>Telephone: (212) 5076680<br>AGENCY.BORROWERS@morganstanley.com | $720,185,000 | Substantially all of 21C's and each Guarantor's Tangible and Intangible Assets; $720,185,000[9] |
| Wilmington Savings Fund Society, FSB | 500 Delaware Avenue, 11th Floor<br>Wilmington DE, 19801<br>Attn: Geoff Lewis<br>Facsimile: (302) 421-9137<br>Telephone: (212) 5076680<br>Email: adminagent@wsfsbank.com | $35,000,000 | Substantially all of MDL's assets, $35,000,000[10] |
| NXT Capital | 1277 Treat Blvd. Suite 950, Walnut Creek, CA 94597<br>Contact: Cliff Lehman<br>(925) 953-150<br>cliff.lehman@nxtcapital.com | $5,791,952 | Equipment; $5,791,952 |
| Varian Medical Systems, Inc.[11] | 3290 Northside Pkwy., NW Suite 400, Atlanta, GA 30327<br>Contact: Jim DuBrava<br>(678) 255-3859<br>Jim.DuBrava@varian.com | $4,650,000 | Equipment; $4,650,000 |
| CAPX Partners | 5 Penn Plaza, 23rd Floor<br>New York, NY 10001<br>Contact: Eric D. Starr<br>(212)-380-1705<br>estar@capxpartners.com | $3,303,896 | Equipment: $3,303,896 |

---

[9]    This number reflects the aggregate principal amount of debt outstanding under the First Lien Credit Agreement, excluding amounts outstanding under letters of credit, accrued and unpaid interest and fees, and premiums (if any).

[10]    This number reflects the aggregate principal amount of debt outstanding under the MDL Facility, excluding accrued and unpaid interest and fees and premiums (if any).

[11]    Inclusion of Varian Medical Systems, Inc.'s claim on this **Exhibit E** is without prejudice to the Debtors' or any other party in interests' right to challenge the validity, extent, or priority of any security interests related to Varian Medical Systems, Inc.'s claim.

## <u>EXHIBIT F</u>

### Summary of the Debtors' Assets and Liabilities

Pursuant to Local Bankruptcy Rule 1007-2(a)(6), the following are estimates of the Debtors' total assets and liabilities on a consolidated basis.  The following financial data is the latest available information and reflects the Debtors' financial condition, as consolidated with its affiliated Debtors and non-Debtors as of the Petition Date.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt.

| Assets and Liabilities | Amount |
|---|---|
| Total Assets (Book Value as of March 31, 2017) | $814,445,000 |
| Total Liabilities (Book Value as of March 31, 2017) | $1,285,850,000 |

## EXHIBIT G

### Summary of the Publicly Held Securities of the Debtors

Pursuant to Local Bankruptcy Rule 1007-2(a)(7), the following lists the number and classes of shares of stock, debentures, or other securities of the Debtors that are publicly held, and the number of holders thereof as of the Petition Date.

As of the Petition Date, the Debtors do not have any publicly held securities.

## EXHIBIT H

### Summary of Debtors' Property Held by Third Parties

Pursuant to Local Rule 1007-2(a)(8), the following lists the Debtors' property, as of the Petition Date, that is in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, secured creditor, or agent for any such entity.

Certain property of the Debtors is likely to be in the possession of various other persons, including maintenance providers, shippers, common carriers, materialmen, custodians, public officers, mortgagees, pledges, assignees of rents, secured creditors, or agents.  Through these arrangements, the Debtors' ownership interest is not affected.  In light of the movement of this property, providing a comprehensive list of the persons or entities in possession of the property, their addresses and telephone numbers, and the location of any court proceeding affecting such property would be impractical.

## EXHIBIT I

**Summary of Debtors' Property From Which the Debtors Operate Their Business**

Pursuant to Local Bankruptcy Rule 1007-2(a)(9), the following lists the location of the premises owned, leased, or held under other arrangement from which the Debtors operate their businesses as of the Petition Date.

| Property Address | City | State | Country | Owned or Leased |
|---|---|---|---|---|
| 23337 Gratiot Avenue | Eastpointe | MI | United States | Owned |
| 1708 Cape Coral Pkwy W 7 | Cape Coral | FL | United States | Owned |
| 1176 Vegas Valley Drive | Las Vegas | NV | United States | Owned |
| 1555 East Street, Suite 230 | Redding | CA | United States | Owned |
| 12165-19B Metro Parkway | Fort Myers | FL | United States | Owned |
| 1860B Boyscout Drive, Suite 203-204 | Fort Myers | FL | United States | Owned |
| 970 North Broadway Suites 101, 102, 103 | Yonkers | NY | United States | Owned |
| 1 Doctor's Park | Asheville | NC | United States | Leased |
| 1 South School Ave. | Sarasota | FL | United States | Leased |
| 10 Doctors Circle, 6 | Supply | NC | United States | Leased |
| 100 & 200 3rd Ave West, Suites 200 & 210 and 120 | Bradenton | FL | United States | Leased |
| 100 Casa Street, Suite C | San Luis Obispo | CA | United States | Leased |
| 100 Casa Street, Suite D1 & D2 | San Luis Obispo | CA | United States | Leased |
| 100 Madrid Blvd, 104 & 105 | Punta Gorda | FL | United States | Leased |
| 1000 Tamiami Trail N | Naples | FL | United States | Leased |
| 1002 South Dixie Hwy, Suite C-1 | Jupiter | FL | United States | Leased |

| Property Address | City | State | Country | Owned or Leased |
|---|---|---|---|---|
| 10115 Forest Hills Blvd, Suite 100 | Wellington | FL | United States | Leased |
| 10141 W. Forest Hill Blvd. | Wellington | FL | United States | Leased |
| 10210 N 92nd Street, 205 | Scottsdale | AZ | United States | Leased |
| 1026 Mar Walt Dr., N.W. | Fort Walton Beach | FL | United States | Leased |
| 10301 Hagen Ranch Road, Suite A960 | Boyton Beach | FL | United States | Leased |
| 1031 SE 9th Pl, Unit 2 | Cape Coral | FL | United States | Leased |
| 10335 N Military Trail, Suite B | Palm Beach Gardens | FL | United States | Leased |
| 104 Medical Park Dr. | Andalusia | AL | United States | Leased |
| 1040 River Heritage Blvd, Suite 202 | Bradenton | FL | United States | Leased |
| 1044 Goodlette Road N | Naples | FL | United States | Leased |
| 1050 K Street | Washington | DC | United States | Leased |
| 1050 Neely Road | Brevard | NC | United States | Leased |
| 1069 Los Palos Drive | Salinas | CA | United States | Leased |
| 1085 N Macomb St | Monroe | MI | United States | Leased |
| 1100 S Main St, Suite 101 & 102 | Belle Glade | FL | United States | Leased |
| 1101 Sylvan Ave. | Modesto | CA | United States | Leased |
| 11141 Parkview Plaza Drive, Suites 110 & 205 | Fort Wayne | IN | United States | Leased |
| 11190 Warner Ave, Suite 115 | Fountain Valley | CA | United States | Leased |
| 1120 Lee Blvd | Lehigh Acres | FL | United States | Leased |

| Property Address | City | State | Country | Owned or Leased |
|---|---|---|---|---|
| 1132 Goodlette Road N | Naples | FL | United States | Leased |
| 115 Cass Avenue, Suite 1A | Woonsocket | RI | United States | Leased |
| 115 West Bay St | Wauchula | Fl | United States | Leased |
| 1150 North 35th Ave, 560 | Hollywood | FL | United States | Leased |
| 1200 Brass Mill Road | Belcamp | MD | United States | Leased |
| 1200 E Broward Blvd | Ft Lauderdale | FL | United States | Leased |
| 1200 S Main St, Suite 200 | Belle Glade | FL | United States | Leased |
| 1206 Country Club Blvd | Cape Coral | FL | United States | Leased |
| 12105 Pembroke Pines, Suite 601 | Pembroke Pines | FL | United States | Leased |
| 1211 Jacaranda Blvd | Venice | FL | United States | Leased |
| 1211 W. La Palma Ave, Suite 100 | Anaheim | CA | United States | Leased |
| 1213 East Ocean Avenue, 100 | Lompoc | CA | United States | Leased |
| 1213 Elm Street | Aynor | SC | United States | Leased |
| 1216 North University Drive., Suite 1216 | Plantation | FL | United States | Leased |
| 1240 Westlake Blvd, Suite 103 | Westlake | CA | United States | Leased |
| 1255 Viscaya Pkwy | Cape Coral | FL | United States | Leased |
| 126 Del Prado Blvd N, Suite 103 | Cape Coral | FL | United States | Leased |
| 12651 Whitehall Drive | Fort Myers | FL | United States | Leased |
| 1269-1327 North University Dr., Suite 1311 | Coral Springs | FL | United States | Leased |

| Property Address | City | State | Country | Owned or Leased |
|---|---|---|---|---|
| 12741 Miramar Parkway, Ste 305 & 306 | Miramar | FL | United States | Leased |
| 1281 East Cottonwood Ln | Casa Grande | AZ | United States | Leased |
| 12993 Southern Blvd | West Palm Beach | FL | United States | Leased |
| 130 Carnie Blvd, Suite 1 & 2 | Vorhees | NJ | United States | Leased |
| 1300 RiverPlace, Suite 610 | Jacksonville | FL | United States | Leased |
| 1309 North Flagler | West Palm Beach | FL | United States | Leased |
| 1309 North Flagler, Suite 1027 | West Palm Beach | FL | United States | Leased |
| 131 Redstone Avenue | Crestview | FL | United States | Leased |
| 1316 Nelson Ave. | Modesto | CA | United States | Leased |
| 13184 N 103rd Dr | Sun City W | AZ | United States | Leased |
| 13214 Palm Beach Blvd | Fort Myers | FL | United States | Leased |
| 1325 E Church St. | Santa Maria | CA | United States | Leased |
| 13685 Doctors Way, Suite 210 | Fort Myers | FL | United States | Leased |
| 13691 Metropolitan Pkwy | Ft. Myers | FL | United States | Leased |
| 1375 Roberts Drive, Suite 101 - 102 | Jacksonville Beach | FL | United States | Leased |
| 13770 Plantation, Suite 2 | Ft. Myers | FL | United States | Leased |
| 1395 State Rd 7, Suite 410 | Wellington | FL | United States | Leased |
| 1401 Route 70, Suite 22 | Cherry Hill | NY | United States | Leased |
| 141 Tryon Rd, Suite B | Rutherfordtom | NC | United States | Leased |

| Property Address | City | State | Country | Owned or Leased |
|---|---|---|---|---|
| 1411 N Flagler , Suite 5100 | West Palm Beach | FL | United States | Leased |
| 1411 N Flagler , Suite 7300 | West Palm Beach | FL | United States | Leased |
| 1419 SE 8th Terrace | Cape Coral | FL | United States | Leased |
| 1419 Viscaya Parkway, | Cape Coral | FL | United States | Leased |
| 142 JFK Dr | Atlantis | FL | United States | Leased |
| 142 Kenyon Avenue, | Wakefield | RI | United States | Leased |
| 14233 and 14235 SW 42nd St., | Miami | FL | United States | Leased |
| 14420 West Meeker Blvd, Suite 203 | Sun City West | AZ | United States | Leased |
| 14506 Meeker Blvd | Sun City | AZ | United States | Leased |
| 14575 Tamiami Trail | North Port | FL | United States | Leased |
| 1500 Pontiac Ave., | Cranston | RI | United States | Leased |
| 1505 Tamiami Trl S | Venice | FL | United States | Leased |
| 1530 Lee Blvd, Suite 1500 | Lehigh Acres | FL | United States | Leased |
| 1539 Atwood Ave, Suite 203 | Johnston | RI | United States | Leased |
| 1551 South 14th , Suite D Bldg 2 | Fernandina | FL | United States | Leased |
| 1575 Soquel Drive | Santa Cruz | CA | United States | Leased |
| 15761 New Hampshire Court | Fort Myers | FL | United States | Leased |
| 1620 South Congress Avenue, Suite 202 | Palm Springs | FL | United States | Leased |
| 16400 Healthpark Commons | Fort Myers | FL | United States | Leased |

| Property Address | City | State | Country | Owned or Leased |
|---|---|---|---|---|
| 16420 Healthpark Commons Drive, | Fort Myers | FL | United States | Leased |
| 1670 N University Drive, A | Coral Springs | FL | United States | Leased |
| 1699 S 14th St | Fernandina Beach | FL | United States | Leased |
| 1699 S 14th St (TI Reimbursement) | Fernandina Beach | FL | United States | Leased |
| 17 West Bank Ave, 101 - 102 | Woodbury | NJ | United States | Leased |
| 17 West Bank Ave, Suite 105 | Woodbury | NJ | United States | Leased |
| 171 Daniel Rd | Forest City | NC | United States | Leased |
| 1725 N University Dr, Suite 400 | Coral Springs | FL | United States | Leased |
| 1735 SW Health Parkway | Naples | FL | United States | Leased |
| 17375 Hall Road, Suite 100 | Macomb Township | MI | United States | Leased |
| 175 Barfield Drive | Marco Island | FL | United States | Leased |
| 179 Buncombe School Road | Weaverville | NC | United States | Leased |
| 180 SW 84th Avenue, Suite 302 | Plantation | FL | United States | Leased |
| 1811 E McMurray Blvd | Casa Grande | AZ | United States | Leased |
| 18308 Murdock Circle, Bldg 14 Units 104 & 105 | Port Charlotte | FL | United States | Leased |
| 1860 Boy Scout Drive, Unit 205 | Fort Myers | FL | United States | Leased |
| 187 Skylar Dr | Fairlea | WV | United States | Leased |
| 1876 East Sabin Dr, Suite 10 | Casa Grande | AZ | United States | Leased |
| 1885 SW Health Pkw | Naples | FL | United States | Leased |

| Property Address | City | State | Country | Owned or Leased |
|---|---|---|---|---|
| 1890 E Florence Blvd. | Casa Grande | AZ | United States | Leased |
| 1890 E Florence Blvd. | Casa Grande | CA | United States | Leased |
| 18900 N Tamiai Trail, Suite A-12 | North Fort Myers | FL | United States | Leased |
| 190 Riverview St, Suite 3 | Franklin | NC | United States | Leased |
| 190 Riverview Street | Franklin | NC | United States | Leased |
| 191 Social Street, Suite 610 | Woonsocket | RI | United States | Leased |
| 1921 Waldemere St, Suite 310 | Sarasota | FL | United States | Leased |
| 195 Center Rd | Venice | FL | United States | Leased |
| 1951 SW 172 Ave, Suite 300 | Miramar | FL | United States | Leased |
| 1951 SW 172nd Ave, Suite 203 | Miramar | FL | United States | Leased |
| 1951 SW 172nd Ave, Suite 305 | Miramar | FL | United States | Leased |
| 199 Village Centre Blvd, Suite 100 | Myrtle Beach | SC | United States | Leased |
| 2 Physicians Park Dr. | Frankfort | KY | United States | Leased |
| 20 Medical Park Drive | Asheville | NC | United States | Leased |
| 200 Avenida Des Parques | Venice | FL | United States | Leased |
| 200 East Vine St | Salisbury | MD | United States | Leased |
| 2000 Foundation Way | Martinsburg | WV | United States | Leased |
| 2000 Foundation Way, Suite 1100 | Martinsburg | WV | United States | Leased |
| 2001 W 68th Street | Hialeah | FL | United States | Leased |

11

| Property Address | City | State | Country | Owned or Leased |
|---|---|---|---|---|
| 2051 Congress Ave, Suite 203 | West Palm Beach | FL | United States | Leased |
| 20601 east Dixie Highway, 330 | Aventura | FL | United States | Leased |
| 207 Quaker Lane 1st Floor | West Warwick | RI | United States | Leased |
| 207 Quaker Lane, 2nd Floor | West Warwick | RI | United States | Leased |
| 21 Barkley Circle | Fort Myers | FL | United States | Leased |
| 210 Jupiter Lakes Blvd, Suite 5000-202 | Jupiter | FL | United States | Leased |
| 210 New Hope Road | Princeton | WV | United States | Leased |
| 2100 E Hallandale Blvd, Suite 202 | Hallandale | FL | United States | Leased |
| 2101 Riverside Drive, Suite 101 | Coral Springs | FL | United States | Leased |
| 21020 South State Road 7, | Boca Raton | FL | United States | Leased |
| 2107 S.E. Ocean Blvd. | Stuart | FL | United States | Leased |
| 2111 and 2115 S.E. Ocean Blvd | Stuart | FL | United States | Leased |
| 21110 Biscayne Blvd, Suite 201 | Aventura | FL | United States | Leased |
| 21110 Biscayne Blvd, Suite 401 | Aventura | FL | United States | Leased |
| 21150 Biscayne Blvd, Suite 304 | Aventura | FL | United States | Leased |
| 21150 Biscayne Blvd, Suites 404 & 406 | Aventura | FL | United States | Leased |
| 212 Smith Church Road | Roanoke Rapids | NC | United States | Leased |
| 21260 Olean, Suite 201 | Port Charlotte | FL | United States | Leased |
| 21260 Olean, Suite 204 | Port Charlotte | FL | United States | Leased |

| Property Address | City | State | Country | Owned or Leased |
|---|---|---|---|---|
| 21260 Olean, Suite 204 | Port Charlotte | FL | United States | Leased |
| 21355 E Dixie Hwy | Aventura | FL | United States | Leased |
| 2140 W 68th ST, Suite 200 | Hialeah | FL | United States | Leased |
| 2140 W 68th ST, Suite 204 | Hialeah | FL | United States | Leased |
| 2140 W 68th ST, Suite 302, 306 | Hialeah | FL | United States | Leased |
| 2141 Alternate A1A, Suite 420 | Jupiter | FL | United States | Leased |
| 2141 Loch Rane Blvd., 116 B&C, 117 & 118 | Orange Park | FL | United States | Leased |
| 2141 Loch Rane Blvd., TI Reimbursement | Orange Park | FL | United States | Leased |
| 215 Beaman St | Clinton | NC | United States | Leased |
| 2160 Colonial Blvd | Fort Myers | FL | United States | Leased |
| 2161 Kingsley Ave, Suite 100 | Orange Park | FL | United States | Leased |
| 2161 Kingsley Avenue | Orange Park | FL | United States | Leased |
| 220 Sunset Road, Suite 4 | Willingboro | NJ | United States | Leased |
| 2230 Lynn Road, Suite 103 | Thousand Oaks | CA | United States | Leased |
| 2234 Colonial Blvd. | Fort Myers | FL | United States | Leased |
| 225 Chimney Corner Lane, | Jupiter | FL | United States | Leased |
| 2261 N University Drive, 202 | Pembroke Pines | FL | United States | Leased |
| 2270 Colonial Blvd | Fort Myers | FL | United States | Leased |
| 2300 N Commerce Parkway | Weston | FL | United States | Leased |

| Property Address | City | State | Country | Owned or Leased |
|---|---|---|---|---|
| 2301 W. Woolbright Avenue | Boynton Beach | FL | United States | Leased |
| 2335 Tamiami Trail | Naples | FL | United States | Leased |
| 2345 Bobcat Village Center Rd, Suite 201 | North Port | FL | United States | Leased |
| 24 Del Prado Blvd. | Cape Coral | FL | United States | Leased |
| 2400 S McCall Rd, Suite C | Englewood | Fl | United States | Leased |
| 2401 University Pkwy | Sarasota | FL | United States | Leased |
| 2407 W Vine St, Suite A | Lodi | CA | United States | Leased |
| 2428 Santa Monica Blvd, Suites 102 & 103 | Santa Monica | CA | United States | Leased |
| 2500 E Hallandale Beach Blvd | Hallandale | FL | United States | Leased |
| 252 Myrtle Trace DR, #5B | Conway | SC | United States | Leased |
| 2525 East Arizona Biltmore Cir, Suite C236 | Phoenix | AZ | United States | Leased |
| 260 Beth Stacey Blvd, 230 | Lehigh Acres | FL | United States | Leased |
| 260 Beth Stacey Boulevard, Suite 220 | Lehigh Acres | FL | United States | Leased |
| 2601 SW 37th Ave, Suite 503 | Coral Gables | FL | United States | Leased |
| 2602 & 2612 Lemon Street | Ft Myers | FL | United States | Leased |
| 2623 Seacrest Blvd, Suite 112 | Boyton Beach | FL | United States | Leased |
| 2623 Seacrest Blvd, Suite 216 | Boynton Beach | FL | United States | Leased |
| 2637 Martin Luther King Blvd, | Fort Myers | FL | United States | Leased |
| 2680 South Val Vista Dr., Units 101,105,107,109,115 | Gilbert | AZ | United States | Leased |

14

| Property Address | City | State | Country | Owned or Leased |
|---|---|---|---|---|
| 270 Quaker Lane, 1st Floor | West Warwick | RI | United States | Leased |
| 270 Quaker Lane, 2nd Floor | West Warwick | RI | United States | Leased |
| 2721 Del Prado Blvd, 230 B | Cape Coral | FL | United States | Leased |
| 2721 Del Prado Blvd., Suite 210 | Cape Coral | FL | United States | Leased |
| 2721 Del Prado, Suite 220 | Cape Coral | FL | United States | Leased |
| 274 Heather Court, Suite A | Templeton | CA | United States | Leased |
| 27800 Medical Center Rd, Suite 160 | Mission Viejo | CA | United States | Leased |
| 2802 McLamb Place | Goldsboro | NC | United States | Leased |
| 2835 Easy Hwy 76, Suite 3 | Mullins | SC | United States | Leased |
| 2851 N. Tenaya Way | Las Vegas | NV | United States | Leased |
| 28595 Orchard Lake Rd, Suite 110 | Farmington Hills | MI | United States | Leased |
| 28850 Trails Edge Blvd. | Bonita Springs | FL | United States | Leased |
| 28850 Trails Edge Blvd., aka 3291 Wood Edge Pkwy, Suite 100 | Bonita Springs | FL | United States | Leased |
| 28930 Trails Edge Blvd | Bonita Springs | FL | United States | Leased |
| 2900 Loma Vista Road, Suite 100 | Ventura | CA | United States | Leased |
| 2985 North Sycamore Drive | Simi Valley | CA | United States | Leased |
| 300 Healthpark Blvd, Suite 1008 | St. Augustine | FL | United States | Leased |
| 3006 S. Maryland Pkwy, Suite 100 | Las Vegas | NV | United States | Leased |
| 303 South Main St | Bluffton | IN | United States | Leased |

| Property Address | City | State | Country | Owned or Leased |
|---|---|---|---|---|
| 30365 Dequindre Ave | Madison Heights | MI | United States | Leased |
| 3080 Harbor Blvd. | Port Charlotte | FL | United States | Leased |
| 310 Hartnell Ave | Redding | CA | United States | Leased |
| 311 S. Ham Lane | Lodi | CA | United States | Leased |
| 314 Franklin Ave | Berlin | MD | United States | Leased |
| 315 E Olympia Ave, 224 | Punta Gorda | FL | United States | Leased |
| 3185 Harbor Blvd | Pt Charlotte | FL | United States | Leased |
| 3201 Southwest 33rd Road | Ocala | FL | United States | Leased |
| 3210 Fruitville Rd | Sarasota | FL | United States | Leased |
| 3227 Lee Blvd | Lehigh Acres | FL | United States | Leased |
| 3291 Woods Edge | Bonita Springs | FL | United States | Leased |
| 3300 US 27 South | Avon Park | FL | United States | Leased |
| 3319 S. State Rd | Wellington | FL | United States | Leased |
| 3319 State Road 7, Suites 105 & 107 | Wellington | FL | United States | Leased |
| 3325 S. Tamiami Trail | Sarasota | FL | United States | Leased |
| 333 School Street | Pawtucket | RI | United States | Leased |
| 3335 Burns Rd., 100 | Palm Beach Gardens | FL | United States | Leased |
| 334 Hatcher Road | Phoenix | AZ | United States | Leased |
| 3343 State Road 7 | Wellington | FL | United States | Leased |

| Property Address | City | State | Country | Owned or Leased |
|---|---|---|---|---|
| 3347 S State Road 7, Suite 101 | Wellington | FL | United States | Leased |
| 3355 Burns Rd., 105 | Palm Beach Gardens | FL | United States | Leased |
| 3364 Woods Edge Cir | Bonita Springs | FL | United States | Leased |
| 3390 Tamiami Tr | Pt. Charlotte | FL | United States | Leased |
| 34 South Bedford | Mount Kisco | NY | United States | Leased |
| 3406 N. Lecanto Highway | Beverly Hills | FL | United States | Leased |
| 3410 Tamiami Trail, Suite 4A | Port Charlotte | FL | United States | Leased |
| 3426 N Roosevelt Rd | Key West | FL | United States | Leased |
| 345 Terracina Blvd | Redlands | CA | United States | Leased |
| 350 NW 84th Ave | Plantation | FL | United States | Leased |
| 3501 Health Center Blvd, Suite 2420 | Bonita Springs | FL | United States | Leased |
| 3501 Health Center Blvd, Suite 2430 | Bonita Springs | FL | United States | Leased |
| 3599 University Blvd, Suite 1000 | Jacksonville | FL | United States | Leased |
| 3599 University Blvd, Suite 1500 | Jacksonville | FL | United States | Leased |
| 3600 Sea Mountain, Suite B | Little River | SC | United States | Leased |
| 3600 Sea Mountain, Suite B | Little River | SC | United States | Leased |
| 3600 Sea Mountain, Suite D | Little River | SC | United States | Leased |
| 3617 Casey St, Suite B | Loris | SC | United States | Leased |
| 3650 Emergency Lane | Sebring | FL | United States | Leased |

17

| Property Address | City | State | Country | Owned or Leased |
|---|---|---|---|---|
| 3651 FAU Blvd, Suite 100 | Boca Raton | FL | United States | Leased |
| 3661 S Miami Ave, Suite 1006 | Miami | FL | United States | Leased |
| 3661 S Miami Ave, Suite 904 | Miami | FL | United States | Leased |
| 3663 Bee Ridge Road | Sarasota | FL | United States | Leased |
| 3680 Broadway | Fort Myers | FL | United States | Leased |
| 375 Commercial Ct, Suite E | Venice | FL | United States | Leased |
| 39 Barkley Circle | Fort Myers | FL | United States | Leased |
| 394 Singleton Ridge Rd | Conway | SC | United States | Leased |
| 400 8th Street North | Naples | FL | United States | Leased |
| 40055 Bob Hope Dr., Suite B, Units A,B,L,K | Rancho Mirage | CA | United States | Leased |
| 401 Manatee Ave, Suite A | Bradenton | FL | United States | Leased |
| 402 Singleton Ridge Rd, Suite B & C | Conway | SC | United States | Leased |
| 4030 Sheridan St, Suite C | Hollywood | FL | United States | Leased |
| 41 S. Colombus Ave | Littlestown | PA | United States | Leased |
| 4120 Woodmere Park Blvd, Unit 8A | Venice | FL | United States | Leased |
| 425 North Lee Street | Jacksonville | FL | United States | Leased |
| 425 North Lee Street, TI Reimbursement | Jacksonville | FL | United States | Leased |
| 4274 West Main St. | Dothan | AL | United States | Leased |
| 43 Barkley Circle, 101 | Fort Myers | FL | United States | Leased |

| Property Address | City | State | Country | Owned or Leased |
|---|---|---|---|---|
| 431 University | Jupiter | FL | United States | Leased |
| 4367 Riverwood Dr, Suite 100 | Murrells Inlet | SC | United States | Leased |
| 4367 Riverwood Dr, Suite 110 | Murrells Inlet | SC | United States | Leased |
| 44 Heathwood Drive | Marco Island | FL | United States | Leased |
| 445 Biltmore Ave Stes G102, G108 & G109 | Asheville | NC | United States | Leased |
| 450 Toll Gate Road | Warwick | RI | United States | Leased |
| 4500 Churchman Ave | Louisville | KY | United States | Leased |
| 4550 Investment Drive, Suite B111 | Troy | MI | United States | Leased |
| 4550 Investment Drive, Suite B111-Vault | Troy | MI | United States | Leased |
| 4571 Colonial Blvd | Ft. Myers | FL | United States | Leased |
| 4600 Linton Blvd, Suite 240 | Delray Beach, | FL | United States | Leased |
| 4637 Vincennes Blvd | Cape Coral | FL | United States | Leased |
| 4708 Oleander Dr | Myrtle Beach | SC | United States | Leased |
| 4722 Quail Lakes Drive | Stockton | CA | United States | Leased |
| 4800 NE 29th Terrace | Fort Lauderdale | FL | United States | Leased |
| 4848 Coconut Creek Parkway, Suite A | Coconut Creek | FL | United States | Leased |
| 4850 West Oakland Park Blvd., Suite C | Lauderdale Lakes | FL | United States | Leased |
| 5 Doctors Park | Ashville | NC | United States | Leased |
| 5 Hospital Drive, 1st Floor | Holyoke | MA | United States | Leased |

| Property Address | City | State | Country | Owned or Leased |
|---|---|---|---|---|
| 50 Maude St | Providence | RI | United States | Leased |
| 500 Hiatus Rd, Suite 107 | Pembroke Pines | FL | United States | Leased |
| 501 South Rancho Dr, Suite H-53 | Las Vegas | NV | United States | Leased |
| 5065 SR 7, Suite 203 | Hialeah | FL | United States | Leased |
| 507 Del Prado Blvd. | Cape Coral | FL | United States | Leased |
| 51 Haddonfield Road, 145 | Cherry Hill | NJ | United States | Leased |
| 5130 Linton Blvd, Suite C-1 | Delray Beach, FL | FL | United States | Leased |
| 513B North Justice St | Hendersonville | NC | United States | Leased |
| 516 East Maumee St | Angola | IN | United States | Leased |
| 5170 Overseas Hwy | Marathon | FL | United States | Leased |
| 52 North Pecos Rd. | Henderson | NV | United States | Leased |
| 520 Techwood Drive | Danville | KY | United States | Leased |
| 5258 Linton Avenue, Suite 104 | Delray Beach | FL | United States | Leased |
| 5280 Summerlin Commons Way, #801, #802, #804 | Fort Myers | FL | United States | Leased |
| 530 International Dr | Myrtle Beach | SC | United States | Leased |
| 530 International Dr, Under Construction | Myrtle Beach | SC | United States | Leased |
| 5301 N Dixie Hwy | Oakland Park | FL | United States | Leased |
| 531 Bald Eagle Dr. | Marco Island | FL | United States | Leased |
| 5350 University Pkwy, Suite 207 | Port Charlotte | FL | United States | Leased |

| Property Address | City | State | Country | Owned or Leased |
|---|---|---|---|---|
| 55 Sayles St. | Southbridge | MA | United States | Leased |
| 550 Twin Cities Blvd, Suite C-1 | Niceville | FL | United States | Leased |
| 554 Twin Cities Blvd., Unit C | Niceville | FL | United States | Leased |
| 5540 So US 41 | Fort Pierce | FL | United States | Leased |
| 555 D'Onofrio Drive, 103 & 104 | Madison | WI | United States | Leased |
| 5601 N Dixie Hwy, Suite 320 | Fort Lauderdale | FL | United States | Leased |
| 5700 Lee Blvd. | Lehigh Acres | FL | United States | Leased |
| 571 Medical Drive | Englewood | FL | United States | Leased |
| 5742 Booth Road,, | Jacksonville | FL | United States | Leased |
| 580 Black River Rd, | Georgetown | SC | United States | Leased |
| 5809 21st Ave West | Bradenton | FL | United States | Leased |
| 58295 29 Palms Hwy | Yucca Valley | CA | United States | Leased |
| 600 Eighth Ave West, 3rd Floor | Palmetto | FL | United States | Leased |
| 600 Hospital Drive, Suite 10 | Clyde | NC | United States | Leased |
| 600 Hospital Drive, Suite 4 | Clyde | NC | United States | Leased |
| 600 Moye Rd | Greenville | NC | United States | Leased |
| 600 N. Hiatus Rd, Suite 209 | Pembroke Pines | FL | United States | Leased |
| 600 Zeagler Avenue | Palatka | FL | United States | Leased |
| 600 Zeagler Drive | Palatka | FL | United States | Leased |

| Property Address | City | State | Country | Owned or Leased |
|---|---|---|---|---|
| 601 E Sample Rd, Suite 106 | Pompano Beach | FL | United States | Leased |
| 601 N Flamingo Rd, Suite 402 | Pembroke Pines | FL | United States | Leased |
| 601 N. Flamingo Rd, Suite 300 | Pembroke Pines | FL | United States | Leased |
| 601 Redstone Ave W | Crestview | FL | United States | Leased |
| 602 S. Atwood Rd, Suite 105 | Bel Air | MD | United States | Leased |
| 603 N. Flamingo Rd, Suite 251 | Pembroke Pines | FL | United States | Leased |
| 6030 Hollywood Blvd, 100 | Hollywood | FL | United States | Leased |
| 6100 Hollywood Blvd, Suite 105 | Hollywood | FL | United States | Leased |
| 6101 Pine Ridge Rd. | Naples | FL | United States | Leased |
| 611 Burrough Chapin Blvd, Suite 105 | Myrtle Beach | SC | United States | Leased |
| 611 NE Harbor Blvd | Port Charlotte | FL | United States | Leased |
| 6130 South Tamiami Trail, 6130 | Sarasota | FL | United States | Leased |
| 6160 S. Fort Apache Rd | Fort Apache | NV | United States | Leased |
| 6215 21st Ave W, Suite B | Manatee County | FL | United States | Leased |
| 63 S. Medical Court | Marion | NC | United States | Leased |
| 6310 Health Pkwy, Unit 100 | Bradenton | FL | United States | Leased |
| 6310 Health Pkwy, Unit 210 | Bradenton | FL | United States | Leased |
| 6310 Health Pkwy, Units 100 & 200 | Bradenton | FL | United States | Leased |
| 6405 N Federal Hwy, Suite 404 | Ft. Lauderdale | FL | United States | Leased |

| Property Address | City | State | Country | Owned or Leased |
|---|---|---|---|---|
| 6450 W 21st Ct, Suite 205 | Hialeah | FL | United States | Leased |
| 6555 Cortez Rd. | Bradenton | FL | United States | Leased |
| 6770 Dixie Highway, Suite 106 | Clarkston | MI | United States | Leased |
| 6825 SW 87th Ave | Miami | FL | United States | Leased |
| 6879 U.S. Hwy 98 West | Santa Rosa Beach | FL | United States | Leased |
| 6900 Orchard Lake Rd, Suite 203 | West Bloomfield | MI | United States | Leased |
| 70 Fulton Street | Pontiac | MI | United States | Leased |
| 7100 W 20th Ave, Suite 703 | Hialeah | FL | United States | Leased |
| 713 East Marion Ave, Suite 135 | Punta Gorda | FL | United States | Leased |
| 7150 West 20th Ave., 406 | Hialeah | FL | United States | Leased |
| 720 Doctors Drive | Englewood | FL | United States | Leased |
| 725 Reservoir Avenue, Suite 104 | Cranston | RI | United States | Leased |
| 725 Reservoir Avenue, Suite 301B | Cranston | RI | United States | Leased |
| 725 Reservoir Avenue, Suite 310B | Cranston | RI | United States | Leased |
| 730 Goodlette Rd N, Suite 204 | Naples | FL | United States | Leased |
| 733 4th Ave North | Naples | FL | United States | Leased |
| 7335 Gladiolus Drive | Ft. Myers | FL | United States | Leased |
| 7337 E. Thomas Rd. | Scottsdale | AZ | United States | Leased |
| 7340 East Thomas Rd | Scottsdale | AZ | United States | Leased |

| Property Address | City | State | Country | Owned or Leased |
|---|---|---|---|---|
| 7341 Gladiolus Drive | Ft Myers | FL | United States | Leased |
| 7379 W Deschutes Avenue | Kennewick | WA | United States | Leased |
| 7421 N University Dr, Suite 201 | Tamarac | FL | United States | Leased |
| 7451 Gladiolus Drive | Fort Myers | FL | United States | Leased |
| 7503 Greenway Ctr Dr | Greenbelt | MD | United States | Leased |
| 7751 Baymeadows Rd., E. | Jacksonville | FL | United States | Leased |
| 77-840 Flora Rd. | Palm Desert | CA | United States | Leased |
| 78 SW 13th Avenue, 201 | Miami | FL | United States | Leased |
| 78 SW 13th Avenue, First Floor | Miami | FL | United States | Leased |
| 78 SW 13th Avenue, Suite 200 | Miami | FL | United States | Leased |
| 7850 North Unviversity Dr | Tamarac | FL | United States | Leased |
| 7910 West Jefferson Boulevard, Suite 110 | Fort Wayne | IN | United States | Leased |
| 800 Goodlette Rd, Suite 110 | Naples | FL | United States | Leased |
| 801 WH Smith Blvd | Greenville | NC | United States | Leased |
| 802 N. Main St, Suite C | Opp | AL | United States | Leased |
| 8059 Myrtle Trace Drive, #5B | Conway | SC | United States | Leased |
| 8100 Arbor Court | Fort Myers | FL | United States | Leased |
| 8140 College Pkwy, Suite 101 | Fort Myers | FL | United States | Leased |
| 815 South Hwy 49 | Jackson | CA | United States | Leased |

| Property Address | City | State | Country | Owned or Leased |
|---|---|---|---|---|
| 8198 Jog Rd, , Suite 209 | Boynton Beach | FL | United States | Leased |
| 820 Goodlette Road N | Naples | FL | United States | Leased |
| 823 82nd Pkwy | Myrtle Beach | SC | United States | Leased |
| 830 N. Mills Ave. | Arcadia | FL | United States | Leased |
| 8340 Collier Blvd, 400 | Naples | FL | United States | Leased |
| 8340 Collier Blvd., 204 | Naples | FL | United States | Leased |
| 8350 Sierra Meadows Blvd | Naples | FL | United States | Leased |
| 842 Sunset Lake Blvd, Suite 403 | Venice | FL | United States | Leased |
| 850 111th Ave. North | Naples | FL | United States | Leased |
| 860 Parkview Dr. N., Units A&B | El Segundo | CA | United States | Leased |
| 8625 Collier Blvd | Naples | FL | United States | Leased |
| 870 Mack Bayou Road, Suite C | Santa Rosa Beach | FL | United States | Leased |
| 880 NW 13th St, Suite 400 | Boca Raton | FL | United States | Leased |
| 8890 W. Oakland Park | Sunrise | FL | United States | Leased |
| 893 S. White Horse Pike | Hammonton | NJ | United States | Leased |
| 8931 Colonial Center Blvd, Suite 301 | Ft. Myers | FL | United States | Leased |
| 8931 Colonial Center Dr, Floor 4 | Fort Myers | FL | United States | Leased |
| 8931 Colonial Center Drive | Fort Myers | FL | United States | Leased |
| 8931 Colonial Center Drive, Lee Cancer Center | Fort Myers | FL | United States | Leased |

| Property Address | City | State | Country | Owned or Leased |
|---|---|---|---|---|
| 8946 77th Terrace | Bradenton | FL | United States | Leased |
| 8980 South US 1, Suite 105 -107 | Port St Lucie | FL | United States | Leased |
| 8991 Brighton Ln. | Bonita Springs | FL | United States | Leased |
| 901 S. Tamiami Trail | Venice | FL | United States | Leased |
| 902 Pine Street | Mt Shasta | CA | United States | Leased |
| 909 Mar Walt Drive, 1101 | Fort Walton Beach | FL | United States | Leased |
| 909 Mar Walt Drive, 1103 | Fort Walton Beach | FL | United States | Leased |
| 914 Mar Walt Drive, Suite B | Ft. Walton Beach | FL | United States | Leased |
| 9159 W. Thunderbird Rd, Bldg F | Peoria | AZ | United States | Leased |
| 920 N Mills Ave | Arcadia | FL | United States | Leased |
| 9325 Glades Rd, Suite 101 | Boca Raton | FL | United States | Leased |
| 937 37th Place | Vero Beach | FL | United States | Leased |
| 955 10th Ave North | Naples | FL | United States | Leased |
| 959 East Venice Ave | Venice | FL | United States | Leased |
| 96 Doctor's Drive | Hendersonville | NC | United States | Leased |
| 963 Butte Street | Redding | CA | United States | Leased |
| 9660 Central Park Blvd, Suite 100 | Boca Raton | FL | United States | Leased |
| 970 N. Broadway, Suite 111A | Yonkers | NY | United States | Leased |
| 970 N. Broadway, Suite 111B & Space C05 | Yonkers | NY | United States | Leased |

| Property Address | City | State | Country | Owned or Leased |
|---|---|---|---|---|
| 9701 S John Young Pkwy | Orlando | FL | United States | Leased |
| 9750 NW 33rd St., Suite 218 | Coral Springs | FL | United States | Leased |
| 990 Tamiami Trail | Naples | FL | United States | Leased |
| 9970 Central Park Blvd, Suite 207 | Boca Raton | FL | United States | Leased |
| 9970 Central Park Blvd, Suite 304 | Boca Raton | FL | United States | Leased |
| Ft Lauderdale/Deerfield Beach | Ft Lauderdale & Deerfield Beach | FL | United States | Leased |
| JFK Med Plaza II 46-883 Monroe, Suite 100 | Indio | CA | United States | Leased |
| One ARH Ln | Low Moor | WV | United States | Leased |

## EXHIBIT J

**Location of the Debtors' Substantial Assets, Books and Records, and Nature and Location of Debtors' Assets Outside the United States**

Pursuant to Local Bankruptcy Rule 1007-2(a)(10), the following provides the location of the Debtors' substantial assets, books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States as of the Petition Date.

| Debtors' Assets | Location |
|---|---|
| Books and records | 2270 Colonial Blvd<br>Fort Myers, FL 33907 |
| All Substantial Assets | All of the Debtors' substantial assets are located at the premises listed in Exhibit H. |
| International Property, Plant and Equipment - $170,483.57 | Argentina |
| Other International Assets - $60,778,018.75 | Argentina |

<u>**EXHIBIT K**</u>

**Summary of Legal Actions Against the Debtors**

Pursuant to Local Bankruptcy Rule 1007-2(a)(11), the following lists material actions and proceedings pending or threatened against the Debtors or their properties where a judgment against the Debtors or a seizure of their property may be imminent as of the Petition Date.  This list reflects actions or proceedings considered material by the Debtors and, if necessary, will be supplemented in the corresponding schedules to be filed by the Debtors in these chapter 11 cases.

| Entity | Counterparty | Nature of the Claim | Status | Case No. | Court and Jurisdiction |
|---|---|---|---|---|---|
| 21st Century Oncology, Inc. | United States Department of Justice | Government Inquiries | Pending | N/A | N/A |
| 21st Century Oncology, LLC | United States Department of Justice | Government Inquiries | Pending | N/A | N/A |
| 21st Century Oncology, Inc. | United States Department of Justice | Government Inquiries | Pending | N/A | N/A |
| 21st Century Oncology, LLC | United States Department of Justice | Government Inquiries | Pending | N/A | N/A |
| 21st Century Oncology, Inc. | Office of Civil Rights | Government Inquiries | Pending | N/A | N/A |
| 21st Century Oncology, Inc. | Florida Attorney General's Office | Government Inquiries | Pending | N/A | N/A |
| 21st Century Oncology, Inc. | Indiana Attorney General's Office | Government Inquiries | Pending | N/A | N/A |
| 21st Century Oncology, Inc. | South Carolina Attorney General's Office | Government Inquiries | Pending | N/A | N/A |
| 21st Century Oncology, Inc. | New York Attorney General's Office | Government Inquiries | Pending | N/A | N/A |
| 21st Century Oncology, Inc.; SFRO Holdings, LLC | Edna Tolnai | Breach of Contract | Pending | 20-2016-CA-010731 | 15th Judicial Circuit Court, Palm Beach County, Florida |

| Entity | Counterparty | Nature of the Claim | Status | Case No. | Court and Jurisdiction |
|---|---|---|---|---|---|
| 21st Century Oncology Services, LLC; 21st Century Oncology Services Inc. | Laura A Hudson, Individually as Personal Representative of the Estate of Todd Michael Hudson | Auto Accident | Pending | 15-CA-000618 | 20th Judicial Circuit Court, Lee County, Florida |
| 21st Century Oncology, Inc. | Diane Heiting | Workers' Compensation | Pending | EMPLOYEE CLAIM PETITION 2014 29944 WC365 | State of New Jersey Department of Labor and Workforce Development Division of Workers' Compensation |
| Jacksonville Radiation Therapy Services, LLC | Flagler Hospital, Inc. | Lease Dispute | Pending | CA16-789 | 7th Judicial Circuit Court, St. Johns County, Florida |
| 21st Century Oncology, LLC | Salley J. Passmore and Paula J. Thyfault | Employee Dispute | Pending | 3:16-CV-01094-MMH-PDB | US District Court Middle District, Florida |
| 21st Century Oncology, Inc. | Andrew Woods | Employee Dispute | Pending | 2:16-cv-897-FtM-38MRM | US District Court Middle District, Florida (Ft. Myers Diviion) |
| 21st Century Oncology, LLC | Dr. Angelo Gousse, MD | Employee Dispute | Pending | CACE-16-020571 M | Broward County Circuit Court, Florida |
| Arizona Radiation Therapy Management Services, Inc.; 21st Century Oncology Services, Inc. | Cancer Treatment Services International - Arizona, LLC | Breach of Contract | Pending | COO 1602174 | Superior Court of the State of AZ - County of Pinal |

| Entity | Counterparty | Nature of the Claim | Status | Case No. | Court and Jurisdiction |
|---|---|---|---|---|---|
| 21st Century Oncology, Inc. | J.E. Cooke & Associates, Inc. | Breach of Contract | Pending | CACE-17-000866 | Circuit Court of the 17th Judicial Circuit, Broward County, Florida |
| 21st Century Oncology, LLC | Palomino Park Professional Center II Condominium Association, Inc. | Real Estate Dispute | Pending | 50-2016-CA-004303-XXXX-MBAA | 15th Judicial Circuit Court, Palm Beach County, Florida |
| 21st Century Oncology, LLC | Shawn Kirby | Employee Dispute | Threatened | N/A | N/A |
| Desiree Gardine-Jefferson | 21st Century Oncology, LLC | Claim for damages | Threatened | N/A | N/A |
| US Equal Employment Opportunity Commission, Veronica Santana | 21st Century Oncology, Inc. | Employee Dispute | Threatened | N/A | N/A |
| 21st Century Oncology, LLC | Gloria J. Harrison, Florida Commission on Human Relations, Harrision is represented by a lawyer from Moran and Morgan | Employee Dispute | Threatened | N/A | N/A |
| 21st Century Oncology, Inc. | Tracy Carter | Employee Dispute | Threatened | N/A | N/A |
| 21st Century Oncology, Inc. | John D'Emilia, MD | Employee Dispute | Threatened | N/A | N/A |
| 21st Century Oncology, Inc. | Miami Equal Employment Opportunity Commission Kathleen Ballard | Employee Dispute | Threatened | N/A | N/A |
| South Florida Medicine LLC | Nakdimon | Medical Malpractive | Threatened | N/A | N/A |

| Entity | Counterparty | Nature of the Claim | Status | Case No. | Court and Jurisdiction |
|---|---|---|---|---|---|
| South Florida Medicine LLC | Confidential | Medical Malpractice | Threatened | N/A | N/A |
| South Florida Medicine LLC | Walker | Medical Malpractice | Threatened | N/A | N/A |
| South Florida Medicine LLC | Carrie Weber, PR Estate of Mary Bondurant, deceased & Jayden Sutherland, surviving minor. | Medical Malpractice | Threatened | N/A | N/A |
| South Florida Medicine LLC | Estate of Pearlice Squire | Medical Malpractice | Threatened | N/A | N/A |
| South Florida Medicine LLC | Unknown | Medical Malpractice | Threatened | N/A | N/A |
| 21st Century Oncology Services, LLC; 21st Century Oncology Holdings, Inc.; 21st Century Oncology Management Services, Inc.; 21st Century Oncology, Inc.; 21st Century Oncology, LLC | The Charter Oak Fire Insurance Company and Travelers Property Casualty Company of America | Insurance Disputes | Pending | 2:16-cv-00732-UA-MRM | U.S. District Court Middle District, Florida |
| 21st Century Oncology Holdings Inc. | Stuart Kaplan, individually and on behalf of all others similarly situated | HIPAA Class Action | Pending | 2:16-CV-210-FtM-38CM | US District Court Middle District, Florida |
| 21st Century Oncology Holdings Inc.; 21st Century Oncology Inc. | John Dickman, individually and on behalf of all others similarly situated | HIPAA Class Action | Pending | 2:16-CV-00218-FtM-99-MRM | US District Court Middle District, Florida |
| 21st Century Oncology Holdings Inc. | Rono Polovoy, individually and on behalf of all others similarly situated | HIPAA Class Action | Pending | 2:16-CV-00219-FtM-99-MRM | US District Court Middle District, Florida |

| Entity | Counterparty | Nature of the Claim | Status | Case No. | Court and Jurisdiction |
|---|---|---|---|---|---|
| 21st Century Oncology Holdings Inc.; 21st Century Oncology Services, LLC; 21st Century Oncology Inc.; 21st Century Oncology, LLC; 21st Century Oncology Management Services Inc. | Jim Bimonte and Mary Ann Rodrigues, individually and on behalf of others similarly situated | HIPAA Class Action | Pending | 2:16-CV-00223-SPC-MRM | US District Court Middle District, Florida (Ft. Myers Division) |
| 21st Century Oncology Holdings Inc. | Stacey Schwartz and Judith Cabrera, individually and on behalf of themselves and others similarly situated | HIPAA Class Action | Pending | 2:16-CV-00241-SPC-MRM | US District Court Middle District, Florida " |
| 21st Century Oncology Holdings Inc. | Robert Russell, individually and on behalf of all other similarly-situated persons | HIPAA Class Action | Pending | 2:16-CV-00242-JES-MRM | US District Court Middle District, Florida (Ft. Myers Division) |

| Entity | Counterparty | Nature of the Claim | Status | Case No. | Court and Jurisdiction |
|---|---|---|---|---|---|
| 21st Century Oncology Holdings Inc. | Dolores Stubbs, Stacey Schall (Adams), Frank Barburchak, Kevin Hennings, Dorothy A. Ivory, Irene Goodman, Lana Izworski, Jeremy Miller, Helene Phillips, Lew Phillips, Leonardo Rodriguez, Kathleen Shaver, Berdenna Thompson, J.V. (a minor by and through parent and natural guardian Robert Vosganian), and Karen Vosganian, each individually and on behalf of all other similarly-situated persons | HIPAA Class Action | Pending | 2:16-CV-245-FtM-29MRM | US District Court Middle District, Florida (Ft Myers Division) |
| 21st Century Oncology Holdings Inc. | Mary Barbieri, individually and on behalf of all other similarly-situated persons | HIPAA Class Action | Pending | 2:16-CV-252-FtM-99CM | US District Court Middle District, Florida |
| 21st Century Oncology Holdings Inc.; 21st Century Oncology Services, LLC; 21st Century Oncology Inc.; 21st Century Oncology, LLC; 21st Century Oncology Management Services Inc. | Matthew Benzion, individually and on behalf of all other similarly-situated persons | HIPAA Class Action | Pending | 502016CA002970XXCXMB | Palm Beach County Circuit Court, FL |

| Entity | Counterparty | Nature of the Claim | Status | Case No. | Court and Jurisdiction |
|---|---|---|---|---|---|
| 21st Century Oncology Holdings Inc. | Timothy Meulenberg and Sharon Macdermid, individually and on behalf of all other similarly-situated persons | HIPAA Class Action | Pending | 3:16-CV-00388-J-25JBT | US District Court Middle District, Florida |
| 21st Century Oncology Holdings Inc. | Wilhelm Radauscher, Elizabeth Cetrulo and David Glichman, individually and on behalf of themselves and others similarly situated | HIPAA Class Action | Pending | 2:16-CV-00257-UA-MRM | US District Court Middle District, Florida |
| 21st Century Oncology Holdings Inc.; 21st Century Oncology Services, LLC; 21st Century Oncology Inc.; 21st Century Oncology, LLC; 21st Century Oncology Management Services Inc. | Maureen Trelease, individually and on behalf of all other similarly-situated persons | HIPAA Class Action | Pending | 2:16-CV-00258-UA-MRM | US District Court Middle District, Florida |
| 21st Century Oncology Holdings Inc. | George Delgado, individually and on behalf of all other similarly-situated persons | HIPAA Class Action | Pending | 2:16-CV-259-FtM-99-MRM | US District Court Middle District, Florida (Tampa) |
| 21st Century Oncology Holdings Inc. | James Corbel and Roxanne Haatvedt, individually and on behalf of themselves and others similarly situated | HIPAA Class Action | Pending | RG16813081 | Alameda County Superior Court, California |

| Entity | Counterparty | Nature of the Claim | Status | Case No. | Court and Jurisdiction |
|---|---|---|---|---|---|
| 21st Century Oncology Holdings Inc. | Melquiades Bonilla | HIPAA Class Action | Pending | RIC 1606640 | Riverside County Superior Court, California |
| 21st Century Oncology Holdings Inc. | Daniel Padilla, individually and on behalf of themselves and others similarly situated | HIPAA Class Action | Pending | RG16817512 | Alameda County Superior Court, California |
| 21st Century Oncology Holdings Inc.; 21st Century Oncology Services, LLC; 21st Century Oncology Inc.; 21st Century Oncology, LLC; 21st Century Oncology Management Services Inc. | Gayle Birken-Sikora, Matthew Sikora, Susan Lewin, Jeffrey-Lewin, Jon Lokitez, Caryn Bendetowies and Rita Marx, individually and on behalf of all other similarly-situated persons | HIPAA Class Action | Pending | 2:16-CV-00334-UA-CM | US District Court Middle District, Florida |
| 21st Century Oncology Holdings Inc | Veneta Delucchi, Bradley Bernius | HIPAA Class Action | Pending | 2:16-CV-695 | US District Court Middle District, Florida |
| 21st Century Oncology, Inc.; 21st Century Oncology, LLC | Netsai Masomere and Christian Masomere, a minor | Medical Malpractice | Pending | 10-38865CA24 | Dade County, FL |
| 21st Century Oncology, Inc. | Young, Dana | Medical Malpractice | Pending | 11-891C CA | Collier County, FL |
| 21st Century Oncology, Inc. | Wexler, Leon | Medical Malpractice | Pending | ME-2011-06298 | State of Florida Department of Health |
| 21st Century Oncology, Inc. | Silverstein, Leon | Medical Malpractice | Pending | 16-23982 CA 20 | Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, FL |

| Entity | Counterparty | Nature of the Claim | Status | Case No. | Court and Jurisdiction |
|---|---|---|---|---|---|
| 21st Century Oncology, Inc.; 21st Century Oncology, LLC | Cummings, Benjamin | Medical Malpractice | Pending | 15-CA-001293 | Circuit Court of the Twentieth Judicial Circuit in and for Lee County, FL |
| 21st Century Oncology, Inc. | Floyd, Sandra | Medical Malpractice | Pending | 15-CA-001791 | Circuit Court of the Twentieth Judicial Circuit in and for Lee County, FL |
| 21st Century Oncology, Inc. | Puckey, Bruce A | Medical Malpractice | Pending | 2015 CA 5340 | Circuit Court of the Twelfth Judicial Circuit in and for Sarasota County, FL |
| 21st Century Oncology, Inc.; 21st Century Oncology, LLC | Donaldson, John (Dec'd)  Christine Donaldson as Personal Representative | Medical Malpractice | Pending | 16-CA-000907 | Circuit Court of the Twentieth Judicial Circuit in and for Lee County, FL |
| 21st Century Oncology, Inc. | Blanche Sigl, by & through the Estate of Alvin Benedict Sigl | Medical Malpractice | Threatened | N/A | N/A |
| 21st Century Oncology, Inc. | Welch, Kayla Scott | Medical Malpractice | Threatened | N/A | N/A |
| 21st Century Oncology, Inc. | Devine, Kevin S and Carol Devine | Medical Malpractice | Pending | 2016-CA-001752-NC | Circuit Court of the Twelfth Judicial Circuit in and for Sarasota County, FL |
| 21st Century Oncology, Inc. | Lucey, David T | Medical Malpractice | Pending | 16001509CA | Circuit Court of the Twentieth Judicial Circuit in and for Charlotte County, FL |

| Entity | Counterparty | Nature of the Claim | Status | Case No. | Court and Jurisdiction |
|---|---|---|---|---|---|
| 21st Century Oncology, Inc. | Jones, Kenneth and Deborah Jones | Medical Malpractice | Pending | CACE-16-014604 | Circuit Court of the 17th Judicial Circuit in and for Broward County, FL |
| 21st Century Oncology, Inc. | Deborah Collymore | Medical Malpractice | Pending | 502016CA000471 | Circuit Court of the Fifteenth Judicial Circuit of Florida, in and for Palm Beach County, FL |
| 21st Century Oncology, Inc. | Robert Dennie | Medical Malpractice | Threatened | N/A | N/A |
| 21st Century Oncology, Inc. | Ms. Niurka Gomez | Medical Malpractice | Threatened | N/A | N/A |
| 21st Century Oncology, Inc. | Chester I Carter | Medical Malpractice | Pending | 16-CA-002737 | Circuit Court of the Twentieth Judicial Circuit in and for Lee County, FL |
| 21st Century Oncology, Inc. | Robert Rochester-Nevada State Board of Medical Examiners | Medical Malpractice | Pending | BME #16-16477 | NV State Board of Medical Examiners |
| 21st Century Oncology, Inc. | Carrie Webber, as PR of the Estate of Mary Wick Bondurant | Medical Malpractice | Threatened | N/A | N/A |
| 21st Century Oncology, Inc. | Estate of Pearlice Squire | Medical Malpractice | Threatened | N/A | N/A |
| 21st Century Oncology, Inc. | Allison P Cox | Medical Malpractice | Threatened | N/A | N/A |
| 21st Century Oncology, Inc. | Unknown | Medical Malpractice | Threatened | N/A | N/A |
| 21st Century Oncology, Inc. | Unknown | Medical Malpractice | Threatened | N/A/ | N/A |
| 21st Century Oncology, Inc. | David Greenberg as PR in the Estate of Linda Greenberg | Medical Malpractice | Threatened | N/A/ | N/A |

| Entity | Counterparty | Nature of the Claim | Status | Case No. | Court and Jurisdiction |
|---|---|---|---|---|---|
| 21st Century Oncology, Inc. | Fernando Piquero & wife, Maria Piquero | Medical Malpractice | Threatened | N/A/ | N/A |
| 21st Century Oncology, Inc. | Kristen Robinson | Medical Malpractice | Threatened | N/A/ | N/A |
| 21st Century Oncology, Inc. | Michael Kosh | Medical Malpractice | Threatened | N/A/ | N/A |
| 21st Century Oncology, Inc. | Jean Celian | Medical Malpractice | Threatened | N/A/ | N/A |
| 21st Century Oncology, Inc. | James Levesque and Carrie Levesque as Personal Rep of the Estate | Medical Malpractice | Threatened | N/A/ | N/A |
| 21st Century Oncology, Inc. | Gentene Davis | Medical Malpractice | Threatened | N/A/ | N/A |
| 21st Century Oncology, Inc. | David Weitman | Medical Malpractice | Threatened | N/A/ | N/A |
| 21st Century Oncology Services, LLC | Hani Fraih | Medical Malpractice | Pending | 67425-2016 | Supreme Court of the State of New York, County of Westchester |
| 21st Century Oncology, Inc. | Brenda Santoro | Medical Malpractice | Threatened | N/A/ | N/A |
| 21st Century Oncology, Inc. | William O'Kelley | Medical Malpractice | Threatened | N/A/ | N/A |
| 21st Century Oncology, Inc. | Mitchell D. Weinstein, DO | Medical Malpractice | Threatened | N/A/ | N/A |
| 21st Century Oncology, Inc. | Claudia Lynn Matyisin deceased - LeeAnna Sloan, as personal rep of the estate of Claudia Lynn Matyisin | Medical Malpractice | Threatened | N/A/ | N/A |

## EXHIBIT L

### Debtors' Senior Management

Pursuant to Local Bankruptcy Rule 1007-2(a)(12), the following provides the names of the individuals who constitute the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their responsibilities and relevant experience as of the Petition Date.

| Name / Position | Relevant Experience / Responsibility | Employed Since |
|---|---|---|
| Paul Rundell - Interim Chief Executive Officer | Mr. Rundell is a managing director of A&M and leads A&M's restructuring practice within A&M's Healthcare practice.  He has worked as a turnaround consultant and financial advisor for almost 20 years.  Mr. Rundell has a great breadth of financial restructuring experience as a result of having served in both senior management positions and as a restructuring advisor to large companies.  Specifically, Mr. Rundell has advised and/or served as a senior executive for, among others, Sears Methodist Retirement System, Erickson Retirement Communities, LLC, Clare Oaks, Lincolnshire Campus, LLC, Naperville Campus, LLC, Hingham Campus, LLC, St. Vincent's Catholic Medical Centers, Sunwest Management Inc. and National Benevolent Association. | 2017 |
| Douglas Staut - Interim Chief Financial Officer | Mr. Staut is a senior director of A&M's Healthcare restructuring practice. He has worked in finance for more than 17 years, and has focused on providing financial advisory services in the healthcare industry for the past nine years. Mr. Staut has led restructuring projects across the healthcare space, ranging from acting as financial advisor to a 150 bed acute care hospital to operational turnaround management for a 400 bed CCRC. | 2017 |

| Name / Position | Relevant Experience / Responsibility | Employed Since |
|---|---|---|
| Constantine A. Mantz - Chief Medical Officer | Dr. Mantz's esteemed educational credentials include a radiation oncology residency at the University of Chicago Hospitals. He earned his medical degree from the University of Chicago's Pritzker School of Medicine and completed a surgical internship at the Hennepin County Medical Center in Minneapolis. Dr. Mantz earned his Bachelor of Science Degree in biology from Loyola University of Chicago.<br><br>Dr. Mantz's professional memberships include the American College of Radiation Oncology (ACRO), the American Medical Association, the American Society for Radiation Oncology (ASTRO), and the Association of Freestanding Radiation Oncology Centers.<br><br>During the course of his career, Dr. Mantz has also been involved in numerous radiation therapy research projects. He has published professional journal articles, given lectures, and presented abstracts and poster sessions at national meetings concerning cancer treatment. Dr. Mantz has special clinical interests in the study and treatment of prostate cancer and breast cancer. Dr. Mantz also has published and lectured on healthcare payment and delivery reform in oncology. | 2000 |
| Ravi Patel - Senior Vice President of Operations | Ravi Patel has served as our Senior Vice President, United States Operations since March 2017. Prior to this role, Mr. Patel was the CEO of South Florida Radiation Oncology, a leading integrated cancer care group in Southeast Florida that he joined in 2008 and expanded from 2 radiation oncology centers to 24 cancer centers and over 95 physicians. Prior to SFRO, Mr. Patel was an investor, executive and an entrepreneur. Mr. Patel founded and led several companies in the technology industry including Maestro Commerce, a leading e-commerce software provider that was later acquired by GoldMine Software (later renamed to FrontRange Solutions). He began his career by founding a Chicago-based IT Systems Consulting company in 1992 that was acquired in 1999. | 2014 |

| Name / Position | Relevant Experience / Responsibility | Employed Since |
|---|---|---|
| Lenny Brunson - Chief Information Officer | Lenny Brunson leads the Information Technology team and oversees the Company's information strategy and operations. Mr. Brunson has more than 29 years of experience in information technology and 16 years in executive leadership.<br><br>Prior to joining 21st Century Oncology in 2016, Lenny served as the CIO for ambulatory services with Hospital Sisters Health System (HSHS) in Springfield, Illinois where he was responsible for the effective use of all technology for HSHS' owned ambulatory groups: 2 large (350+ provider) multispecialty groups and a 100+ provider cardiology group. Additionally, he was responsible for the technology delivery of both the Allscripts TouchWorks® Electronic Health Record (EHR) and Practice Management (PM) systems, as well as the EpicCare Ambulatory EHR, to both internal HSHS entities and affiliated community physician practices.<br><br>Mr. Brunson also served as a Director in Navigant Consulting's healthcare practice, as well as Vice President of Technology with Pivot Health's physician practice management group.  With both of these companies, Mr. Brunson provided medical groups with senior IT analysis, oversight and/or management, including serving for nearly 4 years as the Chief Information Officer of Queens-Long Island Medical Group, PC, of Garden City, New York.<br><br>Lenny earned his Bachelor of Science degree from Excelsior College, and a Master's degree in Computer Resource and Information Management from Webster University. He is a Certified Healthcare Chief Information Officer (CHCIO) through the College of Healthcare Information Management Executives (CHIME), as well as serving on the CIO Leadership Council for the American Medical Group Association (AMGA). | 2016 |

| Name / Position | Relevant Experience / Responsibility | Employed Since |
|---|---|---|
| Gustavo Oliviera - Chief Technical Officer | Gustavo Olivera is 21st Century Oncology's Chief Technical Officer. In this role, he oversees all aspects of the physics department and ensures adherence to Medical Physics quality requirements, accreditation requirements and administration, physics vendor management, and applicable state and federal laws. He is also responsible for strategic development of the physics/technology department.<br><br>Mr. Olivera obtained his Ph.D in Atomic Physics from the National University of Rosario in 1996. He worked during 1996 and 1997 at the Multidisciplinary Ion Laser Research Center (CIRIL) in Normandy, France where he developed Monte Carlo Codes for water Radiolysis at nanometer level. After a short stage at the International Center for Theoretical Physics in Trieste, Italy, he moved to the University of Wisconsin Madison where he was an Adjunct Associate Professor at the department of Medical Physics until 2009.<br><br>He was one of the pioneers in the TomoTherapy(R) field and also one of the original few employees that created the TomoTherapy company and Hi-ART system together with the two founders in 1997. He served as VP of Research from 2006 to 2010 with Accuray, Inc., the manufacturer of TomoTherapy. After a brief period as CTO of Compact Particle Accelerator Corporation (CPAC), he moved to 21st Century Oncology.<br><br>Gustavo has authored and contributed to more than one hundred papers in peer-reviewed journals, as well as 7 book chapters. Gustavo has presented more than 100 presentations at international conferences. He also holds more than 20 U.S. and international patents and lead the development on FDA and CE regulated products. He also served as a permanent member of Radiation Therapeutics and Biology Study section of NIH from 2006 to 2010. He is a referee for several professional journals and is a member of AAPM and ESTRO. | 2011 |
| Gary Delanois - Senior Vice President U.S. Operations | Gary Delanois has served as our Senior Vice President, United States Operations since August 2014 after leading the growth of our integrated cancer care operations network of employed and affiliated physicians for five years. He began his career in business as a Certified Public Accountant with Ernst & Young before leaving to become Chief Operating Officer for a diversified and multi-divisional private company. Mr. Delanois is a member of the American Institute of CPAs and the Florida Institute of Public Accountants. | 2014 |

4

| Name / Position | Relevant Experience / Responsibility | Employed Since |
|---|---|---|
| Eduardo Fernandez - Senior Vice President, Medical Affairs/Medical Director for Latin America | Dr. Fernandez earned his medical degree from the University of Malaga, Spain in 1987, and was subsequently appointed Assistant and Associate Professor of Radiology and Medical Physics, where he defended his doctoral thesis in the molecular biology aspects of photodynamic therapy earning his Ph.D. degree in 1991. At the time, he was in close cooperation with the Department of Biochemical Oncology and Experimental Radiotherapy at Case Western Reserve University.<br><br>He completed his radiation oncology residency at the Cleveland Clinic Foundation, Callahan Center for Radiation Oncology and Robotics, and served as Head of Radiation Oncology at the Cleveland Clinic Florida (with dual appointment at the main campus in Cleveland), where he was responsible for the development of the External Beam and Brachytherapy programs. Simultaneously he undertook an Assistant Professorship of Radiology at the Ohio State University. He is Board Certified in Radiation Oncology.<br><br>Dr. Fernandez Joined 21st Century Oncology in 1998, and since then he has been department chair at numerous hospital in the south Florida community. He has been Medical Director of the east coast of Florida, Co-Vice President of Medical Operations, and Senior Vice President for Regional Operations before his recent appointment.<br><br>With an international reputation, he has lectured or published in every aspect of radiation oncology around the world for more over 200 times, and has received a number of international awards and recognitions, while keeping a busy clinical practice.<br><br>Dr. Fernandez serves as Director of 21St Century Care Foundation and is also a member of the Board of Chancellors of the American College of Radiation Oncology, and member of the Continuing Education and Communications Committee at the American Society for Radiation Oncology.  He has been distinguished with fellowships from both organizations. He is also on faculty at U.C.L.A. where he serves as Assistant Professor in Radiation Oncology. | 1998 |

| Name / Position | Relevant Experience / Responsibility | Employed Since |
|---|---|---|
| Timothy D. Shafman – Senior Vice President, National Medical Director | Dr. Shafman received his M.D., cum laude, from Harvard Medical School in the Harvard University-Massachusetts Institute of Technology Division of Health Sciences and Technology. Following an internship in Internal Medicine at the Brigham and Women's Hospital in Boston, MA, he completed a residency in Radiation Oncology at the Harvard Joint Center for Radiation Therapy, where he was elected Chief Resident in the final year of his training.<br><br>He served as an attending physician for five years at the Harvard Joint Center for Radiation Therapy where he concentrated his clinical practice on brain and lung tumors. He also performed basic research on the Ataxia-Telangiectasia gene and clinical research related to its influence on second tumors. Dr. Shafman continued clinical research on brain and lung tumors as a member of the Duke University Medical Center, Department of Radiation Oncology. Dr. Shafman has published over 45 peer reviewed articles and has also co-authored several chapters in widely read Radiation Oncology textbooks. | 2004 |
| Steve Graham - Chief Accounting Officer | Steven B. Graham has served as Chief Accounting officer of 21st Century Oncology, Inc. since January 2017. Prior to that, he was Vice President and Assistant Controller of HP, Inc., a technology company. Prior to HP, he was the Senior Vice President and Chief Accounting Officer of The Wendy's Company since October 2006. Before joining a predecessor entity to Wendy's, Mr. Graham served as Corporate Controller at Princeton Review LLC from 2004 to 2006, as Vice President – Controller of Sbarro, Inc. from 1994 to 2004 and as the controller for a number of additional retail entities. He began his career as an auditor with Laventhol & Horwath for 13 years. He is a member of the American Institute of CPA's and the Texas Institute of Public Accountants. | 1997 |
| Blake E Howard – Vice President of Financial Planning & Analysis, Treasury | Blake E Howard, joined the Company in 2009 as a Manager of Financial Planning and Analysis. In July 2016, Mr. Howard was promoted to Vice President of FPA and Treasury where he serves as our treasurer. From 2003 to 2009, Mr. Howard served in various progressive roles with the Macquarie Group in both the United States and Canada. Mr. Howard earned his Bachelor of Science degree from the University of Central Arkansas, an MBA from the University of Alabama at Birmingham, and a Master's degree in Healthcare Management from the Johns Hopkins University School of Public Health. | 2009 |

| Name / Position | Relevant Experience / Responsibility | Employed Since |
|---|---|---|
| Betta Sherman – Chief Compliance Officer | Prior to joining 21st Century Oncology, Ms. Sherman served as interim compliance officer and interim privacy officer for a variety of health care organizations. She worked with health systems, physician groups and health plans to develop and implement compliance programs and optimize ongoing compliance operations. Betta has expertise in conducting compliance risk assessments, compliance program reviews, and HIPAA assessments.<br><br>Ms. Sherman earned her Bachelor of Science degree from Northwestern University, and a Master's degree in Public Policy from the University of Chicago. She is Certified in Healthcare Compliance (CHC) and is a Certified HIPAA Professional (CHP). | 2015 |

## EXHIBIT M

**Debtors' Payroll for the 30 Day Period Following the Filing of the
Debtors' Chapter 11 Petitions**

Pursuant to Local Rules 1007-2(b)(1)-(2)(A) and (C), the following provides, for the 30-day period following the Petition Date, the estimated amount of weekly payroll to the Debtors' employees (exclusive of officers, directors, and stockholders), the estimated amount paid and proposed to be paid to officers, stockholders, and directors, and the amount paid or proposed to be paid to financial and business consultants retained by Debtors.

| Payments | Payment Amount |
|---|---|
| Payments to employees (not including officers, directors, and stockholders) | $24,800,000 |
| Payments to officers, directors, and stockholders | $75,000 |
| Payments to financial and business consultants | $0 |

## EXHIBIT N

**Debtors' Estimated Cash Receipts and Disbursements for the Thirty (30) Day Period
Following the Filing of the Chapter 11 Petitions**

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the Petition Date, the Debtors' estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| Type | Amount |
|------|--------|
| Cash Receipts | $67.41 million |
| Cash Disbursements | $59.99 million |
| Net Cash Loss | $7.41 million |
| Unpaid Obligations (excluding professional fees) | $25.00 million |
| Unpaid Receivables (excluding professional fees) | $50.00 million |