**Hearing Date and Time: September 6, 2017 at 10:00 a.m. (prevailing Eastern Time)**
**Objection Deadline: August 30, 2017 at 4:00 p.m. (prevailing Eastern Time)**

Christopher Marcus, P.C.
John T. Weber
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

James H.M. Sprayregen, P.C.
William A. Guerrieri (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) ) ) | Chapter 11 |
| 21st CENTURY ONCOLOGY HOLDINGS, INC., *et al.*,[1] | ) ) ) | Case No. 17-22770 (RDD) |
| Debtors. | ) ) ) | (Jointly Administered) |

**NOTICE OF DEBTORS' MOTION SEEKING ENTRY OF**
**AN ORDER (I) AUTHORIZING THE DEBTORS TO ENTER INTO**
**THE UNWIND AGREEMENT, AND (II) GRANTING RELATED RELIEF**

**PLEASE TAKE NOTICE** that on August 17, 2017, 21st Century Oncology Holdings, Inc. and its affiliated debtors in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "***Debtors***"), filed the *Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to Enter into the Unwind Agreement, and (II) Granting Related Relief* (the "***Motion***"). A hearing on the Motion will be held before the Honorable Robert D. Drain of the United States Bankruptcy Court for the Southern District of New York (the "***Court***"), 300

---

[1] Each of the Debtors in the above-captioned jointly administered chapter 11 cases and their respective tax identification numbers are set forth in the *Order Directing Joint Administration of Chapter 11 Cases* [Docket No. 30]. The location of 21st Century Oncology Holdings Inc.'s corporate headquarters and the Debtors' service address is: 2270 Colonial Boulevard, Fort Myers, Florida 33907.

Quarropas Street, White Plains, New York 10601, on **September 6, 2017, at 10:00 a.m. (prevailing Eastern Time)**.

**PLEASE TAKE FURTHER NOTICE** that any responses or objections to the Motion (each, an "***Objection***") shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, and the *Final Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief* [Docket No. 125] (the "***Case Management Order***"), and shall be filed with the Court (a) by registered users of the Bankruptcy Court's case filing system, electronically in accordance with General Order M–399 (which can be found at http://www.nysb.uscourts.gov) and (b) by all other parties in interest, on a CD-ROM, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers as set forth in the Case Management Order), in accordance with the customary practices of the Bankruptcy Court and General Order M–399, to the extent applicable, and served—so as to be *actually received* no later than **August 30, 2017, at 4:00 p.m. (prevailing Eastern Time)** (the "***Objection Deadline***")—on each of the Standard Parties (as defined in the Case Management Order).

**PLEASE TAKE FURTHER NOTICE** that if no Objections or other responses are timely filed and served with respect to the Motion, the Debtors shall, on or after the Objection Deadline, submit to the Court an order substantially in the form annexed as **<u>Exhibit A</u>** to the Motion, which order the Court may enter without further notice or opportunity to be heard.

**PLEASE TAKE FURTHER NOTICE** that the Hearing may be continued or adjourned thereafter from time to time without further notice other than an announcement of the adjourned date or dates in open court at the Hearing.

2

**PLEASE TAKE FURTHER NOTICE** that copies of the Motion and Case Management Order may be obtained free of charge by visiting the website of Kurtzman Carson Consultants LLC, at www.kccllc.net/21co.   You may also obtain copies of any pleadings by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

New York, New York
Dated:  August 17, 2017

/s/ Christopher Marcus

Christopher Marcus, P.C.
John T. Weber
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
William A. Guerrieri (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**Hearing Date and Time:  September 6, 2017 at 10:00 a.m. (prevailing Eastern Time)**
**Objection Deadline:  August 30, 2017 at 4:00 p.m. (prevailing Eastern Time)**

Christopher Marcus, P.C.
John T. Weber
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

James H.M. Sprayregen, P.C.
William A. Guerrieri (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| 21st CENTURY ONCOLOGY HOLDINGS, INC., *et al.*,[1] | ) | Case No. 17-22770 (RDD) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## DEBTORS' MOTION SEEKING ENTRY OF AN
## ORDER (I) AUTHORIZING THE DEBTORS TO ENTER INTO
## THE UNWIND AGREEMENT, AND (II) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "***Debtors***")
respectfully state as follows in support of this motion:

### Relief Requested

1.    By this motion, the Debtors seek entry of an order, substantially in the form
attached hereto as **Exhibit A** (the "***Order***"):  (a) authorizing the Debtors to enter into that certain
unwind agreement by and between Debtor 21st Century Oncology of New Jersey, Inc. ("***21C***")
and non-debtor Health Management Services Organization, Inc. ("***HMSO***") substantially in the

---

[1]    Each of the Debtors in the above-captioned jointly administered chapter 11 cases and their respective tax
identification numbers are set forth in the *Order Directing Joint Administration of Chapter 11 Cases* [Docket
No. 30].   The location of 21st Century Oncology Holdings Inc.'s corporate headquarters and the Debtors'
service address is:  2270 Colonial Boulevard, Fort Myers, Florida 33907.

form attached to the Order as **Exhibit 1** (the "***Unwind Agreement***"),[2] and (b) granting related relief.  In support of this motion, the Debtors submit the *Declaration of Paul B. Rundell in Support of the Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to Enter into the Unwind Agreement, and (II) Granting Related Relief* attached hereto as **Exhibit B** (the "***Rundell Declaration***").

<u>**Jurisdiction, Venue, and Procedural Background**</u>

2.    The United States Bankruptcy Court for the Southern District of New York has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated December 1, 2016.  The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

3.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4.    The statutory bases for the relief requested herein are sections 105(a) and 363(b) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "***Bankruptcy Code***"), and Bankruptcy Rules 2002(a)(2) and 6004.

5.    On May 25, 2017 (the "***Petition Date***"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their

---

[2]    Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to such terms in the Unwind Agreement.

2

businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On May 26, 2017, the Court entered an order authorizing the joint administration and procedural consolidation of the chapter 11 cases pursuant to Bankruptcy Rule 1015(b) [Docket No. 30].  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.  On June 15, 2017, the Office of the United States Trustee appointed the official committee of unsecured creditors in these chapter 11 cases (the "**Committee**") [Docket Nos. 92, 94].

### The Joint Venture

6.    The Debtors entered the New Jersey market in or around July 2004, opening three clinics located at:    (a) 220 Sunset Road, Suite 4, Willingboro, New Jersey 08046 (the "**Willingboro Office**"), (b) 130 Carnie Boulevard, Voorhees, New Jersey 08043 (the "**Voorhees Office**") and (c) 893 South White Horse Pike, Hammonton, New Jersey 08037 (the "**Hammonton Office**") (collectively, the "**NJ Offices**").    Since their inception, the NJ Offices struggled financially.  In an attempt to turnaround the New Jersey business, the Debtors approached HMSO in late 2014 regarding the formation of a joint venture to provide additional capital to the NJ Offices.  As a result of these efforts, in February 2015, Debtor 21C and HMSO entered into a New Jersey-based joint venture called 21st Century Oncology and Our Lady Of Lourdes Management Company, LLC (the "**Joint Venture**") pursuant to an operating agreement dated as of February 1, 2015 by and between 21C and HMSO, attached hereto as **Exhibit C**. HMSO obtained a 30 percent ownership stake in the Joint Venture in consideration for a capital infusion of approximately $743,000 with 21C retaining the remaining 70 percent.  21C and the Joint Venture then entered into that certain facilities and management services agreement dated

3

as of February 1, 2015 (the "**MSA**"), whereby the Joint Venture provided office facilities, equipment, personnel, supplies, and administrative services to the NJ Offices.

7.     Despite the formation of the Joint Venture and attendant capital infusion, the Joint Venture's operations did not improve.   Over the last twelve months, the Joint Venture has operated at a loss of approximately $1.3 million in the aggregate.   Additionally, on April 29, 2017, one of the Joint Venture's two full-time oncologists terminated his employment.   The second full-time oncologist's employment will terminate as of August 25, 2017.   As a result, the Joint Venture will have no full-time doctors on staff by the end of the month.   The Joint Venture's losses have been so severe that the Joint Venture has effectively shuttered the Voorhees Office and Hammonton Office.   In light of the foregoing, 21C now desires to exit the Joint Venture pursuant to the Unwind Agreement.

**The Unwind Agreement**

8.     The Debtors seek authority to enter into the Unwind Agreement, which seeks to, among other things, terminate the MSA, dissolve the Joint Venture, distribute the Joint Venture's assets, and pay off the Joint Venture's debts.   Specifically, the Unwind Agreement provides that:

- 21C will cease paying management fees to the Joint Venture pursuant the MSA upon execution of the Unwind Agreement;

- HMSO will make a one-time payment to the Joint Venture of $150,000 (the "**HMSO Payment**");

- the Joint Venture will use the proceeds of the HMSO Payment and cash on the balance sheet first, to satisfy outstanding obligations owed to third-parties, and second, to satisfy outstanding obligations owed to 21C and its affiliates; and

- following disbursement of all available cash, the Joint Venture shall be dissolved, at which time (a) the assets, contracts, inventory, supplies, and other property of the Willingboro Office will be assigned to HMSO and (b) the assets, contracts, inventory, supplies, and other property of the Voorhees Office and Hammonton Office will be assigned to 21C.

4

## Basis for Relief

I.    **The Unwind Agreement Is a Sound Exercise of Business Judgment and Is in the Best Interest of the Debtors' Estates.**

9.    Section 363(b) of the Bankruptcy Code permits a debtor, subject to court approval, to enter into a transaction outside the ordinary course of its business so long as there is a "sound business purpose" that justifies such action.  *See Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *see also In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003) (stating that judicial approval under section 363 of the Bankruptcy Code requires a showing that there is a good business reason).

10.    Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task").  Implicit in the fiduciary duties of any debtor-in-possession is the obligation to "protect and preserve the estate, including an operating business's going-concern value." *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).

11.    Further, section 105(a) of the Bankruptcy Code, which codifies the inherent equitable powers of the bankruptcy court, empowers the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Specifically, courts have used their power under section 105(a) of the Bankruptcy Code to, among others things, authorize payment of prepetition obligations and authorize a debtor's sale of its assets outside the ordinary course.  *See, e.g., In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (stating that "the Bankruptcy Court's

5

equitable power may be used to effectuate the purposes of Chapter 11, which include the restructuring of a business' finances to enable it to operate productively, provide jobs for its employees, pay its creditors and produce a return for its stockholders"); *In re Cabrini Med. Ctr.*, No. 09-14398 (AJG), 2010 WL 2824566, at *4 (Bankr. S.D.N.Y. Feb. 11, 2010) (approving a sale transaction pursuant to section 105(a) of the Bankruptcy Code).  The use of section 105(a) of the Bankruptcy Code, also referred to as the "doctrine of necessity" rule, has long been recognized as precedent within the Second Circuit.  *See Ionosphere*, 98 B.R. at 175–76.  The rationale for its utility—the rehabilitation of a debtor in reorganization cases—is considered the "the paramount policy and goal of Chapter 11."  *Id*.  Here, the Debtors' entry into the Unwind Agreement represents a sound exercise of the Debtors' business judgment, and will protect, preserve, and maximize the value of the estates.

12.     Entry into the Unwind Agreement provides the Debtors with certain immediate benefits.  *First*, the Unwind Agreement terminates the Debtors' obligation to pay the Joint Venture management fees of approximately $145,000 per month.  By reducing the Debtors' cash outflows, the Debtors are able to conserve value for distribution to creditors.

13.     *Second*, the Unwind Agreement provides a source of revenue to satisfy certain outstanding obligations of the Joint Venture, including obligations owed to 21C and certain of its Debtor affiliates.  As of the date hereof, the Joint Venture owes approximately $900,000 to third-parties and 21C and certain of its Debtor affiliates.  As discussed, the proceeds of the HMSO Payment will be used to satisfy outstanding obligations of the Joint Venture first, to third parties and second, to 21C and its affiliates.  Absent the Unwind Agreement and the HMSO Payment, it is unlikely that the Joint Venture would be able to satisfy a comparable portion of its outstanding payables, including those owed to the Debtors.

14.    **Third**, the Unwind Agreement provides for the assignment of the assets of the Voorhees Office and Hammonton Office to 21C, which assets will be redeployed to other, more profitable clinics owned by the Debtors.  The assets at the Voorhees Office and Hammonton Office have an estimated net book value of approximately $150,000 in the aggregate and are comprised of furniture, computer equipment, and office supplies.[3]  By redeploying these assets to other clincs, the Debtors can avoid the time and expense associated with liquidating these assets and also retain the value of these assets for the benefit of other practices.

15.    **Fourth**, the Unwind Agreement allows the Debtors to avoid the time, expense, and delay that likely would accompany a sale or liquidation of the Joint Venture in the absence of an orderly unwind.  Absent the Unwind Agreement, the Joint Venture would be required to either liquidate or sell its assets to a third party.  In a liquidation scenario, the proceeds of the liquidation would be applied to, among other things:  (a) the expenses of the liquidation, (b) debts and liabilities of the Joint Venture, (c) debts owed by the Joint Venture to 21C or HMSO, and (d) any loans made by 21C or HMSO to the Joint Venture, with any balance remaining distributed to 21C and HMSO on a pro rata basis.  *See* Ex. C, § 15.  Upon dissolution, the Joint Venture would also have to establish a reserve to cover any contingent or unknown liabilities of the Joint Venture and such reserve would be funded by money otherwise distributable to 21C and HMSO.  *Id*.  In a sale scenario, the Joint Venture and 21C would be required to mutually agree on an appraiser to provide a fair market valuation of the Joint Venture.  The proceeds of any sale must then be applied to satisfy all costs associated with the appraiser and the sale.  *Id*. at § 13.4.  Neither a liquidation nor a sale is likely to generate

---

[3]    Although $150,000 is the estimated net book value, there is no guarantee that 21C would be able to obtain that amount in a liquidation.  As set forth in the Rundell Declaration, 21C believes that if forced to liquidate such

comparable value for distribution to the Debtors as the dissolution pursuant to the Unwind Agreement.

16.     Additionally, assignment of the Willingboro Office to HMSO pursuant to the Unwind Agreement will prevent any disruption to the patients served by such office and provide for continued employment of the approximately eight individuals employed thereby.

17.     The Debtors' entry into the Unwind Agreement will inure to the benefit of all stakeholders.  By exiting the Joint Venture, the Debtors will be able to conserve value for distribution to creditors, efficiently exit a competitive market, and acquire valuable assets that may be redeployed to other Debtor-owned clinics.  Additionally, the Debtors will avoid the time, expense, and distraction associated with a disorderly dissolution of the Joint Venture. Accordingly, the Debtors submit that entry into the Unwind Agreement is in the best interest of the Debtors and all stakeholders and should be approved.

## Motion Practice

18.     This motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated, and a discussion of their application to this motion.  Accordingly, the Debtors submit that this motion satisfies Local Bankruptcy Rule 9013-1(a).

## Waiver of Stay under Bankruptcy Rule 6004(h)

19.     Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  As set forth throughout this motion, failure to grant the relief requested herein would be detrimental to the Debtors, their estates and all stakeholders.

---

assets, it is likely to receive no more than a quarter of the estimated book value.

For this reason and those set forth above, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h).

## **Notice**

20.     The Debtors have provided notice of this motion to:  (a) the United States Trustee for Region 2; (b) counsel to the Committee; (c) counsel to the agent under the Debtors' postpetition financing facility; (d) counsel to the ad hoc committee of lenders under the Debtors' prepetition 21C secured credit facility; (e) counsel to the administrative agent under the Debtors' prepetition 21C secured credit facility; (f) counsel to the ad hoc committee of crossover lenders and noteholders; (g) the indenture trustee for the Debtors' 11% senior notes due 2023; (h) the holders of the Debtors' SFRO PIK Notes; (i) the United States Attorney for the Southern District of New York; (j) the United States Securities and Exchange Commission; (k) the state attorneys general for states in which the Debtors conduct business; (l) the Internal Revenue Service; (m) HMSO; (n) the Joint Venture; and (o) any party that has requested notice pursuant to Bankruptcy Rule 2002.   In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

## **No Prior Request**

21.     No prior request for the relief sought in this motion has been made to this or any other court.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the Debtors respectfully request entry of the Order, substantially in the form attached hereto as **Exhibit A**, (a) granting the relief requested herein and (b) granting such other relief as is just and proper.

New York, New York
Dated:  August 17, 2017

*/s/ Christopher Marcus*
Christopher Marcus, P.C.
John T. Weber
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
William A. Guerrieri (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

## Exhibit A

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| 21st CENTURY ONCOLOGY HOLDINGS, INC., *et al.*,[1] | ) Case No. 17-22770 (RDD) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

## ORDER (I) AUTHORIZING THE DEBTORS TO ENTER INTO
## THE UNWIND AGREEMENT, AND (II) GRANTING RELATED RELIEF

Upon the motion (the "**Motion**") of the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") for entry of an order (this "**Order**"), (a) authorizing the Debtors to enter into the unwind agreement by and between debtor 21st Century Oncology of New Jersey, Inc. and non-debtor Health Management Services Organization, Inc. attached hereto as **Exhibit 1** (the "***Unwind Agreement***"); and (b) granting related relief; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated December 1, 2016; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having considered the Rundell Declaration; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties-in-interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing

---

[1] Each of the Debtors in the above-captioned jointly administered chapter 11 cases and their respective tax identification numbers are set forth in the *Order Directing Joint Administration of Chapter 11 Cases* [Docket No. 30]. The location of 21st Century Oncology Holdings Inc.'s corporate headquarters and the Debtors' service address is: 2270 Colonial Boulevard, Fort Myers, Florida 33907.

on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "*Hearing*"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.       The Motion is granted as set forth herein.

2.       The Debtors are authorized to enter into, perform, execute, and deliver all documents, and take all actions, necessary to immediately continue and fully implement the Unwind Agreement attached hereto as **Exhibit 1** in accordance with the terms, conditions, agreements, and releases set forth or provided for therein, all of which are approved.

3.       Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

4.       The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

5.       This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

New York, New York
Dated: _____, 2017

_____
HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

## __Exhibit 1__

**The Unwind Agreement**

## UNWIND AGREEMENT

This **UNWIND AGREEMENT** ("*Agreement*") is made as of _____, 2017, and is effective as of _____, 2017 ("*Effective Date*") by and between **21ST CENTURY ONCOLOGY OF NEW JERSEY, INC.** ("*21C*") and **HEALTH MANAGEMENT SERVICES ORGANIZATION, INC.** ("*HMSO*").

## RECITALS

The following Recitals are hereby incorporated in this Agreement:

A.       21C and HMSO, pursuant to an Operating Agreement dated February 1, 2015 ("*Operating Agreement*"), are the sole members of 21st Century Oncology and Our Lady Of Lourdes Management Company, LLC, a New Jersey limited liability company ("*Management Company*").

B.       Pursuant to a Facilities and Management Services Agreement between 21C and the Management Company dated February 1, 2015 ("*MSA*"), the Management Company provides certain office facilities, equipment, personnel, supplies and administrative services at 21C's practices located at: (i) 220 Sunset Road, Suite 4, Willingboro, New Jersey 08046 ("*Willingboro Office*"), (ii) 130 Carnie Boulevard, Voorhees, New Jersey 08043 ("*Voorhees Office*") and (iii) 893 South White Horse Pike, Hammonton, New Jersey 08037 ("*Hammonton Office*") (collectively, the "*Offices*").

C.       The parties have agreed to unwind their arrangement, terminate the MSA, dissolve the Management Company and distribute the assets in accordance with the terms set forth herein.

**NOW, THEREFORE**, in consideration of the promises herein contained, and each intending to be legally bound hereby, the parties hereto agree as follows:

1.       <u>Termination of MSA</u>. The MSA is hereby terminated by written mutual agreement of the parties thereto, effective as of the Effective Date, except for those sections and provisions of the MSA that expressly survive termination, but excluding Section 4(c) as described in Section 2 of this Agreement.

2.       <u>Termination of Management Fees</u>. The parties agrees that 21C will cease to pay the Management Fees (as that term is defined in the MSA) to the Management Company as of the Effective Date anything to the contrary in Section 4(c) of the MSA notwithstanding.

3.       <u>Dissolution of the Management Company</u>. 21C and HMSO, pursuant to Section 15.1(a) of the Operating Agreement, agree to dissolve the Management Company as of the Effective Date. 21C shall be responsible for winding up the affairs of the Management Company in accordance with Section 15 of the Operating Agreement and this Agreement; provided, however, in the event of a conflict between this Agreement and Section 15 of the Operating Agreement, this Agreement shall control. In the furtherance of the foregoing, the parties agree as follows:

1

A.    HMSO shall make a payment to the Management Company of One Hundred Fifty Thousand and 00/100 Dollars ($150,000.00) ("**HMSO Payment**") on the Effective Date of this Agreement.

B.    21C shall use the Management Company's cash on hand and the HMSO Payment to pay all third party debts or other obligations owed by the Management Company excluding any debts or other obligations owed to affiliates of 21C (collectively "**Third Party Obligations**").    After payment of the Third Party Obligations, any remaining cash of the Management Company (inclusive of the HMSO Payment) shall be applied against the debts and obligations of the Management Company owed to 21C affiliates ("**21C Affiliates Obligations**"). After payment of such remaining cash to the 21C Affiliates Obligations, the remaining balance of 21C Affiliates Obligations shall be written off by the applicable 21C affiliates.

C.    As it relates to the Willingboro Office, on the Effective Date:

(i)    The Management Company shall transfer to HMSO (or its designated affiliate) the assets listed on Schedule 1 which represent the assets utilized to operate the Willingboro Office.  In the furtherance of the foregoing, the Management Company shall provide to HMSO (or its designated affiliate) general warranty deeds, bills of sale, endorsements, assignments and other instruments of transfer and conveyance reasonably satisfactory in form and substance to HMSO (or it designated affiliate).

(ii)    The Management Company will assign and HMSO (or its designated affiliate) shall take assignment of those agreements set forth on Schedule 2 which shall include all real property and personal property leases for the Willingboro Office ("**HMSO Assumed Contracts**").

(iii)    The Management Company will transfer to HMSO (or its designated affiliate) all operating and employment records required for, or incident to, the operation of the Willingboro Office; provided, however that 21C shall have reasonable access to such property in the future for legitimate business or legal reasons.

(iv)    The Management Company shall transfer all supplies and inventory on hand at the Willingboro Office to HMSO.  HMSO shall pay to the Management Company an amount equal to the inventory, supplies and prepaid expenses associated with the Willingboro Office as set forth on Schedule 3.

D.    As it relates to the Voorhees Office and Hammonton Office, on the Effective Date:

(i)    The Management Company shall transfer to 21C (or its designated affiliate) the assets listed on Schedule 4 which represent the current assets utilized to operate the Voorhees Office and Hammonton Office.  In the furtherance of the foregoing, the Management Company shall provide to 21C (or its designated affiliate) general warranty deeds, bills of sale, endorsements, assignments and other instruments of transfer and conveyance reasonably satisfactory in form and substance to 21C (or it designated affiliate).

2

(ii)    The Management Company will assign and 21C (or its designated affiliate) shall take assignment of those agreements set forth on Schedule 5 which shall include all real property and personal property leases for the Voorhees Office and Hammonton Office ("**21C Assumed Contracts**").

(iii)    The Management Company will transfer to 21C all operating and employment records required for, or incident to, the operation of the Voorhees Office and Hammonton Office; provided, however that HMSO shall have reasonable access to such property in the future for legitimate business or legal reasons.

E.    As of the Effective Date, HMSO (or its designated affiliate) shall take custody of the medical records of 21C related to services provided at the Officers pursuant to the Medical Records Custody Agreement attached as Exhibit A.

4.    Liabilities.

A.    Except for the HMSO Assumed Contracts, HMSO (or its designated affiliate) shall not assume, and in no event shall be deemed to have assumed, any debt, claim, obligation or other liability of 21C or the Management Company.

B.    Except for the 21C Assumed Contracts, 21C (or its designated affiliate) shall not assume, and in no event shall be deemed to have assumed, any debt, claim, obligation or other liability of HMSO or the Management Company.

5.    Representations and Warranties

A.    21C represents and warrants that it has the full power and legal right to execute and deliver this Agreement and to consummate the transactions provided for in this Agreement in the manner and upon the terms herein specified, and this Agreement and the transactions contemplated hereby will not result in the violation of any other agreement to which it is a party or by which it is bound.  This Agreement has been duly executed and delivered by 21C and, assuming due execution and delivery by HMSO, constitutes a legal, valid and binding obligation of 21C, enforceable against 21C in accordance with its terms.

B.    HMSO represents and warrants that it has the full power and legal right to execute and deliver this Agreement and to consummate the transactions provided for in this Agreement in the manner and upon the terms herein specified, and this Agreement and the transactions contemplated hereby will not result in the violation of any other agreement to which it is a party or by which it is bound.  This Agreement has been duly executed and delivered by HMSO and, assuming due execution and delivery by 21C, constitutes a legal, valid and binding obligation of HMSO, enforceable against HMSO in accordance with its terms.

6.    Further Assurances.  In connection with the transactions contemplated under this Agreement, the parties agree to cooperate fully with each other in furtherance of the consummation of this Agreement, and to execute and deliver such further instruments or take such further actions as may be reasonably necessary and proper to effectuate and carry out the transactions contemplated hereunder.

7.    <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of New Jersey, without regard to principles of conflicts law.

8.    <u>Amendment</u>. This Agreement may not be amended except by a further agreement in writing duly executed by each of the parties hereto.

9.    <u>Notices</u>. Any notice or other communication required or which may be given hereunder shall be in writing and shall be delivered personally, sent by certified mail, postage prepaid, return receipt requested or by a nationally recognized overnight courier, and shall be deemed given when so delivered personally or by facsimile, or if mailed, three (3) days after the date of mailing as follows:

| | |
|---|---|
| 21C: | 2270 Colonial Boulevard<br>Ft. Myers, FL  33907<br>Attention:  President |
| HMSO: | 1660 Haddon Avenue<br>Camden, NJ  08103<br>Attention: |

or to such other address and to the attention of such other person(s) or officer(s) as any party may designate by written notice.

10.    <u>Entire Agreement</u>. This Agreement contains the entire understanding between the parties with respect to the transactions contemplated hereby and supersedes all prior agreements between them, written or oral.

11.    <u>Counterparts</u>.   This Agreement may be executed in any number of counterparts, including facsimile or an e-mail of a PDF file containing a copy of the signature page of the person executing this document, each of which shall be an original, but all of which together shall constitute one in the same instrument.

**[SIGNATURE PAGE TO FOLLOW]**

**IN WITNESS WHEREOF**, the parties hereto have executed this Termination Agreement as of the date first above written.

**21ST CENTURY ONCOLOGY OF NEW JERSEY, INC.**

By: _____
Name:
Title:

**HEALTH MANAGEMENT SERVICES ORGANIZATION, INC.**

By: _____
Name:
Title:

4826-0076-8325v4

# SCHEDULE 1

## WILLINGBORO ASSETS

| Asset # | FAS # | Company | Loc # | CL | Description | Serial # | Date Purch | Cost | Acc Depn | NBV |
|---|---|---|---|---|---|---|---|---|---|---|
| 028340 | 554 | NJY | 31002 | AU | 2007 KIA SEDONA SN KNDMB133876139310 | KNDMB133876139310 | 10/31/2007 | $19,396.54 | $19,396.54 | $0.00 |
| **AU (1 record)** | | | | | | | | $19,396.54 | $19,396.54 | $0.00 |
| 019486 | 4947 | LNJ | 31021 | CE | HP COMPAQ PRO 4300 | | 9/26/2013 | $552.15 | $552.15 | $0.00 |
| 019778C | 5231 | LNJ | 31021 | CE | HP COMPAQ PRO | 2UA3391X0H | 12/31/2014 | $832.10 | $832.10 | $0.00 |
| 026383 | 5 | LNJ | 31021 | CE | Computer Equipment-Purchase of Willingbo | 0 | 10/18/2004 | $500.00 | $500.00 | $0.00 |
| 026384 | 6 | LNJ | 31021 | CE | Brother 4750E Laser Fax | F4J624583 | 11/29/2004 | $100.00 | $100.00 | $0.00 |
| 026385 | 7 | LNJ | 31021 | CE | Laserjet 1300N/17 LCD" | SCNCB209825 | 11/29/2004 | $800.00 | $800.00 | $0.00 |
| 026386 | 8 | LNJ | 31021 | CE | HP Color  LaserJet 5550N Printer-w/tray | JPDC4D804G | 2/3/2005 | $1,300.00 | $1,300.00 | $0.00 |
| 026387 | 9 | LNJ | 31021 | CE | LaserJet Printer/Scanmaker | SCNFC53Y044/W4B58A00378 | 6/22/2005 | $200.00 | $200.00 | $0.00 |
| 026388 | 10 | LNJ | 31021 | CE | IBM eSERVER xSERIES 306M | 0 | 4/30/2006 | $800.00 | $800.00 | $0.00 |
| 026389 | 11 | LNJ | 31021 | CE | KYOCERA KM-3035 COPIER | K3032344 | 9/30/2004 | $5,500.00 | $5,500.00 | $0.00 |
| 026434 | 287 | LNJ | 31021 | CE | LENOVO THINKCENTRE A62 | 1S9486A3UMJ02906 | 6/1/2009 | $629.33 | $629.33 | $0.00 |
| 026447 | 345 | LNJ | 31021 | CE | FLOOR MODEL PRINTER | SCNGXL02685 | 10/1/2007 | $900.00 | $900.00 | $0.00 |
| 026471 | 421 | LNJ | 31021 | CE | LENOVO THINKPAD T510 AND CARRYING CASE | 1S43147NUR95X5XD | 11/10/2010 | $1,123.56 | $1,123.56 | $0.00 |
| 026472 | 422 | LNJ | 31021 | CE | FUJITSU 5110C SCANNER | | 11/17/2010 | $700.37 | $700.37 | $0.00 |
| 026493 | 498 | LNJ | 31021 | CE | LENOVO THINKCENTER M91P | | 5/30/2012 | $703.62 | $703.62 | $0.00 |
| 026499 | 512 | LNJ | 31021 | CE | LENOVO THINKCENTER M72E | SMJVAACN | 11/30/2012 | $595.46 | $535.91 | $59.55 |
| 026501 | 527 | LNJ | 31021 | CE | LENOVO THINKPAD EDGE E430 | 1S627155UMP1Y2TW | 3/29/2013 | $638.67 | $532.22 | $106.45 |
| 026502 | 528 | LNJ | 31021 | CE | LENOVO THINKPAD EDGE E430 | 1S627155UMP1Y2VD | 3/29/2013 | $638.67 | $532.22 | $106.45 |
| 026504 | 529 | LNJ | 31021 | CE | LENOVO THINKCENTER M92p | 1S2992A2UMJTLNRX | 3/29/2013 | $921.36 | $767.81 | $153.55 |
| 026505 | 530 | LNJ | 31021 | CE | LENOVO THINKCENTER M92p | 1S2992A2UMJTLNTB | 3/29/2013 | $921.37 | $767.82 | $153.55 |
| 026506 | 531 | LNJ | 31021 | CE | LENOVO THINKCENTER M72E | 1S0958B1UMJMPPW | 3/29/2013 | $710.48 | $592.03 | $118.45 |
| 026507 | 532 | LNJ | 31021 | CE | LENOVO THINKCENTER M72E | 1S0958B1UMJMPPY | 3/29/2013 | $710.48 | $592.03 | $118.45 |
| 026508 | 533 | LNJ | 31021 | CE | LENOVO THINKCENTER M72E | 1S0958B1UMJMPPZ | 3/29/2013 | $710.48 | $592.03 | $118.45 |
| 026509 | 534 | LNJ | 31021 | CE | LENOVO THINKCENTER M72E | 1S0958B1UMJMPPA | 3/29/2013 | $710.48 | $592.03 | $118.45 |

4826-0076-8325v4

17-22770-rdd Claim 3-1 Part 2 Filed 08/17/17 Entered 08/17/17 12:48:09 Main Document

| Asset # | FAS # | Company | Loc # | CL | Description | Serial # | Date Purch | Cost | Acc Depn | NBV |
|---------|-------|---------|-------|----|-------------|----------|------------|------|----------|-----|
| 026510 | 535 | LNJ | 31021 | CE | LENOVO THINKCENTER M72Z | 1S3548C8UMJ040D2 | 3/29/2013 | $804.99 | $670.84 | $134.15 |
| 026511 | 536 | LNJ | 31021 | CE | FUJITSU FI-6130 SCANNER | 651135 | 3/29/2013 | $1,000.49 | $833.74 | $166.75 |
| 026512 | 537 | LNJ | 31021 | CE | FUJITSU FI-6130 SCANNER | 651179 | 3/29/2013 | $1,000.50 | $833.75 | $166.75 |
| 026513 | 538 | LNJ | 31021 | CE | APC BACKUP UPS | | 3/29/2013 | $118.25 | $98.51 | $19.74 |
| 026515 | 539 | LNJ | 31021 | CE | APC BACKUP UPS | | 3/29/2013 | $118.25 | $98.51 | $19.74 |
| 026516 | 540 | LNJ | 31021 | CE | APC BACKUP UPS | | 3/29/2013 | $118.24 | $98.51 | $19.73 |
| 026517 | 541 | LNJ | 31021 | CE | VIEW SONIC VF2228 | STB130340055 | 3/29/2013 | $209.09 | $174.24 | $34.85 |
| 026518 | 542 | LNJ | 31021 | CE | VIEW SONIC VF2228 | STB130340060 | 3/29/2013 | $209.09 | $174.24 | $34.85 |
| 026519 | 543 | LNJ | 31021 | CE | VIEW SONIC VF2228 | STB130340063 | 3/29/2013 | $209.09 | $174.24 | $34.85 |
| 026520 | 544 | LNJ | 31021 | CE | VIEW SONIC VF2228 | STB130340064 | 3/29/2013 | $209.09 | $174.24 | $34.85 |
| 026521 | 545 | LNJ | 31021 | CE | VIEW SONIC VF2228 | STB130340065 | 3/29/2013 | $209.09 | $174.24 | $34.85 |
| 026522 | 546 | LNJ | 31021 | CE | VIEW SONIC VF2228 | STB130340066 | 3/29/2013 | $209.09 | $174.24 | $34.85 |
| 026523 | 547 | LNJ | 31021 | CE | VIEW SONIC VF2228 | STB130340068 | 3/29/2013 | $209.09 | $174.24 | $34.85 |
| 026524 | 548 | LNJ | 31021 | CE | VIEW SONIC VF2228 | STB130340070 | 3/29/2013 | $209.09 | $174.24 | $34.85 |
| 026526 | 549 | LNJ | 31021 | CE | VIEW SONIC VF2228 | STB130340072 | 3/29/2013 | $209.09 | $174.23 | $34.85 |
| 026528 | 642 | LNJ | 31021 | CE | CISCO AIRONET AUTO ACCESS POINT | SFGL1714Z1VU | 5/15/2013 | $572.06 | $467.18 | $104.88 |
| 026529 | 643 | LNJ | 31021 | CE | CISCO AIRONET AUTO ACCESS POINT | SFGL1714Z1WJ | 5/15/2013 | $572.05 | $467.17 | $104.88 |
| 026533 | 742 | LNJ | 31021 | CE | HP Z420 WORK STATION CONFIGURATION | 2UA313070K | 4/19/2013 | $1,521.10 | $1,242.20 | $278.90 |
| 026534 | 743 | LNJ | 31021 | CE | HP Z420 WORK STATION CONFIGURATION | 2UA313071K | 4/19/2013 | $1,521.10 | $1,242.20 | $278.90 |
| 026961 | 216 | LNJ | 31021 | CE | CANNON POWERSHOT DIGITAL CAMERA | | 1/13/2009 | $500.46 | $500.46 | $0.00 |
| 047420 | | LNJ | 31021 | CE | HP 600 G1 i7 4770 4GB DESKTOP | 2UA4252BKL | 6/30/2015 | $828.92 | $817.41 | $11.51 |
| 057206 | | LNJ | 31021 | CE | HP ELITEBOOK 840 LAPTOP | 5CG6033H4J | 3/31/2017 | $1,211.78 | $488.07 | $723.71 |
| 062240 | | LNJ | 31021 | CE | HP ELITEDESK 800 G2 | 2UA6361D1L | 3/31/2018 | $691.89 | $48.05 | $643.84 |
| CE (46 records) | | | | | | | | $33,660.46 | $29,619.98 | $4,040.48 |
| 026475 | 439 | LNJ | 31021 | CS | SOFTWARE - LANTIS HL7 INTERFACE CMS SOFTWARE SERVICE AGREEMENT | | 1/1/2011 | $18,129.01 | $18,129.01 | $0.00 |
| 026476 | 454 | LNJ | 31021 | CS | 1/1/2011- | | 1/1/2011 | $8,754.42 | $8,754.42 | $0.00 |
| 026494 | 501 | LNJ | 31021 | CS | SUP. CONTR - SOFTWARE -ELEKTA 01/01/12-1 | | 1/1/2012 | $10,839.08 | $10,839.08 | $0.00 |
| 026495 | 505 | LNJ | 31021 | CS | SUP. CONTR - SOFTWARE -TOMO EMERALD 01/0 | | 1/1/2012 | $95,043.29 | $95,043.29 | $0.00 |
| 026496 | 507 | LNJ | 31021 | CS | PIPSPRO ANNUAL SOFTWARE MAINT 11/30/2012 | | 11/30/2012 | $498.20 | $498.20 | $0.00 |
| 026500 | 519 | LNJ | 31021 | CS | SUP. CONTR - SOFTWARE -TOMO 01/01/13-12/ | 331 | 1/1/2013 | $80,250.00 | $80,250.00 | $0.00 |

4826-0076-8325v4

| Asset # | FAS # | Company | Loc # | CL | Description | Serial # | Date Purch | Cost | Acc Depn | NBV |
|---------|-------|---------|-------|----|-------------|----------|-----------|------|----------|-----|
| 026530 | 731 | LNJ | 31021 | CS | SUP. CONTR - SOFTWARE -SIEMENS 07/01/13- | | 7/1/2013 | $1,336.98 | $1,336.98 | $0.00 |
| 026532 | 738 | LNJ | 31021 | CS | SUP. CONTR - SOFTWARE -ELEKTA 01/01/2013 | | 1/1/2013 | $9,566.42 | $9,566.42 | $0.00 |
| 042506 | | LNJ | 31021 | CS | SUP. CONTR - SOFTWARE -SIEMENS-2014 | | 1/1/2014 | $2,673.96 | $2,673.96 | $0.00 |
| 042508 | | LNJ | 31021 | CS | SUP. CONTR - SOFTWARE -ACCURAY-2014 | | 1/1/2014 | $88,275.00 | $88,275.00 | $0.00 |
| 044012 | | LNJ | 31021 | CS | PIP ANNUAL SOFTWARE MAIN JAN-1-NOV-1-14 | | 1/1/2014 | $498.20 | $498.20 | $0.00 |
| 044623 | | LNJ | 31021 | CS | SUP. CONTR - SOFTWARE -ELEKTA-01/01/2014 | | 1/1/2014 | $9,566.40 | $9,566.40 | $0.00 |
| 050432 | | LNJ | 31021 | CS | SUP.CONTR-SOFT-SIEMENS-01.01.15-12.31.15 | | 1/1/2015 | $2,673.94 | $2,673.94 | $0.00 |
| 050938 | | LNJ | 31021 | CS | SUP.CONTR-SOFT-ACCURAY -1.01.15-12.31.15 | | 1/1/2015 | $75,916.00 | $75,916.00 | $0.00 |
| 051829 | | LNJ | 31021 | CS | PIP ANNUAL SOFTWARE MAIN JAN-1-NOV-30-15 | | 1/1/2015 | $498.20 | $498.20 | $0.00 |
| 052576 | | LNJ | 31021 | CS | SUP.CONTR-SOFT-ELEKTA -01.01.15-12.31.15 | | 1/1/2015 | $4,783.21 | $4,783.21 | $0.00 |
| 056086 | | LNJ | 31021 | CS | SUP.CONTR-SOFT-ACCURAY 01.01.16-12.31.16 | | 1/1/2016 | $75,916.44 | $75,916.44 | $0.00 |
| 056087 | | LNJ | 31021 | CS | SUP.CONTR-SOFT-SIEMENS 01.01.16-12.31.16 | | 1/1/2016 | $2,673.94 | $2,673.94 | $0.00 |
| 056749 | | LNJ | 31021 | CS | SUP.CONTR-SOFT LIFELINE-01.23.16-01.23.1 | | 1/23/2016 | $1,605.00 | $1,605.00 | $0.00 |
| 058787 | | LNJ | 31021 | CS | SUP.CONTR-SOFT-ELEKTA -1.29.16-1.29.17 | | 1/29/2016 | $4,470.25 | $4,470.25 | $0.00 |
| 061810 | | LNJ | 31021 | CS | SUP.CONTR-SOFT-SIEMENS-01.01.17-06.30.17 | | 1/1/2017 | $1,336.97 | $1,002.73 | $334.24 |
| 061812 | | LNJ | 31021 | CS | SUP.CONTR.SOFT-ACCURAY-01.01.17-12.31.17 | | 1/1/2017 | $75,909.05 | $28,465.89 | $47,443.16 |
| CS (22 records) | | | | | | | | $571,213.96 | $523,436.56 | $47,777.40 |
| 026390 | 61 | LNJ | 31021 | LH | Repair Damage Walls | 0 | 9/1/2007 | $3,700.00 | $3,700.00 | $0.00 |
| 026445 | 320 | LNJ | 31021 | LH | ALARM SYSTEM | | 12/31/2009 | $5,464.64 | $5,464.64 | $0.00 |
| 026446 | 329 | LNJ | 31021 | LH | Labor to Maintain Besam Swingmaster Door | | 2/28/2010 | $2,375.00 | $2,375.00 | $0.00 |
| 026474 | 432 | LNJ | 31021 | LH | FIBER OPTIC CABLING | | 12/31/2010 | $5,500.00 | $5,500.00 | $0.00 |
| 026477 | 459 | LNJ | 31021 | LH | TOMO INSTALL - SECURITY CAMERAS | | 3/31/2011 | $2,834.60 | $2,834.60 | $0.00 |
| 026478 | 460 | LNJ | 31021 | LH | TOMOTHERAPY INSTALL - AIR COMPRESSOR | | 3/31/2011 | $10,191.90 | $10,191.90 | $0.00 |
| 026479 | 461 | LNJ | 31021 | LH | TOMOTHERAPY INSTALL - PROJECT MANAGEMENT | | 3/31/2011 | $28,055.28 | $28,055.28 | $0.00 |
| 026480 | 462 | LNJ | 31021 | LH | TOMOTHERAPY INSTALL - TOMO DESIGN SERVIC | | 3/31/2011 | $29,298.81 | $29,298.81 | $0.00 |
| 026482 | 463 | LNJ | 31021 | LH | TOMO INSTALL - ELECTRICAL WIRING & CABLI | | 3/31/2011 | $3,309.35 | $3,309.35 | $0.00 |
| 026483 | 464 | LNJ | 31021 | LH | TOMOTHERAPY INSTALL - REPLACEMENT OF GU | | 3/31/2011 | $29,972.85 | $29,972.85 | $0.00 |
| 026484 | 465 | LNJ | 31021 | LH | TOMOTHERAPY INSTALL - GENERAL CONSTRUCTI | | 3/31/2011 | $124,842.00 | $124,842.00 | $0.00 |
| 026485 | 468 | LNJ | 31021 | LH | TOMO INSTALL - ELECTRICAL WIRING & CABLI | | 4/30/2011 | $1,272.44 | $1,272.44 | $0.00 |

4826-0076-8325v4

| Asset # | FAS # | Company | Loc # | CL | Description | Serial # | Date Purch | Cost | Acc Depn | NBV |
|---|---|---|---|---|---|---|---|---|---|---|
| 026486 | 471 | LNJ | 31021 | LH | TOMO INSTALL - TOMO DESIGN SERVICES | | 5/31/2011 | $2,474.00 | $2,474.00 | $0.00 |
| 026489 | 486 | LNJ | 31021 | LH | IMPROVEMENTS - CT ROOM WNJ | | 10/31/2011 | $33,298.18 | $33,298.18 | $0.00 |
| 026490 | 487 | LNJ | 31021 | LH | IMPROVEMENTS - REMODELING WNJ | | 10/31/2011 | $77,095.84 | $77,095.84 | $0.00 |
| 026491 | 488 | LNJ | 31021 | LH | IMPROVEMENTS - DOOR OPERATOR | | 11/30/2011 | $1,510.00 | $1,510.00 | $0.00 |
| 026527 | 640 | LNJ | 31021 | LH | PLUMBING INSTALLATION STAINLESS STEEL SI | | 5/31/2012 | $2,456.00 | $2,456.00 | $0.00 |
| 052577 | | LNJ | 31021 | LH | COMPRESSOR AIR | | 7/22/2019 | $3,823.60 | $1,911.82 | $1,911.78 |
| 057205 | | LNJ | 31021 | LH | LEASEHOLD IMPROVEMENT-RENOVATIONS | | 3/31/2019 | $38,385.85 | $10,049.59 | $28,336.26 |
| 057559 | | LNJ | 31021 | LH | BLOW MOTOR & PUM | | 4/14/2020 | $1,356.51 | $339.12 | $1,017.39 |
| 057861 | | LNJ | 31021 | LH | HVAC SYSTEM | | 5/25/2021 | $7,194.00 | $1,696.73 | $5,497.27 |
| 058786 | | LNJ | 31021 | LH | SONYO MINI SPLIT SYSTEM AC | | 9/22/2016 | $7,495.00 | $1,300.16 | $6,194.84 |
| LH (22 records) | | | | | | | | $421,905.85 | $378,948.31 | $42,957.54 |
| 026391 | 66 | LNJ | 31021 | MC | SIEMENS TREATSTATION INTERFACE TO MACHIN | 0 | 6/27/2008 | $24,005.71 | $24,005.71 | $0.00 |
| MC (1 record) | | | | | | | | $24,005.71 | $24,005.71 | $0.00 |
| 026393 | 67 | LNJ | 31021 | ME | QA Beam Checker | 0 | 10/21/2004 | $2,600.00 | $2,405.01 | $194.99 |
| 026394 | 68 | LNJ | 31021 | ME | Dry Air System | 0 | 10/18/2004 | $1,500.00 | $1,387.50 | $112.50 |
| 026395 | 69 | LNJ | 31021 | ME | IBeam Target Sys Addl Chge Asset57 | 0 | 10/31/2004 | $1,800.00 | $1,665.00 | $135.00 |
| 026396 | 70 | LNJ | 31021 | ME | 1984 Varian Clinac 6/100 MV | 0 | 10/18/2004 | $200.00 | $185.01 | $14.99 |
| 026397 | 71 | LNJ | 31021 | ME | 9800 GE Ct Scanner | 0 | 10/18/2004 | $3,500.00 | $3,237.51 | $262.49 |
| 026398 | 72 | LNJ | 31021 | ME | Pinnacel Treatment Planning System | 0 | 10/18/2004 | $21,800.00 | $20,165.01 | $1,634.99 |
| 026399 | 73 | LNJ | 31021 | ME | Lap Laser System w/Computer. | 0 | 10/18/2004 | $1,600.00 | $1,479.99 | $120.01 |
| 026400 | 74 | LNJ | 31021 | ME | CT Room Equipment | 0 | 10/18/2004 | $2,600.00 | $2,405.01 | $194.99 |
| 026401 | 75 | LNJ | 31021 | ME | Exam Room Equipment | 0 | 10/18/2004 | $1,000.00 | $924.99 | $75.01 |
| 026402 | 76 | LNJ | 31021 | ME | Beam Analyzer | 0 | 10/18/2004 | $900.00 | $832.50 | $67.50 |
| 026404 | 77 | LNJ | 31021 | ME | Patient TV Monitors | 0 | 10/18/2004 | $200.00 | $185.01 | $14.99 |
| 026405 | 78 | LNJ | 31021 | ME | Treatment Room Equipment | 0 | 10/18/2004 | $1,300.00 | $1,202.49 | $97.51 |
| 026406 | 79 | LNJ | 31021 | ME | Chiller Evaporator/Chiller Condenser | 0 | 1/11/2007 | $10,400.00 | $9,620.01 | $779.99 |
| 026407 | 81 | LNJ | 31021 | ME | CT Laser Marking System | 001951005 & 001952008 | 2/28/2005 | $14,500.00 | $13,412.49 | $1,087.51 |
| 026408 | 82 | LNJ | 31021 | ME | Instrument Table - Stainless | 0 | 3/21/2005 | $300.00 | $277.50 | $22.50 |
| 026409 | 83 | LNJ | 31021 | ME | Water Phantom Small Tank w/DDA | 0 | 2/25/2005 | $700.00 | $647.49 | $52.51 |
| 026410 | 84 | LNJ | 31021 | ME | Breast Board/Arm and Wrist Support | 0 | 3/10/2005 | $1,700.00 | $1,572.51 | $127.49 |

4

| Asset # | FAS # | Company | Loc # | CL | Description | Serial # | Date Purch | Cost | Acc Depn | NBV |
|---|---|---|---|---|---|---|---|---|---|---|
| 026411 | 85 | LNJ | 31021 | ME | Prime Alert Monitor w/ Remote Alarm | 0 | 3/21/2005 | $700.00 | $647.49 | $52.51 |
| 026412 | 87 | LNJ | 31021 | ME | Cassette Holder | 0 | 5/17/2005 | $1,200.00 | $1,110.00 | $90.00 |
| 026413 | 88 | LNJ | 31021 | ME | Oncologist System | 0 | 4/14/2005 | $37,900.00 | $35,057.49 | $2,842.51 |
| 026415 | 89 | LNJ | 31021 | ME | Cradle Overlay GE Prospeed | 0 | 6/23/2005 | $3,400.00 | $3,144.99 | $255.01 |
| 026416 | 90 | LNJ | 31021 | ME | IMRT Velocity | 0 | 2/28/2005 | $33,400.00 | $30,894.99 | $2,505.01 |
| 026417 | 91 | LNJ | 31021 | ME | Installation Medical Equipment | 0 | 12/31/2005 | $338,700.00 | $313,297.50 | $25,402.50 |
| 026418 | 92 | LNJ | 31021 | ME | Installation Medical Equipment | 0 | 3/1/2006 | $34,500.00 | $31,912.50 | $2,587.50 |
| 026419 | 93 | LNJ | 31021 | ME | I BEAM TARGET | 0 | 9/30/2006 | $61,500.00 | $56,887.50 | $4,612.50 |
| 026420 | 94 | LNJ | 31021 | ME | PRIMALERT | 0 | 1/31/2007 | $1,400.00 | $1,295.01 | $104.99 |
| 026421 | 95 | LNJ | 31021 | ME | HORIZON BREAST BOARD | 0 | 3/1/2007 | $2,800.00 | $2,589.99 | $210.01 |
| 026422 | 96 | LNJ | 31021 | ME | VAULT AC | 0 | 8/31/2007 | $3,100.00 | $2,867.49 | $232.51 |
| 026423 | 97 | LNJ | 31021 | ME | X-RAY CATHETER & TRANSFER TUBE | 0 | 8/31/2007 | $1,200.00 | $1,110.00 | $90.00 |
| 026424 | 98 | LNJ | 31021 | ME | VARIAN DOSIMETRY PKGE | 0 | 12/31/2007 | $26,113.09 | $24,154.64 | $1,958.45 |
| 026426 | 99 | LNJ | 31021 | ME | CENTRALITE RED DIODE SAGITTAL LASER | 7G113 | 5/12/2008 | $1,616.10 | $1,467.98 | $148.12 |
| 026427 | 100 | LNJ | 31021 | ME | Refurbished GE Prospeed w/fast recon #16 | 169688YM1 | 2/28/2008 | $19,000.00 | $17,574.99 | $1,425.01 |
| 026428 | 101 | LNJ | 31021 | ME | TRANSFER TUBE | 0 | 2/7/2008 | $476.00 | $440.31 | $35.69 |
| 026432 | 190 | LNJ | 31021 | ME | VIRTUAL WATER 30X30 | MTVW302 | 12/31/2008 | $537.62 | $452.48 | $85.14 |
| 026433 | 273 | LNJ | 31021 | ME | GREEN APOLLO 90 SINGLE LINE LASER SET | | 3/9/2009 | $3,689.36 | $3,043.71 | $645.65 |
| 026435 | 288 | LNJ | 31021 | ME | CRS ELECTROMETER | | 6/4/2009 | $2,464.26 | $1,971.42 | $492.84 |
| 026438 | 289 | LNJ | 31021 | ME | PTW CHAMBER | | 6/1/2009 | $1,812.58 | $1,450.06 | $362.52 |
| 026439 | 290 | LNJ | 31021 | ME | PTW CHAMBER | | 6/1/2009 | $1,812.58 | $1,450.06 | $362.52 |
| 026440 | 297 | LNJ | 31021 | ME | Digital Electrometer | | 8/31/2009 | $1,682.18 | $1,303.77 | $378.41 |
| 026441 | 299 | LNJ | 31021 | ME | DRILLED WATER 30X30X2 | | 8/31/2009 | $551.21 | $427.15 | $124.06 |
| 026442 | 300 | LNJ | 31021 | ME | BEAM CHECKER PLUS | | 8/31/2009 | $5,556.65 | $4,306.41 | $1,250.24 |
| 026443 | 306 | LNJ | 31021 | ME | APOLLO GREEN CROSS HAIR LASER | | 8/6/2009 | $3,381.20 | $2,648.65 | $732.55 |
| 026444 | 315 | LNJ | 31021 | ME | I BEAM TARGET TRANSPORTATION | | 9/30/2009 | $2,423.20 | $2,207.25 | $215.95 |
| 026449 | 353 | LNJ | 31021 | ME | 1 LARGE BLACK ROLLING CART | 0 | 10/1/2007 | $1,800.00 | $1,665.00 | $135.00 |
| 026461 | 407 | LNJ | 31021 | ME | VERIDOSE DIODE, 5-11MV | 3266848 | 8/31/2010 | $469.94 | $317.26 | $152.68 |
| 026462 | 410 | LNJ | 31021 | ME | TOMOTHERAPY MACHINE | 331 | 9/15/2009 | $1,358,000.00 | $916,650.06 | $441,349.94 |
| 026463 | 411 | LNJ | 31021 | ME | TOMOTHERAPY WAVEGUIDE | 331 | 9/15/2009 | $75,000.00 | $75,000.00 | $0.00 |

5

| Asset # | FAS # | Company | Loc # | CL | Description | Serial # | Date Purch | Cost | Acc Depn | NBV |
|---|---|---|---|---|---|---|---|---|---|---|
| 026464 | 412 | LNJ | 31021 | ME | TOMOTHERAPY RAY DETECTORS | 331 | 9/15/2010 | $100,000.00 | $100,000.00 | $0.00 |
| 026465 | 413 | LNJ | 31021 | ME | TOMOTHERAPY CONSOLE | 331 | 9/15/2010 | $40,000.00 | $40,000.00 | $0.00 |
| 026466 | 414 | LNJ | 31021 | ME | TOMOTHERAPY MEGATRON | 331 | 9/15/2010 | $60,000.00 | $60,000.00 | $0.00 |
| 026467 | 415 | LNJ | 31021 | ME | TOMOTHERAPY TABLE | 331 | 9/15/2010 | $100,000.00 | $67,499.94 | $32,500.06 |
| 026468 | 417 | LNJ | 31021 | ME | TOMOTHERAPY COMPUTER RACK | 331 | 9/15/2010 | $200,000.00 | $200,000.00 | $0.00 |
| 026469 | 418 | LNJ | 31021 | ME | MAP CHECK 2 IMART QA SYSTEM | 6744101 | 9/16/2010 | $35,433.47 | $23,622.37 | $11,811.10 |
| 026473 | 424 | LNJ | 31021 | ME | S/S INSTRUMENT TABLE WITH SHELF | | 11/30/2010 | $544.95 | $354.18 | $190.77 |
| 026487 | 478 | LNJ | 31021 | ME | CT SCANNER - GE LIGHTSPEED PLUS | 929215YM2 | 7/15/2011 | $187,250.00 | $187,250.00 | $0.00 |
| 026488 | 479 | LNJ | 31021 | ME | CT SCANNER - GE LIGHTSPEED PLUS | 929215YM2 | 7/15/2011 | -$3,120.83 | -$3,120.83 | $0.00 |
| 026497 | 510 | LNJ | 31021 | ME | TABLE HELIOS QA PHANTOM | | 10/16/2012 | $1,003.87 | $460.14 | $543.73 |
| 026498 | 511 | LNJ | 31021 | ME | CARBON FIBER OVERLAY TYPE "S" | | 11/19/2012 | $3,862.70 | $1,738.25 | $2,124.45 |
| 026976 | 230 | LNJ | 31021 | ME | WING BOARD | MTWB08T | 1/13/2009 | $682.37 | $574.35 | $108.02 |
| 044622 | | LNJ | 31021 | ME | SBRT BODY RESPIRATORY BELT | | 3/28/2014 | $1,619.98 | $519.75 | $1,100.23 |
| 045272 | | LNJ | 31021 | ME | SBRT BODY PRO-LOK SYSTEM LITE | | 2/28/2014 | $29,939.67 | $9,855.24 | $20,084.43 |
| 045753 | | LNJ | 31021 | ME | SBRT BODY RESPIRATORY BELT | | 3/28/2014 | $0.00 | $0.00 | $0.00 |
| 045754 | | LNJ | 31021 | ME | WINGBOARD | | 3/28/2014 | $700.49 | $224.83 | $475.66 |
| 054413 | | LNJ | 31021 | ME | SBRT BODY RESPIRATORY PLATE | | 11/10/2014 | $872.05 | $134.49 | $737.56 |
| ME (64 records) | | | | | | | | $2,851,574.69 | $2,288,063.89 | $563,510.80 |
| 026429 | 162 | LNJ | 31021 | OE | Furniture from Purchase of Willingboro | 0 | 10/18/2004 | $3,100.00 | $3,100.00 | $0.00 |
| 026430 | 163 | LNJ | 31021 | OE | TASK CHAIR SWIVEL | 0 | 5/10/2005 | $223.84 | $223.84 | $0.00 |
| 026431 | 164 | LNJ | 31021 | OE | BOOKCASE 5-SHELF | 0 | 9/29/2009 | $302.08 | $302.08 | $0.00 |
| 026450 | 354 | LNJ | 31021 | OE | FLOOR LIGHT and SCALE | 0 | 10/17/2007 | $5,833.34 | $5,833.34 | $0.00 |
| 026451 | 386 | LNJ | 31021 | OE | CORNER DESK 66000 SER | 0 | 5/10/2011 | $276.28 | $276.28 | $0.00 |
| 026452 | 387 | LNJ | 31021 | OE | DESK 66000 SERIES 48 | 0 | 5/10/2011 | $190.58 | $190.58 | $0.00 |
| 026453 | 388 | LNJ | 31021 | OE | DESK 66000 SERIES 60 | 0 | 5/10/2011 | $409.30 | $409.30 | $0.00 |
| 026454 | 389 | LNJ | 31021 | OE | DESK DBL PEDESTAL | 0 | 9/29/2009 | $831.18 | $831.18 | $0.00 |
| 026455 | 390 | LNJ | 31021 | OE | CHAIR HIGHBACK BLACK | 0 | 9/29/2009 | $226.55 | $226.55 | $0.00 |
| 026456 | 391 | LNJ | 31021 | OE | CHAIR HIGHBACK LEATH | 0 | 9/29/2009 | $364.26 | $364.26 | $0.00 |
| 026457 | 392 | LNJ | 31021 | OE | CHAIR GUEST BLACK | 0 | 9/29/2009 | $665.34 | $665.34 | $0.00 |
| 026458 | 393 | LNJ | 31021 | OE | PANELL 72x60 W/WALL CONNECTOR | 0 | 9/29/2009 | $210.59 | $210.59 | $0.00 |

4826-0076-8325v4

| Asset # | FAS # | Company | Loc # | CL | Description | Serial # | Date Purch | Cost | Acc Depn | NBV |
|---|---|---|---|---|---|---|---|---|---|---|
| OE (12 records) | | | | | | | | $12,633.34 | $12,633.34 | $0.00 |
| 026460 | 401 | LNJ | 31021 | TE | CISCO IP PHONE, 2900 ROUTER, & POE SWITC | | 6/29/2010 | $14,266.99 | $14,266.99 | $0.00 |
| TE (1 record) | | | | | | | | $14,266.99 | $14,266.99 | $0.00 |
| 31021 (168 records) | | | | | | | Total | $3,948,657.54 | $3,290,371.32 | $658,286.22 |

4826-0076-8325v4

## SCHEDULE 2

## HMSO ASSUMED CONTRACTS

1.       Office Lease for Suites 4A, B, C and D, Rancocas Valley Professional Arts Building (inclusive of Modification and Extension Agreement Number One and Number Two)

2.       B-Safe Electron Protective Systems dated February 19, 2014

3.       Vanguard Service Agreement

4.       RICOH (account number 1395342-3303473)

1

## SCHEDULE 3

### WILLINGBORO PREPAID EXPENSES; SUPPLIES AND INVENTORY

| | |
|---|---|
| Prepaid Annual License – NJ Division of Health | $2,500 |
| Prepaid Accreditation License – ACRO | $2,500 |
| Prepaid Property Taxes | $16,115 |
| Prepaid Software Licenses | $5,079 |
| Supplies and Inventory | $250 |
| | |
| Total | $ |

4826-0076-8325v4

# SCHEDULE 4

## VOORHEES AND HAMMONTON ASSETS

| Asset # | FAS # | Company | Loc # | CL | Description | Serial # | Date Purch | Cost | Acc Depn | NBV |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | VOORHEES | | | | |
| 015403 | 738 | NJY | 31002 | CE | HP PROBOOK 4540S | 2CE3351VC2 | 11/15/2013 | $718.51 | $718.51 | $0.00 |
| 026535 | 13 | NJY | 31002 | CE | Computer Equipment | 0 | 9/21/2004 | $300.00 | $300.00 | $0.00 |
| 026537 | 14 | NJY | 31002 | CE | HP Color LaserJet 5500 Printer | JPEK001288 | 10/9/2004 | $1,100.00 | $1,100.00 | $0.00 |
| 026538 | 15 | NJY | 31002 | CE | Syncmaster | 0 | 7/8/2005 | $400.00 | $400.00 | $0.00 |
| 026539 | 16 | NJY | 31002 | CE | Intellifax 4750E Laser Print | 0 | 11/25/2005 | $200.00 | $200.00 | $0.00 |
| 026540 | 17 | NJY | 31002 | CE | VIEWSONIC 20.1 LCD" | 0 | 9/1/2006 | $300.00 | $300.00 | $0.00 |
| 026541 | 18 | NJY | 31002 | CE | INFOCUS PROJECTOR | 1SANEV644R0520 | 2/28/2007 | $900.00 | $900.00 | $0.00 |
| 026542 | 19 | NJY | 31002 | CE | HP LJ PRINTER | SCNRC6BT52G | 3/1/2007 | $300.00 | $300.00 | $0.00 |
| 026543 | 20 | NJY | 31002 | CE | Hp 17 Panel display | 0 | 5/31/2007 | $300.00 | $300.00 | $0.00 |
| 026544 | 21 | NJY | 31002 | CE | LENOVO THINKPAD T61 w/acc | 1S765803UL3B8960 | 10/31/2007 | $1,402.72 | $1,402.72 | $0.00 |
| 026582 | 184 | NJY | 31002 | CE | CISCO SECURITY BUNDLE ROUTER | FTX1238A0FE | 10/31/2008 | $2,440.29 | $2,440.29 | $0.00 |
| 026583 | 185 | NJY | 31002 | CE | CISCO MULTIFLEX INTERFACE CARD SMARTNET | FOC12353P8U | 10/31/2008 | $1,682.29 | $1,682.29 | $0.00 |
| 026586 | 189 | NJY | 31002 | CE | LENOVO THINKPAD T500 WITH 2007 MS OFFICE | | 11/20/2008 | $1,762.08 | $1,762.08 | $0.00 |
| 026587 | 192 | NJY | 31002 | CE | INFOCUS PROJECTOR AND PROJECTOR CASE | | 12/31/2008 | $1,031.41 | $1,031.41 | $0.00 |
| 026598 | 294 | NJY | 31002 | CE | CISCO CATALYST | SFOC1320W08E | 7/28/2009 | $3,598.23 | $3,598.23 | $0.00 |
| 026601 | 343 | NJY | 31002 | CE | Computer | 0 | 10/1/2007 | $4,700.00 | $4,700.00 | $0.00 |
| 026602 | 346 | NJY | 31002 | CE | SCANNER, FUJITSU fi5120C | 54127 | 10/1/2007 | $800.00 | $800.00 | $0.00 |
| 026604 | 347 | NJY | 31002 | CE | PRINTER, HP LJ 2420d | SCNGJD49475 | 10/1/2007 | $400.00 | $400.00 | $0.00 |
| 026630 | 395 | NJY | 31002 | CE | Cisco 2800 Router Upgrade | | 6/29/2010 | $829.25 | $829.25 | $0.00 |
| 026631 | 398 | NJY | 31002 | CE | Lenovo Thinkpad T500, Targus Case, Optic | SR8564YX | 6/7/2010 | $1,339.56 | $1,339.56 | $0.00 |
| 026632 | 400 | NJY | 31002 | CE | IBM SYSTEM, PROCESSOR, MEMORY, HARD DRIV | 1.11104733333371E17 | 7/14/2010 | $5,700.98 | $5,700.98 | $0.00 |
| 026635 | 419 | NJY | 31002 | CE | GE SFP LC CONNECTOR SX TRANSCEIVER | | 10/29/2010 | $1,193.67 | $1,193.67 | $0.00 |
| 026638 | 426 | NJY | 31002 | CE | LENOVO THINKCENTRE M90P 3282 | | 12/31/2010 | $854.51 | $854.51 | $0.00 |

4826-0076-8325v4

17-22770-rdd    Doc 335    Filed 08/17/17    Entered 08/17/17 12:48:09    Main Docum

| Asset # | FAS # | Company | Loc # | CL | Description | Serial # | Date Purch | Cost | Acc Depn | NBV |
|---------|-------|---------|-------|-----|-------------|----------|------------|------|----------|-----|
| | | | | | **VOORHEES** | | | | | |
| 026640 | 436 | NJY | 31002 | CE | LENOVO THINKCENTRE M70E | | 12/31/2010 | $510.01 | $510.01 | $0.00 |
| 026646 | 475 | NJY | 31002 | CE | RARITAN DOMINION KVM SWITCH | HKG1400083 | 7/22/2011 | $2,353.50 | $2,353.50 | $0.00 |
| 026648 | 476 | NJY | 31002 | CE | BELKIN 17" LCD RACK KVM CONSOLE | 101101000051 | 7/22/2011 | $640.75 | $640.75 | $0.00 |
| 026653 | 494 | NJY | 31002 | CE | FTSERVER 4500 | | 1/17/2012 | $40,615.48 | $40,615.48 | $0.00 |
| 026655 | 499 | NJY | 31002 | CE | LENOVO THINKCENTER M71E | | 5/30/2012 | $559.17 | $559.17 | $0.00 |
| 026661 | 509 | NJY | 31002 | CE | LENOVO THINKPAD T530 | R9RRBMY | 10/31/2012 | $1,028.89 | $943.16 | $85.73 |
| 026665 | 550 | NJY | 31002 | CE | LENOVO THINKCENTER M92p | | 3/29/2013 | $881.07 | $734.22 | $146.85 |
| 026666 | 551 | NJY | 31002 | CE | LENOVO THINKCENTER M92p | | 3/29/2013 | $881.07 | $734.22 | $146.85 |
| 026667 | 552 | NJY | 31002 | CE | LENOVO THINKCENTER M72E | 1S0958B1UMJ080K9 | 3/29/2013 | $632.74 | $527.29 | $105.45 |
| 026668 | 553 | NJY | 31002 | CE | LENOVO THINKCENTER M72E | 1S0958B1UMJ080M4 | 3/29/2013 | $632.74 | $527.29 | $105.45 |
| 026669 | 554 | NJY | 31002 | CE | LENOVO THINKCENTER M72E | 1S0958B1UMJ080N3 | 3/29/2013 | $603.87 | $503.22 | $100.65 |
| 026670 | 555 | NJY | 31002 | CE | LENOVO THINKCENTER M72E | 1S0958B1UMJ080N5 | 3/29/2013 | $603.87 | $503.22 | $100.65 |
| 026672 | 556 | NJY | 31002 | CE | LENOVO THINKPAD EDGE E430 | 1S627155UMP33CKK | 3/29/2013 | $781.54 | $651.29 | $130.25 |
| 026673 | 557 | NJY | 31002 | CE | LENOVO THINKPAD EDGE E430 | 1S627155UMP33CZB | 3/29/2013 | $781.54 | $651.29 | $130.25 |
| 026674 | 558 | NJY | 31002 | CE | LENOVO THINKCENTER M72Z | 1S3548C8UMJ7923G | 3/29/2013 | $816.14 | $680.09 | $136.05 |
| 026675 | 559 | NJY | 31002 | CE | FUJITSU FI-6110 SCANNER | 504415 | 3/29/2013 | $715.74 | $596.49 | $119.25 |
| 026676 | 560 | NJY | 31002 | CE | FUJITSU FI-6130 SCANNER | 643215 | 3/29/2013 | $954.35 | $795.30 | $159.05 |
| 026677 | 561 | NJY | 31002 | CE | FUJITSU FI-6130 SCANNER | 543221 | 3/29/2013 | $954.35 | $795.30 | $159.05 |
| 026678 | 562 | NJY | 31002 | CE | APC BACKUP UPS | | 3/29/2013 | $109.06 | $90.91 | $18.15 |
| 026679 | 563 | NJY | 31002 | CE | APC BACKUP UPS | | 3/29/2013 | $109.06 | $90.91 | $18.15 |
| 026680 | 564 | NJY | 31002 | CE | APC BACKUP UPS | | 3/29/2013 | $109.05 | $90.90 | $18.15 |
| 026683 | 566 | NJY | 31002 | CE | VIEW SONIC VF2228 | STB125240572 | 3/29/2013 | $196.12 | $163.47 | $32.65 |
| 026684 | 567 | NJY | 31002 | CE | VIEW SONIC VF2228 | STB125240574 | 3/29/2013 | $196.12 | $163.47 | $32.65 |
| 026685 | 568 | NJY | 31002 | CE | VIEW SONIC VF2228 | STB125240575 | 3/29/2013 | $196.12 | $163.47 | $32.65 |
| 026686 | 569 | NJY | 31002 | CE | VIEW SONIC VF2228 | STB125240576 | 3/29/2013 | $196.12 | $163.47 | $32.65 |
| 026687 | 570 | NJY | 31002 | CE | VIEW SONIC VF2228 | STB125240577 | 3/29/2013 | $196.12 | $163.47 | $32.65 |
| 026688 | 571 | NJY | 31002 | CE | VIEW SONIC VF2228 | STB125240578 | 3/29/2013 | $196.12 | $163.47 | $32.65 |
| 026689 | 572 | NJY | 31002 | CE | VIEW SONIC VF2228 | STB125240580 | 3/29/2013 | $196.13 | $163.48 | $32.65 |
| 026690 | 573 | NJY | 31002 | CE | VIEW SONIC VF2228 | STB125240581 | 3/29/2013 | $196.13 | $163.48 | $32.65 |

4826-0076-8325v4

| Asset # | FAS # | Company | Loc # | CL | Description | Serial # | Date Purch | Cost | Acc Depn | NBV |
|---|---|---|---|---|---|---|---|---|---|---|
| 026691 | 574 | NJY | 31002 | CE | VIEW SONIC VF2228 | STB125240582 | 3/29/2013 | $196.13 | $163.48 | $32.65 |
| 026692 | 575 | NJY | 31002 | CE | FT SERVER 4500 RACK MOUNTABLE 2 | | 3/29/2013 | $40,976.60 | $34,147.15 | $6,829.45 |
| 026694 | 576 | NJY | 31002 | CE | APC NETSHELTER ENCLOSURE WI RACK | S8N1303E21972 | 3/29/2013 | $1,525.82 | $1,271.50 | $254.32 |
| 026695 | 577 | NJY | 31002 | CE | BELKIN WIDESCREEN RACK CONSOLE | | 3/29/2013 | $654.17 | $545.12 | $109.05 |
| 026696 | 578 | NJY | 31002 | CE | KIM SWITCH | | 3/29/2013 | $4,778.63 | $3,982.18 | $796.45 |
| 026697 | 579 | NJY | 31002 | CE | APC SWITCHD RACK  PDU POWER DISCRIBUTION | | 3/29/2013 | $733.91 | $611.56 | $122.35 |
| 026698 | 580 | NJY | 31002 | CE | APC SWITCHD RACK  PDU POWER DISCRIBUTION | | 3/29/2013 | $891.29 | $742.74 | $148.55 |
| 026699 | 581 | NJY | 31002 | CE | APC SWITCHD RACK  PDU POWER DISCRIBUTION | | 3/29/2013 | $479.33 | $399.48 | $79.85 |
| 026700 | 582 | NJY | 31002 | CE | APC SMART UPS 3000 LCD | SIS1249003254 | 3/29/2013 | $1,325.23 | $1,104.38 | $220.85 |
| 026701 | 583 | NJY | 31002 | CE | APC SMART UPS 3000 LCD | SIS1249003255 | 3/29/2013 | $1,325.22 | $1,104.37 | $220.85 |
| 026705 | 644 | NJY | 31002 | CE | CISCO AIRONET AUTO ACCESS POINT | SFGL1714Z1W0 | 5/15/2013 | $572.06 | $467.18 | $104.88 |
| 026706 | 645 | NJY | 31002 | CE | CISCO AIRONET AUTO ACCESS POINT | SFGL1714Z1WC | 5/15/2013 | $572.06 | $467.18 | $104.88 |
| 026707 | 650 | NJY | 31002 | CE | IBM MEMORY 2GB -QTY 12 | | 5/10/2013 | $638.88 | $521.78 | $117.10 |
| 026708 | 651 | NJY | 31002 | CE | HP WORKSTATION Z420 | 2UA3071X90 | 5/10/2013 | $1,084.76 | $885.92 | $198.84 |
| 026709 | 652 | NJY | 31002 | CE | HP WORKSTATION Z420 | 2UA3071X8V | 5/10/2013 | $1,084.75 | $885.91 | $198.84 |
| 026710 | 653 | NJY | 31002 | CE | HP WORKSTATION Z420 | 2UA3071X92 | 5/10/2013 | $1,084.75 | $885.91 | $198.84 |
| 026711 | 654 | NJY | 31002 | CE | INTEL QUAD CORE PROCESSOR | | 5/10/2013 | $513.08 | $418.98 | $94.10 |
| 026712 | 655 | NJY | 31002 | CE | INTEL QUAD CORE PROCESSOR | | 5/10/2013 | $513.08 | $418.98 | $94.10 |
| 026713 | 656 | NJY | 31002 | CE | INTEL QUAD CORE PROCESSOR | | 5/10/2013 | $513.09 | $418.99 | $94.10 |
| 026716 | 725 | NJY | 31002 | CE | HP ULTROSLIM DCOCKING STATION | CNU324ZV19 | 7/29/2013 | $145.07 | $111.26 | $33.81 |
| 026718 | 727 | NJY | 31002 | CE | APC-BACK-UPS | | 7/29/2013 | $65.44 | $50.14 | $15.30 |
| 026719 | 728 | NJY | 31002 | CE | HP LASERJET PRO 400 M401N PRINTER | VNG614544 | 7/29/2013 | $328.47 | $251.82 | $76.65 |
| 026720 | 729 | NJY | 31002 | CE | HP PRO BOOK 4540S COMPUTER | 2CE3240N10 | 7/29/2013 | $771.57 | $591.56 | $180.01 |
| 026723 | 735 | NJY | 31002 | CE | 4 PORT VOICE INTERFACE CARD | | 8/27/2013 | $584.55 | $584.55 | $0.00 |
| 026960 | 215 | NJY | 31002 | CE | BROTHER MFC-8220 21 PPM FAX QTY 2 | G8J425405, G8J425457 | 1/13/2009 | $1,000.19 | $1,000.19 | $0.00 |
| 027035 | 615 | NJY | 31002 | CE | LENOVO THINKPAD EDGE E430 | 1S627155UMP22CXV | 3/29/2013 | $730.36 | $608.61 | $121.75 |
| 041772 | 2245 | NJY | 31002 | CE | HP ELITEBOOK FOLIO 9470M | CNU338BYMH | 10/21/2013 | $1,611.20 | $1,611.20 | $0.00 |
| 042500 | | NJY | 31002 | CE | HP SB 600I7-4770 DESKTOP | 2UA3511N11 | 1/31/2014 | $906.86 | $906.86 | $0.00 |
| 042501 | | NJY | 31002 | CE | HP SB 4300 I3 DESKTOP | 2UA4010D9X | 1/31/2014 | $545.19 | $545.19 | $0.00 |

4826-0076-8325v4

| Asset # | FAS # | Company | Loc # | CL | Description | Serial # | Date Purch | Cost | Acc Depn | NBV |
|---------|-------|---------|-------|-----|-------------|----------|-----------|------|----------|-----|
| | | | | | **VOORHEES** | | | | | |
| 042502 | | NJY | 31002 | CE | HP SB 450 I5 DESKTOP | 2CE346283Q | 1/31/2014 | $730.01 | $730.01 | $0.00 |
| 042503 | | NJY | 31002 | CE | HP SB 450 I5 DESKTOP | CNU35295H8 | 1/1/2014 | $1,701.83 | $1,701.83 | $0.00 |
| 045496 | | NJY | 31002 | CE | DELL SERVER | | 4/30/2014 | $22,337.39 | $22,337.39 | $0.00 |
| 046071 | | NJY | 31002 | CE | FUJITSU FI-6130Z SCANNER | A36D012415 | 1/31/2014 | $987.59 | $987.59 | $0.00 |
| 048505 | | NJY | 31002 | CE | HP 450 i5-4210U 500GB 4GB LAPTOP | CND43210M0 | 11/28/2014 | $778.30 | $659.41 | $118.89 |
| 051667 | | NJY | 31002 | CE | HP STORAGE WORKS DAT 72 USB | | 4/30/2015 | $503.12 | $356.38 | $146.74 |
| 058406 | | NJY | 31002 | CE | DUAL UPGRADE VRTX | | 5/31/2016 | $1,551.01 | $538.51 | $1,012.50 |
| CE (88 records) | | | | | | | | $183,837.46 | $170,170.58 | $13,666.88 |
| 026580 | 183 | NJY | 31002 | CS | ONCOR IMPRESSION SOFTWARE | | 10/1/2008 | $3,210.00 | $3,210.00 | $0.00 |
| 026588 | 194 | NJY | 31002 | CS | SIEMENS ONCOR IMPRESSION CONTRACT 07/01/ | | 7/1/2008 | $12,840.00 | $12,840.00 | $0.00 |
| 026590 | 267 | NJY | 31002 | CS | SUP. CONTR - LANTIS - 02/07/09-02/06/10 | | 2/7/2009 | $19,423.71 | $19,423.71 | $0.00 |
| 026641 | 440 | NJY | 31002 | CS | SUP. CONTR - SOFTWARE SIEMENS 1/1/2011-1 | | 1/1/2011 | $11,769.96 | $11,769.96 | $0.00 |
| 026642 | 441 | NJY | 31002 | CS | SUP. CONTR - SOFTWARE SIEMENS PERFORMANC | | 1/1/2011 | $38,669.52 | $38,669.52 | $0.00 |
| 026644 | 455 | NJY | 31002 | CS | CMS SOFTWARE SERVICE AGREEMENT 1/1/2011- | | 1/1/2011 | $7,818.17 | $7,818.17 | $0.00 |
| 026649 | 481 | NJY | 31002 | CS | PIPSPRO QC SECURITY LICENSE | | 10/25/2011 | $401.59 | $401.59 | $0.00 |
| 026654 | 495 | NJY | 31002 | CS | FTSERVER 4500 SOFTWARE SUPPORT | | 1/17/2012 | $3,983.00 | $3,983.00 | $0.00 |
| 026656 | 502 | NJY | 31002 | CS | SUP. CONTR - SOFTWARE -ELEKTA 01/01/12-1 | | 1/1/2012 | $8,752.64 | $8,752.64 | $0.00 |
| 026657 | 508 | NJY | 31002 | CS | PIPSPRO ANNUAL SOFTWARE MAINT 11/30/2012 | | 11/30/2012 | $498.20 | $498.20 | $0.00 |
| 026721 | 730 | NJY | 31002 | CS | MICROSOF OFFICE STD 2013 | | 7/29/2013 | $316.58 | $316.58 | $0.00 |
| 026725 | 739 | NJY | 31002 | CS | SUP. CONTR - SOFTWARE -ELEKTA 01/01/2013 | | 1/1/2013 | $8,583.35 | $8,583.35 | $0.00 |
| 044013 | | NJY | 31002 | CS | PIP ANNUAL SOFTWARE MAIN JAN-1-NOV-1-14 | | 1/1/2014 | $498.20 | $498.20 | $0.00 |
| 044624 | | NJY | 31002 | CS | SUP. CONTR - SOFTWARE -ELEKTA-01/01/2014 | | 1/1/2014 | $8,583.36 | $8,583.36 | $0.00 |
| 051668 | | NJY | 31002 | CS | SUP.CONTR-SOFT-ELEKTA -01.01.15-05.15 | | 1/1/2015 | $23,540.00 | $23,540.00 | $0.00 |
| 051826 | | NJY | 31002 | CS | PIP ANNUAL SOFTWARE MAIN JAN-1-NOV-30-15 | | 1/1/2015 | $498.20 | $498.20 | $0.00 |
| 052580 | | NJY | 31002 | CS | SUP.CONTR-SOFT-ELEKTA -01.01.15-12.31.15 | | 1/1/2015 | $4,291.68 | $4,291.68 | $0.00 |
| 052582 | | NJY | 31002 | CS | SUP.CONTR-SOFT-ELEKTA -05.06.15-05.05.16 | | 5/6/2015 | $23,540.00 | $23,540.00 | $0.00 |
| 053583 | | NJY | 31002 | CS | IQ SCRIPTS EDITOR SOFTWARE | | 9/30/2015 | $13,482.00 | $7,677.25 | $5,804.75 |
| 056088 | | NJY | 31002 | CS | SUP.CONTR-SOFT-SIEMENS 01.01.16-12.31.16 | | 1/1/2016 | $39,716.71 | $39,716.71 | $0.00 |
| 056812 | | NJY | 31002 | CS | SUP.CONTR-SOFT LIFELINE-01.23.16-01.23.1 | | 1/23/2016 | $1,605.00 | $1,605.00 | $0.00 |

4826-0076-8325v4

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **VOORHEES** | | | | |
| Asset # | FAS # | Company | Loc # | CL | Description | Serial # | Date Purch | Cost | Acc Depn | NBV |
| 058280 | | NJY | 31002 | CS | INDIVIDUAL PORTAL INTEGRATIONS-BRANDING | | 7/31/2016 | $2,500.00 | $729.15 | $1,770.85 |
| 058281 | | NJY | 31002 | CS | SUP. CONTR - SOFT-ELEKTA-05.6.16-5.5.17 | | 5/6/2016 | $22,000.00 | $22,000.00 | $0.00 |
| 058405 | | NJY | 31002 | CS | DELL ENTERPRISE DEPLOYMENT | | 5/31/2016 | $685.58 | $238.02 | $447.56 |
| 058805 | | NJY | 31002 | CS | SUP.CONTR-SOFT-ELEKTA -1.29.16-1.29.17 | | 1/29/2016 | $4,010.88 | $4,010.88 | $0.00 |
| CS (25 records) | | | | | | | | $261,218.33 | $253,195.17 | $8,023.16 |
| 026545 | 62 | NJY | 31002 | LH | Vault Construction | 0 | 9/21/2004 | $12,500.00 | $12,500.00 | $0.00 |
| 026546 | 63 | NJY | 31002 | LH | Vault Cost - Adjusted Depreciation | 0 | 1/1/2005 | $120,300.00 | $120,300.00 | $0.00 |
| 026549 | 64 | NJY | 31002 | LH | COOLING SYSTEM - CO ROOM | 0 | 9/30/2007 | $6,900.00 | $6,900.00 | $0.00 |
| 026591 | 272 | NJY | 31002 | LH | RESET HP2 ALARM STAGE 2 RESTARTED | | 2/28/2009 | $790.70 | $790.70 | $0.00 |
| 026594 | 276 | NJY | 31002 | LH | COMPRESSOR  INSTALLATION | 37D01143D | 3/12/2009 | $2,289.00 | $2,289.00 | $0.00 |
| 026597 | 286 | NJY | 31002 | LH | AC PUMP REPLACEMENT | | 5/1/2009 | $3,106.70 | $3,106.70 | $0.00 |
| 026600 | 311 | NJY | 31002 | LH | DRAKE CHILLER REPAIRS | | 9/30/2009 | $1,837.05 | $1,837.05 | $0.00 |
| 026639 | 433 | NJY | 31002 | LH | FIBER OPTIC CABLING | | 12/31/2010 | $5,500.00 | $5,500.00 | $0.00 |
| 026703 | 641 | NJY | 31002 | LH | LINAC DOOR REPAIR | | 5/31/2013 | $1,198.40 | $1,198.40 | $0.00 |
| LH (9 records) | | | | | | | | $154,421.85 | $154,421.85 | $0.00 |
| 026589 | 254 | NJY | 31002 | MC | EQUIP. - GANTRY 3RD PARTY RELOADED X RAY | 43394 | 1/1/2009 | $18,797.85 | $15,821.59 | $2,976.26 |
| MC (1 record) | | | | | | | | $18,797.85 | $15,821.59 | $2,976.26 |
| 026552 | 104 | NJY | 31002 | ME | CMS Treatment Planning | 0 | 9/21/2004 | $23,400.00 | $21,645.00 | $1,755.00 |
| 026554 | 106 | NJY | 31002 | ME | Vaclok Compressor System | 0 | 9/23/2004 | $800.00 | $740.01 | $59.99 |
| 026555 | 107 | NJY | 31002 | ME | QA Beam Checker | 0 | 10/21/2004 | $2,600.00 | $2,405.01 | $194.99 |
| 026556 | 108 | NJY | 31002 | ME | CT 4-1 Red Laser Post/Install & Manuals | 003995002/004161001 | 1/31/2005 | $21,800.00 | $20,165.01 | $1,634.99 |
| 026557 | 109 | NJY | 31002 | ME | Lantis | 0 | 6/21/2005 | $153,700.00 | $142,172.49 | $11,527.51 |
| 026558 | 110 | NJY | 31002 | ME | QA Beam Checker | Q051740 | 7/12/2005 | $3,400.00 | $3,144.99 | $255.01 |
| 026561 | 112 | NJY | 31002 | ME | Prima Alert/Chamber Farmer Calibrated/Vi | 0 | 7/29/2005 | $5,800.00 | $5,364.99 | $435.01 |
| 026562 | 113 | NJY | 31002 | ME | SRVY METER,MAIN ASSY,BATTERY, CD,PROBE,I | NONE | 9/1/2005 | $3,200.00 | $2,960.01 | $239.99 |
| 026563 | 114 | NJY | 31002 | ME | Installation Medical Equipment | 0 | 12/31/2005 | $170,100.00 | $157,342.50 | $12,757.50 |
| 026564 | 115 | NJY | 31002 | ME | Installation Medical Equipment | 0 | 3/1/2006 | $17,300.00 | $16,002.51 | $1,297.49 |
| 026565 | 116 | NJY | 31002 | ME | TARGETING SYSTEM | 0 | 9/1/2006 | $59,900.00 | $55,407.51 | $4,492.49 |
| 026566 | 117 | NJY | 31002 | ME | Installation  Scanner | 233866CN3 | 12/1/2006 | $42,200.00 | $39,035.01 | $3,164.99 |

5

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **VOORHEES** | | | | | | | | | | |
| **Asset #** | **FAS #** | **Company** | **Loc #** | **CL** | **Description** | **Serial #** | **Date Purch** | **Cost** | **Acc Depn** | **NBV** |
| 026567 | 118 | NJY | 31002 | ME | CLYSTRON KIT COMPACT | 0 | 1/31/2007 | $94,200.00 | $87,135.00 | $7,065.00 |
| 026569 | 120 | NJY | 31002 | ME | COUCH TOP CARBON PROSPEED | 0 | 2/28/2007 | $5,600.00 | $5,180.01 | $419.99 |
| 026571 | 121 | NJY | 31002 | ME | QA PHANTOM HOLDER | 0 | 2/28/2007 | $600.00 | $555.00 | $45.00 |
| 026572 | 122 | NJY | 31002 | ME | VAULT AC | 0 | 7/31/2007 | $7,700.00 | $7,122.51 | $577.49 |
| 026573 | 123 | NJY | 31002 | ME | SIEMENS - MVISION BEAM | 0 | 8/31/2007 | $200,500.00 | $185,462.49 | $15,037.51 |
| 026574 | 124 | NJY | 31002 | ME | GREEN ASTOR SINGLE CROSSHAIR LASER SET | 0 | 4/30/2008 | $3,132.96 | $2,845.80 | $287.16 |
| 026584 | 186 | NJY | 31002 | ME | ION CHAMBER SURVEY METER | 451B-RYR | 10/2/2008 | $2,182.73 | $1,891.71 | $291.02 |
| 026593 | 274 | NJY | 31002 | ME | GREEN APOLLO CROSSHAIR SINGLE LASER SET | | 3/4/2009 | $3,395.50 | $2,801.31 | $594.19 |
| 026599 | 302 | NJY | 31002 | ME | DRILLED WATER 30X30X2 | | 8/31/2009 | $551.21 | $427.15 | $124.06 |
| 026605 | 351 | NJY | 31002 | ME | EXAM TABLE | 0 | 10/1/2007 | $4,500.00 | $4,162.50 | $337.50 |
| 026606 | 352 | NJY | 31002 | ME | EXAM TABLE | 0 | 10/1/2007 | $3,500.00 | $3,237.51 | $262.49 |
| 026634 | 406 | NJY | 31002 | ME | GREEN ASOTR SINGLE CROSSHAIR LASER SET | | 8/3/2010 | $3,468.94 | $2,370.52 | $1,098.42 |
| 026643 | 451 | NJY | 31002 | ME | MIMI PHANTOM | | 2/4/2011 | $1,075.26 | $680.97 | $394.29 |
| 026645 | 470 | NJY | 31002 | ME | SIEMENS ZXT COUCHTOP | | 5/9/2011 | $24,740.08 | $15,050.32 | $9,689.76 |
| 026650 | 483 | NJY | 31002 | ME | MLC QA PHANTOM | | 10/25/2011 | $591.71 | $330.33 | $261.38 |
| 026664 | 526 | NJY | 31002 | ME | GREN APOLLO CROSSHAIR SINGEL LASER SET | | 2/13/2013 | $4,185.84 | $1,813.78 | $2,372.06 |
| 026724 | 736 | NJY | 31002 | ME | GREEN APOLLO CROSSHAIR SINGLE LASER SET | | 8/29/2013 | $3,377.19 | $1,266.31 | $2,110.88 |
| 047103 | | NJY | 31002 | ME | QA BEAMCHECKER PLUS | | 6/24/2013 | $6,146.08 | $1,818.30 | $4,327.78 |
| 056819 | | NJY | 31002 | ME | DUAL DIODE DOSIMETER | 3373046 | 2/22/2016 | $2,525.02 | $326.12 | $2,198.90 |
| ME (31 records) | | | | | | | | $876,172.52 | $790,862.68 | $85,309.84 |
| 026576 | 165 | NJY | 31002 | OE | Furniture & Fixtures | 0 | 9/21/2004 | $4,200.00 | $4,200.00 | $0.00 |
| 026577 | 166 | NJY | 31002 | OE | Tables, Bookcase, Tackboard, Credenza, D | 0 | 4/5/2005 | $1,800.00 | $1,800.00 | $0.00 |
| 026607 | 356 | NJY | 31002 | OE | 12 ARM CHAIRS | 0 | 10/1/2007 | $350.00 | $350.00 | $0.00 |
| 026608 | 357 | NJY | 31002 | OE | 2 END TABLES | 0 | 10/1/2007 | $291.67 | $291.67 | $0.00 |
| 026609 | 358 | NJY | 31002 | OE | 2 ARM CHAIRS | 0 | 10/1/2007 | $175.00 | $175.00 | $0.00 |
| 026610 | 359 | NJY | 31002 | OE | L-DESK/CHAIR | 0 | 10/1/2007 | $350.00 | $350.00 | $0.00 |
| 026611 | 360 | NJY | 31002 | OE | 2 ARM CHAIRS | 0 | 10/1/2007 | $175.00 | $175.00 | $0.00 |
| 026612 | 361 | NJY | 31002 | OE | 1 LATERAL FILE CABINET | 0 | 10/1/2007 | $291.67 | $291.67 | $0.00 |
| 026613 | 362 | NJY | 31002 | OE | 1-5 SHELF BOOKSHELF | 0 | 10/1/2007 | $408.33 | $408.33 | $0.00 |

| Asset # | FAS # | Company | Loc # | CL | Description | Serial # | Date Purch | Cost | Acc Depn | NBV |
|---------|-------|---------|-------|-----|-------------|----------|-----------|------|----------|-----|
| | | | | | **VOORHEES** | | | | | |
| 026616 | 364 | NJY | 31002 | OE | 2 ARM CHAIRS | 0 | 10/1/2007 | $175.00 | $175.00 | $0.00 |
| 026617 | 365 | NJY | 31002 | OE | ROLLING STOOL | 0 | 10/1/2007 | $175.00 | $175.00 | $0.00 |
| 026618 | 366 | NJY | 31002 | OE | 2 ARM CHAIRS | 0 | 10/1/2007 | $175.00 | $175.00 | $0.00 |
| 026619 | 367 | NJY | 31002 | OE | 2 ARM CHAIRS | 0 | 10/1/2007 | $175.00 | $175.00 | $0.00 |
| 026620 | 368 | NJY | 31002 | OE | FLOOR LIGHT | 0 | 10/1/2007 | $116.67 | $116.67 | $0.00 |
| 026621 | 369 | NJY | 31002 | OE | DESK CHAIR | 0 | 10/1/2007 | $233.33 | $233.33 | $0.00 |
| 026622 | 370 | NJY | 31002 | OE | 4 ARM CHAIRS | 0 | 10/1/2007 | $466.67 | $466.67 | $0.00 |
| 026623 | 371 | NJY | 31002 | OE | 1 END TABLE | 0 | 10/1/2007 | $350.00 | $350.00 | $0.00 |
| 026624 | 372 | NJY | 31002 | OE | 3 ROLLING CHAIRS | 0 | 10/1/2007 | $466.66 | $466.66 | $0.00 |
| 026626 | 373 | NJY | 31002 | OE | 3 ROLLING CHAIRS | 0 | 10/1/2007 | $466.66 | $466.66 | $0.00 |
| 026627 | 374 | NJY | 31002 | OE | 2 LATERAL METAL FILE CABINETS | 0 | 10/1/2007 | $525.00 | $525.00 | $0.00 |
| 026628 | 375 | NJY | 31002 | OE | 1 TABLE | 0 | 10/1/2007 | $291.67 | $291.67 | $0.00 |
| 026629 | 394 | NJY | 31002 | OE | ARTWORK | 0 | 10/1/2007 | $920.27 | $920.27 | $0.00 |
| OE (22 records) | | | | | | | | $12,578.60 | $12,578.60 | $0.00 |
| 026633 | 402 | NJY | 31002 | TE | CISCO IP PHONE & POE SWITCH | | 6/29/2010 | $11,016.88 | $11,016.88 | $0.00 |
| TE (1 record) | | | | | | | | $11,016.88 | $11,016.88 | $0.00 |
| 31002 (178 records) | | | | | | | Total | $1,518,043.49 | $1,408,067.35 | $109,976.14 |

17-22770-rdd    Doc 335    Filed 08/17/17    Entered 08/17/17 12:48:09    Main Document    Pg 38 of 80

4826-0076-8325v4

| Asset # | FAS # | Company | Loc # | CL | Description | Serial # | Date Purch | Cost | Acc Depn | NBV |
|---------|-------|---------|-------|----|-----|-----|-----|------|------|-----|
| | | | | | **HAMMONTON ASSETS** | | | | | |
| 026939 | 196 | LNJ | 31029 | CE | CISCO VOICE ROUTER | SFTX1226A3M0 | 1/13/2009 | $2,282.59 | $2,282.59 | $0.00 |
| 026940 | 197 | LNJ | 31029 | CE | CISCO SWITCH | SFDO1222Y1FV | 1/13/2009 | $5,868.87 | $5,868.87 | $0.00 |
| 026941 | 198 | LNJ | 31029 | CE | LENOVO THINKCENTER A57 | SLKKHNKA | 1/13/2009 | $1,076.16 | $1,076.16 | $0.00 |
| 026942 | 199 | LNJ | 31029 | CE | LENOVO THINKCENTER A57 | SLKKHNLG | 1/13/2009 | $1,076.16 | $1,076.16 | $0.00 |
| 026943 | 200 | LNJ | 31029 | CE | LENOVO THINKCENTER A57 | SLKKHXFX | 1/13/2009 | $1,076.16 | $1,076.16 | $0.00 |
| 026944 | 201 | LNJ | 31029 | CE | LENOVO THINKCENTER A57 | SLKKHXGF | 1/13/2009 | $1,076.16 | $1,076.16 | $0.00 |
| 026945 | 202 | LNJ | 31029 | CE | LENOVO THINKCENTRE A61 | 1S9134AKULKHVBRK | 1/13/2009 | $765.41 | $765.41 | $0.00 |
| 026946 | 203 | LNJ | 31029 | CE | LENOVO THINKCENTRE A61 | 1S9134AKULKHVBRM | 1/13/2009 | $765.41 | $765.41 | $0.00 |
| 026947 | 204 | LNJ | 31029 | CE | LENOVO THINKCENTRE A61 | 1S9134AKULKHVBRT | 1/13/2009 | $765.41 | $765.41 | $0.00 |
| 026949 | 205 | LNJ | 31029 | CE | LENOVO THINKCENTRE A61 | 1S9134AKULKHVBTF | 1/13/2009 | $765.41 | $765.41 | $0.00 |
| 026951 | 207 | LNJ | 31029 | CE | LENOVO THINKCENTRE A61 | 1S9134AKULKHVZCH | 1/13/2009 | $765.41 | $765.41 | $0.00 |
| 026952 | 208 | LNJ | 31029 | CE | CISCO MULTIFLEX TRUNK | SFOC12305S5W | 1/13/2009 | $1,405.22 | $1,405.22 | $0.00 |
| 026953 | 209 | LNJ | 31029 | CE | HP 17"CLD QTY 6 | | 1/13/2009 | $1,156.02 | $1,156.02 | $0.00 |
| 026954 | 210 | LNJ | 31029 | CE | HP 19" CLD QTY 4 | | 1/13/2009 | $958.21 | $958.21 | $0.00 |
| 026955 | 211 | LNJ | 31029 | CE | FUJITSU SCANNER | 14367 | 1/13/2009 | $993.59 | $993.59 | $0.00 |
| 026956 | 212 | LNJ | 31029 | CE | HP PHOTOSMART PRINTER | SMY86BHJ11P | 1/13/2009 | $508.79 | $508.79 | $0.00 |
| 026957 | 213 | LNJ | 31029 | CE | PRINTER HP LJ P2015X | P2015X | 1/13/2009 | $523.03 | $523.03 | $0.00 |
| 026958 | 214 | LNJ | 31029 | CE | HP LJ P2015DN 26PPM | SCNBJY05721 | 1/13/2009 | $500.00 | $500.00 | $0.00 |
| 026962 | 217 | LNJ | 31029 | CE | CISCO 2600/3700 SER 16CH | SF0C12311VUL | 1/13/2009 | $571.47 | $571.47 | $0.00 |
| 026963 | 218 | LNJ | 31029 | CE | CISCO CAT EXPR 500 | SFOC1228V59K | 1/13/2009 | $1,759.32 | $1,759.32 | $0.00 |
| 026964 | 219 | LNJ | 31029 | CE | CISCO 4PT FSX OR DID | SFOC12280ZNB | 1/13/2009 | $580.70 | $580.70 | $0.00 |
| 026965 | 220 | LNJ | 31029 | CE | CISCO CALL MANAGER 10 UNITS | | 1/13/2009 | $2,074.39 | $2,074.39 | $0.00 |
| 026966 | 221 | LNJ | 31029 | CE | CISCO IP PHONE AND SMARTNET QTY 15 | | 1/13/2009 | $3,142.39 | $3,142.39 | $0.00 |
| 026967 | 222 | LNJ | 31029 | CE | CISCO 4PT VOICE INTERFACE CARD | SFOC123305VX | 1/13/2009 | $571.47 | $571.47 | $0.00 |
| 026968 | 223 | LNJ | 31029 | CE | CISCO UNITY EXPRESS AIM 12 MAILBOX | SFOC12214VNC | 1/13/2009 | $1,180.16 | $1,180.16 | $0.00 |
| 026969 | 224 | LNJ | 31029 | CE | CANON COPIER IR3300 CERT | MQC06163/C40005020 | 1/13/2009 | $5,206.62 | $5,206.62 | $0.00 |
| 026998 | 258 | LNJ | 31029 | CE | LENOVO THINKCENTRE M57P | 1S9967A5ULKMBBFP | 1/13/2009 | $952.74 | $952.74 | $0.00 |
| 027012 | 295 | LNJ | 31029 | CE | CISCO CATALYST | SFOC1320W08J | 7/28/2009 | $3,598.23 | $3,598.23 | $0.00 |
| 027021 | 404 | LNJ | 31029 | CE | POE SWITCH | | 6/29/2010 | $5,138.58 | $5,138.58 | $0.00 |

4826-0076-8325v4

17-22770-rdd   Doc 335   Filed 08/17/17   Entered 08/17/17 12:48:09   Main Docum
Pg 39 of 80

| Asset # | FAS # | Company | Loc # | CL | Description | Serial # | Date Purch | Cost | Acc Depn | NBV |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | **HAMMONTON ASSETS** | | | | | |
| 027036 | 616 | LNJ | 31029 | CE | LENOVO THINKCENTER M72E | 1S0958B1UMJ080L4 | 3/29/2013 | $698.49 | $582.04 | $116.45 |
| 027038 | 617 | LNJ | 31029 | CE | LENOVO THINKCENTER M72E | 1S0958B1UMJ080L5 | 3/29/2013 | $592.36 | $493.61 | $98.75 |
| 027039 | 618 | LNJ | 31029 | CE | LENOVO THINKCENTER M72E | 1S0958B1UMJ080N0 | 3/29/2013 | $592.36 | $493.61 | $98.75 |
| 027040 | 619 | LNJ | 31029 | CE | LENOVO THINKCENTER M72E | 1S0958B1UMJ080N1 | 3/29/2013 | $592.36 | $493.61 | $98.75 |
| 027041 | 620 | LNJ | 31029 | CE | LENOVO THINKCENTER M72E | 1S0958B1UMJ8278K | 3/29/2013 | $592.36 | $493.61 | $98.75 |
| 027042 | 621 | LNJ | 31029 | CE | LENOVO THINKCENTER M72Z | 1S3548C8UMJ7923H | 3/29/2013 | $971.01 | $809.16 | $161.85 |
| 027043 | 622 | LNJ | 31029 | CE | FUJITSU FI-6110 SCANNER | 504427 | 3/29/2013 | $714.65 | $595.51 | $119.14 |
| 027045 | 624 | LNJ | 31029 | CE | APC BACKUP UPS | | 3/29/2013 | $108.89 | $90.74 | $18.15 |
| 027046 | 625 | LNJ | 31029 | CE | APC BACKUP UPS | | 3/29/2013 | $108.89 | $90.74 | $18.15 |
| 027047 | 626 | LNJ | 31029 | CE | APC BACKUP UPS | | 3/29/2013 | $108.89 | $90.74 | $18.15 |
| 027049 | 627 | LNJ | 31029 | CE | VIEW SONIC VF2228 | STB124241679 | 3/29/2013 | $195.83 | $163.18 | $32.65 |
| 027050 | 628 | LNJ | 31029 | CE | VIEW SONIC VF2228 | STB124941559 | 3/29/2013 | $195.83 | $163.18 | $32.65 |
| 027051 | 629 | LNJ | 31029 | CE | VIEW SONIC VF2228 | STB124941561 | 3/29/2013 | $195.83 | $163.18 | $32.65 |
| 027052 | 630 | LNJ | 31029 | CE | VIEW SONIC VF2228 | STB124941571 | 3/29/2013 | $195.83 | $163.18 | $32.65 |
| 027053 | 631 | LNJ | 31029 | CE | VIEW SONIC VF2228 | STB125240550 | 3/29/2013 | $195.82 | $163.17 | $32.65 |
| 027054 | 632 | LNJ | 31029 | CE | VIEW SONIC VF2228 | STB125240551 | 3/29/2013 | $195.82 | $163.17 | $32.65 |
| 027055 | 633 | LNJ | 31029 | CE | VIEW SONIC VF2228 | STB125240553 | 3/29/2013 | $195.82 | $163.17 | $32.65 |
| 027056 | 634 | LNJ | 31029 | CE | VIEW SONIC VF2228 | STB125240559 | 3/29/2013 | $195.83 | $163.18 | $32.65 |
| 027057 | 635 | LNJ | 31029 | CE | LENOVO THINKCENTER M92P | | 3/29/2013 | $807.65 | $673.01 | $134.64 |
| 027058 | 636 | LNJ | 31029 | CE | LENOVO THINKCENTER M92P | | 3/29/2013 | $807.65 | $673.01 | $134.64 |
| 027061 | 648 | LNJ | 31029 | CE | CISCO AIRONET AUTO ACCESS POINT | SFGL1714Z1VW | 5/15/2013 | $572.06 | $467.18 | $104.88 |
| 027062 | 649 | LNJ | 31029 | CE | CISCO AIRONET AUTO ACCESS POINT | SFGL1714Z1VY | 5/15/2013 | $572.06 | $467.18 | $104.88 |
| CE (51 records) | | | | | | | | $56,510.37 | $54,923.24 | $1,587.13 |
| 026938 | 195 | LNJ | 31029 | CS | LICENSE - CT SIMULATION | | 1/13/2009 | $19,260.00 | $19,260.00 | $0.00 |
| 027025 | 443 | LNJ | 31029 | CS | SUP. CONTR - SOFTWARE SIEMENS PERFORMANC | | 1/1/2011 | $38,520.00 | $38,520.00 | $0.00 |
| 056750 | | LNJ | 31029 | CS | SUP.CONTR-SOFT LIFELINE-01.23.16-01.23.1 | | 1/23/2016 | $1,605.00 | $1,605.00 | $0.00 |
| CS (3 records) | | | | | | | | $59,385.00 | $59,385.00 | $0.00 |
| 027010 | 282 | LNJ | 31029 | LH | IMPROVEMENTS - HAMMONTON - WIRING & CABL | | 4/30/2009 | $13,789.35 | $11,631.06 | $2,158.29 |

17-22770-rdd    Doc 335    Filed 08/17/17    Entered 08/17/17 12:48:09    Main Docum

4826-0076-8325v4

| Asset # | FAS # | Company | Loc # | CL | Description | Serial # | Date Purch | Cost | Acc Depn | NBV |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | **HAMMONTON ASSETS** | | | | | |
| 027019 | 310 | LNJ | 31029 | LH | COMPRESSOR REPLACEMENT | | 8/31/2009 | $3,890.00 | $3,259.19 | $630.81 |
| 027020 | 314 | LNJ | 31029 | LH | WALL MOUNT CONTOUR FRAME SYSTEM | | 9/30/2009 | $2,472.74 | $2,068.12 | $404.62 |
| 027024 | 435 | LNJ | 31029 | LH | FIBER OPTIC CABLING | | 12/31/2010 | $5,500.00 | $5,500.00 | $0.00 |
| 027028 | 472 | LNJ | 31029 | LH | COMPRESSOR AIR UNIT | | 6/9/2011 | $7,397.10 | $3,481.12 | $3,915.98 |
| 027031 | 496 | LNJ | 31029 | LH | INSTALL NEW COMPRESSOR | | 3/23/2012 | $6,163.76 | $2,691.35 | $3,472.41 |
| LH (6 records) | | | | | | | | $39,212.95 | $28,630.84 | $10,582.11 |
| 026975 | 229 | LNJ | 31029 | ME | LASER ISOCENTER MARKING SYSTEM | | 1/13/2009 | $38,532.84 | $32,431.84 | $6,101.00 |
| 026977 | 231 | LNJ | 31029 | ME | BELLYBOARD CONTOURA | MTBBCF | 1/13/2009 | $3,667.76 | $3,087.02 | $580.74 |
| 026978 | 232 | LNJ | 31029 | ME | TILTING BASEPLATE | MT20103CF | 1/13/2009 | $1,354.33 | $1,139.91 | $214.42 |
| 026979 | 233 | LNJ | 31029 | ME | VACLOCK COMPRESSOR SYSTEM | MTVL1 | 1/13/2009 | $1,658.21 | $1,395.72 | $262.49 |
| 026982 | 235 | LNJ | 31029 | ME | SLIM LINE MACHIDA SCOPE | 86831 | 1/13/2009 | $6,409.26 | $5,394.46 | $1,014.80 |
| 026983 | 236 | LNJ | 31029 | ME | BAROMETER THERAPY QTY 3 | | 1/13/2009 | $1,967.93 | $1,656.35 | $311.58 |
| 026984 | 237 | LNJ | 31029 | ME | CRS 2D SCANNER SYSTEM | | 1/13/2009 | $16,583.26 | $13,957.56 | $2,625.70 |
| 026985 | 238 | LNJ | 31029 | ME | DRILLED WATER 30X30X2 FOR A12 | | 1/13/2009 | $512.32 | $431.22 | $81.10 |
| 026986 | 239 | LNJ | 31029 | ME | A11 CHAMBER WITH CALIBRATION | MTERIA11C | 1/13/2009 | $3,074.70 | $2,587.82 | $486.88 |
| 026989 | 242 | LNJ | 31029 | ME | VIRTUAL WATER 30X30X02/03 | MTVW302/MTVW303 | 1/13/2009 | $514.68 | $433.24 | $81.44 |
| 026990 | 243 | LNJ | 31029 | ME | VIRTUAL WATER 30X30X0.5CM QTY2 | | 1/13/2009 | $514.68 | $433.24 | $81.44 |
| 026991 | 244 | LNJ | 31029 | ME | VIRTUAL WATER 30X30X1CM QTY4 | | 1/13/2009 | $1,021.36 | $859.59 | $161.77 |
| 026994 | 245 | LNJ | 31029 | ME | DRILLED WATER 30X30X2 FOR14 | | 1/13/2009 | $508.32 | $427.86 | $80.46 |
| 026995 | 246 | LNJ | 31029 | ME | VIRTUAL WATER 30X30X5 QTY4 | | 1/13/2009 | $2,185.82 | $1,839.74 | $346.08 |
| 026996 | 247 | LNJ | 31029 | ME | VIRTUAL WATER 30X30X2CM QTY3 | | 1/13/2009 | $962.00 | $809.72 | $152.28 |
| 026997 | 248 | LNJ | 31029 | ME | VIRTUAL WATER 30X30X0.2CM QTY2 | | 1/13/2009 | $537.62 | $452.48 | $85.14 |
| 027000 | 260 | LNJ | 31029 | ME | EQUIP. - EXAM TABLE WITH STOOL | 630-003 | 1/13/2009 | $11,655.85 | $9,810.29 | $1,845.56 |
| 027008 | 277 | LNJ | 31029 | ME | DIGITAL ELECTROMETER | | 4/30/2009 | $2,523.91 | $2,040.11 | $483.80 |
| 027009 | 278 | LNJ | 31029 | ME | 90501-00/ QA BEAM CHECKER PLUS | Z083048 | 4/30/2009 | $5,564.00 | $4,497.60 | $1,066.40 |
| 027011 | 291 | LNJ | 31029 | ME | MANAGEMENT SYSTEM | | 1/13/2009 | $22,713.96 | $19,117.54 | $3,596.42 |
| 027013 | 298 | LNJ | 31029 | ME | Water Phantom manual | | 8/31/2009 | $974.62 | $755.24 | $219.38 |
| 027014 | 301 | LNJ | 31029 | ME | Water Phantom manual | | 8/31/2009 | $974.62 | $755.24 | $219.38 |
| 027016 | 304 | LNJ | 31029 | ME | DRILLED WATER 30X30X2 | | 8/31/2009 | $551.21 | $427.15 | $124.06 |

4826-0076-8325v4

17-22770-rdd   Doc 335   Filed 08/17/17   Entered 08/17/17 12:48:09   Main Docum
Pg 81 of 80

| Asset # | FAS # | Company | Loc # | CL | Description | Serial # | Date Purch | Cost | Acc Depn | NBV |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | **HAMMONTON ASSETS** | | | | | |
| 027022 | 408 | LNJ | 31029 | ME | PRIMALERT 10 TELETHERAPY RADIATION MONIT | 200269 | 8/11/2010 | $1,208.75 | $825.90 | $382.85 |
| 027023 | 409 | LNJ | 31029 | ME | PRIMALARAM - REMOTE ALARM AND BACKUP BAT | 3266403 | 8/11/2010 | $1,119.36 | $764.99 | $354.37 |
| 027027 | 453 | LNJ | 31029 | ME | MIMI PHANTOM | | 2/4/2011 | $1,075.26 | $680.97 | $394.29 |
| 027032 | 514 | LNJ | 31029 | ME | MLC QA PHANTOM | | 10/25/2011 | $586.23 | $327.32 | $258.91 |
| ME (27 records) | | | | | | | | $128,952.86 | $107,340.12 | $21,612.74 |
| 026971 | 225 | LNJ | 31029 | OE | CUBICLE CURTAINS | | 1/13/2009 | $1,415.61 | $1,191.51 | $224.10 |
| 026999 | 259 | LNJ | 31029 | OE | PANASONIC 32"ALPHA IPS LCD | | 1/14/2009 | $741.98 | $741.98 | $0.00 |
| 027001 | 261 | LNJ | 31029 | OE | PICTURES QTY 32 | | 1/13/2009 | $6,934.75 | $5,836.79 | $1,097.96 |
| 027002 | 262 | LNJ | 31029 | OE | STACKON STORAGE WITH BACK ENCLOSURE AND | | 1/13/2009 | $451.03 | $379.66 | $71.37 |
| 027003 | 263 | LNJ | 31029 | OE | TOLLESON SIDE CHAIRS QTY 2 | | 1/13/2009 | $713.41 | $600.45 | $112.96 |
| 027005 | 264 | LNJ | 31029 | OE | PALLET OF PICTURES | | 1/13/2009 | $718.88 | $605.02 | $113.86 |
| 027006 | 265 | LNJ | 31029 | OE | SERVICE WORK TO HANG 5 PAPER TOWEL HOLDE | | 1/13/2009 | $455.12 | $383.02 | $72.10 |
| 027007 | 266 | LNJ | 31029 | OE | EQUIP. - WAITING ROOM-RECEPTION FURNISHI | | 1/13/2009 | $20,033.58 | $16,861.62 | $3,171.96 |
| OE (8 records) | | | | | | | | $31,464.36 | $26,600.05 | $4,864.31 |
| 31029 (95 records) | | | | | | | Total | $315,525.54 | $276,879.25 | $38,646.29 |
| Report Total (441 records) | | | | | | | | | | |
| | | | | | | Grand Total (Willingboro/Voorhees/Hammonton) | | $5,782,226.57 | $4,975,317.92 | $806,908.65 |

17-22770-rdd Doc 335 Filed 08/17/17 Pg 42 of 80 Entered 08/17/17 12:48:09 Main Docum

4826-0076-8325v4

## SCHEDULE 5

### 21C ASSUMED CONTRACTS

Real property leases for the Voorhees Office and Hammonton Office

## EXHIBIT A

## MEDICAL RECORDS CUSTODY AGREEMENT

**<u>Exhibit B</u>**

**Rundell Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| 21st CENTURY ONCOLOGY HOLDINGS, INC., *et al.*,[1] | ) | Case No. 17-22770 (RDD) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

---

**DECLARATION OF PAUL B. RUNDELL IN SUPPORT OF DEBTORS' MOTION
SEEKING ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO ENTER
INTO THE UNWIND AGREEMENT, AND (II) GRANTING RELATED RELIEF**

---

I, Paul B. Rundell, hereby declare under penalty of perjury:

1.       I am the Interim Chief Executive Officer of 21st Century Oncology Holdings, Inc., one of the Debtors in the above-captioned chapter 11 cases. I have served the Debtors in my current capacity since February 27, 2017. In such capacity, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records. I am above 18 years of age, and I am competent to testify.

2.       I submit this declaration in support of the *Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to Enter Into the Unwind Agreement, and (II) Granting Related Relief*, filed contemporaneously herewith.

3.       Except as otherwise indicated herein, all facts set forth in this declaration are based on my personal knowledge, my discussions with other members of the Debtors' management team and the Debtors' advisors, and my review of the relevant documents and information concerning the Debtors' operations, financial affairs, and refinancing and

---

[1]   Each of the Debtors in the above-captioned jointly administered chapter 11 cases and their respective tax identification numbers are set forth in the *Order Directing Joint Administration of Chapter 11 Cases* [Docket No. 30]. The location of 21st Century Oncology Holdings Inc.'s corporate headquarters and the Debtors' service address is:  2270 Colonial Boulevard, Fort Myers, Florida 33907.

restructuring initiatives.  If called upon to testify, I could and would testify competently to the facts set forth herein.

## The Joint Venture

4.     The Debtors entered the New Jersey market in or around July 2004, opening three clinics located at:    (a) 220 Sunset Road, Suite 4, Willingboro, New Jersey 08046 (the "***Willingboro Office***"), (b) 130 Carnie Boulevard, Voorhees, New Jersey 08043 (the "***Voorhees Office***") and (c) 893 South White Horse Pike, Hammonton, New Jersey 08037 (the "***Hammonton Office***") (collectively, the "***NJ Offices***").    Since their inception, the NJ Offices struggled financially.  In an attempt to turnaround the New Jersey business, the Debtors approached HMSO in late 2014 regarding the formation of a joint venture to provide additional capital to the NJ Offices.  As a result of these efforts, in February 2015, Debtor 21C and HMSO entered into a New Jersey-based joint venture called 21st Century Oncology and Our Lady Of Lourdes Management Company, LLC (the "***Joint Venture***") pursuant to an operating agreement dated as of February 1, 2015 by and between 21C and HMSO, attached to the Motion as **Exhibit C**.  HMSO obtained a 30 percent ownership stake in the Joint Venture in consideration for a capital infusion of approximately $743,000 with 21C retaining the remaining 70 percent. 21C and the Joint Venture then entered into that certain facilities and management services agreement dated as of February 1, 2015 (the "***MSA***"), whereby the Joint Venture provided office facilities, equipment, personnel, supplies, and administrative services to the NJ Offices.

5.     Despite the formation of the Joint Venture and attendant capital infusion, the Joint Venture's operations did not improve.  Over the last twelve months, the Joint Venture has operated at a loss of approximately $1.3 million in the aggregate.  Additionally, on April 29, 2017, one of the Joint Venture's two full-time oncologists terminated his employment.    The second full-time oncologist's employment will terminate as of August 25, 2017.  As a result, the

2

Joint Venture will have no full-time doctors on staff by the end of the month.  The Joint

Venture's losses have been so severe that the Joint Venture has effectively shuttered the

Voorhees Office and Hammonton Office.  In light of the foregoing, 21C now desires to exit the

Joint Venture pursuant to the Unwind Agreement.

### The Unwind Agreement

6.      Entry into the Unwind Agreement is the best alternative available to the Debtors.

The Joint Venture is and has been an unprofitable business venture.  Since its inception, the Joint

Venture has failed to generate any profits.  In fact, the Joint Venture has operated at a loss of

approximately $1.3 million over the last twelve months.

7.      Despite the Joint Venture's lower than expected performance, the Debtors remain

obligated to contribute approximately $1.8 million per year to the Joint Venture on account of

management fees owed under the Joint Venture operating agreement.  A swift an orderly exit

from the Joint Venture will allow the Debtors to preserve resources for distribution to creditors

and reinvest in more profitable business units.

8.      Absent the Unwind Agreement, the only available alternatives are either a sale or

a liquidation of the Joint Venture.  Neither of these alternatives is likely to generate greater value

available for distribution to the Joint Venture's creditors, including 21C and its Debtor affiliates.

Further, each of a sale or a liquidation would require additional time and expense to effectuate.

Because the Debtors do not have a more profitable or expedient alternative for exiting the Joint

Venture, I submit that entry into the Unwind Agreement is in the best interests of the Debtors

and should be approved.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  August 17, 2017                     Respectfully Submitted,

                                            */s/ Paul B. Rundell*
                                            Paul B. Rundell
                                            Interim Chief Executive Officer
                                            21st Century Oncology Holdings, Inc.
                                            2270 Colonial Blvd.
                                            Fort Myers, FL 33907

**<u>Exhibit C</u>**

**Operating Agreement**

**EXECUTION COPY**

# OPERATING AGREEMENT

**OPERATING AGREEMENT**, dated as of February 1, 2015, for **21ST CENTURY ONCOLOGY AND OUR LADY OF LOURDES MANAGEMENT COMPANY, LLC**, a New Jersey limited liability company (the "*Company*") by and between **21ST CENTURY ONCOLOGY OF NEW JERSEY, INC.** (the "*21C Member*") and **HEALTH MANAGEMENT SERVICES ORGANIZATION, INC.** (the "*Hospital Member*"). Each of the 21C Member and the Hospital Member may be individually referred to herein as a "*Member*" and collectively as "*Members*."

## INTRODUCTORY STATEMENTS

A.    The 21C Member currently operates certain radiation therapy facilities located in the State of New Jersey; and

B.    The Hospital Member desires to joint venture with the 21C Member in the operation and/or management of such radiation therapy facilities; and

C.    The Members wish to form a limited liability company which will operate and/or manage such radiation therapy centers and engage in other related activities.  The Members have reached certain agreements pertaining to the limited liability company, as more particularly set forth herein.

NOW, THEREFORE, the Members covenant, agree, represent, and warrant as follows:

**1.    Formation of Company**.

1.1    The Company was formed under the New Jersey Limited Liability Company Act (the "*Act*"), by filing a Certificate of Formation (the "*Certificate*") with the New Jersey Secretary of State on July 8, 2013.

1.2    The name of the Company shall be 21st Century Oncology and Our Lady of Lourdes Management Company, LLC, or such other name as determined by the Board of Managers (as such term defined in Section 9).  The Company shall trade under its legal name, or under such other name or names as may be agreed upon by the Members.

**2.    Office and Principal Place of Business**.

The principal office of the Company shall be located at _____, New Jersey, or such other or additional place or places as determined by the Board of Managers.

**3.    Business and Purposes**.

3.1    The business and purpose of the Company shall be to operate and/or manage radiation therapy centers that are either free-standing or part of a physicians' practice ("*the Centers*") in New Jersey as more fully described on **Exhibit** A annexed hereto, and engage in all activities incidental thereto, and to engage in such other business, and have such other

purposes, as the Board of Managers may from time to time jointly determine and as are permitted by the Act, subject to Subject 9.5.

3.2    Company and the Members acknowledge and agree that, for so long as Hospital Member is a Member and is a tax-exempt organization as described in Section 501(c)(3) of the Code, Company and the Centers will be operated in a manner consistent with the continued financial viability of each Center while at the same time operating for the benefit of the community and in a manner that furthers the charitable purposes of Hospital Member and its Affiliates by promoting health for a broad cross-section of the community.  Company and the Members agree that the Company and the Centers will be operated in a non-discriminatory manner that provides access to patient care services based on medical necessity.  In that regard, the Centers will accept all patients without regard to such patients' race, creed, national origin, gender, payor source or ability to pay, including, without limitation, individuals covered by Medicare, Medicaid (including without limitation HMO/managed care Medicaid), New Jersey charity care and other governmental program patients.  The Centers shall remain Medicare and Medicaid providers in order to make their services available to the community in which each Center is located.  Company and the Centers will, at all times, comply with all applicable laws, including, without limitation, the laws and regulations of the State of New Jersey.

3.3    Services provided at the Centers will be performed in a manner that is consistent with the Ethical and Religious Directives for Catholic Health Care Services, as amended from time to time (the "Directives"), to the extent the Directives are not inconsistent with applicable state law.

3.4    If, notwithstanding such actions by the Members, an audit or investigation by the IRS or any other matter indicates that there is a substantial likelihood that this Agreement, or other agreements related hereto will: (i) jeopardize the Hospital Member's status under Section 501(c)(3) of the Code; or (ii) result in sanctions by the IRS; then (A) such Member shall promptly notify the 21C Member in writing of such event and shall provide the 21C Member with a written opinion from independent legal counsel with recognized expertise in the field which states that, in the opinion of such counsel, there is a substantial likelihood of the occurrence of the events listed in (i) and (ii) above; and (B) the Members will work in good faith to take all actions necessary, including, without limitation, restructuring the arrangement contemplated herein, to prevent the occurrence of such event (or events) while seeking to minimize the impact of such actions on the rights and duties of the Members under this Agreement and any other agreements relating hereto.

4.    **Members; Company Interests**.

4.1    The names and addresses of the Members are as set forth on **Exhibit B**.

4.2    The interests of the Members in the profits and losses of the Company (the "***Company Interests***") shall be as set forth on **Exhibit B**.

4.3    No Member shall have any liability for any debt or obligation of the Company.

4.4    Except as provided in this Agreement, no Member shall have the right to withdraw from the Company.

4.5    Additional Members may only be admitted to the Company in accordance with the provisions of Section 9.5.

4.6    Upon each admission of a new Member, the Company shall distribute to the Members a revised list of Members reflecting the Company Interest of each Member.  Each new Member shall be required to agree in writing to be bound by the provisions of this Agreement as if an original party hereto.

## 5.    Capital Accounts, Capital Contributions and Loans.

5.1    A Capital Account ("***Capital Account***") shall be established for each Member and shall be determined and maintained in accordance with the provisions of Treasury Regulation Section 1.704-1(b)(2)(iv). In addition to such other adjustments as may be required under this Agreement or pursuant to such Regulations, each Member's Capital Account shall be (a) increased by (i) the amount of cash and fair market value of any property contributed by such Member to the Company (net of any liabilities, as defined in Treasury Regulation Section 1.752-1(a)(4), assumed by the Company or to which the contributed property is subject), (ii) the amount of any Profits allocated to such Member, and (iii) income and gains allocated to such Member and not included in the computation of Profits and Losses; and (b) decreased by (i) the amount of any Losses allocated to such Member, (ii) the amount of any deductions or losses allocated to such Member and not included in the computation of Profits and Losses, and (iii) the fair market value of any property distributed (net of any liabilities, as defined in Treasury Regulation Section 1.752-1(a)(4), assumed by the Member or to which the distributed property is subject) to such Member by the Company.

5.2    The 21C Member made a contribution to the capital of the Company in the form of assets and cash in accordance with a Contribution Agreement effective February 1, 2015 (the "***Initial Capital Contributions***," which, together with any additional contribution made by a Member to the capital of the Company, shall be referred to as each Member's "***Capital Contribution***").  No interest shall be paid on the Capital Contributions of the Members.

5.3    No Member shall be required to make any additional Capital Contributions or loans to the Company unless the Board of Managers shall deem that the Company requires additional funds for legitimate Company purposes, whether for working capital, capital investment, refinancing of existing liabilities or otherwise ("***Additional Funds***"). If the Board of Managers determines that Additional Funds are needed by the Company, the Board of Managers shall require the Members to make such additional Capital Contributions in proportion with the Members' respective Company Interests.  Additional Capital Contributions shall be due and payable on such date or dates as are determined by the Board of Managers.

5.4    Subject to Section 5.10, in the event a Member fails to make an additional Capital Contribution as required by the Board of Managers, then the Member that has made their additional Capital Contributions shall have the right, at their option, in proportion to their respective Company Interests in the Company or in such percentages as they may agree, to

contribute the unfunded additional Capital Contributions. In such event, then each such Member that makes such additional Capital Contributions shall receive additional Company Interests (from the Company Interests of the non-contributing Member(s)) in such amount determined by <u>dividing</u> the additional Capital Contributions made by such Members electing to contribute on behalf of the Member(s) that did not contribute such necessary additional Capital Contributions by the aggregate Capital Contributions (as increased to the extent of additional Capital Contributions), with the quotient <u>multiplied</u> by two (2) and further <u>multiplied</u> against that contributory percentage of the additional Capital Contributions made by such Members electing to contribute on behalf of the Member(s) that did not contribute their necessary additional Capital Contributions. An illustration of the equity reallocation adjustment is set forth in <u>Schedule 5.4</u> of this Agreement.

5.5    The provisions of Section 5.1 hereof relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulation Section 1.704-1(b)(2)(iv) and shall be interpreted and applied in a manner consistent therewith. If the Board of Managers determines that it is prudent to modify the manner in which the Capital Accounts, or any increases or decreases thereto (including, without limitation, increases or decreases relating to liabilities that are secured by contributed or contributed property or that are assumed by the Company or the Members) are computed in order to comply with Treasury Regulation Section 1.704-1(b)(2)(iv) of the Regulations, the Board of Managers may make such modification.

5.6    Except as provided in this Agreement, no Member shall demand or receive a return of its Capital Contributions or withdraw from the Company without the consent of all Members. Under circumstances requiring a return of any Capital Contributions, no Member shall have the right to receive property other than cash except as may be specifically provided herein.

5.7    Except as may be expressly provided otherwise herein, no Member shall be required to make any contribution to the Company by reason of any negative balance in its Capital Account resulting from the ongoing operation of the Company, nor shall any negative balance in a Member's Capital Account create any liability on the part of the Member to any other Member or to any third party; provided, however, that the 21C Member shall be liable to the Company for the full amount of its Initial Capital Contributions.

5.8    Except as otherwise provided herein or otherwise specifically agreed to in writing by all of the Members, all advances of money or property made by a Member to the Company not required by this Section 5 shall not result in an increase in the Member's Capital Contribution or entitle the Member to any increase in its share of the Profits of the Company, or subject the Member to any greater proportion of the Company's Losses. Except as otherwise provided in herein or otherwise specifically agreed to in writing by all of the Members, the amount of any such advance shall constitute a loan from the Member to the Company and shall bear interest at the then existing Applicable Federal Rate (as defined in the Code), and such loan shall require the approval of all Members. The Company shall be deemed to have waived the statute of limitations with respect to any amounts deemed to be a loan pursuant to this Section 5. No Member shall be obligated by this Agreement to make any loans to the Company, except as specifically provided for herein.

5.9      If the outside lender of any credit facility to the Company requires the Members to guaranty the repayment of such indebtedness, or if the lessor of any space or equipment to the Company requires the Members to guaranty the Company's obligations under the lease, in whole or in part, then, each Member shall guarantee such indebtedness or lease obligations in the same proportion as the Members' Company Interests bear to each other; provided, however, that in lieu of making such guarantee directly, each such Member shall have the right to cause such indebtedness or lease obligations to be guaranteed by another person or persons who is, or who are, satisfactory to such lender or lessor, as the case may be; and further provided, that in no event shall a Member (or such person chosen by such Member) be required to guarantee a greater percentage of such indebtedness or lease obligations than the percentage determined by dividing such Member's Company Interest by the Company Interests of all Members.

5.10     The Members agree that it is preferable to the business of the Company and the overall operation of the Centers that the Hospital Member remain a Member of the Company and maintains a minimum of ten percent (10%) of the Company Interest.  In this regard, to the extent that there is an additional Capital Contribution required, for whatever reason, and Hospital Member is financially unable to contribute the required additional Capital Contribution or the full Capital Contribution and such inability would otherwise result in the Hospital Member's Company Interest being diluted to less than ten percent (10%), then Hospital Member may, at its election, either: (i) contribute such capital (if any) it can afford at the time which may dilute its Company Interest below a ten percent (10%) ownership interest and shall retain the right for a period of six (6) months from the date such capital contribution was due to make such contribution and restore its Company Interest up to the ten percent (10%) level; or (ii) request that the 21C Member lend it that amount necessary to maintain a ten percent (10%) Company Interest, such loan being the interest rate that the 21C Member (or its parent organization) borrows money plus one percent (1%), with full payment due one (1) year after its issuance.

## 6.      Allocation of Profits and Losses.

6.1      The Profits and Losses of the Company for any fiscal year or other period shall be allocated to the Members in proportion to and in accordance with their respective Company Interests.

6.2      Notwithstanding any other provisions in this Section 6, the rules set forth in Sections 6.3, 6.4 and 6.5 shall apply for purposes of (i) allocating income, gain, loss and deductions attributable to nonrecourse deductions and (ii) allocating income, gain loss deductions in the event that Members are not obligated to restore deficits in Capital Account.

6.3      Member nonrecourse deductions (which shall have the same definition as partner nonrecourse deductions in Section 1.704-2(i)(1) and (2) of the Regulations) that are associated with a member nonrecourse liability (which shall have the same definition as partner nonrecourse liability in Section 1.704-2(b)(4) of the Regulations) shall be allocated to the Members in the ratio in which the Members bear the economic risk of loss with respect to such liability.  To the extent no Member bears the economic risk of loss with respect to a nonrecourse

liability, the nonrecourse deductions shall be allocated to the Members in accordance with their respective Company Interests.

6.4    Items of Company gross income and gain shall be allocated to the Members to the extent necessary to comply with the minimum gain chargeback rules set forth in Section 1.704-2(f) and (2)(i)(4) of the Regulations.

6.5    Items of Company income and gain shall be allocated among the Members to the extent necessary to comply with the qualified income offset provisions set forth in Section 1.704-1(b)(2)(ii)(d) of the Regulations relating to unexpected deficit capital account balances after taking into account all capital account adjustments prescribed by Section 1.704-1(b)(2)(ii)(d) of the Regulations.

6.6    Since the allocations described in Sections 6.3, 6.4 and 6.5 (collectively, the "Regulatory Allocations") above may effect results not consistent with the manner in which the Members intend to make distributions, the Board of Managers may make other allocations of Profits, Losses and other items to the Members to prevent the Regulatory Allocations from distorting the manner in which the distributions would be made under Section 7 but for the application of the Regulatory Allocations.  The Board of Managers may accomplish this result in any reasonable manner that is consistent with Section 704 of the Code and related Regulations. The Board of Managers may make any election permitted under Section 704 of the Code that may reduce or eliminate any Regulatory Allocation that would otherwise be required.

6.7    Except as otherwise provided in this Section 6.7, each item of income, gain, loss and deduction of the Company for federal income tax purposes shall be allocated among the Members in the same manner as such items are allocated for book purposes under this Section 6. In accordance with Section 704(c) of the Code and the Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for federal income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Book Value.  In the event the Book Value of any asset is adjusted pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(f), subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value in the same manner as under Section 704(c) of the Code and the Regulations thereunder.  The allocations required by this Section 6.7 shall be made using any permitted method set forth in Treasury Regulation Section 1.704-3, as determined by the Board of Managers.

6.8    The initial Book Value of any asset contributed by a Member to the Company shall be the gross fair market value of the asset at the time of contribution, as determined by the Board of Managers.  The Book Values of all Company assets may, as determined by the Board of Managers, be adjusted to equal their respective gross fair market values, as determined by the Board of Managers, in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(f).  The Book Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Sections 734(b) or 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m);

provided, however, that the Book Values shall not be adjusted pursuant to this sentence to the extent that an adjustment is required pursuant to the previous sentence.  The Book Value of any Company asset distributed to any Member shall be adjusted to equal the gross fair market value of such asset on the date of distribution.   The Book Value of any Company asset shall be adjusted to reflect any cost recovery deductions claimed with respect to such asset as described in Section 6.9(C).

6.9    "Profits" and "Losses" mean, for each fiscal year or other period, an amount equal to the Company's taxable income or loss for such year or other period, determined under Section 703(a) of the Code (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments:

(A)  Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses shall be added to such taxable income or loss;

(B)  Any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as Section 705(a)(2)(B) expenditures pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses shall be subtracted from such taxable income or loss;

(C)  Gain or loss resulting from any disposition of a Company asset with respect to which gain or loss is recognized for federal income tax purposes and depreciation and amortization with respect to such assets shall be computed by reference to the Book Value of the asset disposed of rather than its adjusted tax basis;

(D)  The difference between the gross fair market value of all Company assets, as determined by the Board of Managers, and their respective Book Values shall be added to such taxable income or loss in the circumstances described in the event of a revaluation of Company assets described in Section 6.8;

(E)  Upon any distribution of an asset in-kind, the asset shall be deemed sold by the Company at its fair market value and the difference between such fair market value and the asset's Book Value shall be included in the calculation of Profits or Losses;

(F)  To the extent (and only to the extent) that an adjustment to the adjusted tax basis of any Company asset pursuant to Sections 732, 734 or 743 of the Code is required to be taken into account in determining Capital Accounts pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m), the amount of such adjustment shall be included in the calculation of Profits or Losses; and

(G)  Any items specially allocated pursuant to the Regulatory Allocations shall be excluded.

7.      **Distributions**.

7.1      As soon as practicable after the end of each fiscal year of the Company, but in no event later than ninety (90) days after the end of each fiscal year of the Company, or at more frequent intervals as determined by the Board of Managers, all of the Company's "*Available Cash*" (as hereinafter defined) shall be distributed to the Members in accordance with the Members' respective Company Interests; provided, however, that in no event shall such distribution be less than the amount required to make Tax Distributions (as hereinafter defined) to the Members in accordance with the Members' respective Company Interests to the extent applicable at that time.

7.2      The Company's "*Available Cash*" shall mean the amount, if any, by which (i) all funds received by the Company, including all Capital Contributions of the Members and any funds previously set aside as reserves which the Board of Managers reasonably believes are no longer required as reserves in the efficient conduct of the Company business, exceeds (ii) the sum of (x) all cash expenditures of the Company, including employee salaries, capital expenditures and payments in respect of the Company's indebtedness including, without limitation, the 21C Member's Management Fee as set forth in Section 9.4 below, plus (y) the amount of any funds set aside by the Board of Managers for the establishment and maintenance of reasonable prudent reserves. Unless otherwise determined by the Board of Managers, Tax Distributions (as defined in Section 7.3) shall be made prior to the establishment of reserves.

7.3      "*Tax Distributions*" shall mean an amount equal to the amount by which the income tax liabilities of the Members in respect of their shares of income or profits of the Company for the preceding calendar year exceeds the amount of Available Cash distributed during the preceding calendar year to the Members (other than amounts designated as Tax Distributions). The Members shall in no event be required to make any loans to the capital of the Company to fund such Tax Distributions. For purposes of this Section 7.3, the amount of income tax liabilities of the Members shall be determined by assuming that all income or profits of the Company passed through to each Member will be taxed at the maximum state and federal income tax rate at which the income of any Member can be taxed in the calendar year that includes the last day of the Company's taxable year.

7.4      If all or a portion of a Member's distribution of Available Cash pursuant to Section 7.1 ("Encumbered Member") is required by law or ordered by a court with appropriate jurisdiction to be paid to a governmental agency or any other third party as a result of rights the governmental agency or third party has against the other Member ("Indemnifying Member") unrelated to the operation of the Company, the Indemnifying Member will pay to the Encumbered Member an amount equal to the Available Cash due to the Encumbered Member pursuant to Section 7.1 which was otherwise paid to a governmental agency or third party as payment on amounts owed by the Indemnifying Member to such governmental agency or third party.

8.      **Rights and Liabilities of Members**

8.1      The Members understand and agree that no general agency, employment, partnership or joint venture is created by this Agreement, other than the Company formed by this

Agreement. The Members further agree that no Member is the general agent of any other Member and no representation shall be made by any Member that would create apparent agency, employment, partnership, or joint venture other than the Company formed by this Agreement.

8.2    The fact that a Member or a person in which a Member is directly or indirectly interested in or connected with the Company, is employed by the Company, or sells or provides property or services to the Company, shall not prohibit the Company from contracting with such Member or person or from otherwise dealing with him or it, provided that amounts charged for merchandise, property, or services reflect the fair charge thereof in the relevant geographic area and such agreements are upon such other terms and conditions similar to those among unrelated parties dealing at arm's length, and neither the Company nor any Member shall have any rights in or to any income or profits derived therefrom.

8.3    No Member shall be liable under a judgment, decree, or order of the court, or in any other manner, for a debt, obligation, or liability of the Company, except as provided by applicable law.

8.4    No Member has authority to act for the Company, or is otherwise an agent of the Company, solely by virtue of being a Member of the Company. Neither the Company nor any Member shall be responsible or liable for any indebtedness or obligation incurred by any other Member (or any of such Member's shareholders, partners, members, owners, or Affiliates (as defined in Section 24.3)) unless such indebtedness or obligation is incurred in accordance with the authority granted to such Member under the terms of this Agreement.

8.5    No Member shall be liable, responsible, or accountable in damages or otherwise to the Company or any other Member for any mistake of judgment, omission, or act or thing done in good faith in furtherance of or within the scope of this Agreement (collectively, a "***Good Faith Mistake***"); and the Company (but not any Member) shall indemnify and save harmless a Member which makes a Good Faith Mistake from and against any and all costs, damages, or expenses incurred by such Member in connection with the Good Faith Mistake; provided, however, that such Member shall not be indemnified for any such costs, damages, or expenses resulting, in whole or in part, from such Member's fraud, bad faith, gross negligence, willful misconduct, or material breach of this Agreement. Any amount paid by the Company to indemnify a Member hereunder shall be taken into account (according to the Company's normal accounting method) in computing Profits or Losses and, notwithstanding this Section 8.5, a Member receiving such indemnification payment shall bear a portion of the cost thereof to the extent that his share of such Profits or Losses is thereby affected.

Each Member hereby agrees to indemnify and hold the Company and each other Member wholly and completely harmless from and against any liability, cost, damage, or expense that any such indemnified party may incur (including reasonable legal and accounting fees and other expenses incurred in defending against such liability, cost, damage, or expense) as a result of such Member's fraud, bad faith, gross negligence, willful misconduct, or material breach of this Agreement. No amount paid hereunder shall be treated as a Capital Contribution by the Member making such payment.

8.6    In the event of any litigation against the Company or any Member pertaining to any matter related to Company business under this Agreement, each Member agrees to fully cooperate with the other Members at all times during the pendency of the claim or lawsuit, including providing the Company or other Members with all available information concerning the claim or lawsuit and meeting with the other Members or their representatives prior to giving testimony in connection with such claim or lawsuit, to the extent permitted by law and subject to attorney/client and work product privileges.

9.    **Management of the Company**.

9.1    The authority to establish the overall business policy and operation of the Company shall be vested in a board of managers (the "***Board***" or "***Board of Managers***"), which shall exercise or cause to be exercised all powers of the Company and may do or cause to be done all such lawful acts and things as are not prohibited by this Agreement or applicable law.

9.2    The Board of Managers shall be comprised of five (5) individuals ("***Managers***"). Three (3) Managers shall be selected by the 21C Member (the "***21C Managers***") and two (2) Managers shall be selected by the Hospital Member (the "***Hospital Managers***"). All actions by the Board of Managers shall be decided by the affirmative vote of a majority of the total number of Managers, subject only to Section 9.5 below. The Members shall also be entitled to designate additional individuals who shall be entitled to attend and participate in Board meetings as nonvoting guests, either on a standing basis or for a particular meeting.

9.3    The Managers selected by the 21C Member and Hospital Member to serve on the Board shall be selected or removed, from time to time, by the internal corporate or other procedures governing the actions of such Member. The 21C Member and Hospital Member shall give the other written notice of the name of its selected Managers and any changes thereto, and attendance by a Manager representing the Members at any Board meeting shall be conclusive proof of the election of such person as a Manager representing such Member, unless the other Managers have actual knowledge that such person is not a Manager. In the event that any Manager is unable to participate or attend any regular or special meeting of the Managers, the Member represented by that Manager, may select a temporary alternate Manager to represent its interests and vote in such Managers' meeting

9.4    The 21C Member shall manage the day to day operations of the Centers. Subject to the ultimate direction and control of the Board of Managers and subject to compliance with the terms of this Agreement, the powers of the 21C Member in its capacity as manager shall include, but not be limited to, the power to:

(a)    perform, either directly or through an affiliate, the billing and collection functions of the Company;

(b)    perform all scheduling of patients at the Centers;

(c)    maintain the books and records of the Company;

(d)    perform all required purchasing of goods, supplies and equipment for the Company;

(e)    perform all hiring and firing of professional, para-professional and clinical personnel for the Centers;

(f)    execute, for and on behalf of the Company, any and all documents and instruments which may be necessary to carry on the business of the Company, including, without limitation, any and all deeds, contracts, leases, mortgages, deeds of trust, promissory notes, security agreements, and financing statements pertaining to the Company's assets or obligations;

(g)    finance, improve, grant options with respect to, sell, convey, assign, mortgage, and lease personal, real, and intangible property of the Company;

(h)    execute and modify any agreement, contract, options or licenses with respect to any of the assets or the business of the Company;

(i)    obtain loans, secured and unsecured, for the Company, and secure the same by mortgaging, assigning for security purposes, and pledging or otherwise hypothecating all or any portion of the property and assets of the Company (and in connection therewith to place record title to any such property or assets in the name or names of a nominee or nominees);

(j)    prepay in whole or in part, refinance, recast, increase, decrease, modify, amend, restate, or extend any such mortgage, security assignment, pledge, or other security instrument, and in connection therewith to execute and deliver, for and on behalf of the Company, any extensions, renewals, or modifications thereof;

(k)    draw, make, accept, endorse, sign, and deliver any notes, drafts, or other negotiable instruments or commercial paper;

(l)    establish, maintain, draw upon, and close checking, savings, and other accounts in the name of the Company in such banks or other financial institutions as the 21C Member may from time to time select;

(m)    compromise any claim or liability due to the Company; and

(n)    obtain loans or similar financing arrangements, secured and unsecured, for the Company which require a personal guaranty of any Member.

In consideration for the provision of such management services, the Company shall pay to the 21C Member an amount equal to seven (7%) percent of all collected revenue at the Centers.  In addition, the 21C Member may provide certain contracted services through its national contracts (e.g., linear accelerator and CT Scanner service contracts) and the Company shall reimburse the 21C Member for these third party expenses incurred by the 21C Member to support the operations of the Company.  Such amounts shall be payable monthly for collected revenues or expenses incurred for the preceding month.

9.5    Notwithstanding any other provision of this Agreement, the Management Services Agreement or any other agreement between the Company and any Member or Affiliate

of a Member, the following actions shall constitute "***Major Decisions***" and shall require the unanimous approval of the Board:

        (a)     selling all or substantially all of the assets of the Company or entering into a merger, business combination, joint venture or similar transaction involving the Company;

        (b)     approving the acquisition of any business or a business division from any third party, whether by asset purchase, stock purchase, merger or other business combination;

        (c)     changing the scope of business of the Company;

        (d)     admitting new Members or otherwise issuing additional Company Interests, including to the present Members;

        (e)     making expenditures in excess of Two Hundred Fifty Thousand Dollars ($250,000.00) or entering into indebtedness on behalf of the Company in excess of Five Hundred Thousand Dollars ($500,000.00);

        (f)     entering into, amending, terminating or renewing any real estate lease or facilities and management services agreement relating to the Centers, approval not to be unreasonably withheld;

        (g)     adopting or approving the Company's annual operating budgets and capital budgets;

        (h)     entering into, modifying or terminating any agreement with any Affiliate of a Member;

        (i)     forming or investing in any entity on behalf of the Company;

        (j)     amending this Agreement; or

        (k)     voluntarily dissolving the Company.

        9.6     If the Board fails to unanimously approve any Major Decision and such failure shall continue for a period of thirty (30) calendar days after any Manager shall have given the other Managers written notice of his/her intent to approve such Major Decision, then either Member shall have the right to invoke the dispute resolution provisions of Section 9.12 hereof to resolve such Major Decision.

        9.7     All Managers, when acting in their capacity as Company Managers, shall have the same fiduciary duties to the Company as managers of a New Jersey limited liability company, and shall be entitled to indemnification from the Company as provided in the Act.  No Manager shall be liable, responsible, or accountable in damages or otherwise to the Company or any Member for any act performed by such party within the scope of the authority conferred on

such party by this Agreement, when acting in its capacity as a Company Manager, except for acts of fraud or gross negligence or an intentional breach of this Agreement by such party.

9.8     The Board may appoint such officers of the Company, who shall have such qualifications, duties, and authority as may be determined by the Board from time to time. Any individual may hold more than one office in the Company.  The officers of the Company shall have the same fiduciary duties to the Company as officers of a New Jersey limited liability company, and shall be entitled to indemnification from the Company to the same extent as officers of a New Jersey limited liability company.

9.9     Meetings of the Board of Managers shall occur, and notice thereof shall be given as follows:

(a)     Meetings of the Board of Managers shall be held at the principal place of business of the Company at a time and date convenient for the Managers to participate by phone, or at any place, within or outside the State of New Jersey, as may be determined from time to time by the unanimous agreement of the Board of Managers.  A quorum of the Board of Managers for the transaction of business at a meeting shall be deemed present only if a majority of the Managers are present and at least one (1) Manager appointed by Hospital Member is present.  However, the provisions of the preceding sentence shall be inapplicable in the event that at least one (1) Manager appointed by the Hospital Members fails to attend two (2) consecutive Board of Managers' meetings; in such event a quorum may be held without the Hospital Member's appointed Manager (provided in all cases that due notice is provided for such meetings).  Any Manager who must travel to a meeting of the Managers shall be reimbursed by the Company for his or her reasonable travel and lodging expenses.  Managers may participate in meetings by means of conference telephone or other similar communications equipment by means of which all persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at such meeting.  Written minutes of the business transacted at meetings shall be made by a person designated by the Managers, and such minutes shall be retained at the principal office of the Company and be available for inspection by any Member during regular business hours.

(b)     The Board shall meet as often as it deems necessary, but no less often than quarterly per year.

(c)     A written waiver of notice of any meeting of the Board of Managers signed by a Manager then in office, either before or after the time of the meeting, shall be deemed equivalent to notice to such Manager of such meeting.  Attendance by any Manager at a meeting of the Board of Managers shall constitute a waiver of notice of such meeting, except when the Manager attends the meeting specifically to object to the transaction of any business or certain specified types of business because proper notice of the meeting has not been given in accordance with these procedures.

(d)     Notwithstanding any other provision in this Agreement, in the case of a contract or other transaction between the Company and any Manager or any corporation, firm, or other entity with which such Manager shall be associated or shall have an interest

(including the Member who is represented by such Manager), such Manager shall disclose such interest to the other Managers.

9.10    Whenever the Managers are required or permitted to take any action by vote, such action may be taken without a meeting by the unanimous written consent of the Managers or their proxies, which may be executed in counterparts. Every written consent shall be delivered to the Company at its principal office by personal delivery, first-class mail, or facsimile. Every written consent shall bear the date of the signature of each Manager who signs the consent. A Manager's written consent to an action or decision may be evidenced by his signature on a counterpart of the proposed matter or by a separate writing, including telegram, telex, telecopy, or other electronic facsimile which clearly identifies the matter being considered and the Manager's consent thereto. A written consent signed and delivered in accordance with the provisions of this Section shall have the effect of vote at a meeting and may be described as such in any document.

9.11    The Board may establish such committees with such membership and responsibilities as the Board shall determine from time to time (in all cases, the "***Committees***"). Except as may otherwise be determined by the Board, the members of any Committee need not be Managers. Unless otherwise stated herein or determined by the Board, the provisions of this Section 9.11 shall apply to all Committees:

(a)    The Board of Managers may delegate to any Committee any of the powers of the Board except for the voting on Major Decisions as set forth in Section 9.5.

(b)    Except as may otherwise be determined by the Board: (i) each Committee may fix rules of procedure for its business; and (ii) a majority of the members of a Committee present at any meeting shall constitute a quorum for the transaction of business and the act of a majority of those present at a meeting at which a quorum is present shall be the act of the Committee. Any action required or permitted to be taken at a meeting of a Committee may be taken without a meeting, if a unanimous written consent which sets forth the action is signed by each member of the Committee and filed with the minutes of the Committee.

9.12    In the event that a dispute shall occur with respect to any issue which a Member in good faith believes is (i) vital to the success of the Company, (ii) potentially injurious to the Member or the Member's Affiliates, or (iii) vital to the realization of the strategic plans of the Member or its Affiliates, then the Member having such good faith belief shall give written notice to the other Member of such belief, stating specifically such belief and the basis thereof (a "***Dispute Notice***"). Upon the giving of a Dispute Notice, the Members shall use reasonable efforts to resolve the dispute. "***Reasonable efforts***" shall include discussions over not less than a thirty (30) day period, including at least two (2) in-person meetings between representatives of each Member who have authority to commit the Member to an agreed resolution of the dispute. If after reasonable efforts the dispute has not been resolved, either Member may elect to arbitrate the dispute by giving written notice to the other Member (an "***Arbitration Notice***"). Within twenty (20) days after the date an Arbitration Notice is given, the Members shall jointly select an independent third party to arbitrate the dispute, or, if the Members are unable to agree on an arbitrator within such twenty (20) day period, each Member, shall, within ten (10) days after the end of such twenty (20) day period, submit such dispute to binding arbitration in accordance with

the alternative dispute resolution process established by the American Health Lawyers Association ("*AHLA*").  The arbitrator or arbitrators so chosen shall resolve the dispute in a manner which the arbitrator(s) determine enhances the Company's ability to achieve its budgeted profit levels and otherwise furthers the best interests of the Company and the Members, but which in any case is not injurious to either Member or its Affiliates.  The arbitrator(s) shall take into account any additional expense or lost profit the Company or either Member anticipates experiencing as a result of the proposal, and any indemnity which either Member has offered to the Company or the other Member for such additional expense or lost profit.  The arbitrator(s) shall have the authority to order specific performance by either Member under this Agreement, but in no event shall any arbitrator have the power to (i) require either Member to make capital contributions to the Company beyond the capital contributions required by this Agreement, (ii) require either Member to make any loan to the Company, (iii) require the Company to borrow any funds, or (iv) order dissolution of the Company.  Such arbitration decision will be final and binding on the Members and the Company, and may be enforced through any court having jurisdiction.  Unless otherwise required by the arbitration rules or process, all arbitration sessions shall be conducted in Bordentown, New Jersey at a mutually acceptable site.  Each party will bear its own costs and expenses associated with the arbitration proceedings, including costs of witnesses, travel, attorneys, and other representatives.  The general costs and expenses of the proceedings, such as the fees of the arbitrators and the charges of the AHLA, will be divided equally among the parties to the dispute

9.13    Pending resolution of any dispute pursuant to this Section 9, in the event that the Board shall be unable to reach agreement on the continuation or discontinuance of any action, program, or service which is then being taken or provided, such action, program, or service shall continue to be taken or provided until the difference is resolved, unless the continuance of the action, program, or service is prohibited by this Agreement or applicable law, or is not practical due to the lack of adequate funds. In the event that the Board is unable to agree upon a budget for any fiscal year, the budget in effect for the prior fiscal year shall be adopted as an interim budget until agreement can be reached on the new budget.

9.14    The Managers representing a Member shall have the authority to act for and bind such Member on all matters requiring or permitting such Member's consent hereunder.

9.15    Legal title to property owned by the Company shall be held in the name of the Company.

9.16    Except as approved in accordance with the terms hereof, no Member or Manager shall receive any salary or compensation for services rendered to or for the Company.

9.17    The parties acknowledge that Hospital Member is a nonprofit, tax-exempt corporation and that its status as a nonprofit, tax-exempt corporation is an essential element of the transactions contemplated herein. Notwithstanding any provision in this Agreement to the contrary, the parties agree as follows:

(a)    The Centers will be open to the public and operated on a non-discriminatory basis. The Board of Managers and the Members shall use their best efforts to ensure that the Company will be eligible for reimbursement from treating Medicare and

Medicaid patients. Further, the Company will provide medically necessary services to Medicare and Medicaid recipients and to persons of every creed, race, sex, religion and national origin and without regard to such person's ability to pay for the services.

(b)    The Company will operate and/or manage the Centers in conformity with the mission of the Hospital Member.

(c)    The Company policy shall be that patients will be available for participation in the educational programs of Hospital Member, except where this cannot be reasonably accomplished. The Company shall operate the Centers in compliance with applicable accreditation requirements for clinical educational programs and will take steps necessary to implement policies in connection with clinical educational programs which are necessary and not unreasonably burdensome to enable Hospital Member to meet applicable accreditation standards for its schools and programs, if any. The Company shall be operated in a manner to further the Hospital Member's charitable purpose.

(d)    All research conducted at the Centers which involve patients, including the use of investigational drugs, devices or procedures, shall be subject to prior review and approval by the Hospital Member Institutional Review Board. Research shall be conducted in accordance with the provisions of the Compliance Document on the Protection of Human Subjects filed by Hospital Member with the United States Department of Health and Human Services. Hospital Member will notify the Company of all such research projects approved by the Hospital Member Institutional Review Board. The Company shall allow the Hospital Member Institutional Review Board access to all of its books and records as reasonably necessary to oversee, monitor and manage research.

**10.    Banking, Accounting, and Tax Matters**.

10.1    All revenues of the Company shall be deposited regularly in savings, checking, or other accounts of the Company at such banks or other entities as shall be selected by the 21C Member. Checks or other withdrawals from any bank account of the Company shall be issued or made upon the signature(s) of such persons as the Board of Managers may designate.

10.2    The Company, under the supervision of the 21C Member, shall maintain books of account, in which shall be entered fully and accurately each transaction of the Company. All such books of account, and all other information regarding the affairs of the Company, shall be made available for inspection and copying by any Member at any reasonable time.

10.3    The Company, under the supervision of the 21C Member, shall prepare, or cause to be prepared, un-audited quarterly financial statements for the Company, including income statements, balance sheets, and statements of cash flow, which shall be prepared and furnished to each Member within thirty (30) days of completion. The Company, under the supervision of the 21C Member, shall prepare, or cause to be prepared, monthly income statements and balance sheets, which shall be prepared and furnished to each Member within thirty (30) days of completion.

10.4    The Company, under the supervision of the 21C Member, shall prepare, or cause to be prepared, all necessary federal, state, and local income tax returns of the Company, and shall provide each Member with copies of all such returns.  In addition, the Company, under the supervision of the 21C Member, shall prepare or cause to be prepared, as soon as practicable after the end of each fiscal year, such tax information relating to the Company (including Schedule K-I) as shall be necessary for the preparation of the Members' own federal and State income tax returns.

10.5    The fiscal year of the Company shall begin on January 1, unless the Board of Managers otherwise determines.

10.6    The 21C Member is designated the "***Tax Matters Member***" in accordance with Section 6231(a)(7) of the Code.

10.7    The Tax Matters Member shall have all powers necessary to perform fully, including the power to retain attorneys and accountants of its choice and make tax elections available to the Company in accordance with the Code provided that if such actions are reasonably expected to have an adverse effect on Hospital Member, such action shall not be taken without the consent of the Hospital Member. The Tax Matters Member is authorized to represent the Company before taxing authorities and courts in tax matters affecting the Company and the Members in their capacity as Members and is entitled to take any actions on behalf of the Company in any such tax proceedings in his sole discretion  provided that if such actions are reasonably expected to have an adverse effect on Hospital Member, such action shall not be taken without the consent of the Hospital Member.

10.8    The Tax Matters Member shall be entitled to be reimbursed by the Company for all reasonable costs and expenses incurred by it in connection with any administrative or judicial proceeding with respect to any tax matter involving the Company or the Members in their capacity as Members and to be indemnified by the Company (solely out of Company assets) with respect to any action brought against him in connection with any judgment in or settlement of any such proceeding.

10.9    All calculations of earnings, income, and other financial matters relating to the Company, and all Company financial statements and other representations by the Company of its financial condition shall be made in accordance with generally accepted accounting principles ("***GAAP***") consistently applied.

## 11.    Company Operational Matters

11.1    Each Member will cooperate with the Company, and will cause all physician and other medical service providers under its control to cooperate with the Company, in maintain records, and in providing information necessary for identification of services and procedure performed at the Centers, to facilitate prompt and accurate billing for such services.

11.2    The Company shall purchase professional liability insurance, with limits as may be determined by the Board of Managers, covering the Company, the Members, and each provider of services employed by the Company with respect to all professional and facility services rendered by or on behalf of the Company.  The Company shall also purchase general

liability insurance, with policy limits as may be determined by the Board of Managers. The Company shall also purchase director and officer liability insurance coverage, automobile liability insurance and workers' compensation coverage if so determined by the Board of Managers.

11.3    The Members agree that in the event that the Hospital Member requires inpatient radiation oncology services, the Company shall have the first right of refusal to provide such inpatient radiation therapy services when deemed to be medically necessary and so long as legally permissible.

## 12.    Competitive Restrictions.

12.1    Each Member hereby covenants and agrees that so long as it is a Member and until eighteen (18) months thereafter, no Member nor any Affiliate thereof shall, without first obtaining the prior written consent of the other Members, own, operate, manage or participate in, either directly or indirectly, any radiation oncology facilities or services located within a ten (10) mile radius of any of the Centers owned and operated or managed by the Company (a "***Competing Business***"). Notwithstanding the foregoing, nothing shall prevent 21C Member from managing, owning or operating a radiation oncology facility to be located in Bordentown, New Jersey, Woodbury, New Jersey or in connection with the Kennedy Health System.

12.2    Each Member acknowledges that the terms contained in this Section 12 (i) are necessary for the reasonable and proper protection of the Company's interests; and (ii) are reasonable in respect of such matter, length of time and geographical area.

12.3    If any court or tribunal of competent jurisdiction determines that the duration, geographical limit or any other aspect of any of the restrictive covenants set forth in this Section 12 is unenforceable in accordance with its terms in a particular jurisdiction, such covenant shall not terminate; instead, such covenant shall be deemed amended to the extent required to render it valid and enforceable in such jurisdiction and such court or tribunal is hereby authorized and directed to amend the restrictive covenants set forth in this Section 12 only to the extent that such court or tribunal determines such an amendment is necessary to make it valid and enforceable in said jurisdiction.

12.4    Each Member agrees that damages at law would be an insufficient remedy for the Company in the event any Member violates these provisions, and that the Company and the other Members shall be entitled to, among other remedies, make an application to a court of competent jurisdiction to obtain specific performance or to enjoin the continuing breach of such provisions. By seeking or obtaining any such relief, the aggrieved party will not be precluded from seeking or obtaining any other relief to which such party may be entitled.

## 13.    Restrictions on Transfers of Company Interests.

13.1    For purposes of this Section 13.1, the term "Transfer" shall include any sale, assignment, pledge, hypothecation or other transfer of all or any part of any Company Interest or any interest therein or right with respect thereto, or the grant or occurrence of any lien, security interest, or other encumbrance on all or any part of any Company Interest or any interest therein or right with respect thereto.  Moreover, any direct or indirect change in control of any Member, including, without limitation, any transfer of fifty percent (50%) or more of the equity in such Member by reason of equity sale, merger, consolidation or similar transaction (whether in one transaction or in a series of transactions) shall be deemed to be a transfer by such Member of its Company Interests.  Except as otherwise provided in this Section 13 and elsewhere in this Agreement including Section 14.3, a Member may not Transfer all or any part of the Member's Company Interest without the consent of the Board of Managers, except that (i) a Member may Transfer its Company Interest to an Affiliate of such Member, provided such Affiliate agrees in writing to be bound by all of the provisions of this Agreement, and any guaranty of the transferring Member related to this Agreement, as if an original party hereto, and (ii) the 21C Member can pledge all or any part of its Company Interest to a bank as required by any credit or financing agreement by and between such bank and the 21C Member or the 21C Member's Affiliate.

13.2    Hospital Put Option.

If (i) the 21C Member Transfers all of any part of its Company Interest to an entity that operates an acute care hospital located in Burlington, Camden or Gloucester Counties, New Jersey or Philadelphia, Pennsylvania (collectively, a "Health System") or to an affiliate of such a Health System; or (ii) Hospital Member delivers written notice to the 21C Member that, based on an opinion of nationally recognized counsel selected by Hospital Member, its investment in the Company or any Company action or inaction will:  (A) jeopardize the federal tax-exempt status or the tax-exempt bonds of Hospital Member or any of its Affiliates which are tax-exempt as organizations described in Section 501(c)(3) of the Code; or (B) result in the imposition of a material amount of unrelated business income tax on Hospital Member's allocable share of the Company's income, then: (x) the Members shall within thirty (30) days of the Transfer or Hospital Member's notice negotiate in good faith to resolve any such concerns in a manner that allows the Hospital Member to maintain is Company Interest; and (y) in the event that such negotiations fail to result in mutual agreement resolving such matter, Hospital Member shall have the right to exercise its put option as set forth herein.   To determine the exercise price of the Put Option, Hospital Member and 21C Member or the entity in which its Company Interest is transferred to (the "New Member")   shall each select a reputable appraiser to determine the fair market value of the selling Member's Company Interests (the "Put Option Value").  If the difference between the Put Option Value as determined by Hospital Member's appraiser (the "Hospital Member Put Option Value") and the Put Option Value as determined by the New Member's appraiser (the "New Member Put Option Value") is less than or equal to ten percent (10%) of the higher of the two appraisals, the Put Option Value shall equal the aggregate of the Hospital Member Put Option Value and the New Member Put Option Value divided by two.  If the difference between the Hospital Member Put Option Value and the New Member Put Option Value is more than ten percent (10%) of the higher of the two appraisals, then, within twenty (20) days of the completion of both appraisals, Hospital Member's appraiser and the New

Member's appraiser shall select a third appraiser for the purpose of making a final determination of the Put Option Value, which determination shall be completed within a period of sixty (60) days of the appointment of such appraiser and shall be binding upon the Hospital Member and the New Member.

        13.3    Closing.  The closing of any purchase of Company Interests by the 21C Member pursuant to Section 13.2 (the "<u>Closing</u>") shall occur at the offices of Company and be effective on the first day of the month that occurs at least ten (10) business days following the date on which the notice of exercise is given and the date on which the purchase price for the Company Interests to be purchased is finally determined in accordance with the applicable section hereof, whichever date is later, or at such other time and place as may be mutually agreed to in writing.

        13.4    The following shall apply upon the death incapacity or bankruptcy of a Member:

        (a)    <u>Occurrence of Event</u>.  Upon the death or Incapacity of a Member who is an individual (if and when applicable), and upon the bankruptcy of any Member, subject to the other provisions of this Agreement, Company shall not terminate and Company business shall continue.  For purposes of this Agreement, "Incapacity" means that a Member, who is an individual, is adjudicated mentally incompetent by a court of appropriate jurisdiction.

        (b)    <u>Continued Liability</u>.  Upon the death, Incapacity or bankruptcy of a Member (the "*Affected Member*") nothing herein contained shall be construed to relieve or release such Affected Member, or his, her or its successors, assigns, heirs or legal representatives from any breaches or defaults or obligations of such Member to Company pursuant to the provisions of this Agreement incurred as a result of, in connection with or prior to the termination or transfer, as the case may be, of his, her or its Company Interests, and all such breaches, defaults and obligations shall survive such event.

        (c)    <u>Sale of Units Following Death, Incapacity or Bankruptcy of a Member</u>.

        For one hundred eighty (180) days after any Member becomes an Affected Member, such Affected Member or his, her or its legal representative shall negotiate with the Company in good faith in an attempt to reach a mutually acceptable sale to Company of that Affected Member's Company Interests.  In the event such Company Interests remain unsold after the expiration of such one hundred eighty (180) day period, then Company may, but shall not be obligated to, purchase the Affected Member's Company Interests and shall pay the fair market value for such Company Interests.  If Company shall not have given the Affected Member notice of an election to purchase said Affected Member's Company Interests in accordance with the preceding sentence within thirty (30) days after the end of such one hundred eighty (180) day period, then Company shall be liquidated and dissolved in accordance with Section 15 below.

        Company and the Affected Member, or his or her legal representative, shall each select a reputable appraiser to determine the fair market value of the Affected Member's Company Interests (the "*Sale Value*").  If the difference between the Sale Value as determined

by Company's appraiser (the "*Company Sale Value*") and the Sale Value as determined by the Affected Member's appraiser (the "*Member Sale Value*") is less than or equal to ten percent (10%) of the higher of the two appraisals, the Sale Value shall equal the aggregate of the Company Sale Value and the Member Sale Value divided by two.  If the difference between the Company Sale Value and Member Sale Value is more than ten percent (10%) of the higher of the two appraisals, then, within twenty (20) days of the completion of both appraisals, Company's appraiser and the Affected Member's appraiser shall select a third appraiser for the purpose of making a final determination of the Sale Value, which determination shall be completed within a period of sixty (60) days of the appointment of such appraiser and shall be binding upon Company and the Affected Member.  The costs of such appraisals shall be borne equally by the Affected Member and Company.

Company or the Affected Member, as the case may be, shall pay in cash the Sale Value so determined at the closing of such purchase and sale, which closing shall occur at the offices of Company during business hours on such date and at such time as shall be designated by Company in a notice to the Affected Member; provided that such closing date shall not be more than ninety (90) days after the last day of the one hundred eighty (180) day period referred to above. The person or persons transferring the Company Interests shall execute such documents as may be required to affect the transfer.

13.5    Any Transfer of any Company Interest in violation of such restriction shall be deemed invalid, null and void, and of no force or effect and shall not confer on the purported transferee thereof any rights to receive distributions or allocations from the Company or any other rights as a Member of the Company.

## 14.    Option to Purchase Company Interest.

14.1    In the event that a Member is excluded from participation in the Medicare program or any other federal entitlement program (the "***Excluded Member***"), the Excluded Member shall provide written notice to the other Members of such exclusion within five (5) days of the occurrence of the exclusion (the "***Exclusion Notice***").  Upon receipt of the Exclusion Notice, the 21C Member shall have the right to purchase the Excluded Member's Company Interest if the Excluded Member is the Hospital Member, and the Hospital Member shall have the right to purchase the Excluded Member's Company Interest if the Excluded Member is the 21C Member.  The price to be paid for the Excluded Member's Company Interest shall be an amount equal to the Fair Market Value of the Company Interests as of the date of its exclusion from the Medicare program or any other federal entitlement program.  For purposes of this Agreement, the "Fair Market Value" of the Company Interests shall be determined by an independent appraisal as follows:  each Member shall, within ten (10) days of receipt of the Exclusion Notice from the Excluded Member, select one (1) appraiser, who shall be a member of the American Society of Appraisers and shall possess a designation of "Accredited Senior Appraiser" (or if an appraisal firm is selected, it must have at least one (1) appraiser who is a member of such Society and shall possess a designation of "Accredited Senior Appraiser"), which appraisers shall work together in an effort to determine the appraised, fair market value of the Company Interests to be transferred.  In the event the two selected appraisers cannot agree on an appraised, fair market value within thirty (30) days, such appraisers shall jointly select a third appraiser (which appraiser shall meet the same qualification requirements) to determine the

appraised, fair market value, which determination shall be final and binding upon the parties. Each Member shall be solely responsible for the costs incurred in connection with the appraiser retained by either of them.   In the event a third appraiser is required, the costs incurred in connection with such appraiser shall be divided equally between each Member.

14.2    In the event that a Member purchases the Company Interest, or any portion thereof, from the other Member(s) under either Section 13 or 14, the purchasing Member shall assume the guaranty obligation(s) entered pursuant to this Agreement of the selling Member in proportion to the amount of Company Interest being purchased by the purchasing Member.  In addition, the purchasing Member(s) shall use its reasonable best efforts to cause the selling Member to be released from any such guaranty obligation(s), and, in the event such release is not obtained, the purchasing Member(s) shall indemnify and hold the selling Member wholly and completely harmless from any and all debts, liabilities, and obligations arising out of, relating to, or based on such guaranty obligation(s).

### 15.    Dissolution of the Company.

15.1    The Company shall be dissolved upon the occurrence of any of the following events:

(a)    the unanimous written consent of the Board of Managers;

(b)    the bankruptcy of a Member, unless, within 90 days thereafter, the remaining Members (excluding, for purposes of quorum and vote, the bankrupt Member) consent to the continuation of the Company; or

(c)    the occurrence of any other event causing the dissolution of the Company pursuant to the Act.

15.2    Upon any dissolution of the Company, the assets of the Company shall be liquidated, and the Company's accountant shall prepare a statement setting forth the assets and liabilities of the Company as of the date of dissolution.

15.3    Profits and Losses resulting from such liquidation shall be allocated to the Members in accordance with their respective Company Interests, unless otherwise agreed to by all Members.

15.4    The proceeds of the liquidation shall be applied as follows:

(a)    first, to the expenses of liquidation;

(b)    second, to the payment of all debts and liabilities of the Company, excluding debts or other obligations to a Member;

(c)    third, to the payment of debts or other obligations owed by the Company to the Members, other than interest or principal owed to a Member on any loans by a Member to the Company, but if the amount available for such payment shall be insufficient, then pro-rata on account thereof;

(d)      fourth, to the payment of accrued interest, if any, on any loans made by the Members to the Company, but if the amount available for such payment shall be insufficient, then pro-rata on account thereof;

(e)      fifth, to the repayment of the principal of loans, if any, made by the Members to the Company, but if the amount available for such payment shall be insufficient, then pro-rata on account thereof; and

(f)      any balance remaining shall be distributed to the Members in proportion to the Members' positive Capital Accounts, after giving effect to all contributions, allocations, and distributions for all periods.

15.5    Upon dissolution of the Company, the Company shall establish any reserves which the Company's accountant deems reasonably necessary to cover any contingent or unknown liabilities or obligations of the Company.  The Company is authorized to fund such reserves from the amounts distributable to the Members under Section 15.4(f), in proportion to their respective Company Interests.  Such reserves shall be held in escrow by any attorney or any federally insured bank, savings and loan institution, or trust company doing business in the State of Delaware for the purpose of disbursing such reserves in payment of any liabilities that may become fixed and certain.  The escrow agent may deposit the escrow fund in interest-bearing time deposit accounts in commercial or savings banks, trust companies, or savings and loan institutions.  Eighteen months after the termination of the Company's business or before, in the discretion of the escrow agent, any balance remaining in the escrow fund which is not required to meet then known or reasonably certain liabilities shall be distributed to the Members in the same proportion as the reserve was established.

15.6    In the event of dissolution of the Company, the 21C Member shall have the exclusive option to acquire the assets of the Centers for their fair market value from the Company and to continue to own and operate the Centers.  "Fair Market Value" shall be determined in the manner set forth in Section 14.1.

16.    **Modification for Prospective Legal Events**.

16.1    If, in the good faith opinion of any Member, as supported by the written opinion of counsel to such Member, any Federal or state laws or regulations now existing or hereafter promulgated or enacted, including Medicare and laws relating to tax-exempt entities, are interpreted by judicial decision, a regulatory agency, or legal counsel in any manner as to indicate that the structure of this Agreement (including the Exhibits hereto and other documents referred to herein), or any portion thereof, may be in violation of such laws or regulations, such Member may require the Members to use their respective best efforts to amend this Agreement or other documents to the extent necessary to avoid further violation.  If the Members do not agree that the structure of this Agreement and related documents, or any portion thereof, may be in violation of such laws or regulations, the issue as to whether there is such a violation shall be submitted to binding arbitration in accordance with the alternative dispute resolution process established by the AHLA.  The arbitrator's decision will be final.  Unless otherwise required by the arbitration rules or process, all arbitration sessions shall be conducted in the State.  Each party will bear its own costs and expenses associated with the arbitration proceedings, including

costs of witnesses, travel, attorneys, and other representatives.  The general costs and expenses of the proceedings, such as the fees of the arbitrators and the charges of the AHLA, will be divided equally among the parties to the dispute.

16.2    To the maximum extent possible, any such amendment shall preserve the underlying economic and financial arrangements set forth herein.  A Member requesting such an amendment shall give written notice thereof to the other Members which shall set out in sufficient detail the basis for the amendment request and specifically identify the specific provisions of this Agreement for which renegotiation is sought.  Within thirty (30) days of its receipt of such notice, the other Members shall give notice of any additional provisions of this Agreement as to which they request renegotiation and the reasons thereof.  No provisions of this Agreement other than those specifically designated by the Members for renegotiation shall be affected by the renegotiations.

16.3    Should the Members be unable to agree upon mutually acceptable revisions to this Agreement within ninety (90) days after receipt of the initial request for renegotiation, then the Company shall be dissolved.

16.4    Each of the foregoing time periods shall be shortened if and to the extent necessary to avoid a violation of applicable law in a timely manner.

## 17.    Interpretation and Survival

17.1    Each covenant, promise, agreement, representation, and warranty contained in this Agreement is independent of all other covenants, promises, agreements, representations, and warranties contained herein (whether or not covering any identical or related subject matter) and shall be independently and separately complied with and satisfied.

17.2    All covenants, promises, agreements, representations, and warranties made in this Agreement or pursuant hereto shall survive the date hereof, the execution of this Agreement, the consummation of transactions contemplated hereby, and any inspection or investigation of any alleged breach of this Agreement.  In interpreting this Agreement, this Agreement and each provision hereof shall be deemed to have been drafted equally by both Members.

## 18.    Notices.

All notices required or permitted by this Agreement shall be in writing and shall be deemed to have been given when actually received, one business day after being sent by overnight courier service, or five business days after mailing when mailed by United States registered or certified mail, whichever occurs first.  Notices to the Company shall be sent to all Members.  Notices to a Member shall be addressed to the Member at the address set forth on **Exhibit B**.  A Member may change its address for notice purposes by giving written notice to the other Members.

19. **Confidentiality**.

Each Member shall keep confidential all confidential information about the Company and about other Members and their respective Affiliates learned through the Company, and shall not cause or knowingly permit any such confidential information to be disclosed to or used by any other person or entity for any purpose other than in furtherance of the business and purposes of the Company.  The Members recognize that in furtherance of the business and purposes of the Company it shall be necessary to share confidential information with the Members' respective employees, officers, agents, and professional advisors; and the Members shall take reasonable steps to assure that such persons are made aware of the need to maintain the confidentiality of such information.  To the extent permitted by law, each Member may use general business information concerning the operations of the Company's Centers for the purposes of reporting its taxable income, obtaining financing arrangements for such Member or its Affiliates or for the purpose of establishing ventures similar to the Company in other non-competing markets.  No Member shall issue any press releases or make any other public announcements about the Company unless the other Members have consented thereto.

20. **Further Assurances**.

The Members agree that they and each of them shall take whatever action or actions as are reasonably necessary or desirable from time to time to effectuate the provisions or intent of this Agreement, and to that end the Members agree that they shall execute, acknowledge, seal, and deliver any further instruments or documents which may be necessary to give force and effect to this Agreement or any of the provisions hereof, or to carry out the intent of this Agreement or any of the provisions hereof.

21. **Amendment**.

This Agreement may be amended only by means of a written agreement signed by all of the Members.

22. **Governing Law**.

This Agreement shall be governed by, and interpreted in accordance with, the laws of the State of New Jersey, exclusive of its rules governing conflict of laws.

23. **Severability**.

23.1    In the event that any provision of this Agreement is deemed to be void and invalid by any Court of competent jurisdiction, then this Agreement shall remain in full force and effect, except for such provision.

23.2    Nothing contained in this Agreement shall be construed as requiring the commission of any act contrary to law.  In the event there is any conflict between any provision of this Agreement and any statute, law, ordinance or regulation, the latter shall prevail, but in such event the provisions of this Agreement thus affected shall be curtailed and limited only to the extent necessary to conform with the requirements of law.

68735 v8

24.        **Gender and Context: Definition of Affiliate**.

24.1    Unless the context of this Agreement clearly requires otherwise, references to the plural include the singular, to the singular include the plural, to the part include the whole, and to the male gender shall also pertain to the female and neuter genders and vice versa.   The term "including" is not limiting, and the term "or" has the inclusive meaning represented by the phrase "and/or".   The words "hereof," "herein," "hereby," "hereto," "hereunder," and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement.   The word "person" shall mean any individual, corporation, partnership, limited liability company, trust, association, government (or agency, body, department, instrumentality, or political subdivision thereof), or other entity.

24.2    Section, Schedule, Exhibit and clause references are to this Agreement unless otherwise specified.   The headings herein are inserted only as a matter of convenience and reference, and in no way define, limit, or describe the scope of this Agreement, or the intent of any provisions hereof.

24.3    As used herein, an "*Affiliate*" of a person or entity means an entity controlling, controlled by, or under common control with such person or entity.

25.        **Benefit**.

This Agreement shall be binding upon and shall inure to the benefit of the Members and their successors and permitted assigns.   Except for provisions clearly intended to benefit an Affiliate of a Member, no person or entity not a party to this Agreement shall be deemed a third-party beneficiary of this Agreement or shall have any right, power, or remedy hereunder.

26.        **Entire Agreement**.

This Agreement, together with all Exhibits, sets forth all (and is intended by the Members to be an integration of all) of the promises, agreements, conditions, understandings, representations, and warranties between the Members with respect to the Company.   There are no promises, agreements, conditions, understandings, representations, or warranties, oral or written, express or implied, between them other than as set forth herein.   This Agreement supersedes any and all prior agreements and understandings relating to the subject matter hereof.

27.        **Counterparts.**

This Agreement may be executed in any number of identical counterparts, each of which shall be deemed an original and all of which taken together shall be deemed to be the same instrument.

**[SIGNATURE PAGE TO FOLLOW]**

**IN WITNESS WHEREOF,** the Members a have caused the Agreement to be executed as of the date first above written.

**21C MEMBER:**

21ST CENTURY ONCOLOGY OF
NEW JERSEY, INC.

By:_____
Name:
Title:

**HEALTH MANAGEMENT SERVICES
ORGANIZATION, INC.**

By:_____
Name:
Title:

**[SIGNATURE PAGE FOR OPERATING AGREEMENT]**

## EXHIBIT A

## Locations of Radiation Therapy Centers

**1.**    220 Sunset Road
Willingboro, NJ  08046

**2.**    130 Carnie Boulevard
Voorhees, NJ  08043

**3.**    893 S. White Horse Pike
Hammonton, NJ 0 08037

## EXHIBIT B

| Name and Address of Members | Membership Interest |
|---|---|
| **21C MEMBER** | |
| 21st Century Oncology of New Jersey, Inc. | |
| 2270 Colonial Boulevard | |
| | 70% |
| Fort Myers, FL 33907 | |
| | |
| **HOSPITAL MEMBER** | |
| Health Management Services | 30% |
| Organization, Inc. | |
| 1660 Haddon Avenue | |
| Camden, NJ  08103 | |

68735 v8

## SCHEDULE 5.4

## Example of Equity Reallocation Adjustment

For purposes of illustrating the equity reallocation adjustment contemplated by Section 5.4 the following constitute the relevant assumptions:

(a)    Member A originally contributed $6mm, possesses a 60% Company Interest, plus as part of an additional capital call requiring an Additional Capital Contribution from Member A in the amount of $3mm, Member A contributed $3mm,

(b)    Member B originally contributed $4mm, possesses a 40% Company Interest, plus as part of an additional capital call requiring an Additional Capital Contribution from Member B in the amount of $2mm, Member B did not contribute anything, and

(c)    Member A contributed $2mm on behalf of Member B.

For further purposes of illustration, the numerator of the fraction contemplated by Section 5.4 is $2mm, and the denominator of the fraction contemplated by Section 5.4 is $15mm, resulting in a quotient of 13.33% and then multiplied by 2, resulting in 26.67% of Company Interests to be reallocated pursuant to Section 5.4.  Member A's contributory percentage for the Additional Capital Contribution was 100%.

The 26.67% of the Company Interests to be reallocated shall be reallocated as follows: (a) Member A's Company Interest shall be increased by 26.67% to 86.67% (determined as follows: 100% multiplied against 26.67% = 26.67%), and (b) Member B's Company Interest shall be decreased by 26.67% to 13.33% (determined as follows: 100% multiplied against 26.67% = 26.67%). The following is a general illustration that is not reflective of definitive rounding.