**Marilyn Macron P.C.**
Marilyn Cowhey Macron (MM-8311)
211 Beach 134th Street, 1st Floor
Belle Harbor, NY  11694
Tel. 718-598-0512
Fax. 718-945-7455
*marilyn@marilynmacron.com*

*Attorneys for Plaintiff*
*Central Coast Medical Oncology Corp.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>21st CENTURY ONCOLOGY HOLDINGS, INC., et al.,<br><br>       Debtors.<br>_____<br><br>CENTRAL COAST MEDICAL ONCOLOGY CORP.,<br><br>       Plaintiff,<br><br>  v.<br><br>U.S. CANCER CARE, INC. and ONCURE MEDICAL CORP.<br><br>       Defendants. | Chapter 11<br><br>Case No. 17-22770 (RDD)<br><br>(Jointly Administered)<br><br><br><br>Adversary Proceeding No. 17-08243 |

**ADVERSARY COMPLAINT OF CENTRAL COAST MEDICAL ONCOLOGY CORP.**
**FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF**

In this Adversary Complaint against Debtors U.S. Cancer Care, Inc. ("USCC") and

Oncure Medical Corp. ("ONCURE"), plaintiff Central Coast Medical Oncology Corp.

("CCMO"), alleges as follows:

## INTRODUCTION

1.      CCMO is seeking a declaratory judgment that the executory Amended and

Restated Management Services Agreement, dated October 25, 2013 (the "MSA") and an

unexpired sublease dated February 17, 2012 ("Sublease") with USCC/ONCURE cannot be

assumed under 11 U.S.C. §365. CCMO is also seeking to liquidate its claims against the

USCC/ONCURE bankruptcy estates.

2.      CCMO brings this Adversary Complaint because the status quo at the Mission

Hope Cancer Center ("MHCC"), a state-of-the-art cancer center in Santa Maria, California, is

untenable.  Debtors USCC and ONCURE are supposed to be working alongside CCMO to

provide the Santa Maria community with access to top-notch cancer care, but instead they are

actively undermining CCMO and the provision of care to MHCC's patients.

3.      The MSA cannot be assumed. If the MSA could otherwise be assumed,

USCC/ONCURE can never cure the existing defaults or provide adequate assurance of future

performance under the MSA. The MSA can only be rejected.

4.       First, the MSA purports to require CCMO to make payments to USCC/ONCURE

that constitute a percentage of CCMO's net profits and additional fees exceeding the reasonable

value of USCC/ONCURE's services; this provision violates California law.  USCC/ONCURE

falsely stated to CCMO that the fees USCC/ONCURE charged to CCMO would be the

reasonable fair market value of USCC/ONCURE's services.  CCMO is informed and believes,

and based thereon alleges, that USCC/ONCURE's charges to CCMO are not reasonable, and

USCC/ONCURE have offered materially incomplete financial statements that only serve to

conceal their wrongful actions.

5.      Second, USCC/ONCURE has repeatedly breached the MSA, including by failing to perform software updates on key equipment at MHCC, failing to provide material financial information to CCMO required under the MSA, and failing to assist CCMO in the expansion of its practice.  USCC/ONCURE have failed to cure these defaults or provide adequate assurance that the defaults will ever be cured.  For this additional reason, the MSA should be rejected, not assumed.

6.      The Sublease cannot be assumed. If the Sublease could otherwise be assumed, USCC/ONCURE can never cure the existing defaults or provide adequate assurance of future performance under the Sublease. The Sublease can only be rejected.

7.      USCC/ONCURE are breaching the terms of the Sublease with CCMO by diverting CCMO's patients to a facility in nearby Lompoc, California, that has less advanced equipment and no support services but where it has some financial interest.  USCC/ONCURE are accomplishing the diversion of patients by taking the patients' medical records (CCMO's confidential property) without authorization.  USCC/ONCURE have refused to cure these defaults or provide adequate assurance that the defaults will ever be cured.

8.      CCMO is asking this Court to enter a judgment declaring that:

    a.   the executory MSA is void (or in the alternative find that it has been breached and should be terminated), and cannot be assumed, and

    b.   the unexpired Sublease has been breached, cannot be assumed, and should be rejected.

9.      This Court should deny any attempt to assume the MSA or Sublease and fix and allow damages for the numerous wrongful and tortious acts alleged below.  CCMO also asks that, in awarding such relief, the Court order USCC/ONCURE to do everything in their power to

ensure that there is no disruption to patient care, including by ordering USCC/ONCURE to

provide CCMO with access to all medical records necessary to continue the provision of

radiation oncology services to CCMO's patients.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over the parties and the subject matter of this core

proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O), and 28 U.S.C. § 1334(b).

11.     CCMO consents to the jurisdiction of the bankruptcy court over the issues arising

under the MSA and Sublease.

12.     Venue of this adversary proceeding is proper in this district pursuant to 28 U.S.C.

§ 1409(a).

13.     The statutory basis for the relief requested in this Complaint includes 11 U.S.C.

§ 365.

## PARTIES

14.     CCMO is a corporation organized and existing under the laws of California, with

its principal place of business at the Mission Hope Cancer Center ("MHCC") in Santa Maria,

California.  CCMO provides medical oncology and radiation oncology services to its patients as

part of the integrated cancer care services provided at MHCC.

15.     On information and belief, Debtor USCC is a Delaware corporation doing

business in California, including at MHCC.

16.     On information and belief, Debtor ONCURE is a Delaware corporation.  CCMO

is informed and believes, and based thereon alleges, that ONCURE is the owner of USCC, and

attorneys for USCC and ONCURE have previously represented that "U.S. Cancer Care, Inc.

and/or Oncure Medical Corp." are parties to MSA and Sublease.

4

## FACTUAL BACKGROUND

### A.    The Parties And Contracts At Issue

17.    CCMO is a provider of medical oncology and radiation oncology services to patients at MHCC, a world-class cancer center located on real property owned by Dignity Health, doing business as Marian Regional Health Center ("Dignity") in Santa Maria, California. As part of its mission to provide outstanding care to patients in the Santa Maria area, CCMO played a foundational role in the creation and development of MHCC's supportive, integrated environment.

18.    There are two key contractual arrangements relevant to CCMO and USCC/ONCURE's activities at MHCC.

19.    Under the MSA, USCC/ONCURE provide CCMO with administrative support services, including managing and administering "bookkeeping, billing and collection services, accounts receivable and accounts payable management services." See MSA, 2.1. A true and correct copy of the MSA is attached as Exhibit 1 hereto

20.    Second, services are provided at MHCC according to the terms of several leases.

21.    Dignity leases real property to MHCC, LLC under a Ground Lease dated September 8, 2010 (the "Ground Lease"), a true and correct copy of which is attached as Exhibit 2 hereto.

22.    The Ground Lease between Dignity and MHCC forbids "Disqualified Persons" from using and occupying space at MHCC. See Ground Lease, § 9.A(b)(iii). A "Disqualified Person" is defined as "[a]ny Person or any Affiliate of a Person that directly or indirectly engages in activities within [Santa Barbara] County or within San Luis Obispo County, California that are 'directly competitive'" with Dignity. The prohibition against Disqualified

Persons ensures that patients in the Santa Maria area have access to MHCC's state-of-the-art facility. The Ground Lease expressly states that Section 9 regarding Disqualified Persons is excluded from the Ground Lease's arbitration provision.

23.    CCMO (as tenant) operates its medical oncology practice at MHCC pursuant to an Office Space Lease dated September 16, 2010 (the "Master Lease") with MHCC, LLC (as landlord), a true and correct copy of which is attached as Exhibit 3 hereto. Section 3.4 of the Master Lease incorporates the restriction on "Disqualified Persons" in the Ground Lease.

24.    On February 17, 2012, CCMO entered into a Sublease with USCC/ONCURE for the provision of radiation oncology services (the "Sublease"), a true and correct copy of which is attached as Exhibit 4 hereto. The Sublease provides that it is subordinate to the terms of the Master Lease, including the Ground Lease's limitation on "Disqualified Persons," and that USCC/ONCURE's rights under the Sublease are subject to CCMO's rights under the Master Lease.

**B.    The MSA Is Void**

25.    The MSA purports to require CCMO to pay USCC/ONCURE a variety of fees in exchange for its administrative services (collectively, the "Total Management Fee"), which USCC/ONCURE represented would be fair market value and not include duplicate expenses. See MSA, Art. V.

26.    In particular, the MSA purports to require CCMO to pay a "Total Management Fee" that comprises several separate payments, including payments for Operational Expenses, a Business Offices Services Fee, a Physics Fee, plus a percentage of net profits described as "fifty percent (50%) of the difference between Practice Revenues and all Operational Expenses." See MSA, Art. V.

6

27.     The part of the fee that purports to require payment of net profits is illegal under California law.  See Cal. Bus. & Prof. Code § 650(b).

28.     The fees charged for business office services and physics services (which relate to the use of radiation in connection with radiation oncology services), are also impermissible under California law because they purport to require CCMO to pay fees that are not commensurate with the value of the services provided.  See Cal. Bus. & Prof. Code §§ 650(b), 2052, 2400.

29.     USCC/ONCURE represented to CCMO that the fees paid to USCC/ONCURE would be the reasonable fair market value of the services provided, but USCC/ONCURE have wholly failed to demonstrate that such fees are reasonable or fair market value or that expenses and fees purported to be owed are reasonable and not duplicative.  CCMO is informed and believes, and based thereon alleges, that USCC/ONCURE's fees are not reasonable or fair market value, and given the numerous breaches by USCC/ONCURE discussed herein, the value of the services rendered by USCC/ONCURE is minimal.

30.     CCMO realized that it was not receiving reasonable value for the services rendered and has been placing funds aside until the legality of the MSA can be determined.

31.     The illegality in the MSA is heightened because of the extensive control that USCC/ONCURE exercise over CCMO's operations, including but not limited to, in the following ways.

32.     First, the MSA restricts the locations where CCMO can practice medicine.  MSA, 3.4(h).

33.     Second, USCC/ONCURE exercise significant discretion in hiring physicians and staff in the radiation oncology department.  The MSA strictly prescribes which physicians can practice at MHCC, and requires USCC/ONCURE's prior written consent to permit other

physicians to practice at MHCC.  MSA, 2.7.   The MSA also states that USCC/ONCURE are

responsible for the assignment of all clinical staff to perform services at the Center.   MSA,

2.6(b)

34.    Third, USCC/ONCURE have not sought the Practice's "advice and input . . .

concerning the disciplining and performance of, and the determination of salary increases and/or

bonuses for, the Personnel," even though USCC/ONCURE have an obligation to "respect the

opinion of the Practice and all Physicians as to all such matters whenever possible . . . ."  MSA,

2.6(d).

35.    USCC/ONCURE's staffing practices restrict CCMO's ability to practice medicine

and this results in unnecessary expenditures.  Instead of consulting CCMO, USCC/ONCURE

hired a temporary replacement radiation therapist to fill a position in Spring 2016, which cost

over $50,000 for a single month.  CCMO was never given the opportunity to obtain a less

expensive option.

36.    Fourth, the MSA's term is very long, over 13 years, extending the period in which

USCC/ONCURE exercise this impermissible control.  MSA, 6.1.

37.    CCMO seeks a declaration that the entire MSA is void and contrary to public

policy, and the funds set aside remain CCMO's property.

**C.    USCC/ONCURE Have Breached The MSA By Failing To Update Software
        Of Key Equipment**

38.    The services provided by CCMO at MHCC rely upon the provision of radiation

oncology services through the use of linear accelerators (the machines that deliver radiation

treatments to patients).

39.    Linear accelerators require regular software updates.  In the MSA, USCC/ONCURE agreed to maintain and provide support services for medical equipment at MHCC.  MSA, 2.2(a), 2.4(d).

40.    Although required to do so under the MSA, USCC/ONCURE have failed to update the software of one of MHCC's linear accelerators.

41.     In order to perform the software updates now, Central Coast is informed and believes, and based thereon alleges, that the machine would need to be shut down for approximately five to ten days (but performing the updates in five days would cost approximately $75,000).  Because radiation patients typically receive treatments daily, shutting the machine down for several days would require CCMO to either send patients to competitors or attempt to reschedule all patients on the second radiation machine at MHCC (which would likely be impossible).

**D.    USCC/ONCURE Have Breached The MSA By Failing To Assist In The Expansion Of CCMO's Practice**

42.    USCC/ONCURE have refused to permit CCMO to expand the radiation oncology services offered at MHCC.

43.    CCMO is entitled to review and resolve questions relating to the types and levels of medical services to be provided at MHCC, and has the "ultimate authority to determine the medical equipment and medical supplies needed for the provision of Radiation Oncology Services by the Practice . . . ."  MSA, 4.3(a), 2.2(b).

44.    In contrast to CCMO's broad powers with respect to the services to be provided, the MSA requires USCC/ONCURE to assist CCMO in adding new procedures and services, as

provided for in the annual budget, and provide equipment as necessary or appropriate for the proper delivery of radiation oncology services.  MSA, 2.2(a), 2.10

45.    Since 2013, CCMO has repeatedly attempted to exercise its discretion to expand the types of medical services offered by proposing the addition of a Stereotactic Brain Radiation Therapy ("SBRT") program at MHCC. SBRT is a cutting edge, but increasingly utilized, procedure, the addition of which would be consistent with the parties' obligations and MHCC's mission to provide high quality care.

46.    In response to CCMO's reasonable request to add SBRT, USCC/ONCURE have refused to provide assistance or the necessary and appropriate equipment to offer SBRT. USCC/ONCURE claim that adding SBRT is not within the budget but, as discussed below, USCC/ONCURE have failed to even create a budget, so CCMO has no way of verifying USCC/ONCURE's purported excuse.

47.    CCMO was further denied a good faith opportunity to discuss addition of the SBRT program because USCC/ONCURE failed to meet their obligations with respect to a Joint Governing Board, which USCC/ONCURE failed to establish for approximately two years.  See MSA, 4.1, MSA, 4.2(a), MSA, 4.2(c).

48.    Instead of supporting the addition of SBRT at MHCC, CCMO is informed and believes, and based thereon alleges, that USCC/ONCURE require patients to be referred to the "North Oaks Radiation Oncology Center," in Thousand Oaks, California (the "Thousand Oaks facility"), yet another facility in which USCC/ONCURE have a financial interest.  CCMO is informed and believes, and based thereon alleges, that the Thousand Oaks facility offers Gamma Knife therapy, a treatment similar to SBRT.  However, for patients who reside near MHCC,

USCC/ONCURE are unnecessarily forcing them to travel to, and often spend the night near, the

Thousand Oaks facility for this treatment.

49.    CCMO is informed and believes, and based thereon alleges, that USCC/ONCURE

are refusing to cooperate in good faith to consider changes to expand the services offered at

MHCC or supply the proper equipment to add an SBRT program because USCC/ONCURE have

concluded that not adding SBRT is financially beneficial to USCC/ONCURE.

50.    USCC/ONCURE's actions in this regard have caused significant damage to

CCMO (in an amount to be proven at trial), undermined MHCC's mission, and harmed patients

who no longer receive treatments from CCMO at MHCC.

**E.    USCC/ONCURE Have Breached The MSA By Repeatedly Concealing Material Financial Information**

51.    USCC/ONCURE have breached the MSA by repeatedly failing to provide CCMO

with financial information required to be provided under the MSA and concealing material

financial information from CCMO.

52.    First, USCC/ONCURE have never provided CCMO with an annual budget,

despite CCMO's repeated requests.  In doing so, USCC/ONCURE have prevented CCMO from

exercising its right to comment on, and request changes to, the budget and an expansion of the

services offered.  MSA, 2.3.

53.    Second, USCC/ONCURE have repeatedly failed to provide CCMO with year-end

financial statements, and the monthly statements that are provided are regularly delivered months

late.  MSA, 2.4(k)(ix), 2.5.

54.    Third, what information USCC/ONCURE have provided is presented in general

categories and does not "fully and accurately reflect" all material aspects of the business

operations, nor does the information provided include the detailed line-items with back-up documentation required under the MSA.  See MSA, 2.4(k)(ix), 2.5, 5.3(a), 5.5.

55.    For example, CCMO requested that USCC/ONCURE provide back-up information about several line items (including direct salaries and fringe benefits, outside services, R&M machines, indirect salary and fringe, repairs and maintenance, other G&A), but USCC/ONCURE have failed to do so.  MSA, 5.5.  Regarding salaries, USCC/ONCURE have claimed that they do not have information about the salaries paid to USCC/ONCURE's employees, even though they are able to calculate the amount paid in salaries precisely.

56.    Fourth, USCC/ONCURE have failed to provide CCMO with an ongoing assessment of business activity and patient satisfaction that CCMO needs to monitor and improve its practice.  MSA, 2.4(g).

57.    Fifth, USCC/ONCURE have failed to "develop systems to track revenues, expenses, utilization, quality improvement, Practice and Physician productivity and patient satisfaction."  MSA, 2.11.

58.    Finally, USCC/ONCURE have failed to provide CCMO with meaningful access to USCC/ONCURE's computer information system to monitor USCC/ONCURE's billings and collections practices, despite CCMO's request for such access from the start of the MSA in 2013.  MSA, 2.4(l).  In November 2015, two years after the MSA began, USCC/ONCURE finally provided CCMO with limited access to its computer system, but did not provide any training or instruction on use of the system, rendering it useless.  Thus, USCC/ONCURE have not satisfied their obligation under the MSA to permit CCMO to review billing and collections information, and monitor USCC/ONCURE's billing and collection services.  MSA, 2.4(l).

59.     The failure to provide material financial information is particularly alarming because it prevents CCMO from monitoring USCC/ONCURE, and CCMO has numerous reasons to be concerned.  For example, CCMO is informed and believes, and based thereon alleges, that there has been a decrease in patients seen by CCMO without a decrease in expenses paid by CCMO to USCC/ONCURE, a suspicious result that CCMO is unable to investigate without the financial line-items and backup data that USCC/ONCURE are withholding.

60.     In simple terms, USCC/ONCURE's failure to provide the required financial information has left CCMO in the dark regarding the financial health of its practice and the accuracy of USCC/ONCURE's handling of significant sums.

61.     CCMO is informed and believes, and based thereon alleges, that USCC/ONCURE's actions in failing to provide financial information have caused significant damage to CCMO in an amount to be proven at trial.

**F.      USCC/ONCURE Have Breached The Sublease And The MSA By Diverting Patients Away From MHCC**

62.     USCC/ONCURE have breached the Sublease.

63.     CCMO is informed and believes, and based thereon alleges, that USCC/ONCURE have violated sections 18.1 and 18.2 of the Sublease, which incorporate the Ground Lease's prohibition against engaging in activities that compete with Dignity.

64.     CCMO is informed and believes, and based thereon alleges, that USCC/ONCURE have a financial interest in a facility called "Coastal Radiation Oncology Lompoc" (the "Lompoc facility"), which began operations in or around November 2015.  CCMO is informed and believes, and based thereon alleges, that USCC/ONCURE are facilitating, encouraging, financially benefitting from, or otherwise participating in, the provision of imaging, infusion, and

laboratory services, as well as similar, but less advanced, radiation oncology services at the

Lompoc facility in competition with Dignity.

65.      CCMO is informed and believes, and based thereon alleges, that USCC/ONCURE

are facilitating, encouraging, financially beneffiting from, or otherwise participating in the

offering of services, including CT scans, at another facility in which they have a financial

interest located in San Luis Obispo, California (the "San Luis Obispo facility").  These actions

have placed CCMO in danger of violating its contractual obligations with Dignity and MHCC, as

typified by Dignity naming CCMO as a defendant in its Complaint in the Santa Maria litigation

Case No. 17CV00920.

66.      CCMO is informed and believes, and based thereon alleges, that USCC/ONCURE

staff at MHCC have referred numerous patients away from MHCC to the Lompoc facility.

CCMO is further informed and believes, and based thereon alleges, that in diverting patients

away from MHCC, USCC/ONCURE have not provided written notice to patients that they has a

financial interest in the Lompoc facility or that the patients may seek care elsewhere, in violation

of California law, including California Business & Professions Code § 654.2.

67.      CCMO has seen nothing to suggest that USCC/ONCURE informs patients that

the Lompoc facility offers older equipment and none of the support services found at MHCC,

including for example because:

- MHCC utilizes cutting edge technology, like the TrueBeam Linear Accelerator,

    while Lompoc uses a much older Rapid Arc machine;

- MHCC is an integrated center with a wide array of support services, while the

    Lompoc facility has no support services and the hospital with which it is

    connected cannot provide the most basic chemotherapy, receives substandard

grades from a hospital watchdog group, and is at risk of losing its Medi-Cal

certification following a review by the Centers for Medicare and Medicaid

Services that identified numerous deficiencies;

- Patients who are referred away from MHCC do not receive the benefit of follow-up care from CCMO's physicians;

- USCC/ONCURE is participating in the provision of services at the Lompoc facility because it would be financially or otherwise advantageous, not out of a desire to provide better patient care; and

- The distance between Lompoc and MHCC is negligible given the wide disparity in quality of services offered, and the life or death stakes for CCMO's patients.

68.    CCMO is informed and believes, and based thereon alleges, that USCC/ONCURE staff have facilitated the use of forms that purports to allow the release of medical records without CCMO's permission in order to accomplish the illicit diversion of patients to other USCC/ONCURE facilities. CCMO is informed and believes, and based thereon alleges, that USCC/ONCURE staff transferred patient records out of MHCC and CCMO's possession or made copies of such records without permission.  These records are the confidential and proprietary property of CCMO.  MSA 2.8.  Moreover, without notice to, or authorization from, Central Coast, USCC/ONCURE moved a database of Central Coast's medical records necessary to the provision of radiation oncology services to an office location that Central Coast believes is in Florida.  The transfer of this database is of great concern to CCMO, not least because entities the CCMO is informed and believes, and based thereon alleges, are related to USCC/ONCURE have been embroiled in lawsuits and investigations as a result of data breaches of patient records.

69.    USCC/ONCURE's actions have caused significant monetary damage to CCMO. CCMO's investigation is continuing, but based on information provided by USCC/ONCURE, CCMO is informed and believes, and based thereon alleges, that it has been damaged in an amount to be proven at trial, but in excess of $4,000,000, and counting, as well as unliquidated attorneys' fees and costs of approximately $200,000 as of August 29, 2017.

## NATURE OF THE RELIEF REQUESTED

70.    CCMO asks the Court to void the MSA and terminate the Sublease, reject the MSA and Sublease, deny any attempt to assume the MSA or Sublease, and fix and award CCMO damages for USCC/ONCURE's tortious conduct in an amount to be proven at trial but in excess of $4,000,000, as well as unliquidated attorneys' fees and costs of approximately $200,000 as of August 29, 2017.

## COUNT I

### (Declaratory Judgment)

71.    CCMO repeats and re-alleges paragraphs 1-70 as if fully set forth herein.

72.    CCMO contends that the entire MSA is void and contrary to public policy because it purports to require payment of a percentage of net profits and payments above the reasonable value of the services provided, in violation of California law, including California Business & Professions Code §§ 650, 2052, 2400.  Additionally, CCMO contends that the illegality of the MSA is pervasive, including as a result of the impermissible degree of control exercised by USCC/ONCURE over CCMO's practice of medicine caused by several factors, including but not limited to, the limitations on where CCMO can practice medicine, USCC/ONCURE's discretion in staffing decisions and budgetary matters, and the long length of the MSA.  CCMO contends that as a result of this illegality, the Court should declare that (1) the

MSA is void, cannot be assumed, and must be rejected, (2) the funds set aside by CCMO are CCMO's property, and (3) USCC/ONCURE must quit and surrender the premises and do everything necessary to ensure continuity of care to CCMO patients receiving care at MHCC following termination of the MSA, including but not limited to, promptly providing CCMO with access to all radiation oncology records in USCC/ONCURE's possession, custody or control. CCMO is informed and believes, and based thereon alleges, that USCC/ONCURE contend that the MSA is not void and that USCC/ONCURE are entitled to all fees purportedly due under the MSA.

73.    A judicial determination is necessary so that the parties may ascertain their rights and obligations.

74.    CCMO therefore requests a judicial determination that:

a.    The MSA is void, cannot be assumed, and must be rejected;

b.    Funds set aside by CCMO are CCMO's property; and

c.    The defaults under the unexpired Sublease cannot be cured and the Sublease must be rejected. USCC/ONCURE must quit and surrender the premises and do everything necessary to ensure continuity of care to CCMO patients receiving care at MHCC following termination of the MSA, including but not limited to, providing CCMO with access to all radiation oncology records in USCC/ONCURE's possession, custody or control.

75.    CCMO therefore requests a judicial determination of the parties' respective rights and obligations on the disputes referenced above.

## COUNT II

### (Breach of Contract -- MSA)

76.     CCMO repeats and re-alleges paragraphs 1-75 as if fully set forth herein.

77.     In the alternative, if the MSA is not void, then USCC/ONCURE have breached the MSA and CCMO is entitled to terminate the MSA and, except as necessary to provide care to any patient undergoing treatment at MHCC, USCC/ONCURE must immediately quit and surrender their operations at MHCC.

78.     CCMO entered into the MSA, a valid written contract, with USCC/ONCURE.

79.     CCMO has performed, or has been ready and willing to perform if permitted by USCC/ONCURE, all of the conditions, covenants, and promises that the MSA required, except those waived or excused by reason of USCC/ONCURE's breach or which USCC/ONCURE otherwise prevented or excused CCMO from performing.

80.     As set forth above, CCMO is informed and believes, and thereon alleges that USCC/ONCURE breached their obligations under the MSA in several respects, including, but not limited to, by charging fees that are not reasonable or fair market value, failing to make all necessary software updates to the radiation oncology equipment at MHCC, failing to support the expansion of CCMO's medical practice, transferring patients' medical records (CCMO's confidential property) without proper notice or authorization, and failing to provide numerous types of financial data and information required under the MSA.

81.     CCMO also seeks an injunction with respect to USCC/ONCURE's ongoing conduct in transferring or copying patient medical records (CCMO's confidential property) without CCMO's permission.  CCMO's legal remedies are inadequate in that USCC/ONCURE's

conduct is ongoing and will continue to injure CCMO, including by preventing CCMO from offering care to patients who have been diverted to other facilities by USCC/ONCURE.

82.    CCMO has provided written notice to USCC/ONCURE of the numerous breaches of the MSA described above and time to cure, but USCC/ONCURE have failed to cure the breaches described above.  Therefore, CCMO is entitled to terminate the MSA and, except as necessary to provide care to any patient undergoing treatment at MHCC, USCC/ONCURE must immediately quit and surrender its operations at MHCC.  MSA, 6.3(d), 6.3(i), 6.4(c).

83.    As a direct and proximate result of USCC/ONCURE's breaches of the MSA, CCMO has suffered monetary damages, and continues to suffer monetary damages, as described above, in an amount to be proven at trial, but in excess of $4,000,000, plus interest thereon.

84.    CCMO is entitled to recover its reasonable attorneys' fees and costs incurred in prosecuting this claim under section 11.1(f) of the MSA.

## COUNT III

### (Breach of Contract -- Sublease)

85.    CCMO repeats and re-alleges paragraphs 1-84 as if fully set forth herein.

86.    CCMO entered into the Sublease, a valid written contract, with USCC/ONCURE.

87.    CCMO has performed, or has been ready and willing to perform if permitted by USCC/ONCURE, all of the conditions, covenants, and promises that the Sublease required, except those waived or excused by reason of USCC/ONCURE's breach or which USCC/ONCURE otherwise prevented or excused CCMO from performing.

88.    As set forth above, CCMO is informed and believes, and thereon alleges that USCC/ONCURE breached its obligations under the Sublease.  In particular, USCC/ONCURE

have violated sections 18.1 and 18.2 of the Sublease, which incorporate the Ground Lease's prohibition against engaging in activities that directly compete with Dignity.

89.    As described in more detail above, USCC/ONCURE are offering several competitive services that make it a "Disqualified Person," including, but not limited to having some interest in the Lompoc and San Luis Obispo facilities, which offer various services that directly compete with MHCC and Dignity's San Luis Obispo facility, and participating, assisting, or encouraging the diversion of patients to the Lompoc facility.

90.    Under Section 4(b) of the Sublease, CCMO may terminate the Sublease if USCC/ONCURE fail to remedy a breach within 30 calendar days of written notice of the breach. CCMO provided written notices of breach in July 2015, and in several communications since then, but USCC/ONCURE have failed to remedy the breaches.

91.    Therefore, USCC/ONCURE have failed to cure their defaults, the Sublease should be rejected, USCC/ONCURE's right to possession terminated, and USCC/ONCURE must vacate the premises.

92.    Additionally, as a direct and proximate result of USCC/ONCURE's breaches of the Sublease, CCMO has suffered monetary damages, and continues to suffer monetary damages, as described above, in an amount to be proven at trial, but in excess of $4,000,000, plus interest thereon.

93.    CCMO is also entitled to recover its reasonable attorneys' fees and costs under the Sublease sections 15(a) and 30.6.

## COUNT IV

### (Breach of Implied Covenant of Good Faith and Fair Dealing)

94.    CCMO repeats and re-alleges paragraphs 1-93 as if fully set forth herein.

95.    At all times relevant hereto, there existed a covenant of good faith and fair dealing that was implied in the MSA and Sublease, such that USCC/ONCURE covenanted that they would, in good faith and in the exercise of fair dealing, deal with CCMO fairly and honestly and would not do anything to deprive CCMO of the benefits of the contracts.  The covenant of good faith and fair dealing imposed not only a duty to refrain from doing any act that would render performance under the contracts impossible, but also the duty to do everything that the contracts presupposed that the parties would do in order to accomplish the purposes of the contracts.

96.    As alleged in more detail above, USCC/ONCURE breached the covenant of good faith and fair dealing owed to CCMO by, among other things:

    a.    referring patients to facilities that USCC/ONCURE owns, operates, or in which they have some financial interest, for USCC/ONCURE's own financial gain;

    b.    accomplishing the diversion of patients through misrepresentations, concealment, and the unauthorized transfer of CCMO's property; and

    c.    refusing to expand the services offered at MHCC, and instead referring patients to other facilities USCC/ONCURE own, operate, manage, or in which they has some other financial interest.

97.    As a direct and proximate result of USCC/ONCURE's breaches of the covenant of good faith and fair dealing implied in the contracts, CCMO has suffered monetary damages,

and continues to suffer monetary damages, as described above, in an amount to be proven at
trial, but in excess of $4,000,000, plus interest thereon.

## COUNT V

### (Fraudulent Misrepresentation/Fraudulent Concealment)

98.    CCMO repeats and re-alleges paragraphs 1-97 as if fully set forth herein.

99.    CCMO is informed and believes, and based thereon alleges, that USCC/ONCURE
committed fraud by misrepresenting or concealing material information (a) about expenses
deducted from payments to CCMO, and whether such expenses were reasonable, incurred, and
not duplicated; (b) amounts due and owing to CCMO; and (c) amounts paid to third parties.

100.    USCC/ONCURE repeatedly made such misrepresentations and material
concealments in writing in the incomplete, inaccurate, false, and misleading financial
documentation that USCC/ONCURE sporadically provide to CCMO.  USCC/ONCURE's failure
to provide CCMO with all material information on these subjects, renders the information
USCC/ONCURE has provided materially misleading and deceptive.  As a result of
USCC/ONCURE's concealment, CCMO does not know of the concealed facts.

101.    CCMO is informed and believes, and based thereon alleges, that USCC/ONCURE
knew that such representations were false when they were made, or made them with reckless
disregard for the truth, and intended for CCMO to rely on the representations.  Similarly,
USCC/ONCURE intended to deceive CCMO by concealing this material information.

102.    CCMO reasonably relied on USCC/ONCURE's representations, to its detriment,
by continuing to perform its various obligations at MHCC, to the extent permitted by law.

103.    CCMO is informed and believes, and thereon alleges, that these fraudulent activities were undertaken with the express purpose of deceiving and depriving CCMO of the full amount of compensation due to it.

104.    As a direct and proximate result of USCC/ONCURE's fraudulent misrepresentations and concealment, CCMO has suffered damages in an amount to be proven at trial, but in any event in excess of $4,000,000.

105.    CCMO is informed and believes, and based thereon alleges, that USCC/ONCURE's actions were undertaken with fraud, oppression, and malice.  CCMO is further informed and believes, and based thereon alleges, that in addition to USCC/ONCURE's own actions, USCC/ONCURE's officers, directors, or managing agents had advance knowledge that its employees were engaging in the above-listed wrongful acts and that the employees consciously disregarded CCMO's rights.  CCMO is further informed and believes, and based thereon alleges, that USCC/ONCURE's officers, directors, or managing agents authorized and ratified the above-listed wrongful acts by its employees.  Punitive damages in an amount according to proof should therefore be awarded against USCC/ONCURE.

## COUNT VI

### (Intentional Interference with Existing Contractual Relations)

106.    CCMO repeats and re-alleges paragraphs 1-105 as if fully set forth herein.

107.    CCMO has a contractual relationship with MHCC, LLC through the Master Lease.  USCC/ONCURE are aware of CCMO's contractual relationship with MHCC, LLC but USCC/ONCURE are not parties to the contract.

108.    By engaging in the actions more specifically described above, USCC/ONCURE intended to, or was substantially certain that their actions would, disrupt CCMO's contract with

MHCC, LLC.  USCC/ONCURE's disruptive actions include, but are not limited to, diverting

patients and their medical records to facilities other than MHCC that USCC/ONCURE owns,

operates, manages, or in which it has a financial interest and facilitating, encouraging, financially

benefitting from, or otherwise participating in, the provision of services at locations other than

MHCC, including in Lompoc and San Luis Obispo, that compete with Dignity in violation of the

Disqualified Persons restriction.

109.    USCC/ONCURE's actions actually did disrupt CCMO's contract with MHCC,

LLC because they resulted in CCMO being named as a defendant in Dignity's Complaint in the

Santa Maria litigation.

110.    As a direct and proximate result of USCC/ONCURE's disruptive and improper

conduct, CCMO has been damaged in an amount to be proven at trial but which exceeds

$4,000,000.

111.    CCMO is informed and believes, and based thereon alleges, that

USCC/ONCURE's actions were undertaken with fraud, oppression, and malice.  CCMO is

further informed and believes, and based thereon alleges, that in addition to USCC/ONCURE's

own actions, USCC/ONCURE's officers, directors, or managing agents had advance knowledge

that its employees were engaging in the above-listed wrongful acts and that the employees

consciously disregarded CCMO's rights.  CCMO is further informed and believes, and based

thereon alleges, that USCC/ONCURE's officers, directors, or managing agents authorized and

ratified the above-listed wrongful acts by its employees.  Punitive damages in an amount

according to proof should therefore be awarded against USCC/ONCURE.

## COUNT VII

**(Intentional Interference with Prospective Business Relations)**

112.    CCMO repeats and re-alleges paragraphs 1-111 as if fully set forth herein.

113.    CCMO has existing economic relationships with, among others, patients of CCMO, and these relationships have a reasonable probability of future economic benefit to CCMO because CCMO provides medically necessary services to its patients as required through their course of treatment.

114.    USCC/ONCURE are and were (or should have been) aware of CCMO's economic relationships with its patients.

115.    By engaging in the actions described above, USCC/ONCURE intended to, or was substantially certain that their actions would, disrupt these relationships because by referring patients to facilities other than MHCC and providers other than CCMO, CCMO would no longer care for those patients.

116.    USCC/ONCURE's actions are independently wrongful because CCMO is informed and believes, and based thereon alleges, that USCC/ONCURE are transferring patients to other facilities without providing written notice to the patients that they have a financial interest in those facilities and that patients can seek care elsewhere, in violation of California law, including California Business & Professions Code § 654.2.  Additionally, USCC/ONCURE's actions are independently wrongful because they are interfering with CCMO's business relationship with its patients by using material misrepresentations and concealment to accomplish the referral of patients away from CCMO, and the transfer of their medical records without medical reason or CCMO's permission.

117.    USCC/ONCURE's actions resulted in actual disruption of the relationships between CCMO and its patients because those patients referred away from MHCC and CCMO no longer receive services from CCMO.  Instead, patients referred away from CCMO receive services at facilities that USCC/ONCURE owns, operates, manages, or in which it has some other financial interest.

118.    As a direct and proximate result of the above-described wrongful conduct, CCMO has been damaged in an amount to be proven at trial, but in excess of $4,000,000.

119.    CCMO is informed and believes, and based thereon alleges, that USCC/ONCURE's actions were undertaken with fraud, oppression, and malice.  CCMO is further informed and believes, and based thereon alleges, that in addition to USCC/ONCURE's own actions, USCC/ONCURE's officers, directors, or managing agents had advance knowledge that its employees were engaging in the above-listed wrongful acts and that the employees consciously disregarded CCMO's rights.  CCMO is further informed and believes, and based thereon alleges, that USCC/ONCURE's officers, directors, or managing agents authorized and ratified the above-listed wrongful acts by its employees.  Punitive damages in an amount according to proof should therefore be awarded against USCC/ONCURE.


**WHEREFORE,** CCMO respectfully requests relief as follows:

1.  For a declaration that:

    a.  The MSA is void,

    b.  Neither the MSA nor the Sublease can be assumed, and both must be rejected;

    c.  Funds set aside by CCMO are CCMO's property;

    d.   USCC/ONCURE must quit and surrender the premises and do everything necessary to ensure continuity of care to CCMO patients receiving care at MHCC following termination of the MSA, including but not limited to, providing CCMO with access to all radiation oncology records in USCC/ONCURE's possession, custody or control;

    e.   CCMO has an allowable claim of at least $4,000,000 for pre-petition and post-petition compensatory damages for breach of the MSA and Sublease, fraud, and tortious actions described above as well as unliquidated attorneys' fees and costs of approximately $200,000 as of August 29, 2017; and

    f.   CCMO has an allowable claim for pre-petition and post-petition punitive damages arising from the fraud and tortious actions of USCC/ONCURE.

2.   For an injunction enjoining USCC/ONCURE, and any of their agents, servants, employees, employers, and all persons acting under and in concert with them, from transferring patient medical records (the confidential property of CCMO) without CCMO's permission, and using such records to solicit CCMO's patients and engaging in the wrongful acts described above.

3.   For costs of suit incurred herein; and

4.   For such other and further relief as the Court may deem just and proper.


Dated: August 31, 2017        **Marilyn Macron P.C.**
      Belle Harbor, NY        Attorneys for Central Coast Medical Oncology Corp.

        By:  /s/ Marilyn Cowhey Macron
            Marilyn Cowhey Macron (MM-8311)
            211 Beach 134th Street, 1st Floor
            Belle Harbor, NY  11694
            Tel. 718-598-0512
            Fax. 718-945-7455