Christopher Marcus, P.C.
John T. Weber
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

James H.M. Sprayregen, P.C.
William A. Guerrieri (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| 21st CENTURY ONCOLOGY HOLDINGS, INC., *et al.*,[1] | ) Case No. 17-22770 (RDD) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

## DEBTORS' OMNIBUS REPLY TO OBJECTIONS TO APPROVAL OF THE DEBTORS' DISCLOSURE STATEMENT FOR THE DEBTORS' JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

The above-captioned debtors and debtors in possession (collectively, the "Debtors"),

respectfully submit this omnibus reply (this "Reply") to the objections (each an "Objection" and

collectively, the "Objections")[2] filed opposing approval of the *Disclosure Statement for the Joint*

---

[1] Each of the Debtors in the above-captioned jointly administered chapter 11 cases and their respective tax identification numbers are set forth in the *Order Directing Joint Administration of Chapter 11 Cases* [Docket No. 30]. The location of 21st Century Oncology Holdings Inc.'s corporate headquarters and the Debtors' service address is: 2270 Colonial Boulevard, Fort Myers, Florida 33907.

[2] The Objections include the following: (a) *Objection of United States Trustee to Debtors' Disclosure Statement Relating to the Joint Plan of Reorganization* [Docket No. 318] (the "UST Objection"), (b) *Objection of Cigna Entities to Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of 21st Century Oncology Holdings, Inc. and its Debtor Affiliates* [Docket No. 411] (the "Cigna Objection"), (c) *Objection of Data Breach Plaintiffs to Approval of Proposed Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of 21st Century Oncology Holdings, Inc. and its Debtor Affiliates* [Docket No. 500] (the "Data Breach Objection"); (d) *Objection of Dr. Daniel Dosoretz and Other Creditors to Debtors' Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of 21st Century Oncology Holdings, Inc. and its Debtor Affiliates* [Docket No. 518] (the "Creditor Group Objection").

*Chapter 11 Plan of Reorganization of 21st Century Oncology Holdings, Inc.* (as it may be modified, amended, or supplemented from time to time and including all exhibits and other supplements thereto, the "Disclosure Statement").[3]  In support of this Reply, and in further support of approval of the Disclosure Statement, the Debtors respectfully state as follows:

### Preliminary Statement

1.      A disclosure statement's fundamental purpose is to enable holders of claims and interests entitled to vote on a plan of reorganization to make an informed and intelligent decision regarding whether to vote to accept or to reject that plan.  It is well-settled that the purpose of a hearing to approve a disclosure statement is to determine whether the information provided is adequate as required by section 1125 of the Bankruptcy Code.  While this determination includes considerations of accuracy and fairness, it does not include the consideration of specialized, substantive issues a creditor may have with the plan.  In the present case, the Debtors are providing clear, accurate, and fair information regarding the treatment afforded their various creditor constituencies, and, therefore, respectfully submit that the Disclosure Statement should be approved.

2.      The Debtors received four (4) formal objections from parties in interest opposing approval of the Disclosure Statement.  The arguments in these Objections generally fall into two categories:   (a) objections to the adequacy of the information contained in the Disclosure Statement; and (b) objections that raise Plan confirmation issues that are premature at this stage.  As further described herein, the Disclosure Statement easily satisfies the relevant information and

---

[3]    Capitalized terms used but not defined herein have the meanings given to such terms in the proposed Plan of Reorganization that is attached to the Disclosure Statement as **Exhibit A** (the "Plan"), the Disclosure Statement, or the Objections, as applicable.

disclosure standards, and the objectors' other arguments consist of premature confirmation objections that should not preclude the Bankruptcy Court's approval of the Disclosure Statement.

3.          The Debtors have worked, and will continue to work, with each of the objecting parties to resolve the Objections consensually prior to the Disclosure Statement Hearing.  With respect to the Objections that raise disclosure deficiencies, the Debtors believe that the modified Disclosure Statement addresses each of these objections and the relevant revised provisions are outlined in the chart attached hereto as **Exhibit A** (the "Response Chart").  The remaining Objections are actually Plan confirmation objections, and consideration of such Objections at this juncture would be premature.  Accordingly, there is no basis to delay these cases, imperil the Debtors restructuring efforts, or otherwise frustrate the significant progress that the Debtors have already made since the Petition Date.

4.          For the reasons set forth herein and in the *Debtors' Motion for Entry of an Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Proposed Joint Plan of Reorganization, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Approving the Rights Offering Procedures and Related Materials, (V) Scheduling Certain Dates with Respect Thereto, and (VI) Granting Related Relief* [Docket No. 312] (the "Disclosure Statement Motion"), the Court should find that the Disclosure Statement provides adequate information to enable a hypothetical investor, typical of the holders in each class of claims or interests in these chapter 11 cases, to make an informed judgment about the Plan in satisfaction of the statutory requirements of section 1125 of the Bankruptcy Code.  Accordingly, the Debtors respectfully request that the Bankruptcy Court overrule the Objections on the merits and enter an order approving the relief

requested in the Disclosure Statement Motion (the "<u>Disclosure Statement Order</u>"), a revised form of which is being filed contemporaneously herewith.

<u>**Reply**</u>

### I.    The Debtors' Disclosure Statement Provides Adequate Information that Would Enable a Reasonable Investor to Make an Informed Judgment About the Plan.

5.    The Disclosure Statement complies with all relevant sections of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules for the Southern District of New York, and applicable non-bankruptcy law.  Pursuant to section 1125 of the Bankruptcy Code, the proponent of a chapter 11 plan must provide holders of impaired claims and interests entitled to vote on a plan with "adequate information" regarding the plan.  Section 1125(a)(1) of the Bankruptcy Code states, in relevant part:

> "'[A]dequate information' means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interest in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan."

11 U.S.C. § 1125(a)(1).

6.    "Adequate information" has been interpreted as information that is "reasonably practicable" to permit an "informed judgment" by creditors and interest holders, if applicable, to vote on a plan of reorganization. *See Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994).  The adequacy of information in a disclosure statement is determined on a case-by-case basis.  *See Ionosphere Clubs, Inc. v. Shugrue (In re Ionosphere Clubs, Inc.)*, 179 B.R. 24, 29 (Bankr. S.D.N.Y. 1995) (the adequacy of a disclosure statement "is to be determined on a case-specific basis under a flexible standard that

can promote the policy of chapter 11 towards fair settlement through a negotiation process between informed interested parties") (internal citation omitted).    In evaluating the sufficiency of a disclosure statement, "a debtor cannot be expected to unerringly predict the future, but rather must provide information on all factors known to him at the time that bear upon the success or failure of the proposals set forth in the plan." *In re Walker*, 198 B.R. 476, 479-80 (Bankr. E.D. Va. 1996).

7.      In particular, courts have identified categories of information that generally should be included in a disclosure statement.  *See In re Phoenix Petroleum*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2006) (listing categories of information); *In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 170–71 (S.D. Ohio 1988) (same).  Courts also acknowledge that disclosure of all of the information suggested in these cases is not always necessary.  *See also Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight, Inc.)*, 848 F.2d 414, 417 (3d Cir. 1988) ("From the legislative history of § 1125 we discern that adequate information will be determined by the facts and circumstances of each case.");  *Phoenix Petroleum*, 278 B.R. at 393 ("[I]t is . . . well understood that certain categories of information which may be necessary in one case may be omitted in another; no one list of categories will apply in every case.").

8.      As demonstrated in the table below and consistent with findings of courts in this circuit, the Disclosure Statement contains the categories of information necessary for voting creditors to make an informed judgment to accept or reject the Plan:

[*Remainder of page intentionally left blank.*]

| Category | Description | Location in Disclosure Statement |
|---|---|---|
| Solicitation and Voting Procedures | A description of the procedures for soliciting votes to accept or reject the Plan | Article III |
| The Debtors' Background | An overview of the Debtors' corporate history, business operations, capital structure, and events leading to the chapter 11 cases, including the Debtors' restructuring negotiations | Article V |
| Events of the Chapter 11 Cases | The expected timetable of the chapter 11 cases, a summary of the first day pleadings and DIP financing, and other postpetition matters | Article VI |
| Summary of the Plan | The classification and treatment of claims and interests under the Plan and the releases contemplated by the Plan | Article VII |
| Statutory Requirements for Confirmation of the Plan | Statutory requirements for Confirmation and Consummation of the Plan, including a description of the liquidation analysis, valuation analysis, and financial projections | Article VIII |
| Certain Risk Factors to be Considered Before Voting | Certain risks associated with the Debtors' business and forward-looking statements, and a disclaimer as to the information set forth in the Disclosure Statement | Article IX |
| Certain Securities Law Matters | A description of the applicability of section 1145 of the Bankruptcy Code and the issuance and resale of securities under the Plan | Article X |
| Certain U.S. Federal Income Tax Consequences of the Plan | A description of certain U.S. federal income tax law consequences of the Plan | Article XI |
| Recommendation of the Debtors | A recommendation by the Debtors that holders of Claims in the Voting Classes should vote to accept the Plan | Article XII |
| Liquidation Analysis | An analysis of the liquidation value of the Debtors' estates | Exhibit D |
| Valuation Analysis | A valuation of the post-Confirmation going concern value of the Debtors | Exhibit E |
| Projected Financial Information | A projected consolidated income statement | Exhibit F |

### A. The Revised Disclosure Statement Addresses Objections Raised With Respect to an Alleged Inadequacy of Information.

9.      As noted above, the Response Chart attached hereto summarizes the disclosure issues raised in each Objection and the Debtors' specific responses thereto.  Because the Objections predate the filing of the revised Disclosure Statement, the Response Chart describes how the Debtors have addressed many of the Objections in the revised Disclosure Statement and revised Plan.  In addition, and as indicated in the Response Chart, the Debtors have been working with parties in interest in an effort to resolve outstanding objections, and will continue to do so after filing this Reply.

### B. The Proposed Timing of the Plan Supplement Will Provide Creditors with Ample Time to Formulate an Informed View Prior to Casting their Ballots on the Plan.

10.      In the Creditor Group Objection, the objecting parties argue that due process requires the Debtors to provide disclosure regarding the assumption or rejection of leases prior to balloting in order to provide the Landlords with adequate information and adequate time to respond to Debtors' decisions to assume or reject their leases.  *See* Creditor Group Objection ¶ 38. Relatedly, Cigna objects to approval of the Disclosure Statement on the basis that the Plan's rejection or assumption procedures are flawed in that such provisions do not provide for the 60-day notice period for termination of the relevant agreements.[4]  *See* Cigna Objection ¶ 11.  In addition to the substantial information described above and already included in the Disclosure

---

[4]    Such an argument is not an objection to the level of disclosure contained in the Disclosure Statement, but rather an objection by Cigna that such procedures are improper.  As stated above, the rejection or assumption procedures provided for in the Plan and described in the detail in the Disclosure Statement are standard in form, and substantially similar procedures are approved routinely by courts in this district.  Furthermore, in circumstances where a debtor rejects executory contracts, the rejection is not a termination of the contract, because rejection constitutes a material breach of the subject executory contract and the termination provisions are not implicated.  *See In re Genco Shipping & Trading Limited*, 550 B.R. 676 (S.D.N.Y. 2015) (holding chapter 11 debtor-tenant's rejection of master lease was not to be equated with termination thereof, and did not automatically trigger provisions in lease documents dealing with "termination" of master lease).

Statement (and as is typical in large commercial chapter 11 cases), seven days before the Voting Deadline, the Debtors will file and serve upon parties in interest the Plan Supplement, which will include, among other things, the New Organizational Documents, a list of members of the New Board, and information concerning the assumption or rejection of the remainder of the Executory Contracts and Unexpired Leases.  The proposed timing of the Plan Supplement will provide creditors entitled to vote with ample time to formulate an informed view prior to casting their ballots on the Plan.  In fact, courts routinely approve disclosure statements that provide for the filing of plan supplements within a similar timeframe.  *See e.g. In re BCBG Max Azria Global Holdings, LLC*, Case No. 17-10466 (SCC) (Bankr. S.D.N.Y. July 12, 2017) (plan supplement provided five days prior to the voting deadline); *In re Horsehead Holding Corp.*, Case No. 16-10287 (CSS) (Bankr. D. Del. Aug. 9, 2016) (plan supplement provided ten days prior to voting deadline); *In re Sabine Oil & Gas Corp.*, Case No. 15-11835 (SCC) (Bankr. S.D.N.Y. May 24, 2016) (same); *In re SIGA Technologies, Inc.*, No. 14-12623 (SHL) (Bankr. S.D.N.Y. Mar. 15, 2016) (plan supplement provided seven days prior to voting deadline); *In re MPM Silicones, LLC*, Case No. 14-22503 (RDD) (Bankr. S.D.N.Y. July 18, 2014) (plan supplement provided ten days prior to voting deadline).  Thus, parties to Executory Contracts and Unexpired Leases will have sufficient notice of the Debtors' intentions before they cast their votes on the Plan.

11.     Further, in the Creditor Group Objection, the objecting parties claim that "to date, none of the Landlords have received notice of rejection of any of their leases." *See* Creditor Group Objection, ¶ 33.  While the Landlords' Unexpired Leases have not officially been assumed or rejected to date, the Debtors have been in constant negotiations with the Landlords regarding the treatment of their Unexpired Leases and the Debtors intentions with respect to such Unexpired Leases.  Moreover, the Debtors are not ***required*** to set forth their intentions with respect to

assumption or rejection of a particular executory contract or unexpired lease prior to confirmation

of the Plan. *See* 11 U.S.C. § 365(d) ("the [debtor] may assume or reject an executory contract or

unexpired lease of residential real property or of personal property of the debtor at any time before

the confirmation of a plan . . .").

12.     Accordingly, the Disclosure Statement provides stakeholders with sufficient

information to make informed judgments when voting to accept or reject the Plan, and, as such,

fully satisfies the requirements of section 1125 of the Bankruptcy Code.

C.     **The Revised Disclosure Statement Addresses Objections Raised With Respect to an Alleged Inadequacy of Information.**

13.     Attached hereto as **Exhibit A** is a chart (the "Response Chart") summarizing the

disclosure issues raised in each Objection and the Debtors' specific responses thereto.  Because

the Objections predate the filing of the revised Disclosure Statement, the Response Chart describes

how the Debtors have addressed many of the Objections in the revised Disclosure Statement and

revised Plan.  In addition, and as indicated in the Response Chart, the Debtors have been working

with parties in interest in an effort to resolve outstanding objections, and will continue to do so

after filing this Reply.

II.     **The Remaining Objections Raise Confirmation Issues to be Addressed at the Confirmation Hearing.**

14.     Each of the non-disclosure Objections is a confirmation objection in disguise,

containing specialized discussions of the particularized needs and concerns of the objecting

constituency and seeking to require the Debtors to presently detail its future plans vis-à-vis the

particular constituency or creditor.  Within all of the objections, there is not a single valid basis for

this Court to prevent solicitation of the Plan.  A disclosure statement is intended to serve as the

means to educate voting constituents, thereby enabling them to make informed judgments about

whether to accept or to reject a plan of reorganization.  A disclosure statement hearing is not meant

to address confirmation objections. *See In re Monroe Well Serv., Inc.*, 80 B.R. 324, 333 n. 10 (Bankr. E.D. Pa. 1987) (stating that deciding confirmation issues before disclosure may have a disenfranchising effect because the disclosure statement itself is not mailed to all creditors until after court approval is obtained); *In re Copy Crafters Quickprint*, 92 B.R. 973, 980 (Bankr. N.D.N.Y. 1988) ("[C]are must be taken to ensure that the hearing on the disclosure statement does not turn into a confirmation hearing, due process considerations are protected and objections are restricted to those defects that could not be cured by voting . . . .").

15.     Rather, the hearing to approve a disclosure statement is solely to determine whether the information provided is adequate under section 1125 of the Bankruptcy Code.  In fact, the only time a court may entertain plan objections at a disclosure statement hearing is when any subsequent solicitation would be futile because the proposed plan is "patently unconfirmable." *See, e.g., Cardinal Congregate I*, 121 B.R. at 763-64 (Bankr. S.D. Ohio 1990) (overruling objections to classification and treatment of claims, protection of security interests, and feasibility); *In re Monroe Well Service, Inc.*, 80 B.R. at 333 (holding that objections bearing on confirmability must be limited to defects that could not be overcome by creditor voting results and must also concern matters upon which all material facts are not in dispute or have been fully developed).

16.     As discussed above, the adequacy of information provided in the Disclosure Statement is the only issue presently before the Court and requires a limited analysis.  The Objecting Parties will have ample opportunity to prosecute their confirmation objections in connection with confirmation.  Therefore, the Court should overrule any arguments raised by the Objectors that relate to confirmation of the Plan.  Nevertheless, to aid the Court's analysis, the

Debtors briefly address the confirmation issues raised in the Objections to eliminate any doubt that such issues would render the Plan patently unconfirmable.[5]

### A. The Issue of Feasibility Under 11 U.S.C. § 1129(a)(11) is a Confirmation Issue.

17.     At its heart, the Creditor Group Objection requests that this Court decline to approve the Disclosure Statement because the Plan is not feasible under section 1129(a)(11) of the Bankruptcy Code.  This objection should be overruled, because (a) the issue of whether the Plan is feasible is undoubtedly an issue reserved for determination at the Confirmation Hearing, and (b) the Disclosure Statement includes information regarding the Debtors' relationships to the Creditor Group and the potential risks in the event the parties cannot resolve their disputes by Confirmation.

18.     Courts in this district and others acknowledge that the "feasibility" of a plan pursuant to section 1129(a)(11) of the Bankruptcy Code is a confirmation issue and accordingly should be addressed at confirmation, not at the Disclosure Statement Hearing.  *See In re Hawker Beechcraft, Inc., et al*, Case No. 12-11873 (SMB), Hr'g Trans., 54:5-12, (Bankr. S.D.N.Y. Nov. 29, 2013) ("[A] question of whether or not the plan is feasible . . . [is] a confirmation issue[].  This is a disclosure statement here.").[6]  In the Creditor Group Objection asserts that the Plan is patently unconfirmable because it is not feasible due to the (a) lack of projections, and (b) lack of disclosure

---

[5]    For the avoidance of doubt, the Debtors reserve the right to respond to any and all objections asserted in connection with confirmation of the Plan.

[6]    *See also In re Puff*, No. BR 10-01877, 2011 WL 2604759, at *6 (Bankr. N.D. Iowa June 30, 2011) ("Feasibility of the Plan is specifically an issue for the confirmation stage.") (citing 11 U.S.C. § 1129); *In re Alaska Fur Gallery, Inc.*, No. A09-00196-DMD, 2010 WL 7765565, at *1 (Bankr. D. Alaska May 25, 2010) ("The real battle here is over the feasibility of the debtor's plan.  [The objecting creditor] can argue feasibility at a confirmation hearing."); *In re Camann*, No. 00-11090-JMD, 2000 WL 33679417, at *3 (Bankr. D.N.H. Nov. 16, 2000) ("The issue of feasibility is a matter for confirmation that need not be addressed at [the disclosure statement] stage of the Debtor's case."); *In re U.S. Brass Corp.*, 194 B.R. 420 (Bankr. E.D. Tex. 1996) (refusing to disapprove proposed disclosure statement based on feasibility objection and concluding that "feasibility issues are best determined at confirmation.").

regarding the possible departure of certain key constituencies.  Creditor Group Objection, ¶ 58.

As discussed above, **<u>Exhibit A</u>** outlines how the Debtors have addressed many of the disclosure

related Objections by providing disclosures related to the Financial Projections and the potential

negative impact to those projections if the Debtors do not reach a mutually acceptable resolution

of numerous disputes with the Credit Group.  *See* Disclosure Statement, Article VIII.B.4, Ex. D,

Ex. E, and Ex. F.  Furthermore, the Creditor Group Objection fails to provide any evidentiary

support for the sweeping statement that the Debtors will lose millions if the Creditor Group's

disputes are not resolved.  This lack of evidentiary support for such assertions illustrates that the

Creditor Group cannot establish that the Plan is patently unconfirmable.[7]

19.    Importantly, courts have held that parties' displeasure with certain provisions of the

Plan do not bear on whether the Disclosure Statement contains "adequate information" as required

by section 1125 of the Bankruptcy Code.  Indeed, it is well established that, unless "the disclosure

statement describes a plan that is so fatally flawed that confirmation is ***impossible***", the Court

should approve a disclosure statement that otherwise adequately describes the chapter 11 plan at

issue.  *In re Phoenix Petroleum*, 278 B.R. at 394; *see also In re Cardinal Congregate I*, 121 B.R.

at 764  (review of issues affecting confirmation of the Plan at the disclosure statement phase is

permitted only if the proposed Plan is "patently" or "facially" unconfirmable); *In re Unichem

Corp.*, 72 B.R. 95, 98 (Bankr. N.D. Ill. 1987) (courts should disapprove of the adequacy of a

disclosure statement on confirmability grounds only "where it is readily apparent that the plan

accompanying the disclosure statement could never be legally confirmed").

---

[7]    To the extent the Creditor Group's assertions regarding lost revenue relate to certain of the members in the
Creditor Group ceasing their employment with the Debtors, the Debtors reserve all rights to enforce the parties
relevant agreements including non-compete and non-solicitation rights.

## B.    The Plan's Third Party Release is Appropriate.

20.    The U.S. Trustee's objections to the Debtors' proposed release provisions are similarly confirmation objections. *See In re Drexel Burnham Lambert Group*, 1992 WL 62758, at *1 (Bankr. S.D.N.Y. Mar. 5, 1992) (stating that objections to a plan of reorganization's releases and injunction provisions were in the nature of confirmation objections and therefore improperly raised as objections to the disclosure statement); *In re Specialty Equip. Cos., Inc.*, 1992 WL 279262 at *3 (N.D. Ill. Sept. 25, 1992) (noting that the bankruptcy court below held that "the validity of releases [is] a plan confirmation issue" and overruled objections to the disclosure statement regarding the appropriateness of third-party releases).

21.    Even if the Court were to address the U.S. Trustee's objection to the releases in the Plan now, it should find that the Plan's exculpation and third-party releases are nonetheless valid. As an initial matter, the Bankruptcy Court has the ability to enjoin a creditor from suing a third party, even without the creditor's consent, provided the injunction plays an important part in the debtor's reorganization plan. *See, e.g., In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 141 (2d Cir. 2005) (citing *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 293 (2d Cir. 1992)). What constitutes an "important" role in a debtor's reorganization has not been clearly defined in the case law and involves a highly-specific, case-by-case analysis. *See In re Karta Corp.*, 342 B.R. 45, 54-55 (S.D.N.Y. 2006) (noting absence of cases in the Second Circuit addressing when a non-debtor release is "important" to a debtor's plan); *Metromedia*, 416 F.3d at 142 ("But this is not a matter of factors and prongs.").

22.    Moreover, it is clear that in this district and others, non-debtor third party releases are permissible where the requisite consent is given, ***including*** where eligible voting creditors fail to opt out of the release, so long as they receive adequate notice of the release on the ballot. *See, e.g., In re DBSD North America, Inc.*, 419 B.R. 179, 218 (Bankr. S.D.N.Y. 2009) (holding that

creditors who abstained from voting and failed to opt out were deemed to have consented to the third party releases because the ballot contained, in bold font, notice of the release provisions and an opportunity to opt out), *judgment aff'd in part and reversed in part, on other grounds*, 627 F.3d 496 (2d Cir. 2010); *In re MPM Silicones, LLC*, 14-22503-RDD, 2014 WL 4436335 (Bankr. S.D.N.Y. Sept. 9, 2014) (finding that stakeholders who voted in favor of the plan, regardless of whether they checked the opt-out box on the voting ballot, were deemed to have consented to the third-party release); *In re Legend Parent Inc*, Case No. 14-10701 (RG) (Bankr. S.D.N.Y. 2014) (approving the grant of releases under a plan for holders of claims that (i) are unimpaired by the plan, (ii) have not voted to reject the plan, or (iii) have voted to reject the plan but have not opted out of the releases); *In re Eastman Kodak Company,* Case No. 12-10202 (ALG) (Bankr. S.D.N.Y. Aug. 23, 2013) (order confirming plan with a third-party release structured as a consensual, opt-out release); *In re Calpine Corp.*, 2007 WL 4565223, at *10 (Bankr. S.D.N.Y. Dec. 19, 2007) (approving third-party releases where those "who abstain from voting and choose not to opt out of the releases, or who have otherwise consented to give a release," are consensual).

23.    Here, the Plan's third party releases are structured in such a manner that parties providing the third party release are consenting to release claims against the Released Parties.  All holders of Claims and Interest are afforded the opportunity not to be bound by the third party release.  Further, the ballots and disclosure materials clearly set forth in bold font the terms of the proposed releases and the parties that benefit from them.  Accordingly, the Plan's release provisions do not render the Plan patently unconfirmable, and similar release structures have been approved in this district.  *In re Sabine Oil & Gas Corp.*, Case No. 15-11835 (SCC) (Bankr. S.D.N.Y. July 27, 2016).  Accordingly, the Court should overrule the U.S. Trustee's objection.

### C. This Court has Subject Matter Jurisdiction to Approve the Third Party Releases.

24. The U.S. Trustee Objection argues that this Court does not have subject matter jurisdiction to grant the proposed releases because they potentially purport to release claims of non-debtors against other non-debtors. In support of this argument, the U.S. Trustee cites to two cases from the Second Circuit: (a) *In re Johns-Manville Corp.*, 517 F.3d 52 (2d Cir. 2008) ("*Manville III*"); and (b) *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F. 3d 136, 141 (2d Cir. 2005). However, the U.S. Trustee's characterization of these two cases as creating a blanket ban on releases of claims of non-debtor parties against other non-debtors is a mischaracterization of the controlling law in the Second Circuit. Although the issue of whether this Court has subject matter jurisdiction is clearly one for confirmation, the Debtors respond here in order to correct the record regarding the appropriate standard of review for the proposed releases.

25. In *Manville III*, the Second Circuit held that a bankruptcy court only has the power to enjoin third-party non-debtor claims that directly affect the *res* of the bankruptcy estate. *See* 517 F.3d at 66. However, the United States Supreme Court reversed and remanded *Manville III* in *Travelers Indem. Co. v. Bailey*, 557 U.S. 137 (2009), holding that because the original *Manville* case had been on final review nearly 20 years before *Manville III*, the question of whether the bankruptcy court had jurisdiction and authority to enter the injunction in the original *Manville* case in 1986 was not properly before the Second Circuit in 2008. Although the U.S. Trustee acknowledges that *Manville III* was overturned, it states that the case was overturned on grounds other than the holding. In fact, the Supreme Court actually held that the Second Circuit should never have considered the issue of subject matter jurisdiction in the first place. Accordingly, *Manville III* is not controlling precedent over how this Court should evaluate the releases.

Additionally, while *Metromedia* lays out the circumstances required for the approval of non-consensual third party releases, it does not contain a discussion about subject matter jurisdiction of the kind the U.S. Trustee is challenging here.

26.     In the most recent bankruptcy court decision on this issue, the Bankruptcy Court for the District of Delaware was presented the question, on remand, of whether a bankruptcy court has subject matter jurisdiction to approve a nonconsensual release of non-bankruptcy common law fraud and RICO claims of one non-debtor against another non-debtor.  *See In re Millenium Lab Holdings II, LLC*, No. 15-12284 (LSS) (Bankr. D. Del. Oct. 3, 2017) [Docket No. 476].   In *Millenium Labs* the bankruptcy court held that it did have subject matter jurisdiction to release such claims, holding that a bankruptcy judge's final order on a core issue (in that case, confirmation of a chapter 11 plan) that may have a preclusive effect on a third party lawsuit does not violate the Supreme Court's decision in *Stern v. Marshall*, 564 U.S. 462 (2011).  The bankruptcy court's decision in *Millenium Labs* hinges on the concept that the operative proceeding in the context of approving releases is a federal bankruptcy case, not the underlying litigation from which the claims stem.   In this context, a bankruptcy court clearly has subject matter jurisdiction to enter the releases.  As the bankruptcy court noted, there are many contexts in which a bankruptcy court order impacts a litigant's non-bankruptcy claims.   The fact that those claims may be entirely precluded by a release does not alter the bankruptcy court's subject matter jurisdiction to approve a release.

27.     Accordingly, the releases should be approved, and the Plan is not patently unconfirmable because there may exist some independent claims to which the proposed releases could be read to apply.  Rather, the Debtors assert that if such claims exist, the relevant claimants

can bring their claims and the applicability of the release and injunction provisions to those claims

can be adjudicated at the appropriate time.

**D.      The Plan Does Not Violate the Absolute Priority Rule.**

28.      The Data Breach Objection argues that the Plan violates the absolute priority rule

by providing for the possibility that holders of interests in 21st Century Oncology Holdings, Inc.

("21CH") and 21st Century Oncology Investments, LLC ("21CI") may receive distributions in the

form of warrants while general unsecured creditors are not getting paid in full.   Data Breach

Objection, ¶ 41.  First and foremost, this is a Plan confirmation issue and is premature at this stage.

"As a threshold matter, [the 1129(b)] objection is really more appropriately an objection to

confirmation, as it doesn't relate to information provided to creditors or equity holders, but rather

to a substantive provision of the plan" and should not be considered in approving the Disclosure

Statement.  *AMR Corporation*, Case No. 11-15463 (SHL), Hr'g Trans., 33:10-18 (Bankr. S.D.N.Y.

June 4, 2013).  *See also In re Stoneridge Apartments*, 125 B.R. 794, 795 (Bankr.W.D.Mo.1991)

("Because 11 U.S.C. § 1129(b) comes into play only in the event of an attempted "cram down" of

a plan, the Court rejects this objection as being premature and not germane to the issues involved

in this [disclosure statement] hearing. It will be and is OVERRULED.").  Nevertheless, to aid the

Court's analysis, the Debtors will briefly address this issue.

29.      The Plan was purposefully drafted that a recovery would only flow to the holders

of interest in 21CI and 21CH in Class 11 if at confirmation the Plan satisfied all applicable

requirements of section 1129(a) of the Bankruptcy Code, particularly subjection (a)(8), and that

all classes of creditors either vote to accept the Plan or are deemed to accept the Plan.   More

specifically, a recovery only flows to  holders of interests in 21CH and 21CI if:  (a) all classes of

claims entitled to vote on the Plan vote to accept the Plan, (b) there are no allowed section 510(b)

claims, and (c) holders of allowed interests in 21CH and 21CI in Class 11 vote to accept the Plan.

*See* Plan, Art. III, 3.2(k).  If the Warrant Conditions are satisfied, then the Debtors do not need to seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code, and the Plan may be confirmed notwithstanding the distribution to holders of interests in 21CH and 21CI.

[*Remainder of Page Intentionally Left Blank*]

WHEREFORE, the Debtors respectfully request that the Bankruptcy Court (i) approve the

Disclosure Statement, (ii) enter an order granting the Disclosure Statement Motion, (iii) overrule

all Objections (to the extent that they remain pending as of the Disclosure Statement hearing), and

(iv) grant such other relief as the Bankruptcy Court deems just and proper.

| | |
|---|---|
| New York, New York<br>Dated: October 13, 2017 | */s/ Christopher Marcus, P.C.*<br>Christopher Marcus, P.C.<br>John T. Weber<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone:    (212) 446-4800<br>Facsimile:    (212) 446-4900 |

- and -

James H.M. Sprayregen, P.C.
William A. Guerrieri (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

## **Exhibit A**

**Response Chart**

In re 21st Century Oncology Holdings, Inc., *et al.*, Case No. 17-22770 (RDD)
**Summary of Disclosure Statement Objections** [8]

| Category of Objection | Objector and Docket No. | Arguments | Responses to Objection |
|---|---|---|---|
| | | **Disclosure Objections Addressed** | |
| 1. **Failure to Provide Adequate Information that Would Enable a Hypothetical Investor to Make an Informed Judgment About the Plan** | • Creditor Group [Docket No. 518] | • The Disclosure Statement identifies a liquidation analysis, valuation analysis and financial projections as exhibits, none of which exhibits were filed and served with the Disclosure Statement.<br><br>• The Disclosure Statement is unconformable as it contains no profit and loss statements, income statements, balance sheets or other financial information demonstrating Debtors' post-petition financial condition or performance.<br><br>• The Disclosure Statement does not consider the possibility or consequences if certain of the Debtors' key constituencies leave the Debtors when their contracts are rejected and/or indemnification denied, or if the leases at their practice locations are rejected.<br><br>• Financial projections that fail to take into account which locations, physicians and practice management groups will stay on with the Debtors, and which will leave, do not provide the adequate information required by the Bankruptcy Code.<br><br>• The Disclosure Statement fails to include any projections regarding the total estimated value of allowed Class 6 claims, the estimated percentage range of recovery for these claims under the Plan and what the estimated percentage range of recovery for these claims would be in a Chapter 7 liquidation.<br><br>• The Debtors provide no information regarding the potential value of the New Common Stock. | • The Objection is resolved through the addition of language disclosing the Creditor Group's involvement with the Debtor and the inclusion of the Liquidation Analysis, Valuation Analysis, and Financial Projections. *See* Disclosure Statement, Article VIII.B.4, Exhibit D, Exhibit E, and Exhibit F, respectively.<br><br>• The Disclosure Statement has been revised to include the estimated range of recoveries for each Class under the Plan. *See* Disclosure Statement, Article III.<br><br>• Information regarding the potential value of the New Common Stock has been disclosed in the Valuation Analysis and Financial Projections. *See* Disclosure Statement, Exhibit E and Exhibit F, respectively. |

---

[8]  Capitalized terms used herein but not defined have the meanings given to such terms in the Plan, Disclosure Statement, Motion, relevant Objection, or the Reply (each as defined in the Reply), as applicable.  Objections addressed in the body of the Reply are not addressed in this Summary.

| | | | |
|---|---|---|---|
| | • Data Breach Plaintiffs [Docket No. 500] | • The Disclosure Statement does not mention the Data Breach Litigation or the Data Breach Claims, resulting in inadequate information for creditors to make informed voting decisions.<br><br>• The Disclosure Statement fails to provide adequate information regarding the potential distributions under the Plan on account of the Data Breach Claims.<br><br>• The valuation analysis referenced as Exhibit E to the Disclosure Statement has not been filed.<br><br>• The Disclosure Statement has not been amended to reflect material changes as a result of the Joint Notice of Settlement with the Creditor's Committee attaching a Settlement Term Sheet. | • The Data Breach Claims are disputed, contingent, unliquidated claims, but nonetheless, the Disclosure Statement provide information related to the private litigations claims arising from the data breach as well as disclosures regarding the inquiries from the Office of Civil Rights relating to the data breach.  *See* Disclosure Statement, Article IX.C.12.<br><br>• The Disclosure Statement has been revised to provide additional information regarding the Data Breach Action.  *See* Disclosure Statement, Article V.D.1.b.<br><br>• The Disclosure Statement has been revised to include the estimated range of recovery under the Plan.  *See* Disclosure Statement, Article III.<br><br>• The Liquidation Analysis, Valuation Analysis, and Financial Projections will be filed with the revised Disclosure Statement.  *See* Disclosure Statement, Exhibit D, Exhibit E, and Exhibit F, respectively.<br><br>• The Settlement with the Committee has been incorporated in the revised Plan. *See* Plan. |
| | • Cigna [Docket No. 411] | • The Disclosure Statement fails to inform creditors who hold unsecured claims of the projected value of those claims. | • The Disclosure Statement has been revised to include the estimated range of recovery under the Plan.  *See* Disclosure Statement, Article III. |
| 2. **Lack of Disclosure Related to Rejection or Assumption of Leases and other Executory Contracts** | • Creditor Group [Docket No. 518] | • Without assumption or rejection before approval of the Disclosure Statement, the Debtors must provide an analysis of the effects such assumption or rejection will have on the Debtors' annual revenue and Plan feasibility.<br><br>• The Disclosure Statement fails to include an analysis of potentially hundreds of millions of dollars in lost annual revenues if leases are rejected.<br><br>• Due process requires that the timetable for disclosure of the assumption or rejection of leases must be advanced prior to balloting in order to give the Landlords adequate | • 7 days before the Voting Deadline, the Debtors will file and serve upon parties in interest the Plan Supplement, which will include the Schedule of Assumed Executory Contracts and Unexpired Leases.  On the same date the Debtors will service individualized cure notices and rejection notices. The proposed timing of the Plan Supplement will provide creditors entitled to vote with ample time to formulate an informed view prior to casting their ballots on the Plan, as courts routinely approve |

| | | | |
|---|---|---|---|
| | | information and adequate time to respond to Debtors' decisions to assume or reject. | disclosure statements that provide for the filing of plan supplements within a similar timeframe.[9]<br><br>• At least 14 days before the deadline to object to Confirmation, the Debtors shall distribute, or cause to be distributed, Cure Notices to the applicable third parties, listing the counterparties cure amount. Should a counterparty dispute the Cure amount listed in the Cure Notice, a counterparty may file an objection up until the date that is 7 days before the Confirmation Hearing.  See Disclosure Statement, Article VII.E.3. |
| | • Cigna [Docket No. 411] | • The Cigna Provider Agreements can be terminated without cause only upon sixty (60) days advance written notice. The Debtors have provided no written notice of their intent to terminate such Agreements. Under the Plan, any contract that is not assumed by the Effective Date is deemed to be rejected. The Debtors must be required to provide written notice of proposed rejection of the Cigna Provider Agreements no less than sixty (60) days prior to the Effective Date. | • Rejection of an executory contract or unexpired lease is not equivalent to termination of that contract or lease.  *See In re Drexel Burnham Lambert Group*, 138 B.R. 687, 708 (Bankr. S.D.N.Y. 1992); Debtor's Reply, ¶ 10. |
| 3.  **Inadequate Provision of Cure** | • Cigna [Docket No. 411] | • To satisfy their cure obligations under the Cigna Provider Agreements, and as a condition precedent to any assumption thereof, the Debtors must pay all amounts due and owing thereunder as of the Effective Date. | • At least 14 days before the Confirmation Hearing, the Debtors shall distribute, or cause to be distributed, Cure Notices to the applicable third parties, listing the counterparties cure amount.  Should a counterparty dispute the Cure amount listed in the Cure Notice, a counterparty may file an objection up until the date that is 7 days before the Confirmation Hearing.  *See* Disclosure Statement, Article VII.E.3. |

---

[9]  *See e.g. In re BCBG Max Azria Global Holdings, LLC*, Case No. 17-10466 (SCC) (Bankr. S.D.N.Y. July 12, 2017) (plan supplement provided five days prior to the voting deadline); *In re Horsehead Holding Corp.*, Case No. 16-10287 (CSS) (Bankr. D. Del. Aug. 9, 2016) (plan supplement provided ten days prior to voting deadline); *In re Sabine Oil & Gas Corp.*, Case No. 15-11835 (SCC) (Bankr. S.D.N.Y. May 24, 2016) (same); *In re SIGA Technologies, Inc.*, No. 14-12623 (SHL) (Bankr. S.D.N.Y. Mar. 15, 2016) (plan supplement provided seven days prior to voting deadline; *In re MPM Silicones, LLC*, Case No. 14-22503 (RDD) (Bankr. S.D.N.Y. July 18, 2014) (plan supplement provided ten days prior to voting deadline).

| 4. | **Inadequate Information Regarding Treatment of Classes as Unimpaired** | • U.S. Trustee [Docket No. 318] | • The Plan characterizes Classes 1 and 2 as unimpaired even though the plan imposes the third-party releases on them without their consent. | • All holders of Claims and Interest are afforded the opportunity not to be bound by the third party release. *See* Disclosure Statement, Article VIII.B.1. |
|---|---|---|---|---|

| Confirmation Objections | | | |
|---|---|---|---|
| **5.  The Release Provisions are Unconfirmable** | • Data Breach Plaintiffs [Docket No. 500] | • The definition of "Releasing Parties" in Plan, Art. 1.1.182, is too broad and the Disclosure Statement fails to provide a clear and concise list of persons and entities that are or might be "Releasing Parties" or "Released Parties. <br><br>• The Debtors have not met the unique factors outlined in *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005). <br><br>• Consent to the third-party release is illusory because the opt-out language is confusing—rejecting parties that do not opt-out are deemed to consent to the release. <br><br>• The definition of non-Debtor "Released Parties" may include potential non-Debtor entities that Claimants might later name as defendants in the Data Breach Litigation. <br><br>• The Disclosure Statement includes reference to Excluded Directors and Officers which are not identified, and may not be identified until the filing of the Plan Supplement. <br><br>• Many Releasing Parties do not have an opportunity to opt-out because they will not know about it because they only become Releasing Parties through a relationship to a consensually Releasing Party. *See* Plan, Art. 1.1.182. | • All holders of Claims and Interest are afforded the opportunity not to be bound by the third party release. *See* Debtors' Reply ¶ 23, Disclosure Statement, Article VIII.B.1. <br><br>• The Excluded Directors and Officers will be identified as part of the Plan Supplement which will be filed prior to the voting deadline. *See* Plan, Article I.83. <br><br>• In bold font, the ballots contain notice of the release provisions and provide creditors with an opportunity to opt-out. *See* Disclosure Statement Order, Schedule 3A-3F. |

| | | | |
|---|---|---|---|
| | • U.S. Trustee [Docket No. 318] | • The Plan seeks approval of third-party releases from creditors that reject the Plan, but fail to opt-out of the releases.<br><br>• The Plan seeks approval of third-party releases from creditors that are deemed to reject the plan even though they cannot vote, and therefore, cannot opt-out of the releases.<br><br>• Neither the Disclosure Statement nor the Plan contain provisions to ensure that releases for attorneys are appropriately limited under Rule 1.8(h)(1) of the New York Rules of Professional Conduct.<br><br>• The Second Circuit Does not have subject matter jurisdiction to approve releases of direct, non-derivative, claims by non-debtor third-parties against non-debtor third-parties. | • All holders of Claims and Interest are afforded the opportunity not to be bound by the third party release. *See* Debtors' Reply ¶ 23, Disclosure Statement, Article VIII.B.1.<br><br>• The Objection to the attorney release provision is resolved through the addition of clarifying language to the Plan and Disclosure Statement. *See* Plan, Article, VIII.8.11. *See also* Disclosure Statement, Article VII.H.11.<br><br>• *See* Debtors' Reply, ¶¶ 24-27. |

| 6. | **The Plan Discriminates Against Class 6 Claims** | • Data Breach Plaintiffs [Docket No. 500] | • The Plan discriminate against Class 6 Claims because it creates a $1,000,000 threshold, under which claimants must elect to receive common stock or else be treated as Convenience Claims. First, $1,000,000 is an arbitrary threshold. Second, the majority of Class 6 Claims are under $1,000,000.<br><br>• Different treatment of claims within the same class must be reasonable and necessary for administrative convenience. 11 U.S.C. § 1122(b). Nearly every Class 6 Claim that was filed in a liquidated amount would automatically fall into the Convenience Claim definition and, therefore, disparate treatment is not reasonable and necessary.<br><br>• The Convenience Claim holders participate pro rata in a $500,000 cash distribution pool. Class 6 Claims cannot ascertain their potential share of the $500,000. The $50 minimum distribution threshold in Article 6.4 of the Plan precludes any member of the Putative Class from receiving a distribution at all. | • The Plan does not provide for different treatment of Claims within the same Class, as similarly situated creditors are not forced to accept different treatment. Under the Plan all holders of Class 6 Claims are entitled to receive their Pro Rata share of either: (a) New Common Stock, or (b) the Convenience Claim Distribution. *See* Plan, Article III.3.2.f. |
| 7. | **The Plan Violates Absolute Priority** | • Data Breach Plaintiffs [Docket No. 500] | • The Plan provides the possibility that holders of equity interest are to receive distributions in the form of warrants under certain specified conditions. Permitting holders of existing equity interest to retain or receive any value under the Plan when the classes of creditors senior to equity are not all being paid in full violates the absolute priority rule. | • In order for equity to receive a distribution under the Plan, there must be no allowed claims in Class 8, the only presumed rejecting class, and the remaining classes have either voted to accept the Plan or are deemed to have accepted the Plan, rendering section 1129(b) of the Bankruptcy Code inapplicable to such Classes. *See* Debtors' Reply ¶¶28-29, Disclosure Statement, Article VII.C.2.k. |

| 8. | The Plan Improperly Precludes Creditors from Receiving Distributions | • Data Breach Plaintiffs [Docket No. 500] | • The Plan provides for all the Debtors insurance policies to be treated as executory contracts and assumed, and for all of the Debtors' directors' and officers' liability insurance to remain in effect unmodified. Neither the Plan nor the Disclosure Statement provides any mechanism by which a holder of a claim against a Debtor could independently pursue remedies directly against a Debtor's insurance carrier. | • Section 6.5(c) of the Plan provides that "Notwithstanding anything to the contrary contained herein (including Article VIII), nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity (other than a Released Party), including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers." *See* Plan, Article V.6.5.c. Contrary to the assertion set forth in the Data Breach Objection, the Plan expressly preserves a creditors ability to pursue insurers, if applicable. |