**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| 21st CENTURY ONCOLOGY HOLDINGS, INC., *et al.*,[1] | ) Case No. 17-22770 (RDD) |
|  | ) |
| Debtors. | ) (Jointly Administered) |
|  | ) |

**ORDER (I) APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT,
(II) APPROVING THE SOLICITATION AND NOTICE PROCEDURES WITH
RESPECT TO CONFIRMATION OF THE DEBTORS' PROPOSED JOINT PLAN OF
REORGANIZATION, (III) APPROVING THE FORMS OF BALLOTS AND NOTICES
IN CONNECTION THEREWITH, (IV) APPROVING THE RIGHTS OFFERING
PROCEDURES AND RELATED MATERIALS, (V) SCHEDULING CERTAIN
DATES WITH RESPECT THERETO, AND (VI) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the Debtors for entry of an order (this "Order")

pursuant to sections 105, 363, 1125, 1126, 1128 and 1145 of the Bankruptcy Code,

Bankruptcy Rules 2002, 3016, 3017, 3018, 3020 and Local Bankruptcy Rules 3017-1, 3018-1,

and 3020-1 approving: (a) the adequacy of the *Disclosure Statement for the Joint Chapter 11*

*Plan of Reorganization of 21st Century Oncology Holdings, Inc. and its Debtor Affiliates*,

substantially in the form attached hereto as Schedule 1 (the "Disclosure Statement"); (b) the

Solicitation and Voting Procedures (including without limitation the Voting and Tabulation

Procedures), substantially in the form attached hereto as Schedule 2; (c) the Voting Record Date,

Solicitation Deadline, Voting Deadline and the Governmental Unit Voting Deadline (as defined

below); (d) the manner and form of the Solicitation Packages and the materials contained therein,

---

[1] Each of the Debtors in the above-captioned jointly administered chapter 11 cases and their respective tax identification numbers are set forth in the *Order Directing Joint Administration of Chapter 11 Cases* [Docket No. 30]. The location of 21st Century Oncology Holdings, Inc.'s corporate headquarters and the Debtors' service address is: 2270 Colonial Boulevard, Fort Myers, Florida 33907.

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Motion or, if such terms are not defined in the Motion, the meanings given to such terms in the Plan.

including the Ballots, substantially in the forms attached hereto as <u>Schedules 3A</u>, <u>3B</u>, <u>3C</u>, <u>3D</u>,

<u>3E</u>, and <u>3F</u>, and the Cover Letter and letter in support of Confirmation from the Committee,

substantially in the forms attached hereto as <u>Schedule 7</u> and <u>Schedule 8</u>, respectively; (f) the Plan

Supplement Notice, substantially in the form annexed hereto as <u>Schedule 10</u>; (g) the non-voting

status notices and election forms to be sent to holders of Claims or Interests in the non-voting

Classes, substantially in the forms attached hereto as <u>Schedule 4</u> (the "<u>Unimpaired Non-Voting</u>

<u>Status Notice</u>"), <u>Schedule 5</u> (the "<u>Impaired Non-Voting Status Notice</u>"), and <u>Schedule 6</u> (the

"<u>Notice to Disputed Claim Holders</u>," and, together with the Unimpaired Non-Voting Status

Notice and the Impaired Non-Voting Status Notice, the "<u>Non-Voting Status Notices</u>"); (h) the

Assumption Notice and Rejection Notice, substantially in the forms attached hereto as <u>Schedule</u>

<u>11</u> and <u>Schedule 12</u>; (i) the Rights Offering Procedures, substantially in the forms attached

hereto as <u>Schedule 13</u> and <u>Schedule 14</u>, and the New Notes Rights Exercise Form and the New

Preferred Equity Rights Exercise Form, substantially in the forms attached hereto as <u>Schedule 15</u>

and <u>Schedule 16</u> (together, the "<u>Rights Offering Materials</u>"); (j) the AI Questionnaire,

substantially in the form attached hereto as <u>Schedule 17</u>; (k) the Confirmation Timeline set forth

herein and the Confirmation Hearing Notice, substantially in the form attached hereto as

<u>Schedule 9</u>; and (l) the other dates and deadlines related thereto, all as more fully described in the

Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein

in accordance with 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief

requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue being

proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the

Motion being adequate and appropriate under the particular circumstances; and a hearing having

been held to consider the relief requested in the Motion (the "<u>Disclosure Statement Hearing</u>");

and upon consideration of the record of the Disclosure Statement Hearing held by the Court on October 16, 2017, including the Court's rulings at the hearing, the Debtors filed the amended Disclosure Statement; and upon all proceedings had before the Court; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest, and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and any objections to the requested relief having been withdrawn or overruled on the merits; and after due deliberation and sufficient cause appearing therefor,

IT IS HEREBY FOUND:

A.    The notice of the Disclosure Statement Hearing provided good and sufficient notice to all interested parties and no other or further notice need be provided.

B.    As to each of the Debtors, the Disclosure Statement contains "adequate information" within the meaning of section 1125 of the Bankruptcy Code, and no further information is necessary.

C.    The Disclosure Statement complies with Bankruptcy Rule 3016(c) and describes, in specific and conspicuous language, the acts to be enjoined and the entities subject to the injunction, exculpation, and release (including third party release) provisions contained in the Plan.

D.    The Disclosure Statement complies with all applicable Local Bankruptcy Rules.

E.    The Solicitation and Voting Procedures provide for a fair and equitable voting process and are consistent with sections 1125 and 1126 of the Bankruptcy Code.

F.      The Ballots are sufficiently consistent with Official Form B 314 and adequately address the particular needs of these Chapter 11 Cases and are appropriate for the Voting Classes to vote to accept or reject the Plan.

G.      The proposed contents and distribution of the Solicitation Packages comply with Bankruptcy Rules 2002, 3017, and Local Rule 3017(b), and constitute sufficient notice to all interested parties of the Voting Record Date, Voting Deadline, Governmental Unit Voting Deadline, Plan Objection Deadline, Confirmation Hearing, and all related matters.

H.      Ballots need not be provided to the holders of Claims or Interests in (i) Class 1 (Other Secured Claims), (ii) Class 2 (Other Priority Claims), (iii) Class 7 (Intercompany Claims), (iv) Class 8 (Section 510(b) Claims), (v) Class 9 (Intercompany Interests), (vi) Class 10 (Class B 21C, LLC Interests) or (vii) Class 12 (Non-Debtor Interests) because such holders are presumed to either accept or reject the Plan, as applicable, and are not entitled to vote on account of such Claims or Interests.

I.      The Non-Voting Status Notices comply with the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules and, together with the Confirmation Hearing Notice, provides adequate notice to holders of Claims or Interests in the Non-Voting Classes of their non-voting status, their right to opt-out of the Third Party Release, and of the Confirmation Hearing.  No further notice is necessary.

J.      The period during which the Debtors may solicit acceptances to the Plan is a reasonable and adequate period of time under the circumstances for creditors to make an informed decision to accept or reject the Plan.

K.      The Confirmation Hearing Notice, the Publication Hearing Notice and the procedures set forth below for providing such notice to all known holders of Claims or Interests

4

and all other parties entitled to notice in the Chapter 11 Cases (regardless of whether such parties are entitled to vote to accept or reject the Plan) of the time, date, and place of the Confirmation Hearing and the contents of the Confirmation Hearing Notice and the Solicitation Packages comply with Bankruptcy Rules 2002 and 3017, and service of such materials as set forth herein constitutes sufficient notice to all interested parties.

L.    The Rights Offering Procedures and the Rights Offering Materials reflect the Debtors' exercise of prudent business judgment and provide sufficient information to enable each Rights Offering Participant to duly participate in the Rights Offerings.

NOW, THEREFORE, IT IS HEREBY ORDERED:

1.    The Motion is granted as provided herein.

## I.    Approval of the Disclosure Statement.

2.    The Disclosure Statement is hereby approved as containing adequate information within the meaning of section 1125(a)(1) of the Bankruptcy Code and no further information is necessary.

3.    The Disclosure Statement (including all applicable exhibits thereto) provides holders of Claims, holders of Interests, and other parties in interest with sufficient notice of the injunction, exculpation, and release (including third-party release) provisions contained in Article VIII of the Plan, in satisfaction of the requirements of Bankruptcy Rule 3016(c).

4.    All objections to the Disclosure Statement that have not been withdrawn or resolved previously or at the Disclosure Statement Hearing are hereby overruled.

## II.    Approval of the Solicitation and Voting Procedures.

5.    The Debtors are authorized to solicit, receive, and tabulate votes on the Plan in accordance with the Solicitation and Voting Procedures, including without limitation the Voting and Tabulation Procedures contained therein, which are hereby approved in their entirety.

5

### III.    Approval of the Materials and Timeline for Soliciting Votes and the Procedures for Confirming the Plan.

**A.    Approval of the Confirmation Timeline.**

6.    The following dates are hereby established (subject to modification as necessary, which modifications shall not require a hearing, but the Debtors shall serve notice of such modifications on all affected parties) with respect to the Solicitation of votes on the Plan, filing objections to the Plan, and Confirmation of the Plan (all times prevailing Eastern Time):

| Event | Date |
|---|---|
| Disclosure Statement Objection Deadline | October 9, 2017, at 4:00 p.m. |
| Disclosure Statement Objection Response Deadline | October 13, 2017, at 4:00 p.m. |
| Disclosure Statement Hearing Date | October 16, 2017, at 10:00 a.m. |
| Voting Record Date | October 16, 2017 |
| Rights Offering Record Date | October 16, 2017 |
| Solicitation Deadline | Seven business days following entry of this Order |
| Deadline to Distribute AI Questionnaires | Seven business days following entry of this Order |
| Publication Deadline | October 27, 2017 |
| Deadline to File Confirmation Hearing Notice | October 27, 2017 |
| Deadline to Submit AI Questionnaire | November 6, 2017, at 5:00 p.m. |
| Rights Offering Commencement Date | November 9, 2017 |
| Deadline to File Plan Supplement | November 13, 2017 |
| Voting Deadline | November 20, 2017, at 5:00 p.m. |
| Governmental Unit Voting Deadline[3] | November 27, 2017, at 5:00 p.m. |
| Assumption/Rejection Objection Deadline | November 27, 2017, at 4:00 p.m. |
| Plan Objection Deadline | November 27, 2017, at 4:00 p.m. |
| Rights Offering Termination Time | November 29, 2017, at 5:00 p.m. |

---

[3]    The term "Governmental Unit Voting Deadline" shall have the meaning ascribed to such term in the Solicitation Procedures attached hereto as Schedule 2.

6

| Event | Date |
|---|---|
| Deadline to File Confirmation Brief | December 1, 2017, at 12:00 p.m. |
| Plan Objection Response Deadline | December 1, 2017, at 12:00 p.m. |
| Deadline to File Voting Report | December 1, 2017, at 12:00 p.m. |
| Confirmation Hearing Date | December 11, 2017, at 10:00 a.m. |

**B.      Approval of the Ballots.**

7.      The Ballots are hereby approved.

**C.      Approval of the Form of, and Distribution of, Solicitation Packages to Parties Entitled to Vote on the Plan.**

8.      The Solicitation Packages to be transmitted on or before the Solicitation Deadline to those holders of Claims or Interests in the Voting Classes entitled to vote on the Plan as of the Voting Record Date, shall include the following, the form of each of which is hereby approved:

a.      a copy of the Solicitation and Voting Procedures;

b.      an appropriate form of Ballot, together with detailed voting instructions and a pre-addressed, postage prepaid return envelope;

c.      (i) the Cover Letter and (ii) the letter in support of Confirmation from the Committee (the "Committee Letter");

d.      the Disclosure Statement, as approved by the Court (and the exhibits thereto, including the Plan);

e.      this Order (excluding the exhibits thereto, except for the Solicitation and Voting Procedures);

f.      the Confirmation Hearing Notice; and

g.      such other materials as the Court may direct.

9.      To avoid duplication and reduce expenses, the Solicitation Agent is authorized (but not directed) to provide any holder of a Claim or Interest who has filed multiple and/or duplicate Claims or Interests against any Debtor(s) that are classified under the Plan in the same Voting Class no more than one Solicitation Package and the appropriate number of Ballots for

7

voting such holder's Claims or Interests in such Class, based on the nature of such Claims or Interests and the Debtor(s) against which such Claims or Interests are held.

10.    The Solicitation Packages provide the holders of Claims or Interests entitled to vote on the Plan with adequate information to make informed decisions with respect to voting on the Plan in accordance with Bankruptcy Rules 2002(b) and 3017(d), the Bankruptcy Code, and the Local Bankruptcy Rules.

11.    The Debtors shall distribute Solicitation Packages to all holders of Claims or Interests entitled to vote on the Plan on or before the Solicitation Deadline.  Such service shall satisfy the requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules.

12.    The Debtors are authorized, but not directed or required, to distribute to holders of Claims or Interests entitled to vote on the Plan (a) the Plan, the Disclosure Statement, and this Order (excluding the exhibits thereto, except for the Solicitation and Voting Procedures) *only* in electronic format (*i.e.*, on a CD-ROM or flash drive); and (b) the Ballots, the Cover Letter, the Committee Letter and the Confirmation Hearing Notice *only* in paper format; *provided*, *however*, that the Debtors are not required to mail the Solicitation Packages or any other type of notice in connection with Solicitation to: (x) holders of Claims or Interests that have already been paid in full during the Chapter 11 Cases or that are authorized to be paid in full in the ordinary course of business pursuant to an order previously entered by this Court, (y) holders in Classes 7 (Intercompany Claims) or 9 (Intercompany Interests).  On or before the Solicitation Deadline, the Debtors shall provide (a) complete Solicitation Packages to the U.S. Trustee and (b) this Order (in electronic format) and the Confirmation Hearing Notice to all parties on the 2002 List as of the Voting Record Date.

13.     Any party that receives materials in electronic format, but would prefer to receive materials in paper format, may contact the Solicitation Agent and request paper copies of the corresponding materials previously received in electronic format (to be provided at the Debtors' expense).

14.     The Solicitation Agent is authorized to assist the Debtors in (a) distributing the Solicitation Package, (b) receiving, tabulating, and reporting on Ballots cast to accept or reject the Plan by holders of Claims against or Interests in the Debtors, (c) responding to inquiries from holders of Claims or Interests and other parties in interest relating to the Disclosure Statement, the Plan, the Ballots, the Solicitation Packages, and all other related documents and matters related thereto, including the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan, (d) soliciting votes on the Plan, and (e) if necessary, contacting creditors regarding the Plan.

15.     The Solicitation Agent is also authorized to accept Ballots via electronic online transmission solely through a customized online balloting portal on the Debtors' case website. The encrypted ballot data and audit trail created by such electronic submission shall become part of the record of any Ballot submitted in this manner and the creditor's electronic signature will be deemed to be immediately legally valid and effective.

**D.      Approval of the Confirmation Hearing Notice and Publication Hearing Notice.**

16.     The Confirmation Hearing Notice, together with the Publication Notice, constitute adequate and sufficient notice of the Confirmation Hearing, the manner in which a copy of the Disclosure Statement and the Plan could be obtained, and the time fixed for filing objections thereto, and such Confirmation Hearing Notice is hereby approved.

17.    The Debtors shall (a) file and serve upon the 2002 List the Confirmation Hearing Notice on or before **October 27, 2017**; and (b) publish the Publication Notice one time within five (5) business days following the Solicitation Deadline, and in no event later than **October 27, 2017**, in *USA Today* (National Edition), *Florida Times-Union, Palm Beach Post*, *Fort Myers News-Press*, *Cape Coral Daily Breeze*, *Palm Beach Post*, *Seattle Times*, *Gettysburg Times*, *South Jersey Times*, *Birmingham News*, *Baltimore Sun*, *The Aegis*, *Washington Post*, *Frankfort State Journal*, *Myrtle Beach Sun News*, *Arizona Republic*, *Bluefield Daily Telegraph*, *Las Vegas Review-Journal*, *Worcester Telegram & Gazette*, *The Daily Herald*, *Sampson Independent*, *Goldsboro News-Argus*, and *Oakland Press*. This service and publication comports with the requirements of the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules.

18.    The Confirmation Hearing may be continued from time to time by the Court or the Debtors without further notice to parties in interest other than such adjournment announced in open court and/or a notice of adjournment filed with the Court and served on the 2002 List.

**E.    Approval of Notice of Filing of the Plan Supplement.**

19.    The Debtors shall file and serve the Plan Supplement Notice as soon as reasonably practicable following the date on which the Plan Supplement is filed pursuant to the terms of the Plan, but in any event no later than 14 days prior to the Confirmation Hearing.

**F.    Approval of the Form of Notices and Election Form with Respect to Non-Voting Classes.**

20.    The Non-Voting Status Notices, including without limitation the Election Forms attached thereto, are hereby approved. Except to the extent the Debtors determine otherwise, the Debtors are not required to provide Solicitation Packages to holders of Claims or Interests in Non-Voting Classes, as such holders are not entitled to vote on the Plan. Instead, on or before

the Solicitation Deadline, the Solicitation Agent shall mail (first-class postage prepaid) a Non-Voting Status Notice (inclusive of an Election Form), in lieu of Solicitation Packages to those parties, outlined below, who are not entitled to vote on the Plan:

| Class(es) | Status | Treatment |
|-----------|--------|-----------|
| 1, 2 & 10 | Unimpaired—Presumed to Accept | Will receive an Unimpaired Non-Voting Status Notice (including an Election Form), in lieu of a Solicitation Package. |
| 8 & 12 | Impaired—Presumed to Reject | Will receive an Impaired Non-Voting Status Notice (including an Election Form), in lieu of a Solicitation Package. |
| Various | Disputed Claims | Holders of Claims or Interests that are subject to a pending objection by the Debtors are not entitled to vote the disputed portion of their Claim or Interest. As such, holders of such Claims or Interests will receive a Notice to Disputed Claim Holders (which notice shall be served together with such objection) and an Election Form. |

**G.  Approval of Notices to Contract and Lease Counterparties.**

21.    The Debtors are authorized to mail an Assumption Notice (and any corresponding Cure Claim) or a Rejection Notice to the applicable counterparties to Executory Contracts and Unexpired Leases that will be assumed, assumed and assigned, or rejected pursuant to the Plan (as the case may be), within the time periods specified in the Plan.  The inclusion of an Executory Contract or Unexpired Lease on the Schedule of Assumed Executory Contracts and Unexpired Leases or the Schedule of Rejected Executory Contracts and Unexpired Leases (or any Amended Schedule) is without prejudice to the Debtors' rights to modify their election to assume or reject such Executory Contract or Unexpired Lease in accordance with the Plan.

22.    Notwithstanding anything in this Order to the contrary or in any subsequent notice or motion relating to Confirmation of the Plan, in the event the Debtors propose to reject any of

the Cigna Provider Agreements identified in the *Objection of Cigna Entities to Disclosure Statement for Joint Chapter 11 Plan of Reorganization of 21st Century Oncology Holdings, Inc. and Its Debtor Affiliates* [Docket No. 411] (the "Cigna Objection"), the Debtors shall provide to Cigna (as defined in the Cigna Objection) written, irrevocable notice of that decision no later than November 13, 2017.

### H. Approval of the Procedures for Filing Objections to the Plan.

23.    All objections to Confirmation of the Plan, requests for modifications to the Plan, and objections to the Rejection Notice or the Assumption Notice or the proposed Cure Claims associated therewith, if any, in each case **must**:  (a) be in writing; (b) conform to the Bankruptcy Rules and the Local Bankruptcy Rules; (c) state, with particularity, the legal and factual basis for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; and (d) be filed with the Court (contemporaneously with a proof of service) and served upon the notice parties, with a copy to the Court's chambers, so as to be **actually received** on or before **November 27, 2017, at 4:00 p.m.**, prevailing Eastern Time, by each of the notice parties identified in the Confirmation Hearing Notice.

24.    Any objections to the Plan that are not timely filed and properly served in accordance with this Order will not be considered by the Court and are denied and overruled unless otherwise ordered by the Court.  Any party that fails to object to the assumption of the Executory Contracts and Unexpired Leases identified in the Schedule of Assumed Executory Contracts and Unexpired Leases (or any Amended Schedule) and the proposed Cure Claims associated therewith shall be forever barred, estopped and enjoined from disputing the assumption of such Executory Contracts and Unexpired Leases, and the proposed Cure Claims associated therewith, and asserting any Claim against the Debtors and their Estates arising under section 365(b)(1) of the Bankruptcy Code, except as set forth in the Plan.

## I.    Authority to Make Non-Substantive Modifications

25.    The Debtors are authorized to make any non-substantive or immaterial changes, which are consistent in all material respects with the Restructuring Support Agreement and the *Joint Notice of Settlement with the Creditors' Committee* [Docket No. 425] (the "Committee Settlement"), to the Disclosure Statement, Plan, Ballots, Confirmation Hearing Notice, Solicitation Packages, Non-Voting Status Notices (including Election Forms), Ballots, Publication Notice, Cover Letter, Solicitation and Voting Procedures, Plan Supplement Notice, Assumption Notice and Rejection Notice, Voting and Tabulation Procedures, Rights Offering Procedures, Rights Offering Materials, AI Questionnaire and related documents without further order of the Court, including, without limitation, changes to correct typographical and grammatical errors, if any, and to make conforming changes among the Disclosure Statement, the Plan, and any other materials in the Solicitation Package before their distribution.

## J.    Approval of the Rights Offering Procedures, Rights Offering Materials and AI Questionnaire.

26.    The Rights Offering Procedures are approved.

27.    The Debtors are authorized to commence and conduct the Rights Offerings in accordance with the terms and conditions of the Backstop Purchase Agreement, the Rights Offerings Procedures and the Rights Offering Materials pursuant to sections 105, 363 and 1145 of the Bankruptcy Code.

28.    The New Notes Rights Exercise Form is approved.

29.    The New Preferred Equity Rights Exercise Form is approved.

30.    The AI Questionnaire is approved.  The Debtors are authorized to mail, or cause to be mailed, an AI Questionnaire to each holder of an Allowed Note Claim or an Eligible General Unsecured Claim on or before the Solicitation Deadline.  As a condition to becoming a

Rights Offering Participant, each holder of an Allowed Note Claim or an Eligible General Unsecured Claim intending to participate in the Rights Offerings shall certify that it is an Accredited Investor by properly completing, duly executing and timely delivering an AI Questionnaire to the Subscription Agent so that such AI Questionnaire is *actually received* by the Subscription Agent on or before the Questionnaire Deadline; *provided*, *however*, that any Backstop Party that holds an Allowed Note Claim or an Eligible General Unsecured Claim as of the Rights Offering Record Date and any Backstop Party's Affiliate (as defined in the Backstop Purchase Agreement) that holds an Allowed Note Claim or an Eligible General Unsecured Claim as of the Rights Offering Record Date shall not be required to complete and deliver an AI Questionnaire and shall be deemed a Rights Offering Participant.

31.    The Debtors are authorized to distribute the Rights Offerings Procedures and the Rights Offering Materials to each Rights Offering Participant on or before November 9, 2017.

32.    The Subscription Period is a reasonable period of time for the Rights Offerings Participants to make an informed decision regarding whether to exercise their New Notes Rights and New Preferred Equity Rights and such Subscription Period is approved.

33.    Each Rights Offerings Participant (other than the Backstop Parties) intending to participate in the Rights Offerings must affirmatively make a binding election to exercise its New Notes Rights and New Preferred Equity Rights on or prior to the Rights Offering Termination Time and must otherwise timely satisfy each of the terms and conditions set forth in the Rights Offerings Procedures and the Rights Offering Materials, and will be deemed to have relinquished and waived all rights to participate in the Rights Offerings to the extent such Rights Offering Participant fails to timely satisfy each of the terms and conditions set forth in the Rights Offerings Procedures and the Rights Offering Materials.

14

34.    The Debtor's designation of Kurtzman Carson Consultants LLC as the Subscription Agent for the Rights Offerings is approved.

35.    The New Notes Rights and New Preferred Equity Rights received by each Rights Offering Participant shall not be transferable or assignable.  The New Notes Rights and New Preferred Equity Rights may only be exercised by or through the Rights Offering Participant entitled to exercise such rights on the Rights Offering Record Date.  Any transfer or attempted transfer of the New Notes Rights or the New Preferred Equity Rights will be null and void and the Debtors will not treat any purported transferee thereof as the holder of any New Notes Rights or New Preferred Equity Rights.

36.    The distribution of the New Notes Rights and the New Preferred Equity Rights in connection with the Rights Offerings and the issuance of New Second Lien Notes and shares of New Preferred Equity on the Effective Date to Rights Offering Participants upon exercise of such rights qualify for the exemption from registration under applicable U.S. securities laws to the extent provided by section 1145 of the Bankruptcy Code.  The distribution of unsubscribed New Second Lien Notes and shares of New Preferred Equity purchased by the Backstop Parties pursuant to the Backstop Purchase Agreement qualify for the exemption from registration under applicable U.S. securities laws to the extent provided by section 4(a)(2) of the Securities Act.

37.    The Debtors may modify the Rights Offering Procedures or adopt any additional detailed procedures, consistent with the provisions of the Rights Offering Procedures, to effectuate the Rights Offerings and to issue the New Second Lien Notes and New Preferred Equity.

38.    The Debtors are authorized and empowered to execute and deliver such documents, and to take and perform all actions necessary, to implement and effectuate the Rights Offerings.

## IV.    Miscellaneous.

39.    The Debtors reserve the right to modify the Plan in accordance with Article X thereof, the Restructuring Support Agreement and the Committee Settlement, including the right to withdraw the Plan as to any or all Debtors at any time before the Confirmation Date.

40.    Nothing in this Order shall be construed as a waiver of the right of the Debtors or any other party in interest, as applicable, to object to a proof of claim after the Voting Record Date.

41.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

42.    The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

43.    Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective upon its entry.

44.    The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

45.    This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Dated: White Plains, New York
      October 17, 2017                 /s/Robert D. Drain
                                  HONORABLE ROBERT D. DRAIN
                                  UNITED STATES BANKRUPTCY JUDGE

SCHEDULE 1: Disclosure Statement

SCHEDULE 2:  Form of Solicitation and Voting Procedures

SCHEDULE 3A:  Form of Class 3 Ballot

SCHEDULE 3B:  Form of Class 4 Ballot

SCHEDULE 3C:  Form of Class 5 Master Ballot

SCHEDULE 3D:  Form of Class 5 Beneficial Holder Ballot

SCHEDULE 3E:  Form of Class 6 Ballot

SCHEDULE 3F:  Form of Class 11 Ballot

SCHEDULE 4:  Form of Unimpaired Non-Voting Status Notice

SCHEDULE 5:  Form of Impaired Non-Voting Status Notice

SCHEDULE 6:  Form of Notice to Disputed Claim Holders

SCHEDULE 7:  Form of Cover Letter

SCHEDULE 8:  Form of Committee Letter

SCHEDULE 9:  Form of Confirmation Hearing Notice

SCHEDULE 10:  Form of Plan Supplement Notice

SCHEDULE 11:  Form of Assumption Notice

SCHEDULE 12:  Form of Rejection Notice

SCHEDULE 13:  New Notes Rights Offering Procedures

SCHEDULE 14:  New Preferred Equity Rights Offering Procedures

SCHEDULE 15:  Form of New Notes Rights Exercise Form

SCHEDULE 16:  Form of New Preferred Equity Rights Exercise Form

SCHEDULE 17:  Form of AI Questionnaire

## SCHEDULE 1

## Disclosure Statement

Christopher Marcus, P.C.
John T. Weber
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

James H.M. Sprayregen, P.C.
William A. Guerrieri (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| 21st CENTURY ONCOLOGY HOLDINGS, INC., *et al.*[1] | ) Case No. 17-22770 (RDD) |
|  | ) |
| Debtors. | ) (Jointly Administered) |
|  | ) |

**DISCLOSURE STATEMENT FOR**
**THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF**
**21st CENTURY ONCOLOGY HOLDINGS, INC. AND ITS DEBTOR AFFILIATES**

---

**This is not a solicitation of votes to accept or reject the Plan[2] in accordance with section 1125 of the Bankruptcy Code and within the meaning of section 1126 of the Bankruptcy Code. 11 U.S.C. §§ 1125, 1126. This Disclosure Statement is being submitted for approval but has not been approved by the Bankruptcy Court. The information in this Disclosure Statement is subject to change. This Disclosure Statement is not an offer to sell any securities and is not soliciting an offer to buy any securities.**

---

[1]    Each of the Debtors in the above-captioned jointly administered chapter 11 cases and their respective tax identification numbers are set forth within the *Order Directing Joint Administration of Chapter 11 Cases* [Docket No. 30]. The location of 21st Century Oncology Holdings, Inc.'s corporate headquarters and the Debtors' service address is: 2270 Colonial Boulevard, Fort Myers, Florida 33907.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in the Plan (as defined herein).

| Important Information for You to Read |
| --- |

**The deadline to vote on the Plan**
**with respect to Classes 3, 4, 5, 6, and 11 is**
**November 20, 2017 at 5:00 P.M. (Prevailing Eastern Time)**

**For your vote to be counted, your Ballot (as defined in the**
**Disclosure Statement Order) must be _actually_ received by the Notice**
**and Claims Agent before the Voting Deadline (or, if applicable, the**
**Governmental Unit Voting Deadline) as described herein.**

Subject to Bankruptcy Court approval, the Debtors are providing the information in this Disclosure Statement to holders of Claims or Interests for purposes of soliciting votes to accept or reject the Plan, which is attached hereto as <u>Exhibit A</u>.  Nothing in this Disclosure Statement may be relied upon or used by any Entity for any other purpose.  Before deciding whether to vote for or against the Plan, each holder of a Claim or Interest entitled to vote should carefully consider all of the information in this Disclosure Statement, including the risk factors described in Article IX herein.

The Debtors urge every holder of a Claim or Interest entitled to vote on the Plan to:  (a) read the entire Disclosure Statement and the Plan carefully; (b) consider all of the information in this Disclosure Statement, including, importantly, the risk factors described in Article IX of this Disclosure Statement; and (c) consult with its own advisor(s) with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, all documents attached hereto, and the proposed transactions contemplated thereby.  Furthermore, the Bankruptcy Court's approval of the adequacy of the information contained in this Disclosure Statement does not constitute the Bankruptcy Court's approval of the Plan.

The Plan contains a series of releases that are part of the overall compromise and settlement of various potential Claims and Interests.  In that respect, parties should be aware that, if the Plan is confirmed, they may be receiving and giving releases as set forth in Article VIII of the Plan and Article VII.H of this Disclosure Statement.

This Disclosure Statement contains, among other things, summaries of the Plan, certain statutory provisions, and certain events in the Debtors' Chapter 11 Cases.  Although the Debtors believe that these summaries are fair and accurate, these summaries are qualified in their entirety to the extent that they do not set forth the entire text of such documents or statutory provisions or every detail of such anticipated events.  In the event of any inconsistency or discrepancy between a description in this Disclosure Statement and the terms and provisions of the Plan or any other documents incorporated herein by reference, the Plan or such other documents will govern for all purposes.  Factual information contained in this Disclosure Statement has been provided by the Debtors' management except where otherwise specifically noted.  The Debtors do not represent or warrant that the information contained herein or attached hereto is without any material inaccuracy or omission.

This Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and is not necessarily prepared in accordance with federal or state securities laws or other similar laws.

This Disclosure Statement was not filed with the United States Securities and Exchange Commission (the "SEC") or any state authority and neither the SEC nor any state authority has passed upon the accuracy or adequacy of this Disclosure Statement or upon the merits of the Plan.

In preparing this Disclosure Statement, the Debtors relied on financial data derived from the Debtors' books and records and on various assumptions regarding the Debtors' businesses. While the Debtors believe that such financial information fairly reflects the financial condition of the Debtors as of the applicable presentation date and that the assumptions regarding future events reflect reasonable business judgments, no representations or warranties are made as to the accuracy of the financial information contained herein or assumptions regarding the Debtors' businesses and their future results and operations. The Debtors expressly caution readers not to place undue reliance on any forward-looking statements contained herein.

This Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver. The Debtors may seek to investigate, File, and prosecute Claims and Interests, and may object to Claims and Interests, after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies any such Claims and Interests or objections to Claims and Interests.

The Debtors are making the statements and presenting the financial information contained in this Disclosure Statement as of the date hereof, unless otherwise specifically noted. Although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so, and expressly disclaim any duty to publicly update any forward-looking statements, whether as a result of new information, future events, or otherwise. Holders of Claims or Interests reviewing this Disclosure Statement should not infer that, at the time of their review, the facts set forth herein have not changed since this Disclosure Statement was Filed. Information contained herein is subject to completion, modification, or amendment. The Debtors reserve the right to File an amended or modified Plan and related Disclosure Statement from time to time, subject to the terms of the Plan.

The Debtors have not authorized any Entity to give any information about or concerning the Plan other than that which is contained in this Disclosure Statement. The Debtors have not authorized any representations concerning the Debtors or the value of their property other than as set forth in this Disclosure Statement.

The securities described herein will be issued without registration under the Securities Act, or any similar federal, state, or local laws, in reliance on the exemptions set forth in section 1145 of the Bankruptcy Code to the maximum extent permitted and applicable and, to the extent that reliance on such section is either not permitted or not applicable, the exemption set forth in section 4(a)(2) of the Securities Act. The securities described herein may not be offered or sold except pursuant to a valid exemption or upon registration under the Securities Act. In accordance with section 1125(e) of the Bankruptcy Code, the Debtors or any of their agents that participate, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a security, offered or sold under the Plan, of the Debtors, of an Affiliate participating in the Plan with the Debtors, or of a newly organized successor to the Debtors under the Plan, is not liable, on account of such participation, for violation of any applicable law, rule, or regulation governing the offer, issuance, sale, or purchase of securities.

If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all holders of Claims or Interests (including those holders of Claims or Interests who do not submit Ballots to

accept or reject the Plan, or who are not entitled to vote on the Plan) will be bound by the terms of the Plan and the Restructuring Transactions contemplated thereby.

**This Disclosure Statement has not been approved or disapproved by the SEC nor has the SEC passed upon the accuracy or adequacy of the statements contained herein.**

\*        \*        \*        \*        \*

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................... 4

II.   PRELIMINARY STATEMENT ............................................................................... 4

III.  TREATMENT OF CLAIMS AND INTERESTS ...................................................... 6

IV.   SOLICITATION, VOTING, ELECTION AND CONFIRMATION DEADLINES ............... 8

      A.    Solicitation Packages ...................................................................................... 8
      B.    Voting Deadline and Governmental Unit Voting Deadline ............................... 9
      C.    Voting Procedures ........................................................................................... 9
      D.    Election Deadline: Deadline to "Opt Out" of the Third Party Release ............. 11
      E.    Plan Objection Deadline ................................................................................. 11
      F.    Confirmation Hearing ..................................................................................... 11

V.    THE DEBTORS' BACKGROUND ....................................................................... 11

      A.    The Company's Operations ............................................................................ 11
      B.    The Debtors' Prepetition Corporate and Capital Structure .............................. 17
      C.    The Debtors' Board Members and Executives ................................................ 20
      D.    Events Leading to the Chapter 11 Cases ........................................................ 25

VI.   EVENTS OF THE CHAPTER 11 CASES ............................................................. 32

      A.    Expected Timetable of the Chapter 11 Cases .................................................. 32
      B.    First Day Pleadings and Other Case Matters ................................................... 33
      C.    The Debtors' DIP Financing and Cash Collateral Motion ................................ 36
      D.    Schedules and Bar Dates ................................................................................ 37
      E.    Other Postpetition Matters .............................................................................. 38
      F.    Corporate Structure Upon Emergence ............................................................ 39

VII.  SUMMARY OF THE PLAN ................................................................................ 39

      A.    Overview ....................................................................................................... 40
      B.    Administrative Claims and Professional Claims .............................................. 40
      C.    Classification and Treatment of Claims and Interests ...................................... 42
      D.    Means for Implementation of the Plan ............................................................ 52
      E.    Treatment of Executory Contracts and Unexpired Leases ............................... 66
      F.    Provisions Governing Distributions ................................................................. 70
      G.    Procedures for Resolving Disputed Claims and Interests ................................. 75
      H.    Settlement, Release, Injunction, and Related Provisions .................................. 78
      I.    Conditions Precedent to the Effective Date ..................................................... 82
      J.    Modification, Revocation, or Withdrawal of the Plan ...................................... 85
      K.    Retention of Jurisdiction ................................................................................. 86
      L.    Miscellaneous Provisions ............................................................................... 87

VIII. STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN .................. 91

i

# TABLE OF CONTENTS (CONT'D)

**Page**

|   |   |   |   |
|---|---|---|---|
| A. | Confirmation Hearing | ....... | 91 |
| B. | Confirmation Standards | ....... | 93 |
| C. | Acceptance by Impaired Classes | ....... | 99 |
| D. | Confirmation without Acceptance by All Impaired Classes | ....... | 100 |

**IX. CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING ....... 102**

| A. | Bankruptcy Law Considerations and Other Legal Risks | ....... | 102 |
|---|---|---|---|
| B. | Risks Related to Recoveries under the Plan | ....... | 105 |
| C. | Risks Related to the Debtors' and the Reorganized Debtors' Businesses | ....... | 107 |
| D. | Liquidity Risks | ....... | 115 |
| E. | Risks Associated with Forward-Looking Statement | ....... | 115 |
| F. | Disclosure Statement Disclaimer | ....... | 116 |
| G. | Liquidation Under Chapter 7 | ....... | 117 |

**X. CERTAIN SECURITIES LAW MATTERS ....... 117**

| A. | New Preferred Equity, New Common Stock, New Second Lien Notes, and New Warrants | ....... | 117 |
|---|---|---|---|
| B. | Issuance and Resale of Securities Under the Plan | ....... | 118 |

**XI. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ....... 121**

| A. | Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized Debtors | ....... | 123 |
|---|---|---|---|
| B. | Certain U.S. Federal Income Tax Consequences to U.S. Holders of Certain Allowed Claims or Allowed Interests, Loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility, New Warrants, New Second Lien Notes, New Preferred Equity, and New Common Stock | ....... | 126 |
| C. | Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Certain Allowed Claims | ....... | 138 |
| D. | FATCA | ....... | 142 |
| E. | Information Reporting and Backup Withholding | ....... | 143 |

**XII. RECOMMENDATION OF THE DEBTORS ....... 144**

## EXHIBITS

EXHIBIT A        Joint Chapter 11 Plan of Reorganization

EXHIBIT B        Corporate Organization Chart as of the Petition Date

EXHIBIT C        Disclosure Statement Order

EXHIBIT D        Liquidation Analysis

EXHIBIT E        Valuation Analysis

EXHIBIT F        Financial Projections

## I.      INTRODUCTION

21st Century Oncology Holdings, Inc. ("21CH") and its debtor Affiliates, as debtors and debtors in possession (collectively, the "Debtors"), submit this disclosure statement (together with all exhibits, schedules, and attachments hereto, as may be amended, supplemented, or otherwise modified from time to time, this "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code to holders of Claims against and Interests in the Debtors in connection with the Solicitation of acceptances with respect to the *Joint Chapter 11 Plan of Reorganization of 21st Century Oncology Holdings, Inc. and Its Debtor Affiliates* (together with all exhibits, schedules, and attachments thereto, as may be amended, supplemented, or otherwise modified from time to time, the "Plan"),[1] dated October 13, 2017.  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.

> **The Debtors believe that the Plan is fair and equitable, provides for a greater distribution to the Debtors' creditors and Interest holders than would otherwise result from a liquidation under chapter 7 of the Bankruptcy Code, and maximizes the value of the Debtors' Estates.  At this time, the Debtors believe the Plan represents the best available alternative.  For these reasons and the reasons described herein, the Debtors strongly recommend that you vote to accept the Plan.**

> **IMPORTANT DATES**
> – Voting Deadline:  **November 20, 2017 at 5:00 p.m., prevailing Eastern Time**
> – **Governmental Unit Voting Deadline (if applicable):   November 27, 2017 at 5:00 p.m., prevailing Eastern Time**
> – **Plan Objection Deadline: November 27, 2017 at 4:00 p.m., prevailing Eastern Time**

## II.     PRELIMINARY STATEMENT

The Debtors, together with their non-Debtor Affiliates (collectively, the "Company"), are a leading, global, physician-led provider of integrated cancer care services operating the largest network of cancer treatment centers and affiliated physicians in the world.  With 179 locations worldwide, the Company provides comprehensive care to patients in seven Latin American countries and 17 U.S. States.

The Company employs a range of medical professionals, including radiation oncologists, medical oncologists, breast surgeons, colorectal surgeons, urologists, gynecologic oncologists, and other medical professionals, to provide high-end, complete end-to-end care for cancer patients.  The Company also provides a complete selection of advanced radiotherapy services that may otherwise be unavailable in the communities in which the Company operates.  Finally, the Company provides support services, including psychological and nutritional counseling, as well as transportation assistance.

The Company is headquartered in Fort Myers, Florida, but operates as a global enterprise, including operations across the United States, South America, and Latina America.  Globally, the Company consists of approximately 111 Entities organized under the laws of various nations and jurisdictions, including the United States, the Netherlands, and South America.  The Debtors in these Chapter 11 Cases consist of 61 Entities, each organized under U.S. law.  An organizational chart illustrating the Company's corporate structure in summary format as of the Petition Date (as defined herein) is attached hereto as **Exhibit B**.  As detailed more fully herein, the Debtors entered chapter 11 to undertake a balance sheet restructuring and deleverage their capital structure.

---

[1]    The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

If confirmed and consummated, the Plan will eliminate more than $500 million in net debt from the Debtors' balance sheet, provide the Debtors with the capital necessary to fund distributions to the Debtors' creditors, and provide the Debtors with working capital necessary to fund ongoing operations. The Debtors intend to emerge from chapter 11 pursuant to the Plan on an expedited timeline within six to nine months following the Petition Date.

The Plan substantially reduces the Debtors' current secured debt load, contemplates that the holders of the Debtors' unsecured obligations will receive a Cash or equity distribution on account of their Claims, and allows holders of Interests in 21CH and 21CI to receive New Warrants if certain conditions are satisfied.  Furthermore, the Plan contemplates two separate Rights Offerings that certain Noteholders may participate in to acquire the New Second Lien Notes and New Preferred Equity.  The Debtors respectfully submit that the Plan maximizes recoveries for the Debtors' stakeholders, right-sizes the Debtors' balance sheet, and preserves the Debtors' ongoing operations.

The Debtors seek Bankruptcy Court approval of the Plan.  Before soliciting acceptances of a proposed plan of reorganization, section 1125 of the Bankruptcy Code requires a plan proponent to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of a chapter 11 plan.  This Disclosure Statement is being submitted in accordance with such requirements.  This Disclosure Statement includes, without limitation, information about:

- the Debtors' corporate history and corporate structure, business operations, and prepetition capital structure and indebtedness (Article V.A and Article V.B hereof);

- events leading to the Chapter 11 Cases, including the Debtors' restructuring negotiations (Article V.D hereof);

- significant events in the Chapter 11 Cases (Article VI hereof);

- the classification and treatment of Claims and Interests under the Plan, including who is entitled to vote and how to vote on the Plan (Article VII.C and Article IV.C hereof);

- certain important effects of Confirmation of the Plan (Article VII.H hereof);

- releases contemplated by the Plan that are integral to the overall settlement of Claims and Interests pursuant to the Plan (Article VII.H hereof);

- the statutory requirements for confirming the Plan (Article VIII hereof);

- certain risk factors holders of Claims or Interests should consider before voting to accept or reject the Plan and information regarding alternatives to Confirmation of the Plan (Article IX hereof);

- certain securities law matters with respect to the Plan (Article X hereof); and

- certain U.S. federal income tax consequences of the Plan (Article XI hereof).

In light of the foregoing, the Debtors believe this Disclosure Statement contains "adequate information" to enable a hypothetical reasonable investor to make an informed judgment about the Plan and complies with all aspects of section 1125 of the Bankruptcy Code.

The Debtors' boards of directors, board of managers, and managing members (collectively, the "Authorizing Bodies"), as applicable, have approved the Plan and the transactions contemplated therein and believe the Plan is in the best interests of the Debtors, the Debtors' Estates, and the Debtors' creditors. As such, the Authorizing Bodies recommend that all holders entitled to vote, accept the Plan by returning their Ballots, so as to be actually received by the Debtors' Notice and Claims Agent no later than **November 20, 2017, at 5:00 p.m. prevailing Eastern Time**. Assuming the requisite acceptances to the Plan are obtained, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

The Plan and all documents to be executed, delivered, assumed, and/or performed in connection with the Consummation of the Plan, including the documents to be included in the Plan Supplement, are subject to revision and modification from time to time prior to the Effective Date (subject to the terms of the Plan).

## III.    TREATMENT OF CLAIMS AND INTERESTS

As set forth in Article III of the Plan, and in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code, all Claims and Interests (other than Administrative Claims, Professional Claims, DIP Claims, and Priority Tax Claims) are classified into Classes for all purposes, including voting, Confirmation, and distributions pursuant to the Plan. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class. A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or an Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

Estimated Allowed Claims identified in this Article III are based on the Debtors' books and records after reasonable inquiry, and are presented assuming a hypothetical Effective Date of December 31, 2017. Actual amounts of Allowed Claims could differ materially from the estimates set forth herein, and actual recoveries could differ materially from such estimates, on account of, among other things, any rejection damages that may occur as a result of the Debtors' rejection of Executory Contracts and Unexpired Leases, including those deemed rejected pursuant to Article V of the Plan.

The tables below summarize the classification and treatment of all Claims against and Interests in the Debtors under the Plan. The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors. All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have holders of Claims or Interests in a particular Class or Classes, and such Claims or Interests shall be treated as set forth in Section 3.4 of the Plan. For all purposes under the Plan, each Class will apply for each of the Debtors (*i.e.*, there will be twelve (12) Classes for each Debtor).[2]

**The classification, treatment, and the projected recoveries of classified Claims and Interests are described in summary form below for illustrative purposes only and are subject to material change. Risk factors addressing the effects of the actual amount of Allowed Claims, the effect of such variation on creditor recoveries, and other risks related to Confirmation and the Effective Date of the Plan are addressed in Article IX hereof. In particular, recoveries available to the holders of General Unsecured Claims are estimates based on information known to the Debtors as of the date hereof and actual recoveries could differ materially based on, among other things,**

---

[2]    For the avoidance of doubt, estimated Allowed Claim and Allowed Interest amounts and recoveries in the tables below are aggregate amounts and recoveries for all obligated Debtors.

**whether the amount of Claims actually Allowed against the applicable Debtor exceed the estimates provided below. In such an instance, the recoveries available to the holders of General Unsecured Claims could be materially lower when compared to the estimates provided below.** To the extent that any inconsistency exists between the summaries contained in this Disclosure Statement and the Plan, the terms of the Plan shall govern.

| Unclassified Claim | Plan Treatment | Projected Plan Recovery |
|---|---|---|
| Administrative Claims | Unimpaired | 100% |
| Professional Claims | Unimpaired | 100% |
| DIP Claims | Unimpaired | 100% |
| Priority Tax Claims | Unimpaired | 100% |

| Class | Claim or Interest | Plan Treatment | Estimated Allowed Claims | Estimated Range of % Recovery Under the Plan | Estimated Range of % Recovery Under Chapter 7 |
|---|---|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | $0.00 | 100% | 100% |
| 2 | Other Priority Claims | Unimpaired | $12,850 | 100% | 6.4%-100% |
| 3 | MDL Claims | Impaired | $35,233,333 | 100% | 100% |
| 4 | First Lien Claims | Impaired | $727,661,756 | 100% | 0%-39.3% |
| 5 | Note Claims | Impaired | $412,647,391 | 1.7%–34.8%[3] | 0% |
| 6 | General Unsecured Claims–Convenience Claims | Impaired | $12,056,996–$21,056,996 | 12.3%–21.6% | 0% |
| 6 | General Unsecured Claims–Non-Convenience Class Claims | Impaired | $37,044,718 | 1.7%–34.8%[4] | 0% |

---

[3]   Estimated recoveries for holders of Note Claims include the value of the New Common Stock, the New Notes Rights and the New Preferred Equity Rights, assuming that all such holders are Accredited Investors and will receive the New Common Stock, the New Notes Rights and the New Preferred Equity Rights.

[4]   Estimated recoveries for holders of General Unsecured Claims in this Class 6 will receive their Pro Rata share of the New Common Stock Equity Pool (subject to dilution on account of the shares of New Common Stock issuable upon conversion of the New Preferred Equity, the shares of New Common Stock issuable upon exercise of the New Warrants, and the Management Incentive Plan Equity). In addition, holders of General Unsecured Claims that are Accredited Investors will receive their pro rata share of the New Notes Rights and the New Preferred Equity Rights. The estimated recovery range reflected herein assumes that all such holders are Accredited Investors and will receive the New Common Stock, the New Notes Rights and the New Preferred Equity Rights.

| Class | Claim or Interest | Plan Treatment | Estimated Allowed Claims | Estimated Range of % Recovery Under the Plan | Estimated Range of % Recovery Under Chapter 7 |
|---|---|---|---|---|---|
| 7 | Intercompany Claims | Unimpaired/Impaired | $19,087,046[5] | 100/0% | 0% |
| 8 | Section 510(b) Claims | Impaired | N/A | 0% | 0% |
| 9 | Intercompany Interests | Unimpaired | N/A | 100% | 0% |
| 10 | Class B 21C, LLC Interests | Unimpaired | N/A | 100% | 0% |
| 11 | Interests in 21CH and 21CI | Impaired | $627,166,000[6] | 0.0%-0.5%[7] | 0% |
| 12 | Non-Debtor Interests | Impaired | N/A | 0% | 0% |

## IV.    SOLICITATION, VOTING, ELECTION AND CONFIRMATION DEADLINES

### A.    Solicitation Packages

On October 17, 2017, the Bankruptcy Court entered the Disclosure Statement Order.  For purposes of this Article IV, capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Disclosure Statement Order.  Pursuant to the Disclosure Statement Order, holders of Claims or Interests who are eligible to vote to accept or reject the Plan will receive appropriate Solicitation materials (collectively, the "Solicitation Package"), including:

- the Disclosure Statement, as approved by the Bankruptcy Court (with all exhibits thereto);

- the Disclosure Statement Order (without exhibits thereto);

- the Solicitation and Voting Procedures (as defined in the Disclosure Statement Order);

- the Confirmation Hearing Notice (as defined in the Disclosure Statement Order);

- an appropriate Ballot with voting instructions with respect thereto, together with a pre-addressed, postage prepaid return envelope;

---

[5]    The amount of Intercompany Claims reflected here is the aggregate amount of Intercompany Claims as of the Petition Date offset by corresponding intercompany payables by and among the Debtors.

[6]    Represents the approximate balance of the Series A Preferred Stock as of the Petition Date.

[7]    Estimated range of recovery is based upon value of New Warrants accruing entirely to holders of Series A Preferred Stock. The estimated recovery range reflected herein assumes that (i) all Classes of Claims entitled to vote on the Plan vote to accept the Plan, (ii) there are no Allowed Section 510(b) Claims, and (iii) holders of Allowed Interests in Class 11 vote to accept the Plan.

- a cover letter from the Debtors (1) describing the contents of the Solicitation Package, and (2) urging the holders of Claims or Interests in each of the Voting Classes (as defined in the Disclosure Statement Order) to vote to accept the Plan;

- the letter in support of Confirmation from the Committee; and

- any supplemental documents the Debtors may File with the Bankruptcy Court or that the Bankruptcy Court orders to be made available.

The Solicitation Package may also be obtained: (a) from the Debtors' Notice and Claims Agent by (i) calling the Debtors' restructuring hotline at (888) 251-2679 (US toll-free) and (310) 751-2609 (international toll); (ii) visiting the Debtors' restructuring website at: http://www.kccllc.net/21co; (iii) writing to 21st Century Oncology Holdings, Inc., Claims Processing Center, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245; and/or (iv) emailing 21coInfo@kccllc.com; or (b) for a fee via PACER at https://ecf.nysb.uscourts.gov/.

### B.        Voting Deadline and Governmental Unit Voting Deadline

The deadline to vote on the Plan is **November 20, 2017, at 5:00 p.m., prevailing Eastern Time** (the "Voting Deadline"); *provided*, *however*, that the voting deadline solely with respect to any Governmental Unit that timely submits a Proof of Claim prior to or on the Governmental Bar Date, shall be extended through and including **November 27, 2017, at 5:00 p.m.**, prevailing Eastern Time (the "Governmental Unit Voting Deadline").  All votes to accept or reject the Plan must be actually received by the Notice and Claims Agent by the Voting Deadline or the Governmental Unit Voting Deadline, as applicable.

### C.        Voting Procedures

The Debtors are distributing this Disclosure Statement, accompanied by a Ballot to be used for voting to accept or reject the Plan, to the holders of Claims or Interests entitled to vote to accept or reject the Plan.  If you are a holder of a Claim or Interest in Class 3 (MDL Claims), Class 4 (First Lien Claims), Class 5 (Note Claims), Class 6 (General Unsecured Claims), or Class 11 (Interests in 21CH and 21CI), you may vote to accept or reject the Plan by completing the Ballot and returning it in the envelope provided.

Kurtzman Carson Consultants LLC ("KCC") is the Notice and Claims Agent.  The Notice and Claims Agent is available to answer questions concerning the procedures for voting on the Plan, provide additional copies of all materials, oversee the voting process, and process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan.

| BALLOTS |
|---|
| Ballots must be actually received by the Notice and Claims Agent by the Voting Deadline, which is **November 20, 2017, at 5:00 p.m.,** prevailing **Eastern Time** (or, if applicable, the Governmental Unit Voting Deadline, which is **November 27, 2017, at 5:00 p.m., prevailing Eastern Time**), at the following address: |
| **21st CENTURY ONCOLOGY HOLDINGS, INC.** <br> **BALLOT PROCESSING CENTER** <br> **C/O KURTZMAN CARSON CONSULTANTS LLC** <br> **2335 ALASKA AVENUE** <br> **EL SEGUNDO, CA 90245** |
| If you have any questions on the procedure for voting on the Plan, please call or email the Notice and Claims Agent at: <br><br> (888) 251-2679 (U.S. Toll-Free) and (310) 751-2609 (International Toll) <br> 21coinfo@kccllc.com |

More detailed instructions regarding how to vote on the Plan are contained on the Ballots distributed to holders of Claims or Interests that are entitled to vote to accept or reject the Plan. All votes to accept or reject the Plan must be cast by using the appropriate Ballot. All Ballots must be properly executed, completed, and delivered according to their applicable voting instructions by: (a) first class mail, in the return envelope provided with each Ballot; (b) overnight delivery; or (c) personal delivery, so that the Ballots are **actually received** by the Notice and Claims Agent no later than the Voting Deadline (or, if applicable, the Governmental Unit Voting Deadline) at the return address set forth in the applicable Ballot. Any Ballot that is properly executed by the holder of a Claim or Interest entitled to vote that does not clearly indicate an acceptance or rejection of the Plan or that indicates both an acceptance and a rejection of the Plan will not be counted. Ballots received by facsimile or by electronic means (other than as set forth therein) will not be counted.

Each holder of a Claim or Interest entitled to vote to accept or reject the Plan may cast only one Ballot for each Claim or Interest held by such holder. By signing and returning a Ballot, each holder of a Claim or Interest entitled to vote will certify to the Bankruptcy Court and the Debtors that no other Ballots with respect to such Claim or Interest have been cast or, if any other Ballots have been cast with respect to such Claim or Interest, such earlier Ballots are superseded and revoked.

All Ballots will be accompanied by return envelopes. It is important to follow the specific instructions provided on each Ballot, as failing to do so may result in your Ballot not being counted.

The Debtors are also distributing the Plan, this Disclosure Statement, and the Disclosure Statement Order (without exhibits except the Solicitation Procedures) in electronic format (*i.e.*, on a CD-ROM or flash drive). Any party that receives the materials in electronic format but would prefer paper format may contact KCC by: (a) calling the Debtors' restructuring hotline at (888) 251-2679 (US toll-free) and (310) 751-2609 (international toll); (b) visiting the Debtors' restructuring website at: http://www.kccllc.net/21co; (c) writing to 21st Century Oncology Holdings, Inc., Ballot Processing Center, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245; and/or (d) emailing 21coInfo@kccllc.com and requesting paper copies of the corresponding materials

previously received in electronic format (to be provided at the Debtors' expense). Ballots may be submitted via electronic, online transmissions, solely through a customized online balloting portal on the Debtors' case website to be maintained by KCC. Parties entitled to vote may cast an electronic Ballot and electronically sign and submit the Ballot instantly by utilizing the online balloting portal (which allows a holder to submit an electronic signature). Instructions for electronic, online transmission of Ballots are set forth on the forms of Ballots.

### D. Election Deadline: Deadline to "Opt Out" of the Third Party Release

**All holders of Claims or Interests who are not entitled to vote to accept or reject the Plan are deemed to have consented to the Third-Party Release set forth in Article VIII.8.3 of the Plan unless such holders "opt out" of the Third-Party Release by duly executing and properly completing a copy of the Election Form, attached as Exhibit 1 to the Non-Voting Status Notices, to the Solicitation Agent (as defined in the Disclosure Statement Order) so that it is actually received by the Solicitation Agent on or before November 20, 2017, at 5:00 p.m., prevailing Eastern Time (the "Election Deadline").**

### E. Plan Objection Deadline

The Bankruptcy Court has established **November 27, 2017, at 4:00 p.m., prevailing Eastern Time**, as the deadline to object to Confirmation of the Plan (the "Plan Objection Deadline"). All such objections must be Filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest, in accordance with the Disclosure Statement Order, so that they are **actually received** on or before the Plan Objection Deadline. The Debtors believe that the Plan Objection Deadline, as established by the Bankruptcy Court, affords the Bankruptcy Court, the Debtors, and other parties in interest reasonable time to consider the objections to the Plan before the Confirmation Hearing.

### F. Confirmation Hearing

Assuming the requisite acceptances are obtained for the Plan, the Debtors intend to seek Confirmation of the Plan at the Confirmation Hearing scheduled on **December 11, 2017, at 10:00 a.m. prevailing Eastern Time**, before the Honorable Robert D. Drain, United States Bankruptcy Judge, in Courtroom 248 of the United States Bankruptcy Court for the Southern District of New York, White Plains, New York, New York 10601. The Confirmation Hearing may be continued from time to time, without further notice other than an adjournment announced in open court, or a notice of adjournment Filed with the Bankruptcy Court and served on any Entities who have Filed objections to the Plan. The Bankruptcy Court, in its discretion and before the Confirmation Hearing, may put in place additional procedures governing such hearing. The Plan may be modified, if necessary, before, during, or as a result of the Confirmation Hearing without further notice to parties in interest, subject to the terms of the Plan.

## V.    THE DEBTORS' BACKGROUND

### A.    The Company's Operations

#### 1.    The Company's Corporate History

The Company was founded in 1983 by a group of physicians seeking to deliver academic-level, quality radiation therapy at the community level and has since expanded to become the largest integrated network of cancer treatment centers and affiliated physicians in the world.

On February 21, 2008, the Company was acquired by a private equity firm. Following such acquisition, the Company continued to grow its operations organically through a services agreement model, as well as through the formation of joint ventures and the acquisition of other radiation therapy networks. Certain notable transactions include the 2011 acquisition and partnership with the management team of Medical Developers, LLC, the largest company in South America dedicated to radiation therapy, and the October 2013 acquisition of OnCure Holdings, Inc. ("OnCure"), and certain of its Subsidiaries, which operated a network of 14 medical groups that treated cancer patients at 37 radiation oncology centers located in California, Florida, and Indiana. The Company acquired OnCure for approximately $125 million, consisting of $42.5 million in cash and $82.5 million in assumed debt under 11.75% senior secured notes due 2017 issued by OnCure.

Shortly after the OnCure acquisition, the Company invested in Florida-based SFRO Holdings LLC ("SFRO") in February 2014, acquiring 65 percent of the equity interests in SFRO in consideration for approximately $60 million in cash funded with the proceeds of a new $60 million term loan (the "SFRO Term Loan").

To address challenges relating to the Company's significant debt service obligations and other operational cash needs, on September 27, 2014, the Company and one of its investors, Canada Pension Plan Investment Board ("CPPIB"), reached an agreement whereby CPPIB invested $325 million (the "Preferred Equity Investment") in consideration for shares of Series A Preferred Stock (as defined herein) and the right to appoint certain directors to the board of directors of 21CH. The Debtors used a portion of the Preferred Equity Investment to repay, among other things, outstanding borrowings under the Debtors' then-existing revolving credit facility.

On July 15, 2015, the Company purchased the remaining 35 percent interest in SFRO for $44.1 million, comprised of $15.0 million in cash, $14.6 million in the principal amount of the SFRO PIK Notes (as defined herein), and $14.5 million of preferred stock in the ultimate parent, Debtor 21st Century Oncology Investments, LLC ("21CI").

Additionally, on September 9, 2016, in connection with the First Capital Event (as defined herein), CPPIB agreed to acquire, pursuant to the 2016 Subscription Agreement (as defined herein), an additional 25,000 shares of Series A Preferred Stock, par value $0.001 per share, for a purchase price of $25 million.

## 2.        The Company's Business Operations

Today, the Company is the leading global, physician-led provider of integrated cancer care services, operating the largest network of cancer treatment centers and affiliated physicians in the world. With 179 locations worldwide, the Debtors service patients in seven Latin American countries and 17 U.S. States.



The Company employs a range of medical professionals, including radiation oncologists, medical oncologists, breast surgeons, colorectal surgeons, urologists, gynecologic oncologists, and other medical professionals, to provide high-end, complete end-to-end care for cancer patients. The Company also provides a complete selection of advanced radiotherapy services that may otherwise be unavailable in the communities in which the Company operates. Finally, the Company provides support services, including psychological and nutritional counseling, as well as transportation assistance.

In light of the varied state regulatory landscape for health care services, the Company is unable to directly employ physicians and other medical professionals in certain states in which they operate. As a result, the Company has developed two distinct business models. In the first model, the Company owns treatment facilities and directly employs the medical professionals working therein. In the second model, the Company contracts with private physician groups and provides a variety of administrative, financial, and management services to such physician groups pursuant to exclusive, long-term services agreements. Under certain arrangements, the Company provides management services to independent physician practices.

### (a)    The Company-Owned Business Model

In states that allow for the corporate practice of medicine, the Company offers medical services directly to the general public by employing physicians at Company-owned clinics or treatment facilities owned entirely by the Company or jointly with other Entities. This business model allows the Company to attract and retain the top physicians in their respective fields and maintain management oversight over both the clinical and non-clinical aspects of their services. The majority of revenue generated from this business model is derived from commercial payers, including healthcare insurers, managed care organizations, workers' compensation programs, contract management services, and private pay sources, with the remaining reimbursement derived from Medicare and Medicaid. In addition, when the demand arises, the Company subcontracts the services of Company-employed physicians to hospitals and other cancer treatment centers.

13

### (b)    The Services Agreement Business Model

In states that prohibit the corporate practice of medicine, medical services must be provided at physician-owned clinics. In these states, the Company contracts with physician-owned facilities to provide certain administrative and financial services, including the provision of non-physician clinical and administrative staff, operations management, purchasing assistance, managed care contract negotiation assistance, reimbursement, billing, and collections assistance, information technology, human resource and payroll services, and compliance, accounting, and treasury functions.

In some instances, the Company also leases the facilities where oncology treatment centers are located and provides financing for certain of the medical equipment located in such centers. Importantly, the physicians treat patients and retain full control over the treatment's clinical aspects in compliance with the terms of the services agreements and applicable state law.

In consideration for its services, the Company is reimbursed by the physician groups for certain operating expenses related to the applicable treatment center and earns a monthly management fee from each physician group. The management fees generally are calculated as a percentage of each group's revenue associated with the provision of radiation therapy.

### (c)    Services Overview

Broadly speaking, the Company provides two primary types of radiation therapy: external beam therapy ("External Radiation") and internal radiation therapy ("Internal Radiation"). External Radiation involves directing a high-energy x-ray beam at a patient's tumor. External Radiation is typically administered over the course of 10–40 treatments, depending on the total radiation required to achieve a specific therapeutic goal. Internal Radiation, on the other hand, involves the placement of a radiation-emitting element within or adjacent to the patient's tumor. Internal Radiation delivers a higher dose of radiation in a shorter time than is possible with external treatments, and is typically used to treat cancers of the prostate, cervix, breast, lung, and esophagus.

In addition to these main forms of radiation treatment, the Company has also begun testing a new technology known as adaptive radiotherapy, which allows for near real-time adjustment of radiation delivery in response to anatomic changes that occur during treatment.

The following table sets forth the forms of radiation therapy treatments and advanced services that the Company currently offers:

| Technologies | Description |
| --- | --- |
| **External Beam Therapy** | |
| *Conformal Radiation Therapy* | A process of creating a radiation treatment field that matches precisely the size and shape of the intended target tumor or organ. |
| *Intensity Modulated Radiation Therapy* | A process of adjusting the intensity of the radiation beam in addition to shaping the radiation dose to match the size and shape of the treated tumor, resulting in a higher degree of precision than conformal therapy. |
| *Stereotactic Radiosurgery* | A process of delivering highly precise, highly accurate, high dose radiation to small tumors. |
| **Advanced Services Used with External Beam Therapies** | |
| *Image Guided Radiation Therapy* | Enables radiation oncologists to utilize x-ray imaging at the time of treatment to identify the exact position of the tumor within the patient's body and adjust the radiation beam to that position for better accuracy of treatment delivery. |

| Technologies | Description |
|---|---|
| *Gamma Function* | A proprietary capability that enables precise calculation of the actual amount of radiation dose delivered during a treatment.  Gamma Function also enables the quantitative comparison between the actual radiation dose delivered and the planned radiation dose.  This technology further reports discrepancies in planned-to-actual dose to the physician and provides useful information to assist in the physician's clinical decision-making. |
| *Respiratory Gating* | Coordinates treatment beam activation with the respiratory motion of the patient, thereby permitting accurate delivery of radiation dosage to a tumor that moves with breathing, such as lung and liver cancers. |
| **Internal Radiation Therapy** | |
| *High-Dose Rate Brachytherapy* | Enables radiation oncologists to treat cancer by internally delivering high doses of radiation directly to the cancer using temporarily implanted radioactive elements. |
| *Low-Dose Rate Brachytherapy* | Enables radiation oncologists to treat cancer by internally delivering doses of radiation directly to the cancer over an extended period of time using permanently implanted radioactive elements. |
| *Radiopharmaceutical Therapy* | Enables radiation oncologists to treat cancer that has metastasized widely to the skeleton with an intravenously injected radioactive solution that is rapidly absorbed by the skeleton and delivers the radiation dose comprehensively to the entire skeleton. |

| Technologies | Description |
|---|---|
| **Operating Technologies Under Development** | Nature Reviews \| Clinical Oncology |
| *Adaptive Radiotherapy* | A novel approach to radiation therapy that is currently under development by the Debtors and a small number of academic medical centers. Adaptive radiotherapy is a process that will automatically trigger a new treatment plan during the course of therapy in order to adapt to anatomic changes that occur to the tumor. |

### 3.      The Company's Employees

As of the Petition Date, the Debtors have approximately 3,631 employees, with a limited number of part-time employees, contractors, and temporary employees who are employed through temporary staffing agencies. As a healthcare company, the Debtors employ or contract with numerous individuals with advanced medical training, including approximately 350 physicians.

## B.      The Debtors' Prepetition Corporate and Capital Structure

### 1.      Corporate Structure

As set forth on the structure chart attached as **Exhibit B**, Debtor 21CI serves as the ultimate parent Entity of the Company through its 100 percent equity ownership of Debtor 21CH. Debtor 21CH, in turn, owns, directly or indirectly, each of the Company's 66 domestic Subsidiaries, 59 of which are Debtors in these Chapter 11 Cases. The Company's international Subsidiaries, in turn, are direct or indirect Subsidiaries of Debtor 21CH.

2.      **Capital Structure**

As of the Petition Date, the Debtors' capital structure included approximately $1.143 billion[8] in funded debt, excluding accrued and unpaid interest of approximately $51.4 million and capitalized leases of approximately $30 million.  The Debtors' prepetition funded debt consisted of:  (a) the First Lien Credit Facilities; (b) the MDL Facility; (c) the Notes; and (d) the SFRO PIK Notes (each as defined herein).  Certain of the Debtors' prepetition indebtedness is also subject to the Intercreditor Agreement (as defined herein), which governs the relative contractual rights of lenders under the First Lien Credit Facilities, on the one hand, and the MDL Facility, on the other hand.

3.      **The Debtors' Prepetition Indebtedness**

The Debtors' prepetition indebtedness is summarized as follows and discussed below:

| Indebtedness | Approximate Balance Outstanding ($ millions)[9] |
|---|---:|
| First Lien Term Loan | $    599 |
| First Lien Revolver | 121 |
| MDL Facility | 35 |
| Notes | 368 |
| SFRO PIK Notes | 19 |
| **Total** | **$ 1,143** |

(a)      **The First Lien Credit Facilities**

Debtor 21st Century Oncology, Inc. ("21C")  is the borrower under that certain Credit Agreement, dated as of April 30, 2015 (as amended, restated, supplemented, and otherwise modified from time to time prior to the Petition Date, the "First Lien Credit Agreement"), among 21C, 21CH, the lenders party thereto from time to time (the "First Lien Lenders"), Morgan Stanley Senior Funding, Inc. as administrative agent, issuing bank, and swingline lender (the "First Lien Agent"), and the other agents and arrangers named therein.  The First Lien Credit Agreement provides for credit facilities consisting of a term loan facility (the "First Lien Term Loan") and a revolving loan facility (the "First Lien Revolver," and together with the First Lien Term Loan, the "First Lien Credit Facilities").  As of the Petition Date, the principal amount outstanding under the First Lien Term Loan was approximately $599 million, and the principal amount outstanding under the First Lien Revolver was approximately $121 million, with $3.9 million in outstanding letters of credit.  As of the Petition Date there was approximately $7.5 million in accrued and unpaid interest under the First Lien Credit Facilities.  The First Lien Revolver matures on April 30, 2020 and the First Lien Term Loan matures on April 30, 2022.

The First Lien Credit Facilities are secured by a security interest in substantially all of the Debtors' (excluding the MDL Debtors' (as defined below)) assets (the "21C Domestic Collateral").  The

---

[8]    Total excludes approximately:  (a) $3.9 million of letters of credit outstanding and $7.5 million in accrued and unpaid interest under the First Lien Credit Facilities; (b) $44.5 million in accrued and unpaid interest under the Notes; (c) $130,000 in accrued and unpaid interest under the SFRO PIK Notes; and (d) $233,333 in accrued and unpaid interest outstanding under the MDL Facility.

[9]    Denotes balance outstanding as of May 25, 2017.

First Lien Credit Facilities are guaranteed by Debtor 21CH and each direct and indirect, domestic subsidiary of Debtor 21C (excluding the MDL Debtors).

### (b)      The 11.00% Senior Unsecured Notes

Debtor 21C issued the 11.00% Senior Notes due 2023 (the "Notes") in an aggregate principal amount of $360 million pursuant to that certain Indenture, dated as of April 30, 2015 (as amended, restated, and supplemented from time to time, the "Indenture") by and among 21C, as issuer, Wilmington Trust, National Association, as trustee (the "Indenture Trustee"), and the other parties thereto.  The Notes are guaranteed on a senior unsecured basis by 21CH and each of 21C's existing and future direct and indirect domestic Subsidiaries that is a guarantor under the First Lien Credit Facilities.  As of the Petition Date there is approximately $368.2 million in principal outstanding and approximately $44.5 million in accrued and unpaid interest under the Notes.

### (c)      The SFRO PIK Notes

On July 2, 2015, Debtor 21CH issued $14.6 million of subordinated payable-in-kind notes (the "SFRO PIK Notes") to partially fund the purchase of a non-controlling interest in SFRO.  The SFRO PIK Notes accrue interest at 10 percent annually, which interest is accrued quarterly and added to the outstanding principal amount.  The SFRO PIK Notes mature on June 30, 2019 and provide for accelerated principal payments along with premium payments to the sellers upon achievement of certain operational milestones.  The SFRO PIK Notes are structurally subordinated to the First Lien Credit Facilities and the Notes.  The SFRO PIK Notes are also expressly payment subordinated to the First Lien Credit Facilities and the Notes.  As of the Petition Date, there is approximately $19 million in principal amount of SFRO PIK Notes outstanding and approximately $130,000 in accrued and unpaid interest.

### (d)      The MDL Facility

In connection with the Debtors' (excluding the MDL Debtors) entry into the Forbearance Agreements (as defined herein), as described more fully below, the Debtors entered into a $20 million senior secured delayed draw term loan credit facility (the "MDL Facility") pursuant to that certain credit and guaranty agreement dated as of December 6, 2016 (the "Original MDL Facility Credit Agreement") among Debtor Medical Developers, LLC ("MDL"), as borrower, Debtor MD International Investments, LLC (together with MDL, the "MDL Debtors") and certain other Subsidiaries and Affiliates of Debtor 21C, as guarantors (collectively, the "MDL Guarantors"), Wilmington Savings Fund Society, FSB as administrative agent and collateral agent (the "MDL Agent") and the lenders from time to time party thereto (the "MDL Lenders").

The MDL Facility initially provided the Debtors with $20 million of additional liquidity, $10 million of which was available immediately and the remainder of which was available subject to satisfaction of certain milestones.  The Debtors and the MDL Facility lenders intended for the incremental liquidity provided by the MDL Facility to fund the Debtors' operations while the Crossover Group and the First Lien Lender Group (each as defined herein) engaged with the Debtors regarding the terms of a consensual restructuring.  In connection with the amendment and restatement of the Original MDL Facility Credit Agreement on March 6, 2017 (as discussed more fully below) and certain other subsequent amendments, the borrowings under the MDL Facility were increased to $35 million and its maturity date was extended to May 31, 2017.  As of the Petition Date, there is approximately $233,333 in accrued and unpaid interest outstanding under the MDL Facility. The obligations under the MDL Facility are secured by a first priority lien on substantially all of the Debtors' (including the MDL Debtors') property and assets (such property and assets, collectively, the "MDL Facility Collateral"), including all property and assets securing obligations under the First Lien Credit Facilities and 65 percent of all voting capital stock

and 100 percent of all non-voting capital stock of Medical Developers Coöperatief, U.A. owned by the MDL Debtors.

### 4.    The Equity Interests in the Debtors

#### (a)    Series A Preferred Stock

On September 26, 2014, 21CH entered into a subscription agreement (the "Original Subscription Agreement"), pursuant to which 21CH issued to CPPIB 385,000 newly issued shares of series A convertible preferred stock ("Series A Preferred Stock"), par value $0.001 per share, initial stated value $1,000 per share, for a purchase price of $325 million.

On September 9, 2016, 21CH, CPPIB, 21CI, and 21C entered into a second subscription agreement (the "2016 Subscription Agreement"), pursuant to which 21CH issued to CPPIB an additional 25,000 shares of Series A Preferred Stock, par value $0.001 per share, for a purchase price of $25 million. In connection with the 2016 Subscription Agreement, CPPIB irrevocably and unconditionally waived, released, and forgave any and all default events under the Certificate of Designations (as defined below), occurring prior to the closing of the equity issuance and any and all rights or remedies with respect thereto.

Holders of Series A Preferred Stock have, among other rights, the right to require 21CH to repurchase their shares upon the occurrence of certain events of default and certain change of control transactions, at the prices set forth in the certificate of designations for the Series A Preferred Stock (the "Certificate of Designations"). The Certificate of Designations also provides for certain consent rights of a majority of the holders of the Series A Preferred Stock in connection with specified corporate events of 21CI or its Subsidiaries, including, among other things, with respect to certain equity issuances and certain acquisitions, financing transactions and asset sale transactions. Upon certain events of default and the obtaining of applicable anti-trust regulatory approvals, holders of Series A Preferred Stock are also entitled to vote together with holders of common stock, on an as-converted basis. In addition, the Series A Preferred Stock is senior in preference to 21CH's common stock with respect to dividend rights, rights upon liquidation, winding up or dissolution. As of the Petition Date, all of the Series A Preferred Stock was owned by CPPIB.

#### (b)    Common Equity

Approximately 80 percent of class A voting interests in Debtor 21CI is held by a single private equity firm (the "Common Equity Owner"), which in turn directly or indirectly owns 100 percent interests in all of the Debtors. The remaining 20 percent of class A voting interests in Debtor 21CI are owned by the Company's management and former management as well as several other investors holding less than 1 percent of such interests.

### C.    The Debtors' Board Members and Executives

Set forth below are the names, position(s), and biographical information of the current board of directors of the Company, as well as current key executive officers for the Debtors, each as of the date hereof. These individuals oversee the businesses and affairs of the Debtors.

### 1.    The Company's Executives

*Paul Rundell.* Mr. Rundell has been the Company's Interim Chief Executive Officer since February 27, 2017. Mr. Rundell is a managing director of Alvarez & Marsal Healthcare Industry

Group, LLC ("A&M") and leads A&M's healthcare restructuring practice.  He has worked as a turnaround consultant and financial advisor for almost 20 years.  Mr. Rundell has a great breadth of financial restructuring experience as a result of having served in both senior management positions and as a restructuring advisor to large companies.  Specifically, Mr. Rundell has advised and/or served as a senior executive for, among others, Sears Methodist Retirement System, Erickson Retirement Communities, LLC, Clare Oaks, Lincolnshire Campus, LLC, Naperville Campus, LLC, Hingham Campus, LLC, St. Vincent's Catholic Medical Centers, Sunwest Management Inc. and National Benevolent Association.

*Douglas Staut*.    Mr. Staut has been the Company's Chief Financial Officer since February 27, 2017.  Mr. Staut is a senior director of A&M's healthcare industry group.  He has worked in finance for more than 17 years, and has focused on providing financial advisory services in the healthcare industry for the past nine years. Mr. Staut has led restructuring projects across the healthcare space, ranging from acting as financial advisor to a 150 bed acute care hospital to operational turnaround management for a 400 bed continuing care retirement community.

*Constantine A. Mantz*.    Dr. Mantz has been the Company's Chief Medical Officer since 2000. Dr. Mantz's esteemed educational credentials include a radiation oncology residency at the University of Chicago Hospitals.  He earned his medical degree from the University of Chicago's Pritzker School of Medicine and completed a surgical internship at the Hennepin County Medical Center in Minneapolis. Dr. Mantz earned his Bachelor of Science Degree in biology from Loyola University of Chicago.

Dr. Mantz's professional memberships include the American College of Radiation Oncology, the American Medical Association, the American Society for Radiation Oncology, and the Association of Freestanding Radiation Oncology Centers.

During the course of his career, Dr. Mantz has also been involved in numerous radiation therapy research projects. He has published professional journal articles, given lectures, and presented abstracts and poster sessions at national meetings concerning cancer treatment. Dr. Mantz has special clinical interests in the study and treatment of prostate cancer and breast cancer. Dr. Mantz also has published and lectured on healthcare payment and delivery reform in oncology.

*Ravi Patel*.    Mr. Patel has served as the Company's Senior Vice President, United States Operations since March 2017.   Prior to this role, Mr. Patel was the chief executive officer of South Florida Radiation Oncology, a leading integrated cancer care group in Southeast Florida that he joined in 2008 and expanded from two radiation oncology centers to 24 cancer centers and over 95 physicians.  Prior to South Florida Radiation Oncology, Mr. Patel was an investor, executive and an entrepreneur.  Mr. Patel founded and led several companies in the technology industry including Maestro Commerce, a leading e-commerce software provider that was later acquired by GoldMine Software (later renamed to FrontRange Solutions).   He began his career by founding a Chicago-based IT systems consulting company in 1992 that was acquired in 1999.

*Lenny Brunson*.    Mr. Brunson has been the Company's Chief Information Officer since 2016. Mr. Brunson leads the Information Technology team and oversees the Company's information strategy and operations.   Mr. Brunson has more than 29 years of experience in information technology and 16 years in executive leadership.

Prior to joining the Company in 2016, Lenny served as the Chief Information Officer for ambulatory services with Hospital Sisters Health System ("HSHS") in Springfield, Illinois where he was responsible for the effective use of all technology for HSHS' owned ambulatory groups:  two large (350+ provider) multispecialty groups and a 100+ provider cardiology group.  Additionally, he was

21

responsible for the technology delivery of both the Allscripts TouchWorks® Electronic Health Record and Practice Management systems, as well as the EpicCare Ambulatory EHR, to both internal HSHS entities and affiliated community physician practices.

Mr. Brunson also served as a Director in Navigant Consulting's healthcare practice, as well as Vice President of Technology with Pivot Health's physician practice management group. With both of these companies, Mr. Brunson provided medical groups with senior IT analysis, oversight and/or management, including serving for nearly four years as the Chief Information Officer of Queens-Long Island Medical Group, PC, of Garden City, New York.

Mr. Brunson earned his B.S. from Excelsior College, and a Master's degree in Computer Resource and Information Management from Webster University. He is a Certified Healthcare Chief Information Officer through the College of Healthcare Information Management Executives, as well as serving on the CIO Leadership Council for the American Medical Group Association.

*Gustavo Olivera*. Mr. Olivera has been the Company's Chief Technical Officer since 2016. In this role, he oversees all aspects of the physics department and ensures adherence to Medical Physics quality requirements, accreditation requirements and administration, physics vendor management, and applicable state and federal laws. He is also responsible for strategic development of the physics/technology department.

Mr. Olivera obtained his Ph.D. in Atomic Physics from the National University of Rosario in 1996. He worked during 1996 and 1997 at the Multidisciplinary Ion Laser Research Center in Normandy, France where he developed Monte Carlo Codes for water Radiolysis at nanometer level. After a short stage at the International Center for Theoretical Physics in Trieste, Italy, he moved to the University of Wisconsin Madison where he was an Adjunct Associate Professor at the department of Medical Physics until 2009.

Mr. Olivera was one of the pioneers in the TomoTherapy® field and also one of the original few employees that created the TomoTherapy company and Hi-ART system together with the two founders in 1997. He served as Vice President of Research from 2006 to 2010 with Accuray, Inc., the manufacturer of TomoTherapy. After a brief period as Chief Technical Officer of Compact Particle Accelerator Corporation, he moved to the Company.

Mr. Olivera has authored and contributed to more than 100 papers in peer-reviewed journals, as well as seven book chapters. Mr. Olivera has presented more than 100 presentations at international conferences. He also holds more than 20 U.S. and international patents and lead the development on FDA and CE regulated products. He also served as a permanent member of Radiation Therapeutics and Biology Study section of National Institute of Health from 2006 to 2010. He is a referee for several professional journals and is a member of the American Association of Physicists in Medicine and the European Society for Radiotherapy and Oncology.

*Eduardo Fernandez*. Dr. Fernandez has been the Company's Senior Vice President, Medical Affairs/Medical Director for Latin America since 1998. Dr. Fernandez earned his medical degree from the University of Malaga, Spain in 1987, and was subsequently appointed Assistant and Associate Professor of Radiology and Medical Physics, where he earned his Ph.D. in 1991. At the time, he was in close cooperation with the Department of Biochemical Oncology and Experimental Radiotherapy at Case Western Reserve University.

Dr. Fernandez completed his radiation oncology residency at the Cleveland Clinic Foundation, Callahan Center for Radiation Oncology and Robotics, and served as Head of Radiation Oncology at the

Cleveland Clinic Florida (with dual appointment at the main campus in Cleveland), where he was responsible for the development of the External Beam and Brachytherapy programs. Simultaneously, he undertook an Assistant Professorship of Radiology at the Ohio State University. Dr. Fernandez is Board Certified in Radiation Oncology.

Dr. Fernandez joined the Company in 1998, and since then he has been department chair at numerous hospitals in the south Florida community. He has been Medical Director of the east coast of Florida, Co-Vice President of Medical Operations, and Senior Vice President for Regional Operations before his recent appointment.

Dr. Fernandez serves as Director of 21st Century Care Foundation and is also a member of the Board of Chancellors of the American College of Radiation Oncology, and member of the Continuing Education and Communications Committee at the American Society for Radiation Oncology. He has been distinguished with fellowships from both organizations. Dr. Fernandez is also on faculty at U.C.L.A. where he serves as Assistant Professor in Radiation Oncology.

*Timothy Shafman*. Dr. Shafman has been the Company's Senior Vice President, National Medical Director since 2004. Dr. Shafman received his M.D. from Harvard Medical School in the Harvard University-Massachusetts Institute of Technology Division of Health Sciences and Technology. Following an internship in Internal Medicine at the Brigham and Women's Hospital in Boston, Massachusetts, Dr. Shafman completed a residency in Radiation Oncology at the Harvard Joint Center for Radiation Therapy, where he was elected Chief Resident in the final year of his training.

Mr. Shafman served as an attending physician for five years at the Harvard Joint Center for Radiation Therapy where he concentrated his clinical practice on brain and lung tumors. He also performed basic research on the Ataxia-Telangiectasia gene and clinical research related to its influence on second tumors. Dr. Shafman continued clinical research on brain and lung tumors as a member of the Duke University Medical Center, Department of Radiation Oncology. Dr. Shafman has published over 45 peer-reviewed articles and has also co-authored several chapters in widely read Radiation Oncology textbooks.

*Steve Graham*. Mr. Graham has served as Chief Accounting officer of the Company since January 2017. Prior to that, he was Vice President and Assistant Controller of HP, Inc., a technology company. Prior to HP, he was the Senior Vice President and Chief Accounting Officer of The Wendy's Company since October 2006.

Before joining a predecessor entity to Wendy's, Mr. Graham served as Corporate Controller at Princeton Review LLC from 2004 to 2006, as Vice President – Controller of Sbarro, Inc. from 1994 to 2004 and as the controller for a number of additional retail entities. He began his career as an auditor with Laventhol & Horwath for 13 years. He is a member of the American Institute of Certified Public Accountants and the Texas Institute of Public Accountants.

*Blake Howard*. Blake E. Howard has been the Company's Vice President, Planning & Analysis, Treasury since July 2016. Mr. Howard joined the Company in 2009 as a Manager of Financial Planning and Analysis. From 2003 to 2009, Mr. Howard served in various progressive roles with the Macquarie Group in both the United States and Canada. Mr. Howard earned his B.S. from the University of Central Arkansas, an M.B.A. from the University of Alabama at Birmingham, and a Master's degree in Healthcare Management from the Johns Hopkins University School of Public Health.

*Betta Sherman*. Ms. Sherman has been the Company's Chief Compliance Officer since 2015. Prior to joining the Company, Ms. Sherman served as interim compliance officer and interim privacy

officer for a variety of health care organizations. Ms. Sherman worked with health systems, physician groups and health plans to develop and implement compliance programs and optimize ongoing compliance operations. Ms. Sherman has expertise in conducting compliance risk assessments, compliance program reviews, and HIPAA assessments.

Ms. Sherman earned her B.S. from Northwestern University, and a Master's degree in Public Policy from the University of Chicago. She is Certified in Healthcare Compliance and is a Certified HIPAA Professional.

### 2. The Company's Board of Directors

*James Elrod Jr.* Mr. Elrod has been a member of the Company's Board of Directors since 2008. Prior to joining Vestar in 1998, Mr. Elrod was Executive Vice President, Finance and Operations for Physicians Health Service, a public managed care company. Prior to that, he was a Managing Director and Partner of Dillon, Read & Co. Inc.

Mr. Elrod is currently a director of National Mentor Holdings, Inc. and was a director of Joerns Healthcare, LLC until August 2010 and Essent Healthcare, Inc. until December 2011. Mr. Elrod's experience in the health care industry and collective board experience, financial experience, and diverse personal background led to the conclusion that Mr. Elrod should serve as a director of the Company. Mr. Elrod received his B.A. from Colgate University and his M.B.A. from Harvard Business School.

*Robert Rosner.* Mr. Rosner has been a member of the Company's Board of Directors since 2012. Mr. Rosner is currently a director of Seves S.p.a. and Group OGF and was previously a director of AZ Electronic Materials S.A. until November 2010 and Sunrise Medical, Inc. until December 2012.

Mr. Rosner serves as a member of the Graduate Executive Board of The Wharton School and is a Trustee of The Lawrenceville School. Mr. Rosner's experience in the health care industry and collective board experience, financial experience, and diverse personal background led to the conclusion that he should serve as a director of the Company.

Mr. Rosner received a B.A. in Economics from Trinity College and an M.B.A. with Distinction from The Wharton School at the University of Pennsylvania.

*Christian Hensley.* Mr. Hensley has been a member of the Company's Board of Directors since 2014. As a principal investor, Mr. Hensley had served on five company boards in the Business Services, Healthcare Services, Communications and Education sectors. Mr. Hensley began his career in the Investment Banking division of Salomon Brothers in New York City. Mr. Hensley holds a M.B.A. from Harvard Business School and a B.A. from the University of Pennsylvania.

*Robert Miller.* Mr. Miller has been a member of the Company's Board of Directors since 2015. Mr. Miller previously served as a director of QuadraMed Corporation, from 2003 to 2010, where he was a member of the Audit Committee and the Chairman of the Compensation Committee, and as a director of Sonic Innovation, from 2006 to 2010, where he was a member of the Audit Committee and chairman of the Nominating and Governance Committee. Mr. Miller served on the Nonprofit Board of Directors of Grady Memorial Hospital in Atlanta, Georgia, where he served as Chairperson of its Audit Committee, from 2008 to 2014. In addition, he has served as an Adjunct Professor of Law at Emory University School of Law and Editor-in-Chief of the Journal of Health and Life Sciences Law. Mr. Miller has a B.A. from the University of Georgia and an LL.B. from Yale Law School.

*William Spalding*.  Mr. Spalding has been a member of the Company's Board of Directors since 2016.  Mr. Spalding has served in a number of roles for PharMEDium Healthcare Holdings, Inc., including the Chief Executive Officer from January 2014 until its sale to AmerisourceBergen Corporation in November 2015.  Prior to that, he also served as Executive Vice President of CVS Caremark Corporation and Caremark Rx, Inc.  Earlier in his career, Mr. Spalding was a Senior Partner at King & Spalding, LLP, where he led the Private Equity & Investment Funds Practice and was a member of the firm's management committee.  In addition, Mr. Spalding serves as a board member for MedVantx Corporation, and previously served as a member of the Board of Directors of PharMEDium Healthcare Holdings, Inc., SecureWorks Corp., and The Carter Presidential Center Board of Counselors.  Mr. Spalding has a B.A. from Dartmouth College and a J.D. from Washington & Lee University School of Law.

## D.    Events Leading to the Chapter 11 Cases

### 1.    Prepetition Challenges

The Company's philosophy and business structure has allowed it to hold market-leading positions in most of its domestic and international markets, and the Company's international operations are quickly growing.  Nonetheless, recent market and other developments have left the Debtors with unsustainable debt service obligations, which require a deleveraging of their balance sheet to provide operational liquidity and right-size their capital structure.  As the overall population has aged and the types of coverage offered through readily available health insurance have changed, the Company has seen its profitability decline, due to lower reimbursement rates and higher denials of coverage.  This lower profitability has made it difficult for the Debtors to meet their debt service obligations.  At the same time, the Company has been forced to pay certain amounts in connection with non-compliance with certain regulatory requirements.   In each such circumstance, non-compliance has since been remedied.  Additionally, the Company has experienced material one-time cash outflows in connection with the settlement of certain litigations brought against one or more of the Debtors.

### (a)    Liquidity Constraints

#### i.    Shifting Healthcare Trends

The Debtors' principal capital requirements are for debt service obligations, working capital, acquisitions, expansion, and *de novo* treatment center development.   Current trends affecting the healthcare market, and the Company's patient base, including changes in Medicare reimbursements, a shift by part of the Company's from higher revenue per treatment PPO insurance plans to HMO plans, lower volumes of treatment support services in 2016, and the need to comply with electronic heath records regulations in order to avoid payment adjustments and penalties from Medicare and Medicaid, have led to decreased margins and overall revenue in calendar year 2016 and a net cash outflow of $33.2 million in the twelve months ended December 31, 2016.   Additionally, a changing political landscape has injected uncertainty into the health insurance market.

### (b)    Pending and Settled Litigation

The Debtors' industry is highly regulated at both the federal and state level.  Federal law and regulations are based primarily upon Medicare and Medicaid programs, each of which is financed, at least in part, with federal money.  State jurisdiction is based upon the state's authority to license certain categories of healthcare professionals and providers, the state's interest in regulating the quality of healthcare in the state, regardless of the source of payment, and state healthcare programs.  Further

25

information regarding these various governmental regulations are set forth in the Debtors' most recent Annual Report.[10]

One such federal law is the federal False Claims Act, which provides that the government may fine companies that knowingly submit, or participate in submitting, any claims for payment that are false or fraudulent, or that contain false or misleading information, or if companies knowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money or property to the government. An "obligation" includes an established duty arising from an express or implied contractual arrangement, from statute or regulation, or from the retention of any overpayment. Knowingly making or using a false record or statement to receive payment from the federal government or to improperly retain payment is also a violation. The False Claims Act does not require proof of specific intent to defraud; a provider can be found liable for submitting false claims with actual knowledge or with reckless disregard or deliberate ignorance of such falseness. A False Claims lawsuit may be brought by the government or by a private individual by means of a "qui tam" action. Such lawsuits have increased significantly in recent years. In addition, the federal government has engaged a number of non-governmental audit organizations to assist in tracking and recovering false claims for healthcare services.

Another federal law governing the Debtors' conduct is section 1877 of the Social Security Act, also known as the "Stark Law," which prohibits a physician from referring a patient to a healthcare provider for certain designated health services reimbursable by Medicare if the physician (or close family members) has a financial relationship with that provider, including an investment interest, a loan, debt, or compensation relationship. The Stark Law covers radiology services, infusion therapy, radiation therapy and supplies, clinical laboratory, diagnostic imaging, outpatient prescription drugs, and hospital services, among others. In addition to the conduct directly prohibited by the law, the statute also prohibits "circumvention schemes" that are designed to obtain referrals indirectly that cannot be made directly. The regulatory framework for the Stark Law is to first prohibit all referrals from physicians to Entities for Medicare designated health services and then to except certain types of arrangements from that broad general prohibition. The Debtors' compensation and other financial arrangements with physicians must comply with the Stark Law.

On December 18, 2015, the Debtors entered into a settlement agreement—and paid $19.75 million to the federal government—to resolve an inquiry regarding the ordering, billing and medical necessity of certain laboratory services as well as agreements with certain physicians. Subject to certain conditions, the federal government agreed to release the Debtors from any civil or administrative monetary claim the federal government has with respect to the conduct covered by the settlement agreement under the False Claims Act (which is discussed further below) and certain other statutes and legal theories. This settlement did not constitute an admission of liability by the Debtors.

On March 9, 2016, the Debtors entered into a second settlement agreement—and paid an additional $34.7 million to the federal government—to resolve inquiries pursuant to the False Claims Act concerning allegations that the Debtors knowingly billed for services that were not medically necessary. The allegations related to this second settlement focused on clinical training in new facility locations for a radiation dose calculation system used by radiation oncologists, known as Gamma. The Debtors fully cooperated with the federal government and entered into the second settlement with no admission of wrongdoing. There was no indication that patient harm was a component of the dispute, and the Debtors are not aware of harm to any patient related to this dispute.

---

[10]  21st Century Oncology Holdings, Inc. Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, *available at* https://www.21co.com/investors/sec-filings.

On December 16, 2015, Debtor 21st Century Oncology, LLC entered into a Corporate Integrity Agreement ("CIA") with the U.S. Department of Health and Human Services's Office of Inspector General ("OIG") to resolve the exclusion authority under the Social Security Act implicated by the inquiry that provided the basis for the December 2015 settlement with the federal government. On March 3, 2016, Debtor 21st Century Oncology, LLC and OIG entered into a side letter adding additional requirements to the CIA to resolve exclusion authority implicated by the inquiry that provided the basis for the March 2016 settlement with the federal government.

The Debtors have responded and continue to respond to certain governmental inquiries, including inquiries by the Department of Health and Human Services Office for Civil Rights, the Florida Attorney General's Office and several other states' attorney general's offices, and the Department of Justice.

Certain of these investigations by the Department of Health and Human Services Office for Civil Rights and the states' attorney general's offices relate to potential violations of the Health Insurance Portability and Accountability Act ("HIPAA") arising out of a 2.2 million patient data breach in October, 2015 (the "Data Breach"). As a result of the Data Breach, the Debtors are working with the Department of Health and Human Services Office for Civil Rights to settle its ongoing investigation into potential violations of HIPAA through a resolution agreement, which will likely include a financial settlement and an ongoing corrective action plans, and the Debtors will keep the plaintiffs in the Data Breach Action (defined below) informed of any developments with respect thereto. As of the date of this Disclosure Statement, neither the Department of Health and Human Services Office for Civil Rights nor any states' attorney general's office has formally alleged any wrong doing against the Debtors in connection with the Data Breach; however, the Government Bar Date has not yet passed with respect to these Governmental Units' ability to assert Claims against the Debtors related to the Data Breach.

Additionally, prior to the Petition Date, a number of private litigants commenced several putative class actions against the Debtors seeking to recover damages these private litigants allegedly suffered because of the Data Breach. These sixteen actions were consolidated into a multidistrict litigation by the United States Judicial Panel on Multidistrict Litigation in the United States District Court for the Middle District of Florida (the "Florida District Court"). Thereafter, a consolidated amended complaint was filed in the Data Breach Action in January 2017 asserting claims and causes of action against Debtor defendant 21CI and non-debtor defendant 21st Century Oncology of California, a Medical Corporation ("21C California") on behalf of a putative class of approximately 2.2 million claimants. *See Consolidated Class Action Complaint, In re 21st Century Oncology Customer Data Security Breach Litigation*, No. 8:16-md-2737 (MSS-AEP) (M.D. Fla.) (the "Data Breach Action"). In February 2017, 21CI and 21C California moved to dismiss the Data Breach Action. The Florida District Court heard oral argument on the motion to dismiss on May 16, 2017 and ordered supplemental briefing which was concluded on May 26, 2017. On that same day, 21CI notified the Florida District Court of its Chapter 11 filing and the Florida District Court entered an order staying the entire Data Breach Action.

As of the Petition Date, the plaintiffs in the Data Breach Action had not yet moved for class certification under Rule 23 of the Federal Rules of Civil Procedure. The plaintiffs maintain that for a variety of reasons, any effort to seek class certification at that time given the status of the Data Breach Action would have been premature. After the Petition Date, but prior to the Bar Date, the plaintiffs in the Data Breach Action timely filed six (6) putative class Proofs of Claim against certain of the Debtors, each in the amount of approximately $123.2 million. Certain of the private litigants also filed individual proofs of claim against the Debtors alleging damages related to the Data Breach. On September 12, 2017, the Debtors filed the *Debtors' Motion to Disallow Class Proofs of Claim and Estimate the Customer Data Security Breach Litigation Claims at Zero Dollars* [Docket No. 414] (the "Data Breach Claims Objection"), in which the Debtors dispute (a) whether the Bankruptcy Court should permit the plaintiffs to pursue class Proofs of Claim, and (b) any liability with respect to the underlying Data Breach Action

and Proofs of Claim related thereto.  On October 9, 2017, the Data Breach plaintiffs filed: (a) the *Data Breach Plaintiffs' Memorandum of Law (I) In Opposition to Debtors' Motion to Disallow and/or Estimate Data Breach Claims and (II) In Support of Cross-Motion for Entry of an Order (A) Applying Bankruptcy Rule 7023 to the Class Claims or, in the Alternative, (B) Granting Relief from the Automatic Stay to Permit the Data Breach Litigation to Proceed with Recovery Limited to Available Insurance* [Docket No. 501]; and (b) the *Data Breach Plaintiffs' Cross-Motion for Entry of an Order (A) Applying Bankruptcy Rule 7023 to the Class Claims or, in the Alternative, (B) Granting Relief from the Automatic Stay to Permit the Data Breach Litigation to Proceed with Recovery Limited to Available Insurance* [Docket No. 503] ((a) and (b) together, the "Data Breach Responsive Pleadings").  In the Data Breach Responsive Pleadings, the plaintiffs (x) dispute the Debtors' contentions in the Data Breach Claims Objection, (y) assert that the Bankruptcy Court should exercise its discretion to apply Bankruptcy Rule 7023 to the class proofs of claim and thereafter apply Rule 23 of the Federal Rules of Civil Procedure, and alternatively (z) that the Bankruptcy Court should grant relief from stay to permit the plaintiffs to proceed with the Data Breach Action in the Florida District Court with any settlement or judgment to be satisfied solely through available insurance proceeds.  Notwithstanding that the Data Breach Claims Objection and the Data Breach Responsive Pleadings are before the Bankruptcy Court for adjudication, the Debtors and the Data Breach plaintiffs have agreed to adjourn the hearing scheduled for October 16, 2017 and are engaging in constructive settlement discussions surrounding the potential resolution of the subject Claims against the Debtors' Estates.  At this time, both the Debtors and the Data Breach plaintiffs reserve their rights in connection with continued settlement discussions and the pursuit of their respective positions.  Additionally, the Data Breach plaintiffs expressly reserve all rights to challenge Confirmation of the Plan on any grounds in the event the parties are unable to settle their disputes.

The Debtors are also close to resolution of a Department of Justice investigation related to potential violations of the False Claims Act and the Stark Law in connection with physician compensation arrangements and meaningful use attestations.  The Debtors hope to resolve this matter through a settlement of approximately $25 million and an amendment to the Debtors' CIA.

The Debtors are also working with various agencies of the federal government to resolve certain overpayments, including: a voluntary disclosure related to the Debtors' employment of two excluded providers; disclosures made to the OIG under the CIA involving overpayments owed to Medicare related to meaningful use attestations and retained credit balances; and a voluntary self-disclosure made to the Centers for Medicare & Medicaid Services involving a Stark Law matter.  In addition, the Debtors are working with the federal government to negotiate the assumption of Medicare participation and enrollment agreements, and potentially other relevant agreements.

The Department of Justice is also investigating certain potential criminal anti-trust violations regarding the market in Florida.  In connection with these inquiries, the Debtors are voluntarily producing documents and information and fully cooperation with the relevant governmental agencies regarding all inquiries.

The Debtors have engaged and continue to engage in frequent communications regarding the consensual resolutions of the above-described claims and issues with the relevant governmental agencies of the United States.  Furthermore, resolution of these matters in an essential component and condition precedent to the Debtors' ability to consummate the Restructuring Transactions contemplated by the Plan.  In particular, pursuant to the Backstop Purchase Agreement, the Backstop Parties are not obligated to fund either of the Rights Offerings, which are the cornerstones of the Plan, in the event the above-described matters are not dismissed with prejudice, settled, or otherwise resolved on terms acceptable to the Requisite Backstop Parties.  While the Debtors are optimistic that the claims maintained by the United States and its agencies detailed above will be resolved in the near term, all parties' rights are reserved until such resolutions are finalized and definitive documentation is agreed upon.

In addition to Claims against the Debtors by the United States, the Debtors are named or involved in certain litigations where private litigants have brought claims on behalf of the United States. In one such matter, a private litigant filed a claim on behalf of the United States government as a relator alleging that Debtor 21st Century Oncology, LLC ("21C LLC"), non-Debtor Daniel Dosoretz, M.D., non-Debtor Florida Cancer Specialists, P.L. ("FCS") and non-Debtor William Harwin, M.D. and certain individuals caused damages by entering into "a gentleman's agreement" pursuant to which 21C LLC did not offer medical oncology services to patients in southwest Florida in return for FCS not offering radiation oncology services in the same geographical area. The government declined to intervene in this case and 21C LLC was not served with the complaint. On October 6, 2017, the private litigant dismissed this action, and the United States consented to the dismissal. The Debtors are not aware of any claims that have been asserted by any other Persons with respect to alleged anticompetitive conduct.

On April 18, 2016 another relator, David DiPietro ("DiPietro"), filed a False Claims Act, or *qui tam*, complaint captioned *United States ex rel. David Di Pietro v. 21st Century Oncology, Inc., et al.* (Case No. 16 – 60853-CV-KMW) on behalf of the United States in the United States District Court for the Southern District of Florida (the "District Court"), alleging that 21C and various related or affiliated entities or parties orchestrated or knowingly participated in a fraudulent scheme of illegal kickbacks to control referrals of cancer patients for radiation oncology services at North Broward Hospital District d/b/a Broward Health (the "Broward Case"). As mandated by the False Claims Act, DiPietro filed the complaint under seal. On September 22, 2017, the District Court entered an order unsealing the complaint in the Broward Case. 21C has not yet been served with the complaint, although it has been provided a copy.[11] At this time, the United States government has declined to intervene in the Broward Case.

On September 25, 2017, DiPietro, for himself and for the United States government, filed an adversary proceeding against three of the Debtors, 21CH, 21C, and 21C LLC in the Chapter 11 Cases (Adv. Pro. No. 17-08284) (the "Broward Adversary Proceeding") contending that the debts arising from the claims asserted in the Broward Case are excepted from discharge and survive confirmation of the Plan, pursuant to sections 523(a)(2) and 1141(d)(6) of the Bankruptcy Code [Docket No. 426]. The defendants in the adversary proceeding have been served with the complaint and the Bankruptcy Court has scheduled a pre-trial conference for November 9, 2017. DiPietro, for himself and the United States government, also timely filed unliquidated, general unsecured claims against the bankruptcy estates of each of 21CH, 21C, and 21C LLC.

The Debtors have also entered into a stipulation with the United States government that extends the time for the United States government to file an adversary proceeding to obtain a determination of the dischargeability of any debt pursuant to sections 523 and 1141(d)(6) [Docket No. 439]. Pursuant to the stipulation, the United States government has through and including October 25, 2017 within which to file an adversary proceeding to determine the dischargeability of its debt, without prejudice to further extensions.

DiPietro, for himself and the United States government, has stated his intention to (a) seek relief from the automatic stay, to the extent applicable, in order to prosecute the Broward Case and (b) object to confirmation of any plan proposed in the Chapter 11 cases that provides for a discharge or release, either in favor of any of the Debtors or any third parties, of any of the claims set forth in the Broward Case. The Debtors do not believe the claims involved in the Broward Case have merit and will take the steps necessary to dispute and defend against such claims. Furthermore, to the extent the Debtors do have any

---

[11]    The Debtors have also received a proposed First Amended Complaint in the Broward Case. The First Amended Complaint adds 21st Century Oncology, LLC and 21st Century Oncology Holdings, Inc. as defendants.

liability in connection with the Broward Case, the Debtors do not believe that such liability would be excepted from discharge under sections 523 and 1141(d)(6) of the Bankruptcy Code and will oppose the relief requested by DiPietro in the Broward Adversary Proceeding.

<div align="center">(a)    <b>Credit Agreement Amendment and Supplemental Indenture</b></div>

On May 17, 2016, the Debtors received notice from the Indenture Trustee of a default under the Indenture due to 21C's failure to timely furnish the Indenture Trustee and the Noteholders with the Company's annual report for the fiscal year ended December 31, 2015.  21C's failure to timely furnish this annual report was a result of a required restatement of financial results from prior years.  This default under the Indenture, if left uncured for 60 days, would have triggered a cross-default under the First Lien Credit Agreement and given the Noteholders and the First Lien Lenders the right to accelerate the Debtors' (excluding the MDL Debtors') obligations under the Indenture and First Lien Credit Agreement, respectively.

As a result, on June 10, 2016, the Debtors (excluding the MDL Debtors) entered into an amendment and waiver to the First Lien Credit Agreement waiving through July 31, 2016 any default related to the failure to deliver financial statements and modifying the interest rates thereunder  (the "July 2016 Credit Agreement Amendment").  Similarly, on July 22, 2016, the Debtors (excluding the MDL Debtors) entered into a supplement to the Indenture (the "Supplemental Notes Indenture") to waive the same default through July 31, 2016.  In consideration for entering into these amendments, the Debtors (excluding the MDL Debtors) agreed to pay each Noteholder $2.30 per $1,000 principal amount of Notes held by such Noteholder.  On August 15, 2016 and August 16, 2016, the Debtors (excluding the MDL Debtors) entered into an additional amendment and waiver to each of the First Lien Credit Agreement and the Indenture (collectively, the "August 2016 Amendments"), extending the waivers provided for in the July 2016 Credit Agreement Amendment and Supplemental Notes Indenture through September 10, 2016 for defaults related to the failure to provide an annual report for the fiscal year ended December 31, 2015, and through September 30, 2016 for defaults related to the failure to timely provide quarterly financial statements for the quarters ended March 31, 2016 and June 30, 2016.

The August 2016 Amendments also established certain fundraising milestones the Debtors (excluding the MDL Debtors) were required to satisfy to avoid further defaults under the First Lien Credit Agreement and Indenture, including:

- *First Capital Event*:  Debtor 21C was required to raise net cash proceeds of at least $25 million from specified transactions by September 30, 2016 (the "First Capital Event").

- *Second Capital Event*: Debtor 21C was required to raise additional net cash proceeds of at least $25 million (or an amount such that the aggregate capital raised by the First Capital Event and a second capital event was no less than $50 million) from specified transactions by November 30, 2016 (the "Second Capital Event").

- *Third Capital Event*: Debtor 21C was required to raise additional net cash proceeds from specified transactions by March 31, 2017 of at least (a) $75 million (or an amount such that the aggregate capital raised by all capital events was no less than $125 million) or (b) an amount such that Debtor 21C's cash and unused revolving loan commitments equaled at least $120 million and Debtor 21C's consolidated leverage ratio was not greater than 6.4 to 1.

On September 9, 2016, Debtor 21C satisfied the First Capital Event by entering into the 2016 Subscription Agreement with CPPIB.  However, the Debtors did not raise sufficient capital to satisfy the

<div align="center">30</div>

Second Capital Event, which was due on December 1, 2016. As a result, the Debtors (excluding the MDL Debtors) initiated negotiations with the Noteholders and the First Lien Lenders regarding the terms of a forbearance agreement.

## 2. The Forbearance Agreements and Restructuring Negotiations

In light of the Debtors' constrained liquidity position, Debtor 21C determined to forgo a $19.8 million interest payment due on November 1, 2016 on the Notes (the "November Interest Payment"). In early December 2016, the Debtors negotiated a forbearance agreement (the "Noteholder Forbearance") with the Consenting Noteholders that are the beneficial owners (and investment managers or advisors for beneficial owners) of more than 90 percent of the aggregate principal amount of Notes outstanding. The Noteholder Forbearance provided a forbearance through December 15, 2016 of 21C's failure to satisfy the November Interest Payment and the Second Capital Event. Concurrently therewith, the Debtors (excluding the MDL Debtors) entered into a similar forbearance agreement (the "Lender Forbearance" and together with the Noteholder Forbearance, the "Forbearance Agreements") with the Consenting First Lien Lenders, forbearing on a cross-default under the First Lien Credit Agreement as a result of the Debtors' failure to satisfy the November Interest Payment and the Second Capital Event. Additionally, the Forbearance Agreements provided that the Debtors would, among other things, engage in negotiations with the Consenting Noteholders and Consenting First Lien Lenders regarding the terms a transaction or series of transactions to remedy existing defaults under the Indenture and the First Lien Credit Agreement, with a transaction support agreement to be entered into no later than December 15, 2016 and a transaction to be commenced by January 15, 2017.

On December 15, 2016 the Debtors (excluding the MDL Debtors), Consenting Noteholders, and Consenting First Lien Lenders entered into amendments to the Forbearance Agreements, extending the Forbearance Agreements through January 4, 2017. The same parties subsequently entered into four additional amendments (including certain waivers and consents), each of which extended the forbearance periods, ultimately through May 31, 2017.

To provide the Debtors with additional liquidity, the Original MDL Facility Credit Agreement was amended and restated pursuant to that certain Amended and Restated Credit and Guaranty Agreement, dated as of March 6, 2017 (as amended, supplemented and otherwise modified from time to time prior to the Petition Date, the "MDL Facility Credit Agreement"), by and among MDL, the MDL Guarantors, the MDL Agent and the MDL Lenders to provide for an additional $15 million of new "Tranche B" term loans, bringing the total outstanding principal amount under the MDL Facility to $35 million. In connection with entry into the MDL Facility Credit Agreement, the Debtors (excluding the MDL Debtors) entered into that certain Security Agreement, dated as of March 6, 2017 with the MDL Agent, pursuant to which substantially all property and assets of the Debtors (excluding the MDL Debtors) (including such property and assets constituting 21C Domestic Collateral, collectively, the "New MDL Collateral") were pledged and became part of the collateral package securing the Debtors' obligations under the MDL Facility. To ensure that the security interests in, and liens on, such collateral were senior and prior to the security interests under the First Lien Credit Facilities, the MDL Agent, the First Lien Agent and the Debtors (excluding the MDL Debtors) entered into that certain Intercreditor Agreement, dated as of March 6, 2017 (as amended, restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "Intercreditor Agreement"), pursuant to which the First Lien Agent, on behalf of itself and the First Lien Lenders, subordinated the security interests in and liens on any property and assets constituting New MDL Collateral securing obligations under the First Lien Credit Facilities. The MDL Facility initially matured on January 15, 2017, but the maturity date was subsequently extended in a series of amendments (including under the MDL Facility Credit Agreement) to May 31, 2017. Simultaneously, the Debtors (excluding the MDL Debtors) entered into an amendment

to the First Lien Credit Agreement to allow for the incurrence of additional debt under the MDL Facility without triggering a default under the First Lien Credit Agreement.

### 3. The Restructuring Support Agreement

With the additional runway afforded by the Forbearance Agreements and a revised business plan in place, the Debtors re-engaged in substantive discussions with the Consenting Noteholders and Consenting First Lien Lenders as well as several other key stakeholders, regarding a potential balance sheet restructuring. Following months of restructuring negotiations, the Debtors entered into the Restructuring Support Agreement with the Consenting Noteholders, the Consenting First Lien Lenders, the Consenting MDL Lenders, the Common Equity Owner, and CPPIB on May 25, 2017. The Restructuring Support Agreement contemplates a comprehensive restructuring of the Debtors' balance sheet through, among other things, (a) the conversion of the Debtors' existing obligations under the MDL Facility and the First Lien Credit Facilities into two new term loan credit facilities, (b) a debt-to-equity conversion of the Notes and certain General Unsecured Claims, (c) the Rights Offerings, pursuant to which all Noteholders who are Accredited Investors will receive rights to purchase their *pro rata* shares of (i) $200 million in aggregate original principal amount of the New Second Lien Notes (such rights, the "New <u>Notes Rights</u>") and (ii) the New Preferred Equity with an aggregate initial liquidation value of $88.235 million (such rights, the "New <u>Preferred Equity Rights</u>"), each backstopped by the Backstop Parties, and (d) New Warrants provided to holders of existing equity interests in the Debtors 21CI and 21CH, *provided* that all creditor classes as well as the equity holders vote to accept the Plan.

The restructuring contemplated by the Restructuring Support Agreement will reduce the Debtors' net debt by more than $500 million and provide the Debtors with working capital upon emergence to execute on its new business plan. The Restructuring Support Agreement was subsequently amended on June 27, June 30, August 4, August 11, August 30 and October 2, 2017.

### (a) DIP Financing

Following extensive, prepetition, arm's-length negotiations, the Debtors successfully negotiated a debtor-in-possession term loan credit facility in an aggregate principal amount not to exceed $75 million (the "<u>DIP Facility</u>") with certain of the Consenting First Lien Lenders. The DIP Facility was notable in that it not only provided the Debtors with much needed "Day 1" liquidity, but did so on favorable terms, attractive pricing, and limited "case control" mechanisms that might unduly hinder the Debtors' ability to maximize the value of these chapter 11 estates as a whole. The DIP Facility is discussed more fully at <u>Article VI.C</u> hereof.

## VI. EVENTS OF THE CHAPTER 11 CASES

### A. Expected Timetable of the Chapter 11 Cases

The Debtors expect the Chapter 11 Cases to proceed quickly. Should the Debtors' projected timelines prove accurate, and consistent with the terms set forth in the Plan, the Debtors could emerge from chapter 11 within 6 to 9 months of the Petition Date or earlier if the Debtors are able to resolve outstanding issues with the United States and its agencies in a more timely manner. **<u>No assurances can be made, however, that the Bankruptcy Court will enter any proposed orders discussed below, either at all, or on the timetable anticipated by the Debtors.</u>**

**B.      First Day Pleadings and Other Case Matters**

**1.      First and Second Day Pleadings**

On May 25, 2017 (the "Petition Date"), each of the Debtors filed a petition for relief commencing the Chapter 11 Cases.  To facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, the Debtors Filed certain motions and applications with the Bankruptcy Court on the Petition Date or soon thereafter seeking certain relief summarized below.  The relief sought in the "first day" and "second day" pleadings facilitated the Debtors' seamless transition into chapter 11 and aided in the preservation of the Debtors' going-concern value.  The first and second day pleadings included the following:

- Cash Management.  On May 26, 2017, the Bankruptcy Court entered an interim order authorizing the Debtors to continue using their existing cash management systems, existing bank accounts, and existing business forms as more fully set forth therein [Docket No. 32].  On June 20, 2017, the Bankruptcy Court entered a Final Order granting such relief on a final basis [Docket No. 133].

- DIP and Cash Collateral.  On May 26, 2017, the Bankruptcy Court entered an interim order, consensually reached between the Debtors, the DIP Lenders, the First Lien Lenders and the MDL Lenders approving the use of cash collateral and the incurrence of post-petition superpriority senior secured financing to fund operations and restructuring costs [Docket No. 31] (the "Interim DIP Order").  The Interim DIP Order, among other things, describes the terms and conditions for the access to the DIP Facility and the consensual use of cash collateral, and provides the MDL Lenders and the First Lien Lenders with adequate protection in exchange for the use of such cash collateral.  This relief was necessary to ensure that the Debtors could continue to operate in the ordinary course during the Chapter 11 Cases.  On June 20, 2017, the Bankruptcy Court entered a Final Order granting such relief on a final basis [Docket No. 134] (the "Final DIP Order").

- Insurance.  On May 26, 2017, the Bankruptcy Court entered an interim order authorizing the Debtors to continue operating under insurance coverage for their businesses entered into prepetition, honor prepetition insurance premium financing agreements, and renew their premium financing agreements in the ordinary course of business [Docket No. 36].  On June 20, 2017, the Bankruptcy Court entered a Final Order granting such relief on a final basis [Docket No. 127].

- NOL.  On May 26, 2017, the Bankruptcy Court entered an interim order approving notification and hearing procedures for certain transfers of and declarations of worthlessness with respect to beneficial ownership of common and preferred stock [Docket No. 35].  On June 20, 2017, the Bankruptcy Court entered a Final Order granting such relief on a final basis [Docket No. 130].

- Physician Reimbursement.  On May 26, 2017, the Bankruptcy Court entered an interim order authorizing the Debtors to pay or otherwise honor, solely in the Debtors' discretion, certain prepetition claims and obligations due and owing to physicians employed by or who contract with the Debtors [Docket No. 42].  On June 20, 2017, the Bankruptcy Court entered a Final Order granting such relief on a final basis [Docket No. 131].

- Refund Programs.  On May 26, 2017, the Bankruptcy Court entered an interim order authorizing the Debtors to maintain, administer, modify, and renew the Debtors' refund program and to pay or otherwise honor certain prepetition amounts outstanding under the refund program, solely in the Debtors' discretion [Docket No. 38].  On June 20, 2017, the Bankruptcy Court entered a Final Order granting such relief on a final basis [Docket No. 128].

- Taxes.  On May 26, 2017, the Bankruptcy Court entered an interim order authorizing the Debtors to pay certain prepetition sales, use, franchise, and other taxes in the ordinary course of business [Docket No. 41].  On June 20, 2017, the Bankruptcy Court entered a Final Order granting such relief on a final basis [Docket No. 126].

- Trade Creditors.  On May 26, 2017, the Bankruptcy Court entered an interim order authorizing the Debtors to pay, solely in the Debtors' discretion, certain prepetition claims of certain trade creditors [Docket No. 39].  On June 20, 2017, the Bankruptcy Court entered a Final Order granting such relief on a final basis [Docket No. 129].

- Utilities.  On June 20, 2017, the Bankruptcy Court entered a Final Order authorizing the Debtors to establish procedures for, among other things, determining adequate assurance for utility providers, prohibiting utility providers from altering, refusing, or discontinuing services, and determining that the Debtors are not required to provide any additional adequate assurance [Docket No. 135].

- Wages.  On May 26, 2017, the Bankruptcy Court entered an interim order authorizing the Debtors to (a) pay all employees their wage Claims in the ordinary course of business, (b) pay and honor employee medical and similar benefits, and (c) continue their prepetition benefit programs, including, among others, medical, dental, and 401(k) benefits [Docket No. 40].  On June 15, 2017, the Debtors Filed the *Supplement to the Debtors' Motion for Interim and Final Orders Authorizing the Debtors to (I) Pay Certain Prepetition Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses and (II) Continue Employee Benefits* [Docket No. 93].  On June 20, 2017, the Bankruptcy Court entered a Final Order granting such relief on a final basis [Docket No. 132].

### 2.    Procedural and Administrative Motions

To facilitate the efficient administration of the Chapter 11 Cases and to reduce the administrative burden associated therewith, the Debtors also Filed and received authorization to implement several procedural and administrative motions:

- authorizing the joint administration of the Chapter 11 Cases [Docket No. 30];

- extending the time during which the Debtors may File certain schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs (collectively, the "Schedules"), the filing of which are required under section 521 of the Bankruptcy Code [Docket No. 34];

- establishing certain notice, case management, and administrative procedures [Docket No. 125];

- allowing the Debtors to prepare a list of creditors in lieu of submitting a formatted mailing matrix and to File a consolidated list of the Debtors' 50 largest creditors [Docket No. 33];

- allowing the Debtors to retain and compensate certain Professionals utilized in the ordinary course of business [Docket No. 232];

- approving the procedures for the interim compensation and reimbursement of retained Professionals in the Chapter 11 Cases [Docket No. 233];

- setting bar dates for filing proofs of claim in the Chapter 11 Cases, approving the proof of claim form, and approving notice of the bar dates [Docket No. 253]; and

34

- approving procedures to reject, assume, or assume and assign Executory Contracts and Unexpired Leases [Docket No. 261].

### 3.      Retention of Chapter 11 Professionals

The Debtors also Filed several applications and obtained authority to retain various professionals to assist the Debtors in carrying out their duties under the Bankruptcy Code during the Chapter 11 Cases. These professionals include: (a) Kirkland & Ellis LLP, as counsel to the Debtors; (b) Millco Advisors, LP, as financial advisor and investment banker; (c) KCC, as notice and claims agent and administrative advisor; (d) Hall, Render, Killian, Heath & Lyman, PLLC, as special counsel for general counsel services; (e) Alvarez & Marsal Healthcare Industry Group, LLC, to provide the Debtors a chief executive officer, chief financial officer, vice-president of tax and certain additional personnel; and (f) Allen & Overy LLP, as special counsel for antitrust-related matters [Docket Nos. 37, 229, 238–241, 249]. On October [16], 2017, the Bankruptcy Court entered an order approving Simpson Thacher & Bartlett LLP's replacement of Allen & Overy LLP as the Debtors' special counsel for antitrust-related matters [Docket No. [●]].

### 4.      Appointment of the Patient Care Ombudsman

On June 19, 2017, the Bankruptcy Court entered an order directing the appointment of a patient care ombudsman (the "Patient Care Ombudsman") [Docket No. 121] (the "PCO Appointment Order"). On June 20, 2017, the U.S. Trustee appointed Melanie L. Cyganowski as Patient Care Ombudsman pursuant to section 333 of the Bankruptcy Code [Docket No. 124]. On July 27, 2017, the Bankruptcy Court entered an order approving the Patient Care Ombudsman proposed work plan pursuant to the PCO Appointment Order [Docket No. 264].

The Patient Care Ombudsman Filed an application to retain Otterbourg P.C. as counsel to the Patient Care Ombudsman [Docket No. 226]. On August 14, 2017, the Bankruptcy Court entered an order approving the retention of Otterbourg P.C. [Docket No. 314].

### 5.      Appointment of the Statutory Committee of Unsecured Creditors

On June 8, 2017, the U.S. Trustee selected the members of the official committee of unsecured creditors (the "Creditors' Committee"). On June 15, 2017, the U.S. Trustee Filed a notice of appointment of the Creditors' Committee pursuant to section 1102 of the Bankruptcy Code [Docket No. 92]. On June 16, 2017, the U.S. Trustee Filed an amended notice of appointment [Docket No. 94]. Currently, the members of the Creditors' Committee are: (a) Elekta, Inc.; (b) Florida Oncology Partners, LLC; (c) McKesson Specialty Care Distribution Corporation; (d) Steven Brehio; and (e) Cardinal Health 108, LLC.

The Creditors' Committee Filed applications to retain Morrison & Foerster LLP as lead counsel [Docket No. 206] and Berkeley Research Group, LLC as financial advisor [Docket No. 207]. On August 12, 2017, the Bankruptcy Court entered an order approving the retention of Morrison & Foerster LLP [Docket No. 309] and an order approving the retention of Berkley Research Group, LLC [Docket No. 310].

### 6.      The Ad Hoc Groups

Two ad hoc groups of the Debtors' creditors including: the Crossover Group and the First Lien Lender Group, formed prepetition and are currently active in these Chapter 11 Cases.

- The Crossover Group. This group of creditors is comprised of certain DIP Lenders, First Lien Lenders, MDL Lenders, and Noteholders, in each case in their capacities as such (collectively, the "Crossover Group"). The Crossover Group is currently represented by: (i) Stroock & Stroock & Lavan LLP, as counsel, and (ii) Houlihan Lokey, Inc., as investment banker and financial advisor.[12]

- The First Lien Lender Group. This group of creditors is comprised of certain DIP Lenders and First Lien Lenders, in each case in their capacities as such, that are not members of the Crossover Group (collectively, the "First Lien Lender Group"). The First Lien Lender Group is currently represented by: (i) Milbank, Tweed, Hadley & McCloy LLP, as counsel, and (ii) PJT Partners LP, as investment banker and financial advisor.[13]

## C.     The Debtors' DIP Financing and Cash Collateral Motion

After a significant marketing process and vigorous negotiations, on the Petition Date, the Debtors Filed the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling Final Hearing, and (V) Granting Related Relief* [Docket No. 17] (the "DIP Motion").

The Bankruptcy Court entered the Interim DIP Order on May 26, 2017. Pursuant to the Interim DIP Order, the Debtors were authorized, among other things, to utilize $25 million under the DIP Facility prior to the entry of the Final DIP Order.

On June 20, 2017, the Bankruptcy Court entered the Final DIP Order, which among other things: (i) approved the DIP Facility; (ii) approved the Debtors' consensual use of cash collateral; (iii) granted the adequate protection packages described in the Final DIP Order; and (iv) overruled any objections to the DIP Motion that were not otherwise resolved.

### 1.     Milestones[14]

The Final DIP Order also approved certain chapter 11 case "milestones" (the "Milestones"), which are set forth in the Restructuring Support Agreement and incorporated by reference into the DIP Documents, including the following:

- the entry of the Final DIP Order by the Bankruptcy Court no later than June 24, 2017;

- the filing of the Plan with the Bankruptcy Court no later than July 14, 2017;

---

[12]   The description of the Crossover Group contained herein is based off of the Crossover Group's *Verified Statement of Stroock & Stroock & Lavan LLP Pursuant to Federal Rule Bankruptcy Procedure 2019* Filed on June 2, 2017 [Docket No. 56].

[13]   The description of the First Lien Lender Group contained herein is based off of the First Lien Lender Group's *Verified Statement Pursuant to Bankruptcy Rule 2019* Filed on June 13, 2017 [Docket No. 82].

[14]   The Milestones set forth herein reflect certain amendments to the Restructuring Support Agreement entered into by the requisite parties thereto, including Amendment No. 1 to Restructuring Support Agreement, dated June 27, 2017, Amendment No. 2 to Restructuring Support Agreement, dated June 30, 2017, Amendment No. 3 to Restructuring Support Agreement, dated August 4, 2017, Amendment No. 4 to Restructuring Support Agreement, dated August 11, 2017, Amendment No. 5 to Restructuring Support Agreement, dated August 30, 2017, and Amendment No. 6 to Restructuring Support Agreement, dated October 2, 2017.

- the filing of a motion seeking approval of the Disclosure Statement and the Solicitation Procedures with the Bankruptcy Court no later than August 13, 2017;

- (a) the entry of the Backstop Order by the Bankruptcy Court no later than September 19, 2017, and (b) the execution and delivery to the Backstop Parties of the Backstop Purchase Agreement no later than September 20, 2017;

- the commencement of Solicitation no later than seven days after entry of the Disclosure Statement Order by the Bankruptcy Court;

- the entry of the Confirmation Order by the Bankruptcy Court no later than December 26, 2017; and

- the occurrence of the Effective Date no later than January 10, 2018.

The failure of the Debtors to achieve any of the Milestones will result in an Event of Default (as defined in the DIP Credit Agreement) under the DIP Facility, pursuant to which the DIP Agent may, with the consent of the requisite DIP Lenders, or shall, upon the request of the requisite DIP Lenders, by notice to the Debtors, among other things, terminate the Debtors' continued use of cash collateral on a consensual basis and terminate the DIP Lenders' commitments under the DIP Facility, in each case as set forth more fully in the DIP Documents. During the applicable notice period, the Debtors may seek an expedited hearing with the Bankruptcy Court.

## 2.    Marshaling Waiver

"Marshaling" refers to the legal doctrine by which, in certain circumstances, a secured lender may be compelled to recover on its claim by asserting remedies against certain collateral so as not to prejudice recoveries otherwise available to junior creditors. *In re Global Serv. Group, LLC*, 316 B.R. 451, 463 (Bankr. S.D.N.Y. 2004) ("Marshaling is an equitable principle designed to protect the rights of a junior creditor by compelling a senior creditor to attempt to collect its claim first from another source unavailable to the junior creditor.").

Paragraph 19 of the Final DIP Order provides that none of the DIP Parties or the Prepetition Secured Parties (each as defined therein) (subject to the reservation of rights in paragraph 46 thereof) shall be subject to the equitable doctrine of marshaling or any other similar doctrine with respect to the collateral specified therein, provided that those parties must "use commercially reasonable efforts to first apply, as applicable, all DIP Collateral, Prepetition 21C Collateral, or Prepetition MDL Domestic Collateral before applying proceeds of avoidance actions under chapter 5 of the Bankruptcy Code to repay the DIP Obligations or any adequate protection obligations. . . ." As a result of this waiver, it may be argued that value attributable to unencumbered assets should first be attributed to the value of DIP Claims, since the doctrine of marshaling could not be invoked to cause such DIP Claims to be satisfied first through proceeds available from assets that were otherwise encumbered as of the Petition Date.

## D.    Schedules and Bar Dates

On the Petition Date, the Debtors Filed the *Debtors' Motion for Entry of an Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, Statements of Financial Affairs, and Rule 2015.3 Financial Reports* [Docket No. 5], seeking an extension of the time within which the Debtors must File their Schedules up to and including July 10, 2017, which relief the Bankruptcy Court granted on May 26, 2017 [Docket No. 34].

On July 10, 2017, the Debtors Filed their Schedules [Docket Nos. 190, 192]. Any creditor whose Claim is not scheduled in the Schedules or whose Claim is scheduled as disputed, contingent, or unliquidated must File a proof of claim in accordance with the terms of the Bar Date Order (as defined herein).

On July 24, 2017, the Bankruptcy Court entered an order approving, among other things: (1) September 5, 2017, at 5:00 p.m., prevailing Eastern Time, as the deadline for all non-Governmental Units to File Claims in the Chapter 11 Cases; (2) November 21, 2017, at 5:00 p.m., prevailing Eastern Time, as the deadline for all Governmental Units to File Claims in the Chapter 11 Cases; (3)  procedures for filing proofs of Claim; and (4) the form and manner of notice of the applicable bar dates [Docket No. 253] (the "Bar Date Order").

Because the resolution process for Claims is currently ongoing, the Claims figures identified in this Disclosure Statement represent estimates only and, in particular, the estimated recoveries set forth in this Disclosure Statement for holders of General Unsecured Claims and holders of Interests in Debtors 21CH and 21CI could be materially lower if the actual amounts of Allowed General Unsecured Claims or Allowed Interests in Debtors 21CH and 21CI, as applicable, are higher than the current estimates.

## E.    Other Postpetition Matters

### 1.    Potential Loan Party Claims

Pursuant to the Interim DIP Order and Final DIP Order, the Debtors stipulated that the DIP Lenders hold continuing, valid, binding, enforceable, non-avoidable, and automatically and fully perfected first priority liens on and security interests in the DIP Collateral (as defined in the DIP Orders).

The Final DIP Order provides the Creditors' Committee with a budget of no more than $175,000 from the proceeds of the DIP Facility or any proceeds of the DIP Collateral or Cash Collateral to be utilized in connection with the Creditors' Committee's investigation of any Loan Party Claim (as defined in the Final DIP Order).  The Final DIP Order also provides that the Creditors' Committee's challenge period with respect to any Loan Party Claim, including on behalf of the Debtors' Estates, that may be asserted extends through and including September 18, 2017.  The Creditors' Committee's challenge period was later extended through and including the earlier of: (a) the date that is twenty-one (21) days after the date that the settlement set forth in the *Joint Notice of Settlement with the Creditors' Committee* [Docket No. 425] ceases to be in full force and effect; and (b) the Effective Date [Docket No. 495].

### 2.    Plan Exclusivity

On September 5, 2017, the Debtors Filed the *Debtors' Motion Seeking Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 388] (the "Exclusivity Motion") seeking to extend the time during which the Debtors have the exclusive right to File and solicit acceptance of a chapter 11 plan (the "Exclusivity Deadline").

On September 20, 2017 the Bankruptcy Court entered an order granting the relief requested by the Exclusivity Motion and extending the Debtors' exclusive period to file a plan and solicit acceptance thereof through and including January 20 and March 21, 2018, respectively [Docket No. 444].  The Debtors reserve the right to seek an extension of the Exclusivity Deadline up to a total of 18 months through and including November 26, 2018 pursuant to section 1121 of the Bankruptcy Code.

3.      **Executory Contracts and Unexpired Leases**

(a)      **Assumption/Rejection Procedures Motion**

On June 29, 2017, the Debtors Filed the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving Procedures to Reject, Assume, or Assume and Assign Executory Contracts and Unexpired Leases and (II) Granting Related Relief* [Docket No. 160] (the "Contract Procedures Motion") seeking to establish procedures for the rejection, assumption, or assumption and assignment of the Debtors' Executory Contracts and Unexpired Leases.  On July 25, 2017, the Bankruptcy Court entered an order granting the relief requested by the Contract Procedures Motion [Docket No. 261].

(b)      **Lease Rejection Motion**

On June 29, 2017, the Debtors Filed a motion to reject certain unexpired leases *nunc pro tunc* to the date of the filing of the motion and granting related relief [Docket No. 162] (the "Lease Rejection Motion").  On July 19, 2017, the Bankruptcy Court entered an order granting the Lease Rejection Motion [Docket No. 231].

To the extent an Executory Contract or Unexpired Lease is not otherwise addressed in connection with the relief granted under the Contracts Procedures Motion or the Lease Rejection Motion, such Executory Contract or Unexpired Lease will be addressed by Article V of the Plan, which is discussed in more detail below.

(c)      **Assumption/Rejection Extension Motion**

On September 5, 2017, the Debtors Filed a motion to extend the time to assume or reject Unexpired Leases and granting related relief [Docket No. 389] (the "Assumption/Rejection Extension Motion").   On September 20, 2017, the Bankruptcy Court entered an order granting the Assumption/Rejection Extension Motion and extending the period by which the Debtors must assume or reject the Unexpired Leases through and including December 21, 2017 [Docket No. 445].  The Debtors reserve the right to seek additional extensions of the time to assume or reject the Unexpired Leases.

F.      **Corporate Structure Upon Emergence**

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

VII.   **SUMMARY OF THE PLAN**

The Plan reflects the evaluation and analysis undertaken by the Debtors with respect to a number of different of business, financial, and legal considerations.  Among other things, the Debtors, with the assistance of their advisors, considered both overall enterprise value and the extent to which such value

may be available for distribution to the Debtors' different Classes of stakeholders in light of such parties' legal and equitable rights.

The recoveries and treatment provided under the Plan further reflect consideration of the potential allocation of enterprise value for the entire Company as between the Debtors and their international Affiliates.   Additional factors taken into account by the Debtors include the potential treatment of intercompany obligations as Claims and/or value, if any, attributable to such intercompany relationships, and the potential impact of the marshaling waiver arising under Paragraph 19 of the Final DIP Order.  The Plan further reflects the Debtors' consideration of the time, risk, and expense associated with litigating to Final Order, the foregoing issues.

The Plan is therefore proposed in the nature of a settlement pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019, and the Debtors believe that Confirmation of the Plan is in the best interests of the Debtors' Estates and  their creditors.

## A.      Overview

Articles VII.C and D provide a summary of the classification and treatment of Claims and Interests under the Plan and the structure and means for implementation of the Plan.  The summary provided herein is qualified in its entirety by reference to the Plan (as well as the exhibits thereto and definitions therein).

The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in the documents referred to therein.   The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions of the Plan or documents referred to therein.

The Plan controls the actual treatment of Claims against and Interests in the Debtors under the Plan and will, upon the occurrence of the Effective Date, be binding upon all holders of Claims against and Interests in the Debtors, the Debtors' Estates, the Reorganized Debtors, all parties receiving property under the Plan, and other parties in interest.  In the event of any conflict between this Disclosure Statement and the Plan or any other operative document, the terms of the Plan and/or such other operative document shall control.

## B.      Administrative Claims and Professional Claims

### 1.         Administrative Claims

Except to the extent that a holder of an Allowed Administrative Claim (other than holders of Professional Claims, DIP Claims, and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) and the Debtors or the Reorganized Debtors, as applicable, agree in writing to less favorable treatment for such Allowed Administrative Claim (in each case with the consent of the Requisite Backstop Parties and the Requisite Consenting First Lien Lenders, which consent shall not be unreasonably withheld), each holder of an Allowed Administrative Claim will receive in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its Allowed Administrative Claim an amount of Cash equal to the unpaid portion of such Allowed Administrative Claim either:  (a) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, when such Allowed Administrative Claim is due or as soon thereafter as reasonably practicable); (b) if such Administrative Claim is not Allowed as of the Effective Date, unless otherwise agreed in writing by the holder of such

40

Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon thereafter as reasonably practicable; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the holders of such Allowed Administrative Claim (for the avoidance of doubt, holders of such Allowed Administrative Claims shall not be required to File a request for payment of such Allowed Administrative Claim as provided in the second paragraph of Section 2.1 of the Plan); (d) at such time and upon such terms as may be agreed upon in writing by the holder of such Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, in consultation with the Requisite Backstop Parties and the Requisite Consenting First Lien Lenders; or (e) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

Except as otherwise provided in Section 2.1 of the Plan, and except with respect to Administrative Claims that are DIP Claims, Professional Claims, or Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code, requests for payment of Administrative Claims must be Filed and served on the Debtors or the Reorganized Debtors, as applicable, pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be Filed and served on the Debtors or the Reorganized Debtors, as applicable, and the requesting party no later than 60 days after the Effective Date. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed.

Notwithstanding any provision to the contrary in the Plan, Governmental Units shall not be required to file a request for the payment of an expense described in section 503(b)(1)(B) or (C) of the Bankruptcy Code as a condition of it being Allowed as an Administrative Claim.

**2.      DIP Claims**

The DIP Claims shall be deemed to be Allowed Secured Claims and superpriority Administrative Claims in the full amount due and owing under the DIP Facility as of the Effective Date. In full and final satisfaction, settlement, release, and discharge of and in exchange for each DIP Claim, the unpaid portion of each DIP Claim will be paid in full in Cash to the holder of such DIP Claim on the Effective Date, funded from Cash on hand and the New Preferred Equity Rights Offering Cash Amount.

**3.      Professional Claims**

All requests for payment of Professional Claims must be Filed no later than 45 days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims after notice and a hearing in accordance with the procedures established by the Interim Compensation Order and the Bankruptcy Code. The Reorganized Debtors shall pay Professional Claims in Cash in the amount the Bankruptcy Court Allows following entry of an order by the Bankruptcy Court Allowing such Professional Claims, including from the funds in the Professional Fee Escrow Account.

On the Effective Date, the Reorganized Debtors shall establish the Professional Fee Escrow Account in trust for the Professionals and fund it with Cash equal to the Professional Fee Amount.

Professionals shall estimate in good faith their unpaid Professional Claims through the Effective Date and shall deliver such good faith estimates to the Debtors no later than five Business Days prior to the anticipated Effective Date.  For the avoidance of doubt, no such estimate shall be deemed to limit the amount of the fees and expenses that are the subject of a Professional's final request for payment of Professional Claims Filed with the Bankruptcy Court.  If a Professional does not provide an estimate, the Debtors may, in consultation with the Requisite Backstop Parties, estimate the unpaid and unbilled fees and expenses of such Professional.  No funds in the Professional Fee Escrow Account shall be property of the Estates.  Any funds remaining in the Professional Fee Escrow Account after all Allowed Professional Claims have been paid will be turned over to the Reorganized Debtors.

From and after the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

### 4.        Priority Tax Claims

In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, except to the extent that a holder of an Allowed Priority Tax Claim and the Debtors or the Reorganized Debtors, as applicable, agree in writing to less favorable treatment for such Allowed Priority Tax Claim (in each case with the consent of the Requisite Backstop Parties and the Requisite Consenting First Lien Lenders, which consent shall not be unreasonably withheld), each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in accordance with the terms of any agreement between the Reorganized Debtors and the holder of such Claim, or as may be due and payable under applicable non-bankruptcy law, or in the ordinary course of business.

### 5.        Statutory Fees

All fees due and payable pursuant to section 1930 of title 28 of the U.S. Code prior to the Effective Date shall be paid by the Debtors.  On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.  Each Debtor shall remain obligated to pay the U.S. Trustee Fees until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

## C.        Classification and Treatment of Claims and Interests

### 1.        Summary of Classification

Claims and Interests, except for Administrative Claims, including DIP Claims, Professional Claims, and Priority Tax Claims, are classified in the Classes set forth in Article III of the Plan.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only

to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against each Debtor pursuant to the Plan is as set forth below. The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors. All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have holders of Claims or Interests in a particular Class or Classes, and such Claims shall be treated as set forth in Section 3.4 of the Plan.

(a)    **Class Identification**

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as follows:

| Class | Claim / Interest | Status | Voting Rights |
|-------|------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | MDL Claims | Impaired | Entitled to Vote |
| 4 | First Lien Claims | Impaired | Entitled to Vote |
| 5 | Note Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Intercompany Claims | Unimpaired/Impaired | Not Entitled to Vote (Presumed to Accept/Reject) |
| 8 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Presumed to Reject) |
| 9 | Intercompany Interests | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 10 | Class B 21C, LLC Interests | Unimpaired | Presumed to Accept |
| 11 | Interests in 21CH and 21CI | Impaired | Entitled to Vote |
| 12 | Non-Debtor Interests | Impaired | Not Entitled to Vote (Presumed to Reject) |

2.    **Treatment of Classes of Claims and Interests**

Except to the extent that the Debtors or the Reorganized Debtors, as applicable, and a holder of an Allowed Claim or Allowed Interest, as applicable, agree in writing to less favorable treatment for such Allowed Claim or Allowed Interest, as applicable (in each case with the consent of the Requisite Backstop Parties and the Requisite Consenting First Lien Lenders, which consent shall not be

unreasonably withheld), such holder shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such holder's Allowed Claim or Allowed Interest.  Unless otherwise indicated, the holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon thereafter as reasonably practicable.

> **(a)** **Class 1 — Other Secured Claims**
>
> > i.   *Classification*:  Class 1 consists of all Other Secured Claims.
> >
> > ii.  *Treatment*:  Except to the extent that a holder of an Allowed Other Secured Claim and the Debtors or the Reorganized Debtors, as applicable (with the consent of the Requisite Backstop Parties and the Requisite Consenting First Lien Lenders, which consent shall not be unreasonably withheld) agree in writing to less favorable treatment of its Allowed Other Secured Claim, each holder of an Allowed Other Secured Claim shall receive, in full and complete satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Other Secured Claim, the following, as determined by the Debtors or the Reorganized Debtors, as applicable, in each case with the consent of the Requisite Backstop Parties and the Requisite Consenting First Lien Lenders, which consent shall not be unreasonably withheld:
> >
> > > 1)  payment in full, in Cash, of the unpaid portion of its Allowed Other Secured Claim on the following:  (i) if such Allowed Other Secured Claim is Allowed as of the Effective Date, the Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, the date such Allowed Other Secured Claim becomes due and payable, or as soon thereafter as is reasonably practicable); and (ii) if such Allowed Other Secured Claim is not Allowed as of the Effective Date, the date such Other Secured Claim is Allowed or as soon as reasonably thereafter practicable;
> > >
> > > 2)  reinstatement pursuant to section 1124 of the Bankruptcy Code; or
> > >
> > > 3)  such other treatment that would render its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.
> >
> > iii. *Voting*:  Class 1 is Unimpaired.  Holders of Allowed Other Secured Claims in Class 1 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Other Secured Claims in Class 1 are not entitled to vote to accept or reject the Plan.

> **(b)** **Class 2 — Other Priority Claims**
>
> > i.   *Classification*:  Class 2 consists of all Other Priority Claims.

ii.    *Treatment*:  Except to the extent that a holder of an Allowed Other Priority Claim and the Debtors or the Reorganized Debtors, as applicable (with the consent of the Requisite Backstop Parties and Requisite Consenting First Lien Lenders, which consent shall not be unreasonably withheld), agree in writing to less favorable treatment of its Allowed Other Priority Claim, each holder of an Allowed Other Priority Claim shall receive, in full and complete satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Other Priority Claim, payment in full, in Cash, of the unpaid portion of its Allowed Other Priority Claim on the following:   (i) if such Allowed Other Priority Claim is Allowed as of the Effective Date, the Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, the date such Allowed Other Priority Claim becomes due and payable, or as soon thereafter as is reasonably practicable); and (ii) if such Allowed Other Priority Claim is not Allowed as of the Effective Date, the date such Other Priority Claim is Allowed or as soon thereafter as reasonably practicable.

iii.    *Voting*:   Class 2 is Unimpaired. Holders of Allowed Other Priority Claims in Class 2 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Other Priority Claims in Class 2 are not entitled to vote to accept or reject the Plan.

**(c)    Class 3 — MDL Claims**

i.    *Classification*:  Class 3 consists of all MDL Claims.

ii.    *Allowance*: The MDL Claims are Allowed as set forth in the Final DIP Order, including for the avoidance of doubt any MDL Claims for postpetition interest at the non-default rate set forth in the MDL Facility Credit Agreement.

iii.    *Treatment*:  Except to the extent that a holder of an Allowed MDL Claim and the Debtors or the Reorganized Debtors, as applicable (with the consent of the Requisite Backstop Parties and the Requisite Consenting First Lien Lenders, which consent shall not be unreasonably withheld) agree in writing to less favorable treatment of its Allowed MDL Claim, on the Effective Date or as soon thereafter as reasonably practicable, each holder of an Allowed MDL Claim shall receive, in full and complete satisfaction, settlement, discharge and release of, and in exchange for, its Allowed MDL Claim, the following:

1)    its Pro Rata share of loans provided under the New MDL Term Loan Facility in an aggregate principal amount equal to (i) the aggregate amount of MDL Obligations owned or held by such holder as of immediately prior to the Effective Date <u>minus</u> (ii) the unpaid portion of its Allowed MDL Adequate Protection Payments; and

> 2) payment in full in Cash of the unpaid portion of its Allowed MDL Adequate Protection Payments.

    iv.    *Voting*:  Class 3 is Impaired.  Holders of Allowed MDL Claims in Class 3 are entitled to vote to accept or reject the Plan.

**(d)**     **Class 4 — First Lien Claims**

    i.    *Classification*:  Class 4 consists of all First Lien Claims.

    ii.    *Allowance*:  The First Lien Claims are Allowed as set forth in the Final DIP Order, including for the avoidance of doubt any First Lien Claims for postpetition interest at the non-default rate set forth in the First Lien Credit Agreement.

    iii.    *Treatment*:  Except to the extent that a holder of an Allowed First Lien Claim and the Debtors or the Reorganized Debtors, as applicable (with the consent of the Requisite Backstop Parties and the Requisite Consenting First Lien Lenders, which consent shall not be unreasonably withheld) agree to less favorable treatment of its Allowed First Lien Claim, on the Effective Date or as soon thereafter as reasonably practicable, each holder of an Allowed First Lien Claim, shall receive in full and complete satisfaction, settlement, discharge and release of, and in exchange for, its Allowed First Lien Claim, the following:

> 1) loans provided under the New First Lien Term Loan Credit Facility in an aggregate principal amount equal to (i) the aggregate amount of First Lien Obligations owed or held by such holder as of immediately prior to the Effective Date, <u>minus</u> (ii) the Exchanged Credit Facility Claims of such holder; *provided, however*, that no distributions shall be made on any of the Exchanged Credit Facility Claims other than on account of all accrued and unpaid interest on such Exchanged Credit Facility Claims as of the Effective Date (if any), <u>minus</u> (iii) the unpaid portion of its Allowed First Lien Adequate Protection Payments; and

> 2) payment in full in Cash of the unpaid portion of its Allowed First Lien Adequate Protection Payments.

    iv.    *Voting*:  Class 4 is Impaired.  Holders of Allowed First Lien Claims in Class 4 are entitled to vote to accept or reject the Plan.

**(e)**     **Class 5 — Note Claims**

    i.    *Classification*:  Class 5 consists of all Note Claims.

    ii.    *Allowance*:  The Note Claims are Allowed in the aggregate outstanding principal amount under the Indenture of not less than $368,177,181, plus any accrued and unpaid interest and fees with respect to the foregoing

(which as of the Petition Date was not less than $44,470,210) plus fees, costs, expenses, and other amounts asserted under the Indenture.

iii.    *Treatment*:  Except to the extent that a holder of an Allowed Note Claim and the Debtors or the Reorganized Debtors, as applicable (with the consent of the Requisite Backstop Parties and the Requisite Consenting First Lien Lenders, which consent shall not be unreasonably withheld) agree to less favorable treatment of its Allowed Note Claim, on the Effective Date or as soon thereafter as reasonably practicable, each holder of an Allowed Note Claim shall receive, in full and complete satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Note Claim, (A) its pro rata share (as determined in Section 3.2(e)(3) of the Plan) of:  (i) the New Notes Rights (but only to the extent such holder is an Accredited Investor); and (ii) the New Preferred Equity Rights (but only to the extent such holder is an Accredited Investor); and (B) its Pro Rata share of the New Common Stock Equity Pool (subject to dilution on account of the shares of New Common Stock issuable upon conversion of the New Preferred Equity, the shares of New Common Stock issuable upon exercise of the New Warrants, and the Management Incentive Plan Equity).  Each holder of an Allowed Note Claim that will receive the New Notes Rights and New Preferred Equity Rights shall receive its pro rata share of the New Notes Rights and New Preferred Equity Rights based on the proportion that such holder's Allowed Note Claim as of the Rights Offering Record Date bears to the aggregate amount of (I) all Eligible General Unsecured Claims as of the Rights Offering Record Date held by each Person that has certified that it is an Accredited Investor (as demonstrated by an AI Questionnaire that has been properly completed, duly executed, and timely delivered by such holder to the subscription agent for the Rights Offerings on or before the Questionnaire Deadline in accordance with the Rights Offering Procedures) plus (II) all Allowed Note Claims as of the Rights Offering Record Date.  Additionally, the New Common Stock in the New Common Stock Equity Pool shall be distributed on a Pro Rata basis to (a) holders of Allowed Note Claims and (b) holders of Allowed General Unsecured Claims that receive shares of the New Common Stock Equity Pool in accordance with the terms of the Plan.

iv.    *Voting*: Class 5 is Impaired.  Holders of Allowed Note Claims in Class 5 are entitled to vote to accept or reject the Plan.

**(f)**    **Class 6 — General Unsecured Claims**

i.    *Classification*: Class 6 consists of all General Unsecured Claims.

ii.    *Treatment*:  Except to the extent that a holder of an Allowed General Unsecured Claim and the Debtors or the Reorganized Debtors, as applicable (with the consent of the Requisite Backstop Parties and the Requisite Consenting First Lien Lenders, which consent shall not be unreasonably withheld), agree to less favorable treatment of its Allowed General Unsecured Claim, on the Effective Date or as soon thereafter as reasonably practicable, each holder of an Allowed General Unsecured

Claim shall receive, in full and complete satisfaction, settlement, discharge and release of, and in exchange for, its Allowed General Unsecured Claim, its Pro Rata share of either:

1)      if such Allowed General Unsecured Claim (i) is less than or equal to $1,000,000 and such holder has <u>not</u> properly made the New Common Stock Election on a properly cast Ballot or (ii) is greater than $1,000,000 and such holder has properly made the Convenience Claim Election on a properly cast Ballot (*provided*, that in making such election, the holder has agreed to reduce the amount of such Allowed General Unsecured Claim for purposes of voting and distributions under the Plan to $1,000,000), the Convenience Claim Distribution; or

2)      if such Allowed General Unsecured Claim (i) is greater than $1,000,000 and such holder has <u>not</u> properly made the Convenience Claim Election on a properly cast Ballot or (ii) is less than or equal to $1,000,000 and such holder has properly made the New Common Stock Election on a properly cast Ballot, the New Common Stock Equity Pool (subject to dilution on account of the shares of New Common Stock issuable upon conversion of the New Preferred Equity, the shares of New Common Stock issuable upon exercise of the New Warrants, and the Management Incentive Plan Equity).

Any holder of an Eligible General Unsecured Claim as of the Rights Offering Record Date that (x) has not made the Convenience Claim Election (with respect to an Eligible General Unsecured Claim greater than $1,000,000) or has made the New Common Stock Election (with respect to an Eligible General Unsecured Claim less than or equal to $1,000,000) and (y) is an Accredited Investor (as demonstrated by an AI Questionnaire that has been properly completed, duly executed and timely delivered by such holder to the subscription agent for the Rights Offerings on or before the Questionnaire Deadline in accordance with the Rights Offering Procedures) shall also receive its pro rata share of the New Notes Rights and the New Preferred Equity Rights (based on the proportion that such holder's Eligible General Unsecured Claim as of the Rights Offering Record Date bears to the aggregate amount of (I) all Eligible General Unsecured Claims as of the Rights Offering Record Date held by each Person that has certified that it is an Accredited Investor (as demonstrated by an AI Questionnaire that has been properly completed, duly executed, and timely delivered by such holder to the subscription agent for the Rights Offerings on or before the Questionnaire Deadline in accordance with the Rights Offering Procedures) plus (II) all Allowed Note Claims as of the Rights Offering Record Date).  The New Common Stock in the New Common Stock Equity Pool shall be distributed on a Pro Rata basis to (i) holders of Allowed Note Claims and (ii) holders of Allowed General Unsecured Claims that receive shares of the New Common Stock Equity Pool in accordance with the terms of the Plan.

For the avoidance of doubt, if any holder in Class 6 holds more than one Allowed General Unsecured Claim, its Allowed General Unsecured Claims shall not be aggregated for purposes of any distribution to be made under Section 3.2(f) of the Plan.

iii.    *Voting*:   Class 6 is Impaired.   Holders of Allowed General Unsecured Claims in Class 6 are entitled to vote to accept or reject the Plan.

(g)    **Class 7 — Intercompany Claims**

i.    *Classification*: Class 7 consists of all Intercompany Claims.

ii.    *Treatment*:  Each Allowed Intercompany Claim shall be canceled as of the Effective Date or, at the Debtors' or the Reorganized Debtors' option, with the consent of the Requisite Consenting First Lien Lenders and Requisite Backstop Parties, shall be Reinstated or compromised; *provided*, that the treatment of the Allowed Intercompany Claims shall be effectuated in a tax efficient manner.  No distribution shall be made on account of any Intercompany Claim.

iii.    *Voting*:  Class 7 is either (i) Unimpaired, in which case the holders of Allowed Intercompany Claims in Class 7 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or (ii) Impaired, and not receiving any distribution under the Plan, in which case the holders of Allowed Intercompany Claims in Class 7 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, each holder of an Allowed Intercompany Claim in Class 7 will not be entitled to vote to accept or reject the Plan.

(h)    **Class 8 — Section 510(b) Claims**

i.    *Classification*: Class 8 consists of all Section 510(b) Claims.

ii.    *Treatment*:  Holders of any Section 510(b) Claims shall not receive any recovery on account of such claims.

iii.    *Voting*:  Class 8 is Impaired.  Holders of Claims in Class 8 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

(i)    **Class 9 — Intercompany Interests**

i.    *Classification*: Class 9 consists of all Intercompany Interests.

ii.    *Treatment*:  Each Allowed Intercompany Interest shall be Reinstated.  No distribution shall be made on account of any Intercompany Interest.

iii.    *Voting*:  Class 9 is Unimpaired, and holders of Allowed Intercompany Interests in Class 9 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each

holder of an Allowed Intercompany Interest in Class 9 will not be entitled to vote to accept or reject the Plan.

**(j)     Class 10 — Class B 21C, LLC Interests**

i.      *Classification*:  Class 10 consists of all Class B 21C, LLC Interests.

ii.     *Treatment*:    Each Allowed Class B 21C, LLC Interest shall be Reinstated. No distribution shall be made on account of any Class B 21C, LLC Interest.

iii.    *Voting*:  Class 10 is Unimpaired, and holders of Allowed Class B 21C, LLC Interests in Class 10 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each holder of an Allowed Class B 21C, LLC Interest in Class 10 will not be entitled to vote to accept or reject the Plan.

**(k)     Class 11 — Interests in 21CH and 21CI**

i.      *Classification*:  Class 11 consists of all Interests in 21CH and 21CI.

ii.     *Treatment*:

1)      On the Effective Date, all Interests in 21CH shall be canceled as of the Effective Date or, at the Debtors' or the Reorganized Debtors' option, with the consent of the Requisite Consenting First Lien Lenders and Requisite Backstop Parties, shall be Reinstated or compromised.  In the event that (i) all Classes of Claims entitled to vote on the Plan vote to accept the Plan, (ii) there are no Allowed Section 510(b) Claims, and (iii) holders of Allowed Interests in 21CH and 21CI in Class 11 vote to accept the Plan, each holder of an Allowed Interest in 21CH (which consists of 21CI and CPPIB) shall receive, on the Effective Date or as soon thereafter as reasonably practicable, in full and complete satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Interests, its share of the New Warrants to be allocated as follows: (a) 50% of the New Warrants shall be distributed to 21CI, and (b) 50% of the New Warrants shall be distributed to CPPIB; *provided*, *however*, that if each of clauses (i), (ii), and (iii) in this sentence are not satisfied, then holders of Allowed Interests in 21CH shall receive no distribution on account of such Allowed Interests.

2)      On the Effective Date, all Interests in 21CI shall be Reinstated, or solely at the Debtors' or the Reorganized Debtors' option with the written consent of the Requisite Backstop Parties, (i) the New Warrants distributed to 21CI may be further distributed to the holders of Allowed Interests in 21CI, and (ii) all Interests in 21CI shall be cancelled or Reinstated.

50

iii.    *Voting*:  Class 11 is Impaired.  Holders of Interests in Class 11 are entitled to vote to accept or reject the Plan.

**(l)    Class 12 — Non-Debtor Interests**

i.    *Classification*:  Class 12 consists of all Non-Debtor Interests.

ii.    *Treatment*:  Each Allowed Non-Debtor Interest shall be canceled as of the Effective Date.  No distribution shall be made on account of any Non-Debtor Interest.

iii.    *Voting*:  Class 12 is Impaired.  Holders of Interests in Class 12 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

**3.    Special Provisions Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

**4.    Elimination of Vacant Classes**

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest, or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing, shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**5.    Voting Classes; Presumed Acceptance by Non-Voting Classes**

If a Class contains Claims or Interests eligible to vote on the Plan and no holder of Claims or Interests in such Class eligible to vote on the Plan votes to accept or reject the Plan, the Plan shall be presumed accepted by the holders of such Claims or Interests in such Class.

**6.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code**

The Debtors seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to Class 8 and Class 12 (solely to the extent such Class(es) are not eliminated pursuant to Section 3.4 of the Plan) as the holders of Claims and Interests in Class 8 and Class 12 are presumed to have rejected the Plan.  The Debtors also seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any other Class(es) of Claims or Interests that vote to reject the Plan.  The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan and subject to the terms and conditions of the Restructuring Support Agreement to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by (a) modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules and (b) withdrawing the Plan as to an individual Debtor at any time before the Confirmation Date, in each case with the consent of the Requisite Backstop Parties.

### 7.    Intercompany Interests

To the extent Reinstated under the Plan, distributions on account of Allowed Intercompany Interests are not being received by holders of such Allowed Intercompany Interests on account of their Allowed Intercompany Interests but for the purposes of administrative convenience, for the ultimate benefit of the holders of the New Common Stock, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the holders of Allowed Claims.  For the avoidance of doubt, to the extent Reinstated pursuant to the Plan, on and after the Effective Date, all Allowed Intercompany Interests shall be owned by the same Reorganized Debtor that corresponds with the Debtor that owned such Allowed Intercompany Interests prior to the Effective Date.

### D.    Means for Implementation of the Plan

### 1.    Restructuring Transactions

On the Effective Date, or as soon thereafter as reasonably practicable, the Reorganized Debtors shall take all actions as may be necessary or appropriate to effectuate the Restructuring Transactions, including:  (a) the execution, delivery, and filing, as applicable, of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation, each containing terms that are consistent in all material respects with the terms of the Plan and the Restructuring Support Agreement, and that satisfy the requirements of applicable law and any other terms to which the Requisite Parties may agree; (b) the execution, delivery, and filing, as applicable, of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation, each on terms consistent in all material respects with the terms of the Plan and the Restructuring Support Agreement and having other terms for which the Requisite Parties agree; (c) the execution, delivery, and filing, as applicable, of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (d) such other transactions that are required to effectuate the Restructuring Transactions in the most tax efficient manner, as determined by the Debtors and the Requisite Backstop Parties; (e) the execution, delivery, and filing, if applicable, of the New First Lien Term Loan Documents, New MDL Term Loan Documents, New Second Lien Notes Documents, the New Warrant Documents (if applicable), the New Organizational Documents, and any documentation related to the New Preferred Equity or the Restructuring Transactions; (f) any actions necessary to effectuate the Rights Offerings, and (g) all other actions that the Requisite Parties determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

### 2.    General Settlement of Claims and Interests

Unless otherwise set forth in the Plan, pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved by the Plan.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of Claims and Interests and is fair, equitable, and within the range of reasonableness.  Subject to Article VI of the Plan, all distributions made to holders of Allowed Claims and Allowed Interests in any Class are intended to be and shall be final.

3.      **New Preferred Equity, New Common Stock, and New Warrants**

All existing Interests in 21CH shall be canceled as of the Effective Date and Reorganized 21CH shall issue (a) the New Preferred Equity to (i) Rights Offering Participants who participate in the New Preferred Equity Rights Offering and (ii) the Backstop Parties pursuant to the Backstop Purchase Agreement, (b) the New Common Stock to holders of Allowed Claims entitled to receive New Common Stock pursuant to the Plan, and (c) subject to satisfaction of the conditions set forth in Section 3.2(k)(2) of the Plan, the New Warrants to holders of Allowed Interests in 21CH entitled to receive New Warrants pursuant to the Plan, which issuances and distributions described in clauses (a), (b) and (c) of this sentence shall be authorized by the New Organizational Documents.  The issuance of New Preferred Equity, New Common Stock and New Warrants, including any options for the purchase thereof and equity awards associated therewith (if applicable), shall be authorized without the need for any further corporate action and without any further action by the Debtors, Reorganized 21CH or any of the other Reorganized Debtors, as applicable.  All New Preferred Equity and New Common Stock issued under the Plan (including New Preferred Equity issued to Rights Offering Participants in the New Preferred Equity Rights Offering and New Preferred Equity issued to the Backstop Parties pursuant to the Backstop Purchase Agreement) shall be deemed duly authorized, validly issued, fully paid, and non-assessable and not to have been issued in violation of any preemptive rights, rights of first refusal or similar rights or any applicable law.  All shares of New Common Stock or other Securities to be received upon (x) conversion of any shares of New Preferred Equity or (y) exercise of any Warrants (if applicable) shall be deemed to have been duly authorized, validly issued, fully paid, and nonassessable, and not to have been issued in violation of any preemptive rights, rights of first refusal or similar rights or any applicable law.  It shall be an express condition to the right of a holder of an Allowed Claim or any other Person to receive New Common Stock and/or New Preferred Equity in connection with the Restructuring Transactions that such holder or other Person execute and deliver to Reorganized 21CH a counterpart of the New Stockholders Agreement.  Notwithstanding anything herein to the contrary, each holder of New Preferred Equity and/or New Common Stock (whether such holder received shares of New Common Stock and/or New Preferred Equity on the Effective Date or after the Effective Date (including receipt of shares of New Common Stock upon conversion of shares of New Preferred Equity, upon exercise of New Warrants (if applicable), or otherwise)) shall be deemed to have accepted the terms of the New Stockholders Agreement (solely in their capacity as shareholders of Reorganized 21CH) and to be parties thereto without further action or signature.  The New Stockholders Agreement shall be effective as of the Effective Date and, as of such date, shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each holder of New Preferred Equity and/or New Common Stock shall be bound thereby (including any obligation set forth therein to waive or refrain from exercising any appraisal, dissenters' or similar rights) even if such holder has not actually executed and delivered a counterpart thereof.

4.      **New First Lien Term Loan Credit Facility**

On the Effective Date, the Reorganized 21C Debtors shall incur obligations under the New First Lien Term Loan Credit Facility, the terms of which will be set forth in the New First Lien Term Loan Documents.  Confirmation of the Plan shall be deemed approval of the New First Lien Term Loan Credit Facility and the New First Lien Term Loan Documents, and all transactions contemplated thereby, including, without limitation, the incurrence by Reorganized Debtor 21C of the loans, indebtedness, liabilities and other obligations under the New First Lien Term Loan Credit Facility and the guarantee thereof by the other Reorganized 21C Debtors, any supplemental or additional syndication of the New First Lien Term Loan Credit Facility, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized 21C Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and authorization of the Reorganized 21C Debtors to enter into and execute the New First Lien Term Loan Documents and such other documents as may be required to effectuate the treatment afforded by the New First Lien Term Loan Credit Facility.  On the

Effective Date, all of the Liens and security interests to be granted in accordance with the New First Lien Term Loan Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the New Domestic Collateral granted thereunder in accordance with the terms of the New First Lien Term Loan Documents, (c) shall be deemed automatically, without any further action being required by the Debtors, the Reorganized Debtors, the New First Lien Term Loan Agent, or any of the New First Lien Term Loan Lenders, perfected on the Effective Date and subject to the New Intercreditor Agreement, and (d) shall not be subject to avoidance, recharacterization, or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.    The Reorganized 21C Debtors and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all approvals and consents by Governmental Units necessary to establish and perfect such Liens and security interests under the provisions of applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and the occurrence of the Effective Date and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

### 5.        New MDL Term Loan Facility

On the Effective Date, the Reorganized 21C Debtors shall incur obligations under the New MDL Term Loan Facility, the terms of which will be set forth in the New MDL Term Loan Documents. Confirmation of the Plan shall be deemed approval of the New MDL Term Loan Facility and the New MDL Term Loan Documents, and all transactions contemplated thereby, including, without limitation, the incurrence by Reorganized Debtor 21C of the loans, indebtedness, liabilities and other obligations under the New MDL Term Loan Facility and the guarantee thereof by the other Reorganized 21C Debtors, any supplemental or additional syndication of the New MDL Term Loan Facility, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized 21C Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and authorization of the Reorganized 21C Debtors to enter into and execute the New MDL Term Loan Documents and such other documents as may be required to effectuate the treatment afforded by the New MDL Term Loan Facility.  On the Effective Date, all of the Liens and security interests to be granted in accordance with the New MDL Term Loan Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the New Domestic Collateral granted thereunder in accordance with the terms of the New MDL Term Loan Documents, (c) shall be deemed automatically, without any further action being required by the Debtors, the Reorganized Debtors, the New MDL Term Loan Agent, or any of the New MDL Term Loan Lenders, perfected on the Effective Date and subject to the New Intercreditor Agreement, and (d) shall not be subject to avoidance, recharacterization, or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized 21C Debtors and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all approvals and consents by Governmental Units necessary to establish and perfect such Liens and security interests under the provisions of applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and the occurrence of the Effective Date and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

6.        **New Revolving Credit Facilities**

As set forth in the "Debt and Equity Securities and Obligations to be Issued or Incurred Under the Plan" section of the Restructuring Term Sheet, the Exit Facility Documents will permit (but shall not require) incurrence, after the Effective Date, of indebtedness and other obligations under the New Revolving Credit Facilities, subject to such terms and conditions relating thereto as are set forth in the applicable Exit Facility Documents.

7.        **New Second Lien Notes**

On the Effective Date, Reorganized Debtor 21C shall issue, and the other Reorganized 21C Debtors shall guarantee, the New Second Lien Notes, the terms of which will be set forth in the New Second Lien Notes Documents.  Confirmation of the Plan shall be deemed approval of the New Second Lien Notes and the New Second Lien Notes Documents, and all transactions contemplated thereby, including, without limitation, all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized 21C Debtors in connection therewith, including the incurrence by Reorganized Debtor 21C of the indebtedness, liabilities and other obligations under the New Second Lien Notes and the other New Second Lien Notes Documents  and the guarantee thereof by the other Reorganized 21C Debtors, and the payment of all fees, indemnities, and expenses provided for therein, and authorization of the Reorganized 21C Debtors to enter into and execute the New Second Lien Notes Documents and such other documents as may be required to effectuate the treatment afforded by the New Second Lien Notes.  On the Effective Date, all of the Liens and security interests to be granted in accordance with the New Second Lien Notes Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the New Domestic Collateral granted thereunder in accordance with the terms of the New Second Lien Notes Documents, (c) shall be deemed automatically, without any further action being required by the Debtors, the Reorganized Debtors, the New Second Lien Notes Trustee, or any of the holders of the New Second Lien Notes, perfected on the Effective Date and subject to the New Intercreditor Agreement, and (d) shall not be subject to avoidance, recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized 21C Debtors and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all approvals and consents by Governmental Units necessary to establish and perfect such Liens and security interests under the provisions of applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and the occurrence of the Effective Date and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.  All New Second Lien Notes (and the guarantees thereof) issued on the Effective Date shall be deemed to have been duly authorized, validly issued, fully paid and nonassessable, and not to have been issued in violation of any preemptive rights, rights of first refusal or similar rights or any applicable law.

8.        **Rights Offerings**

The Rights Offerings shall be conducted by the Debtors and consummated on the terms and subject to the conditions set forth in the Rights Offering Procedures, the Backstop Purchase Agreement, and the Backstop Order.  To facilitate the Rights Offerings and the other Restructuring Transactions, the Backstop Parties have agreed to purchase the Unsubscribed Securities offered for sale in the Rights Offerings, subject to the terms and conditions set forth in the Backstop Purchase Agreement.  The Backstop Parties' obligation to purchase the Unsubscribed Securities pursuant to the Backstop Purchase

Agreement shall be contingent upon (a) the entry of the Backstop Order, which approved the payment of certain expenses and other amounts thereunder (including the Equity Put Option Shares, the Notes Put Option Shares, the Liquidated Damages Payment and the Backstop Expenses), and (b) all conditions precedent to closing set forth in the Backstop Purchase Agreement being satisfied or otherwise waived by the Requisite Backstop Parties in accordance with the Backstop Purchase Agreement. Confirmation shall constitute Bankruptcy Court approval of the Rights Offerings (including the transactions contemplated thereby, and all actions to be undertaken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith). Upon the Effective Date, the rights and obligations of the Debtors under the Backstop Purchase Agreement shall vest in the Reorganized Debtors, as applicable.

A Rights Offering Participant shall not be permitted to participate in the Rights Offerings unless such Rights Offering Participant satisfies all of the Rights Offering Conditions. If (i) a Rights Offering Participant shall not be permitted to participate in the Rights Offerings because such Rights Offering Participant failed to satisfy all of the Rights Offering Conditions and (ii) such Rights Offering Participant shall have delivered to the subscription agent for the Rights Offerings the aggregate cash exercise price (or any portion thereof) with respect to the exercise of any of the New Notes Rights and New Preferred Equity Rights received by such Rights Offering Participant, then such aggregate cash exercise price (or portion thereof) shall be refunded to such Rights Offering Participant, without interest, as soon as reasonably practicable (but in no event later than ten (10) Business Days) after the Effective Date (without offset, set-off, counterclaim or reduction of any kind by such subscription agent or any of the Debtors).

If (a) a Rights Offering Participant's Eligible General Unsecured Claim as of the Rights Offering Record Date (or any portion thereof) is not an Allowed (as defined in Section 4.8(c) of the Plan) General Unsecured Claim on the date that is one (1) Business Day after the Confirmation Hearing, or (b) a Rights Offering Participant that holds an Eligible General Unsecured Claim as of the Rights Offering Record Date either (x) makes the Convenience Claim Election with respect to such Eligible General Unsecured Claim on a properly cast ballot under the Plan (if such Eligible General Unsecured Claim is greater than $1,000,000) or (y) fails to make the New Common Stock Election with respect to such Eligible General Unsecured Claim on a properly cast ballot under the Plan (if such Eligible General Unsecured Claim is less than or equal to $1,000,000) (each of the events described in clauses (a) and (b) of this sentence being referred to in the Plan as a "Rights Forfeiture Event"), then (in any such case): (i) such Rights Offering Participant's New Notes Rights and New Preferred Equity Rights that were issued to such Rights Offering Participant on account of such Eligible General Unsecured Claim (or such portion thereof) shall be deemed immediately and automatically terminated as of the date of the occurrence of such Rights Forfeiture Event (even if such New Notes Rights and New Preferred Equity Rights were exercised prior to such date), without a need for any further action on the part of (or notice provided to) any Person, except as otherwise provided in Section 4.8 of the Plan, (ii) such Rights Offering Participant shall not be permitted to participate in the Rights Offerings with respect to such New Notes Rights and New Preferred Equity Rights, and (iii) any exercise of such New Notes Rights and New Preferred Equity Rights by (or on behalf of) such Rights Offering Participant prior to the date of the occurrence of such Rights Forfeiture Event shall be deemed void, irrevocably rescinded and of no further force or effect, and the New Second Lien Notes and New Preferred Equity that could have been subscribed for and purchased pursuant to a valid exercise of such New Notes Rights and New Preferred Equity Rights shall be deemed not to have been subscribed for and purchased in the Rights Offerings.

If (a) a Rights Offering Participant exercised its New Notes Rights and New Preferred Equity Rights (each, on account of its Eligible General Unsecured Claim as of the Rights Offering Record Date (or any portion thereof)) on or before the Rights Offering Termination Time in accordance with the Rights Offering Procedures, and (b) a Rights Forfeiture Event shall occur with respect to such Eligible General Unsecured Claim (or such portion thereof), then such Rights Offering Participant shall be entitled

to receive from the Debtors a notice of such Rights Forfeiture Event as soon as reasonably practicable following the occurrence thereof; *provided*, *however*, that the failure of the Debtors to deliver any such notice shall not affect the occurrence of the Rights Forfeiture Event or the effects thereof on the Rights Offering Participant's New Notes Rights and New Preferred Equity Rights (or the exercise thereof) or the ability of such Rights Offering Participant to participate in the Rights Offerings, all as set forth in the immediately preceding paragraph.  Further, if (i) a Rights Forfeiture Event shall occur with respect to a Rights Offering Participant's Eligible General Unsecured Claim as of the Rights Offering Record Date (or any portion thereof), and (ii) such Rights Offering Participant shall have delivered to the subscription agent for the Rights Offerings the aggregate cash exercise price (or any portion thereof) with respect to the exercise of any of the New Notes Rights and New Preferred Equity Rights received by such Rights Offering Participant on account of such Eligible General Unsecured Claim (or such portion thereof), then such aggregate cash exercise price (or such portion thereof) shall be refunded to such Rights Offering Participant, without interest, as soon as reasonably practicable (but in no event later than ten (10) Business Days) after the Effective Date (without offset, set-off, counterclaim or reduction of any kind by such subscription agent or any of the Debtors).

If the Persons in any Backstop Group (as defined in the Backstop Purchase Agreement) purchase (i) New Second Lien Notes in the New Notes Rights Offering in an aggregate original principal amount that is less than the product of (A) the Rights Offering Percentage (as defined in the Backstop Purchase Agreement) of such Backstop Group and (B) the New Notes Rights Offering Amount, or (ii) New Preferred Equity in the New Preferred Equity Rights Offering with an aggregate initial liquidation value that is less than the product of (A) the Rights Offering Percentage of such Backstop Group and (B) the New Preferred Equity Rights Offering Amount, then, in either case, the Backstop Parties in such Backstop Group shall be required to purchase Unsubscribed Notes or Unsubscribed Equity, as applicable, in an amount equal to such deficiency and such obligation shall constitute the Backstop Commitments of such Backstop Parties (it being understood that such obligation to purchase such Unsubscribed Securities shall be satisfied prior to determining the Backstop Commitments of all other Backstop Parties).

### (a)    New Notes Rights Offering

The Debtors shall distribute the New Notes Rights to the Rights Offerings Participants on behalf of the Reorganized Debtors as set forth in the Plan and the New Notes Rights Offering Procedures. Pursuant to the New Notes Rights Offering Procedures, the New Notes Rights Offering shall be open to all Rights Offerings Participants.  Each Rights Offering Participant shall be offered the New Notes Rights to purchase its pro rata share of the New Notes Rights Offering Amount.  Each Rights Offering Participant shall purchase New Second Lien Notes by, at the election of such Rights Offering Participant: (a) exchanging all or a portion of the Allowed (as defined in Section 1.1.11 of the Plan) First Lien Claims that such Rights Offering Participant owns and/or (b) paying Cash in an aggregate amount (taking together clauses (a) and (b) above) equal to the aggregate original principal amount of the New Second Lien Notes to be acquired by such Rights Offering Participant.

Any Unsubscribed Notes shall be put to and purchased by the Backstop Parties in accordance with the terms and conditions of the Backstop Purchase Agreement and the Backstop Order; *provided*, *however*, that no Backstop Party shall be required to purchase Unsubscribed Notes pursuant to such Backstop Party's Backstop Commitment in an aggregate original principal amount that exceeds (x) the dollar amount set forth opposite the name of such Backstop Party under the heading "Backstop Notes Commitment Amount" on Schedule 1 to the Backstop Purchase Agreement (as it may be amended, supplemented or otherwise modified from time to time in accordance with the terms of the Backstop Purchase Agreement), minus (y) the aggregate original principal amount of all New Second Lien Notes that such Backstop Party subscribes for in the New Notes Rights Offering (such amount, the "Backstop Notes Commitment Amount").  There will be no over-subscription privilege in the New Notes Rights

Offering, such that any Unsubscribed Notes will not be offered to other Rights Offering Participants, but rather will be purchased by the Backstop Parties (subject to their respective Backstop Notes Commitment Amounts) in accordance with the terms and conditions of the Backstop Purchase Agreement and the Backstop Order.

On the Effective Date, Reorganized Debtor 21C shall offer to prepay, at 100% of the principal amount thereof (plus all accrued and unpaid interest thereon to the date of prepayment), the obligations under the New First Lien Term Loan Credit Facility held by the Backstop Parties or any of their respective Affiliates in an aggregate principal amount equal to the lesser of (i) the New Notes Rights Offering Cash Amount and (ii) the aggregate principal amount of the obligations under the New First Lien Term Loan Credit Facility held by the Backstop Parties and their respective Affiliates. Such prepayment (the "Backstop Prepayment") shall be made to the Backstop Parties and their respective Affiliates that accept the offer on a pro rata basis (based on their respective shares of the aggregate principal amount of Note Claims that were held by such Backstop Parties and their respective Affiliates as of the Effective Date (prior to the consummation of the Restructuring Transactions)); *provided, however,* if any portion of the Backstop Prepayment is not accepted by any such Backstop Party or any of its Affiliates, then such portion shall be continually re-offered to the other Backstop Parties and their respective Affiliates that accepted their respective full pro rata shares of the Backstop Prepayment and continue to hold obligations under the New First Lien Term Loan Credit Facility (in accordance with the respective pro rata shares of such Backstop Parties and such Affiliates) until the full amount of the Backstop Prepayment has been accepted by such Backstop Parties and/or such Affiliates or any portion of the Backstop Prepayment is not accepted by such Backstop Parties and their respective Affiliates. If the New Notes Rights Offering Cash Amount exceeds the Backstop Prepayment that is actually paid to Backstop Parties and their respective Affiliates, then Reorganized Debtor 21C shall offer to prepay, at 100% of the principal amount thereof (plus all accrued and unpaid interest thereon to the date of prepayment), obligations under the New First Lien Term Loan Credit Facility held by all holders of such obligations (including, for the avoidance of doubt, obligations under the New First Lien Term Loan Credit Facility held by the Backstop Parties or any of their respective Affiliates) in an aggregate principal amount equal to the amount of such excess, such offer to be made on a pro rata basis to such holders (based on their respective shares of the aggregate principal amount of obligations under the New First Lien Term Loan Credit Facility held by all holders of such obligations) (such prepayment, the "Global Prepayment"). If the New Notes Rights Offering Cash Amount exceeds the sum of (x) the Backstop Prepayment that is actually paid to the Backstop Parties and their respective Affiliates and (y) the Global Prepayment that is actually paid to holders of obligations under the New First Lien Term Loan Credit Facility, then the amount of such excess shall be used by Reorganized Debtor 21C to permanently repay obligations under the New MDL Term Loan Facility in an aggregate amount equal to such excess.

<div align="center">

**(b)    New Preferred Equity Rights Offering**

</div>

The Debtors shall distribute the New Preferred Equity Rights to the Rights Offerings Participants on behalf of the Reorganized Debtors as set forth in the Plan and the New Preferred Equity Rights Offering Procedures. Pursuant to the New Preferred Equity Rights Offering Procedures, the New Preferred Equity Rights Offering shall be open to all Rights Offerings Participants. Each Rights Offering Participant shall be offered the New Preferred Equity Rights to purchase its pro rata share of the New Preferred Equity Rights Offering Amount.

Each Rights Offering Participant electing to exercise its New Preferred Equity Rights shall purchase New Preferred Equity by paying Cash in an aggregate amount equal to eighty-five percent (85%) of the aggregate initial liquidation value of New Preferred Equity to be acquired by such Rights Offering Participant in the New Preferred Equity Rights Offering. For the avoidance of doubt, the total amount of Cash that will be paid for all of the New Preferred Equity offered in the New Preferred Equity

Rights Offering (whether purchased in the New Preferred Equity Rights Offering or pursuant to the Backstop Purchase Agreement) shall be $75.0 million.

Any Unsubscribed Equity shall be put to and purchased by the Backstop Parties in accordance with the terms and conditions of the Backstop Purchase Agreement and the Backstop Order; *provided, however*, that no Backstop Party shall be required to purchase Unsubscribed Equity pursuant to such Backstop Party's Backstop Commitment with an aggregate initial liquidation value that exceeds (i) the dollar amount set forth opposite the name of such Backstop Party under the heading "Backstop Equity Commitment Amount" on Schedule 1 to the Backstop Purchase Agreement (as it may be amended, supplemented or otherwise modified from time to time in accordance with the terms of the Backstop Purchase Agreement), minus (ii) the aggregate initial liquidation value of all New Preferred Equity that such Backstop Party subscribes for in the New Preferred Equity Rights Offering (such amount, the "Backstop Equity Commitment Amount").   There will be no over-subscription privilege in the New Preferred Equity Rights Offering, such that any Unsubscribed Equity will not be offered to other Rights Offering Participants, but rather will be purchased by the Backstop Parties (subject to their respective Backstop Equity Commitment Amounts) in accordance with the terms and conditions of the Backstop Purchase Agreement and the Backstop Order.

The New Preferred Equity Rights Offering Cash Amount shall be used: (x) first, to satisfy any unpaid DIP Claims outstanding on the Effective Date; (y) second, to satisfy out-of-pocket costs and expenses incurred by the Debtors in connection with the Restructuring Transactions and (z) third, for working capital and other general corporate purposes of the Reorganized Debtors following the Effective Date.

### (c)    Certain Rights Offering Definitions

Solely for purposes of Section 4.8 of the Plan (except as otherwise indicated) and as used in the definition of "Eligible General Unsecured Claim" in Section 1.1.77 of the Plan, (i) "Allowed" means, with respect to any Claim (or any portion thereof), as of any date of determination, (A) a Claim that is evidenced by a Proof of Claim Filed by the applicable Bar Date in accordance with the Bar Date Order; (B) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely filed; or (C) a Claim that is allowed pursuant to the Plan or a Final Order of the Bankruptcy Court as of such date; provided, that with respect to a Claim described in clauses (A) and (B) above (except any Claim allowed pursuant to the DIP Orders), such Claim shall be considered "Allowed" as of such date of determination only to the extent that, with respect to such Claim, no objection to allowance or priority or a request for estimation thereof has been interposed on or prior to such date, or such an objection is so interposed and the Claim has been allowed by a Final Order of the Bankruptcy Court as of such date; and (ii) "Disputed" means, with respect to any Claim (or any portion thereof), as of any date of determination, a Claim that is neither Allowed nor disallowed as of such date.

### 9.    Put Option Shares

As consideration for the Debtors' right to call the Backstop Parties' Backstop Commitments, on the Effective Date, the Equity Put Option Shares and the Notes Put Option Shares shall be distributed to the Non-Defaulting Backstop Parties under and as set forth in the Backstop Purchase Agreement.

### 10.    Exemption from Registration Requirements

The offering, issuance, sale and distribution of (a) all shares of New Common Stock, shares of New Preferred Equity, the New Second Lien Notes, and the New Warrants (if any) under the Plan (including New Preferred Equity issued to Rights Offering Participants in the New Preferred Equity

Rights Offering and New Preferred Equity issued to the Backstop Parties pursuant to the Backstop Purchase Agreement), (b) all shares of New Common Stock or other securities issued upon conversion of any shares of New Preferred Equity, and (c) all shares of New Common Stock or other securities issued upon exercise of the New Warrants (if applicable), in each such case) will be exempt from, among other things, the registration and prospectus delivery requirements under the Securities Act or any similar federal, state, or local laws in reliance upon section 1145 of the Bankruptcy Code to the maximum extent permitted and applicable and, to the extent that reliance on such section is either not permitted or not applicable, the exemption set forth in section 4(a)(2) of the Securities Act. All shares of New Common Stock, the New Preferred Equity, the New Second Lien Notes, and the New Warrants (if any) issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom.

Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the New Common Stock, the New Preferred Equity, the New Warrants (if any), or the New Second Lien Notes through the facilities of DTC, the Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of such securities under applicable securities laws.

DTC shall be required to accept and conclusively rely upon the Plan or Confirmation Order in lieu of a legal opinion regarding whether such securities are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

## 11.    Subordination

The allowance, classification, and treatment of all Claims and Interests under the Plan conform to and are consistent with the respective contractual, legal, and equitable subordination rights of such Claims and Interests, and the Plan recognizes and implements any such rights. Pursuant to section 510 of the Bankruptcy Code, except where otherwise provided herein, the rights of the Debtors or the Reorganized Debtors, as applicable, are hereby reserved to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination rights relating thereto upon entry of a Final Order ruling that such Allowed Claim or Allowed Interest (or portion thereof) is subordinated. On the Effective Date, any and all subordination rights or obligations that a holder of a Claim or Interest may have with respect to any distribution to be made under the Plan will be discharged and terminated, and all actions related to the enforcement of such subordination rights will be enjoined permanently. Accordingly, distributions under the Plan to holders of Allowed Claims and Allowed Interests will not be subject to turnover or payment to a beneficiary of such terminated subordination rights, or to levy, garnishment, attachment or other legal process by a beneficiary of such terminated subordination rights.

## 12.    Vesting of Assets in the Reorganized Debtors

Except as otherwise provided herein, or in any agreement, instrument, or other document incorporated in the Plan (including, without limitation, the New First Lien Term Loan Documents, New MDL Term Loan Documents, and New Second Lien Notes Documents, as applicable), on the Effective Date, all property in each Debtor's Estate, all Causes of Action and any property acquired by any of the Debtors under the Plan shall vest in each respective Reorganized Debtor (excluding any Executory Contracts and Unexpired Leases included on the Schedule of Rejected Executory Contracts and Unexpired Leases), free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided herein, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and pursue, compromise or settle any Claims, Interests, or

Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than any restrictions expressly imposed by the Plan, the Plan Supplement, or the Confirmation Order.  Notwithstanding anything to the contrary in the Plan, the Unimpaired Claims against a Debtor shall remain the obligations solely of such Debtor or such Reorganized Debtor and shall not become obligations of any other Debtor or Reorganized Debtor by virtue of the Plan, the Chapter 11 Cases, or otherwise.

## 13.    Cancellation of Notes, Instruments, Certificates, and Other Documents

On the Effective Date, except as otherwise provided in the Plan or any agreement, instrument or other document incorporated in the Plan or the Plan Supplement:  (a) the obligations of the Debtors under (i) the DIP Credit Agreement and the other DIP Documents, (ii) the First Lien Credit Agreement and any other "Loan Document" as defined therein, (iii) the MDL Facility Credit Agreement and any other "Credit Document" as defined therein, (iv) the Indenture and any other "Note Document" as defined therein, and (v) any Interest in any of the Debtors (other than Intercompany Interests) (including the Series A Preferred Stock), or any certificate, share, note, bond, indenture, purchase right, option, warrant, call, put, award, commitment, registration rights, preemptive right, right of first refusal, right of first offer, co-sale right, investor rights, or other instrument or document of any character directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest shall be automatically extinguished, canceled and of no further force or effect, and the Debtors and the Reorganized Debtors shall not have any continuing obligations thereunder; and (b) the obligations of the Debtors pursuant, relating, or pertaining to any instrument or document described in clause (a) above evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors shall be automatically released and discharged, and the holders of, parties to or beneficiaries of any such instrument or document shall have no rights arising from or relating to such instrument or document or the extinguishment or cancellation thereof; *provided*, that notwithstanding Confirmation or the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the holder of an Allowed Claim or an Allowed Interest shall continue in effect solely for purposes of (i) enabling such holder to receive distributions under the Plan on account of such Allowed Claim or Allowed Interest as provided herein, (ii) allowing the DIP Agent or applicable Prepetition Agent to make distributions on account of the DIP Claims, MDL Claims, First Lien Claims, or Note Claims, as applicable, (iii) preserving the DIP Agents' or Prepetition Agents' (as applicable) rights to compensation and indemnification under the DIP Credit Agreement, the MDL Credit Facility Agreement, the First Lien Credit Agreement, or the Indenture, as applicable, as against any money or property distributable to the holders of DIP Claims, First Lien Claims, MDL Claims or Note Claims, including, permitting the Indenture Trustee to maintain, enforce and exercise its Indenture Trustee Charging Lien against distributions on the Note Claims and as otherwise provided under the Indenture, (iv) permitting the DIP Agent and the Prepetition Agents to enforce any obligation owed to it under the Plan, (v) preserving all rights, including rights of enforcement, of the Indenture Trustee against any Person other than a Released Party (including the Debtors and Reorganized Debtors), and (vi) permitting the DIP Agent and Prepetition Agents to appear in the Chapter 11 Cases or in any related proceeding in the Bankruptcy Court or any other court; *provided, further*, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any expense or liability to the Reorganized Debtors, except to the extent set forth in or provided for under the Plan or the Final DIP Order; *provided, further*, that nothing in this section shall effect a cancellation of any New Common Stock, New Preferred Equity, New Warrants (if any) or New Second Lien Notes, or, solely to the extent reinstated or compromised by the Debtors, with the consent of the Requisite Backstop Parties, any Intercompany Interests or Intercompany Claims. Each of the DIP Agent and Prepetition Agents shall be discharged and shall have no further obligation or liability except as provided in the Plan and Confirmation Order, and after the performance by DIP Agent or such Prepetition Agents and their respective representatives and professionals of any of their respective obligations and duties required

under or related to the Plan or Confirmation Order, the DIP Agent or such Prepetition Agents shall be relieved of and released from any obligations and duties arising thereunder.  On the Effective Date, except as set forth in the Plan, any Lien securing any Claim shall be deemed released, and the holder of such Claim shall be authorized and directed to release any collateral or other property of any Debtor held by such holder and to take such actions as may be requested by the Debtors (or the Reorganized Debtors, as the case may be) to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases as may be requested by the Debtors (or the Reorganized Debtors, as the case may be).

If the record holder of the Notes is DTC or its nominee or another securities depository or custodian thereof, and such Notes are represented by a global Security held by or on behalf of the DTC or such other securities depository or custodian, then each such holder of the Notes shall be deemed to have surrendered its Note or other evidence of indebtedness upon surrender of such global Security by DTC or such other securities depository or custodian thereof.

## 14.    Corporate Action

On the Effective Date, or as soon thereafter as is reasonably practicable, all actions as may be necessary or appropriate to effect any transactions described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable: (a) the adoption, execution, delivery and/or filing of the New Organizational Documents (including the New Stockholders Agreement and the Registration Rights Agreement), (b) the selection of the directors, managers, and officers for the Reorganized Debtors, including the appointment of the New Board; (c) the authorization, issuance, delivery and distribution of New Common Stock, New Preferred Equity, and the New Warrants; (d) the authorization, issuance, delivery and distribution of shares of New Common Stock upon conversion of shares of New Preferred Equity and upon exercise of the New Warrants, and the reservation of a sufficient number of shares of New Common Stock for issuance, delivery and distribution upon any such conversion or exercise; (e) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (f) the entry into or issuance of (as applicable) the New First Lien Term Loan Credit Facility, New MDL Term Loan Facility, and New Second Lien Notes and the execution, delivery, and filing of the New First Lien Term Loan Documents, New MDL Term Loan Documents, and New Second Lien Notes Documents, as applicable, and the granting of the Liens and security interests in the collateral under the New First Lien Term Loan Documents, the New MDL Term Loan Documents and the New Second Lien Notes Documents, as applicable; (g) the adoption of the Management Incentive Plan; (h) the Rights Offerings; and (i) all other actions that may be required by applicable law.  Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of Reorganized 21CH and the other Reorganized Debtors, and any corporate action required by the Debtors, Reorganized 21CH, or the other Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors, Reorganized 21CH, or the other Reorganized Debtors.  On or before the Effective Date (as applicable), the appropriate officers of the Debtors, Reorganized 21CH, or the other Reorganized Debtors shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effectuate the Restructuring Transactions) in the name of and on behalf of Reorganized 21CH and the other Reorganized Debtors, including with respect to the New First Lien Term Loan Credit Facility, New MDL Term Loan Facility, New Second Lien Notes, and any and all other agreements, documents, Securities, and instruments relating to the foregoing, to the extent not previously authorized by the Bankruptcy Court.  The authorizations and approvals contemplated by Section 4.14 of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

### 15.      Corporate Existence

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Reorganized Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of Entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of Entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended or amended and restated by the Plan (including pursuant to the provisions of Section 4.13 of the Plan), the New Organizational Documents, or otherwise (in each case, consistent in all material respects with the terms and conditions set forth in the Governance Term Sheet and otherwise in form and substance reasonably acceptable to the Requisite Parties), and to the extent such documents are amended or amended and restated, such documents are deemed to be amended or amended and restated pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).  Nothing in Section 4.15 of the Plan shall alter, change or otherwise modify the treatment of the Class 9, 10, 11 and 12 Interests pursuant to Article III of the Plan.

### 16.      Charter, Bylaws, and New Organizational Documents

On the Effective Date, or as soon thereafter as is reasonably practicable, the Debtors' respective certificates of incorporation and bylaws (and other formation and constituent documents relating to limited liability companies) shall be amended or amended and restated as may be required to be consistent with the provisions of the Plan, the New Organizational Documents, the Exit Facility Documents, and the New Warrant Documents, as applicable, and the Bankruptcy Code.  The New Organizational Documents shall, among other things:  (a) authorize the issuance of the New Common Stock, the New Preferred Equity and the New Warrants (if any); and (b) be modified or deemed to be modified to include a provision, pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, prohibiting the issuance of non-voting equity Securities.  After the Effective Date, each Reorganized Debtor may amend and restate its certificate of incorporation and other formation and constituent documents as permitted by the laws of its respective jurisdiction of formation and the terms of such documents.

### 17.      Effectuating Documents; Further Transactions

On and after the Effective Date, the Reorganized Debtors and the officers and members of the boards of directors and managers thereof shall be authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the New Organizational Documents, the Exit Facility Documents, the Warrant Documents, as applicable, and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan or the Confirmation Order.

### 18.      Section 1146(a) Exemption

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, Security, or other interest in the Debtors

or the Reorganized Debtors; (b) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (c) the making, assignment, or recording of any lease or sublease; (d) the grant of collateral as security for any or all of the New First Lien Term Loan Credit Facility, New MDL Term Loan Facility, or New Second Lien Notes, as applicable; or (e) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 19.    Directors and Officers

The members of the New Board shall be chosen in accordance with the terms of the Governance Term Sheet and shall be identified prior to the Confirmation Hearing in the Plan Supplement or at the Confirmation Hearing consistent with section 1129(a)(5) of the Bankruptcy Code.  On the Effective Date, except as otherwise provided in the Plan Supplement or announced on the record at the Confirmation Hearing, the existing officers of the Debtors shall serve in their current capacities for the Reorganized Debtors.  From and after the Effective Date, each director, officer, or manager of the Reorganized Debtors shall serve pursuant to the terms of the respective Reorganized Debtor's charters and bylaws or other formation and constituent documents, and applicable laws of the respective Reorganized Debtor's jurisdiction of formation.

### 20.    Employee Arrangements of the Reorganized Debtors

As of the Effective Date, the Reorganized Debtors, with the advance written consent of the Requisite Backstop Parties, which consent shall not be unreasonably withheld, shall be authorized to: (a) maintain, amend, or revise employment, indemnification, and other arrangements with their directors, officers, and employees, that were employed by, or serving on the board of directors of, any of the Debtors as of the Petition Date that have not been rejected before or as of the Effective Date, subject to the terms and conditions of any such agreement; and (b) enter into new employment, indemnification, and other arrangements with directors, officers, and employees; in the case of clause (b) herein, as determined by the board of directors of the applicable Reorganized Debtor.  Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

### 21.    Management Incentive Plan

Within one hundred fifty (150) days after the Effective Date, the New Board shall adopt the Management Incentive Plan that provides for the issuance of the Management Incentive Plan Equity to employees, consultants and directors of any of the Reorganized Debtors or any of their respective

Subsidiaries.  The New Board shall determine a percentage of the shares of New Common Stock that are issued and outstanding on the Effective Date after giving effect to the consummation of the Restructuring Transactions (including the distribution of all shares of New Common Stock in respect of the Note Claims and the Allowed General Unsecured Claims and any other distributions of shares of New Common Stock made pursuant to the Plan or in connection with the Restructuring Transactions) that shall be reserved for issuance under the Management Incentive Plan.  The form of the Management Incentive Plan Equity, the participants in the Management Incentive Plan, the allocations of the Management Incentive Plan Equity to such participants (including the amount of allocations and the timing of the grant of the Management Incentive Plan Equity), and the terms and conditions of the Management Incentive Plan (including vesting, exercise prices, base values, hurdles, forfeiture, repurchase rights and transferability) shall be determined by the New Board in its sole discretion.

## 22.     Preservation of Causes of Action

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, including pursuant to <u>Article VIII</u> of the Plan, the DIP Orders, or a Final Order of the Bankruptcy Court, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically identified in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided herein.**  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, including pursuant to <u>Article VIII</u> of the Plan, the DIP Orders, or a Final Order of the Bankruptcy Court, the Reorganized Debtors expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.  For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to <u>Section 4.22</u> of the Plan include any Claim or Cause of Action with respect to, or against, a Released Party.

In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action preserved pursuant to the first paragraph of <u>Section 4.22</u> of the Plan that a Debtor may hold against any Entity shall vest in the Reorganized Debtors.  The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

## 23.     Avoidance Actions

Notwithstanding anything to the contrary in the Plan, on the Effective Date, all Avoidance Actions shall be waived by the Debtors and Reorganized Debtors and their Estates, provided, however that Avoidance Actions against Excluded Directors and Officers shall not be waived.

24.    **Trustee Fees and Expenses**

On the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall pay in Cash, all Indenture Trustee Expenses without the need for the Indenture Trustee to file fee applications or any other applications or motions with the Bankruptcy Court, and from and after the Effective Date, the Reorganized Debtors shall pay in Cash all Indenture Trustee Expenses incurred in connection with facilitating distributions to holders of Note Claims.  Nothing in the Plan shall in any way affect or diminish the right of the Indenture Trustee to assert the Indenture Trustee Charging Lien against any distributions to holders of Note Claims with respect to any unpaid Indenture Trustee Expenses or other amounts payable to the Indenture Trustee under the Indenture.

E.    **Treatment of Executory Contracts and Unexpired Leases**

1.    **Assumption or Assumption and Assignment of Executory Contracts and Unexpired Leases**

On the Effective Date, except as otherwise provided herein, all Executory Contracts or Unexpired Leases will be deemed assumed and assigned to the Reorganized Debtors in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, regardless of whether such Executory Contract or Unexpired Lease is set forth on the Schedule of Assumed Executory Contracts and Unexpired Leases, other than:  (1) those that are identified specifically or by category on the Schedule of Rejected Executory Contracts and Unexpired Leases or any Amended Schedule of Rejected Executory Contracts and Unexpired Leases; (2) those that have been previously rejected by a Final Order; (3) those that previously expired or terminated pursuant to their terms; or (4) those that are the subject of a motion that is made with the prior written consent of the Requisite Backstop Parties to reject that is pending on the Effective Date or pursuant to which the requested effective date of rejection is after the Effective Date.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the assumptions, assumptions and assignments, or rejections, as applicable, of such Executory Contracts or Unexpired Leases pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Unless otherwise indicated, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.  Any motions to assume, assume and assign, or reject Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date.

Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement (a) the Schedule of Rejected Executory Contracts and Unexpired Leases (each, an "Amended Schedule of Rejected Executory Contracts and Unexpired Leases"), and/or (b) the Schedule of Assumed Executory Contracts and Unexpired Leases (each, an "Amended Schedule of Assumed Executory Contracts and Unexpired Leases"), in each case, at any time through and including the date that is sixty (60) days after the Effective Date, which Amended Schedule shall be Filed with the Bankruptcy Court; provided that to the extent any such Amended Schedule is Filed prior to the Effective Date, each such alteration, amendment, modification, or supplement reflected in such Amended Schedule shall require the written consent of the Requisite Backstop Parties prior to such Filing.

66

To the extent applicable, any Executory Contracts or Unexpired Leases, including related instruments and agreements, assumed during the Chapter 11 Cases shall be deemed modified such that the transactions contemplated by the Plan shall not constitute a "change of control" or "assignment" (or terms with similar effect) under, or any other transaction or matter that would result in a violation, breach or default under, or increase, accelerate or otherwise alter any obligations or liabilities of the Debtors or the Reorganized Debtors under, or result in the creation or imposition of a Lien upon any property or asset of the Debtors or the Reorganized Debtors pursuant to, the applicable Executory Contract or Unexpired Lease, and any consent or advance notice required under such Executory Contract or Unexpired Lease shall be deemed satisfied by Confirmation.

### 2.    Rejection of Executory Contracts or Unexpired Leases and Claims Based Thereon

Any objection by a counterparty to the proposed rejection of its Executory Contract or Unexpired Lease must be Filed, served and actually received by the Debtors on or before (a) in the case of an Executory Contract or Unexpired Lease that is identified on the Schedule of Rejected Executory Contracts and Unexpired Leases, November 27, 2017 at 4:00 p.m., prevailing Eastern Time; or (b) in the case of an Executory Contract or Unexpired Lease that is identified on any Amended Schedule of Rejected Executory Contracts and Unexpired Leases, 4:00 p.m., prevailing Eastern Time on the date that is seven (7) days following the Filing of such Amended Schedule.

Each Executory Contract and Unexpired Lease that is listed on the Schedule of Rejected Executory Contracts and Unexpired Leases or an Amended Schedule of Rejected Executory Contracts and Unexpired Leases shall be deemed rejected as of the Effective Date pursuant to section 365 of the Bankruptcy Code.  The Debtors or Reorganized Debtors, as applicable, with the consent of the Requisite Backstop Parties, may abandon any personal property that may be located at any premises that are subject to any rejected Unexpired Lease pursuant to section 554 of the Bankruptcy Code.

Proofs of Claim with respect to Claims against any Debtor arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Bankruptcy Court on or before the Rejection Damages Bar Date; provided that the Rejection Damages Bar Date for any such Executory Contract or Unexpired Lease identified on an Amended Schedule of Rejected Executory Contracts and Unexpired Leases shall be the date that is thirty (30) days following the filing of such Amended Schedule. **Any Claim arising from the rejection of an Executory Contract or Unexpired Lease that is not Filed by the Rejection Damages Bar Date will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity, and any such Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, settled, released, and discharged, and be subject to the permanent injunction set forth in Article VIII of the Plan, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.** Claims arising from the rejection of the Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Section 3.2(f) of the Plan.

### 3.    Cure of Defaults for Assumed or Assumed and Assigned Executory Contracts and Unexpired Leases

Any monetary defaults under an Executory Contract or Unexpired Lease to be assumed or assumed and assigned by the Debtors shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, solely by payment of the Cure amount, as reflected in the applicable Cure Notice, in Cash on the

Effective Date or as soon thereafter as reasonably practicable, subject to the limitations described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree, subject to the prior written consent of the Requisite Backstop Parties.  The proposed Cure amount for an Executory Contract or Unexpired Lease that is assumed or assumed and assigned pursuant to the Plan shall be zero dollars unless otherwise indicated in a Cure Notice.

At least fourteen (14) days before the Confirmation Hearing, the Debtors shall distribute, or cause to be distributed, Cure Notices to the applicable third parties; provided that solely to the extent a Cure amount is related to an Executory Contract or Unexpired Lease that is identified on an Amended Schedule of Assumed Executory Contracts and Unexpired Leases, the Debtors shall distribute, or cause to be distributed, such Cure Notice to the applicable third party on the date that such Amended Schedule is Filed.  **Any objection by a counterparty to an Executory Contract or Unexpired Lease to the proposed assumption, assumption and assignment or related Cure amount must be Filed, served and actually received by the Debtors on or before (a) in the case of an Executory Contract or Unexpired Lease that is identified on the Schedule of Assumed Executory Contracts and Unexpired Leases, November 27, 2017 at 4:00 p.m., prevailing Eastern Time; or (b) in the case of an Executory Contract or Unexpired Lease that is identified on any Amended Schedule of Assumed Executory Contracts and Unexpired Leases, 4:00 p.m. prevailing Eastern Time on the date that is seven (7) days following the Filing of such Amended Schedule.**  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption, assumption and assignment, or Cure amount related thereto (if any) will be deemed to have assented to such assumption, assumption and assignment, or Cure amount.  Notwithstanding anything herein to the contrary, in the event that any Executory Contract or Unexpired Lease is removed from the Schedule of Rejected Executory Contracts and Unexpired Leases after such 14-day deadline, a Cure Notice with respect to such Executory Contract or Unexpired Lease will be sent promptly to the counterparty thereof and a noticed hearing set to consider whether such Executory Contract or Unexpired Lease can be assumed or assumed and assigned.

In the event of a dispute between the Debtors and a counterparty to any Executory Contract or Unexpired Lease to be assumed or assumed and assigned regarding (1) the Cure amount related thereto, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, assumption and assignment or the Cure payments required by section 365(b)(1) of the Bankruptcy Code, such dispute shall be resolved by a Final Order of the Bankruptcy Court (which may be the Confirmation Order) or as may be agreed upon in writing by the Debtors or the Reorganized Debtors, as applicable (with the consent of the Requisite Backstop Parties, which consent shall not be unreasonably withheld), and the counterparty to the Executory Contract or Unexpired Lease.  Cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption or assumption and assignment, which Final Order or orders may, for the avoidance of doubt, be entered (and any related hearing may be held) after the Effective Date.  The Debtors or Reorganized Debtors, as applicable, reserve the right to reject any Executory Contract or Unexpired Lease in resolution of any Cure disputes.  If the Bankruptcy Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtors or Reorganized Debtors, as applicable, will have the right to add such Executory Contract or Unexpired Lease to the Schedule of Rejected Executory Contracts and Unexpired Leases (with the consent of the Requisite Backstop Parties, which consent shall not be unreasonably withheld), in which case such Executory Contract or Unexpired Lease will be deemed rejected as of the Effective Date.

Assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full and final release and satisfaction of any Cures, Claims or defaults against any Debtor, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy related defaults, arising under any such Executory Contract or Unexpired Lease at any time before the effective date of assumption or assumption and assignment.  Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

### 4.        Indemnification

On and as of the Effective Date, the Indemnification Provisions will be assumed and irrevocable and will survive the effectiveness of the Plan; *provided, however*, the assumption of the obligations under the Indemnification Provisions shall not be deemed an assumption by the Debtors of any contract, agreement, resolution, instrument or document in which such Indemnity Provisions are contained, memorialized, agreed to, embodied or created (or any of the terms or provisions thereof) if such contract, agreement, resolution, instrument or document requires the Debtors or the Reorganized Debtors to make any payments or provide any arrangements (including any severance payments) to any current or former director or officer of any of the Debtors other than indemnification payments, reimbursement and advancement of expenses and other similar payments.  Furthermore, the Indemnification Provisions related to the Excluded Directors and Officers shall not be assumed and/or continued.  For the avoidance of doubt, nothing in Section 5.4 of the Plan shall be a determination of the Allowance, Disallowance or priority of the Claims, if any, of any directors or officers of any of the Debtors that served in such capacity only prior to the Petition Date.

### 5.        Insurance Policies

Notwithstanding anything in the Plan to the contrary, all of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto are treated as and deemed to be Executory Contracts under the Plan.  On the Effective Date, pursuant to section 365(a) of the Bankruptcy Code, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments related thereto, including all D&O Liability Insurance Policies (including tail coverage liability insurance).  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of all such insurance policies, including the D&O Liability Insurance Policies.  Notwithstanding anything to the contrary contained in the Plan, Confirmation shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of insurance policies, including the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim need be Filed, and shall survive the Effective Date.

After the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce, modify or restrict in any way, the coverage under any D&O Liability Insurance Policy (including such tail coverage liability insurance) in effect as of the Effective Date, and all members, managers, directors, and officers of the Debtors who served in such capacity at any time prior to the Effective Date of the Plan shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date.

6.      **Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases**

Rejection or repudiation of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such contracts or leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Debtors and the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased, or services previously received, by the contracting Debtors from counterparties to rejected or repudiated Executory Contracts or Unexpired Leases.

7.      **Modifications, Amendments, Supplements, Restatements, or Other Agreements**

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed or assumed and assigned shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

8.      **Reservation of Rights**

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or the Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

9.      **Nonoccurrence of Effective Date**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Executory Contracts or Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

F.      **Provisions Governing Distributions**

1.      **Distributions on Account of Claims and Interests Allowed as of the Effective Date**

Except as otherwise provided in the Plan or by a Final Order, the Reorganized Debtors or the Distribution Agent shall make initial distributions under the Plan on account of Allowed Claims and Allowed Interests on the Distribution Date; *provided*, *however*, that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business shall be paid or

performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (2) Allowed Priority Tax Claims and Allowed Other Secured Claims shall be paid in accordance with Sections 2.4 and 3.2(a) of the Plan, respectively.

## 2.    Special Rules for Distributions to Holders of Disputed Claims and Interests

Notwithstanding any provision to the contrary herein and except as otherwise agreed by the relevant parties:  (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim or Disputed Interest until all such disputes in connection with such Disputed Claim or Disputed Interest have been resolved by settlement or Final Order; and (b) any Entity that holds both (i) an Allowed Claim or Allowed Interest and (ii) a Disputed Claim or Disputed Interest, shall not receive any distribution on the Allowed Claim or Allowed Interest unless and until all objections to the Disputed Claim or Disputed Interest have been resolved by settlement or Final Order or the Claims and Interests have been Allowed or expunged. Any dividends or other distributions arising from property distributed to holders of Allowed Claims or Allowed Interests in a Class and paid to such holders under the Plan shall also be paid, in the applicable amounts, to any holder of a Disputed Claim or Disputed Interest in such Class that becomes an Allowed Claim or Allowed Interest after the date or dates that such dividends or other distributions were earlier paid to holders of Allowed Claims or Allowed Interests in such Class.

## 3.    Delivery of Distributions

### (a)    Record Date for Distributions to Holders of Non-Publicly Traded Securities

On the Effective Date, the Claims Register shall be closed and the Distribution Agent shall be authorized and entitled to recognize only those record holders, if any, listed on the Claims Register as of the close of business on the Effective Date.  Notwithstanding the foregoing, if a Claim, other than one based on a publicly traded Certificate, is transferred and the Debtors have been notified in writing of such transfer less than 10 days before the Effective Date, the Distribution Agent shall make distributions to the transferee (rather than the transferor) only to the extent practical and in any event only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

### (b)    Distribution Process

The Distribution Agent shall make all distributions required under the Plan, except that distributions to holders of Allowed Claims governed by a separate agreement, which shall include the DIP Facility, the Indenture, the MDL Facility Credit Agreement, and the First Lien Credit Agreement, and administered by a Servicer, including the DIP Agent, the Indenture Trustee, the MDL Agent and the First Lien Agent, shall be deposited with the appropriate Servicer, at which time such distributions shall be deemed complete, and the Servicer shall deliver such distributions in accordance with the Plan and the terms of the applicable governing agreement, provided that distributions to holders of Note Claims shall be made at the direction of the Indenture Trustee and the Indenture Trustee may transfer or direct the transfer of such distribution directly through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) and will be entitled to recognize and deal for all purposes under the Plan with the holders of Note Claims to the extent consistent with the customary practices of DTC; provided, further, that distributions shall be subject in all respects to the right of the Indenture Trustee to assert its Indenture Trustee Charging Lien against such distributions. All distributions to be made to holders of Note Claims shall be eligible to be distributed through the facilities of DTC and as provided under the Indenture.  Except as otherwise provided herein, and notwithstanding any authority to the

71

contrary, distributions to holders of Allowed Claims, including Claims that become Allowed after the Effective Date, shall be made to holders of record as of the Effective Date by the Distribution Agent or a Servicer, as appropriate:  (1) to the address of such holder as set forth in the books and records of the applicable Debtor (or if the Debtors have been notified in writing, on or before the date that is 10 days before the Effective Date, of a change of address, to the changed address); (2) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, if no address exists in the Debtors' books and records, no Proof of Claim has been Filed and the Distribution Agent has not received a written notice of a change of address on or before the date that is 10 days before Effective Date; or (3) on any counsel that has appeared in the Chapter 11 Cases on the holder's behalf. The Debtors, the Reorganized Debtors, and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan.

### (c)    Accrual of Dividends and Other Rights

For purposes of determining the accrual of distributions or other rights after the Effective Date, each of the New Common Stock that will compromise the New Common Stock Equity Pool, and the shares of New Preferred Equity, shall be deemed distributed as of the Effective Date regardless of the date on which it is actually distributed; *provided, however*, the Reorganized Debtors shall not pay any such distributions or distribute such other rights, if any, until after distributions of the New Common Stock or New Preferred Equity, as applicable, actually take place.

### (d)    Compliance Matters

In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

### (e)    Foreign Currency Exchange Rate

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal, National Edition*, on the Effective Date.

### (f)    Fractional, Undeliverable, and Unclaimed Distributions

(i)    *Fractional Distributions.*  Whenever any distribution of fractional shares of New Common Stock would otherwise be required pursuant to the Plan, the actual distribution shall reflect a rounding of such fraction to the nearest share (up or down), with half shares or less being rounded down.  Whenever any payment of Cash of a fraction of a dollar pursuant to the Plan would otherwise be required, the actual payment shall reflect

a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

(ii)    *Undeliverable Distributions.*    If any distribution to a holder of an Allowed Claim or Allowed Interest is returned to the Distribution Agent as undeliverable, no further distributions shall be made to such holder unless and until the Distribution Agent is notified in writing of such holder's then-current address or other necessary information for delivery, at which time all currently due missed distributions shall be made to such holder on the next Distribution Date.  Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors or is canceled pursuant to Section 6.3(f)(3) of the Plan below, and shall not be supplemented with any interest, dividends, or other accruals of any kind.

(iii)    *Reversion.*    Any distribution under the Plan that is an Unclaimed Distribution for a period of six months after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revest in the applicable Reorganized Debtor and, to the extent such Unclaimed Distribution is New Common Stock, shall be deemed canceled.  Upon such revesting, the Claim or Interest of the holder or its successors with respect to such property shall be canceled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary.  Nothing contained in the Plan or at law shall require the Debtors, the Reorganized Debtors or any other Distribution Agent to attempt to locate any holder of an Allowed Claim or Allowed Interest.

### (g)  Surrender of Canceled Instruments or Securities

On the Effective Date, each holder of a Certificate shall be deemed to have surrendered such Certificate to the Distribution Agent or a Servicer (to the extent the relevant Claim is governed by an agreement and administered by a Servicer).  Such Certificate shall be canceled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such Certificate.  Notwithstanding the two immediately preceding sentences, Section 6.3(g) of the Plan shall not apply to any Claims and Interests reinstated pursuant to the terms of the Plan.

### 4.    Minimum Distributions

Holders of Allowed Claims entitled to distributions of $50 or less shall not receive distributions, and each Claim to which this limitation applies shall be discharged pursuant to Article VIII of the Plan and its holder shall be forever barred pursuant to Article VIII of the Plan from asserting that Claim against the Reorganized Debtors or their property.

### 5.        Claims and Interests Paid or Payable by Third Parties

#### (a)        Claims and Interests Paid by Third Parties

A Claim or Interest shall be reduced in full, and such Claim or Interest shall be Disallowed without an objection to such Claim or Interest having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim or Interest receives payment in full on account of such Claim or Interest from a party that is not a Debtor or Reorganized Debtor.  To the extent a holder of a Claim or Interest receives a distribution on account of such Claim or Interest and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim or Interest, such holder shall repay, return, or deliver any distribution held by or transferred to such holder to the applicable Reorganized Debtor to the extent such holder's total recovery on account of such Claim or Interest from the third party and under the Plan exceeds the amount of such Claim or Interest as of the date of any such distribution under the Plan.

#### (b)        Claims and Interests Payable by Insurance Carriers

No distributions under the Plan shall be made on account of an Allowed Claim or Allowed Interest that is payable pursuant to one of the Debtors' insurance policies until the holder of such Allowed Claim or Allowed Interest has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim or Interest, then immediately upon such insurers' agreement, such Claim or Interest may be expunged to the extent of any agreed upon satisfaction on the Claims Register by the Notice and Claims Agent without an objection to such Claim or Interest having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

#### (c)        Applicability of Insurance Policies

Except as otherwise provided herein, distributions to holders of Allowed Claims and/or Allowed Interests shall be in accordance with the provisions of any applicable insurance policy.  Notwithstanding anything to the contrary contained in the Plan (including Article VIII of the Plan) nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity (other than any Released Party), including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

### 6.        Setoffs

Except as otherwise expressly provided for herein, each Debtor or Reorganized Debtor, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the holder of a Claim, may, but shall not be required to, set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any Claims, rights, and Causes of Action of any nature whatsoever that such Debtor or Reorganized Debtor, as applicable, may hold against the holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided, however*, that neither the failure to effectuate such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action that such Reorganized Debtor may possess against such holder.  In no event shall any holder of Claims be entitled to setoff any such Claim against any Claim, right, or Cause of Action of any Debtor or Reorganized Debtor (as applicable) unless

such holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

<div align="center">

**7.**      **Allocation Between Principal and Accrued Interest**

</div>

Except as otherwise provided herein, the aggregate consideration paid to holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof) and, thereafter, to interest, if any, on such Allowed Claim accrued and unpaid through the Effective Date.

**G.**      **Procedures for Resolving Disputed Claims and Interests**

<div align="center">

**1.**      **Committee Designee**

**(a)**      **Appointment**

</div>

On or prior to the Effective Date, the Committee shall appoint the Committee Designee to participate in the post-Effective Date reconciliation process for Convenience Class Claims. The role and responsibilities of the Committee Designee shall terminate after all distributions are made to holders of Allowed Convenience Class Claims from the Convenience Claims Distribution and the Reorganized Debtors so advise the Committee Designee in writing (which notice must be sent via email to the Committee Designee and counsel to the Committee Designee, if any).

<div align="center">

**(b)**      **Rights and Powers**

</div>

The Committee Designee and the Reorganized Debtors shall work cooperatively to expeditiously resolve Convenience Class Claims in a cost-effective and expeditious manner consistent with the procedures outlined in <u>Article VII</u> of the Plan. The Reorganized Debtors shall provide the Committee Designee with no less than three (3) Business Days' advance notice of any objections to be filed, or settlements to be entered into, with respect to any Convenience Class Claim. To the extent a dispute arises between the Reorganized Debtors and the Committee Designee with respect to the resolution of a Convenience Class Claim that cannot be resolved consensually, the Committee Designee shall have standing solely for the limited purpose of (i) being heard regarding any objection Filed with respect to a Convenience Class Claim by the Debtors or any other party-in-interest and (ii) seeking appropriate relief from the Bankruptcy Court, including objecting to a proposed settlement of any Convenience Class Claim.

Subject to <u>Section 7.1(c)</u> of the Plan, the Committee Designee shall be authorized and empowered to retain and pay professionals to represent it with respect to its responsibilities without the approval of the Bankruptcy Court.

<div align="center">

**(c)**      **Payment of Fees and Expenses**

</div>

The reasonable and documented fees and expenses of the Committee Designee, including the fees and expenses of any professionals retained by the Committee Designee, in each case, solely to the extent associated with the reconciliation process for the Convenience Claim Distribution and the Convenience Class Claims shall be paid by the Reorganized Debtors up to the amount of $75,000 in the aggregate without further notice or approval from the Bankruptcy Court within 30 days of receipt of each invoice. For the avoidance of doubt, the Reorganized Debtors shall have no obligation to pay any fees and

<div align="center">

75

</div>

expenses of the Committee Designee, including the fees and expenses of any professionals retained by the Committee Designee, in excess of $75,000 in the aggregate.

### 2.    Claims and Interests Administration Responsibilities

After the Effective Date, each of the Reorganized Debtors shall have and retain any and all rights and defenses its predecessor Debtor had with respect to any Claim or Interest immediately before the Effective Date. Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors shall have the sole authority: (1) to File, withdraw, or litigate to judgment objections to Claims or Interests; (2) to settle or compromise any Disputed Claim or Disputed Interest without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

### 3.    Estimation of Claims and Interests

Before or after the Effective Date, the Debtors or the Reorganized Debtors may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim or Disputed Interest pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim or Interest that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Claim or Interest that is Disputed, contingent, or unliquidated, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim or Interest that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has Filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim or Interest is estimated. All of the aforementioned Claims and Interests and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims and Interests may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### 4.    Adjustment to Claims and Interests Without Objection

Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors or the Reorganized Debtors without an objection to such Claim or Interest having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 5.    Objections to Claims and Interests; Time to File

Prior to the Effective Date, the Debtors or any other party in interest may object to the Allowance of any Claim or Interest (unless previously Allowed by an order of the Bankruptcy Court or expressly Allowed pursuant to the terms of the Plan). After the Effective Date, only the Reorganized Debtors may

object to the Allowance of any Claim or Interest (unless previously Allowed by an order of the Bankruptcy Court or expressly Allowed pursuant to the terms of the Plan); *provided*, *however*, that the U.S. Trustee may object to the Allowance of any Professional Claim. Any objections to those Claims or Interests (other than Administrative Claims) shall be served and Filed on or before the Claims Objection Deadline. Notwithstanding any authority to the contrary, an objection to a Claim or Interest shall be deemed properly served on the claimant if the objecting party effects service in any of the following manners: (i) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (ii) by first class mail, postage prepaid, on the Proof of Claim as well as all other representatives identified in the Proof of Claim or any attachment thereto; or (iii) if counsel has agreed to accept service, by first class mail, postage prepaid, on any counsel that has appeared on the claimant's behalf in the Chapter 11 Cases (so long as such appearance has not been subsequently withdrawn). From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.

### 6.    Disallowance of Claims and Interests

Any Claims or Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims or Interests may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Final Order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors. All Proofs of Claim Filed on account of an Indemnification Provision with respect to a director or officer shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Provision is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

**Except as provided herein or otherwise agreed, any and all Proofs of Claim Filed after the applicable Bar Date or requests for payment of an Administrative Claim Filed after the Administrative Claims Bar Date, as applicable, shall be deemed Disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation Hearing such late Filed Claim has been deemed timely Filed by a Final Order.**

### 7.    Amendments to Claims

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court and the Reorganized Debtors and any such new or amended Claim Filed shall be deemed Disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court.

### 8.    No Distributions Pending Allowance

If an objection to a Claim, Interest or portion thereof is Filed as set forth in <u>Article VII</u> of the Plan, no payment or distribution provided under the Plan shall be made on account of such Claim, Interest or portion thereof unless and until such Disputed Claim or Disputed Interest becomes an Allowed Claim or Allowed Interest, respectively.

9.        **Distributions After Allowance**

To the extent that a Disputed Claim or Disputed Interest ultimately becomes an Allowed Claim or Allowed Interest, respectively, distributions (if any) shall be made to the holder of such Allowed Claim or Allowed Interest in accordance with the provisions of the Plan.  On the next Distribution Date following the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Disputed Interest becomes a Final Order, or as otherwise agreed, the Reorganized Debtors shall provide to the holder of such Claim or Interest the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date without any interest, dividends, or accruals to be paid on account of such Claim or Interest unless required under applicable bankruptcy law or as otherwise provided herein.

10.        **Single Satisfaction of Claims and Interests**

Holders of Allowed Claims or Allowed Interests may assert such Claims against or Interests in each Debtor obligated with respect to such Claim or Interests, and such Claims and Interests shall be entitled to share in the recovery provided for the applicable Class of Claims or Interests against each obligated Debtor based upon the full Allowed amount of the Claim or Interest.  Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of Allowed Claims or Allowed Interests exceed 100% of the underlying Allowed Claim or Allowed Interest plus applicable interest.  For the avoidance of doubt, this shall not affect the obligation of each and every Debtor to pay U.S. Trustee Fees until such time as a particular case is closed, dismissed, or converted.

H.        **Settlement, Release, Injunction, and Related Provisions**

1.        **Discharge of Claims and Termination of Interests**

**Except as otherwise provided for herein or in the Confirmation Order, effective as of the Effective Date:  (a) the rights afforded in the Plan and the treatment of all Claims and Interests under the Plan shall be in exchange for and in complete satisfaction, settlement, discharge, and release of all Claims and Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against or in the Debtors or any of their assets, property, or Estates; (b) the Plan shall bind all holders of Claims and Interests, notwithstanding whether any such holders failed to vote to accept or reject the Plan or voted to reject the Plan; (c) all Claims and Interests that arose before the Effective Date, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, shall be satisfied, settled, discharged, and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under sections 502(g), 502(h) or 502(i) of the Bankruptcy Code; and (d) all Entities shall be precluded from asserting against the Debtors, the Debtors' Estates, the Reorganized Debtors, their successors and assigns, and their assets and properties any other or further Claims or Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.  In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order will be a judicial determination, as of the Effective Date, of a discharge of all such Claims and other debts and liabilities against the Debtors and satisfaction, termination or cancellation of all Interests and other rights of equity Security holders in the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge will void any judgment obtained against the Debtors or the Reorganized Debtors at any time, to the extent that such judgment relates to a discharged Claim.**

### 2.    Releases by the Debtors

**Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration provided by each of the Released Parties, the adequacy of which is hereby confirmed, on the Confirmation Date and effective as of the Effective Date, and to the fullest extent permitted by applicable law, in exchange for their cooperation and, to the extent applicable, provision of new money pursuant to the Restructuring Transactions, the Released Parties shall be deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all claims, interests, obligations, debts, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claim asserted on behalf of any Debtor and/or Reorganized Debtor, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, their Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, the Restructuring Transactions, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the Rights Offerings, the Backstop Purchase Agreement, the Backstop Commitments, the Backstop Order, the Restructuring Support Agreement, the negotiation, formulation, preparation, implementation or administration of the Plan, the Plan Supplement, the Disclosure Statement, the Rights Offering Procedures, the DIP Facility, the Exit Facilities, the DIP Documents, the Exit Facility Documents, the New Warrant Documents, the New Organizational Documents, or any other Restructuring Documents, any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes fraud, willful misconduct or gross negligence.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Debtor Release; (3) in the best interests of the Debtors and all holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any claim, cause of action or other assertion of liability released pursuant to the Debtor Release.**

### 3.    Releases by Holders of Claims and Interests

**Notwithstanding anything contained in the Plan to the contrary, on the Confirmation Date and effective as of the Effective Date, and to the fullest extent permitted by applicable law, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all claims, interests, obligations, debts, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claim asserted on behalf of any Debtor and/or Reorganized Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Releasing Party would have been legally entitled to assert (whether individually or**

collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, the Restructuring Transactions, the Chapter 11 Cases, the Rights Offerings, the Backstop Purchase Agreement, the Backstop Commitments, the Backstop Order, the Restructuring Support Agreement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Releasing Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, preparation, implementation or administration of the Plan, the Disclosure Statement, the Plan Supplement, the Rights Offering Procedures, the DIP Facility, the Exit Facilities, the DIP Documents, the Exit Facility Documents, the New Warrant Documents, the New Organizational Documents, or any other Restructuring Documents, any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes fraud, willful misconduct or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third Party Release is:  (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good-faith settlement and compromise of the claims released by the Third-Party Release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Releasing Parties asserting any claim or cause of action released pursuant to the Third-Party Release.

Further information regarding the Debtors' justification and basis for seeking approval of the Third Party Release provided for in Article VIII.8.3 of the Plan is discussed in further detail in <u>Article VIII.B.1</u> of this Disclosure Statement.

4.      Exculpation

Notwithstanding anything contained herein to the contrary, on the Confirmation Date and effective as of the Effective Date, and to the fullest extent permitted by applicable law, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any cause of action, claim or other assertion of liability for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the Filing of the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, administration, implementation or Filing of, as applicable, the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, the Rights Offerings, the Rights Offering Procedures, the DIP Facility, the Exit Facilities, the DIP Documents, the Exit Facility Documents, the New Warrant Documents, the New Organizational Documents, the Backstop Purchase Agreement, the Backstop Order, the Backstop Commitments, any Restructuring Transaction, or any other Restructuring Document or contract, instrument, release or other agreement or document created or entered into in connection with any of the foregoing, the pursuit of Confirmation, the pursuit of Consummation, the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan, except for claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, gross negligence or willful misconduct.  Notwithstanding anything to the contrary herein, the Exculpated Parties shall, in all respects, be entitled to reasonably rely upon the advice of counsel

80

with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the Solicitation of, and distribution of consideration pursuant to, the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the Solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. With respect to any Exculpated Party that is not also an Estate fiduciary, such exculpation shall be as provided for by Bankruptcy Code section 1125(e).

### 5. Injunction

Except as otherwise provided herein or in the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to <u>Section 8.2</u> or <u>Section 8.3</u> of the Plan, discharged or terminated pursuant to <u>Section 8.1</u> of the Plan, or are subject to exculpation pursuant to <u>Section 8.4</u> of the Plan shall be permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties, or any of their respective properties or Estates: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of, in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering in any manner or by any means any judgment, award, decree, or order on account of, in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any Lien or encumbrance of any kind on account of, in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind on account of, in connection with or with respect to any such Claims or Interests, unless such Entity has Filed, on or before the Confirmation Date, a motion with the Bankruptcy Court requesting the right to perform such setoff, notwithstanding any indication that such entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of, in connection with or with respect to any such Claims or Interests discharged, released, exculpated, or settled pursuant to the Plan or that is otherwise inconsistent with the provisions of the Plan.

### 6. Protection Against Discriminatory Treatment

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

### 7. Release of Liens

Except as otherwise specifically provided in the Plan, the Exit Facility Documents (including in connection with any express written amendment of any mortgage, deed of trust, Lien, pledge, or other security interest under the Exit Facility Documents), or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens,

pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors, the DIP Agent, the First Lien Agent, the MDL Agent or any other holder of a Secured Claim.  In addition, at the sole expense of the Debtors or the Reorganized Debtors, the DIP Agent, the First Lien Agent and the MDL Agent shall execute and deliver all documents reasonably requested by the Debtors, Reorganized Debtors or administrative agent(s) or indenture trustee(s) for the Exit Facilities to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors and their designees to file UCC-3 termination statements and other release documentation (to the extent applicable) with respect thereto.

### 8.    Reimbursement or Contribution

If the Bankruptcy Court Disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever Disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (a) such Claim has been adjudicated as noncontingent, or (b) the relevant holder of a Claim has Filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

### 9.    Recoupment

In no event shall any holder of a Claim or Interest be entitled to recoup such Claim or Interest against any Claim, right, interest, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

### 10.    Subordination Rights

Any distributions under the Plan to holders of Claims or Interests shall be received and retained free from any obligations to hold or transfer the same to any other holder and shall not be subject to levy, garnishment, attachment, or other legal process by any holder by reason of claimed contractual subordination rights.  Any such subordination rights shall be waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan.

### 11.    Professional Responsibility

Notwithstanding anything else to the contrary in Article VIII of the Plan, nothing in the Plan shall limit the liability of the attorneys to their respective clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8, Rule 1.8(h)(1) (2009); provided, however, that any party seeking to assert such a claim against any such attorney must first seek relief, on proper notice, from the Bankruptcy Court.

## I.    Conditions Precedent to the Effective Date

### 1.    Conditions Precedent to the Effective Date

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Section 9.2 of the Plan:

(a)    the Professional Fee Escrow Account shall have been established and funded with the Professional Fee Amount;

(b)    each of the DIP Orders shall have been entered by the Bankruptcy Court, and the Final DIP Order shall not have been stayed or modified or vacated on appeal;

(c)    the Disclosure Statement Order shall have been entered by the Bankruptcy Court and such order shall have become a Final Order that has not been stayed or modified or vacated on appeal;

(d)    the Confirmation Order shall have been entered by the Bankruptcy Court confirming the Plan in form and substance consistent in all material respects with the Restructuring Support Agreement and otherwise reasonably acceptable to the Requisite Parties, and such order shall have become a Final Order that has not been stayed or modified or vacated on appeal;

(e)    the Debtors shall not be in default under the DIP Facility or the Final DIP Order (or, to the extent that the Debtors are in default on the proposed Effective Date, such default shall have been waived by the DIP Lenders or cured by the Debtors in a manner consistent with the DIP Facility and the DIP Orders);

(f)    the Plan and the Plan Supplement, including any exhibits, schedules, amendments, modifications, or supplements thereto, and inclusive of any amendments, modifications, or supplements made after the Confirmation Date but prior to the Effective Date, shall have been made in accordance with Section 10.1 of the Plan;

(g)    the Backstop Purchase Agreement shall not have been terminated, and all conditions precedent (including, without limitation, the entry of the Backstop Order by the Bankruptcy Court and the Backstop Order becoming a Final Order, but excluding any conditions related to the occurrence of the Effective Date) to the obligations of the Backstop Parties under the Backstop Purchase Agreement shall have been satisfied or waived in accordance with the terms thereof, and the closing of the Backstop Purchase Agreement shall occur concurrently with the occurrence of the Effective Date;

(h)    the Exit Facility Documents shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the consummation of the Exit Facilities shall have been waived or satisfied in accordance with the terms thereof and the closing of the Exit Facilities shall occur concurrently with the occurrence of the Effective Date;

(i)    all conditions precedent to the issuance of the New Common Stock, the New Preferred Equity and the New Warrants, other than any conditions related to the occurrence of the Effective Date, shall have occurred;

(j)    the New Organizational Documents shall have been duly filed with the applicable authorities in the relevant jurisdictions;

(k)    all governmental and material third party approvals and consents, including Bankruptcy Court approval, necessary in connection with the Restructuring Transactions shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and

83

all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions;

(l)     the Restructuring Support Agreement shall not have validly terminated as to all Restructuring Support Parties thereto and shall be in full force and effect and shall not be the subject of a pending motion to reject, and the Debtors and the Restructuring Support Parties shall be in compliance therewith;

(m)     with respect to all documents and agreements necessary to implement the Plan:  (1) all conditions precedent to such documents and agreements (other than any conditions precedent related to the occurrence of the Effective Date) shall have been satisfied or waived pursuant to the terms of such documents or agreements; (2) such documents and agreements shall have been tendered for delivery to the required parties and been approved by any required parties and, to the extent required, filed with and approved by any applicable Governmental Units in accordance with applicable laws; and (3) such documents and agreements shall have been effected or executed;

(n)     the Plan and all other Restructuring Documents shall be in form and substance consistent in all material respects with the Restructuring Support Agreement and otherwise reasonably acceptable to the Requisite Parties;

(o)     all Transaction Expenses (including Backstop Expenses) shall have been paid in full, in Cash, in accordance with the Restructuring Support Agreement, the Backstop Purchase Agreement, the Plan, the DIP Orders, and the Backstop Order, as applicable;

(p)     there shall be no ruling, judgment or order issued by any Governmental Unit making illegal, enjoining, or otherwise preventing or prohibiting the consummation of the Restructuring Transactions, unless such ruling, judgment or order has been stayed, reversed or vacated within three (3) Business Days after such issuance; and

(q)     there shall be no material litigation or investigation by any Governmental Unit involving the Debtors as of the Effective Date that has had, or would reasonably be expected to have, a material adverse effect on the business, financial condition or results of operations of the Reorganized Debtors, taken as a whole.

## 2.     Waiver of Conditions Precedent

The Debtors, with the prior written consent of the Requisite Backstop Parties and the Requisite Consenting First Lien Lenders, may waive any of the conditions to the Effective Date set forth in Section 9.1 of the Plan (except for Section 9.1(d) thereof) at any time without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm or consummate the Plan.

## 3.     Substantial Consummation

"Substantial consummation" of the Plan, as defined by section 1102(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

### 4.    Effect of Non-Occurrence of Conditions to Consummation

If prior to Consummation, the Confirmation Order is vacated pursuant to a Final Order, then, except as provided in such Final Order, the Plan will be null and void in all respects, and nothing contained in the Plan, the Disclosure Statement, or the Restructuring Support Agreement shall: (a) constitute a waiver or release of any Claims, Interests, or Causes of Action by an Entity; (b) prejudice in any manner the rights of any Debtor or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity.

### J.    Modification, Revocation, or Withdrawal of the Plan

### 1.    Modification of the Plan

Effective as of the date hereof, with the consent of the Requisite Backstop Parties:   (a) the Debtors reserve the right, in accordance with in accordance with section 1127(a) of the Bankruptcy Code, the Bankruptcy Rules and any applicable court order, to amend or modify the Plan before the entry of the Confirmation Order, in either case consistent in all material respects with the terms and conditions set forth herein; and (b) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan, in each case consistent in all material respects with the terms and conditions set forth herein.   Notwithstanding anything to the contrary herein, the Debtors or the Reorganized Debtors, as applicable, shall not amend or modify the Plan in a manner inconsistent in any material respect with the Restructuring Support Agreement.   A holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified or supplemented, if the proposed alteration, amendment, modification or supplement does not materially and adversely change the treatment of the Claim or Interest of such holder.

### 2.    Effect of Confirmation on Modifications

Entry of the Confirmation Order shall constitute approval of all modifications to the Plan occurring after the solicitation of votes thereon pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

### 3.    Revocation or Withdrawal of the Plan

The Debtors reserve the right to revoke or withdraw the Plan with respect to any or all Debtors before the Confirmation Date and to file subsequent chapter 11 plans.   If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then:   (a) the Plan will be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases effectuated by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (c) nothing contained in the Plan shall (1) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity, (2) prejudice in any manner the rights of any Debtor or any other Entity, or (3) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity; *provided*, *however*, that all orders of the Bankruptcy Court and all documents executed pursuant thereto, except the Confirmation Order, shall remain in full force and effect.

### K.    Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.    Allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim against or Interest in a Debtor, including the resolution of any request for payment of any Claim or Interest and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims and Interests;

2.    decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.    resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.    ensure that distributions to holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5.    adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.    enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by Final Order in the Chapter 11 Cases and (b) the Plan, the Confirmation Order, and contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

7.    enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8.    grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

9.    issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

10.    hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including

with respect to: (a) the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely repaid pursuant to Section 6.5(a) of the Plan; (b) the releases, injunctions, and other provisions contained in Article VIII of the Plan, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) the Consummation, interpretation, implementation, or enforcement of the Plan, the Confirmation Order, and contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan; or (d) section 1141 of the Bankruptcy Code;

11.    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

12.    consider any modifications of the Plan to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

13.    hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

14.    hear and determine matters concerning exemptions from state and federal registration requirements in accordance with section 1145 of the Bankruptcy Code;

15.    enter an order or Final Decree concluding or closing the Chapter 11 Cases;

16.    enforce all orders previously entered by the Bankruptcy Court;

17.    decide and resolve all matters related to the Rights Offerings, the Backstop Purchase Agreement, the Backstop Commitments or the Backstop Order; and

18.    hear any other matter not inconsistent with the Bankruptcy Code.

As of the Effective Date, notwithstanding anything in Article XI of the Plan to the contrary, the Exit Facility Documents shall be governed by the jurisdictional provisions therein.

### L.    Miscellaneous Provisions

#### 1.    Immediate Binding Effect

Subject to Section 9.1 of the Plan, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all holders of Claims and Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts or Unexpired Leases with the Debtors.

#### 2.    Additional Documents

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence

the terms and conditions of the Plan.  The Debtors or the Reorganized Debtors, as applicable, and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### 3.        Dissolution of the Committee

On the Effective Date, the Committee shall dissolve automatically and the members thereof and their respective Professionals, including the Committee's Professionals, shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code, provided, however, that the Committee Designee will continue to participate in the post-Effective Date reconciliation of Convenience Class Claims, as more fully described in Section 7.11 of the Plan.

### 4.        Payment of Statutory Fees

All U.S. Trustee Fees shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or a Final Decree is issued, whichever occurs first.

### 5.        Reservation of Rights

The Plan shall have no force or effect unless and until entry by the Bankruptcy Court of the Confirmation Order.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests prior to the Effective Date.

### 6.        Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

### 7.        Service of Documents

Any pleading, notice, or other document shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered, addressed as follows:

**Debtors/Reorganized Debtors**          **21st Century Oncology Holdings, Inc.**
                                         2270 Colonial Boulevard,
                                         Fort Myers, Florida 33907
                                         Attn:    Paul Rundell

| | |
|---|---|
| **Counsel to Debtors** | **Kirkland & Ellis LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Attn:   Christopher Marcus, P.C.<br>          John T. Weber |
| | **Kirkland & Ellis LLP**<br>300 North LaSalle<br>Chicago, Illinois 60654<br>Attn:   William A. Guerrieri<br>          Alexandra Schwarzman |
| **Committee** | **Morrison & Foerster LLP**<br>250 West 55th Street<br>New York, New York 10023<br>Attn.:  Lorenzo Marinuzzi<br>          Jonathan I. Levine<br>          Benjamin Butterfield |
| **United States Trustee** | **Office of the United States Trustee**<br>**for the Southern District of New York**<br>201 Varick Street, Suite 1006<br>New York, New York 10014<br>Attn.:  Paul K. Schwartzberg, Esq. |
| **Certain of the Backstop Parties and DIP Lenders, and the Crossover Group** | **Stroock & Stroock & Lavan LLP**<br>180 Maiden Lane<br>New York, New York 10038<br>Attn.:  Jayme T. Goldstein<br>          Samantha Martin<br>          Odelia Lee |
| **Ad Hoc Committee of First Lien Lenders and DIP Lenders** | **Milbank, Tweed, Hadley & McCloy LLP**<br>28 Liberty Street<br>New York, New York 10005<br>Attn.:  Evan R. Fleck<br>          Matthew L. Brod |

## 8.      Term of Injunctions or Stays

**Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

### 9.        Entire Agreement

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

### 10.        Plan Supplement

After any of such documents included in the Plan Supplement are Filed, copies of such documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from www.kccllc.net/21co or the Bankruptcy Court's website at www.nysb.uscourts.gov.  Unless otherwise ordered by the Bankruptcy Court, to the extent any document in the Plan Supplement is inconsistent with the terms of the Plan, the Plan shall control.  The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date consistent in all material respects with the Restructuring Support Agreement.

### 11.        Non-Severability

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors, the Requisite Consenting First Lien Lenders and Requisite Backstop Parties, consistent with the terms set forth herein and the Restructuring Support Agreement; and (c) nonseverable and mutually dependent.

### 12.        Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, equity holders (regardless of whether such interests are held directly or indirectly), officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan, and, therefore, neither any of such Persons or Entities nor the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the Solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan.

### 13.        Closing of Chapter 11 Cases

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases; *provided,* that, following the Effective Date, the Reorganized Debtors may seek to close certain of the Chapter 11 Cases, other than the Chapter 11

Case pending for 21CH, that have been fully administered, notwithstanding the fact that the reconciliation of General Unsecured Claims may be ongoing and the shares of New Common Stock comprising the New Common Stock Equity Pool may not yet been issued and distributed.

### 14.    Waiver or Estoppel

Each holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement or the Debtors or Reorganized Debtors' right to enter into settlements was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court or the Notice and Claims Agent prior to the Confirmation Date.

## VIII.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

The following is a brief summary of the Confirmation process of the Plan.  Holders of Claims or Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult their own advisors with respect to the summary provided in this Disclosure Statement.

### A.    Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires a bankruptcy court, after notice, to conduct a hearing to consider confirmation of a chapter 11 plan.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.  **The Bankruptcy Court has scheduled the Confirmation Hearing for <u>December 11, 2017, at 10:00 a.m.</u>, prevailing Eastern Time.**  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or the filing of a notice of such adjournment served in accordance with the order approving the Disclosure Statement and Solicitation Procedures.  Any objection to the Plan *must*: (1) be in writing; (2) conform to the Bankruptcy Rules and the Local Rules for the United States Bankruptcy Court for the Southern District of New York, and any orders of the Bankruptcy Court; (3) state, with particularity, the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (4) be Filed with the Bankruptcy Court (contemporaneously with a proof of service) and served upon the following parties so as to be *actually received* on or before the Plan Objection Deadline. **Unless an objection to the Plan is timely served and Filed, it may not be considered by the Bankruptcy Court**.

| Counsel to the Debtors | |
|---|---|
| Christopher Marcus, P.C. | James H.M. Sprayregen, P.C. |
| John T. Weber | William A. Guerrieri (admitted *pro hac vice*) |
| **KIRKLAND & ELLIS LLP** | Alexandra Schwarzman (admitted *pro hac vice*) |
| **KIRKLAND & ELLIS INTERNATIONAL LLP** | **KIRKLAND & ELLIS LLP** |
| 601 Lexington Avenue | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| New York, New York 10022 | 300 North LaSalle Street |
| Telephone:    (212) 446-4800 | Chicago, Illinois 60654 |
| Facsimile:    (212) 446-4900 | Telephone:    (312) 862-2000 |
|  | Facsimile:    (312) 862-2200 |

| ***U.S. Trustee*** |
|---|
| Paul Schwartzberg<br>Susan Golden<br>Office of the United States Trustee<br>for the Southern District of New York<br>U.S. Federal Office Building, 201 Varick Street, Suite 1006<br>New York, New York 10014 |

| ***Counsel to the Committee*** |
|---|
| Lorenzo Marinuzzi<br>Jonathan I. Levine<br>Benjamin Butterfield<br>Morrison & Foerster LLP<br>250 West 55th Street<br>New York, New York 10019 |

| ***Counsel to Certain of the Backstop Parties and DIP Lenders, and the Crossover Group*** |
|---|
| Jayme Goldstein<br>Samantha Martin<br>Odelia Lee<br>Stroock & Stroock & Lavan LLP<br>180 Maiden Lane<br>New York, New York 10038 |

| ***Counsel to the First Lien Lender Group*** |
|---|
| Evan Fleck<br>Matthew Brod<br>Milbank, Tweed, Hadley & McCloy LLP<br>28 Liberty Street<br>New York, New York 10005 |

| ***Counsel to the MDL Agent*** |
|---|
| Seth H. Lieberman<br>Patrick Sibley<br>Matthew W. Silverman<br>Pryor Cashman LLP<br>7 Times Square<br>New York, New York 10036 |

| ***Counsel to the DIP Agent*** |
|---|
| Richard A. Stieglitz, Jr.<br>Joel H. Levitin<br>Cahill Gordon & Reindel LLP<br>Eighty Pine Street<br>New York, New York 10005 |

### B.    Confirmation Standards

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code with respect to *each* of the Debtors.  Because each of the Debtors must satisfy these requirements, it is possible that the Bankruptcy Court will enter a Confirmation Order with respect to certain Debtors and not others.[15]  The Debtors believe that the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code and that they have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code.  Specifically, the Debtors believe that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code, including those set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been or will be disclosed to the Bankruptcy Court, and any such payment:  (1) made before the Confirmation of the Plan is reasonable; or (2) is subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation of the Plan.

- With respect to each Class of Claims, each holder of an Impaired Claim has accepted the Plan or will receive or retain under the Plan on account of such Claim property of a value as of the Effective Date of the Plan that is not less than the amount that such holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.  With respect to each Class of Interests, each holder of an Impaired Interest has accepted the Plan or will receive or retain under the Plan on account of such Interest property of a value as of the Effective Date of the Plan that is not less than the amount that such holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Each Class of Claims and Interests that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class of Claims and Interests pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that:  (1) holders of Claims specified in sections 507(a)(2) and 507(a)(3) will receive, under different circumstances, Cash equal to the amount of such Claim either on the Effective Date (or as soon as practicable thereafter), no later than thirty (30) days after the Claim becomes Allowed, or pursuant to the terms and conditions of the transaction giving rise to the Claim; (2) holders of Claims specified in sections 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of the Bankruptcy

---

[15]    For example, the Bankruptcy Court may deny Confirmation for one or more of the Debtors if any such Debtor fails to obtain the requisite acceptance of the Plan from its Classes, while still confirming the Plan with respect to the other Debtors.

Code will receive on account of such Claims Cash equal to the Allowed amount of such Claim on the Effective Date of the Plan (or as soon thereafter as is reasonably practicable) or Cash payable over no more than six (6) months after the Petition Date; and (3) holders of Claims specified in section 507(a)(8) of the Bankruptcy Code will receive on account of such Claim regular installment payments of Cash of a total value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claim over a period ending not later than five years after the Petition Date.

- At least one Class of Impaired Claims or Interests has accepted the Plan, determined without including any acceptance of the Plan by any "insider," as that term is defined by section 101(31) of the Bankruptcy Code, holding a Claim or Interest in that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan, unless the Plan contemplates such liquidation or reorganization.

- The Debtors have paid or the Plan provides for the payment of the required filing fees pursuant to 28 U.S.C. § 1930 to the clerk of the Bankruptcy Court.

### 1. The Debtor Releases, Third-Party Releases, Exculpation, and Injunctions Provisions

Section 8.2 of the Plan provides for releases of certain claims and Causes of Action of the Debtors against the Released Parties. The Released Parties are, in each case solely in their capacity as such: (i)(a) the Debtors, (b) the Reorganized Debtors, and (c) with respect to each of the foregoing parties in clauses (i)(a) and (i)(b), each of such Entity's current and former Affiliates, partners, Subsidiaries, officers, directors, principals, employees, agents, advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, together with their respective successors and assigns, in each case in their capacity as such, and only if serving in such capacity; and (ii)(a) the Backstop Parties; (b) the DIP Lenders; (c) the DIP Agent; (d) the Consenting MDL Lenders; (e) the MDL Agent; (f) the Consenting First Lien Lenders; (g) the First Lien Agent; (h) the Consenting Noteholders; (i) the Indenture Trustee; (j) the Equity Parties; (k) the Committee; (l) members of the Committee (solely in their capacity as such); and (m) with respect to each of the foregoing Persons described in clauses (ii)(a) through (ii)(l), each of such Person's current and former Affiliates, partners, Subsidiaries, officers, directors, principals, employees (including, in the case of the Equity Parties, any current or former director of any Debtor that is, or was, employed by either Equity Party), agents, managed funds, advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, together with their respective successors and assigns, in each case in their capacity as such, and only if serving in such capacity; *provided*, *however*, that notwithstanding anything to the contrary herein, any Equity Party (and, to the extent related to any Equity Party, any Person described in clause (ii)(m)) shall only constitute a Released Party to the extent such Equity Party becomes a Restructuring Support Party, does not breach its obligations under the Restructuring Support Agreement, and does not terminate the Restructuring Support Agreement; *provided*, *further* that the Excluded Directors and Officers, other than the Specified Directors and Officers, shall not constitute Released Parties.

Section 8.3 of the Plan provides for releases of certain claims and Causes of Action of the Releasing Parties against the Released Parties in exchange for the good and valuable consideration and the valuable compromises made by the Released Parties. The Releasing Parties are, in each case solely in their capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the Backstop Parties; (d) the DIP Lenders; (e) the DIP Agent; (f) the Consenting MDL Lenders; (g) the MDL Agent; (h) the Consenting First Lien Lenders; (i) the First Lien Agent; (j) the Consenting Noteholders; (k) the Indenture Trustee; (l)

the Equity Parties; (m) the Committee; (n) the members of the Committee; (o) all holders of Claims and Interests that are presumed to accept the Plan and do not opt out of the Third-Party Release on their respective Election Forms; (p) all holders of Claims and Interests that are presumed to reject the Plan and do not opt out of the Third-Party Release on their respective Election Forms; (q) all holders of Claims or Interests entitled to vote on the Plan who either (1) vote to accept the Plan or (2) receive a ballot but abstain from voting on the Plan; (r) all holders of Claims and Interests entitled to vote on the Plan who vote to reject the Plan but do not elect on their ballot to opt-out of the Third-Party Release; (s) all Rights Offering Participants that participate in the Rights Offerings; (t) all other holders of Claims and Interests to the fullest extent permitted by law; and (u) with respect to the foregoing clauses (a) through (t), each of such Person's current and former Affiliates, partners, Subsidiaries, officers, directors, principals, employees, agents, managed funds, advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, together with their respective successors and assigns, in each case in their capacity as such.

Section 8.4 of the Plan provides for the exculpation of each Exculpated Party for certain acts or omissions taken in connection with the Chapter 11 Cases.  The Exculpated Parties are, in each case solely in their capacity as such:  (i)(a) the Debtors, (b) the Reorganized Debtors, and (c) with respect to each of the foregoing parties in clauses (i)(a) and (i)(b), each of such Entity's current and former Affiliates, partners, Subsidiaries, officers, directors, principals, employees, agents, advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, together with their respective successors and assigns, in each case in their capacity as such, and only if serving in such capacity; and (ii)(a) the Backstop Parties; (b) the DIP Lenders; (c) the DIP Agent; (d) the Consenting MDL Lenders; (e) the MDL Agent; (f) the Consenting First Lien Lenders; (g) the First Lien Agent; (h) the Consenting Noteholders; (i) the Indenture Trustee; (j) the Equity Parties; (k) the Committee; (l) the members of the Committee (solely in their capacity as such); and (m) with respect to each of the foregoing Persons described in clauses (ii)(a) through (ii)(l), each of such Person's current and former Affiliates, partners, Subsidiaries, officers, directors, principals, employees (including, in the case of the Equity Parties, any current or former director of any Debtor that is, or was, employed by either Equity Party), agents, managed funds, advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, together with their respective successors and assigns, in each case in their capacity as such, and only if serving in such capacity; *provided*, *however*, that notwithstanding anything to the contrary herein, any Equity Party (and, to the extent related to any Equity Party, any Person described in clause (ii)(m)) shall only constitute an Exculpated Party to the extent such Equity Party becomes a Restructuring Support Party, does not breach its obligations under the Restructuring Support Agreement, and does not terminate the Restructuring Support Agreement; *provided*, *further* that the Excluded Directors and Officers shall not constitute Exculpated Parties.

Section 8.5 of the Plan permanently enjoins Entities who have held, hold, or may hold Claims or Interests that have been discharged, terminated, or released pursuant to the Plan, or are subject to exculpation pursuant to the Plan, from asserting such Claims or Interests against the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties.

The Plan provides that all holders of Claims or Interests who are entitled to vote on the Plan who vote to accept the Plan will be granting a release of any claims or rights they have or may have as against many individuals and Entities.  In addition, certain other holders of Claims or Interests identified in the definition of "Releasing Parties" will be granting a release of any claims or rights they have or may have as against many individuals and Entities, unless such holders "opt out" of such release on their Ballot or Election Form, as applicable.

This release, referred to as the Third-Party Release, is broad and it includes any and all claims that such holders may have against the Released Parties, which in any way relate to the Debtors, their

operations either before or after the Chapter 11 Cases began, any securities of the Debtors, whether purchased or sold, including sales or purchases which have been rescinded, and any transaction that these Released Parties had with the Debtors.  Various holders of Claims or Interests may have claims against a Released Party and the Debtors express no opinion on whether a holder has a claim or the value of the claim nor do the Debtors take a position as to whether a holder should consent to grant this release.

It is well-settled that debtors are authorized to settle or release their claims in a chapter 11 plan.[16] Debtor releases are granted by courts in the Second Circuit where the debtors establish that such releases are in the "best interests of the estate."[17]  Courts often find that releases pursuant to a settlement are appropriate.[18]  Additionally, in the Second Circuit, third party releases are permissible where "truly unusual circumstances" render the release terms integral to the success of the plan.[19]  The determination is not a matter of "factors and prongs" but courts have provided some guidance for allowing third party releases. "Unusual circumstances" include instances in which:  (a) the estate received a substantial contribution; (b) the enjoined claims were "channeled" to a settlement fund rather than extinguished; (c) the enjoined claims would indirectly impact the debtors' reorganization by way of indemnity or contribution; (d) the plan otherwise provided for the full payment of the enjoined claims; and (e) the affected creditors consent.[20]  Courts typically allow releases of third party claims against non-debtors where there is the express consent of the party giving the release or where other circumstances in the case justify giving the release.[21]  Finally, exculpation provisions that extend to prepetition conduct and cover non-estate fiduciaries are regularly approved.[22]   In approving these provisions, courts consider a number of factors, including whether the beneficiaries of the exculpation have participated in good faith in negotiating the plan and bringing it to fruition, and whether the provision is integral to the plan.[23]

The Debtors believe that the releases, exculpations, and injunctions set forth in the Plan are appropriate because the releases are related to, among other things, the Debtors' restructuring

---

[16]   See In re Adelphia Commc'ns Corp., 368 B.R. 140, 263 n.289, 269 (Bankr. S.D.N.Y. 2007) (debtor may release its own claims); In re Oneida Ltd., 351 B.R. 79, 94 (Bankr. S.D.N.Y. 2006) (noting that a debtor's release of its own claims is permissible).

[17]   See In re Charter Commc'ns., 419 B.R. 221, 257 (Bankr. S.D.N.Y. 2009) ("When reviewing releases in a debtor's plan, courts consider whether such releases are in the best interest of the estate.").

[18]   See, e.g., In re Spiegel, Inc., 2005 WL 1278094, at *11 (approving releases pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019(a)); In re AMR Corp., No.  11-15463 (SHL) (Bankr. S.D.N.Y. Oct. 22, 2013) (confirming chapter 11 plan containing releases of members, directors, officers and employees of the debtors as well as prepetition lenders that were party to a restructuring support agreement); see also In re Bally Total Fitness Holding Corp., 2007 WL 2779438, at *12 ("To the extent that a release or other provision in the Plan constitutes a compromise of a controversy, this Confirmation Order shall constitute an order under Bankruptcy Rule 9019 approving such compromise."); accord In re Adelphia Communications Corp., 368 B.R. 140, 263 n. 289 (Bankr. S.D.N.Y. 2007) ("The Debtors have considerable leeway in issuing releases of any claims the Debtors themselves own.").

[19]   In re Metromedia Fiber Network, Inc., 416 F.3d 136, 142-43 (2d Cir. 2005).

[20]   Id. at 141.

[21]   In re Metromedia Fiber Network, Inc., 416 F.3d 136, 141 (2d Cir. 2005).

[22]   See, e.g., Oneida, 351 B.R. at 94 & n.22 (considering an exculpation provision covering a number of prepetition actors with respect to certain prepetition actions, as well as postpetition activity).

[23]   See In re Bearing Point, Inc., 435 B.R. 486, 494 (Bankr. S.D.N.Y. 2011) ("Exculpation provisions are included so frequently in chapter 11 plans because stakeholders all too often blame others for failures to get recoveries they desire; seek vengeance against other parties, or simply wish to second guess the decision makers."); In re DBSD N. Am., Inc., 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009) (same), aff'd, In re DBSD N. Am., Inc., No. 09-10156, 2010 WL 1223109 (S.D.N.Y. May 24, 2010), aff'd in part, rev'd in part, 634 F.3d 79 (2d Cir. 2011); In re Bally Total Fitness, 2007 WL 2779438, at *8 (finding exculpation, release, and injunction provisions appropriate because they were fair and equitable, necessary to successful reorganization, and integral to the plan); In re WorldCom, Inc., No. 02-13533, 2003 WL 23861928, at *28 (Bankr. S.D.N.Y. Oct. 31, 2003) (approving an exculpation provision where it "was an essential element of the [p]lan formulation process and negotiations"); In re Enron Corp., 326 B.R. 497, 503 (S.D.N.Y. 2005) (excising similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition").

proceedings, and each of the Released Parties has afforded value to the Debtors and aided in the reorganization process, which facilitated the Debtors' ability to propose and pursue Confirmation of the Plan. The Debtors believe that each of the Released Parties has played an integral role in formulating the Plan and has expended significant time and resources analyzing and negotiating the issues presented by the Debtors' prepetition capital structure. The Debtors further believe that such releases, exculpations, and injunctions are a necessary part of the Plan. The Debtors will be prepared to meet their burden to establish the basis for the releases, exculpations, and injunctions for each Released Party and Exculpated Party as part of Confirmation of the Plan.

The U.S. Trustee filed an objection to approval of the Disclosure Statement as it pertains to the Third Party Release contained in Article VIII.8.3 of the Plan. The Court overruled the U.S. Trustee's objection in connection with approving the Disclosure Statement, but the U.S. Trustee reserves the rights to challenge the Third Party Release in connection with Confirmation of the Plan.

## 2.   Best Interests of Creditors Test—Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankrupt court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an interest in such class either (a) has accepted the plan, or (b) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code.

The Plan provides recoveries to, among others, the holders of Claims or Interests, as applicable, in Classes 1, 2, 3, 4, 5, 6, and 11. As shown in the Debtors' Liquidation Analysis attached hereto as **Exhibit D**, the holders of General Unsecured Claims may not be entitled to any recovery if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. The liquidation valuations in the Liquidation Analysis have been prepared solely for use in this Disclosure Statement and do not represent values that are appropriate for any other purpose. Nothing contained in the Liquidation Analysis is intended to be or constitutes a concession by or admission of the Plan proponents for any purpose.

The recoveries described in this Disclosure Statement that are available to the holders of Claims or Interests are estimates and actual recoveries could differ materially based on, among other things, whether the amount of Claims or Interests actually Allowed against the applicable Debtor exceeds the estimates provided herein. The Debtors reserve the Debtors' or the Reorganized Debtors' right, as applicable, to recalibrate the recoveries based on the Debtors' or Reorganized Debtors' reasonable business judgment to account for, among other things, the Claims asserted against the Debtors' Estates as of the applicable Bar Dates.

The Debtors believe that the treatment of Claims or Interests, as applicable, in Classes 3, 4, 5, 6, and 11 complies with the established case law in the United States Bankruptcy Court for the Southern District of New York because the recoveries available to holders of such Claims or Interests in a liquidation scenario are substantially less than the recoveries provided to holders of Claims and Interest under the Plan.

## 3.   Valuation

**The valuation information contained in this Disclosure Statement with regard to the Reorganized Debtors is not a prediction or guarantee of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan.**

The Debtors' advisors have undertaken the Valuation Analysis (attached hereto as **Exhibit E)** to determine the value available for distribution to holders of Allowed Claims and Allowed Interests pursuant to the Plan, and to analyze and estimate the recoveries to such holders thereunder. Additionally, the estimated valuation of the New Preferred Equity and New Common Stock in this Disclosure Statement is based on the Valuation Analysis, and is used to estimate a range of recovery percentages under the Plan for holders of MDL Claims, First Lien Claims, Note Claims, General Unsecured Claims, and Interests in 21CH and 21CI. Accordingly, if the actual enterprise value of the Debtors differs from the estimated enterprise value in the Valuation Analysis, the actual value of the New Preferred Equity and New Common Stock and actual distributions to holders of MDL Claims, First Lien Claims, General Unsecured Claims, and Interests in 21CH and 21CI may be materially different than the estimations set forth herein.

### 4.    Financial Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that Confirmation is not likely to be followed by the liquidation of the Reorganized Debtors or the need for further financial reorganization, unless the Plan contemplates such liquidation or reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan. As part of this analysis, the Debtors have prepared certain financial projections, which projections and the assumptions upon which they are based are attached hereto as **Exhibit F** (the "Financial Projections"). Based on these Financial Projections, the Debtors believe the deleveraging contemplated by the Plan meets the financial feasibility requirement. Moreover, the Debtors believe that sufficient funds will exist to make all payments required by the Plan. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

An ad hoc group of the Debtors' creditors (collectively, the "Ad Hoc Creditor Group")[24] has objected to approval of this Disclosure Statement and confirmation of the Plan on grounds, including but not limited to, the assertion that the Plan is not feasible (as such term is used in section 1129(a)(11) of the Bankruptcy Code) without the Ad Hoc Creditor Group's support. *See Objection of Dr. Daniel Dosoretz and Other Creditors to Debtors' Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of 21st Century Oncology Holdings, Inc. and Its Debtor Affiliates* [Docket No. 518]. The Ad Hoc Creditor

---

[24]    The Ad Hoc Creditor Group includes: (a) current and former physicians and employees, including: Dr. Daniel Dosoretz, Alejandro Dosoretz, Dr. Michael Katin, Dr. James Rubenstein, and Dr. Bruce Nakfoor, Richard Andisco, Gregory A. Mercurio Jr., Hugo Myslicki, and Dr. Howard Sheridan (collectively, the "Employees/Contractors"); (b) landlords in connection with many of the Debtors' facilities, including: 3680 Broadway Associates, LLP, Arizona Radiation Enterprises, LLC, Chiland, LLC, JRE-CBO 3, LLC, Melis, LLP, North Carolina Radiation Enterprises, LLC, Roofkan, LLC, Theriac Enterprises of Andalusia, LLC, Theriac Enterprises of Bonita Springs, LLC, Theriac Enterprises of Casa Grande, LLC, Theriac Enterprises of Gilbert, LLC, Theriac Enterprises of Hammonton, LLC, Theriac Enterprises of Harrington, LLC, Theriac Enterprises of Littlestown, LLC, Theriac Enterprises of New Jersey, LLC, Theriac Enterprises of Pembroke Pines, LLC, Theriac Enterprises of Peoria, LLC, Theriac Enterprises of Princeton West Virginia, LLC, Theriac Enterprises of Redding, LLC, Scottsdale, LLC, Theriac Enterprises of Troy, LLC, Theriac Rollup, II, LLC, Theriac Rollup, LLC, Theriac-Macomb, LLC, Theriac-Murrell's Inlet, LLC, Theriac-Warwick, LLC, Theriac-Weaverville, LLC, West Palm Beach Radiation Associates, LLC, Yonkers Radiation Enterprises, LLC (collectively, the "Landlords"); and (c) numerous practice management groups in connection with the Debtors' services agreement business model in Article V of the Disclosure Statement, including: 21st Century Healthcare Associates, P.C., 21st Century Specialty Physicians (Michael J. Katin, M.D.), P.C., 21st Century Oncology of California, a medical Corporation, American Oncologic Associates of Michigan, P.C., Katin Radiation Therapy, P.A., Massachusetts Oncology Services .C., Michael J. Katin, M.D., Prof. Corp., New Jersey Oncology Services, P.C., Northwest Cancer Care Associates, P.C., Northwest Cancer Care Management Company, LLC, Oncology Consulting Services, Radiation Therapy Associates of Western North Carolina, P.A., RADS, P.C. Oncology Professionals, Redding Radiation Oncologists, P.C., X-Ray Treatment Center, P.C., Yonkers Radiation Medical Practice, P.A. (collectively, the "Practice Management Groups").

Group includes physicians, contractors, landlords, and practice management groups that represent a material aspect of the Debtors' business structure and operations. Among the Ad Hoc Creditor Group are Dr. Daniel Dosoretz, Dr. Michael Katin, Dr. James Rubenstein, and Dr. Howard Sheridan, the group of physicians who founded the Debtors in 1983 and also founded the Debtors' international business, along with Alejandro Dosoretz, the Chief Executive Officer of Debtor Medical Developers, LLC, who currently runs the Debtors' Central and South American operations.

Furthermore, Dr. Dosoretz, Dr. Katin, and Dr. Rubinstein, along with Dr. Bruce Nakfoor, directly and indirectly, are responsible for a material portion of the Debtors' gross revenue generation. The physicians are also the owners of many of the Practice Management Groups upon which the Debtors' Services Agreement Business Model is based. Moreover, many of the Debtors' facilities are operated at locations leased to the Debtors by the Landlords under numerous lease and master lease agreements. Specifically, the Ad Hoc Creditor Group asserts that (i) the facilities at which the Ad Hoc Creditor Group provides medical services (including physicians associated with them) generate more than $242 million in annual revenue, and the Ad Hoc Creditor Group asserts that a substantial portion of this amount is supported by such physicians, (ii) the Ad Hoc Creditor Group owns Practice Management Groups (including holding state licenses and certificates of need) in certain states that prohibit the corporate practice of medicine, and the Ad Hoc Creditor Group asserts that those practices generate annual revenue in excess of $203 million, and (iii) annual revenue generated just from ten of the Ad Hoc Creditor Group's leased locations exceeds $41 million, according to the Ad Hoc Creditor Group. It is the Ad Hoc Creditor Group's position that a substantial portion of the above described revenues will be put at risk if satisfactory arrangements are not made with the Ad Hoc Creditor Group prior to Confirmation. The Debtors dispute entirely, and reserve all rights with respect to, each of the Ad Hoc Creditor Group's assertions as to the purported amount of revenue discussed in items (i), (ii) and (iii) of this paragraph.

The Debtors and the Ad Hoc Creditor Group have worked and continue to work constructively toward resolving their disputes surrounding, among other things, certain claims asserted by the Ad Hoc Creditor Group against the Debtors, lease and contract assumption and rejection issues, and the structure and nature of the relationship of the Reorganized Debtors with members of the Ad Hoc Creditor Group post-Effective Date. If the Debtors and the Ad Hoc Creditor Group are unable to resolve such disputes in a consensual matter, it is likely that the parties will be forced to engage in costly and time consuming litigation, and the Valuation Analysis and Financial Projections attached hereto as Exhibit E and Exhibit F, respectively, may be negatively impacted.

Additionally, Rajiv Patel, Dr. Kishore Dass, and Dr. Ben Han, directly and indirectly, are responsible for a material portion of the Debtors' gross revenue generation. The Debtors and the Mr. Patel, Dr. Dass, and Dr. Han have worked and continue to work constructively toward resolving certain disputes with Mr. Patel, Dr. Dass, and Dr. Han regarding, among other things, the structure and nature of the relationship of the Reorganized Debtors with Mr. Patel, Dr. Dass, and Dr. Han post-Effective Date. If the Debtors and Mr. Patel, Dr. Dass, and Dr. Han are unable to resolve such disputes in a consensual matter, the Valuation Analysis and Financial Projections attached hereto as Exhibit E and Exhibit F, respectively, may be negatively impacted.

## C.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or interests that is impaired under a plan, accept the plan. A class that is not impaired under a plan is presumed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. Pursuant to section 1124 of the Bankruptcy Code, a class is impaired unless the plan: (1) leaves unaltered the legal, equitable, and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (2) cures any

default, reinstates the original terms of such obligation, and compensates the applicable party in question; or (3) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to or any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired creditors as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class.  Only those holders that actually vote to accept or to reject such plan are counted for purposes of determining whether these dollar and number thresholds are met.  Section 1126(d) of the Bankruptcy Code similarly defines acceptance of a plan by a class of impaired interests.  Thus, a Class of Claims or Interests will have voted to accept the Plan only if holders of two-thirds in dollar amount and more than one-half in number of Claims or Interests, as applicable, in that Class that actually vote cast their Ballots in favor of acceptance of the Plan, subject to Article III of the Plan.

Section 3.5 of the Plan provides in full: "If a Class contains Claims or Interests eligible to vote on the Plan and no holder of Claims or Interests in such Class eligible to vote on the Plan votes to accept or reject the Plan, the Plan shall be presumed accepted by the holders of such Claims or Interests in such Class."  Such "deemed acceptance" by an Impaired Class in which no Class members submit Ballots satisfies section 1129(a)(10) of the Bankruptcy Code.[25]

### D.    Confirmation without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if impaired classes entitled to vote on the plan have not accepted it or if an impaired class is deemed to reject the plan;  as long as the plan is accepted by at least one impaired class (without regard to the votes of insiders).  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

### 1.    No Unfair Discrimination

The test for unfair discrimination applies to classes of claims or interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent but that such treatment be "fair."  In general, courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character).  The Debtors believe the Plan does not discriminate unfairly against any impaired class of Claims or Interests, and have set forth the basis for the disparate treatment of certain Classes of Claims in Article III of the Plan.  Accordingly, the Debtors believe that the Plan and the treatment of all Classes of Claims and Interests satisfy the foregoing requirements for non-consensual Confirmation.

---

[25]    *In re Tribune Co.*, 464 B.R. 126, 183 (Bankr. D. Del. 2011) ("Would 'deemed acceptance' by a non-voting impaired class, in the absence of objection, constitute the necessary 'consent' to a proposed 'per plan' scheme?  I conclude that it may." (footnote omitted)); *see also In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 259–63 (Bankr. S.D.N.Y. 2007).

### 2.    Fair and Equitable Test

The fair and equitable test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class.  As to each non-accepting class, the test sets different standards depending on the type of claims or interests in such class.  As set forth below, the Debtors believe that the Plan satisfies the "fair and equitable" requirement, notwithstanding the fact that certain Classes are deemed to reject the Plan.

### (a)    Secured Claims

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims may be satisfied, among other things, if a debtor demonstrates that:  (i) (x) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another Entity under the plan, and (y) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens; or (ii) the holders of such secured claims realize the indubitable equivalent of such claims.[26]

### (b)    Unsecured Claims

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either:  (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior interest any property.[27]

### (c)    Interests

The condition that a plan be "fair and equitable" to a non-accepting class of interests includes the requirements that either:  (i) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date of the plan, equal to the greater of  (x) the allowed amount of any fixed liquidation preference to which such holder is entitled, and (y) any fixed redemption price to which such holder is entitled; (ii) the value of such interest; or (iii) if the class does not receive the amount as required under clause (i) above, no class of interests junior to the non-accepting class may receive a distribution under the plan.[28]

---

[26]    *See* 11 U.S.C. § 1129(b)(2)(A).

[27]    *See* 11 U.S.C. § 1129(b)(2)(B).

[28]    *See* 11 U.S.C. § 1129(b)(2)(C).

IX.    **CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING**[29]

Holders of Claims or Interests should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

A.    **Bankruptcy Law Considerations and Other Legal Risks**

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to holders of Allowed Claims and Allowed Interests under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of holders of Claims or Interests in such Impaired Classes.

1.    **Parties in Interest May Object to the Plan's Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that parties in interest will not object.

2.    **The Conditions Precedent to the Effective Date of the Plan May Not Occur**

As more fully set forth in Section 9.1 of the Plan, the Effective Date is subject to a number of conditions precedent.  If such conditions precedent are not met or waived, the Effective Date will not take place.

3.    **The Debtors May Fail to Satisfy Vote Requirements**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the holders of Allowed Claims or Allowed Interests as those proposed in the Plan.

4.    **The Debtors May Not Be Able to Secure Confirmation of the Plan**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that:  (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of

---

[29]    Additional Risk Factors may be found in Item 1A of the 10-K filed by the Debtors for Fiscal Year 2015 available at: https://www.21co.com/investors/sec-filings.

distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting holder of an Allowed Claim or Allowed Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met.  If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, holders of Allowed Claims against or Allowed Interests in them would ultimately receive on account of such Allowed Claims or Allowed Interests.

The effectiveness of the Plan is also subject to certain conditions as described in Section 9.1 of the Plan.  If the Plan is not confirmed, it is unclear what distributions, if any, holders of Allowed Claims or Allowed Interests will receive on account of such Allowed Claims or Allowed Interests.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Class junior to such non-accepting Class, than the treatment currently provided in the Plan.  Such less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 5.    Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es).  The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 6.    Continued Risk Upon Confirmation

Even if a chapter 11 plan of reorganization is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to the Chapter 11 Cases, changes in consumer demand for, and acceptance of, their products, and increasing expenses.  Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed.  As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, the Debtors maintain that at all times prior to the Exclusivity Deadline, they have the exclusive right to propose the Plan and will prohibit creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon filing their petitions for chapter 11 relief. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve Confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' businesses after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

### 7.    The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than reorganizing or selling such assets in a controlled manner. thereby affecting the business as a going concern; (b) additional administrative expenses involved in the appointment of a chapter 7 trustee; and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Executory Contracts and Unexpired Leases in connection with cessation of operations.

### 8.    The Debtors May Object to the Amount or Classification of a Claim or Interest

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim or Interest under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim or Interest where such Claim or Interest is subject to an objection. Any holder of a Claim or Interest that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 9.    Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

### 10.    Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to holders of Allowed Claims or Allowed Interests under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims or Allowed Interests to be subordinated to other Allowed Claims or Allowed Interests. The occurrence of any and all such contingencies, which could affect distributions available to holders of Allowed Claims or Allowed Interests under the Plan, will not affect the validity of

104

the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims, Interests, and creditor and equityholder recoveries that are set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims or Interests may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims or Interests may vary from the estimated amounts contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims or Interests that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to holders of Allowed Claims or Allowed Interests under the Plan.

### 11.    Releases, Injunctions, and Exculpations Provisions May Not Be Approved

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, the Reorganized Debtors, the Exculpated Parties, or Released Parties, as applicable.  The releases, injunctions, and exculpations (including, for the avoidance of doubt, the definitions of Released Parties, Releasing Parties, and Exculpated Parties) provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases are not approved, certain parties may not be considered Released Parties, Releasing Parties, or Exculpated Parties, and certain Released Parties or Exculpated Parties may withdraw their support for the Plan.

### 12.    The Restructuring Transactions May Not Be Consummated if the Pending Litigation with Certain U.S. Governmental Agencies Is Not Resolved

Section 8.1 of the Backstop Purchase Agreement requires that any pending, existing, instituted, outstanding, or threatened Proceeding (as defined in the Backstop Purchase Agreement) by, among others, any Governmental Body (as defined in the Backstop Purchase Agreement) or any relator on behalf of a Governmental Body (in either case) involving any of the Debtors or any of their respective current or former officers, employees, or directors (in their capacities as such) shall be dismissed with prejudice, settled on terms acceptable to the Requisite Backstop Parties, or otherwise resolved on terms acceptable to the Requisite Backstop Parties.  In the event the Debtors are unable to resolve, in the manner set forth in the Backstop Purchase Agreement, the matters described in Article V.D.1(b) with the relevant governmental agencies, the Backstop Parties are not obligated to fund the Rights Offerings, the cornerstones of the Plan and Restructuring Transactions contemplated therein.  Further, satisfaction or waiver of all conditions precedent to the obligations of the Backstop Parties under the Backstop Purchase Agreement is a condition precedent to the Effective Date.

### B.    Risks Related to Recoveries under the Plan

### 1.    The Debtors May Not Be Able to Achieve Their Projected Financial Results

The Financial Projections represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Debtors' operations, as well as the United States and world economies in general, and the particular industry segments in which the Debtors operate.  The Financial Projections also depend on other factors such as the state of the oncology market and U.S. healthcare system, and the Debtors' ability to retain and attract key personnel.  While the Debtors believe that the Financial Projections are reasonable, there can be no assurance that they will be realized and are subject to known and unknown risks and uncertainties, many of which are beyond their control.  If the Debtors do

not achieve these projected financial results, (a) the value of the New Preferred Equity and the New Common Stock may be negatively affected; (b) the Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date; and (c) the Reorganized Debtors may be unable to service their debt obligations as they come due.  Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

### 2.    The New Preferred Equity, the New Common Stock, the New Second Lien Notes, and the New Warrants (if any) Will Not Be Publicly Traded

There can be no assurance that an active market for the New Preferred Equity, the New Common Stock, the New Second Lien Notes, or the New Warrants (if any) will develop, nor can any assurance be given as to the prices at which such securities might be traded.  The New Preferred Equity, the New Common Stock, the New Second Lien Notes, and the New Warrants (if any) to be issued under the Plan will not be listed on or traded on any nationally recognized market or exchange.  Further, the New Preferred Equity, the New Common Stock, the New Second Lien Notes, and the New Warrants (if any) to be issued under the Plan have not been registered under the Securities Act or the Securities Exchange Act of 1934 (as amended and including any rule or regulation promulgated thereunder, the "Exchange Act"), any state securities laws, or the laws of any other jurisdiction.  Absent such registration, the New Preferred Equity, the New Common Stock, the New Second Lien Notes, and the New Warrants (if any) may each be offered or sold only in transactions that are not subject to, or that are exempt from, the registration requirements of the Securities Act and other applicable securities laws.  To the extent that the issuance and distribution of the New Preferred Equity, the New Common Stock, the New Second Lien Notes, and the New Warrants (if any) are covered by section 1145 of the Bankruptcy Code, such securities may be resold without registration under the Securities Act or other federal securities laws, unless the holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code.  As explained in more detail in Article X herein, certain recipients of the New Preferred Equity, the New Common Stock, the New Second Lien Notes, or the New Warrants (if any) will be able to resell such securities without registration pursuant to the exemption provided by Rule 144 of the Securities Act, subject to any restrictions set forth in the Plan Supplement.

### 3.    The Restructuring of the Debtors May Adversely Affect the Debtors' Tax Attributes

As a multinational corporation, the Debtors are subject to income taxes in the U.S. and various foreign jurisdictions.  Significant judgment is required in determining the Debtors' global provision for income taxes and other tax liabilities. In the ordinary course of a global business, there are many intercompany transactions and calculations where the ultimate tax determination is uncertain. The Debtors' income tax returns are routinely subject to audits by tax authorities.  Although the Debtors regularly assess the likelihood of adverse outcomes resulting from these examinations to determine their tax estimates, a final determination of tax audits or tax disputes could have an adverse effect on their results of operations and financial condition.  The Debtors are also subject to non-income taxes, such as payroll, sales, use, value-added, net worth, property and goods and services taxes in the U.S. and various foreign jurisdictions.  They are regularly under audit by tax authorities with respect to these non-income taxes and may have exposure to additional non-income tax liabilities which could have an adverse effect on the Debtors' results of operations and financial condition.

In addition, the Debtors' future effective tax rates could be favorably or unfavorably affected by changes in tax rates, changes in the valuation of their deferred tax assets or liabilities, or changes in tax laws or their interpretation. Such changes could have a material adverse impact on their financial results.

For a detailed description of the effect Consummation of the Plan may have on the Debtors' tax attributes, see "Certain U.S. Federal Income Tax Consequences of the Plan," which begins on <u>Article XI</u> herein.

**C.      Risks Related to the Debtors' and the Reorganized Debtors' Businesses**

**1.      The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness**

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, including with respect to the New First Lien Term Loan Credit Facility, New MDL Term Loan Facility, New Revolving Credit Facilities (if any), and New Second Lien Notes depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control.  The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and interest on their indebtedness, including the Exit Facilities.

**2.      The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases**

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy.  These risks include the following:  (a) the ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan or an alternative restructuring transaction; (b) the ability to obtain Bankruptcy Court approval with respect to motions Filed in the Chapter 11 Cases from time to time; (c) the ability to maintain relationships with suppliers, service providers, customers, employees, and other third parties; (d) the ability to maintain contracts that are critical to the Debtors' operations; (e) the ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) the ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' objectives.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition.  Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities.  Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' objectives.

3.    **The Debtors Depend on Payments from Government Medicare and, to a Lesser Extent, Medicaid Programs for a Significant Amount of the Debtors' Revenue. The Debtors' Businesses Could Be Materially Harmed By Any Changes That Result in Reimbursement Reductions**

The Debtors' payer mix is concentrated with Medicare patients due to the high proportion of cancer patients over the age of 65. The Debtors estimate that approximately 40% of their U.S. net patient service revenue for the year ended December 31, 2015 consisted of payments from Medicare and Medicaid.

Only a small percentage of that revenue resulted from Medicaid patients, equaling approximately 1.5% for the year ended December 31, 2015. In addition, Medicare Advantage represents approximately 14% of the Debtors' 2015 U.S. net patient service revenue. These government programs generally reimburse us on a fee-for-service basis based on predetermined government reimbursement rate schedules. As a result of these reimbursement schedules, the Debtors are limited in the amount the Debtors can record as revenue for the Debtors' services from these government programs. Following a public comment period, the Centers for Medicare and Medicaid Services can change these schedules annually and therefore the prices that the agency pays for these services. In addition, if the Debtors' operating costs increase, the Debtors will not be able to recover these costs from government payers. As a result, the Debtors' financial condition and results of operations may be adversely affected by changes in reimbursement for Medicare reimbursement.

Various state Medicaid programs also have recently reduced Medicaid payments to providers based on state budget reductions. There can be no certainty as to whether Medicaid reimbursement will increase or decrease in the future and what affect, if any, this will have on the Debtors' business.

4.    **Reforms to the U.S. Healthcare System May Adversely Affect the Debtors' Business**

A significant portion of the Debtors' U.S. patient volume is derived from government programs, principally Medicare, which are highly regulated and subject to frequent and substantial changes. The Debtors anticipate that any new healthcare legislation passed by the U.S. Congress may significantly affect how the healthcare industry operates in relation to Medicare, Medicaid and the insurance industry.

5.    **If Payments by Managed Care Organizations and Other Commercial Payers Decrease, the Debtors' Revenue and Profitability Could Be Adversely Affected**

The Debtors estimate that approximately 59% of their net patient service revenue for the year ended December 31, 2015 was derived from commercial payers such as managed care organizations and private health insurance programs as well as individuals. As of December 31, 2015, the Debtors had over 1,200 contracts with commercial payers. These commercial payers generally reimburse the Debtors for services rendered to insured patients based upon predetermined rates. Rates for health maintenance organization benefit plans are typically lower than those for preferred provider organization or other benefit plans that offer broader provider access. When Medicare rates change, these commercial rates automatically change as well. Additionally, most commercial payers tend to negotiate their rates as a percentage of Medicare reimbursement. Even when the Debtors' commercial rates are fixed and not tied directly to changes in Medicare, there is often pressure to renegotiate the Debtors' reimbursement to align with these modified levels. If managed care organizations and other private insurers reduce their rates or the Debtors experience a significant shift in the Debtors' revenue mix toward certain additional managed care payers or Medicare or Medicaid reimbursements, then the Debtors' revenue and profitability may

decline and the Debtors' operating margins will be reduced. Non-government payers, including managed care payers, continue to demand discounted fee structures, and the trend toward consolidation among non-government payers tends to increase their bargaining power over fee structures. The Debtors' future success will depend, in part, on the Debtors' ability to retain and renew the Debtors' managed care contracts as well as enter into new managed care contracts on terms favorable to the Debtors.  Any inability to maintain suitable financial arrangements with commercial payers could have a material adverse impact on the Debtors' business.

Increasingly, commercial payers are turning to third-party benefits managers to pre-certify radiation oncology services or develop payment-based treatment protocols.  The failure to obtain such pre-certifications and adhere to such protocols can result in the payers' denial of payment in whole or in part.  While the Debtors are working with such benefits managers to assure compliance with their policies or to obtain modification of what the Debtors believe to be inappropriate policies, there can be no assurance that they will not have a material adverse effect on the Debtors' business.

**6.      Global Economic Trends Could Adversely Affect the Debtors' Business, Results of Operations and Financial Condition, Primarily Through Disruption to the Debtors' Businesses**

During economic downturns, Governmental Units often experience budget deficits as a result of increased costs and lower than expected tax collections.  These budget deficits may force federal, state and local Governmental Units to decrease spending for health and human service programs, including Medicare, Medicaid and similar programs, which represent significant payer sources for the Debtors' treatment centers.  Other risks the Debtors face from general economic weakness include potential declines in the population covered under managed care agreements, patient decisions to postpone or cancel elective procedures as well as routine diagnostic examinations, potential increases in the uninsured and underinsured populations and further difficulties in collecting patient co-payment and deductible receivables.

**7.      Due to the Rising Costs of Managed Care Premiums and Co-Pay Amounts, the Debtors May Realize an Increased Exposure to Bad Debt Due to Patients' Inability to Pay for Certain Forms of Cancer Treatment**

As more patients become uninsured as a result of job losses or receive reduced coverage as a result of cost-control measures by employers to offset the increased costs of managed care premiums, patients are becoming increasingly responsible for the rising costs of treatment, which can decrease the Company's revenues.  This also relates to patient accounts for which the primary insurance carrier has paid the amounts covered by the applicable agreement, but patient responsibility amounts (deductibles and co-payments) remain outstanding.  The shifting responsibility to pay for care has, in some instances, resulted in patients electing not to receive certain forms of cancer treatment.

In response, the Debtors have improved their processes associated with verification of insurance eligibility and patient responsibility payment programs.  In addition, the Debtors have improved the Debtors' patient financial counseling efforts and developed tools to monitor the Debtors' progress in this area.  However, an increase in the proportion of accounts receivable being comprised of uninsured accounts and a deterioration in the collectability of these accounts will adversely affect the Debtors' cash flows and results of operations.

### 8.      The Oncology Treatment Market Is Highly Competitive

The cancer treatment market is highly competitive in each geographic market in which the Debtors operate.  The Debtors' treatment centers face competition from hospitals, other medical practitioners and other operators of radiation treatment centers. There is a growing trend by hospitals to employ medical oncologists and other integrated cancer care physicians.  The Debtors compete against hospitals and other providers to employ these individuals, which generally results in such physicians referring their patients to the hospitals' radiation facilities, rather than free-standing facilities.  There is also a growing trend of physicians in specialties other than radiation oncology, such as urology, entering the radiation treatment business.  If these trends continue, it could harm the Debtors' referrals and their businesses.  Certain of the Debtors' competitors have longer operating histories and greater financial and other resources than the Debtors.  In addition, in states that do not require a certificate of need for the purchase, construction or expansion of healthcare facilities or services, competition in the form of new services, facilities and capital spending is more prevalent. If the Debtors competitors are better able to attract patients, recruit physicians, expand services or obtain favorable managed care contracts at their facilities than the Debtors' centers, the Debtors may experience an overall decline in patient volume.  In the event that the Debtors are not able to compete successfully, the Debtors' businesses may be adversely affected and competition may make it more difficult for the Debtors to affiliate with or employ additional radiation oncologists on terms that are favorable to us.

### 9.      Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses

The Debtors' future results will be dependent upon the successful confirmation and implementation of a plan of reorganization.  A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity.  So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' businesses.  In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization.  Even after a plan of reorganization is approved and implemented, the Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

### 10.     Financial Results May Be Volatile and May Not Reflect Historical Trends

During the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as asset impairments, asset dispositions, restructuring activities and expenses, contract terminations and rejections, and claims assessments significantly impact the Debtors' consolidated

financial statements.  As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.

In addition, if the Debtors emerge from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization.  The Debtors also may be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.

### 11.    The Debtors' Substantial Liquidity Needs May Impact Revenue

The Debtors face uncertainty regarding the adequacy of their liquidity and capital resources and have extremely limited access to additional financing beyond the DIP Facility.  In addition to the cash necessary to fund ongoing operations, the Debtors have incurred significant professional fees and other costs in connection with preparing for the Chapter 11 Cases and expect to continue to incur significant professional fees and costs throughout the Chapter 11 Cases.  The Debtors cannot guarantee that cash on hand, cash flow from operations, and funding from the DIP Facility will be sufficient to continue to fund their operations and allow the Debtors to satisfy obligations related to the Chapter 11 Cases until the Debtors are able to emerge from bankruptcy protection.

The Debtors' liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things: (a) the ability to comply with the terms and conditions of the Interim DIP Order and Final DIP Order; (b) the ability to maintain adequate cash on hand; (c) the ability to generate cash flow from operations; (d) the ability to develop, confirm, and consummate a chapter 11 plan or other alternative restructuring transaction; and (e) the cost, duration, and outcome of the Chapter 11 Cases.  The Debtors' ability to maintain adequate liquidity depends, in part, upon industry conditions and general economic, financial, competitive, regulatory, and other factors beyond the Debtors' control. In the event that cash on hand, cash flow from operations, and funding from the DIP Facility are not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to seek additional financing in excess of the DIP facility.  The Debtors can provide no assurance that additional financing would be available or, if available, offered to the Debtors on acceptable terms.  The Debtors' access to additional financing in excess of the DIP Facility is, and for the foreseeable future likely will continue to be, extremely limited if it is available at all.  The Debtors' long-term liquidity requirements and the adequacy of their capital resources are difficult to predict at this time.

### 12.    The Reorganized Debtors May Suffer an Adverse Outcome Related to the False Claims Act and Stark Law Inquiries and May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases

The Debtors currently are responding to certain governmental inquiries, including inquiries by the Office of Civil Rights, the Florida Attorney General's Office and several other states' attorney general's offices, and the Department of Justice.  The inquiries from the Office of Civil Rights and the states' attorney general's offices relate to potential violations of HIPAA arising out of a 2.2 million patient data breach in 2015.  The Department of Justice has inquiries related to potential violations of the False Claims Act and the Stark Law and an inquiry related to certain potential criminal anti-trust violations regarding the market in Florida.  In connection with these inquiries, the Debtors are voluntarily producing documents and information and fully cooperating with the relevant governmental agencies regarding all

inquiries.  Accordingly, an adverse outcome related to the False Claims Act and Stark Law inquiries could delay the Debtors' intended emergence from the Chapter 11 Cases or prevent altogether the Debtors' ability to consummate the Plan, both of which could adversely affect the Debtors' business operations and the consideration provided to holders of Claims against and Interests in the Debtors under the Plan.

In the future, the Reorganized Debtors may become party to litigation.  In general, litigation can be expensive and time consuming to bring or defend against.  Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results.  It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan.  It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation.  The impact of any such litigation on the Reorganized Debtors businesses and financial stability, however, could be material.

> **13.    The Debtors May Encounter Numerous Business Risks in Identifying, Acquiring, and Developing Additional Treatment Centers, and May Have Difficulty Operating and Integrating Those Treatment Centers**

Over the past three years ended December 31, 2015, the Debtors have acquired 58 treatment centers, acquired six professional/other centers, developed four treatment centers, developed two professional/other centers and transitioned one acquired professional/other center to a freestanding treatment center.  As part of the Debtors' growth strategy, the Debtors expect to continue to add additional treatment centers in the Debtors' existing and new local and international markets.  When the Debtors acquire or develop additional treatment centers, the Debtors may:

- be unable to make acquisitions on terms favorable to the Debtors if at all;

- have difficulty identifying desirable targets or locations for treatment centers in suitable markets;

- be unable to obtain adequate financing to fund the Debtors' growth strategy;

- be unable to successfully operate the treatment centers;

- have difficulty integrating their operations and personnel;

- be unable to retain physicians or key management personnel;

- acquire treatment centers with unknown or contingent liabilities, including liabilities for failure to comply with healthcare laws and regulations;

- experience difficulties with transitioning or integrating the information systems of acquired treatment centers;

- be unable to contract with third-party payers or attract patients to the Debtors' treatment centers; and/or

- experience losses and lower gross revenues and operating margins during the initial periods of operating the Debtors' newly-developed treatment centers.

Larger acquisitions could increase the Debtors' potential exposure to business risks. Furthermore, integrating a new treatment center could be expensive and time consuming, and could disrupt the Debtors' ongoing businesses and distract the Debtors' management and other key personnel. In addition, the Debtors may incur significant transaction fees and expenses, including for potential transactions that are not consummated.

The Debtors may continue to explore acquisition opportunities outside of the United States when favorable opportunities are available. In addition to the risks set forth herein, foreign acquisitions involve unique risks including the particular economic, political and regulatory risks associated with the specific country, currency risks, the relative uncertainty regarding laws and regulations and the potential difficulty of integrating operations across different cultures and languages.

The Debtors plan to continue to develop new treatment centers in existing and new local markets, including international markets. The Debtors may not be able to structure economically beneficial arrangements in new markets as a result of healthcare laws applicable to such markets or otherwise. If these plans change for any reason or the anticipated schedules for opening and costs of development are revised by the Debtors, the Debtors may be negatively impacted. There can be no assurance that these planned treatment centers will be completed or that, if developed, will achieve sufficient patient volume to generate positive operating margins. If the Debtors are unable to timely and efficiently integrate a newly-developed treatment center, the Debtors' businesses could suffer.

The Debtors cannot be assured that they will achieve the anticipated benefits from completed acquisitions or that they will achieve synergies and cost savings or benefits in connection with future acquisitions. In addition, many of the businesses that the Debtors have acquired and will acquire have financial statements that have been prepared by the management of such companies and have not been independently reviewed and audited. The Debtors cannot be assured that the financial statements of companies the Debtors have acquired or will acquire would not be materially different if such statements were audited. Finally, the Debtors cannot be assured that the Debtors will continue to acquire businesses at valuations consistent with the Debtors' prior acquisitions or that the Debtors will complete acquisitions.

### 14.     Any Failure to Comply with Regulations Relating to Privacy and Security of Patient Information Could Subject the Debtors to Significant Penalties

There are numerous federal and state laws and regulations addressing patient information privacy and security concerns, including state laws related to identity theft. In particular, the federal regulations issued under HIPAA contain provisions that:

- protect individual privacy by limiting the uses and disclosures of patient information;

- require notifications to individuals, and in certain cases to government agencies and the media, in the event of a breach of unsecured protected health information;

- require the implementation of security safeguards to ensure the confidentiality, integrity and availability of individually identifiable health information in electronic form; and

- prescribe specific transaction formats and data code sets for certain electronic healthcare transactions.

Furthermore, the Omnibus HIPAA Rule makes business associates directly obligated to adhere to the HIPAA Security Rule and certain provisions of the HIPAA Privacy and Breach Notification Rules,

such that violations of these rules can be enforced by the government directly against the business associate.

Compliance with these regulations requires substantial time and resources. If the Debtors fail to comply with the HIPAA regulations, the Debtors could be subject to civil and criminal penalties and, for the Debtors' employees, possible imprisonment. Furthermore, the Debtors' facilities could be subject to a periodic audit by the federal government, and enforcement of HIPAA violations may occur by either federal agencies or state attorneys general.

### 15.    The Debtors' Businesses Could Be Materially Harmed by Technological and Therapeutic Changes

The treatment of cancer patients is subject to potential significant technological and therapeutic changes. Future technological developments could render the Debtors' equipment obsolete. The Debtors may incur significant costs in replacing or modifying equipment in which the Debtors have already made a substantial investment prior to the end of its anticipated useful life. In addition, there may be significant advances in other cancer treatment methods, such as chemotherapy, surgery, biological therapy or in cancer prevention techniques, which could reduce demand or even eliminate the need for the radiation therapy services the Debtors provide.

### 16.    The Debtors Could Be Materially Harmed if the Debtors Are Unable to Enter into Services Agreements with Professional Corporations, Including Related Party Professional Corporations

Certain states have laws prohibiting business corporations from employing physicians. The Debtors' treatment centers in those states operate through services agreements with professional corporations that employ the radiation oncologists who provide professional services at the treatment centers in those states. In 2015, $141.2 million of the Debtors' net patient service revenue was derived from services agreements, as compared to $858.9 million from all of the Debtors' other centers. The professional corporations in these states are currently owned by certain of the Debtors' directors, executive officers and equityholders, who are licensed to practice medicine in those states. As the Debtors enter into new states that will require a services agreement, there can be no assurance that a related party professional corporation, or any professional corporation, will be willing or able to enter into a services agreement. Furthermore, if the Debtors enter into a services agreement with an unrelated party there could be an increased risk of differences arising or future termination.

The Debtors cannot be assured that a professional corporation will not seek to terminate an agreement with the Debtors on any basis, including on the basis of state laws prohibiting the corporate practice of medicine, nor can the Debtors be assured that governmental authorities in those states will not seek termination of these arrangements on the same basis. While the Debtors have not been subject to such proceedings in the past, the Debtors could be materially harmed if any state governmental authorities or the professional corporations with which the Debtors have a services agreement were to succeed in such a termination.

### 17.    The Loss of Key Personnel Could Adversely Affect the Debtors' Operations

The Debtors' operations are dependent on a relatively small group of key management personnel, including the Debtors' executive officers, and physicians. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and physicians. Because competition for experienced personnel in the healthcare industry can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the

loss of such key management personnel and physicians could adversely affect the Debtors' ability to operate their businesses.  In addition, a loss of key personnel or material erosion of morale at the corporate and/or field levels could have a material adverse effect on the Debtors' ability to meet patient and counterparty expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

<div align="center">

**18.    Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations**

</div>

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation.  With few exceptions, all claims that arise prior to the Debtors' filing a petition for reorganization under the Bankruptcy Code or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged in accordance with the terms of the plan of reorganization. Any claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized debtor and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations on a post-reorganization basis.

### D.    Liquidity Risks

The Reorganized Debtors' ability to carry out capital spending that is important to their growth and productivity will depend on a number of factors, including future operating performance and ability to achieve the business plan.  These factors will be affected by general economic, financial, competitive, regulatory, business, and other factors that are beyond the Reorganized Debtors' control.

### E.    Risks Associated with Forward-Looking Statement

This Disclosure Statement contains certain "forward-looking statements." All statements other than statements of historical fact are "forward-looking" statements for purposes of the U.S. federal and state securities laws. These statements may be identified by the use of forward-looking terminology such as "anticipate," "believe," "continue," "could," "estimate," "expect," "intend," "may," "might," "our vision", "plan," "potential," "preliminary," "predict," "should," "will" or "would" or the negative thereof or other variations thereof or comparable terminology.  The Debtors have based these forward-looking statements on their current expectations, assumptions, estimates and projections. While the Debtors believe these expectations, assumptions, estimates and projections are reasonable, such forward-looking statements are only predictions and involve known and unknown risks and uncertainties, many of which are beyond their control, which may cause their actual results, performance or achievements to differ materially from any future results, performance or achievements expressed or implied by these forward-looking statements. **The financial information contained in this Disclosure Statement has not been audited**.  In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that were available at the time of such preparation.  Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to represent or warrant that the financial information contained in this Disclosure Statement and attached hereto is without inaccuracies.

<div align="center">

115

</div>

F.      **Disclosure Statement Disclaimer**

1.      **Information Contained in this Disclosure Statement is for Soliciting Votes**

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

2.      **This Disclosure Statement Has Not Been Approved by the SEC**

This Disclosure Statement has not and will not be filed with the SEC or any state regulatory authority.   Neither the SEC nor any state regulatory authority has approved or disapproved of the securities described in this Disclosure Statement or has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained in this Disclosure Statement.

3.      **No Legal, Business, Accounting, or Tax Advice Is Provided to You by this Disclosure Statement**

**This Disclosure Statement is not advice to you.**   The contents of this Disclosure Statement should not be construed as legal, business, accounting, or tax advice.   Each holder of a Claim or Interest should consult such holder's own legal counsel, accountant, or other applicable advisor with regard to any legal, business, accounting, tax, and other matters concerning his or her Claim or Interest.   This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

4.      **No Admissions Made**

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors), nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, or holders of Allowed Claims or Allowed Interests, or any other parties in interest.

5.      **Failure to Identify Litigation Claims or Projected Objections**

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement.   The Debtors or Reorganized Debtors, as applicable, may seek to investigate, File, and prosecute Claims and Interests and may object to Claims or Interests after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Interests or objections to such Claims or Interests.

6.      **No Waiver of Right to Object or Right to Recover Transfers and Assets**

The vote by a holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Debtors (or any Entity, as the case may be) to object to that holder's Claim or Interest, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any claims or causes of action of the Debtors or their respective Estates or the Reorganized Debtors are specifically or generally identified in this Disclosure Statement.

### 7. Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained in this Disclosure Statement.

### 8. Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement, unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

### 9. No Representations Outside this Disclosure Statement Are Authorized

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtors and the U.S. Trustee.

## G. Liquidation Under Chapter 7

If no plan can be confirmed, the Debtors' Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims or Interests and the Debtors' Liquidation Analysis is set forth in <u>Article VIII</u> of this Disclosure Statement, "<u>Statutory Requirements for Confirmation of the Plan</u>," and in the Debtors' Liquidation Analysis.

## X. CERTAIN SECURITIES LAW MATTERS

### A. New Preferred Equity, New Common Stock, New Second Lien Notes, and New Warrants

As discussed herein, the Plan provides for the Debtors to distribute New Preferred Equity, New Common Stock, New Second Lien Notes, and, if certain conditions are satisfied, New Warrants to certain holders of Allowed Claims or Allowed Interests. The Debtors believe that the New Preferred Equity, New Common Stock, New Second Lien Notes, and New Warrants (if any) will be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and any applicable state securities law (each, a "<u>Blue Sky Law</u>").

**B.**     **Issuance and Resale of Securities Under the Plan**

    **1.**     **Exemptions from Registration Requirements of the Securities Act and Blue Sky Laws**

    Section 1145 of the Bankruptcy Code provides that the registration requirements of section 5 of the Securities Act (and any applicable state Blue Sky Laws) will not apply to the offer or sale of stock, options, warrants or other securities by a debtor if:  (a) the offer or sale occurs under a plan of reorganization and is for the securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan; (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor; and (c) the securities are issued entirely in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for cash and property.  Section 4(a)(2) of the Securities Act provides that the registration requirements of section 5 of the Securities Act will not apply to the offer or sale of stock, options, warrants, or other securities by an issuer not involving any public offering.  In reliance upon these exemptions, the offer and sale of the New Preferred Equity, the New Common Stock, the New Second Lien Notes, and the New Warrants (if any) under the Plan will not be registered under the Securities Act or any applicable state Blue Sky Laws.

    To the extent that the issuance and distribution of the New Preferred Equity, the New Common Stock, the New Second Lien Notes, and the New Warrants (if any) are covered by section 1145 of the Bankruptcy Code, such securities may be resold without registration under the Securities Act or other federal securities laws, unless the holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code; *provided, however,* such securities will not be freely tradeable if, at the time of transfer, the holder thereof is an "affiliate" of the issuer as defined in Rule 144(a)(1) under the Securities Act or had been such an "affiliate" within 90 days of such transfer.  In addition, the New Preferred Equity, the New Common Stock, the New Second Lien Notes, and the New Warrants (if any) generally may be resold without registration under applicable state Blue Sky Laws pursuant to various exemptions provided by the respective Blue Sky Laws of those states; however, the availability of those exemptions for any such resale cannot be known unless individual state Blue Sky Laws are examined.

    <u>Section 4.10</u> of the Plan contemplates the application of either section 1145 of the Bankruptcy Code or section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder to the offering, issuance, sale, and distribution of (a) all shares of New Common Stock, shares of New Preferred Equity, the New Second Lien Notes, and the New Warrants (if any) under the Plan (including New Preferred Equity issued to Rights Offering Participants in the New Preferred Equity Rights Offering and New Preferred Equity issued to the Backstop Parties pursuant to the Backstop Purchase Agreement), (b) all shares of New Common Stock or other securities issued upon conversion of any shares of New Preferred Equity, and (c) all shares of New Common Stock or other securities issued upon exercise of the New Warrants (if any), but at this time, the Debtors express no view as to whether the issuance of the New Preferred Equity, the New Common Stock, the New Second Lien Notes, or the New Warrants (if any) is exempt from registration pursuant to section 1145 of the Bankruptcy Code and, in turn, whether any Person may freely resell the New Preferred Equity, the New Common Stock, the New Second Lien Notes, or the New Warrants (if any) without registration under the Securities Act, other federal securities laws, or applicable state Blue Sky Laws.  Recipients of the New Preferred Equity, the New Common Stock, the New Second Lien Notes, and the New Warrants (if any) are advised to consult with their own legal advisors as to the applicability of section 1145 of the Bankruptcy Code to the New Preferred Equity, the New Common Stock, the New Second Lien Notes, and the New Warrants (if any) and the availability of any exemption from registration under the Securities Act, other federal securities laws, or applicable state Blue Sky Laws.

Section 4(a)(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving any public offering are exempt from registration under the Securities Act. Regulation D is a non-exclusive safe harbor from registration promulgated by the SEC under section 4(a)(2) of the Securities Act.  All shares of New Preferred Equity, New Common Stock, New Second Lien Notes, and New Warrants (if any) issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder ("4(a)(2) Securities") will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom, including if applicable, Rule 144.

4(a)(2) Securities will be issued in certificated or book-entry form and will bear a restrictive legend.  Each certificate or book-entry representing, or issued in exchange for or upon the transfer, sale or assignment of, any 4(a)(2) Securities shall be stamped or otherwise imprinted with a legend in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON ISSUANCE DATE, HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."

The Reorganized Debtors will reserve the right to require certification or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of the 4(a)(2) Securities.  The Reorganized Debtors will also reserve the right to stop the transfer of any 4(a)(2) Securities if such transfer is not in compliance with Rule 144 or any other available exemption. Any Person who receives 4(a)(2) Securities will be required to acknowledge and agree not to resell such securities except in accordance with Rule 144 or any other available exemption, when available, and that the securities will be subject to the other restrictions described above.

**Recipients of the New Preferred Equity, the New Common Stock, the New Second Lien Notes, and the New Warrants (if any) are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Bankruptcy Code, the Securities Act and any applicable state Blue Sky Law.**

2.    **Resale of the New Preferred Equity, New Common Stock, New Second Lien Notes, and New Warrants (if any) by Persons Deemed to be "Underwriters" and Holders of "Restricted Securities"; Definition of Underwriter**

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an Entity that is not an "issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act.  In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" any Person directly or indirectly controlling or controlled by an issuer, or any Person under direct or indirect common control with an issuer, of securities. As a result, the reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "controlling Persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer, director or significant shareholder of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "controlling person" of such debtor or successor, particularly, with respect to officers and directors, if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of securities of a reorganized debtor may be presumed to be a "controlling person" and, therefore, an underwriter.

Resales of the New Preferred Equity, the New Common Stock, the New Second Lien Notes, and the New Warrants (if any) by Entities deemed to be "underwriters" (which definition includes "controlling persons" of an issuer) are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act, state Blue Sky Laws, or other applicable law. Under certain circumstances, holders of New Preferred Equity, the New Common Stock, the New Second Lien Notes, and the New Warrants (if any) who are deemed to be "underwriters" or holders of securities that are considered "restricted securities" may be entitled to resell their securities pursuant to the limited safe harbor resale provisions of Rule 144.

Rule 144 provides an exemption for the public resale of "restricted securities" if certain conditions are met. These conditions vary depending on whether the holder of the restricted securities is an affiliate of the issuer. An affiliate is defined as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the issuer." A non-affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act and who has not been an affiliate of the issuer during the 90 days preceding such sale may resell restricted securities after a one-year holding period whether or not there is current public information regarding the issuer.

An affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act may resell restricted securities after the one-year holding period if at the time of the sale certain current public information regarding the issuer is available. The issuer of the New Preferred Equity, the New Common Stock, the New Second Lien Notes, and the New Warrants (if any), however, does not intend to file periodic or current reports under the Exchange Act or seek to list any such securities for trading on a national securities exchange. Consequently, "current public information" (as such term is defined in Rule 144) regarding the issuer of the New Preferred Equity, the New Common Stock, the New Second Lien Notes, and the New Warrants (if any) is not expected to be available for purposes of sales of any such securities under Rule 144 by holders who are deemed to be "underwriters" or to holders of "restricted securities."

Whether any particular Person would be deemed to be an "underwriter" (including whether such Person is a "controlling person" of an issuer) with respect to the New Preferred Equity, the New Common Stock, the New Second Lien Notes, and the New Warrants (if any) would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the New Preferred Equity, the New Common Stock, the New Second Lien Notes, and the New Warrants (if any) and, in turn, whether any Person may

120

freely resell any such securities. The Debtors recommend that potential recipients of the New Preferred Equity, the New Common Stock, the New Second Lien Notes, and/or the New Warrants (if any) consult their own counsel concerning their ability to freely trade such securities without compliance with the Securities Act, other federal securities laws, or applicable state Blue Sky Laws.

### 3.    Management Incentive Plan

The Plan contemplates the implementation of the Management Incentive Plan, which will reserve a certain percentage of the New Common Stock for issuance. The Management Incentive Plan will be established and implemented by the New Board as soon as reasonably practicable following the Effective Date. The Debtors plan to issue such New Common Stock pursuant to Rule 701 promulgated under the Securities Act or pursuant to the exemption provided by section 4(a)(2) of the Securities Act and, accordingly, such securities will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom, including if applicable, Rule 144.

## XI.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain U.S. federal income tax consequences of the Consummation of the Plan to the Debtors, the Reorganized Debtors, and to certain holders (which solely for purposes of this discussion means the beneficial owner for U.S. federal income tax purposes) of certain Claims, Interests, loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility, New Warrants, New Second Lien Notes, New Preferred Equity, and New Common Stock. The following discussion does not address the U.S. federal income tax consequences to holders (i) whose Claims or Interests are Unimpaired or otherwise entitled to payment in full in Cash under the Plan or (ii) that are otherwise not entitled to vote under the Plan. Any holders of any such Claims or Interests are urged to consult their tax advisors regarding the federal, state, local, non-U.S. and other tax consequences of the Plan. This summary is based on the Internal Revenue Code of 1986, as amended, (the "IRC"), the Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the Internal Revenue Service (the "IRS") and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to  the Debtors, the Reorganized Debtors, or to the holders of Claims or Interests, or holders of loans under the New MDL Term Loan Facility or the New First Lien Term Loan Credit Facility, New Warrants, New Second Lien Notes, New Preferred Equity, or New Common Stock in light of their individual circumstances, nor does it address tax issues with respect to such holders that are subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, subchapter S corporations, trusts, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies, Persons who are related to the Debtors within the meaning of the IRC, Persons using a mark-to-market method of accounting, holders of Claims or Interests, or loans under the New MDL Term Loan Facility or the New First Lien Term Loan Credit Facility, New Warrants, New Second Lien Notes, New Preferred Equity, or New Common Stock who are themselves in bankruptcy, Persons who received their Claims or Interests, loans under the New MDL Term Loan Facility or the New First

Lien Term Loan Credit Facility, New Warrants, New Second Lien Notes, New Preferred Equity, or New Common Stock pursuant to the exercise of an employee stock option or otherwise as compensation, and regulated investment companies and those holding, or who will hold, Claims or Interests, loans under the New MDL Term Loan Facility or the New First Lien Term Loan Credit Facility, New Warrants, New Second Lien Notes, or New Common Stock or other certain assets, as part of a hedge, straddle, conversion, or constructive sale transaction) or U.S. Holders (as defined below) whose "functional currency" is not the U.S. dollar. The following summary does not address a holder of loans under the New MDL Term Loan Facility or the New First Lien Term Loan Credit Facility, New Warrants, New Second Lien Notes, New Preferred Equity, or New Common Stock other than such a holder that received their loans under the New MDL Term Loan Facility or the New First Lien Term Loan Credit Facility, New Warrants, New Second Lien Notes, New Preferred Stock, or New Common Stock pursuant to the Backstop Purchase Agreement, by exercise of rights pursuant to the New Notes Rights Offering or New Preferred Equity Rights Offering or in exchange for their Claim or Interest pursuant to the Plan. Furthermore, the following summary of certain U.S. federal income tax consequences of the Plan does not purport to address any aspect of state, local, estate, gift, non-U.S., non-income or other tax law or the Medicare tax. This summary assumes that a holder of Claims or Interests holds only Claims or Interests in a single Class and holds a Claim, Interest, loans under the New MDL Term Loan Facility or the New First Lien Term Loan Credit Facility, New Warrants, New Second Lien Notes, or New Common Stock as a "capital asset" (within the meaning of section 1221 of the IRC). The following discussion assumes the debt obligation(s) underlying each Allowed Claim is properly treated as debt (rather than equity) of the Debtor(s) that the holder has the Allowed Claim against. This discussion also assumes that none of the debt obligations underlying the Allowed Claims is treated as a "short-term" debt instrument or a "contingent payment debt instrument" for U.S. federal income tax purposes, that the loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility, and the New Second Lien Notes are not treated as "short-term" debt instruments, "variable rate debt instruments," or "contingent payment debt instruments," for U.S. federal income tax purposes and that each of the debt obligations underlying the Allowed Claims and the loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility, and the New Second Lien Notes are denominated in U.S. dollars. Holders should consult their tax advisors regarding differing and potentially adverse U.S. federal income tax consequences of ownership and disposition of the New MDL Term Loan Facility, the New First Lien Term Loan Credit Facility, and the New Second Lien Notes if any of the foregoing treatments apply to the New MDL Term Loan Facility, the New First Lien Term Loan Credit Facility, and the New Second Lien Notes or they are not denominated in U.S. dollars. Lastly, this discussion assumes that the Restructuring Transactions will be completed in accordance with the Plan and as further described herein and in the Plan and that, except as otherwise specifically stated, any transfer of the New Warrants, New Second Lien Notes, New Preferred Equity, the New Common Stock, or the loans under the New MDL Term Loan Facility or the New First Lien Term Loan Credit Facility in exchange for any Claim will be made by and with the Reorganized Debtors to which such warrants, equity, and debt instruments relate.

For purposes of this discussion, a "U.S. Holder" is a holder that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other Entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States Persons have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States Person. For purposes of this discussion, a "Non-U.S. Holder" is any holder that is not a U.S. Holder other than any partnership (or other Entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other Entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a holder, the tax treatment of a partner (or other owner) generally will depend upon the status of the partner (or other owner) and the activities of the partner (or other owner) and the Entity. Partners (or other owners) of partnerships (or other pass-through entities) that are holders should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of a Claim or Interest, loans under the New MDL Term Loan Facility or the New First Lien Term Loan Credit Facility, New Second Lien Notes, New Warrants, New Preferred Equity, or New Common Stock. All holders of Claims or Interests, loans under the New MDL Term Loan Facility or the New First Lien Term Loan Credit Facility, New Second Lien Notes, New Warrants, New Preferred Equity, or New Common Stock are urged to consult their tax advisors for the federal, state, local, non-U.S., and other tax consequences of the Plan.**

A.    **Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized Debtors**

1.    **Cancellation of Debt and Reduction of Tax Attributes**

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (x) the amount of Cash paid, (y) the "issue price" (as described below) of any indebtedness of the taxpayer issued in satisfaction of the existing indebtedness and (z) the fair market value of any other consideration given in satisfaction of such indebtedness at the time of the exchange.

A debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC. In general, tax attributes are required to be reduced in the following order: (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (f) passive activity loss and credit carryovers; and (g) foreign tax credits. Notwithstanding this required ordering of attribute reduction, a debtor with COD Income may make an election to first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC. The reduction in tax attributes occurs only after the taxable income (or loss) for the year of the debt discharge has been determined. Excess COD Income over the amount of available tax attributes is generally not subject to U.S. federal income tax and generally has no other U.S. federal income tax impact.

In the context of a consolidated group of corporations, the tax rules provide for a complex ordering mechanism in determining how the tax attributes of one member can be reduced by the COD Income of another member. Under the Treasury Regulations, in certain circumstances, the tax attributes of each member of an affiliated group of corporations that is excluding COD Income is first subject to reduction. To the extent the debtor member's tax basis in stock of a lower-tier member of the affiliated group is reduced, a "look through rule" requires that a corresponding reduction be made to the tax attributes of the lower-tier member. If a debtor member's excluded COD Income exceeds its tax

123

attributes, the excess COD Income is applied to reduce certain remaining consolidated tax attributes of the affiliated group.

In connection with the Restructuring Transactions, Debtors expect to realize significant COD Income.  Because the Plan provides that holders of certain Allowed Claims or Allowed Interests will receive New Warrants, New Second Lien Notes, New Preferred Equity and the New Common Stock and may receive loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility, the exact amount of any COD Income that will be realized by the Debtors, and accordingly the amount of tax attributes required to be reduced (if any), will depend in part on the fair market value of the New Warrants, New Second Lien Notes, New Preferred Equity and the New Common Stock and may depend on the "issue price" of the loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility (as described below) and will not be determinable until the Consummation of the Plan.  While the Rights Offering Participants will receive New Preferred Equity upon exercise of their New Preferred Equity Rights for Cash in an aggregate amount equal to 85 percent of the New Preferred Equity Rights Offering Amount, the New Preferred Equity Rights will reduce COD Income based on the full fair market value, if any, of the New Preferred Equity Rights that may be received.  The Debtors expect that the amount of such COD Income will be significant and there will be material reductions in, or elimination of, tax attributes (including net operating losses ("NOLs"), credits and certain of the Debtors' tax basis in their assets).

For the period ending December 31, 2016, the Debtors estimate that they had NOLs for U.S. federal income tax purposes of approximately $600 million.  As discussed above, the Debtors' NOLs will likely be materially reduced after computing the Debtors' taxes for the year in which the Plan is implemented. To the extent that any remain, they will be subject to limitation as described below.

### (a)      General Section 382 Annual Limitation

Under section 382 of the IRC, if a corporation undergoes an "ownership change," the amount of any remaining NOLs, tax credit carryforwards, net unrealized built-in losses, and possibly certain other attributes of the Reorganized Debtors allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally are subject to an annual limitation.  In general, the amount of the annual limitation to which a corporation that undergoes an ownership change would be subject in any "post-change year" is equal to the product of (a) the fair market value of the stock of the loss corporation immediately before the ownership change (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" in effect for the month in which the ownership change occurs (currently, 1.93 percent for October 2017).  The annual limitation under section 382 represents the amount of pre-change NOLs, as well as certain built-in losses recognized within the five year period following the ownership change, that may be used each year to offset income. The section 382 limitation may be increased to the extent that the Debtors have a net unrealized built-in gain in their assets upon implementation of the Plan, and either recognize certain built-in gains in their assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65.  Limitations on the use of built-in losses may be imposed if the Debtors have a net unrealized built-in loss in their assets upon implementation of the Plan.  Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits.  Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.  As discussed below, however, special rules may apply in the case of a corporation which experiences an ownership change as the result of a bankruptcy proceeding.

The exchange of New Preferred Equity and the New Common Stock pursuant to the Plan will result in an ownership change. The Debtors expect to have a net unrealized built-in gain in their assets as of the time the Plan is implemented.

### (b)    Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when a debtor company's former shareholders and so called "qualified creditors" of a debtor company in chapter 11 receive, in respect of their claims or interests, at least 50 percent of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis but, instead, are required to be reduced by the amount of any interest deductions claimed during the three taxable years preceding the taxable year that includes the Effective Date, and during the part of the taxable year prior to and including the Effective Date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another ownership change within two years after Consummation of the Plan, then the Reorganized Debtors' section 382 annual limitation will generally be reduced to zero, which would effectively preclude utilization of Pre-Change Losses.

Where the 382(l)(5) Exception is not applicable (either because the debtor company does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception"). When the 382(l)(6) Exception applies, a corporation in bankruptcy that undergoes an "ownership change" generally is permitted to determine the fair market value of its stock after taking into account the increase in value resulting from any surrender or cancellation of creditors' claims in the bankruptcy. This differs from the ordinary rule that requires the fair market value of a corporation that undergoes an ownership change to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that under it the Reorganized Debtors would not be required to reduce their NOLs by the amount of certain interest deductions claimed by the Debtors within the prior three-year period and the Reorganized Debtors may undergo a change of ownership within two years without triggering any reduction in their section 382 annual limitation.

The Debtors have not yet determined whether they are eligible for, or, if so, whether they will elect out of, the 382(l)(5) Exception.

### 2.    Alternative Minimum Tax

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income ("AMTI") at a 20 percent rate to the extent such tax exceeds the corporation's regular federal income tax for the year. AMTI is generally equal to regular taxable income with certain adjustments. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated. For example, except for alternative tax NOLs generated in or deducted as carryforwards in taxable years ending in certain years, which can offset 100 percent of a corporation's AMTI, only 90 percent of a corporation's AMTI may be offset by available alternative tax NOL carryforwards. Additionally, under section 56(g)(4)(G) of the IRC, an ownership change (as discussed above) that occurs with respect to a corporation having a net unrealized built-in loss in its assets will cause, for AMT purposes, the adjusted basis of each asset of the corporation immediately after the ownership change to be equal to its proportionate share (determined on the basis of respective fair market values) of the fair market value of the assets of the corporation, as determined under section 382(h) of the IRC, immediately before the ownership change.

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular federal income tax liability in future years when the corporation is not subject to the AMT.  Any unused credit is carried forward indefinitely.

**B.**      **Certain U.S. Federal Income Tax Consequences to U.S. Holders of Certain Allowed Claims or Allowed Interests, Loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility, New Warrants, New Second Lien Notes, New Preferred Equity, and New Common Stock**

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan.  Holders of Claims or Interests are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

**1.      U.S. Federal Income Tax Consequences to Holders of Allowed Class 3 Claims and Class 4 Claims**

Pursuant to the Plan and in full and final satisfaction of their Claims, holders of Allowed Class 3 Claims (solely for purposes of this discussion, the "Holders of MDL Claims") will receive (a) their Pro Rata share of loans provided under the New MDL Term Loan Facility in an aggregate amount equal to (i) the aggregate amount of MDL Obligations owned or held by such holder as of immediately prior to the Effective Date minus (ii) the unpaid portion of its Allowed MDL Adequate Protection Payments and (b) payment in full in Cash of the unpaid portion of its Allowed MDL Adequate Protection Payments.

Pursuant to the Plan and in full and final satisfaction of their Claims, holders of Allowed Class 4 Claims (solely for purposes of this discussion, the "Holders of First Lien Claims") will receive (a) loans provided under the New First Lien Term Loan Credit Facility in an aggregate principal amount equal to (i) the aggregate amount of First Lien Obligations owned or held by such holder as of immediately prior to the Effective Date, minus (ii) the Exchanged Credit Facility Claims of such holder; *provided, however,* that no distributions shall be made on any of the Exchanged Credit Facility Claims, minus (iii) the unpaid portion of its Allowed First Lien Adequate Protection Payments and (b) payment in full in Cash of the unpaid portion of its Allowed First Lien Adequate Protection Payments.

Solely for purposes of this discussion, the term "Old Debt" means, in the case of a Holder of MDL Claims, such holder's beneficial interest in the MDL Obligations, and in the case of a Holder of First Lien Claims, such holder's beneficial interest in the First Lien Obligations, as the case may be.

The U.S. federal income tax consequences of the Plan to U.S. Holders that are Holders of MDL Claims and U.S. Holders that are Holders of First Lien Claims will depend, in part, on, among other things, whether the MDL Obligations and First Lien Obligations, as applicable, and the loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility received (if any) in the exchange both constitute "securities" for U.S. federal income tax purposes.  Neither the IRC nor the Treasury Regulations promulgated thereunder defines the term "security."  Whether a debt instrument constitutes a "security" is determined based on all relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes.  These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security.  There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an interest of the obligor, whether payments of interest are fixed, variable, or contingent,

126

and whether such payments are made on a current basis or accrued. **Due to the inherently factual nature of the determination, U.S. Holders are urged to consult their tax advisors regarding the status of the MDL Obligations and the First Lien Obligations and the loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility as "securities" for U.S. federal income tax purposes.**

> **(a)** **Treatment of Holders of MDL Claims and Holders of First Lien Claims That Are U.S. Holders If Such U.S. Holders Receive Loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility and the Old Debt and Loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility Are Both Treated as "Securities" for U.S. Federal Income Tax Purposes**

This section only applies if the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility are not fully syndicated and the Holders of MDL Claims and the Holders of First Lien Claims receive loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility, respectively. If that is the case, and the MDL Obligations and First Lien Obligations and the loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility are treated as "securities" for U.S. federal income tax purposes, the exchange of the Old Debt for loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility and Cash, if any, should, in each case, constitute a "recapitalization" for U.S. federal Income tax purposes.

If the exchange is treated as a recapitalization for U.S. federal income tax purposes, a U.S. Holder exchanging Old Debt would not recognize loss on the exchange and would generally recognize gain equal to the lesser of:

> i.  the fair market value of the amount of Cash received, if any, (other than to the extent attributable to accrued but untaxed interest on the Old Debt which will be treated as discussed below under "—Accrued Interest") ("boot"); and

> ii. the gain realized by the U.S. Holder (*i.e.*, the excess of the "issue price" (as described below) of the loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility received plus the amount of Cash received, if any, (in each case, other than to the extent attributable to accrued but untaxed interest on the Old Debt which will be treated as discussed below under "—Accrued Interest") over the U.S. Holder's adjusted tax basis in the Old Debt surrendered in the exchange).

The adjusted tax basis of the MDL Claim or First Lien Claim, as applicable, generally will equal a U.S. Holder's purchase price for the MDL Claim or First Lien Claim, as reduced in the event that the U.S. Holder claimed a bad debt deduction with respect to MDL Claim or First Lien Claim, increased by any original issue discount ("OID") previously accrued and any market discount previously included in income, and reduced by any amortizable bond premium previously amortized and any payments previously received that do not constitute "qualified stated interest." Except as provided below under "—Market Discount" with respect to accrued market discount, any such gain generally will be long-term capital gain if the U.S. Holder held the MDL Claims or First Lien Claims for more than one year at the time of the exchange. Long-term capital gains of a non-corporate taxpayer may be taxed at a preferential rate.

The determination of the "issue price" of the loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility for purposes of this analysis will depend, in part on whether the Loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility are traded on an "established securities market" for U.S. federal income tax purposes. The issue price of a debt instrument that is traded on an established market (or that is issued for stock or securities so traded) would be the fair market value of such debt instrument (or such stock or securities so traded) on the issue date as determined by such trading. The issue price of a debt instrument that is neither so traded nor issued for stock or securities so traded would be its stated principal amount (provided that the interest rate on the debt instrument exceeds the applicable federal rate published by the IRS). Although not free from doubt, the Debtors believe that either the loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility or the MDL Obligations and First Lien Obligations that are tendered for loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility will be treated as traded on an established securities market for U.S. federal income tax purposes, in which case the issue price of the loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility would be equal to its fair market value, but no assurances can be given in this regard. The rules regarding the determination of issue price are complex and highly detailed and you should consult your tax advisor regarding the determination of the issue price of the loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility.

Except to the extent the loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility received is attributable to accrued interest on the Old Debt, a U.S. Holder's holding period for the loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility received will include the period of time during which the U.S. Holder held the corresponding MDL Obligations or First Lien Obligations, as applicable, and a U.S. Holder's initial tax basis in the loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility will equal the adjusted tax basis in the MDL Obligations and First Lien Obligations immediately prior to the exchange, decreased by the amount of any boot received and increased by the amount of gain, if any, recognized by the U.S. Holder in respect of the exchange. Any portion of the loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility received that is attributable to accrued but untaxed interest will have an initial tax basis in a U.S. Holder's hands equal to such accrued interest and a holding period that begins the day following the Effective Date.

> **(b)** **Treatment of Holders of MDL Claims and Holders of First Lien Claims that are U.S. Holders If (i) the Old Debt and the Loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility Are Not Both Treated as "Securities" for U.S. Federal Income Tax Purposes or (ii) Such U.S. Holders Do Not Receive Any Loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility**

If (i) either the MDL Obligations, the First Lien Obligations, or the loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility are not treated as a "security" for U.S. federal income tax purposes or (ii) the Holders of MDL Claims and Holders of First Lien Claims, as applicable, do not receive any loans under the New MDL Term Loan Facility or the New First Lien Term Loan Credit Facility, respectively, the exchange of the MDL Obligations or First Lien Obligations, as applicable, for a Pro Rata share of the unsubscribed portion of the loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility (if any), and Cash (if any) will, in each case, constitute a fully taxable exchange under section 1001 of the IRC. Accordingly, each Holder of MDL Claims that is a U.S. Holder and each Holder of First Lien Claims that is a U.S. Holder (as applicable) generally should recognize gain or loss in the exchange equal to the difference between (1) the sum of the

amount of Cash received, if any, plus the "issue price" (as discussed above) of the loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility received, if any (in each case, to the extent such consideration is not allocable to accrued but untaxed interest on the MDL Obligations or First Lien Obligations, as applicable, as discussed below under "—Accrued Interest") and (2) such U.S. Holder's adjusted tax basis, if any, in the MDL Obligations or First Lien Obligations, as applicable.  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Old Debt in such U.S. Holder's hands, whether the Old Debt constitutes a capital asset in the hands of the U.S. Holder, whether the Old Debt was purchased at a discount, and whether and to what extent the U.S. Holder has previously claimed a bad debt deduction with respect to the Old Debt.  If recognized gain is capital gain, it generally would be long-term capital gain if the holder held the Old Debt for more than one year at the time of the exchange.  The deductibility of capital losses is subject to certain limitations as discussed below.  In addition, see the discussions of accrued interest and market discount below.  A U.S. Holder's tax basis in the loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility received, if any, should equal its "issue price" (as discussed above).  A U.S. Holder's holding period for the loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility received, if any, should each begin on the day following the Effective Date.

### 2.    U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Class 5 Claims

Pursuant to the Plan and in full and final satisfaction of their Claims, holders of Allowed Class 5 Claims will receive (a) their pro rata share of (i) the New Notes Rights (but only to the extent such holder is an Accredited Investor); and (ii) the New Preferred Equity Rights (but only to the extent such holder is an Accredited Investor); and (b) their Pro Rata share of the New Common Stock Equity Pool (subject to dilution on account of the shares of New Common Stock issuable upon conversion of the New Preferred Equity, the shares of New Common Stock issuable upon exercise of the New Warrants, and the Management Incentive Plan Equity).

The Debtors expect to take the position that the New Preferred Equity Rights, and New Common Stock that will be received by the holders of Note Claims will first be issued and contributed by Reorganized 21CH to Reorganized 21C and then exchanged (in addition to the other consideration, if applicable) with such holders pursuant to the Plan, and to treat such transactions as occurring in the same order (issuance, contribution, and exchange) for U.S. federal income tax purposes.  The Debtors believe, and intend to take the position that, this treatment applies for U.S. federal income tax purposes, and the remainder of the discussion assumes this.  The tax consequences to the Debtors, the Reorganized Debtors, and holders of Note Claims described herein could be materially different in the event this characterization was not respected for U.S. federal income tax purposes.

The tax treatment of the receipt of the New Notes Rights depends, in part, on whether or not such New Notes Rights constitute "securities" for U.S. federal income tax purposes.  There is no clear authority on the tax classification of the New Notes Rights and the New Notes Rights may not constitute securities for U.S. federal income tax purposes.  You should consult your tax advisor regarding whether the New Notes Rights constitute securities for U.S. federal income tax purposes.

If the New Notes Rights and the Notes underlying the holder's Allowed Class 5 Claim do not both constitute "securities" for U.S. federal income tax purposes, the exchange of the Notes underlying the holder's Allowed Class 5 Claim for New Notes Rights, New Preferred Equity Rights, and New Common Stock will constitute a fully taxable exchange under section 1001 of the IRC.

129

Accordingly, each holder of Note Claims that is a U.S. Holder generally should recognize gain or loss in the exchange equal to the difference between (1) the fair market value of the New Notes Rights, New Preferred Equity Rights, and New Common Stock received (in each case, to the extent such consideration is not allocable to accrued but untaxed interest on the old Notes underlying the Note Claims, as applicable, as discussed below under "—Accrued Interest") and (2) such U.S. Holder's adjusted tax basis, if any, in the old Notes underlying the Note Claims, as applicable. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the old Notes in such U.S. Holder's hands, whether the old Notes constitute a capital asset in the hands of the U.S. Holder, whether the old Notes were purchased at a discount, and whether and to what extent the U.S. Holder has previously claimed a bad debt deduction with respect to the old Notes. If recognized gain is capital gain, it generally would be long-term capital gain if the holder held the old Notes for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations as discussed below. In addition, see the discussions of accrued interest and market discount below. A U.S. Holder's tax basis in the New Notes Rights, New Preferred Equity Rights, and New Common Stock received should equal their fair market value on the Effective Date. A U.S. Holder's holding period for the New Notes Rights, New Preferred Equity Rights, and New Common Stock received should each begin on the day following the Effective Date.

If the New Notes Rights and the Notes underlying the holder's Allowed Class 5 Claim both constitute "securities" for U.S. federal income tax purposes, the exchange of the Notes underlying the holder's Allowed Class 5 Claim for New Notes Rights should constitute a "recapitalization" for U.S. federal income tax purposes.

If the exchange is treated as a recapitalization for U.S. federal income tax purposes, a U.S. Holder exchanging Notes underlying the Allowed Class 5 Claims would not recognize loss on the exchange and would generally recognize gain equal to the lesser of:

     i.     the fair market value of the New Preferred Equity Rights and New Common Stock received (other than to the extent attributable to accrued but untaxed interest on the old Notes which will be treated as discussed below under "—Accrued Interest") which is treated as boot; and

     ii.     the gain realized by the U.S. Holder (*i.e.*, the excess of the fair market value of the New Notes Rights, the New Preferred Equity Rights, and New Common Stock received <u>plus</u> the amount of Cash received, if any, (in each case, other than to the extent attributable to accrued but untaxed interest on the old Notes which will be treated as discussed below under "—Accrued Interest") over the U.S. Holder's adjusted tax basis in the old Notes surrendered in the exchange).

The adjusted tax basis of the Note Claim, as applicable, generally will equal a U.S. Holder's purchase price for the Note Claim, as reduced in the event that the U.S. Holder claimed a bad debt deduction with respect to the Note Claim, increased by any OID previously accrued and any market discount previously included in income, and reduced by any amortizable bond premium previously amortized and any payments previously received that do not constitute "qualified stated interest." Except as provided below under "—Market Discount" with respect to accrued market discount, any such gain generally will be long-term capital gain if the U.S. Holder held the Note Claim for more than one year at the time of the exchange. Long-term capital gains of a non-corporate taxpayer may be taxed at a preferential rate. The deductibility of capital losses is subject to limitations as described in more detail below under "—Limitations on Use of Capital Losses."

Except to the extent the New Notes Rights received are attributable to accrued interest on the old Notes, a U.S. Holder's holding period for the New Notes Rights received will include the period of time during which the U.S. Holder held the old Notes underlying the Note Claims exchanged therefor and a U.S. Holder's initial tax basis in the New Notes Rights will equal the adjusted tax basis in the old Notes underlying the Note Claims immediately prior to the exchange, decreased by the amount of any boot received and increased by the amount of gain, if any, recognized by the U.S. Holder in respect of the exchange. Any portion of the New Notes Rights received that is attributable to accrued but untaxed interest will have an initial tax basis in a U.S. Holder's hands equal to such accrued interest and a holding period that begins the day following the Effective Date. A U.S. Holder's initial basis in the New Preferred Equity Rights and New Common Stock will be equal to the fair market value and its holding period for the New Preferred Equity Rights and New Common Stock will generally begin the day following the Effective Date.

### 3. U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Class 6 Claims

Pursuant to the Plan and in full and final satisfaction of their Claims, holders of Allowed Class 6 Claims will receive their Pro Rata share of either the Convenience Claim Distribution or the New Common Stock Equity Pool (subject to dilution on account of the shares of New Common Stock issuable upon conversion of the New Preferred Equity, the shares of New Common Stock issuable upon exercise of the New Warrants, and the Management Incentive Plan Equity) and the holder's pro rata share of the New Notes Rights (but only to the extent such holder is an Accredited Investor holding an Eligible General Unsecured Claim) and the New Preferred Equity Rights (but only to the extent such holder is an Accredited Investor holding an Eligible General Unsecured Claim). The New Common Stock in the New Common Stock Equity Pool shall be distributed on a Pro Rata basis to (a) holders of Allowed Note Claims and (b) certain holders of Allowed General Unsecured Claims.

The receipt of Cash by a U.S. Holder of an Allowed Class 6 Claim should be treated as a taxable exchange under section 1001 of the IRC. The U.S. Holder should recognize capital gain or loss equal to the difference between (1) the Cash received and (2) the U.S. Holder's adjusted tax basis in its Claim. Such gain or loss should be capital in nature (subject to the "market discount" rules described below) and should be long-term capital gain or loss if the debts constituting the surrendered Claim were held for more than one year. To the extent that a portion of the Claim is allocable to accrued but untaxed interest, the U.S. Holder may recognize ordinary interest income. *See* "Accrued Interest" below.

The receipt of New Common Stock and New Notes Rights by a U.S. Holder of an Allowed Class 6 Claim depends on whether the Allowed Class 6 Claim and New Notes Rights both constitute "securities" for U.S. federal income tax purposes and if the Allowed Class 6 Claim is against 21C or 21CH. There is no clear authority on the tax classification of the New Notes Rights and the New Notes Rights may not constitute securities for U.S. federal income tax purposes. You should consult your tax advisor regarding whether the New Notes Rights constitute securities for U.S. federal income tax purposes.

If the New Notes Rights and the debt underlying the Allowed Class 6 Claim are not both treated as "securities" for U.S. federal income tax purposes or if the debt underlying the Allowed Class 6 Claim is debt of 21C, the exchange of the Allowed Class 6 Claim for New Notes Rights, New Preferred Equity Rights, and New Common Stock should be treated by such U.S. Holder as a fully taxable exchange under section 1001 of the IRC. Accordingly, each U.S. Holder of such Claim should recognize gain or loss equal to the difference between (1) the fair market value of the New Notes Rights, New Preferred Equity Rights, and New Common Stock and (2) such U.S. Holder's adjusted tax basis, if any, in the obligation constituting such Claim. The character of such gain or loss as capital gain or loss or as ordinary income

or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in such U.S. Holder's hands, whether the Claim constitutes a capital asset in the hands of the U.S. Holder, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder has previously claimed a bad debt deduction with respect to its Claim.  If recognized gain is capital gain, it generally would be long-term capital gain if the holder held its Claim for more than one year at the time of the exchange.  The deductibility of capital losses is subject to certain limitations as discussed below.  See the discussions of accrued interest and market discount below.  A U.S. Holder's tax basis in any New Notes Rights, New Preferred Equity Rights, and New Common Stock received should equal the fair market value of such stock or issue price of such loan as of the date such stock is distributed or such loan is issued to the U.S. Holder.  A U.S. Holder's holding period for the New Notes Rights, New Preferred Equity Rights, and New Common Stock received should begin on the day following the Effective Date.

If the debt underlying the Allowed Class 6 Claim is treated as a "security" for U.S. federal income tax purposes and is debt of 21CH and the New Notes Rights are treated as "securities" for U.S. federal income tax purposes,  the exchange of the Allowed Class 6 Claim for New Common Stock and New Notes Rights should constitute a "recapitalization" for U.S. federal income tax purposes.  The U.S. federal income tax consequences to such U.S. Holder will be substantially similar to the consequences described above in Section B.1(a) of this <u>Article XI</u> (substituting "New Notes Rights, New Preferred Equity Rights and New Common Stock" for "Loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility" and substituting "General Unsecured Claims" for "Old Debt") that a U.S. Holder of Allowed Class 3 Claims and Allowed Class 4 Claims would experience if such where the debt underlying the Claims and the consideration received in exchange therefore are both treated as "securities" for U.S. federal income tax purposes.

### 4.    U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Class 11 Interests

Pursuant to the Plan and in full and final satisfaction of their Claims, holders of Allowed Interests in 21CH in Class 11 will receive their share of the New Warrants if (i) all Classes of Claims entitled to vote on the Plan vote to accept the Plan, (ii) there are no Allowed Section 510(b) Claims, and (iii) Class 11 votes to accept the Plan (clauses (i), (ii), and (iii) collectively, the "<u>Warrant Conditions</u>").  If each of the Warrant Conditions is not satisfied, a holder of an Allowed Interest in 21CH in Class 11 will receive no recovery.  The following discussion assumes each of the Warrant Conditions is satisfied.

Whether a holder of an Allowed Class 11 Interest recognizes gain or loss as a result of the exchange of its Interest for its share of the New Warrants depends on whether (a) the exchange qualifies as a tax-free recapitalization, which in turn depends on whether the New Warrants are treated as "securities" for the reorganization provisions of the IRC; (b) such holder has claimed a worthless stock deduction with respect to such Allowed Class 11 Interest; and (c) such holder uses the accrual or cash method of accounting for tax purposes.

The Treasury Regulations generally provide that the term "securities" includes rights issued by a party to a reorganization to acquire its stock. Consequently, the Debtors anticipate taking the position that the New Warrants will be treated as "securities" for United States federal income tax purposes.

Under this position, the exchange of such holder's Allowed Class 11 Interest for its share of the New Warrants should be treated as a recapitalization, and therefore a reorganization, under the IRC.  In general, this means such a U.S. Holder will not recognize any gain or loss, on the exchange.  In such case, such a U.S. Holder's tax basis in its share of the New Warrants received should be equal to the tax basis of the 21CH Interests constituting the Allowed Class 11 Interest surrendered therefor, and such a holder's

132

holding period for its share of the New Warrants received should include the holding period for the 21CH Interests constituting the surrendered Allowed Class 11 Interest. If the New Warrants are not treated as "securities", such a U.S. Holder will recognize capital gain, subject to the "market discount" rules discussed below, equal to the difference between the fair market value of the New Warrants and such U.S. Holders' adjusted tax basis, if any, in their Claims. A U.S. Holder that receives no recovery on its Allowed Interest in 21CH in Class 11 will recognize a loss equal to its adjusted tax basis in such Claims, which loss will generally be treated as a capital loss. The deductibility of capital losses is subject to certain limitations as discussed below.

### 5. Accrued Interest

To the extent that any amount received by a U.S. Holder of a surrendered Allowed Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the U.S. Holder's gross income for U.S. federal income tax purposes (any such amount of interest solely for purposes of this discussion "accrued but untaxed interest"), such amount should be taxable to the U.S. Holder as ordinary interest income. Conversely, a U.S. Holder of a surrendered Allowed Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the debt instruments constituting such claim was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by a U.S. Holder of a surrendered Allowed Claim will be attributable to accrued interest on the debt underlying the surrendered Allowed Claim is unclear. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued but unpaid interest and then as a payment of principal. Application of these treatments to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear. Pursuant to the Plan, distributions in respect of Allowed Claims will be allocated first to the principal amount of such Claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of such Claims, to any portion of such Claims for accrued but unpaid interest. However, the provisions of the Plan are not binding on the IRS or a court with respect to the appropriate tax treatment for creditors.

**U.S. Holders should consult their tax advisors concerning the allocation of consideration received in satisfaction of their Claims and Interests and the federal income tax treatment of accrued but untaxed interest.**

### 6. Market Discount

Under the "market discount" provisions of sections 1276 through 1278 of the IRC, some or all of any gain realized by a U.S. Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered Allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if its U.S. Holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (ii) in the case of a debt instrument issued with OID its adjusted issue price, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition (determined as described above) of debt constituting its Allowed Claim that was acquired with "market discount" should be treated as ordinary income to the extent of the "market discount" that accrued thereon while such debts were considered to be held by the U.S. Holder (unless the holder elected to include "market discount" in income as it accrued). To the extent that the surrendered debts that were acquired with market discount are exchanged in a tax-free or other reorganization transaction for other property (as may occur here), any market discount that accrued on the Allowed Claims (*i.e.*, up to the time of the exchange) but was not recognized by the U.S. Holder is carried over to the property received therefore and any gain recognized on the subsequent sale, exchange, redemption or other disposition of the property is treated as ordinary income to the extent of the accrued, but not recognized, market discount.

### 7.      U.S. Federal Income Tax Consequences to U.S. Holders of the New Preferred Equity and the New Common Stock

#### (a)      Dividends on the New Preferred Equity and the New Common Stock

Any distributions made on account of the New Preferred Equity and the New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the Reorganized Debtors as determined under U.S. federal income tax principles. To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares of the New Preferred Equity and the New Common Stock. Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.

Subject to applicable limitations, distributions treated as dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction. However, the dividends-received deduction is only available if certain holding period requirements are satisfied. The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

#### (b)      Sale, Redemption, or Repurchase of the New Preferred Equity and the New Common Stock

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of the New Preferred Equity and the New Common Stock. Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder held the New Preferred Equity and the New Common Stock for more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations as described below.

8.    **U.S. Federal Income Tax Consequences to U.S. Holders of New Second Lien Notes and the Loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility**

(a)    **Interest**

Stated interest paid to a U.S. Holder will be includible in the U.S. Holder's gross income as ordinary interest income at the time interest is received or accrued in accordance with the U.S. Holder's regular method of tax accounting for U.S. federal income tax purposes.

If the "stated redemption price at maturity" of the New Second Lien Notes received by holders of Allowed Class 5 Claims upon exercise of the New Notes Rights or purchased pursuant to the Backstop Purchase Agreement and loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility Debt exceeds the "issue price" of the New Second Lien Notes and loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility Debt by an amount equal to or greater than a statutorily defined de minimis amount, the New Second Lien Notes and loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility Debt will be considered to be issued with OID for U.S. federal income tax purposes. The stated redemption price at maturity of the New Second Lien Notes and loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility is the total of all payments due on the New Second Lien Notes and loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility other than payments of "qualified stated interest." In general, qualified stated interest is stated interest that is payable unconditionally in cash or in property (other than debt instruments of the issuer) at least annually at a single fixed rate (or at certain qualifying floating rates). The determination of the issue price for loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility is discussed above. The issue price for a New Second Lien Note that is traded on an established market will equal its fair market value on the date of issuance. If such a New Second Lien Note is not traded on an established market, its issue price will generally equal its stated principal amount.

For purposes of determining whether there is OID, the de minimis amount is generally equal to ¼ of 1 percent of the principal amount of the New Second Liens and loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility multiplied by the number of complete years to maturity from their original issue date, or if the New Second Liens and loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility provides for payments other than payments of qualified stated interest before maturity, multiplied by the weighted average maturity (as determined under applicable Treasury regulations). If the New Second Liens and loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility are issued with OID, a U.S. Holder generally (i) will be required to include the OID in gross income as ordinary interest income as it accrues on a constant yield to maturity basis over the term of the New Second Liens and loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility, in advance of the receipt of the cash attributable to such OID and regardless of the holder's method of accounting for U.S. federal income tax purposes, but (ii) will not be required to recognize additional income upon the receipt of any Cash payment on the New Second Liens and loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility that is attributable to previously accrued OID that has been included in its income. If the amount of OID on the New Second Liens and loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility is de minimis, rather than being characterized as interest, any payment attributable to the de minimis OID will be treated as gain from the sale of the New Second Liens and loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility, and a pro rata amount of such de minimis OID must be included in income as principal payments are received on the New Second Liens and loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility.

**(b)**     **Sale, Exchange, or Other Taxable Disposition**

Upon the sale, exchange or other taxable disposition of New Second Liens and an interest in the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility, a U.S. Holder generally will recognize taxable gain or loss equal to the difference, if any, between the amount realized on the sale, exchange or other taxable disposition (other than accrued but untaxed interest, which will be taxable as interest) and the U.S. Holder's adjusted tax basis in their interest in the New Second Liens and loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility.  A U.S. Holder's adjusted tax basis in their interest in the New Second Liens and loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility will depend on whether, as described above, the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility is considered a "security" for tax purposes and whether the U.S. Holder receives the New Second Liens and loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility (if any) as part of a transaction that is treated as a reorganization for U.S. federal income tax purposes.  A U.S. Holder's initial tax basis in the New Second Liens and loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility will be increased by any previously accrued OID and decreased by any payments on the New Second Liens and loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility other than qualified stated interest.  Any such gain or loss generally will be capital gain or loss and generally will be long-term capital gain or loss if the interest in the New Second Liens, New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility has been held for more than one year at the time of its sale, exchange or other taxable disposition.  Certain non-corporate U.S. Holders (including individuals) may be eligible for preferential rates of U.S. federal income tax in respect of long-term capital gains.  The deductibility of capital losses is subject to limitations as discussed below.

**9.**     **U.S. Federal Income Tax Consequences to Holders of New Warrants**

The exercise of a New Warrant by the U.S. Holder thereof should not give rise to taxable gain or loss.  The holding period of the New Common Stock acquired upon exercise of the New Warrants should begin on the date of such exercise, and should not include the period during which such New Warrants were held.  The U.S. Holder's tax basis in the New Common Stock acquired upon exercise should include the U.S. Holder's tax basis in the Warrants increased by the amount paid upon exercise.  In the event that a U.S. Holder sells its New Warrants in a taxable transaction, the U.S. Holder will recognize gain or loss upon such sale in an amount equal to the difference between the amount realized upon such sale and the U.S. Holder's tax basis in the New Warrants.  Such gain or loss will be treated as gain or loss from the sale or exchange of property which has the same character as the New Common Stock to which the New Warrants relate would have had in the hands of the U.S. Holder if such New Common Stock had been acquired by the U.S. Holder upon exercise.  If such sale gives rise to capital gain or loss to the U.S. Holder, such gain or loss will be long-term or short-term in character based upon the length of time such U.S. Holder has held his or her New Warrants.

If New Warrants held by a U.S. Holder expire unexercised, such New Warrants should be deemed to have been sold or exchanged on the day of expiration.  Such expiration should therefore in most cases give rise to a capital loss, unless such U.S. Holder previously claimed a deduction for the worthlessness of such New Warrants in a previous taxable period.

The rules applicable to the treatment of warrants are complex, particularly in the context of warrants acquired in a complex transaction such as this one.  U.S. Holders of New Warrants are urged to consult their tax advisors to review and determine the tax consequences associated with the receipt, ownership and disposition of such New Warrants.

136

10.    **The New Preferred Equity Rights, the New Notes Rights, the New Second Lien Notes, and the New Preferred Equity**

A U.S. Holder generally should not recognize any gain or loss upon the exercise for cash of the New Preferred Equity Rights and New Notes Rights for New Preferred Equity and New Second Lien Notes, respectively.  The tax basis of the shares of New Preferred Equity acquired through exercise of a New Preferred Equity Right should equal the sum of the offering price for such shares and the holder's tax basis in such New Preferred Equity Right as described above.  The holding period for the shares of New Preferred Equity acquired through exercise of such New Preferred Equity Right should begin on the day following the Exercise Date.  The tax basis of the New Second Lien Notes acquired through exercise of a New Notes Right should equal the sum of the issue price for such New Second Lien Notes and the holder's tax basis in such New Notes Right as described above.  The holding period for the New Second Lien Notes acquired through exercise of such New Notes Rights should begin on the day following the Exercise Date.

A holder that allows a New Preferred Equity Right or a New Notes Right it received to expire generally should recognize a capital loss equal to the holder's tax basis in such expired New Preferred Equity Right or New Notes Right, which should be long-term capital loss if the holder's holding period for such New Preferred Equity Right or New Notes Right exceeded one year. The deductibility of capital loss may be subject to limitations. Each holder should consult its tax advisor as to the tax consequences of allowing a New Preferred Equity Right or New Notes Right to expire unexercised.

If the New Notes Rights are exercised using Allowed First Lien Claims instead of cash and the New Second Lien Notes and the debt underlying the Allowed First Lien Claims being exchanged for such New Second Lien Notes pursuant to the Backstop Purchase Agreement both constitute "securities" for U.S. federal income tax purposes, the exchange should constitute a "recapitalization" for U.S. federal income tax purposes and have the same consequences as discussed in Section B.2 of this Article XI (substituting "Allowed First Lien Claims" for "Notes underlying the Allowed Class 5 Claims" or "Note Claim" and substituting "New Second Lien Notes" for "New Notes Rights").  If the New Second Lien Notes and the debt underlying the Allowed First Lien Claims being exchanged for such New Second Lien Notes pursuant to the Backstop Purchase Agreement do not both constitute "securities" for U.S. federal income tax purposes, the exchange will constitute a fully taxable exchange under section 1001 of the IRC.

11.    **Limitations on Use of Capital Losses**

U.S. Holders of Claims who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses.  For non-corporate U.S. Holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (1) $3,000 ($1,500 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains.  U.S. Holders, other than corporations, may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains.  Corporate U.S. Holders generally may only carry over unused capital losses for the five years following the capital loss year, but are generally allowed to carry back unused capital losses to the three years preceding the capital loss year.

C. **Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Certain Allowed Claims**

1. **U.S. Federal Income Tax Consequences to Non-U.S. Holders of Allowed Class 3, Class 4, Class 5, and Class 6 Claims and Class 11 Interests**

This following discussion includes only certain U.S. federal income tax consequences of the Restructuring Transactions to Non-U.S. Holders. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder should consult its tax advisor regarding the U.S. federal, state, and local and the foreign tax consequences of the Consummation of the Plan to such Non-U.S. Holder and the ownership and disposition of the New Preferred Equity, the New Common Stock, the New Second Lien Notes, loans under the New MDL Term Loan Facility, and loans under the New First Lien Term Loan Credit Facility, as applicable.

Whether a Non-U.S. Holder realizes gain or loss on the exchange and the amount of such gain or loss is determined in the same manner as these consequences are determined for U.S. Holders as described above in "—B. Certain U.S. Federal Income Tax Consequences to the U.S. Holders of Certain Allowed Claims, Loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility, New Second Lien Notes, New Preferred Equity and New Common Stock."

(a) **Gain Recognition**

Any gain recognized by a Non-U.S. Holder on the exchange of its Claims generally will not be subject to U.S. federal income taxation unless (i) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (ii) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, to the extent that any gain is taxable and does not qualify for deferral as described above in connection with U.S. Holders as described above in "—B. Certain U.S. Federal Income Tax Consequences to the U.S. Holders of Certain Allowed Claims, the New MDL Term Loan Facility, the New First Lien Term Loan Credit Facility, New Second Lien Notes, New Preferred Equity, and New Common Stock," the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder. In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

(b) **Accrued Interest**

Subject to the discussion below regarding "FATCA," payments to a Non-U.S. Holder that are attributable to accrued but untaxed interest generally will not be subject to U.S. federal income or withholding tax, provided that the withholding agent has received or receives, prior to payment,

appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. Person, unless:

    i.    the Non-U.S. Holder actually or constructively owns 10 percent or more of the total combined voting power of all classes of Parent's stock entitled to vote;

    ii.    the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to Parent (each, within the meaning of the IRC);

    iii.    the Non-U.S. Holder is a bank receiving interest described in section 881(c)(3)(A) of the IRC; or

    iv.    such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax generally in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

Subject to the discussion below regarding "FATCA," a Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to accrued but untaxed interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to accrued but untaxed interest. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business. As described above in more detail under the heading "Accrued Interest," the aggregate consideration to be distributed to holders of Allowed Claims in each Class will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any.

    **2.**    **U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of Shares of the New Preferred Equity and the New Common Stock, New Second Lien Notes, and Loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility**

    **(a)**    **Dividends on the New Preferred Equity and the New Common Stock**

Any distributions made with respect to the New Preferred Equity and the New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the Reorganized Debtors' current or accumulated earnings and profits as determined under U.S. federal income tax principles. To the extent that a Non-U.S. Holder receives distributions that exceed such current and accumulated earnings and profits such distributions will be treated first as a non-taxable return of capital reducing the Non-U.S. Holder's basis in its shares. Any such distributions in excess of a Non-U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain from a sale or exchange (and the respective excess distributions as proceeds from a sale or exchange); *see* discussion

below of sale, redemption, or repurchase of the New Preferred Equity and the New Common Stock. Subject to the discussion below regarding "FATCA," except as described below, dividends paid with respect to the New Preferred Equity and the New Common Stock held by a Non-U.S. Holder that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (or if an income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30 percent (or lower treaty rate or exemption from tax, if applicable).  A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E (or a successor form) upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. Person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments.  Dividends paid with respect to the New Preferred Equity and the New Common Stock held by a Non-U.S. Holder that are effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

### (b)        Sale, Redemption, or Repurchase of the New Preferred Equity and the New Common Stock

Subject to the discussion below regarding "FATCA," a Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption) of the New Preferred Equity and the New Common Stock unless:

    i.    such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States; or

    ii.    such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or

    iii.    the Reorganized Debtors are or have been during a specified testing period a "U.S. real property holding corporation" for U.S. federal income tax purposes.

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of the New Preferred Equity and the New Common Stock.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).  The Debtors do not believe, based on their current business plans and operations, that the Debtors have been nor any of the Reorganized Debtors will become in the future during the applicable specified testing period a "U.S. real property holding corporation," but there can be

no assurance in this regard. If 21CH is or becomes a "U.S. real property holding corporation," during the specified testing period, gain recognized by such Non-U.S. Holder on the sale, exchange or other disposition of the New Preferred Equity and the New Common Stock will be subject to tax at generally applicable U.S. federal income tax rates and a purchaser of the New Preferred Equity and the New Common Stock from such Non-U.S. Holder would be required to withhold U.S. federal income tax at a rate of 15% of the amount realized upon such disposition.

### (c)    Payments under the New Second Lien Notes, New MDL Term Loan Facility, and the New First Lien Term Loan Credit Facility

Subject to the discussion below regarding "FATCA," payments to a Non-U.S. Holder with respect to the New Second Lien Notes, New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility that are treated as interest, including payment attributable to any OID (see discussion above) generally will not be subject to U.S. federal income or withholding tax, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. Person, unless:

    i.    the Non-U.S. Holder actually or constructively owns 10 percent or more of the total combined voting power of all classes of the Reorganized Parent's stock entitled to vote;

    ii.    the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to Reorganized Parent (each, within the meaning of the IRC);

    iii.    the Non-U.S. Holder is a bank receiving interest described in section 881(c)(3)(A) of the IRC; or

    iv.    such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

Subject to the discussion below regarding "FATCA," a Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to interest, including any OID.

For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

(d)     **Sale, Exchange or Other Disposition of the New Second Lien Notes and Loans under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility**

Subject to the discussion below regarding "FATCA," any gain recognized by a Non-U.S. Holder on the sale, exchange or other disposition of the New Second Lien Notes, loans provided under the New MDL Term Loan Facility and the loans provided under the New First Lien Term Loan Credit Facility (other than an amount representing accrued but untaxed interest on the New Second Lien Notes, loans provided under the New MDL Term Loan Facility and the loans provided under the New First Lien Term Loan Credit Facility, which is subject to the rules discussed above under "Payments under the New Second Lien Notes, New MDL Term Loan Facility, and the New First Lien Term Loan Credit Facility") generally will not be subject to U.S. federal income taxation unless (i) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the disposition occurs and certain other conditions are met or (ii) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder.  Subject to the discussion below regarding "FATCA," in order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

D.     **FATCA**

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign Entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments."  For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income, including U.S. source interest (including OID) paid in respect of instruments such as the New Second Lien Notes, New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility and dividends, if any, on shares of New Preferred Equity and New Common Stock, and also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends (which includes the New Second Lien Notes, loans provided under the New MDL Term Loan Facility and the New First Lien Term Loan Credit Facility, the New Preferred Equity, and New Common Stock).  FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax.

FATCA withholding rules currently apply to withholdable payments other than payments of gross proceeds from the sale or other disposition of property of a type which can produce U.S. source interest or dividends and under current law will apply to payments of gross proceeds from the sale or other disposition of property of a type which can produce U.S. source interest or dividends that occurs after December 31, 2018.

Both U.S. Holders and Non-U.S. Holders should consult their tax advisors regarding the possible impact of these rules on such holder's exchange any of its Claims pursuant to the Plan and on its ownership of New Second Lien Notes, loans provided under the New MDL Term Loan Facility and the loans provided under the New First Lien Term Loan Credit Facility (if any), the New Preferred Equity, and the New Common Stock.

### E.      Information Reporting and Backup Withholding

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends.  The Debtors will comply with all applicable reporting requirements of the IRC.  In general, information reporting requirements may apply to distributions or payments made to a holder of an Allowed Claim or Interest under the Plan.  Additionally, under the backup withholding rules, a holder of a Claim or Interest may be subject to backup withholding, currently at a rate of 28%, with respect to distributions or payments made pursuant to the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of Non-U.S. Holder, such Non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption).  Backup withholding is not an additional tax but is, instead, an advance payment that may entitle the holder to a refund from the IRS to the extent it results in an overpayment of tax, provided that the required information is provided to the IRS.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

> **The U.S. federal income tax consequences of the Plan are complex.  The foregoing summary does not discuss all aspects of U.S. federal income taxation that may be relevant to a particular holder of a Claim or Interest in light of such holder's circumstances and income tax situation.  All holders of Claims or Interests should consult with their tax advisors as to the particular tax consequences to them under the Plan, including the applicability and effect of any state, local, non-U.S., or other tax laws, and of any change in applicable tax laws.**

## XII.   RECOMMENDATION OF THE DEBTORS

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that holders of Claims or Interests entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  October 17, 2017

Respectfully submitted,

21st Century Oncology Holdings, Inc.,
on behalf of itself and each of the other Debtors

By:      /s/ *Paul B. Rundell*
Name: Paul B. Rundell
Title:   Chief Executive Officer
          21st Century Oncology Holdings, Inc. and its
          Affiliated Debtors and Debtors in Possession

**Exhibit A**

**Joint Chapter 11 Plan of Reorganization**

**<u>Exhibit B</u>**

**Corporate Organization Chart**

**<u>Exhibit C</u>**

**Disclosure Statement Order**

**Exhibit D**

**Liquidation Analysis**

**Exhibit E**

**Valuation Analysis**

**Exhibit F**

**Financial Projections**

# **SCHEDULE 2**

## **Form of Solicitation and Voting Procedures**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| 21st CENTURY ONCOLOGY HOLDINGS, INC., *et al.*,[1] | ) Case No. 17-22770 (RDD) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

## SOLICITATION AND VOTING PROCEDURES

**PLEASE TAKE NOTICE THAT** on October [\_\_], 2017, the United States Bankruptcy Court for the Southern District of New York (the "Court") entered an order (the "Disclosure Statement Order"):  (a) authorizing 21st Century Oncology Holdings, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors") to solicit acceptances for the *Joint Chapter 11 Plan of Reorganization of 21st Century Oncology Holdings, Inc. and its Debtor Affiliates* (as may be modified, amended, or supplemented from time to time, the "Plan");[2] and (b) approving, among other things, (i) the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of 21st Century Oncology Holdings, Inc. and its Debtor Affiliates* (as may be modified, amended, or supplemented from time to time, the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (ii) the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Packages"); (iii) the rights offering procedures and related materials; and (iv) the procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

### A.     The Voting Record Date.

The Court has approved **October 16, 2017** as the record date for purposes of determining which holders of Claims or Interests in Class 3 (MDL Claims), Class 4 (First Lien Claims), Class 5 (Note Claims), Class 6 (General Unsecured Claims), and Class 11 (Interests in 21CH and 21CI) are entitled to vote on the Plan (the "Voting Record Date").

With respect to any transferred Claim or Interest, the transferee shall be entitled to receive a Solicitation Package and, if the holder of such Claim or Interest is entitled to vote with respect to the Plan, cast a Ballot on account of such Claim or Interest *only if*:  (a) all actions necessary to effectuate the transfer of the Claim or Interest pursuant to Bankruptcy Rule 3001(e)

---

[1]    Each of the Debtors in the above-captioned jointly administered chapter 11 cases and their respective tax identification numbers are set forth in the *Order Directing Joint Administration of Chapter 11 Cases* [Docket No. 30].  The location of 21st Century Oncology Holdings, Inc.'s corporate headquarters and the Debtors' service address is: 2270 Colonial Boulevard, Fort Myers, Florida 33907.

[2]    Capitalized terms not otherwise defined herein shall have the same meanings as set forth in the Plan or the Disclosure Statement Order, as applicable.

have been completed by the Voting Record Date or (b) the transferee files by the Voting Record Date (i) the documentation required by Bankruptcy Rule 3001(e) to evidence the transfer and (ii) a sworn statement of the transferor supporting the validity of the transfer. In the event a Claim or Interest is transferred after the Voting Record Date, the transferee of such Claim or Interest shall be bound by any vote on the Plan made by the holder of such Claim or Interest as of the Voting Record Date.

**B.    The Voting Deadline and Governmental Unit Voting Deadline.**

The Court has approved **November 20, 2017, at 5:00 p.m.,** prevailing Eastern Time as the voting deadline (the "Voting Deadline") for the Plan; *provided*, *however*, that the voting deadline solely with respect to any Governmental Unit that timely submits a Proof of Claim on or before the Governmental Bar Date, shall be extended through and including **November 27, 2017, at 5:00 p.m.,** prevailing Eastern Time (the "Governmental Unit Voting Deadline"). The Debtors may extend the Voting Deadline and/or the Governmental Unit Voting Deadline, in their discretion, without further order of the Court. To be counted as votes to accept or reject the Plan, all ballots ("Ballots") must be properly executed, completed, and delivered to the Solicitation Agent (as defined herein) as directed on the applicable Ballot so that they are *actually received* by the Solicitation Agent by the Voting Deadline or the Governmental Unit Voting Deadline, as applicable.

The Voting Deadline is also the deadline for holders of Claims and Interests who receive the *Election Form to Opt Out of Third Party Release* (an "Election Form") to exercise their respective right to opt out of the third party releases contained in Article VIII.8.3 of the Plan.

**C.    Form, Content, and Manner of Notices.**

**1.    The Solicitation Package.**

The following materials shall constitute the solicitation package (the "Solicitation Package"):

a.    a copy of these Solicitation and Voting Procedures;

b.    the *Notice of Hearing to Consider Confirmation of the Chapter 11 Plan Filed by the Debtors and Related Voting and Objection Procedures*, in substantially the form annexed as Schedule 9 to the Disclosure Statement Order (the "Confirmation Hearing Notice");

c.    a cover letter from the Debtors, in substantially the form annexed as Schedule 7 to the Disclosure Statement Order, describing the contents of the Solicitation Package and urging the holders of Claims or Interests in each of the Voting Classes to vote to accept the Plan;

d.    a cover letter from the Committee in substantially the form annexed as Schedule 8 to the Disclosure Statement Order, urging the holders of General Unsecured Claims in Class 6 to vote to accept the Plan;

2

e. the applicable form of Ballot, in substantially the forms annexed as Schedules 3A to 3F to the Disclosure Statement Order, as applicable, together with detailed voting instructions and a pre-addressed, postage-prepaid return envelope;

f. the approved Disclosure Statement annexed as Schedule 1 to the Disclosure Statement Order (and the exhibits thereto, including the Plan);

g. the Disclosure Statement Order (excluding the exhibits thereto, except for the Solicitation and Voting Procedures);

h. any additional documents that the Court has ordered to be made available.

**2.      Distribution of the Solicitation Package.**

The Solicitation Package shall provide the Plan, the Disclosure Statement, and the Disclosure Statement Order (excluding the exhibits thereto, except for the Solicitation and Voting Procedures) in electronic format (i.e., on a CD-ROM or flash drive), and all other contents of the Solicitation Package, including Ballots, shall be provided in paper format.  Any party that receives the materials in electronic format but would prefer paper format may contact Kurtzman Carson Consultants LLC, the solicitation agent retained by the Debtors in these chapter 11 cases (the "Solicitation Agent") by:  (a) calling the Debtors' restructuring hotline at (888) 251-2679 (US toll-free) and (310) 751-2609 (international toll); (b) visiting the Debtors' restructuring website at:  http://www.kccllc.net/21co; (c) writing to 21st Century Oncology Holdings, Inc., Ballot Processing Center, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245; and/or (d) emailing 21coInfo@kccllc.com and requesting paper copies of the corresponding materials previously received in electronic format (to be provided at the Debtors' expense).

Within seven Business Days after entry of the Disclosure Statement Order, the Debtors shall mail, or cause to be mailed, the Solicitation Package to (a) all holders of Claims or Interests in the Voting Classes who are entitled to vote, as described in section D below, and (b) the U.S. Trustee.  With respect to Governmental Units that file Proofs of Claim on or before the Governmental Bar Date, the Debtors shall mail, or cause to be mailed, the Solicitation Package as soon as reasonably practicable.  In addition, the Debtors will provide the Disclosure Statement Order (in electronic format) and the Confirmation Hearing Notice to all parties who have requested service of papers in this case pursuant to Bankruptcy Rule 2002 as of the Voting Record Date.

To avoid duplication and reduce expenses, the Debtors will make every reasonable effort to provide any holder of a Claim or Interest who has filed multiple and/or duplicate Claims or Interests against any Debtor(s) that are classified under the Plan in the same Voting Class no more than one Solicitation Package and the appropriate number of Ballots for voting such holder's Claims or Interests in such Class, based on the nature of such Claims or Interests and the Debtor(s) against which such Claims or Interests are held.

3.      **Resolution of Disputed Claims for Voting Purposes; Resolution Event.**

    a.      Absent a further order of the Court, if a Claim or Interest in a Voting Class is the subject of a pending objection to "reduce and allow" the stated amount of the applicable holder's Claim or Interest that is filed with the Court on or prior to seven days before the Voting Deadline, the applicable Claim or Interest shall be deemed temporarily allowed in the reduced amount for voting purposes only, without further action by the holders of such Claim or Interest and without further order of the Court (unless the Court orders otherwise), and the holder of such Claim or Interest shall be entitled to vote such Claim or Interest in the reduced amount contained in such objection.

    b.      If a Claim or Interest in a Voting Class is subject to an objection other than a "reduce and allow" objection that is filed with the Court on or prior to seven days before the Voting Deadline:  (i) the Debtors shall cause the applicable holder to be served with a Disputed Claim Notice substantially in the form annexed as <u>Schedule 6</u> to the Disclosure Statement Order (which notice shall be served together with such objection); and (ii) the applicable holder shall not be entitled to vote to accept or reject the Plan on account of such Claim or Interest unless a Resolution Event (as defined herein) occurs as provided herein.

    c.      A "<u>Resolution Event</u>" means the occurrence of one or more of the following events no later than two business days prior to the Voting Deadline:

        i.      an order of the Court is entered allowing such Claim or Interest pursuant to section 502(b) of the Bankruptcy Code, after notice and a hearing;

        ii.      an order of the Court is entered temporarily allowing such Claim or Interest for voting purposes only pursuant to Bankruptcy Rule 3018(a), after notice and a hearing;

        iii.      a stipulation or other agreement is executed between the holder of such Claim or Interest and the Debtors resolving the objection and allowing such Claim or Interest in an agreed upon amount; or

        iv.      the pending objection is voluntarily withdrawn by the objecting party.

    d.      No later than two business days following the occurrence of a Resolution Event, the Debtors shall cause the Solicitation Agent to distribute via email, hand delivery, or overnight courier service a Solicitation Package and a pre-addressed, postage pre-paid envelope to the relevant holder to

the extent such holder has not already received a Solicitation Package containing a Ballot.

4.    **Non-Voting Status Notices for Classes Presumed to Accept the Plan, Classes Presumed to Reject the Plan, and Disputed Claims or Interests.**

Certain holders of Claims or Interests that are not classified in accordance with section 1123(a)(1) of the Bankruptcy Code or who are not entitled to vote because they are Unimpaired or otherwise presumed to accept the Plan under section 1126(f) of the Bankruptcy Code will receive only the Unimpaired Non-Voting Status Notice and an Election Form, substantially in the form annexed as Schedule 4 to the Disclosure Statement Order.  Such notice will instruct these holders as to how they may obtain copies of the documents contained in the Solicitation Package (excluding Ballots).  The Election Form will instruct these holders as to how they may submit an Election Form to the Solicitation Agent to opt out of the Third Party Release contained in Article VIII.8.3 of the Plan.

Certain holders of Claims or Interests who are not entitled to vote because they are presumed to reject the Plan under section 1126(g) of the Bankruptcy Code will receive only the Impaired Non-Voting Status Notice and an Election Form, substantially in the form annexed as Schedule 5 to the Disclosure Statement Order.  Such notice will instruct these holders as to how they may obtain copies of the documents contained in the Solicitation Package (excluding Ballots).  The Election Form will instruct these holders as to how they may submit an Election Form to the Solicitation Agent to opt out of the Third Party Release contained in Article VIII.8.3 of the Plan.

Certain holders of Claims or Interests that are subject to a pending objection by the Debtors will receive only the Notice to Disputed Claim Holders and an Election Form, substantially in the form annexed as Schedule 6 to the Disclosure Statement Order.  Such notice will instruct these holders as to how they may obtain copies of the documents contained in the Solicitation Package (excluding Ballots) and notify such holders that they are not entitled to vote any disputed portion of their Claims or Interests on the Plan unless one or more Resolution Events have taken place before November 18, 2017.  The Election Form will instruct these holders as to how they may submit an Election Form to the Solicitation Agent to opt out of the Third Party Release contained in Article VIII.8.3 of the Plan.

5.    **Notices in Respect of Executory Contracts and Unexpired Leases.**

Counterparties to Executory Contracts and Unexpired Leases that receive an *Assumption Notice* or a *Rejection Notice*, substantially in the forms annexed as Schedule 11 and Schedule 12 to the Disclosure Statement Order, respectively, may file an objection to the Debtors' proposed assumption, rejection, and/or cure amount, as applicable.  Such objections must be ***actually received*** by the Debtors by **November 27, 2017, at 4:00 p.m.,** prevailing Eastern Time.

D.     **Voting and Tabulation Procedures.**

1.     **Holders of Claims or Interests Entitled to Vote.**

Only the following holders of Claims or Interests in the Voting Classes shall be entitled to vote with regard to such Claims or Interests:

    a.     holders of Claims or Interests (x) who, on or before the Voting Record Date, have timely filed a Proof of Claim (or an untimely Proof of Claim that has been Allowed as timely by the Court under applicable law on or before the Voting Record Date) or (y) that are Governmental Units that have timely filed a Proof of Claim on or before the Governmental Bar Date, in each case, that (i) has not been expunged, disallowed, disqualified, withdrawn, or superseded prior to the Voting Record Date or the Governmental Unit Voting Deadline, as applicable; and (ii) is not the subject of a pending objection, other than a "reduce and allow" objection, filed with the Court at least seven days prior to the Voting Deadline or the Governmental Voting Deadline (as applicable), pending a Resolution Event as provided herein; *provided* that a holder of a Claim or Interest that is the subject of a pending objection on a "reduce and allow" basis shall receive a Solicitation Package and be entitled to vote such Claim or Interest in the reduced amount contained in such objection absent a further order of the Court; *provided*, *further*, that a holder of a Claim or Interest that is the subject of any other objection shall receive a Solicitation Package and be entitled to vote such Claim or Interest only upon a Resolution Event that results in allowance of such Claim or Interest;

    b.     holders of Claims or Interests that are listed in the Schedules; *provided* that Claims that are scheduled as contingent, unliquidated, or disputed (excluding such scheduled disputed, contingent, or unliquidated Claims that have been paid or superseded by a timely filed Proof of Claim or an untimely Proof of Claim which has been Allowed as timely by the Court) shall be allowed to vote only in the amounts set forth in section D.2(d) of these Solicitation and Voting Procedures;

    c.     holders whose Claims arise (i) pursuant to an agreement or settlement with the Debtors, as reflected in a document filed with the Court, (ii) in an order entered by the Court, or (iii) in a document executed by the Debtors pursuant to authority granted by the Court, in each case regardless of whether a Proof of Claim has been filed;

    d.     holders of any Disputed Claims that have been temporarily allowed to vote on the Plan pursuant to Bankruptcy Rule 3018; and

    e.     the assignee of any Claim or Interest that was transferred on or before the Voting Record Date by any Entity described in subparagraphs (a) through (d) above; *provided* that such transfer or assignment has been fully

6

effectuated pursuant to the procedures set forth in Bankruptcy Rule 3001(e) and such transfer is reflected on the Claims Register on the Voting Record Date, as applicable.

## 2.    <u>Establishing Amounts of Claims and Interests for Voting Purposes.</u>

Each holder of a Claim or Interest in a Voting Class shall be entitled to vote (x) the amount of its Claim or Interest as of the Voting Record Date, or (y) in the case of a Governmental Unit that files a Proof of Claim on or before the Governmental Bar Date, the amount contained in such Proof of Claim, in each case, subject to the provisions of this section D.2. The amount of the Claim or Interest established pursuant to this section D.2 shall control for voting purposes only and shall not constitute the Allowed amount of any Claim or Interest. Moreover, any amounts that are filled in on Ballots by the Debtors through the Solicitation Agent are not binding for purposes of Allowance and distribution.

**Class 3 MDL Claims**.  Claim amounts will be calculated based on the principal amounts outstanding under the MDL Facility Credit Agreement held as of the Voting Record Date by each holder, as evidenced by records of the MDL Agent.

**Class 4 First Lien Claims**.  Claim amounts will be calculated based on the principal amounts outstanding under the First Lien Credit Agreement held as of the Voting Record Date by each holder, as evidenced by records of the First Lien Agent.

**Class 5 Note Claims**.  Claim amounts will be calculated based on the principal amounts outstanding under the Indenture held as of the Voting Record Date by each holder, as evidenced by the securities position report(s) from the DTC; *provided*, *however*, that any principal amounts identified by holders of Class 5 Note Claims on their respective Class 5 Ballots may thereafter be adjusted by the Solicitation Agent, on a proportionate basis (based on the securities position report(s) from the DTC), with a view to reconciling the amount of Note Claims actually voted, including any accrued and unpaid prepetition interest.

**Class 6 General Unsecured Claims**.  In tabulating votes, the following hierarchy shall be used to determine the amount of the Claim associated with each claimant's vote:

a.    the Claim amount (i) settled and/or agreed upon by the Debtors, as reflected in a document filed with the Court, (ii) set forth in an order of the Court, or (iii) set forth in a document executed by the Debtors pursuant to authority granted by the Court;

b.    the Claim amount Allowed (temporarily or otherwise) pursuant to a Resolution Event under section C.3(d) of these Solicitation and Voting Procedures;

c.    the Claim amount contained in a Proof of Claim that has been timely filed by the applicable Claims Bar Date (or deemed timely filed by the Court under applicable law), except for any amounts asserted on account of any interest accrued after the Petition Date; *provided*, *however*, that (i) any Ballot cast by a holder of a Claim who timely files a Proof of Claim in respect of a contingent Claim or a Claim in a wholly-unliquidated or

7

unknown amount (based on a reasonable review by the Debtors and/or the Solicitation Agent) that is not the subject of an objection will count toward satisfying the numerosity requirement of section 1126(c) of the Bankruptcy Code and will count as a Ballot for a Claim in the amount of $1.00 solely for the purposes of satisfying the dollar amount provisions of section 1126(c) of the Bankruptcy Code, and (ii) if a Proof of Claim is filed as partially liquidated and partially unliquidated, such Claim will be Allowed for voting purposes only in the liquidated amount; *provided, further, however*, that to the extent the Claim amount contained in the Proof of Claim is different from the Claim amount set forth in a document filed with the Court as referenced in subparagraph (a) above, the Claim amount in the document filed with the Court shall supersede the Claim amount set forth on the respective Proof of Claim for voting purposes; and

d.      the Claim amount listed in the Schedules (to the extent such Claim is not superseded by a timely filed Proof of Claim) that is not scheduled as contingent, disputed, or unliquidated and/or has not been paid; *provided, however*, that if the applicable Bar Date has not expired prior to the Voting Record Date, a Claim listed in the Schedules as contingent, disputed, or unliquidated will count as a vote towards satisfying the numerosity requirement of section 1126(c) of the Bankruptcy Code and as a vote in the amount of $1.00 solely for the purposes of satisfying the dollar amount provisions of section 1126(c) of the Bankruptcy Code; *provided, further*, that if the applicable Bar Date has expired, a Claim listed in the Schedules as contingent, disputed, or unliquidated shall not be entitled to vote.

Notwithstanding anything to the contrary contained herein: (x) any creditor who has filed or purchased duplicate Claims against the same Debtor within the same Class shall be provided with only one Solicitation Package and one ballot for voting a single Claim in such Class, regardless of whether the Debtors have objected to such duplicate Claims; (y) holders of Claims filed for $0.00 are not entitled to vote; and (z) if a Proof of Claim has been amended by a later timely filed Proof of Claim, only the later filed amending Claim will be counted for voting purposes, regardless of whether the Debtors have objected to such earlier filed Claim.

**Class 11 Interests in 21CH and 21CI**.  Interest amounts will be calculated based on the amount of (a) any capital stock (including common stock and preferred stock), limited liability company interest, partnership interest, equity security (as defined in section 101(16) of the Bankruptcy Code) or other ownership, beneficial or profits interest of 21CH or 21CI, including, without limitation, the Series A Preferred Stock, and (b) any option, warrant, security, stock appreciation right, phantom unit, incentive, commitment, call, redemption right, repurchase right or other agreement, arrangement or right of any kind that is convertible into, exercisable or exchangeable for, or otherwise permits any Person to acquire, any capital stock (including common stock and preferred stock), limited liability company interest, partnership interest or other equity security or other ownership, beneficial or profits interest of 21CH or 21CI (whether or not arising under or in connection with any employment agreement), including any Claim

8

against the Debtors that is subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

3.    **Voting and Ballot Tabulation Procedures.**

The following voting procedures and standard assumptions shall be used in tabulating Ballots, subject to the Debtors' right to waive any of the below specified requirements for completion and submission of Ballots so long as such requirement is not otherwise required by the Bankruptcy Code, Bankruptcy Rules, or Local Bankruptcy Rules:

a.    except as otherwise provided in the Solicitation and Voting Procedures, unless the Ballot being furnished is timely submitted on or before the Voting Deadline or Governmental Unit Voting Deadline, as applicable (as the same may be extended by the Debtors upon notice to the Committee and the Requisite Backstop Parties), the Debtors shall reject such Ballot as invalid and, therefore, shall not count it in connection with Confirmation of the Plan;

b.    the Solicitation Agent will date-stamp all Ballots when received.   The Solicitation Agent shall retain the original Ballots and an electronic copy of the same for a period of one year after the Effective Date of the Plan, unless otherwise ordered by the Court.   The Solicitation Agent shall tabulate Ballots on a Debtor-by-Debtor basis;

c.    the Debtors will file with the Court, prior to the Confirmation Hearing, a voting report (the "Voting Report").   The Voting Report shall, among other things, certify to the Court in writing the amount and number of Allowed Claims or Allowed Interests of each Class accepting or rejecting the Plan, and delineate every Ballot that does not conform to the voting instructions or that contains any form of irregularity including, but not limited to, those Ballots that are late or (in whole or in material part) illegible, contain insufficient information to permit the identification of the holders submitting such Ballots, lack original signatures or any other necessary information, are received via facsimile, email, or any electronic means other than the Solicitation Agent's online balloting portal, or are damaged (collectively, the "Irregular Ballots");

d.    the method of delivery of Ballots to be sent to the Solicitation Agent is at the election and risk of each holder, and except as otherwise provided, a Ballot will be deemed delivered only when the Solicitation Agent actually receives the executed Ballot;

e.    delivery of a Ballot to the Solicitation Agent by facsimile, email, or any electronic means other than the Solicitation Agent's online balloting portal will not be valid;

f.    no Ballot should be sent to the Debtors, the Debtors' agents (other than the Solicitation Agent), the Debtors' financial or legal advisors, or any

9

administrative agent or indenture trustee, and if so sent will not be counted;

g.     if multiple Ballots are received from the same holder with respect to the same Claim or Interest prior to the Voting Deadline or Governmental Unit Voting Deadline (as applicable), the last properly executed Ballot timely received will be deemed to reflect that voter's intent and will supersede and revoke any prior received Ballot;

h.     holders must vote all of their Claims or Interests within a particular Class either to accept or reject the Plan and may not split any votes. Accordingly, a Ballot that partially rejects and partially accepts the Plan will not be counted.  Further, to the extent there are multiple Claims against or Interests in the same Debtor held by any particular holder within the same Class, the applicable Debtor may, in its discretion, aggregate the Claims or Interests of any particular holder within a Class for the purpose of counting votes;

i.     a person signing a Ballot in its capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity of a holder of Claims or Interests must indicate such capacity when signing and if requested by Solicitation Agent, the Debtor or the Court, must submit proper evidence of its authority to act;

j.     the Debtors, subject to a contrary order of the Court, may waive any defects or irregularities as to any particular Irregular Ballot at any time, either before or after the Voting Deadline or Governmental Voting Deadline (as applicable), and any such waivers will be documented in the Voting Report;

k.     neither the Debtors, nor any other Entity, will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report, nor will any of them incur any liability for failure to provide such notification;

l.     unless waived by the Debtors (upon notice to the Committee and the Requisite Backstop Parties) or as ordered by the Court, any defects or irregularities in connection with deliveries of Ballots must be cured prior to the Voting Deadline or the Governmental Unit Voting Deadline (as applicable), or such Ballots will not be counted;

m.     in the event a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim or Interest will be counted for purposes of determining whether the Plan has been accepted and/or rejected;

10

n.      subject to any order of the Court, the Debtors reserve the right to reject any and all Ballots not in proper form, the acceptance of which, in the opinion of the Debtors, would not be in accordance with the provisions of the Bankruptcy Code or the Bankruptcy Rules; *provided* that any such rejections will be documented in the Voting Report;

o.      if a Claim or Interest has been estimated or otherwise Allowed only for voting purposes by order of the Court, such Claim or Interest shall be temporarily Allowed in the amount so estimated or Allowed by the Court for voting purposes only, and not for purposes of Allowance or distribution;

p.      if an objection to a Claim or Interest is filed, such Claim or Interest shall be treated in accordance with the procedures set forth herein;

q.      the following Ballots shall not be counted in determining the acceptance or rejection of the Plan:  (i) any Ballot that is illegible or contains insufficient information to permit the identification of the holder of such Claim or Interest; (ii) any Ballot cast by any Entity that does not hold a Claim or Interest in the applicable Voting Class; (iii) any unsigned Ballot or Ballot lacking an original signature (for the avoidance of doubt, a Ballot submitted via the Solicitation Agent's online balloting portal shall be deemed an original signature); (iv) any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan; and (v) any Ballot submitted by any Entity not entitled to vote pursuant to the procedures described herein;

r.      after the Voting Deadline or Governmental Unit Voting Deadline (as applicable), no Ballot may be withdrawn or modified without the prior written consent of the Debtors (upon notice to the Committee and the Requisite Backstop Parties);

s.      the Debtors are authorized to enter into stipulations with the holder of any Claim or Interest agreeing to the amount of a Claim or Interest for voting purposes;

t.      if a Class contains Claims or Interests eligible to vote on the Plan and no holder of Claims or Interests in such Class eligible to vote on the Plan votes to accept or reject the Plan, the Plan shall be presumed accepted by the holders of such Claims or Interests in such Class;

u.      any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest, or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing, shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of

11

determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code;

v.      in the event a holder of an Allowed General Unsecured Claim makes both the New Common Stock Election and the Convenience Claim Election with respect to its Allowed General Unsecured Claim, such holder shall (i) be deemed to have made neither the New Common Stock Election nor the Convenience Claim Election and (ii) receive the treatment set forth in Section 3.2(f)(2) of the Plan on that basis; and

w.      where any portion of a single Claim or Interest has been transferred to a transferee, all holders of any portion of such single Claim or Interest will be (i) treated as a single creditor for purposes of the numerosity requirements in section 1126(c) of the Bankruptcy Code (and for the other voting and solicitation procedures set forth herein), and (ii) required to vote every portion of such Claim or Interest collectively to accept or reject the Plan.  In the event that (i) a Ballot, (ii) a group of Ballots within a Voting Class received from a single creditor, or (iii) a group of Ballots received from the various holders of multiple portions of a single Claim or Interest partially reject and partially accept the Plan, such Ballots shall not be counted.

**4.      Master Ballot Voting and Tabulation Procedures.**

In addition to the foregoing generally applicable voting and ballot tabulation procedures, the following procedures shall apply to holders of Note Claims who hold their position through a broker, bank, or other nominee or an agent of a broker, bank, or other nominee (each of the foregoing, a "Nominee"):

a.      The Solicitation Agent shall distribute or cause to be distributed to the Nominees identified by the Solicitation Agent as Entities through which Beneficial Holders[3] hold their Class 5 Note Claims the appropriate number of (i) Solicitation Packages for each Beneficial Holder represented by the Nominee as of the Voting Record Date, which will contain copies of Ballots to each beneficial holder (a "Beneficial Holder Ballot"), and (ii) a master ballot (the "Master Ballot");

b.      Each Nominee shall immediately, and in any event within seven Business Days after its receipt of the Solicitation Packages, distribute the Solicitation Packages, including Beneficial Holder Ballots, it receives from the Solicitation Agent to all such Beneficial Holders,[4] providing such

---

[3]    A "Beneficial Holder" means a beneficial owner of publicly-traded securities whose Claims have not been satisfied prior to the Voting Record Date pursuant to Bankruptcy Court order or otherwise, as reflected in the records maintained by the Nominees.

[4]    Solicitation Packages may be sent in paper format or via electronic transmission in accordance with the customary requirements of each Nominee.  Each Nominee will then distribute the Solicitation Packages, as

12

Beneficial Holders with a return address to send the completed Beneficial Holder Ballots, and any Nominee that is a holder of record with respect to Class 5 Note Claims shall obtain votes on behalf of Beneficial Holders of such Claims by one of the following two methods:

i.    "Pre-validate" the individual Class 5 Note Claim Ballot contained in the Solicitation Package and then forward the Solicitation Package to the Beneficial Holder of the Class 5 Claim for voting within five (5) Business Days after the receipt by such Nominee of the Solicitation Package, with the Beneficial Holder then returning the individual Beneficial Holder Ballot directly to the Solicitation Agent in the return envelope to be provided in the Solicitation Package. A Nominee "pre-validates" a Beneficial Holder's Ballot by signing the Beneficial Holder Ballot and including their DTC participant number; indicating the account number of the Beneficial Holder and the principal amount of Class 5 Claim held by the Nominee for such Beneficial Holder; and then forwarding the Beneficial Holder Ballot together with the Solicitation Package to the Beneficial Holder. The Beneficial Holder then completes the information requested on the Beneficial Holder Ballot and returns the Beneficial Holder Ballot directly to the Solicitation Agent. A list of the Beneficial Holders to whom "pre-validated" Beneficial Holder Ballots were delivered should be maintained by Nominees for inspection for at least one year from the Effective Date; OR

ii.    Within five (5) Business Days after receipt by such Nominee of the Solicitation Package, forward the Solicitation Package to the Beneficial Holder of the Class 5 Claim for voting along with a return envelope provided by and addressed to the Nominee, with the Beneficial Holder then returning the individual Beneficial Holder Ballot to the Nominee. In such case, the Nominee will tabulate the votes of its respective owners on a Master Ballot that will be provided to the Nominee separately by the Solicitation Agent, in accordance with any instructions set forth in the instructions to the Master Ballot, and then return the Master Ballot to the Solicitation Agent. The Nominee should advise the Beneficial Holder to return their individual Beneficial Holder Ballots to the Nominee by a date calculated by the Nominee to allow it to prepare and return the Master Ballot to the Solicitation Agent so that the Master Ballot is actually received by the Solicitation Agent on or before the Voting Deadline.

---

appropriate, in accordance with their customary practices and obtain votes to accept or to reject the Plan also in accordance with their customary practices. If it is the Nominee's customary and accepted practice to submit a "voting instruction form" to the Beneficial Holders for the purpose of recording the Beneficial Holder's vote, the Nominee will be authorized to send the voting instruction form in lieu of, or in addition to, a Beneficial Holder Ballot.

c.  each Nominee shall compile and validate the votes and other relevant information of all such Beneficial Holders on the Master Ballot; and transmit the Master Ballot to the Solicitation Agent on or before the Voting Deadline;

d.  any Beneficial Holder holding Class 5 Note Claims as a record holder in its own name shall vote on the Plan by completing and signing a Ballot and returning it directly to the Solicitation Agent on or before the Voting Deadline;

e.  any Beneficial Holder Ballot returned to a Nominee by a Beneficial Holder shall not be counted for purposes of accepting or rejecting the Plan until such Nominee properly completes and delivers to the Solicitation Agent a Master Ballot that reflects the vote of such Beneficial Holders on or before the Voting Deadline or otherwise validates the Beneficial Holder Ballot in a manner acceptable to the Solicitation Agent.  Nominees shall retain all Beneficial Holder Ballots returned by Beneficial Holders for a period of one year after the Effective Date of the Plan;

f.  if a Beneficial Holder holds Class 5 Note Claims through more than one Nominee or through multiple accounts, such Beneficial Holder may receive more than one Beneficial Holder Ballot and each such Beneficial Holder should execute a separate Beneficial Holder Ballot for each block of Class 5 Note Claims that it holds through any Nominee and must return each such Beneficial Holder Ballot to the appropriate Nominee;

g.  if a Beneficial Holder holds a portion of its Class 5 Note Claims through a Nominee or Nominees and another portion in its own name as the record holder, such Beneficial Holder should follow the procedures described in section D.3 herein to vote the portion held in its own name and the procedures described in section D.4 herein to vote the portion held by the Nominee(s);

h.  votes cast by Beneficial Holders through Nominees will be applied to the applicable positions held by such Nominees in Class 5, as of the Voting Record Date, as evidenced by the record and depository listings.  Votes submitted by a Nominee pursuant to a Master Ballot will not be counted in excess of the amount of such Claims held by such Nominee as of the Voting Record Date;

i.  if conflicting votes or "over-votes" are submitted by a Nominee pursuant to a Master Ballot, the Debtors will use reasonable efforts to reconcile discrepancies with the Nominees.  If over-votes on a Master Ballot are not reconciled prior to the preparation of the Voting Report, the Debtors shall apply the votes to accept and to reject the Plan in the same proportion as the votes to accept and to reject the Plan submitted on the Master Ballot

14

that contained the over-vote, but only to the extent of the Nominee's position in Class 5;

j.    for purposes of tabulating votes, each Nominee or Beneficial Holder will be deemed to have voted the principal amount of its Claims in Class 5; *provided*, *however*, that any principal amounts identified by holders of Class 5 Note Claims on their respective Class 5 Ballots may thereafter be adjusted by the Solicitation Agent, on a proportionate basis (based on the securities position report(s) from the DTC), with a view to reconciling the amount of Note Claims actually voted, including any accrued and unpaid prepetition interest;

k.    a single Nominee may complete and deliver to the Solicitation Agent multiple Master Ballots. Votes reflected on multiple Master Ballots will be counted, except to the extent that they are duplicative of other Master Ballots. If two or more Master Ballots submitted by a single Nominee are inconsistent, the latest received valid Master Ballot received prior to the Voting Deadline will, to the extent of such inconsistency, supersede and revoke any prior received Master Ballot. Likewise, if a Beneficial Holder submits more than one Beneficial Holder Ballot to its Nominee, (i) the latest received Beneficial Holder Ballot received before the submission deadline imposed by the Nominee shall be deemed to supersede any prior Beneficial Holder Ballot submitted by the Beneficial Holder, and (ii) the Nominee shall complete the Master Ballot accordingly; and

l.    the Debtors will, upon written request, reimburse Nominees for customary mailing and handling expenses incurred by them in forwarding the Beneficial Holder Ballot and other enclosed materials to the Beneficial Holders for which they are the Nominee. No fees or commissions or other remuneration will be payable to any broker, dealer, or other person for soliciting Beneficial Holder Ballot with respect to the Plan.

**E.    Amendments to the Plan and Solicitation and Voting Procedures.**

The Debtors reserve the right to make non-substantive or immaterial changes, which are consistent in all material respects with the Restructuring Support Agreement and the Committee Settlement, to the Disclosure Statement, Plan, Ballots, Confirmation Hearing Notice, Solicitation Packages, Non-Voting Status Notices (including Election Forms), Ballots, Publication Notice, Cover Letter, Solicitation and Voting Procedures, Plan Supplement Notice, Assumption Notice and Rejection Notice, Voting and Tabulation Procedures, Rights Offering Procedures, Rights Offering Materials, AI Questionnaire and related documents without further order of the Court, including, without limitation, changes to correct typographical and grammatical errors, if any, and to make conforming changes among the Disclosure Statement, the Plan, and any other materials in the Solicitation Package before their distribution.

\*    \*    \*    \*

## <u>SCHEDULE 3A</u>

**Form of Class 3 Ballot**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| 21st CENTURY ONCOLOGY HOLDINGS, INC., *et al.*,[1] | ) Case No. 17-22770 (RDD) |
|  | ) |
| Debtors. | ) (Jointly Administered) |
|  | ) |

**BALLOT FOR VOTING TO ACCEPT OR REJECT**
**THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF**
**21st CENTURY ONCOLOGY HOLDINGS, INC. AND ITS DEBTOR AFFILIATES**

**CLASS 3 BALLOT FOR MDL CLAIMS**

---

**PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**

**IN ORDER FOR YOUR VOTE TO BE COUNTED TOWARD CONFIRMATION OF THE PLAN, THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE *ACTUALLY RECEIVED* BY THE SOLICITATION AGENT BY NOVEMBER 20, 2017, AT 5:00 P.M., PREVAILING EASTERN TIME (THE "VOTING DEADLINE") IN ACCORDANCE WITH THE FOLLOWING:**

---

The above-captioned debtors and debtors in possession (collectively, the "Debtors") are soliciting votes with respect to the *Joint Chapter 11 Plan of Reorganization of 21st Century Oncology Holdings, Inc. and its Debtor Affiliates* (as may be modified, amended, or supplemented from time to time, the "Plan") as set forth in the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of 21st Century Oncology Holdings, Inc. and its Debtor Affiliates* (as may be modified, amended, or supplemented from time to time, the "Disclosure Statement"). The Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") has approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, by entry of an order on October [•], 2017 (the "Disclosure Statement Order"). The Bankruptcy Court's approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

You are receiving this Class 3 ballot (the "Class 3 Ballot") because you are a holder of an MDL Claim in Class 3 as of October 16, 2017 (the "Voting Record Date"). Class 3 MDL Claims include any Claim against any Debtor arising on account of, or in connection with, any MDL Obligations, the MDL Facility Credit Agreement, or any other "Credit Documents" (as defined in the MDL Facility Credit Agreement), including Claims for all accrued and unpaid principal, interest, fees, expenses, costs, and other charges and amounts constituting MDL Obligations.

Your rights are described in the Disclosure Statement, which was included in the package (the "Solicitation Package") you are receiving with this Class 3 Ballot (as well as the Plan, Disclosure Statement Order, and certain other materials). If you received Solicitation Package materials in electronic format and desire paper

---

[1] Each of the Debtors in the above-captioned jointly administered chapter 11 cases and their respective tax identification numbers are set forth in the *Order Directing Joint Administration of Chapter 11 Cases* [Docket No. 30]. The location of 21st Century Oncology Holdings, Inc.'s corporate headquarters and the Debtors' service address is: 2270 Colonial Boulevard, Fort Myers, Florida 33907.

copies, or if you need to obtain additional Solicitation Packages, you may obtain them from (a) Kurtzman Carson Consultants LLC (the "Solicitation Agent") at no charge by: (i) calling the Debtors' restructuring hotline at (888) 251-2679 (US toll-free) and (310) 751-2609 (international toll); (ii) visiting the Debtors' restructuring website at: http://www.kccllc.net/21co; (iii) writing to 21st Century Oncology Holdings, Inc., Ballot Processing Center, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245; and/or (iv) emailing 21coInfo@kccllc.com; or (b) for a fee via PACER at https://ecf.nysb.uscourts.gov/.

This Class 3 Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan. If you believe you have received this Class 3 Ballot in error, or if you believe that you have received the wrong ballot, please contact the Solicitation Agent *immediately* at the address, telephone number, or email address set forth above.

You should review the Disclosure Statement and the Plan before you vote. You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim. Your Claim has been placed in Class 3, MDL Claims, under the Plan. If you hold Claims or Interests in more than one Class, you will receive a ballot for each Class in which you are entitled to vote.

**Item 1. Principal Amount of Claim.**[2]

The undersigned hereby certifies that as of the Voting Record Date, the undersigned was the holder of MDL Claims in the following aggregate unpaid principal amount (insert amount in box below) without regard to any accrued but unpaid interest:



**Item 2. Vote on Plan.**

The holder of the Class 3 MDL Claim against the Debtors set forth in Item 1 votes to (please check one):

| | |
|---|---|
| **ACCEPT** (vote FOR) the Plan | **REJECT** (vote AGAINST) the Plan |

**Item 3. Important Information Regarding the Third Party Release.**

**Article VIII.8.3 of the Plan contains the following provision:**

Notwithstanding anything contained in the Plan to the contrary, on the Confirmation Date and effective as of the Effective Date, and to the fullest extent permitted by applicable law, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all claims, interests, obligations, debts, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claim asserted on behalf of any Debtor and/or Reorganized Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Releasing Party would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, the Restructuring Transactions, the Chapter 11 Cases, the Rights Offerings, the Backstop Purchase Agreement, the Backstop Commitments, the Backstop Order, the Restructuring Support Agreement, the purchase, sale, or rescission of the purchase or sale of any security of

---

2     For voting purposes only and subject to tabulation rules.

the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Releasing Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, preparation, implementation or administration of the Plan, the Disclosure Statement, the Plan Supplement, the Rights Offering Procedures, the DIP Facility, the Exit Facilities, the DIP Documents, the Exit Facility Documents, the New Warrant Documents, the New Organizational Documents, or any other Restructuring Documents, any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes fraud, willful misconduct or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third Party Release is:  (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good-faith settlement and compromise of the claims released by the Third-Party Release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Releasing Parties asserting any claim or cause of action released pursuant to the Third-Party Release.

\*        \*        \*

"*RELEASING PARTIES*" MEANS COLLECTIVELY, AND IN EACH CASE SOLELY IN ITS CAPACITY AS SUCH: (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) THE BACKSTOP PARTIES; (D) THE DIP LENDERS; (E) THE DIP AGENT; (F) THE CONSENTING MDL LENDERS; (G) THE MDL AGENT; (H) THE CONSENTING FIRST LIEN LENDERS; (I) THE FIRST LIEN AGENT; (J) THE CONSENTING NOTEHOLDERS; (K) THE INDENTURE TRUSTEE; (L) THE EQUITY PARTIES; (M) THE COMMITTEE; (N) THE MEMBERS OF THE COMMITTEE; (O) ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE PRESUMED TO ACCEPT THE PLAN AND DO NOT OPT OUT OF THE THIRD-PARTY RELEASE ON THEIR RESPECTIVE ELECTION FORMS; (P) ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE PRESUMED TO REJECT THE PLAN AND DO NOT OPT OUT OF THE THIRD-PARTY RELEASE ON THEIR RESPECTIVE ELECTION FORMS; (Q) ALL HOLDERS OF CLAIMS OR INTERESTS ENTITLED TO VOTE ON THE PLAN WHO EITHER (1) VOTE TO ACCEPT THE PLAN OR (2) RECEIVE A BALLOT BUT ABSTAIN FROM VOTING ON THE PLAN; (R) ALL HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLAN WHO VOTE TO REJECT THE PLAN BUT DO NOT ELECT ON THEIR BALLOT TO OPT-OUT OF THE THIRD-PARTY RELEASE; (S) ALL RIGHTS OFFERING PARTICIPANTS THAT PARTICIPATE IN THE RIGHTS OFFERINGS; (T) ALL OTHER HOLDERS OF CLAIMS AND INTERESTS TO THE FULLEST EXTENT PERMITTED BY LAW; AND (U) WITH RESPECT TO THE FOREGOING CLAUSES (A) THROUGH (T), EACH OF SUCH PERSON'S CURRENT AND FORMER AFFILIATES, PARTNERS, SUBSIDIARIES, OFFICERS, DIRECTORS, PRINCIPALS, EMPLOYEES, AGENTS, MANAGED FUNDS, ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, TOGETHER WITH THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, IN EACH CASE IN THEIR CAPACITY AS SUCH.

**IN CONNECTION WITH THE FOREGOING, PLEASE CAREFULLY REVIEW THE FOLLOWING:**

- If you vote to accept the Plan, you will be a "Releasing Party"[3] under the Plan, and you will be deemed to provide the Third-Party Release provided in Article VIII.8.3 of the Plan. If you vote to accept the plan, you cannot opt out of giving such release.

- If you vote to reject the Plan and wish to opt out of giving the release provided in Article VIII.8.3 of the Plan, you must submit this Class 3 Ballot to the Solicitation Agent by the Voting Deadline and check the opt out box below.

- If you do not vote on the Plan, but wish to opt out of giving the release provided in Article VIII.8.3 of the Plan, you must submit this Class 3 Ballot to the Solicitation Agent by the Voting Deadline, and check the opt out box below.

- If you (i) do not submit a Class 3 Ballot to the Solicitation Agent by the Voting Deadline, or (ii) submit a Class 3 Ballot, but do not vote to accept or reject the Plan, and fail to check the opt out box below, you will be deemed to consent to giving the release provided in Article VIII.8.3 of the Plan.

The holder of the Class 3 MDL Claim set forth in Item 1 that has not voted to accept the Plan elects to:

☐ **Opt Out** of the Third Party Release.

---

[3] "*RELEASING PARTIES*" MEANS COLLECTIVELY, AND IN EACH CASE SOLELY IN ITS CAPACITY AS SUCH: (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) THE BACKSTOP PARTIES; (D) THE DIP LENDERS; (E) THE DIP AGENT; (F) THE CONSENTING MDL LENDERS; (G) THE MDL AGENT; (H) THE CONSENTING FIRST LIEN LENDERS; (I) THE FIRST LIEN AGENT; (J) THE CONSENTING NOTEHOLDERS; (K) THE INDENTURE TRUSTEE; (L) THE EQUITY PARTIES; (M) THE COMMITTEE; (N) THE MEMBERS OF THE COMMITTEE; (O) ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE PRESUMED TO ACCEPT THE PLAN AND DO NOT OPT OUT OF THE THIRD-PARTY RELEASE ON THEIR RESPECTIVE ELECTION FORMS; (P) ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE PRESUMED TO REJECT THE PLAN AND DO NOT OPT OUT OF THE THIRD-PARTY RELEASE ON THEIR RESPECTIVE ELECTION FORMS; (Q) ALL HOLDERS OF CLAIMS OR INTERESTS ENTITLED TO VOTE ON THE PLAN WHO EITHER (1) VOTE TO ACCEPT THE PLAN OR (2) RECEIVE A BALLOT BUT ABSTAIN FROM VOTING ON THE PLAN; (R) ALL HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLAN WHO VOTE TO REJECT THE PLAN BUT DO NOT ELECT ON THEIR BALLOT TO OPT-OUT OF THE THIRD-PARTY RELEASE; (S) ALL RIGHTS OFFERING PARTICIPANTS THAT PARTICIPATE IN THE RIGHTS OFFERINGS; (T) ALL OTHER HOLDERS OF CLAIMS AND INTERESTS TO THE FULLEST EXTENT PERMITTED BY LAW; AND (U) WITH RESPECT TO THE FOREGOING CLAUSES (A) THROUGH (T), EACH OF SUCH PERSON'S CURRENT AND FORMER AFFILIATES, PARTNERS, SUBSIDIARIES, OFFICERS, DIRECTORS, PRINCIPALS, EMPLOYEES, AGENTS, MANAGED FUNDS, ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, TOGETHER WITH THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, IN EACH CASE IN THEIR CAPACITY AS SUCH.

**Item 4. Certifications.**

By signing this Class 3 Ballot, the undersigned certifies to the Bankruptcy Court and the Debtors:

(a) that, as of the Voting Record Date, either: (i) the undersigned is the holder of the MDL Claims being voted; or (ii) the undersigned is an authorized signatory for an Entity that is a holder of the MDL Claims being voted;

(b) that the undersigned (or in the case of an authorized signatory, the holder) has received a copy of the Disclosure Statement, the Plan, the Disclosure Statement Order, and the Solicitation Package and acknowledges that the Solicitation is being made pursuant to the terms and conditions set forth therein;

(c) that the undersigned has cast the same vote with respect to all MDL Claims in Class 3 held by the holder of the MDL Claims being voted; and

(d) that no other Class 3 Ballots with respect to the amount of the MDL Claims identified in Item 1 have been cast or, if any other Class 3 Ballots have been cast with respect to such MDL Claims, then any such earlier Class 3 Ballots are hereby revoked.

| | |
|---|---|
| Name of Holder: | |
| | (Print or Type) |
| | |
| Signature: | |
| Name of Signatory: | |
| | (If other than holder) |
| Title: | |
| Address: | |
| | |
| | |
| Telephone Number: | |
| Email: | |
| Date Completed: | |

**PLEASE COMPLETE, SIGN, AND DATE THIS CLASS 3 BALLOT AND RETURN IT (WITH AN ORIGINAL SIGNATURE) *PROMPTLY* VIA FIRST CLASS MAIL (OR IN THE ENCLOSED REPLY ENVELOPE PROVIDED), OVERNIGHT COURIER, OR HAND DELIVERY TO THE BELOW ADDRESSES. YOUR CLASS 3 BALLOT MUST BE ACTUALLY RECEIVED BY THE VOTING DEADLINE, WHICH IS NOVEMBER 20, 2017, AT 5:00 P.M., PREVAILING EASTERN TIME.**

**21st Century Oncology Holdings, Inc.
Ballot Processing Center
c/o Kurtzman Carson Consultants, LLC
2335 Alaska Avenue
El Segundo, CA 90245**

**PLEASE SELECT JUST ONE OPTION TO VOTE.  EITHER RETURN
THIS PAPER CLASS 3 BALLOT WITH YOUR VOTE
<u>OR</u>
VOTE ELECTRONICALLY AS INSTRUCTED BELOW**

**To submit your Class 3 Ballot via the Solicitation Agent's online portal, please visit
<u>http://www.kccllc.net/21co</u>.  Click on the "eBallot" section of the website and follow the instructions to submit
your Class 3 Ballot.**

**IMPORTANT NOTE:  You will need the following information to retrieve and submit your customized
electronic Class 3 Ballot:**

**Unique eBallot ID#:_____**

**The Solicitation Agent's online portal is the sole manner in which Class 3 Ballots will be accepted via
electronic or online transmission.  Class 3 Ballots submitted by facsimile, email, or other means of electronic
transmission will not be counted toward Confirmation of the Plan.**

**Each eBallot ID# is to be used solely for voting only those MDL Claims described in Item 1 of your electronic
Class 3 Ballot.  Please complete and submit an electronic Class 3 Ballot for each eBallot ID# you receive, as
applicable.**

**Creditors who cast a Class 3 Ballot using the Solicitation Agent's online portal
should NOT also submit a paper Class 3 Ballot.**

| |
|---|
| **IF THE SOLICITATION AGENT DOES NOT *ACTUALLY RECEIVE* THIS CLASS 3 BALLOT ON OR BEFORE NOVEMBER 20, 2017, AT 5:00 P.M., PREVAILING EASTERN TIME (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED BY THIS CLASS 3 BALLOT MAY BE COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS.** |

| Class 3 — MDL Claims |
|---|

## INSTRUCTIONS FOR COMPLETING THIS CLASS 3 BALLOT

1. The Debtors are soliciting the votes of holders of Claims or Interests with respect to the Plan attached as **Exhibit A** to the Disclosure Statement. Capitalized terms used in the Class 3 Ballot or in these instructions (the "Ballot Instructions") but not otherwise defined therein or herein shall have the meanings set forth in the Plan, a copy of which also accompanies the Class 3 Ballot. **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2. The Plan may be confirmed by the Court and thereby made binding upon you if it is accepted by the holders of at least two-thirds in amount and more than one-half in number of Claims or Interests in at least one class of creditors or Interest holders that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code. Please review the Disclosure Statement for more information.

3. To ensure that your Class 3 Ballot is counted toward Confirmation of the Plan, you **must either**: (a) complete and submit this hard copy Class 3 Ballot or (b) vote through the Debtors' online balloting portal accessible through the Debtors' case website http://www.kccllc.net/21co. **Ballots will not be accepted by facsimile, email, or other electronic means (other than the online portal).**

4. **Use of Hard Copy Ballot.** To ensure that your hard copy Class 3 Ballot is counted toward Confirmation of the Plan, you must: (a) complete your Class 3 Ballot in accordance with these instructions; (b) clearly indicate your decision either to accept or reject the Plan in the boxes provided in Item 2 of the Class 3 Ballot; and (c) clearly sign and return your original Class 3 Ballot in the enclosed pre-addressed, pre-paid envelope, or by delivery, overnight courier, or hand delivery to:

   **21st Century Oncology Holdings, Inc.**
   **Ballot Processing Center**
   **c/o Kurtzman Carson Consultants, LLC**
   **2335 Alaska Avenue**
   **El Segundo, CA 90245**

5. **OR Use of Online Ballot Portal.** To ensure that your electronic Class 3 Ballot is counted toward Confirmation of the Plan, please follow the instructions of the Debtors' case administration website at http://www.kccllc.net/21co. You will need to enter your unique eBallot ID# indicated above. The online balloting portal is the sole manner in which Ballots will be accepted via electronic or online transmission. **Ballots will not be accepted by facsimile, email, or other electronic means (other than the online portal).**

6. Your Class 3 Ballot **must** be returned to the Solicitation Agent so as to be **actually received** by the Solicitation Agent on or before the Voting Deadline. **The Voting Deadline is November 20, 2017, at 5:00 p.m.**, prevailing Eastern Time.

7. If a Class 3 Ballot is received **after** the Voting Deadline and if the Voting Deadline is not extended, it may be counted toward Confirmation of the Plan only in the discretion of the Debtors. Additionally, **the following Class 3 Ballots will not be counted toward Confirmation of the Plan:**

   (a) any Class 3 Ballot that partially rejects and partially accepts the Plan;
   (b) any Class 3 Ballot that is sent to the Debtors, the Debtors' agents (other than the Solicitation Agent), any indenture trustee or administrative agent, or the Debtors' financial or legal advisors;
   (c) any Class 3 Ballot that is sent by facsimile, email, or any electronic means other than via the online portal;
   (d) any Class 3 Ballot that is illegible or contains insufficient information to permit the identification of the holder of the Claim;

(e)  any Class 3 Ballot cast by an Entity that does not hold a Claim in Class 3;
(f)  any Class 3 Ballot submitted by a holder not entitled to vote on the Plan;
(g)  any unsigned Class 3 Ballot;
(h)  any Class 3 Ballot that does not contain an original signature; and/or
(i)  any Class 3 Ballot not marked to accept or reject the Plan or any Class 3 Ballot marked both to accept and reject the Plan.

8.  The method of delivery of Class 3 Ballots to the Solicitation Agent is at the election and risk of each holder of an MDL Claim.  Except as otherwise provided herein, such delivery will be deemed made only when the Solicitation Agent ***actually receives*** the originally executed Class 3 Ballot.  In all cases, holders should allow sufficient time to assure timely delivery.

9.  If multiple Class 3 Ballots are received from the same holder of an MDL Claim with respect to the same MDL Claim prior to the Voting Deadline, the latest, timely received, and properly completed Class 3 Ballot will supersede and revoke any earlier received Class 3 Ballots.

10.  You must vote all of your MDL Claims within Class 3 either to accept or reject the Plan and may ***not*** split your vote.  Further, for purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code, the Debtors may, in their discretion, (a) aggregate and treat separate MDL Claims held by a single creditor or separate affiliated Entities in Class 3 as if such creditor or such separate affiliated Entities held one MDL Claim in Class 3, and treat all votes related to such MDL Claim as a single vote to accept or reject the Plan; or (b) not aggregate or treat separate MDL Claims held by a single creditor or separate affiliated Entities in Class 3 as if such creditor or such separate affiliated Entities held one MDL Claim in Class 3, and treat all votes related to such MDL Claims as separate votes to accept or reject the Plan.

11.  This Class 3 Ballot does ***not*** constitute, and shall not be deemed to be, (a) a Proof of Claim or (b) an assertion or admission of a Claim.

12.  **Please be sure to sign and date your Class 3 Ballot**.  If you are signing a Class 3 Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Solicitation Agent, the Debtors, or the Bankruptcy Court, you must submit proper evidence to the requesting party to so act on behalf of such holder.  In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Class 3 Ballot.

13.  If you hold Claims or Interests in more than one Class under the Plan you may receive more than one ballot coded for each different Class.  Each ballot votes ***only*** your Claims or Interests indicated on that ballot, so please complete and return each ballot that you received.

**PLEASE MAIL YOUR CLASS 3 BALLOT PROMPTLY**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS CLASS 3 BALLOT,
THESE VOTING INSTRUCTIONS OR THE PROCEDURES FOR VOTING,
PLEASE CALL THE RESTRUCTURING HOTLINE AT: (888) 251-2679 (US TOLL-FREE) and
(310) 751-2609 (INTERNATIONAL TOLL) OR EMAIL 21COINFO@KCCLLC.COM.**

---

**IF THE SOLICITATION AGENT DOES NOT *ACTUALLY RECEIVE* THIS CLASS 3 BALLOT ON OR BEFORE THE VOTING DEADLINE, WHICH IS NOVEMBER 20, 2017, AT 5:00 P.M., PREVAILING EASTERN TIME (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED HEREBY MAY BE COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS.**

---

## **SCHEDULE 3B**

## **Form of Class 4 Ballot**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| 21st CENTURY ONCOLOGY HOLDINGS, INC., *et al.*,[1] | ) Case No. 17-22770 (RDD) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**BALLOT FOR VOTING TO ACCEPT OR REJECT**
**THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF**
**21st CENTURY ONCOLOGY HOLDINGS, INC. AND ITS DEBTOR AFFILIATES**

**CLASS 4 BALLOT FOR FIRST LIEN CLAIMS**

---

**PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS
CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**

**IN ORDER FOR YOUR VOTE TO BE COUNTED TOWARD CONFIRMATION OF THE PLAN, THIS
BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE
*ACTUALLY RECEIVED* BY THE SOLICITATION AGENT BY NOVEMBER 20, 2017, AT 5:00 P.M.,
PREVAILING EASTERN TIME (THE "VOTING DEADLINE") IN ACCORDANCE WITH THE
FOLLOWING:**

---

The above-captioned debtors and debtors in possession (collectively, the "Debtors") are soliciting votes with respect to the *Joint Chapter 11 Plan of Reorganization of 21st Century Oncology Holdings, Inc. and its Debtor Affiliates* (as may be modified, amended, or supplemented from time to time, the "Plan") as set forth in the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of 21st Century Oncology Holdings, Inc. and its Debtor Affiliates*  (as may be modified, amended, or supplemented from time to time, the "Disclosure Statement").  The Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") has approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, by entry of an order on October [•], 2017 (the "Disclosure Statement Order").   The Bankruptcy Court's approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court.  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

You are receiving this Class 4 ballot (the "Class 4 Ballot") because you are a holder of a First Lien Claim in Class 4 as of October 16, 2017 (the "Voting Record Date").  Class 4 First Lien Claims include any Claim against any Debtor arising on account of, or in connection with, any First Lien Obligations, the First Lien Credit Agreement, or any of the other "Loan Documents" (as defined in the First Lien Credit Agreement), including Claims for all accrued and unpaid principal, interest, fees, expenses, costs, and other charges and amounts constituting First Lien Obligations.

---

[1]     Each of the Debtors in the above-captioned jointly administered chapter 11 cases and their respective tax identification numbers are set forth in the *Order Directing Joint Administration of Chapter 11 Cases* [Docket No. 30].  The location of 21st Century Oncology Holdings, Inc.'s corporate headquarters and the Debtors' service address is: 2270 Colonial Boulevard, Fort Myers, Florida 33907.

Your rights are described in the Disclosure Statement, which was included in the package (the "Solicitation Package") you are receiving with this Class 4 Ballot (as well as the Plan, Disclosure Statement Order, and certain other materials). If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them from (a) Kurtzman Carson Consultants LLC (the "Solicitation Agent") at no charge by: (i) calling the Debtors' restructuring hotline at (888) 251-2679 (US toll-free) and (310) 751-2609 (international toll); (ii) visiting the Debtors' restructuring website at: http://www.kccllc.net/21co; (iii) writing to 21st Century Oncology Holdings, Inc., Ballot Processing Center, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245; and/or (iv) emailing 21coInfo@kccllc.com; or (b) for a fee via PACER at https://ecf.nysb.uscourts.gov/.

This Class 4 Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan. If you believe you have received this Class 4 Ballot in error, or if you believe that you have received the wrong ballot, please contact the Solicitation Agent *immediately* at the address, telephone number, or email address set forth above.

You should review the Disclosure Statement and the Plan before you vote. You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim. Your Claim has been placed in Class 4, First Lien Claims, under the Plan. If you hold Claims or Interests in more than one Class, you will receive a ballot for each Class in which you are entitled to vote.

**Item 1. Principal Amount of Claim.**[2]

The undersigned hereby certifies that as of the Voting Record Date, the undersigned was the holder of First Lien Claims in the following aggregate unpaid principal amount (insert amount in box below) without regard to any accrued but unpaid interest:

$$\boxed{\$\rule{3cm}{0.4pt}}$$

**Item 2. Vote on Plan.**

The holder of the Class 4 First Lien Claim against the Debtors set forth in Item 1 votes to (please check one):

| **ACCEPT** (vote FOR) the Plan | **REJECT** (vote AGAINST) the Plan |
|---|---|

**Item 3. Important Information Regarding the Third Party Release.**

**Article VIII.8.3 of the Plan contains the following provision:**

Notwithstanding anything contained in the Plan to the contrary, on the Confirmation Date and effective as of the Effective Date, and to the fullest extent permitted by applicable law, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all claims, interests, obligations, debts, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claim asserted on behalf of any Debtor and/or Reorganized Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Releasing Party would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole

---

[2]    For voting purposes only and subject to tabulation rules.

2

or in part, the Debtors, the Reorganized Debtors, the Restructuring Transactions, the Chapter 11 Cases, the Rights Offerings, the Backstop Purchase Agreement, the Backstop Commitments, the Backstop Order, the Restructuring Support Agreement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Releasing Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, preparation, implementation or administration of the Plan, the Disclosure Statement, the Plan Supplement, the Rights Offering Procedures, the DIP Facility, the Exit Facilities, the DIP Documents, the Exit Facility Documents, the New Warrant Documents, the New Organizational Documents, or any other Restructuring Documents, any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes fraud, willful misconduct or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third Party Release is:  (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good-faith settlement and compromise of the claims released by the Third-Party Release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Releasing Parties asserting any claim or cause of action released pursuant to the Third-Party Release.

\*       \*       \*

"*RELEASING PARTIES*" MEANS COLLECTIVELY, AND IN EACH CASE SOLELY IN ITS CAPACITY AS SUCH: (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) THE BACKSTOP PARTIES; (D) THE DIP LENDERS; (E) THE DIP AGENT; (F) THE CONSENTING MDL LENDERS; (G) THE MDL AGENT; (H) THE CONSENTING FIRST LIEN LENDERS; (I) THE FIRST LIEN AGENT; (J) THE CONSENTING NOTEHOLDERS; (K) THE INDENTURE TRUSTEE; (L) THE EQUITY PARTIES; (M) THE COMMITTEE; (N) THE MEMBERS OF THE COMMITTEE; (O) ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE PRESUMED TO ACCEPT THE PLAN AND DO NOT OPT OUT OF THE THIRD-PARTY RELEASE ON THEIR RESPECTIVE ELECTION FORMS; (P) ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE PRESUMED TO REJECT THE PLAN AND DO NOT OPT OUT OF THE THIRD-PARTY RELEASE ON THEIR RESPECTIVE ELECTION FORMS; (Q) ALL HOLDERS OF CLAIMS OR INTERESTS ENTITLED TO VOTE ON THE PLAN WHO EITHER (1) VOTE TO ACCEPT THE PLAN OR (2) RECEIVE A BALLOT BUT ABSTAIN FROM VOTING ON THE PLAN; (R) ALL HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLAN WHO VOTE TO REJECT THE PLAN BUT DO NOT ELECT ON THEIR BALLOT TO OPT-OUT OF THE THIRD-PARTY RELEASE; (S) ALL RIGHTS OFFERING PARTICIPANTS THAT PARTICIPATE IN THE RIGHTS OFFERINGS; (T) ALL OTHER HOLDERS OF CLAIMS AND INTERESTS TO THE FULLEST EXTENT PERMITTED BY LAW; AND (U) WITH RESPECT TO THE FOREGOING CLAUSES (A) THROUGH (T), EACH OF SUCH PERSON'S CURRENT AND FORMER AFFILIATES, PARTNERS, SUBSIDIARIES, OFFICERS, DIRECTORS, PRINCIPALS, EMPLOYEES, AGENTS, MANAGED FUNDS, ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, TOGETHER WITH THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, IN EACH CASE IN THEIR CAPACITY AS SUCH.

3

**IN CONNECTION WITH THE FOREGOING, PLEASE CAREFULLY REVIEW THE FOLLOWING:**

- If you vote to accept the Plan, you will be a "Releasing Party"[3] under the Plan, and you will be deemed to provide the Third-Party Release provided in Article VIII.8.3 of the Plan.  If you vote to accept the plan, you cannot opt out of giving such release.

- If you vote to reject the Plan and wish to opt out of giving the release provided in Article VIII.8.3 of the Plan, you must submit this Class 4 Ballot to the Solicitation Agent by the Voting Deadline and check the opt out box below.

- If you do not vote on the Plan, but wish to opt out of giving the release provided in Article VIII.8.3 of the Plan, you must submit this Class 4 Ballot to the Solicitation Agent by the Voting Deadline, and check the opt out box below.

- If you (i) do not submit a Class 4 Ballot to the Solicitation Agent by the Voting Deadline, or (ii) submit a Class 4 Ballot, but do not vote to accept or reject the Plan, and fail to check the opt out box below, you will be deemed to consent to giving the release provided in Article VIII.8.3 of the Plan.

The holder of the Class 4 First Lien Claim set forth in Item 1 that has not voted to accept the Plan elects to:

☐ **Opt Out** of the Third Party Release.

---

[3]  "*RELEASING PARTIES*" MEANS COLLECTIVELY, AND IN EACH CASE SOLELY IN ITS CAPACITY AS SUCH: (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) THE BACKSTOP PARTIES; (D) THE DIP LENDERS; (E) THE DIP AGENT; (F) THE CONSENTING MDL LENDERS; (G) THE MDL AGENT; (H) THE CONSENTING FIRST LIEN LENDERS; (I) THE FIRST LIEN AGENT; (J) THE CONSENTING NOTEHOLDERS; (K) THE INDENTURE TRUSTEE; (L) THE EQUITY PARTIES; (M) THE COMMITTEE; (N) THE MEMBERS OF THE COMMITTEE; (O) ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE PRESUMED TO ACCEPT THE PLAN AND DO NOT OPT OUT OF THE THIRD-PARTY RELEASE ON THEIR RESPECTIVE ELECTION FORMS; (P) ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE PRESUMED TO REJECT THE PLAN AND DO NOT OPT OUT OF THE THIRD-PARTY RELEASE ON THEIR RESPECTIVE ELECTION FORMS; (Q) ALL HOLDERS OF CLAIMS OR INTERESTS ENTITLED TO VOTE ON THE PLAN WHO EITHER (1) VOTE TO ACCEPT THE PLAN OR (2) RECEIVE A BALLOT BUT ABSTAIN FROM VOTING ON THE PLAN; (R) ALL HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLAN WHO VOTE TO REJECT THE PLAN BUT DO NOT ELECT ON THEIR BALLOT TO OPT-OUT OF THE THIRD-PARTY RELEASE; (S) ALL RIGHTS OFFERING PARTICIPANTS THAT PARTICIPATE IN THE RIGHTS OFFERINGS; (T) ALL OTHER HOLDERS OF CLAIMS AND INTERESTS TO THE FULLEST EXTENT PERMITTED BY LAW; AND (U) WITH RESPECT TO THE FOREGOING CLAUSES (A) THROUGH (T), EACH OF SUCH PERSON'S CURRENT AND FORMER AFFILIATES, PARTNERS, SUBSIDIARIES, OFFICERS, DIRECTORS, PRINCIPALS, EMPLOYEES, AGENTS, MANAGED FUNDS, ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, TOGETHER WITH THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, IN EACH CASE IN THEIR CAPACITY AS SUCH.

4

**Item 4.  Certifications.**

By signing this Class 4 Ballot, the undersigned certifies to the Bankruptcy Court and the Debtors:

(a)  that, as of the Voting Record Date, either:  (i) the undersigned is the holder of the First Lien Claims being voted; or (ii) the undersigned is an authorized signatory for an Entity that is a holder of the First Lien Claims being voted;

(b)  that the undersigned (or in the case of an authorized signatory, the holder) has received a copy of the Disclosure Statement, the Plan, the Disclosure Statement Order, and the Solicitation Package and acknowledges that the Solicitation is being made pursuant to the terms and conditions set forth therein;

(c)  that the undersigned has cast the same vote with respect to all First Lien Claims in Class 4 held by the holder of the First Lien Claims being voted; and

(d)  that no other Class 4 Ballots with respect to the amount of the First Lien Claims identified in Item 1 have been cast or, if any other Class 4 Ballots have been cast with respect to such First Lien Claims, then any such earlier Class 4 Ballots are hereby revoked.

Name of Holder: _____

(Print or Type)

_____

Signature: _____

Name of Signatory: _____

(If other than holder)

Title: _____

Address: _____

_____

_____

Telephone
Number: _____

Email: _____

Date Completed: _____

**PLEASE COMPLETE, SIGN, AND DATE THIS CLASS 4 BALLOT AND
RETURN IT (WITH AN ORIGINAL SIGNATURE)** *PROMPTLY* **VIA FIRST CLASS MAIL (OR IN THE
ENCLOSED REPLY ENVELOPE PROVIDED), OVERNIGHT COURIER, OR HAND DELIVERY TO
THE BELOW ADDRESSES.  YOUR CLASS 4 BALLOT MUST BE ACTUALLY RECEIVED BY THE
VOTING DEADLINE, WHICH IS NOVEMBER 20, 2017, AT 5:00 P.M., PREVAILING EASTERN TIME.**

**21st Century Oncology Holdings, Inc.
Ballot Processing Center
c/o Kurtzman Carson Consultants, LLC
2335 Alaska Avenue
El Segundo, CA 90245**

5

**PLEASE SELECT JUST ONE OPTION TO VOTE.  EITHER RETURN
THIS PAPER CLASS 4 BALLOT WITH YOUR VOTE
OR
VOTE ELECTRONICALLY AS INSTRUCTED BELOW**

**To submit your Class 4 Ballot via the Solicitation Agent's online portal, please visit
http://www.kccllc.net/21co.  Click on the "eBallot" section of the website and follow the instructions to submit
your Ballot.**

**IMPORTANT NOTE:  You will need the following information to retrieve and submit your customized
electronic Class 4 Ballot:**

**Unique eBallot ID#:_____**

**The Solicitation Agent's online portal is the sole manner in which Class 4 Ballots will be accepted via
electronic or online transmission.  Class 4 Ballots submitted by facsimile, email, or other means of electronic
transmission will not be counted toward Confirmation of the Plan.**

**Each eBallot ID# is to be used solely for voting only those First Lien Claims described in Item 1 of your
electronic Class 4 Ballot.  Please complete and submit an electronic Class 4 Ballot for each eBallot ID# you
receive, as applicable.**

**Creditors who cast a Class 4 Ballot using the Solicitation Agent's online portal
should NOT also submit a paper Class 4 Ballot.**

---

**IF THE SOLICITATION AGENT DOES NOT *ACTUALLY RECEIVE* THIS CLASS 4 BALLOT ON OR
BEFORE NOVEMBER 20, 2017, AT 5:00 P.M., PREVAILING EASTERN TIME (AND IF THE VOTING
DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED BY THIS CLASS 4 BALLOT MAY BE
COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE
DEBTORS.**

---

| Class 4— First Lien Claims |
|---|

## INSTRUCTIONS FOR COMPLETING THIS CLASS 4 BALLOT

1. The Debtors are soliciting the votes of holders of Claims or Interests with respect to the Plan attached as **Exhibit A** to the Disclosure Statement.  Capitalized terms used in the Class 4 Ballot or in these instructions (the "Ballot Instructions") but not otherwise defined therein or herein shall have the meanings set forth in the Plan, a copy of which also accompanies the Class 4 Ballot.  **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2. The Plan may be confirmed by the Court and thereby made binding upon you if it is accepted by the holders of at least two-thirds in amount and more than one-half in number of Claims or Interests in at least one class of creditors or Interest holders that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code.  Please review the Disclosure Statement for more information.

3. To ensure that your Class 4 Ballot is counted toward Confirmation of the Plan, you *must either*:  (a) complete and submit this hard copy Class 4 Ballot or (b) vote through the Debtors' online balloting portal accessible through the Debtors' case website http://www.kccllc.net/21co.  **Ballots will not be accepted by facsimile, email, or other electronic means (other than the online portal).**

4. **Use of Hard Copy Ballot.**  To ensure that your hard copy Class 4 Ballot is counted toward Confirmation of the Plan, you must:  (a) complete your Class 4 Ballot in accordance with these instructions; (b) clearly indicate your decision either to accept or reject the Plan in the boxes provided in Item 2 of the Class 4 Ballot; and (c) clearly sign and return your original Class 4 Ballot in the enclosed pre-addressed, pre-paid envelope, or by delivery, overnight courier, or hand delivery to:

   **21st Century Oncology Holdings, Inc.**
   **Ballot Processing Center**
   **c/o Kurtzman Carson Consultants, LLC**
   **2335 Alaska Avenue**
   **El Segundo, CA 90245**

5. **OR Use of Online Ballot Portal.**  To ensure that your electronic Class 4 Ballot is counted toward Confirmation of the Plan, please follow the instructions of the Debtors' case administration website at http://www.kccllc.net/21co.  You will need to enter your unique eBallot ID# indicated above.  The online balloting portal is the sole manner in which Ballots will be accepted via electronic or online transmission.  **Ballots will not be accepted by facsimile, email, or other electronic means (other than the online portal).**

6. Your Class 4 Ballot *must* be returned to the Solicitation Agent so as to be **actually received** by the Solicitation Agent on or before the Voting Deadline.  **The Voting Deadline is November 20, 2017, at 5:00 p.m.**, prevailing Eastern Time.

7. If a Class 4 Ballot is received *after* the Voting Deadline and if the Voting Deadline is not extended, it may be counted toward Confirmation of the Plan only in the discretion of the Debtors.  Additionally, **the following Class 4 Ballots will *not* be counted toward Confirmation of the Plan:**

   (a) any Class 4 Ballot that partially rejects and partially accepts the Plan;
   (b) any Class 4 Ballot that is sent to the Debtors, the Debtors' agents (other than the Solicitation Agent), any indenture trustee or administrative agent, or the Debtors' financial or legal advisors;
   (c) any Class 4 Ballot that is sent by facsimile, email, or any electronic means other than via the online portal;

(d) any Class 4 Ballot that is illegible or contains insufficient information to permit the identification of the holder of the Claim;

(e) any Class 4 Ballot cast by an Entity that does not hold a Claim in Class 4;

(f) any Class 4 Ballot submitted by a holder not entitled to vote on the Plan;

(g) any unsigned Class 4 Ballot;

(h) any Class 4 Ballot that does not contain an original signature; and/or

(i) any Class 4 Ballot not marked to accept or reject the Plan or any Class 4 Ballot marked both to accept and reject the Plan.

8. The method of delivery of Class 4 Ballots to the Solicitation Agent is at the election and risk of each holder of a First Lien Claim.  Except as otherwise provided herein, such delivery will be deemed made only when the Solicitation Agent ***actually receives*** the originally executed Class 4 Ballot.  In all cases, holders should allow sufficient time to assure timely delivery.

9. If multiple Class 4 Ballots are received from the same holder of a First Lien Claim with respect to the same First Lien Claim prior to the Voting Deadline, the latest, timely received, and properly completed Class 4 Ballot will supersede and revoke any earlier received Class 4 Ballots.

10. You must vote all of your First Lien Claims within Class 4 either to accept or reject the Plan and may ***not*** split your vote.  Further, for purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code, the Debtors may, in their discretion, (a) aggregate and treat separate First Lien Claims held by a single creditor or separate affiliated Entities in Class 4 as if such creditor or such separate affiliated Entities held one First Lien Claim in Class 4, and treat all votes related to such First Lien Claim as a single vote to accept or reject the Plan; or (b) not aggregate or treat separate First Lien Claims held by a single creditor or separate affiliated Entities in Class 4 as if such creditor or such separate affiliated Entities held one First Lien Claim in Class 4, and treat all votes related to such First Lien Claims as separate votes to accept or reject the Plan.

11. This Class 4 Ballot does ***not*** constitute, and shall not be deemed to be, (a) a Proof of Claim or (b) an assertion or admission of a Claim.

12. **Please be sure to sign and date your Class 4 Ballot**.  If you are signing a Class 4 Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Solicitation Agent, the Debtors, or the Bankruptcy Court, you must submit proper evidence to the requesting party to so act on behalf of such holder.  In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Class 4 Ballot.

13. If you hold Claims or Interests in more than one Class under the Plan you may receive more than one ballot coded for each different Class.  Each ballot votes ***only*** your Claims or Interests indicated on that ballot, so please complete and return each ballot that you received.

### PLEASE MAIL YOUR CLASS 4 BALLOT PROMPTLY

**IF YOU HAVE ANY QUESTIONS REGARDING THIS CLASS 4 BALLOT,
THESE VOTING INSTRUCTIONS OR THE PROCEDURES FOR VOTING,
PLEASE CALL THE RESTRUCTURING HOTLINE AT: (888) 251-2679 (US TOLL-FREE) and
(310) 751-2609 (INTERNATIONAL TOLL) OR EMAIL 21COINFO@KCCLLC.COM.**

**IF THE SOLICITATION AGENT DOES NOT *ACTUALLY RECEIVE* THIS CLASS 4 BALLOT ON OR BEFORE THE VOTING DEADLINE, WHICH IS NOVEMBER 20, 2017, AT 5:00 P.M., PREVAILING EASTERN TIME (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED HEREBY MAY BE COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS.**

## **<u>SCHEDULE 3C</u>**

## **<u>Form of Class 5 Master Ballot</u>**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| 21st CENTURY ONCOLOGY HOLDINGS, INC., *et al.*,[1] | ) Case No. 17-22770 (RDD) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

<div align="center">

**MASTER BALLOT FOR VOTING TO ACCEPT**
**OR REJECT THE JOINT CHAPTER 11 PLAN OF REORGANIZATION**
**OF 21ST CENTURY ONCOLOGY HOLDINGS, INC. AND ITS DEBTOR AFFILIATES**

**CLASS 5 MASTER BALLOT FOR HOLDERS OF NOTE CLAIMS**

**11.00% SENIOR NOTES DUE 2023**

</div>

---

**PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**

**IN ORDER FOR YOUR VOTE TO BE COUNTED TOWARD CONFIRMATION OF THE PLAN, THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE *ACTUALLY RECEIVED* BY THE SOLICITATION AGENT BY NOVEMBER 20, 2017, AT 5:00 P.M., PREVAILING EASTERN TIME (THE "VOTING DEADLINE") IN ACCORDANCE WITH THE FOLLOWING:**

---

The above-captioned debtors and debtors in possession (collectively, the "Debtors") are soliciting votes with respect to the *Joint Chapter 11 Plan of Reorganization of 21st Century Oncology Holdings, Inc. and its Debtor Affiliates* (as may be modified, amended, or supplemented from time to time, the "Plan") as set forth in the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of 21st Century Oncology Holdings, Inc. and its Debtor Affiliates* (as may be modified, amended, or supplemented from time to time, the "Disclosure Statement"). The Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") has approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, by entry of an order on October [•], 2017 (the "Disclosure Statement Order"). The Bankruptcy Court's approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

You are receiving this Class 5 master ballot (the "Master Ballot") because you are the Nominee (as defined below) of a Beneficial Holder[2] of Class 5 Note Claims as of October 16, 2017 (the "Voting Record Date"). Class 5 Note

---

[1]   Each of the Debtors in the above-captioned jointly administered chapter 11 cases and their respective tax identification numbers are set forth in the *Order Directing Joint Administration of Chapter 11 Cases* [Docket No. 30]. The location of 21st Century Oncology Holdings, Inc.'s corporate headquarters and the Debtors' service address is: 2270 Colonial Boulevard, Fort Myers, Florida 33907.

[2]   A "Beneficial Holder" means a beneficial owner of publicly-traded securities whose claims have not been satisfied prior to the Voting Record Date (as defined herein) pursuant to Bankruptcy Court order or otherwise, as reflected in the records maintained by the Nominees.

Claims include any Claim against any Debtor arising on account of, or in connection with, the Note Obligations, the Notes, the Indenture or any other "Note Documents" (as defined in the Indenture), including Claims for all accrued and unpaid principal, interest, fees, expenses, costs, and other charges and amounts constituting Note Obligations.

**This Master Ballot is to be used by you as a broker, bank, or other nominee, or as the agent of a broker, bank, or other nominee (each of the foregoing, a "Nominee"), or as the proxy holder of a Nominee, for certain Beneficial Holders' Class 5 Note Claims (the "Class 5 Claims"), to transmit to the Solicitation Agent (as defined below) the votes of such Beneficial Holders in respect of their Class 5 Claims to accept or reject the Plan.**

The rights and treatment for each Class are described in the Disclosure Statement, which was included in the package (the "Solicitation Package") you are receiving with this Master Ballot (as well as the Plan, Disclosure Statement Order, and certain other materials). If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them from (a) Kurtzman Carson Consultants LLC (the "Solicitation Agent") at no charge by:  (i) calling the Debtors' restructuring hotline at (888) 251-2679 (US toll-free) and (310) 751-2609 (international toll); (ii) visiting the Debtors' restructuring website at:  http://www.kccllc.net/21co; (iii) writing to 21st Century Oncology Holdings, Inc., Ballot Processing Center, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245; and/or (iv) emailing 21coInfo@kccllc.com; or (b) for a fee via PACER at https://ecf.nysb.uscourts.gov/.

This Master Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan. If you believe you have received this Master Ballot in error, please contact the Solicitation Agent *immediately* at the address, telephone number, or email address set forth above.

**YOUR VOTE ON THIS MASTER BALLOT FOR CERTAIN BENEFICIAL HOLDERS OF NOTE CLAIMS IN CLASS 5 SHALL BE APPLIED TO EACH DEBTOR AGAINST WHOM SUCH BENEFICIAL HOLDERS HAVE A CLASS 5 CLAIM.**

You are authorized to collect votes to accept or to reject the Plan from Beneficial Holders in accordance with your customary practices, including the use of a "voting instruction form" in lieu of (or in addition to) a Class 5 ballot for Beneficial Holders of Note Claims (each, a "Beneficial Holder Ballot") or the collection of votes from Beneficial Holders through online voting, by phone, facsimile, or other electronic means.

The Court may confirm the Plan and thereby bind all holders of Claims or Interests. To have the votes of your Beneficial Holders count as either an acceptance or rejection of the Plan, you must complete and return this Master Ballot so that the Solicitation Agent *actually receives* it on or before the Voting Deadline.

**THE VOTING DEADLINE IS ON NOVEMBER 20, 2017, AT 5:00 P.M., PREVAILING EASTERN TIME.**

**Item 1.  Certification of Authority to Vote.**

The undersigned certifies that, as of the Voting Record Date, the undersigned (please check the applicable box):

    ☐   Is a Nominee for the Beneficial Holders of the aggregate principal amount of the Class 5 Claims listed in Item 2 below, and is the record holder of such Notes, or

    ☐   Is acting under a power of attorney and/or agency (a copy of which will be provided upon request) granted by a Nominee that is the registered holder of the aggregate principal amount of Class 5 Claims listed in Item 2 below, or

    ☐   Has been granted a proxy (an original of which is attached hereto) from a Nominee or a Beneficial Holder that is the registered holder of the aggregate principal amount of Class 5 Claims listed in Item 2 below,

2

and accordingly, has full power and authority to vote to accept or reject the Plan, on behalf of the Beneficial Holders of the Class 5 Claims described in Item 2.

**Item 2.  Class 5 Claims Vote on Plan; Item 3. Releases**

The undersigned transmits the following votes and releases of Beneficial Holders of Class 5 Claims and certifies that the following Beneficial Holders of Class 5 Claims, as identified by their respective customer account numbers set forth below, are the Beneficial Holders of such Claims as of the Voting Record Date and have delivered to the undersigned, as Nominee, Beneficial Holder Ballots casting such votes.

Indicate in the appropriate column below the aggregate principal amount voted for each account or attach such information to this Master Ballot in the form of the following table.  Please note that each holder must vote all such Beneficial Holder's Class 5 Claims to accept or reject the Plan and may not split such vote.  Any Beneficial Holder Ballot executed by the Beneficial Holder that does not indicate an acceptance or rejection of the Plan or that indicates both an acceptance and a rejection of the Plan will not be counted toward Confirmation.  If the Beneficial Holder has checked the box on Item 3 of the Beneficial Holder Ballot pertaining to the releases by holders of Claims or Interests, as detailed in Article VIII.8.3 of the Plan, please place an X in the Item 3 column below.

| Your Customer Account Number for Each Beneficial Holder of Class 5 Claims | Principal Amount of Class 5 Claims Held as of Voting Record Date | Item 2 — Indicate the vote cast on the Beneficial Holder Ballot by checking the appropriate box below. | | | | Item 3 — If the "Opt Out" box in Item 3 of the Beneficial Holder Ballot was completed, check the box in the column below (only if holder voted to reject the Plan or did not vote and opted out) |
| --- | --- | --- | --- | --- | --- | --- |
| | | Accept the Plan | or | Reject the Plan | or | |
| 1 | $ | ☐ | | ☐ | | ☐ |
| 2 | $ | ☐ | | ☐ | | ☐ |
| 3 | $ | ☐ | | ☐ | | ☐ |
| 4 | $ | ☐ | | ☐ | | ☐ |
| 5 | $ | ☐ | | ☐ | | ☐ |
| 6 | $ | ☐ | | ☐ | | ☐ |
| TOTALS | $ | | | | | |

**Item 4.  Important Information Regarding the Third Party Release.**

**Article VIII.8.3 of the Plan contains the following Third Party Release:**

**Notwithstanding anything contained in the Plan to the contrary, on the Confirmation Date and effective as of the Effective Date, and to the fullest extent permitted by applicable law, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and**

discharged the Released Parties from any and all claims, interests, obligations, debts, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claim asserted on behalf of any Debtor and/or Reorganized Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Releasing Party would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, the Restructuring Transactions, the Chapter 11 Cases, the Rights Offerings, the Backstop Purchase Agreement, the Backstop Commitments, the Backstop Order, the Restructuring Support Agreement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Releasing Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, preparation, implementation or administration of the Plan, the Disclosure Statement, the Plan Supplement, the Rights Offering Procedures, the DIP Facility, the Exit Facilities, the DIP Documents, the Exit Facility Documents, the New Warrant Documents, the New Organizational Documents, or any other Restructuring Documents, any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes fraud, willful misconduct or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third Party Release is:  (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good-faith settlement and compromise of the claims released by the Third-Party Release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Releasing Parties asserting any claim or cause of action released pursuant to the Third-Party Release.

*      *      *

"*RELEASING PARTIES*" MEANS COLLECTIVELY, AND IN EACH CASE SOLELY IN ITS CAPACITY AS SUCH: (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) THE BACKSTOP PARTIES; (D) THE DIP LENDERS; (E) THE DIP AGENT; (F) THE CONSENTING MDL LENDERS; (G) THE MDL AGENT; (H) THE CONSENTING FIRST LIEN LENDERS; (I) THE FIRST LIEN AGENT; (J) THE CONSENTING NOTEHOLDERS; (K) THE INDENTURE TRUSTEE; (L) THE EQUITY PARTIES; (M) THE COMMITTEE; (N) THE MEMBERS OF THE COMMITTEE; (O) ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE PRESUMED TO ACCEPT THE PLAN AND DO NOT OPT OUT OF THE THIRD-PARTY RELEASE ON THEIR RESPECTIVE ELECTION FORMS; (P) ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE PRESUMED TO REJECT THE PLAN AND DO NOT OPT OUT OF THE THIRD-PARTY RELEASE ON THEIR RESPECTIVE ELECTION FORMS; (Q) ALL HOLDERS OF CLAIMS OR INTERESTS ENTITLED TO VOTE ON THE PLAN WHO EITHER (1) VOTE TO ACCEPT THE PLAN OR (2) RECEIVE A BALLOT BUT ABSTAIN FROM VOTING ON THE PLAN; (R) ALL HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLAN WHO VOTE TO REJECT THE PLAN BUT DO NOT ELECT ON THEIR BALLOT TO OPT-OUT OF THE THIRD-PARTY RELEASE; (S) ALL RIGHTS OFFERING PARTICIPANTS THAT PARTICIPATE IN THE RIGHTS OFFERINGS; (T) ALL OTHER HOLDERS OF CLAIMS AND INTERESTS TO THE FULLEST EXTENT PERMITTED BY LAW; AND (U) WITH RESPECT TO THE FOREGOING CLAUSES (A) THROUGH (T), EACH OF SUCH PERSON'S CURRENT AND FORMER AFFILIATES, PARTNERS, SUBSIDIARIES, OFFICERS, DIRECTORS, PRINCIPALS, EMPLOYEES, AGENTS, MANAGED FUNDS, ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, TOGETHER WITH THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, IN EACH CASE IN THEIR CAPACITY AS SUCH.

**IN CONNECTION WITH THE FOREGOING, PLEASE NOTE THE FOLLOWING LANGUAGE FROM THE BENEFICIAL HOLDER BALLOT**:

- If you vote to accept the Plan, you will be a "Releasing Party"[3] under the Plan, and you will be deemed to provide the Third-Party Release provided in Article VIII.8.3 of the Plan.  If you vote to accept the plan, you cannot opt out of giving such release.

- If you vote to reject the Plan and wish to opt out of the giving the release provided in Article VIII.8.3 of the Plan, you must submit this Beneficial Holder Ballot to the Solicitation Agent by the Voting Deadline and check the opt out box below.

- If you do not vote on the Plan, but wish to opt out of giving the release provided in Article VIII.8.3 of the Plan, you must submit this Beneficial Holder Ballot by the Voting Deadline, and check the opt out box below.

- If you (i) do not submit a Beneficial Holder Ballot by the Voting Deadline, or (ii) submit a Beneficial Holder Ballot, but do not vote to accept or reject the Plan, and fail to check the opt out box below, you will be deemed to consent to giving the release provided in Article VIII.8.3 of the Plan.

<u>Item 5</u>.  **Other Class 5 Ballots Submitted by Beneficial Holders.**  The undersigned certifies that it has transcribed in the following table the information, if any, provided by the Beneficial Holders in Item 4 of the Beneficial Holder Ballot:

---

[3]  "*RELEASING PARTIES*" MEANS COLLECTIVELY, AND IN EACH CASE SOLELY IN ITS CAPACITY AS SUCH: (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) THE BACKSTOP PARTIES; (D) THE DIP LENDERS; (E) THE DIP AGENT; (F) THE CONSENTING MDL LENDERS; (G) THE MDL AGENT; (H) THE CONSENTING FIRST LIEN LENDERS; (I) THE FIRST LIEN AGENT; (J) THE CONSENTING NOTEHOLDERS; (K) THE INDENTURE TRUSTEE; (L) THE EQUITY PARTIES; (M) THE COMMITTEE; (N) THE MEMBERS OF THE COMMITTEE; (O) ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE PRESUMED TO ACCEPT THE PLAN AND DO NOT OPT OUT OF THE THIRD-PARTY RELEASE ON THEIR RESPECTIVE ELECTION FORMS; (P) ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE PRESUMED TO REJECT THE PLAN AND DO NOT OPT OUT OF THE THIRD-PARTY RELEASE ON THEIR RESPECTIVE ELECTION FORMS; (Q) ALL HOLDERS OF CLAIMS OR INTERESTS ENTITLED TO VOTE ON THE PLAN WHO EITHER (1) VOTE TO ACCEPT THE PLAN OR (2) RECEIVE A BALLOT BUT ABSTAIN FROM VOTING ON THE PLAN; (R) ALL HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLAN WHO VOTE TO REJECT THE PLAN BUT DO NOT ELECT ON THEIR BALLOT TO OPT-OUT OF THE THIRD-PARTY RELEASE; (S) ALL RIGHTS OFFERING PARTICIPANTS THAT PARTICIPATE IN THE RIGHTS OFFERINGS; (T) ALL OTHER HOLDERS OF CLAIMS AND INTERESTS TO THE FULLEST EXTENT PERMITTED BY LAW; AND (U) WITH RESPECT TO THE FOREGOING CLAUSES (A) THROUGH (T), EACH OF SUCH PERSON'S CURRENT AND FORMER AFFILIATES, PARTNERS, SUBSIDIARIES, OFFICERS, DIRECTORS, PRINCIPALS, EMPLOYEES, AGENTS, MANAGED FUNDS, ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, TOGETHER WITH THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, IN EACH CASE IN THEIR CAPACITY AS SUCH.

| YOUR customer account number and/or Customer Name for each Beneficial Holder who completed Item 4 of the Beneficial Holder Ballot. | Transcribe from Item 4 of the Beneficial Holder Ballot | | |  |
|---|---|---|---|---|
|  | Account Number | Name of Registered Holder or Nominee | Principal Amount of other Class 5 Note Claims | CUSIP No. of other Class 5 Note Claims Voted |
| 1. |  |  | $ |  |
| 2. |  |  | $ |  |
| 3. |  |  | $ |  |
| 4. |  |  | $ |  |
| 5. |  |  | $ |  |
| 6. |  |  | $ |  |

**Item 6.  Certifications.**

Upon execution of this Master Ballot, the undersigned certifies that:

- it has received a copy of the Disclosure Statement, the Plan, the Disclosure Statement Order, the Beneficial Holder Ballots, and the remainder of the Solicitation Package and has delivered the same to the Beneficial Holders of the Class 5 Claims listed in Item 2 above;

- it has received a completed and signed Beneficial Holder Ballot from each Beneficial Holder listed in Item 2 of this Master Ballot;

- it is the registered holder of all Class 5 Claims listed in Item 2 above being voted, or

- it has been authorized by each Beneficial Holder of Class 5 Claims listed in Item 2 above to vote on the Plan;

- no other Master Ballots with respect to the same Class 5 Claims identified in Item 2 have been cast or, if any other Master Ballots have been cast with respect to such Claims, then any such earlier Master Ballots are hereby revoked;

- it has properly disclosed:  (a) the number of Beneficial Holders of Class 5 Claims who completed the Beneficial Holder Ballots; (b) the respective amounts of the Class 5 Claims owned, as the case may be, by each Beneficial Holder of Class 5 Claims who completed a Beneficial Holder Ballot; (c) the vote by each Beneficial Holder of Class 5 Claims; (e) whether the "Opt Out" box was checked by each Beneficial Holder of the Class 5 Claims in its Beneficial Holder Ballot; (f) each such Beneficial Holder of Class 5 Claims' certification as to other Class 5 Claims voted; and (g) the customer account or other identification number for each such Beneficial Holder of Class 5 Claims; and

- it will maintain Beneficial Holder Ballots and evidence of separate transactions returned by Beneficial Holders of Class 5 Claims (whether properly completed or defective) for at least one (1) year after the Effective Date of the Plan and disclose all such information to the Bankruptcy Court or the Debtors, if so ordered.

6

Name of Nominee: _____
                                     (Print or Type)

Participant Number:

_____

Name of Proxy Holder or Agent for Nominee (if applicable):

_____
                                     (Print or Type)

_____

Signature: _____

Name of Signatory: _____

Title: _____

Address: _____

_____

_____

Date Completed: _____

Email Address: _____

Phone Number: _____

**PLEASE COMPLETE, SIGN, AND DATE THIS MASTER BALLOT AND
RETURN IT (WITH AN ORIGINAL SIGNATURE) *PROMPTLY* VIA FIRST CLASS MAIL,
OVERNIGHT COURIER, OR HAND DELIVERY TO:**

**21st Century Oncology Holdings, Inc.
Ballot Processing Center
c/o Kurtzman Carson Consultants LLC
1290 Avenue of the Americas, 9th Floor
New York, NY 10104**

**IF THE SOLICITATION AGENT DOES NOT *ACTUALLY RECEIVE* THIS MASTER BALLOT ON OR
BEFORE NOVEMBER 20, 2017, AT 5:00 P.M., PREVAILING EASTERN TIME (AND IF THE VOTING
DEADLINE IS NOT EXTENDED), THE VOTES TRANSMITTED BY THIS MASTER BALLOT MAY BE
COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE
DEBTORS.**

| Class 5 — Note Claims |
|---|

### INSTRUCTIONS FOR COMPLETING THIS MASTER BALLOT

1.  The Debtors are soliciting the votes of holders of Claims or Interests with respect to the Plan attached as **Exhibit A** to the Disclosure Statement.  Capitalized terms used in the Master Ballot or in these instructions (the "Ballot Instructions") but not otherwise defined therein or herein shall have the meanings set forth in the Plan, a copy of which also accompanies the Master Ballot.  **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS MASTER BALLOT.**

2.  The Plan can be confirmed by the Court and thereby made binding upon you if it is accepted by the holders of at least two-thirds in amount and more than one-half in number of Claims or Interests in at least one class of creditors or Interest holders that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code.  Please review the Disclosure Statement for more information.

3.  You should immediately distribute the Beneficial Holder Ballots and the Solicitation Packages to all Beneficial Holders of Class 5 Claims and take any action required to enable each such Beneficial Holder to vote timely the Claims that it holds.  You many distribute the Solicitation Packages to Beneficial Holders, as appropriate, in accordance with your customary practices.  You are authorized to collect votes to accept or to reject the Plan from Beneficial Holders in accordance with your customary practices, including the use of a "voting instruction form" in lieu of (or in addition to) the Beneficial Holder Ballot, and the collection of votes from Beneficial Holders through online voting, by phone, facsimile, or other electronic means.  **Any Beneficial Holder Ballot returned to you by a Beneficial Holder of a Class 5 Claim shall not be counted toward Confirmation of the Plan until you properly complete and deliver, to the Solicitation Agent, a Master Ballot that reflects the vote of such Beneficial Holders *so that it is actually received* by November 20, 2017, at 5:00 p.m., prevailing Eastern Time or otherwise validate the Master Ballot in a manner acceptable to the Solicitation Agent**.

4.  If you are transmitting the votes of any Beneficial Holder of Class 5 Claims other than yourself, you may either:

    (a)  "Pre-validate" the individual Class 5 Note Claim Ballot contained in the Solicitation Package and then forward the Solicitation Package to the Beneficial Holder of the Class 5 Claim for voting within five (5) Business Days after the receipt by such Nominee of the Solicitation Package, with the Beneficial Holder then returning the individual Beneficial Holder Ballot directly to the Solicitation Agent in the return envelope to be provided in the Solicitation Package.  A Nominee "pre-validates" a Beneficial Holder's Ballot by signing the Beneficial Holder Ballot and including their DTC participant number; indicating the account number of the Beneficial Holder and the principal amount of Class 5 Claim held by the Nominee for such Beneficial Holder; and then forwarding the Beneficial Holder Ballot together with the Solicitation Package to the Beneficial Holder.  The Beneficial Holder then completes the information requested on the Beneficial Holder Ballot and returns the Beneficial Holder Ballot directly to the Solicitation Agent.  A list of the Beneficial Holders to whom "pre-validated" Beneficial Holder Ballots were delivered should be maintained by Nominees for inspection for at least one year from the Effective Date; OR

    (b)  Within five (5) Business Days after receipt by such Nominee of the Solicitation Package, forward the Solicitation Package to the Beneficial Holder of the Class 5 Claim for voting along with a return envelope provided by and addressed to the Nominee, with the Beneficial Holder then returning the individual Beneficial Holder Ballot to the Nominee.  In such case, the Nominee will tabulate the votes of its respective Beneficial Holders on the Master Ballot, in accordance with any instructions set forth in the instructions to the Master Ballot, and then return the Master Ballot to the Solicitation Agent.  The Nominee should advise the Beneficial Holder to return their individual Beneficial Holder Ballots to the Nominee by a date calculated by the Nominee to allow it to prepare and return the Master Ballot to the Solicitation Agent so that the Master Ballot is actually received by the Solicitation Agent on or before the Voting Deadline.

5. With regard to any Beneficial Holder Ballots returned to you by a Beneficial Holder, you must:  (a) compile and validate the votes and other relevant information of each such Beneficial Holder on the Master Ballot using the customer name or account number assigned by you to each such Beneficial Holder; (b) complete, sign and date the Master Ballot; (c) transmit such Master Ballot to the Solicitation Agent by the Voting Deadline; and (d) retain such Beneficial Holder Ballots from Beneficial Holders, whether in hard copy or by electronic direction, in your files for a period of one year after the Effective Date of the Plan.  You may be ordered to produce the Beneficial Holder Ballots to the Debtors or the Bankruptcy Court.

6. The Master Ballot *must* be returned to the Solicitation Agent so as to be ***actually received*** by the Solicitation Agent on or before the Voting Deadline.  **The Voting Deadline is November 20, 2017, at 5:00 p.m.**, prevailing Eastern Time.

7. If a Master Ballot is received *after* the Voting Deadline and if the Voting Deadline is not extended, it may be counted toward Confirmation of the Plan only in the discretion of the Debtors.  Additionally, **the following Master Ballots will *not* be counted toward Confirmation of the Plan**:

   (a) any Master Ballot that is illegible or contains insufficient information to permit the identification of the holder of the Claim;
   (b) any Master Ballot cast by an Entity that does not hold a Class 5 Claim;
   (c) any Master Ballot sent by facsimile or any electronic means;
   (d) any unsigned Master Ballot;
   (e) any Master Ballot that does not contain an original signature;
   (f) any Master Ballot (i) not marked to accept or reject the Plan, or (ii) marked to indicate that a Beneficial Holder voted both to accept and reject the Plan, in which case only the vote of such Beneficial Holder will not be counted;
   (g) any Master Ballot that is sent to the Debtors, the Debtors' agents (other than the Solicitation Agent), any indenture trustee or administrative agent, or the Debtors' financial or legal advisors; and
   (h) any Master Ballot submitted by any Entity not entitled to cast a vote with respect to the Plan.

8. The method of delivery of Master Ballots to the Solicitation Agent is at the election and risk of each Nominee of Class 5 Claims.  Except as otherwise provided herein, such delivery will be deemed made only when the Solicitation Agent ***actually receives*** the originally executed Master Ballot.  In all cases, Beneficial Holders and Nominees should allow sufficient time to assure timely delivery.

9. If a Beneficial Holder or Nominee holds a Class 5 Claim against multiple Debtors, a vote on their Ballot will apply to all Debtors against whom such Beneficial Holder or Nominee has a Claim, as applicable, in that Voting Class.

10. Multiple Master Ballots may be completed and delivered to the Solicitation Agent.  Votes received by multiple Master Ballots will be counted except to the extent that the votes thereon are duplicative of other Master Ballots.  If two or more Master Ballots are inconsistent, the last valid Master Ballot(s) received prior to the Voting Deadline will, to the extent of such inconsistency, supersede and revoke any prior Master Ballot(s).  If more than one Master Ballot is submitted and the later Master Ballot(s) supplement(s) rather than supersedes the earlier Master Ballot(s), please mark the subsequent Master Ballot(s) with the words "Additional Vote" or such other language as you customarily use to indicate an additional vote that is not meant to revoke an earlier vote.

11. The Master Ballot does *not* constitute, and shall not be deemed to be, (a) a Proof of Claim, (b) an amendment to a Proof of Claim, (c) an assertion of a Claim, or (d) an admission by the Debtors of the nature, validity or amount of any Claim.

12. **Please be sure to sign and date the Master Ballot**.  You must indicate that you are signing a Master Ballot in your capacity as a Nominee, or as the proxy holder of a Nominee, for certain Beneficial Holders' Class 5 Claims and, if required or requested by the Solicitation Agent, the Debtors, or the Bankruptcy Court, must

9

submit proper evidence to the requesting party to so act on behalf of such Beneficial Holder.  In addition, please provide your name and mailing address.

13. If you are both the Nominee and the Beneficial Holder of any of the Class 5 Claims and you wish to vote such Class 5 Claims, you may return a Beneficial Holder Ballot or Master Ballot for such Class 5 Claims and you must vote your entire Class 5 Claims to either to accept or reject the Plan and may not split your vote. Accordingly, a Beneficial Holder Ballot that partially rejects and partially accepts the Plan, other than a Master Ballot with the votes of multiple Beneficial Holders, will not be counted toward Confirmation of the Plan.  If any Beneficial Holder has submitted a Beneficial Holder Ballot attempting to split its vote, please contact the Solicitation Agent immediately.

14. For purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code, the Debtors may, in their discretion, (a) aggregate and treat separate Note Claims held by a single creditor or separate affiliated Entities in Class 5 as if such creditor or such separate affiliated Entities held one Note Claim in Class 5, and treat all votes related to such Note Claim as a single vote to accept or reject the Plan; or (b) not aggregate or treat separate Note Claims held by a single creditor or separate affiliated Entities in Class 5 as if such creditor or such separate affiliated Entities held one Note Claim in Class 5, and treat all votes related to such Note Claims as separate votes to accept or reject the Plan.

15. The following additional rules shall apply to Master Ballots:

   (a) Votes cast by Beneficial Holders through a Nominee will be applied against the positions held by such Entities in the Class 5 Claims as of the Record Voting Date, as evidenced by the record and depository listings.

   (b) Votes submitted by a Nominee, whether pursuant to a Master Ballot or pre-validated Beneficial Holder Ballots, will not be counted in excess of the record amount of the Class 5 Claims held by such Nominee;

   (c) To the extent that conflicting votes or "over-votes" are submitted by a Nominee, whether pursuant to a Master Ballot or pre-validated Beneficial Holder Ballots, the Solicitation Agent will attempt to reconcile discrepancies with the Nominee;

   (d) To the extent that over-votes on a Master Ballot or pre-validated Beneficial Holder Ballots are not reconcilable prior to the preparation of the vote certification, the Solicitation Agent will apply the votes to accept and reject the Plan in the same proportion as the votes to accept and reject the Plan submitted on the Master Ballot or pre-validated Beneficial Holder Ballots that contained the over-vote, but only to the extent of the Nominee's position in Class 5 Claims; and

   (e) For purposes of tabulating votes, each holder holding through a particular account will be deemed to have voted the principal amount relating its holding in that particular account, although the Solicitation Agent may be asked to adjust such principal amount to reflect the Class 5 Claim amount.

<u>**PLEASE MAIL YOUR MASTER BALLOT PROMPTLY**</u>

**IF YOU HAVE ANY QUESTIONS REGARDING THIS MASTER BALLOT,
THESE VOTING INSTRUCTIONS, OR THE PROCEDURES FOR VOTING,
PLEASE CALL THE SOLICITATION AGENT AT:  (877) 833-4150 (US TOLL-FREE) AND (917) 281-4800
(INTERNATIONAL TOLL) OR EMAIL AT 21COINFO@KCCLLC.COM.**

---

**IF THE SOLICITATION AGENT DOES NOT *ACTUALLY RECEIVE* THIS MASTER BALLOT ON OR
BEFORE THE VOTING DEADLINE, WHICH IS NOVEMBER 20, 2017, AT 5:00 P.M., PREVAILING
EASTERN TIME (AND IF THE VOTING DEADLINE IS NOT EXTENDED), THE VOTES
TRANSMITTED HEREBY MAY BE COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN
THE DISCRETION OF THE DEBTORS.**

---

## <u>SCHEDULE 3D</u>

### <u>Form of Class 5 Beneficial Holder Ballot</u>

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| 21st CENTURY ONCOLOGY HOLDINGS, INC., *et al.*,[1] | ) Case No. 17-22770 (RDD) |
|  | ) |
| Debtors. | ) (Jointly Administered) |
|  | ) |

**BENEFICIAL HOLDER BALLOT FOR VOTING TO ACCEPT**
**OR REJECT THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF**
**21ST CENTURY ONCOLOGY HOLDINGS, INC. AND ITS DEBTOR AFFILIATES**

**CLASS 5 BALLOT FOR BENEFICIAL HOLDERS OF NOTE CLAIMS**

**11.00% SENIOR NOTES DUE 2023**

---

**PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**

**IN ORDER FOR YOUR VOTE TO BE COUNTED TOWARD CONFIRMATION OF THE PLAN, YOUR BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE *ACTUALLY RECEIVED* BY THE SOLICITATION AGENT BY NOVEMBER 20, 2017, AT 5:00 P.M., PREVAILING EASTERN TIME (THE "VOTING DEADLINE"). IF, HOWEVER, YOU RECEIVED A RETURN ENVELOPE ADDRESSED TO YOUR NOMINEE, YOU MUST FOLLOW THE DIRECTIONS OF YOUR NOMINEE TO CAST YOUR VOTE AND ALLOW SUFFICIENT TIME FOR YOUR NOMINEE TO RECEIVE YOUR VOTE AND TRANSMIT SUCH VOTE ON A CLASS 5 MASTER BALLOT, WHICH MASTER BALLOT MUST BE RETURNED TO THE SOLICITATION AGENT BY THE VOTING DEADLINE IN ORDER FOR YOUR VOTE TO BE COUNTED TOWARD CONFIRMATION OF THE PLAN.**

---

The above-captioned debtors and debtors in possession (collectively, the "Debtors") are soliciting votes with respect to the *Joint Chapter 11 Plan of Reorganization of 21st Century Oncology Holdings, Inc. and its Debtor Affiliates* (as may be modified, amended, or supplemented from time to time, the "Plan") as set forth in the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of 21st Century Oncology Holdings, Inc. and its Debtor Affiliates* (as may be modified, amended, or supplemented from time to time, the "Disclosure Statement"). The Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") has approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, by entry of an order on October [•], 2017 (the "Disclosure Statement Order"). The Bankruptcy Court's approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

---

[1] Each of the Debtors in the above-captioned jointly administered chapter 11 cases and their respective tax identification numbers are set forth in the *Order Directing Joint Administration of Chapter 11 Cases* [Docket No. 30]. The location of 21st Century Oncology Holdings, Inc.'s corporate headquarters and the Debtors' service address is: 2270 Colonial Boulevard, Fort Myers, Florida 33907.

You are receiving this Class 5 ballot for Beneficial Holders[2] (the "Beneficial Holder Ballot") because you are a Beneficial Holder of a Note Claim in Class 5 as of October 16, 2017 (the "Voting Record Date").  Class 5 Note Claims include any Claim against any Debtor arising on account of, or in connection with, the Note Obligations, the Notes, the Indenture or any other "Note Documents" (as defined in the Indenture), including Claims for all accrued and unpaid principal, interest, fees, expenses, costs, and other charges and amounts constituting Note Obligations. Accordingly, you have a right to vote to accept or reject the Plan.  You may cast your vote through this Beneficial Holder Ballot and return it to your broker, bank, or other nominee, or the agent of a broker, bank, or other nominee (each of the foregoing, a "Nominee"), in accordance with the instructions provided by your Nominee, who will then submit a Class 5 master ballot (the "Master Ballot") on behalf of the Beneficial Holders of Class 5 Claims.

Your rights are described in the Disclosure Statement, which was included in the package (the "Solicitation Package") you are receiving with this Class 5 Ballot (as well as the Plan, Disclosure Statement Order, and certain other materials).  If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them from (a) Kurtzman Carson Consultants LLC (the "Solicitation Agent") at no charge by:  (i) calling the Debtors' restructuring hotline at (888) 251-2679 (US toll-free) and (310) 751-2609 (international toll); (ii) visiting the Debtors' restructuring website at: http://www.kccllc.net/21co; (iii) writing to 21st Century Oncology Holdings, Inc., Ballot Processing Center, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245; and/or (iv) emailing 21coInfo@kccllc.com; or (b) for a fee via PACER at https://ecf.nysb.uscourts.gov/.

This Beneficial Holder Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan.  If you believe you have received this Beneficial Holder Ballot in error, or if you believe that you have received the wrong ballot, please contact the Solicitation Agent *immediately* at the address, telephone number, or email address set forth above.

You should review the Disclosure Statement and the Plan before you vote.  You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim.  Your Claim has been placed in Class 5, Note Claims, under the Plan.  If you hold Claims or Interests in more than one Class, you will receive a ballot for each Class in which you are entitled to vote.

**In order for your vote to count, your Nominee must receive this Beneficial Holder Ballot in sufficient time for your Nominee to include your vote on a Master Ballot that must be received by the Solicitation Agent on or before the Voting Deadline, which is November 20, 2017, at 5:00 p.m., prevailing Eastern Time.  Please allow sufficient time for your vote to be included on the Master Ballot completed by your Nominee.  If a Master Ballot recoding your vote is not received by the Voting Deadline, and if the Voting Deadline is not extended, your vote will not count.**

<u>Item 1</u>.  **Amount of Claim.**[3]

The undersigned hereby certifies that as of the Voting Record Date, the undersigned was the Beneficial Holder of Note Claims in the following aggregate unpaid principal amount (insert amount in box below, unless otherwise completed by your Nominee):



$ _____

---

[2]    A "Beneficial Holder" means a beneficial owner of publicly-traded securities whose claims have not been satisfied prior to the Voting Record Date (as defined herein) pursuant to Bankruptcy Court order or otherwise, as reflected in the records maintained by the Nominees.

[3]    For voting purposes only and subject to tabulation rules.

**Item 2.  Vote on Plan.**

The Beneficial Holder of the Class 5 Note Claim against the Debtors set forth in Item 1 votes to (please check <u>one</u>):

| | |
|---|---|
| <u>**ACCEPT**</u> (vote FOR) the Plan | <u>**REJECT**</u> (vote AGAINST) the Plan |

**Item 3.  Important Information Regarding the Third Party Release.**

<u>**Article VIII.8.3 of the Plan contains the following provision**</u>**:**

       Notwithstanding anything contained in the Plan to the contrary, on the Confirmation Date and effective as of the Effective Date, and to the fullest extent permitted by applicable law, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all claims, interests, obligations, debts, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claim asserted on behalf of any Debtor and/or Reorganized Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Releasing Party would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, the Restructuring Transactions, the Chapter 11 Cases, the Rights Offerings, the Backstop Purchase Agreement, the Backstop Commitments, the Backstop Order, the Restructuring Support Agreement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Releasing Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, preparation, implementation or administration of the Plan, the Disclosure Statement, the Plan Supplement, the Rights Offering Procedures, the DIP Facility, the Exit Facilities, the DIP Documents, the Exit Facility Documents, the New Warrant Documents, the New Organizational Documents, or any other Restructuring Documents, any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes fraud, willful misconduct or gross negligence.

       Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third Party Release is:  (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good-faith settlement and compromise of the claims released by the Third-Party Release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Releasing Parties asserting any claim or cause of action released pursuant to the Third-Party Release.

<div align="center">*      *      *</div>

"*RELEASING PARTIES*" MEANS COLLECTIVELY, AND IN EACH CASE SOLELY IN ITS CAPACITY AS SUCH: (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) THE BACKSTOP PARTIES; (D) THE DIP LENDERS; (E) THE DIP AGENT; (F) THE CONSENTING MDL LENDERS; (G) THE MDL AGENT; (H) THE CONSENTING FIRST LIEN LENDERS; (I) THE FIRST LIEN AGENT; (J) THE CONSENTING NOTEHOLDERS; (K) THE INDENTURE TRUSTEE; (L) THE EQUITY PARTIES; (M) THE COMMITTEE; (N) THE MEMBERS OF THE COMMITTEE; (O) ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE PRESUMED TO ACCEPT THE PLAN AND DO NOT OPT OUT OF THE THIRD-PARTY RELEASE ON THEIR RESPECTIVE ELECTION FORMS; (P) ALL HOLDERS OF

<div align="center">3</div>

CLAIMS AND INTERESTS THAT ARE PRESUMED TO REJECT THE PLAN AND DO NOT OPT OUT OF THE THIRD-PARTY RELEASE ON THEIR RESPECTIVE ELECTION FORMS; (Q) ALL HOLDERS OF CLAIMS OR INTERESTS ENTITLED TO VOTE ON THE PLAN WHO EITHER (1) VOTE TO ACCEPT THE PLAN OR (2) RECEIVE A BALLOT BUT ABSTAIN FROM VOTING ON THE PLAN; (R) ALL HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLAN WHO VOTE TO REJECT THE PLAN BUT DO NOT ELECT ON THEIR BALLOT TO OPT-OUT OF THE THIRD-PARTY RELEASE; (S) ALL RIGHTS OFFERING PARTICIPANTS THAT PARTICIPATE IN THE RIGHTS OFFERINGS; (T) ALL OTHER HOLDERS OF CLAIMS AND INTERESTS TO THE FULLEST EXTENT PERMITTED BY LAW; AND (U) WITH RESPECT TO THE FOREGOING CLAUSES (A) THROUGH (T), EACH OF SUCH PERSON'S CURRENT AND FORMER AFFILIATES, PARTNERS, SUBSIDIARIES, OFFICERS, DIRECTORS, PRINCIPALS, EMPLOYEES, AGENTS, MANAGED FUNDS, ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, TOGETHER WITH THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, IN EACH CASE IN THEIR CAPACITY AS SUCH.

**IN CONNECTION WITH THE FOREGOING, PLEASE CAREFULLY REVIEW THE FOLLOWING**:

- If you vote to accept the Plan, you will be a "Releasing Party"[4] under the Plan, and you will be deemed to provide the Third-Party Release provided in Article VIII.8.3 of the Plan.  If you vote to accept the plan, you cannot opt out of giving such release.

- If you vote to reject the Plan and wish to opt out of the giving the release provided in Article VIII.8.3 of the Plan, you must submit this Beneficial Holder Ballot to the Solicitation Agent by the Voting Deadline and check the opt out box below.

- If you do not vote on the Plan, but wish to opt out of giving the release provided in Article VIII.8.3 of the Plan, you must submit this Beneficial Holder Ballot by the Voting Deadline, and check the opt out box below.

---

[4] "*RELEASING PARTIES*" MEANS COLLECTIVELY, AND IN EACH CASE SOLELY IN ITS CAPACITY AS SUCH: (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) THE BACKSTOP PARTIES; (D) THE DIP LENDERS; (E) THE DIP AGENT; (F) THE CONSENTING MDL LENDERS; (G) THE MDL AGENT; (H) THE CONSENTING FIRST LIEN LENDERS; (I) THE FIRST LIEN AGENT; (J) THE CONSENTING NOTEHOLDERS; (K) THE INDENTURE TRUSTEE; (L) THE EQUITY PARTIES; (M) THE COMMITTEE; (N) THE MEMBERS OF THE COMMITTEE; (O) ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE PRESUMED TO ACCEPT THE PLAN AND DO NOT OPT OUT OF THE THIRD-PARTY RELEASE ON THEIR RESPECTIVE ELECTION FORMS; (P) ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE PRESUMED TO REJECT THE PLAN AND DO NOT OPT OUT OF THE THIRD-PARTY RELEASE ON THEIR RESPECTIVE ELECTION FORMS; (Q) ALL HOLDERS OF CLAIMS OR INTERESTS ENTITLED TO VOTE ON THE PLAN WHO EITHER (1) VOTE TO ACCEPT THE PLAN OR (2) RECEIVE A BALLOT BUT ABSTAIN FROM VOTING ON THE PLAN; (R) ALL HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLAN WHO VOTE TO REJECT THE PLAN BUT DO NOT ELECT ON THEIR BALLOT TO OPT-OUT OF THE THIRD-PARTY RELEASE; (S) ALL RIGHTS OFFERING PARTICIPANTS THAT PARTICIPATE IN THE RIGHTS OFFERINGS; (T) ALL OTHER HOLDERS OF CLAIMS AND INTERESTS TO THE FULLEST EXTENT PERMITTED BY LAW; AND (U) WITH RESPECT TO THE FOREGOING CLAUSES (A) THROUGH (T), EACH OF SUCH PERSON'S CURRENT AND FORMER AFFILIATES, PARTNERS, SUBSIDIARIES, OFFICERS, DIRECTORS, PRINCIPALS, EMPLOYEES, AGENTS, MANAGED FUNDS, ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, TOGETHER WITH THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, IN EACH CASE IN THEIR CAPACITY AS SUCH.

- **If you (i) do not submit a Beneficial Holder Ballot by the Voting Deadline, or (ii) submit a Beneficial Holder Ballot, but do not vote to accept or reject the Plan, and fail to check the opt out box below, you will be deemed to consent to giving the release provided in Article VIII.8.3 of the Plan.**

**The Beneficial Holder of the Class 5 Note Claim set forth in Item 1 that has not voted to accept the Plan and elects to**:

☐ **Opt Out** of the Third Party Release.

**Item 4.  Other Beneficial Holder Ballots Submitted.**  By returning this Beneficial Holder Ballot, the Beneficial Holder of the Class 5 Note Claims identified in Item 1 certifies that (a) this Beneficial Holder Ballot is the only Beneficial Holder Ballot submitted for Note Claims owned by such Beneficial Holder, except as identified in the following table, and (b) *all* Beneficial Holder Ballots submitted by the Beneficial Holder indicate the same vote to accept or reject the Plan that the holder has indicated in Item 2 of this Beneficial Holder Ballot (please use additional sheets of paper if necessary):

<div align="center">

**ONLY COMPLETE THIS TABLE IF YOU HAVE VOTED <u>OTHER</u> CLASS 5 NOTE CLAIMS ON OTHER BENEFICIAL HOLDER BALLOTS**

</div>

| Account Number | Name of Registered Holder or Nominee | Principal Amount of Other Class 5 Note Claims | CUSIP No. of Other Class 5 Note Claims  Voted |
|---|---|---|---|
|  |  | $ |  |
|  |  | $ |  |
|  |  | $ |  |
|  |  | $ |  |

**Item 5.  Certifications.**

By signing this Beneficial Holder Ballot, the undersigned certifies to the Bankruptcy Court and the Debtors:

(a) that, as of the Voting Record Date, either:  (i) the undersigned is the holder of the Note Claims being voted; or (ii) the undersigned is an authorized signatory for an Entity that is a holder of the Note Claims being voted;

(b) that the undersigned (or in the case of an authorized signatory, the holder) has received a copy of the Disclosure Statement, the Plan, the Disclosure Statement Order, and the Solicitation Package and acknowledges that the Solicitation is being made pursuant to the terms and conditions set forth therein;

(c) that the undersigned has cast the same vote with respect to all Note Claims in Class 5 held by the holder of the Note Claims being voted, including any votes cast with respect to other Note Claims identified in Item 4; and

(d) that no other Beneficial Holder Ballots with respect to the amount of the Note Claims identified in Item 1 have been cast or, if any other Beneficial Holder Ballots have been cast with respect to such Note Claims, then any such earlier Beneficial Holder Ballots are hereby revoked.

| | |
|---|---|
| Name of Holder: | _____ |
| | (Print or Type) |
| | _____ |
| Signature: | _____ |
| Name of Signatory: | _____ |
| | (If other than holder) |
| Title: | _____ |
| Address: | _____ |
| | _____ |
| | _____ |
| Telephone Number: | _____ |
| Email: | _____ |
| Date Completed: | _____ |

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND
RETURN IT (WITH AN ORIGINAL SIGNATURE) *PROMPTLY* IN THE ENVELOPE PROVIDED OR
OTHERWISE IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED BY YOUR NOMINEE.**

**IF THE SOLICITATION AGENT DOES NOT *ACTUALLY RECEIVE* EITHER:**

**(1) THIS BENEFICIAL HOLDER BALLOT, OR**

**(2) IF YOU RECEIVED A RETURN ENVELOPE ADDRESSED TO YOUR NOMINEE, THE MASTER
BALLOT REFLECTING YOUR VOTE, WHICH IS TO BE SUBMITTED BY YOUR NOMINEE ON
YOUR BEHALF,**

**ON OR BEFORE <u>NOVEMBER 20, 2017, AT 5:00 P.M., PREVAILING EASTERN TIME</u>**

**(AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED BY THIS
BENEFICIAL HOLDER BALLOT MAY BE COUNTED TOWARD CONFIRMATION OF THE PLAN
ONLY IN THE DISCRETION OF THE DEBTORS.**

| Class 5 — Note Claims |
|---|

**INSTRUCTIONS FOR COMPLETING THIS BENEFICIAL HOLDER BALLOT**

1. The Debtors are soliciting the votes of holders of Claims or Interests with respect to the Plan attached as **Exhibit A** to the Disclosure Statement.  Capitalized terms used in the Beneficial Holder Ballot or in these instructions (the "Ballot Instructions") but not otherwise defined therein or herein shall have the meaning set forth in the Plan, a copy of which also accompanies the Beneficial Holder Ballot.  **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2. The Plan may be confirmed by the Court and thereby made binding upon you if it is accepted by the holders of at least two-thirds in amount and more than one-half in number of Claims or Interests in at least one class of creditors or Interest holders that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code.  Please review the Disclosure Statement for more information.

3. To ensure that your vote is counted toward Confirmation of the Plan:

   (a) if your Nominee has pre-validated your Beneficial Holder Ballot with their DTC participant number, your account number, the principal amount of your Class 5 Claims, and their signature, then you must: (i) complete the Beneficial Holder Ballot; (ii) indicate your decision either to accept or reject the Plan in the boxes provided in Item 2 of the Beneficial Holder Ballot; (iii) if you do not vote to accept the Plan, indicate whether you elect to opt out of the Third Party Release in the box provided in Item 3 of the Beneficial Holder Ballot; and (iv) sign and return your Beneficial Holder Ballot to the Solicitation Agent, using the preaddressed, stamped envelope provided to you in the Solicitation Package, so that it is *actually received* by the Solicitation Agent on or before the Voting Deadline, which is <u>November 20, 2017, at 5:00 p.m.</u>, prevailing Eastern Time.

   (b) if your Nominee has *not* pre-validated your Beneficial Holder Ballot, then you must submit your Beneficial Holder Ballot to your Nominee in the manner directed by your Nominee so that your Nominee can submit a Master Ballot that reflects your vote so that the Master Ballot is actually received by the Solicitation Agent on or before the Voting Deadline, which is <u>November 20, 2017, at 5:00 p.m.</u>, prevailing Eastern Time.  You may instruct your Nominee to vote on your behalf in the Master Ballot by:  (i) completing the Beneficial Holder Ballot; (ii) indicating your decision either to accept or reject the Plan in the boxes provided in Item 2 of the Beneficial Holder Ballot; (iii) if you do not vote to accept the Plan, indicating whether you elect to opt out of the Third Party Release in the box provided in Item 3 of the Beneficial Holder Ballot; and (iv) signing and returning the Beneficial Holder Ballot to your Nominee in accordance with the instructions provided by your Nominee.  Your completed Beneficial Holder Ballot must be received by your Nominee in sufficient time to permit your Nominee to deliver your votes to the Solicitation Agent on or before the Voting Deadline.

   **The Solicitation Agent will not accept any Beneficial Holder Ballots by email, facsimile or other electronic means.**  If you are directed by your Nominee to submit the Beneficial Holder Ballot to the Nominee via electronic means, such instructions to your Nominee shall have the same effect as if you had completed and returned a physical Beneficial Holder Ballot to your Nominee, including all certifications.

4. **The following Beneficial Holder Ballots submitted to your Nominee will *not* be counted toward Confirmation of the Plan**:

   (a) any Beneficial Holder Ballot that partially rejects and partially accepts the Plan;
   (b) any Beneficial Holder Ballot that is sent to the Debtors, the Debtors' agents, any indenture trustee or administrative agent, or the Debtors' financial or legal advisors;

(c) any Beneficial Holder Ballot that is sent by facsimile, email, or any electronic means other than in accordance with the instructions of your Nominee;

(d) any Beneficial Holder Ballot that is illegible or contains insufficient information to permit the identification of the holder of the Claim;

(e) any Beneficial Holder Ballot cast by an Entity that does not hold a Claim in Class 5;

(f) any unsigned Beneficial Holder Ballot;

(g) any Beneficial Holder Ballot submitted by a holder not entitled to vote pursuant to the Plan.

(h) any Beneficial Holder Ballot that does not contain an original signature, except as otherwise instructed by your Nominee; and/or

(i) any Beneficial Holder Ballot not marked to accept or reject the Plan or any Beneficial Holder Ballot marked both to accept and reject the Plan.

5.  To the extent you are required to submit your Beneficial Holder Ballot directly to your Nominee, if your Beneficial Holder Ballot is not received by your Nominee in sufficient time to be included on a timely submitted Master Ballot, it will not be counted toward Confirmation of the Plan unless the Debtors determine otherwise.  In all cases, Beneficial Holders should allow sufficient time to assure timely delivery of your Beneficial Holder Ballot to your Nominee.

6.  No Beneficial Holder Ballot should be sent to any of the Debtors, the Debtors' agents, the Debtors' financial or legal advisors, or any indenture trustee or administrative agent, and if so sent will not be counted toward Confirmation of the Plan.

7.  If you deliver multiple Beneficial Holder Ballots to the Nominee or the Solicitation Agent with respect to the same Note Claim prior to the Voting Deadline, the latest valid Beneficial Holder Ballot or Master Ballot reflecting your vote, as applicable, that is timely received by the Solicitation Agent will supersede and revoke any earlier received Beneficial Holder Ballots.

8.  You must vote all of your Note Claims within Class 5 either to accept or reject the Plan and may **not** split your vote.  Further, for purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code, the Debtors may, in their discretion, (a) aggregate and treat separate Note Claims held by a single creditor or separate affiliated Entities in Class 5 as if such creditor or such separate affiliated Entities held one Note Claim in Class 5, and treat all votes related to such Note Claim as a single vote to accept or reject the Plan; or (b) not aggregate or treat separate Note Claims held by a single creditor or separate affiliated Entities in Class 5 as if such creditor or such separate affiliated Entities held one Note Claim in Class 5, and treat all votes related to such Note Claims as separate votes to accept or reject the Plan.

9.  This Beneficial Holder Ballot does *not* constitute, and shall not be deemed to be, (a) a Proof of Claim, (b) an amendment to a Proof of Claim, (c) an assertion of a Claim, or (d) an admission by the Debtors of the nature, validity or amount of any Claim.

10. **Please be sure to sign and date your Beneficial Holder Ballot**.  If you are signing a Beneficial Holder Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Solicitation Agent, the Debtors, or the Bankruptcy Court, you must submit proper evidence to the requesting party to so act on behalf of such holder.  In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Beneficial Holder Ballot.

11. If you hold Claims or Interests in more than one Class under the Plan you may receive more than one ballot coded for each different Class.  Each ballot votes *only* your Claims or Interests indicated on that ballot, so please complete and return each ballot that you received.

12. The Beneficial Holder Ballot is not a letter of transmittal and may not be used for any purpose other than to vote to accept or reject the Plan.  Accordingly, at this time, holders of Claims should not surrender certificates or

instruments representing or evidencing their Claims, and neither the Debtors nor the Solicitation Agent will accept delivery of any such certificates or instruments surrendered together with a ballot.

**PLEASE MAIL YOUR BENEFICIAL HOLDER BALLOT PROMPTLY**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BENEFICIAL HOLDER BALLOT, THESE VOTING INSTRUCTIONS OR THE PROCEDURES FOR VOTING, PLEASE CALL THE RESTRUCTURING HOTLINE AT:  (888) 251-2679 (US TOLL-FREE) AND (310) 751-2609 (INTERNATIONAL TOLL) OR EMAIL AT: 21COINFO@KCCLLC.COM**

---

**IF THE SOLICITATION AGENT DOES NOT *ACTUALLY RECEIVE* EITHER:**

**(1) THIS BENEFICIAL HOLDER BALLOT, OR**

**(2) IF YOU RECEIVED A RETURN ENVELOPE ADDRESSED TO YOUR NOMINEE, THE MASTER BALLOT REFLECTING YOUR VOTE, WHICH IS TO BE SUBMITTED BY YOUR NOMINEE ON YOUR BEHALF,**

**ON OR BEFORE NOVEMBER 20, 2017, AT 5:00 P.M., PREVAILING EASTERN TIME**

**(AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED BY THIS BENEFICIAL HOLDER BALLOT MAY BE COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS.**

---

## **SCHEDULE 3E**

## **Form of Class 6 Ballot**

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| 21st CENTURY ONCOLOGY HOLDINGS, INC., *et al.*,[1] | ) Case No. 17-22770 (RDD) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

### BALLOT FOR VOTING TO ACCEPT OR REJECT
### THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF
### 21st CENTURY ONCOLOGY HOLDINGS, INC. AND ITS DEBTOR AFFILIATES

### CLASS 6 BALLOT FOR HOLDERS OF GENERAL UNSECURED CLAIMS

---

**PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**

**IN ORDER FOR YOUR VOTE TO BE COUNTED TOWARD CONFIRMATION OF THE PLAN, THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE *ACTUALLY RECEIVED* BY THE SOLICITATION AGENT BY NOVEMBER 20, 2017, AT 5:00 P.M., PREVAILING EASTERN TIME (THE "<u>VOTING DEADLINE</u>")[2] IN ACCORDANCE WITH THE FOLLOWING:**

---

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") are soliciting votes with respect to the *Joint Chapter 11 Plan of Reorganization of 21st Century Oncology Holdings, Inc. and its Debtor Affiliates* (as may be modified, amended, or supplemented from time to time, the "<u>Plan</u>") as set forth in the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of 21st Century Oncology Holdings, Inc. and its Debtor Affiliates* (as may be modified, amended, or supplemented from time to time, the "<u>Disclosure Statement</u>"). The Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>") has approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, by entry of an order on October [●], 2017 (the "<u>Disclosure Statement Order</u>"). The Bankruptcy Court's approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

You are receiving this Class 6 ballot (the "<u>Class 6 Ballot</u>") because you are a holder of a General Unsecured Claim in Class 6 as of October 16, 2017 (the "<u>Voting Record Date</u>"). Class 6 General Unsecured Claims include any Claim against any Debtor that is not a Secured Claim, an Administrative Claim, a Professional Claim, a Priority Tax

---

[1]    Each of the Debtors in the above-captioned jointly administered chapter 11 cases and their respective tax identification numbers are set forth in the *Order Directing Joint Administration of Chapter 11 Cases* [Docket No. 30]. The location of 21st Century Oncology Holdings, Inc.'s corporate headquarters and the Debtors' service address is: 2270 Colonial Boulevard, Fort Myers, Florida 33907.

[2]    **Solely with respect to holders of Claims in Class 6 that are Governmental Units that submit timely Proofs of Claim prior to the Governmental Bar Date, the Voting Deadline for purposes of submitting this Class 6 Ballot shall be November 27, 2017, at 5:00 p.m. prevailing Eastern Time.**

Claim, an Other Priority Claim, a Note Claim, a Section 510(b) Claim, or an Intercompany Claim, that is not otherwise paid in full during the Chapter 11 Cases pursuant to an order of the Bankruptcy Court.

Your rights are described in the Disclosure Statement, which was included in the package (the "Solicitation Package") you are receiving with this Class 6 Ballot (as well as the Plan, Disclosure Statement Order, and certain other materials).  If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them from (a) Kurtzman Carson Consultants LLC (the "Solicitation Agent") at no charge by:  (i) calling the Debtors' restructuring hotline at (888) 251-2679 (US toll-free) and (310) 751-2609 (international toll); (ii) visiting the Debtors' restructuring website at: http://www.kccllc.net/21co; (iii) writing to 21st Century Oncology Holdings, Inc., Ballot Processing Center, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245; and/or (iv) emailing 21coInfo@kccllc.com; or (b) for a fee via PACER at https://ecf.nysb.uscourts.gov/.

This Class 6 Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan.  If you believe you have received this Class 6 Ballot in error, or if you believe that you have received the wrong ballot, please contact the Solicitation Agent *immediately* at the address, telephone number, or email address set forth above.

You should review the Disclosure Statement and the Plan before you vote.  You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim.  Your Claim has been placed in Class 6, General Unsecured Claims, under the Plan.  If you hold Claims or Interests in more than one Class, you will receive a ballot for each Class in which you are entitled to vote.

**Item 1.  Amount of Claim.**[3]

The undersigned hereby certifies that as of the Voting Record Date, the undersigned was the holder of General Unsecured Claims in the following aggregate unpaid amount (insert amount in box below):

$$\boxed{\$\text{_____}}$$

**Item 2.  Vote on Plan.**

The holder of the Class 6 General Unsecured Claim against the Debtors set forth in Item 1 votes to (please check one):

| | |
|---|---|
| **ACCEPT** (vote FOR) the Plan | **REJECT** (vote AGAINST) the Plan |

**Item 3.  Convenience Claim Election.**

Pursuant to Article III.3.2 of the Plan, a holder of a General Unsecured Claim that is asserted in an amount greater than $1,000,000 will receive its Pro Rata[4] share of the New Common Stock Equity Pool[5] (subject to dilution

---

[3]    For voting purposes only and subject to tabulation rules.

[4]    "*Pro Rata*" means the proportion that (a) an Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class, (b) with respect to the New Common Stock Pool, an Allowed Claim in Class 5 or an Allowed Claim in Class 6 (but only if the holder of such Allowed Claim in Class 6 receives shares of the New Common Stock Equity Pool on account of such Allowed Claim in Class 6 in accordance with the terms of the Plan) bears to the aggregate amount of all

on account of the shares of New Common Stock issuable upon conversion of the New Preferred Equity, the shares of New Common Stock issuable upon exercise of the New Warrants, and the Management Incentive Plan Equity), *unless* it elects to receive its Pro Rata share of the Convenience Claim Distribution[6] on account of such asserted General Unsecured Claim (*provided*, that in making such election, such holder agrees to reduce the amount of such asserted General Unsecured Claim for purposes of voting and distributions under the Plan to $1,000,000).

**By checking the following box, you elect to (a) make the Convenience Claim Election and receive a recovery in the form of Cash from the Convenience Claim Distribution; (b) if the amount listed in Item 1 is greater than $1,000,000, cap the Allowed amount of your General Unsecured Claim at $1,000,000; and (c) relinquish any right to receive your Pro Rata share of the New Common Stock Equity Pool.**

---

The undersigned **<u>ELECTS</u>** to make the Convenience Claim Election,
cap its General Unsecured Claim at $1,000,000, and receive a recovery in the
form of Cash from the Convenience Claim Distribution

---

**Item 4.**  **New Common Stock Election.**

Pursuant to Article III.3.2 of the Plan, a holder of a General Unsecured Claim that is asserted in an amount less than or equal to $1,000,000 will receive its Pro Rata share of the Convenience Claim Distribution, *unless* it elects to receive its Pro Rata share of the New Common Stock Equity Pool (subject to dilution on account of the shares of New Common Stock issuable upon conversion of the New Preferred Equity, the shares of New Common Stock issuable upon exercise of the New Warrants, and the Management Incentive Plan Equity).

**By checking the following box, you elect to: (a) make the New Common Stock Election and receive a recovery in the form of New Common Stock; and (b) relinquish any right to receive your Pro Rata share of the Convenience Claim Distribution.**

---

Allowed Claims in Class 5 and Allowed Claims in Class 6 (but only including Allowed Claims in Class 6 that holders of such Allowed Claims in Class 6 receive shares of the New Common Stock Equity Pool on account of such Allowed Claims in Class 6 in accordance with the terms of the Plan), or (c) with respect to the Convenience Claim Distribution, an Allowed Claim in Class 6 (but only if the holder of such Allowed Claim in Class 6 receives Cash from the Convenience Claim Distribution on account of such Allowed Claim in Class 6 in accordance with the terms of the Plan) bears to the aggregate amount of all Allowed Claims in Class 6 (but only including Allowed Claims in Class 6 that holders of such Allowed Claims in Class 6 receive Cash from the Convenience Claim Distribution on account of such Allowed Claims in Class 6 in accordance with the terms of the Plan).

[5]   The "<u>New Common Stock Equity Pool</u>" means the common stock of Reorganized 21CH, consisting of (i) Class A Common Stock, par value $0.001 per share, which is voting stock, and (ii) Class B Common Stock, par value $0.001 per share, which is limited voting stock, in each case, to be issued on terms consistent in all material respects with the terms set forth in the Plan.

[6]   The "<u>Convenience Claim Distribution</u>" means Cash in the aggregate amount of $2.6 million.

The undersigned **ELECTS** to make the New Common Stock Election and receive its Pro Rata share of the New Common Stock Equity Pool (subject to dilution as set forth in the Plan)

**Item 5**.  **Important Information Regarding the Third Party Release.**

**Article VIII.8.3 of the Plan contains the following provision:**

Notwithstanding anything contained in the Plan to the contrary, on the Confirmation Date and effective as of the Effective Date, and to the fullest extent permitted by applicable law, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all claims, interests, obligations, debts, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claim asserted on behalf of any Debtor and/or Reorganized Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Releasing Party would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, the Restructuring Transactions, the Chapter 11 Cases, the Rights Offerings, the Backstop Purchase Agreement, the Backstop Commitments, the Backstop Order, the Restructuring Support Agreement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Releasing Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, preparation, implementation or administration of the Plan, the Disclosure Statement, the Plan Supplement, the Rights Offering Procedures, the DIP Facility, the Exit Facilities, the DIP Documents, the Exit Facility Documents, the New Warrant Documents, the New Organizational Documents, or any other Restructuring Documents, any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes fraud, willful misconduct or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third Party Release is:  (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good-faith settlement and compromise of the claims released by the Third-Party Release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Releasing Parties asserting any claim or cause of action released pursuant to the Third-Party Release.

\*        \*        \*

"*RELEASING PARTIES*" **MEANS COLLECTIVELY, AND IN EACH CASE SOLELY IN ITS CAPACITY AS SUCH: (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) THE BACKSTOP PARTIES; (D) THE DIP LENDERS; (E) THE DIP AGENT; (F) THE CONSENTING MDL LENDERS; (G) THE MDL AGENT; (H) THE CONSENTING FIRST LIEN LENDERS; (I) THE FIRST LIEN AGENT; (J) THE CONSENTING NOTEHOLDERS; (K) THE INDENTURE TRUSTEE; (L) THE EQUITY PARTIES; (M) THE COMMITTEE; (N) THE MEMBERS OF THE COMMITTEE; (O) ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE PRESUMED TO ACCEPT THE PLAN AND DO NOT OPT OUT OF THE THIRD-PARTY RELEASE ON THEIR RESPECTIVE ELECTION FORMS; (P) ALL HOLDERS OF CLAIMS AND**

4

**INTERESTS THAT ARE PRESUMED TO REJECT THE PLAN AND DO NOT OPT OUT OF THE THIRD-PARTY RELEASE ON THEIR RESPECTIVE ELECTION FORMS; (Q) ALL HOLDERS OF CLAIMS OR INTERESTS ENTITLED TO VOTE ON THE PLAN WHO EITHER (1) VOTE TO ACCEPT THE PLAN OR (2) RECEIVE A BALLOT BUT ABSTAIN FROM VOTING ON THE PLAN; (R) ALL HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLAN WHO VOTE TO REJECT THE PLAN BUT DO NOT ELECT ON THEIR BALLOT TO OPT-OUT OF THE THIRD-PARTY RELEASE; (S) ALL RIGHTS OFFERING PARTICIPANTS THAT PARTICIPATE IN THE RIGHTS OFFERINGS; (T) ALL OTHER HOLDERS OF CLAIMS AND INTERESTS TO THE FULLEST EXTENT PERMITTED BY LAW; AND (U) WITH RESPECT TO THE FOREGOING CLAUSES (A) THROUGH (T), EACH OF SUCH PERSON'S CURRENT AND FORMER AFFILIATES, PARTNERS, SUBSIDIARIES, OFFICERS, DIRECTORS, PRINCIPALS, EMPLOYEES, AGENTS, MANAGED FUNDS, ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, TOGETHER WITH THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, IN EACH CASE IN THEIR CAPACITY AS SUCH..**

**IN CONNECTION WITH THE FOREGOING, PLEASE CAREFULLY REVIEW THE FOLLOWING:**

- **If you vote to accept the Plan, you will be a "Releasing Party"[7] under the Plan, and you will be deemed to provide the Third-Party Release provided in Article VIII.8.3 of the Plan.  If you vote to accept the plan, you cannot opt out of giving such release.**

---

[7]  **"*RELEASING PARTIES*" MEANS COLLECTIVELY, AND IN EACH CASE SOLELY IN ITS CAPACITY AS SUCH: (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) THE BACKSTOP PARTIES; (D) THE DIP LENDERS; (E) THE DIP AGENT; (F) THE CONSENTING MDL LENDERS; (G) THE MDL AGENT; (H) THE CONSENTING FIRST LIEN LENDERS; (I) THE FIRST LIEN AGENT; (J) THE CONSENTING NOTEHOLDERS; (K) THE INDENTURE TRUSTEE; (L) THE EQUITY PARTIES; (M) THE COMMITTEE; (N) THE MEMBERS OF THE COMMITTEE; (O) ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE PRESUMED TO ACCEPT THE PLAN AND DO NOT OPT OUT OF THE THIRD-PARTY RELEASE ON THEIR RESPECTIVE ELECTION FORMS; (P) ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE PRESUMED TO REJECT THE PLAN AND DO NOT OPT OUT OF THE THIRD-PARTY RELEASE ON THEIR RESPECTIVE ELECTION FORMS; (Q) ALL HOLDERS OF CLAIMS OR INTERESTS ENTITLED TO VOTE ON THE PLAN WHO EITHER (1) VOTE TO ACCEPT THE PLAN OR (2) RECEIVE A BALLOT BUT ABSTAIN FROM VOTING ON THE PLAN; (R) ALL HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLAN WHO VOTE TO REJECT THE PLAN BUT DO NOT ELECT ON THEIR BALLOT TO OPT-OUT OF THE THIRD-PARTY RELEASE; (S) ALL RIGHTS OFFERING PARTICIPANTS THAT PARTICIPATE IN THE RIGHTS OFFERINGS; (T) ALL OTHER HOLDERS OF CLAIMS AND INTERESTS TO THE FULLEST EXTENT PERMITTED BY LAW; AND (U) WITH RESPECT TO THE FOREGOING CLAUSES (A) THROUGH (T), EACH OF SUCH PERSON'S CURRENT AND FORMER AFFILIATES, PARTNERS, SUBSIDIARIES, OFFICERS, DIRECTORS, PRINCIPALS, EMPLOYEES, AGENTS, MANAGED FUNDS, ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, TOGETHER WITH THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, IN EACH CASE IN THEIR CAPACITY AS SUCH.**

- **If you vote to reject the Plan and wish to opt out of the giving the release provided in Article VIII.8.3 of the Plan, you must submit this Class 6 Ballot to the Solicitation Agent by the Voting Deadline and check the opt out box below.**

- **If you do not vote on the Plan, but wish to opt out of giving the release provided in Article VIII.8.3 of the Plan, you must submit this Class 6 Ballot to the Solicitation Agent by the Voting Deadline, and check the opt out box below.**

- **If you (i) do not submit a Class 6 Ballot to the Solicitation Agent by the Voting Deadline, or (ii) submit a Ballot, but do not vote to accept or reject the Plan, and fail to check the opt out box below, you will be deemed to consent to giving the release provided in Article VIII.8.3 of the Plan.**

**The holder of the Class 6 General Unsecured Claim set forth in Item 1 that has not voted to accept the Plan elects to**:

☐ **Opt Out** of the Third Party Release.

**Item 6.**  **Certifications.**

By signing this Class 6 Ballot, the undersigned certifies to the Bankruptcy Court and the Debtors:

(a) that, as of the Voting Record Date, either:  (i) the undersigned is the holder of the General Unsecured Claims being voted; or (ii) the undersigned is an authorized signatory for an Entity that is a holder of the General Unsecured Claims being voted;

(b) that the undersigned (or in the case of an authorized signatory, the holder) has received a copy of the Disclosure Statement, the Plan, the Disclosure Statement Order, and the Solicitation Package and acknowledges that the Solicitation is being made pursuant to the terms and conditions set forth therein;

(c) that the undersigned has cast the same vote with respect to all General Unsecured Claims in Class 6 held by the holder of the General Unsecured Claims being voted; and

(d) that no other Class 6 Ballots with respect to the amount of the General Unsecured Claims identified in Item 1 have been cast or, if any other Class 6 Ballots have been cast with respect to such General Unsecured Claims, then any such earlier Class 6 Ballots are hereby revoked.

| | |
|---|---|
| Name of Holder: | |
| | (Print or Type) |
| Signature: | |
| Name of Signatory: | |
| | (If other than holder) |
| Title: | |
| Address: | |
| | |
| | |
| Telephone Number: | |
| Email: | |
| Date Completed: | |

**PLEASE COMPLETE, SIGN, AND DATE THIS CLASS 6 BALLOT AND RETURN IT (WITH AN ORIGINAL SIGNATURE) *PROMPTLY* VIA FIRST CLASS MAIL (OR IN THE ENCLOSED REPLY ENVELOPE PROVIDED), OVERNIGHT COURIER, OR HAND DELIVERY TO THE BELOW ADDRESSES.  YOUR CLASS 6 BALLOT MUST BE ACTUALLY RECEIVED BY THE VOTING DEADLINE, WHICH IS NOVEMBER 20, 2017, AT 5:00 P.M., PREVAILING EASTERN TIME.**

**21st Century Oncology Holdings, Inc.**
**Ballot Processing Center**
**c/o Kurtzman Carson Consultants, LLC**
**2335 Alaska Avenue**
**El Segundo, CA 90245**

## PLEASE SELECT JUST ONE OPTION TO VOTE.  EITHER RETURN THIS PAPER CLASS 6 BALLOT WITH YOUR VOTE
## OR
## VOTE ELECTRONICALLY AS INSTRUCTED BELOW

**To submit your Class 6 Ballot via the Solicitation Agent's online portal, please visit http://www.kccllc.net/21co.  Click on the "eBallot" section of the website and follow the instructions to submit your Class 6 Ballot.**

**IMPORTANT NOTE:  You will need the following information to retrieve and submit your customized electronic Class 6 Ballot:**

**Unique eBallot ID#:_____**

7

**The Solicitation Agent's online portal is the sole manner in which Class 6 Ballots will be accepted via electronic or online transmission.  Class 6 Ballots submitted by facsimile, email, or other means of electronic transmission will not be counted toward Confirmation of the Plan.**

**Each eBallot ID# is to be used solely for voting only those General Unsecured Claims described in Item 1 of your electronic Class 6 Ballot.  Please complete and submit an electronic Class 6 Ballot for each eBallot ID# you receive, as applicable.**

## Creditors who cast a Class 6 Ballot using the Solicitation Agent's online portal should NOT also submit a paper Class 6 Ballot.

---

**IF THE SOLICITATION AGENT DOES NOT *ACTUALLY RECEIVE* THIS CLASS 6 BALLOT ON OR BEFORE NOVEMBER 20, 2017, AT 5:00 P.M., PREVAILING EASTERN TIME (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED BY THIS CLASS 6 BALLOT MAY BE COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS.**

---

| Class 6— General Unsecured Claims |
|---|

### INSTRUCTIONS FOR COMPLETING THIS CLASS 6 BALLOT

1. The Debtors are soliciting the votes of holders of Claims or Interests with respect to the Plan attached as **Exhibit A** to the Disclosure Statement. Capitalized terms used in the Class 6 Ballot or in these instructions (the "Ballot Instructions") but not otherwise defined therein or herein shall have the meanings set forth in the Plan, a copy of which also accompanies the Class 6 Ballot. **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2. The Plan may be confirmed by the Court and thereby made binding upon you if it is accepted by the holders of at least two-thirds in amount and more than one-half in number of Claims or Interests in at least one class of creditors or Interest holders that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code. Please review the Disclosure Statement for more information.

3. To ensure that your Class 6 Ballot is counted toward Confirmation of the Plan, you **must either**: (a) complete and submit this hard copy Class 6 Ballot or (b) vote through the Debtors' online balloting portal accessible through the Debtors' case website http://www.kccllc.net/21co. **Ballots will not be accepted by facsimile, email, or other electronic means (other than the online portal).**

4. **Use of Hard Copy Ballot.** To ensure that your hard copy Class 6 Ballot is counted toward Confirmation of the Plan, you must: (a) complete your Class 6 Ballot in accordance with these instructions; (b) clearly indicate your decision either to accept or reject the Plan in the boxes provided in Item 2 of the Class 6 Ballot; and (c) clearly sign and return your original Class 6 Ballot in the enclosed pre-addressed, pre-paid envelope, or by delivery, overnight courier, or hand delivery to:

<div align="center">

**21st Century Oncology Holdings, Inc.**
**Ballot Processing Center**
**c/o Kurtzman Carson Consultants, LLC**
**2335 Alaska Avenue**
**El Segundo, CA 90245**

</div>

5. **OR Use of Online Ballot Portal.** To ensure that your electronic Class 6 Ballot is counted toward Confirmation of the Plan, please follow the instructions of the Debtors' case administration website at http://www.kccllc.net/21co. You will need to enter your unique eBallot ID# indicated above. The online balloting portal is the sole manner in which Ballots will be accepted via electronic or online transmission. **Ballots will not be accepted by facsimile, email, or other electronic means (other than the online portal).**

6. Your Class 6 Ballot **must** be returned to the Solicitation Agent so as to be **actually received** by the Solicitation Agent on or before the Voting Deadline. **The Voting Deadline is November 20, 2017, at 5:00 p.m.**, prevailing Eastern Time.

7. If a Class 6 Ballot is received **after** the Voting Deadline and if the Voting Deadline is not extended, it may be counted toward Confirmation of the Plan only in the discretion of the Debtors upon notice to the Committee. Additionally, **the following Class 6 Ballots will not be counted toward Confirmation of the Plan**:

   (a) any Class 6 Ballot that partially rejects and partially accepts the Plan;

   (b) any Class 6 Ballot that is sent to the Debtors, the Debtors' agents (other than the Solicitation Agent), any indenture trustee or administrative agent, or the Debtors' financial or legal advisors;

   (c) any Class 6 Ballot that is sent by facsimile, email, or any electronic means other than via the online portal;

   (d) any Class 6 Ballot that is illegible or contains insufficient information to permit the identification of the holder of the Claim;

<div align="center">9</div>

    (e)  any Class 6 Ballot cast by an Entity that does not hold a Claim in Class 6;

    (f)  any Class 6 Ballot submitted by a holder not entitled to vote on the Plan;

    (g)  any unsigned Class 6 Ballot;

    (h)  any Class 6 Ballot that does not contain an original signature; and/or

    (i)  any Class 6 Ballot not marked to accept or reject the Plan or any Class 6 Ballot marked both to accept and reject the Plan.

8.    The method of delivery of Class 6 Ballots to the Solicitation Agent is at the election and risk of each holder of a General Unsecured Claim. Except as otherwise provided herein, such delivery will be deemed made only when the Solicitation Agent *actually receives* the originally executed Class 6 Ballot. In all cases, holders should allow sufficient time to assure timely delivery.

9.    If multiple Class 6 Ballots are received from the same holder of a General Unsecured Claim with respect to the same General Unsecured Claim prior to the Voting Deadline, the latest, timely received, and properly completed Class 6 Ballot will supersede and revoke any earlier received Class 6 Ballots.

10.    You must vote all of your General Unsecured Claims within Class 6 either to accept or reject the Plan and may *not* split your vote. Further, for purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code, the Debtors may, in their discretion, (a) aggregate and treat separate General Unsecured Claims held by a single creditor or separate affiliated Entities in Class 6 as if such creditor or such separate affiliated Entities held one General Unsecured Claim in Class 6, and treat all votes related to such General Unsecured Claim as a single vote to accept or reject the Plan; or (b) not aggregate or treat separate General Unsecured Claims held by a single creditor or separate affiliated Entities in Class 6 as if such creditor or such separate affiliated Entities held one General Unsecured Claim in Class 6, and treat all votes related to such General Unsecured Claims as separate votes to accept or reject the Plan.

11.    This Class 6 Ballot does *not* constitute, and shall not be deemed to be, (a) a Proof of Claim or (b) an assertion or admission of a Claim.

12.    **Please be sure to sign and date your Class 6 Ballot**. If you are signing a Class 6 Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Solicitation Agent, the Debtors, or the Bankruptcy Court, you must submit proper evidence to the requesting party to so act on behalf of such holder. In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Class 6 Ballot.

13.    If you hold Claims or Interests in more than one Class under the Plan you may receive more than one ballot coded for each different Class. Each ballot votes *only* your Claims or Interests indicated on that ballot, so please complete and return each ballot that you received.

<div align="center">

**PLEASE MAIL YOUR CLASS 6 BALLOT PROMPTLY**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS CLASS 6 BALLOT,
THESE VOTING INSTRUCTIONS OR THE PROCEDURES FOR VOTING,
PLEASE CALL THE RESTRUCTURING HOTLINE AT: (888) 251-2679 (US TOLL-FREE) and
(310) 751-2609 (INTERNATIONAL TOLL) OR EMAIL 21COINFO@KCCLLC.COM.**

</div>

---

**IF THE SOLICITATION AGENT DOES NOT *ACTUALLY RECEIVE* THIS CLASS 6 BALLOT ON OR BEFORE THE VOTING DEADLINE, WHICH IS NOVEMBER 20, 2017, AT 5:00 P.M., PREVAILING EASTERN TIME (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED HEREBY MAY BE COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS.**

---

## **<u>SCHEDULE 3F</u>**

## **<u>Form of Class 11 Ballot</u>**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| 21st CENTURY ONCOLOGY HOLDINGS, INC., *et al.*,[1] | ) Case No. 17-22770 (RDD) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**BALLOT FOR VOTING TO ACCEPT OR REJECT**
**THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF**
**21st CENTURY ONCOLOGY HOLDINGS, INC. AND ITS DEBTOR AFFILIATES**

**CLASS 11 BALLOT FOR INTERESTS IN 21CH and 21CI**

<div style="border:1px solid">

**PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**

**IN ORDER FOR YOUR VOTE TO BE COUNTED TOWARD CONFIRMATION OF THE PLAN, THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE *ACTUALLY RECEIVED* BY THE SOLICITATION AGENT BY NOVEMBER 20, 2017, AT 5:00 P.M., PREVAILING EASTERN TIME (THE "<u>VOTING DEADLINE</u>") IN ACCORDANCE WITH THE FOLLOWING:**

</div>

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") are soliciting votes with respect to the *Joint Chapter 11 Plan of Reorganization of 21st Century Oncology Holdings, Inc. and its Debtor Affiliates* (as may be modified, amended, or supplemented from time to time, the "<u>Plan</u>") as set forth in the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of 21st Century Oncology Holdings, Inc. and its Debtor Affiliates* (as may be modified, amended, or supplemented from time to time, the "<u>Disclosure Statement</u>"). The Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>") has approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, by entry of an order on October [•], 2017 (the "<u>Disclosure Statement Order</u>"). The Bankruptcy Court's approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

You are receiving this Class 11 ballot (the "<u>Class 11 Ballot</u>") because you are a holder of an Interest in 21CH or 21CI in Class 11 as of October 16, 2017 (the "<u>Voting Record Date</u>"). Class 11 includes (a) any capital stock (including common stock and preferred stock), limited liability company interest, partnership interest, equity security (as defined in section 101(16) of the Bankruptcy Code) or other ownership, beneficial or profits interest of 21CH or 21CI, including, without limitation, the Series A Preferred Stock, and (b) any option, warrant, security, stock appreciation right, phantom unit, incentive, commitment, call, redemption right, repurchase right or other agreement, arrangement or right of any kind that is convertible into, exercisable or exchangeable for, or otherwise

---

[1]    Each of the Debtors in the above-captioned jointly administered chapter 11 cases and their respective tax identification numbers are set forth in the *Order Directing Joint Administration of Chapter 11 Cases* [Docket No. 30]. The location of 21st Century Oncology Holdings, Inc.'s corporate headquarters and the Debtors' service address is: 2270 Colonial Boulevard, Fort Myers, Florida 33907.

permits any Person to acquire, any capital stock (including common stock and preferred stock), limited liability company interest, partnership interest or other equity security or other ownership, beneficial or profits interest of 21CH or 21CI (whether or not arising under or in connection with any employment agreement), including any Claim against 21CH or 21CI that is subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

Your rights are described in the Disclosure Statement, which was included in the package (the "Solicitation Package") you are receiving with this Class 11 Ballot (as well as the Plan, Disclosure Statement Order, and certain other materials). If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them from (a) Kurtzman Carson Consultants LLC (the "Solicitation Agent") at no charge by: (i) calling the Debtors' restructuring hotline at (888) 251-2679 (US toll-free) and (310) 751-2609 (international toll); (ii) visiting the Debtors' restructuring website at: http://www.kccllc.net/21co; (iii) writing to 21st Century Oncology Holdings, Inc., Ballot Processing Center, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245; and/or (iv) emailing 21coInfo@kccllc.com; or (b) for a fee via PACER at https://ecf.nysb.uscourts.gov/.

This Class 11 Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan. If you believe you have received this Class 11 Ballot in error, or if you believe that you have received the wrong ballot, please contact the Solicitation Agent *immediately* at the address, telephone number, or email address set forth above.

You should review the Disclosure Statement and the Plan before you vote. You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Interest. Your Interest has been placed in Class 11, Interests in 21CH or 21CI, under the Plan.

**Item 1.  Amount of Interest.[2]**

The undersigned hereby certifies that as of the Voting Record Date, the undersigned was the holder of an Interest in 21CH or 21CI in the form and in the amount of [_____]:

**Item 2.  Vote on Plan.**

The holder of the Class 11 Interest in 21CH or 21CI against the Debtors set forth in Item 1 votes to (please check one):

---

**ACCEPT** (vote FOR) the Plan                    **REJECT** (vote AGAINST) the Plan

---

**Item 3.  Important Information Regarding the Third Party Release.**

**Article VIII.8.3 of the Plan contains the following provision:**

Notwithstanding anything contained in the Plan to the contrary, on the Confirmation Date and effective as of the Effective Date, and to the fullest extent permitted by applicable law, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all claims, interests, obligations, debts, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claim asserted on behalf of any Debtor and/or Reorganized Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Releasing Party would have been legally entitled to

---

[2]    For voting purposes only and subject to tabulation rules.

assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, the Restructuring Transactions, the Chapter 11 Cases, the Rights Offerings, the Backstop Purchase Agreement, the Backstop Commitments, the Backstop Order, the Restructuring Support Agreement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Releasing Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, preparation, implementation or administration of the Plan, the Disclosure Statement, the Plan Supplement, the Rights Offering Procedures, the DIP Facility, the Exit Facilities, the DIP Documents, the Exit Facility Documents, the New Warrant Documents, the New Organizational Documents, or any other Restructuring Documents, any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes fraud, willful misconduct or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third Party Release is:  (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good-faith settlement and compromise of the claims released by the Third-Party Release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Releasing Parties asserting any claim or cause of action released pursuant to the Third-Party Release.

\*       \*       \*

"*RELEASING PARTIES*" MEANS COLLECTIVELY, AND IN EACH CASE SOLELY IN ITS CAPACITY AS SUCH: (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) THE BACKSTOP PARTIES; (D) THE DIP LENDERS; (E) THE DIP AGENT; (F) THE CONSENTING MDL LENDERS; (G) THE MDL AGENT; (H) THE CONSENTING FIRST LIEN LENDERS; (I) THE FIRST LIEN AGENT; (J) THE CONSENTING NOTEHOLDERS; (K) THE INDENTURE TRUSTEE; (L) THE EQUITY PARTIES; (M) THE COMMITTEE; (N) THE MEMBERS OF THE COMMITTEE; (O) ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE PRESUMED TO ACCEPT THE PLAN AND DO NOT OPT OUT OF THE THIRD-PARTY RELEASE ON THEIR RESPECTIVE ELECTION FORMS; (P) ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE PRESUMED TO REJECT THE PLAN AND DO NOT OPT OUT OF THE THIRD-PARTY RELEASE ON THEIR RESPECTIVE ELECTION FORMS; (Q) ALL HOLDERS OF CLAIMS OR INTERESTS ENTITLED TO VOTE ON THE PLAN WHO EITHER (1) VOTE TO ACCEPT THE PLAN OR (2) RECEIVE A BALLOT BUT ABSTAIN FROM VOTING ON THE PLAN; (R) ALL HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLAN WHO VOTE TO REJECT THE PLAN BUT DO NOT ELECT ON THEIR BALLOT TO OPT-OUT OF THE THIRD-PARTY RELEASE; (S) ALL RIGHTS OFFERING PARTICIPANTS THAT PARTICIPATE IN THE RIGHTS OFFERINGS; (T) ALL OTHER HOLDERS OF CLAIMS AND INTERESTS TO THE FULLEST EXTENT PERMITTED BY LAW; AND (U) WITH RESPECT TO THE FOREGOING CLAUSES (A) THROUGH (T), EACH OF SUCH PERSON'S CURRENT AND FORMER AFFILIATES, PARTNERS, SUBSIDIARIES, OFFICERS, DIRECTORS, PRINCIPALS, EMPLOYEES, AGENTS, MANAGED FUNDS, ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, TOGETHER WITH THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, IN EACH CASE IN THEIR CAPACITY AS SUCH.

**IN CONNECTION WITH THE FOREGOING, PLEASE CAREFULLY REVIEW THE FOLLOWING:**

- **If you vote to accept the Plan, you will be a "Releasing Party"[3] under the Plan, and you will be deemed to provide the Third-Party Release provided in Article VIII.8.3 of the Plan.  If you vote to accept the plan, you cannot opt out of giving such release.**

- **If you vote to reject the Plan, and wish to opt out of the giving the release provided in Article VIII.8.3 of the Plan, you must submit this Class 11 Ballot to the Solicitation Agent by the Voting Deadline and check the opt out box below.**

- **If you do not vote on the Plan, but wish to opt out of giving the release provided in Article VIII.8.3 of the Plan, you must submit this Class 11 Ballot to the Solicitation Agent by the Voting Deadline, and check the opt out box below.**

- **If you (i) do not submit a Class 11 Ballot to the Solicitation Agent by the Voting Deadline, or (ii) submit a Class 11 Ballot, but do not vote to accept or reject the Plan, and fail to check the opt out box below, you will be deemed to consent to giving the release provided in Article VIII.8.3 of the Plan.**

**The holder of the Class 11 Interest in 21CH or 21CI set forth in Item 1 that has not voted to accept the Plan elects to**:

☐ **Opt Out** of the Third Party Release.

---

[3]  **"*RELEASING PARTIES*" MEANS COLLECTIVELY, AND IN EACH CASE SOLELY IN ITS CAPACITY AS SUCH: (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) THE BACKSTOP PARTIES; (D) THE DIP LENDERS; (E) THE DIP AGENT; (F) THE CONSENTING MDL LENDERS; (G) THE MDL AGENT; (H) THE CONSENTING FIRST LIEN LENDERS; (I) THE FIRST LIEN AGENT; (J) THE CONSENTING NOTEHOLDERS; (K) THE INDENTURE TRUSTEE; (L) THE EQUITY PARTIES; (M) THE COMMITTEE; (N) THE MEMBERS OF THE COMMITTEE; (O) ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE PRESUMED TO ACCEPT THE PLAN AND DO NOT OPT OUT OF THE THIRD-PARTY RELEASE ON THEIR RESPECTIVE ELECTION FORMS; (P) ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE PRESUMED TO REJECT THE PLAN AND DO NOT OPT OUT OF THE THIRD-PARTY RELEASE ON THEIR RESPECTIVE ELECTION FORMS; (Q) ALL HOLDERS OF CLAIMS OR INTERESTS ENTITLED TO VOTE ON THE PLAN WHO EITHER (1) VOTE TO ACCEPT THE PLAN OR (2) RECEIVE A BALLOT BUT ABSTAIN FROM VOTING ON THE PLAN; (R) ALL HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLAN WHO VOTE TO REJECT THE PLAN BUT DO NOT ELECT ON THEIR BALLOT TO OPT-OUT OF THE THIRD-PARTY RELEASE; (S) ALL RIGHTS OFFERING PARTICIPANTS THAT PARTICIPATE IN THE RIGHTS OFFERINGS; (T) ALL OTHER HOLDERS OF CLAIMS AND INTERESTS TO THE FULLEST EXTENT PERMITTED BY LAW; AND (U) WITH RESPECT TO THE FOREGOING CLAUSES (A) THROUGH (T), EACH OF SUCH PERSON'S CURRENT AND FORMER AFFILIATES, PARTNERS, SUBSIDIARIES, OFFICERS, DIRECTORS, PRINCIPALS, EMPLOYEES, AGENTS, MANAGED FUNDS, ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, TOGETHER WITH THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, IN EACH CASE IN THEIR CAPACITY AS SUCH.**

**Item 4.  Certifications.**

By signing this Class 11 Ballot, the undersigned certifies to the Bankruptcy Court and the Debtors:

(a)  that, as of the Voting Record Date, either:  (i) the undersigned is the holder of the Interest in 21CH or 21CI being voted; or (ii) the undersigned is an authorized signatory for an Entity that is a holder of the Interest in 21CH or 21CI being voted;

(b)  that the undersigned (or in the case of an authorized signatory, the holder) has received a copy of the Disclosure Statement, the Plan, the Disclosure Statement Order, and the Solicitation Package and acknowledges that the Solicitation is being made pursuant to the terms and conditions set forth therein;

(c)  that the undersigned has cast the same vote with respect to all Interests in 21CH or 21CI in Class 11 held by the holder of the Interests in 21CH or 21CI being voted; and

(d)  that no other Class 11 Ballots with respect to the amount of the Interest in 21CH or 21CI identified in Item 1 have been cast or, if any other Class 11 Ballots have been cast with respect to such Interest in 21CH or 21CI, then any such earlier Class 11 Ballots are hereby revoked.

| | |
|---|---|
| Name of Holder: | |
| | (Print or Type) |
| | |
| Signature: | |
| Name of Signatory: | |
| | (If other than holder) |
| Title: | |
| Address: | |
| | |
| | |
| Telephone Number: | |
| Email: | |
| Date Completed: | |

**PLEASE COMPLETE, SIGN, AND DATE THIS CLASS 11 BALLOT AND RETURN IT (WITH AN ORIGINAL SIGNATURE) *PROMPTLY* VIA FIRST CLASS MAIL (OR IN THE ENCLOSED REPLY ENVELOPE PROVIDED), OVERNIGHT COURIER, OR HAND DELIVERY TO THE BELOW ADDRESSES.  YOUR CLASS 11 BALLOT MUST BE ACTUALLY RECEIVED BY THE VOTING DEADLINE, WHICH IS NOVEMBER 20, 2017, AT 5:00 P.M., PREVAILING EASTERN TIME.**

**21st Century Oncology Holdings, Inc.**
**Ballot Processing Center**
**c/o Kurtzman Carson Consultants, LLC**
**2335 Alaska Avenue**
**El Segundo, CA 90245**

**PLEASE SELECT JUST ONE OPTION TO VOTE.  EITHER RETURN
THIS PAPER CLASS 11 BALLOT WITH YOUR VOTE
<u>OR</u>
VOTE ELECTRONICALLY AS INSTRUCTED BELOW**

**To submit your Class 11 Ballot via the Solicitation Agent's online portal, please visit
<u>http://www.kccllc.net/21co</u>.  Click on the "eBallot" section of the website and follow the instructions to submit
your Class 11 Ballot.**

**IMPORTANT NOTE:  You will need the following information to retrieve and submit your customized
electronic Class 11 Ballot:**

**Unique eBallot ID#:_____**

**The Solicitation Agent's online portal is the sole manner in which Class 11 Ballots will be accepted via
electronic or online transmission.  Class 11 Ballots submitted by facsimile, email or other means of electronic
transmission will not be counted toward Confirmation of the Plan.**

**Each eBallot ID# is to be used solely for voting only those Interests in 21CH or 21CI described in Item 1 of
your electronic Class 11 Ballot.  Please complete and submit an electronic Class 11 Ballot for each eBallot ID#
you receive, as applicable.**

**Interest holders who cast a Class 11 Ballot using the Solicitation Agent's
online portal should NOT also submit a paper Class 11 Ballot.**

---

**IF THE SOLICITATION AGENT DOES NOT *ACTUALLY RECEIVE* THIS CLASS 11 BALLOT ON OR
BEFORE NOVEMBER 20, 2017, AT 5:00 P.M., PREVAILING EASTERN TIME (AND IF THE VOTING
DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED BY THIS CLASS 11 BALLOT MAY
BE COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE
DEBTORS.**

---

| Class 11 — Interests in 21CH or 21CI |
|---|

### INSTRUCTIONS FOR COMPLETING THIS CLASS 11 BALLOT

1. The Debtors are soliciting the votes of holders of Claims or Interests with respect to the Plan attached as **Exhibit A** to the Disclosure Statement. Capitalized terms used in the Class 11 Ballot or in these instructions (the "Ballot Instructions") but not otherwise defined therein or herein shall have the meanings set forth in the Plan, a copy of which also accompanies the Class 11 Ballot. **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2. The Plan may be confirmed by the Court and thereby made binding upon you if it is accepted by the holders of at least two-thirds in amount and more than one-half in number of Claims or Interests in at least one class of creditors or Interest holders that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code. Please review the Disclosure Statement for more information.

3. To ensure that your Class 11 Ballot is counted toward Confirmation of the Plan, you *must either*: (a) complete and submit this hard copy Class 11 Ballot or (b) vote through the Debtors' online balloting portal accessible through the Debtors' case website http://www.kccllc.net/21co. **Ballots will not be accepted by facsimile, email, or other electronic means (other than the online portal).**

4. **Use of Hard Copy Ballot.** To ensure that your hard copy Class 11 Ballot is counted toward Confirmation of the Plan, you must: (a) complete your Class 11 Ballot in accordance with these instructions; (b) clearly indicate your decision either to accept or reject the Plan in the boxes provided in Item 2 of the Class 11 Ballot; and (c) clearly sign and return your original Class 11 Ballot in the enclosed pre-addressed, pre-paid envelope, or by delivery, overnight courier, or hand delivery to:

> **21st Century Oncology Holdings, Inc.**
> **Ballot Processing Center**
> **c/o Kurtzman Carson Consultants, LLC**
> **2335 Alaska Avenue**
> **El Segundo, CA 90245**

5. **OR Use of Online Ballot Portal**. To ensure that your electronic Class 11 Ballot is counted toward Confirmation of the Plan, please follow the instructions of the Debtors' case administration website at http://www.kccllc.net/21co. You will need to enter your unique eBallot ID# indicated above. The online balloting portal is the sole manner in which Ballots will be accepted via electronic or online transmission. **Ballots will not be accepted by facsimile, email, or other electronic means (other than the online portal).**

6. Your Class 11 Ballot *must* be returned to the Solicitation Agent so as to be **actually received** by the Solicitation Agent on or before the Voting Deadline. **The Voting Deadline is November 20, 2017, at 5:00 p.m.**, prevailing Eastern Time.

7. If a Class 11 Ballot is received *after* the Voting Deadline and if the Voting Deadline is not extended, it may be counted toward Confirmation of the Plan only in the discretion of the Debtors. Additionally, **the following Class 11 Ballots will *not* be counted toward Confirmation of the Plan:**

   (a) any Class 11 Ballot that partially rejects and partially accepts the Plan;
   (b) any Class 11 Ballot that is sent to the Debtors, the Debtors' agents (other than the Solicitation Agent), any indenture trustee or administrative agent, or the Debtors' financial or legal advisors;
   (c) any Class 11 Ballot that is sent by facsimile, email, or any electronic means other than via the online portal;
   (d) any Class 11 Ballot that is illegible or contains insufficient information to permit the identification of the holder of the Interest in Class 11;

(e)  any Class 11 Ballot cast by an Entity that does not hold an Interest in Class 11;

(f)  any Class 11 Ballot submitted by a holder not entitled to vote on the Plan;

(g)  any unsigned Class 11 Ballot;

(h)  any Class 11 Ballot that does not contain an original signature; and/or

(i)  any Class 11 Ballot not marked to accept or reject the Plan or any Class 11 Ballot marked both to accept and reject the Plan.

8.  The method of delivery of Class 11 Ballots to the Solicitation Agent is at the election and risk of each holder of an Interest in 21CH or 21CI.  Except as otherwise provided herein, such delivery will be deemed made only when the Solicitation Agent *actually receives* the originally executed Class 11 Ballot.  In all cases, holders should allow sufficient time to assure timely delivery.

9.  If multiple Class 11 Ballots are received from the same holder of an Interest in 21CH or 21CI with respect to the same Interest in 21CH or 21CI prior to the Voting Deadline, the latest, timely received, and properly completed Class 11 Ballot will supersede and revoke any earlier received Class 11 Ballots.

10.  You must vote all of your Interests in 21CH or 21CI within Class 11 either to accept or reject the Plan and may *not* split your vote.  Further, for purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code, the Debtors may, in their discretion, (a) aggregate and treat separate Interests in 21CH or 21CI held by a single creditor or separate affiliated Entities in Class 11 as if such creditor or such separate affiliated Entities held one Interest in 21CH or 21CI in Class 11, and treat all votes related to such Interest in 21CH or 21CI as a single vote to accept or reject the Plan; or (b) not aggregate or treat separate Interests in 21CH or 21CI held by a single creditor or separate affiliated Entities in Class 11 as if such creditor or such separate affiliated Entities held one Interest in 21CH or 21CI in Class 11, and treat all votes related to such Interests in 21CH or 21CI as separate votes to accept or reject the Plan.

11.  This Class 11 Ballot does *not* constitute, and shall not be deemed to be, (a) a Proof of Interest or (b) an assertion or admission of a Claim.

12.  **Please be sure to sign and date your Class 11 Ballot**.  If you are signing a Class 11 Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Solicitation Agent, the Debtors, or the Bankruptcy Court, you must submit proper evidence to the requesting party to so act on behalf of such holder.  In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Class 11 Ballot.

13.  If you hold Claims or Interests in more than one Class under the Plan you may receive more than one ballot coded for each different Class.  Each ballot votes *only* your Claims or Interests indicated on that ballot, so please complete and return each ballot that you received.

## PLEASE MAIL YOUR CLASS 11 BALLOT PROMPTLY

**IF YOU HAVE ANY QUESTIONS REGARDING THIS CLASS 11 BALLOT,
THESE VOTING INSTRUCTIONS OR THE PROCEDURES FOR VOTING,
PLEASE CALL THE RESTRUCTURING HOTLINE AT: (888) 251-2679 (US TOLL-FREE) and
(310) 751-2609 (INTERNATIONAL TOLL) OR EMAIL 21COINFO@KCCLLC.COM.**

---

**IF THE SOLICITATION AGENT DOES NOT *ACTUALLY RECEIVE* THIS CLASS 11 BALLOT ON OR BEFORE THE VOTING DEADLINE, WHICH IS NOVEMBER 20, 2017, AT 5:00 P.M., PREVAILING EASTERN TIME (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED HEREBY MAY BE COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS.**

---

## **SCHEDULE 4**

### **Form of Unimpaired Non-Voting Status Notice**

Christopher Marcus, P.C.
John T. Weber
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

James H.M. Sprayregen, P.C.
William A. Guerrieri (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| 21st CENTURY ONCOLOGY HOLDINGS, INC., *et al.*,[1] | ) Case No. 17-22770 (RDD) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**NOTICE OF NON-VOTING STATUS AND ELECTION**
**FORM WITH RESPECT TO HOLDERS OF UNIMPAIRED CLAIMS OR EQUITY**
**INTERESTS PRESUMED TO ACCEPT THE PLAN**

**PLEASE TAKE NOTICE THAT** on October [●], 2017, the United States Bankruptcy Court for the Southern District of New York (the "Court") entered an order [Docket No.[●]] (the "Disclosure Statement Order"):  (a) authorizing 21st Century Oncology Holdings, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors") to solicit acceptances for the *Joint Chapter 11 Plan of Reorganization of 21st Century Oncology Holdings, Inc. and its Debtor Affiliates* (as may be modified, amended, or supplemented from time to time, the "Plan");[2] and (b) approving, among other things, (i) the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of 21st Century Oncology Holdings, Inc. and its Debtor Affiliates* (as may be modified, amended, or supplemented from time to time, the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (ii) the solicitation materials and documents to be included in the solicitation packages; (iii) the rights offering procedures and related materials; and (iv) the procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

---

[1]    Each of the Debtors in the above-captioned jointly administered chapter 11 cases and their respective tax identification numbers are set forth in the *Order Directing Joint Administration of Chapter 11 Cases* [Docket No. 30].  The location of 21st Century Oncology Holdings, Inc.'s corporate headquarters and the Debtors' service address is: 2270 Colonial Boulevard, Fort Myers, Florida 33907.

[2]    Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** because of the nature and treatment of your Claim or Interest under the Plan, *you are not entitled to vote on the Plan*. Specifically, under the terms of the Plan, as a holder of a Claim (as currently asserted against the Debtors) or Interest in a Debtor that is Unimpaired and presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code, you are *not* entitled to vote on the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** pursuant to the Plan, *you are deemed to have consented to the Third-Party Release set forth in* <u>*Article VIII.8.3*</u> *of the Plan unless you "opt out" of such Third-Party Release* by duly executing and properly completing a copy of the Election Form, attached hereto as <u>**Exhibit 1**</u>, to the Solicitation Agent (as defined below) so that it is *actually received* by the Solicitation Agent on or before <u>**November 20, 2017, at 5:00 p.m.**</u>, prevailing Eastern Time.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider Confirmation of the Plan (the "<u>Confirmation Hearing</u>") will commence on <u>**December 11, 2017, at 10:00 a.m.**</u>, prevailing Eastern Time, before the Honorable Robert D. Drain, in the United States Bankruptcy Court for the Southern District of New York, located at 300 Quarropas Street, Courtroom 248, White Plains, New York 10601-4140.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan is <u>**November 27, at 4:00 p.m.**</u>, prevailing Eastern Time (the "<u>Plan Objection Deadline</u>"). Any objection to the Plan *must*:  (a) be in writing; (b) conform to the Bankruptcy Rules, the Local Bankruptcy Rules, and any orders of the Court; (c) state, with particularity, the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (d) be filed with the Court (contemporaneously with a proof of service) and served upon the following parties so as to be *actually received* on or before the Plan Objection Deadline:

| Counsel to the Debtors | |
|---|---|
| Christopher Marcus, P.C. <br> John T. Weber <br> **KIRKLAND & ELLIS LLP** <br> **KIRKLAND & ELLIS INTERNATIONAL LLP** <br> 601 Lexington Avenue <br> New York, New York 10022 <br> Telephone:  (212) 446-4800 <br> Facsimile:  (212) 446-4900 | James H.M. Sprayregen, P.C. <br> William A. Guerrieri (admitted *pro hac vice*) <br> Alexandra Schwarzman (admitted *pro hac vice*) <br> **KIRKLAND & ELLIS LLP** <br> **KIRKLAND & ELLIS INTERNATIONAL LLP** <br> 300 North LaSalle Street <br> Chicago, Illinois 60654 <br> Telephone:  (312) 862-2000 <br> Facsimile:  (312) 862-2200 |
| *U.S. Trustee* | |
| Paul Schwartzberg <br> Susan Golden <br> Office of the United States Trustee <br> for the Southern District of New York <br> U.S. Federal Office Building, 201 Varick Street, Suite 1006 <br> New York, New York 10014 | |

| *Counsel to the Official Committee of Unsecured Creditors Appointed in These Chapter 11 Cases* |
|---|
| Lorenzo Marinuzzi<br>Jonathan Levine<br>Morrison & Foerster LLP<br>250 West 55th Street<br>New York, New York 10019 |
| *Counsel to Certain Backstop Parties and the Ad Hoc Committee of Crossover Lenders and Noteholders* |
| Jayme Goldstein<br>Samantha Martin<br>Odelia Lee<br>Stroock & Stroock & Lavan LLP<br>180 Maiden Lane<br>New York, New York 10038 |
| *Counsel to the Ad Hoc Committee of Lenders Under the Debtors' Prepetition Secured Credit Facility* |
| Evan Fleck<br>Matthew Brod<br>Milbank, Tweed, Hadley & McCloy LLP<br>28 Liberty Street<br>New York, New York 10005 |
| *Counsel to the MDL Agent* |
| Seth H. Lieberman<br>Patrick Sibley<br>Matthew W. Silverman<br>Pryor Cashman LLP<br>7 Times Square<br>New York, New York 10036 |
| *Counsel to the DIP Agent* |
| Richard A. Stieglitz, Jr.<br>Joel H. Levitin<br>Cahill Gordon & Reindel LLP<br>Eighty Pine Street<br>New York, New York 10005 |

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact Kurtzman Carson Consultants, LLC, the solicitation agent retained by the Debtors in the Chapter 11 Cases (the "Solicitation Agent"), by:  (a) calling the Debtors' restructuring hotline at (888) 251-2679 (US toll-free) and (310) 751-2609 (international toll); (b) visiting the Debtors' restructuring website at:  http://www.kccllc.net/21co; (c) writing to 21st Century Oncology Holdings, Inc., Ballot Processing Center, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245; and/or (d) emailing 21coInfo@kccllc.com.  You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER (the Court's Public Access to Court Electronic Records) at: https://ecf.nysb.uscourts.gov/.  A login

identification and password to PACER are required to access this information and can be obtained through the PACER Service Center at http://www.pacer.psc.uscourts.gov.

---

ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE VIII.8.3 CONTAINS A THIRD-PARTY RELEASE**.  PURSUANT TO THE PLAN YOU ARE DEEMED TO HAVE CONSENTED TO THE RELEASES SET FORTH IN ARTICLE VIII.8.3 OF THE PLAN UNLESS YOU "OPT OUT" OF THE THIRD-PARTY RELEASE IN ACCORDANCE WITH THIS NOTICE.  THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

**IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE SOLICITATION AGENT.**

---

New York, New York  
Dated: _____, 2017

*/s/* _____

Christopher Marcus, P.C.  
John T. Weber  
**KIRKLAND & ELLIS LLP**  
**KIRKLAND & ELLIS INTERNATIONAL LLP**  
601 Lexington Avenue  
New York, New York 10022  
Telephone:    (212) 446-4800  
Facsimile:    (212) 446-4900

- and -

James H.M. Sprayregen, P.C.  
William A. Guerrieri (admitted *pro hac vice*)  
Alexandra Schwarzman (admitted *pro hac vice*)  
**KIRKLAND & ELLIS LLP**  
**KIRKLAND & ELLIS INTERNATIONAL LLP**  
300 North LaSalle Street  
Chicago, Illinois 60654  
Telephone:    (312) 862-2000  
Facsimile:    (312) 862-2200

*Counsel to the Debtors*  
*and Debtors in Possession*

## **Exhibit 1**

**Election Form**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| 21st CENTURY ONCOLOGY HOLDINGS, INC., *et al.*,[1] | ) Case No. 17-22770 (RDD) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

## ELECTION FORM TO OPT OUT OF THIRD PARTY RELEASE

    **PLEASE TAKE NOTICE** that on October [●], 2017, the United States Bankruptcy Court for the Southern District of New York (the "Court") entered an order [Docket No.[●]] (the "Disclosure Statement Order"): (a) authorizing 21st Century Oncology Holdings, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors") to solicit acceptances for the *Joint Chapter 11 Plan of Reorganization of 21st Century Oncology Holdings, Inc. and its Debtor Affiliates* (as may be modified, amended, or supplemented from time to time, the "Plan");[2] and (b) approving, among other things, (i) the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of 21st Century Oncology Holdings, Inc. and its Debtor Affiliates* (as may be modified, amended, or supplemented from time to time, the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (ii) the solicitation materials and documents to be included in the solicitation packages; (iii) the rights offering procedures and related materials; and (iv) the procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

    **PLEASE TAKE FURTHER NOTICE** that because of the nature and treatment of your Claim or Interest under the Plan, *you are not entitled to vote on the Plan*. Nevertheless, this Election Form is being sent to you to provide you with information to determine whether to opt out of the Plan's Third Party Release.

    **PLEASE TAKE FURTHER NOTICE** that the hearing at which the Court will consider Confirmation of the Plan (the "Confirmation Hearing") will commence on **December 11, 2017, at 10:00 a.m.**, prevailing Eastern Time, before the Honorable Robert D. Drain, in the United States Bankruptcy Court for the Southern District of New York, located at 300 Quarropas Street, Courtroom 248, White Plains, New York 10601-4140.

---

[1]    Each of the Debtors in the above-captioned jointly administered chapter 11 cases and their respective tax identification numbers are set forth in the *Order Directing Joint Administration of Chapter 11 Cases* [Docket No. 30]. The location of 21st Century Oncology Holdings, Inc.'s corporate headquarters and the Debtors' service address is: 2270 Colonial Boulevard, Fort Myers, Florida 33907.

[2]    Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

**PLEASE TAKE FURTHER NOTICE** that Article VIII.8.3 of the Plan provides for the following Third Party Release:

Notwithstanding anything contained in the Plan to the contrary, on the Confirmation Date and effective as of the Effective Date, and to the fullest extent permitted by applicable law, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all claims, interests, obligations, debts, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claim asserted on behalf of any Debtor and/or Reorganized Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Releasing Party would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, the Restructuring Transactions, the Chapter 11 Cases, the Rights Offerings, the Backstop Purchase Agreement, the Backstop Commitments, the Backstop Order, the Restructuring Support Agreement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Releasing Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, preparation, implementation or administration of the Plan, the Disclosure Statement, the Plan Supplement, the Rights Offering Procedures, the DIP Facility, the Exit Facilities, the DIP Documents, the Exit Facility Documents, the New Warrant Documents, the New Organizational Documents, or any other Restructuring Documents, any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes fraud, willful misconduct or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third Party Release is:  (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good-faith settlement and compromise of the claims released by the Third-Party Release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Releasing Parties asserting any claim or cause of action released pursuant to the Third-Party Release.

\*      \*      \*

"*RELEASING PARTIES*" MEANS COLLECTIVELY, AND IN EACH CASE SOLELY IN ITS CAPACITY AS SUCH: (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) THE BACKSTOP PARTIES; (D) THE DIP LENDERS; (E) THE DIP AGENT; (F) THE CONSENTING MDL LENDERS; (G) THE MDL AGENT; (H) THE CONSENTING FIRST LIEN LENDERS; (I) THE FIRST LIEN AGENT; (J) THE CONSENTING NOTEHOLDERS; (K) THE INDENTURE TRUSTEE; (L) THE EQUITY PARTIES; (M) THE COMMITTEE; (N) THE MEMBERS OF THE COMMITTEE; (O) ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE PRESUMED TO ACCEPT THE PLAN AND DO NOT OPT OUT OF THE THIRD-PARTY RELEASE ON THEIR RESPECTIVE ELECTION FORMS; (P) ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE PRESUMED TO REJECT THE PLAN AND DO NOT OPT OUT OF THE THIRD-PARTY RELEASE ON THEIR RESPECTIVE ELECTION FORMS; (Q) ALL HOLDERS OF CLAIMS OR INTERESTS ENTITLED TO VOTE ON THE PLAN WHO EITHER (1) VOTE TO ACCEPT THE PLAN OR (2) RECEIVE A BALLOT BUT ABSTAIN FROM VOTING ON THE PLAN; (R) ALL HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLAN WHO VOTE TO REJECT THE PLAN BUT DO NOT ELECT ON THEIR BALLOT TO OPT-OUT OF THE THIRD-PARTY RELEASE; (S) ALL RIGHTS OFFERING PARTICIPANTS THAT PARTICIPATE IN THE RIGHTS OFFERINGS; (T) ALL OTHER HOLDERS OF CLAIMS AND INTERESTS TO THE FULLEST EXTENT PERMITTED BY LAW; AND (U) WITH RESPECT TO THE FOREGOING CLAUSES (A) THROUGH (T), EACH OF SUCH PERSON'S CURRENT AND FORMER AFFILIATES, PARTNERS, SUBSIDIARIES, OFFICERS, DIRECTORS, PRINCIPALS, EMPLOYEES, AGENTS, MANAGED FUNDS,

2

**ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, TOGETHER WITH THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, IN EACH CASE IN THEIR CAPACITY AS SUCH.**

**PLEASE COMPLETE ITEMS 1 AND 2 ONLY IF YOU WISH TO OPT-OUT OF THE THIRD PARTY RELEASE:**

**Item 1.  Optional Release Election.**  If you do not consent to the Third Party Release, you may elect to opt-out and not grant such releases by checking the box below.  If you do not return this Election Form so that it is actually received by the Solicitation Agent (as defined below) on or before 5:00 p.m., prevailing Eastern Time, on November 20, 2017 (the "Election Deadline"), or you return this Election Form but do not check the box below, you will be bound by the Third Party Release.  Election to withhold consent is at your option.

REGARDLESS OF WHETHER YOU ELECT TO OPT OUT OF THE PLAN'S RELEASE PROVISIONS, YOUR RECOVERY UNDER THE PLAN REMAINS UNAFFECTED.

The Holder of the Claim and/or Interest set forth in Item 2 elects to:



☐          **OPT-OUT OF THE THIRD PARTY RELEASE**.

You are strongly encouraged to review the Disclosure Statement and the Plan before you make an election.  You may wish to seek legal advice concerning the Plan and your treatment thereunder.  Should you wish to obtain a copy of either the Disclosure Statement or the Plan, you should contact Kurtzman Carson Consultants, LLC, the solicitation agent retained by the Debtors in the Chapter 11 Cases (the "Solicitation Agent"), by:  (a) calling the Debtors' restructuring hotline at (888) 251-2679 (US toll-free) and (310) 751-2609 (international toll); (b) visiting the Debtors' restructuring website at:  http://www.kccllc.net/21co; (c) writing to 21st Century Oncology Holdings, Inc., Ballot Processing Center, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245; and/or (d) emailing 21coInfo@kccllc.com.  You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER (the Court's Public Access to Court Electronic Records) at:  https://ecf.nysb.uscourts.gov/.  A login identification and password to PACER are required to access this information and can be obtained through the PACER Service Center at http://www.pacer.psc.uscourts.gov.

3

**Item 2.   Acknowledgments.**   By signing this Election Form, the undersigned beneficial holder of the Claim or Interest identified in Item 1 above certifies that (i) it is the holder of the Claim or Interest identified in Item 1 above or (ii) it has full power and authority to act on behalf of the holder of the Claim or Interest identified in Item 1 above.

_____
Name

_____
Social Security or Federal Tax I.D. No. (optional)

_____
Signature

_____
If by Authorized Agent, Name and Title

_____
Name of Institution

_____
Street Address

_____
City, State, Zip Code

_____
Telephone Number

_____
Email Address

_____
Date Completed

**PLEASE COMPLETE, SIGN, AND DATE THIS ELECTION FORM AND RETURN THE ORIGINAL ELECTION FORM SO THAT IT IS _ACTUALLY RECEIVED_ BY THE SOLICITATION AGENT ON OR BEFORE THE ELECTION DEADLINE AT THE FOLLOWING ADDRESS:**
**21st Century Oncology Holdings, Inc.**
**Ballot Processing Center**
**c/o Kurtzman Carson Consultants, LLC**
**2335 Alaska Avenue**
**El Segundo, CA 90245**

4

## INFORMATION AND INSTRUCTIONS FOR COMPLETING THE ELECTION FORM

1.      The Bankruptcy Court may confirm the Plan and thereby make its terms binding on you whether or not you are entitled to vote to accept or reject the Plan.  If you abstain from returning this Election Form or you do not check the box in Item 1, you will be bound by the Third Party Release.  To ensure that your election to opt-out of the Third Party Release is sufficient, you must:  (i) complete your Election Form by providing all the information requested in accordance with these instructions; (ii) clearly indicate your decision to opt-out of the releases contained in Section 8.3 of the Plan; (iii) review and complete Items l and 2 in accordance with the instructions therein; and (iv) clearly sign, date and return an original of your Election Form to the address set forth below.

2.      Please be sure to sign and date your Election Form.  If you are signing an Election Form in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if requested by the Solicitation Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of the holder of the relevant Claim or Interest.  In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Election Form.

3.      Your original signed Election Form must be returned by regular mail, overnight courier or hand delivery to the Solicitation Agent so as to be actually received by the Solicitation Agent on or before 5:00 p.m., Prevailing Eastern Time, on November 20, 2017 (the "Election Deadline") at the following address:

> **21st Century Oncology Holdings, Inc.**
> **Ballot Processing Center**
> **c/o Kurtzman Carson Consultants, LLC**
> **2335 Alaska Avenue**
> **El Segundo, CA 90245**

4.      ***If an Election Form is received after the Election Deadline, it will not qualify as an opt-out of the Third Party Release***.  Election Forms submitted by email, facsimile or other means of electronic submission will not be accepted. **Election Forms should not be sent to the Debtors.**

5.      This Election Form does not constitute, and shall not be deemed to be, a Proof of Claim or Interest, an assertion of a Claim or Interest, an allowance of a Claim or Interest or an admission of the validity of a Claim or Interest.

6.      This Election Form is not a letter of transmittal and may not be used for any purpose other than to elect to opt-out of the Third Party Releases.  Accordingly, at this time, holders of Claims or Interests should not surrender certificates or instruments representing or evidencing their Claims or Interests, if any, and neither the Debtors nor the Solicitation Agent will accept delivery of any such certificates or instruments surrendered together with an Election Form.

### PLEASE RETURN YOUR ELECTION FORM PROMPTLY.

**IF YOU HAVE RECEIVED A DAMAGED ELECTION FORM OR HAVE LOST YOUR ELECTION FORM, OR IF YOU HAVE ANY QUESTIONS CONCERNING THE ELECTION FORM OR THE ELECTION PROCEDURES, PLEASE CONTACT THE SOLICITATION AGENT, KURTZMAN CARSON CONSULTANTS LLC, BY TELEPHONE AT (888) 251-2679 (US TOLL-FREE) AND (310) 751-2609 (INTERNATIONAL TOLL) OR VIA EMAIL AT 21coInfo@kccllc.com.**

THE SOLICITATION AGENT WILL NOT ACCEPT ELECTION FORMS BY EMAIL OR FACSIMILE TRANSMISSION. ELECTION FORMS SHOULD NOT BE SENT TO THE DEBTORS OR ANY OF THEIR AGENTS OTHER THAN THE SOLICITATION AGENT.

> **YOUR ELECTION FORM MUST BE <u>ACTUALLY RECEIVED</u> BY THE ELECTION DEADLINE, WHICH IS NOVEMBER 20, 2016 AT 5:00 P.M., PREVAILING EASTERN TIME, FOR YOUR ELECTION TO QUALIFY AS AN OPT-OUT OF THE THIRD PARTY RELEASE**

**PLEASE TAKE FURTHER NOTICE** that if you have any questions about the status of any of your Claims or Interests, you should contact the Solicitation Agent in accordance with the instructions provided above.

New York, New York
Dated: _____, 2017

/s/ _____

Christopher Marcus, P.C.
John T. Weber
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:     (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
William A. Guerrieri (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:     (312) 862-2200

*Counsel to the Debtors*
*and Debtors in Possession*

2

## **SCHEDULE 5**

### **Form of Impaired Non-Voting Status Notice**

Christopher Marcus, P.C.
John T. Weber
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900

James H.M. Sprayregen, P.C.
William A. Guerrieri (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:   (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| 21st CENTURY ONCOLOGY HOLDINGS, INC., *et al.*,[1] | ) Case No. 17-22770 (RDD) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**NOTICE OF NON-VOTING STATUS AND ELECTION**
**FORM WITH RESPECT TO HOLDERS OF IMPAIRED CLAIMS OR EQUITY**
**INTERESTS PRESUMED TO REJECT THE PLAN**

**PLEASE TAKE NOTICE THAT** on October [●], 2017, the United States Bankruptcy Court for the Southern District of New York (the "Court") entered an order [Docket No.[●]] (the "Disclosure Statement Order"):  (a) authorizing 21st Century Oncology Holdings, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors") to solicit acceptances for the *Joint Chapter 11 Plan of Reorganization of 21st Century Oncology Holdings, Inc. and its Debtor Affiliates* (as may be modified, amended, or supplemented from time to time, the "Plan");[2] and (b) approving, among other things, (i) the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of 21st Century Oncology Holdings, Inc. and its Debtor Affiliates* (as may be modified, amended, or supplemented from time to time, the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (ii) the solicitation materials and documents to be included in the solicitation packages; (iii) the rights offering procedures and related materials; and (iv) the procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

---

[1]   Each of the Debtors in the above-captioned jointly administered chapter 11 cases and their respective tax identification numbers are set forth in the *Order Directing Joint Administration of Chapter 11 Cases* [Docket No. 30].  The location of 21st Century Oncology Holdings, Inc.'s corporate headquarters and the Debtors' service address is: 2270 Colonial Boulevard, Fort Myers, Florida 33907.

[2]   Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** because of the nature and treatment of your Claim or Interest under the Plan, *you are not entitled to vote on the Plan*. Specifically, under the terms of the Plan, as a holder of a Claim (as currently asserted against the Debtors) or Interest in a Debtor that is receiving no distribution under the Plan, you are presumed to reject the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote on the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** pursuant to the Plan, *you are deemed to have consented to the Third-Party Release set forth in <u>Article VIII.8.3</u> of the Plan unless you "opt out" of such Third-Party Release* by duly executing and properly completing a copy of the Election Form, attached hereto as <u>**Exhibit 1**</u>, to the Solicitation Agent (as defined below) so that it is *actually received* by the Solicitation Agent on or before **November 20, 2017, at 5:00 p.m.**, prevailing Eastern Time.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider Confirmation of the Plan (the "<u>Confirmation Hearing</u>") will commence on **December 11, 2017, at 10:00 a.m.**, prevailing Eastern Time, before the Honorable Robert D. Drain, in the United States Bankruptcy Court for the Southern District of New York, located at 300 Quarropas Street, Courtroom 248, White Plains, New York 10601-4140.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan is **November 27, 2017 at 4:00 p.m.**, prevailing Eastern Time (the "<u>Plan Objection Deadline</u>"). Any objection to the Plan *must*: (a) be in writing; (b) conform to the Bankruptcy Rules, the Local Bankruptcy Rules, and any orders of the Court; (c) state, with particularity, the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (d) be filed with the Court (contemporaneously with a proof of service) and served upon the following parties so as to be *actually received* on or before Plan Objection Deadline:

| *Counsel to the Debtors* | |
|---|---|
| Christopher Marcus, P.C.<br>John T. Weber<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone:    (212) 446-4800<br>Facsimile:    (212) 446-4900 | James H.M. Sprayregen, P.C.<br>William A. Guerrieri (admitted *pro hac vice*)<br>Alexandra Schwarzman (admitted *pro hac vice*)<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Telephone:    (312) 862-2000<br>Facsimile:    (312) 862-2200 |
| *U.S. Trustee* | |
| Paul Schwartzberg<br>Susan Golden<br>Office of the United States Trustee<br>for the Southern District of New York<br>U.S. Federal Office Building, 201 Varick Street, Suite 1006<br>New York, New York 10014 | |

| *Counsel to the Official Committee of Unsecured Creditors Appointed in These Chapter 11 Cases* |
|---|
| Lorenzo Marinuzzi<br>Jonathan Levine<br>Morrison & Foerster LLP<br>250 West 55th Street<br>New York, New York 10019 |
| *Counsel to Certain Backstop Parties and the Ad Hoc Committee of Crossover Lenders and Noteholders* |
| Jayme Goldstein<br>Samantha Martin<br>Odelia Lee<br>Stroock & Stroock & Lavan LLP<br>180 Maiden Lane<br>New York, New York 10038 |
| *Counsel to the Ad Hoc Committee of Lenders Under the Debtors' Prepetition Secured Credit Facility* |
| Evan Fleck<br>Matthew Brod<br>Milbank, Tweed, Hadley & McCloy LLP<br>28 Liberty Street<br>New York, New York 10005 |
| *Counsel to the MDL Agent* |
| Seth H. Lieberman<br>Patrick Sibley<br>Matthew W. Silverman<br>Pryor Cashman LLP<br>7 Times Square<br>New York, New York 10036 |
| *Counsel to the DIP Agent* |
| Richard A. Stieglitz, Jr.<br>Joel H. Levitin<br>Cahill Gordon & Reindel LLP<br>Eighty Pine Street<br>New York, New York 10005 |

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact Kurtzman Carson Consultants LLC, the solicitation agent retained by the Debtors in the Chapter 11 Cases (the "Solicitation Agent"), by: (a) calling the Debtors' restructuring hotline at (888) 251-2679 (US toll-free) and (310) 751-2609 (international toll); (b) visiting the Debtors' restructuring website at: http://www.kccllc.net/21co; (c) writing to 21st Century Oncology Holdings, Inc., Ballot Processing Center, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245; and/or (d) emailing 21coInfo@kccllc.com. You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER (the Court's Public Access to Court Electronic Records) at: https://ecf.nysb.uscourts.gov/. A login

identification and password to PACER are required to access this information and can be obtained through the PACER Service Center at http://www.pacer.psc.uscourts.gov.

<div style="border:1px solid">

ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE VIII.8.3 CONTAINS A THIRD-PARTY RELEASE**.  PURSUANT TO THE PLAN YOU ARE DEEMED TO HAVE CONSENTED TO THE RELEASES SET FORTH IN ARTICLE VIII.8.3 OF THE PLAN UNLESS YOU "OPT OUT" OF THE THIRD-PARTY RELEASE IN ACCORDANCE WITH THIS NOTICE.  THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

**IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE SOLICITATION AGENT.**

</div>

New York, New York
Dated: _____, 2017

*/s/* _____

Christopher Marcus, P.C.
John T. Weber
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
William A. Guerrieri (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors*
*and Debtors in Possession*

## **Exhibit 1**

**Election Form**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| 21st CENTURY ONCOLOGY HOLDINGS, INC., *et al.*,[1] | ) Case No. 17-22770 (RDD) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

## ELECTION FORM TO OPT OUT OF THIRD PARTY RELEASE

    **PLEASE TAKE NOTICE** that on October [●], 2017, the United States Bankruptcy
Court for the Southern District of New York (the "Court") entered an order [Docket No.[●]] (the
"Disclosure Statement Order"):  (a) authorizing 21st Century Oncology Holdings, Inc. and its
affiliated debtors and debtors in possession (collectively, the "Debtors") to solicit acceptances
for the *Joint Chapter 11 Plan of Reorganization of 21st Century Oncology Holdings, Inc. and its
Debtor Affiliates* (as may be modified, amended, or supplemented from time to time, the
"Plan");[2] and (b) approving, among other things, (i) the *Disclosure Statement for the Joint
Chapter 11 Plan of Reorganization of 21st Century Oncology Holdings, Inc. and its Debtor
Affiliates* (as may be modified, amended, or supplemented from time to time, the "Disclosure
Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy
Code; (ii) the solicitation materials and documents to be included in the solicitation packages;
(iii) the rights offering procedures and related materials; and (iv) the procedures for soliciting,
receiving, and tabulating votes on the Plan and for filing objections to the Plan.

    **PLEASE TAKE FURTHER NOTICE** that because of the nature and treatment of your
Claim or Interest under the Plan, *you are not entitled to vote on the Plan*.  Nevertheless, this
Election Form is being sent to you to provide you with information to determine whether to opt
out of the Plan's Third Party Release.

    **PLEASE TAKE FURTHER NOTICE** that the hearing at which the Court will consider
Confirmation of the Plan (the "Confirmation Hearing") will commence on **December 11, 2017,
at 10:00 a.m.**, prevailing Eastern Time, before the Honorable Robert D. Drain, in the United
States Bankruptcy Court for the Southern District of New York, located at 300 Quarropas Street,
Courtroom 248, White Plains, New York 10601-4140.

---

[1]    Each of the Debtors in the above-captioned jointly administered chapter 11 cases and their respective tax
    identification numbers are set forth in the *Order Directing Joint Administration of Chapter 11 Cases* [Docket
    No. 30].  The location of 21st Century Oncology Holdings, Inc.'s corporate headquarters and the Debtors'
    service address is: 2270 Colonial Boulevard, Fort Myers, Florida 33907.

[2]    Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

**PLEASE TAKE FURTHER NOTICE** that Article VIII.8.3 of the Plan provides for the following Third Party Release:

Notwithstanding anything contained in the Plan to the contrary, on the Confirmation Date and effective as of the Effective Date, and to the fullest extent permitted by applicable law, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all claims, interests, obligations, debts, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claim asserted on behalf of any Debtor and/or Reorganized Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Releasing Party would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, the Restructuring Transactions, the Chapter 11 Cases, the Rights Offerings, the Backstop Purchase Agreement, the Backstop Commitments, the Backstop Order, the Restructuring Support Agreement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Releasing Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, preparation, implementation or administration of the Plan, the Disclosure Statement, the Plan Supplement, the Rights Offering Procedures, the DIP Facility, the Exit Facilities, the DIP Documents, the Exit Facility Documents, the New Warrant Documents, the New Organizational Documents, or any other Restructuring Documents, any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes fraud, willful misconduct or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third Party Release is: (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good-faith settlement and compromise of the claims released by the Third-Party Release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Releasing Parties asserting any claim or cause of action released pursuant to the Third-Party Release.

\*    \*    \*

"*RELEASING PARTIES*" MEANS COLLECTIVELY, AND IN EACH CASE SOLELY IN ITS CAPACITY AS SUCH: (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) THE BACKSTOP PARTIES; (D) THE DIP LENDERS; (E) THE DIP AGENT; (F) THE CONSENTING MDL LENDERS; (G) THE MDL AGENT; (H) THE CONSENTING FIRST LIEN LENDERS; (I) THE FIRST LIEN AGENT; (J) THE CONSENTING NOTEHOLDERS; (K) THE INDENTURE TRUSTEE; (L) THE EQUITY PARTIES; (M) THE COMMITTEE; (N) THE MEMBERS OF THE COMMITTEE; (O) ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE PRESUMED TO ACCEPT THE PLAN AND DO NOT OPT OUT OF THE THIRD-PARTY RELEASE ON THEIR RESPECTIVE ELECTION FORMS; (P) ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE PRESUMED TO REJECT THE PLAN AND DO NOT OPT OUT OF THE THIRD-PARTY RELEASE ON THEIR RESPECTIVE ELECTION FORMS; (Q) ALL HOLDERS OF CLAIMS OR INTERESTS ENTITLED TO VOTE ON THE PLAN WHO EITHER (1) VOTE TO ACCEPT THE PLAN OR (2) RECEIVE A BALLOT BUT ABSTAIN FROM VOTING ON THE PLAN; (R) ALL HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLAN WHO VOTE TO REJECT THE PLAN BUT DO NOT ELECT ON THEIR BALLOT TO OPT-OUT OF THE THIRD-PARTY RELEASE; (S) ALL RIGHTS OFFERING PARTICIPANTS THAT PARTICIPATE IN THE RIGHTS OFFERINGS; (T) ALL OTHER HOLDERS OF CLAIMS AND INTERESTS TO THE FULLEST EXTENT PERMITTED BY LAW; AND (U) WITH RESPECT TO THE FOREGOING CLAUSES (A) THROUGH (T), EACH OF SUCH PERSON'S CURRENT AND FORMER AFFILIATES, PARTNERS, SUBSIDIARIES, OFFICERS, DIRECTORS, PRINCIPALS, EMPLOYEES, AGENTS, MANAGED FUNDS,

2

**ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, TOGETHER WITH THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, IN EACH CASE IN THEIR CAPACITY AS SUCH.**

## PLEASE COMPLETE ITEMS 1 AND 2 ONLY IF YOU WISH TO OPT-OUT OF THE THIRD PARTY RELEASE:

**Item 1.  Optional Release Election.**  If you do not consent to the Third Party Release, you may elect to opt-out and not grant such releases by checking the box below.  If you do not return this Election Form so that it is actually received by the Solicitation Agent (as defined below) on or before 5:00 p.m., prevailing Eastern Time, on November 20, 2017 (the "Election Deadline"), or you return this Election Form but do not check the box below, you will be bound by the Third Party Release.  Election to withhold consent is at your option

REGARDLESS OF WHETHER YOU ELECT TO OPT OUT OF THE PLAN'S RELEASE PROVISIONS, YOUR RECOVERY UNDER THE PLAN REMAINS UNAFFECTED.

The Holder of the Claim and/or Interest set forth in Item 2 elects to:



☐        **OPT-OUT OF THE THIRD PARTY RELEASE**.

You are strongly encouraged to review the Disclosure Statement and the Plan before you make an election.  You may wish to seek legal advice concerning the Plan and your treatment thereunder.  Should you wish to obtain a copy of either the Disclosure Statement or the Plan, you should contact Kurtzman Carson Consultants, LLC, the solicitation agent retained by the Debtors in the Chapter 11 Cases (the "Solicitation Agent"), by:  (a) calling the Debtors' restructuring hotline at (888) 251-2679 (US toll-free) and (310) 751-2609 (international toll); (b) visiting the Debtors' restructuring website at:  http://www.kccllc.net/21co; (c) writing to 21st Century Oncology Holdings, Inc., Ballot Processing Center, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245; and/or (d) emailing 21coInfo@kccllc.com.  You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER (the Court's Public Access to Court Electronic Records) at: https://ecf.nysb.uscourts.gov/.  A login identification and password to PACER are required to access this information and can be obtained through the PACER Service Center at http://www.pacer.psc.uscourts.gov.

3

**Item 2.  Acknowledgments.**  By signing this Election Form, the undersigned beneficial holder of the Claim or Interest identified in Item 1 above certifies that (i) it is the holder of the Claim or Interest identified in Item 1 above or (ii) it has full power and authority to act on behalf of the holder of the Claim or Interest identified in Item 1 above.

_____
Name

_____
Social Security or Federal Tax I.D. No. (optional)

_____
Signature

_____
If by Authorized Agent, Name and Title

_____
Name of Institution

_____
Street Address

_____
City, State, Zip Code

_____
Telephone Number

_____
Email Address

_____
Date Completed

---

**PLEASE COMPLETE, SIGN, AND DATE THIS ELECTION FORM AND RETURN THE ORIGINAL ELECTION FORM SO THAT IT IS *ACTUALLY RECEIVED* BY THE SOLICITATION AGENT ON OR BEFORE THE ELECTION DEADLINE AT THE FOLLOWING ADDRESS:**
**21st Century Oncology Holdings, Inc.**
**Ballot Processing Center**
**c/o Kurtzman Carson Consultants, LLC**
**2335 Alaska Avenue**
**El Segundo, CA 90245**

4

# INFORMATION AND INSTRUCTIONS FOR COMPLETING THE ELECTION FORM

1.      The Bankruptcy Court may confirm the Plan and thereby make its terms binding on you whether or not you are entitled to vote to accept or reject the Plan.  If you abstain from returning this Election Form or you do not check the box in Item 1, you will be bound by the Third Party Release.  To ensure that your election to opt-out of the Third Party Release is sufficient, you must:  (i) complete your Election Form by providing all the information requested in accordance with these instructions; (ii) clearly indicate your decision to opt-out of the releases contained in Section 8.3 of the Plan; (iii) review and complete Items l and 2 in accordance with the instructions therein; and (iv) clearly sign, date and return an original of your Election Form to the address set forth below.

2.      Please be sure to sign and date your Election Form.  If you are signing an Election Form in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if requested by the Solicitation Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of the holder of the relevant Claim or Interest.  In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Election Form.

3.      Your original signed Election Form must be returned by regular mail, overnight courier or hand delivery to the Solicitation Agent so as to be actually received by the Solicitation Agent on or before 5:00 p.m., Prevailing Eastern Time, on November 20, 2017 (the "Election Deadline") at the following address:

> **21st Century Oncology Holdings, Inc.**
> **Ballot Processing Center**
> **c/o Kurtzman Carson Consultants, LLC**
> **2335 Alaska Avenue**
> **El Segundo, CA 90245**

4.      ***If an Election Form is received after the Election Deadline, it will not qualify as an opt-out of the Third Party Release***.  Election Forms submitted by email, facsimile or other means of electronic submission will not be accepted.  **Election Forms should not be sent to the Debtors.**

5.      This Election Form does not constitute, and shall not be deemed to be, a Proof of Claim or Interest, an assertion of a Claim or Interest, an allowance of a Claim or Interest or an admission of the validity of a Claim or Interest.

6.      This Election Form is not a letter of transmittal and may not be used for any purpose other than to elect to opt-out of the Third Party Release.  Accordingly, at this time, holders of Claims or Interests should not surrender certificates or instruments representing or evidencing their Claims or Interests, if any, and neither the Debtors nor the Solicitation Agent will accept delivery of any such certificates or instruments surrendered together with an Election Form.

**PLEASE RETURN YOUR ELECTION FORM PROMPTLY.**

**IF YOU HAVE RECEIVED A DAMAGED ELECTION FORM OR HAVE LOST YOUR ELECTION FORM, OR IF YOU HAVE ANY QUESTIONS CONCERNING THE ELECTION FORM OR THE ELECTION PROCEDURES, PLEASE CONTACT THE SOLICITATION AGENT, KURTZMAN CARSON CONSULTANTS LLC, BY TELEPHONE AT (888) 251-2679 (US TOLL-FREE) AND (310) 751-2609 (INTERNATIONAL TOLL) OR VIA EMAIL AT 21coInfo@kccllc.com.**

**THE SOLICITATION AGENT WILL NOT ACCEPT ELECTION FORMS BY EMAIL OR FACSIMILE TRANSMISSION. ELECTION FORMS SHOULD NOT BE SENT TO THE DEBTORS OR ANY OF THEIR AGENTS OTHER THAN THE SOLICITATION AGENT.**

> **YOUR ELECTION FORM MUST BE <u>ACTUALLY RECEIVED</u> BY THE ELECTION DEADLINE, WHICH IS NOVEMBER 20, 2016 AT 5:00 P.M., PREVAILING EASTERN TIME, FOR YOUR ELECTION TO QUALIFY AS AN OPT-OUT OF THE THIRD PARTY RELEASE**

**PLEASE TAKE FURTHER NOTICE** that if you have any questions about the status of any of your Claims or Interests, you should contact the Solicitation Agent in accordance with the instructions provided above.

New York, New York  
Dated: _____, 2017

/s/ _____

Christopher Marcus, P.C.  
John T. Weber  
**KIRKLAND & ELLIS LLP**  
**KIRKLAND & ELLIS INTERNATIONAL LLP**  
601 Lexington Avenue  
New York, New York 10022  
Telephone:    (212) 446-4800  
Facsimile:    (212) 446-4900

- and -

James H.M. Sprayregen, P.C.  
William A. Guerrieri (admitted *pro hac vice*)  
Alexandra Schwarzman (admitted *pro hac vice*)  
**KIRKLAND & ELLIS LLP**  
**KIRKLAND & ELLIS INTERNATIONAL LLP**  
300 North LaSalle Street  
Chicago, Illinois 60654  
Telephone:    (312) 862-2000  
Facsimile:    (312) 862-2200

*Counsel to the Debtors*  
*and Debtors in Possession*

2

## **SCHEDULE 6**

## **Form of Notice to Disputed Claim Holders**

Christopher Marcus, P.C.
John T. Weber
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

James H.M. Sprayregen, P.C.
William A. Guerrieri (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| 21st CENTURY ONCOLOGY HOLDINGS, INC., *et al.*,[1] | ) | Case No. 17-22770 (RDD) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE OF NON-VOTING STATUS AND**
**ELECTION FORM WITH RESPECT TO DISPUTED CLAIMS**

**PLEASE TAKE NOTICE THAT** on October [●], 2017, the United States Bankruptcy Court for the Southern District of New York (the "Court") entered an order [Docket No.[●]] (the "Disclosure Statement Order"):  (a) authorizing 21st Century Oncology Holdings, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors") to solicit acceptances for the *Joint Chapter 11 Plan of Reorganization of 21st Century Oncology Holdings, Inc. and its Debtor Affiliates* (as may be modified, amended, or supplemented from time to time, the "Plan");[2] and (b) approving, among other things, (i) the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of 21st Century Oncology Holdings, Inc. and its Debtor Affiliates* (as may be modified, amended, or supplemented from time to time, the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (ii) the solicitation materials and documents to be included in the solicitation packages; (iii) the rights offering procedures and related materials; and (iv) the procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

---

[1]    Each of the Debtors in the above-captioned jointly administered chapter 11 cases and their respective tax identification numbers are set forth in the *Order Directing Joint Administration of Chapter 11 Cases* [Docket No. 30].  The location of 21st Century Oncology Holdings, Inc.'s corporate headquarters and the Debtors' service address is: 2270 Colonial Boulevard, Fort Myers, Florida 33907.

[2]    Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact Kurtzman Carson Consultants, LLC, the solicitation agent retained by the Debtors in the Chapter 11 Cases (the "Solicitation Agent"), by: (a) calling the Debtors' restructuring hotline at (888) 251-2679 (US toll-free) and (310) 751-2609 (international toll); (b) visiting the Debtors' restructuring website at: http://www.kccllc.net/21co; (c) writing to 21st Century Oncology Holdings, Inc., Ballot Processing Center, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245; and/or (d) emailing 21coInfo@kccllc.com. You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER (the Court's Public Access to Court Electronic Records) at: https://ecf.nysb.uscourts.gov/. A login identification and password to PACER are required to access this information and can be obtained through the PACER Service Center at http://www.pacer.psc.uscourts.gov.

**PLEASE TAKE FURTHER NOTICE THAT** you are receiving this notice because you are the holder of a Claim or Interest that is subject to a pending objection by the Debtors. **You are not entitled to vote any disputed portion of your Claim on the Plan unless one or more of the following events have taken place before November 18, 2017 (the date that is two business days before the Voting Deadline)** (each, a "Resolution Event"):

1. an order of the Court is entered allowing such Claim or Interest pursuant to section 502(b) of the Bankruptcy Code, after notice and a hearing;

2. an order of the Court is entered temporarily allowing such Claim or Interest for voting purposes only pursuant to Bankruptcy Rule 3018(a), after notice and a hearing;

3. a stipulation or other agreement is executed between the holder of such Claim or Interest and the Debtors temporarily allowing the holder of such Claim or Interest to vote its Claim or Interest in an agreed upon amount; or

4. the pending objection to such Claim or Interest is voluntarily withdrawn by the objecting party.

**PLEASE TAKE FURTHER NOTICE THAT** pursuant to the Plan, ***you are deemed to have consented to the Third-Party Release set forth in Article VIII.8.3 of the Plan unless you "opt out" of such Third-Party Release*** by duly executing and properly completing a copy of the Election Form, attached hereto as **Exhibit 1**, to the Solicitation Agent (as defined below) so that it is ***actually received*** by the Solicitation Agent on or before **November 20, 2017, at 5:00 p.m.**, prevailing Eastern Time.

**PLEASE TAKE FURTHER NOTICE THAT** if a Resolution Event occurs, then no later than two business days thereafter, the Solicitation Agent shall distribute a Solicitation Package and a pre-addressed, postage pre-paid envelope to you (to the extent such Solicitation Package was not already distributed to you), and you must return your Ballot to the Solicitation Agent in accordance with the instructions set forth in the Solicitation Package no later than the Voting Deadline, which is on **November 20, 2017, at 5:00 p.m.**, prevailing Eastern Time.

3

**PLEASE TAKE FURTHER NOTICE THAT** if you have any questions about the status of any of your Claims, you should contact the Solicitation Agent in accordance with the instructions provided above.

---

ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE VIII.8.3 CONTAINS A THIRD-PARTY RELEASE**. PURSUANT TO THE PLAN YOU ARE DEEMED TO HAVE CONSENTED TO THE RELEASES SET FORTH IN ARTICLE VIII.8.3 OF THE PLAN UNLESS YOU "OPT OUT" OF THE THIRD-PARTY RELEASE IN ACCORDANCE WITH THIS NOTICE. THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

**IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE SOLICITATION AGENT.**

---

New York, New York
Dated: _____, 2017

*/s/*_____

Christopher Marcus, P.C.
John T. Weber
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
William A. Guerrieri (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors*
*and Debtors in Possession*

**<u>Exhibit 1</u>**

**Election Form**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| 21st CENTURY ONCOLOGY HOLDINGS, INC., *et al.*,[1] | ) Case No. 17-22770 (RDD) |
|  | ) |
| Debtors. | ) (Jointly Administered) |
|  | ) |

<div align="center">

**ELECTION FORM TO OPT OUT OF THIRD PARTY RELEASE**

</div>

    **PLEASE TAKE NOTICE** that on October [●], 2017, the United States Bankruptcy Court for the Southern District of New York (the "Court") entered an order [Docket No.[●]] (the "Disclosure Statement Order"): (a) authorizing 21st Century Oncology Holdings, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors") to solicit acceptances for the *Joint Chapter 11 Plan of Reorganization of 21st Century Oncology Holdings, Inc. and its Debtor Affiliates* (as may be modified, amended, or supplemented from time to time, the "Plan");[2] and (b) approving, among other things, (i) the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of 21st Century Oncology Holdings, Inc. and its Debtor Affiliates* (as may be modified, amended, or supplemented from time to time, the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (ii) the solicitation materials and documents to be included in the solicitation packages; (iii) the rights offering procedures and related materials; and (iv) the procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

    **PLEASE TAKE FURTHER NOTICE** that because of the nature and treatment of your Claim or Interest under the Plan, *you are not entitled to vote on the Plan*. Nevertheless, this Election Form is being sent to you to provide you with information to determine whether to opt out of the Plan's Third Party Release.

    **PLEASE TAKE FURTHER NOTICE** that the hearing at which the Court will consider Confirmation of the Plan (the "Confirmation Hearing") will commence on **December 11, 2017, at 10:00 a.m.**, prevailing Eastern Time, before the Honorable Robert D. Drain, in the United States Bankruptcy Court for the Southern District of New York, located at 300 Quarropas Street, Courtroom 248, White Plains, New York 10601-4140.

---

[1]  Each of the Debtors in the above-captioned jointly administered chapter 11 cases and their respective tax identification numbers are set forth in the *Order Directing Joint Administration of Chapter 11 Cases* [Docket No. 30]. The location of 21st Century Oncology Holdings, Inc.'s corporate headquarters and the Debtors' service address is: 2270 Colonial Boulevard, Fort Myers, Florida 33907.

[2]  Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

**PLEASE TAKE FURTHER NOTICE** that Article VIII.8.3 of the Plan provides for the following Third Party Release:

Notwithstanding anything contained in the Plan to the contrary, on the Confirmation Date and effective as of the Effective Date, and to the fullest extent permitted by applicable law, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all claims, interests, obligations, debts, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claim asserted on behalf of any Debtor and/or Reorganized Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Releasing Party would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, the Restructuring Transactions, the Chapter 11 Cases, the Rights Offerings, the Backstop Purchase Agreement, the Backstop Commitments, the Backstop Order, the Restructuring Support Agreement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Releasing Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, preparation, implementation or administration of the Plan, the Disclosure Statement, the Plan Supplement, the Rights Offering Procedures, the DIP Facility, the Exit Facilities, the DIP Documents, the Exit Facility Documents, the New Warrant Documents, the New Organizational Documents, or any other Restructuring Documents, any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes fraud, willful misconduct or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third Party Release is:  (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good-faith settlement and compromise of the claims released by the Third-Party Release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Releasing Parties asserting any claim or cause of action released pursuant to the Third-Party Release.

\*     \*     \*

"*RELEASING PARTIES*" MEANS COLLECTIVELY, AND IN EACH CASE SOLELY IN ITS CAPACITY AS SUCH: (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) THE BACKSTOP PARTIES; (D) THE DIP LENDERS; (E) THE DIP AGENT; (F) THE CONSENTING MDL LENDERS; (G) THE MDL AGENT; (H) THE CONSENTING FIRST LIEN LENDERS; (I) THE FIRST LIEN AGENT; (J) THE CONSENTING NOTEHOLDERS; (K) THE INDENTURE TRUSTEE; (L) THE EQUITY PARTIES; (M) THE COMMITTEE; (N) THE MEMBERS OF THE COMMITTEE; (O) ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE PRESUMED TO ACCEPT THE PLAN AND DO NOT OPT OUT OF THE THIRD-PARTY RELEASE ON THEIR RESPECTIVE ELECTION FORMS; (P) ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE PRESUMED TO REJECT THE PLAN AND DO NOT OPT OUT OF THE THIRD-PARTY RELEASE ON THEIR RESPECTIVE ELECTION FORMS; (Q) ALL HOLDERS OF CLAIMS OR INTERESTS ENTITLED TO VOTE ON THE PLAN WHO EITHER (1) VOTE TO ACCEPT THE PLAN OR (2) RECEIVE A BALLOT BUT ABSTAIN FROM VOTING ON THE PLAN; (R) ALL HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLAN WHO VOTE TO REJECT THE PLAN BUT DO NOT ELECT ON THEIR BALLOT TO OPT-OUT OF THE THIRD-PARTY RELEASE; (S) ALL RIGHTS OFFERING PARTICIPANTS THAT PARTICIPATE IN THE RIGHTS OFFERINGS; (T) ALL OTHER HOLDERS OF CLAIMS AND INTERESTS TO THE FULLEST EXTENT PERMITTED BY LAW; AND (U) WITH RESPECT TO THE FOREGOING CLAUSES (A) THROUGH (T), EACH OF SUCH PERSON'S CURRENT AND FORMER AFFILIATES, PARTNERS, SUBSIDIARIES, OFFICERS, DIRECTORS, PRINCIPALS, EMPLOYEES, AGENTS, MANAGED FUNDS,

2

**ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, TOGETHER WITH THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, IN EACH CASE IN THEIR CAPACITY AS SUCH.**

**PLEASE COMPLETE ITEMS 1 AND 2 ONLY IF YOU WISH TO OPT-OUT OF THE THIRD PARTY RELEASE:**

**Item 1.  Optional Release Election.**  If you do not consent to the Third Party Release, you may elect to opt-out and not grant such releases by checking the box below.  If you do not return this Election Form so that it is actually received by the Solicitation Agent (as defined below) on or before 5:00 p.m., prevailing Eastern Time, on November 20, 2017 (the "Election Deadline"), or you return this Election Form but do not check the box below, you will be bound by the Third Party Release.  Election to withhold consent is at your option.

REGARDLESS OF WHETHER YOU ELECT TO OPT OUT OF THE PLAN'S RELEASE PROVISIONS, YOUR RECOVERY UNDER THE PLAN REMAINS UNAFFECTED.

The Holder of the Claim and/or Interest set forth in Item 2 elects to:

 **OPT-OUT OF THE THIRD PARTY RELEASE**.

You are strongly encouraged to review the Disclosure Statement and the Plan before you make an election.  You may wish to seek legal advice concerning the Plan and your treatment thereunder.  Should you wish to obtain a copy of either the Disclosure Statement or the Plan, you should contact Kurtzman Carson Consultants, LLC, the solicitation agent retained by the Debtors in the Chapter 11 Cases (the "Solicitation Agent"), by:  (a) calling the Debtors' restructuring hotline at (888) 251-2679 (US toll-free) and (310) 751-2609 (international toll); (b) visiting the Debtors' restructuring website at:  http://www.kccllc.net/21co; (c) writing to 21st Century Oncology Holdings, Inc., Ballot Processing Center, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245; and/or (d) emailing 21coInfo@kccllc.com.  You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER (the Court's Public Access to Court Electronic Records) at: https://ecf.nysb.uscourts.gov/.  A login identification and password to PACER are required to access this information and can be obtained through the PACER Service Center at http://www.pacer.psc.uscourts.gov.

**Item 2.  Acknowledgments.**  By signing this Election Form, the undersigned beneficial holder of the Claim or Interest identified in Item 1 above certifies that (i) it is the holder of the Claim or Interest identified in Item 1 above or (ii) it has full power and authority to act on behalf of the holder of the Claim or Interest identified in Item 1 above.

<div style="text-align:center">

_____

Name

_____

Social Security or Federal Tax I.D. No. (optional)

_____

Signature

_____

If by Authorized Agent, Name and Title

_____

Name of Institution

_____

Street Address

_____

City, State, Zip Code

_____

Telephone Number

_____

Email Address

_____

Date Completed

</div>

---

**PLEASE COMPLETE, SIGN, AND DATE THIS ELECTION FORM AND RETURN THE ORIGINAL ELECTION FORM SO THAT IT IS *ACTUALLY RECEIVED* BY THE SOLICITATION AGENT ON OR BEFORE THE ELECTION DEADLINE AT THE FOLLOWING ADDRESS:**
**21st Century Oncology Holdings, Inc.**
**Ballot Processing Center**
**c/o Kurtzman Carson Consultants, LLC**
**2335 Alaska Avenue**
**El Segundo, CA 90245**

## INFORMATION AND INSTRUCTIONS FOR COMPLETING THE ELECTION FORM

1.      The Bankruptcy Court may confirm the Plan and thereby make its terms binding on you whether or not you are entitled to vote to accept or reject the Plan.  If you abstain from returning this Election Form or you do not check the box in Item 1, you will be bound by the Third Party Release.  To ensure that your election to opt-out of the Third Party Release is sufficient, you must:  (i) complete your Election Form by providing all the information requested in accordance with these instructions; (ii) clearly indicate your decision to opt-out of the releases contained in Section 8.3 of the Plan; (iii) review and complete Items l and 2 in accordance with the instructions therein; and (iv) clearly sign, date and return an original of your Election Form to the address set forth below.

2.      Please be sure to sign and date your Election Form.  If you are signing an Election Form in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if requested by the Solicitation Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of the holder of the relevant Claim or Interest.  In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Election Form.

3.      Your original signed Election Form must be returned by regular mail, overnight courier or hand delivery to the Solicitation Agent so as to be actually received by the Solicitation Agent on or before 5:00 p.m., Prevailing Eastern Time, on November 20, 2017 (the "Election Deadline") at the following address:

> **21st Century Oncology Holdings, Inc.**
> **Ballot Processing Center**
> **c/o Kurtzman Carson Consultants, LLC**
> **2335 Alaska Avenue**
> **El Segundo, CA 90245**

4.      *If an Election Form is received after the Election Deadline, it will not qualify as an opt-out of the Third Party Release*.  Election Forms submitted by email, facsimile or other means of electronic submission will not be accepted. **Election Forms should not be sent to the Debtors.**

5.      This Election Form does not constitute, and shall not be deemed to be, a Proof of Claim or Interest, an assertion of a Claim or Interest, an allowance of a Claim or Interest or an admission of the validity of a Claim or Interest.

6.      This Election Form is not a letter of transmittal and may not be used for any purpose other than to elect to opt-out of the Third Party Release.  Accordingly, at this time, holders of Claims or Interests should not surrender certificates or instruments representing or evidencing their Claims or Interests, if any, and neither the Debtors nor the Solicitation Agent will accept delivery of any such certificates or instruments surrendered together with an Election Form.

### PLEASE RETURN YOUR ELECTION FORM PROMPTLY.

**IF YOU HAVE RECEIVED A DAMAGED ELECTION FORM OR HAVE LOST YOUR ELECTION FORM, OR IF YOU HAVE ANY QUESTIONS CONCERNING THE ELECTION FORM OR THE ELECTION PROCEDURES, PLEASE CONTACT THE SOLICITATION AGENT, KURTZMAN CARSON CONSULTANTS LLC, BY TELEPHONE AT (888) 251-2679 (US TOLL-FREE) AND (310) 751-2609 (INTERNATIONAL TOLL) OR VIA EMAIL AT 21coInfo@kccllc.com.**

THE SOLICITATION AGENT WILL NOT ACCEPT ELECTION FORMS BY EMAIL OR FACSIMILE TRANSMISSION. ELECTION FORMS SHOULD NOT BE SENT TO THE DEBTORS OR ANY OF THEIR AGENTS OTHER THAN THE SOLICITATION AGENT.

> **YOUR ELECTION FORM MUST BE <u>ACTUALLY RECEIVED</u> BY THE ELECTION DEADLINE, WHICH IS NOVEMBER 20, 2016 AT 5:00 P.M., PREVAILING EASTERN TIME, FOR YOUR ELECTION TO QUALIFY AS AN OPT-OUT OF THE THIRD PARTY RELEASE**

**PLEASE TAKE FURTHER NOTICE** that if you have any questions about the status of any of your Claims or Interests, you should contact the Solicitation Agent in accordance with the instructions provided above.

New York, New York  
Dated: _____, 2017

/s/ _____

Christopher Marcus, P.C.  
John T. Weber  
**KIRKLAND & ELLIS LLP**  
**KIRKLAND & ELLIS INTERNATIONAL LLP**  
601 Lexington Avenue  
New York, New York 10022  
Telephone:    (212) 446-4800  
Facsimile:     (212) 446-4900

- and -

James H.M. Sprayregen, P.C.  
William A. Guerrieri (admitted *pro hac vice*)  
Alexandra Schwarzman (admitted *pro hac vice*)  
**KIRKLAND & ELLIS LLP**  
**KIRKLAND & ELLIS INTERNATIONAL LLP**  
300 North LaSalle Street  
Chicago, Illinois 60654  
Telephone:    (312) 862-2000  
Facsimile:     (312) 862-2200

*Counsel to the Debtors*  
*and Debtors in Possession*

2

## **SCHEDULE 7**

### **Form of Cover Letter**



[DATE]

<u>Via First Class Mail</u>

<u>RE</u>:    **21st Century Oncology Holdings, Inc., *et al.*,**
        **Chapter 11 Case No. 17-22770 (RDD) (Bankr. S.D.N.Y.) (Jointly Administered)**

TO ALL HOLDERS OF CLAIMS OR INTERESTS ENTITLED TO VOTE ON THE PLAN:

21st Century Oncology Holdings, Inc. and its affiliated debtors and debtors in possession (collectively, the "<u>Debtors</u>")[1] each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (the "<u>Court</u>") on May 25, 2017.

You have received this letter and the enclosed materials because you are entitled to vote on the *Joint Chapter 11 Plan of Reorganization of 21st Century Oncology Holdings, Inc. and its Debtor Affiliates* (as may be modified, amended, or supplemented from time to time, the "<u>Plan</u>").[2]  On October [•], 2017, the Court entered an order (the "<u>Disclosure Statement Order</u>"): (a) authorizing the Debtors to solicit acceptances for the Plan and (b) approving, among other things, (i) the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of 21st Century Oncology Holdings, Inc. and its Debtor Affiliates* (as may be modified, amended, or supplemented from time to time, the "<u>Disclosure Statement</u>") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (ii) the solicitation materials and documents to be included in the solicitation packages (the "<u>Solicitation Packages</u>"); (iii) the rights offering procedures and related materials; and (iv) the procedures for soliciting, receiving, and tabulating votes on the Plan, and for filing objections to the Plan.

> YOU ARE RECEIVING THIS LETTER BECAUSE YOU ARE ENTITLED TO VOTE ON THE PLAN.  THEREFORE, YOU SHOULD READ THIS LETTER CAREFULLY AND DISCUSS IT WITH YOUR ATTORNEY.  IF YOU DO NOT HAVE AN ATTORNEY, YOU MAY WISH TO CONSULT ONE.

---

[1]    Each of the Debtors in the above-captioned jointly administered chapter 11 cases and their respective tax identification numbers are set forth in the *Order Directing Joint Administration of Chapter 11 Cases* [Docket No. 30].  The location of 21st Century Oncology Holdings, Inc.'s corporate headquarters and the Debtors' service address is: 2270 Colonial Boulevard, Fort Myers, Florida 33907.

[2]    Capitalized terms used but not otherwise defined herein have the meanings as set forth in the Plan.

In addition to this cover letter, the enclosed materials comprise your Solicitation Package, and were approved by the Court for distribution to holders of Claims or Interests in connection with the solicitation of votes to accept the Plan. The Solicitation Package consists of the following:

   a.   a copy of the Solicitation and Voting Procedures;

   b.   a Ballot, together with detailed voting instructions and a pre-addressed, postage prepaid return envelope;

   c.   this letter;

   d.   a letter from the official committee of unsecured creditors appointed in these chapter 11 cases supporting confirmation of the Plan;

   e.   the Disclosure Statement, as approved by the Bankruptcy Court (and the exhibits thereto, including the Plan);

   f.   the Disclosure Statement Order (excluding the exhibits thereto, except for the Solicitation and Voting Procedures);

   g.   the notice of the hearing to consider confirmation of the Plan; and

   h.   any other materials as directed by the Court.

21st Century Oncology Holdings, Inc. (on behalf of itself and each of the other Debtors) has approved the filing of the Plan and the solicitation of votes to accept the Plan. The Debtors believe that the acceptance of the Plan is in the best interests of their estates, holders of Claims or Interests, and all other parties in interest. Moreover, the Debtors believe that any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses, which, in turn, likely would result in smaller distributions (or no distributions) on account of Claims or Interests asserted in the Chapter 11 Cases.

> **THE DEBTORS STRONGLY URGE YOU TO PROPERLY AND TIMELY SUBMIT YOUR BALLOT CASTING A VOTE TO ACCEPT THE PLAN IN ACCORDANCE WITH THE INSTRUCTIONS INDICATED ON YOUR BALLOT.**
>
> **IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE COMPLETED, EXECUTED AND RETURNED SO AS TO BE *ACTUALLY RECEIVED* BY THE SOLICITATION AGENT ON OR BEFORE 5:00 P.M. PREVAILING EASTERN TIME ON MONDAY, NOVEMBER 20, 2017.**

If you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact Kurtzman Carson Consultants, LLC, the solicitation agent retained by the Debtors in the Chapter 11 Cases (the "Solicitation Agent"), by: (a) calling the Debtors' restructuring hotline at (888) 251-2679 (US toll-free) and (310) 751-2609 (international toll); (b) visiting the Debtors' restructuring website at: http://www.kccllc.net/21co; (c) writing to 21st Century Oncology Holdings, Inc., Ballot

2

Processing Center, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245; and/or (d) emailing 21coInfo@kccllc.com.  You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER (the Court's Public Access to Court Electronic Records) at: https://ecf.nysb.uscourts.gov/.   A login identification and password to PACER are required to access this information and can be obtained through the PACER Service Center at http://www.pacer.psc.uscourts.gov.  Please be advised that the Solicitation Agent is authorized to answer questions about, and provide additional copies of, the solicitation materials, but may *not* advise you as to whether you should vote to accept or reject the Plan.

Sincerely,

_____

21st Century Oncology Holdings, Inc. on its own behalf and for each of the Debtors

## **SCHEDULE 8**

## **Form Committee Letter**

TO:      HOLDERS OF NOTE CLAIMS AND GENERAL UNSECURED CLAIMS
AGAINST 21ST CENTURY ONCOLOGY HOLDINGS, INC., *ET AL.*
(Holders of Claims in Classes 5 and 6)

FROM:   THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF 21ST
CENTURY ONCOLOGY HOLDINGS, INC., *ET AL.*
        c/o Morrison & Foerster LLP
        250 West 55th Street
        New York, New York 10019

We are writing to you on behalf of the Official Committee (the "Committee") of Unsecured Creditors of 21st Century Oncology Holdings, Inc., *et al.* (collectively, the "Debtors") in connection with the solicitation of your vote as the holders of Claims in Classes 5 and 6 as identified and described in the enclosed Disclosure Statement accompanying the *Joint Plan of Reorganization of 21st Century Oncology Holdings, Inc. and its Debtor Affiliates* (the "Plan"). All capitalized terms not defined in this letter are as defined in the Plan.

**FOR THE REASONS SET FORTH BELOW, THE COMMITTEE RECOMMENDS THAT YOU VOTE TO ACCEPT THE PLAN AND RETURN YOUR BALLOT INDICATING YOUR ACCEPTANCE IN ACCORDANCE WITH THE VOTING INSTRUCTIONS SET FORTH ON THE BALLOT. ALL BALLOTS MUST BE RECEIVED BY NOVEMBER 20, 2017 AT 5:00 P.M. (EASTERN TIME) TO BE COUNTED.[1] YOU SHOULD CAREFULLY READ ALL MATERIALS THAT ACCOMPANY THIS LETTER, INCLUDING THE INSTRUCTIONS FOR COMPLETING AND MAILING YOUR BALLOT. THIS LETTER IS NOT INTENDED AS LEGAL ADVICE AS TO ANY SPECIFIC CLAIM OR THE TREATMENT OF SUCH CLAIM.**

On May 25, 2017 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Since the Petition Date, the Debtors have been managing their assets and operating their businesses as debtors in possession. The Committee has vigorously advocated for meaningful recoveries for unsecured creditors of the Debtors by participating in all significant matters during these chapter 11 cases. Among other things, the Committee conducted an extensive investigation of the liens and security interests securing the Debtors' secured indebtedness, engaged in constructive dialogue with the Debtors and other creditor constituencies regarding the optimal path forward for a successful conclusion of these chapter 11 cases, and pursued amendments to the Plan that would provide unsecured creditors with improved recoveries.

On the Petition Date, the Debtors and certain holders of their prepetition indebtedness executed a Restructuring Support Agreement (the "RSA"), outlining the terms of a proposed consensual restructuring whereby certain creditors would be offered the right to purchase new

---

[1]   Solely with respect to holders of Claims in Class 6 that are Governmental Units that submit timely Proofs of Claim on or before to the Governmental Bar Date, the Voting Deadline for purposes of submitting the Class 6 Ballot shall be November 27, 2017, at 5:00 p.m., prevailing Eastern Time.

debt and equity securities to be issued by the Reorganized Debtors (the "Rights Offerings"). Following the Petition Date, the Debtors sought approval of an agreement (the "Backstop Agreement") with certain holders of the Debtors' senior unsecured notes (the "Backstop Parties"), pursuant to which the Backstop Parties agreed to purchase their *pro rata* share of any unsubscribed securities not sold pursuant to the Rights Offerings. On July 14, 2017, with the support of the Backstop Parties, the Debtors filed a Plan that was consistent with the proposed restructuring described in the RSA. Upon a thorough analysis of the Backstop Agreement, the RSA, and the Plan, the Committee concluded that it could not support the Plan unless modifications were made to ensure fair treatment for holders of General Unsecured Claims that are not party to the RSA. After several weeks of arm's-length, good faith negotiations with the Debtors and Backstop Parties, the Committee executed a settlement agreement [Docket No. 425] (the "Committee Settlement") and agreed to the restructuring transaction detailed in the Disclosure Statement and embodied in the Plan. The Plan incorporates and implements the Committee Settlement—described on pages [__] of the Disclosure Statement—and effectuates a global compromise of numerous disputed issues among the Debtors, the Backstop Parties, and the Committee. Importantly, and as described in greater detail in the Plan, creditors holding Class 6 claims may now elect to either: (a) receive their *pro rata* share of a $2.6 million Convenience Claim Distribution in cash or (b) receive their *pro rata* share of new common stock of the Reorganized Debtors (to be shared on a *pro rata* basis with holders of Allowed Note Claims). In addition, unsecured creditors that are Accredited Investors that do not receive the Convenience Claim Distribution may also participate *pro rata* in the Rights Offerings. **Based on the enhanced recoveries for unsecured creditors provided by the Plan, the Committee, which represents the interests of all unsecured creditors of the Debtors, supports the Plan and believes the Plan provides the best possible recovery under the circumstances**.

The treatment and anticipated recoveries for holders of General Unsecured Claims is set forth in detail on pages [___] of the Disclosure Statement. **THE COMMITTEE ENCOURAGES YOU TO READ THE DISCLOSURE STATEMENT FOR A MORE DETAILED SUMMARY OF THE TREATMENT OF ALLOWED CLAIMS AND MECHANICS FOR DISTRIBUTIONS TO UNSECURED CREDITORS.**

For the purpose of voting on the Plan, the Debtors have provided you with a ballot, which should be completed by you for either accepting or rejecting the Plan and mailed in accordance with the procedures set forth on the ballot and in the Disclosure Statement. Your completed ballots must be received by the Notice and Claims Agent by November 20, 2017 at 5:00 p.m. (Eastern Time).[2]

**THE COMMITTEE ENDORSES THE PLAN AND RECOMMENDS THAT ALL HOLDERS OF GENERAL UNSECURED CLAIMS VOTE TO ACCEPT THE PLAN.** NOTWITHSTANDING THE COMMITTEE'S RECOMMENDATION, EACH CREDITOR (INCLUDING INDIVIDUAL COMMITTEE MEMBERS) MUST MAKE ITS OWN

---

[2]     Solely with respect to holders of Claims in Class 6 that are Governmental Units that submit timely Proofs of Claim on or before to the Governmental Bar Date, the Voting Deadline for purposes of submitting the Class 6 Ballot shall be November 27, 2017, at 5:00 p.m., prevailing Eastern Time.

INDEPENDENT DETERMINATION AS TO WHETHER THE PLAN IS ACCEPTABLE TO IT AND SHOULD CONSULT ITS OWN LEGAL AND/OR FINANCIAL ADVISOR(S) IN MAKING SUCH DETERMINATION.

THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF
21ST CENTURY ONCOLOGY
HOLDINGS, INC., *ET AL.*

## **SCHEDULE 9**

## **Form of Confirmation Hearing Notice**

Christopher Marcus, P.C.
John T. Weber
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

James H.M. Sprayregen, P.C.
William A. Guerrieri (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| 21st CENTURY ONCOLOGY HOLDINGS, INC., *et al.*,[1] | ) | Case No. 17-22770 (RDD) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE OF HEARING TO CONSIDER**
**CONFIRMATION OF THE CHAPTER 11 PLAN FILED BY THE**
**DEBTORS AND RELATED VOTING AND OBJECTION DEADLINES**

      **PLEASE TAKE NOTICE THAT** on October [●], 2017, the United States Bankruptcy Court for the Southern District of New York (the "<u>Court</u>") entered an order [Docket No.[●]] (the "<u>Disclosure Statement Order</u>"):  (a) authorizing 21st Century Oncology Holdings, Inc. and its affiliated debtors and debtors in possession (collectively, the "<u>Debtors</u>") to solicit acceptances for the *Joint Chapter 11 Plan of Reorganization of 21st Century Oncology Holdings, Inc. and its Debtor Affiliates*  (as may be modified, amended, or supplemented from time to time, the "<u>Plan</u>");[2] and (b) approving, among other things, (i) the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of 21st Century Oncology Holdings, Inc. and its Debtor Affiliates*  (as may be modified, amended, or supplemented from time to time, the "<u>Disclosure Statement</u>") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (ii) the solicitation materials and documents to be included in the solicitation packages (the "<u>Solicitation Packages</u>"); (iii) the rights offering procedures and related materials; and (iv) the procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

---

[1]    Each of the Debtors in the above-captioned jointly administered chapter 11 cases and their respective tax identification numbers are set forth in the *Order Directing Joint Administration of Chapter 11 Cases* [Docket No. 30]. The location of 21st Century Oncology Holdings, Inc.'s corporate headquarters and the Debtors' service address is: 2270 Colonial Boulevard, Fort Myers, Florida 33907.

[2]    Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider Confirmation of the Plan (the "Confirmation Hearing") will commence on **December 11, 2017, at 10:00 a.m.,** prevailing Eastern Time, before the Honorable Robert D. Drain, in the United States Bankruptcy Court for the Southern District of New York, located at 300 Quarropas Street, Courtroom 248, White Plains, New York 10601-4140.

> **PLEASE BE ADVISED**: THE CONFIRMATION HEARING MAY BE CONTINUED FROM TIME TO TIME BY THE COURT OR THE DEBTORS **WITHOUT FURTHER NOTICE** OTHER THAN BY SUCH ADJOURNMENT BEING ANNOUNCED IN OPEN COURT OR BY A NOTICE OF ADJOURNMENT FILED WITH THE COURT AND SERVED ON ALL PARTIES ENTITLED TO NOTICE.

## CRITICAL INFORMATION REGARDING VOTING ON THE PLAN

**Voting Record Date**. The voting record date is **October 16, 2017** (the "Voting Record Date"), which is the date for determining which holders of Claims or Interests in Classes 3, 4, 5, 6, and 11 are entitled to vote on the Plan. Holders of Claims or Interests in Classes 1, 2, 7, 8, 9, 10 and 12 are either presumed to accept or reject the Plan or are otherwise not entitled to vote on the Plan.

**Voting Deadline**. The deadline for voting on the Plan is on **Monday, November 20, 2017, at 5:00 p.m.,** prevailing Eastern Time (the "Voting Deadline").[3] If you received a Solicitation Package, including a ballot, and intend to vote on the Plan you *must*: (a) follow the voting instructions carefully; (b) complete *all* of the required information on the ballot; and (c) execute and return your completed ballot according to and as set forth in detail in the voting instructions so that it is *actually received* by the Debtors' solicitation agent, Kurtzman Carson Consultants LLC (the "Solicitation Agent") on or before the Voting Deadline. *A failure to follow such instructions may disqualify your vote*.

## CRITICAL INFORMATION REGARDING OBJECTING TO THE PLAN

> ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE VIII.8.3 CONTAINS A THIRD-PARTY RELEASE**, WHICH PROVISIONS ARE ALSO SET FORTH ON ANNEX 1 HERETO. THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THESE PROVISIONS CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED UNDER THE PLAN.

**Plan Objection Deadline**. The deadline for filing objections to the Plan is **November 27, 2017, at 4:00 p.m.,** prevailing Eastern Time (the "Plan Objection Deadline"). All objections to the relief sought at the Confirmation Hearing *must*: (a) be in writing;

---

[3]    Solely with respect to holders of Claims in Class 6 that are Governmental Units that submit timely Proofs of Claim on or before to the Governmental Bar Date, the Voting Deadline for purposes of submitting the Class 6 Ballot shall be November 27, 2017, at 5:00 p.m., prevailing Eastern Time.

(b) conform to the Bankruptcy Rules, the Local Bankruptcy Rules, and any orders of the Court; (c) state, with particularity, the legal and factual basis for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; ***and*** (d) be filed with the Court (contemporaneously with a proof of service) and served upon the following parties so as to be ***actually received*** on or before the Plan Objection Deadline:

| *Counsel to the Debtors* | |
|---|---|
| Christopher Marcus, P.C.<br>John T. Weber<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone:        (212) 446-4800<br>Facsimile:        (212) 446-4900 | James H.M. Sprayregen, P.C.<br>William A. Guerrieri (admitted *pro hac vice*)<br>Alexandra Schwarzman (admitted *pro hac vice*)<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Telephone:        (312) 862-2000<br>Facsimile:        (312) 862-2200 |

| *U.S. Trustee* |
|---|
| Paul Schwartzberg<br>Susan Golden<br>Office of the United States Trustee<br>for the Southern District of New York<br>U.S. Federal Office Building, 201 Varick Street, Suite 1006<br>New York, New York 10014 |

| *Counsel to the Official Committee of Unsecured Creditors Appointed in These Chapter 11 Cases* |
|---|
| Lorenzo Marinuzzi<br>Jonathan Levine<br>Morrison & Foerster LLP<br>250 West 55th Street<br>New York, New York 10019 |

| *Counsel to Certain Backstop Parties and the Ad Hoc Committee of Crossover Lenders and Noteholders* |
|---|
| Jayme Goldstein<br>Samantha Martin<br>Odelia Lee<br>Stroock & Stroock & Lavan LLP<br>180 Maiden Lane<br>New York, New York 10038 |

| *Counsel to the Ad Hoc Committee of Lenders Under the Debtors' Prepetition Secured Credit Facility* |
|---|
| Evan Fleck<br>Matthew Brod<br>Milbank, Tweed, Hadley & McCloy LLP<br>28 Liberty Street<br>New York, New York 10005 |
| *Counsel to the MDL Agent* |
| Seth H. Lieberman<br>Patrick Sibley<br>Matthew W. Silverman<br>Pryor Cashman LLP<br>7 Times Square<br>New York, New York 10036 |
| *Counsel to the DIP Agent* |
| Richard A. Stieglitz, Jr.<br>Joel H. Levitin<br>Cahill Gordon & Reindel LLP<br>Eighty Pine Street<br>New York, New York 10005 |

## ADDITIONAL INFORMATION

**Obtaining Solicitation Materials**.  If you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact Kurtzman Carson Consultants, LLC, the solicitation agent retained by the Debtors in the Chapter 11 Cases (the "Solicitation Agent"), by:  (a) calling the Debtors' restructuring hotline at (888) 251-2679 (US toll-free) and (310) 751-2609 (international toll); (b) visiting the Debtors' restructuring website at:  http://www.kccllc.net/21co; (c) writing to 21st Century Oncology Holdings, Inc., Ballot Processing Center, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245; and/or (d) emailing 21coInfo@kccllc.com.  You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER (the Court's Public Access to Court Electronic Records) at: https://ecf.nysb.uscourts.gov/.  A login identification and password to PACER are required to access this information and can be obtained through the PACER Service Center at http://www.pacer.psc.uscourts.gov.  Please be advised that the Solicitation Agent is authorized to answer questions about, and provide additional copies of, solicitation materials, but may ***not*** advise you as to whether you should vote to accept or reject the Plan.

**The Plan Supplement**.  The Debtors will file the Plan Supplement on or before **November 13, 2017**, and will serve a notice on all holders of Claims or Interests entitled to vote on the Plan, which will:  (a) inform parties that the Debtors filed the Plan Supplement; (b) list the information contained in the Plan Supplement; and (c) explain how parties may obtain copies of the Plan Supplement.

**BINDING NATURE OF THE PLAN**:

**IF CONFIRMED, THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS OR INTERESTS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WHETHER OR NOT SUCH HOLDER WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, HAS FILED A PROOF OF CLAIM IN THE CHAPTER 11 CASES, FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN, OR VOTED TO REJECT THE PLAN.**

New York, New York

Dated: _____, 2017

/s/ _____

Christopher Marcus, P.C.
John T. Weber
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
William A. Guerrieri (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors*
*and Debtors in Possession*

6

## ANNEX 1

### Effect of Confirmation of the Plan

#### *Discharge of Claims and Termination of Interests (Article VIII.8.1 of the Plan)*

Except as otherwise provided for herein or in the Confirmation Order, effective as of the Effective Date: (a) the rights afforded in the Plan and the treatment of all Claims and Interests under the Plan shall be in exchange for and in complete satisfaction, settlement, discharge, and release of all Claims and Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against or in the Debtors or any of their assets, property, or Estates; (b) the Plan shall bind all holders of Claims and Interests, notwithstanding whether any such holders failed to vote to accept or reject the Plan or voted to reject the Plan; (c) all Claims and Interests that arose before the Effective Date, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, shall be satisfied, settled, discharged, and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under sections 502(g), 502(h) or 502(i) of the Bankruptcy Code; and (d) all Entities shall be precluded from asserting against the Debtors, the Debtors' Estates, the Reorganized Debtors, their successors and assigns, and their assets and properties any other or further Claims or Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date. In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order will be a judicial determination, as of the Effective Date, of a discharge of all such Claims and other debts and liabilities against the Debtors and satisfaction, termination or cancellation of all Interests and other rights of equity Security holders in the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge will void any judgment obtained against the Debtors or the Reorganized Debtors at any time, to the extent that such judgment relates to a discharged Claim.

#### *Releases by the Debtors (Article VIII.8.2 of the Plan)*

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration provided by each of the Released Parties, the adequacy of which is hereby confirmed, on the Confirmation Date and effective as of the Effective Date, and to the fullest extent permitted by applicable law, in exchange for their cooperation and, to the extent applicable, provision of new money pursuant to the Restructuring Transactions, the Released Parties shall be deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all claims, interests, obligations, debts, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claim asserted on behalf of any Debtor and/or Reorganized Debtor, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, their Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or

in part, the Debtors, the Reorganized Debtors, the Restructuring Transactions, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the Rights Offerings, the Backstop Purchase Agreement, the Backstop Commitments, the Backstop Order, the Restructuring Support Agreement, the negotiation, formulation, preparation, implementation or administration of the Plan, the Plan Supplement, the Disclosure Statement, the Rights Offering Procedures, the DIP Facility, the Exit Facilities, the DIP Documents, the Exit Facility Documents, the New Warrant Documents, the New Organizational Documents, or any other Restructuring Documents, any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes fraud, willful misconduct or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Debtor Release; (3) in the best interests of the Debtors and all holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any claim, cause of action or other assertion of liability released pursuant to the Debtor Release.

### *Releases by Holders of Claims and Interests (Article VIII.8.3 of the Plan)*

Notwithstanding anything contained in the Plan to the contrary, on the Confirmation Date and effective as of the Effective Date, and to the fullest extent permitted by applicable law, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all claims, interests, obligations, debts, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claim asserted on behalf of any Debtor and/or Reorganized Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Releasing Party would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, the Restructuring Transactions, the Chapter 11 Cases, the Rights Offerings, the Backstop Purchase Agreement, the Backstop Commitments, the Backstop Order, the Restructuring Support Agreement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any

2

Releasing Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, preparation, implementation or administration of the Plan, the Disclosure Statement, the Plan Supplement, the Rights Offering Procedures, the DIP Facility, the Exit Facilities, the DIP Documents, the Exit Facility Documents, the New Warrant Documents, the New Organizational Documents, or any other Restructuring Documents, any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes fraud, willful misconduct or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third Party Release is: (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good-faith settlement and compromise of the claims released by the Third-Party Release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Releasing Parties asserting any claim or cause of action released pursuant to the Third-Party Release.

### _Releasing Parties (Article VIII.1.1.194 of the Plan)_

"_Releasing Parties_" means collectively, and in each case solely in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the Backstop Parties; (d) the DIP Lenders; (e) the DIP Agent; (f) the Consenting MDL Lenders; (g) the MDL Agent; (h) the Consenting First Lien Lenders; (i) the First Lien Agent; (j) the Consenting Noteholders; (k) the Indenture Trustee; (l) the Equity Parties; (m) the Committee; (n) the members of the Committee; (o) all holders of Claims and Interests that are presumed to accept the Plan and do not opt out of the Third-Party Release on their respective Election Forms; (p) all holders of Claims and Interests that are presumed to reject the Plan and do not opt out of the Third-Party Release on their respective Election Forms; (q) all holders of Claims or Interests entitled to vote on the Plan who either (1) vote to accept the Plan or (2) receive a ballot but abstain from voting on the Plan; (r) all holders of Claims and Interests entitled to vote on the Plan who vote to reject the Plan but do not elect on their ballot to opt-out of the Third-Party Release; (s) all Rights Offering Participants that participate in the Rights Offerings; (t) all other holders of Claims and Interests to the fullest extent permitted by law; and (u) with respect to the foregoing clauses (a) through (t), each of such Person's current and former Affiliates, partners, Subsidiaries, officers, directors, principals, employees, agents, managed funds, advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, together with their respective successors and assigns, in each case in their capacity as such.

### *Released Parties (Article VIII.1.1.193 of the Plan)*

"*Released Parties*" means each of the following: (i)(a) the Debtors, (b) the Reorganized Debtors, and (c) with respect to each of the foregoing parties in clauses (i)(a) and (i)(b), each of such Entity's current and former Affiliates, partners, Subsidiaries, officers, directors, principals, employees, agents, advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, together with their respective successors and assigns, in each case in their capacity as such, and only if serving in such capacity; and (ii)(a) the Backstop Parties; (b) the DIP Lenders; (c) the DIP Agent; (d) the Consenting MDL Lenders; (e) the MDL Agent; (f) the Consenting First Lien Lenders; (g) the First Lien Agent; (h) the Consenting Noteholders; (i) the Indenture Trustee; (j) the Equity Parties; (k) the Committee; (l) members of the Committee (solely in their capacity as such); and (m) with respect to each of the foregoing Persons described in clauses (ii)(a) through (ii)(l), each of such Person's current and former Affiliates, partners, Subsidiaries, officers, directors, principals, employees (including, in the case of the Equity Parties, any current or former director of any Debtor that is, or was, employed by either Equity Party), agents, managed funds, advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, together with their respective successors and assigns, in each case in their capacity as such, and only if serving in such capacity; provided, however, that notwithstanding anything to the contrary herein, any Equity Party (and, to the extent related to any Equity Party, any Person described in clause (ii)(m)) shall only constitute a Released Party to the extent such Equity Party becomes a Restructuring Support Party, does not breach its obligations under the Restructuring Support Agreement, and does not terminate the Restructuring Support Agreement; provided, further that the Excluded Directors and Officers, other than the Specified Directors and Officers, shall not constitute Released Parties.

### *Exculpation (Article VIII.8.4 of the Plan)*

Notwithstanding anything contained herein to the contrary, on the Confirmation Date and effective as of the Effective Date, and to the fullest extent permitted by applicable law, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any cause of action, claim or other assertion of liability for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the Filing of the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, administration, implementation or Filing of, as applicable, the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, the Rights Offerings, the Rights Offering Procedures, the DIP Facility, the Exit Facilities, the DIP Documents, the Exit Facility Documents, the New Warrant Documents, the New Organizational Documents, the Backstop Purchase Agreement, the Backstop Order, the Backstop Commitments, any Restructuring Transaction, or any other Restructuring Document or contract, instrument, release or other agreement or document created or entered into in connection with any of the foregoing, the pursuit of Confirmation, the pursuit of Consummation, the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan, except for claims related to any act or omission that is determined in a Final Order by a court of

4

competent jurisdiction to have constituted actual fraud, gross negligence or willful misconduct.  Notwithstanding anything to the contrary herein, the Exculpated Parties shall, in all respects, be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the Solicitation of, and distribution of consideration pursuant to, the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the Solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.  With respect to any Exculpated Party that is not also an Estate fiduciary, such exculpation shall be as provided for by Bankruptcy Code section 1125(e).

### *Exculpated Parties (Article VIII.1.1.84 of the Plan)*

"*Exculpated Parties*" means each of the following: (i)(a) the Debtors, (b) the Reorganized Debtors, and (c) with respect to each of the foregoing parties in clauses (i)(a) and (i)(b), each of such Entity's current and former Affiliates, partners, Subsidiaries, officers, directors, principals, employees, agents, advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, together with their respective successors and assigns, in each case in their capacity as such, and only if serving in such capacity; and (ii)(a) the Backstop Parties; (b) the DIP Lenders; (c) the DIP Agent; (d) the Consenting MDL Lenders; (e) the MDL Agent; (f) the Consenting First Lien Lenders; (g) the First Lien Agent; (h) the Consenting Noteholders; (i) the Indenture Trustee; (j) the Equity Parties; and (k) the Committee; (l) the members of their Committee (solely in their capacity as such); and (m) with respect to each of the foregoing Persons described in clauses (ii)(a) through (ii)(l), each of such Person's current and former Affiliates, partners, Subsidiaries, officers, directors, principals, employees (including, in the case of the Equity Parties, any current or former director of any Debtor that is, or was, employed by either Equity Party), agents, managed funds, advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, together with their respective successors and assigns, in each case in their capacity as such, and only if serving in such capacity; provided, however, that notwithstanding anything to the contrary herein, any Equity Party (and, to the extent related to any Equity Party, any Person described in clause (ii)(m)) shall only constitute an Exculpated Party to the extent such Equity Party becomes a Restructuring Support Party, does not breach its obligations under the Restructuring Support Agreement, and does not terminate the Restructuring Support Agreement; provided, further that the Excluded Directors and Officers shall not constitute Exculpated Parties.

### *Injunction (Article VIII.8.5 of the Plan)*

Except as otherwise provided herein or in the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to **Section 8.2** or **Section 8.3** of this Plan, discharged or terminated pursuant to **Section 8.1** of this Plan, or are subject to exculpation pursuant to **Section 8.4** of this Plan shall be

permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties, or any of their respective properties or Estates:  (a) commencing or continuing in any manner any action or other proceeding of any kind on account of, in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering in any manner or by any means any judgment, award, decree, or order on account of, in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any Lien or encumbrance of any kind on account of, in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind on account of, in connection with or with respect to any such Claims or Interests, unless such Entity has filed, on or before the Confirmation Date, a motion with the Bankruptcy Court requesting the right to perform such setoff, notwithstanding any indication that such entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of, in connection with or with respect to any such Claims or Interests discharged, released, exculpated, or settled pursuant to the Plan or that is otherwise inconsistent with the provisions of the Plan.

## **SCHEDULE 10**

## **Form of Plan Supplement Notice**

Christopher Marcus, P.C.
John T. Weber
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

James H.M. Sprayregen, P.C.
William A. Guerrieri (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) ) |  Chapter 11 |
| 21st CENTURY ONCOLOGY HOLDINGS, INC., *et al.*,[1] | )  Case No. 17-22770 (RDD) |
| Debtors. | ) )  (Jointly Administered) |

**NOTICE OF FILING OF PLAN SUPPLEMENT**

      **PLEASE TAKE NOTICE THAT** on October [●], 2017, the United States Bankruptcy Court for the Southern District of New York (the "Court") entered an order (the "Disclosure Statement Order"): (a) authorizing 21st Century Oncology Holdings, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *Joint Chapter 11 Plan of Reorganization of 21st Century Oncology Holdings, Inc. and its Debtor Affiliates* (as may be modified, amended, or supplemented from time to time, the "Plan");[2] and (b) approving, among other things, the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of 21st Century Oncology Holdings, Inc. and its Debtor Affiliates* (as may be modified, amended, or supplemented from time to time, the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (ii) the solicitation materials and documents to be included in the solicitation packages; (iii) the rights offering procedures and related materials; and (iv) the procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

---

[1]    Each of the Debtors in the above-captioned jointly administered chapter 11 cases and their respective tax identification numbers are set forth in the *Order Directing Joint Administration of Chapter 11 Cases* [Docket No. 30]. The location of 21st Century Oncology Holdings, Inc.'s corporate headquarters and the Debtors' service address is: 2270 Colonial Boulevard, Fort Myers, Florida 33907.

[2]    Capitalized terms not otherwise defined herein shall have the same meanings as set forth in the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** as contemplated by the Plan and the Disclosure Statement Order, the Debtors filed the Plan Supplement with the Court on November 13, 2017 [Docket No. [___]].  The Plan Supplement contains the following documents, as may be modified, amended, or supplemented from time to time:

| | |
|---|---|
| **Exhibit A:** | Form of the New First Lien Term Loan Credit Agreement (or, in the absence thereof, a term sheet setting forth the terms and conditions governing the New First Lien Term Loan Credit Facility). |
| **Exhibit B:** | Form of the New MDL Term Loan Credit Agreement (or, in the absence thereof, a term sheet setting forth the terms and conditions governing the New MDL Term Loan Facility). |
| **Exhibit C:** | Form of the New Second Lien Notes Indenture (or, in the absence thereof, a term sheet setting forth the terms and conditions governing the New Second Lien Notes) |
| **Exhibit D:** | Form of the New Intercreditor Agreement (or, in the absence thereof, a term sheet setting forth the terms and conditions governing the New Intercreditor Agreement) |
| **Exhibit E:** | Form of New Warrant Documents (or, in the absence thereof, a term sheet setting forth the terms and conditions governing the New Warrants) |
| **Exhibit F:** | Form of the New Organizational Documents |
| **Exhibit G:** | Identities of the members of the New Board and the officers of the Reorganized Debtors (to the extent known) |
| **Exhibit H:** | List of Retained Causes of Action |
| **Exhibit I:** | Schedule of Assumed Executory Contracts and Unexpired Leases |
| **Exhibit J:** | Schedule of Rejected Executory Contracts and Unexpired Leases |
| **Exhibit K:** | Schedule of Excluded Directors and Officers |
| **Exhibit L** | Schedule of Specified Directors and Officers |

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider Confirmation of the Plan (the "Confirmation Hearing") will commence on **December 11, 2017, at 10:00 a.m.,** prevailing Eastern Time, before the Honorable Robert D. Drain, in the United States Bankruptcy Court for the Southern District of New York, located at 300 Quarropas Street, White Plains, New York 10601.  The Confirmation Hearing may be continued from time to time by the Court or the Debtors **without further notice** other than by such adjournment being announced in open court or by a notice of adjournment filed with the Court.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan is **November 27, 2017, at 4:00 p.m.** prevailing Eastern Time (the "Plan Objection Deadline").   Any objection to the Plan **must**: (a) be in writing; (b) conform to the Bankruptcy Rules, the Local Bankruptcy Rules, and any orders of the Court; (c) state, with particularity, the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (d) be filed with the Court (contemporaneously with a proof of service) and served upon the following parties so as to be *actually received* on or before the Plan Objection Deadline:

| Counsel to the Debtors | |
|---|---|
| Christopher Marcus, P.C.<br>John T. Weber<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone:      (212) 446-4800<br>Facsimile:       (212) 446-4900 | James H.M. Sprayregen, P.C.<br>William A. Guerrieri (admitted *pro hac vice*)<br>Alexandra Schwarzman (admitted *pro hac vice*)<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Telephone:      (312) 862-2000<br>Facsimile:       (312) 862-2200 |

| U.S. Trustee |
|---|
| Paul Schwartzberg<br>Susan Golden<br>Office of the United States Trustee<br>for the Southern District of New York<br>U.S. Federal Office Building, 201 Varick Street, Suite 1006<br>New York, New York 10014 |

| Counsel to the Official Committee of Unsecured Creditors Appointed in These Chapter 11 Cases |
|---|
| Lorenzo Marinuzzi<br>Jonathan Levine<br>Morrison & Foerster LLP<br>250 West 55th Street<br>New York, New York 10019 |

| Counsel to Certain Backstop Parties and the Ad Hoc Committee of Crossover Lenders and Noteholders |
|---|
| Jayme Goldstein<br>Samantha Martin<br>Odelia Lee<br>Stroock & Stroock & Lavan LLP<br>180 Maiden Lane<br>New York, New York 10038 |

| *Counsel to the Ad Hoc Committee of Lenders Under the Debtors' Prepetition Secured Credit Facility* |
|---|
| Evan Fleck<br>Matthew Brod<br>Milbank, Tweed, Hadley & McCloy LLP<br>28 Liberty Street<br>New York, New York 10005 |

| *Counsel to the MDL Agent* |
|---|
| Seth H. Lieberman<br>Patrick Sibley<br>Matthew W. Silverman<br>Pryor Cashman LLP<br>7 Times Square<br>New York, New York 10036 |

| *Counsel to the DIP Agent* |
|---|
| Richard A. Stieglitz, Jr.<br>Joel H. Levitin<br>Cahill Gordon & Reindel LLP<br>Eighty Pine Street<br>New York, New York 10005 |

**PLEASE TAKE FURTHER NOTICE** that the Debtors reserve the right, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement, to alter, amend, modify, or supplement any document in the Plan Supplement; *provided* that if any document in the Plan Supplement is altered, amended, modified or supplemented in any material respect prior to the hearing to consider confirmation of the Plan, the Debtors will file a blackline of such document with the Court.

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact Kurtzman Carson Consultants LLC, the solicitation agent retained by the Debtors in the Chapter 11 Cases (the "Solicitation Agent"), by: (a) calling the Debtors' restructuring hotline at (888) 251-2679 (US toll-free) and (310) 751-2609 (international toll); (b) visiting the Debtors' restructuring website at: http://www.kccllc.net/21co; (c) writing to 21st Century Oncology Holdings, Inc., Ballot Processing Center, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245; and/or (d) emailing 21coInfo@kccllc.com. You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER (the Court's Public Access to Court Electronic Records) at: https://ecf.nysb.uscourts.gov/. A login identification and password to PACER are required to access this information and can be obtained through the PACER Service Center at http://www.pacer.psc.uscourts.gov.

---

ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE VIII.8.3 CONTAINS A THIRD-PARTY RELEASE**.  THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE SOLICITATION AGENT.**

---

New York, New York
Dated: _____, 2017

/s/ _____

Christopher Marcus, P.C.
John T. Weber
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
William A. Guerrieri (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors*
*and Debtors in Possession*

## **SCHEDULE 11**

### **Form of Assumption Notice**

Christopher Marcus, P.C.
John T. Weber
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

*Counsel to the Debtors and Debtors in Possession*

James H.M. Sprayregen, P.C.
William A. Guerrieri (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| 21st CENTURY ONCOLOGY HOLDINGS, INC., *et al.*,[1] | ) Case No. 17-22770 (RDD) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**NOTICE OF (A) EXECUTORY CONTRACTS AND**
**UNEXPIRED LEASES TO BE ASSUMED OR ASSUMED AND ASSIGNED BY THE**
**DEBTORS PURSUANT TO THE PLAN, (B) CURE AMOUNTS, IF ANY,**
**AND (C) RELATED PROCEDURES IN CONNECTION THEREWITH**

**PLEASE TAKE NOTICE THAT** on October [●], 2017, the United States Bankruptcy Court for the Southern District of New York (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order"):  (a) authorizing 21st Century Oncology Holdings, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors") to solicit acceptances for the *Joint Chapter 11 Plan of Reorganization of 21st Century Oncology Holdings, Inc. and its Debtor Affiliates*  (as may be modified, amended, or supplemented from time to time, the "Plan");[2] and (b) approving, among other things, (i) the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of 21st Century Oncology Holdings, Inc. and its Debtor Affiliates* (as may be modified, amended, or supplemented from time to time, the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (ii) the solicitation materials and documents to be included in the solicitation packages; (iii) the rights offering procedures and related materials; and (iv) the procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

---

[1]    Each of the Debtors in the above-captioned jointly administered chapter 11 cases and their respective tax identification numbers are set forth in the *Order Directing Joint Administration of Chapter 11 Cases* [Docket No. 30].  The location of 21st Century Oncology Holdings, Inc.'s corporate headquarters and the Debtors' service address is: 2270 Colonial Boulevard, Fort Myers, Florida 33907.

[2]    Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

PLEASE TAKE FURTHER NOTICE THAT the Debtors filed the *Schedule of Assumed Executory Contracts and Unexpired Leases* [Docket No. [●]] (the "Assumption Schedule") with the Court as part of the Plan Supplement on November 13, 2017 as contemplated under the Plan. The determination to assume or assume and assign, as of the Effective Date, the Executory Contracts and Unexpired Leases identified in the Assumption Schedule was made as of November 13, 2017 and is subject to revision at any time prior to the Effective Date.

> **PLEASE TAKE FURTHER NOTICE THAT YOU ARE RECEIVING THIS NOTICE BECAUSE THE DEBTORS' RECORDS REFLECT THAT YOU ARE A PARTY TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE LISTED ON EXHIBIT 1, ATTACHED HERETO, THAT WILL BE ASSUMED OR ASSUMED AND ASSIGNED AS OF THE EFFECTIVE DATE PURSUANT TO THE PLAN. THEREFORE, YOU ARE ADVISED TO REVIEW CAREFULLY THE INFORMATION CONTAINED IN THIS NOTICE AND THE RELATED PROVISIONS OF THE PLAN, INCLUDING THE ASSUMPTION SCHEDULE.[3]**

PLEASE TAKE FURTHER NOTICE THAT the hearing at which the Court will consider Confirmation of the Plan (the "Confirmation Hearing") will commence on **December 11, 2017, at 10:00 a.m.,** prevailing Eastern Time, before the Honorable Robert D. Drain, in the United States Bankruptcy Court for the Southern District of New York, located at 300 Quarropas Street, Courtroom 248, White Plains, New York 10601-4140.

PLEASE TAKE FURTHER NOTICE THAT section 365(b)(1) of the Bankruptcy Code requires a chapter 11 debtor to cure, or provide adequate assurance that it will promptly cure, any defaults under executory contracts and unexpired leases at the time of assumption or assumption and assignment. Accordingly, the Debtors have conducted a thorough review of their books and records and have determined the amounts required to cure defaults, if any, under the Executory Contracts and Unexpired Leases, which amounts are listed in the Assumption Schedule. Please note that if no amount is stated for a particular Executory Contract or Unexpired Lease, the Debtors believe that there is no cure amount outstanding for such Executory Contract or Unexpired Lease.

PLEASE TAKE FURTHER NOTICE THAT absent any pending dispute, the monetary amounts required to cure any existing defaults arising under the Executory Contracts and Unexpired Leases identified in the Assumption Schedule will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by the Debtors in Cash on the Effective Date or as soon as reasonably practicable thereafter. In the event of a dispute, however, payment of the

---

[3]    Neither the exclusion nor inclusion of any contract or lease on the Assumption Schedule, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or Reorganized Debtor has any liability thereunder. Further, the Debtors expressly reserve the right to (a) remove any Executory Contract or Unexpired Lease from the Assumption Schedule and reject such Executory Contract or Unexpired Lease pursuant to the terms of the Plan, up until the Effective Date and (b) contest any Claim asserted in connection with assumption or assumption and assignment of any Executory Contract or Unexpired Lease.

cure amount would be made following the entry of a final order(s) resolving the dispute and approving the assumption or assumption and assignment.   If an objection to the proposed assumption, assumption and assignment, or related cure amount is sustained by the Court, however, the Debtors may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming or assuming and assigning it.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan (including any objections to the assumption or assumption and assignment of an Executory Contract or Unexpired Lease identified in the Assumption Schedule) is **November 27, 2017, at 4:00 p.m.,** prevailing Eastern Time (the "Plan Objection Deadline").  Any objection to the Plan *must*:  (a) be in writing; (b) conform to the Bankruptcy Rules, the Local Bankruptcy Rules and any orders of the Court; (c) state, with particularity, the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (d) be filed with the Court (contemporaneously with a proof of service) and served upon the following parties so as to be *actually received* on or before the Plan Objection Deadline:

| Counsel to the Debtors | |
| --- | --- |
| Christopher Marcus, P.C.<br>John T. Weber<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone:   (212) 446-4800<br>Facsimile:    (212) 446-4900 | James H.M. Sprayregen, P.C.<br>William A. Guerrieri (admitted *pro hac vice*)<br>Alexandra Schwarzman (admitted *pro hac vice*)<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Telephone:   (312) 862-2000<br>Facsimile:    (312) 862-2200 |
| U.S. Trustee | |
| Paul Schwartzberg<br>Susan Golden<br>Office of the United States Trustee<br>for the Southern District of New York<br>U.S. Federal Office Building, 201 Varick Street, Suite 1006<br>New York, New York 10014 | |
| Counsel to the Official Committee of Unsecured Creditors Appointed in These Chapter 11 Cases | |
| Lorenzo Marinuzzi<br>Jonathan Levine<br>Morrison & Foerster LLP<br>250 West 55th Street<br>New York, New York 10019 | |

| *Counsel to Certain Backstop Parties and the Ad Hoc Committee of Crossover Lenders and Noteholders* |
|---|
| Jayme Goldstein<br>Samantha Martin<br>Odelia Lee<br>Stroock & Stroock & Lavan LLP<br>180 Maiden Lane<br>New York, New York 10038 |
| *Counsel to the Ad Hoc Committee of Lenders Under the Debtors' Prepetition Secured Credit Facility* |
| Evan Fleck<br>Matthew Brod<br>Milbank, Tweed, Hadley & McCloy LLP<br>28 Liberty Street<br>New York, New York 10005 |
| *Counsel to the MDL Agent* |
| Seth H. Lieberman<br>Patrick Sibley<br>Matthew W. Silverman<br>Pryor Cashman LLP<br>7 Times Square<br>New York, New York 10036 |
| *Counsel to the DIP Agent* |
| Richard A. Stieglitz, Jr.<br>Joel H. Levitin<br>Cahill Gordon & Reindel LLP<br>Eighty Pine Street<br>New York, New York 10005 |

**PLEASE TAKE FURTHER NOTICE THAT** any objections to the Plan in connection with the assumption or assumption and assignment of the Executory Contracts and Unexpired Leases identified in the Assumption Schedule and/or related cure or adequate assurances proposed in connection with the Plan that remain unresolved as of the Confirmation Hearing will be heard at the Confirmation Hearing (or such other date as fixed by the Court).

> **PLEASE TAKE FURTHER NOTICE THAT any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or assumption and assignment, as applicable, or cure amount will be deemed to have assented to such assumption or assumption and assignment, as applicable, and cure amount.**

**PLEASE TAKE FURTHER NOTICE THAT ASSUMPTION OR ASSUMPTION AND ASSIGNMENT OF ANY EXECUTORY CONTRACT OR UNEXPIRED LEASE PURSUANT TO THE PLAN OR OTHERWISE SHALL RESULT IN THE FULL RELEASE AND SATISFACTION OF ANY CLAIMS OR DEFAULTS, WHETHER MONETARY OR NONMONETARY, INCLUDING DEFAULTS OF PROVISIONS RESTRICTING THE CHANGE IN CONTROL OR OWNERSHIP INTEREST**

**COMPOSITION OR OTHER BANKRUPTCY-RELATED DEFAULTS, ARISING UNDER ANY ASSUMED OR ASSUMED AND ASSIGNED EXECUTORY CONTRACT OR UNEXPIRED LEASE AT ANY TIME BEFORE THE EFFECTIVE DATE OF THE DEBTORS' OR REORGANIZED DEBTORS' ASSUMPTION OR ASSUMPTION AND ASSIGNMENT OF SUCH EXECUTORY CONTRACT OR UNEXPIRED LEASE. ANY PROOFS OF CLAIM FILED WITH RESPECT TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT HAS BEEN ASSUMED OR ASSUMED AND ASSIGNED SHALL BE DEEMED DISALLOWED AND EXPUNGED, WITHOUT FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT.**

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact Kurtzman Carson Consultants, LLC, the solicitation agent retained by the Debtors in the Chapter 11 Cases (the "Solicitation Agent"), by: (a) calling the Debtors' restructuring hotline at (888) 251-2679 (US toll-free) and (310) 751-2609 (international toll); (b) visiting the Debtors' restructuring website at: http://www.kccllc.net/21co; (c) writing to 21st Century Oncology Holdings, Inc., Ballot Processing Center, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245; and/or (d) emailing 21coInfo@kccllc.com. You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER (the Court's Public Access to Court Electronic Records) at: https://ecf.nysb.uscourts.gov/. A login identification and password to PACER are required to access this information and can be obtained through the PACER Service Center at http://www.pacer.psc.uscourts.gov.

---

ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE VIII.8.3 CONTAINS A THIRD-PARTY RELEASE**. THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE SOLICITATION AGENT.**

---

New York, New York
Dated: _____, 2017

/s/ _____

Christopher Marcus, P.C.
John T. Weber
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:     (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
William A. Guerrieri (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:     (312) 862-2200

*Counsel to the Debtors*
*and Debtors in Possession*

**Exhibit 1**

| Debtor Entity | Counterparty | Contract Description | Date | Cure Amount (if any) |
|---|---|---|---|---|
|  |  |  |  |  |

## **SCHEDULE 12**

## **Form of Rejection Notice**

Christopher Marcus, P.C.
John T. Weber
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

James H.M. Sprayregen, P.C.
William A. Guerrieri (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| 21st CENTURY ONCOLOGY HOLDINGS, INC., *et al.*,[1] | ) | Case No. 17-22770 (RDD) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**NOTICE OF EXECUTORY CONTRACTS**
**AND UNEXPIRED LEASES TO BE REJECTED PURSUANT TO THE PLAN**

   **PLEASE TAKE NOTICE THAT** on October [●], 2017, the United States Bankruptcy Court for the Southern District of New York (the "Court") entered an order [Docket No.[●]] (the "Disclosure Statement Order"): (a) authorizing 21st Century Oncology Holdings, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors") to solicit acceptances for the *Joint Chapter 11 Plan of Reorganization of 21st Century Oncology Holdings, Inc. and its Debtor Affiliates* (as may be modified, amended, or supplemented from time to time, the "Plan");[2] and (b) approving, among other things, (i) the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of 21st Century Oncology Holdings, Inc. and its Debtor Affiliates* (as may be modified, amended, or supplemented from time to time, the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (ii) the solicitation materials and documents to be included in the solicitation packages; (iii) the rights offering procedures and related materials; and (iv) the procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

---

[1]    Each of the Debtors in the above-captioned jointly administered chapter 11 cases and their respective tax identification numbers are set forth in the *Order Directing Joint Administration of Chapter 11 Cases* [Docket No. 30]. The location of 21st Century Oncology Holdings, Inc.'s corporate headquarters and the Debtors' service address is: 2270 Colonial Boulevard, Fort Myers, Florida 33907.

[2]    Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors filed the *Schedule of Rejected Executory Contracts and Unexpired Leases* [Docket No. [●]] (the "Rejection Schedule") with the Court as part of the Plan Supplement on November 13, 2017, as contemplated under the Plan.  The determination to reject, as of the Effective Date, the Executory Contracts and Unexpired Leases identified in the Rejection Schedule was made as of November 13, 2017 and is subject to revision at any time prior to the Effective Date.

> **PLEASE TAKE FURTHER NOTICE THAT YOU ARE RECEIVING THIS NOTICE BECAUSE THE DEBTORS' RECORDS REFLECT THAT YOU ARE A PARTY TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE LISTED ON <u>EXHIBIT 1</u>, ATTACHED HERETO, THAT WILL BE REJECTED AS OF THE EFFECTIVE DATE PURSUANT TO THE PLAN.  THEREFORE, YOU ARE ADVISED TO REVIEW CAREFULLY THE INFORMATION CONTAINED IN THIS NOTICE AND THE RELATED PROVISIONS OF THE PLAN.  INCLUDING THE REJECTION SCHEDULE.[3]**

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider Confirmation of the Plan (the "Confirmation Hearing") will commence on **December 11, 2017, at 10:00 a.m.,** prevailing Eastern Time, before the Honorable Robert D. Drain, in the United States Bankruptcy Court for the Southern District of New York, located at 300 Quarropas Street, Courtroom 248, White Plains, New York 10601-4140.

**PLEASE TAKE FURTHER NOTICE THAT** all proofs of Claim with respect to Claims arising from the rejection of Executory Contracts and Unexpired Leases identified in the Rejection Schedule, if any, must be filed[4] so that they are ***actually received***, on or before the date that is thirty days after the date of entry of an order of the Court (including the Confirmation Order) approving such rejection, by either: (i) electronically using the interface available on the website of the Debtors' notice and claims agent at https://epoc.kccllc.net/21co; or (ii) first-class U.S. Mail, overnight mail, or other hand-delivery system, at the following address:

---

[3]  Neither the exclusion nor inclusion of any contract or lease on the Rejection Schedule, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or Reorganized Debtor has any liability thereunder.  Further, the Debtors expressly reserve the right to (a) remove any Executory Contract or Unexpired Lease from the Rejection Schedule and assume or assume and assign such Executory Contract or Unexpired Lease pursuant to the terms of the Plan, up until the Effective Date and (b) contest any Claim asserted in connection with the rejection of any Executory Contract or Unexpired Lease.

[4]  Proofs of claim submitted by facsimile or electronic mail will not be accepted and will not be deemed timely filed.

If delivered by first-class U.S. Mail
or overnight mail:
21st Century Oncology Holdings, Inc.
Claims Processing Center
c/o Kurtzman Carson Consultants LLC
2335 Alaska Avenue
El Segundo, California 90245

If delivered by hand:
United States Bankruptcy Court
Southern District of New York
300 Quarropas Street, Room 248
White Plains, NY 10601

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed on or before the deadline specified herein will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, their Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court.**

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan is **November 27, 2017, at 4:00 p.m.,** prevailing Eastern Time (the "Plan Objection Deadline"). Any objection to the Plan **must**: (a) be in writing; (b) conform to the Bankruptcy Rules, the Local Bankruptcy Rules, and any orders of the Court; (c) state, with particularity, the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (d) be filed with the Court (contemporaneously with a proof of service) and served upon the following parties so as to be actually received on or before the Plan Objection Deadline:

| *Counsel to the Debtors* | |
|---|---|
| Christopher Marcus, P.C.<br>John T. Weber<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone:          (212) 446-4800<br>Facsimile:          (212) 446-4900 | James H.M. Sprayregen, P.C.<br>William A. Guerrieri (admitted *pro hac vice*)<br>Alexandra Schwarzman (admitted *pro hac vice*)<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Telephone:          (312) 862-2000<br>Facsimile:          (312) 862-2200 |
| *U.S. Trustee* | |
| Paul Schwartzberg<br>Susan Golden<br>Office of the United States Trustee<br>for the Southern District of New York<br>U.S. Federal Office Building, 201 Varick Street, Suite 1006<br>New York, New York 10014 | |

3

| *Counsel to the Official Committee of Unsecured Creditors Appointed in These Chapter 11 Cases* |
|---|
| Lorenzo Marinuzzi<br>Jonathan Levine<br>Morrison & Foerster LLP<br>250 West 55th Street<br>New York, New York 10019 |
| *Counsel to Certain Backstop Parties and the Ad Hoc Committee of Crossover Lenders and Noteholders* |
| Jayme Goldstein<br>Samantha Martin<br>Odelia Lee<br>Stroock & Stroock & Lavan LLP<br>180 Maiden Lane<br>New York, New York 10038 |
| *Counsel to the Ad Hoc Committee of Lenders Under the Debtors' Prepetition Secured Credit Facility* |
| Evan Fleck<br>Matthew Brod<br>Milbank, Tweed, Hadley & McCloy LLP<br>28 Liberty Street<br>New York, New York 10005 |
| *Counsel to the MDL Agent* |
| Seth H. Lieberman<br>Patrick Sibley<br>Matthew W. Silverman<br>Pryor Cashman LLP<br>7 Times Square<br>New York, New York 10036 |
| *Counsel to the DIP Agent* |
| Richard A. Stieglitz, Jr.<br>Joel H. Levitin<br>Cahill Gordon & Reindel LLP<br>Eighty Pine Street<br>New York, New York 10005 |

**PLEASE TAKE FURTHER NOTICE THAT** any objections to the Plan in connection with the rejection of the Executory Contracts and Unexpired Leases identified in the Rejection Schedule and/or related rejection damages proposed in connection with the Plan that remain unresolved as of the Confirmation Hearing will be heard at the Confirmation Hearing (or such other date as fixed by the Court).

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact Kurtzman Carson Consultants, LLC, the solicitation agent retained by the Debtors in the Chapter 11 Cases (the "Solicitation Agent"), by: (a) calling the Debtors' restructuring hotline at (888)

251-2679 (US toll-free) and (310) 751-2609 (international toll); (b) visiting the Debtors' restructuring website at: http://www.kccllc.net/21co; (c) writing to 21st Century Oncology Holdings, Inc., Ballot Processing Center, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245; and/or (d) emailing 21coInfo@kccllc.com. You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER (the Court's Public Access to Court Electronic Records) at: https://ecf.nysb.uscourts.gov/. A login identification and password to PACER are required to access this information and can be obtained through the PACER Service Center at http://www.pacer.psc.uscourts.gov/.

---

ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE VIII.8.3 CONTAINS A THIRD-PARTY RELEASE**. THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE SOLICITATION AGENT.**

---

New York, New York
Dated: _____, 2017

*/s/* _____
Christopher Marcus, P.C.
John T. Weber
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
William A. Guerrieri (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors*
*and Debtors in Possession*

**Exhibit 1**

| Debtor Entity | Counterparty | Contract Description | Date |
|---|---|---|---|
|  |  |  |  |

## **<u>SCHEDULE 13</u>**

### **<u>New Notes Rights Offering Procedures</u>**

Christopher Marcus, P.C.
John T. Weber
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

James H.M. Sprayregen, P.C.
William A. Guerrieri (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| 21st CENTURY ONCOLOGY HOLDINGS, INC., *et al.*,[1] | ) Case No. 17-22770 (RDD) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

## NOTES RIGHTS OFFERING PROCEDURES

**1.    Introduction**

        21st Century Oncology Holdings, Inc. ("21C Holdings") and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") are pursuing a proposed restructuring (the "Restructuring") of their existing debt and other obligations to be effectuated pursuant to a plan of reorganization (the "Plan")[2] in connection with voluntary, pre-arranged reorganization cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532 (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), in accordance with the terms and conditions set forth in the Restructuring Support Agreement.

        In connection with the Plan, after obtaining approval of these procedures (these "Notes Rights Offering Procedures") by the Bankruptcy Court and in accordance with the terms of the Backstop Purchase Agreement, the Debtors shall launch a notes rights offering (the "Notes Rights Offering") pursuant to which each holder of an Eligible Claim (as defined below) as of the Rights Offering Record Date (as defined below) that is an Accredited Investor (as set forth in a properly completed and duly executed AI Questionnaire (as defined below) that is delivered by such holder to the Subscription Agent (as defined below) on or prior to the Questionnaire

---

[1]    Each of the Debtors in the above-captioned jointly administered chapter 11 cases and their respective tax identification numbers are set forth in the *Order Directing Joint Administration of Chapter 11 Cases* [Docket No. 30]. The location of 21st Century Oncology Holdings, Inc.'s corporate headquarters and the Debtors' service address is: 2270 Colonial Boulevard, Fort Myers, Florida 33907.

[2]    All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in Plan.

Deadline (as defined below) in accordance with these Notes Rights Offering Procedures) (each such holder, a "Rights Offering Participant" and, collectively, the "Rights Offering Participants") will be entitled to receive non-transferable, non-certificated rights (the "Notes Rights"), but not the obligation, to purchase such Rights Offering Participant's *pro rata* share (based on the proportion that such Rights Offering Participant's Eligible Claim as of the Rights Offering Record Date bears to the aggregate amount of (i) all Eligible General Unsecured Claims (as defined below) as of the Rights Offering Record Date held by each Person that has certified it is an Accredited Investor (as demonstrated by such Person's properly completed, duly executed and timely delivered AI Questionnaire) on or prior to the Questionnaire Deadline plus (ii) all Allowed (as defined below) Note Claims as of the Rights Offering Record Date) of New Second Lien Notes (the "Rights Offering Notes") in an aggregate original principal amount of $200,000,000 (the "Notes Rights Offering Amount").  Rights Offering Participants will be issued Notes Rights at no charge.

"Allowed" means, with respect to any Claim (or any portion thereof), as of any date of determination, (a) a Claim that is evidenced by a Proof of Claim Filed by the applicable Bar Date in accordance with the Bar Date Order; (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely filed; or (c) a Claim that is allowed pursuant to the Plan or a Final Order of the Bankruptcy Court as of such date; provided, that with respect to a Claim described in clauses (a) and (b) above (except any Claim allowed pursuant to the DIP Orders), such Claim shall be considered "Allowed" as of such date of determination only to the extent that, with respect to such Claim, no objection to allowance or priority or a request for estimation thereof has been interposed on or prior to such date, or such an objection is so interposed and the Claim has been allowed by a Final Order of the Bankruptcy Court as of such date.

"Disputed" means, with respect to any Claim (or any portion thereof), as of any date of determination, a Claim that is neither Allowed nor disallowed as of such date.

"Eligible Claim" means any Allowed Note Claim or Eligible General Unsecured Claim.

"Eligible General Unsecured Claim" means any General Unsecured Claim that is either Allowed or Disputed.

Prior to receipt of the Notes Rights Exercise Form (as defined below) and the other documents and materials related to the Notes Rights Offering, each holder of an Eligible Claim as of the Rights Offering Record Date will receive an accredited investor questionnaire (the "AI Questionnaire") to determine whether such holder is an Accredited Investor, which must be completed and delivered to Kurtzman Carson Consultants LLC, the subscription agent for the Notes Rights Offering (in such capacity, the "Subscription Agent"), by each such holder that wants to participate in the Notes Rights Offering by no later than November 6, 2017 (the "Questionnaire Deadline").  Any holder of an Eligible Claim as of the Rights Offering Record Date that does not properly complete, duly execute and deliver to the Subscription Agent an AI Questionnaire so that such AI Questionnaire is actually received by the Subscription Agent on or prior to the Questionnaire Deadline will not be eligible to participate in the Notes Rights Offering unless otherwise agreed to by the Debtors with the written consent of the Requisite

Backstop Parties.  Anything herein to the contrary notwithstanding, the Backstop Parties and their Affiliates (as defined in the Backstop Purchase Agreement), in their capacities as holders of Eligible Claims as of the Rights Offering Record Date, shall not be required to complete, execute and deliver an AI Questionnaire and shall be deemed Rights Offering Participants.  Each holder of an Allowed Note Claim as of the Rights Offering Record Date is entitled to receive sufficient copies of the AI Questionnaire for distribution to the beneficial owners of the Notes for whom such Rights Offering Participant holds such Notes.

Rights Offering Notes shall be issued in minimum denominations of $1,000 per Rights Offering Note, unless otherwise agreed to by the Debtors and the Requisite Backstop Parties.  Fractional Rights Offering Notes shall not be issued upon exercise of the Notes Rights and Rights Offering Participants that otherwise would have received fractional Rights Offering Notes shall not be paid any compensation in respect of such fractional Rights Offering Notes. Each Rights Offering Participant's maximum amount of Rights Offering Notes that such Rights Offering Participant is permitted to subscribe for pursuant to the exercise of its Notes Rights shall be rounded down to the nearest whole Rights Offering Note.

**THE DISCLOSURE STATEMENT DISTRIBUTED IN CONNECTION WITH THE DEBTORS' SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN SETS FORTH IMPORTANT INFORMATION THAT SHOULD BE CAREFULLY READ AND CONSIDERED BY EACH RIGHTS OFFERING PARTICIPANT PRIOR TO MAKING A DECISION TO PARTICIPATE IN THE NOTES RIGHTS OFFERING, INCLUDING ARTICLE IX OF THE DISCLOSURE STATEMENT REGARDING CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE EXERCISING ANY NOTES RIGHTS.**

2.    **Backstop Purchase Agreement**

Any Rights Offering Notes that are not subscribed for and purchased in the Notes Rights Offering by a Rights Offering Participant (including (i) any Rights Offering Notes that holders of Eligible Claims as of the Rights Offering Record Date who are not Accredited Investors (or holders of Eligible Claims as of the Rights Offering Record Date that did not properly complete, duly execute and deliver to the Subscription Agent by the Questionnaire Deadline an AI Questionnaire in accordance with these Notes Rights Offering Procedures) could have purchased if such holders had received Notes Rights if they were Accredited Investors (or had properly completed, duly executed and delivered to the Subscription Agent by the Questionnaire Deadline an AI Questionnaire in accordance with these Notes Rights Offering Procedures) and exercised such Notes Rights in the Notes Rights Offering, (ii) any Rights Offering Notes that are not subscribed for and purchased in the Notes Rights Offering on account of any rounding down of fractional Rights Offering Notes, (iii) any Rights Offering Notes that are not subscribed for and purchased in the Notes Rights Offering by a holder of an Eligible General Unsecured Claim as of the Rights Offering Record Date on account of such holder having either (x) made the Convenience Claim Election with respect to such Eligible General Unsecured Claim on a properly cast ballot under the Plan (if such Eligible General Unsecured Claim is greater than $1,000,000) or (y) failed to make the New Common Stock Election with respect to such Eligible General Unsecured Claim on a properly cast ballot under the Plan (if such Eligible General Unsecured Claim is less than or equal to $1,000,000), (iv) any Rights

Offering Notes that are not subscribed for and purchased in the Notes Rights Offering on account of any Rights Offering Participant failing to satisfy any of the Notes Rights Offering Conditions (as defined below) or Additional Conditions (as defined below), or (v) any Rights Offering Notes that are not subscribed for and purchased in the Notes Rights Offering on account of any Eligible General Unsecured Claim as of the Rights Offering Record Date (or any portion thereof) failing to be an Allowed Claim on the date that is one (1) Business Day after the Confirmation Hearing) (such Rights Offering Notes, the "Unsubscribed Notes") shall be put to and purchased by the Backstop Parties (subject to their respective Backstop Notes Commitment Amounts) in accordance with the terms and conditions of the Backstop Purchase Agreement.

There will be no over-subscription privilege provided in connection with the Notes Rights Offering, such that any Unsubscribed Notes will not be offered to other Rights Offering Participants, but rather will be purchased by the Backstop Parties (subject to their respective Backstop Notes Commitment Amounts) in accordance with the terms and conditions of the Backstop Purchase Agreement.

In consideration for the Debtors' right to call the Backstop Notes Commitments (as defined in the Backstop Purchase Agreement) of the Backstop Parties to purchase the Unsubscribed Notes pursuant to the terms of the Backstop Purchase Agreement, 21C Holdings shall issue to the Backstop Parties (or their designees) additional shares of New Preferred Equity with an aggregate initial liquidation value equal to $15,000,000 (the "Notes Put Option Shares") on a *pro rata* basis based upon their respective Backstop Commitment Percentages. The Notes Put Option Shares will be issued only to the Backstop Parties that do not default on their respective Backstop Notes Commitments.

3.    **Commencement and Expiration of the Notes Rights Offering; Rights Offering Record Date**

The Notes Rights Offering shall commence on November 9, 2017 (the "Rights Offering Commencement Date"). On the Rights Offering Commencement Date, the Notes Rights Exercise Forms and the other documents and materials related to the Notes Rights Offering shall be mailed by or on behalf of the Debtors to the Rights Offering Participants.

The Notes Rights Offering shall expire at 5:00 p.m. (New York City time) on November 29, 2017 (such date, the "Rights Offering Termination Date" and such time on the Rights Offering Termination Date, the "Rights Offering Termination Time"). If the Rights Offering Termination Date and/or the Rights Offering Termination Time is/are extended in accordance with the terms of these Notes Rights Offering Procedures, the Debtors shall promptly notify the Rights Offering Participants, before 9:00 a.m. (New York City time) on the Business Day before the then-effective Rights Offering Termination Date, in writing, of such extension and the date of the new Rights Offering Termination Date and/or the time of the new Rights Offering Termination Time. Each Rights Offering Participant intending to participate in the Notes Rights Offering must affirmatively make an election to exercise its Notes Rights at or prior to the Rights Offering Termination Time in accordance with the provisions of Section 4 below.

"Rights Offering Record Date" means October 16, 2017.

4

4.      **Exercise of Notes Rights**

Each Rights Offering Participant that elects to participate in the Notes Rights Offering must have timely satisfied each of the Notes Rights Offering Conditions.  Any Rights Offering Participant that has timely satisfied each of the Notes Rights Offering Conditions shall be deemed to have made a binding, irrevocable election to exercise its Notes Rights to the extent set forth in the Notes Rights Exercise Form delivered by such Rights Offering Participant (a "Binding Rights Election"); provided, however, that (A) a Rights Offering Participant's right to participate in the Notes Rights Offering shall remain subject to its compliance with the Additional Conditions, and (B) the right of a Rights Offering Participant that holds an Eligible General Unsecured Claim as of the Rights Offering Record Date to participate in the Notes Rights Offering is subject to termination as set forth in the "Notes Rights Forfeiture Events" section of these Notes Rights Offering Procedures.

**The Binding Rights Election Cannot Be Withdrawn.**

Each Rights Offering Participant is entitled to participate in the Notes Rights Offering solely to the extent provided in these Notes Rights Offering Procedures.  Further, each Rights Offering Participant may exercise all or any portion of such Rights Offering Participant's Notes Rights; provided, however, that a Rights Offering Participant shall not be permitted to participate in the Notes Rights Offering unless such Rights Offering Participant also participates in the New Preferred Equity Rights Offering in an equal proportionate amount.

(a)      **Exercise by Rights Offering Participants**

To exercise its Notes Rights, each Rights Offering Participant must satisfy each of the following conditions (collectively, the "Notes Rights Offering Conditions"):  (i) deliver a duly executed and properly completed notes rights offering subscription exercise form (the "Notes Rights Exercise Form") to the Subscription Agent so that such Notes Rights Exercise Form is *actually received* by the Subscription Agent at or before the Rights Offering Termination Time; and (ii) pay to the Subscription Agent, by wire transfer of immediately available funds in accordance with the Payment Instructions (as defined below), its Aggregate Cash Exercise Price (as defined below), so that payment of the Aggregate Cash Exercise Price is *actually received* by the Subscription Agent at or before the Rights Offering Termination Time.  In addition to the foregoing, to participate in the Notes Rights Offering, a Rights Offering Participant must also (x) vote to accept the Plan with respect to all of the Claims and Interests owned by such Rights Offering Participant (to the extent any such Claims and Interests are entitled to vote to accept or reject the Plan) and timely deliver a ballot voting to accept the Plan with respect to all of the Claims and Interests owned by such Rights Offering Participant (to the extent any such Claims and Interests are entitled to vote to accept or reject the Plan) in accordance with solicitation procedures approved by the Bankruptcy Court, (y) not opt out of any releases set forth in Article VIII of the Plan, and (z) validly participate in the New Preferred Equity Rights Offering in the same proportionate amount that such Rights Offering Participant is participating in the Notes Rights Offering (clauses (x), (y) and (z) of this sentence being the "Additional Conditions").  Any Rights Offering Notes that could have been subscribed for and purchased pursuant to a valid exercise of Notes Rights that satisfied the Notes Rights Offering Conditions and the Additional Conditions, but did not satisfy one or more of the Notes Rights Offering Conditions or

Additional Conditions, shall be deemed not to have been subscribed for and purchased in the Notes Rights Offering.

If (A) a Rights Offering Participant shall not be permitted to participate in the Notes Rights Offering because such Rights Offering Participant failed to satisfy all of the Notes Rights Offering Conditions and all of the Additional Conditions, and (B) such Rights Offering Participant shall have delivered to the Subscription Agent such Rights Offering Participant's Aggregate Cash Exercise Price (or any portion thereof), then such Aggregate Cash Exercise Price (or any portion thereof) shall be refunded to such Rights Offering Participant, without interest, as soon as reasonably practicable (but in no event later than ten (10) Business Days) after the Effective Date (without offset, set-off, counterclaim or reduction of any kind by the Subscription Agent or any of the Debtors).

Anything herein to the contrary notwithstanding, if any Backstop Party that holds an Eligible Claim as of the Rights Offering Record Date or any Backstop Party's Affiliate that holds an Eligible Claim as of the Rights Offering Record Date (in either case) participates in the Notes Rights Offering in its capacity as a Rights Offering Participant, then such Backstop Party or such Affiliate shall not be required to pay its Aggregate Cash Exercise Price at or before the Rights Offering Termination Time, but rather shall be permitted to deposit its Aggregate Cash Exercise Price into the Deposit Account (as defined in the Backstop Purchase Agreement) at any time on or before the Deposit Deadline (as defined in the Backstop Purchase Agreement) in the same manner that a Backstop Party would be required to deposit its Aggregate Notes Cash Purchase Price (as defined in the Backstop Purchase Agreement) into the Deposit Account pursuant to Section 2.2(d) of the Backstop Purchase Agreement.

When the Notes Rights Exercise Forms are mailed to Rights Offering Participants, the Debtors shall include in such mailing written instructions (the "Payment Instructions") relating to the payment of the Aggregate Cash Exercise Price for each Rights Offering Participant that exercises its Notes Rights. The Payment Instructions shall include wire transfer instructions for the payment of the Aggregate Cash Exercise Price for each Rights Offering Participant that exercises its Notes Rights.

The purchase price for Rights Offering Notes shall be equal to the principal amount thereof. Any reference to a Rights Offering Participant's "Aggregate Exercise Price" shall mean an aggregate amount equal to the portion of the Notes Rights Offering Amount that such Rights Offering Participant validly elects to subscribe for and purchase (as set forth in the Notes Rights Exercise Form that such Rights Offering Participant properly completes and duly executes and delivers to the Subscription Agent at or before the Rights Offering Termination Time).

Each Rights Offering Participant electing to exercise its Notes Rights in the Notes Rights Offering shall have the right to pay its Aggregate Exercise Price by (at the sole option and election of such Rights Offering Participant) (A) exchanging all or any portion of the principal amount of First Lien Claims owned by such Rights Offering Participant and/or one or more Affiliates of such Rights Offering Participant that are identified in such Rights Offering Participant's Notes Rights Exercise Form, in each case, as of the Rights Offering Termination Time (any such exchange of First Lien Claims, a "Credit Facility Claim Exchange") and/or

6

(B) paying Cash in an aggregate amount (taking together <u>clauses (A)</u> and <u>(B)</u>) equal to the Aggregate Exercise Price for such Rights Offering Participant.  Any First Lien Claims that are exchanged in a Credit Facility Claim Exchange shall acquire Rights Offering Notes on a dollar-for-dollar basis based on the aggregate principal amount of such First Lien Claims (it being understood and agreed that (1) the principal amount of all such First Lien Claims shall continue to accrue interest through the Effective Date and (2) all accrued and unpaid interest on such First Lien Claims as of the Effective Date shall be paid in full in Cash on the Effective Date pursuant to the Plan).  Each Rights Offering Participant shall indicate on its Notes Rights Exercise Form whether such Rights Offering Participant elects to pay such Rights Offering Participant's Aggregate Exercise Price through a Credit Facility Claim Exchange (and the respective aggregate principal amounts of First Lien Claims owned by such Rights Offering Participant and, if applicable, any Affiliate(s) of such Rights Offering Participant whose First Lien Claims will be subject to such Credit Facility Claim Exchange) and/or with Cash (and the amount of such Cash).  The portion of a Rights Offering Participant's Aggregate Exercise Price that such Rights Offering Participant elects to pay in Cash shall be referred to herein as such Rights Offering Participant's "<u>Aggregate Cash Exercise Price</u>".   Subject to the immediately succeeding paragraph, if a Rights Offering Participant shall (I) fail to make an election on its Notes Rights Exercise Form as to the form of payment of its Aggregate Exercise Price or (II) elect on its Notes Rights Exercise Form to pay all or any portion of its Aggregate Exercise Price through a Credit Facility Claim Exchange and the aggregate principal amount of First Lien Claims owned by such Rights Offering Participant and, if applicable, any Affiliate(s) of such Rights Offering Participant that is (are) identified in such Rights Offering Participant's Notes Rights Exercise Form, in each case, as of the Rights Offering Termination Time is less than the aggregate principal amount of First Lien Claims that such Rights Offering Participant has elected to be subject to such Credit Facility Claim Exchange (as specified on such Rights Offering Participant's Notes Rights Exercise Form), then (in either case of <u>clause (I)</u> or <u>clause (II)</u>) such Rights Offering Participant shall be deemed to not have properly completed its Notes Rights Exercise Form and, as such, the Notes Rights Offering Conditions shall not have been satisfied with respect to such Rights Offering Participant.

Anything herein to the contrary notwithstanding, if any Backstop Party that holds an Eligible Claim as of the Rights Offering Record Date or any Backstop Party's Affiliate that holds an Eligible Claim as of the Rights Offering Record Date (in either case) participates in the Notes Rights Offering in its capacity as a Rights Offering Participant, then (a) such Backstop Party or such Affiliate shall not be required to elect the form of payment of its Aggregate Exercise Price in its Notes Rights Exercise Form, but rather shall be permitted to make such election at any time on or before the Purchase Notice Deadline (as defined in the Backstop Purchase Agreement) in the same manner that a Backstop Party would be required to make such election with respect to such Backstop Party's Aggregate Notes Purchase Price (as defined in the Backstop Purchase Agreement) pursuant to Section 2.2(c) of the Backstop Purchase Agreement, and (b) such Backstop Party or such Affiliate shall be permitted to pay all or any portion of its Aggregate Exercise Price through a Credit Facility Claim Exchange with First Lien Claims owned by such Backstop Party or such Affiliate and/or one or more Affiliates of such Backstop Party or such Affiliate that are identified by such Backstop Party or such Affiliate as of the time such Backstop Party or such Affiliate makes the election described in <u>clause (a)</u> of this paragraph.

(b)      **Failure to Exercise Notes Rights**

**Unexercised Notes Rights (including Notes Rights that are not validly exercised) will be relinquished immediately following the Rights Offering Termination Time.**  If a Rights Offering Participant does not satisfy each of the Notes Rights Offering Conditions and each of the Additional Conditions for any reason (including by failing to deliver a duly executed and properly completed Notes Rights Exercise Form to the Subscription Agent so that such document is *actually received* by the Subscription Agent at or before the Rights Offering Termination Time), such Rights Offering Participant shall be deemed to have fully and irrevocably relinquished and waived its Notes Rights.  Notes Rights issued to a Rights Offering Participant that holds an Eligible General Unsecured Claim as of the Rights Offering Record Date are also subject to termination, and the exercise thereof is subject to voidance, rescission and invalidation, pursuant to the terms set forth in the "Notes Rights Forfeiture Events" section of these Notes Rights Offering Procedures.

Any attempt to exercise Notes Rights after the Rights Offering Termination Time shall be null and void and the Debtors shall not be obligated to honor any such purported exercise after the Rights Offering Termination Time, regardless of when the documents relating thereto were sent.

**The method of delivery of the Notes Rights Exercise Form, the AI Questionnaire and any other documents is at the option and sole risk of the Person making such delivery, and delivery will be considered made only when *actually received* by the Subscription Agent.  If delivery is by mail, registered mail with return receipt requested, properly insured, is encouraged and strongly recommended.  In all cases, the Person delivering such documents should allow sufficient time to ensure timely delivery on or prior to the Questionnaire Deadline and the Rights Offering Termination Time (as applicable).**

**The risk of non-delivery of the AI Questionnaire, the Notes Rights Exercise Form and any other documents sent to the Subscription Agent in connection with the Notes Rights Offering and/or the exercise of the Notes Rights lies solely with the Person making such delivery, and none of the Debtors, the Reorganized Debtors, the Backstop Parties, or any of their respective officers, directors, employees, agents or advisors, including the Subscription Agent, assumes the risk of non-delivery under any circumstance whatsoever.**

(c)      **Payment for Rights Offering Notes**

If, on or prior to the Rights Offering Termination Time, the Subscription Agent for any reason does not receive from or on behalf of a Rights Offering Participant immediately available funds by wire transfer in an amount equal to the Aggregate Cash Exercise Price (if any) for such Rights Offering Participant's exercised Notes Rights, such Rights Offering Participant shall be deemed to have fully and irrevocably relinquished and waived its Notes Rights. Anything herein to the contrary notwithstanding, if any Backstop Party that holds an Eligible Claim as of the Rights Offering Record Date or any Backstop Party's Affiliate that holds an Eligible Claim as of the Rights Offering Record Date (in either case) participates in the Notes Rights Offering in its capacity as a Rights Offering Participant, then such Backstop Party or such

8

Affiliate shall not be required to pay its Aggregate Cash Exercise Price (if any) at or before the Rights Offering Termination Time, but rather shall be permitted to deposit its Aggregate Cash Exercise Price into the Deposit Account at any time on or before the Deposit Deadline in the same manner that a Backstop Party would be required to deposit its Aggregate Notes Cash Purchase Price in the Deposit Account pursuant to Section 2.2(d) of the Backstop Purchase Agreement.

The aggregate amount of Cash received by the Debtors from (i) Rights Offering Participants for Rights Offering Notes in the Notes Rights Offering (other than Cash that is to be refunded to Rights Offering Participants as expressly set forth in these Notes Rights Offering Procedures) and (ii) the Backstop Parties for Unsubscribed Notes pursuant to the Backstop Purchase Agreement shall be used by Reorganized 21C solely for the purposes set forth in the Plan.

### (d)    Deemed Representations and Acknowledgements

Any Rights Offering Participant exercising Notes Rights and, except in the case of subclause (i) of this clause (d), any Affiliate of such Rights Offering Participant that is identified in such Rights Offering Participant's Notes Rights Exercise Form shall be deemed to have made the following representations and acknowledgements:

(i)     such Person held an Eligible Claim as of the Rights Offering Record Date;

(ii)    such Person is an Accredited Investor;

(iii)   the Notes Rights are not transferable or assignable, and may only be exercised by the Rights Offering Participant that originally received such Notes Rights;

(iv)    the exercise of the Notes Rights is and shall be irrevocable; provided, that (A) nothing in these Notes Rights Offering Procedures shall amend, modify or otherwise alter the right of the Requisite Backstop Parties to terminate the Backstop Purchase Agreement pursuant to the terms of the Backstop Purchase Agreement, and (B) the right of a Rights Offering Participant that holds an Eligible General Unsecured Claim as of the Rights Offering Record Date to participate in the Notes Rights Offering is subject to termination as set forth in the "Notes Rights Forfeiture Events" section of these Notes Rights Offering Procedures;

(v)     if the Rights Offering Participant elected on its Notes Rights Exercise Form to pay all or any portion of its Aggregate Exercise Price through a Credit Facility Claim Exchange, such Person owns or controls as of the Rights Offering Termination Time at least its respective aggregate principal amount of First Lien Claims subject to such Credit Facility Claim Exchange as set forth on such Notes Rights Exercise Form;

(vi) such Person has read and understands these Notes Rights Offering Procedures, the Notes Rights Exercise Form, the Plan and the Disclosure Statement and understands the terms and conditions herein and therein and the risks associated with the Debtors and their business as described in the Disclosure Statement;

(vii) such Person is not relying upon any information, representation or warranty other than as expressly set forth in these Notes Rights Offering Procedures, the Notes Rights Exercise Form, the Plan, or the Disclosure Statement; <u>provided</u>, <u>however</u>, that the Backstop Parties are relying on the representations and warranties of the Debtors made in the Backstop Purchase Agreement; and

(viii) such Person has consulted, to the extent deemed appropriate, with its own advisors as to the financial, tax, legal and related matters concerning an investment in the Rights Offering Notes and on that basis believes that an investment in the Rights Offering Notes is suitable and appropriate for itself.

**(e)** **<u>Disputes, Waivers, and Extensions</u>**

All determinations as to the proper completion, due execution, timeliness, or eligibility of any exercise of Notes Rights arising in connection with the submission of a Notes Rights Exercise Form or an AI Questionnaire, and other matters affecting the validity or effectiveness of any attempted exercise of any Notes Rights, shall be reasonably made by the Debtors, with the prior written consent of the Requisite Backstop Parties, which determinations shall be final and binding.  A Notes Rights Exercise Form or AI Questionnaire shall be deemed not properly completed, duly executed and/or duly delivered unless and until all defects and irregularities have been waived or cured within such time as the Debtors, with the prior written consent of the Requisite Backstop Parties, determine in their discretion.  The Debtors reserve the right, but are under no obligation, to give notice to any Rights Offering Participant regarding any defect or irregularity in connection with any purported exercise of Notes Rights by such Rights Offering Participant and the Debtors may, but are under no obligation to, permit such defect or irregularity to be cured within such time as they may, with the prior written consent of the Requisite Backstop Parties, determine in their discretion.  None of the Debtors, the Subscription Agent, or the Backstop Parties shall incur any liability for failure to give such notification.

The Debtors, with the prior written consent of the Requisite Backstop Parties, may (i) extend the duration of the Notes Rights Offering or adopt additional procedures to more efficiently administer the distribution and exercise of the Notes Rights; and (ii) make such other changes to the Notes Rights Offering, including changes that affect which Persons constitute Rights Offering Participants, that the Debtors, in the exercise of their reasonable judgment, determine are necessary.

**(f)** **<u>Funds</u>**

All payments required to be made in connection with a Rights Offering Participant's exercise of its Notes Rights (the "<u>Rights Offering Funds</u>") shall be deposited in

10

accordance with the "Payment for Rights Offering Notes" section of these Notes Rights Offering Procedures and held by the Subscription Agent in a segregated account or accounts pending the Effective Date, which segregated account or accounts will: (i) not constitute property of the Debtors' estates until the Effective Date; (ii) be separate and apart from, and not commingled with, the Subscription Agent's general operating funds and any other funds subject to any lien or any cash collateral arrangements; (iii) be maintained for the sole purpose of holding the money for administration of the Notes Rights Offering until the Effective Date; and (iv) be invested only in Cash, Cash equivalents and short-term direct obligations of the United States government. Subject to (x) the second paragraph of the "Exercise of Notes Rights – Exercise by Rights Offering Participants" section of these Notes Rights Offering Procedures, (y) the second paragraph of the "Notes Rights Offering Conditioned Upon Confirmation of the Plan; Reservation of Rights" section of these Notes Rights Offering Procedures and (z) the last paragraph in the "Notes Rights Forfeiture Events" section of these Notes Rights Offering Procedures, the Subscription Agent shall not use the Rights Offering Funds for any purpose other than to release the funds as directed by the Debtors on the Effective Date and shall not encumber, or permit the Rights Offering Funds to be encumbered, by any lien or similar encumbrance.

### (g)    Plan Releases

See Article VIII of the Plan for important information regarding releases.

### 5.    Transfer Restriction; Revocation

The Notes Rights received by each Rights Offering Participant shall not be transferable or assignable. The Notes Rights may only be exercised by or through the Rights Offering Participant entitled to exercise such Notes Rights on the Rights Offering Record Date. Any transfer or attempted transfer of the Notes Rights will be null and void and the Debtors will not treat any purported transferee thereof as the holder of any Notes Rights. Once the Rights Offering Participant has properly exercised its Notes Rights by making a Binding Rights Election, such exercise will not be permitted to be revoked by such Rights Offering Participant.

In addition, if a Rights Offering Participant properly exercises its Notes Rights and elects on its Notes Rights Exercise Form to pay all or any portion of its Aggregate Exercise Price through a Credit Facility Claim Exchange, then such Rights Offering Participant shall not, and shall not permit any Affiliate(s) of such Rights Offering Participant that is (are) identified on such Rights Offering Participant's Notes Rights Exercise Form to, on or after the Rights Offering Termination Time, sell, assign or otherwise transfer any of the First Lien Claims that are owned by such Rights Offering Participant or such Affiliate(s) such that such Rights Offering Participant or such Affiliate(s) shall own First Lien Claims immediately after such sale, assignment or transfer in an aggregate principal amount that is less than the aggregate principal amount of First Lien Claims owned by such Rights Offering Participant or such Affiliate(s) that are subject to such Credit Facility Claim Exchange.

### 6.    Notes Rights Forfeiture Events

If (a) a Rights Offering Participant's Eligible General Unsecured Claim as of the Rights Offering Record Date (or any portion thereof) is not an Allowed General Unsecured

Claim on the date that is one (1) Business Day after the Confirmation Hearing, or (b) a Rights Offering Participant that holds an Eligible General Unsecured Claim as of the Rights Offering Record Date either (x) makes the Convenience Claim Election with respect to such Eligible General Unsecured Claim on a properly cast ballot under the Plan (if such Eligible General Unsecured Claim is greater than $1,000,000) or (y) fails to make the New Common Stock Election with respect to such Eligible General Unsecured Claim on a properly cast ballot under the Plan (if such Eligible General Unsecured Claim is less than or equal to $1,000,000) (each of the events described in clauses (a) and (b) of this sentence being referred to herein as a "Notes Rights Forfeiture Event"), then (in any such case): (i) such Rights Offering Participant's Notes Rights that were issued to such Rights Offering Participant on account of such Eligible General Unsecured Claim (or such portion thereof) shall be deemed immediately and automatically terminated as of the date of the occurrence of such Notes Rights Forfeiture Event (even if such Notes Rights were exercised prior to such date), without a need for any further action on the part of (or notice provided to) any Person, except as otherwise provided in this Section 6, (ii) such Rights Offering Participant shall not be permitted to participate in the Notes Rights Offering with respect to such Notes Rights, and (iii) any exercise of such Notes Rights by (or on behalf of) such Rights Offering Participant prior to the date of the occurrence of such Notes Rights Forfeiture Event shall be deemed void, irrevocably rescinded and of no further force or effect, and the Rights Offering Notes that could have been subscribed for and purchased pursuant to a valid exercise of such Notes Rights shall be deemed not to have been subscribed for and purchased in the Notes Rights Offering.

If (a) a Rights Offering Participant exercised its Notes Rights (on account of its Eligible General Unsecured Claim as of the Rights Offering Record Date (or any portion thereof)) on or before the Rights Offering Termination Time in accordance with the Notes Rights Offering Procedures, and (b) a Notes Rights Forfeiture Event shall occur with respect to such Eligible General Unsecured Claim (or such portion thereof), then such Rights Offering Participant shall be entitled to receive from the Debtors a notice of such Notes Rights Forfeiture Event as soon as reasonably practicable following the occurrence thereof; *provided*, *however*, that the failure of the Debtors to deliver any such notice shall not affect the occurrence of the Notes Rights Forfeiture Event or the effects thereof on the Rights Offering Participant's Notes Rights (or the exercise thereof) or the ability of such Rights Offering Participant to participate in the Notes Rights Offering, all as set forth in the immediately preceding paragraph.  Further, if (i) a Notes Rights Forfeiture Event shall occur with respect to a Rights Offering Participant's Eligible General Unsecured Claim as of the Rights Offering Record Date (or any portion thereof), and (ii) such Rights Offering Participant shall have delivered to the Subscription Agent the Aggregate Cash Exercise Price (or any portion thereof) with respect to the exercise of any of the Notes Rights received by such Rights Offering Participant on account of such Eligible General Unsecured Claim (or such portion thereof), then such Aggregate Cash Exercise Price (or such portion thereof) shall be refunded to such Rights Offering Participant, without interest, as soon as reasonably practicable (but in no event later than ten (10) Business Days) after the Effective Date (without offset, set-off, counterclaim or reduction of any kind by the Subscription Agent or any of the Debtors).

7.    **Inquiries and Transmittal Of Documents; Subscription Agent**

The instructions contained in the Notes Rights Exercise Form should be carefully read and strictly followed.

All questions relating to these Notes Rights Offering Procedures, other documents associated with the Notes Rights Offering, or the requirements to participate in the Notes Rights Offering should be directed to the Subscription Agent:

<div align="center">

**21st Century Oncology Holdings, Inc.**
**c/o Kurtzman Carson Consultants, LLC**
**2335 Alaska Avenue**
**El Segundo, CA 90245**
**Phone:  (888) 251-2679 (US toll-free)**

</div>

8.    **Notes Rights Offering Conditioned Upon Confirmation of the Plan; Reservation of Rights**

All exercises of Notes Rights are subject to and conditioned upon the confirmation and effectiveness of the Plan.  The Debtors will accept a Binding Rights Election only upon the confirmation (subject to termination for a Notes Rights Forfeiture Event) and effectiveness of the Plan.

In the event that (i) the Notes Rights Offering is terminated, (ii) the Debtors revoke or withdraw the Plan, or (iii) the Backstop Purchase Agreement is terminated in accordance with the terms thereof, the Subscription Agent shall return all amounts received from the Rights Offering Participants, without any interest, as soon as reasonably practicable (but in no event later than ten (10) Business Days) after the occurrence of the Effective Date (all without offset, set-off, counterclaim or reduction of any kind by the Subscription Agent or any of the Debtors), and, in the case of clauses (ii) and (iii) above, the Notes Rights Offering shall automatically be terminated.

9.    **Miscellaneous**

(a)    **Rights Offering Distribution Date**

The Rights Offering Notes acquired in connection with the Notes Rights Offering by Rights Offering Participants that have elected to participate in the Notes Rights Offering and who have validly exercised their Notes Rights shall be distributed in accordance with the distribution provisions contained in the Plan.

(b)    **No Public Market or Listing**

There is not and there may not be a public market for the Rights Offering Notes, and the Debtors do not intend to seek any listing or quotation of the Rights Offering Notes on any stock exchange, other trading market or quotation system of any type whatsoever on the Effective Date.  Accordingly, there can be no assurance that an active trading market for the

Rights Offering Notes will ever develop or, if such a market does develop, that it will be maintained.

[*Remainder of Page Intentionally Left Blank.*]

## **SCHEDULE 14**

### **New Preferred Equity Rights Offering Procedures**

Christopher Marcus, P.C.
John T. Weber
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

James H.M. Sprayregen, P.C.
William A. Guerrieri (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| 21st CENTURY ONCOLOGY HOLDINGS, INC., *et al.*,[1] | ) | Case No. 17-22770 (RDD) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## EQUITY RIGHTS OFFERING PROCEDURES

1.    **Introduction**

          21st Century Oncology Holdings, Inc. ("21C Holdings") and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") are pursuing a proposed restructuring (the "Restructuring") of their existing debt and other obligations to be effectuated pursuant to a plan of reorganization (the "Plan")[2] in connection with voluntary, pre-arranged reorganization cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 − 1532 (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), in accordance with the terms and conditions set forth in the Restructuring Support Agreement.

          In connection with the Plan, after obtaining approval of these procedures (these "Equity Rights Offering Procedures") by the Bankruptcy Court and in accordance with the terms of the Backstop Purchase Agreement, the Debtors shall launch an equity rights offering (the "Equity Rights Offering") pursuant to which each holder of an Eligible Claim (as defined below) as of the Rights Offering Record Date (as defined below) that is an Accredited Investor (as set forth in a properly completed and duly executed AI Questionnaire (as defined below) that is

---

[1]    Each of the Debtors in the above-captioned jointly administered chapter 11 cases and their respective tax identification numbers are set forth in the *Order Directing Joint Administration of Chapter 11 Cases* [Docket No. 30]. The location of 21st Century Oncology Holdings, Inc.'s corporate headquarters and the Debtors' service address is: 2270 Colonial Boulevard, Fort Myers, Florida 33907.

[2]    All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in Plan.

delivered by such holder to the Subscription Agent (as defined below) on or prior to the Questionnaire Deadline (as defined below) in accordance with these Equity Rights Offering Procedures) (each such holder, a "Rights Offering Participant" and, collectively, the "Rights Offering Participants") will be entitled to receive non-transferable, non-certificated rights (the "Equity Rights"), but not the obligation, to purchase such Rights Offering Participant's *pro rata* share (based on the proportion that such Rights Offering Participant's Eligible Claim as of the Rights Offering Record Date bears to the aggregate amount of (i) all Eligible General Unsecured Claims (as defined below) as of the Rights Offering Record Date held by each Person that has certified it is an Accredited Investor (as demonstrated by such Person's properly completed, duly executed and timely delivered AI Questionnaire) on or prior to the Questionnaire Deadline plus (ii) all Allowed (as defined below) Note Claims as of the Rights Offering Record Date) of shares of New Preferred Equity (the "Rights Offering Shares") in an aggregate initial liquidation value of $88,235,000 (the "Equity Rights Offering Amount").  Rights Offering Participants will be issued Equity Rights at no charge.

"Allowed" means, with respect to any Claim (or any portion thereof), as of any date of determination, (a) a Claim that is evidenced by a Proof of Claim Filed by the applicable Bar Date in accordance with the Bar Date Order; (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely filed; or (c) a Claim that is allowed pursuant to the Plan or a Final Order of the Bankruptcy Court as of such date; provided, that with respect to a Claim described in clauses (a) and (b) above (except any Claim allowed pursuant to the DIP Orders), such Claim shall be considered "Allowed" as of such date of determination only to the extent that, with respect to such Claim, no objection to allowance or priority or a request for estimation thereof has been interposed on or prior to such date, or such an objection is so interposed and the Claim has been allowed by a Final Order of the Bankruptcy Court as of such date.

"Disputed" means, with respect to any Claim (or any portion thereof), as of any date of determination, a Claim that is neither Allowed nor disallowed as of such date.

"Eligible Claim" means any Allowed Note Claim or Eligible General Unsecured Claim.

"Eligible General Unsecured Claim" means any General Unsecured Claim that is either Allowed or Disputed.

Prior to receipt of the Equity Rights Exercise Form (as defined below) and the other documents and materials related to the Equity Rights Offering, each holder of an Eligible Claim as of the Rights Offering Record Date will receive an accredited investor questionnaire (the "AI Questionnaire") to determine whether such holder is an Accredited Investor, which must be completed and delivered to Kurtzman Carson Consultants LLC, the subscription agent for the Equity Rights Offering (in such capacity, the "Subscription Agent"), by each such holder that wants to participate in the Equity Rights Offering by no later than November 6, 2017 (the "Questionnaire Deadline").  Any holder of an Eligible Claim as of the Rights Offering Record Date that does not properly complete, duly execute and deliver to the Subscription Agent an AI Questionnaire so that such AI Questionnaire is actually received by the Subscription Agent on or prior to the Questionnaire Deadline will not be eligible to participate in the Equity Rights

Offering unless otherwise agreed to by the Debtors with the written consent of the Requisite Backstop Parties.  Anything herein to the contrary notwithstanding, the Backstop Parties and their Affiliates (as defined in the Backstop Purchase Agreement), in their capacities as holders of Eligible Claims as of the Rights Offering Record Date, shall not be required to complete, execute and deliver an AI Questionnaire and shall be deemed Rights Offering Participants.  Each holder of an Allowed Note Claim as of the Rights Offering Record Date is entitled to receive sufficient copies of the AI Questionnaire for distribution to the beneficial owners of the Notes for whom such Rights Offering Participant holds such Notes.

Rights Offering Shares shall have an initial liquidation value of $100 per Rights Offering Share, unless otherwise agreed to by the Debtors and the Requisite Backstop Parties. Fractional Rights Offering Shares shall not be issued upon exercise of the Equity Rights and Rights Offering Participants that otherwise would have received fractional Rights Offering Shares shall not be paid any compensation in respect of such fractional Rights Offering Shares. Each Rights Offering Participant's maximum amount of Rights Offering Shares that such Rights Offering Participant is permitted to subscribe for pursuant to the exercise of its Equity Rights shall be rounded down to the nearest whole Rights Offering Share.

**THE DISCLOSURE STATEMENT DISTRIBUTED IN CONNECTION WITH THE DEBTORS' SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN SETS FORTH IMPORTANT INFORMATION THAT SHOULD BE CAREFULLY READ AND CONSIDERED BY EACH RIGHTS OFFERING PARTICIPANT PRIOR TO MAKING A DECISION TO PARTICIPATE IN THE EQUITY RIGHTS OFFERING, INCLUDING ARTICLE IX OF THE DISCLOSURE STATEMENT REGARDING CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE EXERCISING ANY EQUITY RIGHTS.**

2.    **Backstop Purchase Agreement**

Any Rights Offering Shares that are not subscribed for and purchased in the Equity Rights Offering by a Rights Offering Participant (including (i) any Rights Offering Shares that holders of Eligible Claims as of the Rights Offering Record Date who are not Accredited Investors (or holders of Eligible Claims as of the Rights Offering Record Date that did not properly complete, duly execute and deliver to the Subscription Agent by the Questionnaire Deadline an AI Questionnaire in accordance with these Equity Rights Offering Procedures) could have purchased if such holders had received Equity Rights if they were Accredited Investors (or had properly completed, duly executed and delivered to the Subscription Agent by the Questionnaire Deadline an AI Questionnaire in accordance with these Equity Rights Offering Procedures) and exercised such Equity Rights in the Equity Rights Offering, (ii) any Rights Offering Shares that are not subscribed for and purchased in the Equity Rights Offering on account of any rounding down of fractional Rights Offering Shares, (iii) any Rights Offering Shares that are not subscribed for and purchased in the Equity Rights Offering by a holder of an Eligible General Unsecured Claim as of the Rights Offering Record Date on account of such holder having either (x) made the Convenience Claim Election with respect to such Eligible General Unsecured Claim on a properly cast ballot under the Plan (if such Eligible General Unsecured Claim is greater than $1,000,000) or (y) failed to make the New Common Stock Election with respect to such Eligible General Unsecured Claim on a properly cast ballot

under the Plan (if such Eligible General Unsecured Claim is less than or equal to $1,000,000), (iv) any Rights Offering Shares that are not subscribed for and purchased in the Equity Rights Offering on account of any Rights Offering Participant failing to satisfy any of the Equity Rights Offering Conditions (as defined below) or Additional Conditions (as defined below), or (v) any Rights Offering Shares that are not subscribed for and purchased in the Equity Rights Offering on account of any Eligible General Unsecured Claim as of the Rights Offering Record Date (or any portion thereof) failing to be an Allowed Claim on the date that is one (1) Business Day after the Confirmation Hearing) (such Rights Offering Shares, the "Unsubscribed Shares") shall be put to and purchased by the Backstop Parties (subject to their respective Backstop Equity Commitment Amounts) in accordance with the terms and conditions of the Backstop Purchase Agreement.

There will be no over-subscription privilege provided in connection with the Equity Rights Offering, such that any Unsubscribed Shares will not be offered to other Rights Offering Participants, but rather will be purchased by the Backstop Parties (subject to their respective Backstop Equity Commitment Amounts) in accordance with the terms and conditions of the Backstop Purchase Agreement.

In consideration for the Debtors' right to call the Backstop Equity Commitments (as defined in the Backstop Purchase Agreement) of the Backstop Parties to purchase the Unsubscribed Shares pursuant to the terms of the Backstop Purchase Agreement, 21C Holdings shall issue to the Backstop Parties (or their designees) additional shares of New Preferred Equity with an aggregate initial liquidation value equal to $5,625,000 (the "Equity Put Option Shares") on a *pro rata* basis based upon their respective Backstop Commitment Percentages.  The Equity Put Option Shares will be issued only to the Backstop Parties that do not default on their respective Backstop Equity Commitments.

## 3.    Commencement and Expiration of the Equity Rights Offering; Rights Offering Record Date

The Equity Rights Offering shall commence on November 9, 2017 (the "Rights Offering Commencement Date").  On the Rights Offering Commencement Date, the Equity Rights Exercise Forms and the other documents and materials related to the Equity Rights Offering shall be mailed by or on behalf of the Debtors to the Rights Offering Participants.

The Equity Rights Offering shall expire at 5:00 p.m. (New York City time) on November 29, 2017 (such date, the "Rights Offering Termination Date" and such time on the Rights Offering Termination Date, the "Rights Offering Termination Time").  If the Rights Offering Termination Date and/or the Rights Offering Termination Time is/are extended in accordance with the terms of these Equity Rights Offering Procedures, the Debtors shall promptly notify the Rights Offering Participants, before 9:00 a.m. (New York City time) on the Business Day before the then-effective Rights Offering Termination Date, in writing, of such extension and the date of the new Rights Offering Termination Date and/or the time of the new Rights Offering Termination Time.  Each Rights Offering Participant intending to participate in the Equity Rights Offering must affirmatively make an election to exercise its Equity Rights at or prior to the Rights Offering Termination Time in accordance with the provisions of Section 4 below.

4

"Rights Offering Record Date" means October 16, 2017.

**4.    Exercise of Equity Rights**

Each Rights Offering Participant that elects to participate in the Equity Rights Offering must have timely satisfied each of the Equity Rights Offering Conditions. Any Rights Offering Participant that has timely satisfied each of the Equity Rights Offering Conditions shall be deemed to have made a binding, irrevocable election to exercise its Equity Rights to the extent set forth in the Equity Rights Exercise Form delivered by such Rights Offering Participant (a "Binding Rights Election"); provided, however, that (A) a Rights Offering Participant's right to participate in the Equity Rights Offering shall remain subject to its compliance with the Additional Conditions, and (B) the right of a Rights Offering Participant that holds an Eligible General Unsecured Claim as of the Rights Offering Record Date to participate in the Equity Rights Offering is subject to termination as set forth in the "Equity Rights Forfeiture Events" section of these Equity Rights Offering Procedures.

**The Binding Rights Election Cannot Be Withdrawn.**

Each Rights Offering Participant is entitled to participate in the Equity Rights Offering solely to the extent provided in these Equity Rights Offering Procedures. Further, each Rights Offering Participant may exercise all or any portion of such Rights Offering Participant's Equity Rights; provided, however, that a Rights Offering Participant shall not be permitted to participate in the Equity Rights Offering unless such Rights Offering Participant also participates in the New Notes Rights Offering in an equal proportionate amount.

**(a)    Exercise by Rights Offering Participants**

To exercise its Equity Rights, each Rights Offering Participant must satisfy each of the following conditions (collectively, the "Equity Rights Offering Conditions"): (i) deliver a duly executed and properly completed equity rights offering subscription exercise form (the "Equity Rights Exercise Form") to the Subscription Agent so that such Equity Rights Exercise Form is *actually received* by the Subscription Agent at or before the Rights Offering Termination Time; (ii) pay to the Subscription Agent, by wire transfer of immediately available funds in accordance with the Payment Instructions (as defined below), its Aggregate Exercise Price (as defined below), so that payment of the Aggregate Exercise Price is *actually received* by the Subscription Agent at or before the Rights Offering Termination Time; and (iii) deliver a duly executed and properly completed counterpart signature page to the New Stockholders Agreement to the Subscription Agent so that such counterpart signature page to the New Stockholders Agreement is *actually received* by the Subscription Agent at or before the Rights Offering Termination Time. In addition to the foregoing, to participate in the Equity Rights Offering, a Rights Offering Participant must also (x) vote to accept the Plan with respect to all of the Claims and Interests owned by such Rights Offering Participant (to the extent any such Claims and Interests are entitled to vote to accept or reject the Plan) and timely deliver a ballot voting to accept the Plan with respect to all of the Claims and Interests owned by such Rights Offering Participant (to the extent any such Claims and Interests are entitled to vote to accept or reject the Plan) in accordance with solicitation procedures approved by the Bankruptcy Court, (y) not opt out of any releases set forth in Article VIII of the Plan, and (z) validly participate in the New

5

Notes Rights Offering in the same proportionate amount that such Rights Offering Participant is participating in the Equity Rights Offering (clauses (x), (y) and (z) of this sentence being the "Additional Conditions").  Any Rights Offering Shares that could have been subscribed for and purchased pursuant to a valid exercise of Equity Rights that satisfied the Equity Rights Offering Conditions and the Additional Conditions, but did not satisfy one or more of the Equity Rights Offering Conditions or Additional Conditions, shall be deemed not to have been subscribed for and purchased in the Equity Rights Offering.

If (A) a Rights Offering Participant shall not be permitted to participate in the Equity Rights Offering because such Rights Offering Participant failed to satisfy all of the Equity Rights Offering Conditions and all of the Additional Conditions, and (B) such Rights Offering Participant shall have delivered to the Subscription Agent such Rights Offering Participant's Aggregate Exercise Price (or any portion thereof), then such Aggregate Exercise Price (or any portion thereof) shall be refunded to such Rights Offering Participant, without interest, as soon as reasonably practicable (but in no event later than ten (10) Business Days) after the Effective Date (without offset, set-off, counterclaim or reduction of any kind by the Subscription Agent or any of the Debtors).

Anything herein to the contrary notwithstanding, if any Backstop Party that holds an Eligible Claim as of the Rights Offering Record Date or any Backstop Party's Affiliate that holds an Eligible Claim as of the Rights Offering Record Date (in either case) participates in the Equity Rights Offering in its capacity as a Rights Offering Participant, then such Backstop Party or such Affiliate shall not be required to pay its Aggregate Exercise Price at or before the Rights Offering Termination Time, but rather shall be permitted to deposit its Aggregate Exercise Price into the Deposit Account (as defined in the Backstop Purchase Agreement) at any time on or before the Deposit Deadline (as defined in the Backstop Purchase Agreement) in the same manner that a Backstop Party would be required to deposit its Aggregate Share Purchase Price (as defined in the Backstop Purchase Agreement) in the Deposit Account pursuant to Section 1.2(c) of the Backstop Purchase Agreement.

When the Equity Rights Exercise Forms are mailed to Rights Offering Participants, the Debtors shall include in such mailing written instructions (the "Payment Instructions") relating to the payment of the Aggregate Exercise Price for each Rights Offering Participant that exercises its Equity Rights.  The Payment Instructions shall include wire transfer instructions for the payment of the Aggregate Exercise Price for each Rights Offering Participant that exercises its Equity Rights.

Any reference to a Rights Offering Participant's "Aggregate Exercise Price" shall mean an aggregate amount equal to the product of (a) eighty-five percent (85%) and (b) the portion of the Equity Rights Offering Amount that such Rights Offering Participant validly elects to subscribe for and purchase (as set forth in the Equity Rights Exercise Form that such Rights Offering Participant properly completes and duly executes and delivers to the Subscription Agent at or before the Rights Offering Termination Time).

(b)    **Failure to Exercise Equity Rights**

**Unexercised Equity Rights (including Equity Rights that are not validly exercised) will be relinquished immediately following the Rights Offering Termination Time.** If a Rights Offering Participant does not satisfy each of the Equity Rights Offering Conditions and each of the Additional Conditions for any reason (including by failing to deliver a duly executed and properly completed Equity Rights Exercise Form to the Subscription Agent so that such document is *actually received* by the Subscription Agent at or before the Rights Offering Termination Time), such Rights Offering Participant shall be deemed to have fully and irrevocably relinquished and waived its Equity Rights. Equity Rights issued to a Rights Offering Participant that holds an Eligible General Unsecured Claim as of the Rights Offering Record Date are also subject to termination, and the exercise thereof is subject to voidance, rescission and invalidation, pursuant to the terms set forth in the "Equity Rights Forfeiture Events" section of these Equity Rights Offering Procedures.

Any attempt to exercise Equity Rights after the Rights Offering Termination Time shall be null and void and the Debtors shall not be obligated to honor any such purported exercise after the Rights Offering Termination Time, regardless of when the documents relating thereto were sent.

**The method of delivery of the Equity Rights Exercise Form, the AI Questionnaire and any other documents is at the option and sole risk of the Person making such delivery, and delivery will be considered made only when *actually received* by the Subscription Agent. If delivery is by mail, registered mail with return receipt requested, properly insured, is encouraged and strongly recommended. In all cases, the Person delivering such documents should allow sufficient time to ensure timely delivery on or prior to the Questionnaire Deadline and the Rights Offering Termination Time (as applicable).**

**The risk of non-delivery of the AI Questionnaire, the Equity Rights Exercise Form and any other documents sent to the Subscription Agent in connection with the Equity Rights Offering and/or the exercise of the Equity Rights lies solely with the Person making such delivery, and none of the Debtors, the Reorganized Debtors, the Backstop Parties, or any of their respective officers, directors, employees, agents or advisors, including the Subscription Agent, assumes the risk of non-delivery under any circumstance whatsoever.**

(c)    **Payment for Rights Offering Shares**

If, on or prior to the Rights Offering Termination Time, the Subscription Agent for any reason does not receive from or on behalf of a Rights Offering Participant immediately available funds by wire transfer in an amount equal to the Aggregate Exercise Price for such Rights Offering Participant's exercised Equity Rights, such Rights Offering Participant shall be deemed to have fully and irrevocably relinquished and waived its Equity Rights. Anything herein to the contrary notwithstanding, if any Backstop Party that holds an Eligible Claim as of the Rights Offering Record Date or any Backstop Party's Affiliate that holds an Eligible Claim as of the Rights Offering Record Date (in either case) participates in the Equity Rights Offering

7

in its capacity as a Rights Offering Participant, then such Backstop Party or such Affiliate shall not be required to pay its Aggregate Exercise Price at or before the Rights Offering Termination Time, but rather shall be permitted to deposit its Aggregate Exercise Price into the Deposit Account at any time on or before the Deposit Deadline in the same manner that a Backstop Party would be required to deposit its Aggregate Share Purchase Price into the Deposit Account pursuant to Section 1.2(c) of the Backstop Purchase Agreement.

The aggregate amount of Cash received by the Debtors from (i) Rights Offering Participants for Rights Offering Shares in the Equity Rights Offering (other than Cash that is to be refunded to Rights Offering Participants as expressly set forth in these Equity Rights Offering Procedures) and (ii) the Backstop Parties for Unsubscribed Shares pursuant to the Backstop Purchase Agreement shall be referred to herein as the "Equity Rights Offering Cash Amount". The Equity Rights Offering Cash Amount shall be used: (x) first, to satisfy any unpaid amounts constituting obligations under or arising in connection with the DIP Facility outstanding on the Effective Date; (y) second, to satisfy out-of-pocket costs and expenses incurred by the Debtors in connection with the Restructuring Transaction; and (z) third, for working capital and other general corporate purposes of the Reorganized Debtors following the Effective Date.

### (d) Deemed Representations and Acknowledgements

Any Rights Offering Participant exercising Equity Rights shall be deemed to have made the following representations and acknowledgements:

(i) such Person held an Eligible Claim as of the Rights Offering Record Date;

(ii) such Person is an Accredited Investor;

(iii) the Equity Rights are not transferable or assignable, and may only be exercised by the Rights Offering Participant that originally received such Equity Rights;

(iv) the exercise of the Equity Rights is and shall be irrevocable; provided, that (A) nothing in these Equity Rights Offering Procedures shall amend, modify or otherwise alter the right of the Requisite Backstop Parties to terminate the Backstop Purchase Agreement pursuant to the terms of the Backstop Purchase Agreement, and (B) the right of a Rights Offering Participant that holds an Eligible General Unsecured Claim as of the Rights Offering Record Date to participate in the Equity Rights Offering is subject to termination as set forth in the "Equity Rights Forfeiture Events" section of these Equity Rights Offering Procedures;

(v) such Person has read and understands these Equity Rights Offering Procedures, the Equity Rights Exercise Form, the Plan and the Disclosure Statement and understands the terms and conditions herein and therein and the risks associated with the Debtors and their business as described in the Disclosure Statement;

8

(vi)  such Person is not relying upon any information, representation or warranty other than as expressly set forth in these Equity Rights Offering Procedures, the Equity Rights Exercise Form, the Plan, or the Disclosure Statement; provided, however, that the Backstop Parties are relying on the representations and warranties of the Debtors made in the Backstop Purchase Agreement; and

(vii)  such Person has consulted, to the extent deemed appropriate, with its own advisors as to the financial, tax, legal and related matters concerning an investment in the Rights Offering Shares and on that basis believes that an investment in the Rights Offering Shares is suitable and appropriate for itself.

### (e)    Disputes, Waivers, and Extensions

All determinations as to the proper completion, due execution, timeliness, or eligibility of any exercise of Equity Rights arising in connection with the submission of an Equity Rights Exercise Form or an AI Questionnaire, and other matters affecting the validity or effectiveness of any attempted exercise of any Equity Rights, shall be reasonably made by the Debtors, with the prior written consent of the Requisite Backstop Parties, which determinations shall be final and binding.  An Equity Rights Exercise Form or AI Questionnaire shall be deemed not properly completed, duly executed and/or duly delivered unless and until all defects and irregularities have been waived or cured within such time as the Debtors, with the prior written consent of the Requisite Backstop Parties, determine in their discretion.  The Debtors reserve the right, but are under no obligation, to give notice to any Rights Offering Participant regarding any defect or irregularity in connection with any purported exercise of Equity Rights by such Rights Offering Participant and the Debtors may, but are under no obligation to, permit such defect or irregularity to be cured within such time as they may, with the prior written consent of the Requisite Backstop Parties, determine in their discretion.  None of the Debtors, the Subscription Agent, or the Backstop Parties shall incur any liability for failure to give such notification.

The Debtors, with the prior written consent of the Requisite Backstop Parties, may (i) extend the duration of the Equity Rights Offering or adopt additional procedures to more efficiently administer the distribution and exercise of the Equity Rights; and (ii) make such other changes to the Equity Rights Offering, including changes that affect which Persons constitute Rights Offering Participants, that the Debtors, in the exercise of their reasonable judgment, determine are necessary.

### (f)    Funds

All payments required to be made in connection with a Rights Offering Participant's exercise of its Equity Rights (the "Rights Offering Funds") shall be deposited in accordance with the "Payment for Rights Offering Shares" section of these Equity Rights Offering Procedures and held by the Subscription Agent in a segregated account or accounts pending the Effective Date, which segregated account or accounts will: (i) not constitute property of the Debtors' estates until the Effective Date; (ii) be separate and apart from, and not commingled with, the Subscription Agent's general operating funds and any other funds subject

9

to any lien or any cash collateral arrangements; (iii) be maintained for the sole purpose of holding the money for administration of the Equity Rights Offering until the Effective Date; and (iv) be invested only in Cash, Cash equivalents and short-term direct obligations of the United States government.  Subject to (x) the second paragraph of the "Exercise of Equity Rights – Exercise by Rights Offering Participants" section of these Equity Rights Offering Procedures, (y) the second paragraph of the "Equity Rights Offering Conditioned Upon Confirmation of the Plan; Reservation of Rights" section of these Equity Rights Offering Procedures and (z) the last paragraph in the "Equity Rights Forfeiture Events" section of these Equity Rights Offering Procedures, the Subscription Agent shall not use the Rights Offering Funds for any purpose other than to release the funds as directed by the Debtors on the Effective Date and shall not encumber, or permit the Rights Offering Funds to be encumbered, by any lien or similar encumbrance.

### (g)    **Plan Releases**

See Article VIII of the Plan for important information regarding releases.

## 5.    **Transfer Restriction; Revocation**

The Equity Rights received by each Rights Offering Participant shall not be transferable or assignable.  The Equity Rights may only be exercised by or through the Rights Offering Participant entitled to exercise such Equity Rights on the Rights Offering Record Date. Any transfer or attempted transfer of the Equity Rights will be null and void and the Debtors will not treat any purported transferee thereof as the holder of any Equity Rights.  Once the Rights Offering Participant has properly exercised its Equity Rights by making a Binding Rights Election, such exercise will not be permitted to be revoked by such Rights Offering Participant.

## 6.    **Equity Rights Forfeiture Events**

If (a) a Rights Offering Participant's Eligible General Unsecured Claim as of the Rights Offering Record Date (or any portion thereof) is not an Allowed General Unsecured Claim on the date that is one (1) Business Day after the Confirmation Hearing, or (b) a Rights Offering Participant that holds an Eligible General Unsecured Claim as of the Rights Offering Record Date either (x) makes the Convenience Claim Election with respect to such Eligible General Unsecured Claim on a properly cast ballot under the Plan (if such Eligible General Unsecured Claim is greater than $1,000,000) or (y) fails to make the New Common Stock Election with respect to such Eligible General Unsecured Claim on a properly cast ballot under the Plan (if such Eligible General Unsecured Claim is less than or equal to $1,000,000) (each of the events described in clauses (a) and (b) of this sentence being referred to herein as an "Equity Rights Forfeiture Event"), then (in any such case): (i) such Rights Offering Participant's Equity Rights that were issued to such Rights Offering Participant on account of such Eligible General Unsecured Claim (or such portion thereof) shall be deemed immediately and automatically terminated as of the date of the occurrence of such Equity Rights Forfeiture Event (even if such Equity Rights were exercised prior to such date), without a need for any further action on the part of (or notice provided to) any Person, except as otherwise provided in this Section 6, (ii) such Rights Offering Participant shall not be permitted to participate in the Equity Rights Offering with respect to such Equity Rights, and (iii) any exercise of such Equity Rights by (or on behalf of) such Rights Offering Participant prior to the date of the occurrence of such Equity Rights

Forfeiture Event shall be deemed void, irrevocably rescinded and of no further force or effect, and the Rights Offering Shares that could have been subscribed for and purchased pursuant to a valid exercise of such Equity Rights shall be deemed not to have been subscribed for and purchased in the Equity Rights Offering.

If (a) a Rights Offering Participant exercised its Equity Rights (on account of its Eligible General Unsecured Claim as of the Rights Offering Record Date (or any portion thereof)) on or before the Rights Offering Termination Time in accordance with the Equity Rights Offering Procedures, and (b) an Equity Rights Forfeiture Event shall occur with respect to such Eligible General Unsecured Claim (or such portion thereof), then such Rights Offering Participant shall be entitled to receive from the Debtors a notice of such Equity Rights Forfeiture Event as soon as reasonably practicable following the occurrence thereof; *provided, however,* that the failure of the Debtors to deliver any such notice shall not affect the occurrence of the Equity Rights Forfeiture Event or the effects thereof on the Rights Offering Participant's Equity Rights (or the exercise thereof) or the ability of such Rights Offering Participant to participate in the Equity Rights Offering, all as set forth in the immediately preceding paragraph. Further, if (i) an Equity Rights Forfeiture Event shall occur with respect to a Rights Offering Participant's Eligible General Unsecured Claim as of the Rights Offering Record Date (or any portion thereof), and (ii) such Rights Offering Participant shall have delivered to the Subscription Agent the Aggregate Exercise Price (or any portion thereof) with respect to the exercise of any of the Equity Rights received by such Rights Offering Participant on account of such Eligible General Unsecured Claim (or such portion thereof), then such Aggregate Exercise Price (or such portion thereof) shall be refunded to such Rights Offering Participant, without interest, as soon as reasonably practicable (but in no event later than ten (10) Business Days) after the Effective Date (without offset, set-off, counterclaim or reduction of any kind by the Subscription Agent or any of the Debtors).

## 7.      Inquiries and Transmittal Of Documents; Subscription Agent

The instructions contained in the Equity Rights Exercise Form should be carefully read and strictly followed.

All questions relating to these Equity Rights Offering Procedures, other documents associated with the Equity Rights Offering, or the requirements to participate in the Equity Rights Offering should be directed to the Subscription Agent:

<div align="center">

**21st Century Oncology Holdings, Inc.**
**c/o Kurtzman Carson Consultants, LLC**
**2335 Alaska Avenue**
**El Segundo, CA 90245**
**Phone:  (888) 251-2679 (US toll-free)**

</div>

## 8.      Equity Rights Offering Conditioned Upon Confirmation of the Plan; Reservation of Rights

All exercises of Equity Rights are subject to and conditioned upon the confirmation and effectiveness of the Plan.  The Debtors will accept a Binding Rights Election

only upon the confirmation (subject to termination for an Equity Rights Forfeiture Event) and effectiveness of the Plan.

In the event that (i) the Equity Rights Offering is terminated, (ii) the Debtors revoke or withdraw the Plan, or (iii) the Backstop Purchase Agreement is terminated in accordance with the terms thereof, the Subscription Agent shall return all amounts received from the Rights Offering Participants, without any interest, as soon as reasonably practicable (but in no event later than ten (10) Business Days) after the occurrence of the Effective Date (all without offset, set-off, counterclaim or reduction of any kind by the Subscription Agent or any of the Debtors), and, in the case of <u>clauses (ii)</u> and <u>(iii)</u> above, the Equity Rights Offering shall automatically be terminated.

9.    **<u>Dilution</u>**

Shares of New Preferred Equity issued as of the Effective Date pursuant to the Equity Rights Offering shall be subject to dilution by the issuance of New Warrants.

10.    **<u>Miscellaneous</u>**

(a)    **<u>Rights Offering Distribution Date</u>**

The Rights Offering Shares acquired in connection with the Equity Rights Offering by Rights Offering Participants that have elected to participate in the Equity Rights Offering and who have validly exercised their Equity Rights shall be distributed in accordance with the distribution provisions contained in the Plan.

(b)    **<u>No Public Market or Listing</u>**

There is not and there may not be a public market for the Rights Offering Shares, and the Debtors do not intend to seek any listing or quotation of the Rights Offering Shares on any stock exchange, other trading market or quotation system of any type whatsoever on the Effective Date. Accordingly, there can be no assurance that an active trading market for the Rights Offering Shares will ever develop or, if such a market does develop, that it will be maintained.

*[Remainder of Page Intentionally Left Blank.]*

## **SCHEDULE 15**

### **Form of New Notes Rights Exercise Form**

## INSTRUCTIONS TO NOTES RIGHTS EXERCISE FORM[1]

You have received the attached Notes Rights Exercise Form because you are (i) a holder of an Eligible Claim as of the Rights Offering Record Date and (ii) an Accredited Investor (as set forth in an executed AI Questionnaire that was delivered by you to the Subscription Agent on or prior to the Questionnaire Deadline in accordance with the Notes Rights Offering Procedures). **If you wish to participate in the Notes Rights Offering, each of the Notes Rights Offering Conditions and each of the Additional Conditions must be satisfied at or prior to the Rights Offering Termination Time (5:00 p.m. (New York City time) on November 29, 2017), unless provided otherwise herein.** You may deliver this Notes Rights Exercise Form via electronic mail or regular mail, overnight or hand delivery to the Subscription Agent at the following address:

<div align="center">

**21st Century Oncology Holdings, Inc.**
**c/o Kurtzman Carson Consultants, LLC**
**2335 Alaska Avenue**
**El Segundo, CA 90245**
**E-mail: 21coInfo@kccllc.com**

</div>

The Notes Rights Offering Procedures are hereby incorporated herein by reference as if fully set forth herein. Please consult the Plan, the Disclosure Statement, the Rights Offering Procedures, and the order approving the Rights Offerings (collectively, the "Rights Offering Documents") for a complete description of the Rights Offerings. Copies of the Rights Offering Documents may be obtained, free of charge, by contacting the Subscription Agent.

To subscribe for Rights Offering Notes pursuant to the Notes Rights Offering:

1.    Review the amount of your Eligible Claim set forth in Item 1a.

2.    Review your Total Maximum Subscription Amount (as defined below) set forth in Item 1b.

3.    Calculate your Aggregate Exercise Price, and the portions thereof to be paid through a Credit Facility Claim Exchange and/or in Cash, pursuant to Item 2; *provided*, *however*, that if any Backstop Party that holds an Eligible Claim as of the Rights Offering Record Date or any Backstop Party's Affiliate that holds an Eligible Claim as of the Rights Offering Record Date (in either case) participates in the Notes Rights Offering in its capacity as a Rights Offering Participant, then (a) such Backstop Party or such Affiliate shall not be required to elect the form of payment of its Aggregate Exercise Price in its Notes Rights Exercise Form, but rather shall be permitted to make such election at any time on or before the

---

[1]    All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the notes rights offering procedures (the "Notes Rights Offering Procedures") to which these Instructions to Notes Rights Exercise Form are attached or, if any such term is not defined in the Notes Rights Offering Procedures, such term shall have the meaning given to it in the Plan (as defined in the Notes Rights Offering Procedures).

Purchase Notice Deadline in the same manner that a Backstop Party would be required to make such election with respect to such Backstop Party's Aggregate Notes Purchase Price pursuant to Section 2.2(c) of the Backstop Purchase Agreement, and (b) such Backstop Party or such Affiliate shall be permitted to pay all or any portion of its Aggregate Exercise Price through a Credit Facility Claim Exchange with First Lien Claims owned by such Backstop Party or such Affiliate and/or one more Affiliates of such Backstop Party or such Affiliate that are identified by such Backstop Party or such Affiliate as of the time such Backstop Party or such Affiliate makes the election described in <u>clause (a)</u> of this paragraph.

4.  <u>Read and complete</u> the certifications, representations, warranties and agreements in Item 3.

5.  <u>Deliver</u> a duly executed and properly completed Notes Rights Exercise Form to the Subscription Agent so that it is *actually received* by the Subscription Agent at or before the Rights Offering Termination Time.

6.  <u>Pay</u> the Aggregate Cash Exercise Price (if any) to the Subscription Agent in accordance with the Payment Instructions set forth in Item 4 so that such payment is *actually received* by the Subscription Agent at or before the Rights Offering Termination Time; *provided, however*, that if any Backstop Party that holds an Eligible Claim as of the Rights Offering Record Date or any Backstop Party's Affiliate that holds an Eligible Claim as of the Rights Offering Record Date (in either case) participates in the Notes Rights Offering in its capacity as a Rights Offering Participant, then such Backstop Party or such Affiliate shall be permitted to deposit its Aggregate Cash Exercise Price into the Deposit Account at any time on or before the Deposit Deadline in the same manner that a Backstop Party would be required to deposit its Aggregate Notes Cash Purchase Price into the Deposit Account pursuant to Section 2.2(d) of the Backstop Purchase Agreement.

7.  <u>Deliver</u> your W-8 or W-9, as applicable, to the Subscription Agent so that it is *actually received* by the Subscription Agent at or before the Rights Offering Termination Time pursuant to Item 5.

Participation in the Notes Rights Offering is voluntary, and is limited to Rights Offering Participants. Further, each Rights Offering Participant may exercise all or any portion of such Rights Offering Participant's Notes Rights; *provided, however*, that a Rights Offering Participant shall not be permitted to participate in the Notes Rights Offering unless such Rights Offering Participant also participates in the New Preferred Equity Rights Offering in an equal proportionate amount and satisfies all of the Notes Rights Offering Conditions and all of the Additional Conditions (subject to any exceptions to the satisfaction of any such conditions applicable to any Backstop Party or any of its Affiliates, as set forth in the Notes Rights Offering Procedures). In addition, Notes Rights issued to a Rights Offering Participant on account of an Eligible General Unsecured Claim held by such Rights Offering Participant as of the Rights Offering Record Date (or any portion thereof) are also subject to termination, and the exercise

2

thereof is subject to voidance, rescission and invalidation, pursuant to the terms set forth in the "Notes Rights Forfeiture Events" section of the Notes Rights Offering Procedures.

## NOTES RIGHTS EXERCISE FORM

### Rights Offering Termination Time

**The Rights Offering Termination Time is 5:00 p.m. (New York City time) on November 29, 2017.**

**Please consult the Rights Offering Documents for additional information with respect to this Notes Rights Exercise Form.**

Rights Offering Participants (including any Backstop Party that holds an Eligible Claim as of the Rights Offering Record Date or any Backstop Party's Affiliate that holds an Eligible Claim as of the Rights Offering Record Date) are entitled to participate in the Notes Rights Offering, as further described in the Notes Rights Offering Procedures.  To exercise your Notes Rights, review the amounts in Items 1a and 1b below and read and complete, as applicable, Items 2a-c, 3, 4 and 5 below.

**Item 1.  Amount of Eligible Claim(s)**

Pursuant to the Notes Rights Offering Procedures, each Rights Offering Participant is entitled to participate in the Notes Rights Offering to the extent of such Rights Offering Participant's Eligible Claim as of the Rights Offering Record Date.

**1a**.    As of the Rights Offering Record Date, the amount of your Eligible Claim is:

$\text{\$\underline{\hspace{4cm}}}$
*[PRE-PRINTED]*

**1b**.    Therefore, for the purposes of the Notes Rights Offering, you have Notes Rights to subscribe for up to the **maximum** aggregate original principal amount of Rights Offering Notes set forth in the box below (the "Total Maximum Subscription Amount").  Each Rights Offering Participant may subscribe for all or any portion of its Total Maximum Subscription Amount; *provided*, *however*, that (i) a Rights Offering Participant shall not be permitted to participate in the Notes Rights Offering unless such Rights Offering Participant also participates in the New Preferred Equity Rights Offering in an equal proportionate amount and (ii) a Rights Offering Participant may elect to subscribe for and purchase any portion of its Total Maximum Subscription Amount only in multiples of $1,000.

$\text{\$\underline{\hspace{4cm}}}$
(the Total Maximum Subscription Amount)[1]
*[PRE-PRINTED]*

---

[1]    The Total Maximum Subscription Amount shall equal the product of (rounded down to the nearest whole $1,000) (a) $200.0 million and (b) the quotient obtained by dividing (i) the amount set forth in Item 1a <u>by</u>

1

**Item 2.  Calculation of Aggregate Exercise Price**

**2a**.    Your Aggregate Exercise Price shall be an amount equal to the portion of your Total Maximum Subscription Amount that you validly elect to subscribe for and purchase.  The portion of your Total Maximum Subscription Amount that you elect to subscribe for and purchase shall only be in multiples of $1,000.  Please indicate your Aggregate Exercise Price below.

$\underline{\hspace{3cm}}$
(your Aggregate Exercise Price)

**2b**.    You may elect to pay your Aggregate Exercise Price through a Credit Facility Claim Exchange and/or with Cash.  First Lien Claims that are used to pay any portion of your Aggregate Exercise Price through a Credit Facility Claim Exchange shall only be in multiples of $1,000.  Please indicate below the respective aggregate principal amounts of First Lien Claims owned by you and, if applicable, any of your Affiliate(s) that will be subject to such Credit Facility Claim Exchange.

| Principal Amount of First Lien Claims: | Owned by: |
|---|---|
| $_____ | Rights Offering Participant |
| $_____ | _____ (Name of Affiliate 1 of Rights Offering Participant) |
| $_____ | _____ (Name of Affiliate 2 of Rights Offering Participant) |

**2c**.    Please indicate below the amount of Cash, if any, to be used to pay your Aggregate Exercise Price.  The portion of your Aggregate Exercise Price that you elect to pay in Cash is your Aggregate Cash Exercise Price.

---

(ii) the amount of (x) all Eligible General Unsecured Claims as of the Rights Offering Record Date held by each Person that has certified it is an Accredited Investor (as demonstrated by such Person's properly completed, duly executed and timely returned AI Questionnaire) on or prior to the Questionnaire Deadline plus (y) all Allowed Note Claims as of the Rights Offering Record Date.

2

$\underline{\hspace{4cm}}$
(your Aggregate Cash Exercise Price)

To exercise your Notes Rights, you must pay an amount equal to the Aggregate Cash Exercise Price in accordance with the Payment Instructions set forth below in Item 4 so that such payment is *actually received* by the Subscription Agent at or before the Rights Offering Termination Time; *provided*, *however*, that if any Backstop Party that holds an Eligible Claim as of the Rights Offering Record Date or any Backstop Party's Affiliate that holds an Eligible Claim as of the Rights Offering Record Date (in either case) participates in the Notes Rights Offering in its capacity as a Rights Offering Participant, then (i) such Backstop Party or such Affiliate shall not be required to elect the form of payment of its Aggregate Exercise Price in its Notes Rights Exercise Form, but rather shall be permitted to make such election at any time on or before the Purchase Notice Deadline in the same manner that a Backstop Party would be required to make such election with respect to such Backstop Party's Aggregate Notes Purchase Price pursuant to Section 2.2(c) of the Backstop Purchase Agreement, and (ii) such Backstop Party or such Affiliate shall be permitted to pay all or any portion of its Aggregate Exercise Price through a Credit Facility Claim Exchange with First Lien Claims owned by such Backstop Party or such Affiliate and/or one or more Affiliates of such Backstop Party or such Affiliate that are identified by such Backstop Party or such Affiliate as of the time such Backstop Party or such Affiliate makes the election described in <u>clause (i)</u> of this paragraph.  Further, such Backstop Party or such Affiliate shall be permitted to deposit its Aggregate Cash Exercise Price into the Deposit Account at any time on or before the Deposit Deadline in the same manner that a Backstop Party would be required to deposit its Aggregate Notes Cash Purchase Price into the Deposit Account pursuant to Section 2.2(d) of the Backstop Purchase Agreement.

**Item 3.  Subscription Certifications, Representations, Warranties and Agreements**

Except in the case of Section 1(a) of this Item 3, the certifications, representations, warranties and agreements set forth in this Item 3 shall be deemed to be made jointly and severally by the Rights Offering Participant exercising Notes Rights and any Affiliate of such Rights Offering Participant identified in Item 2b above.  By returning the Notes Rights Exercise Form:

1.    The Rights Offering Participant hereby certifies that it (a) was the holder of the Eligible Claim identified in Item 1a as of the Rights Offering Record Date; (b) agrees to be bound by all the terms and conditions of the Notes Rights Offering Procedures; (c) has obtained a copy of the Rights Offering Documents and understands that the exercise of Notes Rights pursuant to the Notes Rights Offering is subject to all the terms and conditions set forth in such Rights Offering Documents; and (d) has read and understands Article VIII of the Plan and agrees to the releases set forth therein.

3

2.      The Rights Offering Participant hereby represents and warrants that (a) to the extent such Rights Offering Participant is not an individual, it is duly formed, validly existing, and in good standing under the laws of the jurisdiction of its formation; and (b) it has the requisite power and authority to enter into, execute and deliver this Notes Rights Exercise Form and to perform its obligations hereunder and in each of the other Rights Offering Documents and has taken all necessary action required for due authorization, execution, delivery and performance hereunder and thereunder.

3.      The Rights Offering Participant acknowledges and understands that this Notes Rights Exercise Form shall not be binding on the Debtors or Reorganized Debtors until the conditions to effectiveness of the Plan, as set forth in the Plan, are satisfied.

4.      The Rights Offering Participant hereby agrees that this Notes Rights Exercise Form constitutes a valid and binding obligation of the Rights Offering Participant, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium, and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith, and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

5.      The Rights Offering Participant hereby represents and warrants that the exercise of its Notes Rights is and shall be irrevocable; *provided*, that (a) nothing in the Notes Rights Offering Procedures shall amend, modify or otherwise alter the right of the Requisite Backstop Parties to terminate the Backstop Purchase Agreement pursuant to the terms of the Backstop Purchase Agreement, and (b) the right to participate in the Notes Rights Offering of a Rights Offering Participant that holds an Eligible General Unsecured Claim as of the Rights Offering Record Date is subject to termination as set forth in the "Notes Rights Forfeiture Events" section of the Notes Rights Offering Procedures.

6.      The Rights Offering Participant hereby represents and warrants that it has duly executed and properly completed an AI Questionnaire pursuant to which such Rights Offering Participant has certified that it is an Accredited Investor, and such Rights Offering Participant understands that the Debtors are relying on such certification.

7.      The Rights Offering Participant hereby represents and warrants that (a) the Rights Offering Notes are being acquired by such Rights Offering Participant for the account of such Rights Offering Participant for investment purposes only, within the meaning of the Securities Act, and not with a view to the distribution thereof, and in compliance with all applicable securities laws; (b) its Notes Rights are not transferable or assignable, and may only be exercised by such Rights Offering

4

Participant; and (c) no one other than the Rights Offering Participant has any right to acquire the Rights Offering Notes being acquired by the Rights Offering Participant.

8.     The Rights Offering Participant hereby represents and warrants that its financial condition is such that the Rights Offering Participant has no need for any liquidity in its investment in the Reorganized Debtors and is able to bear the risk of holding the Rights Offering Notes for an indefinite period of time and the risk of loss of its entire investment in the Reorganized Debtors.

9.     The Rights Offering Participant hereby represents and warrants that it (a) is capable of evaluating the merits and risks of acquiring the Rights Offering Notes; and (b) has consulted, to the extent deemed appropriate, with its own advisors as to the financial, tax, legal and related matters concerning an investment in the Rights Offering Notes and on that basis believes that an investment in the Rights Offering Notes is suitable and appropriate for itself.

10.    The Rights Offering Participant hereby represents and warrants that (a) it has been given the opportunity to (i) ask questions and receive satisfactory answers concerning the terms and conditions of the Notes Rights Offering, and (ii) obtain additional information in order to evaluate the merits and risks of an investment in the Reorganized Debtors, and to verify the accuracy of the information contained in the Rights Offering Documents; (b) it has read and understands the Rights Offering Documents and the terms and conditions herein and therein and the risks associated with the Debtors and their business as described in the Disclosure Statement; and (c) no statement, printed material or other information that is contrary to the information contained in any Rights Offering Document has been given or made by or on behalf of the Debtors or the Backstop Parties to such Rights Offering Participant.

11.    The Rights Offering Participant acknowledges and understands that:

(a)    An investment in the Reorganized Debtors is speculative and involves significant risks.

(b)    The Rights Offering Notes will be subject to certain restrictions on transferability as described in the Plan and, as a result of the foregoing, the marketability of the Rights Offering Notes will be severely limited.

(c)    The Rights Offering Participant will not transfer, sell or otherwise dispose of the Rights Offering Notes in any manner that will violate the Securities Act or any state or foreign securities laws.

(d)    The Rights Offering Notes have not been, and will not be, registered under the Securities Act or any state or foreign securities laws, and are being offered and sold in reliance upon federal, state and foreign exemptions

5

from registration requirements for transactions not involving any public offering. The Rights Offering Participant recognizes that reliance upon such exemptions is based in part upon the representations of such Rights Offering Participant contained herein and in the AI Questionnaire executed and delivered by the Rights Offering Participant.

12.    The Rights Offering Participant hereby represents and warrants that it is not relying upon any information, representation or warranty other than as expressly set forth in any of the Rights Offering Documents; *provided*, *however*, that the Backstop Parties are relying on the representations and warranties of the Debtors made in the Backstop Purchase Agreement.

13.    The Rights Offering Participant hereby represents and warrants that it is aware that (a) no federal, state, local or foreign agency has passed upon the Rights Offering Notes or made any finding or determination as to the fairness of an investment in the Rights Offering Notes; and (b) the data set forth in any Rights Offering Documents or in any supplemental letters or materials thereto are not necessarily indicative of future returns, if any, which may be achieved by the Reorganized Debtors.

14.    The Rights Offering Participant hereby acknowledges that the Debtors and the Reorganized Debtors seek to comply with all applicable anti-money laundering laws and regulations.   In furtherance of such efforts, the Rights Offering Participant hereby represents and agrees that (a) no part of the Rights Offering Funds used by the Rights Offering Participant to acquire the Rights Offering Notes has been, or shall be, directly or indirectly derived from, or related to, any activity that may contravene federal, state, or international laws and regulations, including anti-money laundering laws and regulations; and (b) no contribution or payment to the Debtors or the Reorganized Debtors by the Rights Offering Participant shall cause the Debtors or the Reorganized Debtors to be in violation of any applicable anti-money laundering laws and regulations including without limitation, the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001 and the U.S. Department of the Treasury Office of Foreign Assets Control regulations, each as amended.   The Rights Offering Participant hereby agrees to (x) provide the Debtors and the Reorganized Debtors all information that may be reasonably requested to comply with applicable U.S. law; and (y) promptly notify the Debtors and the Reorganized Debtors (if legally permitted) if there is any change with respect to the representations and warranties provided herein.

15.    The Rights Offering Participant hereby agrees to provide such information and to execute and deliver such documents as may reasonably be necessary to comply with any and all laws, rules and regulations to which the Debtors or Reorganized Debtors are subject.

6

Certification by Rights Offering Participant: _____

Date: _____

Name of Rights Offering Participant: _____

(Print or Type)

Social Security or Federal Tax I.D. No.: _____

Signature: _____

Name of Person Signing: _____

(If other than Rights Offering Participant)

Title (if corporation, partnership or LLC): _____

Street Address:

City, State, Zip Code: _____

Contact E-mail: _____

Telephone Number: _____

Certification by Affiliate 1[2]: _____

Date: _____

Name of Affiliate: _____

(Print or Type)

Social Security or Federal Tax I.D. No.: _____

Signature: _____

Name of Person Signing: _____

---

[2] Certifications by additional Affiliates to be attached as necessary.

7

(If other than Affiliate)

Title (if corporation, partnership or LLC): _____

Street Address: _____

City, State, Zip Code: _____

Contact E-mail: _____

Telephone Number: _____

## Item 4.  Payment Instructions

You must make your payment of the Aggregate Cash Exercise Price calculated in Item 2c above (if any) by wire transfer so that it is *actually received* by the Subscription Agent at or before the Rights Offering Termination Time.

Please have wire transfers delivered to: [TBD]

## Item 5.  Tax Information

1. Each Rights Offering Participant that is a U.S. person[3] must provide its taxpayer identification number on a signed Internal Revenue Service ("IRS") form W-9 to the Subscription Agent.  This form is necessary for the Debtors and the Reorganized Debtors, as applicable, to comply with its tax filing obligations and to establish that the Rights Offering Participant is not subject to certain withholding tax obligations applicable to U.S. and non-U.S. persons.  The enclosed W-9 form contains detailed instructions for furnishing this information.

2. Each Rights Offering Participant that is not a U.S. person (as defined in the previous paragraph) is required to provide information about its status for withholding purposes, generally on an IRS form W-8BEN (for individuals) or W-8BEN-E (for most foreign entities), form W-8IMY (for most foreign intermediaries, flow-through entities, and certain U.S. branches), form W-8EXP (for most foreign governments, foreign central banks of issue, foreign tax-exempt organizations,

---

[3] The definition of "U.S. person" for this purpose includes a U.S. citizen or resident, a corporation organized in the United States, a partnership organized in the United States, a limited liability company organized in the United States (other than a limited liability company wholly-owned by a foreign person), an estate (other than a foreign estate the income of which, from sources without the United States which is not effectively connected with the conduct of a trade or business within the United States, is not includible in gross income), and a trust if (1) a court within the United States is able to exercise primary supervision over the administration of the trust, and (2) one or more U.S. persons have the authority to control all substantial decisions of the trust.

foreign private foundations, and governments of certain U.S. possessions), or form W-8ECI (for most non-U.S. persons receiving income that is effectively connected with the conduct of a trade or business in the United States).  Each Rights Offering Participant that is not a U.S. person should provide the Subscription Agent with the appropriate form W-8.  Please contact the Subscription Agent if you need further information regarding these forms.  Rights Offering Participants may also access the IRS website (www.irs.gov) to obtain the appropriate form W-8 and its instructions.

### Item 6.  Miscellaneous

1.      The representations, warranties, covenants, and agreements of the Rights Offering Participant contained in this Notes Rights Exercise Form will survive the execution hereof and the distribution of the Rights Offering Notes to such Rights Offering Participant.

2.      Neither this Notes Rights Exercise Form nor any provision hereof shall be waived, modified, discharged, or terminated except by an instrument in writing signed by the party against whom any such waiver, modification, discharge, or termination is sought; *provided*, *however*, that any waiver by (a) the Debtors shall not be valid without the prior written consent of the Requisite Backstop Parties; and (b) the Reorganized Debtors shall be in accordance with the Plan and the terms contained herein.

4.      This Notes Rights Exercise Form may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which taken together shall be deemed to constitute one and the same agreement.

5.      This Notes Rights Exercise Form and its validity, construction and performance shall be governed in all respects by the laws of the State of New York.

[*Remainder of Page Intentionally Left Blank.*]

9

## **SCHEDULE 16**

## **Form of New Preferred Equity Rights Exercise Form**

## INSTRUCTIONS TO EQUITY RIGHTS EXERCISE FORM[1]

You have received the attached Equity Rights Exercise Form because you are (i) a holder of an Eligible Claim as of the Rights Offering Record Date and (ii) an Accredited Investor (as set forth in an executed AI Questionnaire that was delivered by you to the Subscription Agent on or prior to the Questionnaire Deadline in accordance with the Equity Rights Offering Procedures). **If you wish to participate in the Equity Rights Offering, each of the Equity Rights Offering Conditions and each of the Additional Conditions must be satisfied at or prior to the Rights Offering Termination Time (5:00 p.m. (New York City time) on November 29, 2017), unless provided otherwise herein.** You may deliver this Equity Rights Exercise Form via electronic mail or regular mail, overnight or hand delivery to the Subscription Agent at the following address:

<div align="center">

**21st Century Oncology Holdings, Inc.**
**c/o Kurtzman Carson Consultants, LLC**
**2335 Alaska Avenue**
**El Segundo, CA 90245**
**E-mail:  21coInfo@kccllc.com**

</div>

The Equity Rights Offering Procedures are hereby incorporated herein by reference as if fully set forth herein.  Please consult the Plan, the Disclosure Statement, the Rights Offering Procedures, and the order approving the Rights Offerings (collectively, the "Rights Offering Documents") for a complete description of the Rights Offerings.  Copies of the Rights Offering Documents may be obtained, free of charge, by contacting the Subscription Agent.

To subscribe for Rights Offering Shares pursuant to the Equity Rights Offering:

1.    Review the amount of your Eligible Claim set forth in Item 1a.

2.    Review your Total Maximum Subscription Amount (as defined below) set forth in Item 1b.

3.    Calculate your Aggregate Exercise Price pursuant to Item 2.

4.    Read and complete the certifications, representations, warranties and agreements in Item 3.

5.    Deliver a duly executed and properly completed Equity Rights Exercise Form to the Subscription Agent so that it is *actually received* by the Subscription Agent at or before the Rights Offering Termination Time.

---

[1]    All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the equity rights offering procedures (the "Equity Rights Offering Procedures") to which these Instructions to Equity Rights Exercise Form are attached or, if any such term is not defined in the Equity Rights Offering Procedures, such term shall have the meaning given to it in the Plan (as defined in the Equity Rights Offering Procedures).

6. <u>Pay</u> the Aggregate Exercise Price to the Subscription Agent in accordance with the Payment Instructions set forth in Item 4 so that such payment is *actually received* by the Subscription Agent at or before the Rights Offering Termination Time; *provided, however,* that if any Backstop Party that holds an Eligible Claim as of the Rights Offering Record Date or any Backstop Party's Affiliate that holds an Eligible Claim as of the Rights Offering Record Date (in either case) participates in the Equity Rights Offering in its capacity as a Rights Offering Participant, then such Backstop Party or such Affiliate shall be permitted to deposit its Aggregate Exercise Price into the Deposit Account at any time on or before the Deposit Deadline in the same manner that a Backstop Party would be required to deposit its Aggregate Share Purchase Price in the Deposit Account pursuant to Section 1.2(c) of the Backstop Purchase Agreement.

7. <u>Deliver</u> your W-8 or W-9, as applicable, to the Subscription Agent so that it is *actually received* by the Subscription Agent at or before the Rights Offering Termination Time pursuant to Item 5.

Participation in the Equity Rights Offering is voluntary, and is limited to Rights Offering Participants.  Further, each Rights Offering Participant may exercise all or any portion of such Rights Offering Participant's Equity Rights; *provided, however,* that a Rights Offering Participant shall not be permitted to participate in the Equity Rights Offering unless such Rights Offering Participant also participates in the New Notes Rights Offering in an equal proportionate amount and satisfies all of the Equity Rights Offering Conditions and all of the Additional Conditions (subject to any exceptions to the satisfaction of any such conditions applicable to any Backstop Party or any of its Affiliates, as set forth in the Equity Rights Offering Procedures).  In addition, Equity Rights issued to a Rights Offering Participant on account of an Eligible General Unsecured Claim held by such Rights Offering Participant as of the Rights Offering Record Date (or any portion thereof) are also subject to termination, and the exercise thereof is subject to voidance, rescission and invalidation, pursuant to the terms set forth in the "Equity Rights Forfeiture Events" section of the Equity Rights Offering Procedures.

*[Remainder of Page Intentionally Left Blank.]*

2

## EQUITY RIGHTS EXERCISE FORM

### Rights Offering Termination Time

### The Rights Offering Termination Time is 5:00 p.m. (New York City time) on November 29, 2017.

### Please consult the Rights Offering Documents for additional information with respect to this Equity Rights Exercise Form.

Rights Offering Participants (including any Backstop Party that holds an Eligible Claim as of the Rights Offering Record Date or any Backstop Party's Affiliate that holds an Eligible Claim as of the Rights Offering Record Date) are entitled to participate in the Equity Rights Offering, as further described in the Equity Rights Offering Procedures. To exercise your Equity Rights, review the amounts in Items 1a and 1b below and read and complete, as applicable, Items 2, 3, 4 and 5 below.

**Item 1.  Amount of Eligible Claim(s)**

Pursuant to the Equity Rights Offering Procedures, each Rights Offering Participant is entitled to participate in the Equity Rights Offering to the extent of such Rights Offering Participant's Eligible Claim as of the Rights Offering Record Date.

**1a**.    As of the Rights Offering Record Date, the amount of your Eligible Claim is:



$_____
*[PRE-PRINTED]*

**1b**.    Therefore, for the purposes of the Equity Rights Offering, you have Equity Rights to subscribe for up to the **maximum** aggregate initial liquidation value of Rights Offering Shares set forth in the box below (the "Total Maximum Subscription Amount"). Each Rights Offering Participant may subscribe for all or any portion of its Total Maximum Subscription Amount; *provided*, *however*, that (i) a Rights Offering Participant shall not be permitted to participate in the Equity Rights Offering unless such Rights Offering Participant also participates in the New Notes Rights Offering in an equal proportionate amount and (ii) a Rights Offering Participant may elect to subscribe for and purchase any portion of its Total Maximum Subscription Amount only in multiples of $100.

$_____

(the Total Maximum Subscription Amount)[1]
*[PRE-PRINTED]*

## Item 2.  Calculation of Aggregate Exercise Price

Your Aggregate Exercise Price shall be an amount equal to the product of (a) eighty-five percent (85%) and (b) the portion of your Total Maximum Subscription Amount that you validly elect to subscribe for and purchase.  The portion of your Total Maximum Subscription Amount that you elect to subscribe for and purchase shall only be in multiples of $100.00.  Please calculate your Aggregate Exercise Price below.

| $_____ (portion of Total Maximum Subscription Amount for which you elect to subscribe) | x 85% = | $_____ (your Aggregate Exercise Price) |
|---|---|---|

To exercise your Equity Rights, you must pay an amount equal to the Aggregate Exercise Price in accordance with the Payment Instructions set forth below in Item 4 so that such payment is *actually received* by the Subscription Agent at or before the Rights Offering Termination Time; *provided*, *however*, that if any Backstop Party that holds an Eligible Claim as of the Rights Offering Record Date or any Backstop Party's Affiliate that holds an Eligible Claim as of the Rights Offering Record Date (in either case) participates in the Equity Rights Offering in its capacity as a Rights Offering Participant, then such Backstop Party or such Affiliate shall be permitted to deposit its Aggregate Exercise Price into the Deposit Account at any time on or before the Deposit Deadline in the same manner that a Backstop Party would be required to deposit its Aggregate Share Purchase Price into the Deposit Account pursuant to Section 1.2(c) of the Backstop Purchase Agreement.

## Item 3.  Subscription Certifications, Representations, Warranties and Agreements

By returning the Equity Rights Exercise Form:

1. The Rights Offering Participant hereby certifies that it (a) was the holder of the Eligible Claim identified in Item 1a as of the Rights Offering Record Date;

---

[1]    The Total Maximum Subscription Amount shall equal the product of (rounded down to the nearest whole $100) (a) $88.235 million and (b) the quotient obtained by dividing (i) the amount set forth in Item 1a <u>by</u> (ii) the amount of (x) all Eligible General Unsecured Claims as of the Rights Offering Record Date held by each Person that has certified it is an Accredited Investor (as demonstrated by such Person's properly completed, duly executed and timely returned AI Questionnaire) on or prior to the Questionnaire Deadline plus (y) all Allowed Note Claims as of the Rights Offering Record Date.

(b) agrees to be bound by all the terms and conditions of the Equity Rights Offering Procedures; (c) has obtained a copy of the Rights Offering Documents and understands that the exercise of Equity Rights pursuant to the Equity Rights Offering is subject to all the terms and conditions set forth in such Rights Offering Documents; and (d) has read and understands Article VIII of the Plan and agrees to the releases set forth therein.

2.     The Rights Offering Participant hereby represents and warrants that (a) to the extent such Rights Offering Participant is not an individual, it is duly formed, validly existing, and in good standing under the laws of the jurisdiction of its formation; and (b) it has the requisite power and authority to enter into, execute and deliver this Equity Rights Exercise Form and to perform its obligations hereunder and in each of the other Rights Offering Documents and has taken all necessary action required for due authorization, execution, delivery and performance hereunder and thereunder.

3.     The Rights Offering Participant acknowledges and understands that this Equity Rights Exercise Form shall not be binding on the Debtors or Reorganized Debtors until the conditions to effectiveness of the Plan, as set forth in the Plan, are satisfied.

4.     The Rights Offering Participant hereby agrees that this Equity Rights Exercise Form constitutes a valid and binding obligation of the Rights Offering Participant, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium, and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith, and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

5.     The Rights Offering Participant hereby represents and warrants that the exercise of its Equity Rights is and shall be irrevocable; *provided* that (a) nothing in the Equity Rights Offering Procedures shall amend, modify or otherwise alter the right of the Requisite Backstop Parties to terminate the Backstop Purchase Agreement pursuant to the terms of the Backstop Purchase Agreement, and (b) the right to participate in the Equity Rights Offering of a Rights Offering Participant that holds an Eligible General Unsecured Claim as of the Rights Offering Record Date is subject to termination as set forth in the "Equity Rights Forfeiture Events" section of the Equity Rights Offering Procedures.

6.     The Rights Offering Participant hereby represents and warrants that it has duly executed and properly completed an AI Questionnaire pursuant to which such Rights Offering Participant has certified that it is an Accredited Investor, and such Rights Offering Participant understands that the Debtors are relying on such certification.

3

7.      The Rights Offering Participant hereby represents and warrants that (a) the Rights Offering Shares are being acquired by such Rights Offering Participant for the account of such Rights Offering Participant for investment purposes only, within the meaning of the Securities Act, and not with a view to the distribution thereof, and in compliance with all applicable securities laws; (b) its Equity Rights are not transferable or assignable, and may only be exercised by such Rights Offering Participant; and (c) no one other than the Rights Offering Participant has any right to acquire the Rights Offering Shares being acquired by the Rights Offering Participant.

8.      The Rights Offering Participant hereby represents and warrants that its financial condition is such that the Rights Offering Participant has no need for any liquidity in its investment in the Reorganized Debtors and is able to bear the risk of holding the Rights Offering Shares for an indefinite period of time and the risk of loss of its entire investment in the Reorganized Debtors.

9.      The Rights Offering Participant hereby represents and warrants that it (a) is capable of evaluating the merits and risks of acquiring the Rights Offering Shares; and (b) has consulted, to the extent deemed appropriate, with its own advisors as to the financial, tax, legal and related matters concerning an investment in the Rights Offering Shares and on that basis believes that an investment in the Rights Offering Shares is suitable and appropriate for itself.

10.     The Rights Offering Participant hereby represents and warrants that (a) it has been given the opportunity to (i) ask questions and receive satisfactory answers concerning the terms and conditions of the Equity Rights Offering, and (ii) obtain additional information in order to evaluate the merits and risks of an investment in the Reorganized Debtors, and to verify the accuracy of the information contained in the Rights Offering Documents; (b) it has read and understands the Rights Offering Documents and the terms and conditions herein and therein and the risks associated with the Debtors and their business as described in the Disclosure Statement; and (c) no statement, printed material or other information that is contrary to the information contained in any Rights Offering Document has been given or made by or on behalf of the Debtors or the Backstop Parties to such Rights Offering Participant.

11.     The Rights Offering Participant acknowledges and understands that:

        (a)     An investment in the Reorganized Debtors is speculative and involves significant risks.

        (b)     The Rights Offering Shares will be subject to certain restrictions on transferability as described in the Plan and, as a result of the foregoing, the marketability of the Rights Offering Shares will be severely limited.

        (c)     The Rights Offering Participant will not transfer, sell or otherwise dispose of the Rights Offering Shares in any manner that will violate the New

4

Organizational Documents, the Securities Act or any state or foreign securities laws.

(d)    The Rights Offering Shares have not been, and will not be, registered under the Securities Act or any state or foreign securities laws, and are being offered and sold in reliance upon federal, state and foreign exemptions from registration requirements for transactions not involving any public offering. The Rights Offering Participant recognizes that reliance upon such exemptions is based in part upon the representations of such Rights Offering Participant contained herein and in the AI Questionnaire executed and delivered by the Rights Offering Participant.

12.    The Rights Offering Participant hereby represents and warrants that it has (or will have) properly completed, duly executed and delivered to the Subscription Agent a counterpart signature page to the New Stockholders Agreement so that such counterpart signature page to the New Stockholders Agreement is *actually received* by the Subscription Agent at or before the Rights Offering Termination Time. The Rights Offering Participant further acknowledges and understands that it shall be deemed to have accepted the terms of the New Stockholders Agreement (solely in its capacity as a shareholder of Reorganized 21CH) and to be a party thereto without further action or signature. The New Stockholders Agreement shall be effective as of the Effective Date and, as of such date, shall be deemed to be valid, binding, and enforceable in accordance with its terms, and the Rights Offering Participant shall be bound thereby (including any obligation set forth therein to waive or refrain from exercising any appraisal, dissenters' or similar rights) even if it has not actually executed and delivered a counterpart thereof.

13.    The Rights Offering Participant hereby represents and warrants that it is not relying upon any information, representation or warranty other than as expressly set forth in any of the Rights Offering Documents; *provided*, *however*, that the Backstop Parties are relying on the representations and warranties of the Debtors made in the Backstop Purchase Agreement.

14.    The Rights Offering Participant hereby represents and warrants that it is aware that (a) no federal, state, local or foreign agency has passed upon the Rights Offering Shares or made any finding or determination as to the fairness of an investment in the Rights Offering Shares; and (b) the data set forth in any Rights Offering Documents or in any supplemental letters or materials thereto are not necessarily indicative of future returns, if any, which may be achieved by the Reorganized Debtors.

15.    The Rights Offering Participant hereby acknowledges that the Debtors and the Reorganized Debtors seek to comply with all applicable anti-money laundering laws and regulations. In furtherance of such efforts, the Rights Offering Participant hereby represents and agrees that (a) no part of the Rights Offering Funds used by the Rights Offering Participant to acquire the Rights Offering Shares has been, or shall be, directly or indirectly derived from, or related to, any

5

activity that may contravene federal, state, or international laws and regulations, including anti-money laundering laws and regulations; and (b) no contribution or payment to the Debtors or the Reorganized Debtors by the Rights Offering Participant shall cause the Debtors or the Reorganized Debtors to be in violation of any applicable anti-money laundering laws and regulations including without limitation, the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001 and the U.S. Department of the Treasury Office of Foreign Assets Control regulations, each as amended.  The Rights Offering Participant hereby agrees to (x) provide the Debtors and the Reorganized Debtors all information that may be reasonably requested to comply with applicable U.S. law; and (y) promptly notify the Debtors and the Reorganized Debtors (if legally permitted) if there is any change with respect to the representations and warranties provided herein.

16.    The Rights Offering Participant hereby agrees to provide such information and to execute and deliver such documents as may reasonably be necessary to comply with any and all laws, rules and regulations to which the Debtors or Reorganized Debtors are subject.

Date: _____

Name of Rights Offering Participant: _____

(Print or Type)

Social Security or Federal Tax I.D. No.: _____

Signature: _____

Name of Person Signing: _____

(If other than Rights Offering Participant)

Title (if corporation, partnership or LLC): _____

Street Address:

City, State, Zip Code: _____

Contact E-mail: _____

Telephone Number: _____

**Item 4.  Payment Instructions**

You must make your payment of the Aggregate Exercise Price calculated in Item 2 above by wire transfer so that it is *actually received* by the Subscription Agent at or before the Rights Offering Termination Time.

Please have wire transfers delivered to:  [TBD]

**Item 5.  Tax Information**

1.  Each Rights Offering Participant that is a U.S. person[2] must provide its taxpayer identification number on a signed Internal Revenue Service ("IRS") form W-9 to the Subscription Agent.  This form is necessary for the Debtors and the Reorganized Debtors, as applicable, to comply with its tax filing obligations and to establish that the Rights Offering Participant is not subject to certain withholding tax obligations applicable to U.S. and non-U.S. persons.  The enclosed W-9 form contains detailed instructions for furnishing this information.

2.  Each Rights Offering Participant that is not a U.S. person (as defined in the previous paragraph) is required to provide information about its status for withholding purposes, generally on an IRS form W-8BEN (for individuals) or W-8BEN-E (for most foreign entities), form W-8IMY (for most foreign intermediaries, flow-through entities, and certain U.S. branches), form W-8EXP (for most foreign governments, foreign central banks of issue, foreign tax-exempt organizations, foreign private foundations, and governments of certain U.S. possessions), or form W-8ECI (for most non-U.S. persons receiving income that is effectively connected with the conduct of a trade or business in the United States).  Each Rights Offering Participant that is not a U.S. person should provide the Subscription Agent with the appropriate form W-8.  Please contact the Subscription Agent if you need further information regarding these forms.  Rights Offering Participants may also access the IRS website (www.irs.gov) to obtain the appropriate form W-8 and its instructions.

**Item 6.  Miscellaneous**

1.  The representations, warranties, covenants, and agreements of the Rights Offering Participant contained in this Equity Rights Exercise Form will survive the execution hereof and the distribution of the Rights Offering Shares to such Rights Offering Participant.

---

[2]  The definition of "U.S. person" for this purpose includes a U.S. citizen or resident, a corporation organized in the United States, a partnership organized in the United States, a limited liability company organized in the United States (other than a limited liability company wholly-owned by a foreign person), an estate (other than a foreign estate the income of which, from sources without the United States which is not effectively connected with the conduct of a trade or business within the United States, is not includible in gross income), and a trust if (1) a court within the United States is able to exercise primary supervision over the administration of the trust, and (2) one or more U.S. persons have the authority to control all substantial decisions of the trust.

2.      Neither this Equity Rights Exercise Form nor any provision hereof shall be waived, modified, discharged, or terminated except by an instrument in writing signed by the party against whom any such waiver, modification, discharge, or termination is sought; *provided*, *however*, that any waiver by (a) the Debtors shall not be valid without the prior written consent of the Requisite Backstop Parties; and (b) the Reorganized Debtors shall be in accordance with the Plan and the terms contained herein.

3.      This Equity Rights Exercise Form may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which taken together shall be deemed to constitute one and the same agreement.

4.      This Equity Rights Exercise Form and its validity, construction and performance shall be governed in all respects by the laws of the State of New York.

*[Remainder of Page Intentionally Left Blank.]*

## SCHEDULE 17

## Form of AI Questionnaire

## INSTRUCTIONS TO AI QUESTIONNAIRE[1]

You have received the attached accredited investor questionnaire (the "AI Questionnaire") because you are a holder of an Eligible Claim (as defined below) as of October 16, 2017 (the "Rights Offering Record Date").  **If you wish to participate in the Rights Offerings, you must deliver a duly executed and properly completed copy of this AI Questionnaire to the Subscription Agent (as defined below) so that it is *actually received* by the Subscription Agent on or before November 6, 2017 (the "Questionnaire Deadline")**; *provided*, *however*, that any Backstop Party that holds an Eligible Claim as of the Rights Offering Record Date and any Backstop Party's Affiliate that holds an Eligible Claim as of the Rights Offering Record Date shall not be required to complete and deliver an AI Questionnaire and shall be deemed a Rights Offering Participant (as defined below).

"Allowed" means, with respect to any Claim (or any portion thereof), as of any date of determination, (a) a Claim that is evidenced by a Proof of Claim Filed by the applicable Bar Date in accordance with the Bar Date Order; (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely filed; or (c) a Claim that is allowed pursuant to the Plan or a Final Order of the Bankruptcy Court as of such date; provided, that with respect to a Claim described in clauses (a) and (b) above (except any Claim allowed pursuant to the DIP Orders), such Claim shall be considered "Allowed" as of such date of determination only to the extent that, with respect to such Claim, no objection to allowance or priority or a request for estimation thereof has been interposed on or prior to such date, or such an objection is so interposed and the Claim has been allowed by a Final Order of the Bankruptcy Court as of such date.

"Disputed" means, with respect to any Claim (or any portion thereof), as of any date of determination, a Claim that is neither Allowed nor disallowed as of such date.

"Eligible Claim" means any Allowed Note Claim or Eligible General Unsecured Claim.

"Eligible General Unsecured Claim" means any General Unsecured Claim that is either Allowed or Disputed.

"Rights Offering Participant" means each holder of an Eligible General Unsecured Claim or an Allowed Note Claim as of the Rights Offering Record Date that is an Accredited Investor (as demonstrated by an AI Questionnaire that has been properly completed, duly executed and timely delivered by such holder to the Subscription Agent on or prior to the Questionnaire Deadline in accordance with the Rights Offering Procedures).

You may deliver this AI Questionnaire via electronic mail or regular mail, overnight or hand delivery to Kurtzman Carson Consultants LLC, the subscription agent for the Rights Offerings (in such capacity, the "Subscription Agent"), at the following address:

---

[1]    All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Joint Chapter 11 Plan of Reorganization of 21st Century Oncology Holdings, Inc. and Its Debtor Affiliates* (as may be modified, amended, or supplemented from time to time).

**21st Century Oncology Holdings, Inc.**
**c/o Kurtzman Carson Consultants, LLC**
**2335 Alaska Avenue**
**El Segundo, CA 90245**
**E-mail: 21coInfo@kccllc.com**

To duly execute, properly complete and deliver to the Subscription Agent this AI Questionnaire:

1.  <u>Review</u> the amount of your Eligible Claim in Section 1.

2.  <u>Complete</u> the "Eligibility Certification" in Section 2.

3.  <u>Initial</u> next to the applicable paragraph in the "Accredited Investor Certification" in Section 3.

4.  <u>Coordinate</u> to have your Nominee (as defined below) complete the Nominee Confirmation of Ownership in Section 4 if you are a holder of an Allowed Note Claim.

5.  <u>Deliver</u> this AI Questionnaire to the Subscription Agent so that it is *actually received* by the Subscription Agent on or before the Questionnaire Deadline.  You only need to return one AI Questionnaire to participate in both Rights Offerings.

2

## AI QUESTIONNAIRE

### Section 1:  Confirmation of Ownership

**Your ownership of an Eligible Claim must be confirmed in order to be eligible to receive Equity Rights and Notes Rights.**

If you hold an Eligible Claim based on your ownership of Notes, and your Notes are held in "street name" by a bank, brokerage house, or other financial institution (each, a "<u>Nominee</u>"), you must forward your AI Questionnaire to the Nominee with sufficient time for the Nominee to complete the "Nominee Confirmation of Ownership" in Section 4 of this AI Questionnaire (including providing the Nominee's medallion guarantee or list of authorized signatories) and for the Nominee to deliver the AI Questionnaire to the Subscription Agent so that it is *actually received* by the Subscription Agent on or before the Questionnaire Deadline.  If authorized to do so, the Nominee may complete the entire AI Questionnaire on your behalf.

**Item 1.   Amount of Eligible Claim.**   I certify that I hold an Eligible Claim in the following amount as of the Rights Offering Record Date (October 16, 2017) set forth in the box below or that I am the authorized signatory of that beneficial owner.

$$\underline{\$\qquad\qquad\qquad}$$

### Section 2:  Eligibility Certification

In order to receive Equity Rights and Notes Rights under the Plan, the holder of an Eligible Claim must:

1.      Be an Accredited Investor;

2.      Answer "Yes" to Question 1 below; and

3.      Deliver a duly executed and properly completed copy of this AI Questionnaire to the Subscription Agent so that it is *actually received* by the Subscription Agent on or before the Questionnaire Deadline.

**Question 1.**  Is the respondent an "Accredited Investor"? ___ Yes ____ No

If "Yes", please indicate which category (*i.e.,* 1 through 8) of Section 3 below that the respondent falls under:  _____

3

IN WITNESS WHEREOF, I certify that: (i) I am an authorized signatory of the holder indicated below; (ii) I executed this AI Questionnaire on the date set forth below; and (iii) this AI Questionnaire (x) contains accurate representations with respect to the undersigned and (y) is a certification to the Debtors and the Bankruptcy Court.

_____
(Signature)

By: _____
(Please Print or Type)

Title: _____
(Please Print or Type)

Address, telephone number and facsimile number:

_____

_____

_____

Certain communications during the Rights Offerings may be performed via e-mail. For that reason, you are required to provide your e-mail address below:

_____
(E-Mail Address)

**Section 3: Accredited Investor Certification**

Please indicate the basis on which you would be deemed an "Accredited Investor" by initialing the appropriate line provided below.

An Accredited Investor shall include any person who comes within any of the following categories, or who the issuer reasonably believes comes within any of the following categories, at the time of the sale of the securities to that person:

1.    ___ **initials**    any bank as defined in section 3(a)(2) of the Securities Act of 1933 (as amended and including any rule or regulation promulgated thereunder, the "Securities Act"), or any savings and loan association or other institution as defined in section 3(a)(5)(A) of the Securities Act, whether in its individual or fiduciary capacity; any broker or dealer registered pursuant to section 15 of the Securities Exchange Act of 1934, as amended; any insurance company as defined in section 2(a)(13) of the Securities Act; any investment company registered under the Investment Company Act of 1940, as amended,

4

or a business development company as defined in section 2(a)(48) of that Act; any Small Business Investment Company licensed by the U.S. Small Business Administration under section 301(c) or (d) of the Small Business Investment Act of 1958, as amended; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974, as amended, if the investment decision is made by a plan fiduciary, as defined in section 3(21) of such Act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

2. ___ **initials**  any private business development company as defined in section 202(a)(22) of the Investment Advisers Act of 1940, as amended;

3. ___ **initials**  any organization described in section 501(c)(3) of the Internal Revenue Code of 1986, as amended, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

4. ___ **initials**  any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer;

5. ___ **initials**  any natural person whose individual net worth, or joint net worth with that person's spouse, exceeds $1,000,000;

6. ___ **initials**  any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

7. ___ **initials**  any trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in 17 C.F.R. 230.506(b)(2)(ii); and

8. ___ **initials**  any entity in which all of the equity owners are accredited investors.

### Section 4:  Nominee Confirmation of Ownership

**TO BE COMPLETED BY HOLDERS OF NOTES ONLY.  Your ownership of Notes must be confirmed in order to participate in the Rights Offerings.**

**To be completed by Nominee only.**  The Nominee holding your Notes as of the Rights Offering Record Date must complete the box below on your behalf.

| | |
|---|---|
| DTC Participant Name:<br><br>_____<br><br>DTC Participant Number:<br><br>_____<br><br>DTC Participant Contact Name:<br><br>_____<br><br>DTC Participant Authorized Signature:<br><br>_____<br><br>DTC Participant Contact Number:<br><br>_____<br><br>DTC Participant Email Address:<br><br>_____<br><br>Beneficial Holder Name:<br><br>_____<br><br>Beneficial Holder Account Number: | Principal Amount of the Notes (CUSIP [_____]) that was held by Nominee for account indicated below as of the Rights Offering Record Date (October 16, 2017):<br><br>$ _____<br><br><br><br><br><br>**Nominee's Medallion Guarantee (or attach authorized signatory list hereto):** |