Christopher Marcus, P.C.
John T. Weber
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

James H.M. Sprayregen, P.C.
William A. Guerrieri (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| 21st CENTURY ONCOLOGY HOLDINGS, INC., *et al.*,[1] | ) Case No. 17-22770 (RDD) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

## NOTICE OF FILING OF PLAN SUPPLEMENT

**PLEASE TAKE NOTICE THAT** on October 17, 2017, the United States Bankruptcy Court for the Southern District of New York (the "Court") entered an order (the "Disclosure Statement Order"): (a) authorizing 21st Century Oncology Holdings, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *Joint Chapter 11 Plan of Reorganization of 21st Century Oncology Holdings, Inc. and its Debtor Affiliates* (as may be modified, amended, or supplemented from time to time, the "Plan");[2] and (b) approving, among other things, (i) the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of 21st Century Oncology Holdings, Inc. and its Debtor Affiliates* (as may be modified, amended, or supplemented from time to time, the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (ii) the solicitation materials and documents to be included in the solicitation packages; (iii) the rights offering procedures and related materials; and (iv) the procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

---

[1] Each of the Debtors in the above-captioned jointly administered chapter 11 cases and their respective tax identification numbers are set forth in the *Order Directing Joint Administration of Chapter 11 Cases* [Docket No. 30]. The location of 21st Century Oncology Holdings, Inc.'s corporate headquarters and the Debtors' service address is: 2270 Colonial Boulevard, Fort Myers, Florida 33907.

[2] Capitalized terms not otherwise defined herein shall have the same meanings as set forth in the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** as contemplated by the Plan and the Disclosure Statement Order, the Debtors hereby file the Plan Supplement with the Court.  The Plan Supplement contains the following documents, as may be modified, amended, or supplemented from time to time:

| | |
|---|---|
| **Exhibit A:** | Form of the New First Lien Term Loan Credit Agreement |
| **Exhibit B:** | Form of the New MDL Term Loan Credit Agreement |
| **Exhibit C:** | Form of the New Second Lien Notes Indenture |
| **Exhibit D:** | Form of the New Intercreditor Agreement |
| **Exhibit E:** | Form of New Warrant Documents |
| **Exhibit F:** | Form of the New Organizational Documents |
| **Exhibit G:** | Identities of the members of the New Board and the officers of the Reorganized Debtors (to the extent known) |
| **Exhibit H:** | List of Retained Causes of Action |
| **Exhibit I:** | Schedule of Assumed Executory Contracts and Unexpired Leases |
| **Exhibit J:** | Schedule of Rejected Executory Contracts and Unexpired Leases |
| **Exhibit K:** | Schedule of Excluded Directors and Officers |
| **Exhibit L:** | Schedule of Specified Directors and Officers |

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider Confirmation of the Plan (the "Confirmation Hearing") will commence on **December 11, 2017, at 10:00 a.m.,** prevailing Eastern Time, before the Honorable Robert D. Drain, in the United States Bankruptcy Court for the Southern District of New York, located at 300 Quarropas Street, White Plains, New York 10601.  The Confirmation Hearing may be continued from time to time by the Court or the Debtors **without further notice** other than by such adjournment being announced in open court or by a notice of adjournment filed with the Court.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan is **November 27, 2017, at 4:00 p.m.** prevailing Eastern Time (the "Plan Objection Deadline").    Any objection to the Plan **must**: (a) be in writing; (b) conform to the Bankruptcy Rules, the Local Bankruptcy Rules, and any orders of the Court; (c) state, with particularity, the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (d) be filed with the Court (contemporaneously with a proof of service) and served upon the following parties so as to be *actually received* on or before the Plan Objection Deadline:

17-22770-rdd   Doc 678   Filed 11/13/17   Entered 11/13/17 23:39:16   Main Document
Pg 3 of 753

| *Counsel to the Debtors* | |
|---|---|
| Christopher Marcus, P.C.<br>John T. Weber<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone:       (212) 446-4800<br>Facsimile:       (212) 446-4900 | James H.M. Sprayregen, P.C.<br>William A. Guerrieri (admitted *pro hac vice*)<br>Alexandra Schwarzman (admitted *pro hac vice*)<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Telephone:       (312) 862-2000<br>Facsimile:       (312) 862-2200 |
| *U.S. Trustee* | |
| Paul Schwartzberg<br>Susan Golden<br>Office of the United States Trustee<br>for the Southern District of New York<br>U.S. Federal Office Building, 201 Varick Street, Suite 1006<br>New York, New York 10014 | |
| *Counsel to the Official Committee of Unsecured Creditors Appointed in These Chapter 11 Cases* | |
| Lorenzo Marinuzzi<br>Jonathan Levine<br>Morrison & Foerster LLP<br>250 West 55th Street<br>New York, New York 10019 | |
| *Counsel to Certain Backstop Parties and the Ad Hoc Committee of Crossover Lenders and Noteholders* | |
| Jayme Goldstein<br>Samantha Martin<br>Odelia Lee<br>Stroock & Stroock & Lavan LLP<br>180 Maiden Lane<br>New York, New York 10038 | |

| *Counsel to the Ad Hoc Committee of Lenders Under the Debtors' Prepetition Secured Credit Facility* |
|---|
| Evan Fleck<br>Matthew Brod<br>Milbank, Tweed, Hadley & McCloy LLP<br>28 Liberty Street<br>New York, New York 10005 |
| *Counsel to the MDL Agent* |
| Seth H. Lieberman<br>Patrick Sibley<br>Matthew W. Silverman<br>Pryor Cashman LLP<br>7 Times Square<br>New York, New York 10036 |
| *Counsel to the DIP Agent* |
| Richard A. Stieglitz, Jr.<br>Joel H. Levitin<br>Cahill Gordon & Reindel LLP<br>Eighty Pine Street<br>New York, New York 10005 |

**PLEASE TAKE FURTHER NOTICE** that the Debtors reserve the right, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement, to alter, amend, modify, or supplement any document in the Plan Supplement; *provided* that if any document in the Plan Supplement is altered, amended, modified or supplemented in any material respect prior to the hearing to consider confirmation of the Plan, the Debtors will file a blackline of such document with the Court.

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact Kurtzman Carson Consultants LLC, the solicitation agent retained by the Debtors in the Chapter 11 Cases (the "Solicitation Agent"), by: (a) calling the Debtors' restructuring hotline at (888) 251-2679 (US toll-free) and (310) 751-2609 (international toll); (b) visiting the Debtors' restructuring website at: http://www.kccllc.net/21co; (c) writing to 21st Century Oncology Holdings, Inc., Ballot Processing Center, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245; and/or (d) emailing 21coInfo@kccllc.com. You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER (the Court's Public Access to Court Electronic Records) at: https://ecf.nysb.uscourts.gov/. A login identification and password to PACER are required to access this information and can be obtained through the PACER Service Center at http://www.pacer.psc.uscourts.gov.

ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE VIII.8.3 CONTAINS A THIRD-PARTY RELEASE**.  THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE SOLICITATION AGENT.**

New York, New York
Dated:  November 13, 2017

*/s/ Christopher Marcus, P.C.*

Christopher Marcus, P.C.
John T. Weber
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
William A. Guerrieri (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors*
*and Debtors in Possession*

Christopher Marcus, P.C.
John T. Weber
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

James H.M. Sprayregen, P.C.
William A. Guerrieri (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| 21st CENTURY ONCOLOGY HOLDINGS, INC., *et al.*,[1] | ) | Case No. 17-22770 (RDD) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## PLAN SUPPLEMENT FOR THE FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF 21ST CENTURY ONCOLOGY HOLDINGS, INC. AND ITS DEBTOR AFFILIATES

---

[1]    Each of the Debtors in the above-captioned jointly administered chapter 11 cases and their respective tax identification numbers are set forth in the *Order Directing Joint Administration of Chapter 11 Cases* [Docket No. 30]. The location of 21st Century Oncology Holdings Inc.'s corporate headquarters and the Debtors' service address is:  2270 Colonial Boulevard, Fort Myers, Florida 33907. Capitalized terms not otherwise defined herein shall have the same meanings as set forth in the Plan.

## TABLE OF CONTENTS

| **Exhibit** | **Description** |
|---|---|
| A | Form of the New First Lien Term Loan Credit Agreement |
| B | Form of the New MDL Term Loan Credit Agreement |
| C | Form of the New Second Lien Notes Indenture |
| D | Form of the New Intercreditor Agreement |
| E | Form of New Warrant Documents |
| F | Form of the New Organizational Documents |
| G | Identities of the Members of the New Board, and the Officers of the Reorganized Debtors |
| H | List of Retained Causes of Action |
| I | Schedule of Assumed Executory Contracts and Unexpired Leases |
| J | Schedule of Rejected Executory Contracts and Unexpired Leases |
| K | Schedule of Excluded Directors and Officers |
| L | Schedule of Specified Directors and Officers |

## Exhibit A

### Form of the New First Lien Term Loan Credit Agreement

Certain documents, or portions thereof, contained in this Exhibit A and the Plan Supplement remain subject to continuing negotiations among the Debtors and interested parties with respect thereto. The Debtors reserve all rights, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement, to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court.

CREDIT AGREEMENT


among


21ST CENTURY ONCOLOGY HOLDINGS, INC.,
as Holdings and a Guarantor,


21ST CENTURY ONCOLOGY, INC.,
as Borrower,


The Several Lenders from Time to Time Parties Hereto,


and


MORGAN STANLEY SENIOR FUNDING, INC.,
as Administrative Agent


Dated as of [    ], 2017

# TABLE OF CONTENTS

<u>Page</u>

## SECTION 1

## DEFINITIONS

1.1    Defined Terms ................................................................................................2
1.2    Other Definitional Provisions ........................................................................55

## SECTION 2

## AMOUNT AND TERMS OF COMMITMENTS

2.1    Tranche B Term Commitments ......................................................................57
2.2    Procedure for Tranche B Term Loan Borrowings .........................................57
2.3    Repayment of Tranche B Term Loans............................................................57
2.4    [Reserved]......................................................................................................58
2.5    [Reserved]......................................................................................................58
2.6    [Reserved]......................................................................................................58
2.7    [Reserved]......................................................................................................58
2.8    [Reserved]......................................................................................................58
2.9    Termination of Commitments........................................................................58
2.10   Optional Prepayments....................................................................................58
2.11   Mandatory Prepayments ................................................................................66
2.12   Conversion and Continuation Options...........................................................69
2.13   Limitations on Eurodollar Tranches ..............................................................70
2.14   Interest Rates and Payment Dates..................................................................70
2.15   Computation of Interest and Fees ..................................................................70
2.16   Inability to Determine Interest Rate...............................................................71
2.17   Pro Rata Treatment and Payments..................................................................71
2.18   Requirements of Law......................................................................................73
2.19   Taxes...............................................................................................................74
2.20   Indemnity .......................................................................................................77
2.21   Change of Lending Office ..............................................................................78
2.22   Replacement of Lenders .................................................................................78
2.23   Limitation on Additional Amounts, Etc .........................................................79
2.24   Extensions of Term Loans ..............................................................................80
2.25   Incremental Credit Extensions.......................................................................82
2.26   Defaulting Lenders .........................................................................................85
2.27   [Reserved.].....................................................................................................86
2.28   Refinancing Amendments...............................................................................86

SECTION 3

[RESERVED]

SECTION 4

REPRESENTATIONS AND WARRANTIES

4.1 Financial Condition................................................................................................87
4.2 No Change ..........................................................................................................88
4.3 Existence; Compliance with Law ......................................................................88
4.4 Power; Authorization; Enforceable Obligations...............................................88
4.5 No Legal Bar.......................................................................................................89
4.6 Litigation.............................................................................................................89
4.7 No Default...........................................................................................................89
4.8 Ownership of Property; Liens............................................................................89
4.9 Licenses; Intellectual Property..........................................................................89
4.10 Taxes...................................................................................................................90
4.11 Federal Regulations ...........................................................................................90
4.12 Labor Matters.....................................................................................................90
4.13 ERISA.................................................................................................................90
4.14 Investment Company Act ..................................................................................91
4.15 Subsidiaries.........................................................................................................91
4.16 Use of Proceeds .................................................................................................91
4.17 Environmental Matters ......................................................................................91
4.18 Accuracy of Information, Etc ............................................................................92
4.19 Security Documents............................................................................................93
4.20 Solvency..............................................................................................................93
4.21 Regulation H .......................................................................................................94
4.22 OFAC; USA PATRIOT ACT; FCPA...............................................................94

SECTION 5

CONDITIONS PRECEDENT

5.1 Conditions to Initial Extension of Credit..........................................................94
5.2 Conditions to Each Extension of Credit ...........................................................97

SECTION 6

AFFIRMATIVE COVENANTS

6.1 Financial Statements...........................................................................................98
6.2 Certificates; Other Information........................................................................100
6.3 Payment of Taxes..............................................................................................101
6.4 Maintenance of Existence; Compliance ..........................................................101
6.5 Maintenance of Property; Insurance ................................................................101
6.6 Inspection of Property; Books and Records; Discussions ..............................102
6.7 Notices ..............................................................................................................103

6.8     Environmental Laws ...................................................................................103
6.9     Additional Collateral, Etc ...........................................................................104
6.10    Initial Mortgages ........................................................................................108
6.11    Designation of Subsidiaries ........................................................................109
6.12    Post-Closing Obligations ............................................................................110

## SECTION 7

## NEGATIVE COVENANTS

7.1     Financial Condition Covenants....................................................................111
7.2     Indebtedness................................................................................................111
7.3     Liens............................................................................................................116
7.4     Fundamental Changes..................................................................................120
7.5     Disposition of Property................................................................................121
7.6     Restricted Payments.....................................................................................124
7.7     [Reserved]....................................................................................................127
7.8     Investments ..................................................................................................127
7.9     Optional Prepayments and Modifications of Certain Debt Instruments......130
7.10    Transactions with Affiliates.........................................................................131
7.11    Sales and Leasebacks...................................................................................132
7.12    Changes in Fiscal Periods ...........................................................................133
7.13    Negative Pledge Clauses..............................................................................133
7.14    Clauses Restricting Subsidiary Distributions ..............................................133
7.15    Lines of Business .........................................................................................134
7.16    Insurance Subsidiary Investments ...............................................................134
7.17    Insurance Subsidiary....................................................................................135
7.18    OFAC; Sanctions .........................................................................................135

## SECTION 8

## EVENTS OF DEFAULT

## SECTION 9

## THE ADMINISTRATIVE AGENT

9.1     Appointment and Authority..........................................................................140
9.2     Rights as a Lender........................................................................................140
9.3     Exculpatory Provisions................................................................................140
9.4     Reliance by Administrative Agent................................................................142
9.5     Delegation of Duties ...................................................................................142
9.6     Resignation of Administrative Agent ..........................................................142
9.7     Non-Reliance on Administrative Agent and Other Lenders..........................143
9.8     Withholding Tax ..........................................................................................143
9.9     No Fiduciary Duties, Etc .............................................................................144
9.10    Enforcement.................................................................................................144
9.11    Collateral and Guaranty Matters..................................................................144
9.12    Indemnity; Damage Waiver..........................................................................145

SECTION 10

MISCELLANEOUS

10.1      Amendments and Waivers ...................................................................................149
10.2      Notices ...............................................................................................................152
10.3      No Waiver; Cumulative Remedies ....................................................................153
10.4      Survival of Representations and Warranties......................................................154
10.5      Payment of Expenses .........................................................................................154
10.6      Successors and Assigns; Participations and Assignments..................................155
10.7      Adjustments; Set-off ..........................................................................................162
10.8      Counterparts .......................................................................................................164
10.9      Severability ........................................................................................................164
10.10    Integration ..........................................................................................................164
10.11    GOVERNING LAW.............................................................................................164
10.12    Submission to Jurisdiction; Waivers...................................................................164
10.13    Acknowledgements.............................................................................................165
10.14    Releases of Guarantees and Liens .....................................................................165
10.15    Confidentiality ...................................................................................................165
10.16    WAIVERS OF JURY TRIAL ..............................................................................166
10.17    USA PATRIOT ACT............................................................................................166
10.18    Intercreditor Agreement Governs ......................................................................166

iv

SCHEDULES:

| | |
|---|---|
| 1.1A | Tranche B Term Commitments |
| 1.2 | Existing Letters of Credit |
| 4.4 | Consents, Authorizations, Filings and Notices |
| 4.6 | Litigation |
| 4.8 | Initial Mortgaged Property |
| 4.15(a) | Organizational Structure |
| 4.15(b) | Agreements Relating to Capital Stock |
| 4.19 | UCC Filing Jurisdictions |
| 6.11 | Unrestricted Subsidiaries |
| 7.2(d) | Existing Indebtedness |
| 7.3(f) | Existing Liens |
| 7.8(g) | Existing Investments |
| 7.10 | Transactions with Affiliates |

EXHIBITS:

| | |
|---|---|
| A | Form of Assignment and Assumption |
| B | Form of Guarantee and Security Agreement |
| C | Form of Non-Bank Tax Certificate |
| D | Form of Closing Date Certificate |
| E | Form of Reinvestment Notice |
| F | Form of Compliance Certificate |
| G | Form of Affiliated Lender Assignment and Assumption |
| H-1 | Form of Term Loan Borrowing Notice |
| H-2 | Form of Interest Election Request |
| H-3 | Form of Prepayment Notice |
| I | Form of Intercreditor Agreement |
| J | Form of Acceptance and Prepayment Notice |
| K | Form of Discount Range Prepayment Notice |
| L | Form of Discount Range Prepayment Offer |
| M | Form of Specified Discount Prepayment Notice |
| N | Form of Specified Discount Prepayment Response |
| O | Form of Solicited Discounted Prepayment Notice |
| P | Form of Solicited Discounted Prepayment Offer |
| Q | Form of Solvency Certificate |
| R | Form of Perfection Certificate |

**CREDIT AGREEMENT**, dated as of [__], 2017 (as amended, waived, modified or amended and restated, this "Agreement"), among 21st Century Oncology Holdings, Inc., a Delaware corporation, as a Guarantor (as defined herein), 21st Century Oncology, Inc., a Florida corporation and direct subsidiary of Holdings, as borrower (the "Borrower"), the Lenders (as defined below) from time to time party hereto and Morgan Stanley Senior Funding, Inc., as administrative agent for the Lenders and as collateral agent for the Secured Parties (as defined herein) (in such capacities, together with its successors and permitted assigns in such capacities, the "Administrative Agent").

## RECITALS

**WHEREAS**, on May 25, 2017 (the "Petition Date"), the Borrower and the Guarantors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (as defined below) (collectively, the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

**WHEREAS**, on [__], 2017, the Bankruptcy Court entered the Plan Confirmation Order (as defined below) confirming the Plan of Reorganization (as defined below) filed by the Borrower and the Guarantors with the Bankruptcy Court in connection with the Chapter 11 Cases;

**WHEREAS**, certain Lenders and/or their respective affiliates (the "Prepetition Lenders") are parties to, and extended certain loans and provided other financial accommodations to the Borrower under, that certain Credit Agreement, dated as of April 30, 2015, by and among the Borrower, Holdings, the Prepetition Lenders party thereto and Morgan Stanley Senior Funding, Inc., as administrative agent (as amended, supplemented or otherwise modified from time to time prior to the Petition Date, the "Prepetition Credit Agreement");

**WHEREAS**, pursuant to the Plan of Reorganization, on the Plan Effective Date (as defined below), certain Allowed First Lien Claims (as defined below) of the Prepetition Lenders will be automatically converted into indebtedness outstanding hereunder in the form of Tranche B Term Loans (as defined below) and, in connection therewith, the Lenders party hereto on the Closing Date shall be deemed to have advanced to the Borrower on the Closing Date Tranche B Term Loans in an aggregate principal amount equal to $[__], on the terms and subject to the conditions set forth herein, the other Loan Documents (as defined below) and the Plan of Reorganization; and

**WHEREAS**, the Borrower, the Guarantors, the Lenders and the Administrative Agent are entering into this Agreement and the other Loan Documents (as applicable) in connection with the implementation and consummation of, the Plan of Reorganization.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby covenant and agree as follows:

## SECTION 1

## DEFINITIONS

1.1   **Defined Terms**.  As used in this Agreement, the terms listed in this Section 1.1 shall have the respective meanings set forth in this Section 1.1.

"[21C Term Loan Termination Date]":  as defined in the Intercreditor Agreement.

"ABL Priority Collateral":  as defined in the Intercreditor Agreement.

"ABR":  for any day, a rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to the highest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus 1/2 of 1%; (c) the Eurodollar Rate for an Interest Period of one-month beginning on such day (or if such day is not a Business Day, on the immediately preceding Business Day) plus 100 basis points; and (d) with respect to the Tranche B Term Loans, 2.00%.  Any change in such rate due to a change in the Prime Rate, the Federal Funds Rate or the Eurodollar Rate shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Rate or the Eurodollar Rate, as the case may be.

"ABR Loans":  Loans, the rate of interest applicable to which is based upon the ABR.

"Acceptable Discount":  as defined in Section 2.10(c)(iv)(B).

"Acceptable Prepayment Amount":  as defined in Section 2.10(c)(iv)(C).

"Acceptance and Prepayment Notice":  the Acceptance and Prepayment Notice to be submitted by the Loan Party or Subsidiary to the Auction Agent substantially in the form of Exhibit J in accordance with the terms of Section 2.10(c).

"Acceptance Date":  as defined in Section 2.10(c)(iv)(B).

"Accepting Lenders":  as defined in Section 10.1.

"Acquired EBITDA":  with respect to any Acquired Entity or Business or any Converted Restricted Subsidiary (any of the foregoing, a "Pro Forma Entity") for any period, the amount for such period of Consolidated EBITDA of such Pro Forma Entity (determined as if references to the Borrower and the Restricted Subsidiaries in the definition of Consolidated EBITDA were references to such Pro Forma Entity and its Subsidiaries (except to the extent that such Subsidiaries will not constitute Restricted Subsidiaries immediately after giving effect to such acquisition or conversion)), all as determined on a consolidated basis for such Pro Forma Entity.

"Acquired Entity or Business":  as set forth in the definition of the term "Consolidated EBITDA."

"Acquisition":  any acquisition (x) of all or substantially all of the assets or a division, unit, product line or line of business of another Person (or, in each case, any substantial part for which financial statements or other customary financial information is available), (y) which

2

results in owning more than 50% of the Capital Stock of any other Person or (z) of additional equity interests of any Restricted Subsidiary not then held by the Borrower or any other Restricted Subsidiary.

"Additional Debt":  Indebtedness (including, as applicable, Registered Equivalent Notes), in each case, issued or incurred by the Borrower or any of its Restricted Subsidiaries after the Closing Date, the covenants, events of default and other terms of which (other than maturity, fees, discounts, interest rate, redemption terms and redemption premiums, which shall be determined in good faith by the Borrower) shall be on market terms at the time of issuance (as determined in good faith by the Borrower) of such Additional Debt.

"Additional Lender":  as defined in Section 2.25.

"Additional Refinancing Lender":  at any time, any bank, financial institution or other institutional lender or investor (other than any such bank, financial institution or other institutional lender or investor that is a Lender at such time) that agrees to provide any portion of Credit Agreement Refinancing Indebtedness pursuant to a Refinancing Amendment in accordance with Section 2.28.

"Additional Term Notes":  senior secured loans or notes and/or unsecured loans or notes, in each case issued pursuant to an indenture, note purchase agreement or other agreement and in lieu of the incurrence of a portion of the Incremental Tranche B Term Loans; provided that (a) such Additional Term Notes rank *pari passu* or junior in right of payment and (if secured) of security with the Term Loans hereunder, (b) the Additional Term Notes have a final maturity date that is on or after the Latest Maturity Date of the Term Loans outstanding at the time such Additional Term Notes are issued and have a Weighted Average Life to Maturity equal to or longer than the remaining Weighted Average Life to Maturity of such Term Loans (without giving effect to nominal amortization for periods where amortization has been eliminated as a result of a prepayment of the applicable Term Loans), (c) the covenants and events of default and other terms of which (other than maturity, fees, discounts, interest rate, redemption terms and redemption premiums, which shall be determined in good faith by the Borrower) shall be on market terms at the time of issuance of such Additional Term Notes (as determined in good faith by the Borrower) of the Additional Term Notes, (d) the Indebtedness in respect of such Additional Term Notes shall not be secured by Liens on the assets of the Borrower and its Restricted Subsidiaries, other than assets constituting Collateral, (e) no Restricted Subsidiary is a borrower or a guarantor with respect to Indebtedness under such Additional Term Notes unless such Restricted Subsidiary is a Loan Party which shall have previously or substantially concurrently with issuance of such Additional Term Notes guaranteed or borrowed, as applicable, the Obligations, (f) if such Additional Term Notes are secured, all security therefor shall be granted pursuant to documentation that is not more restrictive to the Borrower and its Restricted Subsidiaries than the Security Documents taken as a whole in any material respect (as determined in good faith by the Borrower) and the representative for such Additional Term Notes shall become a party to the Intercreditor Agreement or enter into a customary intercreditor agreement with the Administrative Agent substantially consistent with the terms set forth in the Intercreditor Agreement and (g) immediately after giving effect to the incurrence of such Additional Term Notes on a Pro Forma Basis (to the extent the proceeds of such Additional Term Notes are to be used to prepay Indebtedness, the use of such proceeds for the prepayment

3

of such Indebtedness may be given pro forma effect, but, notwithstanding the definition of Consolidated Total Debt, without including any proceeds of such Additional Term Notes in Cash on Hand for the purposes of making the calculation of the Consolidated Total Secured Leverage Ratio pursuant to this clause (g)), the Consolidated Total Secured Leverage Ratio shall not be greater than 3.40 to 1.00 as of the Applicable Date of Determination (but without giving effect to any Unrestricted Incremental Indebtedness or Unrestricted Additional Term Notes established and/or incurred at such time); provided that any such Indebtedness, whether secured or unsecured, shall be deemed to be secured for purposes of this calculation; provided that to the extent the Additional Term Notes consist of term loans that have a Lien on Collateral that is *pari passu* in right of security with the Lien on the Collateral securing the Tranche B Term Loans, the Tranche B Term Loans shall be subject to adjustment (if applicable) set forth in the proviso to clause (iii) of Section 2.25(d) as if such Additional Term Notes were Incremental Tranche B Term Loans.

"Administrative Agent":  as defined in the preamble.

"Affected Class":  as defined in Section 10.1.

"Affiliate":  as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control" of a Person means the power, directly or indirectly to direct or cause the direction of the management and policies of such Person, whether through the ability to exercise voting power, by contract or otherwise.

"Affiliated Lender Assignment and Assumption":  as defined in Section 10.6(g).

"Agent Fee Letter":  that certain letter, dated as of the date hereof, by and among the Borrower and the Administrative Agent.

"Agreement":  as defined in the preamble.

"AHYDO Catch-Up Payment":  any payment with respect to any obligations of the Borrower or any Restricted Subsidiary, including subordinated debt obligations, in each case to avoid the application of Code Section 163(e)(5) thereto.

"Allowed":  as defined in the Plan of Reorganization.

"Applicable Date of Determination":  the last day of the most recently ended fiscal quarter for which financial statements are available pursuant to Section 6.1(a) or (b), as applicable, or, if such date occurs prior to the date on which financial statements are available pursuant to Section 6.1(a) or (b), as applicable, the last day of the most recently ended fiscal quarter for which financial statements were delivered under Section 6.1(a) or (b).

"Applicable Discount":  as defined in Section 2.10(c)(iii)(B).

"Applicable Margin":  (a) in the case of ABR Loans, 5.125% per annum and (b) in the case of Eurodollar Loans, 6.125% per annum.

4

"Approved Fund": as defined in Section 10.6(b).

"Asset Sale": any Disposition of property or series of related Dispositions of property, excluding (i) any such Disposition permitted by Section 7.5 (other than clauses (e), (h) or (o) thereof), (ii) any Sale Leaseback Transaction, (iii) equity issuances by Holdings or a Parent Entity and (iv) other Dispositions to the extent that the Net Cash Proceeds to the Borrower and its Restricted Subsidiaries of all such other Dispositions do not exceed $7,500,000 in the aggregate in any fiscal year.

"Assignee": as defined in Section 10.6(b).

"Assignment and Assumption": an Assignment and Assumption, substantially in the form of Exhibit A.

"Auction Agent": (a) the Administrative Agent or (b) any other financial institution or advisor employed by the Borrower (whether or not an Affiliate of the Administrative Agent) to act as an arranger in connection with any Discounted Loan Prepayment pursuant to Section 2.10(c)(i); provided that the Borrower shall not designate the Administrative Agent as the Auction Agent without the written consent of the Administrative Agent (it being understood that the Administrative Agent shall be under no obligation to agree to act as the Auction Agent).

"Available Amount": as of any date of determination (the "Reference Date"), an amount determined on a cumulative basis equal to the sum of (without duplication):

(a)    $25,000,000; plus

(b)    an amount equal to 50% of Consolidated Net Income for the period from the first day of the fiscal quarter of the Borrower during which the Closing Date occurred to and including the last day of the most recently ended fiscal quarter of the Borrower prior to the Reference Date for which internal consolidated financial statements of the Borrower are available (or, in the case such Consolidated Net Income for such period is in deficit, minus 100% of such deficit); plus

(c)    the cumulative amount of (A) any capital contributions in respect of Permitted Capital Stock (other than any Cure Amount) made in cash by any Person (other than a Subsidiary of the Borrower) to Borrower after the Closing Date, (B) any Net Cash Proceeds of any issuance of Permitted Capital Stock of Holdings or any Parent Entity after the Closing Date (other than any Cure Amount) to any Person other than a Subsidiary of the Borrower (to the extent further contributed to Borrower) and (C) 100% of the aggregate Net Cash Proceeds (other than any proceeds of any Cure Amount) and the fair market value (as determined in good faith by the Borrower) of marketable securities or other property contributed to the Permitted Capital Stock of Borrower after the Closing Date by any Person other than a Subsidiary of the Borrower, in each case, minus, amounts used to incur Indebtedness pursuant to Section 7.2(ee), amounts used to fund Restricted Payments pursuant to Section 7.6(b) or 7.6(j) and amounts used to fund Investments pursuant to Section 7.8(kk); plus

5

(d)      the aggregate amount received by Borrower or any Restricted Subsidiary after the Closing Date from cash (or Cash Equivalents) dividends and distributions made by any Unrestricted Subsidiary or any Joint Venture that is not a Restricted Subsidiary and interests, returns of principal, repayments and similar payments made by any Unrestricted Subsidiary or Joint Venture that is not a Restricted Subsidiary in respect of Investments made by the Borrower or any Restricted Subsidiary to any Unrestricted Subsidiary or Joint Venture that is not a Restricted Subsidiary, and the Net Cash Proceeds in connection with the sale, transfer or other disposition of assets or the Capital Stock of any Unrestricted Subsidiary or Joint Venture that is not a Restricted Subsidiary of the Borrower to any Person (other than a Restricted Subsidiary) after the Closing Date; plus

(e)      in the event that the Borrower redesignates any Unrestricted Subsidiary as a Restricted Subsidiary after the Closing Date (which, for purposes hereof, shall be deemed to also include (A) the merger, consolidation, liquidation or similar amalgamation of any Unrestricted Subsidiary into the Borrower or any Restricted Subsidiary, so long as the Borrower or such Restricted Subsidiary is the surviving Person, and (B) the transfer of all or substantially all of the assets of an Unrestricted Subsidiary to the Borrower or any Restricted Subsidiary), the fair market value (as determined in good faith by the Borrower) of the Investment in such Unrestricted Subsidiary at the time of such redesignation, combination or transfer (or of the assets transferred or comerged, as applicable); plus

(f)      the aggregate amount of Retained Declined Proceeds; plus

(g)      the fair market value of all Permitted Capital Stock of Holdings or the Borrower issued upon conversion or exchange of Indebtedness or any Capital Stock of the Borrower or any of its Restricted Subsidiaries that is not Permitted Capital Stock after the Closing Date; plus

(h)      to the extent not otherwise included, the aggregate amount of cash Returns to the Borrower or any Restricted Subsidiary in respect of Investments made pursuant to Section 7.8 in reliance on the Available Amount; minus

(i)      the aggregate amount of (A) Restricted Payments made using the Available Amount pursuant to Section 7.6(n), (B) Investments made using the Available Amount pursuant to Section 7.8(cc) and (C) prepayments, redemptions, acquisitions, retirements, cancellations, terminations and repurchases of Indebtedness made using the Available Amount pursuant to clause (i)(B) of the proviso to Section 7.9(a), in each case during the period from and including the Business Day immediately following the Closing Date through and including the Reference Date (without taking account of the intended usage of the Available Amount on such Reference Date).

"Bail-In Action": the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation": with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European

6

Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bankruptcy Code": title 11 of the United States Bankruptcy Code (11 U.S.C. § 101, et seq.), as amended and in effect from time to time, and any successor statute.

"Bankruptcy Court": as defined in the Recitals.

"Benefit Plan":  any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"Benefitted Lender":  as defined in Section 10.7(a).

"Board":  the Board of Governors of the Federal Reserve System of the United States (or any successor).

"Borrower":  as defined in the preamble hereto and including any permitted successors thereto.

"Borrower Offer of Specified Discount Prepayment":  the offer by the Borrower to make a voluntary prepayment of Term Loans at a Specified Discount to par pursuant to Section 2.10(c).

"Borrower Solicitation of Discounted Prepayment Offers":  the solicitation by the Borrower of offers for, and the subsequent corresponding acceptance, if any, by a Lender of, a voluntary prepayment of Term Loans at a discount to par pursuant to Section 2.10(c).

"Borrower Solicitation of Discount Range Prepayment Offers":  the solicitation by the Borrower of offers for, and the corresponding acceptance, if any, by a Lender of, a voluntary prepayment of Term Loans at a specified range of discounts to par pursuant to Section 2.10(c).

"Borrowing Date":  any Business Day specified by the Borrower in the Borrowing Notice as a date on which the Borrower requests the relevant Lenders to make Loans hereunder which, for purposes of the Tranche B Term Loans, shall be the Closing Date.

"Borrowing Notice":  a request by the Borrower for a borrowing of Loans which shall be substantially in the form of Exhibit H-1.

"Business":  as defined in Section 4.17(b).

"Business Day":  a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close; provided that with respect to notices and determinations in connection with, and payments of principal and interest on, and any other amounts due in respect of, Eurodollar Loans, such day is also a day for trading by and between banks in Dollar deposits in the applicable interbank eurodollar market used to determine the Eurodollar Base Rate in accordance with the definition thereof.

"Capital Expenditures":  for any period, with respect to any Person, the aggregate of all expenditures (whether paid in cash or other consideration, financed by the incurrence of Indebtedness or accrued as a liability and including Capitalized Software Expenditures or research and development expenditures that are treated as additions to property, plant and equipment or other capital expenditures in accordance with GAAP) by such Person and its Restricted Subsidiaries during such period that are additions to property, plant and equipment for the acquisition, rental, lease, purchase, construction, replacement, repair or use of any property, the value of which should be capitalized under GAAP and reflected as additions to property, plant and equipment on a consolidated balance sheet of such Person and its Restricted Subsidiaries (including, without limitation, the aggregate principal amount of Capital Lease Obligations incurred during such period).

"Capital Lease Obligations":  as to any Person, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, to the extent such obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP and, for the purposes of this Agreement, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

"Capital Stock":  any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing.

"Capitalized Software Expenditures":  for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities) by a Person and its Restricted Subsidiaries during such period in respect of purchased software or internally developed software and software enhancements that, in conformity with GAAP, are or are required to be reflected as capitalized costs on the consolidated balance sheet of such Person and its Restricted Subsidiaries.

"Cash Equivalents":  (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition; (b) certificates of deposit, time deposits, eurodollar time deposits or overnight bank deposits having maturities of one year or less from the date of acquisition issued by any Lender or by any commercial bank organized under the laws of the United States or any state thereof having combined capital and surplus of not less than $500,000,000; (c) commercial paper of an issuer rated at least A-1 by Standard & Poor's Ratings Services ("S&P") or P-1 by Moody's Investors Service, Inc. ("Moody's"), or carrying an equivalent rating by a nationally recognized rating agency, if both of the two named rating agencies cease publishing ratings of commercial paper issuers generally, and maturing within one year from the date of acquisition; (d) repurchase obligations of any Lender or of any commercial bank satisfying the requirements of clause (b) of this definition, having a term of not more than thirty (30) days, with respect to securities issued or fully guaranteed or insured by the United States government; (e) securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the

8

securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least A by S&P or A by Moody's; (f) securities with maturities of one year or less from the date of acquisition backed by standby letters of credit issued by any Lender or any commercial bank satisfying the requirements of clause (b) of this definition; (g) money market mutual or similar funds that invest substantially in assets satisfying the requirements of clauses (a) through (f) of this definition; (h) money market funds that (i) comply with the criteria set forth in SEC Rule 2a-7 under the Investment Company Act of 1940, as amended, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $5,000,000,000; or (i) other short-term investments utilized by Foreign Subsidiaries in accordance with the normal investment practices for cash management in investments of a type analogous to the foregoing.

"Cash Management Obligations":  any obligations owed by Holdings, the Borrower or any of its Restricted Subsidiaries (other than Excluded Swap Obligations) to the Administrative Agent or any Lender, or any Affiliate of a Lender or the Administrative Agent (or a Person that was a Lender or the Administrative Agent or an Affiliate thereof at the time any such arrangements were entered into) in respect of any overdraft and other liabilities arising from treasury, depository and cash management services (including but not limited to purchase cards), or any automated clearing house transfers of funds and designated by Holdings or the Borrower as being secured under the Security Documents.

"Cash on Hand": as of any date of determination, the sum of (a) the aggregate amount of unrestricted cash and Cash Equivalents of the Borrower and its Restricted Subsidiaries at such date required to be reflected on a consolidated balance sheet of the Borrower in accordance with GAAP; provided that the amount of domestic unrestricted cash and Cash Equivalents of any Restricted Subsidiary that is a Joint Venture that is included in this clause (a) shall be limited to the total amount of domestic unrestricted cash and Cash Equivalents owned by such Restricted Subsidiary that is a Joint Venture *multiplied by* the percentage of Capital Stock of such Restricted Subsidiary that is a Joint Venture that is owned directly or indirectly by the Borrower and (b) the aggregate amount of unrestricted cash and Cash Equivalents of any Joint Venture in which the Borrower directly or indirectly owns Capital Stock but that is not a Restricted Subsidiary of the Borrower *multiplied by* the percentage of Capital Stock in such Joint Venture that is owned directly or indirectly by the Borrower.

"CFC":  a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"Change in Law":  (a) the adoption of any rule, regulation, treaty or other law after the Closing Date, (b) any change in any Requirement of Law or in the interpretation or application thereof by any Governmental Authority after the Closing Date or (c) compliance by any Lender (or, for purposes of Section 2.18(b), by any lending office of such Lender or by such Lender's holding company, if any) with any written request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the Closing Date; provided that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all rules, regulations, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any

9

successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

"Change of Control":  (a) at any time after the Closing Date, any "*person*" or "*group*" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act), shall become the "*beneficial owner*" (as defined in Rules 13(d)-3 and 13(d)-5 under such Act), directly or indirectly, of more than 50% of the Voting Stock of Holdings or any Parent Entity, (b) Holdings or any Parent Entity shall cease to own, directly or indirectly, 100% of the Borrower on a fully diluted basis except as permitted by Section 7.4, (c) the sale, lease or transfer, in one or a series of related transactions, of all or substantially all of the assets of the Borrower and its Restricted Subsidiaries, taken as a whole, to any Person or (d) the approval by the holders of the Capital Stock of the Borrower of any plan for the liquidation or dissolution of the Borrower (whether or not otherwise in compliance with the provisions of this Agreement).  Notwithstanding the foregoing, (A) any holding company, all or substantially all of the assets of which are comprised of the Borrower, Holdings or any Parent Entity and which is controlled by Persons who are equity investors in Holdings on the Closing Date (it being understood that, for this purpose, "control" means the power, directly or indirectly, to direct or cause the direction of the management and policies of such holding company, whether through the ability to exercise voting power, by contract or otherwise), shall not itself be considered a "person" or "group" for these purposes; (B) the transfer of assets between or among the Borrower's Restricted Subsidiaries and the Borrower or Holdings shall not itself constitute a Change of Control; (C) the term Change of Control shall not include a merger or consolidation of the Borrower with or the sale, assignment, conveyance, transfer or other disposition of all or substantially all of the Borrower's assets to, an Affiliate incorporated or organized solely for the purpose of reincorporating or reorganizing the Borrower in another jurisdiction and/or for the sole purpose of forming or collapsing a holding company structure; (D) a "person" or "group" shall not be deemed to have beneficial ownership of securities subject to a stock or asset purchase agreement, merger agreement or similar agreement (or voting or option or similar agreement related thereto) until the consummation of the transactions contemplated by such agreement; and (E) the Transactions and any transactions related thereto shall not constitute a Change of Control.

"Chapter 11 Cases":  as defined in the Recitals.

"Class":  when used in reference to any Loan or borrowing, refers to whether such Loan, or the Loans comprising such borrowing, are Tranche B Term Loans, Incremental Tranche B Term Loans, Replacement Tranche B Term Loans, Refinancing Term Loans or Extended Term Loans; when used in reference to any Commitment, refers to whether such Commitment is a Tranche B Term Commitment, Incremental Tranche B Term Commitment or Refinancing Term Commitment; and when used in reference to any Lender, refers to whether such Lender has a Loan or Commitment with respect to a particular Class.  Incremental Tranche B Term Loans, Replacement Tranche B Term Loans, Extended Term Loans and Refinancing Term Loans (together with the respective Commitments in respect thereof) shall, at the election of the Borrower, be construed to be in different Classes.

"Closing Costs":   non-recurring out-of-pocket costs, fees, charges, expenses, disbursements and other payments (including of external counsel and financial advisors) incurred

and paid by the Loan Parties pursuant to the Loan Documents or otherwise in connection with, or relating to, the Financing Transactions.

"Closing Date":  the date on which the conditions precedent set forth in Section 5.1 shall have been satisfied (or waived by the Agents and the Lenders in accordance herewith) and the initial Tranche B Term Loans have been made or deemed to have been made.

"Closing Date Certificate":  a certificate, substantially in the form of Exhibit D, dated as of the Closing Date and duly executed by a Responsible Officer of the Borrower.

"CMS":  the Centers for Medicare & Medicaid Services.

"Code":  the Internal Revenue Code of 1986, as amended from time to time.

"Collateral":  all property of the Loan Parties (other than Excluded Property), now owned or hereafter acquired, upon which a Lien is purported to be created by any Security Document.

"Commencement Date":  the date that is the later of (a) the last Business Day of the first full calendar quarter ending after the Closing Date, provided, that if the last Business Day of the calendar quarter in which the Closing Date occurs is more than 60 days after the Closing Date, then the date referred to in this clause (a) shall be the last Business Day of the calendar quarter in which the Closing Date occurs and (b) the last Business Day of March 2018.

"Commodity Exchange Act":  the Commodity Exchange Act (7 U.S.C. § 1 *et seq*.), as amended from time to time, and any successor statute.

"Commonly Controlled Entity":  an entity, whether or not incorporated, that is under common control with the Borrower within the meaning of Section 4001 of ERISA or is part of a group of entities that includes the Borrower and that is treated as a single employer under Section 414 of the Code.

"Compliance Certificate":  a certificate duly executed by a Responsible Officer substantially in the form of Exhibit F.

"Conduit Lender":  any special purpose corporation organized and administered by any Lender for the purpose of making Loans otherwise required to be made by such Lender and designated by such Lender in a written instrument; provided that the designation by any Lender of a Conduit Lender shall not relieve the designating Lender of any of its obligations to fund a Loan under this Agreement if, for any reason, its Conduit Lender fails to fund any such Loan, and the designating Lender (and not the Conduit Lender) shall have the sole right and responsibility to deliver all consents and waivers required or requested under this Agreement with respect to its Conduit Lender, and provided, further, that no Conduit Lender shall (a) be entitled to receive any greater amount pursuant to Section 2.18, 2.19, 2.20 or 10.5 than the designating Lender would have been entitled to receive in respect of the extensions of credit made by such Conduit Lender or (b) be deemed to have any Commitment.

"Consolidated Current Assets":  at any date, all amounts (other than cash and Cash Equivalents, deferred income taxes and debts due from Affiliates) that would, in conformity with

GAAP, be set forth opposite the caption "total current assets" (or any like caption) on a consolidated balance sheet of the Borrower and its Restricted Subsidiaries at such date.

"Consolidated Current Liabilities":  at any date, all amounts that would, in conformity with GAAP, be set forth opposite the caption "total current liabilities" (or any like caption) on a consolidated balance sheet of the Borrower and its Restricted Subsidiaries at such date, but excluding (a) the current portion of any Funded Debt (including accrued but unpaid interest) of the Borrower and its Restricted Subsidiaries, (b) the current portion of current and deferred income taxes, (c) without duplication of clause (a) above, all revolving Indebtedness and Indebtedness in respect of letters of credit to the extent otherwise included therein and (d) deferred revenue.

"Consolidated Depreciation and Amortization Expense":  with respect to any Person for any period, the total amount of depreciation and amortization expense, including the amortization of non-cash organization costs of deferred financing fees or costs, capitalized expenditures, customer acquisition costs and incentive payments, conversion costs and contract acquisition costs, the amortization of original issue discount resulting from the issuance of Indebtedness at less than par and amortization of favorable or unfavorable lease assets or liabilities, of such Person and its Restricted Subsidiaries for such period on a consolidated basis and otherwise determined in accordance with GAAP and any writedown of assets or asset value carried on the balance sheet.

"Consolidated EBITDA":  for any period, Consolidated Net Income for such period plus, without duplication and to the extent already deducted (and not added back) in arriving at such Consolidated Net Income (other than with respect to clause (g), (r) or (s) below), the sum of (i) (to the extent attributable to the Borrower and its Restricted Subsidiaries): (a) income (or profits or capital) tax expense (and franchise taxes in the nature of income taxes) and foreign withholding tax expense for such period and any state single business unitary or similar tax, including any penalties and interest related to any tax examinations, (b) consolidated interest expense and, to the extent not reflected in consolidated interest expense, amortization or write-off of deferred financing costs, debt discount and debt issuance costs and commissions, discounts and other fees and charges associated with Indebtedness (including the Loans and all other Indebtedness incurred in connection with the Transactions), costs of surety bonds in connection with financing acquisitions and any losses on hedging obligations or other derivative instruments entered into for the purpose of hedging interest rate risk, (c) Consolidated Depreciation and Amortization Expense, (d) amortization of intangibles (including, but not limited to, goodwill) and organization costs, (e) Non-Cash Charges (as defined below), (f) [reserved], (g) proceeds of business interruption insurance received during such period, (h) expenses incurred to the extent covered by indemnification or refunding provisions in any Permitted Acquisition document, any document pertaining to any acquisition consummated prior to the Closing Date, or any insurance to the extent reimbursed (or reasonably expected to be reimbursed within three hundred and sixty (360) days of the incurrence thereof), (i) losses related to new operations commenced or acquired within 18 months prior to the last day of such period not to exceed $5,000,000 in such period, (j) expenses incurred in connection with the issuance of stock options, warrants or other Permitted Capital Stock by Borrower, Holdings or any Parent Entity to employees of Borrower and its Restricted Subsidiaries and any costs or expenses incurred by the Borrower and its Restricted Subsidiaries pursuant to any management equity plan or stock option plan or any management or

12

employee benefit plan or agreement or any stock subscription or shareholder agreement, (k) [reserved], (l) unusual or non-recurring losses or charges (which shall (x) exclude ordinary course legal expenses and (y) include any non-ordinary course legal expenses (including, without limitation any Designated Non-Ordinary Course Legal Expenses); provided that the aggregate amount of legal expenses referred to in this sub-clause (y) that can be added back pursuant to this clause (l), when taken together with the aggregate amounts added back pursuant to clause (s) of this definition (other than any Designated Non-Ordinary Course Legal Expenses) and the cost savings and synergies added back to Consolidated EBITDA pursuant to the second paragraph of the definition of Pro Forma Basis for such period, shall not exceed 10% of Consolidated EBITDA for such period determined on a Pro Forma Basis before giving effect to all such legal expenses referred to in this sub-clause (y) that would be added back pursuant to this clause (l) and all such amounts that would be added back pursuant to clause (s) of this definition and the second paragraph of the definition of Pro Forma Basis), severance costs, costs of non-compete agreements and relocation costs, (m) any deductions attributable to minority interests (excluding dividends and other distributions paid in cash to the holders of such minority interests), (n) any expenses or charges related to any debt or equity offering, Investment, acquisition, disposition, recapitalization or Indebtedness (whether or not successful), including such fees, expenses or charges related to the Loan Documents, other Indebtedness incurred in connection with the Transaction, any Additional Debt, Additional Term Notes, Refinancing Notes, Permitted Refinancings or any other Transaction and in connection with any actual or proposed registration of any securities (debt or equity) or any amendments, modifications, waivers, forbearances or restructurings or refinancings of any of the foregoing, (o) expenses related to executive employment agreements, stay bonuses, transaction costs, benefits and payroll taxes paid to or on behalf of employees of the relevant seller pertaining to any acquisition or investment permitted hereunder or consummated prior to the Closing Date who are no longer employed by Holdings or its Restricted Subsidiaries not to exceed $1,000,000 for the four fiscal quarters most recently ended, (p) charges in respect of early retirement of Indebtedness, restructuring costs, integration costs, lease run-off expenses or other business optimization expenses, costs associated with establishing new facilities or reserves, consolidation or discontinuance or closure of any operations, employees and/or management (including costs incurred to implement such restructuring), and transaction fees and expenses, including any expense relating to enhanced accounting, finance or revenue cycle management functions, (q) any net loss from disposed or discontinued operations, (r) cash receipts (or any netting arrangements resulting in reduced cash expenditures) not representing Consolidated EBITDA or Consolidated Net Income in any period to the extent non-cash gains relating to such income were deducted in the calculation of Consolidated EBITDA pursuant to clause (a) below for any previous period and not added back, (s) the amount of cost savings, operating expense reductions, other operating improvements and initiatives and synergies, which are reasonably identifiable and projected by the Borrower in good faith to be reasonably anticipated to be realizable within twelve (12) months of the date thereof (which will be added to Consolidated EBITDA as so projected until fully realized and calculated on a pro forma basis as though such cost savings, operating expense reductions, other operating improvements and initiatives and synergies had been realized on the first day of such period), net of the amount of actual benefits realized during such period from such actions, provided that the aggregate amount that can be added back pursuant to this clause (s), when taken together with cost savings and synergies added back to Consolidated EBITDA pursuant to the second paragraph of the definition of Pro Forma Basis for such period, shall not exceed

13

$5,000,000 for such period; provided that the aggregate amounts added back pursuant to this clause (s), when taken together with the aggregate amount of legal expenses described in sub-clause (y) of clause (l) of this definition that are added back pursuant to such clause (l) (other than any Designated Non-Ordinary Course Legal Expenses) and the cost savings and synergies added back to Consolidated EBITDA pursuant to the second paragraph of the definition of Pro Forma Basis for such period, shall not exceed 10% of Consolidated EBITDA for such period determined on a Pro Forma Basis before giving effect to all such amounts that would be added back pursuant to this clause (s), all amounts in respect of the legal expenses referred to in this sub-clause (y) of clause (l) that would be added back pursuant to such clause (l) (other than any Designated Non-Ordinary Course Legal Expenses) and all amounts that would be added back pursuant to the second paragraph of the definition of Pro Forma Basis), (t) [reserved], (u) realized foreign exchange losses resulting from the impact of foreign currency changes on the valuation of assets or liabilities on the balance sheet of the Borrower and its Restricted Subsidiaries, (v) net realized losses from Swap Obligations or embedded derivatives that require similar accounting treatment and the application of Accounting Standard Codification Topic 815 and related pronouncements, (w) Transaction Bonuses, retention, severance, recruiting, relocation and signing bonuses and expenses, (x) any net cash proceeds of any common equity contribution made directly or indirectly to the Borrower, or any net cash proceeds of any issuance of Permitted Capital Stock of the Borrower, in each case in respect of the Cure Right, provided that (A) any such net cash proceeds in respect of such Cure Right shall only be included in the calculation of Consolidated EBITDA for the purposes of determining compliance with the financial covenant in Section 7.1 and (B) shall be so included in such calculation only for the fiscal quarter for which such Cure Right is exercised and shall be included for the subsequent periods that include such fiscal quarter, and (y) all payments made during such period in respect of any settlement with the U.S. Department of Justice relating to potential violations of the False Claims Act and/or the Stark Law, minus (a) without duplication and to the extent included in the statement of such Consolidated Net Income for such period, the sum of (i) any unusual or non-recurring income or gains, (ii) income tax credits (to the extent not netted from income tax expense), (iii) any other non-cash income and (iv) any interest income and gains on hedging or other derivative instruments entered into for the purpose of hedging interest rate risk, and (b) any cash payments made during such period in respect of Non-Cash Charges described in clause (e) which cash payments are made subsequent to the fiscal quarter in which the relevant Non-Cash Charges were reflected as a charge in the statement of Consolidated Net Income, but only to the extent that such cash payments do not exceed such Non-Cash Charges, all as determined on a consolidated basis.  In addition, Consolidated EBITDA shall be calculated without giving effect to (w) any gains or losses from Asset Sales, (x) any gain or loss recognized in determining Consolidated Net Income for such period in respect of post-retirement benefits as a result of the application of FASB 106 and (y) any gain or loss recognized in determining Consolidated Net Income for such period resulting from Earnout Obligations.  Furthermore, (A) there shall be included in determining Consolidated EBITDA for any period, without duplication, (I) Acquired EBITDA of any Person, property, business or asset acquired (other than in the ordinary course of business) by, or contributed to, the Borrower or any Restricted Subsidiary during such period (but not the Acquired EBITDA of any related Person, property, business or assets to the extent not so acquired), to the extent not subsequently sold, transferred or otherwise disposed of by the Borrower or such Restricted Subsidiary (each such Person, property, business or asset acquired or received and not subsequently so disposed of, an

14

"Acquired Entity or Business") and (II) the Acquired EBITDA of any Unrestricted Subsidiary that is converted into a Restricted Subsidiary during such period (each, a "Converted Restricted Subsidiary"), based on the actual Acquired EBITDA of such Acquired Entity or Business or Converted Restricted Subsidiary for such period (including the portion thereof occurring prior to such acquisition or conversion) and the pro forma adjustments made pursuant to the definition of "Pro Forma Basis," if any, applicable thereto and (B) there shall be excluded in determining Consolidated EBITDA for any period (I) the Disposed EBITDA of any Person, property, business or asset sold, transferred or otherwise disposed of, closed or classified as discontinued operations (in each case, other than in the ordinary course of business) by the Borrower or any Restricted Subsidiary during such period (each such Person, property, business or asset so sold or disposed of, a "Sold Entity or Business") and (II) the Disposed EBITDA of any Restricted Subsidiary that is converted into an Unrestricted Subsidiary during such period (each, a "Converted Unrestricted Subsidiary"), based on the actual Disposed EBITDA of such Sold Entity or Business or Converted Unrestricted Subsidiary for such period (including the portion thereof occurring prior to such sale, transfer or disposition or conversion).  Notwithstanding the foregoing, if a Defeasance with respect to any Indebtedness has been consummated, the interest expense with respect to such Indebtedness shall not be added back to Consolidated EBITDA.

For the purpose of the definition of "Consolidated EBITDA," "Non-Cash Charges" means (a) any impairment charge or asset write-off related to intangible assets, long-lived assets, and investments in debt and equity securities pursuant to GAAP, (b) all losses from investments recorded using the equity method, (c) stock-based awards compensation expense, and (d) other non-cash charges.

Unless otherwise provided herein, Consolidated EBITDA shall be calculated with respect to the Borrower and its Restricted Subsidiaries.

Notwithstanding the foregoing, for purposes of determining Consolidated EBITDA for any four fiscal quarter period that includes any of the fiscal quarters ended [_____], [_____], [_____] and [_____], Consolidated EBITDA shall be deemed to be $[__], $[__], $[__] and $[__] respectively, (which amounts, for the avoidance of doubt shall be subject to addbacks and adjustments pursuant to clause (s) above and shall give effect to calculations on a Pro Forma Basis in accordance with Section 1.2 in respect of the Transactions and/or any Specified Transactions (including the cost savings described above or in the definition of "Consolidated Net Income" that in each case may become applicable due to actions taken on or after the Closing Date).

"Consolidated First Lien Debt":  at any date of determination, an amount equal to (a) the sum of (i) the aggregate principal amount of MDL Term Loans outstanding on such date, (ii) the aggregate principal amount of Term Loans outstanding on such date, (iii) all Capital Lease Obligations outstanding on such date and (iv) the aggregate principal amount of any other Consolidated Total Debt outstanding on such date less (b) the sum of (i) all Indebtedness on such date of the Borrower and its Restricted Subsidiaries secured by a Lien that is junior in priority to the Liens securing the Term Loans and (ii) all unsecured Indebtedness of the Borrower and its Restricted Subsidiaries on such date.

15

"Consolidated First Lien Leverage Ratio":  as at the end of any fiscal quarter, the ratio of (a) Consolidated First Lien Debt of the Borrower and its Restricted Subsidiaries on such day to (b) Consolidated EBITDA for the most recently completed four fiscal quarters of the Borrower and its Restricted Subsidiaries for which financial statements have been furnished pursuant to Section 6.1.

"Consolidated Interest Expense":  for any period, total cash interest expense (including that attributable to Capital Lease Obligations), net of cash interest income, of the Borrower and its Restricted Subsidiaries for such period with respect to all outstanding Indebtedness of the Borrower and its Restricted Subsidiaries (including all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing and net costs under Swap Agreements in respect of interest rates to the extent such net costs are allocable to such period in accordance with GAAP); provided, however, that (a) Consolidated Interest Expense shall be determined excluding (to the extent otherwise included therein) (i) all non-recurring cash interest expense consisting of liquidated damages for failure to timely comply with registration rights obligations and financing fees, as calculated on a consolidated basis in accordance with GAAP, (ii) penalties and interest relating to taxes, (iii) any additional cash interest owing pursuant to any registration rights agreement, (iv) accretion or accrual of discounted liabilities other than Indebtedness, (v) any expense resulting from the discounting of any Indebtedness in connection with the application of purchase accounting in connection with any acquisition, (vi) amortization of deferred financing fees, debt issuance costs, commissions, fees and expenses, (vii) any expensing of bridge, commitment and other financing fees and (viii) interest in respect of Indebtedness of any parent of such Person appearing upon the balance sheet of such Person solely by reason of push-down accounting under GAAP and (ix) interest expense in connection with the Indebtedness if a Defeasance is consummated with respect to such Indebtedness, and (b) for the avoidance of doubt, all interest expense of any Unrestricted Subsidiary and any Converted Unrestricted Subsidiary shall be excluded from Consolidated Interest Expense for such period; provided that when determining Consolidated Interest Expense of the Borrower in respect of any period ending prior to the first anniversary of the Closing Date, Consolidated Interest Expense shall be calculated by multiplying the aggregate Consolidated Interest Expense accrued since the Closing Date by 365 and then dividing such product by the number of days from and including the Closing Date to and including the last day of such period.

"Consolidated Leverage Ratio":  as at the end of any fiscal quarter, the ratio of (a) Consolidated Total Debt of the Borrower and its Restricted Subsidiaries on such day to (b) Consolidated EBITDA for the most recently completed four fiscal quarters of the Borrower and its Restricted Subsidiaries for which financial statements have been furnished pursuant to Section 6.1.

"Consolidated Net Income":  for any period, the consolidated net income (or loss) of the Borrower and its Restricted Subsidiaries, determined on a consolidated basis in accordance with GAAP excluding (except with respect to clause (s) which shall be included), without duplication, (a) any extraordinary, exceptional, unusual or nonrecurring gain, loss, charge or expense, or any charges, expenses or reserves in respect of any restructuring, redundancy or severance expenses or any Non-Cash Charges for such period, (b) the cumulative effect of a change in accounting principles during such period, to the extent included in such net income (loss), (c) Closing Costs, accruals, payments, charges and expenses (including rationalization, legal, tax structuring and

16

other costs and expense) related to the Transactions and any amortization thereof thereafter, (d) any fees, costs and expenses (including allocated internal costs and expenses) incurred during such period, or any amortization thereof for such period, in connection with any actual or proposed acquisition, investment, asset disposition, recapitalization, dividend, distribution, issuance or repayment of Indebtedness, issuance of equity interests, refinancing transaction or amendment or modification of any debt instrument (in each case, including any such transaction consummated prior to the Closing Date and any such transaction not completed or initiated) and any charges or non-recurring merger costs incurred during such period as a result of any such transaction, (e) the after-tax effect of any income (or loss) for such period attributable to the early extinguishment of Indebtedness, (f) the income (or deficit) of any Person accrued prior to the date it becomes a Restricted Subsidiary of Borrower or is merged into or consolidated with Borrower or any of its Restricted Subsidiaries (other than for purposes of calculating Consolidated Leverage Ratio, Consolidated Total Secured Leverage Ratio and Consolidated First Lien Leverage Ratio hereunder, as set forth in the definition of "Consolidated EBITDA"), (g) the income (or deficit) of any Person (other than a Restricted Subsidiary of the Borrower) in which the Borrower or any of its Restricted Subsidiaries has an ownership interest, except to the extent that any such income is actually received by the Borrower or such Restricted Subsidiary in the form of dividends or similar distributions, (h) any net gain (or loss) realized upon the sale or other disposition of any asset or disposed operations of the Borrower or any Restricted Subsidiaries (including pursuant to any Sale Leaseback Transaction which is not sold or otherwise disposed of in the ordinary course of business), (i) any (x) non-cash compensation charge or expense arising from any grant of stock, stock options or other equity based awards and any non-cash deemed finance charges in respect of any pension liabilities or other provisions or on the re-valuation of any benefit plan obligation and (y) income (loss) attributable to deferred compensation plans or trusts shall be excluded, (j) all deferred financing costs written off or amortized and premiums paid or other expenses incurred directly in connection with any early extinguishment of Indebtedness and any net gain (loss) from any write-off or forgiveness of Indebtedness, (k) any unrealized gains or losses in respect of Swap Obligations or any ineffectiveness recognized in earnings related to qualifying hedge transactions or the fair value of changes therein recognized in earnings for derivatives that do not qualify as hedge transactions, in each case, in respect of Swap Obligations, (l) any unrealized foreign currency transaction gains or losses in respect of obligations of any Person denominated in a currency other than the functional currency of such Person and any unrealized foreign exchange gains or losses relating to translation of assets and liabilities denominated in foreign currencies, (m) any unrealized foreign currency translation or transaction gains or losses in respect of Indebtedness or other obligations of the Borrower or any Restricted Subsidiary owing to the Borrower or any Restricted Subsidiary, (n) any purchase accounting effects including, but not limited to, adjustments to inventory, property and equipment, software and other intangible assets and deferred revenue in component amounts required or permitted by GAAP and related authoritative pronouncements (including the effects of such adjustments pushed down to the Borrower and the Restricted Subsidiaries), as a result of any consummated acquisition, or the amortization or write-off of any amounts thereof (including any write-off of in process research and development), (o) any goodwill or other asset impairment charge or write-off or write-down, (p) any after-tax effect of income (loss) from the early retirement, extinguishment or cancellation of Indebtedness or Swap Obligations or other derivative instruments shall be excluded, (q) accruals and reserves that are established within twelve months after the Closing Date that are so

17

required to be established as a result of the Transactions in accordance with GAAP, shall be excluded, (r) any net unrealized gains and losses resulting from Swap Obligations or embedded derivatives that require similar accounting treatment and the application of Accounting Standards Codification Topic 815 and related pronouncements shall be excluded, (s) proceeds from any business interruption insurance to the extent not already included in Consolidated Net Income shall be included, (t) the amount of any expense to the extent a corresponding amount is received in cash by the Borrower and the Restricted Subsidiaries from a Person other than the Borrower or any Restricted Subsidiaries, <u>provided</u> such payment has not been included in determining Consolidated Net Income, (u) gains and losses on the sale, exchange or other disposition of assets outside the ordinary course of business or abandonment of assets and from discontinued operations and (v) cash and non-cash charges, paid or accrued, and gains resulting from the application of Financial Accounting Standards No. 141R (Accounting Standards Codification Topic 805) (including with respect to earn-outs incurred by the Borrower or any of its Restricted Subsidiaries). There also shall be excluded from Consolidated Net Income for any period (without duplication of the foregoing) the purchase accounting effects of adjustments to property and equipment, other intangible assets, deferred revenue, lease contracts and debt line items required or permitted by GAAP and related authoritative pronouncements (including the effects of such adjustments pushed down to the Borrower and its Restricted Subsidiaries), as a result of any acquisition consummated prior to the Closing Date, any Permitted Acquisitions, or the amortization or write-off of any amounts thereof.

In addition, to the extent not already included in the Consolidated Net Income of such Person and its Restricted Subsidiaries, notwithstanding anything to the contrary in the foregoing, Consolidated Net Income shall exclude (i) any expenses and charges that are reimbursed by indemnification or other reimbursement provisions, or so long as the Borrower has made a determination that there exists reasonable evidence that such amount will in fact be indemnified or reimbursed (and such amount is in fact reimbursed within three hundred sixty-five (365) days of the date of such charge or payment (with a deduction for any amount so added back to the extent not so reimbursed within such three hundred sixty-five (365) days)), in connection with any investment or any sale, conveyance, transfer or other disposition of assets permitted hereunder, (ii) to the extent covered by insurance and actually reimbursed, or, so long as the Borrower has made a determination that there exists reasonable evidence that such amount will in fact be reimbursed by the insurer and such amount is (A) not denied by the applicable carrier in writing within three hundred sixty-five (365) days and (B) in fact reimbursed within three hundred sixty-five (365) days of the date of such evidence (with a deduction for any amount so added back to the extent not so reimbursed within three hundred sixty-five (365) days), expenses with respect to liability or casualty events or business interruption and (iii) any expenses and charges to the extent paid for, or so long as the Borrower has made a determination that there exists reasonable evidence that such amount will in fact be reimbursed by (and such amount is in fact reimbursed within three hundred sixty-five (365) days of the date of such payment (with a deduction for any amount so added back to the extent not so reimbursed within three hundred sixty-five (365) days)), any third party other than such Person or any of its Restricted Subsidiaries.

"Consolidated Total Debt": at any date, the excess of (a) the aggregate principal amount of all Indebtedness of the Borrower and its Restricted Subsidiaries at such date, determined on a consolidated basis, to the extent consisting of any Indebtedness for borrowed money, Capital

18

Lease Obligations or debt obligations evidenced by bonds, debentures or notes and, for the avoidance of doubt, excluding any undrawn letters of credit, any Earnout Obligation and any changes in GAAP which would classify any operating leases in accordance with GAAP in effect as of the Closing Date as Capital Lease Obligations, required to be reflected on a consolidated balance sheet of the Borrower in accordance with GAAP, minus (b) Cash on Hand, provided that, if a Defeasance is consummated with respect to any Indebtedness that is the subject of such Defeasance, as the case may be, shall not be included in determining Consolidated Total Debt.

"Consolidated Total Secured Leverage Ratio": as at the end of any fiscal quarter, the ratio of (a) Consolidated Total Debt of the Borrower and its Restricted Subsidiaries as of such day less any unsecured Indebtedness of the Borrower and its Restricted Subsidiaries as of such day to (b) Consolidated EBITDA for trailing four quarter period for which financial statements are available.

"Consolidated Working Capital":  at any date, the excess (or deficit) (which may be a negative number) of Consolidated Current Assets on such date over Consolidated Current Liabilities on such date; provided that Consolidated Working Capital shall be calculated without giving effect to (i) any assets or liabilities acquired or assumed in any Permitted Acquisition or other Investment, (ii) as a result of the reclassification of items from short-term to long-term and vice-versa, (iii) non-cash current assets and current liabilities or (iv) purchase accounting.

"Contractual Obligation":  as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Converted Restricted Subsidiary":  has the meaning set forth in the definition of "Consolidated EBITDA."

"Converted Unrestricted Subsidiary":  has the meaning set forth in the definition of "Consolidated EBITDA."

"Credit Agreement Refinancing Indebtedness":  (a) Permitted First Priority Refinancing Debt, (b) Permitted Second Priority Refinancing Debt, (c) Permitted Unsecured Refinancing Debt or (d) other Indebtedness incurred pursuant to a Refinancing Amendment, in each case, issued, incurred or otherwise obtained (including by means of the extension or renewal of existing Indebtedness) in exchange for, or to extend, renew, replace, repurchase, retire or refinance, in whole or part, existing Term Loans, or any then-existing Credit Agreement Refinancing Indebtedness ("Refinanced Debt"); provided that (i) such Indebtedness has a maturity no earlier, and, in the case of Refinancing Term Loans, a Weighted Average Life to Maturity equal to or greater, than the Refinanced Debt (without giving effect to any prepayments or changes to amortization), (ii) such Indebtedness shall not have a greater principal amount than the principal amount of the Refinanced Debt plus accrued interest, fees, premiums (if any) and penalties thereon and fees and expenses associated with the refinancing plus an amount equal to any existing commitments thereunder plus any Term Loans plus other Indebtedness that could otherwise be (A) incurred hereunder (subject to a dollar for dollar usage of any basket (other than any basket that provides for Credit Agreement Refinancing Indebtedness) set forth in Section 7.2) and (B) if such Indebtedness is secured, subject to a dollar for dollar usage of any basket

19

(other than any basket that provides for Liens on Credit Agreement Refinancing Indebtedness) set forth in Section 7.2, plus premiums and accrued and unpaid interest, fees and expenses in respect thereof plus other reasonable costs, fees and expenses (including upfront fees and original issue discount) incurred in connection with such Credit Agreement Refinancing Indebtedness, (iii) the terms and conditions of such Indebtedness (except as otherwise provided in clause (ii) above and with respect to pricing, premiums, fees, rate floors and optional prepayment or redemption terms) reflect market terms and conditions at the time of incurrence or issuance of such Credit Agreement Refinancing Indebtedness, (iv) such Indebtedness shall rank *pari passu* or junior in right of payment and (if secured) of security with the Term Loans hereunder, (v) the obligations in respect of such Indebtedness may not be secured by liens on the assets of the Borrower and its Restricted Subsidiaries, other than assets constituting Collateral and may be guaranteed solely by the Guarantors, except to the extent not originally incurred by an entity that was not a Loan Party, (vi) if such Indebtedness is secured, the Representative for such Indebtedness shall enter into a customary intercreditor agreement with the Administrative Agent substantially consistent with the terms set forth in the Intercreditor Agreement and (vii) such Refinanced Debt shall be repaid, repurchased, retired, Defeased or satisfied and discharged, all accrued interest, fees, premiums (if any) and penalties in connection therewith shall be paid, and all commitments thereunder terminated, on the date such Credit Agreement Refinancing Indebtedness is issued, incurred or obtained.

"Credit Increase":  as defined in Section 2.25(a).

"Cure Amount":  as defined in Section 8.

"Cure Right":  as defined in Section 8.

"Debt Fund Affiliate":  any Person that is organized primarily for the purpose of making debt investments in one or more companies and is a bona fide and diversified investment fund.

"Declined Proceeds":  as defined in Section 2.11(f).

"Default":  any of the events specified in Section 8, whether or not any requirement for the giving of notice, the lapse of time, or both, as set forth therein, has been satisfied.

"Default Interest":  as defined in Section 2.14(c).

"Defaulting Lender":  any Lender that (a) has failed to fund any portion of its Loans required to be funded by it hereunder within one (1) Business Day of the date required to be funded by it hereunder, (b) has notified the Administrative Agent, any Lender and/or Borrower in writing that it does not intend to comply with any of its funding obligations under this Agreement or has made a public statement to the effect that it does not intend to comply with its funding obligations under this Agreement or under other agreements in which it commits to extend credit, (c) has failed, within three (3) Business Days after request by the Administrative Agent, to confirm that it will comply with the terms of this Agreement relating to its obligations to fund prospective Loans, (d) has otherwise failed to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within three (3) Business Days of the date when due, unless the subject of a good faith dispute, or (e) in the case of a Lender that has a Commitment outstanding at such time, shall take, or is the Subsidiary of any

20

person that has taken, any action or be (or is) the subject of any action or proceeding of a type described in Section 8(f) (or any comparable proceeding initiated by a regulatory authority having jurisdiction over such Lender or such person) or become the subject of a Bail-In Action; provided that (1) with respect to (a), (b) or (c), to the extent such Lender is making a good faith claim that it has no obligation to fund because the conditions to borrowing have not been met, then such Lender shall not be considered a Defaulting Lender and (2) as of any date of determination, the determination of whether any Lender is a Defaulting Lender hereunder shall not take into account, and shall not otherwise impair, any amounts funded by such Lender which have been assigned by such Lender to a Conduit Lender pursuant to Section 10.6(f).

"Defeasance":  (x) a covenant defeasance in respect of (a) the Senior PIK Toggle Notes Indenture pursuant to Article VIII of the Senior PIK Toggle Notes Indenture or (b) any similar covenant defeasance in respect of other Indebtedness or (y) the irrevocable deposit of cash with an agent or trustee or into escrow or similar arrangement for the repayment in full of (i) any Indebtedness and (ii) all accrued interest on such Indebtedness and (iii) outstanding fees, premiums, expenses and other obligations relating to such Indebtedness then due or which would be due as a result of such repayment (other than contingent indemnity obligations).

"Designated Non-Cash Consideration":  the fair market value (as determined in good faith by the Borrower) of non-cash consideration received by the Borrower or one of its Restricted Subsidiaries in connection with a Disposition that is so designated as Designated Non-Cash Consideration pursuant to an officer's certificate, setting forth the basis of such valuation, less the amount of cash or Cash Equivalents received in connection with a subsequent payment, redemption, retirement, sale or other disposition of such Designated Non-Cash Consideration.  A particular item of Designated Non-Cash Consideration will no longer be considered to be outstanding when and to the extent it has been paid, redeemed or otherwise retired or sold or otherwise disposed of in compliance with Section 7.5.

"Designated Non-Ordinary Course Legal Expenses": all legal expenses incurred by the Borrower and its Subsidiaries in connection with the Transactions and/or any judgment, fine or settlement.

"Discount Prepayment Accepting Lender":  as defined in Section 2.10(c)(ii)(B).

"Discount Range":  as defined in Section 2.10(c)(iii)(A).

"Discount Range Prepayment Amount":  as defined in Section 2.10(c)(iii)(A).

"Discount Range Prepayment Notice":  a written notice of a Borrower Solicitation of Discount Range Prepayment Offers made pursuant to Section 2.10(c)(iii) substantially in the form of Exhibit K.

"Discount Range Prepayment Offer":  the irrevocable written offer by a Lender, substantially in the form of Exhibit L, submitted in response to an invitation to submit offers following the Auction Agent's receipt of a Discount Range Prepayment Notice.

"Discount Range Prepayment Response Date":  as defined in Section 2.10(c)(iii)(A).

21

"Discount Range Proration":  as defined in Section 2.10(c)(iii)(C).

"Discounted Loan Prepayment":  as defined in Section 2.10(c)(i).

"Discounted Prepayment Determination Date":  as defined in Section 2.10(c)(iv)(C).

"Discounted Prepayment Effective Date":  in the case of any Borrower Offer of Specified Discount Prepayment, Borrower Solicitation of Discount Range Prepayment Offer or Borrower Solicitation of Discounted Prepayment Offer, five (5) Business Days following the respective Specified Discount Prepayment Response Date, Discount Range Prepayment Response Date or Solicited Discounted Prepayment Response Date, as applicable, in accordance with Section 2.10(c)(ii)(A), Section 2.10(c)(iii)(A) or 2.10(c)(iv)(A), respectively, unless a different period is agreed to between the Borrower and the Auction Agent acting in their reasonable discretion.

"Disposed EBITDA":  with respect to any Sold Entity or Business for any period, the amount for such period of Consolidated EBITDA of such Sold Entity or Business (determined as if references to the Borrower and the Restricted Subsidiaries in the definition of Consolidated EBITDA were references to such Sold Entity or Business and its Restricted Subsidiaries), which may be negative, all as determined on a consolidated basis for such Sold Entity or Business.

"Disposition":  with respect to any property, any sale, lease, sale and leaseback, assignment, conveyance, transfer or other disposition thereof.  The terms "Dispose", "Disposed of" and "Disposing" shall have correlative meanings.

"Disqualified Lender":  as defined in Section 10.6(b)(ii)(F).

"Dollars" and "$":  dollars in lawful currency of the United States.

"Domestic Foreign Holding Company":  any Domestic Subsidiary of the Borrower the primary assets of which are (a) equity interests (including, for this purpose, any debt or other instrument treated as equity for U.S. federal income tax purposes) in one or more (x) Foreign Subsidiaries or other Domestic Foreign Holding Companies and (y) other Subsidiaries of the Borrower that own no material assets other than equity interests (including, for this purpose, any debt or other instrument treated as equity for U.S. federal income tax purposes) in one or more Foreign Subsidiaries or other Domestic Foreign Holding Companies or (b) intercompany accounts, cash, Cash Equivalents and debt of one or more Foreign Subsidiaries or other Domestic Foreign Holding Companies.  For the avoidance of doubt, Medical Developers LLC and MD International Investments, LLC are Domestic Foreign Holding Companies.

"Domestic Subsidiary":  any Restricted Subsidiary of the Borrower incorporated or organized in the United States or any State thereof (including for the avoidance of doubt, the District of Columbia), but excluding (except for the purpose of defining Domestic Foreign Holding Company) any Domestic Foreign Holding Company.

"Earnout Obligations":  those payment obligations of the Borrower and its Restricted Subsidiaries to former owners of businesses which were acquired by the Borrower or one of its Restricted Subsidiaries pursuant to an acquisition which are in the nature of deferred purchase

22

price to the extent such payment obligations are required to be set forth on a balance sheet prepared in accordance with GAAP.

"ECF Percentage":  with respect to any fiscal year of the Borrower, 50%; provided that the ECF Percentage shall be (a) 25% in respect of such fiscal year if the Consolidated First Lien Leverage Ratio as of the last day of such fiscal year is less than or equal to 4.00 to 1.00 but greater than 3.00 to 1.00 and (b) 0%, in respect of such fiscal year if the Consolidated First Lien Leverage Ratio as of the last day of such fiscal year is less than or equal to 3.00 to 1.00.

"EEA Financial Institution":  (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country":  any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority":  any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Electing Guarantor":  any Excluded Subsidiary that is a Restricted Subsidiary that, at the option, and in the sole discretion, of the Borrower has been designated a Subsidiary Guarantor, it being understood that the Borrower may undesignate any such Subsidiary subject to Section 6.11; provided that no Subsidiary may be an Electing Guarantor unless it is able to pledge all or substantially all of its assets as Collateral; provided, further, that in the case of a Foreign Subsidiary, such Foreign Subsidiary shall have complied with Section 6.9.

"Environmental Laws":  any and all foreign, Federal, state, local or municipal laws, rules, orders, regulations, statutes, ordinances, codes, decrees, requirements of any Governmental Authority or other Requirements of Law (including common law) regulating, relating to or imposing liability or standards of conduct concerning protection of the environment or of human health as affected by exposure to harmful or deleterious substances, as now or may at any time hereafter be in effect.

"ERISA":  the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"ERISA Plan":  any employee benefit plan that is covered by ERISA and in respect of which any Loan Party or a Commonly Controlled Entity is (or, if such plan were terminated at such time, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA or which any Loan Party or a Commonly Controlled Entity has maintained, contributed to or had any liability (whether or not on account of such Loan Party or any Commonly Controlled Entities or contingent or otherwise) now or in the prior six (6) years.

23

"EU Bail-In Legislation Schedule":  the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Eurocurrency Reserve Requirements":  for any day as applied to a Eurodollar Loan, the aggregate (without duplication) of the maximum rates (expressed as a decimal fraction) of reserve requirements in effect on such day (including basic, supplemental, marginal and emergency reserves) under any regulations of the Board or other Governmental Authority having jurisdiction with respect thereto dealing with reserve requirements prescribed for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board) maintained by a member bank of the Federal Reserve System.

"Eurodollar Base Rate":  for any Interest Period, the rate per annum (rounded upward, if necessary, to the nearest one-sixteenth of one percent (1/16th of 1%)) equal to (i) the offered rate administered by ICE Benchmark Administration (or any successor or substitute for such service, as determined by the Administrative Agent from time to time for purposes of providing quotations of interest rates applicable to Dollar deposits in London or other applicable interbank market in a manner consistent with market practice) as published by Bloomberg (or any successor or substitute service selected by the Administrative Agent from time to time) at approximately 11:00 a.m., London time, two (2) Business Days prior to the commencement of such Interest Period, for Dollar deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period or (ii) if such offered rate is not available at such time for any reason, then the "Eurocurrency Rate" for such Interest Period shall be the rate per annum determined by the Administrative Agent to be the rate at which deposits in Dollars for delivery on the first day of such Interest Period in same day funds in the approximate amount of the Eurodollar Loans being made, continued or converted by the Administrative Agent, and with a term equivalent to such Interest Period would be offered by the Administrative Agent to major banks in the London interbank market (or other applicable interbank market selected by the Administrative Agent) at their request at approximately 11:00 a.m. (London time or the equivalent time in such other applicable interbank market) two (2) Business Days prior to the commencement of such Interest Period.

"Eurodollar Loans":  Loans the rate of interest applicable to which is based upon the Eurodollar Rate.

"Eurodollar Rate":  with respect to each day during each Interest Period pertaining to (x) a Eurodollar Loan or (y) an ABR Loan bearing interest by reference to clause (c) of the definition of ABR, a rate per annum determined for such day in accordance with the following formula (rounded upward to the nearest 1/100th of 1%):



$$\frac{\text{Eurodollar Base Rate}}{1.00 - \text{Eurocurrency Reserve Requirements}}$$

; provided that the Eurodollar Rate with respect to the Tranche B Term Loans shall at all times be deemed to be not less than 1.00% per annum.

"Eurodollar Tranche":  the collective reference to Loans which are Eurodollar Loans under a particular Facility the then current Interest Periods with respect to all of which begin on

24

the same date and end on the same later date (whether or not such Eurodollar Loans shall originally have been made on the same day).

"Event of Default":  any of the events specified in Section 8, provided that any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Excess Cash Flow":  for any period, (a) Consolidated Net Income for such period, plus (b) if there was a net decrease in Consolidated Working Capital during such period, the amount of such net decrease, plus (c) an amount equal to the amount of non-cash charges to the extent deducted in arriving at such Consolidated Net Income, plus (d) non-cash losses from asset sales for such period (other than from sales in the ordinary course of business) to the extent deducted in arriving at such Consolidated Net Income, minus (e) regularly scheduled payments and mandatory prepayments of the principal of any Indebtedness during such period (other than any such payments and prepayments of principal of Indebtedness made with the proceeds of any issuance of Capital Stock or other Indebtedness incurred by the Borrower or any of its Restricted Subsidiaries), but only to the extent that any such prepaid amounts cannot by their terms be reborrowed or redrawn and do not occur in connection with a refinancing of all or any portion of such Indebtedness for such period, minus (f) without duplication of amounts deducted pursuant to clause (o) below in prior fiscal years, Capital Expenditures (other than Capital Expenditures financed with Indebtedness permitted hereunder and other Excluded Capital Expenditures) permitted to be made during such period, minus (g) without duplication of amounts deducted pursuant to clause (o) below in prior fiscal years, the cash portion of consideration for Permitted Acquisitions and other Investments (other than investments pursuant to Section 7.8(b) or (d)) permitted hereunder (other than consideration for Permitted Acquisitions and other Investments financed with Indebtedness or issuances of Capital Stock permitted hereunder) for such period or payable within ninety (90) days of the end of such period (provided that amounts so deducted shall not be deducted in any subsequent period), minus (h) non-cash gains from asset sales for such period (other than from sales in the ordinary course of business) to the extent included in arriving at such Consolidated Net Income, minus (i) if there was a net increase in Consolidated Working Capital during such period the amount of such net increase, minus (j) an amount equal to the amount of all non-cash credits included in arriving at such Consolidated Net Income and cash charges included in clauses (a) through (e) of the definition of "Consolidated Net Income," minus (k) cash payments by the Borrower and its Restricted Subsidiaries during such period in respect of long-term liabilities of the Borrower and its Restricted Subsidiaries other than Indebtedness (other than cash payments in respect of claims offset by receivables from insurance companies) and all payments made during such period in respect of any settlement with the U.S. Department of Justice relating to potential violations of the False Claims Act and/or the Stark Law, minus (l) the amount of cash Restricted Payments paid to a Person other than the Borrower or a Restricted Subsidiary during such period pursuant to Section 7.6(a)(ii), (b), (c), (e), (g), (h), (k), (l), (n) (but, with respect to this clause (n), not to the extent such Restricted Payment is in the form of a cash dividend to the shareholders of Borrower or Holdings in respect of their common stock or a repurchase of such common stock), (o), (p) or (s) to the extent such Restricted Payments were financed with internally generated cash flow of the Borrower and its Restricted Subsidiaries, minus (m) the aggregate amount of expenditures actually made by the Borrower and its Restricted Subsidiaries in cash during such period (including expenditures for the payment of financing fees) to the extent that such expenditures are not expensed during such period, except to the extent financed with the proceeds of Indebtedness or Capital Stock of

25

Holdings, the Borrower or its Restricted Subsidiaries, minus (n) the aggregate amount of any premium, make-whole or penalty payments actually paid in cash by the Borrower and its Restricted Subsidiaries during such period that are required to be made in connection with any prepayment of Indebtedness, minus (o) without duplication of amounts deducted from Excess Cash Flow in prior periods, the aggregate consideration (excluding any such consideration intended to be financed with Indebtedness or issuances of Capital Stock) required to be paid in cash by the Borrower or any of its Restricted Subsidiaries pursuant to contracts (the "Contract Consideration") entered into prior to or during such period relating to Permitted Acquisitions or Capital Expenditures to be consummated or made during the period of two consecutive fiscal quarters of the Borrower following the end of such period, provided that to the extent the aggregate amount of internally generated cash actually utilized to finance such Permitted Acquisitions during such period of two consecutive fiscal quarters is less than the Contract Consideration, the amount of such shortfall shall be added to the calculation of Excess Cash Flow at the end of such period of two consecutive fiscal quarters, plus (p) without duplication, an amount equal to all cash amounts received during such period but excluded in arriving at such Consolidated Net Income pursuant to any of clauses (a) through (e) of the definition of Consolidated Net Income, minus (q) cash payments made during such period in respect of Earnout Obligations, to the extent such Earnout Obligations were not deducted in calculating Excess Cash Flow for such period or any prior period, minus (r) except to the extent reducing amounts required to be paid under Section 2.11(c), voluntary prepayments of Indebtedness (other than Term Loans and revolving Indebtedness, to the extent accompanied by permanent reduction in commitments) during such period, minus (s) cash payments in respect of non-cash charges added back in a prior period minus (t) without duplication, an amount equal to all losses, charges or expenses incurred during such period but excluded in arriving at such Consolidated Net Income pursuant to the definition of Consolidated Net Income.

"Excess Cash Flow Application Date":  as defined in Section 2.11(c).

"Exchange Act":  the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Excluded Capital Expenditures":  all Capital Expenditures:

(a)    made to restore, replace or rebuild property to the condition of such property immediately prior to any damage, loss, destruction or condemnation of such property, to the extent such expenditure is made with, or subsequently reimbursed out of, insurance proceeds, indemnity payments, condemnation awards (or payments in lieu of) or damage recovery proceeds relating to any such damage, loss, destruction or condemnation;

(b)    constituting reinvestment of proceeds (to the extent permitted herein) from Asset Sales, Sale Leaseback Transactions and Recovery Events;

(c)    made by Borrower or any of its Restricted Subsidiaries as a tenant in leasehold improvements, to the extent reimbursed by the landlords; or

26

(d)      made with the Net Cash Proceeds (Not Otherwise Applied) of an issuance after the Closing Date of Capital Stock of Borrower or Holdings.

"Excluded Information":  information regarding the Borrower, Holdings, their respective Affiliates not known to such Lender and that may be material to a decision by such Lender to participate in any prepayment pursuant to Section 2.10(c) or assignment pursuant to Section 10.6(g) (including material non-public information).

"Excluded Party":  any Affiliate of a Lender that is engaged as a principal primarily in private equity, mezzanine financing or venture capital.

"Excluded Property":  as defined in the Security Documents.

"Excluded Subsidiary":  any Subsidiary of the Borrower that is (a) a Domestic Foreign Holding Company or any direct or indirect Domestic Subsidiary of a Foreign Subsidiary, Domestic Foreign Holding Company or any CFC; (b) a direct or indirect Foreign Subsidiary; (c) a Joint Venture or Non-Wholly-Owned Subsidiary; (d) an Immaterial Subsidiary; (e) an Unrestricted Subsidiary; (f) an Insurance Subsidiary or other special purpose entity; (g) a Non-Profit Entity; (h) prohibited by applicable Requirement of Law or Contractual Obligation from guaranteeing or granting Liens to secure any of the Secured Obligations or with respect to which any consent, approval, license or authorization from any Governmental Authority or third party (other than the Borrower or a Restricted Subsidiary thereof) would be required for the provision of any such guaranty (but in the case of such guaranty being prohibited due to a Contractual Obligation, such Contractual Obligation shall have been in place at the Closing Date or at the time such Subsidiary became a Restricted Subsidiary and was not created in contemplation of or in connection with such Person becoming a Restricted Subsidiary); provided that each such Domestic Subsidiary shall cease to be an Excluded Subsidiary solely pursuant to this clause (h) if such consent, approval, license or authorization has been obtained; (i) with respect to which the Borrower and the Administrative Agent reasonably agree that the burden or cost or other consequences of providing a guaranty of the Secured Obligations are excessive in relation to the benefits to the Lenders; (j) a Domestic Subsidiary acquired pursuant to an Acquisition financed with secured Indebtedness permitted to be incurred under Section 7.2(g) and each Domestic Subsidiary that is a Subsidiary thereof to the extent such secured Indebtedness prohibits such Domestic Subsidiary from becoming a Guarantor; provided that each such Domestic Subsidiary shall cease to be an Excluded Subsidiary solely pursuant to this clause (j) if such secured Indebtedness is repaid or becomes unsecured, if such Domestic Subsidiary ceases to guarantee such secured Indebtedness or such prohibition no longer exists, as applicable; (k) a direct or indirect Subsidiary of an Excluded Subsidiary; or (l) any Subsidiary with respect to which the providing of a guarantee of the Secured Obligations, in the reasonable judgment of the Borrower, could reasonably be expected to result in adverse tax consequences (other than *de minimis* adverse tax consequences), in each case other than any Electing Guarantor for so long as such entity is an Electing Guarantor.

"Excluded Swap Obligation":  with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the guarantee of such Guarantor of, or the grant by such Guarantor of a security interest pursuant to the Security Documents to secure, such Swap Obligation (or any guarantee thereof) is or becomes illegal or unlawful under the Commodity

27

Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act at the time the guarantee of such Guarantor or the grant of such security interest would otherwise have become effective with respect to such related Swap Obligation but for such Guarantor's failure to constitute an "eligible contract participant" at such time.

"Excluded Taxes":  as defined in Section 2.19(a).

"Existing LC Issuing Lender":  with respect to an Existing Letter of Credit, the "Issuing Lender" (as defined in clause (a) of the definition thereof in the Prepetition Credit Facility) that issued such Existing Letter of Credit.

"Existing Letters of Credit":  each "Letter of Credit" (as such term is defined in the Prepetition Credit Facility) issued or deemed issued under the Prepetition Credit Facility that is outstanding on the Closing Date, as set forth on Schedule 1.2.[1]

"Extended Term Loans":  as defined in Section 2.24.

"Extended Term Maturity Date":  with respect to any Extended Term Loan, the scheduled maturity date applicable thereto, as determined after giving effect to the applicable Extension pursuant to Section 2.24.

"Extending Term Lender":  as defined in Section 2.24.

"Extension":  as defined in Section 2.24.

"Extension Offer":  as defined in Section 2.24.

"Facility":  each of, as the context may require, (a) the Tranche B Term Commitments and the initial Tranche B Term Loans made thereunder (the "Tranche B Term Facility"), (b) the Incremental Tranche B Term Loans, (c) Refinancing Term Loans and (d) Extended Term Loans.

"FATCA":  Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"FCPA":  the Foreign Corrupt Practices Act of 1977, as amended from time to time, and the rules and regulations thereunder.

"Federal Funds Effective Rate":  for any day, the rate per annum equal to the weighted average (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the

---

[1] To be discussed.

average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) of the quotations for the day of such transactions received by the Administrative Agent, from three federal funds brokers of recognized standing selected by it.

"Financing Transactions":  collectively, (a) the execution and delivery of, and performance by each Loan Party of its Obligations under, the Loan Documents to which it is a party, including (i) the creation and perfection of the Liens on the Collateral and (ii) the payment of Closing Costs and all other fees, costs, expenses and disbursements required to be paid from time to time pursuant to any of the Loan Documents or in connection with the transactions contemplated thereby, (b) the borrowing of the Loans and the use of proceeds thereof by the Borrower and (c) all other transactions consummated in connection with, any of the foregoing.

"[First Lien Claims]":  as defined in the Plan of Reorganization.

"First Lien Senior Secured Notes":  Additional Term Notes, Unrestricted Additional Term Notes or Refinancing Notes, in each case, that are not subordinated in right of payment to the Tranche B Term Loans and are secured by a Lien on the Collateral ranking equal to, or *pari passu* with, Liens on the Collateral securing the Obligations.

"First Priority Obligations Payment Date": as defined in the Intercreditor Agreement.

"Fixed Charge Coverage Ratio":  on any date of determination, the ratio of (a) Consolidated EBITDA for the period of four consecutive fiscal quarters of the Borrower ending on the Applicable Date of Determination to (b) Consolidated Interest Expense for such period of four consecutive fiscal quarters.

"Flood Insurance Laws":  collectively, (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statue thereto, (iii) the National Flood Insurance Reform Act of 1994 as now or hereafter in effect or any successor statute thereto, (iv) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto and (v) Biggert-Waters Flood Insurance Reform Act of 2012 as now or hereafter in effect or any successor statute thereto.

"Foreign Disposition":  as defined in Section 2.11(e).

"Foreign Guarantor":  an Electing Guarantor that is a Foreign Subsidiary.

"Foreign Plan": each employee benefit plan (within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA) that is not subject to US law and is maintained or contributed to by the Borrower or any Commonly Controlled Entity.

"Foreign Prepayment Event":  as defined in Section 2.11(e).

"Foreign Subsidiary":  any Restricted Subsidiary of the Borrower that is not a Domestic Subsidiary.

29

"Funded Debt":  as to any Person, all Indebtedness of such Person that matures more than one year from the date of its creation or matures within one year from such date but is renewable or extendible, at the option of such Person, to a date more than one year from such date or arises under a revolving credit or similar agreement that obligates the lender or lenders to extend credit during a period of more than one year from such date, including all current maturities and current sinking fund payments in respect of such Indebtedness whether or not required to be paid within one year from the date of its creation and, in the case of the Borrower, Indebtedness in respect of the Loans.

"Funding Office":  the office of the Administrative Agent specified in Section 10.2 or such other office as may be specified from time to time by the Administrative Agent as its funding office by written notice to the Borrower and the Lenders.

"GAAP":  generally accepted accounting principles in the United States as in effect from time to time.  Anything in this Agreement to the contrary notwithstanding, any obligation of a Person under a lease (whether existing now or entered into in the future) that is not (or would not be) required to be classified and accounted for as a capital lease on the balance sheet of such Person under GAAP as in effect at the time such lease is entered into shall not be treated as a capital lease solely as a result of (x) the adoption of any changes in, or (y) changes in the application of, GAAP after such lease is entered into.

"Governmental Authority":  any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization (including the National Association of Insurance Commissioners).

"Group Members":  the collective reference to Holdings, the Borrower and its Restricted Subsidiaries.

"Guarantee and Security Agreement":  the Guarantee and Security Agreement, dated as of the Closing Date, entered into by the Borrower, the Guarantors and the Administrative Agent, substantially in the form of Exhibit B.

"Guarantee Obligation":  as to any Person (the "guaranteeing person"), any obligation, including a reimbursement, counterindemnity or similar obligation, of the guaranteeing person that guarantees or in effect guarantees, or which is given to induce the creation of a separate obligation by another Person (including any bank under any letter of credit) that guarantees or in effect guarantees, any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to

30

assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business.  The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by the Borrower in good faith.

"Guarantors":  the collective reference to Holdings and the Subsidiary Guarantors.

"Holdings":  (a) on the Closing Date, 21st Century Oncology Holdings, Inc., a Delaware corporation and (b) on any date of determination after the Closing Date, any other Person which on such date directly holds all of the Capital Stock of Borrower (including, as applicable, any successor to 21st Century Oncology Holdings, Inc.).

"Identified Participating Lenders":  as defined in Section 2.10(c)(iii)(C).

"Identified Qualifying Lenders":  as defined in Section 2.10(c)(iv)(C).

"Immaterial Subsidiary":  at any date of determination, any Domestic Subsidiary of the Borrower that has been designated by the Borrower in writing to the Administrative Agent as an "Immaterial Subsidiary" for purposes of this Agreement; provided that (a) for purposes of this Agreement, at no time shall the consolidated total assets of all Immaterial Subsidiaries as of the last day of the then most recent fiscal year of the Borrower for which financial statements have been delivered pursuant to Section 6.1(a) equal or exceed 10% of the Total Assets of the Borrower and the Restricted Subsidiaries at such date, determined on a Pro Forma Basis, (b) at any time and from time to time, the Borrower may designate any Restricted Subsidiary as a new Immaterial Subsidiary so long as, after giving effect to such designation, the consolidated assets of all Immaterial Subsidiaries do not exceed the limits set forth in clause (a) above at such time of designation and (c) if, as of the date the financial statements for any fiscal year of the Borrower are delivered or required to be delivered pursuant to Section 6.1(a), the consolidated assets of all Restricted Subsidiaries so designated by the Borrower as "Immaterial Subsidiaries" shall have, as of the last day of such fiscal year, exceeded the limits set forth in clause (a) above, then within forty-five (45) days (or such later date as agreed by the Administrative Agent in its reasonable discretion) after the date such financial statements are so delivered (or so required to be delivered), the Borrower shall redesignate one or more Immaterial Subsidiaries, in each case in a written notice to the Administrative Agent, such that, as a result thereof, the consolidated assets and revenues of all Restricted Subsidiaries that are still designated as "Immaterial Subsidiaries" do not exceed such limits.  Upon any such Restricted Subsidiary ceasing to be an Immaterial Subsidiary pursuant to the preceding sentence, such Restricted Subsidiary, to the extent not otherwise qualifying as an Excluded Subsidiary, shall comply with Section 6.9, to the extent applicable.

31

"Incremental Equivalent Debt": as defined in Section 2.25(a).

"Incremental Facility Amendment": as defined in Section 2.25.

"Incremental Term Maturity Date": the scheduled maturity date of any Incremental Tranche B Term Loans and/or Incremental Equivalent Debt, as applicable, which date shall not be earlier than the Tranche B Maturity Date.

"Incremental Tranche B Term Commitment": with respect to each Lender, the commitment, if any, of such Lender to make an Incremental Tranche B Term Loan under any Incremental Facility Amendment with respect thereto, expressed as an amount representing the maximum principal amount of the Incremental Tranche B Term Loans to be made by such Lender under such Incremental Facility Amendment, as such commitment may be (a) reduced from time to time pursuant to Section 2.9 and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 10.6.

"Incremental Tranche B Term Loans": as defined in Section 2.25(a).

"Indebtedness": of any Person at any date, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services (other than (i) trade payables, deferred revenues and accrued expenses incurred in the ordinary course of such Person's business, (ii) Earnout Obligations and (iii) liabilities resulting from application of FASB 150 (other than for Capital Stock referred to in clause (g) below)), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) the principal portion of all Capital Lease Obligations of such Person, (f) all outstanding reimbursement obligations of such Person as an account party or applicant under or in respect of acceptances, letters of credit, surety bonds or similar arrangements, (g) the liquidation value of all mandatorily redeemable preferred Capital Stock of such Person issued to parties other than the Borrower or its Subsidiaries, if the scheduled redemption date is prior to the Tranche B Maturity Date (except as a result of an Initial Public Offering, Change of Control or Asset Sale so long as any rights of the holders thereof upon the occurrence of an Initial Public Offering, Change of Control or Asset Sale shall be subject to the prior repayment in full of the Loans that are accrued and owing), (h) all Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (a) through (g) above, (i) all obligations of the kind referred to in clauses (a) through (h) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation, and (j) for the purposes of Section 8(e) only, the amount of all obligations of such Person in respect of Swap Agreements (determined, for this purpose, in respect of any Swap Agreement, based on the maximum aggregate amount, giving effect to any netting agreements, that such Person would be required to pay if such Swap Agreement were terminated at the time); provided, however, that for purposes of calculating Consolidated Leverage Ratio, Consolidated Total Secured Leverage Ratio and Consolidated First Lien Leverage Ratio, (A)

32

intercompany Indebtedness and (B) obligations constituting non-recourse Indebtedness shall be excluded; provided, further, that (i) the amount of Indebtedness which is limited or non-recourse to such Person or for which recourse is limited to an identified asset shall be equal to the lesser of (1) the amount of such Indebtedness and (2) the fair market value of such asset as at the date of determination, (ii) amounts which are reserved by such Person for payment of insurance premiums due within twelve months of such date shall not constitute Indebtedness and (iii) Indebtedness shall not include obligations with respect to (1) deferred compensation, (2) liabilities associated with customer prepayments and deposits and any obligations under ERISA and other accrued obligations in the ordinary course of business, (3) obligations under employment agreements and (4) deferred revenue and deferred tax liabilities.  Notwithstanding the foregoing, the term "Indebtedness" shall not include contingent post-closing purchase price adjustments, non-compete or consulting obligations or earn-outs to which the seller in an Acquisition or Investment may become entitled until such amounts become due and payable. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness expressly provide that such Person is not liable therefor.

"Initial Mortgaged Properties":  the real properties identified as Initial Mortgaged Properties on Schedule 4.8.

"Initial Public Offering":  the initial public offering of the common stock of Holdings or any Parent Entity.

"Insolvency":  with respect to any Multiemployer Plan, the condition that such Plan is insolvent within the meaning of Section 4245 of ERISA.

"Insolvent":  pertaining to a condition of Insolvency.

"Insurance Subsidiary":  any Subsidiary of the Borrower engaged solely in the general liability, professional liability, health and benefits and workers compensation and such other insurance business as may be approved by the Administrative Agent in its reasonable discretion, for the underwriting of insurance policies for the Borrower and its Subsidiaries and the respective employees, officers or directors thereof.  Notwithstanding anything else herein to the contrary, no Insurance Subsidiary shall be required to become a Subsidiary Guarantor hereunder.

"Intellectual Property":  the collective reference to all rights, priorities and privileges under any intellectual property, whether owned or licensed, and whether arising under United States, multinational or foreign laws or otherwise, including copyrights, patents, trademarks, technology, know-how and processes, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"Intercreditor Agreement":  means (i) that certain Intercreditor Agreement, substantially in the form of Exhibit I, dated as of the Closing Date, by and among the Loan Parties, the ABL Agent (if any), the MDL Term Loan Agent, the Administrative Agent, the PIK Toggle Notes

33

Agent and each other financial institution party thereto from time to time, as it may be amended, restated, supplemented or otherwise modified from time to time in accordance with this Agreement or (ii) [any other intercreditor agreement (in form and substance reasonably satisfactory to the Administrative Agent) entered into by the Administrative Agent with the consent of the Required Lenders (such consent not to be unreasonably withheld or delayed)][2].

"Interest Payment Date":  (a) as to any ABR Loan, the last Business Day of each March, June, September and December to occur while such ABR Loan is outstanding, (b) as to any Eurodollar Loan, the last Business Day of each Interest Period applicable to such Loan; provided, however, that if any Interest Period for a Eurodollar Rate Loan exceeds three months, the respective dates that fall every three months after the beginning of such Interest Period shall also be Interest Payment Dates with respect to such Eurodollar Loan and (c) as to any Loan, (i) each date of any repayment or prepayment made in respect thereof prior to the Termination Date of such Loan and (ii) the Termination Date of such Loan.

"Interest Period":  as to any Eurodollar Loan, (a) initially, the period commencing on the borrowing or conversion date, as the case may be, with respect to such Eurodollar Loan and ending one, two, three or six (or, if agreed to by all Lenders under the relevant Facility, twelve) months thereafter, as selected by the Borrower in its notice of borrowing or notice of conversion, as the case may be, given with respect thereto; and (b) thereafter, each period commencing on the last day of the next preceding Interest Period applicable to such Eurodollar Loan and ending one, two, three or six (or, if agreed to by all Lenders under the relevant Facility, twelve) months thereafter, as selected by the Borrower by irrevocable notice to the Administrative Agent not later than 12:00 Noon, New York City time, on the date that is three (3) Business Days prior to the last day of the then current Interest Period with respect thereto; provided that, all of the foregoing provisions relating to Interest Periods are subject to the following:

(a)     if any Interest Period would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless the result of such extension would be to carry such Interest Period into another calendar month in which event such Interest Period shall end on the immediately preceding Business Day;

(b)     the Borrower may not select an Interest Period under a particular Facility that would extend beyond the date final payment is due on the Tranche B Term Loans;

(c)     any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of a calendar month; and

(d)     the Borrower shall select Interest Periods so as not to require a payment or prepayment of any Eurodollar Loan during an Interest Period for such Loan.

"Investment":  (i) any purchase or other acquisition by the Borrower or any of the Restricted Subsidiaries of, or of a beneficial interest in, any Capital Stock or Indebtedness of any

---

[2] NTD:  Subject to further discussion among Stroock, K&E and Milbank.

34

other Person (including any Restricted Subsidiary), (ii) any loan or advance (by way of guaranty or otherwise) constituting Indebtedness of such other Person, including any partnership or joint venture interest in such other Person (other than accounts receivable and trade credit) or (iii) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person; provided that, in the event that any Investment is made by the Borrower or any Restricted Subsidiary in any Person through substantially concurrent interim transfers of any amount through any other Restricted Subsidiaries, then such other substantially concurrent interim transfers shall be disregarded for purposes of Section 7.8. The amount of any Investment outstanding as of any time shall be the original cost of such Investment (which, in the case of any Investment constituting the contribution of an asset or property, shall be based on the Borrower's good faith estimate of the fair market value of such asset or property at the time such Investment is made) plus the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment, less all Returns received by the Borrower or any Restricted Subsidiary in respect thereof.

"Joint Venture":  a joint venture, partnership or similar arrangement, whether in corporate, partnership or other legal form.  To the extent constituting a Joint Venture, 21st Century Oncology, LLC shall not be, and shall not be deemed to be, a Joint Venture for purposes of the definitions of "Cash on Hand" and "Liquidity".

"Joint Venture Disposition Amount":  (x) with respect to any proposed Disposition pursuant to Section 7.5(x), the greater of (A) $100,000,000 and (B) 8.75% of Total Assets as of the Applicable Date of Determination if after giving effect to such Disposition, Consolidated EBITDA would not be less than prior to giving effect thereto and (y) if immediately preceding clause (x) does not apply, the greater of (A) $30,000,000 and (B) 2.50% of Total Assets as of the Applicable Date of Determination.

"Latest Maturity Date":  with respect to any Class of Loan, at any date of determination, the latest scheduled maturity date applicable to such Class of Loan at such time.

"Latest Tranche B Maturity Date":  as at any date of determination, the later of (a) the Tranche B Maturity Date, (b) the Replacement Tranche B Term Maturity Date, (c) the latest Incremental Term Maturity Date (if any) in effect at such time and (d) the latest Extended Term Maturity Date (if any) in effect at such time.

"Lenders":  each of the banks, financial institutions and other Persons listed on the signature pages hereof as a Lender and each Person that shall become a Lender hereunder after the Closing Date pursuant to Section 2.22 and Section 10.6, in each case, for so long as such Person shall be a party to this Agreement; provided that, unless the context otherwise requires, each reference herein to a Lender shall be deemed to be a reference to a Tranche B Term Lender and to include any Conduit Lender.

"Lien":  any mortgage, pledge, hypothecation, collateral assignment, security deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any

35

capital lease having substantially the same economic effect as any of the foregoing).  For the avoidance of doubt, "Lien" shall not be deemed to include any license or sublicense of Intellectual Property.

"Liquidity": as of any date of determination, shall equal (a) the aggregate amount of domestic unrestricted cash and Cash Equivalents of the Borrower and its Restricted Subsidiaries[3] *plus* (b) borrowing availability under all domestic revolving credit facilities of the Borrower and its Restricted Subsidiaries in effect as of such date *less* (c) the aggregate amount of domestic unrestricted cash and Cash Equivalents of any Restricted Subsidiary of Borrower that is a Joint Venture.

"Loan":  each and any Term Loan made by a Lender pursuant to this Agreement (collectively, the "Loans").

"Loan Documents":  this Agreement, the Agent Fee Letter (except for purposes of Section 10.1), the Security Documents, the Notes and any amendment, waiver, supplement or other modification to any of the foregoing.

"Loan Modification Offer":  as defined in Section 10.1.

"Loan Obligations":  the unpaid principal of and interest on (including Default Interest, interest accruing after the maturity of the Loans and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to the Borrower, whether or not a claim for post-filing or post-petition interest, is allowed or allowable in such proceeding) the Loans, and all other Indebtedness, obligations and liabilities of the Borrower and each other Loan Party (including the Guarantee Obligations of the Guarantors), as applicable, to the Administrative Agent or to any Lender or other Secured Party, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement, any other Loan Document or any other document, agreement or instrument made, delivered or given in connection herewith or therewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including all fees, costs, expenses, charges and disbursements of counsel to the Administrative Agent or to any Lender that are required to be paid by the Borrower or the Guarantors pursuant hereto or any other Loan Document) or otherwise, in each case, including all amounts accruing after the maturity of the Loans or after the filing of any bankruptcy petition or the commencement of any insolvency reorganization or like proceeding relating to any Loan Party whether allowed or allowable in such proceeding.

"Loan Parties":  collectively, Holdings, the Borrower and the Guarantors.

"Majority Facility Lenders":  (a) with respect to the Tranche B Term Facility, Lenders holding more than 50% of the aggregate unpaid principal amount of the Tranche B Term Loans and (b) with respect to the Incremental Tranche B Term Loans, Lenders holding more than 50%

---

[3] NTD:  Inclusion of cash and Cash Equivalents of Medical Developers Cooperatief, U.A., 21st Century Oncology Holdings, B.V. and Medical Developers Holdings, B.V. in this calculation remains subject to further discussion among Stroock, K&E and Milbank.

of the aggregate unpaid principal amount of the Incremental Tranche B Term Loans; provided that the Tranche B Term Loans and the Incremental Tranche B Term Loans of any Defaulting Lender shall be excluded for the purposes of making a determination of Majority Facility Lenders.

"Managed Care Plans":   all health maintenance organizations, preferred provider organizations, individual practice associations, competitive medical plans and similar arrangements.

"Management Stockholders":   the members of management of the Borrower or its Subsidiaries who are investors in Holdings or any direct or indirect parent thereof.

"Material Adverse Effect":   a material adverse effect on (a) the business, property, operations, or financial condition of the Borrower and its Restricted Subsidiaries, taken as a whole, (b) the validity or enforceability of this Agreement, the Notes, Section 2 of the Guarantee and Security Agreement, or, taken as a whole, any of the other Loan Documents, or (c) the rights or remedies of the Administrative Agent or the Lenders under this Agreement, the Notes or, taken as a whole, the other Loan Documents.

"Materials of Environmental Concern":   any gasoline or petroleum (including crude oil or any fraction thereof) or petroleum products or any hazardous or toxic substances, materials or wastes, defined or regulated as such in or under any Environmental Law, including asbestos, polychlorinated biphenyls and urea-formaldehyde insulation.

"MDL Entities":   collectively, Medical Developers LLC, MD International Investments, LLC and their respective Subsidiaries (including Medical Developers Coöperatief U.A.), together with each successor to any of the foregoing.

"MDL Priority Collateral": as defined in the Intercreditor Agreement.

"MDL Sale Proceeds": all Net Cash Proceeds received by any Loan Party or any of their respective Restricted Subsidiaries from the Disposition of, or other value attributed in a bankruptcy, insolvency or similar proceeding with respect to, any MDL Priority Collateral or any other assets or property of the MDL Entities.

"MDL Term Loan Agent":   Wilmington Savings Fund Society, FSB, together with its successors and permitted assigns.

"MDL Term Loan Agreement":   that certain Credit Agreement, dated as of [__], 2017, by and among the Borrower, the lenders party thereto and the MDL Term Loan Agent, as administrative agent and collateral agent, as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"[MDL Term Loan Termination Date]" has the meaning set forth in the Intercreditor Agreement.

"MDL Term Loans": the loans outstanding under the MDL Term Loan Agreement.

37

"Medicaid":  medical assistance provided under a State plan approved under title XIX of the Social Security Act.

"Medicaid Provider Agreements":  any Medicaid provider agreements or similar agreement or arrangement between any of the Loan Parties or any of their Subsidiaries, on the one hand, and, any State or a State Medicaid Agency, on the other hand.

"Medicare":  the health insurance program for the aged and disabled under title XVIII of the Social Security Act.

"Medicare Provider Agreements":  any Medicare provider agreements or similar agreement or arrangement between any of the Loan Parties or any of their Subsidiaries, on the one hand, and, CMS, on the other hand.

"Minimum Extension Condition":  as defined in Section 2.24.

"Minority Investments":  as defined in Section 7.8.

"Moody's":  as defined in the definition of "Cash Equivalents."

"Mortgaged Properties":  the Initial Mortgaged Properties and the other real properties and leasehold interests, if any, of any Loan Party as to which the Administrative Agent for the benefit of the Secured Parties shall be granted a Lien pursuant to the Mortgages.

"Mortgages":  all fee mortgages, leasehold mortgages, if any, mortgage deeds, deeds of trust, deeds to secure debt, and other similar instruments, executed or to be executed by any Loan Party (i) which provide the Administrative Agent, for the benefit of the Secured Parties, a Lien on the Initial Mortgaged Properties and (ii) pursuant to Section 6.9(b), as amended, restated, modified, extended or supplemented from time to time.

"MSSF":  Morgan Stanley Senior Funding, Inc.

"Multiemployer Plan":  an ERISA Plan that is a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA.

"Net Cash Proceeds":  (a) in connection with any Asset Sale, Sale Leaseback Transaction or any Recovery Event, the proceeds thereof in the form of cash and Cash Equivalents (including any such proceeds received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but only as and when received), net of attorneys' fees, accountants' fees, investment banking fees, amounts required to be applied to the repayment of Indebtedness (including, without limitation, principal, interest, premium and penalties, if any) secured by a Lien expressly permitted hereunder on any asset that is the subject of such Asset Sale, Sale Leaseback Transaction or Recovery Event (other than any Lien pursuant to a Security Document) and other related fees and expenses actually incurred in connection therewith and net of taxes paid or reasonably estimated to be payable as a result thereof and net of (i) any reasonable reserves established in connection therewith, (ii) reasonable holdbacks, (iii) reasonable indemnity obligations relating thereto, (iv) in the case of any Disposition or casualty or condemnation or similar proceeding by a Non-Wholly-Owned

38

Subsidiary, the pro rata portion of the Net Cash Proceeds thereof (calculated without regard to this clause (iv)) attributable to minority interests and not available for distribution to or for the account of the Borrower or a wholly-owned Restricted Subsidiary as a result thereof and (v) any funded escrow established pursuant to the documents evidencing any such sale or disposition to secure any indemnification obligations or adjustments to the purchase price associated with any such sale or disposition until such time as the funds are released back to the Borrower or such Restricted Subsidiary pursuant to such escrow agreement and (b) in connection with any issuance or sale of Capital Stock, capital contribution or any incurrence of Indebtedness, the cash proceeds received from such issuance or incurrence, net of attorneys' fees, investment banking fees, accountants' fees, underwriting discounts and commissions and other related fees and expenses actually incurred in connection therewith.

"Non-Bank Tax Certificate":  as defined in Section 2.19(e).

"Non-Consenting Lender":  as defined in Section 2.22(b).

"Non-Debt Fund Affiliate":  an Affiliate of the Borrower that is not a Debt Fund Affiliate or a Purchasing Borrower Party.

"Non-Excluded Taxes":  as defined in Section 2.19(a).

"Non-Indemnifiable Taxes":  as defined in Section 2.19(a).

"Non-Loan Party Additional Term Notes":  Additional Term Notes secured by a non-Loan Party and for which clauses (a), (d), (e) and (f) thereof need not be satisfied.

"Non-Loan Party Unrestricted Additional Term Notes":  Unrestricted Additional Term Notes incurred by a non-Loan Party and for which clauses (a), (d) and (e) need not be satisfied.

"Non-Profit Entities":  any entity or entities duly acquired or formed and organized by the Holdings or any Subsidiary as a not-for-profit entity under applicable state law in furtherance of the business needs of Holdings and its Subsidiaries.

"Non-U.S. Lender":  as defined in Section 2.19(e).

"Non-Wholly-Owned Subsidiary":  any Domestic Subsidiary (other than a Non-Profit Entity or an Insurance Subsidiary) that is not a Wholly-Owned Subsidiary.

"Not Otherwise Applied":  with reference to any amount of Net Cash Proceeds of any transaction or event, that such amount (a) was not required to be applied to prepay the Loans pursuant to Section 2.11, and (b) was not previously applied in determining the permissibility of a transaction under the Loan Documents where such permissibility was (or may have been or concurrently will be) contingent on receipt of such amount or utilization of such amount for a specified purpose.  The Borrower shall promptly notify the Administrative Agent in writing of any application of such amount as contemplated by (b) above.

"Notes":  the collective reference to any promissory note evidencing Loans.

39

"Offered Amount":  as defined in Section 2.10(c)(iv)(A).

"Offered Discount":  as defined in Section 2.10(c)(iv)(A).

"Organizational Documents":  of any Person, the charter, memorandum and articles of association, articles or certificate of organization or incorporation and bylaws or other organizational or governing or constitutive documents of such Person.

"Other Applicable Indebtedness":  as defined in Section 2.11(b).

"Other Connection Taxes":  with respect to the Administrative Agent or any Lender, Taxes imposed as a result of a present or former connection between the Administrative Agent or such Lender and the jurisdiction imposing such Tax (other than connections arising solely from the Administrative Agent or such Lender having executed, delivered, become a party to, performed its obligations under, received payments under or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes":  any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies (including any interest, additions to tax or penalties applicable thereto) arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

"Parent Entity":  any Person of which Holdings at any time is or becomes a subsidiary on or after the Closing Date.

"Participant":  as defined in Section 10.6(c).

"Participating Lender":  as defined in Section 2.10(c)(iii)(B).

"Patriot Act":  the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001).

"PBGC":  the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor).

"Perfection Certificate":  a certificate substantially in the form of Exhibit R.

"Permitted Acquisition":  an Acquisition by the Borrower or a Restricted Subsidiary, subject to the fulfillment of the following conditions:

> (a)    in the case of an acquisition of Capital Stock of any entity by the Borrower or a Guarantor, such entity shall become a party to the Guarantee and Security Agreement and its Capital Stock shall be pledged to the extent required by the terms of Section 6.9 except to the extent that the portion of the fair market value of the consideration for such Acquisition that is attributable to Investments in such entities (whether or not such entities become Subsidiaries) that do not become Subsidiary Guarantors as a result of such Acquisition is treated, at the time of such Acquisition, as

Investments in such entities made pursuant to Section 7.8 (other than Section 7.8(g)) and are permitted to be made thereunder at such time (it being understood that the foregoing is intended to allow an Excluded Subsidiary that becomes a Subsidiary as a result of such Acquisition, to not become a Subsidiary Guarantor as otherwise required by this clause (a), if the conditions of this clause (a) are satisfied);

(b)    the Acquisition must not be of a hostile nature and the Target must be engaged primarily in a business that complies with Section 7.15; and

(c)    as of the date of execution of an agreement in respect of such Acquisition, no Event of Default shall have occurred and be continuing or would result from such Acquisition.

"Permitted Amendments":  as defined in Section 10.1.

"Permitted Capital Stock":  (a) common stock of Holdings or Borrower and (b) any preferred stock of Holdings or Borrower (or any equity security of Holdings or Borrower that is convertible into or exchangeable for any preferred stock of Holdings or Borrower), so long as the terms of any such preferred stock or equity security of Holdings or Borrower, as applicable (i) do not provide any collateral security, (ii) do not provide any guaranty or other support by the Borrower or any Subsidiaries of the Borrower, (iii) do not contain any mandatory put, redemption, repayment, sinking fund or other similar provision occurring before the eighth anniversary of the Closing Date (other than as a result of a change of control or similar event that, in each case, is on customary market terms negotiated in good faith by the Borrower, (iv) do not require the cash payment of dividends or interest, (v) do not contain any financial maintenance covenants, and (vi) to the extent any such preferred stock or equity security does not otherwise comply with clauses (b)(i) through (iv) hereof, such preferred stock or equity security is otherwise reasonably satisfactory to the Administrative Agent.

"Permitted Disposition":  (i) any sale or discount of past due accounts receivable in the ordinary course of business; (ii) (x) any lease as lessor or license as licensor of isolated parcels of real property or isolated items of personal property (including Intellectual Property) in the ordinary course of business and (y) any grant of options to purchase, lease or acquire isolated parcels of real property or isolated items of personal property (including Intellectual Property) in the ordinary course of business; and (iii) any sale or exchange of isolated specific items of equipment, so long as the purpose of each sale or exchange is to acquire (and results within three hundred sixty-five (365) days of such sale or exchange in the acquisition of) replacement items of equipment which are, in the reasonable business judgment of the Borrower and its Restricted Subsidiaries, the functional equivalent of the item of equipment so sold or exchanged; provided that the Administrative Agent has at all times after such acquisition a perfected Lien in the replacement property with the same priority or better than the Collateral being sold or exchanged to the extent such disposed of property was Collateral.

"Permitted First Priority Additional Debt":  as defined in Section 7.2(jj).

"Permitted First Priority Refinancing Debt":  any secured Indebtedness (including any Registered Equivalent Notes) incurred by the Borrower or any other Loan Party in the form of

41

one or more tranches of loans (or revolving commitments in respect thereof) or one or more series of senior secured notes; provided that (i) such Indebtedness is secured by Liens on the Collateral on a *pari passu* basis (but without regard to the control of remedies) with the Liens on the Collateral securing the Obligations and is not secured by any property or assets of Holdings, the Borrower or any Restricted Subsidiary other than the Collateral, (ii) such Indebtedness is not at any time guaranteed by any Subsidiaries other than Subsidiaries that are Guarantors, (iii) such Indebtedness does not mature on or prior to the date that is the Latest Tranche B Maturity Date at the time such Indebtedness is incurred or issued and (iv) a Representative acting on behalf of the holders of such Indebtedness shall have become party to the Intercreditor Agreement or an intercreditor agreement with the Administrative Agent substantially consistent with the terms set forth in the Intercreditor Agreement, which shall be entered into or shall be amended prior to or concurrently with the first issuance of Permitted First Priority Refinancing Debt in accordance with the terms thereof to provide for the sharing of the Collateral on a *pari passu* basis among the holders of the Secured Obligations and the holders of such Permitted First Priority Refinancing Debt.    Permitted First Priority Refinancing Debt will include any Registered Equivalent Notes issued in exchange therefor.

"Permitted Liens":  Liens permitted by Section 7.3.

"Permitted Other Debt Condition":  such applicable debt that does not mature or have scheduled amortization payments of principal and is not subject to mandatory redemption, repurchase, prepayment (except (x) customary asset sale, casualty, condemnation or change of control or similar event provisions that provide for the prior repayment in full of the Loans and all other Obligations or (y) AHYDO Catch-Up Payments) or sinking fund obligations, in each case prior to the Latest Tranche B Maturity Date at the time such Indebtedness is incurred.

"Permitted Refinancing":  modifications, replacements, restructurings, refinancings, refundings, renewals, amendments, restatements or extensions of all or any portion of Indebtedness (including any type of debt facility or debt security); provided that (a) the amount of such Indebtedness is not increased (unless the additional amount is permitted pursuant to another provision of Section 7.2) at the time of such refinancing, refunding, renewal or extension except by an amount equal to the existing unutilized commitments thereunder, accrued but unpaid interest thereon and a premium or penalties paid, and fees and expenses reasonably incurred, in connection with such refinancing, refunding, restructuring, renewal or extension (including any fees and original issue discount incurred in respect of such resulting Indebtedness), (b) the direct and contingent obligors of such Indebtedness shall not be expanded as a result of or in connection with such refinancing, refunding, restructuring, renewal or extension (other than to the extent (i) any such additional obligors are or will become a Loan Party, (ii) none of such obligors on the Indebtedness being modified, replaced, refinanced refunded, restructured, renewed or extended are Loan Parties or (iii) as otherwise permitted by Section 7.2), (c) to the extent such Indebtedness being so refinanced, refunded, renewed or extended is subordinated in right of payment and/or in right of Lien to any of the Obligations, such refinancing, refunding, renewal or extension is subordinated in right of payment and/or in right of Lien (or, in the case of Lien subordination, not secured) to such Obligations on terms (taken as a whole) at least as favorable to the Lenders as those contained in the documentation governing the Indebtedness being so modified, refinanced, refunded, renewed or extended (as determined in good faith by the Borrower) or otherwise reasonably acceptable to the

42

Administrative Agent, and (d) other than with respect to Indebtedness under Section 7.2(e) or (g), such refinancing, refunding, renewal or extension has a final scheduled maturity date equal to or later than the final scheduled maturity date of, the Indebtedness being refinanced, refunded, renewed or extended.

"Permitted Second Priority Refinancing Debt":  secured Indebtedness (including any Registered Equivalent Notes) incurred by the Borrower or any other Loan Party in the form of one or more tranches of secured loans (or revolving commitments in respect thereof) or one or more series of secured notes; provided that (i) such Indebtedness is secured by Liens on the Collateral on a second priority (or other junior priority) basis to the Liens on the Collateral securing the Obligations and the obligations in respect of any Permitted First Priority Refinancing Debt or on a basis that is *pari passu* with the Liens on the Collateral securing the PIK Toggle Notes, notwithstanding any provision to the contrary contained in the definition of "Credit Agreement Refinancing Indebtedness,", and is not secured by any property or assets of Holdings, the Borrower or any Restricted Subsidiary other than the Collateral, (ii) a Representative acting on behalf of the holders of such Indebtedness shall have become party to the Intercreditor Agreement or an intercreditor agreement with the Administrative Agent substantially consistent with the terms set forth in the Intercreditor Agreement, which shall be entered into or shall be amended prior to or concurrently with the first issuance of Permitted Second Priority Refinancing Debt in accordance with the terms thereof to provide for the sharing of the Collateral by the holders of such Permitted Second Priority Refinancing Debt on (x) with respect to the holders of the Secured Obligations and any Permitted First Priority Refinancing Debt, a second priority (or other junior priority) basis and (y) with respect to the holders of the PIK Toggle Notes, a *pari passu* basis and (iii) such Indebtedness meets the Permitted Other Debt Condition.  Permitted Second Priority Refinancing Debt will include any Registered Equivalent Notes issued in exchange therefor.

"Permitted Seller Debt":  Indebtedness of Holdings, the Borrower or any of their Restricted Subsidiaries issued to a seller as a consideration for a Permitted Acquisition.

"Permitted Unsecured Debt":  the collective reference to any Indebtedness incurred in reliance upon Section 7.2(ii) or (jj) that is not secured.

"Permitted Unsecured Refinancing Debt":  unsecured Indebtedness (including any Registered Equivalent Notes) incurred by a Loan Party in the form of one or more series of senior or subordinated unsecured notes or loans (or revolving commitments in respect thereof); provided that (i) such Indebtedness satisfies the requirements in clauses (i)-(v) of the definition of "Credit Agreement Refinancing Indebtedness" and (ii) meets the Permitted Other Debt Condition.

"Person":  an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"Petition Date":  as defined in the Recitals.

43

"PIK Toggle Notes":  the 10.00% / 12.00% Senior Secured PIK Toggle Notes due 2023 issued by Borrower pursuant to the PIK Toggle Notes Indenture, in the aggregate principal amount equal to $[__] *plus* the amount of capitalized interest thereon.

"PIK Toggle Notes Agent":  Wilmington Savings Fund Society, FSB, as trustee and collateral agent under the PIK Toggle Notes Indenture, together with its successors and permitted assigns in such capacities.

"PIK Toggle Notes Indenture":  the Indenture, dated as of the Closing Date, entered into by and among Holdings, the Borrower, the guarantors party thereto and the PIK Toggle Notes Agent, providing for the issuance of the PIK Toggle Notes, together with all instruments and other agreements entered into by the Borrower or such Subsidiaries in connection therewith, in each case as may be amended, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"[PIK Toggle Notes Termination Date]":  has the meaning set forth in the Intercreditor Agreement.

"Plan Confirmation Order":  the "Confirmation Order", as such term is defined in the Plan of Reorganization.

"Plan Documents":  collectively, the Plan of Reorganization, the Plan Confirmation Order and any other orders, documents and agreements entered into in connection therewith.

"Plan Effective Date":  [●], 2017, being the ["Effective Date"] under the Plan of Reorganization.

"Plan of Reorganization":  that certain [Joint Chapter 11 Plan of Reorganization of 21st Century Oncology Holdings, Inc. and its debtor affiliates, dated [●], 2017 filed in the Chapter 11 Cases (as altered, amended, modified, or supplemented from time to time prior to entry of the Plan Confirmation Order (including pursuant to the terms of the Plan Confirmation Order) and including any exhibits, supplements, annexes, appendices and schedules thereto), as confirmed by the Plan Confirmation Order pursuant to section 1129 of the United States Bankruptcy Code, 11 U.S.C. ss. 101 et seq., as amended].

"Prepayment Trigger":  as defined in Section 2.11(b).

"Prepetition Credit Agreement":  as defined in the Recitals.

"Prepetition Lenders":  as defined in the Recitals.

"Prime Rate":  for any day, (a) the per annum rate of interest that is publicly quoted as from time to time by *The Wall Street Journal* as the "prime rate" in effect in the United States or (b) if The Wall Street Journal ceases quoting a base rate of the type described in clause (a), either (i) the per annum rate of interest quoted as the base rate on such corporate loans in a different national publication as selected by the Administrative Agent or (ii) the highest per annum rate of interest published by the Federal Reserve Board in Federal Reserve statistical release H.15 (519) entitled "Selected Interest Rates" as the Bank prime loan rate or its equivalent.  Each change in

the Prime Rate shall be effective on the date such change is effective. The corporate base rate is not necessarily the lowest rate charged by the Administrative Agent to its customers.

"Pro Forma Basis":  with respect to the calculation of the Consolidated First Lien Leverage Ratio, the Consolidated Leverage Ratio, Consolidated Total Secured Leverage Ratio, the Fixed Charge Coverage Ratio, the amount of Consolidated EBITDA or Total Assets or any other financial test or ratio hereunder, for purposes of determining the permissibility of asset sales, prepayments required pursuant to Section 2.11(b) and Section 2.11(c), and for any other specified purpose hereunder, and for purposes of determining compliance with the covenant under Section 7.1, in each case as of any date, that such calculation shall give pro forma effect to the Transactions and all Specified Transactions (with any such incurrence of Indebtedness being deemed to be amortized over the applicable testing period in accordance with its terms) (and the application of the proceeds from any such asset sale or debt incurrence) that have occurred during the relevant testing period for which such financial test or ratio is being calculated and such proposed Specified Transaction for which the calculation of any such ratio is being made and, during the period immediately following the Applicable Date of Determination therefor and prior to or simultaneously with the event for which the calculation of any such ratio on such date of determination is made, including pro forma adjustments arising out of events which are attributable to the Transactions or the proposed Specified Transaction, including giving effect to those specified in accordance with the definition of "Consolidated EBITDA," in each case as certified on behalf of the Borrower by a Responsible Officer of the Borrower, using, for purposes of determining such compliance with a financial test or ratio (including any incurrence test), the historical financial statements of all entities, divisions or lines or assets so acquired or sold and the consolidated financial statements of the Borrower and/or any of its Restricted Subsidiaries, calculated as if the Transactions or such Specified Transaction, and all other Specified Transactions that have been consummated during the relevant period, and any Indebtedness incurred or repaid in connection therewith, had been consummated (and the change in Consolidated EBITDA resulting therefrom) and incurred or repaid at the beginning of such period and Total Assets shall be calculated after giving effect thereto.

Whenever pro forma effect is to be given to the Transactions or a Specified Transaction, the pro forma calculations shall be made in good faith by a Responsible Officer of the Borrower (including adjustments for costs and charges arising out of the Transactions or the proposed Specified Transaction and the "run-rate" cost savings and synergies resulting from the Transactions or such Specified Transaction that have been or are reasonably anticipated and projected by the Borrower in good faith to be reasonably anticipated to be realizable within twelve (12) months of the date thereof ("run-rate" means the full recurring benefit for a test period that is associated with any action taken or expected to be taken or for which a plan for realization has been established (including any savings expected to result from the elimination of a public target's compliance costs with public company requirements); provided that such cost savings and synergies shall not exceed, when taken together with amounts added back to Consolidated EBITDA pursuant to clause (s) of the definition thereof for the relevant period, $5,000,000 for such period, before giving effect to such amounts so added back; provided that such cost savings and synergies, when taken together with amounts added back to Consolidated EBITDA pursuant to clause (s) of the definition thereof and with the aggregate amount of legal expenses described in sub-clause (y) of clause (l) of the definition thereof that are added back to Consolidated EBITDA pursuant to such clause (l), shall not exceed 10% of Consolidated

45

EBITDA for such period determined on a Pro Forma Basis before giving effect to all amounts so added back; provided, however, that (i) such synergies are reasonably identifiable and projected by the Borrower in good faith to result from actions either taken or expected to be taken within eighteen (18) months after the end of the test period in which the Transactions or the Specified Transaction occurred and, in each case, certified by a Responsible Officer of the Borrower and (ii) no amounts shall be added pursuant to this paragraph to the extent duplicative of any amounts that are otherwise added back in computing Consolidated EBITDA for such test period.

If any Indebtedness bears a floating rate of interest and is being given pro forma effect, the interest on such Indebtedness shall be calculated as if the rate in effect on the date of the event for which the calculation is made had been the applicable rate for the entire test period (taking into account any interest hedging arrangements applicable to such Indebtedness). Interest on a Capital Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by a Responsible Officer of the Borrower to be the rate of interest implicit in such Capital Lease Obligation in accordance with GAAP.  Interest on Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate, or other rate, shall be determined to have been based upon the rate actually chosen, or if none, then based upon such optional rate chosen as the Borrower or the applicable Restricted Subsidiary may designate.

"Pro Forma Financial Statements":  as defined in Section 4.1(a).

"Projections":  as defined in Section 6.2(b).

"Properties":  as defined in Section 4.17(a).

"Proposed Change":  as defined in Section 2.22(b).

"PTE":  a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"Public Company":  Holdings or any Parent Entity.

"Public Offering":  a public offering of Permitted Capital Stock occurring after the Closing Date.

"Purchasing Borrower Party":  the Borrower or any Subsidiary of the Borrower that becomes an Assignees or Participant pursuant to Section 10.6(g).

"Qualifying Lender":  as defined in Section 2.10(c)(iv)(C).

"Recovery Event":  any settlement of or payment in respect of any property or casualty insurance claim or any condemnation proceeding relating to any asset of the Borrower or any Restricted Subsidiary, in excess of $10,000,000 in the aggregate for all such amounts in any fiscal year.

"Refinanced Debt":  as set forth in the definition of "Credit Agreement Refinancing Indebtedness."

46

"Refinancing Amendment":  an amendment to this Agreement executed by each of (a) the Borrower, (b) the Administrative Agent, (c) each Additional Refinancing Lender and (d) each Lender that agrees to provide any portion of Refinancing Term Loans incurred pursuant thereto, in accordance with Section 2.28.

"Refinancing Notes":  Permitted First Priority Refinancing Debt, Permitted Second Priority Refinancing Debt and Permitted Unsecured Refinancing Debt.

"Refinancing Term Commitments":  one or more classes of Term Commitments hereunder that are established to fund Refinancing Term Loans of the applicable Refinancing Class hereunder pursuant to a Refinancing Amendment.

"Refinancing Term Loans":  one or more classes of Term Loans hereunder that result from a Refinancing Amendment.

"Register":  as defined in Section 10.6(b).

"Registered Equivalent Notes":  with respect to any notes originally issued in a Rule 144A or other private placement transaction under the Securities Act, substantially identical notes (having the same guarantees) issued in a dollar-for-dollar exchange therefor pursuant to an exchange offer registered with the SEC.

"Regulation H":  Regulation H of the Board as in effect from time to time.

"Regulation S-X":  Regulation S-X under the Securities Exchange Act of 1934.

"Regulation U":  Regulation U of the Board as in effect from time to time.

"Reinvestment Deferred Amount":  with respect to any Reinvestment Event, the aggregate Net Cash Proceeds received by any Group Member in connection therewith that are not applied to prepay the Tranche B Term Loans pursuant to Section 2.11(b) as a result of the delivery of a Reinvestment Notice.

"Reinvestment Event":  any Asset Sale, Sale Leaseback Transaction or Recovery Event in respect of which the Borrower has delivered a Reinvestment Notice.

"Reinvestment Notice":  a written notice executed by a Responsible Officer stating that (a) in connection with a Reinvestment Event constituting an Asset Sale, no Event of Default has occurred and is continuing and (b) the Borrower (directly or indirectly through a Subsidiary) intends and expects to use all or a specified portion of the Net Cash Proceeds of an Asset Sale, Sale Leaseback Transaction or Recovery Event to acquire, develop, upgrade or repair assets useful in its business or in connection with a Permitted Acquisition, Investment or Capital Expenditure, substantially in the form of Exhibit E; provided, however, that to the extent that any such Net Cash Proceeds in excess of $7,500,000 are received in respect of assets constituting Collateral, such Net Cash Proceeds shall be used to acquire or repair assets that constitute Collateral or to make a Permitted Acquisition of or Investment in assets that become Collateral.

47

"Reinvestment Prepayment Amount":  with respect to any Reinvestment Event, the Reinvestment Deferred Amount relating thereto less any amount expended prior to the relevant Reinvestment Prepayment Date in connection with Capital Expenditures, a Permitted Acquisition or other Investments permitted under Section 7.8 or to acquire, develop, upgrade or repair assets to be used in the Borrower's or any Subsidiary's business (subject to the proviso to the definition of the term "Reinvestment Notice").

"Reinvestment Prepayment Date":  with respect to any Reinvestment Event, the earlier of (a)(i) the date occurring three hundred sixty-five (365) days after receipt of the Net Cash Proceeds from such Reinvestment Event or (ii) if within such three hundred sixty-five (365) day period the Borrower (directly or indirectly through a Subsidiary) enters into a legally binding commitment to reinvest such proceeds, the later of (x) the date occurring one hundred eighty (180) days after the date of such commitment or (y) the date occurring three hundred sixty-five (365) days after receipt of such Net Cash Proceeds and (b) the date on which the Borrower shall have determined not to, or shall have otherwise permanently ceased to, acquire or repair assets to be used and useful in the Borrower's or any Subsidiary's business or to use them in connection with a Permitted Acquisition or Investment with all or any portion of the relevant Reinvestment Deferred Amount.

"Related Parties":  with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents and advisors of such person and of such person's Affiliates.

"Replacement Tranche B Term Loans":  as defined in Section 10.1.

"Replacement Tranche B Term Maturity Date":  the maturity date of any Replacement Tranche B Term Loans, which date shall not be earlier than the Tranche B Maturity Date.

"Reportable Event":  any of the events set forth in Section 4043 of ERISA, other than those events as to which the thirty (30) calendar day notice period is waived by applicable regulations under Section 4043 of ERISA.

"Representative":  with respect to any series of Secured Incremental Notes, Credit Agreement Refinancing Indebtedness, any Indebtedness in respect of a Permitted Refinancing thereof, or any other Indebtedness that may from time to time become subject to an intercreditor agreement, the Person designated as "Representative" by the holders of such Indebtedness for purposes of the Loan Documents.

"Required Lenders":  at any time, Lenders holding more than 50% of the sum of the aggregate unpaid principal amount of the Tranche B Term Loans, Incremental Tranche B Term Loans, Refinancing Term Loans and Extended Term Loans then outstanding.

"Requirement of Law":  as to any Person, the Certificate of Incorporation and By-Laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

48

"Responsible Officer":  as to any Person, the chief executive officer, president, vice president, chief financial officer, treasurer or the senior vice president of finance of such Person but, in any event, with respect to financial matters, the chief financial officer, treasurer or senior vice president of finance of such Person.

"Restricted Payments":  as defined in Section 7.6.

"Restricted Subsidiary":  any Subsidiary of the Borrower other than an Unrestricted Subsidiary.

"Retained Declined Proceeds":  as defined in Section 2.11(f).

"Return":  with respect to any Investment, any dividend, distribution, interest, fee, premium, return of capital, repayment of principal, income, profit (from a disposition or otherwise) and any other amount received or realized in respect thereof.

"S&P":  as defined in the definition of "Cash Equivalents."

"Sale Leaseback Transaction":  as defined in Section 7.11.

"SEC":  the Securities and Exchange Commission, any successor thereto and any analogous Governmental Authority.

"Secured Incremental Notes":  as defined in Section 2.25.

"Secured Obligations" or "Obligations":  collectively, the Loan Obligations, the Specified Swap Obligations of the Loan Parties and the Cash Management Obligations.

"Secured Parties":  as defined in the Guarantee and Security Agreement.

"Securities Act":  the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Security Documents":  the collective reference to the Guarantee and Security Agreement, the Intercreditor Agreement, the Mortgages and all other security documents hereafter delivered to the Administrative Agent granting a Lien on any property of any Person to secure the obligations and liabilities of any Loan Party under any Loan Document.

"Single Employer Plan":  any ERISA Plan that is covered by Title IV of ERISA or Section 412 or 430 of the Code, but that is not a Multiemployer Plan.

"Sold Entity or Business":  as set forth in the definition of the term "Consolidated EBITDA."

"Solicited Discount Proration":  as defined in Section 2.10(c)(iv)(C).

"Solicited Discounted Prepayment Amount":  as defined in Section 2.10(c)(iv)(A).

49

"Solicited Discounted Prepayment Notice":  a written notice of Borrower Offer of Specified Discount Prepayment made pursuant to Section 2.10(c) substantially in the form of Exhibit O.

"Solicited Discounted Prepayment Offer":  an irrevocable, written offer submitted by a responding Lender made pursuant to Section 2.10(c)(iv)(A) substantially in the form of Exhibit P.

"Solicited Discounted Prepayment Response Date":  as defined in Section 2.10(c)(iv)(A).

"Solvent":  when used with respect to any Person, means that, as of any date of determination, (a) the amount of the "fair value" of the assets of such Person on a going concern basis will, as of such date, exceed the amount of all "liabilities of such Person, contingent or otherwise," as of such date, as such quoted terms are determined in accordance with applicable federal and state laws governing determinations of the insolvency of debtors, (b) the present fair saleable value (on a going concern basis) of the assets of such Person will, as of such date, be greater than the amount that will be required to pay the probable liability of such Person on its debts as such debts become absolute and matured, (c) such Person will not have, as of such date, an unreasonably small amount of capital with which to conduct its business, and (d) such Person will be able to pay its debts as they mature in the ordinary course of business.  The amount of contingent liabilities at any time shall be computed as the amount that can reasonably be expected to become an actual or matured liability.  For purposes of this definition, (i) "debt" means liability on a "claim," and (ii) "claim" means any (x) right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured or (y) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured or unmatured, disputed, undisputed, secured or unsecured.

"Specified Discount":  as defined in Section 2.10(c)(ii)(A).

"Specified Discount Prepayment Amount":  as defined in Section 2.10(c)(ii)(A).

"Specified Discount Prepayment Notice":  a written notice of Borrower Offer of Specified Discount Prepayment made pursuant to Section 2.10(c) substantially in the form of Exhibit M.

"Specified Discount Prepayment Response":  the irrevocable written response by each Lender, substantially in the form of Exhibit N to a Specified Discount Prepayment Notice.

"Specified Discount Prepayment Response Date":  as defined in Section 2.10(c)(ii)(A).

"Specified Discount Proration":  as defined in Section 2.10(c)(ii)(C).

"Specified Swap Agreement":  any Swap Agreement entered into by any Loan Party and any Agent, Lender or Affiliate thereof (or any Person that was an Agent, a Lender or an Affiliate of an Agent or a Lender at the time such Swap Agreement was entered into).

50

"Specified Swap Obligations":  with respect to any Person, any and all obligations of such Person, in each case, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor) under any and all Specified Swap Agreements; provided that, for purposes of determining any obligations of any Guarantor under the Guarantee and Security Agreement, the definition of "Specified Swap Obligations" shall not create any guarantee by such Guarantor of (or any grant of security interest by any Guarantor to support, if such grant of security interest would be illegal as described in the definition of "Excluded Swap Obligation") any Excluded Swap Obligations of such Guarantor.

"Specified Transaction":  any (a) disposition of all or substantially all the assets of or all the Capital Stock of any Restricted Subsidiary of the Borrower or of any product line, business unit, line of business or division of the Borrower or any of the Restricted Subsidiaries of the Borrower for which historical financial statements are available, (b) Permitted Acquisitions, (c) Investment that results in a Person becoming a Restricted Subsidiary of the Borrower, (d) designation of any Restricted Subsidiary as an Unrestricted Subsidiary, or of any Unrestricted Subsidiary as a Restricted Subsidiary or (e) the proposed incurrence of Indebtedness or making of a Restricted Payment or payment in respect of Indebtedness in respect of which compliance with any financial ratio is by the terms of this Agreement required to be calculated on a Pro Forma Basis.

"State": each of the fifty (50) states of the United States of America and the District of Columbia.

"State Medicaid Agency": the agency administering or supervising the administration of a State Medicaid plan.

"Submitted Amount":  as defined in Section 2.10(c)(iii)(A).

"Submitted Discount":  as defined in Section 2.10(c)(iii)(A).

"Subsidiary":  as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned by such Person.  Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Restricted Subsidiary or Subsidiaries of the Borrower.  Notwithstanding anything else herein to the contrary, the definition of Subsidiary shall not include Non-Profit Entities.

"Subsidiary Guarantor":  each direct or indirect Restricted Subsidiary of the Borrower that executes the Guarantee and Security Agreement or a supplement thereto, or that otherwise guarantees all or any part of the Obligations pursuant to the Loan Documents.

"Survey":  ATLA surveys with respect to each Mortgaged Property provided, however, that a survey shall not be required to the extent that (x) an existing survey together with an "affidavit of no change" satisfactory to the Title Company is delivered to the Administrative Agent and the Title Company and (y) the Title Company removes the standard survey exception

51

and provides reasonable and customary survey related endorsements and other coverage in the applicable title insurance policy.

"Swap Agreement":  any agreement entered into by any Group Member with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or any of its Subsidiaries shall be a "Swap Agreement."

"Swap Obligation":  with respect to any Group Member, any obligation to pay or perform under any Swap Agreement or any other agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"Target":  any Person or any division or line of business of a Person, more than 50.1% of the outstanding Capital Stock or all or substantially all of the assets (or any substantial part for which financial statements or other customary financial information is available) of which (together with any existing owned interests or assets), are proposed to be acquired by the Borrower or any of the Restricted Subsidiaries in connection with a Permitted Acquisition.

"Taxes":  as defined in Section 2.19(a).

"Term Commitment": a Tranche B Term Commitment, an Incremental Tranche B Term Commitment or a Refinancing Term Commitment.

"Term Loans":  the initial Tranche B Term Loans and, unless the context otherwise requires, any Incremental Tranche B Term Loan, any Refinancing Term Loan and any Extended Term Loan.

"Term Priority Collateral": as defined in the Intercreditor Agreement.

"Termination Date":  as to each Loan, the earlier of (a) the Latest Maturity Date of such Loan and (b) the date upon which such Loan shall become due and payable upon acceleration pursuant to Article 8.

"Third Party Payor Programs":  all third party payor programs in which the Borrower and its Subsidiaries currently or in the future may participate, including, without limitation, Medicare, Medicaid, Blue Cross and/or Blue Shield, Managed Care Plans, other private insurance programs and employee assistance programs.

"Title Company":  any title insurance company as shall be retained by Borrower and reasonably acceptable to the Administrative Agent.

"Total Assets":  at any date, the total amount of assets of the Borrower and its consolidated subsidiaries as of the end of the month immediately preceding such date.

"Tranche B Maturity Date": [          ]⁴.

"Tranche B Term Commitment":  as to each Tranche B Term Lender, the obligation of such Tranche B Term Lender to make a Tranche B Term Loan to the Borrower on the Closing Date in the principal amount not to exceed the amount set forth under the heading "Tranche B Term Commitment" opposite such Tranche B Term Lender's name on Schedule 1.1A, in each case, in accordance with this Agreement (including Section 2.1(a)) and the Plan of Reorganization.  The original aggregate amount of the Tranche B Term Commitments is $[___].

"Tranche B Term Facility":  set forth in the definition of "Facility."

"Tranche B Term Lender":  each Lender that has a Tranche B Term Commitment or holds a Tranche B Term Loan.

"Tranche B Term Loan":  as defined in Section 2.1(a).

"Transaction Bonuses":  any bonuses payable to any officer or employee of Holdings or any of its Subsidiaries (including any Person who becomes an officer or employee of any Group Member in connection with a Permitted Acquisition) in connection with any Permitted Acquisition in an aggregate amount not exceeding $10,000,000 in any four fiscal quarter period most recently ended.

"Transactions":  collectively, (a) the Financing Transactions, (b) the entry into, and the incurrence and performance of obligations under, the MDL Term Loan Agreement and the PIK Toggle Notes Indenture, and (c) all other transactions contemplated by, entered into, consummated in connection with, or relating to, the Plan of Reorganization and/or the Plan Confirmation Order (including all mergers, amalgamations, consolidations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions or other corporate or other transactions that the Loan Parties or any of their Affiliates determine to be necessary or appropriate to implement the Plan of Reorganization and/or the Plan Confirmation Order).

"Transferee":  any Assignee or Participant.

"Type":  as to any Loan, its nature as an ABR Loan or a Eurodollar Loan.

"United States" and "U.S.":  the United States of America.

"Unrestricted Additional Term Notes":  first priority senior secured loans or notes and/or junior lien secured loans or notes and/or unsecured loans or notes, in each case issued pursuant to an indenture, note purchase agreement or other agreement and in lieu of the incurrence of Unrestricted Incremental Indebtedness; provided that (a) such Unrestricted Additional Term Notes rank *pari passu* or junior in right of payment and (if secured) of security with the corresponding Class of Term Loans of the Borrower and Term Commitments hereunder, (b) the Unrestricted Additional Term Notes have a final scheduled maturity date that is on or after the then-existing Latest Maturity Date with respect to the Term Loans of the corresponding Class

---

⁴ NTD:  To be calculated as the date that is 5 calendar years after the Closing Date.

and a Weighted Average Life to Maturity (without giving effect to nominal amortization for periods where amortization has been eliminated as a result of a prepayment of the applicable Term Loans) equal to or longer than the remaining Weighted Average Life to Maturity of the corresponding Class of the then-existing Term Loans (without giving effect to nominal amortization for periods where amortization has been eliminated as a result of a prepayment of the applicable Term Loans), (c) the covenants, events of default and other terms of which (other than maturity, fees, discounts, interest rate, redemption terms and redemption premiums, which shall be determined in good faith by the Borrower) of such Unrestricted Additional Term Notes, shall be on market terms at the time of issuance (as determined in good faith by the Borrower) of the Unrestricted Additional Term Notes, (d) no Restricted Subsidiary is a borrower or a guarantor with respect to such Indebtedness unless such Restricted Subsidiary is a Loan Party which shall have previously or substantially concurrently guaranteed or borrowed the Obligations and (e) if such Unrestricted Additional Term Notes are secured, (i) the obligations in respect thereof shall not be secured by Liens on the assets of the Borrower and the Restricted Subsidiaries, other than assets constituting Collateral, (ii) all security therefor shall be granted pursuant to documentation that is not more restrictive than the Security Documents in any material respect (as determined in good faith by the Borrower) or, if the Liens are *pari passu* with the Liens on the Collateral securing the Obligations, pursuant to amendments to the Security Documents reasonably acceptable to the Administrative Agent, in each case taken as a whole and (iii) the obligations in respect thereof shall be subject to the Intercreditor Agreement or a customary intercreditor agreement with the Administrative Agent substantially consistent will the terms set forth in the Intercreditor Agreement (it being understood that the Borrower may redesignate any such Indebtedness originally designated as Unrestricted Additional Term Notes as Additional Term Notes if at the time of such redesignation, the Borrower would be permitted to incur the aggregate principal amount of Indebtedness being so redesignated in accordance with the definition thereof (for purpose of clarity, with any such redesignation having the effect of increasing such Borrower's ability to incur Unrestricted Incremental Indebtedness as of the date of such redesignation by the amount of such Indebtedness so redesignated)); provided that to the extent the Unrestricted Additional Term Notes consist of term loans that have a Lien on Collateral that is *pari passu* in right of security with the Lien on the Collateral securing the initial Tranche B Term Loans, the Tranche B Term Loans shall be subject to adjustment (if applicable) set forth in the proviso to clause (iii) of Section 2.25(d) as if such Unrestricted Additional Term Notes were Incremental Tranche B Term Loans.

"Unrestricted Incremental Indebtedness":  as defined in Section 2.25.

"Unrestricted Subsidiary":  (a) any Subsidiary of an Unrestricted Subsidiary, (b) any Subsidiary of the Borrower designated by the board of directors of the Borrower as an Unrestricted Subsidiary pursuant to Section 6.11 subsequent to the Closing Date and (c) any Subsidiary of the Borrower set forth on Schedule 6.11.

"Unsecured Incremental Notes":  as defined in Section 2.25(a).

"U.S. Person":  a "United States person" as defined in Section 7701(a)(30) of the Code.

"Voting Stock":  of any Person as of any date, the Capital Stock of such Person that is at the time entitled to vote in the election of the board of directors, managers or trustees (as applicable) of such Person.

"Weighted Average Life to Maturity":  when applied to any Indebtedness at any date, the number of years obtained by dividing:  (a) the sum of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (b) the then outstanding principal amount of such Indebtedness.

"Wholly-Owned Subsidiary":  as to any Person, any other Person all of the Capital Stock of which (other than directors' qualifying shares required by law) is owned by such Person directly and/or through other Wholly-Owned Subsidiaries.

"Write-Down and Conversion Powers":  with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

1.2   **Other Definitional Provisions**.

(a)   Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in the other Loan Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b)   As used herein and in the other Loan Documents, and any certificate or other document made or delivered pursuant hereto or thereto, (i) accounting terms relating to any Group Member not defined in Section 1.1 and accounting terms partly defined in Section 1.1, to the extent not defined, shall have the respective meanings given to them under GAAP as in effect from time to time (provided that in the event that any Accounting Change (as defined below) shall occur and such change results in a change in the method of calculation of financial covenants, standards or terms in this Agreement, then the Borrower and the Administrative Agent agree to enter into good faith negotiations in order to amend such provisions of this Agreement so as to equitably reflect such Accounting Change with the desired result that the criteria for evaluating the Borrower's and the Subsidiaries' consolidated financial condition shall be the same after such Accounting Change as if such Accounting Change had not been made and until such time as such an amendment shall have been executed and delivered by the Borrower, the Administrative Agent and the Required Lenders, all financial ratios, covenants, standards and terms in this Agreement shall continue to be calculated or construed as if such Accounting Change had not occurred ("Accounting Change" refers to any change in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants or, if applicable, the SEC)), (ii) the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation," (iii) the word "incur" shall be construed to mean incur, create, issue, assume, become liable in respect of or suffer to exist (and the words "incurred" and "incurrence" shall have correlative meanings), (iv) the words "asset" and

55

"property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, Capital Stock, securities, revenues, accounts, leasehold interests and contract rights, (v) references to agreements or other Contractual Obligations shall, unless otherwise specified, be deemed to refer to such agreements or Contractual Obligations as amended, supplemented, restated or otherwise modified from time to time, (vi) the word "knowledge" when used with respect to any Loan Party shall be deemed to be a reference to the knowledge of any Responsible Officer and (vii) the words "in the ordinary course of business" of the Borrower or any Restricted Subsidiary thereof means (i) in the ordinary course of business of, or in furtherance of an objective that is in the ordinary course of business of the Borrower or such Restricted Subsidiary, as applicable, (ii) customary and usual in the industry or industries of the Borrower and its Subsidiaries in the United States or any other jurisdiction in which the Borrower or any Subsidiary does business, as applicable, or (iii) generally consistent with the past or current practice of the Borrower or such Subsidiary, as applicable, or any similarly situated businesses in the United States or any other jurisdiction in which the Borrower or any Subsidiary does business, as applicable.

(c)     Notwithstanding anything in this Agreement to the contrary, any change in GAAP or the application or interpretation thereof that would require operating leases to be treated similarly as a capital lease shall not be given effect in the definitions of Indebtedness or Liens or any related definitions or in the computation of any financial ratio or requirement.

(d)     With respect to any period during which the Transactions or any Specified Transaction occurs, for purposes of determining the prepayments required pursuant to Section 2.11 or determining compliance with any financial test or ratio hereunder (including any incurrence test) or for any other purpose hereunder, calculation of the Fixed Charge Coverage Ratio, Consolidated First Lien Leverage Ratio, Consolidated Total Secured Leverage Ratio, Consolidated EBITDA, Total Assets and the Consolidated Leverage Ratio with respect to such period shall be made on a Pro Forma Basis.

(e)     All certifications to be made hereunder by an officer or representative of a Loan Party shall be made by such a Person in his or her capacity solely as an officer or a representative of such Loan Party, on such Loan Party's behalf and not in such Person's individual capacity.

(f)     In the event that any Lien, Investment, Indebtedness (whether at the time of incurrence or upon application of all or a portion of the proceeds thereof), Disposition, Restricted Payment, Affiliate transaction, restrictive agreement or prepayment of Indebtedness meets the criteria of one or more than one of the categories of transactions then permitted pursuant to any clause of such Sections in Section 7, such transaction (or portion thereof) at any time shall be permitted under one or more of such clauses as determined by the Borrower in its sole discretion at such time.

(g)     The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

56

(h)   The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(i)   Except as otherwise expressly stated herein, any determination being made or any action required to be taken (including any payment required to be made) pursuant to this Agreement or any other Loan Document on a day that is not a Business Day shall be deemed to be determined or required to be taken on the next succeeding Business Day.  Except to the extent a reference is expressly made to Business Days, each reference to a certain number of "days" shall be a reference to such number of calendar days.

## SECTION 2

## AMOUNT AND TERMS OF COMMITMENTS

2.1   **Tranche B Term Commitments**.

(a)   On the Closing Date, subject to Sections 5.1 and 5.2 and pursuant to the Plan of Reorganization, each Tranche B Term Lender shall be deemed to have extended to the Borrower, without any funding or other action on the part of such Tranche B Term Lender, term loans (the "Tranche B Term Loans") in the aggregate principal amount equal to such Tranche B Term Lender's Tranche B Term Commitment and, immediately upon the incurrence by the Borrower thereof, the amount of each Tranche B Term Lender's Allowed [First Lien] Claims outstanding on the Closing Date (calculated immediately prior to giving effect to the extension of the Tranche B Term Loans) equal to the aggregate principal amount of Tranche B Term Loans made by such Tranche B Term Lender shall be deemed automatically, fully and finally satisfied, released and discharged and converted into Tranche B Term Loans outstanding as of the Closing Date.

(b)   Tranche B Term Loans may from time to time be Eurodollar Loans or ABR Loans, as determined by the Borrower and notified to the Administrative Agent in accordance with Sections 2.2 and 2.12.

2.2   **Procedure for Tranche B Term Loan Borrowings**.  The Borrower shall give the Administrative Agent notice substantially in the form of Exhibit H-1 (which notice must be received by the Administrative Agent prior to 2:00 P.M., New York City time, one (1) Business Day prior to the anticipated Closing Date (or such later time as is reasonably acceptable to the Administrative Agent) or, in the case of Tranche B Term Loans to be made as Eurodollar Loans, three (3) Business Days prior to the anticipated Closing Date) requesting that the Lenders make the Tranche B Term Loans to be made on the Closing Date.  Upon receipt of any such notice the Administrative Agent shall promptly notify each applicable Tranche B Term Lender thereof. Not later than 1:00 P.M., New York City time, on the Closing Date each Tranche B Term Lender shall make available to the Administrative Agent at the Funding Office an amount in immediately available funds equal to its new term loan being made as a Tranche B Term Loan on the Closing Date.  The Administrative Agent shall credit the account of the Borrower on the books of such office of the Administrative Agent with the aggregate of the amounts of Tranche B Term Loans made available on the Closing Date to the Administrative Agent by the Tranche B Term Lenders in immediately available funds.

57

2.3    **Repayment of Tranche B Term Loans**.   The Borrower shall repay the Tranche B Term Loans in installments on the Commencement Date and the last Business Day of each calendar quarter ending thereafter and ending on the Tranche B Maturity Date, in an aggregate principal amount equal to (i) in the case of each such installment due prior to the Tranche B Maturity Date, 0.25% of the aggregate principal amount of Tranche B Term Loans made on the Closing Date and (ii) in the case of the installment due on the Tranche B Maturity Date, the entire remaining balance of the Tranche B Term Loans; provided that any such installment may be reduced as a result of a prepayment in accordance with Section 2.17(b).

2.4    **[Reserved]**.

2.5    **[Reserved**].

2.6    **[Reserved]**.

2.7    **[Reserved]**.

2.8    **[Reserved]**.

2.9    **Termination of Tranche B Term Commitments**.

(a)    [Reserved].

(b)    The Tranche B Term Commitments shall terminate and be fully and finally extinguished on the Closing Date upon the deemed funding of the Tranche B Term Loans in accordance with Section 2.1.

2.10   **Optional Prepayments**.

(a)    The Borrower may at any time and from time to time prepay the Loans, in whole or in part, upon notice (which may be conditional) substantially in the form of Exhibit H-2 delivered to the Administrative Agent no later than 12:00 Noon, New York City time, three (3) Business Days prior thereto, in the case of Eurodollar Loans, and no later than 12:00 Noon, New York City time, one (1) Business Day prior thereto, in the case of ABR Loans, which notice shall specify the date and amount of prepayment and whether the prepayment is of Eurodollar Loans or ABR Loans; provided that if a Eurodollar Loan is prepaid on any day other than the last day of the Interest Period applicable thereto, the Borrower shall also pay any amounts owing pursuant to Section 2.20.   Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.  If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein (subject to any conditions contained therein), together with accrued interest to such date on the amount prepaid.  Partial prepayments of Tranche B Term Loans shall be in an aggregate principal amount of $1,000,000 or a whole multiple thereof.  Notwithstanding anything to the contrary in this Agreement, after any Extension, the Borrower may prepay any borrowing of any Class of non-extended Term Loans pursuant to which the related Extension Offer was made without any obligation to prepay the corresponding Extended Term Loans.

(b)    [Reserved].

58

(c)     Notwithstanding anything in this Agreement or in any other Loan Document to the contrary, so long as no Event of Default has occurred and is continuing, the Loan Parties and their respective Subsidiaries may prepay the outstanding Term Loans (which shall, for the avoidance of doubt, be automatically and permanently canceled immediately upon acquisition by any Loan Party or any Subsidiary thereof) on the following basis:

(i)     Any Loan Party or any of its Subsidiaries shall have the right to make a voluntary prepayment of Loans at a discount to par pursuant to a Borrower Offer of Specified Discount Prepayment, Borrower Solicitation of Discount Range Prepayment Offers or Borrower Solicitation of Discounted Prepayment Offers (any such prepayment, the "Discounted Loan Prepayment"), in each case made in accordance with this Section 2.10(c).

(ii)     (A) Any Loan Party or any of its Subsidiaries may from time to time offer to make a Discounted Loan Prepayment by providing the Auction Agent five (5) Business Days' notice substantially in the form of a Specified Discount Prepayment Notice; provided that (I) any such offer shall be made available, at the sole discretion of the Loan Party or such Subsidiary, to (x) each Lender and/or (y) each Lender with respect to any Class of Loans on an individual tranche basis, (II) any such offer shall specify the aggregate principal amount offered to be prepaid (the "Specified Discount Prepayment Amount") with respect to each applicable tranche, the tranche or tranches of Loans subject to such offer and the specific percentage discount to par (the "Specified Discount") of such Loans to be prepaid (it being understood that different Specified Discounts and/or Specified Discount Prepayment Amounts may be offered with respect to different tranches of Loans and, in such event, each such offer will be treated as a separate offer pursuant to the terms of this Section), (III) the Specified Discount Prepayment Amount shall be in an aggregate amount not less than $5,000,000 and whole increments of $1,000,000 in excess thereof and (IV) subject to subsection (x) below, each such offer shall remain outstanding through the Specified Discount Prepayment Response Date.  The Auction Agent will promptly provide each relevant Lender with a copy of such Specified Discount Prepayment Notice and a form of the Specified Discount Prepayment Response to be completed and returned by each such Lender to the Auction Agent (or its delegate) by no later than 5:00 p.m.  on the third (3rd) Business Day after the date of delivery of such notice to such Lenders (which date may be extended upon notice by the applicable Loan Party or the Subsidiary to the Auction Agent) (the "Specified Discount Prepayment Response Date").

(B)     Each Lender receiving such offer shall notify the Auction Agent (or its delegate) by the Specified Discount Prepayment Response Date whether or not it agrees to accept a prepayment of any of its applicable then outstanding Loans at the Specified Discount and, if so (such accepting Lender, a "Discount Prepayment Accepting Lender"), the amount and the tranches of such Lender's Loans to be prepaid at such offered discount.  Each acceptance of a Discounted Loan Prepayment by a Discount Prepayment Accepting Lender shall be irrevocable.  Any Lender whose Specified Discount Prepayment Response is not received by the Auction Agent by the Specified Discount Prepayment Response Date shall be deemed to have declined to accept the applicable Borrower Offer of Specified Discount Prepayment.

59

(C)   If there is at least one Discount Prepayment Accepting Lender, the relevant Loan Party or Subsidiary will make a prepayment of outstanding Loans pursuant to this paragraph (ii) to each Discount Prepayment Accepting Lender on the Discounted Prepayment Effective Date in accordance with the respective outstanding amount and tranches of Loans specified in such Lender's Specified Discount Prepayment Response given pursuant to subsection (B) above; provided that, if the aggregate principal amount of Loans accepted for prepayment by all Discount Prepayment Accepting Lenders exceeds the Specified Discount Prepayment Amount, such prepayment shall be made pro rata among the Discount Prepayment Accepting Lenders in accordance with the respective principal amounts accepted to be prepaid by each such Discount Prepayment Accepting Lender and the Auction Agent (with the consent of such Loan Party or such Subsidiary and subject to rounding requirements of the Auction Agent made in its reasonable discretion) will calculate such proration (the "Specified Discount Proration"). The Auction Agent shall promptly, and in any case within three (3) Business Days following the Specified Discount Prepayment Response Date, notify (I) the relevant Loan Party or Subsidiary of the respective Lenders' responses to such offer, the Discounted Prepayment Effective Date and the aggregate principal amount of the Discounted Loan Prepayment and the tranches to be prepaid, (II) each Lender of the Discounted Prepayment Effective Date, and the aggregate principal amount and the tranches of Loans to be prepaid at the Specified Discount on such date and (III) each Discount Prepayment Accepting Lender of the Specified Discount Proration, if any, and confirmation of the principal amount, tranche and Type of Loans of such Lender to be prepaid at the Specified Discount on such date.   Each determination by the Auction Agent of the amounts stated in the foregoing notices to the Loan Party and such Lenders shall be conclusive and binding for all purposes absent manifest error.   The payment amount specified in such notice to the Loan Party or Subsidiary shall be due and payable by such Loan Party on the Discounted Prepayment Effective Date in accordance with subsection (vi) below (subject to subsection (x)) below).

(iii)   (A)   Any Loan Party or any of its Subsidiaries may from time to time solicit Discount Range Prepayment Offers by providing the Auction Agent with five (5) Business Days' notice in the form of a Discount Range Prepayment Notice; provided that (I) any such solicitation shall be extended, at the sole discretion of such Loan Party or such Subsidiary, to (x) each Lender and/or (y) each Lender with respect to any Class of Loans on an individual tranche basis, (II) any such notice shall specify the maximum aggregate principal amount of the relevant Loans (the "Discount Range Prepayment Amount"), the tranche or tranches of Loans subject to such offer and the maximum and minimum percentage discounts to par (the "Discount Range") of the principal amount of such Loans with respect to each relevant tranche of Loans willing to be prepaid by such Loan Party or such Subsidiary (it being understood that different Discount Ranges and/or Discount Range Prepayment Amounts may be offered with respect to different tranches of Loans and, in such event, each such offer will be treated as a separate offer pursuant to the terms of this Section), (III) the Discount Range Prepayment Amount shall be in an aggregate amount not less than $5,000,000 and whole increments of $1,000,000 in excess thereof and (IV) subject to subsection (x) below, each such solicitation by any Loan Party or any of its Subsidiaries shall remain outstanding through the Discount Range Prepayment Response Date.   The Auction Agent will promptly provide each appropriate

60

Lender with a copy of such Discount Range Prepayment Notice and a form of the Discount Range Prepayment Offer to be submitted by a responding Lender to the Auction Agent (or its delegate) by no later than 5:00 p.m.  on the third (3rd) Business Day after the date of delivery of such notice to such Lenders (which date may be extended by notice from the Loan Party or Subsidiary to the Auction Agent) (the "Discount Range Prepayment Response Date").  Each Lender's Discount Range Prepayment Offer shall be irrevocable and shall specify one or more (but no more than three for any Lender) discounts to par within the Discount Range (the "Submitted Discount") at which such Lender is willing to allow prepayment of any or all of its then outstanding Loans of the applicable tranche or tranches and the maximum aggregate principal amount and tranches of such Lender's Loans (the "Submitted Amount") such Lender is willing to have prepaid at the Submitted Discount.  Any Lender whose Discount Range Prepayment Offer is not received by the Auction Agent by the Discount Range Prepayment Response Date shall be deemed to have declined to accept a Discounted Loan Prepayment of any of its Loans at any discount to their par value within the Discount Range.

(B)     The Auction Agent shall review all Discount Range Prepayment Offers received on or before the applicable Discount Range Prepayment Response Date and shall determine (with the consent of such Loan Party or such Subsidiary and subject to rounding requirements of the Auction Agent made in its sole reasonable discretion) the Applicable Discount and Loans to be prepaid at such Applicable Discount in accordance with this subsection (B).  The relevant Loan Party or Subsidiary agrees to accept on the Discount Range Prepayment Response Date all Discount Range Prepayment Offers received by the Auction Agent within the Discount Range by the Discount Range Prepayment Response Date, in the order from the Submitted Discount that is the largest discount to par to the Submitted Discount that is the smallest discount to par, up to and including the Submitted Discount that is the smallest discount to par within the Discount Range (such Submitted Discount that is the smallest discount to par within the Discount Range being referred to as the "Applicable Discount") which yields a Discounted Loan Prepayment in an aggregate principal amount equal to the lower of (I) the Discount Range Prepayment Amount and (II) the sum of all Submitted Amounts.  Each Lender that has submitted a Discount Range Prepayment Offer to accept prepayment at a discount to par that is larger than or equal to the Applicable Discount shall be deemed to have irrevocably consented to prepayment of Loans equal to its Submitted Amount (subject to any required proration pursuant to the following subsection (C)) at the Applicable Discount (each such Lender, a "Participating Lender").

(C)     Subject to subsection (x) below, if there is at least one Participating Lender, the relevant Loan Party or Subsidiary will prepay the respective outstanding Loans of each Participating Lender on the Discounted Prepayment Effective Date in the aggregate principal amount and of the tranches specified in such Lender's Discount Range Prepayment Offer at the Applicable Discount; provided that if the Submitted Amount by all Participating Lenders offered at a discount to par greater than the Applicable Discount exceeds the Discount Range Prepayment Amount, prepayment of the principal amount of the relevant Loans for those Participating Lenders whose Submitted Discount is a discount to par greater than or equal to the Applicable Discount (the "Identified Participating Lenders") shall be made pro rata among the Identified

61

Participating Lenders in accordance with the Submitted Amount of each such Identified Participating Lender and the Auction Agent (with the consent of such Loan Party or such Subsidiary and subject to rounding requirements of the Auction Agent made in its sole reasonable discretion) will calculate such proration (the "Discount Range Proration"). The Auction Agent shall promptly, and in any case within five (5) Business Days following the Discount Range Prepayment Response Date, notify (I) the relevant Loan Party or Subsidiary of the respective Lenders' responses to such solicitation, the Discounted Prepayment Effective Date, the Applicable Discount, and the aggregate principal amount of the Discounted Loan Prepayment and the tranches to be prepaid, (II) each Lender of the Discounted Prepayment Effective Date, the Applicable Discount, and the aggregate principal amount and tranches of Loans to be prepaid at the Applicable Discount on such date, (III) each Participating Lender of the aggregate principal amount and tranches of such Lender to be prepaid at the Applicable Discount on such date, and (IV) if applicable, each Identified Participating Lender of the Discount Range Proration. Each determination by the Auction Agent of the amounts stated in the foregoing notices to the relevant Loan Party or Subsidiary and Lenders shall be conclusive and binding for all purposes absent manifest error.  The payment amount specified in such notice to the Loan Party or Subsidiary shall be due and payable by such Loan Party on the Discounted Prepayment Effective Date in accordance with subsection (vi) below (subject to subsection (x) below).

(iv)    (A)   Any Loan Party or any of its Subsidiaries may from time to time solicit offers for discounted prepayments by providing the Auction Agent with five (5) Business Days' notice in substantially the form of a Solicited Discounted Prepayment Notice in the form of Exhibit O; provided that (I) any such solicitation shall be extended, at the sole discretion of such Loan Party or such Subsidiary, to (x) each Lender and/or (y) each Lender with respect to any Class of Loans on an individual tranche basis, (II) any such notice shall specify the maximum aggregate amount of the Loans (the "Solicited Discounted Prepayment Amount") and the tranche or tranches of Loans the Loan Party or Subsidiary is willing to prepay at a discount (it being understood that different Solicited Discounted Prepayment Amounts may be offered with respect to different tranches of Loans and, in such event, each such offer will be treated as separate offer pursuant to the terms of this Section), (III) the Solicited Discounted Prepayment Amount shall be in an aggregate amount not less than $5,000,000 and whole increments of $1,000,000 in excess thereof and (IV) subject to subsection (x) below, each such solicitation by any Loan Party or any of its Subsidiaries shall remain outstanding through the Solicited Discounted Prepayment Response Date.  The Auction Agent will promptly provide each appropriate Lender with a copy of such Solicited Discounted Prepayment Notice and a form of the Solicited Discounted Prepayment Offer in the form of Exhibit P to be submitted by a responding Lender to the Auction Agent (or its delegate) by no later than 5:00 p.m., on the third (3rd) Business Day after the date of delivery of such notice to such Lenders (which date may be extended upon notice from the Loan Party or Subsidiary to the Auction Agent) (the "Solicited Discounted Prepayment Response Date").  Each Lender's Solicited Discounted Prepayment Offer shall (x) be irrevocable, (y) remain outstanding until the Acceptance Date, and (z) specify both one or more (but no more than three) discounts to par (the "Offered Discount") at which such Lender is willing to allow prepayment of its then outstanding Loan and the maximum aggregate principal amount

62

and tranches of such Loans (the "Offered Amount") such Lender is willing to have prepaid at the Offered Discount. Any Lender whose Solicited Discounted Prepayment Offer is not received by the Auction Agent by the Solicited Discounted Prepayment Response Date shall be deemed to have declined prepayment of any of its Loans at any discount.

(B) The Auction Agent shall promptly provide the relevant Loan Party or Subsidiary with a copy of all Solicited Discounted Prepayment Offers received on or before the Solicited Discounted Prepayment Response Date. Such Loan Party or such Subsidiary shall review all such Solicited Discounted Prepayment Offers and select the largest of the Offered Discounts specified by the relevant responding Lenders in the Solicited Discounted Prepayment Offers that is acceptable to the Loan Party or Subsidiary in its sole discretion (the "Acceptable Discount"), if any. If the Loan Party or Subsidiary elects, in its sole discretion, to accept any Offered Discount as the Acceptable Discount, in no event later than by the third (3rd) Business Day after the date of receipt by such Loan Party or such Subsidiary from the Auction Agent of a copy of all Solicited Discounted Prepayment Offers pursuant to the first sentence of this subsection (B) (the "Acceptance Date"), the Loan Party or Subsidiary may submit an Acceptance and Prepayment Notice to the Auction Agent setting forth the Acceptable Discount. If the Auction Agent shall fail to receive an Acceptance and Prepayment Notice in the form of Exhibit J from the Loan Party or Subsidiary by the Acceptance Date, such Loan Party or such Subsidiary shall be deemed to have rejected all Solicited Discounted Prepayment Offers.

(C) Based upon the Acceptable Discount and the Solicited Discounted Prepayment Offers received by Auction Agent by the Solicited Discounted Prepayment Response Date, within three (3) Business Days after receipt of an Acceptance and Prepayment Notice (the "Discounted Prepayment Determination Date"), the Auction Agent will determine (with the consent of such Loan Party or such Subsidiary and subject to rounding requirements of the Auction Agent made in its sole reasonable discretion) the aggregate principal amount and the tranches of Loans (the "Acceptable Prepayment Amount") to be prepaid by the relevant Loan Party or Subsidiary at the Acceptable Discount in accordance with this Section 2.10(c)(iv). If the Loan Party or Subsidiary elects to accept any Acceptable Discount, then the Loan Party or Subsidiary agrees to accept all Solicited Discounted Prepayment Offers received by Auction Agent by the Solicited Discounted Prepayment Response Date, in the order from largest Offered Discount to smallest Offered Discount, up to and including the Acceptable Discount. Each Lender that has submitted a Solicited Discounted Prepayment Offer with an Offered Discount that is greater than or equal to the Acceptable Discount shall be deemed to have irrevocably consented to prepayment of Loans equal to its Offered Amount (subject to any required pro-rata reduction pursuant to the following sentence) at the Acceptable Discount (each such Lender, a "Qualifying Lender"). The Loan Party or Subsidiary may prepay outstanding Loans pursuant to this subsection (iv) to each Qualifying Lender in the aggregate principal amount and of the tranches specified in such Lender's Solicited Discounted Prepayment Offer at the Acceptable Discount; provided that if the aggregate Offered Amount by all Qualifying Lenders whose Offered Discount is greater than or equal to the Acceptable Discount exceeds the Solicited Discounted Prepayment Amount,

63

prepayment of the principal amount of the Loans for those Qualifying Lenders whose Offered Discount is greater than or equal to the Acceptable Discount (the "Identified Qualifying Lenders") shall be made pro rata among the Identified Qualifying Lenders in accordance with the Offered Amount of each such Identified Qualifying Lender and the Auction Agent (with the consent of such Loan Party or such Subsidiary and subject to rounding requirements of the Auction Agent made in its sole reasonable discretion) will calculate such proration (the "Solicited Discount Proration").   On or prior to the Discounted Prepayment Determination Date, the Auction Agent shall promptly notify (I) the relevant Loan Party or Subsidiary of the Discounted Prepayment Effective Date and Acceptable Prepayment Amount comprising the Discounted Loan Prepayment and the tranches to be prepaid, (II) each Lender of the Discounted Prepayment Effective Date, the Acceptable Discount, and the Acceptable Prepayment Amount of all Loans and the tranches to be prepaid at the Applicable Discount on such date, (III) each Qualifying Lender of the aggregate principal amount and the tranches of such Lender to be prepaid at the Acceptable Discount on such date, and (IV) if applicable, each Identified Qualifying Lender of the Solicited Discount Proration.   Each determination by the Auction Agent of the amounts stated in the foregoing notices to such Loan Party or such Subsidiary and Lenders shall be conclusive and binding for all purposes absent manifest error.   The payment amount specified in such notice to such Loan Party or such Subsidiary shall be due and payable by such Loan Party or such Subsidiary on the Discounted Prepayment Effective Date in accordance with subsection (vi) below (subject to subsection (x) below).

(v)   In connection with any Discounted Loan Prepayment, the Loan Parties and the Lenders acknowledge and agree that the Auction Agent may require as a condition to any Discounted Loan Prepayment, the payment of customary and documented fees and out-of-pocket expenses from a Loan Party or Subsidiary in connection therewith.

(vi)   If any Loan is prepaid in accordance with paragraphs (ii) through (iv) above, a Loan Party or Subsidiary shall prepay such Loans on the Discounted Prepayment Effective Date without premium or penalty.   The relevant Loan Party or Subsidiary shall make such prepayment to the Administrative Agent, for the account of the Discount Prepayment Accepting Lenders, Participating Lenders, or Qualifying Lenders, as applicable, at the Funding Office in immediately available funds not later than 1:00 p.m.  on the Discounted Prepayment Effective Date and all such prepayments shall be applied to the remaining principal installments of the relevant tranche of Loans on a pro rata basis across such installments.  The Loans so prepaid shall be accompanied by all accrued and unpaid interest on the par principal amount so prepaid up to, but not including, the Discounted Prepayment Effective Date.   Each prepayment of the outstanding Loans pursuant to this Section 2.10(c) shall be paid to the Discount Prepayment Accepting Lenders, Participating Lenders, or Qualifying Lenders, as applicable, and shall be applied to the relevant Loans of such Lenders in accordance with their respective pro rata share.  The aggregate principal amount of the tranches and installments of the relevant Loans outstanding shall be deemed reduced by the full par value of the aggregate principal amount of the tranches of Loans prepaid on the Discounted Prepayment Effective Date in any Discounted Loan Prepayment.   In

connection with each prepayment pursuant to this Section 2.10(c), each relevant Loan Party and Lender shall render customary "big boy" letters to each other and the Auction Agent regarding Excluded Information.

(vii)   To the extent not expressly provided for herein, each Discounted Loan Prepayment (which for the avoidance of doubt, shall not include any open market purchases of Loans or Term Commitments otherwise permitted by the terms hereof) shall be consummated pursuant to procedures consistent with the provisions in this Section 2.10(c) or as otherwise established by the Auction Agent acting in its reasonable discretion and as reasonably agreed by the Borrower.

(viii)   Notwithstanding anything in any Loan Document to the contrary, for purposes of this Section 2.10(c), to the extent the Administrative Agent is the Auction Agent, each notice or other communication required to be delivered or otherwise provided to the Auction Agent (or its delegate) shall be deemed to have been given upon the Auction Agent's (or its delegate's) actual receipt during normal business hours of such notice or communication; provided that any notice or communication actually received outside of normal business hours shall be deemed to have been given as of the opening of business on the next Business Day.

(ix)   Each of the Loan Parties and the Lenders acknowledge and agree that the Auction Agent may perform any and all of its duties under this Section 2.10(c) by itself or through any Affiliate of the Auction Agent and expressly consents to any such delegation of duties by the Auction Agent to such Affiliate and the performance of such delegated duties by such Affiliate.   The exculpatory provisions pursuant to this Agreement shall apply to each Affiliate of the Auction Agent and its respective activities in connection with any Discounted Loan Prepayment provided for in this Section 2.10(c) as well as activities of the Auction Agent.

(x)   Each Loan Party and any of its Subsidiaries shall have the right, by written notice to the Auction Agent, to revoke or modify its offer to make a Discounted Loan Prepayment and rescind the applicable Specified Discount Prepayment Notice, Discount Range Prepayment Notice or Solicited Discounted Prepayment Notice therefor at its discretion at any time on or prior to the applicable Specified Discount Prepayment Response Date.

(xi)   Any failure by such Loan Party or such Subsidiary to make any prepayment to a Lender, pursuant to this Section 2.10(c) shall not constitute a Default or Event of Default under Section 8 or otherwise.

(xii)   To the extent the Auction Agent is required to deliver notices or communicate such other information to the Lenders pursuant to this Section 2.10(c), the Auction Agent will work with the Administrative Agent (and the Administrative Agent will cooperate with the Auction Agent) in order to procure the delivery of such notices and/or the communication of such information to the applicable Lenders.

(xiii)   Nothing in this <u>Section 2.10(c)</u> shall require the Loan Parties or any of their Subsidiaries to undertake any Discounted Loan Prepayment.

2.11   **<u>Mandatory Prepayments</u>**.

(a)   If Indebtedness shall be issued or incurred by any Loan Party (i) not permitted to be incurred or issued pursuant to <u>Section 7.2</u> or (ii) that is intended to constitute Credit Agreement Refinancing Indebtedness, an amount equal to 100% of the Net Cash Proceeds thereof shall be applied as soon as practicable but in any event within five (5) Business Days after such issuance or incurrence toward the prepayment of the Term Loans on a *pro rata* basis (except (x) as to Incremental Tranche B Term Loans and Refinancing Term Loans, as otherwise set forth in the Incremental Facility Amendment or Refinancing Amendment applicable thereto and (y) as to a Replacement Tranche B Term Loan) as set forth in <u>Section 2.11(d)</u>.

(b)   Subject to <u>clause (e)</u> below:

(i)   if on any date the Borrower or any of its Restricted Subsidiaries shall receive Net Cash Proceeds (other than MDL Sale Proceeds) from any Asset Sale or Recovery Event, then, unless a Reinvestment Notice shall be delivered in respect thereof, the amount of such Net Cash Proceeds shall be applied as soon as practicable but in any event within ten (10) days after the date of receipt thereof toward the prepayment of the Tranche B Term Loans as set forth in <u>Section 2.11(d)</u> on a *pro rata* basis (except as to Incremental Tranche B Term Loans and Refinancing Term Loans, as otherwise set forth in the Incremental Facility Amendment or Refinancing Amendment applicable thereto and as to a Replacement Tranche B Term Loan, which Incremental Facility Amendment or Refinancing Amendment may, at the option of Borrower, provide that Incremental Tranche B Term Loans and Refinancing Term Loans may participate in such prepayments on less than a pro rata basis); <u>provided</u> that, notwithstanding the foregoing, on each Reinvestment Prepayment Date, an amount equal to the Reinvestment Prepayment Amount with respect to the relevant Reinvestment Event shall be applied toward the prepayment of the Tranche B Term Loans as set forth in <u>Section 2.11(d)</u>; <u>provided</u>, <u>further</u>, that with respect to any prepayment event referenced in this sub-clause (i) this <u>paragraph (b)</u>, (x) the Borrower shall not be obligated to make any prepayment otherwise required by this sub-clause (i) of this paragraph (b) unless and until the aggregate amount of Net Cash Proceeds from all such Asset Sale and Recovery Events, after giving effect to the reinvestment rights set forth herein, exceeds $7,500,000 (the "<u>Prepayment Trigger</u>") in any fiscal year of the Borrower, but then from all such Net Cash Proceeds (excluding amounts below the Prepayment Trigger) and (y) the Borrower may use such Net Cash Proceeds to prepay or repurchase (A) with respect to Net Cash Proceeds from any Asset Sale or Recovery Event of ABL Priority Collateral, outstanding Indebtedness (and all related obligations) incurred pursuant to <u>Section 7.2(i)</u> and/or <u>Section 7.2(u)(i)</u>, in each case, to the extent such outstanding Indebtedness is secured by a Lien on ABL Priority Collateral that is senior to the Lien on such ABL Priority Collateral securing the Obligations, (B) with respect to Net Cash Proceeds from any Asset Sale or Recovery Event of Term Priority Collateral, outstanding Indebtedness incurred pursuant to <u>Section 7.2(i)</u> and all related obligations, and (C) with respect to

66

assets that are not Collateral, Indebtedness of any Restricted Subsidiary that is not a Loan Party; and

(ii) if the Borrower or any Restricted Subsidiary receives MDL Sale Proceeds, within ten (10) Business Days from the later of (a) the date of the consummation of the transaction giving rise to such MDL Sale Proceeds and (b) the receipt of such MDL Sale Proceeds, the Borrower or such Restricted Subsidiary shall:

(A) prior to the repayment in full in cash of all Indebtedness incurred pursuant to Section 7.2(u)(ii) and all related obligations, apply an amount equal to the lesser of (x) 100% of MDL Sale Proceeds and (y) the remaining Indebtedness outstanding under Section 7.02(u)(ii) and related obligations to prepay or repurchase outstanding Indebtedness incurred pursuant to Section 7.02(u)(ii) and related obligations;

(B) after the repayment in full in cash of all Indebtedness incurred pursuant to Section 7.02(u)(ii) and related obligations and prior to the [MDL Term Loan Termination Date], apply an amount equal to the lesser of (x) 100% of MDL Sale Proceeds and (y) the remaining amount of Indebtedness outstanding under Section 7.2(i) and related obligations to prepay or repurchase Indebtedness incurred pursuant to Section 7.2(i) and related obligations;

(C) after the [MDL Term Loan Termination Date] and prior to the first anniversary of the Closing Date, apply an amount equal to (x) prior to the [21C Term Loan Termination Date], 60% of such MDL Sale Proceeds to the prepayment or repurchase at par of Term Loans and any other Indebtedness that is secured by Liens on the Collateral that rank *pari passu* with the Liens on the Collateral securing the Loan Obligations, pro rata among the Term Loans and any other such Indebtedness based on principal amounts then outstanding unless otherwise agreed among the Lenders and the holders of such other Indebtedness and (y) prior to the [PIK Toggle Notes Termination Date], all other MDL Sale Proceeds to the prepayment or repurchase of, on an equal and ratable basis, PIK Toggle Notes and any other Indebtedness that is secured by Liens on the Collateral that rank *pari passu* with the Liens on the Collateral securing the PIK Toggle Notes unless otherwise agreed among the holders of the PIK Toggle Notes and the holders of such other Indebtedness; and

(D) after the [MDL Term Loan Termination Date] and on or after the first anniversary of the Closing Date, apply an amount equal to (x) prior to the [21C Term Loan Termination Date], 50% of such MDL Sale Proceeds to the prepayment or repurchase at par of Term Loans and any other Indebtedness that is secured by Liens on the Collateral that rank *pari passu* with the Liens on the Collateral securing the Loan Obligations, pro rata among the Term Loans and any other such Indebtedness based on principal amounts then outstanding unless otherwise agreed among the Lenders and the holders of such other Indebtedness and (y) prior to the [PIK Toggle Notes Termination Date], all other MDL Sale Proceeds to the prepayment or repurchase of, on an equal and ratable basis, PIK

67

Toggle Notes and any other Indebtedness that is secured by Liens on the Collateral that rank *pari passu* with the Liens on the Collateral securing the Notes unless otherwise agreed among the holders of the PIK Toggle Notes and the holders of such other Indebtedness.

(c)      Subject to clause (e) below, if, for any fiscal year of the Borrower commencing with that portion of the fiscal year ending December 31, 2018 which begins on the first day of the first full fiscal quarter after the Closing Date (and for each fiscal year of Borrower thereafter), there shall be Excess Cash Flow, the Borrower shall, on the relevant Excess Cash Flow Application Date, apply an amount equal to (i) the ECF Percentage for such fiscal year of such Excess Cash Flow (if the Closing Date is after January 1, 2018, in the case of the fiscal year ending December 31, 2018, only including for the purposes of this clause (i) Excess Cash Flow which accrues on and after the first day of the first full fiscal quarter after the Closing Date) less (ii) the aggregate principal amount of all prepayments of revolving Indebtedness (to the extent such revolving Indebtedness is not (x) unsecured or (y) secured by a Lien on ABL Priority Collateral that is junior to the Lien on such ABL Priority Collateral securing the Obligations) made during such fiscal year (or, at the option of the Borrower, after the end of the fiscal year but prior to the Excess Cash Flow Application Date; provided that any such prepayment of revolving Indebtedness shall only operate to reduce the required prepayments of Term Loans under this Section 2.11(c) once) to the extent accompanied by a permanent reduction in the commitment in respect thereof and the aggregate amount of cash used for all optional prepayments of Term Loans made during such fiscal year (or at the option of the Borrower, after the end of such fiscal year but prior to the Excess Cash Flow application Date; provided that any such prepayment of the Term Loans shall only operate to reduce the required prepayments of Term Loans under this Section 2.11(c) once), toward the prepayment of any Term Loans as set forth in Section 2.11(d) on a pro rata basis (except (x) as to Incremental Tranche B Term Loans and Refinancing Term Loans, as otherwise set forth in the Incremental Facility Amendment or Refinancing Amendment applicable thereto and (y) as to a Replacement Tranche B Term Loan, which related Incremental Facility Amendment or Refinancing Amendment may, at the option of Borrower, provide that Incremental Tranche B Term Loans and Refinancing Term Loans may participate in such prepayments on less than a pro rata basis); provided, however, that the Borrower shall not be required to make any prepayment pursuant to this Section 2.11(c) if the aggregate amount of unrestricted cash and Cash Equivalents of the Loan Parties as of the close of business on the Business Day immediately prior to the Excess Cash Flow Application Date is less than $50,000,000. Each such prepayment shall be made on a date (an "Excess Cash Flow Application Date") no later than five (5) Business Days after the earlier of (i) the date on which the financial statements of the Borrower referred to in Section 6.1(a), for the fiscal year with respect to which such prepayment is made, are required to be delivered to the Administrative Agent and (ii) the date such financial statements are actually delivered.

(d)      The application of any prepayment of Tranche B Term Loans pursuant to Section 2.11 shall be made, first, to ABR Loans and, second, to Eurodollar Loans; provided that, if such application would be inconsistent with Section 2.17(b), then Section 2.17(b) shall apply. Each prepayment of Tranche B Term Loans under this Section 2.11 shall be accompanied by accrued interest to the date of such prepayment on the amount prepaid and by any amounts payable pursuant to Section 2.20.

68

(e)     Notwithstanding any other provisions of this Section 2.11, (i) to the extent that any of or all the Net Cash Proceeds of any Disposition by a Foreign Subsidiary or Domestic Foreign Holding Company giving rise to a prepayment pursuant to Section 2.11(b) (a "Foreign Disposition"), the Net Cash Proceeds of any such prepayment event pursuant to Section 2.11(b) from a Foreign Subsidiary (a "Foreign Prepayment Event"), or Excess Cash Flow would be (x) prohibited or delayed by applicable local law, (y) restricted by applicable organizational or constitutive documents or any agreement or (z) subject to other onerous organizational or administrative impediments, from being repatriated to the United States, the portion of such Net Cash Proceeds or Excess Cash Flow so affected will not be taken into account in measuring the Borrower's obligation to repay Term Loans as provided in Section 2.11(b) or (c), as the case may be, and instead, such amounts may be retained by the applicable Foreign Subsidiary or Domestic Foreign Holding Company and (ii) to the extent that Borrower has determined in good faith that repatriation of any of or all the Net Cash Proceeds of any Foreign Disposition, any Foreign Prepayment Event or Excess Cash Flow would have an adverse tax cost consequence (other than a de minimis tax consequence) with respect to such Net Cash Proceeds or Excess Cash Flow (which for the avoidance of doubt, includes, but is not limited to, any prepayment whereby doing so Holdings, the Borrower, any Restricted Subsidiary or any of their respective Affiliates and/or equity partners would incur a tax liability, including a tax dividend, deemed dividend pursuant to Code Section 956 or a withholding tax (other than a de minimis tax liability, de minimis tax dividend, de minimis deemed dividend or de minimis withholding tax, respectively), the Net Cash Proceeds or Excess Cash Flow so affected may be retained by the applicable Foreign Subsidiary or Domestic Foreign Holding Company.  The non-application of any prepayment amounts as a consequence of the foregoing provisions will not, for the avoidance of doubt, constitute a Default or an Event of Default.

(f)     In connection with any optional or mandatory prepayment of borrowings hereunder, the Borrower shall, subject to the provisions of this paragraph and paragraph (d) of this Section, select the borrowing or borrowings to be prepaid and shall specify such selection in the notice of such prepayment.  The Administrative Agent will promptly notify each Lender holding the applicable Class of Term Loans of the contents of the Borrower's prepayment notice and of such Lender's *pro rata* share of the prepayment.  Each such Term Loan Lender may reject all (but not less than all) of its pro rata share of any mandatory prepayment (such declined amounts, the "Declined Proceeds") of Term Loans required to be made pursuant to clause (b) or (c) of this Section 2.11 by providing notice to the Administrative Agent at or prior to the time of such prepayment; provided that for the avoidance of doubt, no Lender may reject any prepayment made with the proceeds of Credit Agreement Refinancing Indebtedness.  Any Declined Proceeds remaining thereafter shall be retained by the Borrower ("Retained Declined Proceeds").

(g)     Notwithstanding anything herein to the contrary, the Lenders holding any initial Tranche B Term Loans shall always be entitled to *pro rata* payment in respect of such initial Tranche B Term Loans.

2.12   **Conversion and Continuation Options**.

(a)     The Borrower may elect from time to time to convert Eurodollar Loans to ABR Loans by giving the Administrative Agent prior irrevocable notice of such election no later than

69

12:00 Noon, New York City time, on the Business Day preceding the proposed conversion date, provided that any such conversion of Eurodollar Loans may only be made on the last day of an Interest Period with respect thereto.  The Borrower may elect from time to time to convert ABR Loans to Eurodollar Loans by giving the Administrative Agent prior irrevocable notice of such election substantially in the form of Exhibit H-3 no later than 12:00 Noon, New York City time, on the third (3rd) Business Day preceding the proposed conversion date (which notice shall specify the length of the initial Interest Period therefor), provided that no ABR Loan under a particular Facility may be converted into a Eurodollar Loan in excess of one month when any Event of Default has occurred and is continuing and the Administrative Agent or the Majority Facility Lenders in respect of such Facility have determined in its or their sole discretion not to permit such conversions.  Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.

(b)      Any Eurodollar Loan may be continued as such upon the expiration of the then current Interest Period with respect thereto by the Borrower giving irrevocable notice to the Administrative Agent, in accordance with the applicable provisions of the term "Interest Period" set forth in Section 1.1, of the length of the next Interest Period to be applicable to such Eurodollar Loans, provided that no Eurodollar Loan in excess of one month under a particular Facility may be continued as such when any Event of Default has occurred and is continuing and the Administrative Agent has or the Majority Facility Lenders in respect of such Facility have determined in its or their sole discretion not to permit such continuations, and provided, further, that (i) if the Borrower shall fail to give any required notice as described above in this paragraph or (ii) if such continuation is not permitted pursuant to the preceding proviso such Eurodollar Loans shall be automatically converted to ABR Loans on the last day of such then expiring Interest Period.  Upon receipt of any such notice the Administrative Agent shall promptly notify each Lender thereof.

2.13   **Limitations on Eurodollar Tranches**.  Notwithstanding anything to the contrary in this Agreement, all borrowings, conversions and continuations of Eurodollar Loans and all selections of Interest Periods shall be in such amounts and be made pursuant to such elections so that, (a) after giving effect thereto, the aggregate principal amount of the Eurodollar Loans comprising each Eurodollar Tranche shall be equal to $1,000,000 or a whole multiple of $100,000 in excess thereof and (b) no more than ten Eurodollar Tranches shall be outstanding at any one time plus two for each additional Incremental Term Loan.

2.14   **Interest Rates and Payment Dates**.

(a)      Each Eurodollar Loan shall bear interest for each day during each Interest Period with respect thereto at a rate per annum equal to the Eurodollar Rate determined for such day plus the Applicable Margin.

(b)      Each ABR Loan shall bear interest at a rate per annum equal to the ABR plus the Applicable Margin.

(c)      (i) If all or a portion of the principal amount of any Loan shall not be paid when due in accordance with the terms of this Agreement (whether at the stated maturity, by acceleration or otherwise), such overdue amount shall bear interest at a rate per annum equal to

70

the rate that would otherwise be applicable thereto pursuant to the foregoing provisions of this Section 2.14 plus 2% and (ii) if all or a portion of any interest payable on any Loan or any fee or other amount payable hereunder shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), such overdue amount shall bear interest at a rate per annum equal to the rate then applicable to ABR Loans under the relevant Facility plus 2%, in each case, with respect to clauses (i) and (ii) above (the interest payable thereunder, the "Default Interest"), from the date of such non-payment until such amount is paid in full (as well after as before judgment).

(d)     Interest shall be payable in arrears on each Interest Payment Date, provided that accrued and unpaid Default Interest shall be payable from time to time on demand.

2.15    **Computation of Interest**.

(a)     Interest payable pursuant hereto shall be calculated on the basis of a three hundred sixty- (360-) day year for the actual days elapsed, except that, with respect to ABR Loans the rate of interest on which is calculated on the basis of the Prime Rate, the interest thereon shall be calculated on the basis of a three hundred sixty five- (365-) (or three hundred sixty-six- (366-), as the case may be) day year for the actual days elapsed.  The Administrative Agent shall as soon as practicable notify the Borrower and the Lenders of each determination of a Eurodollar Rate. Any change in the interest rate on a Loan resulting from a change in the ABR or the Eurocurrency Reserve Requirements shall become effective as of the opening of business on the day on which such change becomes effective.  The Administrative Agent shall as soon as practicable notify the Borrower and the Lenders of the effective date and the amount of each such change in interest rate.

(b)     Each determination of an interest rate by the Administrative Agent pursuant to any provision of this Agreement shall be conclusive and binding on the Borrower and the Lenders in the absence of manifest error.  The Administrative Agent shall, at the request of the Borrower, deliver to the Borrower a statement showing the quotations used by the Administrative Agent in determining any interest rate pursuant to Section 2.14(a).

2.16    **Inability to Determine Interest Rate**.  If prior to the first day of any Interest Period:

(a)     the Administrative Agent shall have determined (which determination shall be conclusive and binding upon the Borrower) that, by reason of circumstances affecting the relevant market, adequate and reasonable means do not exist for ascertaining the Eurodollar Rate for such Interest Period, or

(b)     the Administrative Agent shall have received notice from the Majority Facility Lenders in respect of the relevant Facility that the Eurodollar Rate determined or to be determined for such Interest Period will not adequately and fairly reflect the cost to such Lenders (as conclusively certified by such Lenders) of making or maintaining their affected Loans during such Interest Period,

the Administrative Agent shall give telecopy or telephonic notice thereof to the Borrower and the relevant Lenders as soon as practicable thereafter.  If such notice is given (x) any Eurodollar Loans under the relevant Facility requested to be made on the first day of such Interest Period

71

shall be made as ABR Loans, (y) any Loans under the relevant Facility that were to have been converted on the first day of such Interest Period to Eurodollar Loans shall be continued as ABR Loans and (z) any outstanding Eurodollar Loans under the relevant Facility shall be converted, on the last day of the then-current Interest Period, to ABR Loans.  Until such notice has been withdrawn by the Administrative Agent, no further Eurodollar Loans under the relevant Facility shall be made or continued as such, nor shall the Borrower have the right to convert Loans under the relevant Facility to Eurodollar Loans.

2.17   **Pro Rata Treatment and Payments**.

(a)   Except as otherwise provided herein from time to time, each borrowing by the Borrower from the Lenders hereunder and any reduction of the Tranche B Term Commitments of the Lenders shall be made pro rata according to the respective Tranche B Term Commitments of the Tranche B Lenders.

(b)   Except as otherwise provided herein from time to time, each payment (including each prepayment) by the Borrower on account of principal of and interest on the Tranche B Term Loans shall be made (i) in the case of principal, pro rata according to the respective outstanding principal amounts of the Tranche B Term Loans then held by the Tranche B Term Lenders, and (ii) in the case of interest, pro rata according to the respective amounts of accrued and unpaid interest on the Tranche B Term Loans then due to the Tranche B Term Lenders.  The amount of each principal prepayment of the Tranche B Term Loans shall be applied to reduce the then remaining installments of the Tranche B Term Loans as directed by the Borrower by notice to the Administrative Agent (and absent such notice, in direct order of maturity thereof).  Amounts prepaid or repaid on account of the Tranche B Term Loans may not be reborrowed.

(c)   [Reserved].

(d)   All payments (including prepayments) to be made by the Borrower hereunder, whether on account of principal, interest, fees or otherwise, shall be made without setoff or counterclaim and shall be made prior to 2:00 P.M., New York City time, on the due date thereof to the Administrative Agent at the Funding Office, in Dollars and in immediately available funds.  The Administrative Agent shall distribute such payments to the Lenders (or, in the case of amounts payable to it, retained by the Administrative Agent) promptly upon receipt in like funds as received.  If any payment hereunder (other than payments on the Eurodollar Loans) becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day.  If any payment on a Eurodollar Loan becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day unless the result of such extension would be to extend such payment into another calendar month, in which event such payment shall be made on the immediately preceding Business Day.  In the case of any extension of any payment of principal pursuant to the preceding two sentences, interest thereon shall be payable at the then applicable rate during such extension.

(e)   Unless the Administrative Agent shall have been notified in writing by any Lender prior to a borrowing that such Lender will not make the amount that would constitute its share of such borrowing available to the Administrative Agent, the Administrative Agent may

72

assume that such Lender is making such amount available to the Administrative Agent, and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower a corresponding amount. If such amount is not made available to the Administrative Agent by the required time on the Borrowing Date therefor, such Lender shall pay to the Administrative Agent, on demand, such amount with interest thereon, at a rate equal to the greater of (i) the Federal Funds Effective Rate and (ii) a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, for the period until such Lender makes such amount immediately available to the Administrative Agent. A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this paragraph shall be conclusive in the absence of manifest error. If such Lender's share of such borrowing is not made available to the Administrative Agent by such Lender within three (3) Business Days after such Borrowing Date, the Administrative Agent shall also be entitled to recover such amount with interest thereon at the rate per annum applicable to ABR Loans under the relevant Facility, on demand, from the Borrower. If the Borrower and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrower the amount of such interest paid by the Borrower for such period. If such Lender pays its share of the applicable borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Loan included in such borrowing. Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

(f)    Unless the Administrative Agent shall have been notified in writing by the Borrower prior to the date of any payment due to be made by the Borrower hereunder that the Borrower will not make such payment to the Administrative Agent, the Administrative Agent may assume that the Borrower is making such payment, and the Administrative Agent may, but shall not be required to, in reliance upon such assumption, make available to the applicable Lenders their respective pro rata shares of a corresponding amount. If such payment is not made to the Administrative Agent by the Borrower within three (3) Business Days after such due date, the Administrative Agent shall be entitled to recover, on demand, from each Lender to which any amount which was made available pursuant to the preceding sentence, such amount with interest thereon at the rate per annum equal to the daily average Federal Funds Effective Rate. Nothing herein shall be deemed to limit the rights of the Administrative Agent or any Lender against the Borrower.

2.18    **Requirements of Law**.

(a)    If any Change in Law shall:

(i)    shall legally impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances, loans or other extensions of credit by, or any other acquisition of funds by, any office of such Lender that is not otherwise included in the determination of the Eurodollar Rate; or

(ii)    shall impose on such Lender any other condition;

73

and the result of any of the foregoing is to increase the cost to such Lender, by an amount that such Lender deems to be material, of making, converting into, continuing or maintaining Eurodollar Loans, or to reduce any amount receivable by such Lender hereunder in respect thereof, then, in any such case, the Borrower shall promptly and in any event within five (5) Business Days pay such Lender, upon its written demand, any additional amounts necessary to compensate such Lender for such increased cost or reduced amount receivable.  If any Lender becomes entitled to claim any additional amounts pursuant to this paragraph, it shall promptly notify the Borrower (with a copy to the Administrative Agent) of the event by reason of which it has become so entitled.

(b)     If any Lender shall have determined that any Change in Law regarding capital adequacy or liquidity requirements or in the interpretation or application thereof or compliance by such Lender or any corporation controlling such Lender with any request or directive regarding capital adequacy or liquidity requirements (whether or not having the force of law) from any Governmental Authority made subsequent to the Closing Date shall have the effect of reducing the rate of return on such Lender's or such corporation's capital as a consequence of its obligations hereunder to a level below that which such Lender or such corporation could have achieved but for such Change in Law (taking into consideration such Lender's or such corporation's policies with respect to capital adequacy or liquidity requirements) by an amount reasonably deemed by such Lender to be material and to the extent reasonably determined such increase in capital to be allocable to the existence of such Lender's Term Commitments hereunder, then from time to time, after submission by such Lender to the Borrower (with a copy to the Administrative Agent) of a written request therefor, the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or such corporation for such reduction.

(c)     A certificate as to any additional amounts payable pursuant to this Section submitted by any Lender to the Borrower (with a copy to the Administrative Agent) with appropriate detail demonstrating how such amounts were derived shall be conclusive in the absence of manifest error.

(d)     This Section 2.18 shall not apply to taxes, which shall be governed by Section 2.19.

2.19   **Taxes**.

(a)     Unless required by a Requirement of Law, all payments made by any Loan Party under any Loan Document shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings (including any interest, additions to tax or penalties applicable thereto), now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority ("Taxes"), excluding (i) net income Taxes (however denominated) and franchise Taxes (imposed in lieu of net income Taxes), in each case, (x) imposed on the Administrative Agent or any Lender by the United States of America, or by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal lending office is located, or in the case of any Lender, in which its applicable lending office is located or (y) that are Other Connection Taxes and (ii) any branch profits taxes

74

imposed by the United States of America under Section 884 (a) of the Code or any similar taxes, imposed by any jurisdiction described in (i) (clauses (i) and (ii), the "Excluded Taxes"). If any such non-excluded Taxes ("Non-Excluded Taxes") or Other Taxes are required by law to be deducted or withheld by an applicable withholding agent from any amounts payable to the Administrative Agent or any Lender hereunder, the amounts so payable to the Administrative Agent or such Lender shall be increased by the applicable Loan Party to the extent necessary to yield to the Administrative Agent or such Lender (after payment of all Non-Excluded Taxes and Other Taxes) interest or any such other amounts payable under the applicable Loan Document at the rates or in the amounts specified therein as if no such deduction or withholding had been made; provided, however, that a Loan Party shall not be required to increase any such amounts payable to any recipient with respect to any Non-Excluded Taxes (A) that are attributable to such recipient's failure to comply with the requirements of paragraph (d), (e) or (g) of this Section 2.19, (B) that are U.S. federal withholding Taxes imposed on amounts payable to such recipient pursuant to any Requirement of Law in effect at the time such recipient becomes a party to this Agreement or designates a new lending office (other than in the case of a replacement of a Lender pursuant to Section 2.22 or a designation of a new lending office pursuant to Section 2.21 at the request of the Borrower), except to the extent that such recipient or its assignor (if any) was entitled, at the time of designation of a new lending office or assignment, to receive additional amounts from the Borrower with respect to such Non-Excluded Taxes pursuant to this paragraph, or (C) that are U.S. federal withholding Taxes that would not have been imposed but for a failure by such recipient (or any financial institution through which any payment is made to such recipient) to comply with FATCA (clauses (A), (B) and (C), the "Non-Indemnifiable Taxes"). Nothing contained in this Section 2.19(a) shall require the Administrative Agent or any Lender to make available its tax returns (or any information relating to its Taxes which it deems confidential) to the Borrower or any other Person.

(b)     In addition, the Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)     The Loan Parties shall jointly and severally indemnify the Administrative Agent and each Lender, within 10 days after demand therefor, for the full amount of any Non-Excluded Taxes or Other Taxes (including Non-Excluded Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by the Administrative Agent or Lender or required to be withheld or deducted from a payment to the Administrative Agent or Lender and any reasonable expenses arising therefrom or with respect thereto, whether or not such Non-Excluded Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)     Whenever any Taxes are payable by a Loan Party pursuant to this Section 2.19, the applicable Loan Party shall timely pay in cash the full amount to the relevant Governmental Authority and, as promptly as possible thereafter, shall send to the Administrative Agent, for its own account or for the account of the relevant Lender, as the case may be, a copy of an original official receipt received by the applicable Loan Party showing payment thereof. If any Loan Party fails to pay such Taxes when due to the appropriate taxing authority or fails to remit to the

75

Administrative Agent the required receipts or other required documentary evidence, the Loan Parties shall indemnify the Administrative Agent and the Lenders for any incremental taxes, interest, additions to tax and penalties, and any reasonable expenses arising therefrom or in respect thereto that may become payable by the Administrative Agent or any Lender as a result of any such failure.

(e)     Each Lender (or Transferee) that is not a U.S. Person (a "Non-U.S. Lender") shall deliver to the Borrower and the Administrative Agent (or, in the case of a Participant, to the Lender from which the related participation shall have been purchased) two (2) executed original copies of either U.S. Internal Revenue Service Form W-8BEN, W-8BEN-E, W-8ECI or W-8EXP, and, in the case of a Non-U.S. Lender claiming exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest," a certificate substantially in the form of Exhibit C (a "Non-Bank Tax Certificate"), or any subsequent versions thereof or successors thereto, properly completed and duly executed by such Non-U.S. Lender claiming complete exemption from, or a reduced rate of, U.S. federal withholding tax on all applicable payments by the Borrower under this Agreement and the other Loan Documents; provided, however, that any Non-U.S. Lender that is a partnership for U.S. federal income tax purposes or otherwise not the beneficial owner (i.e., who has sold a participation) shall deliver to the Borrower and the Administrative Agent (or, in the case of a Participant, to the Lender from which the related participation shall have been purchased) two (2) executed original copies of U.S. Internal Revenue Service Form W-8IMY, together with the applicable Form W-8, Form W-9 and other required attachments, and, in the case of any beneficial owner claiming the "portfolio interest" exemption, a Non-Bank Tax Certificate; provided, further, that, in the case of a Non-U.S. Lender that is a partnership, any Non-Bank Tax Certificate may be provided by the Non-U.S. Lender on behalf of the beneficial owner(s), except to the extent such Non-U.S. Lender has sold a participation.  Any forms described above shall be delivered by each Non-U.S. Lender on or before the date it becomes a party to this Agreement (or, in the case of any Participant, on or before the date such Participant purchases the related participation).  In addition, each Non-U.S. Lender shall promptly notify the Borrower of any change in circumstances which would modify or render invalid any claimed exemption or reduction and shall deliver such forms promptly upon the obsolescence, expiration or invalidity of any form previously delivered by such Non-U.S. Lender.  Each Non-U.S. Lender shall promptly notify the Borrower and the Administrative Agent at any time it determines that it is no longer in a position to provide any previously delivered certificate to the Borrower (or any other form of certification adopted by the U.S. taxing authorities for such purpose).  Notwithstanding any other provision of this paragraph, a Non-U.S. Lender shall not be required to deliver any form pursuant to this paragraph that such Non-U.S. Lender is not legally able to deliver.

(f)     A Lender that is entitled to an exemption from or reduction of any withholding tax other than U.S. federal withholding tax, with respect to payments under any Loan Document shall deliver to the Borrower (with a copy to the Administrative Agent), at the time or times prescribed by applicable law or reasonably requested by the Borrower, such properly completed and executed documentation prescribed by applicable law as will permit such payments to be made without withholding or at a reduced rate, provided that such Lender is legally entitled to complete, execute and deliver such documentation and in such Lender's judgment such completion, execution or submission would not materially prejudice the legal position of such Lender.

76

(g)      If the Administrative Agent or any Lender determines, in its sole discretion, exercised in good faith, that it has received a refund of any Non-Excluded Taxes or Other Taxes as to which it has been indemnified by any Loan Party or with respect to which any Loan Party has paid additional amounts pursuant to this Section 2.19, it shall pay over such refund to the Borrower (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 2.19 with respect to the Non-Excluded Taxes or Other Taxes giving rise to such refund), net of all reasonable out-of-pocket expenses of the Administrative Agent or such Lender (including any taxes imposed on such refund) and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided that the Borrower, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph (g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (g) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This paragraph shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to its taxes which it deems confidential) to the Loan Party or any other Person.

(h)      At the times specified in Section 2.19(e), each Lender (or Transferee) that is a U.S. Person shall deliver (in the case of a Participant, to the Lender from which the related participation shall have been purchased) two (2) properly completed and duly signed original copies of IRS Form W-9 or any successor form that such Lender is entitled to provide at such time, in order to qualify for an exemption from United States backup withholding requirements. If such Lender fails to deliver such forms, then the Administrative Agent may, notwithstanding Section 2.19(a), deduct and withhold from any applicable payment to such Lender or Transferee an amount equivalent to the applicable backup withholding tax imposed by the Code.

(i)      If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent, at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent, such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower or the Administrative Agent to comply with its obligations under FATCA, to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.

(j)      The agreements in this Section shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

77

(k)     For the avoidance of doubt, the term "Lender" shall, for purposes of this <u>Section 2.19</u>, include each Conduit Lender.

(l)     Each Lender hereby authorizes the Administrative Agent to deliver to the Loan Parties and to any successor Administrative Agent any documentation provided by such Lender to the Administrative Agent pursuant to <u>Section 2.19(e)</u>, (<u>f</u>), (<u>g</u>), (<u>h</u>) or (<u>i</u>).

2.20    **<u>Indemnity</u>**.  The Borrower agrees to indemnify each Lender for, and to hold each Lender harmless from, any loss or expense that such Lender may sustain or incur as a consequence of (a) default by the Borrower in making a borrowing of, conversion into or continuation of Eurodollar Loans after the Borrower has given a notice requesting the same in accordance with the provisions of this Agreement, (b) default by the Borrower in making any prepayment of or conversion from Eurodollar Loans after the Borrower has given a notice thereof in accordance with the provisions of this Agreement or (c) the making of a prepayment of Eurodollar Loans on a day that is not the last day of an Interest Period with respect thereto.  Such indemnification may include an amount equal to the excess, if any, of (i) the amount of interest that would have accrued on the amount so prepaid, or not so borrowed, converted or continued, for the period from the date of such prepayment or of such failure to borrow, convert or continue to the last day of such Interest Period (or, in the case of a failure to borrow, convert or continue, the Interest Period that would have commenced on the date of such failure) in each case at the applicable rate of interest for such Loans provided for herein (excluding, however, the Applicable Margin included therein, if any) over (ii) the amount of interest (as reasonably determined by such Lender) that would have accrued to such Lender on such amount by placing such amount on deposit for a comparable period with leading banks in the interbank eurodollar market.  A certificate as to any amounts payable pursuant to this <u>Section 2.20</u> submitted to the Borrower by any Lender which is submitted within one hundred and eighty (180) days of the incurrence of any loss or expense covered by this <u>Section 2.20</u> with appropriate detail demonstrating how such amounts were derived shall be conclusive in the absence of manifest error.  This covenant shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

2.21    **<u>Change of Lending Office</u>**.  Each Lender agrees that, upon the occurrence of any event giving rise to the operation of <u>Section 2.18</u> or <u>2.19(a)</u> with respect to such Lender, it will, if requested by the Borrower, use reasonable efforts (subject to overall policy considerations of such Lender) to file any certificate or document reasonably requested by the Borrower or designate another lending office for any Loans affected by such event with the object of eliminating or reducing amounts payable pursuant to <u>Section 2.18</u> or <u>2.19(a)</u>; <u>provided</u> that the making of such filing or such designation is made on terms that, in the reasonable judgment of such Lender, cause such Lender and its lending office(s) to suffer no economic, legal or regulatory disadvantage (except to a de minimis extent), and <u>provided</u>, <u>further</u>, that nothing in this <u>Section 2.21</u> shall affect or postpone any of the obligations of the Borrower or the rights of any Lender pursuant to <u>Section 2.18</u> or <u>2.19(a)</u>.

2.22    **<u>Replacement of Lenders</u>**.

(a)     The Borrower shall be permitted to replace any Lender that (A) requests reimbursement for amounts owing pursuant to <u>Section 2.18</u> or <u>2.19(a)</u> or (B) defaults in its

obligation to make Loans hereunder, or is otherwise a Defaulting Lender with a replacement financial institution; <u>provided</u> that (i) such replacement does not conflict with any Requirement of Law, (ii) prior to any such replacement, such Lender shall have taken no action under <u>Section 2.21</u> that has or will eliminate the continued need for payment of amounts owing pursuant to <u>Section 2.18</u> or <u>2.19(a)</u>, (iii) the replacement financial institution shall purchase, at par, all Loans and other amounts owing to such replaced Lender on or prior to the date of replacement (whether or not then due), (iv) the Borrower shall be liable to such replaced Lender under <u>Section 2.20</u> if any Eurodollar Loan owing to such replaced Lender shall be purchased other than on the last day of the Interest Period relating thereto, (v) the replacement financial institution, if not already a Lender, shall be reasonably satisfactory to the Administrative Agent, (vi) the replaced Lender shall be obligated to make such replacement in accordance with the provisions of <u>Section 10.6</u> (<u>provided</u> that the Borrower shall be obligated to pay the registration and processing fee referred to therein), (vii) until such time as such replacement shall be consummated (and thereafter, to the extent related to such earlier time), the Borrower shall pay all additional amounts (if any) required pursuant to <u>Section 2.18</u> or <u>2.19(a)</u>, as the case may be, (viii) any such replacement shall not be deemed to be a waiver of any rights that the Borrower, the Administrative Agent or any other Lender shall have against the replaced Lender, and (ix) in connection with the replacement of a Lender pursuant to <u>clause (A)</u> above, such replacement results in a reduction of the amounts owing pursuant to <u>Section 2.18</u> or <u>2.19(a)</u>.

(b)     If, in connection with any proposed amendment, modification, waiver or termination pursuant to <u>Section 10.1</u> (a "<u>Proposed Change</u>") requiring the consent of all Lenders or all directly and adversely affected Lenders, if the consent of the Required Lenders (and, to the extent any Proposed Change requires the consent of Lenders holding Loans of any Class, the consent of a majority in interest of the outstanding Loans and unused Commitments of such Class) (or, in the case of a consent, waiver or amendment involving directly and adversely affected Lenders, at least 50.1% of such directly and adversely affected Lenders) to such Proposed Change is obtained, but the consent of other Lenders whose consent is required is not obtained (any such Lender whose consent is not obtained as described in this <u>clause (b)</u> being referred to as a "<u>Non-Consenting Lender</u>"), then, at the Borrower's request (i) the Administrative Agent, or a Person or Persons reasonably acceptable to the Administrative Agent, to the extent the Administrative Agent's consent would otherwise be required in connection with an assignment of such Loans, shall have the right (but shall have no obligation) to purchase from such Non-Consenting Lenders, and such Non-Consenting Lenders agree that they shall, upon the Borrower's request, sell and assign to the Administrative Agent or such Person, all of the Loans and Commitments of such Non-Consenting Lenders for an amount equal to the principal balance of all Loans held by the Non-Consenting Lenders and all accrued interest and fees with respect thereto through the date of sale, such purchase and sale to be consummated at par pursuant to an Assignment and Assumption or (ii) terminate the Commitment of such Lender and repay all Obligations of the Borrower due and owing to such Lender relating to the Loans and participations held by such Lender as of such termination date; <u>provided</u> that in the case of any such termination of a Non-Consenting Lender such termination shall be sufficient (together with all other consenting Lenders and terminated Lenders after giving effect hereto) to cause the adoption of the applicable departure, waiver or amendment of the Loan Documents. Any such required sale and assignment shall be treated as a prepayment for purposes of <u>Section 2.20</u> and the Borrower shall be liable for any amounts payable thereunder as a result of such sale and assignment.

2.23   **Limitation on Additional Amounts, Etc**.   Notwithstanding anything to the contrary contained in Sections 2.18 and 2.19 of this Agreement, unless the Administrative Agent or a Lender gives notice to the Borrower that it is obligated to pay an amount under any such Section within two hundred seventy (270) calendar days after the later of (x) the date the Lender incurs the respective increased costs, Non-Excluded Taxes, Other Taxes, loss, expense or liability, reduction in amounts received or receivable or reduction in return on capital or (y) the date such Lender has actual knowledge of its incurrence of the respective increased costs, Non-Excluded Taxes, Other Taxes, loss, expense or liability reductions in amounts received or receivable or reduction in return on capital, then such Lender shall only be entitled to be compensated for such amount by the Loan Parties pursuant to Sections 2.18 and 2.19, as the case may be, to the extent the costs, Non-Excluded Taxes, Other Taxes, loss, expense or liability, reduction in amounts received or receivable or reduction in return on capital are incurred or suffered on or after the date which occurs two hundred seventy (270) calendar days prior to such Lender giving notice to the Borrower that it is obligated to pay the respective amounts pursuant to Sections 2.18 and 2.19, as the case may be; provided that if the circumstances giving rise to such claim is retroactive, then such two hundred seventy- (270-) calendar day period referred to above shall be extended to include the period of retroactive effect thereof.   This Section 2.23 shall have no applicability to any Section of this Agreement other than Sections 2.18 and 2.19.

2.24   **Extensions of Term Loans**.

(a)   Notwithstanding anything to the contrary in this Agreement, pursuant to one or more offers (each, an "Extension Offer") made from time to time by the Borrower to all Lenders holding a Class of Term Loans with a like maturity date on a pro rata basis (based on the aggregate outstanding principal amount of the applicable Class of Term Loans with a like maturity date) and offered on the same terms to each such Lender, the Borrower is hereby permitted to consummate from time to time transactions with individual Lenders that accept the terms contained in such Extension Offers to extend the maturity date of each such Lender's Term Loans in such applicable Class and otherwise modify the terms of such Term Loans pursuant to the terms of the relevant Extension Offer (including, without limitation, by increasing the interest rate, premiums or fees payable in respect of such Term Loans (and related outstandings) and/or modifying the amortization schedule, optional prepayment terms, required prepayment dates and participation in prepayments in respect of such Lender's Term Loans) (each, an "Extension"; all Term Loans in respect of which an Extension Offer was made and which are extended pursuant thereto shall, after giving effect to such Extension, constitute a new Class of Term Loans, which new Class shall constitute a separate Class of Term Loans from the Class of Term Loans that the Term Loans in respect of which such Extension Offer was made were part of prior to giving effect to such Extension; all Term Loans in respect of which such Extension Offer was made but which are not extended pursuant thereto shall constitute a different Class, which shall be separate from the foregoing Classes), so long as the following terms are satisfied (or waived):

(i)   [reserved],

(ii)   except as to interest rates, fees, premiums, amortization, prepayments, AHYDO Catch-Up Payments and final maturity (which shall, subject to the immediately succeeding clauses (iii), (iv) and (v), be determined by the Borrower and set forth in the relevant Extension Offer), the Term Loans of any Lender that agrees to an Extension with

80

respect to such Term Loans (an "Extending Term Lender" and the Term Loans extended pursuant to such Extension, after giving effect thereto, the "Extended Term Loans") shall have covenants, events of default and guarantees, if not consistent with the terms of the Term Loans in respect of which such Extension Offer was made, which shall not be materially more restrictive to the Loan Parties (as reasonably determined in good faith by the Borrower), when taken as a whole, than the terms of the Term Loans in respect of which such Extension Offer was made prior to giving effect to any Extension unless (x) the Lenders holding Term Loans in respect of which such Extension Offer was made who did not accept such Extension Offer receive the benefit of such more restrictive terms or (y) any such provisions apply after the Latest Tranche B Maturity Date in effect at such time, prior to giving effect to the applicable Extension),

(iii)    the Extended Term Maturity Date of the Extended Term Loans created pursuant to the applicable Extension shall be no earlier than the Latest Tranche B Maturity Date of the Class of Term Loans for which such Extension Offer was made in effect at such time, prior to giving effect to the applicable Extension, and at no time shall the Term Loans (including Extended Term Loans) have more than six different maturity dates,

(iv)    the Weighted Average Life to Maturity of the Extended Term Loans shall be no shorter than the remaining Weighted Average Life to Maturity of the Term Loans subject to such Extension, prior to giving effect thereto (without giving effect to amortization for periods where amortization has been eliminated as a result of a prepayment of the applicable Term Loans or amortization changes),

(v)    if the aggregate principal amount of Term Loans (calculated on the face amount thereof) in respect of which Lenders shall have accepted the relevant Extension Offer shall exceed the maximum aggregate principal amount of Term Loans offered to be extended by the Borrower pursuant to such Extension Offer, then the Term Loans of such Lenders shall be extended ratably up to such maximum amount based on the respective principal amounts (but not to exceed actual holdings of record) with respect to which such Lenders have accepted such Extension Offer,

(vi)    all documentation in respect of such Extension shall be consistent with the foregoing, and

(vii)    any applicable Minimum Extension Condition shall be satisfied unless waived by the Borrower.

(b)    With respect to all Extensions consummated by the Borrower pursuant to this Section 2.24, (i) such Extensions shall not constitute voluntary or mandatory payments or prepayments for purposes of Section 2.10 or 2.11 and (ii) no Extension Offer is required to be in any minimum amount or any minimum increment, provided that the Borrower may at its election specify as a condition (a "Minimum Extension Condition") to consummating any such Extension that a minimum amount (to be determined and specified in the relevant Extension Offer in the Borrower's sole discretion and may be waived by the Borrower) of Term Loans of any or all applicable Classes be tendered.  The Administrative Agent and the Lenders hereby consent to the

consummation of the transactions contemplated by this Section 2.24 (including, for the avoidance of doubt, payment of any interest, fees or premium in respect of any Extended Term Loans on such terms as may be set forth in the relevant Extension Offer) and hereby waive the requirements of any provision of this Agreement (including, without limitation, any pro rata payment or amendment section) or any other Loan Document that may otherwise prohibit or restrict any such Extension or any other transaction contemplated by this Section 2.24.

(c) No consent of any Lender or the Administrative Agent shall be required to effectuate any Extension, other than the consent of each Lender agreeing to such Extension with respect to one or more of its Term Loans (or a portion thereof). All Extended Term Loans and all Indebtedness in respect thereof shall be Obligations under this Agreement and the other Loan Documents that are secured by the Collateral on a *pari passu* basis with all other applicable Obligations under this Agreement and the other Loan Documents. The Lenders hereby irrevocably authorize the Administrative Agent to enter into amendments to this Agreement and the other Loan Documents with the Borrower and other Loan Parties as may be necessary or advisable in order to establish new Classes in respect of Term Loans so extended and such technical amendments as may be necessary, advisable or appropriate in the reasonable opinion of the Administrative Agent and the Borrower in connection with the establishment of such new Classes, in each case on terms consistent with this Section 2.24. Without limiting the foregoing, in connection with any Extensions the respective Loan Parties shall (at their expense) amend (and the Administrative Agent is hereby directed to amend) any Mortgage that has a maturity date prior to the latest termination date of any Extended Term Loans so that such maturity date is extended to the latest termination date of any Extended Term Loans (or such later date as may be advised by local counsel to the Administrative Agent). No Lender shall be required to participate in any Extension.

(d) In connection with any Extension, the Borrower shall provide the Administrative Agent at least five (5) Business Days (or such shorter period as may be agreed by the Administrative Agent) prior written notice thereof, and shall agree to such procedures (to ensure reasonable administrative management of the credit facilities hereunder after such Extension), if any, as may be established by, or acceptable to, the Administrative Agent, in each case acting reasonably to accomplish the purposes of this Section 2.24.

2.25 **Incremental Credit Extensions**.

(a) The Borrower may at any time or from time to time after the Closing Date (on one or more occasions), by notice to the Administrative Agent (whereupon the Administrative Agent shall promptly deliver a copy to each of the Lenders), without having to seek consent from the Lenders, (i) request one or more increases of the Tranche B Term Loans or one or more additional tranches of term loans (each such increase or additional tranche, the "Incremental Tranche B Term Loans") and (ii) in lieu of Incremental Tranche B Term Loans, issue *pari passu* or junior secured loans or notes (the "Secured Incremental Notes") and/or unsecured loans or notes ("Unsecured Incremental Notes" and, together with any Secured Incremental Notes, "Incremental Equivalent Debt"; Incremental Equivalent Debt, together with any Incremental Tranche B Term Loans, referred to herein as a "Credit Increase") or any combination thereof in an aggregate amount not to exceed (x) $35,000,000; provided that the proceeds thereof are used to prepay or repay MDL Term Loans on a dollar-for-dollar basis *plus* (y) an unlimited amount;

provided that, solely with respect to clause (y), the Consolidated Total Secured Leverage Ratio (determined on a Pro Forma Basis after giving effect to such Credit Increase and any contemplated use of the proceeds thereof, including any prepayment of Indebtedness and any potential Acquisition or Investment in connection therewith, but, notwithstanding the definition of Consolidated Total Debt, without including any proceeds of such Credit Increase in Cash on Hand for the purposes of making the calculation of the Consolidated Total Secured Leverage Ratio pursuant to this clause (y)) shall not exceed 3.40:1.00; provided, however, that at the option of the Borrower, any such unfunded Credit Increase may instead be tested at the time of the initial funding thereof in lieu of testing at the time of entering into such unfunded commitment *plus* (z) the amount of any voluntary prepayments of Term Loans and voluntary reductions of commitments in respect of revolving Indebtedness, to the extent such voluntary prepayment or voluntary reduction is not funded with long term Indebtedness (including, for the avoidance of doubt, the proceeds of any Credit Increase); provided, further, that upon the effectiveness of any Incremental Facility Amendment referred to below, no Event of Default shall exist and at the time that any such Credit Increase is made (and immediately after giving effect thereto), provided, that if such Credit Increase is executed in connection with a Permitted Acquisition or other permitted Investment, at the option of the lenders providing such Credit Increase, the documentation relating thereto may modify such restrictions consistent with customary "SunGard" provisions; provided, further, that, for the avoidance of doubt, any Incremental Tranche B Term Loans and Incremental Equivalent Debt may be incurred pursuant to clause (y) prior to the utilization of any amounts under clauses (x) or (z) above even if incurred substantially contemporaneously therewith and the amounts incurred or deemed incurred pursuant to clauses (x) or (z) substantially simultaneously with an incurrence pursuant to such clause (y) shall not be included in the calculation of such clause (y); provided, further, that any such Indebtedness incurred pursuant to clauses (x) and (z) above is hereinafter referred to as the "Unrestricted Incremental Indebtedness"; it being understood and agreed that (I) the Borrower shall designate any such Indebtedness as Unrestricted Incremental Indebtedness on or prior to the date of such incurrence by notice to the Administrative Agent and (II) the Borrower may redesignate any such Indebtedness originally designated as Unrestricted Incremental Indebtedness as being incurred pursuant to such clause (y) if, at the time of such redesignation, the Borrower would be permitted to incur under this Section 2.25(a) the aggregate principal amount of Indebtedness being so redesignated (for purposes of clarity, with any such redesignation having the effect of increasing the Borrower's ability to incur Unrestricted Incremental Indebtedness as of the date of such redesignation by the amount of such Indebtedness so redesignated).

(b)    Each Credit Increase shall be in an aggregate principal amount that is not less than $5,000,000 (provided that such amount may be less than $5,000,000 on no more than two occasions if such amount is not less than $1,000,000 on each such occasion, and such amount may be a lesser amount if such amount represents all remaining availability under the limit set forth above).

(c)    (i) Each of the Incremental Tranche B Term Loans may be secured by Liens on the Collateral ranking *pari passu* in right of security with the Liens on the Collateral securing the Tranche B Term Loans (it being understood and agreed that any such Incremental Tranche B Term Loans may be secured solely by the Collateral and may be guaranteed solely by the Guarantors), (ii) the Secured Incremental Notes may rank *pari passu* or junior in right of security

with the Tranche B Term Loans and (iii) the Unsecured Incremental Notes shall be unsecured; provided that with respect to any Secured Incremental Notes, (x) such Secured Incremental Notes shall be secured solely by the Collateral, (y) the Representative of such Secured Incremental Notes shall become a party to the Intercreditor Agreement or another intercreditor agreement that is substantially consistent with the terms set forth in the Intercreditor Agreement and (z) if guaranteed, the Indebtedness of the Borrower under such Secured Incremental Notes shall be guaranteed solely by the Guarantors and (iii) the Unsecured Incremental Notes shall be unsecured and, if guaranteed, the Indebtedness of the Borrower under such Unsecured Incremental Notes shall be guaranteed solely by the Guarantors.

(d)    The Incremental Tranche B Term Loans or Incremental Equivalent Debt, as the case may be, (i) shall not mature earlier than the Tranche B Maturity Date and shall have a Weighted Average Life to Maturity (pursuant to such amortization schedules as may be determined by the Borrower and the lenders thereof) that is no shorter than the then-remaining Weighted Average Life to Maturity of the Tranche B Term Loans calculated without giving effect to prepayments of any amortization thereof, (ii) except as set forth above, all other terms of such Incremental Tranche B Term Loans if not consistent with the terms of the existing initial Tranche B Term Loan Facility shall be as agreed between the Borrower and the lenders providing such Credit Increase, (iii) will accrue interest at rates determined by the Borrower and the lenders providing such Credit Increase; provided that with respect to any Incremental initial Tranche B Term Loans and Incremental Equivalent Debt (to the extent such Incremental Equivalent Debt is in the form of secured term loans), in each case secured on a *pari passu* basis with the initial Tranche B Term Loans, the all-in yield (which shall be determined by including interest rate margins, original issue discount (based on a four-year average life to maturity), upfront fees (which shall be deemed to constitute like amounts of original issue discount) or LIBOR/ABR floors (but only to the extent an increase in the interest rate floor in the initial Tranche B Term Loans would cause an increase in the interest rate then in effect thereunder, and in such case, the interest rate floor (but not the interest rate margin) applicable to the initial Tranche B Term Loans shall be increased to the extent of such differential between interest rate floors), but excluding arrangement, underwriting, structuring, commitment, amendment or similar fees (regardless of whether paid in whole or in part to any or all lenders) and other fees not paid generally to all lenders of such indebtedness) applicable to any Incremental initial Tranche B Term Loans (and, if applicable, Incremental Equivalent Debt) will not be more than 0.50% higher than the corresponding all-in yield (determined on the same basis) for the initial Tranche B Term Loans, unless the interest rate margins (or LIBOR/ABR floors) with respect to the initial Tranche B Term Loan is increased by an amount equal to the difference between the all-in yield with respect to the Incremental Tranche B Term Loans (or such Incremental Equivalent Debt, as the case may be) and the corresponding all-in yield on the initial Tranche B Term Loans minus 0.50%.

(e)    Incremental Tranche B Term Loans may be made by any existing Lender or by any other bank or other financial institution (any such other bank or other financial institution being called an "Additional Lender"); provided that to the extent an assignment of a Tranche B Term Loan to such Additional Lender would require the consent of the Administrative Agent under Section 10.6, the approval of the Administrative Agent shall be required for such Additional Lender acting as a Lender of such Incremental Tranche B Term Loans. Commitments in respect of Credit Increases (other than in connection with Incremental

Equivalent Debt) shall become Commitments under this Agreement pursuant to an amendment (an "Incremental Facility Amendment") to this Agreement and, as appropriate, the other Loan Documents, executed by the Borrower, each Lender agreeing to provide such Commitment, if any, each Additional Lender, if any and the Administrative Agent.  An Incremental Facility Amendment may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to effect the provisions and intent of this Section 2.25 and the application of the proceeds thereof.  No Lender shall be obligated to provide any Credit Increases, unless it so agrees.  The Borrower may use the proceeds of each Credit Increase for any purpose not prohibited by this Agreement unless otherwise agreed in connection with such Credit Increase.  Any Incremental Tranche B Term Loans and Incremental Equivalent Debt made pursuant to this Section 2.25 shall be evidenced by one or more entries in the Register maintained by the Administrative Agent.  In connection with the foregoing, the extent reasonably requested by the Lenders providing the Credit Increase or the Administrative Agent, the Administrative Agent shall receive board resolutions, officers' certificates and/or reaffirmation agreements consistent with those delivered on the Closing Date under Section 5.1, and, to the extent required by Section 6.9, legal opinions consistent with those delivered on the Closing Date (other than changes to such legal opinions resulting from a change in law, change in fact or change to counsel's form of opinion reasonably satisfactory to the Administrative Agent) and, if Mortgages exist at the time of the Incremental Facility Amendment, one or more items referred to in Section 6.10 as may be reasonably requested by the Administrative Agent in connection with such Incremental Facility Amendment.

Notwithstanding anything to the contrary contained herein, a Restricted Subsidiary that is not a Loan Party may incur Incremental Tranche B Term Loans or any Incremental Equivalent Debt without complying with the various requirements concerning collateral and guarantors, provided that in no event shall that aggregate principal amount of all such Credit Increases incurred or guaranteed by a non-Loan Party exceed, when taken together with the aggregate principal amount of Non-Loan Party Additional Term Notes and Non-Loan Party Unrestricted Additional Term Notes, and Additional Debt incurred or guaranteed by a Restricted Subsidiary that is not a Loan Party, $40,000,000.

(f)     This Section 2.25 shall supersede any provisions in Section 2.10, Section 2.11, Section 2.17, Section 10.1 and Section 10.7 to the contrary.  The Administrative Agent and the Lenders hereby (i) agree that the minimum borrowing, pro rata borrowing and pro rata payment requirements contained elsewhere in this Agreement shall not apply to the incurrence of Indebtedness expressly provided for in this Section 2.25 and (ii) waive the requirements of any other provision of this Agreement or any other Loan Document that may otherwise prohibit the incurrence of any Indebtedness expressly provided for by this Section 2.25.  Notwithstanding any other provision of any Loan Document, the Loan Documents may be amended by the Administrative Agent and the Borrower, if necessary or reasonably advisable, to provide for terms applicable to any Incremental Tranche B Term Loans and Incremental Equivalent Debt.

2.26    **Defaulting Lenders**.  Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the following provisions shall apply from the date on which such Lender becomes a Defaulting Lender until such date as such Lender ceases to be a Defaulting Lender:

85

(a)    [reserved];

(b)    [reserved];

(c)    [reserved]; and

(d)    any amount payable to such Defaulting Lender hereunder may, in lieu of being distributed to such Defaulting Lender, be retained by the Administrative Agent in a segregated non-interest-bearing account and, subject to any applicable Requirements of Law, be applied at such time or times as may be determined by the Administrative Agent (i) first, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder, (ii) second, to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent, (iii) third, if so determined by the Administrative Agent and Borrower, held in such account as cash collateral for future funding obligations of the Defaulting Lender under this Agreement, (iv) fourth, pro rata, to the payment of any amounts owing to Borrower or the Lenders as a result of any judgment of a court of competent jurisdiction obtained by Borrower or any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement and (v) fifth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if such payment is (x) a prepayment of the principal amount of any Loans which a Defaulting Lender has funded its participation obligations and (y) made at a time when the conditions set forth in Section 5.2 are satisfied, such payment shall be applied solely to prepay the Loans of all non-Defaulting Lenders, pro rata, prior to being applied to the prepayment of any Loans of any Defaulting Lender.

(e)    [Reserved].

(f)    Default Interest due under Section 2.14(c) shall not accrue on the overdue Loans of a Lender so long as it is a Defaulting Lender and such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent shall be restricted as set forth in Section 10.1.

2.27   **[Reserved.]**

2.28   **Refinancing Amendments**.

(a)    On one or more occasions after the Closing Date, the Borrower may obtain, from any Lender or Additional Refinancing Lender, Credit Agreement Refinancing Indebtedness in respect of all or any portion of the Term Loans and/or Tranche B Term Loan Commitments then outstanding under this Agreement (which for purposes of this Section 2.28(a) will be deemed to include any then outstanding Refinancing Term Loans or Incremental Tranche B Term Loans), in the form of Refinancing Term Loans or Refinancing Term Commitments pursuant to a Refinancing Amendment, or with Refinancing Notes.  In connection with issuing any such Refinancing Term Loans or Refinancing Notes, the Borrower shall have the right to require Lenders holding the Term Loans and/or Commitments being refinanced with proceeds of such Credit Agreement Refinancing Indebtedness to assign their Loans, pursuant to an Assignment and Assumption, to the Lenders and/or Additional Refinancing Lenders providing any such Refinancing Term Loans or Refinancing Notes; provided that such assignment shall only become effective upon receipt by the assigning Lenders of an amount equal to the entire outstanding

86

principal amount of, and all accrued but unpaid interest on, the Loans being assigned, together with all accrued but unpaid fees and other amounts owing in respect the Obligations owed to such Lenders, which amount shall be payable in cash in immediately available funds.

(b)    Each issuance of Credit Agreement Refinancing Indebtedness under Section 2.28(a) shall be in an aggregate principal amount that is (x) not less than $10,000,000 and (y) an integral multiple of $1,000,000 in excess thereof.

(c)    Each of the parties hereto hereby agrees that this Agreement and the other Loan Documents may be amended pursuant to a Refinancing Amendment, without the consent of any Lender other than the Lenders providing the Refinancing Term Loans constituting the applicable Credit Agreement Refinancing Indebtedness, to the extent (but only to the extent) necessary to (i) reflect the existence and terms of the applicable Credit Agreement Refinancing Indebtedness, (ii) make such other changes to this Agreement and the other Loan Documents consistent with the provisions and intent of Section 10.1 (without the consent of the Required Lenders called for therein), and (iii) effect such other amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, in connection with the incurrence of the applicable Credit Agreement Refinancing Indebtedness and to otherwise effect the provisions of this Section 2.28, and the Required Lenders hereby expressly authorize the Administrative Agent to enter into any such Refinancing Amendment.  In connection with the foregoing, the extent reasonably requested by the Lenders providing the Credit Agreement Refinancing Indebtedness or the Administrative Agent, the Administrative Agent shall receive board resolutions, officers' certificates and/or reaffirmation agreements consistent with those delivered on the Closing Date under Section 5.1, and, to the extent required by Section 6.9, legal opinions consistent with those delivered on the Closing Date (other than changes to such legal opinions resulting from a change in law, change in fact or change to counsel's form of opinion reasonably satisfactory to the Administrative Agent) and, if Mortgages exist at the time of the Refinancing Amendment, one or more items referred to in Section 6.10 as may be reasonably requested by the Administrative Agent in connection with such Refinancing Amendment.

(d)    This Section 2.28 shall supersede any provisions in Section 2.10, Section 2.11 (except Section 2.11(a)), Section 2.17, Section 10.1 and Section 10.7 to the contrary.

## SECTION 3

## [RESERVED]

## SECTION 4

## REPRESENTATIONS AND WARRANTIES

To induce the Administrative Agent and the Lenders to enter into this Agreement and to make the Loans, each of Holdings (in the case of Holdings, with respect to Sections 4.3, 4.4 and

4.19 only and as to itself only) and the Borrower hereby represents and warrants to the Administrative Agent and each Lender that:

4.1     **Financial Condition**.

(a)     The unaudited pro forma consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at [December 31, 2017], and unaudited pro forma statement of operations of the Borrower and its consolidated Subsidiaries for the twelve-month period then ended (including the notes thereto) (the "Pro Forma Financial Statements"), have been prepared giving effect to the Transactions and all other transactions that would be required to be given pro forma effect by Regulation S-X, as if such transactions had occurred on [December 31, 2017] (in the case of such unaudited pro forma balance sheet) or at the beginning of such twelve-month period (in the case of such unaudited statement of operations). The Pro Forma Financial Statements have been prepared in good faith by the Borrower, and present fairly in all material respects on a pro forma basis the estimated financial position and results of operations of the Borrower and its consolidated Subsidiaries as at [December 31, 2017], and for such period then ended, assuming that such transactions had actually occurred at such date or at the beginning of such period, as the case may be.

(b)     The audited consolidated balance sheets of the Borrower and its Subsidiaries as at [December 31, 2016 and 2015], and the related consolidated statements of income and of cash flows for the fiscal years ended on such dates, reported on by and accompanied by an unqualified report from Deloitte & Touche, LLP, as the case may be, present fairly in all material respects the consolidated financial condition of the Borrower and its Subsidiaries as at such date, and the consolidated results of its operations and its consolidated cash flows for the respective fiscal years then ended. All such financial statements, including the related schedules and notes thereto, have been prepared in accordance with GAAP applied consistently throughout the periods involved (except as approved by the aforementioned firm of accountants and disclosed therein). The unaudited consolidated balance sheets of the Borrower and its Subsidiaries as at [September 30, 2017], and the related consolidated statements of income and of cash flows for the nine months ended on such date present fairly in all material respects the consolidated financial condition of the Borrower and its Subsidiaries as at such date, and the consolidated results of its operations and its consolidated cash flows for the nine months then ended. All such financial statements, including the related schedules and notes thereto, have been prepared in accordance with GAAP applied consistently throughout the periods involved (except for the absence of footnotes and normal year-end adjustments).

4.2     **No Change**. Since the entry of the Plan Confirmation Order, there has been no development or event that has had or would reasonably be expected to have a Material Adverse Effect.

4.3     **Existence; Compliance with Law**. Each Group Member (a) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) has the power and authority, and the legal right, to own and operate its property, to lease the property it operates as lessee and to conduct the business in which it is currently engaged, (c) is duly qualified as a foreign corporation or other organization and in good standing under the laws of each jurisdiction where its ownership, lease or operation of property or the conduct of its

business requires such qualification except to the extent that the failure to comply therewith would not, in the aggregate, reasonably be expected to have a Material Adverse Effect and (d) is in compliance with all Requirements of Law; except in each case to the extent that the failure to comply therewith would not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

4.4    **Power; Authorization; Enforceable Obligations**.  Each Loan Party has the power, authority and legal right to execute and deliver, and to perform its obligations under, each of the Loan Documents to which it is a party and, in the case of the Borrower, to obtain extensions of credit hereunder.  Each Loan Party has taken all necessary organizational action to authorize the execution, delivery and performance of the Loan Documents to which it is a party and, in the case of the Borrower, to authorize the extensions of credit on the terms and conditions of this Agreement.  Other than the Plan Confirmation Order and the Plan of Reorganization, no material consent or authorization of, filing with, notice to or other act by or in respect of, any Governmental Authority is required in connection with the Transactions, except (i) consents, authorizations, filings and notices described in Schedule 4.4, which consents, authorizations, filings and notices have been obtained or made and are in full force and effect and (ii) the filings referred to in Section 4.19.  Each Loan Document has been duly executed and delivered on behalf of each Loan Party party thereto.  This Agreement constitutes, and each other Loan Document upon execution, will constitute a legal, valid and binding obligation of each Loan Party thereto, enforceable against each such Loan Party in accordance with its terms, subject to bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law) and an implied covenant of good faith and fair dealing.

4.5    **No Legal Bar**.  The Transactions will not violate any material Requirement of Law, contract, agreement, indenture, credit facility, or any Organizational Document of any Group Member and will not result in, or require, the creation or imposition of any Lien on any of their respective properties or revenues pursuant to any Requirement of Law or any such Organizational Document (other than the Liens created by the Security Documents), except in each case (other than as relates to a violation of any Organizational Document) to the extent any of the forgoing could not reasonably be expected to result in a Material Adverse Effect.

4.6    **Litigation**.  Except as set forth on Schedule 4.6, no litigation, or to the knowledge of the Borrower, no investigation or proceeding of or before any arbitrator or Governmental Authority is pending or, to the best knowledge of the Borrower, threatened by or against any Group Member or against any of their respective properties or revenues that would reasonably be expected to have a Material Adverse Effect.

4.7    **No Default**.  No Default or Event of Default has occurred and is continuing.

4.8    **Ownership of Property; Liens**.  Each Group Member has marketable title to, or a valid leasehold interest in, all its real property, and marketable title to, or a valid leasehold interest in, all its material other property, and none of such property is subject to any Lien except as permitted by Section 7.3, except to the extent any of the foregoing could not reasonably be expected to result in an Material Adverse Effect.  As of the Closing Date, set forth on Schedule 4.8 is a complete and correct in all material respects list of all real property with a fair market

value of more than $1,000,000 as reasonably determined in good faith by the Borrower (including street address) (other than condominiums or co-ops) located in the United States and owned by any Loan Party.

4.9   **Licenses; Intellectual Property**.   Except as in the aggregate would not reasonably be expected to have a Material Adverse Effect, each Group Member has all necessary licenses, permits, franchises, rights to participate in, or the benefit of valid agreements to participate in, material Third Party Payor Programs and other rights necessary for the conduct of its business and for the intended use of its properties and assets to the extent necessary to ensure no material interruption in cash flow.  Each Group Member owns, or is licensed or otherwise has the right to use, all Intellectual Property necessary for the conduct of its business as currently conducted except to the extent that a failure would not reasonably be expected to have a Material Adverse Effect.  No material claim has been asserted and is pending by any Person against a Group Member challenging or questioning the use of any Intellectual Property that is material to the business of the Group Members or the validity or effectiveness of any such Intellectual Property, nor does the Borrower have knowledge of any valid basis for any such claim.  Except as would not reasonably be expected to result in a Material Adverse Effect, to the knowledge of the Borrower, the use of Intellectual Property by each Group Member does not infringe on the rights of any Person in any material respect.

4.10   **Taxes**.  Except for any failure, lien, filing or claim, as applicable, that would not be reasonably expected to, individually or in the aggregate, result in a Material Adverse Effect: (i) each Group Member has, and with respect to any taxable period during which the Borrower or any of its Subsidiaries is a member of a consolidated, unitary, combined or similar tax group in which Holdings (or any direct or indirect parent of Holdings) is the common parent, Holdings (or such direct or indirect parent of Holdings) has, filed or caused to be filed all tax returns that are required to be filed and has paid all taxes (including any interest, additions to tax or penalties applicable thereto) due and payable (whether or not shown on a tax return) and any assessments made against it or any of its property and all other taxes, fees or other charges imposed on it or any of its property by any Governmental Authority (other than any tax the amount or validity of which are currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of the relevant Group Member); (ii) no tax Lien has been filed (other than Permitted Liens); and (iii) no claim is being asserted with respect to any such tax, fee or other charge.

4.11   **Federal Regulations**.   No part of the proceeds of any Loans, and no other extensions of credit hereunder, will be used by any Group Member (a) for purposes of "buying" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U as now and from time to time hereafter in effect in violation of Regulation U or (b) for any purpose that violates the provisions of the Regulations of the Board.

4.12   **Labor Matters**.  Except as, in the aggregate, would not reasonably be expected to have a Material Adverse Effect:  (a) there are no strikes or other labor disputes against any Group Member pending or, to the knowledge of the Borrower, threatened; (b) hours worked by and payment made to employees of each Group Member have not been in violation of the Fair Labor Standards Act or any other applicable Requirement of Law dealing with such matters; and

90

(c) all payments due from any Group Member on account of employee health and welfare insurance have been paid or accrued as a liability on the books of the relevant Group Member.

4.13   **ERISA**.   (i) Neither a Reportable Event nor a failure to satisfy the minimum funding standard (within the meaning of Section 412 of the Code or Section 302 of ERISA) has occurred during the five-year period prior to the date on which this representation is made or deemed made with respect to any ERISA Plan, (ii) each ERISA Plan during such five-year period has complied in all material respects with the applicable provisions of ERISA and the Code, (iii) no termination of a Single Employer Plan has occurred, (iv) no Lien in favor of the PBGC or an ERISA Plan has arisen, during such five-year period and (v) the present value of all accrued benefits under each Single Employer Plan (based on those assumptions used to fund such Single Employer Plans) did not, as of the last annual valuation date prior to the date on which this representation is made or deemed made, exceed the value of the assets of such Single Employer Plan allocable to such accrued benefits except as would not reasonably be expected to have a Material Adverse Effect.   Neither the Borrower nor, to the best of the Borrower's knowledge, any Commonly Controlled Entity has had a complete or partial withdrawal from any Multiemployer Plan that has resulted or could reasonably be expected to result in a material liability under ERISA, and neither the Borrower nor, to the best of the Borrower's knowledge any Commonly Controlled Entity would become subject to any material liability under ERISA if the Borrower or any such Commonly Controlled Entity were to withdraw completely from all Multiemployer Plans as of the valuation date most closely preceding the date on which this representation is made or deemed made.   No Loan Party nor any Commonly Controlled Entity contributes to a Multiemployer Plan or has any liability, contingent or otherwise, with respect to a Multiemployer Plan.   The accrued benefit obligations of each Foreign Plan (based on those assumptions used to fund such Foreign Plan with respect to all current and former participants do not exceed the assets of such Foreign Plan. Each Foreign Plan that is required to be registered has been registered and has been maintained in good standing with applicable regulatory authorities. Each Foreign Plan is in compliance with all material provisions of applicable law and all material applicable regulations and published interpretations thereunder with respect to such Foreign Plan with the terms of such plan.

4.14   **Investment Company Act**.   No Loan Party is an "investment company," or a company "controlled" by an "investment company," required to be registered within the meaning of the Investment Company Act of 1940, as amended.

4.15   **Subsidiaries**.   Attached hereto as Schedule 4.15(a) is an organization chart of each Loan Party and its Subsidiaries as of the Closing Date.   As of the Closing Date, there are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments (other than stock options granted to employees or directors and directors' qualifying shares) of any nature relating to any Capital Stock of the Borrower or any Restricted Subsidiary (other than Excluded Subsidiaries), except as created by the Loan Documents or disclosed on Schedule 4.15(b).

4.16   **Use of Proceeds**.   On the Closing Date, the proceeds of the Loans shall be used solely to satisfy certain Allowed First Lien Claims in accordance with the Plan of Reorganization.

4.17   **Environmental Matters**.  Except as, in the aggregate, would not reasonably be expected to have a Material Adverse Effect:

(a)   the facilities and properties owned, leased or operated by any Group Member (the "Properties") do not contain, and have not previously contained, any Materials of Environmental Concern in amounts or concentrations or under circumstances that constitute or constituted a violation of, or could reasonably be expected to give rise to liability under, any applicable Environmental Law;

(b)   no Group Member has received any notice of any violation, alleged violation, non-compliance, liability or potential liability regarding environmental matters or compliance with Environmental Laws with regard to any of the Properties or the business operated by any Group Member (the "Business"), nor does the Borrower have knowledge or reason to believe that any such notice will be received or is being threatened;

(c)   Materials of Environmental Concern have not been transported or disposed of from the Properties in violation of, or in a manner or to a location that would reasonably be expected to give rise to liability under, any Environmental Law, nor have any Materials of Environmental Concern been generated, treated, stored or disposed of at, on or under any of the Properties in violation of, or in a manner that would reasonably be expected to give rise to liability under, any applicable Environmental Law;

(d)   with respect to any liability arising under any Environmental Law, no judicial proceeding or governmental or administrative action is pending or, to the best knowledge of the Borrower, threatened, to which any Group Member is or will be named as a party with respect to the Properties or the Business, nor are there any consent decrees or other decrees, consent orders, administrative orders, or other administrative or judicial requirements outstanding under any Environmental Law with respect to the Properties or the Business;

(e)   there has been no release or threat of release of Materials of Environmental Concern at or from the Properties, or arising from or related to the operations of any Group Member in connection with the Properties or otherwise in connection with the Business, in violation of or in amounts or in a manner that would reasonably be expected to give rise to liability under Environmental Laws;

(f)   the Properties and all operations at the Properties are in compliance, and within all applicable statute-of-limitations periods have been in compliance, with all applicable Environmental Laws, and there is no contamination at, under or about the Properties or violation of any Environmental Law with respect to the Properties or the Business; and

(g)   no Group Member has assumed, contractually or by operation of law, any liability of any other Person under Environmental Laws.

4.18   **Accuracy of Information, Etc**.  No written factual information with respect to any Group Member contained in this Agreement, any other Loan Document or any other factual

92

document, certificate or statement (other than (i) any projections, pro formas, budgets, estimates or other information of a forward looking nature with respect to any Group Member, (ii) information of a general economic nature or industry data or (iii) third party industry data which the Borrower has not independently verified and as to which the Borrower makes no representation) furnished by or by Persons directed on behalf of any Loan Party to the Administrative Agent or the Lenders, or any of them, for use in connection with the transactions contemplated by this Agreement or the other Loan Documents, when taken as a whole, contained as of the date such statement, information, document or certificate was so furnished, any untrue statement of a material fact or omitted to state a material fact necessary to make the statements contained herein or therein not materially misleading in light of the circumstances under which such statements are made and after giving effect to any supplements thereof.  The projections and pro forma financial information contained in the materials referenced above were, and the projections hereafter delivered, when delivered, will be, based upon good faith estimates and assumptions believed by management of each Loan Party to be reasonable at the time made and no Loan Party knows as of the Closing Date any fact making such estimates and assumptions no longer true in any material respects, it being recognized by the Administrative Agent and the Lenders that such financial information as it relates to future events is not to be viewed as fact, such financial information is subject to significant uncertainties and contingencies, many of which are beyond the control of the Group Members, no assurance can be given that any particular projections will be realized and that actual results during the period or periods covered by such financial information may differ from the projected results set forth therein by a material amount.

4.19   **Security Documents**.

(a)     The Guarantee and Security Agreement is effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, legal, valid and enforceable (subject to the effect of bankruptcy, insolvency, reorganization, receivership, moratorium and other similar laws affecting creditors' rights) security interests in the Collateral described therein and proceeds thereof.  In the case of the Pledged Stock (as defined and described in the Guarantee and Security Agreement), when stock certificates representing such Pledged Stock are delivered to the Administrative Agent together with the necessary stock powers or other endorsements, and in the case of the other Collateral described in the any of the Security Documents, when financing statements and other filings specified on Schedule 4.19 in appropriate form are filed in the offices specified on Schedule 4.19, the Guarantee and Security Agreement shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in such Collateral and the proceeds thereof, as security for their respective Obligations (as defined in the Guarantee and Security Agreement) to the extent a Lien on such Collateral (other than the Pledged Stock) can be perfected pursuant to such financing statements and such other filings, in each case prior and superior in right to any other Person (except, in the case of Collateral other than Pledged Stock, Permitted Liens).

(b)     Each of the Mortgages is effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid and enforceable (subject to the effect of bankruptcy, insolvency, reorganization, receivership, moratorium and other similar laws affecting creditors' rights) Lien on the Mortgaged Properties described therein and proceeds thereof, and when the Mortgages are filed in the appropriate recording offices, each such

93

Mortgage shall constitute a fully perfected Lien on, the Mortgaged Properties and the proceeds thereof, as security for the Obligations (as defined in the relevant Mortgage), in each case prior and superior in right to any other Person (except that the Lien and security interest created in such real property and the Mortgaged Property may be subject to Permitted Liens).

4.20    **Solvency**.  On the Closing Date, Holdings, the Borrower and the Borrower's Restricted Subsidiaries on a consolidated basis are, and after giving effect to the Transactions and the incurrence of all Indebtedness and obligations being incurred in connection therewith will be, Solvent.

4.21    **Regulation H**.  No Mortgage encumbers improved real property that is located in an area that has been identified by the Secretary of Housing and Urban Development as a "Special Flood Hazard Area" and in which flood insurance has been made available under the National Flood Insurance Act of 1968, unless flood insurance has been obtained to the extent required in order to satisfy all applicable Requirements of Law in order for a Mortgage to be obtained thereon.

4.22    **OFAC; USA PATRIOT ACT; FCPA**.

(a)    To the extent applicable, each of the Borrower and its Subsidiaries is in compliance, in all material respects, with (i) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto and (ii) the USA PATRIOT Act.

(b)    (i) None of the Borrower or any Subsidiary of the Borrower or, to the knowledge of the Borrower, any of the Borrower's or its Subsidiaries' respective directors or officers or any of their respective agents that will act in any capacity in connection with or benefit from the credit facility established hereby, is the subject of any U.S. sanctions administered by OFAC, the U.S. Department of State, the United Nations Security Council, the European Union, or Her Majesty's Treasury (collectively, "Sanctions") and (ii) neither the Borrower nor any of its Subsidiaries will use the proceeds of the Loans or otherwise make available such proceeds to any Person, for the purpose of financing the activities of any Person, or in any country, that is the subject of any Sanctions, except to the extent licensed or otherwise approved or exempted by OFAC, or in any other manner that would result in a violation of Sanctions by the Borrower or any Subsidiary.

(c)    No part of the proceeds of the Loans will be used for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the FCPA.

**SECTION 5**

**CONDITIONS PRECEDENT**

5.1    **Conditions to Initial Extension of Credit**.  The effectiveness of this Agreement and the agreement of each Lender to make the initial extension of credit requested to be made by

it is subject to the satisfaction or waiver, prior to or concurrently with the making of such extension of credit on the Closing Date, of the following conditions precedent:

(a) <u>Credit Agreement; Security Documents</u>. The Administrative Agent shall have received a copy of each of the following documents: (i) this Agreement, duly executed and delivered by the Borrower and Holdings, (ii) the Guarantee and Security Agreement, duly executed and delivered by Holdings, the Borrower and each Subsidiary Guarantor, (iii) the Agent Fee Letter, duly executed and delivered by the Borrower and Holdings, (iv) the Intercreditor Agreement, duly executed and delivered by the Loan Parties and each of the other parties party thereto, and (v) each other Loan Document reasonably required by the Administrative Agent or the Required Lenders to be effective on the Closing Date, in each case, duly executed and delivered by each of the parties thereto.

(b) <u>Lien Searches, Etc</u>. The Administrative Agent shall have received the results of a recent lien search in each of the jurisdictions where the Loan Parties are organized or where assets of the Loan Parties are located, and such search shall reveal no Liens on any of the assets of the Loan Parties except for (x) Permitted Liens and (y) Liens that will be discharged on or prior to the Closing Date pursuant to documentation reasonably satisfactory to the Administrative Agent.

(c) <u>Insurance</u>[5]. The Administrative Agent shall have received insurance certificates and endorsements satisfying the requirements of Section 5.2 of the Guarantee and Security Agreement.

(d) <u>Fees</u>. The Lenders and the Administrative Agent shall have received all fees required to be paid, and all expenses for which invoices have been presented (including the reasonable fees and expenses of legal counsel), three (3) Business Days prior to the Closing Date.

(e) <u>Organizational Documents; Evidence of Authority; Tax Forms</u>. The Administrative Agent shall have received (i) a copy of each Organizational Document of each Loan Party, to the extent applicable, certified as of a recent date by the appropriate governmental official (or such other date acceptable to the Administrative Agent), each dated the Closing Date or a recent date prior thereto (or such other date acceptable to the Administrative Agent); (ii) signature and incumbency certificates of the officers of such Person executing any Loan Documents to which it is a party; (iii) resolutions of the Board of Directors or similar governing body of each Loan Party approving and authorizing the incurrence of Obligations and, in the case of the Borrower, the borrowing of the Loans, and the execution, delivery and performance of each of the Loan Documents to which such Loan Party is a party or by which it or its assets may be bound as of the Closing Date, certified as of the Closing Date by a Responsible Officer of such Loan Party as being in full force and effect on and as of the Closing Date without modification or amendment; (iv) a good standing certificate from the applicable Governmental Authority of each Loan Party's jurisdiction of incorporation, organization

---

[5] <u>NTD</u>: To be a condition subsequent if this cannot be done by the Closing Date.

95

or formation, each dated a recent date prior to the Closing Date; (v) a completed and executed IRS Form W-9 or other applicable tax form for the Borrower; and (vi) such other documents as Administrative Agent or its counsel may reasonably request relating to the organization, existence and good standing of each Loan Party, the authorization of the Transactions and any other legal matters relating to the Loan Parties, the Loan Documents or the Transactions, all in form and substance reasonably satisfactory to the Administrative Agent or its counsel.

(f)      Legal Opinions.   The Administrative Agent shall have received the following executed legal opinions, dated as of the Closing Date:

(i)       the legal opinion of Kirkland & Ellis LLP, counsel to the Loan Parties, in form and substance reasonably satisfactory to the Administrative Agent; and

(ii)       the legal opinion of special counsel to Holdings, the Borrower and its Subsidiaries in each of California, Delaware, Florida, Maryland, Michigan, Nevada, New York, North Carolina and South Carolina, in form and substance reasonably satisfactory to the Administrative Agent.

(g)      Pledged Stock; Stock Powers; Pledged Notes.   The MDL Term Loan Agent shall have received, in accordance with the Intercreditor Agreement, the original certificates representing the shares of Capital Stock pledged pursuant to the Guarantee and Security Agreement, together with an undated stock power for each such certificate, duly executed in blank by a duly authorized officer of the Loan Party pledging the same.

(h)      Filings, Registrations and Recordings.   The Administrative Agent shall have received each document (including any Uniform Commercial Code financing statement) required by the Security Documents or under law or reasonably requested by the Administrative Agent to be filed, registered or recorded in order to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a perfected Lien on the Collateral described therein under U.S. law, prior and superior in right to any other Person (other than Liens expressly permitted by Section 7.3), and each such document shall be in proper form for filing, registration or recordation; provided that no pledge shall be required of more than 65% of the Capital Stock of a first-tier Foreign Subsidiary or a first-tier Domestic Foreign Holding Company to the extent a pledge of such Capital Stock is required pursuant to the Security Documents; provided, however that to the extent any Collateral (other than a Lien that may be perfected by (a) the filing of a financing statement under the Uniform Commercial Code, (b) a pledge of the capital stock of the  Borrower and the Guarantors (other than Holdings) and (c) filings with the United States Patent and Trademark Office and United States Copyright Office)) is not provided and/or perfected on the Closing Date after the Borrower's use of commercially reasonable efforts to do so, the provision and/or perfection of such Collateral (or surveys and title commitments if applicable) shall not constitute a condition precedent to the availability and initial making of the Tranche B Term Loans on the Closing Date but shall be required to be delivered and/or perfected within the time period agreed by the Borrower and Administrative Agent, but in any event within ninety (90) days (or such

longer period as the Administrative Agent may agree) after the Closing Date pursuant to arrangements to be mutually agreed by the Borrower and Administrative Agent.

(i)      Solvency Certificate.  The Administrative Agent and the Lenders shall have received a solvency certificate in the form attached hereto as Exhibit Q signed by the chief financial officer of the Borrower dated as of the Closing Date with respect to Holdings, the Borrower and the Borrower's consolidated Restricted Subsidiaries, taken as a whole, certifying that Holdings, the Borrower and the Borrower's consolidated Restricted Subsidiaries, taken as a whole, are Solvent as of the Closing Date, both before and immediately after giving effect to the Transactions.

(j)      Material Adverse Change.  Since the entry of the Plan Confirmation Order, there shall not have occurred any material adverse effect on the business, assets, financial condition, or operations of the Borrower and its Subsidiaries, taken as a whole. The Administrative Agent shall have received a certificate signed by a Responsible Officer of the Borrower to the foregoing effect.

(k)      Patriot Act.  Each Loan Party shall have provided such documentation and other information to each Lender at least three (3) Business Days prior to the Closing Date (to the extent reasonably requested by the Lenders in writing at least ten (10) Business Days prior to the Closing Date) that are required by regulatory authorities under the applicable "know your customer" and anti-money-laundering rules and regulations, including without limitation the PATRIOT Act.

(l)      Perfection Certificate.  The Administrative Agent (or its counsel) shall have received a completed Perfection Certificate dated the Closing Date and signed by a Responsible Officer of the Borrower and each Loan Party, together with all attachments contemplated thereby.

(m)      [Existing Letters of Credit.  Each Existing Letter of Credit shall have been cash collateralized in a manner reasonably satisfactory to the Existing LC Issuing Lender.]

(n)      Closing Date Certificate.  The Administrative Agent shall have received the Closing Date Certificate certifying, on and as of the Closing Date, as to the matters set forth in clause (j) of Section 5.1 and clauses (a) and (b) of Section 5.2.

(o)      Restructuring.  The Plan of Reorganization, as in effect on [  ], 2017 at docket no. [  ], shall not have been amended, modified or supplemented except in accordance with the terms thereof.  The Bankruptcy Court shall have entered the Plan Confirmation Order.  All conditions precedent to the Plan Effective Date shall have been, or shall be, satisfied prior to or substantially concurrently with the Closing Date and the Plan Effective Date shall have occurred.

(p)    Releases.  The Administrative Agent shall have received duly executed UCC-3 termination statements and other release documentation relating to any Indebtedness to be exchanged or otherwise satisfied as of the Closing Date.[6]

5.2    **Conditions to Each Extension of Credit**.  Subject to any exceptions granted by any Lenders providing extensions of credit pursuant to Section 2.25, the agreement of each Lender to make any extension of credit requested to be made by it on any date (including its initial extension of credit) is subject to the satisfaction or waiver of the following conditions precedent:

(a)    Representations and Warranties.    Each of the representations and warranties made by any Loan Party in or pursuant to the Loan Documents shall be true and correct in all material respects (or in all respects to the extent already qualified by materiality) on and as of such date as if made on and as of such date (other than representations and warranties which speak only as of a certain date, which representations and warranties shall be made only on such date).

(b)    No Default.  No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the extensions of credit requested to be made on such date.

(c)    Notice.  Other than with respect to Loans issued pursuant to Section 2.25 and Section 2.27, the Administrative Agent shall have received a Borrowing Notice in accordance with the requirements of Section 2.2, Section 2.5, or Section 2.7, as applicable.

## SECTION 6

## AFFIRMATIVE COVENANTS

Holdings (in the case of Holdings, with respect to Section 6.9 only and as to itself only) and the Borrower hereby jointly and severally agree that, so long as any of the Tranche B Term Loan Commitments remain in effect and until all Loans are repaid in full in cash and all other Loan Obligations (other than contingent indemnification obligations surviving after the termination of this Agreement) are paid in full in accordance with this Agreement, each of Holdings (in the case of Holdings, with respect to Section 6.9 only and as to itself only) and the Borrower shall, and Borrower shall cause each of its Restricted Subsidiaries to:

6.1    **Financial Statements**.    Furnish to the Administrative Agent (and the Administrative Agent shall promptly furnish to the Lenders, by posting to Intralinks or otherwise):

(a)    within ninety (90) days after the end of each fiscal year of the Borrower (commencing with the fiscal year ended December 31, 2017), a copy of the audited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end

---

[6] Note to CGR: There will be no debt repaid – all prepetition debt rolls into postpetition debt pursuant to the terms of the Plan of Reorganization.

of such year and the related audited consolidated statements of income and of cash flows for such year, setting forth in each case in comparative form the figures for the previous year, reported on without a "going concern" or like qualification or exception (<u>provided</u> that (i) a qualification or exception may be included in any audit report to the extent such qualification is made solely as a result of the maturity of any of the Obligations or any other Indebtedness maturing within fifteen (15) months and (ii) an exception or explanatory paragraph, but not a qualification, solely with respect to, or resulting solely from, potential inability to satisfy the covenant under <u>Section 7.1</u> on a future date or in a future period), or qualification arising out of the scope of the audit, by Deloitte & Touche, LLP or other independent certified public accountants of nationally recognized standing;

(b)      not later than forty-five (45) days after the end of each of the first three quarterly periods of each fiscal year of the Borrower, the unaudited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such quarter and the related unaudited consolidated statements of income and of cash flows for such quarter and the portion of the fiscal year through the end of such quarter, setting forth in each case in comparative form the figures for the same quarter in the previous year, certified by a Responsible Officer as being fairly stated in all material respects (subject to normal year-end audit adjustments and the absence of footnotes); and

(c)      simultaneously with the delivery of each set of consolidated financial statements referred to in <u>Section 6.1(a)</u> and <u>Section 6.1(b)</u> above, the related consolidating financial statements reflecting the adjustments necessary to eliminate the accounts of (i) Unrestricted Subsidiaries (if any) (which may be in footnote form only) from such consolidated financial statements or (ii) Holdings, if Holdings has any material assets or material liabilities other than equity of the Borrower or liabilities related to debt of the Borrower of any of its Restricted Subsidiaries such that such consolidated financial statements of Holdings and the Borrower are materially different, then consolidating information regarding the Borrower and its Restricted Subsidiaries, compliance certificates and other information reasonably requested by the Lenders through the Administrative Agent (other than information subject to confidentiality obligations or attorney-client privilege) shall be provided by the Borrower at the same time such financial statement and certificates are otherwise required to be provided hereunder.

All such financial statements shall be complete and correct in all material respects and shall be prepared in reasonable detail and in accordance with GAAP.  With regard to interim financial statements, such interim financial statements will not include all of the information and footnotes required by GAAP for complete financial statements.  However, all adjustments (consisting of normal, recurring accrual) considered necessary for a fair presentation will be included therein.

Notwithstanding the foregoing, the obligations to deliver any financial statement or other document, report, proxy statement or other materials pursuant to this <u>Section 6.1</u> may be satisfied with respect to financial information of the Borrower and its consolidated Subsidiaries by furnishing (a) the applicable consolidated financial statements, or other document, report, proxy statement or other materials, respectively, of Holdings or any Parent Entity or (b) to the extent

99

the same contains such financial statement, other document, report, proxy statement or other materials, respectively, Borrower's and/or, as applicable, Holdings', any Parent Entity's or, Form 8-K, 10-K or 10-Q, as applicable, filed with the SEC; provided that in the case of both clause (a) and (b) of this paragraph, to the extent such financial statements, documents, reports, proxies, other materials or Form 8-K, 10-K or 10-Q are those of Holdings or such Parent Entity, such financial statements, documents, reports, proxies, other materials or Form 8-K, 10-K or 10-Q contains or is accompanied by consolidating information that explains in reasonable detail the material differences between the information relating to, as applicable, Holdings or such Parent Entity or Public Company, on the one hand, and the information relating to the Borrower and its Restricted Subsidiaries on a standalone basis, on the other hand.

6.2    **Certificates; Other Information**.  Furnish to the Administrative Agent (and the Administrative Agent shall promptly furnish to the Lenders, by posting to Intralinks or otherwise):

(a)    concurrently with the delivery of any financial statements pursuant to Section 6.1(a) and (b), (i) a Compliance Certificate containing all information and calculations required by the form of such certificate attached as Exhibit F, including those necessary for determining compliance by each Group Member with the provisions of Section 7.1 (including detail with respect to any calculation of Consolidated EBITDA) as of the last day of the fiscal quarter or fiscal year of Borrower, as the case may be, and (ii) to the extent not previously disclosed to the Administrative Agent, a description of any change in the jurisdiction of organization of any Loan Party and a list of any applications or registrations of Intellectual Property filed in the name of, or acquired by, any Loan Party since the date of the most recent report delivered pursuant to this clause (ii) (or, in the case of the first such report so delivered, since the Closing Date);

(b)    commencing with the fiscal year ended December 31, 2017, no later than ninety (90) days after the end of each fiscal year of the Borrower and its Restricted Subsidiaries, a consolidated budget for the following fiscal year including a detailed projected consolidated balance sheet of the Borrower and its consolidated Restricted Subsidiaries for the following fiscal year, the related consolidated statements of projected cash flow and projected income and a description of the underlying assumptions applicable thereto (collectively, the "Projections"), it being understood and agreed that any financial or business projections furnished by any Loan Party (i)(A) are subject to significant uncertainties and contingencies, which may be beyond the control of the Loan Parties, (B) no assurance is given by the Loan Parties that the results or forecast in any such projections will be realized and (C) the actual results may differ from the forecast results set forth in such projections and such differences may be material and (ii) are not a guarantee of performance;

(c)    no later than ten (10) Business Days after the effectiveness thereof, copies of any final amendment, supplement, waiver or other modification with respect to any Indebtedness, agreement or document referred to in Section 7.9;

(d)    within five (5) Business Days after the same are sent, copies of all financial statements and reports that the Borrower sends to the holders of any class of its

100

debt securities (other than the Lenders) in an aggregate principal amount in excess of $20,000,000 for any one issue or public equity securities and not otherwise required to be furnished to the Lenders under this Agreement or any other Loan Documents and, within five (5) Business Days after the same are filed, copies of all financial statements and reports that the Borrower may make to, or file with, the SEC;

(e)     at or prior to the date that any prepayment is required to be made pursuant to Section 2.11 (or any Reinvestment Notice is delivered thereunder), a certificate of a Responsible Officer setting forth a reasonably detailed calculation of the amount of such required prepayment (or the relevant Reinvestment Deferred Amount, as applicable); and

(f)     promptly, such additional financial and other information concerning a Group Member as the Administrative Agent on behalf of any Lender may from time to time reasonably request, provided that none of the Borrower nor any Restricted Subsidiary will be required to disclose or permit the inspection or discussion of, any document, information or other matter (i) that constitutes trade secrets or proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their representatives or contractors) is prohibited by law, fiduciary duty or any binding agreement or (iii) that is subject to attorney client or similar privilege or constitutes attorney work product.

All financial statements and other documents, reports, proxy statements or other materials required to be delivered pursuant to Section 6.1 or this Section 6.2 may be delivered electronically and, if so delivered, shall be deemed to have been delivered on the date (i) such financial statements and/or other documents are posted on the SEC's website on the Internet at www.sec.gov, (ii) on which the Borrower posts such documents, or provide a link thereto, on the Borrower's website or (iii) on which such documents are posted on the Borrower's behalf on an Internet or Intranet website, if any, to which the Administrative Agent and each Lender has access (whether a commercial third-party website or a website sponsored by the Administrative Agent), provided that the Borrower shall notify (which notification may be by facsimile or electronic transmission (including Adobe pdf copy)) the Administrative Agent of the posting of any such documents on any website.  Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.  In the event that the date for any delivery required hereby or any other Loan Document is not a Business Day, then the date for such delivery shall be deemed to fall on the next Business Day.

6.3     **Payment of Taxes**.  Pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all its tax obligations of whatever nature (including any interest, additions to tax or penalties applicable thereto), except where (i) the amount or validity thereof is being contested in good faith by appropriate proceedings and reserves in conformity with GAAP with respect thereto have been provided on the books of the relevant Group Member or (ii) the failure to pay would not reasonably be expected to, individually or in the aggregate, result in a Material Adverse Effect.

6.4     **Maintenance of Existence; Compliance**.  (a)(i) Preserve, renew and keep in full force and effect its organizational existence and (ii) take all reasonable action to maintain all

101

rights, privileges and franchises necessary or desirable in the normal conduct of its business, except, in each case, as otherwise permitted by Section 7.4 and except (other than in respect of clause (i) above with respect to any Loan Party), to the extent that failure to do so would not reasonably be expected to have a Material Adverse Effect; and (b) comply with all Requirements of Law except to the extent that failure to comply therewith would not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

6.5     **Maintenance of Property; Insurance**.  (a) Keep all material property useful and necessary in its business in good working order and condition, ordinary wear and tear and damage by casualty excepted except, in each case, where the failure to do so would not reasonably be expected to result in a Material Adverse Effect, (b) maintain with financially sound and reputable insurance companies insurance (or pursuant to self-insurance to the extent commercially reasonable) in at least such amounts and against at least such risks as are determinate in the reasonable good faith judgment of a Responsible Officer of the Borrower to be prudent; and (c) provide that each casualty or property insurance policy or general liability policy maintained or required to be maintained by any Loan Party shall (i) name the Administrative Agent, on behalf of the Secured Parties, as loss payee pursuant to a so-called "standard mortgagee clause" or "Lender's loss payable endorsement," with respect to property coverage of such Loan Party, and shall name the Administrative Agent on behalf of the Secured Parties as an additional insured, with respect to general liability coverage, (ii) provide that no action of any Loan Party or any Subsidiary or any other Person shall void any such policy as to the Administrative Agent or the Lenders, (iii) use commercially reasonable efforts to see that such certificates provide that the insurers shall endeavor to notify the Administrative Agent of any proposed cancellation in accordance with the policy provisions and that the Administrative Agent or the Lenders will have the opportunity to correct any deficiencies justifying such proposed cancellation and (iv) cause any Insurance Subsidiary to (A) conduct its insurance business in compliance with all applicable insurance laws, rules, regulations and orders and using sound actuarial principles and (B) maintain usual and customary stop-loss coverage and excess coverage reinsurance for individual claims.  The insurance premiums and other expenses charged by any Insurance Subsidiary to the Borrower and its Subsidiaries shall be reasonable and customary.  The Borrower will provide the Administrative Agent (A) copies of any outside actuarial reports prepared with respect to any projection, valuation or appraisal of any Insurance Subsidiary promptly after receipt thereof and (B) once each year promptly after receipt thereof, an actuarial opinion with respect to any Insurance Subsidiary from a recognized actuarial firm reasonably satisfactory to the Administrative Agent; and (e) if any portion of any Mortgaged Property is located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a Special Flood Hazard Area with respect to which flood insurance has been made available under the National Flood Insurance Act of 1968 (as now or hereafter in effect or any successor act thereto), either (x) cause the applicable Mortgage to be released in accordance with Section 9.11 hereof or (y) (A) maintain, or cause to be maintained, with a financially sound and reputable insurer, flood insurance in an amount and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (B) deliver to the Administrative Agent evidence of such compliance in form and substance reasonably acceptable to the Administrative Agent.

6.6     **Inspection of Property; Books and Records; Discussions**.  (a) Keep proper books of records and account in which full, true and correct entries in conformity with GAAP in

102

all material respects shall be made of all material dealings and transactions in relation to its business and activities, and (b) permit representatives of the Administrative Agent to visit and inspect any of its properties and examine and make abstracts from any of its books and records (other than materials protected by the attorney-client privilege and materials which such person may not disclose without violation of a confidentiality obligation binding upon it) at any reasonable time during normal business hours (and upon reasonable notice unless an Event of Default exists) and as often as may reasonably be desired and to discuss the business, operations, properties and financial and other condition of the Group Members with officers and employees of the Group Members and with their independent certified public accountants (provided that the Borrower is given an opportunity to be present at such meetings); provided that so long as no Event of Default is continuing, the Borrower shall not be required to pay or reimburse the expenses (to the extent otherwise required to do so hereunder) of the Administrative Agent of more than one such visit and inspection during any fiscal year.  Notwithstanding anything to the contrary in this Section 6.6, neither the Borrower nor any Restricted Subsidiary will be required to disclose or permit the inspection or discussion of, any document, information or other matter (i) that constitutes trade secrets or proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their representatives or contractors) is prohibited by law, fiduciary duty or any binding agreement or (iii) that is subject to attorney client or similar privilege or constitutes attorney work product.

6.7     **Notices**.   Promptly after knowledge thereof, give notice to the Administrative Agent and the Administrative Agent shall furnish to the Lenders by posting to Intralinks or otherwise of:

(a)     the occurrence of any Default or Event of Default;

(b)     any litigation, investigation or proceeding affecting any Group Member that could reasonably be expected to result in a Material Adverse Effect, or any development or event in respect of any litigation described on Schedule 4.6 which could be expected to be materially adverse to the interests of Borrower and its Restricted Subsidiaries;

(c)     the following events, as soon as possible and in any event within thirty (30) days after any Responsible Officer of the Borrower knows or has reason to know thereof if such event or events could reasonably be expected to result in a Material Adverse Effect:  (i) the occurrence of any Reportable Event with respect to any ERISA Plan, a failure to make any required contribution to a Single Employer Plan or Multiemployer Plan, the creation of any Lien in favor of the PBGC or an ERISA Plan or any withdrawal from, or the termination or Insolvency of, any Multiemployer Plan or (ii) the institution of proceedings or the taking of any other action by the PBGC or the Borrower or any Commonly Controlled Entity or any Multiemployer Plan with respect to the withdrawal from, or the termination or Insolvency of, any Single Employer Plan or Multiemployer Plan; and

(d)     any development or event that has had or would reasonably be expected to have a Material Adverse Effect.

Each notice pursuant to this Section 6.7 shall be accompanied by a statement of a Responsible Officer setting forth details of the occurrence referred to therein and stating what action the relevant Group Member proposes to take with respect thereto.

6.8    **Environmental Laws**.

(a)    Comply in all material respects with, and ensure compliance in all material respects by all tenants and subtenants, if any, at the Properties with, all applicable Environmental Laws, and obtain and comply in all material respects with and maintain, and ensure that all tenants and subtenants obtain and comply in all material respects with and maintain, any and all licenses, approvals, notifications, registrations or permits required by applicable Environmental Laws, except in each case, to the extent that any such failure to do so would not reasonably be expected to have a Material Adverse Effect.  This clause (a) shall be deemed not breached by a noncompliance with the foregoing if, upon learning of such noncompliance, any affected Group Member promptly undertakes reasonable efforts to eliminate such noncompliance, and such noncompliance and the elimination thereof, in the aggregate with any other noncompliance with any of the foregoing and the elimination thereof, could not reasonably be expected to have a Material Adverse Effect.

(b)    Conduct and complete all material investigations, studies, sampling and testing, and all material remedial, removal and other actions required under Environmental Laws and promptly comply in all material respects with all lawful orders and directives of all Governmental Authorities regarding Environmental Laws, except in each case, to the extent that any such failure to do so would not reasonably be expected to have a Material Adverse Effect. This clause (b) shall be deemed not breached by a failure to comply with such an order or directive if any affected Group Member timely challenges in good faith such order or directive in a manner consistent with all applicable Environmental Laws and pursues such challenge diligently, and the pendency and pursuit of such challenge, in the aggregate with the pendency and pursuit of any other such challenges, could not reasonably be expected to have a Material Adverse Effect.

6.9    **Additional Collateral, Etc**.

(a)    With respect to any personal property or Intellectual Property acquired after the Closing Date by any Loan Party (other than any property located outside of the U.S., any motor vehicles, real property, leasehold interests, or any tangible personal property evidenced by a title certificate or, except with respect to any Foreign Guarantor, any other property expressly excluded by the Security Documents) that constitutes "Collateral" (or, with respect to a Foreign Guarantor, is personal property or Intellectual Property of the type the Administrative Agent reasonably determines is customarily pledged in financings in the jurisdiction in which such Foreign Guarantor is organized) and as to which the Administrative Agent, for the benefit of the Secured Parties, does not have a valid, enforceable and fully and properly perfected and recorded Lien on, except as otherwise provided for in this Section 6.9 or, except as to a Foreign Guarantor, in the Guarantee and Security Agreement, such Loan Party shall, except as otherwise provided in the Guarantee and Security Agreement and in any event subject to the limitations set forth therein, promptly (i) execute and deliver to the Administrative Agent such amendments to the Guarantee and Security Agreement or such other documents as the Administrative Agent

104

reasonably deems necessary under U.S. law to grant to the Administrative Agent, for the benefit of the Secured Parties, a valid, enforceable and fully and properly perfected and recorded security interest in and Lien on such property, subject to Liens permitted under Section 7.3, (ii) take all actions as the Administrative Agent reasonably deems necessary under U.S. law to grant to the Administrative Agent, for the benefit of the Secured Parties, a perfected security interest in and Lien on such property, including the filing of Uniform Commercial Code financing statements in such jurisdictions and filings with the United States Patent and Trademark Office and the United States Copyright Office as may be reasonably required by the Guarantee and Security Agreement or by law or as may be reasonably requested by the Administrative Agent, other than foreign collateral documents, unless such Loan Party is a Foreign Guarantor and (iii) in the case of a Foreign Guarantor, take all actions as the Administrative Agent reasonably deems necessary under the law of the jurisdiction where such Foreign Guarantor is organized to grant to the Administrative Agent, for the benefit of the Secured Parties, a perfected security interest in and Lien on such property.

(b) With respect to any fee interest in any real property having a value (together with improvements thereof) of at least $5,000,000 acquired after the Closing Date by any Loan Party (other than any such property subject, or to be subject to, a Lien permitted by Section 7.3), on a quarterly basis reasonably promptly within 60 days after delivery of the financial statements delivered pursuant to Section 6.1(a) or (b) execute and deliver a mortgage or deed of trust subject to the Intercreditor Agreement and the Liens permitted by such mortgage or deed of trust, in a form substantially similar to the Mortgages on the Initial Mortgaged Properties and otherwise reasonably satisfactory to the Administrative Agent, in favor of the Administrative Agent, for the benefit of the Secured Parties, covering such real property and recorded by a nationally recognized title insurance company in such manner and in such place as is required by law to establish, perfect, preserve and protect the Lien in favor of the Administrative Agent required to be granted pursuant to the Mortgage and all taxes, fees and other charges payable in connection therewith shall be paid in full, and delivery a copy of, or a certificate as to coverage under and a copy of the flood insurance policy and a declaration page relating to, the insurance policies required by Section 6.5 (including, without limitation, flood insurance policies, each of which (i) shall be endorsed or otherwise amended to include a "standard" or "New York" lender's loss payable or mortgagee endorsement (as applicable), (ii) shall name the Administrative Agent, on behalf of the Secured Parties, as additional insured, (iii) in the case of flood insurance, if any, such certificate shall (a) identify the addresses of each property located in a special flood hazard area and (b) indicate the applicable flood zone designation, the flood insurance coverage and the deductible relating thereto. Such Loan Party shall otherwise take such actions and execute and/or deliver to the Administrative Agent such documents as the Administrative Agent shall reasonably require to confirm the validity, perfection and priority of the Lien of any existing Mortgage or new Mortgage against such after-acquired real property (including a Title Policy, a Survey and local counsel opinion (in form and substance reasonably satisfactory to the Administrative Agent)).

(c) With respect to any new Subsidiary (other than an Excluded Subsidiary) created or acquired after the Closing Date by any Loan Party or any Subsidiary of a Loan Party that ceases to be an Excluded Subsidiary, promptly (and in any event within 60 days thereof or such later date as may be acceptable to the Administrative Agent) (i) execute and deliver to the Administrative Agent such amendments to the Guarantee and Security Agreement as the

105

Administrative Agent reasonably deems necessary to grant to the Administrative Agent, for the benefit of the Secured Parties, a perfected first-priority security interest and Lien subject to the Intercreditor Agreement and Liens permitted pursuant to Section 7.3, in the Capital Stock of such new Restricted Subsidiary that is directly owned by any Loan Party (provided that such security interest shall be limited (A) in the case of a Foreign Subsidiary or a first-tier Domestic Foreign Holding Company that is, in each case, not a Foreign Guarantor, to 65% of such Capital Stock in such Subsidiary, (B) in the case of any Subsidiary of a Foreign Subsidiary or of a Domestic Foreign Holding Company that is, in each case, not a Foreign Guarantor, to 0% of such Capital Stock in such Subsidiary, (C) in the case of any Insurance Subsidiary, to the lesser of the amount of such Insurance Subsidiary's Capital Stock which can be pledged pursuant to the applicable law governing such Insurance Subsidiary or if such Insurance Subsidiary is a Foreign Subsidiary, the amount which is required to be otherwise pledged hereunder and (D) in the case of any Non-Profit Entity formed after the Closing Date, to the amount of such entity's Capital Stock that can be pledged pursuant to the applicable law or regulations governing such entity), (ii) deliver to the Administrative Agent the certificates representing such Capital Stock, together with undated stock powers, in blank, executed and delivered by a duly authorized officer of the relevant Loan Party, (iii) cause such new Subsidiary (A) to become a party to the Guarantee and Security Agreement, (B) subject to the provisions and limitations set forth in the Guarantee and Security Agreement, to take such actions as the Administrative Agent reasonably deems necessary to grant to the Administrative Agent for the benefit of the Secured Parties a perfected security interest under U.S. law having the priorities set forth in the Intercreditor Agreement and otherwise subject to Liens permitted under Section 7.3 in the Collateral described in the Guarantee and Security Agreement with respect to such new Subsidiary, including filings with the United States Patent and Trademark Office and the United States Copyright Office and the filing of Uniform Commercial Code financing statements in such jurisdictions as may be required by the Guarantee and Security Agreement or by law or as may be reasonably requested by the Administrative Agent (other than, except in the case of equity interests and assets of a Foreign Guarantor, foreign Collateral documents) and (C) to deliver to the Administrative Agent a certificate of such Subsidiary, substantially in the form of Exhibit C or in such other form as may be acceptable to the Administrative Agent, with appropriate insertions and attachments, and (iv) if reasonably requested by the Administrative Agent, deliver to the Administrative Agent legal opinions relating to the matters described above, which opinions shall be in form and substance consistent with those delivered on the Closing Date or otherwise, and from counsel, reasonably satisfactory to the Administrative Agent; provided that, except in the case of a Foreign Guarantor, (1) the Borrower shall not be required to take, or cause any Subsidiary to take, the actions required by this paragraph (c) with respect to any such new Subsidiary prior to the delivery of financial statements delivered pursuant to Section 6.1(a) or (b) for the fiscal quarter of the Borrower during which such new Subsidiary was created or acquired unless (x) the aggregate amount of Investments made by the Group Members in all such new Subsidiaries exceeds $20,000,000 prior to the end of such fiscal quarter or (y) a Default has occurred and is continuing and (2) the Borrower shall not be required to provide the legal opinions required by this paragraph (c) if the applicable new Subsidiary (on a consolidated basis), together with all other new Subsidiaries acquired or created in the same transaction or series of related transactions accounts for less than 2.5% of the assets, revenues or Consolidated EBITDA of the Borrower, in each case on a Pro Forma Basis as of the end of and for the four fiscal quarters most recently ended for which financial statements have been delivered under Section 6.1(a) or

106

(b), as though such Subsidiary had become a Subsidiary at the beginning of such period. Notwithstanding anything to the contrary in this Agreement or any other Loan Document, each Foreign Guarantor shall grant a valid, perfected and enforceable lien on substantially all of its assets to the Administrative Agent pursuant to documentation and arrangements reasonably agreed between the Administrative Agent and the Borrower, subject to customary limitations in such jurisdiction as may be reasonably agreed between the Administrative Agent and the Borrower, and none of the limitation in this Agreement shall in any way limit or restrict the pledge of assets and property by any Foreign Guarantor or the pledge of the equity interests of such Foreign Guarantor by any other Loan Party that holds such equity interests.

(d)     If, at any time, (x) (i) a Restricted Subsidiary is designated as an Unrestricted Subsidiary or an Immaterial Subsidiary in accordance with this Agreement or otherwise meets the criteria of an Excluded Subsidiary or (ii) an Electing Guarantor has been re-designated (at the option, and in the sole discretion, of the Borrower in accordance with Section 6.10(b)) as an Excluded Subsidiary, the Administrative Agent shall (and is hereby authorized to) release such Subsidiary from any guarantee under the Guarantee and Security Agreement and all Security Documents to which it may be a party and to the extent Capital Stock held by such Restricted Subsidiary was pledged (or otherwise secured) as Collateral, such pledge (or other security) shall be released and, upon the request of any Loan Party, any certificates in respect thereof shall be promptly returned to the applicable Loan Party or (y) adverse tax consequences (other than de minimis tax consequences) could (in the good faith determination of the Borrower in consultation with the Administrative Agent) result (i) from any Security Document executed and delivered by any Subsidiary of the Borrower that is a Foreign Subsidiary or any Domestic Foreign Holding Company, the Administrative Agent shall release such Restricted Subsidiary from any such Security Document, or (ii) from any Lien granted under any Loan Document in respect of the Capital Stock in any Foreign Subsidiary or Domestic Foreign Holding Company, such Lien shall be released.  Notwithstanding the foregoing, in no event shall Capital Stock of any Unrestricted Subsidiary or any of such Unrestricted Subsidiary's assets constitute Collateral, and the Administrative Agent shall take all actions required hereunder and under the other Loan Documents to effect the foregoing in accordance with the terms of the Loan Documents.

(e)     Notwithstanding anything in this Agreement (other than the last sentence of Section 6.9(c)) or any Security Document to the contrary:  (i) the Administrative Agent shall not take, and the Loan Parties shall not be required to grant, a security interest in any Excluded Property; (ii) any security interest required to be granted or any action required to be taken, including to perfect such security interest, shall be subject to the same exceptions and limitations as those set forth in the applicable Security Documents; (iii) except in the case of a Foreign Guarantor, no Loan Party shall be required, nor shall the Administrative Agent be authorized to perfect any pledges, charges, assignments, security interests and mortgages in any Collateral by any means other than (A) filings pursuant to the Uniform Commercial Code in the office of the secretary of state (or similar central filing office) of the relevant State(s) and filings in the applicable real estate records with respect to mortgaged properties or any fixtures relating to the Mortgages, (B) filings in United States government offices with respect to Intellectual Property as expressly required by the Loan Documents, (C) delivery to the Administrative Agent to be held in its possession of all Collateral consisting of intercompany notes in an amount individually in excess of $5,000,000, stock certificates of the Borrower and its Restricted Subsidiaries and other instruments issued to any Loan Party in an amount with a fair market

107

value (as determined in good faith by the Borrower) individually in excess of $5,000,000, or (D) mortgages in respect of the Mortgages; (iv) except in the case of a Foreign Guarantor, no Loan Party or any Domestic Subsidiary shall be required to take any action outside the United States to perfect any security interest in the Collateral (including the execution of any agreement, document or other instrument governed by the law of any jurisdiction other than the United States of America or any State thereof (including for the avoidance of doubt, the District of Columbia)); (v) no Loan Party shall have any obligation under any Loan Document to enter into any landlord, bailee or warehousemen waiver, estoppel or consent or any other document of similar effect; and (vi) unless granted for any debtholder or representative thereof that is a party to the Intercreditor Agreement, in no event shall any Loan Party be required to take any action to perfect the security interest granted under the Security Documents in Collateral consisting of (A) cash or Cash Equivalents, (B) entering into any deposit account control agreement or securities account control agreement with respect to any deposit account or securities account (including securities entitlements and related assets credited thereto) or (C) other assets requiring perfection through the implementation of control agreements or perfection by "control" (other than possession by the Administrative Agent to the extent expressly required under the Security Documents) in each case under this clause (vi), except, in each case, to the extent such perfection may be achieved by the filing of a Uniform Commercial Code financing statement.

(f)     The Loan Parties shall not be required to cause the Administrative Agent to obtain or perfect a security interest in any assets of any Loan Party as to which (i) doing so would violate applicable law or (ii) the Administrative Agent shall determine, in its reasonable discretion, that the cost of obtaining or perfecting such security interest is excessive in relation to the benefit to the Lenders of the security afforded thereby.

(g)     Notwithstanding anything in this Agreement or any Security Document to the contrary, the Administrative Agent may, in its sole discretion, grant extensions of time for the satisfaction of any of the requirements under Section 6.9 in respect of any particular Collateral or any particular Subsidiary if it determines that the satisfaction thereof with respect to such Collateral or such Subsidiary cannot be accomplished without undue expense or unreasonable effort or due to factors beyond the control of the Borrower and the Restricted Subsidiaries by the time or times at which it would otherwise be required to be satisfied under this Agreement or any Security Document.

6.10   **Initial Mortgages**.   Deliver to the Administrative Agent on or before the date which is one hundred and twenty (120) days after the Closing Date (which period may be extended by the Administrative Agent from time to time in its reasonable discretion),

(a)     a Mortgage encumbering each Mortgaged Property listed on Schedule 4.8 in favor of the Administrative Agent, for the benefit of the Secured Parties, duly executed and acknowledged by each Loan Party that is the owner of or holder of any interest in such parcel of real property, and otherwise in form for recording in the recording office of each applicable political subdivision where each Mortgage Property listed on Schedule 4.8 is situated, together with such certificates, affidavits, questionnaires or returns as shall be required in connection with the recording or filing thereof to create a lien under applicable Requirements of Law, and such financing statements and any other instruments necessary to grant a mortgage lien under the laws

of any applicable jurisdiction, all of which shall be in form and substance reasonably satisfactory to Administrative Agent;

(b)      with respect to each such Mortgage, a policy of title insurance (or marked up title insurance commitment having the effect of a policy of title insurance) insuring the Lien of such Mortgage as a valid first mortgage Lien on each Mortgaged Property listed on Schedule 4.8 and fixtures described therein in the amount equal to not less than 115% of the estimated fair market value of such parcel of real property and fixtures as set forth below which amount shall be reasonably satisfactory to the Administrative Agent, which policy (or such marked-up commitment) (each, a "Title Policy") shall (A) be issued by the Title Company, (B) to the extent necessary, include such reinsurance arrangements (with provisions for direct access, if necessary) as shall be reasonably acceptable to the Administrative Agent, (C) contain a "tie-in" or "cluster" endorsement, if available under applicable law (i.e., policies which insure against losses regardless of location or allocated value of the insured property up to a stated maximum coverage amount), (D) have been supplemented by such endorsements as shall be reasonably requested by the Administrative Agent, and (E) contain no exceptions to title other than the Liens permitted by such Mortgage and exceptions reasonably acceptable to the Administrative Agent;

(c)      with respect to each Mortgaged Property listed on Schedule 4.8, such affidavits, certificates, information (including financial data) and instruments of indemnification (including a so-called "gap" indemnification) as shall be required to induce the Title Company to issue the Title Policy/ies and endorsements contemplated above;

(d)      evidence reasonably acceptable to the Administrative Agent of payment by Borrower of all Title Policy premiums, search and examination charges, escrow charges and related charges, mortgage recording taxes, fees, charges, costs and expenses required for the recording of such Mortgages and issuance of the Title Policies referred to above;

(e)      Surveys with respect to each Mortgaged Property listed on Schedule 4.8;

(f)      with respect to such Mortgages listed on Schedule 4.8, an opinion of (i) Kirkland & Ellis LLP, special counsel for the Loan Parties, and (ii) local counsel for the Loan Parties in the applicable jurisdiction reasonably acceptable to the Borrower and the Administrative Agent;

(g)      a copy of, or a certificate as to coverage under and a copy of the flood insurance policy and a declaration page relating to, the insurance policies required by Section 6.5 (including, without limitation, flood insurance policies, each of which (i) shall be endorsed or otherwise amended to include a "standard" or "New York" lender's loss payable or mortgagee endorsement (as applicable), (ii) shall name the Administrative Agent, on behalf of the Secured Parties, as additional insured, (iii) in the case of flood insurance, if any, such certificate shall (a) identify the addresses of each property located in a special flood hazard area and (b) indicate the applicable flood zone designation, the flood insurance coverage and the deductible relating thereto; and

(h)      a completed "Life-of-Loan" Federal Emergency Management Agency standard flood hazard determination with respect to each such Mortgaged Property and, if located in a

109

Special Flood Hazard Area, a notice about special flood hazard area status and flood disaster assistance duly executed by the Borrower and if applicable, each Loan Party relating thereto.

### 6.11  **Designation of Subsidiaries**.

(a)     The Borrower may designate (or re-designate) any Restricted Subsidiary as an Unrestricted Subsidiary or any Unrestricted Subsidiary as a Restricted Subsidiary; provided that immediately before and after such designation, no Event of Default shall have occurred and be continuing.  The designation of any Subsidiary as an Unrestricted Subsidiary after the Closing Date in accordance with this Section 6.11 shall constitute an Investment by the Borrower or the relevant Restricted Subsidiary, as applicable, therein at the date of designation in an amount equal to the fair market value (as determined in good faith by the relevant Borrower) of the Investments held by the Borrower and/or the applicable Restricted Subsidiaries in such Unrestricted Subsidiary immediately prior to such designation.  Upon any such designation (but without duplication of any amount reducing such Investment in such Unrestricted Subsidiary pursuant to the definition of "Investment"), the Borrower and/or the applicable Restricted Subsidiaries shall receive a credit against the applicable clause in Section 7.8 that was utilized for the Investment in such Unrestricted Subsidiary for all Returns in respect of such Investment.  The designation of any Unrestricted Subsidiary as a Restricted Subsidiary in accordance with this Section 6.11 shall constitute the incurrence by such Restricted Subsidiary at the time of designation of any Indebtedness or Liens of such Restricted Subsidiary outstanding at such time (to the extent assumed).

(b)     The Borrower may designate (or re-designate) any Restricted Subsidiary that is an Excluded Subsidiary as an Electing Guarantor; provided that no Subsidiary may be an Electing Guarantor unless it is able to pledge all or substantially all of its assets as Collateral; provided, further, that in the case of a Foreign Subsidiary, such Foreign Subsidiary shall have complied with Section 6.9.  The Borrower may designate (or re-designate) any Electing Guarantor as an Excluded Subsidiary; provided that (i) after giving effect to such release, such Restricted Subsidiary shall not be a guarantor of any Credit Agreement Refinancing Indebtedness, any Additional Term Notes, any Unrestricted Additional Term Notes or any Additional Debt, (ii) such redesignation shall constitute an Investment by the Borrower or the relevant Restricted Subsidiary, as applicable, therein at the date of designation in an amount equal to the to the fair market value (as determined in good faith by the Borrower) of the Investments held by the Borrower and/or the applicable Restricted Subsidiaries in such Electing Guarantor immediately prior to such re-designation and such Investments shall otherwise be permitted hereunder and (iii) any Indebtedness or Liens of such Restricted Subsidiary (after giving effect to such release) shall be deemed to be incurred at the time of such release by such Electing Guarantor and such incurrence shall otherwise be permitted hereunder.

### 6.12  **Post-Closing Obligations**.

(a)     Within ninety (90) days following the Closing Date (as such date may be extended by the Administrative Agent, in its sole discretion, in writing), the Borrower shall have delivered to the Administrative Agent the "standard" additional insured and/or mortgagee endorsement for the insurance certificates delivered pursuant to Section 5.1(c).

110

(b)     Within forty-five (45) days following the Closing Date (as such date may be extended by the Administrative Agent, in its sole discretion, in writing), the Borrower shall have delivered to the MDL Term Loan Agent each promissory note pledged to the Administrative Agent pursuant to the Guarantee and Security Agreement endorsed (without recourse) in blank (or accompanied by an executed allonge or similar transfer form in blank) by the Loan Party that is the pledgor thereof.

## SECTION 7

## NEGATIVE COVENANTS

The Borrower hereby agrees that, so long as any of the Tranche B Term Loan Commitments remain in effect and until all Loans are repaid in full in cash and all other outstanding Obligations (other than contingent indemnification obligations surviving after the termination of this Agreement) are fully and finally satisfied and discharged in accordance with this Agreement, the Borrower shall not, and shall not permit any of its Restricted Subsidiaries to:

7.1     **Financial Condition Covenants**.

(a)     Consolidated First Lien Leverage Ratio.  Permit the Consolidated First Lien Leverage Ratio calculated as at the last day of any fiscal quarter of the Borrower for which financial statements of the Borrower were required to have been delivered to the Administrative Agent pursuant to Section 6.1 (commencing with the first full fiscal quarter of the Borrower after the Commencement Date) to exceed 5.50 to 1.00.

(b)     Minimum Liquidity.  Permit Liquidity to be less than $25,000,000 as of the last day of the calendar month in which the Commencement Date occurs and the last day of each calendar month ending thereafter; provided that, if the Consolidated First Lien Leverage Ratio does not exceed 4.50:1.00 as of the last day of the last four quarter period for which internal financial statements are available, Liquidity shall instead be tested on the last day of each fiscal quarter of the Borrower for each test date after the Commencement Date.

7.2     **Indebtedness**.  Create, issue, incur, assume, or become liable in respect of any Indebtedness, except:

(a)     Indebtedness of any Loan Party pursuant to any Loan Document;

(b)     Indebtedness of (i) the Borrower to any Restricted Subsidiary and of any Subsidiary Guarantor to the Borrower or any other Restricted Subsidiary and (ii) of any Restricted Subsidiary that is not a Guarantor to (x) the Borrower or any Subsidiary Guarantor to the extent not in violation of Section 7.8 or (y) any other Subsidiary that is not a Guarantor; provided that any such Indebtedness of a Loan Party shall be subordinated to the prior payment in full in cash of the Obligations (other than the Specified Swap Agreements and Cash Management Obligations) on terms reasonably satisfactory to the Administrative Agent;

(c)     Guarantee Obligations incurred in the ordinary course of business by the Borrower or any of the Restricted Subsidiaries of Indebtedness and other obligations of

111

any Guarantor (in the case of Holdings, to the extent such Obligations of Indebtedness are related to the Borrower or any of its Restricted Subsidiaries);

(d)    Indebtedness outstanding on the Closing Date and listed on Schedule 7.2(d) and any Permitted Refinancing in respect of any such Indebtedness;

(e)    Indebtedness (including, without limitation, Capital Lease Obligations, including those incurred pursuant to Sale Leaseback Transactions) secured by Liens permitted by Section 7.3(g) (or Section 7.3(w), in the case of a Sale Leaseback Transaction), and any Permitted Refinancing in respect of such Indebtedness, in an aggregate principal amount outstanding at any time not to exceed the greater of (x) $60,000,000 and (y) 5.25% of Total Assets as of the Applicable Date of Determination, plus, in the case of any Permitted Refinancing, the amounts set forth in clause (a) of the proviso to the definition of Permitted Refinancing;

(f)    Indebtedness (or Guarantee Obligations, as applicable) of the Borrower and the Subsidiary Guarantors in respect of the PIK Toggle Notes and any Permitted Refinancing thereof;

(g)    (a) Indebtedness of (1) any Person acquired or assumed in connection with an Acquisition or permitted Investment or any assets acquired in connection therewith and (2) any Unrestricted Subsidiary that is redesignated as a Restricted Subsidiary (it being acknowledged that (x) a Person that becomes a direct or indirect Restricted Subsidiary of the Borrower as a result of an Acquisition or permitted Investment may remain liable with respect to Indebtedness existing on the date of such acquisition and (y) an Unrestricted Subsidiary that is redesignated as a Restricted Subsidiary may remain liable with respect to Indebtedness existing on the date of such redesignation); provided that (A) such Indebtedness is not created in anticipation of such acquisition or redesignation and (B) the aggregate principal amount of such Indebtedness incurred under this clause (g) does not exceed an amount of Indebtedness such that immediately after giving effect to such Acquisition, permitted Investment or redesignation, as the case may be, and the assumption of such Indebtedness, the Fixed Charge Coverage Ratio computed on a Pro Forma Basis as of the Applicable Date of Determination is either (x) not less than 2.00 to 1.00 or (y) not less than such Fixed Charge Coverage Ratio immediately prior to the consummation of such Acquisition, permitted Investment or redesignation and the assumption of such Indebtedness; and (b) any Permitted Refinancing thereof;

(h)    any other Indebtedness of the Borrower or any of its Restricted Subsidiaries in an aggregate amount outstanding at any time not exceeding the greater of (x) $35,000,000 and (y) 3.00% of Total Assets as of the Applicable Date of Determination;

(i)    Indebtedness under the MDL Term Loan Agreement in an aggregate principal amount outstanding not to exceed $35,000,000 (which amount shall be reduced on a dollar for dollar basis with the amounts of any prepayments thereof, except to the extent such prepayments are made with proceeds of any Permitted Refinancing

112

Indebtedness) and any Permitted Refinancing thereof in an aggregate principal amount not to exceed $[20,000,000][7], plus the amounts set forth in clause (a) of the proviso to the definition of Permitted Refinancing;

(j)      obligations in respect of letters of credit issued in the ordinary course of business and of performance, surety, statutory or appeal bonds or with respect to worker's compensation claims or other bonds permitted under Section 7.3;

(k)      Indebtedness incurred in the ordinary course of business in respect of netting services, overdraft protections and otherwise in connection with deposit accounts;

(l)      Indebtedness of any Loan Party (other than Holdings) consisting of promissory notes or similar obligations issued by such Loan Party relating to leases, licenses or otherwise to be acquired in connection with a Permitted Acquisition that cannot be transferred to such Loan Party prior to or concurrently with the consummation of such Permitted Acquisition not exceeding $25,000,000 at any one time outstanding;

(m)      Indebtedness consisting of promissory notes issued by the Borrower to officers, directors and employees of Holdings, the Borrower or any Restricted Subsidiary of the Borrower to purchase or redeem Capital Stock of Holdings or any of its direct or indirect parent companies to the extent permitted hereunder;

(n)      Indebtedness under Swap Agreements permitted pursuant to Section 7.7 and Cash Management Obligations;

(o)      Indebtedness of the Borrower that may be deemed to exist under any acquisition agreement pertaining to acquisitions consummated prior to the Closing Date in an aggregate principal amount not exceeding $5,000,000;

(p)      Indebtedness that is outstanding on the Closing Date but that is repaid on the Closing Date pursuant to the Plan of Reorganization;

(q)      Indebtedness consisting of Sale Leaseback Transactions permitted by Section 7.11;

(r)      Subordinated Indebtedness incurred pursuant to Section 10.6(g)(iv);

(s)      Indebtedness representing deferred compensation or similar arrangements to employees of the Borrower and its Restricted Subsidiaries incurred in the ordinary course of business;

(t)      Indebtedness of the Borrower or a Subsidiary Guarantor supported by a letter of credit; provided, however, that (i) the aggregate principal amount of any such Indebtedness does not at any time exceed the amount available to be drawn under such letter of credit, and (ii) such Indebtedness matures at least five (5) Business Days prior to the scheduled expiry date of such letter of credit;

---

[7] Subject to further discussion.

113

(u)     Indebtedness under (i) one or more revolving credit facilities incurred and guaranteed only by the Loan Parties and any Permitted Refinancing thereof, in an aggregate principal amount outstanding at any time not to exceed $85,000,000, plus the amounts set forth in clause (a) of the proviso to the definition of Permitted Refinancing; provided that all net cash proceeds of any such Indebtedness in excess of $50,000,000 shall solely be used to repay, on a dollar-for-dollar basis, MDL Term Loans outstanding on the Closing Date and (ii) one or more revolving credit facilities incurred by one or more MDL Entities and any Permitted Refinancing thereof, in an aggregate principal amount outstanding at any time not to exceed $10,000,000, plus the amounts set forth in clause (a) of the proviso to the definition of Permitted Refinancing;

(v)     Indebtedness consisting of (i) Earnout Obligations and (ii) other obligations of the Borrower or its Restricted Subsidiaries under deferred compensation or other similar arrangements incurred by such Person in connection with the Transaction and Permitted Acquisitions or any other Investment expressly permitted hereunder;

(w)     Indebtedness of Excluded Subsidiaries that are Restricted Subsidiaries or Restricted Subsidiaries thereof to finance working capital and general corporate purposes not exceeding the greater of (x) $15,000,000 and (y) 1.25% of Total Assets as of the Applicable Date of Determination;

(x)     accretion or amortization of original issue discount and accretion of interest paid in kind, in each case in respect of Indebtedness otherwise permitted by this Section 7.2;

(y)     Indebtedness owed to any Person providing property, casualty, business interruption or liability insurance to Holdings (to the extent such obligations or activities of Holdings are related to the Borrower or any of its Restricted Subsidiaries), the Borrower or any of their Restricted Subsidiaries, provided that such Indebtedness is incurred to finance insurance premiums in respect of such insurance;

(z)     Permitted Seller Debt and any Permitted Refinancing in respect thereof in an aggregate principal amount outstanding at any time not exceeding the greater of (i) $25,000,000 and (ii) 2.25% of Total Assets as of the Applicable Date of Determination, plus, in the case of any Permitted Refinancing, the amounts set forth in clause (a) of the proviso to the definition of Permitted Refinancing;

(aa)    Indebtedness incurred by the Borrower or any of their Restricted Subsidiaries arising from agreements providing for indemnification, adjustment of purchase price or similar obligations, or from guaranties or letters of credit, surety bonds or performance bonds securing the performance of the Borrower or any such Restricted Subsidiary pursuant to such agreements, in connection with Permitted Acquisitions, other permitted Investments or permitted dispositions of any business, assets or Subsidiary of the Borrower or any of their Restricted Subsidiaries;

(bb)    guaranties by the Borrower or any Restricted Subsidiary of Indebtedness of the Borrower or any other Restricted Subsidiary of the Borrower otherwise permitted

114

to be incurred pursuant to this Section 7.2; provided that guarantees by any Loan Party of Indebtedness of any Foreign Subsidiary are permitted under Section 7.8;

(cc)     any Incremental Equivalent Debt;

(dd)     Credit Agreement Refinancing Indebtedness and any Permitted Refinancing thereof;

(ee)     Indebtedness incurred by the Borrower or any Subsidiary Guarantor in an amount equal to 100% of the Net Cash Proceeds received by Holdings since immediately after the Closing Date from the issuance or sale of Permitted Capital Stock of Holdings plus cash contributed to the capital of Holdings (in each case, other than (i) proceeds of sales of Capital Stock to Holdings or any of its Subsidiaries or (ii) any Cure Amount) to the extent such Net Cash Proceeds or cash have been contributed to the Borrower;

(ff)     to the extent constituting Indebtedness, Guarantee Obligations in the ordinary course of business of the obligations of suppliers, customers, franchisees and licensees of the Borrower and its Restricted Subsidiaries;

(gg)     performance Guarantee Obligations of the Borrower and its Restricted Subsidiaries primarily guaranteeing performance of Contractual Obligations of the Borrower or Restricted Subsidiaries to a third party and not primarily for the purpose of guaranteeing payment of Indebtedness;

(hh)     obligations in respect of letters of support, guarantees or similar obligations issued, made or incurred for the benefit of any Subsidiary of the Borrower to the extent required by law or in connection with any statutory filing or the delivery of audit opinions performed in jurisdictions other than within the United States;

(ii)     (a) Additional Term Notes, Unrestricted Additional Term Notes, Non-Loan Party Additional Term Notes, Non-Loan Party Unrestricted Additional Term Notes, and Refinancing Notes, provided, however, that the aggregate principal amount of Non-Loan Party Additional Term Notes and Non-Loan Party Unrestricted Additional Term Notes, shall not exceed, when taken together with the Indebtedness referred to in the last paragraph of Section 2.25(e) and Additional Debt incurred or guaranteed by any Restricted Subsidiary that is not a Subsidiary Guarantor, $40,000,000 at any one time outstanding; and (b) any Permitted Refinancings of any of the foregoing;

(jj)     (1) unlimited Additional Debt if immediately after giving effect to each such incurrence and the application of the proceeds therefrom, (A) no Event of Default has occurred and is continuing or would result therefrom, subject to customary "SunGard" provisions for Indebtedness used to finance Permitted Acquisitions and permitted Investments and (B)(X) if the Additional Debt has a Lien on the Collateral, the Consolidated Total Secured Leverage Ratio computed on a Pro Forma Basis as of the Applicable Date of Determination shall not be more than 3.40:1.00 (without giving effect to any Unrestricted Incremental Indebtedness or Unrestricted Additional Term Notes established and/or being incurred at such time, but, notwithstanding the definition of Consolidated Total Debt, without including any proceeds of such Additional Debt in

115

Cash on Hand for the purposes of making the calculation of the Consolidated Total Secured Leverage Ratio pursuant to this clause (y)) and (Y) if the Additional Debt is not of the type described in the foregoing clause (X), the Fixed Charge Coverage Ratio computed on a Pro Forma Basis as of the Applicable Date of Determination shall not be less than 2:00:1.00; provided that if such Additional Debt is incurred in connection with a Permitted Acquisition, an Acquisition or a permitted Investment, (x) the Fixed Charge Coverage Ratio computed on a Pro Forma Basis as of the Applicable Date of Determination shall not be less than 2:00:1.00 or (y) such Fixed Charge Coverage Ratio computed on a Pro Forma Basis shall not be less than the Fixed Charge Coverage Ratio immediately prior to the consummation of such Permitted Acquisition, Acquisition or Permitted Investment and the incurrence of such Indebtedness and (2) any Permitted Refinancing thereof; provided that (A) if such Additional Debt has a Lien on the Collateral that is *pari passu* in right of security with the Liens on the Collateral securing the Tranche B Term Loans (the "Permitted First Priority Additional Debt") and is in the form of a term loan, then the Tranche B Term Loans shall be subject to the adjustment (if applicable) set forth in the proviso to clause (iii) of Section 2.25(d) as if such Additional Debt were an Incremental Tranche B Term Loan hereunder, (B) [reserved] and (C) Additional Debt incurred or guaranteed by any Restricted Subsidiary that is not a Subsidiary Guarantor shall not exceed, when taken together with Non-Loan Party Additional Term Notes, Non-Loan Party Unrestricted Additional Term Notes and the Indebtedness referred to in the last paragraph of Section 2.25(e), $40,000,000; and

(kk)    guaranties by the Borrower or any Restricted Subsidiary of obligations or activities of Holdings (to the extent such obligations or activities of Holdings are related to the Borrower or any of its Restricted Subsidiaries).

For purposes of determining compliance with this Section 7.2, in the event that an item of Indebtedness (or any portion thereof) at any time meets the criteria of more than one of the categories described above in this Section 7.2 or is entitled to be incurred pursuant to this Section 7.2, the Borrower, in its sole discretion, may classify or reclassify (or later divide, classify or reclassify) such item of Indebtedness (or any portion thereof) and shall only be required to include the amount and type of such Indebtedness in one of the above clauses. Accrual of interest or dividends, the accretion of accreted value, the accretion or amortization of original issue discount and the payment of interest, premium, fees or expenses, in the form of additional Indebtedness or preferred stock shall not be deemed to be an incurrence of Indebtedness for purposes of this Section 7.2.

For purposes of determining compliance with any restriction on the incurrence of Indebtedness, the principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first committed, in the case of revolving credit debt; provided that if such Indebtedness is incurred to extend, replace, refund, refinance, renew or Defease other Indebtedness denominated in a foreign currency, and such extension, replacement, refunding, refinancing, renewal or Defeasance would cause the applicable restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such extension, replacement, refunding, refinancing, renewal or defeasance, such restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing

116

Indebtedness does not exceed the principal amount of such Indebtedness being extended, replaced, refunded, refinanced, renewed or Defeased, plus the amount of any premium paid, and fees and expenses incurred, in connection with such extension, replacement, refunding refinancing, renewal or Defeasance (including any fees and original issue discount incurred in respect of such resulting Indebtedness).

7.3    **Liens**.  Create, incur, assume or suffer to exist any Lien upon any of its property, whether now owned or hereafter acquired, except:

(a)    Liens for taxes, assessments, charges or other governmental levies not overdue for a period of more than sixty (60) days or that are being contested in good faith by appropriate proceedings, <u>provided</u> that adequate reserves with respect thereto are maintained on the books of the Borrower or its Subsidiaries, as the case may be, in conformity with GAAP or such amounts are not otherwise required to be paid under <u>Section 6.3</u>;

(b)    carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business that are not overdue for a period of more than sixty (60) days or that are being contested in good faith by appropriate proceedings, so long as reserves or other appropriate provisions, if any, as shall be required by GAAP shall have been made for any such contested amounts;

(c)    pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation and deposits securing liability insurance carriers under insurance or self-insurance arrangements;

(d)    deposits to secure the performance of bids, trade contracts (other than for borrowed money), leases, statutory obligations, contractual or warranty obligation, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case incurred in the ordinary course of business;

(e)    easements, rights-of-way, restrictions and other similar encumbrances that, in the aggregate, do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the Borrower or any of its Restricted Subsidiaries;

(f)    Liens in existence on the Closing Date listed on <u>Schedule 7.3(f)</u>, securing Indebtedness permitted by <u>Section 7.2(d)</u>, <u>provided</u> that no such Lien is spread to cover any additional property after the Closing Date and that the amount of Indebtedness secured thereby is not increased;

(g)    Liens securing Indebtedness of the Borrower or any of its Restricted Subsidiaries incurred pursuant to <u>Section 7.2(e)</u> solely to finance the acquisition, development, construction, restoration, replacement, rebuilding, maintenance, upgrade or improvement of new equipment, fixed or capital assets or real property or the repair or improvement thereof or the refinancing of real property, <u>provided</u> that (i) such Liens and the Indebtedness secured thereby shall be created within two hundred and seventy (270) days after the acquisition, construction, repair or improvement of such new equipment,

117

fixed assets or real property or improvements thereto and (ii) such Liens do not at any time encumber any property other than the equipment, fixed assets or real property (or the real property improved by such improvements) financed by such Indebtedness;

(h)     Liens created pursuant to the Security Documents;

(i)     contractual or statutory Liens of landlords and Liens of suppliers (including sellers of goods) and other Liens imposed by law or pursuant to customary reservations or retentions of title arising in the ordinary course of business;

(j)     rights of setoff or bankers' liens upon deposits of cash in favor of banks or other depository institutions whether arising by contract or operation of law, incurred in the ordinary course of business so long as such deposits are not intended to be collateral for any obligations;

(k)     Liens attaching solely to cash earnest money deposits in connection with any letter of intent or purchase agreement in connection with a Permitted Acquisition or Investment;

(l)     Liens arising from precautionary Uniform Commercial Code financing statements regarding operating leases not constituting Indebtedness or consignments;

(m)     Liens securing Indebtedness permitted hereunder on property or assets acquired pursuant to a Permitted Acquisition or permitted Investment, or on property or assets of a Restricted Subsidiary of the Borrower in existence at the time such Subsidiary is acquired pursuant to a Permitted Acquisition or permitted Investment, provided that (A) such Lien was not created in contemplation of such acquisition or such Person becoming a Restricted Subsidiary and (B) such Lien does not extend to or cover any other assets or property (other than the proceeds or products thereof and other than after-acquired property subject to a Lien securing Indebtedness and other obligations incurred prior to such time and which Indebtedness and other obligations are permitted hereunder that require or include, pursuant to their terms at such time, a pledge of after-acquired property, it being understood that such requirement shall not be permitted to apply to any property to which such requirement would not have applied but for such acquisition);

(n)     Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(o)     Liens encumbering customary initial deposits and margin deposits, and similar Liens and margin deposits, and similar Liens attaching to commodity trading accounts or other brokerage accounts, in each case incurred in the ordinary course of business;

(p)     Liens incurred in connection with the purchase or shipping of goods or assets on the related goods or assets and proceeds thereof in favor of the seller or shipper of such goods or assets;

118

(q)     Liens in favor of customs and revenues authorities which secure payment of customs duties in connection with the importation of goods;

(r)     Liens arising out of judgments or awards not constituting an Event of Default under Section 8(h) and notices of lis pendens and associated rights related to litigation being contested in good faith by appropriate proceedings and for which adequate reserves have been made;

(s)     any interest or title of a licensor, sublicensor, lessor or sublessor under any license or lease agreement in the ordinary course of business not interfering with the business of the Borrower or any of its Restricted Subsidiaries;

(t)     licenses, sublicenses, leases or subleases granted to third Persons in the ordinary course of business not interfering in any material respect with the business of the Borrower or any of its Restricted Subsidiaries;

(u)     Liens which arise under Article 2 and Article 4 of the New York UCC (as defined in the Guarantee and Security Agreement), or the corresponding provisions of the Uniform Commercial Code in other jurisdictions, on items in collection and documents and proceeds related thereto;

(v)     Liens not otherwise permitted by this Section 7.3 so long as the aggregate outstanding principal amount of the obligations secured thereby does not exceed the greater of (x) $25,000,000 and (y) 2.25% of Total Assets as of the Applicable Date of Determination;

(w)     Liens on assets subject to a Sale Leaseback Transaction securing Capital Lease Obligations incurred pursuant to such Sale Leaseback Transaction;

(x)     Liens (i) on cash advances in favor of the seller of any property to be acquired in an Investment permitted pursuant to Section 7.8(g) or (y) to be applied against the purchase price for such Investment, or (ii) consisting of an agreement to Dispose of any property in a Disposition permitted under Section 7.5, in each case, solely to the extent such Investment or Disposition, as the case may be, would have been permitted on the date of the creation of such Lien;

(y)     ground leases in respect of real property on which facilities owned or leased by the Borrower or any of its Restricted Subsidiaries are located;

(z)     Liens on Collateral securing Indebtedness incurred pursuant to Section 7.2(f) and Section 7.2(i), which Liens shall have the priority set forth in the Intercreditor Agreement;

(aa)     zoning, building codes and other land use laws regulating the use or occupancy of real property or the activities conducted thereon which are imposed by any Governmental Authority having jurisdiction over such real property and are not violated by the current use or occupancy of such real property or materially interfere with the

119

ordinary conduct of the business of the Borrower or any of its Restricted Subsidiaries thereon;

(bb)    Liens securing repurchase obligations under Cash Equivalents;

(cc)    Liens securing Indebtedness incurred pursuant to Section 7.2(u); provided that (i) the agent or other representative for any Indebtedness incurred pursuant to Section 7.02(u)(i) shall become a party to the Intercreditor Agreement as the "ABL Agent" or any corresponding definition thereof and (ii) any Liens securing Indebtedness incurred pursuant to Section 7.02(u)(ii) shall be limited to Liens on assets of the MDL Entities and shall not extend to any Collateral;

(dd)    Liens on assets of Restricted Subsidiaries of the Borrower that are not Subsidiary Guarantors to secure Indebtedness of Restricted Subsidiaries of the Borrower that are not Subsidiary Guarantors under Section 7.2(h) and/or (w);

(ee)    Liens on the equity interest of Unrestricted Subsidiaries;

(ff)    Liens in favor of any Loan Party (other than Holdings (except with respect to Liens securing obligations to Holdings that are comprised of Guarantee Obligations of Borrower or any of its Restricted Subsidiaries, or that otherwise secure Indebtedness or other obligations owed to Holdings that relate to Borrower or one of its Restricted Subsidiaries)); provided that any such Liens on any assets of a Loan Party constituting Collateral are subordinated to the Liens on the Collateral securing the Obligations;

(gg)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into in the ordinary course of business;

(hh)    pledges or deposits of cash and Cash Equivalents securing deductibles, self-insurance, co-payment, co-insurance, retentions or other similar obligations to providers of property, casualty or liability insurance in the ordinary course of business;

(ii)    Liens securing Permitted First Priority Refinancing Debt and Permitted Second Priority Refinancing Debt;

(jj)    In the case of Non-Wholly-Owned Subsidiaries, Liens securing put and call arrangements;

(kk)    Liens securing Swap Agreements and Cash Management Obligations;

(ll)    Liens on Collateral securing Secured Incremental Notes and any Incremental Tranche B Term Loans;

(mm)    Liens securing any Permitted Refinancing; provided that such Liens are otherwise permitted under this Section 7.3 and secure Indebtedness otherwise permitted by Section 7.2;

120

(nn)     Liens on Collateral securing (i) obligations of any of the Loan Parties in respect of Indebtedness and related obligations permitted by Section 7.2(cc), Section 7.2(dd), and/or Section 7.2(ii) and (ii) any Permitted First Priority Refinancing Debt or Permitted Second Priority Refinancing Debt relating thereto;

(oo)     Liens securing obligations (other than obligations representing Indebtedness for borrowed money) under operating, reciprocal easement or similar agreements entered into in the ordinary course of business of the Borrower and its Subsidiaries;

(pp)     utility and similar deposits in the ordinary course of business;

(qq)     purchase options, call and similar rights of, and restrictions for the benefit of, a third party with respect to Capital Stock held by the Borrower or any Restricted Subsidiary in Joint Ventures;

(rr)     Liens disclosed as exceptions to coverage in the final title policies and endorsements issued to the Administrative Agent with respect to any real properties subject to a Mortgage;

(ss)     [Reserved]; and

(tt)     Liens securing Additional Debt incurred pursuant to Section 7.2(jj); provided that such Liens shall be subject to the Intercreditor Agreement or any other intercreditor agreement that is reasonably acceptable to the Administrative Agent.

7.4     **Fundamental Changes**.  Enter into any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or Dispose of all or substantially all of its property or business, except that:

(a)     any Restricted Subsidiary of the Borrower may be merged or consolidated with or into the Borrower (provided that the Borrower shall be the continuing or surviving corporation) or with or into any other Restricted Subsidiary (provided that when a Restricted Subsidiary that is not a Subsidiary Guarantor is merging or consolidating with a Subsidiary Guarantor, the Subsidiary Guarantor shall be the continuing or surviving corporation);

(b)     any Restricted Subsidiary of the Borrower may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) (i) to the Borrower or any other Restricted Subsidiary (upon voluntary liquidation or otherwise) (provided that when a Subsidiary that is a Subsidiary Guarantor is so Disposing of all or substantially of its assets to another Subsidiary, such other Subsidiary must be a Subsidiary Guarantor) or (ii) pursuant to a Disposition permitted by Section 7.5;

(c)     any Restricted Subsidiary of the Borrower may liquidate or dissolve or change its legal form if the Borrower determines in good faith that such action is in the best interests of the Borrower and its Restricted Subsidiaries and is not disadvantageous to the Lenders in any material respect; and

121

(d)      any Investment expressly permitted by Section 7.8 may be structured as a merger, consolidation or amalgamation.

7.5      **Disposition of Property**.  Dispose of any of its property, whether now owned or hereafter acquired, or, in the case of any Restricted Subsidiary, issue or sell any shares of such Restricted Subsidiary's Capital Stock to any Person, except:

(a)      the Disposition of obsolete or worn out property or of property no longer used or useful in the conduct of the Borrower and its Restricted Subsidiaries, in each case in the ordinary course of business;

(b)      the Disposition of Cash Equivalents and sale of inventory in the ordinary course of business;

(c)      Dispositions permitted by Section 7.4(a), clause (i) of Section 7.4(b) and Section 7.4(c);

(d)      the sale or issuance of any Restricted Subsidiary's Capital Stock to the Borrower or any Wholly-Owned Subsidiary that is a Restricted Subsidiary;

(e)      the Disposition for fair market value of property; provided that if such Disposition, together with all related Dispositions, involves assets with a fair market value in excess of $10,000,000, not less than 75% of the total consideration (other than (A) the assumption by the transferee of Indebtedness or other liabilities contingent or otherwise of the Borrower or any of its Restricted Subsidiaries (other than Indebtedness and other liabilities that are subordinated in right of payment to the Obligations) and the valid release of the Borrower or such Restricted Subsidiary, by all applicable creditors in writing, from all liability on such Indebtedness or other liability in connection with such Disposition, (B) securities, notes or other obligations received by the Borrower or any of its Restricted Subsidiaries from the transferee that are converted by the Borrower or any of its Restricted Subsidiaries into cash or Cash Equivalents within one hundred eighty (180) days following the closing of such Disposition, (C) Indebtedness of any Restricted Subsidiary that is no longer a Restricted Subsidiary as a result of such Disposition, to the extent that the Borrower and each other Restricted Subsidiary are released from any Guarantee Obligations of payment of such Indebtedness in connection with such Disposition and (D) in connection with an asset swap, all of which shall be deemed "cash" for this purpose) received is cash or Cash Equivalents or Designated Non-Cash Consideration to the extent that all Designated Non-Cash Consideration at such time does not exceed the greater of (x) $25,000,000 and (y) 2.25% of Total Assets as of the Applicable Date of Determination (with the fair market value of each item of Designated Non-Cash Consideration being measured at the time received and without giving effect to subsequent changes in value) and all of the consideration received is at least equal to the fair market value of the assets sold, transferred or otherwise disposed of);

(f)      (a) any of the Borrower and its Restricted Subsidiaries may transfer assets to the Borrower or any Subsidiary Guarantor and (b) any Restricted Subsidiary that is not a Guarantor may transfer assets to any other Restricted Subsidiary that is not a Guarantor;

122

(g)      any of the Borrower and its Restricted Subsidiaries shall be permitted to make Permitted Dispositions;

(h)      any of the Borrower and its Restricted Subsidiaries shall be permitted to sell or otherwise dispose of property and other assets pursuant to Sale Leaseback Transactions permitted under Section 7.11;

(i)      sale or like-kind exchanges of existing assets for similar replacement assets, so long as the receipt of the replacement assets in such sale or exchange occurs promptly following the transfer thereof; provided that to the extent the assets that were subject to, and exchanged in connection with, such sale or like-kind exchange constituted Collateral, assets acquired in connection therewith shall constitute Collateral;

(j)      any of the Borrower and its Restricted Subsidiaries shall be permitted to dispose of the Capital Stock or debt of an Unrestricted Subsidiary for fair market value;

(k)      condemnations and casualty events, so long as the Recovery Event is applied in accordance with Section 2.11(b);

(l)      issue Capital Stock to qualify directors of the board of directors (or similar governing body) of any Subsidiary of the Borrower where required by applicable law; and

(m)      the unwinding of any Swap Agreement or Cash Management Obligations;

(n)      the lapse or abandonment in the commercially reasonable business judgment of the Borrower or its Restricted Subsidiaries of any registrations or applications for registration of any immaterial Intellectual Property rights;

(o)      Disposition of Investments in (i) Joint Ventures to the extent required by, or made pursuant to customary buy/sell arrangements between, the joint venture parties set forth in joint venture arrangements and similar binding agreements or (ii) Non-Wholly-Owned Subsidiaries under put and call arrangements;

(p)      Dispositions of non-core or obsolete assets acquired in connection with an acquisition or permitted Investment;

(q)      Dispositions constituting Investments permitted under Section 7.8 or permitted Restricted Payments under Section 7.6;

(r)      Dispositions to a non-Loan Party to the extent that it is otherwise a permitted Investment;

(s)      the incurrence of Liens permitted hereunder;

(t)      de minimis amounts of equipment provided to employees;

123

(u)      the Borrower and any Restricted Subsidiary may (i) terminate or otherwise collapse its cost sharing agreements with the Borrower or any Subsidiary and settle any crossing payments in connection therewith, (ii) convert any intercompany Indebtedness to Capital Stock, (iii) transfer any intercompany Indebtedness to the Borrower or any Restricted Subsidiary, (iv) settle, discount, write off, forgive or cancel any intercompany Indebtedness or other obligation owing by the Borrower or any Restricted Subsidiary, (v) settle, discount, write off, forgive or cancel any Indebtedness owing by any present or former consultants, directors, officers or employees of any Parent Entity, Holdings, the Borrower, or any Subsidiary or any of their successors or assigns, (vi) surrender or waive contractual rights and settle or waive contractual or litigation claims or (vii) terminate any Swap Agreement.

(v)      Dispositions for fair market value (including those of the type otherwise described herein) made after the Closing Date in an aggregate amount not to exceed the greater of (x) $25,000,000 and (y) 2.25% of Total Assets as of the Applicable Date of Determination;

(w)      any swap of assets in exchange for services in the ordinary course of business of comparable or greater fair market value of usefulness to the business of the Borrower and its Restricted Subsidiaries as a whole, as determined in good faith by the Borrower; and

(x)      Dispositions involving assets with an aggregate value not in excess of the greater of the JV Disposition Amount as of the Applicable Date of Determination, to a Joint Venture or other non-Loan Party (other than an Unrestricted Subsidiary).

Notwithstanding the foregoing, the Disposition of any Capital Stock of a Restricted Subsidiary (other than as permitted by clause (d) above) shall not be permitted unless all the Capital Stock of such Restricted Subsidiary is Disposed of pursuant to such Disposition (and any other Investments in such Restricted Subsidiary, or any of its Restricted Subsidiaries, are also Disposed of or otherwise repaid in connection with such Disposition), or are treated as Investments under, and permitted by, clause (y) of Section 7.8).

To the extent the Required Lenders waive the provisions of this Section 7.5 with respect to the sale or other disposition of any Collateral, or any Collateral is sold or disposed of as permitted by this Section 7.5, such Collateral in each case (unless sold or disposed of to a Loan Party) shall be sold or otherwise disposed of free and clear of the Liens created by the Loan Documents and the Administrative Agent shall take such actions in accordance with Section 10.14 as are appropriate in connection therewith.

7.6    **Restricted Payments**.  Declare or pay any dividend (other than dividends payable solely in stock of the Person making such dividend) on, or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of, any Capital Stock of any Group Member, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of any Group Member (collectively, "Restricted Payments"), except that:

124

(a)     any Restricted Subsidiary may make Restricted Payments to (i) the Borrower and Restricted Subsidiaries and (ii) to each of its other equity holders on a pro rata basis;

(b)     so long as no Default or Event of Default shall have occurred and be continuing or would result therefrom, the Borrower may pay dividends to Holdings to permit Holdings to purchase (and Holdings may purchase) or to pay dividends to any of its direct or indirect parent companies to permit any of its direct or indirect parent companies to purchase Capital Stock of Holdings or any of its direct or indirect parent companies from present or former officers or employees of any Group Member, their estates and their heirs upon the death, disability or termination of employment of such officer or employee, provided that the aggregate amount of payments under this clause (b) after the Closing Date (net of any proceeds received by Holdings and contributed to the Borrower after the Closing Date in connection with resales of any such Capital Stock) shall not exceed $15,000,000 in cash in the aggregate during any fiscal year plus (A) the balance of any such $15,000,000 limit not used in any fiscal year (which may be used in any subsequent fiscal year), (B) the amount of any equity contribution made to the Borrower (through Holdings) for the purpose of such repurchase (and Not Otherwise Applied), and (C) the proceeds of any key-man life insurance with respect to such employee paid to Holdings, the Borrower or any of its Restricted Subsidiaries;

(c)     the Borrower may pay dividends to Holdings to provide for the payment by Holdings of, or to permit Holdings to pay dividends to any of its direct or indirect parent companies to provide for the payment by or any of its direct or indirect parent companies of, customary corporate indemnities owing to directors of the Holdings, or any of its direct or indirect parent companies, the Borrower, its Subsidiaries or any of their Affiliates in the ordinary course of business;

(d)     [Reserved];

(e)     Restricted Payments made on or after the Closing Date to consummate, or otherwise in connection with, the Transactions;

(f)     the Borrower and its Restricted Subsidiaries may pay dividends through issuance of Permitted Capital Stock and may redeem any Capital Stock in exchange for other Permitted Capital Stock;

(g)     the Borrower may make Restricted Payments to Holdings to enable it to pay Closing Costs and to make payments required to be made by it pursuant to any acquisition agreement pertaining to acquisitions by the Borrower and its Restricted Subsidiaries consummated prior to the Closing Date and Permitted Acquisitions by the Borrower and its Restricted Subsidiaries thereafter;

(h)     the Borrower may directly or indirectly make distributions to Holdings (and Holdings may make distributions to any of its direct or indirect parent companies) or make payments on behalf of Holdings (or any of its direct or indirect parent companies), to the extent necessary to pay the taxes and the operating and administrative expenses of

125

Holdings (or any of its direct or indirect parent companies) incurred in the ordinary course of its business including, without limitation, reasonable directors' fees and expenses;

(i)      [reserved];

(j)      the Borrower or any Restricted Subsidiary may make additional Restricted Payments to the extent that such Restricted Payments are made with net proceeds received by Holdings or any Parent Entity after the Closing Date from the issuance or sale of Permitted Capital Stock of Holdings or proceeds of an equity contribution initially made to Holdings (other than any proceeds of any Cure Amount), in each case to the extent such proceeds have been contributed to the common equity of the Borrower (which such equity proceeds so utilized shall not also increase the Available Amount or be credited for any other purpose);

(k)      the Borrower and the Restricted Subsidiaries may make Restricted Payments (or may make Restricted Payments to Holdings or any Parent Entity for such purpose) the proceeds of which shall be used to pay customary costs, fees and expenses related to any unsuccessful equity or debt offering permitted by this Agreement, so long as the proceeds of such offering were intended to be contributed to the Borrower or any Restricted Subsidiary or such offering was otherwise related to the business of the Borrower and the Restricted Subsidiaries;

(l)      the Borrower and the Restricted Subsidiaries may make Restricted Payments to Holdings or any Parent Entity to pay cash in lieu of fractional Capital Stock in connection with any dividend, split or combination thereof or any Acquisition, Investment or other transaction otherwise permitted hereunder;

(m)      so long as no Event of Default shall have occurred and be continuing or would result therefrom, the Borrower and the Restricted Subsidiaries may make Restricted Payments so that Holdings (or Public Company) may declare and pay regular quarterly dividends on its common stock (or similar Capital Stock of Holdings) in an amount not to exceed 6% per year of the aggregate net cash proceeds of any Public Offering that were actually received by Borrower or contributed to the Borrower in or from all such Public Offerings;

(n)      (i) so long as (A) no Event of Default shall have occurred and be continuing or result therefrom and (B) on a Pro Forma Basis after giving effect thereto as of the Applicable Date of Determination, the Consolidated Leverage Ratio shall be less than or equal to 5.00:1.00, the Borrower and the Restricted Subsidiaries may make Restricted Payments in an aggregate amount equal to the sum of the amounts available under clauses (a), (b) and (f) of the definition of "Available Amount" and (ii) so long as no Event of Default shall have occurred and be continuing or would result therefrom, any Parent Entity, the Borrower and the Restricted Subsidiaries may make Restricted Payments in an aggregate amount not to exceed the Available Amount (excluding amounts available under clauses (a), (b) and (f) of the definition thereof);

126

(o)      with respect to any taxable period during which the Borrower or any of its Subsidiaries is a member of a consolidated, unitary, combined or similar tax group in which the Borrower (or any direct or indirect parent of the Borrower) is the common parent, the Borrower (or another Restricted Subsidiary of the Borrower) may directly (or indirectly through the Borrower) make payment to Holdings in order for Holdings (or any direct or indirect parent of Holdings) to pay the portion of its consolidated, unitary, combined or similar U.S. federal, state and local and non-U.S. income taxes attributable to the income of the Borrower and any of its Subsidiaries in an amount not to exceed the income tax liabilities that would have been payable by the Borrower and its Subsidiaries on a stand-alone basis, reduced by any such income taxes paid or to be paid directly by the Borrower or its Subsidiaries; provided that the amount of any such payments, dividends or distributions attributable to any income of an Unrestricted Subsidiary shall be limited to the cash distributions made by such Unrestricted Subsidiary to the Borrower or its Restricted Subsidiaries for such purpose;

(p)      the Borrower or any Restricted Subsidiary may make Restricted Payments with the Capital Stock of, and/or the proceeds of the sale of Capital Stock of, an Unrestricted Subsidiary or proceeds of a dividend or distribution from an Unrestricted Subsidiary;

(q)      [reserved];

(r)      [reserved]; and

(s)      When, on a Pro Forma Basis after giving effect thereto the Consolidated Leverage Ratio shall have been less than or equal to 3.50:1.0, so long as no Event of Default shall have occurred and be continuing or would result therefrom, the Borrower or the Restricted Subsidiaries may make Restricted Payments to Holdings to permit Holdings to pay in cash dividends to the holders of preferred stock issued by Holdings and any additional preferred stock issued by Holdings on substantially the same terms as any preferred stock outstanding on the Closing Date.

7.7   [**Reserved**].

7.8   **Investments**.  Make any Investment, except in the case of Borrower and any of its Restricted Subsidiaries (other than any Insurance Subsidiary unless otherwise expressly included in this Section 7.8 or permitted by Section 7.16):

(a)      accounts receivable and other extensions of trade credit by the Borrower and its Subsidiaries in the ordinary course of business and advances made to physicians in the ordinary course of business;

(b)      Investments in Cash Equivalents;

(c)      Guarantee Obligations permitted by Section 7.2;

(d)      intercompany Investments by (i) any Group Member (x) in the Borrower or any Person that, prior to such investment, is a Subsidiary Guarantor or (y) in any Excluded

127

Subsidiary (other than an Unrestricted Subsidiary) and (ii) by any Restricted Subsidiary that is not a Guarantor in any other Restricted Subsidiary that is not a Guarantor; provided, however, that any such Investments in any Insurance Subsidiary must be made in compliance with clause (u) below and the aggregate amount of Investments made pursuant to subclause (y) shall not exceed the greater of (a) $50,000,000 and (b) 4.50% of Total Assets as of the Applicable Date of Determination;

(e)     existing Investments as listed on Schedule 7.8(g);

(f)     Capital Expenditures;

(g)     Permitted Acquisitions;

(h)     the formation of and Investments in new Restricted Subsidiaries of the Borrower that are Subsidiary Guarantors, provided that (i) such Restricted Subsidiary is owned by the Borrower or a Subsidiary Guarantor and (ii) after the date of the formation or acquisition of any such Restricted Subsidiary and the Investment therein, and after giving effect thereto, such new Restricted Subsidiary and its parent shall have entered into any and all agreements (in form and substance reasonably satisfactory to the Administrative Agent) necessary to comply with Section 6.9;

(i)     the Borrower and its Restricted Subsidiaries may receive and own Capital Stock or other investments acquired as non-cash consideration pursuant to dispositions permitted under Section 7.5;

(j)     the Borrower and its Restricted Subsidiaries may make pledges and deposits permitted under Section 7.3;

(k)     the Borrower and its Restricted Subsidiaries may make Investments and guarantees expressly permitted under Sections 7.2, 7.4, 7.5 (other than 7.5(u)) and 7.6;

(l)     [reserved];

(m)     the Borrower and its Restricted Subsidiaries may hold Investments to the extent such Investments reflect an increase in the value of Investments and would otherwise exceed the limitations herein;

(n)     Investments consisting of endorsements for collection or deposit in the ordinary course of business;

(o)     Investments in deposit accounts opened and maintained in the ordinary course of business;

(p)     the Borrower may acquire and hold promissory notes of employees of Holdings or its Restricted Subsidiaries in connection with such Person's purchase of Permitted Capital Stock of Holdings;

128

(q)      Investments received in connection with any bankruptcy or reorganization of, or any good faith settlement of delinquent accounts and disputes with, any customer or supplier arising in the ordinary course of business;

(r)      the Borrower may enter into Swap Agreements that are not speculative in nature to the extent permitted hereunder;

(s)      any Investments consisting of deferred compensation owed to employees of Holdings, the Borrower and their respective Restricted Subsidiaries;

(t)      Investments and formations by the Borrower and the Restricted Subsidiaries in and of Joint Ventures or Restricted Subsidiaries (other than Insurance Subsidiaries) that are not Guarantors, which does not exceed the greater of (x) $50,000,000 and (y) 4.50% of Total Assets as of the Applicable Date of Determination; provided that any Joint Ventures referred to in this clause (t) are with bona fide third parties;

(u)      Investments by the Borrower or any Wholly-Owned Subsidiary in any Insurance Subsidiary (including in respect of the formation thereof) solely to the extent permitted by Section 7.17(b);

(v)      Investments consisting of loans and advances to directors and employees of any Group Member (including for travel, entertainment and relocation expenses) in the ordinary course of business;

(w)      Investments in 50% or less of the equity interest of other Persons ("Minority Investments") held by a Restricted Subsidiary acquired pursuant to a Permitted Acquisition, which Minority Investments existed at the time of such Permitted Acquisition and were not made in contemplation of or in connection with such Permitted Acquisition;

(x)      Investments made in connection with the funding of contributions under any non-qualified retirement plan or similar employee compensation plan in an amount not to exceed the amount of compensation expense recognized by the Borrower and its Restricted Subsidiaries in connection with such plans;

(y)      Investments that do not exceed, in the aggregate, the greater of (A) $50,000,000 and (B) 4.50% of Total Assets as of the Applicable Date of Determination;

(z)      Investments made with Permitted Capital Stock;

(aa)     [Reserved];

(bb)     [Reserved];

(cc)     Investments in an amount not to exceed the Available Amount;

(dd)     guarantees made by the Borrower or any Restricted Subsidiary of Holdings in respect of any obligation or activity of Holdings (to the extent the obligations or activities of Holdings are related to the Borrower or any of its Restricted Subsidiaries), the Borrower or any

129

other Restricted Subsidiary of Holdings to the extent the underlying obligation is permitted hereunder;

(ee)    Investments consisting of loans and advances to directors and employees of any Group Member (including for travel, entertainment and relocation expenses) not exceeding $2,000,000 in the aggregate at any time outstanding;

(ff)    Investments held by a Restricted Subsidiary acquired pursuant to a Permitted Acquisition, which Investments existed at the time of such Permitted Acquisition and were not made in contemplation of or in connection with such Permitted Acquisition;

(gg)    Investments made in connection with the funding of contributions under any non-qualified retirement plan or similar employee compensation plan in an amount not to exceed the amount of compensation expense recognized by the Borrower and its Restricted Subsidiaries in connection with such plans;

(hh)    (i) deposits in the ordinary course of business consistent with past practices to secure the performance of operating leases and payment of utility contracts and (ii) good faith deposits required in connection with Permitted Acquisitions and other Investments permitted under this Section 7.8;

(ii)    Investments in Joint Ventures or Unrestricted Subsidiaries having an aggregate fair market value (measured on the date each such Investment was made and without giving effect to subsequent changes in value), when taken together with all other Investments made pursuant to this clause (ii) since the Closing Date, not to exceed the greater of (a) $15,000,000 and (b) 1.25% of Total Assets as of the Applicable Date of Determination (but, to the extent that any Investment made pursuant to this clause (ii) since the Closing Date is sold or otherwise liquidated for cash or designated as a Restricted Subsidiary, plus all Returns (other than Returns that have otherwise increased the Available Amount) with respect to such Investment (less the cost of disposition, if any) or the fair market value of such Unrestricted Subsidiary at the time of redesignation (as applicable)); provided that any Joint Ventures referred to in this clause (ii) are with bona fide third parties

(jj)    following the consummation of a Permitted Acquisition of Capital Stock of a Person that, immediately thereafter, is not wholly owned, Investments consisting of the purchase of additional Capital Stock of such Persons; and

(kk)    additional Investments made solely with the Net Cash Proceeds of any capital contributions or other equity issuances of Permitted Capital Stock (other than any proceeds of any Cure Amount or any other capital contribution or equity issuances to the extent utilized in connection with other transactions permitted hereunder on or prior to the date of such Investment) made or received by the Borrower.

The amount of any Investment shall be the initial amount of such Investment and any addition thereto, as reduced by any repayment of principal (in the case of an Investment constituting Indebtedness) or any distribution constituting a return of capital (in the case of any other Investment).

130

7.9 **Optional Prepayments and Modifications of Certain Debt Instruments**. (a) Make any optional or voluntary payment, prepayment, repurchase or redemption of or otherwise optionally or voluntarily Defease or segregate funds with respect to any Indebtedness in excess of $50,000,000 that is contractually subordinated in right of payment to the Obligations (it being understood that Indebtedness shall not be deemed to be subordinated in right of payment merely because such Indebtedness is secured by a Lien that is senior to the Lien securing the Obligations), or any Permitted Refinancing incurred in respect of any of the foregoing; provided that (i) the Borrower may pay, prepay, repurchase or redeem any of the foregoing Indebtedness, (A) pursuant to a refinancing thereof with Permitted Refinancings (to the extent permitted by Section 7.2), (B) with the Available Amount, (C) to the extent that the consideration therefor consists of Permitted Capital Stock (or proceeds thereof) of Holdings or Capital Stock of any direct or indirect prepayment or parent of Holdings (other than any proceeds of any Cure Amount or any other capital contribution or equity issuances to the extent utilized in connection with other transactions permitted hereunder on or prior to the date of such payment, prepayment, repurchase, redemption, Defeasance or segregation) or (D) in whole or in part, in lieu of Restricted Payments permitted under Section 7.6(p) and (ii) the foregoing shall not be construed to prohibit the Refinancing or the conversion of any such Indebtedness into Permitted Capital Stock; (b) amend, modify, waive or otherwise change, or consent or agree to any material amendment, modification, waiver or other change to, any of the terms of any Indebtedness described in clause (a) above that is materially adverse to the interests of the Lenders (determined by comparison to such terms in effect on the Closing Date or otherwise to such terms in effect on the date of creation thereof and disregarding any default or potential default in respect thereof) except (x) in accordance with the terms of the applicable intercreditor or subordination terms or agreement or (y) as permitted pursuant to or reasonably necessary to effect a Permitted Refinancing thereof; or (c) designate any Indebtedness (other than the Obligations) as "Designated Senior Indebtedness" (or any other defined term having a similar purpose) for the purposes of any Indebtedness described in clause (a) above that is subordinated to the Obligations; or

(b) make any cash interest payment on the PIK Toggle Notes at any time that (i) the Consolidated First Lien Leverage Ratio exceeds 3.25:1.00 or (ii) the aggregate domestic unrestricted cash and Cash Equivalents of the Borrower and its Restricted Subsidiaries[8] is less than $50,000,000.

7.10 **Transactions with Affiliates**. Enter into any transaction, including any purchase, sale, lease or exchange of property, the rendering of any service or the payment of any management, advisory or similar fees with a fair market value in excess of $5,000,000 with any Affiliate (other than Holdings, the Borrower or any Subsidiary Guarantor) unless such transaction is (a) otherwise permitted under this Agreement and (b) upon fair and reasonable terms no less favorable to the relevant Group Member than it would obtain in a comparable arm's length transaction with a Person that is not an Affiliate. Notwithstanding the foregoing,

---

[8] NTD: Inclusion of cash and Cash Equivalents of Medical Developers Cooperatief, U.A., 21st Century Oncology Holdings, B.V. and Medical Developers Holdings, B.V. in this calculation remains subject to further discussion among Stroock, K&E and Milbank.

131

(a)      the Borrower and its Restricted Subsidiaries may pay customary fees to, and the out-of-pocket expenses of, its board of directors, employees and officers and may provide customary corporate indemnities for the benefit of members of its board of directors, employees and officers,

(b)      the payment of Closing Costs;

(c)      Restricted Payments permitted under Section 7.6;

(d)      transactions pursuant to permitted agreements in existence on the Closing Date and set forth on Schedule 7.10 as such agreements may be amended, modified, supplemented, extended, renewed or refinanced from time to time to the extent not more disadvantageous to the Lenders in any material respect (taken as a whole);

(e)      loans or advances to employees, officers and directors permitted under Section 7.8;

(f)      payroll, travel and similar advances to cover matters permitted under Section 7.8;

(g)      the payment of reasonable fees and reimbursement of out-of-pocket expenses to directors of Public Company, Holdings, Borrower or any Restricted Subsidiary;

(h)      compensation (including bonuses) and employee benefit arrangements paid to, indemnities provided for the benefit of, and employment and severance arrangements entered into with, directors, officers, managers, consultants or employees of Public Company, Holdings, Borrower or the Subsidiaries in the ordinary course of business, including in connection with the Transactions and any other transaction permitted hereunder;

(i)      any issuances of securities or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment agreements, stock options and stock ownership plans;

(j)      [reserved];

(k)      [reserved];

(l)      transactions between and among the Borrower and its Subsidiaries which are in the ordinary course of business and transactions between the Borrower, Holdings and its direct or indirect shareholders in the ordinary course of business with respect to the Capital Stock in Holdings or any direct or indirect parent of Holdings, such as shareholder agreements, registration agreements and including providing expense reimbursement and indemnities in respect thereof;

(m)      the Transactions;

(n)      the existence and performance of agreements and transactions with any Unrestricted Subsidiary that were entered into prior to the designation of a Restricted Subsidiary as such Unrestricted Subsidiary to the extent that the transaction was permitted at the time that it

132

was entered into with such Restricted Subsidiary and transactions entered into by an Unrestricted Subsidiary with an Affiliate prior to the redesignation of any such Unrestricted Subsidiary as a Restricted Subsidiary;

(o)     Affiliate repurchases of the Loans or Tranche B Term Loan Commitments to the extent permitted hereunder and the holding of such Loans or Tranche B Term Loan Commitments and the payments and other transactions contemplated herein in respect thereof;

(p)     payments to or from, and transactions with, Restricted Subsidiaries and Joint Ventures (to the extent any such Joint Venture is only an Affiliate as a result of Investments by the Borrower and the Restricted Subsidiaries in such Joint Venture) in the ordinary course of business;

(q)     loans and other transactions by and among Holdings, Public Company, Borrower and its Restricted Subsidiaries to the extent not prohibited Section 7.2;

(r)     transactions by Borrower and its Restricted Subsidiaries with customers, clients, Joint Venture partners, suppliers or purchasers or sellers of goods or services, in each case in the ordinary course of business and otherwise in compliance with the terms of this Agreement that are fair to Borrower and the Restricted Subsidiaries, as determined in good faith by the board of directors or the senior management of the relevant Person, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party;

(s)     any transaction between or among the Borrower or any Restricted Subsidiary and any Affiliate of the Borrower or a Joint Venture or similar entity that would constitute an Affiliate transaction solely because the Borrower or a Restricted Subsidiary owns an equity interest in or otherwise controls such Affiliate, Joint Venture or similar entity; and

(t)     transactions in which the Borrower or any Restricted Subsidiary, as the case may be, delivers to the Administrative Agent a letter from an independent financial advisor stating that such transaction is fair to the Borrower or such Restricted Subsidiary from a financial point of view or meets the requirements of this Section 7.10.

7.11    **Sales and Leasebacks**.  Enter into any arrangement with any Person providing for the leasing by any Group Member of any property or containing an obligation of such Group Member to repurchase such property from such Person, which property has been or is to be sold or transferred by such Group Member to such Person (or any Affiliate thereof) or to any other Person (or any Affiliate thereof) to whom funds have been or are to be advanced by such Person (or any Affiliate thereof) on the security of such property or rental obligations of such Group Member (any such transaction a "Sale Leaseback Transaction") except any Sale Leaseback Transaction (a) in respect of property consisting of capital assets so sold pursuant to such Sale Leaseback Transaction solely for cash consideration in an amount not less than the cost thereof within one hundred and eighty (180) days after the date that such property was initially acquired by a Group Member or (b) in respect of any other property consisting of capital assets so sold pursuant to such Sale Leaseback Transaction for market value and solely for cash consideration and in respect of which the Borrower shall comply with Section 2.11(b).

7.12 **Changes in Fiscal Periods**. Permit the fiscal year of Holdings or the Borrower to end on a day other than December 31st or change the Borrower's or Holdings' method of determining fiscal quarters; provided, however, that the Borrower may, upon written notice to the Administrative Agent, change its fiscal year to any other fiscal year reasonably acceptable to the Administrative Agent, provided that as a condition to any such change the Borrower and the Administrative Agent shall, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary or appropriate to reflect such change in fiscal year.

7.13 **Negative Pledge Clauses**. Enter into or suffer to exist or become effective any agreement that prohibits or limits the ability of any Group Member to create, incur, assume or suffer to exist any Lien upon any of its property or revenues, whether now owned or hereafter acquired, to secure its obligations under the Loan Documents to which it is a party other than (a) this Agreement and the other Loan Documents, the MDL Term Loan Agreement, the PIK Toggle Notes Indenture, any Credit Agreement Refinancing Indebtedness, any Additional Debt, any Additional Term Notes, any Incremental Equivalent Debt, any Permitted Unsecured Debt, any Unrestricted Additional Term Notes or documents evidencing Indebtedness incurred under Section 7.2, and any Permitted Refinancing in respect of any such Indebtedness, (b) agreements which (i) are binding on a Restricted Subsidiary at the time such Restricted Subsidiary first becomes a Restricted Subsidiary, so long as such agreements were not entered into in contemplation of such Person becoming a Restricted Subsidiary, (ii) are customary provisions in joint venture agreements and other similar agreements applicable to joint ventures permitted under Section 7.8 and applicable solely to such joint venture entered into in the ordinary course of business, (iii) are customary restrictions on leases, subleases, licenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate to the assets subject thereto, (iv) are customary provisions restricting subletting or assignment of any lease governing a leasehold interest of the Borrower or any Restricted Subsidiary, (v) are customary provisions restricting assignment of any agreement entered into in the ordinary course of business, and (vi) are restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business and (c) restrictions applicable only to Foreign Subsidiaries that are not Loan Parties.

7.14 **Clauses Restricting Subsidiary Distributions**. Enter into or suffer to exist or become effective any consensual encumbrance or restriction on the ability of any Restricted Subsidiary of the Borrower to make Restricted Payments in respect of any Capital Stock of such Restricted Subsidiary held by, or pay any Indebtedness owed to, the Borrower or any other Restricted Subsidiary of the Borrower, except for (x) agreements which (i) are binding on a Restricted Subsidiary at the time such Restricted Subsidiary first becomes a Restricted Subsidiary, so long as such agreements were not entered into in contemplation of such Person becoming a Restricted Subsidiary, (ii) are customary provisions in joint venture agreements and other similar agreements applicable to joint ventures permitted under Section 7.8 and applicable solely to such joint venture entered into in the ordinary course of business, (iii) are customary restrictions on leases, subleases, licenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate to the assets subject thereto, (iv) are customary provisions restricting subletting or assignment of any lease governing a leasehold interest of the Borrower or any Restricted Subsidiary, (v) are customary provisions restricting assignment of any agreement entered into in the ordinary course of business, and (vi) are restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of

134

business), (y) such encumbrances or restrictions existing under or by reason of (i) any restrictions existing under the Loan Documents, the MDL Term Loan Agreement, the PIK Toggle Notes Indenture, any Credit Agreement Refinancing Indebtedness, any Additional Debt, any Additional Term Note, any Incremental Equivalent Debt, any Permitted Unsecured Debt, any Non-Loan Party Additional Term Notes, any Non-Loan Party Unrestricted Additional Term Debt, any Unrestricted Additional Term Notes or documents evidencing Indebtedness incurred under Section 7.2, and any Permitted Refinancing in respect of any such Indebtedness or (ii) any restrictions with respect to a Subsidiary imposed pursuant to an agreement that has been entered into in connection with the Disposition of all or substantially all of the Capital Stock or assets of such Subsidiary and (z) restrictions applicable only to Foreign Subsidiaries.

7.15   **Lines of Business**.   Enter into any business, either directly or through any Restricted Subsidiary, except for those businesses in which the Borrower and its Restricted Subsidiaries are engaged on the date of this Agreement or that are reasonably related, supportive, synergetic, complementary or ancillary thereto, it being understood and acknowledged that any Insurance Subsidiary shall be the only entity conducting insurance business (and business reasonably related thereto) and that any Insurance Subsidiary shall be engaged for the underwriting of insurance policies for Holdings, the Borrower and its Restricted Subsidiaries and each of such Person's respective employees, officers or directors.

7.16   **Insurance Subsidiary Investments**.   Permit any Insurance Subsidiary to make any Investment in any Person except:

(a)   Investments in Cash Equivalents;

(b)   Investments in deposit accounts opened and maintained in the ordinary course of business;

(c)   Investments in accounts receivable in the ordinary course of business; and

(d)   Investments in notes or bonds (including interest only notes or bonds) in an aggregate amount (for all Insurance Subsidiaries combined) up to the greater of (x) $10,000,000 and (y) 1.00% of Total Assets as of the Applicable Date of Determination that are rated at least BBB-by S&P or Baa3 by Moody's at the time of purchase; provided that an aggregate amount up to $6,000,000 of such Investments shall have a rating of at least A by S&P or A2 by Moody's at the time of purchase.

7.17   **Insurance Subsidiary**.   (a) Permit any Insurance Subsidiary to enter into any (or renew, extend or materially modify any existing) reinsurance or stop-loss insurance arrangements except in the ordinary course of business with reinsurers rated as least "A-" by A.M. Best & Co. or reinsurers whose obligations to the Insurance Subsidiary are secured by letters of credit or other collateral reasonably acceptable to the board of directors of such Insurance Subsidiary or (b) permit any Investment in any Insurance Subsidiary, except for Investments in an aggregate amount (for all Insurance Subsidiaries combined) not in excess of the greater of (x) $25,000,000 and (y) 2.25% of Total Assets as of the Applicable Date of Determination; provided that such amount may be increased by non-material amounts in the discretion and with the approval of the Administrative Agent (for the avoidance of doubt, such

investments shall exclude any expenses and premiums paid to any Insurance Subsidiary by any Group Member in the ordinary course of such Group Member's business).

7.18   **OFAC; Sanctions**.   The Borrower will not use the proceeds of the Loans or otherwise make available such proceeds to any Person, for the purpose of financing the activities of any Person, or in any country, that is the subject of any U.S. sanctions administered by OFAC Sanctions, except to the extent licensed or otherwise approved or exempted by OFAC, or in any other manner that would result in a violation of Sanctions by the Borrower or any Restricted Subsidiary.

## SECTION 8

## EVENTS OF DEFAULT

If any of the following events shall occur and be continuing:

(a)      the Borrower shall fail to pay (i) any principal of any Loan when due in accordance with the terms hereof or (ii) any interest on any Loan within five (5) Business Days of the due date thereof or (iii) any other amount payable hereunder or under any other Loan Document, within twenty (20) days after such other amount becomes due in accordance with the terms hereof; or

(b)      any representation or warranty made or deemed made by any Loan Party herein or in any other Loan Document or that is contained in any certificate, document or financial statement furnished by it at any time under or in connection with this Agreement or any such other Loan Document shall prove to have been inaccurate in any materially adverse respect on or as of the date made or deemed made, and in the case of any misrepresentation capable of being cured, such default shall continue unremedied for a period of thirty (30) days after notice to the Borrower from the Administrative Agent or the Required Lenders; or

(c)      any Loan Party shall default in the observance or performance of any agreement contained in clause (i) of Section 6.4(a) (with respect to the Borrower only in its jurisdiction of incorporation), Section 6.7(a) (provided that the delivery of a notice of Default or Event of Default at any time will cure an Event of Default under Section 6.7(a) arising from the failure of the Borrower to timely deliver such notice of Default or Event of Default; provided that in the case of such a Default, the delivery of such notice of Default at any time prior to the Default that is the subject of such notice becoming an Event of Default (and, when determining whether such Default has become an Event of Default, the notice by Administrative Agent of such Default shall be deemed given on the day such Default first arose) shall cure the Event of Default resulting from the failure to timely deliver such notice) or Section 7 of this Agreement; provided, further, that an Event of Default under Section 7.1(a) is subject to the Cure Right set forth in Section 8; or

(d)      any Loan Party shall default in the observance or performance of any other agreement contained in this Agreement or any other Loan Document (other than as provided in paragraphs (a) through (c) of this Section 8), and such default shall continue unremedied for a

period of thirty (30) days after notice to the Borrower from the Administrative Agent or the Required Lenders; or

(e)      any Group Member shall (i) default in making any payment of any principal of any Indebtedness (including any Guarantee Obligation, but excluding the Obligations) on the scheduled or original due date with respect thereto, or (ii) default in making any payment of any interest on any such Indebtedness (excluding the Obligations), in each case of clauses (i) and (ii), beyond the period of grace and giving of notice, if any, provided in the instrument or agreement under which such Indebtedness was created and such default has not been waived or (iii) default in the observance or performance of any other agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or beneficiary of such Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) to cause, beyond all applicable grace periods and with the giving of notice if required, such Indebtedness to become due prior to its stated maturity or (in the case of any such Indebtedness constituting a Guarantee Obligation) to become payable and such default has not been waived; provided that a default, event or condition described in clause (i), (ii) or (iii) of this paragraph (e) shall not at any time constitute an Event of Default unless, at such time, one or more defaults, events or conditions of the type described in clauses (i), (ii) and (iii) of this paragraph (e) shall have occurred and be continuing with respect to Indebtedness the outstanding principal amount of which exceeds in the aggregate the greater of (x) $50,000,000 and (y) 4.50% of Total Assets as of the Applicable Date of Determination; provided, further, that this paragraph (e) shall not apply to any breach or default of Indebtedness (x) that is remedied by the Borrower or the applicable Restricted Subsidiary or (y) that is waived (including in the form of amendment) by the requisite holders of the applicable item of Indebtedness, in either case, prior to the acceleration of all the Loans pursuant to this Section 8, and such remedy shall cause any default arising hereunder to cease to exists; provided that this clause (e) shall not apply to intercompany Indebtedness or Indebtedness that is incurred on a non-recourse basis; or

(f)      (i) any Group Member shall commence any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or any Group Member shall make a general assignment for the benefit of its creditors; or (ii) there shall be commenced against any Group Member any case, proceeding or other action of a nature referred to in clause (i) above that (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed or undischarged for a period of sixty (60) days; or (iii) there shall be commenced against any Group Member any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets that results in the entry of an order for any such relief that shall not have been vacated, discharged, or stayed or bonded pending appeal within sixty (60) days from the entry thereof; or (iv) any Group Member shall take any action in furtherance of, or

137

indicating its consent to, approval of, or acquiescence in, any of the acts set forth in <u>clause (i)</u>, <u>(ii)</u>, or <u>(iii)</u> above; or

(g)      (i) any Person shall engage in any non-exempt "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any ERISA Plan, (ii) a failure to satisfy the minimum funding standard (within the meaning of Section 302 of ERISA or Section 412 of the Code), whether or not waived, or any Lien in favor of the PBGC or an ERISA Plan shall arise on the assets of the Borrower or any Commonly Controlled Entity, (iii) a Reportable Event shall occur with respect to, or proceedings shall commence to have a trustee appointed, or a trustee shall be appointed, to administer or to terminate, any Single Employer Plan, which Reportable Event or commencement of proceedings or appointment of a trustee is, in the reasonable opinion of the Required Lenders, likely to result in the termination of such Plan for purposes of Title IV of ERISA, (iv) any Single Employer Plan shall terminate for purposes of Title IV of ERISA or the receipt by any Loan Party or any Commonly Controlled Entity from the PBGC of any notice relating to an intention to terminate any Single Employer Plan or appoint a trustee to administer any Single Employer, (v) the Borrower or any Commonly Controlled Entity shall incur any liability in connection with a withdrawal from, or the Insolvency of, or Multiemployer Plan, (vi) the filing of an application for a waiver of the minimum funding standard with respect to any Single Employer Plan, (vii) failure by any Loan Party or any Commonly Controlled Entity to make any required contribution to a Multiemployer Plan, (viii) a determination that any Single Employer Plan is, or is expected to be, in "at risk" status (within the meaning of Section 430 of the Code), (ix) the imposition of liability on any Loan Party or any Commonly Controlled Entity pursuant to Section 4062 or 4069 of ERISA, (x) receipt from the Internal Revenue Service of notice of the failure of any ERISA Plan to qualify under Section 4019a) of the Code or the failure of any trust forming part of any ERISA Plan intended to be qualified under Section 401(a) of the Code to qualify for exemption from taxation under Section 501(a) of the Code or (xi) any other similar event or condition shall occur or exist with respect to an ERISA Plan.  With respect to any Foreign Plan, (i) the failure to make or, if applicable, accrue in accordance with normal accounting practices, any employer or employee contributions required by applicable law or by the terms of such Foreign Plan; (ii) the failure to register or loss of good standing with applicable regulatory authorities of any such Foreign Plan required to be registered; or (iii) the failure of any Foreign Plan to comply with any material provisions of applicable law and regulations or with the material terms of such Foreign Plan; or

(h)      one or more judgments or decrees shall be entered against any Group Member or any Group Member shall be subject to any fines by any Governmental Authorities or shall agree to any settlements of legal claims involving in the aggregate a liability (not paid or covered by insurance as to which the relevant insurance company has not denied coverage) of the greater of (x) $50,000,000 and (y) 4.50% of Total Assets as of the Applicable Date of Determination or more, and all such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within forty-five (45) days from the entry thereof; or

(i)      any of the Security Documents shall cease, for any reason, to be in full force and effect (except in accordance with its terms), or any Loan Party or any Affiliate of any Loan Party shall so assert, or any Lien created by any of the Security Documents shall cease to be enforceable and of the same effect and priority purported to be created thereby (except in accordance with its terms); or

138

(j)      the guarantee contained in Section 2 of the Guarantee and Security Agreement shall cease, for any reason, to be in full force and effect or any Loan Party or any Affiliate of any Loan Party shall so assert (except in accordance with its terms); or

(k)      a Change of Control shall occur; or

(l)      any Insurance Subsidiary shall become subject to any conservation, rehabilitation, liquidation order, directive or mandate issued by any Governmental Authority which could reasonably be expected to have a Material Adverse Effect;

then, and in any such event, other than (x) prior to the expiration of the ability to effectuate the Cure Right if such Cure Right has not been so exercised, an event described in paragraph (c) of this Section 8 in respect of a default of performance or compliance with the covenant under Section 7.1(a) or (y) an event with respect to the Borrower described in clause (i) or (ii) of paragraph (f) of this Section 8; provided that in the case of clause (x), the actions hereinafter described will be permitted to occur upon and following the expiration of the ability to effectuate the Cure Right if such Cure Right has not been so exercised, (A) if such event is an Event of Default specified in clause (y) above with respect to the Borrower, automatically the Commitments shall immediately terminate and the Loans (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents shall immediately become due and payable, and (B) if such event is any other Event of Default (other than as described in clause (x) (prior to the expiration of the ability to effectuate the Cure Right if such Cure Right has not been so exercised) or clause (y) above), either or both of the following actions may be taken:  (i) with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, by notice to the Borrower declare the Commitments to be terminated forthwith, whereupon the Commitments shall immediately terminate; and (ii) with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, by notice to the Borrower, declare the Loans (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents to be due and payable forthwith, whereupon the same shall immediately become due and payable.  Except as expressly provided above in this Section, presentment, demand, protest and all other notices of any kind are hereby expressly waived by the Borrower.

Solely for the purposes of determining whether a Default or an Event of Default has occurred under paragraphs (e), (f) or (h) of this Section 8, any reference in any such paragraph to any Restricted Subsidiary shall be deemed not to include any such Restricted Subsidiaries affected by any event or circumstance referred to in such paragraph that did not, in the aggregate when taken together with any other similarly situated Restricted Subsidiaries, as of the last day of the fiscal quarter of the Borrower most recently ended, have aggregate assets with a value equal to or greater than 7.5% of Total Assets of the Borrower and its Restricted Subsidiaries as of such date, based on the consolidated balance sheet of the Borrower and its Restricted Subsidiaries as of such date.

Notwithstanding anything to the contrary contained in Section 8, in the event that the Borrower fails to comply with the requirements of the covenant under Section 7.1(a) at the end of any fiscal quarter, until the expiration of the fifteenth (15th) Business Day subsequent to the

139

date that the Compliance Certificate is required to be delivered pursuant to Section 6.2(b), in respect of the period ending on the last day of such quarter (such date of required delivery, the "Required Delivery Date"), any net cash proceeds of any common equity contribution made, directly or indirectly to the Borrower, or any net cash proceeds of any issuance of Permitted Capital Stock of the Borrower, in each case following the Closing Date and/or following the end of such fiscal quarter and on or prior to such fifteenth (15th) Business Day and from a Person other than the Borrower or a Subsidiary of the Borrower, in each case in an aggregate amount equal to the amount necessary to cure the relevant failure to comply with such covenant may, at the election of the Borrower be included in the calculation of Consolidated EBITDA for purposes of determining compliance with such covenant (the "Cure Right"), and upon the earlier of (x) the delivery by the Borrower of written notice to the Administrative Agent that it intends to exercise the Cure Right hereunder (it being understood that to the extent such notice is provided in advance of delivery of a Compliance Certificate for the applicable period, the amount of such net cash proceeds that are received as the Cure Amount may be lower than specified in such notice to the extent that the amount necessary to cure any Event of Default under Section 7.1(a) is less than the full amount of any originally designated amount) and (y) receipt by the Borrower of such cash proceeds (the "Cure Amount"), such covenant shall be recalculated giving effect to the following *pro forma* statements:

(i)      solely for the purpose of determining the existence of an Event of Default under Section 7.1(a), Consolidated EBITDA for the fiscal quarter of the Borrower for which such certificate is required to be delivered shall be increased by an amount equal to the Cure Amount, and such increase shall be effective for all periods that include the fiscal quarter of the Borrower for which such Cure Right was exercised and not for any other purpose under this Agreement; and

(ii)      if, after giving effect to the foregoing recalculations (but not giving effect to any payment of Indebtedness made with such Cure Amount (when calculating compliance with Section 7.1(a) at the end of such (but no other) fiscal quarter), the Borrower shall then be in compliance with the requirements of the covenant under Section 7.1(a) at the end of such fiscal quarter, the Borrower shall be deemed to have satisfied the requirements of the covenant under Section 7.1(a) as of the last day of such fiscal quarter with the same effect as though there had been no failure to comply therewith at such date, and the applicable breach or Default or Event of Default of the covenant under Section 7.1(a) that had occurred shall be deemed cured for this purpose under this Agreement and the other Loan Documents) if the Borrower has delivered written notice pursuant to clause (x) above; provided that if the Cure Amount is not received by the Borrower prior to such fifteenth (15th) Business Day, such Default or Event of Default shall be deemed reinstated and Consolidated EBITDA shall not be so increased as set forth in the immediately preceding clause (i) above.

Notwithstanding anything herein to the contrary, (i) in each four-fiscal-quarter period of the Borrower there shall be at least two (2) fiscal quarters in which the Cure Right is not exercised, (ii) the Cure Right shall not be exercised more than five (5) times during the term of this Agreement, (iii) the Cure Amount shall not exceed the amount required to cause the Borrower to be in compliance with the covenant under Section 7.1(a) and (iv) neither the Administrative Agent nor any Lender or Secured Party shall exercise any remedy under the Loan

140

Documents or applicable law on the basis of an Event of Default caused by the failure to comply with Section 7.1(a) until after the Borrower's ability to cure has lapsed and Borrower has not exercised the Cure Right.  Notwithstanding any other provision in this Agreement to the contrary, the Cure Amount received pursuant to any exercise of the Cure Right shall be disregarded for all other purposes.

## SECTION 9

## THE ADMINISTRATIVE AGENT

9.1    **Appointment and Authority**.  Each of the Lenders hereby irrevocably appoints MSSF to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are expressly delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  The provisions of this Section 9.1 are solely for the benefit of the Administrative Agent and the Lenders, and neither Borrower nor any other Loan Party shall have rights as a third party beneficiary of any of such provisions.

9.2    **Rights as a Lender**.  Each person serving as the Administrative Agent from time to time hereunder shall have the same rights and powers in its capacity as a Lender (if the Administrative Agent is acting as a Lender) as any other Lender and may exercise the same as though it were not the Administrative Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include each person serving as the Administrative Agent hereunder in its individual capacity.  Such person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with Borrower or any Subsidiary or other Affiliate thereof as if such person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

9.3    **Exculpatory Provisions**.  The Administrative Agent shall have no duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, the Administrative Agent:

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); provided that the Administrative Agent shall not be required to take any action that, in its judgment or the judgment of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable Requirements of Law; and

141

(c)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to Borrower or any of its Affiliates that is communicated to or obtained by the person serving as the Administrative Agent or any of its Affiliates in any capacity.

The Administrative Agent shall not be liable for any action taken or not taken by it (x) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Section 10.2) or (y) in the absence of its own gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable judgment).  The Administrative Agent shall not be deemed to have knowledge of any Default unless and until notice describing such Default is given to the Administrative Agent by Borrower or a Lender.

The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or the existence, value or sufficiency of the Collateral or the validity of perfection or priority of any Lien created or purported to be created by the Loan Documents or (v) the satisfaction of any condition set forth in Section 5 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.  Without limiting the generality of the foregoing, the use of the term "agent" in this Agreement with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead, such term is used merely as a matter of market custom and is intended to create or reflect only an administrative relationship between independent contracting parties.

Each party to this Agreement acknowledges and agrees that the Administrative Agent may use an outside service provider for the tracking of all Uniform Commercial Code financing statements required to be filed pursuant to the Loan Documents and notification to the Administrative Agent of, among other things, the upcoming lapse or expiration thereof, and that any such service provider will be deemed to be acting at the request and on behalf of Borrower and the other Loan Parties.  The Administrative Agent shall not be liable for any action taken or not taken by any such service provider.

9.4    **Reliance by Administrative Agent**.  The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper person.  The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper person, and shall not incur any liability for relying thereon.  In

142

determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender in writing prior to the making of such Loan.  The Administrative Agent may consult with legal counsel (who may be counsel for Borrower or the Lenders or its own counsel), independent accountants and other experts selected by it, and shall be entitled to rely upon the advice of any such counsel, accountants or experts and shall not be liable for any action taken or not taken by it in accordance with such advice.

9.5    **Delegation of Duties**.  The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through, or delegate any and all such rights and powers to, any one or more sub-agents appointed by the Administrative Agent.  The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this <u>Section 9</u> shall apply to any such subagent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

9.6    **Resignation of Administrative Agent**.

(a)    The Administrative Agent may at any time give notice of its resignation to the Lenders and Borrower.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right, with the Borrower's consent (such consent not to be unreasonably withheld or delayed), to appoint a successor, which shall be a bank or other financial institution with an office in the United States, or an Affiliate of any such bank or other financial institution with an office in the United States.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent meeting the qualifications set forth above <u>provided</u> that if the Administrative Agent shall notify Borrower and the Lenders that no qualifying person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Loan Documents, the retiring Administrative Agent shall continue to hold such collateral security as nominee until such time as a successor Administrative Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Administrative Agent as provided for above in this paragraph.  Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent, and the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this paragraph).  The fees payable by Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between Borrower and such

143

successor.  After the retiring Administrative Agent's resignation hereunder and under the other Loan Documents, the provisions of this Section 9 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent.

(b)     [Reserved].

9.7     **Non-Reliance on Administrative Agent and Other Lenders**.  Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender further represents and warrants that it has had the opportunity to review each document made available to it in connection with this Agreement and has acknowledged and accepted the terms and conditions applicable to the recipients thereof.  Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

9.8     **Withholding Tax**.  To the extent required by any applicable law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding tax, in which case the Administrative Agent shall act in accordance with the first sentence of Section 2.19(d) as if it were a Loan Party, with any relevant receipts being delivered to the applicable Lender(s).  Without limiting or expanding the provisions of Section 2.18, 2.19 or 2.20, each Lender shall, and does hereby, indemnify the Administrative Agent against, and shall make payable in respect thereof within thirty (30) days after demand therefor, any and all taxes, interest, additions to tax and penalties and any and all related losses, claims, liabilities and expenses (including fees, charges and disbursements of any counsel for the Administrative Agent) incurred by or asserted against the Administrative Agent by the Internal Revenue Service or any other Governmental Authority as a result of the failure of the Administrative Agent to properly withhold tax from amounts paid to or for the account of any Lender for any reason (including, without limitation, because the appropriate form was not delivered or not property executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of, withholding tax ineffective).  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this Section 9.8.  The agreements in this Section 9.8 shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.  For the avoidance of doubt, the term "Lender" shall, for purposes of this Section 9.8, include each Conduit Lender.

144

9.9     **No Fiduciary Duties, Etc**.

(a)     In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each Loan Party acknowledges and agrees that (i) (A) the arranging and other services regarding this Agreement, if any, provided by the Administrative Agent and the Lenders are arm's-length commercial transactions between the Loan Parties and their respective Affiliates, on the one hand, and the Administrative Agent and the Lenders, on the other hand, (B) each Loan Party has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) each Loan Party is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) each of the Administrative Agent and the Lenders is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not and will not be acting as an advisor, agent or fiduciary for the Borrower, any of its Affiliates or any other Person and (B) none of the Lenders nor the Administrative Agent has any obligation to the Loan Parties or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Administrative Agent and the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower and its Affiliates, and none of the Lenders nor the Administrative Agent has any obligation to disclose any of such interests to the Borrower or any of its Affiliates.

(b)     [Reserved].

9.10     **Enforcement**.  Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent, or as the Required Lenders may require or otherwise direct, for the benefit of all the Lenders; provided, however, that the foregoing shall not prohibit (a) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) hereunder and under the other Loan Documents, (b) [reserved], (c) any Lender from exercising setoff rights in accordance with, and subject to, the terms of this Agreement, or (d) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any bankruptcy or insolvency law.

9.11     **Collateral and Guaranty Matters**.  Each of the Lenders (on behalf of itself, its Affiliates and Related Parties (including as counterparty to any Specified Swap Agreement or an obligor of Cash Management Obligations) irrevocably authorize the Administrative Agent, at its option and in its discretion:

(a)     to release any Lien on any property granted to or held by the Administrative Agent under any Loan Document (i) upon the payment in full of all Loan Obligations (other than contingent obligations not then due and payable), termination or expiration of the Commitments of the Lenders to make any Loan, (ii) that is sold or transferred or to be sold or transferred as part of or in connection with any sale permitted

145

hereunder to a Person that is not a Loan Party, (iii) that constitutes Excluded Property, (iv) if the property subject to such a Lien is owned by a Guarantor upon release of such Guarantor from its obligation under the Loan Documents, (v) if the real property subject to such Lien is located in an area that has been identified by the Secretary of Housing and Urban Development as a "Special Flood Hazard Area" or other area having special flood hazards (whether as a result of a change in the mapping of Special Flood Hazard Areas or otherwise) and in which flood insurance has been made available under the National Flood Insurance Act of 1968, (vi) if approved, authorized or ratified in writing in accordance with Section 10.2 or (vii) as contemplated by the Intercreditor Agreement;

(b)    to release any Subsidiary Guarantor from its Obligations (including any Guarantee Obligations) (i) if such Person ceases to be a Restricted Subsidiary (including upon the designation of a Subsidiary as an Unrestricted Subsidiary) or becomes an Excluded Subsidiary, in each case, as a result of a transaction permitted hereunder or (ii) if such release is required pursuant to the Intercreditor Agreement; and

(c)    to subordinate any Lien on any property (including the Collateral) granted to or held by the Administrative Agent under any Loan Document to the Liens on such property securing any other Lien on such property that is permitted to be senior hereunder, whether such subordination is effected pursuant to the Intercreditor Agreement or otherwise and to enter into customary intercreditor agreements (in form and substance reasonably satisfactory to the Administrative Agent) in connection with the incurrence of any such Lien permitted to be senior hereunder to effectuate such subordination and other customary terms.

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in and Liens on particular types or items of property (including the Collateral), or to release any Guarantor from its obligations under this Agreement and other Loan Documents pursuant to this Section 9.11. In each case as specified in this Section 9.11, the Administrative Agent will, at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of property or Collateral from the assignment and security interest and Lien granted under the Security Documents, or to subordinate its interest in and Lien on such item, or to release such Guarantor from its obligations under the Loan Documents, in each case in accordance with the terms of the Loan Documents and this Section 9.11.

9.12    **Indemnity; Damage Waiver**.

(a)    Reserved.

(b)    Reimbursement by Lenders. To the extent that Borrower for any reason fails to indefeasibly pay any amount required under Section 10.5 to be paid by it to the Administrative Agent (or any sub-agent thereof) or any Related Party of the Administrative Agent, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent) or such Related Party, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount (such

146

indemnity shall be effective whether or not the related losses, claims, damages, liabilities and related expenses are incurred or asserted by any party hereto or any third party); <u>provided</u> that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent) or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent) in connection with such capacity.  The obligations of the Lenders under this paragraph (b) are subject to the provisions of <u>Section 2.17</u>.  For purposes hereof, a Lender's "pro rata share" shall be determined on any date based upon its share of the sum of the outstanding Term Loans on such date.

(c)      <u>Waiver of Consequential Damages, Etc</u>.   To the fullest extent permitted by applicable Requirements of Law, no party hereto shall assert, and each party hereto hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.  No Indemnitee referred to in paragraph (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

(d)      <u>Payments</u>.  All amounts due under this <u>Section 9.12</u> shall be payable not later than three (3) Business Days after demand therefor.

(e)      <u>Specified Swap Agreements and Cash Management Obligations</u>.  No Lender (or any Affiliate of such Lender) that is a counterparty to any Specified Swap Agreement or in respect of any Cash Management Obligation that obtains the benefits of the Guarantee and Security Agreement or any Collateral by virtue of the provisions hereof or of the Security Agreement or any Security Document shall have any right to notice of any action or to consent to, direct or object to any action hereunder or under any other Loan Document or otherwise in respect of the Collateral (including the release or impairment of any Collateral) other than in its capacity as a Lender and, in such case, only to the extent expressly provided in the Loan Documents.   Notwithstanding any other provision of this <u>Section 9</u> to the contrary, the Administrative Agent shall not be required to verify the payment of, or that other satisfactory arrangements have been made with respect to Specified Swap Obligations or Cash Management Obligations unless the Administrative Agent has received written notice of such Specified Swap Obligations, together with such supporting documentation as the Administrative Agent may request from the applicable Lender.

9.13   [**Certain ERISA Matters**.

(a)      Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of the Administrative Agent and its Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that at least one of the following is and will be true:

(i)      such Lender is not using "plan assets" (within the meaning of 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA) of one or more Benefit Plans in connection with the Loans, any Existing Letters of Credit or the Commitments,

(ii)     the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, any Existing Letters of Credit, the Commitments and this Agreement,

(iii)    (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, any Existing Letters of Credit, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, any Existing Letters of Credit, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, any Existing Letters of Credit, the Commitments and this Agreement, or

(iv)     such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)      In addition, (I) unless sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or (II) if such sub-clause (i) is not true with respect to a Lender and such Lender has not provided another representation, warranty and covenant as provided in sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and its Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that:

(i)      none of the Administrative Agent or any of its Affiliates is a fiduciary with respect to the assets of such Lender (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related hereto or thereto),

(ii)     the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, any Existing Letters of Credit, the Term Commitments and this Agreement is

148

independent (within the meaning of 29 CFR § 2510.3-21) and is a bank, an insurance carrier, an investment adviser, a broker-dealer or other Person that holds, or has under management or control, total assets of at least $50 million, in each case as described in 29 CFR § 2510.3-21(c)(1)(i)(A)-(E),

(iii)    the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, any Existing Letters of Credit, the Term Commitments and this Agreement is capable of evaluating investment risks independently, both in general and with regard to particular transactions and investment strategies (including in respect of the Obligations),

(iv)    the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, any Existing Letters of Credit, the Term Commitments and this Agreement is a fiduciary under ERISA or the Code, or both, with respect to the Loans, any Existing Letters of Credit, the Term Commitments and this Agreement and is responsible for exercising independent judgment in evaluating the transactions hereunder, and

(v)    no fee or other compensation is being paid directly to the Administrative Agent or any of its Affiliates for investment advice (as opposed to other services) in connection with the Loans, any Existing Letters of Credit, the Term Commitments or this Agreement.

(c)    The Administrative Agent hereby informs the Lenders that it is not undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Person has a financial interest in the transactions contemplated hereby in that such Person or an Affiliate thereof (i) may receive interest or other payments with respect to the Loans, any Existing Letters of Credit, the Term Commitments and this Agreement, (ii) may recognize a gain if it extended the Loans, any Existing Letters of Credit or the Term Commitments for an amount less than the amount being paid for an interest in the Loans, any Existing Letters of Credit or the Term Commitments by such Lender or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Loan Documents or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, letter of credit fees, fronting fees, deal-away or alternate transaction fees, amendment fees, processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.]

## SECTION 10

## MISCELLANEOUS

10.1   **Amendments and Waivers**.  Except as provided in Section 2.24 with respect to an Extension Offer, in Section 2.25 with respect to any Incremental Facility Amendment, in Section 2.28 with respect to any Refinancing Amendments, in Permitted Amendments or as otherwise specifically provided herein, neither this Agreement nor any other Loan Document,

149

nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this Section 10.1.  The Required Lenders and each Loan Party party to the relevant Loan Document may, or, with the written consent of the Required Lenders, the Administrative Agent and each Loan Party party to the relevant Loan Document may, from time to time, (a) enter into written amendments, supplements or modifications hereto and to the other Loan Documents for the purpose of adding any provisions to this Agreement or the other Loan Documents or changing in any manner the rights of the Lenders or of the Loan Parties hereunder or thereunder or (b) waive, on such terms and conditions as the Required Lenders or the Administrative Agent, as the case may be, may specify in such instrument, any of the requirements of this Agreement or the other Loan Documents or any Default or Event of Default and its consequences; provided, however, that no such waiver and no such amendment, supplement or modification shall (i) except as provided for hereunder with respect to Refinancing Amendments, Section 2.10 or Section 2.24, forgive the principal amount or extend the final scheduled date of maturity of any Loan, reduce the stated rate of any interest or fee payable hereunder (except (x) in connection with the waiver of applicability of any post-default increase in interest rates (which waiver shall be effective with the consent of the Required Lenders) and (y) that any amendment or modification of defined terms used in the financial covenants in this Agreement shall not constitute a reduction in the rate of interest or fees for purposes of this clause (i)) or extend the scheduled date of any payment thereof, in each case without the written consent of each Lender (it being understood that waivers or modifications of conditions precedent, covenants, Defaults or Events of Default or of any mandatory reductions of Term Commitments shall not constitute an increase of Term Commitment of any Lender and that an increase in the available portion of any Term Commitment of any Lender shall not constitute an increase in the Term Commitment of any Lender) directly and adversely affected thereby; (ii) eliminate or reduce the voting rights of any Lender under this Section 10.1 without the written consent of such Lender; (iii) reduce any percentage specified in the definition of Required Lenders without the written consent of all Lenders (it being understood that, other than as specifically provided in this Agreement, including pursuant to (w) this Section 10.1 with respect to Replacement Tranche B Term Loans, (x) any Incremental Facility Amendment (the consent requirements for which are set forth in Section 2.25), (y) a Refinancing Amendment (the consent requirements for which are set forth in Section 2.28) and (z) an Extension Offer pursuant to Section 2.24, with the consent of the Required Lenders, additional extensions of credit pursuant to this Agreement may be included in the determination of the Required Lenders or a particular Class of Lenders on substantially the same basis as the Tranche B Term Loans on the Closing Date), (iv) consent to the assignment or transfer by the Borrower of any of its rights and obligations under this Agreement and the other Loan Documents, release all or substantially all of the Collateral or release all or substantially all of the Loan Parties (or Loan Parties owning all or substantially all of the Collateral) from their obligations under the Guarantee and Security Agreement (except as permitted hereunder or in accordance with its terms), in each case without the written consent of all Lenders (it being understood that any subordination of a Lien permitted hereunder shall not constitute a release of a Lien under this section and the granting of any *pari passu* Liens in connection with the incurrence of debt or the granting of Liens otherwise permitted hereunder from time to time (including pursuant to amendments) shall not constitute a release of Liens); (v) alter any provision regarding the pro rata treatment of the Lenders in a manner that would result in the Tranche B Term Lenders receiving less than their respective pro rata payments without the consent of all of the Tranche B Term Lenders, (vi) reduce the

150

percentage specified in the definition of Majority Facility Lenders with respect to any Facility without the written consent of all Lenders under such Facility; (vii) notwithstanding the first paragraph of this Section 10.1, amend, modify or waive any provision of Section 9 (or any other provision of any Loan Document affecting the rights and obligations of the Administrative Agent) without the written consent of the Administrative Agent; (viii) [reserved]; (ix) [reserved]; or (x) in connection with an amendment that addresses solely a repricing transaction in which any Class of Term Loans is refinanced with a Class of term loans bearing (or is modified in such a manner such that the resulting term loans bear) a lower yield, only the consent of the Lenders holding Term Loans subject to such permitted repricing transaction that will continue as a Lender in respect of the repriced tranche of Term Loans or modified Term Loans (it being agreed that if the opportunity of consent is made available to all Lenders on the same terms, only the consent of the Borrower and any of the parties identified in clauses (i) through (x) shall be required for an amendment, modification, supplement or waiver referred to therein).  Any such waiver and any such amendment, supplement or modification shall apply equally to each of the Lenders and shall be binding upon the Loan Parties, the Lenders, the Administrative Agent and all future holders of the Loans.  In the case of any waiver, the Loan Parties, the Lenders and the Administrative Agent shall be restored to their former position and rights hereunder and under the other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.  Notwithstanding the foregoing, no Lender consent is required to effect any amendment, modification or supplement to any intercreditor agreement or arrangement permitted under this Agreement or in any document pertaining to any Indebtedness permitted hereby that is permitted to be secured by the Collateral, including any Incremental Tranche B Term Loan, Refinancing Term Loan, Extended Term Loans, Refinancing Notes, Additional Term Notes, Additional Debt, Unrestricted Additional Term Notes and Permitted First Priority Refinancing Debt, Permitted Second Priority Refinancing Debt, or Permitted Unsecured Refinancing Debt for the purpose of adding the holders of such Indebtedness (or their Representative) as a party thereto and otherwise causing such Indebtedness to be subject thereto, in each case, as contemplated by the terms of the Intercreditor Agreement.

Notwithstanding the foregoing, this Agreement may be amended (or amended and restated) with the written consent of the then Required Lenders, the Administrative Agent and the Borrower (a) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents with the extensions of credit under the Facilities and the accrued interest and fees in respect thereof and (b) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders and Majority Facility Lenders.

In addition, notwithstanding the foregoing, this Agreement may be amended with the written consent of the Administrative Agent, the Borrower and the Lenders providing the relevant Replacement Tranche B Term Loans (as defined below) to permit the refinancing, replacement or modification of all outstanding Tranche B Term Loans ("Refinanced Tranche B Term Loans") with a replacement "B" term loan tranche hereunder ("Replacement Tranche B Term Loans"), provided that (a) the aggregate principal amount of such Replacement Tranche B Term Loans (with appropriate adjustments to take into account any upfront fees or original issue

151

discount) shall not exceed the aggregate principal amount of such Refinanced Tranche B Term Loans, (b) the Applicable Margin for such Replacement Tranche B Term Loans shall not be higher than the Applicable Margin for such Refinanced Tranche B Term Loans, (c) the weighted average life to maturity of such Replacement Tranche B Term Loans shall not be shorter than the weighted average life to maturity of such Refinanced Tranche B Term Loans at the time of such refinancing, and (d) the Lenders providing the relevant Replacement Tranche B Term Loans shall have the same relative rights and priorities under the Loan Documents as the Lenders of the Refinanced Tranche B Term Loans at the time of such refinancing.

If the Borrower wishes to replace the Term Commitments, Loans and other extensions of credit, as applicable, under any Facility (the "Facility Interests") with ones having different terms, it shall have the option, with the consent of the Administrative Agent and subject to at least three (3) Business Days' advance notice to the Lenders under such Facility, instead of reducing, terminating and repaying such Facility Interests to be replaced, to (i) require the Lenders under such Facility to assign such Facility Interests to the Administrative Agent or its designees and (ii) amend the terms thereof in accordance with this Section 10.1 (with such replacement, if applicable, being deemed to have been made pursuant to this Section 10.1). Pursuant to any such assignment, all Facility Interests to be replaced shall be purchased by the Borrower at par (allocated among the Lenders under such Facility in the same manner as would be required if all Loans included therein were being optionally prepaid and all Term Commitments included therein were being optionally reduced or terminated by the Borrower), accompanied by payment of any accrued interest and fees thereon and any amounts owing pursuant to Sections 2.20 or 3. By receiving such purchase price, the Lenders under such Facility shall automatically be deemed to have assigned the Facility Interests under such Facility pursuant to the terms of the form of Assignment and Assumption attached hereto as Exhibit A, and accordingly no other action by such Lenders shall be required in connection therewith. The provisions of this paragraph are intended to facilitate the maintenance of the perfection and priority of existing security interests in and Liens on the Collateral during any such replacement.

The Borrower may, by written notice to the Administrative Agent from time to time, make one or more offers (each, a "Loan Modification Offer") to all the Lenders of one or more Classes of Loans and/or Term Commitments (each Class subject to such a Loan Modification Offer, an "Affected Class") to make one or more Permitted Amendments (as defined below) pursuant to procedures reasonably specified by the Administrative Agent and reasonably acceptable to the Borrower. Such notice shall set forth (i) the terms and conditions of the requested Permitted Amendment and (ii) the date on which such Permitted Amendment is requested to become effective (which shall not be less than five (5) Business Days nor more than thirty (30) Business Days after the date of such notice, unless otherwise agreed to by the Administrative Agent). Permitted Amendments shall become effective only with respect to the Loans and Term Commitments of the Lenders of the Affected Class that accept the applicable Loan Modification Offer (such Lenders, the "Accepting Lenders") and, in the case of any Accepting Lender, only with respect to such Lender's Loan and Term Commitments of such Affected Class as to which such Lender's acceptance has been made.

The Borrower and each Accepting Lender shall execute and deliver to the Administrative Agent such documentation as the Administrative Agent shall reasonably specify to evidence the acceptance of the Permitted Amendments and the terms and conditions thereof. The

152

Administrative Agent shall promptly notify each Lender as to the effectiveness of each Permitted Amendment.  Each of the parties hereto hereby agrees that, upon the effectiveness of any Permitted Amendment, this Agreement shall be deemed amended to the extent (but only to the extent) necessary to reflect the existence and terms of such Permitted Amendment and only with respect to the Loans and Term Commitments of the Accepting Lenders of the Affected Class.  Notwithstanding the foregoing, no Permitted Amendment shall become effective unless the Administrative Agent, to the extent so reasonably requested by the Administrative Agent, shall have received legal opinions, board resolutions and/or an officer's certificate consistent with those delivered on the Closing Date under Sections 5.1 and 5.2.

"Permitted Amendments" shall be (i) an extension of the final maturity date of the applicable Loans and/or Term Commitments of the Accepting Lenders (provided that such extensions may not result in having more than one additional final maturity date under this Agreement in any year without the consent of the Administrative Agent), (ii) a reduction or elimination of the scheduled amortization of the applicable Loans of the Accepting Lenders, (iii) change in the required percentage with respect to the applicable Loans and/or Term Commitments of the Accepting Lenders (including by implementation of a new "LIBOR floor") and the payment of additional fees to the Accepting Lenders (any such increase and/or payments to be in the form of cash, Capital Stock or other property to the extent not prohibited by this Agreement) and (iv) if the right to participate in such amendment is provided to all Lenders on the same terms, a reduction of the principal amount of the applicable Loans and/or Term Commitments or a conversion of the principal amount of the applicable Loans to equity.

10.2   **Notices**.  All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered, or three (3) Business Days after being deposited in the mail, postage prepaid, or, in the case of telecopy notice, when received, addressed as follows in the case of the Borrower and the Administrative Agent, and as set forth in an administrative questionnaire delivered to the Administrative Agent in the case of the Lenders, or to such other address as may be hereafter notified by the respective parties hereto:

the Borrower:  21ST CENTURY ONCOLOGY, INC.
2270 Colonial Boulevard
Fort Myers, FL 33907
Attention:   [Kim Commins-Tzoumakas]
Telecopy:   [(239) 931-7380]

with a copy to:  KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Attn:  Christopher Butler, P.C.
Telecopy:   (312) 862-2200
Telephone:  (312) 862-2000

Administrative Agent:  MORGAN STANLEY SENIOR FUNDING, INC.

153

1300 Thames Street, 4th Floor
Baltimore, MD 21231
Telecopy: (917) 260-0588
Telephone: (212) 507-6680
E-mail (for Borrower):
AGENCY.BORROWERS@morganstanley.com
E-mail (for Lenders):
MSAGENCY@morganstanley.com

with a copy to:  CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, NY 10005
Attn: Darren Silver, Richard Stieglitz Jr. and Joel Levitin
Telecopy: (212) 378-2452
Telephone: (212) 701-3393
E-mail: dsilver@cahill.com, rstieglitz@cahill.com and jlevitin@cahill.com

provided that any notice, request or demand to or upon the Administrative Agent or the Lenders shall not be effective until received.

Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices pursuant to Section 2 unless otherwise agreed by the Administrative Agent and the applicable Lender. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

10.3  **No Waiver; Cumulative Remedies**. The Lenders and the Administrative Agent shall have other rights and remedies not inconsistent herewith as provided under the Uniform Commercial Code, by law, or in equity. No failure to exercise and no delay in exercising, on the part of the Administrative Agent or any Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

10.4  **Survival of Representations and Warranties**. All representations and warranties made hereunder, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loans and other extensions of credit hereunder.

10.5  **Payment of Expenses**. The Borrower agrees (a) to pay or reimburse the Administrative Agent for all its reasonable and documented (with supporting documentation)

154

out-of-pocket costs and expenses (including, but not limited to, due diligence expenses, syndication expenses and travel expenses) incurred in connection with the development, preparation and execution of, and any amendment, supplement or modification to, this Agreement and the other Loan Documents and any other documents prepared in connection herewith or therewith, and the consummation and administration of the transactions contemplated hereby and thereby, including the reasonable and documented fees and disbursements of one counsel to the Administrative Agent (and, to the extent necessary, one local counsel to the Administrative Agent in any applicable jurisdiction as to which the Administrative Agent reasonably determines local counsel is necessary) and such other counsel and any other advisor or consultant to the Administrative Agent as is retained solely with the Borrower's consent, and filing and recording fees and expenses, with statements with respect to the foregoing to be submitted to the Borrower prior to the Closing Date (in the case of amounts to be paid on the Closing Date) and from time to time thereafter on a quarterly basis or such other periodic basis as the Administrative Agent and Borrower shall deem appropriate, (b) to pay or reimburse the Administrative Agent for all its reasonable and documented out-of-pocket costs and expenses incurred in connection with the enforcement of any rights under this Agreement, the other Loan Documents and any such other documents, limited, in the case of legal fees, to the reasonable and documented fees and disbursements of one counsel to all Lenders and the Agents in the aggregate and one local counsel in each applicable jurisdiction, (c) to pay, indemnify, and hold the Administrative Agent harmless from, any and all recording and filing fees that may be payable or determined to be payable in connection with the execution and delivery of, or consummation or administration of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Agreement, the other Loan Documents and any such other documents, and (d) to pay, indemnify, and hold (i) each Lender and each Agent and (ii) each of the foregoing's respective partners, trustees, shareholders, officers, directors, employees, agents and controlling persons (each, an "Indemnitee") harmless from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Agreement, the other Loan Documents and any such other documents, including any of the foregoing relating to the use of proceeds of the Loans or the violation of, noncompliance with or liability under, any Environmental Law applicable to the operations of any Group Member or any of the Properties and the reasonable fees and expenses of one legal counsel for the Agents and all Lenders (and one local counsel to such Lenders in any applicable jurisdiction as to which the Lenders reasonably determine is necessary and one regulatory counsel to such Lenders and Agents) in connection with claims, actions or proceedings by any Indemnitee against any Loan Party under any Loan Document (all the foregoing in this clause (d), collectively, the "Indemnified Liabilities"), provided that the Borrower shall have no obligation hereunder to any Indemnitee with respect to Indemnified Liabilities to the extent such Indemnified Liabilities are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from the gross negligence, bad faith, willful misconduct of or material breach of any Loan Document by such Indemnitee (or any of such Indemnitee's Affiliates, partners, trustees, shareholders, officers, directors, employees, agents, controlling persons or their respective officers, directors, employees or agents), to the extent such Indemnitee has settled any claim without the consent of the Borrower (which is not to be unreasonably withheld or delayed) or disputes between Lenders not arising from any act or

155

omission of the Borrower or any of its Affiliates (other than with respect to a dispute with a Lender in its capacity as Administrative Agent).  Without limiting the foregoing, and to the extent permitted by applicable law, the Borrower agrees not to assert and to cause its Subsidiaries not to assert, and hereby waives and agrees to cause its Subsidiaries to waive, all rights for contribution or any other rights of recovery with respect to all claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind or nature, under or related to Environmental Laws, that any of them might have by statute or otherwise against any Indemnitee, except to the extent such claims, demands, penalties, fines, liabilities, settlements, damages, costs, and expenses of whatever kind or nature, under or related to Environmental Laws, are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from (i) the gross negligence, bad faith or willful misconduct, of or material breach of any Loan Document by, such Indemnitee (or any of such Indemnitee's Affiliates or their respective officers, directors, employees or agents), as determined by a court of competent jurisdiction in a final and nonappealable decision, (ii) to the extent such Indemnitee has settled any claim without the consent of the Borrower (which is not to be unreasonably withheld or delayed) or (iii) disputes solely between Indemnitees (other than with respect to a dispute with an Indemnitee in its capacity as Administrative Agent) that do not arise out of any act or omission of the Borrower or any of its Subsidiaries.  In the case of any investigation, litigation or other proceeding to which the indemnity in clause (d) of this Section applies, such indemnity shall be effective whether or not such investigation, litigation or other proceeding is brought by a third party or any Group Member or an Indemnitee, and whether or not an Indemnitee is otherwise a party thereto.  All amounts due under this Section 10.5 shall be payable not later than thirty (30) days after written demand therefor.  Statements payable by the Borrower pursuant to this Section 10.5 shall be submitted to the address of the Borrower set forth in Section 10.2, or to such other Person or address as may be hereafter designated by the Borrower in a written notice to the Administrative Agent.  The agreements in this Section 10.5 shall survive termination of the Term Commitments and repayment of the Loans and all other amounts payable hereunder.  This Section 10.5 shall not apply with respect to Taxes other than Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

10.6   **Successors and Assigns; Participations and Assignments**.

(a)   The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section.

(b)   (i) Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more assignees (each, an "Assignee") all or a portion of its rights and obligations under this Agreement (including all or a portion of its Term Commitments and the Loans at the time owing to it) with the prior written consent of:

(A)   the Borrower (such consent not to be unreasonably withheld or delayed), provided that no consent of the Borrower shall be required for an assignment to a Lender,

156

an Affiliate of a Lender, an Approved Fund (as defined below) or, if an Event of Default under Section 8(a) or 8(f) has occurred and is continuing, any other Person; and

(B) [reserved].

(ii) Assignments shall be subject to the following additional conditions:

(A) except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's interests under any Facility, the amount of the Term Commitments or Tranche B Term Loans, as applicable, of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000 unless each of the Borrower and the Administrative Agent otherwise consent, provided that no such consent of the Borrower shall be required if an Event of Default under Section 8(a) or 8(f) has occurred and is continuing;

(B) except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, the Administrative Agent shall consent to such assignment (such consent not to be unreasonably withheld, delayed or conditioned);

(C) each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement, provided that this clause shall not be construed to prohibit the assignment of a proportionate part of all the assigning Lender's rights and obligations in respect of each Facility. Section 10.6(b)(ii)(B) shall not be construed to prohibit assignment of a proportionate part of all the assigning Lender's rights and obligations in respect of a single Facility;

(D) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500;

(E) the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an administrative questionnaire in which the Assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Borrower, the Loan Parties and their Related Parties or their respective securities) will be made available and who may receive such information in accordance with the Assignee's compliance procedures and applicable laws, including Federal and state securities laws; and

(F) No assignment shall be made to (i) a competitor of the Borrower or a Subsidiary of the Borrower separately identified in writing by Borrower or Holdings to the Administrative Agent at any time after the Closing Date and any Affiliate of any such competitor that is either separately identified in writing by Borrower or Holdings to the Administrative Agent or any such Affiliate of any such competitor that is reasonably identifiable as an Affiliate of such competitor on the basis of such Affiliate's name (other than any such Affiliates that are bona fide debt funds that are engaged in making or purchasing commercial loans in the ordinary course of business, except to the extent such

157

Affiliate is otherwise disqualified pursuant to following clause (ii), (iii) or (iv)), (ii) any other Person identified by the Borrower to the Administrative Agent in writing on or prior to the Closing Date, (iii) (x) any Affiliate or (y) any fund that is administered or managed by an Affiliate, in each case, of the Persons described in the preceding clause (ii) that is in each case either separately identified in writing by Borrower or Holdings to the Administrative Agent or that is reasonably identifiable as an Affiliate of such Person or fund administered or managed by such Person (or an Affiliate of such Person) referred to in clause (ii) on the basis of such Affiliate's or fund's name, and (iv) any Excluded Party (each, a "Disqualified Lender"); it being understood and agreed that list referenced in clauses (i) and (ii) above shall be available to the Lenders upon request.

For the purposes of this Section 10.6, "Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

(iii)    Subject to acceptance and recording thereof pursuant to paragraph (b)(iv) below, from and after the effective date specified in each Assignment and Assumption the Assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.18, 2.19, 2.20 and 10.5).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 10.6 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section.

(iv)    The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Term Commitments of, and principal and stated interest amount of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by the Borrower or any Lender (but in the case of any Lender (in its capacity as such), as to such Lender's Loans, Term Commitments, principal and fees owing to such Lender only) at any reasonable time and from time to time upon reasonable prior notice.

(v)    Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an Assignee, the Assignee's completed administrative questionnaire (unless the Assignee shall already be a Lender hereunder),

158

the processing and recordation fee referred to in paragraph (b) of this Section and any written consent to such assignment required by paragraph (b) of this Section, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.  Notwithstanding anything to the contrary contained in this Agreement, the Loans are registered obligations and the right, title and interest of the Lenders in and to such Loans shall be transferable only in accordance with the terms hereof.  This Section 10.6(b)(v) shall be construed so that the Loans are at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code.

(c)      (i)  Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations to one or more banks or other entities that are not a Disqualified Lender (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Term Commitments and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of the Loan Documents; provided that such agreement may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that (1) requires the consent of each Lender directly affected thereby pursuant to the proviso to the second sentence of Section 10.1 and (2) directly affects such Participant.  Subject to paragraph (c)(ii) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.18, 2.19 and 2.20 (subject to the requirements and limitations of such Sections (including Sections 2.19(e), (f) and (h)) and Sections 2.21 and 2.22 as if the Participant were a Lender) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.7(b) as though it were a Lender, provided that such Participant shall be subject to Section 10.7(a) as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register of its Participants in compliance with Section 5f.103-1(c) of the United States Treasury Regulations; provided, however, that no Lender shall have any obligation to disclose all or any portion of such register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in a Participant register shall be conclusive absent manifest error, and the parties shall treat each Person whose name is recorded in the Participant register as the Participant for all purposes of this Agreement, notwithstanding a notice to the contrary.

(ii)      A Participant shall not be entitled to receive any greater payment under Section 2.18 or 2.19 than the applicable Lender would have been entitled to receive with

159

respect to the participation sold to such Participant except to the extent such entitlement to a greater payment results from a change in any Requirement of Law after the Participant became a Participant.

(d)      Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender (and any initial or subsequent pledgee or grantee, as the case may be, may in turn at any time and from time to time pledge or grant a security interest in all or any portion of such rights as collateral security to secure obligations of such Person), including any pledge or assignment to secure obligations to a Federal Reserve Bank or other central bank, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or Assignee for such Lender as a party hereto.

(e)      The Borrower, upon receipt of written notice from the relevant Lender, agrees to issue Notes to any Lender requiring Notes to facilitate transactions of the type described in paragraph (d) above.

(f)      Notwithstanding the foregoing, any Conduit Lender may assign any or all of the Loans it may have funded hereunder to its designating Lender without the consent of the Borrower or the Administrative Agent and without regard to the limitations set forth in Section 10.6(b).  Each of the Borrower, each Lender and the Administrative Agent hereby confirms that it will not institute against a Conduit Lender or join any other Person in instituting against a Conduit Lender any bankruptcy, reorganization, arrangement, insolvency or liquidation proceeding under any state bankruptcy or similar law, for one year and one (1) day after the payment in full of the latest maturing commercial paper note issued by such Conduit Lender; provided, however, that each Lender designating any Conduit Lender hereby agrees to indemnify, save and hold harmless each other party hereto for any loss, cost, damage or expense arising out of its inability to institute such a proceeding against such Conduit Lender during such period of forbearance.

(g)      (i) Notwithstanding anything else to the contrary contained in this Agreement, any Lender may assign all or a portion of its Term Loans to any Debt Fund Affiliate, Non-Debt Fund Affiliate or Purchasing Borrower Party; provided that:

(A)      if a Purchasing Borrower Party is an assignee, no Default or Event of Default has occurred or is continuing or would result therefrom;

(B)      the assigning Lender and Non-Debt Fund Affiliate or Purchasing Borrower Party purchasing such Lender's Term Loans shall execute and deliver to the Administrative Agent an assignment agreement substantially in the form of Exhibit G (an "Affiliated Lender Assignment and Assumption") in lieu of an Assignment and Assumption (which shall include a customary "big boy" disclaimer by all parties thereto);

(C)      [reserved];

160

(D)     any Term Loans assigned to any Purchasing Borrower Party shall be automatically and permanently cancelled upon the effectiveness of such assignment and will thereafter no longer be outstanding for any purpose hereunder;

(E)     [reserved]; and

(F)     no Term Loan may be assigned to a Non-Debt Fund Affiliate pursuant to this Section 10.6(g) if after giving effect to such assignment, Non-Debt Fund Affiliate in the aggregate would own in excess of 25% of the aggregate principal amount of all Term Loans then outstanding.

(ii)     Notwithstanding anything to the contrary in this Agreement, no Non-Debt Fund Affiliate shall have any right to (i) attend (including by telephone) any meeting or discussions (or portion thereof) among the Administrative Agent or any Lender to which representatives of the Loan Parties are not invited, and (ii) receive any information or material prepared by the Administrative Agent or any Lender or any communication by or among the Administrative Agent and/or one or more Lenders, except to the extent such information or materials have been made available to any Loan Party or its representatives (and in any case, other than the right to receive notices of prepayments and other administrative notices in respect of its Loans required to be delivered to Lenders), or (iii) make or bring (or participate in, other than as a passive participant in or recipient of its pro rata benefits of) any claim, in its capacity as a Lender, against the Administrative Agent or any other Lender with respect to any duties or obligations or alleged duties or obligations of such Agent or any other such Lender under the Loan Documents (other than for payments due).

(iii)     Each Lender participating in any assignment to any Non-Debt Fund Affiliate or Purchasing Borrower Party acknowledges and agrees that in connection with such assignment, (1) any Non-Debt Fund Affiliate or Purchasing Borrower Party then may have, and later may come into possession of information regarding Holdings, the Borrower, their respective Affiliates not known to such Lender and that may be material to a decision by such Lender to participate in such prepayment (including material non-public information), (2) such Lender has independently and, without reliance on any Non-Debt Fund Affiliate or Purchasing Borrower Party or any of their Subsidiaries, the Borrower or any of their Subsidiaries, or the Administrative Agent, has made its own analysis and determination to participate in such assignment notwithstanding such Lender's lack of knowledge of the Excluded Information, (3) none of any Non-Debt Fund Affiliate or Purchasing Borrower Party or any of their Subsidiaries, the Borrower or their respective Subsidiaries, or the Administrative Agent shall have any liability to such Lender, and such Lender hereby waives and releases, to the extent permitted by law, any claims such Lender may have against any Non-Debt Fund Affiliate or Purchasing Borrower Party and any of their Subsidiaries, the Borrower and their respective Subsidiaries, and the Administrative Agent, under applicable laws or otherwise, with respect to the nondisclosure of the Excluded Information and (4) that the Excluded Information may not be available to the Administrative Agent or the other Lenders.

161

(iv)     Any Non-Debt Fund Affiliate may, with the consent of the Borrower and with written notice to the Administrative Agent, contribute any of its Term Loans to the Borrower (whether through any of its direct or indirect parent entities or otherwise) and, to the extent agreed with the Borrower, may in return receive (1) loans or Permitted Capital Stock of the Borrower or any parent entity of the Borrower (to the extent not constituting a Change of Control) or (2) an unsecured loan from the Borrower that (v) does not have a cash interest rate in excess of the interest rate applicable to the Loans so contributed by such Non-Debt Fund Affiliate plus 3.0%, (w) is subordinated in right of payment to the Obligations of the Borrower, (x) is not subject to any scheduled amortization, redemption, sinking fund or similar payment and does not have a final maturity, in each case, on or before the date that is 91 days after the Tranche B Maturity Date, (y) does not include any financial covenants and (z) does not include any covenant, default or other agreement that is more restrictive (taken as a whole) on the Loan Parties in any material respect than any comparable covenant in this Agreement.  Any Term Loans so contributed pursuant to this subsection shall, without further action by any Person, be deemed cancelled for all purposes and no longer outstanding (and may not be resold by the Borrower), for all purposes of this Agreement and all other Loan Documents, including, but not limited to (A) the making of, or the application of, any payments to the Lenders under this Agreement or any other Loan Document, (B) the making of any request, demand, authorization, direction, notice, consent or waiver under this Agreement or any other Loan Document or (C) the determination of Required Lenders, or for any similar or related purpose, under this Agreement or any other Loan Document.  In connection with any Term Loans so cancelled pursuant to this subsection, Administrative Agent is authorized to make appropriate entries in the Register to reflect any such cancellation.  Any non-cash gains from the cancellation of such Term Loans shall not increase Consolidated EBITDA or Excess Cash Flow for any purpose hereunder.  The cancellations contemplated by this subsection shall be deemed to be optional prepayments by the Borrower pursuant to Section 2.10, and the principal amount of any such Term Loans so cancelled shall be applied on a pro rata basis to reduce the scheduled remaining installments of principal on such Term Loans (including the installment due on the Tranche B Maturity Date).

(h)     Notwithstanding anything in Section 10.1 or the definition of "Majority Facility Lenders" or "Required Lenders" to the contrary, for purposes of determining whether the "Majority Facility Lenders" with respect to the Tranche B Term Facility or "Required Lenders" have (i) consented (or not consented) to any amendment, modification, waiver, consent or other action with respect to any of the terms of any Loan Document or any departure by any Loan Party therefrom, (ii) otherwise acted on any matter related to any Loan Document, or (iii) directed or required the Administrative Agent or any Lender to undertake any action (or refrain from taking any action) with respect to or under any Loan Document:

(i)     all Tranche B Term Loans held by any Non-Debt Fund Affiliate shall be deemed to be not outstanding for all purposes of calculating whether the Required Lenders have taken any actions; and

(ii)     all Tranche B Term Loans held by Debt Fund Affiliates may not account for more than 49.9% of the aggregate principal amount of the Tranche B Term Loans of

162

consenting Lenders then outstanding included in determining whether the "Required Lenders" have consented to any action pursuant to Section 10.1.

Additionally, the Loan Parties and each Non-Debt Fund Affiliate hereby agree that if a case under Title 11 of the United States Code is commenced against any Loan Party, such Loan Party shall seek (and each Non-Debt Fund Affiliate shall consent) to provide that the vote of any Non-Debt Fund Affiliate (in its capacity as a Lender) with respect to any plan of reorganization of such Loan Party shall not be counted except that such Non-Debt Fund Affiliates' vote (in its capacity as a Lender) may be counted to the extent any such plan of reorganization proposed to treat the Obligations held by such Non-Debt Fund Affiliate in a manner that is less favorable in any material respect to such Non-Debt Fund Affiliate than the proposed treatment of similar Obligations held by Lenders that are not Affiliates of the Borrower.  Each Non-Debt Fund Affiliate hereby irrevocably appoints the Administrative Agent (such appointment being coupled with an interest) as such Non-Debt Fund Affiliate's attorney-in-fact, with full authority in the place and stead of such Non-Debt Fund Affiliate and in the name of such Non-Debt Fund Affiliate, from time to time in the Administrative Agent's discretion to take any action and to execute any instrument that the Administrative Agent may deem reasonably necessary to carry out the provisions of this paragraph.

(i)     Notwithstanding anything else to the contrary contained in this Agreement, the Administrative Agent shall not have any responsibility or liability for monitoring the list of or processing assignments to Disqualified Lenders or any Affiliates of the Borrower or compliance with the terms of any of the provisions set forth herein with respect to Disqualified Lenders or Affiliates of the Borrower.  Notwithstanding the foregoing or anything else to the contrary in this Agreement, each of the parties hereto acknowledges and agrees that the Administrative Agent (x) shall not have any responsibility or obligation to determine whether any Lender or any potential assignee Lender is a Disqualified Lender or an Affiliate of the Borrower or (y) shall not have any liability with respect to any assignment or participation made to a Disqualified Lender or an Affiliate of the Borrower.

10.7   **Adjustments; Set-off**.

(a)     Except to the extent that this Agreement expressly provides for payments to be allocated to a particular Lender or to the Lenders under a particular Facility, if any Lender (a "Benefitted Lender") shall receive any payment of all or part of the Obligations owing to it, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set-off, pursuant to events or proceedings of the nature referred to in Section 8(f), or otherwise), in a greater proportion than any such payment to or collateral received by any other Lender, if any, in respect of the Obligations owing to such other Lender, such Benefitted Lender shall purchase for cash from the other Lenders a participating interest in such portion of the Obligations owing to each such other Lender, or shall provide such other Lenders with the benefits of any such collateral, as shall be necessary to cause such Benefitted Lender to share the excess payment or benefits of such collateral ratably with each of the Lenders; provided, however, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefitted Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest; provided, further, that no amount received from any Loan Party shall be applied to any Excluded Swap Obligation of such Loan Party; provided, further, that the

163

provisions of this paragraph shall not be construed to apply to (v) any payment or prepayment made by or on behalf of the Borrower or any other Loan Party pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender), (w) [reserved], (x) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant or the termination of any Lender's commitment and non-pro rata repayment of Loans pursuant to Section 2.22 or 2.27, (y) transactions in connection with an open market purchase or a "Dutch auction", or (z) in connection with a transaction pursuant to an Extension Offer, Refinancing Amendment or Incremental Facility Amendment or amendment in connection with a Permitted Refinancing, or Indebtedness incurred pursuant to Section 10.6. For the avoidance of doubt, this Section shall not limit the ability of the Borrower or any Restricted Subsidiary to (i) purchase and retire Term Loans pursuant to an open market purchase or a "Dutch auction" or (ii) pay principal, fees, premiums and interest with respect to Refinancing Term Loans, Refinanced Tranche B Term Loans or Incremental Tranche B Term Loans following the effectiveness of any Refinancing Amendment, any Extension Offer or Incremental Facility Amendment or exchange, as applicable, on a basis different from the Loans of such Class that will continue to be held by Lenders that were not Extending Term Lenders or Lenders pursuant to such Incremental Facility Amendment, as applicable.

(b)      In addition to any rights and remedies of the Lenders provided by law, each Lender shall have the right after the occurrence and during the continuance of an Event of Default, subject to the prior written consent of the Administrative Agent, without prior notice to the Borrower, any such notice being expressly waived by the Borrower to the extent permitted by applicable law, upon any amount becoming due and payable by the Borrower hereunder (whether at the stated maturity, by acceleration or otherwise), to set off and appropriate and apply against such amount then due and payable any and all deposits (general or special, time or demand, provisional or final other than payroll or trust accounts), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any branch or agency thereof to or for the credit or the account of the Borrower, as the case may be; provided that if any Defaulting Lender shall exercise any such right of setoff, (i) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of this Agreement and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders and (ii) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the obligations owing to such Defaulting Lender as to which it exercised such right of set-off.  Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such setoff and application made by such Lender, provided that the failure to give such notice shall not affect the validity of such setoff and application.

10.8   **Counterparts**.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  Delivery of an executed signature page of this Agreement by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.  A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrower and the Administrative Agent.

10.9   **Severability**.   Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

10.10   **Integration**.   This Agreement and the other Loan Documents represent the entire agreement of the Borrower, the Administrative Agent and the Lenders with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Administrative Agent or any Lender relative to the subject matter hereof not expressly set forth or referred to herein or in the other Loan Documents.

10.11   **GOVERNING LAW**.   THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (EXCEPT AS EXPRESSLY SET FORTH TO THE CONTRARY THEREIN), AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

10.12   **Submission to Jurisdiction; Waivers**.   Each of the parties hereto hereby irrevocably and unconditionally:

(a)   submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the general jurisdiction of the courts of the State of New York, the courts of the United States for the Southern District of New York, and appellate courts from any thereof, in each case, located in the Borough of Manhattan;

(b)   consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)   agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to the Borrower, as the case may be at its address set forth in Section 10.2 or at such other address of which the Administrative Agent shall have been notified pursuant thereto;

(d)   agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction; and

(e)   waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section any special, exemplary, punitive or consequential damages; provided that nothing contained in this Section 10.12(e) shall limit the Borrower's indemnity and reimbursement obligations to the extent set forth in Section 10.5.

10.13   **Acknowledgements**.   The Borrower hereby acknowledges that:

165

(a)     it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b)     neither the Administrative Agent nor any Lender has any fiduciary relationship with or duty to the Borrower arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Administrative Agent and Lenders, on one hand, and the Borrower, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)     no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or among the Borrower and the Lenders.

10.14  **Releases of Guarantees and Liens**.  Notwithstanding anything to the contrary contained herein or in any other Loan Document, the Administrative Agent is hereby irrevocably authorized by each Lender (without requirement of notice to or consent of any Lender except as expressly required by Section 10.1) to take any action requested by the Borrower having the effect of releasing any Collateral or guarantee obligations (i) to the extent necessary to permit consummation of any sale or Disposition of Collateral (to a Person that is not a Loan Party) not prohibited by any Loan Document or that has been consented to in accordance with Section 10.1 or (ii) under the circumstances described in Section 9.11.

10.15  **Confidentiality**.  Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority (including any self-regulatory authority), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or the enforcement of rights hereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations thereunder, (g) with the consent of the Borrower or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Administrative Agent or any Lender on a non-confidential basis from a source other than the Borrower; provided, however, that with respect to disclosures pursuant to clauses (b) and (c) of this Section (other than disclosures pursuant to routine regulatory examinations) and clause (e) of this Section (as such clause relates to suits, actions or proceedings in which disclosure is being sought by a third party), unless prohibited by applicable Requirements of Law or court order, each Lender and the Administrative Agent shall (x) notify the Borrower of any request by any Governmental Authority or representative thereof or other Person for disclosure of confidential and non-public information after receipt of such request and (y) if such disclosure of such confidential or non-public information is legally required, furnish only such portion of such information as it is

166

legally compelled to disclose and exercise commercially reasonable efforts to obtain an order or other reliable assurance that confidential treatment will be accorded to the disclosed information.

For the purposes of this Section, "Information" means all information received from the Borrower relating to the Borrower or its business, other than any such information that is available to the Administrative Agent or any Lender on a non-confidential basis prior to disclosure by the Borrower; provided that, in the case of information received from the Borrower after the Closing Date, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

EACH LENDER ACKNOWLEDGES THAT INFORMATION AS DEFINED IN SECTION 10.15 FURNISHED TO IT PURSUANT TO THIS AGREEMENT MAY INCLUDE MATERIAL NON-PUBLIC INFORMATION CONCERNING THE BORROWER AND ITS RELATED PARTIES OR THEIR RESPECTIVE SECURITIES, AND CONFIRMS THAT IT HAS DEVELOPED COMPLIANCE PROCEDURES REGARDING THE USE OF MATERIAL NON-PUBLIC INFORMATION AND THAT IT WILL HANDLE SUCH MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH THOSE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

10.16 **WAIVERS OF JURY TRIAL**.  HOLDINGS, THE BORROWER, THE ADMINISTRATIVE AGENT AND THE LENDERS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.

10.17 **USA PATRIOT ACT**.  Each Lender that is subject to the requirements of the Patriot Act hereby notifies the Borrower and each Guarantor that pursuant to the requirements of the Act, it is required to obtain, verify and record information that identifies the Borrower or such Guarantor, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower and each Guarantor in accordance with the Patriot Act.

10.18 **Intercreditor Agreement Governs**.  Each Lender and Agent (a) hereby agrees that it will be bound by and will take no actions contrary to the provisions of any intercreditor agreement (including the Intercreditor Agreement) entered into pursuant to the terms hereof, (b) hereby authorizes and instructs the Administrative Agent to enter into each intercreditor agreement (including the Intercreditor Agreement) entered into pursuant to the terms hereof and to subject the Liens securing the Secured Obligations to the provisions thereof and (c) hereby authorizes and instructs the Administrative Agent to enter into any intercreditor agreement that includes, or to amend any then existing intercreditor agreement to provide for, the terms described in the definition of the terms "Permitted First Priority Refinancing Debt" or "Permitted Second Priority Refinancing Debt" or other "First Lien Senior Secured Note," as applicable or as otherwise provided for by the terms of this Agreement; provided that in each case, such

167

intercreditor agreement is substantially consistent with the Intercreditor Agreement together with (A) any immaterial changes and (B) material changes thereto in light of prevailing market conditions, which material changes shall be posted to the Lenders not less than five (5) Business Days before execution thereof and, if the Required Lenders shall not have objected to such changes within five (5) Business Days after posting, then the Required Lenders shall be deemed to have agreed that the Administrative Agent's entry into such intercreditor agreement (with such changes) is reasonable and to have consented to such intercreditor agreement (with such changes) and to the Administrative Agent's execution thereof (it being understood that junior Liens are not required to be pari passu with other junior Liens, and that Indebtedness secured by junior Liens may be secured by Liens that are pari passu with, or junior in priority to, other Liens that are junior to the Liens securing the Secured Obligations).

10.19 **Acknowledgement and Consent to Bail-In of EEA Financial Institutions**. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)     the effects of any Bail-in Action on any such liability, including, if applicable:

(i)     a reduction in full or in part or cancellation of any such liability;

(ii)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)     the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first written above.

21ST CENTURY ONCOLOGY, INC.,
as Borrower


By:_____
Name:
Title:


21ST      CENTURY      ONCOLOGY
HOLDINGS, INC.,
as Holdings


By:_____
Name:
Title:



MORGAN      STANLEY      SENIOR
FUNDING, INC.,
as Administrative Agent


By:_____
Name:
Title:

169

## Exhibit B

### Form of the New MDL Term Loan Credit Agreement

Certain documents, or portions thereof, contained in this Exhibit B and the Plan Supplement remain subject to continuing negotiations among the Debtors and interested parties with respect thereto. The Debtors reserve all rights, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement, to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court.

CREDIT AGREEMENT


among


21ST CENTURY ONCOLOGY HOLDINGS, INC.,
as Holdings and a Guarantor,


21ST CENTURY ONCOLOGY, INC.,
as Borrower,


The Several Lenders from Time to Time Parties Hereto,


and


WILMINGTON SAVINGS FUND SOCIETY, FSB,
as Administrative Agent


Dated as of [    ], 2017

**TABLE OF CONTENTS**

<u>Page</u>

**SECTION 1**

**DEFINITIONS**

1.1 Defined Terms .............................................................................................................2
1.2 Other Definitional Provisions ....................................................................................42

**SECTION 2**

**AMOUNT AND TERMS OF COMMITMENTS**

2.1 Commitments..............................................................................................................44
2.2 Procedure for Loan Borrowings ................................................................................45
2.3 Repayment of Loans ..................................................................................................45
2.4 [Reserved]..................................................................................................................45
2.5 [Reserved]..................................................................................................................45
2.6 [Reserved]..................................................................................................................45
2.7 [Reserved]..................................................................................................................45
2.8 [Reserved]..................................................................................................................45
2.9 Termination of Commitments....................................................................................45
2.10 Optional Prepayments................................................................................................45
2.11 Mandatory Prepayments ............................................................................................45
2.12 [Reserved]..................................................................................................................48
2.13 [Reserved]..................................................................................................................48
2.14 Interest Rates and Payment Dates.............................................................................48
2.15 Computation of Interest .............................................................................................48
2.16 [Reserved]..................................................................................................................48
2.17 Pro Rata Treatment and Payments.............................................................................48
2.18 Requirements of Law.................................................................................................49
2.19 Taxes..........................................................................................................................50
2.20 Indemnity...................................................................................................................54
2.21 Change of Lending Office .........................................................................................54
2.22 Replacement of Lenders ............................................................................................55
2.23 Limitation on Additional Amounts, Etc ...................................................................56
2.24 [Reserved]..................................................................................................................56
2.25 [Reserved]..................................................................................................................56
2.26 Defaulting Lenders ....................................................................................................56
2.27 [Reserved]..................................................................................................................57
2.28 [Reserved]..................................................................................................................57

i

## SECTION 3

## [RESERVED]

## SECTION 4

## REPRESENTATIONS AND WARRANTIES

4.1     Financial Condition..................................................................................................57
4.2     No Change ..............................................................................................................58
4.3     Existence; Compliance with Law ...........................................................................58
4.4     Power; Authorization; Enforceable Obligations.....................................................58
4.5     No Legal Bar...........................................................................................................59
4.6     Litigation.................................................................................................................59
4.7     No Default...............................................................................................................59
4.8     Ownership of Property; Liens..................................................................................59
4.9     Licenses; Intellectual Property................................................................................59
4.10    Taxes.......................................................................................................................60
4.11    Federal Regulations ................................................................................................60
4.12    Labor Matters..........................................................................................................60
4.13    ERISA......................................................................................................................60
4.14    Investment Company Act ........................................................................................61
4.15    Subsidiaries.............................................................................................................61
4.16    Use of Proceeds ......................................................................................................61
4.17    Environmental Matters ...........................................................................................61
4.18    Accuracy of Information, Etc ..................................................................................62
4.19    Security Documents.................................................................................................63
4.20    Solvency..................................................................................................................63
4.21    Regulation H ...........................................................................................................63
4.22    OFAC; USA PATRIOT ACT; FCPA.....................................................................63

## SECTION 5

## CONDITIONS PRECEDENT

5.1     Conditions to Initial Extension of Credit................................................................64
5.2     Conditions to Each Extension of Credit ........................................................................67

## SECTION 6

## AFFIRMATIVE COVENANTS

6.1     Financial Statements...............................................................................................68
6.2     Certificates; Other Information................................................................................69
6.3     Payment of Taxes....................................................................................................71
6.4     Maintenance of Existence; Compliance ..................................................................71
6.5     Maintenance of Property; Insurance........................................................................71
6.6     Inspection of Property; Books and Records; Discussions ........................................72
6.7     Notices ....................................................................................................................73

6.8     Environmental Laws ................................................................................73
6.9     Additional Collateral, Etc ......................................................................74
6.10    Initial Mortgages ...................................................................................78
6.11    Designation of Subsidiaries ....................................................................79
6.12    Post-Closing Obligations .......................................................................80

## SECTION 7

## NEGATIVE COVENANTS

7.1     Financial Condition Covenants ................................................................80
7.2     Indebtedness .........................................................................................81
7.3     Liens ....................................................................................................85
7.4     Fundamental Changes .............................................................................89
7.5     Disposition of Property ..........................................................................90
7.6     Restricted Payments ...............................................................................93
7.7     [Reserved] ............................................................................................95
7.8     Investments ...........................................................................................96
7.9     Optional Prepayments and Modifications of Certain Debt Instruments .......99
7.10    Transactions with Affiliates ..................................................................100
7.11    Sales and Leasebacks ...........................................................................101
7.12    Changes in Fiscal Periods .....................................................................102
7.13    Negative Pledge Clauses ......................................................................102
7.14    Clauses Restricting Subsidiary Distributions .........................................102
7.15    Lines of Business .................................................................................103
7.16    Insurance Subsidiary Investments .........................................................103
7.17    Insurance Subsidiary ...........................................................................103
7.18    OFAC; Sanctions .................................................................................104

## SECTION 8

## EVENTS OF DEFAULT

## SECTION 9

## THE ADMINISTRATIVE AGENT

9.1     Appointment and Authority ...................................................................109
9.2     Rights as a Lender ...............................................................................109
9.3     Exculpatory Provisions .........................................................................109
9.4     Reliance by Administrative Agent ..........................................................110
9.5     Delegation of Duties ............................................................................111
9.6     Resignation of Administrative Agent ......................................................111
9.7     Non-Reliance on Administrative Agent and Other Lenders .......................112
9.8     Withholding Tax ..................................................................................112
9.9     No Fiduciary Duties, Etc ......................................................................113
9.10    Enforcement ........................................................................................113
9.11    Collateral and Guaranty Matters ............................................................113
9.12    Indemnity; Damage Waiver ...................................................................114

## SECTION 10

### MISCELLANEOUS

10.1     Amendments and Waivers ................................................................................115
10.2     Notices .............................................................................................................117
10.3     No Waiver; Cumulative Remedies ..................................................................118
10.4     Survival of Representations and Warranties....................................................118
10.5     Payment of Expenses ......................................................................................118
10.6     Successors and Assigns; Participations and Assignments...............................120
10.7     Adjustments; Set-off .......................................................................................127
10.8     Counterparts ....................................................................................................128
10.9     Severability .....................................................................................................128
10.10    Integration .......................................................................................................129
10.11    GOVERNING LAW.........................................................................................129
10.12    Submission to Jurisdiction; Waivers...............................................................129
10.13    Acknowledgements..........................................................................................129
10.14    Releases of Guarantees and Liens ..................................................................130
10.15    Confidentiality ................................................................................................130
10.16    WAIVERS OF JURY TRIAL ..........................................................................131
10.17    USA PATRIOT ACT.........................................................................................131
10.18    Intercreditor Agreement Governs ...................................................................131
10.19    Acknowledgement and Consent to Bail-In of EEA Financial Institutions...................132

SCHEDULES:

| | |
|---|---|
| 1.1A | Commitments |
| 4.4 | Consents, Authorizations, Filings and Notices |
| 4.6 | Litigation |
| 4.8 | Initial Mortgaged Property |
| 4.15(a) | Organizational Structure |
| 4.15(b) | Agreements Relating to Capital Stock |
| 4.19 | UCC Filing Jurisdictions |
| 6.11 | Unrestricted Subsidiaries |
| 7.2(d) | Existing Indebtedness |
| 7.3(f) | Existing Liens |
| 7.8(g) | Existing Investments |
| 7.10 | Transactions with Affiliates |

EXHIBITS:

| | |
|---|---|
| A | Form of Assignment and Assumption |
| B | Form of Guarantee and Security Agreement |
| C | Form of Non-Bank Tax Certificate |
| D | Form of Closing Date Certificate |
| E | Form of Reinvestment Notice |
| F | Form of Compliance Certificate |
| G | Form of Affiliated Lender Assignment and Assumption |
| H-1 | Form of Loan Borrowing Notice |
| H-2 | Form of Interest Election Request |
| H-3 | Form of Prepayment Notice |
| I | Form of Intercreditor Agreement |
| J | Form of Solvency Certificate |
| K | Form of Perfection Certificate |

v

**CREDIT AGREEMENT**, dated as of [__], 2017 (as amended, waived, modified or amended and restated, this "Agreement"), among 21st Century Oncology Holdings, Inc., a Delaware corporation, as a Guarantor (as defined herein), 21st Century Oncology, Inc., a Florida corporation and direct subsidiary of Holdings, as borrower (the "Borrower"), the Lenders (as defined below) from time to time party hereto and Wilmington Savings Fund Society, FSB, as administrative agent for the Lenders and as collateral agent for the Secured Parties (as defined herein) (in such capacities, together with its successors and permitted assigns in such capacities, the "Administrative Agent").

## RECITALS

**WHEREAS**, on May 25, 2017 (the "Petition Date"), the Borrower and the Guarantors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (as defined below) (collectively, the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

**WHEREAS**, on [__], 2017, the Bankruptcy Court entered the Plan Confirmation Order (as defined below) confirming the Plan of Reorganization (as defined below) filed by the Borrower and the Guarantors with the Bankruptcy Court in connection with the Chapter 11 Cases;

**WHEREAS**, certain Lenders and/or their respective affiliates (the "Prepetition Lenders") are parties to, and extended certain loans and provided other financial accommodations under, that certain Amended and Restated Credit and Guaranty Agreement, dated as of March 6, 2017, by and among Medical Developers, LLC, a Subsidiary of the Borrower, as borrower, the Guarantors, the Prepetition Lenders party thereto and Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent (as amended, supplemented or otherwise modified from time to time prior to the Petition Date, the "Prepetition Credit Agreement");

**WHEREAS**, pursuant to the Plan of Reorganization, on the Plan Effective Date (as defined below), certain Allowed MDL Claims (as defined below) of the Prepetition Lenders will be automatically converted into indebtedness outstanding hereunder in the form of Loans (as defined below) and, in connection therewith, the Lenders party hereto on the Closing Date shall be deemed to have advanced to the Borrower on the Closing Date Loans in an aggregate principal amount equal to $[__], on the terms and subject to the conditions set forth herein, the other Loan Documents (as defined below) and the Plan of Reorganization; and

**WHEREAS**, the Borrower, the Guarantors, the Lenders and the Administrative Agent are entering into this Agreement and the other Loan Documents (as applicable) in connection with the implementation and consummation of, the Plan of Reorganization.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby covenant and agree as follows:

## SECTION 1

## DEFINITIONS

1.1    **Defined Terms**.  As used in this Agreement, the terms listed in this Section 1.1 shall have the respective meanings set forth in this Section 1.1.

"21C Term Loan Agent":  Morgan Stanley Senior Funding, Inc., together with its successors and permitted assigns.

"21C Term Loan Agreement":  that certain Credit Agreement, dated as of [__], 2017, by and among the Borrower, the lenders party thereto and the 21C Term Loan Agent, as administrative agent and collateral agent, as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"21C Term Loans": the loans outstanding under the 21C Term Loan Agreement.

"ABL Priority Collateral":  as defined in the Intercreditor Agreement.

"Acquired EBITDA":  with respect to any Acquired Entity or Business or any Converted Restricted Subsidiary (any of the foregoing, a "Pro Forma Entity") for any period, the amount for such period of Consolidated EBITDA of such Pro Forma Entity (determined as if references to the Borrower and the Restricted Subsidiaries in the definition of Consolidated EBITDA were references to such Pro Forma Entity and its Subsidiaries (except to the extent that such Subsidiaries will not constitute Restricted Subsidiaries immediately after giving effect to such acquisition or conversion)), all as determined on a consolidated basis for such Pro Forma Entity.

"Acquired Entity or Business":  as set forth in the definition of the term "Consolidated EBITDA."

"Acquisition":  any acquisition (x) of all or substantially all of the assets or a division, unit, product line or line of business of another Person (or, in each case, any substantial part for which financial statements or other customary financial information is available), (y) which results in owning more than 50% of the Capital Stock of any other Person or (z) of additional equity interests of any Restricted Subsidiary not then held by the Borrower or any other Restricted Subsidiary.

"Administrative Agent":  as defined in the preamble.

"Affected Class":  as defined in Section 10.1.

"Affiliate":  as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control" of a Person means the power, directly or indirectly to direct or cause the direction of the management and policies of such Person, whether through the ability to exercise voting power, by contract or otherwise.

"Affiliated Lender Assignment and Assumption":  as defined in Section 10.6(g).

2

"Agent Action": as defined in the definition of "Permitted Business Judgment".

"Agent Fee Letter":  that certain letter, dated as of the date hereof, by and among the Borrower and the Administrative Agent.

"Agreement":  as defined in the preamble.

"AHYDO Catch-Up Payment":  any payment with respect to any obligations of the Borrower or any Restricted Subsidiary, including subordinated debt obligations, in each case to avoid the application of Code Section 163(e)(5) thereto.

"Allowed":  as defined in the Plan of Reorganization.

"Applicable Date of Determination":  the last day of the most recently ended fiscal quarter for which financial statements are available pursuant to Section 6.1(a) or (b), as applicable, or, if such date occurs prior to the date on which financial statements are available pursuant to Section 6.1(a) or (b), as applicable, the last day of the most recently ended fiscal quarter for which financial statements were delivered under Section 6.1(a) or (b).

"Approved Fund":  as defined in Section 10.6(b).

"Asset Sale":  any Disposition of property or series of related Dispositions of property, excluding (i) any such Disposition permitted by Section 7.5 (other than clauses (e), (h) or (o) thereof), (ii) any Sale Leaseback Transaction, (iii) equity issuances by Holdings or a Parent Entity and (iv) other Dispositions to the extent that the Net Cash Proceeds to the Borrower and its Restricted Subsidiaries of all such other Dispositions do not exceed $7,500,000 in the aggregate in any fiscal year.

"Assignee":  as defined in Section 10.6(b).

"Assignment and Assumption":  an Assignment and Assumption, substantially in the form of Exhibit A.

"Available Amount":  as of any date of determination (the "Reference Date"), an amount determined on a cumulative basis equal to the sum of (without duplication):

      (a)    $25,000,000; plus

      (b)    an amount (which shall not be less than zero) equal to 50% of Consolidated Net Income for the period from the first day of the fiscal quarter of the Borrower during which the Closing Date occurred to and including the last day of the most recently ended fiscal quarter of the Borrower prior to the Reference Date for which internal consolidated financial statements of the Borrower are available (or, in the case such Consolidated Net Income for such period is in deficit, minus 100% of such deficit); plus

      (c)    the cumulative amount of (A) any capital contributions in respect of Permitted Capital Stock (other than any Cure Amount) made in cash by any Person (other

3

than a Subsidiary of the Borrower) to Borrower after the Closing Date, (B) any Net Cash Proceeds of any issuance of Permitted Capital Stock of Holdings or any Parent Entity after the Closing Date (other than any Cure Amount) to any Person other than a Subsidiary of the Borrower (to the extent further contributed to Borrower) and (C) 100% of the aggregate Net Cash Proceeds (other than any proceeds of any Cure Amount) and the fair market value (as determined in good faith by the Borrower) of marketable securities or other property contributed to the Permitted Capital Stock of Borrower after the Closing Date by any Person other than a Subsidiary of the Borrower, in each case, minus, amounts used to incur Indebtedness pursuant to Section 7.2(ee), amounts used to fund Restricted Payments pursuant to Section 7.6(b) or 7.6(j) and amounts used to fund Investments pursuant to Section 7.8(kk); plus

(d)     the aggregate amount received by Borrower or any Restricted Subsidiary after the Closing Date from cash (or Cash Equivalents) dividends and distributions made by any Unrestricted Subsidiary or any Joint Venture that is not a Restricted Subsidiary and interests, returns of principal, repayments and similar payments made by any Unrestricted Subsidiary or Joint Venture that is not a Restricted Subsidiary in respect of Investments made by the Borrower or any Restricted Subsidiary to any Unrestricted Subsidiary or Joint Venture that is not a Restricted Subsidiary, and the Net Cash Proceeds in connection with the sale, transfer or other disposition of assets or the Capital Stock of any Unrestricted Subsidiary or Joint Venture that is not a Restricted Subsidiary of the Borrower to any Person (other than a Restricted Subsidiary) after the Closing Date; plus

(e)     in the event that the Borrower redesignates any Unrestricted Subsidiary as a Restricted Subsidiary after the Closing Date (which, for purposes hereof, shall be deemed to also include (A) the merger, consolidation, liquidation or similar amalgamation of any Unrestricted Subsidiary into the Borrower or any Restricted Subsidiary, so long as the Borrower or such Restricted Subsidiary is the surviving Person, and (B) the transfer of all or substantially all of the assets of an Unrestricted Subsidiary to the Borrower or any Restricted Subsidiary), the fair market value (as determined in good faith by the Borrower) of the Investment in such Unrestricted Subsidiary at the time of such redesignation, combination or transfer (or of the assets transferred or comerged, as applicable); plus

(f)     the aggregate amount of Retained Declined Proceeds; plus

(g)     the fair market value of all Permitted Capital Stock of Holdings or the Borrower issued upon conversion or exchange of Indebtedness or any Capital Stock of the Borrower or any of its Restricted Subsidiaries that is not Permitted Capital Stock after the Closing Date; plus

(h)     to the extent not otherwise included, the aggregate amount of cash Returns to the Borrower or any Restricted Subsidiary in respect of Investments made pursuant to Section 7.8 in reliance on the Available Amount; minus

(i)     the aggregate amount of (A) Restricted Payments made using the Available Amount pursuant to Section 7.6(n), (B) Investments made using the Available

4

Amount pursuant to Section 7.8(cc) and (C) prepayments, redemptions, acquisitions, retirements, cancellations, terminations and repurchases of Indebtedness made using the Available Amount pursuant to clause (i)(B) of the proviso to Section 7.9(a), in each case during the period from and including the Business Day immediately following the Closing Date through and including the Reference Date (without taking account of the intended usage of the Available Amount on such Reference Date).

"Bail-In Action": the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation": with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bankruptcy Code": title 11 of the United States Bankruptcy Code (11 U.S.C. § 101, et seq.), as amended and in effect from time to time, and any successor statute.

"Bankruptcy Court":  as defined in the Recitals.

"Benefit Plan":  any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"Benefitted Lender":  as defined in Section 10.7(a).

"Board":  the Board of Governors of the Federal Reserve System of the United States (or any successor).

"Borrower":  as defined in the preamble hereto and including any permitted successors thereto.

"Borrowing Date":  any Business Day specified by the Borrower in the Borrowing Notice as a date on which the Borrower requests the relevant Lenders to make Loans hereunder, which shall be the Closing Date.

"Borrowing Notice":  a request by the Borrower for a borrowing of Loans which shall be substantially in the form of Exhibit H-1.

"Business":  as defined in Section 4.17(b).

"Business Day":  a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close.

"Capital Expenditures":  for any period, with respect to any Person, the aggregate of all expenditures (whether paid in cash or other consideration, financed by the incurrence of Indebtedness or accrued as a liability and including Capitalized Software Expenditures or

5

research and development expenditures that are treated as additions to property, plant and equipment or other capital expenditures in accordance with GAAP) by such Person and its Restricted Subsidiaries during such period that are additions to property, plant and equipment for the acquisition, rental, lease, purchase, construction, replacement, repair or use of any property, the value of which should be capitalized under GAAP and reflected as additions to property, plant and equipment on a consolidated balance sheet of such Person and its Restricted Subsidiaries (including, without limitation, the aggregate principal amount of Capital Lease Obligations incurred during such period).

"Capital Lease Obligations":  as to any Person, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, to the extent such obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP and, for the purposes of this Agreement, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

"Capital Stock":  any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing.

"Capitalized Software Expenditures":  for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities) by a Person and its Restricted Subsidiaries during such period in respect of purchased software or internally developed software and software enhancements that, in conformity with GAAP, are or are required to be reflected as capitalized costs on the consolidated balance sheet of such Person and its Restricted Subsidiaries.

"Cash Equivalents":  (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition; (b) certificates of deposit, time deposits, eurodollar time deposits or overnight bank deposits having maturities of one year or less from the date of acquisition issued by any Lender or by any commercial bank organized under the laws of the United States or any state thereof having combined capital and surplus of not less than $500,000,000; (c) commercial paper of an issuer rated at least A-1 by Standard & Poor's Ratings Services ("S&P") or P-1 by Moody's Investors Service, Inc. ("Moody's"), or carrying an equivalent rating by a nationally recognized rating agency, if both of the two named rating agencies cease publishing ratings of commercial paper issuers generally, and maturing within one year from the date of acquisition; (d) repurchase obligations of any Lender or of any commercial bank satisfying the requirements of clause (b) of this definition, having a term of not more than thirty (30) days, with respect to securities issued or fully guaranteed or insured by the United States government; (e) securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least A by S&P or A by Moody's; (f) securities with maturities of one year or less from the date of acquisition backed by standby

6

letters of credit issued by any Lender or any commercial bank satisfying the requirements of clause (b) of this definition; (g) money market mutual or similar funds that invest substantially in assets satisfying the requirements of clauses (a) through (f) of this definition; (h) money market funds that (i) comply with the criteria set forth in SEC Rule 2a-7 under the Investment Company Act of 1940, as amended, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $5,000,000,000; or (i) other short-term investments utilized by Foreign Subsidiaries in accordance with the normal investment practices for cash management in investments of a type analogous to the foregoing.

"Cash Management Obligations":  any obligations owed by Holdings, the Borrower or any of its Restricted Subsidiaries (other than Excluded Swap Obligations) to the Administrative Agent or any Lender, or any Affiliate of a Lender or the Administrative Agent (or a Person that was a Lender or the Administrative Agent or an Affiliate thereof at the time any such arrangements were entered into) in respect of any overdraft and other liabilities arising from treasury, depository and cash management services (including but not limited to purchase cards), or any automated clearing house transfers of funds and designated by Holdings or the Borrower as being secured under the Security Documents.

"Cash on Hand": as of any date of determination, the sum of (a) the aggregate amount of unrestricted cash and Cash Equivalents of the Borrower and its Restricted Subsidiaries at such date required to be reflected on a consolidated balance sheet of the Borrower in accordance with GAAP; provided that the amount of domestic unrestricted cash and Cash Equivalents of any Restricted Subsidiary that is a Joint Venture that is included in this clause (a) shall be limited to the total amount of domestic unrestricted cash and Cash Equivalents owned by such Restricted Subsidiary that is a Joint Venture *multiplied by* the percentage of Capital Stock of such Restricted Subsidiary that is a Joint Venture that is owned directly or indirectly by the Borrower and (b) the aggregate amount of unrestricted cash and Cash Equivalents of any Joint Venture in which the Borrower directly or indirectly owns Capital Stock but that is not a Restricted Subsidiary of the Borrower *multiplied by* the percentage of Capital Stock in such Joint Venture that is owned directly or indirectly by the Borrower.

"CFC":  a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"Change in Law":  (a) the adoption of any rule, regulation, treaty or other law after the Closing Date, (b) any change in any Requirement of Law or in the interpretation or application thereof by any Governmental Authority after the Closing Date or (c) compliance by any Lender (or, for purposes of Section 2.18(b), by any lending office of such Lender or by such Lender's holding company, if any) with any written request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the Closing Date; provided that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all rules, regulations, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

7

"Change of Control":  (a) at any time after the Closing Date, any "*person*" or "*group*" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act), shall become the "*beneficial owner*" (as defined in Rules 13(d)-3 and 13(d)-5 under such Act), directly or indirectly, of more than 50% of the Voting Stock of Holdings or any Parent Entity, (b) Holdings or any Parent Entity shall cease to own, directly or indirectly, 100% of the Borrower on a fully diluted basis except as permitted by Section 7.4, (c) the sale, lease or transfer, in one or a series of related transactions, of all or substantially all of the assets of the Borrower and its Restricted Subsidiaries, taken as a whole, to any Person or (d) the approval by the holders of the Capital Stock of the Borrower of any plan for the liquidation or dissolution of the Borrower (whether or not otherwise in compliance with the provisions of this Agreement).   Notwithstanding the foregoing, (A) any holding company, all or substantially all of the assets of which are comprised of the Borrower, Holdings or any Parent Entity, and which is controlled by Persons who are equity investors in Holdings on the Closing Date (it being understood that, for this purpose, "control" means the power, directly or indirectly, to direct or cause the direction of the management and policies of such holding company, whether through the ability to exercise voting power, by contract or otherwise), shall shall not itself be considered a "person" or "group" for these purposes; (B) the transfer of assets between or among the Borrower's Restricted Subsidiaries and the Borrower or Holdings shall not itself constitute a Change of Control; (C) the term Change of Control shall not include a merger or consolidation of the Borrower with or the sale, assignment, conveyance, transfer or other disposition of all or substantially all of the Borrower's assets to, an Affiliate incorporated or organized solely for the purpose of reincorporating or reorganizing the Borrower in another jurisdiction and/or for the sole purpose of forming or collapsing a holding company structure; (D) a "person" or "group" shall not be deemed to have beneficial ownership of securities subject to a stock or asset purchase agreement, merger agreement or similar agreement (or voting or option or similar agreement related thereto) until the consummation of the transactions contemplated by such agreement; and (E) the Transactions and any transactions related thereto shall not constitute a Change of Control.

"Chapter 11 Cases":  as defined in the Recitals.

"Closing Costs":   non-recurring out-of-pocket costs, fees, charges, expenses, disbursements and other payments (including of external counsel and financial advisors) incurred and paid by the Loan Parties pursuant to the Loan Documents or otherwise in connection with, or relating to, the Financing Transactions.

"Closing Date":  the date on which the conditions precedent set forth in Section 5.1 shall have been satisfied (or waived by the Agents and the Lenders in accordance herewith) and the Loans have been made or deemed to have been made.

"Closing Date Certificate":  a certificate, substantially in the form of Exhibit D, dated as of the Closing Date and duly executed by a Responsible Officer of the Borrower.

"CMS":  the Centers for Medicare & Medicaid Services.

"Code":  the Internal Revenue Code of 1986, as amended from time to time.

"Collateral":  all property of the Loan Parties (other than Excluded Property), now owned or hereafter acquired, upon which a Lien is purported to be created by any Security Document.

"Commencement Date":  the date that is the later of (a) the last Business Day of the first full calendar quarter ending after the Closing Date, provided, that if the last Business Day of the calendar quarter in which the Closing Date occurs is more than 60 days after the Closing Date, then the date referred to in this clause (a) shall be the last Business Day of the calendar quarter in which the Closing Date occurs and (b) the last Business Day of March 2018.

"Commitment":  as to each Lender, the obligation of such Lender to make a Loan to the Borrower on the Closing Date in the principal amount not to exceed the amount set forth under the heading "Commitment" opposite such Lender's name on Schedule 1.1A, in each case, in accordance with this Agreement (including Section 2.1(a)) and the Plan of Reorganization.  The original aggregate amount of the Commitments is $[___].

"Commodity Exchange Act":  the Commodity Exchange Act (7 U.S.C. § 1 *et seq*.), as amended from time to time, and any successor statute.

"Commonly Controlled Entity":  an entity, whether or not incorporated, that is under common control with the Borrower within the meaning of Section 4001 of ERISA or is part of a group of entities that includes the Borrower and that is treated as a single employer under Section 414 of the Code.

"Compliance Certificate":  a certificate duly executed by a Responsible Officer substantially in the form of Exhibit F.

"Conduit Lender":  any special purpose corporation organized and administered by any Lender for the purpose of making Loans otherwise required to be made by such Lender and designated by such Lender in a written instrument; provided that the designation by any Lender of a Conduit Lender shall not relieve the designating Lender of any of its obligations to fund a Loan under this Agreement if, for any reason, its Conduit Lender fails to fund any such Loan, and the designating Lender (and not the Conduit Lender) shall have the sole right and responsibility to deliver all consents and waivers required or requested under this Agreement with respect to its Conduit Lender, and provided, further, that no Conduit Lender shall (a) be entitled to receive any greater amount pursuant to Section 2.18, 2.19, 2.20 or 10.5 than the designating Lender would have been entitled to receive in respect of the extensions of credit made by such Conduit Lender or (b) be deemed to have any Commitment.

"Consolidated Depreciation and Amortization Expense":  with respect to any Person for any period, the total amount of depreciation and amortization expense, including the amortization of non-cash organization costs of deferred financing fees or costs, capitalized expenditures, customer acquisition costs and incentive payments, conversion costs and contract acquisition costs, the amortization of original issue discount resulting from the issuance of Indebtedness at less than par and amortization of favorable or unfavorable lease assets or liabilities, of such Person and its Restricted Subsidiaries for such period on a consolidated basis and otherwise determined in accordance with GAAP and any writedown of assets or asset value carried on the balance sheet.

9

"Consolidated EBITDA":  for any period, Consolidated Net Income for such period plus, without duplication and to the extent already deducted (and not added back) in arriving at such Consolidated Net Income (other than with respect to clause (g), (r) or (s) below), the sum of (i) (to the extent attributable to the Borrower and its Restricted Subsidiaries): (a) income (or profits or capital) tax expense (and franchise taxes in the nature of income taxes) and foreign withholding tax expense for such period and any state single business unitary or similar tax, including any penalties and interest related to any tax examinations, (b) consolidated interest expense and, to the extent not reflected in consolidated interest expense, amortization or write-off of deferred financing costs, debt discount and debt issuance costs and commissions, discounts and other fees and charges associated with Indebtedness (including the Loans and all other Indebtedness incurred in connection with the Transactions), costs of surety bonds in connection with financing acquisitions and any losses on hedging obligations or other derivative instruments entered into for the purpose of hedging interest rate risk, (c) Consolidated Depreciation and Amortization Expense, (d) amortization of intangibles (including, but not limited to, goodwill) and organization costs, (e) Non-Cash Charges (as defined below), (f) [reserved], (g) proceeds of business interruption insurance received during such period, (h) expenses incurred to the extent covered by indemnification or refunding provisions in any Permitted Acquisition document, any document pertaining to any acquisition consummated prior to the Closing Date, or any insurance to the extent reimbursed (or reasonably expected to be reimbursed within three hundred and sixty (360) days of the incurrence thereof), (i) losses related to new operations commenced or acquired within 18 months prior to the last day of such period not to exceed $5,000,000 in such period, (j) expenses incurred in connection with the issuance of stock options, warrants or other Permitted Capital Stock by Borrower, Holdings or any Parent Entity to employees of Borrower and its Restricted Subsidiaries and any costs or expenses incurred by the Borrower and its Restricted Subsidiaries pursuant to any management equity plan or stock option plan or any management or employee benefit plan or agreement or any stock subscription or shareholder agreement, (k) [reserved], (l) unusual or non-recurring losses or charges (which shall (x) exclude ordinary course legal expenses and (y) include any non-ordinary course legal expenses (including, without limitation any Designated Non-Ordinary Course Legal Expenses); provided that the aggregate amount of legal expenses referred to in this sub-clause (y) that can be added back pursuant to this clause (l), when taken together with the aggregate amounts added back pursuant to clause (s) of this definition (other than any Designated Non-Ordinary Course Legal Expenses) and the cost savings and synergies added back to Consolidated EBITDA pursuant to the second paragraph of the definition of Pro Forma Basis for such period, shall not exceed 10% of Consolidated EBITDA for such period determined on a Pro Forma Basis before giving effect to all such legal expenses referred to in this sub-clause (y) that would be added back pursuant to this clause (l) and all such amounts that would be added back pursuant to clause (s) of this definition and the second paragraph of the definition of Pro Forma Basis), severance costs, costs of non-compete agreements and relocation costs, (m) any deductions attributable to minority interests (excluding dividends and other distributions paid in cash to the holders of such minority interests), (n) any expenses or charges related to any debt or equity offering, Investment, acquisition, disposition, recapitalization or Indebtedness (whether or not successful), including such fees, expenses or charges related to the Loan Documents, other Indebtedness incurred in connection with the Transaction, Permitted Refinancings or any other Transaction and in connection with any actual or proposed registration of any securities (debt or equity) or any amendments, modifications, waivers, forbearances or restructurings or refinancings of any of the foregoing, (o) expenses

10

related to executive employment agreements, stay bonuses, transaction costs, benefits and payroll taxes paid to or on behalf of employees of the relevant seller pertaining to any acquisition or investment permitted hereunder or consummated prior to the Closing Date who are no longer employed by Holdings or its Restricted Subsidiaries not to exceed $1,000,000 for the four fiscal quarters most recently ended, (p) charges in respect of early retirement of Indebtedness, restructuring costs, integration costs, lease run-off expenses or other business optimization expenses, costs associated with establishing new facilities or reserves, consolidation or discontinuance or closure of any operations, employees and/or management (including costs incurred to implement such restructuring), and transaction fees and expenses, including any expense relating to enhanced accounting, finance or revenue cycle management functions, (q) any net loss from disposed or discontinued operations, (r) cash receipts (or any netting arrangements resulting in reduced cash expenditures) not representing Consolidated EBITDA or Consolidated Net Income in any period to the extent non-cash gains relating to such income were deducted in the calculation of Consolidated EBITDA pursuant to clause (a) below for any previous period and not added back, (s) the amount of cost savings, operating expense reductions, other operating improvements and initiatives and synergies, which are reasonably identifiable and projected by the Borrower in good faith to be reasonably anticipated to be realizable within twelve (12) months of the date thereof (which will be added to Consolidated EBITDA as so projected until fully realized and calculated on a pro forma basis as though such cost savings, operating expense reductions, other operating improvements and initiatives and synergies had been realized on the first day of such period), net of the amount of actual benefits realized during such period from such actions, provided that the aggregate amount that can be added back pursuant to this clause (s), when taken together with cost savings and synergies added back to Consolidated EBITDA pursuant to the second paragraph of the definition of Pro Forma Basis for such period, shall not exceed $5,000,000 for such period; provided that the aggregate amounts added back pursuant to this clause (s), when taken together with the aggregate amount of legal expenses described in sub-clause (y) of clause (l) of this definition that are added back pursuant to such clause (l) (other than any Designated Non-Ordinary Course Legal Expenses) and the cost savings and synergies added back to Consolidated EBITDA pursuant to the second paragraph of the definition of Pro Forma Basis for such period, shall not exceed 10% of Consolidated EBITDA for such period determined on a Pro Forma Basis before giving effect to all such amounts that would be added back pursuant to this clause (s), all amounts in respect of the legal expenses referred to in this sub-clause (y) of clause (l) that would be added back pursuant to such clause (l) (other than any Designated Non-Ordinary Course Legal Expenses) and all amounts that would be added back pursuant to the second paragraph of the definition of Pro Forma Basis), (t) [reserved], (u) realized foreign exchange losses resulting from the impact of foreign currency changes on the valuation of assets or liabilities on the balance sheet of the Borrower and its Restricted Subsidiaries, (v) net realized losses from Swap Obligations or embedded derivatives that require similar accounting treatment and the application of Accounting Standard Codification Topic 815 and related pronouncements, (w) Transaction Bonuses, retention, severance, recruiting, relocation and signing bonuses and expenses, (x) any net cash proceeds of any common equity contribution made directly or indirectly to the Borrower, or any net cash proceeds of any issuance of Permitted Capital Stock of the Borrower, in each case in respect of the Cure Right, provided that (A) any such net cash proceeds in respect of such Cure Right shall only be included in the calculation of Consolidated EBITDA for the purposes of determining compliance with the financial covenant in Section 7.1

11

and (B) shall be so included in such calculation only for the fiscal quarter for which such Cure Right is exercised and shall be included for the subsequent periods that include such fiscal quarter, and (y) all payments made during such period in respect of any settlement with the U.S. Department of Justice relating to potential violations of the False Claims Act and/or the Stark Law, minus (a) without duplication and to the extent included in the statement of such Consolidated Net Income for such period, the sum of (i) any unusual or non-recurring income or gains, (ii) income tax credits (to the extent not netted from income tax expense), (iii) any other non-cash income and (iv) any interest income and gains on hedging or other derivative instruments entered into for the purpose of hedging interest rate risk, and (b) any cash payments made during such period in respect of Non-Cash Charges described in clause (e) which cash payments are made subsequent to the fiscal quarter in which the relevant Non-Cash Charges were reflected as a charge in the statement of Consolidated Net Income, but only to the extent that such cash payments do not exceed such Non-Cash Charges, all as determined on a consolidated basis.  In addition, Consolidated EBITDA shall be calculated without giving effect to (w) any gains or losses from Asset Sales, (x) any gain or loss recognized in determining Consolidated Net Income for such period in respect of post-retirement benefits as a result of the application of FASB 106 and (y) any gain or loss recognized in determining Consolidated Net Income for such period resulting from Earnout Obligations.  Furthermore, (A) there shall be included in determining Consolidated EBITDA for any period, without duplication, (I) Acquired EBITDA of any Person, property, business or asset acquired (other than in the ordinary course of business) by, or contributed to, the Borrower or any Restricted Subsidiary during such period (but not the Acquired EBITDA of any related Person, property, business or assets to the extent not so acquired), to the extent not subsequently sold, transferred or otherwise disposed of by the Borrower or such Restricted Subsidiary (each such Person, property, business or asset acquired or received and not subsequently so disposed of, an "Acquired Entity or Business") and (II) the Acquired EBITDA of any Unrestricted Subsidiary that is converted into a Restricted Subsidiary during such period (each, a "Converted Restricted Subsidiary"), based on the actual Acquired EBITDA of such Acquired Entity or Business or Converted Restricted Subsidiary for such period (including the portion thereof occurring prior to such acquisition or conversion) and the pro forma adjustments made pursuant to the definition of "Pro Forma Basis," if any, applicable thereto and (B) there shall be excluded in determining Consolidated EBITDA for any period (I) the Disposed EBITDA of any Person, property, business or asset sold, transferred or otherwise disposed of, closed or classified as discontinued operations (in each case, other than in the ordinary course of business) by the Borrower or any Restricted Subsidiary during such period (each such Person, property, business or asset so sold or disposed of, a "Sold Entity or Business") and (II) the Disposed EBITDA of any Restricted Subsidiary that is converted into an Unrestricted Subsidiary during such period (each, a "Converted Unrestricted Subsidiary"), based on the actual Disposed EBITDA of such Sold Entity or Business or Converted Unrestricted Subsidiary for such period (including the portion thereof occurring prior to such sale, transfer or disposition or conversion).  Notwithstanding the foregoing, if a Defeasance with respect to any Indebtedness has been consummated, the interest expense with respect to such Indebtedness shall not be added back to Consolidated EBITDA.

For the purpose of the definition of "Consolidated EBITDA," "Non-Cash Charges" means (a) any impairment charge or asset write-off related to intangible assets, long-lived assets, and investments in debt and equity securities pursuant to GAAP, (b) all losses from investments

12

recorded using the equity method, (c) stock-based awards compensation expense, and (d) other non-cash charges.

Unless otherwise provided herein, Consolidated EBITDA shall be calculated with respect to the Borrower and its Restricted Subsidiaries.

Notwithstanding the foregoing, for purposes of determining Consolidated EBITDA for any four fiscal quarter period that includes any of the fiscal quarters ended [_____], [_____], [_____] and [_____], Consolidated EBITDA shall be deemed to be $[__], $[__], $[__] and $[__] respectively, (which amounts, for the avoidance of doubt shall be subject to addbacks and adjustments pursuant to clause (s) above and shall give effect to calculations on a Pro Forma Basis in accordance with Section 1.2 in respect of the Transactions and/or any Specified Transactions (including the cost savings described above or in the definition of "Consolidated Net Income" that in each case may become applicable due to actions taken on or after the Closing Date).

"Consolidated First Lien Debt":  at any date of determination, an amount equal to (a) the sum of (i) the aggregate principal amount of 21C Term Loans outstanding on such date, (ii) the aggregate principal amount of Loans outstanding on such date, (iii) all Capital Lease Obligations outstanding on such date and (iv) the aggregate principal amount of any other Consolidated Total Debt outstanding on such date less (b) the sum of (i) all Indebtedness on such date of the Borrower and its Restricted Subsidiaries secured by a Lien that is junior in priority to the Liens securing the Loans and (ii) all unsecured Indebtedness of the Borrower and its Restricted Subsidiaries on such date.

"Consolidated First Lien Leverage Ratio":  as at the end of any fiscal quarter, the ratio of (a) Consolidated First Lien Debt of the Borrower and its Restricted Subsidiaries on such day to (b) Consolidated EBITDA for the most recently completed four fiscal quarters of the Borrower and its Restricted Subsidiaries for which financial statements have been furnished pursuant to Section 6.1.

"Consolidated Interest Expense":  for any period, total cash interest expense (including that attributable to Capital Lease Obligations), net of cash interest income, of the Borrower and its Restricted Subsidiaries for such period with respect to all outstanding Indebtedness of the Borrower and its Restricted Subsidiaries (including all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing and net costs under Swap Agreements in respect of interest rates to the extent such net costs are allocable to such period in accordance with GAAP); provided, however, that (a) Consolidated Interest Expense shall be determined excluding (to the extent otherwise included therein) (i) all non-recurring cash interest expense consisting of liquidated damages for failure to timely comply with registration rights obligations and financing fees, as calculated on a consolidated basis in accordance with GAAP, (ii) penalties and interest relating to taxes, (iii) any additional cash interest owing pursuant to any registration rights agreement, (iv) accretion or accrual of discounted liabilities other than Indebtedness, (v) any expense resulting from the discounting of any Indebtedness in connection with the application of purchase accounting in connection with any acquisition, (vi) amortization of deferred financing fees, debt issuance costs, commissions, fees and expenses, (vii) any expensing of bridge, commitment and other financing fees and (viii)

13

interest in respect of Indebtedness of any parent of such Person appearing upon the balance sheet of such Person solely by reason of push-down accounting under GAAP and (ix) interest expense in connection with the Indebtedness if a Defeasance is consummated with respect to such Indebtedness, and (b) for the avoidance of doubt, all interest expense of any Unrestricted Subsidiary and any Converted Unrestricted Subsidiary shall be excluded from Consolidated Interest Expense for such period; provided that when determining Consolidated Interest Expense of the Borrower in respect of any period ending prior to the first anniversary of the Closing Date, Consolidated Interest Expense shall be calculated by multiplying the aggregate Consolidated Interest Expense accrued since the Closing Date by 365 and then dividing such product by the number of days from and including the Closing Date to and including the last day of such period.

"Consolidated Leverage Ratio":   as at the end of any fiscal quarter, the ratio of (a) Consolidated Total Debt of the Borrower and its Restricted Subsidiaries on such day to (b) Consolidated EBITDA for the most recently completed four fiscal quarters of the Borrower and its Restricted Subsidiaries for which financial statements have been furnished pursuant to Section 6.1.

"Consolidated Net Income":   for any period, the consolidated net income (or loss) of the Borrower and its Restricted Subsidiaries, determined on a consolidated basis in accordance with GAAP excluding (except with respect to clause (s) which shall be included), without duplication, (a) any extraordinary, exceptional, unusual or nonrecurring gain, loss, charge or expense, or any charges, expenses or reserves in respect of any restructuring, redundancy or severance expenses or any Non-Cash Charges for such period, (b) the cumulative effect of a change in accounting principles during such period, to the extent included in such net income (loss), (c) Closing Costs, accruals, payments, charges and expenses (including rationalization, legal, tax structuring and other costs and expense) related to the Transactions and any amortization thereof thereafter, (d) any fees, costs and expenses (including allocated internal costs and expenses) incurred during such period, or any amortization thereof for such period, in connection with any actual or proposed acquisition, investment, asset disposition, recapitalization, dividend, distribution, issuance or repayment of Indebtedness, issuance of equity interests, refinancing transaction or amendment or modification of any debt instrument (in each case, including any such transaction consummated prior to the Closing Date and any such transaction not completed or initiated) and any charges or non-recurring merger costs incurred during such period as a result of any such transaction, (e) the after-tax effect of any income (or loss) for such period attributable to the early extinguishment of Indebtedness, (f) the income (or deficit) of any Person accrued prior to the date it becomes a Restricted Subsidiary of Borrower or is merged into or consolidated with Borrower or any of its Restricted Subsidiaries (other than for purposes of calculating Consolidated Leverage Ratio, Consolidated Total Secured Leverage Ratio and Consolidated First Lien Leverage Ratio hereunder, as set forth in the definition of "Consolidated EBITDA"), (g) the income (or deficit) of any Person (other than a Restricted Subsidiary  of the Borrower) in which the Borrower or any of its Restricted Subsidiaries has an ownership interest, except to the extent that any such income is actually received by the Borrower or such Restricted Subsidiary in the form of dividends or similar distributions, (h) any net gain (or loss) realized upon the sale or other disposition of any asset or disposed operations of the Borrower or any Restricted Subsidiaries (including pursuant to any Sale Leaseback Transaction which is not sold or otherwise disposed of in the ordinary course of business), (i) any (x) non-cash compensation charge or expense arising from any grant of stock, stock options or other equity based awards

14

and any non-cash deemed finance charges in respect of any pension liabilities or other provisions or on the re-valuation of any benefit plan obligation and (y) income (loss) attributable to deferred compensation plans or trusts shall be excluded, (j) all deferred financing costs written off or amortized and premiums paid or other expenses incurred directly in connection with any early extinguishment of Indebtedness and any net gain (loss) from any write-off or forgiveness of Indebtedness, (k) any unrealized gains or losses in respect of Swap Obligations or any ineffectiveness recognized in earnings related to qualifying hedge transactions or the fair value of changes therein recognized in earnings for derivatives that do not qualify as hedge transactions, in each case, in respect of Swap Obligations, (l) any unrealized foreign currency transaction gains or losses in respect of obligations of any Person denominated in a currency other than the functional currency of such Person and any unrealized foreign exchange gains or losses relating to translation of assets and liabilities denominated in foreign currencies, (m) any unrealized foreign currency translation or transaction gains or losses in respect of Indebtedness or other obligations of the Borrower or any Restricted Subsidiary owing to the Borrower or any Restricted Subsidiary, (n) any purchase accounting effects including, but not limited to, adjustments to inventory, property and equipment, software and other intangible assets and deferred revenue in component amounts required or permitted by GAAP and related authoritative pronouncements (including the effects of such adjustments pushed down to the Borrower and the Restricted Subsidiaries), as a result of any consummated acquisition, or the amortization or write-off of any amounts thereof (including any write-off of in process research and development), (o) any goodwill or other asset impairment charge or write-off or write-down, (p) any after-tax effect of income (loss) from the early retirement, extinguishment or cancellation of Indebtedness or Swap Obligations or other derivative instruments shall be excluded, (q) accruals and reserves that are established within twelve months after the Closing Date that are so required to be established as a result of the Transactions in accordance with GAAP, shall be excluded, (r) any net unrealized gains and losses resulting from Swap Obligations or embedded derivatives that require similar accounting treatment and the application of Accounting Standards Codification Topic 815 and related pronouncements shall be excluded, (s) proceeds from any business interruption insurance to the extent not already included in Consolidated Net Income shall be included, (t) the amount of any expense to the extent a corresponding amount is received in cash by the Borrower and the Restricted Subsidiaries from a Person other than the Borrower or any Restricted Subsidiaries, provided such payment has not been included in determining Consolidated Net Income, (u) gains and losses on the sale, exchange or other disposition of assets outside the ordinary course of business or abandonment of assets and from discontinued operations and (v) cash and non-cash charges, paid or accrued, and gains resulting from the application of Financial Accounting Standards No. 141R (Accounting Standards Codification Topic 805) (including with respect to earn-outs incurred by the Borrower or any of its Restricted Subsidiaries).  There also shall be excluded from Consolidated Net Income for any period (without duplication of the foregoing) the purchase accounting effects of adjustments to property and equipment, other intangible assets, deferred revenue, lease contracts and debt line items required or permitted by GAAP and related authoritative pronouncements (including the effects of such adjustments pushed down to the Borrower and its Restricted Subsidiaries), as a result of any acquisition consummated prior to the Closing Date, any Permitted Acquisitions, or the amortization or write-off of any amounts thereof.

In addition, to the extent not already included in the Consolidated Net Income of such Person and its Restricted Subsidiaries, notwithstanding anything to the contrary in the foregoing,

15

Consolidated Net Income shall exclude (i) any expenses and charges that are reimbursed by indemnification or other reimbursement provisions, or so long as the Borrower has made a determination that there exists reasonable evidence that such amount will in fact be indemnified or reimbursed (and such amount is in fact reimbursed within three hundred sixty-five (365) days of the date of such charge or payment (with a deduction for any amount so added back to the extent not so reimbursed within such three hundred sixty-five (365) days)), in connection with any investment or any sale, conveyance, transfer or other disposition of assets permitted hereunder, (ii) to the extent covered by insurance and actually reimbursed, or, so long as the Borrower has made a determination that there exists reasonable evidence that such amount will in fact be reimbursed by the insurer and such amount is (A) not denied by the applicable carrier in writing within three hundred sixty-five (365) days and (B) in fact reimbursed within three hundred sixty-five (365) days of the date of such evidence (with a deduction for any amount so added back to the extent not so reimbursed within three hundred sixty-five (365) days), expenses with respect to liability or casualty events or business interruption and (iii) any expenses and charges to the extent paid for, or so long as the Borrower has made a determination that there exists reasonable evidence that such amount will in fact be reimbursed by (and such amount is in fact reimbursed within three hundred sixty-five (365) days of the date of such payment (with a deduction for any amount so added back to the extent not so reimbursed within three hundred sixty-five (365) days)), any third party other than such Person or any of its Restricted Subsidiaries.

"Consolidated Total Debt":  at any date, the excess of (a) the aggregate principal amount of all Indebtedness of the Borrower and its Restricted Subsidiaries at such date, determined on a consolidated basis, to the extent consisting of any Indebtedness for borrowed money, Capital Lease Obligations or debt obligations evidenced by bonds, debentures or notes and, for the avoidance of doubt, excluding any undrawn letters of credit, any Earnout Obligation, and any changes in GAAP which would classify any operating leases in accordance with GAAP in effect as of the Closing Date as Capital Lease Obligations, required to be reflected on a consolidated balance sheet of the Borrower in accordance with GAAP minus (b) Cash on Hand, provided that, if a Defeasance is consummated with respect to any Indebtedness that is the subject of such Defeasance, as the case may be, shall not be included in determining Consolidated Total Debt.

"Consolidated Total Secured Leverage Ratio": as at the end of any fiscal quarter, the ratio of (a) Consolidated Total Debt of the Borrower and its Restricted Subsidiaries as of such day less any unsecured Indebtedness of the Borrower and its Restricted Subsidiaries as of such day to (b) Consolidated EBITDA for trailing four quarter period for which financial statements are available.

"Contractual Obligation":  as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Converted Restricted Subsidiary":  has the meaning set forth in the definition of "Consolidated EBITDA."

"Converted Unrestricted Subsidiary":  has the meaning set forth in the definition of "Consolidated EBITDA."

"Cure Amount":  as defined in Section 8.

"Cure Right":  as defined in Section 8.

"Debt Fund Affiliate":  any Person that is organized primarily for the purpose of making debt investments in one or more companies and is a bona fide and diversified investment fund.

"Declined Proceeds":  as defined in Section 2.11(f).

"Default":  any of the events specified in Section 8, whether or not any requirement for the giving of notice, the lapse of time, or both, as set forth therein, has been satisfied.

"Default Interest":  as defined in Section 2.14(c).

"Defaulting Lender":  any Lender that (a) has failed to fund any portion of its Loans required to be funded by it hereunder within one (1) Business Day of the date required to be funded by it hereunder, (b) has notified the Administrative Agent, any Lender and/or Borrower in writing that it does not intend to comply with any of its funding obligations under this Agreement or has made a public statement to the effect that it does not intend to comply with its funding obligations under this Agreement or under other agreements in which it commits to extend credit, (c) has failed, within three (3) Business Days after request by the Administrative Agent, to confirm that it will comply with the terms of this Agreement relating to its obligations to fund prospective Loans, (d) has otherwise failed to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within three (3) Business Days of the date when due, unless the subject of a good faith dispute, or (e) in the case of a Lender that has a Commitment outstanding at such time, shall take, or is the Subsidiary of any person that has taken, any action or be (or is) the subject of any action or proceeding of a type described in Section 8(f) (or any comparable proceeding initiated by a regulatory authority having jurisdiction over such Lender or such person) or become the subject of a Bail-In Action; provided that (1) with respect to (a), (b) or (c), to the extent such Lender is making a good faith claim that it has no obligation to fund because the conditions to borrowing have not been met, then such Lender shall not be considered a Defaulting Lender and (2) as of any date of determination, the determination of whether any Lender is a Defaulting Lender hereunder shall not take into account, and shall not otherwise impair, any amounts funded by such Lender which have been assigned by such Lender to a Conduit Lender pursuant to Section 10.6(f).

"Defeasance":  (x) a covenant defeasance in respect of (a) the Senior PIK Toggle Notes Indenture pursuant to Article VIII of the Senior PIK Toggle Notes Indenture or (b) any similar covenant defeasance in respect of other Indebtedness or (y) the irrevocable deposit of cash with an agent or trustee or into escrow or similar arrangement for the repayment in full of (i) any Indebtedness and (ii) all accrued interest on such Indebtedness and (iii) outstanding fees, premiums, expenses and other obligations relating to such Indebtedness then due or which would be due as a result of such repayment (other than contingent indemnity obligations).

"Designated Non-Cash Consideration":  the fair market value (as determined in good faith by the Borrower) of non-cash consideration received by the Borrower or one of its Restricted Subsidiaries in connection with a Disposition that is so designated as Designated Non-Cash Consideration pursuant to an officer's certificate, setting forth the basis of such valuation,

17

less the amount of cash or Cash Equivalents received in connection with a subsequent payment, redemption, retirement, sale or other disposition of such Designated Non-Cash Consideration. A particular item of Designated Non-Cash Consideration will no longer be considered to be outstanding when and to the extent it has been paid, redeemed or otherwise retired or sold or otherwise disposed of in compliance with Section 7.5.

"Designated Non-Ordinary Course Legal Expenses": all legal expenses incurred by the Borrower and its Subsidiaries in connection with the Transactions and/or any judgment, fine or settlement.

"Disposed EBITDA": with respect to any Sold Entity or Business for any period, the amount for such period of Consolidated EBITDA of such Sold Entity or Business (determined as if references to the Borrower and the Restricted Subsidiaries in the definition of Consolidated EBITDA were references to such Sold Entity or Business and its Restricted Subsidiaries), which may be negative, all as determined on a consolidated basis for such Sold Entity or Business.

"Disposition": with respect to any property, any sale, lease, sale and leaseback, assignment, conveyance, transfer or other disposition thereof. The terms "Dispose", "Disposed of" and "Disposing" shall have correlative meanings.

"Disqualified Lender": as defined in Section 10.6(b)(ii)(F).

"Dollars" and "$": dollars in lawful currency of the United States.

"Domestic Foreign Holding Company": any Domestic Subsidiary of the Borrower the primary assets of which are (a) equity interests (including, for this purpose, any debt or other instrument treated as equity for U.S. federal income tax purposes) in one or more (x) Foreign Subsidiaries or other Domestic Foreign Holding Companies and (y) other Subsidiaries of the Borrower that own no material assets other than equity interests (including, for this purpose, any debt or other instrument treated as equity for U.S. federal income tax purposes) in one or more Foreign Subsidiaries or other Domestic Foreign Holding Companies or (b) intercompany accounts, cash, Cash Equivalents and debt of one or more Foreign Subsidiaries or other Domestic Foreign Holding Companies. For the avoidance of doubt, Medical Developers LLC and MD International Investments, LLC are Domestic Foreign Holding Companies.

"Domestic Subsidiary": any Restricted Subsidiary of the Borrower incorporated or organized in the United States or any State thereof (including for the avoidance of doubt, the District of Columbia), but excluding (except for the purpose of defining Domestic Foreign Holding Company) any Domestic Foreign Holding Company.

"Earnout Obligations": those payment obligations of the Borrower and its Restricted Subsidiaries to former owners of businesses which were acquired by the Borrower or one of its Restricted Subsidiaries pursuant to an acquisition which are in the nature of deferred purchase price to the extent such payment obligations are required to be set forth on a balance sheet prepared in accordance with GAAP.

"EEA Financial Institution": (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority,

18

(b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country":  any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority":  any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Electing Guarantor":  any Excluded Subsidiary that is a Restricted Subsidiary that, at the option, and in the sole discretion, of the Borrower has been designated a Subsidiary Guarantor, it being understood that the Borrower may undesignate any such Subsidiary subject to Section 6.11; provided that no Subsidiary may be an Electing Guarantor unless it is able to pledge all or substantially all of its assets as Collateral; provided, further, that in the case of a Foreign Subsidiary, such Foreign Subsidiary shall have complied with Section 6.9.

"Environmental Laws":  any and all foreign, Federal, state, local or municipal laws, rules, orders, regulations, statutes, ordinances, codes, decrees, requirements of any Governmental Authority or other Requirements of Law (including common law) regulating, relating to or imposing liability or standards of conduct concerning protection of the environment or of human health as affected by exposure to harmful or deleterious substances, as now or may at any time hereafter be in effect.

"ERISA":  the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"ERISA Plan":  any employee benefit plan that is covered by ERISA and in respect of which any Loan Party or a Commonly Controlled Entity is (or, if such plan were terminated at such time, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA or which any Loan Party or a Commonly Controlled Entity has maintained, contributed to or had any liability (whether or not on account of such Loan Party or any Commonly Controlled Entities or contingent or otherwise) now or in the prior six (6) years.

"EU Bail-In Legislation Schedule":  the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default":  any of the events specified in Section 8, provided that any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Exchange Act":  the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Excluded Capital Expenditures":  all Capital Expenditures:

19

(a)    made to restore, replace or rebuild property to the condition of such property immediately prior to any damage, loss, destruction or condemnation of such property, to the extent such expenditure is made with, or subsequently reimbursed out of, insurance proceeds, indemnity payments, condemnation awards (or payments in lieu of) or damage recovery proceeds relating to any such damage, loss, destruction or condemnation;

(b)    constituting reinvestment of proceeds (to the extent permitted herein) from Asset Sales, Sale Leaseback Transactions and Recovery Events;

(c)    made by Borrower or any of its Restricted Subsidiaries as a tenant in leasehold improvements, to the extent reimbursed by the landlords; or

(d)    made with the Net Cash Proceeds (Not Otherwise Applied) of an issuance after the Closing Date of Capital Stock of Borrower or Holdings.

"Excluded Information":  information regarding the Borrower, Holdings, their respective Affiliates not known to such Lender and that may be material to a decision by such Lender to participate in any prepayment pursuant to Section 2.10(c) or assignment pursuant to Section 10.6(g) (including material non-public information).

"Excluded Party":  any Affiliate of a Lender that is engaged as a principal primarily in private equity, mezzanine financing or venture capital.

"Excluded Property":  as defined in the Security Documents.

"Excluded Subsidiary":  any Subsidiary of the Borrower that is (a) a Domestic Foreign Holding Company or any direct or indirect Domestic Subsidiary of a Foreign Subsidiary, Domestic Foreign Holding Company or any CFC; (b) a direct or indirect Foreign Subsidiary; (c) a Joint Venture or Non-Wholly-Owned Subsidiary; (d) an Immaterial Subsidiary; (e) an Unrestricted Subsidiary; (f) an Insurance Subsidiary or other special purpose entity; (g) a Non-Profit Entity; (h) prohibited by applicable Requirement of Law or Contractual Obligation from guaranteeing or granting Liens to secure any of the Secured Obligations or with respect to which any consent, approval, license or authorization from any Governmental Authority or third party (other than the Borrower or a Restricted Subsidiary thereof) would be required for the provision of any such guaranty (but in the case of such guaranty being prohibited due to a Contractual Obligation, such Contractual Obligation shall have been in place at the Closing Date or at the time such Subsidiary became a Restricted Subsidiary and was not created in contemplation of or in connection with such Person becoming a Restricted Subsidiary); provided that each such Domestic Subsidiary shall cease to be an Excluded Subsidiary solely pursuant to this clause (h) if such consent, approval, license or authorization has been obtained; (i) with respect to which the Borrower and the Administrative Agent reasonably agree that the burden or cost or other consequences of providing a guaranty of the Secured Obligations are excessive in relation to the benefits to the Lenders; (j) a Domestic Subsidiary acquired pursuant to an Acquisition financed with secured Indebtedness permitted to be incurred under Section 7.2(g) and each Domestic Subsidiary that is a Subsidiary thereof to the extent such secured Indebtedness prohibits such Domestic Subsidiary from becoming a Guarantor; provided that each such Domestic Subsidiary

20

shall cease to be an Excluded Subsidiary solely pursuant to this clause (j) if such secured Indebtedness is repaid or becomes unsecured, if such Domestic Subsidiary ceases to guarantee such secured Indebtedness or such prohibition no longer exists, as applicable; (k) a direct or indirect Subsidiary of an Excluded Subsidiary; or (l) any Subsidiary with respect to which the providing of a guarantee of the Secured Obligations, in the reasonable judgment of the Borrower, could reasonably be expected to result in adverse tax consequences (other than *de minimis* adverse tax consequences), in each case other than any Electing Guarantor for so long as such entity is an Electing Guarantor.

"Excluded Swap Obligation":  with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the guarantee of such Guarantor of, or the grant by such Guarantor of a security interest pursuant to the Security Documents to secure, such Swap Obligation (or any guarantee thereof) is or becomes illegal or unlawful under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act at the time the guarantee of such Guarantor or the grant of such security interest would otherwise have become effective with respect to such related Swap Obligation but for such Guarantor's failure to constitute an "eligible contract participant" at such time.

"Excluded Taxes":  as defined in Section 2.19(a).

"Facility":  the Commitments and the Loans made thereunder.

"FATCA":  Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"FCPA":  the Foreign Corrupt Practices Act of 1977, as amended from time to time, and the rules and regulations thereunder.

"Financing Transactions":  collectively, (a) the execution and delivery of, and performance by each Loan Party of its Obligations under, the Loan Documents to which it is a party, including (i) the creation and perfection of the Liens on the Collateral and (ii) the payment of Closing Costs and all other fees, costs, expenses and disbursements required to be paid from time to time pursuant to any of the Loan Documents or in connection with the transactions contemplated thereby, (b) the borrowing of the Loans and the use of proceeds thereof by the Borrower and (c) all other transactions contemplated by, relating to, or entered into in connection with, any of the foregoing.

"First Priority Obligations Payment Date": as defined in the Intercreditor Agreement.

"Fixed Charge Coverage Ratio":  on any date of determination, the ratio of (a) Consolidated EBITDA for the period of four consecutive fiscal quarters of the Borrower ending on the Applicable Date of Determination to (b) Consolidated Interest Expense for such period of four consecutive fiscal quarters.

21

"Flood Insurance Laws":  collectively, (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statue thereto, (iii) the National Flood Insurance Reform Act of 1994 as now or hereafter in effect or any successor statute thereto, (iv) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto and (v) Biggert-Waters Flood Insurance Reform Act of 2012 as now or hereafter in effect or any successor statute thereto.

"Foreign Disposition":  as defined in Section 2.11(e).

"Foreign Guarantor":  an Electing Guarantor that is a Foreign Subsidiary.

"Foreign Plan": each employee benefit plan (within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA) that is not subject to US law and is maintained or contributed to by the Borrower or any Commonly Controlled Entity.

"Foreign Prepayment Event":  as defined in Section 2.11(e).

"Foreign Subsidiary":  any Restricted Subsidiary of the Borrower that is not a Domestic Subsidiary.

"Funded Debt":  as to any Person, all Indebtedness of such Person that matures more than one year from the date of its creation or matures within one year from such date but is renewable or extendible, at the option of such Person, to a date more than one year from such date or arises under a revolving credit or similar agreement that obligates the lender or lenders to extend credit during a period of more than one year from such date, including all current maturities and current sinking fund payments in respect of such Indebtedness whether or not required to be paid within one year from the date of its creation and, in the case of the Borrower, Indebtedness in respect of the Loans.

"Funding Office":  the office of the Administrative Agent specified in Section 10.2 or such other office as may be specified from time to time by the Administrative Agent as its funding office by written notice to the Borrower and the Lenders.

"GAAP":  generally accepted accounting principles in the United States as in effect from time to time.  Anything in this Agreement to the contrary notwithstanding, any obligation of a Person under a lease (whether existing now or entered into in the future) that is not (or would not be) required to be classified and accounted for as a capital lease on the balance sheet of such Person under GAAP as in effect at the time such lease is entered into shall not be treated as a capital lease solely as a result of (x) the adoption of any changes in, or (y) changes in the application of, GAAP after such lease is entered into.

"Governmental Authority":  any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization (including the National Association of Insurance Commissioners).

"Group Members":  the collective reference to Holdings, the Borrower and its Restricted Subsidiaries.

"Guarantee and Security Agreement":  the Guarantee and Security Agreement, dated as of the Closing Date, entered into by the Borrower, the Guarantors and the Administrative Agent, substantially in the form of Exhibit B.

"Guarantee Obligation":  as to any Person (the "guaranteeing person"), any obligation, including a reimbursement, counterindemnity or similar obligation, of the guaranteeing person that guarantees or in effect guarantees, or which is given to induce the creation of a separate obligation by another Person (including any bank under any letter of credit) that guarantees or in effect guarantees, any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business.  The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by the Borrower in good faith.

"Guarantors":  the collective reference to Holdings and the Subsidiary Guarantors.

"Holdings":  (a) on the Closing Date, 21st Century Oncology Holdings, Inc., a Delaware corporation and (b) on any date of determination after the Closing Date, any other Person which on such date directly holds all of the Capital Stock of Borrower (including, as applicable, any successor to 21st Century Oncology Holdings, Inc.).

"Immaterial Subsidiary":  at any date of determination, any Domestic Subsidiary of the Borrower that has been designated by the Borrower in writing to the Administrative Agent as an "Immaterial Subsidiary" for purposes of this Agreement; provided that (a) for purposes of this Agreement, at no time shall the consolidated total assets of all Immaterial Subsidiaries as of the last day of the then most recent fiscal year of the Borrower for which financial statements have been delivered pursuant to Section 6.1(a) equal or exceed 10% of the Total Assets of the Borrower and the Restricted Subsidiaries at such date, determined on a Pro Forma Basis, (b) at any time and from time to time, the Borrower may designate any Restricted Subsidiary as a new

23

Immaterial Subsidiary so long as, after giving effect to such designation, the consolidated assets of all Immaterial Subsidiaries do not exceed the limits set forth in clause (a) above at such time of designation and (c) if, as of the date the financial statements for any fiscal year of the Borrower are delivered or required to be delivered pursuant to Section 6.1(a), the consolidated assets of all Restricted Subsidiaries so designated by the Borrower as "Immaterial Subsidiaries" shall have, as of the last day of such fiscal year, exceeded the limits set forth in clause (a) above, then within forty-five (45) days (or such later date as agreed by the Administrative Agent in its reasonable discretion) after the date such financial statements are so delivered (or so required to be delivered), the Borrower shall redesignate one or more Immaterial Subsidiaries, in each case in a written notice to the Administrative Agent, such that, as a result thereof, the consolidated assets and revenues of all Restricted Subsidiaries that are still designated as "Immaterial Subsidiaries" do not exceed such limits.  Upon any such Restricted Subsidiary ceasing to be an Immaterial Subsidiary pursuant to the preceding sentence, such Restricted Subsidiary, to the extent not otherwise qualifying as an Excluded Subsidiary, shall comply with Section 6.9, to the extent applicable.

"Indebtedness":  of any Person at any date, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services (other than (i) trade payables, deferred revenues and accrued expenses incurred in the ordinary course of such Person's business, (ii) Earnout Obligations and (iii) liabilities resulting from application of FASB 150 (other than for Capital Stock referred to in clause (g) below)), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) the principal portion of all Capital Lease Obligations of such Person, (f) all outstanding reimbursement obligations of such Person as an account party or applicant under or in respect of acceptances, letters of credit, surety bonds or similar arrangements, (g) the liquidation value of all mandatorily redeemable preferred Capital Stock of such Person issued to parties other than the Borrower or its Subsidiaries, if the scheduled redemption date is prior to the Maturity Date (except as a result of an Initial Public Offering, Change of Control or Asset Sale so long as any rights of the holders thereof upon the occurrence of an Initial Public Offering, Change of Control or Asset Sale shall be subject to the prior repayment in full of the Loans that are accrued and owing), (h) all Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (a) through (g) above, (i) all obligations of the kind referred to in clauses (a) through (h) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation, and (j) for the purposes of Section 8(e) only, the amount of all obligations of such Person in respect of Swap Agreements (determined, for this purpose, in respect of any Swap Agreement, based on the maximum aggregate amount, giving effect to any netting agreements, that such Person would be required to pay if such Swap Agreement were terminated at the time); provided, however, that for purposes of calculating Consolidated Leverage Ratio, Consolidated Total Secured Leverage Ratio and Consolidated First Lien Leverage Ratio, (A) intercompany Indebtedness and (B) obligations constituting non-recourse Indebtedness shall be excluded; provided, further, that (i) the amount of Indebtedness which is limited or non-recourse to such Person or for which

24

recourse is limited to an identified asset shall be equal to the lesser of (1) the amount of such Indebtedness and (2) the fair market value of such asset as at the date of determination, (ii) amounts which are reserved by such Person for payment of insurance premiums due within twelve months of such date shall not constitute Indebtedness and (iii) Indebtedness shall not include obligations with respect to (1) deferred compensation, (2) liabilities associated with customer prepayments and deposits and any obligations under ERISA and other accrued obligations in the ordinary course of business, (3) obligations under employment agreements and (4) deferred revenue and deferred tax liabilities.  Notwithstanding the foregoing, the term "Indebtedness" shall not include contingent post-closing purchase price adjustments, non-compete or consulting obligations or earn-outs to which the seller in an Acquisition or Investment may become entitled until such amounts become due and payable.  The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness expressly provide that such Person is not liable therefor.

"Initial Mortgaged Properties":  the real properties identified as Initial Mortgaged Properties on Schedule 4.8.

"Initial Public Offering":  the initial public offering of the common stock of Holdings or any Parent Entity.

"Insolvency":  with respect to any Multiemployer Plan, the condition that such Plan is insolvent within the meaning of Section 4245 of ERISA.

"Insolvent":  pertaining to a condition of Insolvency.

"Insurance Subsidiary":  any Subsidiary of the Borrower engaged solely in the general liability, professional liability, health and benefits and workers compensation and such other insurance business as may be approved by the Administrative Agent in its reasonable discretion, for the underwriting of insurance policies for the Borrower and its Subsidiaries and the respective employees, officers or directors thereof.  Notwithstanding anything else herein to the contrary, no Insurance Subsidiary shall be required to become a Subsidiary Guarantor hereunder.

"Intellectual Property":  the collective reference to all rights, priorities and privileges under any intellectual property, whether owned or licensed, and whether arising under United States, multinational or foreign laws or otherwise, including copyrights, patents, trademarks, technology, know-how and processes, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"Intercreditor Agreement":  means (i) that certain Intercreditor Agreement, substantially in the form of Exhibit I, dated as of the Closing Date, by and among the Loan Parties, the ABL Agent (if any), the 21C Term Loan Agent, the Administrative Agent, the PIK Toggle Notes Agent and each other financial institution party thereto from time to time, as it may be amended, restated, supplemented or otherwise modified from time to time in accordance with this Agreement or (ii) any other intercreditor agreement that the Administrative Agent, acting at the

25

direction of the Borrower, has posted to the Lenders on the Platform not less than five (5) Business Days before execution thereof and to which the Required Lenders have not objected in writing (which objections shall be posted to the Platform) within five (5) Business Days after such posting.

"Interest Payment Date":  as to any Loan (a) the last Business Day of each March, June, September and December to occur while such Loan is outstanding, (b) each date of any repayment or prepayment made in respect thereof prior to the Termination Date of such Loan and (c) the Termination Date of such Loan.

"Investment":  (i) any purchase or other acquisition by the Borrower or any of the Restricted Subsidiaries of, or of a beneficial interest in, any Capital Stock or Indebtedness of any other Person (including any Restricted Subsidiary), (ii) any loan or advance (by way of guaranty or otherwise) constituting Indebtedness of such other Person, including any partnership or joint venture interest in such other Person (other than accounts receivable and trade credit) or (iii) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person; provided that, in the event that any Investment is made by the Borrower or any Restricted Subsidiary in any Person through substantially concurrent interim transfers of any amount through any other Restricted Subsidiaries, then such other substantially concurrent interim transfers shall be disregarded for purposes of Section 7.8. The amount of any Investment outstanding as of any time shall be the original cost of such Investment (which, in the case of any Investment constituting the contribution of an asset or property, shall be based on the Borrower's good faith estimate of the fair market value of such asset or property at the time such Investment is made) plus the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment, less all Returns received by the Borrower or any Restricted Subsidiary in respect thereof.

"Joint Venture":  a joint venture, partnership or similar arrangement, whether in corporate, partnership or other legal form.  To the extent constituting a Joint Venture, 21st Century Oncology, LLC shall not be, and shall not be deemed to be, a Joint Venture for purposes of the definitions of "Cash on Hand" and "Liquidity".

"Joint Venture Disposition Amount":  (x) with respect to any proposed Disposition pursuant to Section 7.5(x), the greater of (A) $100,000,000 and (B) 8.75% of Total Assets as of the Applicable Date of Determination if after giving effect to such Disposition, Consolidated EBITDA would not be less than prior to giving effect thereto and (y) if immediately preceding clause (x) does not apply, the greater of (A) $30,000,000 and (B) 2.50% of Total Assets as of the Applicable Date of Determination.

"Lenders":  each of the banks, financial institutions and other Persons listed on the signature pages hereof as a Lender and each Person that shall become a Lender hereunder after the Closing Date pursuant to Section 2.22 and Section 10.6, in each case, for so long as such Person shall be a party to this Agreement; provided that, unless the context otherwise requires, each reference herein to a Lender shall be deemed to be a reference to a Lender and to include any Conduit Lender.

26

"Lien":   any mortgage, pledge, hypothecation, collateral assignment, security deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any capital lease having substantially the same economic effect as any of the foregoing).  For the avoidance of doubt, "Lien" shall not be deemed to include any license or sublicense of Intellectual Property.

"Liquidity": as of any date of determination, shall equal (a) the aggregate amount of domestic unrestricted cash and Cash Equivalents of the Borrower and its Restricted Subsidiaries[1] *plus* (b) borrowing availability under all domestic revolving credit facilities of the Borrower and its Restricted Subsidiaries in effect as of such date *less* (c) the aggregate amount of domestic unrestricted cash and Cash Equivalents of any Restricted Subsidiary of Borrower that is a Joint Venture.

"Loans":  as defined in Section 2.1(a).

"Loan Documents":   this Agreement, the Agent Fee Letter (except for purposes of Section 10.1), the Security Documents, the Notes and any amendment, waiver, supplement or other modification to any of the foregoing.

"Loan Obligations":  the unpaid principal of and interest on (including Default Interest, interest accruing after the maturity of the Loans and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to the Borrower, whether or not a claim for post-filing or post-petition interest, is allowed or allowable in such proceeding) the Loans, and all other Indebtedness, obligations and liabilities of the Borrower and each other Loan Party (including the Guarantee Obligations of the Guarantors), as applicable, to the Administrative Agent or to any Lender or other Secured Party, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement, any other Loan Document or any other document, agreement or instrument made, delivered or given in connection herewith or therewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including all fees, costs, expenses, charges and disbursements of counsel to the Administrative Agent or to any Lender that are required to be paid by the Borrower or the Guarantors pursuant hereto or any other Loan Document) or otherwise, in each case, including all amounts accruing after the maturity of the Loans or after the filing of any bankruptcy petition or the commencement of any insolvency reorganization or like proceeding relating to any Loan Party whether allowed or allowable in such proceeding.

"Loan Parties":  collectively, Holdings, the Borrower and the Guarantors.

"Managed Care Plans":   all health maintenance organizations, preferred provider organizations, individual practice associations, competitive medical plans and similar arrangements.

---

[1] NTD: Inclusion of cash and Cash Equivalents of Medical Developers Cooperatief, U.A., 21st Century Oncology Holdings, B.V. and Medical Developers Holdings, B.V. in this calculation remains under consideration.

"Management Stockholders":   the members of management of the Borrower or its Subsidiaries who are investors in Holdings or any direct or indirect parent thereof.

"Material Adverse Effect":   a material adverse effect on (a) the business, property, operations, or financial condition of the Borrower and its Restricted Subsidiaries, taken as a whole, (b) the validity or enforceability of this Agreement, the Notes, Section 2 of the Guarantee and Security Agreement, or, taken as a whole, any of the other Loan Documents, or (c) the rights or remedies of the Administrative Agent or the Lenders under this Agreement, the Notes or, taken as a whole, the other Loan Documents.

"Materials of Environmental Concern":   any gasoline or petroleum (including crude oil or any fraction thereof) or petroleum products or any hazardous or toxic substances, materials or wastes, defined or regulated as such in or under any Environmental Law, including asbestos, polychlorinated biphenyls and urea-formaldehyde insulation.

"Maturity Date":   [        ][2].

"[MDL Claims]":   as defined in the Plan of Reorganization.

"MDL Entities":   collectively, Medical Developers LLC, MD International Investments, LLC and their respective Subsidiaries (including Medical Developers Coöperatief U.A.), together with each successor to any of the foregoing.

"MDL Priority Collateral":   as defined in the Intercreditor Agreement.

"MDL Sale Proceeds":   all Net Cash Proceeds received by any Loan Party or any of their respective Restricted Subsidiaries from the Disposition of, or other value attributed in a bankruptcy, insolvency or similar proceeding with respect to, any MDL Priority Collateral or any other assets or property of the MDL Entities.

"Medicaid":   medical assistance provided under a State plan approved under title XIX of the Social Security Act.

"Medicaid Provider Agreements":   any Medicaid provider agreements or similar agreement or arrangement between any of the Loan Parties or any of their Subsidiaries, on the one hand, and, any State or a State Medicaid Agency, on the other hand.

"Medicare":   the health insurance program for the aged and disabled under title XVIII of the Social Security Act.

"Medicare Provider Agreements":   any Medicare provider agreements or similar agreement or arrangement between any of the Loan Parties or any of their Subsidiaries, on the one hand, and, CMS, on the other hand.

"Minority Investments":   as defined in Section 7.8.

---

[2] NTD:  To be calculated as the date that is four and three-quarter (4-3/4) calendar years after the Closing Date.

28

"Moody's":  as defined in the definition of "Cash Equivalents."

"Mortgaged Properties":  the Initial Mortgaged Properties and the other real properties and leasehold interests, if any, of any Loan Party as to which the Administrative Agent for the benefit of the Secured Parties shall be granted a Lien pursuant to the Mortgages.

"Mortgages":  all fee mortgages, leasehold mortgages, if any, mortgage deeds, deeds of trust, deeds to secure debt, and other similar instruments, executed or to be executed by any Loan Party (i) which provide the Administrative Agent, for the benefit of the Secured Parties, a Lien on the Initial Mortgaged Properties and (ii) pursuant to Section 6.9(b), as amended, restated, modified, extended or supplemented from time to time.

"Multiemployer Plan":  an ERISA Plan that is a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA.

"Net Cash Proceeds":  (a) in connection with any Asset Sale, Sale Leaseback Transaction or any Recovery Event, the proceeds thereof in the form of cash and Cash Equivalents (including any such proceeds received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but only as and when received), net of attorneys' fees, accountants' fees, investment banking fees, amounts required to be applied to the repayment of Indebtedness (including, without limitation, principal, interest, premium and penalties, if any) secured by a Lien expressly permitted hereunder on any asset that is the subject of such Asset Sale, Sale Leaseback Transaction or Recovery Event (other than any Lien pursuant to a Security Document) and other related fees and expenses actually incurred in connection therewith and net of taxes paid or reasonably estimated to be payable as a result thereof and net of (i) any reasonable reserves established in connection therewith, (ii) reasonable holdbacks, (iii) reasonable indemnity obligations relating thereto, (iv) in the case of any Disposition or casualty or condemnation or similar proceeding by a Non-Wholly-Owned Subsidiary, the pro rata portion of the Net Cash Proceeds thereof (calculated without regard to this clause (iv)) attributable to minority interests and not available for distribution to or for the account of the Borrower or a wholly-owned Restricted Subsidiary as a result thereof and (v) any funded escrow established pursuant to the documents evidencing any such sale or disposition to secure any indemnification obligations or adjustments to the purchase price associated with any such sale or disposition until such time as the funds are released back to the Borrower or such Restricted Subsidiary pursuant to such escrow agreement and (b) in connection with any issuance or sale of Capital Stock, capital contribution or any incurrence of Indebtedness, the cash proceeds received from such issuance or incurrence, net of attorneys' fees, investment banking fees, accountants' fees, underwriting discounts and commissions and other related fees and expenses actually incurred in connection therewith.

"Non-Bank Tax Certificate":  as defined in Section 2.19(e).

"Non-Consenting Lender":  as defined in Section 2.22(b).

"Non-Excluded Taxes":  as defined in Section 2.19(a).

"Non-Indemnifiable Taxes":  as defined in Section 2.19(a).

29

"Non-Profit Entities":  any entity or entities duly acquired or formed and organized by the Holdings or any Subsidiary as a not-for-profit entity under applicable state law in furtherance of the business needs of Holdings and its Subsidiaries.

"Non-U.S. Lender":  as defined in Section 2.19(e).

"Non-Wholly-Owned Subsidiary":  any Domestic Subsidiary (other than a Non-Profit Entity or an Insurance Subsidiary) that is not a Wholly-Owned Subsidiary.

"Not Otherwise Applied":  with reference to any amount of Net Cash Proceeds of any transaction or event, that such amount (a) was not required to be applied to prepay the Loans pursuant to Section 2.11, and (b) was not previously applied in determining the permissibility of a transaction under the Loan Documents where such permissibility was (or may have been or concurrently will be) contingent on receipt of such amount or utilization of such amount for a specified purpose.  The Borrower shall promptly notify the Administrative Agent in writing of any application of such amount as contemplated by (b) above.

"Notes":  the collective reference to any promissory note evidencing Loans.

"Organizational Documents":  of any Person, the charter, memorandum and articles of association, articles or certificate of organization or incorporation and bylaws or other organizational or governing or constitutive documents of such Person.

"Other Connection Taxes":  with respect to the Administrative Agent or any Lender, Taxes imposed as a result of a present or former connection between the Administrative Agent or such Lender and the jurisdiction imposing such Tax (other than connections arising solely from the Administrative Agent or such Lender having executed, delivered, become a party to, performed its obligations under, received payments under or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes":  any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies (including any interest, additions to tax or penalties applicable thereto) arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

"Parent Entity":  any Person of which Holdings at any time is or becomes a subsidiary on or after the Closing Date.

"Participant":  as defined in Section 10.6(c).

"Participating Lender":  as defined in Section 2.10(c)(iii)(B).

"Patriot Act":  the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001).

"PBGC":  the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor).

"Perfection Certificate":  a certificate substantially in the form of Exhibit K.

"Permitted Acquisition":  an Acquisition by the Borrower or a Restricted Subsidiary, subject to the fulfillment of the following conditions:

(a)     in the case of an acquisition of Capital Stock of any entity by the Borrower or a Guarantor, such entity shall become a party to the Guarantee and Security Agreement and its Capital Stock shall be pledged to the extent required by the terms of Section 6.9 except to the extent that the portion of the fair market value of the consideration for such Acquisition that is attributable to Investments in such entities (whether or not such entities become Subsidiaries) that do not become Subsidiary Guarantors as a result of such Acquisition is treated, at the time of such Acquisition, as Investments in such entities made pursuant to Section 7.8 (other than Section 7.8(g)) and are permitted to be made thereunder at such time (it being understood that the foregoing is intended to allow an Excluded Subsidiary that becomes a Subsidiary as a result of such Acquisition, to not become a Subsidiary Guarantor as otherwise required by this clause (a), if the conditions of this clause (a) are satisfied);

(b)     the Acquisition must not be of a hostile nature and the Target must be engaged primarily in a business that complies with Section 7.15; and

(c)     as of the date of execution of an agreement in respect of such Acquisition, no Event of Default shall have occurred and be continuing or would result from such Acquisition.

"Permitted Business Judgment":  with respect to any term or provision of this Agreement or the other Loan Documents, that requires the approval, satisfaction, discretion, determination, decision, action or inaction or any similar concept of or by the Administrative Agent, in each case, whether at the request of the Borrower or otherwise, as applicable (collectively, an "Agent Action"), a determination made in good faith with respect to such Agent Action by the Administrative Agent in the exercise of its reasonable business judgment; provided, that, at the Administrative Agent's option, the Administrative Agent may confirm its authority to take such Agent Action, including after giving such consent, by (a) notifying all Lenders via the Platform of the proposed Agent Action and (b) Lenders constituting Required Lenders consenting to such Agent Action in the manner prescribed in the relevant communication; provided, that if a Lender does not expressly provide its consent or does not expressly provide its lack of consent with respect to such Agent Action within five (5) Business Days of receiving such communication (or such shorter period set forth in this Agreement), then such Lender shall be deemed to have consented to such Agent Action.

"Permitted Capital Stock":  (a) common stock of Holdings or Borrower and (b) any preferred stock of Holdings or Borrower (or any equity security of Holdings or Borrower that is convertible into or exchangeable for any preferred stock of Holdings or Borrower), so long as the terms of any such preferred stock or equity security of Holdings or Borrower, as applicable (i) do not provide any collateral security, (ii) do not provide any guaranty or other support by the Borrower or any Subsidiaries of the Borrower, (iii) do not contain any mandatory put, redemption, repayment, sinking fund or other similar provision occurring before the eighth

31

anniversary of the Closing Date (other than as a result of a change of control or similar event that, in each case, is on customary market terms negotiated in good faith by the Borrower, (iv) do not require the cash payment of dividends or interest, (v) do not contain any financial maintenance covenants, and (vi) to the extent any such preferred stock or equity security does not otherwise comply with clauses (b)(i) through (iv) hereof, such preferred stock or equity security is otherwise reasonably satisfactory to the Administrative Agent.

"Permitted Disposition":  (i) any sale or discount of past due accounts receivable in the ordinary course of business; (ii) (x) any lease as lessor or license as licensor of isolated parcels of real property or isolated items of personal property (including Intellectual Property) in the ordinary course of business and (y) any grant of options to purchase, lease or acquire isolated parcels of real property or isolated items of personal property (including Intellectual Property) in the ordinary course of business; and (iii) any sale or exchange of isolated specific items of equipment, so long as the purpose of each sale or exchange is to acquire (and results within three hundred sixty-five (365) days of such sale or exchange in the acquisition of) replacement items of equipment which are, in the reasonable business judgment of the Borrower and its Restricted Subsidiaries, the functional equivalent of the item of equipment so sold or exchanged; provided that the Administrative Agent has at all times after such acquisition a perfected Lien in the replacement property with the same priority or better than the Collateral being sold or exchanged to the extent such disposed of property was Collateral.

"Permitted Liens":  Liens permitted by Section 7.3.

"Permitted Refinancing":   modifications, replacements, restructurings, refinancings, refundings, renewals, amendments, restatements or extensions of all or any portion of Indebtedness (including any type of debt facility or debt security); provided that (a) the amount of such Indebtedness is not increased (unless the additional amount is permitted pursuant to another provision of Section 7.2) at the time of such refinancing, refunding, renewal or extension except by an amount equal to the existing unutilized commitments thereunder, accrued but unpaid interest thereon and a premium or penalties paid, and fees and expenses reasonably incurred, in connection with such refinancing, refunding, restructuring, renewal or extension (including any fees and original issue discount incurred in respect of such resulting Indebtedness), (b) the direct and contingent obligors of such Indebtedness shall not be expanded as a result of or in connection with such refinancing, refunding, restructuring, renewal or extension (other than to the extent (i) any such additional obligors are or will become a Loan Party, (ii) none of such obligors on the Indebtedness being modified, replaced, refinanced refunded, restructured, renewed or extended are Loan Parties or (iii) as otherwise permitted by Section 7.2), (c) to the extent such Indebtedness being so refinanced, refunded, renewed or extended is subordinated in right of payment and/or in right of Lien to any of the Obligations, such refinancing, refunding, renewal or extension is subordinated in right of payment and/or in right of Lien (or, in the case of Lien subordination, not secured) to such Obligations on terms (taken as a whole) at least as favorable to the Lenders as those contained in the documentation governing the Indebtedness being so modified, refinanced, refunded, renewed or extended (as determined in good faith by the Borrower) or otherwise reasonably acceptable to the Administrative Agent, and (d) other than with respect to Indebtedness under Section 7.2(e) or (g), such refinancing, refunding, renewal or extension has a final scheduled maturity date equal

32

to or later than the final scheduled maturity date of, the Indebtedness being refinanced, refunded, renewed or extended.

"Permitted Seller Debt":  Indebtedness of Holdings, the Borrower or any of their Restricted Subsidiaries issued to a seller as a consideration for a Permitted Acquisition.

"Person":  an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"Petition Date":  as defined in the Recitals.

"PIK Toggle Notes":  the 10.00% / 12.00% Senior Secured PIK Toggle Notes due 2023 issued by Borrower pursuant to the PIK Toggle Notes Indenture, in the aggregate principal amount equal to $[__] *plus* the amount of capitalized interest thereon.

"PIK Toggle Notes Agent":  Wilmington Savings Fund Society, FSB, as trustee and collateral agent under the PIK Toggle Notes Indenture, together with its successors and permitted assigns in such capacities.

"PIK Toggle Notes Indenture":  the Indenture, dated as of the Closing Date, entered into by and among Holdings, the Borrower, the guarantors party thereto and the PIK Toggle Notes Agent, providing for the issuance of the PIK Toggle Notes, together with all instruments and other agreements entered into by the Borrower or such Subsidiaries in connection therewith, in each case as may be amended, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"[PIK Toggle Notes Termination Date]": has the meaning set forth in the Intercreditor Agreement.

"Plan Confirmation Order":  the "Confirmation Order", as such term is defined in the Plan of Reorganization.

"Plan Documents":  collectively, the Plan of Reorganization, the Plan Confirmation Order and any other orders, documents and agreements entered into in connection therewith.

"Plan Effective Date":  [●], 2017, being the ["Effective Date"] under the Plan of Reorganization.

"Plan of Reorganization":  that certain [Joint Chapter 11 Plan of Reorganization of 21st Century Oncology Holdings, Inc. and its debtor affiliates, dated [●], 2017 filed in the Chapter 11 Cases (as altered, amended, modified, or supplemented from time to time prior to entry of the Plan Confirmation Order (including pursuant to the terms of the Plan Confirmation Order) and including any exhibits, supplements, annexes, appendices and schedules thereto), as confirmed by the Plan Confirmation Order pursuant to section 1129 of the United States Bankruptcy Code, 11 U.S.C. ss. 101 et seq., as amended].

"Platform": any electronic system, including e-mail, e-fax, Intralinks®, ClearPar®, Debt Domain, Syndtrak and any other Internet or Intranet website to which the Administrative Agent and each Lender has access (whether a commercial third-party website or a website sponsored by the Administrative Agent).

"Prepayment Trigger":  as defined in Section 2.11(b).

"Prepetition Credit Agreement":  as defined in the Recitals.

"Prepetition Lenders":  as defined in the Recitals.

"Pro Forma Basis":  with respect to the calculation of the Consolidated First Lien Leverage Ratio, the Consolidated Leverage Ratio, Consolidated Total Secured Leverage Ratio, the Fixed Charge Coverage Ratio, the amount of Consolidated EBITDA or Total Assets or any other financial test or ratio hereunder, for purposes of determining the permissibility of asset sales, prepayments required pursuant to Section 2.11(b) and Section 2.11(c), and for any other specified purpose hereunder, and for purposes of determining compliance with the covenant under Section 7.1, in each case as of any date, that such calculation shall give pro forma effect to the Transactions and all Specified Transactions (with any such incurrence of Indebtedness being deemed to be amortized over the applicable testing period in accordance with its terms) (and the application of the proceeds from any such asset sale or debt incurrence) that have occurred during the relevant testing period for which such financial test or ratio is being calculated and such proposed Specified Transaction for which the calculation of any such ratio is being made and, during the period immediately following the Applicable Date of Determination therefor and prior to or simultaneously with the event for which the calculation of any such ratio on such date of determination is made, including pro forma adjustments arising out of events which are attributable to the Transactions or the proposed Specified Transaction, including giving effect to those specified in accordance with the definition of "Consolidated EBITDA," in each case as certified on behalf of the Borrower by a Responsible Officer of the Borrower, using, for purposes of determining such compliance with a financial test or ratio (including any incurrence test), the historical financial statements of all entities, divisions or lines or assets so acquired or sold and the consolidated financial statements of the Borrower and/or any of its Restricted Subsidiaries, calculated as if the Transactions or such Specified Transaction, and all other Specified Transactions that have been consummated during the relevant period, and any Indebtedness incurred or repaid in connection therewith, had been consummated (and the change in Consolidated EBITDA resulting therefrom) and incurred or repaid at the beginning of such period and Total Assets shall be calculated after giving effect thereto.

Whenever pro forma effect is to be given to the Transactions or a Specified Transaction, the pro forma calculations shall be made in good faith by a Responsible Officer of the Borrower (including adjustments for costs and charges arising out of the Transactions or the proposed Specified Transaction and the "run-rate" cost savings and synergies resulting from the Transactions or such Specified Transaction that have been or are reasonably anticipated and projected by the Borrower in good faith to be reasonably anticipated to be realizable within twelve (12) months of the date thereof ("run-rate" means the full recurring benefit for a test period that is associated with any action taken or expected to be taken or for which a plan for realization has been established (including any savings expected to result from the elimination of

34

a public target's compliance costs with public company requirements); provided that such cost savings and synergies shall not exceed, when taken together with amounts added back to Consolidated EBITDA pursuant to clause (s) of the definition thereof for the relevant period, $5,000,000 for such period, before giving effect to such amounts so added back; provided that such cost savings and synergies, when taken together with amounts added back to Consolidated EBITDA pursuant to clause (s) of the definition thereof and with the aggregate amount of legal expenses described in sub-clause (y) of clause (l) of the definition thereof that are added back to Consolidated EBITDA pursuant to such clause (l), shall not exceed 10% of Consolidated EBITDA for such period determined on a Pro Forma Basis before giving effect to all amounts so added back; provided, however, that (i) such synergies are reasonably identifiable and projected by the Borrower in good faith to result from actions either taken or expected to be taken within eighteen (18) months after the end of the test period in which the Transactions or the Specified Transaction occurred and, in each case, certified by a Responsible Officer of the Borrower and (ii) no amounts shall be added pursuant to this paragraph to the extent duplicative of any amounts that are otherwise added back in computing Consolidated EBITDA for such test period.

If any Indebtedness bears a floating rate of interest and is being given pro forma effect, the interest on such Indebtedness shall be calculated as if the rate in effect on the date of the event for which the calculation is made had been the applicable rate for the entire test period (taking into account any interest hedging arrangements applicable to such Indebtedness). Interest on a Capital Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by a Responsible Officer of the Borrower to be the rate of interest implicit in such Capital Lease Obligation in accordance with GAAP.  Interest on Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate, or other rate, shall be determined to have been based upon the rate actually chosen, or if none, then based upon such optional rate chosen as the Borrower or the applicable Restricted Subsidiary may designate.

"Pro Forma Financial Statements":  as defined in Section 4.1(a).

"Projections":  as defined in Section 6.2(b).

"Properties":  as defined in Section 4.17(a).

"Proposed Change":  as defined in Section 2.22(b).

"PTE":  a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"Public Company":  Holdings or any Parent Entity.

"Public Offering":  a public offering of Permitted Capital Stock occurring after the Closing Date.

"Purchasing Borrower Party":  the Borrower or any Subsidiary of the Borrower that becomes an Assignees or Participant pursuant to Section 10.6(g).

"Recovery Event":  any settlement of or payment in respect of any property or casualty insurance claim or any condemnation proceeding relating to any asset of the Borrower or any Restricted Subsidiary, in excess of $10,000,000 in the aggregate for all such amounts in any fiscal year.

"Register":  as defined in Section 10.6(b).

"Regulation H":  Regulation H of the Board as in effect from time to time.

"Regulation S-X":  Regulation S-X under the Securities Exchange Act of 1934.

"Regulation U":  Regulation U of the Board as in effect from time to time.

"Reinvestment Deferred Amount":  with respect to any Reinvestment Event, the aggregate Net Cash Proceeds received by any Group Member in connection therewith that are not applied to prepay the Loans pursuant to Section 2.11(b) as a result of the delivery of a Reinvestment Notice.

"Reinvestment Event":  any Asset Sale, Sale Leaseback Transaction or Recovery Event in respect of which the Borrower has delivered a Reinvestment Notice.

"Reinvestment Notice":  a written notice executed by a Responsible Officer stating that (a) in connection with a Reinvestment Event constituting an Asset Sale, no Event of Default has occurred and is continuing and (b) the Borrower (directly or indirectly through a Subsidiary) intends and expects to use all or a specified portion of the Net Cash Proceeds of an Asset Sale, Sale Leaseback Transaction or Recovery Event to acquire, develop, upgrade or repair assets useful in its business or in connection with a Permitted Acquisition, Investment or Capital Expenditure, substantially in the form of Exhibit E; provided, however, that to the extent that any such Net Cash Proceeds in excess of $7,500,000 are received in respect of assets constituting Collateral, such Net Cash Proceeds shall be used to acquire or repair assets that constitute Collateral or to make a Permitted Acquisition of or Investment in assets that become Collateral.

"Reinvestment Prepayment Amount":  with respect to any Reinvestment Event, the Reinvestment Deferred Amount relating thereto less any amount expended prior to the relevant Reinvestment Prepayment Date in connection with Capital Expenditures, a Permitted Acquisition or other Investments permitted under Section 7.8 or to acquire, develop, upgrade or repair assets to be used in the Borrower's or any Subsidiary's business (subject to the proviso to the definition of the term "Reinvestment Notice").

"Reinvestment Prepayment Date":  with respect to any Reinvestment Event, the earlier of (a)(i) the date occurring three hundred sixty-five (365) days after receipt of the Net Cash Proceeds from such Reinvestment Event or (ii) if within such three hundred sixty-five (365) day period the Borrower (directly or indirectly through a Subsidiary) enters into a legally binding commitment to reinvest such proceeds, the later of (x) the date occurring one hundred eighty (180) days after the date of such commitment or (y) the date occurring three hundred sixty-five (365) days after receipt of such Net Cash Proceeds and (b) the date on which the Borrower shall have determined not to, or shall have otherwise permanently ceased to, acquire or repair assets to be used and useful in the Borrower's or any Subsidiary's business or to use them in connection

36

with a Permitted Acquisition or Investment with all or any portion of the relevant Reinvestment Deferred Amount.

"Related Parties":  with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents and advisors of such person and of such person's Affiliates.

"Reportable Event":  any of the events set forth in Section 4043 of ERISA, other than those events as to which the thirty (30) calendar day notice period is waived by applicable regulations under Section 4043 of ERISA.

"Representative":  with respect to any series of any Indebtedness that may from time to time become subject to an intercreditor agreement, the Person designated as "Representative" by the holders of such Indebtedness for purposes of the Loan Documents.

"Required Lenders":  at any time, Lenders holding more than 50% of the aggregate unpaid principal amount of the Loans then outstanding.

"Requirement of Law":  as to any Person, the Certificate of Incorporation and By-Laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Responsible Officer":  as to any Person, the chief executive officer, president, vice president, chief financial officer, treasurer or the senior vice president of finance of such Person but, in any event, with respect to financial matters, the chief financial officer, treasurer or senior vice president of finance of such Person.

"Restricted Payments":  as defined in Section 7.6.

"Restricted Subsidiary":  any Subsidiary of the Borrower other than an Unrestricted Subsidiary.

"Return":  with respect to any Investment, any dividend, distribution, interest, fee, premium, return of capital, repayment of principal, income, profit (from a disposition or otherwise) and any other amount received or realized in respect thereof.

"S&P":  as defined in the definition of "Cash Equivalents."

"Sale Leaseback Transaction":  as defined in Section 7.11.

"SEC":  the Securities and Exchange Commission, any successor thereto and any analogous Governmental Authority.

"Secured Obligations" or "Obligations":  collectively, the Loan Obligations, the Specified Swap Obligations of the Loan Parties and the Cash Management Obligations.

"Secured Parties":  as defined in the Guarantee and Security Agreement.

"Securities Act":  the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Security Documents":  the collective reference to the Guarantee and Security Agreement, the Intercreditor Agreement, the Mortgages and all other security documents hereafter delivered to the Administrative Agent granting a Lien on any property of any Person to secure the obligations and liabilities of any Loan Party under any Loan Document.

"Single Employer Plan":  any ERISA Plan that is covered by Title IV of ERISA or Section 412 or 430 of the Code, but that is not a Multiemployer Plan.

"Sold Entity or Business":  as set forth in the definition of the term "Consolidated EBITDA."

"Solvent":  when used with respect to any Person, means that, as of any date of determination, (a) the amount of the "fair value" of the assets of such Person on a going concern basis will, as of such date, exceed the amount of all "liabilities of such Person, contingent or otherwise," as of such date, as such quoted terms are determined in accordance with applicable federal and state laws governing determinations of the insolvency of debtors, (b) the present fair saleable value (on a going concern basis) of the assets of such Person will, as of such date, be greater than the amount that will be required to pay the probable liability of such Person on its debts as such debts become absolute and matured, (c) such Person will not have, as of such date, an unreasonably small amount of capital with which to conduct its business, and (d) such Person will be able to pay its debts as they mature in the ordinary course of business.  The amount of contingent liabilities at any time shall be computed as the amount that can reasonably be expected to become an actual or matured liability.  For purposes of this definition, (i) "debt" means liability on a "claim," and (ii) "claim" means any (x) right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured or (y) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured or unmatured, disputed, undisputed, secured or unsecured.

"Specified Swap Agreement":  any Swap Agreement entered into by any Loan Party and any Agent, Lender or Affiliate thereof (or any Person that was an Agent, a Lender or an Affiliate of an Agent or a Lender at the time such Swap Agreement was entered into).

"Specified Swap Obligations":  with respect to any Person, any and all obligations of such Person, in each case, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor) under any and all Specified Swap Agreements; provided that, for purposes of determining any obligations of any Guarantor under the Guarantee and Security Agreement, the definition of "Specified Swap Obligations" shall not create any guarantee by such Guarantor of (or any grant of security interest by any Guarantor to support, if such grant of

38

security interest would be illegal as described in the definition of "Excluded Swap Obligation") any Excluded Swap Obligations of such Guarantor.

"Specified Transaction":  any (a) disposition of all or substantially all the assets of or all the Capital Stock of any Restricted Subsidiary of the Borrower or of any product line, business unit, line of business or division of the Borrower or any of the Restricted Subsidiaries of the Borrower for which historical financial statements are available, (b) Permitted Acquisitions, (c) Investment that results in a Person becoming a Restricted Subsidiary of the Borrower, (d) designation of any Restricted Subsidiary as an Unrestricted Subsidiary, or of any Unrestricted Subsidiary as a Restricted Subsidiary or (e) the proposed incurrence of Indebtedness or making of a Restricted Payment or payment in respect of Indebtedness in respect of which compliance with any financial ratio is by the terms of this Agreement required to be calculated on a Pro Forma Basis.

"State":  each of the fifty (50) states of the United States of America and the District of Columbia.

"State Medicaid Agency":  the agency administering or supervising the administration of a State Medicaid plan.

"Subsidiary":  as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned by such Person.  Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Restricted Subsidiary or Subsidiaries of the Borrower.  Notwithstanding anything else herein to the contrary, the definition of Subsidiary shall not include Non-Profit Entities.

"Subsidiary Guarantor":  each direct or indirect Restricted Subsidiary of the Borrower that executes the Guarantee and Security Agreement or a supplement thereto, or that otherwise guarantees all or any part of the Obligations pursuant to the Loan Documents.

"Survey":  ATLA surveys with respect to each Mortgaged Property provided, however, that a survey shall not be required to the extent that (x) an existing survey together with an "affidavit of no change" satisfactory to the Title Company is delivered to the Administrative Agent and the Title Company and (y) the Title Company removes the standard survey exception and provides reasonable and customary survey related endorsements and other coverage in the applicable title insurance policy.

"Swap Agreement":  any agreement entered into by any Group Member with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by

39

current or former directors, officers, employees or consultants of the Borrower or any of its Subsidiaries shall be a "Swap Agreement."

"Swap Obligation":  with respect to any Group Member, any obligation to pay or perform under any Swap Agreement or any other agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"Target":  any Person or any division or line of business of a Person, more than 50.1% of the outstanding Capital Stock or all or substantially all of the assets (or any substantial part for which financial statements or other customary financial information is available) of which (together with any existing owned interests or assets), are proposed to be acquired by the Borrower or any of the Restricted Subsidiaries in connection with a Permitted Acquisition.

"Taxes":  as defined in Section 2.19(a).

"Term Priority Collateral": as defined in the Intercreditor Agreement.

"Termination Date":  as to each Loan, the earlier of (a) the Maturity Date of such Loan and (b) the date upon which such Loan shall become due and payable upon acceleration pursuant to Article 8.

"Third Party Payor Programs":  all third party payor programs in which the Borrower and its Subsidiaries currently or in the future may participate, including, without limitation, Medicare, Medicaid, Blue Cross and/or Blue Shield, Managed Care Plans, other private insurance programs and employee assistance programs.

"Title Company":  any title insurance company as shall be retained by Borrower and reasonably acceptable to the Administrative Agent.

"Total Assets":  at any date, the total amount of assets of the Borrower and its consolidated subsidiaries as of the end of the month immediately preceding such date.

"Transaction Bonuses":  any bonuses payable to any officer or employee of Holdings or any of its Subsidiaries (including any Person who becomes an officer or employee of any Group Member in connection with a Permitted Acquisition) in connection with any Permitted Acquisition in an aggregate amount not exceeding $10,000,000 in any four fiscal quarter period most recently ended.

"Transactions":  collectively, (a) the Financing Transactions, (b) the entry into, and the incurrence and performance of obligations under, the 21C Term Loan Agreement and the PIK Toggle Notes Indenture, and (c) all other transactions contemplated by, entered into, consummated in connection with, or relating to, the Plan of Reorganization and/or the Plan Confirmation Order (including all mergers, amalgamations, consolidations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions or other corporate or other transactions that the Loan Parties or any of their Affiliates determine to be necessary or appropriate to implement the Plan of Reorganization and/or the Plan Confirmation Order).

40

"Transferee":  any Assignee or Participant.

"United States" and "U.S.":  the United States of America.

"Unrestricted Subsidiary":  (a) any Subsidiary of an Unrestricted Subsidiary, (b) any Subsidiary of the Borrower designated by the board of directors of the Borrower as an Unrestricted Subsidiary pursuant to Section 6.11 subsequent to the Closing Date and (c) any Subsidiary of the Borrower set forth on Schedule 6.11.

"U.S. Person":  a "United States person" as defined in Section 7701(a)(30) of the Code.

"Voting Stock":  of any Person as of any date, the Capital Stock of such Person that is at the time entitled to vote in the election of the board of directors, managers or trustees (as applicable) of such Person.

"Weighted Average Life to Maturity":  when applied to any Indebtedness at any date, the number of years obtained by dividing:  (a) the sum of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (b) the then outstanding principal amount of such Indebtedness.

"Wholly-Owned Subsidiary":  as to any Person, any other Person all of the Capital Stock of which (other than directors' qualifying shares required by law) is owned by such Person directly and/or through other Wholly-Owned Subsidiaries.

"Write-Down and Conversion Powers":  with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

1.2   **Other Definitional Provisions**.

(a)   Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in the other Loan Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b)   As used herein and in the other Loan Documents, and any certificate or other document made or delivered pursuant hereto or thereto, (i) accounting terms relating to any Group Member not defined in Section 1.1 and accounting terms partly defined in Section 1.1, to the extent not defined, shall have the respective meanings given to them under GAAP as in effect from time to time (provided that in the event that any Accounting Change (as defined below) shall occur and such change results in a change in the method of calculation of financial covenants, standards or terms in this Agreement, then the Borrower and the Administrative Agent agree to enter into good faith negotiations in order to amend such provisions of this Agreement so as to equitably reflect such Accounting Change with the desired result that the criteria for evaluating the Borrower's and the Subsidiaries' consolidated financial condition shall be the same after such Accounting Change as if such Accounting Change had not been made and

41

until such time as such an amendment shall have been executed and delivered by the Borrower, the Administrative Agent and the Required Lenders, all financial ratios, covenants, standards and terms in this Agreement shall continue to be calculated or construed as if such Accounting Change had not occurred ("Accounting Change" refers to any change in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants or, if applicable, the SEC)), (ii) the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation," (iii) the word "incur" shall be construed to mean incur, create, issue, assume, become liable in respect of or suffer to exist (and the words "incurred" and "incurrence" shall have correlative meanings), (iv) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, Capital Stock, securities, revenues, accounts, leasehold interests and contract rights, (v) references to agreements or other Contractual Obligations shall, unless otherwise specified, be deemed to refer to such agreements or Contractual Obligations as amended, supplemented, restated or otherwise modified from time to time, (vi) the word "knowledge" when used with respect to any Loan Party shall be deemed to be a reference to the knowledge of any Responsible Officer and (vii) the words "in the ordinary course of business" of the Borrower or any Restricted Subsidiary thereof means (i) in the ordinary course of business of, or in furtherance of an objective that is in the ordinary course of business of the Borrower or such Restricted Subsidiary, as applicable, (ii) customary and usual in the industry or industries of the Borrower and its Subsidiaries in the United States or any other jurisdiction in which the Borrower or any Subsidiary does business, as applicable, or (iii) generally consistent with the past or current practice of the Borrower or such Subsidiary, as applicable, or any similarly situated businesses in the United States or any other jurisdiction in which the Borrower or any Subsidiary does business, as applicable.

(c)    Notwithstanding anything in this Agreement to the contrary, any change in GAAP or the application or interpretation thereof that would require operating leases to be treated similarly as a capital lease shall not be given effect in the definitions of Indebtedness or Liens or any related definitions or in the computation of any financial ratio or requirement.

(d)    With respect to any period during which the Transactions or any Specified Transaction occurs, for purposes of determining the prepayments required pursuant to Section 2.11 or determining compliance with any financial test or ratio hereunder (including any incurrence test) or for any other purpose hereunder, calculation of the Fixed Charge Coverage Ratio, Consolidated First Lien Leverage Ratio, Consolidated Total Secured Leverage Ratio, Consolidated EBITDA, Total Assets and the Consolidated Leverage Ratio with respect to such period shall be made on a Pro Forma Basis.

(e)    All certifications to be made hereunder by an officer or representative of a Loan Party shall be made by such a Person in his or her capacity solely as an officer or a representative of such Loan Party, on such Loan Party's behalf and not in such Person's individual capacity.

(f)    In the event that any Lien, Investment, Indebtedness (whether at the time of incurrence or upon application of all or a portion of the proceeds thereof), Disposition, Restricted Payment, Affiliate transaction, restrictive agreement or prepayment of Indebtedness meets the criteria of one or more than one of the categories of transactions then permitted pursuant to any

42

clause of such Sections in <u>Section 7</u>, such transaction (or portion thereof) at any time shall be permitted under one or more of such clauses as determined by the Borrower in its sole discretion at such time.

(g)   The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(h)   The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(i)   Except as otherwise expressly stated herein, any determination being made or any action required to be taken (including any payment required to be made) pursuant to this Agreement or any other Loan Document on a day that is not a Business Day shall be deemed to be determined or required to be taken on the next succeeding Business Day.  Except to the extent a reference is expressly made to Business Days, each reference to a certain number of "days" shall be a reference to such number of calendar days.

(j)   Each Agent Action, or proposed Agent Action, shall be determined by the relevant Agent in its Permitted Business Judgment.

## SECTION 2

## AMOUNT AND TERMS OF COMMITMENTS

2.1   **<u>Commitments</u>**.

(a)   On the Closing Date, subject to <u>Sections 5.1</u> and <u>5.2</u> and pursuant to the Plan of Reorganization, each Lender shall be deemed to have extended to the Borrower, without any funding or other action on the part of such Lender, term loans (the "<u>Loans</u>") in the aggregate principal amount equal to such Lender's Commitment and, immediately upon the incurrence by the Borrower thereof, the amount of each Lender's Allowed MDL Claims outstanding on the Closing Date (calculated immediately prior to giving effect to the extension of the Loans) equal to the aggregate principal amount of Loans made by such Lender shall be deemed automatically, fully and finally satisfied, released and discharged and converted into Loans outstanding as of the Closing Date.

2.2   **<u>Procedure for Loan Borrowings</u>**.  The Administrative Agent shall credit the account of the Borrower on the books of such office of the Administrative Agent with the aggregate of the amounts of Loans made available on the Closing Date by the Lenders in accordance with <u>Section 2.1</u>.

2.3   **<u>Repayment of Loans</u>**.  The Borrower shall repay outstanding Loans on the Maturity Date.

2.4    **[Reserved]**.

2.5    **[Reserved**].

2.6    **[Reserved]**.

2.7    **[Reserved]**.

2.8    **[Reserved]**.

2.9    **Termination of Commitments**.

(a)    [Reserved].

(b)    The Commitments shall terminate and be fully and finally extinguished on the Closing Date upon the deemed funding of the Loans in accordance with Section 2.1.

2.10    **Optional Prepayments**.

The Borrower may at any time and from time to time prepay the Loans, in whole or in part, upon notice (which may be conditional) substantially in the form of Exhibit H-2 delivered to the Administrative Agent no later than 12:00 Noon, New York City time, one (1) Business Day prior thereto, which notice shall specify the date and amount of prepayment.  Upon receipt of any such notice the Administrative Agent shall promptly notify each Lender thereof.  If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein (subject to any conditions contained therein), together with accrued interest to such date on the amount prepaid.  Partial prepayments of Loans shall be in an aggregate principal amount of $1,000,000 or a whole multiple thereof.

2.11    **Mandatory Prepayments**.

(a)    If Indebtedness shall be issued or incurred by any Loan Party not permitted to be incurred or issued pursuant to Section 7.2, an amount equal to 100% of the Net Cash Proceeds thereof shall be applied as soon as practicable but in any event within five (5) Business Days after such issuance or incurrence toward the prepayment of outstanding Loans on a *pro rata* basis and in accordance with Section 2.11(d).

(b)    Subject to clause (e) below:

(i)    if on any date the Borrower or any of its Restricted Subsidiaries shall receive Net Cash Proceeds (other than MDL Sale Proceeds) from any Asset Sale or Recovery Event, then, unless a Reinvestment Notice shall be delivered in respect thereof, the amount of such Net Cash Proceeds shall be applied as soon as practicable but, in any event, within ten (10) days after the date of receipt thereof, toward the prepayment of outstanding Loans on a *pro rata* basis and in accordance with Section 2.11(d); provided that, notwithstanding the foregoing, on each Reinvestment Prepayment Date, an amount equal to the Reinvestment Prepayment Amount with respect to the relevant Reinvestment Event shall be applied toward the prepayment of the Loans on a *pro rata* basis and in

44

accordance with Section 2.11(d); provided, further, that with respect to any prepayment event referenced in this sub-clause (i) this paragraph (b), (x) the Borrower shall not be obligated to make any prepayment otherwise required by this sub-clause (i) of this paragraph (b) unless and until the aggregate amount of Net Cash Proceeds from all such Asset Sale and Recovery Events, after giving effect to the reinvestment rights set forth herein, exceeds $7,500,000 (the "Prepayment Trigger") in any fiscal year of the Borrower, but then from all such Net Cash Proceeds (excluding amounts below the Prepayment Trigger) and (y) the Borrower may use such Net Cash Proceeds to prepay or repurchase (A) with respect to Net Cash Proceeds from any Asset Sale or Recovery Event of ABL Priority Collateral (1) outstanding Indebtedness (and all related obligations) incurred pursuant to Section 7.2(u)(i) that is secured by a Lien on ABL Priority Collateral that is senior to the Liens on such ABL Priority Collateral securing the Obligations and/or (2) outstanding Indebtedness (and all related obligations) incurred pursuant to Section 7.2(u)(i) that is secured by a Lien on ABL Priority Collateral that ranks *pari passu* with the Liens on such ABL Priority Collateral securing the Obligations, in an amount not exceeding the product of (x) the amount of such Net Cash Proceeds *multiplied by* (y) a fraction, the numerator of which is the outstanding principal amount of such Indebtedness and the denominator of which is the sum of (I) the outstanding principal amount of such Indebtedness and (II) the outstanding principal amount of the Loans and (B) with respect to assets that are not Collateral, Indebtedness of any Restricted Subsidiary that is not a Loan Party; and

(ii)    if the Borrower or any Restricted Subsidiary receives MDL Sale Proceeds, within ten (10) Business Days from the later of (a) the date of the consummation of the transaction giving rise to such MDL Sale Proceeds and (b) the receipt of such MDL Sale Proceeds, the Borrower or such Restricted Subsidiary shall:

(A)    prior to the repayment in full in cash of all Indebtedness incurred pursuant to Section 7.2(u)(ii) (and all related obligations), apply an amount equal to the lesser of (x) 100% of such MDL Sale Proceeds and (y) the principal amount of Indebtedness incurred pursuant to Section 7.02(u)(ii) (and related obligations) outstanding at such time to prepay or repurchase such outstanding Indebtedness (and related obligations); and

(B)    after the repayment in full in cash of all Indebtedness incurred pursuant to Section 7.02(u)(ii) (and related obligations), apply an amount equal to the lesser of (x) 100% of such MDL Sale Proceeds and (y) the outstanding principal amount of Loans on a *pro rata* basis and in accordance with Section 2.11(d).

(c)    [Reserved].

(d)    The application of any prepayment of Loans pursuant to Section 2.11 shall be made in accordance with Section 2.17(b). Each prepayment of Loans under this Section 2.11 shall be accompanied by accrued interest to the date of such prepayment on the amount prepaid and by any amounts payable pursuant to Section 2.20.

(e)      Notwithstanding any other provisions of this Section 2.11, (i) to the extent that any of or all the Net Cash Proceeds of any Disposition by a Foreign Subsidiary or Domestic Foreign Holding Company giving rise to a prepayment pursuant to Section 2.11(b) (a "Foreign Disposition"), the Net Cash Proceeds of any such prepayment event pursuant to Section 2.11(b) from a Foreign Subsidiary (a "Foreign Prepayment Event") would be (x) prohibited or delayed by applicable local law, (y) restricted by applicable organizational or constitutive documents or any agreement or (z) subject to other onerous organizational or administrative impediments, from being repatriated to the United States, the portion of such Net Cash Proceeds so affected will not be taken into account in measuring the Borrower's obligation to repay Loans as provided in Section 2.11(b) and, instead, such amounts may be retained by the applicable Foreign Subsidiary or Domestic Foreign Holding Company and (ii) to the extent that Borrower has determined in good faith that repatriation of any of or all the Net Cash Proceeds of any Foreign Disposition, any Foreign Prepayment Event would have an adverse tax cost consequence (other than a de minimis tax consequence) with respect to such Net Cash Proceeds (which for the avoidance of doubt, includes, but is not limited to, any prepayment whereby doing so Holdings, the Borrower, any Restricted Subsidiary or any of their respective Affiliates and/or equity partners would incur a tax liability, including a tax dividend, deemed dividend pursuant to Code Section 956 or a withholding tax (other than a de minimis tax liability, de minimis tax dividend, de minimis deemed dividend or de minimis withholding tax, respectively), the Net Cash Proceeds so affected may be retained by the applicable Foreign Subsidiary or Domestic Foreign Holding Company.  The non-application of any prepayment amounts as a consequence of the foregoing provisions will not, for the avoidance of doubt, constitute a Default or an Event of Default.

(f)      In connection with any optional or mandatory prepayment of borrowings hereunder, the Borrower shall, subject to the provisions of this paragraph and paragraph (d) of this Section, deliver to the Administrative Agent a notice of such prepayment specifying the amount of such prepayment.  The Administrative Agent will promptly notify each Lender of the contents of the Borrower's prepayment notice and of such Lender's *pro rata* share of the prepayment.  Each such Lender may reject all (but not less than all) of its pro rata share of any mandatory prepayment (such declined amounts, the "Declined Proceeds") of Loans required to be made pursuant to clause (b) of this Section 2.11 by providing notice to the Administrative Agent at or prior to the time of such prepayment.  Any Declined Proceeds remaining thereafter shall be retained by the Borrower ("Retained Declined Proceeds").

(g)      Notwithstanding anything herein to the contrary, the Lenders holding Loans issued on the Closing Date shall always be entitled to *pro rata* payment in respect of such Loans.

2.12   **[Reserved]**.

2.13   **[Reserved]**.

2.14   **Interest Rates and Payment Dates**.

(a)      [Reserved].

(b)      Each Loan shall bear interest at a rate per annum equal to 10.0% per annum.

(c)     If all or a portion of the principal amount of any Loan, the interest payable on any Loan or any fee or other amount payable hereunder shall not be paid when due (whether at the stated maturity, by acceleration or otherwise) in accordance with the terms of this Agreement, such overdue amount shall bear interest at a rate per annum equal to 14.0% per annum (the "Default Interest"), which Default Interest shall accrue from the date of such non-payment until such amount is paid in full (as well after as before judgment).

(d)     Interest shall be payable in arrears on each Interest Payment Date, provided that accrued and unpaid Default Interest shall be payable from time to time on demand.

2.15   **Computation of Interest**.

(a)     Interest payable pursuant hereto shall be calculated on the basis of a three hundred sixty- (360-) day year for the actual days elapsed.

(b)     [Reserved].

2.16   **[Reserved]**.

2.17   **Pro Rata Treatment and Payments**.

(a)     Except as otherwise provided herein from time to time, each borrowing by the Borrower from the Lenders hereunder and any reduction of the Commitments of the Lenders shall be made pro rata according to the respective Commitments of the Lenders.

(b)     Except as otherwise provided herein from time to time, each payment (including each prepayment) by the Borrower on account of principal of and interest on the Loans shall be made (i) in the case of principal, pro rata according to the respective outstanding principal amounts of the Loans then held by the Lenders, and (ii) in the case of interest, pro rata according to the respective amounts of accrued and unpaid interest on the Loans then due to the Lenders. The amount of each principal prepayment of the Loans shall be applied to reduce the then remaining installments of the Loans as directed by the Borrower by notice to the Administrative Agent (and absent such notice, in direct order of maturity thereof). Amounts prepaid or repaid on account of the Loans may not be reborrowed.

(c)     [Reserved].

(d)     All payments (including prepayments) to be made by the Borrower hereunder, whether on account of principal, interest, fees or otherwise, shall be made without setoff or counterclaim and shall be made prior to 2:00 P.M., New York City time, on the due date thereof to the Administrative Agent at the Funding Office, in Dollars and in immediately available funds. The Administrative Agent shall distribute such payments to the Lenders (or, in the case of amounts payable to it, retained by the Administrative Agent) promptly upon receipt in like funds as received. If any payment hereunder becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day. In the case of any extension of any payment of principal pursuant to the preceding sentence, interest thereon shall be payable at the then applicable rate during such extension.

47

(e)      [Reserved].

2.18   **Requirements of Law**.

(a)      If any Change in Law shall:

(i)      shall legally impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances, loans or other extensions of credit by, or any other acquisition of funds by, any office of such Lender that is not otherwise included in the interest rate applicable to the Loans; or

(ii)      shall impose on such Lender any other condition;

and the result of any of the foregoing is to increase the cost to such Lender, by an amount that such Lender deems to be material, of making or maintaining Loans, or to reduce any amount receivable by such Lender hereunder in respect thereof, then, in any such case, the Borrower shall promptly and in any event within five (5) Business Days pay such Lender, upon its written demand, any additional amounts necessary to compensate such Lender for such increased cost or reduced amount receivable.  If any Lender becomes entitled to claim any additional amounts pursuant to this paragraph, it shall promptly notify the Borrower (with a copy to the Administrative Agent) of the event by reason of which it has become so entitled.

(b)      If any Lender shall have determined that any Change in Law regarding capital adequacy or liquidity requirements or in the interpretation or application thereof or compliance by such Lender or any corporation controlling such Lender with any request or directive regarding capital adequacy or liquidity requirements (whether or not having the force of law) from any Governmental Authority made subsequent to the Closing Date shall have the effect of reducing the rate of return on such Lender's or such corporation's capital as a consequence of its obligations hereunder to a level below that which such Lender or such corporation could have achieved but for such Change in Law (taking into consideration such Lender's or such corporation's policies with respect to capital adequacy or liquidity requirements) by an amount reasonably deemed by such Lender to be material and to the extent reasonably determined such increase in capital to be allocable to the existence of such Lender's Commitments hereunder, then from time to time, after submission by such Lender to the Borrower (with a copy to the Administrative Agent) of a written request therefor, the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or such corporation for such reduction.

(c)      A certificate as to any additional amounts payable pursuant to this Section submitted by any Lender to the Borrower (with a copy to the Administrative Agent) with appropriate detail demonstrating how such amounts were derived shall be conclusive in the absence of manifest error.

(d)      This Section 2.18 shall not apply to taxes, which shall be governed by Section 2.19.

2.19   **Taxes**.

(a)      Unless required by a Requirement of Law, all payments made by any Loan Party under any Loan Document shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings (including any interest, additions to tax or penalties applicable thereto), now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority ("Taxes"), excluding (i) net income Taxes (however denominated) and franchise Taxes (imposed in lieu of net income Taxes), in each case, (x) imposed on the Administrative Agent or any Lender by the United States of America, or by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal lending office is located, or in the case of any Lender, in which its applicable lending office is located or (y) that are Other Connection Taxes and (ii) any branch profits taxes imposed by the United States of America under Section 884 (a) of the Code or any similar taxes, imposed by any jurisdiction described in (i) (clauses (i) and (ii), the "Excluded Taxes").  If any such non-excluded Taxes ("Non-Excluded Taxes") or Other Taxes are required by law to be deducted or withheld by an applicable withholding agent from any amounts payable to the Administrative Agent or any Lender hereunder, the amounts so payable to the Administrative Agent or such Lender shall be increased by the applicable Loan Party to the extent necessary to yield to the Administrative Agent or such Lender (after payment of all Non-Excluded Taxes and Other Taxes) interest or any such other amounts payable under the applicable Loan Document at the rates or in the amounts specified therein as if no such deduction or withholding had been made; provided, however, that a Loan Party shall not be required to increase any such amounts payable to any recipient with respect to any Non-Excluded Taxes (A) that are attributable to such recipient's failure to comply with the requirements of paragraph (d), (e) or (g) of this Section 2.19, (B) that are U.S. federal withholding Taxes imposed on amounts payable to such recipient pursuant to any Requirement of Law in effect at the time such recipient becomes a party to this Agreement or designates a new lending office (other than in the case of a replacement of a Lender pursuant to Section 2.22 or a designation of a new lending office pursuant to Section 2.21 at the request of the Borrower), except to the extent that such recipient or its assignor (if any) was entitled, at the time of designation of a new lending office or assignment, to receive additional amounts from the Borrower with respect to such Non-Excluded Taxes pursuant to this paragraph, or (C) that are U.S. federal withholding Taxes that would not have been imposed but for a failure by such recipient (or any financial institution through which any payment is made to such recipient) to comply with FATCA (clauses (A), (B) and (C), the "Non-Indemnifiable Taxes").  Nothing contained in this Section 2.19(a) shall require the Administrative Agent or any Lender to make available its tax returns (or any information relating to its Taxes which it deems confidential) to the Borrower or any other Person.

(b)      In addition, the Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)      The Loan Parties shall jointly and severally indemnify the Administrative Agent and each Lender, within 10 days after demand therefor, for the full amount of any Non-Excluded Taxes or Other Taxes (including Non-Excluded Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by the Administrative Agent or Lender or required to be withheld or deducted from a payment to the Administrative Agent or

49

Lender and any reasonable expenses arising therefrom or with respect thereto, whether or not such Non-Excluded Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)     Whenever any Taxes are payable by a Loan Party pursuant to this Section 2.19, the applicable Loan Party shall timely pay in cash the full amount to the relevant Governmental Authority and, as promptly as possible thereafter, shall send to the Administrative Agent, for its own account or for the account of the relevant Lender, as the case may be, a copy of an original official receipt received by the applicable Loan Party showing payment thereof.  If any Loan Party fails to pay such Taxes when due to the appropriate taxing authority or fails to remit to the Administrative Agent the required receipts or other required documentary evidence, the Loan Parties shall indemnify the Administrative Agent and the Lenders for any incremental taxes, interest, additions to tax and penalties, and any reasonable expenses arising therefrom or in respect thereto that may become payable by the Administrative Agent or any Lender as a result of any such failure.

(e)     Each Lender (or Transferee) that is not a U.S. Person (a "Non-U.S. Lender") shall deliver to the Borrower and the Administrative Agent (or, in the case of a Participant, to the Lender from which the related participation shall have been purchased) two (2) executed original copies of either U.S. Internal Revenue Service Form W-8BEN, W-8BEN-E, W-8ECI or W-8EXP, and, in the case of a Non-U.S. Lender claiming exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest," a certificate substantially in the form of Exhibit C (a "Non-Bank Tax Certificate"), or any subsequent versions thereof or successors thereto, properly completed and duly executed by such Non-U.S. Lender claiming complete exemption from, or a reduced rate of, U.S. federal withholding tax on all applicable payments by the Borrower under this Agreement and the other Loan Documents; provided, however, that any Non-U.S. Lender that is a partnership for U.S. federal income tax purposes or otherwise not the beneficial owner (i.e., who has sold a participation) shall deliver to the Borrower and the Administrative Agent (or, in the case of a Participant, to the Lender from which the related participation shall have been purchased) two (2) executed original copies of U.S. Internal Revenue Service Form W-8IMY, together with the applicable Form W-8, Form W-9 and other required attachments, and, in the case of any beneficial owner claiming the "portfolio interest" exemption, a Non-Bank Tax Certificate; provided, further, that, in the case of a Non-U.S. Lender that is a partnership, any Non-Bank Tax Certificate may be provided by the Non-U.S. Lender on behalf of the beneficial owner(s), except to the extent such Non-U.S. Lender has sold a participation.  Any forms described above shall be delivered by each Non-U.S. Lender on or before the date it becomes a party to this Agreement (or, in the case of any Participant, on or before the date such Participant purchases the related participation).  In addition, each Non-U.S. Lender shall promptly notify the Borrower of any change in circumstances which would modify or render invalid any claimed exemption or reduction and shall deliver such forms promptly upon the obsolescence, expiration or invalidity of any form previously delivered by such Non-U.S. Lender.  Each Non-U.S. Lender shall promptly notify the Borrower and the Administrative Agent at any time it determines that it is no longer in a position to provide any previously delivered certificate to the Borrower (or any other

50

form of certification adopted by the U.S. taxing authorities for such purpose). Notwithstanding any other provision of this paragraph, a Non-U.S. Lender shall not be required to deliver any form pursuant to this paragraph that such Non-U.S. Lender is not legally able to deliver.

(f)    A Lender that is entitled to an exemption from or reduction of any withholding tax other than U.S. federal withholding tax, with respect to payments under any Loan Document shall deliver to the Borrower (with a copy to the Administrative Agent), at the time or times prescribed by applicable law or reasonably requested by the Borrower, such properly completed and executed documentation prescribed by applicable law as will permit such payments to be made without withholding or at a reduced rate, provided that such Lender is legally entitled to complete, execute and deliver such documentation and in such Lender's judgment such completion, execution or submission would not materially prejudice the legal position of such Lender.

(g)    If the Administrative Agent or any Lender determines, in its sole discretion, exercised in good faith, that it has received a refund of any Non-Excluded Taxes or Other Taxes as to which it has been indemnified by any Loan Party or with respect to which any Loan Party has paid additional amounts pursuant to this Section 2.19, it shall pay over such refund to the Borrower (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 2.19 with respect to the Non-Excluded Taxes or Other Taxes giving rise to such refund), net of all reasonable out-of-pocket expenses of the Administrative Agent or such Lender (including any taxes imposed on such refund) and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided that the Borrower, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (g) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to its taxes which it deems confidential) to the Loan Party or any other Person.

(h)    At the times specified in Section 2.19(e), each Lender (or Transferee) that is a U.S. Person shall deliver (in the case of a Participant, to the Lender from which the related participation shall have been purchased) two (2) properly completed and duly signed original copies of IRS Form W-9 or any successor form that such Lender is entitled to provide at such time, in order to qualify for an exemption from United States backup withholding requirements. If such Lender fails to deliver such forms, then the Administrative Agent may, notwithstanding Section 2.19(a), deduct and withhold from any applicable payment to such Lender or Transferee an amount equivalent to the applicable backup withholding tax imposed by the Code.

51

(i)        If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent, at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent, such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower or the Administrative Agent to comply with its obligations under FATCA, to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.

(j)        The agreements in this Section shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

(k)        For the avoidance of doubt, the term "Lender" shall, for purposes of this Section 2.19, include each Conduit Lender.

(l)        Each Lender hereby authorizes the Administrative Agent to deliver to the Loan Parties and to any successor Administrative Agent any documentation provided by such Lender to the Administrative Agent pursuant to Section 2.19(e), (f), (g), (h) or (i).

2.20    **Indemnity**.  The Borrower agrees to indemnify each Lender for, and to hold each Lender harmless from, any loss or expense that such Lender may sustain or incur as a consequence of (a) default by the Borrower in making a borrowing of Loans after the Borrower has given a notice requesting the same in accordance with the provisions of this Agreement or (b) default by the Borrower in making any prepayment of Loans after the Borrower has given a notice thereof in accordance with the provisions of this Agreement.  Such indemnification may include an amount equal to the excess, if any, of (i) the amount of interest that would have accrued on the amount so prepaid, or not so borrowed, for the period from the date of such prepayment or of such failure to borrow to the next Interest Payment Date, in each case at the applicable rate of interest for such Loans provided for herein over (ii) the amount of interest (as reasonably determined by such Lender) that would have accrued to such Lender on such amount by placing such amount on deposit for a comparable period with leading banks in the interbank eurodollar market.  A certificate as to any amounts payable pursuant to this Section 2.20 submitted to the Borrower by any Lender which is submitted within one hundred and eighty (180) days of the incurrence of any loss or expense covered by this Section 2.20 with appropriate detail demonstrating how such amounts were derived shall be conclusive in the absence of manifest error.  This covenant shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

2.21    **Change of Lending Office**.  Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 2.18 or 2.19(a) with respect to such Lender, it will, if requested by the Borrower, use reasonable efforts (subject to overall policy considerations of such Lender) to file any certificate or document reasonably requested by the Borrower or designate another lending office for any Loans affected by such event with the object of

52

eliminating or reducing amounts payable pursuant to Section 2.18 or 2.19(a); provided that the making of such filing or such designation is made on terms that, in the reasonable judgment of such Lender, cause such Lender and its lending office(s) to suffer no economic, legal or regulatory disadvantage (except to a de minimis extent), and provided, further, that nothing in this Section 2.21 shall affect or postpone any of the obligations of the Borrower or the rights of any Lender pursuant to Section 2.18 or 2.19(a).

2.22   **Replacement of Lenders**.

(a)     The Borrower shall be permitted to replace any Lender that (A) requests reimbursement for amounts owing pursuant to Section 2.18 or 2.19(a) or (B) defaults in its obligation to make Loans hereunder, or is otherwise a Defaulting Lender with a replacement financial institution; provided that (i) such replacement does not conflict with any Requirement of Law, (ii) prior to any such replacement, such Lender shall have taken no action under Section 2.21 that has or will eliminate the continued need for payment of amounts owing pursuant to Section 2.18 or 2.19(a), (iii) the replacement financial institution shall purchase, at par, all Loans and other amounts owing to such replaced Lender on or prior to the date of replacement (whether or not then due), (iv) [reserved], (v) the replacement financial institution, if not already a Lender, shall be reasonably satisfactory to the Administrative Agent, (vi) the replaced Lender shall be obligated to make such replacement in accordance with the provisions of Section 10.6 (provided that the Borrower shall be obligated to pay the registration and processing fee referred to therein), (vii) until such time as such replacement shall be consummated (and thereafter, to the extent related to such earlier time), the Borrower shall pay all additional amounts (if any) required pursuant to Section 2.18 or 2.19(a), as the case may be, (viii) any such replacement shall not be deemed to be a waiver of any rights that the Borrower, the Administrative Agent or any other Lender shall have against the replaced Lender, and (ix) in connection with the replacement of a Lender pursuant to clause (A) above, such replacement results in a reduction of the amounts owing pursuant to Section 2.18 or 2.19(a).

(b)     If, in connection with any proposed amendment, modification, waiver or termination pursuant to Section 10.1 (a "Proposed Change") requiring the consent of all Lenders or all directly and adversely affected Lenders, if the consent of the Required Lenders (or, in the case of a consent, waiver or amendment involving directly and adversely affected Lenders, at least 50.1% of such directly and adversely affected Lenders) to such Proposed Change is obtained, but the consent of other Lenders whose consent is required is not obtained (any such Lender whose consent is not obtained as described in this clause (b) being referred to as a "Non-Consenting Lender"), then, at the Borrower's request (i) the Administrative Agent, or a Person or Persons reasonably acceptable to the Administrative Agent, to the extent the Administrative Agent's consent would otherwise be required in connection with an assignment of such Loans, shall have the right (but shall have no obligation) to purchase from such Non-Consenting Lenders, and such Non-Consenting Lenders agree that they shall, upon the Borrower's request, sell and assign to the Administrative Agent or such Person, all of the Loans and Commitments of such Non-Consenting Lenders for an amount equal to the principal balance of all Loans held by the Non-Consenting Lenders and all accrued interest and fees with respect thereto through the date of sale, such purchase and sale to be consummated at par pursuant to an Assignment and Assumption or (ii) terminate the Commitment of such Lender and repay all Obligations of the Borrower due and owing to such Lender relating to the Loans and participations held by such

53

Lender as of such termination date; <u>provided</u> that in the case of any such termination of a Non-Consenting Lender such termination shall be sufficient (together with all other consenting Lenders and terminated Lenders after giving effect hereto) to cause the adoption of the applicable departure, waiver or amendment of the Loan Documents.  Any such required sale and assignment shall be treated as a prepayment for purposes of <u>Section 2.20</u> and the Borrower shall be liable for any amounts payable thereunder as a result of such sale and assignment.

2.23    **Limitation on Additional Amounts, Etc**.   Notwithstanding anything to the contrary contained in <u>Sections 2.18</u> and <u>2.19</u> of this Agreement, unless the Administrative Agent or a Lender gives notice to the Borrower that it is obligated to pay an amount under any such Section within two hundred seventy (270) calendar days after the later of (x) the date the Lender incurs the respective increased costs, Non-Excluded Taxes, Other Taxes, loss, expense or liability, reduction in amounts received or receivable or reduction in return on capital or (y) the date such Lender has actual knowledge of its incurrence of the respective increased costs, Non-Excluded Taxes, Other Taxes, loss, expense or liability reductions in amounts received or receivable or reduction in return on capital, then such Lender shall only be entitled to be compensated for such amount by the Loan Parties pursuant to <u>Sections 2.18</u> and <u>2.19</u>, as the case may be, to the extent the costs, Non-Excluded Taxes, Other Taxes, loss, expense or liability, reduction in amounts received or receivable or reduction in return on capital are incurred or suffered on or after the date which occurs two hundred seventy (270) calendar days prior to such Lender giving notice to the Borrower that it is obligated to pay the respective amounts pursuant to <u>Sections 2.18</u> and <u>2.19</u>, as the case may be; <u>provided</u> that if the circumstances giving rise to such claim is retroactive, then such two hundred seventy- (270-) calendar day period referred to above shall be extended to include the period of retroactive effect thereof.  This <u>Section 2.23</u> shall have no applicability to any Section of this Agreement other than <u>Sections 2.18</u> and <u>2.19</u>.

2.24    **[Reserved]**.

2.25    **[Reserved]**.

2.26    **Defaulting Lenders**.   Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the following provisions shall apply from the date on which such Lender becomes a Defaulting Lender until such date as such Lender ceases to be a Defaulting Lender:

(a)    [reserved];

(b)    [reserved];

(c)    [reserved]; and

(d)    any amount payable to such Defaulting Lender hereunder may, in lieu of being distributed to such Defaulting Lender, be retained by the Administrative Agent in a segregated non-interest-bearing account and, subject to any applicable Requirements of Law, be applied at such time or times as may be determined by the Administrative Agent (i) <u>first</u>, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder, (ii) <u>second</u>, to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent,

54

(iii) third, if so determined by the Administrative Agent and Borrower, held in such account as cash collateral for future funding obligations of the Defaulting Lender under this Agreement, (iv) fourth, pro rata, to the payment of any amounts owing to Borrower or the Lenders as a result of any judgment of a court of competent jurisdiction obtained by Borrower or any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement and (v) fifth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if such payment is (x) a prepayment of the principal amount of any Loans which a Defaulting Lender has funded its participation obligations and (y) made at a time when the conditions set forth in Section 5.2 are satisfied, such payment shall be applied solely to prepay the Loans of all non-Defaulting Lenders, pro rata, prior to being applied to the prepayment of any Loans of any Defaulting Lender.

(e)     [Reserved].

(f)     Default Interest due under Section 2.14(c) shall not accrue on the overdue Loans of a Lender so long as it is a Defaulting Lender and such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent shall be restricted as set forth in Section 10.1.

**SECTION 3**

**[RESERVED]**

**SECTION 4**

**REPRESENTATIONS AND WARRANTIES**

To induce the Administrative Agent and the Lenders to enter into this Agreement and to make the Loans, each of Holdings (in the case of Holdings, with respect to Sections 4.3, 4.4 and 4.19 only and as to itself only) and the Borrower hereby represents and warrants to the Administrative Agent and each Lender that:

4.1     **Financial Condition**.

(a)     The unaudited pro forma consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at [December 31, 2017], and unaudited pro forma statement of operations of the Borrower and its consolidated Subsidiaries for the twelve-month period then ended (including the notes thereto) (the "Pro Forma Financial Statements"), have been prepared giving effect to the Transactions and all other transactions that would be required to be given pro forma effect by Regulation S-X, as if such transactions had occurred on [December 31, 2017] (in the case of such unaudited pro forma balance sheet) or at the beginning of such twelve-month period (in the case of such unaudited statement of operations).  The Pro Forma Financial Statements have been prepared in good faith by the Borrower, and present fairly in all material respects on a pro forma basis the estimated financial position and results of operations of the Borrower and its consolidated Subsidiaries as at [December 31, 2017], and for such period then ended, assuming that such transactions had actually occurred at such date or at the beginning of such period, as the case may be.

55

(b)      The audited consolidated balance sheets of the Borrower and its Subsidiaries as at [December 31, 2016 and 2015], and the related consolidated statements of income and of cash flows for the fiscal years ended on such dates, reported on by and accompanied by an unqualified report from Deloitte & Touche, LLP, as the case may be, present fairly in all material respects the consolidated financial condition of the Borrower and its Subsidiaries as at such date, and the consolidated results of its operations and its consolidated cash flows for the respective fiscal years then ended.  All such financial statements, including the related schedules and notes thereto, have been prepared in accordance with GAAP applied consistently throughout the periods involved (except as approved by the aforementioned firm of accountants and disclosed therein).  The unaudited consolidated balance sheets of the Borrower and its Subsidiaries as at [September 30, 2017], and the related consolidated statements of income and of cash flows for the nine months ended on such date present fairly in all material respects the consolidated financial condition of the Borrower and its Subsidiaries as at such date, and the consolidated results of its operations and its consolidated cash flows for the nine months then ended.  All such financial statements, including the related schedules and notes thereto, have been prepared in accordance with GAAP applied consistently throughout the periods involved (except for the absence of footnotes and normal year-end adjustments).

4.2      **No Change**.  Since the entry of the Plan Confirmation Order, there has been no development or event that has had or would reasonably be expected to have a Material Adverse Effect.

4.3      **Existence; Compliance with Law**.  Each Group Member (a) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) has the power and authority, and the legal right, to own and operate its property, to lease the property it operates as lessee and to conduct the business in which it is currently engaged, (c) is duly qualified as a foreign corporation or other organization and in good standing under the laws of each jurisdiction where its ownership, lease or operation of property or the conduct of its business requires such qualification except to the extent that the failure to comply therewith would not, in the aggregate, reasonably be expected to have a Material Adverse Effect and (d) is in compliance with all Requirements of Law; except in each case to the extent that the failure to comply therewith would not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

4.4      **Power; Authorization; Enforceable Obligations**.  Each Loan Party has the power, authority and legal right to execute and deliver, and to perform its obligations under, each of the Loan Documents to which it is a party and, in the case of the Borrower, to obtain extensions of credit hereunder.  Each Loan Party has taken all necessary organizational action to authorize the execution, delivery and performance of the Loan Documents to which it is a party and, in the case of the Borrower, to authorize the extensions of credit on the terms and conditions of this Agreement.  Other than the Plan Confirmation Order and the Plan of Reorganization, no material consent or authorization of, filing with, notice to or other act by or in respect of, any Governmental Authority is required in connection with the Transactions, except (i) consents, authorizations, filings and notices described in Schedule 4.4, which consents, authorizations, filings and notices have been obtained or made and are in full force and effect and (ii) the filings referred to in Section 4.19.  Each Loan Document has been duly executed and delivered on behalf of each Loan Party party thereto.  This Agreement constitutes, and each other Loan

56

Document upon execution, will constitute a legal, valid and binding obligation of each Loan Party thereto, enforceable against each such Loan Party in accordance with its terms, subject to bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law) and an implied covenant of good faith and fair dealing.

4.5    **No Legal Bar**.  The Transactions will not violate any material Requirement of Law, contract, agreement, indenture, credit facility, or any Organizational Document of any Group Member and will not result in, or require, the creation or imposition of any Lien on any of their respective properties or revenues pursuant to any Requirement of Law or any such Organizational Document (other than the Liens created by the Security Documents), except in each case (other than as relates to a violation of any Organizational Document) to the extent any of the forgoing could not reasonably be expected to result in a Material Adverse Effect.

4.6    **Litigation**.  Except as set forth on Schedule 4.6, no litigation, or to the knowledge of the Borrower, no investigation or proceeding of or before any arbitrator or Governmental Authority is pending or, to the best knowledge of the Borrower, threatened by or against any Group Member or against any of their respective properties or revenues that would reasonably be expected to have a Material Adverse Effect.

4.7    **No Default**.  No Default or Event of Default has occurred and is continuing.

4.8    **Ownership of Property; Liens**.  Each Group Member has marketable title to, or a valid leasehold interest in, all its real property, and marketable title to, or a valid leasehold interest in, all its material other property, and none of such property is subject to any Lien except as permitted by Section 7.3, except to the extent any of the foregoing could not reasonably be expected to result in an Material Adverse Effect.  As of the Closing Date, set forth on Schedule 4.8 is a complete and correct in all material respects list of all real property with a fair market value of more than $1,000,000 as reasonably determined in good faith by the Borrower (including street address) (other than condominiums or co-ops) located in the United States and owned by any Loan Party.

4.9    **Licenses; Intellectual Property**.  Except as in the aggregate would not reasonably be expected to have a Material Adverse Effect, each Group Member has all necessary licenses, permits, franchises, rights to participate in, or the benefit of valid agreements to participate in, material Third Party Payor Programs and other rights necessary for the conduct of its business and for the intended use of its properties and assets to the extent necessary to ensure no material interruption in cash flow.  Each Group Member owns, or is licensed or otherwise has the right to use, all Intellectual Property necessary for the conduct of its business as currently conducted except to the extent that a failure would not reasonably be expected to have a Material Adverse Effect.  No material claim has been asserted and is pending by any Person against a Group Member challenging or questioning the use of any Intellectual Property that is material to the business of the Group Members or the validity or effectiveness of any such Intellectual Property, nor does the Borrower have knowledge of any valid basis for any such claim.  Except as would not reasonably be expected to result in a Material Adverse Effect, to the knowledge of the Borrower, the use of Intellectual Property by each Group Member does not infringe on the rights of any Person in any material respect.

4.10    **Taxes**.  Except for any failure, lien, filing or claim, as applicable, that would not be reasonably expected to, individually or in the aggregate, result in a Material Adverse Effect: (i) each Group Member has, and with respect to any taxable period during which the Borrower or any of its Subsidiaries is a member of a consolidated, unitary, combined or similar tax group in which Holdings (or any direct or indirect parent of Holdings) is the common parent, Holdings (or such direct or indirect parent of Holdings) has, filed or caused to be filed all tax returns that are required to be filed and has paid all taxes (including any interest, additions to tax or penalties applicable thereto) due and payable (whether or not shown on a tax return) and any assessments made against it or any of its property and all other taxes, fees or other charges imposed on it or any of its property by any Governmental Authority (other than any tax the amount or validity of which are currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of the relevant Group Member); (ii) no tax Lien has been filed (other than Permitted Liens); and (iii) no claim is being asserted with respect to any such tax, fee or other charge.

4.11    **Federal Regulations**.  No part of the proceeds of any Loans, and no other extensions of credit hereunder, will be used by any Group Member (a) for purposes of "buying" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U as now and from time to time hereafter in effect in violation of Regulation U or (b) for any purpose that violates the provisions of the Regulations of the Board.

4.12    **Labor Matters**.  Except as, in the aggregate, would not reasonably be expected to have a Material Adverse Effect:  (a) there are no strikes or other labor disputes against any Group Member pending or, to the knowledge of the Borrower, threatened; (b) hours worked by and payment made to employees of each Group Member have not been in violation of the Fair Labor Standards Act or any other applicable Requirement of Law dealing with such matters; and (c) all payments due from any Group Member on account of employee health and welfare insurance have been paid or accrued as a liability on the books of the relevant Group Member.

4.13    **ERISA**.  (i) Neither a Reportable Event nor a failure to satisfy the minimum funding standard (within the meaning of Section 412 of the Code or Section 302 of ERISA) has occurred during the five-year period prior to the date on which this representation is made or deemed made with respect to any ERISA Plan, (ii) each ERISA Plan during such five-year period has complied in all material respects with the applicable provisions of ERISA and the Code, (iii) no termination of a Single Employer Plan has occurred, (iv) no Lien in favor of the PBGC or an ERISA Plan has arisen, during such five-year period and (v) the present value of all accrued benefits under each Single Employer Plan (based on those assumptions used to fund such Single Employer Plans) did not, as of the last annual valuation date prior to the date on which this representation is made or deemed made, exceed the value of the assets of such Single Employer Plan allocable to such accrued benefits except as would not reasonably be expected to have a Material Adverse Effect.  Neither the Borrower nor, to the best of the Borrower's knowledge, any Commonly Controlled Entity has had a complete or partial withdrawal from any Multiemployer Plan that has resulted or could reasonably be expected to result in a material liability under ERISA, and neither the Borrower nor, to the best of the Borrower's knowledge any Commonly Controlled Entity would become subject to any material liability under ERISA if the Borrower or any such Commonly Controlled Entity were to withdraw completely from all Multiemployer Plans as of the valuation date most closely preceding the date on which this

58

representation is made or deemed made.  No Loan Party nor any Commonly Controlled Entity contributes to a Multiemployer Plan or has any liability, contingent or otherwise, with respect to a Multiemployer Plan.  The accrued benefit obligations of each Foreign Plan (based on those assumptions used to fund such Foreign Plan with respect to all current and former participants do not exceed the assets of such Foreign Plan.  Each Foreign Plan that is required to be registered has been registered and has been maintained in good standing with applicable regulatory authorities.  Each Foreign Plan is in compliance with all material provisions of applicable law and all material applicable regulations and published interpretations thereunder with respect to such Foreign Plan with the terms of such plan.

4.14   **Investment Company Act**.  No Loan Party is an "investment company," or a company "controlled" by an "investment company," required to be registered within the meaning of the Investment Company Act of 1940, as amended.

4.15   **Subsidiaries**.  Attached hereto as Schedule 4.15(a) is an organization chart of each Loan Party and its Subsidiaries as of the Closing Date.  As of the Closing Date, there are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments (other than stock options granted to employees or directors and directors' qualifying shares) of any nature relating to any Capital Stock of the Borrower or any Restricted Subsidiary (other than Excluded Subsidiaries), except as created by the Loan Documents or disclosed on Schedule 4.15(b).

4.16   **Use of Proceeds**.  On the Closing Date, the proceeds of the Loans shall be used solely to satisfy certain Allowed MDL Claims in accordance with the Plan of Reorganization.

4.17   **Environmental Matters**.  Except as, in the aggregate, would not reasonably be expected to have a Material Adverse Effect:

(a)   the facilities and properties owned, leased or operated by any Group Member (the "Properties") do not contain, and have not previously contained, any Materials of Environmental Concern in amounts or concentrations or under circumstances that constitute or constituted a violation of, or could reasonably be expected to give rise to liability under, any applicable Environmental Law;

(b)   no Group Member has received any notice of any violation, alleged violation, non-compliance, liability or potential liability regarding environmental matters or compliance with Environmental Laws with regard to any of the Properties or the business operated by any Group Member (the "Business"), nor does the Borrower have knowledge or reason to believe that any such notice will be received or is being threatened;

(c)   Materials of Environmental Concern have not been transported or disposed of from the Properties in violation of, or in a manner or to a location that would reasonably be expected to give rise to liability under, any Environmental Law, nor have any Materials of Environmental Concern been generated, treated, stored or disposed of at, on or under any of the Properties in violation of, or in a manner that would reasonably be expected to give rise to liability under, any applicable Environmental Law;

59

(d)      with respect to any liability arising under any Environmental Law, no judicial proceeding or governmental or administrative action is pending or, to the best knowledge of the Borrower, threatened, to which any Group Member is or will be named as a party with respect to the Properties or the Business, nor are there any consent decrees or other decrees, consent orders, administrative orders, or other administrative or judicial requirements outstanding under any Environmental Law with respect to the Properties or the Business;

(e)      there has been no release or threat of release of Materials of Environmental Concern at or from the Properties, or arising from or related to the operations of any Group Member in connection with the Properties or otherwise in connection with the Business, in violation of or in amounts or in a manner that would reasonably be expected to give rise to liability under Environmental Laws;

(f)      the Properties and all operations at the Properties are in compliance, and within all applicable statute-of-limitations periods have been in compliance, with all applicable Environmental Laws, and there is no contamination at, under or about the Properties or violation of any Environmental Law with respect to the Properties or the Business; and

(g)      no Group Member has assumed, contractually or by operation of law, any liability of any other Person under Environmental Laws.

4.18    **Accuracy of Information, Etc**.  No written factual information with respect to any Group Member contained in this Agreement, any other Loan Document or any other factual document, certificate or statement (other than (i) any projections, pro formas, budgets, estimates or other information of a forward looking nature with respect to any Group Member, (ii) information of a general economic nature or industry data or (iii) third party industry data which the Borrower has not independently verified and as to which the Borrower makes no representation) furnished by or by Persons directed on behalf of any Loan Party to the Administrative Agent or the Lenders, or any of them, for use in connection with the transactions contemplated by this Agreement or the other Loan Documents, when taken as a whole, contained as of the date such statement, information, document or certificate was so furnished, any untrue statement of a material fact or omitted to state a material fact necessary to make the statements contained herein or therein not materially misleading in light of the circumstances under which such statements are made and after giving effect to any supplements thereof.  The projections and pro forma financial information contained in the materials referenced above were, and the projections hereafter delivered, when delivered, will be, based upon good faith estimates and assumptions believed by management of each Loan Party to be reasonable at the time made and no Loan Party knows as of the Closing Date any fact making such estimates and assumptions no longer true in any material respects, it being recognized by the Administrative Agent and the Lenders that such financial information as it relates to future events is not to be viewed as fact, such financial information is subject to significant uncertainties and contingencies, many of which are beyond the control of the Group Members, no assurance can be given that any particular projections will be realized and that actual results during the period or periods covered by such financial information may differ from the projected results set forth therein by a material amount.

60

4.19   **Security Documents**.

(a)     The Guarantee and Security Agreement is effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, legal, valid and enforceable (subject to the effect of bankruptcy, insolvency, reorganization, receivership, moratorium and other similar laws affecting creditors' rights) security interests in the Collateral described therein and proceeds thereof.  In the case of the Pledged Stock (as defined and described in the Guarantee and Security Agreement), when stock certificates representing such Pledged Stock are delivered to the Administrative Agent together with the necessary stock powers or other endorsements, and in the case of the other Collateral described in the any of the Security Documents, when financing statements and other filings specified on Schedule 4.19 in appropriate form are filed in the offices specified on Schedule 4.19, the Guarantee and Security Agreement shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in such Collateral and the proceeds thereof, as security for their respective Obligations (as defined in the Guarantee and Security Agreement) to the extent a Lien on such Collateral (other than the Pledged Stock) can be perfected pursuant to such financing statements and such other filings, in each case prior and superior in right to any other Person (except, in the case of Collateral other than Pledged Stock, Permitted Liens).

(b)     Each of the Mortgages is effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid and enforceable (subject to the effect of bankruptcy, insolvency, reorganization, receivership, moratorium and other similar laws affecting creditors' rights) Lien on the Mortgaged Properties described therein and proceeds thereof, and when the Mortgages are filed in the appropriate recording offices, each such Mortgage shall constitute a fully perfected Lien on, the Mortgaged Properties and the proceeds thereof, as security for the Obligations (as defined in the relevant Mortgage), in each case prior and superior in right to any other Person (except that the Lien and security interest created in such real property and the Mortgaged Property may be subject to Permitted Liens).

4.20   **Solvency**.   On the Closing Date, Holdings, the Borrower and the Borrower's Restricted Subsidiaries on a consolidated basis are, and after giving effect to the Transactions and the incurrence of all Indebtedness and obligations being incurred in connection therewith will be, Solvent.

4.21   **Regulation H**.   No Mortgage encumbers improved real property that is located in an area that has been identified by the Secretary of Housing and Urban Development as a "Special Flood Hazard Area" and in which flood insurance has been made available under the National Flood Insurance Act of 1968, unless flood insurance has been obtained to the extent required in order to satisfy all applicable Requirements of Law in order for a Mortgage to be obtained thereon.

4.22   **OFAC; USA PATRIOT ACT; FCPA**.

(a)     To the extent applicable, each of the Borrower and its Subsidiaries is in compliance, in all material respects, with (i) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR

Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto and (ii) the USA PATRIOT Act.

(b)     (i) None of the Borrower or any Subsidiary of the Borrower or, to the knowledge of the Borrower, any of the Borrower's or its Subsidiaries' respective directors or officers or any of their respective agents that will act in any capacity in connection with or benefit from the credit facility established hereby, is the subject of any U.S. sanctions administered by OFAC, the U.S. Department of State, the United Nations Security Council, the European Union, or Her Majesty's Treasury (collectively, "Sanctions") and (ii) neither the Borrower nor any of its Subsidiaries will use the proceeds of the Loans or otherwise make available such proceeds to any Person, for the purpose of financing the activities of any Person, or in any country, that is the subject of any Sanctions, except to the extent licensed or otherwise approved or exempted by OFAC, or in any other manner that would result in a violation of Sanctions by the Borrower or any Subsidiary.

(c)     No part of the proceeds of the Loans will be used for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the FCPA.

## SECTION 5

## CONDITIONS PRECEDENT

5.1     **Conditions to Initial Extension of Credit**.  The effectiveness of this Agreement and the agreement of each Lender to make the initial extension of credit requested to be made by it is subject to the satisfaction or waiver, prior to or concurrently with the making of such extension of credit on the Closing Date, of the following conditions precedent:

(a)     Credit Agreement; Security Documents; Other Documents.     The Administrative Agent shall have received a copy of each of the following documents: (i) this Agreement, duly executed and delivered by the Borrower and Holdings, (ii) the Guarantee and Security Agreement, duly executed and delivered by Holdings, the Borrower and each Subsidiary Guarantor, (iii) the Agent Fee Letter, duly executed and delivered by the Borrower and Holdings, (iv) the Intercreditor Agreement, duly executed and delivered by the Loan Parties and each of the other parties party thereto, (v) each other Loan Document reasonably required by the Administrative Agent or the Required Lenders to be effective on the Closing Date, in each case, duly executed and delivered by each of the parties thereto and (vi) the 21C Term Loan Agreement and the PIK Toggle Notes Indenture, in each case, duly executed and delivered by each of the Persons party thereto.

(b)     Lien Searches, Etc.  The Administrative Agent shall have received the results of a recent lien search in each of the jurisdictions where the Loan Parties are organized or where assets of the Loan Parties are located, and such search shall reveal no Liens on any of the assets of the Loan Parties except for (x) Permitted Liens and (y)

62

Liens that will be discharged on or prior to the Closing Date pursuant to documentation reasonably satisfactory to the Administrative Agent.

(c)      Insurance[3].   The Administrative Agent shall have received insurance certificates and endorsements satisfying the requirements of Section 5.2 of the Guarantee and Security Agreement.

(d)      Fees.   The Lenders and the Administrative Agent shall have received all fees required to be paid, and all expenses for which invoices have been presented (including the reasonable fees and expenses of legal counsel), three (3) Business Days prior to the Closing Date.

(e)      Organizational Documents; Evidence of Authority; Tax Forms.   The Administrative Agent shall have received (i) a copy of each Organizational Document of each Loan Party, to the extent applicable, certified as of a recent date by the appropriate governmental official (or such other date acceptable to the Administrative Agent), each dated the Closing Date or a recent date prior thereto (or such other date acceptable to the Administrative Agent); (ii) signature and incumbency certificates of the officers of such Person executing any Loan Documents to which it is a party; (iii) resolutions of the Board of Directors or similar governing body of each Loan Party approving and authorizing the incurrence of Obligations and, in the case of the Borrower, the borrowing of the Loans, and the execution, delivery and performance of each of the Loan Documents to which such Loan Party is a party or by which it or its assets may be bound as of the Closing Date, certified as of the Closing Date by a Responsible Officer of such Loan Party as being in full force and effect on and as of the Closing Date without modification or amendment; (iv) a good standing certificate from the applicable Governmental Authority of each Loan Party's jurisdiction of incorporation, organization or formation, each dated a recent date prior to the Closing Date; (v) a completed and executed IRS Form W-9 or other applicable tax form for the Borrower; and (vi) such other documents as Administrative Agent or its counsel may reasonably request relating to the organization, existence and good standing of each Loan Party, the authorization of the Transactions and any other legal matters relating to the Loan Parties, the Loan Documents or the Transactions, all in form and substance reasonably satisfactory to the Administrative Agent or its counsel.

(f)      Legal Opinions.   The Administrative Agent shall have received the following executed legal opinions, dated as of the Closing Date:

(i)      the legal opinion of Kirkland & Ellis LLP, counsel to the Loan Parties, in form and substance reasonably satisfactory to the Administrative Agent; and

(ii)      the legal opinion of special counsel to Holdings, the Borrower and its Subsidiaries in each of California, Delaware, Florida, Maryland, Michigan,

---

[3] NTD:  To be a condition subsequent if this cannot be done by the Closing Date.

Nevada, New York, North Carolina and South Carolina, in form and substance reasonably satisfactory to the Administrative Agent.

(g)    Pledged Stock; Stock Powers; Pledged Notes. The Administrative Agent shall have received, in accordance with the Intercreditor Agreement, the original certificates representing the shares of Capital Stock pledged pursuant to the Guarantee and Security Agreement, together with an undated stock power for each such certificate, duly executed in blank by a duly authorized officer of the Loan Party pledging the same.

(h)    Filings, Registrations and Recordings. The Administrative Agent shall have received each document (including any Uniform Commercial Code financing statement) required by the Security Documents or under law or reasonably requested by the Administrative Agent to be filed, registered or recorded in order to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a perfected Lien on the Collateral described therein under U.S. law, prior and superior in right to any other Person (other than Liens expressly permitted by Section 7.3), and each such document shall be in proper form for filing, registration or recordation; provided that no pledge shall be required of more than 65% of the Capital Stock of a first-tier Foreign Subsidiary or a first-tier Domestic Foreign Holding Company to the extent a pledge of such Capital Stock is required pursuant to the Security Documents; provided, however that to the extent any Collateral (other than a Lien that may be perfected by (a) the filing of a financing statement under the Uniform Commercial Code, (b) a pledge of the capital stock of the Borrower and the Guarantors (other than Holdings) and (c) filings with the United States Patent and Trademark Office and United States Copyright Office)) is not provided and/or perfected on the Closing Date after the Borrower's use of commercially reasonable efforts to do so, the provision and/or perfection of such Collateral (or surveys and title commitments if applicable) shall not constitute a condition precedent to the availability and initial making of the Loans on the Closing Date but shall be required to be delivered and/or perfected within the time period agreed by the Borrower, the Administrative Agent and the Required Lenders, but in any event within ninety (90) days (or such longer period as the Administrative Agent may agree) after the Closing Date pursuant to arrangements to be mutually agreed by the Borrower, the Administrative Agent and the Required Lenders.

(i)    Solvency Certificate. The Administrative Agent and the Lenders shall have received a solvency certificate in the form attached hereto as Exhibit J signed by the chief financial officer of the Borrower dated as of the Closing Date with respect to Holdings, the Borrower and the Borrower's consolidated Restricted Subsidiaries, taken as a whole, certifying that Holdings, the Borrower and the Borrower's consolidated Restricted Subsidiaries, taken as a whole, are Solvent as of the Closing Date, both before and immediately after giving effect to the Transactions.

(j)    Material Adverse Change. Since the entry of the Plan Confirmation Order, there shall not have occurred any material adverse effect on the business, assets, financial condition, or operations of the Borrower and its Subsidiaries, taken as a whole. The Administrative Agent shall have received a certificate signed by a Responsible Officer of the Borrower to the foregoing effect.

64

(k)      Patriot Act.  Each Loan Party shall have provided such documentation and other information to each Lender at least three (3) Business Days prior to the Closing Date (to the extent reasonably requested by the Lenders in writing at least ten (10) Business Days prior to the Closing Date) that are required by regulatory authorities under the applicable "know your customer" and anti-money-laundering rules and regulations, including without limitation the PATRIOT Act.

(l)      Perfection Certificate.  The Administrative Agent (or its counsel) shall have received a completed Perfection Certificate dated the Closing Date and signed by a Responsible Officer of the Borrower and each Loan Party, together with all attachments contemplated thereby.

(m)      Indebtedness and Minority Interests.   After giving effect to the Transactions and the consummation of the Plan of Reorganization, no Loan Party shall have outstanding any Indebtedness or preferred stock or Liens, except, in each case, as expressly contemplated by the Plan of Reorganization and expressly permitted under the Loan Documents.

(n)      Closing Date Certificate.  The Administrative Agent shall have received the Closing Date Certificate certifying, on and as of the Closing Date, as to the matters set forth in clause (j) of Section 5.1 and clauses (a) and (b) of Section 5.2.

(o)      Restructuring.  The Plan of Reorganization, as in effect on [   ], 2017 at docket no. [   ], shall not have been amended, modified or supplemented except in accordance with the terms thereof.  The Bankruptcy Court shall have entered the Plan Confirmation Order.  All conditions precedent to the Plan Effective Date shall have been, or shall be, satisfied prior to or substantially concurrently with the Closing Date and the Plan Effective Date shall have occurred.  All Transactions (including the issuance of the 21C Term Loans and the PIK Toggle Notes) required by the Plan of Reorganization or the Plan Confirmation Order to be consummated on the Plan Effective Date or substantially concurrently with the initial issuance of the Loans shall have been or shall be consummated prior to or substantially concurrently with the Closing Date.

(p)      Releases.  The Administrative Agent shall have received duly executed UCC-3 termination statements and other release documentation relating to any Indebtedness to be exchanged or otherwise satisfied as of the Closing Date.

5.2      **Conditions to Each Extension of Credit**.  Subject to any exceptions granted by any Lenders providing extensions of credit pursuant to Section 2.25, the agreement of each Lender to make any extension of credit requested to be made by it on any date (including its initial extension of credit) is subject to the satisfaction or waiver of the following conditions precedent:

(a)      Representations and Warranties.   Each of the representations and warranties made by any Loan Party in or pursuant to the Loan Documents shall be true and correct in all material respects (or in all respects to the extent already qualified by materiality) on and as of such date as if made on and as of such date (other than

65

representations and warranties which speak only as of a certain date, which representations and warranties shall be made only on such date).

(b)    No Default.  No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the extensions of credit requested to be made on such date.

(c)    Notice.  The Administrative Agent shall have received a Borrowing Notice in accordance with the requirements of Section 2.2.

## SECTION 6

## AFFIRMATIVE COVENANTS

Holdings (in the case of Holdings, with respect to Section 6.9 only and as to itself only) and the Borrower hereby jointly and severally agree that, so long as any of the Commitments remain in effect and until all Loans are repaid in full in cash and all other Loan Obligations (other than contingent indemnification obligations surviving after the termination of this Agreement) are paid in full in accordance with this Agreement, each of Holdings (in the case of Holdings, with respect to Section 6.9 only and as to itself only) and the Borrower shall, and Borrower shall cause each of its Restricted Subsidiaries to:

6.1    **Financial Statements**.    Furnish to the Administrative Agent (and the Administrative Agent shall promptly furnish to the Lenders, by posting to the Platform or otherwise):

(a)    within ninety (90) days after the end of each fiscal year of the Borrower (commencing with the fiscal year ended December 31, 2017), a copy of the audited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such year and the related audited consolidated statements of income and of cash flows for such year, setting forth in each case in comparative form the figures for the previous year, reported on without a "going concern" or like qualification or exception (provided that (i) a qualification or exception may be included in any audit report to the extent such qualification is made solely as a result of the maturity of any of the Obligations or any other Indebtedness maturing within fifteen (15) months and (ii) an exception or explanatory paragraph, but not a qualification, solely with respect to, or resulting solely from, potential inability to satisfy the covenant under Section 7.1 on a future date or in a future period), or qualification arising out of the scope of the audit, by Deloitte & Touche, LLP or other independent certified public accountants of nationally recognized standing;

(b)    not later than forty-five (45) days after the end of each of the first three quarterly periods of each fiscal year of the Borrower, the unaudited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such quarter and the related unaudited consolidated statements of income and of cash flows for such quarter and the portion of the fiscal year through the end of such quarter, setting forth in each case in comparative form the figures for the same quarter in the previous year,

certified by a Responsible Officer as being fairly stated in all material respects (subject to normal year-end audit adjustments and the absence of footnotes); and

(c)      simultaneously with the delivery of each set of consolidated financial statements referred to in Section 6.1(a) and Section 6.1(b) above, the related consolidating financial statements reflecting the adjustments necessary to eliminate the accounts of (i) Unrestricted Subsidiaries (if any) (which may be in footnote form only) from such consolidated financial statements or (ii) Holdings, if Holdings has any material assets or material liabilities other than equity of the Borrower or liabilities related to debt of the Borrower of any of its Restricted Subsidiaries such that such consolidated financial statements of Holdings and the Borrower are materially different, then consolidating information regarding the Borrower and its Restricted Subsidiaries, compliance certificates and other information reasonably requested by the Lenders through the Administrative Agent (other than information subject to confidentiality obligations or attorney-client privilege) shall be provided by the Borrower at the same time such financial statement and certificates are otherwise required to be provided hereunder.

All such financial statements shall be complete and correct in all material respects and shall be prepared in reasonable detail and in accordance with GAAP.  With regard to interim financial statements, such interim financial statements will not include all of the information and footnotes required by GAAP for complete financial statements.  However, all adjustments (consisting of normal, recurring accrual) considered necessary for a fair presentation will be included therein.

Notwithstanding the foregoing, the obligations to deliver any financial statement or other document, report, proxy statement or other materials pursuant to this Section 6.1 may be satisfied with respect to financial information of the Borrower and its consolidated Subsidiaries by furnishing (a) the applicable consolidated financial statements, or other document, report, proxy statement or other materials, respectively, of Holdings or any Parent Entity or (b) to the extent the same contains such financial statement, other document, report, proxy statement or other materials, respectively, Borrower's and/or, as applicable, Holdings', any Parent Entity's or, Form 8-K, 10-K or 10-Q, as applicable, filed with the SEC; provided that in the case of both clause (a) and (b) of this paragraph, to the extent such financial statements, documents, reports, proxies, other materials or Form 8-K, 10-K or 10-Q are those of Holdings or such Parent Entity, such financial statements, documents, reports, proxies, other materials or Form 8-K, 10-K or 10-Q contains or is accompanied by consolidating information that explains in reasonable detail the material differences between the information relating to, as applicable, Holdings or such Parent Entity or Public Company, on the one hand, and the information relating to the Borrower and its Restricted Subsidiaries on a standalone basis, on the other hand.

6.2     **Certificates; Other Information**.  Furnish to the Administrative Agent (and the Administrative Agent shall promptly furnish to the Lenders, by posting to the Platform or otherwise):

(a)      concurrently with the delivery of any financial statements pursuant to Section 6.1(a) and (b), (i) a Compliance Certificate containing all information and calculations required by the form of such certificate attached as Exhibit F, including those

67

necessary for determining compliance by each Group Member with the provisions of Section 7.1 (including detail with respect to any calculation of Consolidated EBITDA) as of the last day of the fiscal quarter or fiscal year of Borrower, as the case may be, and (ii) to the extent not previously disclosed to the Administrative Agent, a description of any change in the jurisdiction of organization of any Loan Party and a list of any applications or registrations of Intellectual Property filed in the name of, or acquired by, any Loan Party since the date of the most recent report delivered pursuant to this clause (ii) (or, in the case of the first such report so delivered, since the Closing Date);

(b)     commencing with the fiscal year ended December 31, 2017, no later than ninety (90) days after the end of each fiscal year of the Borrower and its Restricted Subsidiaries, a consolidated budget for the following fiscal year including a detailed projected consolidated balance sheet of the Borrower and its consolidated Restricted Subsidiaries for the following fiscal year, the related consolidated statements of projected cash flow and projected income and a description of the underlying assumptions applicable thereto (collectively, the "Projections"), it being understood and agreed that any financial or business projections furnished by any Loan Party (i)(A) are subject to significant uncertainties and contingencies, which may be beyond the control of the Loan Parties, (B) no assurance is given by the Loan Parties that the results or forecast in any such projections will be realized and (C) the actual results may differ from the forecast results set forth in such projections and such differences may be material and (ii) are not a guarantee of performance;

(c)     no later than ten (10) Business Days after the effectiveness thereof, copies of any final amendment, supplement, waiver or other modification with respect to any Indebtedness, agreement or document referred to in Section 7.9;

(d)     within five (5) Business Days after the same are sent, copies of all financial statements and reports that the Borrower sends to the holders of any class of its debt securities (other than the Lenders) in an aggregate principal amount in excess of $20,000,000 for any one issue or public equity securities and not otherwise required to be furnished to the Lenders under this Agreement or any other Loan Documents and, within five (5) Business Days after the same are filed, copies of all financial statements and reports that the Borrower may make to, or file with, the SEC;

(e)     at or prior to the date that any prepayment is required to be made pursuant to Section 2.11 (or any Reinvestment Notice is delivered thereunder), a certificate of a Responsible Officer setting forth a reasonably detailed calculation of the amount of such required prepayment (or the relevant Reinvestment Deferred Amount, as applicable); and

(f)     promptly, such additional financial and other information concerning a Group Member as the Administrative Agent on behalf of any Lender may from time to time reasonably request, provided that none of the Borrower nor any Restricted Subsidiary will be required to disclose or permit the inspection or discussion of, any document, information or other matter (i) that constitutes trade secrets or proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their representatives or contractors) is prohibited by law, fiduciary duty or any

68

binding agreement or (iii) that is subject to attorney client or similar privilege or constitutes attorney work product.

All financial statements and other documents, reports, proxy statements or other materials required to be delivered pursuant to Section 6.1 or this Section 6.2 may be delivered electronically and, if so delivered, shall be deemed to have been delivered on the date (i) such financial statements and/or other documents are posted on the SEC's website on the Internet at www.sec.gov, (ii) on which the Borrower posts such documents, or provide a link thereto, on the Borrower's website or (iii) on which such documents are posted on the Borrower's behalf on the Platform, provided that the Borrower shall notify (which notification may be by facsimile or electronic transmission (including Adobe pdf copy)) the Administrative Agent of the posting of any such documents on any website.  Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.  In the event that the date for any delivery required hereby or any other Loan Document is not a Business Day, then the date for such delivery shall be deemed to fall on the next Business Day.

6.3     **Payment of Taxes**.  Pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all its tax obligations of whatever nature (including any interest, additions to tax or penalties applicable thereto), except where (i) the amount or validity thereof is being contested in good faith by appropriate proceedings and reserves in conformity with GAAP with respect thereto have been provided on the books of the relevant Group Member or (ii) the failure to pay would not reasonably be expected to, individually or in the aggregate, result in a Material Adverse Effect.

6.4     **Maintenance of Existence; Compliance**.  (a)(i) Preserve, renew and keep in full force and effect its organizational existence and (ii) take all reasonable action to maintain all rights, privileges and franchises necessary or desirable in the normal conduct of its business, except, in each case, as otherwise permitted by Section 7.4 and except (other than in respect of clause (i) above with respect to any Loan Party), to the extent that failure to do so would not reasonably be expected to have a Material Adverse Effect; and (b) comply with all Requirements of Law except to the extent that failure to comply therewith would not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

6.5     **Maintenance of Property; Insurance**.  (a) Keep all material property useful and necessary in its business in good working order and condition, ordinary wear and tear and damage by casualty excepted except, in each case, where the failure to do so would not reasonably be expected to result in a Material Adverse Effect, (b) maintain with financially sound and reputable insurance companies insurance (or pursuant to self-insurance to the extent commercially reasonable) in at least such amounts and against at least such risks as are determinate in the reasonable good faith judgment of a Responsible Officer of the Borrower to be prudent; and (c) provide that each casualty or property insurance policy or general liability policy maintained or required to be maintained by any Loan Party shall (i) name the Administrative Agent, on behalf of the Secured Parties, as loss payee pursuant to a so-called "standard mortgagee clause" or "Lender's loss payable endorsement," with respect to property coverage of such Loan Party, and shall name the Administrative Agent on behalf of the Secured Parties as an additional insured, with respect to general liability coverage, (ii) provide that no

69

action of any Loan Party or any Subsidiary or any other Person shall void any such policy as to the Administrative Agent or the Lenders, (iii) use commercially reasonable efforts to see that such certificates provide that the insurers shall endeavor to notify the Administrative Agent of any proposed cancellation in accordance with the policy provisions and that the Administrative Agent or the Lenders will have the opportunity to correct any deficiencies justifying such proposed cancellation and (iv) cause any Insurance Subsidiary to (A) conduct its insurance business in compliance with all applicable insurance laws, rules, regulations and orders and using sound actuarial principles and (B) maintain usual and customary stop-loss coverage and excess coverage reinsurance for individual claims.  The insurance premiums and other expenses charged by any Insurance Subsidiary to the Borrower and its Subsidiaries shall be reasonable and customary.  The Borrower will provide the Administrative Agent (A) copies of any outside actuarial reports prepared with respect to any projection, valuation or appraisal of any Insurance Subsidiary promptly after receipt thereof and (B) once each year promptly after receipt thereof, an actuarial opinion with respect to any Insurance Subsidiary from a recognized actuarial firm reasonably satisfactory to the Administrative Agent; and (e) if any portion of any Mortgaged Property is located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a Special Flood Hazard Area with respect to which flood insurance has been made available under the National Flood Insurance Act of 1968 (as now or hereafter in effect or any successor act thereto), either (x) cause the applicable Mortgage to be released in accordance with Section 9.11 hereof or (y) (A) maintain, or cause to be maintained, with a financially sound and reputable insurer, flood insurance in an amount and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (B) deliver to the Administrative Agent evidence of such compliance in form and substance reasonably acceptable to the Administrative Agent.

6.6     **Inspection of Property; Books and Records; Discussions**.  (a) Keep proper books of records and account in which full, true and correct entries in conformity with GAAP in all material respects shall be made of all material dealings and transactions in relation to its business and activities, and (b) permit representatives of the Administrative Agent to visit and inspect any of its properties and examine and make abstracts from any of its books and records (other than materials protected by the attorney-client privilege and materials which such person may not disclose without violation of a confidentiality obligation binding upon it) at any reasonable time during normal business hours (and upon reasonable notice unless an Event of Default exists) and as often as may reasonably be desired and to discuss the business, operations, properties and financial and other condition of the Group Members with officers and employees of the Group Members and with their independent certified public accountants (provided that the Borrower is given an opportunity to be present at such meetings); provided that so long as no Event of Default is continuing, the Borrower shall not be required to pay or reimburse the expenses (to the extent otherwise required to do so hereunder) of the Administrative Agent of more than one such visit and inspection during any fiscal year.  Notwithstanding anything to the contrary in this Section 6.6, neither the Borrower nor any Restricted Subsidiary will be required to disclose or permit the inspection or discussion of, any document, information or other matter (i) that constitutes trade secrets or proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their representatives or contractors) is prohibited by law, fiduciary duty or any binding agreement or (iii) that is subject to attorney client or similar privilege or constitutes attorney work product.

70

6.7   **Notices**.   Promptly after knowledge thereof, give notice to the Administrative Agent and the Administrative Agent shall furnish to the Lenders by posting to the Platform or otherwise of:

(a)   the occurrence of any (i) Default or Event of Default and (ii) "Default" or "Event of Default" under, and as such terms are defined in, the 21C Term Loan Agreement or the PIK Toggle Notes Indenture;

(b)   any litigation, investigation or proceeding affecting any Group Member that could reasonably be expected to result in a Material Adverse Effect, or any development or event in respect of any litigation described on Schedule 4.6 which could be expected to be materially adverse to the interests of Borrower and its Restricted Subsidiaries;

(c)   the following events, as soon as possible and in any event within thirty (30) days after any Responsible Officer of the Borrower knows or has reason to know thereof if such event or events could reasonably be expected to result in a Material Adverse Effect:  (i) the occurrence of any Reportable Event with respect to any ERISA Plan, a failure to make any required contribution to a Single Employer Plan or Multiemployer Plan, the creation of any Lien in favor of the PBGC or an ERISA Plan or any withdrawal from, or the termination or Insolvency of, any Multiemployer Plan or (ii) the institution of proceedings or the taking of any other action by the PBGC or the Borrower or any Commonly Controlled Entity or any Multiemployer Plan with respect to the withdrawal from, or the termination or Insolvency of, any Single Employer Plan or Multiemployer Plan; and

(d)   any development or event that has had or would reasonably be expected to have a Material Adverse Effect.

Each notice pursuant to this Section 6.7 shall be accompanied by a statement of a Responsible Officer setting forth details of the occurrence referred to therein and stating what action the relevant Group Member proposes to take with respect thereto.

6.8   **Environmental Laws**.

(a)   Comply in all material respects with, and ensure compliance in all material respects by all tenants and subtenants, if any, at the Properties with, all applicable Environmental Laws, and obtain and comply in all material respects with and maintain, and ensure that all tenants and subtenants obtain and comply in all material respects with and maintain, any and all licenses, approvals, notifications, registrations or permits required by applicable Environmental Laws, except in each case, to the extent that any such failure to do so would not reasonably be expected to have a Material Adverse Effect.  This clause (a) shall be deemed not breached by a noncompliance with the foregoing if, upon learning of such noncompliance, any affected Group Member promptly undertakes reasonable efforts to eliminate such noncompliance, and such noncompliance and the elimination thereof, in the aggregate with any other noncompliance with any of the foregoing and the elimination thereof, could not reasonably be expected to have a Material Adverse Effect.

71

(b)      Conduct and complete all material investigations, studies, sampling and testing, and all material remedial, removal and other actions required under Environmental Laws and promptly comply in all material respects with all lawful orders and directives of all Governmental Authorities regarding Environmental Laws, except in each case, to the extent that any such failure to do so would not reasonably be expected to have a Material Adverse Effect. This clause (b) shall be deemed not breached by a failure to comply with such an order or directive if any affected Group Member timely challenges in good faith such order or directive in a manner consistent with all applicable Environmental Laws and pursues such challenge diligently, and the pendency and pursuit of such challenge, in the aggregate with the pendency and pursuit of any other such challenges, could not reasonably be expected to have a Material Adverse Effect.

6.9      **Additional Collateral, Etc**.

(a)      With respect to any personal property or Intellectual Property acquired after the Closing Date by any Loan Party (other than any property located outside of the U.S., any motor vehicles, real property, leasehold interests, or any tangible personal property evidenced by a title certificate or, except with respect to any Foreign Guarantor, any other property expressly excluded by the Security Documents) that constitutes "Collateral" (or, with respect to a Foreign Guarantor, is personal property or Intellectual Property of the type the Administrative Agent reasonably determines is customarily pledged in financings in the jurisdiction in which such Foreign Guarantor is organized) and as to which the Administrative Agent, for the benefit of the Secured Parties, does not have a valid, enforceable and fully and properly perfected and recorded Lien on, except as otherwise provided for in this Section 6.9 or, except as to a Foreign Guarantor, in the Guarantee and Security Agreement, such Loan Party shall, except as otherwise provided in the Guarantee and Security Agreement and in any event subject to the limitations set forth therein, promptly (i) execute and deliver to the Administrative Agent such amendments to the Guarantee and Security Agreement or such other documents it deems necessary under U.S. law to grant to the Administrative Agent, for the benefit of the Secured Parties, a valid, enforceable and fully and properly perfected and recorded security interest in and Lien on such property, subject to Liens permitted under Section 7.3, (ii) take all actions as it deems necessary under U.S. law to grant to the Administrative Agent, for the benefit of the Secured Parties, a perfected security interest in and Lien on such property, including the filing of Uniform Commercial Code financing statements in such jurisdictions and filings with the United States Patent and Trademark Office and the United States Copyright Office as may be reasonably required by the Guarantee and Security Agreement or by law, other than foreign collateral documents, unless such Loan Party is a Foreign Guarantor and (iii) in the case of a Foreign Guarantor, take all actions as such Foreign Guarantor deems necessary under the law of the jurisdiction where such Foreign Guarantor is organized to grant to the Administrative Agent, for the benefit of the Secured Parties, a perfected security interest in and Lien on such property.

(b)      With respect to any fee interest in any real property having a value (together with improvements thereof) of at least $5,000,000 acquired after the Closing Date by any Loan Party (other than any such property subject, or to be subject to, a Lien permitted by Section 7.3), on a quarterly basis reasonably promptly within 60 days after delivery of the financial statements delivered pursuant to Section 6.1(a) or (b) execute and deliver a mortgage or deed of trust subject to the Intercreditor Agreement and the Liens permitted by such mortgage or deed of trust, in a

72

form substantially similar to the Mortgages on the Initial Mortgaged Properties, for the benefit of the Secured Parties, covering such real property and recorded by a nationally recognized title insurance company in such manner and in such place as is required by law to establish, perfect, preserve and protect the Lien in favor of the Administrative Agent required to be granted pursuant to the Mortgage and all taxes, fees and other charges payable in connection therewith shall be paid in full, and delivery a copy of, or a certificate as to coverage under and a copy of the flood insurance policy and a declaration page relating to, the insurance policies required by Section 6.5 (including, without limitation, flood insurance policies, each of which (i) shall be endorsed or otherwise amended to include a "standard" or "New York" lender's loss payable or mortgagee endorsement (as applicable), (ii) shall name the Administrative Agent, on behalf of the Secured Parties, as additional insured, (iii) in the case of flood insurance, if any, such certificate shall (a) identify the addresses of each property located in a special flood hazard area and (b) indicate the applicable flood zone designation, the flood insurance coverage and the deductible relating thereto.  Such Loan Party shall otherwise take such actions and execute and/or deliver to the Administrative Agent such documents as required to confirm the validity, perfection and priority of the Lien of any existing Mortgage or new Mortgage against such after-acquired real property (including a Title Policy, a Survey and local counsel opinion).

(c)      With respect to any new Subsidiary (other than an Excluded Subsidiary) created or acquired after the Closing Date by any Loan Party or any Subsidiary of a Loan Party that ceases to be an Excluded Subsidiary, promptly (and in any event within 60 days thereof or such later date as may be acceptable to the Administrative Agent) (i) execute and deliver to the Administrative Agent such amendments to the Guarantee and Security Agreement as the Administrative Agent reasonably deems necessary to grant to the Administrative Agent, for the benefit of the Secured Parties, a perfected first-priority security interest and Lien subject to the Intercreditor Agreement and Liens permitted pursuant to Section 7.3, in the Capital Stock of such new Restricted Subsidiary that is directly owned by any Loan Party (provided that such security interest shall be limited (A) in the case of a Foreign Subsidiary or a first-tier Domestic Foreign Holding Company that is, in each case, not a Foreign Guarantor, to 65% of such Capital Stock in such Subsidiary, (B) in the case of any Subsidiary of a Foreign Subsidiary or of a Domestic Foreign Holding Company that is, in each case, not a Foreign Guarantor, to 0% of such Capital Stock in such Subsidiary, (C) in the case of any Insurance Subsidiary, to the lesser of the amount of such Insurance Subsidiary's Capital Stock which can be pledged pursuant to the applicable law governing such Insurance Subsidiary or if such Insurance Subsidiary is a Foreign Subsidiary, the amount which is required to be otherwise pledged hereunder and (D) in the case of any Non-Profit Entity formed after the Closing Date, to the amount of such entity's Capital Stock that can be pledged pursuant to the applicable law or regulations governing such entity), (ii) deliver to the Administrative Agent the certificates representing such Capital Stock, together with undated stock powers, in blank, executed and delivered by a duly authorized officer of the relevant Loan Party, (iii) cause such new Subsidiary (A) to become a party to the Guarantee and Security Agreement, (B) subject to the provisions and limitations set forth in the Guarantee and Security Agreement, to take such actions as the Administrative Agent reasonably deems necessary to grant to the Administrative Agent for the benefit of the Secured Parties a perfected security interest under U.S. law having the priorities set forth in the Intercreditor Agreement and otherwise subject to Liens permitted under Section 7.3 in the Collateral described in the Guarantee and Security Agreement with respect to such new Subsidiary, including filings with the United States Patent and Trademark Office and the United States Copyright Office and the

73

filing of Uniform Commercial Code financing statements in such jurisdictions as may be required by the Guarantee and Security Agreement or by law or as may be reasonably requested by the Administrative Agent (other than, except in the case of equity interests and assets of a Foreign Guarantor, foreign Collateral documents) and (C) to deliver to the Administrative Agent a certificate of such Subsidiary, substantially in the form of Exhibit C or in such other form as may be acceptable to the Administrative Agent, with appropriate insertions and attachments, and (iv) if reasonably requested by the Administrative Agent, deliver to the Administrative Agent legal opinions relating to the matters described above, which opinions shall be in form and substance consistent with those delivered on the Closing Date or otherwise, and from counsel, reasonably satisfactory to the Administrative Agent; provided that, except in the case of a Foreign Guarantor, (1) the Borrower shall not be required to take, or cause any Subsidiary to take, the actions required by this paragraph (c) with respect to any such new Subsidiary prior to the delivery of financial statements delivered pursuant to Section 6.1(a) or (b) for the fiscal quarter of the Borrower during which such new Subsidiary was created or acquired unless (x) the aggregate amount of Investments made by the Group Members in all such new Subsidiaries exceeds $20,000,000 prior to the end of such fiscal quarter or (y) a Default has occurred and is continuing and (2) the Borrower shall not be required to provide the legal opinions required by this paragraph (c) if the applicable new Subsidiary (on a consolidated basis), together with all other new Subsidiaries acquired or created in the same transaction or series of related transactions accounts for less than 2.5% of the assets, revenues or Consolidated EBITDA of the Borrower, in each case on a Pro Forma Basis as of the end of and for the four fiscal quarters most recently ended for which financial statements have been delivered under Section 6.1(a) or (b), as though such Subsidiary had become a Subsidiary at the beginning of such period. Notwithstanding anything to the contrary in this Agreement or any other Loan Document, each Foreign Guarantor shall grant a valid, perfected and enforceable lien on substantially all of its assets to the Administrative Agent pursuant to documentation and arrangements reasonably agreed between the Administrative Agent and the Borrower, subject to customary limitations in such jurisdiction as may be reasonably agreed between the Administrative Agent and the Borrower, and none of the limitation in this Agreement shall in any way limit or restrict the pledge of assets and property by any Foreign Guarantor or the pledge of the equity interests of such Foreign Guarantor by any other Loan Party that holds such equity interests.

(d) If, at any time, (x) (i) a Restricted Subsidiary is designated as an Unrestricted Subsidiary or an Immaterial Subsidiary in accordance with this Agreement or otherwise meets the criteria of an Excluded Subsidiary or (ii) an Electing Guarantor has been re-designated (at the option, and in the sole discretion, of the Borrower in accordance with Section 6.10(b)) as an Excluded Subsidiary, the Administrative Agent shall (and is hereby authorized to) release such Subsidiary from any guarantee under the Guarantee and Security Agreement and all Security Documents to which it may be a party and to the extent Capital Stock held by such Restricted Subsidiary was pledged (or otherwise secured) as Collateral, such pledge (or other security) shall be released and, upon the request of any Loan Party, any certificates in respect thereof shall be promptly returned to the applicable Loan Party or (y) adverse tax consequences (other than *de minimis* tax consequences) could (in the good faith determination of the Borrower in consultation with the Administrative Agent) result (i) from any Security Document executed and delivered by any Subsidiary of the Borrower that is a Foreign Subsidiary or any Domestic Foreign Holding Company, the Administrative Agent shall release such Restricted Subsidiary from any such Security Document, or (ii) from any Lien granted under any Loan Document in respect of the

74

Capital Stock in any Foreign Subsidiary or Domestic Foreign Holding Company, such Lien shall be released.  Notwithstanding the foregoing, in no event shall Capital Stock of any Unrestricted Subsidiary or any of such Unrestricted Subsidiary's assets constitute Collateral, and the Administrative Agent shall take all actions required hereunder and under the other Loan Documents to effect the foregoing in accordance with the terms of the Loan Documents.

(e)	Notwithstanding anything in this Agreement (other than the last sentence of Section 6.9(c)) or any Security Document to the contrary:  (i) the Administrative Agent shall not take, and the Loan Parties shall not be required to grant, a security interest in any Excluded Property; (ii) any security interest required to be granted or any action required to be taken, including to perfect such security interest, shall be subject to the same exceptions and limitations as those set forth in the applicable Security Documents; (iii) except in the case of a Foreign Guarantor, no Loan Party shall be required, nor shall the Administrative Agent be authorized to perfect any pledges, charges, assignments, security interests and mortgages in any Collateral by any means other than (A) filings pursuant to the Uniform Commercial Code in the office of the secretary of state (or similar central filing office) of the relevant State(s) and filings in the applicable real estate records with respect to mortgaged properties or any fixtures relating to the Mortgages, (B) filings in United States government offices with respect to Intellectual Property as expressly required by the Loan Documents, (C) delivery to the Administrative Agent to be held in its possession of all Collateral consisting of intercompany notes in an amount individually in excess of $5,000,000, stock certificates of the Borrower and its Restricted Subsidiaries and other instruments issued to any Loan Party in an amount with a fair market value (as determined in good faith by the Borrower) individually in excess of $5,000,000, or (D) mortgages in respect of the Mortgages; (iv) except in the case of a Foreign Guarantor, no Loan Party or any Domestic Subsidiary shall be required to take any action outside the United States to perfect any security interest in the Collateral (including the execution of any agreement, document or other instrument governed by the law of any jurisdiction other than the United States of America or any State thereof (including for the avoidance of doubt, the District of Columbia)); (v) no Loan Party shall have any obligation under any Loan Document to enter into any landlord, bailee or warehousemen waiver, estoppel or consent or any other document of similar effect; and (vi) unless granted for any debtholder or representative thereof that is a party to the Intercreditor Agreement, in no event shall any Loan Party be required to take any action to perfect the security interest granted under the Security Documents in Collateral consisting of (A) cash or Cash Equivalents, (B) entering into any deposit account control agreement or securities account control agreement with respect to any deposit account or securities account (including securities entitlements and related assets credited thereto) or (C) other assets requiring perfection through the implementation of control agreements or perfection by "control" (other than possession by the Administrative Agent to the extent expressly required under the Security Documents) in each case under this clause (vi), except, in each case, to the extent such perfection may be achieved by the filing of a Uniform Commercial Code financing statement.

(f)	The Loan Parties shall not be required to cause the Administrative Agent to obtain or perfect a security interest in any assets of any Loan Party as to which (i) doing so would violate applicable law or (ii) the Administrative Agent shall determine, in its reasonable discretion, that the cost of obtaining or perfecting such security interest is excessive in relation to the benefit to the Lenders of the security afforded thereby.

(g)     Notwithstanding anything in this Agreement or any Security Document to the contrary, the Administrative Agent may, in its sole discretion, grant extensions of time for the satisfaction of any of the requirements under Section 6.9 in respect of any particular Collateral or any particular Subsidiary if it determines that the satisfaction thereof with respect to such Collateral or such Subsidiary cannot be accomplished without undue expense or unreasonable effort or due to factors beyond the control of the Borrower and the Restricted Subsidiaries by the time or times at which it would otherwise be required to be satisfied under this Agreement or any Security Document.

6.10   **Initial Mortgages**.   Deliver to the Administrative Agent on or before the date which is one hundred and twenty (120) days after the Closing Date (which period may be extended by the Administrative Agent from time to time in its reasonable discretion),

(a)     a Mortgage encumbering each Mortgaged Property listed on Schedule 4.8 in favor of the Administrative Agent, for the benefit of the Secured Parties, duly executed and acknowledged by each Loan Party that is the owner of or holder of any interest in such parcel of real property, and otherwise in form for recording in the recording office of each applicable political subdivision where each Mortgage Property listed on Schedule 4.8 is situated, together with such certificates, affidavits, questionnaires or returns as shall be required in connection with the recording or filing thereof to create a lien under applicable Requirements of Law, and such financing statements and any other instruments necessary to grant a mortgage lien under the laws of any applicable jurisdiction, all of which shall be in form and substance reasonably satisfactory to Administrative Agent;

(b)     with respect to each such Mortgage, a policy of title insurance (or marked up title insurance commitment having the effect of a policy of title insurance) insuring the Lien of such Mortgage as a valid first mortgage Lien on each Mortgaged Property listed on Schedule 4.8 and fixtures described therein in the amount equal to not less than 115% of the estimated fair market value of such parcel of real property and fixtures as set forth below which amount shall be reasonably satisfactory to the Administrative Agent, which policy (or such marked-up commitment) (each, a "Title Policy") shall (A) be issued by the Title Company, (B) to the extent necessary, include such reinsurance arrangements (with provisions for direct access, if necessary) as shall be reasonably acceptable to the Administrative Agent, (C) contain a "tie-in" or "cluster" endorsement, if available under applicable law (i.e., policies which insure against losses regardless of location or allocated value of the insured property up to a stated maximum coverage amount), (D) have been supplemented by such endorsements as shall be reasonably requested by the Administrative Agent, and (E) contain no exceptions to title other than the Liens permitted by such Mortgage and exceptions reasonably acceptable to the Administrative Agent;

(c)     with respect to each Mortgaged Property listed on Schedule 4.8, such affidavits, certificates, information (including financial data) and instruments of indemnification (including a so-called "gap" indemnification) as shall be required to induce the Title Company to issue the Title Policy/ies and endorsements contemplated above;

(d)     evidence reasonably acceptable to the Administrative Agent of payment by Borrower of all Title Policy premiums, search and examination charges, escrow charges and

related charges, mortgage recording taxes, fees, charges, costs and expenses required for the recording of such Mortgages and issuance of the Title Policies referred to above;

(e)     Surveys with respect to each Mortgaged Property listed on Schedule 4.8;

(f)     with respect to such Mortgages listed on Schedule 4.8, an opinion of (i) Kirkland & Ellis LLP, special counsel for the Loan Parties, and (ii) local counsel for the Loan Parties in the applicable jurisdiction reasonably acceptable to the Borrower and the Administrative Agent;

(g)     a copy of, or a certificate as to coverage under and a copy of the flood insurance policy and a declaration page relating to, the insurance policies required by Section 6.5 (including, without limitation, flood insurance policies, each of which (i) shall be endorsed or otherwise amended to include a "standard" or "New York" lender's loss payable or mortgagee endorsement (as applicable), (ii) shall name the Administrative Agent, on behalf of the Secured Parties, as additional insured, (iii) in the case of flood insurance, if any, such certificate shall (a) identify the addresses of each property located in a special flood hazard area and (b) indicate the applicable flood zone designation, the flood insurance coverage and the deductible relating thereto; and

(h)     a completed "Life-of-Loan" Federal Emergency Management Agency standard flood hazard determination with respect to each such Mortgaged Property and, if located in a Special Flood Hazard Area, a notice about special flood hazard area status and flood disaster assistance duly executed by the Borrower and if applicable, each Loan Party relating thereto.

6.11    **Designation of Subsidiaries**.

(a)     The Borrower may designate (or re-designate) any Restricted Subsidiary as an Unrestricted Subsidiary or any Unrestricted Subsidiary as a Restricted Subsidiary; provided that immediately before and after such designation, no Event of Default shall have occurred and be continuing.  The designation of any Subsidiary as an Unrestricted Subsidiary after the Closing Date in accordance with this Section 6.11 shall constitute an Investment by the Borrower or the relevant Restricted Subsidiary, as applicable, therein at the date of designation in an amount equal to the fair market value (as determined in good faith by the relevant Borrower) of the Investments held by the Borrower and/or the applicable Restricted Subsidiaries in such Unrestricted Subsidiary immediately prior to such designation.  Upon any such designation (but without duplication of any amount reducing such Investment in such Unrestricted Subsidiary pursuant to the definition of "Investment"), the Borrower and/or the applicable Restricted Subsidiaries shall receive a credit against the applicable clause in Section 7.8 that was utilized for the Investment in such Unrestricted Subsidiary for all Returns in respect of such Investment. The designation of any Unrestricted Subsidiary as a Restricted Subsidiary in accordance with this Section 6.11 shall constitute the incurrence by such Restricted Subsidiary at the time of designation of any Indebtedness or Liens of such Restricted Subsidiary outstanding at such time (to the extent assumed).

(b)     The Borrower may designate (or re-designate) any Restricted Subsidiary that is an Excluded Subsidiary as an Electing Guarantor; provided that no Subsidiary may be an Electing Guarantor unless it is able to pledge all or substantially all of its assets as Collateral; provided,

77

further, that in the case of a Foreign Subsidiary, such Foreign Subsidiary shall have complied with Section 6.9. The Borrower may designate (or re-designate) any Electing Guarantor as an Excluded Subsidiary; provided that (i) such redesignation shall constitute an Investment by the Borrower or the relevant Restricted Subsidiary, as applicable, therein at the date of designation in an amount equal to the to the fair market value (as determined in good faith by the Borrower) of the Investments held by the Borrower and/or the applicable Restricted Subsidiaries in such Electing Guarantor immediately prior to such re-designation and such Investments shall otherwise be permitted hereunder and (ii) any Indebtedness or Liens of such Restricted Subsidiary (after giving effect to such release) shall be deemed to be incurred at the time of such release by such Electing Guarantor and such incurrence shall otherwise be permitted hereunder.

6.12   **Post-Closing Obligations**.

(a)      Within ninety (90) days following the Closing Date (as such date may be extended by the Administrative Agent, in its sole discretion, in writing), the Borrower shall have delivered to the Administrative Agent the "standard" additional insured and/or mortgagee endorsement for the insurance certificates delivered pursuant to Section 5.1(c).

(b)      Within forty-five (45) days following the Closing Date (as such date may be extended by the Administrative Agent, in its sole discretion, in writing), the Borrower shall have delivered to the Administrative Agent each promissory note pledged to the Administrative Agent pursuant to the Guarantee and Security Agreement endorsed (without recourse) in blank (or accompanied by an executed allonge or similar transfer form in blank) by the Loan Party that is the pledgor thereof.

## SECTION 7

## NEGATIVE COVENANTS

The Borrower hereby agrees that, so long as any of the Commitments remain in effect and until all Loans are repaid in full in cash and all other outstanding Obligations (other than contingent indemnification obligations surviving after the termination of this Agreement) are fully and finally satisfied and discharged in accordance with this Agreement, the Borrower shall not, and shall not permit any of its Restricted Subsidiaries to:

7.1   **Financial Condition Covenants**.

(a)      Consolidated First Lien Leverage Ratio. Permit the Consolidated First Lien Leverage Ratio calculated as at the last day of any fiscal quarter of the Borrower for which financial statements of the Borrower were required to have been delivered to the Administrative Agent pursuant to Section 6.1 (commencing with the first full fiscal quarter of the Borrower after the Commencement Date) to exceed 5.50 to 1.00.

(b)      Minimum Liquidity. Permit Liquidity to be less than $25,000,000 as of the last day of the calendar month in which the Commencement Date occurs and the last day of each calendar month ending thereafter; provided that, if the Consolidated First Lien Leverage Ratio does not exceed 4.50:1.00 as of the last day of the last four quarter period for which internal

financial statements are available, Liquidity shall instead be tested on the last day of each fiscal quarter of the Borrower for each test date after the Commencement Date.

7.2    **Indebtedness**.  Create, issue, incur, assume, or become liable in respect of any Indebtedness, except:

(a)    Indebtedness of any Loan Party pursuant to any Loan Document and any Permitted Refinancing in respect of any such Indebtedness;

(b)    Indebtedness of (i) the Borrower to any Restricted Subsidiary and of any Subsidiary Guarantor to the Borrower or any other Restricted Subsidiary and (ii) of any Restricted Subsidiary that is not a Guarantor to (x) the Borrower or any Subsidiary Guarantor to the extent not in violation of Section 7.8 or (y) any other Subsidiary that is not a Guarantor; provided that any such Indebtedness of a Loan Party shall be subordinated to the prior payment in full in cash of the Obligations (other than the Specified Swap Agreements and Cash Management Obligations) on terms reasonably satisfactory to the Administrative Agent;

(c)    Guarantee Obligations incurred in the ordinary course of business by the Borrower or any of the Restricted Subsidiaries of Indebtedness and other obligations of any Guarantor (in the case of Holdings, to the extent such Obligations of Indebtedness are related to the Borrower or any of its Restricted Subsidiaries);

(d)    Indebtedness outstanding on the Closing Date and listed on Schedule 7.2(d) and any Permitted Refinancing in respect of any such Indebtedness;

(e)    Indebtedness (including, without limitation, Capital Lease Obligations, including those incurred pursuant to Sale Leaseback Transactions) secured by Liens permitted by Section 7.3(g) (or Section 7.3(w), in the case of a Sale Leaseback Transaction), and any Permitted Refinancing in respect of such Indebtedness, in an aggregate principal amount outstanding at any time not to exceed the greater of (x) $60,000,000 and (y) 5.25% of Total Assets as of the Applicable Date of Determination, *plus*, in the case of any Permitted Refinancing, the amounts set forth in clause (a) of the proviso to the definition of Permitted Refinancing;

(f)    Indebtedness (or Guarantee Obligations, as applicable) of the Borrower and the Subsidiary Guarantors in respect of the PIK Toggle Notes and any Permitted Refinancing thereof;

(g)    (a) Indebtedness of (1) any Person acquired or assumed in connection with an Acquisition or permitted Investment or any assets acquired in connection therewith and (2) any Unrestricted Subsidiary that is redesignated as a Restricted Subsidiary (it being acknowledged that (x) a Person that becomes a direct or indirect Restricted Subsidiary of the Borrower as a result of an Acquisition or permitted Investment may remain liable with respect to Indebtedness existing on the date of such acquisition and (y) an Unrestricted Subsidiary that is redesignated as a Restricted Subsidiary may remain liable with respect to Indebtedness existing on the date of such redesignation); provided that (A) such Indebtedness is not created in anticipation of such acquisition or

79

redesignation and (B) the aggregate principal amount of such Indebtedness incurred under this clause (g) does not exceed an amount of Indebtedness such that immediately after giving effect to such Acquisition, permitted Investment or redesignation, as the case may be, and the assumption of such Indebtedness, the Fixed Charge Coverage Ratio computed on a Pro Forma Basis as of the Applicable Date of Determination is either (x) not less than 2.00 to 1.00 or (y) not less than such Fixed Charge Coverage Ratio immediately prior to the consummation of such Acquisition, permitted Investment or redesignation and the assumption of such Indebtedness; and (b) any Permitted Refinancing thereof;

(h)      any other Indebtedness of the Borrower or any of its Restricted Subsidiaries in an aggregate amount outstanding at any time not exceeding the greater of (x) $35,000,000 and (y) 3.00% of Total Assets as of the Applicable Date of Determination;

(i)      Indebtedness incurred pursuant to the 21C Term Loan Agreement (including any Indebtedness in the form of incremental loans or notes permitted thereunder) in an aggregate principal amount not to exceed $[   ][4] at any time outstanding and any Permitted Refinancing thereof; provided that all net cash proceeds of any such Indebtedness in excess of $[  ] shall be used to repay the outstanding Loan Obligations on a dollar-for-dollar basis;

(j)      obligations in respect of letters of credit issued in the ordinary course of business and of performance, surety, statutory or appeal bonds or with respect to worker's compensation claims or other bonds permitted under Section 7.3;

(k)      Indebtedness incurred in the ordinary course of business in respect of netting services, overdraft protections and otherwise in connection with deposit accounts;

(l)      Indebtedness of any Loan Party (other than Holdings) consisting of promissory notes or similar obligations issued by such Loan Party relating to leases, licenses or otherwise to be acquired in connection with a Permitted Acquisition that cannot be transferred to such Loan Party prior to or concurrently with the consummation of such Permitted Acquisition not exceeding $25,000,000 at any one time outstanding;

(m)      Indebtedness consisting of promissory notes issued by the Borrower to officers, directors and employees of Holdings, the Borrower or any Restricted Subsidiary of the Borrower to purchase or redeem Capital Stock of Holdings or any of its direct or indirect parent companies to the extent permitted hereunder;

(n)      Indebtedness under Swap Agreements permitted pursuant to Section 7.7 and Cash Management Obligations;

---

[4] NTD:  To include amount of exit loans plus $35mm of incremental capacity available under 21C Credit Agreement.

(o)      Indebtedness of the Borrower that may be deemed to exist under any acquisition agreement pertaining to acquisitions consummated prior to the Closing Date in an aggregate principal amount not exceeding $5,000,000;

(p)      Indebtedness that is outstanding on the Closing Date but that is repaid on the Closing Date pursuant to the Plan of Reorganization;

(q)      Indebtedness consisting of Sale Leaseback Transactions permitted by Section 7.11;

(r)      Subordinated Indebtedness incurred pursuant to Section 10.6(g)(iv);

(s)      Indebtedness representing deferred compensation or similar arrangements to employees of the Borrower and its Restricted Subsidiaries incurred in the ordinary course of business;

(t)      Indebtedness of the Borrower or a Subsidiary Guarantor supported by a letter of credit; provided, however, that (i) the aggregate principal amount of any such Indebtedness does not at any time exceed the amount available to be drawn under such letter of credit, and (ii) such Indebtedness matures at least five (5) Business Days prior to the scheduled expiry date of such letter of credit;

(u)      Indebtedness under (i) one or more revolving credit facilities incurred and guaranteed only by the Loan Parties and any Permitted Refinancing thereof, in an aggregate principal amount outstanding at any time not to exceed $85,000,000 *plus* the amounts set forth in clause (a) of the proviso to the definition of Permitted Refinancing; provided that all net cash proceeds of any such Indebtedness in excess of $50,000,000 shall solely be used to repay, on a dollar-for-dollar basis, the outstanding Loan Obligations and (ii) one or more revolving credit facilities incurred by one or more MDL Entities and any Permitted Refinancing thereof, in an aggregate principal amount outstanding at any time not to exceed $10,000,000 *plus* the amounts set forth in clause (a) of the proviso to the definition of Permitted Refinancing;

(v)      Indebtedness consisting of (i) Earnout Obligations and (ii) other obligations of the Borrower or its Restricted Subsidiaries under deferred compensation or other similar arrangements incurred by such Person in connection with the Transaction and Permitted Acquisitions or any other Investment expressly permitted hereunder;

(w)      Indebtedness of Excluded Subsidiaries that are Restricted Subsidiaries or Restricted Subsidiaries thereof to finance working capital and general corporate purposes not exceeding the greater of (x) $15,000,000 and (y) 1.25% of Total Assets as of the Applicable Date of Determination;

(x)      accretion or amortization of original issue discount and accretion of interest paid in kind, in each case in respect of Indebtedness otherwise permitted by this Section 7.2;

81

(y)     Indebtedness owed to any Person providing property, casualty, business interruption or liability insurance to Holdings (to the extent such obligations or activities of Holdings are related to the Borrower or any of its Restricted Subsidiaries), the Borrower or any of their Restricted Subsidiaries, provided that such Indebtedness is incurred to finance insurance premiums in respect of such insurance;

(z)     Permitted Seller Debt and any Permitted Refinancing in respect thereof in an aggregate principal amount outstanding at any time not exceeding the greater of (i) $25,000,000 and (ii) 2.25% of Total Assets as of the Applicable Date of Determination, *plus*, in the case of any Permitted Refinancing, the amounts set forth in clause (a) of the proviso to the definition of Permitted Refinancing;

(aa)     Indebtedness incurred by the Borrower or any of their Restricted Subsidiaries arising from agreements providing for indemnification, adjustment of purchase price or similar obligations, or from guaranties or letters of credit, surety bonds or performance bonds securing the performance of the Borrower or any such Restricted Subsidiary pursuant to such agreements, in connection with Permitted Acquisitions, other permitted Investments or permitted dispositions of any business, assets or Subsidiary of the Borrower or any of their Restricted Subsidiaries;

(bb)     guaranties by the Borrower or any Restricted Subsidiary of Indebtedness of the Borrower or any other Restricted Subsidiary of the Borrower otherwise permitted to be incurred pursuant to this Section 7.2; provided that guarantees by any Loan Party of Indebtedness of any Foreign Subsidiary are permitted under Section 7.8;

(cc)     [reserved];

(dd)     [reserved];

(ee)     Indebtedness incurred by the Borrower or any Subsidiary Guarantor in an amount equal to 100% of the Net Cash Proceeds received by Holdings since immediately after the Closing Date from the issuance or sale of Permitted Capital Stock of Holdings plus cash contributed to the capital of Holdings (in each case, other than (i) proceeds of sales of Capital Stock to Holdings or any of its Subsidiaries or (ii) any Cure Amount) to the extent such Net Cash Proceeds or cash have been contributed to the Borrower;

(ff)     to the extent constituting Indebtedness, Guarantee Obligations in the ordinary course of business of the obligations of suppliers, customers, franchisees and licensees of the Borrower and its Restricted Subsidiaries;

(gg)     performance Guarantee Obligations of the Borrower and its Restricted Subsidiaries primarily guaranteeing performance of Contractual Obligations of the Borrower or Restricted Subsidiaries to a third party and not primarily for the purpose of guaranteeing payment of Indebtedness;

(hh)     obligations in respect of letters of support, guarantees or similar obligations issued, made or incurred for the benefit of any Subsidiary of the Borrower to

82

the extent required by law or in connection with any statutory filing or the delivery of audit opinions performed in jurisdictions other than within the United States;

(ii)   [reserved];

(jj)   [reserved]; and

(kk)   guaranties by the Borrower or any Restricted Subsidiary of obligations or activities of Holdings (to the extent such obligations or activities of Holdings are related to the Borrower or any of its Restricted Subsidiaries).

For purposes of determining compliance with this Section 7.2, in the event that an item of Indebtedness (or any portion thereof) at any time meets the criteria of more than one of the categories described above in this Section 7.2 or is entitled to be incurred pursuant to this Section 7.2, the Borrower, in its sole discretion, may classify or reclassify (or later divide, classify or reclassify) such item of Indebtedness (or any portion thereof) and shall only be required to include the amount and type of such Indebtedness in one of the above clauses.  Accrual of interest or dividends, the accretion of accreted value, the accretion or amortization of original issue discount and the payment of interest, premium, fees or expenses, in the form of additional Indebtedness or preferred stock shall not be deemed to be an incurrence of Indebtedness for purposes of this Section 7.2.

For purposes of determining compliance with any restriction on the incurrence of Indebtedness, the principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first committed, in the case of revolving credit debt; provided that if such Indebtedness is incurred to extend, replace, refund, refinance, renew or Defease other Indebtedness denominated in a foreign currency, and such extension, replacement, refunding, refinancing, renewal or Defeasance would cause the applicable restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such extension, replacement, refunding, refinancing, renewal or defeasance, such restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being extended, replaced, refunded, refinanced, renewed or Defeased, plus the amount of any premium paid, and fees and expenses incurred, in connection with such extension, replacement, refunding refinancing, renewal or Defeasance (including any fees and original issue discount incurred in respect of such resulting Indebtedness).

7.3   **Liens**.  Create, incur, assume or suffer to exist any Lien upon any of its property, whether now owned or hereafter acquired, except:

(a)   Liens for taxes, assessments, charges or other governmental levies not overdue for a period of more than sixty (60) days or that are being contested in good faith by appropriate proceedings, provided that adequate reserves with respect thereto are maintained on the books of the Borrower or its Subsidiaries, as the case may be, in conformity with GAAP or such amounts are not otherwise required to be paid under Section 6.3;

83

(b)     carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business that are not overdue for a period of more than sixty (60) days or that are being contested in good faith by appropriate proceedings, so long as reserves or other appropriate provisions, if any, as shall be required by GAAP shall have been made for any such contested amounts;

(c)     pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation and deposits securing liability insurance carriers under insurance or self-insurance arrangements;

(d)     deposits to secure the performance of bids, trade contracts (other than for borrowed money), leases, statutory obligations, contractual or warranty obligation, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case incurred in the ordinary course of business;

(e)     easements, rights-of-way, restrictions and other similar encumbrances that, in the aggregate, do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the Borrower or any of its Restricted Subsidiaries;

(f)     Liens in existence on the Closing Date listed on Schedule 7.3(f), securing Indebtedness permitted by Section 7.2(d), provided that no such Lien is spread to cover any additional property after the Closing Date and that the amount of Indebtedness secured thereby is not increased;

(g)     Liens securing Indebtedness of the Borrower or any of its Restricted Subsidiaries incurred pursuant to Section 7.2(e) solely to finance the acquisition, development, construction, restoration, replacement, rebuilding, maintenance, upgrade or improvement of new equipment, fixed or capital assets or real property or the repair or improvement thereof or the refinancing of real property, provided that (i) such Liens and the Indebtedness secured thereby shall be created within two hundred and seventy (270) days after the acquisition, construction, repair or improvement of such new equipment, fixed assets or real property or improvements thereto and (ii) such Liens do not at any time encumber any property other than the equipment, fixed assets or real property (or the real property improved by such improvements) financed by such Indebtedness;

(h)     Liens created pursuant to the Security Documents;

(i)     contractual or statutory Liens of landlords and Liens of suppliers (including sellers of goods) and other Liens imposed by law or pursuant to customary reservations or retentions of title arising in the ordinary course of business;

(j)     rights of setoff or bankers' liens upon deposits of cash in favor of banks or other depository institutions whether arising by contract or operation of law, incurred in the ordinary course of business so long as such deposits are not intended to be collateral for any obligations;

(k)      Liens attaching solely to cash earnest money deposits in connection with any letter of intent or purchase agreement in connection with a Permitted Acquisition or Investment;

(l)      Liens arising from precautionary Uniform Commercial Code financing statements regarding operating leases not constituting Indebtedness or consignments;

(m)      Liens securing Indebtedness permitted hereunder on property or assets acquired pursuant to a Permitted Acquisition or permitted Investment, or on property or assets of a Restricted Subsidiary of the Borrower in existence at the time such Subsidiary is acquired pursuant to a Permitted Acquisition or permitted Investment, provided that (A) such Lien was not created in contemplation of such acquisition or such Person becoming a Restricted Subsidiary and (B) such Lien does not extend to or cover any other assets or property (other than the proceeds or products thereof and other than after-acquired property subject to a Lien securing Indebtedness and other obligations incurred prior to such time and which Indebtedness and other obligations are permitted hereunder that require or include, pursuant to their terms at such time, a pledge of after-acquired property, it being understood that such requirement shall not be permitted to apply to any property to which such requirement would not have applied but for such acquisition);

(n)      Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(o)      Liens encumbering customary initial deposits and margin deposits, and similar Liens and margin deposits, and similar Liens attaching to commodity trading accounts or other brokerage accounts, in each case incurred in the ordinary course of business;

(p)      Liens incurred in connection with the purchase or shipping of goods or assets on the related goods or assets and proceeds thereof in favor of the seller or shipper of such goods or assets;

(q)      Liens in favor of customs and revenues authorities which secure payment of customs duties in connection with the importation of goods;

(r)      Liens arising out of judgments or awards not constituting an Event of Default under Section 8(h) and notices of lis pendens and associated rights related to litigation being contested in good faith by appropriate proceedings and for which adequate reserves have been made;

(s)      any interest or title of a licensor, sublicensor, lessor or sublessor under any license or lease agreement in the ordinary course of business not interfering with the business of the Borrower or any of its Restricted Subsidiaries;

(t)      licenses, sublicenses, leases or subleases granted to third Persons in the ordinary course of business not interfering in any material respect with the business of the Borrower or any of its Restricted Subsidiaries;

85

(u)     Liens which arise under Article 2 and Article 4 of the New York UCC (as defined in the Guarantee and Security Agreement), or the corresponding provisions of the Uniform Commercial Code in other jurisdictions, on items in collection and documents and proceeds related thereto;

(v)     Liens not otherwise permitted by this Section 7.3 so long as the aggregate outstanding principal amount of the obligations secured thereby does not exceed the greater of (x) $25,000,000 and (y) 2.25% of Total Assets as of the Applicable Date of Determination;

(w)     Liens on assets subject to a Sale Leaseback Transaction securing Capital Lease Obligations incurred pursuant to such Sale Leaseback Transaction;

(x)     Liens (i) on cash advances in favor of the seller of any property to be acquired in an Investment permitted pursuant to Section 7.8(g) or (y) to be applied against the purchase price for such Investment, or (ii) consisting of an agreement to Dispose of any property in a Disposition permitted under Section 7.5, in each case, solely to the extent such Investment or Disposition, as the case may be, would have been permitted on the date of the creation of such Lien;

(y)     ground leases in respect of real property on which facilities owned or leased by the Borrower or any of its Restricted Subsidiaries are located;

(z)     Liens on Collateral securing Indebtedness incurred pursuant to Section 7.2(f) or Section 7.2(i), which Liens shall have the priority set forth in the Intercreditor Agreement;

(aa)    zoning, building codes and other land use laws regulating the use or occupancy of real property or the activities conducted thereon which are imposed by any Governmental Authority having jurisdiction over such real property and are not violated by the current use or occupancy of such real property or materially interfere with the ordinary conduct of the business of the Borrower or any of its Restricted Subsidiaries thereon;

(bb)    Liens securing repurchase obligations under Cash Equivalents;

(cc)    Liens securing Indebtedness incurred pursuant to Section 7.2(u); provided that (i) the agent or other representative for any Indebtedness incurred pursuant to Section 7.02(u)(i) shall become a party to the Intercreditor Agreement as the "ABL Agent" or any corresponding definition thereof and (ii) any Liens securing Indebtedness incurred pursuant to Section 7.02(u)(ii) shall be limited to Liens on assets of the MDL Entities and shall not extend to any Collateral;

(dd)    Liens on assets of Restricted Subsidiaries of the Borrower that are not Subsidiary Guarantors to secure Indebtedness of Restricted Subsidiaries of the Borrower that are not Subsidiary Guarantors under Section 7.2(h) and/or (w);

(ee)    Liens on the equity interest of Unrestricted Subsidiaries;

(ff)    Liens in favor of any Loan Party (other than Holdings (except with respect to Liens securing obligations to Holdings that are comprised of Guarantee Obligations of Borrower or any of its Restricted Subsidiaries, or that otherwise secure Indebtedness or other obligations owed to Holdings that relate to Borrower or one of its Restricted Subsidiaries)); provided that any such Liens on any assets of a Loan Party constituting Collateral are subordinated to the Liens on the Collateral securing the Obligations;

(gg)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into in the ordinary course of business;

(hh)    pledges or deposits of cash and Cash Equivalents securing deductibles, self-insurance, co-payment, co-insurance, retentions or other similar obligations to providers of property, casualty or liability insurance in the ordinary course of business;

(ii)    [reserved];

(jj)    In the case of Non-Wholly-Owned Subsidiaries, Liens securing put and call arrangements;

(kk)    Liens securing Swap Agreements and Cash Management Obligations;

(ll)    [reserved];

(mm)    Liens securing any Permitted Refinancing; provided that such Liens are otherwise permitted under this Section 7.3 and secure Indebtedness otherwise permitted by Section 7.2;

(nn)    [reserved];

(oo)    Liens securing obligations (other than obligations representing Indebtedness for borrowed money) under operating, reciprocal easement or similar agreements entered into in the ordinary course of business of the Borrower and its Subsidiaries;

(pp)    utility and similar deposits in the ordinary course of business;

(qq)    purchase options, call and similar rights of, and restrictions for the benefit of, a third party with respect to Capital Stock held by the Borrower or any Restricted Subsidiary in Joint Ventures; and

(rr)    Liens disclosed as exceptions to coverage in the final title policies and endorsements issued to the Administrative Agent with respect to any real properties subject to a Mortgage.

7.4    **Fundamental Changes**.  Enter into any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or Dispose of all or substantially all of its property or business, except that:

87

(a)      any Restricted Subsidiary of the Borrower may be merged or consolidated with or into the Borrower (provided that the Borrower shall be the continuing or surviving corporation) or with or into any other Restricted Subsidiary (provided that when a Restricted Subsidiary that is not a Subsidiary Guarantor is merging or consolidating with a Subsidiary Guarantor, the Subsidiary Guarantor shall be the continuing or surviving corporation);

(b)      any Restricted Subsidiary of the Borrower may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) (i) to the Borrower or any other Restricted Subsidiary (upon voluntary liquidation or otherwise) (provided that when a Subsidiary that is a Subsidiary Guarantor is so Disposing of all or substantially of its assets to another Subsidiary, such other Subsidiary must be a Subsidiary Guarantor) or (ii) pursuant to a Disposition permitted by Section 7.5;

(c)      any Restricted Subsidiary of the Borrower may liquidate or dissolve or change its legal form if the Borrower determines in good faith that such action is in the best interests of the Borrower and its Restricted Subsidiaries and is not disadvantageous to the Lenders in any material respect; and

(d)      any Investment expressly permitted by Section 7.8 may be structured as a merger, consolidation or amalgamation.

7.5      **Disposition of Property**.  Dispose of any of its property, whether now owned or hereafter acquired, or, in the case of any Restricted Subsidiary, issue or sell any shares of such Restricted Subsidiary's Capital Stock to any Person, except:

(a)      the Disposition of obsolete or worn out property or of property no longer used or useful in the conduct of the Borrower and its Restricted Subsidiaries, in each case in the ordinary course of business;

(b)      the Disposition of Cash Equivalents and sale of inventory in the ordinary course of business;

(c)      Dispositions permitted by Section 7.4(a), clause (i) of Section 7.4(b) and Section 7.4(c);

(d)      the sale or issuance of any Restricted Subsidiary's Capital Stock to the Borrower or any Wholly-Owned Subsidiary that is a Restricted Subsidiary;

(e)      the Disposition for fair market value of property; provided that if such Disposition, together with all related Dispositions, involves assets with a fair market value in excess of $10,000,000, not less than 75% of the total consideration (other than (A) the assumption by the transferee of Indebtedness or other liabilities contingent or otherwise of the Borrower or any of its Restricted Subsidiaries (other than Indebtedness and other liabilities that are subordinated in right of payment to the Obligations) and the valid release of the Borrower or such Restricted Subsidiary, by all applicable creditors in writing, from all liability on such Indebtedness or other liability in connection with such Disposition, (B) securities, notes or other obligations received by the Borrower or any of

88

its Restricted Subsidiaries from the transferee that are converted by the Borrower or any of its Restricted Subsidiaries into cash or Cash Equivalents within one hundred eighty (180) days following the closing of such Disposition, (C) Indebtedness of any Restricted Subsidiary that is no longer a Restricted Subsidiary as a result of such Disposition, to the extent that the Borrower and each other Restricted Subsidiary are released from any Guarantee Obligations of payment of such Indebtedness in connection with such Disposition and (D) in connection with an asset swap, all of which shall be deemed "cash" for this purpose) received is cash or Cash Equivalents or Designated Non-Cash Consideration to the extent that all Designated Non-Cash Consideration at such time does not exceed the greater of (x) $25,000,000 and (y) 2.25% of Total Assets as of the Applicable Date of Determination (with the fair market value of each item of Designated Non-Cash Consideration being measured at the time received and without giving effect to subsequent changes in value) and all of the consideration received is at least equal to the fair market value of the assets sold, transferred or otherwise disposed of);

(f)      (a) any of the Borrower and its Restricted Subsidiaries may transfer assets to the Borrower or any Subsidiary Guarantor and (b) any Restricted Subsidiary that is not a Guarantor may transfer assets to any other Restricted Subsidiary that is not a Guarantor;

(g)      any of the Borrower and its Restricted Subsidiaries shall be permitted to make Permitted Dispositions;

(h)      any of the Borrower and its Restricted Subsidiaries shall be permitted to sell or otherwise dispose of property and other assets pursuant to Sale Leaseback Transactions permitted under Section 7.11;

(i)      sale or like-kind exchanges of existing assets for similar replacement assets, so long as the receipt of the replacement assets in such sale or exchange occurs promptly following the transfer thereof; provided that to the extent the assets that were subject to, and exchanged in connection with, such sale or like-kind exchange constituted Collateral, assets acquired in connection therewith shall constitute Collateral;

(j)      any of the Borrower and its Restricted Subsidiaries shall be permitted to dispose of the Capital Stock or debt of an Unrestricted Subsidiary for fair market value;

(k)      condemnations and casualty events, so long as the Recovery Event is applied in accordance with Section 2.11(b);

(l)      issue Capital Stock to qualify directors of the board of directors (or similar governing body) of any Subsidiary of the Borrower where required by applicable law; and

(m)      the unwinding of any Swap Agreement or Cash Management Obligations;

(n)      the lapse or abandonment in the commercially reasonable business judgment of the Borrower or its Restricted Subsidiaries of any registrations or applications for registration of any immaterial Intellectual Property rights;

89

(o)     Disposition of Investments in (i) Joint Ventures to the extent required by, or made pursuant to customary buy/sell arrangements between, the joint venture parties set forth in joint venture arrangements and similar binding agreements or (ii) Non-Wholly-Owned Subsidiaries under put and call arrangements;

(p)     Dispositions of non-core or obsolete assets acquired in connection with an acquisition or permitted Investment;

(q)     Dispositions constituting Investments permitted under Section 7.8 or permitted Restricted Payments under Section 7.6;

(r)     Dispositions to a non-Loan Party to the extent that it is otherwise a permitted Investment;

(s)     the incurrence of Liens permitted hereunder;

(t)     *de minimis* amounts of equipment provided to employees;

(u)     the Borrower and any Restricted Subsidiary may (i) terminate or otherwise collapse its cost sharing agreements with the Borrower or any Subsidiary and settle any crossing payments in connection therewith, (ii) convert any intercompany Indebtedness to Capital Stock, (iii) transfer any intercompany Indebtedness to the Borrower or any Restricted Subsidiary, (iv) settle, discount, write off, forgive or cancel any intercompany Indebtedness or other obligation owing by the Borrower or any Restricted Subsidiary, (v) settle, discount, write off, forgive or cancel any Indebtedness owing by any present or former consultants, directors, officers or employees of any Parent Entity, Holdings, the Borrower, or any Subsidiary or any of their successors or assigns, (vi) surrender or waive contractual rights and settle or waive contractual or litigation claims or (vii) terminate any Swap Agreement.

(v)     Dispositions for fair market value (including those of the type otherwise described herein) made after the Closing Date in an aggregate amount not to exceed the greater of (x) $25,000,000 and (y) 2.25% of Total Assets as of the Applicable Date of Determination;

(w)     any swap of assets in exchange for services in the ordinary course of business of comparable or greater fair market value of usefulness to the business of the Borrower and its Restricted Subsidiaries as a whole, as determined in good faith by the Borrower; and

(x)     Dispositions involving assets with an aggregate value not in excess of the greater of the JV Disposition Amount as of the Applicable Date of Determination, to a Joint Venture or other non-Loan Party (other than an Unrestricted Subsidiary).

Notwithstanding the foregoing, the Disposition of any Capital Stock of a Restricted Subsidiary (other than as permitted by clause (d) above) shall not be permitted unless all the Capital Stock of such Restricted Subsidiary is Disposed of pursuant to such Disposition (and any other Investments in such Restricted Subsidiary, or any of its Restricted Subsidiaries, are also

Disposed of or otherwise repaid in connection with such Disposition), or are treated as Investments under, and permitted by, clause (y) of Section 7.8).

To the extent the Required Lenders waive the provisions of this Section 7.5 with respect to the sale or other disposition of any Collateral, or any Collateral is sold or disposed of as permitted by this Section 7.5, such Collateral in each case (unless sold or disposed of to a Loan Party) shall be sold or otherwise disposed of free and clear of the Liens created by the Loan Documents and the Administrative Agent shall take such actions in accordance with Section 10.14 as are appropriate in connection therewith.

7.6     **Restricted Payments**.  Declare or pay any dividend (other than dividends payable solely in stock of the Person making such dividend) on, or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of, any Capital Stock of any Group Member, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of any Group Member (collectively, "Restricted Payments"), except that:

(a)     any Restricted Subsidiary may make Restricted Payments to (i) the Borrower and Restricted Subsidiaries and (ii) to each of its other equity holders on a pro rata basis;

(b)     so long as no Default or Event of Default shall have occurred and be continuing or would result therefrom, the Borrower may pay dividends to Holdings to permit Holdings to purchase (and Holdings may purchase) or to pay dividends to any of its direct or indirect parent companies to permit any of its direct or indirect parent companies to purchase Capital Stock of Holdings or any of its direct or indirect parent companies from present or former officers or employees of any Group Member, their estates and their heirs upon the death, disability or termination of employment of such officer or employee, provided that the aggregate amount of payments under this clause (b) after the Closing Date (net of any proceeds received by Holdings and contributed to the Borrower after the Closing Date in connection with resales of any such Capital Stock) shall not exceed $15,000,000 in cash in the aggregate during any fiscal year plus (A) the balance of any such $15,000,000 limit not used in any fiscal year (which may be used in any subsequent fiscal year), (B) the amount of any equity contribution made to the Borrower (through Holdings) for the purpose of such repurchase (and Not Otherwise Applied), and (C) the proceeds of any key-man life insurance with respect to such employee paid to Holdings, the Borrower or any of its Restricted Subsidiaries;

(c)     the Borrower may pay dividends to Holdings to provide for the payment by Holdings of, or to permit Holdings to pay dividends to any of its direct or indirect parent companies to provide for the payment by or any of its direct or indirect parent companies of, customary corporate indemnities owing to directors of the Holdings, or any of its direct or indirect parent companies, the Borrower, its Subsidiaries or any of their Affiliates in the ordinary course of business;

(d)     [Reserved];

(e)      Restricted Payments made on or after the Closing Date to consummate, or otherwise in connection with, the Transactions;

(f)      the Borrower and its Restricted Subsidiaries may pay dividends through issuance of Permitted Capital Stock and may redeem any Capital Stock in exchange for other Permitted Capital Stock;

(g)      the Borrower may make Restricted Payments to Holdings to enable it to pay Closing Costs and to make payments required to be made by it pursuant to any acquisition agreement pertaining to acquisitions by the Borrower and its Restricted Subsidiaries consummated prior to the Closing Date and Permitted Acquisitions by the Borrower and its Restricted Subsidiaries thereafter;

(h)      the Borrower may directly or indirectly make distributions to Holdings (and Holdings may make distributions to any of its direct or indirect parent companies) or make payments on behalf of Holdings (or any of its direct or indirect parent companies), to the extent necessary to pay the taxes and the operating and administrative expenses of Holdings (or any of its direct or indirect parent companies) incurred in the ordinary course of its business including, without limitation, reasonable directors' fees and expenses;

(i)      [reserved];

(j)      the Borrower or any Restricted Subsidiary may make additional Restricted Payments to the extent that such Restricted Payments are made with net proceeds received by Holdings or any Parent Entity after the Closing Date from the issuance or sale of Permitted Capital Stock of Holdings or proceeds of an equity contribution initially made to Holdings (other than any proceeds of any Cure Amount), in each case to the extent such proceeds have been contributed to the common equity of the Borrower (which such equity proceeds so utilized shall not also increase the Available Amount or be credited for any other purpose);

(k)      the Borrower and the Restricted Subsidiaries may make Restricted Payments (or may make Restricted Payments to Holdings or any Parent Entity for such purpose) the proceeds of which shall be used to pay customary costs, fees and expenses related to any unsuccessful equity or debt offering permitted by this Agreement, so long as the proceeds of such offering were intended to be contributed to the Borrower or any Restricted Subsidiary or such offering was otherwise related to the business of the Borrower and the Restricted Subsidiaries;

(l)      the Borrower and the Restricted Subsidiaries may make Restricted Payments to Holdings or any Parent Entity to pay cash in lieu of fractional Capital Stock in connection with any dividend, split or combination thereof or any Acquisition, Investment or other transaction otherwise permitted hereunder;

(m)      so long as no Event of Default shall have occurred and be continuing or would result therefrom, the Borrower and the Restricted Subsidiaries may make Restricted Payments so that Holdings (or Public Company) may declare and pay regular

92

quarterly dividends on its common stock (or similar Capital Stock of Holdings) in an amount not to exceed 6% per year of the aggregate net cash proceeds of any Public Offering that were actually received by Borrower or contributed to the Borrower in or from all such Public Offerings;

(n)    (i) so long as (A) no Event of Default shall have occurred and be continuing or result therefrom and (B) on a Pro Forma Basis after giving effect thereto as of the Applicable Date of Determination, the Consolidated Leverage Ratio shall be less than or equal to 5.00:1.00, the Borrower and the Restricted Subsidiaries may make Restricted Payments in an aggregate amount equal to the sum of the amounts available under clauses (a), (b) and (f) of the definition of "Available Amount" and (ii) so long as no Event of Default shall have occurred and be continuing or would result therefrom, any Parent Entity, the Borrower and the Restricted Subsidiaries may make Restricted Payments in an aggregate amount not to exceed the Available Amount (excluding amounts available under clauses (a), (b) and (f) of the definition thereof);

(o)    with respect to any taxable period during which the Borrower or any of its Subsidiaries is a member of a consolidated, unitary, combined or similar tax group in which the Borrower (or any direct or indirect parent of the Borrower) is the common parent, the Borrower (or another Restricted Subsidiary of the Borrower) may directly (or indirectly through the Borrower) make payment to Holdings in order for Holdings (or any direct or indirect parent of Holdings) to pay the portion of its consolidated, unitary, combined or similar U.S. federal, state and local and non-U.S. income taxes attributable to the income of the Borrower and any of its Subsidiaries in an amount not to exceed the income tax liabilities that would have been payable by the Borrower and its Subsidiaries on a stand-alone basis, reduced by any such income taxes paid or to be paid directly by the Borrower or its Subsidiaries; provided that the amount of any such payments, dividends or distributions attributable to any income of an Unrestricted Subsidiary shall be limited to the cash distributions made by such Unrestricted Subsidiary to the Borrower or its Restricted Subsidiaries for such purpose;

(p)    the Borrower or any Restricted Subsidiary may make Restricted Payments with the Capital Stock of, and/or the proceeds of the sale of Capital Stock of, an Unrestricted Subsidiary or proceeds of a dividend or distribution from an Unrestricted Subsidiary;

(q)    [reserved];

(r)    [reserved]; and

(s)    when, on a Pro Forma Basis after giving effect thereto the Consolidated Leverage Ratio shall have been less than or equal to 3.50:1.0, so long as no Event of Default shall have occurred and be continuing or would result therefrom, the Borrower or the Restricted Subsidiaries may make Restricted Payments to Holdings to permit Holdings to pay in cash dividends to the holders of preferred stock issued by Holdings and any additional preferred stock issued by Holdings on substantially the same terms as any preferred stock outstanding on the Closing Date.

93

7.7     [**Reserved**].

7.8     **Investments**.  Make any Investment, except in the case of Borrower and any of its Restricted Subsidiaries (other than any Insurance Subsidiary unless otherwise expressly included in this Section 7.8 or permitted by Section 7.16):

(a)     accounts receivable and other extensions of trade credit by the Borrower and its Subsidiaries in the ordinary course of business and advances made to physicians in the ordinary course of business;

(b)     Investments in Cash Equivalents;

(c)     Guarantee Obligations permitted by Section 7.2;

(d)     intercompany Investments by (i) any Group Member (x) in the Borrower or any Person that, prior to such investment, is a Subsidiary Guarantor or (y) in any Excluded Subsidiary (other than an Unrestricted Subsidiary) and (ii) by any Restricted Subsidiary that is not a Guarantor in any other Restricted Subsidiary that is not a Guarantor; provided, however, that any such Investments in any Insurance Subsidiary must be made in compliance with clause (u) below and the aggregate amount of Investments made pursuant to subclause (y) shall not exceed the greater of (a) $50,000,000 and (b) 4.50% of Total Assets as of the Applicable Date of Determination;

(e)     existing Investments as listed on Schedule 7.8(g);

(f)     Capital Expenditures;

(g)     Permitted Acquisitions;

(h)     the formation of and Investments in new Restricted Subsidiaries of the Borrower that are Subsidiary Guarantors, provided that (i) such Restricted Subsidiary is owned by the Borrower or a Subsidiary Guarantor and (ii) after the date of the formation or acquisition of any such Restricted Subsidiary and the Investment therein, and after giving effect thereto, such new Restricted Subsidiary and its parent shall have entered into any and all agreements (in form and substance reasonably satisfactory to the Administrative Agent) necessary to comply with Section 6.9;

(i)     the Borrower and its Restricted Subsidiaries may receive and own Capital Stock or other investments acquired as non-cash consideration pursuant to dispositions permitted under Section 7.5;

(j)     the Borrower and its Restricted Subsidiaries may make pledges and deposits permitted under Section 7.3;

(k)     the Borrower and its Restricted Subsidiaries may make Investments and guarantees expressly permitted under Sections 7.2, 7.4, 7.5 (other than 7.5(u)) and 7.6;

(l)     [reserved];

94

(m) the Borrower and its Restricted Subsidiaries may hold Investments to the extent such Investments reflect an increase in the value of Investments and would otherwise exceed the limitations herein;

(n) Investments consisting of endorsements for collection or deposit in the ordinary course of business;

(o) Investments in deposit accounts opened and maintained in the ordinary course of business;

(p) the Borrower may acquire and hold promissory notes of employees of Holdings or its Restricted Subsidiaries in connection with such Person's purchase of Permitted Capital Stock of Holdings;

(q) Investments received in connection with any bankruptcy or reorganization of, or any good faith settlement of delinquent accounts and disputes with, any customer or supplier arising in the ordinary course of business;

(r) the Borrower may enter into Swap Agreements that are not speculative in nature to the extent permitted hereunder;

(s) any Investments consisting of deferred compensation owed to employees of Holdings, the Borrower and their respective Restricted Subsidiaries;

(t) Investments and formations by the Borrower and the Restricted Subsidiaries in and of Joint Ventures or Restricted Subsidiaries (other than Insurance Subsidiaries) that are not Guarantors, which does not exceed the greater of (x) $50,000,000 and (y) 4.50% of Total Assets as of the Applicable Date of Determination; provided that any Joint Ventures referred to in this clause (t) are with bona fide third parties;

(u) Investments by the Borrower or any Wholly-Owned Subsidiary in any Insurance Subsidiary (including in respect of the formation thereof) solely to the extent permitted by Section 7.17(b);

(v) Investments consisting of loans and advances to directors and employees of any Group Member (including for travel, entertainment and relocation expenses) in the ordinary course of business;

(w) Investments in 50% or less of the equity interest of other Persons ("Minority Investments") held by a Restricted Subsidiary acquired pursuant to a Permitted Acquisition, which Minority Investments existed at the time of such Permitted Acquisition and were not made in contemplation of or in connection with such Permitted Acquisition;

(x) Investments made in connection with the funding of contributions under any non-qualified retirement plan or similar employee compensation plan in an amount not to exceed the amount of compensation expense recognized by the Borrower and its Restricted Subsidiaries in connection with such plans;

(y)    Investments that do not exceed, in the aggregate, the greater of (A) $50,000,000 and (B) 4.50% of Total Assets as of the Applicable Date of Determination;

(z)    Investments made with Permitted Capital Stock;

(aa)   [Reserved];

(bb)   [Reserved];

(cc)   Investments in an amount not to exceed the Available Amount;

(dd)   guarantees made by the Borrower or any Restricted Subsidiary of Holdings in respect of any obligation or activity of Holdings (to the extent the obligations or activities of Holdings are related to the Borrower or any of its Restricted Subsidiaries), the Borrower or any other Restricted Subsidiary of Holdings to the extent the underlying obligation is permitted hereunder;

(ee)   Investments consisting of loans and advances to directors and employees of any Group Member (including for travel, entertainment and relocation expenses) not exceeding $2,000,000 in the aggregate at any time outstanding;

(ff)   Investments held by a Restricted Subsidiary acquired pursuant to a Permitted Acquisition, which Investments existed at the time of such Permitted Acquisition and were not made in contemplation of or in connection with such Permitted Acquisition;

(gg)   Investments made in connection with the funding of contributions under any non-qualified retirement plan or similar employee compensation plan in an amount not to exceed the amount of compensation expense recognized by the Borrower and its Restricted Subsidiaries in connection with such plans;

(hh)   (i) deposits in the ordinary course of business consistent with past practices to secure the performance of operating leases and payment of utility contracts and (ii) good faith deposits required in connection with Permitted Acquisitions and other Investments permitted under this Section 7.8;

(ii)   Investments in Joint Ventures or Unrestricted Subsidiaries having an aggregate fair market value (measured on the date each such Investment was made and without giving effect to subsequent changes in value), when taken together with all other Investments made pursuant to this clause (ii) since the Closing Date, not to exceed the greater of (a) $15,000,000 and (b) 1.25% of Total Assets as of the Applicable Date of Determination (but, to the extent that any Investment made pursuant to this clause (ii) since the Closing Date is sold or otherwise liquidated for cash or designated as a Restricted Subsidiary, plus all Returns (other than Returns that have otherwise increased the Available Amount) with respect to such Investment (less the cost of disposition, if any) or the fair market value of such Unrestricted Subsidiary at the time of redesignation (as applicable)); provided that any Joint Ventures referred to in this clause (ii) are with bona fide third parties

(jj)    following the consummation of a Permitted Acquisition of Capital Stock of a Person that, immediately thereafter, is not wholly owned, Investments consisting of the purchase of additional Capital Stock of such Persons; and

(kk)    additional Investments made solely with the Net Cash Proceeds of any capital contributions or other equity issuances of Permitted Capital Stock (other than any proceeds of any Cure Amount or any other capital contribution or equity issuances to the extent utilized in connection with other transactions permitted hereunder on or prior to the date of such Investment) made or received by the Borrower.

The amount of any Investment shall be the initial amount of such Investment and any addition thereto, as reduced by any repayment of principal (in the case of an Investment constituting Indebtedness) or any distribution constituting a return of capital (in the case of any other Investment).

7.9    **Optional Prepayments and Modifications of Certain Debt Instruments**. (a) Make any optional or voluntary payment, prepayment, repurchase or redemption of or otherwise optionally or voluntarily Defease or segregate funds with respect to any Indebtedness in excess of $50,000,000 that is contractually subordinated in right of payment to the Obligations (it being understood that Indebtedness shall not be deemed to be subordinated in right of payment merely because such Indebtedness is secured by a Lien that is senior to the Lien securing the Obligations), or any Permitted Refinancing incurred in respect of any of the foregoing; provided that (i) the Borrower may pay, prepay, repurchase or redeem any of the foregoing Indebtedness, (A) pursuant to a refinancing thereof with Permitted Refinancings (to the extent permitted by Section 7.2), (B) with the Available Amount, (C) to the extent that the consideration therefor consists of Permitted Capital Stock (or proceeds thereof) of Holdings or Capital Stock of any direct or indirect prepayment or parent of Holdings (other than any proceeds of any Cure Amount or any other capital contribution or equity issuances to the extent utilized in connection with other transactions permitted hereunder on or prior to the date of such payment, prepayment, repurchase, redemption, Defeasance or segregation) or (D) in whole or in part, in lieu of Restricted Payments permitted under Section 7.6(p) and (ii) the foregoing shall not be construed to prohibit the Refinancing or the conversion of any such Indebtedness into Permitted Capital Stock; (b) amend, modify, waive or otherwise change, or consent or agree to any material amendment, modification, waiver or other change to, any of the terms of any Indebtedness described in clause (a) above that is materially adverse to the interests of the Lenders (determined by comparison to such terms in effect on the Closing Date or otherwise to such terms in effect on the date of creation thereof and disregarding any default or potential default in respect thereof) except (x) in accordance with the terms of the applicable intercreditor or subordination terms or agreement or (y) as permitted pursuant to or reasonably necessary to effect a Permitted Refinancing thereof; or (c) designate any Indebtedness (other than the Obligations) as "Designated Senior Indebtedness" (or any other defined term having a similar purpose) for the purposes of any Indebtedness described in clause (a) above that is subordinated to the Obligations; or

(b)    make any cash interest payment on the PIK Toggle Notes at any time that (i) the Consolidated First Lien Leverage Ratio exceeds 3.25:1.00 or (ii) the aggregate domestic

unrestricted cash and Cash Equivalents of the Borrower and its Restricted Subsidiaries[5] is less than $50,000,000.

7.10   **Transactions with Affiliates**.  Enter into any transaction, including any purchase, sale, lease or exchange of property, the rendering of any service or the payment of any management, advisory or similar fees with a fair market value in excess of $5,000,000 with any Affiliate (other than Holdings, the Borrower or any Subsidiary Guarantor) unless such transaction is (a) otherwise permitted under this Agreement and (b) upon fair and reasonable terms no less favorable to the relevant Group Member than it would obtain in a comparable arm's length transaction with a Person that is not an Affiliate.  Notwithstanding the foregoing,

(a)   the Borrower and its Restricted Subsidiaries may pay customary fees to, and the out-of-pocket expenses of, its board of directors, employees and officers and may provide customary corporate indemnities for the benefit of members of its board of directors, employees and officers,

(b)   the payment of Closing Costs;

(c)   Restricted Payments permitted under Section 7.6;

(d)   transactions pursuant to permitted agreements in existence on the Closing Date and set forth on Schedule 7.10 as such agreements may be amended, modified, supplemented, extended, renewed or refinanced from time to time to the extent not more disadvantageous to the Lenders in any material respect (taken as a whole);

(e)   loans or advances to employees, officers and directors permitted under Section 7.8;

(f)   payroll, travel and similar advances to cover matters permitted under Section 7.8;

(g)   the payment of reasonable fees and reimbursement of out-of-pocket expenses to directors of Public Company, Holdings, Borrower or any Restricted Subsidiary;

(h)   compensation (including bonuses) and employee benefit arrangements paid to, indemnities provided for the benefit of, and employment and severance arrangements entered into with, directors, officers, managers, consultants or employees of Public Company, Holdings, Borrower or the Subsidiaries in the ordinary course of business, including in connection with the Transactions and any other transaction permitted hereunder;

(i)   any issuances of securities or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment agreements, stock options and stock ownership plans;

(j)   [reserved];

---

[5] NTD:  Inclusion of cash and Cash Equivalents of Medical Developers Cooperatief, U.A., 21st Century Oncology Holdings, B.V. and Medical Developers Holdings, B.V. in this calculation remains under consideration.

(k)     [reserved];

(l)     transactions between and among the Borrower and its Subsidiaries which are in the ordinary course of business and transactions between the Borrower, Holdings and its direct or indirect shareholders in the ordinary course of business with respect to the Capital Stock in Holdings or any direct or indirect parent of Holdings, such as shareholder agreements, registration agreements and including providing expense reimbursement and indemnities in respect thereof;

(m)     the Transactions;

(n)     the existence and performance of agreements and transactions with any Unrestricted Subsidiary that were entered into prior to the designation of a Restricted Subsidiary as such Unrestricted Subsidiary to the extent that the transaction was permitted at the time that it was entered into with such Restricted Subsidiary and transactions entered into by an Unrestricted Subsidiary with an Affiliate prior to the redesignation of any such Unrestricted Subsidiary as a Restricted Subsidiary;

(o)     Affiliate repurchases of the Loans or Commitments to the extent permitted hereunder and the holding of such Loans or Commitments and the payments and other transactions contemplated herein in respect thereof;

(p)     payments to or from, and transactions with, Restricted Subsidiaries and Joint Ventures (to the extent any such Joint Venture is only an Affiliate as a result of Investments by the Borrower and the Restricted Subsidiaries in such Joint Venture) in the ordinary course of business;

(q)     loans and other transactions by and among Holdings, Public Company, Borrower and its Restricted Subsidiaries to the extent not prohibited Section 7.2;

(r)     transactions by Borrower and its Restricted Subsidiaries with customers, clients, Joint Venture partners, suppliers or purchasers or sellers of goods or services, in each case in the ordinary course of business and otherwise in compliance with the terms of this Agreement that are fair to Borrower and the Restricted Subsidiaries, as determined in good faith by the board of directors or the senior management of the relevant Person, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party;

(s)     any transaction between or among the Borrower or any Restricted Subsidiary and any Affiliate of the Borrower or a Joint Venture or similar entity that would constitute an Affiliate transaction solely because the Borrower or a Restricted Subsidiary owns an equity interest in or otherwise controls such Affiliate, Joint Venture or similar entity; and

(t)     transactions in which the Borrower or any Restricted Subsidiary, as the case may be, delivers to the Administrative Agent a letter from an independent financial advisor stating that such transaction is fair to the Borrower or such Restricted Subsidiary from a financial point of view or meets the requirements of this Section 7.10.

99

7.11    **Sales and Leasebacks**.  Enter into any arrangement with any Person providing for the leasing by any Group Member of any property or containing an obligation of such Group Member to repurchase such property from such Person, which property has been or is to be sold or transferred by such Group Member to such Person (or any Affiliate thereof) or to any other Person (or any Affiliate thereof) to whom funds have been or are to be advanced by such Person (or any Affiliate thereof) on the security of such property or rental obligations of such Group Member (any such transaction a "Sale Leaseback Transaction") except any Sale Leaseback Transaction (a) in respect of property consisting of capital assets so sold pursuant to such Sale Leaseback Transaction solely for cash consideration in an amount not less than the cost thereof within one hundred and eighty (180) days after the date that such property was initially acquired by a Group Member or (b) in respect of any other property consisting of capital assets so sold pursuant to such Sale Leaseback Transaction for market value and solely for cash consideration and in respect of which the Borrower shall comply with Section 2.11(b).

7.12    **Changes in Fiscal Periods**.  Permit the fiscal year of Holdings or the Borrower to end on a day other than December 31st or change the Borrower's or Holdings' method of determining fiscal quarters; provided, however, that the Borrower may, upon written notice to the Administrative Agent, change its fiscal year to any other fiscal year reasonably acceptable to the Administrative Agent, provided that as a condition to any such change the Borrower and the Administrative Agent shall, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary or appropriate to reflect such change in fiscal year.

7.13    **Negative Pledge Clauses**.  Enter into or suffer to exist or become effective any agreement that prohibits or limits the ability of any Group Member to create, incur, assume or suffer to exist any Lien upon any of its property or revenues, whether now owned or hereafter acquired, to secure its obligations under the Loan Documents to which it is a party other than (a) this Agreement and the other Loan Documents, the 21C Term Loan Agreement, the PIK Toggle Notes Indenture or documents evidencing Indebtedness incurred under Section 7.2, and any Permitted Refinancing in respect of any such Indebtedness, (b) agreements which (i) are binding on a Restricted Subsidiary at the time such Restricted Subsidiary first becomes a Restricted Subsidiary, so long as such agreements were not entered into in contemplation of such Person becoming a Restricted Subsidiary, (ii) are customary provisions in joint venture agreements and other similar agreements applicable to joint ventures permitted under Section 7.8 and applicable solely to such joint venture entered into in the ordinary course of business, (iii) are customary restrictions on leases, subleases, licenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate to the assets subject thereto, (iv) are customary provisions restricting subletting or assignment of any lease governing a leasehold interest of the Borrower or any Restricted Subsidiary, (v) are customary provisions restricting assignment of any agreement entered into in the ordinary course of business, and (vi) are restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business and (c) restrictions applicable only to Foreign Subsidiaries that are not Loan Parties.

7.14    **Clauses Restricting Subsidiary Distributions**.  Enter into or suffer to exist or become effective any consensual encumbrance or restriction on the ability of any Restricted Subsidiary of the Borrower to make Restricted Payments in respect of any Capital Stock of such Restricted Subsidiary held by, or pay any Indebtedness owed to, the Borrower or any other Restricted Subsidiary of the Borrower, except for (x) agreements which (i) are binding on a

100

Restricted Subsidiary at the time such Restricted Subsidiary first becomes a Restricted Subsidiary, so long as such agreements were not entered into in contemplation of such Person becoming a Restricted Subsidiary, (ii) are customary provisions in joint venture agreements and other similar agreements applicable to joint ventures permitted under Section 7.8 and applicable solely to such joint venture entered into in the ordinary course of business, (iii) are customary restrictions on leases, subleases, licenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate to the assets subject thereto, (iv) are customary provisions restricting subletting or assignment of any lease governing a leasehold interest of the Borrower or any Restricted Subsidiary, (v) are customary provisions restricting assignment of any agreement entered into in the ordinary course of business, and (vi) are restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business), (y) such encumbrances or restrictions existing under or by reason of (i) any restrictions existing under the Loan Documents, the 21C Term Loan Agreement, the PIK Toggle Notes Indenture or documents evidencing Indebtedness incurred under Section 7.2, and any Permitted Refinancing in respect of any such Indebtedness or (ii) any restrictions with respect to a Subsidiary imposed pursuant to an agreement that has been entered into in connection with the Disposition of all or substantially all of the Capital Stock or assets of such Subsidiary and (z) restrictions applicable only to Foreign Subsidiaries.

7.15   **Lines of Business**.   Enter into any business, either directly or through any Restricted Subsidiary, except for those businesses in which the Borrower and its Restricted Subsidiaries are engaged on the date of this Agreement or that are reasonably related, supportive, synergetic, complementary or ancillary thereto, it being understood and acknowledged that any Insurance Subsidiary shall be the only entity conducting insurance business (and business reasonably related thereto) and that any Insurance Subsidiary shall be engaged for the underwriting of insurance policies for Holdings, the Borrower and its Restricted Subsidiaries and each of such Person's respective employees, officers or directors.

7.16   **Insurance Subsidiary Investments**.   Permit any Insurance Subsidiary to make any Investment in any Person except:

(a)   Investments in Cash Equivalents;

(b)   Investments in deposit accounts opened and maintained in the ordinary course of business;

(c)   Investments in accounts receivable in the ordinary course of business; and

(d)   Investments in notes or bonds (including interest only notes or bonds) in an aggregate amount (for all Insurance Subsidiaries combined) up to the greater of (x) $10,000,000 and (y) 1.00% of Total Assets as of the Applicable Date of Determination that are rated at least BBB-by S&P or Baa3 by Moody's at the time of purchase; provided that an aggregate amount up to $6,000,000 of such Investments shall have a rating of at least A by S&P or A2 by Moody's at the time of purchase.

7.17   **Insurance Subsidiary**.   (a) Permit any Insurance Subsidiary to enter into any (or renew, extend or materially modify any existing) reinsurance or stop-loss insurance

101

arrangements except in the ordinary course of business with reinsurers rated as least "A-" by A.M. Best & Co. or reinsurers whose obligations to the Insurance Subsidiary are secured by letters of credit or other collateral reasonably acceptable to the board of directors of such Insurance Subsidiary or (b) permit any Investment in any Insurance Subsidiary, except for Investments in an aggregate amount (for all Insurance Subsidiaries combined) not in excess of the greater of (x) $25,000,000 and (y) 2.25% of Total Assets as of the Applicable Date of Determination; provided that such amount may be increased by non-material amounts in the discretion and with the approval of the Administrative Agent (for the avoidance of doubt, such investments shall exclude any expenses and premiums paid to any Insurance Subsidiary by any Group Member in the ordinary course of such Group Member's business).

7.18   **OFAC; Sanctions**.  The Borrower will not use the proceeds of the Loans or otherwise make available such proceeds to any Person, for the purpose of financing the activities of any Person, or in any country, that is the subject of any U.S. sanctions administered by OFAC Sanctions, except to the extent licensed or otherwise approved or exempted by OFAC, or in any other manner that would result in a violation of Sanctions by the Borrower or any Restricted Subsidiary.

## SECTION 8

## EVENTS OF DEFAULT

If any of the following events shall occur and be continuing:

(a)   the Borrower shall fail to pay (i) any principal of any Loan when due in accordance with the terms hereof or (ii) any interest on any Loan within five (5) Business Days of the due date thereof or (iii) any other amount payable hereunder or under any other Loan Document, within twenty (20) days after such other amount becomes due in accordance with the terms hereof; or

(b)   any representation or warranty made or deemed made by any Loan Party herein or in any other Loan Document or that is contained in any certificate, document or financial statement furnished by it at any time under or in connection with this Agreement or any such other Loan Document shall prove to have been inaccurate in any materially adverse respect on or as of the date made or deemed made, and in the case of any misrepresentation capable of being cured, such default shall continue unremedied for a period of thirty (30) days after notice to the Borrower from the Administrative Agent or the Required Lenders; or

(c)   any Loan Party shall default in the observance or performance of any agreement contained in clause (i) of Section 6.4(a) (with respect to the Borrower only in its jurisdiction of incorporation), Section 6.7(a) (provided that the delivery of a notice of Default or Event of Default at any time will cure an Event of Default under Section 6.7(a) arising from the failure of the Borrower to timely deliver such notice of Default or Event of Default; provided that in the case of such a Default, the delivery of such notice of Default at any time prior to the Default that is the subject of such notice becoming an Event of Default (and, when determining whether such Default has become an Event of Default, the notice by Administrative Agent of such Default shall be deemed given on the day such Default first arose) shall cure the Event of Default

102

resulting from the failure to timely deliver such notice) or Section 7 of this Agreement; provided, further, that an Event of Default under Section 7.1(a) is subject to the Cure Right set forth in Section 8; or

(d)      any Loan Party shall default in the observance or performance of any other agreement contained in this Agreement or any other Loan Document (other than as provided in paragraphs (a) through (c) of this Section 8), and such default shall continue unremedied for a period of thirty (30) days after notice to the Borrower from the Administrative Agent or the Required Lenders; or

(e)      any Group Member shall (i) default in making any payment of any principal of any Indebtedness (including any Guarantee Obligation, but excluding the Obligations) on the scheduled or original due date with respect thereto, or (ii) default in making any payment of any interest on any such Indebtedness (excluding the Obligations), in each case of clauses (i) and (ii), beyond the period of grace and giving of notice, if any, provided in the instrument or agreement under which such Indebtedness was created and such default has not been waived or (iii) default in the observance or performance of any other agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or beneficiary of such Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) to cause, beyond all applicable grace periods and with the giving of notice if required, such Indebtedness to become due prior to its stated maturity or (in the case of any such Indebtedness constituting a Guarantee Obligation) to become payable and such default has not been waived; provided that a default, event or condition described in clause (i), (ii) or (iii) of this paragraph (e) shall not at any time constitute an Event of Default unless, at such time, one or more defaults, events or conditions of the type described in clauses (i), (ii) and (iii) of this paragraph (e) shall have occurred and be continuing with respect to Indebtedness the outstanding principal amount of which exceeds in the aggregate the greater of (x) $50,000,000 and (y) 4.50% of Total Assets as of the Applicable Date of Determination; provided, further, that this paragraph (e) shall not apply to any breach or default of Indebtedness (x) that is remedied by the Borrower or the applicable Restricted Subsidiary or (y) that is waived (including in the form of amendment) by the requisite holders of the applicable item of Indebtedness, in either case, prior to the acceleration of all the Loans pursuant to this Section 8, and such remedy shall cause any default arising hereunder to cease to exists; provided that this clause (e) shall not apply to intercompany Indebtedness or Indebtedness that is incurred on a non-recourse basis; or

(f)      (i) any Group Member shall commence any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or any Group Member shall make a general assignment for the benefit of its creditors; or (ii) there shall be commenced against any Group Member any case, proceeding or other action of a nature referred to in clause (i) above that (A) results in the entry of an order for relief or any such adjudication or

103

appointment or (B) remains undismissed or undischarged for a period of sixty (60) days; or (iii) there shall be commenced against any Group Member any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets that results in the entry of an order for any such relief that shall not have been vacated, discharged, or stayed or bonded pending appeal within sixty (60) days from the entry thereof; or (iv) any Group Member shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii), or (iii) above; or

(g)     (i) any Person shall engage in any non-exempt "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any ERISA Plan, (ii) a failure to satisfy the minimum funding standard (within the meaning of Section 302 of ERISA or Section 412 of the Code), whether or not waived, or any Lien in favor of the PBGC or an ERISA Plan shall arise on the assets of the Borrower or any Commonly Controlled Entity, (iii) a Reportable Event shall occur with respect to, or proceedings shall commence to have a trustee appointed, or a trustee shall be appointed, to administer or to terminate, any Single Employer Plan, which Reportable Event or commencement of proceedings or appointment of a trustee is, in the reasonable opinion of the Required Lenders, likely to result in the termination of such Plan for purposes of Title IV of ERISA, (iv) any Single Employer Plan shall terminate for purposes of Title IV of ERISA or the receipt by any Loan Party or any Commonly Controlled Entity from the PBGC of any notice relating to an intention to terminate any Single Employer Plan or appoint a trustee to administer any Single Employer, (v) the Borrower or any Commonly Controlled Entity shall incur any liability in connection with a withdrawal from, or the Insolvency of, any Multiemployer Plan, (vi) the filing of an application for a waiver of the minimum funding standard with respect to any Single Employer Plan, (vii) failure by any Loan Party or any Commonly Controlled Entity to make any required contribution to a Multiemployer Plan, (viii) a determination that any Single Employer Plan is, or is expected to be, in "at risk" status (within the meaning of Section 430 of the Code), (ix) the imposition of liability on any Loan Party or any Commonly Controlled Entity pursuant to Section 4062 or 4069 of ERISA, (x) receipt from the Internal Revenue Service of notice of the failure of any ERISA Plan to qualify under Section 4019a) of the Code or the failure of any trust forming part of any ERISA Plan intended to be qualified under Section 401(a) of the Code to qualify for exemption from taxation under Section 501(a) of the Code or (xi) any other similar event or condition shall occur or exist with respect to an ERISA Plan.  With respect to any Foreign Plan, (i) the failure to make or, if applicable, accrue in accordance with normal accounting practices, any employer or employee contributions required by applicable law or by the terms of such Foreign Plan; (ii) the failure to register or loss of good standing with applicable regulatory authorities of any such Foreign Plan required to be registered; or (iii) the failure of any Foreign Plan to comply with any material provisions of applicable law and regulations or with the material terms of such Foreign Plan; or

(h)     one or more judgments or decrees shall be entered against any Group Member or any Group Member shall be subject to any fines by any Governmental Authorities or shall agree to any settlements of legal claims involving in the aggregate a liability (not paid or covered by insurance as to which the relevant insurance company has not denied coverage) of the greater of (x) $50,000,000 and (y) 4.50% of Total Assets as of the Applicable Date of Determination or more, and all such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within forty-five (45) days from the entry thereof; or

104

(i)      any of the Security Documents shall cease, for any reason, to be in full force and effect (except in accordance with its terms), or any Loan Party or any Affiliate of any Loan Party shall so assert, or any Lien created by any of the Security Documents shall cease to be enforceable and of the same effect and priority purported to be created thereby (except in accordance with its terms); or

(j)      the guarantee contained in Section 2 of the Guarantee and Security Agreement shall cease, for any reason, to be in full force and effect or any Loan Party or any Affiliate of any Loan Party shall so assert (except in accordance with its terms); or

(k)      a Change of Control shall occur; or

(l)      any Insurance Subsidiary shall become subject to any conservation, rehabilitation, liquidation order, directive or mandate issued by any Governmental Authority which could reasonably be expected to have a Material Adverse Effect;

then, and in any such event, other than (x) prior to the expiration of the ability to effectuate the Cure Right, if such Cure Right has not been so exercised, an event described in paragraph (c) of this Section 8 in respect of a default of performance or compliance with the covenant under Section 7.1(a) or (y) an event with respect to the Borrower described in clause (i) or (ii) of paragraph (f) of this Section 8; provided that in the case of clause (x), the actions hereinafter described will be permitted to occur upon and following the expiration of the ability to effectuate the Cure Right if such Cure Right has not been so exercised, (A) if such event is an Event of Default specified in clause (y) above with respect to the Borrower, automatically the Commitments shall immediately terminate and the Loans (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents shall immediately become due and payable, and (B) if such event is any other Event of Default (other than as described in clause (x) (prior to the expiration of the ability to effectuate the Cure Right, if such Cure Right has not been so exercised) or clause (y) above), either or both of the following actions may be taken:  (i) with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, by notice to the Borrower declare the Commitments to be terminated forthwith, whereupon the Commitments shall immediately terminate; and (ii) with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, by notice to the Borrower, declare the Loans (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents to be due and payable forthwith, whereupon the same shall immediately become due and payable.  Except as expressly provided above in this Section, presentment, demand, protest and all other notices of any kind are hereby expressly waived by the Borrower.

Solely for the purposes of determining whether a Default or an Event of Default has occurred under paragraphs (e), (f) or (h) of this Section 8, any reference in any such paragraph to any Restricted Subsidiary shall be deemed not to include any such Restricted Subsidiaries affected by any event or circumstance referred to in such paragraph that did not, in the aggregate when taken together with any other similarly situated Restricted Subsidiaries, as of the last day of the fiscal quarter of the Borrower most recently ended, have aggregate assets with a value equal to or greater than 7.5% of Total Assets of the Borrower and its Restricted Subsidiaries as

105

of such date, based on the consolidated balance sheet of the Borrower and its Restricted Subsidiaries as of such date.

Notwithstanding anything to the contrary contained in Section 8, in the event that the Borrower fails to comply with the requirements of the covenant under Section 7.1(a) at the end of any fiscal quarter, until the expiration of the fifteenth (15th) Business Day subsequent to the date that the Compliance Certificate is required to be delivered pursuant to Section 6.2(b), in respect of the period ending on the last day of such quarter (such date of required delivery, the "Required Delivery Date"), any net cash proceeds of any common equity contribution made, directly or indirectly to the Borrower, or any net cash proceeds of any issuance of Permitted Capital Stock of the Borrower, in each case following the Closing Date and/or following the end of such fiscal quarter and on or prior to such fifteenth (15th) Business Day and from a Person other than the Borrower or a Subsidiary of the Borrower, in each case in an aggregate amount equal to the amount necessary to cure the relevant failure to comply with such covenant may, at the election of the Borrower be included in the calculation of Consolidated EBITDA for purposes of determining compliance with such covenant (the "Cure Right"), and upon the earlier of (x) the delivery by the Borrower of written notice to the Administrative Agent that it intends to exercise the Cure Right hereunder (it being understood that to the extent such notice is provided in advance of delivery of a Compliance Certificate for the applicable period, the amount of such net cash proceeds that are received as the Cure Amount may be lower than specified in such notice to the extent that the amount necessary to cure any Event of Default under Section 7.1(a) is less than the full amount of any originally designated amount) and (y) receipt by the Borrower of such cash proceeds (the "Cure Amount"), such covenant shall be recalculated giving effect to the following *pro forma* statements:

(i)    solely for the purpose of determining the existence of an Event of Default under Section 7.1(a), Consolidated EBITDA for the fiscal quarter of the Borrower for which such certificate is required to be delivered shall be increased by an amount equal to the Cure Amount, and such increase shall be effective for all periods that include the fiscal quarter of the Borrower for which such Cure Right was exercised and not for any other purpose under this Agreement; and

(ii)    if, after giving effect to the foregoing recalculations (but not giving effect to any payment of Indebtedness made with such Cure Amount (when calculating compliance with Section 7.1(a) at the end of such (but no other) fiscal quarter), the Borrower shall then be in compliance with the requirements of the covenant under Section 7.1(a) at the end of such fiscal quarter, the Borrower shall be deemed to have satisfied the requirements of the covenant under Section 7.1(a) as of the last day of such fiscal quarter with the same effect as though there had been no failure to comply therewith at such date, and the applicable breach or Default or Event of Default of the covenant under Section 7.1(a) that had occurred shall be deemed cured for this purpose under this Agreement and the other Loan Documents) if the Borrower has delivered written notice pursuant to clause (x) above; provided that if the Cure Amount is not received by the Borrower prior to such fifteenth (15th) Business Day, such Default or Event of Default shall be deemed reinstated and Consolidated EBITDA shall not be so increased as set forth in the immediately preceding clause (i) above.

106

Notwithstanding anything herein to the contrary, (i) in each four-fiscal-quarter period of the Borrower there shall be at least two (2) fiscal quarters in which the Cure Right is not exercised, (ii) the Cure Right shall not be exercised more than five (5) times during the term of this Agreement, (iii) the Cure Amount shall not exceed the amount required to cause the Borrower to be in compliance with the covenant under Section 7.1(a) and (iv) neither the Administrative Agent nor any Lender or Secured Party shall exercise any remedy under the Loan Documents or applicable law on the basis of an Event of Default caused by the failure to comply with Section 7.1(a) until after the Borrower's ability to cure has lapsed and Borrower has not exercised the Cure Right.  Notwithstanding any other provision in this Agreement to the contrary, the Cure Amount received pursuant to any exercise of the Cure Right shall be disregarded for all other purposes.

## SECTION 9

## THE ADMINISTRATIVE AGENT

9.1     **Appointment and Authority**.  Each of the Lenders hereby irrevocably appoints Wilmington Savings Fund Society, FSB to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are expressly delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  The provisions of this Section 9.1 are solely for the benefit of the Administrative Agent and the Lenders, and neither Borrower nor any other Loan Party shall have rights as a third party beneficiary of any of such provisions.

9.2     **Rights as a Lender**.  Each person serving as the Administrative Agent from time to time hereunder shall have the same rights and powers in its capacity as a Lender (if the Administrative Agent is acting as a Lender) as any other Lender and may exercise the same as though it were not the Administrative Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include each person serving as the Administrative Agent hereunder in its individual capacity.  Such person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with Borrower or any Subsidiary or other Affiliate thereof as if such person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

9.3     **Exculpatory Provisions**.  The Administrative Agent shall have no duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, the Administrative Agent:

(a)     shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)     shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or

107

percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); provided that the Administrative Agent shall not be required to take any action that, in its judgment or the judgment of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable Requirements of Law; and

(c)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to Borrower or any of its Affiliates that is communicated to or obtained by the person serving as the Administrative Agent or any of its Affiliates in any capacity.

The Administrative Agent shall not be liable for any action taken or not taken by it (x) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Section 10.2), including as a result of exercising its Permitted Business Judgment in the manner described in the proviso to such definition or (y) in the absence of its own gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable judgment).    The Administrative Agent shall not be deemed to have knowledge of any Default unless and until notice describing such Default is given to the Administrative Agent by Borrower or a Lender.

The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or the existence, value or sufficiency of the Collateral or the validity of perfection or priority of any Lien created or purported to be created by the Loan Documents or (v) the satisfaction of any condition set forth in Section 5 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.    Without limiting the generality of the foregoing, the use of the term "agent" in this Agreement with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead, such term is used merely as a matter of market custom and is intended to create or reflect only an administrative relationship between independent contracting parties.    For the avoidance of doubt, the Administrative Agent shall not be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any time or times or otherwise perfecting or maintaining the perfection of any security interest in the Collateral.

9.4    **Reliance by Administrative Agent**.   The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have

108

been signed, sent or otherwise authenticated by the proper person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender in writing prior to the making of such Loan. The Administrative Agent may consult with legal counsel (who may be counsel for Borrower or the Lenders or its own counsel), independent accountants and other experts selected by it, and shall be entitled to rely upon the advice of any such counsel, accountants or experts and shall not be liable for any action taken or not taken by it in accordance with such advice.

9.5   **Delegation of Duties**. The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through, or delegate any and all such rights and powers to, any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this Section 9 shall apply to any such subagent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

9.6   **Resignation of Administrative Agent**.

(a)   The Administrative Agent may at any time give notice of its resignation to the Lenders and Borrower. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, with the Borrower's consent, to appoint a successor, which shall be a bank or other financial institution with an office in the United States, or an Affiliate of any such bank or other financial institution with an office in the United States. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent meeting the qualifications set forth above provided that if the Administrative Agent shall notify Borrower and the Lenders that no qualifying person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Loan Documents, the retiring Administrative Agent shall continue to hold such collateral security as nominee until such time as a successor Administrative Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Administrative Agent as provided for above in this paragraph. Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent, and the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged

109

therefrom as provided above in this paragraph).  The fees payable by Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between Borrower and such successor.  After the retiring Administrative Agent's resignation hereunder and under the other Loan Documents, the provisions of this Section 9 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent.

(b)    [Reserved].

9.7    **Non-Reliance on Administrative Agent and Other Lenders**.  Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender further represents and warrants that it has had the opportunity to review each document made available to it in connection with this Agreement and has acknowledged and accepted the terms and conditions applicable to the recipients thereof.  Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

9.8    **Withholding Tax**.    To the extent required by any applicable law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding tax, in which case the Administrative Agent shall act in accordance with the first sentence of Section 2.19(d) as if it were a Loan Party, with any relevant receipts being delivered to the applicable Lender(s).  Without limiting or expanding the provisions of Section 2.18, 2.19 or 2.20, each Lender shall, and does hereby, indemnify the Administrative Agent against, and shall make payable in respect thereof within thirty (30) days after demand therefor, any and all taxes, interest, additions to tax and penalties and any and all related losses, claims, liabilities and expenses (including fees, charges and disbursements of any counsel for the Administrative Agent) incurred by or asserted against the Administrative Agent by the Internal Revenue Service or any other Governmental Authority as a result of the failure of the Administrative Agent to properly withhold tax from amounts paid to or for the account of any Lender for any reason (including, without limitation, because the appropriate form was not delivered or not property executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of, withholding tax ineffective). A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this Section 9.8.  The agreements in this Section 9.8 shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.  For the avoidance of doubt, the term "Lender" shall, for purposes of this Section 9.8, include each Conduit Lender.

110

9.9   **No Fiduciary Duties, Etc**.

(a)      In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each Loan Party acknowledges and agrees that (i) (A) the arranging and other services regarding this Agreement, if any, provided by the Administrative Agent and the Lenders are arm's-length commercial transactions between the Loan Parties and their respective Affiliates, on the one hand, and the Administrative Agent and the Lenders, on the other hand, (B) each Loan Party has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) each Loan Party is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) each of the Administrative Agent and the Lenders is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not and will not be acting as an advisor, agent or fiduciary for the Borrower, any of its Affiliates or any other Person and (B) none of the Lenders nor the Administrative Agent has any obligation to the Loan Parties or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Administrative Agent and the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower and its Affiliates, and none of the Lenders nor the Administrative Agent has any obligation to disclose any of such interests to the Borrower or any of its Affiliates.

(b)      [Reserved].

9.10   **Enforcement**.  Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent, or as the Required Lenders may require or otherwise direct, for the benefit of all the Lenders; provided, however, that the foregoing shall not prohibit (a) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) hereunder and under the other Loan Documents, (b) [reserved], (c) any Lender from exercising setoff rights in accordance with, and subject to, the terms of this Agreement, or (d) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any bankruptcy or insolvency law.

9.11   **Collateral and Guaranty Matters**.  Each of the Lenders (on behalf of itself, its Affiliates and Related Parties (including as counterparty to any Specified Swap Agreement or an obligor of Cash Management Obligations) irrevocably authorize the Administrative Agent, at its option and in its discretion:

(a)      to release any Lien on any property granted to or held by the Administrative Agent under any Loan Document (i) upon the payment in full of all Loan Obligations (other than contingent obligations not then due and payable), termination or expiration of the Commitments of the Lenders to make any Loan, (ii) that is sold or transferred or to be sold or transferred as part of or in connection with any sale permitted

111

hereunder to a Person that is not a Loan Party, (iii) that constitutes Excluded Property, (iv) if the property subject to such a Lien is owned by a Guarantor upon release of such Guarantor from its obligation under the Loan Documents, (v) if the real property subject to such Lien is located in an area that has been identified by the Secretary of Housing and Urban Development as a "Special Flood Hazard Area" or other area having special flood hazards (whether as a result of a change in the mapping of Special Flood Hazard Areas or otherwise) and in which flood insurance has been made available under the National Flood Insurance Act of 1968, (vi) if approved, authorized or ratified in writing in accordance with Section 10.2 or (vii) as contemplated by the Intercreditor Agreement;

(b)      to release any Subsidiary Guarantor from its Obligations (including any Guarantee Obligations) (i) if such Person ceases to be a Restricted Subsidiary (including upon the designation of a Subsidiary as an Unrestricted Subsidiary) or becomes and Excluded Subsidiary, in each case, as a result of a transaction permitted hereunder or (ii) if such release is required pursuant to the Intercreditor Agreement; and

(c)      to subordinate any Lien on any property (including the Collateral) granted to or held by the Administrative Agent under any Loan Document to the Liens on such property securing any other Lien on such property that is permitted to be senior hereunder, whether such subordination is effected pursuant to the Intercreditor Agreement or otherwise and to enter into customary intercreditor agreements (in form and substance reasonably satisfactory to the Administrative Agent) in connection with the incurrence of any such Lien permitted to be senior hereunder to effectuate such subordination and other customary terms.

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in and Liens on particular types or items of property (including the Collateral), or to release any Guarantor from its obligations under this Agreement and other Loan Documents pursuant to this Section 9.11.  In each case as specified in this Section 9.11, the Administrative Agent will, at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of property or Collateral from the assignment and security interest and Lien granted under the Security Documents, or to subordinate its interest in and Lien on such item, or to release such Guarantor from its obligations under the Loan Documents, in each case in accordance with the terms of the Loan Documents and this Section 9.11.

9.12   **Indemnity; Damage Waiver**.

(a)      Reserved.

(b)      Reimbursement by Lenders.  To the extent that Borrower for any reason fails to indefeasibly pay any amount required under Section 10.5 to be paid by it to the Administrative Agent (or any sub-agent thereof) or any Related Party of the Administrative Agent, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent) or such Related Party, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount (such

112

indemnity shall be effective whether or not the related losses, claims, damages, liabilities and related expenses are incurred or asserted by any party hereto or any third party); provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent) or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent) in connection with such capacity.  The obligations of the Lenders under this paragraph (b) are subject to the provisions of Section 2.17.  For purposes hereof, a Lender's "pro rata share" shall be determined on any date based upon its share of the sum of the outstanding Loans on such date.

(c)    Waiver of Consequential Damages, Etc.  To the fullest extent permitted by applicable Requirements of Law, no party hereto shall assert, and each party hereto hereby waives, any claim against any Indemnitee (as defined below), on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.  No Indemnitee referred to in paragraph (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

(d)    Payments.  All amounts due under this Section 9.12 shall be payable not later than three (3) Business Days after demand therefor.

(e)    Specified Swap Agreements and Cash Management Obligations.  No Lender (or any Affiliate of such Lender) that is a counterparty to any Specified Swap Agreement or in respect of any Cash Management Obligation that obtains the benefits of the Guarantee and Security Agreement or any Collateral by virtue of the provisions hereof or of the Security Agreement or any Security Document shall have any right to notice of any action or to consent to, direct or object to any action hereunder or under any other Loan Document or otherwise in respect of the Collateral (including the release or impairment of any Collateral) other than in its capacity as a Lender and, in such case, only to the extent expressly provided in the Loan Documents.  Notwithstanding any other provision of this Section 9 to the contrary, the Administrative Agent shall not be required to verify the payment of, or that other satisfactory arrangements have been made with respect to Specified Swap Obligations or Cash Management Obligations unless the Administrative Agent has received written notice of such Specified Swap Obligations, together with such supporting documentation as the Administrative Agent may request from the applicable Lender.

## SECTION 10

## MISCELLANEOUS

10.1    **Amendments and Waivers**.  Except as otherwise specifically provided herein, neither this Agreement nor any other Loan Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this Section

10.1.  The Required Lenders and each Loan Party party to the relevant Loan Document may, or, with the written consent of the Required Lenders, the Administrative Agent and each Loan Party party to the relevant Loan Document may, from time to time, (a) enter into written amendments, supplements or modifications hereto and to the other Loan Documents for the purpose of adding any provisions to this Agreement or the other Loan Documents or changing in any manner the rights of the Lenders or of the Loan Parties hereunder or thereunder or (b) waive, on such terms and conditions as the Required Lenders or the Administrative Agent, as the case may be, may specify in such instrument, any of the requirements of this Agreement or the other Loan Documents or any Default or Event of Default and its consequences; provided, however, that no such waiver and no such amendment, supplement or modification shall (i) except as provided for hereunder with respect to Refinancing Amendments, Section 2.10 or Section 2.24, forgive the principal amount or extend the final scheduled date of maturity of any Loan, reduce the stated rate of any interest or fee payable hereunder (except (x) in connection with the waiver of applicability of any post-default increase in interest rates (which waiver shall be effective with the consent of the Required Lenders) and (y) that any amendment or modification of defined terms used in the financial covenants in this Agreement shall not constitute a reduction in the rate of interest or fees for purposes of this clause (i)) or extend the scheduled date of any payment thereof, in each case without the written consent of each Lender (it being understood that waivers or modifications of conditions precedent, covenants, Defaults or Events of Default or of any mandatory reductions of Commitments shall not constitute an increase of Commitment of any Lender and that an increase in the available portion of any Commitment of any Lender shall not constitute an increase in the Commitment of any Lender) directly and adversely affected thereby; (ii) eliminate or reduce the voting rights of any Lender under this Section 10.1 without the written consent of such Lender; (iii) reduce any percentage specified in the definition of Required Lenders without the written consent of all Lenders (it being understood that, other than as specifically provided in this Agreement, with the consent of the Required Lenders, additional extensions of credit pursuant to this Agreement may be included in the determination of the Required Lenders on substantially the same basis as the Loans on the Closing Date), (iv) consent to the assignment or transfer by the Borrower of any of its rights and obligations under this Agreement and the other Loan Documents, release all or substantially all of the Collateral or release all or substantially all of the Loan Parties (or Loan Parties owning all or substantially all of the Collateral) from their obligations under the Guarantee and Security Agreement (except as permitted hereunder or in accordance with its terms), in each case without the written consent of all Lenders (it being understood that any subordination of a Lien permitted hereunder shall not constitute a release of a Lien under this section and the granting of any *pari passu* Liens in connection with the incurrence of debt or the granting of Liens otherwise permitted hereunder from time to time (including pursuant to amendments) shall not constitute a release of Liens); (v) alter any provision regarding the pro rata treatment of the Lenders in a manner that would result in the Lenders receiving less than their respective pro rata payments without the consent of all of the Lenders or (vi) notwithstanding the first paragraph of this Section 10.1, amend, modify or waive any provision of Section 9 (or any other provision of any Loan Document affecting the rights and obligations of the Administrative Agent) without the written consent of the Administrative Agent.  Any such waiver and any such amendment, supplement or modification shall apply equally to each of the Lenders and shall be binding upon the Loan Parties, the Lenders, the Administrative Agent and all future holders of the Loans.  In the case of any waiver, the Loan Parties, the Lenders and the Administrative Agent shall be restored to their former

114

position and rights hereunder and under the other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon. Notwithstanding the foregoing, no Lender consent is required to effect any amendment, modification or supplement to any intercreditor agreement or arrangement permitted under this Agreement or in any document pertaining to any Indebtedness permitted hereby that is permitted to be secured by the Collateral for the purpose of adding the holders of such Indebtedness (or their Representative) as a party thereto and otherwise causing such Indebtedness to be subject thereto, in each case, as contemplated by the terms of the Intercreditor Agreement.

Notwithstanding the foregoing, this Agreement may be amended (or amended and restated) with the written consent of the then Required Lenders, the Administrative Agent and the Borrower (a) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents with the extensions of credit under the Facility and the accrued interest and fees in respect thereof and (b) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders.

10.2   **Notices**.   All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered, or three (3) Business Days after being deposited in the mail, postage prepaid, or, in the case of telecopy notice, when received, addressed as follows in the case of the Borrower and the Administrative Agent, and as set forth in an administrative questionnaire delivered to the Administrative Agent in the case of the Lenders, or to such other address as may be hereafter notified by the respective parties hereto:

| | |
|---|---|
| the Borrower: | 21ST CENTURY ONCOLOGY, INC.<br>2270 Colonial Boulevard<br>Fort Myers, FL 33907<br>Attention:   [Kim Commins-Tzoumakas]<br>Telecopy:   [(239) 931-7380]<br>Telephone:   [  ]<br>E-mail: [  ] |
| with a copy to: | KIRKLAND & ELLIS LLP<br>300 North LaSalle Street<br>Chicago, IL 60654<br>Attn:   Christopher Butler, P.C.<br>Telecopy:   (312) 862-2200<br>Telephone:   (312) 862-2000<br>E-mail: [  ] |
| Administrative Agent: | WILMINGTON SAVINGS FUND SOCIETY, FSB<br>500 Delaware Avenue, 11th Floor |

115

Wilmington, DE 19801
Attn:   Geoffrey Lewis
Telecopy:   (302) 421-9137
Telephone:  [  ]
E-mail:       adminagent@wsfsbank.com

with a copy to:                PRYOR CASHMAN LLP
7 Times Square
New York, NY 10036-6569
Attn:   Seth H. Lieberman, Esq. and Eric M. Hellige
Telecopy:   (212) 798-6917
Telephone:   [   ]
E-mail:  slieberman@pryorcashman.com and
ehellige@pryorcashman.com

provided that any notice, request or demand to or upon the Administrative Agent or the Lenders shall not be effective until received.

Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices pursuant to Section 2 unless otherwise agreed by the Administrative Agent and the applicable Lender.  The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

10.3    **No Waiver; Cumulative Remedies**.  The Lenders and the Administrative Agent shall have other rights and remedies not inconsistent herewith as provided under the Uniform Commercial Code, by law, or in equity.  No failure to exercise and no delay in exercising, on the part of the Administrative Agent or any Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

10.4    **Survival of Representations and Warranties**.   All representations and warranties made hereunder, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loans and other extensions of credit hereunder.

10.5    **Payment of Expenses**.   The Borrower agrees (a) to pay or reimburse the Administrative Agent for all its reasonable and documented (with supporting documentation) out-of-pocket costs and expenses (including, but not limited to, due diligence expenses, syndication expenses and travel expenses) incurred in connection with the development, preparation and execution of, and any amendment, supplement or modification to, this Agreement and the other Loan Documents and any other documents prepared in connection

116

herewith or therewith, and the consummation and administration of the transactions contemplated hereby and thereby, including the reasonable and documented fees and disbursements of one counsel to the Administrative Agent (and, to the extent necessary, one local counsel to the Administrative Agent in any applicable jurisdiction as to which the Administrative Agent reasonably determines local counsel is necessary) and such other counsel and any other advisor or consultant to the Administrative Agent as is retained solely with the Borrower's consent, and filing and recording fees and expenses, with statements with respect to the foregoing to be submitted to the Borrower prior to the Closing Date (in the case of amounts to be paid on the Closing Date) and from time to time thereafter on a quarterly basis or such other periodic basis as the Administrative Agent and Borrower shall deem appropriate, (b) to pay or reimburse the Administrative Agent for all its reasonable and documented out-of-pocket costs and expenses incurred in connection with the enforcement of any rights under this Agreement, the other Loan Documents and any such other documents, limited, in the case of legal fees, to the reasonable and documented fees and disbursements of one counsel to all Lenders and the Agents in the aggregate and one local counsel in each applicable jurisdiction, (c) to pay, indemnify, and hold the Administrative Agent harmless from, any and all recording and filing fees that may be payable or determined to be payable in connection with the execution and delivery of, or consummation or administration of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Agreement, the other Loan Documents and any such other documents, and (d) to pay, indemnify, and hold (i) each Lender and each Agent and (ii) each of the foregoing's respective partners, trustees, shareholders, officers, directors, employees, agents and controlling persons (each, an "Indemnitee") harmless from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Agreement, the other Loan Documents and any such other documents, including any of the foregoing relating to the use of proceeds of the Loans or the violation of, noncompliance with or liability under, any Environmental Law applicable to the operations of any Group Member or any of the Properties and the reasonable fees and expenses of one legal counsel for the Agents and all Lenders (and one local counsel to such Lenders in any applicable jurisdiction as to which the Lenders reasonably determine is necessary and one regulatory counsel to such Lenders and Agents) in connection with claims, actions or proceedings by any Indemnitee against any Loan Party under any Loan Document (all the foregoing in this clause (d), collectively, the "Indemnified Liabilities"), provided that the Borrower shall have no obligation hereunder to any Indemnitee with respect to Indemnified Liabilities to the extent such Indemnified Liabilities are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Indemnitee (or any of such Indemnitee's Affiliates, partners, trustees, shareholders, officers, directors, employees, agents, controlling persons or their respective officers, directors, employees or agents), to the extent such Indemnitee has settled any claim without the consent of the Borrower (which is not to be unreasonably withheld or delayed) or disputes between Lenders not arising from any act or omission of the Borrower or any of its Affiliates (other than with respect to a dispute with a Lender in its capacity as Administrative Agent).  Without limiting the foregoing, and to the extent permitted by applicable law, the Borrower agrees not to assert and to cause its Subsidiaries not to assert, and hereby waives and agrees to cause its Subsidiaries to waive, all rights for contribution or any other rights of recovery with respect to all claims, demands,

117

penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind or nature, under or related to Environmental Laws, that any of them might have by statute or otherwise against any Indemnitee, except to the extent such claims, demands, penalties, fines, liabilities, settlements, damages, costs, and expenses of whatever kind or nature, under or related to Environmental Laws, are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from (i) the gross negligence or willful misconduct of such Indemnitee (or any of such Indemnitee's Affiliates or their respective officers, directors, employees or agents), as determined by a court of competent jurisdiction in a final and nonappealable decision, (ii) to the extent such Indemnitee has settled any claim without the consent of the Borrower (which is not to be unreasonably withheld or delayed) or (iii) disputes solely between Indemnitees (other than with respect to a dispute with an Indemnitee in its capacity as Administrative Agent) that do not arise out of any act or omission of the Borrower or any of its Subsidiaries.  In the case of any investigation, litigation or other proceeding to which the indemnity in clause (d) of this Section applies, such indemnity shall be effective whether or not such investigation, litigation or other proceeding is brought by a third party or any Group Member or an Indemnitee, and whether or not an Indemnitee is otherwise a party thereto.  All amounts due under this Section 10.5 shall be payable not later than thirty (30) days after written demand therefor.  Statements payable by the Borrower pursuant to this Section 10.5 shall be submitted to the address of the Borrower set forth in Section 10.2, or to such other Person or address as may be hereafter designated by the Borrower in a written notice to the Administrative Agent.  The agreements in this Section 10.5 shall survive termination of this Agreement, the Commitments and repayment of the Loans and all other amounts payable hereunder.  This Section 10.5 shall not apply with respect to Taxes other than Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

10.6   **Successors and Assigns; Participations and Assignments**.

(a)   The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section.

(b)   (i) Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more assignees (each, an "Assignee") all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans at the time owing to it) with the prior written consent of:

(A)   the Borrower (such consent not to be unreasonably withheld or delayed), provided that no consent of the Borrower shall be required for an assignment to a Lender, an Affiliate of a Lender, an Approved Fund (as defined below) or, if an Event of Default under Section 8(a) or 8(f) has occurred and is continuing, any other Person; and

(B)   [reserved].

(ii)   Assignments shall be subject to the following additional conditions:

118

(A)     except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's interests, the amount of the Commitments or Loans, as applicable, of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000 unless each of the Borrower and the Administrative Agent otherwise consent, <u>provided</u> that no such consent of the Borrower shall be required if an Event of Default under <u>Section 8(a)</u> or <u>8(f)</u> has occurred and is continuing;

(B)     except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, the Administrative Agent shall consent to such assignment (such consent not to be unreasonably withheld, delayed or conditioned);

(C)     each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement, <u>provided</u> that this clause shall not be construed to prohibit the assignment of a proportionate part of all the assigning Lender's rights and obligations in respect of the Facility.   <u>Section 10.6(b)(ii)(B)</u> shall not be construed to prohibit assignment of a proportionate part of all the assigning Lender's rights and obligations in respect of the Facility;

(D)     the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500;

(E)     the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an administrative questionnaire in which the Assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Borrower, the Loan Parties and their Related Parties or their respective securities) will be made available and who may receive such information in accordance with the Assignee's compliance procedures and applicable laws, including Federal and state securities laws; and

(F)     No assignment shall be made to (i) a competitor of the Borrower or a Subsidiary of the Borrower separately identified in writing by Borrower or Holdings to the Administrative Agent at any time after the Closing Date and any Affiliate of any such competitor that is either separately identified in writing by Borrower or Holdings to the Administrative Agent or any such Affiliate of any such competitor that is reasonably identifiable as an Affiliate of such competitor on the basis of such Affiliate's name (other than any such Affiliates that are bona fide debt funds that are engaged in making or purchasing commercial loans in the ordinary course of business, except to the extent such Affiliate is otherwise disqualified pursuant to following clause (ii), (iii) or (iv)), (ii) any other Person identified by the Borrower to the Administrative Agent in writing on or prior to the Closing Date, (iii) (x) any Affiliate or (y) any fund that is administered or managed by an Affiliate, in each case, of the Persons described in the preceding <u>clause (ii)</u> that is in each case either separately identified in writing by Borrower or Holdings to the Administrative Agent or that is reasonably identifiable as an Affiliate of such Person

119

or fund administered or managed by such Person (or an Affiliate of such Person) referred to in clause (ii) on the basis of such Affiliate's or fund's name, and (iv) any Excluded Party (each, a "Disqualified Lender"); it being understood and agreed that list referenced in clauses (i) and (ii) above shall be available to the Lenders upon request.

For the purposes of this Section 10.6, "Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

(iii)    Subject to acceptance and recording thereof pursuant to paragraph (b)(iv) below, from and after the effective date specified in each Assignment and Assumption the Assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.18, 2.19, 2.20 and 10.5).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 10.6 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section.

(iv)    The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal and stated interest amount of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by the Borrower or any Lender (but in the case of any Lender (in its capacity as such), as to such Lender's Loans, Commitments, principal and fees owing to such Lender only) at any reasonable time and from time to time upon reasonable prior notice.

(v)    Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an Assignee, the Assignee's completed administrative questionnaire (unless the Assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section and any written consent to such assignment required by paragraph (b) of this Section, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.  Notwithstanding anything to the contrary contained in this Agreement, the

120

Loans are registered obligations and the right, title and interest of the Lenders in and to such Loans shall be transferable only in accordance with the terms hereof.  This Section 10.6(b)(v) shall be construed so that the Loans are at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code.

(c)     (i)  Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations to one or more banks or other entities that are not a Disqualified Lender (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of the Loan Documents; provided that such agreement may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that (1) requires the consent of each Lender directly affected thereby pursuant to the proviso to the second sentence of Section 10.1 and (2) directly affects such Participant.  Subject to paragraph (c)(ii) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.18, 2.19 and 2.20 (subject to the requirements and limitations of such Sections (including Sections 2.19(e), (f) and (h)) and Sections 2.21 and 2.22 as if the Participant were a Lender) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.7(b) as though it were a Lender, provided that such Participant shall be subject to Section 10.7(a) as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register of its Participants in compliance with Section 5f.103-1(c) of the United States Treasury Regulations; provided, however, that no Lender shall have any obligation to disclose all or any portion of such register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in a Participant register shall be conclusive absent manifest error, and the parties shall treat each Person whose name is recorded in the Participant register as the Participant for all purposes of this Agreement, notwithstanding a notice to the contrary.

(ii)     A Participant shall not be entitled to receive any greater payment under Section 2.18 or 2.19 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant except to the extent such entitlement to a greater payment results from a change in any Requirement of Law after the Participant became a Participant.

(d)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender (and any initial or

121

subsequent pledgee or grantee, as the case may be, may in turn at any time and from time to time pledge or grant a security interest in all or any portion of such rights as collateral security to secure obligations of such Person), including any pledge or assignment to secure obligations to a Federal Reserve Bank or other central bank, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or Assignee for such Lender as a party hereto.

(e)     The Borrower, upon receipt of written notice from the relevant Lender, agrees to issue Notes to any Lender requiring Notes to facilitate transactions of the type described in paragraph (d) above.

(f)     Notwithstanding the foregoing, any Conduit Lender may assign any or all of the Loans it may have funded hereunder to its designating Lender without the consent of the Borrower or the Administrative Agent and without regard to the limitations set forth in Section 10.6(b). Each of the Borrower, each Lender and the Administrative Agent hereby confirms that it will not institute against a Conduit Lender or join any other Person in instituting against a Conduit Lender any bankruptcy, reorganization, arrangement, insolvency or liquidation proceeding under any state bankruptcy or similar law, for one year and one (1) day after the payment in full of the latest maturing commercial paper note issued by such Conduit Lender; provided, however, that each Lender designating any Conduit Lender hereby agrees to indemnify, save and hold harmless each other party hereto for any loss, cost, damage or expense arising out of its inability to institute such a proceeding against such Conduit Lender during such period of forbearance.

(g)     (i) Notwithstanding anything else to the contrary contained in this Agreement, any Lender may assign all or a portion of its Loans to any Debt Fund Affiliate, Non-Debt Fund Affiliate or Purchasing Borrower Party; provided that:

(A)     if a Purchasing Borrower Party is an assignee, no Default or Event of Default has occurred or is continuing or would result therefrom;

(B)     the assigning Lender and Non-Debt Fund Affiliate or Purchasing Borrower Party purchasing such Lender's Loans shall execute and deliver to the Administrative Agent an assignment agreement substantially in the form of Exhibit G (an "Affiliated Lender Assignment and Assumption") in lieu of an Assignment and Assumption (which shall include a customary "big boy" disclaimer by all parties thereto);

(C)     [reserved];

(D)     any Loans assigned to any Purchasing Borrower Party shall be automatically and permanently cancelled upon the effectiveness of such assignment and will thereafter no longer be outstanding for any purpose hereunder;

(E)     [reserved]; and

(F)     no Loan may be assigned to a Non-Debt Fund Affiliate pursuant to this Section 10.6(g) if after giving effect to such assignment, Non-Debt Fund Affiliate in the

122

aggregate would own in excess of 25% of the aggregate principal amount of all Loans then outstanding.

(ii)    Notwithstanding anything to the contrary in this Agreement, no Non-Debt Fund Affiliate shall have any right to (i) attend (including by telephone) any meeting or discussions (or portion thereof) among the Administrative Agent or any Lender to which representatives of the Loan Parties are not invited, and (ii) receive any information or material prepared by the Administrative Agent or any Lender or any communication by or among the Administrative Agent and/or one or more Lenders, except to the extent such information or materials have been made available to any Loan Party or its representatives (and in any case, other than the right to receive notices of prepayments and other administrative notices in respect of its Loans required to be delivered to Lenders), or (iii) make or bring (or participate in, other than as a passive participant in or recipient of its pro rata benefits of) any claim, in its capacity as a Lender, against the Administrative Agent or any other Lender with respect to any duties or obligations or alleged duties or obligations of such Agent or any other such Lender under the Loan Documents (other than for payments due).

(iii)    Each Lender participating in any assignment to any Non-Debt Fund Affiliate or Purchasing Borrower Party acknowledges and agrees that in connection with such assignment, (1) any Non-Debt Fund Affiliate or Purchasing Borrower Party then may have, and later may come into possession of information regarding Holdings, the Borrower, their respective Affiliates not known to such Lender and that may be material to a decision by such Lender to participate in such prepayment (including material non-public information), (2) such Lender has independently and, without reliance on any Non-Debt Fund Affiliate or Purchasing Borrower Party or any of their Subsidiaries, the Borrower or any of their Subsidiaries, or the Administrative Agent, has made its own analysis and determination to participate in such assignment notwithstanding such Lender's lack of knowledge of the Excluded Information, (3) none of any Non-Debt Fund Affiliate or Purchasing Borrower Party or any of their Subsidiaries, the Borrower or their respective Subsidiaries, or the Administrative Agent shall have any liability to such Lender, and such Lender hereby waives and releases, to the extent permitted by law, any claims such Lender may have against any Non-Debt Fund Affiliate or Purchasing Borrower Party and any of their Subsidiaries, the Borrower and their respective Subsidiaries, and the Administrative Agent, under applicable laws or otherwise, with respect to the nondisclosure of the Excluded Information and (4) that the Excluded Information may not be available to the Administrative Agent or the other Lenders.

(iv)    Any Non-Debt Fund Affiliate may, with the consent of the Borrower and with written notice to the Administrative Agent, contribute any of its Loans to the Borrower (whether through any of its direct or indirect parent entities or otherwise) and, to the extent agreed with the Borrower, may in return receive (1) loans or Permitted Capital Stock of the Borrower or any parent entity of the Borrower (to the extent not constituting a Change of Control) or (2) an unsecured loan from the Borrower that (v) does not have a cash interest rate in excess of the interest rate applicable to the Loans so contributed by such Non-Debt Fund Affiliate plus 3.0%, (w) is subordinated in right of payment to the Obligations of the Borrower, (x) is not subject to any scheduled

123

amortization, redemption, sinking fund or similar payment and does not have a final maturity, in each case, on or before the date that is 91 days after the Maturity Date, (y) does not include any financial covenants and (z) does not include any covenant, default or other agreement that is more restrictive (taken as a whole) on the Loan Parties in any material respect than any comparable covenant in this Agreement.  Any Loans so contributed pursuant to this subsection shall, without further action by any Person, be deemed cancelled for all purposes and no longer outstanding (and may not be resold by the Borrower), for all purposes of this Agreement and all other Loan Documents, including, but not limited to (A) the making of, or the application of, any payments to the Lenders under this Agreement or any other Loan Document, (B) the making of any request, demand, authorization, direction, notice, consent or waiver under this Agreement or any other Loan Document or (C) the determination of Required Lenders, or for any similar or related purpose, under this Agreement or any other Loan Document.  In connection with any Loans so cancelled pursuant to this subsection, Administrative Agent is authorized to make appropriate entries in the Register to reflect any such cancellation.  Any non-cash gains from the cancellation of such Loans shall not increase Consolidated EBITDA or Excess Cash Flow for any purpose hereunder.  The cancellations contemplated by this subsection shall be deemed to be optional prepayments by the Borrower pursuant to Section 2.10, and the principal amount of any such Loans so cancelled shall be applied on a pro rata basis to reduce the scheduled remaining installments of principal on such Loans (including the installment due on the Maturity Date).

(h)    Notwithstanding anything in Section 10.1 or the definition of "Required Lenders" to the contrary, for purposes of determining whether the "Required Lenders" have (i) consented (or not consented) to any amendment, modification, waiver, consent or other action with respect to any of the terms of any Loan Document or any departure by any Loan Party therefrom, (ii) otherwise acted on any matter related to any Loan Document, or (iii) directed or required the Administrative Agent or any Lender to undertake any action (or refrain from taking any action) with respect to or under any Loan Document:

(i)    all Loans held by any Non-Debt Fund Affiliate shall be deemed to be not outstanding for all purposes of calculating whether the Required Lenders have taken any actions; and

(ii)    all Loans held by Debt Fund Affiliates may not account for more than 49.9% of the aggregate principal amount of the Loans of consenting Lenders then outstanding included in determining whether the "Required Lenders" have consented to any action pursuant to Section 10.1.

Additionally, the Loan Parties and each Non-Debt Fund Affiliate hereby agree that if a case under Title 11 of the United States Code is commenced against any Loan Party, such Loan Party shall seek (and each Non-Debt Fund Affiliate shall consent) to provide that the vote of any Non-Debt Fund Affiliate (in its capacity as a Lender) with respect to any plan of reorganization of such Loan Party shall not be counted except that such Non-Debt Fund Affiliates' vote (in its capacity as a Lender) may be counted to the extent any such plan of reorganization proposed to treat the Obligations held by such Non-Debt Fund Affiliate in a manner that is less favorable in

124

any material respect to such Non-Debt Fund Affiliate than the proposed treatment of similar Obligations held by Lenders that are not Affiliates of the Borrower.  Each Non-Debt Fund Affiliate hereby irrevocably appoints the Administrative Agent (such appointment being coupled with an interest) as such Non-Debt Fund Affiliate's attorney-in-fact, with full authority in the place and stead of such Non-Debt Fund Affiliate and in the name of such Non-Debt Fund Affiliate, from time to time in the Administrative Agent's discretion to take any action and to execute any instrument that the Administrative Agent may deem reasonably necessary to carry out the provisions of this paragraph.

(i)     Notwithstanding anything else to the contrary contained in this Agreement, the Administrative Agent shall not have any responsibility or liability for monitoring the list of or processing assignments to Disqualified Lenders or any Affiliates of the Borrower or compliance with the terms of any of the provisions set forth herein with respect to Disqualified Lenders or Affiliates of the Borrower.  Notwithstanding the foregoing or anything else to the contrary in this Agreement, each of the parties hereto acknowledges and agrees that the Administrative Agent (x) shall not have any responsibility or obligation to determine whether any Lender or any potential assignee Lender is a Disqualified Lender or an Affiliate of the Borrower or (y) shall not have any liability with respect to any assignment or participation made to a Disqualified Lender or an Affiliate of the Borrower.

10.7   **Adjustments; Set-off**.

(a)     If any Lender (a "Benefitted Lender") shall receive any payment of all or part of the Obligations owing to it, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set-off, pursuant to events or proceedings of the nature referred to in Section 8(f), or otherwise), in a greater proportion than any such payment to or collateral received by any other Lender, if any, in respect of the Obligations owing to such other Lender, such Benefitted Lender shall purchase for cash from the other Lenders a participating interest in such portion of the Obligations owing to each such other Lender, or shall provide such other Lenders with the benefits of any such collateral, as shall be necessary to cause such Benefitted Lender to share the excess payment or benefits of such collateral ratably with each of the Lenders; provided, however, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefitted Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest; provided, further, that no amount received from any Loan Party shall be applied to any Excluded Swap Obligation of such Loan Party; provided, further, that the provisions of this paragraph shall not be construed to apply to (v) any payment or prepayment made by or on behalf of the Borrower or any other Loan Party pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender), (w) [reserved], (x) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant or the termination of any Lender's commitment and non-pro rata repayment of Loans pursuant to Section 2.22 or 2.27 or (y) transactions in connection with an open market purchase or a "Dutch auction".  For the avoidance of doubt, this Section shall not limit the ability of the Borrower or any Restricted Subsidiary to purchase and retire Loans pursuant to an open market purchase or a "Dutch auction".

125

(b)     In addition to any rights and remedies of the Lenders provided by law, each Lender shall have the right after the occurrence and during the continuance of an Event of Default, subject to the prior written consent of the Administrative Agent, without prior notice to the Borrower, any such notice being expressly waived by the Borrower to the extent permitted by applicable law, upon any amount becoming due and payable by the Borrower hereunder (whether at the stated maturity, by acceleration or otherwise), to set off and appropriate and apply against such amount then due and payable any and all deposits (general or special, time or demand, provisional or final other than payroll or trust accounts), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any branch or agency thereof to or for the credit or the account of the Borrower, as the case may be; provided that if any Defaulting Lender shall exercise any such right of setoff, (i) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of this Agreement and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders and (ii) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the obligations owing to such Defaulting Lender as to which it exercised such right of set-off.  Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such setoff and application made by such Lender, provided that the failure to give such notice shall not affect the validity of such setoff and application.

10.8    **Counterparts**.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  Delivery of an executed signature page of this Agreement by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.  A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrower and the Administrative Agent.

10.9    **Severability**.   Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

10.10   **Integration**.  This Agreement and the other Loan Documents represent the entire agreement of the Borrower, the Administrative Agent and the Lenders with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Administrative Agent or any Lender relative to the subject matter hereof not expressly set forth or referred to herein or in the other Loan Documents.

10.11   **GOVERNING LAW**.   THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (EXCEPT AS EXPRESSLY SET FORTH TO THE CONTRARY THEREIN), AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

10.12 **Submission to Jurisdiction; Waivers**.   Each of the parties hereto hereby irrevocably and unconditionally:

(a)      submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the general jurisdiction of the courts of the State of New York, the courts of the United States for the Southern District of New York, and appellate courts from any thereof, in each case, located in the Borough of Manhattan;

(b)      consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)      agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to the Borrower, as the case may be at its address set forth in Section 10.2 or at such other address of which the Administrative Agent shall have been notified pursuant thereto;

(d)      agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction; and

(e)      waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section any special, exemplary, punitive or consequential damages; provided that nothing contained in this Section 10.12(e) shall limit the Borrower's indemnity and reimbursement obligations to the extent set forth in Section 10.5.

10.13 **Acknowledgements**.   The Borrower hereby acknowledges that:

(a)      it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b)      neither the Administrative Agent nor any Lender has any fiduciary relationship with or duty to the Borrower arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Administrative Agent and Lenders, on one hand, and the Borrower, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)      no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or among the Borrower and the Lenders.

10.14 **Releases of Guarantees and Liens**.   Notwithstanding anything to the contrary contained herein or in any other Loan Document, the Administrative Agent is hereby irrevocably authorized by each Lender (without requirement of notice to or consent of any Lender except as expressly required by Section 10.1) to take any action requested by the Borrower having the effect of releasing any Collateral or guarantee obligations (i) to the extent necessary to permit

127

consummation of any sale or Disposition of Collateral (to a Person that is not a Loan Party) or other transaction not prohibited by any Loan Document or that has been consented to in accordance with Section 10.1 or (ii) under the circumstances described in Section 9.11.

10.15  **Confidentiality**.  Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority (including any self-regulatory authority), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or the enforcement of rights hereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations thereunder, (g) with the consent of the Borrower or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Administrative Agent or any Lender on a non-confidential basis from a source other than the Borrower; provided, however, that with respect to disclosures pursuant to clauses (b) and (c) of this Section (other than disclosures pursuant to routine regulatory examinations) and clause (e) of this Section (as such clause relates to suits, actions or proceedings in which disclosure is being sought by a third party), unless prohibited by applicable Requirements of Law or court order, each Lender and the Administrative Agent shall (x) notify the Borrower of any request by any Governmental Authority or representative thereof or other Person for disclosure of confidential and non-public information after receipt of such request and (y) if such disclosure of such confidential or non-public information is legally required, furnish only such portion of such information as it is legally compelled to disclose and exercise commercially reasonable efforts to obtain an order or other reliable assurance that confidential treatment will be accorded to the disclosed information.

For the purposes of this Section, "Information" means all information received from the Borrower relating to the Borrower or its business, other than any such information that is available to the Administrative Agent or any Lender on a non-confidential basis prior to disclosure by the Borrower; provided that, in the case of information received from the Borrower after the Closing Date, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

EACH LENDER ACKNOWLEDGES THAT INFORMATION AS DEFINED IN SECTION 10.15 FURNISHED TO IT PURSUANT TO THIS AGREEMENT MAY INCLUDE MATERIAL NON-PUBLIC INFORMATION CONCERNING THE BORROWER AND ITS RELATED PARTIES OR THEIR RESPECTIVE SECURITIES, AND CONFIRMS THAT IT HAS DEVELOPED COMPLIANCE PROCEDURES REGARDING THE USE OF

128

MATERIAL NON-PUBLIC INFORMATION AND THAT IT WILL HANDLE SUCH MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH THOSE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

10.16 **WAIVERS OF JURY TRIAL**.   HOLDINGS, THE BORROWER, THE ADMINISTRATIVE AGENT AND THE LENDERS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.

10.17 **USA PATRIOT ACT**.   Each Lender that is subject to the requirements of the Patriot Act hereby notifies the Borrower and each Guarantor that pursuant to the requirements of the Act, it is required to obtain, verify and record information that identifies the Borrower or such Guarantor, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower and each Guarantor in accordance with the Patriot Act.

10.18 **Intercreditor Agreement Governs**.   Each Lender and Agent (a) hereby agrees that it will be bound by and will take no actions contrary to the provisions of any intercreditor agreement (including the Intercreditor Agreement) entered into pursuant to the terms hereof, (b) hereby authorizes and instructs the Administrative Agent to enter into each intercreditor agreement (including the Intercreditor Agreement) entered into pursuant to the terms hereof and to subject the Liens securing the Secured Obligations to the provisions thereof and (c) hereby authorizes and instructs the Administrative Agent to enter into any intercreditor agreement that includes, or to amend any then existing intercreditor agreement as provided for by the terms of this Agreement; provided that in each case, such intercreditor agreement is substantially consistent with the Intercreditor Agreement together with (A) any immaterial changes and (B) material changes thereto in light of prevailing market conditions, which material changes shall be posted to the Lenders on the Platform not less than five (5) Business Days before execution thereof and, if the Required Lenders shall not have objected to such changes in writing posted to the Platform within five (5) Business Days after posting, then the Required Lenders shall be deemed to have agreed that the Administrative Agent's entry into such intercreditor agreement (with such changes) is reasonable and to have consented to such intercreditor agreement (with such changes) and to the Administrative Agent's execution thereof (it being understood that junior Liens are not required to be pari passu with other junior Liens, and that Indebtedness secured by junior Liens may be secured by Liens that are pari passu with, or junior in priority to, other Liens that are junior to the Liens securing the Secured Obligations).

10.19 **Acknowledgement and Consent to Bail-In of EEA Financial Institutions**.   Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

129

(a)      the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)      the effects of any Bail-in Action on any such liability, including, if applicable:

(i)      a reduction in full or in part or cancellation of any such liability;

(ii)      a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)      the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first written above.

21ST CENTURY ONCOLOGY, INC.,
as Borrower

By:_____
Name:
Title:

21ST      CENTURY      ONCOLOGY
HOLDINGS, INC.,
as Holdings

By:_____
Name:
Title:

WILMINGTON      SAVINGS      FUND
SOCIETY, FSB,
as Administrative Agent

By:_____
Name:
Title:

131

## **Exhibit C**

### **Form of the New Second Lien Notes Indenture**

Certain documents, or portions thereof, contained in this Exhibit C and the Plan Supplement remain subject to continuing negotiations among the Debtors and interested parties with respect thereto. The Debtors reserve all rights, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement, to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court.

21st CENTURY ONCOLOGY, INC.,

THE GUARANTORS PARTY HERETO FROM TIME TO TIME

AND

WILMINGTON SAVINGS FUND SOCIETY, FSB,
as Trustee and Collateral Agent

10.00% / 12.00% Senior Secured PIK Toggle Notes due 2023[1]

INDENTURE

Dated as of [  ], 2017

[Intercreditor Agreement legend to be added]

---

[1]    Maturity date to be 5-1/4 years after the effective date of the Chapter 11 plan of reorganization.

# TABLE OF CONTENTS

**PAGE**

## ARTICLE I

### DEFINITIONS AND INCORPORATION BY REFERENCE

SECTION 1.1.    Definitions ................................................................................................ 1

SECTION 1.2.    Other Definitions ...................................................................................... 41

SECTION 1.3.    [Reserved] ................................................................................................ 43

SECTION 1.4.    Rules of Construction .............................................................................. 43

## ARTICLE II

### THE NOTES

SECTION 2.1.    Form, Dating and Terms .......................................................................... 44

SECTION 2.2.    Execution and Authentication .................................................................. 54

SECTION 2.3.    Registrar and Paying Agent ..................................................................... 55

SECTION 2.4.    Paying Agent to Hold Money in Trust ..................................................... 56

SECTION 2.5.    Holder Lists .............................................................................................. 56

SECTION 2.6.    Transfer and Exchange ............................................................................. 56

SECTION 2.7.    Form of Certificate to be Delivered upon Termination of Restricted
Period ....................................................................................................... 61

SECTION 2.8.    Form of Certificate to be Delivered in Connection with Transfers to
IAIs .......................................................................................................... 62

SECTION 2.9.    Form of Certificate to be Delivered in Connection with Transfers
Pursuant to Regulation S ........................................................................ 64

SECTION 2.10.   Form of Certificate to be Delivered in Connection with Transfers to
AIs ........................................................................................................... 66

SECTION 2.11.   Mutilated, Destroyed, Lost or Stolen Notes ............................................ 67

SECTION 2.12.   Outstanding Notes .................................................................................... 68

SECTION 2.13.   Temporary Notes ...................................................................................... 69

SECTION 2.14.   Cancellation .............................................................................................. 69

SECTION 2.15.   Payment of Interest; Defaulted Interest ................................................... 70

SECTION 2.16.   CUSIP and ISIN Numbers ....................................................................... 71

SECTION 2.17.   Calculations .............................................................................................. 71

ARTICLE III

COVENANTS

SECTION 3.1.   Payment of Notes ................................................................................ 71

SECTION 3.2.   Limitation on Indebtedness ................................................................. 72

SECTION 3.3.   Limitation on Restricted Payments ..................................................... 77

SECTION 3.4.   Limitation on Restrictions on Distributions from Restricted
Subsidiaries ........................................................................................ 84

SECTION 3.5.   Limitation on Sales of Assets and Subsidiary Stock ........................... 86

SECTION 3.6.   Limitation on Liens ............................................................................ 91

SECTION 3.7.   Future Guarantors .............................................................................. 91

SECTION 3.8.   Limitation on Affiliate Transactions ................................................... 92

SECTION 3.9.   Change of Control .............................................................................. 95

SECTION 3.10.   Reports .............................................................................................. 97

SECTION 3.11.   Creation and Perfection of Liens Securing Collateral; Further
Assurances ........................................................................................ 100

SECTION 3.12.   Maintenance of Office or Agency ...................................................... 101

SECTION 3.13.   Corporate Existence .......................................................................... 101

SECTION 3.14.   Payment of Taxes .............................................................................. 101

SECTION 3.15.   Transactions ...................................................................................... 102

SECTION 3.16.   Compliance Certificate ...................................................................... 102

SECTION 3.17.   [Reserved] ......................................................................................... 102

SECTION 3.18.   Conduct of Business .......................................................................... 102

SECTION 3.19.   Statement by Officers as to Default .................................................... 102

SECTION 3.20.   Designation of Restricted and Unrestricted Subsidiaries .................... 102

SECTION 3.21.   Suspension of Certain Covenants on Achievement of Investment
Grade Status ..................................................................................... 103

ARTICLE IV

SUCCESSOR COMPANY; SUCCESSOR PERSON

SECTION 4.1.   Merger and Consolidation ................................................................. 104

ARTICLE V

REDEMPTION OF SECURITIES

SECTION 5.1.   Notices to Trustee .............................................................................. 106

SECTION 5.2.   Selection of Notes to Be Redeemed or Purchased .............................. 106

SECTION 5.3.   Notice of Redemption ........................................................................ 107

SECTION 5.4.    [Reserved] ................................................................................. 108

SECTION 5.5.    Deposit of Redemption or Purchase Price ................................................. 108

SECTION 5.6.    Notes Redeemed or Purchased in Part........................................................ 108

SECTION 5.7.    Optional Redemption ................................................................. 108

SECTION 5.8.    Mandatory Redemption ................................................................. 109

## ARTICLE VI

## DEFAULTS AND REMEDIES

SECTION 6.1.    Events of Default ..................................................... 109

SECTION 6.2.    Acceleration ..................................................... 112

SECTION 6.3.    Other Remedies..................................................... 113

SECTION 6.4.    Waiver of Past Defaults ..................................................... 113

SECTION 6.5.    Control by Majority ..................................................... 113

SECTION 6.6.    Limitation on Suits..................................................... 114

SECTION 6.7.    Rights of Holders to Receive Payment ..................................................... 114

SECTION 6.8.    Collection Suit by Trustee ..................................................... 114

SECTION 6.9.    Trustee May File Proofs of Claim ..................................................... 114

SECTION 6.10.    Priorities..................................................... 115

SECTION 6.11.    Undertaking for Costs..................................................... 115

## ARTICLE VII

## TRUSTEE

SECTION 7.1.    Duties of Trustee..................................................... 115

SECTION 7.2.    Rights of Trustee..................................................... 117

SECTION 7.3.    Individual Rights of Trustee ..................................................... 118

SECTION 7.4.    Trustee's Disclaimer ..................................................... 119

SECTION 7.5.    Notice of Defaults..................................................... 119

SECTION 7.6.    [Reserved] ..................................................... 119

SECTION 7.7.    Compensation and Indemnity ..................................................... 119

SECTION 7.8.    Replacement of Trustee ..................................................... 120

SECTION 7.9.    Successor Trustee by Merger..................................................... 121

SECTION 7.10.    Eligibility; Disqualification ..................................................... 121

SECTION 7.11.    [Reserved] ..................................................... 121

SECTION 7.12.    Trustee's Application for Instruction from the Issuer................................. 121

## ARTICLE VIII

### LEGAL DEFEASANCE AND COVENANT DEFEASANCE

SECTION 8.1.   Option to Effect Legal Defeasance or Covenant Defeasance;
Defeasance .................................................................................................. 122

SECTION 8.2.   Legal Defeasance and Discharge .................................................... 122

SECTION 8.3.   Covenant Defeasance .................................................................... 122

SECTION 8.4.   Conditions to Legal or Covenant Defeasance ............................... 123

SECTION 8.5.   Deposited Money and U.S. Government Obligations to be Held in
Trust; Other Miscellaneous Provisions ...................................... 124

SECTION 8.6.   Repayment to the Issuer ............................................................... 125

SECTION 8.7.   Reinstatement ............................................................................... 125

## ARTICLE IX

### AMENDMENTS

SECTION 9.1.   Without Consent of Holders ......................................................... 125

SECTION 9.2.   With Consent of Holders ............................................................... 127

SECTION 9.3.   Compliance with this Indenture .................................................... 129

SECTION 9.4.   Revocation and Effect of Consents and Waivers .......................... 129

SECTION 9.5.   Notation on or Exchange of Notes ................................................ 129

SECTION 9.6.   Trustee and Collateral Agent to Sign Amendments ..................... 129

## ARTICLE X

### GUARANTEE

SECTION 10.1.   Guarantee ................................................................................... 130

SECTION 10.2.   Limitation on Liability; Termination, Release and Discharge ...... 132

SECTION 10.3.   Right of Contribution .................................................................. 133

SECTION 10.4.   No Subrogation ........................................................................... 133

## ARTICLE XI

### COLLATERAL AND RANKING OF NOTE LIENS

SECTION 11.1.   Security Documents ..................................................................... 133

SECTION 11.2.   Collateral Agent .......................................................................... 134

SECTION 11.3.   Authorization of Actions to Be Taken ......................................... 135

SECTION 11.4.   Release of Collateral ................................................................... 136

SECTION 11.5.   [Reserved.] .................................................................................. 138

SECTION 11.6.   [Reserved.] .................................................................................. 138

SECTION 11.7.    Powers Exercisable by Receiver or Trustee..................................................... 138

SECTION 11.8.    Release Upon Termination of the Issuer's Obligations ............................... 138

SECTION 11.9.    Relative Rights.................................................................................................... 138

ARTICLE XII

SATISFACTION AND DISCHARGE

SECTION 12.1.    Satisfaction and Discharge........................................................................... 140

SECTION 12.2.    Application of Trust Money............................................................................ 141

ARTICLE XIII

MISCELLANEOUS

SECTION 13.1.    Notices .............................................................................................................. 141

SECTION 13.2.    Certificate and Opinion as to Conditions Precedent .................................... 142

SECTION 13.3.    Statements Required in Certificate or Opinion ............................................ 143

SECTION 13.4.    When Notes Disregarded ................................................................................ 143

SECTION 13.5.    Rules by Trustee, Paying Agent and Registrar ............................................ 143

SECTION 13.6.    Legal Holidays ................................................................................................. 143

SECTION 13.7.    Governing Law ................................................................................................. 143

SECTION 13.8.    Jurisdiction....................................................................................................... 144

SECTION 13.9.    Waivers of Jury Trial ...................................................................................... 144

SECTION 13.10.  USA PATRIOT Act........................................................................................... 144

SECTION 13.11.  No Recourse Against Others........................................................................... 144

SECTION 13.12.  Successors ........................................................................................................ 144

SECTION 13.13.  Multiple Originals............................................................................................ 144

SECTION 13.14.  Table of Contents; Headings.......................................................................... 145

SECTION 13.15.  Force Majeure .................................................................................................. 145

SECTION 13.16.  Severability ...................................................................................................... 145


EXHIBIT A      –    FORM OF GLOBAL RESTRICTED NOTE..........................................A-1
EXHIBIT B      –    FORM OF SUPPLEMENTAL INDENTURE TO BE
                              DELIVERED BY GUARANTORS ....................................................... B-1

INDENTURE dated as of [    ], 2017, among 21st CENTURY ONCOLOGY, INC. (the "Issuer"), the Guarantors (as defined herein) and WILMINGTON SAVINGS FUND SOCIETY, FSB, as trustee (in such capacity, together with its successors and assigns, the "Trustee") and as collateral agent (in such capacity, together with its successors and assigns, the "Collateral Agent").

W I T N E S S E T H

WHEREAS, the Issuer has duly authorized the execution and delivery of this Indenture to provide for the issuance of (i) its 10.00% / 12.00% Senior Secured PIK Toggle Notes due 2023 issued on the date hereof (the "Initial Notes") and (ii) any PIK Notes (as defined in Section 1.1) and any additional Notes ("Additional Notes" and, together with the Initial Notes and the PIK Notes, and as further defined in Section 1.1, the "Notes") that may be issued hereunder after the Issue Date.

WHEREAS, the Issuer and each Guarantor has duly authorized the execution and delivery of this Indenture;

WHEREAS, all things necessary (i) to make the Notes, when executed and duly issued by the Issuer and authenticated and delivered hereunder, and all Notes Obligations (as defined herein) the valid obligations of the Issuer, (ii) to make the Note Guarantees (as defined herein) the valid obligations of the Guarantors and (iii) to make this Indenture a valid agreement of the Issuer and the Guarantors have been done; and

NOW, THEREFORE, in consideration of the premises and the purchase of the Notes by the Holders thereof, it is mutually covenanted and agreed, for the equal and proportionate benefit of all Holders, as follows:

ARTICLE I

DEFINITIONS AND INCORPORATION BY REFERENCE

SECTION 1.1.Definitions.

"21C Agent" means Morgan Stanley Senior Funding, Inc., in its capacity as administrative agent and as collateral agent under the 21C Exit Credit Agreement (including any successor appointed in such capacity in accordance with the 21C Exit Credit Agreement).

"21C Exit Credit Agreement" means that certain Credit Agreement, dated as of [    ], 2017 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among the Issuer, as borrower, the Subsidiaries of the Issuer party thereto as guarantors, the Persons party thereto as lenders and the 21C Agent.

"21C Priority Obligations" means (i) all Obligations under the 21C Exit Credit Agreement and (ii) all other Indebtedness Incurred pursuant to Section 3.2 that is secured by Liens on the Collateral that rank *pari passu* with the Liens on the Collateral securing the Obligations under the 21C Exit Credit Agreement; *provided* that an authorized representative of the holders of such Indebtedness shall have executed a joinder to the Intercreditor Agreement.

"21C Term Loan Termination Date" has the meaning set forth in the Intercreditor Agreement.

"ABL Priority Collateral" has the meaning set forth in the Intercreditor Agreement.

"ABL Priority Obligations" means (i) all Obligations under the MDL Exit Credit Agreement, (ii) all Obligations under the 21C Exit Credit Agreement and (iii) all other Indebtedness Incurred pursuant to Section 3.2 that is secured by Liens on the ABL Priority Collateral that rank senior to the Note Liens on the ABL Priority Collateral; *provided* that an authorized representative of the holders of such Indebtedness shall have executed a joinder to the Intercreditor Agreement.

"Acquired Indebtedness" means Indebtedness (1) of a Person or any of its Subsidiaries existing at the time such Person becomes a Restricted Subsidiary, or (2) assumed in connection with the acquisition of assets from such Person, in each case whether or not Incurred by such Person in connection with such Person becoming a Restricted Subsidiary of the Issuer or such acquisition or (3) of a Person at the time such Person merges or amalgamates with or into or consolidates or otherwise combines with the Issuer or any Restricted Subsidiary.  Acquired Indebtedness shall be deemed to have been Incurred, with respect to clause (1) of the preceding sentence, on the date such Person becomes a Restricted Subsidiary and, with respect to clause (2) of the preceding sentence, on the date of consummation of such acquisition of assets and, with respect to clause (3) of the preceding sentence, on the date of the relevant merger, amalgamation, consolidation or other combination.

"Additional Assets" means:

(1)     any property or assets (other than Capital Stock) used or to be used by the Issuer or a Restricted Subsidiary or are otherwise useful in a Similar Business (it being understood that capital expenditures on property or assets already used in a Similar Business or to replace any property or assets that are the subject of such Asset Disposition shall be deemed an investment in Additional Assets);

(2)     the Capital Stock of a Person that is engaged in a Similar Business and becomes a Restricted Subsidiary as a result of the acquisition of such Capital Stock by the Issuer or a Restricted Subsidiary of the Issuer; or

(3)     Capital Stock constituting a minority interest in any Person that at such time is a Restricted Subsidiary of the Issuer.

"Affiliate" of any specified Person means any other Person, directly or indirectly, controlling or controlled by, or under direct or indirect common control with, such specified Person.  For the purposes of this definition, "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"AI" means an "accredited investor" as described in Rule 501(a)(4) under the Securities Act.

"Alternative Currency" means any currency other than Dollars that is a lawful currency that is readily available and freely transferable and convertible into Dollars.

"Asset Disposition" means:

(a)     the sale, conveyance, transfer or other disposition, whether in a single transaction or a series of related transactions, of property or assets (including by way of a Sale and Leaseback Transaction) of the Issuer or any of its Restricted Subsidiaries (in each case other than Capital Stock of the Issuer) (each referred to in this definition as a "disposition"); or

(b)     the issuance or sale of Capital Stock of any Restricted Subsidiary (other than directors' qualifying shares and shares issued to foreign nationals as required under applicable law), whether in a single transaction or a series of related transactions;

in each case, other than:

(1)     a disposition by a Restricted Subsidiary to the Issuer or by the Issuer or a Restricted Subsidiary to a Restricted Subsidiary;

(2)     a disposition of cash, Cash Equivalents or Investment Grade Securities;

(3)     a disposition of inventory or other assets in the ordinary course of business or consistent with past practice (including allowing any registrations or any applications for registrations of any intellectual property rights to lapse or go abandoned in the ordinary course of business or consistent with past practice);

(4)     a disposition of obsolete, surplus or worn out property, equipment or other assets or property, equipment or other assets that are no longer used or useful in the conduct of the business of the Issuer and its Restricted Subsidiaries;

(5)     transactions permitted under Section 4.1 hereof or a transaction that constitutes a Change of Control;

(6)     an issuance of Capital Stock by a Restricted Subsidiary to the Issuer or to another Restricted Subsidiary or as part of or pursuant to an equity incentive or compensation plan approved by the Board of Directors;

(7)     any dispositions of Capital Stock, properties or assets in a single transaction or series of related transactions with a fair market value (as determined in good faith by the Issuer) of less than $7.5 million;

(8)     any Restricted Payment that is permitted to be made, and is made, under Section 3.3 and the making of any Permitted Payment or Permitted Investment or, solely for purposes of Section 3.5(a)(3), asset sales, the proceeds of which are used to make such Restricted Payments or Permitted Investments;

(9)     dispositions in connection with Permitted Liens;

-3-

(10)    dispositions of receivables in connection with the compromise, settlement or collection thereof in the ordinary course of business or consistent with past practice or in bankruptcy or similar proceedings and exclusive of factoring or similar arrangements;

(11)    the licensing or sub-licensing of intellectual property or other general intangibles and licenses, sub-licenses, leases or subleases of other property, in each case, in the ordinary course of business or consistent with past practice;

(12)    foreclosure, condemnation or any similar action with respect to any property or other assets;

(13)    the sale or discount (with or without recourse, and on customary or commercially reasonable terms and for credit management purposes) of accounts receivable or notes receivable arising in the ordinary course of business or consistent with past practice, or the conversion or exchange of accounts receivable for notes receivable;

(14)    any disposition of Capital Stock, Indebtedness or other securities of an Unrestricted Subsidiary;

(15)    any disposition of Capital Stock of a Restricted Subsidiary pursuant to an agreement or other obligation with or to a Person (other than the Issuer or a Restricted Subsidiary) from whom such Restricted Subsidiary was acquired, or from whom such Restricted Subsidiary acquired its business and assets (having been newly formed in connection with such acquisition), made as part of such acquisition and in each case comprising all or a portion of the consideration in respect of such sale or acquisition;

(16)    (i) dispositions of property to the extent that such property is exchanged for credit against the purchase price of similar replacement property that is promptly purchased, (ii) dispositions of property to the extent that the proceeds of such disposition are promptly applied to the purchase price of such replacement property (which replacement property is actually promptly purchased) and (iii) to the extent allowable under Section 1031 of the Code, any exchange of like property (excluding any boot thereon) for use in a Similar Business;

(17)    [reserved];

(18)    any financing transaction with respect to property constructed, acquired, replaced, repaired or improved (including any reconstruction, refurbishment, renovation and/or development of real property) by the Issuer or any Restricted Subsidiary after the Issue Date, including Sale and Leaseback Transactions and asset securitizations, permitted by this Indenture;

(19)    dispositions of Investments in joint ventures or similar entities to the extent required by, or made pursuant to customary buy/sell arrangements between, the parties to such joint venture set forth in joint venture arrangements and similar binding arrangements;

-4-

(20) any surrender or waiver of contract rights or the settlement, release or surrender of contract, litigation, tort or other claims of any kind;

(21) the unwinding of any Hedging Obligations or Cash Management Services pursuant to the terms thereof; and

(22) any swap of assets in exchange for services or other assets in the ordinary course of business of comparable or greater value or usefulness to the business as determined in good faith by the Issuer.

"Associate" means (i) any Person engaged in a Similar Business of which the Issuer or its Restricted Subsidiaries are the legal and beneficial owners of between 20% and 50% of all outstanding Voting Stock and (ii) any joint venture entered into by the Issuer or any Restricted Subsidiary of the Issuer.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York or another court having jurisdiction over the Chapter 11 Cases.

"Bankruptcy Law" means Title 11 of the United States Code or similar federal or state law for the relief of debtors.

"Board of Directors" means (1) with respect to the Issuer or any corporation, the board of directors or managers, as applicable, of the corporation, or any duly authorized committee thereof; (2) with respect to any partnership, the board of directors or other governing body of the general partner of the partnership or any duly authorized committee thereof; and (3) with respect to any other Person, the board or any duly authorized committee of such Person serving a similar function. Whenever any provision requires any action or determination to be made by, or any approval of, a Board of Directors, such action, determination or approval shall be deemed to have been taken or made if approved by a majority of the directors on any such Board of Directors (whether or not such action or approval is taken as part of a formal board meeting or as a formal board approval).

"Board Resolution" means a copy of a resolution certified by the Secretary or an Assistant Secretary of a Person to have been duly adopted by the Board of Directors of such Person and to be in full force and effect on the date of such certification, and delivered to the Trustee.

"Business Day" means each day that is not a Saturday, Sunday or other day on which banking institutions in New York, New York, United States or the jurisdiction of the place of payment are authorized or required by law to close.

"Capital Stock" of any Person means any and all shares of, rights to purchase, warrants, options or depositary receipts for, or other equivalents of or partnership or other interests in (however designated), equity of such Person, including any Preferred Stock, but excluding any debt securities convertible into such equity.

"Capitalized Lease Obligations" means an obligation that is required to be classified and accounted for as a capitalized lease for financial reporting purposes on the basis of GAAP. The

-5-

amount of Indebtedness represented by such obligation will be the capitalized amount of such obligation at the time any determination thereof is to be made as determined on the basis of GAAP, and the Stated Maturity thereof will be the date of the last payment of rent or any other amount due under such lease prior to the first date such lease may be terminated without penalty.

"Cash Equivalents" means:

(1)      (a) United States dollars, Canadian dollars, Euro, or any national currency of any member state of the European Union; or (b) any other foreign currency held by the Issuer and the Restricted Subsidiaries in the ordinary course of business;

(2)      securities issued or directly and fully Guaranteed or insured by the United States or Canadian governments, a member state of the European Union or, in each case, or any agency or instrumentality of the foregoing (provided that the full faith and credit obligation of such country or such member state is pledged in support thereof), having maturities of not more than two years from the date of acquisition;

(3)      certificates of deposit, time deposits, Eurodollar time deposits, overnight bank deposits or bankers' acceptances having maturities of not more than one year from the date of acquisition thereof issued by any lender or by any bank or trust company (a) whose commercial paper is rated at least "A-2" or the equivalent thereof by S&P or at least "P-2" or the equivalent thereof by Moody's (or if at the time neither is issuing comparable ratings, then a comparable rating of another Nationally Recognized Statistical Rating Organization) or (b) (in the event that the bank or trust company does not have commercial paper which is rated) having combined capital and surplus in excess of $100.0 million;

(4)      repurchase obligations for underlying securities of the types described in clauses (2), (3) and (7) entered into with any bank meeting the qualifications specified in clause (3) above;

(5)      securities with maturities of one year or less from the date of acquisition backed by standby letters of credit issued by any Person referenced in clause (3) above;

(6)      commercial paper rated at least (A) "A-1" or higher by S&P or "P-1" or higher by Moody's (or, if at the time, neither is issuing comparable ratings, then a comparable rating of another Nationally Recognized Statistical Rating Organization selected by the Issuer) maturing within two years after the date of creation thereof or (B) "A-2" or higher by S&P or "P-2" or higher by Moody's (or, if at the time, neither is issuing comparable ratings, then a comparable rating of another Nationally Recognized Statistical Rating Organization selected by the Issuer) maturing within one year after the date of creation thereof, or, in each case, if no rating is available in respect of the commercial paper, the issuer of which has an equivalent rating in respect of its long-term debt;

(7)      marketable short-term money market and similar securities having a rating of at least "P-2" or "A-2" from either S&P or Moody's, respectively (or, if at the time, neither is issuing comparable ratings, then a comparable rating of another Nationally

-6-

Recognized Statistical Rating Organization selected by the Issuer) and in each case maturing within 24 months after the date of creation or acquisition thereof;

(8)    readily marketable direct obligations issued by any state, commonwealth or territory of the United States of America or any political subdivision, taxing authority or public instrumentality thereof, in each case, having one of the two highest ratings categories by S&P or Moody's (or, if at the time, neither is issuing comparable ratings, then a comparable rating of another Nationally Recognized Statistical Rating Organization selected by the Issuer) with maturities of not more than two years from the date of acquisition;

(9)    readily marketable direct obligations issued by any foreign government or any political subdivision, taxing authority or public instrumentality thereof, in each case, having one of the two highest ratings categories obtainable by S&P or Moody's (or, if at the time, neither is issuing comparable ratings, then a comparable rating of another Nationally Recognized Statistical Rating Organization selected by the Issuer) with maturities of not more than two years from the date of acquisition;

(10)    Investments with average maturities of 12 months or less from the date of acquisition in money market funds rated within the three highest ratings categories by S&P or Moody's (or, if at the time, neither is issuing comparable ratings, then a comparable rating of another Nationally Recognized Statistical Rating Organization selected by the Issuer);

(11)    with respect to any Foreign Subsidiary:  (i) obligations of the national government of the country in which such Foreign Subsidiary maintains its chief executive office and principal place of business provided such country is a member of the Organization for Economic Cooperation and Development, in each case maturing within one year after the date of investment therein, (ii) certificates of deposit of, bankers' acceptance of, or time deposits with, any commercial bank which is organized and existing under the laws of the country in which such Foreign Subsidiary maintains its chief executive office and principal place of business provided such country is a member of the Organization for Economic Cooperation and Development, and whose short-term commercial paper rating from S&P is at least "A-1" or the equivalent thereof or from Moody's is at least "P-1" or the equivalent thereof (any such bank being an "Approved Foreign Bank"), and in each case with maturities of not more than 270 days from the date of acquisition and (iii) the equivalent of demand deposit accounts which are maintained with an Approved Foreign Bank;

(12)    Indebtedness or Preferred Stock issued by Persons with a rating of "A" or higher from S&P or "A2" or higher from Moody's (or, if at the time, neither is issuing comparable ratings, then a comparable rating of another Nationally Recognized Statistical Rating Organization selected by the Issuer) with maturities of 24 months or less from the date of acquisition;

-7-

(13)    bills of exchange issued in the United States, Canada, a member state of the European Union, or Japan eligible for rediscount at the relevant central bank and accepted by a bank (or any dematerialized equivalent);

(14)    Cash Equivalents or instruments similar to those referred to in clauses (1) through (13) above denominated in Dollars or any Alternative Currency;

(15)    interests in any investment company, money market or enhanced high yield fund or other investment fund which invests 90% or more of its assets in instruments of the types specified in clauses (1) through (14) above; and

(16)    for purposes of clause (2) of the definition of "Asset Disposition," any marketable securities portfolio owned by the Issuer and its Subsidiaries on the Issue Date.

In the case of Investments by any Foreign Subsidiary that is a Restricted Subsidiary or Investments made in a country outside the United States of America, Cash Equivalents shall also include (a) investments of the type and maturity described in clauses (1) through (9) and clauses (11), (12), (13) and (14) above of foreign obligors, which Investments or obligors (or the parents of such obligors) have ratings described in such clauses or equivalent ratings from comparable foreign rating agencies and (b) other short-term investments utilized by Foreign Subsidiaries that are Restricted Subsidiaries in accordance with normal investment practices for cash management in investments analogous to the foregoing investments in clauses (1) through (14) and in this paragraph.  Notwithstanding the foregoing, Cash Equivalents shall include amounts denominated in currencies other than those set forth in clause (1) above, provided that such amounts are converted into any currency listed in clause (1) as promptly as practicable and in any event within 10 Business Days following the receipt of such amounts.  For the avoidance of doubt, any items identified as Cash Equivalents under this definition (other than clause (16) above) will be deemed to be Cash Equivalents for all purposes under this Indenture regardless of the treatment of such items under GAAP.

"Cash Management Services" means any of the following, to the extent not constituting a line of credit (other than an overnight draft facility that is not in default): automated clearing house transfers of funds, treasury, depository, credit or debit card, purchasing card, and/or cash management services, including controlled disbursement services, overdraft facilities, foreign exchange facilities, deposit and other accounts and merchant services.

"Change of Control" means:

(1)    the Issuer becomes aware of (by way of a report or any other filing pursuant to Section 13(d) of the Exchange Act, proxy, vote, written notice or otherwise) any "person" or "group" of related persons (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act as in effect on the Issue Date) is or becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Exchange Act as in effect on the Issue Date), directly or indirectly, of more than 50% of the total voting power of the Voting Stock of the Issuer other than in connection with any transaction or series of transactions in which the Issuer shall become the Wholly Owned Subsidiary of a Parent

-8-

Entity of which no person or group, as noted above, holds more than 50% of the total voting power;

(2)     the sale, lease, transfer, conveyance or other disposition (other than by way of merger, consolidation or other business combination transaction), in one or a series of related transactions, of all or substantially all of the assets of the Issuer and its Restricted Subsidiaries taken as a whole to a Person, other than a Restricted Subsidiary;

(3)     the approval by the holders of the Capital Stock of the Issuer of any plan for the liquidation or dissolution of the Issuer (whether or not otherwise in compliance with the provisions of this Indenture); or

(4)     a "Change of Control" occurs under and as defined in any Exit Credit Agreement or any other agreement governing any Indebtedness outstanding at such time, solely to the extent that the outstanding principal amount of Indebtedness under the applicable Exit Credit Agreement or such other agreement exceeds $30.0 million.

Notwithstanding the foregoing: (A) any holding company, all or substantially all of the assets of which are comprised of the Issuer or any Parent Entity of the Company, shall not itself be considered a "person" or "group" for these purposes; (B) the transfer of assets between or among the Issuer's Restricted Subsidiaries and the Issuer shall not itself constitute a Change of Control; (C) the term "Change of Control" shall not include a merger or consolidation of the Issuer with or the sale, assignment, conveyance, transfer or other disposition of all or substantially all of the Issuer's assets to, an Affiliate incorporated or organized solely for the purpose of reincorporating or reorganizing the Issuer in another jurisdiction and/or for the sole purpose of forming or collapsing a holding company structure; (D) a "person" or "group" shall not be deemed to have beneficial ownership of securities subject to a stock or asset purchase agreement, merger agreement or similar agreement (or voting or option or similar agreement related thereto) until the consummation of the transactions contemplated by such agreement; and (E) the Transactions and any transactions related thereto shall not constitute a Change of Control.

"Chapter 11 Cases" means [the jointly administered proceedings commenced by 21st Century Oncology Holdings, Inc. and certain affiliated debtors under Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 in the Bankruptcy Court, titled "In re: 21st Century Oncology Holdings, Inc., et. al.", Case No. 17-22770 (RDD), as may be amended or supplemented from time to time.]

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Collateral" means, collectively, the assets and property (and rights and interests in such assets and property), now owned or hereafter acquired, by any Grantor subject to, or intended or required to be subject to, the Liens created by the Collateral Documents; provided, that neither "Collateral" nor any defined term used in the Collateral Documents shall include any Excluded Property so long as such assets and property (or rights and interests therein) continue to be Excluded Property.

"Collateral Documents" means, collectively, the Security Agreement, the Mortgages, the Intercreditor Agreement, each other intercreditor agreement, all collateral trust agreements,

-9-

pledges, financing statements, patent, trademark or copyright filings, mortgages or other filings, agreements or documents that create (or purport to create), evidence or relate to a Lien in any property or assets in favor of the Collateral Agent (for the benefit of the Trustee and the Holders), as they may be amended, modified, supplemented, restated, amended and restated, extended or replaced from time to time, and any instruments of assignment, control agreements, lockbox letters or other instruments or agreements executed pursuant to the foregoing.

"Consolidated EBITDA" means [_____].[2]

"Consolidated First Lien Leverage Ratio" means, as at any date of determination, the ratio of (a) Consolidated Total Indebtedness that is secured by any Liens on the Collateral that rank senior to the Note Liens on such Collateral as of such date to (b) Consolidated EBITDA for the most recently completed four fiscal quarters of the Issuer and its Restricted Subsidiaries for which internal consolidated financial statements of the Issuer are available, in each case, with such *pro forma* adjustments as are consistent with the *pro forma* adjustments set forth in the definition of "Fixed Charge Coverage Ratio" and as determined in good faith by the Issuer.

"Consolidated Interest Expense" means, with respect to any Person for any period, total cash interest expense (including that attributable to Capitalized Lease Obligations), net of cash interest income, of such Person for such period with respect to all outstanding Indebtedness of the Issuer and its Restricted Subsidiaries (including all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing and net costs under Hedging Obligations in respect of interest rates to the extent such net costs are allocable to such period in accordance with GAAP); provided, however, that (a) Consolidated Interest Expense shall be determined excluding (to the extent otherwise included therein) (i) all non-recurring cash interest expense consisting of liquidated damages for failure to timely comply with registration rights obligations and financing fees, as calculated on a consolidated basis in accordance with GAAP, (ii) penalties and interest relating to taxes, (iii) any additional cash interest owing pursuant to any registration rights agreement, (iv) accretion or accrual of discounted liabilities other than Indebtedness, (v) any expense resulting from the discounting of any Indebtedness in connection with the application of purchase accounting in connection with any acquisition, (vi) amortization of deferred financing fees, debt issuance costs, commissions, fees and expenses, (vii) any expensing of bridge, commitment and other financing fees and (viii) interest in respect of Indebtedness of any parent of such Person appearing upon the balance sheet of such Person solely by reason of push-down accounting under GAAP and (ix) interest expense in connection with any Indebtedness if a defeasance, discharge, redemption, repayment, extinguishment or repurchase in full is consummated with respect to such Indebtedness, and (b) for the avoidance of doubt, all interest expense of any Unrestricted Subsidiary shall be excluded from Consolidated Interest Expense for such period; provided, that when determining Consolidated Interest Expense of the Issuer in respect of any period ending prior to the first anniversary of the Issue Date, Consolidated Interest Expense shall be calculated by multiplying the aggregate Consolidated Interest Expense accrued since the Issue Date by 365 and then dividing such product by the number of days from and including the Issue Date to and including the last day of such period.

---

[2] To match corresponding definition in Exit Credit Agreements.

"Consolidated Net Income" means [      ].[3]

"Consolidated Total Indebtedness" means, as of any date of determination, (a) the aggregate principal amount of Indebtedness for borrowed money (other than Indebtedness with respect to Cash Management Services) and Obligations in respect of Capitalized Lease Obligations of the Issuer and its Restricted Subsidiaries outstanding on such date; *provided* that if a defeasance, discharge or other redemption, repayment or repurchase in full is consummated with respect to any Indebtedness, such Indebtedness shall not be included in determining Consolidated Total Indebtedness; and *minus* (b) the sum of (i) the aggregate amount of cash and Cash Equivalents of the Issuer and its Restricted Subsidiaries as of date of such determination with such pro forma adjustments as are consistent with the pro forma adjustments set forth in the definition of "Fixed Charge Coverage Ratio" and as determined in good faith by the Issuer; *provided* that the amount of domestic unrestricted cash and Cash Equivalents of any Restricted Subsidiary that is a joint venture that is included in such calculation shall be limited to the total amount of domestic cash and Cash Equivalents owned by such Restricted Subsidiary that is a joint venture *multiplied by* the percentage of Capital Stock of such Restricted Subsidiary that is a joint venture that is owned directly or indirectly by the Issuer; and (ii) the aggregate amount of cash and Cash Equivalents of any joint venture in which the Issuer directly or indirectly owns Capital Stock but that is not a Restricted Subsidiary of the Issuer *multiplied by* the percentage of Capital Stock in such joint venture that is owned directly or indirectly by the Issuer.

"Consolidated Total Leverage Ratio" means, as of any date of determination, the ratio of (x) Consolidated Total Indebtedness as of such date to (y) the aggregate amount of Consolidated EBITDA for the period of the most recent four consecutive fiscal quarters ending prior to the date of such determination for which internal consolidated financial statements of the Issuer are available, in each case with such pro forma adjustments as are consistent with the pro forma adjustments set forth in the definition of "Fixed Charge Coverage Ratio."

"Consolidated Total Secured Leverage Ratio" means, as of any date of determination, the ratio of (x) Consolidated Total Indebtedness secured by Liens on the Collateral as of such date to (y) the aggregate amount of Consolidated EBITDA for the period of the most recent four consecutive fiscal quarters ending prior to the date of such determination for which internal consolidated financial statements of the Issuer are available, in each case with such *pro forma* adjustments as are consistent with the pro forma adjustments set forth in the definition of "Fixed Charge Coverage Ratio."

"Contingent Obligations" means, with respect to any Person, any obligation of such Person guaranteeing in any manner, whether directly or indirectly, any operating lease, dividend or other obligation that does not constitute Indebtedness ("primary obligations") of any other Person (the "primary obligor"), including any obligation of such Person, whether or not contingent:

> (1)    to purchase any such primary obligation or any property constituting direct or indirect security therefor;

---

[3] NTD: To match corresponding definition on Exit Credit Agreements.

-11-

(2)     to advance or supply funds:

     (a)     for the purchase or payment of any such primary obligation; or

     (b)     to maintain the working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor; or

(3)     to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation against loss in respect thereof.

"Credit Facility" means, with respect to the Issuer or any of its Restricted Subsidiaries, one or more debt facilities, indentures or other arrangements (including the Exit Credit Agreements) or commercial paper facilities and overdraft facilities) with banks, other financial institutions or investors providing for revolving credit loans, term loans, notes, receivables financing (including through the sale of receivables to such institutions or to special purpose entities formed to borrow from such institutions against such receivables), letters of credit or other Indebtedness, in each case, as amended, restated, modified, renewed, refunded, replaced, restructured, refinanced, repaid, increased or extended in whole or in part from time to time (and whether in whole or in part and whether or not with the original administrative agent and lenders or another administrative agent or agents or other banks or institutions and whether provided under the original Exit Credit Agreements or one or more other credit or other agreements, indentures, financing agreements or otherwise) and in each case including all agreements, instruments and documents executed and delivered pursuant to or in connection with the foregoing (including any notes and letters of credit issued pursuant thereto and any Guarantee and collateral agreement, patent and trademark security agreement, mortgages or letter of credit applications and other Guarantees, pledges, agreements, security agreements and collateral documents).  Without limiting the generality of the foregoing, the term "Credit Facility" shall include any agreement or instrument (1) changing the maturity of any Indebtedness Incurred thereunder or contemplated thereby, (2) adding Subsidiaries of the Issuer as additional borrowers or guarantors thereunder, (3) increasing the amount of Indebtedness Incurred thereunder or available to be borrowed thereunder or (4) otherwise altering the terms and conditions thereof.

"Custodian" means any receiver, trustee, assignee, liquidator, custodian or similar official under any Bankruptcy Law.

"Debtor Relief Laws" means the Title 11 of the U.S. Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default; provided that any Default that results solely from the taking of an action that would have been permitted but for the continuation of a previous Default will be deemed to be cured if such previous Default is cured prior to becoming an Event of Default.

-12-

"Definitive Notes" means certificated Notes.

"Designated Non-Cash Consideration" means the fair market value (as determined in good faith by the Issuer) of non-cash consideration received by the Issuer or one of its Restricted Subsidiaries in connection with an Asset Disposition that is so designated as Designated Non-Cash Consideration pursuant to an Officer's Certificate, setting forth the basis of such valuation, less the amount of cash or Cash Equivalents received in connection with a subsequent payment, redemption, retirement, sale or other disposition of such Designated Non-Cash Consideration. A particular item of Designated Non-Cash Consideration will no longer be considered to be outstanding when and to the extent it has been paid, redeemed or otherwise retired or sold or otherwise disposed of in compliance with Section 3.5 hereof.

"Designated Preferred Stock" means, with respect to the Issuer, Preferred Stock (other than Disqualified Stock) (a) that is issued for cash (other than to the Issuer or a Subsidiary of the Issuer or an employee stock ownership plan or trust established by the Issuer or any such Subsidiary for the benefit of their employees to the extent funded by the Issuer or such Subsidiary) and (b) that is designated as "Designated Preferred Stock" pursuant to an Officer's Certificate of the Issuer at or prior to the issuance thereof, the Net Cash Proceeds of which are excluded from the calculation set forth in Section 3.3(a)(iii)(C) hereof.

"Disinterested Director" means, with respect to any Affiliate Transaction, a member of the Board of Directors of the Issuer having no material direct or indirect financial interest in or with respect to such Affiliate Transaction. A member of the Board of Directors of the Issuer shall be deemed not to have such a financial interest by reason of such member's holding Capital Stock of the Issuer or any options, warrants or other rights in respect of such Capital Stock.

"Disqualified Stock" means, with respect to any Person, any Capital Stock of such Person which by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable) or upon the happening of any event:

   (1)   matures or is mandatorily redeemable for cash or in exchange for Indebtedness pursuant to a sinking fund obligation or otherwise; or

   (2)   is or may become (in accordance with its terms) upon the occurrence of certain events or otherwise redeemable or repurchasable for cash or in exchange for Indebtedness at the option of the holder of the Capital Stock in whole or in part,

in each case on or prior to the earlier of (a) the Stated Maturity of the Notes or (b) the date on which there are no Notes outstanding; provided, however, that (i) only the portion of Capital Stock which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date will be deemed to be Disqualified Stock and (ii) any Capital Stock that would constitute Disqualified Stock solely because the holders thereof have the right to require the Issuer to repurchase such Capital Stock upon the occurrence of a change of control or asset sale (howsoever defined or referred to) shall not constitute Disqualified Stock if any such redemption or repurchase obligation is subject to compliance by the relevant Person with Section 3.3 hereof; provided, however, that if such Capital Stock is issued to any plan for the benefit of employees of the Issuer or its Subsidiaries or

-13-

by any such plan to such employees, such Capital Stock shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Issuer or its Subsidiaries in order to satisfy applicable statutory or regulatory obligations.

"Dollars" or "$" means the lawful money of the United States of America.

"Domestic Subsidiary" means any direct or indirect Subsidiary of the Issuer other than a Foreign Subsidiary.

"DTC" means The Depository Trust Company or any successor securities clearing agency.

"Equity Offering" means (x) a public sale of Capital Stock of the Issuer (other than Disqualified Stock) other than offerings registered on Form S-8 (or any successor form) under the Securities Act or any similar offering in other jurisdictions, or (y) the public sale of Capital Stock or other securities, the proceeds of which are contributed to the equity (other than through the issuance of Disqualified Stock or Designated Preferred Stock or through an Excluded Contribution) of the Issuer or any of its Restricted Subsidiaries.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"Exchange Act" means the U.S. Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder, as amended.

"Excluded Contribution" means Net Cash Proceeds or property or assets received by the Issuer as capital contributions to the equity (other than through the issuance of Disqualified Stock or Designated Preferred Stock) of the Issuer after the Issue Date or from the issuance or sale (other than to a Restricted Subsidiary or an employee stock ownership plan or trust established by the Issuer or any Subsidiary of the Issuer for the benefit of their employees to the extent funded by the Issuer or any Restricted Subsidiary) of Capital Stock (other than Disqualified Stock or Designated Preferred Stock) of the Issuer, in each case, to the extent designated as an Excluded Contribution pursuant to an Officer's Certificate of the Issuer.

"Excluded Property" has the meaning set forth in the Security Agreement.

"Exit Credit Agreements" means, collectively, the MDL Exit Credit Agreement and the 21C Exit Credit Agreement.

"fair market value" may be conclusively established by means of an Officer's Certificate or resolutions of the Board of Directors of the Issuer setting out such fair market value as determined by such Officer or such Board of Directors in good faith.

"Fitch" means Fitch Ratings, Inc. or any of its successors or assigns that is a Nationally Recognized Statistical Rating Organization.

"Fixed Charge Coverage Ratio" means, with respect to any Person on any determination date, the ratio of (x) Consolidated EBITDA of such Person for the most recent four consecutive

-14-

fiscal quarters ending immediately prior to such determination date for which internal consolidated financial statements are available to (y) the Fixed Charges of such Person for the most recent four consecutive fiscal quarters for which internal consolidated financial statements are available; provided that if a defeasance, discharge, redemption, repayment, extinguishment or repurchase in full is consummated with respect to any Indebtedness, the Consolidated Interest Expense associated with such Indebtedness shall not be included in determining the Fixed Charges.

In the event that the Issuer or any Restricted Subsidiary Incurs, assumes, Guarantees, redeems, defeases, retires or extinguishes any Indebtedness (other than Indebtedness incurred under any revolving credit facility unless such Indebtedness has been permanently repaid and has not been replaced) or issues or redeems Disqualified Stock or Preferred Stock subsequent to the commencement of the period for which the Fixed Charge Coverage Ratio is being calculated but prior to or simultaneously with the event for which the calculation of the Fixed Charge Coverage Ratio is made (the "Fixed Charge Coverage Ratio Calculation Date"), then the Fixed Charge Coverage Ratio shall be calculated giving *pro forma* effect to such Incurrence, assumption, Guarantee, redemption, defeasance, retirement or extinguishment of Indebtedness, or such issuance or redemption of Disqualified Stock or Preferred Stock, as if the same had occurred at the beginning of the applicable four-quarter period.

For purposes of making the computation referred to above, any Investments, acquisitions, dispositions, mergers, consolidations and disposed operations that have been made by the Issuer or any of its Restricted Subsidiaries, during the four-quarter reference period or subsequent to such reference period and on or prior to or simultaneously with the Fixed Charge Coverage Ratio Calculation Date shall be calculated on a *pro forma* basis assuming that all such Investments, acquisitions, dispositions, mergers, consolidations and disposed or discontinued operations (and the change in any associated fixed charge obligations and the change in Consolidated EBITDA resulting therefrom) had occurred on the first day of the four-quarter reference period. If since the beginning of such period any Person that subsequently became a Restricted Subsidiary or was merged with or into the Issuer or any of its Restricted Subsidiaries since the beginning of such period shall have made any Investment, acquisition, disposition, merger, consolidation or disposed or discontinued operation that would have required adjustment pursuant to this definition, then the Fixed Charge Coverage Ratio shall be calculated giving *pro forma* effect thereto for such period as if such Investment, acquisition, disposition, merger, consolidation or disposed operation had occurred at the beginning of the applicable four-quarter period.

Notwithstanding anything in this definition to the contrary, when calculating the Consolidated First Lien Leverage Ratio, the Consolidated Total Secured Leverage Ratio, the Consolidated Total Leverage Ratio or the Fixed Charge Coverage Ratio, as applicable, in each case in connection with the Incurrence of any Indebtedness or Liens, or a Limited Condition Acquisition, the date of determination of such ratio and of any default or event of default blocker shall, at the option of the Issuer, be the date the definitive agreements for such Limited Condition Acquisition are entered into and such ratios shall be calculated on a *pro forma* basis after giving effect to such Limited Condition Acquisition and the other transactions to be entered into in connection therewith (including any incurrence of Indebtedness and the use of proceeds thereof) as if they occurred at the beginning of the four-quarter reference period, and, for the avoidance of doubt, (x) if any such ratios are exceeded as a result of fluctuations in such ratio (including due

-15-

to fluctuations in Consolidated EBITDA of the Issuer or the target company) at or prior to the consummation of the relevant Limited Condition Acquisition, such ratios will not be deemed to have been exceeded as a result of such fluctuations solely for purposes of determining whether the Limited Condition Acquisition is permitted hereunder and (y) such ratios shall not be tested at the time of consummation of such Limited Condition Acquisition or related transactions; provided, further, that if the Issuer elects to have such determinations occur at the time of entry into such definitive agreement, any such transaction shall be deemed to have occurred on the date the definitive agreements are entered and outstanding thereafter for purposes of subsequently calculating any ratios under this Indenture after the date of such agreement and before the consummation of such Limited Condition Acquisition and to the extent baskets were utilized in satisfying any covenants, such baskets shall be deemed utilized, but any calculation of Total Assets or Consolidated Net Income for purposes of other incurrences of Indebtedness or Liens or making of Restricted Payments (not related to such Limited Condition Acquisition) shall not reflect such Limited Condition Acquisition until it is closed.

For purposes of this definition, whenever *pro forma* effect is to be given to a transaction, the *pro forma* calculations shall be made in good faith by a responsible financial or chief accounting officer of the Issuer (including cost savings and synergies; provided that (i) such cost savings are reasonably identifiable, reasonably attributable to the action specified and reasonably anticipated to result from such actions either taken or to be taken within eighteen (18) months after the end of the test period in which the transaction occurred, and, in each case, certified by a responsible financial or chief accounting officer of the Issuer and (ii) no amounts shall be added pursuant to this paragraph to the extent duplicative of any amounts that are otherwise added back in computing Consolidated EBITDA for such test period. If any Indebtedness bears a floating rate of interest and is being given *pro forma* effect, the interest on such Indebtedness shall be calculated as if the rate in effect on the Fixed Charge Coverage Ratio Calculation Date had been the applicable rate for the entire period (taking into account any Hedging Obligations applicable to such Indebtedness). Interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by a responsible financial or accounting officer of the Issuer to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP. For purposes of making the computation referred to above, interest on any Indebtedness under a revolving credit facility computed with a *pro forma* basis shall be computed based upon the average daily balance of such Indebtedness during the applicable period except as set forth in the first paragraph of this definition. Interest on Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate, or other rate, shall be determined to have been based upon the rate actually chosen, or if none, then based upon such optional rate chosen as the Issuer may designate.

"Fixed Charges" means, with respect to any Person for any period, the sum of:

(1)     Consolidated Interest Expense of such Person for such period;

(2)     all cash dividends or other distributions paid (excluding items eliminated in consolidation) on any series of Preferred Stock of any Restricted Subsidiary of such Person during such period; and

-16-

(3)     all cash dividends or other distributions paid (excluding items eliminated in consolidation) on any series of Disqualified Stock during this period.

"Foreign Subsidiary" means with respect to any Person any Subsidiary of such Person that is not organized or existing under the laws of the United States, any state thereof or the District of Columbia and any Subsidiary of such Subsidiary.

"GAAP" means generally accepted accounting principles in the United States of America as in effect on the date of any calculation or determination required hereunder.  Except as otherwise set forth in this Indenture, all ratios and calculations based on GAAP contained in this Indenture shall be computed in accordance with GAAP as in effect on the Issue Date.  At any time after the Issue Date, the Issuer may elect to establish that GAAP shall mean the GAAP as in effect on or prior to the date of such election; provided that any such election, once made, shall be irrevocable.  At any time after the Issue Date, the Issuer  may elect to apply IFRS accounting principles in lieu of GAAP and, upon any such election, references herein to GAAP shall thereafter be construed to mean IFRS (except as otherwise provided in this Indenture), including as to the ability of the Issuer to make an election pursuant to the previous sentence; provided that any such election, once made, shall be irrevocable; provided, further, that any calculation or determination in this Indenture that require the application of GAAP for periods that include fiscal quarters ended prior to the Issuer's election to apply IFRS shall remain as previously calculated or determined in accordance with GAAP; provided, further again, that the Issuer may only make such election if it also elects to report any subsequent financial reports required to be made by the Issuer, including pursuant to Section 13 or Section 15(d) of the Exchange Act and Section 3.10 hereof, in IFRS.  The Issuer shall give notice of any such election made in accordance with this definition to the Trustee and the Holders.

"Governmental Authority" means any nation, sovereign or government, any state, province, territory or other political subdivision thereof, and any entity or authority exercising executive, legislative, judicial, regulatory, self regulatory or administrative functions of or pertaining to government, including a central bank, or stock exchange.

"Guarantee" means, any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Indebtedness of any other Person, including any such obligation, direct or indirect, contingent or otherwise, of such Person:

(1)     to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness of such other Person (whether arising by virtue of partnership arrangements, or by agreements to keep-well, to purchase assets, goods, securities or services, to take-or-pay or to maintain financial statement conditions or otherwise); or

(2)     entered into primarily for purposes of assuring in any other manner the obligee of such Indebtedness of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part);

-17-

provided, however, that the term "Guarantee" will not include endorsements for collection or deposit in the ordinary course of business or consistent with past practice. The term "Guarantee" used as a verb has a corresponding meaning.

"Guarantor" means Holdings and any Restricted Subsidiary that Guarantees the Notes, until such Note Guarantee is released in accordance with the terms of this Indenture.

"Hedging Obligations" means, with respect to any Person, the obligations of such Person under any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, commodity swap agreement, commodity cap agreement, commodity collar agreement, foreign exchange contracts, currency swap agreement or similar agreement providing for the transfer or mitigation of interest rate, commodity price or currency risks either generally or under specific contingencies.

"Holder" means each Person in whose name the Notes are registered on the Registrar's books, which shall initially be the respective nominee of DTC (and, for the avoidance of doubt, each reference to "Holder" shall, unless specified otherwise, be construed as a reference to a Holder of the Notes, determined in accordance with this definition).

"Holdings" means 21st Century Oncology Holdings Inc., a Delaware corporation, or any successor thereto.

"IAI" means an institutional "accredited investor" as described in Rule 501(a)(1), (2), (3) or (7) under the Securities Act.

"IFRS" means the International Financial Reporting Standards, as issued by the International Accounting Standards Board as in effect from time to time.

"Immaterial Subsidiary" means, at any date of determination, each Restricted Subsidiary of the Issuer that (i) has not guaranteed any other Indebtedness of the Issuer and (ii) has Total Assets together with all other Immaterial Subsidiaries (other than Foreign Subsidiaries) (as determined in accordance with GAAP) and Consolidated EBITDA of less than 5.0% of the Issuer's Total Assets and Consolidated EBITDA (measured, in the case of Total Assets, at the end of the most recent fiscal period for which internal financial statements are available and, in the case of Consolidated EBITDA, for the most recently ended four consecutive fiscal quarters ended for which internal consolidated financial statements are available, in each case measured on a *pro forma* basis giving effect to any acquisitions or dispositions of the companies, division or lines of business since such balance sheet date or the start of such four quarter period, as applicable, and on or prior to the date of acquisition of such Subsidiary).

"Incur" means issue, create, assume, enter into any Guarantee of, incur, extend or otherwise become liable for; provided, however, that any Indebtedness or Capital Stock of a Person existing at the time such Person becomes a Restricted Subsidiary (whether by merger, consolidation, acquisition or otherwise) will be deemed to be Incurred by such Restricted Subsidiary at the time it becomes a Restricted Subsidiary and the terms "Incurred" and "Incurrence" have meanings correlative to the foregoing and any Indebtedness pursuant to any revolving credit or similar facility shall only be "Incurred" at the time any funds are borrowed thereunder.

-18-

"Indebtedness" means, with respect to any Person on any date of determination (without duplication):

(1)    the principal amount of indebtedness of such Person for borrowed money;

(2)    the principal amount of obligations of such Person evidenced by bonds, debentures, notes or other similar instruments;

(3)    all reimbursement obligations of such Person in respect of letters of credit, bankers' acceptances or other similar instruments (the amount of such obligations being equal at any time to the aggregate then undrawn and unexpired amount of such letters of credit or other instruments plus the aggregate amount of drawings thereunder that have been reimbursed) (except to the extent such reimbursement obligations relate to trade payables and such obligations are satisfied within 30 days of Incurrence);

(4)    the principal component of all obligations of such Person to pay the deferred and unpaid purchase price of property (except trade payables), which purchase price is due more than one year after the date of placing such property in service or taking final delivery and title thereto;

(5)    Capitalized Lease Obligations of such Person;

(6)    the principal component of all obligations, or liquidation preference, of such Person with respect to any Disqualified Stock or, with respect to any Restricted Subsidiary, any Preferred Stock (but excluding, in each case, any accrued dividends);

(7)    the principal component of all Indebtedness of other Persons secured by a Lien on any asset of such Person, whether or not such Indebtedness is assumed by such Person; *provided*, *however*, that the amount of such Indebtedness will be the lesser of (a) the fair market value of such asset at such date of determination (as determined in good faith by the Issuer) and (b) the amount of such Indebtedness of such other Persons;

(8)    Guarantees by such Person of the principal component of Indebtedness of other Persons to the extent Guaranteed by such Person; and

(9)    to the extent not otherwise included in this definition, net obligations of such Person under Hedging Obligations (the amount of any such obligations to be equal at any time to the net payments under such agreement or arrangement giving rise to such obligation that would be payable by such Person at the termination of such agreement or arrangement);

with respect to clauses (1), (2), (4) and (5) above, if and to the extent that any of the foregoing Indebtedness (other than letters of credit and Hedging Obligations) would appear as a liability upon a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP; *provided* that Indebtedness of any Parent Entity appearing upon the balance sheet of the Issuer solely by reason of push-down accounting under GAAP shall be excluded.

-19-

The term "Indebtedness" shall not include any lease, concession or license of property (or Guarantee thereof) which would be considered an operating lease under GAAP as in effect on the Issue Date, any prepayments of deposits received from clients or customers in the ordinary course of business, or obligations under any license, permit or other approval (or Guarantees given in respect of such obligations) Incurred prior to the Issue Date or in the ordinary course of business.

The amount of Indebtedness of any Person at any time in the case of a revolving credit or similar facility shall be the total amount of funds borrowed and then outstanding.  The amount of any Indebtedness outstanding as of any date shall be (a) the accreted value thereof in the case of any Indebtedness issued with original issue discount and (b) the principal amount of Indebtedness, or liquidation preference thereof, in the case of any other Indebtedness. Indebtedness shall be calculated without giving effect to the effects of Financial Accounting Standards Board Accounting Standards Codification Topic No. 815 and related interpretations to the extent such effects would otherwise increase or decrease an amount of Indebtedness for any purpose under this Indenture as a result of accounting for any embedded derivatives created by the terms of such Indebtedness.

Notwithstanding the above provisions, in no event shall the following constitute Indebtedness:

(i)     Contingent Obligations, other than Guarantees or other assumptions of Indebtedness;

(ii)     Cash Management Services;

(iii)     any lease, concession or license of property (or Guarantee thereof) which would be considered an operating lease under GAAP as in effect on the Issue Date or any prepayments of deposits received from clients or customers in the ordinary course of business or consistent with past practice;

(iv)     obligations under any license, permit or other approval (or Guarantees given in respect of such obligations) incurred prior to the Issue Date or in the ordinary course of business or consistent with past practice;

(v)     in connection with the purchase by the Issuer or any Restricted Subsidiary of any business, any post-closing payment adjustments to which the seller may become entitled to the extent such payment is determined by a final closing balance sheet or such payment depends on the performance of such business after the closing; *provided*, *however*, that, at the time of closing, the amount of any such payment is not determinable and, to the extent such payment thereafter becomes fixed and determined, the amount is paid in a timely manner; or

(vi)     for the avoidance of doubt, any obligations in respect of workers' compensation claims, early retirement or termination obligations, pension fund obligations or contributions or similar claims, obligations or contributions or social security or wage Taxes.

-20-

"Indenture" means this Indenture as amended or supplemented from time to time.

"Independent Financial Advisor" means an investment banking or accounting firm of international standing or any third party appraiser of international standing; provided, however, that such firm or appraiser is not an Affiliate of the Issuer.

"Initial Notes" has the meaning ascribed to it in the second introductory paragraph of this Indenture.

"Insurance Subsidiary" means each Subsidiary of the Issuer engaged solely in one or more of the general liability, professional liability, health and benefits and workers compensation and any other insurance businesses, providing insurance coverage for the Issuer, its Subsidiaries and any of its direct or indirect parents and the respective employees, officers or directors thereof.

"Intercreditor Agreement" means (i) that certain Intercreditor Agreement, dated as of the Issue Date (as amended, restated, amended and restated, supplemented or otherwise modified from time to time and including any joinders thereto), by and among the Issuer, the Guarantors, the MDL Agent, the 21C Agent, the Collateral Agent and each of the other institutions thereto from time to time, as it may be amended, restated, supplemented or otherwise modified from time to time in accordance with this Indenture and (ii) any other intercreditor agreement that is not materially less favorable to the Holders of the Notes than the intercreditor agreement referred to in clause (i), as determined by the Issuer in good faith.

"Investment" means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the form of any direct or indirect advance, loan or other extensions of credit (other than advances or extensions of credit to customers, suppliers, directors, officers or employees of any Person in the ordinary course of business or consistent with past practice, and excluding any debt or extension of credit represented by a bank deposit other than a time deposit) or capital contribution to (by means of any transfer of cash or other property to others or any payment for property or services for the account or use of others), or the Incurrence of a Guarantee of any obligation of, or any purchase or acquisition of Capital Stock, Indebtedness or other similar instruments issued by, such other Persons and all other items that are or would be classified as investments on a balance sheet prepared on the basis of GAAP; provided, however, that endorsements of negotiable instruments and documents in the ordinary course of business or consistent with past practice will not be deemed to be an Investment. If the Issuer or any Restricted Subsidiary issues, sells or otherwise disposes of any Capital Stock of a Person that is a Restricted Subsidiary such that, after giving effect thereto, such Person is no longer a Restricted Subsidiary, any Investment by the Issuer or any Restricted Subsidiary in such Person remaining after giving effect thereto will be deemed to be a new Investment at such time.

For purposes of Section 3.3 and Section 3.20 hereof:

(1)    "Investment" will include the portion (proportionate to the Issuer's equity interest in a Restricted Subsidiary to be designated as an Unrestricted Subsidiary) of the fair market value of the net assets of such Restricted Subsidiary of the Issuer at the time that such Restricted Subsidiary is designated an Unrestricted Subsidiary; provided,

-21-

however, that upon a redesignation of such Subsidiary as a Restricted Subsidiary, the Issuer will be deemed to continue to have a permanent "Investment" in an Unrestricted Subsidiary in an amount (if positive) equal to (a) the Issuer's "Investment" in such Subsidiary at the time of such redesignation less (b) the portion (proportionate to the Issuer's equity interest in such Subsidiary) of the fair market value of the net assets (as conclusively determined by the Board of Directors of the Issuer in good faith) of such Subsidiary at the time that such Subsidiary is so re-designated a Restricted Subsidiary; and

(2)     any property transferred to or from an Unrestricted Subsidiary will be valued at its fair market value at the time of such transfer, in each case as determined in good faith by the Board of Directors of the Issuer.

"Investment Grade Securities" means:

(1)     securities issued or directly and fully Guaranteed or insured by the United States or Canadian government or any agency or instrumentality thereof (other than Cash Equivalents);

(2)     securities issued or directly and fully guaranteed or insured by a member of the European Union, or any agency or instrumentality thereof (other than Cash Equivalents);

(3)     debt securities or debt instruments with a rating of "A-" or higher from S&P or "A3" or higher by Moody's or the equivalent of such rating by such rating organization or, if no rating of Moody's or S&P then exists, the equivalent of such rating by any other Nationally Recognized Statistical Ratings Organization, but excluding any debt securities or instruments constituting loans or advances among the Issuer and its Subsidiaries; and

(4)     investments in any fund that invests exclusively in investments of the type described in clauses (1), (2) and (3) above which fund may also hold cash and Cash Equivalents pending investment or distribution.

"Investment Grade Status" shall occur when the Notes receive two of the following:

(1)     a rating of "BBB-" or higher from S&P;

(2)     a rating of "Baa3" or higher from Moody's;

(3)     a rating of "BBB-" or higher from Fitch; or

(4)     the equivalent of such rating by either such rating organization or, if no rating of Moody's or S&P, then exists, the equivalent of such rating by any other Nationally Recognized Statistical Ratings Organization.

"Issue Date" means [  ], 2017.

-22-

"Junior Lien Obligations" means all Indebtedness Incurred pursuant to Section 3.2 that is secured by Liens on the Collateral that rank junior to the Note Liens on the Collateral; *provided* that an authorized representative of the holders of such Indebtedness shall have entered into a intercreditor agreement with the Collateral Agent that is not materially less favorable to the Holders of the Notes as compared to the treatment of the "First Priority Liens" as defined in the Intercreditor Agreement as determined by the Company in good faith.

"Lien" means any mortgage, pledge, security interest, encumbrance, lien, hypothecation or charge of any kind (including any conditional sale or other title retention agreement or lease in the nature thereof).

"Limited Condition Acquisition" means any acquisition, including by means of a merger or consolidation, by the Issuer or one or more of its Restricted Subsidiaries, the consummation of which is not conditioned upon the availability of, or on obtaining, third party financing; provided that for purposes of determining compliance with Section 3.3 hereof, the Consolidated Net Income (and any other financial defined term derived therefrom) shall not include any Consolidated Net Income of or attributable to the target company or assets associated with any such Limited Condition Acquisition unless and until the closing of such Limited Condition Acquisition shall have actually occurred.

"Management Advances" means loans or advances made to, or Guarantees with respect to loans or advances made to, directors, officers, employees or consultants of any Parent Entity, the Issuer or any Restricted Subsidiary or to any physician affiliated with the Issuer or its Restricted Subsidiaries or to any employee of such physician:

(1)    (a) in respect of travel, entertainment or moving related expenses Incurred in the ordinary course of business or consistent with past practice or (b) for purposes of funding any such person's purchase of Capital Stock (or similar obligations) of the Issuer, its Subsidiaries or any Parent Entity with (in the case of this sub-clause (b)) the approval of the Board of Directors;

(2)    in respect of moving related expenses Incurred in the ordinary course of business or consistent with past practice in connection with any closing or consolidation of any facility or office; or

(3)    not exceeding $5.0 million in the aggregate outstanding at any time.

"MDL Agent" means Wilmington Savings Fund Society, FSB, in its capacity as administrative agent and as collateral agent under the MDL Exit Credit Agreement (including any successor appointed in such capacity in accordance with the MDL Exit Credit Agreement).

"MDL Entities" means collectively, Medical Developers LLC, MD International Investments, LLC and their respective Subsidiaries (including Medical Developers Coöperatief U.A.), together with each successor to any of the foregoing.

"MDL Exit Credit Agreement" means that certain Credit Agreement, dated as of [  ], 2017 (as amended, restated, amended and restated, supplemented or otherwise modified from

-23-

time to time), by and among the Issuer, as borrower, the Subsidiaries of the Issuer party thereto as Guarantors, the Persons party thereto as lenders and the MDL Agent.

"MDL Sale Proceeds" means all Net Available Cash received by the Issuer or any of its Restricted Subsidiaries from an Asset Sale of, or other value attributed in a bankruptcy, insolvency or similar proceeding with respect to, any MDL Priority Collateral or any assets or property of the MDL Entities.

"MDL Priority Collateral" has the meaning set forth in the Intercreditor Agreement.

"MDL Priority Obligations" means (i) all Obligations under the MDL Exit Credit Agreement and (ii) all other Indebtedness Incurred pursuant to Section 3.2 that is secured by Liens on the MDL Priority Collateral that rank senior to the Note Liens on the MDL Priority Collateral; *provided* that an authorized representative of the holders of such Indebtedness shall have executed a joinder to the Intercreditor Agreement.

"MDL Term Loan Termination Date" has the meaning set forth in the Intercreditor Agreement.

"Moody's" means Moody's Investors Service, Inc. or any of its successors or assigns that is a Nationally Recognized Statistical Rating Organization.

"Mortgaged Properties" means the Real Property owned or leased by the Issuer or any Guarantor encumbered by a Mortgage to secure the Note Obligations.   For the avoidance of doubt, Mortgaged Properties shall include all Real Property that secures Indebtedness under any Exit Credit Agreement or any other Credit Facility secured by a Permitted Lien.

"Mortgages" means, collectively, the mortgages, trust deeds, deeds of trust, deeds to secure debt, assignments of leases and rents, and other security documents delivered with respect to Mortgaged Properties, as amended, supplemented or otherwise modified from time to time in accordance with the terms of this Indenture.

"Nationally Recognized Statistical Rating Organization" means a nationally recognized statistical rating organization within the meaning of Rule 436 under the Securities Act.

"Net Available Cash" from an Asset Disposition means cash payments received (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or otherwise and net proceeds from the sale or other disposition of any securities received as consideration, but only as and when received, but excluding any other consideration received in the form of assumption by the acquiring person of Indebtedness or other obligations relating to the properties or assets that are the subject of such Asset Disposition or received in any other non-cash form) therefrom, in each case net of:

> (1)     all legal, accounting, investment banking, title and recording tax expenses, commissions and other fees and expenses Incurred, and all Taxes paid, reasonably estimated to be actually payable or accrued as a liability under GAAP (including, for the avoidance of doubt, any income, withholding and other Taxes payable as a result of the distribution of such proceeds to the Issuer and after taking into account any available tax

-24-

credits or deductions and any tax sharing agreements), as a consequence of such Asset Disposition, including distributions for Related Taxes;

(2)     all payments made on any Indebtedness which is secured by any assets subject to such Asset Disposition, in accordance with the terms of any Lien upon such assets, or which by applicable law be repaid out of the proceeds from such Asset Disposition;

(3)     all distributions and other payments required to be made to minority interest holders (other than any Parent Entity, the Issuer or any of its respective Subsidiaries) in Subsidiaries or joint ventures as a result of such Asset Disposition; and

(4)     the deduction of appropriate amounts required to be provided by the seller as a reserve, on the basis of GAAP, against any liabilities associated with the assets disposed of in such Asset Disposition and retained by the Issuer or any Restricted Subsidiary after such Asset Disposition.

"Net Cash Proceeds", with respect to any issuance or sale of Capital Stock, means the cash proceeds of such issuance or sale net of attorneys' fees, accountants' fees, underwriters' or placement agents' fees, listing fees, discounts or commissions and brokerage, consultant and other fees and charges actually Incurred in connection with such issuance or sale and net of Taxes paid or reasonably estimated to be actually payable as a result of such issuance or sale (including, for the avoidance of doubt, any income, withholding and other Taxes payable as a result of the distribution of such proceeds to the Issuer and after taking into account any available tax credit or deductions and any tax sharing agreements, and including distributions for Related Taxes).

"Non-Guarantor" means any Restricted Subsidiary that is not a Guarantor.

"Non-U.S. Person" means a Person who is not a U.S. Person (as defined in Regulation S).

"Note Documents" means this Indenture, the Notes (including Additional Notes), the Note Guarantees and the Collateral Documents.

"Note Guarantee" means a Guarantee of Notes and other Guaranteed Obligations pursuant to Article X hereof or in the form of a supplemental indenture substantially in the form of Exhibit B.

"Note Liens" means the Liens and security interests securing the Notes, the Note Guarantees and any and all Note Obligations.

"Note Obligations" means (i) all principal of, interest (including, without limitation, any interest which accrues after the commencement of any proceeding under any Debtor Relief Law with respect to any of the Issuer or any Guarantor, whether or not a claim for Post-Petition Interest is allowed in such proceedings), and premium, if any, on any Note, (ii) all fees, expenses, penalties, indemnification obligations, reimbursement obligations, damages and other amounts of whatever nature, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, now or hereafter payable by the Issuer or any

Guarantor to the Holders of the Notes, the Collateral Agent and/or the Trustee (including, without limitation, any amounts which accrue after the commencement of any proceeding under any Debtor Relief Law with respect to the Issuer or any Guarantor, whether or not a claim for Post-Petition Interest is allowed in such proceedings) pursuant to, arising under, out of or in connection with, this Indenture, the Notes, the Intercreditor Agreement or any Collateral Document or any other document made, delivered or given in connection herewith or therewith, (iii) all expenses of the Trustee and the Collateral Agent (and any agent, sub-agent and counsel thereof) under this Indenture as to which the Trustee and the Collateral Agent and one or more of such agents and/or counsel have a right to reimbursement or under any other similar provision of any Collateral Document, including, without limitation, any and all sums advanced by the Trustee and the Collateral Agent to preserve the Collateral or preserve its security interests, mortgages or Liens in the Collateral to the extent permitted under this Indenture, the Notes, the Intercreditor Agreement or any other Collateral Document or applicable law and (iv) in the case of each Guarantor, all amounts now or hereafter payable by such Guarantor to the Holders of the Notes, the Collateral Agent and the Trustee and all other obligations or liabilities (including all Guaranteed Obligations) now existing or hereafter arising or incurred (including, without limitation, any amounts which accrue after the commencement of any proceeding under any Debtor Relief Law with respect to the Issuer or such Guarantor, whether or not allowed or allowable as a claim in any such proceeding) on the part of such Guarantor owing to the Holders of the Notes, the Collateral Agent and the Trustee pursuant to the Notes Documents, this Indenture, the Note Guarantees, the Intercreditor Agreement or any other Collateral Document, together in each case with all renewals, modifications, consolidations or extensions thereof.

"Notes" has the meaning ascribed to it in the second introductory paragraph of this Indenture.

"Notes Custodian" means the custodian with respect to the Global Notes (as appointed by DTC), or any successor Person thereto and shall initially be the Trustee.

"Obligations" means any principal, interest (including interest accruing on or after the filing of any proceeding under any Debtor Relief Law relating to the Issuer or any Guarantor whether or not a claim for Post-Petition Interest is allowed in such proceedings), premium, if any, penalties, fees, expenses, indemnifications, reimbursements (including, without limitation, reimbursement obligations with respect to letters of credit and bankers' acceptances), damages and other amounts or liabilities payable under the documentation governing any Indebtedness.

"Officer" means, with respect to any Person, (1) the Chairman of the Board of Directors, the Chief Executive Officer, the President, the Chief Financial Officer, any Vice President, the Treasurer, any assistant Treasurer,  any Managing Director, or the Secretary (a) of such Person or (b) if such Person is owned or managed by a single entity, of such entity, or (2) any other individual designated as an "Officer" for the purposes of this Indenture by the Board of Directors of such Person.

"Officer's Certificate" means, with respect to any Person, a certificate signed by one Officer of such Person.

"Opinion of Counsel" means a written opinion from legal counsel who is reasonably satisfactory to the Trustee. The counsel may be an employee of or counsel to the Issuer or its Subsidiaries.

"Parent Entity" means any direct or indirect parent of the Issuer.

"Parent Entity Expenses" means:

(1)     costs (including all professional fees and expenses) Incurred by any Parent Entity in connection with reporting obligations under or otherwise Incurred in connection with compliance with applicable laws, rules or regulations of any governmental, regulatory or self-regulatory body or stock exchange, this Indenture or any other agreement or instrument relating to the Notes, the Guarantees or any other Indebtedness of the Issuer or any Restricted Subsidiary, including in respect of any reports filed or delivered with respect to the Securities Act or Exchange Act or the respective rules and regulations promulgated thereunder;

(2)     customary indemnification obligations of any Parent Entity owing to directors, officers, employees or other Persons under its articles, charter, by-laws, partnership agreement or other constating documents or pursuant to written agreements with any such Person to the extent relating to the Issuer and its Subsidiaries;

(3)     obligations of any Parent Entity in respect of director and officer insurance (including premiums therefor) to the extent relating to the Issuer and its Subsidiaries;

(4)     (x) general corporate overhead expenses, including professional fees and expenses and (y) other operational expenses of any Parent Entity related to the ownership or operation of the business of the Issuer or any of its Restricted Subsidiaries; and

(5)     expenses Incurred by any Parent Entity in connection with any offering, sale, conversion or exchange of Capital Stock or Indebtedness.

"Pari Passu Lien Obligations" means all Indebtedness Incurred pursuant to Section 3.2 that is secured by Liens on the Collateral that rank *pari passu* with the Note Liens on the Collateral; *provided* that an authorized representative of the holders of such Indebtedness shall have executed a joinder to the Intercreditor Agreement.

"Paying Agent" means any Person authorized by the Issuer to pay the principal of (and premium, if any) or interest on any Note on behalf of the Issuer.

"Permitted Asset Swap" means the concurrent purchase and sale or exchange of assets used or useful in a Similar Business or a combination of such assets and cash, Cash Equivalents between the Issuer or any of its Restricted Subsidiaries and another Person; provided that any cash or Cash Equivalents received in excess of the value of any cash or Cash Equivalents sold or exchanged must be applied in accordance with Section 3.5 hereof.

"Permitted Investment" means (in each case, by the Issuer or any of its Restricted Subsidiaries):

-27-

(1)     Investments in (a) a Restricted Subsidiary (including the Capital Stock of a Restricted Subsidiary) or the Issuer or (b) a Person (including the Capital Stock of any such Person) that will, upon the making of such Investment, become a Restricted Subsidiary;

(2)     Investments in another Person if such Person is engaged in any Similar Business and as a result of such Investment such other Person is merged, amalgamated, consolidated or otherwise combined with or into, or transfers or conveys all or substantially all its assets to, the Issuer or a Restricted Subsidiary;

(3)     Investments in cash, Cash Equivalents or Investment Grade Securities;

(4)     Investments in receivables owing to the Issuer or any Restricted Subsidiary created or acquired in the ordinary course of business or consistent with past practice;

(5)     Investments in payroll, travel and similar advances to cover matters that are expected at the time of such advances ultimately to be treated as expenses for accounting purposes and that are made in the ordinary course of business or consistent with past practice;

(6)     Management Advances;

(7)     Investments received in settlement of debts created in the ordinary course of business or consistent with past practice and owing to the Issuer or any Restricted Subsidiary or in exchange for any other Investment or accounts receivable held by the Issuer or any such Restricted Subsidiary, or as a result of foreclosure, perfection or enforcement of any Lien, or in satisfaction of judgments or pursuant to any plan of reorganization or similar arrangement including upon the bankruptcy or insolvency of a debtor under any Debtor Relief Law or otherwise with respect to any secured Investment or other transfer of title with respect to any secured Investment in default;

(8)     Investments made as a result of the receipt of non-cash consideration from a sale or other disposition of property or assets, including an Asset Disposition;

(9)     Investments existing or pursuant to agreements or arrangements in effect on the Issue Date and any modification, replacement, renewal or extension thereof; provided that the amount of any such Investment may not be increased except (a) as required by the terms of such Investment as in existence on the Issue Date or (b) as otherwise permitted under this Indenture;

(10)     Hedging Obligations, which transactions or obligations are Incurred in compliance with Section 3.2 hereof;

(11)     pledges or deposits with respect to leases or utilities provided to third parties in the ordinary course of business or Liens otherwise described in the definition of "Permitted Liens" or made in connection with Liens permitted under Section 3.6 hereof;

-28-

(12)   any Investment to the extent made using Capital Stock of the Issuer (other than Disqualified Stock) or Capital Stock of any Parent Entity as consideration;

(13)   any transaction to the extent constituting an Investment that is permitted and made in accordance with Section 3.8(b) hereof (except those described in Sections 3.8(b)(1), (3), (6), (8), (9), (12) and (14));

(14)   Investments consisting of purchases and acquisitions of inventory, supplies, materials and equipment or licenses or leases of intellectual property, in any case, in the ordinary course of business and in accordance with this Indenture;

(15)   (i) Guarantees of Indebtedness not prohibited by Section 3.2 hereof and (other than with respect to Indebtedness) guarantees, keepwells and similar arrangements in the ordinary course of business and (ii) performance guarantees with respect to obligations that are permitted by this Indenture;

(16)   Investments consisting of earnest money deposits required in connection with a purchase agreement, or letter of intent, or other acquisitions to the extent not otherwise prohibited by this Indenture;

(17)   Investments of a Restricted Subsidiary acquired after the Issue Date or of an entity merged into or amalgamated with the Issuer or merged into or amalgamated or consolidated with a Restricted Subsidiary after the Issue Date to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger, amalgamation or consolidation and were in existence on the date of such acquisition, merger, amalgamation or consolidation;

(18)   Investments consisting of licensing or contribution of intellectual property pursuant to joint marketing arrangements with other Persons;

(19)   contributions to a "rabbi" trust for the benefit of employees or other grantor trust subject to claims of creditors in the case of a bankruptcy or other proceeding under any Debtor Relief Law with respect to the Issuer;

(20)   Investments in joint ventures and similar entities having an aggregate fair market value, when taken together with all other Investments made pursuant to this clause that are at the time outstanding, not to exceed the greater of $25.0 million and 2.25% of Total Assets at the time of such Investment (with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value); provided that any joint ventures referred to in this clause (20) are with bona fide third parties;

(21)   [reserved];

(22)   additional Investments having an aggregate fair market value, taken together with all other Investments made pursuant to this clause (22) that are at that time outstanding, not to exceed the greater of $50.0 million and 4.50% of Total Assets (with the fair market value of each Investment being measured at the time made and without

-29-

giving effect to subsequent changes in value) *plus* the amount of any distributions, dividends, payments or other returns in respect of such Investments (without duplication for purposes of Section 3.3 of any amounts applied pursuant to clause (c) of the first paragraph of such covenant); provided that if such Investment is in Capital Stock of a Person that subsequently becomes a Restricted Subsidiary, such Investment shall thereafter be deemed permitted under clause (1) or (2) above and shall not be included as having been made pursuant to this clause (22);

(23)    [reserved];

(24)    repurchases of Notes;

(25)    Investments by an Unrestricted Subsidiary entered into prior to the day such Unrestricted Subsidiary is redesignated as a Restricted Subsidiary as described under the caption "Designation of Restricted and Unrestricted Subsidiaries"; and

(26)    Investments relating to Insurance Subsidiaries, up to an aggregate principal amount outstanding at any one time equal to $15.0 million.

"Permitted Liens" means, with respect to any Person:

(1)    Liens on assets or property of a Restricted Subsidiary that is not a Guarantor securing Indebtedness of any Restricted Subsidiary that is not a Guarantor;

(2)    pledges, deposits or Liens under workmen's compensation laws, payroll taxes, unemployment insurance laws, social security laws or similar legislation, or insurance related obligations (including pledges or deposits securing liability to insurance carriers under insurance or self-insurance arrangements), or in connection with bids, tenders, completion guarantees, contracts (other than for borrowed money) or leases, or to secure utilities, licenses, public or statutory obligations, or to secure surety, indemnity, judgment, appeal or performance bonds, guarantees of government contracts (or other similar bonds, instruments or obligations), or as security for contested taxes or for import or customs duties or for the payment of rent, or other obligations of like nature, in each case Incurred in the ordinary course of business;

(3)    Liens imposed by law, including carriers', warehousemen's, mechanics', landlords', materialmen's, repairmen's, construction contractors' or other like Liens, in each case for sums not yet overdue for a period of more than 60 days or that are bonded or being contested in good faith by appropriate proceedings;

(4)    Liens for Taxes which are not overdue for a period of more than 60 days or which are being contested in good faith by appropriate proceedings; provided that appropriate reserves required pursuant to GAAP have been made in respect thereof;

(5)    encumbrances, ground leases, easements (including reciprocal easement agreements), survey exceptions, or reservations of, or rights of others for, licenses, rights of way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning, building codes or other restrictions (including minor defects or irregularities in

-30-

title and similar encumbrances) as to the use of real properties or Liens incidental to the conduct of the business of the Issuer and its Restricted Subsidiaries or to the ownership of their properties which do not in the aggregate materially adversely affect the value of said properties or materially impair their use in the operation of the business of the Issuer and its Restricted Subsidiaries;

(6)     Liens (a) on assets or property of the Issuer or any Restricted Subsidiary securing Hedging Obligations or Cash Management Services permitted under this Indenture; (b) that are contractual rights of set-off or, in the case of clause (i) or (ii) below, other bankers' Liens (i) relating to Cash Management Services in the ordinary course of business and not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Issuer or any Subsidiary or (iii) relating to purchase orders and other agreements entered into with customers of the Issuer or any Restricted Subsidiary in the ordinary course of business; (c) on cash accounts securing Indebtedness incurred under Section 3.2(b)(8)(iii) with financial institutions; (d) encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business, consistent with past practice and not for speculative purposes; and/or (e) (i) of a collection bank arising under Section 4-210 of the UCC on items in the course of collection and (ii) in favor of a banking institution arising as a matter of law encumbering deposits (including the right of set-off) arising in the ordinary course of business in connection with the maintenance of such accounts and (iii) arising under customary general terms of the account bank in relation to any bank account maintained with such bank and attaching only to such account and the products and proceeds thereof, which Liens, in any event, do not to secure any Indebtedness;

(7)     leases, licenses, subleases and sublicenses of assets (including real property and intellectual property rights), in each case entered into in the ordinary course of business;

(8)     Liens arising out of judgments, decrees, orders or awards not giving rise to an Event of Default so long as (a) any appropriate legal proceedings which may have been duly initiated for the review of such judgment, decree, order or award have not been finally terminated, (b) the period within which such proceedings may be initiated has not expired or (c) no more than 60 days have passed after (i) such judgment, decree, order or award has become final or (ii) such period within which such proceedings may be initiated has expired;

(9)     Liens (i) on assets or property of the Issuer or any Restricted Subsidiary for the purpose of securing Capitalized Lease Obligations or Purchase Money Obligations, or securing the payment of all or a part of the purchase price of, or securing other Indebtedness Incurred to finance or refinance the acquisition, improvement or construction of, assets or property acquired or constructed in the ordinary course of business; provided that (a) the aggregate principal amount of Indebtedness secured by such Liens is otherwise permitted to be Incurred under this Indenture and (b) any such Liens may not extend to any assets or property of the Issuer or any Restricted Subsidiary

-31-

other than assets or property acquired, improved, constructed or leased with the proceeds of such Indebtedness and any improvements or accessions to such assets and property and (ii) on any interest or title of a lessor under any Capitalized Lease Obligations or operating lease;

(10)   Liens perfected or evidenced by UCC financing statement filings (or similar filings in other applicable jurisdictions) regarding operating leases entered into by the Issuer and its Restricted Subsidiaries in the ordinary course of business;

(11)   Liens existing on the Issue Date after giving effect to the Transactions, and Liens created after the Issue Date pursuant to agreements in existence on the Issue date requiring the creation of such Liens;

(12)   Liens on property, other assets or shares of stock of a Person at the time such Person becomes a Restricted Subsidiary (or at the time the Issuer or a Restricted Subsidiary acquires such property, other assets or shares of stock, including any acquisition by means of a merger, consolidation or other business combination transaction with or into the Issuer or any Restricted Subsidiary); provided, however, that such Liens are not created, Incurred or assumed in anticipation of or in connection with such other Person becoming a Restricted Subsidiary (or such acquisition of such property, other assets or stock); provided, further, that such Liens are limited to all or part of the same property, other assets or stock (plus improvements, accession, proceeds or dividends or distributions in connection with the original property, other assets or stock) that secured (or, under the written arrangements under which such Liens arose, could secure) the obligations to which such Liens relate;

(13)   Liens on assets or property of the Issuer or any Restricted Subsidiary securing Indebtedness or other obligations of the Issuer or such Restricted Subsidiary owing to the Issuer or another Restricted Subsidiary, or Liens in favor of the Issuer or any Restricted Subsidiary;

(14)   Liens securing Refinancing Indebtedness Incurred to refinance Indebtedness that was previously so secured, and permitted to be secured under this Indenture; provided that, except with respect to Liens securing Refinancing Indebtedness Incurred to refinance Indebtedness Incurred pursuant to Section 3.2(b)(l)(y), any such Lien is limited to all or part of the same property or assets (plus improvements, accessions, proceeds or dividends or distributions in respect thereof) that secured (or, under the written arrangements under which the original Lien arose, could secure) the Indebtedness being refinanced or is in respect of property that is or could be the security for or subject to a Permitted Lien hereunder;

(15)   (a) mortgages, liens, security interests, restrictions, encumbrances or any other matters of record that have been placed by any government, statutory or regulatory authority, developer, landlord or other third party on property over which the Issuer or any Restricted Subsidiary of the Issuer has easement rights or on any leased property and subordination or similar arrangements relating thereto and (b) any condemnation or eminent domain proceedings affecting any real property;

(16)     any encumbrance or restriction (including put and call arrangements) with respect to Capital Stock of any joint venture or similar arrangement pursuant to any joint venture or similar agreement;

(17)     Liens on property or assets under construction (and related rights) in favor of a contractor or developer or arising from progress or partial payments by a third party relating to such property or assets;

(18)     Liens arising out of conditional sale, title retention, hire purchase, consignment or similar arrangements for the sale of goods entered into in the ordinary course of business;

(19)     Liens securing Indebtedness permitted to be Incurred under Credit Facilities, including any letter of credit facility relating thereto, that was permitted by the terms of this Indenture to be Incurred pursuant to Section 3.2(b)(1);

(20)     Liens to secure Indebtedness of any Non-Guarantor permitted by Section 3.2(b)(11) covering only the assets of such Subsidiary;

(21)     Liens on Capital Stock or other securities or assets of any Unrestricted Subsidiary that secure Indebtedness of such Unrestricted Subsidiary;

(22)     any security granted over the marketable securities portfolio described in clause (9) of the definition of "Cash Equivalents" in connection with the disposal thereof to a third party;

(23)     Liens on specific items of inventory of other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(24)     Liens on equipment of the Issuer or any Restricted Subsidiary and located on the premises of any client or supplier in the ordinary course of business;

(25)     Liens on assets or securities deemed to arise in connection with and solely as a result of the execution, delivery or performance of contracts to sell such assets or securities if such sale is otherwise permitted by this Indenture;

(26)     Liens arising by operation of law or contract on insurance policies and the proceeds thereof to secure premiums thereunder, and Liens, pledges and deposits in the ordinary course of business securing liability for premiums or reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefits of) insurance carriers;

(27)     Liens solely on any cash earnest money deposits made in connection with any letter of intent or purchase agreement permitted under this Indenture;

-33-

(28)     Liens (i) on cash advances in favor of the seller of any property to be acquired in an Investment permitted pursuant to Permitted Investments to be applied against the purchase price for such Investment, and (ii) consisting of an agreement to sell any property in an asset sale permitted under Section 3.5, in each case, solely to the extent such Investment or asset sale, as the case may be, would have been permitted on the date of the creation of such Lien;

(29)     Liens securing Indebtedness and other obligations in an aggregate principal amount not to exceed the greater of (a) $50.0 million and (b) 4.5% of Total Assets, at any one time outstanding; and

(30)     Liens securing the Note Obligations and the Note Guarantees.

For purposes of this definition, the term Indebtedness shall be deemed to include interest on such Indebtedness including interest which increases the principal amount of such Indebtedness.  In the event that a Permitted Lien meets the criteria of more than one of the types of Permitted Liens (at the time of incurrence or at a later date), the Issuer in its sole discretion may divide, classify or from time to time reclassify all or any portion of such Permitted Lien in any manner that complies with the related covenants and such Permitted Lien shall be treated as having been made pursuant only to the clause or clauses of the definition of "Permitted Lien" to which such Permitted Lien has been classified or reclassified.

["Permitted Tax Distribution" means:

(a)     if and for so long as the Issuer is a member of a group filing a consolidated or combined tax return with any Parent Entity, any dividends or other distributions to fund any income Taxes for which such Parent Entity is liable up to an amount not to exceed with respect to such Taxes the amount of any such Taxes that the Issuer and its Subsidiaries would have been required to pay on a separate company basis or on a consolidated basis if the Issuer and its Subsidiaries had paid Tax on a consolidated, combined, group, affiliated or unitary basis on behalf of an affiliated group consisting only of the Issuer and its Subsidiaries; provided, that the amount of any such payments, dividends or distributions attributable to any income of an Unrestricted Subsidiary shall be limited to the cash distributions made by such Unrestricted Subsidiary to the Issuer or its Restricted Subsidiaries for such purpose; and

(b)     for any taxable year (or portion thereof) ending after the Issue Date for which the Issuer is treated as a disregarded entity, partnership, or other flow-through entity for federal, state and/or local income Tax purposes, the payment of dividends or other distributions to the Issuer's direct owner(s) to fund the income Tax liability of such owner(s) (or, if a direct owner is a pass-through entity, of the indirect owner(s)) for such taxable year (or portion thereof) attributable to the operations and activities of the Issuer and its direct and indirect Subsidiaries, in an aggregate amount not the exceed the product of (x) the highest combined marginal federal and applicable state and/or local statutory Tax rate (after taking into account the deductibility of U.S. state and local income Tax for U.S. federal income Tax purposes), and (y) the taxable income of the Issuer

for such taxable year (or portion thereof) taking into account any applicable loss incurred in prior taxable years (or portions thereof).][4]

"Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, limited liability company, government or any agency or political subdivision thereof or any other entity.

"PIK Toggle Notes Termination Date" has the meaning set forth in the Intercreditor Agreement.

"Plan Confirmation Order" means that certain order entered by the Bankruptcy Court on [ ], 2017 confirming the Plan of Reorganization pursuant to section 1129 of the United States Bankruptcy Code, 11 U.S.C. ss. 101 et seq., as amended.

"Plan of Reorganization" means [that certain Joint Chapter 11 Plan of Reorganization of 21st Century Oncology Holdings, Inc. and its debtor affiliates, dated [ ], 2017 filed in the Chapter 11 Cases, as altered, amended, modified, or supplemented from time to time prior to entry of the Plan Confirmation Order, including any exhibits, supplements, annexes, appendices and schedules thereto, as confirmed by the Bankruptcy Court pursuant to the Plan Confirmation Order].

"Post-Petition Interest" means any interest or entitlement to fees or expenses or other charges that accrue after the filing of any petition or the commencement of any bankruptcy or insolvency proceeding under any Debtor Relief Law, whether or not allowed or allowable as a claim in any such bankruptcy or insolvency proceeding.

"Predecessor Note" of any particular Note means every previous Note evidencing all or a portion of the same debt as that evidenced by such particular Note; and, for the purposes of this definition, any Note authenticated and delivered under Section 2.11 in exchange for or in lieu of a mutilated, destroyed, lost or stolen Note shall be deemed to evidence the same debt as the mutilated, destroyed, lost or stolen Note.

"Preferred Stock," as applied to the Capital Stock of any Person, means Capital Stock of any class or classes (however designated) which is preferred as to the payment of dividends or as to the distribution of assets upon any voluntary or involuntary liquidation or dissolution of such Person, over shares of Capital Stock of any other class of such Person.

"Purchase Money Obligations" means any Indebtedness Incurred to finance or refinance the acquisition, leasing, construction or improvement of property (real or personal) or assets (including Capital Stock), and whether acquired through the direct acquisition of such property or assets or the acquisition of the Capital Stock of any Person owning such property or assets, or otherwise.

"QIB" means any "qualified institutional buyer" as such term is defined in Rule 144A.

---

[4] NTD:  Subject to review by SSL tax.

-35-

"Real Property" means, collectively, all right, title and interests (including any leasehold, mineral or other estate) in and to any and all parcels of or interests in real property owned, leased or operated by any Person, whether by lease, license or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all buildings, structures, parking areas and improvements and appurtenant fixtures and equipment, all general intangibles and contract rights and other property and rights incidental to the ownership, lease or operation thereof.

"Refinance" means refinance, refund, replace, renew, repay, modify, restate, defer, substitute, supplement, exchange, reissue, resell, extend or increase (including pursuant to any defeasance or discharge mechanism) and the terms "refinances," "refinanced" and "refinancing" as used for any purpose in this Indenture shall have a correlative meaning.

"Refinancing Indebtedness" means Indebtedness that is Incurred to Refinance any Indebtedness existing on the Issue Date or Incurred in compliance with this Indenture (including Indebtedness of the Issuer that Refinances Indebtedness of any Restricted Subsidiary and Indebtedness of any Restricted Subsidiary that Refinances Indebtedness of the Issuer or another Restricted Subsidiary) including Indebtedness that refinances Refinancing Indebtedness; provided, however, that:

(1)     (a) such Refinancing Indebtedness has a Weighted Average Life to Maturity at the time such Refinancing Indebtedness is Incurred which is not less than the remaining Weighted Average Life to Maturity of the Indebtedness, Disqualified Stock or Preferred Stock being refunded or refinanced; and (b) to the extent such Refinancing Indebtedness refinances Subordinated Indebtedness, Disqualified Stock or Preferred Stock, such Refinancing Indebtedness is subordinated to the Notes on terms at least as favorable to the Holders as those contained in the documentation governing the Indebtedness being refinanced;

(2)     Refinancing Indebtedness shall not include:

(i)     Indebtedness, Disqualified Stock or Preferred Stock a Subsidiary of the Issuer that is not a Guarantor that refinances Indebtedness, Disqualified Stock or Preferred Stock of the Issuer or a Guarantor; or

(ii)     Indebtedness, Disqualified Stock or Preferred Stock of the Issuer or a Restricted Subsidiary that refinances Indebtedness, Disqualified Stock or Preferred Stock of an Unrestricted Subsidiary; and

(3)     such Refinancing Indebtedness has an aggregate principal amount (or if Incurred with original issue discount, an aggregate issue price) that is equal to or less than the aggregate principal amount (or if Incurred with original issue discount, the aggregate accreted value) then outstanding plus fees and expenses, including any premium and defeasance costs under the Indebtedness being Refinanced.

Refinancing Indebtedness in respect of any Credit Facility or any other Indebtedness may be Incurred from time to time after the termination, discharge or repayment of any such Credit Facility or other Indebtedness.

-36-

"Regulation S" means Regulation S under the Securities Act.

"Regulation S-X" means Regulation S-X under the Securities Act.

["Related Taxes" means, without duplication, any Taxes, including sales, use, transfer, rental, ad valorem, value added, stamp, property, consumption, franchise, license, capital, registration, business, customs, net worth, gross receipts, excise, occupancy, intangibles or similar Taxes and other fees and expenses (other than (x) Taxes measured by income and (y) withholding Taxes), required to be paid (provided such Taxes are in fact paid) by any Parent Entity by virtue of its:

(a)    being organized or having Capital Stock outstanding (but not by virtue of owning stock or other equity interests of any corporation or other entity other than, directly or indirectly, the Issuer or any of the Issuer's Subsidiaries) or otherwise maintain its existence or good standing under applicable law;

(b)    being a holding company parent, directly or indirectly, of the Issuer or any of the Issuer's Subsidiaries;

(c)    receiving dividends from or other distributions in respect of the Capital Stock of, directly or indirectly, the Issuer or any of the Issuer's Subsidiaries;

(d)    having made any payment in respect to any of the items for which the Issuer is permitted to make payments to any Parent Entity pursuant to Section 3.3; or

(e)    any Permitted Tax Distribution.][5]

"Requisite Holders" means, as of any date of determination, Holders holding at least a majority in aggregate principal amount of Notes issued and outstanding at such time.

"Restricted Investment" means any Investment other than a Permitted Investment.

"Restricted Notes" means Initial Notes and Additional Notes bearing one of the restrictive legends described in Section 2.1(d).

"Restricted Notes Legend" means the legend set forth in Section 2.1(d)(1) and, in the case of the Temporary Regulation S Global Note, the legend set forth in Section 2.1(d)(2).

"Restricted Subsidiary" means any Subsidiary of the Issuer other than an Unrestricted Subsidiary.

"Reversion Date" means, during any period of time during which the Issuer and the Restricted Subsidiaries are not subject to Sections 3.2, 3.3, 3.4, 3.5, 3.7, 3.8 and 4.1(a)(3) (collectively, the "Suspended Covenants") as provided for pursuant to Section 3.21, the date on which the Notes cease to have Investment Grade Status and after which date the Suspended Covenants will thereafter be reinstated as if such covenants had never been suspended and such

---

[5] NTD: Subject to review by SSL tax.

-37-

Suspended Covenants will be applicable pursuant to the terms of this Indenture (including in connection with performing any calculation or assessment to determine compliance with the terms of this Indenture).

"Rule 144A" means Rule 144A under the Securities Act.

"S&P" means Standard & Poor's Investors Ratings Services or any of its successors or assigns that is a Nationally Recognized Statistical Rating Organization.

"Sale and Leaseback Transaction" means any arrangement providing for the leasing by the Issuer or any of its Restricted Subsidiaries of any real or tangible personal property, which property has been or is to be sold or transferred by the Issuer or such Restricted Subsidiary to a third Person in contemplation of such leasing.

"SEC" means the U.S. Securities and Exchange Commission or any successor thereto.

"Securities Act" means the U.S. Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder, as amended.

"Security Agreement" means that certain [Security Agreement], dated as of the Issue Date, among the Issuer, the Guarantors party thereto from time to time and the Collateral Agent, as such agreement may be amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms.

"Series A Preferred Stock" means [    ].

"Significant Subsidiary" means any Restricted Subsidiary that would be a "significant subsidiary" as defined in Article 1, Rule 1-02 of Regulation S-X, promulgated pursuant to the Securities Act, as such regulation is in effect on the Issue Date.

"Similar Business" means (a) any businesses, services or activities engaged in by the Issuer or any of its Subsidiaries or any Associates on the Issue Date and (b) any businesses, services and activities engaged in by the Issuer or any of its Subsidiaries or any Associates that are related, complementary, incidental, ancillary or similar to any of the foregoing or are extensions or developments of any thereof.

"Stated Maturity" means, with respect to any security, the date specified in such security as the fixed date on which the payment of principal of such security is due and payable, including pursuant to any mandatory redemption provision, but shall not include any contingent obligations to repay, redeem or repurchase any such principal prior to the date originally scheduled for the payment thereof.

"Subordinated Indebtedness" means, with respect to any person, any Indebtedness (whether outstanding on the Issue Date or thereafter Incurred) which is expressly subordinated in right of payment to the Notes pursuant to a written agreement.

"Subsidiary" means, with respect to any Person:

-38-

(1)      any corporation, association, or other business entity (other than a partnership, joint venture, limited liability company or similar entity) of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time of determination owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof; or

(2)      any partnership, joint venture, limited liability company or similar entity of which:

(a)      more than 50% of the capital accounts, distribution rights, total equity and voting interests or general or limited partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof whether in the form of membership, general, special or limited partnership interests or otherwise; and

(b)      such Person or any Subsidiary of such Person is a controlling general partner or otherwise controls such entity.

"Taxes" means all present and future taxes, levies, imposts, deductions, charges, duties and withholdings and any charges of a similar nature (including interest, penalties and other liabilities with respect thereto) that are imposed by any government or other taxing authority.

"Term Priority Collateral" has the meaning set forth in the Intercreditor Agreement.

"Term Priority Obligations" means (i) all Obligations under the MDL Exit Credit Agreement, (ii) all Obligations under the 21C Exit Credit Agreement and (iii) all other Indebtedness Incurred pursuant to Section 3.2 that is secured by Liens on the Term Priority Collateral that rank senior to the Note Liens on the Term Priority Collateral; *provided* that an authorized representative of the holders of such Indebtedness shall have executed a joinder to the Intercreditor Agreement.

"TIA" means the Trust Indenture Act of 1939, as amended.

"Total Assets" means, as of any date, the total consolidated assets of the Issuer and its Restricted Subsidiaries on a consolidated basis, as shown on the most recent consolidated balance sheet of the Issuer and its Restricted Subsidiaries, determined on a *pro forma* basis in a manner consistent with the *pro forma* basis contained in the definition of "Fixed Charge Coverage Ratio".

"Transaction Expenses" means any fees or expenses incurred or paid by Holdings, the Issuer or any Restricted Subsidiary in connection with the Transactions.

"Transactions" means, collectively, (i) the execution and delivery, and incurrence and performance of obligations under, or arising in connection with, this Indenture, the other Notes Documents and all related agreements and documents, (ii) the issuance of the Notes, (iii) the consummation of all transactions contemplated by the Plan of Reorganization and includes the

-39-

transactions contemplated by the Exit Credit Agreements, and (iv) the payment of all Transaction Expenses.

"Trust Officer" means, when used with respect to the Trustee, any vice president, assistant vice president, any trust officer or any other officer of the Trustee who shall have direct responsibility for the administration of this Indenture, or any other person to whom any corporate trust matter relating to this Indenture is referred because of such person's knowledge of and familiarity with the particular subject.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York.

"Unrestricted Subsidiary" means:

(1)    any Subsidiary of the Issuer that at the time of determination is an Unrestricted Subsidiary (as designated by the Issuer in the manner provided below); and

(2)    any Subsidiary of an Unrestricted Subsidiary.

The Issuer may designate any Subsidiary of the Issuer, respectively, (including any newly acquired or newly formed Subsidiary or a Person becoming a Subsidiary through merger, consolidation or other business combination transaction, or Investment therein) to be an Unrestricted Subsidiary only if:

(1)    such Subsidiary or any of its Subsidiaries does not own any Capital Stock or Indebtedness of, or own or hold any Lien on any property of, the Issuer or any other Subsidiary of the Issuer which is not a Subsidiary of the Subsidiary to be so designated or otherwise an Unrestricted Subsidiary; and

(2)    such designation and the Investment of the Issuer in such Subsidiary complies with Section 3.3 hereof.

"U.S. Government Obligations" means securities that are (1) direct obligations of the United States of America for the timely payment of which its full faith and credit is pledged or (2) obligations of a Person controlled or supervised by and acting as an agency or instrumentality of the United States of America the timely payment of which is unconditionally Guaranteed as a full faith and credit obligation of the United States of America, which, in either case, are not callable or redeemable at the option of the issuers thereof, and shall also include a depositary receipt issued by a bank (as defined in Section 3(a)(2) of the Securities Act), as custodian with respect to any such U.S. Government Obligations or a specific payment of principal of or interest on any such U.S. Government Obligations held by such custodian for the account of the holder of such depositary receipt; provided that (except as required by law) such custodian is not authorized to make any deduction from the amount payable to the holder of such depositary receipt from any amount received by the custodian in respect of the U.S. Government Obligations or the specific payment of principal of or interest on the U.S. Government Obligations evidenced by such depositary receipt.

"Voting Stock" of a Person means all classes of Capital Stock of such Person then outstanding and normally entitled to vote in the election of directors.

"Weighted Average Life to Maturity" means, when applied to any Indebtedness, Disqualified Stock or Preferred Stock, as the case may be, at any date, the quotient obtained by dividing:

(1)   the sum of the products of the number of years from the date of determination to the date of each successive scheduled principal payment of such Indebtedness or redemption or similar payment with respect to such Disqualified Stock or Preferred Stock multiplied by the amount of such payment, *by*

(2)   the sum of all such payments.

"Wholly Owned Domestic Subsidiary" means a Domestic Subsidiary of the Issuer, all of the Capital Stock of which (other than directors' qualifying shares or shares required by any applicable law or regulation to be held by a Person other than the Issuer or another Domestic Subsidiary) is owned by the Issuer or another Domestic Subsidiary.

"Wholly Owned Subsidiary" means as to any Person, any other Person all of the Capital Stock of which (other than directors' qualifying shares required by law) is owned by such Person directly and/or through other Wholly Owned Subsidiaries.

SECTION 1.2. Other Definitions.

| Term | Defined in Section |
|---|---|
| "Additional Restricted Notes" | 2.1(b) |
| "Affiliate Transaction" | 3.8(a) |
| "Agent Members" | 2.1(e)(2) |
| "Approved Foreign Bank" | "Cash Equivalents" |
| "Asset Disposition Offer" | 3.5(b) |
| "Authenticating Agent" | 2.2 |
| "Automatic Exchange" | 2.6(e) |
| "Automatic Exchange Date" | 2.6(e) |
| "Automatic Exchange Notice" | 2.6(e) |
| "Automatic Exchange Notice Date" | 2.6(e) |
| "Cash Interest" | Exhibit A |
| "Cash Interest Rate" | Exhibit A |
| "Change of Control Offer" | 3.9(a) |

-41-

| Term | Defined in Section |
|---|---|
| "Change of Control Payment" | 3.9(a) |
| "Change of Control Payment Date" | 3.9(a)(2) |
| "Clearstream" | 2.1(b) |
| "Covenant Defeasance" | 8.3 |
| "Defaulted Interest" | 2.15 |
| "Euroclear" | 2.1(b) |
| "Event of Default" | 6.1 |
| "Excess Proceeds" | 3.5(b) |
| "Foreign Disposition" | 3.5(d)(i) |
| "Global Notes" | 2.1(b) |
| "Guaranteed Obligations" | 10.1 |
| "Increased Amount" | 3.6 |
| "Initial Default" | 6.1(b) |
| "Initial Notes" | Recitals |
| "Institutional Accredited Investor Global Note" | 2.1(b) |
| "Institutional Accredited Investor Notes" | 2.1(b) |
| "Issuer Order" | 2.2 |
| "Legal Defeasance" | 8.2 |
| "Legal Holiday" | 12.8 |
| "Notes Register" | 2.3 |
| "Other Guarantee" | 10.2(b)(5) |
| "Permanent Regulation S Global Note" | 2.1(b) |
| "PIK Interest" | Exhibit A |
| "PIK Interest Rate" | Exhibit A |
| "PIK Notes" | 2.1(h) |
| "PIK Payment" | 2.1(h) |
| "protected purchaser" | 2.11 |
| "Redemption Date" | 5.7(a) |
| "Registrar" | 2.3 |
| "Regulation S Global Note" | 2.1(b) |

| Term | Defined in Section |
|------|--------------------|
| "Regulation S Notes" | 2.1(b) |
| "Resale Restriction Termination Date" | 2.6(b) |
| "Restricted Global Note" | 2.6(e) |
| "Restricted Payments" | 3.3(a) |
| "Restricted Period" | 2.1(b) |
| "Rule 144A Global Note" | 2.1(b) |
| "Rule 144A Notes" | 2.1(b) |
| "Special Interest Payment Date" | 2.15(a) |
| "Special Record Date" | 2.15(a) |
| "Successor Company" | 4.1(a)(1) |
| "Suspended Covenants" | "Reversion Date" |
| "Suspension Period" | 3.21 |
| "Temporary Regulation S Global Note" | 2.1(b) |
| "Trustee" | Introductory Paragraph |
| "Unrestricted Global Note" | 2.6(e) |

SECTION 1.3. [Reserved].

SECTION 1.4. Rules of Construction.  Unless the context otherwise requires:

(1)     a term has the meaning assigned to it;

(2)     an accounting term not otherwise defined has the meaning assigned to it in accordance with GAAP;

(3)     "or" is not exclusive;

(4)     "including", "includes"  and "include", in each case, shall be deemed to be followed by "without limitation";

(5)     words in the singular include the plural and words in the plural include the singular;

(6)     "will" shall be interpreted to express a command and shall be construed to have the same meaning and effect as the word "shall";

-43-

(7)     the principal amount of any non-interest bearing or other discount security at any date shall be the principal amount thereof that would be shown on a balance sheet of the issuer dated such date prepared in accordance with GAAP;

(8)     the principal amount of any preferred stock shall be (i) the maximum liquidation value of such preferred stock or (ii) the maximum mandatory redemption or mandatory repurchase price with respect to such preferred stock, whichever is greater;

(9)     all amounts expressed in this Indenture or in any of the Notes in terms of money refer to the lawful currency of the United States of America;

(10)     references in this Indenture to any Article, Section, clause or subclause refer to such Article, Section, clause or subclause as contained in this Indenture;

(11)     the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section or other subdivision;

(12)     the words "asset" and "property" shall be construed as having the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights;

(13)     unless otherwise specifically indicated, the term "consolidated" with respect to any Person refers to such Person consolidated with its Restricted Subsidiaries, and excludes from such consolidation any Unrestricted Subsidiary as if such Unrestricted Subsidiary were not an Affiliate of such Person;

(14)     unless the context requires otherwise, (a) references to "Notes" for all purposes of this Indenture shall include any PIK Notes that are actually issued and any increase in the principal amount of the outstanding Notes (including PIK Notes) as a result of a PIK Interest Payment, (b) references to "principal amount" of the Notes shall include any increase in the principal amount of the outstanding Notes (including PIK Notes) as a result of a PIK Interest Payment and (c) references to "interest" on the Notes shall include all accrued and unpaid PIK Interest; and

(15)     the words "in the ordinary course of business" of the Issuer or any Subsidiary thereof means (i) in the ordinary course of business of, or in furtherance of an objective that is in the ordinary course of business of the Issuer or such Subsidiary, as applicable, (ii) customary and usual in the industry or industries of the Issuer and its Subsidiaries in the United States or any other jurisdiction in which the Issuer or any Subsidiary does business, as applicable, or (iii) generally consistent with the past or current practice of the Issuer or such Subsidiary, as applicable, or any similarly situated businesses in the United States or any other jurisdiction in which the Issuer or any Subsidiary does business, as applicable.

ARTICLE II

THE NOTES

SECTION 2.1.  Form, Dating and Terms.

(a)      The aggregate principal amount of Notes that may be authenticated and delivered under this Indenture is unlimited.  The Initial Notes issued on the date hereof will be in an aggregate principal amount of $[  ].  In addition, the Issuer may issue, from time to time in accordance with the provisions of this Indenture, Additional Notes and PIK Notes (as provided herein).  Furthermore, Notes may be authenticated and delivered upon registration of transfer, exchange or in lieu of, other Notes pursuant to Sections 2.2, 2.6, 2.11, 2.13, 5.6 or 9.5, in connection with an Asset Disposition Offer pursuant to Section 3.5 or in connection with a Change of Control Offer pursuant to Section 3.9.

Notwithstanding anything to the contrary contained herein, the Issuer may not issue any Additional Notes, unless such issuance is in compliance with Sections 3.2 and 3.6.

With respect to any Additional Notes, the Issuer shall set forth in an Officer's Certificate or one or more indentures supplemental hereto, the following information:

(A)      the aggregate principal amount of such Additional Notes to be authenticated and delivered pursuant to this Indenture;

(B)      the issue price and the issue date of such Additional Notes, including the date from which interest shall accrue; and

(C)      whether such Additional Notes shall be Restricted Notes.

In authenticating and delivering Additional Notes, the Trustee shall be entitled to receive and shall be fully protected in relying upon, in addition to the Opinion of Counsel and Officer's Certificate required by Section 12.2, an Opinion of Counsel as to the due execution, delivery, validity and enforceability of such Additional Notes.

The Initial Notes, the Additional Notes and the PIK Notes shall be considered collectively as a single class for all purposes of this Indenture.  Holders of the Initial Notes, the Additional Notes and the PIK Notes will vote and consent together on all matters to which such Holders are entitled to vote or consent as one class, and none of the Holders of the Initial Notes, the Additional Notes or the PIK Notes shall have the right to vote or consent as a separate class on any matter to which such Holders are entitled to vote or consent.

(b)      The Initial Notes and any Additional Notes (if issued as Restricted Notes) (the "Additional Restricted Notes") will be resold initially only to (A) Persons they reasonably believe to be QIBs in reliance on Rule 144A and (B) Non-U.S. Persons in reliance on Regulation S.  Such Initial Notes and Additional Restricted Notes may thereafter be transferred to, among others, QIBs, purchasers in reliance on Regulation S, AIs and IAIs in accordance with Rule 501 under the Securities Act, in each case, in accordance with the procedure described

herein.  Additional Notes offered after the date hereof may be offered and sold by the Issuer from time to time pursuant to one or more purchase agreements in accordance with applicable law.

Initial Notes and Additional Restricted Notes offered and sold to QIBs in the United States of America in reliance on Rule 144A (the "Rule 144A Notes") shall be issued in the form of a permanent global Note substantially in the form of Exhibit A, which is hereby incorporated by reference and made a part of this Indenture, including appropriate legends as set forth in Section 2.1(d) (the "Rule 144A Global Note"), deposited with the Trustee, as custodian for DTC, duly executed by the Issuer and authenticated by the Trustee as hereinafter provided.  The Rule 144A Global Note may be represented by more than one certificate, if so required by DTC's rules regarding the maximum principal amount to be represented by a single certificate. The aggregate principal amount of the Rule 144A Global Note may from time to time be increased or decreased by adjustments made on the records of the Trustee, as custodian for DTC or its nominee, as hereinafter provided.

Initial Notes and any Additional Restricted Notes offered and sold to non-U.S. Persons outside the United States of America (the "Regulation S Notes") in reliance on Regulation S shall initially be issued in the form of a temporary global Note (the "Temporary Regulation S Global Note").  Beneficial interests in the Temporary Regulation S Global Note will be exchanged for beneficial interests in a corresponding permanent global Note substantially in the form of Exhibit A including appropriate legends as set forth in Section 2.1(d) (the "Permanent Regulation S Global Note" and, together with the Temporary Regulation S Global Note, each a "Regulation S Global Note") within a reasonable period after the expiration of the Restricted Period (as defined below) upon delivery of the certification contemplated by Section 2.7.  Each Regulation S Global Note will be deposited upon issuance with, or on behalf of, the Trustee as custodian for DTC in the manner described in this Article II.  Prior to the 40th day after the later of the commencement of the offering of the Initial Notes and the Issue Date (such period through and including such 40th day, the "Restricted Period"), interests in the Temporary Regulation S Global Note may only be transferred to non-U.S. persons pursuant to Regulation S, unless exchanged for interests in a Global Note in accordance with the transfer and certification requirements described herein.

Investors may hold their interests in the Regulation S Global Note through organizations other than Euroclear or Clearstream that are participants in DTC's system or directly through Euroclear or Clearstream, if they are participants in such systems, or indirectly through organizations which are participants in such systems.  If such interests are held through Euroclear or Clearstream, Euroclear and Clearstream will hold such interests in the applicable Regulation S Global Note on behalf of their participants through customers' securities accounts in their respective names on the books of their respective depositaries.  Such depositaries, in turn, will hold such interests in the applicable Regulation S Global Note in customers' securities accounts in the depositaries' names on the books of DTC.

The Regulation S Global Note may be represented by more than one certificate, if so required by DTC's rules regarding the maximum principal amount to be represented by a single certificate.  The aggregate principal amount of the Regulation S Global Note may from time to time be increased or decreased by adjustments made on the records of the Trustee, as custodian for DTC or its nominee, as hereinafter provided.

Initial Notes and Additional Restricted Notes resold to IAIs (the "Institutional Accredited Investor Notes") in the United States of America shall be issued in the form of a permanent global Note substantially in the form of Exhibit A including appropriate legends as set forth in Section 2.1(d) (the "Institutional Accredited Investor Global Note") deposited with the Trustee, as custodian for DTC, duly executed by the Issuer and authenticated by the Trustee as hereinafter provided. The Institutional Accredited Investor Global Note may be represented by more than one certificate, if so required by DTC's rules regarding the maximum principal amount to be represented by a single certificate. The aggregate principal amount of the Institutional Accredited Investor Global Note may from time to time be increased or decreased by adjustments made on the records of the Trustee, as custodian for DTC or its nominee, as hereinafter provided.

Initial Notes and Additional Restricted Notes resold to AIs in the United States of America shall be issued in the form of a Definitive Note substantially in the form of Exhibit A including the legend as set forth in Section 2.1(d)(5) (an "Accredited Investor Note").

The Rule 144A Global Note, the Regulation S Global Note and the Institutional Accredited Investor Global Note are sometimes collectively herein referred to as the "Global Notes."

The principal of (and premium, if any) and interest on the Notes shall be payable at the office or agency of Paying Agent designated by the Issuer maintained for such purpose (which shall initially be the office of the Trustee maintained for such purpose), or at such other office or agency of the Issuer as may be maintained for such purpose pursuant to Section 2.3; provided, however, that, at the option of the Paying Agent, each installment of Cash Interest may be paid by (i) check mailed to addresses of the Persons entitled thereto as such addresses shall appear on the Notes Register or (ii) wire transfer to an account located in the United States maintained by the payee, subject to the last sentence of this paragraph. Payments (other than PIK Interest Payments) in respect of Notes represented by a Global Note (including principal, premium, if any, and interest) will be made by wire transfer of immediately available funds to the accounts specified by DTC. Payments (other than PIK Interest Payments) in respect of Notes represented by Definitive Notes (including principal, premium, if any, and interest) held by a Holder of at least $1,000,000 aggregate principal amount of Notes represented by Definitive Notes will be made in accordance with the Notes Register, or by wire transfer to a U.S. dollar account maintained by the payee with a bank in the United States if such Holder elects payment by wire transfer by giving written notice to the Trustee or the Paying Agent to such effect designating such account no later than 15 days immediately preceding the relevant due date for payment (or such other date as the Trustee may accept in its discretion).

The Notes may have notations, legends or endorsements required by law, stock exchange rule or usage, in addition to those set forth on Exhibit A and in Section 2.1(d). The Issuer shall approve any notation, endorsement or legend on the Notes. Each Note shall be dated the date of its authentication. The terms of the Notes set forth in Exhibit A are part of the terms of this Indenture and, to the extent applicable, the Issuer, the Guarantors and the Trustee, by their execution and delivery of this Indenture, expressly agree to be bound by such terms.

-47-

(c)      Denominations.  The Notes shall be issuable only in fully registered form in minimum denominations of $1,000 and any integral multiple of $1,000 in excess thereof, except that if a PIK Payment is made, the Notes may be issued in minimum denominations of $1.00 and integral multiples of $1.00 in excess thereof.

(d)      Restrictive Legends.  Unless and until (i) an Initial Note or an Additional Note issued as a Restricted Note is sold under an effective registration statement or (ii) the Issuer receives an Opinion of Counsel satisfactory to it to the effect that neither such legend nor the related restrictions on transfer are required in order to maintain compliance with the provisions of the Securities Act:

(1)      the Rule 144A Global Note, the Regulation S Global Note and the Institutional Accredited Investor Global Note shall bear the following legend on the face thereof:

THE SECURITY (OR ITS PREDECESSOR) EVIDENCED HEREBY WAS ORIGINALLY ISSUED IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 5 OF THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND THE SECURITY EVIDENCED HEREBY MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN APPLICABLE EXEMPTION THEREFROM. EACH PURCHASER OF THE SECURITY EVIDENCED HEREBY IS HEREBY NOTIFIED THAT THE SELLER MAY BE RELYING ON EXEMPTIONS FROM THE PROVISIONS OF SECTION 5 OF THE SECURITIES ACT. THE HOLDER OF THE SECURITY EVIDENCED HEREBY AGREES FOR THE BENEFIT OF THE ISSUER THAT (A) SUCH SECURITY MAY BE RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (i) (a) TO A PERSON WHO IS A QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A, (b) IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144 UNDER THE SECURITIES ACT, (c) OUTSIDE THE UNITED STATES TO A NON-U.S. PERSON IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 904 UNDER THE SECURITIES ACT, OR (d) IN ACCORDANCE WITH ANOTHER EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT (AND BASED UPON AN OPINION OF COUNSEL IF THE ISSUER SO REQUESTS), (ii) TO THE ISSUER, OR (iii) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT AND, IN EACH CASE IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER APPLICABLE JURISDICTION, AND (B) THE HOLDER WILL, AND EACH SUBSEQUENT HOLDER IS REQUIRED TO, NOTIFY ANY PURCHASER FROM IT OF THE SECURITY EVIDENCED HEREBY OF THE RESALE RESTRICTIONS SET FORTH IN CLAUSE (A) ABOVE. NO REPRESENTATION CAN BE MADE AS TO THE AVAILABILITY OF THE EXEMPTION PROVIDED BY RULE 144 FOR RESALE OF THE SECURITY EVIDENCED HEREBY.

-48-

IN THE CASE OF THE REGULATION S GLOBAL NOTE:  BY ITS ACQUISITION HEREOF, THE HOLDER HEREOF REPRESENTS THAT IT IS NOT A U.S. PERSON NOR IS IT PURCHASING FOR THE ACCOUNT OF A U.S. PERSON AND IS ACQUIRING THIS SECURITY IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH REGULATION S UNDER THE SECURITIES ACT.

BY ITS ACQUISITION OF THIS SECURITY THE HOLDER AND ANY SUBSEQUENT TRANSFEREE HEREOF WILL BE DEEMED TO HAVE REPRESENTED AND WARRANTED THAT EITHER (I) THE PURCHASER IS NOT ACQUIRING OR HOLDING SUCH NOTE OR AN INTEREST THEREIN WITH THE ASSETS OF (A) AN "EMPLOYEE BENEFIT PLAN" (AS DEFINED IN SECTION 3(3) OF ERISA) THAT IS SUBJECT TO ERISA, (B) A "PLAN" DESCRIBED IN SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), (C) ANY ENTITY DEEMED TO HOLD "PLAN ASSETS" OF ANY OF THE FOREGOING BY REASON OF AN EMPLOYEE BENEFIT PLAN'S OR PLAN'S INVESTMENT IN SUCH ENTITY OR (D) A GOVERNMENTAL PLAN OR CHURCH PLAN SUBJECT TO SUCH PROVISIONS THAT ARE SIMILAR TO SUCH PROVISIONS OF ERISA OR THE CODE (COLLECTIVELY, "SIMILAR LAWS") OR (II) THE ACQUISITION AND HOLDING OF SUCH NOTE BY THE PURCHASER, THROUGHOUT THE PERIOD THAT IT HOLDS SUCH NOTE AND THE DISPOSITION OF SUCH NOTE OR AN INTEREST THEREIN WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT PROHIBITED TRANSACTION UNDER SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE, A BREACH OF FIDUCIARY DUTY UNDER ERISA OR A VIOLATION OF ANY PROVISIONS OF ANY APPLICABLE SIMILAR LAW.

(2)     The Temporary Regulation S Global Note shall bear the following additional legend on the face thereof:

THIS SECURITY IS A TEMPORARY GLOBAL NOTE.  PRIOR TO THE EXPIRATION OF THE RESTRICTED PERIOD APPLICABLE HERETO, BENEFICIAL INTERESTS HEREIN MAY NOT BE HELD BY ANY PERSON OTHER THAN (1) A NON-U.S. PERSON OR (2) A U.S. PERSON THAT PURCHASED SUCH INTEREST IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT.  BENEFICIAL INTERESTS HEREIN ARE NOT EXCHANGEABLE FOR PHYSICAL NOTES OTHER THAN A PERMANENT GLOBAL NOTE IN ACCORDANCE WITH THE TERMS OF THE INDENTURE.  TERMS IN THIS LEGEND ARE USED AS USED IN REGULATION S UNDER THE SECURITIES ACT.

(3)     Each Global Note, whether or not an Initial Note, shall bear the following legend on the face thereof:

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), NEW YORK, NEW YORK, TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND

-49-

ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFERS OF THIS GLOBAL NOTE SHALL BE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO DTC, TO NOMINEES OF DTC OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE AND TRANSFERS OF PORTIONS OF THIS GLOBAL NOTE SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE REFERRED TO ON THE REVERSE HEREOF.

(4)     Each Accredited Investor Note shall bear the following legend on the face thereof:

THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAWS.   NEITHER THIS SECURITY NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, REGISTRATION.

THE HOLDER OF THIS SECURITY, BY ITS ACCEPTANCE HEREOF (1) REPRESENTS THAT (A) IT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT), (B) IT IS A NON-U.S. PERSON AND IS ACQUIRING THIS SECURITY IN AN OFFSHORE TRANSACTION WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT AND IN ACCORDANCE WITH THE LAWS APPLICABLE TO SUCH PURCHASER IN THE JURISDICTION IN WHICH SUCH PURCHASE IS MADE, OR (C) IT IS AN "ACCREDITED INVESTOR" WITHIN THE MEANING OF RULE 501 UNDER THE SECURITIES ACT AND (2) AGREES TO OFFER, SELL OR OTHERWISE TRANSFER SUCH SECURITY, PRIOR TO THE EXPIRATION OF THE APPLICABLE HOLDING PERIOD WITH RESPECT TO RESTRICTED SECURITIES SET FORTH IN RULE 144 UNDER THE SECURITIES ACT, ONLY (A) TO THE ISSUER OR ANY SUBSIDIARY THEREOF, (B) FOR SO LONG AS THE SECURITIES ARE ELIGIBLE FOR RESALE PURSUANT TO RULE 144A, TO A PERSON IT REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT THAT PURCHASES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHICH NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, (C) PURSUANT TO OFFERS AND SALES TO NON-U.S. PERSONS THAT OCCUR OUTSIDE THE

-50-

UNITED STATES WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT AND IN ACCORDANCE WITH THE LAWS APPLICABLE TO IT IN THE JURISDICTION IN WHICH SUCH PURCHASE IS MADE, (D) TO AN "ACCREDITED INVESTOR" WITHIN THE MEANING OF RULE 501 UNDER THE SECURITIES ACT THAT IS ACQUIRING THE SECURITY FOR ITS OWN ACCOUNT, OR FOR THE ACCOUNT OF SUCH AN ACCREDITED INVESTOR, FOR INVESTMENT PURPOSES AND NOT WITH A VIEW TO, OR FOR OFFER OR SALE IN CONNECTION WITH, ANY DISTRIBUTION IN VIOLATION OF THE SECURITIES ACT, (E) PURSUANT TO A REGISTRATION STATEMENT WHICH HAS BEEN DECLARED EFFECTIVE UNDER THE SECURITIES ACT, OR (F) PURSUANT TO ANOTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, SUBJECT TO THE ISSUER'S RIGHT PRIOR TO ANY SUCH OFFER, SALE OR TRANSFER PURSUANT TO CLAUSE (C), (D) OR (F) TO REQUIRE THE DELIVERY OF AN OPINION OF COUNSEL, CERTIFICATION AND/OR OTHER INFORMATION SATISFACTORY TO THE ISSUER, AND IN EACH OF THE FOREGOING CASES, A CERTIFICATE OF TRANSFER IN THE FORM APPEARING ON THE OTHER SIDE OF THIS SECURITY IS COMPLETED AND DELIVERED BY THE TRANSFEROR TO THE TRUSTEE OR REGISTRAR. THIS LEGEND WILL BE REMOVED UPON THE REQUEST OF THE HOLDER AFTER THE EXPIRATION OF THE APPLICABLE HOLDING PERIOD WITH RESPECT TO RESTRICTED SECURITIES SET FORTH IN RULE 144 UNDER THE SECURITIES ACT.

BY ITS ACQUISITION OF THIS SECURITY THE HOLDER AND ANY SUBSEQUENT TRANSFEREE HEREOF WILL BE DEEMED TO HAVE REPRESENTED AND WARRANTED THAT EITHER (I) THE PURCHASER IS NOT ACQUIRING OR HOLDING SUCH NOTE OR AN INTEREST THEREIN WITH THE ASSETS OF (A) AN "EMPLOYEE BENEFIT PLAN" (AS DEFINED IN SECTION 3(3) OF ERISA) THAT IS SUBJECT TO ERISA, (B) A "PLAN" DESCRIBED IN SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), (C) ANY ENTITY DEEMED TO HOLD "PLAN ASSETS" OF ANY OF THE FOREGOING BY REASON OF AN EMPLOYEE BENEFIT PLAN'S OR PLAN'S INVESTMENT IN SUCH ENTITY OR (D) A GOVERNMENTAL PLAN OR CHURCH PLAN SUBJECT TO SUCH PROVISIONS THAT ARE SIMILAR TO SUCH PROVISIONS OF ERISA OR THE CODE (COLLECTIVELY, "SIMILAR LAWS") OR (II) THE ACQUISITION AND HOLDING OF SUCH NOTE BY THE PURCHASER, THROUGHOUT THE PERIOD THAT IT HOLDS SUCH NOTE AND THE DISPOSITION OF SUCH NOTE OR AN INTEREST THEREIN WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT PROHIBITED TRANSACTION UNDER SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE, A BREACH OF FIDUCIARY DUTY UNDER ERISA OR A VIOLATION OF ANY PROVISIONS OF ANY APPLICABLE SIMILAR LAW.

(e)    Book-Entry Provisions.  (i) This Section 2.1(e) shall apply only to Global Notes deposited with the Trustee, as custodian for DTC.

-51-

(1)     Each Global Note initially shall (x) be registered in the name of DTC or the nominee of DTC, (y) be delivered to the Notes Custodian for DTC and (z) bear legends as set forth in Section 2.1(d).  Transfers of a Global Note (but not a beneficial interest therein) will be limited to transfers thereof in whole, but not in part, to the DTC, its successors or its respective nominees, except as set forth in Section 2.1(e)(4) and 2.1(f).  If a beneficial interest in a Global Note is transferred or exchanged for a beneficial interest in another Global Note, the Notes Custodian will (x) record a decrease in the principal amount of the Global Note being transferred or exchanged equal to the principal amount of such transfer or exchange and (y) record a like increase in the principal amount of the other Global Note.  Any beneficial interest in one Global Note that is transferred to a Person who takes delivery in the form of an interest in another Global Note, or exchanged for an interest in another Global Note, will, upon transfer or exchange, cease to be an interest in such Global Note and become an interest in the other Global Note and, accordingly, will thereafter be subject to all transfer and exchange restrictions, if any, and other procedures applicable to beneficial interests in such other Global Note for as long as it remains such an interest.

(2)     Members of, or participants in, DTC ("Agent Members") shall have no rights under this Indenture with respect to any Global Note held on their behalf by DTC or by the Notes Custodian as the custodian of DTC or under such Global Note, and DTC may be treated by the Issuer, the Trustee and any agent of the Issuer or the Trustee as the absolute owner of such Global Note for all purposes whatsoever.  Notwithstanding the foregoing, nothing herein shall prevent the Issuer, the Trustee or any agent of the Issuer or the Trustee from giving effect to any written certification, proxy or other authorization furnished by DTC or impair, as between DTC and its Agent Members, the operation of customary practices of DTC governing the exercise of the rights of a holder of a beneficial interest in any Global Note.

(3)     In connection with any transfer of a portion of the beneficial interest in a Global Note pursuant to Section 2.1(f) to beneficial owners who are required to hold Definitive Notes, the Notes Custodian shall reflect on its books and records the date and a decrease in the principal amount of such Global Note in an amount equal to the principal amount of the beneficial interest in the Global Note to be transferred, and the Issuer shall execute, and the Trustee shall authenticate and make available for delivery, one or more Definitive Notes of like tenor and amount.

(4)     In connection with the transfer of an entire Global Note to beneficial owners pursuant to Section 2.1(f), such Global Note shall be deemed to be surrendered to the Trustee for cancellation, and the Issuer shall execute, and the Trustee shall authenticate and make available for delivery, to each beneficial owner identified by DTC in exchange for its beneficial interest in such Global Note, an equal aggregate principal amount of Definitive Notes of authorized denominations.

(5)     The registered Holder of a Global Note may grant proxies and otherwise authorize any person, including Agent Members and persons that may hold interests through Agent Members, to take any action which a Holder is entitled to take under this Indenture or the Notes.

(6) Any Holder of a Global Note shall, by acceptance of such Global Note, agree that transfers of beneficial interests in such Global Note may be effected only through a book-entry system maintained by (i) the Holder of such Global Note (or its agent) or (ii) any holder of a beneficial interest in such Global Note, and that ownership of a beneficial interest in such Global Note shall be required to be reflected in a book entry.

(f) <u>Definitive Notes</u>. (ii) Except as provided below, owners of beneficial interests in Global Notes will not be entitled to receive Definitive Notes. Definitive Notes shall be transferred to all beneficial owners in exchange for their beneficial interests in a Global Note if (A) DTC notifies the Issuer that it is unwilling or unable to continue as depositary for such Global Note or DTC ceases to be a clearing agency registered under the Exchange Act, at a time when DTC is required to be so registered in order to act as depositary, and in each case a successor depositary is not appointed by the Issuer within 90 days of such notice, (B) the Issuer in its sole discretion executes and deliver to the Trustee and Registrar an Officer's Certificate stating that such Global Note shall be so exchangeable or (C) an Event of Default has occurred and is continuing and the Registrar has received a written request from DTC. In the event of the occurrence of any of the events specified in the second preceding sentence or in clause (A), (B) or (C) of the preceding sentence, the Issuer shall promptly make available to the Trustee a reasonable supply of Definitive Notes. In addition, any Note transferred to an affiliate (as defined in Rule 405 under the Securities Act) of the Issuer or evidencing a Note that has been acquired by an affiliate in a transaction or series of transactions not involving any public offering must, until one year after the last date on which either the Issuer or any affiliate of the Issuer was an owner of the Note, be in the form of a Definitive Note and bear the legend regarding transfer restrictions in <u>Section 2.1(d)</u>. If required to do so pursuant to any applicable law or regulation, beneficial owners may also obtain Definitive Notes in exchange for their beneficial interests in a Global Note upon written request in accordance with DTC's and the Registrar's procedures.

(1) Any Definitive Note delivered in exchange for an interest in a Global Note pursuant to <u>Section 2.1(e)</u> shall, except as otherwise provided by <u>Section 2.6(d)</u>, bear the applicable legend regarding transfer restrictions applicable to the Global Note set forth in <u>Section 2.1(d)</u>.

(2) If a Definitive Note is transferred or exchanged for a beneficial interest in a Global Note, the Trustee will (x) cancel such Definitive Note, (y) record an increase in the principal amount of such Global Note equal to the principal amount of such transfer or exchange and (z) in the event that such transfer or exchange involves less than the entire principal amount of the canceled Definitive Note, the Issuer shall execute, and the Trustee shall authenticate and make available for delivery, to the transferring Holder a new Definitive Note representing the principal amount not so transferred.

(3) If a Definitive Note is transferred or exchanged for another Definitive Note, (x) the Trustee will cancel the Definitive Note being transferred or exchanged, (y) the Issuer shall execute, and the Trustee shall authenticate and make available for delivery, one or more new Definitive Notes in authorized denominations having an aggregate principal amount equal to the principal amount of such transfer or exchange to the transferee (in the case of a transfer) or the Holder of the canceled Definitive Note (in

the case of an exchange), registered in the name of such transferee or Holder, as applicable, and (z) if such transfer or exchange involves less than the entire principal amount of the canceled Definitive Note, the Issuer shall execute, and the Trustee shall authenticate and make available for delivery to the Holder thereof, one or more Definitive Notes in authorized denominations having an aggregate principal amount equal to the untransferred or unexchanged portion of the canceled Definitive Notes, registered in the name of the Holder thereof.

(4)     Notwithstanding anything to the contrary in this Indenture, in no event shall a Definitive Note be delivered upon exchange or transfer of a beneficial interest in the Temporary Regulation S Global Note prior to the end of the Restricted Period.

(g)     Legends. Each Global Note (whether or not an Initial Note) and each Definitive Note (including each PIK Note) (and all Notes issued in exchange therefor or substitution thereof) shall bear the following legend on the face thereof:

[          ]$^6$

(h)     PIK Payments.  In connection with the payment of PIK Interest in respect of the Notes, the Issuer shall, without the consent of the Holders, increase the principal amount of the outstanding Notes represented by one or more Global Notes or, with respect to Definitive Notes represented by individual certificates, if any, issue additional Notes in certificated form, which Notes shall bear the description "PIK" on their face ("PIK Notes") under this Indenture on the same terms and conditions except that PIK Notes will have different issuance dates, offering prices and, in certain circumstances, dates from which interest will accrue) as the Initial Notes (in each case, a "PIK Payment").  The Initial Notes (as may be increased by a PIK Payment), the PIK Notes and any Additional Notes (as may be increased by a PIK Payment) issued under this Indenture will be treated as a single class for all purposes under this Indenture, including waivers, amendments, redemptions and offers to purchase.  In connection with any payment of PIK Interest, no later than ten (10) Business Days prior to the relevant Interest Payment Date, the Issuer shall deliver to the Holders, the Trustee and the Paying Agent (if other than the Trustee) written notice setting forth the amount of PIK Interest to be paid on such Interest Payment Date, and in the case of the Trustee and Paying Agent, accompanied by either (i) an Issuer Order directing the Trustee and the Paying Agent (if other than the Trustee) to increase the principal amount of the Notes in accordance with this paragraph, which Issuer Order the Trustee and Paying Agent shall be entitled to rely upon or (ii) PIK Notes and an Issuer Order to the Trustee for authentication of the PIK Notes.  Interest for each interest period commencing on the Issue Date shall be payable pursuant to the terms of the Notes set forth in Exhibit A.  Notwithstanding anything to the contrary in this Section, the payment of accrued interest in connection with any redemption of Notes as described under Section 5.7, in connection with any repurchase of Notes as described under Sections 3.5 and 3.9 or at Stated Maturity shall be made solely in cash.

SECTION 2.2.Execution and Authentication.  One Officer shall sign the Notes for the Issuer by manual or electronic signature.  If the Officer whose signature is on a Note no longer

---

$^6$ NTD: To match legend in Intercreditor Agreement.

-54-

holds that office at the time the Trustee authenticates the Note, the Note shall be valid nevertheless.

A Note shall not be valid until an authorized officer of the Trustee manually or electronically authenticates the Note. The signature of the Trustee on a Note shall be conclusive evidence that such Note has been duly and validly authenticated and issued under this Indenture. A Note shall be dated the date of its authentication.

At any time and from time to time after the execution and delivery of this Indenture, the Trustee shall authenticate and make available for delivery: (1) Initial Notes for original issue on the Issue Date in an aggregate principal amount of $[   ] and any increases thereof as the result of a PIK Payment, (2) subject to the terms of this Indenture, Additional Notes for original issue in an unlimited principal amount, (3) PIK Notes in accordance with Section 2.1(h) and (4) under the circumstances set forth in Section 2.6(e), Initial Notes in the form of an Unrestricted Global Note, in each case upon a written order of the Issuer signed by one Officer (the "Issuer Order"). Such Issuer Order shall specify whether the Notes will be in the form of Definitive Notes or Global Notes, the amount of the Notes to be authenticated, the date on which the original issue of Notes is to be authenticated, the holder of the Notes and whether the Notes are to be Initial Notes, Additional Notes or PIK Notes.

The Trustee may appoint an agent (the "Authenticating Agent") reasonably acceptable to the Issuer to authenticate the Notes. Any such appointment shall be evidenced by an instrument signed by a Trust Officer, a copy of which shall be furnished to the Issuer. Unless limited by the terms of such appointment, any such Authenticating Agent may authenticate Notes whenever the Trustee may do so. Each reference in this Indenture to authentication by the Trustee includes authentication by the Authenticating Agent. An Authenticating Agent has the same rights as any Registrar, Paying Agent or agent for delivery of notices and demands.

In case the Issuer or any Guarantor, pursuant to Article IV or Section 10.2, as applicable, shall be consolidated or merged with or into any other Person or shall convey, transfer, lease or otherwise dispose of all or substantially all of its properties and assets to any Person, and the successor Person resulting from such consolidation, or surviving such merger, or into which the Issuer or any Guarantor shall have been merged, or the Person which shall have received a conveyance, transfer, lease or other disposition as aforesaid, shall have executed an indenture supplemental hereto with the Trustee pursuant to Article IV, any of the Notes authenticated or delivered prior to such consolidation, merger, conveyance, transfer, lease or other disposition may (but shall not be required), from time to time, at the request of the successor Person, be exchanged for other Notes executed in the name of the successor Person with such changes in phraseology and form as may be appropriate to reflect such successor Person, but otherwise in substance of like tenor as the Notes surrendered for such exchange and of like principal amount; and the Trustee, upon the Issuer Order of the successor Person, shall authenticate and make available for delivery Notes as specified in such order for the purpose of such exchange. If Notes shall at any time be authenticated and delivered in any new name of a successor Person pursuant to this Section 2.2 in exchange or substitution for or upon registration of transfer of any Notes, such successor Person, at the option of the Holders but without expense to them, shall provide for the exchange of all Notes at the time outstanding for Notes authenticated and delivered in such new name.

SECTION 2.3.Registrar and Paying Agent.  The Issuer shall maintain an office or agency where Notes may be presented for registration of transfer or for exchange (the "Registrar") and an office or agency where Notes may be presented for payment.  The Registrar shall keep a register of the Notes and of their transfer and exchange (the "Notes Register").  The Issuer may have one or more co-registrars and one or more additional paying agents.  The term "Paying Agent" includes any additional paying agent and the term "Registrar" includes any co-registrar.

The Issuer shall enter into an appropriate agency agreement with any Registrar or Paying Agent not a party to this Indenture.  The agreement shall implement the provisions of this Indenture that relate to such agent.  The Issuer shall notify the Trustee in writing of the name and address of each such agent.  If the Issuer fails to maintain a Registrar or Paying Agent, the Trustee shall act as such and shall be entitled to appropriate compensation therefor pursuant to Section 7.7.  The Issuer or any Guarantor may act as Paying Agent, Registrar or transfer agent.

The Issuer initially appoints the Trustee as Registrar and Paying Agent for the Notes. The Issuer may change any Registrar or Paying Agent without prior notice to the Holders, but upon written notice to such Registrar or Paying Agent and to the Trustee; provided, however, that no such removal shall become effective until (i) acceptance of any appointment by a successor as evidenced by an appropriate agreement entered into by the Issuer and such successor Registrar or Paying Agent, as the case may be, and delivered to the Trustee and the passage of any waiting or notice periods required by DTC procedures or (ii) written notification to the Trustee that the Trustee shall serve as Registrar or Paying Agent until the appointment of a successor in accordance with clause (i) above.  The Registrar or Paying Agent may resign at any time upon written notice to the Issuer and the Trustee.

SECTION 2.4.Paying Agent to Hold Money in Trust.  By no later than 11:00 a.m. (Eastern time) on the date on which any principal of, premium, if any, or interest on any Note is due and payable, the Issuer shall deposit with the Paying Agent a sum sufficient in immediately available funds to pay such principal, premium or, in the case of Cash Interest, interest when due. The Issuer shall require each Paying Agent (other than the Trustee) to agree in writing that such Paying Agent shall hold in trust for the benefit of Holders or the Trustee all money held by such Paying Agent for the payment of principal of, premium, if any, or interest on the Notes (whether such assets have been distributed to it by the Issuer or other obligors on the Notes), shall notify the Trustee in writing of any default by the Issuer or any Guarantor in making any such payment and shall during the continuance of any default by the Issuer (or any other obligor upon the Notes) in the making of any payment in respect of the Notes, upon the written request of the Trustee, forthwith deliver to the Trustee all sums held in trust by such Paying Agent for payment in respect of the Notes together with a full accounting thereof.  If the Issuer or a Subsidiary of the Issuer acts as Paying Agent, it shall segregate the money held by it as Paying Agent and hold it as a separate trust fund.  The Issuer at any time may require a Paying Agent (other than the Trustee) to pay all money held by it to the Trustee and to account for any funds or assets disbursed by such Paying Agent.  Upon complying with this Section 2.4, the Paying Agent (if other than the Issuer or a Subsidiary of the Issuer) shall have no further liability for the money delivered to the Trustee.  Upon any bankruptcy, reorganization or similar proceeding under any Debtor Relief Law with respect to the Issuer, the Trustee shall serve as Paying Agent for the Notes.

-56-

SECTION 2.5.Holder Lists.   The Trustee shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of Holders. If the Trustee is not the Registrar, the Issuer, on its own behalf and on behalf of each of the Guarantors, shall furnish or cause the Registrar to furnish to the Trustee, in writing at least ten Business Days before each interest payment date and at such other times as the Trustee may request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of Holders.

SECTION 2.6.Transfer and Exchange.

(a)      A Holder may transfer a Note (or a beneficial interest therein) to another Person or exchange a Note (or a beneficial interest therein) for another Note or Notes of any authorized denomination by presenting to the Registrar a written request therefor stating the name of the proposed transferee or requesting such an exchange, accompanied by any certification, opinion or other document required by this Section 2.6.  The Registrar will promptly register any transfer or exchange that meets the requirements of this Section 2.6 by noting the same in the Notes Register maintained by the Registrar for the purpose, and no transfer or exchange will be effective until it is registered in such Notes Register.  The transfer or exchange of any Note (or a beneficial interest therein) may only be made in accordance with this Section 2.6 and Section 2.1(e) and 2.1(f), as applicable, and, in the case of a Global Note (or a beneficial interest therein), the applicable rules and procedures of DTC, Euroclear and Clearstream.  The Registrar shall refuse to register any requested transfer or exchange that does not comply with this paragraph.

(b)      Transfers of Rule 144A Notes and Institutional Accredited Investor Notes.  The following provisions shall apply with respect to any proposed registration of transfer of a Rule 144A Note or an Institutional Accredited Investor Note prior to the date that is one year after the later of the date of its original issue and the last date on which the Issuer or any Affiliate of the Issuer was the owner of such Notes (or any predecessor thereto) (the "Resale Restriction Termination Date"):

(1)      a registration or transfer of a Rule 144A Note or an Institutional Accredited Investor Note or a beneficial interest therein to a QIB shall be made upon the representation of the transferee in the form as set forth on the reverse of the Note that it is purchasing for its own account or an account with respect to which it exercises sole investment discretion and that it and any such account is a "qualified institutional buyer" within the meaning of Rule 144A, and is aware that the sale to it is being made in reliance on Rule 144A and acknowledges that it has received such information regarding the Issuer as the undersigned has requested pursuant to Rule 144A or has determined not to request such information and that it is aware that the transferor is relying upon its foregoing representations in order to claim the exemption from registration provided by Rule 144A; provided that no such written representation or other written certification shall be required in connection with the transfer of a beneficial interest in the Rule 144A Global Note to a transferee in the form of a beneficial interest in that Rule 144A Global Note in accordance with this Indenture and the applicable procedures of DTC;

-57-

(2)     a registration of transfer of a Rule 144A Note or an Institutional Accredited Investor Note or a beneficial interest therein to an IAI or an AI shall be made upon receipt by the Registrar or its agent of a certificate substantially in the form set forth in Section 2.8 or Section 2.10, respectively, from the proposed transferee and the delivery of an Opinion of Counsel, certification and/or other information satisfactory to the Issuer; and

(3)     a registration of transfer of a Rule 144A Note or an Institutional Accredited Investor Note or a beneficial interest therein to a Non-U.S. Person shall be made upon receipt by the Registrar or its agent of a certificate substantially in the form set forth in Section 2.9 from the proposed transferee and the delivery of an Opinion of Counsel, certification and/or other information satisfactory to the Issuer.

(c)     Transfers of Regulation S Notes.   The following provisions shall apply with respect to any proposed transfer of a Regulation S Note prior to the expiration of the Restricted Period:

(1)     a transfer of a Regulation S Note or a beneficial interest therein to a QIB shall be made upon the representation of the transferee, in the form of assignment on the reverse of the certificate, that it is purchasing the Note for its own account or an account with respect to which it exercises sole investment discretion and that it and any such account is a "qualified institutional buyer" within the meaning of Rule 144A, is aware that the sale to it is being made in reliance on Rule 144A and acknowledges that it has received such information regarding the Issuer as the undersigned has requested pursuant to Rule 144A or has determined not to request such information and that it is aware that the transferor is relying upon its foregoing representations in order to claim the exemption from registration provided by Rule 144A;

(2)     a transfer of a Regulation S Note or a beneficial interest therein to an IAI or an AI shall be made upon receipt by the Registrar or its agent of a certificate substantially in the form set forth in Section 2.8 or Section 2.10, respectively, from the proposed transferee and the delivery of an Opinion of Counsel, certification and/or other information satisfactory to the Issuer; and

(3)     a transfer of a Regulation S Note or a beneficial interest therein to a Non-U.S. Person shall be made upon receipt by the Registrar or its agent of a certificate substantially in the form set forth in Section 2.9 hereof from the proposed transferee and receipt by the Registrar or its agent of an Opinion of Counsel, certification and/or other information satisfactory to the Issuer.

After the expiration of the Restricted Period, interests in the Regulation S Note may be transferred in accordance with applicable law without requiring the certification set forth in Section 2.8, Section 2.9, Section 2.10 or any additional certification.

(d)     Restricted Notes Legend.   Upon the transfer, exchange or replacement of Notes not bearing a Restricted Notes Legend, the Registrar shall deliver Notes that do not bear a Restricted Notes Legend.   Upon the transfer, exchange or replacement of Notes bearing a

-58-

Restricted Notes Legend, the Registrar shall deliver only Notes that bear a Restricted Notes Legend unless (1) an Initial Note is being transferred pursuant to an effective registration statement, (2) Initial Notes are being exchanged for Notes that do not bear the Restricted Notes Legend in accordance with Section 2.6(e) or (3) there is delivered to the Registrar an Opinion of Counsel reasonably satisfactory to the Issuer to the effect that neither such legend nor the related restrictions on transfer are required in order to maintain compliance with the provisions of the Securities Act.  Any Additional Notes sold in a registered offering shall not be required to bear the Restricted Notes Legend.

(e)    Automatic Exchange from Global Note Bearing Restricted Notes Legend to Global Note Not Bearing Restricted Notes Legend.  Upon the Issuer's satisfaction that the Restricted Notes Legend shall no longer be required in order to maintain compliance with the Securities Act, beneficial interests in a Global Note bearing the Restricted Notes Legend (a "Restricted Global Note") may be automatically exchanged into beneficial interests in a Global Note not bearing the Restricted Notes Legend (an "Unrestricted Global Note") without any action required by or on behalf of the Holder (the "Automatic Exchange") at any time on or after the date that is the 366th calendar day after (1) with respect to the Notes issued on the Issue Date, the Issue Date or (2) with respect to Additional Notes, if any, the issue date of such Additional Notes, or, in each case, if such day is not a Business Day, on the next succeeding Business Day (the "Automatic Exchange Date").  Upon the Issuer's satisfaction that the Restricted Notes Legend shall no longer be required in order to maintain compliance with the Securities Act, the Issuer shall (i) provide written notice to DTC and the Trustee at least fifteen (15) calendar days prior to the Automatic Exchange Date, instructing DTC to exchange all of the outstanding beneficial interests in a particular Restricted Global Note to the Unrestricted Global Note, which the Issuer shall have previously otherwise made eligible for exchange with the DTC, (ii) provide prior written notice (the "Automatic Exchange Notice") to each Holder at such Holder's address appearing in the register of Holders at least fifteen (15) calendar days prior to the Automatic Exchange Date (the "Automatic Exchange Notice Date"), which notice must include (w) the Automatic Exchange Date, (x) the section of this Indenture pursuant to which the Automatic Exchange shall occur, (y) the "CUSIP" number of the Restricted Global Note from which such Holder's beneficial interests will be transferred and (z) the "CUSIP" number of the Unrestricted Global Note into which such Holder's beneficial interests will be transferred, and (iii) on or prior to the Automatic Exchange Date, deliver to the Trustee for authentication one or more Unrestricted Global Notes, duly executed by the Issuer and an Issuer Order requesting the Trustee to authenticate, in an aggregate principal amount equal to the aggregate principal amount of Restricted Global Notes to be exchanged into such Unrestricted Global Notes.  At the Issuer's written request on no less than five (5) calendar days' notice prior to the Automatic Exchange Notice Date, the Trustee shall deliver, in the Issuer's name and at its expense, the Automatic Exchange Notice to each Holder at such Holder's address appearing in the register of Holders; provided that the Issuer has delivered to the Trustee the information required to be included in such Automatic Exchange Notice.

Notwithstanding anything to the contrary in this Section 2.6(e), during the fifteen (15) calendar day period prior to the Automatic Exchange Date, no transfers or exchanges other than pursuant to this Section 2.6(e) shall be permitted without the prior written consent of the Issuer. As a condition to any Automatic Exchange, the Issuer shall provide, and the Trustee shall be entitled to conclusively rely upon, an Officer's Certificate and Opinion of Counsel to the Issuer

-59-

to the effect that the Automatic Exchange shall be effected in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Restricted Notes Legend shall no longer be required in order to maintain compliance with the Securities Act and that the aggregate principal amount of the particular Restricted Global Note is to be transferred to the particular Unrestricted Global Note by adjustment made on the records of the Trustee, as custodian for the Depositary to reflect the Automatic Exchange. Upon such exchange of beneficial interests pursuant to this Section 2.6(e), the aggregate principal amount of the Global Notes shall be increased or decreased by adjustments made on the records of the Trustee, as custodian for the Depositary, to reflect the relevant increase or decrease in the principal amount of such Global Note resulting from the applicable exchange. The Restricted Global Note from which beneficial interests are transferred pursuant to an Automatic Exchange shall be cancelled following the Automatic Exchange.

(f)    Retention of Written Communications. The Registrar shall retain copies of all letters, notices and other written communications received pursuant to Section 2.1 or this Section 2.6. The Issuer shall have the right to inspect and make copies of all such letters, notices or other written communications at any reasonable time upon the giving of reasonable prior written notice to the Registrar.

(g)    Obligations with Respect to Transfers and Exchanges of Notes. To permit registrations of transfers and exchanges, the Issuer shall, subject to the other terms and conditions of this Article II, execute and the Trustee shall authenticate Definitive Notes and Global Notes at the Issuer's and Registrar's written request.

No service charge shall be made to a Holder for any registration of transfer or exchange, but the Issuer may require the Holder to pay a sum sufficient to cover any transfer tax assessments or similar governmental charge payable in connection therewith (other than any such transfer taxes, assessments or similar governmental charges payable upon exchange or transfer pursuant to Sections 2.2, 2.6, 2.11, 2.13, 3.5, 5.6 or 9.5).

The Issuer (and the Registrar) shall not be required to register the transfer of or exchange of any Note (A) for a period beginning (1) 15 calendar days before the mailing of a notice of an offer to repurchase or redeem Notes and ending at the close of business on the day of such mailing or (2) 15 calendar days before an interest payment date and ending on such interest payment date or (B) called for redemption, except the unredeemed portion of any Note being redeemed in part.

Prior to the due presentation for registration of transfer of any Note, the Issuer, the Trustee, the Paying Agent or the Registrar may deem and treat the person in whose name a Note is registered as the owner of such Note for the purpose of receiving payment of principal of, premium, if any, and (subject to paragraph 2 of the forms of Notes attached hereto as Exhibits A, B and C) interest on such Note and for all other purposes whatsoever, including without limitation the transfer or exchange of such Note, whether or not such Note is overdue, and none of the Issuer, the Trustee, the Paying Agent or the Registrar shall be affected by notice to the contrary.

-60-

Any Definitive Note delivered in exchange for an interest in a Global Note pursuant to Section 2.1(f) shall, except as otherwise provided by Section 2.6(d), bear the applicable legend regarding transfer restrictions applicable to the Definitive Note set forth in Section 2.1(d).

All Notes issued upon any transfer or exchange pursuant to the terms of this Indenture shall evidence the same debt and shall be entitled to the same benefits under this Indenture as the Notes surrendered upon such transfer or exchange.

(h)  No Obligation of the Trustee.  Neither the Trustee nor the Registrar shall have any responsibility or obligation to any beneficial owner of a Global Note, a member of, or a participant in, DTC or other Person with respect to the accuracy of the records of DTC or its nominee or of any participant or member thereof, with respect to any ownership interest in the Notes or with respect to the delivery to any participant, member, beneficial owner or other Person (other than DTC) of any notice (including any notice of redemption or purchase) or the payment of any amount or delivery of any Notes (or other security or property) under or with respect to such Notes.  All notices and communications to be given to the Holders and all payments to be made to Holders in respect of the Notes shall be given or made only to or upon the order of the registered Holders (which shall be DTC or its nominee in the case of a Global Note).  The rights of beneficial owners in any Global Note shall be exercised only through DTC subject to the applicable rules and procedures of DTC.  The Trustee may rely and shall be fully protected in relying upon information furnished by DTC with respect to its members, participants and any beneficial owners.

Neither the Trustee nor the Registrar shall have any obligation or duty to monitor, determine or inquire as to compliance with any restrictions on transfer imposed under this Indenture or under applicable law with respect to any transfer of any interest in any Note (including any transfers between or among DTC participants, members or beneficial owners in any Global Note) other than to require delivery of such certificates and other documentation or evidence as are expressly required by, and to do so if and when expressly required by, the terms of this Indenture, and to examine the same to determine substantial compliance as to form with the express requirements hereof. Neither the Trustee nor any of its agents shall have any responsibility for any actions taken or not taken by DTC.

SECTION 2.7.Form of Certificate to be Delivered upon Termination of Restricted Period.

[Date]

21st Century Oncology, Inc.
2270 Colonial Blvd.
Fort Myers, Florida, 33907
Attention:  Corporate Secretary

Wilmington Savings Fund Society, FSB,
as Trustee,
500 Delaware Avenue
Wilmington, Delaware 19801

Attention:  Geoffrey J. Lewis
Telecopy:  (302) 421-9137

with a copy to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York  10022
Attention:  Joshua Korff, Esq.
Facsimile:  (212) 446-4900

Re:    21st Century Oncology, Inc. (the "Issuer")

10.00% / 12.00% Senior Secured PIK Toggle Notes due 2023 (the "Notes")

Ladies and Gentlemen:

This letter relates to Notes represented by a temporary global Note (the "Temporary Regulation S Global Note").  Pursuant to Section 2.1 of the Indenture dated as of [   ], 2017 relating to the Notes (the "Indenture"), we hereby certify that the persons who are the beneficial owners of $[_____] principal amount of Notes represented by the Temporary Regulation S Global Note are persons outside the United States to whom beneficial interests in such Notes could be transferred in accordance with Rule 904 of Regulation S promulgated under the Securities Act of 1933, as amended.  Accordingly, you are hereby requested to issue a Permanent Regulation S Global Note representing the undersigned's interest in the principal amount of Notes represented by the Temporary Regulation S Global Note, all in the manner provided by the Indenture.  We certify that we [are][are not] an Affiliate of the Issuer.

The Trustee and the Issuer are entitled to conclusively rely upon this letter and are irrevocably authorized to produce this letter or a copy hereof to any interested party in any administrative or legal proceedings or official inquiry with respect to the matters covered hereby. Terms used in this letter have the meanings set forth in Regulation S.

Very truly yours,

[Name of Transferor]

By:    _____
       Authorized Signature


SECTION 2.8. Form of Certificate to be Delivered in Connection with Transfers to IAIs.

[Date]

21st Century Oncology, Inc.
2270 Colonial Blvd.

-62-

Fort Myers, Florida, 33907
Attention:  Corporate Secretary

Wilmington Savings Fund Society, FSB,
as Trustee,
500 Delaware Avenue
Wilmington, Delaware 19801
Attention:  Geoffrey J. Lewis
Telecopy:  (302) 421-9137

Re:      21st Century Oncology, Inc.

Ladies and Gentlemen:

This certificate is delivered to request a transfer of $[_____] principal amount of the 10.00% / 12.00% Senior Secured PIK Toggle Notes due 2023 (the "Notes") of 21st Century Oncology, Inc. (the "Issuer").

Upon transfer, the Notes would be registered in the name of the new beneficial owner as follows:

Name: _____

Address: _____

Taxpayer ID
Number: _____

The undersigned represents and warrants to you that:

1.      We are an institutional "accredited investor" (as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act of 1933, as amended (the "Securities Act")) purchasing for our own account or for the account of such an institutional "accredited investor" at least $250,000 principal amount of the Notes, and we are acquiring the Notes not with a view to, or for offer or sale in connection with, any distribution in violation of the Securities Act.  We have such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risk of our investment in the Notes and we invest in or purchase securities similar to the Notes in the normal course of our business.  We and any accounts for which we are acting are each able to bear the economic risk of our or its investment.

2.      We understand that the Notes have not been registered under the Securities Act and, unless so registered, may not be sold except as permitted in the following sentence.  We agree on our own behalf and on behalf of any investor account for which we are purchasing Notes to offer, sell or otherwise transfer such Notes prior to the date that is one year after the later of the date of original issue and the last date on which the Issuer or any affiliate of the Issuer were the owner of such Notes (or any predecessor thereto) (the "Resale Restriction

-63-

Termination Date") only (a) to the Issuer or any Subsidiary thereof, (b) pursuant to an effective registration statement under the Securities Act, (c) in a transaction complying with the requirements of Rule 144A under the Securities Act, to a person we reasonably believe is a "qualified institutional buyer" under Rule 144A of the Securities Act (a "QIB") that is purchasing for its own account or for the account of a QIB and to whom notice is given that the transfer is being made in reliance on Rule 144A, (d) pursuant to offers and sales to non-U.S. persons that occur outside the United States within the meaning of Regulation S under the Securities Act, (e) to an institutional "accredited investor" within the meaning of Rule 501(a)(1), (2), (3) or (7) under the Securities Act that is purchasing for its own account or for the account of such an institutional "accredited investor," in each case in a minimum principal amount of Notes of $250,000 for investment purposes and not with a view to or for offer or sale in connection with any distribution in violation of the Securities Act or (f) pursuant to any other available exemption from the registration requirements of the Securities Act, subject in each of the foregoing cases to any requirement of law that the disposition of our property or the property of such investor account or accounts be at all times within our or their control and in compliance with any applicable state securities laws. The foregoing restrictions on resale will not apply subsequent to the Resale Restriction Termination Date. If any resale or other transfer of the Notes is proposed to be made pursuant to clause (e) above prior to the Resale Restriction Termination Date, the transferor shall deliver a letter from the transferee substantially in the form of this letter to the Issuer and the Trustee, which shall provide, among other things, that the transferee is an institutional "accredited investor" (within the meaning of Rule 501(a)(1), (2), (3) or (7) under the Securities Act) and that it is acquiring such Notes for investment purposes and not for distribution in violation of the Securities Act. Each purchaser acknowledges that the Issuer and the Trustee reserve the right prior to any offer, sale or other transfer prior to the Resale Termination Date of the Notes pursuant to clauses (d), (e) or (f) above to require the delivery of an opinion of counsel, certifications and/or other information satisfactory to the Issuer.

3.    We [are][are not] an Affiliate of the Issuer.

TRANSFEREE: _____

BY: _____

SECTION 2.9. Form of Certificate to be Delivered in Connection with Transfers Pursuant to Regulation S.

[Date]

21st Century Oncology, Inc.
2270 Colonial Blvd.,
Fort Myers, Florida, 33907
Attention: Corporate Secretary

Wilmington Savings Fund Society, FSB,
as Trustee,
500 Delaware Avenue

Wilmington, Delaware 19801
Attention:  Geoffrey J. Lewis
Telecopy:  (302) 421-9137

Re:      21st Century Oncology, Inc. (the "Issuer")

10.00% / 12.00% Senior Secured PIK Toggle Notes due 2023 (the "Notes")

Ladies and Gentlemen:

In connection with our proposed sale of $[_____] aggregate principal amount of the Notes, we confirm that such sale has been effected pursuant to and in accordance with Regulation S under the United States Securities Act of 1933, as amended (the "Securities Act"), and, accordingly, we represent that:

(a)      the offer of the Notes was not made to a person in the United States;

(b)      either (i) at the time the buy order was originated, the transferee was outside the United States or we and any person acting on our behalf reasonably believed that the transferee was outside the United States or (ii) the transaction was executed in, on or through the facilities of a designated off-shore securities market and neither we nor any person acting on our behalf knows that the transaction has been pre-arranged with a buyer in the United States;

(c)      no directed selling efforts have been made in the United States in contravention of the requirements of Rule 903(a)(2) or Rule 904(a)(2) of Regulation S, as applicable; and

(d)      the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act.

In addition, if the sale is made during a restricted period and the provisions of Rule 903(b)(2), Rule 903(b)(3) or Rule 904(b)(1) of Regulation S are applicable thereto, we confirm that such sale has been made in accordance with the applicable provisions of Rule 903(b)(2), Rule 903(b)(3) or Rule 904(b)(1), as the case may be.

We also hereby certify that we [are][are not] an Affiliate of the Issuer and, to our knowledge, the transferee of the Notes [is][is not] an Affiliate of the Issuer.

The Trustee and the Issuer are entitled to conclusively rely upon this letter and are irrevocably authorized to produce this letter or a copy hereof to any interested party in any administrative or legal proceedings or official inquiry with respect to the matters covered hereby. Terms used in this certificate have the meanings set forth in Regulation S.

Very truly yours,

[Name of Transferor]

-65-

-66-

By: _____

Authorized Signature

SECTION 2.10.      Form of Certificate to be Delivered in Connection with Transfers to AIs.

[Date]

21st Century Oncology, Inc.
2270 Colonial Blvd., Fort Myers, Florida, 33907
Fort Myers, Florida, 33907
Attention:  Corporate Secretary

Wilmington Savings Fund Society, FSB,
as Trustee,
500 Delaware Avenue
Wilmington, Delaware 19801
Attention:  Geoffrey J. Lewis
Telecopy:  (302) 421-9137

Re:      21st Century Oncology, Inc.

Ladies and Gentlemen:

This certificate is delivered to request a transfer of $[_____] principal amount of the 10.00% / 12.00% Senior Secured PIK Toggle Notes due 2023 (the "Notes") of 21st Century Oncology, Inc. (the "Issuer").

Upon transfer, the Notes would be registered in the name of the new beneficial owner as follows:

Name:      _____

Address:      _____

Taxpayer ID
Number:      _____

The undersigned represents and warrants to you that:

1.      I am an "accredited investor" (as defined in Rule 501(a)(4) under the U.S. Securities Act of 1933, as amended (the "Securities Act")) and I am acquiring the Notes not with a view to, or for offer or sale in connection with, any distribution in violation of the Securities Act.  I have such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risk of my investment in the Notes and I invest in or purchase securities similar to the Notes in the normal course of my business.  I am able to bear the economic risk of my investment.

2.      I understand that the Notes have not been registered under the Securities Act and, unless so registered, may not be sold except as permitted in the following sentence.  I agree on my own behalf to offer, sell or otherwise transfer such Notes prior to the date that is one year

-67-

after the later of the date of original issue and the last date on which the Issuer or any affiliate of the Issuer were the owner of such Notes (or any predecessor thereto) (the "Resale Restriction Termination Date") only (a) to the Issuer or any Subsidiary thereof, (b) pursuant to an effective registration statement under the Securities Act, (c) in a transaction complying with the requirements of Rule 144A under the Securities Act, to a person I reasonably believe is a "qualified institutional buyer" under Rule 144A of the Securities Act (a "QIB") that is purchasing for its own account or for the account of a QIB and to whom notice is given that the transfer is being made in reliance on Rule 144A, (d) pursuant to offers and sales to non-U.S. persons that occur outside the United States within the meaning of Regulation S under the Securities Act, (e) to an institutional "accredited investor" within the meaning of Rule 501(a)(1), (2), (3) or (7) under the Securities Act that is purchasing for its own account or for the account of such an institutional "accredited investor," in each case in a minimum principal amount of Notes of $200,000 for investment purposes and not with a view to or for offer or sale in connection with any distribution in violation of the Securities Act or (f) pursuant to any other available exemption from the registration requirements of the Securities Act, subject in each of the foregoing cases to any requirement of law that the disposition of my property be at all times within my control and in compliance with any applicable state securities laws.  The foregoing restrictions on resale will not apply subsequent to the Resale Restriction Termination Date.  Each purchaser acknowledges that the Issuer and the Trustee reserve the right prior to any offer, sale or other transfer prior to the Resale Termination Date of the Notes pursuant to clauses (d), (e) or (f) above to require the delivery of an opinion of counsel, certifications and/or other information satisfactory to the Issuer.

6.      I understand and acknowledge that upon the issuance thereof, and until such time as the same is no longer required under applicable requirements of the Securities Act or state securities laws, the Notes that I acquire will be certificated Notes that will bear, and all certificates issued in exchange therefor or in substitution thereof will bear, a restrictive legend set forth in Section 2.1(d) of the Indenture.

7.      I am an Affiliate of the Issuer.

TRANSFEREE:  _____

BY:  _____

SECTION 2.11.      Mutilated, Destroyed, Lost or Stolen Notes.

If a mutilated Note is surrendered to the Registrar or if the Holder of a Note claims that the Note has been lost, destroyed or wrongfully taken, the Issuer shall issue and the Trustee shall authenticate a replacement Note if the requirements of Section 8-405 of the Uniform Commercial Code are met, such that the Holder (a) satisfies the Issuer and the Trustee that such Note has been lost, destroyed or wrongfully taken within a reasonable time after such Holder has notice of such loss, destruction or wrongful taking and the Registrar has not registered a transfer prior to receiving such notification, (b) makes such request to the Issuer and the Trustee prior to the Note being acquired by a protected purchaser as defined in Section 8-303 of the Uniform Commercial Code (a "protected purchaser"), (c) satisfies any other reasonable requirements of the Trustee and (d) provides an indemnity bond, as more fully described below; provided,

-68-

however, if after the delivery of such replacement Note, a protected purchaser of the Note for which such replacement Note was issued presents for payment or registration such replaced Note, the Trustee and/or the Issuer shall be entitled to recover such replacement Note from the Person to whom it was issued and delivered or any Person taking therefrom, except a protected purchaser, and shall be entitled to recover upon the security or indemnity provided therefor to the extent of any loss, damage, cost or expense incurred by the Issuer or the Trustee in connection therewith.   Such Holder shall furnish an indemnity bond sufficient in the judgment of the (i) Trustee to protect the Trustee and (ii) the Issuer to protect the Issuer, the Trustee, the Paying Agent and the Registrar, from any loss which any of them may suffer if a Note is replaced, and, in the absence of notice to the Issuer, any Guarantor or the Trustee that such Note has been acquired by a protected purchaser, the Issuer shall execute, and upon receipt of an Issuer Order, the Trustee shall authenticate and make available for delivery, in exchange for any such mutilated Note or in lieu of any such destroyed, lost or stolen Note, a new Note of like tenor and principal amount, bearing a number not contemporaneously outstanding.

In case any such mutilated, destroyed, lost or stolen Note has become or is about to become due and payable, the Issuer in its discretion may, instead of issuing a new Note, pay such Note.

Upon the issuance of any new Note under this Section 2.11, the Issuer may require that such Holder pay a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of counsel and of the Trustee) in connection therewith.

Subject to the proviso in the initial paragraph of this Section 2.11, every new Note issued pursuant to this Section 2.11, in lieu of any mutilated, destroyed, lost or stolen Note shall constitute an original additional contractual obligation of the Issuer, any Guarantor (if applicable) and any other obligor upon the Notes, whether or not the mutilated, destroyed, lost or stolen Note shall be at any time enforceable by anyone, and shall be entitled to all benefits of this Indenture equally and proportionately with any and all other Notes duly issued hereunder.

The provisions of this Section 2.11 are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Notes.

SECTION 2.12.      Outstanding Notes.  Notes outstanding at any time are all Notes authenticated by the Trustee except for those cancelled by it, those delivered to it for cancellation, those paid pursuant to Section 2.11 and those described in this Section 2.12 as not outstanding. A Note does not cease to be outstanding in the event the Issuer or an Affiliate of the Issuer holds the Note; provided, however, that (i) for purposes of determining which are outstanding for consent or voting purposes hereunder, the provisions of Section 12.4 shall apply and (ii) in determining whether the Trustee shall be protected in making a determination whether the Holders of the requisite principal amount of outstanding Notes are present at a meeting of Holders of Notes for quorum purposes or have consented to or voted in favor of any request, demand, authorization, direction, notice, consent, waiver, amendment or modification hereunder, or relying upon any such quorum, consent or vote, only Notes which a Trust Officer of the

-69-

Trustee actually knows to be held by the Issuer or an Affiliate of the Issuer shall not be considered outstanding.

If a Note is replaced pursuant to Section 2.11 (other than a mutilated Note surrendered for replacement), it ceases to be outstanding unless the Trustee and the Issuer receive proof satisfactory to them that the replaced Note is held by a protected purchaser. A mutilated Note ceases to be outstanding upon surrender of such Note and replacement pursuant to Section 2.11.

If the Paying Agent segregates and holds in trust, in accordance with this Indenture, on a Redemption Date or maturity date, money sufficient to pay all principal, premium, if any, and accrued interest payable on that date with respect to the Notes (or portions thereof) to be redeemed or maturing, as the case may be, and the Paying Agent is not prohibited from paying such money to the Holders on that date pursuant to the terms of this Indenture, then on and after that date such Notes (or portions thereof) cease to be outstanding and interest on them ceases to accrue.

SECTION 2.13.      Temporary Notes. In the event that Definitive Notes are to be issued under the terms of this Indenture, until such Definitive Notes are ready for delivery, the Issuer may prepare and the Trustee shall authenticate temporary Notes. Temporary Notes shall be substantially in the form, and shall carry all rights, of Definitive Notes but may have variations that the Issuer considers appropriate for temporary Notes. Without unreasonable delay, the Issuer shall prepare and the Trustee shall authenticate Definitive Notes. After the preparation of Definitive Notes, the temporary Notes shall be exchangeable for Definitive Notes upon surrender of the temporary Notes at any office or agency maintained by the Issuer for that purpose and such exchange shall be without charge to the Holder. Upon surrender for cancellation of any one or more temporary Notes, the Issuer shall execute, and the Trustee shall, upon receipt of an Issuer Order, authenticate and make available for delivery in exchange therefor, one or more Definitive Notes representing an equal principal amount of Notes. Until so exchanged, the Holder of temporary Notes shall in all respects be entitled to the same benefits under this Indenture as a Holder of Definitive Notes.

SECTION 2.14.      Cancellation. The Issuer at any time may deliver Notes to the Trustee for cancellation. The Registrar and the Paying Agent shall forward to the Trustee any Notes surrendered to them for registration of transfer, exchange or payment. The Trustee and no one else shall cancel all Notes surrendered for registration of transfer, exchange, payment or cancellation and dispose of such Notes in accordance with its internal policies and customary procedures (subject to the record retention requirements of the Exchange Act and the Trustee). If the Issuer or any Guarantor acquires any of the Notes, such acquisition shall not operate as a redemption or satisfaction of the Indebtedness represented by such Notes unless and until the same are surrendered to the Trustee for cancellation pursuant to this Section 2.14. The Issuer may not issue new Notes to replace Notes it has paid or delivered to the Trustee for cancellation for any reason other than in connection with a transfer or exchange.

At such time as all beneficial interests in a Global Note have either been exchanged for Definitive Notes, transferred, redeemed, repurchased or canceled, such Global Note shall be returned by DTC to the Trustee for cancellation or retained and canceled by the Trustee. At any time prior to such cancellation, if any beneficial interest in a Global Note is exchanged for

-70-

Definitive Notes, transferred in exchange for an interest in another Global Note, redeemed, repurchased or canceled, the principal amount of Notes represented by such Global Note shall be reduced and an adjustment shall be made on the books and records of the Trustee (if it is then the Notes Custodian for such Global Note) with respect to such Global Note, by the Trustee or the Notes Custodian, to reflect such reduction.

SECTION 2.15.        Payment of Interest; Defaulted Interest.    Interest on any Note which is payable, and is punctually paid or duly provided for, on any interest payment date shall be paid to the Person in whose name such Note (or one or more Predecessor Notes) is registered at the close of business on the regular record date for such payment at the office or agency of the Issuer maintained for such purpose pursuant to Section 2.3.

Any interest on any Note (whether in the form of Cash Interest or PIK Interest) which is payable, but is not paid when the same becomes due and payable and such nonpayment continues for a period of 30 days shall forthwith cease to be payable to the Holder on the regular record date, and such defaulted interest and (to the extent lawful) interest on such defaulted interest (which shall be payable as Cash Interest at the Cash Interest Rate) (such defaulted interest and interest thereon herein collectively called "Defaulted Interest") shall be paid by the Issuer, at its election, as provided in clause (a) or (b) below:

(a)        The Issuer may elect to make payment of any Defaulted Interest to the Persons in whose names the Notes (or their respective predecessor Notes) are registered at the close of business on a Special Record Date (as defined below) for the payment of such Defaulted Interest, which shall be fixed in the following manner. The Issuer shall notify the Trustee in writing of the amount of Defaulted Interest proposed to be paid on each Note and the date (not less than 30 days after such notice) of the proposed payment (the "Special Interest Payment Date"), and at the same time the Issuer shall deposit with the Trustee an amount of money equal to the aggregate amount proposed to be paid in respect of such Defaulted Interest or shall make arrangements satisfactory to the Trustee for such deposit prior to the date of the proposed payment, such money when deposited to be held in trust for the benefit of the Persons entitled to such Defaulted Interest as in this Section 2.15(a). Thereupon the Issuer shall fix a record date (the "Special Record Date") for the payment of such Defaulted Interest, which date shall be not more than 20 calendar days and not less than 15 calendar days prior to the Special Interest Payment Date and not less than 10 calendar days after the receipt by the Trustee of the notice of the proposed payment. The Issuer shall promptly notify the Trustee in writing of such Special Record Date, and in the name and at the expense of the Issuer, the Trustee shall cause notice of the proposed payment of such Defaulted Interest and the Special Record Date and Special Interest Payment Date therefor to be given in the manner provided for in Section 12.1, not less than 10 calendar days prior to such Special Record Date. Notice of the proposed payment of such Defaulted Interest and the Special Record Date and Special Interest Payment Date therefor having been so given, such Defaulted Interest shall be paid on the Special Interest Payment Date to the Persons in whose names the Notes (or their respective predecessor Notes) are registered at the close of business on such Special Record Date and shall no longer be payable pursuant to the provisions in Section 2.15(b).

-71-

(b)     The Issuer may make payment of any Defaulted Interest in any other lawful manner not inconsistent with the requirements of any securities exchange on which the Notes may be listed, and upon such notice as may be required by such exchange, if, after written notice given by the Issuer to the Trustee of the proposed payment pursuant to this Section 2.15(b), such manner of payment shall be deemed practicable by the Trustee.

Subject to the foregoing provisions of this Section 2.15, each Note delivered under this Indenture upon registration of, transfer of or in exchange for or in lieu of any other Note shall carry the rights to interest accrued and unpaid, and to accrue, which were carried by such other Note.

SECTION 2.16.     CUSIP and ISIN Numbers.

The Issuer in issuing the Notes may use "CUSIP" and "ISIN" numbers and, if so, the Trustee and the Notes Custodian shall use "CUSIP and "ISIN" numbers in notices of redemption or purchase as a convenience to Holders; provided, however, that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Notes or as contained in any notice of a redemption or purchase and that reliance may be placed only on the other identification numbers printed on the Notes, and any such redemption or purchase shall not be affected by any defect in or omission of such CUSIP and ISIN numbers.  The Issuer shall promptly notify the Trustee and the Notes Custodian in writing of any change in the CUSIP and ISIN numbers.

SECTION 2.17.     Calculations.  The Issuer shall be responsible for making all calculations called for under the Notes and the Indenture, including but not limited to determination of redemption price, premium, if any, interest, determination of how much interest shall be payable as PIK Interest or Cash Interest, as applicable, and any additional amounts or other amounts payable on the Notes.  The Issuer will make the calculations in good faith and, absent manifest error, its calculations will be final and binding on the Holders.  The Issuer will provide a schedule of its calculations to the Trustee when requested by the Trustee, and the Trustee is entitled to rely conclusively on the accuracy of the Issuer's calculations without independent verification.

ARTICLE III

COVENANTS

SECTION 3.1. Payment of Notes.  The Issuer shall promptly pay the principal of, premium, if any, and interest on the Notes on the dates and in the manner provided in the Notes and in this Indenture.  Principal, premium, if any, and interest shall be considered paid on the date due if by 11:00 a.m. (New York City time) on such date the Trustee or the Paying Agent holds in accordance with this Indenture money sufficient to pay all principal, premium, if any, and, with respect to Cash Interest, interest then due or, with respect to PIK Interest, if by such time the Trustee has recorded an increase in the principal amount of Global Notes to reflect such PIK Interest or issued PIK Notes in certificated form in respect of such PIK Interest, in accordance with the terms of this Indenture and the Notes, and the Trustee or the Paying Agent,

-72-

as the case may be, is not prohibited from paying such money to the Holders on that date pursuant to the terms of this Indenture.

The Issuer shall pay interest on overdue principal in the form of Cash Interest at a rate that is 2.00% higher than the Cash Interest Rate, and it shall pay interest on overdue installments of interest at the same rate to the extent lawful.

Notwithstanding anything to the contrary contained in this Indenture, the Issuer may, to the extent it is required to do so by law, deduct or withhold income or other similar taxes imposed by the United States of America from principal or interest payments hereunder.

SECTION 3.2.Limitation on Indebtedness.

(a)     The Issuer shall not, and shall not permit any of its Restricted Subsidiaries to, Incur any Indebtedness (including Acquired Indebtedness); provided, however, that the Issuer and any of its Restricted Subsidiaries may Incur Indebtedness (including Acquired Indebtedness) if on the date of such Incurrence and after giving *pro forma* effect thereto (including *pro forma* application of the proceeds thereof), the Fixed Charge Coverage Ratio for the Issuer and its Restricted Subsidiaries is greater than 2.00 to 1.00; provided, further, that Non-Guarantors may not Incur Indebtedness if, after giving *pro forma* effect to such Incurrence (including a *pro forma* application of the net proceeds therefrom), more than an aggregate of the greater of (a) $40.0 million and (b) 3.5% of Total Assets of Indebtedness of Non-Guarantors would be outstanding pursuant to this paragraph at such time.

(b)     The first paragraph of this covenant shall not prohibit the Incurrence of the following Indebtedness:

(1)     Indebtedness Incurred pursuant to any Credit Facility (including letters of credit or bankers' acceptances issued or created under any Credit Facility) and any Refinancing Indebtedness in respect thereof, and Guarantees in respect of such Indebtedness, in a maximum aggregate principal amount at any time outstanding not exceeding (x) $650.0 million *plus* in the case of any refinancing of any Indebtedness permitted under this Section 3.2(b)(1)(x) or any portion thereof, the aggregate amount of fees, underwriting discounts, accrued and unpaid interest, premiums and other costs and expenses Incurred in connection with such refinancing plus (y) an unlimited aggregate principal amount of Indebtedness so long as, at the time of Incurrence thereof and after giving pro forma effect thereto (including pro forma application of the proceeds thereof), the Consolidated Total Secured Leverage Ratio does not exceed 3.40 to 1.00;

(2)     (i) Guarantees by the Issuer or any Restricted Subsidiary of Indebtedness or other obligations of the Issuer or any Restricted Subsidiary so long as the Incurrence of such Indebtedness or other obligation is not prohibited by the terms of this Indenture;

(3)     Indebtedness of the Issuer owing to and held by any Restricted Subsidiary or Indebtedness of a Restricted Subsidiary owing to and held by the Issuer or any Restricted Subsidiary; provided, however, that:

(i)     any subsequent issuance or transfer of Capital Stock or any other event which results in any such Indebtedness being beneficially held by a Person other than the Issuer or a Restricted Subsidiary; and

(ii)     any sale or other transfer of any such Indebtedness to a Person other than the Issuer or a Restricted Subsidiary;

shall be deemed, in each case, to constitute an Incurrence of such Indebtedness by the Issuer or such Restricted Subsidiary, as the case may be;

(4)     Indebtedness represented by (i) the Notes (other than any Additional Notes), including any PIK Notes issued from time to time to pay PIK Interest in accordance with the terms of this Indenture and any Guarantee thereof, (ii) any Indebtedness (other than Indebtedness incurred pursuant to clauses (1) and (3)) outstanding on the Issue Date, (iii) Refinancing Indebtedness Incurred in respect of any Indebtedness described in this clause or clauses (1)(y), (4), (5), (7), (10), (11) or (14) of this Section 3.2(b) or Incurred pursuant to Section 3.2(a), and (iv) Management Advances;

(5)     Indebtedness of (x) the Issuer or any Restricted Subsidiary Incurred or issued to finance an acquisition or (y) Acquired Indebtedness of Persons that are acquired by the Issuer or any Restricted Subsidiaries or merged into or consolidated with the Issuer or any Restricted Subsidiary in accordance with the terms of this Indenture after giving effect to such acquisition, merger or consolidation, either

(i)     the Issuer would be permitted to Incur at least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in Section 3.2(a); or

(ii)     the Fixed Charge Coverage Ratio of the Issuer and the Restricted Subsidiaries would not be lower than immediately prior to such acquisition, merger or consolidation;

(6)     Hedging Obligations (excluding Hedging Obligations entered into for speculative purposes);

(7)     Indebtedness represented by Capitalized Lease Obligations, Purchase Money Obligations and/or Sale and Leaseback Transactions, in an aggregate outstanding principal amount which, when taken together with the principal amount of all other Indebtedness Incurred pursuant to this clause (7) and then outstanding, does not exceed the greater of (x) $65.0 million and (y) 5.75% of Total Assets at the time of Incurrence and any Refinancing Indebtedness in respect thereof;

(8)     Indebtedness in respect of (i) self-insurance obligations, performance, indemnity, surety, judgment, appeal, advance payment, customs, value added or other tax or other guarantees or other similar bonds, instruments or obligations and completion guarantees and warranties provided by the Issuer or a Restricted Subsidiary or relating to liabilities, obligations or guarantees Incurred in the ordinary course of business or

consistent with past practice, (ii) the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business or consistent with past practice; provided, however, that such Indebtedness is extinguished within five Business Days of Incurrence; (iii) customer deposits and advance payments received in the ordinary course of business or consistent with past practice from customers for goods or services purchased in the ordinary course of business or consistent with past practice; (iv) letters of credit, bankers' acceptances, guarantees or other similar instruments or obligations issued or relating to liabilities or obligations Incurred in the ordinary course of business or consistent with past practice, and (v) any customary treasury, depositary, cash management, automatic clearinghouse arrangements, overdraft protections, cash pooling or netting or setting off arrangements or similar arrangements in the ordinary course of business or consistent with past practice;

(9)     Indebtedness arising from agreements providing for guarantees, indemnification, obligations in respect of earn-outs or other adjustments of purchase price or, in each case, similar obligations, in each case, Incurred or assumed in connection with the acquisition or disposition of any business or assets or Person or any Capital Stock of a Subsidiary (other than Guarantees of Indebtedness Incurred by any Person acquiring or disposing of such business or assets or such Subsidiary for the purpose of financing such acquisition or disposition); provided that the maximum liability of the Issuer and its Restricted Subsidiaries in respect of all such Indebtedness in connection with a disposition shall at no time exceed the gross proceeds, including the fair market value of non-cash proceeds (measured at the time received and without giving effect to any subsequent changes in value), actually received by the Issuer and its Restricted Subsidiaries in connection with such disposition;

(10)     Indebtedness in an aggregate outstanding principal amount which, when taken together with any Refinancing Indebtedness in respect thereof and the principal amount of all other Indebtedness Incurred pursuant to this clause (10) and then outstanding, will not exceed 100% of the aggregate Net Cash Proceeds received by the Issuer from the issuance or sale (other than to a Restricted Subsidiary of the Issuer) of its Capital Stock (other than Disqualified Stock, Designated Preferred Stock or an Excluded Contribution) or otherwise contributed to the equity (other than through the issuance of Disqualified Stock, Designated Preferred Stock or an Excluded Contribution) of the Issuer, in each case, subsequent to the Issue Date; provided, however, that (i) any such Net Cash Proceeds that are so received or contributed shall not increase the amount available for making Restricted Payments to the extent the Issuer and its Restricted Subsidiaries Incur Indebtedness in reliance thereon and (ii) any Net Cash Proceeds that are so received or contributed shall be excluded for purposes of Incurring Indebtedness pursuant to this clause (10) to the extent such Net Cash Proceeds or cash have been applied to make Restricted Payments;

(11)     Indebtedness of Non-Guarantors in an aggregate amount not to exceed the greater of (a) $15.0 million and (b) 1.25% of Total Assets at any time outstanding and any Refinancing Indebtedness in respect thereof;

(12)     Indebtedness consisting of promissory notes issued by the Issuer or any of its Subsidiaries to any current or former employee, director or consultant of the Issuer, any of its Subsidiaries or any Parent Entity (or permitted transferees, assigns, estates, or heirs of such employee, director or consultant), to finance the purchase or redemption of Capital Stock of the Issuer or any Parent Entity that is permitted by Section 3.3;

(13)     Indebtedness of the Issuer or any of its Restricted Subsidiaries consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements, in each case Incurred in the ordinary course of business or consistent with past practice;

(14)     Indebtedness in an aggregate outstanding principal amount which, when taken together with any Refinancing Indebtedness in respect thereof and the principal amount of all other Indebtedness Incurred pursuant to this clause and then outstanding, will not exceed the greater of (a) $40.0 million and (b) 3.50% of Total Assets;

(15)     [reserved]; and

(16)     Indebtedness of the Issuer or a Restricted Subsidiary to the extent the proceeds of such Indebtedness are deposited and used to defease the Notes as described in Sections 8.1, 8.2, 8.3 and 11.1 hereof.

(c)     For purposes of determining compliance with, and the outstanding principal amount of any particular Indebtedness Incurred pursuant to and in compliance with, this Section 3.2:

(1)     in the event that all or any portion of any item of Indebtedness meets the criteria of more than one of the types of Indebtedness described in the first and second paragraphs of this covenant, the Issuer, in its sole discretion, shall classify, and may from time to time reclassify, all or any portion of such item of Indebtedness and only be required to include the amount and type of such Indebtedness in any of the clauses of Section 3.2(a) or (b);

(2)     additionally, all or any portion of any item of Indebtedness may later be reclassified as having been Incurred pursuant to any type of Indebtedness described in one of the clauses of Section 3.2(a) or (b) so long as such Indebtedness is permitted to be Incurred pursuant to such provision at the time of reclassification;

(3)     all Indebtedness outstanding on the Issue Date under the Exit Credit Agreements shall be deemed to have been incurred on the Issue Date under Section 3.2(b)(1) and may not be reclassified;

(4)     in the case of any refinancing of any Indebtedness, such Indebtedness shall not include the aggregate amount of fees, underwriting discounts, premiums and other costs and expenses Incurred in connection with such refinancing;

(5)     Guarantees of, or obligations in respect of letters of credit, bankers' acceptances or other similar instruments relating to, or Liens securing, Indebtedness that

-76-

is otherwise included in the determination of a particular amount of Indebtedness shall not be included;

(6)     if obligations in respect of letters of credit, bankers' acceptances or other similar instruments are Incurred pursuant to any Credit Facility and are being treated as Incurred pursuant to clause (a), (b)(1), (b)(7), (b)(10), (b)(11) or (b)(14) of this Section 3.2 and the letters of credit, bankers' acceptances or other similar instruments relate to other Indebtedness, then such other Indebtedness shall not be included;

(7)     the principal amount of any Disqualified Stock of the Issuer or a Restricted Subsidiary, or Preferred Stock of a Restricted Subsidiary, will be equal to the greater of the maximum mandatory redemption or repurchase price (not including, in either case, any redemption or repurchase premium) or the liquidation preference thereof;

(8)     Indebtedness permitted by this covenant need not be permitted solely by reference to one provision permitting such Indebtedness but may be permitted in part by one such provision and in part by one or more other provisions of this covenant permitting such Indebtedness; and

(9)     the amount of any Indebtedness outstanding as of any date shall be (a) the accreted value thereof in the case of any Indebtedness issued with original issue discount and (b) the principal amount of Indebtedness, or liquidation preference thereof, in the case of any other Indebtedness.

Accrual of interest, accrual of dividends, the accretion of accreted value, the accretion or amortization of original issue discount, the payment of interest in the form of additional Indebtedness, the payment of dividends in the form of additional shares of Preferred Stock or Disqualified Stock or the reclassification of commitments or obligations not treated as Indebtedness due to a change in GAAP, will not be deemed to be an Incurrence of Indebtedness for purposes of this Section 3.2.

If at any time an Unrestricted Subsidiary becomes a Restricted Subsidiary, any Indebtedness of such Subsidiary shall be deemed to be Incurred by a Restricted Subsidiary of the Issuer as of such date (and, if such Indebtedness is not permitted to be Incurred as of such date under this Section 3.2, the Issuer shall be in default of this Section 3.2).

For purposes of determining compliance with any U.S. dollar-denominated restriction on the incurrence of Indebtedness, the U.S. dollar equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was Incurred, in the case of term debt, or first committed, in the case of revolving credit debt; provided, that if such Indebtedness is Incurred to refinance other Indebtedness denominated in a foreign currency, and such refinancing would cause the applicable U.S. dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such U.S. dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed (a) the principal amount of such Indebtedness being refinanced plus (b) the aggregate amount of fees, underwriting discounts,

premiums (including tender premiums) and other costs and expenses (including original issue discount, upfront fees or similar fees) incurred in connection with such refinancing.

Notwithstanding any other provision of this Section 3.2, the maximum amount of Indebtedness that the Issuer or a Restricted Subsidiary may Incur pursuant to this Section 3.2 shall not be deemed to be exceeded solely as a result of fluctuations in the exchange rate of currencies. The principal amount of any Indebtedness Incurred to refinance other Indebtedness, if Incurred in a different currency from the Indebtedness being refinanced, shall be calculated based on the currency exchange rate applicable to the currencies in which such Refinancing Indebtedness is denominated that is in effect on the date of such refinancing.

The Issuer shall not, and shall not permit any Subsidiary Guarantor to, directly or indirectly, Incur any Indebtedness (including Acquired Indebtedness) that is subordinated or junior in right of payment to any Indebtedness of the Issuer or such Subsidiary Guarantor, as the case may be, unless such Indebtedness is expressly subordinated in right of payment to the Notes or such Subsidiary Guarantor's Note Guarantee to the extent and in the same manner as such Indebtedness is subordinated to other Indebtedness of the Issuer or such Subsidiary Guarantor, as the case may be; provided, that for purposes of this Indenture, (1) unsecured Indebtedness shall not be treated as subordinated or junior to Secured Indebtedness merely because it is unsecured and (2) senior Indebtedness shall not be treated as subordinated or junior to any other senior Indebtedness merely because it has a junior priority with respect to the same collateral or is secured by different collateral or because it is guaranteed by different obligors.

SECTION 3.3.Limitation on Restricted Payments.

(a)     The Issuer shall not, and shall not permit any of its Restricted Subsidiaries, directly or indirectly, to:

(1)     declare or pay any dividend or make any distribution on or in respect of the Issuer's or any Restricted Subsidiary's Capital Stock (including any such payment in connection with any merger, amalgamation or consolidation involving the Issuer or any of its Restricted Subsidiaries) except:

(i)     dividends or distributions payable in Capital Stock of the Issuer (other than Disqualified Stock) or in options, warrants or other rights to purchase such Capital Stock of the Issuer; and

(ii)     dividends or distributions payable to the Issuer or a Restricted Subsidiary (and, in the case of any such Restricted Subsidiary making such dividend or distribution, to holders of its Capital Stock other than the Issuer or another Restricted Subsidiary on no more than a *pro rata* basis);

(2)     purchase, redeem, retire or otherwise acquire for value any Capital Stock of the Issuer or any Parent Entity of the Issuer held by Persons other than the Issuer or a Restricted Subsidiary of the Issuer;

(3)     purchase, repurchase, redeem, defease or otherwise acquire or retire for value, prior to scheduled maturity, scheduled repayment or scheduled sinking fund

-78-

payment, any Subordinated Indebtedness (other than (i) any such purchase, repurchase, redemption, defeasance or other acquisition or retirement in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case, due within one year of the date of purchase, repurchase, redemption, defeasance or other acquisition or retirement and (ii) any Indebtedness Incurred pursuant to Section 3.2(b)(3)); or

(4)     make any Restricted Investment;

(any such dividend, distribution, purchase, redemption, repurchase, defeasance, other acquisition, retirement or Restricted Investment referred to in clauses (1) through (4) are referred to herein as a "Restricted Payment"), if at the time the Issuer or such Restricted Subsidiary makes such Restricted Payment:

(i)     a Default shall have occurred and be continuing (or would result immediately thereafter therefrom);

(ii)     the Issuer is not able to Incur an additional $1.00 of Indebtedness pursuant to Section 3.2(a) after giving effect, on a *pro forma* basis, to such Restricted Payment; or

(iii)     the aggregate amount of such Restricted Payment and all other Restricted Payments made subsequent to the Issue Date (and not returned or rescinded) (including Permitted Payments permitted by Section 3.3(b)(1) (without duplication), (10) and (20) but excluding all other Restricted Payments permitted by Section 3.3(b)) would exceed the sum of (without duplication):

(A)     $25.0 million; provided that such $25.0 million amount shall only be available to make Restricted Payments if after giving effect to such Restricted Payment on a *pro forma* basis the Consolidated Total Leverage Ratio as of the end of the most recently completed four-quarter period for which internal consolidated financial statements are available is not greater than 5.00 to 1.00;

(B)     50% of Consolidated Net Income for the period (treated as one accounting period) from the first day of the first fiscal quarter in which the Issue Date occurs to the end of the most recent fiscal quarter ending prior to the date of such Restricted Payment for which internal consolidated financial statements of the Issuer are available (or, in the case such Consolidated Net Income is a deficit, *minus* 100% of such deficit);

(C)     100% of the aggregate Net Cash Proceeds, and the fair market value, as determined in good faith by the Issuer, of property or assets or marketable securities, received by the Issuer from the issue or sale of its Capital Stock (other than Disqualified Stock or Designated Preferred Stock) or as a result of a merger or consolidation with another person subsequent to the Issue Date or otherwise contributed to the equity (other than through the issuance of Disqualified Stock or Designated Preferred Stock) of the Issuer subsequent to the Issue Date (other than

-79-

(x) Net Cash Proceeds or property or assets or marketable securities received from an issuance or sale of such Capital Stock to a Restricted Subsidiary or an employee stock ownership plan or trust established by the Issuer or any Subsidiary of the Issuer for the benefit of its employees to the extent funded by the Issuer or any Restricted Subsidiary, (y) Net Cash Proceeds or property or assets or marketable securities to the extent that any Restricted Payment has been made from such proceeds in reliance on Section 3.3(b)(6) and (z) Excluded Contributions);

(D)   100% of the aggregate Net Cash Proceeds, and the fair market value of property or assets or marketable securities, received by the Issuer or any Restricted Subsidiary from the issuance or sale (other than to the Issuer or a Restricted Subsidiary of the Issuer or an employee stock ownership plan or trust established by the Issuer or any Subsidiary of the Issuer for the benefit of their employees to the extent funded by the Issuer or any Restricted Subsidiary) by the Issuer or any Restricted Subsidiary subsequent to the Issue Date of any Indebtedness, Disqualified Stock or Designated Preferred Stock that has been converted into or exchanged for Capital Stock of the Issuer (other than Disqualified Stock or Designated Preferred Stock) *plus*, without duplication, the amount of any cash, and the fair market value of property or assets or marketable securities, received by the Issuer or any Restricted Subsidiary upon such conversion or exchange;

(E)   100% of the aggregate amount received in cash and the fair market value, as determined in good faith by the Issuer, of marketable securities or other property received by means of:  (i) the sale or other disposition (other than to the Issuer or a Restricted Subsidiary) of Restricted Investments made by the Issuer or its Restricted Subsidiaries and repurchases and redemptions of such Restricted Investments from the Issuer or its Restricted Subsidiaries and repayments of loans or advances, and releases of guarantees, which constitute Restricted Investments by the Issuer or its Restricted Subsidiaries, in each case after the Issue Date or (ii) the sale (other than to the Issuer or a Restricted Subsidiary) of the stock of an Unrestricted Subsidiary or a distribution from an Unrestricted Subsidiary (other than to the extent of the amount of the Investment that constituted a Permitted Investment which will instead increase the amount available under the applicable clause of the definition of "Permitted Investments") or a dividend from an Unrestricted Subsidiary after the Issue Date; and

(F)   in the case of the redesignation of an Unrestricted Subsidiary as a Restricted Subsidiary or the merger, amalgamation or consolidation of an Unrestricted Subsidiary into the Issuer or a Restricted Subsidiary or the transfer of all or substantially all of the assets of an Unrestricted Subsidiary to the Issuer or a Restricted Subsidiary after the Issue Date, the fair market value of the Investment in such Unrestricted

-80-

Subsidiary (or the assets transferred), as determined in good faith by the Issuer at the time of the redesignation of such Unrestricted Subsidiary as a Restricted Subsidiary or at the time of such merger, amalgamation or consolidation or transfer of assets (after taking into consideration any Indebtedness associated with the Unrestricted Subsidiary so designated or merged, amalgamated or consolidated or Indebtedness associated with the assets so transferred), other than to the extent of the amount of the Investment that constituted a Permitted Investment.

(b)     The foregoing provisions of Section 3.3(a) will not prohibit any of the following (collectively, "Permitted Payments"):

(1)     the payment of any dividend or distribution within 60 days after the date of declaration thereof, if at the date of declaration such payment would have complied with the provisions of this Indenture or the redemption, repurchase or retirement of Indebtedness if, at the date of any redemption notice, such payment would have complied with the provisions of this Indenture;

(2)     any purchase, repurchase, redemption, defeasance or other acquisition or retirement of Capital Stock or Subordinated Indebtedness made by exchange (including any such exchange pursuant to the exercise of a conversion right or privilege in connection with which cash is paid in lieu of the issuance of fractional shares) for, or out of the proceeds of the substantially concurrent sale of, Capital Stock of the Issuer (other than Disqualified Stock or Designated Preferred Stock) ("Refunding Capital Stock") or a substantially concurrent contribution to the equity (other than through the issuance of Disqualified Stock or Designated Preferred Stock or through an Excluded Contribution) of the Issuer; provided, however, that to the extent so applied, the Net Cash Proceeds, or fair market value of property or assets or of marketable securities, from such sale of Capital Stock or such contribution will be excluded from Section 3.3(a)(iii);

(3)     any purchase, repurchase, redemption, defeasance or other acquisition or retirement of Subordinated Indebtedness made by exchange for, or out of the proceeds of the substantially concurrent sale of, Refinancing Indebtedness permitted to be Incurred pursuant to Section 3.2;

(4)     any purchase, repurchase, redemption, defeasance or other acquisition or retirement of Preferred Stock of the Issuer or a Restricted Subsidiary made by exchange for or out of the proceeds of the substantially concurrent sale of Preferred Stock of the Issuer or a Restricted Subsidiary, as the case may be, that, in each case, is permitted to be Incurred pursuant to Section 3.2;

(5)     any purchase, repurchase, redemption, defeasance or other acquisition or retirement of Subordinated Indebtedness or Disqualified Stock or Preferred Stock of a Restricted Subsidiary:

(i)     from Net Available Cash to the extent permitted under Section 3.5, but only if the Issuer shall have first complied with the terms described under

-81-

Section 3.5 and purchased all Notes tendered pursuant to any offer to repurchase all the Notes required thereby, prior to purchasing, repurchasing, redeeming, defeasing or otherwise acquiring or retiring such Subordinated Indebtedness, Disqualified Stock or Preferred Stock; or

(ii)    to the extent required by the agreement governing such Subordinated Indebtedness, Disqualified Stock or Preferred Stock following the occurrence of a Change of Control (or other similar event described therein as a "change of control"), but only if the Issuer shall have first complied with Section 3.9 and purchased all Notes tendered pursuant to the offer to repurchase all the Notes required thereby, prior to purchasing, repurchasing, redeeming, defeasing or otherwise acquiring or retiring such Subordinated Indebtedness, Disqualified Stock or Preferred Stock; or

(iii)    consisting of Acquired Indebtedness (other than Indebtedness Incurred (A) to provide all or any portion of the funds utilized to consummate the transaction or series of related transactions pursuant to which such Person became a Restricted Subsidiary or was otherwise acquired by the Issuer or a Restricted Subsidiary or (B) otherwise in connection with or contemplation of such acquisition);

(6)    a Restricted Payment to pay for the repurchase, redemption or other acquisition or retirement for value of Capital Stock (other than Disqualified Stock) of the Issuer or of any Parent Entity held by any future, present or former employee, director or consultant of the Issuer, any of its Subsidiaries or of any Parent Entity (or permitted transferees, assigns, estates, trusts or heirs of such employee, director or consultant) either pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement or upon the termination of such employee, director or consultant's employment or directorship; provided, however, that the aggregate Restricted Payments made under this clause (6) do not exceed $10.0 million in any fiscal year (with unused amounts in any fiscal year being carried over to succeeding fiscal years subject to a maximum of $20.0 million in any fiscal year); provided further that such amount in any fiscal year may be increased by an amount not to exceed:

(i)    the Net Cash Proceeds from the sale (other than to a Restricted Subsidiary) of Capital Stock (other than Disqualified Stock or Designated Preferred Stock or Excluded Contributions) of the Issuer and, to the extent contributed to the equity capital of the Issuer (other than through the issuance of Disqualified Stock or Designated Preferred Stock or an Excluded Contribution), Capital Stock of any Parent Entity, in each case to members of management, directors or consultants of the Issuer, any of its Subsidiaries or any Parent Entity that occurred after the Issue Date, to the extent the cash proceeds from the sale of such Capital Stock have not otherwise been applied to the payment of Restricted Payments by virtue of Section 3.3(a)(iii); *plus*

-82-

(ii)     the cash proceeds of key man life insurance policies received by the Issuer and its Restricted Subsidiaries after the Issue Date; *less*

(iii)     the amount of any Restricted Payments made in previous calendar years pursuant to clauses (i) and (ii) of this clause (6);

and provided further that cancellation of Indebtedness owing to the Issuer or any Restricted Subsidiary from any future, present or former members of management, directors, employees or consultants of the Issuer, or any Parent Entity or Restricted Subsidiaries in connection with a repurchase of Capital Stock of the Issuer or any Parent Entity will not be deemed to constitute a Restricted Payment for purposes of this covenant or any other provision of this Indenture;

(7)     the declaration and payment of dividends on Disqualified Stock, or Preferred Stock of a Restricted Subsidiary, Incurred in accordance with Section 3.2;

(8)     purchases, repurchases, redemptions, defeasances or other acquisitions or retirements of Capital Stock deemed to occur upon the exercise of stock options, warrants or other rights in respect thereof if such Capital Stock represents a portion of the exercise price thereof;

(9)     dividends, loans, advances or distributions to any Parent Entity or other payments by the Issuer or any Restricted Subsidiary in amounts equal to (without duplication):

(i)     the amounts required for any Parent Entity to pay any Parent Entity Expenses or any Related Taxes; or

(ii)     amounts constituting or to be used for purposes of making payments to the extent specified in Section 3.8(b)(2), (3), (5), (11) and (12);

(10)     the declaration and payment by the Issuer of, dividends on the common stock or common equity interests of the Issuer or any Parent following a public offering of such common stock or common equity interests, in an amount not to exceed 6% of the aggregate proceeds received by or contributed to the Issuer in or from any such public offering in any fiscal year;

(11)     payments by the Issuer, or loans, advances, dividends or distributions to any Parent Entity to make payments, to holders of Capital Stock of the Issuer or any Parent Entity in lieu of the issuance of fractional shares of such Capital Stock; provided, however, that any such payment, loan, advance, dividend or distribution shall not be for the purpose of evading any limitation of this covenant or otherwise to facilitate any dividend or other return of capital to the holders of such Capital Stock (as determined in good faith by the Board of Directors);

(12)     Restricted Payments that are made with Excluded Contributions;

-83-

(13)   (i) the declaration and payment of dividends on Designated Preferred Stock of the Issuer issued after the Issue Date; and (ii) the declaration and payment of dividends on Refunding Capital Stock that is Preferred Stock; provided, however, that, in the case of clause (i), the amount of all dividends declared or paid pursuant to this clause shall not exceed 100% of the aggregate Net Cash Proceeds received by the Issuer or the aggregate amount contributed in cash to the equity (other than through the issuance of Disqualified Stock or an Excluded Contribution of the Issuer), from the issuance or sale of such Designated Preferred Stock; provided further, in the case of clauses (i) and (ii), that for the most recently ended four fiscal quarters for which internal financial statements are available immediately preceding the date of issuance of such Designated Preferred Stock or declaration of such dividends on such Refunding Capital Stock, after giving effect to such payment on a *pro forma* basis the Issuer would be permitted to Incur at least $1.00 of additional Indebtedness pursuant to Section 3.2(a);

(14)   dividends or other distributions of Capital Stock of, or Indebtedness owed to the Issuer or a Restricted Subsidiary by, Unrestricted Subsidiaries (unless the Unrestricted Subsidiary's principal asset is cash and Cash Equivalents);

(15)   [reserved];

(16)   any Restricted Payment made in connection with the Transactions or as set forth in the Plan Confirmation Order, and any Transaction Expenses and any other costs and expenses (including all legal, accounting and other professional fees and expenses) related thereto or used to fund amounts owed to Affiliates in connection with the Transactions or such other transactions (including dividends to any Parent Entity of the Issuer to permit payment by such Parent Entity of such amounts);

(17)   [reserved];

(18)   mandatory redemptions of Disqualified Stock issued as a Restricted Payment or as consideration for a Permitted Investment; provided that the amount of such redemptions are no greater than the amount that constituted a Restricted Payment or Permitted Investment;

(19)   any Restricted Payment by the Issuer or any Restricted Subsidiary to Holdings to permit Holdings to repurchase, redeem or otherwise acquire or retire the Series A Preferred Stock issued by Holdings or any Preferred Stock issued pursuant to the terms thereof; provided that after giving effect to such Restricted Payment on a *pro forma* basis the Consolidated Total Leverage Ratio as of the end of the most recently completed four-quarter period for which financial statements have been provided that is not greater than 4.0 to 1.00, and no Event of Default shall have occurred and be continuing; and

(20)   any Restricted Payment by the Issuer or any Restricted Subsidiary to Holdings to permit Holdings to pay cash dividends to the holders of the Series A Preferred Stock issued by Holdings or any Preferred Stock issued pursuant to the terms thereof; provided that after giving effect to such Restricted Payment and to the Incurrence

-84-

of any Indebtedness to pay for such dividends on a *pro forma* basis the Consolidated Total Leverage Ratio as of the end of the most recently completed four-quarter period for which financial statements have been provided that is not greater than 3.5 to 1.00, and no Event of Default shall have occurred and be continuing.

For purposes of determining compliance with this Section 3.3, in the event that a Restricted Payment meets the criteria of more than one of the categories of Permitted Payments described in clauses (1) through (20) of paragraph (b), or is permitted pursuant to paragraph (a) of this Section 3.3, the Issuer will be entitled to classify such Restricted Payment (or portion thereof) on the date of its payment or later reclassify such Restricted Payment (or portion thereof) in any manner that complies with this Section 3.3.

The amount of all Restricted Payments (other than cash) shall be the fair market value on the date of such Restricted Payment of the asset(s) or securities proposed to be paid, transferred or issued by the Issuer or such Restricted Subsidiary, as the case may be, pursuant to such Restricted Payment.  The fair market value of any cash Restricted Payment shall be its face amount, and the fair market value of any non-cash Restricted Payment, property or assets other than cash shall be determined conclusively by the Issuer acting in good faith.

SECTION 3.4. Limitation on Restrictions on Distributions from Restricted Subsidiaries.

(a)     The Issuer shall not, and shall not permit any Restricted Subsidiary to, create or otherwise cause or permit to exist or become effective any consensual encumbrance or consensual restriction on the ability of any Restricted Subsidiary to:

(1)     pay dividends or make any other distributions in cash or otherwise on its Capital Stock or pay any Indebtedness or other obligations owed to the Issuer or any Restricted Subsidiary;

(2)     make any loans or advances to the Issuer or any Restricted Subsidiary that is a Guarantor; or

(3)     sell, lease or transfer any of its property or assets to the Issuer or any Restricted Subsidiary that is a Guarantor;

provided that (x) the priority of any Preferred Stock in receiving dividends or liquidating distributions prior to dividends or liquidating distributions being paid on common stock and (y) the subordination of (including the application of any standstill requirements to) loans or advances made to the Issuer or any Restricted Subsidiary to other Indebtedness Incurred by the Issuer or any Restricted Subsidiary shall not be deemed to constitute such an encumbrance or restriction.

(b)     The provisions of Section 3.4(a) shall not prohibit:

(1)     any encumbrance or restriction pursuant to (i) any Credit Facility, or (ii) any other agreement or instrument, in each case, in effect at or entered into on the Issue Date;

-85-

(2)     this Indenture, the Notes and the Note Guarantees;

(3)     any encumbrance or restriction pursuant to an agreement or instrument of a Person or relating to any Capital Stock or Indebtedness of a Person, entered into on or before the date on which such Person was acquired by or merged, amalgamated, consolidated or otherwise combined with or into the Issuer or any Restricted Subsidiary, or was designated as a Restricted Subsidiary or on which such agreement or instrument is assumed by the Issuer or any Restricted Subsidiary in connection with an acquisition of assets (other than Capital Stock or Indebtedness Incurred as consideration in, or to provide all or any portion of the funds utilized to consummate, the transaction or series of related transactions pursuant to which such Person became a Restricted Subsidiary or was acquired by the Issuer or was merged, amalgamated, consolidated or otherwise combined with or into the Issuer or any Restricted Subsidiary or entered into in contemplation of or in connection with such transaction) and outstanding on such date; provided that, for the purposes of this clause, if another Person is the Successor Company, any Subsidiary thereof or agreement or instrument of such Person or any such Subsidiary shall be deemed acquired or assumed by the Issuer or any Restricted Subsidiary when such Person becomes the Successor Company;

(4)     any encumbrance or restriction:  (i) that restricts in a customary manner the subletting, assignment or transfer of any property or asset that is subject to a lease, license or similar contract or agreement, or the assignment or transfer of any lease, license or other contract or agreement; (ii) contained in mortgages, pledges, charges or other security agreements permitted under this Indenture or securing Indebtedness of the Issuer or a Restricted Subsidiary permitted under this Indenture to the extent such encumbrances or restrictions restrict the transfer or encumbrance of the property or assets subject to such mortgages, pledges, charges or other security agreements; or (iii) pursuant to customary provisions restricting dispositions of real property interests set forth in any reciprocal easement agreements of the Issuer or any Restricted Subsidiary;

(5)     any encumbrance or restriction pursuant to Purchase Money Obligations and Capitalized Lease Obligations permitted under this Indenture, in each case, that impose encumbrances or restrictions on the property so acquired;

(6)     any encumbrance or restriction imposed pursuant to an agreement entered into for the direct or indirect sale or disposition to a Person of all or substantially all the Capital Stock or assets of the Issuer or any Restricted Subsidiary (or the property or assets that are subject to such restriction) pending the closing of such sale or disposition;

(7)     customary provisions in leases, licenses, shareholder agreements, joint venture agreements, organizational documents and other similar agreements and instruments;

(8)     encumbrances or restrictions arising or existing by reason of applicable law or any applicable rule, regulation or order, or required by any regulatory authority;

-86-

(9)     any encumbrance or restriction on cash or other deposits or net worth imposed by customers under agreements entered into in the ordinary course of business or consistent with past practice;

(10)     any encumbrance or restriction pursuant to Hedging Obligations;

(11)     other Indebtedness, Disqualified Stock or Preferred Stock of Foreign Subsidiaries permitted to be Incurred or issued subsequent to the Issue Date pursuant Section 3.2 that impose restrictions solely on the Foreign Subsidiaries party thereto or their Subsidiaries;

(12)     [reserved];

(13)     any encumbrance or restriction arising pursuant to an agreement or instrument (which if it relates to any Indebtedness, shall only be permitted if such Indebtedness is permitted to be Incurred pursuant to Section 3.2) if the encumbrances and restrictions contained in any such agreement or instrument taken as a whole (i) are not materially less favorable to the Holders than the encumbrances and restrictions contained in the 21C Exit Credit Agreement, together with the security documents associated therewith as in effect on the Issue Date or (ii) either (A) the Issuer determines at the time of entry into such agreement or instrument that such encumbrances or restrictions will not adversely affect, in any material respect, the Issuer's ability to make principal or interest payments on the Notes or (B) such encumbrance or restriction applies only during the continuance of a default relating to such agreement or instrument;

(14)     any encumbrance or restriction existing by reason of any lien permitted under Section 3.6; or

(15)     any encumbrance or restriction pursuant to an agreement or instrument effecting a refinancing of Indebtedness Incurred pursuant to, or that otherwise refinances, an agreement or instrument referred to in clauses (1) to (14) of this Section 3.4(b) or this clause (15) (an "Initial Agreement") or contained in any amendment, supplement or other modification to an agreement referred to in clauses (1) to (14) of this Section 3.4(b) or this clause (15); provided, however, that the encumbrances and restrictions with respect to such Restricted Subsidiary contained in any such agreement or instrument are no less favorable in any material respect to the Holders taken as a whole than the encumbrances and restrictions contained in the Initial Agreement or Initial Agreements to which such refinancing or amendment, supplement or other modification relates (as determined in good faith by the Issuer).

SECTION 3.5.Limitation on Sales of Assets and Subsidiary Stock.

(a)     The Issuer shall not, and shall not permit any of its Restricted Subsidiaries to, make any Asset Disposition unless:

(1)     the Issuer or such Restricted Subsidiary, as the case may be, receives consideration (including by way of relief from, or by any other Person assuming responsibility for, any liabilities, contingent or otherwise) at least equal to the fair market

-87-

value (such fair market value to be determined on the date of contractually agreeing to such Asset Disposition), as determined in good faith by the Issuer, of the shares and assets subject to such Asset Disposition (including, for the avoidance of doubt, if such Asset Disposition is a Permitted Asset Swap);

(2)     in any such Asset Disposition, or series of related Asset Dispositions (except to the extent the Asset Disposition is a Permitted Asset Swap) with a purchase price in excess of $5.0 million, at least 75% of the consideration from such Asset Disposition (including by way of relief from, or by any other Person assuming responsibility for, any liabilities, contingent or otherwise), together with all other Asset Dispositions since the Issue Date (on a cumulative basis), received by the Issuer or such Restricted Subsidiary, as the case may be, is in the form of cash or Cash Equivalents; and

(3)     an amount equal to 100% of the Net Available Cash (other than MDL Sale Proceeds) from such Asset Disposition is applied by the Issuer or any Restricted Subsidiary (as applicable) within 365 days from the later of (a) the date of such Asset Disposition and (b) the receipt of such Net Available Cash to:

(i)     prepay or repurchase (A) with respect to Net Available Cash from any Asset Disposition of ABL Priority Collateral, Indebtedness constituting ABL Priority Obligations, (B) with respect to Net Available Cash in respect of Term Priority Collateral, Indebtedness constituting Term Priority Obligations, (C) with respect to assets that are not Collateral, Indebtedness of any Non-Guarantor, (D) Notes or (E) Indebtedness constituting Pari Passu Lien Obligations; provided that if the Issuer or any Restricted Subsidiary shall so reduce Pari Passu Lien Obligations under this clause (E), the Issuer shall equally and ratably reduce Notes Obligations as provided under Section 5.7, through open-market purchases (to the extent such purchases are at or above 100% of the principal amount thereof) or by making an offer (in accordance with the procedures set forth below for an Asset Disposition Offer) to all Holders to purchase their Notes at a purchase price equal to 100% of the principal amount thereof, plus accrued and unpaid interest, if any); or

(ii)     with respect to Net Available Cash from any such Asset Disposition, whether or not involving Collateral, invest in or commit to invest in Additional Assets (including by means of an investment in Additional Assets by a Restricted Subsidiary with Net Available Cash received by the Issuer or another Restricted Subsidiary);

provided, however, that a binding agreement shall be treated as a permitted application of Net Available Cash from the date of such commitment with the good faith expectation that such Net Available Cash will be applied to satisfy such commitment within 180 days of such commitment; and

(4)     if the Issuer or any Restricted Subsidiary receives MDL Sale Proceeds, within ten (10) Business Days from the later of (a) the date of such Asset Disposition and (b) the receipt of such MDL Sale Proceeds, the Issuer or such Restricted Subsidiary shall:

(i)      prior to the repayment in full in cash of all Indebtedness of Medical Developers, LLC and MD International Investments, LLC, apply an amount equal to the lesser of (x) 100% of MDL Sale Proceeds and (y) the aggregate principal amount of such Indebtedness then outstanding to prepay or repurchase such Indebtedness;

(ii)      after the repayment in full in cash of all Indebtedness of Medical Developers, LLC and MD International Investments, LLC and prior to the MDL Term Loan Termination Date, apply an amount equal to 100% of MDL Sale Proceeds to prepay or repurchase Indebtedness constituting MDL Priority Obligations;

(iii)      after the MDL Term Loan Termination Date and prior to the first anniversary of the Issue Date, apply an amount equal to (x) prior to the 21C Term Loan Termination Date, 60% of such MDL Sale Proceeds to the prepayment or repurchase of Indebtedness constituting 21C Priority Obligations and (y) prior to the PIK Toggle Notes Termination Date, all other MDL Sale Proceeds to the prepayment or repurchase of, on an equal and ratable basis, (A) Notes as provided under Section 5.7 or through open-market purchases (provided that such purchases are at or above 100% of the principal amount thereof) and (B) Indebtedness constituting Pari Passu Lien Obligations; and

(iv)      after the MDL Term Loan Termination Date and on or after the first anniversary of the Issue Date, apply an amount equal to (x) prior to the 21C Term Loan Termination Date, 50% of such MDL Sale Proceeds to the prepayment or repurchase of Indebtedness constituting 21C Priority Obligations and (y) prior to the PIK Toggle Notes Termination Date, all other MDL Sale Proceeds to the prepayment or repurchase of, on an equal and ratable basis, (A) Notes as provided under Section 5.7 or through open-market purchases (provided that such purchases are at or above 100% of the principal amount thereof) and (B) Indebtedness constituting Pari Passu Lien Obligations;

provided that pending the final application of the amount of any such Net Available Cash in accordance with clauses (3) or (4) above, the Issuer and its Restricted Subsidiaries may temporarily reduce Indebtedness or otherwise use such Net Available Cash in any manner not prohibited by this Indenture.

(b)      The amount of any Net Available Cash from Asset Dispositions that is not applied or invested or committed to be applied or invested as provided in Section 3.5(a) will be deemed to constitute "Excess Proceeds" under this Indenture.  On the 366th day after the later of the applicable Asset Disposition or the receipt of such Net Available Cash, if the aggregate amount of Excess Proceeds under this Indenture exceeds (i) $10.0 million, in the case of a single transaction or a series of related transactions, or (ii) $20.0 million aggregate amount in any fiscal year, the Issuer will within 10 Business Days be required to make an offer ("Asset Disposition Offer") to (A) all Holders of Notes and (B) to the extent the Issuer elects or is required by the terms of any other Indebtedness constituting Pari Passu Lien Obligations to all holders of such Indebtedness, to purchase the maximum principal amount of Notes and any such Indebtedness

constituting Pari Passu Lien Obligations to which the Asset Disposition Offer applies that may be purchased out of the Excess Proceeds, at an offer price in respect of the Notes in an amount equal to 100% of the principal amount of the Notes and such Indebtedness constituting Pari Passu Lien Obligations in each case, plus accrued and unpaid interest, if any, to, but not including, the date of purchase, in accordance with the procedures set forth in this Indenture or the agreements governing such other Indebtedness constituting Pari Passu Lien Obligations and, with respect to the Notes, in minimum denominations of $1,000 and in integral multiples of $1,000 in excess thereof (or if any PIK Payment has been made, in minimum denominations of $1.00 and in integral multiples of $1.00 in excess thereof).  The Issuer will deliver notice of such Asset Disposition Offer electronically or by first-class mail, with a copy to the Trustee, to each Holder of Notes at the address of such Holder appearing in the security register or otherwise in accordance with the procedures of DTC, describing the transaction or transactions that constitute the Asset Disposition and offering to repurchase the Notes for the specified purchase price on the date specified in the notice, which date will be no earlier than 30 days and no later than 60 days from the date such notice is delivered, pursuant to the procedures required by this Indenture and described in such notice.  The Issuer may satisfy the foregoing obligations with respect to any Net Available Cash from an Asset Disposition by making an Asset Disposition Offer with respect to all Net Available Cash prior to the expiration of the relevant 365 days (or such longer period provided above) or with respect to any unapplied Excess Proceeds.

(c)    To the extent that the aggregate amount of Notes and such Indebtedness constituting Pari Passu Lien Obligations so validly tendered and not properly withdrawn pursuant to an Asset Disposition Offer is less than the Excess Proceeds, the Issuer may use any remaining Excess Proceeds for any purpose not prohibited in this Indenture.  If the aggregate principal amount of the Notes surrendered in any Asset Disposition Offer by Holders and other such Indebtedness constituting Pari Passu Lien Obligations, as applicable, surrendered by holders or lenders, collectively, exceeds the amount of Excess Proceeds, the Excess Proceeds shall be allocated among the Notes and such Indebtedness constituting Pari Passu Lien Obligations to be purchased on a pro rata basis on the basis of the aggregate principal amount of tendered Notes and such Indebtedness constituting Pari Passu Lien Obligations provided, that no Notes or such Indebtedness constituting Pari Passu Lien Obligations will be selected and purchased in an unauthorized denomination.  Upon completion of any Asset Disposition Offer, the amount of Excess Proceeds shall be reset at zero.  Additionally, the Issuer may, at its option, make an Asset Disposition Offer using proceeds from any Asset Disposition at any time after the consummation of such Asset Disposition.  Upon consummation or expiration of any Asset Disposition Offer, any remaining Net Available Cash shall not be deemed Excess Proceeds and the Issuer may use such Net Available Cash for any purpose not prohibited by the Indenture.

(d)    Notwithstanding any other provisions of this Section 3.5,

(i)    to the extent that any of or all the Net Available Cash of any Asset Disposition by a Foreign Subsidiary (a "Foreign Disposition") is prohibited or delayed by applicable local law from being repatriated to the United States, the portion of such Net Available Cash so affected will not be required to be applied in compliance with this Section 3.5, and such amounts may be retained by the applicable Foreign Subsidiary so long, but only so long, as the applicable local law will not permit repatriation to the United States (the Issuer hereby agreeing to cause the applicable Foreign Subsidiary to

-90-

promptly take all commercially reasonable actions available under the applicable local law to permit such repatriation), and once such repatriation of any of such affected Net Available Cash is permitted under the applicable local law, such repatriation will be promptly effected and such repatriated Net Available Cash will be promptly (and in any event not later than three (3) Business Days after such repatriation) applied (net of additional Taxes payable or reserved against a result thereof) in compliance with this Section 3.5; and

(ii)    to the extent that the Issuer has determined in good faith that repatriation of any of or all the Net Available Cash of any Foreign Disposition would have an adverse Tax consequence (which for the avoidance of doubt, includes, but is not limited to, any repatriation whereby doing so the Issuer, any Restricted Subsidiary, or any of their respective affiliates and/or equity owners would incur a tax liability, including as a result of a dividend or deemed dividend, or a withholding tax, but taking into account any foreign tax credit or benefit received in connection with such repatriation) with respect to such Net Available Cash, the Net Available Cash so affected may be retained by the applicable Foreign Subsidiary.

(e)    To the extent that any portion of Net Available Cash payable in respect of the Notes is denominated in a currency other than U.S. dollars, the amount thereof payable in respect of the Notes shall not exceed the net amount of funds in U.S. dollars that is actually received by the Issuer upon converting such portion into U.S. dollars.

(f)    For the purposes of Section 3.5(a)(2) hereof, the following will be deemed to be cash:

(1)    the assumption by the transferee of Indebtedness or other liabilities contingent or otherwise of the Issuer or a Restricted Subsidiary (other than Subordinated Indebtedness of the Issuer or a Guarantor) and the release of the Issuer or such Restricted Subsidiary from all liability on such Indebtedness or other liability in connection with such Asset Disposition;

(2)    securities, notes or other obligations received by the Issuer or any Restricted Subsidiary of the Issuer from the transferee that are converted by the Issuer or such Restricted Subsidiary into cash or Cash Equivalents within 180 days following the closing of such Asset Disposition;

(3)    Indebtedness of any Restricted Subsidiary that is no longer a Restricted Subsidiary as a result of such Asset Disposition, to the extent that the Issuer and each other Restricted Subsidiary are released from any Guarantee of payment of such Indebtedness in connection with such Asset Disposition;

(4)    consideration consisting of Indebtedness of the Issuer (other than Subordinated Indebtedness) received after the Issue Date from Persons who are not the Issuer or any Restricted Subsidiary; and

(5)    any Designated Non-Cash Consideration received by the Issuer or any Restricted Subsidiary in such Asset Dispositions having an aggregate fair market value,

-91-

taken together with all other Designated Non-Cash Consideration received pursuant to this covenant that is at that time outstanding, not to exceed the greater of (i) $30.0 million and (ii) 2.5% of Total Assets (with the fair market value of each item of Designated Non-Cash Consideration being measured at the time received and without giving effect to subsequent changes in value).

(g)   The Issuer will comply, to the extent applicable, with the requirements of Rule 14e-1 of the Exchange Act and any other securities laws, rules and regulations thereunder to the extent such laws or regulations are applicable in connection with the repurchase of Notes pursuant to this Section 3.5.   To the extent that the provisions of any securities laws or regulations conflict with the provisions of this Indenture, the Issuer will comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations described in this Indenture by virtue thereof.

(h)   The provisions of this Indenture relative to the Issuer's obligation to make an offer to repurchase the Notes as a result of an Asset Disposition may be waived or modified with the written consent of the Requisite Holders.

SECTION 3.6. Limitation on Liens.   The Issuer shall not, and shall not permit any Restricted Subsidiary to, directly or indirectly, create, Incur or permit to exist any Lien (except Permitted Liens) that secures obligations under any Indebtedness or any related guarantee, on any asset or property of the Issuer or any Restricted Subsidiary, unless:

(1)   in the case of Liens securing Subordinated Indebtedness, the Notes and Note Guarantees are secured by a Lien on such property, assets or proceeds that is senior in priority to such Liens; or

(2)   in the case of a Lien on any asset or property that is not at that time Collateral securing any other Indebtedness, the Notes and Note Guarantees are equally and ratably secured therewith.  Any Lien created for the benefit of the Holders of the Notes pursuant to the preceding sentence shall provide by its terms that such Lien shall be automatically and unconditionally released and discharged upon the release and discharge of the initial Lien.

With respect to any Lien securing Indebtedness that was permitted to secure such Indebtedness at the time of the Incurrence of such Indebtedness, such Lien shall also be permitted to secure any Increased Amount of such Indebtedness.  The "Increased Amount" of any Indebtedness shall mean any increase in the amount of such Indebtedness in connection with any accrual of interest, the accretion of accreted value, the amortization of original issue discount, the payment of interest in the form of additional Indebtedness with the same terms, accretion of original issue discount or liquidation preference and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies or increases in the value of property securing Indebtedness.

SECTION 3.7. Future Guarantors.

(a)   The Issuer shall cause each Restricted Subsidiary that guarantees any Indebtedness of the Issuer or any Guarantor to execute and deliver to the Trustee within 60

-92-

calendar days of the date on which such guarantee of Indebtedness takes effect (i) a supplemental indenture substantially in the form of Exhibit B pursuant to which such Restricted Subsidiary will guarantee the Note Obligations and comply with any other provision of this Indenture applicable to Guarantors and (ii) joinders to or new Collateral Documents and take all actions required by the Collateral Documents to perfect the Liens created thereunder. The Issuer may elect, in its sole discretion, to cause any Subsidiary that is not otherwise required to become a Guarantor to become a Guarantor, in which case such Subsidiary will not be required to comply with the 60 calendar day period described above.

(b)     If any Guarantor becomes an Immaterial Subsidiary, the Issuer shall have the right, by execution and delivery of a supplemental indenture substantially in the form of Exhibit B to the Trustee, to cause such Immaterial Subsidiary to cease to be a Guarantor, subject to the requirement described in the first paragraph above that such Subsidiary shall be required to become a Guarantor if it ceases to be an Immaterial Subsidiary (except that if such Subsidiary has been properly designated as an Unrestricted Subsidiary it shall not be so required to become a Guarantor or execute a supplemental indenture); provided, further, that such Immaterial Subsidiary shall not be permitted to Guarantee any Credit Facilities or capital market debt securities of the Issuer or other Guarantors, unless it again becomes a Guarantor.

SECTION 3.8. Limitation on Affiliate Transactions.

(a)     The Issuer shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, enter into or conduct any transaction or series of related transactions (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any Affiliate of the Issuer (an "Affiliate Transaction") involving aggregate value in excess of $5.0 million unless:

(1)     the terms of such Affiliate Transaction taken as a whole are not materially less favorable to the Issuer or such Restricted Subsidiary, as the case may be, than those that could be obtained in a comparable transaction at the time of such transaction or the execution of the agreement providing for such transaction in arm's length dealings with a Person who is not such an Affiliate; and

(2)     in the event such Affiliate Transaction involves an aggregate value in excess of $15.0 million, the terms of such transaction have been approved by a majority of the members of the Board of Directors.

Any Affiliate Transaction shall be deemed to have satisfied the requirements set forth in clause (2) of this Section 3.8(a) if such Affiliate Transaction is approved by a majority of the Disinterested Directors, if any.

(b)     The provisions of clause (a) of this Section 3.8 above shall not apply to:

(1)     any Restricted Payment permitted to be made pursuant to Section 3.3, or any Permitted Investment (other than pursuant to clause (24) of the definition of "Permitted Investments");

(2)      any issuance or sale of Capital Stock, options, other equity-related interests or other securities, or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, or entering into, or maintenance of, any employment, consulting, collective bargaining or benefit plan, program, agreement or arrangement, related trust or other similar agreement and other compensation arrangements, options, warrants or other rights to purchase Capital Stock of the Issuer, any Restricted Subsidiary or any Parent Entity, restricted stock plans, long-term incentive plans, stock appreciation rights plans, participation plans or similar employee benefits or consultants' plans (including valuation, health, insurance, deferred compensation, severance, retirement, savings or similar plans, programs or arrangements) or indemnities provided on behalf of officers, employees, directors or consultants approved by the Board of Directors of the Issuer, in each case in the ordinary course of business or consistent with past practice;

(3)      any Management Advances and any waiver or transaction with respect thereto;

(4)      any transaction between or among the Issuer and any Restricted Subsidiary (or entity that becomes a Restricted Subsidiary as a result of such transaction), or between or among Restricted Subsidiaries;

(5)      the payment of compensation, reasonable fees and reimbursement of expenses to, and customary indemnities (including under customary insurance policies) and employee benefit and pension expenses provided on behalf of, directors, officers, consultants or employees of the Issuer or any Restricted Subsidiary (whether directly or indirectly and including through any Person owned or controlled by any of such directors, officers or employees);

(6)      the entry into and performance of obligations of the Issuer or any of its Restricted Subsidiaries under the terms of any transaction arising out of, and any payments pursuant to or for purposes of funding, any agreement or instrument in effect as of or on the Issue Date, as these agreements and instruments may be amended, modified, supplemented, extended, renewed or refinanced from time to time in accordance with the other terms of this covenant or to the extent not more disadvantageous to the Holders in any material respect;

(7)      [reserved];

(8)      transactions with customers, clients, suppliers or purchasers or sellers of goods or services, in each case in the ordinary course of business or consistent with past practice, which are fair to the Issuer or the relevant Restricted Subsidiary in the reasonable determination of the Board of Directors or the senior management of the Issuer or the relevant Restricted Subsidiary, or are on terms no less favorable than those that could reasonably have been obtained at such time from an unaffiliated party;

(9)      any transaction between or among the Issuer or any Restricted Subsidiary and any Affiliate of the Issuer or an Associate or similar entity that would constitute an

-94-

Affiliate Transaction solely because the Issuer or a Restricted Subsidiary owns an equity interest in or otherwise controls such Affiliate, Associate or similar entity;

(10)    issuances or sales of Capital Stock (other than Disqualified Stock or Designated Preferred Stock) of the Issuer or options, warrants or other rights to acquire such Capital Stock and the granting of registration and other customary rights in connection therewith or any contribution to capital of the Issuer or any Restricted Subsidiary;

(11)    (i) payments by the Issuer or any Restricted Subsidiary to any Affiliate (whether directly or indirectly) of annual customary management, consulting, monitoring, refinancing, subsequent transaction exit fees, advisory fees and related costs and expenses and indemnities in connection therewith and (ii) customary payments by the Issuer or any Restricted Subsidiary to any Affiliate (whether directly or indirectly, including through any Parent Entity) for financial advisory, financing, underwriting or placement services or in respect of other investment banking activities, including in connection with acquisitions or divestitures, which payments are approved by a majority of the Board of Directors in good faith;

(12)    payment to any Affiliate of all reasonable out of pocket expenses Incurred by such Affiliate in connection with its direct or indirect investment in the Issuer and its Subsidiaries;

(13)    the Transactions and the payment of Transaction Expenses;

(14)    transactions in which the Issuer or any Restricted Subsidiary, as the case may be, delivers to the Trustee a letter from an Independent Financial Advisor stating that such transaction is fair to the Issuer or such Restricted Subsidiary from a financial point of view or meets the requirements of Section 3.8(a)(1);

(15)    the existence of, or the performance by the Issuer or any Restricted Subsidiary of its obligations under the terms of, any equityholders' agreement (including any registration rights agreement or purchase agreements related thereto) to which it is party as of the Issue Date and any similar agreement that it may enter into thereafter; provided, however, that the existence of, or the performance by the Issuer or any Restricted Subsidiary of its obligations under any future amendment to the equityholders' agreement or under any similar agreement entered into after the Issue Date will only be permitted under this clause (15) to the extent that the terms of any such existing agreement together with all amendments thereto, taken as a whole, or such new agreement are not otherwise disadvantageous to the Holders in any material respects as compared to the original agreement as in effect on the Issue Date;

(16)    (i) investments by Affiliates in securities of the Issuer or any of its Restricted Subsidiaries (and payment of reasonable out-of-pocket expenses incurred by such Affiliates in connection therewith) so long as the investment is being offered by the Issuer or such Restricted Subsidiary generally to other non-affiliated third party investors on the same or more favorable terms and (ii) payments to Affiliates in respect of

-95-

securities of the Issuer or any of its Restricted Subsidiaries contemplated in the foregoing subclause (i) or that were acquired from Persons other than the Issuer and its Restricted Subsidiaries, in each case, in accordance with the terms of such securities;

(17) payments by the Issuer (and any Parent Entity) and its Restricted Subsidiaries pursuant to any tax sharing agreements or other shareholder equity agreements in respect of "Related Taxes" among the Issuer (and any such Parent Entity) and its Restricted Subsidiaries on customary terms to the extent attributable to the ownership or operation of the Issuer and its Subsidiaries;

(18) transactions entered into by an Unrestricted Subsidiary with an Affiliate prior to the day such Unrestricted Subsidiary is redesignated as a Restricted Subsidiary as set forth in Section 3.20;

(19) purchases or payments for professional liability and other insurance by the Issuer, its Restricted Subsidiaries, their respective employees or any Person that is an Affiliate of the Issuer to an Insurance Subsidiary in the ordinary course of business or consistent with past practice and at fair market value as determined by the Issuer in good faith; and

(20) leasing of property or equipment from the Issuer's employees or any person that is an Affiliate of the Issuer in the ordinary course of business or consistent with past practice and at fair market values as determined by the Issuer in good faith.

SECTION 3.9. Change of Control.

(a) If a Change of Control occurs, unless the Issuer has previously or concurrently delivered a redemption notice with respect to all of the outstanding Notes as set forth under Section 5.7(a) or Section 5.7(d), the Issuer shall make an offer to purchase all of the Notes pursuant to the offer (the "Change of Control Offer") at a price in cash (the "Change of Control Payment") equal to 101% of the aggregate principal amount thereof plus accrued and unpaid interest, if any, to but excluding the date of repurchase, subject to the right of Holders of the Notes of record on the relevant record date to receive interest due on the relevant interest payment date. Within 30 days following any Change of Control, the Issuer will deliver notice of such Change of Control Offer electronically or by first class mail, with a copy to the Trustee, to each Holder of Notes at the address of such Holder appearing in the security register or otherwise in accordance with the procedures of DTC, with the following information:

(1) that a Change of Control Offer is being made pursuant to this Section 3.9, and that all Notes properly tendered pursuant to such Change of Control Offer will be accepted for payment by the Issuer;

(2) the purchase price and the purchase date, which will be no earlier than 30 days nor later than 60 days from the date such notice is delivered (the "Change of Control Payment Date");

(3) that any Note not properly tendered will remain outstanding and continue to accrue interest;

(4)    that unless the Issuer defaults in the payment of the Change of Control Payment, all Notes accepted for payment pursuant to the Change of Control Offer will cease to accrue interest, on the Change of Control Payment Date;

(5)    that Holders electing to have any Notes purchased pursuant to a Change of Control Offer will be required to surrender such Notes, with the form entitled "Option of Holder to Elect Purchase" on the reverse of such Notes completed, to the Paying Agent specified in the notice at the address specified in the notice prior to the close of business on the third Business Day preceding the Change of Control Payment Date;

(6)    that Holders will be entitled to withdraw their tendered Notes and their election to require the Issuer to purchase such Notes; provided that the Paying Agent receives, not later than the close of business on the second Business Day prior to the expiration date of the Change of Control Offer, a telegram, facsimile transmission or letter setting forth the name of the Holder of the Notes, the principal amount of Notes tendered for purchase, and a statement that such Holder is withdrawing its tendered Notes and its election to have such Notes purchased;

(7)    that Holders whose Notes are being purchased only in part will be issued new Notes and such new Notes will be equal in principal amount to the unpurchased portion of the Notes surrendered.  The unpurchased portion of the Notes must be equal to at least $1,000 or any integral multiple of $1,000 in excess thereof (or if any PIK Payment has been made, at least $1.00 or any integral multiple of $1.00 in excess thereof);

(8)    if such notice is delivered prior to the occurrence of a Change of Control, stating that the Change of Control Offer is conditional on the occurrence of such Change of Control; and

(9)    the other instructions, as determined by the Issuer, consistent with this Section 3.9, that a Holder must follow.

The Paying Agent will promptly deliver to each Holder of the Notes tendered the Change of Control Payment for such Notes, and the Trustee will promptly authenticate and mail (or cause to be transferred by book-entry) to each Holder a new Note equal in principal amount to any unpurchased portion of the Notes surrendered, if any; provided, that each such new Note will be in a minimum principal amount of $1,000 or an integral multiple of $1,000 in excess thereof (or if any PIK Payment has been made, in a minimum principal amount of $1.00 or an integral multiple of $1.00 in excess thereof).  The Issuer will publicly announce the results of the Change of Control Offer on or as soon as practicable after the Change of Control Payment Date.

If the Change of Control Payment Date is on or after an interest record date and on or before the related interest payment date, any accrued and unpaid interest (including any accrued and unpaid PIK Interest) will be paid in the form of Cash Interest at the applicable interest rate on the relevant interest payment date to the Person in whose name a Note is registered at the close of business on such record date.

-97-

(b)      On the Change of Control Payment Date, the Issuer will, to the extent permitted by law,

(1)      accept for payment all Notes issued by it or portions thereof properly tendered pursuant to the Change of Control Offer,

(2)      deposit with the Paying Agent an amount equal to the aggregate Change of Control Payment in respect of all Notes or portions thereof so tendered, and

(3)      deliver, or cause to be delivered, to the Trustee for cancellation the Notes so accepted together with an Officer's Certificate to the Trustee stating that such Notes or portions thereof have been tendered to and purchased by the Issuer.

(c)      The Issuer will not be required to make a Change of Control Offer following a Change of Control if (x) a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements set forth in this Indenture applicable to a Change of Control Offer made by the Issuer and purchases all Notes validly tendered and not withdrawn under such Change of Control Offer or (y) a notice of redemption of all outstanding Notes has been given pursuant to Section 5.7 hereof unless and until there is a default in the payment of the redemption price on the applicable redemption date or the redemption is not consummated due to the failure of a condition precedent contained in the applicable redemption notice to be satisfied.

(d)      Notwithstanding anything to the contrary in this Section 3.9, a Change of Control Offer may be made in advance of a Change of Control, conditional upon such Change of Control if a definitive agreement is in place for the Change of Control at the time of making the Change of Control Offer.

(e)      [Reserved]

(f)      While the Notes are in global form and the Issuer makes an offer to purchase all of the Notes pursuant to the Change of Control Offer, a Holder may exercise its option to elect for the purchase of the Notes through the facilities of DTC, subject to its rules and regulations.

(g)      The Issuer will comply, to the extent applicable, with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws, rules and regulations thereunder to the extent such laws or regulations are applicable in connection with the repurchase of the Notes pursuant to a Change of Control Offer.  To the extent that the provisions of any securities laws, rules or regulations conflict with the provisions of this Indenture, the Issuer will comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations described in this Indenture by virtue thereof.

SECTION 3.10.      Reports.

(a)      Notwithstanding that the Issuer may not be subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act or otherwise report on an annual and quarterly basis on forms provided for such annual and quarterly reporting pursuant to rules and regulations

promulgated by the SEC, from and after the Issue Date, the Issuer shall furnish to the Trustee, within 15 days after the time periods specified below:

(1) within 90 days after the end of each fiscal year (commencing with the fiscal year ended December 31, 2017), all financial information (including audited financial statements) that would be required to be contained in an annual report on Form 10-K, or any successor or comparable form, filed with the SEC, including a "Management's discussion and analysis of financial condition and results of operations" and a report on the annual financial statements by the Issuer's independent registered public accounting firm;

(2) within 45 days after the end of each of the first three fiscal quarters of each fiscal year, all financial information that would be required to be contained in a quarterly report on Form 10-Q, or any successor or comparable form, filed with the SEC; and

(3) promptly after the occurrence of any of the following events, all current reports that would be required to be filed with the SEC on Form 8-K or any successor or comparable form (if the Issuer had been a reporting company under Section 15(d) of the Exchange Act); provided, that the foregoing shall not obligate the Issuer to (i) make available any information otherwise required to be included on a Form 8-K regarding the occurrence of any such events if the Issuer determines in its good faith judgment that such event that would otherwise be required to be disclosed is not material to the Holders of the Notes or the business, assets, operations, financial positions or prospects of the Issuer and its Restricted Subsidiaries taken as a whole or (ii) make available copies of any agreements, financial statements or other items that would be required to be filed as exhibits to a current report on Form 8-K:

(A) the entry into or termination of material agreements;

(B) significant acquisitions or dispositions;

(C) the sale of equity securities;

(D) bankruptcy or other proceeding under any Debtor Relief Law;

(E) cross-default under direct material financial obligations;

(F) a change in the Issuer's certifying independent auditor;

(G) the appointment or departure of directors or executive officers;

(H) non-reliance on previously issued financial statements; and

(I) change of control transactions,

in each case, in a manner that complies in all material respects with the requirements specified in such form, except as described above or below and subject to exceptions consistent with the

-99-

presentation of information in the Issuer's Offering Memorandum dated April 28, 2015; provided, however, that the Issuer shall not be required to (i) comply with Regulation G under the Exchange Act or Item 10(e) of Regulation S-K with respect to any "non-GAAP" financial information contained therein, (ii) provide any information that is not otherwise similar to information included in the Issuer's Offering Memorandum dated April 28, 2015 or (iii) provide the type of information contemplated by Rule 3-10 of Regulation S-X with respect to separate financial statements for Guarantors or any financial statements for unconsolidated Subsidiaries or 50% or less owned Persons or other information contemplated by Rule 3-09 or Rule 3-10 of Regulation S-X or any schedules required by Regulation S-X, or in each case any successor provisions; provided, that, the Issuer, shall provide the revenues, "EBITDA" and "Adjusted EBITDA'' (in each case, presented consistent with the Issuer's historical public disclosure), assets and liabilities of (i) the Issuer and the Guarantors, collectively and (ii) the Non-Guarantors separately.  In addition, notwithstanding the foregoing, the Issuer shall not be required to (i) comply with Sections 302, 906 and 404 of the Sarbanes-Oxley Act of 2002, as amended, or (ii) otherwise furnish any information, certificates or reports required by Items 307 or 308 of Regulation S-K.  To the extent any such information is not so filed or furnished, as applicable, within the time periods specified above and such information is subsequently filed or furnished, as applicable, the Issuer will be deemed to have satisfied its obligations with respect thereto at such time and any Default with respect thereto shall be deemed to have been cured; provided, that such cure shall not otherwise affect the rights of the Holders under Section 6.1 hereof if Holders of at least 30% in principal amount of the then total outstanding Notes have declared the principal, premium, if any, interest and any other monetary obligations on all the then outstanding Notes to be due and payable immediately and such declaration shall not have been rescinded or cancelled prior to such cure.  Additionally, the Issuer will cause such documents to be filed with the SEC unless the SEC will not accept such documents. To the extent the Issuer is not able, within the periods prescribed above, to file its quarterly report on Form 10-Q with the SEC, the Issuer will post to its website such financial statements including an MD&A therewith within such time periods and be deemed to have timely met its obligations hereunder; provided, however that the Issuer shall file with the SEC such 10-Q as soon as practicable thereafter; provided, further, however, that the Issuer will (upon request) provide one copy of the foregoing to the Trustee and will (upon request) provide additional copies of such exhibits to any Holder or prospective Holder. In addition, to the extent not satisfied by the foregoing, the Issuer shall agree that, for so long as any Notes are outstanding, it shall furnish to Holders and to securities analysts and prospective investors, upon their request, the information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act.

(b)   [Reserved].

(c)   Substantially concurrently with the furnishing or making such information available to the Trustee in accordance with the immediately preceding paragraph, the Issuer shall also post copies of such information required by immediately preceding paragraph on a website (which may be nonpublic and may be maintained by the Issuer or a third party) to which access will be given to the Holders, prospective investors in the Notes (which prospective investors shall be limited to "qualified institutional buyers" within the meaning of Rule 144A of the Securities Act or non-U.S. persons (as defined in Regulation S under the Securities Act) that certify their status as such to the reasonable satisfaction of the Issuer), and securities analysts and market making financial institutions that are reasonably satisfactory to the Issuer.

(d)      The Issuer shall also hold quarterly conference calls for the Holders of Notes to discuss financial information for the previous quarter (it being understood that such quarterly conference call may be the same conference call as with the Issuer's (or as applicable, any of any Parent Entity's) equity investors and analysts).  The conference call will be following the last day of each fiscal quarter of the Issuer and not later than 10 Business Days from the time that the Issuer distributes the financial information as set forth in clause (a) above.  No fewer than two days prior to the conference call, the Issuer shall issue a press release announcing the time and date of such conference call and providing instructions for Holders, securities analysts and prospective investors to obtain access to such call; provided, however, that such press release can be distributed solely to certified users of the website described in clause (c) above.

(e)      The Issuer may satisfy its obligations pursuant to this Section 3.10 with respect to financial information relating to the Issuer by furnishing financial information relating to a Parent Entity; provided, that the same is accompanied by consolidating information that explains in reasonable detail the differences between the information relating to a Parent Entity, on the one hand, and the information relating to the Issuer and its Restricted Subsidiaries on a standalone basis, on the other hand.  For the avoidance of doubt, the consolidating information referred to in the proviso in the preceding sentence need not be audited.

(f)      If the Issuer or any Parent Entity of the Issuer has filed with the SEC (or furnished to Holders of the Notes in accordance with this Section 3.10) the reports described in the preceding paragraphs with respect to the Issuer or any Parent Entity, the Issuer shall be deemed to be in compliance with the provisions of this Section 3.10.

SECTION 3.11.        Creation and Perfection of Liens Securing Collateral; Further Assurances.

(a)      On or prior to the Issue Date, the Issuer and the Guarantors shall have granted legal, valid and enforceable (subject to the effect of bankruptcy, insolvency, reorganization, receivership, moratorium and other similar laws affecting creditors' rights) security interests in the Collateral described therein and proceeds thereof and perfected such security interests in the Collateral in favor of the Collateral Agent for the benefit of the Trustee, the Collateral Agent and the Holders; provided, that to the extent any such security interest, mortgage or other Lien was not perfected by the Issue Date, the Issuer and the Guarantors shall use commercially reasonable efforts to have such Lien perfected as promptly as practicable following the Issue Date, and so long as such Lien is perfected concurrently with the perfection of Liens in the same assets pursuant to the Exit Credit Agreements, the Issuer and the Guarantors shall be deemed to have satisfied their obligations hereunder.

(b)      Subject to the terms, conditions and provisions of the Collateral Documents and this Indenture, the Issuer and the Guarantors shall execute any and all further documents, financing statements, agreements and instruments, and take all further action that may be required under applicable law, or that the Holders, the Trustee or the Collateral Agent may reasonably request, in order to grant, create, preserve, maintain, enforce, protect and perfect the validity and priority of the Liens created or purported to be created by this Indenture and the Collateral Documents in the Collateral.

-101-

(c)     To the extent required pursuant to the terms, conditions and provisions of the Collateral Documents and this Indenture, from time to time, the Issuer and the Guarantors shall reasonably promptly secure the Note Obligations by pledging or creating, or causing to be pledged or created, perfected Liens with respect to the Collateral. Such security interests, mortgages and Liens shall be created under the Collateral Documents and other security agreements, mortgages, deeds of trust and other instruments and documents in form and substance substantially similar to the security agreements, mortgages, deeds of trust and other instruments and documents delivered in connection with the Exit Credit Agreements (if any), with such changes as may be reasonably necessary to reflect the different obligations being secured.

(d)     The Issuer and each of the Guarantors shall do or cause to be done all acts and things that may be required, or that the Trustee or the Collateral Agent from time to time may reasonably request, to assure and confirm that the Collateral Agent holds, for the benefit of the Trustee, the Collateral Agent and the Holders, duly created and enforceable and perfected Liens upon the Collateral (including any property or assets that are acquired or otherwise become Collateral after the Issue Date), in each case, as contemplated by, and with the lien priority required under, this Indenture and the Collateral Documents; provided, that the Issuer and the Guarantors shall not be required to provide, and the Collateral Agent shall not request, any additional Liens in respect of any Excluded Property.

SECTION 3.12.     Maintenance of Office or Agency.

The Issuer will maintain an office or agency where the Notes may be presented or surrendered for payment, where, if applicable, the Notes may be surrendered for registration of transfer or exchange.  The corporate trust office of the Trustee, which initially shall be located at Wilmington Savings Fund Society, FSB, [    ], Attention: [                            ], shall be such office or agency of the Issuer, unless the Issuer shall designate and maintain some other office or agency for one or more of such purposes.  The Issuer will give prompt written notice to the Trustee of any change in the location of any such office or agency.  If at any time the Issuer shall fail to maintain any such required office or agency or shall fail to furnish the Trustee with the address thereof, such presentations and surrenders may be made or served at the corporate trust office of the Trustee, and the Issuer hereby appoints the Trustee as its agent to receive all such presentations and surrenders.

The Issuer may also from time to time designate one or more other offices or agencies where the Notes may be presented or surrendered for any or all such purposes and may from time to time rescind any such designation.  The Issuer will give prompt written notice to the Trustee of any such designation or rescission and any change in the location of any such other office or agency.

SECTION 3.13.     Corporate Existence.  Except as otherwise provided in this Article III, Article IV and Section 10.2(b), the Issuer will do or cause to be done all things necessary to preserve and keep in full force and effect its corporate existence and the corporate, partnership, limited liability company or other existence of each Restricted Subsidiary and the rights (charter and statutory), licenses and franchises of the Issuer and each Restricted Subsidiary; provided, however, that the Issuer shall not be required to preserve any such right,

license or franchise or the corporate, partnership, limited liability company or other existence of any Restricted Subsidiary if the respective Board of Directors or, with respect to a Restricted Subsidiary that is not a Significant Subsidiary (or group of Restricted Subsidiaries that taken together would not be a Significant Subsidiary), senior management of the Issuer determines that the preservation thereof is no longer desirable in the conduct of the business of the Issuer and each of its Restricted Subsidiaries, taken as a whole, and that the loss thereof is not, and will not be, disadvantageous in any material respect to the Holders.

SECTION 3.14.    Payment of Taxes.  The Issuer shall pay or discharge or cause to be paid or discharged, before the same shall become delinquent, all material taxes, assessments and governmental charges levied or imposed upon the Issuer or any Subsidiary; provided, however, that the Issuer shall not be required to pay or discharge or cause to be paid or discharged any such tax, assessment, charge or claim the amount, applicability or validity of which is being contested in good faith by appropriate proceedings and for which appropriate reserves, if necessary (in the good faith judgment of management of the Issuer), are being maintained in accordance with GAAP or where the failure to effect such payment will not be disadvantageous to the Holders.

SECTION 3.15.    Transactions.  For the avoidance of doubt and notwithstanding anything to the contrary in this Indenture, the Transactions and all transactions contemplated by the Plan of Reorganization shall, to the extent carried out in compliance with and otherwise permitted under the Plan of Reorganization, be automatically permitted under this Indenture.

SECTION 3.16.    Compliance Certificate.  The Issuer shall deliver to the Trustee within 120 days after the end of each fiscal year of the Issuer an Officer's Certificate, the signers of which shall be the principal executive officer, principal financial officer or principal accounting officer of the Issuer, stating that in the course of the performance by the signer of his or her duties as an Officer of the Issuer he or she would normally have knowledge of any Default or Event of Default and whether or not the signer knows of any Default or Event of Default that occurred during the previous fiscal year; provided, that no such Officer's Certificate shall be required for any fiscal year ended prior to the Issue Date.  If such Officer does have such knowledge, the certificate shall describe the Default or Event of Default, its status and the action the Issuer is taking or proposes to take with respect thereto.

SECTION 3.17.    [Reserved].

SECTION 3.18.    Conduct of Business.  The Issuer will not, and will not permit any of its Restricted Subsidiaries to, engage in any businesses other than any business conducted or proposed to be conducted by the Issuer and its Restricted Subsidiaries on the Issue Date or any business that is similar, reasonably related, incidental or ancillary thereto or any reasonable extension thereof.

SECTION 3.19.    Statement by Officers as to Default.  The Issuer shall deliver to the Trustee, as soon as possible and in any event within 30 days after the Issuer becomes aware of the occurrence of any Default or Event of Default, an Officer's Certificate setting forth the details of such Event of Default or Default, its status and the actions which the Issuer is taking or proposes to take with respect thereto.

SECTION 3.20.    Designation of Restricted and Unrestricted Subsidiaries.    The Issuer may designate any Restricted Subsidiary to be an Unrestricted Subsidiary if that designation would not cause a Default. If a Restricted Subsidiary is designated as an Unrestricted Subsidiary, the aggregate fair market value of all outstanding Investments owned by the Issuer and its Restricted Subsidiaries in the Subsidiary designated as an Unrestricted Subsidiary will be deemed to be an Investment made as of the time of the designation and will reduce the amount available for Restricted Payments as described in Section 3.3 herein or under one or more clauses of the definition of Permitted Investments, as determined by the Issuer. That designation will only be permitted if the Investment would be permitted at that time and if the Restricted Subsidiary otherwise meets the definition of an Unrestricted Subsidiary. The Issuer may redesignate any Unrestricted Subsidiary to be a Restricted Subsidiary if that redesignation would not cause a Default.

Any designation of a Subsidiary of the Issuer as an Unrestricted Subsidiary will be evidenced to the Trustee by an Officer's Certificate certifying that such designation complies with the preceding conditions and was permitted by Section 3.3 herein. If, at any time, any Unrestricted Subsidiary would fail to meet the preceding requirements as an Unrestricted Subsidiary, it will thereafter cease to be an Unrestricted Subsidiary for purposes of this Indenture and any Indebtedness of such Subsidiary will be deemed to be incurred by a Restricted Subsidiary of the Issuer as of such date and, if such Indebtedness is not permitted to be incurred as of such date by Section 3.2 herein, the Issuer will be in default of such covenant.

The Issuer may at any time designate any Unrestricted Subsidiary to be a Restricted Subsidiary of the Issuer; provided, that such designation will be deemed to be an incurrence of Indebtedness by a Restricted Subsidiary of the Issuer of any outstanding Indebtedness of such Unrestricted Subsidiary, and such designation will only be permitted if (1) such Indebtedness is permitted under Section 3.2 herein, calculated on a *pro forma* basis as if such designation had occurred at the beginning of the applicable reference period; and (2) no Default or Event of Default would be in existence following such designation. Any such designation by the Issuer shall be evidenced to the Trustee by an Officer's Certificate certifying that such designation complies with the preceding conditions.

SECTION 3.21.    Suspension of Certain Covenants on Achievement of Investment Grade Status.  Following the first day the Notes have achieved Investment Grade Status and no Default or Event of Default has occurred and is continuing under this Indenture, the beginning on that day and ending on a Reversion Date (such period a "Suspension Period"), the Issuer and its Restricted Subsidiaries will not be subject to Sections 3.2, 3.3, 3.4, 3.5, 3.7, 3.8 and 4.1(a)(3).

On each Reversion Date, all Indebtedness Incurred during the Suspension Period will be classified as having been Incurred pursuant to clause 4(ii) of Section 3.2(b).  Calculations made after the Reversion Date of the amount available to be made as Restricted Payments under Section 3.3 will be made as though Section 3.3 had been in effect since the Issue Date and throughout the Suspension Period.  Accordingly, Restricted Payments made prior to but not during the Suspension Period will reduce the amount available to be made as Restricted Payments under Section 3.3(a).  As described above, however, no Default, Event of Default or breach of any kind shall be deemed to have occurred as a result of the Reversion Date occurring on the basis of any actions taken or the continuance of any circumstances resulting from actions

-104-

taken or the performance of obligations under agreements entered into by the Issuer or any of the Restricted Subsidiaries during the Suspension Period (other than agreements to take actions after the Reversion Date that would not be permitted outside of the Suspension Period entered into in contemplation of the Reversion Date).

The Issuer shall provide the Trustee notice of any suspension of covenants pursuant to Section 3.21 or Reversion Date.  The Trustee will have no obligation to (i) independently determine or verify if such events have occurred or (ii) make any determination regarding the impact of actions taken during the Suspension Period on the Issuer's future compliance with its covenants.  In addition, the Trustee shall have no duty to monitor the ratings of the Notes, shall not be deemed to have any knowledge of the ratings of the Notes and shall have no duty to notify Holders if the Notes achieve Investment Grade Status or if the Reversion Date occurs.

ARTICLE IV

SUCCESSOR COMPANY; SUCCESSOR PERSON

SECTION 4.1.Merger and Consolidation.

(a)      The Issuer will not consolidate with or merge with or into or convey, transfer or lease all or substantially all its assets to, any Person, unless:

(1)      the resulting, surviving or transferee Person (the "Successor Company") will be a Person organized and existing under the laws of the United States of America, any State of the United States or the District of Columbia and the Successor Company (if not the Issuer) will expressly assume by supplemental indenture, executed and delivered to the Trustee, all the obligations of the Issuer under the Notes, this Indenture and the Collateral Documents, and if such Successor Company is not a corporation, a co-obligor of the Notes is a corporation organized or existing under such laws;

(2)      immediately after giving effect to such transaction (and treating any Indebtedness that becomes an obligation of the applicable Successor Company or any Subsidiary of the applicable Successor Company as a result of such transaction as having been Incurred by the applicable Successor Company or such Subsidiary at the time of such transaction), no Default or Event of Default shall have occurred and be continuing;

(3)      immediately after giving effect to such transaction, either (a) the applicable Successor Company would be able to Incur at least an additional $1.00 of Indebtedness pursuant to Section 3.2(a) hereof or (b) the Fixed Charge Coverage Ratio would not be lower than it was immediately prior to giving effect to such transaction; and

(4)      the Issuer shall have delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each to the effect that such consolidation, merger or transfer and such supplemental indenture (if any) comply with this Indenture and applicable Collateral Documents, and an Opinion of Counsel to the effect that such supplemental indenture (if any) have been duly authorized, executed and delivered and are a legal, valid and binding agreement enforceable against the applicable Successor Company (in each case, in form satisfactory to the Trustee); provided, that in giving an Opinion of Counsel, counsel may

-105-

rely on an Officer's Certificate as to any matters of fact, including as to satisfaction of clauses (2) and (3) above.

(b)      For purposes of this Section 4.1, the sale, lease, conveyance, assignment, transfer, or other disposition of all or substantially all of the properties and assets of one or more Subsidiaries of the Issuer, which properties and assets, if held by the Issuer instead of such Subsidiaries, would constitute all or substantially all of the properties and assets of the Issuer on a consolidated basis, shall be deemed to be the transfer of all or substantially all of the properties and assets of the Issuer.

(c)      Upon any consolidation or merger, or any sale, assignment, transfer, conveyance or other disposition of all or substantially all of the assets of the Issuer or the Issuer and its Restricted Subsidiaries taken as a whole, in accordance with Section 4.1 hereof, the Successor Company will succeed to, and be substituted for (so that from and after the date of such consolidation, merger, sale, assignment, transfer, conveyance or other disposition, the provisions of this Indenture referring to the "Issuer" shall refer instead to the Successor Company and not to the Issuer), and may exercise every right and power of, the Issuer under this Indenture with the same effect as if such Successor Company had been named as the Issuer herein.  In any such event (other than any transfer by way of lease), the predecessor Issuer shall be released and discharged from all liabilities and obligations in respect of the Notes and this Indenture and the predecessor Issuer may be dissolved, wound up or liquidated at any time thereafter.

(d)      Notwithstanding the preceding clauses (a)(2), (a)(3) and (a)(4) (which do not apply to transactions referred to in this sentence), (i) any Restricted Subsidiary of the Issuer may consolidate or otherwise combine with or merge into or transfer all or part of its properties and assets to the Issuer and (ii) any Restricted Subsidiary may consolidate or otherwise combine with or merge into or transfer all or part of its properties and assets to any other Restricted Subsidiary. Notwithstanding the preceding clauses (a)(2) and (a)(3) (which do not apply to the transactions referred to in this sentence), the Issuer may consolidate or otherwise combine with or merge into an Affiliate incorporated or organized for the purpose of changing the legal domicile of the Issuer, reincorporating the Issuer in another jurisdiction, or changing the legal form of the Issuer.

(e)      The foregoing provisions (other than the requirements of clause (a)(2)) shall not apply to the creation of a new Subsidiary as a Restricted Subsidiary of the Issuer.

(f)      No Guarantor may:

(1)      consolidate with or merge or amalgamate with or into any Person; or

(2)      sell, convey, transfer or dispose of, all or substantially all its assets, in one transaction or a series of related transactions, to, any Person; or

(3)      permit any Person to merge or amalgamate with or into such Guarantor, unless

(i)      the other Person is the Issuer or any Restricted Subsidiary that is a Guarantor or becomes a Guarantor concurrently with the transaction; or

-106-

(ii)    (A)    either (x) a Guarantor is the continuing Person or (y) the resulting, surviving or transferee Person, expressly assumes all of the obligations of the Guarantor under its Note Guarantee, this Indenture and the Collateral Documents; and

(B)    immediately after giving effect to the transaction, no Default has occurred and is continuing; or

(iii)    the transaction constitutes a sale or other disposition (including by way of consolidation or merger) of the Guarantor or the sale or disposition of all or substantially all the assets of the Guarantor (in each case other than to the Issuer or a Restricted Subsidiary) otherwise permitted by this Indenture.

ARTICLE V

REDEMPTION OF SECURITIES

SECTION 5.1.Notices to Trustee.  If the Issuer elects to redeem Notes pursuant to the optional redemption provisions of Section 5.7 hereof, it must furnish to the Trustee, at least 30 days but not more than 60 days before a redemption date, an Officer's Certificate setting forth:

(1)    the clause of this Indenture pursuant to which the redemption shall occur;

(2)    the redemption date;

(3)    the principal amount of Notes to be redeemed; and

(4)    the redemption price.

Any optional redemption referenced in such Officer's Certificate may be cancelled by the Issuer at any time prior to notice of redemption being sent to any Holder and thereafter shall be null and void.

SECTION 5.2.Selection of Notes to Be Redeemed or Purchased.  If less than all of the Notes are to be redeemed pursuant to Section 5.7 or purchased in an Asset Disposition Offer pursuant to Section 3.5 or a redemption pursuant to Section 5.9, the Trustee will select Notes for redemption or purchase (a) if the Notes are in global form, on a pro rata basis or by lot or such similar method in accordance with the procedures of DTC and (b) if the Notes are in definitive form, on a pro rata basis (subject to adjustments to maintain the authorized Notes denomination requirements) except:

(1)    if the Notes are listed on any national securities exchange, in compliance with the requirements of the principal national securities exchange on which the Notes are listed; or

(2)    if otherwise required by law.

-107-

No Notes in a denomination of $1,000 in aggregate principal amount or less shall be redeemed in part (unless a PIK Payment has been made, in which case no Notes in a denomination of $1.00 in aggregate principal amount or less shall be redeemed in part).  In the event of partial redemption, the particular Notes to be redeemed or purchased will be selected, unless otherwise provided herein, not less than 30 days nor more than 60 days prior to the redemption or purchase date by the Trustee from the outstanding Notes not previously called for redemption or purchase.

The Trustee will promptly notify the Issuer in writing of the Notes selected for redemption or purchase and, in the case of any Note selected for partial redemption or purchase, the principal amount thereof to be redeemed or purchased.  Notes and portions of Notes selected will be in amounts of $1,000 or whole multiples of $1,000 in excess thereof (or if any PIK Payment has been made, in amounts of $1.00 or whole multiples of $1.00 in excess thereof); except that if all of the Notes of a Holder are to be redeemed or purchased, the entire outstanding amount of Notes held by such Holder shall be redeemed or purchased.  Except as provided in the preceding sentence, provisions of this Indenture that apply to Notes called for redemption or purchase also apply to portions of Notes called for redemption or purchase.

SECTION 5.3.Notice of Redemption.  At least 30 days but not more than 60 days before a redemption date, the Issuer will send or cause to be sent, by electronic delivery or by first class mail postage prepaid, a notice of redemption to each Holder whose Notes are to be redeemed at the address of such Holder appearing in the security register or otherwise in accordance with the procedures of DTC, except that redemption notices may be sent more than 60 days prior to a redemption date if the notice is issued in connection with a defeasance of the Notes or a satisfaction and discharge of this Indenture pursuant to Articles VIII or XI hereof.

The notice will identify the Notes (including the CUSIP or ISIN number) to be redeemed and will state:

    (1)    the redemption date;

    (2)    the redemption price;

    (3)    if any Note is being redeemed in part, the portion of the principal amount of such Note to be redeemed and that, after the redemption date upon surrender of such Note, a new Note or Notes in principal amount equal to the unredeemed portion will be issued upon cancellation of the original Note;

    (4)    the name and address of the Paying Agent;

    (5)    that Notes called for redemption must be surrendered to the Paying Agent to collect the redemption price;

    (6)    that, unless the Issuer defaults in making such redemption payment, interest on Notes called for redemption ceases to accrue on and after the redemption date;

    (7)    the paragraph of the Notes and/or Section of this Indenture pursuant to which the Notes called for redemption are being redeemed; and

-108-

(8)    that no representation is made as to the correctness or accuracy of the CUSIP number, if any, listed in such notice or printed on the Notes.

At Issuer's request, the Trustee will give the notice of redemption in the Issuer's name and at the Issuer's expense; provided, however, that the Issuer has delivered to the Trustee, at least 45 days prior to the redemption date (or such shorter period as the Trustee may agree but in no event less than 30 days), an Officer's Certificate requesting that the Trustee give such notice and setting forth the information to be stated in such notice as provided in the preceding paragraph.

Notice of any redemption of the Notes in connection with a corporate transaction (including but not limited to an Equity Offering, an incurrence of Indebtedness or a Change of Control) may, at the Issuer's discretion, be given prior to the completion thereof and any redemption or notice of redemption may, at the Issuer's discretion, be subject to one or more conditions precedent, including, but not limited to, completion of the related transaction.  If such redemption or purchase is so subject to satisfaction of one or more conditions precedent such notice shall describe each such condition, and if applicable, shall state that, in the Issuer's discretion, the redemption date may be delayed until such time as any or all such conditions shall be satisfied, or such redemption or purchase may not occur and such notice may be rescinded in the event that any or all such conditions shall not have been satisfied by the redemption date, or by the redemption date as so delayed.  In addition, the Issuer may provide in such notice that payment of the redemption price and performance of the Issuer's obligations with respect to such redemption may be performed by another Person.

SECTION 5.4.[Reserved]

SECTION 5.5.Deposit of Redemption or Purchase Price.   Prior to 11:00 a.m. Eastern Time on the redemption or purchase date, the Issuer will deposit with the Trustee or with the Paying Agent money sufficient to pay the redemption or purchase price of and accrued interest on, all Notes to be redeemed or purchased on that date.  The Trustee or the Paying Agent will promptly return to the Issuer any money deposited with the Trustee or the Paying Agent by the Issuer in excess of the amounts necessary to pay the redemption or purchase price of, and accrued interest, on, all Notes to be redeemed or purchased.

If the Issuer complies with the provisions of the preceding paragraph, on and after the redemption or purchase date, interest will cease to accrue on the Notes or the portions of Notes called for redemption or purchase.  If a Note is redeemed or purchased on or after an interest record date but on or prior to the related interest payment date, then any accrued and unpaid interest shall be paid to the Person in whose name such Note was registered at the close of business on such record date.  If any Note called for redemption or purchase is not so paid upon surrender for redemption or purchase because of the failure of the Issuer to comply with the preceding paragraph, interest shall be paid on the unpaid principal, from the redemption or purchase date until such principal is paid, and to the extent lawful on any interest not paid on such unpaid principal, in each case at the rate provided in the Notes and in Section 3.1 hereof.

SECTION 5.6.Notes Redeemed or Purchased in Part.  Upon surrender of a Note that is redeemed or purchased in part, the Issuer will issue and, upon receipt of an Issuer Order, the

Trustee will authenticate for the Holder at the expense of the Issuer a new Note equal in principal amount to the unredeemed or unpurchased portion of the Note surrendered; provided, that each such new Note will be in a minimum principal amount of $1,000 or an integral multiple of $1,000 in excess thereof (or if any PIK Payment has been made, in a minimum principal amount of $1.00 or an integral multiple of $1.00 in excess thereof).

SECTION 5.7.Optional Redemption.

(a)     At any time and from time to time, the Issuer may redeem the Notes, in whole or in part, upon not less than 30 nor more than 60 days prior notice, with a copy to the Trustee, to each Holder of Notes to the address of such Holder appearing in the Notes Register at a redemption price equal to 100% of the principal amount of the Notes to be redeemed, plus accrued and unpaid interest thereon, if any, to but excluding the applicable date of redemption (the "Redemption Date"), subject to the right of Holders of record of the Notes on the relevant record date to receive interest due on the relevant interest payment date.

(b)     Notwithstanding the foregoing, in connection with any tender offer for the Notes, including a Change of Control Offer or Asset Disposition Offer, if Holders of not less than 90% in aggregate principal amount of the outstanding Notes validly tender and do not withdraw such Notes in such tender offer and the Issuer, or any third party making such tender offer in lieu of the Issuer, purchases all of the Notes validly tendered and not withdrawn by such Holders, the Issuer or such third party shall have the right upon not less than 30 nor more than 60 days prior notice, with a copy to the Trustee, to each Holder of Notes to the address of such Holder appearing in the Notes Register, given not more than 30 days following such purchase date to redeem all Notes that remain outstanding following such purchase at a redemption price equal to the price offered to each other Holder in such tender offer plus, to the extent not included in the tender offer payment, accrued and unpaid interest, if any, thereon, to but not including, the date of such redemption.

(c)     Unless the Issuer defaults in the payment of the redemption price, interest will cease to accrue on the Notes or portions thereof called for redemption on the applicable Redemption Date.

(d)     If the Notes are accelerated or otherwise become due prior to their maturity date, in each case, as a result of an Event of Default, the amount of principal of, premium (if any) and accrued and unpaid interest on the Notes that becomes due and payable shall equal the redemption price applicable with respect to an optional redemption of the Notes, in effect on the date of such acceleration as if such acceleration were an optional redemption of the Notes accelerated.

(e)     Any redemption pursuant to this Section 5.7 shall be made pursuant to the provisions of Sections 5.1 through 5.6.

SECTION 5.8.Mandatory Redemption.  The Issuer is not required to make mandatory redemption or sinking fund payments with respect to the Notes; provided, however, that under certain circumstances, the Issuer may be required to offer to purchase Notes under Section 3.5

and <u>Section 3.9</u>.  The Issuer may at any time and from time to time purchase Notes in the open market or otherwise.

ARTICLE VI

<u>DEFAULTS AND REMEDIES</u>

SECTION 6.1.<u>Events of Default.</u>

(a)     Each of the following is an "<u>Event of Default</u>":

(1)     default in any payment of interest on any Note when due and payable, continued for 30 days;

(2)     default in the payment of the principal amount of or premium, if any, on any Note issued under this Indenture when due at its Stated Maturity, upon optional redemption, upon required repurchase, upon declaration or otherwise;

(3)     failure to comply, for 60 days after written notice by the Trustee on behalf of the Holders to the Issuer or by the Holders of at least 30% in principal amount of the outstanding Notes to the Issuer and the Trustee, with any agreement or obligation contained in this Indenture;

(4)     default under any mortgage, indenture or instrument under which there may be issued or by which there may be secured or evidenced any Indebtedness for money borrowed by the Issuer or any of its Restricted Subsidiaries (or the payment of which is Guaranteed by the Issuer or any of its Restricted Subsidiaries), other than Indebtedness owed to the Issuer or a Restricted Subsidiary, whether such Indebtedness or Guarantee now exists, or is created after the date hereof, which default:

(A)     is caused by a failure to pay principal of such Indebtedness, at its Stated Maturity (after giving effect to any applicable grace periods provided in such Indebtedness); or

(B)     results in the acceleration of such Indebtedness prior to its Stated Maturity;

and, in each case, the principal amount of any such Indebtedness, together with the principal amount of any other such Indebtedness under which there has been a payment default or the maturity of which has been so accelerated, aggregates $30.0 million or more;

(5)     failure by the Issuer or any Significant Subsidiary (or group of Restricted Subsidiaries that together (as of the latest audited consolidated financial statements of the Issuer and its Restricted Subsidiaries) would constitute a Significant Subsidiary), to pay final judgments aggregating in excess of $30.0 million other than any judgments covered by indemnities provided by, or insurance policies issued by, reputable and creditworthy companies, which final judgments remain unpaid, undischarged and unstayed for a period

-111-

of more than 60 days after such judgment becomes final, and in the event such judgment is covered by insurance, an enforcement proceeding has been commenced by any creditor upon such judgment or decree which is not promptly stayed;

(6)      any Note Guarantee ceases to be in full force and effect, other than (x) in accordance with the terms of this Indenture, (y) a Guarantor denies or disaffirms its obligations under its Note Guarantee, other than in accordance with the terms of this Indenture or upon release of such Note Guarantee in accordance with this Indenture or (z) in connection with the bankruptcy or other proceeding under any Debtor Relief Law in respect of a Guarantor, so long as the aggregate assets of such Guarantor and any other Guarantor whose Note Guarantee ceased or ceases to be in full force as a result of a bankruptcy or other proceeding under any Debtor Relief Law are less than $30.0 million;

(7)      Holdings, the Issuer or any Guarantor that is Significant Subsidiary or any group of Guarantors that together (as of the latest audited consolidated financial statements of the Issuer and its Restricted Subsidiaries) would constitute a Significant Subsidiary pursuant to or within the meaning of any Bankruptcy Law:

(A)      commences a voluntary case or proceeding;

(B)      consents to the entry of an order for relief against it in an involuntary case or proceeding;

(C)      consents to the appointment of a Custodian of it or for substantially all of its property;

(D)      makes a general assignment for the benefit of its creditors;

(E)      consents to or acquiesces in the institution of a bankruptcy or an insolvency or other proceeding under any Debtor Relief Law against it; or

(F)      takes any comparable action under any foreign laws relating to insolvency;

(8)      a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that:

(A)      is for relief against Holdings, the Issuer or any Guarantor that is a Significant Subsidiary or any group of Guarantors that, taken together as of the latest audited consolidated financial statements for the Issuer, would constitute a Significant Subsidiary, in an involuntary case;

(B)      appoints a Custodian of Holdings, the Issuer, any Guarantor that is a Significant Subsidiary or any group of Guarantors that, taken together as of the latest audited consolidated financial statements for the Issuer, would constitute a Significant Subsidiary, for substantially all of its property;

(C)      orders the winding up or liquidation of Holdings, the Issuer, any Guarantor that is a Significant Subsidiary or any group of Guarantors that, taken together as of the latest audited consolidated financial statements for the Issuer, would constitute a Significant Subsidiary; or

(D)      or any similar relief is granted under any foreign laws and the order, decree or relief remains unstayed and in effect for 60 consecutive days; or

(9)      except (x) in connection with any transaction not prohibited by this Indenture or as otherwise set forth in, or contemplated by, this Indenture or any Collateral Document or (y) due to the failure of the Collateral Agent to take any action, any Collateral Document shall for any reason cease to be in full force and effect and enforceable in accordance with its terms (subject to the effect of bankruptcy, insolvency, reorganization, receivership, moratorium and other similar laws affecting creditors' rights) with respect to a Lien on Collateral with a fair market value of more than $30.0 million, if not remedied within 45 days after written notice has been given by the Trustee to the Issuer on behalf of the Holders or by the Holders of at least 30% in principal amount of the outstanding Notes to the Issuer and the Trustee.

(b)      If a Default for a failure to report or failure to deliver a required certificate in connection with another default (the "Initial Default") occurs, then at the time such Initial Default is cured, such Default for a failure to report or failure to deliver a required certificate in connection with another default that resulted solely because of that Initial Default shall also be cured without any further action.

(c)      Any Default or Event of Default for the failure to comply with the time periods prescribed in Section 3.10 hereof or otherwise to deliver any notice or certificate pursuant to any other provision of this Indenture shall be deemed to be cured upon the delivery of any such report required by such provision or such notice or certificate, as applicable, even though such delivery is not within the prescribed period specified in this Indenture.

SECTION 6.2. Acceleration.  If any Event of Default (other than an Event of Default described in clause (7) or (8) of Section 6.1(a)) occurs and is continuing, the Trustee by notice to the Issuer, or the Holders of at least 30% in principal amount of the outstanding Notes by written notice to the Issuer and the Trustee, may declare the principal of, premium, if any, and accrued and unpaid interest, if any, on all the Notes to be immediately due and payable.  Upon such a declaration, such principal, premium and accrued and unpaid interest, will be due and payable immediately.

In the event of any Event of Default specified in clause (4) of Section 6.1(a), such Event of Default and all consequences thereof shall be annulled, waived and rescinded, automatically and without any action by the Trustee or the Holders, if within 30 days after such Event of Default arose:

(1)      (x)      the Indebtedness that gave rise to such Event of Default shall have been discharged in full; or

-113-

(y)      the holders thereof have rescinded or waived the acceleration, notice or action (as the case may be) giving rise to such Event of Default; or

(z)      if the default that is the basis for such Event of Default has been cured; and

(2)      (a)      the annulment of the acceleration of the Notes would not conflict with any judgment or decree of a court of competent jurisdiction; and

(b)      all existing Events of Default, except nonpayment of principal, premium or interest, on the Notes that became due solely because of the acceleration of the Notes, have been cured or waived.

If an Event of Default described in clause (7) or (8) of Section 6.1(a) occurs and is continuing, the principal of, premium and accrued and unpaid interest, on all Notes will become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Holders.

SECTION 6.3.Other Remedies.   If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy by proceeding at law or in equity to collect the payment of principal of, or premium, if any, or interest, on the Notes or to enforce the performance of any provision of the Notes, the Note Guarantees, this Indenture or any Collateral Document.

The Trustee may maintain a proceeding even if it does not possess any of the Notes or the Note Guarantees or does not produce any of them in the proceeding.  A delay or omission by the Trustee or any Holder in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default. No remedy is exclusive of any other remedy.  All available remedies are cumulative.

SECTION 6.4.Waiver of Past Defaults.   The Requisite Holders, by written notice to the Trustee, may, on behalf of all of the Holders, (a) waive, by their consent (including, without limitation, consents obtained in connection with a purchase of, or tender offer or exchange offer for, Notes), an existing Default or Event of Default and its consequences under this Indenture except (i) a Default or Event of Default in the payment of the principal of, or premium, if any, or interest, on a Note or (ii) a Default or Event of Default in respect of a provision that under Section 9.2 cannot be amended without the consent of each Holder affected and (b) rescind any acceleration with respect to the Notes and its consequences if (1) such rescission would not conflict with any judgment or decree of a court of competent jurisdiction, (2) all existing Events of Default have been cured or waived except nonpayment of principal, premium, if any, interest that has become due solely because of the acceleration, (3) to the extent the payment of such interest is lawful, interest on overdue installments of interest, premium, if any, and overdue principal, which has become due otherwise than by such declaration of acceleration, has been paid, (4) the Issuer has paid the Trustee its compensation and reimbursed the Trustee for its reasonable expenses, disbursements and advances, including the reasonable compensation expenses, disbursements and advances of its agents and counsel and (5) in the event of the cure or waiver of an Event of Default of the type described in clause (4) of Section 6.1(a), the Trustee

-114-

shall have received an Officer's Certificate and an Opinion of Counsel stating that such Event of Default has been cured or waived.  No such rescission shall affect any subsequent Default or impair any right consequent thereto.  When a Default or Event of Default is waived, it is deemed cured, but no such waiver shall extend to any subsequent or other Default or Event of Default or impair any consequent right.

SECTION 6.5.Control by Majority.  The Requisite Holders may direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or of exercising any trust or power conferred on the Trustee.  However, the Trustee may refuse to follow any direction that conflicts with law or this Indenture or the Notes or, subject to Sections 7.1 and 7.2, that the Trustee determines is unduly prejudicial to the rights of other Holders or would involve the Trustee in personal liability; provided, however, that the Trustee may take any other action deemed proper by the Trustee that is not inconsistent with such direction.  Prior to taking any such action hereunder, the Trustee shall be entitled to indemnification satisfactory to it against all fees, losses and expenses (including attorney's fees and expenses) caused by taking or not taking such action.

SECTION 6.6.Limitation on Suits.  Subject to Section 6.7, a Holder may not pursue any remedy with respect to this Indenture, the Notes or the Note Guarantees unless:

(1)     such Holder has previously given the Trustee written notice that an Event of Default is continuing;

(2)     Holders of at least 30% in principal amount of the outstanding Notes have requested in writing the Trustee to pursue the remedy;

(3)     such Holders have offered in writing the Trustee security or indemnity satisfactory to the Trustee against any loss, liability or expense;

(4)     the Trustee has not complied with such request within 60 days after the receipt of the written request and the offer of security or indemnity; and

(5)     the Requisite Holders have not given the Trustee a written direction that, in the opinion of the Trustee, is inconsistent with such request within such 60-day period.

A Holder may not use this Indenture to prejudice the rights of another Holder or to obtain a preference or priority over another Holder (it being understood that the Trustee does not have an affirmative duty to ascertain whether or not such actions or forbearances are unduly prejudicial to such Holders).

SECTION 6.7.Rights of Holders to Receive Payment.  Notwithstanding any other provision of this Indenture (including, without limitation, Section 6.6) or any Collateral Document, the right of any Holder to receive payment of principal of, premium, if any, or interest, on the Notes held by such Holder, on or after the respective due dates expressed or provided for in the Notes, or to bring suit for the enforcement of any such payment on or after such respective dates, shall be absolute and unconditional and shall not be impaired or affected without the consent of such Holder.

SECTION 6.8.Collection Suit by Trustee.  If an Event of Default specified in clauses (1) or (2) of Section 6.1(a) occurs and is continuing, the Trustee may recover judgment in its own name and as trustee of an express trust against the Issuer for the whole amount then due and owing (together with interest on any unpaid interest to the extent lawful) and the amounts provided for in Section 7.7.

SECTION 6.9.Trustee May File Proofs of Claim.  The Trustee may file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel) and the Holders allowed in any judicial proceedings relative to the Issuer, its Subsidiaries or its or their respective creditors or properties and, unless prohibited by law or applicable regulations, may be entitled and empowered to participate as a member of any official committee of creditors appointed in such matter and may vote on behalf of the Holders in any election of a trustee in bankruptcy or other Person performing similar functions, and any Custodian in any such judicial proceeding is hereby authorized by each Holder to make payments to the Trustee and, in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due it for the compensation, expenses, disbursements and advances of the Trustee, its agents and its counsel, and any other amounts due the Trustee under Section 7.7.

No provision of this Indenture shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder thereof or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

SECTION 6.10.        Priorities.

If the Trustee collects any money or property pursuant to this Article VI, it shall pay out the money or property in the following order:

FIRST:  to the Trustee for amounts due to it under Section 7.7;

SECOND:  to Holders for amounts due and unpaid on the Notes for principal of, or premium, if any, and interest, ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal of, or premium, if any, and interest, respectively; and

THIRD:  to the Issuer, or to the extent the Trustee collects any amount for any Guarantor, to such Guarantor.

(a)        The Trustee may fix a record date and payment date for any payment to Holders pursuant to this Section 6.10.  At least 15 days before such record date, the Issuer shall send or cause to be sent to each Holder and the Trustee a notice that states the record date, the payment date and amount to be paid.

SECTION 6.11.        Undertaking for Costs.  In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as Trustee, a court in its discretion may require the filing by any party litigant in the suit of

-116-

an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees and expenses, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant.  This Section 6.11 does not apply to a suit by the Trustee, a suit by the Issuer, a suit by a Holder pursuant to Section 6.7 or a suit by Holders of more than 10% in outstanding principal amount of the Notes.

ARTICLE VII

TRUSTEE

SECTION 7.1.Duties of Trustee.

(a)      If an Event of Default has occurred and is continuing, the Trustee shall exercise the rights and powers vested in it by this Indenture and use the same degree of care and skill in its exercise as a prudent Person would exercise or use under the circumstances in the conduct of such person's own affairs.

(b)      Except during the continuance of an Event of Default:

(1)      the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture or the Collateral Documents, as applicable, and no implied covenants or obligations shall be read into this Indenture or the Collateral Documents, as applicable, against the Trustee; and

(2)      in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates, opinions or orders furnished to the Trustee and conforming to the requirements of this Indenture or the Notes, as the case may be.  However, in the case of any such certificates or opinions which by any provisions hereof are specifically required to be furnished to the Trustee, the Trustee shall examine such certificates and opinions to determine whether or not they conform to the requirements of this Indenture or the Notes, as the case may be (but need not confirm or investigate the accuracy of mathematical calculations or other facts stated therein).

(c)      The Trustee may not be relieved from liability for its own negligent action, its own negligent failure to act or its own willful misconduct, except that:

(1)      this paragraph does not limit the effect of paragraph (b) of this Section 7.1;

(2)      the Trustee shall not be liable for any error of judgment made in good faith by a Trust Officer unless it is proved that the Trustee was negligent in ascertaining the pertinent facts; and

(3)      the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.5.

(d)      No provision of this Indenture, any Collateral Document or the Notes shall require the Trustee to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties hereunder or thereunder or in the exercise of any of its rights or powers, if it shall have reasonable grounds to believe that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(e)      Every provision of this Indenture and any Collateral Document that in any way relates to the Trustee is subject to paragraphs (a), (b) and (c) of this Section 7.1.

(f)      The Trustee shall not be liable for interest on any money received by it except as the Trustee may agree in writing with the Issuer.

(g)      Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

(h)      Every provision of this Indenture and any Collateral Document relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Section 7.1.

SECTION 7.2.Rights of Trustee.  Subject to Section 7.1:

(a)      The Trustee may conclusively rely on and shall be fully protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order or other paper or document (whether in its original or facsimile form) reasonably believed by it to be genuine and to have been signed or presented by the proper Person.  The Trustee need not investigate any fact or matter stated in the document. The Trustee shall receive and retain financial reports and statements of the Issuer as provided herein, but shall have no duty to review or analyze such reports or statements to determine compliance with covenants or other obligations of the Issuer.

(b)      Before the Trustee acts or refrains from acting, it may require an Officer's Certificate and/or an Opinion of Counsel.  The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on an Officer's Certificate or Opinion of Counsel.

(c)      The Trustee may execute any of the trusts and powers hereunder or perform any duties hereunder either directly by or through its attorneys and agents and shall not be responsible for the misconduct or negligence of any agent or attorney appointed with due care by it hereunder.

(d)      The Trustee shall not be liable for any action it takes or omits to take in good faith which it believes to be authorized or within its rights or powers conferred upon it by this Indenture.

(e)      The Trustee may consult with counsel of its selection, and the advice or opinion of counsel relating to this Indenture or the Notes shall be full and complete authorization and protection from liability in respect of any action taken, omitted or suffered by it hereunder or under the Notes in good faith and in accordance with the advice or opinion of such counsel.

-118-

(f)     The Trustee shall not be deemed to have notice of any Default or Event of Default or whether any entity or group of entities constitutes a Significant Subsidiary unless a Trust Officer of the Trustee has actual knowledge thereof or unless written notice of any event which is in fact such a Default or of any such Significant Subsidiary is received by the Trustee at the corporate trust office of the Trustee specified in Section 3.12, and such notice references the Notes and this Indenture.  Delivery of reports to the Trustee pursuant to Section 3.10 hereof shall not constitute actual knowledge of, or notice to, the Trustee of the information contained therein.

(g)     The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and to each agent, custodian and other Person employed to act hereunder.

(h)     The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture, any Collateral Document or the Notes at the request, order or direction of any of the Holders pursuant to the provisions of this Indenture, unless such Holders shall have offered to the Trustee security or indemnity satisfactory to it against the costs, expenses and liabilities which may be incurred therein or thereby.

(i)     The Trustee shall not be deemed to have knowledge of any fact or matter unless such fact or matter is known to a Trust Officer of the Trustee.

(j)     Whenever in the administration of this Indenture, any Collateral Document or the Notes the Trustee shall deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder or thereunder, the Trustee (unless other evidence be herein specifically prescribed) may, in the absence of negligence or willful misconduct on its part, conclusively rely upon an Officer's Certificate.

(k)     The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, report, notice, request, direction, consent, order, bond, debenture, coupon or other paper or document, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine, during business hours and upon reasonable notice, the books, records and premises of the Issuer and the Restricted Subsidiaries, personally or by agent or attorney at the sole cost of the Issuer and shall incur no liability or additional liability of any kind by reason of such inquiry or investigation.

(l)     The Trustee shall not be required to give any bond or surety in respect of the performance of its powers and duties hereunder.

(m)     The Trustee may request that the Issuer deliver an Officer's Certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Indenture or the Notes.

(n)     In no event shall the Trustee be liable to any Person for special, punitive, indirect, consequential or incidental loss or damage of any kind whatsoever (including, but not limited to, lost profits), even if the Trustee has been advised of the likelihood of such loss or damage.

-119-

(o)     Unless otherwise specifically provided in this Indenture, any demand, request, direction or notice from the Issuer shall be sufficient if signed by one Officer of the Issuer.

(p)     The permissive rights of the Trustee enumerated herein shall not be construed as duties.

SECTION 7.3.Individual Rights of Trustee.

The Trustee in its individual or any other capacity may become the owner or pledgee of Notes and may otherwise deal with the Issuer, Guarantors or their Affiliates with the same rights it would have if it were not Trustee.  Any Paying Agent, Registrar, co-registrar or co-paying agent may do the same with like rights.  However, the Trustee must comply with Sections 7.10 and 7.11.  In addition, the Trustee shall be permitted to engage in transactions with the Issuer; provided, however, that if the Trustee acquires any conflicting interest, the Trustee must (i) eliminate such conflict within 90 days of acquiring such conflicting interest, (ii) apply to the SEC for permission to continue acting as Trustee or (iii) resign.

SECTION 7.4.Trustee's Disclaimer.  The Trustee shall not be responsible for and makes no representation as to the validity or adequacy of this Indenture or the Notes, shall not be accountable for the Issuer's use of the proceeds from the sale of the Notes, shall not be responsible for the use or application of any money received by any Paying Agent other than the Trustee or any money paid to the Issuer pursuant to the terms of this Indenture and shall not be responsible for any statement of the Issuer in this Indenture or in any document issued in connection with the sale of the Notes or in the Notes other than the Trustee's certificate of authentication.

SECTION 7.5.Notice of Defaults.  If a Default or Event of Default occurs and is continuing and if a Trust Officer has actual knowledge thereof, the Trustee shall send or cause to be sent electronically or by first class mail to each Holder at the address set forth in the Notes Register notice of the Default or Event of Default within 60 days after it is actually known to a Trust Officer, unless such Default or Event of Default shall have been cured or waived before the giving of such notice and a Trust Officer received written notice of such cure or waiver.  Except in the case of a Default or Event of Default in payment of principal of, or premium, if any, or interest on any Note (including payments pursuant to the optional redemption or required repurchase provisions of such Note), the Trustee may withhold the notice if and so long as it in good faith determines that withholding the notice is in the interests of Holders.

SECTION 7.6.[Reserved].

SECTION 7.7.Compensation and Indemnity.  The Issuer and each Guarantor, jointly and severally, shall pay to the Trustee from time to time compensation for its services hereunder and under the Notes as the Issuer and the Trustee shall from time to time agree in writing.  The Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust.  The Issuer and each Guarantor, jointly and severally, shall reimburse the Trustee upon request for all reasonable out of pocket expenses incurred or made by it, including, but not limited to, costs of collection, costs of preparing reports, certificates and other documents, costs of preparation and mailing of notices to Holders.  Such expenses shall include the reasonable

-120-

compensation and expenses, disbursements and advances of the agents, counsel, accountants and experts of the Trustee.  The Issuer and each Guarantor, jointly and severally, shall indemnify the Trustee against any and all loss, liability, damages, claims or expense, including taxes (other than taxes based upon the income of the Trustee) (including reasonable attorneys' and agents' fees and expenses) incurred by it without willful misconduct or gross negligence, as determined by a final nonappealable order of a court of competent jurisdiction, on its part in connection with the administration of this trust and the performance of its duties hereunder or thereunder and under the Notes or any Note Documents, including the costs and expenses of enforcing this Indenture (including this Section 7.7) and the Notes and of defending itself against any claims (whether asserted by any Holder, the Issuer, any Guarantor or otherwise).  The Trustee shall notify the Issuer promptly of any claim for which it may seek indemnity of which it has received written notice.  Failure by the Trustee to so notify the Issuer shall not relieve the Issuer of its obligations hereunder.   The Issuer shall defend the claim and the Trustee shall provide reasonable cooperation at the Issuer's expense in the defense.  The Trustee may have separate counsel and the Issuer shall pay the fees and expenses of such counsel; provided that if the Issuer assumes the Trustee's defense and the Trustee's outside counsel determines, exercising its reasonable judgment, that there is no conflict of interest between the Issuer and the Trustee in connection with such defense, the Issuer shall not be required to pay any fees and expenses of such separate counsel incurred after the date of such determination in connection with such defense.

Notwithstanding anything to the contrary in Section 3.6, to secure the Issuer's and the Guarantors' payment obligations in this Section 7.7, the Trustee shall have a lien prior to the Notes on all money or property held or collected by the Trustee other than money or property held in trust to pay principal of and interest on particular Notes.  Such lien shall survive the satisfaction and discharge of this Indenture.  The Trustee's respective right to receive payment of any amounts due under this Section 7.7 shall not be subordinate to any other liability or Indebtedness of the Issuer.

The Issuer's and the Guarantors' payment obligations pursuant to this Section 7.7 shall survive the discharge of this Indenture and any resignation or removal of the Trustee under Section 7.8.  Without prejudice to any other rights available to the Trustee under applicable law, when the Trustee incurs fees, expenses or renders services after the occurrence of a Default specified in clause (7) or clause (8) of Section 6.1(a), the expenses (including the reasonable fees and expenses of its counsel) are intended to constitute expenses of administration under any Bankruptcy Law.

SECTION 7.8.Replacement of Trustee.  The Trustee may resign at any time by so notifying the Issuer in writing no less than 30 days prior to the effective date of such resignation. The Requisite Holders may remove the Trustee by so notifying the removed Trustee in writing no less than 30 days prior to the effective date of such removal and may appoint a successor Trustee with the Issuer's written consent, which consent will not be unreasonably withheld.  The Issuer shall remove the Trustee if:

> (1)     the Trustee fails to comply with Section 7.10 hereof;

> (2)     the Trustee is adjudged bankrupt or insolvent;

-121-

(3)      a receiver or other public officer takes charge of the Trustee or its property; or

(4)      the Trustee otherwise becomes incapable of acting.

If the Trustee resigns or is removed by the Issuer or by the Requisite Holders and such Requisite Holders do not reasonably promptly appoint a successor Trustee as described in the preceding paragraph, or if a vacancy exists in the office of the Trustee for any reason (the Trustee in such event being referred to herein as the retiring Trustee), the Issuer shall promptly appoint a successor Trustee.

A successor Trustee shall deliver a written acceptance of its appointment to the retiring Trustee and to the Issuer.  Thereupon the resignation or removal of the retiring Trustee shall become effective, and the successor Trustee shall have all the rights, powers and duties of the Trustee under this Indenture.  The successor Trustee shall mail or send electronically a notice of its succession to Holders of the Notes.  The retiring Trustee shall, at the expense of the Issuer, promptly transfer all property held by it as Trustee to the successor Trustee, subject to the lien provided for in Section 7.7.

If a successor Trustee does not take office within 60 days after the retiring Trustee resigns or is removed, the retiring Trustee or the Holders of at least 10% in principal amount of the Notes may petition, at the Issuer's expense, any court of competent jurisdiction for the appointment of a successor Trustee.

If the Trustee fails to comply with Section 7.10, unless the Trustee's duty to resign is stayed as provided in TIA Section 310(b), any Holder, who has been a bona fide holder of a Note for at least six months, may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

Notwithstanding the replacement of the Trustee pursuant to this Section 7.8, the Issuer's obligations under Section 7.7 shall continue for the benefit of the retiring Trustee.  The predecessor Trustee shall have no liability for any action or inaction of any successor Trustee.

SECTION 7.9.Successor Trustee by Merger.  If the Trustee consolidates with, merges or converts into, or transfers all or substantially all its corporate trust business or assets to, another corporation or banking association, the resulting, surviving or transferee corporation without any further act shall be the successor Trustee.

In case at the time such successor or successors by merger, conversion or consolidation to the Trustee shall succeed to the trusts created by this Indenture, any of the Notes shall have been authenticated but not delivered, any such successor to the Trustee may adopt the certificate of authentication of any predecessor trustee, and deliver such Notes so authenticated; and in case at that time any of the Notes shall not have been authenticated, any successor to the Trustee may authenticate such Notes either in the name of any predecessor hereunder or in the name of the successor to the Trustee; provided, that the right to adopt the certificate of authentication of any predecessor Trustee or authenticate Notes in the name of any predecessor Trustee shall only apply to its successor or successors by merger, consolidation or conversion.

-122-

SECTION 7.10.       Eligibility; Disqualification.  This Indenture shall always have a Trustee.  The Trustee shall have a combined capital and surplus of at least $100 million as set forth in its most recent published annual report of condition.

SECTION 7.11.       [Reserved].

SECTION 7.12.       Trustee's Application for Instruction from the Issuer.   Any application by the Trustee for written instructions from the Issuer may, at the option of the Trustee, set forth in writing any action proposed to be taken or omitted by the Trustee under this Indenture and the date on and/or after which such action shall be taken or such omission shall be effective.  The Trustee shall not be liable for any action taken by, or omission of, the Trustee in accordance with a proposal included in such application on or after the date specified in such application (which date shall not be less than three Business Days after the date any Officer of the Issuer actually receives such application, unless any such Officer shall have consented in writing to any earlier date) unless prior to taking any such action (or the effective date in the case of an omission), the Trustee shall have received written instructions in response to such application specifying the action to be taken or omitted.

ARTICLE VIII

LEGAL DEFEASANCE AND COVENANT DEFEASANCE

SECTION 8.1.Option to Effect Legal Defeasance or Covenant Defeasance; Defeasance. The Issuer may, at its option and at any time, elect to have either Section 8.2 or 8.3 hereof be applied to all outstanding Notes upon compliance with the conditions set forth below in this Article VIII.

SECTION 8.2.Legal Defeasance and Discharge.   Upon the Issuer's exercise under Section 8.1 hereof of the option applicable to this Section 8.2, the Issuer and each of the Guarantors will, subject to the satisfaction of the conditions set forth in Section 8.4 hereof, be deemed to have been discharged from their obligations with respect to all outstanding Notes (including the Guarantees) on the date the conditions set forth below are satisfied (hereinafter, "Legal Defeasance").   For this purpose, Legal Defeasance means that the Issuer and the Guarantors will be deemed to have paid and discharged the entire Indebtedness represented by the outstanding Notes (including the Guarantees), which will thereafter be deemed to be "outstanding" only for the purposes of Section 8.5 hereof and the other Sections of this Indenture referred to in clauses (1) and (2) below, and to have satisfied all of their other obligations under such Notes, the Guarantees and this Indenture (and the Trustee, on written demand of and at the expense of the Issuer, shall execute such instruments reasonably requested by the Issuer acknowledging the same) and to have cured all then existing Events of Default, except for the following provisions which will survive until otherwise terminated or discharged hereunder:

(1)       the rights of Holders of Notes issued under this Indenture to receive payments in respect of the principal of, premium, if any, and interest, on the Notes when such payments are due solely out of the trust referred to in Section 8.4 hereof;

(2)     the Issuer's obligations with respect to the Notes under Article II concerning issuing temporary Notes, registration of such Notes, mutilated, destroyed, lost or stolen Notes and Section 3.12 hereof concerning the maintenance of an office or agency for payment and money for security payments held in trust;

(3)     the rights, powers, trusts, duties and immunities of the Trustee and the Issuer's or Guarantors' obligations in connection therewith; and

(4)     this Article VIII with respect to provisions relating to Legal Defeasance.

SECTION 8.3.Covenant Defeasance.   Upon the Issuer's exercise under Section 8.1 hereof of the option applicable to this Section 8.3, the Issuer and each of the Guarantors will, subject to the satisfaction of the conditions set forth in Section 8.4 hereof, be released from each of their obligations under the covenants contained in Section 3.2, 3.3, 3.4, 3.5, 3.6, 3.7, 3.8, 3.9, 3.10, 3.11, 3.16, 3.19, 3.21 and Section 4.1 (except Section 4.1(a)(1) and (a)(2)) hereof with respect to the outstanding Notes on and after the date the conditions set forth in Section 8.4 hereof are satisfied (hereinafter, "Covenant Defeasance"), and the Notes will thereafter be deemed not "outstanding" for the purposes of any direction, waiver, consent or declaration or act of Holders (and the consequences of any thereof) in connection with such covenants, but will continue to be deemed "outstanding" for all other purposes hereunder.   For this purpose, Covenant Defeasance means that, with respect to the outstanding Notes and Guarantees, the Issuer and the Guarantors may omit to comply with and shall have no liability in respect of any term, condition or limitation set forth in any such covenant, whether directly or indirectly, by reason of any reference elsewhere herein to any such covenant or by reason of any reference in any such covenant to any other provision herein or in any other document and such omission to comply shall not constitute a Default or an Event of Default under Section 6.1(a) hereof, but, except as specified above, the remainder of this Indenture and such Notes and Guarantees will be unaffected thereby.   In addition, upon the Issuer's exercise under Section 8.1 hereof of the option applicable to this Section 8.3, subject to the satisfaction of the conditions set forth in Section 8.4 hereof, Sections 6.1(a)(3) (other than with respect to Section 4.1(a)(1) and (a)(2)), 6.1(a)(4), 6.1(a)(5), 6.1(a)(6), 6.1(a)(7) (with respect only to a Guarantor that is a Significant Subsidiary or any group of Guarantors that taken together would constitute a Significant Subsidiary), 6.1(a)(8) (with respect only to a Guarantor that is a Significant Subsidiaries or any group of Guarantors that taken together would constitute a Significant Subsidiary) and 6.1(a)(9) hereof shall not constitute Events of Default.

SECTION 8.4.Conditions to Legal or Covenant Defeasance.  In order to exercise either Legal Defeasance or Covenant Defeasance under either Section 8.2 or 8.3 hereof:

(1)     the Issuer must irrevocably deposit with the Trustee, in trust, for the benefit of the Holders, cash in U.S. dollars, U.S. Government Obligations, or a combination thereof, in such amounts as will be sufficient, in the opinion of a nationally recognized firm of independent public accountants, to pay the principal of and premium, if any, interest, due on the Notes issued under this Indenture on the stated maturity date or on the applicable redemption date, as the case may be, and the Issuer must specify whether such Notes are being defeased to maturity or to a particular redemption date;

-124-

(2)    in the case of Legal Defeasance, the Issuer shall have delivered to the Trustee an Opinion of Counsel confirming that, subject to customary assumptions and exclusions;

    (A)    the Issuer has received from, or there has been published by, the United States Internal Revenue Service a ruling; or

    (B)    since the issuance of such Notes, there has been a change in the applicable U.S. federal income tax law;

in either case to the effect that, and based thereon such Opinion of Counsel shall confirm that, subject to customary assumptions and exclusions, the Holders, in their capacity as Holders of the Notes; will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such Legal Defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Legal Defeasance had not occurred;

(3)    in the case of Covenant Defeasance, the Issuer shall have delivered to the Trustee an Opinion of Counsel confirming that, subject to customary assumptions and exclusions, the Holders, in their capacity as Holders of the Notes, will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such Covenant Defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Covenant Defeasance had not occurred;

(4)    no Default or Event of Default (other than that resulting from borrowing funds to be applied to make such deposit and the granting of Liens in connection therewith) shall have occurred and be continuing on the date of such deposit;

(5)    such Legal Defeasance or Covenant Defeasance shall not result in a breach or violation of, or constitute a default under the Credit Facilities or any other material agreement or instrument (other than this Indenture) to which, the Issuer or any Guarantor is a party or by which the Issuer or any Guarantor is bound;

(6)    the Issuer shall have delivered to the Trustee an Opinion of Counsel to the effect that, as of the date of such opinion and subject to customary assumptions and exclusions following the deposit, the trust funds will not be subject to the effect of Sections 547 and 548 of Title 11 of the United States Code, as amended, or any applicable Debtor Relief Laws;

(7)    the Issuer shall have delivered to the Trustee an Officer's Certificate stating that the deposit was not made by the Issuer with the intent of defeating, hindering, delaying, defrauding or preferring any creditors of the Issuer or any Guarantor or others; and

(8)    the Issuer shall have delivered to the Trustee an Officer's Certificate and an Opinion of Counsel in the United States (which Opinion of Counsel may be subject to customary assumptions and exclusions) each stating that all conditions precedent

provided for or relating to the Legal Defeasance or the Covenant Defeasance, as the case may be, have been complied with.

SECTION 8.5. Deposited Money and U.S. Government Obligations to be Held in Trust; Other Miscellaneous Provisions.  Subject to Section 8.6 hereof, all money in U.S. dollars and U.S. Government Obligations (including the proceeds thereof) deposited with the Trustee (or other qualifying trustee, collectively for purposes of this Section 8.5, the "Trustee") pursuant to Section 8.4 hereof in respect of the outstanding Notes will be held in trust and applied by the Trustee, in accordance with the provisions of such Notes and this Indenture, to the payment, either directly or through any Paying Agent (including the Issuer acting as Paying Agent) as the Trustee may determine, to the Holders of such Notes of all sums due and to become due thereon in respect of principal, premium, and interest, but such money need not be segregated from other funds except to the extent required by law.

The Issuer will pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the cash or U.S. Government Obligations deposited pursuant to Section 8.4 hereof or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Holders of the outstanding Notes.

Notwithstanding anything in this Article VIII to the contrary, the Trustee will deliver or pay to the Issuer from time to time upon the request of the Issuer any money or U.S. Government Obligations held by it as provided in Section 8.4 hereof which, in the opinion of a nationally recognized firm of independent public accountants expressed in a written certification thereof delivered to the Trustee (which may be the opinion delivered under Section 8.4(1) hereof), are in excess of the amount thereof that would then be required to be deposited to effect an equivalent Legal Defeasance or Covenant Defeasance.

SECTION 8.6. Repayment to the Issuer.  Any money deposited with the Trustee or any Paying Agent, or then held by the Issuer, in trust for the payment of the principal of, premium or interest on, any Note and remaining unclaimed for two years after such principal, premium or interest has become due and payable shall be paid to the Issuer on their written request unless an abandoned property law designates another Person or (if then held by the Issuer) will be discharged from such trust; and the Holder of such Note will thereafter be permitted to look only to the Issuer for payment thereof unless an abandoned property law designates another Person, and all liability of the Trustee or such Paying Agent with respect to such trust money, and all liability of the Issuer as trustee thereof, will thereupon cease; provided, however, that the Trustee or such Paying Agent, before being required to make any such repayment, shall at the expense of the Issuer cause to be published once, in the New York Times and The Wall Street Journal (national edition), notice that such money remains unclaimed and that, after a date specified therein, which will not be less than 30 days from the date of such notification or publication, any unclaimed balance of such money then remaining will be repaid to the Issuer.

SECTION 8.7. Reinstatement.

If the Trustee or Paying Agent is unable to apply any money or U.S. dollars or U.S. Government Obligations in accordance with Section 8.2 or 8.3 hereof, as the case may be, by reason of any order or judgment of any court or Governmental Authority enjoining, restraining

or otherwise prohibiting such application, then the Issuer's and the Guarantors' obligations under this Indenture and the Notes and the Guarantees will be revived and reinstated as though no deposit had occurred pursuant to Section 8.2 or 8.3 hereof until such time as the Trustee or Paying Agent is permitted to apply all such money in accordance with Section 8.2 or 8.3 hereof, as the case may be; provided, however, that, if the Issuer make any payment of principal of, premium, or interest on, any Note following the reinstatement of its obligations, the Issuer will be subrogated to the rights of the Holders of such Notes to receive such payment from the money or U.S. Government Obligations held by the Trustee or Paying Agent.

ARTICLE IX

AMENDMENTS

SECTION 9.1. Without Consent of Holders.   Notwithstanding Section 9.2 of this Indenture, the Issuer, any Guarantor (with respect to its Guarantee or this Indenture) and the Trustee and, if applicable, the Collateral Agent, may amend, supplement or modify this Indenture, any Note Guarantee, any Collateral Document and the Notes without the consent of any Holder:

(1)    to cure any ambiguity, omission, mistake, defect, error or inconsistency, conform any provision to any provision relating to the description of the Notes in the Plan of Reorganization, or reduce the minimum denomination of the Notes;

(2)    to provide for the assumption by a successor Person of the obligations of the Issuer or any Guarantor under any Note Document;

(3)    to provide for uncertificated Notes in addition to or in place of certificated Notes;

(4)    to add to the covenants or provide for a Note Guarantee for the benefit of the Holders or to surrender any right or power conferred upon the Issuer or any Restricted Subsidiary;

(5)    to make any change that does not adversely affect the rights of any Holder in any material respect;

(6)    at the Issuer's election, comply with any requirement of the SEC in connection with the qualification of the Indenture under the TIA, if such qualification is required;

(7)    make such provisions as necessary (as determined in good faith by the Issuer) for the issuance of Additional Notes and PIK Notes;

(8)    provide for any Restricted Subsidiary to provide a Note Guarantee in accordance with Section 3.7, to add Guarantees with respect to the Notes, to add security to or for the benefit of the Notes, or to confirm and evidence the release, termination, discharge or retaking of any Guarantee or Lien with respect to or securing the Notes

-127-

when such release, termination, discharge or retaking is provided for under this Indenture;

(9)     evidence and provide for the acceptance and appointment under this Indenture or any Collateral Document of a successor Trustee or Collateral Agent pursuant to the requirements hereof or any Collateral Document, to provide for the accession by the Trustee and/or Collateral Agent or any other party to any Note Document in accordance with the terms thereof and to provide for other amendments thereto that are administrative or ministerial in nature;

(10)     make any amendment to the provisions of this Indenture relating to the transfer and legending of Notes as permitted by this Indenture, including to facilitate the issuance and administration of Notes; provided, however, that (i) compliance with this Indenture as so amended would not result in Notes being transferred in violation of the Securities Act or any other applicable securities law and (ii) such amendment does not adversely affect the rights of Holders to transfer Notes in any material respect;

(11)     in the event that PIK Notes are issued in certificated form, to make appropriate amendments to reflect an appropriate minimum denomination of certificated PIK Notes, and establish minimum redemption amounts for certificated PIK Notes;

(12)     with respect to the Intercreditor Agreement, to add additional secured creditors holding ABL Priority Obligations, MDL Priority Obligations, Term Priority Obligations, 21C Priority Obligations, Pari Passu Lien Obligations or Junior Lien Obligations but only to the extent and so long as neither the Incurrence nor the existence of such obligations nor the securing of such obligations with Liens is prohibited by this Indenture or the Collateral Documents;

(13)     to the extent required under the Intercreditor Agreement or any other intercreditor agreement permitted hereby, to conform any Collateral Documents to reflect permitted amendments or modifications to comparable provisions under any security documents in respect of obligations incurred pursuant to a Credit Facility; and

(14)     to mortgage, pledge, hypothecate or grant a security interest in favor of the Collateral Agent for the benefit of the Trustee and the Holders of the Notes as additional security for the payment and performance of the Issuer's and any Guarantor's Note Obligations, in any property or assets, which are required to be mortgaged, pledged or hypothecated, or in which a security interest is required to be granted to the Trustee or the Collateral Agent pursuant to this Indenture or otherwise.

Subject to Section 9.2, upon the request of the Issuer upon receipt by the Trustee of the documents described in Sections 9.6 and 12.4 hereof, the Trustee will join with the Issuer and the Guarantors in the execution of such amended or supplemental indenture unless such amended or supplemental indenture affects the Trustee's own rights, duties, liabilities or immunities under this Indenture or otherwise, in which case the Trustee may in its discretion, but will not be obligated to, enter into such amended or supplemental Indenture.

SECTION 9.2.<u>With Consent of Holders</u>.  Except as provided below in this <u>Section 9.2</u>, the Issuer, the Guarantors and the Trustee and Collateral Agent, as applicable, may amend or supplement this Indenture, any Guarantee, any Collateral Document and the Notes issued hereunder with the consent of the Requisite Holders, including, without limitation, consents obtained in connection with a purchase of, or tender offer or exchange offer for, Notes, and, subject to <u>Sections 6.4</u> and <u>6.7</u> hereof, any existing Default or Event of Default (other than a Default or Event of Default in the payment of the principal of, premium, if any, or interest on the Notes, except a payment default resulting from an acceleration that has been rescinded) or compliance with any provision of this Indenture, any Collateral Document, the Notes and the Guarantees may be waived with the consent of the Requisite Holders (including consents obtained in connection with a purchase of or tender offer or exchange offer for Notes). <u>Section 2.12</u> hereof and <u>Section 12.4</u> hereof shall determine which Notes are considered to be "outstanding" for the purposes of this <u>Section 9.2</u>.

Upon the request of the Issuer upon the filing with the Trustee of evidence of the consent of the Requisite Holders as aforesaid, and upon receipt by the Trustee of the documents described in <u>Sections 9.6</u> and <u>12.4</u> hereof, the Trustee and, if applicable, the Collateral Agent, will join with the Issuer and the Guarantors in the execution of such amended or supplemental indenture or such amended or supplemental Collateral Document unless such amended or supplemental indenture or such amended or supplemental Collateral Document, as applicable, affects the Trustee's own rights, duties, liabilities or immunities under this Indenture or otherwise, in which case the Trustee may in its discretion, but will not be obligated to, enter into such amended or supplemental Indenture or such amended or supplemental Collateral Document, as applicable.

Without the consent of each Holder of Notes affected, an amendment, supplement or waiver may not, with respect to any Notes issued thereunder and held by a nonconsenting Holder:

> (1)    reduce the principal amount of such Notes whose Holders must consent to an amendment;

> (2)    reduce the stated rate of or extend the stated time for payment of interest on any such Note (other than provisions relating to <u>Section 3.5</u> and <u>Section 3.9</u>);

> (3)    reduce the principal of or extend the Stated Maturity of any such Note (other than provisions relating to <u>Section 3.5</u> and <u>Section 3.9</u>);

> (4)    reduce the premium payable upon the redemption of any such Note or change the time at which any such Note may be redeemed, in each case as set forth in <u>Section 5.7</u>;

> (5)    make any such Note payable in currency other than that stated in such Note;

> (6)    impair the right of any Holder to institute suit or to receive payment of principal of and interest on such Holder's Notes on or after the due dates therefor;

(7)      waive a Default or Event of Default with respect to the nonpayment of principal, premium or interest (except pursuant to a rescission of acceleration of the Notes by the Requisite Holders and a waiver of the payment default that resulted from such acceleration);

(8)      release any Guarantor from any of its obligations under its Note Guarantee or this Indenture, except in accordance with the terms of this Indenture; or

(9)      make any change in the amendment or waiver provisions which require the Holders' consent described in this Section 9.2.

Except as expressly provided by this Indenture, without the consent of holders of at least 66⅔% in aggregate principal amount of the Notes then outstanding, no amendment may modify or release the Note Guarantee of any Significant Subsidiary in any manner adverse to the holders of the Notes. In addition, except as expressly provided by this Indenture, without the consent of the holders of at least 66⅔% in aggregate principal amount of Notes then outstanding, no amendment or waiver may release all or substantially all of the Collateral from the Lien of this Indenture and the Collateral Documents with respect to the Notes.

It shall not be necessary for the consent of the Holders under this Indenture to approve the particular form of any proposed amendment, supplement or waiver, but it shall be sufficient if such consent approves the substance thereof.  A consent to any amendment, supplement or waiver under this Indenture by any Holder of the Notes given in connection with a tender or exchange of such Holder's Notes will not be rendered invalid by such tender or exchange.

SECTION 9.3.Compliance with this Indenture.  Every amendment or supplement to this Indenture, any Guarantee and the Notes will be set forth in an amended or supplemental indenture that complies with this Indenture as then in effect.  Every amendment or supplement of a Collateral Document will be set forth in an amendment agreement that complies with the terms hereof and thereof.

SECTION 9.4.Revocation and Effect of Consents and Waivers.  Until an amendment, supplement or waiver becomes effective, a consent to it by a Holder of a Note is a continuing consent by the Holder of a Note and every subsequent Holder of a Note or portion of a Note that evidences the same debt as the consenting Holder's Note, even if notation of the consent or waiver is not made on any Note.  However, any such Holder of a Note or subsequent Holder of a Note may revoke the consent or waiver as to such Holder's Note or portion of its Note if the Trustee receives written notice of revocation before the date the amendment, supplement or waiver becomes effective.  An amendment, supplement or waiver becomes effective in accordance with its terms and thereafter binds every Holder.

The Issuer may, but shall not be obligated to, fix a record date for the purpose of determining the Holders entitled to give their consent or take any other action described above or required or permitted to be taken pursuant to this Indenture.  If a record date is fixed, then notwithstanding the immediately preceding paragraph, those Persons who were Holders at such record date (or their duly designated proxies), and only those Persons, shall be entitled to give such consent or to revoke any consent previously given or to take any such action, whether or not

-130-

such Persons continue to be Holders after such record date.  No such consent shall be valid or effective for more than 120 days after such record date.

SECTION 9.5.Notation on or Exchange of Notes.  The Trustee may place an appropriate notation about an amendment, supplement or waiver on any Note thereafter authenticated.  The Issuer in exchange for all Notes may issue and the Trustee shall, upon receipt of an Issuer Order, authenticate new Notes that reflect the amendment, supplement or waiver.

Failure to make the appropriate notation or issue a new Note will not affect the validity and effect of such amendment, supplement or waiver.

SECTION 9.6.Trustee and Collateral Agent to Sign Amendments.  The Trustee and, if applicable, the Collateral Agent, shall sign any amended or supplemental indenture or any amended or supplemental Collateral Document authorized pursuant to this Article IX if, in the Trustee's or the Collateral Agent's sole discretion, as applicable, the amendment or supplement does not adversely affect the rights, duties, liabilities or immunities of the Trustee or the Collateral Agent, as applicable.  In executing any amended or supplemental indenture or any amended or supplemental Collateral Document, as applicable, the Trustee and/or Collateral Agent, as applicable, will be entitled to receive and shall be provided with and (subject to Sections 7.1 and 7.2 hereof) shall be fully protected in conclusively relying upon, in addition to the documents required by Section 12.2 hereof, an Officer's Certificate and an Opinion of Counsel stating that the execution of such amended or supplemental indenture, or such amended or supplemental Collateral Document, as applicable, is authorized or permitted by this Indenture and is valid, binding and enforceable against the Issuer in accordance with its terms, and that all conditions precedent in this Indenture and in the Collateral Documents to the execution, delivery and performance of such amended or supplemental indenture, or such amended or supplemental Collateral Document, as applicable, have been satisfied.

ARTICLE X

GUARANTEE

SECTION 10.1.        Guarantee.  Subject to the provisions of this Article X, each Guarantor hereby fully, unconditionally and irrevocably guarantees, as primary obligor and not merely as surety, jointly and severally with each other Guarantor, to each Holder of the Notes, and the Trustee the full and punctual payment when due, whether at maturity, by acceleration, by redemption or otherwise, of the principal of, premium, if any, and interest on the Notes and all Note Obligations and other obligations, amounts and liabilities of the Issuer under this Indenture and the other Note Documents (in each case, as amended, restated, amended and restated, supplemented, renewed, extended, consolidated or otherwise modified from time to time) (including, without limitation, all interest and all other amounts accruing after the filing of any petition in bankruptcy, or the commencement of any other proceeding under any Debtor Relief Law relating to the Issuer or any Guarantor, whether or not a claim for Post-Petition Interest is allowed in such proceeding and the obligations under Section 7.7) (all the foregoing being hereinafter collectively called the "Guaranteed Obligations").  Each Guarantor agrees that the Guaranteed Obligations will rank equally in right of payment with other Indebtedness of such Guarantor, except to the extent such other Indebtedness is subordinate to the Guaranteed

Obligations, in which case the obligations of the Guarantors under the Guarantees will rank senior in right of payment to such other Indebtedness.

To evidence its Guarantee set forth in this Section 10.1, each Guarantor hereby agrees that this Indenture shall be executed on behalf of such Guarantor by an Officer of such Guarantor.

Each Guarantor hereby agrees that its Guarantee set forth in this Section 10.1 shall remain in full force and effect notwithstanding the absence of the endorsement of any notation of such Guarantee on the Notes.

If an Officer whose signature is on this Indenture no longer holds that office at the time the Trustee authenticates the Note, the Guarantee shall be valid nevertheless.

Each Guarantor further agrees (to the extent permitted by law) that the Guaranteed Obligations may be extended or renewed, in whole or in part, without notice or further assent from it, and that it will remain bound under this Article X notwithstanding any extension or renewal of any Guaranteed Obligation.

Each Guarantor waives presentation to, demand of payment from and protest to the issuer of any of the Guaranteed Obligations and also waives notice of protest for nonpayment. Each Guarantor waives notice of any default under the Notes or the Guaranteed Obligations.

Each Guarantor further agrees that its Guarantee herein constitutes a Guarantee of payment when due (and not a Guarantee of collection) and waives any right to require that any resort be had by any Holder to any security held for payment of the Guaranteed Obligations.

Except as set forth in Section 10.2, the obligations of each Guarantor hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason (other than payment of the Guaranteed Obligations in full), including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any defense of setoff, counterclaim, recoupment or termination whatsoever or by reason of the invalidity, illegality or unenforceability of the Guaranteed Obligations or otherwise. Without limiting the generality of the foregoing, the Guaranteed Obligations of each Guarantor herein shall not be discharged or impaired or otherwise affected by (a) the failure of any Holder to assert any claim or demand or to enforce any right or remedy against the Issuer or any other person under this Indenture, the Notes or any other agreement or otherwise; (b) any extension or renewal of any thereof; (c) any rescission, waiver, amendment or modification of any of the terms or provisions of this Indenture, the Notes or any other agreement; (d) the release of any security held by any Holder for the Guaranteed Obligations; (e) the failure of any Holder to exercise any right or remedy against any other Guarantor; (f) any change in the ownership of the Issuer; (g) any default, failure or delay, willful or otherwise, in the performance of the Guaranteed Obligations; or (h) any other act or thing or omission or delay to do any other act or thing which may or might in any manner or to any extent vary the risk of any Guarantor or would otherwise operate as a discharge of such Guarantor as a matter of law or equity.

Each Guarantor agrees that its Guarantee herein shall remain in full force and effect until payment in full of all the Guaranteed Obligations or such Guarantor is released from its

-132-

Guarantee in compliance with Section 10.2, Article VIII or Article XII.  Each Guarantor further agrees that its Guarantee herein shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of principal of, premium, if any, interest on any of the Guaranteed Obligations is rescinded or must otherwise be restored by any Holder upon the bankruptcy or reorganization or other proceeding under any Debtor Relief Law in respect of the Issuer, or otherwise.

In furtherance of the foregoing and not in limitation of any other right which any Holder has at law or in equity against any Guarantor by virtue hereof, upon the failure of the Issuer to pay any of the Guaranteed Obligations when and as the same shall become due, whether at maturity, by acceleration, by redemption or otherwise, each Guarantor hereby promises to and will, upon receipt of written demand by the Trustee, forthwith pay, or cause to be paid, in cash, to the Holders or the Trustee on behalf of the Holders an amount equal to the sum of (i) the unpaid amount of such Guaranteed Obligations then due and owing and (ii) accrued and unpaid interest on such Guaranteed Obligations then due and owing (but only to the extent not prohibited by law) (including Post-Petition Interest accruing during any proceeding under any Debtor Relief Law with respect to the Issuer or any Guarantor, whether or not a claim for Post-Petition Interest is allowed in such proceeding).

Each Guarantor further agrees that, as between such Guarantor, on the one hand, and the Holders, on the other hand, (x) the maturity of the Guaranteed Obligations guaranteed hereby may be accelerated as provided in this Indenture for the purposes of its Guarantee herein, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the Guaranteed Obligations guaranteed hereby and (y) in the event of any such declaration of acceleration of such Guaranteed Obligations, such Guaranteed Obligations (whether or not due and payable) shall forthwith become due and payable by the Guarantor for the purposes of this Guarantee.

Each Guarantor also agrees to pay any and all fees, costs and expenses (including attorneys' fees and expenses) incurred by the Trustee or the Holders in enforcing any rights under this Section.

SECTION 10.2.        Limitation on Liability; Termination, Release and Discharge.

(a)      Any term or provision of this Indenture to the contrary notwithstanding, the obligations of each Guarantor hereunder will be limited to the maximum amount as will, after giving effect to all other contingent and fixed liabilities of such Guarantor and after giving effect to any collections from or payments made by or on behalf of any other Guarantor in respect of the obligations of such other Guarantor under its Guarantee or pursuant to its contribution obligations under this Indenture, result in the obligations of such Guarantor under its Guarantee not constituting a fraudulent conveyance or fraudulent transfer under federal, foreign or state law and not otherwise being void or voidable under any similar laws affecting the rights of creditors generally.

(b)      Any Note Guarantee of a Guarantor shall be automatically and unconditionally released and discharged upon:

-133-

(1)     a sale or other disposition (including by way of consolidation, merger or amalgamation) of the Capital Stock of such Guarantor or the sale or disposition of all or substantially all the assets of the Guarantor to a Person other than to the Issuer or a Restricted Subsidiary and as otherwise permitted by this Indenture;

(2)     the designation in accordance with this Indenture of the Guarantor as an Unrestricted Subsidiary or the occurrence of any event after which the Guarantor is no longer a Restricted Subsidiary;

(3)     defeasance or discharge of the Notes pursuant to Article VIII or Article XII;

(4)     to the extent that such Guarantor is not an Immaterial Subsidiary solely due to the operation of clause (i) of the definition of "Immaterial Subsidiary," upon the release of the guarantee referred to in such clause;

(5)     the occurrence of any event or condition pursuant to which the Intercreditor Agreement requires the release of the Note Guarantee of such Guarantor; or

(6)     upon the achievement of Investment Grade Status by the Notes; provided, that such Note Guarantee shall be reinstated upon the Reversion Date.

SECTION 10.3.     Right of Contribution.  Each Guarantor hereby agrees that to the extent that any Guarantor shall have paid more than its proportionate share of any payment made on the obligations under the Guarantees, such Guarantor shall be entitled to seek and receive contribution from and against the Issuer or any other Guarantor who has not paid its proportionate share of such payment.  The provisions of this Section 10.3 shall in no respect limit the obligations and liabilities of each Guarantor to the Trustee and the Holders and each Guarantor shall remain liable to the Trustee and the Holders for the full amount guaranteed by such Guarantor hereunder.

SECTION 10.4.     No Subrogation.  Notwithstanding any payment or payments made by each Guarantor hereunder, no Guarantor shall be entitled to be subrogated to any of the rights of the Trustee or any Holder against the Issuer or any other Guarantor or any collateral security or guarantee or right of offset held by the Trustee or any Holder for the payment of the Guaranteed Obligations, nor shall any Guarantor seek or be entitled to seek any contribution or reimbursement from the Issuer or any other Guarantor in respect of payments made by such Guarantor hereunder, until all amounts owing to the Trustee and the Holders by the Issuer on account of the Guaranteed Obligations are paid in full.  If any amount shall be paid to any Guarantor on account of such subrogation rights at any time when all of the Guaranteed Obligations shall not have been paid in full, such amount shall be held by such Guarantor in trust for the Trustee and the Holders, segregated from other funds of such Guarantor, and shall, forthwith upon receipt by such Guarantor, be turned over to the Trustee in the exact form received by such Guarantor (duly indorsed by such Guarantor to the Trustee, if required), to be applied against the Guaranteed Obligations.

-134-

ARTICLE XI

COLLATERAL AND RANKING OF NOTE LIENS

SECTION 11.1.        Security Documents.

The payment of the principal of and interest and premium, if any, on the Notes when due, whether on an Interest Payment Date, at maturity, by acceleration, repurchase, redemption or otherwise and whether by the Issuer pursuant to the Notes or by the Guarantors pursuant to the Note Guarantees, the payment of all other Note Obligations and the performance of all other obligations of the Issuer and the Guarantors under this Indenture, the Notes, the Note Guarantees and the Collateral Documents are secured as provided in the Collateral Documents which the Issuer and the Subsidiary Guarantors have entered into and will be secured by Collateral Documents hereafter delivered as required or permitted by this Indenture. Subject to the terms of the Intercreditor Agreement, the Issuer shall, and shall cause each Restricted Subsidiary to, and each Restricted Subsidiary shall, make all filings (including filings of continuation statements and amendments to UCC financing statements that may be necessary to continue the effectiveness of such UCC financing statements) and all other actions as are necessary or required by the Collateral Documents to maintain (at the sole cost and expense of the Issuer and its Restricted Subsidiaries) the Liens created by the Collateral Documents on the Collateral (other than with respect to any Collateral the Lien on which is not required to be perfected under the Collateral Documents) as a perfected Lien, subject only to Permitted Liens.

SECTION 11.2.        Collateral Agent.

(a)        The Collateral Agent shall have all the rights and protections provided in the Collateral Documents.

(b)        Subject to Section 7.1, neither the Trustee nor the Collateral Agent nor any of their respective officers, directors, employees, attorneys or agents will be responsible or liable for the existence, genuineness, value or protection of any Collateral, for the legality, enforceability, effectiveness or sufficiency of the Collateral Documents,  for obtaining or maintaining insurance on any Collateral, for the creation, perfection, priority, sufficiency, continuation, maintenance or protection of any Lien, or any defect or deficiency as to any such matters, or for any failure to demand, collect, foreclose or realize upon or otherwise enforce any Lien under this Indenture or the Collateral Documents or any delay in doing so.  Beyond the exercise of reasonable care in the custody thereof, the Trustee shall have no duty as to any Collateral in its possession or control or in the possession or control of any agent or bailee or any income thereon or as to preservation of rights against prior parties or any other rights pertaining thereto and the Trustee, in its capacity as such, shall not be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any time or times or otherwise perfecting or maintaining the perfection of any Lien on the Collateral. The Trustee and the Collateral Agent shall be deemed to have exercised reasonable care in the custody of the Collateral in its possession if the Collateral is accorded treatment equal to that which it accords its own property and shall not be liable or responsible for any loss or diminution in the value of any of the Collateral, by reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by the Trustee in good faith.

(c)     Subject to the Collateral Documents and the Intercreditor Agreement, (i) the Trustee shall direct the Collateral Agent and (ii) except as directed by the Trustee, as required or permitted by this Indenture or pursuant to the Collateral Documents, the holders acknowledge that Collateral Agent will not be obligated:

(1)     to act upon directions purported to be delivered to it by any other Person;

(2)     to foreclose upon or otherwise enforce any Note Lien; or

(3)     to take any other action whatsoever with regard to any or all of the Note Liens, Collateral Documents or Collateral.

(d)     The Holders agree that the Collateral Agent shall be entitled to the rights, privileges, protections, immunities, indemnities and benefits provided to the Collateral Agent by the Collateral Documents.  Furthermore, each holder of a Note, by accepting such Note, consents to the terms of and authorizes and directs the Trustee (in each of its capacities) and the Collateral Agent to enter into and perform the Intercreditor Agreement and the Collateral Documents in each of its capacities thereunder.

(e)     The Collateral Agent will be accountable only for amounts that it actually receives as a result of the enforcement of the Liens securing Obligations under this Indenture or the Collateral Documents.

(f)     If the Issuer (i) Incurs ABL Priority Obligations, MDL Priority Obligations, Term Priority Obligations or 21C Priority Obligations in compliance with this Indenture at any time when the Intercreditor Agreement is not in effect or at any time when Indebtedness constituting ABL Priority Obligations, MDL Priority Obligations, Term Priority Obligations or 21C Priority Obligations entitled to the benefit of an existing intercreditor agreement is concurrently retired, and (ii) delivers to the Collateral Agent an Officer's Certificate so stating and requesting the Collateral Agent to enter into an intercreditor agreement (on substantially the same terms as the Intercreditor Agreement in effect on the Issue Date) in favor of a designated agent or representative for the holders of the ABL Priority Obligations, MDL Priority Obligations, Term Priority Obligations or 21C Priority Obligations so Incurred, the holders acknowledge that the Collateral Agent is hereby authorized and directed to enter into such intercreditor agreement, bind the holders on the terms set forth therein and perform and observe its obligations thereunder.

(g)     At all times when the Trustee is not itself the Collateral Agent, the Issuer shall deliver to the Trustee copies of all Collateral Documents delivered to the Collateral Agent and copies of all documents delivered to the Collateral Agent pursuant to this Indenture and the Collateral Documents.

SECTION 11.3.     Authorization of Actions to Be Taken.

(a)     Each holder of Notes, by its acceptance thereof, consents and agrees to the terms of each Collateral Document and the Intercreditor Agreement as originally in effect and as amended, supplemented or replaced from time to time in accordance with its terms and the terms of this Indenture, appoints the Collateral Agent as its collateral agent, authorizes and directs the

-136-

Trustee and the Collateral Agent to enter into the Collateral Documents to which it is a party, authorizes and empowers the Trustee to direct the Collateral Agent to enter into, and the Collateral Agent to execute and deliver, the Intercreditor Agreement and authorizes and empowers the Trustee and the Collateral Agent to bind the Holders and other holders of Obligations as set forth in the Collateral Documents to which it is a party and the Intercreditor Agreement and to perform its obligations and exercise its rights and powers thereunder.

(b)     The Trustee is authorized and empowered to receive for the benefit of the Holders any funds collected or distributed under the Collateral Documents to which the Trustee is a party and to make further distributions of such funds to the Holders according to the provisions of this Indenture.

(c)     Subject to the provisions of Section 7.1 and Section 7.2 hereof, the Intercreditor Agreement and the Collateral Documents, the Trustee may, in its sole discretion and without the consent of the Holders, direct, on behalf of the Holders, the Collateral Agent to take all actions (in each case to the extent the Collateral Agent is permitted to take such action pursuant to the terms hereof) it deems necessary or appropriate in order to:

(1)     foreclose upon or otherwise enforce any or all of the Note Liens;

(2)     enforce any of the terms of the Collateral Documents to which the Collateral Agent or Trustee is a party; and/or

(3)     collect and receive payment of any and all Note Obligations.

Subject to the terms of the Intercreditor Agreement, the Trustee is authorized and empowered to institute and maintain, or direct the Collateral Agent to institute and maintain, such suits and proceedings as it may deem expedient to protect or enforce the Note Liens or the Collateral Documents to which the Collateral Agent or Trustee is a party or to prevent any impairment of Collateral by any acts that may be unlawful or in violation of the Collateral Documents to which the Collateral Agent or Trustee is a party or this Indenture, and such suits and proceedings as the Trustee or the Collateral Agent may deem expedient to preserve or protect its interests and the interests of the Holders in the Collateral, including power to institute and maintain suits or proceedings to restrain the enforcement of or compliance with any legislative or other governmental enactment, rule or order that may be unconstitutional or otherwise invalid if the enforcement of, or compliance with, such enactment, rule or order would impair the Lien hereunder or be prejudicial to the interests of Holders, the Trustee or the Collateral Agent.

SECTION 11.4.     Release of Collateral.

(a)     Collateral may be released from the Lien created by the Collateral Documents to secure the Notes and obligations under this Indenture at any time or from time to time in accordance with the provisions of the Intercreditor Agreement or as provided hereby or in the Collateral Documents. The applicable assets included in the Collateral shall be automatically released from the Liens securing the Notes, and the applicable Guarantor shall be automatically released from its obligations under this Indenture and the Security Documents, under any one or

more of the following circumstances or any applicable circumstance as provided in the Intercreditor Agreement or the Collateral Documents:

(1)     to enable the Issuer or Guarantor to consummate the disposition of property or assets to a Person that is not the Issuer or a Guarantor to the extent not prohibited under Section 3.5 and otherwise in compliance with this Indenture;

(2)     in respect of the property and assets of a Guarantor, upon the designation of such Guarantor to be an Unrestricted Subsidiary in accordance with Sections 3.3 and 3.20 and the definition of "Unrestricted Subsidiary," and such Guarantor shall be automatically released from its obligations hereunder and under the Collateral Documents;

(3)     in respect of the property or assets of the Issuer, upon the release or discharge of Note Obligations in accordance with this Indenture;

(4)     in respect of the property and assets of a Guarantor, upon the release or discharge of the Note Guarantee of such Guarantor in accordance with this Indenture;

(5)     as described under Article IX; and

(6)     if and as required by the Collateral Documents or the Intercreditor Agreement.

In addition, the Liens granted pursuant to the Collateral Documents securing the Note Obligations shall automatically terminate and/or be released all without delivery of any instrument or performance of any act by any party, and all rights to the Collateral shall revert to the applicable Grantor, as of the date upon (i) all the Obligations under the Notes and this Indenture (other than contingent or unliquidated obligations or liabilities not then due) have been paid in full in cash or immediately available funds, (ii) a Legal Defeasance or Covenant Defeasance or discharge under Article XII, or (iii) the holders of at least 66⅔% in aggregate principal amount of the Notes then outstanding consent to the termination of the Collateral Documents.

In connection with any termination or release pursuant to this Section 11.4(a), the Collateral Agent shall execute and deliver to any Grantor, at such Grantor's expense, all documents that such Grantor shall reasonably request to evidence such termination or release (including, without limitation, UCC termination statements), and will duly assign and transfer to such Grantor, such of the [Pledged Collateral (as defined in the Security Agreement)] that may be in the possession of the Collateral Agent and has not theretofore been sold or otherwise applied or released pursuant to this Indenture or the Collateral Documents. Any execution and delivery of documents pursuant to this Section 11.4(a) shall be without recourse to or warranty by the Collateral Agent. In connection with any release pursuant to this Section 11.4(a), the Grantors shall be permitted to take any action in connection therewith consistent with such release including, without limitation, the filing of UCC termination statements.

Upon the receipt of an Officer's Certificate from the Issuer, as described in Section 11.4(b) below, if applicable, and any necessary or proper instruments of termination, satisfaction

-138-

or release prepared by the Issuer, the Collateral Agent shall execute, deliver or acknowledge such instruments or releases to evidence the release of any Collateral permitted to be released pursuant to this Indenture or the Collateral Documents or the Intercreditor Agreement.

(b)      Notwithstanding anything herein to the contrary, in connection with any release of Collateral pursuant to Section 11.4(a), the Collateral Agent shall not be required to execute, deliver or acknowledge any instruments of termination, satisfaction or release unless, in each case, an Officer's Certificate and Opinion of Counsel certifying that all conditions precedent, including, without limitation, this Section 11.4, have been met and stating under which of the circumstances set forth in Section 11.4(a) above the Collateral is being released have been delivered to the Collateral Agent and the Trustee on or prior to the date on which the Collateral Agent executes any such instrument.

(c)      Notwithstanding anything herein to the contrary, at any time when an Event of Default has occurred and the maturity of the Notes has been accelerated (whether by declaration or otherwise), the Trustee shall deliver a notice of such acceleration to the Collateral Agent, and no release of Collateral pursuant to the provisions of this Indenture or the Collateral Documents will be effective as against the Holders, except as otherwise provided in the Intercreditor Agreement.

(d)      To the extent necessary and for so long as required for the Issuer or any Subsidiary not to be subject to any requirement pursuant to Rule 3-16 of Regulation S-X under the Securities Act to file separate financial statements with the SEC (or any other governmental agency), the Capital Stock of the Issuer or any Subsidiary shall not be included in the Collateral with respect to the respective Notes so affected and shall not be subject to the Liens securing such Notes and the Note Obligations in accordance with and only to the extent provided in the Collateral Documents.

SECTION 11.5.      [Reserved.]

SECTION 11.6.      [Reserved.]

SECTION 11.7.      Powers Exercisable by Receiver or Trustee.  In case the Collateral shall be in the possession of a receiver or trustee, lawfully appointed, the powers conferred in this Article XI upon the Issuer or the Guarantors with respect to the release, sale or other disposition of such property may be exercised by such receiver or trustee, and an instrument signed by such receiver or trustee shall be deemed the equivalent of any similar instrument of the Issuer or the Guarantors or of any officer or officers thereof required by the provisions of this Article XI; and if the Trustee, the Collateral Agent or a nominee of the Trustee or the Collateral Agent shall be in the possession of the Collateral under any provision of this Indenture, then such powers may be exercised by the Trustee, the Collateral Agent or a nominee of the Trustee or the Collateral Agent, as the case may be.

SECTION 11.8.      Release Upon Termination of the Issuer's Obligations.  In the event (i) that the Issuer delivers to the Trustee, in form and substance acceptable to the Trustee, an Officer's Certificate and Opinion of Counsel certifying that all the obligations under this Indenture, the Notes and the Collateral Documents have been satisfied and discharged by the

payment in full in cash of the Issuer's obligations under the Notes, this Indenture and the Collateral Documents, and all such obligations have been so satisfied, in each case other than inchoate indemnity obligations, or (ii) a discharge occurs under Article XII or a Legal Defeasance or Covenant Defeasance of this Indenture occurs under Article VIII, the Trustee shall deliver to the Issuer and the Collateral Agent a notice stating that the Trustee, on behalf of the Holders, disclaims and gives up any and all rights it has in or to the Collateral, and any rights it has under the Collateral Documents, and upon receipt by the Collateral Agent of such notice, the Collateral Agent shall be deemed not to hold a Lien in the Collateral on behalf of the Trustee and the Holders, and the Trustee shall (or shall direct the Collateral Agent to) do or cause to be done all acts reasonably necessary to release such Lien as soon as is reasonably practicable.

SECTION 11.9.    Relative Rights.

The Intercreditor Agreement defines the relative rights, as lienholders, of holders of Liens securing the ABL Priority Obligations, holders of Liens securing the MDL Priority Obligations, holders of Liens securing the Term Priority Obligations, holders of Liens securing the 21C Priority Obligations and holders of Liens securing the Note Obligations. Nothing in this Indenture or the Intercreditor Agreement will:

(a)    impair, as between the Issuer or any other obligor under this Indenture and Holders, the obligation of the Issuer, which is absolute and unconditional, to pay principal of, premium and interest on Notes in accordance with their terms or to perform any other obligation of the Issuer or any other obligor under this Indenture, the Notes, the Note Guarantees and the Collateral Documents;

(b)    restrict the right of any Holder to sue for payments that are then due and owing, in a manner not inconsistent with the provisions of the Intercreditor Agreement;

(c)    prevent the Trustee, the Collateral Agent or any Holder from exercising against the Issuer or any other obligor any of its other available remedies upon a Default or Event of Default (other than its rights as a secured party, which are subject to the terms of the Intercreditor Agreement); or

(d)    restrict the right of the Trustee, the Collateral Agent or any Holder:

(1)    to make, support or oppose any request for an order for dismissal, abstention or conversion in any insolvency or liquidation proceeding;

(2)    to make, support or oppose, in any insolvency or liquidation proceeding, any request for an order extending or terminating any period during which the debtor (or any other Person) has the exclusive right to propose a plan of reorganization or other dispositive restructuring or liquidation plan therein;

(3)    to seek the creation of, or appointment to, any official committee representing creditors (or certain of the creditors) in any insolvency or liquidation proceedings and, if appointed, to serve and act as a member of such committee without being in any respect restricted or bound by, or liable for, any of the obligations under this Article XI;

-140-

(4)     to seek or object to the appointment of any professional person to serve in any capacity in any insolvency or liquidation proceeding or to support or object to any request for compensation made by any professional person or others therein;

(5)     to make, support or oppose any request for order appointing a trustee or examiner in any insolvency or liquidation proceedings; or

(6)     otherwise to make, support or oppose any request for relief in any insolvency or liquidation proceeding that it is permitted by law to make, support or oppose, as if it were a holder of unsecured claims;

(x)     as to any matter relating to any plan of reorganization; or

(y)     any restructuring or liquidation plan or as to any matter relating to the administration of the estate or the disposition of the case or proceeding (in each case except as set forth in the Intercreditor Agreement).

ARTICLE XII

SATISFACTION AND DISCHARGE

SECTION 12.1.     Satisfaction and Discharge.  This Indenture will be discharged and will cease to be of further effect as to all Notes issued hereunder, when:

(a)     either:

(1)     all Notes that have been authenticated and delivered, except lost, stolen or destroyed Notes that have been replaced or paid and Notes for whose payment money has theretofore been deposited in trust, have been delivered to the Trustee for cancellation; or

(2)     all such Notes not theretofore delivered to the Trustee for cancellation (i) have become due and payable by reason of the making of a notice of redemption or otherwise or (ii) will become due and payable within one year at their Stated Maturity or (iii) are to be called for redemption within one year under arrangements satisfactory to the Trustee for the giving of notice of redemption by the Trustee, in the name, and at the expense of the Issuer;

(b)     the Issuer has irrevocably deposited or caused to be deposited with the Trustee as trust funds in trust solely for the benefit of the Holders, cash in U.S. dollars, U.S. Government Obligations, or a combination thereof, in such amounts as will be sufficient, without consideration of any reinvestment of interest, to pay and discharge the entire Indebtedness on such Notes not previously delivered to the Trustee for cancellation, for principal, premium, if any, and interest to the date of deposit (in the case of Notes that have become due and payable), or to the Stated Maturity or redemption date, as the case may be;

(c)     no Default or Event of Default (other than that resulting from borrowing funds to be applied to make such deposit and the granting of Liens in connection therewith) with respect to this Indenture or the Notes issued hereunder shall have occurred and be continuing on the date

-141-

of such deposit or shall occur as a result of such deposit and such deposit will not result in a breach or violation of, or constitute a default under the Credit Facilities or any other material agreement or instrument (other than this Indenture) to which the Issuer or any Guarantor is a party or by which the Issuer or any Guarantor is bound;

(d) the Issuer or any Guarantor has paid or caused to be paid all sums payable by the Issuer under this Indenture; and

(e) the Issuer has delivered irrevocable instructions to the Trustee to apply the deposited money toward the payment of such Notes issued hereunder at maturity or the redemption date, as the case may be.

In addition, the Issuer shall deliver an Officer's Certificate and an Opinion of Counsel to the Trustee stating that all conditions precedent to satisfaction and discharge have been satisfied.

Notwithstanding the satisfaction and discharge of this Indenture, if money has been deposited with the Trustee pursuant to clause (a)(2) of this Section 12.1, the provisions of Sections 12.2 and 8.6 hereof will survive.

SECTION 12.2.   Application of Trust Money.   Subject to the provisions of Section 8.6 hereof, all money or U.S. Government Obligations deposited with the Trustee pursuant to Section 12.1 hereof shall be held in trust and applied by it, in accordance with the provisions of the Notes and this Indenture, to the payment, either directly or through any Paying Agent (including the Issuer acting as its own Paying Agent) as the Trustee may determine, to the Persons entitled thereto, of the principal (and premium) and interest for whose payment such money or U.S. Government Obligations has been deposited with the Trustee; but such money or U.S. Government Obligations need not be segregated from other funds except to the extent required by law.

If the Trustee or Paying Agent is unable to apply any money or U.S. Government Obligations in accordance with Section 12.1 hereof by reason of any legal proceeding or by reason of any order or judgment of any court or Governmental Authority enjoining, restraining or otherwise prohibiting such application, the Issuer's and any Guarantor's obligations under this Indenture and the Notes shall be revived and reinstated as though no deposit had occurred pursuant to Section 12.1 hereof; provided, that if the Issuer has made any payment of principal of, premium or interest on, any Notes because of the reinstatement of its obligations, the Issuer shall be subrogated to the rights of the Holders of such Notes to receive such payment from the money or U.S. Government Obligations held by the Trustee or Paying Agent.

ARTICLE XIII

MISCELLANEOUS

SECTION 13.1.   Notices.   Any notice, request, direction, consent or communication made pursuant to the provisions of this Indenture or the Notes shall be in writing and delivered in person, sent by facsimile, sent by electronic mail in pdf format, delivered by commercial courier service or mailed by first-class mail, postage prepaid, addressed as follows:

-142-

if to the Issuer or to any Guarantor:
21st Century Oncology, Inc.
2270 Colonial Blvd.
Fort Myers, Florida, 33907
Attention:  Corporate Secretary

with a copy to:
Kirkland & Ellis LLP
601 Lexington Ave
New York, New York 10022
Attention:  Joshua Korff, Esq.
Facsimile:  (212) 446-4900

if to the Trustee:
at its corporate trust office, which corporate trust office for purposes of this Indenture is
at the date hereof located at:
Wilmington Savings Fund Society, FSB, as Trustee
500 Delaware Avenue
Wilmington, Delaware 19801
Attention:  Geoffrey J. Lewis
Telecopy:  (302) 421-9137

The Issuer or the Trustee by written notice to the other may designate additional or different addresses for subsequent notices or communications.

Any notice or communication to the Issuer or the Guarantors shall be deemed to have been given or made as of the date so delivered if personally delivered or if delivered electronically, in pdf format; when receipt is acknowledged, if telecopied; and seven calendar days after mailing if sent by registered or certified mail, postage prepaid (except that a notice of change of address shall not be deemed to have been given until actually received by the addressee).  Any notice or communication to the Trustee shall be deemed delivered upon receipt.

Any notice or communication sent to a Holder shall be mailed to the Holder at the Holder's address as it appears in the Notes Register and shall be sufficiently given if so sent within the time prescribed.

Failure to mail a notice or communication to a Holder or any defect in it shall not affect its sufficiency with respect to other Holders.  If a notice or communication is sent in the manner provided above, it is duly given, whether or not the addressee receives it, except that notices to the Trustee shall be effective only upon receipt.

Notwithstanding any other provision of this Indenture or any Note, where this Indenture or any Note provides for notice of any event (including any notice of redemption or purchase) to a Holder of a Global Note (whether by mail or otherwise), such notice shall be sufficiently given if given to DTC (or its designee) pursuant to the standing instructions from DTC or its designee.

SECTION 13.2.        Certificate and Opinion as to Conditions Precedent.   Upon any request or application by the Issuer or any of the Guarantors to the Trustee to take or refrain from taking any action under this Indenture, the Issuer or such Guarantor, as the case may be, shall furnish to the Trustee:

(1)        an Officer's Certificate in form satisfactory to the Trustee (which shall include the statements set forth in Section 12.3 hereof) stating that, in the opinion of the signers, all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been satisfied; and

(2)        an Opinion of Counsel in form satisfactory to the Trustee (which shall include the statements set forth in Section 12.3 hereof) stating that, in the opinion of such counsel, all such conditions precedent have been satisfied and all covenants have been complied with.

SECTION 13.3.        Statements Required in Certificate or Opinion.   Each certificate or opinion with respect to compliance with a covenant or condition provided for in this Indenture:

(1)        a statement that the individual making such certificate or opinion has read such covenant or condition;

(2)        a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(3)        a statement that, in the opinion of such individual, he has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(4)        a statement as to whether or not, in the opinion of such individual, such covenant or condition has been complied with.

In giving such Opinion of Counsel, counsel may rely as to factual matters on an Officer's Certificate or on certificates of public officials.

SECTION 13.4.        When Notes Disregarded.   In determining whether the Holders of the required aggregate principal amount of Notes have concurred in any direction, waiver or consent, Notes owned by the Issuer or any Guarantor, but not any Affiliate thereof, shall be disregarded and deemed not to be outstanding, except that, for the purpose of determining whether the Trustee shall be protected in relying on any such direction, waiver or consent, only Notes which a Trust Officer of the Trustee actually knows are so owned shall be so disregarded. Also, subject to the foregoing, only Notes outstanding at the time shall be considered in any such determination.

SECTION 13.5.        Rules by Trustee, Paying Agent and Registrar.   The Trustee may make reasonable rules for action by, or at meetings of, Holders. The Registrar and the Paying Agent may make reasonable rules for their functions.

SECTION 13.6.    Legal Holidays.  A "Legal Holiday" is a Saturday, a Sunday or other day on which commercial banking institutions are authorized or required to be closed in New York, New York or the state of the place of payment.  If a payment date or redemption date is a Legal Holiday, payment shall be made on the next succeeding day that is not a Legal Holiday, and no interest shall accrue for the intervening period.  If a regular record date is a Legal Holiday, the record date shall not be affected.

SECTION 13.7.    Governing Law.  THIS INDENTURE, THE NOTES AND THE GUARANTEES SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

SECTION 13.8.    Jurisdiction.  The Issuer and the Guarantors agree that any suit, action or proceeding against the Issuer or any Guarantor brought by any Holder or the Trustee arising out of or based upon this Indenture, the Guarantee or the Notes may be instituted in any state or Federal court in the Borough of Manhattan, New York, New York, and any appellate court from any thereof, and each of them irrevocably submits to the non-exclusive jurisdiction of such courts in any suit, action or proceeding.  The Issuer and the Guarantors irrevocably waive, to the fullest extent permitted by law, any objection to any suit, action, or proceeding that may be brought in connection with this Indenture, the Guarantee or the Notes, including such actions, suits or proceedings relating to securities laws of the United States of America or any state thereof, in such courts whether on the grounds of venue, residence or domicile or on the ground that any such suit, action or proceeding has been brought in an inconvenient forum.  The Issuer and the Guarantors agree that final judgment in any such suit, action or proceeding brought in such court shall be conclusive and binding upon the Issuer or the Guarantors, as the case may be, and may be enforced in any court to the jurisdiction of which the Issuer or the Guarantors, as the case may be, are subject by a suit upon such judgment.

SECTION 13.9.    Waivers of Jury Trial.  **EACH OF THE ISSUER, THE GUARANTORS AND THE TRUSTEE HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE, THE NOTES OR THE GUARANTEES AND FOR ANY COUNTERCLAIM THEREIN.**

SECTION 13.10.    USA PATRIOT Act.  The parties hereto acknowledge that in accordance with Section 326 of the USA PATRIOT Act, the Trustee, like all financial institutions and in order to help fight the funding of terrorism and money laundering, is required to obtain, verify, and record information that identifies each person or legal entity that establishes a relationship or opens an account.  The parties to this Indenture agree that they will provide the Trustee with such information as it may request in order to satisfy the requirements of the USA PATRIOT Act.

SECTION 13.11.    No Recourse Against Others.  No director, officer, employee, incorporator or shareholder of the Issuer or any of their respective Subsidiaries or Affiliates, or such (other than the Issuer and the Guarantors), shall have any liability for any obligations of the Issuer or the Guarantors under the Notes, the Guarantees or this Indenture or for any claim based

-145-

on, in respect of, or by reason of such obligations or their creation. Each Holder by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes. Such waiver may not be effective to waive liabilities under the federal securities laws and it is the view of the SEC that such a waiver is against public policy.

SECTION 13.12.     Successors. All agreements of the Issuer and each Guarantor in this Indenture and the Notes shall bind their respective successors. All agreements of the Trustee in this Indenture shall bind its successors.

SECTION 13.13.     Multiple Originals. The parties may sign any number of copies of this Indenture. Each signed copy shall be an original, but all of them together represent the same agreement. The exchange of copies of this Indenture and of signature pages by facsimile or PDF transmission shall constitute effective execution and delivery of this Indenture as to the parties hereto and may be used in lieu of the original Indenture for all purposes. Signatures of the parties hereto transmitted by facsimile or PDF shall be deemed to be their original signatures for all purposes.

SECTION 13.14.     Table of Contents; Headings.    The table of contents, cross-reference table and headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not intended to be considered a part hereof and shall not modify or restrict any of the terms or provisions hereof.

SECTION 13.15.     Force Majeure. In no event shall the Trustee be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services, it being understood that the Trustee shall use reasonable best efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

SECTION 13.16.     Severability. In case any provision in this Indenture or in the Notes shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

[Signature on following pages]

-146-

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly executed as of the date first above written.

21st CENTURY ONCOLOGY, INC., as Issuer


By: _____
Name:
Title:

GUARANTORS
21C East Florida, LLC
21st Century Oncology Management Services, Inc.
21st Century Oncology of Alabama, LLC
21st Century Oncology of Harford County, Maryland LLC
21st Century Oncology of Jacksonville, LLC
21st Century Oncology of Kentucky, LLC
21st Century Oncology of New Jersey, Inc.
21st Century Oncology of Pennsylvania, Inc.
21st Century Oncology of Prince Georges County, Maryland, LLC
21st Century Oncology of South Carolina, LLC
21st Century Oncology of Washington, LLC
21st Century Oncology Services, LLC
21st Century Oncology Holdings, Inc.
21st Century Oncology, LLC
AHLC, LLC
American Consolidated Technologies, L.L.C.
Arizona Radiation Therapy Management Services, Inc.
Asheville CC, LLC
Atlantic Urology Clinics, LLC
Aurora Technology Development, LLC
Berlin Radiation Therapy Treatment Center, LLC
California Radiation Therapy Management Services, Inc.
Carepoint Health Solutions, LLC
Carolina Radiation and Cancer Treatment Center, LLC
Carolina Regional Cancer Center, LLC
Derm-Rad Investment Company, LLC
Devoto Construction of Southwest Florida, Inc.
Financial Services of Southwest Florida, LLC
Fountain Valley & Anaheim Radiation Oncology Centers, Inc.
Gettysburg Radiation, LLC
Goldsboro Radiation Therapy Services, LLC
Jacksonville Radiation Therapy Services, LLC
Maryland Radiation Therapy Management Services, LLC
Michigan Radiation Therapy Management Services, Inc.

21C – PIK Toggle Notes Indenture

Nevada Radiation Therapy Management Services, Incorporated
New England Radiation Therapy Management Services, Inc.
New York Radiation  Therapy Management Services, LLC
North Carolina Radiation Therapy Management Services, LLC
OnCure Holdings, Inc.
OnCure Medical Corp.
Phoenix Management Company,  LLC
Radiation Therapy School For Radiation Therapy Technology, Inc.
Radiation Therapy Services International, Inc.
RVCC, LLC
Sampson Accelerator, LLC
Sampson Simulator, LLC
U.S. Cancer Care, Inc.
USCC Florida Acquisition LLC
West Virginia Radiation Therapy Services, Inc.

By:

Name:

Title:

Palms West Radiation Therapy, L.L.C.

By:        21st Century Oncology, LLC
           Its Sole Member

By:

Name:

Title:

21C – PIK Toggle Notes Indenture

21st Century of Florida Acquisition, LLC


By: _____
Name:
Title:

WILMINGTON SAVINGS FUND SOCIETY,
FSB, as Trustee and as Collateral Agent

By: _____
     Name:
     Title:

**EXHIBIT A**

**[FORM OF FACE OF GLOBAL RESTRICTED NOTE]**

[Applicable Restricted Notes Legend]
[Depository Legend, if applicable]
[OID Legend, if applicable]
[Temporary Regulation S Legend, if applicable]
[Intercreditor Agreement Legend]

No. [___]

Principal Amount $[_____] [as revised by the Schedule of Increases and Decreases in Global Note attached hereto][7]
CUSIP NO.

21st CENTURY ONCOLOGY, INC.

10.00% / 12.00% Senior Secured PIK Toggle Notes due 2023

21st Century Oncology, Inc., a Florida corporation ("Issuer"), promises to pay to [Cede & Co.],[8] or its registered assigns, the principal sum of _____ Dollars, [as revised by the Schedule of Increases and Decreases in Global Note attached hereto],[9] on [   ].

Interest Payment Dates:  [  ] and [  ], commencing on [  ], 2018

Record Dates: [  ] and [  ]

Additional provisions of this Note are set forth on the other side of this Note.

---

[7]     Insert in Global Notes only.
[8]     Insert in Global Notes only.
[9]     Insert in Global Notes only.

A-1

IN WITNESS WHEREOF, the Issuer has caused this instrument to be duly executed.

21st CENTURY ONCOLOGY, INC.

By: _____

Name:

Title:

TRUSTEE CERTIFICATE OF AUTHENTICATION

This Note is one of the 10.00% / 12.00% Senior Secured PIK Toggle Notes due 2023 referred to in the within-mentioned Indenture.

[          ]
as Trustee


By:  _____
        Authorized Signatory:


Dated:  _____

A-3

[FORM OF REVERSE SIDE OF NOTE]
21st CENTURY ONCOLOGY, INC.
10.00% / 12.00% SENIOR SECURED PIK TOGGLE NOTES DUE 2023

Capitalized terms used herein and not defined herein have the meanings ascribed thereto in the Indenture.

1.      Interest

(a)      The Issuer promises to pay interest on the principal amount of this Note at the per annum rate and in the form set forth below from the Issue Date until maturity.  The Issuer will pay interest semi-annually in arrears on [    ] and [    ] of each year or, if any such day is not a Business Day, on the next succeeding Business Day (each, an "Interest Payment Date") and on the scheduled maturity date of the Notes or, if earlier, on the date of any acceleration of the Notes.  Interest on the Notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from the date of issuance; provided, that if there is no existing Default in the payment of interest and if this Note is authenticated between a record date referred to on the face hereof and the next succeeding Interest Payment Date, interest shall accrue from such next succeeding Interest Payment Date; provided, further, that the first Interest Payment Date shall be [   ], 2018.

(b)      Interest on the Notes will be payable in kind ("PIK Interest") at the rate of 12.00% per annum (the "PIK Interest Rate") by increasing the principal amount of the outstanding Notes represented by one or more Global Notes or, with respect to Definitive Notes, if any, by issuing PIK Notes in a principal amount equal to such interest; provided, that if (x) the Consolidated First Lien Leverage Ratio is not greater than 3.25 to 1.00 and (y) the aggregate cash and Cash Equivalents of the Issuer and its Restricted Subsidiaries as of the Business Day immediately preceding such Interest Payment Date is not less than $50.0 million, the Issuer may elect to pay interest in cash, whole or in part ("Cash Interest"), at a rate equal to 10.00% per annum (the "Cash Interest Rate") in accordance with the provisions hereof.

(c)      The Issuer shall pay Cash Interest at the Cash Interest Rate on overdue installments of interest from the date such installment becomes due, without regard to any applicable grace period.  The Issuer shall pay Cash Interest on overdue principal at a rate that is 2% higher than the Cash Interest Rate.

(d)      Interest on the Notes will be computed on the basis of a 360-day year comprised of twelve 30-day months.

[Until this Regulation S Temporary Global Note is exchanged for one or more Regulation S Permanent Global Notes, the Holder hereof shall not be entitled to receive payments of interest hereon; until so exchanged in full, this Regulation S Temporary Global Note shall in all other respects be entitled to the same benefits as other Notes under the Indenture.]

2.      Method of Interest Election and Payment Mechanics

(a)      Subject to Section 1(b) above, the Issuer may elect to pay interest in the form of Cash Interest by delivering a written notice of such election in the form of an Issuer Order (the

"Cash Interest Election") to the Holders, the Trustee and the Paying Agent (if other than the Trustee) no later than five (5) Business Days prior to the applicable Interest Payment Date, which Cash Interest Election shall (i) specify (x) if the Issuer elects to pay all interest payable on such Interest Payment Date in the form of Cash Interest, the amount of Cash Interest due on such Interest Payment Date or (y) if the Issuer elects to pay the interest payable on such Interest Payment Date in the form of Cash Interest and PIK Interest, the percentage of the aggregate principal amount of Notes outstanding at such time in respect of which Cash Interest will be payable and the aggregate amount of Cash Interest payable on such Interest Payment Date (it being understood that PIK Interest shall be payable in respect of the remaining Notes in accordance with Section 2(b) below) and (ii) certify that no Default or Event of Default exists or is continuing or would result from the payment of such Cash Interest, and that the Issuer has complied with all applicable provisions in the Indenture relating to payment of Cash Interest.

(b)    In connection with any payment of PIK Interest on any Interest Payment Date, no later than five (5) Business Days prior to such Interest Payment Date, the Issuer shall deliver to the Holders, the Trustee and the Paying Agent (if other than the Trustee) written notice in the form of an Issuer Order setting forth the amount of PIK Interest to be paid on such Interest Payment Date, which PIK Interest shall be payable:

(i)    with respect to Notes represented by one or more Global Notes registered in the name of, or held by, DTC or its nominee on the relevant record date, by the Trustee (as directed in the applicable Issuer Order) recording on such Global Note an increase to the principal amount of the outstanding Global Note by an amount equal to the amount of PIK Interest for the applicable interest period (rounded down to the nearest whole dollar); or

(ii)    with respect to Notes represented by Definitive Notes, by issuing PIK Notes in certificated form, in an aggregate principal amount equal to the amount of PIK Interest for the applicable interest period (rounded down to the nearest whole dollar), which PIK Notes shall (as directed in the applicable Issuer Order) be authenticated and delivered in certificated form by the Trustee for original issuance to the Holders as of the relevant record date, as shown on the register of Holders.

(c)    Following an increase in the principal amount of the outstanding Global Notes as a result of a PIK Payment made in accordance with Section 2(b)(i) above, such Global Note will bear interest on such increased principal amount from and after the immediately preceding Interest Payment Date, at the rate and in the form applicable to Notes at such time. Any PIK Notes issued in certificated form as Definitive Notes in accordance with Section 2(b)(ii) above will be dated as of the date of such Notes' authentication but will be deemed issued and bear interest as of the applicable immediately preceding Interest Payment Date. All PIK Notes issued pursuant to a PIK Payment in accordance with Section 2(b) above will mature on the same dates, and shall have the same rights and benefits (as such rights and benefits may be amended or supplemented from time to time in accordance with the terms of the Indenture), as the Notes issued on the Issue Date, and all such PIK Notes will be governed by, and subject to the terms, provisions and conditions of, the Indenture in the same manner as all other Notes issued pursuant to the Indenture.

A-5

(d)     Notwithstanding anything to the contrary herein, the payment of accrued interest in connection with any redemption of Notes as described under Section 5.7 of the Indenture, in connection with any repurchase of Notes as described under Sections 3.5 and 3.9 of the Indenture or at Stated Maturity shall be made solely in the form of Cash Interest at the Cash Interest Rate.

(e)     By no later than 11:00 a.m. (New York City time) on the date on which any principal of, premium (if any) and/or interest, on any Note is due and payable, the Issuer shall deposit with the Paying Agent a sum sufficient in immediately available funds to pay such principal, premium and/or Cash Interest when due and, if a payment of PIK Interest is to be made, deliver an Issuer Order to the Trustee in accordance with Section 2(b) above to, as applicable, increase the principal amount of the Global Notes or issue PIK Notes in certificated form.  Interest on any Note which is payable, and is timely paid or duly provided for, on any Interest Payment Date shall be paid to the Person in whose name such Note (or one or more Predecessor Notes) is registered at the close of business on the preceding [   ] and [   ] at the office or agency of the Issuer maintained for such purpose pursuant to Section 2.3 of the Indenture.  The principal of (and premium, if any) and interest on the Notes shall be payable at the office or agency of Paying Agent or Registrar designated by the Issuer maintained for such purpose (which shall initially be the office of the Trustee maintained for such purpose), or at such other office or agency of the Issuer as may be maintained for such purpose pursuant to Section 2.3 of the Indenture; provided, however, that, at the option of the Paying Agent, each installment of Cash Interest may be paid by (i) check mailed to addresses of the Persons entitled thereto as such addresses shall appear on the Notes Register or (ii) wire transfer to an account located in the United States maintained by the payee, subject to the last sentence of this paragraph.  Payments in respect of Notes represented by a Global Note (including principal, premium, if any, and interest) will be made by wire transfer of immediately available funds to the accounts specified by The Depository Trust Company or any successor depository. Payments in respect of Notes represented by Definitive Notes (including principal, premium, if any, and interest) held by a Holder of at least $1,000,000 aggregate principal amount of Notes represented by Definitive Notes will be made in accordance with the Notes Register, or by wire transfer to a U.S. dollar account maintained by the payee with a bank in the United States if such Holder elects payment by wire transfer by giving written notice to the Trustee or the Paying Agent to such effect designating such account no later than 15 days immediately preceding the relevant due date for payment (or such other date as the Trustee may accept in its discretion).  If an Interest Payment Date is a Legal Holiday, payment shall be made on the next succeeding day that is not a Legal Holiday, and no interest shall accrue for the intervening period.  If a regular record date is a Legal Holiday, the record date shall not be affected.

3.     Paying Agent and Registrar

The Issuer initially appoints Wilmington Savings Fund Society, FSB (in such capacity and together with its successors and assignees, the "Trustee") as Registrar and Paying Agent for the Notes, and the Holders, by accepting and holding the Notes, shall be deemed to agree to such appointments.  The Issuer may change any Registrar or Paying Agent without prior notice to the Holders.  The Issuer or any Guarantor may act as Paying Agent, Registrar or transfer agent.

4.     Indenture

The Issuer issued the Notes under an Indenture dated as of [    ], 2017 (as it may be amended, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "Indenture"), among the Issuer, the guarantors named therein, the Trustee and Wilmington Savings Fund Society, FSB, as collateral agent.  The terms of the Notes include those stated in the Indenture.  The Notes are subject to all terms and provisions of the Indenture, and Holders are referred to the Indenture for a statement of those terms.

The Notes are senior obligations of the Issuer.  The aggregate principal amount of Notes that may be authenticated and delivered under the Indenture is unlimited.  This Note is one of the 10.00% / 12.00% Senior Secured PIK Toggle Notes due 2023 referred to in the Indenture.  The Notes include (i) $[   ] principal amount of the Issuer's 10.00% / 12.00% Senior Secured PIK Toggle Notes due 2023 issued under the Indenture on [   ], 2017 (the "Initial Notes"), (ii) if and when issued, additional Notes that may be issued from time to time under the Indenture subsequent to [   ], 2017 (the "Additional Notes") as provided in Section 2.1(a) of the Indenture and (iii) any PIK Notes (and any increases in principal amount of any Global Note) issued as provided in Section 2.1(h) of the Indenture.  The Initial Notes (including any increases in the principal amount as the result of a PIK Interest payment), the Additional Notes and the PIK Notes (if any) shall be considered collectively as a single class for all purposes of the Indenture; provided, that the Additional Notes will not be issued with the same CUSIP as the existing Notes unless such Additional Notes are fungible with the existing Notes for U.S. federal income tax purposes.  The Indenture imposes certain limitations on the incurrence of indebtedness, the making of restricted payments, the sale of assets, the incurrence of certain liens, the making of payments for consents, the entering into of agreements that restrict distribution from restricted subsidiaries and the consummation of mergers and consolidations.  The Indenture also imposes requirements with respect to the provision of financial information and the provision of guarantees of the Notes by certain subsidiaries.

5.    [Reserved]

6.    Guarantees

To guarantee the due and punctual payment of the principal, premium (if any) and interest (including Post-Petition Interest, as defined in the Indenture) on the Notes and all other amounts (including all Note Obligations, as defined in the Indenture) payable by the Issuer under the Indenture, the Notes, the Collateral Documents entered into in connection therewith and the other Note Documents (as defined in the Indenture) when and as the same shall be due and payable, whether at maturity, by acceleration or otherwise, according to the terms of the Notes and the Indenture, each Guarantor will unconditionally guarantee (and future guarantors, jointly and severally with the Guarantors on the date hereof, will fully and unconditionally Guarantee) such obligations on a senior secured basis pursuant to the terms of the Indenture.

7.    Redemption

(a)    At any time and from time to time, the Issuer may redeem the Notes in whole or in part, at its option, upon not less than 30 nor more than 60 days' prior notice, with a copy to the Trustee, to each Holder to the address of such Holder appearing in the Notes Register, at a redemption price (expressed as percentages of principal amount of the Notes to be redeemed)

equal to 100% of the principal amount of Notes to be redeemed plus the accrued and unpaid interest, to but excluding the date of redemption (the "Redemption Date") and any premium, subject to the rights of holders of the Notes on the relevant record date to receive interest due on the relevant interest payment date.

(b)     Notwithstanding the foregoing, in connection with any tender offer for the Notes, including a Change of Control Offer or Asset Disposition Offer, if Holders of not less than 90% in aggregate principal amount of the outstanding Notes validly tender and do not withdraw such Notes in such tender offer and the Issuer, or any third party making such tender offer in lieu of the Issuer, purchases all of the Notes validly tendered and not withdrawn by such Holders, the Issuer or such third party shall have the right upon not less than 30 nor more than 60 days' prior notice, with a copy to the Trustee, to each Holder of Notes to the address of such Holder appearing in the Notes Register, given not more than 30 days following such purchase date to redeem all Notes that remain outstanding following such purchase at a redemption price equal to the price offered to each other Holder in such tender offer plus, to the extent not included in the tender offer payment, accrued and unpaid interest, if any, thereon, to but not including, the date of such redemption.

(c)     Unless the Issuer defaults in the payment of the redemption price, interest will cease to accrue on the Notes or portions thereof called for redemption on the applicable Redemption Date.

(d)     If the Notes are accelerated or otherwise become due prior to their maturity date, in each case, as a result of an Event of Default the amount of principal of, premium (if any) and accrued and unpaid interest on the Notes that becomes due and payable shall equal the redemption price applicable with respect to an optional redemption of the Notes, in effect on the date of such acceleration as if such acceleration were an optional redemption of the Notes accelerated.  All such accrued and unpaid interest shall be payable in the form of Cash Interest.

(e)     Any redemption pursuant to this paragraph 7 shall be made pursuant to the provisions of Sections 5.1 through 5.6 of the Indenture.

Except as set forth in paragraph 5 above, the Issuer is not required to make mandatory redemption or sinking fund payments with respect to the Notes.

8.     Repurchase Provisions

If a Change of Control occurs, each Holder will have the right to require the Issuer to repurchase from each Holder all or any part (equal to $1,000 or an integral multiple of $1,000 in excess thereof, or if any PIK Payment has been made, equal to $1.00 or an integral multiple of $1.00 in excess thereof) of such Holder's Notes at a purchase price in cash equal to 101% of the aggregate principal amount thereof plus accrued and unpaid interest, to but excluding the date of purchase, subject to the right of Holders of record on the relevant record date to receive interest due on the relevant interest payment date as provided in, and subject to the terms of, the Indenture.

Upon certain Asset Dispositions and subject to certain exceptions, the Issuer may be required to use the Excess Proceeds from such Asset Dispositions to offer to purchase the

maximum aggregate principal amount of Notes (that is $1,000 or an integral multiple of $1,000 in excess thereof, or if any PIK Payment has been made, that is $1.00 or an integral multiple of $1.00 in excess thereof) at an offer price in cash in an amount equal to 100% of the principal amount thereof, plus accrued and unpaid interest, to the date fixed for the closing of such offer, in accordance with the procedures set forth in Section 3.5 and in Article V of the Indenture.

9.      Denominations; Transfer; Exchange

The Notes shall be issuable only in fully registered form in minimum denominations of principal amount of $1,000 and any integral multiple of $1,000 in excess thereof (or if any PIK Payment has been made, in minimum denominations of principal amount of $1.00 and any integral multiple of $1.00 in excess thereof).  A Holder may transfer or exchange Notes in accordance with the Indenture.  The Registrar may require a Holder, among other things, to furnish appropriate endorsements or transfer documents and to pay a sum sufficient to cover any tax and fees required by law or permitted by the Indenture.  The Registrar need not register the transfer of or exchange of any Note (A) for a period beginning (1) 15 days before the mailing of a notice of an offer to repurchase or redeem Notes and ending at the close of business on the day of such mailing or (2) 15 days before an Interest Payment Date and ending on such Interest Payment Date or (B) called for redemption, except the unredeemed portion of any Note being redeemed in part.

[This Regulation S Temporary Global Note is exchangeable in whole or in part for one or more Global Notes only (i) on or after the expiration of the Restricted Period and (ii) upon presentation of certificates (accompanied by an Opinion of Counsel, if applicable) required by Article II of the Indenture.  Upon exchange of this Regulation S Temporary Global Note for one or more Global Notes, the Trustee shall cancel this Regulation S Temporary Global Note.]

10.      Persons Deemed Owners

The registered Holder of this Note may be treated as the owner of it for all purposes.

11.      Unclaimed Money

If money for the payment of principal, premium (if any) and/or interest remains unclaimed for two years, the Trustee or Paying Agent shall pay the money back to the Issuer at its written request unless an abandoned property law designates another Person to receive such money.  After any such payment, Holders entitled to the money must look only to the Issuer and not to the Trustee for payment as general creditors unless an abandoned property law designates another person for payment.

12.      Discharge and Defeasance

Subject to certain exceptions and conditions set forth in the Indenture, the Issuer at any time may terminate some or all of its obligations under the Notes and the Indenture if the Issuer deposits with the Trustee money or U.S. Government Obligations for the payment of principal, premium (if any) and interest on the Notes to redemption or maturity, as the case may be.

13.    Amendment, Supplement, Waiver

Subject to certain exceptions contained in the Indenture, the Indenture and the Notes may be amended, or a Default thereunder may be waived, with the consent of the Requisite Holders. Without notice to or the consent of any Holder, the Issuer, the Guarantors and the Trustee may amend or supplement the Indenture and the Notes as provided in the Indenture.

14.    Defaults and Remedies

A Default under clauses (3), (4) or (5) of Section 6.1 of the Indenture will not constitute an Event of Default until the Trustee or the Holders of 30% in principal amount of the outstanding Notes notify the Issuer (with a copy to the Trustee if given by the Holders) of the Default and, with respect to clauses (3) and (5) of Section 6.1 of the Indenture, the Issuer does not cure such Default within the time specified in clauses (3) and (5), as applicable, of Section 6.1 of the Indenture after receipt of such notice.

If an Event of Default (other than an Event of Default relating to certain events of bankruptcy, insolvency, reorganization or other proceeding under any Debtor Relief Law with respect to the Issuer or any Guarantor) occurs and is continuing, the Trustee by notice to the Issuer, or the Holders of at least 30% in principal amount of the outstanding Notes by notice to the Issuer and the Trustee, may declare the principal of, premium (if any) and accrued and unpaid interest, and any other monetary obligations on all the Notes to be due and payable immediately.  Upon the effectiveness of such declaration, such principal, premium, interest, and other monetary obligations will be due and payable immediately in cash.  If a bankruptcy, insolvency, reorganization or other proceeding under any Debtor Relief Law with respect to the Issuer or any Guarantor occurs and is continuing, the principal of, premium (if any) and accrued and unpaid interest and any other monetary obligations on all the Notes will become and be immediately due and payable in cash without any declaration or other act on the part of the Trustee or any Holders.  Under certain circumstances, the Requisite Holders may rescind any such acceleration with respect to the Notes and its consequences.

15.    Trustee and Collateral Agent Dealings with the Issuer

Subject to certain limitations set forth in the Indenture, each of the Trustee and the Collateral Agent, each in its individual or any other capacity, may make loans to, accept deposits from, and perform services for the Issuer or its Affiliates, may become the owner or pledgee of Notes and may otherwise deal with the Issuer or its Affiliates with the same rights it would have if it were not Trustee and/or the Collateral Agent, as the case may be.  In addition, each of the Trustee and the Collateral Agent shall be permitted to engage in transactions with the Issuer and/or its Affiliates; provided, however, that if the Trustee or Collateral Agent, as applicable, acquires any conflicting interest under the Act, the Trustee or Collateral Agent, as applicable, must (i) eliminate such conflict within 90 days of acquiring such conflicting interest, (ii) apply to the Commission for permission to continue acting as Trustee or Collateral Agent, as applicable or (iii) resign.

A-10

16.     No Recourse Against Others

No director, officer, employee, incorporator or shareholder of the Issuer or any of its Subsidiaries or Affiliates, as such (other than the Issuer and the Guarantors), shall have any liability for any obligations of the Issuer or the Guarantors under the Notes, the Guarantees or the Indenture or for any claim based on, in respect of, or by reason of such obligations or their creation.  Each Holder by accepting a note waives and releases all such liability.  The waiver and release are part of the consideration for issuance of the Notes.  Such waiver may not be effective to waive liabilities under the federal securities laws and it is the view of the SEC that such a waiver is against public policy.

17.     Authentication

This Note shall not be valid until an authorized signatory of the Trustee (or an authenticating agent acting on its behalf) manually signs the certificate of authentication on the other side of this Note.

18.     Abbreviations

Customary abbreviations may be used in the name of a Holder or an assignee, such as TEN COM (= tenants in common), TEN ENT (= tenants by the entirety), JT TEN (= joint tenants with rights of survivorship and not as tenants in common), CUST (= custodian) and U/G/M/A (= Uniform Gift to Minors Act).

19.     CUSIP and ISIN Numbers

The Issuer has caused CUSIP and ISIN numbers, if applicable, to be printed on the Notes and has directed the Trustee to use CUSIP and ISIN numbers, if applicable, in notices of redemption or purchase as a convenience to Holders.  No representation is made as to the accuracy of such numbers either as printed on the Notes or as contained in any notice of redemption or purchase and reliance may be placed only on the other identification numbers placed thereon.

20.     Governing Law

This Note shall be governed by, and construed in accordance with, the laws of the State of New York.

The Issuer will furnish to any Holder upon written request and without charge to the Holder a copy of the Indenture.  Requests may be made to:

> 21st Century Oncology, Inc.
> 2270 Colonial Blvd.
> Fort Myers, Florida, 33907
> Attention:  Corporate Secretary

A-11

ASSIGNMENT FORM

To assign this Note, fill in the form below:

I or we assign and transfer this Note to:

---

(Print or type assignee's name, address and zip code)

---

(Insert assignee's social security or tax I.D. No.)

and irrevocably appoint _____ agent to transfer this Note on the books of the Issuer.  The agent may substitute another to act for him.

Date: _____          Your Signature: _____

Signature Guarantee: _____                                    _____

(Signature must be guaranteed)

---

Sign exactly as your name appears on the other side of this Note.

The signature(s) should be guaranteed by an eligible guarantor institution (banks, stockbrokers, savings and loan associations and credit unions with membership in an approved signature guarantee medallion program), pursuant to Exchange Act Rule 17Ad-15.

The undersigned hereby certifies that it ☐ is / ☐ is not an Affiliate of the Issuer and that, to its knowledge, the proposed transferee ☐ is / ☐ is not an Affiliate of the Issuer.

In connection with any transfer or exchange of any of the Notes evidenced by this certificate occurring prior to the date that is one year after the later of the date of original issuance of such Notes and the last date, if any, on which such Notes were owned by the Issuer or any Affiliate of the Issuer, the undersigned confirms that such Notes are being:

CHECK ONE BOX BELOW:

> (1)     ☐     acquired for the undersigned's own account, without transfer; or

> (2)     ☐     transferred to the Issuer; or

> (3)     ☐     transferred pursuant to and in compliance with Rule 144A under the Securities Act of 1933, as amended (the "Securities Act"); or

> (4)     ☐     transferred pursuant to an effective registration statement under the Securities Act; or

A-12

(5) ☐ transferred pursuant to and in compliance with Regulation S under the Securities Act; or

(6) ☐ transferred to an institutional "accredited investor" (as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act) or an "accredited investor" (as defined in Rule 501(a)(4) under the Securities Act), that has furnished to the Trustee a signed letter containing certain representations and agreements (the form of which letter appears as Section 2.8 or 2.10 of the Indenture, respectively); or

(7) ☐ transferred pursuant to another available exemption from the registration requirements of the Securities Act of 1933, as amended.

Unless one of the boxes is checked, the Trustee will refuse to register any of the Notes evidenced by this certificate in the name of any person other than the registered Holder thereof; provided, however, that if box (5), (6) or (7) is checked, the Issuer may require, prior to registering any such transfer of the Notes, in its sole discretion, such legal opinions, certifications and other information as the Issuer may reasonably request to confirm that such transfer is being made pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act of 1933, as amended, such as the exemption provided by Rule 144 under such Act.

|  | |
|---|---|
|  | Signature |
| Signature Guarantee: | |

|  | |
|---|---|
| (Signature must be guaranteed) | Signature |

The signature(s) should be guaranteed by an eligible guarantor institution (banks, stockbrokers, savings and loan associations and credit unions with membership in an approved signature guarantee medallion program), pursuant to Exchange Act Rule 17Ad-15.

TO BE COMPLETED BY PURCHASER IF BOX (1) OR (3) ABOVE IS CHECKED.

The undersigned represents and warrants that it is purchasing this Note for its own account or an account with respect to which it exercises sole investment discretion and that it and any such account is a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act of 1933, as amended, and is aware that the sale to it is being made in reliance on Rule 144A and acknowledges that it has received such information regarding the Issuer as the undersigned has requested pursuant to Rule 144A or has determined not to request such information and that it is aware that the transferor is relying upon the undersigned's foregoing representations in order to claim the exemption from registration provided by Rule 144A.

|  |
|---|
| Dated: |

A-13

[TO BE ATTACHED TO GLOBAL NOTES]

SCHEDULE OF INCREASES OR DECREASES IN GLOBAL NOTES

The following increases or decreases in this Global Note have been made:

| Date of Exchange | Amount of decrease in Principal Amount of this Global Note | Amount of increase in Principal Amount of this Global Note | Principal Amount of this Global Note following such decrease or increase | Signature of authorized signatory of Trustee or Notes Custodian |
| --- | --- | --- | --- | --- |

A-14

OPTION OF HOLDER TO ELECT PURCHASE

If you elect to have this Note purchased by the Issuer pursuant to Section 3.5 or 3.9 of the Indenture, check either box:

Section 3.5 ☐  Section 3.9 ☐

If you want to elect to have only part of this Note purchased by the Issuer pursuant to Section 3.5 or 3.9 of the Indenture, state the amount in principal amount (must be in minimum denominations of $1,000 or an integral multiple of $1,000 in excess thereof, or if any PIK Payment has been made, in minimum denominations of $1.00 and in integral multiples of $1.00 in excess thereof)  $_____ and specify the denomination or denominations (which shall not be less than the minimum authorized denomination) of the Notes to be issued to the Holder for the portion of the within Note not being repurchased (in the absence of any such specification, one such Note will be issued for the portion not being repurchased): _____.

Date: _____ Your Signature

_____

(Sign exactly as your name appears on the other side of the Note)


Signature Guarantee:

_____

(Signature must be guaranteed)

The signature(s) should be guaranteed by an eligible guarantor institution (banks, stockbrokers, savings and loan associations and credit unions with membership in an approved signature guarantee medallion program), pursuant to Exchange Act Rule 17Ad-15.

A-15

**EXHIBIT B**

**[FORM OF SUPPLEMENTAL INDENTURE
TO BE DELIVERED BY GUARANTORS]**

SUPPLEMENTAL INDENTURE (this "Supplemental Indenture"), dated as of _____, among _____ (the "Guarantor"), a subsidiary of 21st CENTURY ONCOLOGY, INC., a Delaware corporation (the "Issuer"), the Issuer and the other Guarantors (as defined in the Indenture referred to herein) and [                    ], as trustee under the Indenture (in such capacity, together with its successors is such capacity, the "Trustee").

WITNESSETH

WHEREAS, the Issuer and the guarantors party thereto have heretofore executed and delivered to the Trustee an indenture, dated as of [   ], 2017 (as it may be amended, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "Indenture"), providing for the issuance by the Issuer of 10.00% / 12.00% Senior Secured PIK Toggle Notes due 2023 (the "Notes");

WHEREAS, the Indenture provides that, under certain circumstances, the Guarantor shall execute and deliver to the Trustee a supplemental indenture pursuant to which the Guarantor shall unconditionally guarantee all of the Issuer's Obligations (including the Note Obligations) under the Notes and the Indenture on the terms and conditions set forth herein (the "Note Guarantee"); and

WHEREAS, pursuant to Section 9.1 of the Indenture, the Trustee is authorized to execute and deliver this Supplemental Indenture, without the consent of Holders.

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Issuer, the Guarantor and the Trustee mutually covenant and agree for the equal and ratable benefit of the Holders of the Notes as follows:

1.    CAPITALIZED TERMS.  Capitalized terms used herein without definition shall have the meanings assigned to them in the Indenture.

2.    AGREEMENT TO GUARANTEE.  The Guarantor hereby agrees jointly and severally, fully and unconditionally, with all other Guarantors, to guarantee the Note Obligations on the terms and subject to the conditions set forth in Article X of the Indenture and to be bound by all other applicable provisions of the Indenture.  From and after the date hereof, the Guarantor shall be a Guarantor for all purposes under the Indenture and the Notes.

3.    EXECUTION AND DELIVERY.  Each Guarantor agrees that the Note Guarantees shall remain in full force and effect notwithstanding any failure to endorse on each Note a notation of such Note Guarantee.

4.    GUARANTOR MAY CONSOLIDATE, ETC. ON CERTAIN TERMS.  A Guarantor may not sell or otherwise dispose of all or substantially all of its assets to, or

B-1

consolidate with or merge with or into (whether or not such Guarantor is the surviving Person), another Person, other than the Issuer or another Guarantor, except in accordance the Indenture.

5.      RELEASES.  A Note Guarantee shall be released in accordance with Section 10.2 of the Indenture.

6.      NO RECOURSE AGAINST OTHERS.   No director, officer, employee, incorporator, stockholder, member, manager or partner of the Guarantor, as such, shall have any liability for any obligations of the Issuer or any Guarantor under the Notes, the Indenture, this Supplemental Indenture or the Note Guarantees or for any claim based on, in respect of, or by reason of, such obligations or their creation.  Each Holder of Notes by accepting a Note waives and releases all such liability.  The waiver and release are part of the consideration for the issuance of the Notes.  Such waiver may not be effective to waive liabilities under the federal securities laws and it is the view of the SEC that such a waiver is against public policy.

7.      NEW YORK LAW TO GOVERN.  THIS SUPPLEMENTAL INDENTURE WILL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

8.      COUNTERPARTS.   The parties may sign any number of copies of this Supplemental Indenture.  Each signed copy shall be an original, but all of them together represent the same agreement.  The exchange of copies of this Supplemental Indenture and of signature pages by facsimile or pdf transmission shall constitute effective execution and delivery of this Supplemental Indenture as to the parties hereto and may be used in lieu of the original Supplemental Indenture for all purposes.

9.      EFFECT OF HEADINGS.  The Section headings herein are for convenience only and shall not affect the construction hereof.

10.      THE TRUSTEE. The Trustee shall not be responsible in any manner whatsoever for or in respect of the validity or sufficiency of this Supplemental Indenture or for or in respect of the recitals contained herein, all of which recitals are made solely by the Guarantor and the Issuer.

11.      RATIFICATION OF INDENTURE; SUPPLEMENTAL INDENTURES PART OF INDENTURE.  Except as expressly amended hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect.  This Supplemental Indenture shall form a part of the Indenture for all purposes, and every Holder of Notes heretofore or hereafter authenticated and delivered shall be bound hereby.

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed and attested, all as of the date first above written.

[*Guarantor*]

By:  _____
       Name:
       Title:

21st CENTURY ONCOLOGY, INC.

By:  _____
       Name:
       Title:

[*Existing Guarantors*]

By:  _____
       Name:
       Title:

[                              ], as Trustee

By:  _____
       Authorized Signatory

B-3

## **Exhibit D**

### **Form of the New Intercreditor Agreement**

Certain documents, or portions thereof, contained in this Exhibit D and the Plan Supplement remain subject to continuing negotiations among the Debtors and interested parties with respect thereto. The Debtors reserve all rights, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement, to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court.

[TO COME]

## Exhibit E

## Form of the New Warrant Documents

Certain documents, or portions thereof, contained in this Exhibit E and the Plan Supplement remain subject to continuing negotiations among the Debtors and interested parties with respect thereto. The Debtors reserve all rights, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement, to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court.

THIS WARRANT AND THE UNDERLYING SHARES OF COMMON STOCK ISSUABLE UPON EXERCISE OF THIS WARRANT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER SECURITIES LAWS.   THIS WARRANT AND THE UNDERLYING SHARES OF COMMON STOCK ISSUABLE UPON EXERCISE OF THIS WARRANT MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION OF SUCH SECURITIES UNDER THE ACT AND ANY OTHER APPLICABLE SECURITIES LAWS, OR RECEIPT BY THE COMPANY OF AN OPINION OF COUNSEL OR OTHER EVIDENCE ACCEPTABLE TO THE COMPANY THAT SUCH SALE OR TRANSFER OF SUCH SECURITIES IS EXEMPT FROM REGISTRATION UNDER THE ACT.

## WARRANT

Date of Issuance:        [_____], 20[__]                          Certificate No. W-[__]

Date of Expiration:     [_____], 20[__][1]

For Value Received, 21ST CENTURY ONCOLOGY HOLDINGS, INC., a Delaware corporation (the "Company"), hereby grants to [_____], a [_____] (together with its successors and permitted assigns, the "Holder"), the right to purchase from the Company up to a total of [_____] shares of Class A Voting Common Stock, $0.001 par value per value (the "Common Stock"), of the Company (as adjusted from time to time in accordance with Section 3 hereof, each such share, a "Warrant Share" and all such shares, the "Warrant Shares") at the price of $[_____][2] per Warrant Share (as adjusted from time to time in accordance with Section 3 hereof, the "Exercise Price").   The amount and kind of securities that may be purchased hereunder and the Exercise Price are subject to adjustment pursuant to the provisions of this Warrant.

This Warrant to purchase shares of Common Stock (this "Warrant") is subject to the following provisions:

1.        Definitions.  As used herein, the following terms have the meanings set forth below:

"Accredited Investor" shall mean an "accredited investor" as such term is defined in Rule 501 under the Securities Act.

"Affiliate" shall mean, with respect to any Person, any other Person that (either directly or indirectly) controls, is controlled by, or is under common control with the specified

---

[1] Note to Draft: Insert date that is the 5 year anniversary of the Date of Issuance.

[2] Note to Draft:  Insert the amount equal to the quotient obtained by dividing (a) $600.0 million by (b) the sum of (x) the total number of shares of Common Stock that are issued and outstanding on the Effective Date (immediately after giving effect to the consummation of the Restructuring Transactions (as defined in the Plan)) and (y) the total number of shares of Common Stock that are issuable upon full conversion of the New Preferred Equity (as defined in the Plan) on the Effective Date.

Person, and shall also include (a) any Related Fund of such Person and (b) in the case of a specified Person who is an individual, any Family Member or Personal Representative of such Person.  The term "control" includes the possession, directly or indirectly, of the power to direct the management or policies of a Person, whether through the ownership of securities, by contract or otherwise.

"Board of Directors" shall mean the Board of Directors of the Company.

"Business Day" shall mean any day other than a Saturday, Sunday, or other day on which commercial banks are authorized or required to close under the laws of the State of New York.

"Capital Stock" shall mean, with respect to any Person, all of the shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership, equity or profit interests or units in, including any limited or general partnership interest and any limited liability company interest) such Person.

"Certificate of Incorporation" shall mean the Amended and Restated Certificate of Incorporation of the Company filed on the Effective Date with the Secretary of State of the State of Delaware pursuant to the Delaware General Corporation Law, as amended, amended and restated, supplemented or otherwise modified and in effect from time to time.

"Effective Date" shall mean the "Effective Date" as defined in the Plan.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Fair Market Value" shall mean, with respect to a Warrant Share as of any date of determination, the fair market value of a Warrant Share as of such date, as determined by the Board of Directors.

"Family Members" shall mean, if the Holder is an individual, (a) any Related Person of such individual or (b) any trust, limited partnership, limited liability company or other estate or tax planning vehicle or entity, the sole owners or beneficiaries of which are such individual or one or more of such individual's Related Persons.

"GAAP" shall mean generally accepted accounting principles in effect in the United States from time to time consistently applied, as recommended by the American Institute of Certified Public Accountants.

"Governmental Authority" shall mean any nation or government, any state or other political subdivision thereof, any entity, authority or body exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any government authority, agency, department, board, body, commission or instrumentality of the United States or any other nation, or any state or other political subdivision thereof, any court, tribunal or arbitrator and any self-regulatory organization.

"Lien" shall mean any lien, encumbrance, claim, right, demand, charge, mortgage, deed of trust, option, pledge, security interest or similar interest, title defect, hypothecation, easement, right of way, restrictive covenant, encroachment, right of first refusal, preemptive right, judgment, conditional sale or other title retention agreement and all other impositions, imperfections, defects, limitations or restrictions of any nature or kind whatsoever.

"Liquidity Event" shall mean the consummation of:

(a)   a sale, conveyance or disposition of all or substantially all of the assets of the Company and any direct and/or indirect Subsidiaries of the Company, taken as a whole (including by or through the sale, conveyance or other disposition of the Capital Stock of, or reorganization, merger, share exchange, consolidation or other business combination involving, any direct and/or indirect Subsidiary or Subsidiaries of the Company, if substantially all of the assets of the Company and any direct and/or indirect Subsidiaries of the Company, taken as a whole, are held by such Subsidiary or Subsidiaries);

(b)   a reorganization, merger, share exchange, consolidation or other business combination of the Company with or into any other entity in which transaction the Persons who hold more than fifty percent (50%) of the total voting power of the Voting Securities of the Company (or, if the Company is not the acquiring, resulting or surviving entity in such transaction, such acquiring, resulting or surviving entity) immediately after such transaction are not Persons who, immediately prior to such transaction, held more than fifty percent (50%) of the total voting power of the Voting Securities of the Company;

(c)   an acquisition (in one transaction or a series of related transactions) of Voting Securities of the Company representing in the aggregate more than fifty percent (50%) of the total voting power of the Voting Securities of the Company (after giving effect to such acquisition) by any Person or "group" (as such term is used in Section 13(d)(3) of the Exchange Act) of Persons;

(d)   a Qualified Public Offering; or

(e)   the liquidation, dissolution or winding up of the Company.

"Other Warrants" shall mean all warrants to purchase Common Stock, other than this Warrant, issued pursuant to the Plan.

"Permitted Liens" shall mean Liens that are imposed (a) by the Stockholders Agreement, (b) by the Certificate of Incorporation, or (c) under applicable securities laws.

"Permitted Transferee" shall mean, in connection with any Transfer of this Warrant by the Holder, an Affiliate of the Holder that is an Accredited Investor at the time of such Transfer.

"Person" shall mean an individual, partnership, corporation, unincorporated organization, joint stock company, limited liability company, association, trust, joint venture or any other entity, or a Governmental Authority.

3

"Personal Representative" shall mean the legal representative (including a guardian, executor, administrator or conservator) of a deceased or incompetent Holder that is an individual.

"Plan" shall mean the joint plan of reorganization under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, filed in the United States Bankruptcy Court for the Southern District of New York by the Company and certain of its direct and indirect Subsidiaries, as amended, supplemented or otherwise modified from time to time.

"Preferred Stock" shall mean the Capital Stock of the Company that is designated as "Preferred Stock" under the Certificate of Incorporation.

"Qualified Public Offering" shall mean the first underwritten public offering pursuant to an effective registration statement covering a sale of shares of Common Stock to the public that (a) results in shares of Common Stock being listed on a national securities exchange or quoted on the Nasdaq Stock Market, and (b) either (i) involves gross cash proceeds of at least $100.0 million or (ii) results in a market capitalization of the Company immediately after consummation of the offering that is not less than $150.0 million.

"Related Fund" shall mean, with respect to any Person, any fund, account or investment vehicle that is controlled or managed by (a) such Person, (b) an Affiliate of such Person or (c) the same investment manager, advisor or subadvisor as such Person or an Affiliate of such investment manager, advisor or subadvisor.

"Related Persons" shall mean, with respect to a Holder that is an individual, any of such individual's parents, spouse, siblings, children and grandchildren.

"Securities Act" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Stockholders Agreement" shall mean the Stockholders Agreement, dated as of the Effective Date, by and among the Company and the stockholders of the Company party thereto, as amended, amended and restated, supplemented or otherwise modified from time to time.

"Subsidiary" shall mean any Person in which the Company, directly or indirectly through one or more Subsidiaries or otherwise, beneficially owns more than 50% of the voting power of the securities of such Person, the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person.

"Transfer" shall mean any direct or indirect sale, transfer, gift, hypothecation, pledge, assignment, devise or other disposition of this Warrant (including (a) a disposition under judicial order, legal process, execution, attachment, foreclosure or enforcement of a Lien and (b) the granting of any option or entering into any agreement for the future sale, transfer or other disposition of this Warrant), whether voluntary or involuntary, whether of record, constructively or beneficially, whether with or without consideration, and whether by operation of law or

4

otherwise.  The terms "Transferee," "Transferor," "Transferred," and other forms of the word "Transfer" shall have the correlative meanings.

"Voting Securities" shall mean, with respect to any Person, the Capital Stock of such Person, the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person.

2.      Exercise of Warrant.

(a)      Exercise Period.  The Holder may exercise, in whole or in part, the purchase rights represented by this Warrant at any time and from time to time during the period commencing on the Date of Issuance (as set forth on the first page hereof) and ending on the earlier of (i) the consummation of a Liquidity Event and (ii) 5:00 p.m. (New York time) on the Date of Expiration (as set forth on the first page hereof) (such period, the "Exercise Period").

(b)      Exercise Procedure.

(i)      This Warrant shall be deemed to have been validly exercised when the Company has received all of the following items (the date on which the Company shall have received all such items with respect to any exercise of this Warrant being the "Date of Exercise"):

A.      a completed Exercise Agreement, as described in Section 2(c) hereof, duly executed by the Holder;

B.      a completed Stockholders Joinder Agreement, as described in Section 2(d) hereof, duly executed by the Holder and/or, if any of the Warrant Shares are not to be issued in the name of the Holder, duly executed by the Person to whom the Warrant Shares are to be issued;

C.      this Warrant or an affidavit of loss and indemnity, reasonably acceptable to the Company, if the Holder does not have possession of this Warrant at the time of exercise;

D.      if this Warrant is not registered in the name of the Holder, an assignment or assignments evidencing the Transfer of this Warrant to the Holder in accordance with Section 6 hereof; and

E.      payment in an amount equal to the product of the Exercise Price multiplied by the number of Warrant Shares being purchased upon such exercise (the "Aggregate Exercise Price"). Such payment shall be in the form of cash or in the form of a bank or certified check payable to the Company; provided, however, that in the event that the Holder is exercising this Warrant in connection with, or in contemplation of, the occurrence of a Liquidity Event, in lieu of delivering cash or a bank or certified

5

check payable to the Company in an amount equal to the Aggregate Exercise Price, the Holder may elect (the "Cashless Exercise") that the Company deduct from the number of Warrant Shares to be delivered to the Holder upon such exercise a number of Warrant Shares having a Fair Market Value, on the Business Day immediately prior to the Date of Exercise, equal to the Aggregate Exercise Price; provided, further that any such Cashless Exercise shall be subject to, and conditioned upon, the consummation of such Liquidity Event.

(ii)     Certificates (if any) for the Warrant Shares purchased upon exercise of this Warrant shall be delivered by the Company to the Holder as promptly as reasonably practicable after the Date of Exercise; provided, however, that if the Company has not issued certificates representing shares of Common Stock, the Company shall cause to be delivered to the Holder evidence of a book-entry interest in the Warrant Shares purchased upon exercise of this Warrant registered on the books of the Company's transfer agent.  Unless this Warrant has expired or all of the purchase rights represented hereby have been exercised, the Company shall prepare and deliver to the Holder a new Warrant, substantially identical hereto, for the remaining number of Warrant Shares covered hereby.

(iii)     The Warrant Shares issuable upon the exercise of this Warrant shall be deemed to have been issued to the Holder, and the Holder shall be deemed for all purposes to have become the record holder of such Warrant Shares, at the close of business on the Date of Exercise; provided, however, that in the event that the Holder is exercising this Warrant in connection with, or in contemplation of, the occurrence of a Liquidity Event, the Warrant Shares shall be deemed to have been issued to the Holder, and the Holder shall be deemed for all purposes to have become the record holder of such Warrant Shares, as of immediately prior to the consummation of such Liquidity Event.

(iv)     The issue of Warrant Shares on exercise of this Warrant shall be made without charge to the Holder for any issue or transfer tax, withholding tax, transfer agent fee or other incidental tax or expense in respect of the issue thereof.  The Company shall not, however, be required to pay any tax, expense or charge which may be payable in respect of the issue and delivery of Warrant Shares or a new Warrant in, or the payment of any cash or other property in respect of Warrant Shares or this Warrant to, any name other than that of the Holder, and any such taxes, expenses or charges shall be paid by the Holder and the Company shall not be required to issue or deliver any Warrant Shares or new Warrant (or pay any cash or other property) until such taxes, expenses or charges shall have been paid or it is established to the Company's reasonable satisfaction that no tax, expense or charge is due.

6

(c)      Exercise Agreement.  Upon any exercise of this Warrant, the Exercise Agreement shall be substantially in the form set forth in Exhibit A hereto (the "Exercise Agreement"), except that if the Warrant Shares are not to be issued in the name of the Holder, the Exercise Agreement shall also state the name of the Person to whom the Warrant Shares are to be issued, and if the number of Warrant Shares to be issued does not include all the Warrant Shares purchasable hereunder, it shall also state the name of the Person to whom a new Warrant for the unexercised portion is to be issued and delivered.  The Company reserves the right to reject any Exercise Agreement that is not in proper form (including if an Exercise Agreement specifies delivery of Warrant Shares to an improper recipient) and the Company shall not incur any liability for any such rejection.  Such determination by the Company shall be final and binding on the Holder.

(d)      Joinder to Stockholders Agreement.  Upon any exercise of this Warrant, the Holder shall execute and deliver a joinder agreement to the Stockholders Agreement, in the form set forth in Exhibit B hereto (the "Stockholders Joinder Agreement"), except that if the Warrant Shares are not to be issued in the name of the Holder, the Joinder Agreement shall be executed by the Person to whom the Warrant Shares are to be issued.

(e)      Termination of this Warrant.  If this Warrant (or any portion hereof) is not validly exercised prior to the expiration of the Exercise Period, then (i) this Warrant (or such unexercised portion hereof) shall (x) not be exercisable after the expiration of the Exercise Period (such right to exercise being deemed permanently and irrevocably waived following the expiration of the Exercise Period), and (y) become permanently and irrevocably null and void at the expiration of the Exercise Period and all rights hereunder shall cease and terminate at the expiration of the Exercise Period, and (ii) the Holder shall not be entitled to any distribution, payment or other amount on or in respect of this Warrant (or any portion hereof).  Any solicitation, negotiation or closing of a Liquidity Event shall be subject to the sole and absolute discretion of the Company and the holders of the Company's Capital Stock.  The Company and/or holders of the Company's Capital Stock will determine in their sole discretion whether to effect or consummate a Liquidity Event.

Anything herein the contrary notwithstanding, the Holder shall not be permitted to (x) request that Warrant Shares issuable upon exercise of this Warrant be issued in the name of any Person other than the Holder unless the Holder would be permitted to transfer such Warrant Shares to such Person pursuant to the Certificate of Incorporation and the Stockholders Agreement (and the Holder shall comply with the terms, provisions and procedures set forth therein applicable to a transfer of shares of Common Stock as a condition precedent to making any such request), and (y) request that a new Warrant be issued in the name of any Person other than the Holder unless the Holder would be permitted to transfer this Warrant to such Person pursuant to the terms hereof (and the Holder shall comply with the terms, provisions and procedures set forth herein applicable to a Transfer of this Warrant as a condition precedent to making any such request).

3.      Adjustment of Exercise Price and Number of Warrant Shares.  The Exercise Price and the number of Warrant Shares issuable upon exercise of this Warrant shall be adjusted from time to time as follows:

7

(a)  Common Stock Dividends.  In case the Company shall hereafter pay a dividend or make a distribution to all holders of the outstanding shares of Common Stock in shares of Common Stock, the Exercise Price shall be decreased so that the Exercise Price shall equal the product of (i) the Exercise Price in effect immediately prior to the payment of such dividend or the making of such distribution, and (ii) a fraction,

A.  the numerator of which shall be the number of shares of Common Stock outstanding at the close of business on the Business Day immediately prior to the Business Day on which such dividend or distribution is paid or made; and

B.  the denominator of which shall be the sum of (x) the number of shares of Common Stock outstanding at the close of business on the Business Day immediately prior to the Business Day on which such dividend or distribution is paid or made and (y) the total number of shares of Common Stock constituting such dividend or other distribution.

The number of shares of Common Stock issuable upon exercise of this Warrant shall be correspondingly increased by dividing such number by the same fraction.  The adjustments to the Exercise Price and the number of shares of Common Stock issuable upon exercise of this Warrant described in this Section 3(a) shall become effective immediately after the opening of business on the first Business Day following the Business Day on which the applicable dividend or distribution is paid or made.

(b)  Subdivisions and Combinations.  In case outstanding shares of Common Stock shall be subdivided into a greater number of shares of Common Stock, or combined into a smaller number of shares of Common Stock, (i) the number of shares of Common Stock to be issued upon exercise of this Warrant shall be appropriately adjusted such that the proportion of the number of shares of Common Stock issuable hereunder to the total number of outstanding shares of Common Stock prior to such subdivision or combination is equal to the proportion of the number of shares of Common Stock issuable hereunder after such subdivision or combination to the total number of outstanding shares of Common Stock after such subdivision or combination and (ii) the Exercise Price in effect immediately prior to the time at which such subdivision or combination becomes effective shall be proportionately decreased or increased (as applicable).  The adjustments to the Exercise Price and the number of shares of Common Stock issuable upon exercise of this Warrant described in this Section 3(b) shall become effective immediately after the opening of business on the first Business Day following the Business Day on which the applicable subdivision or combination becomes effective.

(c)  Fundamental Change.  If (i) the Company shall consummate any transaction or series of related transactions constituting (x) any reclassification or change of the outstanding shares of Common Stock (other than a subdivision or combination to which Section 3(b) applies), or (y) any consolidation, merger, share exchange or combination of the Company with another Person in which, in the case of clause (x) or clause (y), the previously outstanding shares of Common Stock shall be cancelled, reclassified or converted or changed into or exchanged for other stock, other securities or other property or assets (including cash),

8

and (ii) such transaction or series of related transactions referred to in clause (i) is not a Liquidity Event (any such transaction or series of related transactions, a "Fundamental Change"), then the Holder will have the right upon any subsequent exercise of this Warrant (and payment of the applicable Exercise Price) to receive (but only out of legally available funds, to the extent required by applicable law) the kind and amount of stock, other securities, cash and assets that such Holder would have received if this Warrant had been exercised pursuant to the terms hereof immediately prior to the consummation of such Fundamental Change (assuming such Holder failed to exercise its rights of election, if any, as to the kind or amount of stock, securities, cash or other property receivable upon such Fundamental Change).  Upon the consummation of each Fundamental Change, appropriate adjustment shall be deemed to be made with respect to the Holder's rights under this Warrant, including, without limitation, with respect to the kind and amount of stock, securities, cash or assets thereafter acquirable upon exercise of this Warrant, such that the provisions of this Warrant shall thereafter be applicable, as nearly as possible, to any shares of stock, securities, cash or assets thereafter acquirable upon exercise of this Warrant. The provisions of this Section 3(c) shall similarly apply to successive Fundamental Changes. Any adjustment required by this Section 3(c) with respect to a Fundamental Change shall be made immediately after the effective date for such Fundamental Change.

(d)     Calculations.  All calculations under this Section 3 shall be made by the Company and shall be made to the nearest cent or to the nearest one-ten thousandth of a share, as the case may be, with one half-cent and 0.00005 of a share, respectively, being rounded upward. The number of shares of Common Stock outstanding at any given time shall not include shares owned or held by or for the account of the Company.

(e)     Notice of Adjustments.  Whenever the Exercise Price and the number of shares of Common Stock issuable upon exercise of this Warrant are adjusted as herein provided:

(i)     A notice by the Company stating that the Exercise Price and the number of shares of Common Stock issuable upon exercise of this Warrant have been adjusted and setting forth the adjusted Exercise Price and the adjusted number of shares of Common Stock issuable upon exercise of this Warrant shall be delivered to the Holder in accordance with Section 8; and

(ii)     The Company shall compute the adjusted Exercise Price and the adjusted number of shares of Common Stock issuable upon exercise of this Warrant in accordance with this Section 3 and shall include in such notice to the Holder a certificate signed by an officer of the Company setting forth the adjusted Exercise Price and the adjusted number of shares of Common Stock issuable upon exercise of this Warrant and showing in reasonable detail the method of calculation upon which such adjustments are based.

4.     Covenants of the Company.

(a)     Covenants As To Warrant Shares.  The Company covenants and agrees that all Warrant Shares issuable upon the exercise of the rights represented by this Warrant will,

9

upon issuance, be validly issued and outstanding, fully paid and nonassessable, and free from all Liens with respect to the issuance thereof (other than Permitted Liens). The Company further covenants and agrees that the Company will, at all times during the Exercise Period, have authorized and reserved a sufficient number of shares of Common Stock to provide for the full exercise of the rights represented by this Warrant.

(b)     Information Rights.

(i)     Subject to the execution and delivery to the Company by the Holder of a confidentiality agreement that is acceptable to the Board of Directors (the "Confidentiality Agreement") and such Confidentiality Agreement being in full force and effect and the Holder not being in breach thereof, the Company shall make available to the Holder the following information:

A.     within one hundred and twenty (120) days after the end of each fiscal year of the Company, copies of the audited consolidated financial statements of the Company and its Subsidiaries, including a consolidated balance sheet and consolidated statements of operations and comprehensive loss, changes in equity and cash flows, for such fiscal year, together with the auditors' report on such audited consolidated financial statements in accordance with GAAP; and

B.     within forty-five (45) days after the end of each fiscal quarter in each of the Company's first three (3) fiscal quarters in each fiscal year of the Company, copies of the unaudited consolidated financial statements of the Company and its Subsidiaries, including a consolidated balance sheet and consolidated statements of operations and comprehensive loss and cash flows, for such fiscal quarter, in accordance with GAAP, subject to the absence of footnotes and to year-end adjustments.

(ii)     At the option of the Board of Directors, the Company may make available the information described in Section 4(b)(i) on a password-protected website. As a condition to gaining access to the information posted on such website, the Holder may be required to "click through" or take other affirmative action pursuant to which the Holder shall acknowledge its confidentiality obligations in respect of such information pursuant to the Confidentiality Agreement.

(iii)     Unless this Warrant is terminated earlier pursuant to the terms hereof, the requirements of this Section 4(b) shall cease to apply at such time as the Company becomes obligated to file reports with the United States Securities and Exchange Commission under Section 13 or Section 15(d) of the Exchange Act or as a voluntary filer pursuant to contractual obligations (so long as the Company makes such filings).

(c)     Notices of Record Date. In the event of:

10

(i)      any taking by the Company of a record of the holders of any class of Capital Stock of the Company for the purpose of determining the holders thereof who are entitled to receive any dividend or other distribution, or any right to subscribe for, purchase or otherwise acquire any class of Capital Stock of the Company or any other securities or property, or to receive any other right; or

(ii)     any capital reorganization of the Company, any reclassification or recapitalization of the Capital Stock of the Company or any transfer of all or substantially all the assets of the Company to, or any consolidation or merger of the Company with or into, any other Person; or

(iii)    any voluntary or involuntary dissolution, liquidation or winding-up of the Company,

then, and in each such event, the Company will deliver a notice to the Holder specifying (x) the date on which any such record is to be taken for the purpose of such dividend, distribution or right, and stating the amount and character of such dividend, distribution or right, or (y) the date on which any such reorganization, reclassification, recapitalization, transfer, consolidation, merger, dissolution, liquidation or winding-up is anticipated to be effective.  The Company shall use commercially reasonable efforts to provide such notice at least five (5) Business Days prior to the date fixed as any such record date or any such effective date.

5.      No Rights as Stockholder.  Nothing contained in this Warrant shall be construed as conferring upon the Holder (in its capacity as the holder of this Warrant) the right to vote or to receive dividends or to consent or to receive notice as a stockholder of the Company in respect of any meeting of stockholders of the Company for the election of directors of the Company or of any other matter, or any rights whatsoever as a stockholder of the Company (including appraisal rights, dissenters rights, subscription rights or otherwise), or be deemed the holder of Capital Stock of the Company.

6.      Transfer of Warrant.

(a)      The Holder may not, directly or indirectly, sell, assign or otherwise Transfer all or any portion of this Warrant, except to a Permitted Transferee and only in compliance with the terms of this Agreement.

(b)      Notwithstanding Section 6(a), unless otherwise waived by the Board of Directors in its sole discretion, neither this Warrant nor any portion of this Warrant shall be Transferred by the Holder, if:

(i)      such Transfer would, if consummated, result in any violation of the Securities Act or any state securities laws or regulations, or any other applicable federal or state laws or order of any Governmental Authority having jurisdiction over the Company or any of its Subsidiaries;

(ii)     such Transfer would, if consummated (after taking into account any other proposed Transfers or transfers of any class of shares of

11

Common Stock or Preferred Stock for which a notice of any thereof has been previously delivered to the Board of Directors, but not yet consummated), result in the Company having, in the aggregate, 400 or more holders of record (as such concept is understood for purposes of Section 12(g) of the Exchange Act) of either (x) this Warrant and the Other Warrants or (y) shares of Common Stock (assuming, for purposes of this clause (y), that all issued and outstanding shares of Capital Stock and other securities of the Company that are exercisable or exchangeable for, or convertible into, directly or indirectly, shares of Common Stock (including this Warrant and the Other Warrants and all issued and outstanding shares of Preferred Stock) were exercised, exchanged or converted at the time of such Transfer), unless at the time of such Transfer the Company is already subject to the reporting obligations under Section 13 or Section 15(d) of the Exchange Act; provided, that the number 400 as used in this Section 6(b)(ii) shall be increased by the number of such holders that acquire, after the Effective Date, shares of Common Stock or shares of other Capital Stock or other securities of the Company that are exercisable or exchangeable for, or convertible into, shares of Common Stock, in any such case from the Company other than on account of an exercise or conversion of Other Warrants or Preferred Stock that was issued on the Effective Date or in connection with a distribution to all holders of any shares of Common Stock, Capital Stock or securities; or

(iii)     such Transfer would, if consummated (after taking into account any proposed transfers of Other Warrants or transfers of shares of Common Stock or Preferred Stock for which a notice of any thereof has been previously delivered to the Board of Directors, but not yet consummated), require the Company to register any class of Common Stock, Preferred Stock or any other equity securities of the Company under the Exchange Act (as a result of the number of stockholders or otherwise), unless at the time of such Transfer, the Company is already subject to the reporting obligations under Sections 13 or 15(d) of the Exchange Act.

(c)     In addition to the other restrictions set forth in this Section 6, neither this Warrant nor any portion of this Warrant shall be Transferred by the Holder unless, prior to such Transfer, (i) the Holder has delivered written notice of such Transfer to the Company, which written notice shall (A) specify the name, address, facsimile number, e-mail address and telephone number of the Transferee, (B) certify that the Transferee is a Permitted Transferee, (C) if this entire Warrant is not being Transferred, specify the portion of this Warrant being Transferred, and (D) specify the date on which the Transfer is expected to take place, (ii) the Holder has delivered to the Company a duly executed written instrument of assignment in the form of Exhibit C attached hereto, (iii) the Holder and the Transferee shall have delivered to the Company representation letters in such form as may be approved from time to time by the Board of Directors and (iv) the Holder shall have delivered to the Company a legal opinion reasonably acceptable to the Board of Directors, stating that the registration of this Warrant is not required under the Securities Act or any applicable state securities or "blue sky" laws.

12

Any purported Transfer in violation of this <u>Section 6</u> shall be void *ab initio* and shall not be recognized by the Company.

7.    <u>Warrant Exchangeable for Different Denominations</u>.  This Warrant is exchangeable, upon the surrender hereof by the Holder at the principal office of the Company, for new Warrants of like tenor representing in the aggregate the purchase rights hereunder, and each of such new Warrants shall represent such portion of such rights as is designated by the Holder at the time of such surrender.  The Effective Date shall be deemed to be the "<u>Date of Issuance</u>" hereof regardless of the number of times new certificates representing the unexpired and unexercised rights formerly represented by this Warrant shall be issued.

8.    <u>Notices</u>.  All notices, requests, waivers and other communications made pursuant to this Warrant shall be in writing and shall be deemed to have been effectively given, delivered, provided or received (a) when personally delivered to the party to be notified; (b) when sent by facsimile or by electronic mail ("<u>e-mail</u>") to the party to be notified; (c) three (3) Business Days after deposit in the United States mail, postage prepaid, by certified or registered mail with return receipt requested, addressed to the party to be notified; or (d) one (1) Business Day after deposit with a national overnight delivery service, postage prepaid, addressed to the party to be notified with next-Business Day delivery guaranteed, in each case as follows: (i) in the case of the Holder, to the Holder at its address, facsimile number or e-mail address set forth in the books of the Company; and (ii) in the case of the Company, to the Secretary of the Company at the Company's address, facsimile number or e-mail address set forth on its signature page to this Warrant.  The Company may change its address, facsimile number or e-mail address for purposes of notice hereunder by giving notice of such change in the manner provided in this <u>Section 8</u>.

9.    <u>No Fractional Warrant Shares</u>.  The Holder shall only be permitted to exercise this Warrant for whole shares of Common Stock and the Company shall not be required to issue any fraction of a share of Common Stock in connection with the exercise of this Warrant.  The Holder shall receive no payment or other amount in respect of any fractional share of Common Stock that would otherwise be issuable upon exercise of this Warrant.

10.    <u>Amendment</u>.  This Warrant shall not be amended except by an instrument in writing signed by the Company and the Holder.

11.    <u>Descriptive Headings</u>.  The headings herein are inserted for convenience of reference only and are not to be considered in interpreting this Warrant.

12.    **<u>GOVERNING LAW</u>.  THIS WARRANT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO ITS CONFLICTS OF LAW DOCTRINE.**

13.    **<u>CONSENT TO JURISDICTION; SERVICE OF PROCESS; WAIVER OF JURY TRIAL</u>.  THE COMPANY AND (BY ITS ACCEPTANCE OF THIS WARRANT) THE HOLDER HEREBY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE DELAWARE COURT OF CHANCERY AND ANY STATE APPELLATE COURT THEREFROM WITHIN THE STATE OF DELAWARE**

13

**(UNLESS THE DELAWARE COURT OF CHANCERY SHALL DECLINE TO ACCEPT JURISDICTION OVER A PARTICULAR MATTER, IN WHICH CASE, OF ANY DELAWARE STATE OR FEDERAL COURT WITHIN THE STATE OF DELAWARE), AND ANY JUDICIAL PROCEEDING BROUGHT AGAINST THE COMPANY OR THE HOLDER WITH RESPECT TO ANY DISPUTE ARISING OUT OF THIS WARRANT OR ANY MATTER RELATED HERETO SHALL BE BROUGHT ONLY IN SUCH COURTS.   EACH OF THE COMPANY AND (BY ITS ACCEPTANCE OF THIS WARRANT) THE HOLDER HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION IT MAY HAVE OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.   EACH OF THE COMPANY AND (BY ITS ACCEPTANCE OF THIS WARRANT) THE HOLDER HEREBY CONSENTS TO PROCESS BEING SERVED IN ANY SUCH PROCEEDING BY THE MAILING OF A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE ADDRESS SPECIFIED IN SECTION 8, OR IN ANY OTHER MANNER PERMITTED BY LAW.   EACH OF THE COMPANY AND (BY ITS ACCEPTANCE OF THIS WARRANT) THE HOLDER HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUCH PROCEEDING.**

14.   Severability.   Any provision of this Warrant which is prohibited, unenforceable or not authorized in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition, unenforceability or non-authorization without invalidating the remaining provisions hereof or affecting the validity, enforceability or legality of such provision in any other jurisdiction.

*[remainder of page intentionally left blank; signature page follows]*

14

IN WITNESS WHEREOF, THE COMPANY HAS CAUSED THIS WARRANT TO BE SIGNED BY A DULY AUTHORIZED OFFICER AND TO BE DATED THE DATE OF ISSUANCE HEREOF.

**21ST CENTURY ONCOLOGY HOLDINGS, INC.**

By:_____
    Name:
    Title:

EXHIBIT A

EXERCISE AGREEMENT

To:     Dated:

The undersigned, pursuant to the provisions set forth in the attached Warrant (Certificate No. _) (the "Warrant"; capitalized terms used herein without definitions shall have the meanings given to such terms in the Warrant), hereby irrevocably elects to subscribe for the purchase of _____ shares of Common Stock covered by the Warrant and (check one):

☐     herewith tenders payment of the Aggregate Exercise Price for such shares of Common Stock by bank or certified check payable to the Company in the amount of $_____; or

☐     hereby agrees that it is exercising the Warrant in connection with, or in contemplation of, the occurrence of a Liquidity Event and is electing a Cashless Exercise by requesting that the Company deduct from the number of shares of Common Stock to be delivered to the Holder upon such exercise a number of shares of Common Stock having a Fair Market Value, on the Business Day immediately prior to the date of such exercise, equal to the Aggregate Exercise Price; provided, however, that such Cashless Exercise shall be subject to, and conditioned upon, the consummation of such Liquidity Event.

The undersigned hereby requests that the shares of Common Stock issuable upon exercise of the Warrant specified above be issued in such names set forth below; provided, however, that the undersigned acknowledges and agrees that no such shares of Common Stock shall be delivered to, or for the account of, any Person to whom the undersigned would not have been permitted to sell or otherwise transfer shares of Common Stock pursuant to the Certificate of Incorporation or the Stockholders Agreement.

| | |
|---|---|
| Signature | _____ |
| Name | _____ |
| Address | _____ |
| | _____ |

Shares of Common Stock to be issued in the name(s) of: [_____]

Note: If the shares of Common Stock to be issued are to be registered in a name other than that in which the Warrant is registered, the signature of the Holder must be guaranteed.

SIGNATURE GUARANTEED BY:

_____

Signatures must be guaranteed by a participant in the Securities Transfer Agent Medallion Program, the Stock Exchanges Medallion Program or the New York Stock Exchange, Inc. Medallion Signature Program.

17

EXHIBIT B

STOCKHOLDERS JOINDER AGREEMENT

This Joinder Agreement (this "Joinder") is executed pursuant to the terms of that certain Stockholders Agreement dated as of [_____] (as amended, the "Agreement"), by and among 21st Century Oncology Holdings, Inc. and the Stockholders (as defined in the Agreement). Capitalized terms used and not defined herein shall have the meanings set forth in the Agreement. By the execution of this Joinder, the undersigned agrees as follows:

(1) Acknowledgement. The undersigned acknowledges that the undersigned is acquiring shares of Class A Common Stock subject to the terms and conditions of the Agreement. The undersigned further acknowledges and agrees to all terms, conditions and provisions set forth in the Certificate of Incorporation and this Agreement, including, without limitation, the restrictions on transfer of Shares set forth in the Certificate of Incorporation and the Agreement.

(2) Agreement. The undersigned agrees that for all purposes of the Agreement the undersigned shall, effective as of the date hereof, be bound by all of the terms and provisions thereof, with the same force and effect as if the undersigned were originally a party thereto as a "Stockholder" (as defined in the Agreement).

The address, facsimile number and e-mail address to which notices required or permitted by the Agreement may be sent to the undersigned are as follows:

Facsimile No.:
Address:
E-mail Address:

Date: _____        _____
                                   Name:

EXHIBIT C

FORM OF ASSIGNMENT

For value received, the undersigned registered holder of the within Warrant hereby sells, assigns and transfers unto _____ [include name, address, facsimile number, e-mail address and telephone number of the transferee] the rights represented by the Warrant to purchase _____ shares of Class A Common Stock of 21st Century Oncology Holdings, Inc. to which the Warrant relates, and appoints _____ Attorney to make such transfer on the books of 21st Century Oncology Holdings, Inc. maintained for the purpose, with full power of substitution in the premises.

Dated: _____ _____, _____

Name: _____
　　　　　(Print or Type Name)

Signature: _____
　　　　　(Signature must conform in all respects to name of holder as specified on the face of Warrant)

## Exhibit F

### Form of the New Organizational Documents[1]

This Exhibit F includes the following organizational documents for Reorganized 21CH:

- Exhibit F-1:    Form of the Amended and Restated Certificate of Incorporation of 21st Century Oncology Holdings, Inc.

- Exhibit F-2:    Form of the Amended and Restated Bylaws of 21st Century Oncology Holdings, Inc.

- Exhibit F-3:    Form of the New Stockholders' Agreement

- Exhibit F-4:    Form of the New Registration Rights Agreement

- Exhibit F-5:    Form of the Certificate of Designations of Series A Convertible Preferred Stock of 21st Century Oncology Holdings, Inc.

Certain documents, or portions thereof, contained in this Exhibit F and the Plan Supplement remain subject to continuing negotiations among the Debtors and interested parties with respect thereto. The Debtors reserve all rights, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement, to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court.

---

[1]    The organizational documents for each of the Reorganized Debtors that are direct and indirect subsidiaries of Reorganized 21CH will be consistent in form and substance with the organizational documents governing such entities prior the Effective Date, subject to modifications required to facilitate the operations, management and corporate formalities of each respective Reorganized Debtor.

**Exhibit F-1**

**Form of the Amended and Restated Certificate of Incorporation of
21st Century Oncology Holdings, Inc.**

**AMENDED AND RESTATED CERTIFICATE OF INCORPORATION**

**of**

**21ST CENTURY ONCOLOGY HOLDINGS, INC.**

21ST CENTURY ONCOLOGY HOLDINGS, INC., a corporation organized and existing under the laws of the State of Delaware, hereby certifies as follows:

The name of the corporation is 21ST CENTURY ONCOLOGY HOLDINGS, INC. (the "Corporation"). The Corporation filed its original Certificate of Incorporation with the Secretary of State of the State of Delaware on October 9, 2007 (as amended, amended and restated, supplemented or otherwise modified prior to the filing of this Amended and Restated Certificate of Incorporation, the "Current Certificate of Incorporation"). This Amended and Restated Certificate of Incorporation (as amended, amended and restated, supplemented or otherwise modified from time to time, this "Certificate of Incorporation") was duly adopted, without the need for approval of the Board of Directors of the Corporation (the "Board of Directors") or the stockholders of the Corporation, in accordance with §§ 242, 245 and 303 of the Delaware General Corporation Law (the "DGCL") and in accordance with a plan of reorganization of the Corporation (the "Plan") approved by order of the United States Bankruptcy Court for the Southern District of New York in *In re 21st Century Oncology Holdings, Inc., et al.*, under Chapter 11 of the United States Bankruptcy Code (11 U.S.C. §§ 101–1330), as amended (the "Bankruptcy Code"), which Plan became effective on [_____] (the "Plan Effective Date").

The Current Certificate of Incorporation of the Corporation is hereby amended and restated to read in its entirety as follows:

1.      **Name.**  The name of the corporation is 21st Century Oncology Holdings, Inc.

2.      **Registered Office and Agent.**  The Corporation's registered office in the State of Delaware is located at 251 Little Falls Drive, in the City of Wilmington, County of New Castle, 19808. The name of its registered agent at such address is Corporation Service Company.

3.      **Purpose.**  The nature of the business or purposes to be conducted or promoted by the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware (the "DGCL").

4.      **Authorized Capital Stock; Number of Shares.**

4.1      The total number of shares of all classes of capital stock that the Corporation shall have the authority to issue is [_____] shares, consisting solely of (a) [_____] shares of Class A Voting Common Stock, $0.001 par value per share ("Class A Common Stock"); (b) [_____] shares of Class B Limited-Voting Common Stock, $0.001 par value per share ("Class B Common Stock" and, together with Class A Common Stock, "Common Stock"); and (c) [_____] shares of Preferred Stock, $0.001 par value per share ("Preferred Stock").

Shares of Class B Common Stock shall be issuable only pursuant to the terms of awards that may be granted under any equity incentive plan to be adopted by the Board of Directors of the Corporation (an "Equity Incentive Plan").

Notwithstanding anything herein to the contrary, the Corporation shall not issue non-voting equity securities of any class, series or other designation to the extent prohibited by Section 1123(a)(6) of the Bankruptcy Code; provided, however, that the foregoing restriction (i) shall have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code, (ii) shall only have such force and effect to the extent and for so long as such Section 1123(a)(6) is in effect and applies to the Corporation and (iii) may be amended or eliminated in accordance with applicable law as from time to time may be in effect.

5.     **Rights of Stockholders.**

5.1     ***Common Stock.***

5.1.1     *Relative Rights*.  Common Stock shall be subject to all of the rights, privileges, preferences and priorities of any series of Preferred Stock.  Subject to applicable law and except as otherwise expressly provided in this Certificate of Incorporation, the powers, designations, rights, preferences, privileges, qualifications, limitations and restrictions with respect to the Class A Common Stock and the Class B Common Stock shall be identical in all respects.

5.1.2     *Dividends*.  Subject to the rights of holders of any outstanding series of Preferred Stock, the Board of Directors may cause dividends to be declared and paid on outstanding shares of Common Stock out of funds legally available for the payment of dividends.  When, as and if dividends are declared by the Board of Directors, whether payable in cash, in property, in stock or otherwise, in accordance with this Certificate of Incorporation and the Amended and Restated Bylaws of the Corporation, as in effect from time to time (the "Bylaws"), out of the assets of the Corporation which are at law available therefor, the holders of outstanding shares of Common Stock shall be entitled to share equally in, and to receive in accordance with the number of shares of Common Stock held by each such holder, all such dividends, except that if at any time dividends are declared that are payable in shares of Common Stock, such stock dividends shall be payable at the same rate on the shares of each class of Common Stock and shall be payable only in shares of Class A Common Stock to holders of issued and outstanding shares of Class A Common Stock and only in shares of Class B Common Stock to holders of issued and outstanding shares of Class B Common Stock, and only to the extent that an adequate number of shares of each such class of Common Stock are available for the payment of such dividend.

5.1.3     *Liquidation Rights*.  In the event of any liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary, the holders of issued and outstanding shares of Common Stock shall be entitled to share, ratably according to the number of shares of Common Stock held by each such holder, in the remaining assets of the Corporation available for distribution to its stockholders after the payment, or provision for payment, of all debts and other liabilities of the Corporation and the payment of any outstanding Preferred Stock that has preferential rights on distributions upon a liquidation, dissolution or winding up of the Corporation.

2

5.1.4    *Stockholder Voting Rights*.  Subject to applicable law and except as otherwise expressly provided elsewhere in this Certificate of Incorporation or the Bylaws, and subject to the rights of holders of any outstanding series of Preferred Stock:

(i)    each holder of record of one or more issued and outstanding shares of Class A Common Stock shall be entitled to one vote for each share of Class A Common Stock standing in such holder's name on the books of the Corporation;

(ii)    each holder of record of one or more issued and outstanding shares of Class B Common Stock shall be entitled to one vote for each share of Class B Common Stock standing in such holder's name on the books of the Corporation for matters that holders of Class B Common Stock are entitled to vote on;

(iii)    the holders of the issued and outstanding shares of Class A Common Stock shall possess voting power on all matters on which the Corporation's stockholders are entitled to vote;

(iv)    the holders of the issued and outstanding shares of Class B Common Stock shall have no right to vote on any matter submitted to stockholders of the Corporation for vote, consent or approval, and the Class B Common Stock shall not be included in determining the number of shares voting or entitled to vote on such matters; provided, however, that holders of the issued and outstanding shares of Class B Common Stock shall have the right to vote on, and the Class B Common Stock shall be included in determining the number of shares voting or entitled to vote on, a dissolution of the Corporation pursuant to Section 275 of the DGCL; and

(v)    the holders of the issued and outstanding shares of Class A Common Stock and the holders of the issued and outstanding Class B Common Stock shall vote together as a single class on all matters submitted to a vote or consent of stockholders for which holders of shares of Class A Common Stock and holders of Class B Common Stock are entitled to vote.

5.1.5    *Conversion Rights*.

(i)    In the event that the Corporation consummates a Qualified Public Offering (as defined below), then all then-issued and outstanding shares of Class B Common Stock will automatically convert into an equal number of fully paid and nonassessable shares of Class A Common Stock, and all outstanding warrants, options and other securities of the Corporation that are convertible into, or exchangeable or exercisable for, shares of Class B Common Stock will become automatically convertible into, or exchangeable or exercisable for, an equal number of shares of Class A Common Stock.

(ii)    In the event of a Sale Transaction (as defined below), any shares of Class B Common Stock that are sold or otherwise transferred in such Sale Transaction by any stockholder shall automatically convert into an equal number of fully paid and nonassessable shares of Class A Common Stock upon the consummation of such Sale Transaction.

(iii)    Except as provided in clauses (i) and (ii) of this Section 5.1.5, shares of Class B Common Stock shall not be convertible into shares of Class A Common Stock.

3

(iv)     The Corporation shall at all times reserve and keep available for issuance, upon the conversion of any shares of Class B Common Stock, shares of Class A Common Stock sufficient to permit the conversion of the outstanding shares of Class B Common Stock into Class A Common Stock in accordance with this Section 5.1.5.

(v)     Upon any automatic conversion of shares of Class B Common Stock into shares of Class A Common Stock pursuant to clause (i) or clause (ii) of this Section 5.1.5, the holders of shares of Class B Common Stock shall surrender the certificates (if any) formerly representing such shares at the office of the Corporation.  Thereupon, there shall be issued and delivered to each such holder, promptly at the office of the Corporation and in the holder's name as shown on such surrendered certificate or certificates, a certificate or certificates for the number of shares of Class A Common Stock into which such shares of Class B Common Stock were so converted; provided, however, that if the Corporation has not issued certificates representing shares of Class A Common Stock, the Corporation shall cause to be delivered to each such holder evidence of a book-entry interest in the shares of Class A Common Stock into which such shares of Class B Common Stock were so converted registered on the books of the Corporation's transfer agent. To the extent the Corporation has issued certificates representing shares of Class B Common Stock, the Corporation shall not be obligated to issue certificates evidencing, or evidence of the book-entry interest in, the shares of the Class A Common Stock issuable upon such conversion unless and until certificates formerly evidencing the converted shares of Class B Common Stock are either delivered to the Corporation, or the holder thereof notifies the Corporation that such certificates have been lost, stolen or destroyed and executes and delivers an agreement, reasonably acceptable to the Corporation, to indemnify the Corporation from any loss incurred by the Corporation in connection therewith.  Such conversion, to the extent permitted by law, will be deemed to have been effected as of the close of business on the date on which such certificate or certificates (if any) have been surrendered in accordance herewith (or, if the Corporation has not issued certificates representing shares of Class A Common Stock, as of the close of business on the date on which the Qualified Public Offering or Sale Transaction, as applicable, shall have become effective or closed, as applicable), and at such time the rights of the holder of such shares of Class B Common Stock will cease and the Person or Persons in whose name or names the certificate or certificates, or book-entry registration, as applicable, for shares of Class A Common Stock are to be issued upon such conversion shall be deemed to have become the holder or holders of record of the shares of Class A Common Stock represented thereby.

(vi)     The issuance of certificates for, or the delivery of evidence of a book-entry interest in, shares of Class A Common Stock upon automatic conversion of shares of Class B Common Stock pursuant to clause (i) or clause (ii) of this Section 5.1.5 shall be made without charge to any original holder of any shares of Class B Common Stock for any issuance tax in respect thereof, or other cost incurred by the Corporation in connection with such conversion and the related issuance of shares of Class A Common Stock, provided, that the Corporation will not be required to pay any such taxes or costs which may be payable in respect of any such conversion by any other Person or in respect of any transfer involved in the issuance and delivery of any shares of Class A Common Stock in a name other than that of the registered holder of the shares of Class B Common Stock converted.

4

5.2     *Preferred Stock*.  Shares of Preferred Stock may be issued from time to time in one or more series.  Subject to applicable law and the provisions of this Certificate of Incorporation, the Board of Directors is authorized to determine the designation of any series of Preferred Stock, to fix the number of shares of any series of Preferred Stock, and to determine the rights, powers (including voting powers, if any), preferences, privileges, limitations and restrictions granted to or imposed upon any series of Preferred Stock and, within the limits and restrictions stated in any resolution or resolutions of the Board of Directors originally fixing the number of shares constituting any series of Preferred Stock, to increase or decrease (but not below the number of shares of any such series then outstanding) the number of shares of any such series subsequent to the issuance of shares of that series.  If the number of shares of any series of Preferred Stock shall be so decreased, the shares constituting such decrease shall resume the status which they had prior to the adoption of the resolution originally fixing the number of shares of such series.

5.3     *Consideration*.  Subject to applicable law and except as otherwise provided in this Certificate of Incorporation, the capital stock of the Corporation, regardless of class or series, may be issued for such consideration and for such corporate purposes as the Board of Directors may from time to time determine.

5.4     *Stockholders Agreement*.  To the fullest extent permitted by law, every holder of shares of Common Stock and Preferred Stock shall be subject to, shall be required to enter into, shall be deemed to have entered into, and shall be deemed to be bound by, the Stockholders Agreement dated as of the Plan Effective Date among the Corporation and the stockholders of the Corporation (as the same may be amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the provisions thereof, the "Stockholders Agreement") (including the transfer restrictions therein), at such time as such holder receives shares of Common Stock and/or Preferred Stock (whether by sale, gift, inheritance or other transfer, through the exercise or conversion of warrants, options or other securities, by operation of law or otherwise), regardless of whether any such holder has executed the Stockholders Agreement, and the Stockholders Agreement shall be deemed to be a valid, binding and enforceable obligation of such holder [(including any obligation set forth therein to waive or refrain from exercising any appraisal, dissenters or similar rights)] even if such holder has not actually executed and delivered a counterpart of the Stockholders Agreement.

If any provisions of this Section 5.4 or the application thereof to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Section 5.4 and the application of such provision to other Persons and circumstances shall not be affected thereby and such provision shall be enforced to the greatest extent permitted by law.

The Corporation will furnish without charge to each holder of record of shares of Common Stock and/or Preferred Stock a copy of the Stockholders Agreement upon written request to the Corporation at its principal place of business.

6.     **Transfers of Shares.**

6.1     *Restrictions on Transfer*.

5

6.1.1   *Prohibited Transfers.*   Without limiting any other provisions or restrictions or conditions of this Section 6, unless otherwise waived by the Board of Directors in its sole discretion, no shares of Common Stock or Preferred Stock shall be Transferred by any stockholder (regardless of the manner in which the Transferor initially acquired such shares of Common Stock or Preferred Stock), if:

(i)   such Transfer would, if consummated, result in any violation of the Securities Act or any state securities laws or regulations, or any other applicable federal or state laws or order of any Governmental Authority having jurisdiction over the Corporation or any of its subsidiaries;

(ii)   such Transfer would, if consummated (after taking into account any other proposed Transfers or transfers of Warrants for which a notice of any thereof has been previously delivered to the Board of Directors, but not yet consummated), result in the Corporation having, in the aggregate, 400 or more holders of record (as such concept is understood for purposes of Section 12(g) of the Exchange Act) of either (x) the class of shares of Common Stock or Preferred Stock proposed to be Transferred (assuming, for purposes of this clause (x), that all issued and outstanding shares of capital stock and other securities of the Corporation that are exercisable or exchangeable for, or convertible into, directly or indirectly, the class of shares of Common Stock or Preferred Stock proposed to be Transferred were exercised, exchanged or converted at the time of such Transfer) or (y) any class of shares of Common Stock or Preferred Stock into which the shares of Common Stock or Preferred Stock proposed to be Transferred are convertible (assuming, for purposes of this clause (y), that all issued and outstanding shares of capital stock and other securities of the Corporation that are exercisable or exchangeable for, or convertible into, directly or indirectly, the class of shares of Common Stock or Preferred Stock into which the shares of Common Stock or Preferred Stock of the class proposed to be Transferred are convertible were exercised, exchanged or converted at the time of such Transfer), unless at the time of such Transfer the Corporation is already subject to the reporting obligations under Section 13 or Section 15(d) of the Exchange Act; provided, that the number 400 as used in this Section 6.1.1(ii) shall be increased by the number of such holders that acquire, after the Plan Effective Date, shares of Common Stock or Preferred Stock of the class proposed to be Transferred or shares of capital stock and other securities of the Corporation that are exercisable or exchangeable for, or convertible into, shares of Common Stock or Preferred Stock of the class proposed to be Transferred or shares of Common Stock or Preferred Stock of the class into which the shares of Common Stock or Preferred Stock of the class proposed to be Transferred are convertible, in any such case from the Corporation other than on account of an exercise or conversion of Warrants or Preferred Stock or in connection with a distribution to all holders of any such shares of Common Stock or Preferred Stock, capital stock or other securities;

(iii)   such Transfer would, if consummated (after taking into account any other proposed Transfers or transfers of Warrants for which a notice of any thereof has been previously delivered to the Board of Directors, but not yet consummated), require the Corporation to register any class of Common Stock, Preferred Stock or any other equity securities of the Corporation under the Exchange Act (as a result of the number of

6

stockholders or otherwise), unless at the time of such Transfer the Corporation is already subject to the reporting obligations under Section 13 or Section 15(d) of the Exchange Act; or

(iv)     such Transfer is to a Competitor.

6.1.2 *Certificates; Legal Opinion.*   In addition to the restrictions set forth in Section 6.1.1, no shares of Common Stock or Preferred Stock shall be Transferred by any stockholder unless (i) the certificates (if any) representing such shares bear legends as provided in Sections 2.1(e)(i) and 2.1(e)(ii) of the Stockholders Agreement (and, with respect to uncertificated shares, notice of such legends is provided in accordance with applicable law), for so long as such legends are applicable, and (ii) either (A) the Transferee is an Affiliate of the Transferor or (B) prior to such Transfer (1) the Transferee and the Transferor shall have delivered to the Corporation representation letters in such form as may be approved from time to time by the Board of Directors and available from the Secretary of the Corporation and (2) the Transferor shall have delivered to the Corporation a legal opinion, reasonably acceptable to the Board of Directors, stating that the registration of the shares of Common Stock or Preferred Stock that are the subject of such proposed Transfer is not required under the Securities Act or any applicable state securities or "blue sky" laws.   Any of the requirements set forth in clause (B) of the immediately preceding sentence may be waived by the Board of Directors in its sole discretion.

6.1.3 *Notice of Transfer*.   Subject to Section 7, and unless otherwise provided by the Board of Directors, any stockholder effecting a Transfer of shares of Common Stock or Preferred Stock must submit to the Corporation, not less than five (5) Business Days prior to such Transfer, a written notice (a "Transfer Notice") of such Transfer.   A Transfer Notice shall be delivered to (i) the Secretary or Chief Financial Officer of the Corporation, or any of their designees, and (ii) the Chairman of the Board of Directors (the "Transfer Notice Recipients"), in each case in accordance with Section 13.   A Transfer Notice shall include or be accompanied by (A) the name, address, facsimile number, e-mail address and telephone number of the Transferor and the Transferee, (B) whether the Transferee is an Affiliate of the Transferor and whether the Transferee is an Accredited Investor, (C) the number and class of shares of Common Stock or Preferred Stock proposed to be Transferred to, and acquired by, the Transferee, (D) the date on which the Transfer is expected to take place, (E) the percentage of the Transferor's total number of shares of Common Stock or Preferred Stock of the same class to be Transferred, (F) a joinder agreement to the Stockholders Agreement, duly completed and executed by the Transferee to the extent such Transferee has not already signed a counterpart of the Stockholders Agreement or executed any such joinder agreement and (G) a request that the Corporation register the Transfer on the books of the Corporation and inform the Corporation's stock transfer agent (if any) of the Transfer.   So long as the other provisions of this Section 6 are satisfied and complied with, the Board of Directors (or an officer of the Corporation to whom such determination has been delegated by the Board of Directors) shall, within five (5) Business Days after a Transfer Notice is delivered to the Corporation, cause the Transfer to be registered on the books of the Corporation and inform the Corporation's stock transfer agent (if any) of such Transfer unless, prior to the expiration of such five (5) Business Day period, the Board of Directors (or such delegated officer) or any of the Transfer Notice Recipients request information demonstrating that the Transfer complies with this Section 6 (including information demonstrating that the

7

Transferee or any of its Affiliates is not a Competitor), in which case the Transfer shall be registered on the books of the Corporation no later than five (5) Business Days after the Board of Directors (or such delegated officer) or such Transfer Notice Recipient receives such information, unless the Board of Directors (or such delegated officer) determines during any such 5-Business Day period referred to above that the Transfer is not permitted pursuant to the terms of this Section 6, in which case the Board of Directors (or such delegated officer) shall promptly inform the Transferor of such determination.

6.1.4   *Prohibited Transfers Void.*   The Corporation shall not record upon its books any Transfer of any shares of Common Stock or Preferred Stock except in accordance with the terms and provisions of this Certificate of Incorporation and, in the case of any shares of Class B Common Stock, the terms and provisions of any applicable Equity Incentive Plan.   Any purported Transfer of shares of Common Stock or Preferred Stock in violation of such terms and provisions shall be void *ab initio* and shall not be recognized by the Corporation.

6.1.5   *Legends on Certificates*.   All certificates (if any) evidencing shares of Common Stock or Preferred Stock shall conspicuously bear, or shall be deemed to conspicuously bear (even if such certificate does not actually bear such legends), the legends set forth in Sections 2.1(e)(i) and 2.1(e)(ii) of the Stockholders Agreement (to the extent the Stockholders Agreement requires such certificates to bear such legends).   Each stockholder shall be deemed to have actual knowledge of the terms, provisions, restrictions and conditions set forth in this Certificate of Incorporation and the Stockholders Agreement (including, without limitation, the restrictions on Transfer set forth in this Section 6 and the restrictions on Transfer set forth in Article II of the Stockholders Agreement) for all purposes of this Certificate of Incorporation, the Stockholders Agreement and applicable law (including, without limitation, the DGCL and the Uniform Commercial Code as adopted and in effect in any applicable jurisdiction), whether or not any certificate evidencing shares of Common Stock or Preferred Stock owned or held by such stockholder bears the legends set forth in Sections 2.1(e)(i) and 2.1(e)(ii) of the Stockholders Agreement or whether or not any such stockholder received a separate notice of such terms, provisions, restrictions and conditions.

6.2   **Termination.**   Except for the legend requirements set forth in Section 6.1.2 (to the extent still applicable), the provisions of this Section 6 shall terminate automatically upon the consummation of a Qualified Public Offering.

7.   **Drag-Along Transactions.**

7.1   ***Drag-Along Transactions.***

7.1.1   In the event that one or more stockholders that own or hold, together with their Affiliates, at least 66.67% of the shares of Fully Diluted Common Stock at the time of the delivery of a Drag Notice (for purposes of this Section 7.1, each, a "Selling Holder" and, collectively, the "Selling Holders") determine to effect, approve or otherwise take any action that would cause the occurrence of, or desire to consummate, a Sale Transaction, the Corporation or the Selling Holders (or a designated representative acting on behalf of the Selling Holders) will have the right (but not the obligation) to deliver written notice thereof (a "Drag Notice") to all other stockholders (each, a "Dragged Holder" and, collectively, the "Dragged Holders"),

8

including any holders of shares of Class B Common Stock. Such written notice shall be delivered to the Dragged Holders in accordance with Section 13 at any time prior to the closing of the Sale Transaction, and shall contain a general description of the material terms and conditions of the Sale Transaction, including the amount and form of consideration to be paid by the Third Party Purchaser and the proposed date (which may be an estimated date or range of dates) for the closing of the Sale Transaction; provided, that the Selling Holders may elect to omit from the Drag Notice any such terms and conditions of, or information relating to, the Sale Transaction if the Selling Holders determine that the disclosure thereof to the Dragged Holders would have an adverse effect on the Sale Transaction or the consummation thereof, but the omission of any such terms, conditions or information shall not have any effect on the validity of the Drag Notice.

7.1.2   If a Drag Notice is delivered by the Corporation or by or on behalf of the Selling Holders to the Dragged Holders in accordance with Section 7.1.1, each of the Dragged Holders shall:

(i)   if such Sale Transaction is structured as a Transfer of shares of Common Stock and/or Preferred Stock, be obligated to Transfer to the Third Party Purchaser (subject to the other terms of this Section 7.1.2), at the closing of such Sale Transaction, all shares of Common Stock and/or Preferred Stock held by such Dragged Holder (or the applicable portion of such Dragged Holder's shares of Common Stock and/or Preferred Stock that are required to be Transferred in connection with such Sale Transaction, as determined in accordance with Section 7.1.3) on purchase terms and conditions that are substantially the same as those purchase terms and conditions applicable to the shares of Common Stock and/or Preferred Stock of the Selling Holders of the same class (excluding any investment or reinvestment opportunity given to management of the Corporation or any of its subsidiaries), free and clear of any Liens (other than Permitted Liens); provided, that each stockholder will receive, in respect of such stockholder's shares of Common Stock and/or Preferred Stock, the same portion of the aggregate consideration paid in such Sale Transaction that such stockholder would have received if such aggregate consideration had been distributed by the Corporation in complete liquidation pursuant to the rights and preferences set forth in this Certificate of Incorporation as in effect immediately prior to the consummation of such Sale Transaction;

(ii)   if such Sale Transaction is structured as a sale or transfer of assets (including by or through the sale, issuance or other disposition of the capital stock or other equity interests of, or reorganization, merger, share exchange, consolidation or other business combination involving, any direct and/or indirect subsidiary or subsidiaries of the Corporation), approve any subsequent dissolution and liquidation of the Corporation or any of its subsidiaries in connection therewith and execute and/or deliver any applicable documents, instruments or agreements related thereto; provided, that, in any such liquidation, each stockholder shall receive on account of its shares of Common Stock and/or Preferred Stock the distributions pursuant to the rights and preferences set forth in this Certificate of Incorporation as in effect immediately prior to the consummation of such Sale Transaction;

9

(iii)    (A) be required to vote (including by written consent) such Dragged Holder's shares of Common Stock and Preferred Stock (to the extent of any voting rights), whether by proxy, voting agreement or otherwise, in favor of such Sale Transaction, and (B) not raise any objection against such Sale Transaction (including objections relating to consideration being paid in connection therewith) or the process pursuant to which it was arranged, negotiated or consummated;

(iv)    execute and deliver any applicable purchase agreement, merger agreement, indemnity agreement, escrow agreement, letter of transmittal, release or other agreements or documents governing or relating to such Sale Transaction that the Corporation, the Selling Holders or the Third Party Purchaser may request and which are executed and delivered by the Selling Holders (other than any agreements or documents that relate to any investment or reinvestment opportunity given to management of the Corporation or any of its subsidiaries) (the "Sale Transaction Documents"); provided, however, that no Dragged Holder shall be required to agree to, or be bound by, any non-competition covenants;

(v)    use commercially reasonable efforts to obtain or make any consents or filings necessary to be obtained or made by such Dragged Holder to effectuate such Sale Transaction;

(vi)    [waive and refrain from exercising any appraisal, dissenters or similar rights with respect to such Sale Transaction (and each stockholder shall be deemed to have irrevocably waived any appraisal, dissenters or similar rights arising from or relating to any Sale Transaction);]

(vii)    not (A) take any action that might impede, be prejudicial to or be inconsistent with, such Sale Transaction, (B) assert, any claim against the Corporation, any member of the Board of Directors (or any committee thereof), any member of any Subsidiary Governing Body, or any other stockholder or any of its Affiliates (including any Selling Holder and any of its Affiliates) in connection with such Sale Transaction (including any claim for breach of fiduciary duty), or (C) except as required by a Governmental Authority, disclose to any Person any information related to such Sale Transaction (including, without limitation, the identity of the Third Party Purchaser, the fact that discussions or negotiations are taking place concerning such Sale Transaction, or any of the terms, conditions or other information with respect to such Sale Transaction); and

(viii)    take all necessary or desirable actions reasonably requested by the Selling Holders, the Third Party Purchaser and/or the Corporation in connection with the consummation of such Sale Transaction, including voting such Dragged Holder's shares of Common Stock and Preferred Stock (to the extent of any voting rights), whether by proxy, voting agreement or otherwise, in favor of such Sale Transaction.

7.1.3    In the case of a Sale Transaction involving less than 100% of the then-issued and outstanding shares of Common Stock and Preferred Stock, a percentage of the shares of Common Stock and Preferred Stock, determined on an as-converted basis,

10

owned or held by each Dragged Holder and each Selling Holder shall be Transferred in such Sale Transaction, which percentage shall be equal to the quotient obtained by dividing (i) the total number of shares of Common Stock and Preferred Stock owned or held by the Selling Holders in the aggregate that are proposed to be Transferred in such Sale Transaction (determined on an as-converted basis) by (ii) the total number of shares of Common Stock and Preferred Stock owned or held by the Selling Holders in the aggregate (determined on an as-converted basis).  In the event that the Selling Holders are collectively Transferring less than 100% of all of the shares of Common Stock and Preferred Stock owned or held by the Selling Holders in the aggregate and the Selling Holders collectively own or hold shares of Common Stock and Preferred Stock of more than one class, then any Dragged Holder that owns or holds shares of Common Stock and Preferred Stock of more than one class shall be required to Transfer a percentage of the shares of Common Stock and Preferred Stock of each class owned or held by such Dragged Holder equal to the quotient obtained in the immediately preceding sentence.

7.1.4   At the closing of any Sale Transaction that is structured as a sale or other Transfer of shares of Common Stock and Preferred Stock in which the Selling Holders have exercised their rights under this Section 7.1, each Dragged Holder shall deliver at such closing, against payment of the purchase price therefor in accordance with the terms of the Sale Transaction Documents, certificates or other documentation (or other evidence thereof reasonably acceptable to the Third Party Purchaser) representing such Dragged Holder's shares of Common Stock and Preferred Stock to be sold, duly endorsed for transfer or accompanied by duly endorsed stock powers (to the extent any shares of Common Stock or Preferred Stock are certificated), and such other documents as are deemed reasonably necessary by any one or more of the Selling Holders, the Third Party Purchaser and/or the Corporation for the proper transfer of such shares of Common Stock and Preferred Stock on the books of the Corporation, free and clear of any Liens (other than Permitted Liens).

7.1.5   Each Selling Holder and each Dragged Holder will bear its *pro rata* share (based upon the allocation among the Selling Holders and the Dragged Holders of the consideration payable in respect of shares of Common Stock and Preferred Stock in the Sale Transaction) of the costs and expenses of any Sale Transaction to the extent such costs and expenses are incurred for the benefit of all stockholders or the Corporation and are not otherwise paid by the Corporation or the Third Party Purchaser.  Costs and expenses incurred by any stockholder on its own behalf will not be considered costs and expenses of the Sale Transaction and will be borne solely by such stockholder.

7.1.6   The Corporation shall, and shall use its commercially reasonable efforts to cause its officers, employees, agents, contractors and others under its control to, cooperate and assist in any proposed Sale Transaction and not take any action which might impede, be prejudicial to or be inconsistent with, any such Sale Transaction. Pending the completion of any proposed Sale Transaction, the Corporation shall use commercially reasonable efforts to operate in the ordinary course of business and to maintain all existing business relationships in good standing (unless otherwise required by the Sale Transaction Documents) and otherwise comply with the terms of the Sale Transaction Documents to which it is a party.

11

7.1.7   The Corporation shall cooperate with the Selling Holders to enter into a Sale Transaction and to take any and all such further action in connection therewith as the Selling Holders may deem necessary or appropriate in order to consummate (or, if directed by the Selling Holders, abandon) any such Sale Transaction.  Neither the Corporation, any of its subsidiaries nor any of the Selling Holders shall have any liability if any such Sale Transaction is not consummated for any reason.  Subject to the provisions of this Section 7.1, the Selling Holders, in exercising their rights under this Section 7.1, shall have complete discretion over the terms and conditions of any Sale Transaction effected hereby, including price, payment terms, conditions to closing, representations, warranties, affirmative covenants, negative covenants, indemnification, releases, holdbacks and escrows.  At the request of the Selling Holders, the Board of Directors shall authorize and direct the Corporation or any now or hereafter created subsidiary of the Corporation to execute such agreements, documents, applications, authorizations, registration statements and instruments as they may deem necessary or appropriate in connection with any Sale Transaction.

7.1.8   IN ORDER TO SECURE THE OBLIGATIONS OF EACH DRAGGED HOLDER TO VOTE SUCH DRAGGED HOLDER'S SHARES OF COMMON STOCK AND PREFERRED STOCK IN FAVOR OF A SALE TRANSACTION [AND TO WAIVE ANY APPRAISAL, DISSENTERS OR SIMILAR RIGHTS THAT SUCH DRAGGED HOLDER HAS (OR MAY HAVE) WITH RESPECT TO ANY SALE TRANSACTION], IN EACH CASE AS SET FORTH IN SECTION 7.1.2, EACH DRAGGED HOLDER SHALL BE DEEMED TO IRREVOCABLY APPOINT THE SELLING HOLDERS (AND EACH OF THEM) AS SUCH DRAGGED HOLDER'S TRUE AND LAWFUL PROXY AND ATTORNEY, WITH FULL POWER OF SUBSTITUTION, TO VOTE ALL SHARES OF COMMON STOCK AND PREFERRED STOCK OWNED OR HELD BY SUCH DRAGGED HOLDER OR OVER WHICH SUCH DRAGGED HOLDER HAS VOTING CONTROL TO EFFECTUATE SUCH VOTES AND WAIVERS FOR THE DURATION OF THE EXISTENCE OF THE CORPORATION.  IN ADDITION, IN ORDER TO SECURE THE OBLIGATIONS OF EACH DRAGGED HOLDER TO EXECUTE AND DELIVER THE SALE TRANSACTION DOCUMENTS, AND TO TAKE ACTIONS IN CONNECTION WITH THE CONSUMMATION OF A SALE TRANSACTION, IN EACH CASE AS SET FORTH IN SECTION 7.1.2, EACH DRAGGED HOLDER SHALL BE DEEMED TO IRREVOCABLY GRANT TO THE SELLING HOLDERS (AND EACH OF THEM) A POWER-OF-ATTORNEY TO SIGN ANY AND ALL SUCH SALE TRANSACTION DOCUMENTS AND TO TAKE ANY AND ALL SUCH ACTIONS, IN THE NAME AND ON BEHALF OF SUCH DRAGGED HOLDER.  THE PROXIES AND POWERS OF ATTORNEY GRANTED BY EACH DRAGGED HOLDER PURSUANT TO THIS SECTION 7.1.8 ARE COUPLED WITH AN INTEREST, ARE IRREVOCABLE, AND SHALL NOT BE AFFECTED BY AND SHALL SURVIVE THE DEATH, INCOMPETENCY, INCAPACITY, DISABILITY, BANKRUPTCY OR INSOLVENCY OF ANY DRAGGED HOLDER WHO IS AN INDIVIDUAL AND THE MERGER, CONSOLIDATION, LIQUIDATION, BANKRUPTCY, INSOLVENCY OR DISSOLUTION OF ANY DRAGGED HOLDER THAT IS NOT AN INDIVIDUAL.

7.1.9   If the Selling Holders enter into any negotiation or transaction for which Rule 506 of Regulation D (or any similar rule then in effect) promulgated by the United States Securities and Exchange Commission may be available with respect to such negotiation or transaction (including a merger, consolidation or other reorganization), each Dragged Holder who is not an Accredited Investor shall, at the request of the Corporation or the Selling Holders, appoint a "purchaser representative" (as such term is defined in Rule 501 of Regulation D) reasonably acceptable to the Corporation or the Selling Holders (as applicable) in connection with such negotiation or transaction and the Corporation shall pay the fees and expenses of such purchaser representative.

7.1.10   Any shares of Class B Common Stock Transferred in a Sale Transaction by a Selling Holder or a Dragged Holder shall immediately and automatically convert into shares of Class A Common Stock upon the consummation of such Sale Transaction.

7.1.11   The provisions of this Section 7.1 shall be in addition to, and not in limitation of, the provisions of Article III of the Stockholders Agreement.

7.1.12   A Transfer of shares of Common Stock and Preferred Stock in a Sale Transaction by a Selling Holder or a Dragged Holder pursuant to this Section 7.1 shall not be subject to the requirements of Section 6 other than Section 6.1.1(i).

7.1.13   Nothing in this Section 7.1 or elsewhere in this Certificate of Incorporation shall, or shall be deemed to, limit, restrict, supersede or otherwise modify or alter the right of the Supermajority Preferred Stockholders (as defined in the Series A Certificate of Designations) to require that shares of Series A Preferred Stock be converted into shares of Class A Common Stock in accordance with Section 7.2 of the Series A Certificate of Designations and such rights may be exercised in accordance with Section 7.2 of the Series A Certificate of Designations prior to, concurrently with and/or after the exercise of any rights of the Selling Holders pursuant to this Section 7.1.

7.2      *Termination*.  The provisions of this Section 7 shall terminate automatically upon the consummation of a Qualified Public Offering.

8.      **Directors.**  This Section 8 is inserted for the management of the business and for the conduct of the affairs of the Corporation and it is expressly provided that it is intended to be in furtherance of and not in limitation or exclusion of the powers conferred by applicable law.

8.1      *Powers*.  Except as may otherwise be provided in this Certificate of Incorporation, the Bylaws or the DGCL, the business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors.

8.2      *Composition of the Board of Directors*.

8.2.1    Subject to the rights and preferences of any series of outstanding Preferred Stock, the number of directors constituting the whole Board of Directors shall be fixed from time to time in accordance with the provisions of the Bylaws and the Stockholders Agreement.  As of the Plan Effective Date, the Board of Directors shall consist of the seven (7) individuals identified in the Plan (such seven individuals, the "Initial Board").  Each member of the Initial

13

Board shall hold office until his or her respective successor is duly elected and qualified in accordance with the terms of this Certificate of Incorporation, the Bylaws and the Stockholders Agreement.

8.2.2    Subject to the special voting rights, if any, of holders of any outstanding series of Preferred Stock, the holders of the shares of Class A Common Stock and Preferred Stock (voting together as a single class and on an as-converted basis) shall have the right and power to elect all the directors of the Corporation by vote of holders of a plurality of the votes of the shares of shares of Class A Common Stock and Preferred Stock (voting together as a single class and on an as-converted basis) present in person or represented by proxy at any meeting at which a quorum is present called for the purpose of electing directors; provided, however, that holders of shares of Class A Common Stock and Preferred Stock shall be required to vote their shares of Class A Common Stock and Preferred Stock to elect as directors (including by executing written consents) those individuals that are nominated and designated in accordance with the terms of the Stockholders Agreement.

8.2.3    The election of directors need not be by written ballot.

8.3    *Tenure*.  The term of office of each director shall expire at the first meeting of the Board of Directors following the annual meeting of stockholders next occurring after the director's election or appointment to the Board of Directors, or upon such director's earlier death, resignation or removal.

8.4    *Removal*.  Except as otherwise provided by this Certificate of Incorporation, the Stockholders Agreement or the DGCL, any director may be removed at any time, with or without cause, upon the affirmative vote of the holders of the shares of Class A Common Stock and Preferred Stock (voting together as a single class and on an as-converted basis); provided, however, that no removal of a director shall be made that is in violation of any restrictions or limitations set forth in the Stockholders Agreement.  If the Board of Directors terminates the employment of the chief executive officer of the Corporation for any reason, and such chief executive officer is then serving as a director, the terminated chief executive officer will be required to immediately resign as a director.

8.5    *Newly Created Directorships and Vacancies*.  Subject to the rights and preferences of any series of outstanding Preferred Stock and subject to the voting rights and board designation rights set forth herein and in the Stockholders Agreement, newly created directorships resulting from any increase in the authorized number of directors or any vacancies in the Board of Directors resulting from death, resignation, retirement, disqualification, removal from office, or other cause, shall be filled by a plurality of the votes of the issued and outstanding shares of Class A Common Stock and Preferred Stock (voting together as a single class and on an as-converted basis) present in person or represented by proxy at a special meeting of stockholders called for such purpose in accordance with the terms of the Bylaws.  Any director(s) so chosen shall hold office until their respective successors are duly elected at the next annual meeting of stockholders, or upon such director's earlier death, resignation or removal.

14

8.6    *Cumulative Voting*.  There shall not be cumulative voting by stockholders in the election of directors of the Corporation.

9.    **Compromise, Arrangement or Reorganization.**  Whenever a compromise or arrangement is proposed between this Corporation and its creditors or any class of them and/or between this Corporation and its stockholders or any class of them, any court of equitable jurisdiction within the State of Delaware may, on the application in a summary way of this Corporation or of any creditor or stockholder thereof or on the application of any receiver or receivers appointed for this Corporation under the provisions of Section 291 of the DGCL or on the application of trustees in dissolution or of any receiver or receivers appointed for this Corporation under the provisions of Section 279 of the DGCL, order a meeting of the creditors or class of creditors, and/or of the stockholders or class of stockholders of this Corporation, as the case may be, to be summoned in such manner as the said court directs. If a majority in number representing three-fourths in value of the creditors or class of creditors, and/or of the stockholders or class of stockholders of this Corporation, as the case may be, agree to any compromise or arrangement and to any reorganization of this Corporation as a consequence of such compromise or arrangement, the said compromise or arrangement and the said reorganization shall, if sanctioned by the court to which the said application has been made, be binding on all the creditors or class of creditors, and/or on all the stockholders or class of stockholders, of this Corporation, as the case may be, and also on this Corporation.

10.    **Limitation of Liability.**  To the fullest extent permitted by the DGCL, no director of the Corporation shall be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, including breaches resulting from such director's grossly negligent behavior, except for liability (a) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (b) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (c) under Section 174 of the DGCL or (d) for any transaction from which the director derived an improper personal benefit. If the DGCL is hereafter amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the DGCL, as so amended.  Any amendment, repeal or modification of this Section 10 by the stockholders of the Corporation shall not adversely affect any right or protection of a director of the Corporation existing at or prior to the time of such amendment, repeal or modification.

11.    **Indemnification.**

11.1    To the fullest extent permitted by law, the Corporation shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding ("Proceeding"), whether civil, criminal, administrative or investigative (other than an action by or in the right of the Corporation) by reason of the fact that the person is or was a director or officer of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise ("Other Entity"), against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by the person in connection with such Proceeding if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the Corporation, and, with

15

respect to any criminal action or proceeding, had no reasonable cause to believe the person's conduct was unlawful.  The termination of any Proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which the person reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had reasonable cause to believe that the person's conduct was unlawful.  To the extent specified by the Board of Directors at any time and to the fullest extent permitted by law, the Corporation shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the Corporation to procure a judgment in its favor by reason of the fact that the person is or was a director or officer of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of an Other Entity against expenses (including attorneys' fees) actually and reasonably incurred by the person in connection with the defense or settlement of such action or suit if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the Corporation and except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the Corporation unless and only to the extent that the Court of Chancery of the State of Delaware (the "Court of Chancery") or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper.

11.2    The Corporation shall, from time to time, reimburse or advance to any director or officer entitled to indemnification hereunder the funds necessary for payment of expenses, including attorneys' fees and disbursements, incurred in connection with any Proceeding, in advance of the final disposition of such Proceeding; provided, however, that, if required by the DGCL, such expenses incurred by or on behalf of any director or officer may be paid in advance of the final disposition of a Proceeding only upon receipt by the Corporation of an undertaking, by or on behalf of such director or officer, to repay any such amount so advanced if it shall ultimately be determined by final judicial decision from which there is no further right of appeal that such director or officer is not entitled to be indemnified for such expenses.

11.3    The rights to indemnification and reimbursement or advancement of expenses provided by, or granted pursuant to, this Section 11 shall not be deemed exclusive of any other rights to which a person seeking indemnification or reimbursement or advancement of expenses may have or hereafter be entitled under any statute, this Certificate of Incorporation, the Bylaws, any agreement (including any policy of insurance purchased or provided by the Corporation under which directors or officers of the Corporation are covered), any vote of stockholders or disinterested directors or otherwise, both as to action in his or her official capacity and as to action in another capacity while holding such office.

11.4    The rights to indemnification and reimbursement or advancement of expenses provided by, or granted pursuant to, this Section 11 shall continue as to a person who has ceased to be a director or officer and shall inure to the benefit of the executors, administrators, legatees and distributees of such person.

16

11.5    The Corporation shall have the power to purchase and maintain insurance on behalf of any person who is or was a director or officer of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of an Other Entity, against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such person's status as such, whether or not the Corporation would have the power to indemnify such person against such liability under the provisions of this Section 11, the Bylaws or under Section 145 of the DGCL or any other provision of law.

11.6    The provisions of this Section 11 shall be a contract between the Corporation, on the one hand, and each director and officer who serves in such capacity at any time while this Section 11 is in effect and any other Person indemnified hereunder, on the other hand, pursuant to which the Corporation and each such director, officer or other Person intend to be legally bound.  Notwithstanding anything to the contrary contained in this Certificate of Incorporation, no amendment, repeal or modification of this Section 11 shall affect any rights or obligations with respect to any state of facts then or theretofore existing or any proceeding theretofore or thereafter brought or threatened based in whole or in part upon any such state of facts.

11.7    The rights to indemnification and reimbursement or advancement of expenses provided by, or granted pursuant to, this Section 11 shall be enforceable by any person entitled to such indemnification or reimbursement or advancement of expenses in any court of competent jurisdiction.   Neither the failure of the Corporation (including its Board of Directors, its independent legal counsel and its stockholders) to have made a determination prior to the commencement of such action that such indemnification or reimbursement or advancement of expenses is proper in the circumstances nor an actual determination by the Corporation (including its Board of Directors, its independent legal counsel and its stockholders) that such person is not entitled to such indemnification or reimbursement or advancement of expenses shall constitute a defense to the action or create a presumption that such person is not so entitled. Such a person shall also be indemnified, to the fullest extent permitted by law, for any expenses incurred in connection with successfully establishing his or her right to such indemnification or reimbursement or advancement of expenses, in whole or in part, in any such action.

11.8    Any director or officer of the Corporation serving in any capacity in (i) another corporation of which a majority of the shares entitled to vote in the election of its directors is held, directly or indirectly, by the Corporation or (ii) any employee benefit plan of the Corporation or any corporation referred to in clause (i) shall be deemed to be doing so at the request of the Corporation.

11.9    Any person entitled to be indemnified or to reimbursement or advancement of expenses as a matter of right pursuant to this Section 11 may elect to have the right to indemnification or reimbursement or advancement of expenses interpreted on the basis of the applicable law in effect at the time of the occurrence of the event or events giving rise to the applicable Proceeding, to the extent permitted by law, or on the basis of the applicable law in effect at the time such indemnification or reimbursement or advancement of expenses is sought. Such election shall be made, by a notice in writing to the Corporation, at the time indemnification or reimbursement or advancement of expenses is sought; provided, however, that if no such notice is given, the right to indemnification or reimbursement or advancement of

17

expenses shall be determined by the law in effect at the time indemnification or reimbursement or advancement of expenses is sought.

11.10   It is the intent that with respect to all advancement, reimbursement and indemnification obligations under this Section 11, the Corporation shall be the indemnitor of first resort (i.e., its obligations to indemnitees under this Certificate of Incorporation are primary and any obligation of any stockholder (or any of its Affiliates) to provide advancement or indemnification for the same losses incurred by indemnitees are secondary), and if a stockholder pays or causes to be paid, for any reason, any amounts otherwise indemnifiable hereunder or under any other indemnification agreement (whether pursuant to this Certificate of Incorporation, the Bylaws, contract, law or regulation), then (i) such stockholder (or such Affiliate, as the case may be) shall be fully subrogated to all rights hereunder of the indemnitee with respect to such payment and (ii) the Corporation shall reimburse such stockholder (or such Affiliate, as the case may be) for the payments actually made and waive any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of such stockholder (or such Affiliate, as the case may be).

12.   **Books and Records.**   The books and records of the Corporation may be kept (subject to any provision contained in the DGCL or other applicable law) at such place or places as may be designated from time to time by the Board of Directors or in the Bylaws.

13.   **Notices.**   All notices, requests, waivers and other communications made pursuant to this Certificate of Incorporation shall be in writing and shall be deemed to have been effectively given, delivered, provided or received (a) when personally delivered to the party to be notified; (b) if given by electronic transmission in the manner provided in Section 232 of the DGCL, in accordance with Section 232 of the DGCL; (c) three (3) Business Days after deposit in the United States mail, postage prepaid, by certified or registered mail with return receipt requested, addressed to the party to be notified; or (d) one (1) Business Day after deposit with a national overnight delivery service, postage prepaid, addressed to the party to be notified with next-Business Day delivery guaranteed, in each case as follows:   (i) in the case of any stockholder, to such stockholder at its address, facsimile number or e-mail address set forth in the stock records of the Corporation, or at its address, facsimile number or e-mail address set forth in the Stockholders Agreement; and (ii) in the case of the Corporation, to the Secretary of the Corporation at the Corporation's principal place of business or at its address, facsimile number or e-mail address set forth in the Stockholders Agreement.   A party may change its address, facsimile number or e-mail address for purposes of notice hereunder by giving notice of such change in the manner provided in this Section 13.

14.   **Restrictions on Transactions.**   The Corporation elects not to be governed by the provisions of Section 203 of the DGCL.

15.   **Amendments.**   The Corporation reserves the right to amend, alter, change or repeal any provision contained in this Certificate of Incorporation, in the manner now or hereafter prescribed by the DGCL.   Notwithstanding the provisions of Section 242(b)(2) of the DGCL, the number of authorized shares of Common Stock or Preferred Stock of any class may be increased or decreased (but not below the number of shares of such class then-issued and outstanding, plus the number of shares of such class then reserved for future issuance) in

18

accordance with the preceding sentence, without a separate vote of the holders of such class of Common Stock or Preferred Stock.

16. **Corporate Opportunities**.

16.1    Each stockholder of the Corporation (other than a stockholder of the Corporation who is also an employee of the Corporation or any of its subsidiaries), each member of the Board of Directors or any committee thereof (other than any such member who is also an employee of the Corporation or any of its subsidiaries), each member of any Subsidiary Governing Body (other than any such member who is also an employee of the Corporation or any of its subsidiaries), and each Affiliate, manager, director, principal, officer, employee and other representative of each such stockholder, member of the Board of Directors (or committee thereof) or member of any Subsidiary Governing Body (other than any such Person who is also an employee of the Corporation or any of its subsidiaries) (the foregoing Persons being referred to, collectively, as "Identified Persons" and, each individually, as an "Identified Person") may now engage, may continue to engage, and/or may, in the future, decide to engage, in the same or similar activities or lines of business as those in which the Corporation or any of its subsidiaries, directly or indirectly, now engage or may engage or other business activities that overlap with, are complementary to, or compete with those in which the Corporation or any of its subsidiaries, directly or indirectly, now engage or may engage (any such activity or line of business, an "Opportunity").  No Identified Person shall have any duty to refrain, directly or indirectly, from (i) engaging in any Opportunity or (ii) otherwise competing with the Corporation or any of its subsidiaries.  No Identified Person shall have any duty or obligation to refer, offer or otherwise make available to the Corporation or any of its subsidiaries any Opportunity, and the Corporation hereby renounces, on behalf of itself and each of its subsidiaries, any interest or expectancy of the Corporation or any of its subsidiaries in, or in being offered, an opportunity to participate in any Opportunity which may be a corporate (or analogous) or business opportunity for the Corporation or any of its subsidiaries.

16.2    In the event that any Identified Person acquires knowledge of an Opportunity which may be a corporate (or analogous) or business opportunity for the Corporation or any of its subsidiaries, such Identified Person shall have no duty to communicate, offer or otherwise make available such Opportunity to the Corporation or any of its subsidiaries and shall not be liable to the Corporation, any of its subsidiaries or any of the stockholders of the Corporation for breach of any purported fiduciary duty by reason of the fact that such Identified Person pursues or acquires such Opportunity for itself, or offers or directs such Opportunity to another Person (including any Affiliate of such Identified Person).

17.    The Identified Persons may now own, may continue to own, and from time to time may acquire and own, investments in one or more other entities (each such entity, a "Related Company" and all such entities, collectively, "Related Companies") that are direct competitors of, or that otherwise may have interests that do or could conflict with those of, the Corporation, any of its subsidiaries, any of the stockholders of the Corporation or any of their respective Affiliates, and (i) the enjoyment, exercise and enforcement of the rights, interests, privileges, powers and benefits granted or available to the Identified Persons under this Certificate of Incorporation and/or the Stockholders Agreement shall not be in any manner reduced, diminished, affected or impaired, and the obligations of the Identified Persons under

19

this Certificate of Incorporation and/or the Stockholders Agreement (if any) shall not be in any manner augmented or increased, by reason of any act, circumstance, occurrence or event arising from or in any respect relating to (x) the ownership by an Identified Person of any interest in any Related Company, (y) the affiliation of any Related Company with an Identified Person or (z) any action taken or omitted by any Related Company or an Identified Person in respect of any Related Company, (ii) no Identified Person shall, by reason of such ownership, affiliation or action, become subject to any fiduciary duty to the Corporation, any of its subsidiaries, any of the stockholders of the Corporation or any of their respective Affiliates, (iii) none of the duties imposed on an Identified Person, whether by contract or law, do or shall limit or impair the right of any Identified Person lawfully to compete with the Corporation, any of its subsidiaries, any of the stockholders of the Corporation or any of their respective Affiliates and (iv) the Identified Persons are not and shall not be obligated to disclose to the Corporation, any of its subsidiaries, any of the stockholders of the Corporation or any of their respective Affiliates any information related to their respective businesses or opportunities, including acquisition opportunities, or to refrain from or in any respect to be restricted in competing against the Corporation, any of its subsidiaries, any of the stockholders of the Corporation or any of their respective Affiliates in any such business or as to any such opportunities.

18.     **Forum**.   Unless the Corporation consents in writing to the selection of an alternative forum, the Court of Chancery shall, to the fullest extent permitted by law, be the sole and exclusive forum for (a) any derivative action or proceeding brought on behalf of the Corporation, (b) any action asserting a claim for breach of a fiduciary duty owed by any director, officer, employee or agent of the Corporation to the Corporation or the Corporation's stockholders, (c) any action asserting a claim arising pursuant to any provision of the DGCL, this Certificate of Incorporation or the Bylaws, or (d) any action asserting a claim governed by the internal affairs doctrine, in each case subject to said Court of Chancery having personal jurisdiction over the indispensable parties named as defendants therein.  Any Person purchasing or otherwise acquiring shares of capital stock of the Corporation shall be deemed to have notice of and consented to the provisions of this Section 18.

19.     **Enforceability; Severability**.   Each provision of this Certificate of Incorporation shall be enforceable in accordance with its terms to the fullest extent permitted by law, but in case any one or more of the provisions contained in this Certificate of Incorporation shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Certificate of Incorporation, and this Certificate of Incorporation shall be construed as if such invalid, illegal or unenforceable provision or provisions had never been contained herein.

20.     **Bylaws**.   In furtherance and not in limitation of the powers conferred by law, the Board of Directors is expressly authorized and empowered to adopt, amend or repeal any or all of the Bylaws without any action on the part of the stockholders of the Corporation, subject to the power of the Majority Stockholders to amend or repeal any Bylaws adopted or amended by the Board of Directors.

21.     **Certain Definitions.**   As used in this Certificate of Incorporation, the following terms shall have the following meanings:

20

(i)      "Accredited Investor" means an "accredited investor" as such term is defined in Rule 501 under the Securities Act.

(ii)      "Affiliate" means, with respect to any Person, any other Person that (either directly or indirectly) controls, is controlled by, or is under common control with the specified Person, and shall also include (i) any Related Fund of such Person and (ii) in the case of a specified Person who is an individual, any Family Member or Personal Representative of such Person.  The term "control" includes the possession, directly or indirectly, of the power to direct the management or policies of a Person, whether through the ownership of securities, by contract or otherwise.  No stockholder of the Corporation shall be deemed an Affiliate of another Person solely by virtue of being a party to the Stockholders Agreement or by being a lender to or creditor of such other Person.

(iii)      "Business Day" means any day other than a day which is a Saturday, Sunday or legal holiday on which banks in the City of New York are authorized or obligated by law to close.

(iv)      "Certificate of Incorporation" means this Certificate of Incorporation, as amended, amended and restated, supplemented or otherwise modified from time to time.

(v)      "Competitor" means a Person that is engaged in competition with the Corporation or any of its subsidiaries, as determined by the Board of Directors, and shall also include any such Person's Affiliates.

(vi)      "Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

(vii)      "Family Member" means, with respect to any individual, (x) any Related Person of such individual or (y) any trust, limited partnership, limited liability company or other estate or tax planning vehicle or entity, the sole owners or beneficiaries of which are such individual or one or more of such individual's Related Persons.

(viii)      "Fully Diluted Common Stock" means, as of any time of determination, all issued and outstanding shares of Class A Common Stock as of such time (other than any shares of Class A Common Stock owned by the Corporation or any of its subsidiaries), assuming that all issued and outstanding shares of Preferred Stock were converted into shares of Class A Common Stock as of such time and the shares of Class A Common Stock issuable upon such conversion were issued as of such time.  Any reference in this Certificate of Incorporation to shares of Fully Diluted Common Stock owned or held by any Person (or group of Persons) shall mean the sum of (i) the shares of Class A Common Stock owned or held by such Person (or group of Persons) as of the time in question and (ii) the shares of Class A Common Stock that such Person (or group of Persons) would own or hold as of the time in question if all shares of Preferred Stock owned or held by such Person (or group of Persons) as of such time were converted into shares of Class A Common Stock as of such time and the shares of Class A Common Stock issuable upon such conversion were issued to such Person (or group of Persons) as

21

of such time.  For the avoidance of doubt, the determination of Fully Diluted Common Stock as of any time of determination shall not take into account the shares of Class A Common Stock that are issuable upon exercise of the Warrants at such time.

(ix)   "Governmental Authority" means any nation or government, any state or other political subdivision thereof, any entity, authority or body exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any government authority, agency, department, board, body, commission or instrumentality of the United States or any other nation, or any state or other political subdivision thereof, any court, tribunal or arbitrator and any self-regulatory organization.

(x)   "Liens" means any lien, encumbrance, claim, right, demand, charge, mortgage, deed of trust, option, pledge, security interest or similar interest, title defect, hypothecation, easement, right of way, restrictive covenant, encroachment, right of first refusal, preemptive right, judgment, conditional sale or other title retention agreement and all other impositions, imperfections, defects, limitations or restrictions of any nature or kind whatsoever.

(xi)   "Majority Stockholders" means, as of any time of determination, stockholders of the Corporation that collectively own or hold greater than fifty percent (50%) of all of the shares of Fully Diluted Common Stock as of such time.

(xii)   "Permitted Liens" means Liens that are imposed (x) by this Certificate of Incorporation, (y) by the Stockholders Agreement, or (z) under applicable securities laws.

(xiii)   "Person" means an individual, partnership, corporation, unincorporated organization, joint stock company, limited liability company, association, trust, joint venture or any other entity, or a Governmental Authority.

(xiv)   "Qualified Public Offering" means the first underwritten public offering pursuant to an effective registration statement covering a sale of shares of Class A Common Stock to the public that (x) results in shares of Class A Common Stock being listed on a national securities exchange or quoted on the Nasdaq Stock Market, and (y) either (A) involves gross cash proceeds of at least $100.0 million or (B) results in a market capitalization of the Corporation immediately after consummation of the offering that is not less than $150.0 million.

(xv)   "Related Fund" means, with respect to any Person, any fund, account or investment vehicle that is controlled or managed by (x) such Person, (y) an Affiliate of such Person or (z) the same investment manager, advisor or subadvisor as such Person or an Affiliate of such investment manager, advisor or subadvisor.

(xvi)   "Related Person" means, with respect to any individual, any of such individual's parents, spouse, siblings, children and grandchildren.

(xvii) "Sale Transaction" means the sale, lease, transfer, issuance or other disposition, in one transaction or a series of related transactions, of (x) all or substantially

22

all of the consolidated assets of the Corporation and its subsidiaries (including by or through the issuance, sale, contribution, transfer or other disposition (including by way of reorganization, merger, share exchange, consolidation or other business combination) of a majority of the capital stock or other equity interests of any direct and/or indirect subsidiary or subsidiaries of the Corporation if substantially all of the consolidated assets of the Corporation and its subsidiaries are held by such subsidiary or subsidiaries) or (y) shares of Common Stock and/or Preferred Stock representing at least a majority of the Fully Diluted Common Stock (whether directly or indirectly or by way of any merger, share exchange, recapitalization, sale or contribution of equity, tender offer, reclassification, consolidation or other business combination transaction or purchase of beneficial ownership), to (in either case of clause (x) or clause (y)) any Person or "group" (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision) of Persons (other than the Selling Holders or any Affiliates thereof) (a "Third Party Purchaser").

(xviii) "Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

(xix)   "Series A Certificate of Designations" means the Corporation's Certificate of Designations of Series A Convertible Preferred Stock, filed with the Secretary of State of the State of Delaware pursuant to the DGCL on the date of this Certificate of Incorporation, which created the shares of Series A Preferred Stock, as amended, amended and restated, supplemented or otherwise modified from time to time.

(xx)    "Series A Preferred Stock" means the Series A Convertible Preferred Stock of the Corporation that is designated as "Series A Convertible Preferred Stock" under the Series A Certificate of Designations.

(xxi)   "Subsidiary Governing Body" means the board of directors, the board of managers or other similar governing body (including any committee of any such governing body) of each subsidiary of the Corporation.

(xxii) "Third Party Purchaser" has the meaning specified in the definition of "Sale Transaction."

(xxiii) "Transfer" means any direct or indirect sale, transfer, gift, hypothecation, pledge, assignment, devise or other disposition of shares of Common Stock or Preferred Stock (including (x) a disposition under judicial order, legal process, execution, attachment, foreclosure or enforcement of a Lien and (y) the granting of any option or entering into any agreement for the future sale, transfer or other disposition of shares of Common Stock or Preferred Stock), whether voluntary or involuntary, whether of record, constructively or beneficially, whether with or without consideration, and whether by operation of law or otherwise, including by recapitalization, merger, consolidation, liquidation, dissolution, dividend, distribution or otherwise.  Notwithstanding the foregoing, any transaction in which a stockholder lends or borrows any shares of Common Stock or Preferred Stock to or from investment funds (and the general partners of such investment funds), brokers, banks, or other financial institutions for the purpose

23

of effecting margin transactions, or pledges or otherwise encumbers shares of Common Stock or Preferred Stock in connection with such stockholder's financing arrangements, in any case in the ordinary course of business, shall not constitute a Transfer of shares of Common Stock or Preferred Stock for purposes of this Certificate of Incorporation; provided, however, that any foreclosure (including the retention of shares of Common Stock or Preferred Stock in satisfaction of any obligations) on shares of Common Stock or Preferred Stock by any such investment fund, broker, bank or other financial institution shall be deemed a Transfer of shares of Common Stock or Preferred Stock, as applicable, for purposes of this Certificate of Incorporation.  The terms "Transferee," "Transferring", "Transferor," "Transferred," and other forms of the word "Transfer" shall have the correlative meanings.

(xxiv)  "Warrants" means the Warrants to purchase shares of Class A Common Stock issued by the Corporation on the Plan Effective Date pursuant to the Plan, as any of the same may be amended, amended and restated, supplemented or otherwise modified from time to time.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

24

IN WITNESS WHEREOF, the Corporation has caused this Amended and Restated Certificate of Incorporation, which amends and restates the Corporation's Certificate of Incorporation, to be made, executed and acknowledged by its duly authorized officer this [__] day of [_____], [____], as directed by and provided for in the Order of the United States Bankruptcy Court for the Southern District of New York, dated [_____], confirming the Plan under Chapter 11 of the Bankruptcy Code.

_____

Name:
Title:

**<u>Exhibit F-2</u>**

**Form of the Amended and Restated Bylaws of 21st Century Oncology Holdings, Inc.**

**AMENDED AND RESTATED BYLAWS**

**of**

**21ST CENTURY ONCOLOGY HOLDINGS, INC.**

*(Effective as of [_____], [_____])*

**ARTICLE I**

**Offices**

1.  **Business Offices.**   21st Century Oncology Holdings, Inc. (the "Corporation") may have one or more offices at such place or places, either within or outside the State of Delaware, as the Board of Directors of the Corporation (the "Board of Directors") may from time to time determine or as the business of the Corporation may require.

2.  **Registered Office.**   The registered office of the Corporation shall be as set forth in the Amended and Restated Certificate of Incorporation of the Corporation (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Certificate of Incorporation"), unless changed as provided by the provisions of the Delaware General Corporation Law (as amended from time to time, the "DGCL").

**ARTICLE II**

**Stockholders' Meetings**

1.  **Annual Meetings.**   An annual meeting of stockholders of the Corporation for the election of directors shall be held in each year beginning in [2018] on such date and at such time as the Board of Directors shall designate.   At any such annual meeting, the stockholders entitled to vote thereon shall elect directors of the Corporation in accordance with the provisions of the Certificate of Incorporation and the Stockholders Agreement dated as of [_____], 20__, among the Corporation and the stockholders of the Corporation (as the same may be amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the provisions thereof, the "Stockholders Agreement"), and shall transact such other business as may properly come before the meeting; provided, however, that no annual meeting of stockholders need be held if directors are elected by written consent of the stockholders entitled to vote thereon in lieu of an annual meeting, in accordance with Section 211 of the DGCL.

2.  **Special Meetings.**   Special meetings of stockholders may be called at any time by the Chairman of the Board of Directors or the President of the Corporation, and shall be called by the President of the Corporation when directed to do so by resolution of the Board of Directors or upon the written request (which shall state the purpose or purposes therefor) of the

holders of not less than 33.33% of the shares of Fully Diluted Common Stock (as defined in the Certificate of Incorporation).  The record date for determining the holders of shares of stock entitled to request a special meeting of stockholders shall be the date on which the first demand for a special meeting is made.  Business transacted at any special meeting of stockholders shall be limited to the purpose or purposes stated in the notice provided pursuant to Section 4 of this Article II.

3.     **Place of Meetings.**  Meetings of stockholders may be held (i) at any place within or outside the State of Delaware designated by the Board of Directors or, in the case of a special meeting called at the request of the stockholders holding the requisite percentage of shares of stock, the stockholders that requested such meeting to be called as set forth in the written request therefor, or (ii) if the Board of Directors or such stockholders so determine, solely by means of remote communication.  Any stockholder participating in a meeting by remote communication is deemed to be present in person at the meeting.  In the absence of any such designation by the Board of Directors or such stockholders, stockholder meetings shall be held at the principal place of business of the Corporation.

4.     **Notice of Meetings.**  Not less than ten (10) nor more than sixty (60) days prior to each annual or special meeting of the Corporation's stockholders, written notice of the meeting shall be given to each stockholder entitled to vote at such meeting (unless such notice is waived by such stockholder as provided in Article IV of these Bylaws); provided, however, that if greater notice is required by the DGCL, the applicable provisions of the DGCL shall govern.  All notices shall be in writing and shall be deemed to have been effectively given, delivered, provided or received (a) when personally delivered to the party to be notified; (b) if given by electronic transmission in the manner provided in Section 232 of the DGCL, in accordance with Section 232 of the DGCL, (c) three (3) business days after deposit in the United States mail, postage prepaid, by certified or registered mail with return receipt requested, addressed to the party to be notified; or (d) one (1) business day after deposit with a national overnight delivery service, postage prepaid, addressed to the party to be notified with next-business day delivery guaranteed, in each case to such stockholder at its address, electronic mail address or facsimile number set forth in the stock records of the Corporation, or at its address, facsimile number or e-mail address set forth in the Stockholders Agreement.  The notice of any meeting shall state the place, if any, date and time of the meeting.  The notice of a special meeting shall, in addition, state the purposes of the meeting.

5.     **Stockholders List.**  A complete record of the stockholders entitled to vote at each meeting (or an adjourned meeting described in Section 9 of this Article II), arranged by class of shares and, within each class, in alphabetical order, showing the address of each stockholder and the number of shares of each class of stock registered in the name of such stockholder, shall be prepared by the officer or agent of the Corporation who has charge of the stock transfer books of the Corporation.  Such record of stockholders shall be available for inspection by any stockholder entitled to vote at the meeting beginning ten (10) days before the meeting and continuing through the meeting and any adjournment thereof, subject to the requirements of the DGCL, either on a reasonably accessible electronic network, provided, that the information required to gain access to such network is provided with the notice of the meeting, or during normal business hours at the principal place of business of the Corporation.  Such record of stockholders shall also be produced and kept at the time and place of the meeting during the

-2-

whole time thereof and shall be subject to inspection for any purpose germane to the meeting by any stockholder entitled to vote at such meeting who may be present.

6.    **Organization.**   The Chairman of the Board of Directors or, in the Chairman's absence, the President (or, in the President's absence, any Vice President), shall call meetings of stockholders to order and act as chairperson of such meetings.  In the absence of said officers, any stockholder entitled to vote at the meeting, or any proxy of any such stockholder, may call the meeting to order and a chairperson shall be elected by the affirmative vote of holders of a majority of the voting power of the shares of stock present in person or represented by proxy and entitled to vote at such meeting.  The Secretary or any Assistant Secretary of the Corporation or any person appointed by the chairperson may act as secretary of such meetings.

7.    **Agenda and Procedure.**   The Board of Directors shall have the responsibility of establishing an agenda for each meeting of stockholders, subject to the rights of stockholders to raise matters for consideration which may otherwise properly be brought before an annual meeting although not included within the agenda.  The chairperson shall be charged with the orderly conduct of all meetings of stockholders.

8.    **Quorum.**   Unless otherwise provided in the Certificate of Incorporation, these Bylaws, the DGCL or other applicable law, at any annual or special meeting of stockholders, the holders of shares representing a majority of the voting power of the then issued and outstanding shares entitled to vote on a matter at the meeting, either present in person or represented by proxy, shall constitute a quorum with respect to action on such matter, and action may be taken with respect to any matter presented at the meeting only if a quorum exists with respect to such matter.  However, in the absence of a quorum at any meeting of stockholders, the holders of shares representing a majority of the voting power of the then issued and outstanding shares that are present in person or represented by proxy at the meeting and are entitled to vote on one (1) or more matters at the meeting may adjourn the meeting from time to time without further notice (except as provided in Section 9 of this Article II) until a quorum shall be present or represented.

9.    **Adjournment.**   When a meeting is for any reason adjourned to another time or place, notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken.  At the adjourned meeting, any business may be transacted which might have been transacted at the original meeting.  However, if the adjournment is for more than thirty (30) days from the date of the original meeting, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

10.   **Voting.**

a.    Except as otherwise required by law or otherwise provided in the Certificate of Incorporation, the Stockholders Agreement or these Bylaws, and subject to the rights of holders of any series of preferred stock of the Corporation (if any), (i) at every meeting of stockholders (or with respect to corporate action which may be taken without a meeting), every holder of record of stock of the Corporation entitled to vote on any matter at such meeting shall be entitled, with respect to such matter, to one (1) vote for each share of such stock held of record by such stockholder on the record date designated therefor pursuant to Section 3 of

<u>Article IX</u> of these Bylaws (or the record date established pursuant to statute in the absence of such designation), (ii) whenever directors are to be elected by vote of stockholders, they shall be elected in accordance with the provisions of <u>Section 1</u> of <u>Article III</u> of these Bylaws, and (iii) whenever any corporate action, other than the election of directors, is to be taken by vote of stockholders, such corporate action shall be authorized by the affirmative vote of holders of a majority of the voting power of the shares of stock present in person or represented by proxy at the meeting and entitled to vote with respect to such corporate action.

b.      At any meeting of stockholders, a stockholder may vote the stockholder's shares either in person or by proxy.  A stockholder may appoint a proxy in person or through an attorney-in-fact and such appointment may be transmitted by any written statement of appointment permitted by the DGCL (including the appointment made pursuant to the terms of the Stockholders Agreement and the Certificate of Incorporation).  The appointment of a proxy shall be effective for the period expressly specified in the appointment form.

c.      The voting rights of fiduciaries, beneficiaries, pledgors, pledgees and joint, common and other multiple owners of shares of stock shall be as provided from time to time by the DGCL and any other applicable law.

d.      Shares of the Corporation held of record by another corporation or entity that are entitled to vote may be voted by such officer, agent or proxy as the bylaws of such other corporation or entity may prescribe, or, in the absence of such provision, as the board of directors or similar governing body of such other corporation or entity may determine.

11.     **Inspectors.**  The chairperson of any meeting of stockholders may at any time appoint one (1) or more inspectors to serve at such meeting.  Such inspectors shall decide upon the qualifications of voters, including the validity of proxies, accept and count the votes for and against the questions presented, report the results of such votes, and subscribe and deliver to the secretary of the meeting a certificate stating the number of shares of stock issued and outstanding and entitled to vote thereon and the number of shares voted for and against the questions presented.  The voting inspectors need not be stockholders of the Corporation, and any director or officer of the Corporation may be an inspector on any question other than a vote for or against such director's or officer's election to any position with the Corporation or on any other question in which such officer or director may be directly interested.

12.     **Stockholder Director Nominations.**

a.      Except as otherwise provided in the Stockholders Agreement, stockholders who are entitled to vote for the election of directors of the Corporation shall be entitled to submit nominees for election as directors to be voted upon by such stockholders at any annual meeting or at any special meeting of the stockholders called for such purpose, <u>provided</u>, that such nominations comply with the procedures set forth in this <u>Section 12</u>.  Only those nominations which satisfy all requirements specified in this <u>Section 12</u> shall be deemed "Qualified Stockholder Nominations".

b.      In order for nominees to constitute "Qualified Stockholder Nominations", all of the following requirements must be satisfied:

-4-

1.      The nominations must be made for an election to be held at an annual meeting of stockholders or at a special meeting of stockholders called for such purpose;

2.      The nominees must be submitted by a stockholder who shall be (i) entitled to vote on the election of directors and (ii) a record holder on the record date for determining stockholders entitled to receive notice of and to vote at such annual meeting or special meeting (a "Proposing Stockholder");

3.      The Proposing Stockholder must deliver a written notice identifying such nominees to the Corporation's Secretary at the Corporation's principal place of business at least two (2) business days prior to the meeting by (i) personal delivery, (ii) facsimile or electronic transmission, (iii) registered or certified mail, postage prepaid, return receipt requested, or (iv) nationally recognized overnight or other express courier service.  All notices shall be effective and shall be deemed delivered (a) if by personal delivery, on the date of delivery, (b) if by facsimile or electronic transmission, on the business day of dispatch of such facsimile or electronic transmission, (c) if by courier service, on the next business day after dispatch of a notice addressed to the Corporation, and (d) if by mail, on the fifth (5th) day after deposit in the mail, addressed to the Corporation;

4.      The Proposing Stockholder's notice must include (i) the name and address of the Proposing Stockholder, as they appear on the Corporation's books, and the telephone number at which the Proposing Stockholder may be contacted during normal business hours through the time for which the meeting is scheduled, (ii) the class and number of shares of stock which are owned by the Proposing Stockholder, and (iii) the names and qualifications of the Proposing Stockholder's nominees; and

5.      The Proposing Stockholder must also provide such other information as any officer of the Corporation shall reasonably deem relevant with respect to the nominees within such time limits as any officer of the Corporation shall reasonably impose for such information.

## ARTICLE III

### Board of Directors

1.      **Election; Term.**  The business and affairs of the Corporation shall be managed by or at the direction of the Board of Directors.  Subject to the terms of the Stockholders Agreement, the number of directors shall be determined by the Board of Directors or by the stockholders at any meeting of the stockholders.  Each director will be elected by vote of holders of a plurality of the votes of the shares of stock present in person or represented by proxy at the meeting of stockholders and entitled to vote thereon.  Each director shall be elected to serve and

to hold office until the next succeeding annual meeting and until such director's successor shall be elected and shall qualify, or until such director's earlier death, resignation or removal.  To the extent the Stockholders Agreement sets forth procedures governing the Board of Directors and any committees thereof, including, without limitation, with respect to composition, nomination, election, term, qualification and number of directors, the Corporation, the stockholders and the Board of Directors must act in accordance with the provisions of the Stockholders Agreement in complying with this Article III.

2.      **Qualification.**  Each director must be a natural person at least eighteen (18) years of age on the date of election but need not be a stockholder.

3.      **Annual Meetings.**  On the same day as, and immediately following, each annual stockholders' meeting, the Board of Directors shall meet for the purpose of organization, election of officers and the transaction of any other business.

4.      **Regular Meetings.**  Regular meetings of the Board of Directors shall be held at such time or times (not less frequently than once each calendar quarter) as may be determined by the Board of Directors and specified in the notice of such meetings.

5.      **Special Meetings.**  Special meetings of the Board of Directors may be called by the Chairman of the Board of Directors or any three (3) directors.

6.      **Place of Meetings.**  Any meeting of the Board of Directors may be held at such place or places as shall from time to time be determined by the Board of Directors and as shall be designated in the notice of the meeting.  If no other place is designated in the notice of the meeting, such meeting shall be held at the Corporation's principal executive offices.

7.      **Quorum.**  A quorum for meetings of the Board of Directors will require the attendance of at least a majority of the directors then in office.  The vote of a majority of the directors present and entitled to vote at a meeting at which a quorum is present shall be the act of the Board of Directors, unless the express provision of the DGCL, the Certificate of Incorporation or the Stockholders Agreement requires a different vote, in which case such express provision shall govern and control.  In the absence of a quorum at any such meeting, a majority of the directors present and entitled to vote at such meeting may adjourn the meeting from time to time without further notice, other than announcement at the meeting, until a quorum shall be present.

8.      **Notice of Meetings.**  Notice of each meeting of the Board of Directors, whether annual, regular or special, shall be given to each director (unless such notice is waived by such director as provided in Article IV of these Bylaws).  Unless a longer period is required by the DGCL, if such notice is given either (a) by personally delivering written notice to a director, (b) by personally telephoning such director or (c) by facsimile or email transmission at the facsimile number or email address of such director on the books and records of the Corporation, it shall be so given at least 24 hours prior to the meeting.  Unless a longer period is required by the DGCL, if such notice is given by depositing a written notice by overnight courier service, postage prepaid, directed to such director at that person's residence or place of business, it shall be so

-6-

given at least two (2) days prior to the meeting.  The notice shall state the date and time of the meeting, but need not, unless otherwise required by the DGCL, state the purposes of the meeting.

9.      **Meetings by Telecommunication.**  One (1) or more members of the Board of Directors or any committee designated by the Board of Directors may hold or participate in a meeting of the Board of Directors or such committee through the use of any means of communication by which all persons participating can hear each other at the same time or by any other means permitted by the DGCL.  Any director participating in a meeting by any such means of communication is deemed to be present in person at the meeting.

10.      **Organization, Agenda and Procedure.**  The directors shall choose a Chairman of the Board to preside over the meetings of the Board of Directors; provided, that if the Stockholders Agreement requires a specific director to serve as the Chairman of the Board, then such specific director shall be chosen.  The Secretary, any Assistant Secretary, or any other person appointed by the Chairman of the Board shall act as secretary of each meeting of the Board of Directors.  The procedure for such meetings shall be as determined by the Chairman of the Board.  All proposed agenda topics to be reviewed at the annual meetings and the regular meetings shall be delivered to each director prior to, or at the time that, notice of such meeting is provided to such director.

11.      **Resignation.**  Any director of the Corporation may resign at any time by giving written notice of such director's resignation to the Board of Directors, the President, any Vice President or the Secretary of the Corporation.  Such resignation shall take effect at the date of receipt of such notice or at any later time specified therein and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.  A director who resigns may deliver to the Secretary of State for filing a statement to that effect.

12.      **Vacancies.**  Vacancies on the Board of Directors shall be filled in the manner provided in the Certificate of Incorporation and the Stockholders Agreement.

13.      **Committees.**  At its sole discretion and in accordance with the terms of the Stockholders Agreement, the Board of Directors may from time to time establish from among its members an audit committee, a compensation committee, a nominating and corporate governance committee, and any other committee deemed appropriate or necessary by the Board of Directors (each to consist of one (1) or more directors).  The Board of Directors may designate a chairperson of each such committee from among its members.  Each such committee, to the extent provided in the resolution establishing such committee and except as otherwise prescribed by the DGCL and the Stockholders Agreement, shall have and may exercise all of the authority of the Board of Directors in the management of the Corporation between meetings of the Board of Directors; provided, however, that no such committee shall have the authority to (a) approve or propose to stockholders any action that the DGCL requires to be approved by stockholders, or (b) adopt, amend, or repeal these Bylaws.  Subject to the Certificate of Incorporation and the Stockholders Agreement, any or all members of any committee may be removed, with or without cause, by resolution of the Board of Directors.  Rules governing the procedures for meetings of each committee shall be as established by the Board of Directors.

14.    **Compensation and Expense Reimbursement.**    Each director who is not employed by (a) the Corporation, (b) any subsidiary of the Corporation, (c) any stockholder of the Corporation or (d) any affiliate of any stockholder of the Corporation shall be paid such amount per annum or such fixed sum, in such form (including cash, securities or a combination thereof) as reasonably determined by a majority of the directors who are employed by (i) the Corporation, (ii) any subsidiary of the Corporation, (iii) any stockholder of the Corporation or (iv) any affiliate of any stockholder of the Corporation from time to time to be market-rate compensation for the performance of such director's duties, subject to approval by the Majority Stockholders (as defined in the Stockholders Agreement).    Each director who is not employed by the Corporation or any of its subsidiaries shall be reimbursed for the reasonable and necessary expenses incurred by such director in connection with the performance of such director's duties (including expenses incurred in attending meetings of the Board of Directors or any committee thereof).    Nothing herein contained shall be construed to preclude any director from serving the Corporation or any of its subsidiaries in any other capacity and receiving proper compensation therefor.

## ARTICLE IV

### Waiver of Notice by Stockholders and Directors; Action of Stockholders and Directors by Consent

1.    **Waiver of Notice.**    A stockholder may waive any notice required by the DGCL, the Certificate of Incorporation, the Stockholders Agreement or these Bylaws, and a director may waive any notice of a meeting of the Board of Directors, whether before or after the date or time stated in the notice as the date or time when any action will occur or has occurred.    Any such waiver shall be in writing, be signed by the stockholder or director entitled to the notice, and be delivered to the Secretary of the Corporation for inclusion in the minutes or filing with the corporate records, but such delivery and filing shall not be conditions of the effectiveness of the waiver.    Attendance of a stockholder (in person or by duly authorized proxy) at a meeting of stockholders, or attendance or participation by a director at a meeting of the Board of Directors, (a) shall be deemed a waiver of objection to lack of required notice or defective notice of the meeting, unless the stockholder at the beginning of the meeting, or the director, at the beginning of the meeting or promptly upon his or her later arrival, expressly objects to holding the meeting or transacting business at the meeting because of lack of notice or defective notice, and does not thereafter vote for or assent to action taken at the meeting, and (b) shall be deemed a waiver of objection to consideration of a particular matter at the meeting that is not within the purpose or purposes described in the meeting notice, or of a matter without special notice required by the DGCL, the Certificate of Incorporation, the Stockholders Agreement or these Bylaws, unless the stockholder or director expressly objects to considering the matter when it is presented and does not thereafter vote for or assent to action taken at the meeting with respect to such matter.

2.    **Action By Written Consent Without a Meeting.**

a.    Unless the Certificate of Incorporation, the Stockholders Agreement or the DGCL expressly requires that such action be taken solely at a stockholders' meeting, any action required or permitted to be taken at an annual or special meeting of the stockholders of the Corporation may be taken without a meeting and without a vote if a consent or consents in

-8-

writing, setting forth the action so taken, shall be signed by the holders of outstanding shares of stock having not less than the minimum voting power that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted and shall be delivered to the Corporation by delivery to its registered office in Delaware, its principal place of business, or an officer or agent of the Corporation having custody of the books in which proceedings of meetings of stockholders are recorded.   Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested.   Such action shall be effective as of the time the last writing necessary to effect the action is received by the Corporation, unless all writings necessary to effect the action specify a later time, in which case the later time shall be the time of the action; provided, however, such action shall not be effective if the last writing necessary to effect the action is received by the Corporation later than sixty (60) days after the date the first such written consent was received by the Corporation.   Prompt notice of the taking of corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing.

       b.     Unless otherwise required by the Certificate of Incorporation or the Stockholders Agreement, any action required or permitted to be taken at any meeting of the Board of Directors, or any committee thereof, may be taken without a meeting if all members of the Board of Directors or such committee, as the case may be, consent thereto in writing, and the writing or writings are filed with the minutes of proceedings of the Board of Directors or such committee.   Such action shall be effective as of the time the last director signs a writing describing the action taken unless before such time the Secretary has received a written revocation of the consent of any other director, and any action so taken shall be effective at the time taken unless the directors specify a different effective time.

## ARTICLE V

### Officers

1.     **Election, Authority and Tenure.**   The officers of the Corporation shall consist of a Chairman of the Board, a President (who shall also be the Chief Executive Officer), a Chief Financial Officer, a Secretary and a Treasurer, each of whom shall be appointed annually by the Board of Directors.   The Board of Directors may also designate and appoint such other officers and assistant officers as may be deemed necessary or advisable.   The Board of Directors may expressly delegate to any such officer the power to appoint or remove subordinate officers, agents or employees.   Any two or more offices may be held by the same person.   Each officer so appointed shall continue in office until a successor shall be appointed and shall qualify, or until the officer's earlier death, resignation or removal.   Each officer shall be a natural person who is eighteen (18) years of age or older.

2.     **Resignation, Removal and Vacancies.**   Any officer may resign at any time by giving written notice of resignation to the Board of Directors, the President or the Secretary. Such resignation shall take effect when the notice is received by the Corporation unless the notice specifies a later date, and acceptance of the resignation shall not be necessary to render such resignation effective unless such resignation so states.   The Board of Directors may at any time terminate, remove or modify the authority of any officer, with or without cause.   If any

-9-

office becomes vacant for any reason, the vacancy may be filled by the Board of Directors. An officer appointed to fill a vacancy shall be appointed for the unexpired term of such officer's predecessor in office and shall continue in office until a successor shall be elected or appointed and shall qualify, or until such officer's earlier death, resignation or removal. The appointment of an officer shall not itself create contract rights in favor of the officer, and the removal of an officer shall not affect the officer's contract rights, if any, with the Corporation, and the resignation of an officer does not affect the Corporation's contract rights, if any, with the officer.

3.      **Compensation.**  Officers of the Corporation shall be entitled to such salaries, emoluments, compensation or reimbursement as shall be fixed or allowed from time to time by the Board of Directors or in such manner as the Board of Directors shall provide.

4.      **Chairman of the Board.**  The Chairman of the Board shall preside over the meetings of the Board of Directors and meetings of stockholders and have such powers and responsibilities as are incident thereto.  However, the Chairman of the Board shall not have responsibility for the day-to-day business operations of the Corporation.

5.      **President.**  The President shall be the chief executive officer of the Corporation. The President shall (i) have general and active management of the business of the Corporation, and preside over the day-to-day business operations of the Corporation; (ii) see that all orders and resolutions of the Board of Directors are carried into effect; and (iii) perform all duties as may from time to time be assigned by the Board of Directors.

6.      **Chief Financial Officer.**  The Chief Financial Officer shall perform such duties and shall have such powers as may from time to time be assigned by the Board of Directors or the President, and shall perform such duties and have such powers and responsibilities as are incident to the office of Chief Financial Officer.  In addition, the Chief Financial Officer shall have, along with the President, responsibility for the day-to-day business operations of the Corporation.

7.      **Vice Presidents.**  The Vice Presidents, if any, shall perform such duties and possess such powers as from time to time may be assigned to them by the Board of Directors or the President.  In the absence of the President or in the event of the inability or refusal of the President to act, the Vice President (or in the event there be more than one Vice President, the Vice Presidents in the order designated by the Board of Directors, or in the absence of any designation, then in the order of the election or appointment of the Vice Presidents) shall perform the duties of the President and when so performing shall have all the powers of and be subject to all the restrictions upon the President.

8.      **Secretary.**  The Secretary shall perform such duties and shall have such powers as may from time to time be assigned by the Board of Directors or the President.  In addition, the Secretary shall perform such duties and have such powers as are incident to the office of Secretary, including, without limitation, the duty and power to give notice of all meetings of stockholders and the Board of Directors, the preparation and maintenance of minutes of the directors' and stockholders' meetings and other records and information required to be kept by the Corporation under these Bylaws and for authenticating records of the Corporation, and to be custodian of the corporate seal and to affix and attest to the same on documents, the execution of

-10-

which on behalf of the Corporation is authorized by these Bylaws or by the action of the Board of Directors.

9.      **Treasurer.**  The Treasurer shall perform such duties and shall have such powers as may from time to time be assigned by the Board of Directors or the President.  In addition, the Treasurer shall perform such duties and have such powers as are incident to the office of Treasurer, including, without limitation, the duty and power to keep and be responsible for all funds and securities of the Corporation, to deposit funds of the Corporation in depositories selected in accordance with these Bylaws, to disburse such funds as ordered by the Board of Directors, making proper accounts thereof, and to render as required by the Board of Directors statements of all such transactions as Treasurer and of the financial condition of the Corporation.

10.     **Assistant Secretaries and Assistant Treasurers.**  The Assistant Secretaries and Assistant Treasurers, if any, shall perform such duties as shall be assigned to them by the Secretary or the Treasurer, respectively, or by the President or the Board of Directors.  In the absence, inability or refusal of the Secretary or the Treasurer to act, the Assistant Secretaries or Assistant Treasurers, respectively, in the order designated by the Board of Directors, or in the absence of any designation, then in the order of their election or appointment, shall perform the duties and exercise the powers of the Secretary or Treasurer, as the case may be.

## ARTICLE VI

### Execution of Instruments; Borrowing; Checks and Endorsements; Deposits; Proxies

1.      **Execution of Instruments.**  The President, the Chief Financial Officer or any Vice President shall have the power to execute and deliver on behalf of and in the name of the Corporation any instrument requiring the signature of an officer of the Corporation, except as otherwise provided in these Bylaws or when the execution and delivery of the instrument shall be expressly delegated by the Board of Directors to some other officer or agent of the Corporation.  Unless authorized to do so by these Bylaws or by the Board of Directors or incident to the powers of the office of any particular officer, no officer, agent or employee shall have any power or authority to bind the Corporation in any way, to pledge its credit or to render it liable pecuniarily for any purpose or in any amount.

2.      **Borrowing.**  No loan shall be contracted on behalf of the Corporation, and no evidence of indebtedness shall be issued, endorsed or accepted in its name, unless authorized by the Board of Directors or a committee designated by the Board of Directors so to act.  Such authority may be general or confined to specific instances.  When so authorized, an officer may (a) effect loans at any time for the Corporation from any bank or other entity and for such loans may execute and deliver promissory notes or other evidences of indebtedness of the Corporation; and (b) mortgage, pledge or otherwise encumber any real or personal property, or any interest therein, owned or held by the Corporation as security for the payment of any loans or obligations of the Corporation, and to that end may execute and deliver for the Corporation such instruments as may be necessary or proper in connection with such transaction.

3.  **Checks and Endorsements.**  All checks, drafts or other orders for the payment of money, obligations, notes or other evidences of indebtedness, bills of lading, warehouse receipts, trade acceptances and other such instruments shall be signed or endorsed for the Corporation by such officers or agents of the Corporation as shall from time to time be determined by resolution of the Board of Directors, which resolution may provide for the use of facsimile signatures.

4.  **Deposits.**   All funds of the Corporation not otherwise employed shall be deposited from time to time to the Corporation's credit in such banks or other depositories as shall from time to time be determined by resolution of the Board of Directors, which resolution may specify the officers or agents of the Corporation who shall have the power, and the manner in which such power shall be exercised, to make such deposits and to endorse, assign and deliver for collection and deposit checks, drafts and other orders for the payment of money payable to the Corporation or its order.

5.  **Proxies.**  The Board of Directors may (i) from time to time appoint one (1) or more agents of the Corporation, in the name and on behalf of the Corporation, (a) to cast the votes which the Corporation may be entitled to cast as the holder of stock or other securities in any other corporation, association or other entity whose stock or other securities may be held by the Corporation, at meetings of the holders of the stock or other securities of such other corporation, association or other entity, or (b) to consent in writing to any action by such other corporation, association or other entity; and (ii) instruct the person so appointed (a) as to the manner of casting such votes or giving such consent, and (b) to execute or cause to be executed in the name and on behalf of the Corporation and under its corporate seal, or otherwise, all such written proxies or other instruments as may be deemed necessary or proper.

## ARTICLE VII

### Shares of Stock

1.  **Certificates of Stock.**  The shares of the Corporation may, but need not, be represented by certificates.  Unless the DGCL or another law expressly provides otherwise, the fact that the shares are not represented by certificates shall have no effect on the rights and obligations of stockholders.  If the shares are represented by certificates, such certificates shall be signed by any two (2) authorized officers of the Corporation, and may, but need not, be sealed with the corporate seal of the Corporation; provided, however, that where any such certificate is signed or countersigned by a transfer agent or registrar the signatures of such officers of the Corporation may be in facsimile form.  In case any officer of the Corporation who shall have signed, or whose facsimile signature shall have been placed on, any certificate shall cease for any reason to be such officer before such certificate shall have been issued or delivered by the Corporation, such certificate may nevertheless be issued and delivered by the Corporation as though the person who signed such certificate, or whose facsimile signature shall have been placed thereon, had not ceased to be such officer of the Corporation.  Every certificate representing shares (if any) issued by the Corporation shall state the number of shares owned by the holder in the Corporation, shall designate the class of stock to which such shares belong, and shall otherwise be in such form as is required by law and as the Board of Directors shall prescribe.

-12-

2.      **Shares Without Certificates.**  The Board of Directors may authorize the issuance of any class or series of shares of the Corporation without certificates.  Such authorization shall not affect shares already represented by certificates until they are surrendered to the Corporation, or its transfer agent.  Within a reasonable time following the issue or transfer of shares without certificates, the Corporation shall send, or direct its transfer agent to send, the stockholder a complete written statement of the information required on certificates by the DGCL, the Certificate of Incorporation and the Stockholders Agreement.

3.      **Record.**  A record shall be kept of the name of each person or entity holding the stock represented by each certificate for shares of the Corporation issued, the number and class of shares represented by each such certificate, the date thereof and, in the case of cancellation, the date of cancellation.  The person or other entity in whose name shares of stock stand on the books of the Corporation shall be deemed the owner thereof, and thus a holder of record of such shares of stock, for all purposes as regards the Corporation.

4.      **Transfer of Stock.**  Except as otherwise provided by the Certificate of Incorporation and the Stockholders Agreement, transfers of shares of the stock of the Corporation shall be made only on the books of the Corporation by the registered holder thereof, or by such registered holder's attorney thereunto authorized, and on the surrender of the certificate or certificates (if any) for such shares properly endorsed.  The stock record book and other transfer records shall be in the possession of the Secretary or of a transfer agent for the Corporation.

5.      **Transfer Agents and Registrars; Regulations.**  The Corporation, by resolution of the Board of Directors, may from time to time appoint a transfer agent and a registrar, under such arrangements and upon such terms and conditions as the Board of Directors deems advisable, but until and unless the Board of Directors appoints some other person, firm or corporation as its transfer agent (and upon the revocation of any such appointment, thereafter until a new appointment is similarly made) the Secretary of the Corporation shall be the transfer agent of the Corporation without the necessity of any formal action of the Board of Directors, and the Secretary, or any person designated by the Secretary, shall perform all of the duties of such transfer agent.  The Board of Directors may make such rules and regulations as it may deem expedient and as are not inconsistent with the Certificate of Incorporation, the Stockholders Agreement and these Bylaws concerning the issue, transfer and registration of certificates for shares of the stock of the Corporation.

6.      **Lost, Destroyed or Mutilated Certificates.**  In case of the alleged loss, destruction or mutilation of a certificate representing stock of the Corporation, a new certificate may be issued in place thereof, in such manner and upon such terms and conditions as the Board of Directors may prescribe, and shall be issued in such situations as required by the DGCL.

## ARTICLE VIII

### Fiscal Year

The fiscal year of the Corporation shall be the calendar year ending December 31, unless another fiscal year is established by the Board of Directors.

-13-

## ARTICLE IX

## Corporate Books and Records

1.      **Books and Records.**  The books and records of the Corporation may be kept at such place or places as may be from time to time designated by the Board of Directors.  The Corporation shall keep correct and complete books and records of account, including the amount of its assets and liabilities, minutes of the proceedings of its stockholders and the Board of Directors (and any committee having the authority of the Board of Directors), and the names and places of residence of its officers.

2.      **Addresses of Stockholders.**  Each stockholder shall furnish to the Secretary of the Corporation or the Corporation's transfer agent an address to which notices from the Corporation, including notices of meetings, may be directed, and if any stockholder shall fail so to designate such an address, it shall be sufficient for any such notice to be directed to such stockholder at such stockholder's address last known to the Secretary or transfer agent, or the address for such stockholder set forth in the Stockholders Agreement.

3.      **Fixing Record Date.**  Except as otherwise set forth in the Stockholders Agreement:

a.      in order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, the Board of Directors may fix, in advance, a record date for notice and voting which shall not be more than sixty (60) days nor less than ten (10) days before the date of such meeting;

b.      in order that the Corporation may determine the stockholders entitled to express consent to corporate action in writing without a meeting, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be more than ten (10) days after the date upon which the resolution fixing the record date is adopted by the Board of Directors; and

c.      in order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion or exchange of stock or for the purpose of any other lawful action, the Board of Directors may fix a record date, which shall not be more than sixty (60) days prior to such other action.

Except as otherwise set forth in the Stockholders Agreement, if no record date is fixed: (a) the record date for determining stockholders entitled to notice of and to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held; (b) the record date for determining stockholders entitled to express consent to corporate action in writing without a meeting, when no prior action by the Board of Directors is necessary, shall be the day on which the first written consent is delivered to the Corporation in accordance with applicable law; (c) the record date for determining stockholders

-14-

entitled to express consent to corporate action in writing without a meeting, when prior action by the Board of Directors is required, shall be at the close of business on the day on which the Board of Directors adopts the resolution taking such prior action; and (d) the record date for determining stockholders for any other purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.   A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board of Directors may fix a new record date for the adjourned meeting.

4.      **Audits of Books and Accounts.**  The Corporation's books and accounts shall be audited at such times and by such auditors as shall be specified and designated by the Board of Directors.

## ARTICLE X

## Amendments

Except as otherwise set forth in the Certificate of Incorporation, the Board of Directors is expressly authorized and empowered to adopt, amend or repeal any or all of these Bylaws without any action on the part of the stockholders of the Corporation, subject to the power of the Majority Stockholders to amend or repeal any Bylaws adopted or amended by the Board of Directors.

## ARTICLE XI

## Conflicts

These Bylaws are subject to the terms and conditions of the Stockholders Agreement.  To the extent that any of the terms of these Bylaws (including any amendment or proposed amendment) conflict, or are otherwise inconsistent, with the terms of the Certificate of Incorporation and/or the Stockholders Agreement, the Corporation, the Board of Directors and the stockholders must and shall act in accordance with the terms of the Certificate of Incorporation and the Stockholders Agreement (including any voting agreements therein), as applicable, and to the extent that there is any ambiguity with respect to whether the Certificate of Incorporation or the Stockholders Agreement, on the one hand, and the Bylaws, on the other hand, control with respect to any matter affecting the Corporation, the terms of the Certificate of Incorporation or the Stockholders Agreement, as applicable, shall be deemed to control and the Corporation, the Board of Directors and the stockholders shall act in accordance therewith.  In these Bylaws, references to law, the Certificate of Incorporation, the Stockholders Agreement and these Bylaws mean the DGCL and the laws promulgated pursuant thereto and thereunder, and the provisions of the Certificate of Incorporation, the Stockholders Agreement and these Bylaws, as may from time to time be in effect.

**<u>Exhibit F-3</u>**

**Form of the New Stockholders' Agreement**

**21ST CENTURY ONCOLOGY HOLDINGS, INC.**

**STOCKHOLDERS AGREEMENT**

This STOCKHOLDERS AGREEMENT (as amended, amended and restated, supplemented or otherwise modified from time to time, this "Agreement") is made as of the [__] day of [_____], [___], by and among (a) 21st Century Oncology Holdings, Inc., a Delaware corporation (the "Corporation"), and (b)(i) each of the holders of shares of Common Stock (as defined below) on the date hereof (each of which, pursuant to Section 7.8 hereof, is deemed to have entered into this Agreement pursuant to the Plan (as defined below), regardless of whether such holder has actually executed this Agreement), (ii) each of the holders of shares of Series A Preferred Stock (as defined below) on the date hereof (each of which, pursuant to Section 7.8 hereof, is deemed to have entered into this Agreement pursuant to the Plan, regardless of whether such holder has actually executed this Agreement) and (iii) each Person (as defined below) who hereafter becomes a holder of any Shares (as defined below) and is thereby required to sign a Joinder Agreement (as defined below) pursuant to the terms hereof (such holders of Shares referred to in the foregoing clause (b) are each, a "Stockholder" and, collectively, the "Stockholders").

**W I T N E S S E T H :**

WHEREAS, the Corporation and certain of its direct and indirect Subsidiaries (as defined below) filed a joint plan of reorganization (as amended, supplemented or otherwise modified from time to time, the "Plan") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York;

WHEREAS, on the date hereof, the Plan became effective;

WHEREAS, pursuant to the Plan and the Confirmation Order (as defined in the Plan), the Corporation is authorized to enter into this Agreement; and

WHEREAS, the parties hereto are entering into this Agreement (and, pursuant to the Plan, each of the Stockholders is deemed to have entered into this Agreement) to set forth certain rights and obligations with respect to the affairs of the Corporation and the Shares owned or held by the Stockholders.

NOW, THEREFORE, in consideration of the premises and the mutual agreements, covenants and provisions contained herein, and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

**ARTICLE I**

**CERTAIN DEFINITIONS**

As used in this Agreement, the following terms shall have the definitions set forth below:

(a) "Accredited Investor" means an "accredited investor" as such term is defined in Rule 501 under the Securities Act.

(b) "Additional Securities" has the meaning specified in Section 3.3(a).

(c) "Affiliate" means, with respect to any Person, any other Person that (either directly or indirectly) controls, is controlled by, or is under common control with the specified Person, and shall also include (i) any Related Fund of such Person and (ii) in the case of a specified Person who is an individual, any Family Member or Personal Representative of such Person.  The term "control" includes the possession, directly or indirectly, of the power to direct the management or policies of a Person, whether through the ownership of securities, by contract or otherwise.  No Stockholder shall be deemed an Affiliate of another Person solely by virtue of being a party to this Agreement or by being a lender to or creditor of such other Person.

(d) "Affiliate Transaction" has the meaning specified in Section 5.1.

(e) "Agreement" has the meaning specified in the preamble of this Agreement.

(f) "Award Agreement" means any agreement, contract or other instrument or document (including, without limitation, any repurchase agreement) evidencing or governing an award issued under any Equity Incentive Plan, including any award consisting of shares of Class B Common Stock or any award that is convertible into, or exercisable or exchangeable for, shares of Class B Common Stock.

(g) "Backstop Party" means each Person listed on Schedule 1 hereto.

(h) "Bankruptcy Code" has the meaning specified in the recitals to this Agreement.

(i) "Board of Directors" means the board of directors of the Corporation.

(j) "BP Director" or "BP Directors" has the meaning specified in Section 4.1(a)(ii).

(k) "BP Stockholders" means, collectively, (i) Beach Point Capital Management LP and (ii) any Affiliates of Beach Point Capital Management LP that own or hold Shares, so long as any such Affiliate remains an Affiliate of Beach Point Capital Management LP.  Any consent, approval, decision (including any decision as to whether a Person, action or thing is acceptable), determination, nomination, designation, direction, specification, request, removal, instruction or other action to be provided, granted, given, made, performed, rendered or otherwise taken by the BP Stockholders pursuant to this Agreement at any time shall be provided, granted, given, made, performed, rendered or otherwise taken by the BP Stockholders that own or hold a majority of the shares of Fully Diluted Common Stock owned or held by all of the BP Stockholders at such time.

2

(l)     "Business Day" means any day other than a day which is a Saturday, Sunday or legal holiday on which banks in the City of New York are authorized or obligated by law to close.

(m)     "Bylaws" means the Amended and Restated Bylaws of the Corporation, as amended, amended and restated, supplemented or otherwise modified and in effect from time to time.

(n)     "Capital Stock" means, with respect to any Person, all of the shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership, equity or profit interests or units in, including any limited or general partnership interest and any limited liability company interest) such Person.

(o)     "Certificate of Incorporation" means the Amended and Restated Certificate of Incorporation of the Corporation filed with the Secretary of State of the State of Delaware pursuant to the DGCL on the date of this Agreement, as amended, amended and restated, supplemented or otherwise modified and in effect from time to time, including as supplemented and modified by the Series A Certificate of Designations.

(p)     "Chairman" means, as of any time of determination, the chairman of the Board of Directors as of such time.

(q)     "Class" means any of the following:  (i) shares of Class A Common Stock, (ii) shares of Class B Common Stock, and (iii) shares of Series A Preferred Stock.

(r)     "Class A Common Stock" means the common stock, par value $0.001 per share, of the Corporation that is designated as "Class A Voting Common Stock" under the Certificate of Incorporation.

(s)     "Class B Common Stock" means the common stock, par value $0.001 per share, of the Corporation that is designated as "Class B Limited Voting Common Stock" under the Certificate of Incorporation.

(t)     "Common Stock" means, collectively, Class A Common Stock and Class B Common Stock.

(u)     "Competitor" means any Person that is engaged in competition with the Corporation or any of its Subsidiaries, as reasonably determined by the Board of Directors, and shall also include any such Person's Affiliates.

(v)     "Confidential Information" has the meaning specified in Section 7.3(a).

(w)     "Confidentiality Period" has the meaning specified in Section 7.3(a).

(x)     "Corporation" has the meaning specified in the preamble of this Agreement.

3

(y)    "Designation Right" means any of the following:  (i) the right of the BP Stockholders to nominate and designate any number of directors pursuant to Section 4.1(a)(ii) and (ii) the right of the Specified Stockholders to nominate and designate any number of directors pursuant to Section 4.1(a)(iii).

(z)    "DGCL" means the Delaware General Corporation Law, as amended from time to time.

(aa)    "Drag Notice" has the meaning specified in Section 3.1(a).

(bb)    "Dragged Holder" or "Dragged Holders" has the meaning specified in Section 3.1(a).

(cc)    "Effective Date" means the "Effective Date" as defined in the Plan.

(dd)    "e-mail" has the meaning specified in Section 7.2.

(ee)    "Equity Incentive Plan" means any employee benefit plan or program, incentive compensation plan or program (including any Award Agreement), executive compensation agreement or directors' compensation program, in each case approved by the Board of Directors.

(ff)    "Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

(gg)    "Excluded Issuance" means, in each case as approved by the Board of Directors, any issuance of Additional Securities (i) by means of a *pro rata* distribution to all holders of any Class of Shares, (ii) pursuant to any Equity Incentive Plan or otherwise to directors, officers, employees or consultants of the Corporation in connection with their service as directors of the Corporation, their employment by the Corporation or their retention by the Corporation, (iii) to any lender to the Corporation or any of its Subsidiaries in connection with a *bona fide* financing or refinancing of any indebtedness of the Corporation or any of its Subsidiaries, (iv) in a public offering of equity securities of the Corporation, (v) pursuant to the conversion, exchange or exercise of any options, warrants or other securities granted after the Effective Date so long as the initial sale, issuance or grant of such options, warrants or other securities complied with the terms of Section 3.3, (vi) that consists of shares of Class A Common Stock issued (A) upon exercise of the Warrants in accordance with the terms thereof or (B) upon conversion of the shares of Series A Preferred Stock in accordance with the terms of the Series A Certificate of Designations, and (vii) in connection with (A) the funding of an acquisition (whether by share sale, merger, recapitalization, asset purchase or otherwise) of another Person (or portion thereof) or (B) a joint venture, partnership or strategic alliance with another Person.

(hh)    "Excluded Tag-Along Transfer" means, with respect to any Stockholder, any Transfer of Shares made by such Stockholder: (i) to any Affiliate of such Stockholder, (ii) in the case of any Stockholder that is an investment fund, account or other investment vehicle, as an in-kind distribution to its partners, members or

4

accountholders (including any such distribution that is made in connection with a winding up or liquidation of such Stockholder), (iii) in the case of any Stockholder that is a nominee, investment manager, advisor or subadvisor for a beneficial owner of Shares, to such beneficial owner or to a Person that will serve as a nominee, investment manager, advisor or subadvisor for such beneficial owner with respect to such Shares, (iv) in connection with a Sale Transaction pursuant to Section 3.1 and such Stockholder is a Dragged Holder or a Selling Holder, and (v) in connection with a Tag-Along Transaction pursuant to Section 3.2 and such Stockholder is a Tag-Along Seller.

(ii)   "Family Member" means, with respect to any individual, (i) any Related Person of such individual or (ii) any trust, limited partnership, limited liability company or other estate or tax planning vehicle or entity, the sole owners or beneficiaries of which are such individual or one or more of such individual's Related Persons.

(jj)   "Fully Diluted Common Stock" means, as of any time of determination, all issued and outstanding shares of Class A Common Stock as of such time (other than any shares of Class A Common Stock owned by the Corporation or any Subsidiary), assuming that all issued and outstanding shares of Series A Preferred Stock were converted into shares of Class A Common Stock as of such time and the shares of Class A Common Stock issuable upon such conversion were issued as of such time.  Any reference in this Agreement to shares of Fully Diluted Common Stock owned or held by any Person (or group of Persons) shall mean the sum of (i) the shares of Class A Common Stock owned or held by such Person (or group of Persons) as of the time in question and (ii) the shares of Class A Common Stock that such Person (or group of Persons) would own or hold as of the time in question if all shares of Series A Preferred Stock owned or held by such Person (or group of Persons) as of such time were converted into shares of Class A Common Stock as of such time and the shares of Class A Common Stock issuable upon such conversion were issued to such Person (or group of Persons) as of such time.  For the avoidance of doubt, the determination of Fully Diluted Common Stock as of any time of determination shall not take into account the shares of Class A Common Stock that are issuable upon exercise of the Warrants at such time.

(kk)   "GAAP" means generally accepted accounting principles in effect in the United States from time to time consistently applied, as recommended by the American Institute of Certified Public Accountants.

(ll)   "Governmental Authority" means any nation or government, any state or other political subdivision thereof, any entity, authority or body exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any government authority, agency, department, board, body, commission or instrumentality of the United States or any other nation, or any state or other political subdivision thereof, any court, tribunal or arbitrator and any self-regulatory organization.

(mm)   "Holder Directors" means, collectively, (i) each of the BP Directors and (ii) each of the Specified Directors; and each of the BP Directors and each of the Specified Directors shall be referred to, individually, as a "Holder Director".

5

(nn)    "Identified Person" or "Identified Persons" has the meaning specified in Section 5.2(a).

(oo)    "Indebtedness" has the meaning specified in Section 5.3.

(pp)    "Initiating Holder" or "Initiating Holders" has the meaning specified in Section 3.2(a).

(qq)    "Joinder Agreement" means a Joinder Agreement in the form attached hereto as Exhibit A.

(rr)    "Liens" means any lien, encumbrance, claim, right, demand, charge, mortgage, deed of trust, option, pledge, security interest or similar interest, title defect, hypothecation, easement, right of way, restrictive covenant, encroachment, right of first refusal, preemptive right, judgment, conditional sale or other title retention agreement and all other impositions, imperfections, defects, limitations or restrictions of any nature or kind whatsoever.

(ss)    "Majority Stockholders" means, as of any time of determination, Stockholders that collectively own or hold greater than fifty percent (50%) of all of the shares of Fully Diluted Common Stock as of such time.

(tt)    "Meeting" has the meaning specified in Section 4.4(a).

(uu)    "Observer" has the meaning specified in Section 4.4(a).

(vv)    "Opportunity" has the meaning specified in Section 5.2(a).

(ww)    "Other Preemptive Stockholder" or "Other Preemptive Stockholders" has the meaning specified in Section 3.3(d).

(xx)    "Permitted Liens" means Liens that are imposed (i) by this Agreement, (ii) by the Certificate of Incorporation, or (iii) under applicable securities laws.

(yy)    "Person" means an individual, partnership, corporation, unincorporated organization, joint stock company, limited liability company, association, trust, joint venture or any other entity, or a Governmental Authority.

(zz)    "Personal Representative" means the legal representative (including a guardian, executor, administrator or conservator) of a deceased or incompetent Stockholder that is an individual.

(aaa)    "Plan" has the meaning specified in the recitals to this Agreement.

(bbb)    "Preemptive Rights Notice" has the meaning specified in Section 3.3(a).

(ccc)    "Preemptive Stockholder" or "Preemptive Stockholders" has the meaning specified in Section 3.3(a).

6

(ddd)    "Pro Rata Portion" has the meaning specified in Section 3.3(a).

(eee)    "Qualified Public Offering" means the first underwritten public offering pursuant to an effective registration statement covering a sale of shares of Class A Common Stock to the public that (i) results in shares of Class A Common Stock being listed on a national securities exchange or quoted on the Nasdaq Stock Market, and (ii) either (A) involves gross cash proceeds of at least $100.0 million or (B) results in a market capitalization of the Corporation immediately after consummation of the offering that is not less than $150.0 million.

(fff)    "Related Company" or "Related Companies" has the meaning specified in Section 5.2(c).

(ggg)    "Related Fund"  means, with respect to any Person, any fund, account or investment vehicle that is controlled or managed by (i) such Person, (ii) an Affiliate of such Person or (iii) the same investment manager, advisor or subadvisor as such Person or an Affiliate of such investment manager, advisor or subadvisor.

(hhh)    "Related Person" means, with respect to any individual, any of such individual's parents, spouse, siblings, children and grandchildren.

(iii)    "Representatives" has the meaning specified in Section 7.3(b)(i).

(jjj)    "Sale Notice" has the meaning specified in Section 3.2(a).

(kkk)    "Sale Transaction" means the sale, lease, transfer, issuance or other disposition, in one transaction or a series of related transactions, of (i) all or substantially all of the consolidated assets of the Corporation and its Subsidiaries (including by or through the issuance, sale, contribution, transfer or other disposition (including by way of reorganization, merger, share exchange, consolidation or other business combination) of a majority of the Capital Stock or other equity interests of any direct and/or indirect Subsidiary or Subsidiaries of the Corporation if substantially all of the consolidated assets of the Corporation and its Subsidiaries are held by such Subsidiary or Subsidiaries) or (ii) Shares representing at least a majority of the Fully Diluted Common Stock (whether directly or indirectly or by way of any merger, share exchange, recapitalization, sale or contribution of equity, tender offer, reclassification, consolidation or other business combination transaction or purchase of beneficial ownership), to (in either case of clause (i) or clause (ii)) any Person or "group" (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision) of Persons (other than the Selling Holders or any Affiliates thereof) (a "Third Party Purchaser").

(lll)    "Sale Transaction Documents" has the meaning specified in Section 3.1(b)(iv).

(mmm)"SEC" means the United States Securities and Exchange Commission.

(nnn)    "Secretary" means, as of any time of determination, the Secretary of the Corporation as of such time.

7

(ooo)   "Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

(ppp)   "Selling Holder" or "Selling Holders" has the meaning specified in Section 3.1(a).

(qqq)   "Series A Certificate of Designations" means the Corporation's Certificate of Designations of Series A Convertible Preferred Stock, filed with the Secretary of State of the State of Delaware pursuant to the DGCL on the date of this Agreement, which created the shares of Series A Preferred Stock, as amended, amended and restated, supplemented or otherwise modified from time to time.

(rrr)   "Series A Preferred Stock" means the Series A Convertible Preferred Stock of the Corporation that is designated as "Series A Convertible Preferred Stock" under the Series A Certificate of Designations.

(sss)   "Shares" means, collectively, the shares of Common Stock and the shares of Series A Preferred Stock.  For purposes of this Agreement, if Shares of any Class have been reclassified or changed, or if the Corporation pays a dividend or makes a distribution on Shares of any Class in shares of Capital Stock of the Corporation, or subdivides (or combines) outstanding Shares of any Class into a greater (or smaller) number of such Shares, a Share of such Class that is subject to such reclassification, change, dividend, distribution, subdivision or combination shall be deemed to be such number of shares and amount of other securities to which a holder of such a Share outstanding immediately prior to such reclassification, change, dividend, distribution, subdivision or combination would be entitled to hold as a result of such change, reclassification, dividend, distribution, subdivision or combination.

(ttt)   "Significant Stockholder" means, as of any time of determination, any Stockholder that individually, or together with its Affiliates, owns or holds Shares representing at least five percent (5.0%) of all of the shares of Fully Diluted Common Stock as of such time; provided, however, that, at any time of determination, each of the Backstop Parties and each of the Affiliates of any Backstop Party shall constitute a Significant Stockholder for so long as such Backstop Party and its Affiliates collectively own or hold the lesser of (i) at least five percent (5.0%) of the Fully Diluted Common Stock at such time and (ii) at least fifty percent (50.0%) of the shares of Fully Diluted Common Stock that such Backstop Party and its Affiliates collectively owned or held on the Effective Date (subject to adjustment for splits, combinations, subdivisions, reclassifications and similar events having a similar effect on the Class A Common Stock).

(uuu)   "Specified Director" or "Specified Directors" has the meaning specified in Section 4.1(a)(iii).

(vvv)   "Specified Preemptive Stockholder" or "Specified Preemptive Stockholders" has the meaning specified in Section 3.3(d).

8

(www) "<u>Specified Stockholders</u>" means, collectively, (i) the Backstop Parties that own or hold Shares (not including any of the BP Stockholders) and (ii) any Affiliates of the Backstop Parties (not including any of the BP Stockholders) that own or hold Shares, so long as any such Affiliate remains an Affiliate of any of the Backstop Parties (not including any of the BP Stockholders).  Unless otherwise expressly set forth in this Agreement, any consent, approval, decision (including any decision as to whether a Person, action or thing is acceptable), determination, nomination, designation, direction, specification, request, removal, instruction or other action to be provided, granted, given, made, performed, rendered or otherwise taken by the Specified Stockholders pursuant to this Agreement at any time shall be provided, granted, given, made, performed, rendered or otherwise taken by Specified Stockholders that own or hold a majority of the shares of Fully Diluted Common Stock owned or held by all of the Specified Stockholders at such time.

(xxx)  "<u>Stockholders</u>" has the meaning specified in the preamble; <u>provided</u>, <u>however</u>, for the avoidance of doubt, any Person shall cease to be a Stockholder under this Agreement at such time that such Person becomes a Terminated Party (subject to the first proviso set forth in <u>Section 7.1</u>).  The term "<u>Stockholder</u>" means any one of the Stockholders.

(yyy)  "<u>Subsidiary</u>" means any Person in which the Corporation, directly or indirectly through one or more Subsidiaries or otherwise, beneficially owns more than 50% of the voting power of the securities of such Person, the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person.

(zzz)  "<u>Subsidiary Governing Body</u>" means the board of directors, the board of managers or other similar governing body (including any committee of any such governing body) of each Subsidiary of the Corporation; <u>provided</u>, <u>however</u>, that, solely for purposes of <u>Section 4.2</u> hereof, "Subsidiary Governing Body" means the board of directors, the board of managers or other similar governing body (including any committee of any such governing body) of each wholly-owned Subsidiary of the Corporation.

(aaaa)  "<u>Super-Majority Stockholders</u>" means, as of any time of determination, Stockholders that collectively own or hold at least seventy-five percent (75.0%) of all of the shares of Fully Diluted Common Stock at such time.

(bbbb) "<u>Tag-Along Seller</u>" or "<u>Tag-Along Sellers</u>" has the meaning specified in <u>Section 3.2(a)</u>.

(cccc) "<u>Tag-Along Transaction</u>" means any transaction or series of related transactions involving a Transfer (excluding any Excluded Tag-Along Transfer) by one or more Stockholders that collectively own or hold at least fifteen percent (15.0%) of all of the shares of Fully Diluted Common Stock at the time of such transaction (or, in the case of a series of transactions, at the time of the first transaction in such series of

9

transactions) to a single Person or "group" (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision) of Persons.

(dddd) "Tag-Along Transaction Documents" has the meaning specified in Section 3.2(c).

(eeee) "Terminated Party" has the meaning specified in Section 7.1.

(ffff) "Third Party Purchaser" has the meaning specified in the definition of "Sale Transaction."

(gggg) "Transfer" means any direct or indirect sale, transfer, gift, hypothecation, pledge, assignment, devise or other disposition of Shares (including (x) a disposition under judicial order, legal process, execution, attachment, foreclosure or enforcement of a Lien and (y) the granting of any option or entering into any agreement for the future sale, transfer or other disposition of Shares), whether voluntary or involuntary, whether of record, constructively or beneficially, whether with or without consideration, and whether by operation of law or otherwise, including by recapitalization, merger, consolidation, liquidation, dissolution, dividend, distribution or otherwise. Notwithstanding the foregoing, any transaction in which a Stockholder lends or borrows any Shares to or from investment funds (and the general partners of such investment funds), brokers, banks, or other financial institutions for the purpose of effecting margin transactions, or pledges or otherwise encumbers Shares in connection with such Stockholder's financing arrangements, in any case in the ordinary course of business, shall not constitute a Transfer of Shares for purposes of this Agreement; provided, however, that any foreclosure (including the retention of Shares in satisfaction of any obligations) on Shares by any such investment funds, broker, bank or other financial institution shall be deemed a Transfer of Shares for purposes of this Agreement. The terms "Transferee," "Transferring," "Transferor," "Transferred," and other forms of the word "Transfer" shall have the correlative meanings.

(hhhh) "Transfer Notice" has the meaning specified in Section 2.1(c).

(iiii) "Transfer Notice Recipients" has the meaning specified in Section 2.1(c).

(jjjj) "Warrants" means the Warrants to purchase shares of Class A Common Stock issued by the Corporation on the Effective Date pursuant to the Plan, as any of the same may be amended, amended and restated, supplemented or otherwise modified from time to time.

## ARTICLE II

### TRANSFERS OF SHARES

SECTION 2.1    Restrictions on Transfer.

(a)    *Prohibited Transfers.* Without limiting any other provisions, restrictions or conditions of this Article II, unless otherwise waived by the Board of Directors in its

10

sole discretion, no Shares shall be Transferred by any Stockholder (regardless of the manner in which the Transferor initially acquired such Shares), if:

(i)     such Transfer would, if consummated, result in any violation of the Securities Act or any state securities laws or regulations, or any other applicable federal or state laws or order of any Governmental Authority having jurisdiction over the Corporation or any of its Subsidiaries;

(ii)     such Transfer would, if consummated (after taking into account any other proposed Transfers or transfers of Warrants for which a notice of any thereof has been previously delivered to the Board of Directors, but not yet consummated), result in the Corporation having, in the aggregate, 400 or more holders of record (as such concept is understood for purposes of Section 12(g) of the Exchange Act) of either (x) the Class of Shares proposed to be Transferred (assuming, for purposes of this clause (x), that all issued and outstanding shares of Capital Stock and other securities of the Corporation that are exercisable or exchangeable for, or convertible into, directly or indirectly, the Class of Shares proposed to be Transferred were exercised, exchanged or converted at the time of such Transfer) or (y) any Class of Shares into which the Shares proposed to be Transferred are convertible (assuming, for purposes of this clause (y), that all issued and outstanding shares of Capital Stock and other securities of the Corporation that are exercisable or exchangeable for, or convertible into, directly or indirectly, the Class of Shares into which the Shares proposed to be Transferred are convertible were exercised, exchanged or converted at the time of such Transfer), unless at the time of such Transfer the Corporation is already subject to the reporting obligations under Section 13 or Section 15(d) of the Exchange Act; provided, that the number 400 as used in this Section 2.1(a)(ii) shall be increased by the number of such holders that acquire, after the Effective Date, Shares of the Class proposed to be Transferred or shares of Capital Stock or other securities of the Corporation that are exercisable or exchangeable for, or convertible into, Shares of the Class proposed to be Transferred or Shares of the Class into which the Shares of the Class proposed to be Transferred are convertible, in any such case from the Corporation other than on account of an exercise or conversion of Warrants or Series A Preferred Stock or in connection with a distribution to all holders of any such Shares, Capital Stock or securities;

(iii)     such Transfer would, if consummated (after taking into account any other proposed Transfers or transfers of Warrants for which a notice of any thereof has been previously delivered to the Board of Directors, but not yet consummated), require the Corporation to register any Class of Shares or other equity securities of the Corporation under the Exchange Act (as a result of the number of stockholders or otherwise), unless at the time of such Transfer the Corporation is already subject to the reporting obligations under Section 13 or Section 15(d) of the Exchange Act; or

(iv)     such Transfer is to a Competitor.

11

(b)    *Certificates; Legal Opinion.*  In addition to the restrictions set forth in Section 2.1(a), no Shares shall be Transferred by any Stockholder unless (i) the certificates (if any) representing such Shares bear legends as provided in Section 2.1(e) (and, with respect to uncertificated Shares, notice of such legends is provided in accordance with applicable law), for so long as such legends are applicable, and (ii) either (A) the Transferee is an Affiliate of the Transferor or (B) prior to such Transfer (1) the Transferee and the Transferor shall have delivered to the Corporation representation letters in such form as may be approved from time to time by the Board of Directors and available from the Secretary and (2) the Transferor shall have delivered to the Corporation a legal opinion, reasonably acceptable to the Board of Directors, stating that the registration of the Shares that are the subject of such proposed Transfer is not required under the Securities Act or any applicable state securities or "blue sky" laws. Any of the requirements set forth in clause (B) of the immediately preceding sentence may be waived by the Board of Directors in its sole discretion.

(c)    *Notice of Transfer.*  Subject to Section 3.1, and unless otherwise provided by the Board of Directors, any Stockholder effecting a Transfer of Shares must submit to the Corporation, not less than five (5) Business Days prior to such Transfer, a written notice (a "Transfer Notice") of such Transfer.  A Transfer Notice shall be delivered to (i) the Secretary or Chief Financial Officer of the Corporation, or any of their designees, and (ii) the Chairman (the "Transfer Notice Recipients"), in each case in accordance with Section 7.2.  A Transfer Notice shall include or be accompanied by (A) the name, address, facsimile number, e-mail address and telephone number of the Transferor and the Transferee, (B) whether the Transferee is an Affiliate of the Transferor and whether the Transferee is an Accredited Investor, (C) the number and Class of Shares proposed to be Transferred to, and acquired by, the Transferee, (D) the date on which the Transfer is expected to take place, (E) the percentage of the Transferor's total number of Shares of the same Class to be Transferred, (F) a Joinder Agreement, duly completed and executed by the Transferee to the extent such Transferee has not already signed a counterpart of this Agreement or executed a Joinder Agreement and (G) a request that the Corporation register the Transfer on the books of the Corporation and inform the Corporation's stock transfer agent (if any) of the Transfer.  So long as the other provisions of this Article II are satisfied and complied with, the Board of Directors (or an officer of the Corporation to whom such determination has been delegated by the Board of Directors) shall, within five (5) Business Days after a Transfer Notice is delivered to the Corporation, cause the Transfer to be registered on the books of the Corporation and inform the Corporation's stock transfer agent (if any) of such Transfer unless, prior to the expiration of such five (5) Business Day period, the Board of Directors (or such delegated officer) or any of the Transfer Notice Recipients request information demonstrating that the Transfer complies with this Article II (including information demonstrating that the Transferee or any of its Affiliates is not a Competitor), in which case the Transfer shall be registered on the books of the Corporation no later than five (5) Business Days after the Board of Directors (or such delegated officer) or such Transfer Notice Recipient receives such information, unless the Board of Directors (or such delegated officer) determines during any such 5-Business Day period referred to above that the Transfer is not permitted pursuant to the terms of this Article II, in which case the Board of Directors (or such delegated officer) shall promptly inform the Transferor of such determination.

12

(d)    *Prohibited Transfers Void.*   The Corporation shall not record upon its books any Transfer of any Shares except in accordance with the terms and provisions of this Agreement and the Certificate of Incorporation and, in the case of any shares of Class B Common Stock, the terms and provisions of any applicable Equity Incentive Plan.  Any purported Transfer of Shares in violation of such terms and provisions shall be void *ab initio* and shall not be recognized by the Corporation.

(e)    *Legends on Certificates*.

(i)    All certificates (if any) evidencing any Shares shall conspicuously bear, or shall be deemed to conspicuously bear (even if such certificate does not actually bear such legend), the following legend (subject to Section 2.1(e)(iii) below):

"THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS AND MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF 1933, AS AMENDED, OR AN EXEMPTION THEREFROM AND, IN EACH CASE, IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS."

(ii)    In addition to the legend required by Section 2.1(e)(i) above, all certificates (if any) evidencing any Shares shall conspicuously bear, or shall be deemed to conspicuously bear (even if such certificate does not actually bear such legend), the following legend (subject to Section 2.1(e)(iii) below):

"THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO VARIOUS TERMS, PROVISIONS AND CONDITIONS, INCLUDING CERTAIN RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER, AS SET FORTH IN A STOCKHOLDERS AGREEMENT DATED AS OF [_____] (AS AMENDED, SUPPLEMENTED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "STOCKHOLDERS AGREEMENT"), TO WHICH THE CORPORATION AND ALL STOCKHOLDERS ARE PARTY.  NO REGISTRATION OR TRANSFER OF THESE SHARES WILL BE MADE ON THE BOOKS OF THE CORPORATION UNLESS AND UNTIL SUCH RESTRICTIONS SHALL HAVE BEEN COMPLIED WITH.  THE CORPORATION WILL FURNISH, WITHOUT CHARGE, TO EACH HOLDER OF RECORD OF THE SHARES REPRESENTED BY THIS CERTIFICATE A COPY OF THE STOCKHOLDERS AGREEMENT, CONTAINING THE ABOVE-REFERENCED RESTRICTIONS ON TRANSFERS OF STOCK, UPON WRITTEN REQUEST TO THE CORPORATION AT ITS PRINCIPAL PLACE OF BUSINESS."

(iii)    In the event that any Shares represented by a certificate shall be registered for Transfer under the Securities Act, the Corporation shall, upon the written request of the holder of such Shares, issue to such holder a new certificate evidencing such Shares without the legend required by Section 2.1(e)(i).  In the event that any Shares represented by a certificate shall cease to be subject to the

13

restrictions on Transfer set forth in this Section 2.1, the Corporation shall, upon the written request of the holder of such Shares, issue to such holder a new certificate evidencing such Shares without the legend required by Section 2.1(e)(ii).

(iv)    In the case of uncertificated Shares, the Corporation shall provide notice to the Stockholders of the legend required by Sections 2.1(e)(i) and 2.1(e)(ii) above in accordance with applicable law.

(v)    Each Stockholder shall be deemed to have actual knowledge of the terms, provisions, restrictions and conditions set forth in this Agreement (including, without limitation, the restrictions on Transfer set forth in this Article II) for all purposes of this Agreement and applicable law (including, without limitation, the DGCL and the Uniform Commercial Code as adopted and in effect in any applicable jurisdiction), whether or not any certificate evidencing Shares owned or held by such Stockholder bears the legends set forth in Sections 2.1(e)(i) and 2.1(e)(ii) and whether or not any such Stockholder received a separate notice of such terms, provisions, restrictions and conditions.

(f)    *Transfer Agents and Registrars; Regulations*.    The Corporation, by resolution of the Board of Directors, may from time to time appoint a transfer agent and a registrar, under such arrangements and upon such terms and conditions as the Board of Directors deems advisable.  Unless and until the Board of Directors appoints some other Person as its transfer agent (and upon the revocation of any such appointment, thereafter until a new appointment is similarly made) the Secretary shall be the transfer agent of the Corporation without the necessity of any formal action of the Board of Directors, and the Secretary, or any Person designated by the Secretary, shall perform all of the duties of such transfer agent.  The Board of Directors may make such rules and regulations as it may deem expedient and as are not inconsistent with this Agreement, concerning the issue, registration and Transfer of Shares.

(g)    *Transfers of Class B Common Stock*.  Anything in this Agreement to the contrary notwithstanding, shares of Class B Common Stock shall not be Transferred by any Stockholder unless such Transfer complies with any restrictions on Transfer set forth in any applicable Equity Incentive Plan (which restrictions may be in addition to, and/or more restrictive than, the restrictions on Transfer of Shares set forth in this Agreement).

SECTION 2.2    Certain Stockholders.  If any Stockholder is an entity that was formed for the primary purpose of acquiring indebtedness of, or securities in, the Corporation, or that has no substantial assets other than Shares and indebtedness of, or securities in, the Corporation, then such Stockholder agrees that no shares of Capital Stock of, or other equity interests in, such Stockholder may be sold, transferred or otherwise disposed to any Person other than in accordance with the terms and provisions of this Article II as if such Capital Stock or other equity interests were Shares.

14

## ARTICLE III

## DRAG-ALONG; TAG-ALONG; PREEMPTIVE RIGHTS

SECTION 3.1     Drag-Along Rights in Sale Transaction.

(a)     In the event that one or more Stockholders that own or hold at least 66.67% of the shares of Fully Diluted Common Stock at the time of the delivery of a Drag Notice (for purposes of this Section 3.1, each, a "Selling Holder" and, collectively, the "Selling Holders") determine to effect, approve or otherwise take any action that would cause the occurrence of, or desire to consummate, a Sale Transaction, the Corporation or the Selling Holders (or a designated representative acting on behalf of the Selling Holders) will have the right (but not the obligation) to deliver written notice thereof (a "Drag Notice") to all other Stockholders (each, a "Dragged Holder" and, collectively, the "Dragged Holders"), including any holders of shares of Class B Common Stock.  Such written notice shall be delivered to the Dragged Holders in accordance with Section 7.2 at any time prior to the closing of the Sale Transaction, and shall contain a general description of the material terms and conditions of the Sale Transaction, including the amount and form of consideration to be paid by the Third Party Purchaser and the proposed date (which may be an estimated date or range of dates) for the closing of the Sale Transaction; provided, that the Selling Holders may elect to omit from the Drag Notice any such terms and conditions of, or information relating to, the Sale Transaction if the Selling Holders determine that the disclosure thereof to the Dragged Holders would have an adverse effect on the Sale Transaction or the consummation thereof, but the omission of any such terms, conditions or information shall not have any effect on the validity of the Drag Notice.

(b)     If a Drag Notice is delivered by the Corporation or by or on behalf of the Selling Holders to the Dragged Holders in accordance with Section 3.1(a), each of the Dragged Holders shall:

(i)     if such Sale Transaction is structured as a Transfer of Shares, be obligated to Transfer to the Third Party Purchaser (subject to the other terms of this Section 3.1(b)), at the closing of such Sale Transaction, all Shares held by such Dragged Holder (or the applicable portion of such Dragged Holder's Shares that are required to be Transferred in connection with such Sale Transaction, as determined in accordance with Section 3.1(c)) on purchase terms and conditions that are substantially the same as those purchase terms and conditions applicable to the Shares of the Selling Holders of the same Class (excluding any investment or reinvestment opportunity given to management of the Corporation or any of its Subsidiaries), free and clear of any Liens (other than Permitted Liens); provided, that each Stockholder will receive, in respect of such Stockholder's Shares, the same portion of the aggregate consideration paid in such Sale Transaction that such Stockholder would have received if such aggregate consideration had been distributed by the Corporation in complete liquidation pursuant to the rights and preferences set forth in the Certificate of Incorporation as in effect immediately prior to the consummation of such Sale Transaction;

15

(ii)     if such Sale Transaction is structured as a sale or transfer of assets (including by or through the sale, issuance or other disposition of the Capital Stock or other equity interests of, or reorganization, merger, share exchange, consolidation or other business combination involving, any direct and/or indirect Subsidiary or Subsidiaries of the Corporation), approve any subsequent dissolution and liquidation of the Corporation or any of its Subsidiaries in connection therewith and execute and/or deliver any applicable documents, instruments or agreements related thereto; provided, that, in any such liquidation, each Stockholder shall receive on account of its Shares the distributions pursuant to the rights and preferences set forth in the Certificate of Incorporation as in effect immediately prior to the consummation of such Sale Transaction;

(iii)    (A) be required to vote (including by written consent) such Dragged Holder's Shares (to the extent of any voting rights), whether by proxy, voting agreement or otherwise, in favor of such Sale Transaction, and (B) not raise any objection against such Sale Transaction (including objections relating to consideration being paid in connection therewith) or the process pursuant to which it was arranged, negotiated or consummated;

(iv)    execute and deliver any applicable purchase agreement, merger agreement, indemnity agreement, escrow agreement, letter of transmittal, release or other agreements or documents governing or relating to such Sale Transaction that the Corporation, the Selling Holders or the Third Party Purchaser may request and which are executed and delivered by the Selling Holders (other than any agreements or documents that relate to any investment or reinvestment opportunity given to management of the Corporation or any of its Subsidiaries) (the "Sale Transaction Documents"); provided, however, that no Dragged Holder shall be required to agree to, or be bound by, any non-competition covenants;

(v)     use commercially reasonable efforts to obtain or make any consents or filings necessary to be obtained or made by such Dragged Holder to effectuate such Sale Transaction;

(vi)    waive and refrain from exercising any appraisal, dissenters or similar rights with respect to such Sale Transaction (and each Stockholder shall be deemed to have irrevocably waived any appraisal, dissenters or similar rights arising from or relating to any Sale Transaction);

(vii)    not (A) take any action that might impede, be prejudicial to or be inconsistent with, such Sale Transaction, (B) assert any claim against the Corporation, any member of the Board of Directors (or any committee thereof), any member of any Subsidiary Governing Body or any other Stockholder or any of its Affiliates (including any Selling Holder and any of its Affiliates) in connection with such Sale Transaction (including any claim for breach of fiduciary duty), or (C) except as required by a Governmental Authority, disclose to any Person any information related to such Sale Transaction (including, without limitation, the identity of the Third Party Purchaser, the fact that

16

discussions or negotiations are taking place concerning such Sale Transaction, or any of the terms, conditions or other information with respect to such Sale Transaction); and

(viii)   take all necessary or desirable actions reasonably requested by the Selling Holders, the Third Party Purchaser and/or the Corporation in connection with the consummation of such Sale Transaction, including voting such Dragged Holder's Shares (to the extent of any voting rights), whether by proxy, voting agreement or otherwise, in favor of such Sale Transaction.

(c)     In the case of a Sale Transaction pursuant to which the Selling Holders are collectively Transferring less than 100% of all of the Shares owned or held by the Selling Holders in the aggregate, then each Dragged Holder shall be required to Transfer a percentage of the Shares owned or held by such Dragged Holder equal to the quotient obtained by dividing (i) the total number of shares of Fully Diluted Common Stock owned or held by the Selling Holders that are proposed to be Transferred in such Sale Transaction by (ii) the total number of shares of Fully Diluted Common Stock owned or held by the Selling Holders in the aggregate.  In the event that the Selling Holders are collectively Transferring less than 100% of all of the Shares owned or held by the Selling Holders in the aggregate and the Selling Holders collectively own or hold Shares of more than one Class, then any Dragged Holder that owns or holds Shares of more than one Class shall be required to Transfer a percentage of the Shares of each Class owned or held by such Dragged Holder equal to the quotient obtained in the immediately preceding sentence.

(d)     At the closing of any Sale Transaction that is structured as a sale or other Transfer of Shares in which the Selling Holders have exercised their rights under this Section 3.1, each Dragged Holder shall deliver at such closing, against payment of the purchase price therefor in accordance with the terms of the Sale Transaction Documents, certificates or other documentation (or other evidence thereof reasonably acceptable to the Third Party Purchaser) representing such Dragged Holder's Shares to be sold, duly endorsed for transfer or accompanied by duly endorsed stock powers (to the extent any Shares are certificated), and such other documents as are deemed reasonably necessary by any one or more of the Selling Holders, the Third Party Purchaser and/or the Corporation for the proper transfer of such Shares on the books of the Corporation, free and clear of any Liens (other than Permitted Liens).

(e)     Each Selling Holder and each Dragged Holder will bear its *pro rata* share (based upon the allocation among the Selling Holders and the Dragged Holders of the consideration payable in respect of Shares in the Sale Transaction) of the costs and expenses of any Sale Transaction to the extent such costs and expenses are incurred for the benefit of all Stockholders or the Corporation and are not otherwise paid by the Corporation or the Third Party Purchaser.  Costs and expenses incurred by any Stockholder on its own behalf will not be considered costs and expenses of the Sale Transaction and will be borne solely by such Stockholder.

17

(f)      The Corporation shall, and shall use its commercially reasonable efforts to cause its officers, employees, agents, contractors and others under its control to, cooperate and assist in any proposed Sale Transaction and not take any action which might impede, be prejudicial to or be inconsistent with, any such Sale Transaction. Pending the completion of any proposed Sale Transaction, the Corporation shall use commercially reasonable efforts to operate in the ordinary course of business and to maintain all existing business relationships in good standing (unless otherwise required by the Sale Transaction Documents) and otherwise comply with the terms of the Sale Transaction Documents to which it is a party.

(g)      The Corporation shall cooperate with the Selling Holders to enter into a Sale Transaction and to take any and all such further action in connection therewith as the Selling Holders may deem necessary or appropriate in order to consummate (or, if directed by the Selling Holders, abandon) any such Sale Transaction.  Neither the Corporation, any of its Subsidiaries nor any of the Selling Holders shall have any liability if any such Sale Transaction is not consummated for any reason.  Subject to the provisions of this Section 3.1, the Selling Holders, in exercising their rights under this Section 3.1, shall have complete discretion over the terms and conditions of any Sale Transaction effected hereby, including price, payment terms, conditions to closing, representations, warranties, affirmative covenants, negative covenants, indemnification, releases, holdbacks and escrows.  At the request of the Selling Holders, the Board of Directors shall authorize and direct the Corporation or any now or hereafter created Subsidiary to execute such agreements, documents, applications, authorizations, registration statements and instruments as they may deem necessary or appropriate in connection with any Sale Transaction.

(h)      IN ORDER TO SECURE THE OBLIGATIONS OF EACH DRAGGED HOLDER TO VOTE SUCH DRAGGED HOLDER'S SHARES IN FAVOR OF A SALE TRANSACTION AND TO WAIVE ANY APPRAISAL, DISSENTERS OR SIMILAR RIGHTS THAT SUCH DRAGGED HOLDER HAS (OR MAY HAVE) WITH RESPECT TO ANY SALE TRANSACTION, IN EACH CASE AS SET FORTH IN  SECTION 3.1(b), EACH DRAGGED HOLDER HEREBY IRREVOCABLY APPOINTS THE SELLING HOLDERS (AND EACH OF THEM) AS SUCH DRAGGED HOLDER'S TRUE AND LAWFUL PROXY AND ATTORNEY, WITH FULL POWER OF SUBSTITUTION, TO VOTE ALL SHARES OWNED OR HELD BY SUCH DRAGGED HOLDER OR OVER WHICH SUCH DRAGGED HOLDER HAS VOTING CONTROL TO EFFECTUATE SUCH VOTES AND WAIVERS FOR THE DURATION OF THE EXISTENCE OF THE CORPORATION.  IN ADDITION, IN ORDER TO SECURE THE OBLIGATIONS OF EACH DRAGGED HOLDER TO EXECUTE AND DELIVER THE SALE TRANSACTION DOCUMENTS, AND TO TAKE ACTIONS IN CONNECTION WITH THE CONSUMMATION OF A SALE TRANSACTION, IN EACH CASE AS SET FORTH IN SECTION 3.1(b), EACH DRAGGED HOLDER HEREBY IRREVOCABLY GRANTS TO THE SELLING HOLDERS (AND EACH OF THEM) A POWER-OF-ATTORNEY TO SIGN ANY AND ALL SUCH SALE TRANSACTION DOCUMENTS AND TO TAKE ANY AND ALL SUCH ACTIONS, IN THE NAME AND ON BEHALF OF SUCH DRAGGED HOLDER.  THE PROXIES AND POWERS OF ATTORNEY GRANTED BY EACH

18

DRAGGED HOLDER PURSUANT TO THIS <u>SECTION 3.1(h)</u> ARE COUPLED WITH AN INTEREST, ARE IRREVOCABLE, AND SHALL NOT BE AFFECTED BY AND SHALL SURVIVE THE DEATH, INCOMPETENCY, INCAPACITY, DISABILITY, BANKRUPTCY OR INSOLVENCY OF ANY DRAGGED HOLDER WHO IS AN INDIVIDUAL AND THE MERGER, CONSOLIDATION, LIQUIDATION, BANKRUPTCY, INSOLVENCY OR DISSOLUTION OF ANY DRAGGED HOLDER THAT IS NOT AN INDIVIDUAL.

(i)       If the Selling Holders enter into any negotiation or transaction for which Rule 506 of Regulation D (or any similar rule then in effect) promulgated by the SEC may be available with respect to such negotiation or transaction (including a merger, consolidation or other reorganization), each Dragged Holder who is not an Accredited Investor shall, at the request of the Corporation or the Selling Holders, appoint a "purchaser representative" (as such term is defined in Rule 501 of Regulation D) reasonably acceptable to the Corporation or the Selling Holders (as applicable) in connection with such negotiation or transaction and the Corporation shall pay the fees and expenses of such purchaser representative.

(j)       Any shares of Class B Common Stock Transferred in a Sale Transaction by a Selling Holder or a Dragged Holder shall immediately and automatically convert into shares of Class A Common Stock upon the consummation of such Sale Transaction.

(k)       The provisions of this <u>Section 3.1</u> shall be in addition to, and not in limitation of, the provisions of Section 7.1 of the Certificate of Incorporation.

(l)       A Transfer of Shares in a Sale Transaction by a Selling Holder or a Dragged Holder pursuant to this <u>Section 3.1</u> shall not be subject to the requirements of <u>Article II</u> other than <u>Section 2.1(a)(i)</u>.

(m)       Nothing in this <u>Section 3.1</u> or elsewhere in this Agreement shall, or shall be deemed to, limit, restrict, supersede or otherwise modify or alter the right of the Supermajority Preferred Stockholders (as defined in the Series A Certificate of Designations) to require that shares of Series A Preferred Stock be converted into shares of Class A Common Stock in accordance with Section 7.2 of the Series A Certificate of Designations and such rights may be exercised in accordance with Section 7.2 of the Series A Certificate of Designations prior to, concurrently with and/or after the exercise of any rights of the Selling Holders pursuant to this <u>Section 3.1</u>.

SECTION 3.2       <u>Tag-Along Rights</u>.

(a)       In the event that one or more Stockholders (each, an "<u>Initiating Holder</u>" and, collectively, the "<u>Initiating Holders</u>") desire to effect a Tag-Along Transaction, the Initiating Holders (or a designated representative acting on their behalf) shall deliver written notice (a "<u>Sale Notice</u>") to all other Stockholders that own or hold Shares that are in the same Class as the Shares proposed to be Transferred by the Initiating Holders (each, a "<u>Tag-Along Seller</u>" and, collectively, the "<u>Tag-Along Sellers</u>") and the Corporation, in accordance with <u>Section 7.2</u>, at least ten (10) Business Days prior to the

19

consummation of such Tag-Along Transaction, offering the Tag-Along Sellers the opportunity to participate in such Tag-Along Transaction on the terms and conditions set forth in the Sale Notice (which terms and conditions applicable to any Class of Shares proposed to be Transferred shall be substantially the same as those terms and conditions applicable to such Class of Shares that are owned or held by the Initiating Holders (except that if the Initiating Holders are given an option as to the form of consideration to be received in exchange for their Shares of any Class, each of the Tag-Along Sellers that own or hold Shares of such Class shall only need to be given the same option with respect to their Shares of such Class)).   The Sale Notice shall contain a general description of the material terms and conditions of the Tag-Along Transaction, including the total number of Shares of each Class proposed to be Transferred and the proposed amount and form of consideration for the Shares of each Class proposed to be Transferred.

(b)      Each Tag-Along Seller may, by written notice to the Initiating Holders (or their designated representative) delivered within five (5) Business Days after delivery of the Sale Notice to such Tag-Along Seller, elect to Transfer Shares of the same Class proposed to be Transferred in such Tag-Along Transaction, on the terms and conditions set forth in the Sale Notice that are applicable to such Class; provided, however, that if the proposed Transferee in the Tag-Along Transaction desires to purchase a number of Shares of any Class that is less than the aggregate number of Shares of such Class proposed to be Transferred by the Initiating Holders and all Tag-Along Sellers electing to Transfer Shares of such Class in the Tag-Along Transaction, then the Initiating Holders may elect to either (i) terminate such Tag-Along Transaction with respect to the Initiating Holders and each Tag-Along Seller either in its entirety or solely with respect to the portion of such Tag-Along Transaction that relates to the Transfer of Shares of such Class or (ii) consummate such Tag-Along Transaction on the basis of such lesser number of Shares of such Class and, upon such election to consummate the Tag-Along Transaction, each Initiating Holder and each electing Tag-Along Seller shall be permitted to Transfer to such Transferee up to that number of Shares of such Class owned or held by such Initiating Holder or such Tag-Along Seller, as the case may be, equal to the product of (x) the total number of Shares of such Class to be acquired by the Transferee in the proposed Tag-Along Transaction and (y) such Initiating Holder's or such Tag-Along Seller's (as applicable) proportionate percentage of the total number of then-issued and outstanding Shares of such Class collectively owned or held by the Initiating Holders and all electing Tag-Along Sellers that own or hold Shares of such Class.

(c)      In connection with any Tag-Along Transaction in which any Tag-Along Seller elects to participate pursuant to this Section 3.2, each such Tag-Along Seller will take all necessary or desirable actions reasonably requested by the Initiating Holders and/or the Transferee in the Tag-Along Transaction in connection with the consummation of such Tag-Along Transaction, including executing and delivering the applicable purchase agreement, merger agreement, indemnity agreement, escrow agreement, letter of transmittal, release or other agreements or documents governing or relating to such Tag-Along Transaction that the Initiating Holders or the Transferee in such Tag-Along Transaction may request (the "Tag-Along Transaction Documents").   No Stockholder shall (i) take any action that might impede, be prejudicial to or be inconsistent with, any

20

Tag-Along Transaction, (ii) assert any claim against the Corporation, any member of the Board of Directors (or any committee thereof), any member of any Subsidiary Governing Body or any other Stockholder or any of its Affiliates (including any Initiating Holder and any of its Affiliates) in connection with such Tag-Along Transaction (including any claim for breach of fiduciary duty), or (iii) except as required by a Governmental Authority, disclose to any Person any information related to such Tag-Along Transaction (including, without limitation, the identity of the Transferee, the fact that discussions or negotiations are taking place concerning such Tag-Along Transaction, or any of the terms, conditions or other information with respect to such Tag-Along Transaction).

(d)     At the closing of any Tag-Along Transaction in which any Tag-Along Seller has elected to participate under this Section 3.2, such Tag-Along Seller shall deliver at such closing, against payment of the consideration therefor in accordance with the terms of the Tag-Along Transaction Documents, certificates or other documentation (or other evidence thereof reasonably acceptable to the Transferee of such Shares) representing its Shares to be Transferred, duly endorsed for transfer or accompanied by duly endorsed stock powers (to the extent such Shares are certificated), and such other documents as are deemed reasonably necessary by the Initiating Holders, the Transferee and/or the Corporation for the proper Transfer of such Shares on the books of the Corporation, free and clear of any Liens (other than Permitted Liens).

(e)     Each Initiating Holder and each Tag-Along Seller electing to participate in a Tag-Along Transaction under this Section 3.2 will bear its *pro rata* share (based upon the allocation among the Initiating Holders and the Tag-Along Sellers of the consideration payable in respect of Shares in the Tag-Along Transaction) of the costs and expenses of any such Tag-Along Transaction to the extent such costs and expenses are incurred for the benefit of all such Stockholders and are not otherwise paid by the Corporation or the Transferee.  Costs and expenses incurred by any such Stockholder on its own behalf will not be considered costs of the Tag-Along Transaction and will be borne solely by such Stockholder.

(f)     Subject to the provisions of this Section 3.2, the Initiating Holders shall have complete discretion over the terms and conditions of any Tag-Along Transaction, including price, payment terms, conditions to closing, representations, warranties, affirmative covenants, negative covenants, indemnification, releases, holdbacks and escrows.  Neither the Corporation, any of its Subsidiaries nor any of the Initiating Holders shall have any liability if any Tag-Along Transaction is not consummated for any reason.

(g)     The Corporation shall, and shall use its commercially reasonable efforts to cause its officers, employees, agents, contractors and others under its control to, cooperate and assist in any proposed Tag-Along Transaction and not take any action which might impede, be prejudicial to or be inconsistent with, any such Tag-Along Transaction.  Pending the completion of any proposed Tag-Along Transaction, the Corporation shall use commercially reasonable efforts to operate in the ordinary course of business and to maintain all existing business relationships in good standing and

21

otherwise comply with the terms of the Tag-Along Transaction Documents to which it is a party.

(h)    If any Tag-Along Seller electing to participate in a Tag-Along Transaction breaches any of its obligations under this Section 3.2 or under any of the Tag-Along Transaction Documents, then (i) such Tag-Along Seller will not be permitted to participate in such Tag-Along Transaction and the Initiating Holders can proceed to close such Tag-Along Transaction excluding the sale of such Tag-Along Seller's Shares therefrom and, (ii) if the number of Shares of any Class to be Transferred by the Initiating Holders and the Tag-Along Sellers was calculated pursuant to clause (ii) of Section 3.2(b) and such breaching Tag-Along Seller owns or holds Shares of such Class and elected to Transfer Shares of such Class in such Tag-Along Transaction, then, at the option of the Initiating Holders, the number of Shares of such Class to be Transferred by the Initiating Holders and the Tag-Along Sellers (excluding the breaching Tag-Along Seller) shall be recalculated pursuant to clause (ii) of Section 3.2(b) excluding the breaching Tag-Along Seller from such calculation.

(i)    Notwithstanding anything to the contrary contained in this Agreement, Stockholders that own or hold shares of Class B Common Stock shall not be entitled to participate in a Tag-Along Transaction pursuant to this Section 3.2 in respect of shares of Class B Common Stock owned or held by such Stockholder.

(j)    The provisions of this Section 3.2 shall not apply to any Transfer of Shares by any Selling Holder or any Dragged Holder in connection with a Sale Transaction pursuant to Section 3.1.

(k)    In no event shall any Tag-Along Seller have any rights under this Section 3.2 or otherwise with respect to a sale or other transfer by any Stockholders of any debt securities or other Indebtedness of the Corporation or any of its Subsidiaries.

(l)    The exercise or non-exercise of the rights of any of the Stockholders under this Section 3.2 to participate in one or more Tag-Along Transactions shall not adversely affect their rights to participate in subsequent Tag-Along Transactions subject to this Section 3.2.

SECTION 3.3    Preemptive Rights.

(a)    The Corporation shall not, after the Effective Date, sell or issue to any Person (including any then-current Stockholder) any additional Shares, other shares of Capital Stock, equity interests or equity securities of the Corporation, or any options, warrants or other securities that are convertible into, or exchangeable or exercisable for, any Shares, other shares of Capital Stock, equity interests or equity securities of the Corporation (collectively, the "Additional Securities") (other than pursuant to an Excluded Issuance), unless the Corporation first submits written notice (a "Preemptive Rights Notice") to each Significant Stockholder that is an Accredited Investor (any such Significant Stockholder, a "Preemptive Stockholder" and, collectively, the "Preemptive Stockholders") identifying the material terms of the Additional Securities (including the

22

price, number or amount and type of Additional Securities, and all other material terms thereof) and offers to each Preemptive Stockholder the opportunity to purchase up to a portion of the Additional Securities (a "Pro Rata Portion") on such terms and conditions set forth in the Preemptive Rights Notice. A Preemptive Stockholder's Pro Rata Portion shall be equal to the product of (x) the total number or amount of Additional Securities subject to the sale or issuance and (y) a fraction, (A) the numerator of which is the number of shares of Fully Diluted Common Stock then owned or held by such Preemptive Stockholder, and (B) the denominator of which is the total number of then-issued and outstanding shares of Fully Diluted Common Stock then owned or held by all Preemptive Stockholders collectively.

(b)    The Corporation's offer to each Preemptive Stockholder shall remain open for a period of five (5) Business Days after the Preemptive Rights Notice is delivered to such Preemptive Stockholder in accordance with Section 7.2. A Preemptive Stockholder may accept such offer by delivering written notice of such acceptance to the Corporation prior to the expiration of such five (5) Business Day period, which notice shall set forth the number or amount of such Additional Securities to be purchased by such Preemptive Stockholder (which, in any event, shall not exceed the number or amount equal to such Preemptive Stockholder's Pro Rata Portion). If not all Preemptive Stockholders subscribe for their full Pro Rata Portion of Additional Securities, then the Corporation shall notify in writing the fully-subscribing Preemptive Stockholders of such fact and shall offer such fully-subscribing Preemptive Stockholders the right to acquire such unsubscribed Additional Securities on the terms set forth in the Preemptive Rights Notice. Each fully-subscribing Preemptive Stockholder shall have the right to elect to purchase up to its *pro rata* share of such unsubscribed Additional Securities (in proportion to the Pro Rata Portions of all fully-subscribing Preemptive Stockholders), by delivering written notice to the Corporation, within two (2) Business Days from the date such notice from the Corporation is delivered to such Preemptive Stockholder. To the extent the procedure described in the preceding sentence does not result in the subscription of all unsubscribed Additional Securities, such procedure shall be repeated until there are no unsubscribed Additional Securities or until no Preemptive Stockholder has elected to purchase unsubscribed Additional Securities.

(c)    In the event that any Additional Securities are not subscribed for by the Preemptive Stockholders in accordance with this Section 3.3, the Corporation will have sixty (60) days after the expiration of the last period in which Preemptive Stockholders are entitled to subscribe for Additional Securities to sell the unsubscribed Additional Securities, at a price and upon other terms no more favorable, in the aggregate, than those specified in the Preemptive Rights Notice delivered to the Preemptive Stockholders pursuant to Section 3.3(a). Following the earlier to occur of (i) the date the Corporation sells all such unsubscribed Additional Securities and (ii) the date of the expiration of the sixty (60) day period referred to in the immediately preceding sentence, the Corporation will not issue or sell any Additional Securities (other than pursuant to an Excluded Issuance) without first offering such Additional Securities to each of the Preemptive Stockholders in the manner provided in this Section 3.3 (it being understood, however, that prior to such earlier date the Corporation shall not be permitted to sell or issue any Additional Securities (other than such unsubscribed Additional Securities or pursuant to

23

an Excluded Issuance) without first offering such Additional Securities to each of the Preemptive Stockholders in the manner provided in this Section 3.3).

(d)      Notwithstanding anything to the contrary set forth herein, the Corporation may comply with its obligations under this Section 3.3 by first selling to one or more Preemptive Stockholders (each, a "Specified Preemptive Stockholder" and, collectively, the "Specified Preemptive Stockholders") all of the Additional Securities contemplated to be sold, and, promptly thereafter, offering to sell to the Preemptive Stockholders (other than the Specified Preemptive Stockholders) (each, an "Other Preemptive Stockholder" and, collectively, the "Other Preemptive Stockholders") the number or amount of such Additional Securities the Other Preemptive Stockholders would have been entitled to purchase pursuant to this Section 3.3 by applying Sections 3.3(a) and 3.3(b) as if the Corporation had not first sold all of the Additional Securities to the Specified Preemptive Stockholders but rather had offered to sell the Additional Securities to all Preemptive Stockholders at the same time in accordance with the terms of those Sections.  In the event that any Other Preemptive Stockholder purchases Additional Securities pursuant to any such offer referred to in the immediately preceding sentence, then the Specified Preemptive Stockholders shall sell to the Corporation, for a price equal to the original cost thereof (plus any accrued and unpaid preferred yield or interest thereon, if applicable), the same number or amount and class of Additional Securities acquired by the Other Preemptive Stockholders pursuant to such offer.

## ARTICLE IV

### BOARD OF DIRECTORS

SECTION 4.1      Election of Directors; Number and Composition.

(a)      *Designees.*   To the extent a Stockholder has voting rights, such Stockholder agrees to vote, execute proxies or written consents, or otherwise cause to be voted all of its Shares and any other Shares over which it exercises voting control, and to take such other actions as are necessary, so as to (x) fix the number of directors of the Corporation at seven (7) persons and (y) elect and continue in office as directors and to take all other action within its control to cause such election and continuance (including using its commercially reasonable efforts to cause the Corporation to call a special meeting of stockholders) of the following:

(i)      one (1) director who shall be the individual serving as the Chief Executive Officer of the Corporation on the Effective Date, provided, that if for any reason such individual shall cease to serve as the Chief Executive Officer of the Corporation, each Stockholder shall (A) vote, execute proxies or written consents or otherwise cause to be voted all of its Shares (to the extent such Shares have voting rights) and any other Shares over which such Stockholder exercises voting control, and take any other action necessary, to remove such individual from the Board of Directors if such individual has not resigned as a member of the Board of Directors, and (B) elect as a director the successor Chief Executive Officer when such person becomes Chief Executive Officer;

24

(ii)      (A) for so long as the BP Stockholders continue to own or hold at least forty percent (40.0%) of the shares of Fully Diluted Common Stock, four (4) directors nominated and designated by the BP Stockholders; (B) for so long as the BP Stockholders continue to own or hold at least thirty percent (30.0%) of the shares of Fully Diluted Common Stock, but less than forty percent (40.0%) of the shares of Fully Diluted Common Stock, three (3) directors nominated and designated by the BP Stockholders; (C) for so long as the BP Stockholders continue to own or hold at least twenty-five percent (25.0%) of the shares of Fully Diluted Common Stock, but less than thirty percent (30.0%) of the shares of Fully Diluted Common Stock, two (2) directors nominated and designated by the BP Stockholders; and (D) for so long as the BP Stockholders continue to own or hold at least fifteen percent (15.0%) of the shares of Fully Diluted Common Stock, but less than twenty-five percent (25.0%) of the shares of Fully Diluted Common Stock, one (1) director nominated and designated by the BP Stockholders (each such person described in clauses (A) through (D) hereof, a "BP Director" and, collectively, the "BP Directors"); provided, however, that if the BP Stockholders are entitled to nominate and designate four (4) individuals to serve as directors in accordance with clause (A) hereof, then one (1) of such individuals (I) must qualify as an "Independent Director" under the listing requirements of NYSE MKT LLC and (II) shall be reasonably acceptable, at the time of nomination and designation, to the Specified Stockholders; and

(iii)      (A) for so long as the Specified Stockholders continue to own or hold at least twenty-five percent (25.0%) of the shares of Fully Diluted Common Stock, two (2) directors nominated and designated by the Specified Stockholders and (B) for so long as the Specified Stockholders continue to own or hold at least fifteen percent (15.0%) of the shares of Fully Diluted Common Stock, but less than twenty-five percent (25.0%) of the shares of Fully Diluted Common Stock, one (1) director nominated and designated by the Specified Stockholders (each such person described in clauses (A) and (B) hereof, a "Specified Director" and, collectively, the "Specified Directors"); provided, however, that at least one (1) individual designated by the Specified Stockholders must qualify as an "Independent Director" under the listing requirements of NYSE MKT LLC.

(b)      *Termination of Nomination and Designation Right*.  If at any time the Designation Right of a Stockholder set forth in Section 4.1(a)(ii) or Section 4.1(a)(iii) terminates or is reduced because the Persons included within the definition of "BP Stockholders" or "Specified Stockholders", as applicable, own or hold shares of Fully Diluted Common Stock that are less than any applicable percentage of the shares of Fully Diluted Common Stock as set forth in Section 4.1(a)(ii) or Section 4.1(a)(iii), as applicable, then each Stockholder agrees to vote, execute proxies or written consents or otherwise cause to be voted all of its Shares (to the extent such Shares have voting rights) and any other Shares over which such Stockholder exercises voting control, and to take any other action necessary, for the removal of the applicable number of directors previously nominated and designated pursuant to such Designation Right to give effect to such termination or reduction, and the vacancy on the Board of Directors created by such removal shall be filled in accordance with the terms of the Certificate of Incorporation

25

and the Bylaws; and the Corporation shall cause such removal to be made, and shall cause such vacancy to be filled, with respect to each applicable Subsidiary Governing Body to give effect to Section 4.2. The termination or reduction of any Stockholder's or group of Stockholders' Designation Right shall not affect the Designation Right of any other Stockholder or group of Stockholders.

For purposes of this Section 4.1(b), if the Designation Right of the BP Stockholders to nominate and designate directors pursuant to Section 4.1(a)(ii) is reduced to a number of directors that is at least one (1) director, and assuming that the Board of Directors then consists of at least two (2) directors that have been previously nominated and designated by the BP Stockholders pursuant to Section 4.1(a)(ii), then the director or directors that the BP Stockholders previously nominated and designated that should be removed from the Board of Directors pursuant to this Section 4.1(b) shall be the director or directors specified by the BP Stockholders in writing to the Corporation or, if the BP Stockholders shall not so specify within five (5) Business Days after the date on which such Designation Right is reduced, the director or directors specified by the Corporation in writing to the Stockholders.

For purposes of this Section 4.1(b), if the Designation Right of the Specified Stockholders to nominate and designate directors pursuant to Section 4.1(a)(iii) is reduced to one (1) director pursuant to Section 4.1(a)(iii), and assuming that the Board of Directors then consists of two (2) directors that have been previously nominated and designated by the Specified Stockholders pursuant to Section 4.1(a)(iii), then the director previously nominated and designated by the Specified Stockholders to be removed from the Board of Directors pursuant to this Section 4.1(b) shall be the director specified in writing to the Corporation by the Specified Stockholders or, if the Specified Stockholders shall not so specify within five (5) Business Days after the date on which such Designation Right is reduced, the director specified by the Corporation in writing to the Stockholders.

(c)     *Designation Notice*.

(i)     With respect to (x) the nomination and designation of a director by the BP Stockholders pursuant to Section 4.1(a)(ii) (including any such nomination and designation made following the removal of a director made at the request of the BP Stockholders pursuant to Section 4.1(g)), (y) any identification by the BP Stockholders of a director to be removed pursuant to Section 4.1(b) (as contemplated by the second to last paragraph of Section 4.1(b)) or (z) any request by the BP Stockholders pursuant to Section 4.1(g) for the removal of any director from the Board of Directors that was previously nominated and designated by the BP Stockholders pursuant to Section 4.1(a)(ii), the BP Stockholders shall execute and deliver to the Corporation a written notice (a "BP Designation Notice") identifying the individual that the BP Stockholders are nominating and designating or specifying the identity of the director to be removed from the Board of Directors (as applicable) pursuant to any such Section and certifying to the Corporation that the Stockholder(s) executing and delivering such BP Designation Notice own(s) or hold(s) a majority of the shares of Fully Diluted

26

Common Stock owned or held by all of the BP Stockholders. The Corporation shall confirm, based on the information set forth in the books and records of the Corporation or the Corporation's stock transfer agent (if any), that the Stockholder(s) executing and delivering such BP Designation Notice own(s) or hold(s) a majority of the shares of Fully Diluted Common Stock owned or held by all of the BP Stockholders. If the Corporation confirms that a BP Designation Notice has been executed and delivered by the Stockholder(s) that own(s) or hold(s) a majority of the shares of Fully Diluted Common Stock owned or held by all of the BP Stockholders, the Corporation shall deliver notice of such fact to the other Stockholders and the other Stockholders may rely on such notice from the Corporation in determining their obligations under this Section 4.1 with respect to the election of a director that has been nominated and designated pursuant to Section 4.1(a)(ii) or the removal of a director from the Board of Directors pursuant to Section 4.1(b) or Section 4.1(g) that was previously nominated and designated by the BP Stockholders pursuant to Section 4.1(a)(ii), as applicable. If the Corporation confirms that a BP Designation Notice has not been executed and delivered by the Stockholder(s) that own(s) or hold(s) a majority of the shares of Fully Diluted Common Stock owned or held by all of the BP Stockholders, then such BP Designation Notice shall be deemed void and invalid, and the Stockholders shall have no obligation to vote their Shares or any other Shares over which they exercise voting control, or to take any other necessary actions, to elect and continue in office as a director the individual nominated and designated in such BP Designation Notice (unless and until a valid BP Designation Notice is executed and delivered to the Corporation with respect to such individual) or to remove the director from the Board of Directors specified in such BP Designation Notice, as applicable.

(ii)     With respect to (x) the nomination and designation of a director by the Specified Stockholders pursuant to Section 4.1(a)(iii) (including any such nomination and designation made following the removal of a director made at the request of the Specified Stockholders pursuant to Section 4.1(g)), (y) any identification by the Specified Stockholders of a director to be removed pursuant to Section 4.1(b) (as contemplated by the last paragraph of Section 4.1(b)) or (z) any request by the Specified Stockholders pursuant to Section 4.1(g) for the removal of any director from the Board of Directors that was previously nominated and designated by the Specified Stockholders pursuant to Section 4.1(a)(iii), the Specified Stockholders shall execute and deliver to the Corporation a written notice (a "Specified Designation Notice") identifying the individual that the Specified Stockholders are nominating and designating or specifying the identity of the director to be removed from the Board of Directors (as applicable) pursuant to any such Section and certifying to the Corporation that the Stockholder(s) executing and delivering such Specified Designation Notice own(s) or hold(s) a majority of the shares of Fully Diluted Common Stock owned or held by all of the Specified Stockholders. The Corporation shall confirm, based on the information set forth in the books and records of the Corporation or the Corporation's stock transfer agent (if any), that the Stockholder(s) executing and delivering such Specified Designation Notice own(s) or hold(s) a majority of

27

the shares of Fully Diluted Common Stock owned or held by all of the Specified Stockholders. If the Corporation confirms that a Specified Designation Notice has been executed and delivered by the Stockholder(s) that own(s) or hold(s) a majority of the shares of Fully Diluted Common Stock owned or held by all of the Specified Stockholders, the Corporation shall deliver notice of such fact to the other Stockholders and the other Stockholders may rely on such notice from the Corporation in determining their obligations under this Section 4.1 with respect to the election of a director that has been nominated and designated pursuant to Section 4.1(a)(iii) or the removal of a director from the Board of Directors pursuant to Section 4.1(b) or Section 4.1(g) that was previously nominated and designated by the Specified Stockholders pursuant to Section 4.1(a)(iii), as applicable. If the Corporation confirms that a Specified Designation Notice has not been executed and delivered by the Stockholder(s) that own(s) or hold(s) a majority of the shares of Fully Diluted Common Stock owned or held by all of the Specified Stockholders, then such Specified Designation Notice shall be deemed void and invalid, and the Stockholders shall have no obligation to vote their Shares or any other Shares over which they exercise voting control, or to take any other necessary actions, to elect and continue in office as a director the individual nominated and designated in such Specified Designation Notice (unless and until a valid Specified Designation Notice is executed and delivered to the Corporation with respect to such individual) or to remove the director from the Board of Directors specified in such Specified Designation Notice, as applicable.

(d)    *Committees*. Each Holder Director shall have the right (but shall not be obligated) to serve on any committee of the Board of Directors (other than any committee that is established to evaluate, consider, approve, negotiate or otherwise deal with a contract, transaction or other matter with respect to which such Holder Director, or the Stockholders that nominated and designated such Holder Director pursuant to a Designation Right or any Affiliates of any such Stockholder, has/have a conflict of interest), with at least the same proportional voting rights as such Holder Director has on the Board of Directors.

(e)    *Transferability of Designation Right*. The Designation Rights shall not be transferable to any Person (excluding, for the avoidance of doubt, any Person included within the definition of "BP Stockholders" (in the case of the Designation Right referred to in Section 4.1(a)(ii)) or the definition of "Specified Stockholders" (in the case of the Designation Right referred to in Section 4.1(a)(iii))).

(f)    *Chairman*. The Chairman shall be one of the Holder Directors nominated and designated by the BP Stockholders, as determined by the BP Stockholders; provided, however, that if the BP Stockholders own or hold less than forty percent (40.0%) of the shares of Fully Diluted Common Stock, then the Chairman shall be elected by majority vote of the directors on the Board of Directions. The Chairman must be a director.

(g)    *Removal; Replacement*. Each Stockholder agrees to vote, execute proxies or written consents or otherwise cause to be voted all of its Shares (to the extent such Shares have voting rights) and any other Shares over which such Stockholder exercises

28

voting control, and take any other action necessary, for the removal of any Holder Director upon the request of the Stockholder(s) that hold(s) the related Designation Right, and for the election or appointment to the Board of Directors of a substitute nominated and designated by such Stockholder(s) in accordance with the provisions hereof. Except for the removal of a director on account of the termination or reduction of a Designation Right (which removal shall be governed by Section 4.1(b)), the applicable Stockholders holding a Designation Right shall have the exclusive right to request the removal, whether with or without cause, of the Holder Director nominated and designated by such Stockholders (but not any other Holder Director). Each Stockholder further agrees to vote, execute proxies or written consents or otherwise cause to be voted all of its Shares (to the extent such Shares have voting rights) and any other Shares over which such Stockholder exercises voting control, and take any other action as shall be necessary or appropriate, to ensure that any vacancy on the Board of Directors resulting from the resignation or removal of a Holder Director (other than a resignation or removal of a Holder Director on account of the termination or reduction of a Designation Right), or resulting from a Holder Director becoming unable to serve as a result of death, disability or otherwise, shall be filled by the Stockholder(s) that hold the Designation Right pursuant to which such Holder Director was nominated and designated to be a director. Any director that is not nominated or designated pursuant to a Designation Right may be removed, with or without cause, by the Majority Stockholders at the time of such removal and the vacancy on the Board of Directors created by such removal shall be filled in accordance with the terms of the Certificate of Incorporation and the Bylaws; and the Corporation shall cause such removal to be made, and shall cause such vacancy to be filled, with respect to each applicable Subsidiary Governing Body to give effect to Section 4.2.

(h)   *No Liability for Election of Recommended Director.*   None of the Stockholders, and no officer, director, manager, stockholder, partner, member, employee or agent of any Stockholder, makes any representation or warranty as to the fitness or competence of the designee or nominee of any party hereunder to serve on the Board of Directors (or any committee thereof) or any Subsidiary Governing Body by virtue of being a party to this Agreement or by the act of such party in voting for such designee or nominee pursuant to this Agreement.

(i)   *Compensation.*   Each director who is not employed by (i) the Corporation, (ii) any Subsidiary of the Corporation, (iii) any Stockholder or (iv) any Affiliate of any Stockholder shall be paid such amount per annum or such fixed sum, in such form (including cash, securities or a combination thereof) as reasonably determined by a majority of the directors who are employed by (w) the Corporation, (x) any Subsidiary of the Corporation, (y) any Stockholder or (z) any Affiliate of any Stockholder from time to time to be market-rate compensation for the performance of such director's duties, subject to approval by the Majority Stockholders. Each director who is not employed by the Corporation or any of its Subsidiaries shall be reimbursed for the reasonable and necessary expenses incurred by such director in connection with the performance of such director's duties (including expenses incurred in attending Meetings). Nothing herein contained shall be construed to preclude any director from serving the Corporation or any of its Subsidiaries in any other capacity and receiving proper compensation therefor.

29

SECTION 4.2   Subsidiary Governing Bodies.   The Corporation agrees to take all necessary and desirable actions (including the voting of any and all of the Capital Stock or other equity securities of the Subsidiaries owned or held by the Corporation (or over which the Corporation has voting control), the execution of written consents, the calling of special meetings, the removal of directors, the filling of vacancies on the Subsidiary Governing Bodies, the waiving of notice and the attending of meetings) so that each Subsidiary Governing Body of any wholly-owned Subsidiary of the Corporation shall be comprised of the same individuals who serve on the Board of Directors or any committee thereof, as applicable, unless any such individual declines to serve on any such Subsidiary Governing Body; provided, however, that the obligations of the Corporation under this Section 4.2 shall not apply to any Subsidiary of the Corporation which is either (a) a limited liability company that is managed by its member(s) or a limited partnership that is managed by its general partner, (b) not organized under the laws of the United States of America or any State thereof or the District of Columbia or (c) required by law or contract to have a different composition.

SECTION 4.3   PROXY AND POWER OF ATTORNEY.   IN ORDER TO SECURE THE OBLIGATIONS OF EACH STOCKHOLDER TO VOTE SUCH STOCKHOLDER'S SHARES (TO THE EXTENT SUCH SHARES HAVE VOTING RIGHTS) IN ACCORDANCE WITH THE PROVISIONS OF THIS ARTICLE IV, EACH STOCKHOLDER HEREBY IRREVOCABLY APPOINTS EACH OFFICER OF THE CORPORATION (WHETHER AN OFFICER ON THE EFFECTIVE DATE OR THEREAFTER APPOINTED) AS SUCH STOCKHOLDER'S TRUE AND LAWFUL PROXY AND ATTORNEY, WITH FULL POWER OF SUBSTITUTION, TO VOTE ALL SHARES OWNED OR HELD BY SUCH STOCKHOLDER OR OVER WHICH SUCH STOCKHOLDER HAS VOTING CONTROL TO EFFECTUATE SUCH VOTES FOR THE DURATION OF THE EXISTENCE OF THE CORPORATION. IN ADDITION, IN ORDER TO SECURE THE OBLIGATIONS OF EACH STOCKHOLDER TO EXECUTE AND DELIVER PROXIES AND WRITTEN CONSENTS, AND TO TAKE ACTIONS REQUIRED TO BE TAKEN BY SUCH STOCKHOLDER SET FORTH IN THIS ARTICLE IV, EACH STOCKHOLDER HEREBY IRREVOCABLY GRANTS TO EACH OFFICER OF THE CORPORATION (WHETHER AN OFFICER ON THE EFFECTIVE DATE OR THEREAFTER APPOINTED) A POWER-OF-ATTORNEY TO SIGN ANY AND ALL SUCH PROXIES AND WRITTEN CONSENTS AND TO TAKE ANY AND ALL SUCH ACTIONS, IN THE NAME AND ON BEHALF OF SUCH STOCKHOLDER. THE PROXIES AND POWERS OF ATTORNEY GRANTED BY EACH STOCKHOLDER PURSUANT TO THIS SECTION 4.3 ARE COUPLED WITH AN INTEREST, ARE IRREVOCABLE, AND SHALL NOT BE AFFECTED BY AND SHALL SURVIVE THE DEATH, INCOMPETENCY, INCAPACITY, DISABILITY, BANKRUPTCY OR INSOLVENCY OF ANY STOCKHOLDER WHO IS AN INDIVIDUAL AND THE MERGER, CONSOLIDATION, LIQUIDATION, BANKRUPTCY, INSOLVENCY OR DISSOLUTION OF ANY STOCKHOLDER THAT IS NOT AN INDIVIDUAL.

SECTION 4.4   Board Observers.

(a)   For so long as the BP Stockholders own or hold ten percent (10.0%) or more of the shares of Fully Diluted Common Stock, the BP Stockholders shall have the right to have one designated representative attend, as an observer in a non-voting capacity (the "BP Observer"), each meeting of the Board of Directors, each meeting of each

30

committee of the Board of Directors and each meeting of each Subsidiary Governing Body (each such meeting, a "Meeting").  The Specified Stockholders shall have the right to designate the following number of representatives to attend, as an observer in a non-voting capacity (each, a "Specified Observer" and, together with the BP Observer, each, an "Observer"), each Meeting:  (i) two (2) representatives for so long as the Specified Stockholders collectively own or hold twenty percent (20.0%) or more of the shares of Fully Diluted Common Stock, and (ii) one (1) representative for so long as the Specified Stockholders collectively own or hold ten percent (10.0%) or more of the shares of Fully Diluted Common Stock, but less than twenty percent (20.0%) of the shares of Fully Diluted Common Stock.

(b)     The Corporation or the applicable Subsidiary of the Corporation, shall give each Observer advance notice of all Meetings and all materials and other information given to members of the Board of Directors, any committee of the Board of Directors or any Subsidiary Governing Body (as applicable) in connection with any Meeting.  Notwithstanding any of the foregoing, an Observer shall not be entitled to observe any portion of a Meeting (or any portion of a notice of a Meeting) or to receive any materials or other information that the Board of Directors, the committee of the Board of Directors or the applicable Subsidiary Governing Body (as applicable) determines (i) would jeopardize or impair the ability of the Corporation or any of its Subsidiaries to take advantage of the attorney-client privilege if such Meeting were observed or if such portion of such notice, such materials or such other information was received by such Observer or (ii) that such Observer or the Stockholder(s) that designated such Observer or any Affiliate of any such Stockholder(s) has/have a conflict of interest with respect to the subject matter of such portion of the Meeting (or such portion of such notice of a Meeting) or such materials or other information.  The failure of any Observer to attend any Meeting (or to receive any portion of a notice of a Meeting) or to receive any materials or other information shall not prevent any such Meeting from proceeding or otherwise affect the validity of such Meeting or any actions taken at such Meeting.  No Observer shall be entitled to vote on any matters submitted to a vote at any Meeting.  No Observer shall be entitled to any fees or other compensation for acting as an Observer; provided, however, that the reasonable travel and lodging expenses incurred by an Observer in connection with attending any Meeting shall be reimbursed by the Corporation.

(c)     So long as the BP Stockholders or the Specified Stockholders are entitled to designate an Observer pursuant to Section 4.4(a), the BP Stockholders or the Specified Stockholders, as applicable, may from time to time, in their sole discretion and by providing the Corporation with prior written notice thereof, remove and replace any Observer designated by such Stockholders with a new Observer.

(d)     The rights of the BP Stockholders and the Specified Stockholders to designate any Observer, and to replace any Observer with a new Observer, shall be subject to the execution and delivery by such Observer of a confidentiality agreement that is acceptable to the Board of Directors.

31

(e)     The right of a Stockholder to appoint an Observer shall not be transferable to any Person (excluding, for the avoidance of doubt, any Person included within the definition of "BP Stockholders" (in the case of the right to designate the BP Observer) or the definition of "Specified Stockholders" (in the case of the right to designate a Specified Observer)).

## ARTICLE V

## AFFILIATE TRANSACTIONS; CORPORATE OPPORTUNITIES; CREDITOR RELATIONSHIPS

SECTION 5.1     Affiliate Transactions.  Other than (x) any transaction or agreement entered into, consummated or effected on the Effective Date or (y) transactions that are contemplate by Section 3.3, any transaction or series of related transactions between the Corporation or any Subsidiary, on the one hand, and any Affiliate of the Corporation or any such Subsidiary (other than the Corporation or any of its Subsidiaries), on the other hand (each, an "Affiliate Transaction"), involving aggregate payments or other consideration in excess of $1,000,000 shall require the approval of a majority of the directors that are disinterested with respect to such Affiliate Transaction.

SECTION 5.2     Corporate Opportunities.

(a)     The Corporation and each Stockholder acknowledge that each Stockholder (other than a Stockholder who is also an employee of the Corporation or any of its Subsidiaries), each member of the Board of Directors or any committee thereof (other than any such member who is also an employee of the Corporation or any of its Subsidiaries), each member of any Subsidiary Governing Body (other than any such member who is also an employee of the Corporation or any of its Subsidiaries), and each Affiliate, manager, director, principal, officer, employee and other representative of each such Stockholder, member of the Board of Directors (or committee thereof) or member of any Subsidiary Governing Body (other than any such Person who is also an employee of the Corporation or any of its Subsidiaries) (the foregoing Persons being referred to, collectively, as "Identified Persons" and, each individually, as an "Identified Person") may now engage, may continue to engage, and/or may, in the future, decide to engage, in the same or similar activities or lines of business as those in which the Corporation or any of its Subsidiaries, directly or indirectly, now engage or may engage or other business activities that overlap with, are complementary to, or compete with those in which the Corporation or any of its Subsidiaries, directly or indirectly, now engage or may engage (any such activity or line of business, an "Opportunity").  No Identified Person shall have any duty to refrain, directly or indirectly, from (i) engaging in any Opportunity or (ii) otherwise competing with the Corporation or any of its Subsidiaries.  No Identified Person shall have any duty or obligation to refer, offer or otherwise make available to the Corporation or any of its Subsidiaries any Opportunity, and the Corporation hereby renounces, on behalf of itself and each of its Subsidiaries, any interest or expectancy of the Corporation or any of its Subsidiaries in, or in being offered, an opportunity to participate in any Opportunity which may be a corporate (or analogous) or business opportunity for the Corporation or any of its Subsidiaries.

32

(b)    In the event that any Identified Person acquires knowledge of an Opportunity which may be a corporate (or analogous) or business opportunity for the Corporation or any of its Subsidiaries, such Identified Person shall have no duty to communicate, offer or otherwise make available such Opportunity to the Corporation or any of its Subsidiaries and shall not be liable to the Corporation, any of its Subsidiaries or any of the Stockholders for breach of any purported fiduciary duty by reason of the fact that such Identified Person pursues or acquires such Opportunity for itself, or offers or directs such Opportunity to another Person (including any Affiliate of such Identified Person).

(c)    The Corporation, on behalf of itself and each of its Subsidiaries, and each Stockholder (i) acknowledge that the Identified Persons may now own, may continue to own, and from time to time may acquire and own, investments in one or more other entities (each such entity, a "Related Company" and all such entities, collectively, "Related Companies") that are direct competitors of, or that otherwise may have interests that do or could conflict with those of, the Corporation, any of its Subsidiaries, any of the Stockholders or any of their respective Affiliates, and (ii) agree that (A) the enjoyment, exercise and enforcement of the rights, interests, privileges, powers and benefits granted or available to the Identified Persons under this Agreement shall not be in any manner reduced, diminished, affected or impaired, and the obligations of the Identified Persons under this Agreement (if any) shall not be in any manner augmented or increased, by reason of any act, circumstance, occurrence or event arising from or in any respect relating to (x) the ownership by an Identified Person of any interest in any Related Company, (y) the affiliation of any Related Company with an Identified Person or (z) any action taken or omitted by any Related Company or an Identified Person in respect of any Related Company, (B) no Identified Person shall, by reason of such ownership, affiliation or action, become subject to any fiduciary duty to the Corporation, any of its Subsidiaries, any of the Stockholders or any of their respective Affiliates, (C) none of the duties imposed on an Identified Person, whether by contract or law, do or shall limit or impair the right of any Identified Person lawfully to compete with the Corporation, any of its Subsidiaries, any of the Stockholders or any of their respective Affiliates as if the Identified Persons were not a party to this Agreement and (D) the Identified Persons are not and shall not be obligated to disclose to the Corporation, any of its Subsidiaries, any of the Stockholders or any of their respective Affiliates any information related to their respective businesses or opportunities, including acquisition opportunities, or to refrain from or in any respect to be restricted in competing against the Corporation, any of its Subsidiaries, any of the Stockholders or any of their respective Affiliates in any such business or as to any such opportunities.

SECTION 5.3    Creditor Relationships.  Anything in this Agreement to the contrary notwithstanding, the Corporation and each of the Stockholders hereby agree and acknowledge that certain Stockholders and/or their Affiliates are also holders of indebtedness and debt securities and guarantees thereof of the Corporation and its Subsidiaries (collectively, "Indebtedness"), and in such capacity may have interests that are divergent from the Corporation, its Subsidiaries and/or the other Stockholders, and that under no circumstances will any such Stockholder or any such Affiliate be prohibited from taking any action or enforcing any right entitled to it under the terms of the documentation relating to or governing the Indebtedness

33

held by such Stockholder or such Affiliate or to which it is entitled under law.  To the fullest extent permitted by law, no holder of Indebtedness shall be liable to the Corporation, any of its Subsidiaries or the other Stockholders for breach of any fiduciary duty by reason of any such activities of such holder, including exercising any rights of such holder under documentation relating to or governing such Indebtedness or to which such holder may be entitled under law, and the Corporation and each Stockholder hereby irrevocably waives any and all rights to claim any such actions are a breach of this Agreement or the fiduciary duties (if any) of such holder.  In addition, any holder of Indebtedness, in exercising its rights as a lender or creditor of the Corporation or any of its Subsidiaries, including making its decision on whether to foreclose on any collateral security, will have no duty to consider (a) its status or the status of any of its Affiliates as a Stockholder, (b) the interests of the Corporation, any of its Subsidiaries or any of the Stockholders, or (c) any duty it may have to any other Stockholder, except as may be required under the applicable financing documents relating to such Indebtedness.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES

The Corporation and each Stockholder (including each Stockholder that is deemed to have entered into this Agreement), severally and not jointly, as of the Effective Date or, with respect to any Stockholder that becomes a party hereto after the Effective Date, the date any such Stockholder executes and delivers a Joinder Agreement, represents and warrants that:

SECTION 6.1    Ownership and Authority.  This Agreement constitutes the valid and binding obligation of such party, enforceable in accordance with its terms (except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other laws relating to or affecting creditors' rights generally and the effect and application of general principles of equity and the availability of equitable remedies).

SECTION 6.2    Organization.  If an entity, such party is duly organized, validly existing and, if applicable, in good standing under the laws of the jurisdiction of its organization.

SECTION 6.3    Authority.  Such party has the full power, right and authority to enter into this Agreement, to perform, observe and comply with all of such party's agreements and obligations hereunder, and to consummate the transactions contemplated hereby.  If an entity, such party has taken all action required to be taken by it with respect to the execution and delivery of this Agreement, and the consummation of the transactions contemplated hereby.

SECTION 6.4    No Conflict.  The execution, delivery and performance by such party of this Agreement does not and will not, and the consummation of the transactions contemplated hereby in compliance with the terms and provisions hereof will not, to the best knowledge of such party, with or without the giving of notice, the passage of time, or both, conflict with, result in a breach of, constitute a violation or default of, or give any third party the right to terminate, accelerate or modify any obligation under (i) any material agreement or other document or instrument to which such party is a party or by which such party is bound or affected, (ii) if an entity, the organizational documents of such party, or (iii) any law, statute, rule, regulation, ordinance, writ, order or judgment to which such party is bound or affected.

34

The representations and warranties of the Corporation and each Stockholder contained in this Agreement shall survive the execution of this Agreement (including any deemed execution of this Agreement by a Stockholder pursuant to the Plan) by the Corporation or such Stockholder and continue in full force and effect indefinitely.

## ARTICLE VII

## MISCELLANEOUS

SECTION 7.1     Term and Termination.  At such time as any Stockholder shall cease to own or hold any Shares (a "Terminated Party"), such Terminated Party shall automatically no longer be a party to this Agreement and shall cease to be a Stockholder hereunder; provided, however, that such Terminated Party shall continue to be bound by the provisions of Section 7.3 in accordance with the terms thereof.  Except for the legend requirements set forth in Section 2.1(e) (to the extent still applicable) and, to the extent still applicable, Section 7.3, all of the rights and obligations of the parties set forth in this Agreement shall terminate automatically upon the earliest of: (i) the consummation of a Qualified Public Offering, (ii) the consummation of a Sale Transaction; provided that for purposes of this Section 7.1, the term "Sale Transaction" shall not include (x) the phrase "(other than the Selling Holders or any Affiliates thereof)" set forth therein or (y) any consolidation, merger or other business combination of the Corporation with or into an Affiliate of the Corporation for the purpose of changing the legal domicile of the Corporation or any other transaction for the purpose of reincorporating the Corporation in another jurisdiction or changing the legal form of the Corporation, and (iii) all Shares being owned by a single Person; provided, however, that (x) any claims or rights of a Selling Holder or the Corporation against any Dragged Holder arising under or relating to Section 3.1 hereof and (y) any authorizations, obligations, covenants or liabilities of a Dragged Holder arising under or relating to Section 3.1 hereof shall, in either such case, survive the termination of this Agreement.

SECTION 7.2     Notices.  All notices, requests, waivers and other communications made pursuant to this Agreement shall be in writing and shall be deemed to have been effectively given, delivered, provided or received (a) when personally delivered to the party to be notified; (b) when sent by facsimile or by electronic mail ("e-mail") to the party to be notified; (c) three (3) Business Days after deposit in the United States mail, postage prepaid, by certified or registered mail with return receipt requested, addressed to the party to be notified; or (d) one (1) Business Day after deposit with a national overnight delivery service, postage prepaid, addressed to the party to be notified with next-Business Day delivery guaranteed, in each case as follows: (i) in the case of any Stockholder, to such Stockholder at its address, facsimile number or e-mail address set forth on its signature page to this Agreement or a Joinder Agreement; and (ii) in the case of the Corporation, to the Secretary (or to another officer of the Corporation that is required to be provided with such notice, request, waiver or other communication pursuant to the terms of this Agreement) at the Corporation's address, facsimile number or e-mail address set forth on its signature page to this Agreement.  A party may change its address, facsimile number or e-mail address for purposes of notice hereunder by giving notice of such change in the manner provided in this Section 7.2.

35

SECTION 7.3       Confidentiality.

(a)       Each Stockholder hereby agrees that, during the period commencing on the Effective Date (or, with respect to any Stockholder that becomes a party hereto after the Effective Date, the date any such Stockholder executes and delivers a Joinder Agreement) and ending on the first anniversary of the date on which such Stockholder became a Terminated Party (such period, the "Confidentiality Period"), such Stockholder will keep strictly confidential and will not disclose or divulge to any other Person (other than as permitted by this Section 7.3) any (x) confidential, business, financial or proprietary information regarding the Corporation or any of its Subsidiaries, or any confidential, business, financial or proprietary information regarding the business or affairs of any other Stockholder in respect of the Corporation or any of its Subsidiaries (in any such case, whether in written, oral or electronic form), that is obtained from, or on behalf of, the Corporation or any of its Subsidiaries, the Corporation's or any such Subsidiary's legal or financial advisors or any other agents or advisors engaged by the Corporation or any of its Subsidiaries or from any other Stockholder and (y) notes, analyses, compilations, studies, interpretations or other documents prepared by such Stockholder or any of its Representatives which contain, reflect or are based upon the information referred to in clause (x) above (collectively, "Confidential Information"). Confidential Information shall not include information which (A) is known or becomes known to the public in general (other than as a result of a breach of this Section 7.3 by a Stockholder or any of its Representatives), (B) is or becomes available to a Stockholder on a non-confidential basis from a source other than the Corporation, its Affiliates or its Representatives or any other Stockholder (provided that such Stockholder is not aware that such source is under an obligation to keep such Confidential Information confidential) prior to such information being provided to such Stockholder by or on behalf of (or obtained from) the Corporation, its Affiliate or its Representatives or any other Stockholder or (C) is independently developed by such Stockholder or its Representatives without reference to the Confidential Information.

(b)       Notwithstanding clause (a) of this Section 7.3, a Stockholder may disclose Confidential Information as follows:

(i)       Confidential Information may be provided, on a confidential basis, to a Stockholder's managers, officers, directors, employees, partners, members, representatives, attorneys, accountants, other professional advisors and financing sources (collectively, "Representatives"), to the extent reasonably necessary in connection with such Stockholder's investment in the Corporation; provided, however, that such Stockholder shall cause its Representatives to comply, and such Stockholder shall be responsible for ensuring that its Representatives comply, with the restrictions in this Section 7.3 as if such Representatives were a party hereto and bound by such restrictions.

(ii)       Confidential Information may be provided, on a confidential basis, to an actual or potential Transferee of all or a portion of the Shares owned or held by such Stockholder, to the extent reasonably necessary to consummate a Transfer of such Shares permitted under this Agreement; provided, however, that (x) in the

36

case that such actual or potential Transferee is a Competitor, such disclosure shall be permitted only if such Competitor has been expressly authorized by the Board of Directors to receive Confidential Information, and (y) prior to such Stockholder's delivery of Confidential Information to an actual or potential Transferee of Shares pursuant to this clause (ii), such actual or potential Transferee shall have executed and delivered to such Stockholder and the Corporation a transferee confidentiality agreement substantially in the form attached hereto as Exhibit B.

(iii)    In the event that such Stockholder (x) determines, in good faith upon the advice of counsel, that disclosure of Confidential Information is required under applicable law or regulation, or (y) is requested or required (by oral questions, interrogatories, request for information or documents in legal proceedings, subpoena, civil investigative demand or similar process, or by regulatory authorities having jurisdiction over such Stockholder) to disclose any of the Confidential Information, such Stockholder, to the extent legally permitted and practicable under the circumstances, will promptly provide the Corporation with written notice (which shall be, to the extent legally permitted and practicable under the circumstances, prior to any such disclosure) so that the Corporation may seek an appropriate protective order or other remedy and/or waive compliance with this Agreement.  Provided that such notice (to the extent legally permitted and practicable under the circumstances) is furnished, if, in the absence of a protective order, other remedy or receipt of a waiver by the Corporation, such Stockholder is, in the opinion of its counsel, legally compelled, required or requested to disclose Confidential Information, such Stockholder may disclose pursuant to this Section 7.3(b)(iii) only that portion of such Confidential Information, and only to those parties, that such counsel has advised is compelled, required or requested to be disclosed, without liability under this Agreement.

(c)    *Termination*.  All of the rights and obligations of the Stockholders set forth in this Section 7.3 shall terminate automatically upon the expiration of the Confidentiality Period; provided, however, that no such termination shall relieve any Stockholder from any liability relating to any breach of this Section 7.3.

SECTION 7.4    Binding Effect.  This Agreement shall be binding upon and inure to the benefit of the respective successors and assigns of the parties hereto.

SECTION 7.5    Entire Agreement.  This Agreement, together with the Certificate of Incorporation and the Bylaws, supersedes all prior discussions and agreements among any of the parties hereto (and their Affiliates) with respect to the subject matter hereof and contains the sole and entire understanding of the parties with respect to the subject matter hereof.

SECTION 7.6    Amendments.  Any term, condition or provision of this Agreement may be amended, modified or waived if, and only if, such amendment, modification or waiver is in writing and signed, (x) in the case of an amendment or modification, by the Corporation and the Majority Stockholders at the time of such amendment or modification, or (y) in the case of a waiver, by the party against whom the waiver is to be effective.  Notwithstanding the foregoing

37

sentence, no amendment or modification of any term, condition or provision of this Agreement shall be made relating to:

(a)      Article II, Article III or Section 5.1 hereof (including any of the defined terms used therein, solely to the extent such defined terms are used therein), in any such case, without the affirmative vote or written consent of the Corporation and the Super-Majority Stockholders at the time of such amendment or modification;

(b)      (i) the first paragraph of Section 4.1(a), (ii) Section 4.1(a)(ii), (iii) the first and second paragraphs of Section 4.1(b), (iv) Section 4.1(c)(i), (v) Section 4.1(d), solely as it relates to the rights applicable to a BP Director thereunder, (vi) Section 4.1(e), (vii) Section 4.1(f), (viii) Section 4.1(g), (ix) Section 4.1(h), (x) Section 4.2, solely as it relates to the right of a BP Director to serve on Subsidiary Governing Bodies, (xi) Section 4.3, (xii) Section 4.4, solely as it relates to the BP Observer, and (xiii) the definition of "BP Stockholders" (including any defined terms used in any of the Sections referred to in clauses (i)–(xii) above or the definition of "BP Stockholders", solely to the extent such defined terms are used in such Sections or such definition), in any such case referred to in clauses (i)–(xiii) above, without the affirmative vote or written consent of the Corporation, the Majority Stockholders and the BP Stockholders;

(c)      (i) the first paragraph of Section 4.1(a), (ii) Section 4.1(a)(iii), (iii) the first and third paragraphs of Section 4.1(b), (iv) Section 4.1(c)(ii), (v) Section 4.1(d), solely as it relates to the rights applicable to a Specified Director thereunder, (vi) Section 4.1(e), (vii) Section 4.1(g), (viii) Section 4.1(h), (ix) Section 4.2, solely as it relates to the right of a Specified Director to serve on Subsidiary Governing Bodies, (x) Section 4.3, and (xi) Section 4.4, solely as it relates to any Specified Observer (including any defined terms used in any of the Sections referred to in clauses (i)–(xi) above, solely to the extent such defined terms are used in such Sections), in any such case referred to in clauses (i)–(xi) above, without the affirmative vote or written consent of the Corporation, the Majority Stockholders and the Specified Stockholders that own or hold a majority of the shares of Fully Diluted Common Stock owned or held by all of the Specified Stockholders;

(d)      the definition of "Super-Majority Stockholders" without the affirmative vote or written consent of the Corporation and the Super-Majority Stockholders;

(e)      the definition of "Specified Stockholders" without the affirmative vote or written consent of the Corporation, the Majority Stockholders and all of the Stockholders that fall within the definition of "Specified Stockholders";

(f)      Section 7.17 or the definition of "Significant Stockholder" without the affirmative vote or written consent of the Corporation and all of the Stockholders that fall within the definition of "Significant Stockholder"; and

(g)      this Section 7.6 without the prior written consent of the Corporation and the specific Stockholder or the Stockholders that own or hold the requisite percentage of the shares of Fully Diluted Common Stock, as applicable, that would be required to amend the underlying provision or definition of this Agreement to which such

38

amendment or modification relates; provided, however, that no amendment or modification of this Section 7.6(g) shall be made without the affirmative vote or written consent of all of the Stockholders.

Anything in this Agreement to the contrary notwithstanding, no amendment, modification or waiver of any provision of this Agreement (including any amendments made pursuant to or in connection with a merger of the Corporation) that would materially and adversely affect the rights or materially increase the obligations of any Stockholder set forth in this Agreement in a manner that is disproportionate in any material respect to the comparable rights and obligations of the Majority Stockholders at the time of such amendment, modification or waiver (without regard to any effect resulting from (A) the individual circumstances of any such Stockholder, (B) the differences in the respective percentages of ownership of Shares of the Stockholders, or (C) the different Classes of Shares owned by the Stockholders) shall be made without the affirmative vote or written consent of such affected Stockholder; provided, however, that, for the avoidance of doubt, neither the authorization or creation of a new class or series of shares of Capital Stock or other equity or equity-based securities of the Corporation, nor the issuance of any additional Shares or any other shares of Capital Stock or other equity or equity-based securities of the Corporation, shall be deemed to adversely affect the rights or obligations of any Stockholder.

Without limiting the provisions of the Certificate of Incorporation, anything in this Agreement to the contrary notwithstanding, the holders of shares of Class B Common Stock shall have no right to vote on, or right to consent to, any amendment, modification or waiver of or to this Agreement.

SECTION 7.7    No Third Party Beneficiary.    The terms and provisions of this Agreement are intended solely for the benefit of each party hereto or identified herein and its successors and permitted assigns, and it is not the intention of the parties to confer third-party beneficiary rights upon any other Person.

SECTION 7.8    Deemed Execution; Effective Date.    On the Effective Date, pursuant to Section 4.3 of the Plan, each Person that receives any Shares pursuant to the Plan or in connection with any of the transactions contemplated thereby (including pursuant to the New Preferred Equity Rights Offering (as defined in the Plan) or pursuant to the Backstop Purchase Agreement (as defined in the Plan)) shall be deemed to have entered into this Agreement, regardless of whether any such holder has executed this Agreement, and this Agreement shall be deemed to be a valid, binding and enforceable obligation of such Person (including any obligation set forth herein to waive or refrain from exercising any appraisal, dissenters or similar rights) even if such Person has not actually executed and delivered a counterpart hereof.

SECTION 7.9    Execution; Joinder.    No additional Shares shall be issued by the Corporation unless the Person to whom such Shares are issued is an existing party to this Agreement or executes and delivers to the Corporation a Joinder Agreement. This Agreement shall apply to all Shares owned by a Stockholder, no matter when or how acquired. This Agreement shall take effect immediately and automatically on the Effective Date without any further action on the part of any Person.

39

SECTION 7.10   Interpretation.   The titles and section headings set forth in this Agreement are for convenience only and shall not be considered as part of the agreement of the parties hereto. When the context requires, the plural shall include the singular and the singular the plural, and any gender shall include all other genders or neuter. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." No provision of this Agreement shall be interpreted or construed against any party because such party or its counsel was the drafter thereof.   Any reference to the DGCL or other statutes or laws will include all amendments, modifications or replacements of the specific sections and provisions concerned. Numbered or lettered articles, sections, and subsections herein contained refer to articles, sections and subsections of this Agreement unless otherwise expressly stated.

SECTION 7.11   Governing Law; Consent to Jurisdiction and Service of Process.   THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO ITS CONFLICTS OF LAW DOCTRINE.   THE CORPORATION AND EACH STOCKHOLDER HEREBY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE DELAWARE COURT OF CHANCERY AND ANY STATE APPELLATE COURT THEREFROM WITHIN THE STATE OF DELAWARE (UNLESS THE DELAWARE COURT OF CHANCERY SHALL DECLINE TO ACCEPT JURISDICTION OVER A PARTICULAR MATTER, IN WHICH CASE, OF ANY DELAWARE STATE OR FEDERAL COURT WITHIN THE STATE OF DELAWARE), AND ANY JUDICIAL PROCEEDING BROUGHT AGAINST THE CORPORATION OR ANY STOCKHOLDER WITH RESPECT TO ANY DISPUTE ARISING OUT OF THIS AGREEMENT OR ANY MATTER RELATED HERETO SHALL BE BROUGHT ONLY IN SUCH COURTS.   THE CORPORATION AND EACH STOCKHOLDER HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION IT MAY HAVE OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.  THE CORPORATION AND EACH STOCKHOLDER HEREBY CONSENTS TO PROCESS BEING SERVED IN ANY SUCH PROCEEDING BY THE MAILING OF A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE ADDRESS SPECIFIED IN SECTION 7.2, OR IN ANY OTHER MANNER PERMITTED BY LAW.  THE CORPORATION AND EACH STOCKHOLDER HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUCH PROCEEDING.

SECTION 7.12   Injunctive Relief.  It is hereby agreed and acknowledged that it will be impossible to measure in money the damages that would be suffered if the parties to this Agreement fail to comply with any of the obligations imposed on them by this Agreement and that in the event of any such failure, a non-breaching party hereto will be irreparably damaged and will not have an adequate remedy at law.  Any such Person shall, therefore, be entitled to injunctive relief, specific performance or other equitable remedies to enforce such obligations, this being in addition to any other remedy to which such Person is entitled at law or in equity. Each of the parties hereto hereby waives any defense that a remedy at law is adequate and any requirement to post bond or other security in connection with actions instituted for injunctive relief, specific performance or other equitable remedies.  Each of the parties hereto hereby agrees

40

not to assert that specific performance, injunctive relief and other equitable remedies are unenforceable, violate public policy, invalid, contrary to law or inequitable for any reason.  The right of specific performance, injunctive relief and other equitable remedies is an integral part of the transactions contemplated by this Agreement.

SECTION 7.13    Enforceability; Severability.  Each provision of this Agreement shall be enforceable in accordance with its terms to the fullest extent permitted by law, but in case any one or more of the provisions contained in this Agreement shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision or provisions had never been contained herein.

SECTION 7.14    Recapitalization.  In the event that any Capital Stock or other securities are issued in respect of, in exchange for, or in substitution of, shares of Capital Stock of the Corporation by reason of any reorganization, recapitalization, reclassification, merger, consolidation, spin-off, partial or complete liquidation, stock dividend, split-up, sale of assets, distribution to stockholders or combination of any Class of Shares or any other change in the Corporation's capital structure, appropriate adjustments shall be made to the provisions of this Agreement so as to fairly and equitably preserve, as far as practicable, the original rights and obligations of the parties hereto under this Agreement.

SECTION 7.15    Conflict with Bylaws.  The Stockholders agree that in the event any term or provision of the Bylaws conflicts with this Agreement, this Agreement shall control.

SECTION 7.16    Additional Actions and Documents.  The parties hereto agree to execute and deliver any further instruments or perform any additional acts that are or may become reasonably necessary to carry out the purposes and intent of this Agreement.

SECTION 7.17    Information Rights.

(a)    Subject to the obligations of the Stockholders under Section 7.3, the Corporation shall make available to each Significant Stockholder the following information:

(i)    within one hundred and twenty (120) days after the end of each fiscal year of the Corporation, copies of the audited consolidated financial statements of the Corporation and its Subsidiaries, including a consolidated balance sheet and consolidated statements of operations and comprehensive loss, changes in equity and cash flows, for such fiscal year, together with the auditors' report on such audited consolidated financial statements in accordance with GAAP; and

(ii)    within forty-five (45) days after the end of each fiscal quarter in each of the Corporation's first three (3) fiscal quarters in each fiscal year of the Corporation, copies of the unaudited consolidated financial statements of the Corporation and its Subsidiaries, including a consolidated balance sheet and consolidated statements of operations and comprehensive loss and cash flows, for

41

such fiscal quarter, in accordance with GAAP, subject to the absence of footnotes and to year-end adjustments.

(b)     At the option of the Board of Directors, the Corporation may make available the information described in Section 7.17(a) on a password-protected website that is only available to the Significant Stockholders and, at the option of the Corporation and to the extent the Warrants are still outstanding, the holders of the Warrants.  As a condition to gaining access to the information posted on such website, a Significant Stockholder may be required to "click through" or take other affirmative action pursuant to which such Significant Stockholder shall (i) confirm and ratify that it is a party to, and bound by all of the terms and provisions of, this Agreement, (ii) acknowledge its confidentiality obligations in respect of such information and (iii) certify its status as a Significant Stockholder hereunder.

(c)     Unless terminated earlier pursuant to the terms of Section 7.1, the requirements of this Section 7.17 shall cease to apply at such time as the Corporation becomes obligated to file reports with the SEC under Section 13 or Section 15(d) of the Exchange Act or as a voluntary filer pursuant to contractual obligations (so long as the Corporation makes such filings).

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

42

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives, or are deemed to have executed this Agreement, as of the date hereof.

**CORPORATION***:*

21ST CENTURY ONCOLOGY HOLDINGS, INC.

By: _____

Name:        Paul Rundell
Title:         Interim CEO

**STOCKHOLDER***:*

[ ]

By:  _____

      Name:
      Title:

**Exhibit A**

**Form of Joinder Agreement**

This Joinder Agreement (this "Joinder") is executed pursuant to the terms of that certain Stockholders Agreement dated as of [_____] (as amended, the "Agreement"), by and among 21st Century Oncology Holdings, Inc. (the "Corporation") and the Stockholders (as defined in the Agreement). Capitalized terms used and not defined herein shall have the meanings set forth in the Agreement. By the execution of this Joinder, the undersigned agrees as follows:

(1) Acknowledgement. The undersigned acknowledges that the undersigned is acquiring shares of [Class A Common Stock] [Class B Common Stock] [Series A Preferred Stock] subject to the terms and conditions of the Agreement. The undersigned further acknowledges and agrees to all terms, conditions and provisions set forth in the Certificate of Incorporation and this Agreement, including, without limitation, the restrictions on transfer of Shares set forth in the Certificate of Incorporation and this Agreement.

(2) Agreement. The undersigned agrees that for all purposes of the Agreement the undersigned shall, effective as of the date hereof, be bound by all of the terms and provisions thereof, with the same force and effect as if the undersigned were originally a party thereto as a "Stockholder" (as defined in the Agreement).

The address, facsimile number and e-mail address to which notices required or permitted by the Agreement may be sent to the undersigned are as follows:

Facsimile No.:
Address:
E-mail Address:

Date: _____        _____
                                 Name:

**Exhibit B**

**Form of Transferee Confidentiality Agreement**

## CONFIDENTIALITY AGREEMENT

[NAME OF POTENTIAL TRANSFEREE]
[ADDRESS]

Attention:

Re:     Confidentiality Agreement

Ladies and Gentlemen:

In connection with a possible transaction (the "Transaction") involving the sale or transfer of shares of capital stock or other securities of 21st Century Oncology Holdings, Inc. (the "Corporation") owned or held by [INSERT NAME OF TRANSFEROR] (the "Transferor") to [INSERT NAME OF POTENTIAL TRANSFEREE] (the "Potential Transferee"), the Transferor is prepared to make available to the Potential Transferee certain Confidential Information (as defined below).  As a condition to such Confidential Information being furnished to the Potential Transferee, the Potential Transferee hereby agrees that it will comply with the following terms of this letter agreement (this "Confidentiality Agreement"):

1.     Confidential Information.     (a) "Confidential Information" means any (x) confidential, business, financial or proprietary information regarding the Corporation or any of its subsidiaries, or any confidential, business, financial or proprietary information regarding the business or affairs of any stockholder of the Corporation in respect of the Corporation or any of its subsidiaries (in any such case, whether in written, oral or electronic form), that has been obtained by the Transferor from the Corporation or any of its subsidiaries, the Corporation's or any such subsidiary's legal or financial advisors or any other agents or advisors engaged by the Corporation or any of its subsidiaries, or from any other stockholder of the Corporation and (y) notes, analyses, compilations, studies, interpretations or other documents prepared by the Transferor or the Potential Transferee or any of their respective officers, directors, employees, partners, members, representatives, attorneys, accountants, other professional advisors and financing sources (collectively, "Representatives"), which contain, reflect or are based upon the information referred to in clause (x) above.  Confidential Information shall not include information which (A) is known or becomes known to the public in general (other than as a result of a breach of the confidentiality obligations hereunder or otherwise by the Transferor, the Potential Transferee or any of their respective Representatives), (B) is or becomes available to the Potential Transferee on a non-confidential basis from a source other than the Corporation, any of its subsidiaries, the Transferor or any of their respective Representatives (provided that the Potential Transferee is not aware that such source is under an obligation to keep such Confidential Information confidential) prior to such information being provided to such Potential Transferee by or on behalf of (or obtained from) the Corporation, any of its subsidiaries, the Transferor or any of their respective Representatives or (C) is independently developed by the Potential Transferee or its Representatives without reference to the Confidential Information.

(b) The Potential Transferee recognizes and acknowledges the competitive value and confidential nature of the Confidential Information and the damage that could result to the Corporation and the Transferor if any Confidential Information is disclosed to a third party, and

hereby agrees that it will keep strictly confidential and will not disclose, divulge or use for any purpose, other than to evaluate the Transaction, the Confidential Information delivered, disclosed or furnished (irrespective of the form of communication) by, or on behalf of, the Corporation, any of its subsidiaries, the Transferor or any of their respective Representatives to the Potential Transferee; provided, however, that any of the Confidential Information may be disclosed, on a confidential basis, to any of the Potential Transferee's Representatives that need to know such information for the purpose of evaluating the Transaction.  The Potential Transferee shall cause its Representatives to comply, and the Potential Transferee shall be responsible for ensuring that its Representatives comply, with the restrictions set forth in this Confidentiality Agreement as if such Representatives were a party hereto and bound by such restrictions.

2.      Disclosure of Confidential Information.  In the event that the Potential Transferee (a) determines, in good faith upon the advice of counsel, that disclosure of Confidential Information is required under applicable law or regulation, or (b) is requested or required (by oral questions, interrogatories, request for information or documents in legal proceedings, subpoena, civil investigative demand or similar process, or by regulatory authorities having jurisdiction over the Potential Transferee) to disclose any of the Confidential Information or to take any other action prohibited hereby, the Potential Transferee, to the extent legally permitted and practicable under the circumstances, will promptly provide the Transferor and the Corporation with written notice so that they may seek an appropriate protective order or other remedy and/or waive compliance with the provisions of this Confidentiality Agreement. Provided that such foregoing notice (if legally permitted and practicable under the circumstances) is furnished, if, in the absence of a protective order, other remedy or receipt of a waiver, the Potential Transferee is, in the opinion of its counsel, legally compelled, required or requested to disclose Confidential Information, the Potential Transferee may disclose pursuant to this paragraph only that portion of such Confidential Information, and only to those parties, that such counsel has advised is compelled, required or requested to be disclosed, without liability under this Confidentiality Agreement.

3.      Return and Destruction of Confidential Information.  In the event that the Potential Transferee decides not to proceed with the Transaction, the Potential Transferee will promptly inform the Transferor of that decision.  In that case, or at any time upon the request of the Transferor for any reason, the Potential Transferee will, as directed by the Transferor, promptly deliver to the Transferor or the Corporation all Confidential Information (and any copies thereof) furnished to the Potential Transferee or any of its Representatives, by or on behalf of the Corporation, any of its subsidiaries, the Transferor or any of their respective Representatives.  In the event of such a decision or request, all other Confidential Information prepared by the Potential Transferee or on the Potential Transferee's behalf, shall be returned or destroyed.  Upon the Transferor's request, the Potential Transferee shall provide the Transferor with prompt written confirmation of the Potential Transferee's compliance with this paragraph. Notwithstanding the return or destruction of the Confidential Information, the Potential Transferee and its Representatives shall continue to be bound by the obligations of confidentiality and other obligations and agreements hereunder.

4.      No Representations or Warranties.  The Potential Transferee understands, acknowledges and agrees that neither the Corporation or any of its subsidiaries, nor the Transferor makes any representation or warranty, express or implied, as to the accuracy or

2

completeness of the Confidential Information furnished hereunder, and neither the Corporation or any of its subsidiaries, nor the Transferor shall have any liability to the Potential Transferee or to any of its Representatives relating to or resulting from the use of the Confidential Information or any errors therein or omissions therefrom.  Only those representations or warranties which are made in a final definitive agreement regarding any transactions contemplated hereby, when, as and if executed and delivered, and subject to such limitations and restrictions as may be specified therein, will have any legal effect.

5.      Injunctive Relief.  It is hereby agreed and acknowledged that it will be impossible to measure in money the damages that would be suffered by the Corporation and the Transferor if the Potential Transferee fails to comply with any of the obligations imposed on it by this Confidentiality Agreement and that in the event of any such failure, the Transferor and the Corporation will be irreparably damaged and will not have an adequate remedy at law.  The Transferor and the Corporation, therefore, shall be entitled to injunctive relief, specific performance or other equitable remedies to enforce such obligations, this being in addition to any other remedy to which either the Transferor or the Corporation is entitled at law or in equity.  The Potential Transferee hereby waives any defense that a remedy at law is adequate and any requirement to post bond or other security in connection with actions instituted for injunctive relief, specific performance or other equitable remedies.  The Potential Transferee hereby agrees not to assert that specific performance, injunctive relief and other equitable remedies are unenforceable, violate public policy, invalid, contrary to law or inequitable for any reason.  The right of specific performance, injunctive relief and other equitable remedies is an integral part of the transactions contemplated by this Confidentiality Agreement.

6.      Governing Law.  THIS CONFIDENTIALITY AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE WITHOUT REGARD TO ITS CONFLICTS OF LAW DOCTRINE. EACH OF THE PARTIES BY EXECUTION HEREOF (I) HEREBY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE DELAWARE COURT OF CHANCERY AND ANY STATE APPELLATE COURT THEREFROM WITHIN THE STATE OF DELAWARE (UNLESS THE DELAWARE COURT OF CHANCERY SHALL DECLINE TO ACCEPT JURISDICTION OVER A PARTICULAR MATTER, IN WHICH CASE, OF ANY DELAWARE STATE OR FEDERAL COURT WITHIN THE STATE OF DELAWARE), AND ANY JUDICIAL PROCEEDING ARISING HEREUNDER OR RELATED HERETO WITH RESPECT TO ANY DISPUTE ARISING OUT OF THIS CONFIDENTIALITY AGREEMENT OR ANY MATTER RELATED HERETO SHALL BE BROUGHT ONLY IN SUCH COURTS AND (II) HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION IT MAY HAVE OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.  EACH OF THE PARTIES HERETO HEREBY CONSENTS TO PROCESS BEING SERVED IN ANY SUCH PROCEEDING BY THE MAILING OF A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE ADDRESS SPECIFIED IN SECTION 8 HEREOF, OR IN ANY OTHER MANNER PERMITTED BY LAW.  EACH OF THE PARTIES BY EXECUTION HEREOF HEREBY KNOWINGLY, VOLUNTARILY, AND

3

INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUCH PROCEEDING.

7.      Term.  This Confidentiality Agreement will terminate on the earlier of (a) one (1) year from the date hereof and (b) the Potential Transferee executing a joinder agreement to the Stockholders Agreement of the Corporation, dated as of [_____], among the Corporation and the other parties thereto, as amended, supplemented, amended and restated or otherwise modified from time to time, agreeing to be bound by the terms thereof; provided, however, that no such termination of this Confidentiality Agreement shall relieve the Potential Transferee from any liability relating to any breach of this Confidentiality Agreement.

8.      Notices.  All notices, requests, waivers and other communications made pursuant to this Confidentiality Agreement shall be in writing and shall be deemed to have been effectively given, delivered, provided or received (a) when personally delivered to the party to be notified; (b) when sent by facsimile or by electronic mail ("e-mail") to the party to be notified; (c) three (3) business days after deposit in the United States mail, postage prepaid, by certified or registered mail with return receipt requested, addressed to the party to be notified; or (d) one (1) business day after deposit with a national overnight delivery service, postage prepaid, addressed to the party to be notified with next-business day delivery guaranteed, in each case as follows:

to the Transferor, at:

[        ]

to the Potential Transferee, at:

[        ]

A party may change its address, facsimile number or e-mail address for purposes of notice hereunder by giving notice of such change to the other party in the manner provided in this Section 8.

9.      Miscellaneous.  This Confidentiality Agreement contains the entire agreement between the Transferor and the Potential Transferee regarding its subject matter and supersedes all prior agreements, understandings, arrangements and discussions between the Transferor and the Potential Transferee regarding such subject matter.  It is understood and agreed that no failure or delay by the Transferor or the Corporation in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder.  No provision in this Confidentiality Agreement can be waived or amended except by written consent of the Transferor, the Potential Transferee and the Corporation, which consent shall specifically refer to the provision to be waived or amended and shall explicitly make such waiver or amendment.  This Confidentiality Agreement may be signed by facsimile or electronic transmission and in one or more counterparts, each of which shall be deemed an original but all of which shall be deemed to constitute a single instrument.  If any provision of this Confidentiality Agreement is found to violate any statute, regulation, rule, order or decree of any governmental authority, court, agency or exchange, such invalidity shall not be deemed to affect any other provision hereof or the validity of the remainder of this Confidentiality

4

Agreement, and such invalid provision shall be deemed deleted herefrom to the minimum extent necessary to cure such violation.  The provisions of this Confidentiality Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective legal representatives, heirs, administrators, executors, successors and permitted assigns.  The Potential Transferee may not assign this Confidentiality Agreement without the prior written consent of the Transferor and the Corporation.  The Potential Transferee agrees and acknowledges that the Corporation shall be an express third party beneficiary hereof, having all rights to enforce this Confidentiality Agreement.

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Confidentiality Agreement as of this __ day of _____, 20__.

Very truly yours,

TRANSFEROR

[                              ]

By:   _____
          Name:
          Title:

CONFIRMED AND AGREED
as of the date written above:

POTENTIAL TRANSFEREE

[           ]

By:   _____
          Name:
          Title:

*[Signature page to Confidentiality Agreement*

**Schedule 1**

**Backstop Parties**

## Exhibit F-4

## Form of the New Registration Rights Agreement

## REGISTRATION RIGHTS AGREEMENT

This REGISTRATION RIGHTS AGREEMENT (as amended, supplemented, amended and restated or otherwise modified from time to time, this "Agreement"), is made as of [_____], [____] between (a) 21st Century Oncology Holdings, Inc., a Delaware corporation (the "Corporation"), and (b)(i) each holder of Registrable Securities (as defined below) on the date hereof and (ii) each holder of Registrable Securities who hereafter becomes a party hereto by signing a joinder agreement in the form of Exhibit A attached hereto (a "Joinder Agreement").

WHEREAS, the Corporation desires to grant to the Holders (as defined below) certain registration rights with respect to Registrable Securities owned or controlled by the Holders.

NOW, THEREFORE, in consideration of the mutual premises set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1. Definitions.

(a) *Certain Defined Terms*. As used in this Agreement, unless the context requires a different meaning, the following terms shall have the following meanings:

"Action" has the meaning specified in Section 6(c).

"Adverse Effect" has the meaning specified in Section 2(e).

"Affiliate" means, with respect to any Person, any other Person that (either directly or indirectly) controls, is controlled by, or is under common control with the specified Person, and shall also include (i) any Related Fund of such Person and (ii) in the case of a specified Person who is an individual, any Family Member or Personal Representative of such Person. The term "control" includes the possession, directly or indirectly, of the power to direct the management or policies of a Person, whether through the ownership of securities, by contract or otherwise.

"Agreement" has the meaning specified in the preamble.

"Board of Directors" means the board of directors of the Corporation.

"Business Day" means any day other than a day which is a Saturday, Sunday or legal holiday on which banks in the City of New York are authorized or obligated by law to close.

"Certificate of Incorporation" means the certificate of incorporation of the Corporation, as amended, amended and restated, supplemented or otherwise modified and in effect from time to time.

"Common Stock" has the meaning specified in the Certificate of Incorporation.

"Competitor" means any Person that is engaged in competition with the Corporation or any of its Subsidiaries, as reasonably determined by the Board of Directors, and shall also include any such Person's Affiliates.

"control" has the meaning specified in the definition of "Affiliate".

"Corporation" has the meaning specified in the preamble.

"Corporation Indemnified Person" has the meaning specified in Section 6(b).

"Demand Registration" has the meaning specified in Section 2(a).

"Demand Request" has the meaning specified in Section 2(a).

"e-mail" has the meaning specified in Section 9(e).

"Equity Incentive Plan" means any employee benefit plan or program, incentive compensation plan or program, executive compensation agreement or directors' compensation program, in each case approved by the Board of Directors.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, or any successor federal statute, and the rules and regulations of the SEC promulgated thereunder.

"Family Member" means, with respect to any individual, (i) any Related Person of such individual or (ii) any trust, limited partnership, limited liability company or other estate or tax planning vehicle or entity, the sole owners or beneficiaries of which are such individual or one or more of such individual's Related Persons.

"FINRA" has the meaning specified in Section 5(a)(xiv).

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, any entity, authority or body exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any government authority, agency, department, board, body, commission or instrumentality of the United States or any other nation, or any state or other political subdivision thereof, any court, tribunal or arbitrator and any self-regulatory organization.

"Holder" means, subject to the restrictions set forth in Section 8, any holder of Registrable Securities who has actually signed a counterpart of this Agreement or actually signed a Joinder Agreement, but in each case for so long as such holder continues to own or control, together with its Affiliates, Registrable Securities representing at least five percent (5%) of all of the shares of Common Stock that are issued and outstanding.

"Indemnified Person" has the meaning specified in Section 6(a).

"Indemnitee" has the meaning specified in Section 6(c).

"Inspectors" has the meaning specified in Section 5(a)(xii).

"Joinder Agreement" has the meaning specified in the preamble.

"Joining Holder" has the meaning specified in Section 2(b).

2

"Loss" and "Losses" have the meanings specified in Section 6(a).

"Majority Requesting Holders" means, with respect to any registration of Registrable Securities under this Agreement in a registration statement pursuant to a Demand Registration, the Requesting Holder or Requesting Holders at the relevant time that hold at least a majority of the Registrable Securities held by all Requesting Holders to be included in the registration statement in question.

"Material Disclosure Event" means, as of any date of determination, any pending or imminent event relating to the Corporation or any of its Subsidiaries, which, in the reasonable determination of the Corporation, (i) would require disclosure of material, non-public information relating to such event in any registration statement or related prospectus (including documents incorporated by reference therein) so that such registration statement or related prospectus would not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they are made, not misleading, (ii) is otherwise not required to be publicly disclosed at that date (e.g., on Forms 10-K, 8-K, or 10-Q) under applicable federal or state securities laws and (iii) if publicly disclosed as of such date, could reasonably be expected to have a material adverse effect on the business, financial condition or prospects of the Corporation and its Subsidiaries or would materially adversely affect a pending or proposed acquisition, merger, recapitalization, consolidation, reorganization, financing or similar transaction, or negotiations with respect thereto.

"Participating Holder" means any Holder on whose behalf Registrable Securities are registered pursuant to Section 2 or Section 3.

"Person" means an individual, partnership, corporation, unincorporated organization, joint stock company, limited liability company, association, trust, joint venture or any other entity, or a Governmental Authority.

"Personal Representative" means the legal representative (including a guardian, executor, administrator or conservator) of a deceased or incompetent Holder that is an individual.

"Qualified Public Offering" means the first underwritten public offering pursuant to an effective registration statement covering a sale of shares of Common Stock to the public that (i) results in shares of Common Stock being listed on a national securities exchange or quoted on the Nasdaq Stock Market, and (ii) either (A) involves gross cash proceeds of at least $100 million or (B) results in a market capitalization of the Corporation immediately after consummation of the offering that is not less than $150 million.

"Records" has the meaning specified in Section 5(a)(xii).

"Registrable Securities" means (i) shares of Common Stock, (ii) any securities issued with respect to Registrable Securities by way of a stock dividend, stock split or reverse stock split or in connection with a combination of shares, recapitalization, reclassification, merger, consolidation or otherwise and (iii) any securities issued in exchange for or in replacement of Registrable Securities; provided, however, that as to any securities that are Registrable Securities, such securities shall cease to constitute "Registrable Securities" for purposes of this

3

Agreement if and when (A) a registration statement under the Securities Act with respect to the sale of such securities shall have been declared effective by the SEC and such securities shall have been sold pursuant thereto, (B) such securities are sold or transferred in accordance with the provisions of Rule 144 under the Securities Act, without regard to volume or manner of sale restrictions, or (C) such securities are no longer outstanding.

"Registration Expenses" has the meaning specified in Section 7.

"Related Fund" means, with respect to any Person, any fund, account or investment vehicle that is controlled or managed by (i) such Person, (ii) an Affiliate of such Person or (iii) the same investment manager, advisor or subadvisor as such Person or an Affiliate of such investment manager, advisor or subadvisor.

"Related Person" means, with respect to any individual, any of such individual's parents, spouse, siblings, children and grandchildren.

"Requesting Holder" and "Requesting Holders" have the meanings specified in Section 2(a).

"SEC" means the United States Securities and Exchange Commission, or any other federal agency at the time administering the Securities Act or the Exchange Act.

"Securities Act" means the Securities Act of 1933, as amended, or any successor federal statute, and the rules and regulations of the SEC promulgated thereunder.

"Shelf Registration" has the meaning specified in Section 2(a).

"Subsidiary" means any Person in which the Corporation, directly or indirectly through one or more Subsidiaries or otherwise, beneficially owns more than fifty percent (50%) of the voting power of the securities of such Person, the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or Persons performing similar functions) of such Person.

"Suspension Notice" has the meaning specified in Section 4(b).

"Suspension Period" has the meaning specified in Section 4(b).

(b)     *Rules of Construction.*  Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)     All references in this Agreement to Articles, Sections, clauses, parts, Schedules and Exhibits shall be deemed to refer to Articles, Sections, clauses, parts, Schedules and Exhibits of or to this Agreement.

(ii)     All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

4

(iii)     The words "include," "includes" and "including," when used herein shall be deemed in each case to be followed by the words "without limitation" (regardless or whether such words or similar words actually appear).

(iv)     When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day.

(v)     Any reference in this Agreement to "$" or "dollars" shall mean U.S. dollars.

(vi)     Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(vii)     The words "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

2.     Demand Registration.

(a)     *Request for Registration*.  Subject to the provisions contained in this Section 2(a), at any time and from time to time after one hundred eighty (180) days following the effective date of a Qualified Public Offering, any Holder or group of Holders (acting together) that own or control Registrable Securities representing at least twenty-five percent (25%) of the then-issued and outstanding Registrable Securities (each such Holder, a "Requesting Holder" and, collectively, the "Requesting Holders"), may request (a "Demand Request") that the Corporation effect the registration under the Securities Act (a "Demand Registration") of Registrable Securities held by the Requesting Holder(s) covering at least ten percent (10%) of the Registrable Securities held by the Requesting Holder(s) then outstanding, or any lesser percentage if the aggregate value of the Registrable Securities offered would exceed $20 million (based on the market price or fair market value on the date of such Demand Request and net of underwriting discounts or commissions) and specifying the intended method of disposition thereof, including, if such disposition is pursuant to an underwritten offering, whether such offering shall be "firm commitment" underwriting; provided, however, that (i) the Corporation will not be required to effect more than two (2) Demand Registrations in total; provided, however, that a Demand Request for a non-underwritten Shelf Registration on Form S-3 (or any equivalent successor form) if the Corporation is a registrant qualified to use Form S-3 (or such equivalent successor form) shall not count towards such limit, and (ii) the Corporation will not be obligated to take any action to effect any Demand Registration within one hundred eighty (180) days immediately following the effective date of a previous Demand Registration or any other registration statement in which Holders were permitted to register the offer and sale under the Securities Act the Registrable Securities requested to be included therein.  The Demand

5

Request may specify that the intended distribution of the Registrable Securities to be registered pursuant to the Demand Registration be made by means of a shelf registration statement pursuant to Rule 415 under the Securities Act (a "Shelf Registration").  Upon receipt of a Demand Request, the Corporation will cause to be included in a registration statement under the Securities Act, filed with the SEC as promptly as reasonably practicable but in any event not later than sixty (60) days after receiving a Demand Request, such Registrable Securities as may be requested by such Requesting Holders in their Demand Request together with any other Registrable Securities of the same class as requested by Joining Holders joining in such request pursuant to Section 2(b).  The Corporation shall use its commercially reasonable efforts to cause any such registration statement to be declared effective by the SEC as promptly as practicable after such filing.

(b)     *Joining Holders*.  If at any time the Corporation proposes to register Registrable Securities for the account of the Requesting Holders pursuant to Section 2(a), then the Corporation shall give, or cause to be given, written notice of such proposed filing to all other Holders as soon as practicable (but in no event less than thirty (30) days before the anticipated filing date).  Upon the written request of any Holder, delivered to the Corporation no later than the fifteenth (15th) Business Day after the Corporation's notice is delivered to such Holder (each such Holder, a "Joining Holder"), to register, on the same terms and conditions as the securities otherwise being sold pursuant to such Demand Registration, any of its Registrable Securities of the same class as the securities otherwise being sold pursuant to such Demand Registration, the Corporation will use its commercially reasonable efforts to cause such Registrable Securities to be included in the registration statement proposed to be filed by the Corporation on the same terms and conditions as any securities of the same class included therein.

(c)     *Effective Registration*.  A registration will not count as a Demand Registration for purposes of the limitations set forth in Section 2(a) unless the related registration statement has been declared effective and has remained effective until (i) in the case of a registration statement other than a Shelf Registration, the earlier of (x) such time as all of the Registrable Securities covered thereby have been sold (but in no event for a period of more than ninety (90) days after such registration statement becomes effective) and (y) the expiration of the time when a prospectus relating to such registration is required to be delivered under the Securities Act and (ii) in the case of a Shelf Registration, such time as all of the Registrable Securities covered thereby have been sold (but in no event for a period of more than twenty-four (24) months after such Shelf Registration becomes effective); provided, however, that if, after a registration statement has become effective, an offering of Registrable Securities pursuant to such registration statement is terminated by any stop order, injunction, or other order of the SEC or other Governmental Authority, such registration pursuant thereto will be deemed not to have been effected and will not count as a Demand Registration for purposes of the limitations set forth in Section 2(a).  In addition, a registration will not count as a Demand Registration for purposes of the limitations set forth in Section 2(a) if, (A) the registration statement relating to such Demand Registration is not declared effective within forty-five (45) days (in any case where the SEC has no comments on the registration statement) or ninety (90) days (in any case where the SEC has comments on

6

the registration statement) of the date such registration statement is first filed with the SEC (so long as the Requesting Holders withdraw their request prior to the effective date of the registration statement), (B) more than ten percent (10%) of the Registrable Securities requested by the Requesting Holders to be included in such Demand Registration are not so included pursuant to Section 2(e), or (C) the conditions to closing specified in the underwriting agreement or purchase agreement entered into in connection with the registration relating to such Demand Request are not satisfied.  Notwithstanding the foregoing, the Corporation will pay all Registration Expenses in connection with any Demand Registration, regardless of whether or not such Demand Registration counts as one of the permitted Demand Registrations under Section 2(a).

(d)     *Selection of Underwriters*.  With respect to any offering of Registrable Securities pursuant to a Demand Registration in the form of an underwritten offering, the Majority Requesting Holders shall have the right to select an investment banking firm of national standing, reasonably satisfactory to the Corporation, to be the managing underwriter for the offering.

(e)     *Priority on Demand Registrations*.  With respect to any offering of Registrable Securities pursuant to a Demand Registration in the form of an underwritten offering, no securities to be sold for the account of any Person (including the Corporation) other than the Requesting Holders and the Joining Holders shall be included in a Demand Registration unless the managing underwriter advises the Requesting Holders in writing that the inclusion of such securities will not have a material adverse effect on the price or success of the offering (an "Adverse Effect").  Furthermore, in the event that the managing underwriter advises the Requesting Holders in writing that the amount of Registrable Securities proposed to be included in such Demand Registration by the Requesting Holders and the Joining Holders is sufficiently large (even after exclusion of all securities of any other Person pursuant to the immediately preceding sentence) to cause an Adverse Effect, the number of Registrable Securities to be included in such Demand Registration shall be allocated among all such Requesting Holders and Joining Holders *pro rata* based on the ratio that the number of Registrable Securities that each such Holder requested to be included in such Demand Registration bears to the total number of Registrable Securities that all Requesting Holders and Joining Holders requested to be included in such Demand Registration; provided, that if, as a result of such pro-ration, any Requesting Holder or Joining Holder shall not be entitled to include in a registration all Registrable Securities of the class that such Holder had requested to be included, such Holder may elect to withdraw its request to include such Registrable Securities in such registration or may reduce the number requested to be included, whereupon only the Registrable Securities, if any, it desires to have included will be so included and the Holders not so reducing shall be entitled to a corresponding increase in the amount of Registrable Securities to be included in such Demand Registration; provided, however, that such withdrawal or reduction (x) must be made in writing by the Holder desiring to effect such withdrawal or reduction prior to the earlier of the execution of the underwriting agreement and the execution of the custody agreement with respect to such registration and (y) shall be irrevocable.

7

(f)      *Registration Statement Form*.  Demand Registrations shall be on such appropriate registration form of the SEC (i) as shall be selected by the Majority Requesting Holders and (ii) which shall be available for the sale of Registrable Securities in accordance with (x) the intended method or methods of disposition specified in the Demand Request and (y) applicable law.  The Corporation agrees to consult with any Participating Holder with respect to any information which such Participating Holder, upon advice of counsel, has reasonably requested to be included in the registration statement.

(g)      *Exclusive Rights*.  The registration rights granted pursuant to the provisions of this Section 2 shall be in addition to the registration rights granted pursuant to the provisions of Section 3.

3.      Piggy-Back Registration.

(a)      *Holder Piggyback Registration*.  If the Corporation at any time proposes to file a registration statement under the Securities Act with respect to an offering of any equity securities for the Corporation's own account (except pursuant to registrations on Form S-4 or any successor form, or otherwise in connection with the acquisition of a business or assets of a business, a merger, or an exchange offer for the securities of the issuer or another entity, or registrations on Form S-8 or any successor form relating solely to securities offered pursuant to any Equity Incentive Plan) or for the account of any holder of securities of the Corporation (other than a Holder) on a form that would permit registration of Registrable Securities for sale to the public under the Securities Act, then the Corporation shall give written notice of such proposed filing to the Holders as soon as practicable (but in no event less than thirty (30) days before the anticipated filing date), describing in reasonable detail the proposed registration (including the number and class of securities proposed to be registered, the proposed date of filing of such registration statement, any proposed means of distribution of such securities, any proposed managing underwriter of such securities and a good faith estimate by the Corporation of the proposed maximum offering price of such securities as such price is proposed to appear on the facing page of such registration statement), and offering the Holders the opportunity to register such number of Registrable Securities as each Holder may request.  Upon the written request of any Holder, given by such Holder to the Corporation no later than fifteen (15) Business Days after the Corporation's notice is delivered to such Holder, to register, on the same terms and conditions as the securities otherwise being sold pursuant to such registration, any of such Holder's Registrable Securities (which request shall state the intended method of disposition thereof if the securities otherwise being sold are being sold by more than one method of disposition), the Corporation will use its commercially reasonable efforts to cause such Registrable Securities as to which registration shall have been so requested by such Holder to be included in the registration statement proposed to be filed by the Corporation on the same terms and conditions as any similar securities included therein; provided, however, that, notwithstanding the foregoing, the Corporation may at any time, in its sole discretion, without the consent of any Holder, delay or abandon the proposed offering in which any Holder had requested to participate pursuant to this Section 3(a) or cease the filing (or obtaining or maintaining the effectiveness) of or withdraw the related registration

8

statement or other governmental approvals, registrations or qualifications.  In such event, the Corporation shall so notify each Holder that had notified the Corporation in accordance with this Section 3(a) of its intention to participate in such offering and, except for the obligation of the Corporation to pay Registration Expenses pursuant to Section 7, the Corporation shall incur no liability for its failure to complete any such offering.  There is no limitation on the number of registrations that may be requested by any Holder pursuant to this Section 3(a) which the Corporation is obligated to effect.  The registration rights granted pursuant to the provisions of this Section 3 shall be in addition to the registration rights granted pursuant to the provisions of Section 2.

(b)    *Priority on Piggyback Registrations*.

(i)    If the Registrable Securities requested to be included in a registration statement by any Holder pursuant to Section 3(a) differ from the type of securities proposed to be registered by the Corporation and the managing underwriter for the related underwritten offering advises the Corporation in writing that due to such differences the inclusion of such Registrable Securities would cause an Adverse Effect, and the Corporation notifies such Holder in writing of such advice, then (A) the number of such Holder's or Holders' Registrable Securities to be included in the registration statement shall be reduced to an amount which, in the judgment of such managing underwriter, would eliminate such Adverse Effect or (B) if no such reduction would, in the judgment of such managing underwriter, eliminate such Adverse Effect, then the Corporation shall have the right to exclude all such Registrable Securities from such registration statement; provided, however, that, in the case of this clause (B), no other securities that are the same as, or similar to, the Registrable Securities that had been requested to be included in a registration statement by any Holder pursuant to Section 3(a) shall be included and offered for the account of any other Person (other than the Corporation) in such registration statement.  Any partial reduction in the number of Registrable Securities to be included in the registration statement pursuant to clause (A) of the immediately preceding sentence shall be effected on a *pro rata* basis among each of the Holders requesting inclusion of Registrable Securities in such registration statement and each of the other holders of securities of the Corporation that are requesting inclusion of securities of the Corporation in such registration statement that are the same as, or similar to, the Registrable Securities that had been requested to be included in such registration statement based on the ratio that the number of Registrable Securities or other securities of the Corporation that each such Holder or each such other holder requested to be included in such registration statement bears to the total number of Registrable Securities and other securities of the Corporation that all Holders and such other holders requested to be included in such registration statement.

(ii)    If the Registrable Securities requested to be included in the registration statement pursuant to Section 3(a) are of the same type as the securities being registered by the Corporation and the managing underwriter advises the Corporation in writing that the inclusion of such Registrable Securities would cause an Adverse Effect, and the Corporation notifies the requesting Holders in writing of such advice, then (A) in the event that the registration is an underwritten registration on behalf of the Corporation, the Corporation will be obligated to include in such registration statement only that

9

number of Registrable Securities which, in the judgment of the managing underwriter, would not have an Adverse Effect; provided, that any reduction in the number of Registrable Securities to be included in such registration statement shall be made on a *pro rata* basis among each of the Holders requesting inclusion of Registrable Securities in such registration statement and each of the other holders of securities of the Corporation that are requesting inclusion of securities of the Corporation in such registration statement based on the ratio that the number of Registrable Securities or other securities of the Corporation that each such Holder or each such other holder requested to be included in such registration statement bears to the total number of Registrable Securities and other securities of the Corporation that all Holders and such other holders requested to be included in such registration statement and (B) in the event that the registration relates to an underwritten registration on behalf of holders of the securities of the Corporation (other than the Holders), the Corporation will be obligated to include in such registration statement only that number of Registrable Securities which, in the judgment of the managing underwriter, would not have an Adverse Effect; provided, that any reduction in the number of Registrable Securities to be included in such registration statement shall be made on a *pro rata* basis among each of the Holders requesting inclusion of their respective Registrable Securities in such registration statement and each of the other holders of securities of the Corporation (other than the holders of securities of the Corporation requesting such registration) that are requesting inclusion of securities of the Corporation in such registration statement based on the ratio that the number of Registrable Securities or other securities of the Corporation that each such Holder or each such other holder requested to be included in such registration statement bears to the total number of Registrable Securities and other securities of the Corporation that all Holders and such other holders requested to be included in such registration statement; provided, further that the Corporation shall not be permitted to include any of its securities in such registration statement to be sold for its own account if the number of Registrable Securities to be included in such registration statement is reduced pursuant to this Section 3(b)(ii)(B).

(c)     *Withdrawals*.  Each Holder shall have the right to withdraw its request for inclusion of its Registrable Securities in any registration statement pursuant to this Section 3 or may reduce the number of Registrable Securities requested to be included by giving written notice to the Corporation of its request to withdraw or reduce, whereupon only the Registrable Securities, if any, it desires to have included will be so included and the Holders not so reducing shall be entitled to a corresponding increase in the amount of Registrable Securities to be included in such registration; provided, however, that such withdrawal or reduction (x) must be made in writing by the Holder desiring to effect such withdrawal or reduction prior to the earlier of the execution of the underwriting agreement and the execution of the custody agreement with respect to such registration and (y) shall be irrevocable.

(d)     *Underwritten Offerings*.

(i)     In connection with the exercise of any registration rights granted to Holders pursuant to this Section 3, if the registration is to be effected by means of an underwritten offering, the Corporation may condition the participation in such

10

registration by any such Holder upon such Holder's entering into an underwriting agreement pursuant to Section 5(b)(iv).

(ii)     With respect to any offering of Registrable Securities pursuant to this Section 3 in the form of an underwritten offering, the Corporation shall select an investment banking firm of national standing to be the managing underwriter for the offering.

4.     Standstill and Suspension Periods.

(a)     *Corporation Standstill Period*.  In the event of an underwritten offering of Registrable Securities pursuant to Section 2(a), the Corporation agrees not to effect, without the prior written consent of the Majority Requesting Holders, any public sale or public distribution of any securities (except securities that may be held by the Corporation for its own account under the relevant registration statement) that are the same as, or similar to, the Registrable Securities, or any securities convertible into, or exchangeable or exercisable for, any securities of the Corporation that are the same as, or similar to, the Registrable Securities (except pursuant to registrations on Form S-4 or any successor form, or otherwise in connection with the acquisition of a business or assets of a business, a merger, or an exchange offer for the securities of the issuer or another entity, or registrations on Form S-8 or any successor form relating solely to securities offered pursuant to any Equity Incentive Plan), during the period commencing fifteen (15) days prior to the effective date of the registration statement relating to such Demand Registration and ending on the ninetieth (90th) day after such effective date.

(b)     *Suspension Period*.  If (x) there shall occur a Material Disclosure Event or (y) the Board of Directors determines, in good faith, that it would be detrimental to the Corporation and its shareholders for a registration statement pursuant to a Demand Registration to be filed and it is therefore advisable to defer the filing of such registration statement, the Corporation, by notice in writing to each Holder, may postpone the filing or effectiveness of any registration requested pursuant to this Agreement, or otherwise suspend the Demand Registration rights of the Holders for any period of time determined by the Corporation (such period, a "Suspension Period").  Notwithstanding anything herein to the contrary, the Corporation shall not be entitled to more than three (3) Suspension Periods, which Suspension Periods shall have durations of not more than thirty (30) days each, during any consecutive 12-month period, and which Suspension Periods shall not exceed more than sixty (60) days in the aggregate in any consecutive 12-month period.  Each Holder agrees that, upon receipt of a written notice from the Corporation declaring a Suspension Period as a result of the occurrence of a Material Disclosure Event (a "Suspension Notice"), such Holder will forthwith discontinue any disposition of Registrable Securities pursuant to any public sale or distribution, including pursuant to Rule 144 under the Securities Act, until the earlier of (i) the expiration of the Suspension Period and (ii) the Corporation's delivery of the written notice described in the immediately following sentence.  In the event that the Corporation has delivered a Suspension Notice, the Corporation shall, promptly after such time as the related Material Disclosure Event no longer exists, provide written notice to all Holders that the Suspension Period has ended, and take any and all actions necessary or desirable to give

11

effect to any Holder's rights under this Agreement that may have been affected by such Suspension Notice, including the Holders' Demand Registration rights. Any suspension of the right to use any registration statement shall result in an extension of the registration period equal to the number of days of the suspension.

(c)     *Holder Standstill Period*.   Each Holder who sells Registrable Securities in an underwritten public offering on a firm commitment basis pursuant to Section 2(a) or Section 3(a) agrees not to effect, without the prior written consent of the managing underwriter for such underwritten offering, any disposition (except for dispositions included in, or pursuant to, such underwritten offering) pursuant to any Shelf Registration or any public sale or distribution, including pursuant to Rule 144 under the Securities Act, of any Registrable Securities or any securities convertible into, or exchangeable or exercisable for, any securities of the Corporation that are the same as, or similar to, the Registrable Securities, during the period commencing fifteen (15) days prior to the effective date of any registration statement relating to such securities of the Corporation and ending on the ninetieth (90th) day after such effective date.

5.     Registration Procedures.

(a)     *Corporation Obligations*.   Whenever the Corporation is required pursuant to this Agreement to register Registrable Securities, it will:

(i)     provide the Participating Holders with a reasonable opportunity to review any related registration statement to be prepared and filed pursuant to this Agreement prior to the filing thereof with the SEC;

(ii)     cause any such registration statement and the related prospectus and any amendment or supplement thereto, as of the effective date of such registration statement or amendment or the date of such supplement, (x) to comply in all material respects with the applicable requirements of the Securities Act and (y) not to contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading;

(iii)     subject to Section 4(b), prepare and file with the SEC such amendments and supplements to such registration statement and the prospectus used in connection therewith as may be necessary to keep such registration statement effective and to comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such registration statement until the earlier of such time that (x) all of such securities have been sold thereunder and (y) the Corporation is no longer required to keep such registration statement effective pursuant to the terms of this Agreement;

(iv)     furnish, at its expense and as promptly as possible, to the Participating Holders and each underwriter, if any, without charge, such number of conformed copies of such registration statement and of each such amendment thereto, in each case including all exhibits thereto, such number of copies of the prospectus included

12

in such registration statement (including each preliminary prospectus and each supplement thereto), and such number of the documents, if any, incorporated by reference in such registration statement or prospectus, as the Participating Holders reasonably may request;

(v) use its commercially reasonable efforts to register or qualify the Registrable Securities covered by such registration statement under such securities or "blue sky" laws of the jurisdictions of the United States as the Participating Holders or the managing underwriter, if any, reasonably shall request, to keep such registration or qualification in effect for so long as such registration statement remains in effect, and to do any and all other acts and things that may be necessary or advisable to enable the Participating Holders to consummate the disposition in such jurisdictions of the Registrable Securities covered by such registration statement, except that the Corporation shall not, for any such purpose, be required to qualify generally to do business as a foreign corporation in any jurisdiction in which it is not obligated to be so qualified but for this clause (v), or to subject itself to material taxation in any such jurisdiction, or to consent to general service of process in any such jurisdiction, or to amend its Certificate of Incorporation, bylaws or other organizational documents in a manner that the Board of Directors determines is inadvisable; and use its commercially reasonable efforts to obtain all other approvals, consents, exemptions or authorizations from such securities regulatory authorities or other Governmental Authorities as may be necessary to enable such Participating Holders to sell such Registrable Securities under such registration statement;

(vi) notify the Participating Holders and the managing underwriter, if any, immediately, and (if requested by any such Person) confirm such notice in writing, at any time when (x) a prospectus or prospectus supplement relating thereto is required to be delivered under the Securities Act or (y) upon discovery that, or upon the occurrence of any event as a result of which, the prospectus included in such registration statement, as then in effect, includes an untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, which untrue statement or omission requires amendment of the registration statement or supplementation of the prospectus, and, as promptly as practicable following such notice (subject to Section 4(b)), prepare and furnish, at its expense, to the Participating Holders a reasonable number of copies of a supplement to such prospectus as may be necessary so that, as thereafter delivered to the purchasers of such Registrable Securities, such prospectus shall not include an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading;

(vii) use its commercially reasonable efforts to comply with all applicable rules and regulations of the SEC, and make available to holders of its securities, as soon as reasonably practicable, an earnings statement covering the period of at least twelve (12) months, but not more than eighteen (18) months, beginning with the first (1st) full calendar month after the effective date of the registration statement, which

13

earnings statement shall satisfy the provisions of Section 11(a) of the Securities Act and Rule 158 promulgated thereunder;

(viii)   provide, and cause to be maintained, a transfer agent and registrar for the Registrable Securities covered by such registration statement (which transfer agent and registrar shall be the Corporation's existing transfer agent and registrar, unless otherwise specified by the Corporation), and provide a CUSIP number for all such Registrable Securities, in each case from and after a date not later than the effective date of such registration statement, for the period during which securities are transferred and registered on the books of the Corporation pursuant to such registration statement;

(ix)   notify the Participating Holders and the managing underwriter, if any, immediately, and (if requested by any such Person) confirm such notice in writing, (A) when a registration statement, prospectus, prospectus supplement or post-effective amendment related to such registration statement has been filed, and, with respect to such registration statement or any post-effective amendment thereto, when the same has become effective, (B) of any request by the SEC or any other Governmental Authority for amendments or supplements to such registration statement or related prospectus, (C) of the issuance by the SEC or any other Governmental Authority of any stop order suspending the effectiveness of such registration statement or the initiation or threat of any proceedings for that purpose and (D) of the receipt by the Corporation of any notification with respect to the suspension of the qualification or exemption from qualification of any of the Registrable Securities for sale in any jurisdiction or the initiation or threatening of any proceeding for such purpose;

(x)   use its commercially reasonable efforts to obtain, as promptly as practicable, (x) the withdrawal of any order suspending the effectiveness of a registration statement and (y) the lifting of any suspension of the qualification (or exemption from qualification) of any of the Registrable Securities for sale in any jurisdiction;

(xi)   in the event of an underwritten public offering of Registrable Securities pursuant to Section 2(a), enter into customary agreements (including underwriting agreements in customary form, which may include, in the case of an underwritten offering on a firm commitment basis, "lock-up" obligations substantially similar to those contained in Section 4(a)) and take such other actions (including using its commercially reasonable efforts to make such road show presentations and otherwise engaging in such reasonable marketing support in connection with any such underwritten offering, including the obligation to make its executive officers available for such purpose if so requested by the managing underwriter for such offering) as are reasonably requested by the Majority Requesting Holders or the managing underwriter in order to expedite or facilitate the sale of such Registrable Securities;

(xii)   (A) make available for inspection by each Participating Holder, any underwriter participating in any disposition pursuant to such registration, and any attorney, accountant, advisor or other agent retained by such Participating Holder or any such underwriter (collectively, the "Inspectors"), all financial and other records, and all pertinent corporate documents and properties of the Corporation and any of its

14

Subsidiaries (collectively, the "Records") as shall be reasonably necessary to enable each Inspector to exercise its due diligence responsibility and (B) cause the officers, directors and employees of the Corporation to supply all information reasonably requested by any such Inspector in connection with such registration, provided, however, that (1) in connection with any such inspection, any such Inspector shall cooperate to the extent reasonably practicable to minimize any disruption to the operation by the Corporation of its business and shall comply with all Corporation site safety rules, (2) Records and information obtained, furnished or otherwise made available hereunder shall be used by such Inspectors only to exercise their due diligence responsibility and (3) Records or information obtained, furnished or otherwise made available hereunder shall be kept confidential and shall not be disclosed by such Inspector unless (x) such Inspector advises the Corporation that the disclosure of such Records or information is necessary to avoid or correct a misstatement or omission in a registration statement or is otherwise required by law (provided that such Inspector complies with its obligations under Section 5(b)(iii)), (y) the release of such Records or information is ordered pursuant to a subpoena or other order from a court or other Governmental Authority of competent jurisdiction (provided that such Inspector complies with its obligations under Section 5(b)(iii)) or (z) such Records or information otherwise become generally available to the public other than through disclosure by such Inspector in breach of, or by any other Person of which such Inspector is actually aware is in breach of, any other confidentiality arrangement with the Corporation;

(xiii)    if requested by the Majority Requesting Holders (in the event of a Demand Registration) and/or the managing underwriter, if any, use commercially reasonable efforts to obtain (A) an opinion or opinions of counsel to the Corporation, (B) a comfort letter or comfort letters from the Corporation's independent public accountants who have certified the Corporation's financial statements included or incorporated by reference in such registration statement and (C) officers' certificates and other customary closing documents, each in customary form and covering such matters of the type customarily covered by opinions, comfort letters or officers' certificates, as the case may be;

(xiv)    reasonably cooperate with each seller of Registrable Securities and any underwriter in the disposition of such Registrable Securities and with underwriters' counsel, if any, in connection with any filings required to be made with the Financial Industry Regulatory Authority, Inc. ("FINRA");

(xv)    use its commercially reasonable efforts to cause all such Registrable Securities to be listed on each securities exchange or trading system on which securities of the same class issued by the Corporation are then listed;

(xvi)    cooperate with the Participating Holders and the managing underwriter, if any, to facilitate the timely preparation and delivery of certificates not bearing any restrictive legends representing the Registrable Securities to be sold, and cause such Registrable Securities to be issued in such denominations and registered in such names in accordance with the underwriting agreement prior to any sale of Registrable Securities to the underwriters or, if not an underwritten offering, in

15

accordance with the instructions of the Participating Holders prior to any sale of Registrable Securities; and

(xvii)    use its commercially reasonable efforts to take or cause to be taken all other actions, and do and cause to be done all other things, necessary or reasonably advisable to effect the registration of such Registrable Securities contemplated hereby.

The Corporation agrees not to file or make any amendment to any registration statement with respect to any Registrable Securities, or any amendment of or supplement to the prospectus used in connection therewith, that refers to any Holder covered thereby by name, or otherwise identifies such Holder as the holder of any securities of the Corporation, without the written consent of such Holder, such consent not to be unreasonably withheld or delayed, unless and to the extent such disclosure is required by law.

(b)    *Holder Obligations*.  Each Holder agrees:

(i)    that it shall furnish to the Corporation such information regarding such Holder and the plan and method of distribution of Registrable Securities intended by such Holder (A) as the Corporation may, from time to time, reasonably request in writing and (B) as shall be required by law or by the SEC in connection therewith;

(ii)    that information relating to the Corporation and its Affiliates that is provided by or on behalf of the Corporation to it or its other Inspectors shall be deemed confidential and shall not be used by it as the basis for any market transactions in the securities of the Corporation or its Affiliates unless and until such information is made generally available to the public;

(iii)    to use reasonable efforts, prior to making any disclosure allowed under clause (x) or clause (y) of the proviso in Section 5(a)(xii), to provide the Corporation with prior written notice that such disclosure is necessary to avoid or correct a misstatement or omission in the registration statement or is ordered pursuant to a subpoena or other order from a court or other Governmental Authority of competent jurisdiction or otherwise required by law, in sufficient time to afford the Corporation with an opportunity to seek a protective order or other appropriate remedy in response; and

(iv)    in the case of an underwritten offering of Registrable Securities pursuant to this Agreement, if requested by the managing underwriter, to enter into an underwriting agreement with the underwriters for such offering containing such reasonable representations and warranties by each Holder and such other terms and provisions as are customarily contained in such underwriting agreements, including reasonable and customary indemnity and contribution provisions and "lock-up" obligations substantially similar to those contained in Section 4(c); provided, however, that no Holder will be required to agree to any indemnification obligations on the part of such Holder that are greater than its obligations pursuant to Section 6(b).

16

6.      Indemnification.

(a)      *Indemnification by the Corporation.*   In the event of any registration of any Registrable Securities under the Securities Act pursuant to this Agreement, the Corporation shall indemnify and hold harmless (i) each Holder and its Affiliates and their respective directors, partners, members and officers, (ii) any selling agent selected by the Holders with respect to such Registrable Securities and (iii) each Person who controls (within the meaning of Section 15 of the Securities Act) any Holder or such Affiliate, or selling agent, including directors and officers thereof (each such Person being sometimes referred to as an "Indemnified Person"), against any losses, claims, damages, expenses or liabilities, joint or several (each, a "Loss" and, collectively, "Losses"), to which such Indemnified Person may become subject under the Securities Act, the Exchange Act, state securities or "blue sky" laws or otherwise, to the extent that such Losses (or related actions or proceedings, whether commenced or threatened) arise out of or are based upon (A) any untrue statement or alleged untrue statement of any material fact contained in any registration statement in which such Registrable Securities were included for registration under the Securities Act, or any preliminary prospectus or any final prospectus included in such registration statement (or any amendment or supplement to such registration statement or prospectus), (B) any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading or (C) any violation by the Corporation or any of its agents of any rule or regulation promulgated under the Securities Act, the Exchange Act or any state securities laws applicable to the Corporation and relating to action or inaction required of the Corporation in connection with any such registration; and the Corporation agrees to reimburse such Indemnified Person for any legal or other expenses reasonably incurred by it in connection with investigating, defending or settling any such Loss (or related actions or proceedings, whether commenced or threatened) as such expenses are incurred; provided, however, that the Corporation shall have no obligation to provide any indemnification hereunder (1) to the extent that any such Losses (or actions or proceedings in respect thereof) arise out of or are based upon an untrue statement or alleged untrue statement or omission or alleged omission made in such registration statement, preliminary prospectus, final prospectus, amendment or supplement, in reliance upon and in conformity with written information furnished to the Corporation by a Holder, or on such Holder's behalf, specifically for inclusion, respectively, in such registration statement, preliminary prospectus, final prospectus, amendment or supplement, or (2) to the extent that such Losses (or actions or proceedings in respect thereof) arise out of or are based upon a Holder's failure to deliver a copy of the registration statement or prospectus or any amendments or supplements thereto after the Corporation has furnished such Holder with a sufficient number of copies thereof.  The indemnity provided in this Section 6(a) shall survive the transfer of the Registrable Securities by any Holder or any such other Persons.  In connection with an underwritten offering, the Corporation, if requested, will indemnify the underwriters, their officers and directors and each Person who controls (within the meaning of Section 15 of the Securities Act) such underwriters, to the same extent, and with the same limitations, as provided above with respect to the indemnification of the Indemnified Persons.

17

(b)      *Indemnification by the Holders*.  In the event of any registration of any Registrable Securities under the Securities Act pursuant to this Agreement, each Holder that participates in such registration shall indemnify and hold harmless (in the same manner and to the same extent as set forth in Section 6(a)) the Corporation, each director and officer of the Corporation and each other Person, if any, who controls (within the meaning of Section 15 of the Securities Act) the Corporation (each such Person being sometimes referred to as a "Corporation Indemnified Person"), against Losses to which any such Corporation Indemnified Person may become subject under the Securities Act or otherwise, to the extent that such Losses (or related actions or proceedings) arise out of or are based upon (i) any untrue statement or alleged untrue statement of any material fact contained in any registration statement in which Registrable Securities were included for registration under the Securities Act, or any preliminary prospectus or any final prospectus included in such registration statement (or any amendment or supplement to such registration statement or prospectus) or (ii) any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, in each case, only to the extent that such untrue statement or alleged untrue statement or omission or alleged omission was made in such registration statement, preliminary prospectus, final prospectus, amendment or supplement in reliance upon and in conformity with written information furnished to the Corporation by such Holder, or on such Holder's behalf, specifically for inclusion, respectively, in such registration statement, preliminary prospectus, final prospectus, amendment or supplement; and each Holder agrees to reimburse such Corporation Indemnified Person for any legal or other expenses reasonably incurred by it in connection with investigating, defending or settling any such action or claim related to such Holder as such expenses are incurred; provided, however, that the obligation to indemnify and hold harmless will be individual and several to each Holder and a Holder's aggregate liability under this Agreement with respect to Losses arising from a particular registration of Registrable Securities shall be limited to an amount equal to the net proceeds (after deducting the underwriter's discount and expenses) received by such Holder from the sale of such Holder's Registrable Securities pursuant to such registration, except in the case of fraud by such Holder.

(c)      *Notice of Claims*, *Etc*.  Promptly after receipt by any Person entitled to indemnity under Section 6(a) or Section 6(b) (an "Indemnitee") of notice of the commencement of any action or proceeding (an "Action") involving a claim referred to in either of such Sections, such Indemnitee shall, if indemnification is sought against an indemnifying party, give written notice to such indemnifying party of the commencement of such Action; provided, however, that the failure of any Indemnitee to give said notice shall not relieve the indemnifying party of its obligations under Section 6(a) or Section 6(b), except to the extent that the indemnifying party is actually prejudiced by such failure.  In case an Action is brought against any Indemnitee, and such Indemnitee notifies the indemnifying party of the commencement thereof, each indemnifying party shall be entitled to participate therein and, to the extent it elects to do so by written notice delivered to the Indemnitee promptly after receiving the aforesaid notice, to assume the defense thereof with counsel reasonably satisfactory to such Indemnitee.  Notwithstanding the foregoing, the Indemnitee shall have the right to

18

employ its own counsel in any such case, but the fees and expenses of such counsel shall be at the expense of such Indemnitee unless (i) the employment of such counsel shall have been authorized in writing by the indemnifying party, (ii) the indemnifying party shall have failed to assume the defense of such Action or shall not have employed counsel reasonably satisfactory to the Indemnitee to take charge of the defense of such Action reasonably promptly after notice of the commencement thereof or (iii) such Indemnitee reasonably shall have concluded that there may be defenses available to it which are different from or additional to those available to the indemnifying party which, if the indemnifying party and the Indemnitee were to be represented by the same counsel, could result in a conflict of interest for such counsel or materially prejudice the prosecution of the defenses available to such Indemnitee.  If any of the events specified in clauses (i), (ii) or (iii) of the preceding sentence shall have occurred or otherwise shall be applicable, then the fees and expenses of counsel for the Indemnitee shall be borne by the indemnifying party; provided, however, that the indemnifying party shall not, in connection with any one such claim or proceeding, or separate but substantially similar or related claims or proceedings arising out of the same general allegations or circumstances, be liable for the fees and expenses of more than one separate firm of attorneys (together with appropriate local counsel) at any time for all Indemnitees hereunder (unless in the reasonable judgment of any Indemnitee a conflict of interest may exist between such Indemnitee and any other of such Indemnitees with respect to such claim or proceeding), or for fees and expenses that are not reasonable.  Anything in this Section 6(c) to the contrary notwithstanding, an indemnifying party shall not be liable for the settlement of any Action effected without its prior written consent (which consent shall not be unreasonably withheld or delayed), but if settled with the prior written consent of the indemnifying party, the indemnifying party agrees to indemnify the Indemnitee from and against any loss or liability by reason of such settlement.  No indemnifying party shall, without the prior written consent of the Indemnitee (which consent shall not be unreasonably withheld or delayed), consent to entry of any judgment or enter into any settlement or compromise, with respect to any pending or threatened Action in respect of which the Indemnitee would be entitled to indemnification or contribution hereunder (whether or not the Indemnitee is an actual party to such Action), which (x) does not include as a term thereof the unconditional release of the Indemnitee from all liability in respect of such Action or (y) includes a statement as to, or an admission of, fault, culpability or a failure to act, by or on behalf of the Indemnitee.

(d)      *Contribution.*  If the indemnification provided for in this Section 6 is unavailable or insufficient to hold harmless an Indemnitee in respect of any Losses, then each indemnifying party shall, in lieu of indemnifying such Indemnitee, contribute to the amount paid or payable by such Indemnitee as a result of such Losses in such proportion as appropriate to reflect the relative fault of the indemnifying party, on the one hand, and the Indemnitee, on the other hand, which relative fault shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact relates to information supplied by such Indemnitee or such indemnifying party, and such parties' relative intent, knowledge, access to information and opportunity to correct or mitigate the damage in respect of, or prevent the untrue statement or omission giving rise to, such indemnification obligation.  The parties hereto agree that it would not be just and

19

equitable if contributions pursuant to this Section 6(d) were determined solely by *pro rata* allocation or by any other method of allocation which did not take account of the equitable considerations referred to above.   No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) with respect to a claimed indemnification event shall be entitled to contribution from any Person who is not guilty of fraudulent misrepresentation with respect to the same indemnification event.   Notwithstanding the foregoing, the amount any Holder will be obligated to contribute pursuant to this Section 6(d) will be limited to an amount equal to the proceeds to such Holder of the Registrable Securities sold pursuant to the registration statement which gave rise to such obligation to contribute (less the aggregate amount of any damages which such Holder has otherwise been required to pay in respect of the applicable Losses).

(e)   *Indemnification Payments; Other Remedies; Investigation and Survival.*

(i)   Periodic payments of amounts required to be paid pursuant to this Section 6 shall be made during the course of the investigation, defense or settlement, as and when reasonably itemized bills therefor are delivered to the indemnifying party in respect of any particular Loss as incurred.

(ii)   The remedies provided in this Section 6 are not exclusive and shall not limit any rights or remedies that may otherwise be available to an Indemnitee at law or in equity.

(iii)   The indemnification and contribution provided for under this Section 6 will remain in full force and effect regardless of any investigation made by or on behalf of an Indemnitee or any officer, director or controlling Person of such Indemnitee and will survive the registration and sale of any securities by any Indemnitee and the expiration or termination of this Agreement.

7.   Registration Expenses.   In connection with any requests for, or offerings pursuant to, the filing of a registration statement hereunder, the Corporation will pay all expenses arising from or incident to its performance of, and compliance with, this Agreement (whether or not any such registration statement becomes effective and whether or not all Registrable Securities originally requested to be included in such registration are withdrawn or otherwise ultimately not included in such registration) ("Registration Expenses"), including (a) all registration and filing fees, (b) all fees and expenses of compliance with state securities or "blue sky" laws (including reasonable fees and disbursements of counsel in connection with "blue sky" laws qualifications of the Registrable Securities), (c) printing and duplicating expenses, (d) internal expenses of the Corporation (including all salaries and expenses of its officers and employees performing legal or accounting duties), (e) fees, disbursements and expenses of counsel and independent certified public accountants retained by the Corporation (including the expenses of any comfort letters or costs associated with the delivery by independent certified public accountants of a comfort letter or comfort letters or with any required special audits), (f) the reasonable fees and expenses of any special experts retained by the Corporation, (g) fees and expenses in connection with any review of underwriting arrangements by FINRA, including

20

fees and expenses of any "qualified independent underwriter" in connection with an underwritten offering, (h) reasonable fees and expenses of not more than one counsel for the Participating Holders (as a group), which counsel shall be selected by (i) with respect to a Demand Registration, the Majority Requesting Holders and (ii) with respect to a registration pursuant to Section 3, Participating Holders that at the relevant time hold at least a majority of the Registrable Securities held by all Participating Holders to be included in such registration, (i) fees and expenses in connection with filings required to be made with any securities exchange or other trading market on which the Registrable Securities are listed for trading and (j) all duplicating, distribution and delivery expenses.  In connection with any offerings pursuant to a registration statement hereunder, each Participating Holder will pay (i) any underwriting discounts or commissions attributable to the sale of Registrable Securities by such Participating Holder in connection with an underwritten offering, (ii) any out-of-pocket expenses of such Participating Holder, including any fees and expenses of counsel to such Participating Holder (other than as set forth in clause (h) of the immediately preceding sentence), and (iii) any applicable transfer taxes.

8.     Transfer of Rights.  This Agreement, and the rights and obligations of each Holder hereunder, may be assigned by such Holder to (a) any Person to which Registrable Securities are transferred by such Holder (other than a Person who is a Competitor), so long as such Person owns or controls Registrable Securities representing at least five percent (5%) of all of the shares of Common Stock that are issued and outstanding or (b) to any Affiliate of such Holder, and, in each case, such transferee shall be deemed a Holder for purposes of this Agreement; provided that such assignment of rights shall be contingent upon the transferee executing and delivering to the Corporation a Joinder Agreement.

9.     Miscellaneous.

(a)     *Recapitalizations*, *Exchanges*, *Etc*.  The provisions of this Agreement shall apply, to the full extent set forth herein with respect to the Registrable Securities, to any and all shares of capital stock of the Corporation or any successor or assign of the Corporation (whether by merger, consolidation, sale of assets or otherwise) which may be issued in respect of, in exchange for or in substitution of, the Registrable Securities and shall be appropriately adjusted for any stock dividends, splits, reverse splits, combinations, recapitalizations and the like occurring after the date hereof.

(b)     *Entire Agreement*.  This Agreement (including the exhibits, schedules and other documents referred to in this Agreement) contains the entire understanding among the Holders and the Corporation with respect to the subject matter of this Agreement and supersedes any prior understandings, agreements or representations, written or oral, relating to the subject matter of this Agreement.

(c)     *Counterparts*.  For the convenience of the parties hereto, this Agreement may be executed and delivered (by facsimile or PDF signature) in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

(d)      *Severability*.  In the event that any provision hereof would be invalid or unenforceable in any respect under applicable law, such provision shall be construed by modifying or limiting it so as to be valid and enforceable to the maximum extent compatible with, and possible under, applicable law.  The provisions hereof are severable, and in the event any provision hereof should be held invalid or unenforceable in any respect, it shall not invalidate, render unenforceable or otherwise affect any other provision hereof.

(e)      *Notices*.  All notices, requests, waivers and other communications made pursuant to this Agreement shall be in writing and shall be deemed to have been effectively given, sent, provided, delivered or received (i) when personally delivered to the party to be notified, (ii) when sent by facsimile or by electronic mail ("e-mail") to the party to be notified, (iii) three (3) Business Days after deposit in the United States mail, postage prepaid, by certified or registered mail with return receipt requested, addressed to the party to be notified or (iv) one (1) Business Day after deposit with a national overnight delivery service, postage prepaid, addressed to the party to be notified with next-Business Day delivery guaranteed, in each case as follows:  (A) in the case of any Holder, to such Holder at its address, facsimile number or e-mail address set forth on its signature page to this Agreement or a Joinder Agreement; and (B) in the case of the Corporation, to the Secretary of the Corporation at its address, facsimile number or an e-mail address set forth on its signature page to this Agreement.  A party may change its address, facsimile number or e-mail address for purposes of notice hereunder by (x) in the case of the Corporation, giving notice of such change to all of the Holders in the manner provided in this Section 9(e) and (y) in the case of any Holder, giving notice of such change to the Corporation in the manner provided in this Section 9(e).

(f)      *Successors and Assigns*.  This Agreement shall be binding upon the permitted transferees, successors, assigns and legal representatives of the parties to this Agreement.  Notwithstanding any transfer of such rights, all of the obligations of the Corporation hereunder shall survive any such transfer and shall continue to inure to the benefit of all transferees.

(g)      *Headings*.  The headings of the various sections of this Agreement have been inserted for convenience of reference only and shall not be deemed to be a part of this Agreement.

(h)      *Governing Law*.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO ITS CONFLICTS OF LAW DOCTRINE.  THE CORPORATION AND EACH HOLDER HEREBY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE DELAWARE COURT OF CHANCERY AND ANY STATE APPELLATE COURT THEREFROM WITHIN THE STATE OF DELAWARE (UNLESS THE DELAWARE COURT OF CHANCERY SHALL DECLINE TO ACCEPT JURISDICTION OVER A PARTICULAR MATTER, IN WHICH CASE, OF ANY DELAWARE STATE OR FEDERAL COURT WITHIN THE STATE OF DELAWARE), AND ANY JUDICIAL PROCEEDING BROUGHT AGAINST THE CORPORATION OR ANY HOLDER WITH RESPECT TO ANY

22

DISPUTE ARISING OUT OF THIS AGREEMENT OR ANY MATTER RELATED HERETO SHALL BE BROUGHT ONLY IN SUCH COURTS.  THE CORPORATION AND EACH HOLDER HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION IT MAY HAVE OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.   THE CORPORATION AND EACH HOLDER HEREBY CONSENT TO PROCESS BEING SERVED IN ANY SUCH PROCEEDING BY THE MAILING OF A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE ADDRESS SPECIFIED IN SECTION 9(e), OR IN ANY OTHER MANNER PERMITTED BY LAW.  THE CORPORATION AND EACH HOLDER HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUCH ACTION OR PROCEEDING.

(i)      *Third Party Beneficiaries*.   The terms and provisions of this Agreement are intended solely for the benefit of each party hereto and its successors and permitted assigns, and it is not the intention of the parties to confer third-party beneficiary rights upon any other Person, except for any Indemnitee not a party hereto (solely with respect to Section 6).

(j)      *Injunctive Relief*.  It is hereby agreed and acknowledged that it will be impossible to measure in money the damages that would be suffered if the parties to this Agreement fail to comply with any of the obligations imposed on them by this Agreement and that in the event of any such failure, a non-breaching party hereto will be irreparably damaged and will not have an adequate remedy at law.  Any such Person shall, therefore, be entitled to injunctive relief, specific performance or other equitable remedies to enforce such obligations, this being in addition to any other remedy to which such Person is entitled at law or in equity.  Each of the parties hereto hereby waives any defense that a remedy at law is adequate and any requirement to post bond or other security in connection with actions instituted for injunctive relief, specific performance or other equitable remedies.  Each of the parties hereto hereby agrees not to assert that specific performance, injunctive relief and other equitable remedies are unenforceable, violate public policy, invalid, contrary to law or inequitable for any reason.  The right of specific performance, injunctive relief and other equitable remedies is an integral part of the transactions contemplated by this Agreement.

(k)      *Additional Actions and Documents*.  The parties agree to execute and deliver any further instruments or perform any acts that are or may become necessary to carry out or to perform the provisions of this Agreement.

(l)      *Amendments and Waivers*.  The provisions of this Agreement, including the provisions of this sentence, may not be amended, modified or supplemented, or waived unless the same shall be in writing and signed by the Corporation and Holders who beneficially own at least a majority of the then outstanding Registrable Securities; provided, however, that any party may give a waiver as to itself.

23

No waiver of any terms or conditions of this Agreement shall operate as a waiver of any other breach of such terms and conditions or any other term or condition, nor shall any failure to enforce any provision hereof operate as a waiver of such provision or of any other provision hereof.  No written waiver hereunder, unless it by its own terms explicitly provides to the contrary, shall be construed to effect a continuing waiver of the provisions being waived and no such waiver in any instance shall constitute a waiver in any other instance or for any other purpose or impair the right of the party against whom such waiver is claimed in all other instances or for all other purposes to require full compliance with such provision.  The failure of any party to enforce any provision of this Agreement shall not be construed as a waiver of such provision and shall not affect the right of such party thereafter to enforce each provision of this Agreement in accordance with its terms.

(m)   *Termination*.   The obligations of the Corporation and of any Holder, other than those obligations contained in Section 6 and this Section 9, shall terminate with respect to the Corporation and such Holder as soon as such Holder no longer beneficially owns any Registrable Securities.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

24

IN WITNESS WHEREOF, the undersigned have caused this Registration Rights Agreement to be executed and delivered by their respective officers hereunto duly authorized on the date first above written.

21ST CENTURY ONCOLOGY
HOLDINGS, INC.


By: _____
    Name:
    Title:

[HOLDERS]


By: _____
    Name:
    Title:

*Signature Page to Registration Rights Agreement*

**Schedule A**

Holders

| | |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |

*Schedule A to Registration Rights Agreement*

**Exhibit A to**
**Registration Rights Agreement**

## FORM OF JOINDER AGREEMENT

The undersigned hereby agrees, effective as of the date hereof, to become a party to that certain Registration Rights Agreement (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Agreement"), dated as of [_____], [____] , by and among 21st Century Oncology Holdings, Inc. (the "Corporation") and the other parties thereto, and for all purposes of the Agreement, the undersigned shall, effective as of the date hereof, be bound by the terms and provisions of the Agreement applicable to Holders and be included within the term "Holder" (as defined in the Agreement).

The address, facsimile number and e-mail address to which notices may be sent to the undersigned is as follows:

[Address]


Facsimile No.:

E-mail Address:

[NAME OF PARTY]


Date:                                    By:_____
                                              Name:
                                              Title:

**Exhibit F-5**

**Form of the Certificate of Designations of Series A Convertible Preferred Stock of 21st Century Oncology Holdings, Inc.**

CERTIFICATE OF DESIGNATIONS

OF

SERIES A CONVERTIBLE PREFERRED STOCK

OF

21ST CENTURY ONCOLOGY HOLDINGS, INC.

_____

pursuant to Section 151 of the

General Corporation Law of the State of Delaware

_____

21ST CENTURY ONCOLOGY HOLDINGS, INC., a corporation organized and existing under the laws of the State of Delaware (the "Corporation"), hereby certifies that, pursuant to the Amended and Restated Certificate of Incorporation of the Corporation, which authorizes the issuance by the Corporation of one or more series of up to [_____] shares of preferred stock, $0.001 per share ("Preferred Stock"), and in accordance with §§ 151 and 303 of the Delaware General Corporation Law and a plan of reorganization of the Corporation approved by order of the United States Bankruptcy Court for the District of Delaware in *In re 21st Century Oncology Holdings, Inc., et al.*, under Chapter 11 of the United States Bankruptcy Code (11 U.S.C. §§ 101–1330), as amended, which plan of reorganization became effective on [_____], a series of Preferred Stock designated as "Series A Preferred Stock" is hereby created, which shall consist of [_____] shares of Preferred Stock, having the designations, preferences, relative participating, optional and other special rights, qualifications, limitations and restrictions as hereinafter set forth:

1.      Designation and Ranking.

The designation of the series of Preferred Stock created by this Certificate of Designations shall be "Series A Convertible Preferred Stock" and the number of shares of Preferred Stock constituting such series is [_____] ("Series A Preferred Stock").  Each share of Series A Preferred Stock shall be identical in all respects to every other share of Series A Preferred Stock.  Series A Preferred Stock will rank equally with Parity Stock, if any, will rank senior to Common Stock and other Junior Stock, if any, and will rank junior to Senior Stock, if any.  The Series A Preferred Stock shall be subordinate, and rank junior in right of payment, to all indebtedness of the Corporation.

2.      Defined Terms.

"Board of Directors" means the board of directors of the Corporation.

"Business Day" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized or required to close under the laws of the State of New York.

"Bylaws" means the Amended and Restated Bylaws of the Corporation, as amended, amended and restated, supplemented or otherwise modified and in effect from time to time.

"Capital Stock" means, with respect to any Person, all of the shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership, equity or profit interests or units in, including any limited or general partnership interest and any limited liability company interest) such Person.

"Certificate of Designations" means this Certificate of Designations of Series A Convertible Preferred Stock, as amended, amended and restated, supplemented or otherwise modified and in effect from time to time.

"Certificate of Incorporation" means the Amended and Restated Certificate of Incorporation of the Corporation filed with the Secretary of State of the State of Delaware pursuant to the DGCL on the Effective Date, as amended, amended and restated, supplemented or otherwise modified and in effect from time to time, including as supplemented and modified by this Certificate of Designations.

"Class A Common Stock" means the common stock, par value $0.001 per share, of the Corporation that is designated as "Class A Voting Common Stock" under the Certificate of Incorporation.

"Class B Common Stock" means the common stock, par value $0.001 per share, of the Corporation that is designated as "Class B Limited Voting Common Stock" under the Certificate of Incorporation.

"Common Stock" means, collectively, Class A Common Stock and Class B Common Stock.

"Conversion Date" has the meaning specified in Section 7.1(c) or, with respect to an automatic conversion as set forth in Section 7.3, the meaning specified in Section 7.3(a).

"Conversion Notice" has the meaning specified in Section 7.1(c).

"Conversion Price" means $[__][1], as such amount is adjusted pursuant to the terms of Section 7 hereof.

"Corporation" has the meaning specified in the preamble.

---

[1] Note to Draft: Insert an amount equal to the quotient obtained by dividing (a) the aggregate Liquidation Preference of all shares of Series A Preferred Stock as of the Effective Date, by (b) an amount equal to (i) the product of (x) the number of shares of Class A Common Stock that are issued and outstanding on the Effective Date (after giving effect to the consummation of the Restructuring Transactions (as defined in the Plan)) and (y) 0.85, divided by (ii) 0.15.

2

"DGCL" means the Delaware General Corporation Law, as amended from time to time.

"Dividend Payment Date" means January 1, April 1, July 1 and October 1 of each year, commencing on [●].

"Dividend Rate" has the meaning specified in Section 3.1.

"Effective Date" means the "Effective Date" as defined in the Plan.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Extraordinary Stock Event" means (a) the issuance of additional shares of Class A Common Stock as a dividend or other distribution on outstanding shares of Class A Common Stock, (b) the subdivision or split of outstanding shares of Class A Common Stock into a greater number of shares of Class A Common Stock, or (c) the combination of outstanding shares of Class A Common Stock into a smaller number of shares of Class A Common Stock.

"Fundamental Change" has the meaning specified in Section 7.6.

"Junior Stock" means the Common Stock and any other class or series of Capital Stock of the Corporation, now existing or hereafter authorized, not expressly ranking senior to or on parity with the Series A Preferred Stock with respect to the payment of dividends or the distribution of assets in the event of any Liquidation Event.

"Liquidation Amount" has the meaning specified in Section 4.1.

"Liquidation Event" means the consummation of:

(a)    a sale, conveyance or disposition of all or substantially all of the assets of the Corporation and any direct and/or indirect Subsidiaries of the Corporation, taken as a whole (including by or through the sale, conveyance or other disposition of the Capital Stock of, or reorganization, merger, share exchange, consolidation or other business combination involving, any direct and/or indirect Subsidiary or Subsidiaries of the Corporation, if substantially all of the assets of the Corporation and any direct and/or indirect Subsidiaries of the Corporation, taken as a whole, are held by such Subsidiary or Subsidiaries);

(b)    a reorganization, merger, share exchange, consolidation or other business combination of the Corporation with or into any other entity in which transaction the Persons who hold more than fifty percent (50%) of the total voting power of the Voting Securities of the Corporation (or, if the Corporation is not the acquiring, resulting or surviving entity in such transaction, such acquiring, resulting or surviving entity) immediately after such transaction are not Persons who, immediately prior to such transaction, held more than fifty percent (50%) of the total voting power of the Voting Securities of the Corporation;

3

(c)     an acquisition (in one transaction or a series of related transactions) of Voting Securities of the Corporation representing in the aggregate more than fifty percent (50%) of the total voting power of the Voting Securities of the Corporation (after giving effect to such acquisition) by any Person or "group" (as such term is used in Section 13(d)(3) of the Exchange Act) of Persons; or

(d)     the liquidation, dissolution or winding up of the Corporation.

"Liquidation Preference" means, as of any date of determination, with respect to each share of Series A Preferred Stock, the sum of (a) the Stated Value as of such date plus (b) all accrued and unpaid dividends (including dividends that have been compounded on any Dividend Payment Date in accordance with Section 3.3 hereof) owed with respect to such share of Series A Preferred Stock as of such date.

"Majority Preferred Stockholders" means, as of any date of determination, the holder or holders of more than fifty percent (50%) of the total number of issued and outstanding shares of Series A Preferred Stock as of such date.

"Management Stockholder" means any holder of shares of Common Stock that is (a) an employee of the Corporation or any of its Subsidiaries or (b) a member of the Board of Directors or any Subsidiary Governing Body.

"Mandatory Conversion Election" has the meaning specified in Section 7.2(a).

"Mandatory Conversion Percentage" means, with respect to any Mandatory Conversion Election, a fraction, expressed as a percentage, (a) the numerator of which is the total number of shares of Series A Preferred Stock that are being converted by the Supermajority Preferred Stockholders in connection with such Mandatory Conversion Election and (b) the denominator of which is the total number of shares of Series A Preferred Stock owned by the Supermajority Preferred Stockholders on the applicable Conversion Date immediately prior to the time of conversion of shares of Series A Preferred Stock.

"New Security" has the meaning specified in Section 7.6.

"Parity Stock" means any class or series of Capital Stock of the Corporation hereafter authorized that expressly ranks equally with the Series A Preferred Stock with respect to the payment of dividends or the distribution of assets in the event of any Liquidation Event.

"Person" means an individual, partnership, corporation, unincorporated organization, joint stock company, limited liability company, association, trust, joint venture or any other entity, or a governmental agency or political subdivision thereof.

"Plan" means the joint plan of reorganization under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, filed in the United States Bankruptcy Court for the Southern District of New York by the Corporation and certain of its direct and indirect Subsidiaries, as amended, supplemented or otherwise modified from time to time.

"Preferred Stock" has the meaning specified in the preamble.

4

"Qualified Public Offering" means the first underwritten public offering pursuant to an effective registration statement covering a sale of shares of Class A Common Stock to the public that (a) results in shares of Class A Common Stock being listed on a national securities exchange or quoted on the Nasdaq Stock Market, and (b) either (i) involves gross cash proceeds of at least $100.0 million or (ii) results in a market capitalization of the Corporation immediately after consummation of the offering that is not less than $150.0 million.

"Recipient" has the meaning specified in Section 7.1(c).

"Senior Stock" means any class or series of Capital Stock of the Corporation hereafter authorized which expressly ranks senior to the Series A Preferred Stock and has preference or priority over the Series A Preferred Stock with respect to the payment of dividends or the distribution of assets in the event of any Liquidation Event.

"Series A Preferred Stock" has the meaning specified in Section 1.

"Stated Value" means $100.00 per share of Series A Preferred Stock, subject to appropriate adjustment in the event of any stock dividend, stock split, combination or other similar recapitalization affecting the shares of Series A Preferred Stock.

"Stockholders Agreement" means the Stockholders Agreement, dated as of the Effective Date, by and among the Corporation and the holders of its shares of Capital Stock party thereto as "Stockholders" thereunder, as amended, amended and restated, supplemented or otherwise modified from time to time.

"Subsidiary" means any Person in which the Corporation, directly or indirectly through one or more Subsidiaries or otherwise, beneficially owns more than fifty percent (50%) of the voting power of the Voting Securities of such Person.

"Subsidiary Governing Body" means the board of directors, the board of managers or other similar governing body (including any committee of any such governing body) of each Subsidiary of the Corporation.

"Supermajority Preferred Stockholders" means, as of any date of determination, the holder or holders of at least 66-2/3% of the total number of issued and outstanding shares of Series A Preferred Stock as of such date.  For purposes of determining Supermajority Preferred Stockholders for purposes of whether a Mandatory Conversion Election has been made, such determination shall be made on the Business Day immediately preceding the Conversion Date.

"Voting Securities" means, with respect to any Person, the Capital Stock of such Person, the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person.

3.    Dividends.

3.1    Dividend Rate.  The Corporation will pay preferential dividends to the holders of shares of Series A Preferred Stock as provided in this Section 3.  Dividends on each outstanding share of Series A Preferred Stock will accrue cumulatively on a daily basis during each fiscal

5

year of the Corporation at the rate of fifteen percent (15.0%) per annum (the "Dividend Rate") on the Stated Value thereof.

3.2     Accrual of Dividends.  Dividends on each outstanding share of Series A Preferred Stock will accrue from and including the date of issuance thereof to and including the date on which the Liquidation Amount on such share of Series A Preferred Stock is paid in full, whether or not such dividends have been declared and whether or not there are profits, surplus or other funds of the Corporation legally available for the payment of dividends.  The date on which the Corporation initially issues any share of Series A Preferred Stock will be deemed to be its "date of issuance", regardless of the number of times transfer of such share is made on the stock records maintained by or for the Corporation and regardless of the number of certificates which may be issued to evidence such share.

3.3     Payment of Dividends.  Unless dividends on shares of Series A Preferred Stock are paid in cash on a Dividend Payment Date, accrued and unpaid dividends on shares of Series A Preferred Stock shall be compounded quarterly on each Dividend Payment Date with the effect that an additional dividend shall accrue on each outstanding share of Series A Preferred Stock at a rate per annum equal to the Dividend Rate on the amount so compounded until such amount is actually paid in full.  Dividends on each outstanding share of Series A Preferred Stock shall be payable in full upon a Liquidation Event.  The Corporation shall be permitted to pay dividends on shares of Series A Preferred Stock in cash if such dividends are paid ratably with respect to all outstanding shares of Series A Preferred Stock.

3.4     No Payments on Junior Stock.  So long as any shares of Series A Preferred Stock are outstanding, except for (i) any repurchase of shares of Junior Stock or options therefor owned or held by a Management Stockholder following termination of such Management Stockholder's employment with the Corporation or any of its Subsidiaries or termination of such Management Stockholder's service as a member of the Board of Directors or any Subsidiary Governing Body, (ii) distributions or dividends in shares of Junior Stock to the holders of shares of Junior Stock, and (iii) repurchases or redemptions of fractional shares of Junior Stock following any reverse stock split or other combination thereof, the Corporation shall not declare, pay or set apart for payment any dividend on any shares of Junior Stock, or make any payment on account of, or set apart for payment money for a sinking or other similar fund for, the purchase, redemption or other retirement of any shares of Junior Stock or any warrants, rights, calls or options exercisable for or convertible into any shares of Junior Stock, or make any distribution in respect thereof, either directly or indirectly, and whether in cash, obligations or shares of Capital Stock of the Corporation or other property, and shall not permit any Person directly or indirectly controlled by the Corporation to purchase or redeem any shares of Junior Stock or any warrants, rights, calls or options exercisable for or convertible into any shares of Junior Stock, in any such case without the prior written consent of the Supermajority Preferred Stockholders.

4.     Liquidation Event.

4.1     Liquidation Amount.  In the event of the consummation or effectiveness of any Liquidation Event, the holders of issued and outstanding shares of Series A Preferred Stock shall be entitled to be paid out of the assets of the Corporation available for distribution to stockholders, before any payment or distribution shall be made to or set aside for the holders of

6

shares of Common Stock or other shares of Junior Stock, but after any distribution on any shares of Senior Stock, with respect to each share of Series A Preferred Stock then held by any such holder, an amount equal to the greater of (i) the Liquidation Preference as of the date of the consummation or effectiveness of such Liquidation Event and (ii) the amount the holder of such share of Series A Preferred Stock would be entitled to receive upon the consummation or effectiveness of such Liquidation Event if such share of Series A Preferred Stock was converted into shares of Class A Common Stock in accordance with Section 7 hereof immediately prior to the consummation or effectiveness of such Liquidation Event (such greater amount, the "Liquidation Amount"). If, upon the consummation or effectiveness of any Liquidation Event, the assets lawfully available to be distributed to the holders of the shares of Series A Preferred Stock pursuant to this Section 4.1 are insufficient to permit payment to such holders of their full Liquidation Amount per share of Series A Preferred Stock, then all of the assets of the Corporation lawfully available for distribution to stockholders shall be distributed ratably among the holders of shares of Series A Preferred Stock and holders of any shares of Parity Stock, based on the respective amounts which would otherwise be payable in respect of shares of Series A Preferred Stock and such shares of Parity Stock.

4.2    Non-Cash Assets.   In the event of the consummation or effectiveness of a Liquidation Event resulting in the availability of assets other than cash for distribution to the holders of shares of Series A Preferred Stock, such holders shall be entitled to a distribution of cash and/or other assets equal in value to the full amount to which they are entitled to receive pursuant to Section 4.1, subject to the terms and conditions set forth therein; provided, that the holders of shares of Series A Preferred Stock shall be entitled to receive distributions of cash before distributions of any other assets. In the event that such distribution to the holders of shares of Series A Preferred Stock shall include any assets other than cash, the Board of Directors shall reasonably determine the value of such assets for such purpose, and such determination shall be final, binding and conclusive on all holders of shares of Series A Preferred Stock.

4.3    Cancellation of Series A Preferred Stock.   Upon the payment in full of the Liquidation Amount on any share of Series A Preferred Stock upon or after the consummation or effectiveness of a Liquidation Event, then (a) such share of Series A Preferred Stock shall be deemed cancelled and no longer outstanding, and (b) the holder of such share of Series A Preferred Stock shall have no further rights in respect of such share of Series A Preferred Stock to any assets of the Corporation.

4.4    No Affect on Conversion Rights.   Nothing contained in this Section 4 shall limit the right of the holder of any shares of Series A Preferred Stock to convert such shares of Series A Preferred Stock, or to cause the conversion of shares of Series A Preferred Stock pursuant to a Mandatory Conversion Election, pursuant to and in accordance with Section 7 hereof; provided, however, that upon any such conversion such shares of Series A Preferred Stock shall no longer be deemed to be outstanding for purposes of this Section 4.

5.    Voting Rights.

5.1    General.   Except as otherwise expressly required by applicable law, the holder of each share of Series A Preferred Stock shall be entitled to vote on all matters on which holders of

7

shares of Class A Common Stock are entitled to vote, including, without limitation, the election of directors of the Corporation, and shall be entitled to notice of any stockholders' meetings in accordance with the Bylaws. Each share of Series A Preferred Stock shall entitle the holder thereof to such number of votes per share of Series A Preferred Stock as shall equal the number of shares of Class A Common Stock into which such share of Series A Preferred Stock is convertible pursuant to Section 7 hereof, as of the record date for the determination of stockholders entitled to vote on any matter, or if no record date is established, at the date such vote is taken or any written consent of stockholders is solicited. Except as otherwise provided herein or as otherwise required by applicable law, the holders of the shares of Series A Preferred Stock and the holders of shares of Common Stock shall vote together as a single class on all matters submitted to a vote or consent of stockholders.

5.2     Amendments; Waivers. So long as any shares of Series A Preferred Stock are outstanding, the Corporation shall not, without the prior written consent or affirmative vote of the Majority Preferred Stockholders, (a) amend, alter or repeal the preferences, special rights or other powers of the Series A Preferred Stock set forth in the Certificate of Incorporation or this Certificate of Designations so as to adversely affect the Series A Preferred Stock, or (b) authorize or create any class of Senior Stock or Parity Stock, provided that (i) neither the increase of the number of shares of any existing or new class or series of Capital Stock which the Corporation shall be or become authorized to issue nor the issuance by the Corporation of any shares of any such series or class shall be deemed to adversely affect the Series A Preferred Stock and (ii) neither any of the provisions of this Certificate of Designations that provide rights (including any consent or approval rights) to the Supermajority Preferred Stockholders nor the definition of "Supermajority Preferred Stockholders" shall be amended, altered or repealed without the prior written consent or affirmative vote of the Supermajority Preferred Stockholders.

6.     Redemption.

The shares of Series A Preferred Stock are not redeemable at the option of the Corporation. Without limiting the rights of the holders of Series A Preferred Stock under Section 4 hereof, the holders of shares of Series A Preferred Stock shall not have any right to require the Corporation to redeem shares of Series A Preferred Stock.

7.     Conversion.

7.1     Optional Conversion.

(a)     Subject to and in compliance with the provisions of this Section 7, each holder of shares of Series A Preferred Stock may, at any time and from time to time, elect to convert all or any part of the shares of Series A Preferred Stock held by such holder into shares of Class A Common Stock.

(b)     Each share of Series A Preferred Stock may be converted (including any conversion pursuant to this Section 7.1, any deemed conversion pursuant to Section 7.2, or any automatic conversion pursuant to Section 7.3) into the number of shares of Class A Common Stock obtained by dividing (i) the Liquidation Preference of such share of Series A Preferred Stock as of the Conversion Date, by (ii) the Conversion Price then in

8

effect.  Whenever in this Section 7 there is a reference to a conversion (including any conversion pursuant to this Section 7.1, any deemed conversion pursuant to Section 7.2, or any automatic conversion pursuant to Section 7.3) of shares of Series A Preferred Stock (or any reference of a similar import or meaning), such reference shall be deemed to mean and include the conversion of all accrued and unpaid dividends on such shares of Series A Preferred Stock (including dividends that have been compounded on any Dividend Payment Date in accordance with Section 3.3 hereof) to and including the Conversion Date.

(c)    To exercise the right to convert shares of Series A Preferred Stock into shares of Class A Common Stock pursuant to this Section 7.1, a holder of shares of Series A Preferred Stock shall deliver written notice to the Corporation that such holder elects to convert shares of Series A Preferred Stock into shares of Class A Common Stock pursuant to this Section 7.1 (a "Conversion Notice").  The Conversion Notice shall state (i) the number of shares of Series A Preferred Stock such holder is electing to convert into shares of Class A Common Stock and (ii) the name or names (with address(es), facsimile number(s) and e-mail address(es)) of the Person or Persons (any such Person, a "Recipient") in which the shares of Class A Common Stock issuable upon such conversion shall be registered on the books and records of the Corporation (or its transfer agent); provided, however, that (A) no Conversion Notice shall specify that shares of Class A Common Stock be issued to, or registered in the name of, any Person to whom shares of Class A Common Stock could not be transferred by a stockholder of the Corporation pursuant to the terms of the Certificate of Incorporation or the Stockholders Agreement, and (B) if any Recipient is not a party to the Stockholders Agreement, such Recipient shall have executed and delivered a Joinder Agreement (as defined in the Stockholders Agreement) to the Corporation.  To the extent the Corporation has issued certificates representing shares of Series A Preferred Stock, a holder of shares of Series A Preferred Stock that is electing to convert shares of Series A Preferred Stock into shares of Class A Common Stock pursuant to this Section 7.1 shall also be required to deliver to the Corporation the certificate or certificates evidencing the converted shares of Series A Preferred Stock or, if such holder notifies the Corporation that such certificate(s) have been lost, stolen or destroyed, such holder shall be required to execute and deliver to the Corporation an affidavit of loss and an agreement, reasonably acceptable to the Corporation, to indemnify the Corporation from any loss incurred by the Corporation in connection therewith.  The date on which the Corporation receives (x) a Conversion Notice, (y) the certificate or certificates evidencing the shares of Series A Preferred Stock or such an affidavit of loss and agreement to indemnify the Corporation, and (z) a Joinder Agreement executed and delivered by each Recipient that is required to deliver a Joinder Agreement pursuant to this Section 7.1(c), shall be the deemed the "Conversion Date" with respect to a conversion of shares of Series A Preferred Stock pursuant to this Section 7.1 and any conversion of shares of Series A Preferred Stock pursuant to Section 7.2.

(d)    A conversion of shares of Series A Preferred Stock pursuant to this Section 7.1 shall be deemed to have been effected as of the close of business on the Conversion Date, and, at such time, the rights of the holder of such shares of Series A Preferred Stock, with respect to such shares of Series A Preferred Stock, shall cease and the Recipient of the shares of Class A Common Stock issuable upon the conversion of

9

such shares of Series A Preferred Stock shall be deemed to have become the holder of record of such shares of Class A Common Stock. As promptly as practicable after any Conversion Date with respect to a conversion of shares of Series A Preferred Stock pursuant to this Section 7.1, the Corporation shall deliver to the holders of the shares of Series A Preferred Stock being converted a certificate or certificates for the number of shares of Class A Common Stock into which such shares of Series A Preferred Stock were so converted in the name(s) of the Person(s) required by this Section 7.1; provided, however, that if the Corporation has not issued certificates representing shares of Class A Common Stock, the Corporation shall cause to be delivered to each such holder evidence of a book-entry interest in the shares of Class A Common Stock into which such shares of Series A Preferred Stock were so converted registered on the books of the Corporation's transfer agent in the name(s) of the Person(s) required by this Section 7.1. To the extent the Corporation has issued certificates representing shares of Series A Preferred Stock, the Corporation shall not be obligated to issue certificates evidencing, or evidence of the book-entry interest in, the shares of the Class A Common Stock issuable upon such conversion unless and until certificates formerly evidencing the converted shares of Series A Preferred Stock are either delivered to the Corporation, or the holder thereof notifies the Corporation that such certificates have been lost, stolen or destroyed and executes and delivers an affidavit of loss and agreement, reasonably acceptable to the Corporation, to indemnify the Corporation from any loss incurred by the Corporation in connection therewith.

7.2    Mandatory Conversion.

(a)    In the event that the Supermajority Preferred Stockholders have elected to convert any shares of Series A Preferred Stock pursuant to Section 7.1, such holders shall have the right (but not the obligation) to elect (which election shall be set forth in the Conversion Notice delivered by such holders) (a "Mandatory Conversion Election") to require all other holders of shares of Series A Preferred Stock to convert shares of Series A Preferred Stock pursuant to the terms of this Section 7.2.

(b)    If the Supermajority Preferred Stockholders make a Mandatory Conversion Election, then each other holder of shares of Series A Preferred Stock shall be deemed to have converted a number of shares of Series A Preferred Stock equal to the product of (i) the total number of shares of Series A Preferred Stock held by such holder on the Conversion Date and (ii) the Mandatory Conversion Percentage. Such deemed conversion of shares of Series A Preferred Stock shall occur on the Conversion Date, without any further action on the part of, or notice to, any holder of such shares of Series A Preferred Stock or any other Person.

(c)    If a Mandatory Conversion Election is made by the Supermajority Preferred Stockholders, the Corporation shall promptly notify each other holder of shares of Series A Preferred Stock in writing of such Mandatory Conversion Election, which notice shall state (i) the number of shares of Series A Preferred Stock owned by such holder that have been converted into shares of Class A Common Stock in connection with such Mandatory Conversion Election and (ii) the Conversion Date. The failure of the Corporation to deliver the notice referred to in the immediately preceding sentence shall

10

not delay, inhibit or otherwise impede the conversion of shares of Series A Preferred Stock, it being understood that such conversion shall take effect on the Conversion Date, without any further action on the part of, or notice to, any holder of such shares of Series A Preferred Stock or any other Person.

(d)     A conversion of shares of Series A Preferred Stock pursuant to this Section 7.2 shall be deemed to have been effected as of the close of business on the Conversion Date, and, at such time, the rights of the holder of such shares of Series A Preferred Stock, with respect to such shares of Series A Preferred Stock, shall cease and the Person in whose name the shares of Class A Common Stock issuable upon the conversion of such shares of Series A Preferred Stock shall be deemed to have become the holder of record of such shares of Class A Common Stock.  As promptly as practicable after any Conversion Date with respect to a conversion of shares of Series A Preferred Stock pursuant to this Section 7.2, the Corporation shall deliver to the holders of the shares of Series A Preferred Stock being converted a certificate or certificates for the number of shares of Class A Common Stock into which such shares of Series A Preferred Stock were so converted in the name(s) of the Person(s) required by this Section 7.2; provided, however, that if the Corporation has not issued certificates representing shares of Class A Common Stock, the Corporation shall cause to be delivered to each such holder evidence of a book-entry interest in the shares of Class A Common Stock into which such shares of Series A Preferred Stock were so converted registered on the books of the Corporation's transfer agent in the name(s) of the Person(s) required by this Section 7.2.  To the extent the Corporation has issued certificates representing shares of Series A Preferred Stock, the Corporation shall not be obligated to issue certificates evidencing, or evidence of the book-entry interest in, the shares of the Class A Common Stock issuable upon such conversion unless and until certificates formerly evidencing the converted shares of Series A Preferred Stock are either delivered to the Corporation, or the holder thereof notifies the Corporation that such certificates have been lost, stolen or destroyed and executes and delivers an affidavit of loss and an agreement, reasonably acceptable to the Corporation, to indemnify the Corporation from any loss incurred by the Corporation in connection therewith.

(e)     Shares of Class A Common Stock issued by the Corporation in connection with a deemed conversion of shares of Series A Preferred Stock pursuant to this Section 7.2 shall be issued and registered in the names of the holders of such shares of Series A Preferred Stock shown on the books and records of the Corporation (or its transfer agent).

7.3     Automatic Conversion.

(a)     Each share of Series A Preferred Stock outstanding shall be converted into the number of shares of Class A Common Stock into which such share is then convertible pursuant to Section 7.1(b), automatically and without any further action on the part of, or notice to, any holder of such shares of Series A Preferred Stock or any other Person, immediately upon the closing of a Qualified Public Offering.  The date on which the Qualified Public Offering closes shall be the deemed the "Conversion Date" with respect to a conversion of shares of Series A Preferred Stock pursuant to this Section 7.3.

11

(b)     A conversion of shares of Series A Preferred Stock pursuant to this Section 7.3 shall be deemed to have been effected as of the close of business on the Conversion Date, and, at such time, the rights of the holder of such shares of Series A Preferred Stock, with respect to such shares of Series A Preferred Stock, shall cease and the Person in whose name the shares of Class A Common Stock issuable upon the conversion of such shares of Series A Preferred Stock shall be deemed to have become the holder of record of such shares of Class A Common Stock.  As promptly as practicable after any Conversion Date with respect to a conversion of shares of Series A Preferred Stock pursuant to this Section 7.3, the Corporation shall deliver to the holders of the shares of Series A Preferred Stock being converted a certificate or certificates for the number of shares of Class A Common Stock into which such shares of Series A Preferred Stock were so converted in the name(s) of the Person(s) required by this Section 7.3; provided, however, that if the Corporation has not issued certificates representing shares of Class A Common Stock, the Corporation shall cause to be delivered to each such holder evidence of a book-entry interest in the shares of Class A Common Stock into which such shares of Series A Preferred Stock were so converted registered on the books of the Corporation's transfer agent in the name(s) of the Person(s) required by this Section 7.3.  To the extent the Corporation has issued certificates representing shares of Series A Preferred Stock, the Corporation shall not be obligated to issue certificates evidencing, or evidence of the book-entry interest in, the shares of the Class A Common Stock issuable upon such conversion unless and until certificates formerly evidencing the converted shares of Series A Preferred Stock are either delivered to the Corporation, or the holder thereof notifies the Corporation that such certificates have been lost, stolen or destroyed and executes and delivers an affidavit of loss and an agreement, reasonably acceptable to the Corporation, to indemnify the Corporation from any loss incurred by the Corporation in connection therewith.

(c)     Shares of Class A Common Stock issued by the Corporation in connection with a conversion of shares of Series A Preferred Stock pursuant to this Section 7.3 shall be issued and registered in the names of the holders of such shares of Series A Preferred Stock shown on the books and records of the Corporation (or its transfer agent).

7.4     Adjustments for Extraordinary Stock Events.  Upon the happening of any Extraordinary Stock Event, automatically and without further action on the part of any Person, and simultaneously with the happening of such Extraordinary Stock Event, the Conversion Price in effect immediately prior to such Extraordinary Stock Event shall be adjusted by multiplying (a) such then-effective Conversion Price by (b) a fraction, (i) the numerator of which shall be the number of shares of Class A Common Stock outstanding immediately before such Extraordinary Stock Event and (ii) the denominator of which shall be the number of shares of Class A Common Stock outstanding immediately after such Extraordinary Stock Event, and the product so obtained shall thereafter be the Conversion Price.  The Conversion Price, as so adjusted, shall be readjusted in the same manner upon the happening of each successive Extraordinary Stock Event.

7.5     Adjustments for Reclassifications.  If the shares of Class A Common Stock are changed into the same or a different number of shares of any class(es) or series of Capital Stock, whether by reclassification or otherwise (other than an Extraordinary Stock Event or a

12

Fundamental Change), then and in each such event the holder of each share of Series A Preferred Stock shall have the right thereafter to convert such share of Series A Preferred Stock into the kind and amount of shares of Capital Stock and other securities and property receivable upon such reclassification or other change by a holder of the number of shares of Class A Common Stock into which a share of Series A Preferred Stock would have been convertible immediately prior to such reclassification or change, all subject to further adjustment as provided in this Section 7.

7.6    Adjustments for Fundamental Changes. If at any time or from time to time there is any merger, consolidation or other reorganization of the Corporation (other than an Extraordinary Stock Event or a Liquidation Event) and the Corporation is not the surviving, acquiring or resulting entity in any such merger, consolidation or other reorganization (any such merger, consolidation or other reorganization, a "Fundamental Change"), then lawful and adequate provision shall be made so that each share of Series A Preferred Stock outstanding immediately prior to the consummation or effectiveness of such Fundamental Change shall be converted into, or exchanged for, a security of the surviving, acquiring or resulting entity of such Fundamental Change having preferences, rights, and privileges that are equivalent to such share of Series A Preferred Stock (any such security, a "New Security"), except that in lieu of being able to convert into shares of Class A Common Stock or shares of common stock of the surviving, acquiring or resulting entity of such Fundamental Change, the holders of such New Securities shall thereafter be entitled to receive upon conversion of such New Securities the shares of Capital Stock, securities, cash, assets or other property to which a holder of the number of shares of Class A Common Stock into which a share of Series A Preferred Stock would have been convertible immediately prior to such Fundamental Change would have been entitled to receive upon the consummation or effectiveness of such Fundamental Change. In any such case, appropriate provisions shall be made with respect to the rights of the holders of such New Security to the end that the provisions of this Section 7 (including, without limitation, provisions for adjustment of the Conversion Price) shall thereafter be applicable, as nearly as may be, with respect to any shares of Capital Stock, securities, cash, assets or other property to be deliverable thereafter upon the conversion of such New Security.

7.7    Certificate as to Adjustments. In each case of an adjustment or readjustment of the Conversion Price pursuant to this Section 7, the Corporation shall promptly furnish each holder of shares of Series A Preferred Stock with a certificate, prepared by an officer of the Corporation, showing such adjustment or readjustment, and stating the facts upon which such adjustment or readjustment is based.

7.8    Fractional Shares. No fractional shares of Class A Common Stock shall be issued upon the conversion of any shares of Series A Preferred Stock, and the number of shares of Class A Common Stock to be issued shall be rounded upward or downward to the nearest whole share of Class A Common Stock (with 0.5 of a share of Class A Common Stock being rounded upward). No holder of shares of Series A Preferred Stock shall receive any payment or other distribution in respect of any fraction of a share of Class A Common Stock such holder does not receive as a result of such a rounding down. Whether or not fractional shares of Class A Common Stock are issuable upon such conversion shall be determined on the basis of the total number of shares of Series A Preferred Stock that a holder is at the time converting into shares of

13

Class A Common Stock and the number of shares of Class A Common Stock issuable upon such aggregate conversion.

7.9     <u>Reservation of Shares of Class A Common Stock</u>.  The Corporation shall at all times reserve and keep available out of its authorized but unissued shares of Class A Common Stock, solely for the purpose of effecting the conversion of shares of Series A Preferred Stock, such number of shares of Class A Common Stock as from time to time is sufficient to effect the conversion of all outstanding shares of Series A Preferred Stock, and if at any time the number of authorized but unissued shares of Class A Common Stock is not sufficient to effect the conversion of all shares of Series A Preferred Stock then outstanding, the Corporation shall take such corporate action as may, in the opinion of its counsel, be necessary to increase its authorized but unissued shares of Class A Common Stock to such number of shares of Class A Common Stock as is sufficient for such purpose.

7.10     <u>Taxes</u>.  The Corporation shall pay any and all issue taxes and other taxes that may be payable in respect of any issuance of shares of Class A Common Stock upon conversion of any shares of Series A Preferred Stock pursuant to this <u>Section 7</u>.  The Corporation shall not, however, be required to pay any tax that may be payable in respect of any issuance of shares of Class A Common Stock in a name other than that in which the shares of Series A Preferred Stock being converted were registered on the books and records of the Corporation (or its transfer agent), and no such issuance shall be made unless and until the holder requesting such issuance has paid, or caused to be paid, to the Corporation the amount of any such tax or has established, to the satisfaction of the Corporation, that such tax has been paid.

7.11     <u>Fully Paid and Non-Assessable</u>.  Upon the conversion of any shares of Series A Preferred Stock, each share of Class A Common Stock issued upon the conversion thereof shall be fully paid and non-assessable.

8.     <u>Status of Acquired Shares of Series A Preferred Stock</u>.

Any shares of Series A Preferred Stock which are acquired by the Corporation by reason of purchase, conversion, or otherwise will resume the status of authorized and unissued shares of Preferred Stock, undesignated as to series and available for future issuance.

14

IN WITNESS WHEREOF, the Corporation has caused this Certificate of Designations to be made, executed and acknowledged by its duly authorized officer this [__] day of [_____], [____], as directed by and provided for in the Order of the United States Bankruptcy Court for the District of Delaware, dated [_____], Confirming the Plan under Chapter 11 of the Bankruptcy Code.

21ST CENTURY ONCOLOGY HOLDINGS, INC.

By:  _____

Name:

Title:

**<u>Exhibit G</u>**

**Identities of the Members of the New Board and the Officers of the Reorganized Debtors**

[TO COME]

## Exhibit H

## List of Retained Causes of Action

**List of Retained Causes of Action**

Section 4.22 of the Plan provides as follows:

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, including pursuant to Article VIII of this Plan, the DIP Orders, or a Final Order of the Bankruptcy Court, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically identified in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided herein.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, including pursuant to Article VIII of this Plan, the DIP Orders, or a Final Order of the Bankruptcy Court, the Reorganized Debtors expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to this Section 4.22 include any Claim or Cause of Action with respect to, or against, a Released Party.

In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action preserved pursuant to the first paragraph of this Section 4.22 that a Debtor may hold against any Entity shall vest in the Reorganized Debtors. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

Notwithstanding and without limiting the generality of Section 4.22 of the Plan, the Debtors and the Reorganized Debtors, as applicable, expressly reserve their rights with respect to all Causes of Action that are not expressly released under the Plan, including the following types of claims:

### A.      Claims Related to Contracts and Leases

Unless otherwise released by the Plan, the Debtors and Reorganized Debtors, as applicable, expressly reserve their rights with respect to Causes of Action based in whole or in part upon any and all contracts and leases, including without limitation all licenses and similar instruments, to which any of the Debtors or Reorganized Debtors is a party or pursuant to which any of the Debtors or Reorganized Debtors has any rights whatsoever, regardless of whether such contract or lease is specifically identified herein, including, without limitation, all contracts and leases that are assumed pursuant to the Plan or were previously assumed by the Debtors. The Causes of Action reserved include Causes of Action against vendors, suppliers of goods and services, employees or any other parties: (a) for overpayments, back charges, duplicate payments, improper holdbacks, deductions owing or improper deductions taken, deposits, warranties, guarantees, indemnities, recoupment, or setoff; (b) for wrongful or improper termination, suspension of services or supply of goods, or failure to meet other contractual or regulatory obligations; (c) for failure to fully perform or to condition performance on additional requirements under contracts with any one or more of the Debtors before the assumption or rejection, if applicable, of such contracts; (d) for payments, deposits, holdbacks, reserves or other amounts owed by any creditor, utility, supplier, vendor, insurer, surety, factor, lender, lessor or other party; (e) for any liens, including mechanics', artisans', materialmens', possessory or statutory liens held by any one or more of the Debtors; (f) arising out of environmental or contaminant exposure matters against landlords, lessors, environmental consultants, environmental agencies or suppliers of environmental services or goods; (g) for counter-claims and defenses related to any contractual obligations; (h) for any turnover actions arising under sections 542 or 543 of the Bankruptcy Code; (i) for recovery of commissions or retention payments made to employees that are required to be returned to the Debtors or Reorganized Debtors (as applicable) under the relevant arrangements or agreements between the Debtors or Reorganized Debtors (as applicable) and the subject employees, and (j) for unfair competition, interference with contract or potential business advantage, breach of contract, infringement of intellectual property or any business tort claims.  Without limiting the generality of the foregoing, the Debtors and the Reorganized Debtors, as applicable, expressly reserve all of their rights with respect to Causes of Action against the Entities identified in **Exhibit H-1** attached hereto.

### B.      Claims Related to Insurance Policies

Unless otherwise released by the Plan, the Debtors and the Reorganized Debtors, as applicable, expressly reserve all of their rights with respect to Causes of Action based in whole or in part upon any and all insurance contracts and insurance policies to which any Debtor or Reorganized Debtor is a party or pursuant to which any Debtor or Reorganized Debtor has any rights whatsoever, regardless of whether such contract or policy is specifically identified herein, including Causes of Action against insurance carriers, reinsurance carriers, insurance brokers, underwriters, occurrence carriers, or surety bond issuers relating to coverage, indemnity, contribution, reimbursement, or any other matters.  Without limiting the generality of the foregoing, the Debtors and the Reorganized Debtors, as applicable, expressly reserve all of their rights with respect to Causes of Action related to those insurance policies identified in **Exhibit H-2** attached hereto.

### C.    Claims Related to Liens

Unless otherwise released by the Plan or the DIP Orders, the Debtors and the Reorganized Debtors, as applicable, expressly reserve all of their rights with respect to Causes of Action based in whole or in part upon any and all liens regardless of whether such lien is specifically identified herein.

### D.    Claims, Defenses, Cross-Claims and Counter-Claims Related to Litigation and Potential Litigation

Unless otherwise released by the Plan, the Debtors and the Reorganized Debtors, as applicable, expressly reserve all of their rights with respect to Causes of Action against or related to all Entities that are party to or that may in the future become party to litigation, arbitration, or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal or judicial or non-judicial, regardless of whether such Entity is specifically identified in the Plan, this Plan Supplement, or any amendments thereto.  Without limiting the generality of the foregoing, the Debtors and the Reorganized Debtors, as applicable, expressly reserve all of their rights with respect to Causes of Action against the Entities identified in **Exhibit H-3** attached hereto.

### E.    Claims Related to Accounts Receivable and Accounts Payable

Unless otherwise released by the Plan, the Debtors and the Reorganized Debtors, as applicable, expressly reserve all of their rights with respect to Causes of Action against or related to all Entities that owe or that may in the future owe money to the Debtors or Reorganized Debtors, regardless of whether such Entity is expressly identified in the Plan, this Plan Supplement, or any amendments thereto.  Furthermore, the Debtors expressly reserve all of their rights with respect to Causes of Action against or related to all Entities who assert or may assert that the Debtors or Reorganized Debtors, as applicable, owe money to them.

### F.    Claims Related to Deposits, Adequate Assurance Postings, and Other Collateral Postings

Unless otherwise released by the Plan, the Debtors and the Reorganized Debtors, as applicable, expressly reserve all of their rights with respect to Causes of Action based in whole or in part upon any and all postings of a security deposits, adequate assurance payment, or any other type of deposit or collateral, regardless of whether such posting of security deposit, adequate assurance payment, or any other type of deposit or collateral is specifically identified herein.  Without limiting the generality of the foregoing, the Debtors and the Reorganized Debtors, as applicable, expressly reserve all of their rights with respect to Causes of Action against the Entities identified in **Exhibit H-4** attached hereto.

### G.    Claims Related to Tax Refunds

Unless otherwise released by the Plan, the Debtors and the Reorganized Debtors, as applicable, expressly reserve all of their rights with respect to Causes of Action against or related to all Entities that owe or that may in the future owe money related to tax refunds to the Debtors

or Reorganized Debtors, regardless of whether such Entity is specifically identified herein. Furthermore, the Debtors expressly reserve all of their rights with respect to Causes of Action against or related to all Entities who assert or may assert that the Debtors or Reorganized Debtors owe taxes to them.

## **Exhibit H-1**

### **Claims Related to Contracts and Leases**

| Debtor(s) | Third-Party (ies) | Address | Description |
|---|---|---|---|
| 21st Century Oncology, Inc. | Flagler Hospital, Inc. | 400 Health Park Boulevard St. Augustine, Florida 32086 | Breach of Contract |
| 21st Century Oncology, Inc. | NCH Healthcare System, Inc.; Naples Community Hospital, Inc. | 350 7th Street North Naples, FL 34102 | Breach of Contract |
| OnCure Medical Corp.; U.S. Cancer Care, Inc. | Central Coast Medical Oncology Corp. | 220 South Palisade, Suite 204 Santa Maria, CA 93454 | Breach of Contract |

**Exhibit H-2**

**Claims Related to Insurance Policies**

| # | Carrier | Coverage Type | Policy # |
|---|---------|---------------|----------|
| 1 | Lexington Insurance Company | Property/All Risk | 015909422 |
| 2 | Underwriters at Lloyd's | Property/All Risk | PTNAM1701046 |
| 3 | Liberty Mutual Fire Insurance Company | Property/All Risk | MJ2-L9L-460568-017 |
| 4 | HDI Global Insurance Company | Property/All Risk | CPD14755-00 |
| 5 | Landmark American Insurance Company | Property/All Risk | LHD900090 |
| 6 | Liberty Surplus Insurance Corporation | Property/All Risk | 1000079611-04 |
| 7 | Certain Underwriters at Lloyds, London-Brit Syndicate 2987 | Property/All Risk | PD-10082-03 |
| 8 | Endurance American Specialty Insurance Company | Property/All Risk | ARP10010918600 |
| 9 | Scottsdale Insurance Company | Property/All Risk | FXS0000770 |
| 10 | Certain Underwriters at Lloyd's London | Property/All Risk | CMCTR1700808 |
| 11 | Zurich American Insurance Company | General Liability | 0277024-00 |
| 12 | Zurich American Insurance Company | Auto Liability/Physical Damage | BAP0277004-00 |
| 13 | Zurich American Insurance Company | Umbrella | AUC027724700 |
| 14 | Zurich American Insurance Company | Workers' Compensation - AOS | WC027700500 |
| 15 | Zurich American Insurance Company | Workers' Compensation - MA & WI | WC027702200 |
| 16 | Zurich American Insurance Company | International Package Policy | ZE 9171842-04 |
| 17 | Property & Casualty Ins. Co. of Hartford | Workers' Compensation - NY | 10WBAN6624 |
| 18 | The Zenith | Workers' Compensation - NJ | Z127106903 |
| 19 | Travelers Property Casualty Co. of America | Inland Marine | QT-600-9D91811A-TIL-17 |
| 20 | Ace American Insurance Company | Storage Tank Liability | G24697101007 |
| 21 | NATIONAL UNION FIRE INS CO (AIG) | Directors & Officers / Employment Practices / Fiduciary Liability | 01-817-66-34 |
| 22 | ACE AMERICAN INS CO | Directors & Officers - 1st Layer, Excess | G25100384 002 |
| 23 | ENDURANCE | Directors & Officers - 2nd Layer, Excess | DOX 10006399201 |
| 24 | STARR INDEMNITY INS CO | Directors & Officers - 3rd Layer, Excess | 1000056704161 |
| 25 | NATIONAL UNION FIRE INS CO (AIG) | Directors & Officers - 4th Layer, Excess | 01-818-97-97 |
| 26 | XL SPECIALTY INS CO | Directors & Officers - 5th Layer, Excess | ELU146177-16 |
| 27 | QBE INS CORP | Directors & Officers - 6th Layer, Excess | QPL0371418 |

| # | Carrier | Coverage Type | Policy # |
|---|---------|---------------|----------|
| 28 | FREEDOM SPECIALTY (NATIONWIDE) | Directors & Officers - 7th Layer, Excess | XMF1602428 |
| 29 | ZURICH AMERICAN INS CO | Commercial Crime Coverage | FID 9384323 07 |
| 30 | NATIONAL UNION FIRE INS CO of PITTSBURGH, PA | Special Risk Coverage (K&R) | 88-084-649 |
| 31 | Lloyd's Syndicate 2623/623 | Network Security / E&O (Cyber) | W140E2160401 |
| 32 | Lexington Insurance Company (AIG) | Network Security / E&O (Cyber) Excess | 01-773-90-28 |
| 33 | American Southern Insurance Company | MEDICAID PROVIDER BOND Obligee: AHCA (21C-C21) | 60903 |
| 34 | American Southern Insurance Company | AZ TPA Bond - Carepoint | 63229 |
| 35 | American Southern Insurance Company | FISO BOND-Obligee: State of FL Dept. of Insurance (DOI) | 61205 |
| 36 | NORTHWESTERN MUTUAL | Term Life Insurance | 18-975-223 (Dosoretz MD) |
| 37 | NORTHWESTERN MUTUAL | Term Life Insurance | 18-956-592 (Galmarini) |
| 39 | PRUDENTIAL | Term Life Insurance | L8488257 |
| 40 | Auto-Owners Insurance Company | Auto | 42-592-087-01 |
| 41 | Southern-Owners Insurance Company | GL | 002312-20608806-16 |
| 42 | Auto-Owners Insurance Company | Umbrella | 42-592-087-02 |
| 43 | AGCS Marine Insurance Company | Property | MXI93074405 |
| 44 | Indian Harbor Insurance Company | Business Owners Policy | UBP0001425-01 |
| 45 | Erie Insurance Exchange | Package | Q392770134 |
| 46 | Palomar Specialty Insurance | Property | PAR16000001900 |
| 47 | Auto Owners Insurance | Umbrella | 49-917-790-00 |
| 48 | Auto Owners Insurance | General Liability | 142316-36917790-16 |
| 49 | The Hartford Steam Boiler | Equipment Breakdown | FBP2359120 |
| 50 | Peerless Insurance Company (Liberty Mutual) | General Liability | GL8805565 |
| 51 | Old Dominion Insurance Co | Business Owners Policy | BPG9981B |
| 52 | RockHill Insurance Co | Individual Business Owner | THB0011492-02 |
| 53 | MSA Insurance Co | Business Owners Policy | BPG1870G |
| 54 | Old Dominion Insurance Co | Business Owners Policy | BPG1864G |
| 55 | Palomar Specialty Insurance | Property | PAR16000005600 |
| 56 | Nationwide Mutual Fire Insurance Co | Business Owners Policy | Pol # ACP BPOF 2343509945 |
| 57 | Bankers Insurance Group / First Community | Business Owners Policy | 09 0004984501 9 05 |
| 58 | State Farm Fire & Casualty Co | Business Owners Policy | 99-BC-K728-4 |
| 59 | Great American | Flood | IMP 9-02-82-70-18 |
| 60 | MSA Insurance Co | Business Owners Policy | BPG8865G |
| 61 | Citizens Property Insurance Corp | Wind | CST00050869-03 |
| 62 | State Farm FL Insurance Co | Business Owners Policy | 98-68-4658-2 |
| 63 | The Doctors Company | Malpractice | 1130669 |
| 64 | The Doctors Company | Malpractice | 0967623 |
| 65 | The Doctors Company | Malpractice | 945949 |

| # | Carrier | Coverage Type | Policy # |
|---|---------|---------------|----------|
| 66 | The Doctors Company | Malpractice | 0966347 |
| 67 | The Doctors Company | Malpractice | 0943539 |
| 68 | The Doctors Company | Malpractice | 0911639 |
| 69 | The Doctors Company | Malpractice | 0911818 |
| 70 | The Doctors Company | Malpractice | 0949619 |
| 71 | Norcal Mutual | Malpractice | 721934N |
| 72 | The Doctors Company | Malpractice | 0948561 |
| 73 | Professional Security Insurance | Malpractice | ESP160000402 |
| 74 | MAG MUTUAL | Malpractice | PSL16000411801 |
| 75 | MAG MUTUAL | Malpractice | PSL 010395315 01 |
| 76 | MAG MUTUAL | Malpractice | PSL16008461501 |
| 77 | MAG MUTUAL | Malpractice | PSL161605605 |
| 78 | PROASSURANCE | Malpractice | MP59800 |
| 79 | PROASSURANCE | Malpractice | MP52127 |
| 80 | PROASSURANCE | Malpractice | MP77761 |
| 81 | MED MAL DIRECT | Malpractice | FL707794 |
| 82 | MEDICAL PROTECTIVE | Malpractice | 613537 |
| 83 | APPLIED-MEDICO LEGAL SOLUTIONS RRG, INC. | Malpractice | I-AMS-109026 |
| 84 | SCRUBS MUTUAL ASSURANCE COMPANY, RRG | Malpractice | SCRUBS-FL-08001-16 |
| 85 | The Doctors Company | Malpractice | 1058263 |
| 86 | PHYSICIANS CASUALTY RRG | Malpractice | PCX-2014-850 |
| 87 | PHYSICIANS INDEMNITY RRG | Malpractice | PIR1002010-1-16 |
| 88 | MAG Mutual | Malpractice | PSL 160327901 |
| 89 | MAG Mutual | Malpractice | PSL 160013718 |
| 90 | ProAssurance | Malpractice | Reimburse - PSA |
| 91 | ProAssurance | Malpractice | MP40405 |
| 92 | SC JUA | Malpractice | JB009629 |
| 93 | South Carolina Patients' Comp Fund | Malpractice | 85255 |
| 94 | SC JUA | Malpractice | JB017090 |
| 95 | South Carolina Patients' Comp Fund | Malpractice | 71605 |
| 96 | SC JUA | Malpractice | JB014155 |
| 97 | South Carolina Patients' Comp Fund | Malpractice | 78102 |
| 98 | SC JUA | Malpractice | JB022431 |
| 99 | South Carolina Patients' Comp Fund | Malpractice | 77846 |
| 100 | SC JUA | Malpractice | JBM03867 |
| 101 | South Carolina Patients' Comp Fund | Malpractice | 70887 |
| 102 | SC JUA | Malpractice | JB016655 |
| 103 | South Carolina Patients' Comp Fund | Malpractice | 31249 |
| 104 | SC JUA | Malpractice | JB022374 |
| 105 | South Carolina Patients' Comp Fund | Malpractice | 77787 |
| 106 | SC JUA | Malpractice | JBM03256 |
| 107 | South Carolina Patients' Comp Fund | Malpractice | 81589 |
| 108 | SC JUA | Malpractice | JBM03257 |

| # | Carrier | Coverage Type | Policy # |
|---|---------|---------------|----------|
| 109 | South Carolina Patients' Comp Fund | Malpractice | 62890 |
| 110 | SC JUA | Malpractice | JBM03255 |
| 111 | South Carolina Patients' Comp Fund | Malpractice | 79668 |
| 112 | SC JUA | Malpractice | JBM03254 |
| 113 | South Carolina Patients' Comp Fund | Malpractice | 84308 |
| 114 | SC JUA | Malpractice | JBM06706 |
| 115 | South Carolina Patients' Comp Fund | Malpractice | 5000064 |
| 116 | SC JUA | Malpractice | JBM06707 |
| 117 | South Carolina Patients' Comp Fund | Malpractice | 5000063 |
| 118 | SC JUA | Malpractice | JBM05928 |
| 119 | South Carolina Patients' Comp Fund | Malpractice | 113058 |
| 120 | SC JUA | Malpractice | JBM06141 |
| 121 | South Carolina Patients' Comp Fund | Malpractice | 4000188 |
| 122 | SC JUA | Malpractice | JBM06422 |
| 123 | South Carolina Patients' Comp Fund | Malpractice | 90194 |
| 124 | SC JUA | Malpractice | JBM06807 |
| 125 | South Carolina Patients' Comp Fund | Malpractice | 5000127 |
| 126 | SC JUA | Malpractice | JMB07055 |
| 127 | South Carolina Patients' Comp Fund | Malpractice | 5000319 |
| 128 | SC JUA | Malpractice | JMB06970 |
| 129 | South Carolina Patients' Comp Fund | Malpractice | 5000259 |
| 130 | SCJUA | Malpractice | JMB07187 |
| 131 | South Carolina Patients' Comp Fund | Malpractice | 5000422 |
| 132 | SCJUA | Malpractice | JBM07239 |
| 133 | South Carolina Patients' Comp Fund | Malpractice | 4000124 |
| 134 | SCJUA | Malpractice | JBM07218 |
| 135 | South Carolina Patients' Comp Fund | Malpractice | 5000446 |
| 136 | SCJUA | Malpractice | JBM07358 |
| 137 | South Carolina Patients' Comp Fund | Malpractice | 5000541 |
| 138 | SC JUA | Malpractice | JBM03561 |
| 139 | South Carolina Patients' Comp Fund | Malpractice | 10101 |
| 140 | MEDICAL LIABILITY MUTUAL INS CO (MLMIC) | Malpractice | NY-PZ-PO-3016913-ND |
| 141 | PHYSICIANS' RECIPROCAL INSURERS (PRI) | Malpractice | 41222-03-00 |
| 142 | MUTUAL INSURANCE COMPANY OF AZ (MICA) | Malpractice | MD0103000 |
| 143 | MUTUAL INSURANCE COMPANY OF AZ (MICA) | Malpractice | MICA007006 |
| 144 | MUTUAL INSURANCE COMPANY OF AZ (MICA) | Malpractice | MICA019037 |
| 145 | Capson Physicians Insurance Company | Malpractice | I001603 |
| 146 | MEDICAL PROTECTIVE | Malpractice | G00824 |
| 147 | MEDICAL MUTUAL | Malpractice | PS117521 |
| 148 | MEDICAL MUTUAL | Malpractice | PS118343 |

| # | Carrier | Coverage Type | Policy # |
|---|---------|---------------|----------|
| 149 | MEDICAL MUTUAL | Malpractice | PG110486 |
| 150 | MEDICAL MUTUAL | Malpractice | PS113197 |
| 151 | MEDICAL MUTUAL | Malpractice | PG116454 |
| 152 | MEDICAL MUTUAL | Malpractice | PG118353 |
| 153 | MEDICAL MUTUAL | Malpractice | PS119411 |
| 154 | MAG MUTUAL INSURANCE COMPANY | Malpractice | PSL 170218503 |
| 155 | MAG MUTUAL INSURANCE COMPANY | Malpractice | PSL 170037111 |
| 156 | MAG MUTUAL INSURANCE COMPANY | Malpractice | PSL 170117612 |
| 158 | THE DOCTORS COMPANY (TDC) | Malpractice | 004873 |
| 159 | Medical Insurance Exchange | Malpractice | DR05-00181I |
| 160 | Lone Star Alliance | Malpractice | 4-100123 |
| 161 | THE DOCTORS COMPANY (TDC) | Malpractice | 429208 |
| 162 | Medical Insurance Exchange | Malpractice | PSA-Arrangement |
| 163 | Medical Insurance Exchange | Malpractice | DR11-01176I |
| 164 | THE DOCTORS COMPANY (TDC) | Malpractice | 426899 |
| 165 | THE DOCTORS COMPANY (TDC) | Malpractice | 425520 |
| 166 | Coverys (ProSelect Insurance Co) | Malpractice | 00RI000014862 |
| 167 | Physicians Insurance | Malpractice | 300003487 |
| 168 | Aspen American Insurance Company | Malpractice | PPPAAIC01263416 |
| 169 | The Doctors Company | Malpractice | 0951187 |
| 170 | ProAssurance Casualty Company | Malpractice | MP44248 |
| 171 | The Doctors Company | Malpractice | 0955343 |
| 172 | Physicians Insurance Company | Malpractice | 131222 |
| 173 | MedMal Direct | Malpractice | FL707221 |
| 174 | MedMal Direct | Malpractice | FL707653 |
| 175 | The Doctors Company | Malpractice | 0930662 |
| 176 | The Doctors Company | Malpractice | 0066980 |
| 177 | Healthcare Underwriters Group, Inc. | Malpractice | 120-000 |
| 178 | The Doctors Company | Malpractice | 0911599 |
| 179 | Lancet Indemnity Risk Retention Group, Inc. | Malpractice | LR091111000683 |
| 180 | The Doctors Company | Malpractice | 0966058 |
| 181 | The Doctors Company | Malpractice | 0913260 |
| 182 | The Doctors Company | Malpractice | 0911783 |
| 183 | The Doctors Company | Malpractice | 1089232 |
| 184 | The Doctors Company | Malpractice | 0954411 |
| 185 | The Doctors Company | Malpractice | 0913309 |
| 186 | The Doctors Company | Malpractice | 0447282 |
| 188 | All State | Flood | 4804821811 |
| 189 | American Bankers | Flood | AB00022679 |
| 190 | Auto-Owners | Flood | 4000492696 |
| 191 | American Bankers | Flood | AB00024261 |
| 192 | National Flood | Flood | SF00287608 |
| 195 | Hartford | Flood | 870626286232017 |
| 196 | American Bankers | Flood | 65011951992016 |

| # | Carrier | Coverage Type | Policy # |
|---|---------|---------------|----------|
| 197 | American Bankers | Flood | 74057950292017 |
| 198 | American Bankers | Flood | 65008635162016 |
| 199 | American Bankers | Flood | 1011124104 |
| 200 | Wright Flood | Flood | 91150342955 |
| 201 | Wright Flood | Flood | 091150409847 05 |
| 202 | Hartford | Flood | 87029832952016 |
| 203 | Nationwide Mutual | Flood | 50503719872016 |
| 204 | Wright Flood | Flood | 9115073069305 |
| 205 | Hartford | Flood | 87050437522016 |
| 206 | Hartford | Flood | 87050438742016 |
| 207 | Hartford | Flood | 87050438362016 |
| 208 | Hartford | Flood | 87050438792016 |
| 209 | American Bankers | Flood | AB00035668 |
| 210 | American Bankers | Flood | AB00097254 |
| 211 | American Bankers | Flood | AB00034938 |
| 212 | Wright Flood | Flood | 9115128329101 |
| 213 | American Bankers | Flood | AB00038500 |
| 214 | American Bankers | Flood | AB00039029 |
| 215 | American Bankers | Flood | 60100448562016 |
| 216 | American Bankers | Flood | 60100448552016 |
| 217 | American Bankers | Flood | AB00169106 |
| 218 | Hartford | Flood | 87052978722015 |
| 219 | American Bankers | Flood | AB00169104 |
| 220 | American Bankers | Flood | AB00039028 |
| 221 | Wright Flood | Flood | 9115010191007 |
| 222 | Wright Flood | Flood | 9115010190907 |
| 223 | American Bankers | Flood | AB00042591 |
| 224 | American Bankers | Flood | AB00042676 |
| 225 | American Bankers | Flood | AB00042672 |
| 226 | American Bankers | Flood | AB00042677 |
| 227 | Homesite Insurance | Flood | 3000017287 |
| 228 | Homesite Insurance | Flood | 3000017284 |
| 229 | Homesite Insurance | Flood | 3000017296 |
| 230 | Homesite Insurance | Flood | 3000017292 |
| 231 | Hartford | Flood | 87051005382016 |
| 232 | Hartford | Flood | 87051003532016 |
| 233 | American Bankers | Flood | AB00201174 |
| 234 | American Bankers | Flood | AB00042674 |
| 235 | American Bankers | Flood | AB00201174 |
| 236 | American Bankers | Flood | AB00042675 |
| 237 | American Bankers | Flood | 1011189713 |
| 238 | American Bankers | Flood | 1011188275 |
| 239 | American Bankers | Flood | AB00042114 |
| 240 | American Bankers | Flood | AB00043980 |

| # | Carrier | Coverage Type | Policy # |
|---|---------|---------------|----------|
| 241 | American Bankers | Flood | AB00016253 |
| 242 | American Bankers | Flood | AB00131151 |
| 243 | American Bankers | Flood | 1011160459 |
| 244 | American Bankers | Flood | 60102657962016 |
| 245 | Wright Flood | Flood | 091150189519 07 |
| 246 | American Bankers | Flood | AB00021821 |
| 247 | Bankers Insurance | Property & Casualty | 90004970800609 |
| 248 | Old Dominion Insurance | Property & Casualty | BPG77524 |
| 249 | Old Dominion Insurance | Property & Casualty | IMG77524 |
| 250 | Southern-Owners Insurance | Property & Casualty | 122382-72071097-16 |
| 251 | Southern-Owners Insurance | Property & Casualty | 49-299-639-00 |
| 252 | Auto-Owners Insurance | Property & Casualty | 89-409-908-00 |
| 253 | Foremost Insurance Group | Property & Casualty | PAS26196858 |
| 254 | Old Dominion Insurance | Property & Casualty | BPG20516 |
| 255 | Bankers Insurance | Property & Casualty | 90005805996600 |
| 256 | First Community Insurance | Property & Casualty | 09000580889190 |
| 257 | The Hartford | Property & Casualty | 21SBAIG0495 |
| 258 | Seneca Specialty Insurance (PKG) | Property & Casualty | BAK-1008783-1 |
| 259 | Scottsdale Insurance (Excess) | Property & Casualty | XBS0068165 |
| 260 | Auto-Owners Insurance (GL) | Property & Casualty | 154682-72040916-15 |
| 261 | Auto-Owners Insurance (Umbrella) | Property & Casualty | 42-858-712-00 |
| 262 | Old Dominion Insurance | Property & Casualty | BPG8475B |
| 263 | Old Dominion Insurance | Property & Casualty | CUG8475B |
| 264 | MSA Insurance Company | Property & Casualty | BPG0848E |
| 265 | Allied Insurance (Nationwide Insurance) (BOP) | Property & Casualty | ACPBPOC 5964330521 |
| 266 | Weston Insurance Company (Wind) | Property & Casualty | CFA14006400209 |
| 267 | Nationwide Insurance | Property & Casualty | ACP5935414258 |
| 268 | Bankers Insurance | Property & Casualty | 90004992984903 |
| 269 | Hartford Casualty Ins Co | Property & Casualty | 65SBMZR7652 |
| 270 | First Community Insurance | Property & Casualty | 90004980605207 |
| 271 | Travelers Insurance | Property & Casualty | I6603C424403-COF-16 |
| 272 | Travelers Insurance | Property & Casualty | P-660-515D1067-COF-15 |
| 273 | Travelers Insurance | Property & Casualty | P-660-515D1067-COF-16 |
| 274 | Travelers Insurance | Property & Casualty | PSM-CUP-515D1067-TIL-15 |
| 275 | Beazley | Data Security | W140E2150301 |

**Exhibit H-3**

**Claims, Defenses, Cross-Claims and Counterclaims Related to Litigation and Potential Litigation**

| Debtor(s) | Litigation Party(ies) | Caption of Suit, Case Number and Jurisdiction (If Applicable) | Description and Nature of Proceeding |
|---|---|---|---|
| 21st Century Oncology, LLC | Alexandre M. Rosen | 21st Century Oncology, LLC v. Alexandre M. Rosen, M.D., No. 11-2017-CA-001290 (12th Judicial Dist., Collier County, Fla.) | Enforcement of Employment Agreement |
| 21st Century Oncology, LLC | B. Barckley Storey | 21st Century Oncology, LLC v. B. Barckley Storey (12th Judicial Dist., Collier County, Fla.) | Enforcement of Employment Agreement |
| 21st Century Oncology, LLC | Angelo Gousse | Angelo E. Gousse M.D. v. 21st Century Oncology, LLC, No. CACE16022806 (17th Judicial Dist., Broward County, Fla.) | Employment/Contract Dispute |
| 21st Century Oncology, LLC | British Petroleum Deepwater Horizon oil spill settlement fund | N/A | Settlement Distribution |
| 21st Century Oncology Services, LLC; 21st Century Oncology Holdings, Inc.; 21st Century Oncology Management Services, Inc.; 21st Century Oncology, Inc.; 21st Century Oncology Investments, LLC | The Charter Oak Fire Insurance Company; Travelers Property Casualty Company of America | The Charter Oak Fire Insurance Company and Travelers Property Casualty Company of America v. 21st Century Oncology Services, LLC, et al., Case No. 8:17-cv-582-MSS-AEP (M.D. Fla.) | Insurance Coverage Dispute. |
| OnCure Medical Corp.; U.S. Cancer Care, Inc. | Central Coast Medical Oncology Corp. | Central Coast Medical Oncology Corp. v. U.S. Cancer Care, Inc., et al., Adv. Pro. No. 17-08280 (Bankr. S.D.N.Y. (RDD)) | Contract Dispute |

**Exhibit H-4**

**Claims Related to Deposits, Adequate Assurance Postings, and Other Collateral Postings**

| Debtor | Third-Party | Address | Description | Amount |
|---|---|---|---|---|
| 21st Century Oncology, LLC | Broward Health | 1600 S Andrews Ave., Fort Lauderdale, FL 33316 | Lease Deposit | $77,833 |
| 21st Century Oncology, LLC | Public Health Trust of Miami Dade County | 6825 SW 87th Ave., Miami FL | Lease Deposit | $73,771 |
| 21st Century Oncology, LLC | Coconut Creek | 4848 Coconut Creek Pkwy - Coconut Creek FL | Lease Deposit | $134,520 |
| 21st Century Oncology, LLC | Palmetto | 2001 W 68th St. - Hialeah FL | Lease Deposit | $170,000 |
| 21st Century Oncology, LLC | Florida Power & Light | Various Florida Addresses | Utility Deposit | $144,689 |
| Maryland Radiation Therapy Management Services, LLC | Second Trade Center Office | 7503 Greenway Ctr Dr. - Greenbelt MD | Lease Deposit | $54,600 |
| 21st Century Oncology, LLC | Varian Medical Systems, Inc | 70140 Network Place Chicargo Il 60673-1701 | Prepayment on machine upgrade | $416,025 |
| 21st Century Oncology, LLC | Elekta, Inc. | PO BOX 404199 Atlanta Ga 30384-4199 | Prepayment on machine upgrade | $95,355 |
| 21st Century Oncology, LLC | BC Technical, Inc. | 6209 Gheens Mill Road Jeffersonville In 47130 | Prepayment on installation of CT Scanner | $57,240 |
| U.S. Cancer Car, Inc. | Accuray, Inc. | 1310 Chesapeake Terrace Sunnyvale, CA 94089 | Prepayment on machine relocation | $100,000 |
| 21st Century Oncology of Prince Georges County, Maryland, LLC | Accuray, Inc. | 1310 Chesapeake Terrace Sunnyvale, CA 94089 | Deposit on machine | $61,250 |
| North Carolina Radiation Therapy Management Services, Inc. | Accuray, Inc. | 1310 Chesapeake Terrace Sunnyvale, CA 94089 | Deposit on machine | $61,250 |

## **Exhibit I**

**Schedule of Assumed Executory Contracts and Unexpired Leases**

### Schedule of Assumed Executory Contracts and Unexpired Leases

The Debtors reserve all rights, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement, to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court.

Nothing herein shall be construed as a concession or evidence that any of the contracts or leases identified herein: (i) constitutes an "executory contract" or "unexpired lease" within the meaning of 11 U.S.C. § 365 and other applicable law; or (ii) has not expired, been terminated or otherwise currently is in full force and effect.  Rather, the Debtors expressly reserve all of their rights with respect thereto, including their right to seek a later determination of these issues and their right to dispute the validity, status, characterization or enforceability of any contracts, agreements or leases set forth herein.

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st Century Oncology, LLC | 10115 FOREST HILL LLC | Equipment Lease | 03/15/2016 | $ - |
| 21st Century Oncology, LLC | 10115 FOREST HILL, LLC/WINDROSE WELLINGTON PROPERTIES, LLC | Building and Land Lease | 03/05/2016 | $ - |
| OnCure Medical Corp. | 1101 SYLVAN AVE LLC | Building and Land Lease | 07/01/2014 | $ - |
| Berlin Radiation Therapy Treatment Center, LLC | 200 EAST VINE, LLC | Building and Land Lease | 07/03/2007 | $ - |
| California Radiation Therapy Management Services, Inc. | 21ST CENTURY ONCOLOGY - CHW, LLC | Management Services Agreement | 10/13/2008 | $ - |
| 21st Century Oncology of New Jersey, Inc. | 21ST CENTURY ONCOLOGY AND OUR LADY OF LOURDES MANAGEMENT COMPANY, LLC | Management Services Agreement | 01/30/2015 | $ - |
| California Radiation Therapy Management Services, Inc. | 21ST CENTURY ONCOLOGY OF CALIFORNIA, A MEDICAL CORPORATION | Management Services Agreement | 09/08/2006 | $ - |
| U.S. Cancer Care, Inc. | 21ST CENTURY ONCOLOGY OF CALIFORNIA, A MEDICAL CORPORATION | Management Services Agreement | 10/23/2013 | $ - |
| California Radiation Therapy Management Services, Inc. | 21ST CENTURY ONCOLOGY OF EL SEGUNDO, LLC | Management Services Agreement | 12/01/2009 | $ - |
| U.S. Cancer Care, Inc. | 21ST CENTURY ONCOLOGY, LLC | Management Services Agreement | 10/23/2013 | $ - |
| Nevada Radiation Therapy Management Services, Incorporated | 21ST CENTURY SPECIALTY PHYSICIANS (MICHAEL J. KATIN, M.D.), P.C.; MICHAEL J. KATIN, MD | Transition Agreement and Stock Pledge | 07/31/2008 | $ - |
| 21st Century Oncology, LLC | 2500 HALLANDALE BEACH, LLC | Building and Land Lease | 10/26/2007 | $ - |
| 21st Century Oncology, Inc. | 3680 BROADWAY BUILDING ASSOCIATES | Building and Land Lease | 06/01/2004 | $ - |
| 21st Century Oncology, LLC | 4030 C PROPERTY HOLDINGS, LLC | Building and Land Lease | 01/23/2012 | $ - |
| 21st Century Oncology, LLC | 507 DEL PRADO, LLC | Building and Land Lease | 06/27/2016 | $ - |
| 21st Century Oncology, LLC | 5258 LINTON, LLC | Building and Land Lease | 01/30/2016 | $ - |
| 21st Century Oncology, LLC | 600 PALMETTO, L.C. | Equipment Lease | 10/01/2013 | $ - |
| 21st Century Oncology, LLC | 600 PALMETTO, L.C. | Equipment Lease | 10/01/2013 | $ - |
| 21st Century Oncology, LLC | 7335 GLADIOLUS LLC | Building and Land Lease | 09/18/2013 | $ - |
| 21st Century Oncology | A Better Connection | Answering Service Agreement | 5/17/2013 | $ 397.18 |
| 21st Century Oncology, LLC | ABBOTT LABORATORIES INC. | Master Agreement | 03/28/2017 | $ - |
| 21st Century Oncology, LLC | ABBOTT LABORATORIES, INC. | Vendor Agreement | 03/28/2017 | $ - |
| 21st Century Oncology, LLC | ABBOTT MOLECULAR INC. | Equipment Service Program Agreement | 03/09/2017 | $ 24,595.00 |
| 21st Century Oncology, Inc. | ABBVIE US LLC | Clinic Agreement | 11/17/2014 | $ - |
| 21st Century Oncology, LLC | ABBVIE US LLC | Vendor Agreement | 07/14/2010 | $ - |
| 21st Century Oncology, LLC | ABOU-LAHOUD, GILBERT M | Employment Agreement - Physician Surgery | 10/01/2015 | $ - |
| 21st Century Oncology, Inc. | ABRAHAMY, RAN | Employment Agreement - Medical Director | 12/01/2007 | $ - |
| 21st Century Oncology, Inc. | ABRAHAMY, RAN | Employment Agreement - Physician Urology | 10/26/2007 | $ - |
| 21st Century Oncology, LLC | ABRAHAMY, RAN | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/23/2016 | $ - |
| Arizona Radiation Therapy Management Services, Inc. | ABRAZO ADVANTAGE HEALTH PLAN, INC. | Payor Agreement | 01/01/2006 | $ - |
| OnCure Medical Corp. | ABSOLUTE ONCOLOGY, LLC | Master Service Agreement | 07/29/2015 | $ - |
| Atlantic Urology Clinics, LLC | ABSOLUTE TOTAL CARE, INC. | Payor Agreement | 11/22/2008 | $ - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| Carolina Regional Cancer Center, LLC | ABSOLUTE TOTAL CARE, INC. | Payor Agreement | 01/28/2009 | $ - |
| 21st Century Oncology, LLC | ABU SHAHIN, FADI | Employment Agreement - Bonus Pool Diagnostic (Lee County) | 12/28/2009 | $ - |
| 21st Century Oncology, LLC | ABU SHAHIN, FADI | Employment Agreement - Physician GYN Oncology | 06/03/2009 | $ - |
| South Florida Radiation Oncology, LLC | ACCELETRONICS SERVICES, INC. | Service Contract | 12/20/2014 | $ - |
| 21st Century Oncology, Inc. | ACCESSONE MEDCARD, INC. | Medical Charge Account Agreement | 01/03/2017 | $ - |
| 21st Century Oncology, Inc. | ACCURAY, INC. | End User Agreement | 01/01/2015 | $ - |
| 21st Century Oncology, Inc. | ACCURAY, INC. | End User Agreement | 01/01/2016 | $ - |
| 21st Century Oncology, Inc. | ACCURAY, INC. | End User Agreement | 04/01/2015 | $ - |
| 21st Century Oncology, Inc. | ACCURAY, INC. | Service Agreement | 01/01/2015 | $ 320,341.77 |
| 21st Century Oncology, Inc. | ACCURAY, INC. | Service Agreement | 01/01/2015 | $ - |
| 21st Century Oncology, Inc. | ACCURAY, INC. | Service Agreement | 01/01/2015 | $ - |
| 21st Century Oncology, Inc. | ACCURAY, INC. | Service Agreement | 01/01/2015 | $ - |
| 21st Century Oncology, Inc. | ACCURAY, INC. | Service Agreement | 01/01/2015 | $ - |
| 21st Century Oncology, Inc. | ACCURAY, INC. | Service Agreement | 01/01/2015 | $ - |
| 21st Century Oncology, Inc. | ACCURAY, INC. | Service Agreement | 01/01/2015 | $ - |
| 21st Century Oncology, Inc. | ACCURAY, INC. | Service Agreement | 01/01/2015 | $ - |
| 21st Century Oncology, Inc. | ACCURAY, INC. | Service Agreement | 01/01/2015 | $ - |
| 21st Century Oncology, Inc. | ACCURAY, INC. | Service Agreement | 01/01/2015 | $ - |
| 21st Century Oncology, Inc. | ACCURAY, INC. | Service Agreement | 01/01/2015 | $ - |
| 21st Century Oncology, Inc. | ACCURAY, INC. | Service Agreement | 01/01/2015 | $ - |
| 21st Century Oncology, Inc. | ACCURAY, INC. | Service Agreement | 01/01/2015 | $ - |
| 21st Century Oncology, Inc. | ACCURAY, INC. | Service Agreement | 01/01/2015 | $ - |
| 21st Century Oncology, Inc. | ACCURAY, INC. | Service Agreement | 01/01/2015 | $ - |
| 21st Century Oncology, Inc. | ACCURAY, INC. | Service Agreement | 01/01/2015 | $ - |
| 21st Century Oncology, Inc. | ACCURAY, INC. | Service Agreement | 04/01/2015 | $ - |
| 21st Century Oncology, Inc. | ACCURAY, INC. | Service Quote/Volume Service Agreement | 01/01/2015 | $ - |
| 21st Century Oncology, Inc. | ACCURAY, INC. | Service Quote/Volume Service Agreement | 01/01/2015 | $ - |
| 21st Century Oncology, Inc. | ACCURAY, INC. | Volume Service Agreement | 01/01/2015 | $ - |
| 21st Century Oncology Investments, LLC | ACE AMERICAN INSURANCE COMPANY | Insurance Policy - Directors & Officers - 1st Layer, Excess | 08/01/2017 | $ - |
| 21st Century Oncology, LLC | ACE AMERICAN INSURANCE COMPANY | Insurance Policy - Storage Tank Liability | 02/15/2017 | $ - |
| 21st Century Oncology, LLC | ADI, ASHISH M | Employment Agreement - Bonus Pool Diagnostic (Lee County Pulmonologist) | 02/05/2014 | $ - |
| 21st Century Oncology, LLC | ADI, ASHISH M | Employment Agreement - Physician-Pulmonology | 02/05/2014 | $ - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st Century Oncology Holdings, Inc. | Adler Pollock & Sheehan PC | Local Counsel - Rhode Island | Engagement Letter | $ - |
| OnCure Medical Corp. | ADT LLC | Small Business Contract | 04/29/2017 | $ - |
| Atlantic Urology Clinics, LLC | ADVICARE CORP. | Payor Agreement | 05/01/2016 | $ - |
| Carolina Regional Cancer Center, LLC | ADVICARE CORP. | Payor Agreement | 06/01/2015 | $ - |
| 21st Century Oncology of Kentucky, LLC | AETNA HEALTH INC. | Payor Agreement | 04/17/1997 | $ - |
| 21st Century Oncology of Kentucky, LLC | AETNA HEALTH INC. | Payor Agreement | 11/01/2008 | $ - |
| 21st Century Oncology of New Jersey, Inc. | AETNA HEALTH INC. | Payor Agreement | 03/20/2002 | $ - |
| 21st Century Oncology Services, LLC | AETNA HEALTH INC. | Payor Agreement | 05/01/2014 | $ - |
| 21st Century Oncology, Inc. | AETNA HEALTH INC. | Payor Agreement | 04/01/2014 | $ - |
| 21st Century Oncology, LLC | AETNA HEALTH INC. | Payor Agreement | 03/15/2013 | $ - |
| Arizona Radiation Therapy Management Services, Inc. | AETNA HEALTH INC. | Payor Agreement | 04/01/2016 | $ - |
| Atlantic Urology Clinics, LLC | AETNA HEALTH INC. | Payor Agreement | 11/01/2013 | $ - |
| 21st Century Oncology, Inc. | AFIA, INC. | Master Services Agreement | 08/03/2016 | $ 47,375.00 |
| 21st Century Oncology of Jacksonville, LLC | AGALIOTIS, DIMITRIOS P | Employment Agreement - Bonus Pool Diagnostic | 09/01/2009 | $ - |
| 21st Century Oncology of Jacksonville, LLC | AGALIOTIS, DIMITRIOS P | Employment Agreement - Physician Medical Oncology | 05/01/2008 | $ - |
| 21st Century Oncology, LLC | AGALIOTIS, DIMITRIOS P | Employment Agreement - Bonus Pool Pathology Lab Addendum | 01/01/2016 | $ - |
| 21st Century Oncology, LLC | AGARWAL, ANURAG | Employment Agreement - Physician RAD Oncology | 06/07/2013 | $ - |
| 21st Century Oncology, LLC | Ahamad, Anesa W | Employment Agreement - Physician (employment ceased) | 2/28/2011 | $ - |
| 21st Century Oncology, LLC | AHMAD, IMTIAZ | Employment Agreement - Bonus Pool Diagnostic (Lee County) | 12/13/2013 | $ - |
| 21st Century Oncology, LLC | AHMAD, IMTIAZ | Employment Agreement - Physician MSP | 12/13/2013 | $ - |
| 21st Century Oncology, LLC | AIHARA, RIE | Employment Agreement - Bonus Pool Diagnostic (Lee County) | 03/23/2010 | $ - |
| 21st Century Oncology, LLC | AIHARA, RIE | Employment Agreement - Physician Surgery | 03/23/2010 | $ - |
| Michigan Radiation Therapy Management Services, Inc. | Aktina Medical Corporation | Purchase Orders | 4/11/2017 | $ 2,671.68 |
| 21st Century Oncology, LLC | ALAN PIERCE, M.D. | Amended and Restated Contract for Services Rendered (Laboratory Director) | 04/19/2017 | $ - |
| 21st Century Oncology, Inc. | ALBION STAFFING SOLUTIONS INC | Staffing Services | | $ 14,606.21 |
| Medical Developers, LLC | Alejandro Dosoretz | Employment Agreement | 9/22/2015 | $ - |
| South Florida Medicine, LLC | ALFRED BRANDON, M.D. | Professional Services Agreement | 01/01/2015 | $ - |
| Maryland Radiation Therapy Management Services, LLC | ALI REZAZADEH-TEHRANI, MD | Joint Venture Agreement | 07/13/2005 | $ - |
| U.S. Cancer Care, Inc. | ALL GUARD SECURITY SYSTEMS | Alarm System Sale & Services Agreement | 11/20/2014 | $ - |
| 21st Century Oncology, LLC | ALLCARE MEDICAL CENTERS, P.C. | Building and Land Lease | 01/01/2017 | $ - |
| 21st Century Oncology, LLC | ALLEN, BRYAN J | Employment Agreement - Physician Urology | 06/24/2015 | $ - |
| Arizona Radiation Therapy Mngt Services | Allgood, Leann C | Employment Agreement - Physician (employment ceased) | 12/1/2008 | $ - |
| OnCure Medical Corp. | ALLIANCE HEALTHCARE SERVICES, INC. D/B/A ALLIANCE HEALTHCARE RADIOLOGY | PET CT Master Services Agreement | 06/13/2016 | $ 32,131.25 |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st Century Oncology of Kentucky, LLC | ALLIANCE OF COMMUNITY HOSPICES & PALLIATIVE CARE SERVICES, INC. DBA HOSPICE & PALLIATIVE CARE OF CENTRAL KENTUCKY, DBA HOSPICE & PALLIATIVE CARE OF LOUISVILLE | Consulting Physician Agreement | 08/15/2005 | $ - |
| 21st Century Oncology, LLC | ALLSCRIPTS HEALTHCARE, LLC | Master Client Relationship Agreement | 06/19/2015 | $ - |
| 21st Century Oncology, LLC | ALLSCRIPTS HEALTHCARE, LLC | Master Client Relationship Agreement | 06/19/2015 | $ - |
| 21st Century Oncology, Inc. | ALSCO, INC. | Vendor Agreement | 09/15/2016 | $ - |
| 21st Century Oncology of Jacksonville, LLC | ALTOS SOLUTIONS, INC. | Licensing Agreement | 08/28/2013 | $ - |
| 21st Century Oncology, LLC | ALTOS SOLUTIONS, INC. | End User License Agreement | 09/12/2014 | $ - |
| Maryland Radiation Therapy Management Services, LLC | AMBERGRIS, LLC | Management Services Agreement | | $ - |
| 21st Century Oncology, LLC | America's Call Center | Answering Service Agreement | 5/1/2008 | $ 3,954.09 |
| 21st Century Oncology, Inc. | AMERICAN BANKERS | Insurance Policy - Flood | 02/03/2017 | $ - |
| 21st Century Oncology, Inc. | AMERICAN BANKERS | Insurance Policy - Flood | 02/28/2017 | $ - |
| 21st Century Oncology, Inc. | AMERICAN BANKERS | Insurance Policy - Flood | 04/24/2017 | $ - |
| 21st Century Oncology, Inc. | AMERICAN BANKERS | Insurance Policy - Flood | 05/06/2017 | $ - |
| 21st Century Oncology, Inc. | AMERICAN BANKERS | Insurance Policy - Flood | 08/10/2016 | $ - |
| 21st Century Oncology, Inc. | AMERICAN BANKERS | Insurance Policy - Flood | 08/22/2016 | $ - |
| 21st Century Oncology, Inc. | AMERICAN BANKERS | Insurance Policy - Flood | 09/01/2016 | $ - |
| 21st Century Oncology, Inc. | AMERICAN BANKERS | Insurance Policy - Flood | 09/07/2016 | $ - |
| 21st Century Oncology, Inc. | AMERICAN BANKERS | Insurance Policy - Flood | 09/07/2016 | $ - |
| 21st Century Oncology, Inc. | AMERICAN BANKERS | Insurance Policy - Flood | 09/07/2016 | $ - |
| 21st Century Oncology, Inc. | AMERICAN BANKERS | Insurance Policy - Flood | 09/08/2016 | $ - |
| 21st Century Oncology, Inc. | AMERICAN BANKERS | Insurance Policy - Flood | 09/19/2016 | $ - |
| 21st Century Oncology, Inc. | AMERICAN BANKERS | Insurance Policy - Flood | 09/23/2016 | $ - |
| 21st Century Oncology, Inc. | AMERICAN BANKERS | Insurance Policy - Flood | 10/06/2016 | $ - |
| 21st Century Oncology, Inc. | AMERICAN BANKERS | Insurance Policy - Flood | 10/13/2016 | $ - |
| 21st Century Oncology, Inc. | AMERICAN BANKERS | Insurance Policy - Flood | 10/17/2016 | $ - |
| 21st Century Oncology, Inc. | AMERICAN BANKERS | Insurance Policy - Flood | 10/17/2016 | $ - |
| 21st Century Oncology, Inc. | AMERICAN BANKERS | Insurance Policy - Flood | 10/25/2016 | $ - |
| 21st Century Oncology, Inc. | AMERICAN BANKERS | Insurance Policy - Flood | 10/25/2016 | $ - |
| 21st Century Oncology, Inc. | AMERICAN BANKERS | Insurance Policy - Flood | 10/25/2016 | $ - |
| 21st Century Oncology, Inc. | AMERICAN BANKERS | Insurance Policy - Flood | 10/31/2016 | $ - |
| 21st Century Oncology, Inc. | AMERICAN BANKERS | Insurance Policy - Flood | 11/05/2016 | $ - |
| 21st Century Oncology, Inc. | AMERICAN BANKERS | Insurance Policy - Flood | 11/13/2016 | $ - |
| 21st Century Oncology, Inc. | AMERICAN BANKERS | Insurance Policy - Flood | 12/06/2016 | $ - |
| 21st Century Oncology, Inc. | AMERICAN BANKERS | Insurance Policy - Flood | 12/14/2016 | $ - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st Century Oncology, Inc. | AMERICAN BANKERS | Insurance Policy - Flood | 12/26/2017 | $ - |
| 21st Century Oncology, LLC | AMERICAN BANKERS | Insurance Policy - Flood | 03/12/2017 | $ - |
| 21st Century Oncology, LLC | AMERICAN BANKERS | Insurance Policy - Flood | 04/07/2017 | $ - |
| 21st Century Oncology, LLC | AMERICAN BANKERS | Insurance Policy - Flood | 04/14/2017 | $ - |
| 21st Century Oncology, LLC | AMERICAN BANKERS | Insurance Policy - Flood | 09/20/2016 | $ - |
| Palms West Radiation Therapy, L.L.C. | AMERICAN BANKERS | Insurance Policy - Flood | 12/12/2016 | $ - |
| 21st Century Oncology, LLC | AMERICAN HERITAGE LIFE INSURANCE COMPANY | Employee Benefit Plan Agreement - Customer Agreement | 01/01/2017 | $ - |
| Michigan Radiation Therapy Management Services, Inc. | AMERICAN ONCOLOGIC ASSOCIATES OF MI, P.C. | Management Services Agreement | | $ - |
| Phoenix Management Company, LLC | AMERICAN ONCOLOGIC ASSOCIATES OF MI, P.C. | Management Services Agreement | 10/15/2000 | $ - |
| Michigan Radiation Therapy Management Services, Inc. | AMERICAN ONCOLOGIC ASSOCIATES OF MICHIGAN, P.C. | Equipment Lease | 10/01/2012 | $ - |
| 21st Century Oncology, Inc. | AMERICAN SOUTHERN INSURANCE COMPANY | Insurance Policy - FISO BOND-Obligee: State of FL Dept. of Insurance (DOI) | 04/23/2017 | $ - |
| 21st Century Oncology, LLC | AMERICAN SOUTHERN INSURANCE COMPANY | Insurance Policy - MEDICAID PROVIDER BOND Obligee: AHCA (21C-C21) | 02/21/2017 | $ - |
| 21st Century Oncology of New Jersey, Inc. | AMERICHOICE OF NEW JERSEY | Payor Agreement | 04/01/2014 | $ - |
| 21st Century Oncology of New Jersey, Inc. | AMERIGROUP | Payor Agreement | 02/03/2015 | $ - |
| 21st Century Oncology, Inc. | AMERIGROUP | Payor Agreement | 08/28/2008 | $ - |
| 21st Century Oncology of New Jersey, Inc. | AMERIHEALTH | Payor Agreement | 11/01/2015 | $ - |
| 21st Century Oncology, Inc. | AMERIHEALTH | Payor Agreement | 09/12/2008 | $ - |
| 21st Century Oncology, LLC | AMERITAS LIFE INSURANCE CORP. | Employee Benefit Plan Agreement - Group Eye Care Insurance | 01/01/2004 | $ - |
| 21st Century Oncology, Inc. | AMOS, WARREN RICHARD | Employment Agreement - Physician RAD Oncology | 04/01/2004 | $ - |
| 21st Century Oncology, LLC d/b/a Urology Treatment Center | Analogic Corporation | Quote - Equipment Purchase | 11/29/2016 | $ 17,255.79 |
| 21st Century Oncology, LLC | ANDREWS, PHILLIP E | Employment Agreement - Bonus Pool Pathology Lab Addendum | 01/31/2014 | $ - |
| 21st Century Oncology, LLC | ANDREWS, PHILLIP E | Employment Agreement - Physician ENT | 01/31/2014 | $ - |
| Carolina Regional Cancer Center, LLC | ANDREWS, STEPHEN F | Employment Agreement - Physician RAD Oncology | 02/01/2010 | $ - |
| 21st Century Oncology, LLC | ANFUSO, ANTHONY J | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/05/2016 | $ - |
| 21st Century Oncology, LLC | ANFUSO, ANTHONY J | Employment Agreement - Physician Otolaryngology | 03/01/2015 | $ - |
| 21st Century Oncology, LLC | ANFUSO, ANTHONY J | Employment Agreement - Physician Recruitment | 07/20/2015 | $ - |
| 21st Century Oncology, LLC | ANGEL MEDICAL CENTER, INC. | Building and Land Lease | 07/01/1998 | $ - |
| 21st Century Oncology, LLC | ANGEL MEDICAL CENTER, INC. | Building and Land Lease | 12/01/2010 | $ - |
| Arizona Radiation Therapy Mngt Services | Angeles, Janice S | Employment Agreement - Physician (employment ceased) | 6/28/2013 | $ - |
| OnCure Medical Corp. | ANIL SHARMA | Independent Contractor Agreement | 04/20/2015 | $ - |
| Arizona Radiation Therapy Management Services, Inc. | ANKENBRANDT, LEO | Employment Agreement - Physician Consulting | 04/07/2008 | $ - |
| 21st Century Oncology of Kentucky, LLC | ANTHEM BCBS | Payor Agreement | 09/01/2006 | $ - |
| Berlin Radiation Therapy Treatment Center, LLC | ANTHEM BCBS | Payor Agreement | 04/01/2005 | $ - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| Financial Services of Southwest Florida, LLC | ANTON COLMAN, MUNCH E. BACKEN, PA | Management Services Agreement | 07/08/2011 | $    - |
| 21st Century Oncology, Inc. | ANTOSEK WEINSTEIN HOLDING | Building and Land Lease | 10/26/2007 | $    - |
| 21st Century Oncology, Inc. | ANTOSEK, RICHARD B | Employment Agreement - Medical Director | 10/01/2008 | $    - |
| 21st Century Oncology, Inc. | ANTOSEK, RICHARD B | Employment Agreement - Medical Director | 12/01/2007 | $    - |
| 21st Century Oncology, LLC | ANTOSEK, RICHARD B | Employment Agreement - Bonus Pool Pathology Lab | 06/23/2009 | $    - |
| 21st Century Oncology, LLC | ANTOSEK, RICHARD B | Employment Agreement - Physician Urology | 10/26/2007 | $    - |
| North Carolina Radiation Therapy Management Services, LLC | AOR MANAGEMENT COMPANY OF VIRGINIA, LLC/TST ASHEVILLE MOB, LLC | Building and Land Lease | 02/15/2015 | $    - |
| North Carolina Radiation Therapy Management Services, LLC | AOR MANAGEMENT COMPANY OF VIRGINIA, LLC/TST ASHEVILLE MOB, LLC | Building and Land Lease | 11/06/2012 | $    - |
| U.S. Cancer Care, Inc. | ARCO'S SELF STORAGE | Rental Agreement | 01/30/2014 | $    - |
| 21st Century Oncology, LLC | ARGUELLES, ELIZABETH A | Employment Agreement - Bonus Pool CT Diagnostic | 11/13/2015 | $    - |
| 21st Century Oncology, LLC | ARGUELLES, ELIZABETH A | Employment Agreement - Bonus Pool PET/CT Diagnostic | 11/13/2015 | $    - |
| 21st Century Oncology, LLC | ARGUELLES, ELIZABETH A | Employment Agreement - Bonus Pool Subgrp Path Lab (SW FL Surgeons) | 11/13/2015 | $    - |
| 21st Century Oncology, LLC | ARGUELLES, ELIZABETH A | Employment Agreement - Physician Surgery | 11/13/2015 | $    - |
| 21st Century Oncology, LLC | ARGUELLES, RAMON FRANCISCO | Employment Agreement - Physician RAD Oncology | 12/28/2012 | $    - |
| 21st Century Oncology, LLC | ARHC AMAVTFL01, LLC/LILLIBRIDGE HEALTHCARE SERVICES, INC. | Building and Land Lease | 10/26/2007 | $    - |
| Arizona Radiation Therapy Management Services, Inc. | ARIZONA FOUNDATION FOR MEDICAL CARE | Payor Agreement | 01/01/2015 | $    - |
| Arizona Radiation Therapy Management Services, Inc. | ARIZONA FOUNDATION FOR MEDICAL CARE | Payor Agreement | 04/24/2014 | $    - |
| Arizona Radiation Therapy Management Services, Inc. | ARIZONA FOUNDATION FOR MEDICAL CARE | Payor Agreement | 07/15/2003 | $    - |
| Arizona Radiation Therapy Management Services, Inc. | ARIZONA FOUNDATION FOR MEDICAL CARE | Payor Agreement | 07/15/2013 | $    - |
| Arizona Radiation Therapy Management Services, Inc. | ARIZONA FOUNDATION FOR MEDICAL CARE | Payor Agreement | 07/15/2014 | $    - |
| Arizona Radiation Therapy Management Services, Inc. | ARIZONA INTEGRATED PHYSICIANS, INC. | Payor Agreement | 01/01/2009 | $    - |
| U.S. Cancer Care, Inc. | ARMC CALMED INVESTMENT, LP | Building and Land Lease | 09/16/2005 | $    - |
| 21st Century Oncology, LLC | ARMOR CORRECTIONAL | Payor Agreement | 10/01/2015 | $    - |
| 21st Century Oncology Holdings, Inc. | Arnold & Porter Kaye Scholer LLP | Government Relations - non-legal | 11/15/2016 | $    - |
| Maryland Radiation Therapy Management Services, LLC | ARNOLD J. WILLIS, MD | Joint Venture Agreement | 07/13/2005 | $    - |
| 21st Century Oncology, LLC | ARVIND SHARMA, M.D. | Building and Land Lease | 07/01/2010 | $    - |
| 21st Century Oncology, Inc. f/k/a Radiation Therapy Services, Inc. | AT&T Corp | Service Agreement No. 954 N22-0042 042 | 6/3/2014 | $    - |
| Atlantic Urology Clinics, LLC | ATLANTIC MOUNTAIN, LLC | Building and Land Lease | 05/01/2010 | $    - |
| North Carolina Radiation Therapy Management Services, LLC | AUA HOLDING COMPANY, LLC | Building and Land Lease | 10/14/2011 | $    - |
| 21st Century Oncology, LLC | AUGUSTO E. TIRADO, M.D., P.A. | Equipment Lease | 03/26/2017 | $    - |
| 21st Century Oncology, LLC | Austin, Jean Philippe | Employment Agreement - Physician (employment ceased) | 6/6/2011 | $    - |
| 21st Century Oncology, Inc. | AUTO-OWNERS INSURANCE | Insurance Policy - Property & Casualty | 12/17/2016 | $    - |
| Devoto Construction of Southwest Florida, Inc. | AUTO-OWNERS INSURANCE | Insurance Policy - Umbrella | 12/01/2016 | $    - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st  Century Oncology, LLC | Avallone, Anthony N | Employment Agreement - Physician (employment ceased) | 2/2/2015 | $                    - |
| 21st Century Oncology, Inc. | AVALON DUNCAN | Patient Navigator Services Agreement | 11/01/2015 | $                    - |
| 21st Century Oncology, LLC | AVMED | Payor Agreement | 11/01/2014 | $                    - |
| 21st  Century Oncology of Kentucky, LLC | Baas, William | Employment Agreement - Physician (employment ceased) | 12/22/2008 | $                    - |
| 21st Century Oncology, LLC | BABBIN, BRIAN A | Employment Agreement - Physician Pathology | 07/15/2014 | $                    - |
| 21st Century Oncology, LLC | BAGAN SURGICAL ASSOCIATES REALTY , LLC | Building and Land Lease | 12/05/2013 | $                    - |
| 21st Century Oncology, LLC | BAGAN, MATTHEW R | Employment Agreement - Bonus Pool Pathology Lab Addendum | 01/01/2016 | $                    - |
| 21st Century Oncology, LLC | BAGAN, MATTHEW R | Employment Agreement - Bonus Pool Subgrp Pathology Lab (SW FL Surgeons) | 12/01/2013 | $                    - |
| 21st Century Oncology, LLC | BAGAN, MATTHEW R | Employment Agreement - Physician Surgery | 12/05/2013 | $                    - |
| 21st Century Oncology Holdings, Inc. | Baker Hostetler | Data Breach Representation | 12/5/2015 | $                    - |
| 21st Century Oncology, LLC | BALANDRA, ARTURO | Employment Agreement - Bonus Pool Diagnostic CT | 10/01/2013 | $                    - |
| 21st Century Oncology, LLC | BALANDRA, ARTURO | Employment Agreement - Bonus Pool Diagnostic Pathology Lab Bonus Pool No 2 | 11/01/2011 | $                    - |
| 21st Century Oncology, LLC | BALANDRA, ARTURO | Employment Agreement - Bonus Pool Diagnostic Pathology Lab Bonus Pool No 3 | 02/25/2015 | $                    - |
| 21st Century Oncology, LLC | BALANDRA, ARTURO | Employment Agreement - Bonus Pool Diagnostic PET/CT | 10/01/2013 | $                    - |
| 21st Century Oncology, LLC | BALANDRA, ARTURO | Employment Agreement - Physician Urology | 11/10/2010 | $                    - |
| Arizona Radiation Therapy Management Services, Inc. | BANS, LARRY L | Employment Agreement - Physician Urology | 12/28/2012 | $                    - |
| 21st Century Oncology, Inc. | BARDEN, ROBERT E | Employment Agreement - Physician GYN Oncology | 06/16/2008 | $                    - |
| 21st Century Oncology of Kentucky, LLC | BARR, JAMES M | Employment Agreement - Physician Consulting | 10/01/2011 | $                    - |
| 21st Century Oncology, LLC | BARRON-WHITE, INC. | Building and Land Lease | 10/01/2010 | $                    - |
| 21st Century Oncology, LLC | BARROW, HOWARD N | Employment Agreement - Bonus Pool Pathology Lab Addendum | 01/01/2016 | $                    - |
| 21st Century Oncology, LLC | BARROW, HOWARD N | Employment Agreement - Physician ENT | 01/31/2014 | $                    - |
| 21st Century Oncology, Inc. | BARZELL, WINSTON E | Employment Agreement - Bonus Pool Pathology Lab Addendum | 01/01/2016 | $                    - |
| 21st Century Oncology, Inc. | BARZELL, WINSTON E | Employment Agreement - Physician Urology | 03/01/2007 | $                    - |
| 21st Century Oncology, LLC | BASHEIN, HAL J | Employment Agreement - Physician Urology | 10/14/2010 | $                    - |
| 21st Century Oncology, LLC | BASIL D. FOSSUM AND CHRISTINE H. AUFDERHEIDE-FOSSUM | Building and Land Lease | 09/19/2011 | $                    - |
| 21st Century Oncology, Inc. | BASWARE INC. | Sales Agreement | 04/01/2017 | $                    - |
| 21st Century Oncology, Inc. | BASWARE INC. | Services Agreement | 04/01/2017 | $          16,824.50 |
| 21st  Century Oncology, LLC | Battaglia, Frank | Employment Agreement - Physician (employment ceased) | 11/11/1997 | $                    - |
| Arizona Radiation Therapy Management Services, Inc. | BAUER, ANDERSON A | Employment Agreement - Physician RAD Oncology | 02/23/2015 | $                    - |
| 21st Century Oncology, Inc. | BC TECHNICAL INC. | Master Service Agreement | 04/01/2017 | $        335,595.09 |
| 21st Century Oncology of Jacksonville, LLC | BC TECHNICAL, INC. | Equipment Lease | 07/26/2012 | $                    - |
| 21st Century Oncology, LLC | BC TECHNICAL, INC. | Full Service Agreement | 01/01/2016 | $                    - |
| 21st Century Oncology, LLC | BC TECHNICAL, INC. | Full Service Agreement | 01/01/2016 | $                    - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st Century Oncology, Inc. d/b/a Financial Services of Southwest Florida Inc. | BCA FINANCIAL SERVICES INC | Collections services | 6/22/2010 | $ 19,065.79 |
| 21st Century Oncology, LLC | BCBS HEALTH OPTIONS | Payor Agreement | 04/15/2010 | $ - |
| 21st Century Oncology, LLC | BCBS HEALTH OPTIONS | Payor Agreement | 05/20/2009 | $ - |
| 21st Century Oncology, LLC | BCBS HEALTH OPTIONS | Payor Agreement | 05/20/2012 | $ - |
| 21st Century Oncology, LLC | BCBS HEALTH OPTIONS | Payor Agreement | 06/01/2009 | $ - |
| 21st Century Oncology, LLC | BCBS OF FLORIDA | Payor Agreement | 04/15/2010 | $ - |
| 21st Century Oncology, LLC | BCBS OF FLORIDA | Payor Agreement | 05/20/2009 | $ - |
| 21st Century Oncology, LLC | BCBS OF FLORIDA | Payor Agreement | 05/20/2009 | $ - |
| 21st Century Oncology, LLC | BCBS OF FLORIDA | Payor Agreement | 06/01/2009 | $ - |
| 21st Century Oncology Services, LLC | BCBS OF RI | Payor Agreement | 03/12/2016 | $ - |
| 21st Century Oncology Services, LLC | BCBS OF RI | Payor Agreement | 12/03/2013 | $ - |
| 21st Century Oncology, LLC | BECKER, EDWARD R | Employment Agreement - Physician Urology | 12/01/2009 | $ - |
| Atlantic Urology Clinics, LLC | BECKMAN COULTER, INC. | Vendor Agreement | 05/31/2017 | $ - |
| 21st Century Oncology, LLC | BEEKLEY CORPORATION | Vendor Agreement | 05/01/2009 | $ - |
| 21st Century Oncology, Inc. | BEEKLEY CORPORATION | Financial Services |  | $ 15,171.95 |
| 21st  Century Oncology, LLC | Beg, Rasha N | Employment Agreement - Physician (employment ceased) | 10/21/2013 | $ - |
| 21st Century Oncology, LLC | BEHAIRY, AHMED S | Employment Agreement - Physician Medical Oncology | 12/12/2016 | $ - |
| 21st Century Oncology, LLC | BEJANY, DARWICH L | Employment Agreement - Physician Urology | 03/16/2012 | $ - |
| 21st  Century Oncology, LLC | Belcastro, Vincent J | Employment Agreement - Physician (employment ceased) | 2/1/2007 | $ - |
| 21st  Century Oncology, LLC | Benitez, Omar | Employment Agreement - Physician (employment ceased) | 7/15/1999 | $ - |
| 21st Century Oncology, LLC | BENJAMIN TRIPP, M.D, P.A./FLA-PALM COURT, LP | Building and Land Lease | 01/30/2015 | $ - |
| 21st Century Oncology, Inc. | BERGER, GARY L | Employment Agreement - Medical Director | 12/01/2007 | $ - |
| 21st Century Oncology, Inc. | BERGER, GARY L | Employment Agreement - Physician Urology | 11/03/2006 | $ - |
| 21st Century Oncology, LLC | BERGER, GARY L | Employment Agreement - Bonus Pool Pathology Lab (Charlotte & Sarasota Co, Port Charlotte, Sarasota Venice Subgrp) | 08/17/2009 | $ - |
| 21st Century Oncology, LLC | BERGER, GARY L | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/24/2016 | $ - |
| 21st Century Oncology, LLC | BERGER, GARY L | Employment Agreement - Bonus Pool Subgrp Urology Pathology Lab (Charlotte County) | 01/01/2013 | $ - |
| 21st  Century Oncology, LLC | Bergman, Stuart M | Employment Agreement - Physician (employment ceased) | 5/25/2013 | $ - |
| 21st Century Oncology, LLC | BEST CHOICE PLUS | Payor Agreement | 12/01/2011 | $ - |
| 21st Century Oncology, LLC | BEST CHOICE PLUS | Payor Agreement | 12/01/2011 | $ - |
| 21st Century Oncology, LLC | BEST CHOICE PLUS | Payor Agreement | 12/01/2011 | $ - |
| 21st Century Oncology, LLC | BEST CHOICE PLUS | Payor Agreement | 12/01/2011 | $ - |
| 21st Century Oncology, LLC | BEST CHOICE PLUS | Payor Agreement | 12/01/2011 | $ - |
| 21st Century Oncology, LLC | BEST CHOICE PLUS | Payor Agreement | 12/01/2011 | $ - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st Century Oncology, LLC | BETHESDA HOSPITAL, INC. | Assignment and Assumption Agreement Radiation Oncology Services Agreement | | $ - |
| Arizona Radiation Therapy Management Services, Inc. | BHATNAGAR, AJAY | Employment Agreement - Physician | 10/15/2009 | $ - |
| 21st Century Oncology, LLC | Bianco, Fernando J | Employment Agreement - Physician (employment ceased) | 12/28/2015 | $ - |
| 21st Century Oncology, LLC | BIG IRON MEDICAL IMAGING, LLC | Maintenance Agreement | 05/01/2017 | $ - |
| 21st Century Oncology, LLC | BILIK JR, ALFRED JOSEPH | Employment Agreement - Bonus Pool Pathology Lab Addendum | 01/01/2016 | $ - |
| 21st Century Oncology, LLC | BILIK JR, ALFRED JOSEPH | Employment Agreement - Physician Urology | 03/30/2012 | $ - |
| 21st Century Oncology, LLC | BIOVIEW INC. | Service Agreement | 12/03/2016 | $ - |
| 21st Century Oncology, LLC | BIRDS EYE HEALTHCARE, LLC | Vendor Agreement | 12/01/2016 | $ - |
| 21st Century Oncology, LLC | BIRD'S EYE HEALTHCARE, LLC | Software Terms of Service Agreement | 12/01/2016 | $ - |
| 21st Century Oncology, Inc. | BITGLASS, INC. | Subscription Agreement | 12/30/2016 | $ - |
| 21st Century Oncology, LLC | BLACK, LAWRENCE R | Employment Agreement - Bonus Pool Diagnostic (Lee County) | 04/01/2013 | $ - |
| 21st Century Oncology, LLC | BLACK, LAWRENCE R | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/15/2016 | $ - |
| 21st Century Oncology, LLC | BLACK, LAWRENCE R | Employment Agreement - Physician Surgery | 04/01/2013 | $ - |
| 21st Century Oncology, Inc. | BLACKWELL, LEA M | Employment Agreement - Physician Surgery | 06/20/2008 | $ - |
| 21st Century Oncology, LLC | BLACKWELL, LEA M | Employment Agreement - Bonus Pool Diagnostic (Lee County) | 12/01/2009 | $ - |
| 21st Century Oncology Management Services, Inc. | BLITZ, BARRY F | Employment Agreement - Independent Contractor | 07/01/2007 | $ - |
| 21st Century Oncology, Inc. | BLITZ, BARRY F | Employment Agreement - Medical Director | 12/01/2007 | $ - |
| 21st Century Oncology, Inc. | BLITZ, BARRY F | Employment Agreement - Physician Urology | 12/14/2006 | $ - |
| 21st Century Oncology, LLC | BLITZ, BARRY F | Employment Agreement - Bonus Pool Diagnostic (Lee County) | 09/01/2011 | $ - |
| 21st Century Oncology, LLC | BLITZ, BARRY F | Employment Agreement - Bonus Pool Pathology Lab Addendum | 04/18/2016 | $ - |
| 21st Century Oncology, LLC | BLOOMSTON, PAUL M | Employment Agreement - Bonus Pool Diagnostic (Lee County) | 05/20/2015 | $ - |
| 21st Century Oncology, LLC | BLOOMSTON, PAUL M | Employment Agreement - Bonus Pool Pathology Lab Addendum | 01/01/2016 | $ - |
| 21st Century Oncology, LLC | BLOOMSTON, PAUL M | Employment Agreement - Physician Surgical Oncology | 05/20/2015 | $ - |
| Atlantic Urology Clinics, LLC | BLUE CHOICE | Payor Agreement | 01/01/2016 | $ - |
| Atlantic Urology Clinics, LLC | BLUE CHOICE | Payor Agreement | 10/06/2009 | $ - |
| Atlantic Urology Clinics, LLC | BLUE CHOICE | Payor Agreement | 12/26/2006 | $ - |
| Carolina Regional Cancer Center, LLC | BLUE CHOICE | Payor Agreement | 05/03/2010 | $ - |
| Carolina Regional Cancer Center, LLC | BLUE CHOICE | Payor Agreement | 06/02/2010 | $ - |
| Atlantic Urology Clinics, LLC | BLUE CROSS AND BLUE SHIELD NC | Payor Agreement | 07/01/2016 | $ - |
| Atlantic Urology Clinics, LLC | BLUE CROSS AND BLUE SHIELD NC | Payor Agreement | 10/30/2013 | $ - |
| 21st Century Oncology of Alabama, LLC | BLUE CROSS AND BLUE SHIELD OF ALABAMA | Payor Agreement | 01/01/2008 | $ - |
| Arizona Radiation Therapy Management Services, Inc. | BLUE CROSS AND BLUE SHIELD OF ARIZONA | Payor Agreement | 03/01/2015 | $ - |
| Arizona Radiation Therapy Management Services, Inc. | BLUE CROSS AND BLUE SHIELD OF ARIZONA | Payor Agreement | 10/15/2016 | $ - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| Arizona Radiation Therapy Management Services, Inc. | BLUE CROSS AND BLUE SHIELD OF ARIZONA, INC. | Payor Agreement | 01/15/2016 | $ - |
| Arizona Radiation Therapy Management Services, Inc. | BLUE CROSS AND BLUE SHIELD OF ARIZONA, INC. | Payor Agreement | 04/01/2001 | $ - |
| Arizona Radiation Therapy Management Services, Inc. | BLUE CROSS AND BLUE SHIELD OF ARIZONA, INC. | Payor Agreement | 04/01/2014 | $ - |
| Arizona Radiation Therapy Management Services, Inc. | BLUE CROSS AND BLUE SHIELD OF ARIZONA, INC. | Payor Agreement | 07/01/2008 | $ - |
| Arizona Radiation Therapy Management Services, Inc. | BLUE CROSS AND BLUE SHIELD OF ARIZONA, INC. | Payor Agreement | 11/15/2013 | $ - |
| Arizona Radiation Therapy Management Services, Inc. | BLUE CROSS AND BLUE SHIELD OF ARIZONA, INC. | Payor Agreement | 12/01/2007 | $ - |
| Arizona Radiation Therapy Management Services, Inc. | BLUE CROSS AND BLUE SHIELD OF ARIZONA, INC. | Payor Agreement | 12/01/2015 | $ - |
| Atlantic Urology Clinics, LLC | BLUE CROSS AND BLUE SHIELD OF SOUTH CAROLINA | Payor Agreement | 01/01/2015 | $ - |
| Atlantic Urology Clinics, LLC | BLUE CROSS AND BLUE SHIELD OF SOUTH CAROLINA | Payor Agreement | 01/09/2013 | $ - |
| Atlantic Urology Clinics, LLC | BLUE CROSS AND BLUE SHIELD OF SOUTH CAROLINA | Payor Agreement | 01/31/2013 | $ - |
| Atlantic Urology Clinics, LLC | BLUE CROSS AND BLUE SHIELD OF SOUTH CAROLINA | Payor Agreement | 02/27/2012 | $ - |
| Atlantic Urology Clinics, LLC | BLUE CROSS AND BLUE SHIELD OF SOUTH CAROLINA | Payor Agreement | 04/30/2015 | $ - |
| Atlantic Urology Clinics, LLC | BLUE CROSS AND BLUE SHIELD OF SOUTH CAROLINA | Payor Agreement | 07/13/2015 | $ - |
| Atlantic Urology Clinics, LLC | BLUE CROSS AND BLUE SHIELD OF SOUTH CAROLINA | Payor Agreement | 09/16/2014 | $ - |
| Atlantic Urology Clinics, LLC | BLUE CROSS AND BLUE SHIELD OF SOUTH CAROLINA | Payor Agreement | 09/28/2012 | $ - |
| Atlantic Urology Clinics, LLC | BLUE CROSS AND BLUE SHIELD OF SOUTH CAROLINA | Payor Agreement | 10/16/2012 | $ - |
| Atlantic Urology Clinics, LLC | BLUE CROSS AND BLUE SHIELD OF SOUTH CAROLINA | Payor Agreement | 11/12/2012 | $ - |
| Atlantic Urology Clinics, LLC | BLUE CROSS AND BLUE SHIELD OF SOUTH CAROLINA | Payor Agreement | 12/12/2012 | $ - |
| Atlantic Urology Clinics, LLC | BLUE CROSS AND BLUE SHIELD OF SOUTH CAROLINA | Payor Agreement | 12/19/2012 | $ - |
| Atlantic Urology Clinics, LLC | BLUE CROSS AND BLUE SHIELD OF SOUTH CAROLINA | Payor Agreement | 12/19/2012 | $ - |
| Atlantic Urology Clinics, LLC | BLUE CROSS AND BLUE SHIELD OF SOUTH CAROLINA | Payor Agreement | 12/19/2012 | $ - |
| Atlantic Urology Clinics, LLC | BLUE CROSS AND BLUE SHIELD OF SOUTH CAROLINA | Payor Agreement | 12/19/2012 | $ - |
| Atlantic Urology Clinics, LLC | BLUE CROSS AND BLUE SHIELD OF SOUTH CAROLINA | Payor Agreement | 12/19/2012 | $ - |
| Atlantic Urology Clinics, LLC | BLUE CROSS AND BLUE SHIELD OF SOUTH CAROLINA | Payor Agreement | 12/19/2012 | $ - |
| Atlantic Urology Clinics, LLC | BLUE CROSS AND BLUE SHIELD OF SOUTH CAROLINA | Payor Agreement | 12/19/2012 | $ - |
| Carolina Regional Cancer Center, LLC | BLUE CROSS AND BLUE SHIELD OF SOUTH CAROLINA | Payor Agreement | 09/09/2011 | $ - |
| Carolina Regional Cancer Center, LLC | BLUE CROSS AND BLUE SHIELD OF SOUTH CAROLINA | Payor Agreement | 09/10/2012 | $ - |
| Carolina Regional Cancer Center, LLC | BLUE CROSS AND BLUE SHIELD OF SOUTH CAROLINA | Payor Agreement | 09/16/2014 | $ - |
| Carolina Regional Cancer Center, LLC | BLUE CROSS AND BLUE SHIELD OF SOUTH CAROLINA | Payor Agreement | 10/15/2010 | $ - |
| 21st Century Oncology of Kentucky, LLC | BLUEGRASS REGIONAL CANCER CENTER, LLP | Professional Services |  | $ - |
| 21st Century Oncology, Inc. | BOCA R&D PROJECT 7, LLC | Building and Land Lease | 09/08/1999 | $ - |
| 21st Century Oncology Services, LLC | Boechler, David | Employment Agreement - Physician (employment ceased) | 12/22/2008 | $ - |
| Atlantic Urology Clinics, LLC | Bogache, William K | Employment Agreement - Physician (employment ceased) | 1/1/2007 | $ - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st  Century Oncology, LLC | Boggs, Charles C | Employment Agreement - Physician (employment ceased) | 10/1/2008 | $                    - |
| 21st Century Oncology, LLC | BOHRER, MINDY S | Employment Agreement - Physician Medical Oncology | 07/01/2013 | $                    - |
| 21st Century Oncology, Inc. | BOINIS ASSOCIATES, LTD | Building and Land Lease | 08/26/1994 | $                    - |
| 21st Century Oncology, LLC | BON SECOURS VENICE HEALTHCARE CORPORATION | Radiation Therapy Service Agreement | 08/01/2004 | $                    - |
| 21st Century Oncology, LLC | BONAFIDE BUSINESS ASSOCIATES, INC. | Building and Land Lease | 08/01/2014 | $                    - |
| 21st Century Oncology, LLC | BONITA COMMUNITY HEALTH CENTER | Building and Land Lease | 02/01/2011 | $                    - |
| 21st Century Oncology, LLC | BONITA COMMUNITY HEALTH CENTER | Building and Land Lease | 03/01/2016 | $                    - |
| 21st Century Oncology, Inc. | BORDEN, JAMES D | Employment Agreement - Physician Urology | 12/12/2005 | $                    - |
| 21st Century Oncology, LLC | BORDEN, JAMES D | Employment Agreement - Bonus Pool Diagnostic (Lee County) | 09/01/2011 | $                    - |
| 21st Century Oncology, LLC | BORDEN, JAMES D | Employment Agreement - Bonus Pool Pathology Lab Addendum | 01/01/2016 | $                    - |
| 21st Century Oncology, LLC | BORDEN, JAMES D | Employment Agreement - On Call Coverage (Lee Memorial) | 04/01/2015 | $                    - |
| 21st Century Oncology, LLC | BORDEN, JAMES/LEE MEMORIAL HEALTH SYSTEM | Letter of Agreement re: LMHS On-Call Coverage Subsidy Arrangements | 04/01/2015 | $                    - |
| 21st Century Oncology, LLC | BR METRO, LLC | Building and Land Lease | 03/01/2007 | $                    - |
| 21st Century Oncology of Kentucky, LLC | BRADFORD SQUARE NURSING, LLC DBA BRADFORD SQUARE CARE AND REHABILITATION CENTER | Radiation Therapy Service Agreement | 01/01/2011 | $                    - |
| 21st  Century Oncology, LLC | Brafman, Aaron F | Employment Agreement - Physician | 8/1/2017 | $                    - |
| 21st Century Oncology, Inc. | BREGG, KENNETH J | Employment Agreement - Physician Urology | 03/01/2007 | $                    - |
| 21st Century Oncology, LLC | BREGG, KENNETH J | Employment Agreement - Bonus Pool Pathology Lab Addendum | 01/01/2016 | $                    - |
| 21st Century Oncology, Inc. | BRETTON, PAUL R | Employment Agreement - Medical Director | 12/01/2007 | $                    - |
| 21st Century Oncology, Inc. | BRETTON, PAUL R | Employment Agreement - On Call Coverage (Lee Memorial) | 04/01/2015 | $                    - |
| 21st Century Oncology, Inc. | BRETTON, PAUL R | Employment Agreement - Physician Urology | 12/12/2005 | $                    - |
| 21st Century Oncology, LLC | BRETTON, PAUL R | Employment Agreement - Bonus Pool Diagnostic (Lee County) | 09/01/2011 | $                    - |
| 21st Century Oncology, LLC | BRETTON, PAUL R | Employment Agreement - Bonus Pool Pathology Lab Addendum | 01/01/2016 | $                    - |
| 21st Century Oncology, LLC | BRETTON, PAUL/LEE MEMORIAL HEALTH SYSTEM | Letter of Agreement re: LMHS On-Call Coverage Subsidy Arrangements | 04/01/2015 | $                    - |
| North Carolina Radiation Therapy Management Services, LLC | BREVARD CANCER CENTER, LLC | Building and Land Lease | 08/01/2011 | $                    - |
| 21st Century Oncology, LLC | BRIGHTHOUSE NETWORKS, LLC | Installation and Access Agreement | 03/25/2016 | $                    - |
| 21st Century Oncology, LLC | BRITO, ROGELIO A | Employment Agreement - Physician Medical Oncology | 07/01/2013 | $                    - |
| 21st Century Oncology Holdings, Inc. | Broad and Cassell, LLP | Litigation counsel | 6/28/2017 | $                    - |
| 21st Century Oncology, Inc. | BROWN JR, ALAN L | Employment Agreement - Physician RAD Oncology | 04/03/2006 | $                    - |
| 21st Century Oncology, LLC | BROWN JR, ALAN L | Employment Agreement - Bonus Pool Diagnostic (Lee County) | 01/08/2010 | $                    - |
| 21st Century Oncology, LLC | BROWN JR, ALAN L | Employment Agreement - Bonus Pool Pathology Lab Addendum | 01/01/2016 | $                    - |
| 21st Century Oncology, LLC d/b/a Southwest Florida Urologic Associates | Buckingham Palace II, Inc. | Yearly Floor Care Service Agreement | 1/1/2017 | $                    - |
| 21st Century Oncology of New Jersey, Inc. | BURLINGTON WOODS CONVALESCENT CENTER, INC. | Radiation Therapy Service Agreement | 01/01/2011 | $                    - |
| 21st Century Oncology, LLC | BURNS, JOHN R | Employment Agreement - Physician Consulting | 11/05/2013 | $                    - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st Century Oncology, LLC | BUSHKIN, FREDERIC L | Employment Agreement - Physician Surgery | 07/01/2013 | $ - |
| 21st Century Oncology, LLC | BYRNE, ALEXANDER JAMES | Employment Agreement - Physician Covering | 01/01/2011 | $ - |
| Atlantic Urology Clinics, LLC | C&F LEASING | Building and Land Lease | 05/03/2010 | $ - |
| 21st Century Oncology, LLC | CAESAR, SCOTT R | Employment Agreement - Bonus Pool Urology Subgrp Pathology Lab (Lee Collier) | 01/01/2015 | $ - |
| 21st Century Oncology, LLC | CAESAR, SCOTT R | Employment Agreement - Physician Urology | 10/01/2013 | $ - |
| 21st Century Oncology, LLC d/b/a South Florida Regional Breast Care | Call 4 Health | Call Center Agreement | 5/2/2015 | $ 4,201.53 |
| 21st Century Oncology, LLC | Callstar | Service Agreement | 3/22/2000 | $ 1,074.24 |
| 21st Century Oncology, LLC | Cancer CarePoint, Inc. | Locum Tenens Coverage Agreement | 11/19/2013 | $ - |
| Arizona Radiation Therapy Management Services, Inc. | CANCER TREATMENT SERVICES INTERNATIONAL – ARIZONA, LLC; REGIONAL HEALTHCARE VENTURES, INC. | Joint Venture Agreement | 07/01/2013 | $ - |
| 21st Century Oncology of New Jersey, Inc. | CANCERCARE OF SOUTHERN NEW JERSEY, P.C. | Management Services Agreement | 07/13/2013 | $ - |
| 21st Century Oncology of New Jersey, Inc. | CANCERCARE OF SOUTHERN NEW JERSEY, P.C.; MICHAEL J. KATIN, MD | Transition Agreement and Stock Pledge | 05/14/2013 | $ - |
| 21st Century Oncology, LLC | CAPE CORAL MEDICAL AND SURGICAL SUITES, LLC | Building and Land Lease | 04/04/2005 | $ - |
| 21st Century Oncology, LLC | CAPE CORAL MEDICAL AND SURGICAL SUITES, LLC | Building and Land Lease | 09/01/2015 | $ - |
| 21st Century Oncology, LLC | CAPE CORAL MEDICAL AND SURGICAL SUITES, LLC | Building and Land Lease | 10/01/2014 | $ - |
| 21st Century Oncology, LLC | CAPE CORAL MEDICAL BUILDING, LLC | Building and Land Lease | 02/01/2007 | $ - |
| 21st Century Oncology, Inc. | CAPE CORAL MEDICAL INVESTORS LC STORE-FL, LLC | Building and Land Lease | 12/14/2006 | $ - |
| 21st Century Oncology, LLC | CAPITAL STRATEGIES, INC. | Agreement for Services | 01/03/2005 | $ - |
| 21st Century Oncology of Alabama, LLC | CAPX FUND IV, L.P. | Equipment Lease | 12/06/2013 | $ - |
| 21st Century Oncology, LLC | CAPX FUND IV, L.P. | Equipment Lease | 12/06/2013 | $ - |
| 21st Century Oncology, LLC | CAPX FUND IV, L.P. | Equipment Lease | 12/06/2013 | $ - |
| California Radiation Therapy Management Services, Inc. | CAPX FUND IV, L.P. | Equipment Lease | 12/06/2013 | $ - |
| Nevada Radiation Therapy Management Services, Incorporated | CAPX FUND IV, L.P. | Equipment Lease | 12/06/2013 | $ - |
| 21st Century Oncology, LLC | CAPX FUND IV, L.P. | Equipment Lease | 12/06/2013 | $ - |
| New York Radiation Therapy Management Services, LLC | CAPX FUND IV, L.P. | Equipment Lease | 12/06/2013 | $ - |
| 21st Century Oncology, Inc. | CARBON BLACK, INC. | Cloud Services Agreement | 03/17/2016 | $ - |
| South Florida Medicine, LLC | Care Cloud | View Only Access Monthly | 5/19/2017 | $ - |
| 21st Century Oncology, LLC | CARE RESOURCE | Payor Agreement | 06/01/2016 | $ - |
| Arizona Radiation Therapy Management Services, Inc. | CARE1ST HEALTH PLAN ARIZONA, INC. | Payor Agreement | 07/01/2009 | $ - |
| Arizona Radiation Therapy Management Services, Inc. | CARE1ST HEALTH PLAN ARIZONA, INC. | Payor Agreement | 07/01/2009 | $ - |
| South Florida Medicine, LLC | CARECLOUD CORPORATION | Service Agreement | 03/30/2010 | $ 4,000.00 |
| 21st Century Oncology, Inc. | CAREFIRST BCBS | Payor Agreement | 12/01/2012 | $ - |
| 21st Century Oncology, Inc. | CAREFIRST BLUE CHOICE | Payor Agreement | 12/01/2012 | $ - |
| 21st Century Oncology, LLC | CAREPLUS | Payor Agreement | 01/01/2003 | $ - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st Century Oncology, LLC | CAREPLUS | Payor Agreement | 11/01/2013 | $ - |
| 21st Century Oncology, LLC | CAREPLUS HEALTH PLANS, INC. | Payor Agreement | 10/01/2010 | $ - |
| 21st Century Oncology, Inc. | CAREY, ROBERT I | Employment Agreement - Physician Urology | 03/01/2007 | $ - |
| 21st Century Oncology, LLC | CAREY, ROBERT I | Employment Agreement - Bonus Pool Pathology Lab Addendum | 01/01/2016 | $ - |
| 21st Century Oncology of Kentucky, LLC | CARLSEN, GREGORY H. | Employment Agreement - Physician RAD Oncology | 09/01/2000 | $ - |
| 21st Century Oncology Holdings, Inc. | Carlton Fields | Arbitration Appeals with Third-Party Payors | Engagement Letter | $ - |
| 21st Century Oncology, LLC | Carrasquillo, Thomas | Employment Agreement - Physician (employment ceased) | 2/1/2009 | $ - |
| 21st Century Oncology, LLC | CASEY, JUSTIN T | Employment Agreement - Bonus Pool Pathology Lab Addendum | 07/11/2016 | $ - |
| 21st Century Oncology, LLC | CASEY, JUSTIN T | Employment Agreement - Physician ENT | 10/01/2015 | $ - |
| 21st Century Oncology, LLC | CASTELLUCCI, SEAN A | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/01/2016 | $ - |
| 21st Century Oncology, LLC | CASTELLUCCI, SEAN A | Employment Agreement - Physician Urology | 11/01/2012 | $ - |
| 21st Century Oncology, LLC | CASTILLO, ALVARO | Physician Relocation, Practice Development and Service Agreement | 04/13/2016 | $ - |
| 21st Century Oncology, LLC | CASTILLO, ALVARO E | Employment Agreement - Physician Surgery | 05/23/2016 | $ - |
| 21st Century Oncology of Jacksonville, LLC | CASTILLO, CARLOS M | Employment Agreement - Bonus Pool Diagnostic (Jacksonville) | 12/03/2009 | $ - |
| 21st Century Oncology of Jacksonville, LLC | CASTILLO, CARLOS M | Employment Agreement - Physician Medical Oncology | 05/01/2008 | $ - |
| 21st Century Oncology, LLC | CASTILLO, CARLOS M | Employment Agreement - Bonus Pool Pathology Lab Addendum | 01/01/2016 | $ - |
| 21st Century Oncology, LLC | CASTILLO, CARLOS M | Employment Agreement - Physician Medical Oncology | 05/01/2008 | $ - |
| 21st Century Oncology, Inc. | CASTILLO, VINCENT | Employment Agreement - Physician Consulting | 12/01/2006 | $ - |
| 21st Century Oncology, LLC | CASTLESPIE, LLC | Building and Land Lease | 04/01/2016 | $ - |
| South Florida Radiation Oncology, LLC | Celtic Communications | Service Agreement | 5/1/2009 | $ 769.50 |
| 21st Century Oncology of Alabama, LLC | CENTER, BRIAN C | Employment Agreement - Physician RAD Oncology | 01/22/2009 | $ - |
| U.S. Cancer Care, Inc. | CENTRAL COAST MEDICAL ONCOLOGY CORP. | Building and Land Lease | 10/26/2013 | $ - |
| U.S. Cancer Care, Inc. | CENTRAL COAST MEDICAL ONCOLOGY CORP. | Management Services Agreement | 10/25/2013 | $ - |
| New England Radiation Therapy Management Services, Inc. | CENTRAL MASSACHUSETTS COMPREHENSIVE CANCER CENTER, LLC | Management Services Agreement | 06/01/2009 | $ - |
| 21st Century Oncology, LLC | CENTURYLINK SALES SOLUTIONS | Products and Service Agreement | 11/04/2015 | $ - |
| 21st Century Oncology Management Services, Inc. | CENTURYLINK SALES SOLUTIONS, INC. | Master Services Agreement | 02/04/2011 | $ 68,668.98 |
| 21st Century Oncology, Inc. | CENTURYLINK SALES SOLUTIONS, INC. | Third Amendment to Custom Cover Agreement | 12/07/2015 | $ - |
| 21st Century Oncology, LLC | CENTURYLINK SALES SOLUTIONS, INC. | Products and Services Agreement | 11/05/2015 | $ - |
| 21st Century Oncology, LLC | CENTURYLINK SALES SOLUTIONS, INC. | Products and Services Agreement | 11/05/2015 | $ - |
| 21st Century Oncology, LLC | CENTURYLINK SALES SOLUTIONS, INC. | Total Advantage Express Agreement | 12/22/2015 | $ - |
| Atlantic Urology Clinics, LLC | CERASARO, THOMAS S | Employment Agreement - Physician Urology | 03/31/2010 | $ - |
| 21st Century Oncology, LLC | CHAMORRO, JOSE A | Employment Agreement - Physician Urology | 01/25/2013 | $ - |
| 21st Century Oncology, Inc. | CHANGE HEALTHCARE SOLUTIONS LLC | Collections services | 11/22/2013 | $ 24,444.94 |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st Century Oncology, LLC | CHASE BUILDER CORPORATION | Construction Agreement | 03/15/2017 | $                          - |
| 21st Century Oncology, LLC | CHEN, CHRISTOPHER T | Employment Agreement - Physician RAD Oncology | 07/01/2006 | $                          - |
| 21st Century Oncology, LLC | CHENVEN, ERIC S | Employment Agreement - Bonus Pool Subgrp Pathology Lab (Southeast FL) | 06/30/2009 | $                          - |
| 21st Century Oncology, LLC | CHENVEN, ERIC S | Employment Agreement - Physician Urology | 04/01/2009 | $                          - |
| Maryland Radiation Therapy Management Services, LLC | CHESAPEAKE SURGERY CENTER | Under Arrangement Agreement - Prostate Seed Implant Technical Services and Equipment | 08/01/2008 | $                          - |
| 21st  Century Oncology, LLC | Chobe, Rashmi Jude | Employment Agreement - Physician (employment ceased) | 2/7/2005 | $                          - |
| 21st Century Oncology, LLC | CHON, JOANNA K | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/28/2016 | $                          - |
| 21st Century Oncology, LLC | CHON, JOANNA K | Employment Agreement - Bonus Pool Pathology Lab | 03/28/2016 | $                          - |
| 21st Century Oncology, LLC | CHON, JOANNA K | Employment Agreement - Bonus Pool Urology Subgrp Pathology Lab (Lee Collier) | 07/30/2013 | $                          - |
| 21st Century Oncology, LLC | CHON, JOANNA K | Employment Agreement - Physician Urology | 02/29/2012 | $                          - |
| Arizona Radiation Therapy Mngt Services | Chowdhury, Rezwan H | Employment Agreement - Physician (employment ceased) | 9/14/2015 | $                          - |
| 21st Century Oncology, Inc. | CHRIST, MARK H | Employment Agreement - Physician Urology | 10/26/2007 | $                          - |
| 21st Century Oncology, LLC | CHRIST, MARK H | Employment Agreement - Bonus Pool Pathology Lab Addendum | 04/07/2016 | $                          - |
| 21st Century Oncology Holdings, Inc. | CHRISTIAN HENSLEY | Indemnification Agreement | 09/26/2014 | $                          - |
| 21st Century Oncology of Kentucky, LLC | CHRISTY CARLSEN, P.A. | Physician Assistant Services Agreement | 12/01/2014 | $                          - |
| 21st Century Oncology, Inc. | CHUSID, PAULINE | Employment Agreement - Physician Covering | 02/12/1998 | $                          - |
| 21st Century Oncology of Alabama, LLC | CIGNA- CONNECTICUT GENERAL LIFE INSURANCE COMPANY | Payor Agreement | 04/13/2009 | $                          - |
| 21st Century Oncology of New Jersey, Inc. | CIGNA- CONNECTICUT GENERAL LIFE INSURANCE COMPANY | Payor Agreement | 01/15/2008 | $                          - |
| 21st Century Oncology of Prince Georges County, Maryland, LLC | CIGNA- CONNECTICUT GENERAL LIFE INSURANCE COMPANY | Payor Agreement | 06/01/2007 | $                          - |
| 21st Century Oncology, LLC | CIGNA- CONNECTICUT GENERAL LIFE INSURANCE COMPANY | Payor Agreement | 01/01/2014 | $                          - |
| 21st Century Oncology, LLC | CIGNA- CONNECTICUT GENERAL LIFE INSURANCE COMPANY | Payor Agreement | 01/01/2015 | $                          - |
| Atlantic Urology Clinics, LLC | CIGNA- CONNECTICUT GENERAL LIFE INSURANCE COMPANY | Payor Agreement | 05/15/2014 | $                          - |
| Berlin Radiation Therapy Treatment Center, LLC | CIGNA- CONNECTICUT GENERAL LIFE INSURANCE COMPANY | Payor Agreement | 08/01/2002 | $                          - |
| Arizona Radiation Therapy Management Services, Inc. | CIGNA HEALTHCARE OF ARIZONA, INC. | Payor Agreement | 01/01/2010 | $                          - |
| 21st Century Oncology of Prince Georges County, Maryland, LLC | CIGNA HEALTHSPRINGS | Payor Agreement | 11/01/2014 | $                          - |
| Berlin Radiation Therapy Treatment Center, LLC | CIGNA HEALTHSPRINGS | Payor Agreement | 11/01/2014 | $                          - |
| 21st Century Oncology, LLC | CINGULAR SCIENTIFIC | Service Agreement | 01/17/2017 | $                          - |
| 21st Century Oncology, Inc. | CINTAS CORPORATION NO. 2 DBA CINTAS DOCUMENT MANAGEMENT | Vendor Agreement | 09/16/2013 | $                          - |
| 21st Century Oncology, Inc. | Cipher Security, LLC | Statement of Work & Services Agreement | 11/11/2016 | $                  18,939.87 |
| 21st Century Oncology, LLC | CIT FINANCE | Equipment Lease | 09/24/2012 | $                          - |
| 21st Century Oncology, LLC | CIT FINANCE | Equipment Lease | 10/31/2012 | $                          - |
| 21st Century Oncology, Inc. | CITY HOSPITAL, INC. D/B/A BERKELEY MEDICAL CENTER | Joint Venture Agreement | 03/25/1998 | $                          - |
| 21st Century Oncology, Inc. | CIVCO MEDICAL SOLUTIONS | Vendor Agreement | 12/18/2014 | $                          - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st Century Oncology, Inc. | CLARITY GROUP, INC. | Patient Safety Organization Provider Services Agreement | 01/28/2016 | $ - |
| Maryland Radiation Therapy Management Services, LLC | CLEAN TEAM JANITORIAL SERVICE, INC. | Service Agreement | 08/01/2016 | $ - |
| 21st Century Oncology, Inc. | CLEVELAND CLINIC FLORIDA | Radiation Therapy Service Agreement | 10/01/2008 | $ - |
| 21st Century Oncology, Inc. | CMM GLOBAL | Payor Agreement | 11/15/2013 | $ - |
| U.S. Cancer Care, Inc. | COASTAL RADIATION ONCOLOGY MEDICAL GROUP, INC. | Management Services Agreement | 02/16/2006 | $ - |
| Atlantic Urology Clinics, LLC | COASTAL UROLOGY PROPERTIES | Building and Land Lease | 05/03/2010 | $ - |
| 21st Century Oncology, Inc. | CODA LINK, INC. | Agreement for Interpreter Services | 04/01/2016 | $ - |
| 21st Century Oncology, Inc. | CODING CONTINUUM, INC. | Services Agreement | 08/24/2016 | $ - |
| 21st Century Oncology, Inc. | COGENTIX MEDICAL, INC. | Vendor Agreement | 12/12/2013 | $ 11,837.95 |
| 21st Century Oncology, LLC | COHEN, ROSS A | Employment Agreement - Physician Urology | 12/01/2009 | $ - |
| Financial Services of Southwest Florida, LLC | COLLECTION SERVICE BUREAU, INC. | Services Agreement | 10/22/2013 | $ - |
| 21st Century Oncology, LLC | Colli, Janet L | Employment Agreement - Physician (employment ceased) | 3/20/2014 | $ - |
| 21st Century Oncology, LLC | COLUMBIA HOSPITAL CORPORATION OF SOUTH BROWARD D/B/A WESTSIDE REGIONAL MEDICAL CENTER | Professional Services Agreement | 03/01/2017 | $ - |
| 21st Century Oncology, LLC | COLUMBIA HOSPITAL CORPORATION OF SOUTH BROWARD DBA WESTSIDE REGIONAL MEDICAL CENTER | Professional Services Agreement | 03/01/2015 | $ - |
| 21st Century Oncology, LLC | COLUMBIA PROFEESIONAL CENTER, LLC | Building and Land Lease | 02/27/2016 | $ - |
| 21st Century Oncology, Inc. | Comcast | Network Services Agreement | 9/3/2010 | $ 17,081.09 |
| 21st Century Oncology, Inc. | COMCAST BUSINESS | Business Service Order Agreement | 02/08/2017 | $ - |
| 21st Century Oncology of New Jersey, Inc. | COMCAST CABLE BUSINESS COMMUNICATIONS, LLC | Network Services Agreement | 03/19/2010 | $ - |
| 21st Century Oncology, Inc. | COMCAST CABLE COMMUNICATION MANAGEMENT LLC | Business Service Order Agreement | 09/20/2016 | $ - |
| 21st Century Oncology, Inc. | COMMONAGE CORP. | Building and Land Lease | 12/01/1992 | $ - |
| 21st Century Oncology, Inc. | COMMONWEALTH CARE ALLIANCE, INC. | Payor Agreement | 11/01/2014 | $ - |
| 21st Century Oncology of Kentucky, LLC | COMMONWEALTH HEMATOLOGY ONCOLOGY D/B/A COMMONWEALTH CANCER CENTER OF LONDON | Management Services Agreement | 06/13/2011 | $ - |
| U.S. Cancer Care, Inc. | COMMUNITY MEMORIAL HEALTH SYSTEM | Building and Land Lease | 02/01/2010 | $ - |
| U.S. Cancer Care, Inc. | COMMUNITY MEMORIAL HEALTH SYSTEMS, INC./DON L. CARLTON PROPERTY MANAGEMENT | Building and Land Lease | 10/26/2013 | $ - |
| 21st Century Oncology, LLC | CompHealth | Service Agreement for Physician Locum Tenens Coverage | 7/10/2008 | $ - |
| 21st Century Oncology, LLC | CompHealth Associates, Inc. | Contingency Search Agreement | 9/19/2016 | $ - |
| 21st Century Oncology, Inc. | COMPLIANCE RESOURCE CENTER, LLC | Services Agreement | 12/14/2015 | $ - |
| 21st Century Oncology, LLC | COMPREHENSIVE BENEFITS ADMINISTRATOR | Payor Agreement | 08/01/2006 | $ - |
| 21st Century Oncology, LLC | Concur Technologies, Inc. | Business Services Agreement | 9/29/2015 | $ 12,836.00 |
| 21st Century Oncology, LLC | CONECO REALTY, LLC | Building and Land Lease | 11/01/2015 | $ - |
| Arizona Radiation Therapy Management Services, Inc. | CONFINITY | Payor Agreement | 01/01/2009 | $ - |
| New York Radiation Therapy Management Services, LLC | CONNECTIPHI, INC. | Call Services Agreement | 10/10/2016 | $ - |
| 21st Century Oncology, LLC | CONSORTIA HEALTH CLINICAL CONTINENCE SERVICES, LLC | Equipment and Personnel Lease | 12/30/2016 | $ - |

| Debtor | Creditor | Description | Date | Cure Amount |
|--------|----------|-------------|------|-------------|
| 21st Century Oncology, Inc. | CONTRACT NEGOTIATION CORPORATION | Consulting Agreement | 06/06/2016 | $ - |
| 21st Century Oncology, Inc. | CONVERGENT REVENUE CYCLE MANAGEMENT INC. | Master Services Agreement | 04/18/2017 | $ - |
| Atlantic Urology Clinics, LLC | CONWAY HOSPITAL COMMUNITY SERVICES | Building and Land Lease | 05/01/2010 | $ - |
| 21st  Century Oncology of Alabama, LLC | Cooper, Sally Ann | Employment Agreement - Physician (employment ceased) | 2/9/2009 | $ - |
| 21st Century Oncology, Inc. | CORAL SPRINGS SURGI-CENTER, LTD. DBA SURGERY CENTER AT CORAL SPRINGS | Equipment Sterilization Services Agreement | 03/01/2008 | $ - |
| 21st Century Oncology, LLC | CORBITT, JOHN DEWEY | Employment Agreement - Physician Surgery | 04/01/2015 | $ - |
| 21st Century Oncology, LLC | CORIZON HEALTH | Payor Agreement | 01/01/2016 | $ - |
| 21st Century Oncology, LLC | Cornelius Turalba, MD | Locum Tenens Agreement | 2/26/2015 | $ 12,778.48 |
| 21st Century Oncology, LLC | CORONATO, ERIC E | Employment Agreement - Bonus Pool Pathology Lab Addendum | 01/01/2016 | $ - |
| 21st Century Oncology, LLC | CORONATO, ERIC E | Employment Agreement - Bonus Pool Urology Subgrp Pathology Lab (Charlotte Co) | 01/01/2013 | $ - |
| 21st Century Oncology, LLC | CORONATO, ERIC E | Employment Agreement - Physician Urology | 03/31/2010 | $ - |
| 21st Century Oncology, LLC | CORONATO, ERIC E | Employment Agreement - Relocation, Practice Development & Svc | 04/15/2010 | $ - |
| 21st Century Oncology Holdings, Inc. | CORPORATION SERVICE COMPANY | Service Contract | 01/21/2015 | $ - |
| 21st Century Oncology, Inc. | COVENANT HOSPICE, INC. | Consulting Physician's Agreement | 01/01/2005 | $ - |
| 21st Century Oncology of Alabama, LLC | COVENTRY HEALTH CARE, INC. | Payor Agreement | 09/01/2009 | $ - |
| 21st Century Oncology of New Jersey, Inc. | COVENTRY HEALTH CARE, INC. | Payor Agreement | 09/01/2008 | $ - |
| 21st Century Oncology of Prince Georges County, Maryland, LLC | COVENTRY HEALTH CARE, INC. | Payor Agreement | 09/01/2007 | $ - |
| Arizona Radiation Therapy Management Services, Inc. | COVENTRY HEALTH CARE, INC. | Payor Agreement | 01/01/2010 | $ - |
| Atlantic Urology Clinics, LLC | COVENTRY HEALTH CARE, INC. | Payor Agreement | 11/01/2009 | $ - |
| Berlin Radiation Therapy Treatment Center, LLC | COVENTRY HEALTH CARE, INC. | Payor Agreement | 09/01/2008 | $ - |
| West Virginia Radiation Therapy Services, Inc. | COVENTRY HEALTH CARE, INC. | Payor Agreement | 03/01/2009 | $ - |
| Carolina Regional Cancer Center, LLC | COVINGTON, RICHARD S | Employment Agreement - Physician Consulting | 12/02/2010 | $ - |
| 21st Century Oncology, Inc. | COX COMMUNICATIONS | Communications services | 8/15/2017 | $ 23,322.63 |
| 21st Century Oncology, LLC | COX FAMILY LIMITED PARTNERSHIP | Building and Land Lease | 01/09/2012 | $ - |
| 21st Century Oncology, Inc. | CRESCIMANO, LESLIE A | Employment Agreement - Medical Director | 12/01/2007 | $ - |
| 21st Century Oncology, Inc. | CRESCIMANO, LESLIE A | Employment Agreement - Physician Urology | 10/26/2007 | $ - |
| 21st Century Oncology, LLC | CRESCIMANO, LESLIE A | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/26/2016 | $ - |
| 21st Century Oncology, LLC | CRESTVIEW HOSPITAL CORPORATION DBA NORTH OKALOOSA MEDICAL CENTER | Independent Contractor Agreement | 08/01/2010 | $ - |
| 21st Century Oncology, LLC | CRIB HOLDINGS, LLC | Building and Land Lease | 11/15/2010 | $ - |
| 21st Century Oncology, LLC | CROOK, WILLIAM F | Employment Agreement - Physician RAD Oncology | 11/25/2013 | $ - |
| Atlantic Urology Clinics, LLC | Croshaw, Randal L | Employment Agreement - Physician (employment ceased) | 9/29/2014 | $ - |
| 21st Century Oncology, Inc. | CROSS, CHAUNDRE K | Employment Agreement - Physician RAD Oncology | 10/08/2007 | $ - |
| 21st Century Oncology, Inc. | CROSS, CHAUNDRE K | Employment Agreement - Physician RAD Oncology | 11/03/2003 | $ - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st Century Oncology, LLC | CROSS, CHAUNDRE K | Employment Agreement - Bonus Pool CT Diagnostic (Collier County) | 11/10/2010 | $                      - |
| 21st Century Oncology, LLC | CROSS, CHAUNDRE K | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/16/2016 | $                      - |
| 21st Century Oncology, LLC | CROSS, CHAUNDRE K | Employment Agreement - Bonus Pool PET/CT Diagnostic (Collier County) | 07/01/2011 | $                      - |
| 21st Century Oncology, Inc., f/k/a Radiation Therapy Services, Inc. | Crowther Roofing & Sheet Metal of Florida, Inc. | Inspection and Service Agreement | 6/20/2016 | $            16,022.46 |
| 21st Century Oncology, Inc. | CT ENTERPRISES, LLC | Master Service Agreement | 07/01/2008 | $                      - |
| 21st Century Oncology, LLC d/b/a Specialists in Urology | Culligan Water | Water Equipment Rental Agreement | 8/30/2012 | $                 352.31 |
| 21st Century Oncology, LLC | CURTIS, GERARD A | Employment Agreement - Bonus Pool Pathology Lab Addendum | 01/01/2016 | $                      - |
| 21st Century Oncology, LLC | CURTIS, GERARD A | Employment Agreement - Emergency Care Center (ECC) Urology | 04/01/2009 | $                      - |
| 21st Century Oncology, LLC | CURTIS, GERARD A | Employment Agreement - Physician Urology | 03/01/2009 | $                      - |
| 21st  Century Oncology, LLC | Daller, Meir | Employment Agreement - Physician (employment ceased) | 1/2/2007 | $                      - |
| 21st  Century Oncology, LLC | D'Angelo, Michael F | Employment Agreement - Physician (employment ceased) | 5/25/2013 | $                      - |
| 21st Century Oncology, LLC | DANIEL K. HELLERSTEIN, M.D, P.A./HTA - AW VICTOR FARRIS LLC | Building and Land Lease | 02/27/2016 | $                      - |
| 21st Century Oncology, LLC | DANIEL N. EAD, M.D. | Equipment Lease and License Agreement | 07/28/2014 | $                      - |
| 21st Century Oncology, LLC | DANIELS SHARPSMART, INC. | Vendor Agreement | 09/22/2014 | $            11,279.12 |
| West Virginia Radiation Therapy Services, Inc. | DARLENE HALL | Consulting Agreement | 03/21/2011 | $                      - |
| 21st Century Oncology, LLC | DASS, KISHORE KUMAR | Employment Agreement - Physician RAD Oncology | 02/10/2014 | $                      - |
| 21st Century Oncology, LLC | DataSavers of Jacksonville, Inc. | Records Storage Agreement | 1/30/2008 | $              1,333.42 |
| Financial Services of Southwest Florida, LLC | DAVID KAHN, M.D., P.A. | Billing Services Agreement | 05/17/2016 | $                      - |
| SFRO Holdings, LLC | DE LAGE LANDEN FINANCIAL SERVICES, INC. | Equipment Lease | 02/16/2012 | $                      - |
| SFRO Holdings, LLC | DE LAGE LANDEN FINANCIAL SERVICES, INC. | Equipment Lease | 04/01/2015 | $                      - |
| SFRO Holdings, LLC | DE LAGE LANDEN FINANCIAL SERVICES, INC. | Equipment Lease | 04/29/2016 | $                      - |
| SFRO Holdings, LLC | DE LAGE LANDEN FINANCIAL SERVICES, INC. | Equipment Lease | 05/19/2009 | $                      - |
| SFRO Holdings, LLC | DE LAGE LANDEN FINANCIAL SERVICES, INC. | Equipment Lease | 05/19/2009 | $                      - |
| SFRO Holdings, LLC | DE LAGE LANDEN FINANCIAL SERVICES, INC. | Equipment Lease | 06/01/2012 | $                      - |
| SFRO Holdings, LLC | DE LAGE LANDEN FINANCIAL SERVICES, INC. | Equipment Lease | 12/31/2014 | $                      - |
| South Florida Medicine, LLC | DE LAGE LANDEN FINANCIAL SERVICES, INC. | Equipment Lease | 07/14/2010 | $                      - |
| 21st Century Oncology Services, LLC | DELANOIS, GARY H | Employment Agreement - Executive Employment Agreement | 01/01/2013 | $                      - |
| 21st Century Oncology, Inc. | DELAWARE CHARTER GUARANTEE & TRUST COMPANY DBA PRINCIPAL TRUST COMPANY | Employee Benefit Plan - Principal Trust Company Directed Trust Agreement, NQDC Plan, 401K | 03/06/2017 | $                      - |
| 21st Century Oncology, LLC | DEMELCO, INC. | Building and Land Lease | 01/01/2016 | $                      - |
| 21st Century Oncology, Inc. | DEPARTMENT OF ENERGY | Payor Agreement | 07/29/1996 | $                      - |
| 21st Century Oncology, LLC | DEPARTMENT OF VETERANS AFFAIRS | Payor Agreement | 06/01/2016 | $                      - |
| 21st Century Oncology, LLC | DEPARTMENT OF VETERANS AFFAIRS | Payor Agreement | 06/01/2016 | $                      - |
| 21st Century Oncology, LLC | DEPARTMENT OF VETERANS AFFAIRS | VA Contract | 07/14/2016 | $                      - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st Century Oncology, LLC | DEPARTMENT OF VETERANS AFFAIRS | VA Contract | 07/22/2016 | $                    - |
| 21st Century Oncology, LLC | DEPARTMENT OF VETERANS AFFAIRS | VA Contract | 07/22/2016 | $                    - |
| Arizona Radiation Therapy Management Services, Inc. | DEPARTMENT OF VETERANS AFFAIRS | VA Contract | 08/24/2016 | $                    - |
| South Florida Radiation Oncology, LLC | DEPARTMENT OF VETERANS AFFAIRS | Payor Agreement | 06/01/2016 | $                    - |
| West Virginia Radiation Therapy Services, Inc. | DEPARTMENT OF VETERANS AFFAIRS | Payor Agreement | 09/19/2016 | $                    - |
| West Virginia Radiation Therapy Services, Inc. | DEPARTMENT OF VETERANS AFFAIRS | VA Contract | 09/12/2016 | $                    - |
| 21st Century Oncology of Harford County, Maryland, LLC | DEVON HEALTH SERVICES INC. | Payor Agreement | 11/01/2011 | $                    - |
| 21st Century Oncology of Prince Georges County, Maryland, LLC | DEVON HEALTH SERVICES INC. | Payor Agreement | 11/01/2011 | $                    - |
| Berlin Radiation Therapy Treatment Center, LLC | DEVON HEALTH SERVICES INC. | Payor Agreement | 11/01/2011 | $                    - |
| 21st Century Oncology, LLC | DEX IMAGING, INC. | Dex Dox Services Agreement | 05/18/2016 | $                    - |
| 21st Century Oncology, LLC | DEX IMAGING, INC. | Lease Agreement | 04/03/2017 | $         15,605.41 |
| U.S. Cancer Care, Inc. | DHARANIRAJAN RAJENDRAN | Physics Services Agreement | 04/15/2017 | $                    - |
| California Radiation Therapy Management Services, Inc. | DIGNITY HEALTH F/K/A CATHOLIC HEALTHCARE WEST | Joint Venture Agreement | 06/16/2003 | $                    - |
| 21st Century Oncology, LLC | DIMENSION HEALTH, INC. | Payor Agreement | 01/01/2014 | $                    - |
| 21st Century Oncology, LLC | DISCOVERY BENEFITS | Employee Benefit Plan - Reimbursement Account Administrative Services Agreement | 01/01/2015 | $                    - |
| 21st Century Oncology, LLC | DISICK, GRANT I S | Employment Agreement - Physician Urology | 07/11/2011 | $                    - |
| 21st Century Oncology of Prince Georges County, Maryland, LLC | DIVISION OF CANCER CONTROL | Payor Agreement | 06/01/2007 | $                    - |
| 21st Century Oncology, LLC | DIXIE HIGHWAY PARTNERS, LLC | Building and Land Lease | 03/24/2014 | $                    - |
| 21st Century Oncology, LLC | DIXIE HIGHWAY PARTNERS, LLC | Building and Land Lease | 12/01/2016 | $                    - |
| 21st  Century Oncology, LLC | Dixon, Carolyn M | Employment Agreement - Physician (employment ceased) | 5/10/2012 | $                    - |
| 21st Century Oncology, LLC | DOC-21ST CENTURY SARASOTA, LLC/PHYSICIANS REALTY L.P | Building and Land Lease | 10/25/2013 | $                    - |
| 21st Century Oncology, LLC | DOC-21ST CENTURY SARASOTA, LLC/PHYSICIANS REALTY L.P | Building and Land Lease | 10/25/2013 | $                    - |
| 21st Century Oncology, LLC | DOC-21ST CENTURY SARASOTA, LLC/PHYSICIANS REALTY L.P | Building and Land Lease | 10/25/2013 | $                    - |
| 21st Century Oncology, LLC | DOC-21ST CENTURY SARASOTA, LLC/PHYSICIANS REALTY L.P | Building and Land Lease | 10/25/2013 | $                    - |
| 21st Century Oncology, LLC | DOMENECH, GABRIEL H | Employment Agreement - Physician Medical Oncology | 10/27/2014 | $                    - |
| 21st Century Oncology, LLC | DONALD J. ZELLER, M.D., P.A. | Professional Services Agreement | 11/01/2015 | $                    - |
| 21st Century Oncology, LLC | DONNA H. KLEBAN, MD, FACS,PA/WINDROSE WELLINGTON PROPERTIES, LLC | Building and Land Lease | 12/15/2015 | $                    - |
| 21st  Century Oncology, LLC | Donoway, Robert B | Employment Agreement - Physician (employment ceased) | 12/28/2015 | $                    - |
| 21st  Century Oncology, LLC | Doria, Orlando | Employment Agreement - Physician (employment ceased) | 4/10/2000 | $                    - |
| 21st Century Oncology, LLC | DOSORETZ, ARIE P | Employment Agreement - Bonus Pool Diagnostic | 11/06/2015 | $                    - |
| 21st Century Oncology, LLC | DOSORETZ, ARIE P | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/14/2016 | $                    - |
| 21st Century Oncology, LLC | DOSORETZ, ARIE P | Employment Agreement - Physician RAD Oncology | 02/03/2015 | $                    - |
| 21st Century Oncology, Inc. | DOSORETZ, DANIEL | Employment Agreement - Physician RAD Oncology SR | 02/21/2008 | $                    - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st Century Oncology, LLC | DOSORETZ, DANIEL | Employment Agreement - Bonus Pool Diagnostic (Lee County) | 07/01/2009 | $ - |
| 21st Century Oncology, LLC | DR GEORGE PATSIAS AND DR RAHUL PATEL/INDIANTOWN ROAD LLC | Building and Land Lease | 01/16/2016 | $ - |
| 21st Century Oncology of Jacksonville, LLC | DRAGUN, JOANNE M | Employment Agreement - Bonus Pool Diagnostic (Jacksonville) | 11/09/2009 | $ - |
| 21st Century Oncology of Jacksonville, LLC | DRAGUN, JOANNE M | Employment Agreement - Physician RAD Oncology | 04/07/2008 | $ - |
| 21st Century Oncology, LLC | DRAGUN, JOANNE M | Employment Agreement - Physician RAD Oncology | 04/07/2008 | $ - |
| 21st Century Oncology, LLC | DRSCRIBE, INC. | Software License Agreement | 01/01/2014 | $ - |
| 21st Century Oncology, LLC | DTP MANAGEMENT COMPANY, LLC | Building and Land Lease | 01/31/2007 | $ - |
| 21st Century Oncology, LLC | DUDAK, MARLA W | Employment Agreement - Physician Surgery | 11/23/2010 | $ - |
| 21st Century Oncology, LLC | DUDAK, SCOTT D | Employment Agreement - Physician Surgery | 11/23/2010 | $ - |
| 21st Century Oncology, Inc. | DURDEN OUTDOOR DISPLAYS, INC. | Advertising Agreement | 11/14/2016 | $ - |
| 21st Century Oncology, Inc. | DWAYNE THWAITES, M.D. | Service Agreement | 05/01/2015 | $ - |
| 21st Century Oncology, Inc. | DYKE, VALERIE RUTH | Employment Agreement - Physician Surgery | 01/11/2005 | $ - |
| 21st Century Oncology, LLC | DYKE, VALERIE RUTH | Employment Agreement - Bonus Pool Diagnostic (Lee County) | 12/28/2009 | $ - |
| 21st Century Oncology, LLC | DYNTEK SERVICES, INC. | Purchase Agreement | 12/01/2016 | $ - |
| South Florida Radiation Oncology, LLC | E.D.S. Air Conditioning Plumbing | Preventative Maintenance Service Agreement | 9/2/2011 | $ 13,355.78 |
| South Florida Radiation Oncology, LLC | E.D.S. Air Conditioning Plumbing | Preventative Maintenance Service Agreement | 8/11/2011 | $ - |
| South Florida Radiation Oncology, LLC | E.D.S. Air Conditioning Plumbing | Preventative Maintenance Service Agreement | 11/1/2010 | $ - |
| South Florida Radiation Oncology, LLC | E.D.S. Air Conditioning Plumbing | Preventative Maintenance Service Agreement | 10/1/2011 | $ - |
| South Florida Radiation Oncology, LLC | E.D.S. Air Conditioning Plumbing | Preventative Maintenance Service Agreement | 6/13/2014 | $ - |
| South Florida Radiation Oncology, LLC | E.D.S. Air Conditioning Plumbing | Preventative Maintenance Service Agreement | 9/20/2011 | $ - |
| South Florida Radiation Oncology, LLC | E.D.S. Air Conditioning Plumbing | Preventative Maintenance Service Agreement | 10/4/2011 | $ - |
| South Florida Radiation Oncology, LLC | E.D.S. Air Conditioning Plumbing | Preventative Maintenance Service Agreement | 7/9/2015 | $ - |
| South Florida Radiation Oncology, LLC | E.D.S. Air Conditioning Plumbing | Preventative Maintenance Service Agreement | 10/4/2011 | $ - |
| South Florida Radiation Oncology, LLC | E.D.S. Air Conditioning Plumbing | Preventative Maintenance Service Agreement | 10/5/2011 | $ - |
| South Florida Radiation Oncology, LLC | E.D.S. Air Conditioning Plumbing | Preventative Maintenance Service Agreement | 2/27/2015 | $ - |
| South Florida Radiation Oncology, LLC | E.D.S. Air Conditioning Plumbing | Preventative Maintenance Service Agreement | 8/1/2014 | $ - |
| 21st Century Oncology, LLC | EAD, DANIEL N | Employment Agreement - Bonus Pool Pathology Lab Addendum | 04/18/2016 | $ - |
| 21st Century Oncology, LLC | EAD, DANIEL N | Employment Agreement - Physician Urology | 07/28/2014 | $ - |
| 21st Century Oncology, LLC | EAD, DANIEL N | Equipment Lease | 07/28/2014 | $ - |
| 21st Century Oncology Management Services, Inc. | EAGLE TECHNOLOGY MANAGEMENT, INC. | Software as a Service Agreement | 10/05/2016 | $ - |
| 21st Century Oncology, Inc. | EAGLEMOUNT, LTD. | Marketing Services Agreement | 11/01/2015 | $ - |
| 21st Century Oncology, LLC | EAR NOSE AND THROAT SPECIALISTS OF FL, P.A. | Building and Land Lease | 02/01/2014 | $ - |
| 21st Century Oncology, LLC | EAR NOSE AND THROAT SPECIALISTS OF FL, P.A. | Building and Land Lease | 02/01/2014 | $ - |

| Debtor | Creditor | Description | Date | Cure Amount |
|--------|----------|-------------|------|-------------|
| 21st Century Oncology, LLC | EAST COAST VALET, INC. | Agreement for Valet Parking Services | 01/04/2016 | $ - |
| 21st Century Oncology, LLC | ECLINICALWORKS LLC | Assignment of Software License and Support | 8/16/2010 | $ - |
| Arizona Radiation Therapy Mngt Services | Eder, Michael W | Employment Agreement - Physician | 4/18/2011 | $ - |
| 21st Century Oncology, Inc. | EDLEMAN, THOMAS M | Employment Agreement - Physician Covering | 08/10/2004 | $ - |
| 21st Century Oncology, LLC | EDUARDO GARCIA-MONTES, M.D./HCP MOB MIAMI, LLC | Building and Land Lease | 07/01/2016 | $ - |
| Carolina Regional Cancer Center, LLC | EDWARDS-BENNETT, SOPHIA M | Employment Agreement - Physician RAD Oncology | 03/07/2012 | $ - |
| USCC Florida Acquisition, LLC | EIGHTH CITY LANDOWNERS, LLC | Building and Land Lease | 11/01/2002 | $ - |
| Atlantic Urology Clinics, LLC | EIP | Payor Agreement | 01/01/1993 | $ - |
| Atlantic Urology Clinics, LLC | EIP | Payor Agreement | 01/01/1994 | $ - |
| Atlantic Urology Clinics, LLC | EIP | Payor Agreement | 02/23/2011 | $ - |
| Atlantic Urology Clinics, LLC | EIP | Payor Agreement | 04/01/1993 | $ - |
| Atlantic Urology Clinics, LLC | EIP | Payor Agreement | 04/30/2015 | $ - |
| Atlantic Urology Clinics, LLC | EIP | Payor Agreement | 05/01/1995 | $ - |
| Atlantic Urology Clinics, LLC | EIP | Payor Agreement | 07/13/2015 | $ - |
| Atlantic Urology Clinics, LLC | EIP | Payor Agreement | 07/20/2012 | $ - |
| Atlantic Urology Clinics, LLC | EIP | Payor Agreement | 07/24/2006 | $ - |
| Atlantic Urology Clinics, LLC | EIP | Payor Agreement | 10/01/1999 | $ - |
| Atlantic Urology Clinics, LLC | EIP | Payor Agreement | 11/03/1994 | $ - |
| Atlantic Urology Clinics, LLC | EIP | Payor Agreement | 11/06/2003 | $ - |
| Atlantic Urology Clinics, LLC | EIP | Payor Agreement | 11/20/1993 | $ - |
| Atlantic Urology Clinics, LLC | EIP | Payor Agreement | 12/01/1993 | $ - |
| Atlantic Urology Clinics, LLC | EIP | Payor Agreement | 12/22/2011 | $ - |
| Carolina Regional Cancer Center, LLC | EIP | Payor Agreement | 09/09/2011 | $ - |
| Carolina Regional Cancer Center, LLC | EIP | Payor Agreement | 09/10/2012 | $ - |
| Carolina Regional Cancer Center, LLC | EIP | Payor Agreement | 10/15/2010 | $ - |
| 21st Century Oncology, LLC | Eisenberg, Howard | Employment Agreement - Physician (employment ceased) | 9/19/2016 | $ - |
| 21st Century Oncology Management Services, Inc. | ELEKTA, INC. | Purchase and License Agreement | 04/29/2016 | $ - |
| 21st Century Oncology Management Services, Inc. | ELEKTA, INC. | Purchase and License Agreement | 04/30/2011 | $ - |
| 21st Century Oncology, Inc. | ELEKTA, INC. | Purchase and License Agreement | 10/20/2016 | $ - |
| 21st Century Oncology, Inc. | ELEKTA, INC. | Purchase and License Agreement | 10/20/2016 | $ - |
| 21st Century Oncology, LLC | ELEKTA, INC. | Purchase and License Agreement | 03/21/2014 | $ - |
| 21st Century Oncology, LLC | ELEKTA, INC. | Purchase and License Agreement | 04/20/2015 | $ - |
| 21st Century Oncology, LLC | ELEKTA, INC. | Purchase and License Agreement | 04/30/2015 | $ - |

| Debtor | Creditor | Description | Date | Cure Amount |
|--------|----------|-------------|------|-------------|
| 21st Century Oncology, LLC | ELEKTA, INC. - NUCLETRON | Service Agreement | 12/24/2012 | $ 316,000.00 |
| 21st Century Oncology, LLC | ELSEVIER INC. | Subscription Agreement | 11/01/2013 | $ - |
| 21st Century Oncology, LLC | EMERALD COAST HEALTH ALLIANCE | Payor Agreement | 02/04/2014 | $ - |
| 21st Century Oncology, LLC | EMERGENCY AND ACUTE CARE MEDICAL COMPANY - SOUTHEAST, LLC | Payor Agreement | 01/23/2007 | $ - |
| Financial Services of Southwest Florida, LLC | ENABLEPATH, LLC | Master Services Agreement | 04/21/2014 | $ 15,900.76 |
| 21st Century Oncology, Inc. | ENDO PHARMACEUTICALS, INC. | Vendor Agreement | 12/11/2013 | $ - |
| 21st Century Oncology Investments, LLC | ENDURANCE AMERICAN SPECIALTY INSURANCE COMPANY | Insurance Policy - Directors & Officers - 2nd Layer, Excess | 09/01/2016 | $ - |
| 21st Century Oncology Investments, LLC | ENDURANCE AMERICAN SPECIALTY INSURANCE COMPANY | Insurance Policy - Property/All Risk | 04/01/2017 | $ - |
| 21st Century Oncology of Alabama, LLC | Enmon Enterprises, LLC d/b/a Jani-King of Montgomery | Maintenance Agreement | 2/22/2010 | $ 3,548.27 |
| 21st Century Oncology of Alabama, LLC | Enmon Enterprises, LLC d/b/a Jani-King of Montgomery | Maintenance Agreement | 2/22/2010 | $ - |
| 21st Century Oncology, Inc. | ENTERPRISE FM TRUST | Vendor Agreement | 06/21/2013 | $ - |
| California Radiation Therapy Management Services, Inc. | EPIC MANAGEMENT LP | Building and Land Lease | 08/01/2003 | $ - |
| 21st Century Oncology, LLC | Ercolani, Matthew C | Employment Agreement - Physician (employment ceased) | 8/2/2010 | $ - |
| Maryland Radiation Therapy Management Services, LLC | ERIC EMANUEL, MD | Joint Venture Agreement | 07/13/2005 | $ - |
| 21st Century Oncology Holdings, Inc. | ERIN RUSSELL | Indemnification Agreement | 09/26/2014 | $ - |
| 21st Century Oncology of Kentucky, LLC | EROC, LLC | Building and Land Lease | 06/11/2010 | $ - |
| 21st Century Oncology, LLC | ESJ VII, LLC | Building and Land Lease | 01/04/2010 | $ - |
| 21st Century Oncology, Inc. | ESMAILI, SINA | Employment Agreement - Physician Consulting | 04/01/2008 | $ - |
| 21st Century Oncology, LLC | ESPAILLAT, LUIS F | Employment Agreement - Physician Surgery | 02/01/2016 | $ - |
| 21st Century Oncology, LLC | EVANS, BLAKE J | Employment Agreement - Bonus Pool Diagnostic (Lee County) | 10/12/2016 | $ - |
| 21st Century Oncology, LLC | EVANS, BLAKE J | Employment Agreement - Bonus Pool Pathology Lab Addendum | 10/12/2016 | $ - |
| 21st Century Oncology, LLC | EVANS, BLAKE J | Employment Agreement - On Call Coverage (Lee Memorial) | 04/01/2015 | $ - |
| 21st Century Oncology, LLC | EVANS, BLAKE J | Employment Agreement - Physician Urology | 07/01/2013 | $ - |
| 21st Century Oncology, LLC | EVANS, BLAKE J | Employment Agreement - Physician Urology | 07/01/2013 | $ - |
| 21st Century Oncology, LLC | EVANS, BLAKE/LEE MEMORIAL HEALTH SYSTEM | Letter of Agreement re: LMHS On-Call Coverage Subsidy Arrangements | 04/01/2015 | $ - |
| 21st Century Oncology, Inc. | EVANS, WILLIAM P | Employment Agreement - Physician Urology | 07/01/2007 | $ - |
| 21st Century Oncology, LLC | EVANS, WILLIAM P | Employment Agreement - Bonus Pool Lee County Diagnostic | 09/01/2011 | $ - |
| 21st Century Oncology, LLC | EVANS, WILLIAM P | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/01/2016 | $ - |
| 21st Century Oncology, LLC | EVANS, WILLIAM/LEE MEMORIAL HEALTH SYSTEM | Letter of Agreement re: LMHS On-Call Coverage Subsidy Arrangements | 04/01/2015 | $ - |
| 21st Century Oncology, Inc. | EVERGREEN | Payor Agreement | 07/01/2014 | $ - |
| 21st Century Oncology, LLC | EVOLUTIONS HEALTHCARE SYSTEMS, INC. | Payor Agreement | 04/29/2013 | $ - |
| U.S. Cancer Care, Inc. | EXTRA SPACE STORAGE | Space Rental Agreement | 02/05/2014 | $ - |
| 21st Century Oncology, LLC | EXTROPY LLC | Financial Analysis and Consulting Services Agreement | 01/08/2016 | $ 20,112.50 |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| Atlantic Urology Clinics, LLC | Fanning, James | Employment Agreement - Physician (employment ceased) | 4/14/2014 | $ - |
| Michigan Radiation Therapy Management Services, Inc. | FARMINGTON MRT, LLC | Physics Professional Services Agreement | 04/01/2015 | $ - |
| 21st Century Oncology, LLC | FAWCETT MEMORIAL HOSPITAL D/B/A FAWCETT MEMORIAL HOSPITAL | Professional Services Agreement | 02/05/2016 | $ - |
| 21st Century Oncology, LLC | FAWCETT MEMORIAL HOSPITAL D/B/A FAWCETT MEMORIAL HOSPITAL | Service Agreement | 01/01/2017 | $ - |
| 21st Century Oncology, Inc. | FAWCETT MEMORIAL HOSPITAL, INC. | Building and Land Lease | 10/28/2016 | $ - |
| 21st Century Oncology, LLC | FAWCETT MEMORIAL HOSPITAL, INC. | Building and Land Lease | 10/28/2016 | $ - |
| 21st Century Oncology, LLC | FAWCETT MEMORIAL HOSPITAL, INC. DBA FAWCETT MEMORIAL HOSPITAL | Service Contract | 11/14/2016 | $ - |
| 21st Century Oncology, LLC | FAWCETT MEMORIAL HOSPITAL, INC. DBA FAWCETT MEMORIAL HOSPITAL | Service Contract | 11/14/2016 | $ - |
| 21st Century Oncology, LLC | FAWCETT MEMORIAL HOSPITAL, INC. DBA FAWCETT MEMORIAL HOSPITAL | Service Contract | 11/14/2016 | $ - |
| 21st Century Oncology, LLC | FAWCETT MEMORIAL HOSPITAL, INC. DBA FAWCETT MEMORIAL HOSPITAL | Service Contract | 11/14/2016 | $ - |
| New York Radiation Therapy Management Services, LLC | FAXTON HOSPITAL | Administrative Services Agreement | 06/01/1998 | $ - |
| New York Radiation Therapy Management Services, LLC | FAXTON -ST. LUKE'S HEALTHCARE | Administrative Services Agreement | 02/02/2011 | $ - |
| New York Radiation Therapy Management Services, LLC | FAXTON-ST. LUKE HOSPITAL; ST. ELIZABETH HOSPITAL MANAGEMENT COMPANY | Joint Venture Agreement | | $ - |
| New York Radiation Therapy Management Services, LLC | FAXTON-ST. LUKE'S HEALTHCARE | Management Services Agreement | 06/01/1998 | $ - |
| 21st Century Oncology, LLC | FEDERICO DUMENIGO, M.D. | Promissory Note | 12/28/2012 | $ - |
| 21st Century Oncology, LLC | FERNANDEZ-SALVADOR, VERONIQUE N | Employment Agreement - Bonus Pool Diagnostic | 09/01/2011 | $ - |
| 21st Century Oncology, LLC | FERNANDEZ-SALVADOR, VERONIQUE N | Employment Agreement - Bonus Pool Pathology Lab Addendum | 04/19/2016 | $ - |
| 21st Century Oncology, LLC | FERNANDEZ-SALVADOR, VERONIQUE N | Employment Agreement - Physician Urology | 08/21/2009 | $ - |
| 21st Century Oncology, Inc. | FERNANDEZ-VICIO, EDUARDO | Employment Agreement - Executive Employment Agreement | 01/01/2002 | $ - |
| 21st Century Oncology, Inc. | FERNANDEZ-VICIO, EDUARDO | Employment Agreement - Physician SVP Medical Affairs | 01/01/2002 | $ - |
| 21st Century Oncology, Inc. | FERRING PHARMACEUTICALS, INC. | Vendor Agreement | 01/01/2013 | $ - |
| 21st Century Oncology Holdings, Inc. | Ferrucci Russo, PC | Local Counsel - Rhode Island | Engagement Letter | $ - |
| 21st Century Oncology, LLC | FIELDS, ALLAN | Employment Agreement - Physician Covering | 12/15/2010 | $ - |
| 21st Century Oncology, Inc. | FINANCIAL SERVICES OF SOUTHWEST FLORIDA, LLC | Assignment and Assumption of Billing and Collection Agreement | 04/01/2005 | $ - |
| 21st Century Oncology, LLC | FINE, MATTHEW S | Employment Agreement - Physician Urology | 06/29/2012 | $ - |
| Arizona Radiation Therapy Mngt Services | Finkelstein, Steven E | Employment Agreement - Physician (employment ceased) | 7/11/2011 | $ - |
| 21st Century Oncology, Inc. | FIRST FEDERAL CREDIT CONTROL, INC. | Agreement for Collection Service | 11/29/2016 | $ - |
| 21st Century Oncology, LLC | FIRST NATIONAL BANK OF THE GULF COAST | Equipment Lease | 05/25/2013 | $ - |
| 21st Century Oncology, LLC | FIRST NATIONAL BANK OF THE GULF COAST | Equipment Lease | 10/01/2013 | $ - |
| 21st Century Oncology, LLC | FIRST NATIONAL BANK OF THE GULF COAST | Equipment Lease | 12/07/2011 | $ - |
| 21st Century Oncology, Inc. | FITCH, DWIGHT L | Employment Agreement - Physician RAD Oncology | 08/01/2006 | $ - |
| 21st Century Oncology, LLC | FL CANCER SPECIALISTS | Building and Land Lease | 12/05/2015 | $ - |
| U.S. Cancer Care, Inc. | FL REGIONAL CANCER CENTER | Building and Land Lease | 02/01/2008 | $ - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| U.S. Cancer Care, Inc. | FLAGLER HOSPITAL, INC. | Building and Land Lease | 10/01/2007 | $ - |
| 21st Century Oncology, LLC | Flagship solutions LLC | Records Storage Contract | 8/26/2015 | $ 27,115.43 |
| 21st Century Oncology, Inc. | FLAMINGO MARKET PLACE, LLC | Building and Land Lease | 07/23/2008 | $ - |
| North Carolina Radiation Therapy Management Services, LLC | FLETCHER HOSPITAL, INC. DBA PARK RIDGE HEALTH | Assignment and Assumption Agreement | 11/06/2012 | $ - |
| 21st Century Oncology, LLC | FLORES, LUIS A | Employment Agreement - Physician Consulting | 08/17/2009 | $ - |
| 21st Century Oncology, LLC | FLORIDA CANCER SPECIALISTS, P.L. | Nuclear Medicine Professional Services Agreement | 05/16/2016 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 01/14/2010 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 01/22/2013 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 01/22/2013 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 01/31/2012 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 01/31/2012 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 02/06/2012 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 03/12/2009 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 03/19/2012 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 03/19/2012 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 05/19/2016 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 05/19/2016 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 06/17/2011 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 06/17/2011 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 06/20/2011 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 06/20/2011 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 06/27/2011 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 06/28/2011 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 06/28/2011 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 06/30/2011 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 07/01/2016 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 07/01/2016 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 07/01/2016 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 07/01/2016 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 07/03/2013 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 07/03/2013 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 07/04/2016 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 07/09/2016 | $ - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 07/13/2016 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 07/16/2012 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 07/16/2012 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 07/16/2012 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 07/25/2011 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 07/25/2011 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 07/25/2011 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 07/26/2010 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 08/05/2010 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 08/05/2010 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 08/05/2010 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 08/09/2010 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 08/18/2010 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 08/18/2010 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 08/23/2010 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 08/23/2010 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 08/26/2010 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 09/04/2009 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 09/05/2012 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 09/10/2012 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 09/15/2011 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 09/15/2011 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 09/15/2011 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 09/15/2011 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 09/16/2010 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 09/19/2011 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 09/22/2010 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 10/07/2010 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 10/07/2010 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 10/07/2010 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 10/07/2010 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 10/07/2010 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 10/12/2010 | $ - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 10/16/2015 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 10/17/2007 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 10/18/2011 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 10/25/2010 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 10/26/2013 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 11/07/2013 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 11/07/2013 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 11/07/2013 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 11/07/2013 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 11/07/2013 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 11/10/2011 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 11/11/2011 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 11/13/2013 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 11/13/2013 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 11/16/2010 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 11/17/2010 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 11/19/2012 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 11/27/2013 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 11/27/2013 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 11/27/2013 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 12/04/2011 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 12/04/2011 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 12/04/2011 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 12/04/2011 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 12/05/2012 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 12/05/2015 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 12/05/2015 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 12/05/2015 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 12/05/2015 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 12/05/2015 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 12/05/2015 | $ - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 12/05/2015 | $ - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 12/05/2015 | $                    - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 12/12/2015 | $                    - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 12/27/2010 | $                    - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 12/27/2010 | $                    - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 12/27/2010 | $                    - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 12/27/2010 | $                    - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 12/27/2010 | $                    - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 12/27/2010 | $                    - |
| 21st Century Oncology, LLC | FLORIDA DEPARTMENT OF HEALTH | Payor Agreement | 12/27/2010 | $                    - |
| 21st Century Oncology, LLC | Florida Pest Control & Chemical Co. | Commercial Service Agreement | 6/15/2004 | $            274.42 |
| 21st Century Oncology, LLC | FLORIDA UROLOGICAL ASSOCIATES, P.A. | Equipment Lease | 02/06/2016 | $                    - |
| 21st Century Oncology, Inc. | FLUKE ELECTRONICS CORPORATION | Vendor Agreement | 10/26/2016 | $                    - |
| Atlantic Urology Clinics, LLC | FOGARTY, JAMES D | Employment Agreement - Physician Urology | 03/31/2010 | $                    - |
| 21st  Century Oncology, LLC | Foo, May L | Employment Agreement - Physician (employment ceased) | 1/2/2007 | $                    - |
| 21st Century Oncology Holdings, Inc. | Ford Harrison, LLP | Employment and Labor Counsel in Florida | Engagement Letter | $                    - |
| 21st Century Oncology Services, LLC | Forman, Jeffrey D | Employment Agreement - Physician (employment ceased) | 12/1/2011 | $                    - |
| 21st Century Oncology, Inc. | FORSZPANIAK, JAN | Employment Agreement - Physician Surgery | 08/01/2006 | $                    - |
| 21st Century Oncology, LLC | FORSZPANIAK, JAN | Employment Agreement - Bonus Pool CT | 11/29/2010 | $                    - |
| 21st Century Oncology, LLC | FORSZPANIAK, JAN | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/14/2016 | $                    - |
| 21st Century Oncology, LLC | FORSZPANIAK, JAN | Employment Agreement - Bonus Pool PET/CT | 07/01/2011 | $                    - |
| 21st Century Oncology, LLC | FORSZPANIAK, JAN | Employment Agreement - Medical Director Agreement | 12/01/2007 | $                    - |
| 21st Century Oncology, LLC | FORT MYERS MEDICAL BUILDING, LLC | Building and Land Lease | 02/01/2007 | $                    - |
| 21st Century Oncology, LLC | FORT WALTON BEACH MEDICAL CENTER, INC. DBA FORT WALTON BEACH MEDICAL CENTER | Professional Service Agreement | 08/03/2016 | $                    - |
| 21st Century Oncology, LLC | FORT WALTON BEACH MEDICAL CENTER, INC. DBA FORT WALTON BEACH MEDICAL CENTER | Professional Service Agreement | 08/07/2015 | $                    - |
| 21st Century Oncology, LLC | FOSSUM, BASIL D | Employment Agreement - Physician Urology | 09/19/2011 | $                    - |
| 21st Century Oncology, LLC | FOX, AMY M | Employment Agreement - Bonus Pool Lee County Diagnostic | 01/01/2013 | $                    - |
| 21st Century Oncology, LLC | FOX, AMY M | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/01/2016 | $                    - |
| 21st Century Oncology, LLC | FOX, AMY M | Employment Agreement - Physician RAD Oncology RH | 04/16/2009 | $                    - |
| Carolina Regional Cancer Center, LLC | FRANCKE, PATRICK MICHAEL | Employment Agreement - Physician RAD Oncology | 08/01/2010 | $                    - |
| Maryland Radiation Therapy Management Services, LLC | FRANK S MELOGRANA, MD | Joint Venture Agreement | 07/13/2005 | $                    - |
| Atlantic Urology Clinics, LLC | FRANK, WALTER | Employment Agreement - Physician Urology | 03/31/2010 | $                    - |
| 21st Century Oncology of Kentucky, LLC | FRANKFORT HOSPITAL, INC. DBA FRANKFORT REGIONAL MEDICAL CENTER | Under Arrangement Agreement for Radiation Therapy Services | 09/01/2004 | $                    - |
| 21st Century Oncology, LLC | FRE IV LLC | Building and Land Lease | 04/01/2014 | $                    - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st Century Oncology, LLC | FREEDOM HEALTH | Payor Agreement | 09/01/2008 | $ - |
| 21st Century Oncology Investments, LLC | FREEDOM SPECIALTY INSURANCE COMPANY | Insurance Policy - Directors & Officers - 7th Layer, Excess | 09/01/2016 | $ - |
| Arizona Radiation Therapy Management Services, Inc. | FRESENIUS HEALTH PARTNERS | Payor Agreement | 01/01/2016 | $ - |
| 21st Century Oncology, LLC | FRIGER, MARANGELI | Employment Agreement - Physician RAD Oncology | 12/28/2012 | $ - |
| 21st Century Oncology, Inc. | FULL CIRCLE PR, INC. | Master Services Agreement | 07/03/2012 | $ 16,000.00 |
| 21st Century Oncology, LLC | FULLER, JAMES H | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/01/2016 | $ - |
| 21st Century Oncology, LLC | FULLER, JAMES H | Employment Agreement - Physician ENT | 01/31/2014 | $ - |
| Atlantic Urology Clinics, LLC | GAJEWSKI, TIM A | Employment Agreement - Physician Urology | 12/01/2014 | $ - |
| South Florida Medicine, LLC | GANDHI, SUNIL | Employment Agreement - Physician Surgery | 08/19/2014 | $ - |
| Atlantic Urology Clinics, LLC | GANGI, GLENN R | Employment Agreement - Physician Urology | 03/31/2010 | $ - |
| 21st Century Oncology, LLC | GAPIN, TRACY B | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/01/2016 | $ - |
| 21st Century Oncology, LLC | GAPIN, TRACY B | Employment Agreement - Physician Urology | 03/30/2012 | $ - |
| 21st Century Oncology, LLC | GARCIA-MONTES, EDUARDO | Employment Agreement - Physician Urology | 05/23/2014 | $ - |
| 21st Century Oncology Holdings, Inc. | Garfunkel Wild, P.C. | Local Counsel - New York on matters unrelated to Chapter 11 cases | Engagement Letter | $ - |
| 21st  Century Oncology, LLC | Gasiorek, Scott A | Employment Agreement - Physician (employment ceased) | 12/28/2015 | $ - |
| 21st Century Oncology of Kentucky, LLC | GATEWAY HEALTH PLAN | Payor Agreement | 04/09/2015 | $ - |
| 21st Century Oncology, Inc. | GAW, JANETTE UYECIO | Employment Agreement - Physician Surgery | 04/05/2005 | $ - |
| 21st Century Oncology, LLC | GAW, JANETTE UYECIO | Employment Agreement - Bonus Pool Lee County Diagnostic | 12/28/2009 | $ - |
| 21st Century Oncology, LLC | GE HEALTHCARE | Service Agreement | 10/01/2013 | $ - |
| 21st Century Oncology, LLC | GEBBIE, DOUGLAS | Employment Agreement - Physician Covering | 05/18/2011 | $ - |
| 21st Century Oncology of Alabama, LLC | GENERAL ELECTRIC CAPITAL CORPORATION | Equipment Lease | 11/15/2013 | $ - |
| 21st Century Oncology of Kentucky, LLC | GENERAL ELECTRIC CAPITAL CORPORATION | Equipment Lease | 11/15/2013 | $ - |
| 21st Century Oncology of South Carolina, LLC | GENERAL ELECTRIC CAPITAL CORPORATION | Equipment Lease | 11/15/2013 | $ - |
| 21st Century Oncology, LLC | GENERAL ELECTRIC CAPITAL CORPORATION | Equipment Lease | 01/29/2014 | $ - |
| 21st Century Oncology, LLC | GENERAL ELECTRIC CAPITAL CORPORATION | Equipment Lease | 06/06/2012 | $ - |
| 21st Century Oncology, LLC | GENERAL ELECTRIC CAPITAL CORPORATION | Equipment Lease | 11/15/2013 | $ - |
| California Radiation Therapy Management Services, Inc. | GENERAL ELECTRIC CAPITAL CORPORATION | Equipment Lease | 11/15/2013 | $ - |
| California Radiation Therapy Management Services, Inc. | GENERAL ELECTRIC CAPITAL CORPORATION | Equipment Lease | 11/15/2013 | $ - |
| Michigan Radiation Therapy Management Services, Inc. | GENERAL ELECTRIC CAPITAL CORPORATION | Equipment Lease | 11/15/2013 | $ - |
| Nevada Radiation Therapy Management Services, Incorporated | GENERAL ELECTRIC CAPITAL CORPORATION | Equipment Lease | 11/15/2013 | $ - |
| New York Radiation Therapy Management Services, LLC | GENERAL ELECTRIC CAPITAL CORPORATION | Equipment Lease | 11/15/2013 | $ - |
| U.S. Cancer Care, Inc. | GENERAL ELECTRIC CAPITAL CORPORATION | Equipment Lease | 01/03/2008 | $ - |
| U.S. Cancer Care, Inc. | GENERAL ELECTRIC CAPITAL CORPORATION | Equipment Lease | 12/06/2013 | $ - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| U.S. Cancer Care, Inc. | GENERAL ELECTRIC CAPITAL CORPORATION | Equipment Lease | 12/18/2013 | $                    - |
| 21st Century Oncology Management Services, Inc. | GEOPATIENT, LLC | Consulting Agreement | 03/28/2011 | $                    - |
| Atlantic Urology Clinics, LLC | GEORGETOWN MEMORIAL HOSPITAL DBA TIDELANDS GEORGETOWN MEMORIAL HOSPITAL | Building and Land Lease | | $                    - |
| Maryland Radiation Therapy Management Services, LLC | GERALD H LIN, MD | Joint Venture Agreement | 07/13/2005 | $                    - |
| 21st Century Oncology, LLC | GERSHMAN, ERIC A | Employment Agreement - Physician Medical Oncology | 03/06/2015 | $                    - |
| 21st Century Oncology of Pennsylvania, Inc. | GETTYSBURG RADIATION, L.L.C. | Management Services Agreement | 01/03/2007 | $                    - |
| 21st  Century Oncology, LLC | Gheiler, Edward L | Employment Agreement - Physician (employment ceased) | 12/28/2015 | $                    - |
| 21st  Century Oncology, LLC | Gioacchini, Larina | Employment Agreement - Physician (employment ceased) | 12/8/1997 | $                    - |
| 21st Century Oncology, Inc. | GITTELMAN, MARC C | Employment Agreement - Physician Urology | 10/26/2007 | $                    - |
| 21st Century Oncology, LLC | GITTELMAN, MARC C | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/23/2016 | $                    - |
| 21st Century Oncology, LLC | GITTELMAN, MARC C | Employment Agreement - Bonus Pool SE FL Diagnostic CT | 06/23/2009 | $                    - |
| South Florida Medicine, LLC | GITTLEMAN, ALICIA E | Employment Agreement - Physician RAD Oncology | 08/11/2015 | $                    - |
| 21st Century Oncology, LLC | GLADIOLUS MEDICAL, LLC | Building and Land Lease | 07/02/2015 | $                    - |
| 21st Century Oncology, Inc. | GLADIOLUS SURGERY CENTER | Ultrasound Equipment/Technical Services Agreement | 08/01/2004 | $                    - |
| Michigan Radiation Therapy Management Services, Inc. | GLENDALE INVESTMENTS, LLC | Building and Land Lease | 04/01/2008 | $                    - |
| 21st Century Oncology, Inc. | GLOBAL HR RESEARCH, INC. | Research End-User Agreement | 08/15/2016 | $            22,253.90 |
| Carolina Regional Cancer Center, LLC | GLOBAL PHYSICS SOLUTIONS, INC. D/B/A LANDAUER MEDICAL PHYSICS | Agreement for Radiation Oncology Medical Physics Services | 12/23/2015 | $            57,237.72 |
| 21st Century Oncology, LLC | GND OHANA, LLC | Building and Land Lease | 05/01/2015 | $                    - |
| 21st Century Oncology, Inc. | GOLDBERGER, JACOB H | Employment Agreement - Physician Surgery | 10/25/2006 | $                    - |
| 21st Century Oncology, LLC | GOLDBERGER, JACOB H | Employment Agreement - Bonus Pool Lee County Diagnostic | 01/01/2013 | $                    - |
| 21st Century Oncology, LLC | GOLDBERGER, JACOB H | Employment Agreement - Medical Director Agreement | 12/01/2007 | $                    - |
| 21st Century Oncology of Jacksonville, LLC | GOLDEN POND II | Building and Land Lease | 08/31/2011 | $                    - |
| 21st  Century Oncology, LLC | Goldin, Steven B | Employment Agreement - Physician (employment ceased) | 7/7/2014 | $                    - |
| 21st Century Oncology Holdings, Inc. | Gonzalez Law, LLC | CTSA Litigation | Engagement Letter | $                    - |
| 21st  Century Oncology, LLC | Gonzalez, Ricardo D | Employment Agreement - Physician | 10/23/2017 | $                    - |
| 21st Century Oncology, LLC | GOOD SAMARITAN MEDICAL CENTER | Radiation Therapy Services Agreement | 02/14/2017 | $                    - |
| 21st Century Oncology, LLC | GOOD SAMARITAN MEDICAL CENTER, INC. DBA GOOD SAMARITAN MEDICAL CENTER | Building and Land Lease | 11/01/2015 | $                    - |
| 21st Century Oncology, LLC | GORBATIY, VLADISLAV | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/01/2016 | $                    - |
| 21st Century Oncology, LLC | GORBATIY, VLADISLAV | Employment Agreement - Physician Urology | 08/01/2015 | $                    - |
| 21st Century Oncology, LLC | GOTARDO A. RODRIGUES, M.D. | Equipment Lease | 12/28/2012 | $                    - |
| 21st Century Oncology, LLC | GOTARDO A. RODRIGUES, M.D., L.L.C. | Equipment Lease | 03/26/2016 | $                    - |
| 21st  Century Oncology, LLC | Gousse, Angelo E | Employment Agreement - Physician (employment ceased) | 4/16/2012 | $                    - |
| 21st Century Oncology, LLC | GRADUATE SURGICAL, P.A. | Equipment Lease | 03/05/2016 | $                    - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| Carolina Regional Cancer Center, LLC | GRAND STRAND REGIONAL MEDICAL CENTER | Graduate Medical Education Faculty Teaching and Administrative Agreement | 07/01/2016 | $ - |
| 21st Century Oncology Management Services, LLC f/k/a 21st Century Oncology Management Services, Inc. | Granite Telecommunications, LLC | Service Agreement | 11/2/2012 | $ 98,014.03 |
| 21st Century Oncology, LLC | GRANT DISICK, M.D., P.A. | Equipment Lease | 03/19/2016 | $ - |
| 21st Century Oncology, LLC | GRANT DISICK, M.D., P.A./LINTON GROVE, LLC | Building and Land Lease | 03/19/2016 | $ - |
| 21st Century Oncology, LLC | GRASSI, FRANK T | Employment Agreement - Bonus Pool Lee County Pulmonologist Subgroup Diagnostic | 02/05/2014 | $ - |
| 21st Century Oncology, LLC | GRASSI, FRANK T | Employment Agreement - Physician-Pulmonology | 02/05/2014 | $ - |
| 21st Century Oncology, Inc. | GRASSO, ELLEN L | Employment Agreement - Executive Employment Agreement | 08/01/2014 | $ - |
| 21st Century Oncology, Inc. | GREAT COMPUTER GUY | Services Agreement | 04/20/2017 | $ - |
| 21st Century Oncology, Inc. | GREEN, JOSHUA T | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/01/2016 | $ - |
| 21st Century Oncology, Inc. | GREEN, JOSHUA T | Employment Agreement - Medical Director Agreement | 12/01/2007 | $ - |
| 21st Century Oncology, Inc. | GREEN, JOSHUA T | Employment Agreement - Physician Urology | 03/01/2007 | $ - |
| Maryland Radiation Therapy Management Services, LLC | GREENBELT UROLOGICAL INSTITUTE, LLC | Seed Implantation Technical & Personnel Services Agreement | 08/01/2009 | $ - |
| Maryland Radiation Therapy Management Services, LLC | GREENBELT UROLOGY INSTITUTE, LLC | Agreement for Seed Implantation Technical and Personnel Services | 04/06/2009 | $ - |
| 21st Century Oncology, Inc. | GREENBRIER COUNTY NURSING HOME ASSOCIATION D/B/A GREENBRIER MANOR | Radiation Therapy Services Agreement | 09/17/2009 | $ - |
| West Virginia Radiation Therapy Services, Inc. | GREENBRIER COUNTY NURSING HOME ASSOCIATION DBA BRIER MANOR | Radiation Therapy Services Agreement | 08/21/2012 | $ - |
| 21st Century Oncology of Kentucky, LLC | GREGORY H. CARLSEN | Payor Agreement | 04/05/2010 | $ - |
| 21st Century Oncology of Kentucky, LLC | GREGORY H. CARLSEN | Payor Agreement | 10/30/2000 | $ - |
| 21st Century Oncology, LLC | GRENDYS, EDWARD C | Employment Agreement - Bonus Pool Lee County Diagnostic | 11/11/2009 | $ - |
| 21st Century Oncology, LLC | GRENDYS, EDWARD C | Employment Agreement - Physician GYN Oncology | 11/27/2009 | $ - |
| Michigan Radiation Therapy Management Services, Inc. | Greshams Seasonal Services | Lawn Maintenance | 4/5/2017 | $ 3,778.99 |
| 21st Century Oncology, LLC | GRIECO, EMIL R | Employment Agreement - Bonus Pool D'Angelo-Gurevitch-Luke Diagnostic | 12/01/2014 | $ - |
| 21st Century Oncology, LLC | GRIECO, EMIL R | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/01/2016 | $ - |
| 21st Century Oncology, LLC | GRIECO, EMIL R | Employment Agreement - Physician Urology | 07/01/2013 | $ - |
| 21st Century Oncology Management Services, Inc. | GRIFFIN AND ASSOCIATES CONSULTING, LLC | Consulting Agreement | 08/01/2011 | $ - |
| 21st Century Oncology, LLC | GROSSO, KATHLEEN E MINNICK | Employment Agreement - Physician Surgery | 01/01/2015 | $ - |
| 21st Century Oncology of New Jersey, Inc. | GROUP HEALTH INCORPORATED | Payor Agreement | 08/01/2005 | $ - |
| 21st Century Oncology, LLC | GROVER, PRIYANKA | Employment Agreement - Radiologist RH | 06/11/2014 | $ - |
| Atlantic Urology Clinics, LLC | GRUDZINSKI, ANDREW R | Employment Agreement - Physician Urology | 03/31/2010 | $ - |
| U.S. Cancer Care, Inc. | GRUPE-SQUAW VALLEY COMPANY, LTD | Building and Land Lease | 06/15/2000 | $ - |
| 21st Century Oncology, LLC | GUADIZ, HERMENEGILDO V | Employment Agreement - Physician Consulting | 12/27/2010 | $ - |
| 21st Century Oncology, Inc. | GUARDIAN LIFE OF THE CARIBBEAN | Payor Agreement | 03/01/2014 | $ - |
| 21st Century Oncology, Inc. | GULF CARE INC. DBA GULF COAST VILLAGE | Radiation Therapy Services Agreement | 03/31/2005 | $ - |
| 21st Century Oncology, LLC | GULF COAST COMMERCIAL GROUP, LLC | Building and Land Lease | 08/08/2014 | $ - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st Century Oncology, Inc. | GULF COAST UROLOGY PROPERTIES, LLP | Building and Land Lease | 11/01/2007 | $ - |
| 21st Century Oncology, LLC | GULF STREAM EAST, LLC | Building and Land Lease | 05/01/2010 | $ - |
| SFRO Holdings, LLC | GULFSTREAM BUSINESS BANK | Equipment Lease | 12/21/2010 | $ - |
| 21st Century Oncology, LLC | Gurevitch, Earl J | Employment Agreement - Physician (employment ceased) | 5/25/2013 | $ - |
| 21st Century Oncology, Inc. | GURSOY, AHMET | Employment Agreement - Physician Covering | 03/04/1999 | $ - |
| 21st Century Oncology, LLC | GUTHRIE, TROY H | Employment Agreement - Physician Medical Oncology | 06/29/2015 | $ - |
| 21st Century Oncology, LLC | GUTTMAN, MARC J | Employment Agreement - Bonus Pool Diagnostic CT | 10/01/2013 | $ - |
| 21st Century Oncology, LLC | GUTTMAN, MARC J | Employment Agreement - Bonus Pool Diagnostic PET/CT | 10/01/2013 | $ - |
| 21st Century Oncology, LLC | GUTTMAN, MARC J | Employment Agreement - Bonus Pool Lee/Collier Counties Urology Subgroup Pathology Lab No. 2 | 11/01/2011 | $ - |
| 21st Century Oncology, LLC | GUTTMAN, MARC J | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/01/2016 | $ - |
| 21st Century Oncology, LLC | GUTTMAN, MARC J | Employment Agreement - Physician Urology | 04/30/2011 | $ - |
| 21st Century Oncology, LLC | H&O EQUIPMENT, INC. | Revolving Sales Order Terms Agreement | 03/17/2017 | $ - |
| 21st Century Oncology, LLC | HAL J. BASHEIN, D.O., P.A. | Equipment Lease | 02/27/2016 | $ - |
| 21st Century Oncology Holdings, Inc. | Hall, Render, Killian, Heath & Lyman, PLLC | Legal Services | Engagement Letter | $ - |
| 21st Century Oncology, LLC | HAMADY, GHASSAN T | Employment Agreement - Physician Urology | 02/07/2012 | $ - |
| 21st Century Oncology, LLC | HAN, BEN H | Employment Agreement - Physician RAD Oncology | 02/10/2014 | $ - |
| 21st Century Oncology, LLC | HAN, HOKE | Employment Agreement - Physician RAD Oncology | 12/22/2014 | $ - |
| 21st Century Oncology, LLC | HANEY, WILLIAM M | Employment Agreement - Physician Surgery | 05/09/2016 | $ - |
| 21st Century Oncology, LLC | HANNAN, STEPHEN E | Employment Agreement - Bonus Pool Lee County Pulmonologist Subgroup Diagnostic | 02/05/2014 | $ - |
| 21st Century Oncology, LLC | HANNAN, STEPHEN E | Employment Agreement - Physician-Pulmonology | 02/05/2014 | $ - |
| 21st Century Oncology, Inc. | HANUS, MICHAEL | Employment Agreement - Physician RAD Oncology | 08/06/2004 | $ - |
| 21st Century Oncology, LLC | HANUS, MICHAEL | Employment Agreement - Bonus Pool CT | 11/29/2010 | $ - |
| 21st Century Oncology, LLC | HANUS, MICHAEL | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/01/2016 | $ - |
| 21st Century Oncology, LLC | HANUS, MICHAEL | Employment Agreement - Bonus Pool PET/CT | 07/01/2011 | $ - |
| Maryland Radiation Therapy Management Services, LLC | HARBHAJAN S AJRAWAT, MD | Joint Venture Agreement | 07/13/2005 | $ - |
| 21st Century Oncology Holdings, Inc. | Harbuck Keith & Holmes LLC | Local Counsel - Alabama | 3/28/2017 | $ - |
| OnCure Medical Corp. | HARDER PHYSICS LLC | Physics Services Agreement | 04/06/2017 | $ - |
| 21st Century Oncology, LLC | HARMON, CLAUDE A | Employment Agreement - Physician RAD Oncology | 07/01/2014 | $ - |
| New England Radiation Therapy Management Services, Inc. | HARRINGTON MEMORIAL HOSPITAL, INC.; UMASS MEMORIAL HEALTH VENTURES, INC. | Joint Venture Agreement | 01/07/2008 | $ - |
| 21st Century Oncology, LLC | HARRIS, DAVID S | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/01/2016 | $ - |
| 21st Century Oncology, LLC | HARRIS, DAVID S | Employment Agreement - Bonus PoolSlu Subgroup Diagnostic | 02/18/2014 | $ - |
| 21st Century Oncology, LLC | HARRIS, DAVID S | Employment Agreement - Physician Urology | 05/01/2013 | $ - |
| 21st Century Oncology of Jacksonville, LLC | HARRIS, JEFFREY M | Employment Agreement - Physician Medical Oncology | 02/28/2014 | $ - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st Century Oncology, Inc. | HARRIS, JEFFREY M | Employment Agreement - Bonus Pool Diagnostic | 12/02/2009 | $ - |
| 21st Century Oncology, LLC | HARRIS, JEFFREY M | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/01/2016 | $ - |
| Arizona Radiation Therapy Management Services, Inc. | HARRISON, NEDRA J | Employment Agreement - Physician Surgery | 10/01/2015 | $ - |
| 21st Century Oncology, Inc. | HARRISON, STEVEN A | Employment Agreement - Physician Urology | 12/14/2006 | $ - |
| 21st Century Oncology, LLC | HARRISON, STEVEN A | Employment Agreement - Bonus Pool Lee County Diagnostic | 09/01/2011 | $ - |
| 21st Century Oncology, LLC | HARRISON, STEVEN A | Employment Agreement - Bonus Pool Pathology Lab Addendum | 04/15/2016 | $ - |
| 21st Century Oncology, LLC | HART, MELINDA B | Employment Agreement - Physician Surgery | 01/09/2012 | $ - |
| 21st Century Oncology, Inc. | HARTFORD | Insurance Policy - Flood | 08/08/2016 | $ - |
| 21st Century Oncology, Inc. | HARTFORD | Insurance Policy - Flood | 08/08/2016 | $ - |
| 21st Century Oncology, Inc. | HARTFORD | Insurance Policy - Flood | 08/08/2016 | $ - |
| 21st Century Oncology, Inc. | HARTFORD | Insurance Policy - Flood | 08/08/2016 | $ - |
| 21st Century Oncology, LLC | HARTFORD | Insurance Policy - Flood | 06/20/2016 | $ - |
| 21st Century Oncology, LLC | HARTFORD | Insurance Policy - Flood | 09/19/2016 | $ - |
| 21st Century Oncology, LLC | HARTFORD | Insurance Policy - Flood | 10/23/2016 | $ - |
| 21st Century Oncology, LLC | HARTFORD | Insurance Policy - Flood | 10/24/2016 | $ - |
| 21st Century Oncology of New Jersey, Inc. | HARVEY, ALEXIS M | Employment Agreement - Physician RAD Oncology | 07/23/2007 | $ - |
| 21st Century Oncology of Jacksonville, LLC | HCP-RTS, LLC/HC-7751 BAYMEADOWS, LLC | Building and Land Lease | 04/01/2010 | $ - |
| 21st Century Oncology of Jacksonville, LLC | HCP-RTS, LLC/HC-7751 BAYMEADOWS, LLC | Building and Land Lease | 04/19/2010 | $ - |
| 21st Century Oncology, Inc. | HCP-RTS, LLC/HC-7850 NORTH UNIVERSITY DRIVE, LLC | Building and Land Lease | 04/01/2010 | $ - |
| 21st Century Oncology Investments, LLC | HDI GLOBAL INSURANCE COMPANY | Insurance Policy - Property/All Risk | 04/01/2017 | $ - |
| 21st Century Oncology, LLC | HEALTH CARE DISTRICT OF PALM BEACH COUNTY | Payor Agreement | 03/01/2016 | $ - |
| 21st Century Oncology, LLC | HEALTH CARE REIT, INC. | Building and Land Lease | 04/21/2014 | $ - |
| Arizona Radiation Therapy Management Services, Inc. | HEALTH CHOICE ARIZONA | Payor Agreement | 07/01/2013 | $ - |
| 21st Century Oncology of New Jersey, Inc. | HEALTH MANAGEMENT SERVICES ORGANIZATION, INC. | Joint Venture Agreement | 07/08/2013 | $ - |
| 21st Century Oncology of Alabama, LLC | HEALTH NET FEDERAL SERVICES, LLC | Payor Agreement | 07/08/2014 | $ - |
| 21st Century Oncology of New Jersey, Inc. | HEALTH NET FEDERAL SERVICES, LLC | Payor Agreement | 06/01/2013 | $ - |
| 21st Century Oncology of Prince Georges County, Maryland, LLC | HEALTH NET FEDERAL SERVICES, LLC | Payor Agreement | 09/29/2014 | $ - |
| Berlin Radiation Therapy Treatment Center, LLC | HEALTH NET FEDERAL SERVICES, LLC | Payor Agreement | 06/01/2013 | $ - |
| Carolina Regional Cancer Center, LLC | HEALTH NET FEDERAL SERVICES, LLC | Payor Agreement | 07/08/2014 | $ - |
| West Virginia Radiation Therapy Services, Inc. | HEALTH NET FEDERAL SERVICES, LLC | Payor Agreement | 06/01/2013 | $ - |
| Arizona Radiation Therapy Management Services, Inc. | HEALTH NET OF ARIZONA, INC. | Payor Agreement | 02/01/2013 | $ - |
| 21st Century Oncology, LLC | HEALTH SPRINGS | Payor Agreement | 11/21/2016 | $ - |
| 21st Century Oncology, LLC | HEALTH SUN HEALTH PLAN | Payor Agreement | 12/01/2006 | $ - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st Century Oncology, Inc. | HEALTH VALUE MANAGEMENT, INC. | Payor Agreement | 08/01/2012 | $                    - |
| New York Radiation Therapy Management Services, LLC | HEALTHCARE PROPERTIES | Building and Land Lease | 03/20/1998 | $                    - |
| OnCure Medical Corp. | HEALTHCARE REALTY SERVICES INCORPORATED | Building and Land Lease | 09/15/2005 | $                    - |
| 21st Century Oncology, Inc. | Healthcare Support Staffing, Inc. | Temporary/Right to Hire Agreement & Direct Placement Agreement | 12/29/2014 | $           245,387.56 |
| 21st Century Oncology, LLC | Healthcare Waste Removal & Shredding, LLC | Medical Waste Pickup Service Agreement | 1/1/2017 | $                    - |
| 21st Century Oncology, Inc. | HEALTHMARK REGIONAL MEDICAL CENTER | Agreement for Physician Office Space and Services | 03/01/2005 | $                    - |
| Atlantic Urology Clinics, LLC | HEALTHNET | Payor Agreement | 08/21/2014 | $                    - |
| 21st Century Oncology of Alabama, LLC | HEALTHNET OF ALABAMA | Payor Agreement | 04/30/2008 | $                    - |
| 21st Century Oncology of Alabama, LLC | HEALTHNET OF ALABAMA | Payor Agreement | 06/03/2009 | $                    - |
| West Virginia Radiation Therapy Services, Inc. | HEALTHSMART PREFERRED CARE | Payor Agreement | 03/01/2011 | $                    - |
| 21st Century Oncology, LLC | HEALTHSPRINGS OF FLORIDA, INC. | Payor Agreement | 01/25/2016 | $                    - |
| 21st Century Oncology, Inc. | HEALTHTRONICS INFORMATION TECHNOLOGY SOLUTIONS, LLC AS SUCCESSOR TO INTUITIVE MEDICAL SOFTWARE, LLC | Master Software License and Support Services Agreement | 07/19/2012 | $                    - |
| 21st Century Oncology, Inc. | HEARTLAND HEALTH CARE | Radiation Therapy Services Agreement | 11/16/2006 | $                    - |
| West Virginia Radiation Therapy Services, Inc. | HEARTLAND NURSING HOME | Radiation Therapy Services Agreement | 04/29/2009 | $                    - |
| 21st Century Oncology, Inc. | HEARTLAND OF BOCA RATON DBA HCR MANOR CARE | Radiation Therapy Services Agreement | 03/25/2008 | $                    - |
| West Virginia Radiation Therapy Services, Inc. | HEARTLAND OF RAINELLE, WEST VIRGINIA, LLC, INC. DBA HEARTLAND OF RAINELLE | Radiation Therapy Services Agreement | 08/21/2012 | $                    - |
| 21st Century Oncology, LLC | HELLERSTEIN, DANIEL K | Employment Agreement - Physician Urology | 10/15/2010 | $                    - |
| 21st Century Oncology, LLC | HEMATOLOGY & MEDICAL ONCOLOGYOF SOUTHERN PALM BEACH COUNTY, INC. | Building and Land Lease | 01/29/2007 | $                    - |
| 21st Century Oncology, LLC | HEMATOLOGY AND MEDICAL ONCOLOGY OF SOUTHERN PALM BEACH, FL | Building and Land Lease | 01/30/2016 | $                    - |
| 21st Century Oncology, LLC | HEMATOLOGY AND MEDICAL ONCOLOGY OF SOUTHERN PALM BEACH, FL | Building and Land Lease | 08/11/2010 | $                    - |
| 21st Century Oncology, LLC | HEMATOLOGY ONCOLOGY ASSOCIATES OF BOCA RATON, P.A./WINDROSE WEST BOCA PROPERTIES, LTD. | Building and Land Lease | 03/12/2016 | $                    - |
| North Carolina Radiation Therapy Management Services, LLC | HENDERSON MEDICAL OFFICES, LLC | Building and Land Lease | 10/31/2002 | $                    - |
| 21st Century Oncology, LLC | HENDERSON, RAYMOND | Employment Agreement - Physician Surgery | 03/20/2013 | $                    - |
| 21st Century Oncology, Inc. | HENRY SCHEIN INC | Lab supplies |  | $            12,671.01 |
| 21st Century Oncology of Kentucky, LLC | HERITAGE HOSPICE, INC. | Service Agreement | 03/18/2008 | $                    - |
| 21st Century Oncology, LLC | HERITAGE SUMMIT HEALTHCARE | Payor Agreement | 01/01/2011 | $                    - |
| 21st  Century Oncology, LLC | Hernandez, Cindy | Employment Agreement - Physician (employment ceased) | 8/11/2009 | $                    - |
| 21st Century Oncology, LLC | HERRMAN, EDWARD | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/01/2016 | $                    - |
| 21st Century Oncology, LLC | HERRMAN, EDWARD | Employment Agreement - Physician Urology | 03/30/2012 | $                    - |
| 21st Century Oncology, LLC | HIGGINS, DANIEL R | Employment Agreement - Physician Surgery | 12/01/2009 | $                    - |
| 21st Century Oncology, LLC d/b/a Adult Urology Clinic | Highland Capital Corporation | Equipment Lease Agreement | 1/27/2015 | $                109.16 |
| 21st Century Oncology, LLC | HILL, GEORGE A | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/01/2016 | $                    - |
| 21st Century Oncology, LLC | HILL, GEORGE A | Employment Agreement - Physician Urology | 03/30/2012 | $                    - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st Century Oncology of Alabama, LLC | HMHS TRICARE | Payor Agreement | 01/01/2008 | $ - |
| 21st Century Oncology, LLC | HNFS VA | Payor Agreement | 07/30/2014 | $ - |
| 21st Century Oncology, LLC | HOKU PROPERTIES, LLC | Building and Land Lease | 10/27/2014 | $ - |
| 21st Century Oncology, LLC | HOLLEN, TYLER R | Employment Agreement - Physician RAD Oncology | 08/04/2014 | $ - |
| 21st Century Oncology, LLC | HOLOGIC, INC. | Maintenance Agreement | 10/14/2014 | $ 31,093.65 |
| 21st Century Oncology, LLC | HOLY CROSS HOSPITAL, INC. | Building and Land Lease | 10/26/2007 | $ - |
| 21st Century Oncology of Jacksonville, LLC | HOMESITE INSURANCE | Insurance Policy - Flood | 10/20/2016 | $ - |
| 21st Century Oncology of Jacksonville, LLC | HOMESITE INSURANCE | Insurance Policy - Flood | 10/20/2016 | $ - |
| OnCure Medical Corp. | HOMESITE INSURANCE | Insurance Policy - Flood | | $ - |
| OnCure Medical Corp. | HOMESITE INSURANCE | Insurance Policy - Flood | | $ - |
| OnCure Medical Corp. | HOMESITE INSURANCE | Insurance Policy - Flood | 10/20/2016 | $ - |
| OnCure Medical Corp. | HOMESITE INSURANCE | Insurance Policy - Flood | 10/20/2016 | $ - |
| 21st Century Oncology, LLC | HOPE HOSPICE AND COMMUNITY SERVICES, INC. | Payor Agreement | 10/01/2009 | $ - |
| 21st Century Oncology, LLC | HOPE HOSPICE AND COMMUNITY SERVICES, INC. DBA HOPE HOSPICE | Independent Contractor Agreement | 05/21/2014 | $ - |
| 21st Century Oncology of New Jersey, Inc. | HORIZON HEALTHCARE OF NEW JERSEY, INC. | Payor Agreement | 09/16/2002 | $ - |
| 21st Century Oncology of New Jersey, Inc. | HORIZON HEALTHCARE OF NEW JERSEY, INC. | Payor Agreement | 12/01/2005 | $ - |
| 21st  Century Oncology of New Jersey Inc | Horvick, David E | Employment Agreement - Physician (employment ceased) | 9/15/2008 | $ - |
| 21st Century Oncology, LLC | HOSPICE OF MARION COUNTY, INC. | Agreement for Radiation Therapy | 06/20/2014 | $ - |
| 21st Century Oncology, Inc. | HOSPITAL BOARD OF DIRECTORS OF LEE COUNTY DBA LEE MEMORIAL HEALTH SYSTEM | Radiation Therapy Services Agreement | 01/04/1999 | $ - |
| 21st Century Oncology of Jacksonville, LLC | HOU, ZHEN | Employment Agreement - Physician Medical Oncology | 05/01/2008 | $ - |
| 21st Century Oncology, LLC | HOU, ZHEN | Employment Agreement - Bonus Pool Diagnostic | 12/12/2009 | $ - |
| 21st Century Oncology, LLC | HOU, ZHEN | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/01/2016 | $ - |
| 21st Century Oncology, LLC | HOU, ZHEN | Employment Agreement - Physician Medical Oncology | 05/01/2008 | $ - |
| 21st Century Oncology Holdings, Inc. | HOWARD SHERIDAN | Indemnification Agreement | 09/26/2014 | $ - |
| 21st Century Oncology of Prince Georges County, Maryland, LLC | HOWARD UNIVERSITY ON BEHALF OF FACULTY PRACTICE PLAN HOWARD UNIVERSITY | Agreement for Technical HDR Brachytherapy Services | 12/15/2009 | $ - |
| 21st Century Oncology of Kentucky, LLC | HROMYAK JR, GEORGE F | Employment Agreement - Physician Consulting | 03/22/2011 | $ - |
| 21st Century Oncology, LLC | HRUBY, ROBERT E | Employment Agreement - Physician Surgery | 09/13/2012 | $ - |
| 21st Century Oncology, LLC | HTA-AW PALMETTO, LLC | Building and Land Lease | 08/01/2013 | $ - |
| 21st Century Oncology, LLC | HTA-COMMONS V, LLC | Building and Land Lease | 05/01/2013 | $ - |
| 21st Century Oncology, Inc. | HT-GAF Holdings, LLC dba Gaffey Healthcare | Master Revenue Cycle Services Agreement | 4/28/2017 | $ - |
| 21st Century Oncology, Inc. | HTSG Holdings, LLC f/k/a HT-GAF Holdings, LLC d/b/a GAFFEY Healthcare | Healthcare services contract | 5/9/2017 | $ 15,000.00 |
| 21st Century Oncology, LLC | HUDDLESTUN, JAMES E | Employment Agreement - Physician Consulting | 04/04/2011 | $ - |
| 21st Century Oncology of Kentucky, LLC | HUMANA INSURANCE COMPANY | Payor Agreement | 04/01/2009 | $ - |

| Debtor | Creditor | Description | Date | Cure Amount |
|--------|----------|-------------|------|-------------|
| 21st Century Oncology, Inc. | HUMANA INSURANCE COMPANY | Payor Agreement | 08/01/2012 | $                           - |
| 21st Century Oncology, LLC | HUMANA INSURANCE COMPANY | Payor Agreement | 01/01/2016 | $                           - |
| 21st Century Oncology, LLC | HUMANA INSURANCE COMPANY | Payor Agreement | 03/11/2011 | $                           - |
| 21st Century Oncology, LLC | HUMANA INSURANCE COMPANY | Payor Agreement | 08/01/2003 | $                           - |
| 21st Century Oncology, LLC | HUMANA INSURANCE COMPANY | Payor Agreement | 12/01/2007 | $                           - |
| Arizona Radiation Therapy Management Services, Inc. | HUMANA INSURANCE COMPANY | Payor Agreement | 08/01/2008 | $                           - |
| Arizona Radiation Therapy Mngt Services | Hurm, Raymond A | Employment Agreement - Physician (employment ceased) | 3/21/2013 | $                           - |
| 21st Century Oncology, LLC | IBA DOSIMETRY AMERICA | Maintenance Agreement | 03/20/2017 | $                           - |
| 21st Century Oncology, LLC | IGLESIAS, ARTHUR J | Employment Agreement - Physician RAD Oncology | 01/08/2013 | $                           - |
| 21st Century Oncology, LLC | IJA, INC./THOMAS RYAN REAL ESTATE MANAGEMENT, INC. | Building and Land Lease | 02/01/2015 | $                           - |
| 21st  Century Oncology, LLC | Illel, Jaime | Employment Agreement - Physician (employment ceased) | 7/12/2005 | $                           - |
| 21st Century Oncology, LLC | IMAGEFIRST HEALTHCARE LAUNDRY SPECIALISTS, INC. | Vendor Agreement | 03/24/2014 | $                  41,652.18 |
| Arizona Radiation Therapy Management Services, Inc. | IMAGINE HEALTH | Payor Agreement | 07/01/2015 | $                           - |
| OnCure Medical Corp. | INALSINGH RAY | Building and Land Lease | 07/01/2004 | $                           - |
| OnCure Medical Corp. | INALSINGH RAY | Building and Land Lease | 07/01/2004 | $                           - |
| 21st Century Oncology, Inc. | INCLINE PLANNING SOLUTIONS, INC. | Professional Services Agreement | 08/16/2016 | $                           - |
| 21st Century Oncology, LLC | INMATE HEALTH SERVICES | Payor Agreement | 11/20/2016 | $                           - |
| Arizona Radiation Therapy Management Services, Inc. | INMATE HEALTH SERVICES | Payor Agreement | 01/11/2016 | $                           - |
| 21st Century Oncology, Inc. | INNOVATIVE SURGICAL RESOURCES, INC. | Consulting Agreement | 09/22/2008 | $                           - |
| 21st Century Oncology of New Jersey, Inc. | INSPIRA MEDICAL CENTER | Payor Agreement | 07/25/2013 | $                           - |
| 21st Century Oncology, Inc. | INTELLITECH CONSULTING, INC. | Consulting Agreement | 04/13/2013 | $                           - |
| Financial Services of Southwest Florida, LLC | INTERNAL MEDICINE & WOUND CARE SPECIALISTS LLC | Management Services Agreement | 02/01/2014 | $                           - |
| 21st Century Oncology, LLC | Intrinsiq Specialty Solutions, Inc. | Consulting Agreement & SOW | 1/24/2017 | $                  15,391.43 |
| 21st Century Oncology, LLC | INTUITIVE MEDICAL SOFTWARE, LLC | Software License and Support Services Agreement | 12/22/2009 | $                           - |
| U.S. Cancer Care, Inc. | IOM HEALTH SYSTEM, LP DBA LUTHERAN HOSPITAL OF INDIANA | Professional Services Agreement | 06/06/2016 | $                           - |
| 21st Century Oncology, LLC | ISAAC VAISMAN, M.D. | Radiation Oncology Professional Services Agreement | 01/23/2017 | $                           - |
| 21st Century Oncology, LLC | J.P.&G., LLC | Building and Land Lease | 06/02/2016 | $                           - |
| 21st  Century Oncology, LLC | Jaffe, David | Employment Agreement - Physician (employment ceased) | 12/22/2008 | $                           - |
| 21st Century Oncology, LLC | JAMES CHATHAM ENTERPRISES LLC | Professional Services Agreement | 05/01/2017 | $                           - |
| 21st Century Oncology Holdings, Inc. | JAMES ELROD | Indemnification Agreement | 09/26/2014 | $                           - |
| Atlantic Urology Clinics, LLC | JANSEN, ROBERT M | Employment Agreement - Physician Urology | 08/01/2016 | $                           - |
| 21st Century Oncology, LLC | JAY, JONATHAN K | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/01/2016 | $                           - |
| 21st Century Oncology, LLC | JAY, JONATHAN K | Employment Agreement - Bonus Pool SIU Subgroup Diagnostic | 02/19/2014 | $                           - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st Century Oncology, LLC | JAY, JONATHAN K | Employment Agreement - Physician Urology | 05/01/2013 | $                    - |
| 21st Century Oncology, LLC | JEFFREY W. LEWIS, M.D., P.A. | Equipment Lease | 11/15/2012 | $                    - |
| 21st Century Oncology, LLC | JEROME PROPERTIES 1699 LLC | Building and |  | $                    - |
| 21st Century Oncology of Kentucky, LLC | JEWISH HERITAGE FUND FOR EXCELLENCE, INC. D/B/A JEWISH HOSPITAL HEALTHCARE SERVICES, INC. | Joint Venture Agreement | 07/19/2007 | $                    - |
| 21st Century Oncology, Inc. | JIPA NETWORK | Payor Agreement | 03/01/2014 | $                    - |
| 21st Century Oncology, LLC | JOHN A. RIMMER, M.D., P.A. | Equipment Lease | 02/27/2016 | $                    - |
| 21st Century Oncology of Prince Georges County, Maryland, LLC | JOHN HOPKINS HEALTHCARE | Payor Agreement | 06/01/2007 | $                    - |
| Berlin Radiation Therapy Treatment Center, LLC | JOHN HOPKINS HEALTHCARE | Payor Agreement | 06/04/2010 | $                    - |
| 21st Century Oncology, LLC | JOHNSON & JOHNSON HEALTH CARE SYSTEMS, INC. | Vendor Agreement | 01/01/2017 | $                    - |
| 21st Century Oncology Holdings, Inc. | Johnson, Pope, Bokor, Ruppel & Burns | Litigation counsel | 12/19/2016 | $                    - |
| Maryland Radiation Therapy Management Services, LLC | JONAH D. MURDOCK, MD | Joint Venture Agreement | 07/13/2005 | $                    - |
| 21st Century Oncology, LLC | JONATHAN D. BRATTER D.O. P.A./SOUTH BROWARD HOSPITAL DISTRICT | Building and Land Lease | 01/06/2014 | $                    - |
| 21st  Century Oncology of Kentucky, LLC | Jones, Mark Robert | Employment Agreement - Physician | 6/1/1994 | $                    - |
| 21st Century Oncology, LLC | JORDAN, JACOB H | Employment Agreement - Bonus Pool Diagnostic CT | 11/29/2010 | $                    - |
| 21st Century Oncology, LLC | JORDAN, JACOB H | Employment Agreement - Bonus Pool Diagnostic PET/CT | 07/01/2011 | $                    - |
| 21st Century Oncology, LLC | JORDAN, JACOB H | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/15/2016 | $                    - |
| 21st Century Oncology, LLC | JORDAN, JACOB H | Employment Agreement - Physician Surgery | 09/10/2010 | $                    - |
| 21st Century Oncology, LLC | JOSE A. CHAMORRO, M.D./HEALTHCARE REALTY SERVICES INCORPORATED | Building and Land Lease | 03/26/2016 | $                    - |
| 21st Century Oncology, LLC | JOSEPH VICKARYOUS, D.O., P.A. | Building and Land Lease | 08/20/2013 | $                    - |
| 21st  Century Oncology, LLC | Joyce, Robert A | Employment Agreement - Physician (employment ceased) | 5/1/2008 | $                    - |
| 21st Century Oncology, LLC | JUBRAN HOCHE, M.D. | Building and Land Lease |  | $                    - |
| 21st Century Oncology, LLC | JUPITER MEDICAL CENTER INC. | Building and Land Lease | 12/15/2015 | $                    - |
| 21st Century Oncology, LLC | JUPITER ULTRASOUND SERVICES, INC. | Ultrasound Technician Services Agreement | 11/16/2015 | $                    - |
| 21st Century Oncology Management Services, Inc. | JYP ORLANDO, LLC | Master Services Agreement | 04/26/2010 | $                    - |
| 21st Century Oncology Management Services, Inc. | JYP ORLANDO, LLC | Master Services Agreement | 04/26/2010 | $                    - |
| 21st Century Oncology Management Services, Inc. | JYP ORLANDO, LLC | Master Services Agreement | 11/05/2010 | $                    - |
| 21st Century Oncology, LLC | K&V LEASING, LLC | Building and Land Lease | 03/22/2017 | $                    - |
| 21st Century Oncology, LLC | KAHN, DAVID M | Employment Agreement - Physician Medical Oncology | 07/23/2013 | $                    - |
| 21st Century Oncology, LLC | KAHN, PAUL R | Employment Agreement - Bonus Pool Broward County Urology Subgroup Pathology Lab | 07/01/2013 | $                    - |
| 21st Century Oncology, LLC | KAHN, PAUL R | Employment Agreement - Bonus Pool Pathology Lab Addendum | 04/07/2016 | $                    - |
| 21st Century Oncology, LLC | KAHN, PAUL R | Employment Agreement - Physician Urology | 09/10/2012 | $                    - |
| 21st Century Oncology, Inc. | KAISER PERMANENTE | Payor Agreement | 05/01/2014 | $                    - |
| 21st Century Oncology, LLC | KALEMERIS, GEORGE C | Employment Agreement - Physician Pathology | 07/15/2014 | $                    - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st  Century Oncology, LLC | Kalkounos, Peggy C | Employment Agreement - Physician (employment ceased) | 11/1/2010 | $                    - |
| 21st  Century Oncology, LLC | Kammerlocher, Thad C | Employment Agreement - Physician (employment ceased) | 2/1/2007 | $                    - |
| 21st Century Oncology, LLC | KAPLAN, EDWARD J | Employment Agreement - Physician RAD Oncology | 06/01/2013 | $                    - |
| 21st  Century Oncology, LLC | Kaplan, Kenneth A | Employment Agreement - Physician (employment ceased) | 10/26/2013 | $                    - |
| 21st Century Oncology, LLC | KAPLON, DANIEL | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/01/2016 | $                    - |
| 21st Century Oncology, LLC | KAPLON, DANIEL | Employment Agreement - Physician Urology | 06/22/2011 | $                    - |
| 21st Century Oncology of Harford County, Maryland, LLC | KATIN RADIATION THERAPY, P.A. | Professional Services | | $                    - |
| Berlin Radiation Therapy Treatment Center, LLC | KATIN RADIATION THERAPY, P.A. | Professional Services Agreement | 01/01/2005 | $                    - |
| Maryland Radiation Therapy Management Services, LLC | KATIN RADIATION THERAPY, P.A. | Management Services Agreement | 10/31/1998 | $                    - |
| West Virginia Radiation Therapy Services, Inc. | KATIN RADIATION THERAPY, P.A. | Professional Services Agreement | 01/01/2011 | $                    - |
| Maryland Radiation Therapy Management Services, LLC | KATIN RADIATION THERAPY, P.A.; MICHAEL J. KATIN, MD | Transition Agreement and Stock Pledge | 08/01/2002 | $                    - |
| 21st Century Oncology, Inc. | KATIN, MICHAEL | Employment Agreement - Executive Physician RAD Oncology | 02/21/2008 | $                    - |
| 21st  Century Oncology, LLC | Katin, Michael | Employment Agreement - Physician | 7/1/1981 | $                    - |
| 21st Century Oncology, LLC | KATZ, ANDREA | Employment Agreement - Physician Covering | 06/01/2017 | $                    - |
| 21st  Century Oncology, LLC | Kaufman, Ariel M | Employment Agreement - Physician (employment ceased) | 12/28/2015 | $                    - |
| 21st Century Oncology, LLC | KAZA, SRINIVAS | Employment Agreement - Physician Surgery | 08/21/2012 | $                    - |
| Carolina Regional Cancer Center, LLC | KELLEY, MICHAEL H | Employment Agreement - Physician Consulting | 03/01/2011 | $                    - |
| 21st  Century Oncology of Kentucky, LLC | Kemper, Warren | Employment Agreement - Physician | 12/14/2009 | $                    - |
| Arizona Radiation Therapy Management Services, Inc. | KENNELL, WILLIAM J | Employment Agreement - Physician Consulting | 03/09/2009 | $                    - |
| U.S. Cancer Care, Inc. | KENNETH S. BERGMAN; ESMOND K. CHAN TRUSTEE OF THE CHAN FAMILY TRUST UDT DATED APRIL 5, 1993; ROBERT I. FISHBURN TRUSTEE OF THE ROBERT I. FISHBURN FAMILY | Joint Venture Agreement | 03/08/2001 | $                    - |
| 21st Century Oncology, LLC | KERNS, ALBERT | Employment Agreement - Physician Consulting | 07/14/2009 | $                    - |
| 21st Century Oncology, LLC | KERWIN, TIMOTHY L | Employment Agreement - Physician RAD Oncology | 05/23/2013 | $                    - |
| 21st  Century Oncology, LLC | Kester, Robert R | Employment Agreement - Physician (employment ceased) | 9/23/2013 | $                    - |
| 21st Century Oncology, Inc. | KESTIN, LARRY L | Employment Agreement - Director Thorasic Lung Research | 03/16/2011 | $                    - |
| 21st Century Oncology Holdings, Inc. | KEY EQUIPMENT FINANCE, INC. | Equipment Lease | 08/29/2011 | $                    - |
| 21st Century Oncology Holdings, Inc. | KEY EQUIPMENT FINANCE, INC. | Equipment Lease | 08/29/2011 | $                    - |
| 21st Century Oncology Holdings, Inc. | KEY EQUIPMENT FINANCE, INC. | Equipment Lease | 12/01/2010 | $                    - |
| 21st Century Oncology Holdings, Inc. | KEY EQUIPMENT FINANCE, INC. | Equipment Lease | 12/16/2010 | $                    - |
| 21st Century Oncology, LLC | KEY EQUIPMENT FINANCE, INC. | Equipment Lease | 04/01/2010 | $                    - |
| 21st Century Oncology, LLC | KEY EQUIPMENT FINANCE, INC. | Equipment Lease | 04/01/2010 | $                    - |
| 21st Century Oncology, LLC | Keys Energy Services | Electricity Utility Agreement | 9/2/2016 | $                    - |
| 21st Century Oncology, LLC | Keys Energy Services | Electricity Utility Agreement | 12/21/2004 | $                    - |
| 21st Century Oncology of New Jersey, Inc. | KEYSTONE HEALTH PLAN | Payor Agreement | 11/01/2015 | $                    - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st  Century Oncology of Kentucky, LLC | Khan, Khuda D | Employment Agreement - Physician | 8/1/2017 | $ - |
| 21st Century Oncology of Jacksonville, LLC | KHAN, MOHAMMAD | Employment Agreement - Bonus Pool Jacksonville Diagnostic | 07/01/2014 | $ - |
| 21st Century Oncology of Jacksonville, LLC | KHAN, MOHAMMAD | Employment Agreement - Physician Medical Oncology | 06/09/2011 | $ - |
| 21st Century Oncology, LLC | KHAN, MOHAMMAD | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/01/2016 | $ - |
| 21st Century Oncology, LLC | KHAN, MOHAMMAD | Employment Agreement - Physician Medical Oncology | 06/09/2011 | $ - |
| 21st  Century Oncology of Kentucky, LLC | Khan, Mohammad I | Employment Agreement - Physician | 8/1/2017 | $ - |
| Atlantic Urology Clinics, LLC | KIDNEY CORNER ASSOCIATES, LLC | Building and Land Lease | 05/01/2012 | $ - |
| 21st Century Oncology of Jacksonville, LLC | KIM, GEORGE P | Employment Agreement - Bonus Pool Pathology Lab Addendum | 04/07/2016 | $ - |
| 21st Century Oncology of Jacksonville, LLC | KIM, GEORGE P | Employment Agreement - Physician Medical Oncology | 08/25/2014 | $ - |
| 21st Century Oncology, LLC | KIM, GEORGE P | Employment Agreement - Bonus Pool Pathology Lab Addendum | 04/07/2016 | $ - |
| 21st Century Oncology, LLC | KIM, GEORGE P | Employment Agreement - Physician Medical Oncology | 08/25/2014 | $ - |
| 21st  Century Oncology, LLC | King, Sherry A | Employment Agreement - Physician (employment ceased) | 6/22/2012 | $ - |
| OnCure Medical Corp. | KIRK C. WENTLAND | Building and Land Lease | 06/01/2004 | $ - |
| 21st Century Oncology Investments, LLC; 21C East Florida, LLC | Kishore Dass, Seema Dass 2014 GRAT, Ben Han and Rajiv Patel | Securities Contribution and Purchase Agreement | 7/2/2015 | $ - |
| 21st Century Oncology, LLC | KLEBAN, DONNA H | Employment Agreement - Physician Surgery | 03/13/2015 | $ - |
| 21st Century Oncology, LLC | KLEIN, THOMAS J | Employment Agreement - Physician RAD Oncology | 04/01/2013 | $ - |
| 21st  Century Oncology, LLC | Klopukh, Boris | Employment Agreement - Physician (employment ceased) | 12/28/2015 | $ - |
| 21st Century Oncology, LLC | KLUTKE, CARL G | Employment Agreement - Bonus Pool Pathology Lab Addendum | 09/20/2016 | $ - |
| 21st Century Oncology, LLC | KLUTKE, CARL G | Employment Agreement - Physician Urology | 09/20/2016 | $ - |
| 21st Century Oncology, Inc. | KONE INC | Maintenance Agreement | 1/19/2011 | $ 12,368.60 |
| 21st Century Oncology, LLC | KOPIDAKIS, GEORGE | Employment Agreement - Physician Surgery | 07/08/2013 | $ - |
| 21st  Century Oncology, LLC | Kopp, Robert W | Employment Agreement - Physician | 7/17/2017 | $ - |
| 21st Century Oncology, LLC | KOSHY, MARY | Employment Agreement - Physician RAD Oncology | 10/01/2013 | $ - |
| 21st  Century Oncology, LLC | Kowalchik, Kristin V | Employment Agreement - Physician (employment ceased) | 3/1/2015 | $ - |
| 21st Century Oncology, Inc. | KOWALSKY, THOMAS E | Employment Agreement - Medical Director Agreement | 09/01/2008 | $ - |
| 21st Century Oncology, Inc. | KOWALSKY, THOMAS E | Employment Agreement - Physician Surgery | 02/01/2007 | $ - |
| 21st Century Oncology, LLC | KOWALSKY, THOMAS E | Employment Agreement - Bonus Pool Diagnostic | 12/01/2009 | $ - |
| 21st Century Oncology, LLC | KOWALSKY, THOMAS E | Employment Agreement - Call Coverage Agreement with Lee Memorial Health System | 05/30/2008 | $ - |
| 21st Century Oncology, Inc. | KRONOS INCORPORATED | Software License and Services Agreement | 04/27/2011 | $ - |
| 21st Century Oncology, LLC | KRUGLYAK, ELENA | Employment Agreement - Physician Medical Oncology | 01/01/2012 | $ - |
| Atlantic Urology Clinics, LLC | KRZYZANIAK, KENNETH E | Employment Agreement - Physician Urology | 03/31/2010 | $ - |
| 21st Century Oncology of Jacksonville, LLC | KURUVILLA, ANAND M | Employment Agreement - Physician RAD Oncology | 03/01/2015 | $ - |
| 21st Century Oncology, LLC | KURUVILLA, ANAND M | Employment Agreement - Physician RAD Oncology | 03/01/2015 | $ - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st  Century Oncology, LLC | Kuruvilla, Anand M | Employment Agreement - Physician (employment ceased) | 3/1/2015 | $                 - |
| 21st Century Oncology, LLC | KURZER, ELIECER | Employment Agreement - Bonus Pool Pathology Lab Addendum | 04/05/2016 | $                 - |
| 21st Century Oncology, LLC | KURZER, ELIECER | Employment Agreement - Bonus Pool SE FL Subgroup Pathology Lab | 05/23/2011 | $                 - |
| 21st Century Oncology, LLC | KURZER, ELIECER | Employment Agreement - Physician Urology | 05/23/2011 | $                 - |
| 21st Century Oncology, LLC | LABORIE MEDICAL TECHNOLOGIES CORP | Support and Maintenance Agreement | 04/10/2017 | $        27,385.46 |
| 21st Century Oncology, LLC | LACLAUSTRA, YVETTE | Employment Agreement - Physician Surgery | 01/01/2015 | $                 - |
| 21st Century Oncology, LLC | LAKEWOOD RANCH ONCOLOGY HOLDINGS, LLC | Building and Land Lease | 03/31/2012 | $                 - |
| 21st  Century Oncology, LLC | Lakomy, Dale G | Employment Agreement - Physician (employment ceased) | 10/26/2013 | $                 - |
| 21st Century Oncology, LLC | LANDAU, EVAN M | Employment Agreement - Physician RAD Oncology | 09/28/2011 | $                 - |
| 21st Century Oncology, Inc. | LANDESK SOFTWARE, INC. | Amendment to Master Software License and Support Agreement | 08/31/2016 | $                 - |
| 21st Century Oncology, Inc. | LANDESK SOFTWARE, INC. | Master Software License and Support Agreement | 12/12/2012 | $                 - |
| 21st Century Oncology, LLC | LANDGROVE ASSOCIATES, LLC | Building and Land Lease | 10/09/2006 | $                 - |
| 21st Century Oncology Investments, LLC | LANDMARK AMERICAN INSURANCE COMPANY | Insurance Policy - Property/All Risk | 04/01/2017 | $                 - |
| 21st  Century Oncology, LLC | Lane, Richard J | Employment Agreement - Physician (employment ceased) | 2/1/2014 | $                 - |
| 21st Century Oncology, LLC | LANGFORD, CAROLYN F | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/25/2016 | $                 - |
| 21st Century Oncology, LLC | LANGFORD, CAROLYN F | Employment Agreement - Bonus Pool SIU Subgroup Diagnostic | 02/18/2014 | $                 - |
| 21st Century Oncology, LLC | LANGFORD, CAROLYN F | Employment Agreement - Physician Urology | 05/01/2013 | $                 - |
| 21st Century Oncology Harford | Lanphear, David M | Employment Agreement - Physician (employment ceased) | 12/3/2009 | $                 - |
| 21st  Century Oncology, LLC | Lascheid, William | Employment Agreement - Physician (employment ceased) | 12/22/2008 | $                 - |
| Arizona Radiation Therapy Mngt Services | Latif, Shahid | Employment Agreement - Physician (employment ceased) | 11/17/2008 | $                 - |
| 21st Century Oncology, LLC | LAVILLA PARTNERS, LLP | Building and Land Lease | 08/01/2015 | $                 - |
| 21st Century Oncology, LLC | LAWRENCE R. BLACK,M D.O., P.A. | Equipment Sublease and License Agreement | 04/01/2013 | $                 - |
| 21st Century Oncology, LLC | LBL REAL ESTATE, LLC | Building and Land Lease | 02/01/2014 | $                 - |
| 21st Century Oncology, Inc. | LEE MEMORIAL HEALTH SYSTEM | Building and Land Lease | 10/27/2008 | $                 - |
| 21st Century Oncology, Inc. | LEE MEMORIAL HEALTH SYSTEM | Service Contract | 07/14/2003 | $                 - |
| 21st Century Oncology, LLC | LEE MEMORIAL HEALTH SYSTEM | Agreement for Uronav MRI Fusion Guide Biopsy Services | 01/18/2016 | $                 - |
| 21st Century Oncology, LLC | LEE MEMORIAL HEALTH SYSTEM | Building and Land Lease | 01/01/2011 | $                 - |
| 21st Century Oncology, LLC | LEE MEMORIAL HEALTH SYSTEM | Building and Land Lease | 10/27/2008 | $                 - |
| 21st Century Oncology, LLC | LEE MEMORIAL HEALTH SYSTEM | Equipment Lease and Accessory Purchase Agreement | 06/11/2012 | $                 - |
| 21st Century Oncology, LLC | LEE MEMORIAL HEALTH SYSTEM | Equipment Lease | 06/01/2012 | $                 - |
| 21st Century Oncology, LLC | LEE MEMORIAL HEALTH SYSTEM | Equipment Sterilization Services Agreement | 02/05/2014 | $                 - |
| 21st Century Oncology, LLC | LEE MEMORIAL HEALTH SYSTEM | Equipment Sterilization Services Agreement | 11/14/2014 | $                 - |
| 21st Century Oncology, LLC | LEE MEMORIAL HEALTH SYSTEM | Independent Contractor Agreement | 03/24/2016 | $                 - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st Century Oncology, LLC | LEE MEMORIAL HEALTH SYSTEM | Independent Contractor Agreement | 06/01/2012 | $ - |
| 21st Century Oncology, LLC | LEE MEMORIAL HEALTH SYSTEM | Independent Contractor Agreement | 07/07/2016 | $ - |
| 21st Century Oncology, LLC | LEE MEMORIAL HEALTH SYSTEM | Management Services Agreement | 03/01/2013 | $ - |
| 21st Century Oncology, LLC | LEE MEMORIAL HEALTH SYSTEM | Physician Recruitment Agreement (Foregut Surgery) | 10/22/2015 | $ - |
| 21st Century Oncology, LLC | LEE MEMORIAL HEALTH SYSTEM | Physician Recruitment Agreement (Head/Neck Surgery) | 07/20/2015 | $ - |
| 21st Century Oncology, LLC | LEE MEMORIAL HEALTH SYSTEM | Professional Services Agreement | 01/01/2008 | $ - |
| 21st Century Oncology, LLC | LEE MEMORIAL HEALTH SYSTEM | Professional Services Agreement | 02/20/2014 | $ - |
| 21st Century Oncology, LLC | LEE MEMORIAL HEALTH SYSTEM | Professional Services Agreement | 05/01/2011 | $ - |
| 21st Century Oncology, LLC | LEE MEMORIAL HEALTH SYSTEM | Professional Services Agreement | 05/30/2008 | $ - |
| 21st Century Oncology, LLC | LEE MEMORIAL HEALTH SYSTEM | Professional Services Agreement | 09/28/2011 | $ - |
| 21st Century Oncology, LLC | LEE, TONY T | Employment Agreement - Physician RAD Oncology | 11/01/2010 | $ - |
| 21st Century Oncology, Inc. | LETSON JR, WILLIAM M | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/01/2016 | $ - |
| 21st Century Oncology, Inc. | LETSON JR, WILLIAM M | Employment Agreement - Medical Director Agreement | 12/01/2007 | $ - |
| 21st Century Oncology, Inc. | LETSON JR, WILLIAM M | Employment Agreement - Physician Urology | 08/01/2007 | $ - |
| 21st  Century Oncology, LLC | Letson Sr, William | Employment Agreement - Physician (employment ceased) | 12/22/2008 | $ - |
| 21st  Century Oncology, LLC | Lewis, Jeffrey W | Employment Agreement - Physician (employment ceased) | 11/15/2012 | $ - |
| 21st Century Oncology, LLC | LEXINGTON INSURANCE COMPANY | Insurance Policy - Network Security / E&O (Cyber) Excess | 08/30/2016 | $ - |
| 21st Century Oncology Investments, LLC | LEXINGTON INSURANCE COMPANY | Insurance Policy - Property/All Risk | 04/01/2017 | $ - |
| 21st Century Oncology, LLC | LIBERMAN, MARK A | Employment Agreement - Bonus Pool Collier County Diagnostic PET/CT | 07/31/2011 | $ - |
| 21st Century Oncology, LLC | LIBERMAN, MARK A | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/01/2016 | $ - |
| 21st Century Oncology, LLC | LIBERMAN, MARK A | Employment Agreement - Physician Surgery | 02/01/2011 | $ - |
| 21st Century Oncology, LLC | LIBERTY HEALTHSHARE | Payor Agreement | 04/01/2016 | $ - |
| 21st Century Oncology Investments, LLC | LIBERTY MUTUAL FIRE INSURANCE COMPANY | Insurance Policy - Property/All Risk | 04/01/2017 | $ - |
| 21st Century Oncology Investments, LLC | LIBERTY SURPLUS INSURANCE CORPORATION | Insurance Policy - Property/All Risk | 04/01/2017 | $ - |
| 21st Century Oncology, Inc. | LIEBERFARB, MARSHAL EVAN | Employment Agreement - Physician RAD Oncology | 09/16/2005 | $ - |
| 21st Century Oncology, LLC | LIEBERT, CARL W | Employment Agreement - Physician Covering | 04/18/2011 | $ - |
| 21st Century Oncology, LLC | LIEF, MATTHEW S | Employment Agreement - Physician Urology | 11/13/2013 | $ - |
| Maryland Radiation Therapy Management Services, LLC | LIFEBRIDGE INVESTMENTS, INC. | Joint Venture Agreement | 06/04/2001 | $ - |
| 21st Century Oncology, Inc. | Lifeline Software, Inc | Support services and maintenance agreement | 1/23/2017 | $ 37,602.50 |
| Arizona Radiation Therapy Management Services, Inc. | LIFEPRINT | Payor Agreement | 09/01/2011 | $ - |
| Arizona Radiation Therapy Management Services, Inc. | LIPSON, ROBERT S | Employment Agreement - Physician Urology | 02/22/2013 | $ - |
| 21st Century Oncology, LLC | LLB LAND CORP | Building and Land Lease | 12/01/2002 | $ - |
| 21st Century Oncology Investments, LLC | LLOYD'S | Insurance Policy - Property/All Risk | 04/01/2017 | $ - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st Century Oncology Investments, LLC | LLOYD'S LONDON | Insurance Policy - Property/All Risk | 04/01/2017 | $ - |
| 21st Century Oncology Investments, LLC | LLOYDS LONDON-BRIT SYNDICATE 2987 | Insurance Policy - Property/All Risk | 04/01/2017 | $ - |
| 21st Century Oncology Investments, LLC | LLOYD'S SYNDICATE 2623/623 | Insurance Policy - Network Security / E&O (Cyber) | 08/30/2016 | $ - |
| OnCure Medical Corp. | LODI MEMORIAL HOSPITAL ASSOCIATION, INC. | Building and Land Lease | 06/01/2007 | $ - |
| 21st Century Oncology, LLC | LOMAS, GREGORY M | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/24/2016 | $ - |
| 21st Century Oncology, LLC | LOMAS, GREGORY M | Employment Agreement - Physician Urology | 07/30/2009 | $ - |
| U.S. Cancer Care, Inc. | LOMPOC RADIATION ONCOLOGY CENTER, LLC | Building and Land Lease | 11/01/2015 | $ - |
| 21st  Century Oncology, LLC | Long, Robert L | Employment Agreement - Physician (employment ceased) | 1/27/2009 | $ - |
| 21st Century Oncology, LLC | LOPEZ, RAFAEL R | Employment Agreement - Physician Urology | 12/01/2009 | $ - |
| Carolina Regional Cancer Center, LLC | LOWER CAPE FEAR HOSPICE, INC. | Radiation Therapy Services Agreement | 08/02/2012 | $ - |
| 21st Century Oncology, Inc. | LUCAS ASSOCIATES, INC. D/B/A LUCAS GROUP | Recruiting Services Contingency-Based Fee Agreement | 03/29/2017 | $ - |
| Arizona Radiation Therapy Management Services, Inc. | LUCIA CLOVER, M.D. | Professional Services Agreement | 09/01/2016 | $ - |
| 21st Century Oncology of Jacksonville, LLC | LUKE, MATHEW | Employment Agreement - Bonus Pool Jacksonville Diagnostic | 12/03/2009 | $ - |
| 21st Century Oncology of Jacksonville, LLC | LUKE, MATHEW | Employment Agreement - Physician Medical Oncology | 01/01/2011 | $ - |
| 21st Century Oncology, LLC | LUKE, MATHEW | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/01/2016 | $ - |
| 21st Century Oncology, LLC | LUKE, MATHEW | Employment Agreement - Physician Medical Oncology | 01/01/2011 | $ - |
| 21st  Century Oncology, LLC | Luke, Steven W | Employment Agreement - Physician (employment ceased) | 5/25/2013 | $ - |
| Arizona Radiation Therapy Mngt Services | Ly, David | Employment Agreement - Physician (employment ceased) | 8/24/2015 | $ - |
| 21st Century Oncology, LLC | LYNN, GEOFFREY M | Employment Agreement - Physician Surgery | 05/13/2014 | $ - |
| 21st Century Oncology, LLC | MAGDA SORIAL | Building and Land Lease | 11/15/2010 | $ - |
| 21st Century Oncology of Jacksonville, LLC | MAKEYEV, YAN G | Employment Agreement - Physician Medical Oncology | 02/25/2014 | $ - |
| 21st Century Oncology, LLC | MAKEYEV, YAN G | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/01/2016 | $ - |
| 21st Century Oncology, LLC | MAKEYEV, YAN G | Employment Agreement - Physician Medical Oncology | 02/25/2014 | $ - |
| 21st Century Oncology, LLC | MALUCO, LLC | Building and Land Lease | 01/30/2016 | $ - |
| 21st Century Oncology, LLC | MALUCO, LLC | Building and Land Lease | 08/11/2010 | $ - |
| 21st Century Oncology, LLC | MANATEE MEMORIAL HOSPITAL | Professional Services Agreement | 03/01/2011 | $ - |
| 21st  Century Oncology, LLC | Mann Jr, David E | Employment Agreement - Physician (employment ceased) | 7/2/2007 | $ - |
| 21st Century Oncology, Inc. | MANORCARE OF FORT MYERS | Radiation Therapy Services Agreement | 01/04/2007 | $ - |
| 21st Century Oncology, Inc. | MANTZ, CONSTANTINE | Employment Agreement - Physician SR VP Clinical | 06/01/2003 | $ - |
| 21st Century Oncology, LLC | MANTZ, CONSTANTINE | Employment Agreement - Bonus Pool Lee County Diagnostic | 12/07/2009 | $ - |
| 21st Century Oncology, LLC | MANTZ, CONSTANTINE | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/14/2016 | $ - |
| 21st Century Oncology, LLC | MANTZ, CONSTANTINE | Employment Agreement - Executive Employment Agreement | 07/01/2003 | $ - |
| 21st Century Oncology, LLC | MANUEL MARTORELL, M.D. | Professional Services Agreement | 12/12/2015 | $ - |

| Debtor | Creditor | Description | Date | Cure Amount |
|--------|----------|-------------|------|-------------|
| 21st Century Oncology, LLC | MARAUDER PROPERTIES, LLC | Building and Land Lease | 12/01/2016 | $ - |
| 21st Century Oncology, Inc. | MARC MELSER AND CINDY MELSER | Building and Land Lease | 11/18/2008 | $ - |
| 21st Century Oncology, Inc. | MARCIA PARKER | Consulting Agreement | 11/01/2013 | $ - |
| 21st Century Oncology, LLC | Marcucci, Pedro A | Employment Agreement - Physician (employment ceased) | 1/2/2007 | $ - |
| Arizona Radiation Therapy Management Services, Inc. | MARICOPA | Payor Agreement | 08/15/2014 | $ - |
| 21st Century Oncology, LLC | MARIE GRECO | Building and Land Lease | 08/01/2016 | $ - |
| Atlantic Urology Clinics, LLC | MARION REGIONAL HEALTH CARE SYSTEM | Building and Land Lease | 10/01/2011 | $ - |
| 21st Century Oncology of Jacksonville | Marks, Alan R | Employment Agreement - Physician (employment ceased) | 5/1/2008 | $ - |
| 21st Century Oncology of Kentucky, LLC | MARLIN K. SPARKS MANAGEMENT COMPANY, INC. DBA CHARLESTON HEALTH CARE CENTER | Radiation Therapy Services Agreement | 11/11/2011 | $ - |
| 21st Century Oncology, Inc. | MARSH USA INC. | Consulting Agreement | 02/01/2017 | $ - |
| Arizona Radiation Therapy Mngt Services | Marsh, James C | Employment Agreement - Physician (employment ceased) | 7/1/2011 | $ - |
| 21st Century Oncology, LLC | Marsland, Thomas A | Employment Agreement - Physician (employment ceased) | 3/1/2014 | $ - |
| New York Radiation Therapy Management Services, LLC | MARTIN G. WERTKIN, M.D., FACS | Equipment Lease | 07/23/2012 | $ - |
| 21st Century Oncology, Inc. | MARTINEZ, ALVARO | Employment Agreement - SVP Scientific and Clinical Strategies | 12/01/2011 | $ - |
| 21st Century Oncology of Prince Georges County, Maryland, LLC | MARYLAND PHYSICIAN CARE | Payor Agreement | 04/01/2010 | $ - |
| Berlin Radiation Therapy Treatment Center, LLC | MARYLAND PHYSICIAN CARE | Payor Agreement | 07/01/2006 | $ - |
| 21st Century Oncology, LLC | MASEL, JONATHAN L. | Employment Agreement - Bonus Pool Pathology Lab Addendum | 04/07/2016 | $ - |
| 21st Century Oncology, LLC | MASEL, JONATHAN L. | Employment Agreement - Physician Urology | 01/23/2012 | $ - |
| 21st Century Oncology of Kentucky, LLC | MASONIC HOMES OF KENTUCKY, INC. DBA MASONIC HOME OF SHELBYVILLE | Radiation Therapy Services Agreement | 01/01/2011 | $ - |
| 21st Century Oncology, Inc. | MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY/STRATEGIC GROUP VARIABLE UNIVERSAL LIFE | Employee Benefit Plan Agreement - Executive Group Life | 03/08/2017 | $ - |
| New England Radiation Therapy Management Services, Inc. | MASSACHUSETTS ONCOLOGY SERVICES, P.C. | Management Services Agreement | 06/01/2005 | $ - |
| New England Radiation Therapy Management Services, Inc. | MASSACHUSETTS ONCOLOGY SERVICES, P.C.; MICHAEL KATIN, MD & DANIEL E. DOSORETZ, MD | Transition Agreement and Stock Pledge | 06/01/2005 | $ - |
| 21st Century Oncology, LLC | MATT S. LIEF, M.D., P.A./GARY V. CAPLAN, TRUSTEE | Building and Land Lease | 03/19/2016 | $ - |
| 21st Century Oncology, LLC | MATTHEW LIEF, M.D., P.A. | Equipment Lease | 03/19/2016 | $ - |
| 21st Century Oncology, LLC | MCARTHUR, KENDRICK D | Employment Agreement - Physician Surgery | 11/04/2015 | $ - |
| 21st Century Oncology, LLC | MCKENNA, DANIEL J | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/01/2016 | $ - |
| 21st Century Oncology, LLC | MCKENNA, DANIEL J | Employment Agreement - Physician ENT | 01/31/2014 | $ - |
| 21st Century Oncology, Inc. | McKesson Specialty Care Distribution Corporation | McKesson Specialty Health Value Program Agreement | 9/13/2017 | $ - |
| 21st Century Oncology, LLC | MCKESSON SPECIALTY HEALTH/ONMARK | Vendor Agreement | 05/19/2014 | $ - |
| Atlantic Urology Clinics, LLC | MCLEOD REGIONAL MEDICAL CENTER OF THE PEE DEE, INC. | Building and Land Lease | 09/08/2016 | $ - |
| Atlantic Urology Clinics, LLC | MCLEOD REGIONAL MEDICAL CENTER OF THE PEE DEE, INC. | Building and Land Lease | 10/28/2014 | $ - |
| 21st Century Oncology, LLC | MD PP, LLC | Building and Land Lease | 02/27/2016 | $ - |
| 21st Century Oncology, LLC | MDPP LLC | Equipment Lease | 02/27/2016 | $ - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st Century Oncology, LLC d/b/a Lakewood Ranch Radiology Oncology | Mechanical Services of Central Florida, Inc. | Mechanical System Maintenance Agreement | 7/17/2013 | $ 1,347.44 |
| 21st Century Oncology, Inc. | MEDASSETS PERFORMANCE MANAGEMENT SOLUTIONS, INC. | Vendor Agreement | 02/01/2014 | $ - |
| 21st Century Oncology, Inc. | MedAssets Performance Management Solutions, Inc. | Services Agreement | 2/1/2014 | $ - |
| Atlantic Urology Clinics, LLC | MEDCOST | Payor Agreement | 07/19/2007 | $ - |
| Carolina Regional Cancer Center, LLC | MEDCOST | Payor Agreement | 11/01/2003 | $ - |
| 21st Century Oncology, LLC | MEDICA HEALTHCARE PLANS | Payor Agreement | 02/01/2006 | $ - |
| Financial Services of Southwest Florida, LLC | MEDICAID ELIGIBILITY & DENIAL SOLUTIONS, INC. | Master Services Agreement | 12/31/2013 | $ - |
| Carolina Regional Cancer Center, LLC | Medical Accelerator Services | Medical Accelerator Service Contract | 3/14/2011 | $ - |
| 21st Century Oncology, LLC | MEDICAL ARTS CENTER OF MARCO ISLAND | Building and Land Lease | 10/30/2009 | $ - |
| 21st Century Oncology, LLC | Medical Doctor Associates, LLC | Locum Tenens Agreement | 11/24/2015 | $ 21,076.98 |
| 21st Century Oncology, LLC | MEDICAL OFFICE BUILDINGS OF PLANTATION, LLC | Building and Land Lease | 12/16/2011 | $ - |
| 21st Century Oncology, LLC d/b/a Hematology Oncology Associates of Boca Raton | Medical Specialties Distributors, LLC | Supply and Services Agreement | 10/1/2016 | $ - |
| 21st Century Oncology, Inc. | Medifax-EDI, LLC, and Emdeon Company | Receivable Analysis Customer Agreement Payment Automation Services Addendum | 12/24/2004 | $ - |
| Financial Services of Southwest Florida, LLC | Medifax-EDI, LLC, and Emdeon Company | Third Party Vendor Agreement Payment Automation Services Addendum | 11/12/2013 | $ - |
| Financial Services of Southwest Florida, LLC | Medifax-EDI, LLC, and Emdeon Company | Third Party Vendor Agreement | 11/12/2013 | $ - |
| 21st Century Oncology, LLC | MEDINA, ABDON J | Employment Agreement - Physician RAD Oncology | 06/01/2013 | $ - |
| 21st Century Oncology, LLC | MEDINCREASE HEALTH PLANS | Payor Agreement | 06/17/2015 | $ - |
| 21st Century Oncology, Inc. | MEDMAL DIRECT INSURANCE COMPANY | Insurance Policy - Malpractice | 07/12/2016 | $ - |
| 21st Century Oncology, Inc. | MEDTEC INC. - CIVCO MEDICAL SOLUTIONS | Preferred Vendor Agreement | 01/01/2017 | $ 13,461.65 |
| 21st Century Oncology, LLC | MEHTA, NIRAJ H | Employment Agreement - Physician RAD Oncology RH | 02/22/2013 | $ - |
| 21st Century Oncology, LLC | MELSER, MARC A | Employment Agreement - Bonus Pool Charlotte Urology Pathology Lab | 01/21/2013 | $ - |
| 21st Century Oncology, LLC | MELSER, MARC A | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/28/2016 | $ - |
| 21st Century Oncology, LLC | MELSER, MARC A | Employment Agreement - Physician Urology | 11/18/2008 | $ - |
| 21st Century Oncology, LLC | MEMORIAL HEALTH NETWORK CORP | Payor Agreement | 11/02/2015 | $ - |
| Arizona Radiation Therapy Management Services, Inc. | MERCY CARE PLAN | Payor Agreement | 09/01/2009 | $ - |
| 21st Century Oncology Holdings, Inc. | MERRILL COMMUNICATIONS, LLC | Service Contract | 05/19/2017 | $ 4,000.00 |
| Maryland Radiation Therapy Management Services, LLC | METROPOLITAN AMBULATORY UROLOGIC INSTITUTE, LLC | Joint Venture Agreement | 07/13/2005 | $ - |
| 21st Century Oncology, LLC | MEYER, MARK J | Employment Agreement - Physician Surgery | 04/25/2016 | $ - |
| OnCure Medical Corp. | MICHAEL BLIGH | Physics Services Agreement | 04/27/2017 | $ - |
| Nevada Radiation Therapy Management Services, Incorporated | MICHAEL J. KATIN, M.D., PROF. CORP. | Management Services Agreement | 01/09/1998 | $ - |
| 21st Century Oncology, LLC | MICHAEL K. WARGEL | Ultrasound Technician Services Agreement | 05/24/2017 | $ - |
| 21st Century Oncology, LLC | MICOLUCCI ENTERPRISES, INC. | Building and Land Lease | 11/16/2016 | $ - |
| North Carolina Radiation Therapy Management Services, LLC | MID-SOUTH INVESTMENTS, LLC | Building and Land Lease | 12/21/2011 | $ - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st Century Oncology of Jacksonville, LLC | MIGNONE, JOSEPH | Employment Agreement - Medical Director Agreement | 10/01/2011 | $ - |
| 21st Century Oncology of Jacksonville, LLC | MIGNONE, JOSEPH | Employment Agreement - Physician Medical Oncology | 04/30/2008 | $ - |
| 21st Century Oncology, LLC | MIGNONE, JOSEPH | Employment Agreement - Bonus Pool Jacksonville Diagnostic | 12/03/2009 | $ - |
| 21st Century Oncology, LLC | MIGNONE, JOSEPH | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/01/2016 | $ - |
| 21st Century Oncology, LLC | MIGNONE, JOSEPH | Employment Agreement - Medical Director Agreement | 10/01/2011 | $ - |
| 21st Century Oncology, LLC | MIGNONE, JOSEPH | Employment Agreement - Physician Medical Oncology | 04/30/2008 | $ - |
| 21st Century Oncology, LLC | MILLER, ALAN K | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/01/2016 | $ - |
| 21st Century Oncology, LLC | MILLER, ALAN K | Employment Agreement - Physician Urology | 03/30/2012 | $ - |
| 21st Century Oncology, LLC | MILLER, KEITH LAURENCE | Employment Agreement - Bonus Pool Lee County Diagnostic | 12/28/2009 | $ - |
| 21st Century Oncology, LLC | MILLER, KEITH LAURENCE | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/01/2016 | $ - |
| 21st Century Oncology, LLC | MILLER, KEITH LAURENCE | Employment Agreement - Physician RAD Oncology | 08/11/2004 | $ - |
| Arizona Radiation Therapy Mngt Services | Miller, Patrick R | Employment Agreement - Physician (employment ceased) | 6/6/2008 | $ - |
| 21st Century Oncology, LLC | MILLS, JAMES | Employment Agreement - Physician Consulting | 02/09/2009 | $ - |
| 21st Century Oncology of Jacksonville, LLC | MILTON LARREA | Consulting Agreement | 01/01/2011 | $ - |
| 21st Century Oncology, Inc. | MINGLE ANALYTICS, LLC | Master Services Agreement | 06/12/2015 | $ 17,232.80 |
| 21st Century Oncology, LLC | Mintz, Mark A | Employment Agreement - Physician (employment ceased) | 1/1/1997 | $ - |
| 21st Century Oncology, LLC | MIRABEAU BEALE, KRISTINA L | Employment Agreement - Physician RAD Oncology | 04/01/2015 | $ - |
| 21st Century Oncology, LLC | Mirakian, Alex S | Employment Agreement - Physician (employment ceased) | 12/28/2015 | $ - |
| 21st Century Oncology, LLC | MIRANDA SOUSA, ALEJANDRO J | Employment Agreement - Bonus Pool Pathology Lab Addendum | 01/01/2016 | $ - |
| 21st Century Oncology, LLC | MIRANDA SOUSA, ALEJANDRO J | Employment Agreement - Physician Urology MS | 01/31/2012 | $ - |
| U.S. Cancer Care, Inc. | MISSION LINEN SUPPLY | Linen and Uniform Rental Agreement | 03/15/2017 | $ - |
| OnCure Medical Corp. | MISSION VIEJO RADIATION ONCOLOGY CORP. | Management Services Agreement | 09/01/2004 | $ - |
| 21st Century Oncology, LLC | MISSIONPOINT | Payor Agreement | 09/01/2015 | $ - |
| 21st Century Oncology of Alabama, LLC | MIZELL MEMORIAL HOSPITAL, INC. | CT Services Agreement | 01/01/2010 | $ - |
| Nevada Radiation Therapy Management Services, Incorporated | MJ-MOUNTAIN VIEW, LLC | Building and Land Lease | 02/01/2012 | $ - |
| Nevada Radiation Therapy Management Services, Incorporated | MOB 47 OF NEVADA, LLC | Building and Land Lease | 05/01/2005 | $ 15,450.76 |
| 21st Century Oncology, LLC | MODERNIZING MEDICINE INC. | License Agreement | 01/25/2017 | $ - |
| Atlantic Urology Clinics, LLC | MODERNIZING MEDICINE INC. | License Agreement | 11/29/2016 | $ - |
| 21st Century Oncology, LLC | MOLINA HEALTHCARE | Payor Agreement | 01/01/2011 | $ - |
| Atlantic Urology Clinics, LLC | MOLINA HEALTHCARE | Payor Agreement | 05/23/2015 | $ - |
| Carolina Regional Cancer Center, LLC | MOLINA HEALTHCARE | Payor Agreement | 05/23/2015 | $ - |
| 21st Century Oncology, LLC | Molina-Pierce, Claudia M | Employment Agreement - Physician (employment ceased) | 7/8/2013 | $ - |
| 21st Century Oncology, LLC | Mon, Michelle D | Employment Agreement - Physician (employment ceased) | 2/1/2007 | $ - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st Century Oncology, Inc. | MORGAN WHITE ADM. INTERNATIONAL, INC. | Payor Agreement | 05/01/2013 | $ - |
| 21st Century Oncology, Inc. | MOUNT KISKO MEDICAL CENTER | Building and Land Lease | 10/02/2000 | $ - |
| West Virginia Radiation Therapy Services, Inc. | MOUNTAIN STATE BLUE CROSS & BLUE SHIELD | Payor Agreement | 01/01/2009 | $ - |
| 21st  Century Oncology, LLC | Mouraviev, Vladimir | Employment Agreement - Physician (employment ceased) | 12/14/2015 | $ - |
| 21st Century Oncology, Inc. | MOURELO, RAMON S | Business Development Agreement | 04/14/2014 | $ - |
| 21st Century Oncology, Inc. | MOYER & OSIBODU UNCLAIMED PROPERTY SERVICES, LLC | Business Consultant Agreement | 11/17/2015 | $ - |
| 21st Century Oncology, LLC | MSKP RAMBLEWOOD SQUARE, LLC | Building and Land Lease | 07/11/2013 | $ - |
| 21st Century Oncology, LLC | MUHLETALER MAGGIOLO, FRED | Employment Agreement - Physician Urology | 04/27/2015 | $ - |
| 21st Century Oncology, Inc. | MULTIPLAN, INC. | Payor Agreement | 02/01/2012 | $ - |
| 21st Century Oncology, LLC | MUPA PROPERTY, LLP | Building and Land Lease | 03/30/2012 | $ - |
| South Florida Medicine, LLC | MY DOCTOR, P.A. | Building and Land Lease | 01/01/2010 | $ - |
| Maryland Radiation Therapy Management Services, LLC | MYRON I MURDOCK, MD | Joint Venture Agreement | 07/13/2005 | $ - |
| Atlantic Urology Clinics, LLC | MYRTLE BEACH FARMS COMPANY, INC. | Building and Land Lease | 08/15/2016 | $ - |
| 21st Century Oncology, LLC | NAKFOOR, BRUCE | Employment Agreement - Bonus Pool Pathology Addendum | 10/22/2013 | $ - |
| 21st Century Oncology, LLC | NAKFOOR, BRUCE | Employment Agreement - Physician RAD Oncology | 10/21/2013 | $ - |
| Arizona Radiation Therapy Management Services, Inc. | NAMBIAR, ABHILASH P | Employment Agreement - Physician RAD Oncology | 01/28/2015 | $ - |
| Financial Services of Southwest Florida, LLC | NANCY R. SCHLEIDER, M.D. | Management Services Agreement | 03/09/1998 | $ - |
| 21st Century Oncology, Inc. | NAPLES COMMUNITY HOSPITAL, INC. | Building and Land Lease | 04/16/2008 | $ - |
| 21st Century Oncology, Inc. | NAPLES COMMUNITY HOSPITAL, INC. | Professional Services Agreement | 04/15/2008 | $ - |
| 21st Century Oncology, LLC | NAPLES DAY SURGERY, LLC | Agreement for Uronav MRI Fusion Guide Biopsy Services | 01/19/2016 | $ - |
| 21st Century Oncology, LLC | NAPLES HMA, LLC | Building and Land Lease | 05/24/2014 | $ - |
| 21st Century Oncology, LLC | NAPLES HMA, LLC | Building and Land Lease | 11/05/2013 | $ - |
| 21st Century Oncology, LLC | NAPLES HMA, LLC | Building and Land Lease | 12/01/2015 | $ - |
| 21st Century Oncology, Inc. | NATIONAL PHARMACEUTICAL RETURNS, INC. | Returned Goods Services Agreement - Group | 12/14/2016 | $ - |
| 21st Century Oncology, Inc. | NATIONAL PHARMACEUTICAL RETURNS, INC. | Vendor Agreement | 12/14/2016 | $ - |
| 21st Century Oncology Investments, LLC | NATIONAL UNION FIRE INSURANCE COMPANY | Insurance Policy - Directors & Officers  - 4th Layer, Excess | 09/01/2016 | $ - |
| 21st Century Oncology Investments, LLC | NATIONAL UNION FIRE INSURANCE COMPANY | Insurance Policy - Directors & Officers  / Employment Practices / Fiduciary Liability | 09/01/2016 | $ - |
| 21st Century Oncology Investments, LLC | NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA | Insurance Policy - Special Risk Coverage (K&R) | 09/01/2016 | $ - |
| 21st Century Oncology, Inc. | NATIONWIDE HEALTH PROPERTIES, INC. | Building and Land Lease | 09/30/2008 | $ - |
| 21st Century Oncology, Inc. | NATIONWIDE HEALTH PROPERTIES, INC. | Building and Land Lease | 09/30/2008 | $ - |
| 21st Century Oncology, Inc. | NATIONWIDE HEALTH PROPERTIES, INC. | Building and Land Lease | 09/30/2008 | $ - |
| 21st Century Oncology, Inc. | NATIONWIDE HEALTH PROPERTIES, INC. | Building and Land Lease | 09/30/2008 | $ - |
| 21st Century Oncology, Inc. | NATIONWIDE HEALTH PROPERTIES, INC. | Building and Land Lease | 09/30/2008 | $ - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st Century Oncology, Inc. | NATIONWIDE HEALTH PROPERTIES, INC. | Building and Land Lease | 09/30/2008 | $ - |
| 21st Century Oncology, Inc. | NATIONWIDE HEALTH PROPERTIES, INC. | Building and Land Lease | 09/30/2008 | $ - |
| 21st Century Oncology, Inc. | NATIONWIDE HEALTH PROPERTIES, INC. | Building and Land Lease | 09/30/2008 | $ - |
| 21st Century Oncology, Inc. | NATIONWIDE HEALTH PROPERTIES, INC. | Building and Land Lease | 09/30/2008 | $ - |
| 21st Century Oncology, Inc. | NATIONWIDE HEALTH PROPERTIES, INC. | Building and Land Lease | 09/30/2008 | $ - |
| 21st Century Oncology, Inc. | NATIONWIDE HEALTH PROPERTIES, INC. | Building and Land Lease | 09/30/2008 | $ - |
| 21st Century Oncology, Inc. | NATIONWIDE HEALTH PROPERTIES, INC. | Building and Land Lease | 09/30/2008 | $ - |
| Financial Services of Southwest Florida, LLC | NAVICURE, INC. | Data Transfer Agreement | 04/03/2014 | $ 55,629.71 |
| 21st Century Oncology, Inc. | NAVIGATING CANCER, INC. | Patient Portal Company Agreement | 02/06/2015 | $ - |
| Maryland Radiation Therapy Management Services, LLC | NAVIN C. SHAH, MD | Joint Venture Agreement | 07/13/2005 | $ - |
| 21st Century Oncology, LLC | NCH HEALTHCARE SYSTEM, INC. | IT Contract - Powerchart Access Agreement | 04/26/2016 | $ - |
| 21st Century Oncology, LLC | NEALE, JEFFREY A | Employment Agreement - Bonus Pool Diagnostic (Lee County) | 07/09/2010 | $ - |
| 21st Century Oncology, LLC | NEALE, JEFFREY A | Employment Agreement - Physician Surgery | 07/09/2010 | $ - |
| 21st  Century Oncology, LLC | Neiner, John R | Employment Agreement - Physician | 8/7/2017 | $ - |
| Financial Services of Southwest Florida, LLC | NEVADA RADIATION THERAPY MANAGEMENT SERVICES, INC. | Billing and Collection Service Agreement | 07/31/1997 | $ - |
| 21st Century Oncology, LLC | NEW CENTURY HEALTH | Payor Agreement | 02/15/2015 | $ - |
| Arizona Radiation Therapy Management Services, Inc. | NEW CENTURY HEALTH | Payor Agreement | 10/01/2012 | $ - |
| 21st Century Oncology, Inc. | NEW LOOK LAWN & LANDSCAPING SERVICE INC | Landscaping services | 8/1/2016 | $ 15,915.02 |
| Financial Services of Southwest Florida, LLC | NEW YORK RADIATION THERAPY MANAGEMENT SERVICES, INC. | Billing and Collection Service Agreement | 07/01/1998 | $ - |
| 21st  Century Oncology, LLC | Newman, Evan | Employment Agreement - Physician | 11/5/2001 | $ - |
| 21st Century Oncology Holdings, Inc. | Nexsen Pruet, LLC | Local Counsel - South Carolina | Engagement Letter | $ - |
| 21st Century Oncology, LLC | NGUYEN SPERRY, JANET L | Employment Agreement - Physician RAD Oncology | 02/05/2013 | $ - |
| USCC Florida Acquisition, LLC | NINTH CITY LANDOWNERS, LLC | Building and Land Lease | 02/01/2003 | $ - |
| USCC Florida Acquisition, LLC | NINTH CITY LANDOWNERS, LLC | Joint Venture Agreement | 10/25/2013 | $ - |
| USCC Florida Acquisition, LLC | NINTH CITY LANDOWNERS, LLC | Joint Venture Agreement | 11/21/2005 | $ - |
| 21st Century Oncology, LLC | NOGUERA, CARLOS A | Employment Agreement - Physician Medical Oncology | 05/22/2013 | $ - |
| 21st Century Oncology, LLC | NORTH BROWARD HOSPITAL DISTRICT | Building and Land Lease | 11/01/2016 | $ - |
| 21st Century Oncology, LLC | NORTH BROWARD HOSPITAL DISTRICT D/B/A BROWARD HEALTH | Building and Land Lease | 03/12/2012 | $ - |
| 21st Century Oncology, LLC | NORTH BROWARD HOSPITAL DISTRICT D/B/A BROWARD HEALTH | Building and Land Lease | 03/12/2012 | $ - |
| 21st Century Oncology, LLC | NORTH BROWARD HOSPITAL DISTRICT D/B/A BROWARD HEALTH | Licensing Agreement | 03/12/2012 | $ - |
| 21st Century Oncology, LLC | NORTH BROWARD HOSPITAL DISTRICT DBA BROWARD HEALTH | Amended and Restated Radiation Oncology Services Agreement | 03/27/2012 | $ - |
| 21st Century Oncology, LLC | NORTH BROWARD HOSPITAL DISTRICT DBA BROWARD HEALTH | Equipment Sterilization Services Agreement | 03/12/2012 | $ - |
| 21st Century Oncology, LLC | NORTH BROWARD HOSPITAL DISTRICT DBA BROWARD HEALTH | Licensing Agreement | 03/12/2012 | $ - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st Century Oncology, LLC | NORTH BROWARD HOSPITAL DISTRICT DBA BROWARD HEALTH AND GORBATIY, VLADISLAV MD | Collection Guarantee Agreement | 09/28/2012 | $ - |
| North Carolina Radiation Therapy Management Services, LLC | NORTH CAROLINA RADIATION ENTERPRISES, LLC | Building and Land Lease | 11/14/2013 | $ - |
| Financial Services of Southwest Florida, LLC | NORTH CAROLINA RADIATION THERAPY MANAGEMENT SERVICES, INC. | Billing Services Agreement | 02/02/2002 | $ - |
| 21st Century Oncology, LLC | NORTH OKALOOSA HEALTHCARE ASSOCIATES, LLC DBA SHOAL CREEK REHAB CENTER | Radiation Therapy Services Agreement | 01/28/2011 | $ - |
| 21st Century Oncology, LLC | NORTH SHORE MEDICAL CENTER, INC. DBA NORTH SHORE MEDICAL CENTER | Amendment Assignment & Assumption Agmt | 12/05/2015 | $ - |
| South Florida Radiation Oncology, LLC | NORTH SHORE MEDICAL CENTER, INC. DBA NORTH SHORE MEDICAL CENTER | Amendment Assignment & Assumption Agmt | 12/05/2015 | $ - |
| California Radiation Therapy Management Services, Inc. | NORTH STATE SECURITY INC. | Services Agreement | 01/12/2017 | $ - |
| New York Radiation Therapy Management Services, LLC | NORTHERN WESTCHESTER HOSPITAL CENTER | Service Contract | 07/01/2013 | $ - |
| New York Radiation Therapy Management Services, LLC | NORTHERN WESTCHESTER HOSPITAL CENTER | Service Contract | 08/01/2002 | $ - |
| New York Radiation Therapy Management Services, LLC | NORTHWELL HEALTH INC. - NORTHERN WESTCHESTER HOSPITAL CENTER | Physics & Dosimetry Services Agreement | 04/03/2017 | $ - |
| New York Radiation Therapy Management Services, LLC | NORTHWELL HEALTH, INC. DBA NORTHERN WESTCHESTER HOSPITAL CENTER | Service Contract | 04/03/2017 | $ - |
| 21st Century Oncology of Washington, LLC | NORTHWEST CANCER CLINIC, LLC | Joint Venture Agreement | 12/04/2014 | $ - |
| 21st Century Oncology of Alabama, LLC | NOVANET | Payor Agreement | 01/01/2008 | $ - |
| 21st Century Oncology, LLC | NOVANET | Payor Agreement | 12/15/2005 | $ - |
| 21st Century Oncology, Inc. | NOVOCURE, INC. | Agreement to Revive and Amend Novotal System License Agreement | 05/08/2017 | $ - |
| 21st Century Oncology, Inc. | NUANCE COMMUNICATIONS, INC. | Services Activation Agreement | 06/30/2015 | $ - |
| 21st Century Oncology, Inc. | NUANCE COMMUNICATIONS, INC. | Vendor Agreement | 06/30/2015 | $ 100,000.00 |
| U.S. Cancer Care, Inc. | NXT CAPITAL, LLC | Equipment Lease | 12/29/2014 | $ - |
| U.S. Cancer Care, Inc. | NXT CAPITAL, LLC | Equipment Lease | 12/29/2014 | $ - |
| U.S. Cancer Care, Inc. | NXT CAPITAL, LLC | Equipment Lease | 12/29/2014 | $ - |
| U.S. Cancer Care, Inc. | NXT CAPITAL, LLC | Equipment Lease | 12/29/2014 | $ - |
| U.S. Cancer Care, Inc. | NXT CAPITAL, LLC | Equipment Lease | 12/29/2014 | $ - |
| Atlantic Urology Clinics, LLC | NXTHERA, INC. | Equipment Loan Agreement | 08/12/2016 | $ - |
| 21st Century Oncology, LLC | Nyberg, David A | Employment Agreement - Physician | 6/5/2017 | $ - |
| U.S. Cancer Care, Inc. | OCALA COMMUNITY CANCER CENTER | Building and Land Lease | 02/01/2008 | $ - |
| 21st Century Oncology, LLC | OKALOOSA HOSPITAL, INC. DBA TWIN CITIES HOSPITAL | Building and Land Lease | 05/09/2016 | $ - |
| 21st Century Oncology, LLC | O'LEARY, ANDREW W | Employment Agreement - Physician RAD Oncology | 06/07/2013 | $ - |
| 21st Century Oncology, Inc. | Oliver Wyman Actuarial Consulting, Inc. | Engagement Letter - Professional Liability and Workers Compensation Actuarial Services | 11/16/2016 | $ 50,000.00 |
| 21st Century Oncology, Inc. | OLYMPUS AMERICA INC. | Equipment Lease | 10/27/2015 | $ - |
| 21st Century Oncology, LLC | OLYMPUS AMERICA INC. | Equipment Service Agreement | 12/21/2016 | $ - |
| 21st Century Oncology, LLC | ONCOLOGY CONSULTING SERVICES, INC. | Payor Agreement | 02/01/2013 | $ - |
| 21st Century Oncology, Inc. | Oncology Services International | PMI Only Service Contract Agreement | 9/22/2015 | $ 11,495.00 |
| 21st Century Oncology, Inc. | Oncology Services International | PMI Only Service Contract Agreement | 9/22/2015 | $ - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st Century Oncology, Inc. | Oncology Services International | PMI Only Service Contract Agreement | 9/22/2015 | $ - |
| 21st Century Oncology, Inc. | Oncology Services International | PMI Only Service Contract Agreement | 9/22/2015 | $ - |
| 21st Century Oncology, Inc. | Oncology Services International | PMI Only Service Contract Agreement | 9/22/2015 | $ - |
| 21st Century Oncology, LLC | ORNSTEIN, DAVID K | Employment Agreement - Bonus Pool Diagnostic CT (Collier County) | 11/22/2010 | $ - |
| 21st Century Oncology, LLC | ORNSTEIN, DAVID K | Employment Agreement - Bonus Pool Diagnostic CT (Fort Myers) | 12/31/2009 | $ - |
| 21st Century Oncology, LLC | ORNSTEIN, DAVID K | Employment Agreement - Bonus Pool Diagnostic PET/CT (Collier County) | 07/01/2011 | $ - |
| 21st Century Oncology, LLC | ORNSTEIN, DAVID K | Employment Agreement - Bonus Pool Pathology Lab Addendum | 01/01/2016 | $ - |
| 21st Century Oncology, LLC | ORNSTEIN, DAVID K | Employment Agreement - Bonus Pool Subgrp Pathology Lab (Lee/Collier) | 12/31/2009 | $ - |
| 21st Century Oncology, LLC | ORNSTEIN, DAVID K | Employment Agreement - Physician Urology | 06/26/2009 | $ - |
| 21st  Century Oncology, LLC | Orr, James | Employment Agreement - Physician | 1/1/1999 | $ - |
| 21st Century Oncology, LLC | ORTIZ ALVARADO, OMAR | Employment Agreement - Physician Urology | 06/08/2015 | $ - |
| 21st Century Oncology, LLC | OSBOURNE, AUDLEY L M | Employment Agreement - Physician Urology | 08/01/2012 | $ - |
| 21st Century Oncology Services, LLC | PACE ORGANIZATION | Payor Agreement | 04/28/2014 | $ - |
| 21st Century Oncology, LLC | PACHTER, ERIC M | Employment Agreement - Bonus Pool Pathology Lab | 04/07/2016 | $ - |
| 21st Century Oncology, LLC | PACHTER, ERIC M | Employment Agreement - Physician Urology | 01/31/2012 | $ - |
| 21st Century Oncology, LLC | PALETSKY, STEVEN H | Employment Agreement - Bonus Pool CT Diagnostic (Fort Myers) | 12/02/2009 | $ - |
| 21st Century Oncology, LLC | PALETSKY, STEVEN H | Employment Agreement - Bonus Pool CT Diagnostic No. 2 | 02/01/2011 | $ - |
| 21st Century Oncology, LLC | PALETSKY, STEVEN H | Employment Agreement - Bonus Pool Diagnostic (Lee County) | 09/01/2011 | $ - |
| 21st Century Oncology, LLC | PALETSKY, STEVEN H | Employment Agreement - Bonus Pool Diagnostic (Lee County) | 10/28/2010 | $ - |
| 21st Century Oncology, LLC | PALETSKY, STEVEN H | Employment Agreement - Bonus Pool Subgrp Pathology Lab No. 3 (Urology) | 01/30/2015 | $ - |
| 21st Century Oncology, LLC | PALETSKY, STEVEN H | Employment Agreement - Bonus Pool Subgrp Pathology Lab Urology (Lee/Collier) | 08/31/2009 | $ - |
| 21st Century Oncology, LLC | PALETSKY, STEVEN H | Employment Agreement - Independent Contrator | 05/01/2006 | $ - |
| 21st Century Oncology, LLC | PALETSKY, STEVEN H | Employment Agreement - Medical Director | 05/14/2008 | $ - |
| 21st Century Oncology, LLC | PALETSKY, STEVEN H | Employment Agreement - Physician Urology | 01/02/2007 | $ - |
| 21st Century Oncology, LLC | PALM BEACH UROLOGY ASSOCIATES, P.A. | Equipment Lease | 01/16/2016 | $ - |
| California Radiation Therapy Management Services, Inc. | PALM DESERT MIII, LLC | Building and Land Lease | 01/01/2008 | $ - |
| Financial Services of Southwest Florida, LLC | PALMS WEST RADIATION THERAPY, L.L.C. | Billing Services Agreement | 06/01/2001 | $ - |
| Arizona Radiation Therapy Management Services, Inc. | PALO VERDE HEMATOLOGY/ONCOLOGY, LTD. | Radiation Oncology Professional Services Agreement | 06/27/2016 | $ - |
| 21st Century Oncology, LLC | PANOFF, JOSEPH E | Employment Agreement - Physician RAD Oncology | 03/20/2017 | $ - |
| 21st Century Oncology, Inc. | PARASAIL HEALTH INC. | Service Agreement | 03/06/2017 | $ - |
| 21st Century Oncology, LLC | PARK SHOPPING, LLC | Building and Land Lease | 09/01/2015 | $ - |
| 21st Century Oncology, LLC | PARSONS, JAMES T | Employment Agreement - Physician RAD Oncology | 06/01/2012 | $ - |
| 21st Century Oncology, LLC | PARTNERS FOR BREAST CANCER CARE | Payor Agreement | 01/05/2012 | $ - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st Century Oncology, LLC | PARTNERS FOR BREAST CANCER CARE | Payor Agreement | 06/09/2008 | $ - |
| 21st Century Oncology, LLC | PARTNERS FOR BREAST CANCER CARE | Payor Agreement | 06/11/2008 | $ - |
| 21st Century Oncology, LLC | PARTNERS FOR BREAST CANCER CARE | Payor Agreement | 06/11/2008 | $ - |
| 21st Century Oncology, LLC | PARTNERS FOR BREAST CANCER CARE | Payor Agreement | 06/24/2008 | $ - |
| 21st Century Oncology, LLC | PARTNERS FOR BREAST CANCER CARE | Payor Agreement | 06/27/2011 | $ - |
| 21st Century Oncology, LLC | PARTNERS FOR BREAST CANCER CARE | Payor Agreement | 07/28/2010 | $ - |
| 21st Century Oncology, LLC | PARTNERS FOR BREAST CANCER CARE | Payor Agreement | 09/15/2008 | $ - |
| 21st  Century Oncology, LLC | Paryani, Nitesh N | Employment Agreement - Physician (employment ceased) | 8/17/2015 | $ - |
| 21st  Century Oncology, LLC | Paryani, Shyam B | Employment Agreement - Physician (employment ceased) | 3/1/2015 | $ - |
| 21st Century Oncology Harford | Patanaphan, Vinita | Employment Agreement - Physician (employment ceased) | 9/1/2006 | $ - |
| 21st Century Oncology of Alabama, LLC | PATEL, HEJAL C | Employment Agreement - Physician RAD Oncology | 12/03/2007 | $ - |
| South Florida Medicine, LLC | PATEL, RAJIV R | Employment Agreement - Executive Employment Agreement | 02/10/2014 | $ - |
| 21st Century Oncology, LLC | PATEL, SUNIL C | Employment Agreement - Physician Medical Oncology | 09/06/2012 | $ - |
| 21st Century Oncology, LLC | PATONE, VINCENT H | Employment Agreement - Physician RAD Oncology RH | 12/28/2012 | $ - |
| 21st Century Oncology, Inc. | PATRICE, STEPHEN | Employment Agreement - Physician RAD Oncology | 01/04/1999 | $ - |
| 21st Century Oncology, LLC | PATSIAS, GEORGIS | Employment Agreement - Physician Urology | 12/01/2009 | $ - |
| 21st  Century Oncology, LLC | Patwardhan, Nilima A | Employment Agreement - Physician (employment ceased) | 4/16/2012 | $ - |
| 21st Century Oncology, LLC | PBG COMMERCIAL, LTD. | Building and Land Lease | 12/05/2015 | $ - |
| 21st Century Oncology, LLC | PBU HOLDINGS, LLC | Building and Land Lease | 02/27/2016 | $ - |
| 21st Century Oncology, LLC | PDF INVESTORS, LLC | Equipment Lease | 11/14/2015 | $ - |
| Financial Services of Southwest Florida, LLC | PEDIATRIC GASTROENTEROLOGY OF FLORIDA, P.A. | Management Services Agreement | 03/09/2017 | $ - |
| Maryland Radiation Therapy Management Services, LLC | PENINSULA REGIONAL MEDICAL CENTER, INC. | Personnel Services Agreement | 02/28/2005 | $ - |
| 21st Century Oncology, Inc. | PERELMAN, JASON D | Employment Agreement - Physician Urology | 10/26/2007 | $ - |
| 21st Century Oncology, LLC | PERELMAN, JASON D | Employment Agreement - Bonus Pool Pathology Lab Addendum | 01/01/2016 | $ - |
| 21st  Century Oncology, LLC | Perkins, Charles L | Employment Agreement - Physician (employment ceased) | 10/14/2009 | $ - |
| 21st Century Oncology, LLC | PERMAN, MARK LEE | Employment Agreement - Physician RAD Oncology | 08/31/2009 | $ - |
| Boynton Beach Radiation Oncology, L.L.C. | PERMAN, MARK LEE | Employment Agreement - Physician RAD Oncology | 08/31/2009 | $ - |
| 21st Century Oncology, LLC | PERRY, MATTHEW J | Employment Agreement - Bonus Pool Pathology Lab Addendum | 01/01/2016 | $ - |
| 21st Century Oncology, LLC | PERRY, MATTHEW J | Employment Agreement - Physician Urology | 03/30/2012 | $ - |
| 21st Century Oncology of Jacksonville | Peters, William P | Employment Agreement - Physician (employment ceased) | 3/8/2010 | $ - |
| 21st Century Oncology, LLC | PHILIP COTTER, PH.D. | Consulting Agreement | 09/01/2009 | $ - |
| 21st Century Oncology, LLC | PHILIP DUNCAN, M.D. | Radiation Oncology Professional Services Agreement | 01/01/2016 | $ - |
| 21st Century Oncology, LLC | PHILLIPS, BRUCE W | Employment Agreement - Physician RAD Oncology | 03/28/2014 | $ - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| Arizona Radiation Therapy Management Services, Inc. | PHOENIX HEALTH PLAN | Payor Agreement | 10/01/2005 | $ - |
| 21st Century Oncology, LLC | PHYSICIANS DAY SURGERY, INC. | Building and Land Lease | 07/01/2016 | $ - |
| 21st Century Oncology, LLC d/b/a Fauer, Yogel & Chenven | Physicians Own Pharmacy | Application for Account | 4/4/2014 | $ 3,240.00 |
| 21st Century Oncology, LLC | PINES NURSING HOME | Radiation Therapy Services Agreement | 10/13/2008 | $ - |
| 21st Century Oncology, Inc. | PINES, JACK A | Employment Agreement - Medical Director | 12/01/2007 | $ - |
| 21st Century Oncology, Inc. | PINES, JACK A | Employment Agreement - Physician Urology | 10/26/2007 | $ - |
| 21st Century Oncology, LLC | PINES, JACK A | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/31/2016 | $ - |
| 21st Century Oncology, Inc. | PINTAURO, WILLIAM L | Employment Agreement - Physician Urology | 10/26/2007 | $ - |
| 21st Century Oncology, LLC | PINTAURO, WILLIAM L | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/26/2016 | $ - |
| 21st Century Oncology Harford | Pirovolidis, DL | Employment Agreement - Physician (employment ceased) | 12/22/2008 | $ - |
| 21st Century Oncology Management Services, Inc. | PITNEY BOWES | Lease Agreement | 07/01/2016 | $ - |
| 21st Century Oncology Management Services, Inc. | PITNEY BOWES, INC. | Vendor Agreement | 07/01/2016 | $ - |
| 21st Century Oncology, Inc. | PITNEY BOWES, INC. | Vendor Agreement | 07/01/2016 | $ - |
| North Carolina Radiation Therapy Management Services, LLC | PITT COUNTY MEMORIAL HOSPITAL, INCORPORATED, DBA VIDANT MEDICAL CENTER | Joint Venture Agreement | 08/18/2015 | $ - |
| 21st Century Oncology of New Jersey Inc | Podgorski, Edward | Employment Agreement - Physician (employment ceased) | 3/8/2010 | $ - |
| 21st Century Oncology, LLC | Podolsky, Sherman | Employment Agreement - Physician (employment ceased) | 9/23/2013 | $ - |
| 21st Century Oncology, LLC | PORT CHARLOTTE HMA, LLC DBA BAYFRONT HEALTH PORT CHARLOTTE | Call Coverage Agreement | 07/01/2014 | $ - |
| 21st Century Oncology, LLC | PORTELA, DAMIAN | Employment Agreement - Physician Urology | 12/01/2009 | $ - |
| 21st Century Oncology, LLC | PORTER RADIATION-ONCOLOGY, P.A. | Professional Services Agreement | 09/30/2013 | $ - |
| 21st Century Oncology of New Jersey, Inc. | PORTFOLIO ONE DBA MANORCARE HEALTH SERVICES - WASHINGTON TOWNSHIP | Radiation Therapy Services Agreement | 07/01/2012 | $ - |
| 21st Century Oncology, LLC | POSITIVE HEALTHCARE OF FLORIDA | Payor Agreement | 06/01/2010 | $ - |
| 21st Century Oncology Holdings, Inc. | Poyner Spruill | Litigation counsel | Engagement Letter | $ - |
| 21st Century Oncology, LLC | PPM CAPITAL LLC | Building and Land Lease | | $ - |
| 21st Century Oncology, LLC & South Florida Radiation Oncology, LLC | Precision Air Systems Inc. | Service Agreement | 6/1/2016 | $ 3,314.73 |
| 21st Century Oncology, LLC | PREFERRED CARE PARTNERS | Payor Agreement | 02/29/2004 | $ - |
| 21st Century Oncology, LLC | PREFERRED CARE PARTNERS | Payor Agreement | 11/01/2010 | $ - |
| 21st Century Oncology, LLC | PREMIER MEDICAL EQUIPMENT LEASING, LLC | Equipment Lease | 01/31/2006 | $ - |
| 21st Century Oncology, Inc. | PREMOLI, JUAN M | Employment Agreement - Physician Urology | 10/26/2007 | $ - |
| 21st Century Oncology, LLC | PREMOLI, JUAN M | Employment Agreement - Bonus Pool Pathology Lab Addendum | 04/07/2016 | $ - |
| 21st Century Oncology, LLC | PRESTIGE HEALTH CHOICE, LLC | Payor Agreement | 02/20/2008 | $ - |
| 21st Century Oncology, Inc. | Prices' Refrigeration & Heating Service, Inc. | HVAC Service Agreement | 1/10/2017 | $ 502.87 |
| 21st Century Oncology, LLC | PRINCETON COMMUNITY HOSPITAL | Investigator Agreement | 12/31/2012 | $ - |
| 21st Century Oncology, Inc. | ProClean Authority, Inc. | Janitorial Maintenance | xx/xx/2006 | $ 20,345.73 |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st Century Oncology, LLC | PROCUREMENT ADVISORS (FORMERLY VESTAR GLOBAL PURCHASING) | Vendor Agreement | 12/14/2009 | $ - |
| North Carolina Radiation Therapy Management Services, LLC | PROFESSIONAL LAND DEVELOPERS | Building and Land Lease | 01/01/1973 | $ - |
| 21st Century Oncology, Inc. | PROGRESS SOFTWARE CORPORATION D/B/A BRAVEPOINT | Master Services Agreement | 03/21/2016 | $ - |
| 21st Century Oncology, Inc. | PROSPECT CHARTERCARE RWMC, LLC D/B/A ROGER WILLIAMS MEDICAL CENTER; CARE NEW ENGLAND HEALTH SYSTEM | Joint Venture Agreement | 04/23/2002 | $ - |
| New England Radiation Therapy Management Services, Inc. | PROSPECT CHARTERCARE RWMC, LLC D/B/A ROGER WILLIAMS MEDICAL CENTER; CARE NEW ENGLAND HEALTH SYSTEM | Joint Venture Agreement | 06/09/2005 | $ - |
| South Florida Radiation Oncology, LLC | PROTRANSPORTATION INC | Transportation services | 4/1/2013 | $ 21,008.25 |
| 21st Century Oncology, Inc. | PROVANT HEALTH SOLUTIONS, LLC | Employee Benefit Plan - Master Services Agreement for Health Promotion Services | 10/01/2015 | $ - |
| 21st Century Oncology, LLC | PUBLIC HEALTH TRUST OF MIAMI-DADE COUNTY, FL | Equipment Lease | 12/17/2014 | $ - |
| 21st Century Oncology, LLC | PUBLIC HEALTH TRUST OF MIAMI-DADE COUNTY, FLORIDA | Medical Equipment Lease Agreement | 02/08/2015 | $ - |
| 21st Century Oncology, LLC | PUNTA GORDA HMA, LLC DBA BAYFRONT HEALTH PUNTA GORDA | Building and Land Lease | 11/01/2016 | $ - |
| 21st Century Oncology Investments, LLC | QBE INSURANCE COMPANY | Insurance Policy - Directors & Officers - 6th Layer, Excess | 09/01/2016 | $ - |
| 21st Century Oncology, Inc. | QGENDA, INC. | Software Services Agreement | 03/24/2016 | $ - |
| 21st Century Oncology of New Jersey, Inc. | QUALCARE | Payor Agreement | 12/18/2008 | $ - |
| 21st Century Oncology, LLC | QUALITY ASSURANCE SERVICES, INC. | Medical Physics Consulting Services Agreement | 10/09/2009 | $ - |
| 21st Century Oncology, Inc. | QUALITY HEALTH MGMT. | Payor Agreement | 12/01/2015 | $ - |
| 21st Century Oncology, LLC | QUALITY HEALTH MGMT. | Payor Agreement | 02/01/2010 | $ - |
| Atlantic Urology Clinics, LLC | QUILLEN, TIMOTHY J | Employment Agreement - Physician Urology | 03/31/2010 | $ - |
| 21st Century Oncology, LLC | Quintero, Ricardo J | Employment Agreement - Physician (employment ceased) | 3/16/2015 | $ - |
| 21st Century Oncology Holdings, Inc. | R. SCOTT LAWRENCE | Indemnification Agreement | 09/26/2014 | $ - |
| Carolina Regional Cancer Center, LLC | R. STEVEN BASS | Building and Land Lease | 05/03/2010 | $ - |
| U.S. Cancer Care, Inc. | RADIATION ONCOLOGY ASSOCIATES, P.C. | Management Services Agreement | 07/01/2008 | $ - |
| North Carolina Radiation Therapy Management Services, LLC | RADIATION THERAPY ASSOCIATES OF WESTERN NORTH CAROLINA, P.A. | Management Services Agreement | 01/01/2002 | $ - |
| North Carolina Radiation Therapy Management Services, LLC | RADIATION THERAPY ASSOCIATES OF WESTERN NORTH CAROLINA, P.A.; MICHAEL J. KATIN, MD | Transition Agreement and Stock Pledge | 08/01/2002 | $ - |
| 21st Century Oncology, LLC | Radiology Regional Center, P.A. | MRI Services, Office, Equipment and Personnel Lease Agreement | 10/1/2000 | $ - |
| 21st Century Oncology, LLC f/k/a 21st Century Oncology, Inc. | Radiology Regional Center, P.A. | PET Services, Office, Equipment and Personnel Lease Agreement | 6/1/2002 | $ - |
| 21st Century Oncology, LLC | Radiology Regional Center, P.A. | Amendment 1 to Medical Image Archive Agreement | 7/2/2012 | $ - |
| 21st Century Oncology, LLC f/k/a 21st Century Oncology, Inc. | Radiology Regional Center, P.A. | Radiology Coverage Agreement | 10/1/2002 | $ 18,284.67 |
| 21st Century Oncology, LLC | Radiology Regional Center, P.A./Dr. Carron | Reading Agreement | 3/1/2011 | $ - |
| U.S. Cancer Care, Inc. | RADIOTHERAPY, LLC | Joint Venture Agreement | 12/09/2004 | $ - |
| California Radiation Therapy Management Services, Inc. | RADS, P.C. ONCOLOGY PROFESSIONALS; MICHAEL J. KATIN, MD | Transition Agreement and Stock Pledge | 09/03/2003 | $ - |
| 21st Century Oncology of Kentucky, LLC | Raghavan, Vijay M | Employment Agreement - Physician | 8/1/2017 | $ - |
| 21st Century Oncology, LLC | RAJPARA, RAJ S | Employment Agreement - Physician RAD Oncology | 04/10/2017 | $ - |
| 21st Century Oncology, LLC | RAJU, KRISHNA P | Employment Agreement - Bonus Pool Diagnostic (Lee County Pulmonologist) | 02/05/2014 | $ - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st Century Oncology, LLC | RAJU, KRISHNA P | Employment Agreement - Physician-Pulmonology | 02/05/2014 | $ - |
| California Radiation Therapy Management Services, Inc. | RANCHO MIRAGE SURGERY CENTER, LLC | Under Arrangement Agreement (Prostate Seed Implant Technical Services) | 05/31/2012 | $ - |
| 21st Century Oncology of New Jersey, Inc. | RANCOCAS VALLEY PROFESSIONAL ARTS BUILDING LP | Building and Land Lease | 10/18/2004 | $ - |
| 21st Century Oncology, LLC | RAO, JAYANTH K | Employment Agreement - Physician RAD Oncology | 10/01/2013 | $ - |
| 21st Century Oncology, LLC | RAUCH, MITCHELL K | Employment Agreement - Physician Urology | 03/02/2011 | $ - |
| 21st Century Oncology, LLC | RAVELO, RAUL | Employment Agreement - Physician RAD Oncology | 07/01/2014 | $ - |
| 21st Century Oncology, LLC | RAVIPATI, NAGESH B | Employment Agreement - Bonus Pool Diagnostic (Lee County | 10/31/2010 | $ - |
| 21st Century Oncology, LLC | RAVIPATI, NAGESH B | Employment Agreement - Physician Surgery | 07/01/2010 | $ - |
| 21st Century Oncology, LLC | RAYMOND HENDERSON, M.D., P.A. | Equipment Lease | 01/02/2016 | $ - |
| 21st Century Oncology, LLC | RAYMOND HENDERSON, M.D., P.A./HTA - AW VICTOR FARRIS LLC | Building and Land Lease | 01/01/2016 | $ - |
| 21st Century Oncology, Inc. f/k/a Radiation Therapy Services, Inc. | Real Asset Management, Inc. | Software Licensing and Support Agreement | 7/18/2013 | $ 4,225.00 |
| 21st Century Oncology, LLC | RECORDS MANAGEMENT SERVICES, INC. | Agreement for Services | 01/19/2011 | $ - |
| 21st Century Oncology, LLC | REDDY, SAMARTH L | Employment Agreement - Physician Medical Oncology | 09/06/2012 | $ - |
| North Carolina Radiation Therapy Management Services, LLC | REGIONAL DEVELOPMENT PARTNERS/PROFESSIONAL LAND DEVELOPERS | Building and Land Lease | 01/11/2002 | $ - |
| 21st Century Oncology, LLC | REICH, ELIZABETH A | Employment Agreement - Physician Medical Oncology | 02/01/2011 | $ - |
| Atlantic Urology Clinics, LLC | Reilly, John F | Employment Agreement - Physician (employment ceased) | 1/1/2016 | $ - |
| Atlantic Urology Clinics, LLC | Rentz, Michael W | Employment Agreement - Physician (employment ceased) | 11/15/2010 | $ - |
| 21st Century Oncology Holdings, Inc. | Resource Partners, LLC | Engagement Letter | 9/14/2016 | $ 100,000.00 |
| 21st Century Oncology, LLC | REYES, ANTONIO | Employment Agreement - Bonus Pool Pathology Lab Addendum | 04/07/2016 | $ - |
| 21st Century Oncology, LLC | REYES, ANTONIO | Employment Agreement - Bonus Pool Subgrp Pathology Lab | 04/03/2012 | $ - |
| 21st Century Oncology, LLC | REYES, ANTONIO | Employment Agreement - Physician Urology | 04/03/2012 | $ - |
| 21st Century Oncology, LLC | Rice, David | Employment Agreement - Physician | 7/26/1999 | $ - |
| 21st Century Oncology of Kentucky, LLC | RICHARDS, WILLIAM F | Employment Agreement - Physician, RAD Oncology | 09/14/2015 | $ - |
| Arizona Radiation Therapy Mngt Services | Richmond, Jeffrey G | Employment Agreement - Physician (employment ceased) | 7/9/2012 | $ - |
| New England Radiation Therapy Management Services, Inc. | RICKEY R. BRACKETT | General Maintenance Services Agreement | 11/03/2016 | $ - |
| 21st Century Oncology, Inc. | RICOH USA, INC. | Master Lease | 06/16/2016 | $ - |
| 21st Century Oncology, Inc. | RICOH USA, INC. | Vendor Agreement | 02/01/2016 | $ - |
| 21st Century Oncology, LLC | RIMMER PROPERTIES, LLC | Building and Land Lease | 02/27/2016 | $ - |
| 21st Century Oncology, LLC | RIMMER, JOHN A P | Employment Agreement - Physician Surgery | 06/15/2011 | $ - |
| Financial Services of Southwest Florida, LLC | RISARC CONSULTING LLC | Consulting Agreement | 09/06/2012 | $ - |
| 21st Century Oncology, LLC | RIVERA, ROLANDO | Employment Agreement - Bonus Pool Pathology Lab Addendum | 01/01/2016 | $ - |
| 21st Century Oncology, LLC | RIVERA, ROLANDO | Employment Agreement - Bonus Pool SIU Diagnostic | 02/19/2014 | $ - |
| 21st Century Oncology, LLC | RIVERA, ROLANDO | Employment Agreement - Bonus Pool SIU Pathology Lab | 01/20/2014 | $ - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st Century Oncology, LLC | RIVERA, ROLANDO | Employment Agreement - Physician Urology | 05/01/2013 | $ - |
| 21st Century Oncology, LLC | RIVERA, ROLANDO | Employment Agreement - Physician Urology | 10/01/2010 | $ - |
| 21st Century Oncology, Inc. | RIVERSIDE HEALTH | Payor Agreement | 07/11/2012 | $ - |
| 21st Century Oncology, LLC | RIVERSIDE INVESTORS LLLP | Building and Land Lease | 01/01/2014 | $ - |
| 21st Century Oncology, LLC | RIWA INC. D/B/A RAUCH WELLNESS AND AESTHETICS | Equipment Lease | 03/12/2016 | $ - |
| 21st Century Oncology, LLC | Rizzo, Jasper J | Employment Agreement - Physician | 5/1/1993 | $ - |
| 21st Century Oncology Services, LLC | Rizzo, Joseph | Employment Agreement - Physician | 12/22/2008 | $ - |
| 21st Century Oncology, LLC | RNMX, LLC | Equipment Lease | 01/09/2016 | $ - |
| U.S. Cancer Care, Inc. | ROA ASSOCIATES, LLP | Building and Land Lease | 07/01/2008 | $ - |
| 21st Century Oncology, Inc. f/k/a Radiation Therapy Services, Inc. | Robert Half Internationl Inc. (Accountemps) | Staffing Services | 11/10/2014 | $ 17,985.18 |
| 21st Century Oncology Holdings, Inc. | ROBERT MILLER | Independent Contractor Agreement | 12/21/2015 | $ - |
| 21st Century Oncology Investments, LLC | ROBERT MILLER | Company Sale Bonus Agreement | 12/21/2015 | $ - |
| 21st Century Oncology Investments, LLC | ROBERT MILLER | Incentive Unit Grant Agreement | 12/21/2015 | $ - |
| 21st Century Oncology Holdings, Inc. | ROBERT ROSNER | Indemnification Agreement | 09/26/2014 | $ - |
| Atlantic Urology Clinics, LLC | ROBERTS, BRIAN J | Employment Agreement - Physician Urology | 03/31/2010 | $ - |
| 21st Century Oncology, LLC | Robinson, Lewis | Employment Agreement - Physician (employment ceased) | 4/29/2005 | $ - |
| 21st Century Oncology, LLC | Robles, Manuel A | Employment Agreement - Physician (employment ceased) | 10/1/2010 | $ - |
| 21st Century Oncology, LLC | ROCK, DAVID T | Employment Agreement - Bonus Pool Diagnostic (Lee County) | 09/15/2011 | $ - |
| 21st Century Oncology, LLC | ROCK, DAVID T | Employment Agreement - Physician Surgery | 06/15/2011 | $ - |
| 21st Century Oncology, LLC | RODRIGUES, GOTARDO A | Employment Agreement - Physician Medical Oncology | 02/19/2013 | $ - |
| 21st Century Oncology, LLC | RODRIGUEZ-PINERO, FELIX A | Employment Agreement - Physician Medical Oncology | 07/01/2013 | $ - |
| New England Radiation Therapy Management Services, Inc. | ROGER WILLIAMS RADIATION THERAPY, LLC | Management Services Agreement | 01/31/2007 | $ - |
| 21st Century Oncology, LLC | RONALD B. FAUER, M.D AND LINDA M. FAUER | Building and Land Lease | 04/01/2009 | $ - |
| 21st Century Oncology, LLC | Ronald B. Fauer, M.D and Linda M. Fauer | 10167-1 | 4/1/2009 | $ - |
| 21st Century Oncology, LLC | Rose, Marc C | Employment Agreement - Physician (employment ceased) | 12/28/2015 | $ - |
| 21st Century Oncology, LLC | Rosen, Alexandre M | Employment Agreement - Physician (employment ceased) | 8/1/2013 | $ - |
| 21st Century Oncology, LLC | Rosen, Evan G | Employment Agreement - Physician (employment ceased) | 12/28/2015 | $ - |
| 21st Century Oncology, LLC | Ross Jr, Robert R | Employment Agreement - Physician (employment ceased) | 11/1/2007 | $ - |
| 21st Century Oncology, LLC | ROUNDTOWER TECHNOLOGIES | Support and Maintenance Agreement | 04/01/2017 | $ - |
| Carolina Regional Cancer Center, LLC | RSB CONWAY MEDICAL PROPERTIES, LLC | Building and Land Lease | 08/01/2010 | $ - |
| 21st Century Oncology, Inc. | RUANE, THOMAS J | Employment Agreement - Medical Director | 12/01/2007 | $ - |
| 21st Century Oncology, Inc. | RUANE, THOMAS J | Employment Agreement - Physician Urology | 11/01/2007 | $ - |
| 21st Century Oncology, LLC | RUANE, THOMAS J | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/23/2016 | $ - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st Century Oncology, LLC | RUANE, THOMAS J | Employment Agreement - Bonus Pool Subgrp Pathology Lab (Charlotte & Sarasota Co, Prt Charlotte, Sarasota, Venice) | 11/01/2010 | $                    - |
| 21st Century Oncology, LLC | RUBENSTEIN, JAMES | Employment Agreement - Bonus Pool Diagnostic (Lee County) | 12/14/2009 | $                    - |
| 21st Century Oncology, LLC | RUBENSTEIN, JAMES | Employment Agreement - Physician RAD Oncology | 02/21/2008 | $                    - |
| 21st Century Oncology, LLC | RUTH WISE TRUST UTD 10/07/2000 | Building and Land Lease | 01/04/2010 | $                    - |
| North Carolina Radiation Therapy Management Services, LLC | RUTHERFORD MEDICAL OFFICES, LLC | Building and Land Lease | 01/11/2002 | $                    - |
| North Carolina Radiation Therapy Management Services, LLC | RUTHERFORD MEDICAL OFFICES, LLC | Building and Land Lease | 02/16/1998 | $                    - |
| 21st Century Oncology, LLC | SACHEDINA, AZEEM M | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/25/2016 | $                    - |
| 21st Century Oncology, LLC | SACHEDINA, AZEEM M | Employment Agreement - Bonus Pool Subgrp Pathology Lab | 10/14/2013 | $                    - |
| 21st Century Oncology, LLC | SACHEDINA, AZEEM M | Employment Agreement - Physician Urology | 10/14/2013 | $                    - |
| 21st  Century Oncology, LLC | Sachedina, Nasheer A | Employment Agreement - Physician | 8/1/2014 | $                    - |
| 21st Century Oncology, LLC | SACHUKANI HOLDINGS LLC | Building and Land Lease | 01/01/2015 | $                    - |
| 21st Century Oncology, LLC | SACRED HEART HEALTH SYSTEM | Payor Agreement | 09/13/2012 | $                    - |
| 21st Century Oncology, LLC | SACRED HEART HEALTH SYSTEM DBA SACRED HEART OF PENSACOLA/ALFRED H. BRANDON, M.D., P.A. | Independent Contractor Agreement | 12/05/2015 | $                    - |
| 21st Century Oncology, LLC | SACRED HEART HEALTH SYSTEM DBA SCARED HEART ON THE EMERALD COAST | Equipment Sterilization Services Agreement | 09/01/2015 | $                    - |
| 21st Century Oncology, LLC | SAFETEC OF AMERICA, INC. | Vendor Agreement | 06/15/2015 | $                    - |
| 21st Century Oncology, Inc., f/k/a Radiation Therapy Services, Inc. | Sage Software Healthcare, Inc. | System Purchase and License Agreement | 3/25/2010 | $                    - |
| 21st Century Oncology, LLC | SAI GLOBAL COMPLIANCE, INC. | Master Solutions Agreement | 01/04/2017 | $                    - |
| 21st Century Oncology, LLC | SAKORNSIN, FLORA | Employment Agreement - Physician Consulting | 05/28/2013 | $                    - |
| 21st Century Oncology, LLC | SALAZAR, OMAR M | Employment Agreement - Locum Tenens | 08/24/2016 | $                    - |
| 21st Century Oncology, Inc. | SALESFORCE.COM INC. | Master Agreement | 03/06/2017 | $                    - |
| 21st Century Oncology, Inc. | SAMOWITZ, HARVEY R | Employment Agreement - Physician Urology | 10/26/2007 | $                    - |
| 21st Century Oncology, LLC | SAMOWITZ, HARVEY R | Employment Agreement - Bonus Pool Pathology Lab Addendum | 04/07/2016 | $                    - |
| North Carolina Radiation Therapy Management Services, LLC | SAMPSON REGIONAL CANCER CENTER, LLC | Building and Land Lease | 04/12/2012 | $                    - |
| 21st  Century Oncology, LLC | Sanchez, Caridad S | Employment Agreement - Physician | 12/23/2013 | $                    - |
| 21st Century Oncology, Inc. | SANCHEZ, EDUARDO | Employment Agreement - Physician Covering | 12/15/1999 | $                    - |
| 21st Century Oncology, LLC | SANCHEZ, SANDRA P | Employment Agreement - Physician Surgery | 10/01/2015 | $                    - |
| 21st Century Oncology, LLC | SANDADI, SAMITH | Employment Agreement - Physician GYN Oncology | 03/01/2014 | $                    - |
| 21st Century Oncology, LLC | SANDRAPATY, RAVICHANDRA K | Employment Agreement - Physician RAD Oncology | 10/01/2013 | $                    - |
| U.S. Cancer Care, Inc. | SANTA CRUZ RADIATION ONCOLOGY MEDICAL GROUP, INCORPORATED | First Amendment to Management Services Agreement | 10/04/2016 | $                    - |
| U.S. Cancer Care, Inc. | SANTA CRUZ RADIATION ONCOLOGY MEDICAL GROUP, INCORPORATED | Management Services Agreement | 01/05/2007 | $                    - |
| U.S. Cancer Care, Inc. | SANTA CRUZ RADIATION ONCOLOGY MEDICAL GROUP, INCORPORATED | Management Services Agreement | 01/05/2007 | $                    - |
| 21st Century Oncology, Inc. | SANTOS, CARIDAD | Employment Agreement - Physician Consulting | 02/18/2008 | $                    - |
| 21st Century Oncology, LLC | SANTOS, RAMON | Employment Agreement - Physician Covering | 01/27/2003 | $                    - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st Century Oncology, LLC | SANTUCCI, RAYMOND D | Employment Agreement - Bonus Pool Diagnostic (Lee County Pulmonologist) | 02/05/2014 | $ - |
| 21st Century Oncology, LLC | SANTUCCI, RAYMOND D | Employment Agreement - Physician-Pulmonology | 02/05/2014 | $ - |
| 21st Century Oncology, Inc. | SANUS HEALTH | Payor Agreement | 04/01/2013 | $ - |
| 21st Century Oncology, LLC | SARASOTA COUNTY PUBLIC HOSPITAL DISTRICT | Building and Land Lease | 02/01/2017 | $ - |
| 21st Century Oncology, LLC | SARASOTA COUNTY PUBLIC HOSPITAL DISTRICT | Building and Land Lease | 03/19/2012 | $ - |
| 21st Century Oncology, LLC | SARASOTA COUNTY PUBLIC HOSPITAL DISTRICT | Building and Land Lease | 03/19/2012 | $ - |
| 21st Century Oncology, LLC | SARASOTA COUNTY PUBLIC HOSPITAL DISTRICT | Payor Agreement | 08/31/2001 | $ - |
| 21st Century Oncology, LLC | SARASOTA COUNTY PUBLIC HOSPITAL DISTRICT | Payor Agreement | 09/19/2001 | $ - |
| 21st Century Oncology, LLC | SARASOTA COUNTY PUBLIC HOSPITAL DISTRICT | Payor Agreement | 09/25/2012 | $ - |
| 21st Century Oncology, LLC | SARASOTA COUNTY PUBLIC HOSPITAL DISTRICT | Payor Agreement | 09/25/2012 | $ - |
| 21st Century Oncology, LLC | SARASOTA COUNTY PUBLIC HOSPITAL DISTRICT | Payor Agreement | 11/20/2012 | $ - |
| 21st Century Oncology, LLC | SARASOTA COUNTY PUBLIC HOSPITAL DISTRICT | Payor Agreement | 12/18/2013 | $ - |
| 21st Century Oncology, LLC | SARASOTA COUNTY PUBLIC HOSPITAL DISTRICT | Payor Agreement | 12/18/2013 | $ - |
| 21st Century Oncology, Inc. | SARASOTA DOCTORS HOSPITAL, INC. DBA DOCTORS HOSPITAL OF SARASOTA | Radiation Therapy Services Agreement | 11/01/2004 | $ - |
| 21st Century Oncology, Inc. | SARASOTA DOCTORS HOSPITAL, INC. DBA DOCTORS HOSPITAL OF SARASOTA | Under Arrangement Agreement for Radiation Therapy Services | 04/07/2008 | $ - |
| 21st Century Oncology, LLC | SARASOTA ENDO INVESTORS, LLC | Building and Land Lease | 10/01/2016 | $ - |
| 21st Century Oncology, LLC | SAREH, HOUTAN | Employment Agreement - Bonus Pool Diagnostic (Lee County Pulmonologist) | 02/05/2014 | $ - |
| 21st Century Oncology, LLC | SAREH, HOUTAN | Employment Agreement - Physician-Pulmonology | 02/05/2014 | $ - |
| 21st Century Oncology, LLC | SARSOTA SUN CENTER, LLP | Building and Land Lease | 07/01/2014 | $ - |
| 21st Century Oncology, LLC | SAWH, SEAN L | Employment Agreement - Physician Urology | 01/23/2017 | $ - |
| 21st  Century Oncology, LLC | Scappa, Robert A | Employment Agreement - Physician (employment ceased) | 1/2/2007 | $ - |
| 21st Century Oncology, LLC | SCARED HEART ON THE EMERALD COAST GUILD, INC. | Radiation Therapy Services Agreement | 02/18/2014 | $ - |
| 21st Century Oncology, LLC | SCARZELLA, DAWN M | Employment Agreement - Physician Urology | 06/20/2013 | $ - |
| 21st Century Oncology of Kentucky, LLC | SCG CAPITAL CORPORATION | Equipment Lease | 12/06/2013 | $ - |
| 21st Century Oncology of South Carolina, LLC | SCG CAPITAL CORPORATION | Equipment Lease | 12/06/2013 | $ - |
| 21st Century Oncology, LLC | SCG CAPITAL CORPORATION | Equipment Lease | 02/05/2014 | $ - |
| 21st Century Oncology, LLC | SCG CAPITAL CORPORATION | Equipment Lease | 12/06/2013 | $ - |
| California Radiation Therapy Management Services, Inc. | SCG CAPITAL CORPORATION | Equipment Lease | 12/06/2013 | $ - |
| Michigan Radiation Therapy Management Services, Inc. | SCG CAPITAL CORPORATION | Equipment Lease | 12/06/2013 | $ - |
| 21st Century Oncology, LLC | SCHNEIDER, ALAN R | Employment Agreement - Bonus Pool Pathology Lab Addendum | 04/19/2016 | $ - |
| 21st Century Oncology, LLC | SCHNEIDER, ALAN R | Employment Agreement - Physician Urology | 09/24/2010 | $ - |
| 21st Century Oncology, Inc. | SCHWARTZ, BRIAN N | Employment Agreement - Physician Urology | 12/14/2006 | $ - |
| 21st Century Oncology, LLC | SCHWARTZ, BRIAN N | Employment Agreement - Bonus Pool Diagnostic (Lee County) | 09/01/2011 | $ - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st Century Oncology, LLC | SCHWARTZ, BRIAN N | Employment Agreement - Bonus Pool Pathology Lab Addendum | 04/15/2016 | $ - |
| 21st Century Oncology, LLC | SCHWARTZWALD, DAVID | Employment Agreement - Physician Urology | 09/22/2011 | $ - |
| Financial Services of Southwest Florida, LLC | SCIO Management Solutions, LLC | Services Agreement | 6/4/2012 | $ 118,019.33 |
| Financial Services of Southwest Florida, LLC | SCIO Management Solutions, LLC | Patient Collections Services Agreement | 7/17/2012 | $ - |
| 21st Century Oncology, LLC | SCOTT D. STRIESAND, M.D. | Building and Land Lease | 11/01/2016 | $ - |
| 21st  Century Oncology, LLC | Scott, Roger | Employment Agreement - Physician (employment ceased) | 1/31/2006 | $ - |
| 21st Century Oncology Investments, LLC | SCOTTSDALE INSURANCE | Insurance Policy - Property/All Risk | 04/01/2017 | $ - |
| 21st Century Oncology, LLC | ScribeAmerica, LLC | Independent Contractor Agreement | 1/22/2014 | $ 19,945.22 |
| 21st Century Oncology, Inc. | SCRYPT, INC. | Service Agreement | 02/19/2015 | $ - |
| 21st Century Oncology, LLC | SEACOAST NATIONAL BANK | Equipment Lease | 12/31/2013 | $ - |
| Atlantic Urology Clinics, LLC | SELECT HEALTH OF SOUTH CAROLINA, INC. | Payor Agreement | 01/01/2015 | $ - |
| Atlantic Urology Clinics, LLC | SELECT HEALTH OF SOUTH CAROLINA, INC. | Payor Agreement | 12/01/2012 | $ - |
| Carolina Regional Cancer Center, LLC | SELECT HEALTH OF SOUTH CAROLINA, INC. | Payor Agreement | 12/01/2012 | $ - |
| West Virginia Radiation Therapy Services, Inc. | SELECTNET PLUS, INC. | Payor Agreement | 05/18/2012 | $ - |
| 21st Century Oncology of New Jersey, Inc. | SHADY LANE NURSING HOME | Equipment Sterilization Services Agreement | 10/11/2010 | $ - |
| 21st Century Oncology of Jacksonville, LLC | SHAH, NEENAD M | Employment Agreement - Physician RAD Oncology | 03/01/2015 | $ - |
| 21st Century Oncology, LLC | SHAH, NEENAD M | Employment Agreement - Physician RAD Oncology | 03/01/2015 | $ - |
| Maryland Radiation Therapy Management Services, LLC | SHAILENDRA KUMAR, MD | Joint Venture Agreement | 07/13/2005 | $ - |
| 21st Century Oncology of Jacksonville, LLC | SHANDS JACKSONVILLE MEDICAL CENTER, INC. DBA UF HEALTH JACKSONVILLE | Laboratory Agreement | 11/01/2015 | $ - |
| 21st Century Oncology, LLC | SHANDS JACKSONVILLE MEDICAL CENTER, INC. DBA UNIVERSITY OF FLORIDA HEALTH JACKSONVILLE, LLC | Management Services Agreement | 11/17/2014 | $ 6,151.79 |
| 21st Century Oncology, LLC | SHANDS JACKSONVILLE MEDICAL CENTER, INC. DBA UNIVERSITY OF FLORIDA HEALTH JACKSONVILLE, LLC | Professional Services Agreement | 11/14/2014 | $ - |
| 21st Century Oncology, LLC | SHAPIRO, HENRY J | Employment Agreement - Physician Medical Oncology | 02/01/2011 | $ - |
| 21st Century Oncology, LLC | SHARMA, ARVIND | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/23/2016 | $ - |
| 21st Century Oncology, LLC | SHARMA, ARVIND | Employment Agreement - Bonus Pool Pathology Lab Urology (Charlotte County) | 01/01/2013 | $ - |
| 21st Century Oncology, LLC | SHARMA, ARVIND | Employment Agreement - Physician Urology | 07/01/2010 | $ - |
| 21st Century Oncology, LLC | SHARMA, VINAY | Employment Agreement - Physician RAD Oncology | 06/01/2012 | $ - |
| 21st Century Oncology, LLC | SHASHA, ITZHAK I | Employment Agreement - Physician Surgery | 12/01/2009 | $ - |
| 21st  Century Oncology, LLC | Sherman, Robert H | Employment Agreement - Physician (employment ceased) | 1/9/2012 | $ - |
| 21st  Century Oncology of Kentucky, LLC | Sheth, Subhash P | Employment Agreement - Physician | 8/1/2017 | $ - |
| 21st Century Oncology, LLC | SHIEH, GENE | Employment Agreement - Physician RAD Oncology | 08/30/2010 | $ - |
| Treasure Coast Medicine, LLC | SHIEH, GENE | Employment Agreement - Physician RAD Oncology | 08/30/2010 | $ - |
| 21st Century Oncology, Inc. | SHORE, NEAL D | Employment Agreement - National Director | 07/01/2012 | $ - |
| Atlantic Urology Clinics, LLC | SHORE, NEAL D | Employment Agreement - Physician Urology | 03/31/2010 | $ - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| South Florida Radiation Oncology, LLC | Shred It USA, LLC | Service Agreement | 12/11/2014 | $ 15,251.44 |
| South Florida Radiation Oncology, LLC | Shred It USA, LLC | Service Agreement | 7/11/2014 | $ - |
| Arizona Radiation Therapy Management Services, Inc. | SHUKLA, VERSHALEE | Employment Agreement - Physician RAD Oncology | 01/06/2014 | $ - |
| 21st Century Oncology, LLC | SIEMENS MEDICAL SOLUTIONS USA, INC. | Service Agreement | 01/08/2015 | $ 96,008.91 |
| 21st Century Oncology, LLC | SIEMENS MEDICAL SOLUTIONS USA, INC. | Service Agreement | 01/15/2015 | $ - |
| 21st Century Oncology, LLC | SIEMENS MEDICAL SOLUTIONS USA, INC. | Service Agreement | 01/15/2015 | $ - |
| 21st Century Oncology, LLC | SIEMENS MEDICAL SOLUTIONS USA, INC. | Service Agreement | 07/01/2013 | $ - |
| 21st Century Oncology, LLC | SIEMENS MEDICAL SOLUTIONS USA, INC. | Service Agreement | 12/01/2013 | $ - |
| 21st  Century Oncology, LLC | Silver, Allison R | Employment Agreement - Physician (employment ceased) | 4/13/2009 | $ - |
| 21st Century Oncology, Inc. | SILVERLANE REALTY, LLC | Building and Land Lease | 11/27/2005 | $ - |
| 21st Century Oncology, Inc. | SILVERMAN, LARRY | Employment Agreement - Physician RAD Oncology | 04/01/2006 | $ - |
| 21st Century Oncology, LLC | SILVERSTEIN, ARI D | Employment Agreement - Physician Urology | 09/21/2011 | $ - |
| 21st Century Oncology, LLC | SILVIO TANEV, LLC | Professional Services Agreement | 09/12/2016 | $ - |
| U.S. Cancer Care, Inc. | SIMI VALLEY CANCER CENTER MANAGEMENT LLC | Management Services Agreement | 12/01/2011 | $ - |
| U.S. Cancer Care, Inc. | SIMI VALLEY CANCER CENTER MANAGEMENT, LLC | Equipment Sublease and License Agreement | 02/01/2015 | $ - |
| U.S. Cancer Care, Inc. | SIMI VALLEY HOSPITAL AND HEALTHCARE SERVICES, INC. | Joint Venture Agreement | 10/31/2011 | $ - |
| 21st Century Oncology of Jacksonville, LLC | SIMMONS, DWELVIN L | Employment Agreement - Physician RAD Oncology | 03/01/2015 | $ - |
| 21st Century Oncology, LLC | SIMMONS, DWELVIN L | Employment Agreement - Physician RAD Oncology | 03/01/2015 | $ - |
| 21st Century Oncology, LLC | SIMON, MICHAEL A | Employment Agreement - Physician Urology | 05/23/2011 | $ - |
| 21st Century Oncology, LLC | SIMPLY HEALTHCARE PLANS, INC. | Payor Agreement | 07/14/2014 | $ - |
| 21st Century Oncology, LLC | SINGER, JERRY H | Employment Agreement - Physician Urology | 06/05/1900 | $ - |
| 21st Century Oncology, LLC | SINGLETON AND WHEELER, LLC | Building and Land Lease | 08/01/2011 | $ - |
| 21st Century Oncology Management Services, Inc. | SITECORE USA | Proposal for Software Licensing Agreement | 06/30/2015 | $ - |
| OnCure Medical Corp. | SIXTH CITY LANDOWNERS | Building and Land Lease | 05/01/2012 | $ - |
| 21st Century Oncology, LLC | SLEEPWORKS, LLC | HST Sleep Diagnostic Services Agreement | 11/01/2014 | $ - |
| Arizona Radiation Therapy Mngt Services | Sloan, Devin J | Employment Agreement - Physician (employment ceased) | 9/8/2014 | $ - |
| 21st  Century Oncology, LLC | Sloss, Joseph H | Employment Agreement - Physician (employment ceased) | 4/1/2012 | $ - |
| 21st Century Oncology, Inc. | SMGL LLC - THAD HARVEY | Consulting Agreement | 03/29/2017 | $ - |
| 21st  Century Oncology, LLC | Smith, Michael D | Employment Agreement - Physician (employment ceased) | 5/6/2013 | $ - |
| 21st Century Oncology, LLC | SORIAL, REDA F | Employment Agreement - Bonus Pool Pathology Lab Addendum | 04/07/2016 | $ - |
| 21st Century Oncology, LLC | SORIAL, REDA F | Employment Agreement - Physician Urology | 11/15/2010 | $ - |
| 21st Century Oncology, LLC | SOUND RESOLUTION, LLC | Building and Land Lease | 05/01/2016 | $ - |
| 21st Century Oncology, Inc. | SOUTH BROWARD HOSPITAL DISTRICT | Building and Land Lease | 10/26/2007 | $ - |

| Debtor | Creditor | Description | Date | Cure Amount |
|--------|----------|-------------|------|-------------|
| 21st Century Oncology, LLC | SOUTH BROWARD HOSPITAL DISTRICT | Building and Land Lease | 03/01/2016 | $ - |
| 21st Century Oncology, LLC | SOUTH BROWARD HOSPITAL DISTRICT | Building and Land Lease | 06/01/2012 | $ - |
| 21st Century Oncology, LLC | SOUTH BROWARD HOSPITAL DISTRICT | Building and Land Lease | 07/09/2015 | $ - |
| 21st Century Oncology, LLC | SOUTH BROWARD HOSPITAL DISTRICT | Building and Land Lease | 10/01/2013 | $ - |
| 21st Century Oncology, LLC | SOUTH BROWARD HOSPITAL DISTRICT | Building and Land Lease | 10/26/2007 | $ - |
| 21st Century Oncology, Inc. | SOUTH COUNTY HOSPITAL HEALTHCARE SYSTEM | Joint Venture Agreement | 01/08/2003 | $ - |
| New England Radiation Therapy Management Services, Inc. | SOUTH COUNTY RADIATION THERAPY, LLC | Management Services Agreement | 08/30/2005 | $ - |
| 21st Century Oncology, LLC | SOUTH FLORIDA COMMERCIAL CLEANING | Janitorial Services Agreement | 11/11/2016 | $ - |
| 21st Century Oncology, LLC | SOUTH FLORIDA ONCOLOGY AND HEMATOLOGY CONSULTANTS | Professional Services Agreement | 03/01/2004 | $ - |
| 21st Century Oncology, Inc. | SOUTHEAST COMPUTER SOLUTIONS INC. | Master Services Agreement | 04/10/2017 | $ - |
| West Virginia Radiation Therapy Services, Inc. | SOUTHEAST SERVICES, INC. | Payor Agreement | 04/12/2012 | $ - |
| West Virginia Radiation Therapy Services, Inc. | SOUTHEAST SERVICES, INC. | Payor Agreement | 04/12/2012 | $ - |
| New England Radiation Therapy Management Services, Inc. | SOUTHERN NEW ENGLAND REGIONAL CANCER CENTER, LLC | Management Services Agreement | 08/01/2002 | $ - |
| 21st Century Oncology, LLC d/b/a Allergy Sleep & Lung Care | Southern Sleep Services, Inc. | Technical Services Agreement | 1/1/2016 | $ 19,912.50 |
| Devoto Construction of Southwest Florida, Inc. | SOUTHERN-OWNERS INSURANCE COMPANY | Insurance Policy - GL | 12/01/2016 | $ - |
| 21st Century Oncology, LLC | SOUTHWEST FLORIDA COPIER SERVICE INC. | Office Equipment Lease | 03/01/2017 | $ - |
| Financial Services of Southwest Florida, LLC | SOUTHWEST FLORIDA COPIER SERVICE INC. | Office Equipment Lease | 03/01/2017 | $ - |
| Phoenix Management Company, LLC | SP III WEST BLOOMFIELD, LLC | Building and Land Lease | 10/01/2007 | $ - |
| 21st Century Oncology Holdings, Inc. | Sparks Law Firm | Arbitration Counsel California | 12/7/2012 | $ - |
| Arizona Radiation Therapy Management Services, Inc. | SPECTRUM DERMATOLOGY, PLLC | Professional Services Agreement | 04/15/2014 | $ - |
| 21st Century Oncology, LLC | SPIRIT MASTER FUNDING VII, LLC | Building and Land Lease | 08/30/2012 | $ - |
| 21st Century Oncology, LLC | SPIRIT MASTER FUNDING VII, LLC | Building and Land Lease | 08/30/2012 | $ - |
| 21st Century Oncology, LLC | SPIRIT MASTER FUNDING VII, LLC | Building and Land Lease | 08/30/2012 | $ - |
| 21st Century Oncology, LLC | SPIRIT MASTER FUNDING VII, LLC | Building and Land Lease | 08/30/2012 | $ - |
| 21st Century Oncology, LLC | SPIRIT MASTER FUNDING VII, LLC | Building and Land Lease | 08/30/2012 | $ - |
| 21st Century Oncology, LLC | SPIRIT MASTER FUNDING VII, LLC | Building and Land Lease | 08/30/2012 | $ - |
| 21st Century Oncology, LLC | SPIRIT MASTER FUNDING VII, LLC | Building and Land Lease | 08/30/2012 | $ - |
| 21st Century Oncology, LLC | SPIRIT MASTER FUNDING VII, LLC | Building and Land Lease | 08/30/2012 | $ - |
| 21st Century Oncology, LLC | SPIRIT MASTER FUNDING VII, LLC | Building and Land Lease | 11/10/2016 | $ - |
| 21st Century Oncology Management Services, Inc. | SPROUTLOUD MEDIA NETWORKS, LLC | Service Level Agreement | 02/15/2012 | $ - |
| 21st Century Oncology, LLC | SPUNBERG, JEROME J | Employment Agreement - Physician RAD Oncology | 06/13/2011 | $ - |
| 21st Century Oncology of Alabama, LLC | Spurlin, Richard J | Employment Agreement - Physician (employment ceased) | 12/26/2008 | $ - |
| Aurora Technology Development, LLC | STANDARD IMAGING, INC. | Software Distribution Agreement | 02/01/2015 | $ - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st Century Oncology Investments, LLC | STARR INDEMNITY INSURANCE COMPANY | Insurance Policy - Directors & Officers - 3rd Layer, Excess | 09/01/2016 | $ - |
| 21st Century Oncology, LLC | Stein, Marvin | Employment Agreement - Physician (employment ceased) | 12/28/2015 | $ - |
| Maryland Radiation Therapy Management Services, LLC | STEPHAN L WERNER, MD | Joint Venture Agreement | 07/13/2005 | $ - |
| 21st Century Oncology, Inc. | STEVENS, JAMES | Employment Agreement - Physician RAD Oncology | 11/01/2004 | $ - |
| 21st Century Oncology of Alabama, LLC | Stokes, Steven H | Employment Agreement - Physician | 9/30/2017 | $ - |
| South Florida Radiation Oncology, LLC | STORE MASTER FUNDING | Building and Land Lease | 03/31/2014 | $ - |
| South Florida Radiation Oncology, LLC | STORE MASTER FUNDING | Building and Land Lease | 03/31/2014 | $ - |
| South Florida Radiation Oncology, LLC | STORE MASTER FUNDING | Building and Land Lease | 03/31/2014 | $ - |
| South Florida Radiation Oncology, LLC | STORE MASTER FUNDING | Building and Land Lease | 03/31/2014 | $ - |
| South Florida Radiation Oncology, LLC | STORE MASTER FUNDING | Building and Land Lease | 03/31/2014 | $ - |
| South Florida Radiation Oncology, LLC | STORE MASTER FUNDING | Building and Land Lease | 03/31/2014 | $ - |
| South Florida Radiation Oncology, LLC | STORE MASTER FUNDING | Building and Land Lease | 03/31/2014 | $ - |
| South Florida Radiation Oncology, LLC | STORE MASTER FUNDING | Building and Land Lease | 03/31/2014 | $ - |
| South Florida Radiation Oncology, LLC | STORE MASTER FUNDING | Building and Land Lease | 03/31/2014 | $ - |
| 21st Century Oncology, LLC | Storey, Benjamin B | Employment Agreement - Physician (employment ceased) | 8/1/2013 | $ - |
| North Carolina Radiation Therapy Management Services, LLC | STRATEGIC HEALTHCARE ADVISORS LLC | Letter Agreement | 03/07/2017 | $ - |
| 21st Century Oncology, LLC | STREISAND, SCOTT DAVID | Employment Agreement - Physician Urology | 06/13/2013 | $ - |
| 21st Century Oncology, Inc. | STRICKLAND, MICHAEL G | Employment Agreement - Physician Urology | 07/01/2007 | $ - |
| 21st Century Oncology, LLC | STRICKLAND, MICHAEL G | Employment Agreement - Bonus Pool Diagnostic (Lee County) | 10/01/2011 | $ - |
| 21st Century Oncology, LLC | STRICKLAND, MICHAEL G | Employment Agreement - Bonus Pool Subgrp Pathology Lab Addendum | 01/01/2016 | $ - |
| 21st Century Oncology, LLC | Suarez, Miguel A | Employment Agreement - Physician (employment ceased) | 12/28/2015 | $ - |
| 21st Century Oncology, LLC | SULLIVAN, ALBERT L | Employment Agreement - Physician Consulting | 02/01/2013 | $ - |
| 21st Century Oncology of Jacksonville, LLC | SULLIVAN, JOSEPH W | Employment Agreement - Physician Medical Oncology | 02/28/2014 | $ - |
| 21st Century Oncology, LLC | SULLIVAN, JOSEPH W | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/23/2016 | $ - |
| 21st Century Oncology, LLC | SULLIVAN, JOSEPH W | Employment Agreement - Physician Medical Oncology | 02/28/2014 | $ - |
| Arizona Radiation Therapy Management Services, Inc. | SUMMERS, DEBORAH K | Employment Agreement - Physician Consulting | 02/16/2009 | $ - |
| 21st Century Oncology, LLC | Sun Nuclear Corporation | Product/Service Agreement Purchase Orders | | $ 9,076.69 |
| New York Radiation Therapy Management Services, LLC | SUN, CHEGWEI PH.D. | Purchased Services Agreement | 11/01/1998 | $ - |
| 21st Century Oncology, LLC | SUNERGY OUTPATIENT SURGERY CENTER, LLC | Agreement for Uronav MRI Fusion Guide Biopsy Services | 02/01/2016 | $ - |
| 21st Century Oncology, Inc. | SUNLIFE ASSURANCE COMPANY OF CANADA | Employee Benefit Plan Agreement - Life & Disability Insurance | 01/01/2013 | $ - |
| 21st Century Oncology, LLC | SUNSHINE STATE HEALTH PLAN | Payor Agreement | 09/01/2013 | $ - |
| 21st Century Oncology, LLC | SURGERY CENTER OF SOUTHWEST FLORIDA, INC. | Agreement for Uronav MRI Fusion Guide Biopsy Services | 01/24/2017 | $ - |
| 21st Century Oncology, LLC | SURGICAL ASSOCIATES OF THE PALM BEACHES, INC. | Building and Land Lease | 03/05/2016 | $ - |

| Debtor | Creditor | Description | Date | Cure Amount |
|--------|----------|-------------|------|-------------|
| 21st Century Oncology, Inc. | SUTTER MEDICAL FOUNDATION | Physician services | | $ 14,338.00 |
| 21st Century Oncology, Inc. | SWOR, GRAY BOWEN | Employment Agreement - Physician RAD Oncology | 06/01/2006 | $ - |
| 21st Century Oncology, LLC | Syed, Kirin K | Employment Agreement - Physician (employment ceased) | 7/1/2015 | $ - |
| 21st Century Oncology, LLC | SYLVESTER, JOHN E | Employment Agreement - Physician RAD Oncology | 03/01/2012 | $ - |
| 21st Century Oncology of Jacksonville, LLC | SYLVESTER, LINDA S | Employment Agreement - Physician Medical Oncology PT | 03/01/2014 | $ - |
| 21st Century Oncology, LLC | SYLVESTER, LINDA S | Employment Agreement - Physician Medical Oncology PT | 03/01/2014 | $ - |
| Atlantic Urology Clinics, LLC | SZCZESNIAK, CARL J | Employment Agreement - Physician Pathology | 01/18/2016 | $ - |
| 21st Century Oncology, LLC | Szell, Nicole M | Employment Agreement - Physician (employment ceased) | 7/11/2016 | $ - |
| 21st Century Oncology, Inc. | TANNENBAUM, STEPHEN | Employment Agreement - Medical Director | 12/01/2007 | $ - |
| 21st Century Oncology, Inc. | TANNENBAUM, STEPHEN | Employment Agreement - Physician Urology | 10/26/2007 | $ - |
| 21st Century Oncology, LLC | TANNENBAUM, STEPHEN | Employment Agreement - Bonus Pool Pathology Lab Addendum | 04/07/2016 | $ - |
| 21st Century Oncology, LLC | TAYENGCO-MAISOG, VICTORIA | Employment Agreement - Physician Consulting | 02/09/2009 | $ - |
| 21st Century Oncology, Inc. | TECHSABE | IT Service Agreement | 02/22/2017 | $ - |
| U.S. Cancer Care, Inc. | TekTegrity | Managed Services Agreement | 4/5/2012 | $ 2,550.00 |
| North Carolina Radiation Therapy Management Services, LLC | THE ARCHER MARSTON LAND PARTNERSHIP | Building and Land Lease | 05/04/2011 | $ - |
| 21st Century Oncology, Inc. | THE CSI COMPANIES INC. | Direct Hire Agreement | 04/27/2017 | $ - |
| 21st Century Oncology, Inc. | THE CSI COMPANIES INC. | Temp & Temp to Hire Agreements | 04/24/2017 | $ - |
| 21st Century Oncology Investments, LLC | THE DOCTORS COMPANY | Insurance Policy - Excess Malpractice | 11/01/2016 | $ - |
| 21st Century Oncology Investments, LLC | THE DOCTORS COMPANY | Insurance Policy - Malpractice | 11/01/2016 | $ - |
| 21st Century Oncology, Inc. | THE DOCTORS COMPANY | Insurance Policy - Malpractice | 02/15/2017 | $ - |
| 21st Century Oncology, Inc. | THE DOCTORS COMPANY | Insurance Policy - Malpractice | 06/01/2016 | $ - |
| 21st Century Oncology, LLC | THE DOCTORS COMPANY | Insurance Policy - Malpractice | 12/01/2016 | $ - |
| 21st Century Oncology, LLC | THE NEGOTIATORS, LLC D/B/A SUNRISE | Billing Services Agreement | 05/01/2012 | $ 62,626.53 |
| 21st Century Oncology, LLC | THE NEGOTIATORS, LLC D/B/A SUNSHINE PHYSICIANS SERVICES | Billing Services Agreement | 05/30/2012 | $ - |
| 21st Century Oncology, Inc. | THE NETWORK, INC. | Master Subscription Agreement | 12/17/2015 | $ - |
| 21st Century Oncology, LLC | THE NEWS-PRESS | Employment Advertising Agreement | 06/30/2016 | $ 17,684.77 |
| Arizona Radiation Therapy Management Services, Inc. | THE UNIVERSITY OF AZ HEALTH PLANS | Payor Agreement | 08/15/2014 | $ - |
| Nevada Radiation Therapy Management Services, Incorporated | THERIAC - MACOMB, LLC | Building and Land Lease | 12/21/2012 | $ - |
| 21st Century Oncology of New Jersey, Inc. | THERIAC ENTERPRISES OF HAMMONTON, LLC/THERIAC ROLLUP, LLC | Building and Land Lease | 04/01/2010 | $ - |
| 21st Century Oncology, Inc. | THERIAC ENTERPRISES OF HARRINGTON, LLC/THERIAC ROLLUP, LLC | Building and Land Lease | 04/01/2010 | $ - |
| 21st Century Oncology of Pennsylvania, Inc. | THERIAC ENTERPRISES OF LITTLESTOWN, LLC | Building and Land Lease | 07/01/2007 | $ - |
| 21st Century Oncology of New Jersey, Inc. | THERIAC ENTERPRISES OF NEW JERSEY | Building and Land Lease | 03/01/2008 | $ - |
| 21st Century Oncology of New Jersey, Inc. | THERIAC ENTERPRISES OF NEW JERSEY | Building and Land Lease | 09/21/2004 | $ - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st Century Oncology, LLC | THERIAC ENTERPRISES OF PEMBROKE PINES, LLC | Building and Land Lease | 03/26/2011 | $ - |
| West Virginia Radiation Therapy Services, Inc. | THERIAC ENTERPRISES OF PRINCETON WV, LLC/THERIAC ROLLUP II, LLC | Building and Land Lease | 12/12/2011 | $ - |
| North Carolina Radiation Therapy Management Services, LLC | THERIAC ENTERPRISES OF WEAVERVILLE, LLC | Building and Land Lease | 11/10/2014 | $ - |
| 21st Century Oncology, Inc. | THERIAC ROLL UP, LLC | Building and Land Lease | 12/01/2011 | $ - |
| 21st Century Oncology of Alabama, LLC | THERIAC ROLLUP II, LLC | Building and Land Lease | 12/01/2011 | $ - |
| 21st Century Oncology, Inc. | THERIAC ROLLUP II, LLC/THERIAC ENTERPRISES OF BONITA SPRINGS, LLC | Building and Land Lease | 12/01/2011 | $ - |
| 21st Century Oncology Holdings, Inc. | THOMAS D. GORDON | Board Observer Agreement | 09/06/2016 | $ - |
| 21st Century Oncology, Inc. | THOMAS D. GORDON | Board Observer Agreement | 09/06/2016 | $ - |
| 21st  Century Oncology, LLC | Thompson, William | Employment Agreement - Physician (employment ceased) | 12/22/2008 | $ - |
| 21st  Century Oncology, LLC | Tillett, John W | Employment Agreement - Physician (employment ceased) | 5/25/2013 | $ - |
| 21st Century Oncology, LLC | TIME WARNER CABLE ENTERPRISES, LLC | Service Agreement | 07/15/2016 | $ - |
| 21st Century Oncology, LLC | TINGLE, WILLIAM J | Employment Agreement - Physician Urology | 03/30/2012 | $ - |
| 21st Century Oncology, LLC | TIRADO, AUGUSTO E | Employment Agreement - Physician Urology | 01/29/2013 | $ - |
| 21st Century Oncology, LLC | TOCCI, PAUL E | Employment Agreement - Bonus Pool Pathology Lab Addendum | 04/05/2016 | $ - |
| 21st Century Oncology, LLC | TOCCI, PAUL E | Employment Agreement - Physician Urology | 09/17/2010 | $ - |
| 21st Century Oncology, LLC | TOLEP, KENNETH A | Employment Agreement - Bonus Pool Diagnostic (Lee County Pulmonologist) | 02/05/2014 | $ - |
| 21st Century Oncology, LLC | TOLEP, KENNETH A | Employment Agreement - Physician-Pulmonology | 02/05/2014 | $ - |
| 21st Century Oncology, LLC | TOLMAR PHARMACEUTICALS, INC. | Vendor Agreement | 11/09/2016 | $ - |
| 21st Century Oncology, LLC | TOLNAI, EDIT | Employment Agreement - Physician Medical Oncology | 02/19/2010 | $ - |
| Associates In Radiation Oncology Services, LLC | TOLNAI, EDIT | Employment Agreement - Physician Medical Oncology | 02/19/2010 | $ - |
| 21st Century Oncology, Inc. | TOMASELLI, MARY BETH | Employment Agreement - Medical Director | 12/01/2007 | $ - |
| 21st Century Oncology, Inc. | TOMASELLI, MARY BETH | Employment Agreement - Physician Surgery RH | 08/10/2007 | $ - |
| 21st Century Oncology of Alabama, LLC | TOMBERLIN, CHARLES G | Employment Agreement - Physician Consulting | 08/05/2011 | $ - |
| 21st Century Oncology, LLC | TOWER HILL INSURANCE | Insurance Policy | | $ - |
| 21st Century Oncology, LLC | TRANE | Maintenance Agreement | 11/01/2017 | $ - |
| 21st Century Oncology, Inc. | TRAVELERS PROPERTY CASUALTY CO. OF AMERICA | Insurance Policy - Inland Marine | 03/01/2017 | $ - |
| OnCure Medical Corp. | TRAVERS J. MCLOUGHLIN, M.D., INC. F/K/A HARVEY GILBERT, M.D., INC. | Management Services Agreement | 01/16/2004 | $ - |
| 21st  Century Oncology, LLC | Treiman, Alan R | Employment Agreement - Physician (employment ceased) | 3/1/2007 | $ - |
| 21st Century Oncology of Alabama, LLC | TRIAD OF AL, LLC D/B/A FLOWERS HOSPITAL | Building and Land Lease | 08/01/2012 | $ - |
| 21st Century Oncology, Inc. | TRICARE | Payor Agreement | 09/01/2011 | $ - |
| 21st Century Oncology, LLC | TRICARE | Payor Agreement | 06/05/2008 | $ - |
| 21st Century Oncology, LLC | TRICARE | Payor Agreement | 07/01/1996 | $ - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st Century Oncology, LLC | TRICARE | Payor Agreement | 09/15/2011 | $ - |
| Atlantic Urology Clinics, LLC | TRICARE | Payor Agreement | 09/01/2009 | $ - |
| Carolina Regional Cancer Center, LLC | TRICARE | Payor Agreement | 02/03/2011 | $ - |
| 21st Century Oncology, LLC d/b/a Southwest Florida Urologic Associates | Tri-County Cleaning, Inc. | Housekeeping Services Agreement | 9/1/2009 | $ - |
| Phoenix Management Company, LLC | TRINITY HEALTH-MI D/B/A ST JOSEPH MERCY OAKLAND | Building and Land Lease | 12/19/2008 | $ - |
| 21st Century Oncology, LLC | TRIPP, BENJAMIN M | Employment Agreement - Physician Urology | 11/30/2011 | $ - |
| 21st Century Oncology, Inc. | TRIVANTIS (LECTORA) | License | | $ - |
| 21st Century Oncology, LLC | TRIWEST HEALTHCARE ALLIANCE CORP. | Payor Agreement | 09/01/2014 | $ - |
| Arizona Radiation Therapy Management Services, Inc. | TRIWEST HEALTHCARE ALLIANCE CORP. | Payor Agreement | 03/01/2014 | $ - |
| 21st Century Oncology of Kentucky, LLC | TRIWEST PC3 | Payor Agreement | 11/01/2014 | $ - |
| 21st Century Oncology Services, LLC | TUFTS HEALTH PLAN | Payor | | $ - |
| 21st Century Oncology Services, LLC | TUFTS HEALTH PLAN | Payor Agreement | 07/19/2016 | $ - |
| 21st Century Oncology Services, LLC | TUFTS HEALTH PLAN | Payor Agreement | 09/01/2010 | $ - |
| 21st Century Oncology Services, LLC | TUFTS HEALTH PLAN | Payor Agreement | 10/01/2010 | $ - |
| 21st Century Oncology, Inc. | TUFTS HEALTH PLAN | Payor Agreement | 01/01/2016 | $ - |
| 21st Century Oncology, LLC | TUNKLE, ALYOSHA S | Employment Agreement - Bonus Pool Diagnostic CT (Collier County) | 11/29/2010 | $ - |
| 21st Century Oncology, LLC | TUNKLE, ALYOSHA S | Employment Agreement - Bonus Pool Diagnostic PET/CT (Collier County) | 07/01/2011 | $ - |
| 21st Century Oncology, LLC | TUNKLE, ALYOSHA S | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/21/2016 | $ - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st Century Oncology, LLC | TUNKLE, ALYOSHA S | Employment Agreement - Physician Surgery | 10/01/2010 | $                -   |
| 21st Century Oncology, LLC | UMR, INC. | Employee Benefit Plan Agreement | 01/01/2016 | $                -   |
| Michigan Radiation Therapy Management Services, Inc. | UNASOURCE HEALTH II, LLC | Building and Land Lease | 12/01/2011 | $                -   |
| West Virginia Radiation Therapy Services, Inc. | UNICARE HEALTH PLANS | Payor Agreement | 01/01/2009 | $                -   |
| 21st Century Oncology, Inc. | UNITED HEALTHCARE | Administrative Services Agreement | 01/01/2010 | $                -   |
| South Florida Medicine, LLC | UNITED HEALTHCARE | Payor Agreement | 08/01/2014 | $                -   |
| West Virginia Radiation Therapy Services, Inc. | UNITED HEALTHCARE | Payor Agreement | 01/01/2009 | $                -   |
| West Virginia Radiation Therapy Services, Inc. | UNITED MINE WORKERS OF AMERICA | Payor Agreement | 06/01/2009 | $                -   |
| Arizona Radiation Therapy Management Services, Inc. | UNITEDHEALTH MILITARY AND VETERANS SERVICE, LLC | Payor Agreement | 04/01/2013 | $                -   |
| Arizona Radiation Therapy Management Services, Inc. | UNITEDHEALTHCARE COMMUNITY PLAN | Payor Agreement | 03/15/2011 | $                -   |
| 21st Century Oncology of Alabama, LLC | UNITEDHEALTHCARE INSURANCE COMPANY | Payor Agreement | 01/01/2008 | $                -   |
| 21st Century Oncology of Kentucky, LLC | UNITEDHEALTHCARE INSURANCE COMPANY | Payor Agreement | 02/01/2015 | $                -   |
| 21st Century Oncology of New Jersey, Inc. | UNITEDHEALTHCARE INSURANCE COMPANY | Payor Agreement | 02/15/2012 | $                -   |
| 21st Century Oncology, Inc. | UNITEDHEALTHCARE INSURANCE COMPANY | Payor Agreement | 12/01/2011 | $                -   |
| 21st Century Oncology, LLC | UNITEDHEALTHCARE INSURANCE COMPANY | Payor Agreement | 11/01/2012 | $                -   |
| 21st Century Oncology, LLC | UNITEDHEALTHCARE INSURANCE COMPANY | Payor Agreement | 11/01/2012 | $                -   |
| 21st Century Oncology, LLC | UNITEDHEALTHCARE INSURANCE COMPANY | Payor Agreement | 11/01/2012 | $                -   |
| Arizona Radiation Therapy Management Services, Inc. | UNITEDHEALTHCARE INSURANCE COMPANY | Payor Agreement | 06/01/2012 | $                -   |
| Atlantic Urology Clinics, LLC | UNITEDHEALTHCARE INSURANCE COMPANY | Payor Agreement | 02/01/2014 | $                -   |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| Carolina Regional Cancer Center, LLC | UNITEDHEALTHCARE INSURANCE COMPANY | Payor Agreement | 02/01/2014 | $ - |
| North Carolina Radiation Therapy Management Services, LLC | UNIVERSITY HEALTH SYSTEMS OF EASTERN CAROLINA, INC. D/B/A VIDANT MEDICAL CENTER | Physics Agreement | 05/17/2017 | $ - |
| 21st Century Oncology of Kentucky, LLC | UNIVERSITY HEALTHCARE, INC. | Payor Agreement | 02/09/2015 | $ - |
| 21st Century Oncology, LLC | UNIVERSITY HOSPITAL, LTD., DBA UNIVERSITY HOSPITAL AND MEDICAL CENTER | Building and Land Lease | 02/01/2017 | $ - |
| 21st Century Oncology, Inc. | UPS | Staffing Services | 4/6/2009 | $ 18,984.25 |
| 21st Century Oncology, LLC | UROHIALEAH, LLC/LIFEMARK HOSPITALS, INC. | Building and Land Lease | 02/13/2016 | $ - |
| 21st Century Oncology, LLC | UROLEASE LLC | Equipment Lease | 01/23/2016 | $ - |
| 21st Century Oncology, LLC | UROLEASE LLC DADE-BROWARD UROLOGY, LLC/AMERICAN MEDICORP DEVELOPMENT CO. | Building and Land Lease | 01/23/2016 | $ - |
| 21st Century Oncology, LLC | UROLEASE LLC DADE-BROWARD UROLOGY, LLC/HOLLYWOOD EXECUTIVE CENTER, LLC | Building and Land Lease | 01/23/2016 | $ - |
| 21st Century Oncology, LLC | UROLEASE, LLC | Building and Land Lease | 01/23/2016 | $ - |
| 21st Century Oncology, Inc. | US & UK MEDICAL ABROAD, LLC | Payor Agreement | 05/23/2016 | $ - |
| 21st Century Oncology of New Jersey, Inc. | US FAMILY HEALTH PLAN | Payor Agreement | 03/31/2014 | $ - |
| North Carolina Radiation Therapy Management Services, LLC | US ONCOLOGY CORPORATE, INC., A MCKESSON SPECIALTY HEALTH BUSINESS | Hosted Application Subscription Agreement | 02/06/2012 | $ - |
| U.S. Cancer Care, Inc. | V. VONGTAMA, M.D., INC. | Management Services Agreement | 04/15/2004 | $ - |
| California Radiation Therapy Management Services, Inc. | V.S. AND S.J. BOBBA REVOCABLE TRUST 1994 | Building and Land Lease | 03/01/2008 | $ - |
| 21st Century Oncology, LLC | Vaisman, Isaac | Employment Agreement - Physician | 1/23/2017 | $ - |
| 21st Century Oncology, Inc. | VALICOM | Service Agreement | 03/21/2016 | $ - |
| 21st Century Oncology, LLC | Van Beever, Bert F | Employment Agreement - Physician (employment ceased) | 12/14/2006 | $ - |
| 21st Century Oncology | Vanguard Cleaning Systems | Janitorial Service Agreement | 2/8/2012 | $ 3,707.88 |
| 21st Century Oncology | Vanguard Cleaning Systems | Janitorial Service Agreement | 8/30/2016 | $ - |
| 21st Century Oncology, LLC | VARADY, STEVEN | Employment Agreement - Physician Urology | 06/01/2014 | $ - |
| 21st Century Oncology, LLC | VARGAS, CARLOS F | Employment Agreement - Physician Consulting | 02/01/2013 | $ - |
| 21st Century Oncology, LLC | VARIAN MEDICAL SYSTEMS | Master Delivery Support Agreement | 01/01/2010 | $ - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st Century Oncology, LLC | VARIAN MEDICAL SYSTEMS | Software Support Agreement | 10/01/2013 | $                    - |
| 21st Century Oncology, Inc. | VARIAN MEDICAL SYSTEMS | Master Delivery Support Agreement | 01/01/2017 | $                    - |
| 21st Century Oncology, Inc. | VARIAN MEDICAL SYSTEMS INC. | Maintenance Agreement | 01/08/2017 | $          123,195.12 |
| 21st Century Oncology, LLC | VARIAN MEDICAL SYSTEMS, INC. | Equipment Lease | 04/01/2016 | $                    - |
| 21st Century Oncology, LLC | VASCULAR SPECIALISTS OF VENICE AND SARASOTA, P.L. | Professional Services Agreement | 03/01/2016 | $                    - |
| 21st  Century Oncology, LLC | Vedula, Ramesh | Employment Agreement - Physician (employment ceased) | 3/1/2015 | $                    - |
| 21st Century Oncology, Inc. | VENICE HOSPITAL | Ultrasound Equipment/Technical Services Agreement | 08/01/2004 | $                    - |
| 21st Century Oncology, LLC | VERATHON | Sales Agreement | 03/01/2016 | $                    - |
| 21st Century Oncology, LLC | VERATHON | Sales Agreement | 06/01/2016 | $                    - |
| 21st Century Oncology, LLC | VERATHON | Sales Agreement | 07/28/2016 | $                    - |
| 21st Century Oncology, LLC | VIA ONCOLOGY, LLC | License Agreement | 10/27/2015 | $                    - |
| 21st Century Oncology, Inc. | VICINI, FRANK A | Employment Agreement - Director-Breast Care Clinical | 03/13/2011 | $                    - |
| North Carolina Radiation Therapy Management Services, LLC | VIDANT RADIATION ONCOLOGY, LLC | Management Services Agreement | 01/01/2016 | $                    - |
| 21st Century Oncology, LLC | VILLA, JACY | Employment Agreement - Physician Medical Oncology | 07/01/2013 | $                    - |
| 21st Century Oncology, LLC | VILLICANA, PATRICK | Employment Agreement - Physician Urology | 02/01/2014 | $                    - |
| 21st Century Oncology, LLC | VITAS HEALTHCARE CORPORATION OF FLORIDA | Provider Service Agreement | 09/30/2016 | $                    - |
| 21st Century Oncology, LLC | VMS INC., ONCOLOGY SYSTEMS | Velocity 10 Concurrent System Agreement | 03/08/2016 | $                    - |
| 21st Century Oncology, LLC | VORSTMAN, ALBERT W | Employment Agreement - Physician Urology | 06/20/2013 | $                    - |
| 21st Century Oncology, Inc. | W & L NOSTEL ENTERPRISES, LLC | Building and Land Lease | 12/01/2008 | $                    - |
| Atlantic Urology Clinics, LLC | WACCAMAW COMMUNITY HOSPITAL | Building and Land Lease | 04/01/2017 | $                    - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| Atlantic Urology Clinics, LLC | WACCAMAW COMMUNITY HOSPITAL | Building and Land Lease | 04/01/2017 | $                    - |
| 21st Century Oncology, Inc. | WALLNER, PAUL ELLIOT | Employment Agreement - Executive Employment Agreement | 10/30/2004 | $                    - |
| 21st Century Oncology, LLC | Wanuck, Stuart L | Employment Agreement - Physician (employment ceased) | 7/12/2004 | $                    - |
| 21st Century Oncology, LLC | WARNER, JUSTIN D | Employment Agreement - Bonus Pool Diagnostic CT (Collier County) | 11/01/2010 | $                    - |
| 21st Century Oncology, LLC | WARNER, JUSTIN D | Employment Agreement - Bonus Pool Diagnostic PET/CT (Collier County) | 07/01/2011 | $                    - |
| 21st Century Oncology, LLC | WARNER, JUSTIN D | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/14/2016 | $                    - |
| 21st Century Oncology, LLC | WARNER, JUSTIN D | Employment Agreement - Physician Surgery | 09/21/2010 | $                    - |
| 21st Century Oncology, LLC | WARREN STREISAND, M.D., P.A. | Equipment Lease | 03/19/2016 | $                    - |
| U.S. Cancer Care, Inc. | WARSAW HEALTH SYSTEM LLC - KOSCIUSKO COMMUNITY HOSPITAL | Employee Lease Agreement | 03/23/2017 | $                    - |
| 21st Century Oncology, Inc. | WARSAW HEALTH SYSTEM LLC DBA KOSCIUSKO COMMUNITY HOSPITAL | First Amendment to Services | | $                    - |
| 21st Century Oncology, Inc. | WARSAW HEALTH SYSTEM LLC DBA KOSCIUSKO COMMUNITY HOSPITAL | Service Agreement | 06/20/2014 | $                    - |
| U.S. Cancer Care, Inc. | WARSAW HEALTH SYSTEM LLC DBA KOSCIUSKO COMMUNITY HOSPITAL | First Amendment to Services Agreement | | $                    - |
| U.S. Cancer Care, Inc. | WARSAW HEALTH SYSTEM LLC DBA KOSCIUSKO COMMUNITY HOSPITAL | Second Amendment to Medical Physics for Radiation Oncology Agreement | 01/20/2014 | $                    - |
| U.S. Cancer Care, Inc. | WARSAW HEALTH SYSTEM LLC DBA KOSCIUSKO COMMUNITY HOSPITAL | Service Agreement | 06/20/2014 | $                    - |
| 21st Century Oncology, Inc. | Waterlogic USA dba Pure Water Technology of Mid-Michigan | Rental Agreement | 11/5/2014 | $                    - |
| 21st Century Oncology, LLC | Waters, Elaine F | Employment Agreement - Physician (employment ceased) | 9/20/2013 | $                    - |
| 21st Century Oncology, Inc. | WEINSTEIN, MITCHELL D | Employment Agreement - Medical Director | 12/01/2007 | $                    - |
| 21st Century Oncology, Inc. | WEINSTEIN, MITCHELL D | Employment Agreement - Physician Urology | 10/26/2007 | $                    - |
| 21st Century Oncology, LLC | WEINSTEIN, MITCHELL D | Employment Agreement - Bonus Pool Subgrp Pathology Lab | 06/23/2009 | $                    - |
| 21st Century Oncology, LLC | WEINTRAUB, MARK P | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/01/2016 | $                    - |
| 21st Century Oncology, LLC | WEINTRAUB, MARK P | Employment Agreement - Physician Urology | 03/30/2012 | $                    - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st Century Oncology, Inc. | WEITZEL, ANDREW K | Employment Agreement - Medical Director | 09/01/2008 | $                    - |
| 21st Century Oncology, Inc. | WEITZEL, ANDREW K | Employment Agreement - Physician Urology | 06/26/2008 | $                    - |
| 21st Century Oncology, LLC | WEITZEL, ANDREW K | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/01/2016 | $                    - |
| 21st Century Oncology, LLC | WEITZEL, ANDREW K | Employment Agreement - Bonus Pool Subgrp Pathology Lab (Charlotte Co) | 03/09/2015 | $                    - |
| 21st Century Oncology, LLC | WEITZEL, ANDREW K | Employment Agreement - Bonus Pool Subgrp Pathology Lab Urology (Charlotte Co) | 01/01/2013 | $                    - |
| 21st Century Oncology, LLC | WEITZENFELD, MARK B | Employment Agreement - Physician Urology | 05/01/2012 | $                    - |
| 21st Century Oncology, LLC | WELLCARE | Payor Agreement | 01/01/2016 | $                    - |
| Atlantic Urology Clinics, LLC | WELLCARE | Payor Agreement | 06/01/2016 | $                    - |
| 21st Century Oncology, LLC | WELLINGTON REGIONAL MEDICAL CENTER | Assignment and Assumption Agreement - Radiation Oncology Services | 08/17/2016 | $                    - |
| SFRO Holdings, LLC | WELLINGTON REGIONAL MEDICAL CENTER, INC. | Joint Venture Agreement | 02/10/2014 | $                    - |
| 21st Century Oncology, LLC | WEST BOCA MEDICAL CENTER | Specialty Services Agreement | 04/02/2015 | $                    - |
| West Virginia Radiation Therapy Services, Inc. | WEST VIRGINIA SENIOR ADVANTAGE | Payor Agreement | 09/01/2016 | $                    - |
| 21st Century Oncology of New Jersey, Inc. | WHITE HORSE HEALTHCARE, LLC DBA INNOVA HEALTH & REHAB AT HAMMONTON | Radiation Therapy Service Agreement | 11/22/2010 | $                    - |
| 21st Century Oncology Management Services, Inc. | WHITE RHINO PRODUCTIONS, INC. | Master Services Agreement | 02/18/2011 | $                    - |
| 21st Century Oncology, LLC | WHITEHALL MEDICAL, LLC | Building and Land Lease | 11/10/2016 | $                    - |
| 21st Century Oncology, LLC | WIITA, BRUCE E | Employment Agreement - Physician Urology | 12/01/2009 | $                    - |
| 21st  Century Oncology, LLC | Wiley, Hazel | Employment Agreement - Physician (employment ceased) | 9/28/2009 | $                    - |
| 21st  Century Oncology, LLC | Wiley, William N | Employment Agreement - Physician (employment ceased) | 5/1/2011 | $                    - |
| 21st Century Oncology of Jacksonville, LLC | WILF, LARRY H | Employment Agreement - Radiologist | 03/06/2015 | $                    - |
| 21st Century Oncology, LLC | WILF, LARRY H | Employment Agreement - Radiologist | 03/06/2015 | $                    - |
| 21st Century Oncology, LLC | WILKINSON, DAVID R | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/01/2016 | $                    - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st Century Oncology, LLC | WILKINSON, DAVID R | Employment Agreement - Bonus Pool SIU Division Diagnostic | 02/24/2014 | $ - |
| 21st Century Oncology, LLC | WILKINSON, DAVID R | Employment Agreement - Physician Urology | 05/01/2013 | $ - |
| 21st Century Oncology Holdings, Inc. | WILLIAM SPALDING | Independent Contractor Agreement | 05/12/2016 | $ - |
| 21st Century Oncology of Kentucky, LLC | Williams, Brian A | Employment Agreement - Physician (employment ceased) | 10/23/2006 | $ - |
| 21st Century Oncology, LLC | WILLIAMS, THOMAS H | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/01/2016 | $ - |
| 21st Century Oncology, LLC | WILLIAMS, THOMAS H | Employment Agreement - Physician Urology | 03/30/2012 | $ - |
| Medical Developers, LLC | WILMINGTON SAVINGS FUND SOCIETY, FSB | Banking Service Agreement | 12/01/2016 | $ - |
| 21st Century Oncology, LLC | WING, MICHAEL K | Employment Agreement - Physician RAD Oncology | 10/01/2013 | $ - |
| 21st Century Oncology, Inc. | WINTON, LAWRENCE | Employment Agreement - Physician Urology | 10/26/2007 | $ - |
| 21st Century Oncology, LLC | WINTON, LAWRENCE | Employment Agreement - Bonus Pool Pathology Lab Addendum | 04/07/2016 | $ - |
| 21st Century Oncology, LLC | WINTON, LAWRENCE | Employment Agreement - Bonus Pool Southeast FL Diagnostic CT | 06/23/2009 | $ - |
| 21st Century Oncology, LLC | WISE, KENDALL L | Employment Agreement - Bonus Pool Collier County Diagnostic | 11/30/2010 | $ - |
| 21st Century Oncology, LLC | WISE, KENDALL L | Employment Agreement - Bonus Pool Collier County Diagnostic PET/CT | 07/31/2011 | $ - |
| 21st Century Oncology, LLC | WISE, KENDALL L | Employment Agreement - Bonus Pool Lee/Collier Counties Urology Subgroup Pathology Lab | 01/18/2010 | $ - |
| 21st Century Oncology, LLC | WISE, KENDALL L | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/01/2016 | $ - |
| 21st Century Oncology, LLC | WISE, KENDALL L | Employment Agreement - Physician Urology | 01/04/2010 | $ - |
| Atlantic Urology Clinics, LLC | WOOD, JOSEPH C | Employment Agreement - Physician Urology | 03/31/2010 | $ - |
| 21st Century Oncology, LLC | WOODLANDS MEDICAL SPECIALISTS, P.A. | Professional Services Agreement | 10/10/2014 | $ - |
| 21st Century Oncology, LLC | WRIGHT NATIONAL FLOOD INSURANCE COMPANY | Insurance Policy - Flood | 01/01/2017 | $ - |
| 21st Century Oncology, LLC | WRIGHT NATIONAL FLOOD INSURANCE COMPANY | Insurance Policy - Flood | 10/02/2016 | $ - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st Century Oncology, LLC | WRIGHT NATIONAL FLOOD INSURANCE COMPANY | Insurance Policy - Flood | 10/02/2016 | $ - |
| 21st Century Oncology Investments, LLC | XL SPECIALTY INSURANCE COMPANY | Insurance Policy - Directors & Officers - 5th Layer, Excess | 09/01/2016 | $ - |
| 21st Century Oncology, LLC | XORAN TECHNOLOGIES LLC | Purchase Agreement | 01/17/2017 | $ - |
| Phoenix Management Company, LLC | X-RAY TREATMENT CENTER, P.C. | Management Services Agreement | 10/15/1999 | $ - |
| Phoenix Management Company, LLC | X-RAY TREATMENT CENTER, P.C.; MICHAEL J. KATIN, MD | Transition Agreement and Stock Pledge | 08/01/2007 | $ - |
| Arizona Radiation Therapy Management Services, Inc. | XSTRAHL, INC. | Service Agreement | 04/06/2016 | $ - |
| 21st Century Oncology, LLC | YADVEN, MITCHELL W | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/01/2016 | $ - |
| 21st Century Oncology, LLC | YADVEN, MITCHELL W | Employment Agreement - Physician Urology | 03/30/2012 | $ - |
| 21st Century Oncology, Inc. | YASHASIM, LLC | Building and Land Lease | 10/17/2007 | $ - |
| 21st Century Oncology, Inc. | YEI CORPORATION | Client Agreement | 08/27/2015 | $ - |
| 21st Century Oncology, LLC | YOGEL, LOUIS R | Employment Agreement - Bonus Pool Pathology Lab Addendum | 03/01/2016 | $ - |
| 21st Century Oncology, LLC | YOGEL, LOUIS R | Employment Agreement - Bonus Pool SE FL Diagnostic CT | 06/30/2009 | $ - |
| 21st Century Oncology, LLC | YOGEL, LOUIS R | Employment Agreement - Physician Urology | 04/01/2009 | $ - |
| New York Radiation Therapy Management Services, LLC | YONKERS RADIATION ENTERPRISES, LLC | Building and Land Lease | 01/21/2013 | $ - |
| New York Radiation Therapy Management Services, LLC | YONKERS RADIATION MEDICAL PRACTICE, P.C. | Management Services Agreement | 01/01/1999 | $ - |
| Atlantic Urology Clinics, LLC | YOUNG, RICHARD W | Employment Agreement - Physician Urology | 03/31/2010 | $ - |
| 21st Century Oncology of New Jersey Inc | Youssef, Ashraf | Employment Agreement - Physician (employment ceased) | 8/22/2014 | $ - |
| 21st Century Oncology, LLC | YUVRAJ SINGH, M.D., P.L. | Professional Services Agreement | 12/12/2015 | $ - |
| 21st Century Oncology, LLC | Zachos, Thomas D | Employment Agreement - Physician (employment ceased) | 6/21/2010 | $ - |
| 21st Century Oncology, LLC | ZARGAROFF, SHERWIN | Employment Agreement - Physician Urology | 05/06/2016 | $ - |
| 21st Century Oncology, Inc. | ZENITH ENVIRONMENTAL SERVICES, LLC | Master Agreement | 08/15/2015 | $ - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st Century Oncology, Inc. | ZENITH ENVIRONMENTAL SERVICES, LLC | Vendor Agreement | 06/15/2016 | $                          - |
| 21st Century Oncology of Alabama, LLC | ZENITH TRANSACTION SERVICES, LLC | Electronic Prescription Transaction Processing Services Agreement | 10/27/2016 | $                          - |
| 21st Century Oncology of Kentucky, LLC | ZENITH TRANSACTION SERVICES, LLC | Electronic Prescription Transaction Processing Services Agreement | 10/26/2016 | $                          - |
| Arizona Radiation Therapy Management Services, Inc. | ZENITH TRANSACTION SERVICES, LLC | Electronic Prescription Transaction Processing Services Agreement | 10/25/2016 | $                          - |
| Berlin Radiation Therapy Treatment Center, LLC | ZENITH TRANSACTION SERVICES, LLC | Electronic Prescription Transaction Processing Services Agreement | 10/25/2016 | $                          - |
| 21st Century Oncology, Inc. | ZERO CANCER | Letter of Agreement | 02/24/2017 | $                          - |
| 21st  Century Oncology, LLC | Zinn, Charles | Employment Agreement - Physician (employment ceased) | 2/11/2002 | $                          - |
| 21st Century Oncology, LLC | ZOLFOGHARY, MIRIAM C | Employment Agreement - Bonus Pool Lee County Diagnostic CT | 07/01/2014 | $                          - |
| 21st Century Oncology, LLC | ZOLFOGHARY, MIRIAM C | Employment Agreement - Bonus Pool Lee County Diagnostic PET/CT | 07/31/2014 | $                          - |
| 21st Century Oncology, LLC | ZOLFOGHARY, MIRIAM C | Employment Agreement - Physician Surgery | 05/01/2011 | $                          - |
| 21st Century Oncology, Inc. | ZUCKER, IRA A | Employment Agreement - Bonus Pool Lee County Diagnostic | 09/01/2011 | $                          - |
| 21st Century Oncology, Inc. | ZUCKER, IRA A | Employment Agreement - Bonus Pool Pathology Lab Addendum | 04/19/2016 | $                          - |
| 21st Century Oncology, Inc. | ZUCKER, IRA A | Employment Agreement - Independent Contractor Agreement | 07/01/2007 | $                          - |
| 21st Century Oncology, Inc. | ZUCKER, IRA A | Employment Agreement - Medical Director Agreement | 12/01/2007 | $                          - |
| 21st Century Oncology, Inc. | ZUCKER, IRA A | Employment Agreement - Physician Urology | 12/14/2006 | $                          - |
| 21st Century Oncology Investments, LLC | ZURICH AMERICAN INSURANCE COMPANY | Insurance Policy - Auto Liability/Physical Damage | 04/01/2017 | $                          - |
| 21st Century Oncology Investments, LLC | ZURICH AMERICAN INSURANCE COMPANY | Insurance Policy - Commercial Crime Coverage | 09/01/2016 | $                          - |
| 21st Century Oncology Investments, LLC | ZURICH AMERICAN INSURANCE COMPANY | Insurance Policy - General Liability | 04/01/2017 | $                          - |
| 21st Century Oncology Investments, LLC | ZURICH AMERICAN INSURANCE COMPANY | Insurance Policy - International Package Policy | 04/01/2017 | $                          - |
| 21st Century Oncology Investments, LLC | ZURICH AMERICAN INSURANCE COMPANY | Insurance Policy - Umbrella | 04/01/2017 | $                          - |

| Debtor | Creditor | Description | Date | Cure Amount |
|---|---|---|---|---|
| 21st Century Oncology Investments, LLC | ZURICH AMERICAN INSURANCE COMPANY | Insurance Policy - Workers' Compensation - AOS | 04/01/2017 | $ - |
| 21st Century Oncology Investments, LLC | ZURICH AMERICAN INSURANCE COMPANY | Insurance Policy - Workers' Compensation - MA & WI | 04/01/2017 | $ - |
| California Radiation Therapy Management Services, Inc. | ZUYO INVESTMENTS, LLC; EL SEGUNDO SAFA, LLC; LA RADIOTHERAPY INVESTMENTS, LLC | Joint Venture Agreement | 12/08/2009 | $ - |

## Exhibit J

**Schedule of Rejected Executory Contracts and Unexpired Leases**

## Schedule of Rejected Executory Contracts and Unexpired Leases

The Debtors reserve all rights, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement, to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court.

Nothing herein shall be construed as a concession or evidence that any of the contracts or leases identified herein: (i) constitutes an "executory contract" or "unexpired lease" within the meaning of 11 U.S.C. § 365 and other applicable law; or (ii) has not expired, been terminated or otherwise currently is in full force and effect.  Rather, the Debtors expressly reserve all of their rights with respect thereto, including their right to seek a later determination of these issues and their right to dispute the validity, status, characterization or enforceability of any contracts, agreements or leases set forth herein.

**CONTRACTS TO REJECT**

| Debtor | Counterparty | Contract Description | Date |
|---|---|---|---|
| 21st Century Oncology, Inc. f/k/a Radiation Therapy Services, Inc. | AT&T Corp | Service Agreement No. 831-000-0829-973 | 12/11/2006 |
| 21st Century Oncology, Inc. f/k/a Radiation Therapy Services, Inc. | AT&T Corp | Service Agreement No. 954 V68 1511 001 1809 | 3/30/2012 |
| 21st Century Oncology, Inc. f/k/a Radiation Therapy Services, Inc. | AT&T Florida | Service Agreement No. 954-V68-8830-001-1806 | 3/20/2010 |
| 21st Century Oncology Investments, LLC; 21st Century Oncology Services, LLC; 21st Century Oncology Holdings, Inc.; 21st Century Oncology Management Services, Inc.; 21st Century Oncology of California | Barnes & Thornburg, LLP | Engagement Letter - representation | 12/6/2016 |
| 21st Century Oncology Holdings, Inc. | DANIEL E. DOSORETZ, MD | Indemnification Agreement | 09/26/2014 |
| 21st Century Oncology of Arizona | DocuSafe of Phoenix, Inc. (Access Storage) | Storage services | 10/1/2006 |
| 21st Century Oncology, LLC | DORNAUS, MADLYN | Employment Agreement - Consulting Agreement | 09/01/2015 |
| 21st Century Oncology, Inc. | DORNAUS, MADLYN | Severance Agreement | 10/01/2015 |
| 21st Century Oncology Holdings, Inc. | Ernst & Young | Audit Services | 11/30/2016 |
| 21st Century Oncology, Inc. | FTI Consulting | Consulting Services | 5/24/2014 |
| 21st Century Oncology, Inc. | Genesis Capital | Lease Renewal Consulting Services | 7/8/2016 |
| 21st Century Oncology, Inc. f/k/a Radiation Therapy Services, Inc. | Level 3 Communications, LLC | Business Markets Master Service Agreement | 11/2007 |
| 21st Century Oncology Holdings, Inc. | McDermott Will & Emery | California Litigation Counsel | Engagement Letter |
| 21st Century Oncology, Inc. | Press, Ganey Associates, Inc. | Satisfaction Survey Services | 3/17/2003 |
| 21st Century Oncology Holdings, Inc. | STEWART, LEANN M. | Employment Agreement - Release | 03/06/2017 |
| 21st Century Oncology, Inc. | STEWART, LEANNE M. | Employment Agreement - Release | 03/06/2017 |
| 21st Century Oncology, LLC | THE MEDICUS FIRM, LLC | Physician Recruitment | 07/06/2016 |
| 21st Century Oncology Holdings, Inc. | VESTAR CAPITAL PARTNERS | A&R Management Agreement | 09/26/2014 |
| 21st Century Oncology Investments, LLC | VESTAR CAPITAL PARTNERS | A&R Management Agreement | 09/26/2014 |
| 21st Century Oncology, Inc. | VESTAR CAPITAL PARTNERS | A&R Management Agreement | 09/26/2014 |
| 21st Century Oncology, Inc. | Waste Management | Waste and recycling services | 9/14/2016 |
| 21st Century Oncology, LLC d/b/a Regional Consultants in Hematology and Oncology | Windstream Communications f/k/a NuVox Communications, Inc. | Customer Service Agreement | 2/4/2010 |
| Arizona Radiation Therapy Services, Inc. | Frederick S. Simonie, MD | Sub-Lease at 10210 N. 92nd Street, Scottsdale, AZ | 9/25/2015 |
| Arizona Radiation Therapy Services, Inc. | HCP MOB Scottsdale | Sub-Lease at 10210 N. 92nd Street, Scottsdale, AZ | 9/25/2015 |
| South Florida Medicine, LLC | Atrium 6030, LLC | Lease Agreement | 7/27/2000 |

**<u>Exhibit K</u>**

**Schedule of Excluded Directors and Officers**

**Schedule of Excluded Directors and Officers**

| Name of Excluded Directors and Officers |
| --- |
| • Daniel E. Dosoretz, M.D.<br><br>• Madlyn C. Dornaus |

**Exhibit L**

**Schedule of Specified Directors and Officers**

**Schedule of Specified Directors and Officers**

| Name of Specified Directors and Officers |
|---|
| • Daniel E. Dosoretz, M.D. |